Lee Gelernt*
Omar C. Jadwat*
Anand Balakrishnan*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*

Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles,

       *Plaintiffs*,

      v.

William Barr, Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kevin K. McAleenan, Acting Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Kenneth T. Cuccinelli, Acting Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; John P. Sanders, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Matthew T. Albence, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,

       *Defendants*.

Case No.:


**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**


**IMMIGRATION ACTION**

1

2

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T: (470) 606-9307
F: (404) 221-5857
*mary.bauer@splcenter.org*

3

4

5

6

7

8

9

10

11

12

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*
*asalceda@aclunc.org*

13

*Attorneys for Plaintiffs*

14

*Pro hac vice application forthcoming
** Application for admission pending*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      The United States has a longstanding commitment under domestic and international law to protecting people fleeing persecution from further harm.

2.      The Immigration and Nationality Act reflects Congress's carefully considered balance between effectuating our broad, historic commitment to international humanitarian law principles in the context of our asylum system and ensuring fairness and efficiency in the process.  In crafting our asylum laws, Congress sought to implement the principles in the 1951 Refugee Convention, which was designed to avoid the horrors visited on refugees around World War II.

3.      As part of our nation's commitment to the protection of people fleeing persecution and consistent with our international obligations, it is longstanding federal law that merely transiting through a third country is not a basis to categorically deny asylum to refugees who arrive at our shores.

4.      Specifically, Congress expressly provided in the Immigration and Nationality Act ("INA") that a noncitizen is ineligible for asylum in the United States only if she "was firmly resettled in another country prior to arriving in the United States."  8 U.S.C. § 1158(b)(2)(A)(vi). The concept of firm resettlement—which involves far more than a mere transitory relationship with a third country—dates back to international agreements crafted after World War II, and takes into account the ties an individual fleeing persecution formed with another country and his or her particular ability to enjoy safety and legal protection there.

5.      Moreover, Congress expressly spoke to when an asylum seeker may be removed to a third country and required to seek protection there: only where the United States and that country have entered into a bilateral or multilateral agreement, the removal is pursuant to that agreement, and there is a determination that the asylum seeker would not face persecution and "would have access to a full and fair procedure for determining a claim to asylum" in that country.  8 U.S.C. § 1158(a)(2)(A).

1

6.     Indeed, Congress made clear that noncitizens may apply for asylum regardless of where they enter the United States, "whether or not at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  All asylum seekers coming from a country other than a country contiguous to the United States who enter between ports of arrival necessarily transited through another country before reaching the southern border.  Congress therefore guaranteed that they, too, should be able to seek asylum free of any categorical restriction based on their route to the United States.

7.     Together, these provisions illustrate the careful balance Congress struck between protecting vulnerable individuals from harm and sharing the burdens of asylum processing with other countries in which safety and fair processing can be assured and are appropriate, and its decision that only in specific narrow circumstances could a noncitizen's transit or even residence in a third country justify a denial of protection in the United States.

8.     Despite Congress's clear commands, on July 16, 2019, the Attorney General and Acting Secretary of Homeland Security promulgated an interim final rule ("Rule") providing that noncitizens who transit through another country prior to reaching the southern border of the United States are ineligible for asylum here.  The Rule, which takes effect on July 16, has only three narrow exceptions, for those who applied for protection in a transit country and were denied it in a final judgment; who meet the definition of a "victim of severe form of trafficking in persons"; or who transited only through countries that are not parties to the 1951 Convention on the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the Convention Against Torture.  Mexico, the only country adjoining the southern border of the United States, is a party to the 1951 Refugee Convention, the 1967 Refugee Protocol, and the Convention Against Torture.

9.     The Rule thus bars virtually every noncitizen fleeing persecution from obtaining asylum in the United States if they passed through another country on their way here, no matter the conditions or purpose of their journey through that country or their prospect of protection, rights, or permanent legal status in that country.  Accordingly, anyone fleeing persecution from the ongoing

2

humanitarian crisis in the countries that constitute the Northern Triangle who reasonably does not apply for protection while en route will be categorically denied the opportunity to seek asylum in the United States and likely forced to return to countries that are rife with danger and violence.  The Rule is a part of an unlawful effort to significantly undermine, if not virtually repeal, the U.S. asylum system at the southern border, and cruelly closes our doors to refugees fleeing persecution, forcing them to return to harm.

10.    The Rule directly violates Congress's clear requirement that for a noncitizen to be denied asylum because of his or her relationship with a third country, the noncitizen had to be firmly resettled in that third country or subject to a safe third country agreement, as well as Congress's requirement that asylum cannot be categorically denied based on an asylum seeker's route to the United States.  It is also arbitrary and capricious.

11.    In addition, the Attorney General and Acting Secretary of Homeland Security issued the Rule immediately, without abiding by the required procedural steps of the Administrative Procedure Act ("APA").

12.    Plaintiffs seek a declaration that these actions violate the INA and the APA, and an order enjoining the Rule.

**JURISDICTION AND VENUE**

13.    This case arises under the APA, 5 U.S.C. § 701, *et seq.* and the INA, 8 U.S.C. § 1101, *et seq*.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

14.    Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and 1) at least one plaintiff resides in this district; and/or 2) a substantial part of the events or omissions giving rise to the claim occurred in this district.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**PARTIES**

15.     Plaintiff East Bay Sanctuary Covenant ("EBSC") is a nonprofit organization incorporated in California.  EBSC's main office is in Berkeley, California.

16.     EBSC was founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala.  EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping political persecution, terror, war, intolerance, exploitation, and other violence.  In particular, one of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum in the United States.  EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

17.     Plaintiff Al Otro Lado is a nonprofit, nonpartisan organization established in 2014 and incorporated in California.

18.     Al Otro Lado is a legal services organization that serves indigent deportees, migrants, refugees, and their families, and operates primarily in Southern California, and Tijuana, Mexico.  Al Otro Lado's mission is to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings; to seek redress for civil rights violations; and to provide assistance with other legal and social service needs.

19.     Plaintiff Innovation Law Lab is a nonprofit organization that has projects in multiple states, including an office in Oakland, California.

20.     Innovation Law Lab seeks to advance the legal rights of immigrants and refugees in the United States, with a focus on providing and facilitating representation to asylum seekers.

21.     Plaintiff Central American Resource Center ("CARECEN") is a nonprofit organization incorporated in California.

22.     CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice and promoting cultural diversity.  CARECEN offers low-cost immigration legal services; community education programs;

4

and advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies in Los Angeles.  A central part of CARECEN's mission is to provide legal counseling and representation to asylum seekers.

23.     Defendant William Barr is the Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he issued the interim final rule challenged in this suit.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

24.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

25.     Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

26.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts limited review of negative credible fear determinations.

27.     Defendant Kevin K. McAleenan is the Acting Secretary of Homeland Security.  He is sued in his official capacity.  In that capacity, he issued the interim final rule challenged in this suit. He directs each of the component agencies within the Department of Homeland Security.  In his official capacity, Defendant McAleenan is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits.

28.     Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

29.     Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is sued in his official capacity.

30.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum.

31.     Defendant John P. Sanders is the Acting Commissioner of CBP.  He is sued in his official capacity.

32.     Defendant CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border or who present themselves at ports of entry.

33.     Defendant Matthew T. Albence is the Acting Director of ICE.  He is sued in his official capacity.

34.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

## BACKGROUND

**The U.S. Asylum System**

35.     Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of any one of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group.  8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A).  Withholding of removal also offers protection to individuals targeted on account of one of the five grounds, but it requires an applicant to show that such persecution is more likely than not—a much higher standard of proof than that needed for asylum.

36.     Congress also provided asylees with certain benefits that are critical to the noncitizen's safety and ability to successfully transition to a life free from persecution.  *See* 8 U.S.C. §§ 1159(b) (ability to adjust to the status of a lawful permanent resident); 1427 (ability to become a United States citizen after being lawfully admitted for permanent residence).  The spouse and children of a person granted asylum are likewise eligible for asylum.  8 U.S.C. § 1158(b)(3).  These

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

benefits are not available with certain other forms of relief from removal, like withholding of removal.

37. There are three principal ways for an individual to seek asylum:

38. First, where a noncitizen is not in any kind of removal proceedings, his or her application is "affirmative." *See* 8 C.F.R. §§208.2(a), 208.9. He or she files an application with USCIS, and has an interview with an asylum officer.

39. Second, a noncitizen in ordinary removal proceedings, *see* 8 U.S.C. § 1229a, may apply for asylum as a form of relief from removal, 8 C.F.R. § 208.2(b). These applications are referred to as "defensive" asylum applications.

40. Third, Congress established an alternative process, "expedited removal," applicable to certain noncitizens who are arriving at ports of entry or apprehended after entering without inspection. *See* 8 U.S.C. § 1225(b)(1); *see also Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) (expedited removal applicable to those who entered without inspection and are apprehended within 14 days of entry and 100 miles of the border).

41. As part of the expedited removal system, a noncitizen who expresses a fear of return to his or her home country is entitled to a "credible fear" screening interview. 8 U.S.C. § 1225(b)(1)(B). If the screening officer finds a "significant possibility" that the individual "could establish eligibility for asylum," he or she is placed in regular removal proceedings and may apply for asylum. *Id.*

**U.S. Law on Asylum Seekers and Third Countries**

42. Federal law provides several forms of protection for individuals fleeing persecution and torture. These forms of protection include asylum, 8 U.S.C. § 1158; withholding of removal, 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture, *see* Foreign Affairs

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

43.     The modern asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, which was incorporated into the INA.  The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to our national commitment to human rights and humanitarian concerns."  Sen. Rep. No. 256, 96th Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141.

44.     The statutory provisions governing asylum represent an effort by Congress to bring the United States into compliance with its international obligations under the 1951 Refugee Convention and the 1967 Protocol.

45.     It is obvious and well understood that asylum seekers often pass through third countries on their way to seeking refuge in the United States.  Accordingly, in crafting the statutory provisions governing asylum, Congress took care to ensure that noncitizens within our country or at the border would be able to seek asylum even if they transited through another country to reach the United States.

46.     8 U.S.C. § 1158(a)(1) provides: "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  Congress thus was clear that entering the United States at or between ports of arrival is not a basis to categorically deny asylum to refugees.  In so providing, Congress recognized that many asylum seekers would transit through another country before reaching the United States.  That is because, except for Mexicans arriving at the southern border and Canadians arriving at the northern border, virtually all asylum seekers arriving between ports of arrival at a land border necessarily transit through at least one other

8

country before reaching the United States.  In guaranteeing that entering the United States at or between ports of arrival could not be a basis for categorically denying asylum, Congress also guaranteed that merely transiting through another country to reach the United States could not be a categorical barrier either.

47.    Congress also spoke directly to the circumstances when a noncitizen may be deemed ineligible for asylum based on his or her relationship with a third country.  8 U.S.C. § 1158(b)(2)(A) specifically provides that a noncitizen shall be ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  The plain text of the statute, agency regulations, and case law have long made clear that firm resettlement requires far more than merely transiting through another country.

48.    Under international law, firm resettlement requires more than transiting through a third country.  For example, the 1951 United Nations Convention Relating to the Status of Refugees provides that it shall not apply to a person who "acquired a new nationality, and enjoys the protection of the country of his new nationality" or "is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country."  Art. 1, §§ C(3), E, adopted July 28, 1951, 189 U.N.T.S. 150.

49.    In 1980, the former Immigration and Naturalization Service ("INS") issued interim regulations providing that a noncitizen would be considered firmly resettled "if he was offered resident status, citizenship, or some other type of permanent resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution."  8 C.F.R. § 208.14 (1981).  The regulations further provided for an exception if the asylum applicant established "that the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of asylum/refuge that he was not in fact resettled."  *Id.* Officers were to consider "the type of housing, whether permanent or temporary, made available to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country." *Id.*

50.     The Attorney General amended the firm resettlement regulations in 1991.  The definition of firm resettlement provided in those regulations is substantially the same as the current firm resettlement regulations set out at 8 C.F.R. §§ 208.15, 1208.15.  The 1991 regulation provided that a noncitizen would be "considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless" he could establish that "his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation" or that "the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he was not in fact resettled."  8 C.F.R. § 208.15 (revised Jan. 1, 1991).  The regulation directed that the asylum officer and/or immigration judge undertake an individualized inquiry and consider the following factors: "the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry and/or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country." *Id.*

51.     Congress then adopted the current firm resettlement bar, 8 U.S.C. § 1158(b)(2)(A)(vi), in 1996, when it amended the INA in the Illegal Immigration Reform and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Immigrant Responsibility Act.  In so doing, it codified the regulatory definition of "firm resettlement."

52.     The implementing regulation on firm resettlement was finalized in 2000, and is substantively identical to the 1991 version.  It provides: "An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes: (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country."

53.     Furthermore, Congress also spoke directly to the circumstances when noncitizens may be returned to a third country to have their asylum claims processed there.  8 U.S.C. § 1158(a)(2)(A) provides that the Attorney General may do so only when he or she "determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion,

11

and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States."

54.     The only such agreement that the United States has entered into is with Canada.  *See* https://www.canada.ca/en/immigration-refugees-citizenship/corporate/mandate/policies-operational-instructions-agreements/agreements/safe-third-country-agreement/final-text.html.

55.     The United States has attempted to negotiate third-country agreements with Mexico and Guatemala, but has not succeeded in obtaining such agreements, and in any event, an agreement with those particular countries would not satisfy the INA's strict requirements for such agreements. *See* 8 U.S.C. § 1158(b)(2)(A).

56.     These statutory provisions governing asylum and a noncitizen's relationship to or opportunity to apply for asylum in a third country, including 8 U.S.C. §§ 1158(a)(1), (b)(2)(A), and (b)(2)(A)(vi), represent a carefully crafted effort by Congress to satisfy its domestic and international obligations to protect those fleeing persecution and torture while also taking account of the need to share the burden of protecting asylum seekers with those countries capable of offering safety and full and fair asylum proceedings.

57.     Our immigration laws track international humanitarian law, under which protection of an individual fleeing persecution is paramount and individuals may not be required to seek protection in a country where they lack a genuine guarantee of safety and access to a functioning procedure, even if they transited through that country.

58.     The 1951 Refugee Convention and the 1967 Protocol do not require refugees to apply for protection in the first country where it could have been sought and do not require refugees to be returned to a country that was crossed in transit.

59.     The United Nations High Commissioner for Refugees ("UNHCR") has consistently issued guidance on the "safe third country" concept, noting that the "primary responsibility to

12

provide protection rests with the State where asylum is sought." Asylum should not be refused "solely on the ground that it could be sought from another State," and an asylum-seeker should not be required "to seek asylum in a country with which he has not established any relevant links." UNHCR's analysis provides significant guidance for courts on issues of refugee law.

60.     UNHCR has also explained that the mere fact that a country is a party to the 1951 Convention and/or its 1967 Protocol does not allow one to be required to seek asylum in that country.

61.     Consistent with this long-standing guidance, UNHCR has publicly stated that the Rule at issue here jeopardizes the right to *non-refoulement* and ignores the lack of effective international protection in transit countries. *See* UNHCR Deeply Concerned About New U.S. Asylum Restrictions (July 15, 2019), https://www.unhcr.org/en-us/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html.

**The Interim Final Rule**

62.     On July 16, 2019, Defendant Barr, in his role as Attorney General, and Defendant McAleenan, in his role as Acting Secretary of Homeland Security, promulgated an interim final rule pursuant to 8 U.S.C. § 1158(b)(2)(C), which provides that the Attorney General may "by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum," and 8 U.S.C. § 1158(d)(5)(B), which provides that the Attorney General may "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter."

63.     The Rule renders ineligible for asylum noncitizens who transit through another country before arriving in the United States, with only extremely limited exceptions.

64.     Specifically, the Rule provides that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after" the effective date of the Rule "after transiting through at least one country outside the alien's country of citizenship, nationality, or last

13

lawful habitual residence en route to the United States," shall be found ineligible for asylum unless one of three conditions is met: (1) "The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;" (2) "The alien demonstrates that he or she satisfies the definition of 'victim of a severe form of trafficking in persons' provided in 8 C.F.R. 214.11;" or (3) "The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment."

65.     Noncitizens subject to expedited removal who seek protection will be screened by an asylum officer.  The asylum officer will determine whether the noncitizen is subject to the bar set out in the Rule.  If the asylum officer determines that the noncitizen is subject to the bar, the asylum officer will deny asylum and then apply the reasonable-fear standard, rather than the credible-fear asylum standard, to assess the noncitizen's claims for statutory withholding of removal and Convention Against Torture protection.  A noncitizen who passes the reasonable-fear screening will be placed in removal proceedings where they will be permitted to apply for withholding and/or Convention Against Torture protection.  A noncitizen may seek review of the asylum officer's determination that he or she is subject to the eligibility bar before an immigration judge.  If the immigration judge affirms the determination that the bar applies, and that the noncitizen has failed to pass the reasonable fear standard, the applicant will be subject to removal without any opportunity for judicial review.

66.     The Rule does not require any individualized assessment of the asylum system in the country or countries a noncitizen transited through en route to the United States, or any assessment

14

of the asylum seeker's protection claims or reasons for not seeking protection in the transit country. It does not require an assessment of whether the transit country had a functioning asylum system capable of processing the asylum seeker's claim in a full and fair manner; whether the country was able to offer the asylum seeker effective protection against persecution or torture; whether the asylum seeker could even access—practically or legally—the asylum system; whether the asylum system would recognize the asylum seeker's particular claim for protection; or why the asylum seeker otherwise did not apply for protection. If, for example, an asylum seeker has a protection claim rooted in persecution based on sexual orientation but the transit country does not offer asylum on that basis, the asylum seeker would nonetheless be subject to the Rule. So too if the asylum seeker faced threats to her safety in the transit country and staying to apply for asylum and receive a final judgment would have required her to risk further harm.

67.     The Rule further does not require that a transit country have signed the 1951 Refugee Convention, 1967 Protocol, and the Convention Against Torture for the asylum seeker to be deemed ineligible for asylum in the United States. Rather, it is sufficient that the transit country has signed only one. An individual thus will be denied asylum for transiting through a country that signed the Convention Against Torture but not the 1951 Refugee Convention without applying for protection, even if the individual had a claim for asylum but not for relief under the Convention Against Torture.

68.     Many countries that are plainly unable to provide adequate protection to asylum seekers and lack full and fair asylum systems nonetheless are signatories to the 1951 Refugee Convention, including Afghanistan, Chad, the Democratic Republic of Congo, Iran, Somalia, and Sudan. The U.S. State Department has recognized in its Country Reports that many signatories to the Convention do not adequately protect refugees or lack adequate asylum processing systems. For example, Egypt is a signatory to the Convention, but according to the State Department, Egypt's "laws do not provide for granting asylum or refugee status, and the government has not established a

15

comprehensive legal regime for providing protection to refugees."  Similarly, Angola is a signatory to the Convention, but according to the State Department, "[t]he law provides for the granting of asylum or refugee status, but the law did not function during the year."

69.     The Rule contains no exception for unaccompanied children as defined in 6 U.S.C. § 279(g).  They, too, must apply for protection in a country through which they transit or will be deemed ineligible for asylum in the United States, irrespective of their age, knowledge of or ability to understand the Rule's requirements, or knowledge of or ability—practical or legal—to access the asylum system in a transit country.  By contrast, Congress expressly exempted unaccompanied children from the safe third country exception in the INA.  *See* 8 U.S.C. § 1158(a)(2)(E).

70.     Under the Rule, asylum seekers with the financial means, time, and other resources required to obtain travel documents, a visa, and plane tickets to the United States are still able to access asylum.  But asylum seekers who are forced to flee immediately because of exigent danger, and so lack the time to make such preparations, as well as asylum seekers without adequate financial resources, will be denied.

71.     Because the Rule provides that the eligibility bar will not apply to individuals who receive final judgments denying them protection, individuals whose asylum claims have already been rejected once are still considered eligible for asylum in the United States, while individuals whose claims have not been rejected are considered ineligible.

72.     On July 15, 2019, Defendant James R. McHenry, Director of the Executive Office for Immigration Review in the Department of Justice, issued guidance entitled "Guidelines Regarding New Regulations Governing Asylum and Protection Claims."  The Guidelines review the substance of the Rule and the screening process it establishes.

73.     On the same day, John Lafferty, head of USCIS's asylum division, also advised asylum officers regarding the new Rule.  Lafferty informed asylum officers that the division was "being asked to adapt and to do so with very little time to train and prepare."

74.     The APA generally requires a period of public notice and comment on proposed regulations to ensure that agency actions are transparent, lawful, and appropriately vetted.  But Defendants issued the Rule without following this statutory obligation.  Instead, Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and the 30-day waiting period that is required even where notice and comment are not, 5 U.S.C. § 553(d).  They also invoked the "foreign affairs" exception to those procedures.  5 U.S.C. § 553(a)(1).

**The Administration's Persistent Attacks on Asylum Seekers**

75.     The new Rule bears stark resemblance to the November 8, 2018 interim final rule ("2018 Rule"), also enacted pursuant to 8 U.S.C. § 1158(b)(2)(C), and President Trump's signed 2018 Proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" ("2018 Proclamation").  The 2018 Rule provided that all persons subject to a presidential proclamation concerning the southern border issued pursuant to the INA § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), were ineligible for asylum. The Proclamation suspended the entry of all persons entering without inspection at the southern border.

76.     Together, the 2018 Rule and 2018 Proclamation barred people from obtaining asylum if they entered the United States somewhere along the southern border other than a designated port of arrival—in direct violation of Congress's clear command that manner of entry cannot constitute a categorical asylum bar.

77.     On November 9, 2018, East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center—the same Plaintiffs in this action—challenged the procedural and substantive validity of the 2018 Rule.  On December 19, 2018, the district court granted a preliminary injunction preventing the government from taking any action to continue to implement the 2018 Rule.  The order remains in effect pending a final judgement and is before the

17

Ninth Circuit on the merits.  On December 21, 2018, the U.S. Supreme Court denied the government's request for a stay pending appeal of the district court's order granting a temporary restraining order.

78.     The new Rule serves to bar a similar group of people in a categorical fashion—noncitizens who transit through another country prior to reaching the southern border.  Indeed, the new Rule is more draconian than its 2018 counterpart because it forecloses the protection of asylum to those who seek asylum even at a <u>port of entry</u>.  As such, asylum seekers coming from a country other than a country contiguous to the United States—such as those from the Northern Triangle—are left with only two more limited forms of protection—withholding of removal and protection under the Convention Against Torture—regardless of whether they present themselves at a port of arrival.

79.     The new Rule is the latest in a series of attacks on asylum seekers and a further attempt to undermine the statutory provisions governing asylum.

**Asylum Seekers at the Southern Border**

*Dire Conditions in Central America Have Prompted Many to Seek Refuge Elsewhere*

80.     Individuals who arrive at the southern border seeking protection in the United States through the asylum process, including children, are fleeing some of the most dangerous countries in the world.

81.     Although asylum seekers come to the southern border from all over the world, many come from El Salvador, Guatemala, and Honduras, countries known as the "Northern Triangle." According to a recent report from UNHCR, these countries are experiencing epidemic levels of violence.  Human rights groups have compared the levels of violence in this region to those typically seen in war zones.

82.     Those who leave often are running from life-threatening situations, leaving everything behind to make a dangerous journey.  In particular, violence against women by criminal

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

armed groups has escalated dramatically in Central America, and those governments have been unable or unwilling to provide effective protection.

83.     Asylum seekers fleeing their home countries in Central America face an arduous journey to the United States, involving a high risk of violence, including sexual assault, along the way.

84.     Many asylum seekers from Central American have no choice but to travel by land to the United States due to documentation requirements that would be necessary to board a plane, as well as financial constraints.

85.     The vast majority of asylum seekers from Central America thus arrive at the southern border after traveling by land across one or more countries.  Those coming from Guatemala necessarily transit through Mexico, and those coming from El Salvador and Honduras transit through Guatemala and Mexico.

86.     Many of the migrants coming to the southern border have legitimate claims to asylum.

87.     According to UNHCR, in fiscal year 2015, 82 percent of the women from El Salvador, Guatemala, Honduras, and Mexico who were subject to a credible fear screening by an asylum officer were found to have a significant possibility of establishing eligibility for asylum or protection under the Convention Against Torture.

88.     Between fiscal years 2014 and 2016, 8,848 people from El Salvador, Guatemala, and Honduras were granted asylum affirmatively, and 3,502 people from those countries were granted asylum defensively.

*Guatemala Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

89.     For most asylum seekers, remaining in Guatemala and seeking protection there is not an option.  The country lacks a full and fair asylum processing system, and is often extremely dangerous for migrants.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

90.     According to the U.S. State Department, rape, violence against women, trafficking, violence against LGBTQ persons, gang recruitment of children, and corruption are serious issues in Guatemala.

91.     The State Department's Overseas Security Advisory Council reports that "Guatemala remains among the most dangerous countries in the world" and has an "alarmingly high murder rate" that "appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable."

92.     Guatemala was in the top four countries whose nationals were granted asylum in the United States in fiscal years 2015, 2016, and 2017.

93.     Guatemala's asylum system is new and barely functioning.

94.     According to the U.S. State Department, UNHCR "reported that identification and referral mechanisms for potential asylum seekers" in Guatemala "were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status."

95.     According to the UNHCR, only 262 people applied for refugee status in Guatemala between January and November 2018, and that number was a 75 percent increase from the prior year.  Since 2015, Guatemala has received on average fewer than 100 cases per year for asylum processing.  In the last two years, it has only decided roughly 20 to 30 asylum cases.  There are very few officials working on the asylum process in Guatemala, and its capacity to handle asylum claims is extremely limited.

96.     The Rule is silent as to Guatemala's asylum system and ability to protect migrants from persecution or torture.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Mexico Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

97.     For most asylum seekers, remaining in Mexico and seeking protection there is not an option.  The country lacks a full and fair asylum processing system, and is often extremely dangerous for migrants.

98.     According to the U.S. State Department's 2017 Mexico Country Report, "violence against migrants by government officers and organized criminal groups" is one of "[t]he most significant human rights issues" in Mexico.  The State Department also reported in 2018 that the dangers that forced many Central American migrants to flee their homes are likewise present in Mexico, as the presence of Central American gangs has "spread farther into the country and threatened migrants who had fled the same gangs in their home countries," that there were reports of migrants being victimized "by criminal groups and in some cases by police, immigration officers, and customs officials," that "[t]here were media reports that criminal groups kidnapped undocumented migrants to extort money from migrants' relatives or force them into committing criminal acts on their behalf," that "[t]here were numerous instances of armed groups limiting the movements of migrants, including by kidnapping and homicides," and that there were "5,824 reported crimes against migrants" and "99 percent of the crimes were unresolved" at the federal level.

99.     Migrants in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms.  Lesbian, gay, bisexual, and transgender persons, as well as people with indigenous heritage, regularly have been subject to persecution in Mexico.  Children in particular are at risk of robbery, sexual violence, kidnapping, femicide, extortion, and threats.

100.     Mexico experienced its highest number of murders recorded in 2018, up 33% from 2017, which previously was the highest number recorded.

101.    President Trump has himself acknowledged that Mexico is not a safe place, tweeting on January 31, 2019: "Very sadly, Murder cases in Mexico in 2018 rose 33% from 2017, to 33,341." He further stated that the situation in Mexico is "[w]orse even than Afghanistan."

102.    The asylum system in Mexico is not adequate to protect the rights of asylum seekers. Among other problems, Central American asylum seekers in Mexico face a substantial risk of being involuntarily repatriated to the countries they have fled.  Intergovernmental and human rights organizations have documented widespread instances of Mexican officials returning Central American migrants to their home countries despite their fears of persecution or torture, without any meaningful process.

103.    The U.S. Department of State has noted "incidents in which immigration agents had been known to threaten and abuse migrants to force them to accept voluntary deportation and discourage them from seeking asylum."  It further noted that "NGOs reported bribes sometimes influenced the adjudication of asylum petitions and requests for transit visas."

104.    Data from the Mexican government indicates that very few of the children who are apprehended by Mexican immigration authorities are recognized as refugees or given other formal protection in Mexico, and that Mexican immigration authorities routinely fail to inform detained children about their right to seek protection and fail to adequately screen them for refugee recognition.

105.    Despite Mexican law prohibiting the detention of children for migration purposes, many children continue to be detained by Mexico's immigration agency.  Conditions in Mexican detention centers have been widely reported to be harmful to children and in violation of international law.  Mexico also sometimes deports unaccompanied children to danger, in many cases in violation of its own child protection laws.

106.    President Trump recently encouraged Mexico to deport individuals who arrived on "caravans" regardless of their claims for asylum or other forms of protection: "Mexico should move

22

the flag waving Migrants, many of whom are stone cold criminals, back to their countries.  Do it by plane, do it by bus, do it anyway [sic] you want, but they are NOT coming into the U.S.A.  We will close the Border permanently if need be."

107.    The Rule offers no analysis or evidence as to the adequacy of Mexico's asylum system and ability to protect migrants from persecution or torture.  It notes only the number of asylum applications Mexico received in 2016, 2017, and 2018.

108.    Despite the growing number of asylum applications, Mexico's Commission for Refugee Assistance ("COMAR") has not grown its personnel or its budget accordingly.  Mexico's asylum system is strained as a result.  COMAR has failed to make a decision within the time limits provided by Mexico law on 22,000 asylum cases, and more than 50,000 asylum claims are pending.

**Harms to Plaintiffs**

109.    Plaintiffs are nonprofit organizations that provide assistance to asylum seekers, including those who came to the United States after transiting through another country.  The new Rule will cause each Plaintiff significant harm.

110.    Plaintiff East Bay Sanctuary Covenant provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, and Oregon.  It offers clients legal assistance in affirmative asylum applications; provides social services; and helps train professionals to assist immigrant and refugee communities.

111.    EBSC's affirmative asylum program is a key part of the organization's mission, is its most important program, and accounts for nearly half of its organizational budget.  Since 1992, EBSC has filed nearly 5,000 affirmative asylum cases.  Over 97 percent of those adjudicated cases have been granted.

112.    An estimated 50 percent of the clients in EBSC's affirmative asylum program in 2018 came to the United States through the southern land border after transiting through a third country en

23

route to seek asylum in the United States, and EBSC expects that rate to be similar in the future. Most of those clients fled persecution in Central America.

113.    EBSC works mainly with low-income and poor individuals from around the world, and works especially closely with vulnerable populations including victims of gender-based violence and domestic violence, indigenous Guatemalans, LGBT individuals, those affected by HIV/AIDS, and unaccompanied children.

114.    Funding for EBSC's affirmative asylum program is based in part on the number of cases EBSC handles per year, and the number of clients EBSC anticipates serving.

115.    The new Rule will significantly harm EBSC as an organization, seriously frustrates EBSC's mission, and cause it to divert organizational resources.

116.    As a result of the new policy, EBSC will have to expend significant resources to adjust to a new regulatory landscape and substantially reduce its affirmative asylum practice, thus reducing the number of clients it can serve and frustrating its mission of serving asylum seekers fleeing persecution and violence regardless of their manner of entry, means of entry, or travel route.

117.    EBSC also will have to divert significant resources to, among other things, understanding the new policy and its impact on the communities EBSC serves, and educating and advising its staff, clients, and prospective clients accordingly.  To properly counsel new prospective clients who seek its affirmative asylum services going forward, EBSC will need to invest resources in training multiple intake staff not only to screen for asylum eligibility based on the new Rule, but to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.  These alternative forms of relief, including withholding of removal and Convention Against Torture protection, require a far greater expenditure of staff resources per client.

118.    Under the new policy, EBSC will no longer be able to train law students to handle affirmative asylum cases, or would have to substantially reduce its training program, which

frustrates its mission of helping to train legal professionals to assist individuals fleeing violence and persecution.

119.    The new policy jeopardizes EBSC's funding streams.  If EBSC is no longer able to handle affirmative asylum cases for individuals who enter after transiting through another country, it will face a marked decrease in its budget and will have to significantly cut its program and staff, or dramatically overhaul its program to provide types of assistance it is not currently equipped or trained to provide.  The grant that funds EBSC's work is only to serve people who make under 250 percent of the poverty guidelines.  In practice, the few noncitizens who will remain eligible to apply affirmatively for asylum under the new Rule will mostly be those who have visas of some kind and could travel to the U.S. by air and so likely fall outside of the population it is EBSC's mission to serve and outside of the income requirements for EBSC's services.

120.    Plaintiff Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States after transiting through another country.  Approximately two-thirds of the individuals it serves out of its Tijuana office transited through another country en route to the United States.

121.    The new Rule frustrates Al Otro Lado's mission and will force Al Otro Lado to divert significant resources away from its other programs.  Because individuals who enter after transiting through another country are categorically ineligible for asylum under the Rule, Al Otro Lado will have to revamp its representation strategy, overhaul the materials it uses to train pro bono attorneys, and evaluate the eligibility of each of its clients for other types of immigration relief.  It will also have to expend resources to litigate eligibility issues, including under the higher standard governing withholding of removal, resulting in additional hearings and time spent on each case.

122.    The new policy also jeopardizes some of Al Otro Lado's most critical funding streams.

123.     Most of Al Otro Lado's asylum clients are families traveling with minor children. Because they will be ineligible for asylum under the new policy, spouses and minor children can no longer be counted as derivatives in a single application.  Al Otro Lado must now prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.  Withholding and Convention Against Torture applications also require more time and greater legal resources.

124.     The new Rule will also require Al Otro Lado to shut down or restructure its Border Rights Project in San Diego, which is focused on helping detained asylum seekers apply for bond or parole.

125.     Plaintiff Innovation Law Lab, among other services, has established "Centers of Excellence," which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.  These projects are established in Georgia, Kansas, Missouri, North Carolina, and Oregon, with expansion underway to Texas, New Mexico, and California.

126.     The new policy will require Innovation Law Lab to significantly divert its limited resources.  The vast majority of people Innovation Law Lab serves are asylum seekers, and nearly all of its asylum-seeking clients have traveled through a country other than their country of origin on their way to the United States and did not seek asylum in the countries through which they transited. The new Rule thus would make a high percentage of the asylum seekers Innovation Law Lab serves ineligible for asylum.  The new policy will, among other things, require Innovation Law Lab to entirely rework the advice and guidance it provides in its legal services workshops, and respond to a flood of inquiries and uncertainty from the immigrant communities Innovation Law Lab serves regarding the attempt to change asylum law.  The new Rule will also make a significant percentage of Innovation Law Lab's new pro bono cases a great deal more complicated and will require it to reevaluate relief eligibility in all of the cases that it screens and mentors.  And because withholding

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of removal and Convention Against Torture relief claims have a higher standard of proof than asylum, do not allow for derivative applications, and are more time-consuming to handle, the Centers of Excellence may begin to lose more cases, requiring a shift of significant resources toward mentoring pro bono attorneys on complicated appeals.

127. The new Rule will also eliminate release eligibility for a significant percentage of the clients in Innovation Law Lab's detention-focused programs.

128. Innovation Law Lab also will have to deploy expensive and limited engineering resources to recode its software to create new analytical modeling to account for the new Rule. Innovation Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country. The new asylum Rule will require Innovation Law Lab to substantially revise this material and create new learning engagements and materials on the asylum Rule.

129. Thousands of individuals rely on the Innovation Law Lab's systems; the new asylum Rule will require the organization to divert its limited resources away from other projects and priorities.

130. Plaintiff CARECEN in Los Angeles, California, provides immigration legal services to clients throughout Southern California. These services include affirmative and defensive representation for asylum seekers. CARECEN also educates immigrants through citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities. CARECEN also helps to organize immigrant communities to advocate for their rights on specific policy issues.

131. Nearly all of CARECEN's asylum applicant clients entered the United States through the southern border after transiting through at least one other country en route from their country of origin.

132.     Funding for CARECEN's asylum cases is based in part on the number of cases it handles per year, and the number of clients it anticipates serving.  The Rule will seriously harm CARECEN in multiple respects, and frustrate CARECEN's mission and divert organizational resources.

133.     For example, CARECEN's mission as it relates to asylum applicants will be frustrated because the organization will be unable to assist most asylum seekers from Central America because they will no longer be eligible for asylum given that they traveled through another country en route to the United States and did not apply for asylum in those countries.  CARECEN will be unable to fulfill its mission of helping asylum seekers apply affirmatively to USCIS, and will instead be forced to assist them in applying for withholding and Convention Against Torture protection in removal proceedings, a much more resource-intensive process.  The additional staff time required to handle such cases because of the more stringent standards for withholding and CAT and lack of derivative applications will require diverting resources from other critical areas of work.

134.     CARECEN's mission is to provide representation to asylum seekers, regardless of their manner of entry or how they traveled to the U.S.  CARECEN cannot, consistent with its mission, cherry pick and serve only those few individuals who entered the U.S. without transiting through a third country.  It would also be difficult, as a practical matter, for CARECEN to verify in the intake process when and how an individual traveled to the United States, and enter into an attorney-client relationship accordingly.  CARECEN would not be compensated for this additional screening work, which would strain the organization's resources.

135.     CARECEN will also have to divert resources to training staff and educating prospective clients about the effects of the new policy.

136.     Plaintiffs have also been harmed because they were denied the opportunity to comment.  If Defendants had provided an opportunity for notice and comment before the Rule,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs would have informed Defendants of their serious objections to the Rule, and they may have convinced Defendants to adopt a different approach.

## FIRST CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act and Administrative Procedure Act)

137.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

138.    The Immigration and Nationality Act provides that "any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

139.    The Immigration and Nationality Act further provides that a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi).

140.    The Immigration and Nationality Act likewise provides that asylum is not available to a noncitizen "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States." 8 U.S.C. § 1558(a)(2)(A).

141.    Any additional condition or limitation on asylum established by the Attorney General must be "consistent with" § 1158. *See* 8 U.S.C. § 1158(b)(2)(C); *see also* § 1158(d)(5)(B) (requiring that "any other conditions or limitations on the consideration of an application for asylum" be "not inconsistent with this chapter").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

142.     The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

143.     The Rule is contrary to law, including 8 U.S.C. §§ 1158(a)(1), 1158(a)(2)(A), and 1158(b)(2)(A)(vi).

## SECOND CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act)

144.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

145.     The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  The Attorney General and Acting Secretary of Homeland Security failed to provide notice and an opportunity to comment in a timely manner.

146.     The APA requires that a regulation be published "no less than 30 days before its effective date."  5 U.S.C. § 553(d).  The Attorney General and Acting Secretary of Homeland Security failed to publish the regulation 30 days before its effective date.

147.     The Attorney General and Acting Secretary of Homeland Security have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

## THIRD CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act, Arbitrary & Capricious)

148.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

149.     The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

150.    Among other reasons, the Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agency's longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.  A declaration pursuant to 28 U.S.C. § 2201 that the interim final rule is unlawful and invalid;

b.  A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the interim final rule;

c.  An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

d.  Such other and further relief as the Court deems equitable, just, and proper.

Dated: July 16, 2019

Respectfully submitted,

Lee Gelernt*
Omar Jadwat*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*

/s/ Katrina Eiland
Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
melissa.crow@splcenter.org

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T: (470) 606-9307
F: (404) 221-5857
mary.bauer@splcenter.org

Attorneys for Plaintiffs


*Pro hac vice application forthcoming
** Application for admission pending

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda**
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
csun@aclunc.org
vtalla@aclunc.org
asalceda@aclunc.org


Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gschwarz@ccrjustice.org

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF