1   Lee Gelernt*
    Omar C. Jadwat*
2   Anand Balakrishnan*
    ACLU FOUNDATION
3   IMMIGRANTS' RIGHTS PROJECT
    125 Broad Street, 18th Floor
4   New York, NY 10004
    T: (212) 549-2660
5   F: (212) 549-2654
    *lgelernt@aclu.org*
6   *ojadwat@aclu.org*
    *abalakrishnan@aclu.org*
7

Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

8

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

9

10          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**

11

12   East Bay Sanctuary Covenant; Al Otro Lado;
     Innovation Law Lab; and Central American
     Resource Center in Los Angeles,

Case No.: 19-cv-04073

13

14                    *Plaintiffs*,

15                        v.

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER**

16   William Barr, Attorney General, in his official
     capacity; U.S. Department of Justice; James
17   McHenry, Director of the Executive Office for
     Immigration Review, in his official capacity; the
18   Executive Office for Immigration Review; Kevin
     McAleenan, Acting Secretary of Homeland
19   Security, in his official capacity; U.S. Department
     of Homeland Security; Ken Cuccinelli, Acting
20   Director of the U.S. Citizenship and Immigration
     Services, in his official capacity; U.S. Citizenship
21   and Immigration Services; John Sanders,
     Commissioner of U.S. Customs and Border
22   Protection, in his official capacity; U.S. Customs
     and Border Protection; Matthew Albence, Acting
23   Director of Immigration and Customs
     Enforcement, in his official capacity; Immigration
24   and Customs Enforcement,

25                   *Defendants*.

26

27

28

1    Melissa Crow*
     SOUTHERN POVERTY LAW CENTER
2    1101 17th Street, NW Suite 705
     Washington, D.C. 20036
3    T: (202) 355-4471
     F: (404) 221-5857
4    *melissa.crow@splcenter.org*

5    Mary Bauer*
     SOUTHERN POVERTY LAW CENTER
6    1000 Preston Avenue
     Charlottesville, VA  22903
7    T:  (470) 606-9307
     F:  (404) 221-5857
8    *mary.bauer@splcenter.org*

9

10

11

12   *Attorneys for Plaintiffs*

13   *Pro hac vice application forthcoming
     **Application for admission pending*

14

15

Baher Azmy*
Angelo Guisado*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gschwarz@ccrjustice.org

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*
*asalceda@aclunc.org*

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A. Statutory Background ............................................................................. 2

    B. The Interim Final Rule .......................................................................... 4

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ..................................................................................................... 6

    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .................................... 6

    I. The Bar to Asylum for Noncitizens Who Transit Through a Third Country

       Violates the INA. ........................................................................... 6

       A. The Rule Conflicts with the Firm Resettlement Bar, 8 U.S.C.

         § 1158(b)(2)(A)(vi)..................................................................... 7

       B. The Rule Confilcts with the Safe Third Country Provision, 8 U.S.C.

         § 1158(a)(2)(A) ........................................................................ 9

       C. The Rule Conflicts with the Asylum Statute's Opening Guarantee,

         8 U.S.C. § 1158(a)(1).............................................................. 12

    II. The Interim Final Rule Violates the Procedural Requirements of the APA .... 14

       A. The Rule is Invalid Because the Government Failed to Follow the

         APA's Notice and Comment Procedures. .............................................. 15

          1. The Foreign Affairs Exception Does Not Apply. ....................... 15

          2. The Good Cause Exception Does Not Apply  ............................. 16

       B. The Attorney General Also Violated the APA's Required 30-day Grace

         Period ...................................................................................18

    III. The Rule is Arbitrary and Capricious In Violation of the APA .................. 19

    THE REMAINING FACTORS DECIDEDLY FAVOR GRANTING A TRO AND

       PRESERVING THE STATUS QUO ........................................................ 21

CONCLUSION.................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ..................................................... 6, 24

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................................................ 5

*Andriasian v. I.N.S.*,
   180 F.3d 1033 (9th Cir. 1999) ........................................................ 9

*Bragdon v. Abbott*,
   524 U.S. 624 (1998) ........................................................................ 8

*California v. Azar*,
   911 F. 3d 558 (9th Cir. 2018) ....................................................... 21

*Cresote Council v. Johnson*,
   555 F.Supp.2d 36 (D.D.C. 2008) .................................................. 24

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ...................................................... 23

*Damaize v. INS*,
   787 F.2d 1332 (9th Cir. 1986) .................................................. 8, 19

*East Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018) ................................................. passim

*East Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018) ...................................... passim

*East Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) .................................... passim

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ....................................................... 20

*Karouni v. Gonzales*,
   399 F.3d 1163 (9th Cir. 2005) ........................................................ 3

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ........................................................................ 8

*Maryland v. King*,
   567 U.S. 1301 (2012) .................................................................... 24

*Matter of A-G-G-*,
   25 I & N. Dec. 486 (BIA 2011) ...................................................... 8

*Matter of B-R-*,
   26 I&N Dec. 119 (BIA 2013) ........................................................ 13

*Melkonian v. Ashcroft,*
  320 F.3d 1061 (9th Cir. 2003) ................................................................. 8, 19

*Mohammed v. Gonzales,*
  400 F.3d 785 (9th Cir. 2005) ..................................................................... 12

*Motor Vehicle Mrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) .................................................................................... 19

*Murray v. The Schooner Charming Betsy,*
  6 U.S. 64 (1804) .......................................................................................... 9

*Munoz v. Ashcroft,*
  339 F.3d 950 (9th Cir. 2003)) ..................................................................... 9

*New Jersey v. EPA,*
  626 F.2d 1038 (D.C. Cir.1980) ................................................................. 23

*Ngou v. Schweiker,*
  535 F. Supp. 1214 (D.D.C. 1982) ............................................................ 19

*Nken v. Holder,*
  556 U.S. 418 (2009) .................................................................................. 23

*NRDC v. Evans,*
  316 F.3d 904 (9th Cir. 2003) ..................................................................... 17

*Orantes-Hernandez v. Thornburgh,*
  919 F.2d 549 (9th Cir. 1990) ....................................................................... 2

*Prows v. Dep't of Justice,*
  938 F.2d 274 (D.C. Cir. 1991) ................................................................... 18

*United States v. Mead Corp.,*
  533 U.S. 218 (2001) .................................................................................. 15

*United States v. Valverde,*
  628 F.3d 1159 (9th Cir. 2010) ................................................................... 16

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ................................................................... 21

*Yassini v. Crosland,*
  618 F.2d 1356 (9th Cir. 1980) ............................................................ 15, 16

**Statutes**

5 U.S.C. § 553(b) ......................................................................................... 14

5 U.S.C. § 553(c). ........................................................................................ 14

5 U.S.C. § 553(d) ................................................................................... 14, 18

6 U.S.C. § 279(g)(2) .................................................................................... 20

8 U.S.C. § 1101(a)(42)(A) ............................................................................. 3

iii

8 U.S.C. § 1158(a)(1) .................................................................................................... passim

8 U.S.C. § 1158(a)(2)(A) .............................................................................................. passim

8 U.S.C. § 1158(b)(1)(A) ..................................................................................................... 3

8 U.S.C. § 1158(a)(2)(E) ................................................................................................... 20

8 U.S.C. § 1158(b)(2)(A)(vi) ..................................................................................... 1, 4, 7, 8

8 U.S.C. § 1158(b)(2)(C) ............................................................................................... 2, 5, 6

8 U.S.C. § 1158(b)(3)(C) ................................................................................................... 20

8 U.S.C. § 1158(d)(5)(B) ................................................................................................. 5, 6

8 U.S.C. § 1225(b)(1)(B) ..................................................................................................... 3

8 U.S.C. § 1232 ................................................................................................................. 20

**Regulations**

8 C.F.R. § 208.2(a) .............................................................................................................. 3

8 C.F.R. § 208.2(b) .............................................................................................................. 3

8 C.F.R. § 208.9 ................................................................................................................... 3

8 C.F.R. § 208.14 ................................................................................................................. 7

8 C.F.R. § 208.15 ............................................................................................................. 4, 8

**Other Authorities**

Federal Register, 84 Fed. Reg. 33829 ........................................................................... passim

Agreement between the Government of Canada and the Government of the United States of America
    For cooperation in the examination of refugee status claims from nationals of third countries,
    *available at* https://www.canada.ca/en/immigration-refugees-
    citizenship/corporate/mandate/policies-operational-instructions-agreements/agreements/safe-third-
    country-agreement/final-text.html ............................................................................... 10

UN Convention relating to the Status of Refugees (July 28, 1951) ...................................... 9

UNHCR Guidance Note on Asylum U.N. Doc EC/SCP/12 (Aug. 30, 1979) ...................................... 11

UNHCR Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum
    Seekers (May 2013), *available at* https://www.refworld.org/pdfid/51af82794.pdf ...................... 11

UNHCR States Parties to the 1951 Convention relating to the Status of Refugees and the 1967
    Protocol, *available at* https://www.unhcr.org/en-us/protection/basic/3b73b0d63/states-parties-
    1951-convention-its-1967-protocol.html (last accessed July 16, 2019) ........................................ 11

U.S. Dept. of State, Angola 2018 Human Rights Report, *available at* https://www.state.gov/wp-
    content/uploads/2019/03/angola-2018.pdf .................................................................................. 11

U.S. Dept. of State, Egypt 2018 Human Rights Report, *available at* https://www.state.gov/wp-

iv

content/uploads/2019/03/EGYPT-2018.pdf. ............................................................................ 11

U.S. Dept. of State, Guatemala 2018 Human Rights Report, *available at* https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf. ............................................................. 10

U.S. Dept. of State, Mexico 2018 Human Rights Report, *available at* https://www.state.gov/wp-content/uploads/2019/03/MEXICO-2018.pdf.. ............................................................ 10

U.S. Dept. of State, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety Report, (February 28, 2019) *available at* https://www.osac.gov/Content/Report/5f31517e-62bb-4f2c-8956-15f4aeaab930 ................................................................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

The government has issued an emergency interim final rule ("Rule") that categorically bars asylum for individuals who cross the southern border without having applied for and been denied asylum in any country through which they transited en route to the United States.  That categorical bar applies no matter the conditions or purpose of their journey through that other country; whether they practically or legally could have sought asylum there; whether they would have been safe from persecution there; or the degree of danger they would face if removed to their home country.  The Rule will gravely undermine, if not virtually repeal, the U.S. asylum system at the southern border, and cruelly close our doors to refugees fleeing persecution.  It is a dramatic abandonment of our country's longstanding commitment to the protection of vulnerable asylum seekers.

The Rule's categorical ban on asylum, based solely on the fact that an individual transited through a third country but did not seek asylum there, is patently unlawful under the Immigration and Nationality Act ("INA").  Congress specifically provided in 8 U.S.C. § 1158 that the only circumstances in which a noncitizen could be denied asylum because of her relationship with a transit country were if she was firmly resettled there or was subject to a safe third country agreement.  *See* 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi).  Congress further provided that asylum cannot be categorically denied based on an asylum seeker's route to the United States.  *Id.* § 1158(a)(1).  Together, these provisions illustrate the careful and considered balance Congress struck between protecting vulnerable individuals from harm and sharing the burdens of asylum processing with other countries in which safety and fair processing could be assured.  Congress clearly decided that only in specific narrow circumstances can a noncitizen's relationship to a transit country justify a denial of protection in the United States, precluding administrative attempts to circumvent that deliberate scheme.  The Rule upends that legislative balance and guts Congress's specifically enumerated limits.  It was also issued without notice-and-comment procedures or the 30-day waiting period required by the Administrative Procedure Act ("APA").  The Rule further

violates the APA because it is arbitrary and capricious.

Although the Attorney General has the power to impose "additional limitations and conditions" on asylum eligibility, they must be "consistent with [§ 1158]," the asylum statute. 8 U.S.C. § 1158(b)(2)(C). The Executive cannot override Congress's explicit and longstanding directives. If the Attorney General is allowed to take this step here, he could unilaterally shut down the asylum system. That is not what Congress meant to allow. *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1250-51 (9th Cir. 2018) ("*East Bay II*") (explaining that the executive branch may not re-write the asylum laws).

A Temporary Restraining Order enjoining the Rule nationwide is warranted given the enormous stakes, disruption to the longstanding status quo, and serious claims at issue in this case. For decades, the law has been clear that merely transiting through another country en route to the United States is not a basis to categorically deny asylum. In the absence of immediate judicial intervention, Plaintiffs will suffer serious and irreparable harm. Chaos at the border will ensue, and the lives of untold asylum seekers in grave danger will be put at risk, as they may be imminently removed and effectively delivered back to their persecutors without ever having had the chance even to apply for asylum in the United States. *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1117 (N.D. Cal. 2018) ("*East Bay III*").

## BACKGROUND

### A. Statutory Background

Federal law provides for asylum, which is a form of protection available to individuals who fear persecution in their home countries. The asylum laws reflect Congress's intent to bring the United States into compliance with its international obligations under the 1967 United Nations Protocol Relating to the Status of Refugees. *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 551-52 (9th Cir. 1990). Asylum law affords protection to individuals who have a "well-founded fear of persecution" on account of any one of five protected grounds: race, religion, nationality, political

1   opinion, or membership in a particular social group.  8 U.S.C. § 1158(b)(1)(A); *id.* § 1101(a)(42)(A).

2   A ten percent chance of harm is sufficient to establish a well-founded fear.  *Karouni v. Gonzales*,

3   399 F.3d 1163, 1172 (9th Cir. 2005).

4       There are three principal ways for an individual to seek asylum.  First, where a noncitizen is

5   not in any kind of removal proceedings, his or her application is considered to be an "affirmative"

6   filing.  *See* 8 C.F.R. §§ 208.2(a), 208.9.  Second, a noncitizen in ordinary removal proceedings, *see* 8

7   U.S.C. § 1229a, may submit a "defensive" application for asylum as a form of relief from removal,

8   *see* 8 C.F.R. § 208.2(b).  Third, as part of the expedited removal system—an alternative summary

9   removal system currently applicable to certain individuals at or within 100 miles of the border—a

10  noncitizen who expresses a fear of return to his or her home country is entitled to a "credible fear"

11  screening interview.  8 U.S.C. § 1225(b)(1)(B).  If the screening officer finds a

12  "significant possibility" that the individual "could establish eligibility for asylum," he or she is

13  placed in ordinary removal proceedings and given an opportunity to apply for asylum.  *Id.*

14      Critically, as part of our nation's commitment to the protection of people fleeing persecution

15  and consistent with our international obligations, it is longstanding federal law that merely transiting

16  through a third country is not a basis to categorically deny asylum to refugees who arrive in the

17  United States.

18      Section 1158(a)(1) provides that "[a]ny alien who is physically present in the United States

19  or who arrives in the United States (*whether or not at a designated port of arrival* and including an

20  alien who is brought to the United States after having been interdicted in international or United

21  States waters), irrespective of such alien's status, may apply for asylum in accordance with this

22  section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1) (emphasis added).

23  All asylum seekers coming from a country other than a country contiguous to the United States who

24  enter between ports of arrival necessarily transited through another country before reaching the

25  southern border.  Congress guaranteed that these individuals should be able to seek asylum free from

26  any categorical restrictions based on their route to the United States.

27      Congress also spoke directly to the circumstances when a noncitizen may be deemed

28  ineligible for asylum based on his or her relationship with a third country, and intentionally chose

narrow ones.  Section § 1158(b)(2)(A)(iv) provides that a noncitizen shall be ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  Firm resettlement requires more than transiting through a third country.  Pursuant to federal regulation, a noncitizen can be

> considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
>
> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 208.15.

Finally, Congress spoke directly to the circumstances when noncitizens may be returned to a third country to have their asylum claims processed there.  Section § 1158(a)(2)(A) provides that the Attorney General may do so only when he or she

> determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

## B.  The Interim Final Rule

On July 16, 2019, the Attorney General and Acting Secretary of Homeland Security

promulgated an interim final rule providing that noncitizens who transit through another country prior to reaching the southern land border of the United States are ineligible for asylum here.  The Rule has only three narrow exceptions, for those who applied for protection elsewhere and were denied it in a final judgment; who meet the definition of a "victim of a severe form of trafficking in persons"; or who transited through countries that are not parties to the 1951 Refugee Convention, the 1967 Refugee Protocol, or the Convention Against Torture.  Defendants issued the Rule pursuant to the Attorney General's authority to impose conditions and limitations on eligibility for asylum that are "consistent with" the asylum statute, 8 U.S.C. § 1158, and pursuant to his authority to establish "conditions or limitations on the consideration of an application for asylum" consistent with the Immigration and Nationality Act, § 1158(B)(2)(C), (d)(5)(B).  IFR at 4-5, 22.[1]

The Rule thus bars virtually every noncitizen fleeing persecution from obtaining asylum in the United States if they passed through another country on their way to the United States, no matter the conditions or purpose of their journey through that country or their prospects for protection, rights, or permanent legal status there.  The Rule contains no exception for unaccompanied children. They, too, must apply for protection in a country through which they transit or will be deemed ineligible for asylum in the United States, irrespective of their age, knowledge of or ability to understand the Rule's requirements, or knowledge of or ability—practical or legal—to access the asylum system in a transit country.

**LEGAL STANDARD**

On a motion for a TRO, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *East Bay Sanctuary Covenant v. Trump* ("*East Bay I*"), 349 F. Supp. 3d 838, 855 (N.D. Cal. 2018) (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)).  A TRO may issue where "serious questions going to the merits [are] raised and the balance of hardships tips

---

[1] All citations to the Rule in this memorandum are to the version released on July 15, 2019, and made available at https://s3.amazonaws.com/public-inspection.federalregister.gov/2019-15246.pdf. The Rule has since been published in the Federal Register, 84 Fed. Reg. 33829.  That version is available at https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications.

sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## ARGUMENT

## PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs move for a TRO on three grounds, any one of which is sufficient to warrant preserving the status quo.  First, the government's near-categorical denial of asylum to those who enter the United States through the southern border after transiting through a third country violates the INA, and thus is contrary to law and ultra vires under the APA's substantive standards.  Second, the government lacked any sufficient justification to disregard the procedural requirements of the APA.  Third, the Rule is arbitrary and capricious because it fails to consider numerous relevant factors—including the many reasons individuals may not seek asylum in a third country unrelated to the merits of their claims; because it is not rationally related to the stated goal of ensuring access to asylum for only those with meritorious claims; and because it lacks an exception for unaccompanied children.

I.     **The Bar to Asylum for Noncitizens Who Transit Through a Third Country Violates the INA.**

The Rule at issue here categorically denies asylum to all noncitizens who enter or attempt to enter the United States at the southern land border after transiting through another country without having sought and been denied protection there.  The government claims authority to enact the Rule based on the power granted to the Attorney General under 8 U.S.C. § 1158(b)(2)(C) to "establish additional limitations and conditions" on asylum eligibility.  But, as the Ninth Circuit and district court in *East Bay v. Trump* both recognized, the statute expressly requires that any such limitation or conditions be "consistent with [§ 1158]."  *Id*; *see id.* § 1158(d)(5)(B) (requiring that "any other conditions or limitations on the consideration of an application for asylum" imposed by the Attorney General be "not inconsistent with this chapter"); *East Bay II*, 909 F.3d at 1247 ("Despite his facial invocation of § 1158(b)(2)(C), the Attorney General's rule of decision is inconsistent with § 1158(a)(1)."); *East Bay Sanctuary III*, 354 F. Supp. 3d at 1111-12 (enjoining rule barring asylum eligibility based on manner of entry because "[i]t would be hard to imagine a more direct conflict"

6

with § 1158).

The new Rule is flatly inconsistent with the INA in multiple respects.  Congress spoke directly to the issue of seeking asylum in another country and created two narrow circumstances when asylum can be denied based on a third country.  First, Congress stated that a noncitizen may be denied asylum where the noncitizen is firmly resettled in a third country.  Second, Congress stated that asylum may be denied where the United States has entered into a formal safe third country agreement that satisfies certain enumerated conditions.  Neither exception remotely applies here.  Moreover, the new Rule further violates Congress's requirement that asylum cannot be categorically denied based on an asylum seeker's route to the United States.

**A.  The Rule Conflicts with the Firm Resettlement Bar, 8 U.S.C. § 1158(b)(2)(A)(vi).**

Congress spoke directly to the circumstances in which a noncitizen may be deemed ineligible for asylum based on his or her relationship with a third country.  8 U.S.C. § 1158(b)(2)(A)(vi) specifically provides that a noncitizen shall be ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  The plain text of that provision, agency regulations, domestic case law, and international law have long made clear that firm resettlement requires far more than merely transiting through another country.  By requiring that asylum be denied for mere transit through another country, the Rule reads Congress's firm resettlement limitation out of § 1158.

As a matter of plain text, firm resettlement plainly requires far more than mere transit through a country, even one where there may be a possibility of seeking protection.  Agency regulations too have long made clear that mere transit is not enough, and that there must be an individualized inquiry into the ties a noncitizen fleeing persecution formed with another country and her particular ability to enjoy safety and legal protection there.

In 1980, the Immigration and Naturalization Service ("INS") issued interim regulations providing that a noncitizen would be considered firmly resettled "if he was offered resident status, citizenship, or some other type of *permanent* resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution."  8 C.F.R. § 208.14 (1981) (emphasis added); *see also Matter of A-G-G-*, 25 I & N. Dec. 486, 492 (BIA 2011) (discussing

history of firm resettlement bar).  Thus, asylum officers assessing firm resettlement were required to consider, among other things, the individual's access to housing, employment, property ownership, and other rights and privileges.  *Id.* at 492-93.

The Attorney General amended the firm resettlement regulation in 1991.  That regulation was substantially the same as the current firm resettlement regulation set out at 8 C.F.R. § 208.15.  The 1991 regulation provided that a noncitizen would be "considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement . . . ." 8 C.F.R. § 208.15 (revised Jan. 1, 1991).  Indeed, the regulation directed the asylum officer or immigration judge to undertake an *individualized* inquiry and consider the following factors:

> the conditions under which other residents of the country live, the type of housing made available to the refugee, whether permanent or temporary, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation including a right of entry and/or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

*Id.* § 208.15(b) (1991).

Congress adopted the current firm resettlement bar, set out at 8 U.S.C. § 1158(b)(2)(A)(vi), in 1996, when it amended the INA in the Illegal Immigration Reform and Immigrant Responsibility Act.  In so doing, it codified the long extant regulatory definition of "firm resettlement."  *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998); *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978).  The implementing regulation on firm resettlement was finalized in 2000, and is substantively identical to the 1991 version.  *See* 8 C.F.R. § 208.15.

In keeping with this established meaning of "firm resettlement" as requiring more than mere transit, the Ninth Circuit has long held that "a refugee need not seek asylum in the first place where he arrives."  *Melkonian v. Ashcroft*, 320 F.3d 1061, 1071 (9th Cir. 2003).  "Rather," the Ninth Circuit has explained, "it is 'quite reasonable' for an individual fleeing persecution 'to seek a new homeland that is insulated from the instability [of his home country] . . . ."  *Id.* (quoting *Damaize v.*

1   *INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)); *see also Andriasian v. I.N.S.*, 180 F.3d 1033, 1045 n.21

2   (9th Cir. 1999) (explaining that government conceded at oral argument that "failure to take

3   affirmative steps to apply for permanent status in a third country would not justify denial of

4   asylum").

5          Congress's express command that mere transit through a third country is not an appropriate

6   basis to categorically deny asylum is also consistent with foundational international humanitarian

7   law principles.  *See Murray v. The Schooner Charming Betsy*, 6 U.S. 64, 118 (1804); *Munoz v.*

8   *Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003) ("[I]t is also well settled that an act of Congress should

9   be construed so as not to conflict with international law where it is possible to do so without

10  distorting the statute.")  Neither the 1951 United Nations Convention Relating to the Status of

11  Refugees nor the 1967 Protocol requires refugees to apply for protection in the first country where it

12  could have been sought, or that refugees be returned to a country they crossed in transit.  Instead, the

13  Refugee Convention applies except to a person who "acquired a new nationality, and enjoys the

14  protection of the country of his new nationality" or "is recognized by the competent authorities of

15  the country in which he has taken residence as having the rights and obligations which are attached

16  to the possession of the nationality of that country."  Art. 1, §§ C(3), E, adopted July 28, 1951, 189

17  U.N.T.S. 150.  One who merely transits through a third country has none of those rights.

18         **B.  The Rule Conflicts with the Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A).**

19         Congress prescribed one other very narrow circumstance involving an individual's

20  relationship with a third country where asylum may be denied: the safe third country provision.  To

21  satisfy it, the United States and that country must have entered into "a bilateral or multilateral

22  agreement"; the removal must be "pursuant to" that agreement; the Attorney General must determine

23  that the asylum seeker's "life or freedom would not be threatened on account of race, religion,

24  nationality, membership in a particular social group, or political opinion"; and the Attorney General

25  must determine that the asylum seeker and "would have access to a full and fair procedure for

26  determining a claim to asylum or equivalent temporary protection" in that country.  8 U.S.C.

27  § 1158(a)(2)(A).

28         The Rule does not and cannot rely on this limited exception.  The only safe-third-country

9

agreement that the United States has entered into is with Canada.  *See* Agreement between the Government of Canada and the Government of the United States of America For cooperation in the examination of refugee status claim from nationals of third countries, https://tinyurl.com/yxqjnyg4. Although the United States has reportedly sought third-country agreements with Mexico and Guatemala, it has not succeeded.  The Rule is Defendants' effort to accomplish indirectly what they could not do directly, but Defendants may not use this Rule or any other regulatory action in an effort to circumvent Congress's carefully drawn requirements for a safe-third-country agreement.[2]

The government may seek to argue that the 1951 Refugee Convention, 1967 Protocol, and Convention Against Torture constitute safe third country agreements within the meaning of § 1158(a)(2)(A).  But that would render superfluous the provision requiring a bilateral or multilateral agreement.  Virtually every country in the world has signed one of these treaties.  Were that enough, there would have been no need for Congress to require another agreement.

Moreover, Congress did not just require a separate agreement, but one with a country that provides a safe place to seek protection and affords a "full and fair procedure."  § 1158(a)(2)(A).

---

[2] In any event, an agreement with those particular countries could not satisfy the INA's strict requirements that the third country provide safety from persecution and full and fair protection procedures.  As the U.S. State Department has acknowledged, "Guatemala remains among the most dangerous countries in the world," with an "alarmingly high murder rate."  U.S. Dep't of State, Overseas Security Advisory Council, Guatemala 2019 Crime & Safety Report, Feb. 28, 2019, https://www.osac.gov/Content/Report/5f31517e-62bb-4f2c-8956-15f4aeaab930.  Rape, violence against women and LGBTQ persons, gang recruitment of children, and corruption are serious issues in Guatemala, *see* U.S. Dep't of State, Guatemala 2018 Human Rights Report at 1, 14-18, 21-22, https://www.state.gov/wp-content/uploads/2019/03/GUATEMALA-2018.pdf.  Guatemala's nascent asylum system is barely functioning.  *See* Frydman Decl. ¶ 14.  According to the State Department, UNHCR "reported that identification and referral mechanisms for potential asylum seekers" in Guatemala "were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status."  Guatemala 2018 Human Rights Report at 13.

Mexico likewise is not safe for many asylum seekers, nor is its asylum system adequately protective.  *See* Compl. ¶¶ 97-108.  Among other issues, the State Department has noted "incidents in which immigration agents had been known to threaten and abuse migrants to force them to accept voluntary deportation and discourage them from seeking asylum."  U.S. Dep't of State, Mexico 2018 Human Rights Report at 19, https://www.state.gov/wp-content/uploads/2019/03/MEXICO-2018.pdf.  The Rule offers no analysis or evidence as to the adequacy of Mexico's asylum system and ability to protect migrants from persecution or torture.  It notes only the number of asylum applications Mexico received in 2016, 2017, and 2018.  *See* IFR at 38.  But Mexico's asylum agency lacks the necessary personnel and budget to provide adequate procedures.  *See* Frydman Decl. ¶ 23; Pinheiro Decl. ¶¶ 27-28.

The fact that a country has merely signed one of these treaties does not guarantee its compliance with the obligations to provide safe haven to those seeking protection, much less mean it affords safety from persecution and a "full and fair procedure" for those seeking protection.  *See* Anker & Hathaway Decl. ¶ 11.  Indeed, there are no meaningful international procedures to ensure that signatories are discharging their obligations.  *Id.* ¶ 7.  Accordingly, many countries that are plainly unable to provide full and fair asylum procedures nonetheless are signatories to the Refugee Convention and Protocol, including Afghanistan, Chad, the Democratic Republic of Congo, Iran, Somalia, and Sudan.  *See* UNHCR, States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol, https://www.unhcr.org/en-us/protection/basic/3b73b0d63/states-parties-1951-convention-its-1967-protocol.html (last accessed July 16, 2019).

The U.S. State Department itself has recognized that many signatories to these international treaties do not adequately protect refugees or lack adequate asylum processing systems.  For example, Egypt is a signatory to the Convention, but according to the State Department, Egypt's "laws do not provide for granting asylum or refugee status, and the government has not established a comprehensive legal regime for providing protection to refugees."  U.S. Dep't of State, Egypt 2018 Human Rights Report at 34, https://www.state.gov/wp-content/uploads/2019/03/EGYPT-2018.pdf.  Similarly, Angola is a signatory to the Convention, but its asylum law "did not function during" the last year.  U.S. Dep't of State, Angola 2018 Human Rights Report at 15, https://www.state.gov/wp-content/uploads/2019/03/angola-2018.pdf.

As with firm resettlement, the limitations Congress imposed around third country agreements are similar to those under international law.  The Office of the United Nations High Commissioner for Refugees ("UNHCR") has consistently issued guidance on the "safe third country" concept, noting that the "primary responsibility to provide protection rests with the State where asylum is sought."  UNHCR, Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers ¶ 1 (May 2013), https://www.refworld.org/pdfid/51af82794.pdf.  Asylum should not be refused "solely on the ground that it could be sought from another State," and an asylum-seeker should not be required "to seek asylum in a country with which he has not established any relevant links."  UNHCR, Note on Asylum ¶ 11, U.N. Doc. EC/SCP/12 (Aug. 30, 1979),

1    https://www.unhcr.org/en-us/excom/scip/3ae68cd44/note-asylum.html.  "[UNHCR's] 'analysis

2    provides significant guidance for issues of refugee law.'"  *East Bay III*, 354 F. Supp. 3d at 1113

3    (quoting *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005)).  Consistent with this long-

4    standing guidance, UNHCR has publicly stated that the Rule at issue here jeopardizes the right to

5    *non-refoulement* and ignores the lack of effective international protection in transit countries.  *See*

6    UNHCR Deeply Concerned About New U.S. Asylum Restrictions (July 15, 2019),

7    https://www.unhcr.org/en-us/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-

8    restrictions.html.

9    **C.  The Rule Conflicts with the Asylum Statute's Opening Guarantee, 8 U.S.C.**

10   **§ 1158(a)(1).**

11   In the opening provision of the asylum statute, Congress made clear that noncitizens may

12   apply for asylum regardless of where they enter the United States, "whether or not at a designated

13   port of arrival."  8 U.S.C. § 1158(a)(1).  Congress thus was clear that entering the United States at or

14   between ports of arrival is not a basis to categorically deny asylum to refugees.  *See East Bay II*, 909

15   F.3d at 1247-48.  In so providing, Congress recognized that many asylum seekers would transit

16   through another country before reaching the United States.  That is because, except for Mexicans

17   arriving at the southern border and Canadians arriving at the northern border, virtually all asylum

18   seekers arriving at or between ports of entry at a land border necessarily transit through at least one

19   other country before reaching the United States.  In guaranteeing that entering the United States at or

20   between ports of arrival could not be a basis for categorically denying asylum, Congress also

21   guaranteed that merely transiting through another country to reach the United States could not be a

22   categorical barrier either.

23   * * *

24   In short, Congress carefully crafted the statutory provisions governing asylum to ensure that

25   noncitizens within our country or at the border could seek asylum even if they transited through

26   another country to reach the United States.  In so doing, Congress sought to satisfy its domestic and

27   international obligations to protect those fleeing persecution and torture while also accounting for

28   the need to share the burden of protecting asylum seekers with those countries capable of offering

12

safety and full and fair asylum proceedings.  The provisions make clear that only in specific narrow circumstances not present here could a noncitizen's transit justify a denial of protection in the United States.

The Rule upends and undermines that careful scheme, eviscerating the limits Congress set on denying asylum based on an asylum seeker's relationship with a third country.  It makes a noncitizen ineligible for asylum in the United States if that individual had any opportunity to seek asylum in a third country but did not take it, however difficult, dangerous, or illusory doing so may have been.  It bars asylum regardless of whether the United States has a bilateral or multilateral agreement with that country, whether the individual would be safe from persecution or torture in that country, and whether the individual would have access to a full and fair asylum proceeding in that country.  And it does so even if the individual merely passed through that country in the course of fleeing persecution without ever coming close to being firmly resettled there.

As Michael Knowles, president of the American Federation of Government Employees Local 1924, a union whose members include asylum officers, said: "[The Rule] flies in the face of everything we've been trained and guided to in implementing existing law for decades."  Nick Miroff et al., *Trump administration moves to restrict asylum access, aiming to curb Central American migration,* Washington Post (July 16, 2019), https://www.washingtonpost.com/ immigration/trump-administration-moves-to-restrict-asylum-access-aiming-to-curb-central-american-migration/2019/07/15/f3360576-a704-11e9-9214-246e594de5d5_story.html.  "There is nothing in that body of law that says that this is okay.  They are twisting the law beyond recognition." *Id.*

Defendants make no effort in the Rule's preamble and discussion to reconcile the categorical sea change worked by the Rule with Congress's carefully crafted statutory scheme. In fact, the cases they cite in support of the Rule make clear that the third country options may only be considered where the third country is "safe."  *See* IFR at 17-18 (citing, e.g., *Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013) (explaining that the firm resettlement and safe third country provisions "limit an alien's ability to claim asylum in the United States when other *safe* options are available") (emphasis added)).  The Rule, however, in no way accounts for

whether a particular country is safe, either generally or for an individual asylum seeker.  It does not require, or provide for, an assessment of whether the transit country had a functioning asylum system capable of processing the asylum seeker's claim in a full and fair manner; whether the country was able to offer the asylum seeker effective protection against persecution or torture; whether the asylum seeker could even access—practically or legally— the asylum system; whether the asylum system would recognize the asylum seeker's particular claim for protection; or why the asylum seeker otherwise did not apply for protection.  If, for example, an asylum seeker has a protection claim rooted in persecution based on sexual orientation but the transit country does not offer asylum on that basis, the asylum seeker would nonetheless be subject to the Rule.  So too if the asylum seeker faced threats to her safety in the transit country and staying to apply for asylum and receive a final judgment would have required her to risk further harm.  These glaring shortcomings make clear that the Rule is sharply inconsistent with the protections Congress provided for in the statute.

The Rule's categorical ban on asylum for all those who enter or attempt the enter the United States at its southern land border after having transited through another country where they did not apply for protection is fundamentally inconsistent with the third-country-related limitations already contained in the statute.  Indeed, it essentially strips them from the statute, upending the careful balance Congress struck.  The Rule therefore violates the INA and is contrary to law.

## II.     The Interim Final Rule Violates the Procedural Requirements of the APA.

The new regulation violates the APA's procedural requirements in two respects.  First, the Departments of Justice and Homeland Security issued the Rule without providing notice and opportunity for comment, a bedrock requirement that ensures the public's involvement in the formulation of governmental policy.  5 U.S.C. §§ 553(b), (c).  Second, and alternatively, the rule takes immediate effect, without the 30-day notice period required by law, in violation of 5 U.S.C. § 553(d).  Contrary to the government's assertion, there is no good cause for the regulation to go into immediate effect, nor does this case fall within the narrow foreign affairs exception.

**A. The Rule Is Invalid Because the Government Failed to Follow the APA's Notice-and-Comment Procedures.**

The Rule violates the APA because the government failed to give the public notice and an opportunity to comment before enacting a fundamental change to asylum law.  The APA requires agencies to give at least 30 days for public comment on major new policies, 5 U.S.C. § 553(c)-(d), a requirement designed to "foster the fairness and deliberation that should underlie a pronouncement of such force." *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (quotation marks omitted); *see East Bay III*, 354 F. Supp. 3d at 1113 n.12 (noting value of public participation in setting refugee policy); *East Bay I*, 349 F. Supp. 3d at 860 (agencies "may not treat" notice and comment "as an empty formality").

The government bypassed these procedures entirely, enacting the Rule on an emergency basis, and claiming authority under two exceptions to the APA's notice-and-comment requirement. *See* IFR at 41-48.  But the government has failed to show any concrete harm that would result from a 30-day notice-and-comment period.  Neither exception applies here.  If accepted, the government's reasoning would subvert the APA's procedural requirements for virtually every policy involving immigration.

**1. The Foreign Affairs Exception Does Not Apply.**

The foreign affairs exception applies only where the APA's "public rulemaking provisions will provoke definitely undesirable international consequences." *East Bay II*, 909 F.3d at 1252 (alteration omitted, quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)).  It is not enough for the government to "merely recite that the Rule 'implicates' foreign affairs." *Id.* at 1251.  Rather, it must show how the "*announcement* of a proposed rule" in the Federal Register would concretely harm foreign relations in a way that immediate enactment does not. *Id.* at 1252.

The government has utterly failed to carry this burden.  The Rule contains only conclusory statements that immigration "implicates [U.S.] foreign policy," and that the rule is related to "ongoing diplomatic negotiations with foreign countries regarding migration issues."  IFR at 45.  But it does not explain how a 30-day notice-and-comment period would harm those negotiations, other than vague statements that dispensing with APA requirements would "facilitate" or "strengthen" negotiations.  IFR at 45, 47.  The Ninth Circuit has made clear that such ipse dixit is insufficient to

1    invoke the foreign affairs exception.  *See Yassini*, 618 F.2d at 1360 n.4 (explaining that "[t]he

2    foreign affairs exception would become distended" if it applied to most immigration policies simply

3    because "immigration matters typically implicate foreign affairs"); *East Bay II*, 909 F.3d at 1252

4    (same).

5         The only further explanation the government has provided lacks any evidence and is illogical

6    on its own terms.  The Rule states that notice and comment would "provok[e] a disturbance in

7    domestic politics in Mexico and the Northern Triangle countries" and "harm the goodwill between

8    the United States" and those countries.  IFR at 46.  But the government provides no reason why

9    either of those should be true: no reports, no past incidents, nothing.  And even if it could establish

10   these effects, it fails to explain why they are unique to notice and comment—in other words, why the

11   immediate enactment of the ban would not produce the exact same effects.  *See East Bay II*, 909

12   F.3d at 1252 (holding that government must credibly explain why the "*announcement* of a proposed

13   rule followed by a 30-day period of notice and comment" would harm foreign relations in a way that

14   "immediate *publication* of the Rule" would not).

15        The government has thus failed to carry its burden to establish that "definitely undesirable

16   international consequences" will result from following the APA's requirements.  And it is not likely

17   to do any better at a later stage of the case, since the Rule itself does not articulate any concrete

18   effect on foreign relations, even after courts in the Ninth Circuit made clear that the government

19   must specifically explain "how eliminating notice and comment would assist the United States in its

20   negotiations." *East Bay I*, 349 F. Supp. 3d at 862; *see East Bay II*, 909 F.3d at 1253 (government

21   must establish the "connection between negotiations" and "immediate implementation").  The ban's

22   incompatibility with the APA therefore presents an independent reason to enjoin it.

23        **2.  The Good Cause Exception Does Not Apply.**

24        The good cause exception is an "emergency procedure" that must be "narrowly construed

25   and only reluctantly countenanced." *East Bay II*, 909 F.3d at 1253 (quotation marks omitted).  This

26   is a "high bar" that requires an agency to show that "delay would do real harm." *United States v.*

27   *Valverde*, 628 F.3d 1159, 1164-65 (9th Cir. 2010) (quotation marks omitted).

28        The Rule's only good-cause claim is that publishing the Rule in the Federal Register and

allowing 30 days for public comment might cause "a surge of aliens" to cross the southern border. IFR at 42.  The Ninth Circuit previously rejected that exact same concern as "speculative," explaining that "even the Government admits that it cannot 'determine how . . . entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter.'"  *East Bay II*, 909 F.3d at 1254 (citation omitted).

The Rule provides virtually no evidence to support this speculation.  A number of things would have to be true for a surge to happen:  A large number of Central Americans who were not already planning to come to the United States during the comment period would have to learn about a regulatory publication in the Federal Register, decide to migrate, travel thousands of miles to the U.S.-Mexico border, and enter the United States—all in less than 30 days.  In support of that claim, the IFR cites a newspaper article that mentions reports that smugglers told migrants when DHS halted a *different* policy—forcibly separating families at the border—with no indication of any sudden surge caused by that policy change.  IFR at 42-44.

In *East Bay*, the district court, on remand from the court of appeals, ruled that the same newspaper article likely established good cause for a different asylum policy.  *East Bay III*, 354 F. Supp. 3d at 1115.  Plaintiffs respectfully disagree with that decision, because the good-cause exception requires the government to actually "*show*" that a 30-day comment period "*would* do real harm."  *East Bay II*, 909 F.3d at 1253 (quotation marks omitted, emphases added); *see id.* at 1254 n.16 (government must actually "make a sufficient showing" of likely harm, not just a "rational" reason why harm could, conceivably, occur) (quoting *NRDC v. Evans*, 316 F.3d 904, 912 (9th Cir. 2003) (quotation marks omitted)).

But, in any event, subsequent events have undermined the government's reliance on this newspaper article, which is the sum total of the Rule's good-cause evidence.  When the district court temporarily enjoined the last asylum ban in November 2018, according to the government's argument, there should have been an immediate surge of migrants racing to cross the border before the injunction could be stayed.  And yet the Rule in this case makes no such claim that happened.  In other words, the immediate influx the government claimed did not come to pass.  It is telling that almost a year after the newspaper article, the government still cannot marshal a single other piece of

17

evidence to support its surge theory.

Subsequent changes at the border make an influx even less likely.  The government is currently enforcing a policy under which asylum seekers are deported to Mexico to pursue their asylum claims from there.  *See* Camilo Montoya-Galvez & Angel Canales, *More than 10,000 Asylum Seekers Returned Under "Remain in Mexico" as U.S. Set to Expand Policy*, CBS News (June 8, 2019), https://www.cbsnews.com/news/remain-in-mexico-asylum-seekers-returned-as-us-seeks-to-expand-policy-2019-06-08/.  And Mexico has recently launched an expansive campaign to prevent migrants from reaching the U.S. border.  *See* Nick Miroff, *Border Arrests Drop as Mexico's Migration Crackdown Appears to Cut Crossings*, Washington Post (July 9, 2019), https://www.washingtonpost.com/immigration/border-arrests-drop-for-first-time-this-year-as-mexico-migration-crackdown-appears-to-cut-crossings/2019/07/09/e5eecf60-a254-11e9-bd56-eac6bb02d01d_story.html.  Moreover, it is well documented that migration is not possible for many migrants in the hot summer months.  *See* Miriam Jordan & Kirk Semple, *A Sharp Drop in Migrant Arrivals on the Border*, N.Y. Times (July 10, 2019) ("[M]igrant arrivals typically decline as the hot, hazardous summer months set in."), https://www.nytimes.com/2019/07/10/us/border-migrants-remain-mexico.html.  Together, these changes make it exceedingly unlikely that thousands of Central Americans would suddenly uproot and race to the border in a matter of weeks.  And yet the Rule does not even attempt to address these circumstances.

The good cause exception therefore does not apply, and this Court should enjoin the ban for violating the APA.

**B. The Attorney General Also Violated the APA's Required 30-day Grace Period.**

Even if notice and comment were not required, the rule would still violate 5 U.S.C. § 553(d)'s separate requirement that a rule be published "no less than 30 days before its effective date, except . . . as otherwise provided by the agency for good cause found and published with the rule."  This requirement "protects those who are affected by agency action taken during the 30–day waiting period without disturbing later action that is not the product of the violation."  *Prows v. Dep't of Justice*, 938 F.2d 274, 276 (D.C. Cir. 1991).  For the same reasons stated above, the agency cannot show good cause why the 30-day waiting period should not apply to the rule, or that the

foreign affairs exception applies.  If the Court reaches this alternate ground for relief, the proper

remedy is to immediately stay the rule for the necessary 30 days.  *Ngou v. Schweiker*, 535 F. Supp.

1214, 1216 (D.D.C. 1982).

### III.    The Rule Is Arbitrary and Capricious In Violation Of The APA.

The Rule's near-blanket ban on asylum for any person who transited through a third country

en route to the southern border but did not apply for asylum there is arbitrary and capricious in

violation of the APA, for at least several reasons.

*First*, the Rule is premised on two false and wholly unsupported assumptions. The Rule

primarily asserts that individuals who do not seek asylum in at least one transit country are likely to

lack meritorious claims.  Without explanation or support, the Rule asserts that transiting through a

third country without seeking asylum is necessarily equivalent to "having no urgent or genuine need

for asylum."  IFR at 7.  But, as discussed above, the Ninth Circuit has long recognized that "it is

quite reasonable" for individuals who have experienced persecution in their home countries "to seek

a new homeland that is insulated from the instability" of the region.  *Damaize*, 787 F.2d at 1337

(finding no basis for the immigration judge's assumption "that an individual who truly fears

persecution in his homeland will automatically seek asylum in the first country in which he

arrives"); *see also Melkonian*, 320 F.3d at 1071.  The failure to seek asylum in countries transited

through "reveals nothing about whether or not [a noncitizen] feared for his safety" in his country of

origin.  *Damaize*, 787 F.2d at 1338.

The Rule is also premised on the assertion that an individual who transits through a third

country "could have obtained protection" there.  IFR 7.  But that is often untrue, and the Rule

entirely fails to consider the factors relevant to this question.  *See supra* at 10-12 & n.2, 14-15.

These include whether the individual is free from the risk of persecution or torture in the third

country, whether a functioning asylum system exists that would recognize the person's claims for

protection, and whether the individual can safely await a decision on her claims.  The Rule's failure

to acknowledge, much less examine these critical considerations—which may vary significantly by

transit country and the nature of the individual's claim—is arbitrary and capricious.  *See Motor*

*Vehicle Mrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983) (action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem").

*Second*, the Rule is not rationally related to the government's stated purpose of preserving access to asylum for only those individuals who have meritorious claims. *See* IFR at 7. Indeed, the Rule exempts from the ban any asylum seeker who has already applied for and received a final judgment denying their claims for protection in a third country. *Id.* at 22. Thus, the Rule irrationally allows those who were *already denied* protection in another country to access asylum in the United States, while barring those who may not have had a true opportunity to seek protection in another country. *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1024 (9th Cir. 2011) (agency's failure to rationally support its conclusion is arbitrary and capricious).

*Finally*, the Rule is arbitrary and capricious because it fails to exempt unaccompanied children, as defined in 6 U.S.C. § 279(g)(2), from its coverage in violation of the special rights Congress has afforded such children under the INA and the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232. As Congress recognized, unaccompanied children who travel to the United States seeking protection are particularly vulnerable. Congress accordingly gave them special rights, two of which are especially relevant here. First, unaccompanied children have the right to present their case for asylum in the first instance to a USCIS Asylum Officer in a non-adversarial setting, rather than in immigration court litigating against a trained prosecutor. *See* 8 U.S.C. § 1158(b)(3)(C). But now, under the Rule, unaccompanied children who transit through third countries will not only lose the right to seek asylum altogether, but also will simultaneously lose their right to have their claim for protection heard in the first instance by an Asylum Officer. Their only available protection is to seek withholding and torture claims before an immigration judge in an adversarial proceeding. Second, and notably, Congress expressly exempted unaccompanied children from the provision governing safe third-country agreements. 8 U.S.C. § 1158(a)(2)(E). Thus, even if the administration had entered into a safe-third-country agreement with Guatemala, Mexico, or some other country,

unaccompanied children would *not* have been required to seek asylum in that country.  Yet now, without a third-country agreement, the Rule requires unaccompanied children who transit through a third country to seek asylum there.  It is difficult enough for such children to seek asylum here; in dangerous countries without developed asylum systems, it will be virtually impossible.  *See* Frydman Decl. ¶¶ 12-24.  The Rule fails to recognize, much less explain, the Rule's disregard for the unique needs of unaccompanied children that Congress has recognized.

## THE REMAINING FACTORS DECIDELY FAVOR GRANTING A TRO AND PRESERVING THE STATUS QUO

Plaintiffs will suffer irreparable harm if the Rule is not enjoined.  In their prior challenge to the government's first asylum ban, these very Plaintiffs established a likelihood of irreparable harm "based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from other sources."  *East Bay III*, 354 F. Supp. 3d at 1116 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).  Plaintiffs' prompt filing of this action following issuance of the Rule "also weighs in their favor" for the irreparable harm analysis.  *Id.* (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)).

The Rule frustrates Plaintiffs' ability to carry out their mission and forces them to dramatically divert resources to address the new regulatory landscape, pursuing more complex, and limited, forms of relief available to their clients.  *See* Complaint ¶¶ 116-18, 121-25, 126-29, 132-35; Pinheiro Decl. ¶¶ 12, 15-17; Smith Decl. ¶¶ 15, 17-20; Sharp Decl. ¶¶ 10-15; Manning Decl. ¶¶ 16-21.  For example, Plaintiff Al Otro Lado operates programs that assist asylum-seekers in applying for asylum, represents them in credible fear interviews, and represents detained individuals in bond hearings and parole applications.  Pinheiro Decl. ¶¶ 4-11.  The rule affects the majority of the clients served by Al Otro Lado, forcing them to revamp their representation strategy, overhaul and develop training materials, shift resources from the United States to Mexico, expend additional resources to brief eligibility issues, prepare separate cases for each family member, and pursue complex forms of relief and appeals.  *Id.* ¶¶ 12-13, 15-17.  Al Otro Lado would be forced to shift resources to representation in removal proceedings and shut down or restructure its Otay Mesa Release Project.

*Id.* ¶ 17.  The Ninth Circuit found that these precise harms—preventing the provision of legal aid to affirmative asylum applicants, shifting legal resources to removal proceedings, developing new training materials, submitting a greater number of applications for family members, requiring new education and outreach initiatives—require the diversion of resources and "perceptibly impair[] [their] ability to provide the services [they were] formed to provide." *East Bay II*, 909 F.3d at 1241.

In addition, Plaintiffs face an extraordinary loss of funding tied to asylum applications and bond applications, threatening their very existence.  *See id.* at 1243 (Plaintiffs' likely loss of substantial amount of funding sufficient to confer organizational standing); Complaint ¶¶ 119, 122-23, 126, 132-34; Pinheiro Decl. ¶ 18; Smith Decl. ¶ 16; Sharp Decl. ¶¶ 7, 13; Manning Decl. ¶¶ 16-17.  Plaintiff East Bay Sanctuary Covenant's ("EBSC") affirmative asylum program accounts for nearly half of its organizational budget.  Smith Decl. ¶ 8.  The State of California funds EBSC to file affirmative applications.  *Id.* ¶ 12.  EBSC's grant for 2018 was based on its filing of approximately 280 affirmative asylum cases in 2017, half of which were for individuals who entered the United States through a southern land border after transiting through a third country.  *Id.*  EBSC's budget would be drastically cut since it would no longer be able to handle affirmative asylum cases for people subject to the rule.  *Id.* ¶ 16; *see also* Sharp Decl. ¶¶ 10, 13 (Rule would financially strain CARECEN by forcing attorneys to devote more hours per case to pursue complex non-asylum relief and appeals, work that is not currently contemplated in the flat per-case reimbursement rate from the State of California); Pinheiro Decl. ¶ 18 (Al Otro Lado may no longer be funded by the State of California for bond representation).

Plaintiffs also suffer irreparable harm arising from the lost opportunity to offer comments on the Rule.  As this District has recognized, Plaintiffs' loss of such an opportunity to comment on the prior asylum ban, combined with the frustration of their missions, diversion of resources, and lack of remedy, can constitute irreparable harm.  *East Bay I*, 349 F. Supp. 3d at 865; *see also East Bay II*, 909 F.3d at 1243 n.8 (recognizing that Plaintiffs possessed organizational standing to challenge lack of notice-and-comment procedures in promulgation of prior asylum ban).  Had Defendants provided an opportunity for notice and comment before putting the rule into effect, Plaintiffs would have informed Defendants that the rule will not address the reasons proffered for its promulgation,

commented on the quality of the data cited in the rule, and described the individual harm caused by the rule.  *See* Complaint ¶ 136; Pinheiro Decl. ¶ 20; Smith Decl. ¶ 21; Sharp Decl. ¶ 16; Manning Decl. ¶¶ 22-23.

Apart from these serious impacts on Plaintiffs' organizations, the Rule also causes grave and irreparable harm to individuals fleeing horrific violence in some of the most dangerous countries in the world, many of whom will be effectively denied a realistic path to asylum.  Complaint ¶¶ 81-108; *see* Frydman Decl. ¶¶ 8-11, 13-15, ¶ 19-24 (explaining that Mexico and Guatemala do not provide meaningful access to asylum or protection to unaccompanied children).  The urgency of the harms these individuals and Plaintiffs will face because of the Rule, and the urgency with which Plaintiffs accordingly must act, factors strongly in favor of emergency injunctive relief.

With respect to the balance of the equities and the public interest, "[w]hen the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  The government cannot identify any real harm that would result from the requested TRO.  *See East Bay II*, 909 F.3d at 1254 (rejecting the government's argument that the order enjoining prior asylum ban would inflict institutional injury).  There is no urgency or emergency necessitating the Rule.  Indeed, the Rule upsets the decades-long status quo.

In contrast, if the Rule becomes effective, hundreds of thousands of asylum seekers will encounter sharply-narrowed forms of relief, significantly higher hurdles to obtaining that relief, and greater likelihood of *refoulement*.  The public interest lies "in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556 U.S. 418, 436 (2009).

Further, as this district found when issuing a temporary restraining order enjoining the prior asylum ban, the government's interest in "deterring asylum seekers—whether or not their claims are meritorious—on a basis that Congress did not authorize carries drastically less weight, if any."  *East Bay I*, 349 F. Supp. 3d at 865–66; *see also East Bay II*, 909 F.3d at 1255 (public possesses interest in ensuring that "statutes enacted by [their] representatives" are not imperiled by executive fiat) (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (quotation marks omitted)).

Finally, the public interest is served when administrative agencies comply with their

obligations under the APA.  *See New Jersey v. U.S. Envtl. Prot. Agency*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) ("It is now a commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive."); *Cresote Council v. Johnson*, 555 F.Supp.2d 36, 40 (D.D.C. 2008) (explaining that there is a "general public interest in open and accountable agency decision-making").  The government can begin a new rulemaking process, this time following the mandatory procedures.  Thus, "the balance of hardships tips sharply in [plaintiffs'] favor."  *All. for the Wild Rockies*, 632 F.3d at 1131 (quotation marks omitted).

* * *

At bottom, this is a case about the separation of powers, just as it was in the original *East Bay* case involving the first (and now enjoined) asylum ban.  As the Ninth Circuit stated in that case in denying the government's emergency stay request, the administration may not unilaterally re-write the asylum laws that Congress has enacted.  *East Bay II*, 909 F.3d at 1250-51 ("[T]he Executive . . . may not legislative from the Oval Office. . . .  There surely are enforcement measures that the President and the Attorney General can take to ameliorate the crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our immigration laws.").

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a TRO should be granted.

1

2      Dated: July 17, 2019                          Respectfully submitted,

3      Lee Gelernt*                                  /s/Katrina L. Eiland
       Omar C. Jadwat*                               Katrina Eiland (SBN 275701)
4      Anand Balakrishnan*                           Cody Wofsy (SBN 294179)
       ACLU FOUNDATION                               Spencer Amdur (SBN 320069)
5      IMMIGRANTS' RIGHTS PROJECT                    Julie Veroff (SBN 310161)
       125 Broad Street, 18th Floor                  ACLU FOUNDATION
6      New York, NY 10004                            IMMIGRANTS' RIGHTS PROJECT
       T: (212) 549-2660                             39 Drumm Street
7      F: (212) 549-2654                             San Francisco, CA 94111
       *lgelernt@aclu.org*                           T: (415) 343-0770
8      *ojadwat@aclu.org*                            F: (415) 395-0950
       *abalakrishnan@aclu.org*                      *keiland@aclu.org*
9                                                    *cwofsy@aclu.org*
       Melissa Crow*                                 *samdur@aclu.org*
10     SOUTHERN POVERTY LAW CENTER                   *jveroff@aclu.org*
       1101 17th Street NW, Suite 705
11     Washington, DC 20036                          Baher Azmy*
       T: (202) 355-4471                             Angelo Guisado*
12     F: (404) 221-5857                             Ghita Schwarz*
       *melissa.crow@splcenter.org*                  CENTER FOR CONSTITUTIONAL RIGHTS
13                                                   666 Broadway, 7th Floor
       Mary Bauer*                                   New York, NY 10012
14     SOUTHERN POVERTY LAW CENTER                   Telephone: (212) 614-6464
       1000 Preston Avenue                           Facsimile: (212) 614-6499
15     Charlottesville, VA  22903                    bazmy@ccrjustice.org
       T:  (470) 606-9307                            aguisado@ccrjustice.org
16     F:  (404) 221-5857                            gschwarz@ccrjustice.org
       *mary.bauer@splcenter.org*
17                                                   Christine P. Sun (SBN 218701)
       *Attorneys for Plaintiffs*                    Vasudha Talla (SBN 316219)
18                                                   Angélica Salceda**
       *Pro hac vice application forthcoming*        AMERICAN CIVIL LIBERTIES UNION
19     **Application for admission pending**         FOUNDATION OF NORTHERN
                                                     CALIFORNIA, INC.
20                                                   39 Drumm Street
                                                     San Francisco, CA 94111
21                                                   T: (415) 621-2493
                                                     F: (415) 255-8437
22                                                   *csun@aclunc.org*
                                                     *vtalla@aclunc.org*
23                                                   *asalceda@aclunc.org*

24

25

26

27

28