DECLARATION OF MICHAEL SMITH, REFUGEE RIGHTS PROGRAM DIRECTOR,
EAST BAY SANCTUARY COVENANT

I, Michael Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.  I am the Refugee Rights Program Director of the East Bay Sanctuary Covenant ("EBSC"). I helped start EBSC's affirmative asylum program in 1992, and have been with the organization since. In my current role, I oversee our affirmative asylum practice, which includes over 500 cases currently pending before the U.S. Citizenship and Immigration Services ("USCIS").

3.  EBSC is a 50l(c)(3) nonprofit corporation, incorporated in 1996 in Berkeley, California. Our office is located at 2362 Bancroft Way, Berkeley, California, 94704.

**EBSC's mission and activities**

4.  EBSC is part of the National Sanctuary Movement founded in 1982 to assist refugees fleeing the terrible civil wars and violence in El Salvador and Guatemala.

5.  EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping war, terror, political persecution, intolerance, exploitation, and other expressions of violence. In particular, one of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum and similar humanitarian relief in the United States. EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

6.  As part of its mission, EBSC provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in

1

California, Washington, and Oregon. We offer our clients legal assistance in applying for affirmative asylum, Deferred Action for Childhood Arrivals ("DACA"), Temporary Protective Status ("TPS"), Special Immigrant Juvenile Status ("SIJS"), permanent residency, and naturalization. We also provide social services, including regular workshops on integrating new immigrants into the United States, English as a second language tutoring program, and one-on-one assistance in finding housing, employment, or educational opportunities.

7.   Also, as part of its mission, EBSC helps train professionals to assist immigrant and refugee communities. For example, we partner with law schools to provide legal training opportunities to law students and attorneys looking to get experience in immigration and asylum law.

**EBSC's affirmative asylum program**

8.   EBSC's affirmative asylum program is a key part of the organization's mission. It is our most important program and accounts for nearly half of our organizational budget. Its success is the reason that EBSC has been able to grow and develop other programs. Affirmative asylum applications are those that are filed with USCIS rather than in immigration court, on behalf of applicants who are not in removal proceedings. Individuals not in removal proceedings cannot apply for other forms of relief like Withholding of Removal or protection under the Convention against Torture, which only an Immigration Judge can adjudicate.

9.   Our program is among the largest in the country and provides legal services to individuals applying for affirmative asylum within the San Francisco Asylum Office jurisdiction. Since the affirmative asylum program began in 1992, we have filed nearly

5,000 cases. Over 97% of adjudicated asylum applications have been granted. Currently, we handle about 20 intakes per week, and have over 500 pending cases before USCIS.

10. Approximately 50% of the clients in our affirmative asylum program in 2018 entered the country through the southern land border after transiting through a third country en route to seek asylum in the United States, and we expect that the rate will be similar in the future. Most of these individuals are fleeing persecution in their home countries in Central America.

11. We work mainly with low-income and poor refugees and immigrants from around the world in the jurisdiction of the San Francisco Asylum Office. We work especially closely with vulnerable populations in the immigrant and refugee community, including victims of gender-based violence and domestic violence, indigenous Guatemalans, LGBT (lesbian, gay, bi-sexual, transgender) individuals, and those suffering from HIV/AIDS, as well as unaccompanied children.

12. Funding for our affirmative asylum program is based in part on the number of cases we handle per year, and the number of cases we anticipate serving. For instance, one of our main grants is currently from the California Department of Social Services. In applying for this grant for the year 2018, we relied on the fact that we filed approximately 280 affirmative asylum cases in 2017. Around half of these cases were for individuals who entered the U.S. through the southern land border after transiting through a third country. We currently receive $2,000 for every asylum case we handle, which does not cover the full cost of our services.

13. Currently, we have 13 staff members who work primarily in our affirmative asylum program. These include 6 attorneys, 1 BIA accredited representative, and 6 support or administrative staff. These individuals carry out legal intakes, work with clients to fill out paperwork, help clients collect relevant evidence for their case, prepare clients for interviews,

3

and represent clients in affirmative asylum interviews with USCIS officers. We also work with and train law students to represent clients in affirmative asylum cases. Since 1994, for instance, we have worked with U.C. Berkeley School of Law. Currently, we help oversee the law school's California Asylum Representation Clinic (CARC), which represents approximately 40 affirmative asylum cases per year. We also have second- and third-year law students from other schools perform externships, and have a summer internship program. Law students are an important part of our work because they are able to represent clients for much of the affirmative asylum process, under the supervision of one of our attorneys. Law students allow us to significantly increase the number of cases we can process.

**The threat to EBSC's mission and affirmative asylum program**

14. The new regulation barring individuals from asylum who enter through the southern land border after transiting through a third country will significantly harm EBSC as an organization, seriously frustrate EBSC's mission, and divert organizational resources. As the result of the new rule, the organization will have to expend significant resources to adjust to a new regulatory landscape and substantially reduce its affirmative asylum practice. This would result in a significant restricting of our organization and the overall number of clients we can serve, and a diversion of resources from our current practice. The new policies also directly frustrate EBSC's mission of providing assistance and support to individuals fleeing persecution and violence, especially through our affirmative asylum program.

15. As noted above, providing legal services to affirmative asylum applicants, regardless of their manner or means of entry is a key part EBSC's mission and core activities. Since the rule makes individuals who enter through the southern land border after transiting through a third country unable to obtain asylum, EBSC would be unable to continue much of the work it does in this regard. Because approximately 50% of our affirmative asylum

4

clients have entered the U.S. through the southern land border after passing through another country first, EBSC would no longer be able to serve about half of our entire client base going forward.

16. The new rule would also jeopardize EBSC's funding streams. Currently, under our California Department of Social Services grant, we receive $2,000 for every affirmative asylum case we file. If the organization were no longer able to handle affirmative cases for individuals who transited through a third country en route to the southern border, we would likely face a marked decrease in our budget. The grant that funds EBSC's work is only to serve people who make under 250% of the poverty guidelines and EBSC's mission is to serve poor asylum seekers from all around the world who have few resources and cannot afford attorneys. In practice, many of the few noncitizens who will remain eligible to apply affirmatively for asylum under this rule are those who have visas of some kind and can travel to the United States by air. For the most part, individuals who obtain visas and travel without transiting through a third country fall outside of the population it is EBSC's mission to serve, and they likely do not meet the income requirements for EBSC's services.

17. As a result of the new policies, we would either have to significantly cut our affirmative asylum program and staff, or dramatically overhaul our program to provide types of assistance we are not currently equipped or trained to provide. EBSC does not currently have capacity to handle applications for humanitarian relief in the removal context. We handle defensive asylum cases only in the rare situation in which one of our clients who initially applies affirmatively is then referred to immigration court by the asylum office. We currently have only four defensive asylum cases on our docket. Shifting from an almost exclusively affirmative asylum-based model to representing much larger numbers of individuals in removal cases would be extremely resource intensive, and would involve developing such a

5

program, developing training materials, identifying a new client base, significant training of existing staff, and hiring different staff experienced in practicing before the immigration court. In addition, as noted, much of our affirmative asylum work is done by volunteers—law students and non-practicing attorney who prepare applications under supervision of EBSC attorneys—but these volunteers would not be able to appear independently in immigration court.

18. Even if EBSC were to attempt to overhaul our service delivery model to represent asylum seekers in removal proceedings, it would be extremely resource intensive to represent these individuals on Withholding of Removal and/or Convention against Torture claims instead of asylum. That is in part because such claims are subject to a stricter standard and do not allow for derivative claims for certain close family members as with asylum applications. Instead, EBSC would have to prepare a separate application for each individual. Given the intensive resources required, if we were forced to shift our model to do increased removal cases, EBSC would be able to serve only a fraction of the individuals that we currently represent through our affirmative asylum program.

19. In addition, we would have to divert significant resources because of the new rule. This would include devoting staff time and organizational resources to understanding the new rule, its impact on the communities we serve, and subsequently educating and advising our staff, clients, and prospective clients accordingly. Educating the communities we serve about the new policies would require significant resources and take away from our other existing programs. To properly counsel new prospective clients who seek our affirmative asylum services going forward, we would need to invest resources in training multiple intake staff not only to screen for asylum eligibility based on the new rule, but to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as

appropriate.

20. In addition, as part of its mission, EBSC supervises and trains law students to prepare and represent clients in affirmative cases. As a result of the new rule, however, we would be unable to continue training law students to handle these types of cases, or would have to substantially reduce our training program. This would frustrate our mission of helping to train legal professionals to assist individuals fleeing persecution and violence.

21. EBSC is also harmed by the inability to provide comment on the new rule before it went into effect. If the government had provided an opportunity for notice and comment before promulgating the new rule, EBSC would have submitted comments regarding why the rule is unlawful and factually unsupported.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Michael Smith

Executed this 15th day of July, 2019

7