## DECLARATION OF ERIKA PINHEIRO, LITIGATION AND POLICY DIRECTOR, AL OTRO LADO

I, Erika Pinheiro, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.    I am a U.S. licensed attorney practicing in the areas of immigration law and international human rights.  I am barred by the State of California and am over the age of 18.

3.    I have over sixteen years of experience in the immigration arena, including representation of over 100 detained clients in removal proceedings.  From 2011 to 2015, I administered Department of Justice-funded legal access programs for immigrant adults and children detained in prisons, jails, and shelters, as well as legal orientation programs for unaccompanied children following their release from government custody.  Previously, I managed one of the largest free legal programs in California for DACA recipients, overseeing the completion of thousands of applications, as well as managed representation programs for unaccompanied children.  I regularly provide technical assistance to numerous Los Angeles County agencies and train Federal Public Defender offices on the intersection between criminal and immigration law.  In 2017, I was a New America California Fellow, and my organization, Al Otro Lado, has received numerous awards and commendations, including two 2019 awards from the National Lawyers Guild (Los Angeles Chapter and National Immigration Project), the 2018 Courageous Luminaries Award from the National Immigration

Law Center, the YWCA Pasadena 2018 Racial Justice Award, and a 2017 commendation from Los Angeles County Supervisor Hilda Solis.

4.      Since 2017, I have served as the Director of Litigation and Policy at Al Otro Lado, a non-profit, binational legal services organization incorporated in California. Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles and San Diego, California, and Tijuana, Mexico.  Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to assist deportees, refugees, and other indigent immigrants with legal and social service needs.  We have a staff of 9 people in our Tijuana office.

5.      Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops at our offices in Tijuana, Mexico.  Our focus is on providing information about the U.S. asylum system to migrants who wish to seek asylum in the United States. As part of this representation, our staff accompany some asylum seekers who wish to present themselves to Customs and Border Protection (CBP) officers at the San Ysidro Port of Entry, represent them at their credible/reasonable fear interviews before asylum officers with U.S. Citizenship and Immigration Services (USCIS), and assist them with their pro se I-589 asylum applications. On average, Al Otro Lado, our volunteer attorneys, and clinic students from law schools around the country provide representation to about 30 individuals per year in their credible fear interviews.  Since November of 2018, we have helped over 4,000 migrants prepare for their credible fear interviews.  Because we only encourage migrants to present themselves at a

Port of Entry, our service delivery model in Tijuana, our volunteer training program, and our materials are solely based on preparing asylum seekers for credible fear, rather than reasonable fear interviews.   We also work with individuals returned to Mexico pending the resolution of their immigration proceedings pursuant to the Migrant Protection Protocols, and with individuals who are waiting in Mexico for the opportunity to apply for asylum in the United States but have been delayed in doing so because of the U.S. policy of metering migrants at ports of entry.

6.      To expand our capacity, Al Otro Lado frequently recruits and trains volunteers and pro bono attorneys to assist with legal orientation workshops in Tijuana, border accompaniment, and credible/reasonable fear representation.  Since November 2018, we have trained and deployed over 1,700 volunteers.

7.      We also work with asylum seekers and other community advocates to document human rights violations by both U.S. and Mexican immigration authorities against asylum seekers.

8.      Al Otro Lado also has an office in San Diego, California, through which we provide representation to detained asylum seekers in Southern California.  Al Otro Lado's San Diego office hosts our Otay Mesa Release Project, focused on helping detained asylum seekers apply for bond or parole.

9.      Pursuant to the Trump Administration's "Zero Tolerance" and "Operation Streamline" policies, large numbers of migrants entering the United States without inspection are criminally prosecuted. If asylum seekers enter without inspection near San Diego, they are

usually detained at the Otay Mesa Detention Facility and represented by federal public defenders in their criminal proceedings. The federal public defenders often refer these asylum seekers to Al Otro Lado for representation in their bond and/or removal proceedings.

10.     Generally, when asylum seekers who entered without inspection are referred to Al Otro Lado, our attorneys represent them in their bond proceedings. Almost all these clients are released on bond. If an individual goes to the Los Angeles area following release, our Los Angeles office continues to represent him or her before the Los Angeles immigration court. If the client moves to another jurisdiction, Al Otro Lado connects the client with local pro bono counsel or a local nonprofit.

11.     The San Diego office also receives referrals from the Tijuana office.  Al Otro Lado staff in Tijuana identify particularly vulnerable asylum seekers, and we then work to prepare their parole applications.  Al Otro Lado's Otay Mesa Release Project is an established partnership with Innovation Law Lab's Border X Project, through which we collaborate to locate sponsors, prepare parole and bond applications, and represent asylum seekers in their requests for release from custody. Through this collaboration, we have helped obtain release for over 50 asylum seekers since January of 2019.

**Harms Caused by the New Rule**

12.     If individuals who transit through a third country while en route to the United States and do not apply for asylum there are ineligible for asylum in the United States, Al Otro Lado will have to completely revamp its representation strategy, overhaul the materials we use to train volunteers and pro bono attorneys, overhaul our service delivery model and the

materials we have developed to assist asylum seekers out of our Tijuana office, shift our resources from engaging U.S. attorneys to engaging Mexican attorneys, redo all of our registration documents for our non-profit status in Mexico, and develop a whole new training program for our attorneys in our San Diego office. In addition, we would have to expend additional resources to brief eligibility issues, resulting in additional hearings and time spent on each case, and would have to apply for more complex and time-consuming forms of relief for our clients, thus limiting the number of clients we can represent. Furthermore, the new policy will jeopardize our existing funding streams, as we may no longer be able to qualify for or satisfy the conditions of certain grants.

13.     Approximately two-thirds of the individuals Al Otro Lado serves out of its Tijuana office transited through another country. We serve individuals from approximately 50 different countries. The new Rule thus affects the majority of the individuals Al Otro built its mission and programs to serve.

14.     Al Otro Lado's primary mission and program is to assist migrants who wish to seek asylum in the United States. We are not Mexican attorneys and we do not advise on the Mexican asylum system; rather, we refer asylum seekers who wish to seek protection in Mexico to the UNHCR and partner nonprofits. In our years of working with asylum seekers, the UNCHR, and local Mexican attorneys, we have identified numerous barriers for asylum seekers in Tijuana who wish to seek protection in Mexico. There is no Mexican asylum office (COMAR) in Tijuana, and no established, publicly-accessible procedure for migrants who wish to apply for protection. Ostensibly, migrants can submit their asylum applications

through the National Migration Institute (INM), but INM agents are often unfamiliar with asylum procedures and frequently reject applications. This means that migrants require legal representation, but there are only a handful of local attorneys and organizations with the capacity to provide these services. We anticipate that the new Rule would completely overwhelm the under-resourced local Mexican immigration service network because many U.S.-bound migrants will seek information about the Mexican asylum system, and many will require representation to access it. The new Rule accordingly would require us to restructure our service delivery model, which is focused on helping migrants apply for asylum in the United States. We would have to hire Mexican attorneys or shift from engaging U.S. attorneys in a pro bono or volunteer capacity to engaging Mexican attorneys in the same capacity. Based on our experience, recruiting volunteer Mexican attorneys will likely be extremely difficult, because Mexico lacks the same kind of pro bono culture that exists in the United States, and there are few immigration attorneys. We therefore will likely have to shift funding away from our core programs to hire Mexican attorneys.

15.     The new Rule will also require us to divert resources away from our core programs to litigate the eligibility bar in individual cases, as well as to pursue more complex and time-consuming forms of relief. The vast majority of our asylum-seeking clients who enter or attempt to enter the United States at the southern border have immediate family members in their countries of origin with whom they hope to reunify once they gain lawful status in the United States. Stripping these individuals of the ability to qualify for asylum would also eliminate their ability to petition for their immediate family members, even if they

ultimately win Withholding of Removal or protection under the Convention Against Torture. In many cases, the spouses and children left behind in the country of origin also face persecution, and our clients are anxious to win asylum so that they can remove their family members from dangerous situations. Given our clients' goals, Al Otro Lado would have no choice but to vigorously litigate issues of asylum eligibility for any client who transited through another country and would otherwise be eligible for asylum.

16.     In addition, most of Al Otro Lado's asylum clients are families traveling with minor children.  Unlike asylum applications, withholding and CAT applications do not allow for a principal applicant to petition for derivative applicants such as children.  Thus, should they become ineligible for asylum, spouses and minor children could no longer be counted as derivatives in a single application.  Al Otro Lado would be forced to prepare separate cases for each family member, exponentially increasing the number of hours required to prepare the cases for a family unit.  This will require significant additional staff time to prepare and litigate each case, including preparing separate evidence and witnesses in each separate case. Compared to asylum applications, withholding and CAT applications require meeting a higher evidentiary standard, and often require more time and greater legal resources. Similarly, because the evidentiary standard for withholding and CAT is higher, these regulatory changes will also likely lead to a greater number of losses in immigration court, and a greater number of appeals filed by attorneys.

17.     The new Rule would also place individuals who enter or attempt to enter after transiting through another country in "withholding-only " proceedings, rendering them

ineligible for bond for at least six months in the vast majority of cases. The question of whether they are eligible thereafter is the subject of ongoing litigation and would need to be briefed accordingly, requiring additional resources to litigate bond hearings. Many more of Al Otro Lado's clients would remain detained throughout their removal cases, which would proceed on a much faster timetable than if they were not detained. To effectively serve this population, Al Otro Lado would have to devote virtually all its resources to representation of individuals in removal proceedings. As a result, we would need to shut down or restructure our entire Otay Mesa Release Project in San Diego. We also would have to find new referral streams for clients, as we currently get referrals of asylum seekers eligible for either bond or parole from the Federal Public Defender and our Tijuana office. We do not have the capacity or the funding to provide full representation to all of the asylum seekers we currently represent for purposes of bond or parole only.

18.     The Rule also would jeopardize some of Al Otro Lado's most critical funding streams. Currently, the California Department of Social Services (CDSS) gives us funding at a fixed per-case rate to represent individuals in bond proceedings, which may no longer be available to individuals subject to the Rule. We also receive a fixed per-case rate to represent migrants in their removal cases, but this funding is limited to a small number of cases. Even now, the funding received per full removal case ($5,000 for released, $6,500 for detained) does not cover the true cost of a complex asylum case that requires extensive briefing, expert testimony, and multiple hearings to litigate eligibility issues. The Rule would make such cases even more challenging and labor-intensive.

19.     Al Otro Lado is in the final stages of establishing itself as a civil association in Mexico, and has expended significant resources and time to do so.  In Mexico, non-profit organizations' activities are strictly limited to those described in the organization's registration documents. Because of the Rule, we will have to redo all of our registration documents, as we necessarily will have to change what we are doing in Mexico if the United States is no longer offering asylum to migrants who pass through Mexico. We had not previously contemplated offering any direct services to migrants seeking protection in Mexico, and would need to expend resources to consult with our local counsel to determine whether it is a possibility and how we could move forward.

20.     If the government had provided an opportunity for notice and comment before promulgating the new Rule, Al Otro Lado would have submitted comments regarding why the Rule violates the Immigration and Nationality Act and is arbitrary and capricious.  Al Otro Lado also would have offered comments and evidence to show that the government's proffered reasons for promulgating the Rule are unlikely to be addressed by the Rule, and to show that the Rule is likely to result in significant harm to many migrants.

**Many Asylum Seekers Cannot Access Protection in Mexico or Guatemala**

21.     Individuals who arrive at the southern border seeking protection in the United States through the asylum process are fleeing some of the most dangerous countries in the world.

22.     For many who reach the United States after transiting through Guatemala and/or Mexico, remaining in those countries and pursuing asylum there is not an option.

23.   Many of Al Otro Lado's non-Mexican clients face discrimination and persecution in Mexico, as well as in other countries through which they transited.  For example, Hondurans face significant persecution in Mexico based on their nationality. Haitian and African migrants similarly face discrimination on the basis of national origin and race.  Lesbian, gay, bisexual, and transgender persons regularly are subject to discrimination and persecution in Guatemala and Mexico.

24.   Several people Al Otro Lado has served have suffered persecution or torture at the hands of Mexican officials, who turned them over to cartels, beat them, or extorted them.

25.   Al Otro Lado clients have been kidnapped, raped, assaulted, and murdered in Tijuana, which is one of the most dangerous cities in the world right now.  Migrants are particularly vulnerable to violence here.

26.   Central Americans fleeing gang violence will not be safe in Guatemala, as their persecutors are often able to find them there, given that travel between the Northern Triangle countries is virtually unrestricted and the reach of persecuting criminal networks is often transnational.

27.   Mexico's Commission for Refugee Assistance ("COMAR") is underfunded, understaffed, and overwhelmed.  Based on my experience, COMAR does not have sufficient resources to adequately process asylum seekers now, let alone additional asylum seekers forced to apply in Mexico because of the new Rule.  The asylum system in Mexico is far less well developed than the asylum system in the United States.  It is difficult to access and unpredictable in its processing.

28.    Because COMAR does not have any meaningful presence north of Mexico City, it is very difficult for anyone in northern Mexico to apply for asylum in Mexico.

29.    Asylum seekers in Mexico are also vulnerable to being forced to return to their home countries by Mexican authorities.  Mexican authorities have deported asylum seekers back to their home countries even as they wait on a list in one of the northern border cities to apply for asylum in the United States.  Mexican authorities have also forced or coerced asylum seekers returned to Mexico pursuant to the Migrant Protection Protocols to return to their home countries.

30.    Many asylum seekers must transit through a third country before reaching the United States because they lack the resources or ability to travel directly to the United States. For some, the danger they face in their home country compels them to leave without having had the time to gather the necessary resources to get a visa and secure a flight.  Other asylum seekers, particularly many Central Americans, do not have the financial means to travel to the United States except by land.  Some asylum seekers do not have passports and are unable to obtain them to fly directly to the United States, especially if they are fleeing imminent persecution from their own governments.

31.    Many of the asylum seekers Al Otro Lado serves have family and networks in the United States who can help them, but lack similar connections in Mexico.  Without such support, asylum seekers in Mexico may lack a safe place to stay and access to basic resources, like food and shelter.  Given these vulnerable conditions, Mexico is not a feasible alternative for many, especially those traveling with children.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

Erika Pinheiro
EXECUTED this 16th day of July 2019