**DECLARATION OF STEPHEN W. MANNING, EXECUTIVE DIRECTOR, INNOVATION LAW LAB**

I, Stephen W. Manning, declare as follows:

1. I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States. I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2. I am the Executive Director of the Innovation Law Lab ("Law Lab"), a nonprofit in Oregon that I founded to improve the legal rights of immigrants and refugees in the United States.

3. Law Lab has an office in Oakland, California, as well as in other locations around the United States.

4. In my role at the Law Lab, I led the organizing of the Artesia Pro Bono Project in 2014 and the Dilley Pro Bono Project in 2015, which are detention-based projects that provided universal representation to detained families in rapid removal proceedings. I designed the model for the Southeast Immigrant Freedom Initiative, an initiative of the Southern Poverty Law Center in collaboration with the Law Lab, to provide representation to adult noncitizens detained at immigration facilities in the Southeastern United States in 2017. I designed and direct the pro bono representation project called the Centers of Excellence, which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims. Through the Centers of Excellence, I direct representation projects in Georgia, Kansas, Missouri, North Carolina, and Oregon, with expansion underway to Texas, New

Mexico, and California. In Oregon, under my direction, approximately 125 pro bono lawyers have been trained on asylum and removal defense. I also designed and head coordination of the Equity Corps of Oregon, which is the region's first government-funded universal representation program. I designed and directed a program called BorderX that uses technology and collaboration tools to provide support to legal service providers at immigrant detention centers and, under a recent expansion, at the U.S.-Mexico border. I designed BorderX so that remote attorneys and advocates—that is, attorneys and advocates who are unable to physically enter a detention center because of its remoteness—can participate by telephone and through cloud-software to scale representation efficiently.

5. The Artesia Pro Bono Project provided representation to more than 700 women and children who were detained at the Artesia Family Residential Center in Artesia, New Mexico, including representation during the credible and reasonable fear screenings, applications for release, and merits adjudication on immigration relief. The Artesia Pro Bono Project lasted six months and ended when the detention center in Artesia was closed in December 2014.

6. The Dilley Pro Bono Project, which continues to operate at the South Texas Family Residential Center, has been representing noncitizen asylum seekers during proceedings since its inception in 2015. A related project operates at the Karnes Family Residential Center; together, both projects have represented over 100,000 individuals since their launch.

7. As part of designing and scaling representation projects at detention centers, I have relied on data acquired during the different representation phases of immigration proceedings to make estimates about when and how long attorneys and other legal workers must spend interviewing, conferring, and consulting with clients. My estimates form the basis of the

representational models, which have proven to be very successful when measured by client outcomes, with most individuals prevailing in seeking relief.

8. In 2015, I was awarded the AILA Founder Award as a person who had the most substantial impact on the field of immigration law or policy in relation to the Artesia Pro Bono Project and the Dilley Pro Bono Project. In 2017, I was named the most innovative lawyer in North America by *Financial Times* for my work in creating these immigrant and refugee representation detention-based projects.

9. Innovation Law Lab's work is centered on providing representation to asylum seekers. In 2018, we mobilized around the civil detention of 123 asylum-seeking immigrant men at the Federal Correctional Institution Sheridan, Oregon ("FCI Sheridan"). The Law Lab provided pro bono legal representation to every man in the Sheridan cohort who requested our representation. In collaboration with almost 200 legal advocates and community members, the Law Lab represented 80 men from 11 different countries. Every individual represented by the Law Lab was found to have a credible fear of persecution or torture; leading to, for most, the conclusion of expedited removal proceedings, the initiation of immigration judge § 240 proceedings, and eligibility for release from detention. All but three of our 80 clients were released from FCI Sheridan on bond or parole. Law Lab has continued to represent, or facilitate pro bono representation, on the merits in the cases that remain before the Portland Immigration Court.

10. Innovation Law Lab also has played a central role in the development and piloting of the Equity Corps, Oregon's first universal representation program, which launched on October 1, 2018. Innovation Law Lab coordinates and reviews all case intake and provides technical and strategic support to partner nonprofit immigration legal service providers who represent immigrants in removal proceedings before the Portland Immigration Court. The Equity Corps

recently received an additional two million dollars of funding that will enable expansion of services throughout the state of Oregon for a two-year period. The Equity Corps provides representation regardless of case type. A high number- likely close to 90 percent- of the Equity Corps's clients are people who are fleeing persecution, many of whom arrived to the United States recently. Every week we receive referrals and begin providing services to newly-arrived asylum seekers in the state of Oregon.

11. Innovation Law Lab has also recently increased its presence at sites on the U.S.-Mexico border. With partner organizations, we have developed, launched, and implemented a series of legal service workshops for persons fleeing persecution in Tijuana, Mexico. We continue to provide technical assistance, support, and on-the-ground staffing on a weekly basis. We are working to expand this model to serve asylum seekers in Ciudad Juarez, where workshops will begin later this year.

12. We are also a founding member of the El Paso Immigration Collaborative (EPIC), which is launching later this year to provide legal services and representation to all release-eligible asylum seekers detained at four detention centers in the El Paso jurisdiction. We have hired a new staff member who will manage the program and provide technical assistance and strategic support in requests for release from detention and representation on the merits.

13. Innovation Law Lab provides strategic support, limited legal assistance, and advocacy for cases of people fleeing persecution who were forcibly returned to Mexico under the "Migrant Protection Protocols" (MPP) program. Because Mexican nationals cannot be subject to MPP, all of the cases we support in this work are asylum cases where the applicant traveled or resided in a country other than their country of origin before seeking asylum in the United States.

14. With the exception of Mexican nationals, all of Law Lab's asylum-seeking clients have traveled through a country other than their country of origin on their way to the United States. A meaningful majority of the people we serve are nationals of the Northern Triangle countries of El Salvador, Honduras, and Guatemala; we also provide services to nationals of countries in Africa, South America, Asia, and Europe. By necessity, these persons who have fled persecution have traveled through at least one other country, if not several, in order to seek asylum in the United States. By statute, asylum can only be sought when physically present in the United States or arriving to the United States. Traveling directly to the United States would require travel documents, a valid visa, and funds to pay for air or sea travel; our indigent clients do not have access to any of these.

15. The majority of the asylum seekers served by Law Lab's programs also did not seek asylum in the countries through which they transited. Our recent work with asylum seekers subject to the MPP vividly illustrates why most asylum seekers are not safe in Mexico, Guatemala, or other countries through which they've traveled. Asylum seekers who remain in Mexico under MPP have suffered kidnapping, rape, and extortion; many are homeless and lack the opportunity to work to support themselves. The asylum systems in Mexico and Guatemala are not set up to fairly adjudicate asylum claims, and the countries' institutions are not sufficiently strong to provide protection from the harms that most asylum seekers are fleeing. Many of the persecutors of Law Lab's clients have transnational reach; gangs work across Central American borders, and persecutors can often travel freely to find their victims in Mexico or other Central American countries.

16. Because of the Law Lab's organizational focus on asylum seekers, and the high percentage of people we serve who have transited through a country other than their country of

nationality en route to the United States without seeking asylum in those countries, the new asylum rule will require us to divert our limited resources significantly. Though most of our programmatic work serves immigrants without eligibility restrictions based on case type, the vast majority of the people we serve in Georgia, Kansas, Missouri, North Carolina, Oregon, Texas, New Mexico, California, and at the U.S.-Mexico border are asylum seekers. In Georgia, Kansas, Oregon, and Tijuana, Mexico, we conduct and support legal services asylum workshops to assist people who have fled persecution in removal proceedings with legal advice, application preparation and filing. The new rule would make a high percentage of the asylum seekers we serve entirely ineligible for asylum because they traveled through a third country before reaching the United States without seeking asylum there. Implementation of the new rule would require us to rework the advice and guidance we provide in our legal services workshops and respond to a flood of inquiries and uncertainty from the immigrant communities we serve regarding the attempt to change asylum law.

17. Through the Centers of Excellence, Law Lab also places and mentors pro bono cases across the country. The new rule would make a significant percentage of our new pro bono cases a great deal more complicated and will require us to reevaluate relief eligibility in all of the cases that we screen and mentor. This will require, for each pro bono case, significant legal research and multiple strategy meetings with pro bono counsel. Additionally, if clients represented are only eligible for withholding of removal or Convention Against Torture relief, which have a higher standard of proof than asylum, do not allow for derivative applications, and are more time-consuming cases to handle, the Centers of Excellence may begin to lose more cases. We would then be forced to shift a significant portion of our resources towards mentoring pro bono attorneys on complicated appeals before the Board of Immigration Appeals and the circuit courts.

18. Our BorderX program, and the soon-to-be-launched EPIC program, will also suffer immediate and dramatic impacts from the new rule. BorderX builds better systems for advocates working in immigrant detention centers, and, as a part of its mission, coordinates effective release strategies for noncitizens in detention. Since the program's launch in October 2017, 100% of the noncitizens served have been asylum seekers, the majority of whom transited through a third country before arriving to the United States. BorderX's release strategy is, in many ways, dependent on a noncitizen's asylum eligibility, as release becomes possible only after passing a credible fear interview, which moves the asylum seeker out of expedited removal proceedings and into immigration judge § 240 or withholding proceedings. The new asylum rule, which would apply to credible fear screenings, would eliminate release eligibility for a significant percentage of clients of both BorderX and EPIC. Pivoting to determine advocacy strategies for this group will take a significant amount of resources, and will divert our attention from the noncitizen population that remains eligible for asylum under the new rule and who will still remain in desperate need of the support of BorderX and EPIC.

19. Thousands of individuals rely on Law Lab's systems. The new rule will require Law Lab to deploy expensive and limited engineering resources to recode its software to create new analytical modeling. Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country. The new rule will require Law Lab to substantially revise this material and create new learning engagements and materials. This endeavor would represent such a substantial burden that it could cause Law Lab to cease most of its pro bono activities.

20. Finally, Law Lab's work creating accountability within the immigration system will be significantly hindered due to the impact of the new rule. We are currently engaged in research and policy advocacy around improving due process and access to justice in the asylum process and removal proceedings. Given the centrality of the asylum process to our organizational work and mission, the new rule will force us to turn our attention from the many pressing issues we are currently investigating towards mitigating the effects of this new policy on our existing programs and clients.

21. In sum, every single one of the Law Lab's existing programs will be significantly affected, irrevocably damaged, and immediately diverted by the new rule.

22. Because of its significant impact on our organization as well as the impact it has on our clients and others seeking asylum, the Law Lab would have taken advantage of an opportunity to provide comments on a proposed rule. The Law Lab is committed to providing well-researched, data-driven public comment and legal analysis of regulations affecting our organization and our clients. For example, the Law Lab co-leads an initiative called Protect Oregon's Immigrant Families to respond to the proposed "public charge" regulation. The Law Lab provided comments on that proposed regulation, and supported individuals and organizations in submitting their own. Similarly, the Law Lab provided legal analysis and support to over 35 local organizations commenting on the proposed *Flores* rule. Law Lab staff filed their own comments and public opposition to the proposed *Flores* regulation changes with the Federal Register.

23. Had the opportunity been provided, the Law Lab would have used a similar data-driven, well-researched approach to explain why the new rule likely would not achieve the objectives it has set forth, as well as comment on the quality of the data proffered in support of the

new rule, and would harm the population Law Lab is dedicated to serving. Law Lab also would have included in its comments the many reasons why many asylum seekers must transit through third countries before reaching the United States and are unable to seek and receive protection in those countries.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 16th day of July, 2019.

_____
Stephen W. Manning, OSB #013373