# DECLARATION OF LISA FRYDMAN

I, Lisa Frydman, hereby declare as follows:

1. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order. If called as a witness, I could and would testify competently as follows.

**Professional Experience with Central American Children Seeking Asylum**

2. I am an attorney and have been, since 2017, Vice President for Regional Policy and Initiatives ("Regional Team") at Kids in Need of Defense ("KIND"), a nonprofit advocacy and legal services organization based in the United States. From 2015-2017 I served as KIND's Director for Regional Policy and Initiatives. In this capacity, I supervise KIND's Regional Team and regularly visit Honduras, Guatemala, and El Salvador (the "Northern Triangle" countries) and Mexico to carry out the organization's work described here.

3. KIND's Regional Team offers direct programming with children and adolescents in Central America (sometimes referred to herein as "the Region"). Currently, the Regional Team, through civil society partner organizations, provides reintegration support services for unaccompanied and separated children repatriating to Guatemala and Honduras, as well as sexual and gender-based violence prevention programming for children in certain high migration communities in Guatemala and Honduras. Through its Reintegration Program and other Regional programming and visits, KIND's Regional Team has communicated with approximately 350 Central American unaccompanied and children in the past year. From 2015-2017, the Regional Team provided support services to children in Honduras and El Salvador with pending cases for refugee resettlement in the United States under an in-country refugee processing and parole effort known as the Central American Minors ("CAM") Program. In 2018 the Regional Team,

1

through civil society partners, conducted a project in the Region to empower adolescent refugees and migrants, as well as internally displaced adolescents from El Salvador, Guatemala, and Honduras, to tell their stories related to immigration and internal displacement.

4. In addition to direct programming, the Regional Team engages in research and fact finding related to the root causes of child migration from Central America and develops recommendations on how to resolve the problems forcing children to leave their homes. In 2017, I coauthored and KIND published two reports focused on sexual and gender-based violence and children migration.[1] These reports were based on extensive interviews with unaccompanied children from Honduras, El Salvador, and Guatemala; with government agencies; and with civil society organizations. KIND's Regional Team regularly collects information regarding country conditions and the root causes of migration and uses this information to inform our plans for work in the region, to update KIND's Legal Services Team about developing trends in the region that may impact claims for immigration relief, and to inform advocacy.

5. The team, myself included, travels to the Region regularly to conduct fact finding, as well as to participate in training and capacity building sessions for government and civil society organizations; in regional conferences on child migration attended by civil society experts, international organizations involved in migration and refugee protection, and governments of the region; and in regional advocacy networks and forums. Since December

---

[1] Rachel Dotson and Lisa Frydman, Kids in Need of Defense, "Neither Security nor Justice: Sexual and Gender-based Violence and Gang Violence in El Salvador, Honduras, and Guatemala" (2017), at https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf; Rachel Dotson and Lisa Frydman, Kids in Need of Defense and CDH Fray Matías, "Childhood Cut Short: Sexual and Gender-based Violence Against Central American Migrant and Refugee Children" (June 2017), at https://supportkind.org/wp-content/uploads/2017/06/Childhood-Cut-Short-KIND-SGBV-Report_June2017.pdf.

2018, the Regional Team has traveled to Mexico nine times to engage in fact finding and to participate in human rights monitoring along the northern and southern borders of Mexico, to provide training, and to meet with government agencies and civil society organizations with expertise in children's rights, migrants' rights, and refugee protection.

6. The statements in this Declaration are based on (1) conversations with civil society organizations in Honduras, El Salvador, Guatemala and Mexico working directly with children and youth, (2) interviews with government agencies in the Region, (3) participation in fact finding trips and/or supervision of Regional Team staff participating in fact finding trips, (4) conversations with unaccompanied children in Tijuana, Mexico, (5) conversations with repatriated unaccompanied children and/or their parents, (6) conversations with children who had pending claims in the CAM program, including current cases with pending Requests for Review, (7) extensive tracking of news articles from the Region and extensive research into country conditions throughout the Region, and (8) calls for help from unaccompanied children and/or their family members during migration, or from civil society organizations providing support to unaccompanied children.

**Causes of Child Migration from Central America**

7. In KIND's research into the root causes of child migration from Central America we have found that violence, in combination with impunity and a failure of protection in the children's home countries, causes children to flee their homes and seek safety in the United States. The main forms of violence that we have found unaccompanied children from the Northern Triangle seek to escape are violence inflicted by criminal gangs or other organized crime, for example by drug cartels; sexual and gender-based violence, including violence and

3

extreme discrimination based on sexual orientation and/or gender identity; and child abuse. KIND has found through its research that lesbian, gay, bisexual, transgender, and intersex (LGBTI) children and youth also face very high level of sexual and gender-based violence in the Northern Triangle; human trafficking of children is also common there. Children are trafficked from rural to urban areas and across borders or to border areas, where they are sexually exploited or subject to exploitative labor, in many cases in agricultural or domestic work. Femicide, or the gender-motivated killing of women and girls, is pervasive in the Northern Triangle countries, and Honduras, El Salvador, and Guatemala are among the ten countries with the highest homicide rates globally.[2]

8. Based on our interviews and research, KIND has found that children targeted by gangs and cartels, LGBTI children, and children targeted for other sexual and gender-based violence cannot rely on the governments of Honduras, El Salvador, or Guatemala to protect them, and that children from these countries accordingly have no faith in their governments' ability to protect them. As a result, violence against children is highly underreported in each of these countries, and even those crimes that do get reported rarely result in justice. In the vast majority of cases the perpetrator is never punished. Over 90% of homicide cases in the Northern Triangle end in impunity, and in cases involving sexual and gender-based violence the impunity rate is even higher—at 95%. LGBTI rights organizations in the Region have informed KIND that law enforcement officers sometimes target LGBTI individuals precisely when they come in to report violence.

---

[2] This understanding is informed by the United Nations Office on Drugs and Crime (UNODC), *Global Study on Homicide* (2019), at https://www.unodc.org/unodc/en/data-and-analysis/global-study-on-homicide.html.

9. Closely related to impunity is also the significant problem of corruption in the region. Corruption is well documented, but KIND's Regional Team has also been told in particular by women's rights organizations of numerous cases involving domestic violence or sexual violence perpetrated by a male involved in organized crime who was able to "buy off" law enforcement. We have heard examples of police officers as well as judges being bought off. I personally have spoken with numerous women who fled abusive domestic partners in Central America whose partners had either money or family connections that protected them from prosecution. Severely repressive measures by state security forces, including military police, army, and other security forces in the region have frequently targeted adolescent boys from neighborhoods under control of organized crime. Extrajudicial killings of youth by security forces in Honduras and El Salvador have been well-documented, but other measures including mass arrests or threats against the young males of a particular neighborhood erodes public trust in law enforcement or security forces in the region. Experts at the Salvadoran Women's Organization for Peace (ORMUSA), for example, have explained to KIND that one reason girls who are victims of sexual and gender-based violence in El Salvador underreport is their worry that contacting the police or other law enforcement could lead to broad scale repression or violence against all of the young males in the neighborhood, i.e. including against their brothers and other male family members.

10. In addition to impunity, corruption, and repression, children from the Northern Triangle in need of protection cannot rely on the child welfare system for help. Child welfare agencies throughout the region are underfunded, highly centralized (meaning no shelters outside of the capital city), and weak, and often have inappropriate conditions for children. For example, in March 2017 a fire broke out at a Guatemalan shelter for abused, abandoned, and neglected

children that led to the death of 40 teenagers. Following the incident numerous media articles came out detailing accounts of physical, psychological, and sexual abuse of children in the shelter that had never been investigated despite repeated complaints by children. When conducting research for one of the reports referenced in footnote 1 above, KIND's Regional Team heard from child welfare officials in the Northern Triangle countries they could not take children fleeing gang violence into shelters because they could not protect those children.

11. Based on KIND's research we found that sexual violence perpetrated by gangs is one of the most common forms of violence that migrant children face. Gangs now dominate much of the urban areas of Guatemala, El Salvador, and Honduras, and their control has increasingly spread to rural areas as well. Where gangs dominate, women and girls are in constant danger of being targeted for sexual violence. Gangs use rape and the threat of rape as a tactic of control in the areas where they operate. Girls are also targeted for forced sexual relationships with gang members and those who resist these advances face violence or even death. Boys and increasingly girls are forcibly recruited by gangs and once invited to join a gang, those who resist face threats, torture, and ultimately death. Civil society organizations working directly with children and families living in gang-controlled areas in Honduras, El Salvador, and Guatemala told KIND's Regional Team that when victims attempt to escape by relocating within their countries gangs often track them down and ruthlessly punish them.

**Common Risks and Inadequate Institutions Preclude Children from Obtaining Protection in Another Northern Triangle Country**

12. From the conversations KIND's Regional Team has had with repatriated unaccompanied children in Guatemala and Honduras, and from our project working with Central

American children to document their migration related stories, it is clear to me that children from the Northern Triangle who are seeking protection from violence do not believe that a different Northern Triangle country would be able to provide more protection than their own country, and the data proves them right. The problems of sexual and gender-based violence, forced gang recruitment, cartel violence, violence against LGBTI children and youth, and human trafficking exist throughout the Northern Triangle of Central America, as do the staggering rates of impunity and the weak child welfare systems mentioned above. Consequently, a teenager seeking to escape threats from a drug cartel in El Salvador, for example, would not be safe and would not feel safe to seek asylum in Honduras or Guatemala. An LGBTI teenager escaping persecution in Honduras would be no safer in Guatemala or El Salvador, and vice versa, as LGBTI individuals from the Northern Triangle are at risk of suffering violence at the hands of private actors, as well as the state.

13. Experts on organized crime in the region have repeatedly told us that gangs and cartels have region-wide reach and can locate individuals throughout the region. Thus, fleeing a gang in El Salvador or Honduras means one is also unsafe in Guatemala.

14. Guatemala's asylum system is brand new and is barely functioning. In May 2017, Guatemala's new migration code went into effect, with provisions for Guatemala's asylum system. The law, however, requires implementing regulations that were only issued in April 2019 and which have not yet been made public. In the past two years Guatemala has received about 350 applications for asylum and has only decided 20-30 of these cases. Immigration-focused organizations in Guatemala have informed KIND's Regional Team that between March 2018 and May 2019, Guatemala decided zero asylum cases and that the country only has three officers to interview asylum seekers.

15. More generally, children traveling alone, without the protection of a parent or legal guardian, face significant difficulty in understanding the complex immigration laws and procedures in the countries they are transiting, even if those procedures are more effective than those of the Northern Triangle countries or Mexico.

**Risks to Unaccompanied Children in Mexico**

16. I believe based on KIND Regional's research, numerous trips to Mexico, and interviews with unaccompanied children and with civil society organizations in Mexico, that unaccompanied children face significant risk of suffering harm in Mexico. Mexican crime data is to the same effect: Migrants and refugees are targets of violence in Mexico. Children in particular are at risk of robbery, sexual violence, kidnapping, falling prey to human traffickers, and femicide, as well as extortion, threats, and sexual violence, and the overwhelming majority these crimes result in impunity. Violence against LGBTI individuals and violence against women are also pervasive problems in Mexico, often making unaccompanied children fleeing these forms of harm no safer there than in Central America. While in Mexico in February 2019, KIND met a Honduran teenager who, fleeing abuse in his own country, had been kidnapped and tortured in Mexico, and forced to watch as two of his friends—also unaccompanied children—were murdered. There have also been documented cases in which police, military, and other Mexican government officials have been directly and indirectly involved in violence against migrants and refugees, including kidnapping and extortion. These incidents increase migrants' mistrust of authorities in Mexico and their feeling of insecurity there, and they especially increase children's fear and mistrust.

17. Mexico's proximity to the Northern Triangle countries from which many children have fled—and the presence of the same, and related, gangs and other organized criminal groups

in Mexico—expose children to risk of being located and targeted by their persecutors. I recently spoke with a young man from El Salvador who fled gang violence there only to be beaten while in immigration custody in Mexico. He noted the presence of gang members in immigration custody and how terrified he felt the entire time he was in detention in Mexico. He decided he would be safer going back to El Salvador and trying again to reach the United States rather than remaining in custody in Mexico, where he felt he had no protection and where officials did not care if he was safe. During a visit to Mexico's northern border in March 2019, a human rights organization that assists migrants and refugees told me of a case involving a teenager from El Salvador who had fled violence and death threats by organized crime and had been placed in the custody of Mexico's child protection agency (Sistema Nacional para el Desarollo Integral de la Familia, known as "DIF"), and for whom DIF had determined that the child could not safely remain in Mexico because his persecutors were pursuing him there.

18. In Tijuana, Mexico in February 2019, a civil society shelter that cares for unaccompanied children asked KIND to meet with a Central American teenage girl who had become increasingly anxious upon learning that her persecutor, a gang member, had tracked her down and was making his way to Mexico to find her. The organization Human Rights Center of Fray Matias de Córdoba (Centro de Derechos Humanos Fray Matías de Córdoba, "Fray Matías"), based in Tapachula, Mexico, conducts monitoring of unaccompanied children in DIF shelters there and has engaged in monitoring in of children detained in centers run by Mexico's immigration agency (Instituto Nacional de Migración, or "INM") in the past. Fray Matías also provides legal representation to migrants, including families and children in Tapachula, Mexico. Fray Matías staff have told KIND during more than one visit to Tapachula that they are aware of

cases in which unaccompanied children detained in Tapachula are terrified because they have been threatened by gang members who are held in the same INM detention center or DIF shelter.

### **Mexico Does Not Provide Meaningful Access to Asylum or Protection to Unaccompanied Children**

19. For the past three years KIND has been observing and researching Mexico's asylum system and the availability of international protection for unaccompanied children in Mexico. We have conducted interviews with child protection officials, with Mexico's refugee agency (Comisión Mexicana de Ayuda a Refugiados, or "COMAR"), children's rights organizations, immigrant and refugee rights organizations, immigrants and refugees, and international organizations.

20. It is my belief that while COMAR has made some important progress, Mexico has a long way to go to provide meaningful protection, particularly when it comes to unaccompanied children. Despite Mexican law prohibiting the detention of children for migration control purposes, many children continue to be detained by INM. Conditions in INM detention centers have been widely reported to be harmful to children and in violation of international law. They include overcrowding, unhygienic conditions, mixing of unaccompanied children with unrelated adults, lack of education and recreation, and the use of isolation cells as punishment for misbehavior. Even children placed in DIF (child welfare) shelters endure inappropriate conditions for long term care of children. These conditions deter children from seeking asylum in Mexico. Unaccompanied children have confided this directly to KIND, and repeatedly have told this to Fray Matías staff. During a trip to Mexico in February 2019, unaccompanied teenage girls

told KIND that they had previously been in Mexico in DIF custody and that they had been treated so terribly that they did not apply for asylum in Mexico.

21. Mexico's child protection officers (OPIs), charged with identifying international protection needs and protecting children in custody, work for INM—the very agency detaining and seeking to deport them. This is an inherent conflict of interest, and very different from the system Congress created for protecting unaccompanied children under U.S. law. OPIs and officials from Mexico's child welfare agency, DIF, fail to inform children of their right to seek asylum and to identify children with protection needs in some cases; in others they fail to provide children with child-appropriate or clear information about the right to seek asylum. Officials frequently discourage children from seeking asylum, warning that they will face long-term detention if they do. Children are also often told that even if they are granted asylum, they will be institutionalized until their 18th birthday, dissuading them from seeking asylum.

22. Unaccompanied children who do seek asylum in Mexico face significant barriers to protection. Mexico's child protection law provides for representation of migrant children by the Child Protection Authority (Procuraduría de Derechos de Niños, Niñas, y Adolescentes), the agency within the child protection system that is charged with determining children's best interests and guaranteeing their rights[3]; in reality, however, attorneys of the Child Protection Authority offices lack capacity to represent them and rarely represent them during asylum interviews with COMAR or seek other immigration relief for them. Civil society organizations in Mexico cannot provide legal consultation or representation to the vast majority of unaccompanied children in custody because Mexico limits the access that attorneys from civil

---

[3] In Mexico, DIF provides services such as shelter to children in the child protection system, while the Child Protection Authority is responsible for providing legal representation to children in the system and for protecting their rights.

society organizations have to children in INM and DIF facilities, and because a number of the Child Protection Authority offices refuse to permit these organizations to represent children. KIND recently documented discriminatory attitudes against unaccompanied children on the part of staff from the Child Protection Authority in Tapachula, (the office that sees the highest number of unaccompanied children) who described "all" Honduran youth as "aggressive."

23. Although COMAR has had a nearly 200% increase in the filing of asylum applications in 2019, the agency has not grown to meet the need or number of claims being filed. Rather than increase COMAR's budget to grow the agency and meet the need, Mexico actually reduced the agency's budget by 20 percent. COMAR currently has only 4 offices and fewer than 30 Asylum Officers in the entire country that are qualified to interview and adjudicate asylum cases. Only 5-6 of these officers interview children seeking asylum. During a May 2019 trip, KIND's Regional Team documented that the COMAR office in Tapachula—the COMAR office that receives the highest number of claims—was completely overwhelmed by cases and lacked the staffing and resources needed to meet the demand. The Director of the office explained that staff had to use their own personal money to pay for gas needed to conduct their work. During this visit KIND observed about 100 families and unaccompanied children camping out on the street outside of COMAR's Tapachula office, exposing themselves to danger, in the hope that COMAR would receive them the next day.

24. Mexico deports unaccompanied children to danger, in many cases in violation of Mexico's own child protection laws. Mexico's general children's law and migration law require consideration of the best interests of the child in all proceedings affecting them, and require best interests determinations (BIDs) prior to the deportation of a child. BIDs, which Mexico began in 2016, are conducted on a very limited basis due to lack of resources, capacity, and in some cases,

will by Child Protection Authority offices. Very few children have BIDs prior to deportation decisions, and in some cases, children have been deported during the BID process.

**The U.S. Protection System Is Designed To Care for Unaccompanied Children Who Transit Mexico**

25.     Many unaccompanied children from the Northern Triangle have a close family member living in the United States, including a parent or stepparent, grandparent, aunt or uncle, or adult sibling. Even if children with close family in the United States could reasonably access protection in Mexico or in Guatemala, they often long to receive the love and support of a family member. If they were able to receive asylum in Mexico or in Guatemala they would face long term institutionalization, rather than the ability to reunify with close family as they seek protection.

26.     Congress has recognized that unaccompanied children are an especially vulnerable population and have extended extra procedural protections in U.S. immigration law to ensure they have safety from persecution, human trafficking, and *refoulment* (return to the country where they were persecuted). In 2008, Congress unanimously passed the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) to create critical protective measures for these unaccompanied children.[4] The protections include referral to the Department of Health and Human Services' Office of Refugee Resettlement (ORR), which provides care and custody for unaccompanied children and in whose care children can be screened by child welfare professionals and legal professionals for any protection needs or particular vulnerabilities. These provisions reflect Congress' recognition of the difficulties

---

[4] Pub. L. 110-457, 122 Stat. 5044, *codified in part at* 8 U.S.C. §§ 1158, 1232.

13

children might face in understanding their rights or the legal procedures governing their cases without a government funded attorney to assist them while in CBP custody. Once in ORR custody, children receive legal orientation presentations, legal screenings, and in some cases, an appointed child advocate to help them navigate a complex system, remain safe from exploitation in the process, and safeguard their best interests.

27. The TVPRA also ensures that children will not be subjected to expedited removal by directing their placement in full immigration proceedings under Section 240 of the INA. 8 U.S.C. 1232(a)(5)(D). These provisions recognize the difficulty of ascertaining the full scope of a child's situation and needs in an expedited manner at the border and through a cursory interview by a CBP officer. As such, children are afforded the ability to tell their story and have their case heard before a trained adjudicator—an immigration judge—rather than having to make their case before a CBP agent shortly after apprehension.

28. The TVPRA also explicitly exempts unaccompanied children from the safe third country bar to asylum (8 U.S.C. §1158(a)(2)(E)) in further recognition that children traveling alone would have no one to explain complex international agreements governing immigration and international protection, and the risks of foreclosing access to protection under such circumstances. These concerns are echoed in the TVPRA's provisions on the safe repatriation and reintegration of unaccompanied children, which provide further evidence of congressional intent to ensure heightened protections for unaccompanied children to ensure they are not returned to harm. Among other requirements, these provisions direct the Secretary of Homeland Security to "consult the Department of State's Country Reports on Human Rights Practices and the Trafficking in Persons Report in assessing whether to repatriate an unaccompanied alien child to a particular country." 8 USC § 1232(a)(5)(B).

29. Finally, while TVPRA broadly limits the ability of the government to directly return unaccompanied children to their home countries, Congress did allow more direct procedures for immediate repatriation of some children from "contiguous countries"—Mexico and Canada (8 U.S.C. § 1232(a)(2)). In differentiating so sharply between children from contiguous and non-contiguous countries, Congress acted with clear recognition that children with fear of return would transit the southern border with Mexico and need to be processed for protection. It then provided the range of procedural protections for those children noted above. These TVPRA protections provide unaccompanied children who transit Mexico, reach our southern border, and seek protection substantially more safety than do the limited protection systems in Mexico, Guatemala, and other possible transit countries. Barring such children from accessing the TVPRA protections would deprive them of the only meaningful protection system that is available to them.

30. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed: July 16, 2019

Lisa Frydman