# DECLARATION OF PROFESSORS DEBORAH ANKER, HARVARD LAW SCHOOL, AND JAMES C. HATHAWAY, UNIVERSITY OF MICHIGAN LAW SCHOOL

We, James C. Hathaway and Deborah Anker, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746:

1. We make this declaration based on our expert professional knowledge. If called as witnesses, we would testify competently and truthfully to these matters.

2. James C. Hathaway has been engaged in research, scholarship and teaching of international and comparative refugee law for more than thirty-five years. He is presently the James E. and Sarah A. Degan Professor of Law at the University of Michigan, where he serves as Director of the Program in Refugee and Asylum Law. He is also Distinguished Visiting Professor of International Refugee Law at the University of Amsterdam. He regularly provides training on refugee law to academic, nongovernmental, and official audiences around the world. He is the author of two leading treatises on international refugee law, *The Rights of Refugees under International Law* (2005) and *The Law of Refugee Status* (2nd edition 2014, with Michelle Foster). His work has been cited by leading courts around the world, including the British House of Lords and Supreme Court, the High Court of Australia, and the Supreme Court of Canada.

3. Deborah Anker has been engaged in the practice, research, scholarship and teaching of U.S. asylum and refugee law for more than thirty years. She is Clinical Professor of Law and Founder and Director of the Harvard Law School Immigration and Refugee Clinical Program. She is the author of a leading treatise, *Law of Asylum in the United States* (2016), as well as numerous law review articles and amicus curiae briefs. Her work has been cited frequently by international and domestic courts and tribunals,

including the U.S. Supreme Court.

4. The principal international agreement governing States' legal obligations to protect refugees is the 1951 United Nations Convention relating to the Status of Refugees ("Refugee Convention"). The mandatory scope of the Refugee Convention was originally limited to persons fleeing events in Europe prior to January 1, 1951.

5. A State may accede to the Refugee Convention by depositing an instrument of accession with the United Nations Secretary-General. The instrument must be signed by the Foreign Minister or the Head of State or Government.

6. Most States accede simultaneously to both the Refugee Convention and the 1967 United Nations Protocol relating to the Status of Refugees ("1967 Protocol"), which prospectively removed the temporal and geographic restrictions in the Refugee Convention.

7. A State Party's accession to the Refugee Convention and/or the 1967 Protocol does not require it to submit to any meaningful international procedure to ensure that its obligations are in fact discharged. Article 38 of the Refugee Convention permits a State Party to refer a dispute with another State Party regarding interpretation or application of the Refugee Convention to the International Court of Justice, but no country has ever done so. Similarly, while under Article 35, the Office of the United Nations High Commissioner for Refugees ("UNHCR") has the "duty of supervising the application of the provisions of the Convention," UNHCR has no authority to define a breach of international refugee law, to order a State Party to change its practice, or to expel a signatory.

8. The Refugee Convention neither permits nor prohibits State Parties from sharing protective responsibility for refugees among themselves through bilateral or multilateral agreements. However, the prerogative of State Parties to share protective

responsibility may not be pursued at the cost of depriving refugees of their rights under the Refugee Convention.

9. Article 33 of the Refugee Convention provides:

> No Contracting State shall expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

10. According to the principle of *non-refoulement*, State Parties are prohibited from removing a refugee – that is, a person who faces a real chance or a reasonable possibility of being persecuted in his or her country to his or her country of origin. Because *refoulement* is prohibited in "any manner whatsoever," a State Party is bound to refrain not only from the direct removal of a refugee to a place in which the risk of being persecuted exists, but also to any country from which there is a foreseeable risk of a chain of transfers that would ultimately expose the refugee to the risk of being persecuted (indirect *refoulement*).

11. In order to know whether a State Party to the Refugee Convention and/or 1967 Protocol is in compliance with its obligations, a review of the country's actual practices on the ground is required. Moreover, because a given State may offer meaningful protection to some but not all categories of refugees, a particularized and claimant-specific (rather than generic) assessment of compliance with duties under international refugee law is required.

12. The interim final rule proposed by the Department of Justice and the Department of Homeland Security ("Rule") will effectively deprive many asylum seekers from Central America and elsewhere of access to asylum under U.S. law. If such individuals are unable to meet the higher standard under U.S. law for withholding of removal or relief under the Convention Against Torture, they could be deported to their home countries, in violation of the United States' *non-refoulement* obligations under Article 33 of the Refugee Convention.

14.     It is also noteworthy that the rule seems not to require that a transit country be a party to each of the 1951 Refugee Convention, 1967 Protocol, and the Convention Against Torture for the asylum seeker to be deemed ineligible for asylum in the United States.  Rather, it applies even if the transit country has signed only one of those three treaties.  An individual thus will be denied asylum for transiting through a country that signed the Convention Against Torture but not the 1951 Refugee Convention without applying for protection, even if the individual had a claim for asylum but not relief under the Convention Against Torture.

We hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of our knowledge.

*/s/ James Hathaway*                                      */s/ Deborah Anker*

_____          _____
James C. Hathaway                                          Deborah Anker

EXECUTED this 16th day of July 2019