JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

_____
East Bay Sanctuary Covenant, *et al.*,

       Plaintiffs,

v.

William Barr, *et al.*,

       Defendants.
_____

Civil Action No. 1:19-cv-04073-JST

## TABLE OF CONTENTS

INTRODUCTION.....................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND ...................................................................4

ARGUMENT...........................................................................................................................7

I.    The Government is Likely to Succeed on the Merits ...................................................8

      A.    The Rule Is Consistent With The INA ................................................................8

      B.    The Rule Satisfies the APA's Procedural Requirements ...................................15

      C.    The Rule Is Not Arbitrary and Capricious ........................................................19

II.   The Other TRO Factors Foreclose Issuing a TRO ...................................................23

III.  Any Interim Relief Must Be Sharply Limited ..........................................................24

CONCLUSION .....................................................................................................................25

CERTIFICATE OF SERVICE ..............................................................................................27

# TABLE OF AUTHORITIES

## CASE LAW

*Adams v. Vance,*
  570 F.2d 950 (D.C. Cir. 1978) ................................................................. 24

*Am. Ass'n for Homecare v. Leavitt,*
  2008 WL 2580217 (D.D.C. June 30, 2008) ............................................. 23

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
  751 F.2d 1239 (Fed. Cir. 1985) ......................................................... 17, 18

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) .............................................................................. 23

*Andriasian v. INS,*
  180 F.3d 1033 (9th Cir. 1999) ............................................................... 10

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ............................................................................... 8

*California Hosp. Ass'n v. Maxwell-Jolly,*
  2011 WL 464008 (E.D. Cal. Feb. 4, 2011) ............................................. 24

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ................................................................. 24

*Capital Area Immigrants' Rights Coalition v. Trump,*
  (D.D.C. filed Jul. 16, 2019) ................................................................... 25

*Caribbean Marine Servs. Co. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) ................................................................. 23

*Choeum v. INS,*
  129 F.3d 29 (1st Cir. 1997) ................................................................... 14

*City and Cty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................... 24

*City of Los Angeles v. Barr,*
  --- F.3d --- (9th Cir. July 12, 2019) 2019 WL 3049129, .................... 20, 22

*Clarke v. Sec. Indus. Ass'n,*
  479 U.S. 388 (1987) ............................................................................... 8

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ...........................................................................................22

*East Bay Sanctuary Covenant v. Trump,*
  909 F.3d 1219 (9th Cir. 2018) ..................................................................*passim*

*East Bay Sanctuary Covenant v. Trump,*
  354 F. Supp. 3d 1115 (N.D. Cal. 2018) ...................................... 3, 15, 16, 24

*Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.,*
  858 F. Supp. 2d 1 (D.D.C. 2012).............................................................23

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985).................................................................................17

*Fook Hong Mak v. INS,*
  435 F.2d 728 (2d Cir. 1970) ......................................................................9

*Gill v. U.S. Dep't of Justice,*
  913 F.3d 1179 (9th Cir. 2019) ...............................................................19

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ............................................................................24

*Hawaii Helicopter Operators Ass'n v. FAA,*
  51 F.3d 212 (9th Cir. 1995) .....................................................................15

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010)......................................................................................16

*Inland Empire Pub. Lands Council v. Schultz,*
  992 F.2d 977 (9th Cir. 1993) ...................................................................19

*Innovation Law Lab v. McAleenan,*
  924 F.3d 503 (9th Cir. 2019) ...................................................................24

*INS v. Aguirre-Aguirre,*
  526 U.S. 415 (1999)....................................................................................8

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987)..................................................................................11

*J.E.F.M. v. Lynch,*
  837 F.3d 1026 (9th Cir. 2016) ...................................................................8

*Khan v. Holder*,
  584 F.3d 773 (9th Cir. 2009) ...................................................................................11

*Komarenko v. I.N.S.*
  35 F.3d 436 (9th Cir. 1994) .....................................................................................14

*L.A. Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ...................................................................................24

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) .................................................................................23

*Landon v. Plasencia*,
  459 U.S. 21 (1982)...................................................................................................23

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973)...................................................................................................7

*Lopez v. Davis*,
  531 U.S. 230 (2001)...................................................................................................9

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994).................................................................................................24

*Maharaj v. Gonzales*,
  450 F.3d 961 (9th Cir. 2006) ...................................................................................10

*Melkonian v. Aschroft*,
  320 F.3d 1061 (9th Cir. 2003) .................................................................................10

*Mobil Oil Corp. v. Dep't of Energy*,
  728 F.2d 1477 (TECA 1983) ...................................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................................19

*Nijjar v. Holder*,
  689 F.3d 1077 (9th Cir. 2012) .................................................................................14

*R-S-C- v. Sessions*,
  869 F.3d 1176 (10th Cir. 2017) ..........................................................................13, 14

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ....................................................................................18

*Sacora v. Thomas*,
    628 F.3d 1059 (9th Cir. 2010) ................................................................. 19, 22

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................7

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) .............................................................................................7

*Tchitchui v. Holder*,
    657 F.3d 132 (2d Cir. 2011) ........................................................... 20, 22, 23

*Trump v. Hawaii*,
    138 S. Ct. 2425 (2018) ......................................................................................25

*United States v. Malenge*,
    294 F. App'x 642 (2d Cir. 2008) ....................................................................12

*United States v. Mendoza*,
    464 U.S. 154, (1984) .........................................................................................25

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..........................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 20 (2008) .............................................................................................25

*Yang v. INS*,
    79 F.3d 936  (9th Cir. 1996) ............................................................................14

*Yassini v. Crosland*,
    618 F.2d 1356 (9th Cir. 1980) .......................................................... 17, 18, 19

**ADMINISTRATIVE DECISIONS**

*Matter of B–R–*,
    26 I&N Dec. 119 (BIA 2013) ...........................................................................10

*Matter of Pula*,
    19 I&N Dec. 467 (BIA 1987) ........................................................ 9, 12, 14, 21

**FEDERAL STATUTES**

5 U.S.C. § 553(a)(1) ................................................................................... 3, 15, 18

5 U.S.C. § 553(b) ............................................................................................... 3, 6

5 U.S.C. § 553(b)(B) ................................................................................................ 3, 15

5 U.S.C. § 553(c) ............................................................................................................. 6

5 U.S.C. § 553(d) ............................................................................................................ 6

5 U.S.C. § 553(d)(3) .................................................................................................. 3, 15

5 U.S.C. § 701(a)(1) ....................................................................................................... 8

5 U.S.C. § 706 ................................................................................................................. 6

5 U.S.C. § 706(2)(A) ...................................................................................................... 6

8 U.S.C. § 1101(a)(42) ................................................................................................... 4

8 U.S.C. § 1158 .............................................................................................. 4, 6, 8, 13

8 U.S.C. § 1158(a)(1) .............................................................................................. 2, 4, 6

8 U.S.C. § 1158(a)(2) ...................................................................................................... 6

8 U.S.C. § 1158(a)(2)(A) ............................................................................... 11, 14, 21, 23

8 U.S.C. § 1158(a)(3) ...................................................................................................... 6

8 U.S.C. § 1158(b)(1)(A) ......................................................................................... 2, 4, 8

8 U.S.C. § 1158(b)(2) ...................................................................................................... 4

8 U.S.C. § 1158(b)(2)(A) ................................................................................................ 8

8 U.S.C. § 1158(b)(2)(A)(iv) ...................................................................................... 6, 9

8 U.S.C. § 1158(b)(2)(A)(vi) .................................................................................... 14, 21

8 U.S.C. § 1158(b)(2)(C) ................................................................................... 2, 4, 5, 8, 9

8 U.S.C. § 1158(d)(5)(B) ................................................................................................ 5

8 U.S.C. § 1225 ............................................................................................................... 4

8 U.S.C. § 1225(b) ...................................................................................................... 4, 6

8 U.S.C. § 1231(b)(3)(A) .......................................................................................... 5, 11

8 U.S.C. § 1252 .................................................................................................8

8 U.S.C. § 1252(a)(5) ........................................................................................8

8 U.S.C. § 1252(b)(9) ........................................................................................8

8 U.S.C. § 1252(e)(1) .......................................................................................24

8 U.S.C. § 1252(e)(3) .......................................................................................24

8 U.S.C. § 1329 .................................................................................................8

## FEDERAL REGULATIONS

8 C.F.R. § 208.15 .............................................................................................10

8 C.F.R. § 208.30(e)(5) ......................................................................................5

8 C.F.R. § 1208.16(c) .........................................................................................5

8 C.F.R. §§ 1208.16(c)-1208.18 .......................................................................11

## FEDERAL REGISTER

69 Fed. Reg. 69,480 .........................................................................................13

84 Fed. Reg. 33,384 ...........................................................................................1

84 Fed. Reg. 33,829 ...........................................................................................1

84 Fed. Reg. 33,830 ......................................................................................5, 14

84 Fed. Reg. 33,831 .....................................................................................*passim*

84 Fed. Reg. 33,833 ...........................................................................................4

84 Fed. Reg. 33,834 ....................................................................................12, 23

84 Fed. Reg. 33,837 ...........................................................................................4

84 Fed. Reg. 33,838 ......................................................................................1, 11

84 Fed. Reg. 33,839 ...........................................................................8, 15, 21, 22

84 Fed. Reg. 33,841 .................................................................................. 3, 15, 17

84 Fed. Reg. 33,842 .................................................................................. 3, 19

**INTRODUCTION**

This case arises from a few special-interest groups' efforts to halt on a nationwide basis an important, timely, and well-supported interim final rule promulgated jointly by the Departments of Justice and Homeland Security to address the urgent, ongoing crisis on the United States' southern border. *See* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019). During the first eight months of FY2019 the Department of Homeland Security (DHS) has apprehended an astonishing 524,446 non-Mexican border-crossers—nearly double from the prior two years combined. *Id.* at 33,838; *see* AR21, 208-10, 222-30. Based on historical trends, many of these aliens will claim a fear of persecution, secure release into our country, and then never apply for asylum, never show up for their asylum hearings, or ultimately have their asylum claims rejected as meritless. 84 Fed. Reg. at 33,839-41; *see* AR21-22, 45, 192, 558-59, 664, 770.

Faced with this overwhelming crush on our asylum system—and amidst ongoing diplomatic discussions with the governments of Mexico, El Salvador, Guatemala, and Honduras, 84 Fed. Reg. at 33,831, 33,842; AR537, 635-37—the Departments issued a rule that renders ineligible for asylum an alien who enters or attempts to enter the United States' southern border after failing to apply for protection from persecution or torture while in a third country through which the alien transited en route to the United States. *See* 84 Fed. Reg. at 33,838. The rule thus addresses the problems presented by the many aliens who have no bona fide asylum claim "by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity," raising "questions about the validity and urgency of the alien's claim." *Id.* at 33,839. The rule encourages aliens to apply for protection in other countries that they enter before proceeding to the United States, aids ongoing negotiations with Mexico and other countries on deterring mass migration to the United States, and promotes asylum's purpose of helping desperate refugees who reach our shores with truly nowhere else to turn. Importantly, aliens subject to the rule's eligibility bar can still seek protection from removal, so they will not be sent back to countries where they are more likely than not to face persecution or torture.

Despite the Executive Branch's established authority and sound policy aims, Plaintiffs—a

1  collection of organizations who are on standby to assault whatever significant asylum initiative

2  that the Executive Branch may pursue—ask this Court to issue immediate nationwide relief halting

3  this rule.  This Court should deny Plaintiffs' extraordinary request.

4        Plaintiffs' claims lack merit.  *First*, Plaintiffs contend that the new rule violates the

5  Administrative Procedure Act (APA) because it is inconsistent with 8 U.S.C. § 1158(a)(1),

6  (a)(2)(A), and (b)(2)(A)(vi), which, respectively, permit aliens to apply for asylum, bar an asylum

7  applications if (among other things) the alien may be removed under a bilateral or multilateral

8  agreement, and render ineligible for asylum aliens who firmly resettled in another country before

9  arriving in the United States.  TRO Br. ("Br.") 6-14.  But section 1158 squarely authorizes the

10  Departments to issue the rule here, and the rule is consistent with each of those provisions.  The

11  Immigration and Nationality Act (INA) confers broad discretionary authority on the Attorney

12  General and Secretary of Homeland Security as to whether to grant asylum, 8 U.S.C.

13  § 1158(b)(1)(A), including authority to adopt categorical "limitations and conditions" on asylum

14  eligibility by rule, beyond those specified in the statute, so long as those rules are "consistent with"

15  section 1158, *id.* § 1158(b)(2)(C).  The rule, promulgated under that broad authority, is consistent

16  with section 1158.  The rule does not restrict any alien's right to apply for asylum, and so is

17  consistent with section 1158(a)(1)'s general entitlement that an alien "may apply for asylum."  Nor

18  does the rule conflict with section 1158(b)(2)(A)(iv), which renders ineligible for asylum any alien

19  who "was firmly resettled in another country prior to arriving in the United States."  The new rule

20  addresses a different set of aliens from the firm-settlement bar (those who could have applied (but

21  did not apply) for protection in a third country, rather than aliens who firmly resettled in a third

22  country) and imposes the bar based on a different ground (failure to seek relief rather than having

23  firmly resettled).  And the rule is consistent with section 1158(b)(2)(A), which bars applications

24  for asylum "if the Attorney General determines that the alien may be removed, pursuant to a

25  bilateral or multilateral agreement, to a country" because (among other things) nothing in section

26  1158(a)(2)(A) prohibits the Departments from taking into account, in considering eligibility for

27  asylum, an applicant's failure to seek relief in a third country while in transit to the United States.

28

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Barr*,
Case No. 1:19-cv-04073-JST

2

*Second*, Plaintiffs maintain that the rule violates the APA's notice-and-comment and effective-date requirements. Br. 14-19. But those requirements do not apply where (as here) they would harm important national interests—good cause excuses those procedures. *See* 5 U.S.C. § 553(b)(B), (d)(3). Here, notice and comment "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect" by encouraging a "surge in migrants," 84 Fed. Reg. at 33,841, good cause is satisfied—as this Court has already recognized in similar circumstances. *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018); AR119, 208, 434-56, 664, 676, 682. Nor is notice and comment required when agencies are implementing a measure linked intimately with foreign affairs—here, ongoing negotiations between the United States, Mexico, and Northern Triangle countries to address the current crisis in mass migration and methods for burden-sharing in addressing claims for asylum. *See* 5 U.S.C. § 553(a)(1). Awaiting notice and comment would "[h]inder" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis"—precisely the "undesirable international consequence that warrants invocation of the foreign affairs exception." *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252 (9th Cir. 2018); *see* 84 Fed. Reg. at 33,842; AR533-46, 635-37, 676, 698.

*Third*, Plaintiffs argue that the rule is arbitrary and capricious, Br. 19-21, but this argument fails too. The agencies explained the reason for the rule, and have supported that rule with a robust administrative record. AR1-784. The rule explains its rationale—the need to dis-incentivize aliens with meritless asylum claims from seeking admission to the United States, thereby relieving stress on immigration enforcement and adjudicatory authorities, prioritizing individuals who are unable to obtain protection from persecution elsewhere, curtailing human smuggling, and strengthening the United States' negotiating hand in "ongoing diplomatic negotiations ... between the United States and Mexico," 84 Fed. Reg. at 33,831—and provides a robust evidentiary basis for its conclusions. *E.g.*, AR21-24, 37-44, 45, 109-10, 119, 121-37, 192, 208-32, 558-65, 581-88, 634, 679, 768-70. Plaintiffs' policy disagreements with the Executive's considered policy judgments are no basis to second-guess the considered conclusions of the agency heads.

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Barr*,
Case No. 1:19-cv-04073-JST

3

Finally, Plaintiffs cannot demonstrate that the balance of harms warrants drastic and immediate injunctive relief based on the alleged risk that these organizations may need to adapt to new rules. Br. 21-24. The rule aims to save lives by discouraging asylum seekers from making dangerous, unlawful border crossings, while promoting asylum's core purpose of providing refuge to desperate refugees who reach our shores with nowhere else to turn. And the Executive has a paramount sovereign interest in maintaining the integrity of the United States' borders, in enforcing the immigration laws, and in ensuring that immigration cases can be adjudicated swiftly. Indeed, Plaintiffs have not even brought before this Court a single alien plaintiff to claim harm. The United States and the public, by contrast, would plainly be harmed by any halting of the important measure adopted by the rule at issue in this case. The Court should deny a TRO.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. Congress has empowered the Attorney General and Secretary of Homeland Security to decide who may be admitted to this country as a refugee. 8 U.S.C. §§ 1101(a)(42), 1158, 1225. As a general matter, aliens have a right to apply for asylum. "Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival ... ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b), which governs expedited removal of aliens]." *Id.* § 1158(a)(1). But a grant of asylum is entirely discretionary. Asylum "*may* [be] grant[ed] to an alien who has applied," *id.* § 1158(b)(1)(A) (emphasis added), if the alien satisfies certain standards and is not subject to an application or eligibility bar, *id.* § 1158(a)(2), (b)(1)(B), (b)(2). As part of this discretion, "[t]he Attorney General [and Secretary] may by regulation establish additional limitations and conditions, consistent with this section [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C). Separate from the discretionary authority to grant asylum, the United States has a mandatory duty to provide two forms of protection from removal: withholding of removal (when an alien faces a probability of persecution on a protected ground in another country) and protection under the Convention Against Torture (CAT) (when an alien faces a probability of torture in another country). *See* 8 U.S.C. § 1231(b)(3)(A) (withholding); 8 C.F.R. § 1208.16(c) (CAT).

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Barr,*
Case No. 1:19-cv-04073-JST

4

1     Joint Rule.  On July 16, 2019, the Attorney General and Acting Secretary issued a joint

2    interim final rule providing (with limited exceptions) that "an alien who enters or attempts to enter

3    the United States across the southern border after failing to apply for protection in a third country

4    outside the alien's country of citizenship, nationality, or last lawful habitual residence through

5    which the alien transited en route to the United States is ineligible for asylum."  84 Fed. Reg. at

6    33,830.    The Attorney General and Acting Secretary invoked their authority to establish

7    "additional limitations … under which an alien shall be ineligible for asylum" (8 U.S.C.

8    § 1158(b)(2)(C)) and to impose "limitations on the consideration of an application for asylum" (*id.*

9    § 1158(d)(5)(B)).  *See* 84 Fed. Reg. at 33,830-31.  The rule provides that aliens who are ineligible

10   for asylum may still receive protections from removal if they establish a reasonable fear of

11   persecution or torture.  *Id.* at 33,834, 33,837-38.

12       The rule seeks to discourage "asylum claims raised by those apprehended at the southern

13   border [that] are ultimately determined to be without merit" and that impose a "strain on the

14   nation's immigration system," "undermine[ ] many of the humanitarian purposes of asylum," have

15   "exacerbated the humanitarian crisis of human smuggling," and "affect[ ] the United States'

16   ongoing diplomatic negotiations with foreign countries."  84 Fed. Reg. at 33,831.  It does so by

17   "de-prioritizing the applications of individuals who could have obtained protection in another

18   country" and "ensur[ing] that those refugees who have no alternative to U.S.-based asylum relief

19   or have been subjected to an extreme form of human trafficking are able to obtain relief more

20   quickly."  *Id.*  "[C]urrently more than 900,000 cases are pending before immigration courts," *id.*,

21   many tens of thousands of which involve asylum claims that will not be granted.  AR21, 121.  The

22   rule combats that serious systemic strain by "reducing the incentive for aliens without an urgent

23   or genuine need for asylum to cross the border—in the hope of a lengthy asylum process that will

24   enable them to remain in the United States for years, typically free from detention and with work

25   authorization, despite their statutory ineligibility for relief."  *Id.*  The rule thus "mitigates the strain

26   on the country's immigration system by more efficiently identifying aliens who are misusing the

27   asylum system to enter and remain in the United States rather than legitimately seeking urgent

28   protection from persecution or torture."  *Id.*  "Aliens who transited through another country where

protection was available, and yet did not seek protection, may fall within that category." *Id.*

The rule was issued as an interim final rule, effective immediately during the comment period under the good-cause and foreign-affairs exceptions to the notice-and-comment and effective-date requirements of the APA. *See id.* at 33,840-41.

<u>This Lawsuit.</u> The day the rule was published, four organizations that provide services to immigrants and refugees filed this suit seeking immediate injunctive relief. Plaintiffs allege that the rule unlawfully "bars virtually every noncitizen fleeing persecution from obtaining asylum in the United States." Compl. ¶ 9. Plaintiffs' own alleged injuries are different, however, since none of them is an alien: Plaintiffs allege that they must "divert organizational resources" to, "among other things, understand[ ] the new policy" and "educat[e] ... staff," *id.* ¶¶ 115, 117, 121, 126, and that the rule could mean fewer cases and fewer "funding streams," *id.* ¶¶ 119, 122.

Plaintiffs bring three APA claims. *First*, they claim that the rule conflicts with the asylum statute, 8 U.S.C. § 1158, and so is contrary to law. Compl. ¶¶ 137-50; *see* 5 U.S.C. § 706. Plaintiffs claim that the rule conflicts with INA provisions that: (1) provide that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival ... ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]," 8 U.S.C. § 1158(a)(1); (2) render ineligible for asylum aliens who "may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened," *id.* § 1158(a)(2)(A); and (3) prohibit granting asylum to an alien that was "was firmly resettled in another country prior to arriving in the United States," *id.* § 1158(b)(2)(A)(iv). Compl. ¶¶ 137-50. *Second*, Plaintiffs claim that the rule was improperly issued without notice and an opportunity to comment and was published less than 30 days before its effective date. Compl. ¶¶ 144-47; *see* 5 U.S.C. § 553(b), (c), (d). *Third*, Plaintiffs allege that the rule is not based on reasoned decision-making and so is arbitrary and capricious. Compl. ¶¶ 148-50; *see* 5 U.S.C. § 706(2)(A). Plaintiffs moved for a TRO preventing the rule from taking effect. *See* Br. 6-24. They argue that such relief is necessary because they are irreparably harmed by their inability to comment on the rule, by their need to divert resources to provide training on the rule, and by their potential loss of income that

might come from preparing asylum applications.  Br. 21-23.

## ARGUMENT

The Court should deny a TRO—Plaintiffs' claims lack merit, the equities are against them, and their requested relief is far too broad in any event.[1]

## I.    The Government is Likely to Succeed on the Merits

### A.  The Rule Is Consistent With The INA.

Plaintiffs' lead argument is that the rule violates the INA by denying eligibility for asylum to certain aliens.  *See* Br. 6-14.  That argument fails.

The rule is consistent with the INA—and, in particular, with the asylum statute, 8 U.S.C. § 1158.  The asylum statute provides that a grant of asylum is a matter of the Executive's

---

[1] The government maintains that this suit is not justiciable, but it recognizes that the Court is unlikely to agree in light of its decision and the Ninth Circuit's decision in *East Bay*.  The government therefore maintains its position and, even if the Court disagrees, respectfully preserves the position, which will be only briefly articulated here.  Plaintiffs allege that the rule will force them to divert resources to assist their asylum-seeker clients or because their funding will be reduced.  *See* Compl. ¶¶ 116-36.  None of the organizational Plaintiffs has a justiciable claim based on those allegations.  Plaintiffs may not assert "third-party standing" based on unidentified aliens' ineligibility for asylum when they do not even identify "any client" affected by the rule.  *See East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1240-41 & n.7 (9th Cir. 2018).  To be sure, *East Bay* held that organizations may demonstrate organizational standing "by showing that the Rule will cause them to lose a substantial amount of funding" or "a diversion-of-resources injury."  *Id.* at 1241-43.   The government respectfully disagrees with *East Bay*'s theory that advocacy organizations can have standing or a cognizable claim to enjoin policies directed to aliens under the immigration laws based on the diversion of their resources.  That portion of *East Bay* is also inconsistent with the rule that a party, organizational or otherwise, generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984), points *East Bay* did not consider.  Independently, the INA precludes this suit and Plaintiffs' claims are outside the zone of interests of the statutes that they invoke.  "[T]he interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987).  The INA itself specifies the manner and scope of judicial review in connection with asylum claims proceedings, *see* 8 U.S.C. §§ 1252, 1329, and such review may be sought only by the affected alien.  *Id.* § 1252(a)(5), (b)(9).  Even "policies-and-practices" challenges like the present suit are cognizable only in removal proceedings. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016).  Although *East Bay* held otherwise, it did not consider section 1252 or 1329, which preclude review at the behest of third parties, including the Plaintiff organizations.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 344-45, 349-51 (1984); *see* 5 U.S.C. § 701(a)(1).

---

1    discretion: asylum "*may* [be] grant[ed] to an alien" who satisfies all governing requirements—it

2    never *must* be granted to an alien. 8 U.S.C. § 1158(b)(1)(A) (emphasis added); *see INS v. Aguirre-*

3    *Aguirre*, 526 U.S. 415, 420 (1999) ("decision whether asylum should be granted to an eligible

4    alien is committed to the Attorney General's discretion").  And the asylum statute expressly

5    authorizes the Executive to establish categorical "limitations and conditions" on asylum eligibility,

6    on top of those already provided by statute (*see* 8 U.S.C. § 1158(b)(2)(A)), so long as those

7    limitations and conditions are "consistent with" the asylum statute.  *Id.* § 1158(b)(2)(C).

8    The rule here is well within those discretionary grants of authority over asylum.  To start,

9    the rule is consistent with the discretionary nature of asylum and the authority to adopt new

10   eligibility bars.  In the rule, the Department heads determined, in the exercise of discretion, that

11   aliens who fail to apply for protection in at least one third country through which they transited

12   should not be granted the discretionary benefit of asylum, because they are not refugees with

13   nowhere else to turn.  84 Fed. Reg. at 33,839.  The broad delegation of authority to establish

14   additional eligibility bars requires only that regulatory asylum-eligibility bars be "consistent with"

15   section 1158.  8 U.S.C. § 1158(b)(2)(C).  That describes the rule here.  The rule bars asylum

16   eligibility for aliens who fail to seek asylum at the first available opportunity, and instead wait to

17   reach their preferred destination of the United States, rendering doubtful the validity and urgency

18   of the alien's claim.  Nothing in section 1158 precludes such a rule.  This rule further is consistent

19   with Board of Immigration Appeals precedent recognizing that an alien's attempts to seek asylum

20   in a third country are relevant to the discretionary determination whether to grant him asylum.  *See*

21   *Matter of Pula*, 19 I&N Dec. 467, 473-74 (BIA 1987) (adverse factors supporting denial of asylum

22   include "whether the alien passed through an other countries or arrived in the United States directly

23   from his country, whether orderly refugee procedures were in fact available to help him in any

24   country he passed through, and whether he made any attempts to seek asylum before coming to

25   the United States"); *see also Kalubi v. Ashcroft*, 364 F.3d 1134, 1140 (9th Cir. 2004) (noting that

26   forum-shopping might be "part of the totality of circumstances that sheds light on a request for

27   asylum in this country").  The rule does adopt a categorical bar rather than a case-by-case approach.

28   But that too is consistent with the asylum statute.  If the Attorney General and the Acting Secretary

may take account of that factor in individual cases, settled principles of administrative law dictate that they may do so categorically as well. *See Lopez v. Davis*, 531 U.S. 230, 243-44 (2001); *Fook Hong Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970) (upholding INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

Plaintiffs make several arguments that the new eligibility bar is not "consistent with" the asylum statute, but those arguments lack merit.

*First*, Plaintiffs contend that the rule conflicts with the firm-resettlement bar to asylum eligibility, 8 U.S.C. § 1158(b)(2)(A)(iv), because it precludes asylum in the United States in circumstances that fall short of a permanent offer of residence in a third country. Br. 7-9. Plaintiffs claim that "Congress spoke directly to the circumstances in which a noncitizen may be ineligible for asylum based on his or her relationship with a third country," and that the new rule "reads Congress's firm resettlement" bar "out of § 1158." Br. 7.

Plaintiffs are incorrect. The third-country-transit bar addresses a different set of aliens than the firm-settlement bar—those who could have applied (but did not apply) for protection in a third country. The firm-resettlement bar in section 1158(b)(2)(A)(iv), by contrast, renders ineligible for asylum any alien who "was firmly resettled in another country prior to arriving in the United States." It applies to aliens who, "prior to arrival in the United States, ... entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15. The two bars are thus concerned with different circumstances, different classes of aliens, and different actions (or inactions). There is no inconsistency between barring both classes from asylum eligibility. Indeed, the rule here promotes aims that are complementary to the firm-resettlement bar—it prioritizes applicants "with nowhere else to turn." *Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013). The logic of the firm-resettlement bar is that if someone was offered permanent status in a third country, there is categorically no need to afford them asylum in the United States. Similarly, the logic of the third-country-transit bar is that if someone could have applied for and obtained protection in a third country but failed to do so, there is categorically no need to afford them asylum in the United

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Barr*,
Case No. 1:19-cv-04073-JST

9

States.  Those harmonized, reinforcing judgments reflect that the new bar is just the sort of "condition" or "limitation" that Congress authorized the Department heads to adopt.[2]

Plaintiffs rely on cases construing the "established meaning of 'firm resettlement'" (Br. 8-9) to argue that the mere possibility of seeking relief in a third country is insufficient to establish firm resettlement under the statute and regulations.  *See Melkonian v. Aschroft*, 320 F.3d 1061, 1071 (9th Cir. 2003); *see also Maharaj v. Gonzales*, 450 F.3d 961, 971-77 (9th Cir. 2006) (en banc).  But those cases are beside the point because they address whether an alien had in fact properly been found subject to the resettlement bar, which is not at issue here.  They say nothing about the permissibility of the distinct bar adopted by the present rule.  And Plaintiffs' argument just reinforces that the new bar is appropriately distinct from the already existing firm-resettlement bar:  it would make little sense to adopt a new bar that just parroted an existing one.[3]

Plaintiffs relatedly contend that the rule is inconsistent "with foundational international humanitarian law principles," citing the Refugee Convention and its 1967 Protocol, which provide "that mere transit through a third country is not an appropriate basis to categorically deny asylum."[4] Br. 9.  Plaintiffs are correct that neither instrument "*requires* refugees to apply for protection in the first country where it could have been sought, or that refugees be returned to a country they crossed in transit." *Id.* (emphasis added).  But that gets Plaintiffs nothing.  Neither instrument *prohibits* a rule like the one at issue here.  And nothing in the rule puts the United States at odds with its international obligations:  The United States has implemented its non-refoulement

---

[2] Plaintiffs previously contended that under section 1158(b)(2)(C) the government can promulgate an eligibility bar only if that bar is similar to existing statutory bars. TRO Br. (ECF 8-1), No. 18-6810, at 14 (arguing that eligibility bar must be consistent with "the six limitations already contained in the statute").  Now they argue the converse, that a bar is unlawful if it is similar to or complements a pre-existing bar.  Br. 7-12.  They cannot have it both ways.

[3] One of Plaintiffs' cited cases (Br. 9) turned on the absolute unavailability of avenues to seek asylum or related relief, *see Andriasian v. INS*, 180 F.3d 1033, 1045 n.21 (9th Cir. 1999) (noting evidence that the third country "had no procedures for application for asylum or citizenship ... and that any application would have therefore been fruitless").  But even if relevant, the government has determined that Mexico's law for considering asylum applications are consistent with international law and sufficiently robust to be a potential alternative to relief in the United States. *See* 84 Fed. Reg. at 33,838; AR286-317, 318-433, 638-57, 702-66; *contra* Br. 13-14, 23.

[4] The United States is not a signatory to the Convention, but is to the 1967 Protocol that adopted the Convention's substantive provisions.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987).

obligations by providing withholding of removal, 8 U.S.C. § 1231(b)(3)(A), and CAT protection, 8 C.F.R. §§ 1208.16(c)-1208.18.  *See Cardoza-Fonseca*, 480 U.S. at 429.  The rule leaves those protections in place.  Asylum, by contrast, is a discretionary benefit that is not required by any U.S. treaty commitment.  *See id.* at 441.  Moreover, the Convention and its Protocol contemplate the permissibility of formal safe-third-country agreements,[5] meaning that the availability of relief in a third country may be a factor that a State Party can take into account in assessing asylum eligibility.  So, for aliens fleeing harm who transit through third countries, the Convention and Protocol allow the use of conditions and limitations on those aliens' eligibility for relief.  In any event, neither the Convention nor the Protocol has "the force of law in American courts," *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009).

*Second*, Plaintiffs contend that the rule is an "end-run" around 8 U.S.C. § 1158(a)(2)(A), which bars an alien from applying for asylum if he or she may be removed to a safe third country under a bilateral or multilateral treaty, and in which he or she "would have access to a full and fair procedure for determining a claim to asylum or equivalent protection."  *See* Br. 9-12.  Plaintiffs argue that, aside from the firm-resettlement bar, "Congress prescribed one other very narrow circumstance involving an individual's relationship with a third country where asylum may be denied:  the safe third country provision." Br. 9.  Because the United States has no safe-third-country-agreement with Mexico and other countries through which migrants transit to reach the United States, Plaintiffs claim, the rule is an improper attempt to "accomplish indirectly what [the government] could not do directly" and "circumvent Congress's carefully drawn requirements for a safe-third country agreement." Br. 10.

Plaintiffs are mistaken.  The rule is consistent with section 1158(a)(2)(A).  Section 1158(a)(2)(A) categorically bars applications for asylum "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country ... in which the alien's life or freedom would not be threatened on account" of a protected ground.  The safe-third-country bar is potent and unyielding:  it prohibits an alien from even *applying* for asylum.

---

[5] *See* Article 31(1) (states "shall not impose penalties, on account of their illegal entry or presence, on refugees who, *coming directly from a territory where their life or freedom was threatened* ... enter or are present in their territory without authorization") (emphasis added)

But nothing in section 1158(a)(2)(A)'s asylum-*application* bar forecloses the Department heads from taking into account, in considering the applicant's *eligibility* for relief, the applicant's failure to seek potential relief in a third country while in transit to the United States—particularly when that transit was undertaken to flee a different country for the purported purpose of finding a safe country. Further, the safe-third-country provision offers a potential mechanism for categorically sending away all would-be asylum applicants to a third country to apply for relief, *see* 8 U.S.C. 1158(a)(2)(A), and to entirely bypass withholding-of-removal proceedings, *see Asylum Claims Made By Aliens Arriving From Canada at Land Border Ports-of-Entry*, 69 Fed. Reg. 69,490, 69,490 (Nov. 29, 2004). This rule is significantly different, providing for a more tailored determination of whether an alien passed through a country where he could have, but did not, apply for relief. Further, this rule preserves withholding of removal for aliens who demonstrate that they have a reasonable fear of persecution. *See* 84 Fed. Reg. at 33,830, 33,831.

An additional distinction between the present rule and the types of agreements permissible under the safe-third-country statutory provision is that, under this country's safe-third-country agreement with Canada, a potential asylee traveling through Canada would be barred from applying for asylum in the United States *even if* that applicant had applied for asylum in Canada and had his or her claim *rejected*. *See Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries*, U.S.–Can., Dec. 5, 2002, State Dept. No. 05-35, Article 5; *see also* 69 Fed. Reg. 69,480, 69,480 (Nov. 29, 2004). Not so under this rule. Here, the rule bars eligibility *only if* an alien failed to *seek* potential relief in at least one third country while in transit to the southern border. If that claim is denied in that country, then, unlike aliens subject to the safe-third-country agreement with Canada, an alien is not subject to the new eligibility bar and can still obtain asylum in the United States. 84 Fed. Reg. at 33,831. That agreement makes it so that an alien may apply for asylum only in the first of the two countries he steps foot in; this new rule, by contrast, provides no such one-country limit and instead just requires certain aliens to have exhausted at least one other potential avenue to relief before being eligible for relief in the United States. *Id.* at 33,839.

Finally, as noted above, the failure to seek such relief in a country where there is a colorable claim that relief could have been obtained has long been recognized as a sufficient factor to deny asylum. *See Pula*, 19 I&N Dec. at 473-74. And denying asylum on this ground is consistent with the purpose of the safe-third-country bar, which is "to prevent forum-shopping by asylum seekers, and to promote the orderly handling of asylum claims." *United States v. Malenge*, 294 F. App'x 642, 645 (2d Cir. 2008). Thus, far from conflicting with section 1158(a)(2)(A), the rule complements it, reaching a different class of aliens who the agencies have concluded may be "forum-shopping ... after transiting through one or more third countries where they could have sought protection, but did not," 84 Fed. Reg. at 33,384, while—unlike the safe-third-country bar— permitting those aliens to apply for asylum if they first apply in another country. *See* AR121, 770.

There is a repeated, erroneous suggestion running through Plaintiffs' lead arguments: that section 1158's asylum bars regarding third countries somehow occupy the field for how an alien's "relationship with a third country" (Br. 7, 9) can bear on eligibility to be granted asylum, because "Congress specifically provided in 8 U.S.C. § 1158 that [those are the] only circumstances in which a noncitizen could be denied asylum because of her relationship with a transit country." Br. 1. That suggestion is baseless. In section 1158 Congress simply made clear, in the safe-third-country provision and firm-resettlement bar, that two particular third-country actions or relationships are *definite* bars. Congress nowhere said that those express bars are the only permitted bars concerning an alien's "relationship with a third country." Far from it: section 1158(b)(2)(C) authorizes the Executive to adopt further categorical "limitations" on asylum eligibility that are "consistent" with the rest of section 1158—including those that promote the logic and purposes of those statutory bars. In contrast to many other regulatory statutes, here Congress expressly specified the creation of additional extra-statutory limitations on asylum eligibility. Plaintiffs' contrary reading would "disabl[e] the Attorney General from adopting [a] further limitation[]" that the statute "clearly empowers him" to adopt. *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017).

*Third*, Plaintiffs contend that, because aliens transiting Mexico to enter the southern border must travel through third countries in which they could apply for asylum, the rule contravenes section 1158(a)(1)'s prescription that aliens may apply for asylum "whether or not at a designated

port of arrival." Br. 12.  Plaintiffs maintain that "Congress recognized that many asylum seekers would transit through another country before reaching the United States." *Id.*  This argument fails as well.  The rule does not bar aliens from applying for asylum.  It simply makes it so that an alien is not *eligible* for asylum if he transits a third country without seeking relief that he could have sought in that country.  84 Fed. Reg. at 33,830.  To be sure, the Ninth Circuit in *East Bay* held that a different rule providing that "illegal entry, through Mexico specifically, will always be disqualifying" conflicts with section 1158(a)(1)'s  provision that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival ... )" may apply for asylum, thereby (in the court of appeals' view) rendering the right to apply a "dead letter."  909 F.3d at 1247, 124.  But nothing in section 1158(a)(1) suggests that consideration of an alien's actions or non-actions in a third-country also renders the right to apply for asylum a dead letter.  Holding otherwise would be to read Congress as having declared that there can be "no categories of aliens for whom asylum would be completely unavailable," an argument rejected by this and other courts.  *Komarenko*, 35 F.3d at 436; *see Yang*, 79 F.3d at 936-39; *Choeum v. INS*, 129 F.3d 29, 44 (1st Cir. 1997).

Plaintiffs also argue that, "[i]n guaranteeing that entering the United States at or between ports of arrival could not be a basis for categorically denying asylum, Congress also guaranteed that merely transiting through another country to reach the United States could not be a categorical barrier either." Br. 12.  But section 1158(a)(1) does not say anything that would bar the Executive from consider the relevance of what happens before someone reaches the southern border.  Indeed, as noted, the asylum statute expressly recognizes the relevance of an alien's transit through third countries.  *See* 8 U.S.C. § 1158(a)(2)(A) (safe-third-country provision); *id.* § 1158(b)(2)(A)(vi) (firm-resettlement bar); *see also Pula*, 19 I&N Dec. at 473-74.  And Congress did not purport to limit the Executive in implementing other bars, given section 1158(b)(2)(C), *see R-S-C-*, 869 F.3d at 1187, so there is no basis to view Congress as intending 1158(a)(1) to bar the agencies from taking into account, when assessing asylum eligibility, considerations such as those embodied in this rule.  And, in any event, contrary to Plaintiffs' suggestion, the rule does not punish "merely transiting." Br. 6.  Rather, it render aliens ineligible for asylum if they pass through a country but

fail to apply for asylum there, thereby "rais[ing] questions about the validity and urgency of the alien's claim." 84 Fed. Reg. at 33,839.

### B.  The Rule Satisfies the APA's Procedural Requirements.

Plaintiffs contend that the rule was unlawfully issued without notice and an opportunity for comment (Br. 15-18) and improperly published less than 30 days before its effective date (Br. 18-19).  But the APA provides exceptions to its notice-and-comment and publication requirements when either "the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), (d)(3), or the rule "involve[s] ... [a] foreign affairs function of the United States," *id.* § 553(a)(1).  The rule here fits within both exceptions and is consistent with similar interim rules affecting the border.

<u>Good Cause.</u>  The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare."  *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (TECA 1983). Significant public-safety harms provide good cause to make rule changes without pre-promulgation notice and comment.  *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (delay may increase "threat[s] to public safety").  This standard is met where "an announcement of a proposed rule creates an incentive for those affected to act prior to a final administrative determination."  *East Bay*, 909 F.3d at 1253; *see East Bay*, 354 F. Supp. 3d at 1115.

Consistent with these principles, the Departments recognized that pre-promulgation notice and comment or a delayed effective date "would be destabilizing and would jeopardize the lives and welfare of aliens who could surge to the border to enter the United States before the rule took effect" by encouraging a "surge in migrants."  84 Fed. Reg. at 33,841; *e.g.*, AR438-48, 664.  Their "experience has been that when public announcements are made regarding changes in our immigration laws and procedures, there are dramatic increases in the numbers of aliens who enter or attempt to enter the United States along the southern border."  *Id.* (citing *East Bay*, 354 F. Supp. 3d at 1115); *e.g.*, AR438-48, 676.  The Departments described the "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations."  *Id.*; *e.g.* AR682.

DEFENDANTS' OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER
*East Bay Sanctuary v. Barr*,
Case No. 1:19-cv-04073-JST

15

Further, the Departments determined that "an additional surge of aliens ... would be destabilizing to the region, as well as to the U.S. immigration system." *Id.*; *e.g.*, AR21-22, 45, 119, 208-20, 679.  They specified the factors that contribute to the "massive increase in aliens arriving at the southern border who assert a fear of persecution [that] is overwhelming our immigration system." *Id.*; AR21-22, 37-44, 45, 119, 121, 770, 192, 208-20, 222-30, 241-63, 634, 679, 768-79.  They stressed that the "concern is particularly acute in the current climate in which illegal immigration flows fluctuate significantly in response to news events." *Id.*; *e.g.*, AR438-48, 540-54, 664, 682. The Departments therefore lawfully concluded that "[a] large additional influx of aliens who intend to enter unlawfully or who lack proper documentation to enter this country, all at once, would exacerbate the existing border crisis." *Id.*  The promulgation of the rule without notice and comment "is thus a practical means to address the time-sensitive influx of aliens and avoid creating an even larger short-term influx," and "[a]n extended notice-and-comment rulemaking process would be impracticable and self-defeating" for those reasons. *Id.*; AR119, 208, 434-56, 664, 676, 682; *see East Bay*, 909 F.3d at 1253; 54 F. Supp. 3d at 1115 (noting that the Departments' evidence on border surges "supports the inference that smugglers might similarly communicate the Rule's potentially relevant change in U.S. immigration policy" and in turn precipitate changes in immigration patterns, warranting the application of the good-cause exception).

Plaintiffs argue that the government's conclusion that "allowing 30 days for public comment might cause 'a surge of aliens' to cross the southern border" is "speculative." Br. 15, 17; *see* Br. 16-18.  Plaintiffs elide the issue, which is whether the lengthy (far longer than 30 days) period necessary for notice and comment and promulgating a final rule will result in such a problematic surge.  And this Court already—as Plaintiffs admit, Br. 17—found good cause on a similar showing.  *See East Bay*, 354 F. Supp. 3d at 1115; AR439 ("Americans do not jail parents who bring children—and to hurry up before they might start doing so again.").  Under Plaintiffs' argument, the federal government could never rely on the good-cause exception by making predictive judgments about how persons would rationally act based on past behavior.  But the government obviously cannot provide evidence for actions that have not occurred in response to a rule that has yet to be promulgated, and courts are ill-equipped to second-guess the Executive

Branch's prospective judgment. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) ("The Government, when seeking to prevent imminent harms in the context of international affairs and national security, is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusion."). In an APA case, the Court's review of the merits must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Plaintiffs' attempt to substitute its own record and views for that of the Departments is inappropriate.[6]

 <u>Foreign Affairs.</u>  The foreign-affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). "A rule of law that would inhibit the flexibility of the political branches [in matters of foreign affairs] should be adopted with only the greatest caution." *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980).

 The Departments properly invoked this exception.  First, the "flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy and national security interests of the United States." 84 Fed. Reg. at 33,841; *e.g.*, AR676, 698.  The Departments found that the "rule will facilitate ongoing diplomatic negotiations with foreign countries regarding migration issues, including measures to control the flow of aliens into the United States ... and the urgent need to address the current humanitarian and security crises along the southern land border between the United States and Mexico."  84 Fed. Reg. at 33,842; AR537, 635-37.  The Departments concluded that the "negotiations would be disrupted" by the surge of migrants who would attempt to enter the United States in response to the rule:  the rule's delayed effective date would "provok[e] a disturbance in domestic politics in Mexico and the Northern Triangle countries, and erod[e] the sovereign authority of the United States to pursue the negotiating strategy it deems to be most appropriate as it engages its foreign partners." *Id.*

---

[6] Plaintiffs disingenuously claim no evidence of a surge in *East Bay I* ever materialized. Br. 17-18. Of course, the rule was enjoined almost immediately, so no surge directly tied to the rule could arise. But certainly aliens continue to surge across the border in ever greater numbers, as the rule at issue here, 84 Fed. Reg. at 33,838, and the record, AR119, demonstrate.

Moreover, a delay in effectiveness would prompt the undesirable consequence of an increase in the number of migrants who could have sought assistance in foreign countries at the "U.S. border, which has little present capacity to provide assistance." 84 Fed. Reg. at 33,842; AR208-20, 222-30, 558-59, 679. "Addressing this crisis will be more effective and less disruptive to long-term U.S. relations with Mexico and the Northern Triangle countries the sooner that this interim final rule is in place" to slow the "enormous flow of aliens through these countries to the southern U.S. border," thereby "facilitat[ing] the likelihood of success" in the United States' ongoing negotiations with Mexico "regarding regional and bilateral approaches to asylum," and supporting the President's foreign-policy aims. 84 Fed. Reg. at 33,842; *e.g.*, AR231-32, 676, 698. Indeed, just last month, the United States, relying on another immigration initiative—the Migrant Protection Protocols (MPP)—successfully negotiated an agreement with Mexico concerning asylum seekers whereby MPP would be implemented "across its entire Southern Border" and "Mexico will take unprecedented steps to increase enforcement to curb irregular migration, to include the deployment of its National Guard throughout Mexico" and take "decisive action to dismantle human smuggling and trafficking organizations as well as their illicit financial and transportation networks." AR24, *see* AR45-50, 138-39, 231-32 533-57, 635-37, 676, 698. The two countries will "continue their discussions on the terms of additional understandings to address irregular migrant flows and asylum issues." 84 Fed. Reg. at 33,842.

An immigration initiative like the rule here—which promotes the interlocking goals of securing the border and promoting negotiations with other countries—is thus "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249. The Executive Branch's choice—to require aliens seeking asylum here to first seek protection in countries that offer asylum and thus stem the transit through countries with which the United States is negotiating—is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini*, 618 F.2d at 1361. Indeed, this is a more straightforward case than *Yassini*, which involved Iranians *already in the United States* who were required to leave. *Id.* This case involves only aliens transiting countries

with whom the United States is negotiating.

Plaintiffs argue that the rule does not show that "public rulemaking" "will provoke definitely undesirable international consequences." Br. 15, 16. The statute requires no such showing. The exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm. 5 U.S.C. § 553(a)(1); *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (there is "no requirement" that agency state a finding of undesirable international consequences, particularly "when the consequences are seemingly as evident" as they are here). Indeed, "[h]indering" the Executive's "ability to implement a new policy in response to a current foreign affairs crisis is the type of definitely undesirable international consequence that warrants invocation of the foreign affairs exception." *East Bay*, 909 F.3d at 1252. And even if a showing that harm will follow "immediate *publication* of the Rule, instead of *announcement*," were required, it is present here: the Executive has shown that a delay in publishing the rule would overwhelm an already-taxed border and detrimentally alter the status quo by *increasing* the very migration that the negotiations seek to decrease, undermining the United States' negotiations with Mexico. 84 Fed. Reg. at 33,842; *e.g.*, AR438-48, 450-54, 664; *Yassini*, 618 F.2d at 1360 ("prompt response" required to embassy takeover). Plaintiffs assert that the government has not provided "evidence" that notice-and-comment will harm "goodwill between" Mexico and the United States and its explanation is supposedly "illogical on its own terms." Br. 16. But the record defies that view. AR24, 45-50, 138-39, 533-57, 635-37, 676, 698. And recent diplomatic successes following MPP's issuance overcome the view that immigration initiatives like this rule are not closely associated with the United States' diplomacy. The rule satisfies the foreign-affairs exception.

## C. The Rule Is Not Arbitrary and Capricious

Plaintiffs also argue that the new rule is arbitrary and capricious in violation of the APA. Br. 19-21. This claim also lacks merit.

To begin, arbitrary-and-capricious review is limited and "highly deferential, presuming the agency action to be valid," *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010), and courts may not substitute their "judgment for that of the agency." *Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1187-88 (9th Cir. 2019). It is "reasonable for the [agency] to rely on its experience" to arrive

at its conclusions, even if those conclusions are not supported with "empirical research." *Sacora*, 628 F.3d at 1068-69.  The agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983), and Plaintiffs cannot demonstrate a likelihood of success by relying on non-record materials.  *See, e.g.*, *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir. 1993).[7]  In cases like this one, which does not concern a statutory gap but rather the express grant of authority to prescribe rules and standards, the "agency's promulgations are entitled to more than mere deference or weight; rather, they are entitled to legislative effect." *City of Los Angeles v. Barr*, --- F.3d --- (9th Cir. July 12, 2019), 2019 WL 3049129, at *8.

The rule here was promulgated based on several considerations, including: (1) the need to dis-incentivize aliens with meritless asylum claims from seeking entry to the United States, thereby relieving stress on immigration enforcement and adjudicatory authorities; (2) the policy decision to "prioritize[] individuals who are unable to obtain protection from persecution elsewhere and individuals who are victims of a 'severe form of trafficking in persons,'" "ensur[ing] that those refugees who have no alternative to U.S.-based asylum relief or have been subjected to an extreme form of human trafficking can obtain to obtain relief more quickly"; (3) the need "to curtail the humanitarian crisis" of human smuggling; and (4) strengthening the United States' negotiating hand in "ongoing diplomatic negotiations" "regarding migration issues in general, related measures employed to control the flow of aliens in the United States ... , and the urgent need to address the humanitarian and security crisis along the southern land border between the United States and Mexico." 84 Fed. Reg. at 33,831.

The rule is reasonably related to all these objectives.  As the rule concludes, aliens with non-meritorious asylum claims will have less incentive to seek entry to the United States, and thus less incentive to rely on "human smuggling" and suffer "its tragic effects," if they cannot take advantage of a lengthy delay in adjudicating that claim to live and work in this country. *Id.* at 33,840; AR109-10, 664, 676, 682.  This relieves stress on the adjudicatory authorities of both DHS

---

[7] Plaintiffs seek to do this repeatedly, and the Court should strike, or at the least, disregard those citations. *See, e.g.*, Br. 10 n.2, 11, 13, 17-18, 21.

and DOJ, and on border enforcement given fewer incentives to illegally seek entry.  *See* 84 Fed. Reg. at 33,831, 33,840-41; AR21-22, 37-45, 109-10, 119, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70.  Likewise, by ensuring that the adjudicators are able to focus on the claims of aliens who have not been able to obtain relief in a third country, the rule focuses on the class of aliens who have no other country to turn to, making it easier for those adjudicators to fulfill the humanitarian nature of asylum relief.  *See id.*; *accord Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011) ("core regulatory purpose of asylum … is not to provide [aliens] with a broader choice of safe homelands, but rather, to protect refugees with nowhere else to turn").  And by declining to consider asylum claims by aliens who transit Mexico and Northern Triangle countries without seeking relief, the government is in a better position to negotiate a formal and lasting resolution to the "humanitarian and security crisis along the southern" border with those same countries.  84 Fed. Reg. at 33,831, 33,842; AR231-32.  This shifts the onus to consider such claims to other countries within that region that are able to provide fair adjudications of requests for asylum, while pointing towards an eventual burden-sharing framework of the kind that already governs consideration of asylum claims made by many aliens on the northern border with Canada.  AR138-39, 231-32, 537, 635-36.

In branding the rule arbitrary and capricious, Plaintiffs repeatedly seek to cast doubt on the government's judgments underlying the rule.  They argue that "the Rule is premised on two false and wholly unsupported assumptions," Br. 19: "that transiting through a third country without seeking asylum is necessarily equivalent to 'having no urgent or genuine need for asylum,'" *id.*, and that "an individual who transits through a third country 'could have obtained protection' there," Br. 19-20.  But the rule does not rest on such assumptions.  Rather, the rule rests on (among other determinations) the judgment that a "decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful," and so the rule "ensure[s] that those asylees who need relief most urgently are better able to obtain it."  84 Fed. Reg. at 33,839.  And those determinations were reasonable: Immigration law has long supported the denial of relief to individuals who could have sought, but

1   failed to seek, relief in a third country while in transit to the United States, *see Pula*, 19 I&N Dec.

2   at 473-74, and the asylum statute recognizes the relevance of third-country relief as relevant to an

3   alien's ability to apply for or be eligible for asylum in the United States, *see* 8 U.S.C.

4   §§ 1158(a)(2)(A), (b)(2)(A)(vi).  Moreover, the government determined that Mexico is a signatory

5   to and in compliance with the relevant international instruments governing consideration of

6   refugee claims, that its domestic law and procedures regarding such relief are robust and capable

7   of handling claims made by Central American aliens in transit to the United States, and that the

8   statistics regarding the influx of claims in that country support the conclusion that asylum in

9   Mexico is a feasible alternative to relief in the United States.  *See* 84 Fed. Reg. 33,839; AR231-

10   32, 286-433, 533-37, 560-65, 581-83, 588, 638-57, 702-66.

11      Plaintiffs also argue that the exemption for those who have been denied asylum in a third

12   country "irrationally allows those who were *already denied* protection in another country to access

13   asylum in the United States, while barring those who may not have had a true opportunity to seek

14   protection in another country."  Br. 20.  But that is backwards.  The point of the rule is that an

15   "opportunity" to seek protection exists in those countries that an alien necessarily must transit to

16   reach the southern border, *see* 84 Fed. Reg. 33,839, and so the rule bars from relief only those who

17   did not attempt to avail themselves of those protections.  And consistent with the humanitarian

18   aims of asylum, the Department heads reasonably decided to allow individuals who were unable

19   to obtain relief elsewhere an opportunity to seek it in this country.  *See Tchitchui*, 657 F.3d at 137.

20      Finally, Plaintiffs contend that "the Rule is arbitrary and capricious because it fails to

21   exempt unaccompanied children ... from its coverage in violation of the special rights that

22   Congress has afforded such children under the INA and the Trafficking Victims Protection and

23   Reauthorization Act."  Br. 20; *see* Br. 20-21.  But the INA contains no general mandate that every

24   rule must treat unaccompanied children differently, and such children are subject to the same

25   eligibility criteria as other aliens. Section 1158(b)(2)(A)'s eligibility bars make no exception for

26   unaccompanied alien children, so there is no reason to believe that an eligibility bar promulgated

27   under section 1158(b)(2)(C) must make special dispensation for such individuals.  Unaccompanied

28   alien children, like all other aliens, have no right to be eligible for or granted asylum.  And the rule

1    is consistent with section 1158(b)(3)(C), *contra* Br. 20-21, as unaccompanied alien children who

2    retain asylum eligibility will still have their claims heard initially by an asylum officer.

3            Plaintiffs' claims are just disagreements with the judgment of the agencies.  But this Court

4    may not "second-guess[ ] the" agencies' "weighing of risks and benefits."  *Dep't of Commerce v.*

5    *New York*, 139 S. Ct. 2551, 2571 (2019). The rule is supported by reasonable justifications rooted

6    in the government's "experience," *Sacora*, 628 F.3d at 1069, and passes muster under the

7    deferential review applicable to such rules, *City of Los Angeles*, 2019 WL 3049129, *8.

8    **II.    The Other TRO Factors Foreclose Issuing a TRO**

9            A TRO would irreparably harm the United States and the public.  It is always in the public

10   interest to protect the country's borders and enforce its immigration laws.  *See Landon v.*

11   *Plasencia*, 459 U.S. 21, 34 (1982).  Here, the Executive Branch has identified a crisis at the

12   southern border—of thousands of aliens entering our country, overwhelming the immigration

13   system, incentivizing human trafficking, and risking their lives—and has taken targeted measures

14   to address that crisis.  *See* 84 Fed. Reg. at 33,831 (noting an "increase of more than 100,000 cases

15   (or a greater than 13 percent increase in the number of pending cases) since the start of FY 2019"

16   and recognizing that between FY 2015 and FY 2019 there has been a "nearly 125 percent" increase

17   in pending cases even with "double the number of immigration judges as in 2010"); AR21-22, 37-

18   45, 109-10, 119, 121, 138-39, 192, 208-32, 558-65, 634, 679, 768-70.  The public interest is served

19   by encouraging aliens to apply for asylum in the first country in which they may take refuge, rather

20   than picking among preferred destinations.  *See Tchitchui*, 657 F.3d at 137.

21           Against this, Plaintiffs fail (Br. 21-24) to show any "immediate threatened injury."

22   *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). They do not identify

23   a single alien affected by the rule.  And even if they had, aliens ineligible for asylum lose only a

24   discretionary benefit to which they are never entitled; they remain eligible for mandatory

25   protections from removal.  84 Fed. Reg. at 33,834.  And Plaintiffs may not even properly invoke

26   the alleged harm to third parties from the rule.  *East Bay*, 909 F.3d at 1240.  Plaintiffs are

27   organizations and the *only* harms they allege to themselves are speculations about their funding

28   and the need to plan for the new rules.  *See, e.g.*, Compl. ¶ 115-36; Br. 21-24.  Even these alleged

harms ring hollow since expending resources is not irreparable injury.  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  And the loss of an opportunity to comment, Br. 23, is not sufficient.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).  A putative procedural violation does not produce irreparable injury because the violation has already occurred and can "be remedied by a decision on the merits" (by requiring the agency to re-do the decision using the proper procedures).  *See Elk Assoc. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012).  Thus, "irreparable injury cannot stand on procedural violation alone."  *Am. Ass'n for Homecare v. Leavitt*, 2008 WL 2580217, *5 (D.D.C. June 30, 2008).  And even if credited, those administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and undermines the "efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

**III.     Any Interim Relief Must Be Sharply Limited.**

Even if Plaintiffs were entitled to any relief, it would need to be strictly limited.

First, to the extent that Plaintiffs could be deemed to challenge any aspect of the rule as applied to expedited removals, the Court "lacks the authority" to issue any such relief.  *East Bay*, 354 F. Supp. 3d at 1118; *see* 8 U.S.C. § 1252(e)(1), (3).

Second, Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  And the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Those restrictions are especially important at the TRO stage, where relief must be "as narrow as possible to prevent the irreparable injury" of Plaintiffs—and only Plaintiffs. *California Hosp. Ass'n v. Maxwell-Jolly*, 2011 WL 464008, *1 (E.D. Cal. Feb. 4, 2011).  Here, any relief must be tailored to remedying Plaintiffs' particular alleged resource-allocation harms, *see L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011), especially at this stage, where

the purpose of any TRO or injunction is to "preserve the relative positions of the parties until a trial," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Indeed, the Ninth Circuit has recently narrowed nationwide injunctions even when the challenges to statutes were facial. *See California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).  Contrary to the stay panel's decision in *East Bay*, 909 F.3d at 1255-56, immigration law is not a special context that warrants different consideration—especially where, as here, the farther plaintiffs are from being actually affected by a rule, the more likely they could assert a successful nationwide "harm":  an individual plaintiff, who is actually affected by the rule, could receive a complete remedy by an individualized injunction, while under Plaintiffs' theory of Article III, an organizational plaintiff, less personally affected, could receive a far more encompassing remedy.  And it Plaintiffs who bear the burden of showing their requested injunction is not impermissibly broad, given that it is their burden to demonstrate their entitlement to an injunction.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

Finally, this is not the only case challenging this rule—and this Court's ruling should respect that.  *See Capital Area Immigrants' Rights Coalition v. Trump*, No. 19-2117 (D.D.C.).  If this Court issues any relief, it should not preempt the D.C. district court's ability to consider the issue, under D.C. Circuit law, by issuing relief beyond Plaintiffs' demonstrated harms to themselves.  To do otherwise "take[s] a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring); *see also United States v. Mendoza*, 464 U.S. 154, 160, (1984) ("[a]llowing only one final adjudication would" "substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue").  At a minimum, then, the Court may not issue an injunction affecting the District Court for the District of Columbia's ability to decide the same issues under the D.C. Circuit precedent.

## CONCLUSION

For these reasons, the Court should deny the motion for a TRO.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

By: /s/ *Erez Reuveni*
    EREZ REUVENI
    Assistant Director
    Office of Immigration Litigation
    U.S. Department of Justice, Civil Division
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Tel: (202) 307-4293
    Email: Erez.R.Reuveni@usdoj.gov

    PATRICK GLEN
    Senior Litigation Counsel

Dated: July 19, 2019          *Attorneys for Defendants*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on July 19, 2019, I electronically filed the foregoing document with

3  the Clerk of the Court for the United States Court of for the Northern District of California by

4  using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be

5  accomplished by the CM/ECF system.

6

7                         By: */s/ Erez Reuveni*
                             EREZ REUVENI
8                            Assistant Director
                             United States Department of Justice
9                            Civil Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
Assistant Director
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*
FRANCESCA GENOVA
*Trial Attorney*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| East Bay Sanctuary Covenant, *et al.*, | ) | Civil Action No. 3:19-cv-0407-JST |
|  | ) |  |
| Plaintiffs, | ) | **[PROPOSED] ORDER** |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| William Barr, *et al.*, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

        Pending before the Court is Plaintiffs' motion for temporary restraining order. Having

considered the motion, Defendants' opposition, Plaintiffs' reply, and oral argument held on July

24, 2019, the Court HEREBY DENIES the motion.

Dated: July __, 2019

                                        _____
                                        United States District Judge