1

JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
*Senior Litigation Counsel*

2

3

4

5

6

7

8

9

10

11

12

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14

15  East Bay Sanctuary Covenant, *et al.*,

16          Plaintiffs,                              **ADMINISTRATIVE RECORD**

17  v.                                               Civil Action No. 3:19-cv-04073-JST

18  William Barr, *et al.*,

19          Defendants.

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 3:19-cv-04073-JST |
| ) | |
| v. ) | |
| ) | |
| William Barr, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## CERTIFIED INDEX TO ADMINISTRATIVE RECORD

**DOCUMENT**            **PAGE**

1. Aliens Subject to a Bar on Entry under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) . . . . . . . . . . . . . . . . . . . . . AR001

2. Executive Office for Immigration Review, Pending Cases as of May 30, 2019 . . . . . . . AR021

3. Executive Office for Immigration Review, Adjudication Statistics: Pending Cases (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR022

4. Executive Office for Immigration Review, Immigration Judge (IJ) Hiring (July 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR023

5. Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 FR 6811 (Feb. 28, 2019) . . . . . . . . . . . . . . . . AR024

6. Refugee and Asylum Procedures, 45 FR 37392 (June 2, 1980) . . . . . . . . . . . . . . . . . . AR025

7. H.R. Rep. No. 104-469, pt. 1, p.107 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR030

8. United States Citizenship & Immigration Services, Credible Fear and Reasonable Fear Statistics and Nationality Report: Fiscal Year 2018, 4th Quarter, July 1- Sept. 30, 2018 (Nov. 16, 2018) . . . . . . . . . . . . . AR037

9. United States Citizenship & Immigration Services, Credible Fear Workload Report Summary: January 2019 (Feb. 22, 2019) . . . . . . . . . . . . . . . . . . . . . . AR041

10. Executive Office for Immigration Review, Adjudication Statistics: Total Asylum Applications (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR045

11. Department of Homeland Security, Migrant Protection Protocols (Jan. 24, 2019) . . . . AR046

12. Department of Homeland Security, Border Security Metrics Report (May 1, 2018) . . . AR051

13. U.S. Customs and Border Protection, Enforcement Actions
    Southwest Border Total: Apprehensions and Inadmissible Aliens
    by Country of Citizenship (FY17–FY19 TD May) . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR119

14. United States Citizenship & Immigration Services, Credible Fear
    & Reasonable Fear Workload: FY06–FY13 Q1 (May 16, 2013). . . . . . . . . . . . . . . . . AR120

15. Executive Office for Immigration Review, Adjudication Statistics:
    Asylum Decision & Filing Rates in Cases Originating
    with a Credible Fear Claim (Apr. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR121

16. European Union, Convention Determining the State Responsible
    for Examining Applications for Asylum Lodged in one of the
    Member States of the European Communities (Dublin Convention)
    (June 15, 1990), Official Journal C 254, p.0001-0012 (Aug. 19, 1997) . . . . . . . . . . . . AR122

17. UN High Commissioner for Refugees (UNHCR), UNHCR Position on
    Conventions Recently Concluded in Europe (Dublin and Schengen
    Conventions) (Aug. 16, 1991), 3 European Series 2, p. 385 . . . . . . . . . . . . . . . . . . . . . AR138

18. Regulation (EU) No 604/2013 of the European Parliament and of the Council
    of 26 June 2013, Establishing the Criteria and Mechanisms for Determining
    the Member State Responsible for Examining an Application for International
    Protection Lodged in One of the Member States by a Third-Country National
    or a Stateless Person (Recast), 2013 O.J. (L 180) 31 . . . . . . . . . . . . . . . . . . . . . . . . . AR143

19. Visas: Documentation of Nonimmigrants Under the Immigration and
    Nationality Act, as Amended, 81 FR 5906 (Feb. 4, 2016) . . . . . . . . . . . . . . . . . . . . . . AR172

20. Suspending the 30-Day and Annual Interview Requirements
    From the Special Registration Process for Certain Nonimmigrants,
    68 FR 67578 (Dec. 2, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR175

21. Eliminating Exception to Expedited Removal Authority for Cuban Nationals
    Arriving by Air, 82 FR 4769 (Jan. 17, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR182

22. Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) . . . . . . . . . AR187

23. Executive Office for Immigration Review, Adjudication Statistics:
    "Family Unit" Data for Select Courts (June 17, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . AR192

24. Exec. Order 13767, 82 FR 8793 (Jan. 25, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR193

25. Flights to and From Cuba, 81 FR 14948 (Mar. 21, 2016) . . . . . . . . . . . . . . . . . . . . . . AR198

26. Eliminating Exception To Expedited Removal Authority for Cuban Nationals
Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017) . . . . AR204

27. Department of Homeland Security, Southwest Border Encounters
of Non-Mexican Aliens by Month and Year FY2013–FY2019Q2 . . . . . . . . . . . . . . . . .AR208

28. U.S. Customs & Border Protection, Southwest Border Enforcement
Actions: March Official Reporting (Apr. 1, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR210

29. U.S. Customs & Border Protection, Southwest Border Total Apprehensions
& Inadmissible Aliens FY19 April–September Planning Profile (Apr. 10, 2019) . . . . .AR212

30. Department of Homeland Security, OTM Caravan Breakdown
in Mexico (Apr. 22, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR221

31. U.S. Customs & Border Protection, Southwest Border Apprehensions
by Sector: Fiscal Year 2019 (July 10, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR222

32. U.S.-Mexico Joint Declaration (June 7, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR231

33. Proposed Interdiction of Haitian Flag Vessels, 5 Op. O.L.C. 242, 244-45 (1981) . . . . .AR233

34. Stipulated Settlement Agreement, *Flores v. Reno*,
No. 85-cv-4544 (C.D. Cal. Jan. 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR241

35. Memorandum for All Immigration Judges, et al., from The Office of the Chief
Immigration Judge, Executive Office for Immigration Review (May 14, 1999) . . . . . . AR264

36. Memorandum of Understanding Between the Department of Homeland Security
of the United States of America and the Secretariat of Governance and the Secretariat
of Foreign Affairs of the United Mexican States, on the Safe, Orderly,
Dignified and Humane Repatriation of Mexican Nationals (Feb. 20, 2004) . . . . . . . . . AR277

37. Statement by Secretary Johnson on Southwest Border Security, Oct. 17, 2016 . . . . . . .AR282

38. Medecins Sans Frontieres, Forced to Flee Central America's Northern Triangle:
A Neglected Humanitarian Crisis (May 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR286

39. United Nations, Food Security and Emigration, Aug. 2017 . . . . . . . . . . . . . . . . . . . . . .AR318

40. United Nations, Food Security and Emigration, Sept. 2017 . . . . . . . . . . . . . . . . . . . . . .AR342

41. Juan Montes, *Migrant Caravan Crosses Mexico's Southern Border*,
Wall St. J. (Oct. 19, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR434

42. Nick Miroff & Carolyn Van Houten, *The Border Is Tougher To Cross than Ever.
But There's Still One Way into America*, Wash. Post. (Oct. 24, 2018) . . . . . . . . . . . . .AR438

43. Delphine Schrank, *Mexico Offers Plan To Keep U.S.-bound Immigrants
    in Mexico*, Reuters (Oct. 26, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR450

44. Christopher Sherman, *'We're heading north!' Migrants nix offer
    to stay in Mexico*, Associated Press (Oct. 27, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . .AR452

45. Remarks by President Trump on the Illegal Immigration Crisis
    and Border Security, Nov. 1, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR455

46. Asylum and Withholding of Deportation Procedures,
    55 FR 30674 (July 27, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR466

47. New Rules Regarding Procedures for Asylum and Withholding of Removal,
    63 FR 31945 (June 11, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR481

48. Regulations Concerning the Convention Against Torture,
    64 FR 8478 (Feb. 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR487

49. Asylum Procedures, 65 FR 76121 (Dec. 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR506

50. Implementation of the Agreement Between the Government of the
    United States of America and the Government of Canada Regarding
    Asylum Claims Made in Transit and at Land Border Ports-of-Entry,
    69 FR 10620 (Mar. 8, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR525

51. UNHCR, Fact Sheet: Mexico (April 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR533

52. Frank Jack Daniel & Julio-Cesar Chavez, U.S. Ramps Up Mexico Asylum
    Returns, Trump Confirms 'Safe Third Country' Plan, Reuters (June 14, 2019) . . . . . . AR537

53. Department of Homeland Security, Memorandum from Secretary
    Kirstjen M. Nielsen for Kevin K. McAleenan, Commissioner,
    U.S. Customs and Border Protection, and Ronald D. Vitiello,
    Deputy Director and Senior Official Performing the Duties of Director,
    U.S. Immigration and Customs Enforcement, Policy Guidance for
    Implementation of the Migrant Protection Protocols (Jan. 25, 2019) . . . . . . . . . . . . . . AR539

54. U.S. Customs and Border Protection, Guiding Principles for
    Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR543

55. U.S. Customs and Border Protection, Memorandum from Kevin K. McAleenan,
    Commissioner, for Todd C. Owen, Executive Assistant Commissioner,
    Field Operations, and Carla L. Provost, Chief, U.S. Border Patrol,
    Implementation of the Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . . .AR545

56. U.S. Customs and Border Protection, Memorandum from Todd A. Hoffman,
    Executive Director, Admissibility and Passenger Programs,
    Office of Field Operations, for Director, Field Operations, Office of Field

Operations and Director Field Operators Academy, Office of Training and
Development, Guidance on Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . .AR546

57. U.S. Immigration and Customs Enforcement, Memorandum from Ronald
Vitello, Deputy Director and Senior Official Performing the Duties of the
Director, for Executive Associate Directors and Principal Legal Advisor,
Implementation of the Migrant Protection Protocols (Feb. 12, 2019) . . . . . . . . . . . . . . AR547

58. U.S. Immigration and Customs Enforcement, Memorandum from
Nathalie R. Asher, Acting Executive Associate Director,
for Field Office Directors, Enforcement and Removal Operations,
Migrant Protection Protocols Guidance (Feb. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . .AR549

59. U.S. Citizenship and Immigration Services, Policy Memorandum PM-602-0169,
Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality
Act and the Migrant Protection Protocols (Jan. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . AR553

60. Executive Office for Immigration Review, Adjudication Statistics:
New Cases and Total Completions: FY1983–FY2019 Q2 (Apr. 23, 2019) . . . . . . . . . .AR558

61. United Nations, 1951 Convention Relating to the Status of Refugees,
Treaty Series, vol. 189, p.137 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR560

62. United Nations, 1967 Protocol Relating to the Status of Refugees,
Treaty Series, vol. 606, p.267 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR581

63. United Nations, Convention Against Torture and Other Cruel, Inhuman,
or Degrading Treatment or Punishment, Treaty Series, vol. 1465, p.85 . . . . . . . . . . . .AR588

64. Executive Office for Immigration Review, Statistics Yearbook FY2017 . . . . . . . . . . .  AR589

65. Executive Office for Immigration Review, Asylum Median
Processing Time (I-862 & I-863 Case Completions),
October 1, 2014 through June 30, 2019 (July 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . .  AR634

66. Louise Radnofsky, Trump Says Guatemala Is Set To Help Stem
Migrant Flow, WSJ (Jun 18, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR635

67. UNHCR, Universal Periodic Review: Mexico (3rd Cycle, 31st Session) . . . . . . . . . . . AR638

68. Memorandum from President Donald J. Trump to the Attorney General and
Secretary of Homeland Security, Additional Measures to Enhance Border Security
and Restore Integrity to Our Immigration System (Apr. 29, 2019) . . . . . . . . . . . . . . . AR658

69. Sarah Kinosian, As United States' 'Remain in Mexico' Plan Begins,
Mexico Plans To Shut Its 'Too Successful' Humanitarian Visa Program,
GlobalPost (Jan. 24, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR660

70. UNHCR, Universal Periodic Review: Commonwealth of the Bahamas. . . . . . . . . . . . .AR669

71. Dara Lind, The Border Is in Crisis. Here's How It Got This Bad,
Vox (June 5, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..  . . . . . .AR675

72. Department of Homeland Security, Migrant Protection Protocols:
Daily Situational Report (June 5, 20-19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR693

73. Sonia Perez, Migrants Anxious After Mexican Authorities Raid Caravan,
Associated Press (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR696

74. Lizbeth Diaz & Delphine Schrank, Mexico's Refugee Agency Turns
to UN Amid Asylum Surge, Funding Cuts, Reuters (May 22, 2019) . . . . . . . . . . . . . .AR699

75. Human Rights First, Is Mexico Safe for Refugees and Asylum Seekers?,
Fact Sheet (Nov. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR702

76. Amnesty International, Overlooked, Under-Protected: Mexico's Deadly
*Refoulement* of Central Americans Seeking Asylum (Jan. 2018) . . . . . . . . . . . . . . . . .AR704

77. U.S. Department of State, 2017 Country Reports on Human
Rights Practices (Apr. 20, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR728

78. Jose A. Del Real, 'They Were Abusing Us the Whole Way': A Tough
Path for Gay and Trans Migrants, New York Times (July 11, 2018) . . . . . . . . . . . . . .AR756

79. Miriam Jordan, More Migrants Are Crossing the Border this Year.
What's Changed?, NY Times (March 5, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR767

80. Executive Office for Immigration Review, Credible Fear & Asylum Process:
FY2008–FY2019 Q2 (Apr. 23, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR770

81. *Safe Third Countries for Asylum-Seekers: Why Mexico Does Not Qualify
as a Safe Third Country*, Women's Refugee Commission (May 21, 2018) . . . . . . . . . .AR771

82. Valeria Fernandez, *On the way to the US, Children
Seeking Asylum Are Often Put in Mexico's Detention Centers*,
Public Radio International (Jan. 3, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . AR777

83. U.S. Citizenship and Immigration Services, Credible fear Process at the FRCs. . . . . .AR789

84. The White House, Our Nation's Weak Asylum Laws Are
Encouraging an Overwhelming Increase in Illegal Immigration,
Fact Sheet (Nov.1, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .AR790

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| East Bay Sanctuary Covenant, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>William Barr, *et al.*, )<br><br>Defendants. ) | Civil Action No. 1:19-cv-04073-JST |

## CERTIFICATION OF ADMINISTRATIVE RECORD

My name is James McHenry. I am employed with the U.S. Department of Justice ("DOJ"), as the Director of the Executive Office for Immigration Review (EOIR). I am responsible for the management and supervision of EOIR. I have held this position since January 10, 2018, including on July 16, 2019, when the Departments of Justice and Homeland Security issued the interim final rule, "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019).

I am the custodian of the signed interim final rule at DOJ and of a copy of the administrative record for the rule for DOJ. I certify that, to the best of my knowledge, information, and belief, the attached index was developed by the personnel who developed the interim final rule and contains all non-privileged documents considered by DOJ, and that these documents constitute the administrative record the agency considered in issuing the rule.

Executed this 19th day of July, 2019 in Washington, D.C.

James McHenry
Director

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____
                                      )
East Bay Sanctuary Covenant, *et al.*,   )
                                      )
            Plaintiffs,               )
                                      )
v.                                    )       Civil Action No. 1:19-cv-04073-JST
                                      )
William Barr, *et al.*,               )
                                      )
            Defendants.               )
_____)

## CERTIFICATION OF ADMINISTRATIVE RECORD

My name is Christina Bobb. I am employed with the U.S. Department of Homeland Security, as the Executive Secretary.  I am responsible for the oversight and management of the Office of the Executive Secretary, which oversees the management of written communication intended for, and originated by, the Secretary and Deputy Secretary of Homeland Security and maintains official Department records.  I have held this position since May 2018, including on July 16, 2019, when the Departments of Justice and Homeland Security issued the interim final rule entitled, "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019).

I am the custodian of the signed interim final rule at DHS and of a copy of the administrative record for the rule for DHS. I certify that, to the best of my knowledge, information, and belief, the attached index was developed by the personnel who developed the interim final rule and contains all non-privileged documents considered by DHS, and that these documents constitute the administrative record the agency considered in issuing the rule.

Executed this 19th day of July, 2019 in Washington, D.C.

_____
Christina Bobb
Executive Secretary

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC34**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

[EOIR Docket No. 18–0501; A.G. Order No. 4327–2018]

**RIN 1125–AA89**

**Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or, collectively, "the Departments") are adopting an interim final rule governing asylum claims in the context of aliens who are subject to, but contravene, a suspension or limitation on entry into the United States through the southern border with Mexico that is imposed by a presidential proclamation or other presidential order ("a proclamation") under section 212(f) or 215(a)(1) of the Immigration and Nationality Act ("INA"). Pursuant to statutory authority, the Departments are amending their respective existing regulations to provide that aliens subject to such a proclamation concerning the southern border, but who contravene such a proclamation by entering the United States after the effective date of such a proclamation, are ineligible for asylum. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where they would be processed in a controlled, orderly, and lawful manner. This rule would apply only prospectively to a proclamation issued after the effective date of this rule. It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation. DHS is amending its regulations to specify a screening

process for aliens who are subject to this specific bar to asylum eligibility. DOJ is amending its regulations with respect to such aliens. The regulations would ensure that aliens in this category who establish a reasonable fear of persecution or torture could seek withholding of removal under the INA or protection from removal under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

**DATES:**

*Effective date:* This rule is effective November 9, 2018.

*Submission of public comments:* Written or electronic comments must be submitted on or before January 8, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0501, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0501 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule;

explain the reason for any recommended change; and include data, information, or authority that supports the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0501. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office of Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Final Rule**

This interim final rule ("interim rule" or "rule") governs eligibility for asylum and screening procedures for aliens subject to a presidential proclamation or order restricting entry issued pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), that concerns entry to the United States along the southern border with Mexico and is issued on or after the effective date of this rule. Pursuant to statutory authority, the interim rule renders such aliens ineligible for asylum if they enter the United States after the effective date of

such a proclamation, become subject to the proclamation, and enter the United States in violation of the suspension or limitation of entry established by the proclamation. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner. Aliens who enter prior to the effective date of an applicable proclamation will not be subject to this asylum eligibility bar unless they depart and reenter while the proclamation remains in effect. Aliens also will not be subject to this eligibility bar if they fall within an exception or waiver within the proclamation that makes the suspension or limitation of entry in the proclamation inapplicable to them, or if the proclamation provides that it does not affect eligibility for asylum.

As discussed further below, asylum is a discretionary immigration benefit. In general, aliens may apply for asylum if they are physically present or arrive in the United States, irrespective of their status and irrespective of whether or not they arrive at a port of entry, as provided in section 208(a) of the INA, 8 U.S.C. 1158(a). Congress, however, provided that certain categories of aliens could not receive asylum and further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility that are consistent with the asylum statute and "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In the Illegal Immigration Reform and Immigration Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, Congress, concerned with rampant delays in proceedings to remove illegal aliens, created expedited procedures for removing inadmissible aliens, and authorized the extension of such procedures to aliens who entered illegally and were apprehended within two years of their entry. *See generally* INA 235(b), 8 U.S.C. 1225(b). Those procedures were aimed at facilitating the swift removal of inadmissible aliens, including those who had entered illegally, while also expeditiously resolving any asylum claims. For instance, Congress provided that any alien who asserted a fear of persecution would appear before an asylum officer, and that any alien who is determined to

have established a "credible fear"—meaning a "significant possibility . . . that the alien could establish eligibility for asylum" under the asylum statute—would be detained for further consideration of an asylum claim. *See* INA 235(b)(1), (b)(1)(B)(v), 8 U.S.C. 1225(b)(1), (b)(1)(B)(v).

When the expedited procedures were first implemented approximately two decades ago, relatively few aliens within those proceedings asserted an intent to apply for asylum or a fear of persecution. Rather, most aliens found inadmissible at the southern border were single adults who were immediately repatriated to Mexico. Thus, while the overall number of illegal aliens apprehended was far higher than it is today (around 1.6 million in 2000), aliens could be processed and removed more quickly, without requiring detention or lengthy court proceedings.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who assert an intent to apply for asylum or a fear of persecution during that process and are subsequently placed into removal proceedings in immigration court. Most of those aliens unlawfully enter the country between ports of entry along the southern border. Over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview jumped from approximately 5% to above 40%, and the total number of credible-fear referrals for interviews increased from about 5,000 a year in Fiscal Year ("FY") 2008 to about 97,000 in FY 2018. Furthermore, the percentage of cases in which asylum officers found that the alien had established a credible fear—leading to the alien's placement in full immigration proceedings under section 240 of the INA, 8 U.S.C. 1229a—has also increased in recent years. In FY 2008, when asylum officers resolved a referred case with a credible-fear determination, they made a positive finding about 77% of the time. That percentage rose to 80% by FY 2014. In FY 2018, that percentage of positive credible-fear determinations has climbed to about 89% of all cases. After this initial screening process, however, significant proportions of aliens who receive a positive credible-fear determination never file an application for asylum or are ordered removed in absentia. In FY 2018, a total of about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of

cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures thus consumes an ever increasing amount of resources of DHS, which must surveil, apprehend, and process the aliens who enter the country. Congress has also required DHS to detain all aliens during the pendency of their credible-fear proceedings, which can take days or weeks. And DOJ must also dedicate substantial resources: Its immigration judges adjudicate aliens' claims, and its officials are responsible for prosecuting and maintaining custody over those who violate the criminal law. The strains on the Departments are particularly acute with respect to the rising numbers of family units, who generally cannot be detained if they are found to have a credible fear, due to a combination of resource constraints and the manner in which the terms of the Settlement Agreement in *Flores* v. *Reno* have been interpreted by courts. *See* Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85–cv–4544 (N.D. Cal. Jan. 17, 1997).

In recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border. At the same time, large caravans of thousands of aliens, primarily from Central America, are attempting to make their way to the United States, with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation. Central American nationals represent a majority of aliens who enter the United States unlawfully, and are also disproportionately likely to choose to enter illegally between ports of entry rather than presenting themselves at a port of entry. As discussed below, aliens who enter unlawfully between ports of entry along the southern border, as opposed to at a port of entry, pose a greater strain on DHS's already stretched detention and processing resources and also engage in conduct that seriously endangers themselves, any children traveling with them, and the U.S. Customs and Border Protection ("CBP") agents who seek to apprehend them.

The United States has been engaged in sustained diplomatic negotiations with Mexico and the Northern Triangle countries (Honduras, El Salvador, and Guatemala) regarding the situation on the southern border, but those negotiations have, to date, proved

unable to meaningfully improve the situation.

The purpose of this rule is to limit aliens' eligibility for asylum if they enter in contravention of a proclamation suspending or restricting their entry along the southern border. Such aliens would contravene a measure that the President has determined to be in the national interest. For instance, a proclamation restricting the entry of inadmissible aliens who enter unlawfully between ports of entry would reflect a determination that this particular category of aliens necessitates a response that would supplement existing prohibitions on entry for all inadmissible aliens. Such a proclamation would encourage such aliens to seek admission and indicate an intention to apply for asylum at ports of entry. Aliens who enter in violation of that proclamation would not be eligible for asylum. They would, however, remain eligible for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or for protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT.

The Departments anticipate that a large number of aliens who would be subject to a proclamation-based ineligibility bar would be subject to expedited-removal proceedings. Accordingly, this rule ensures that asylum officers and immigration judges account for such aliens' ineligibility for asylum within the expedited-removal process, so that aliens subject to such a bar will be processed swiftly. Furthermore, the rule continues to afford protection from removal for individuals who establish that they are more likely than not to be persecuted or tortured in the country of removal. Aliens rendered ineligible for asylum by this interim rule and who are referred for an interview in the expedited-removal process are still eligible to seek withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT. Such aliens could pursue such claims in proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a, if they establish a reasonable fear of persecution or torture.

## III. Background

### A. Joint Interim Rule

The Attorney General and the Secretary of Homeland Security publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended, transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security. The Homeland Security Act of 2002 charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* 1103(a)(3). The Homeland Security Act of 2002 also transferred to DHS some responsibility for affirmative asylum applications, *i.e.*, applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). Those authorities have been delegated to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.9.

But the Homeland Security Act of 2002 retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) in DOJ, under the Executive Office for Immigration Review ("EOIR") and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA" or "Board"), also within DOJ, in turn hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the INA provides "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.*, INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad with prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and may receive certain financial assistance from the federal government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *see Moncrieffe* v. *Holder*, 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *Romilus* v. *Ashcroft*, 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arriv[e]" in the United States, "whether or not at a designated port of arrival" and "irrespective of such alien's status"—but the applicant must also "apply for asylum in accordance with" the rest of section 208 or with the expedited-removal process in section 235 of the INA. INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to be granted asylum, the alien must demonstrate that he or she meets the statutory definition

of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A).

In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, an alien must show that he or she does not fit within one of the statutory bars to granting asylum and is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by a regulation that is "consistent with" section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 8 CFR 1240.8(d). The INA currently bars a grant of asylum to any alien: (1) Who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground; (2) who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States"; (3) for whom there are serious reasons to believe the alien "has committed a serious nonpolitical crime outside the United States" prior to arrival in the United States; (4) for whom "there are reasonable grounds for regarding the alien as a danger to the security of the United States"; (5) who is described in the terrorism-related inadmissibility grounds, with limited exceptions; or (6) who "was firmly resettled in another country prior to arriving in the United States." INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

An alien who falls within any of those bars is subject to mandatory denial of asylum. Where there is evidence that "one or more of the grounds for mandatory denial of the application for relief may apply," the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir.

2007) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "is a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.'" *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis. Under the Board's decision in *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), and its progeny, "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor" and "circumvention of orderly refugee procedures" can be a "serious adverse factor" against exercising discretion to grant asylum, *id.* at 473, but "[t]he danger of persecution will outweigh all but the most egregious adverse factors," *Matter of Kasinga,* 21 I&N Dec. 357, 367 (BIA 1996).

### C. Establishing Bars to Asylum

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the title. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) ("The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, *e.g.,* having been convicted of a serious crime, constitutes a danger to the United States."). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See id.* at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who persecuted others on account of a protected ground, were convicted of a particularly serious crime in the United States, firmly resettled in another country, or presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). In the Immigration Act of 1990, Public Law 101–649, Congress added an additional mandatory bar to applying for or being granted asylum for "[a]n[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515.

AR004

In IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three exceptions to section 208(a)(1)'s provision that an alien may apply for asylum, for (1) aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C).

Congress also adopted six mandatory exceptions to the authority of the Attorney General or Secretary to grant asylum that largely reflect pre-existing bars set forth in the Attorney General's asylum regulations. These exceptions cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime"; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific exceptions, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical offenses." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime" that "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to

identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006); *Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii). Although these provisions continue to refer only to the Attorney General, the Departments interpret these provisions to also apply to the Secretary of Homeland Security by operation of the Homeland Security Act of 2002. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the imposition by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide

by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the Homeland Security Act, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Beyond providing discretion to further define particularly serious crimes and serious nonpolitical offenses, Congress has provided the Attorney General and Secretary with discretion to establish by regulation any additional limitations or conditions on eligibility for asylum or on the consideration of applications for asylum, so long as these limitations are consistent with the asylum statute.

*D. Other Forms of Protection*

Aliens who are not eligible to apply for or be granted asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is also deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the authority of the implementing legislation regarding Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 1208.3(b); *see also* 8 CFR 1208.16–1208.17.

These forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544–45 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason—for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien may be entitled to

statutory withholding of removal if not otherwise barred for that form of protection. INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) (''[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood.''). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 1208.16(c). But, unlike asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture; (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as protection for derivative family members). *See R–S–C,* 869 F.3d at 1180.

*E. Implementation of Treaty Obligations*

The framework described above is consistent with current U.S. obligations under the 1967 Protocol Relating to the Status of Refugees (''Refugee Protocol''), which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees (''Refugee Convention''), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ('[T]he [Refugee] Protocol is not self-executing.''); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT ''was not self-executing''). These treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented through domestic implementing legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 208.16(c), 208.17– 208.18; 1208.16(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are consistent with these provisions. *See R– S–C,* 869 F.3d at 1188 & n.11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n. 16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited ''penalty'' under Article 31(1) of the Refugee Convention. *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees ''lawfully staying'' in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188.

## IV. Regulatory Changes

*A. Limitation on Eligibility for Asylum for Aliens Who Contravene a Presidential Proclamation Under Section 212(f) or 215(a)(1) of the INA Concerning the Southern Border*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), and who enter the United States in contravention of such a proclamation after the effective date of this rule. The bar would be subject to several further limitations: (1) The bar would apply only prospectively, to aliens who enter the United States after the effective date of such a proclamation; (2) the proclamation must concern entry at the southern border; and (3) the bar on asylum eligibility would not apply if the proclamation expressly disclaims affecting asylum eligibility for aliens within its scope, or expressly provides for a waiver or exception that entitles the alien to relief from the limitation on entry imposed by the proclamation.

The President has both statutory and inherent constitutional authority to suspend the entry of aliens into the United States when it is in the national interest. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) (''The exclusion of aliens is a fundamental act of sovereignty'' that derives from ''legislative power'' and also ''is inherent in the executive power to control the foreign affairs of the nation.''); *see also Proposed Interdiction of Haitian Flag Vessels,* 5 Op. O.L.C. 242, 244–45 (1981) (''[T]he sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government,'' and even without congressional action, the President may ''act[ ] to protect the United States from massive illegal immigration.'').

Congress, in the INA, has expressly vested the President with broad authority to restrict the ability of aliens to enter the United States. Section 212(f) states: ''Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' 8 U.S.C. 1182(f). ''By its plain language, [8 U.S.C.] § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States,'' including the authority ''to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA.'' *Trump* v. *Hawaii,* 138 S. Ct. 2392, 2408 – 12 (2018). For instance, the Supreme Court considered it ''perfectly clear that 8 U.S.C. 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian immigrants the ability to disembark on our shores,'' thereby preventing them from entering

AR006

the United States and applying for asylum. *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 187 (1993).

The President's broad authority under section 212(f) is buttressed by section 215(a)(1), which states it shall be unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1). The presidential orders that the Supreme Court upheld in *Sale* were promulgated pursuant to both sections 212(f) and 215(a)(1)—*see* 509 U.S. at 172 & n.27; *see also* Exec. Order 12807 (May 24, 1992) ("Interdiction of Illegal Aliens"); Exec. Order 12324 (Sept. 29, 1981) ("Interdiction of Illegal Aliens") (revoked and replaced by Exec. Order 12807)—as was the proclamation upheld in *Trump* v. *Hawaii, see* 138 S. Ct. at 2405. Other presidential orders have solely cited section 215(a)(1) as authority. *See, e.g.,* Exec. Order 12172 (Nov. 26, 1979) ("Delegation of Authority With Respect to Entry of Certain Aliens Into the United States") (invoking section 215(a)(1) with respect to certain Iranian visa holders).

An alien whose entry is suspended or limited by a proclamation is one whom the President has determined should not enter the United States, or only should do so under certain conditions. Such an order authorizes measures designed to prevent such aliens from arriving in the United States as a result of the President's determination that it would be against the national interest for them to do so. For example, the proclamation and order that the Supreme Court upheld in *Sale,* Proc. 4865 (Sept. 29, 1981) ("High Seas Interdiction of Illegal Aliens"); Exec. Order 12324, directed the Coast Guard to interdict the boats of tens of thousands of migrants fleeing Haiti to prevent them from reaching U.S. shores, where they could make claims for asylum. The order further authorized the Coast Guard to intercept any vessel believed to be transporting undocumented aliens to the United States, "[t]o make inquiries of those on board, examine documents, and take such actions as are necessary to carry out this order," and "[t]o return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws." Exec. Order 12807, sec. 2(c).

An alien whose entry is suspended or restricted under such a proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws. For instance, an alien subject to a proclamation who nevertheless entered the country in contravention of its terms generally would be placed in expedited-removal proceedings under section 235 of the INA, 8 U.S.C. 1225, and those proceedings would allow the alien to raise any claims for protection before being removed from the United States, if appropriate. Furthermore, the asylum statute provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)," and "irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] 1225(b)." INA 208(a)(1), 8 U.S.C. 1158(a)(1). Some past proclamations have accordingly made clear that aliens subject to an entry bar may still apply for asylum if they have nonetheless entered the United States. *See, e.g.,* Proc. 9645, sec. 6(e) (Sept. 24, 2017) ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats") ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.").

As noted above, however, the asylum statute also authorizes the Attorney General and Secretary "by regulation" to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum," INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), and to set conditions or limitations on the consideration of an application for asylum, INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). The Attorney General and the Secretary have determined that this authority should be exercised to render ineligible for a grant of asylum any alien who is subject to a proclamation suspending or restricting entry along the southern border with Mexico, but who nonetheless enters the United States after such a proclamation goes into effect. Such an alien would have engaged in actions that undermine a particularized determination in a proclamation that the President judged as being required by the national interest: That the alien should not enter the United States.

The basis for ineligibility in these circumstances would be the Departments' conclusion that aliens who contravene such proclamations should not be eligible for asylum. Such proclamations generally reflect sensitive determinations regarding foreign relations and national security that Congress recognized should be entrusted to the President. *See Trump* v. *Hawaii,* 138 S. Ct. at 2411. Aliens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States. For instance, previous proclamations were directed solely at Haitian migrants, nearly all of whom were already inadmissible by virtue of other provisions of the INA, but the proclamation suspended entry and authorized further measures to ensure that such migrants did not enter the United States contrary to the President's determination. *See, e.g.,* Proc. 4865; Exec. Order 12807.

In the case of the southern border, a proclamation that suspended the entry of aliens who crossed between the ports of entry would address a pressing national problem concerning the immigration system and our foreign relations with neighboring countries. Even if most of those aliens would already be inadmissible under our laws, the proclamation would impose limitations on entry for the period of the suspension against a particular class of aliens defined by the President. That judgment would reflect a determination that certain illegal entrants—namely, those crossing between the ports of entry on the southern border during the duration of the proclamation—were a source of particular concern to the national interest. Furthermore, such a proclamation could authorize additional measures to prevent the entry of such inadmissible aliens, again reflecting the national concern with this subset of inadmissible aliens. The interim final rule reflects the Departments' judgment that, under the extraordinary circumstances presented here, aliens crossing the southern border in contravention of such a proclamation should not be eligible for a grant of asylum during the period of suspension or limitation on entry. The result would be to channel to ports of entry aliens who seek to enter the United States and assert an intention to apply for asylum or a fear of persecution, and to provide for consideration of those statements there.

Significantly, this bar to eligibility for a grant of asylum would be limited in scope. This bar would apply only prospectively. This bar would further

AR007

apply only to a proclamation concerning entry along the southern border, because this interim rule reflects the need to facilitate urgent action to address current conditions at that border. This bar would not apply to any proclamation that expressly disclaimed an effect on eligibility for asylum. And this bar would not affect an applicant who is granted a waiver or is excepted from the suspension under the relevant proclamation, or an alien who did not at any time enter the United States after the effective date of such proclamation.

Aliens who enter in contravention of a proclamation will not, however, overcome the eligibility bar merely because a proclamation has subsequently ceased to have effect. The alien still would have entered notwithstanding a proclamation at the time the alien entered the United States, which would result in ineligibility for asylum (but not for statutory withholding or for CAT protection). Retaining eligibility for asylum for aliens who entered the United States in contravention of the proclamation, but evaded detection until it had ceased, could encourage aliens to take riskier measures to evade detection between ports of entry, and would continue to stretch government resources dedicated to apprehension efforts.

This restriction on eligibility to asylum is consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). The regulation establishes a condition on asylum eligibility, not on the ability to apply for asylum. *Compare* INA 208(a), 8 U.S.C. 1158(a) (describing conditions for applying for asylum), *with* INA 208(b), 8 U.S.C. 1158(b) (identifying exceptions and bars to granting asylum). And, as applied to a proclamation that suspends the entry of aliens who crossed between the ports of entry at the southern border, the restriction would not preclude an alien physically present in the United States from being granted asylum if the alien arrives in the United States through any border other than the southern land border with Mexico or at any time other than during the pendency of a proclamation suspending or limiting entry.

*B. Screening Procedures in Expedited Removal for Aliens Subject to Proclamations*

The rule would also modify certain aspects of the process for screening claims for protection asserted by aliens who have entered in contravention of a proclamation and who are subject to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1). Under current procedures, aliens who unlawfully enter

the United States may avoid being removed on an expedited basis by making a threshold showing of a credible fear of persecution at a initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in section 240 proceedings especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to an entry proclamation concerning the southern border would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings.[1] The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening an entry proclamation.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens—apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an alien encountered in the interior of the United States who entered in contravention of a proclamation and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA. The interim rule does not invite comment on existing regulations implementing the present scope of expedited removal.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, legislators expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." *See* H.R. Rep. No. 104–469, pt. 1, at 107 (1996). Members of Congress accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (DC Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum and its attendant benefits, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

---

[1] As noted below, in FY 2018, approximately 171,511 aliens entered illegally between ports of entry, were apprehended by CBP, and were placed in expedited removal. Approximately 59,921 inadmissible aliens arrived at ports of entry and were placed in expedited removal. Furthermore, ICE arrested some 3,102 aliens and placed them in expedited removal.

AR008

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5); *Pena* v. *Lynch,* 815 F.3d 452, 457 (9th Cir. 2016). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.,* "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the federal courts of appeals, *see* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1. The interim rule does not invite comment on existing regulations implementing this framework.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b) (requiring implementation of CAT); IIRIRA, Public Law 104–208, sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately granting asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic,* 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey,* 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B) *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for asylum are not necessarily eligible for

statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.3(b), 208.30(e)(2)– (4), 1208.3(b), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," not CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have were referred as well. This was done on the assumption that that it would not "disrupt[ ] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not require that approach, *see Foti* v. *INS,* 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same way.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protections. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent resident alien subject to an administrative order of removal

resulting from an aggravated felony conviction, then he is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a "reasonable fear" of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e). Reasonable fear is defined by regulation to mean a "reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* § 208.31(c). "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson,* No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing "fair and efficient procedures" in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, "[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum," and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. "Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of entering in contravention of a proclamation, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to

implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103, 8 U.S.C. 1103(a)(3), and to regulate "conditions or limitations on the consideration of an application for asylum," *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in her "sole and unreviewable discretion," the exercise of which may be "modified at any time"—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.[2]

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to a relevant proclamation and nonetheless has entered the United States after the effective date of such a proclamation in contravention of that proclamation would be ineligible for asylum and would thus not be able to establish a "significant possibility . . . [of] eligibility for asylum under section 1158." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). As current USCIS guidance explains, under the credible-fear standard, "[a] claim that has no possibility, or only a minimal or mere possibility, of success, would not meet the 'significant possibility' standard." USCIS, Office of Refugee, Asylum, & Int'l Operations, Asylum Div., *Asylum Officer Basic Training Course, Lesson Plan on Credible Fear* at 15 (Feb. 13, 2017). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation

or suspension on entry imposed by a proclamation. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of contravening a proclamation, however, would still be screened, but in a manner that reflects that their only viable claims would be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16(a). After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with the Department of Justice's longstanding rationale that "aliens ineligible for asylum," who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 ("Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.").

The screening process established by the interim rule will accordingly proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All aliens seeking asylum, statutory withholding of

removal, or CAT protection will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the proclamation bar, then the asylum officer will make a negative credible-fear finding. The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the proclamation-based asylum bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the proclamation ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the proclamation, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the BIA and then seek review from a federal court of appeals.

Conversely, an alien who is found to be subject to the proclamation asylum bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the proclamation asylum bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the proclamation eligibility bar to asylum will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the

---

[2] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769 (Jan. 17, 2017); Designating Aliens For Expedited Removal, 69 FR 48877; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (March 8, 2004); New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 FR 31945 (June 11, 1998); Asylum Procedures, 65 FR 76121; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999).

reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.[3]

2. The above process will not affect the process in 8 CFR 208.30(e)(5) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings if they are otherwise eligible for asylum and obtain immigration judge review of their asylum claims, followed by further review before the BIA and the courts of appeals. Specifically, with the exceptions of stowaways and aliens entering from Canada at a port of entry (who are generally ineligible to apply for asylum by virtue of a safe-third-country agreement), 8 CFR 208.30(e)(5) provides that "if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the [INA] . . . [DHS] shall nonetheless place the alien in proceedings under section 240 of the [INA] for full consideration of the alien's claim."

The language providing that the agency "shall nonetheless place the alien in proceedings under section 240 of the [INA]" was promulgated in 2000 in a final rule implementing asylum procedures after the 1996 enactment of IIRIRA. *See Asylum Procedures*, 65 FR at 76137. The explanation for this change was that some commenters suggested that aliens should be referred to section 240 proceedings "regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]. The Department has adopted that suggestion and has so amended the regulation." *Id.* at 76129.

This rule will avoid a textual ambiguity in 8 CFR 208.30(e)(5), which is unclear regarding its scope, by adding a new sentence clarifying the process

applicable to an alien barred under a covered proclamation. *See* 8 CFR 208.30(e)(5) (referring to an alien who "appears to be subject to one or more of the mandatory bars to . . . asylum contained in section 208(a)(2) and 208(b)(2) of the [INA]"). By using a definite article ("the mandatory bars to . . . asylum") and the phrase "contained in," 8 CFR 208.30(e)(5) may refer only to aliens who are subject to the defined mandatory bars "contained in" specific parts of section 208 of the INA, such as the bar for aggravated felons, INA 208(b)(2)(B)(i), 8 U.S.C. 1558(b)(2)(B)(i), or the bar for aliens reasonably believed to be a danger to U.S. security, INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). It is thus not clear whether an alien subject to a further limitation or condition on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA would also be subject to the procedures set forth in 8 CFR 208.30(e)(5). Notably, the preamble to the final rule adopting 8 CFR 208.30(e)(5) indicated that it was intended to apply to "any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]," and did not address future regulatory ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Asylum Procedures, 65 FR at 76129. This rule does not resolve that question, however, but instead establishes an express regulatory provision dealing specifically with aliens subject to a limitation under section 212(f) or 215(a)(1) of the INA.

*C. Anticipated Effects of the Rule*

1. The interim rule aims to address an urgent situation at the southern border. In recent years, there has been a significant increase in the number and percentage of aliens who seek admission or unlawfully enter the United States and then assert an intent to apply for asylum or a fear of persecution. The vast majority of such assertions for protection occur in the expedited-removal context, and the rates at which such aliens receive a positive credible-fear determination have increased in the last five years. Having passed through the credible-fear screening process, many of these aliens are released into the interior to await further section 240 removal proceedings. But many aliens who pass through the credible-fear screening thereafter do not pursue their claims for asylum. Moreover, a substantial number fail to appear for a section 240 proceeding. And even aliens who passed through credible-fear screening and apply for asylum are granted it at a low rate.

Recent numbers illustrate the scope and scale of the problems caused by the disconnect between the number of aliens asserting a credible fear and the number of aliens who ultimately are deemed eligible for, and granted, asylum. In FY 2018, DHS identified some 612,183 inadmissible aliens who entered the United States, of whom 404,142 entered unlawfully between ports of entry and were apprehended by CBP, and 208,041 presented themselves at ports of entry. Those numbers exclude the inadmissible aliens who crossed but evaded detection, and interior enforcement operations conducted by U.S. Immigration and Customs Enforcement ("ICE"). The vast majority of those inadmissible aliens—521,090—crossed the southern border. Approximately 98% (396,579) of all aliens apprehended after illegally crossing between ports of entry made their crossings at the southern border, and 76% of all encounters at the southern border reflect such apprehensions. By contrast, 124,511 inadmissible aliens presented themselves at ports of entry along the southern border, representing 60% of all port traffic for inadmissible aliens and 24% of encounters with inadmissible aliens at the southern border.

Nationwide, DHS has preliminarily calculated that throughout FY 2018, approximately 234,534 aliens who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. Of that total, approximately 171,511 aliens were apprehended crossing between ports of entry; approximately 59,921 were inadmissible aliens who presented at ports of entry; and approximately 3,102 were arrested by ICE and referred to expedited removal.[4] The total number of aliens of all nationalities referred to expedited-removal proceedings has significantly increased over the last decade, from 161,516 aliens in 2008 to approximately 234,534 in FY 2018 (an overall increase of about 45%). Of those totals, the number of aliens from the Northern Triangle referred to expedited-removal proceedings has increased from 29,206 in FY 2008 (18% of the total

---

[3] Nothing about this screening process or in this interim rule would alter the existing procedures for processing alien stowaways under the INA and associated regulations. An alien stowaway is unlikely to be subject to 8 CFR 208.13(c)(3) and 1208.13(c)(3) unless a proclamation specifically applies to stowaways or to entry by vessels or aircraft. INA 101(a)(49), 8 U.S.C. 1101(a)(49). Moreover, an alien stowaway is barred from being placed into section 240 proceedings regardless of the level of fear of persecution he establishes. INA 235(a)(2), 8 U.S.C. 1225(a)(2). Similarly, despite the incorporation of a reasonable-fear standard into the evaluation of certain cases under credible-fear procedures, nothing about this screening process or in this interim rule implicates existing reasonable-fear procedures in 8 CFR 208.31 and 1208.31.

[4] All references to the number of aliens subject to expedited removal in FY 2018 reflect data for the first three quarters of the year and projections for the fourth quarter of FY 2018. It is unclear whether the ICE arrests reflect additional numbers of aliens processed at ports of entry. Another approximately 130,211 aliens were subject to reinstatement, meaning that the alien had previously been removed and then unlawfully entered the United States again. The vast majority of reinstatements involved Mexican nationals. Aliens subject to reinstatement who express a fear of persecution or torture receive reasonable-fear determinations under 8 CFR 208.31.

161,516 aliens referred) to approximately 103,752 in FY 2018 (44% of the total approximately 234,534 aliens referred, an increase of over 300%). In FY 2018, nationals of the Northern Triangle represented approximately 103,752 (44%) of the aliens referred to expedited-removal proceedings; approximately 91,235 (39%) were Mexican; and nationals from other countries made up the remaining balance (17%). As of the date of this rule, final expedited-removal statistics for FY 2018 specific to the southern border are not available. But the Departments' experience with immigration enforcement has demonstrated that the vast majority of expedited-removal actions have also occurred along the southern border.

Once in expedited removal, some 97,192 (approximately 41% of all aliens in expedited removal) were referred for a credible-fear interview with an asylum officer, either because they expressed a fear of persecution or torture or an intent to apply for protection. Of that number, 6,867 (7%) were Mexican nationals, 25,673 (26%) were Honduran, 13,433 (14%) were Salvadoran, 24,456 (25%) were Guatemalan, and other nationalities made up the remaining 28% (the largest proportion of which were 7,761 Indian nationals).

In other words: Approximately 61% of aliens from Northern Triangle countries placed in expedited removal expressed the intent to apply for asylum or a fear of persecution and triggered credible-fear proceedings in FY 2018 (approximately 69% of Hondurans, 79% of Salvadorans, and 49% of Guatemalans). These aliens represented 65% of all credible-fear referrals in FY 2018. By contrast, only 8% of aliens from Mexico trigger credible-fear proceedings when they are placed in expedited removal, and Mexicans represented 7% of all credible-fear referrals. Other nationalities compose the remaining 26,763 (28%) referred for credible-fear interviews.

Once these 97,192 aliens were interviewed by an asylum officer, 83,862 cases were decided on the merits (asylum officers closed the others).[5]

Those asylum officers found a credible fear in 89% (74,574) of decided cases—meaning that almost all of those aliens' cases were referred on for further immigration proceedings under section 240, and many of the aliens were released into the interior while awaiting those proceedings.[6] As noted, nationals of Northern Triangle countries represent the bulk of credible-fear referrals (65%, or 63,562 cases where the alien expressed an intent to apply for asylum or asserted a fear). In cases where asylum officers decided whether nationals of these countries had a credible fear, they received a positive credible-fear finding 88% of the time.[7] Moreover, when aliens from those countries sought review of negative findings by an immigration judge, they obtained reversals approximately 18% of the time, resulting in some 47,505 cases in which nationals of Northern Triangle countries received positive credible-fear determinations.[8] In other words: Aliens from Northern Triangle countries ultimately received a positive credible-fear determination 89% of the time. Some 6,867 Mexican nationals were interviewed; asylum officers gave them a positive credible-fear determination in 81% of decided cases (4,261), and immigration judges

reversed an additional 91 negative credible-fear determinations, resulting in some 4,352 cases (83% of cases decided on the merits) in which Mexican nationals were referred to section 240 proceedings after receiving a positive credible-fear determination.

These figures have enormous consequences for the asylum system writ large. Asylum officers and immigration judges devote significant resources to these screening interviews, which the INA requires to happen within a fixed statutory timeframe. These aliens must also be detained during the pendency of expedited-removal proceedings. *See* INA 235(b), 8 U.S.C. 1225(b); *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 834 (2018). And assertions of credible fear in expedited removal have rapidly grown in the last decade—especially in the last five years. In FY 2008, for example, fewer than 5,000 aliens were in expedited removal (5%) and were thus referred for a credible-fear interview. In FY 2014, 51,001 referrals occurred (representing 21% of aliens in expedited removal). The credible-fear referral numbers today reflect a 190% increase from FY 2014 and a nearly 2000% increase from FY 2008. Furthermore, the percentage of cases in which asylum officers found that aliens had established a credible fear—leading to the aliens being placed in section 240 removal proceedings—has also increased in recent years. In FY 2008, asylum officers found a credible fear in about 3,200 (or 77%) of all cases. In FY 2014, asylum officers found a credible fear in about 35,000 (or 80%) of all cases in which they made a determination. And in FY 2018, asylum officers found a credible fear in nearly 89% of all such cases.

Once aliens are referred for section 240 proceedings, their cases may take months or years to adjudicate due to backlogs in the system. As of November 2, 2018, there were approximately 203,569 total cases pending in the immigration courts that originated with a credible-fear referral—or 26% of the total backlog of 791,821 removal cases. Of that number, 136,554 involved nationals of Northern Triangle countries (39,940 cases involving Hondurans; 59,702 involving Salvadoran nationals; 36,912 involving Guatemalan nationals). Another 10,736 cases involved Mexican nationals.

In FY 2018, immigration judges completed 34,158 total cases that originated with a credible-fear referral.[9]

---

[5] DHS sometimes calculates credible-fear grant rates as a proportion of all cases (positive, negative, and closed cases). Because this rule concerns the merits of the screening process and closed cases are not affected by that process, this preamble discusses the proportions of determinations on the merits when describing the credible-fear screening process. This preamble does, however, account for the fact that some proportion of closed cases are also sent to section 240 proceedings when discussing the number of cases that immigration judges completed involving aliens referred for a credible-fear interview while in expedited-removal proceedings.

[6] Stowaways are the only category of aliens who would receive a positive credible-fear determination and go to asylum-only proceedings, as opposed to section 240 proceedings, but the number of stowaways is very small. Between FY 2013 and FY 2017, an average of roughly 300 aliens per year were placed in asylum-only proceedings, and that number includes not only stowaways but all classes of aliens subject to asylum-only proceedings. 8 CFR 1208.2(c)(1) (describing 10 categories of aliens, including stowaways found to have a credible fear, who are subject to asylum-only proceedings).

[7] Asylum officers decided 53,205 of these cases on the merits and closed the remaining 10,357 (but sent many of the latter to section 240 proceedings). Specifically, 25,673 Honduran nationals were interviewed; 21,476 of those resulted in a positive screening on the merits, 2,436 received a negative finding, and 1,761 were closed—meaning that 90% of all Honduran cases involving a merits determination resulted in a positive finding, and 10% were denied. Some 13,433 Salvadoran nationals were interviewed; 11,034 of those resulted in a positive screening on the merits 1,717 were denied, and 682 were closed—meaning that 86% of all Salvadoran cases involving a merits determination resulted in a positive finding, and 14% were denied. Some 24,456 Guatemalan nationals were interviewed; 14,183 of those resulted in a positive screening on the merits, 2,359 were denied, and 7,914 were closed—meaning that 86% of all Guatemalan cases involving a merits determination resulted in a positive finding, and 14% were denied. Again, the percentages exclude closed cases so as to describe how asylum officers make decisions on the merits.

[8] Immigration judges in 2018 reversed 18% (288) of negative credible-fear determinations involving Hondurans, 19% (241) of negative credible-fear determinations involving Salvadorans, and 17% (285) of negative credible-fear determinations involving Guatemalans.

[9] All descriptions of case outcomes before immigration judges reflect initial case completions by an immigration judge during the fiscal year

Continued

Those aliens were likely referred for credible-fear screening between 2015 and 2018; the vast majority of these cases arose from positive credible-fear determinations as opposed to the subset of cases that were closed in expedited removal and referred for section 240 proceedings. In a significant proportion of these cases, the aliens did not appear for section 240 proceedings or did not file an application for asylum in connection with those proceedings. In FY 2018, of the 34,158 completions that originated with a credible-fear referral, 24,361 (71%) were completed by an immigration judge with the issuance of an order of removal. Of those completed cases, 10,534 involved in absentia removal orders, meaning that in approximately 31% of all initial completions in FY 2018 that originated from a credible-fear referral, the alien failed to appear at a hearing. Moreover, of those 10,534 cases, there were 1,981 cases where an asylum application was filed, meaning 8,553 did not file an asylum application and failed to appear at a hearing. Further, 40% of all initial completions originating with a credible-fear referral (or 13,595 cases, including the 8,553 aliens just discussed) were completed in FY 2018 without an alien filing an application for asylum. In short, in nearly half of the cases completed by an immigration judge in FY 2018 involving aliens who passed through a credible-fear referral, the alien failed to appear at a hearing or failed to file an asylum application.

Those figures are consistent with trends from FY 2008 through FY 2018, during which time DHS pursued some 354,356 cases in the immigration courts that involved aliens who had gone through a credible-fear review (i.e., the aliens received a positive credible-fear determination or their closed case was referred for further proceedings). During this period, however, only about 53% (189,127) of those aliens filed an asylum application, despite the fact that they were placed into further immigration proceedings under section 240 because they alleged a fear during expedited-removal proceedings.

Even among those aliens who received a credible-fear interview, filed for asylum, and appeared in section 240 proceedings to resolve their asylum claims—a category that would logically include the aliens with the greatest confidence in the merits of their claims—only a very small percentage received asylum. In FY 2018 immigration judges completed 34,158 cases that originated with a credible-fear referral; only 20,563 of those cases involved an application for asylum, and immigration judges granted only 5,639 aliens asylum. In other words, in FY 2018, less than about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum. (An additional 322 aliens received either statutory withholding or CAT protection.) Because there may be multiple bases for denying an asylum application and immigration judges often make alternative findings for consideration of issues on appeal, EOIR does not track reasons for asylum denials by immigration judges at a granular level. Nevertheless, experience indicates that the vast majority of those asylum denials reflect a conclusion that the alien failed to establish a significant possibility of persecution, rather than the effect of a bar to asylum eligibility or a discretionary decision by an immigration judge to deny asylum to an alien who qualifies as a refugee.

The statistics for nationals of Northern Triangle countries are particularly illuminating. In FY 2018, immigration judges in section 240 proceedings adjudicated 20,784 cases involving nationals of Northern Triangle countries who were referred for credible-fear interviews and then referred to section 240 proceedings (i.e., they expressed a fear and either received a positive credible-fear determination or had their case closed and referred to section 240 proceedings for an unspecified reason). Given that those aliens asserted a fear of persecution and progressed through credible-fear screening, those aliens presumably would have had the greatest reason to then pursue an asylum application. Yet in only about 54% of those cases did the alien file an asylum application. Furthermore, about 38% of aliens from Northern Triangle countries who were referred for credible-fear interviews and passed to section 240 proceedings did not appear, and were ordered removed in absentia. Put

differently: Only a little over half of aliens from Northern Triangle countries who claimed a fear of persecution and passed threshold screening submitted an application for asylum, and over a third did not appear at section 240 proceedings.[10] And only 1,889 aliens from Northern Triangle countries were granted asylum, or approximately 9% of completed cases for aliens from Northern Triangle countries who received a credible-fear referral, 17% of the cases where such aliens filed asylum applications in their removal proceedings, and about 23% of cases where such aliens' asylum claims were adjudicated on the merits. Specifically, in FY 2018, 536 Hondurans, 408 Guatemalans, and 945 Salvadorans who initially were referred for a credible-fear interview (whether in FY 2018 or earlier) and progressed to section 240 proceedings were granted asylum.

The Departments thus believe that these numbers underscore the major costs and inefficiencies of the current asylum system. Again, numbers for Northern Triangle nationals—who represent the vast majority of aliens who claim a credible fear—illuminate the scale of the problem. Out of the 63,562 Northern Triangle nationals who expressed an intent to apply for asylum or a fear of persecution and received credible-fear screening interviews in FY 2018, 47,507 received a positive credible-fear finding from the asylum officer or immigration judge. (Another 10,357 cases were administratively closed, some of which also may have been referred to section 240 proceedings.) Those aliens will remain in the United States to await section 240 proceedings while immigration judges work through the current backlog of nearly 800,000 cases—136,554 of which involve nationals of Northern Triangle countries who passed through credible-

---

unless otherwise noted. All references to applications for asylum generally involve applications for asylum, as opposed to some other form of protection, but EOIR statistics do not distinguish between, for instance, the filing of an application for asylum or the filing of an application for statutory withholding. As noted, an application for asylum is also deemed an application for other forms of protection, and whether an application will be for asylum or only for some other form of protection is often a post-filing determination made by the immigration judge (for instance, because the one-year filing bar for asylum applies).

[10] These percentages are even higher for particular nationalities. In FY 2018, immigration judges adjudicated 7,151 cases involving Hondurans whose cases originated with a credible-fear referral in expedited-removal proceedings. Of that 7,151, only 49% (3,509) filed an application for asylum, and 44% (3,167) had their cases completed with an in absentia removal order because they failed to appear. Similarly, immigration judges adjudicated 5,382 cases involving Guatemalans whose cases originated with a credible-fear referral; only 46% (2,457) filed an asylum application, and 41% (2,218) received in absentia removal orders. The 8,251 Salvadoran cases had the highest rate of asylum applications (filed in 65% of cases, or 5,341), and 31% of the total cases (2,534) involved in absentia removal orders. For Mexican nationals reflected similar trends. In FY 2018, immigration judges adjudicated 3,307 cases involving Mexican nationals who progressed to section 240 proceedings after being referred for a credible-fear interview; 49% of them filed applications for asylum in these proceedings, and 25% of the total cases resulted in an in absentia removal order.

fear screening interviews. Immigration judges adjudicated 20,784 cases involving such nationals of Northern Triangle countries in FY 2018; slightly under half of those aliens did not file an application for asylum, and over a third were screened through expedited removal but did not appear for a section 240 proceeding. Even when nationals of Northern Triangle countries who passed through credible-fear screening applied for asylum (as 11,307 did in cases completed in FY 2018), immigration judges granted asylum to only 1,889, or 17% of the cases where such aliens filed asylum applications in their removal proceedings. Immigration judges found in the overwhelming majority of cases that the aliens had no significant possibility of persecution.

These existing burdens suggest an unsustainably inefficient process, and those pressures are now coupled with the prospect that large caravans of thousands of aliens, primarily from Central America, will seek to enter the United States unlawfully or without proper documentation and thereafter trigger credible-fear screening procedures and obtain release into the interior. The United States has been engaged in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) about the problems on the southern border, but those negotiations have, to date, proved unable to meaningfully improve the situation.

2. In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system. Aliens who could not establish a credible fear for asylum purposes due to the proclamation-based eligibility bar could nonetheless seek statutory withholding of removal or CAT protection, but would receive a positive finding only by establishing a reasonable fear of persecution or torture. In FY 2018, USCIS issued nearly 7,000 reasonable-fear determinations (*i.e.,* made a positive or negative determination)—a smaller number because the current determinations are limited to the narrow categories of aliens described above. Of those determinations, USCIS found a reasonable fear in 45% of cases in 2018, and 48% of cases in 2017. Negative reasonable-fear determinations were then subject to further review, and immigration judges reversed approximately 18%.

Even if rates of positive reasonable-fear findings increased when a more general population of aliens became subject to the reasonable-fear screening

process, this process would better filter those aliens eligible for that form of protection. Even assuming that grant rates for statutory withholding in the reasonable-fear screening process (a higher standard) would be the same as grant rates for asylum, this screening mechanism would likely still allow through a significantly higher percentage of cases than would likely be granted. And the reasonable-fear screening rates would also still allow a far greater percentage of claimants through than would ultimately receive CAT protection. Fewer than 1,000 aliens per year, of any nationality, receive CAT protection.

To the extent that aliens continued to enter the United States in violation of a relevant proclamation, the application of the rule's bar to eligibility for asylum in the credible-fear screening process (combined with the application of the reasonable-fear standard to statutory withholding and CAT claims) would reduce the number of cases referred to section 240 proceedings. Finally, the Departments emphasize that this rule would not prevent aliens with claims for statutory withholding or CAT protection from having their claims adjudicated in section 240 proceedings after satisfying the reasonable-fear standard.

Further, determining whether an alien is subject to a suspension of entry proclamation would ordinarily be straightforward, because such orders specify the class of aliens whose entry is restricted. Likewise, adding questions designed to elicit whether an alien is subject to an entry proclamation, and employing a bifurcated credible-fear analysis for the asylum claim and reasonable-fear review of the statutory withholding and CAT claims, will likely not be unduly burdensome. Although DHS has generally not applied existing mandatory bars to asylum in credible-fear determinations, asylum officers currently probe for this information and note in the record where the possibility exists that a mandatory bar may apply. Though screening for proclamation-based ineligibility for asylum may in some cases entail some additional work, USCIS will account for it under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.,* as needed, following issuance of a covered proclamation. USCIS asylum officers and EOIR immigration judges have almost two decades of experience applying the reasonable-fear standard to statutory withholding and CAT claims, and do so in thousands of cases per year already (13,732 in FY 2018 for both EOIR and USCIS). *See, e.g.,* Memorandum for All Immigration Judges, et al., from The

Office of the Chief Immigration Judge, Executive Office for Immigration Review at 6 (May 14, 1999) (explaining similarities between credible-fear and reasonable-fear proceedings for immigration judges).

That said, USCIS estimates that asylum officers have historically averaged four to five credible-fear interviews and completions per day, but only two to three reasonable-fear case completions per day. Comparing this against current case processing targets, and depending on the number of aliens who contravene a presidential proclamation, such a change might result in the need to increase the number of officers required to conduct credible-fear or reasonable-fear screenings to maintain current case completion goals. However, current reasonable-fear interviews are for types of aliens (aggravated felons and aliens subject to reinstatement) for whom relevant criminal and immigration records take time to obtain, and for whom additional interviewing and administrative processing time is typically required. The population of aliens who would be subject to this rule would generally not have the same type of criminal and immigration records in the United States, but additional interviewing time might be necessary. Therefore, it is unclear whether these averages would hold once the rule is implemented.

If an asylum officer determines that credible fear has been established but for the existence of the proclamation bar, and the alien seeks review of such determination before an immigration judge, DHS may need to shift additional resources towards facilitating such review in immigration court in order to provide records of the negative credible-fear determination to the immigration court. However, ICE attorneys, while sometimes present, generally do not advocate for DHS in negative credible-fear or reasonable-fear reviews before an immigration judge.

DHS would, however, also expend additional resources detaining aliens who would have previously received a positive credible-fear determination and who now receive, and challenge, a negative credible-fear and reasonable-fear determination. Aliens are generally detained during the credible-fear screening, but may be eligible for parole or release on bond if they establish a credible fear. To the extent that the rule may result in lengthier interviews for each case, aliens' length of stay in detention would increase. Furthermore, DHS anticipates that more negative determinations would increase the number of aliens who would be

detained and the length of time they would be detained, since fewer aliens would be eligible for parole or release on bond. Also, to the extent this rule would increase the number of aliens who receive both negative credible-fear and reasonable-fear determinations, and would thus be subject to immediate removal, DHS will incur increased and more immediate costs for enforcement and removal of these aliens. That cost would be counterbalanced by the fact that it would be considerably more costly and resource-intensive to ultimately remove such an alien after the end of section 240 proceedings, and the desirability of promoting greater enforcement of the immigration laws.

Attorneys from ICE represent DHS in full immigration proceedings, and immigration judges (who are part of DOJ) adjudicate those proceedings. If fewer aliens are found to have credible fear or reasonable fear and referred to full immigration proceedings, such a development will allow DOJ and ICE attorney resources to be reallocated to other immigration proceedings. The additional bars to asylum are unlikely to result in immigration judges spending much additional time on each case where the nature of the proclamation bar is straightforward to apply. Further, there will likely be a decrease in the number of asylum hearings before immigration judges because certain respondents will no longer be eligible for asylum and DHS will likely refer fewer cases to full immigration proceedings. If DHS officers identify the proclamation-based bar to asylum (before EOIR has acquired jurisdiction over the case), EOIR anticipates a reduction in both in-court and out-of-court time for immigration judges.

A decrease in the number of credible-fear findings and, thus, asylum grants would also decrease the number of employment authorization documents processed by DHS. Aliens are generally eligible to apply for and receive employment authorization and an Employment Authorization Document (Form I–766) after their asylum claim has been pending for more than 180 days. *See* INA 208(d)(5)(A)(iii), 8 U.S.C. 1158(d)(5)(A)(iii); 8 CFR 1208.7(a)(1)(2). This rule and any associated future presidential proclamations would also be expected to have a deterrent effect that could lessen future flows of illegal immigration.

3. The Departments are not in a position to determine how all entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter the United States through the southern border in the near future. The

focus of this rule is on the tens of thousands of aliens each year (97,192 in FY 2018) who assert a credible fear in expedited-removal proceedings and may thereby be placed on a path to release into the interior of the United States. The President has announced his intention to take executive action to suspend the entry of aliens between ports of entry and instead to channel such aliens to ports of entry, where they may seek to enter and assert an intent to apply for asylum in a controlled, orderly, and lawful manner. The Departments have accordingly assessed the anticipated effects of such a presidential action so as to illuminate how the rule would be applied in those circumstances.

a. *Effects on Aliens.* Such a proclamation, coupled with this rule, would have the most direct effect on the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry and then assert a credible fear in expedited-removal proceedings.[11] If such aliens contravened a proclamation suspending their entry unless they entered at a port of entry, they would become ineligible for asylum, but would remain eligible for statutory withholding or CAT protection. And for the reasons discussed above, their claims would be processed more expeditiously. Conversely, if such aliens decided to instead arrive at ports of entry, they would remain eligible for asylum and would proceed through the existing credible-fear screening process.

Such an application of this rule could also affect the decision calculus for the estimated 24,000 or so aliens a year (as of FY 2018) who arrive at ports of entry along the southern border and assert a credible fear in expedited-removal proceedings.[12] Such aliens would likely face increased wait times at a U.S. port of entry, meaning that they would spend

more time in Mexico. Third-country nationals in this category would have added incentives to take advantage of Mexican asylum procedures and to make decisions about travel to a U.S. port of entry based on information about which ports were most capable of swift processing.

Such an application of this rule could also affect aliens who apply for asylum affirmatively or in removal proceedings after entering through the southern border. Some of those asylum grants would become denials for aliens who became ineligible for asylum because they crossed illegally in contravention of a proclamation effective before they entered. Such aliens could, however, still obtain statutory withholding of removal or CAT protection in section 240 proceedings.

Finally, such a proclamation could also affect the thousands of aliens who are granted asylum each year. Those aliens' cases are equally subject to existing backlogs in immigration courts, and could be adjudicated more swiftly if the number of non-meritorious cases declined. Aliens with meritorious claims could thus more expeditiously receive the benefits associated with asylum.

b. *Effects on the Departments' Operations.* Applying this rule in conjunction with a proclamation that channeled aliens seeking asylum to ports of entry would likely create significant overall efficiencies in the Departments' operations beyond the general efficiencies discussed above. Channeling even some proportion of aliens who currently enter illegally and assert a credible fear to ports of entry would, on balance, be expected to help the Departments more effectively leverage their resources to promote orderly and efficient processing of inadmissible aliens.

At present, CBP dedicates enormous resources to attempting to apprehend aliens who cross the southern border illegally. As noted, CBP apprehended 396,579 such aliens in FY 2018. Such crossings often occur in remote locations, and over 16,000 CBP officers are responsible for patrolling hundreds of thousands of square miles of territory, ranging from deserts to mountainous terrain to cities. When a United States Border Patrol (''Border Patrol'' or ''USBP'') agent apprehends an alien who enters unlawfully, the USBP agent takes the alien into custody and transports the alien to a Border Patrol station for processing—which could be hours away. Family units apprehended after crossing illegally present additional logistical challenges, and may require additional agents to assist

---

[11] The Departments estimated this number by using the approximately 171,511 aliens in FY 2018 who were referred to expedited removal after crossing illegally between ports of entry and being apprehended by CBP. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

[12] The Departments estimated this number by using the approximately 59,921 aliens in FY 2018 who were referred to expedited removal after presenting at a port of entry. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

AR015

with the transport of the illegal aliens from the point of apprehension to the station for processing. And apprehending one alien or group of aliens may come at the expense of apprehending others while other agents are dedicating resources to transportation instead of patrolling.

At the Border Patrol station, a CBP agent obtains an alien's fingerprints, photographs, and biometric data, and begins asking background questions about the alien's nationality and purpose in crossing. At the same time, agents must make swift decisions, in coordination with DOJ, as to whether to charge the alien with an immigration-related criminal offense. Further, agents must decide whether to apply expedited-removal procedures, to pursue reinstatement proceedings if the alien already has a removal order in effect, to authorize voluntary return, or to pursue some other lawful course of action. Once the processing of the alien is completed, the USBP temporarily detains any alien who is referred for removal proceedings. Once the USBP determines that an alien should be placed in expedited-removal proceedings, the alien is expeditiously transferred to ICE custody in compliance with federal law. The distance between ICE detention facilities and USBP stations, however, varies. Asylum officers and immigration judges review negative credible-fear findings during expedited-removal proceedings while the alien is in ICE custody.

By contrast, CBP officers are able to employ a more orderly and streamlined process for inadmissible aliens who present at one of the ports of entry along the southern border—even if they claim a credible fear. Because such aliens have typically sought admission without violating the law, CBP generally does not need to dedicate resources to apprehending or considering whether to charge such aliens. And while aliens who present at a port of entry undergo threshold screening to determine their admissibility, *see* INA 235(b)(2), 8 U.S.C. 1225(b)(2), that process takes approximately the same amount of time as CBP's process for obtaining details from aliens apprehended between ports of entry. Just as for illegal entrants, CBP officers at ports of entry must decide whether inadmissible aliens at ports of entry are subject to expedited removal. Aliens subject to such proceedings are then generally transferred to ICE custody so that DHS can implement Congress's statutory mandate to detain such aliens during the pendency of expedited-removal proceedings. As with

stations, ports of entry vary in their proximity to ICE detention facilities.

The Departments acknowledge that in the event all of the approximately 70,000 aliens per year who cross illegally and assert a credible fear instead decide to present at a port of entry, processing times at ports of entry would be slower in the absence of additional resources or policies that would encourage aliens to enter at less busy ports. Using FY 2018 figures, the number of aliens presenting at a port of entry would rise from about 124,511 to about 200,000 aliens if all illegal aliens who assert a credible fear went to ports of entry. That would likely create longer lines at U.S. ports of entry, although the Departments note that such ports have variable capacities and that wait times vary considerably between them. The Departments nonetheless believe such a policy would be preferable to the status quo. Nearly 40% of inadmissible aliens who present at ports of entry today are Mexican nationals, who rarely claim a credible fear and who accordingly can be processed and admitted or removed quickly.

Furthermore, the overwhelming number of aliens who would have an incentive under the rule and a proclamation to arrive at a port of entry rather than to cross illegally are from third countries, not from Mexico. In FY 2018, CBP apprehended and referred to expedited removal an estimated 87,544 Northern Triangle nationals and an estimated 66,826 Mexican nationals, but Northern Triangle nationals assert a credible fear over 60% of the time, whereas Mexican nationals assert a credible fear less than 10% of the time. The Departments believe that it is reasonable for third-country aliens, who appear highly unlikely to be persecuted on account of a protected ground or tortured in Mexico, to be subject to orderly processing at ports of entry that takes into account resource constraints at ports of entry and in U.S. detention facilities. Such orderly processing would be impossible if large proportions of third-country nationals continue to cross the southern border illegally.

To be sure, some Mexican nationals who would assert a credible fear may also have to spend more time waiting for processing in Mexico. Such nationals, however, could still obtain statutory withholding of removal or CAT protection if they crossed illegally, which would allow them a safeguard against persecution. Moreover, only 178 Mexican nationals received asylum in FY 2018 after initially asserting a credible fear of persecution in expedited-removal proceedings, indicating that the category of Mexican

nationals most likely to be affected by the rule and a proclamation would also be highly unlikely to establish eligibility for asylum.

**Regulatory Requirements**

*A. Administrative Procedure Act*

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). This exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States,* 20 Cl. Ct. 324, 333 (1990), *aff'd,* 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union,* 671 F.2d 607, 611 (D.C. Cir. 1982); *United States* v. *Dean,* 604 F.3d 1275, 1279 (11th Cir. 2010). Agencies have previously relied on this exception in promulgating a host of immigration-related interim rules.[13] Furthermore, DHS has invoked this exception in promulgating rules related to expedited removal—a context in which Congress recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[14]

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over six months).

[14] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770 (claiming good cause exception because the ability to detain certain Cuban nationals "while admissibility and identity are
Continued

AR016

The Departments have concluded that the good-cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid creating an incentive for aliens to seek to cross the border during pre-promulgation notice and comment under 5 U.S.C. 553(b) or during the 30-day delay in the effective date under 5 U.S.C. 553(d).

DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770. DHS in particular cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." Id. DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." Id. DHS concluded: "[A] surge could result in significant loss of human life." Id.; accord, e.g., Designating Aliens For Expedited Removal, 69 FR 48877 (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good-cause exception applicable

because of similar short-run incentive concerns).

These same concerns would apply here as well. Pre-promulgation notice and comment, or a delay in the effective date, could lead to an increase in migration to the southern border to enter the United States before the rule took effect. For instance, the thousands of aliens who presently enter illegally and make claims of credible fear if and when they are apprehended would have an added incentive to cross illegally during the comment period. They have an incentive to cross illegally in the hopes of evading detection entirely. Even once apprehended, at present, they are able to take advantage of a second opportunity to remain in the United States by making credible-fear claims in expedited-removal proceedings. Even if their statements are ultimately not found to be genuine, they are likely to be released into the interior pending section 240 proceedings that may not occur for months or years. Based on the available statistics, the Departments believe that a large proportion of aliens who enter illegally and assert a fear could be released while awaiting section 240 proceedings. There continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." Designating Aliens For Expedited Removal, 69 FR at 48878.

Furthermore, there are already large numbers of migrants—including thousands of aliens traveling in groups, primarily from Central America— expected to attempt entry at the southern border in the coming weeks. Some are traveling in large, organized groups through Mexico and, by reports, intend to come to the United States unlawfully or without proper documentation and to express an intent to seek asylum. Creating an incentive for members of those groups to attempt to enter the United States unlawfully before this rule took effect would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations. This interim rule is thus a practical means to address these developments and avoid creating an even larger short-term influx; an extended notice-and-comment rulemaking process would be impracticable.

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). The flow of aliens across the

southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States. See, e.g., Exec. Order 13767 (Jan. 25, 2017). Presidential proclamations invoking section 212(f) or 215(a)(1) of the INA at the southern border necessarily implicate our relations with Mexico and the President's foreign policy, including sensitive and ongoing negotiations with Mexico about how to manage our shared border.[15] A proclamation under section 212(f) of the INA would reflect a presidential determination that some or all entries along the border "would [be] detrimental to the interests of the United States." And the structure of the rule, under which the Attorney General and the Secretary are exercising their statutory authority to establish a mandatory bar to asylum eligibility resting squarely on a proclamation issued by the President, confirms the direct relationship between the President's foreign policy decisions in this area and the rule.

For instance, a proclamation aimed at channeling aliens who wish to make a claim for asylum to ports of entry at the southern border would be inextricably related to any negotiations over a safe-third-country agreement (as defined in INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), or any similar arrangements. As noted, the vast majority of aliens who enter illegally today come from the Northern Triangle countries, and large portions of those aliens assert a credible fear. Channeling those aliens to ports of entry would encourage these aliens to first avail themselves of offers of asylum from Mexico.

Moreover, this rule would be an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx of tens of thousands of migrants from Central America through Mexico and into the United States. For instance, over the past few weeks, the United States has consistently engaged with the Security and Foreign Ministries of El Salvador, Guatemala, and Honduras, as well as the Ministries of Governance and Foreign Affairs of Mexico, to

---

determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR at 48880 (claiming good cause exception for expansion of expedited-removal program due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

---

[15] For instance, since 2004, the United States and Mexico have been operating under a memorandum of understanding concerning the repatriation of Mexican nationals. Memorandum of Understanding Between the Department of Homeland Security of the United States of America and the Secretariat of Governance and the Secretariat of Foreign Affairs of the United Mexican States, on the Safe, Orderly, Dignified and Humane Repatriation of Mexican Nationals (Feb. 20, 2004). Article 6 of that memorandum reserves the movement of third-country nationals through Mexico and the United States for further bilateral negotiations.

AR017

discuss how to address the mass influx of aliens traveling together from Central America who plan to seek to enter at the southern border. Those ongoing discussions involve negotiations over issues such as how these other countries will develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible, and how to establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection. Furthermore, the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement, and this rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations.

This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exporters & Importers-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. This rulemaking explained that it was covered by the foreign affairs exception because it was "consistent with U.S. foreign policy goals"—specifically, the "continued effort to normalize relations between the two countries." Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was subject to the foreign affairs exception because it was "part of a major foreign policy initiative

announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries." Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR at 4904–05.

For the foregoing reasons, taken together, the Departments have concluded that the foreign affairs exemption to notice-and-comment rulemaking applies.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This interim final rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866 because the rule is exempt under the foreign-affairs exemption in section 3(d)(2) as part of the actual exercise of diplomacy. The rule is consequently also exempt from Executive Order

13771 because it is not a significant regulatory action under Executive Order 12866. Though the potential costs, benefits, and transfers associated with some proclamations may have any of a range of economic impacts, this rule itself does not have an impact aside from enabling future action. The Departments have discussed what some of the potential impacts associated with a proclamation may be, but these impacts do not stem directly from this rule and, as such, they do not consider them to be costs, benefits, or transfers of this rule.

This rule amends existing regulations to provide that aliens subject to restrictions on entry under certain proclamations are ineligible for asylum. The expected effects of this rule for aliens and on the Departments' operations are discussed above. As noted, this rule will result in the application of an additional mandatory bar to asylum, but the scope of that bar will depend on the substance of relevant triggering proclamations. In addition, this rule requires DHS to consider and apply the proclamation bar in the credible-fear screening analysis, which DHS does not currently do. Application of the new bar to asylum will likely decrease the number of asylum grants. By applying the bar earlier in the process, it will lessen the time that aliens who are ineligible for asylum and who lack a reasonable fear of persecution or torture will be present in the United States. Finally, DOJ is amending its regulations with respect to aliens who are subject to the proclamation bar to asylum eligibility to ensure that aliens who establish a reasonable fear of persecution or torture may still seek, in proceedings before immigration judges, statutory withholding of removal under the INA or CAT protection.

*Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

AR018

*G. Paperwork Reduction Act*

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Regulatory Amendments

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. In § 208.13, add paragraph (c)(3) to read as follows:

**§ 208.13   Establishing asylum eligibility.**

* * * * *

(c) * * *

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order

expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 3. In § 208.30, revise the section heading and add a sentence at the end of paragraph (e)(5) to read as follows:

**§ 208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

* * * * *

(e) * * *

(5) * * * If the alien is found to be an alien described in 8 CFR 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture if the alien establishes a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

* * * * *

Approved:

Dated: November 5, 2018.

**Kirstjen M. Nielsen,**

*Secretary of Homeland Security.*

**DEPARTMENT OF JUSTICE**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28

U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A– 326 to –328.

■ 5. In § 1003.42, add a sentence at the end of paragraph (d) to read as follows:

**§ 1003.42   Review of credible fear determination.**

* * * * *

(d) * * * If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

* * * * *

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraph (c)(3) to read as follows:

**§ 1208.13   Establishing asylum eligibility.**

* * * * *

(c) * * *

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 8. In § 1208.30, revise the section heading and add paragraph (g)(1) to read as follows:

**§ 1208.30   Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

\*       \*       \*       \*       \*

(g) \* \* \*

(1) *Review by immigration judge of a mandatory bar finding.* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\*       \*       \*       \*       \*

Dated: November 6, 2018.

**Jefferson B. Sessions III,**
*Attorney General.*

[FR Doc. 2018–24594 Filed 11–8–18; 4:15 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

---

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### 14 CFR Part 39

**[Docket No. FAA–2018–0589; Product Identifier 2018–NM–021–AD; Amendment 39–19489; AD 2018–23–03]**

**RIN 2120–AA64**

### Airworthiness Directives; Airbus SAS Airplanes

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of false resolution advisories (RAs) from certain traffic collision avoidance systems (TCASs). This AD requires modification or replacement of certain TCAS processors. We are issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective December 14, 2018.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of December 14, 2018.

**ADDRESSES:** For service information identified in this final rule, contact Honeywell Aerospace, Technical Publications and Distribution, M/S 2101–201, P.O. Box 52170, Phoenix, AZ 85072–2170; phone: 602–365–5535; fax: 602–365–5577; internet: *http://www.honeywell.com.* You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589.

### Examining the AD Docket

You may examine the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the regulatory evaluation, any comments received, and other information. The address for Docket Operations (phone: 800–647–5527) is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Steven Dzierzynski, Aerospace Engineer, Avionics and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7367; fax 516–794–5531.

**SUPPLEMENTARY INFORMATION:**

### Discussion

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was published in the **Federal Register** on July 10, 2018 (83 FR 31911). The NPRM was prompted by reports of false RAs from certain TCASs. The NPRM proposed to require modification or replacement of certain TCAS processors.

We are issuing this AD to address the occurrence of false RAs from the TCAS, which could lead to a loss of separation from other airplanes, possibly resulting in a mid-air collision.

The European Aviation Safety Agency (EASA), which is the Technical Agent for the Member States of the European Union, has issued EASA AD 2017–0196, dated October 5, 2017 (referred to after this as the Mandatory Continuing Airworthiness Information, or ''the MCAI''), to correct an unsafe condition for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The MCAI states:

Since 2012, a number of false TCAS resolution advisories (RA) have been reported by various European Air Navigation Service Providers. EASA has published certification guidance material for collision avoidance systems (AMC 20–15) which defines a false TCAS RA as an RA that is issued, but the RA condition does not exist. It is possible that more false (or spurious) RA events have occurred, but were not recorded or reported. The known events were mainly occurring on Airbus single-aisle (A320 family) aeroplanes, although several events have also occurred on Airbus A330 aeroplanes. Investigation determined that the false RAs are caused on aeroplanes with a Honeywell TPA–100B TCAS processor installed, P/N [part number] 940–0351–001. This was caused by a combination of three factors: (1) Hybrid surveillance enabled; (2) processor connected to a hybrid GPS [global positioning system] source, without a direct connection to a GPS source; and (3) an encounter with an intruder aeroplane with noisy (jumping) ADS–B Out position.

EASA previously published Safety Information Bulletin (SIB) 2014–33 to inform owners and operators of affected aeroplanes about this safety concern. At that time, the false RAs were not considered an unsafe condition. Since the SIB was issued, further events have been reported, involving a third aeroplane.

This condition, if not corrected, could lead to a loss of separation with other aeroplanes, possibly resulting in a mid-air collision.

Prompted by these latest findings, and after review of the available information, EASA reassessed the severity and rate of occurrence of false RAs and has decided that mandatory action must be taken to reduce the rate of occurrence, and the risk of loss of separation with other aeroplanes. Honeywell International Inc. published Service Bulletin

**Executive Office for Immigration Review (EOIR)**
**Pending Cases as of May 30, 2019**

Pending Cases shown with I-589 Applications as of May 30, 2019

| FY | Pending I-862 and I-863 cases | Pending I-862 and I-863 cases with Asylum Application |
|---|---|---|
| 2019 (as of May 30, 2019) | 904,189 | 436,382 |

AR021

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Pending Cases[1]



| FY | Pending Cases at End of Fiscal Year |
|---|---|
| 2008 | 186,095 |
| 2009 | 223,761 |
| 2010 | 262,718 |
| 2011 | 298,148 |
| 2012 | 327,527 |
| 2013 | 356,167 |
| 2014 | 430,004 |
| 2015 | 459,915 |
| 2016 | 521,284 |
| 2017 | 655,698 |
| 2018 | 794,316 |
| 2019 (Second Quarter)[1] | 876,552 |

Data Generated: April 23, 2019
[1] Pending cases equals removal, deportation, exclusion, asylum-only, and withholding only.
[2] FY 2019 Second Quarter through March 31, 2019.

Case 3:19-cv-04073-JST   Document 29-1   Filed 07/19/19   Page 32 of 185

### Immigration Judge (IJ) Hiring



| FY | Total IJs Hired | Total IJs on Board |
|---|---|---|
| 2010 | 17 | 245 |
| 2011 | 39 | 273 |
| 2012 | 4 | 267 |
| 2013 | 8 | 262 |
| 2014 | 0 | 249 |
| 2015 | 20 | 254 |
| 2016 | 56 | 289 |
| 2017 | 64 | 338 |
| 2018 | 81 | 395 |
| 2019 (Third Quarter) | 69 | 431 |

AR023


and wire connect, the origin of each component must be identified. Please note that if you wish to mark the stimulating probes, the insulated stimulating probe, or the packaging containing these products to indicate that they are ''Made in the USA'', the marking must comply with the requirements of the Federal Trade Commission (FTC). We suggest that you direct any questions on this issue to the FTC.

HOLDING:

Based on the information provided, with the exception of the insulated stimulating probe with a removable handle, the country of origin of the stimulating probes is the United States. With regard to the insulated stimulating probe with a removable handle, which is only packaged in China, the country of origin of the individual packaged components remains unchanged.

Notice of this final determination will be given in the *Federal Register*, as required by 19 C.F.R. § 177.29. Any party-at-interest other than the party which requested this final determination may request, pursuant to 19 C.F.R. § 177.31, that CBP reexamine the matter anew and issue a new final determination. Pursuant to 19 C.F.R. § 177.30, any party-at-interest may, within 30 days after publication of the *Federal Register* notice referenced above, seek judicial review of this final determination before the Court of International Trade.

Sincerely,

Alice A. Kipel,

*Executive Director, Regulations and Rulings, Office of Trade.*

[FR Doc. 2019–03539 Filed 2–27–19; 8:45 am]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

### Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice of availability.

**SUMMARY:** This document announces the availability of the ''Policy Guidance for Implementation of the Migrant Protection Protocols'' on the Department of Homeland Security (DHS) website, and of other related documents on DHS component websites.

**DATES:** The policy guidance was issued on January 25, 2019.

**SUPPLEMENTARY INFORMATION:** On December 20, 2018, the Secretary of Homeland Security (Secretary) announced that DHS, consistent with the Migrant Protection Protocols, would begin implementation of section 235(b)(2)(C) of the Immigration and Nationality Act on a wide-scale basis to resolve the migration crisis along our southern border.

On January 25, 2019, the Secretary issued ''Policy Guidance for Implementation of the Migrant Protection Protocols.'' The January 25, 2019, policy guidance is available on the DHS website at the following location: *https://www.dhs.gov/sites/ default/files/publications/19_0129_ OPA_migrant-protection-protocols- policy-guidance.pdf.*

DHS components subsequently issued the following related documents, which are available on the DHS component websites at the following locations:

• U.S. Customs and Border Protection, *Guiding Principles for Migrant Protection Protocols* (Jan. 28, 2019), available at *https://www.cbp.gov/ sites/default/files/assets/documents/ 2019-Jan/MPP%20Guiding %20Principles%201-28-19.pdf.*

• U.S. Customs and Border Protection, Memorandum from Kevin K. McAleenan, Commissioner, for Todd C. Owen, Executive Assistant Commissioner, Field Operations, and Carla L. Provost, Chief, U.S. Border Patrol, *Implementation of the Migrant Protection Protocols* (Jan. 28, 2019), available at *https://www.cbp.gov/sites/ default/files/assets/documents/2019- Jan/Implementation%20of%20the%20 Migrant%20Protection%20 Protocols.pdf.*

• U.S. Customs and Border Protection, Memorandum from Todd A. Hoffman, Executive Director, Admissibility and Passenger Programs, Office of Field Operations, for Director, Field Operations, Office of Field Operations and Director Field Operators Academy, Office of Training and Development, *Guidance on Migrant Protection Protocols* (Jan. 28, 2019), available at *https://www.cbp.gov/sites/ default/files/assets/documents/2019- Jan/MPP%20OFO%20Memo%201-28- 19.pdf.*

• U.S. Immigration and Customs Enforcement, Memorandum from Ronald Vitello, Deputy Director and Senior Official Performing the Duties of the Director, for Executive Associate Directors and Principal Legal Advisor, *Implementation of the Migrant Protection Protocols* (Feb. 12, 2019), available at *https://www.ice.gov/ factsheets/migrant-protection-protocols- mpp.*

• U.S. Immigration and Customs Enforcement, Memorandum from Nathalie R. Asher, Acting Executive Associate Director, for Field Office Directors, Enforcement and Removal Operations, *Migrant Protection Protocols Guidance* (Feb. 12, 2019), available at *https://www.ice.gov/sites/ default/files/documents/Fact%20sheet/ 2019/ERO-MPP-Implementation- Memo.pdf.*

• U.S. Citizenship and Immigration Services, Policy Memorandum PM–602– 0169, *Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols* (Jan. 28, 2019), available at *https://www.uscis.gov/sites/ default/files/USCIS/Laws/Memoranda/ 2019/2019-01-28-Guidance-for- Implementing-Section-35-b-2-C- INA.pdf.*

Kirstjen M. Nielsen,

*Secretary.*

[FR Doc. 2019–03541 Filed 2–27–19; 8:45 am]

**BILLING CODE 9110–9B–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Immigration and Customs Enforcement

**[OMB Control Number 1653–0045]**

### Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Affidavit in Lieu of Lost Receipt of United States ICE for Collateral Accepted as Security

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** 60-Day notice.

**SUMMARY:** In accordance with the Paperwork Reductions Act (PRA) of 1995 the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) will submit the following Information Collection Request (ICR) to the Office of Management and Budget (OMB) for review and clearance.

**DATES:** Comments are encouraged and will be accepted until April 29, 2019.

**ADDRESSES:** You may submit comments, identified by docket number ICEB– 2019–0001 by one of the following methods:

• *Federal E-rulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting.

• *Email: icepra@ice.dhs.gov.* Please include the docket number in the subject line of the message.

AR024

**DEPARTMENT OF JUSTICE**

**8 CFR Parts 207, 208, 209, and 245**

**Immigration and Naturalization Service**

**Aliens and Nationality; Refugee and Asylum Procedures**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Interim regulations with requests for comments.

**SUMMARY:** On March 17, 1980 the President signed into law the Refugee Act of 1980. These interim regulations implement Title II of the Refugee Act. They contain the procedures for the admission of refugees into the United States, the grant of asylum to aliens seeking to enter or remain in the United States, and for the adjustment of status to permanent resident of refugees and asylees.

**DATES:** Effective date: June 1, 1980. Comment date: Written comments will be considered if received no later than July 31, 1980.

**ADDRESS:** Please submit written representations, in duplicate, to the Commissioner of Immigration and Naturalization, Room 7100, 425 Eye Street, N.W., Washington, DC 20536.

**FOR FURTHER INFORMATION CONTACT:** For general information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, N.W., Washington, DC 20536. Telephone: (202) 633-3048.

**FOR SPECIFIC INFORMATION:**

Asylum Procedures, Deputy Assistant Commissioner, Adjudications, Harry J. Klajbor, Immigration and Naturalization Service, 425 Eye Street, N.W., Washington, D.C. 20536. Telephone (202) 633-3229

Admission of Refugees, Director, Refugee and Parole, John G. Rebsamen, Immigration and Naturalization Service, 425 Eye Street, N.W., Washington, D.C. 20536. Telephone: (202) 633-2361

**SUPPLEMENTARY INFORMATION:**

**Admission of Refugees**

The interim regulations on the admission of refugees are contained in 8 CFR 207. Any alien who believes him/herself to be eligible for admission to the United States as a refugee and who is within one of the groups designated by the President to be of special humanitarian concern may apply overseas with the INS Officer in Charge in the area in which the alien is located. There is provision for the admission of the refugee's spouse and children as well.

Any alien who is firmly resettled in a third country is not eligible for admission as a refugee. If the applicant is qualified for admission to the United States as an immediate relative of a United States citizen or a special immigrant, he/she will not be presumed for admission as a refugee unless to do so would be in the public interest. If it appears that the applicant could be admitted to the United States as an immigrant by means other than as an immediate relative or as a refugee he/she will be advised, but not required, to seek admission by that other process.

The applicant must appear in person for questioning, unless under 14 year of age, and must submit to a medical examination. In addition, an assurance of housing and employment for one year and transportation to the U.S. destination must also be obtained before refugee status is granted. If the alien needs a waiver of inadmissibility, an application is made to the Officer in Charge who will conduct whatever investigation is necessary. No appeal is provided from a denial of a waiver.

Waiting lists will be maintained according to the date an application is received. The Attorney General, however, may select refugees for admission from these lists in other than chronological order for reasons which best support the policies and interests of the United States. Each time refugee status is approved, a number will be deducted from the number authorized by the President for the particular group. The approval of an application for admission as a refugee is valid for four months.

**Asylum in the United States**

Asylum procedures are set out in section 208 of the interim regulations. The District Director will consider all applications for asylum with the exception of an application filed after the alien has been placed in exclusion or deportation proceedings. In such a case only the immigration judge will consider the application. An application denied by the District Director may be renewed in exclusion or deportation proceedings before an immigration judge. The burden is on the applicant to show that he is eligible. Each applicant will be interviewed; the District Director will then request an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs (BHRHA) at the Department of State. The immigration judge will not request a new advisory opinion if there already is an opinion from BHRHA in the case unless he determines that changed or special circumstances require an updated report. In the request the District Director will state his evaluation of the case and his assessment of the applicant's credibility. If the BHRHA opinion is not received within 45 days, and no additional time is requested by State, the District Director will decide the case without the opinion.

The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, e.g., having been convicted of a serious crime, constitutes a danger to the United States. In addition, the application may be denied in the exercise of discretion if there is an outstanding offer of resettlement by a third nation and resettlement is in the public interest. Asylum status may be terminated for the same grounds or if there are changed circumstances in the asylee's country which eliminates the need for asylum. Authorization to work in six month increments may be granted in the discretion of the District Director in non-frivolous cases.

Applicants at land border ports, with limited exceptions, must await a decision in Canada or Mexico. Crewmen will be detained on board the vessel pending action on the application, unless the atmosphere on board is not conducive to an interview.

Persons granted asylum will be interviewed after one year to determine their continuing need for asylum and their eligibility for adjustment to permanent resident status.

**Adjustment to Permanent Resident**

Section 209 contains the procedures for adjustment to lawful permanent resident alien status by refugees and asylees. Notice will be sent to all refugees and asylees after one year to report for an interview. Providing the refugee is admissible, he/she will be adjusted to lawful permanent resident alien status. An admissible asylee who continues to qualify as a refugee, that is, there are no changed circumstances in the home country eliminating the need for asylum, may also be adjusted, provided there is a number available. Under the Refugee Act, up to 5,000 numbers per year may be made available for adjusting asylees. A denial of adjustment may not be appealed, but the application may be renewed in deportation or exclusion proceedings before an immigration judge. Pending applications for adjustment by aliens who were eligible under the proviso to section 203(a)(7) will be considered for adjustment as asylees.

AR025

Pursuant to 5 U.S.C. § 553(d)(3), these amendments are made effective immediately for good cause in order to give timely effect to Title II of the Refugee Act.

All interested persons are invited to submit comments. After the comments and the experience under the interim regulations have been evaluated, final regulations will be promulgated.

Accordingly, Chapter I of Title 8 of the Code of Federal Regulations is amended by adding new Parts 207, 208, and 209 and by amending Part 245 as follows:

**PART 207—ADMISSION OF REFUGEES**

Sec.
207.1 Eligibility.
207.2 Application processing.
207.3 Inadmissible applicants.
207.4 Approved applications.
207.5 Waiting lists and priority of handling.
207.6 Control of approved refugee numbers.
207.7 Action at time of arrival in United States.

Authority: Secs. 101, 201, 207, 212; 94 Stat. 102, 103; 8 U.S.C. 11001, 1151, 1157, 1182, 1521 note.

**§ 207.1 Eligibility.**

(a) *Presidential Designation.* At the commencement of each fiscal year the President, after appropriate consultation with Congress, shall determine the numerical allocation of admissions under this chapter among specific refugee groups of special humanitarian concern to the United States. Any alien believing himself/herself to be included within one of the groups of special humanitarian concern as designated by the President and to fall within the terms of "refugee" as described by Section 101(a)(42) of the Act, may make application for admission into the United States under this chapter by filing Form I–590 with the overseas INS Officer-in-Charge exercising jurisdiction over the area in which the applicant is located.

(b) *Firmly Resettled.* Any applicant who has become firmly resettled in a foreign country is not eligible for the granting of refugee status under this chapter. A refugee is considered to be "firmly resettled" if he has been offered resident status, citizenship, or some other type of permanent resettlement by another nation and has travelled to and entered that nation as a consequence of his flight from persecution, unless the refugee establishes, to the satisfaction of the United States Government officer reviewing the case, that the conditions of his residence in that nation have been so substantially and consciously restricted by the authorities of that country that he has not in fact been resettled. In making this determination,

the officer shall consider, in light of the conditions under which other residents of the country live, the type of housing, whether permanent or temporary, made available to the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee has received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country.

(c) *Immediate Relatives and Special Immigrants.* An applicant for refugee status who is qualified as an immediate relative or special immigrant will not be processed as a refugee unless to do so would be in the public interest. Such an alien shall be advised concerning the steps to be taken to secure an immediate relative or special immigrant visa and will be furnished the proper petition forms for transmission to any prospective petitioners. An applicant who appears to be eligible for classification under Sections 203(a) (1), (2), (3), (4), (5), (6), or (7) of the Act, and for whom a visa number is currently available, shall be advised, but not required to seek such classification.

(d) *Spouse and Children.* The spouse or child of any refugee who qualifies for admission shall, if not otherwise entitled to admission, and if not a person described in the second sentence of Section 101(a)(42), be entitled to the same status as such refugee if accompanying, or following to join such refugee and if the spouse or child is otherwise admissible under the Act. The entry of such spouse or child into the United States shall be charged against the numerical limitation under which the refugee's entry is charged.

**§ 207.2 Application processing.**

A separate form I–590 is required of each individual seeking admission under these provisions. Each applicant who has reached his 14th birthday must also submit a properly executed and signed Form G–325c and Form FD–258 fingerprint chart.

(a) *Hearing.* Each applicant under this paragraph shall appear in person before an immigration officer and, excepting a child under 14 years of age, shall, prior to the adjudication of his application, be interrogated under oath concerning his eligibility for admission to the United States as a refugee.

(b) *Medical Examination and Sponsorship.* All applicants under this chapter shall be required to submit to a medical examination as provided by Sections 221(d) and 235 of the Immigration and Nationality Act. Regugee status will not be authorized

until assurances of employment and housing in the United States for a period of 1 year are presented and until assurances of transportation from the applicant's place of abode to the point of final destination in the United States have been provided.

**§ 207.3 Inadmissible applicants.**

Refugees found to be inadmissible on grounds arising out of Sections 212(a)(27), (29), (33), or so much of (23) as relates to trafficking in narcotics, are not eligible for a waiver of such provisions under this chapter. The provisions of Sections 212(a)(14), (15), (20), (21), (25), and (32) are statutorily declared not to be applicable to refugees. All other grounds of excludability arising out of Section 212(a) of the Act may be waived at the discretion of the Attorney General. Application for such waiver may be made by filing Form I–602 with the Officer-in-Charge before whom the refugee's Form I–590 is pending. The burden of proof is upon the applicant to show that such waiver should be granted for humanitarian purposes, to assure family unity, or in the public interest. The Officer-in-Charge will cause such investigation as is necessary to establish the facts and circumstances in the case upon which to base his decision. The applicant shall be notified in writing of the decision, and, if the application is denied, the reasons why. No appeal shall lie from a denial of a waiver by the Officer-in-Charge.

**§ 207.4 Approved application.**

The approval of an application by an Officer-in-Charge outside the United States authorizes the District Director of the port of entry to conditionally admit the applicant as a refugee under his/her arrival at such port within 4 months after the date of approval of the Form I–590.

**§ 207.5 Waiting lists and priority of handling.**

Waiting lists will be maintained for each designated refugee group of special humanitarian concern, and each applicant upon acceptance of his application for filing by INS will be registered on the appropriate list in the chronological order of application receipt. The date so registered will be considered a priority date for purposes of case control. The Attorney General may select such refugees or groups of refugees from these lists in a manner that will best support the policies and interests of the United States. In so doing, appropriate criteria for the selection of refugees and the assignment of processing priorities as is deemed

AR026

advisable by the Attorney General may be adopted for each designated refugee group. These criteria will be based on such considerations as reunification of family, close association with the United States, compelling humanitarian considerations, and public interest factors. The granting of priorities as described is at the discretion of the Attorney General.

### § 207.6   Control of approved refugee numbers.

A current numerical accounting of approved refugees shall be maintained for each special group designated by the President. As refugee status is authorized for each applicant, a number will be deducted from the appropriate group so that information will be immediately available indicating how many refugee numbers remain available for issuance.

### § 207.7   Action at time of arrival in United States.

Upon arrival, every refugee 14 years of age or older shall execute Form I-592. For the purposes of adjustment of status under Section 209(a)(1), the one year period shall commence on the date of the applicant's entry as a refugee into the United States.

## PART 208—ASYLUM PROCEDURES

Sec.
208.1   Jurisdiction.
208.2   Application.
208.3   Filing application.
208.4   Employment authorization.
208.5   Burden of proof.
208.6   Appearance.
208.7   Advisory opinions from BHRHA.
208.8   Decision by district director.
208.9   Renewal of asylum request.
208.10   Asylum request in exclusion or deportation proceedings.
208.11   Asylum requests after completion of exclusion or deportation hearing.
208.12   Leal liability of asylees.
208.13   Definition of country of habitual residence.
208.14   Termination of asylum status.
208.15   Expulsion of former asylees.

Authority: Secs. 101, 208, 94 Stat. 105; 8 U.S.C. 1101, 1158.

### § 208.1   Jurisdiction.

Jurisdiction over any request for asylum made by an applicant for admission at a port of entry shall lie with the district director having jurisdiction over that port of entry. Jurisdiction over any request for asylum made by an alien in the United States shall lie with the district director having jurisdiction over the applicant's residence, except that jurisdiction over an asylum request made by an alien after he/she has been placed under exclusion proceedings pursuant to 8 CFR 236.2, or served an order to show cause pursuant to 8 CFR 242.1, shall lie with the immigration judge.

### § 208.2   Application.

Application for political asylum shall be made on Form I-589, "Request for Asylum in the United States." The applicant's spouse and children as defined in sections 101(b)(1) (A), (B), (C), (D) and (E) of the Act, may be included in the application. Each application shall be accompanied by a completed Form G-325A and an FD-258 fingerprint chart for every individual included in the application who is fourteen years of age or older.

### § 208.3   Filing the application.

(a) With the district director. The asylum application shall be filed in triplicate with the district director when the applicant:

(1) Is seeking admission to the United States, or;

(2) Is in the United States, regardless of his/her status, and has not been placed under exclusion proceedings or served an order to show cause.

(b) With the immigration judge. Asylum requests made after the institution of exclusion or deportation proceedings shall be filed in quadruplicate with the docket clerk of the immigration court. Such asylum requests shall also be considered as requests for withholding exclusion or deportation pursuant to section 243(h) of the Act.

### § 208.4   Employment authorization.

Upon the filing of a non-frivolous I-589, the district director may, in his discretion, grant a request by the applicant for employment authorization.

### § 208.5   Burden of proof.

The burden is on the asylum applicant to establish that he/she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of the country of such person's nationality or, in the case of a person having no nationality, the country in which such person habitually resided, because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

### § 208.6   Appearance.

The applicant shall be examined in person by an immigration officer or judge prior to adjudication of the asylum application. The personal appearance of any children included in the application may be waived by the district director or immigration judge.

### § 208.7   Advisory opinions from the Bureau of Human Rights and Humanitarian Affairs.

Upon receipt of Form I-589, the district director shall in all cases request an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs (BHRHA) of the Department of State. The immigration judge shall request BHRHA advisory opinions as prescribed in paragraph 208.10(b) of this chapter.

### § 208.8   Decision by the district director.

(a) Discretion. The district director may approve or deny the asylum application in the exercise of discretion.

(b) Writing. The decision of the district director shall be in writing.

(c) Appeal. No appeal shall lie from the decision of the district director.

(d) Decision based on BHRHA opinion. If the decision is based in whole or in part on a BHRHA opinion, the opinion is to be made a part of the record of proceeding unless it is classified under Executive Order No. 12065 (3 CFR 190, June 28, 1978). If the BHRHA opinion is included in the record, the applicant shall be given an opportunity to inspect, explain, and rebut the opinion, as prescribed in § 103.2(b)(2) of this chapter.

(e) Approval. When an I-589 is approved, asylum status shall be granted for a period of one year from the date of approval.

(1) Annual interview of asylee. Every asylee shall be interviewed annually to determine continuing eligibility for asylum and eligibility for adjustment of status.

(2) Extension of asylum status. If after the annual interview it is determined that an alien is still eligible for asylum, but does not wish or is ineligible to adjust status under any section of the Act, his/her asylum status may be extended for one year.

(f) Denial.

(1) General. The district director shall deny a request for asylum or extension of asylum status if it is determined that the alien:

(i) Is not a refugee within the meaning of section 101(a)(42) of the Act;

(ii) Has been firmly resettled in a foreign country;

(iii) That the alien ordered, incited, assisted or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion;

(iv) The alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

(v) There are serious reasons for considering that the alien has committed

AR027

a serious non-political crime outside the United States prior to the arrival of the alien in the United States; or

(vi) There are reasonable grounds for regarding the alien as a danger to the security of the United States.

(2) *Discretion.* Among other grounds, the district director may deny a request for asylum or extension of asylum status in the exercise of discretion if it is determined that there is an outstanding offer of resettlement by a third nation where the applicant will not be subject to persecution and the applicant's resettlement in a third nation is in the public interest.

(3) *Applicant for admission.* If an asylum request by an applicant for admission is denied, he/she shall be expeditiously placed under exclusion proceedings, unless the applicant elects to withdraw the application for admission.

(4) *Applicant in the United States.* If a request for asylum or extension of asylum by an alien in the United States is denied, the district director may in his discretion, grant voluntary departure pursuant to O.I. 242.10, or commence deportation proceedings pursuant to 8 CFR 242.1.

§ 208.9  Renewal of asylum request.

Where an application for asylum is denied by the district director, the applicant may renew his/her request for asylum before an immigration judge in exclusion or deportation proceedings.

§ 208.10  Asylum requests in exclusion or deportation proceedings.

(a) *Application.* A request for asylum made in exclusion or deportation proceedings shall be made on Form I-589.

(b) *BHRHA advisory opinion.* When the asylum request is filed, the hearing shall be adjourned for the purpose of requesting an advisory opinion from BHRHA. The immigration judge shall not request such opinion if an opinion has been received in connection with an application under paragraph 208.7 of this part, unless he finds, in his discretion, that circumstances have changed so substantially since the first opinion was provided that a second referral would materially aid in adjudication of the asylum request. The BHRHA opinion, unless classified under Executive Order No. 12065, shall be made part of the record, and the applicant given an opportunity to inspect, explain, and rebut it.

(c) *Record and non-record evidence.* Both the applicant and the Service may present evidence for the record in the exclusion or deportation proceedings. Additionally, the Service may present non-record evidence to be considered by the immigration judge, provided such information is classified under Executive Order No. 12065. When the

immigration judge receives non-record evidence, the applicant shall be informed as to whether the character of the evidence concerns political, social or other conditions in a specified country, or personally relates to the applicant.

(d) *Disclosure of non-record evidence.* The immigration judge may disclose to the asylum applicant the non-record evidence, or any part thereof, to the extent that he believes he can do so and still safeguard the information and its source. The applicant shall be provided opportunity to rebut any evidence so disclosed. A decision based in whole or in part on non-record evidence shall state that such evidence is material to the decision.

(e) *Approval.* When the immigration judge grants asylum, it shall be for a period of one year.

(f) *Denial.* When the immigration judge denies asylum, the exclusion or deportation proceedings shall be reinstituted.

§ 208.11  Asylum requests after completion of exclusion or deportation hearing.

An alien may request that an exclusion or deportation proceeding be reopened pursuant to 8 CFR 103.5 or 8 CFR 242.22 respectively, on the basis of a request for asylum. Such request must reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding. If the alien fails to do so, the asylum claim shall be considered frivolous, absent any evidence to the contrary. Nothing in this part, however, shall be construed to prevent an alien from requesting relief under section 243(h) during exclusion or deportation proceedings.

§ 208.12  Legal liability of asylees.

A grant of asylum status in no way exempts an alien from any liability under civil or criminal proceedings by any department, bureau or agency of any federal, state or local government.

§ 208.13  Definition of country of habitual residence.

The term "country of habitual residence" means the customary, usual, or regular place of abode.

§ 208.14  Definition of firm resettlement.

An alien is considered to be "firmly resettled" if he was offered resident status, citizenship, or some other type of permanent resettlement by another nation and travelled to and entered that nation as a consequence of his flight from persecution, unless the refugee establishes, to the satisfaction of the United States Government officer reviewing the case, that the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of asylum/refuge that he was not in fact resettled. In making this determination, the officer shall consider, in light of the

conditions under which other residents of the country live, the type of housing, whether permanent or temporary, made available to the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country.

§ 208.15  Termination of asylum status.

(a) *Ground.* (1) Changed circumstances in the asylee's country of nationality, or last habitual residence if he/she has no nationality, eliminates the need for asylum, or;

(2) The asylee poses a danger to the security of the United States, or because of conviction of a serious crime poses a danger to the community, as described in part 208.8(f)(iv) of this chapter, or;

(3) It appears that the alien was not in fact eligible for asylum for any reason specified in 208.8(f).

(b) *By district director.* The district director may terminate asylum status granted under § 208.8(e). Prior to termination, the alien shall be given written notice of the intent to rescind asylum status, including the reason(s) therefor, and provided an opportunity to present evidence tending to establish that he/she is still a refugee within the meaning of section 101(a)(42), and/or does not pose a danger to either the security of the United States or the community. If it is subsequently determined, notwithstanding any evidence presented to the contrary, the alien is no longer a refugee, he/she shall be given written notice of termination of asylum status.

(c) *By immigration judge or Board of Immigration Appeals.* The immigration judge or Board of Immigration Appeals may reopen a case pursuant to Parts 3.2 or 242.22 of this chapter for the purpose of terminating asylum status granted under Part 208.10.

§ 208.16  Expulsion of former asylees.

Once an alien's asylum status is terminated as specified in § 208.15 of this part, the alien, unless eligible for other immigration benefits for which he/she makes application, shall be placed under:

(a) Deportation proceedings if he/she was in the United States at the time asylum status was granted, or;

(b) Exclusion proceedings if he/she was an applicant for admission to the United States at the time asylum status was granted.

PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

Sec.
209.1  Admission for permanent residence after one year.

AR028

Sec.
209.2 Adjustment of aliens granted asylum.
    Authority: Secs. 101, 209; 94 Stat. 105; 8 U.S.C. 1101, 1159.

§ 209.1 Admission as permanent resident after one year.

(a) *Eligibility.* Any alien whose entry into the United States as a refugee pursuant to section 207 has not been terminated, shall be required to appear before an immigration officer one year after entry in order to determine his/her admissibility in accordance with sections 235, 236, and 237 of the Act. The applicant shall be interrogated under oath and a determination of admissibility made. If the applicant is determined to be admissible, he/she shall be inspected and admitted for lawful permanent residence. If the applicant is determined to be inadmissible, he/she shall be informed that he/she may renew the request for adjustment in proceeding under section 236.

(b) *Processing Application.* (1) One year after arrival in the United States, a refugee entrant shall be notified on Form I–594 to appear for examination by a primary inspector. Concurrent with the preparation of Form I–594, Form I–181 shall be completed except for date and place accorded permanent residence and signature blocks.

(2) By interrogation of the applicant under oath and examination of his file, a determination of eligibility for permanent residence shall be made in the normal primary inspection manner. Since section 207 of the Act requires that the alien must have been in the United States for at least one year, further inspections shall be postponed until the alien shall have completed one year physical presence in the United States. If the refugee entrant has had the required amount of physical presence, Form FD–258 and Form G–325A shall be processed in accordance with O.I. 105.10(b). Unless there were medical grounds for exclusion at the time of arrival, a USPHS medical examination shall not be required.

(3) If the alien is found admissible after inspection in accordance with section 207, he shall be issued Forms I–551 and I–357 upon conclusion of the interview, and the Form G–325 check shall be completed on a post audit basis. If a positive response to the G–325 check is subsequently received, appropriate action shall be taken promptly.

§ 209.2 Adjustment of status of aliens granted asylum.

(a) *Eligibility.* An alien who has been granted asylum in the United States may be given adjustment of status to that of an alien lawfully admitted for permanent residence in the discretion of the Attorney General, provided the alien (a) applies for such adjustment, (b) has been physically present in the United

States for at least one year after having been granted asylum, (c) continues to be a refugee within the meaning of section 101(a)(42)(A) of the Act, or the spouse or child of such refugee, (d) has not been firmly resettled in any foreign country, (e) is admissible to the United States as an immigrant under the Act at the time of examination for adjustment without regard to paragraphs (14), (15), (20), (21), (25), and (32) of section 212(a), which paragraphs shall not be applicable, and (f) has a refugee number available under section 207(a) of the Act.

(b) *Inadmissible aliens.* An applicant who is inadmissible to the United States under section 212(a) of the Act, may under section 209(c) have the grounds of inadmissibility waived by the Attorney General (except for those under paragraphs (27), (29), (33), and so much of (23) as relates to trafficking in narcotics) for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest. An application for such waiver may be filed, without fee, concurrently with the application for adjustment. An applicant for adjustment who has had the status of an exchange alien or of a nonimmigrant under section 101(a)(15)(J) of the Act, and who thereby became subject to the foreign residence requirement of section 212(e) of the Act, shall not be eligible for adjustment unless the applicant has complied with the foreign residence requirement or has been granted a waiver thereof.

(c) *Application.* An application for the benefits of section 209(b) of the Act shall be filed, without fee, on Form I–485 with the District Director having jurisdiction over the applicant's place of residence. A separate application shall be filed by each alien, and if the alien has reached the age of 14 years, it shall be accompanied by a completed Biographic Form G–325A and Fingerprint Card, Form FD–258. It must also be supported by evidence that the applicant has been granted asylum and has thereafter been physically present in the United States for at least one year. After an alien has been served with an order to show cause or placed under exclusion proceedings, the application shall be made and considered only in proceedings under section 242 or 235 of the Act.

(d) *Medical examination.* Upon acceptance of the application, the applicant shall be required to submit to an examination by a selected civil surgeon, whose report setting forth the findings of the mental and physical condition of the applicant shall be incorporated into the record. Any applicant certified under paragraph (1), (2), (3), (4), or (5) of section 212(a) of the Act may appeal to a Board of Medical Officers of the U.S. Public Health Service as provided in section 234 of the

Act and Part 235 of this chapter.

(e) *Interview.* Each applicant for adjustment of status under this Part shall be interviewed by an immigration officer. The interview may be waived in the case of a child under the age of 14.

(f) *Decision.* The applicant shall be notified of the decision, and, if the application is denied, of the reasons therefor. No appeal shall lie from the denial of an application by the District Director but such denial shall be without prejudice to the alien's right to renew the application in proceedings under Part 242 or 236 of this chapter. If the application is approved, the District Director shall record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application.

PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR PERMANENT RESIDENCE

§ 245.1 [Amended]

1. 8 CFR 245.1(d) is amended by deleting the last sentence.

2. 8 CFR 245.1(h) is amended by substituting "one year" for "two years" in the second sentence.

§ 245.4 [Amended]

3. 8 CFR 245.4 is amended to read as follows:

(a) *Adjustment of status of aliens within the proviso to Section 203(a)(7) of the Act.* The proviso to Section 203(a)(7) of the Act was repealed by the Refugee Act of 1980, effective April 1, 1980. Adjustment thereunder is therefore no longer possible. However, any properly filed adjustment application under that proviso pending on March 31, 1980, may be adjudicated as an application under Section 209(b) of the Act and Part 209 of this chapter, and may be approved if it satisfies all of the conditions of that Section and Part. For this purpose, the applicant found to be a refugee within the meaning of Section 101(a)(42)(A) of the Act (or the spouse or child of such refugee), who had not earlier been granted asylum, may be deemed to have been granted asylum as of the date the adjustment application was filed.

(b) *Adjustment of Status of Aliens under Section 209(b) of the Act.* For the regulation affecting adjustment of aliens under this section of the Act, see Part 209 of the chapter.

*    *    *    *    *

(Secs. 103, 209, 245; Stat. 105; 8 U.S.C. 1103, 1159, 1255)

    Effective date: June 1, 1980.
    Dated: May 30, 1980.

**David Crosland,**
*Acting Commissioner of Immigration and Naturalization.*

[FR Doc. 80-16375 Filed 5-30-60; 11:41 am]
BILLING CODE 4410-10-M

AR029

| 104TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPT. 104–469 Part 1 |
|---|---|---|

# IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

―――――――

# R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

AR030

IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

AR031

1

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPT. 104–469<br>Part 1 |
| --- | --- | --- |

# IMMIGRATION IN THE
# NATIONAL INTEREST ACT OF 1995

————

## R E P O R T

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ON

## H.R. 2202

together with

## ADDITIONAL AND DISSENTING VIEWS

[Including cost estimate of the Congressional Budget Office]



MARCH 4, 1996.—Ordered to be printed

———

U.S. GOVERNMENT PRINTING OFFICE
22–948                           WASHINGTON : 1996

AR032

AR033

# C O N T E N T S

———————

|                                                                                  | Page |
|----------------------------------------------------------------------------------|------|
| The Amendment ...................................................................| 1    |
| Explanation of Amendment ......................................................| 106  |
| Purpose and Summary .............................................................| 106  |
| Background and Need for Legislation ........................................| 110  |
| Hearings ...............................................................................| 182  |
| Committee Consideration ........................................................| 182  |
| Vote of the Committee ............................................................| 182  |
| Committee Oversight Findings .................................................| 205  |
| Committee on Government Reform and Oversight Findings .............| 205  |
| New Budget Authority and Tax Expenditures ............................| 205  |
| Congressional Budget Office Cost Estimate ...............................| 205  |
| Inflationary Impact Statement ................................................| 218  |
| Section-by-Section Analysis and Discussion ...............................| 219  |
| Agency Views .......................................................................| 278  |
| Changes in Existing Law Made by the Bill, as Reported .............| 282  |
| Additional/Minority Views ......................................................| 512  |

AR034

104TH CONGRESS  } HOUSE OF REPRESENTATIVES {  REPT. 104–469
2d Session                                        Part 1

---

IMMIGRATION IN THE NATIONAL INTEREST ACT OF 1995

---

MARCH 4, 1996.—Ordered to be printed

---

Mr. HYDE, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## ADDITIONAL AND DISSENTING VIEWS

[To accompany H.R. 2202]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 2202) to amend the Immigration and Nationality Act to improve deterrence of illegal immigration to the United States by increasing border patrol and investigative personnel, by increasing penalties for alien smuggling and for document fraud, by reforming exclusion and deportation law and procedures, by improving the verification system for eligibility for employment, and through other measures, to reform the legal immigration system and facilitate legal entries into the United States, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE; AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Immigration in the National Interest Act of 1995".

(b) AMENDMENTS TO IMMIGRATION AND NATIONALITY ACT.—Except as otherwise specifically provided—

(1) whenever in this Act an amendment or repeal is expressed as the amendment or repeal of a section or other provision, the reference shall be considered

AR035

107

The result is a crisis at the land border, allowing hundreds of thousands of illegal aliens to cross each year, and contributing more than half of the 300,000 to 400,000 annual growth in the illegal alien population. The problem is not limited to illegal immigration from this hemisphere: alien smugglers from around the globe have set routes through Latin America and Canada to smuggle people into the United States.

More border patrol agents, enhanced training, and improved border technology are all critical to regaining control over our nation's borders. H.R. 2202 includes all of these reforms, including a 1,000 annual increase in Border Patrol agents from now until the end of the century. But H.R. 2202 does something more—it requires a focus on prevention and deterrence of illegal immigration, modeled after the successful "Operation Hold-the-Line" in El Paso, Texas. H.R. 2202 also improves the security of Border Crossing Identification Cards, so that such cards will only be used by those who have been granted the privilege of carrying them.

Finally, illegal immigration control is not simply a matter of securing the land border. Close to half of illegal immigrants enter on temporary visas and overstay. H.R. 2202 authorizes new resources for the prosecution of aliens with multiple illegal entries, and establishes pilot programs: (1) to deter multiple illegal entries into the United States through strategies such as interior repatriation or third country repatriation; (2) to use closed military facilities for detention of illegal aliens; and (3) to create a system for tracking the departures of temporary visitors.

TITLE II—ENFORCEMENT AGAINST ALIEN SMUGGLING AND DOCUMENT FRAUD

Illegal immigration is facilitated through criminal activity: alien smuggling, often carried out by organized criminal elements, and document fraud, including visa and passport fraud. Federal law enforcement should have the same tools to combat immigration crimes it does to combat other serious crimes that threaten public safety and national security. Thus, H.R. 2202 extends current wiretap and undercover investigation authority to the investigation of alien smuggling, document fraud, and other immigration-related crimes. It increases criminal penalties for alien smuggling and document fraud, establishes new civil penalties for document fraud, and extends coverage of the federal anti-racketeering statute (RICO) to organized criminal enterprises engaging in such activity.

TITLE III—REFORMING PROCEDURES FOR REMOVAL OF ILLEGAL ALIENS

Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative. Removal of aliens who enter the United States illegally, even those who are ordered deported after a full due process hearing, is an all-too-rare event. The asylum system has been abused by those who seek to use it as a means of "backdoor" immigration.

H.R. 2202 streamlines rules and procedures for removing illegal aliens, and establishes special procedures for removing alien terrorists. Aliens who arrive in the United States with no valid documents will be removed on an expedited basis; arriving aliens with

## Credible Fear Workload Report Summary
### FY 2018 Total Caseload

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 99,035 | 7,296 | 7,307 | 7,462 | 8,121 | 6,621 | 8,266 | 8,500 | 9,968 | 9,742 | 6,565 | 10,230 | 8,957 |
| Interviews Conducted | 85,018 | 5,339 | 6,365 | 6,265 | 6,926 | 5,699 | 7,280 | 7,142 | 8,877 | 8,941 | 6,065 | 8,066 | 8,053 |
| All Decisions | 97,728 | 6,359 | 7,494 | 7,164 | 8,108 | 6,880 | 8,640 | 7,869 | 10,067 | 10,080 | 7,155 | 8,755 | 9,157 |
| Fear Established (Y) | 74,677 | 4,797 | 5,781 | 5,606 | 6,171 | 5,134 | 6,247 | 6,175 | 8,079 | 7,472 | 5,246 | 6,639 | 7,230 |
| Fear Not Established (N) | 9,659 | 531 | 591 | 669 | 715 | 676 | 767 | 719 | 821 | 1,314 | 945 | 1,082 | 829 |
| Closings | 13,392 | 1,031 | 1,122 | 889 | 1,222 | 1,070 | 1,526 | 975 | 1,167 | 1,294 | 964 | 1,034 | 1,098 |

### Credible Fear Workload Report by Month Total Caseload

#### OCT. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,296 | 859 | 46 | 10 | 152 | 5,390 | 244 | 59 | 199 | 13 | 59 | 265 |
| Interviews Conducted | 5,339 | 625 | 40 | 2 | 89 | 3,943 | 199 | 41 | 149 | 16 | 42 | 193 |
| All Decisions | 6,359 | 811 | 68 | 2 | 108 | 4,675 | 203 | 50 | 172 | 16 | 49 | 205 |
| Fear Established (Y) | 4,797 | 502 | 37 | 2 | 65 | 3,604 | 192 | 30 | 127 | 14 | 35 | 189 |
| Fear Not Established (N) | 531 | 124 | 4 | 0 | 24 | 328 | 7 | 11 | 22 | 2 | 7 | 2 |
| Closings | 1,031 | 185 | 27 | 0 | 19 | 743 | 4 | 9 | 23 | 0 | 7 | 14 |

#### NOV. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,307 | 538 | 167 | 44 | 153 | 5,590 | 352 | 71 | 122 | 3 | 65 | 202 |
| Interviews Conducted | 6,365 | 497 | 46 | 1 | 136 | 4,972 | 322 | 21 | 147 | 1 | 20 | 202 |
| All Decisions | 7,494 | 660 | 75 | 1 | 163 | 5,809 | 346 | 25 | 160 | 2 | 22 | 231 |
| Fear Established (Y) | 5,781 | 411 | 36 | 1 | 124 | 4,545 | 302 | 20 | 127 | 1 | 18 | 196 |
| Fear Not Established (N) | 591 | 94 | 11 | 0 | 13 | 425 | 20 | 1 | 19 | 0 | 2 | 6 |
| Closings | 1,122 | 155 | 28 | 0 | 26 | 839 | 24 | 4 | 14 | 1 | 2 | 29 |

#### DEC. 2017 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 7,462 | 698 | 375 | 28 | 125 | 5,135 | 364 | 201 | 191 | 39 | 44 | 262 |
| Interviews Conducted | 6,265 | 488 | 402 | 18 | 131 | 4,412 | 271 | 96 | 181 | 0 | 47 | 219 |
| All Decisions | 7,164 | 632 | 434 | 18 | 152 | 5,043 | 288 | 106 | 196 | 0 | 60 | 235 |
| Fear Established (Y) | 5,606 | 360 | 367 | 17 | 108 | 4,011 | 246 | 84 | 159 | 0 | 41 | 213 |
| Fear Not Established (N) | 669 | 123 | 37 | 1 | 23 | 411 | 24 | 12 | 25 | 0 | 6 | 7 |
| Closings | 889 | 149 | 30 | 0 | 21 | 621 | 18 | 10 | 12 | 0 | 13 | 15 |

#### JAN. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,121 | 883 | 400 | 15 | 108 | 5,675 | 432 | 73 | 203 | 14 | 127 | 191 |
| Interviews Conducted | 6,926 | 620 | 256 | 2 | 84 | 5,237 | 241 | 40 | 130 | 0 | 108 | 208 |
| All Decisions | 8,108 | 922 | 357 | 3 | 94 | 5,840 | 406 | 42 | 194 | 1 | 69 | 180 |
| Fear Established (Y) | 6,171 | 559 | 262 | 1 | 67 | 4,556 | 337 | 29 | 146 | 1 | 55 | 158 |
| Fear Not Established (N) | 715 | 175 | 21 | 0 | 9 | 443 | 37 | 4 | 14 | 0 | 6 | 6 |
| Closings | 1,222 | 188 | 74 | 2 | 18 | 841 | 32 | 9 | 34 | 0 | 8 | 16 |

#### FEB. 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,621 | 653 | 217 | 5 | 120 | 4,878 | 255 | 103 | 155 | 4 | 47 | 184 |
| Interviews Conducted | 5,699 | 566 | 167 | 7 | 96 | 4,061 | 270 | 121 | 140 | 68 | 63 | 140 |
| All Decisions | 6,880 | 757 | 149 | 8 | 106 | 4,926 | 304 | 142 | 156 | 78 | 99 | 155 |
| Fear Established (Y) | 5,134 | 449 | 114 | 6 | 48 | 3,775 | 257 | 104 | 116 | 67 | 76 | 122 |
| Fear Not Established (N) | 676 | 157 | 20 | 0 | 23 | 411 | 24 | 11 | 7 | 5 | 10 | 8 |
| Closings | 1,070 | 151 | 15 | 2 | 35 | 740 | 23 | 27 | 33 | 6 | 13 | 25 |

#### MARCH 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,266 | 787 | 389 | 5 | 82 | 5,959 | 270 | 82 | 153 | 5 | 151 | 383 |
| Interviews Conducted | 7,280 | 609 | 363 | 7 | 57 | 5,531 | 166 | 26 | 157 | 0 | 107 | 257 |
| All Decisions | 8,640 | 683 | 386 | 8 | 126 | 6,615 | 205 | 40 | 180 | 0 | 100 | 297 |
| Fear Established (Y) | 6,347 | 435 | 301 | 8 | 69 | 4,884 | 141 | 31 | 140 | 0 | 81 | 257 |
| Fear Not Established (N) | 767 | 124 | 47 | 0 | 17 | 533 | 19 | 0 | 14 | 0 | 5 | 8 |
| Closings | 1,526 | 124 | 38 | 0 | 40 | 1,198 | 45 | 9 | 26 | 0 | 14 | 32 |

#### APRIL 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,500 | 812 | 224 | 16 | 138 | 6,092 | 474 | 77 | 153 | 14 | 213 | 287 |
| Interviews Conducted | 7,142 | 753 | 207 | 9 | 93 | 4,857 | 482 | 44 | 149 | 1 | 217 | 330 |
| All Decisions | 7,869 | 905 | 246 | 9 | 97 | 5,249 | 551 | 52 | 174 | 1 | 249 | 336 |
| Fear Established (Y) | 6,175 | 558 | 187 | 7 | 69 | 4,209 | 453 | 39 | 160 | 0 | 216 | 277 |
| Fear Not Established (N) | 719 | 190 | 32 | 0 | 10 | 414 | 34 | 1 | 5 | 1 | 13 | 19 |
| Closings | 975 | 157 | 27 | 2 | 18 | 626 | 64 | 12 | 9 | 0 | 20 | 40 |

#### MAY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,968 | 1,106 | 337 | 45 | 103 | 7,025 | 654 | 67 | 184 | 4 | 140 | 303 |
| Interviews Conducted | 8,877 | 924 | 263 | 27 | 91 | 6,452 | 556 | 59 | 156 | 0 | 109 | 240 |
| All Decisions | 10,067 | 1,107 | 309 | 35 | 119 | 7,279 | 570 | 71 | 170 | 0 | 127 | 280 |
| Fear Established (Y) | 8,079 | 730 | 212 | 28 | 78 | 6,040 | 484 | 51 | 117 | 0 | 97 | 242 |
| Fear Not Established (N) | 821 | 167 | 48 | 1 | 21 | 485 | 43 | 8 | 23 | 0 | 14 | 11 |
| Closings | 1,167 | 210 | 49 | 6 | 20 | 754 | 43 | 12 | 30 | 0 | 16 | 27 |

#### JUNE 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 9,742 | 939 | 402 | 72 | 76 | 6,547 | 532 | 73 | 203 | 12 | 419 | 467 |
| Interviews Conducted | 8,941 | 878 | 420 | 54 | 40 | 6,126 | 521 | 43 | 189 | 2 | 351 | 317 |
| All Decisions | 10,080 | 1,034 | 488 | 55 | 37 | 6,988 | 566 | 59 | 225 | 1 | 368 | 259 |
| Fear Established (Y) | 7,472 | 668 | 316 | 49 | 26 | 5,224 | 479 | 34 | 178 | 1 | 281 | 216 |
| Fear Not Established (N) | 1,314 | 176 | 76 | 4 | 3 | 913 | 66 | 5 | 29 | 0 | 30 | 12 |
| Closings | 1,294 | 190 | 96 | 2 | 8 | 851 | 21 | 20 | 18 | 0 | 57 | 31 |

#### JULY 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 6,565 | 1,126 | 432 | 44 | 117 | 3,686 | 394 | 77 | 88 | 2 | 354 | 245 |
| Interviews Conducted | 6,065 | 840 | 242 | 31 | 106 | 3,680 | 375 | 51 | 91 | 0 | 333 | 316 |
| All Decisions | 7,155 | 950 | 287 | 37 | 136 | 4,384 | 403 | 72 | 107 | 0 | 395 | 384 |
| Fear Established (Y) | 5,246 | 640 | 163 | 27 | 83 | 3,231 | 343 | 39 | 77 | 0 | 297 | 346 |
| Fear Not Established (N) | 945 | 145 | 46 | 5 | 25 | 616 | 32 | 14 | 14 | 0 | 9 | 37 |
| Closings | 964 | 165 | 78 | 5 | 28 | 537 | 28 | 19 | 16 | 0 | 14 | 27 |

#### AUGUST 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 10,230 | 1,492 | 127 | 42 | 230 | 6,986 | 637 | 74 | 156 | 15 | 277 | 194 |
| Interviews Conducted | 8,066 | 1,167 | 167 | 33 | 174 | 5,405 | 488 | 63 | 118 | 0 | 277 | 164 |
| All Decisions | 8,755 | 1,249 | 235 | 34 | 223 | 5,766 | 503 | 72 | 131 | 0 | 316 | 226 |
| Fear Established (Y) | 6,639 | 932 | 179 | 29 | 135 | 4,339 | 422 | 64 | 82 | 0 | 260 | 197 |
| Fear Not Established (N) | 1,082 | 179 | 25 | 4 | 45 | 717 | 48 | 3 | 21 | 0 | 38 | 2 |
| Closings | 1,034 | 138 | 31 | 1 | 43 | 710 | 33 | 5 | 28 | 0 | 18 | 27 |

#### SEPTEMBER 2018 (FY 2018)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 8,957 | 1,243 | 457 | 45 | 136 | 6,054 | 461 | 94 | 111 | 0 | 122 | 234 |
| Interviews Conducted | 8,053 | 987 | 410 | 33 | 118 | 5,577 | 456 | 52 | 116 | 0 | 154 | 150 |
| All Decisions | 9,157 | 1,246 | 470 | 8 | 99 | 6,375 | 497 | 41 | 114 | 0 | 153 | 154 |
| Fear Established (Y) | 7,230 | 916 | 377 | 5 | 62 | 5,054 | 425 | 21 | 105 | 0 | 128 | 137 |
| Fear Not Established (N) | 829 | 142 | 29 | 0 | 21 | 563 | 42 | 8 | 6 | 0 | 11 | 7 |
| Closings | 1,098 | 188 | 64 | 3 | 16 | 758 | 30 | 12 | 3 | 0 | 14 | 10 |



**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Reasonable Fear Workload Report Summary**
**FY 2018 Total Caseload**

| | Totals | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 11,101 | 862 | 856 | 855 | 922 | 775 | 888 | 915 | 1,041 | 979 | 969 | 1,125 | 914 |
| Interviews Conducted | 7,212 | 579 | 528 | 528 | 491 | 480 | 642 | 598 | 737 | 746 | 546 | 751 | 586 |
| All Decisions | 10,964 | 896 | 839 | 837 | 786 | 785 | 952 | 910 | 1,066 | 1,065 | 883 | 1,079 | 866 |
| Fear Established (Y) | 3,161 | 273 | 229 | 221 | 235 | 244 | 313 | 276 | 322 | 308 | 212 | 287 | 241 |
| Fear Not Established (N) | 3,826 | 306 | 283 | 306 | 258 | 249 | 313 | 304 | 373 | 393 | 311 | 435 | 295 |
| Closings | 3,977 | 317 | 327 | 310 | 293 | 292 | 326 | 330 | 371 | 364 | 360 | 357 | 330 |

**Reasonable Fear Workload Report Monthly Caseload by Office**

**OCT. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 862 | 142 | 121 | 5 | 48 | 277 | 50 | 18 | 46 | 29 | 39 | 87 |
| Interviews Conducted | 579 | 72 | 42 | 0 | 43 | 193 | 37 | 8 | 40 | 78 | 14 | 52 |
| All Decisions | 896 | 135 | 107 | 0 | 52 | 274 | 46 | 15 | 44 | 120 | 27 | 76 |
| Fear Established (Y) | 273 | 31 | 15 | 0 | 18 | 70 | 24 | 0 | 21 | 53 | 10 | 31 |
| Fear Not Established (N) | 306 | 42 | 26 | 0 | 25 | 121 | 15 | 8 | 19 | 25 | 4 | 21 |
| Closings | 317 | 62 | 66 | 0 | 9 | 83 | 7 | 7 | 4 | 42 | 13 | 24 |

**NOV. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 856 | 133 | 99 | 17 | 47 | 370 | 33 | 36 | 22 | 4 | 38 | 57 |
| Interviews Conducted | 528 | 83 | 55 | 1 | 37 | 224 | 25 | 12 | 27 | 1 | 23 | 40 |
| All Decisions | 839 | 147 | 121 | 1 | 53 | 335 | 35 | 19 | 30 | 1 | 39 | 58 |
| Fear Established (Y) | 229 | 40 | 23 | 0 | 15 | 73 | 14 | 4 | 12 | 0 | 18 | 30 |
| Fear Not Established (N) | 283 | 40 | 31 | 1 | 22 | 138 | 13 | 8 | 14 | 1 | 5 | 10 |
| Closings | 327 | 67 | 67 | 0 | 16 | 124 | 8 | 7 | 4 | 0 | 16 | 18 |

**DEC. 2017 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 855 | 150 | 90 | 11 | 50 | 319 | 44 | 40 | 44 | 16 | 30 | 61 |
| Interviews Conducted | 528 | 97 | 51 | 5 | 34 | 214 | 23 | 21 | 31 | 0 | 11 | 41 |
| All Decisions | 837 | 155 | 101 | 6 | 50 | 339 | 31 | 25 | 34 | 1 | 32 | 63 |
| Fear Established (Y) | 221 | 40 | 20 | 1 | 11 | 63 | 10 | 14 | 20 | 0 | 8 | 34 |
| Fear Not Established (N) | 306 | 59 | 31 | 4 | 23 | 146 | 13 | 7 | 12 | 0 | 3 | 8 |
| Closings | 310 | 56 | 50 | 1 | 16 | 130 | 8 | 4 | 2 | 1 | 21 | 21 |

**JAN. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 922 | 161 | 106 | 14 | 66 | 326 | 51 | 28 | 50 | 3 | 36 | 81 |
| Interviews Conducted | 491 | 98 | 25 | 6 | 45 | 190 | 21 | 19 | 32 | 0 | 11 | 44 |
| All Decisions | 786 | 164 | 80 | 8 | 54 | 302 | 30 | 24 | 36 | 0 | 29 | 59 |
| Fear Established (Y) | 235 | 49 | 12 | 2 | 13 | 74 | 7 | 11 | 23 | 0 | 8 | 36 |
| Fear Not Established (N) | 258 | 49 | 14 | 4 | 31 | 118 | 12 | 9 | 9 | 0 | 3 | 9 |
| Closings | 293 | 66 | 54 | 2 | 10 | 110 | 11 | 4 | 4 | 0 | 18 | 14 |

**FEB. 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 775 | 102 | 102 | 10 | 54 | 315 | 54 | 21 | 21 | 8 | 34 | 54 |
| Interviews Conducted | 480 | 83 | 50 | 13 | 38 | 168 | 28 | 13 | 31 | 2 | 23 | 31 |
| All Decisions | 785 | 141 | 100 | 13 | 52 | 294 | 38 | 19 | 32 | 3 | 41 | 52 |
| Fear Established (Y) | 244 | 52 | 19 | 5 | 17 | 69 | 11 | 5 | 21 | 2 | 19 | 24 |
| Fear Not Established (N) | 249 | 45 | 23 | 8 | 19 | 109 | 15 | 7 | 10 | 0 | 5 | 8 |
| Closings | 292 | 44 | 58 | 0 | 16 | 116 | 12 | 7 | 1 | 1 | 17 | 20 |

**MARCH 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 888 | 140 | 117 | 8 | 56 | 337 | 62 | 37 | 21 | 3 | 33 | 74 |
| Interviews Conducted | 642 | 90 | 54 | 2 | 34 | 276 | 69 | 15 | 27 | 19 | 17 | 39 |
| All Decisions | 952 | 123 | 115 | 2 | 53 | 409 | 76 | 30 | 28 | 27 | 33 | 56 |
| Fear Established (Y) | 313 | 42 | 28 | 0 | 14 | 122 | 33 | 4 | 17 | 15 | 13 | 25 |
| Fear Not Established (N) | 313 | 42 | 21 | 2 | 19 | 156 | 28 | 12 | 10 | 4 | 6 | 13 |
| Closings | 326 | 39 | 66 | 0 | 20 | 131 | 15 | 14 | 1 | 8 | 14 | 18 |

**APRIL 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 915 | 167 | 95 | 11 | 44 | 410 | 43 | 32 | 19 | 13 | 53 | 28 |
| Interviews Conducted | 598 | 126 | 53 | 8 | 32 | 242 | 44 | 27 | 14 | 8 | 17 | 27 |
| All Decisions | 910 | 172 | 95 | 7 | 43 | 377 | 59 | 36 | 21 | 8 | 51 | 41 |
| Fear Established (Y) | 276 | 58 | 18 | 3 | 16 | 97 | 33 | 9 | 10 | 8 | 8 | 16 |
| Fear Not Established (N) | 304 | 53 | 31 | 3 | 20 | 145 | 15 | 13 | 6 | 0 | 6 | 12 |
| Closings | 330 | 61 | 46 | 1 | 7 | 135 | 11 | 14 | 5 | 0 | 37 | 13 |

**MAY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,041 | 142 | 126 | 12 | 51 | 468 | 47 | 28 | 30 | 9 | 41 | 87 |
| Interviews Conducted | 737 | 145 | 83 | 6 | 35 | 306 | 40 | 22 | 25 | 0 | 23 | 52 |
| All Decisions | 1,066 | 222 | 147 | 9 | 47 | 418 | 59 | 35 | 26 | 0 | 39 | 64 |
| Fear Established (Y) | 322 | 79 | 24 | 7 | 12 | 115 | 31 | 5 | 14 | 0 | 12 | 23 |
| Fear Not Established (N) | 373 | 67 | 38 | 1 | 18 | 173 | 16 | 20 | 10 | 0 | 10 | 20 |
| Closings | 371 | 76 | 85 | 1 | 17 | 130 | 12 | 10 | 2 | 0 | 17 | 21 |

**JUNE 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 979 | 138 | 156 | 9 | 67 | 356 | 55 | 30 | 24 | 1 | 92 | 51 |
| Interviews Conducted | 746 | 143 | 120 | 7 | 42 | 272 | 42 | 13 | 23 | 0 | 51 | 33 |
| All Decisions | 1,065 | 164 | 165 | 5 | 57 | 422 | 62 | 17 | 25 | 0 | 91 | 57 |
| Fear Established (Y) | 308 | 57 | 46 | 4 | 17 | 100 | 14 | 3 | 11 | 0 | 31 | 25 |
| Fear Not Established (N) | 393 | 52 | 55 | 1 | 22 | 180 | 28 | 11 | 11 | 0 | 19 | 14 |
| Closings | 364 | 55 | 64 | 0 | 18 | 142 | 20 | 3 | 3 | 0 | 41 | 18 |

**JULY 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 969 | 186 | 153 | 18 | 50 | 346 | 39 | 18 | 36 | 0 | 67 | 56 |
| Interviews Conducted | 546 | 89 | 63 | 6 | 39 | 241 | 19 | 14 | 27 | 0 | 31 | 17 |
| All Decisions | 883 | 158 | 110 | 10 | 49 | 362 | 30 | 23 | 35 | 0 | 61 | 45 |
| Fear Established (Y) | 212 | 40 | 23 | 4 | 6 | 84 | 12 | 1 | 12 | 0 | 20 | 10 |
| Fear Not Established (N) | 311 | 40 | 38 | 4 | 29 | 143 | 8 | 14 | 14 | 0 | 11 | 10 |
| Closings | 360 | 78 | 49 | 2 | 14 | 135 | 10 | 8 | 9 | 0 | 30 | 25 |

**AUGUST 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 1,125 | 187 | 101 | 12 | 48 | 534 | 57 | 22 | 39 | 0 | 64 | 61 |
| Interviews Conducted | 751 | 126 | 84 | 12 | 31 | 329 | 44 | 15 | 36 | 0 | 40 | 34 |
| All Decisions | 1,079 | 185 | 154 | 12 | 48 | 473 | 44 | 18 | 38 | 0 | 63 | 44 |
| Fear Established (Y) | 287 | 45 | 28 | 5 | 8 | 120 | 17 | 4 | 15 | 0 | 26 | 19 |
| Fear Not Established (N) | 435 | 64 | 44 | 7 | 25 | 220 | 19 | 12 | 21 | 0 | 13 | 10 |
| Closings | 357 | 76 | 82 | 0 | 15 | 133 | 8 | 2 | 2 | 0 | 24 | 15 |

**SEPTEMBER 2018 (FY 2018)**

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 914 | 149 | 132 | 18 | 56 | 372 | 33 | 24 | 32 | 4 | 45 | 49 |
| Interviews Conducted | 586 | 112 | 59 | 6 | 25 | 284 | 27 | 12 | 22 | 0 | 25 | 14 |
| All Decisions | 866 | 170 | 102 | 10 | 43 | 391 | 32 | 21 | 24 | 0 | 48 | 25 |
| Fear Established (Y) | 241 | 48 | 14 | 1 | 7 | 119 | 12 | 4 | 11 | 0 | 19 | 6 |
| Fear Not Established (N) | 295 | 43 | 26 | 5 | 14 | 172 | 11 | 8 | 8 | 0 | 2 | 6 |
| Closings | 330 | 79 | 62 | 4 | 22 | 100 | 9 | 9 | 5 | 0 | 27 | 13 |



**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR038

# Monthly Credible and Reasonable Fear Nationality Reports

| | Credible Fear Nationality Report October 2017 (FY 2018) | | | | Reasonable Fear Nationality Report October 2017 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,126 | | 1 | MEXICO | 313 |
| 2 | HONDURAS | 1,399 | | 2 | HONDURAS | 164 |
| 3 | EL SALVADOR | 1,127 | | 3 | GUATEMALA | 160 |
| 4 | MEXICO | 701 | | 4 | EL SALVADOR | 149 |
| 5 | INDIA | 599 | | 5 | UNKNOWN | 24 |

| | Credible Fear Nationality Report November 2017 (FY 2018) | | | | Reasonable Fear Nationality Report November 2017 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,144 | | 1 | MEXICO | 302 |
| 2 | HONDURAS | 1,509 | | 2 | HONDURAS | 209 |
| 3 | EL SALVADOR | 1,222 | | 3 | GUATEMALA | 161 |
| 4 | INDIA | 551 | | 4 | EL SALVADOR | 134 |
| 5 | MEXICO | 533 | | 5 | BRAZIL | 14 |

| | Credible Fear Nationality Report December 2017 (FY 2018) | | | | Reasonable Fear Nationality Report December 2017 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,247 | | 1 | MEXICO | 292 |
| 2 | HONDURAS | 1,576 | | 2 | GUATEMALA | 200 |
| 3 | EL SALVADOR | 1,153 | | 3 | HONDURAS | 178 |
| 4 | INDIA | 689 | | 4 | EL SALVADOR | 124 |
| 5 | MEXICO | 467 | | 5 | BRAZIL | 16 |

| | Credible Fear Nationality Report January 2018 (FY 2018) | | | | Reasonable Fear Nationality Report January 2018 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,365 | | 1 | MEXICO | 286 |
| 2 | HONDURAS | 1,948 | | 2 | HONDURAS | 244 |
| 3 | EL SALVADOR | 1,059 | | 3 | GUATEMALA | 194 |
| 4 | INDIA | 728 | | 4 | EL SALVADOR | 146 |
| 5 | MEXICO | 630 | | 5 | BRAZIL | 14 |

| | Credible Fear Nationality Report February 2018 (FY 2018) | | | | Reasonable Fear Nationality Report February 2018 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 1,981 | | 1 | MEXICO | 285 |
| 2 | HONDURAS | 1,648 | | 2 | HONDURAS | 175 |
| 3 | EL SALVADOR | 755 | | 3 | GUATEMALA | 146 |
| 4 | MEXICO | 649 | | 4 | EL SALVADOR | 103 |
| 5 | CUBA | 325 | | 5 | DOMINICAN REPUBLIC | 5 |

| | Credible Fear Nationality Report March 2018 (FY 2018) | | | | Reasonable Fear Nationality Report March 2018 (FY 2018) | |
|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** |
| 1 | GUATEMALA | 2,044 | | 1 | MEXICO | 330 |
| 2 | HONDURAS | 1,115 | | 2 | HONDURAS | 212 |
| 3 | EL SALVADOR | 705 | | 3 | GUATEMALA | 175 |
| 4 | MEXICO | 868 | | 4 | EL SALVADOR | 132 |
| 5 | CUBA | 181 | | 5 | BRAZIL | 12 |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR039

| | Credible Fear Nationality Report April 2018 (FY 2018) | | | | Reasonable Fear Nationality Report April 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,531 | | 1 | MEXICO | 283 | |
| 2 | GUATEMALA | 1,878 | | 2 | HONDURAS | 231 | |
| 3 | EL SALVADOR | 972 | | 3 | GUATEMALA | 178 | |
| 4 | MEXICO | 613 | | 4 | EL SALVADOR | 140 | |
| 5 | CUBA | 546 | | 5 | BRAZIL | 12 | |

| | Credible Fear Nationality Report May 2018 (FY 2018) | | | | Reasonable Fear Nationality Report May 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,952 | | 1 | MEXICO | 317 | |
| 2 | GUATEMALA | 2,406 | | 2 | HONDURAS | 242 | |
| 3 | EL SALVADOR | 1,245 | | 3 | GUATEMALA | 218 | |
| 4 | INDIA | 686 | | 4 | EL SALVADOR | 166 | |
| 5 | MEXICO | 654 | | 5 | BRAZIL | 11 | |

| | Credible Fear Nationality Report June 2018 (FY 2018) | | | | Reasonable Fear Nationality Report June 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 3,169 | | 1 | MEXICO | 307 | |
| 2 | GUATEMALA | 2,348 | | 2 | HONDURAS | 269 | |
| 3 | EL SALVADOR | 1,416 | | 3 | GUATEMALA | 198 | |
| 4 | INDIA | 691 | | 4 | EL SALVADOR | 156 | |
| 5 | CUBA | 621 | | 5 | BRAZIL | 14 | |

| | Credible Fear Nationality Report July 2018 (FY 2018) | | | | Reasonable Fear Nationality Report July 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 1,617 | | 1 | MEXICO | 328 | |
| 2 | GUATEMALA | 1,427 | | 2 | HONDURAS | 215 | |
| 3 | EL SALVADOR | 959 | | 3 | GUATEMALA | 203 | |
| 4 | INDIA | 677 | | 4 | EL SALVADOR | 151 | |
| 5 | CUBA | 480 | | 5 | BRAZIL | 19 | |

| | Credible Fear Nationality Report August 2018 (FY 2018) | | | | Reasonable Fear Nationality Report August 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,636 | | 1 | MEXICO | 322 | |
| 2 | GUATEMALA | 2,035 | | 2 | HONDURAS | 311 | |
| 3 | INDIA | 1,343 | | 3 | GUATEMALA | 261 | |
| 4 | EL SALVADOR | 1,342 | | 4 | EL SALVADOR | 144 | |
| 5 | CUBA | 772 | | 5 | NICARAGUA | 31 | |

| | Credible Fear Nationality Report September 2018 (FY 2018) | | | | Reasonable Fear Nationality Report September 2018 (FY 2018) | | |
|---|---|---|---|---|---|---|---|
| | **Nationality** | **Receipts** | | | **Nationality** | **Receipts** | |
| 1 | HONDURAS | 2,541 | | 1 | MEXICO | 281 | |
| 2 | GUATEMALA | 1,728 | | 2 | HONDURAS | 268 | |
| 3 | EL SALVADOR | 1,284 | | 3 | GUATEMALA | 173 | |
| 4 | INDIA | 870 | | 4 | EL SALVADOR | 119 | |
| 5 | NICARAGUA | 604 | | 5 | NICARAGUA | 24 | |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR040

**Credible Fear Workload Report Summary**
**FY2019 Total Caseload**

| | Totals | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | 35,310 | 9,446 | 7,918 | 8,070 | 9,876 | | | | | | | | |
| Interviews Conducted | 28,847 | 7,773 | 7,487 | 6,933 | 6,654 | | | | | | | | |
| All Decisions | 32,188 | 8,593 | 7,848 | 8,405 | 7,342 | | | | | | | | |
| Fear Established (Y) | 25,060 | 6,902 | 6,000 | 6,460 | 5,698 | | | | | | | | |
| Fear Not Established (N) | 3,403 | 721 | 1,028 | 881 | 773 | | | | | | | | |
| Closings | 3,725 | 970 | 820 | 1,064 | 871 | | | | | | | | |

| October 2018 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 9,446 | 1,140 | 385 | 18 | 133 | 6,509 | 601 | 138 | 131 | - | 138 | 253 |
| Interviews Conducted | 7,773 | 1,192 | 273 | 15 | 113 | 5,110 | 498 | 111 | 122 | - | 120 | 219 |
| All Decisions | 8,593 | 1,178 | 259 | 25 | 158 | 5,822 | 508 | 149 | 139 | - | 151 | 204 |
| Fear Established (Y) | 6,902 | 842 | 188 | 20 | 108 | 4,782 | 435 | 104 | 120 | - | 124 | 179 |
| Fear Not Established (N) | 721 | 145 | 22 | 3 | 34 | 400 | 56 | 22 | 13 | - | 17 | 9 |
| Closings | 970 | 191 | 49 | 2 | 16 | 640 | 17 | 23 | 6 | - | 10 | 16 |

| November 2018 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 7,918 | 909 | 279 | 23 | 191 | 5,486 | 476 | 127 | 81 | - | 122 | 224 |
| Interviews Conducted | 7,487 | 934 | 198 | 20 | 168 | 5,266 | 412 | 108 | 84 | - | 101 | 196 |
| All Decisions | 7,848 | 1,109 | 231 | 22 | 151 | 5,376 | 436 | 124 | 77 | - | 101 | 221 |
| Fear Established (Y) | 6,000 | 803 | 178 | 20 | 120 | 4,108 | 352 | 84 | 67 | - | 84 | 184 |
| Fear Not Established (N) | 1,028 | 152 | 18 | - | 14 | 742 | 49 | 24 | 9 | - | 4 | 16 |
| Closings | 820 | 154 | 35 | 2 | 17 | 526 | 35 | 16 | 1 | - | 13 | 21 |

| December 2018 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 8,070 | 1,212 | 277 | 13 | 189 | 5,363 | 433 | 215 | 61 | 9 | 133 | 165 |
| Interviews Conducted | 6,933 | 840 | 246 | 4 | 151 | 4,858 | 411 | 150 | 41 | - | 109 | 123 |
| All Decisions | 8,405 | 1,000 | 319 | 7 | 210 | 5,928 | 448 | 180 | 49 | - | 122 | 142 |
| Fear Established (Y) | 6,460 | 685 | 230 | 3 | 142 | 4,670 | 362 | 121 | 41 | - | 94 | 112 |
| Fear Not Established (N) | 881 | 152 | 30 | 1 | 31 | 556 | 53 | 26 | 3 | - | 14 | 15 |
| Closings | 1,064 | 163 | 59 | 3 | 37 | 702 | 33 | 33 | 5 | - | 14 | 15 |

| January 2019 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | 9,876 | 1,434 | 466 | 14 | 164 | 6,591 | 498 | 154 | 68 | 81 | 152 | 254 |
| Interviews Conducted | 6,654 | 796 | 258 | 5 | 144 | 4,524 | 350 | 147 | 69 | 33 | 122 | 206 |
| All Decisions | 7,342 | 939 | 286 | 5 | 156 | 4,914 | 405 | 164 | 78 | 36 | 125 | 234 |
| Fear Established (Y) | 5,698 | 637 | 172 | 5 | 101 | 3,984 | 298 | 118 | 60 | 31 | 98 | 194 |
| Fear Not Established (N) | 773 | 159 | 49 | - | 36 | 426 | 46 | 28 | 10 | 2 | 8 | 9 |
| Closings | 871 | 143 | 65 | - | 19 | 504 | 61 | 18 | 8 | 3 | 19 | 31 |

| February 2018 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

| March 2018 (FY 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR041

### April 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### May 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### June 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### July 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### August 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

### September 2019 (FY 2019)

| | Totals | ZAC | ZAR | ZBO | ZCH | ZHN | ZLA | ZMI | ZNK | ZNY | ZOL | ZSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Receipts | | | | | | | | | | | | |
| Interviews Conducted | | | | | | | | | | | | |
| All Decisions | | | | | | | | | | | | |
| Fear Established (Y) | | | | | | | | | | | | |
| Fear Not Established (N) | | | | | | | | | | | | |
| Closings | | | | | | | | | | | | |

U.S. Citizenship and Immigration Services

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

**Monthly Credible Fear Top 5 Nationalities Received**
**Fiscal Year 2019**

| Monthly Credible Fear Nationality Report | |
|---|---|
| October-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 2,507 |
| 2 GUATEMALA | 1,936 |
| 3 EL SALVADOR | 1,337 |
| 4 INDIA | 852 |
| 5 CUBA | 786 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| November-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,857 |
| 2 GUATEMALA | 1,482 |
| 3 EL SALVADOR | 997 |
| 4 CUBA | 870 |
| 5 INDIA | 713 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| December-18 | |
| Nationality | Receipts |
| 1 HONDURAS | 1,853 |
| 2 GUATEMALA | 1,695 |
| 3 CUBA | 1,091 |
| 4 EL SALVADOR | 939 |
| 5 INDIA | 645 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| January-19 | |
| Nationality | Receipts |
| 1 HONDURAS | 3,327 |
| 2 GUATEMALA | 1,747 |
| 3 EL SALVADOR | 1,145 |
| 4 CUBA | 1,005 |
| 5 INDIA | 508 |

| Monthly Credible Fear Nationality Report | |
|---|---|
| February-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| March-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| April-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| May-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| June-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| July-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| August-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

| Monthly Credible Fear Nationality Report | |
|---|---|
| September-19 | |
| Nationality | Receipts |
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

**U.S. Citizenship and Immigration Services**

The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR043

Credible Fear Processing Times
FY 2019 through January 2019

| FY2019 - All Credible Fear cases | Totals | % | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Decisions Served (Any Period) | 28,495 | | 7,633 | 7,031 | 7,351 | 6,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Completions (Closings + Served) | 32,219 | | 8,603 | 7,851 | 8,414 | 7,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 Days or Less | 16,775 | 52.1% | 4,934 | 3,237 | 4,700 | 3,904 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Over 10 Days | 15,444 | 47.9% | 3,669 | 4,614 | 3,714 | 3,447 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Percent Timely Completed | 52.1% | | 57.4% | 41.2% | 55.9% | 53.1% | | | | | | | | |



The Asylum Division of U.S. Citizenship and Immigration Services routinely provides detailed asylum and credible fear data as part of a statistical package made available during regularly scheduled, quarterly stakeholder engagement meetings.

AR044

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Total Asylum Applications[1]



| Fiscal Year | Filed | Granted | Total Receipts : Total Grants Ratio |
|---|---|---|---|
| 2008 | 42,836 | 8,777 | 4.88:1 |
| 2009 | 35,811 | 8,384 | 4.27:1 |
| 2010 | 32,882 | 8,234 | 3.99:1 |
| 2011 | 41,459 | 9,866 | 4.2:1 |
| 2012 | 44,562 | 10,460 | 4.26:1 |
| 2013 | 43,439 | 9,690 | 4.48:1 |
| 2014 | 47,491 | 8,559 | 5.54:1 |
| 2015 | 63,562 | 8,108 | 7.83:1 |
| 2016 | 82,224 | 8,684 | 9.46:1 |
| 2017 | 144,053 | 10,537 | 13.67:1 |
| 2018 | 162,060 | 13,168 | 12.3:1 |
| 2019 (Second Quarter[2]) | 103,658 | 7,563 | 13.7:1 |

Data Generated: April 23, 2019
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications granted (initial case completions) in removal, deportation, exclusion, and asylum-only proceedings.
[2] FY 2019 Second Quarter through March 31, 2019.

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

# Migrant Protection Protocols

**Release Date:**  January 24, 2019

*"We have implemented an unprecedented action that will address the urgent humanitarian and security crisis at the Southern border. This humanitarian approach will help to end the exploitation of our generous immigration laws. The Migrant Protection Protocols represent a methodical commonsense approach, exercising long-standing statutory authority to help address the crisis at our Southern border." – Secretary of Homeland Security Kirstjen M. Nielsen*

## What Are the Migrant Protection Protocols?

The Migrant Protection Protocols (MPP) are a U.S. Government action whereby certain foreign individuals entering or seeking admission to the U.S. from Mexico – illegally or without proper documentation – may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings, where Mexico will provide them with all appropriate humanitarian protections for the duration of their stay.

## Why is DHS Instituting MPP?

The U.S. is facing a security and humanitarian crisis on the Southern border. The Department of Homeland Security (DHS) is using all appropriate resources and authorities to address the crisis and execute our missions to secure the borders, enforce immigration and customs laws, facilitate legal trade and travel, counter traffickers, smugglers and transnational criminal organizations, and interdict drugs and illegal contraband.

AR046

MPP will help restore a safe and orderly immigration process, decrease the number of those taking advantage of the immigration system, and the ability of smugglers and traffickers to prey on vulnerable populations, and reduce threats to life, national security, and public safety, while ensuring that vulnerable populations receive the protections they need.

Historically, illegal aliens to the U.S. were predominantly single adult males from Mexico who were generally removed within 48 hours if they had no legal right to stay; now over 60% are family units and unaccompanied children and 60% are non-Mexican. In FY17, CBP apprehended 94,285 family units from Honduras, Guatemala, and El Salvador (Northern Triangle) at the Southern border. Of those, 99% remain in the country today.

Misguided court decisions and outdated laws have made it easier for illegal aliens to enter and remain in the U.S. if they are adults who arrive with children, unaccompanied alien children, or individuals who fraudulently claim asylum. As a result, DHS continues to see huge numbers of illegal migrants and a dramatic shift in the demographics of aliens traveling to the border, both in terms of nationality and type of aliens- from a demographic who could be quickly removed when they had no legal right to stay to one that cannot be detained and timely removed.

In October, November, and December of 2018, DHS encountered an average of 2,000 illegal and inadmissible aliens a day at the Southern border. While not an all-time high in terms of overall numbers, record increases in particular types of migrants, such as family units, travelling to the border who require significantly more resources to detain and remove (when our courts and laws even allow that), have overwhelmed the U.S. immigration system, leading to a "system" that enables smugglers and traffickers to flourish and often leaves aliens in limbo for years. This has been a prime  cause of our near-800,000 case backlog in immigration courts and delivers no consequences to aliens who have entered illegally.

Smugglers and traffickers are also using outdated laws to entice migrants to undertake the dangerous journey north where on the route migrants report high rates of abuse, violence, and sexual assault. Human smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational

AR047

criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities.  The activities of these smugglers, traffickers, gangs and criminals endanger the security of the U.S., as well as partner nations in the region.

The situation has had severe impacts on U.S. border security and immigration operations.  The dramatic increase in illegal migration, including unprecedented number of families and fraudulent asylum claims is making it harder for the U.S. to devote appropriate resources to individuals who are legitimately fleeing persecution. In fact, approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges. Because of the court backlog and the impact of outdated laws and misguided court decisions, many of these individuals have disappeared into the country before a judge denies their claim and simply become fugitives.

The MPP will provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S., and allow more resources to be dedicated to individuals who legitimately qualify for asylum.

## What Gives DHS the Authority to Implement MPP?

Section 235 of the Immigration and Nationality Act (INA) addresses the inspection of aliens seeking to be admitted into the U.S. and provides specific procedures regarding the treatment of those not clearly entitled to admission, including those who apply for asylum.  Section 235(b)(2)(C) provides that "in the case of an alien  . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the U.S.," the Secretary of Homeland Security "may return the alien to that territory pending a [removal] proceeding under § 240" of the INA."  The U.S. has notified the Government of Mexico that it is implementing these procedures under U.S. law.

## Who is Subject to MPP?

With certain exceptions, MPP applies to aliens arriving in the U.S. on land from Mexico (including those apprehended along the border) who are not clearly

Case 3:19-cv-04073-JST   Document 29-1   Filed 07/19/19   Page 58 of 185

admissible and who are placed in removal proceedings under INA § 240.  This includes aliens who claim a fear of return to Mexico at any point during apprehension, processing, or such proceedings, but who have been assessed not to be more likely than not to face persecution or torture in Mexico. Unaccompanied alien children and aliens in expedited removal proceedings will not be subject to MPP.  Other individuals from vulnerable populations may be excluded on a case-by-case basis.

## How Will MPP Work Operationally?

Certain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim.  Instead, these aliens will be given a "Notice to Appear" for their immigration court hearing and will be returned to Mexico until their hearing date.

While aliens await their hearings in Mexico, the Mexican government has made its own determination to provide such individuals the ability to stay in Mexico, under applicable protection based on the type of status given to them.

Aliens who need to return to the U.S. to attend their immigration court hearings will be allowed to enter and attend those hearings.  Aliens whose claims are found meritorious by an immigration judge will be allowed to remain in the U.S. Those determined to be without valid claims will be removed from the U.S. to their country of nationality or citizenship.

DHS is working closely with the U.S. Department of Justice's Executive Office for Immigration Review to streamline the process and conclude removal proceedings as expeditiously as possible.

## Will Migrants in MPP Have Access to Counsel?

Consistent with the law, aliens in removal proceedings can use counsel of their choosing at no expense to the U.S. Government.  Aliens subject to MPP will be

AR049

afforded the same right and provided with a list of legal services providers in the area which offer services at little or no expense to the migrant.

# What Are the Anticipated Benefits of MPP?

Every month, tens of thousands of individuals arrive unlawfully at the Southern Border.  MPP will reduce the number of aliens taking advantage of U.S. law and discourage false asylum claims.  Aliens will not be permitted to disappear into the U.S. before a court issues a final decision on whether they will be admitted and provided protection under U.S. law.  Instead, they will await a determination in Mexico and receive appropriate humanitarian protections there.  This will allow DHS to more effectively assist legitimate asylum-seekers and individuals fleeing persecution, as migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey.  Moreover, MPP will reduce the extraordinary strain on our border security and immigration system, freeing up personnel and resources to better protect our sovereignty and the rule of law by restoring integrity to the American immigration system.

# Additional Information

- <u>Secretary Nielsen Implementation Memo</u> (/publication/policy-guidance-implementation-migrant-protection-protocols) (January 25, 2019, PDF)

Topics:  <u>Border Security</u> (/topics/border-security) , <u>Immigration and Customs Enforcement</u> (/topics/immigration-enforcement)

Keywords:  <u>Border Security</u> (/keywords/border-security) , <u>immigration enforcement</u> (/keywords/immigration-enforcement) , <u>southwest border</u> (/keywords/southwest-border)

Last Published Date: January 29, 2019

AR050



# Department of Homeland Security Border Security Metrics Report

*May 1, 2018*



AR051

# Message from Homeland Security

May 1, 2018

The "Department of Homeland Security Border Security Metrics Report" is submitted pursuant to the Fiscal Year (FY) 2017 National Defense Authorization Act (NDAA), which directs that "Not later than 180 days after the date of the enactment of this section, the Secretary (of Homeland Security) shall develop metrics, informed by situational awareness, to measure the effectiveness of security between ports of entry, at ports of entry, in the maritime environment and to measure the effectiveness of the aviation assets and operations of Air and Marine Operations of U.S. Customs and Border Protection."  The Act further directs the Secretary to annually assess, report, and implement the specified metrics.

The outcome-based performance measures called for by the Act are the most comprehensive, rigorous set of border security metrics required of the Department of Homeland Security (DHS) to date.  Through previous efforts, DHS has established processes and procedures to collect and analyze essential data to meet most, but not all, of the Act's requirements.  This initial report identifies which measures are still unavailable; DHS commits to continuing efforts to produce all the measures required by the Act no later than submission of the next annual report.

DHS considers this report to be the beginning of a consequential dialogue with Congress and the American public wherein defensible data create the foundation for discussions of border security policies and strategies.  This initial report focuses on providing data and information on DHS methodological approaches.  In accordance with the Act, future annual reports will include trend analysis of the measures being reported.

Thank you for your continuing support and commitment to strengthening the operating effectiveness of DHS.

Pursuant to congressional requirements, this notification is being provided to the following Members of Congress:

> The Honorable Ron Johnson
> Chairman, Senate Committee on Homeland Security and Governmental Affairs

> The Honorable Claire McCaskill
> Ranking Member, Senate Committee on Homeland Security and Governmental Affairs

> The Honorable Michael McCaul
> Chairman, House Committee on Homeland Security

> The Honorable Bennie Thompson
> Ranking Member, House Committee on Homeland Security

Inquiries relating to this report may be directed to the DHS Office of Legislative Affairs at (202) 447-5890.

AR052

Sincerely,


James W. McCament
Deputy Under Secretary
Office of Strategy, Policy, and Plans

AR053



# DHS Border Security Metrics Report

# Table of Contents

I.  Legislative Language ...................................................................................................5

II.  Introduction ...............................................................................................................6

III.  SEC. 1092 BORDER SECURITY METRICS ...........................................................9

§ 1092 (b) METRICS FOR SECURING THE BORDER BETWEEN PORTS OF ENTRY ..........................9

§ 1092 (c) METRICS FOR SECURING THE BORDER AT PORTS OF ENTRY ...................................33

§ 1092 (d) METRICS FOR SECURING THE MARITIME BORDER ...................................................44

§ 1092 (e) AIR AND MARINE SECURITY METRICS IN THE LAND DOMAIN ...............................51

§ 1092 (g)(3)(D) Other Appropriate Information ...................................................................56

IV.  Conclusion ...............................................................................................................62

Appendix A – Repeated Trials Model Methodology ...............................................................63

Appendix B – Drugs Seizures – All Ports of Entry ...............................................................66

AR054

# I.    Legislative Language

Section 1092 of the FY 2017 National Defense Authorization Act (NDAA), signed into law December 23, 2016, directs the Secretary of Homeland Security to provide annually to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate specific "Metrics for Securing the Border Between Ports of Entry," "Metrics for Securing the Border At Ports of Entry," "Metrics for Securing the Maritime Border," and "Air and Marine Security Metrics in the Land Domain." The NDAA further directs that the Secretary "in accordance with applicable privacy laws, make data related to apprehensions, inadmissible aliens, drug seizures, and other enforcement actions available to the public, law enforcement communities, and academic research communities."

AR055

# II.   Introduction

As President Donald Trump indicated in Executive Order 13767 "Border Security and Immigration Enforcement Improvements" (January 25, 2017), border security is critically important to the national security of the United States.  The Department's ability to measure its border-security inputs, activities, outputs, and outcomes is essential to the effective and efficient management of the Department, including management of the new activities and investments directed by the President's Executive Orders on border security and immigration enforcement.

Comprehensive and rigorous performance management data provide DHS leadership with the foundation to support responsible evidence-based decision-making for resource allocation and investments and for operational and mission management.  Further, DHS implementation of this approach provides a pair of unifying border security goals under the Department's mission to secure and manage U.S. borders.  As summarized in the DHS Quadrennial Homeland Security Review (QHSR), the Department's first two goals under the border security mission area are to "Secure U.S. Air, Land, and Sea Borders and Approaches" by preventing illegal entry and to "Safeguard and Expedite Lawful Travel and Trade" by safeguarding key nodes, conveyances, and pathways, and by managing the risk of people and goods in transit.  Ultimately, the border security metrics described in this report are designed to assess the ability of the Department's border security policies and investments to achieve these outcomes.

For analytic purposes, the metrics included in this report may be divided into four categories:
- Inputs:  Resources acquired or expended to secure the border.  Examples of border security inputs include the number of U.S. Customs and Border Protection (CBP) Office of Field Operations (OFO) officers and U.S. Border Patrol (USBP) agents deployed, miles of fencing and other border infrastructure, and numbers of aircraft committed to the border security mission.
- Activities:  Specific actions taken to secure the border.  Examples of border security activities include illegal border crossers apprehended, travelers admitted or denied admission at ports of entry (POE), and pounds of narcotics seized.
- Outputs:  Immediate results of enforcement activities as they relate to the border security goals.  Examples of border security outputs include the rate at which intending unlawful border crossers are apprehended or interdicted, and the accuracy of screening results for travelers and goods at POEs.
- Outcomes:  The ultimate impacts of border security policies.  As defined by the QHSR, the most important border security outcomes are the numbers of illegal migrants and quantities of illegal goods entering the United States (Goal 2.1), and the ease with which lawful travelers and goods pass through POEs (Goal 2.2).

In general, border security *inputs* and *activities* are directly observable and can be measured with a high degree of reliability.  Policymakers have direct control over resource allocation, and data on inputs are available in budget and acquisitions documents.  Operational agencies also track enforcement activities as part of their case management process.  In short, the Department knows exactly how many agents it deploys, how many miles of fence it erects, how many aliens it apprehends, and how many travelers it admits.  Input and activity measures tend to provide insight into the level and type of enforcement effort undertaken—what the Department is

AR056

doing—that are useful for workload management and tactical decision-making; but in and of themselves these metrics typically provide limited insight into the state of border security.

*Outcome* and *output* measures often provide more insight than inputs and activities when it comes to evaluating border security and may be powerful tools for policy and program evaluation. Yet many output and outcome metrics are difficult to measure directly because illegal border crossers actively seek to evade detection, and some flows are undetected and therefore can never be measured directly. This challenge is nearly universal when measuring illegal activities, which is why law enforcement agencies typically rely on crime *reports* as indicators of *total* criminal activities, for example. Measuring border security outputs and outcomes is also difficult because of the diversity and complexity of the enforcement mission along the United States' 6,000 miles of land borders, 95,471 miles of coastline, and 350 POEs. Moreover, enforcement outcomes only partially depend on border security policies, since immigration flows also reflect numerous factors outside enforcement agencies' control, including the broader set of U.S. immigration policies and numerous economic, demographic, and other structural factors.

Historically, DHS and the legacy Immigration and Naturalization Service addressed these measurement challenges by relying on alien apprehensions (an activity metric) as a proxy measure of illegal immigration between POEs (an outcome metric). More recently, CBP and DHS have initiated a number of new estimation strategies to better model unknown flows. These efforts have focused primarily on border security between POEs in the land domain (NDAA § 1092(b)), a domain that has been identified by Congress and the last several Administrations as a top enforcement priority. Some of this research remains a work in progress as DHS is not yet able to validate certain modeling assumptions or to quantify the uncertainty around its new estimation techniques. In addition, many of the metrics in this report remain limited to the southwest border. The Department's future work on border metrics will continue to refine these new indicators of border security between POEs and expand data collection and methodologies to the northern border, while also developing additional indicators of border security, including those identified as incomplete in this report.

Pursuant to the NDAA, this report covers a mix of input, activity, output, and outcome metrics between POEs, at POEs, in the maritime domain, and with respect to air and marine security in the land domain. While most of these measures involve data the Department has tracked for many years, some remain under development or fall outside the scope of the Department's existing measurement methodologies. This report includes the following information for each border security metric:
- Definition of the metric and brief description of how the metric contributes to the Department's understanding of border security;
- Discussion of the Department's current methodology for producing the metric and related methodological limitations; and
- Available data, including historical data where possible, and brief discussion of implications for the current state of border security.

The following sections of this report provide this information for each metric directed by the NDAA. In addition to the specific metrics identified in sections §1092(b) – (e), this report

AR057

includes supplemental measures that inform the Department's assessment of the state of border security between POEs, as directed by NDAA § 1092(g)(3)(D).

AR058

# III.  SEC. 1092 BORDER SECURITY METRICS

## § 1092(b) Metrics for Securing the Border between Ports of Entry

### § 1092(b)(1)(A)(i) Attempted Unlawful Border Crosser Apprehension Rate

**Definition**

In general, the attempted unlawful border crosser apprehension rate is defined as the proportion of attempted border crossers that is apprehended by USBP:

$$Apprehension\ Rate = \frac{Apprehensions}{Unlawful\ Entry\ Attempts}$$

While USBP has reliable administrative data on apprehensions, the Department does not have an exact count of unlawful entry attempts since an unknown number of illegal border crossers evade detection.  As a result of this so-called "denominator problem," the Department must estimate the apprehension rate.  Current methodologies allow DHS to produce two apprehension rate estimates:

*Model-based Apprehension Rate* ($AR_{Model-based}$) – Based on statistical modeling, the estimated share of all attempted unlawful border crossers between land POEs that is apprehended.

*Observational Apprehension Rate* ($AR_{Observational}$) – Based on direct (unlawful border crossers observed by USBP) and indirect (residual evidence of a border crosser, i.e. footprints) observations of attempted unlawful border crossers, the estimated share of observed attempted unlawful border crossers that is apprehended.

The apprehension rate is an *output measure* that describes the difficulty of illegally crossing the border successfully.

A conceptual limitation of apprehension rate data is that they include information about border *apprehensions*, but exclude information about *turn backs* (see section 1092 (b)(1)(A)(iv) for definition), which are a key element of USBP's enforcement strategy, with underlying operational implications.  In this sense, measures of the apprehension rate understate USBP's overall enforcement success rate.  On the other hand, some analysts consider information about turn backs difficult to interpret since an unknown share of turn backs make additional entry attempts.

9

**Methodology and Limitations**

*Model-based Apprehension Rate*

The Model-based Apprehension Rate is based on the repeated trials model (RTM) methodology. As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the AR$_{Model-based}$ methodology consists of four additional steps.

First, all attempted unlawful border crossers are divided into two groups, which are labeled "impactable" and "non-impactable" by traditional DHS enforcement policies.  Impactable border crossers include adults without children who are not asylum seekers and (prior to 2017) are not from Cuba.  Aliens in this group are described as impactable because they are generally subject to the full range of DHS and Department of Justice (DOJ) enforcement consequences, and therefore potentially impacted by existing border enforcement.  Non-impactable border crossers include unaccompanied minors, family units, individuals who request asylum, and (prior to 2017) Cubans.  Aliens in this group are described as non-impactable because, historically, they have usually been released into the United States with a Notice to Appear in immigration court for legal proceedings on a future date, rather than being subject to immediate DHS enforcement consequences.  These aliens are assumed generally to be "non-impactable" by traditional DHS enforcement activities at the border because even if they are apprehended they are typically unlikely to be immediately removed or returned.[1]

Second, the AR$_{Model-based}$ methodology assumes an apprehension rate for each of these two groups:  1) all attempted unlawful border crossers in the impactable population are assumed to be apprehended at the partial apprehension rate generated by the RTM methodology; and 2) all unlawful border crossers in the non-impactable population are assumed to intentionally present themselves to a USBP agent or OFO officer and therefore to have a 100 percent apprehension rate.  Notably, these assumptions do not reflect the actual behavior of all border crossers, as noted below, but they serve to construct a probability model.

Third, the Partial Apprehension Rate is used to calculate the total number of impactable aliens making illegal entry attempts.  The methodology assumes (in the previous step) that all impactable aliens are apprehended at the PAR rate generated by the RTM methodology:

$$PAR = \frac{Apprehensions_{Impactable}}{Attempts_{Impactable}}$$

---

[1] Cubans were considered "non-impactable" between 1995 and January 2017 because they were routinely granted parole into the United States if they reached U.S. soil, under the wet-foot/dry-foot policy.  The Obama Administration terminated the special parole component of the wet-foot/dry-foot policy in January 2017.

AR060

Mathematically, this equation can be re-arranged to define the total number of impactable aliens making an illegal entry attempt as follows:

$$Attempts_{Impactable} = \frac{Apprehensions_{Impactable}}{PAR}$$

Since non-impactable aliens are assumed to have a 100% apprehension rate, the number of entry attempts of non-impactable aliens is equal to the number of their apprehensions.

Finally, the Total Apprehension Rate is calculated as a weighted average of the total numbers of impactable and non-impactable aliens attempting unlawful entry times their respective apprehension rates:

$$AR_{Model-based} = \frac{(Attempts_{Impactable} * PAR) + (Attempts_{Non-impactable} * 100\%)}{(Attempts_{Impactable} + Attempts_{Non-impactable})}$$

The current $AR_{Model-based}$ methodology makes a number of assumptions that cannot be fully validated. First, the $AR_{Model-based}$ methodology builds on the RTM's partial apprehension rate, and so incorporates all of the RTM modeling assumptions and associated limitations discussed in Appendix A. In addition, the current $AR_{Model-based}$ methodology also assumes: that the entire cohort of border crossers can be divided into impactable and non-impactable groups, that the entire impactable group is apprehended at the same rate as RTM aliens included in the PAR analysis, and that the entire non-impactable group is apprehended 100 percent of the time. Each of these additional assumptions introduces potential biases into the estimated apprehension rate.

The Department has not precisely quantified the impact of these assumptions on the $AR_{Model-based}$ estimates. For these reasons, DHS considers the $AR_{Model-based}$ methodology to be a work in progress. DHS is working to refine the $AR_{Model-based}$ methodology to address these limitations and to more precisely describe their impact on the $AR_{Model-based}$ estimate. The estimated apprehension rates reported here may be updated in the future as the Department continues to refine the model-based estimation methodology.

*Observational Apprehension Rate*

The Observational Apprehension Rate is calculated as the ratio of USBP apprehensions to the sum of apprehensions and observed (directly or indirectly) got aways:

$$AR_{Observational} = \frac{Apprehensions}{Apprehensions + Got\ Aways}$$

"Got aways" are defined as subjects at the southwest border who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

Since 2014, USBP has implemented a standard, southwest border-wide methodology for determining when to report a subject as a got away. Some subjects are observed directly as evading apprehension or turning back; others are acknowledged as got aways or turn backs after

agents follow evidence that indicate entries have occurred such as foot sign (i.e. tracks), sensor activations, interviews with apprehended subjects, camera views, and communication between and among stations and sectors.  The scope of these data includes all areas of the southwest land border at or below the northernmost law enforcement posture (typically a USBP checkpoint) within a given area of responsibility, and those individuals apprehended less than 30 days after entering the United States.

In an effort to maintain reliable best practices, command staff at all southern border stations ensure all agents are aware of and utilize proper definitions for apprehensions, got aways and turn backs at their respective stations.  They also ensure the necessary communication takes place between and among sectors and stations to minimize double-counting when subjects cross more than one station's area of responsibility. In addition to station-level safeguards, designated USBP Headquarters components validate data integrity by utilizing various data quality reports.

The primary limitation to $AR_{Observational}$ is that the denominator excludes an unknown number of unobserved got aways.  Over the past several years, DHS has invested millions of dollars in technology that has facilitated the ability to see and detect more at the border.  Improvements in situational awareness give DHS an ever-increasing, real-time ability to understand how much illegal activity agents are encountering at the immediate border and their ability to respond.  As a result, despite the fact that overall border entries are substantially lower today than in any previous fiscal year, agents are currently interdicting slightly *lower* percentages of the total known flow.  This observation reflects USBP's increased domain awareness—i.e., that through technological advances, the agency has improved its awareness of illegal entry attempts (known got aways)—rather than experienced a drop in enforcement effectiveness.  Increasing situational awareness narrows the gap between the known and unknown flow, and puts DHS in a position to build ever better observational estimates of border security.  The Department will continue to refine these observational estimates and is currently working on a methodology to estimate their statistical reliability.

An additional methodological limitation is that the estimated count of got aways aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to establish reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Table 1 provides the estimated model-based apprehensions rate for FY 2003 – FY 2016 and the estimated observational apprehension rate for FYs 2006-2016, the years for which these data are available.

AR062

Table 1:  Model-Based and Observational Apprehension Rates, FY 2000 – FY 2016

| Fiscal Year | Model-based Apprehension Rate | Observational Apprehension Rate |
|---|---|---|
| 2003 | 34.1 | NA |
| 2004 | 37.0 | NA |
| 2005 | 39.1 | NA |
| 2006 | 39.2 | 63.5 |
| 2007 | 40.2 | 64.1 |
| 2008 | 44.6 | 67.7 |
| 2009 | 47.2 | 70.7 |
| 2010 | 46.6 | 74.4 |
| 2011 | 46.1 | 79.4 |
| 2012 | 48.0 | 77.5 |
| 2013 | 51.0 | 70.8 |
| 2014 | 65.5 | 74.8 |
| 2015 | 63.5 | 76.7 |
| 2016 | 64.8 | 79.4 |

Since FY 2003, the model-based apprehension rate has climbed from less than 35 percent to nearly 65 percent in FY 2016.  These increases reflect a higher apprehension rate for "impactable" border crossers as well as an increase in the share of border crossers who are "non-impactable" and therefore assumed to be apprehended 100 percent of the time.

The observational apprehension rate has also shown improvements since FY 2006.  Despite its limitations, the upward trend in $AR_{Observational}$ is noteworthy because it independently reinforces the upward trend observed in the model-based estimate.  Moreover, with increasing situational awareness along the border during this period, it is likely that CBP detects an increasing share of total got aways over time.  As a result, the upward trend in $AR_{Observational}$ likely under-estimates the actual increase in the total share of attempted border crossers that is apprehended.

## § 1092(b)(1)(A)(ii) Detected unlawful entries

**Definition**

*Detected unlawful entries* – The total number of attempted unlawful border crossers between land POEs who are directly or indirectly observed or detected by USBP.

Detected unlawful entries is an *outcome measure* that describes the numbers of migrants detected crossing or attempting to cross the border unlawfully.  Detected unlawful entries is not a comprehensive outcome measure since it excludes undetected unlawful entries, as discussed below.  The ratio of detected to undetected unlawful entries, also discussed below, is an *output measure* that describes the Department's ability to detect unlawful entries.

13

AR063

**Methodology and Limitations**

The number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions.  Turn backs are defined as subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.  Got aways are defined as subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.  Apprehensions are defined as removable aliens arrested by USBP.

Turn backs and got aways are observational estimates; USBP records total and by-sector estimates of turn backs and got aways based on direct and indirect observations as described above.  Apprehensions are calculated based on nationwide DHS administrative data and are not limited to the southwest border; USBP apprehension data are considered a reliable count of apprehensions.

The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

**Available Data and Discussion**

Figure 1 depicts available data on estimated detected unlawful entries for FY 2006 – FY 2016, the years for which data are available.  As the figure indicates, estimated detected unlawful entries (the sum of apprehensions, turn backs, and got aways) fell from 2.0 million to 624 thousand during this period, a 69 percent decrease.

Figure 1:  Estimated Detected Unlawful Entries Nationwide Between POEs, FY 2006 – FY 2016



14

AR064

# § 1092(b)(1)(A)(iii) Estimated undetected unlawful entries

**Definition**

*Undetected unlawful entries* – An estimate of the number of attempted unlawful border crossers between land POEs who are not directly or indirectly observed or detected by USBP.  By assumption, undetected unlawful entries evade apprehension and enter the United States unlawfully.

Undetected unlawful entries is an *outcome measure* that describe the numbers of migrants who completely evade detection and successfully enter the United States unlawfully.  Undetected unlawful entries is not a comprehensive outcome measure since it excludes detected unlawful entries, discussed above.  The ratio of detected to total unlawful entries (i.e., the probability of detection) is an *output measure* that describes the Department's ability to detect unlawful entries, as discussed below. At present, this methodology only exists for the southwest land border between ports of entry. Research is underway on methods to produce this estimate for the northern border.

**Methodology and Limitations**

Currently, the Department's best available methodology for estimating undetected unlawful entries builds on the repeated trials model (RTM) methodology to produce a model-based estimate of total successful unlawful entries.  The estimated number of undetected unlawful entries is calculated as the difference between the model-based estimate of total successful unlawful entries and the estimated number of got aways (i.e., *detected* successful unlawful entries):

$$Undetected\ Unlawful\ Entries\\ = Total\ Successful\ Unlawful\ Entries - Detected\ Got\ Aways$$

As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps.

First, as in the calculation of the model-based apprehension rate discussed above, all attempted unlawful border crossers are divided into "impactable" and "non-impactable" groups.  Second, the PAR is used to estimate the odds of successful entry for aliens within the impactable population group.[2]  Third, the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.  Because non-impactable aliens are assumed to be apprehended 100 percent of the time, only impactable aliens contribute to the estimated count of total successful unlawful entries:

---

[2] Mathematically, $odds\ of\ successful\ entry = \left(\frac{1-PAR}{PAR}\right)$.

AR065

$$Total\ Successful\ Unlawful\ Entries$$
$$= Odds\ of\ Successful\ Entry * Apprehensions\ of\ Impactable\ Aliens$$

The estimated number of undetected unlawful entries is derived from the observational estimate of detected unlawful entries, with limitations discussed above, and the model-based estimate of total successful unlawful entries, which in turn is derived from the RTM methodology and the model-based apprehension rate, with additional limitations discussed above. DHS is working to refine both the observational and model-based methodologies and to more precisely describe the impact of these limitations on estimates of total and undetected unlawful entries.

**Available Data and Discussion**

Figure 2 depicts available data on estimated undetected unlawful entries for FY 2006 – FY 2016, the years for which data are available. As the figure indicates, estimated undetected unlawful entries fell from approximately 851,000 to nearly 62,000 during this period, a 93 percent decrease.

Figure 2:  Estimated Southwest Border Undetected Unlawful Entries, FY 2006 – FY 2016



## § 1092(b)(1)(A)(iv) Turn backs

**Definition**

*Turn backs* –An estimate of the number of subjects who, after making an illegal entry into the United States, return to the country from which they entered, not resulting in an apprehension or got away.

Turn backs are an *activity measure* that USBP uses for tactical decision-making.

16

Turn backs also contribute to several other border security metrics, including Detected Unlawful Entries, discussed above, and the Unlawful Border Crossing Effectiveness Rate, discussed below.

**Methodology and Limitations**

Turn backs are a nationwide observational estimate; USBP records total and by-sector estimates of turn backs based on direct and indirect observations as described above.

The primary limitation to detected turn backs is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.  In addition, some unlawful border crossers may enter the United States to drop off drug loads or to act as decoys to lure agents away from a certain area and then return to Mexico, and therefore may be misidentified as turn backs.[3]

**Available Data and Discussion**

Table 2:  Southwest Border Turn Backs between POEs, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 254,490 | 204,176 | 178,566 | 150,005 | 121,007 | 121,079 | 156,581 | 147,025 | 105,670 | 108,601 |

The number of turn backs has decreased by more than 57 percent since FY 2007. This decrease is consistent with numerous other between-POE metrics than suggest a decrease in flow over the past 10 years.


# § 1092(b)(1)(A)(v) Got aways

**Definition**

*Got aways* – An estimate of the number of subjects who, after making an illegal entry, are not turned back or apprehended, and are no longer being actively pursued by USBP agents.

*Total Successful Unlawful Entries* – An estimate of the total number of subjects who cross the border unlawfully and who enter the United States without being apprehended.

**Methodology and Limitations**

*Got Aways*

---

[3] U.S. Government Accountability Office, "Border Patrol: Goals and Measures Not Yet in Place to Inform Border Security Status and Resource Needs," GAO-13-330T, February 26, 2013, p. 15.

AR067

Got aways are an observational estimate; USBP records total and by-sector estimates of got aways based on direct and indirect observations as described above.  While got aways are recorded by USBP at all borders, got aways in this section refer to the southwest border between-ports of entry only.

The primary methodological limitation of got aways is that the estimate aggregates potentially subjective observations from thousands of individual agents.  USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Conceptually, the got aways metric is limited to *observed* (directly or indirectly) flows; it is not a comprehensive measure of successful unlawful entries.  USBP's recent work to increase situational awareness, including through the use of Geospatial Intelligence, gives the Department growing confidence in its got away count.  As situational awareness continues to improve, observed got aways will become an increasingly comprehensive measure of successful unlawful entries.  USBP and DHS are working to refine USBP's observational methodology and to more precisely describe the gap between observed and unobserved got aways.

*Total Successful Unlawful Entries*

The current methodology for estimating total successful unlawful entries is based on the repeated trials model (RTM) methodology.  As explained in detail in Appendix A, the RTM methodology yields an estimated partial apprehension rate (PAR) for southwest border crossings, which focuses on a relatively small share of attempted unlawful border crossers.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps, as described above:  attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the number of apprehensions of impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A.  Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases.  DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries.

**Available Data and Discussion**

Figure 3 depicts southwest border between-ports of entry detected got aways for FY 2006 – FY 2016 and estimated total successful unlawful entries for FY 2000 – FY 2016, the years for which data are available.  As the figure illustrates, estimated total successful unlawful entries declined from 1.8 million to 168,000 between FY 2000 and FY 2016, a 91 percent decrease.  Estimated got aways declined from 615,000 to 106,000 between FY 2006 and FY 2016, an 83 percent decrease.

AR068

Figure 3:  Southwest Border Got Aways and Estimated Total Successful Unlawful Entries between POEs, FY 2000 – FY 2016



Notably, the model-based estimate of total successful unlawful entries declined at a faster rate than observed got aways, with the model based estimate falling 89 percent between FY 2006 and FY 2016 (the period for which both data series are available), versus an 83 percent decrease for detected got aways during this period.  Relatedly, the two series have substantially converged over this time period, with observed got aways accounting for 42 percent of total estimated successful unlawful entries in FY 2006 versus 63 percent in FY 2016.  These facts suggest that USBP detects an increasingly comprehensive share of all attempted unlawful border crossers.

## § 1092(b)(1)(B) A measurement of situational awareness achieved in each U.S. Border Patrol sector

**Definition**

*Situational awareness* – Knowledge and understanding of current unlawful cross-border activity.

Situational awareness is an output measure that describes the Department's awareness of unlawful cross-border activity.

**Methodology and Limitations**

DHS is in the process of developing a defensible, analytically sound measure for situational awareness for each USBP sector that meets the intent of the NDAA § 1092(b)(1)(B).  DHS anticipates this measure will be reported in the annual report due to Congress in November 2020.  In the interim, a number of the Department's existing metrics are informed by the Department's

awareness of migrants and other threats in the near border regions (CBP has operational jurisdiction within 100 miles of U.S. borders) and in the approaches [*See* § 1092(b)(1)(A)(ii to v) and § 1092(b)(1)(D)].

# § 1092(b)(1)(C) Unlawful Border Crossing Effectiveness Rate

**Definition**

*Unlawful Border Crossing Effectiveness Rate* – The estimated percentage of all attempted unlawful border crossers that is interdicted by USBP, where interdictions include apprehensions and turn backs.

The Unlawful Border Crossing Effectiveness Rate is an *output measure* that describes how difficult it is for unlawful border crossers to enter the United States without being interdicted.

**Methodology and Limitations**

The Unlawful Border Crossing Effectiveness Rate is calculated by dividing the number of apprehensions and turn backs between land POEs by the sum of the number of apprehensions, turn backs, and total estimated successful unlawful entries:

$$Effectiveness\ Rate = \frac{Apprehensions + Turn\ backs}{Apprehensions + Turn\ backs + Successful\ unlawful\ entries}$$

The NDAA calls for an effectiveness rate that incorporates USBP's observational estimate of turn backs and DHS's current model-based estimate of total estimated successful unlawful entries.  This measure would confront all of the methodological challenges associated with each of its component parts, as discussed above.

The Unlawful Border Crossing Effectiveness Rate is conceptually similar to USBP's Interdiction Effectiveness Rate (IER), which USBP reports in its Annual Performance Report pursuant to the Government Performance and Results Modernization Act (GPRMA) of 2010.  The Unlawful Border Crossing Effectiveness Rate differs from the IER in that the former includes total estimated successful unlawful entries in its denominator and IER includes known got aways.

The Unlawful Border Crossing Effectiveness Rate is also conceptually similar to the estimated apprehension rate, with the difference being that the Effectiveness Rate includes data on turn backs and apprehensions while the apprehension rate focuses exclusively on apprehensions.  An advantage to examining the effectiveness rate, rather than the apprehension rate, is that effectiveness rate more completely captures USBP's actual enforcement practices, which include efforts to turn back border crossers, in addition to efforts to apprehend them.  On the other hand, some analysts consider the effectiveness rate (along with IER) to be an ambiguous indicator of enforcement success since an unknown share of turn backs make additional entry attempts.

20

Despite its shortcomings as an analytic tool, to date, only the IER is available for analysis at the sector level.  While a southwest border-wide estimate has been developed, sector-level estimates of unlawful entries and attempts have not yet been produced and validated by DHS.  These estimates are projected to be available for the 2019 report.

**Available Data and Discussion**

Table 3:  Interdiction Effectiveness Rate by Southwest Border Sector, FY 2014 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ |
|---|---|---|---|---|---|---|---|---|---|
| **FY2014** | 72% | 76% | 85% | 92% | 74% | 80% | 89% | 75% | 91% |
| **FY2015** | 77% | 73% | 83% | 90% | 74% | 82% | 88% | 80% | 95% |
| **FY2016** | 70% | 79% | 81% | 89% | 78% | 83% | 89% | 82% | 96% |

IER often vary from year to year and by sector.  One point of note for FY 2016 is the 96 percent IER for Yuma, AZ, which often scores the highest rating.  Del Rio reported the largest increase in all sectors, climbing six percentage points in FY 2016 to 79 percent.  Big Bend reported the largest loss in FY 2016, decreasing by seven percentage points to 70 percent.  Due to the small number of attempted and successful entries along the Northern Border, a Northern Border IER has not been developed.

# § 1092(b)(1)(D) Probability of Detection Rate

**Definition**

*Estimated probability of detection* - The estimated probability that DHS detects attempted unlawful border crossers between land POEs.

The estimated probability of detection is an *output measure* that describes the ability of attempted unlawful border crossers to enter without being detected. Because successful unlawful entry estimate is available only for the southwest border between-ports of entry, data in this section refer exclusively to this region.

**Methodology and Limitations**

The estimated probability of detection is defined as the ratio of detected unlawful entries to estimated total unlawful entries:

$$Probability\ of\ Detection = \frac{Detected\ Unlawful\ Entries}{Estimated\ Total\ Unlawful\ Entries}$$

AR071

As described above, the number of detected unlawful entries is calculated as the sum of turn backs, got aways, and apprehensions, a mix of observational estimates and administrative data. The primary limitation to detected unlawful entries is that this metric incorporates turn back and got away estimates that aggregate potentially subjective observations from thousands of individual agents. USBP has taken a number of steps to address this problem by establishing consistent and reliable turn back and got away methodologies, as discussed above.

Estimated total unlawful entries is calculated as the sum of turn backs, apprehensions, and the model-based estimate of total successful unlawful entries.  As described above, the methodology for estimating total successful unlawful entries begins with the RTM methodology's partial apprehension rate, discussed in detail in Appendix A.  Following the calculation of the PAR, the methodology for estimating total successful unlawful entries consists of three additional steps: attempted border crossers are divided into impactable and non-impactable groups; the PAR is used to estimate the odds of successful entry; and the number of successful unlawful entries is estimated based on the odds of successful entry among this group times the apprehension count among impactable aliens.

The RTM methodology to estimate the PAR confronts a number of methodological limitations, as discussed in Appendix A.  Each of the additional assumptions involved in using the PAR to estimate total successful unlawful entries introduces additional methodological limitations and potential biases.  DHS is working to refine the model-based methodology and to more precisely describe the impact of these limitations on estimates of total successful unlawful entries in future State of the Border reports.

**Available Data and Discussion**

Figure 4 depicts the estimated probability of detection for FY 2006 – FY 2016, the years for which data are available.  As the figure indicates, the estimated probability increased from 70 percent in FY 2006 (when an estimated 2.0 million unlawful border crossers were detected out of an estimated 2.9 million total unlawful border crossers) to 91 percent in FY 2016 (611,000 detected out of 673,000 total estimated unlawful border crossers).

Figure 4:  Southwest Border Between-Ports of Entry Estimated Probability of Detection, FY 2006 – FY 2016



AR072

# § 1092(b)(1)(E) Apprehensions in Each U.S Border Patrol Sector

**Definition**

*Apprehension* - The arrest of a removable alien by DHS USBP.

Apprehensions are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

For many years, DHS and the legacy Immigration and Naturalization Service also used apprehensions as a proxy indicator of successful unlawful border crossings, i.e., an *outcome measure*.  Over the long-term and across multiple locations, apprehensions are a problematic indicator of enforcement outcomes since the relationship between apprehensions and successful unlawful entries depends on the apprehension rate, which changes over time and may also differ by location.  But in the short-term and in a fixed geographic area, DHS continues to view changes in apprehensions as a useful outcome indicator because short term changes in apprehensions are more likely to be driven by changes in the number of unlawful border crossing attempts than by changes in the apprehension rate.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable.

Apprehensions displayed below are event counts, meaning each apprehension of the same alien in a fiscal year is counted separately.  These data do not represent a count of unique aliens apprehended.

**Available Data and Discussion**

Table 4: Southwest Border Apprehension by USBP sector, FY 2007 – FY 2016

| Sector | FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 5,536 | 5,391 | 6,360 | 5,288 | 4,036 | 3,964 | 3,684 | 4,096 | 5,031 | 6,366 |
| Del Rio, TX | 22,920 | 20,761 | 17,082 | 14,694 | 16,144 | 21,720 | 23,510 | 24,255 | 19,013 | 23,078 |
| EL Centro, CA | 55,883 | 40,961 | 33,521 | 32,562 | 30,191 | 23,916 | 16,306 | 14,511 | 12,820 | 19,448 |
| EL Paso, TX | 75,464 | 30,312 | 14,999 | 12,251 | 10,345 | 9,678 | 11,154 | 12,339 | 14,495 | 25,634 |
| Laredo, TX | 56,714 | 43,668 | 40,569 | 35,287 | 36,053 | 44,872 | 50,749 | 44,049 | 35,888 | 36,562 |
| Rio Grande | 73,430 | 75,473 | 60,989 | 59,766 | 59,243 | 97,762 | 154,453 | 256,393 | 147,257 | 186,830 |

23

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Valley, TX | | | | | | | | | |
| San Diego, CA | 152,460 | 162,390 | 118,721 | 68,565 | 42,447 | 28,461 | 27,496 | 29,911 | 26,290 | 31,891 |
| Tucson, AZ | 378,239 | 317,696 | 241,673 | 212,202 | 123,285 | 120,000 | 120,939 | 87,915 | 63,397 | 64,891 |
| Yuma, AZ | 37,992 | 8,363 | 6,951 | 7,116 | 5,833 | 6,500 | 6,106 | 5,902 | 7,142 | 14,170 |
| **Total** | **858,638** | **705,015** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Apprehension numbers often vary considerably from year to year and by sector.  Since FY 2013, the Rio Grande Valley (RGV) sector has displaced the Tucson sector as the leader in apprehensions, with over 120,000 more apprehensions than the next leading sector in FY 2016.  Apprehensions were up across the board in FY 2016, with each sector reporting increases.  The largest numeric increase was seen in RGV with almost 40,000 more apprehensions in FY 2016 than in FY 2015; however, the largest percent increase was seen in Yuma, where the apprehension count roughly doubled.  Tucson and San Diego, historically major sectors for apprehensions, continue to report considerably lower numbers than earlier years shown in the chart, with Tucson reporting 64,891 apprehensions in FY 2016, as compared to 378,239 in FY 2007.

# § 1092(b)(1)(F) Apprehensions of Unaccompanied Alien Children

**Definition**

*Unaccompanied alien child (UAC)* - one who has no lawful immigration status in the United States; has not attained 18 years of age, and with respect to whom; 1) there is no parent or legal guardian in the United States; or 2) no parent or legal guardian in the United States is available to provide care and physical custody [6 U.S.C. § 279(g)(2)].

UAC apprehensions are an *activity measure* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

**Methodology and Limitations**

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Since 2008, USBP systems have included a flag for children who are found to meet the legal definition of a UAC.  USBP's count of apprehensions is considered reliable, but some outside analysts have raised questions about agents' ability to reliably distinguish among older children and young adults (e.g., to distinguish between 17 and 18 year-olds) and to confirm whether children are traveling alone or in family groups.[4]

---

[4] OIG-10-12 Department of Homeland Security Office of Inspector General.  *Age Determination Practices for Unaccompanied Alien Children in ICE Custody*.  November 2009

AR074

USBP began collecting data on UACs in FY 2008; data are unavailable for earlier years.

**Data and Discussion**

Tables 5a – 5d provide counts of UAC apprehensions by citizenship and by USBP sector for FY 2008 through FY 2016, the years for which data are available.

Table 5a:  Total Southwest Border Apprehensions of UACs, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 84 | 147 | 197 | 189 | 168 | 125 | 256 | 839 | 951 |
| Del Rio, TX | 834 | 1,085 | 1,014 | 1,113 | 1,618 | 2,135 | 3,268 | 2,285 | 2,689 |
| EL Centro, CA | 337 | 673 | 448 | 457 | 498 | 434 | 662 | 668 | 1,379 |
| EL Paso, TX | 1,139 | 889 | 1,011 | 697 | 659 | 744 | 1,029 | 1,662 | 3,885 |
| Laredo, TX | 799 | 1,901 | 1,570 | 1,608 | 2,658 | 3,795 | 3,800 | 2,459 | 2,953 |
| Rio Grande Valley, TX | 2,523 | 3,835 | 4,977 | 5,236 | 10,759 | 21,553 | 49,959 | 23,864 | 36,714 |
| San Diego, CA | 888 | 3,028 | 980 | 549 | 524 | 656 | 954 | 1,084 | 1,553 |
| Tucson, AZ | 1,271 | 7,606 | 7,998 | 5,878 | 7,239 | 9,070 | 8,262 | 6,019 | 6,302 |
| Yuma, AZ | 47 | 276 | 216 | 222 | 280 | 247 | 351 | 1,090 | 3,266 |
| **Total** | **7,922** | **19,440** | **18,411** | **15,949** | **24,403** | **38,759** | **68,541** | **39,970** | **59,692** |

Table 5b:  Southwest Border Apprehensions of UACs from Mexico, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 59 | 127 | 180 | 183 | 137 | 104 | 102 | 73 | 118 |
| Del Rio, TX | 396 | 851 | 772 | 801 | 911 | 1,082 | 821 | 798 | 867 |
| EL Centro, CA | 306 | 631 | 404 | 427 | 418 | 328 | 278 | 397 | 610 |
| EL Paso, TX | 1,067 | 841 | 947 | 663 | 616 | 654 | 698 | 823 | 1,149 |
| Laredo, TX | 118 | 1,308 | 886 | 1,022 | 1,369 | 1,652 | 1,354 | 1,299 | 1,515 |
| Rio Grande Valley, TX | 365 | 2,401 | 2,787 | 3,009 | 4,361 | 6,366 | 7,081 | 3,243 | 3,389 |
| San Diego, CA | 879 | 2,990 | 950 | 523 | 480 | 598 | 740 | 823 | 851 |
| Tucson, AZ | 79 | 6,582 | 6,485 | 4,893 | 5,405 | 6,241 | 4,394 | 3,412 | 3,293 |
| Yuma, AZ | 33 | 258 | 204 | 192 | 246 | 194 | 166 | 144 | 134 |
| **Total** | **3,302** | **15,989** | **13,615** | **11,713** | **13,943** | **17,219** | **15,634** | **11,012** | **11,926** |

Table 5c:  Southwest Border Apprehensions of UACs from Northern Triangle Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 23 | 19 | 16 | 6 | 29 | 18 | 151 | 760 | 824 |
| Del Rio, TX | 423 | 229 | 238 | 307 | 701 | 1,044 | 2,422 | 1,479 | 1,806 |
| EL Centro, CA | 28 | 42 | 42 | 29 | 70 | 104 | 379 | 269 | 641 |
| EL Paso, TX | 65 | 46 | 58 | 32 | 40 | 80 | 290 | 824 | 2,685 |
| Laredo, TX | 627 | 523 | 598 | 528 | 1,228 | 2,028 | 2,329 | 1,113 | 1,382 |
| Rio Grande Valley, TX | 2,051 | 1,389 | 2,057 | 2,030 | 6,229 | 14,696 | 42,020 | 20,260 | 32,935 |

AR075

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| San Diego, CA | 9 | 37 | 28 | 25 | 44 | 48 | 209 | 255 | 625 |
| Tucson, AZ | 1,091 | 938 | 1,326 | 927 | 1,753 | 2,731 | 3,727 | 2,497 | 2,904 |
| Yuma, AZ | 14 | 15 | 8 | 28 | 34 | 36 | 178 | 930 | 3,091 |
| **Total** | **4,331** | **3,238** | **4,371** | **3,912** | **10,128** | **20,785** | **51,705** | **28,387** | **46,893** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

Table 5d:  Southwest Border Apprehensions of UACs from All Other Countries, FY 2008 – FY 2016

| Sector | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|---|---|---|
| Big Bend, TX | 2 | 1 | 1 | 0 | 2 | 3 | 3 | 6 | 9 |
| Del Rio, TX | 15 | 5 | 4 | 5 | 6 | 9 | 25 | 8 | 16 |
| EL Centro, CA | 3 | 0 | 2 | 1 | 10 | 2 | 5 | 2 | 128 |
| EL Paso, TX | 7 | 2 | 6 | 2 | 5 | 10 | 41 | 15 | 51 |
| Laredo, TX | 54 | 70 | 86 | 58 | 61 | 115 | 117 | 47 | 56 |
| Rio Grande Valley, TX | 107 | 45 | 133 | 199 | 169 | 491 | 858 | 361 | 390 |
| San Diego, CA | 0 | 1 | 2 | 1 | 0 | 10 | 5 | 6 | 77 |
| Tucson, AZ | 101 | 86 | 187 | 58 | 82 | 98 | 141 | 110 | 105 |
| Yuma, AZ | 0 | 3 | 4 | 2 | 0 | 17 | 7 | 16 | 41 |
| **Total** | **289** | **213** | **425** | **326** | **335** | **755** | **1,202** | **571** | **873** |

After averaging 15,000 per year from FY 2008 – FY 2011, UAC apprehensions increased an average of more than 60 percent per year in FY 2012 – FY 2014, peaking at 68,541 in FY 2014. UAC numbers returned to their FY 2013 level in FY 2015, but then climbed to 59,692 in FY 2016.  More than half of all UACs were reported in RGV (36,714), most of whom were from the Northern Triangle countries of Honduras, Guatemala, and El Salvador (32,935).

# § 1092(b)(1)(G) Apprehensions of Family Units

## Definition

*Family unit* - the number of individuals apprehended with a family member by the USBP.  For example, a mother and child apprehended together are counted as two family units.

Family unit apprehensions (FMUA) are *activity measures* that provide information used for program planning and operational purposes, among other uses.  Historically, the Department has also used apprehensions as a proxy indicator of illegal entries, an outcome measure.

## Methodology and Limitations

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  USBP's count of apprehensions is considered reliable, but agents may not always be able to reliably identify family units.

AR076

USBP began collecting data on family units in FY 2012; data on family unit apprehensions are unavailable for earlier years.

## Data and Discussion

Table 6a:  Total Southwest Border Apprehensions of FMUAs, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| FY2012 | 76 | 349 | 1,127 | 265 | 1,825 | 2,625 | 1,373 | 3,254 | 222 | **11,116** |
| FY2013 | 102 | 711 | 365 | 298 | 1,688 | 7,265 | 1,576 | 2,630 | 220 | **14,855** |
| FY2014 | 176 | 4,950 | 630 | 562 | 3,591 | 52,326 | 1,723 | 3,812 | 675 | **68,445** |
| FY2015 | 807 | 2,141 | 675 | 1,220 | 1,372 | 27,409 | 1,550 | 2,930 | 1,734 | **39,838** |
| FY2016 | 1,051 | 3,549 | 1,593 | 5,664 | 1,640 | 52,006 | 2,863 | 3,139 | 6,169 | **77,674** |

Table 6b:  Southwest Border Apprehensions of FMUAs from Mexico, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 56 | 218 | 699 | 241 | 1,623 | 1,555 | 1,325 | 2,940 | 194 | **8,851** |
| **FY2013** | 90 | 177 | 294 | 267 | 1,116 | 1,690 | 1,343 | 2,216 | 163 | **7,356** |
| **FY2014** | 61 | 141 | 260 | 213 | 779 | 1,832 | 1,213 | 1,057 | 83 | **5,639** |
| **FY2015** | 40 | 174 | 196 | 188 | 713 | 1,326 | 854 | 696 | 89 | **4,276** |
| **FY2016** | 38 | 229 | 163 | 224 | 518 | 1,392 | 346 | 487 | 84 | **3,481** |

Table 6c:  Southwest Border Apprehensions of FMUAs from Northern Triangle Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 120 | 12 | 19 | 175 | 989 | 31 | 130 | 3 | **1,489** |
| **FY2013** | 8 | 522 | 40 | 23 | 522 | 5,354 | 39 | 254 | 19 | **6,781** |
| **FY2014** | 100 | 4,753 | 337 | 291 | 2,767 | 49,790 | 351 | 2,553 | 392 | **61,334** |
| **FY2015** | 764 | 1929 | 470 | 1,002 | 602 | 25,296 | 617 | 2,127 | 1,556 | **34,363** |
| **FY2016** | 1,005 | 3,233 | 1,380 | 4,634 | 827 | 49,919 | 1,615 | 2,496 | 5,298 | **70,407** |

Note:  Northern Triangle Countries refers to El Salvador, Guatemala, and Honduras.

AR077

Table 6d:  Southwest Border Apprehensions of FMUAs from All Other Countries, FY 2015 – FY 2016

|  | Big Bend, TX | Del Rio, TX | EL Centro, CA | EL Paso, TX | Laredo, TX | Rio Grande Valley, TX | San Diego, CA | Tucson, AZ | Yuma, AZ | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **FY2012** | 10 | 11 | 416 | 5 | 27 | 81 | 17 | 184 | 25 | **776** |
| **FY2013** | 4 | 12 | 31 | 8 | 50 | 221 | 194 | 160 | 38 | **718** |
| **FY2014** | 15 | 56 | 33 | 58 | 45 | 704 | 159 | 202 | 200 | **1,472** |
| **FY2015** | 3 | 38 | 9 | 30 | 57 | 787 | 79 | 107 | 89 | **1,199** |
| **FY2016** | 8 | 87 | 50 | 806 | 295 | 695 | 902 | 156 | 787 | **3,786** |

From 2015 to 2016, FMUA numbers increased considerably across all sectors.  Similar to the UAC trend observed in these two years, total FMUAs nearly doubled in 2016, and more than doubled in some sectors.  Yuma reported only 1,734 FMUAs in 2015 but 6,169 in 2016; El Paso saw a similar trend.  Like the UACs, most FMUAs (70,407 of 77,674) were from Northern Triangle countries.  In fact, despite the overall increase in FMUAs, the total count of FMUAs from Mexico decreased by 19 percent in 2016.

## § 1092(b)(1)(H) Between the Ports Illicit Drugs Seizure Rate

**Definition**

*Between the Ports Illicit Drug Seizure Rate* – For each type of illicit drug seized by USBP between POEs, the ratio of the amount of illicit drugs seized in any fiscal year relative to the average amount seized in the immediately preceding five FYs.

The Illicit Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Between-the-ports drug seizure data are obtained from USBP administrative records.  These data are considered reliable.

Pursuant to the definition of the Illicit Drug Seizure Rate directed by NDAA § 1092 (b)(1)(H), the drug seizure rate describes the ratio of each year's seizures relative to illicit drugs seizures in the preceding five years; the measure does not describe the rate at which illicit drugs are seized.

**Available Data and Discussion**

Table 7:  Illicit Drugs Seized Relative to Preceding Five Years ("Illicit Drug Seizure Rate") between POEs, FY 2012 – FY 2016

AR078

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 101% | 100% | 83% | 81% | 72% |
| | Lbs seized | 2,299,864 | 2,430,123 | 1,922,545 | 1,538,307 | 1,294,052 |
| Cocaine | Rate | 117% | 53% | 57% | 206% | 71% |
| | Lbs seized | 12,161 | 4,596 | 4,554 | 11,220 | 5,473 |
| Heroin | Rate | 151% | 142% | 142% | 141% | 129% |
| | Oz seized | 6,873 | 9,212 | 9,691 | 8,282 | 9,062 |
| Methamphetamines | Rate | 228% | 160% | 149% | 215% | 168% |
| | Lbs seized | 3,715 | 3,580 | 3,930 | 6,443 | 8,224 |

Drug seizure trends varied in FY 2016 by type of illicit drug. Marijuana and cocaine both saw declines in FY 2016 as compared to the previous five years (72 percent and 71 percent of the previous five year average, respectively).  This is a continuous trend for marijuana seizures, which have been on the decline since FY 2014.  Cocaine seizures had been declining until FY 2015, in which year a resurgence in seizures was observed.  Heroin and methamphetamines seizures continue to increase, as they have in each year at least since FY 2012.

# § 1092(b)(1)(I) Estimates of the Impact of the Consequence Delivery System on Recidivism

**Definition**

*Consequence Delivery System (CDS)* – a process implemented by USBP to uniquely evaluate each apprehended subject and to identify the most effective and efficient consequences to deliver to impede and deter further illegal activity.

*Recidivist Rate* – The share of subjects apprehended by USBP who are apprehended more than once in the same fiscal year.

The annual recidivist rate is an *output measure* that offers insight into what share of deportees are deterred from making additional unlawful entry attempts, though not accounting for unknown attempts/entries.  USBP use the annual recidivist rate as one of its 15 metrics of the effectiveness of enforcement consequences under the CDS.

**Methodology and Limitations**

Since 2007, USBP has collected biometric data (including fingerprints and digital photographs) from most unlawful border crossers it apprehends.  These data are used to identify subjects apprehended more than once in a given fiscal year.  USBP data on re-apprehensions in the same fiscal year is considered reliable.  The annual recidivist rate is defined as the number of unique subjects apprehended multiple times in a fiscal year divided by the total number of unique subjects in the fiscal year:

29

$$\text{Annual Recidivist Rate} = \frac{\text{Number of Unique Subjects Apprehended Multiple Times}}{\text{Total Number of Unique Subjects}}$$

The annual recidivism rate is a valid indicator of the probability that deportees make subsequent attempts at re-apprehensions in that a drop in the annual recidivism rate very likely reflects a drop in unlawful re-entry attempts. The measure has the further advantages that USBP can calculate annual recidivism based strictly on its own apprehension data and that it can reliably be calculated at the end of each fiscal year. These features make the annual recidivism rate a useful measure for USBP performance management.

Nonetheless, as the U.S. Government Accountability Office (GAO) has argued, if the goal is to accurately describe the share of deportees who make additional unlawful entry attempts, the current measure of recidivism could be strengthened in at least two ways: 1) count re-apprehensions based on the date on which a subject is removed or returned, rather than that the date of apprehension; 2) count re-apprehensions that occur within a fixed period of time defined by the subject's repatriation date, rather than by the fiscal year.[5] When based on a one year window, these refinements yield a more expansive definition of the recidivism rate that DHS refers to as the "Total One-Year Recidivism Rate"; future versions of this report will include estimates of the impact of CDS on both the annual recidivism rate and a longer-term recidivism rate.

**Available Data and Discussion**

Table 8: CDS Recidivism Rate Change by Sector

| Southwest Border Sector | Year CDS Implemented | Average Annual Recidivism Rate in 3 Prior Years[1] | Average Annual Recidivism Rate in 3 Subsequent Years[2] |
|---|---|---|---|
| San Diego | FY 2012 | 38% | 31% |
| El Centro | FY 2012 | 42% | 36% |
| Yuma | FY 2012 | 18% | 16% |
| Tucson | FY 2012 | 26% | 20% |
| El Paso | FY 2012 | 10% | 10% |
| Big Bend | FY 2012 | 11% | 7% |
| Del Rio | FY 2012 | 8% | 6% |
| Laredo | FY 2012 | 14% | 12% |
| Rio Grande Valley | FY 2012 | 15% | 12% |

[1]Refers to the 3 years prior to CDS being implemented in that sector
[2]Refers to the 3 years after CDS was implemented in that sector

With the exception of the El Paso sector, where rates remained unchanged, the annual recidivism rates dropped across the board following the implementation of CDS. While changes in

---

[5] U.S. Government Accountability Office, "Border Patrol: Actions Needed to Improve Oversight of Post-Apprehension Consequences," GAO-17-66, January 2017, pp. 13-17.

AR080

recidivism should not be interpreted solely as a function of CDS given that border enforcement is a complex, dynamic system, some sectors showed noticeable improvements in recidivism rates, such as the Tucson and El Centro sectors which saw six percent drops after CDS, and San Diego which saw a seven percent drop.  Other sectors, which already had the lowest recidivism rates, saw smaller improvements.  Recidivism data are not available to calculate the impact of CDS at the Northern Border due to the small number of attempted illegal entries along the Northern Border.

## § 1092(b)(1)(J) Examination of Each Consequence under the CDS

**Definition**

*Consequence* – An administrative, programmatic, or criminal justice process imposed on a subject following the subject's apprehension.  CDS is designed to identify, for any given subject, the ideal consequences to deliver to impede and deter further illegal activity.

**Methodology and Limitations**

USBP's current methodology for assessing the CDS involves analyzing the effectiveness and efficiency of each enforcement consequence.  One of the key effectiveness metrics is the annual recidivism rate, which is calculated separately for each enforcement consequence.

Under the CDS, USBP specifically targets aliens with more extensive records of unlawful border crossing behavior for consequences that are designed to have a greater deterrent impact.  For example, the Target Enforcement Initiative utilizes partnerships with the U.S. Department of Justice to prioritize and prosecute individuals with six or more apprehensions.  As a result, differences in recidivism rates by enforcement consequence may reflect differences in the propensity of the targeted population to make further re-entry attempts, in addition to the possible impact of each consequence on recidivism.

An additional limitation of currently-available data is that they are based on apprehension data for a given fiscal year, not repatriation data.  Depending on the consequence and the timing of the apprehension, some individuals may not be repatriated to their country of origin during the fiscal year of their apprehension, and therefore may not have an opportunity to attempt re-entry.  DHS and CBP are working to refine their analysis of CDS and will seek to address these limitations in the FY 2018 version of this report.

**Available Data and Discussion**

Table 9:  Annual Recidivism Rate by Consequence, FY 2012 – FY 2016

AR081

| Consequence | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Voluntary Return | 27.06% | 28.61% | 30.50% | 27.03% | 24.55% |
| Warrant of Arrest/ Notice to Appear | 3.83% | 1.44% | 0.60% | 0.89% | 0.41% |
| Expedited Removal | 16.44% | 16.66% | 17.54% | 18.08% | 15.46% |
| Reinstatement of Removal | 15.88% | 16.42% | 15.80% | 15.41% | 16.62% |
| Alien Transfer Exit Program | 23.82% | 25.48% | 28.63% | 27.17% | 28.80% |
| Criminal Consequence Program | 10.30% | 9.26% | 8.24% | 6.67% | 8.36% |
| Standard Prosecution | 9.09% | 10.17% | 9.18% | 8.79% | 8.16% |
| Operation Against Smugglers Initiative on Safety and Security | 10.24% | 18.04% | 18.25% | 22.97% | 30.93% |

While these data should be interpreted with caution for the reasons identified above, some trends are noteworthy.  For example, the more punitive consequence programs such as CCP and standard prosecution generally showed lower recidivism rates (8.36 percent, 8.16 percent) than less punitive programs like voluntary return (24.55 percent) or expedited removal (15.46 percent).  At the same time, recidivism rates are notably high among individuals in the Operation Against Smugglers Initiative on Safety and Security (OASISS) consequence group; this finding likely reflects the fact that the population selected for OASISS—suspected smugglers—routinely make multiple crossing attempts.

AR082

# § 1092(c) Metrics for Securing the Border at Ports of Entry

## § 1092(c)(1)(A)(i) Total Inadmissible Travelers at Ports of Entry

**Definition**

*Inadmissible Alien* – An alien seeking admission at a POE who does not meet the criteria in the INA for admission.

*Known Inadmissible Aliens* – Aliens seeking admission at a POE who are found by OFO to be inadmissible.

*Total Attempted Inadmissible Aliens* – The estimated number of inadmissible aliens who attempt to enter the United States.  Total attempted inadmissible aliens include known inadmissible aliens and successful unlawful entries at POEs.

Inadmissible aliens and known inadmissible aliens are *activity measures* that describes OFO officer workload.  Known inadmissible aliens may also be used as a proxy indicator of total attempted inadmissible aliens, which is an *outcome measure*.

**Methodology and Limitations**

Known inadmissible aliens are recorded in OFO administrative records with a unique identifier created for each inadmissibility determination.  OFO's count of known inadmissible aliens is considered reliable.

The Department does not currently have a methodology in place to estimate the number of attempted inadmissible aliens.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

**Available Data and Discussion**

Table 10: Known Inadmissible Aliens at Ports of Entry, FY 2007 - FY2016

| FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| 203,310 | 224,770 | 225,149 | 231,306 | 216,355 | 197,362 | 205,920 | 224,927 | 254,637 | 292,614 |

From the recent low in FY 2012, the number of aliens identified as inadmissible at POEs has continue to climb. In FY 2016, 292,614 aliens were deemed inadmissible at POEs, the highest number this decade. The FY 2016 count represents an increase of 48 percent over the 197,362 inadmissible aliens in FY 2012.

## § 1092(c)(1)(A)(ii) Refusal and Interdiction Rates at Ports of Entry

33

**Definition**

*Refusal Rate* – The share of all passengers seeking admission at a port of entry that is found inadmissible.  Refusal Rate is an *activity measure* that describes OFO officer workload.

*Port of Entry Interdiction Rate* – The share of attempted inadmissible aliens that is found inadmissible.  POE Interdiction Rate is an *output measure* that describes the difficulty of entering the United States unlawfully through a port of entry.

**Methodology and Limitations**

The refusal rate is calculated by dividing known inadmissible aliens (i.e., aliens found inadmissible by OFO officers at POEs) by the total number of passengers seeking admission at ports of entry:

$$Refusal\ Rate = \frac{Inadmissibility\ Determinations}{Arivals\ at\ POEs}$$

Data on inadmissibility determinations and total passengers is obtained from OFO administrative records; these data are considered reliable.

The Department does not have a methodology in place to calculate total attempted inadmissible aliens, and therefore currently cannot calculate a POE interdiction rate.

**Available Data and Discussion**

Table 11: Inadmissible Aliens and Refusal Rate at Ports of Entry FY 2007 - FY2016

|         | Passengers   | Inadmissible | Refusal Rate |
|---------|--------------|--------------|--------------|
| **FY 2007** | 407,677,568 | 203,310 | 0.05% |
| **FY 2008** | 401,481,071 | 224,770 | 0.06% |
| **FY 2009** | 361,191,781 | 225,149 | 0.06% |
| **FY 2010** | 352,980,607 | 231,306 | 0.07% |
| **FY 2011** | 340,364,884 | 216,355 | 0.06% |
| **FY 2012** | 351,551,007 | 197,362 | 0.06% |
| **FY 2013** | 362,333,988 | 205,920 | 0.06% |
| **FY 2014** | 374,974,750 | 224,927 | 0.06% |
| **FY 2015** | 383,200,225 | 254,637 | 0.07% |
| **FY 2016** | 390,592,745 | 292,614 | 0.07% |

Since 2012, the number of passengers at POEs has increased 11 percent (from 352 to 391 million), while the number of known inadmissible passengers has increased 48 percent (from 197,000 to 293,000), resulting in a 33 percent increase in the refusal rate (from under 0.06

34

AR084

percent to over 0.07 percent).  This increase may indicate that inadmissible aliens represent an increasingly large share of passengers, that OFO is better able to detect inadmissible aliens, or both.  With an FY 2016 refusal rate of .0749 percent, however, the number of known inadmissible aliens is still a very small share of passengers coming through POEs.

## § 1092(c)(1)(A)(iii) Unlawful Entries at Ports of Entry

**Definition**

*Successful Unlawful Entries* - The estimated number of inadmissible aliens who unlawfully enter the United States through POEs.

Successful unlawful entries is an *outcome measure*.

**Methodology and Limitations**

The Department does not currently have a methodology to reliably estimate the number of successful unlawful entries through POEs.  DHS and CBP are working to establish a methodology to produce such an estimate in time to be included in the 2018 State of the Border Report.

## § 1092(c)(1)(B) Illicit Drugs Seized at Ports of Entry

**Definition**

*Drug Seizures* – Seizures of illicit drugs by CBP officers at POEs.

Drug Seizures are an *activity measure*.  Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Methodology and Limitations**

Drugs seizure data are obtained from OFO administrative records, measured in kilograms.  These data are considered reliable.

**Available Data and Discussion**

Drug seizures at POEs is contained in Appendix B.  A total of 367,612.58 kilos of illicit drugs were seized at POEs in FY 2016, which represents a nine percent decline from a total of 400,719.44 kilos in FY 2015, but is still higher than the previous five-year average of 352,399.84 kilos.

AR085

# § 1092(c)(1)(C) Port of Entry Illicit Drug Seizure Rate

**Definition**

*Port of Entry Illicit Drug Seizure Rate* – For each type of illicit drug seized by OFO at POEs, the ratio of the amount of illicit drugs seized in any fiscal year to the average of the amount seized in the immediately preceding five fiscal years.

**Methodology and Limitations**

At-ports-of-entry drug seizure data are obtained from OFO administrative records.  These data are considered reliable.

Pursuant to the definition of the illicit drug seizure rate directed by NDAA § 1092(c)(1)(C), the drug seizure rate describes recent seizure trends (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are seized.

The Drug Seizure Rate is an *activity measure*, which compares trends in activity data over time.  Drug seizures may also be interpreted as a proxy indicator of illicit drug inflows through POEs, an *outcome measure*.

**Available Data and Discussion**

Table 12: Port of Entry Illicit Drug Seizure Rate, FY 2012 – FY 2016

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 88% | 81% | 77% | 118% | 102% |
| | Kg seized | 219,344 | 195,270 | 180,686 | 250,637 | 219,960 |
| Cocaine | Rate | 73% | 82% | 71% | 87% | 103% |
| | Kg seized | 7,294 | 7,413 | 6,234 | 7,190 | 8,209 |
| Heroin | Rate | 209% | 208% | 168% | 174% | 106% |
| | Kg seized | 1,125 | 1,475 | 1,556 | 1,984 | 1,483 |
| Methamphetamines | Rate | 233% | 263% | 200% | 200% | 203% |
| | Kg seized | 4,888 | 7,503 | 8,285 | 10,861 | 14,279 |

Unlike recent trends in drug seizures between POEs, marijuana and cocaine seizures at POEs held fairly constant in FY 2016 as compared to the previous five-year average (two percent and three percent increase respectively).  Notably, however, seizures of marijuana and cocaine have fallen in recent years, and the volume of seizures in FY 2016 were still relatively low by recent historical standards.  Heroin and methamphetamines, however, continued their increases into FY 2016, with heroin increasing six percent over a constantly growing five year average and methamphetamines more than doubling its previous five year average each of the past five years.

# § 1092(c)(1)(D) Major Infractions at Ports of Entry

**Definition**

AR086

*Major Infractions* – OFO considers major infractions to include all arrests, including arrests related to terrorism, drugs, criminal alien [including zero tolerance (ZT) arrests], currency, merchandise, agriculture products, National Crime Information Center (NCIC) hits, and Terrorist Screening Database (TSDB) hits, among others.

*Known Major Infractions* – The number of major infractions interdicted by OFO.

*Undetected Major Infractions* – The estimated number of major infractions not interdicted by OFO.

Known Major Infractions are an *activity measure*. Undetected major infractions are an *outcome measure*.

**Methodology and Limitations**

These data are recorded in OFO administrative records and are considered reliable.

The Department does not currently have a methodology to estimate the number of undetected major infractions.

**Available Data and Discussion**

Table 13:  Known Major Infractions at Ports of Entry, FY 2007 – FY 2016

|  | Passengers | Major Infractions | Infraction Rate |
|---|---|---|---|
| **FY 2007** | 407,677,568 | 90,718 | 0.02% |
| **FY 2008** | 401,481,071 | 96,330 | 0.02% |
| **FY 2009** | 361,191,781 | 108,941 | 0.03% |
| **FY 2010** | 352,980,607 | 112,446 | 0.03% |
| **FY 2011** | 340,364,884 | 120,491 | 0.04% |
| **FY 2012** | 351,551,007 | 111,185 | 0.03% |
| **FY 2013** | 362,333,988 | 112,471 | 0.03% |
| **FY 2014** | 374,974,750 | 106,354 | 0.03% |
| **FY 2015** | 383,200,225 | 112,562 | 0.03% |
| **FY 2016** | 390,592,745 | 113,665 | 0.03% |

OFO officers interdicted 113,665 passengers based on major infractions at ports of entry in FY 2016.  The number of major infractions was almost unchanged from FY 2015, and similar to the number each year since FY 2010.  With the number of passengers increasing slightly over this period, the infraction rate fell slightly from 0.04 percent in FY 2011 to 0.03 percent in FY 2016. Over the last 10 years (i.e., since FY 2007), both the number of total seizures and the infraction rate both showed modest increases.

AR087

## § 1092(c)(1)(E) Cocaine Seizure Effectiveness Rate

**Definition**

*Cocaine seizure effectiveness rate* – In consultation with the Office of National Drug Control Policy (ONDCP), the amount of cocaine seized by OFO at land POEs compared to the total estimated flow of cocaine through land POEs.

Cocaine seizures is an *activity measure*.  Seizures may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*.  Seizure effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Seizure data is obtained from OFO administrative records and is considered reliable.  Estimates of the total cocaine flow are provided by ONDCP.  The U.S. Government does not have an estimate of the share of the total cocaine flow that passes through land POEs, but the U.S. Drug Enforcement Agency's National Drug Threat Assessment states that the southwest border remains the key entry point for the majority of the cocaine entering the Unites States.

**Available Data and Discussion**

Table 14:  Estimates of Cocaine Seizure at Land Ports of Entry FY 2012 – FY 2016

|  | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|
| Estimated Flow | 479 | 475 | 479 | 684 | 1,142 |
| Seizures | 45,260.18 | 39,074.63 | 41,311.88 | 38,145.00 | 52,900.67 |
| Seizure Effectiveness Rate | 4.2% | 3.7% | 3.9% | 2.5% | 2.1% |

Notes:  Estimated flow is measure in metric tons. Cocaine seizure estimates reported in pounds. Estimated cocaine flows are based on the IACM mid-point estimate for 2012-2014 and based on confirmed and substantiated CCDB estimate for 2015-2016.

## § 1092(c)(1)(F)(i) Average Wait Times and Traffic Volume

**Definition**

*Average Wait Time* – Average minute wait time for vehicles to pass through a land POE.

*Private Vehicle Volume* – The number of private vehicles passing through a land POE per year.

*Commercial Vehicle Volume* – The number of commercial vehicles passing through a land POE per year.

AR088

Average wait time is an *output measure* describing the ease of crossing the border.  Vehicle volume is an *activity measure*.

**Methodology and Limitations**

OFO calculates average wait times for each POE by a variety of methods, some automated using Radio Frequency Identification and others manually using either surveying or line of sight determinations.  For manual wait time determinations, OFO officers record average minute wait times in the Border Wait Time tool, for automated wait times the time is recorded automatically every 30 minutes.  Wait time data is not available for all POEs, particularly small northern border POEs with negligible wait times.  OFO leadership directed POEs to provide wait times in March 2014.  The policy is currently under review and new guidance will be issued in the near future to account for the improvements in automation and recording.

OFO records counts of Personally Owned Vehicles (POV) as administrative data in its Operations Management Report (OMR); these data are considered reliable.

**Available Data and Discussion**

Data on Average Wait Times, and counts of private and commercial vehicles for each land POE for which data are available are contained in Appendix C. Appendix C contains law enforcement sensitive information and has been redacted from this public report.


# § 1092(c)(1)(F)(ii) Infrastructure Capacity Utilization Rate

**Definition**

*Infrastructure Capacity Utilization Rate* – Average number of vehicles processed per booth, per hour at each land POE.

The Infrastructure Capacity Utilization Rate is an *output measure* that describes OFO's ability to process traffic relative to the physical and staffing capacity.

**Methodology and Limitations**

Data are obtained from OFO administrative records.  The data comes from CBP systems with booth hours and throughput as calculated fields.  The hours serve as a proxy measure for the number of CBP officer hours spent processing and are measured on a one-for-one basis.  Throughput is then calculated by summing all vehicles that passed through a site in a year and then dividing it by total booth hours.

**Available Data and Discussion**

Infrastructure capacity utilization rate data is contained in Appendix D. Appendix D contains law enforcement sensitive information and has been redacted from this public report.

AR089

Each OFO land POE is unique in terms of staffing authorizations and physical layouts.  Land POEs may be physically constrained by the available space around them and so unable to expand to yield greater capacity.  Land POEs in the United States are also impacted by the adjoining Canadian and Mexican land POE management decisions on staffing and physical layouts.  Both the OFO Mission Support Facilities Division and the CBP Office of Facilities and Asset Management are working on establishing methods to determine resourcing decisions for land POEs.

Infrastructure capacity utilization rate varies by location and year.  In general, the southern border reports higher utilization rates because of higher flows through the POEs.  The overall utilization rate increased in FY 2016 over the previous year, due to a combination of increased efficiency and increased traffic demand for a fixed number of processing lanes.  CBP processed an average of 47.4 vehicles per lane, per hour in FY 2016 (34.6 on the northern border; 54.4 on the southern border).

Table 15:  Average infrastructure capacity utilization rate FY 2012 – FY 2016

| Border | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| Northern Border | 36.2 | 38.2 | 39 | 35.7 | 34.6 |
| Southern Border | 47.7 | 46.8 | 49.1 | 53 | 54.4 |
| Total | 43.1 | 43.5 | 45.3 | 46.6 | 47.4 |

# § 1092(c)(1)(F)(iii) Secondary Examination Rate

**Definition**

*Secondary Examination Rate* – Percentage of passengers subject to secondary inspection at each land POE.

Secondary Examination Rate is an *activity measure* that describes OFO workload and practices.

**Methodology and Limitations**

Data are obtained from OFO administrative records. Secondary examination rate is determined by the recorded number of passengers sent for secondary inspection versus the total number of recorded passengers.

**Available Data and Discussion**

Frequency of secondary inspections data is contained in Appendix E. Appendix E contains law enforcement sensitive information and has been redacted from this public report.

AR090

Secondary inspection rates vary considerably among the various POEs.  Among the northern border POEs, the rate of secondary inspection declined from 8.52 percent in FY 2012 to 7.30 percent in FY 2016.  The southern border Secondary Inspection Rate remained stable over the past four years, with 11.88 percent of passengers receiving secondary inspection in FY 2016.  This number is down from the prior three year average from FY 2010 to FY 2012, when closer to 15 percent of passengers received secondary inspection.  The highest secondary inspection rates were northern border POEs such as St. John (32.30 percent) and Vanceboro (29.83 percent).  Certain smaller land POEs have high secondary examination rates due to low volume of traffic that allow officers increased time to thoroughly examine a larger share of passengers.

## § 1092(c)(1)(F)(iv) Secondary Examinations Effectiveness Rate

This measure is under review.  OFO does not presently measure the effectiveness of secondary examinations at the enterprise level.

## § 1092(c)(1)(G)(i) Number of Potentially "High-Risk" Cargo Containers

**Definition**

*Potentially High-Risk Cargo Containers* – Shipping containers carrying cargo shipments identified as potentially high-risk using National Targeting Center (NTC) security criteria.

Potentially High-Risk Cargo Containers is an *activity measure* that describes OFO workload.

**Methodology and Limitations**

All international cargo shipments coming to the United States via the sea, land, and air modes of transportation are screened by the NTC using the Automated Targeting System (ATS) to identify those shipments that may be considered potentially high-risk according to NTC security criteria.  Any cargo container carrying a shipment identified as potentially high-risk is identified for immediate review and assessed or scanned prior to lading at a Container Security Initiative (CSI) member foreign port of origin or at arrival at a U.S. POE.  Assessing, resolving, and when required, scanning and physically inspecting cargo found to be potentially high-risk ensures the safety of the public and minimizes the impact to the trade through the effective use of risk-focused targeting.

The NTC periodically refines, improves, and revises the security criteria applied by the Automated Targeting System, which in turn improves the focus of the risk assessment applied and somewhat reduces the overall number of cargo shipments identified as potentially high-risk.  This process of continual review and refinement in the security criteria applied and ATS methodology has led to significant reductions in the total number of cargo containers identified as potentially high-risk year-to-year, even though the total amount of cargo arriving at U.S. POEs has increased over the same time period.

AR091

**Available Date and Discussion**

Table 16:  Potentially High-Risk Cargo Containers at Seaports, FY 2013 – FY 2016

| FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|
| 89,598 | 74,509 | 72,974 | 71,815 |

The number of potentially high-risk cargo containers declined in 2016 for the third year in a row. Overall, the number of potentially high-risk containers fell from 89,598 in FY 2013 to 71,815 in FY 2016, a 20 percent decrease.


# § 1092(c)(1)(G)(ii) Ratio of Potentially High-Risk Cargo Containers Scanned Relative to High-Risk Containers Entering in Previous Fiscal Year

**Definition**

*Ratio of Potentially High-Risk Containers Scanned* – The ratio of potentially high-risk containers scanned relative to the number of potentially high-risk containers entering in the previous fiscal year.

*Percentage of Potentially High-Risk Containers Scanned* – The percentage of potentially high-risk containers scanned relative to the total number of potentially high-risk containers entering in the same fiscal year.

The ratio of potentially high-risk containers scanned is an *activity measure*, which compares trends in activity data over time. Ratio of High Risk Containers may also be interpreted as a proxy indicator of high risk containers successfully be scanned and entering through ports of entry, an *outcome measure*.

The percentage of potentially high-risk containers scanned is an *output measure*, which describes CBP's ability to scan containers identified as being potentially high-risk.

**Methodology and Limitations**

Inspection data are obtained from OFO administrative records.  These data include potentially high-risk cargo containers reviewed, assessed, or scanned.  These three methods of inspection are not currently distinguishable with available data sources.

The ratio compares potentially high-risk containers in one year to the number entering in the previous year and should not be confused with the percentage of potentially high-risk containers scanned relative to the number entering in the current year.

AR092

A container is considered "high-risk" if even one shipment within it is designated high-risk.  One container may have multiple high-risk shipments within it which could cause the same container to be reviewed or scanned multiple times.

**Available Data and Discussion**

The ratio of potentially high-risk containers reviewed, assessed, or scanned relative to previous years' entries along with the percentage scanned in the current year are contained in Appendix F. Appendix F contains law enforcement sensitive information and has been redacted from this public report.

With respect to the percentage scanned, nearly all sea POEs reported 100 percent scanning of high-risk cargo containers in FY 2016 or indicated that no high-risk containers passed through the POE.  The few POEs that reported lower than a 100 percent scanning rate reported at least a 99 percent rate.

## § 1092(c)(1)(G)(iii) Potentially High-Risk Cargo Containers Scanned Upon Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.

## § 1092(c)(1)(G)(iv) Potentially High-Risk Cargo Containers Scanned Before Arrival at a U.S. POE

This measure is under review and will be provided in the FY 2018 report.

AR093

# § 1092(d) Metrics for Securing the Maritime Border

## § 1092(d)(1)(A) Situational Awareness in the Maritime Environment

**Definition**

The NDAA calls for DHS to develop a measure for situational awareness based on "knowledge and understanding of current unlawful cross-border activity, including the following: (A) Threats and trends concerning illicit trafficking and unlawful crossings; (B) The ability to forecast future shifts in such threats and trends; (C) The ability to evaluate such threats and trends at a level sufficient to create actionable plans; and (D) The operational capability to conduct persistent and integrated surveillance of the international borders of the United States."

Situational awareness is an *output measure*.

**Methodology and Limitations**

DHS is in the multi-year process of developing a defensible, analytically sound measure for situational awareness in the maritime domain that meets the intent of the NDAA.

In the interim, the Department reports on the following operational activities contributing to maritime domain situational awareness:

- CBP Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Aircraft Hours Flown for Situational Awareness or Interdiction Support
- USCG Cutter Hours Contributing to Situational Awareness or Interdiction
- CBP Boat Hours Contributing to Situational Awareness or Interdiction
- USCG Boat Hours Contributing to Situational Awareness or Interdiction
- CBP Tethered Aerostat Radar System (TARS) Radar Operating Hours
- Number of Vessel Manifests Screened by Coastwatch

**Available Data and Discussion**

Table 17a:  CBP Aircraft Flight Hours Within/Outside Transit Zone, FY 2016

|  | **FY2016** |
|---|---|
| Inside Transit Zone - CBP | 6,420 |
| Outside Transit Zone – CBP | 13,188 |

Table 17b:  USCG Aircraft Flight Hours Within/Outside Transit Zone, FY 2012 – FY 2016

|  | **FY2012** | **FY2013** | **FY2014** | **FY2015** | **FY2016** |
|---|---|---|---|---|---|
| Inside Transit Zone – USCG | 5,082 | 4,599 | 4,567 | 5,426 | 4,110 |
| Outside Transit Zone – USCG | 14,721 | 14,258 | 13,896 | 14,003 | 13,736 |

44

USCG reported a decrease in the number of flight hours both inside and outside the transit zone in FY 2016.  Between FY 2012 and FY 2015, an average of 4,919 hours were flown inside the transit zone, while only 4,110 were flown in FY 2016 – the lowest recorded flight hours in the last five years.  Similarly, 13,736 hours were flown outside the transit zone in FY 2016, as compared to the FY 2012-2015 average of 14,220.  This FY 2016 total was also the lowest number of hours flown outside the transit zone in the last five years.

Table 18:  USCG Cutter underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 37,866 | 25,388 | 14,456 | 16,964 | 28,205 |
| Outside Transit Zone | 127,671 | 117,114 | 117,093 | 112,773 | 78,462 |

Table 19a:  USCG Boat underway hours within/outside transit zone FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Inside Transit Zone | 0 | 2,031 | 0 | 0 | 0 |
| Outside Transit Zone | 46,326 | 37,640 | 30,726 | 32,701 | 28,525 |

Table 19b:  CBP Boat underway hours within/outside transit zone FY 2016

|  | FY2016 |
|---|---|
| Inside Transit Zone | 0 |
| Outside Transit Zone | 40,241 |

Note:  CBP maritime hours include Air and Marine Operations vessel underway hours.

Table 20:  Total operational hours for TARS radars FY 2012 – FY 2016

|  | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|
| Cudjoe Key, FL | 5,752 | 6,289 | 6,165 | 6,306 | 4,886 |
| Lajas, PR | 0[1] | 0[1] | 1,230[1] | 5,049 | 4,559 |

[1] TARS site at Lajas, Puerto Rico crashed in 2011; CBP re-established operations in May 2014.
Source:  CBP administrative records

CBP's Air and Marine Operations (AMO) uses TARS to provide long-range detection of low-altitude aircraft at the radar's maximum range.  The elevated sensor mitigates curvature of the earth and terrain masking limitations.  The number of TARS operational hours declined for both locations in FY 2016.  Cudjoe Key saw a 1,420 hour decrease in hours (23 percent decrease from FY 2015).  Lajas reported a 490 hour decrease (10 percent decrease from FY 2015).  FY 2016 saw an increase in severe tropical weather throughout the storm season because of a La Niña effect, which impacted operations.  In addition to the weather, AMO switched out the aerostat envelope of the TARS in Cudjoe Key over March and April 2017.

Table 21:  Vessel Manifests Screened by Coastwatch for National Security Concerns Prior to Arrival at U.S. POE, FY 2012 – FY 2016

| FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|
| 118,098 | 126,112 | 124,661 | 122,133 | 117,736 |

AR095

# § 1092(d)(1)(B) Known Maritime Migrant Flow Rate

**Definition**

*Known Maritime Flow* - Total maritime migrant flow interdicted, identified directly or indirectly but not interdicted, or otherwise believed to have unlawfully entered the United States

Known Maritime Flow is an *outcome measure*.

**Methodology and Limitations**

Migrant flow data are obtained from USCG and CBP administrative records.  The USCG maintains a robust accounting of USCG, international partner, and domestic partner interdictions and sightings of undocumented maritime migrants.  The USCG relies upon its partners to report their interdictions to the USCG for compilation in the database.  At times, undocumented maritime migrants are counted by both USCG and CBP (or other partners) when interdicted as agencies often cooperate during these operations.  In certain limited cases undocumented maritime migrant interdictions by partners are not reported to the USCG, and these cases are not accounted for in the figures below.  Additionally, while partners report cases to the USCG when undocumented maritime migrants are apprehended on shore or evidence is found of their arrival on shore, some migrants arrive without being apprehended and leave no evidence.  These cases are never reported and are also excluded from the known maritime migrant flow figures below.

Table 22:  Migrants interdicted in the maritime domain by DHS Component FY 2007 – FY 2016

|         | USCG  | CBP   | DHS and Partners |
|---------|-------|-------|------------------|
| **FY 2007** | 5,981 | NA | NA |
| **FY 2008** | 4,565 | NA | NA |
| **FY 2009** | 3,682 | NA | NA |
| **FY 2010** | 2,121 | NA | NA |
| **FY 2011** | 2,458 | NA | NA |
| **FY 2012** | 2,732 | NA | NA |
| **FY 2013** | 2,093 | NA | NA |
| **FY 2014** | 3,587 | NA | 7,752 |
| **FY 2015** | 3,825 | NA | 6,028 |
| **FY 2016** | 6,326 | 2,683 | 8,167 |

Note:  Some interdictions may be counted by both USCG and CBP as some migrant interdictions involve assets from both agencies.  Interdictions by DHS and partners may include international partners.

Table 23:  Known maritime migrant flow, FY 2007 – FY 2016

| FY2007 | FY2008 | FY2009 | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 14,682 | 10,879 | 9,850 | 4,443 | 4,566 | 5,298 | 7,631 | 10,631 | 8,057 | 10,319 |

AR096

# § 1092(d)(1)(C) Illicit Drug Removal Rate

**Terms**

*Illicit Drugs Removal Rate* –The ratio of illicit drugs removed by DHS maritime security in any fiscal year, including drugs abandoned at sea, relative to the average amount removed or abandoned in the immediately preceding five fiscal years.

The Illicit Drug Removal Rate is an *activity measure*, which compares trends in activity data over time.

**Methodology and Limitations**

Drug removals are obtained from USCG and CBP administrative records; these data are considered reliable.

Pursuant to the definition of the Illicit Drug Removal Rate directed by NDAA § 1092 (d)(1)(C), the Drug Removal Rate describes recent trends in drugs removed or abandoned at sea (i.e., current year compared to five previous years); the measure does not describe the rate at which illicit drugs are removed.

Non-commercial maritime drug removals includes those seized by the USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted or abandoned by drug trafficking organizations.

**Available Data and Discussion**

Table 24:  Ratio of Drugs Removed or Abandoned at Sea Relative to Previous Five Fiscal Years ("Illicit Drug Removal Rate"), FY 2012 – FY 2016

| Drug Type | | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 |
|---|---|---|---|---|---|---|
| Marijuana | Rate | 337% | 137% | 154% | 100% | 61% |
| | Quantity Removed | 124,585 | 81,008 | 108,535 | 78,262 | 52,613 |
| Methamphetamine | Rate | 0% | 150% | 265% | 36% | 4332% |
| | Quantity Removed | 0 | 17.4 | 32.1 | 4.8 | 599.5 |
| Heroin | Rate | 762% | 0% | 0% | 676% | 327% |
| | Quantity Removed | 24 | 0 | 0 | 52.4 | 44 |

Note:  Marijuana measured in pounds, amphetamines and heroin measured in kilograms.
Data only includes removals by USCG.

AR097

# § 1092(d)(1)(D) Cocaine Removal Effectiveness Rate

**Definition**

*Cocaine Removal Effectiveness Rate* – In consultation with ONDCP, the amount of cocaine removed by DHS inside and outside the maritime transit zone compared to total estimated flow of cocaine through the maritime domain.

Cocaine Removals is an *activity measure*. Removals may also be used as a proxy indicator of total attempts to import cocaine, an *outcome measure*. Cocaine Removal Effectiveness rate (i.e., cocaine seized as compared to the total estimate cocaine flow) is an *output measure*.

**Methodology and Limitations**

Drug removal data are obtained from ONDCP, JIATF-S, CBP, and USCG administrative records through the Consolidated Counter Drug Database (CCDB), and are considered reliable. Flow quantities are the best estimates available based on intelligence reporting and case data. Additionally, while other government estimates for production in major cocaine producing countries in South America and consumption of cocaine within America do not align with the estimated non-commercial maritime flow figures inside the transit zone derived from the CCDB, this metric was derived based upon the non-commercial maritime flow estimates.

For the purposes of this metric, based upon where the data was gathered, the transit zone is defined by the Joint Interagency Task Force South area of responsibility. Non-commercial maritime drug removals include those seized by USCG, CBP, other law enforcement agencies, and international partners, as well as those disrupted by anti-drug trafficking operations. The cocaine removal rate is based on estimates of noncommercial maritime cocaine flow from the CCDB. Outside the transit zone data is not considered as robust with regard to intelligence on flow. As a result, the interdiction rate for cocaine outside the transit zone is not considered reliable.

**Available Data and Discussion**

Table 25: Cocaine Removed by DHS Relative to the Total Estimated Flow in the Maritime Transit Zone, FY 2012 – FY 2016

| Location | | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|---|
| Inside Transit Zone | Rate | 23% | 12% | 17% | 21% | 17% |
| | Quantity Removed | 186.4 | 155.4 | 178.8 | 277.2 | 482.7 |
| | Estimated Flow | 799.5 | 1260.4 | 1042.2 | 1308.8 | 2852.6 |
| Outside Transit Zone | Rate | 49% | 19% | 50% | 73% | 28% |
| | Quantity Removed | 21.3 | 15.1 | 13.2 | 39 | 17.7 |
| | Estimated Flow | 43.8 | 81.5 | 26.2 | 53.2 | 62.3 |

Note: Removal and estimated flow quantities measured in metric tons.

Figure 5: Flow and Removal of Cocaine in the Maritime Transit Zone, FY 2012 – FY 2016

48



The flow of cocaine is estimated to have risen in 2016 to over 2,800 metric tons, based on the decrease in aerial eradication of cocaine crops in Colombia and improved intelligence reporting throughout the Transit Zone.

## § 1092(d)(1)(E) DHS Maritime Threat Response Rate

**Definition**

*DHS Maritime Threat Response Rate* – The ability of DHS maritime security components to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity. Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that does not support submission at this time. DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

## § 1092(d)(1)(F) Intergovernmental Maritime Threat Response Rate

**Definition**

AR099

*Intergovernmental Maritime Threat Response Rate* – The ability of DHS maritime security components or other U.S. Government entities to respond to and resolve known maritime threats, whether inside or outside a transit zone, by placing assets on-scene, relative to the total number of known threats.

**Methodology and Limitations**

Currently, this data only exists associated with cocaine response activity.  Further, DHS data is part of a larger set of interagency data and may not be able to be separated from the larger interagency data set, which is currently assessed and reconciled on a cycle and process outside of DHS that doesn't support submission at this time.  DHS, in cooperation with interagency partners, intends to explore options to collect response data for non-cocaine response events, as well as options to provide the response rate measures data to meet the intent of the Act and hopes to provide an update in the November 2018 report.

AR100

# § 1092(e) Air and Marine Security Metrics in the Land Domain

## § 1092(e)(1)(A) Flight Hour Effectiveness Rate

**Definition**

Flight Hour Effectiveness Rate in the Land Domain – Number of flight hours flown by DHS Air and Marine Operations in the Land Domain as a percentage of AMO's unconstrained and unfunded flight hour requirements.

Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

This Flight Hour Effectiveness Rate is determined by dividing the total hours flown by the number of flight hours determined during the annual collection process. The flight hour requirements for the subsequent fiscal year are collected by AMO operating locations based on unconstrained requirements collected from USBP, ICE and other partner agencies as well as internal AMO requirements. In FY 2016, AMO collected the following unconstrained flight hour requirements from these partner agencies in the Land Domain: USBP – 209,448 hours; ICE – 54,580 hours; OFO - 6,820 hours; and 24,377 hours for all other enforcement and non-enforcement Land Domain missions (U.S. Secret Service event security, local Law Enforcement coordination, training, maintenance, etc.). In 2016, AMO's unconstrained flight hour requirement in the Land Domain totaled 295,225 hours. However, after incorporating the approved funding for FY 2016, the total funded flight hours in the Land Domain was reduced to 79,774 programmed hours.

**Available Data and Discussion**

AMO completed 27 percent of the unconstrained flight hour requirement during FY 2016, with 79,872 hours flown against the unconstrained 295,225 hours. Data from previous years are not available for analysis.

## § 1092(e)(1)(B) Funded Flight Hour Effectiveness Rate

**Definition**

*Funded Flight Hour Effectiveness Rate* – Number of flight hours flown by Air and Marine Operations as a percentage of the number of flight hours funded by Congress.

Funded Flight Hour Effectiveness Rate is an *output measure*.

**Methodology and Limitations**

AR101

Flight hour data are obtained from AMO administrative records.  This rate is determined by dividing the total hours flown by the number of flight hours funded by Congress.

**Available Data and Discussion**

AMO's Flight Hour Effectiveness Rate was 100 percent in FY 2016, with 79,872 hours flown against 79,774 funded hours.  Data from previous years are not available for analysis.

## § 1092(e)(1)(C) AMO Readiness Rate

**Definition**

*AMO Readiness Rate -* The percentage of mission requests that AMO was able to fulfill, excluding those requests that could not be fulfilled due to reasons beyond AMO's control.

AMO Readiness Rate is an *activity measure*.

**Methodology and Limitations**

Missions data are obtained from AMO administrative records.  The rate is determined by dividing the missions flown by the total number of mission requests (number of missions flown plus the number of missions cancelled due to causes within AMO control, such as maintenance, personnel, and asset availability).

Table 26:  AMO Missions Cancelled and Readiness Rate FY 2016

|  | FY2016 |
|---|---|
| Total Non-Cancelled Missions | **31,635** |
| Missions cancelled - asset availability | **4,978** |
| Missions cancelled - crew availability | **1,738** |
| Total cancelled missions within AMO control | **6,716** |
| Readiness rate due to causes within AMO control | **82%** |

AMO's readiness rate was 82 percent in FY 2016, with 6,716 out of 38,351  planned missions cancelled due to causes within AMO control.  Data from previous years are not available for analysis.

## § 1092(e)(1)(D) AMO Weather-Related Cancelation Rate

**Definition**

*AMO Weather-Related Cancelation Rate -* The number of missions cancelled by AMO due to weather as a percentage of total planned AMO missions.

52

AR102

AMO Weather-related cancelation rate is an *activity measure*.

**Methodology and Limitations**

Mission data are obtained from AMO administrative records.  The Weather-Related Cancelation Rate is calculated by dividing the number of missions cancelled due to weather by the total number of missions requested by AMO's partner agencies.

**Available Data and Discussion**

Table 27:  AMO Weather-Related Cancelation Rate, FY 2016

| | |
|---|---|
| Total Missions Requested by Partner Agencies | 42,761 |
| Missions Cancelled – Weather | 3,083 |
| Cancellation Rate due to Weather | 7% |

Data from previous years are not available for analysis.


# § 1092(e)(1)(E) AMO Individuals Detected

**Definition**

*AMO Individuals Detected* – Number of individuals detected by CBP AMO through the use of unmanned aerial systems and manned aircraft.

AMO Individuals Detected is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records.  The Department's currently available data on detections by unmanned aircraft are limited to the number of VADER detections, and current data on detections from manned aircraft are limited to detections leading to apprehensions and arrests.

These data exclude certain detections because AMO does not presently track data from all sensors on unmanned and manned aircraft.  For this reason, the Department considers the current AMO Individuals Detected measure to be a work in progress, and expects to provide more comprehensive data on AMO detections as part of the FY 2019 State of the Border Report.

**Available Data and Discussion**

Table 28:  Individuals Detected by AMO by Aircraft Type

| Aircraft Type | FY2016 |
|---|---|
| Manned | 54,879 |
| Unmanned | 7,908 |

AR103

Data from previous years are not available for analysis.

## § 1092(e)(1)(F) AMO Apprehensions Assisted

**Definition**

*AMO Apprehensions Assisted* – USBP apprehensions assisted by AMO through the use of unmanned aerial systems and manned aircraft.

AMO Apprehensions Assisted is an *activity measure*.

**Methodology and Limitations**

Data are obtained from AMO administrative records.  The metric consists of apprehensions and arrests that are attributed to manned and unmanned aircraft operations.  These data are based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain

**Available Data and Discussion**

Table 29:  Apprehensions Assisted by AMO by Aircraft Type and Flight Hours

| | FY2016 | |
|---|---|---|
| Aircraft Type | Enforcement Flight Hours | Apprehensions |
| Manned | 64,639 | 50,646 |
| Unmanned | 4,857 | 1,729 |

Data from previous years are not available for analysis.

## § 1092(e)(1)(G) Illicit Drug Seizures Assisted by AMO

**Definition**

*Illicit Drug Seizures Assisted by AMO* - The number and quantity of illicit drug seizures assisted by AMO through the use of unmanned aerial systems and manned aircraft.

Illegal Drug Seizures Assisted is an *activity measure*.

**Methodology and Limitations**

AR104

Drug seizure data are obtained from AMO administrative records.  The metric consists of the total number of events and quantity in pounds of drug seizures using manned and unmanned systems.  A "drug event" is defined as a single law enforcement action resulting in a drug seizure(s).  This is based on Aircraft Enforcement Hours (non-maritime), therefore excluding DHC-8, P-3, and MEA aircraft operations occurring in the maritime domain.

**Available Data and Discussion**

Table 30:  Illicit Drug Seizures and Drug Events by AMO by Aircraft Type and Flight Hours

| Aircraft Type | FY2016 | | |
|---|---|---|---|
| | Enforcement Flight Hours | Drug Events | Drug Seizures (lbs) |
| Manned | 64,639 | 3,834 | 651,759 |
| Unmanned | 4,857 | 78 | 30,033 |

Data from previous years are not available for analysis.

# § 1092(e)(1)(H) AMO Actionable Intelligence

**Definition**

*AMO Actionable Intelligence* - The number of times that actionable intelligence related to border security was obtained through the use of unmanned aerial systems and manned aircraft.

This measure is under review and will be provided in the FY 2019 State of the Border report.

AR105

# § 1092(g)(3)(D) Other Appropriate Information

Pursuant to NDAA § 1092(g)(3)(D), this section provides three additional metrics of border security between ports of entry:  1) selected characteristics of USBP apprehensions; 2) the estimated at-the-border deterrence rate; and 3) estimated border crossing costs.

## Selected Characteristics of Recent USBP Apprehensions

**Definition**

Historically, the overwhelming majority of individuals apprehended between POEs along the southwest border have been Mexican adults, and very few of them have sought asylum or other forms of humanitarian relief from removal.  The profile of USBP apprehensions has changed in important ways in recent years, as growing shares of individuals apprehended are:  a) from countries other than Mexico (primarily the Northern Triangle of Central America countries of El Salvador, Guatemala, and Honduras), b) UACs or children and adults traveling together as FMUAs, and/or c) seeking asylum by claiming credible or reasonable fear of being returned to their countries of citizenship when potentially subject to expedited removal.

These shifting characteristics have an important impact on border security and USBP border enforcement because existing enforcement policies were largely designed with the more traditional alien profile in mind. For example, many consequences under CBP's Consequence Delivery Program such as the Alien Transfer Exit Program and the Mexican Interior Repatriation Program are only applicable to Mexican nationals.  And UACs, FMUAs, and aliens making successful credible/reasonable fear claims are generally not subject to expedited removal and have been considered "not impactable" by traditional USBP enforcement efforts because upon apprehension they have typically been released into the United States with a Notice to Appear in immigration court on a future date.  More generally, the drivers of migration from countries other than Mexico and for aliens who may seek humanitarian relief from removal may be different from those that motivated earlier generations of unlawful border crossers, potentially causing U.S. policymakers to rethink their policy response.

To monitor these changing dynamics, the Department tracks two main sets of characteristics:

*Apprehensions by Citizenship* – The share of aliens apprehended by USBP from Mexico, El Salvador, Guatemala, Honduras, and all other countries.

*Apprehensions by Potential Humanitarian Equities* – The share of aliens apprehended by USBP who are unaccompanied children, are apprehended as part of a family unit, and/or who make successful credible or reasonable fear claims.

Apprehensions is an *activity measure*.

AR106

## Methodology and Limitations

Apprehensions are recorded in administrative record systems with a unique identifier created for each apprehension.  Apprehensions by citizenship, by UAC status, and by family unit status are generally considered reliable, though agents may not always be able to identify UACs or family units.

## Available Data and Discussion

Table 31:  USBP Southwest Border Apprehensions by Citizenship, FY 2008 – FY 2016

| Country | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| Mexico | 653,035 | 495,582 | 396,819 | 280,580 | 262,341 | 265,409 | 226,771 | 186,017 | 190,760 |
| El Salvador | 12,133 | 11,181 | 13,123 | 10,368 | 21,903 | 36,957 | 66,419 | 43,392 | 71,848 |
| Guatemala | 15,143 | 14,125 | 16,831 | 17,582 | 34,453 | 54,143 | 80,473 | 56,691 | 74,601 |
| Honduras | 18,110 | 13,344 | 12,231 | 11,270 | 30,349 | 46,448 | 90,968 | 33,445 | 52,952 |
| All Other | 6,584 | 6,633 | 8,727 | 7,777 | 7,827 | 11,440 | 14,740 | 11,788 | 18,709 |
| **Total** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

In recent years, apprehensions have started to shift from consisting overwhelmingly of Mexican nationals to an equal share of Mexican nationals and border crossers from other areas, mostly Northern Triangle countries.  In 2014 and 2016, southwest border apprehensions peaked, most noticeably for Northern Triangle countries.  In 2016, only 46 percent of southwest border apprehensions were Mexican nationals while 48 percent were from Northern Triangle countries.  Apprehensions of border crossers from all other countries also rose considerably in 2016, increasing by more than 50 percent.

Table 32:  USBP Southwest Border Apprehensions by Potential Humanitarian Claim, FY 2008 – FY 2016

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| FMUA | NA | NA | NA | NA | 11,116 | 14,855 | 68,445 | 39,838 | 77,674 |
| UAC | 7,922 | 19,440 | 18,411 | 15,949 | 24,403 | 38,759 | 68,541 | 39,970 | 59,692 |
| Credible/ Reasonable Fear Claim | 7,454 | 8,627 | 12,499 | 13,994 | 22,087 | 44,380 | 57,936 | 47,117 | 87,585 |
| **Total Apprehensions** | **705,005** | **540,865** | **447,731** | **327,577** | **356,873** | **414,397** | **479,371** | **331,333** | **408,870** |

Note: Table rows are not mutually exclusive categories; some individuals are counted as FMUA and credible/reasonable fear.

Consistent with the surge of apprehensions seen in 2016, the number of family unit apprehensions and UAC apprehensions rose in 2016, with family unit numbers roughly doubling from 2015 and UAC apprehensions increasing 49 percent.  Credible fear claims also rose substantially in 2016, with an 86 percent increase over the previous year. All three of these "non-impactable" flows have increased dramatically over the past decade.  As compared to 2008, credible fear/reasonable fear claims have increased eleven-fold, while UAC numbers have

AR107

increased seven-fold; and FMUA apprehensions have increased seven-fold since 2012 (the first year for which data are available).

## At-the-Border Deterrence

**Definition**

*Deterrence* - the estimated share of migrants who, following a failed unlawful entry attempt, are deterred from making a subsequent reentry and decide instead to return home or otherwise remain in Mexico.

The deterrence rate is an *output measure* associated with the difficulty of crossing the border unlawfully because it reflects decisions by people who have already decided to migrate illegally to abandon their effort.

**Methodology and Limitations**

As with the apprehension or interdiction rate, deterrence cannot be observed directly.

DHS currently estimates deterrence based on migrant surveys; the Department believes surveys or interviews are one of the only ways to directly measure deportees' intentions to make a further illegal entry attempt. The most important survey data on deterrence comes from the Colegio de la Frontera Norte International Border Survey (EMIF), which interviews deportees immediately at repatriation facilities upon their return to Mexico and asks them about their intentions to return to the United States within the next 7-90 days. In work for DHS, the Institute for Defense Analyses (IDA) Corporation used a combination of EMIF and CBP data to build an econometric model of 90-day deterrence for all USBP apprehensions since 2000.[6]

In addition to the standard concerns about the validity of survey samples and survey instruments, questions about deterrence are especially hard to measure accurately given the ever-evolving enforcement environment. A further limitation is that the EMIF data is restricted to Mexican northern border deportees, and cannot be assumed to apply to migrants from other regions/countries because they face different trade-offs and geographic barriers when considering a re-entry attempt.

**Available Data and Discussion**

   Figure 6:  At the Border Deterrence for Mexican Border Deportees, FY 1993 – FY 2016

---

[6] John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.

AR108



The data describe relatively limited deterrence levels prior to 2007 (20-40 percent in the seven-day survey and 10-30 percent in the 90-day model), and substantial growth in the deterrence rate since that time.  Estimated seven-day deterrence rates have exceeded 75 percent every year since 2012, and estimated 90-day deterrence rates hovered around 60 percent in 2014 through 2016.

## Border Crossing Costs

**Definition**

*Percent hiring smuggler* – the share of migrants who hire a smuggler.

*Border crossing costs* - the average fees that smugglers charge.

Smuggling usage and average smuggling fees are *output measures* associated with the difficulty of crossing the border unlawfully.  Migrants will only tolerate higher fees to the extent that smugglers provide an essential and successful service.  Smugglers also compete to attract customers by offering their services at the lowest profitable rate, so higher fees indicate rising costs to smugglers.  Rising smuggling fees also reflect an increased risk to smugglers of a criminal conviction; smugglers pass this risk along to customers in the form of higher fees.

**Methodology and Limitations**

The only available data on smuggling fees come from migrant surveys and USBP custodial interviews.  These data may be subject to response bias if migrants are reluctant to admit to hiring a smuggler, but such bias should be broadly consistent over time, so changes in survey/interview data should reflect changes in the difficulty of crossing the border.

AR109

**Available Data and Discussion**

One finding across multiple surveys is that smuggler usage rates have increased steadily over the last five decades.  Previous research by the Office of Immigration Statistics found that smuggler usage rates climbed from 40-50 percent during the 1970s, to 59 percent in the late 1970s and early 1980s, 70-80 percent in the 1980s to 1990s, 80 to 93 percent in the 1990s to 2000s, and 95 percent for first-time crossers surveyed in 2006.  Similarly, according to USBP interviews, relatively few illegal border crossers hired a smuggler prior to 2001, but usage rates climbed to 80-95 percent among apprehended border crossers in 2015.

Figure 7:  Border Crossing Cost Estimates, FY 1999 – FY 2015



Source:  U.S. Border Patrol apprehension records, El Colegio de la Frontera Norte Encuestas sobre Migracion en las Fronteras Norte y Sur de Mexico (EMIF).

Survey results also indicate steady increases in fees paid to migrant smugglers.  Averaging across the available sources depicted in Figure X, smuggling fees increased by five percent per year during the 1980s, 12 percent per year during the 1990s, and nine percent per year during the decade ending in 2015.

Custodial interviews conducted by USBP have found that smuggling fees are often paid in stages.  Initial fees required to approach staging locations along the border were often lower than $100 prior to the late 2000s, and an additional $1,000-$3,000 in fees were charged upon delivery to the final destination.  More recently, smuggling fees for Mexicans and Central Americans reportedly have been as high as $1,200 for the initial staging payment and up to $8,000 at the final destination.  Custodial interviews also find evidence of an increase in alternative forms of payment in exchange for passage, including migrants being required to participate in smuggling controlled substances or other illicit items across the border or to work off debts upon arrival in

AR110

the United States, as well as reports of harsh negotiations concerning payment plans with family members.

AR111

# IV.  Conclusion

DHS recognizes that its ability to accurately measure its border security outcomes, outputs, activities, and inputs is essential to the effective and efficient management of the Department. The metrics contained in this report will be the baseline that DHS uses to measure its progress towards meeting the goals contained in the Executive Order on *Border Security and Immigration Enforcement Improvement*.  As such, the Department will continue to refine these metrics through internal and external engagement and collaboration, including with Congress.  DHS looks forward to updating Congress on this progress through periodic briefings and formally with the submission of future State of the Border Reports.

AR112

# Appendix A – Repeated Trials Model Methodology

The Department's current model-based estimates of the Apprehension Rate, of the total number of successful unlawful entries, and of related measures such as undetected unlawful entries build on research conducted for DHS by the Institute for Defense Analyses (IDA) based on long-standing social science research on the Repeated Trials Methodology (RTM).[7]  The Department views some of IDA's assumptions as problematic and is still working to validate and refine the modeling methodology.  For this reason, while this report includes metrics based on IDA's model-based approach, DHS views the model itself as a work in progress, and future reports will update resulting metrics as the Department continues to improve its own modeling ability.

The primary building block for the model-based Apprehension Rate and total estimated successful unlawful entries is an estimated apprehension rate for a particular subset of border crossers that DHS refers to as a partial apprehension rate (PAR).  The approach focuses on illegal border crossers who are apprehended and deported to the Mexican border and who make a subsequent re-entry attempt.  The logic of the PAR is to use USBP biometric data to assess what share of migrants who make repeated entry attempts is subsequently re-apprehended.

The PAR methodology consists of three main steps (see Figure 2).  First, the model identifies a subset of illegal border crossers who are candidates to attempt re-entry, the so-called RTM population.  Under IDA's methodology, this group excludes all non-Mexicans, those deported to the Mexican interior or remotely through the Alien Transfer and Exit Program, aliens who have ever requested asylum, those facing criminal charges, and children under 18 years old.

---

[7] For a full discussion of IDA's model-based estimate, see John W. Bailey et al., "Assessing Southern Border Security," Institute for Defense Analyses, IDA Paper NS P-5304, May 2016.  Also see Thomas J. Espenshade, "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier," *International Migration Review* (1995): 545-565; Joseph Chang, "CBP Apprehensions at the Border," Homeland Security Studies and Analysis Institute, 2006.

AR113



Figure 1:  Partial Apprehension Rate Methodology

Source:  DHS Office of Immigration Statistics adaptation of Bailey et al. 2016.

The second step in calculating the PAR is to distinguish between deportees who give up and return home or otherwise remain in Mexico versus those who attempt to re-enter the United States.  IDA estimates this share based on an analysis of a survey of recent deportees conducted by the College of the Northern Border, the so-called EMIF survey.

Third, by definition, RTM assumes deportees who are not deterred following an apprehension always make a subsequent reentry attempt.  Thus, by observing in DHS administrative records how many migrants from the RTM population are re-apprehended, the model infers the number that successfully re-enters.  The ratio of re-apprehensions to successful re-entries is used to estimate the partial apprehension rate.

The PAR model confronts important limitations at each point in the modeling process.  The most notable and challenging to overcome is the assumption of the RTM that subjects who are not deterred will always attempt re-entry until successful.  One problem with this assumption is the lack of reliable data on who is deterred.  IDA relies primarily on the EMIF survey to estimate the deterrence rate.  And while the EMIF is widely recognized as one of the best migrant surveys available, its results are still dependent on the characteristics of the sample, the quality of the survey instrument, and the honesty of the respondents.  More fundamentally, the EMIF survey asks recent deportees about their *intentions* to re-enter the United States, and it therefore does not take account of shifting border enforcement efforts, potential changes in behavior by individuals who have been exposed to consequence programs, or other deterrent factors along the border.  The structure of the RTM model means that any resulting undercount in the estimate of the deterred population results in a downward bias in the PAR.

Second, the RTM population represents a shrinking share of southwest border apprehensions.  Mexican adults quickly deported to the nearest border accounted for about 95 percent of apprehensions when the RTM methodology was developed in the 1990s.  But changes in the composition of border flows (i.e., rising numbers of Central Americans and asylum seekers);

64

AR114

changes in CBPs enforcement strategy to emphasize criminal charges, lateral repatriation, and other enforcement consequences; and IDA's restrictive modeling choices mean that as few as 20 percent of U.S. Border Patrol (USBP) apprehensions in recent years are used to estimate the PAR.  In addition, because the RTM sample excludes aliens who are more likely to surrender to USBP (i.e., aliens with a higher apprehension rate), the PAR is biased downwards as an indicator of the overall apprehension rate; this bias may be substantial given the number of aliens excluded from the RTM sample.

Third, IDA makes somewhat restrictive assumptions about which re-apprehensions to include in the final stage of the PAR calculation.  In particular, IDA excludes apprehensions occurring at check points and other remote locations and those occurring more than four days after an illegal entry.  Given USBP's defense-in-depth strategy, which places resources at and behind the border, these assumptions result in a slight further downward bias in the PAR.

Despite these limitations, the Department views the RTM methodology as a promising approach to estimating an apprehension rate that takes great advantage of USBP's collection of biometric data since 2000.  DHS is currently working to relax certain aspects of IDA's modeling assumptions and to more fully describe the impact of each assumption on the PAR and on related model-based metrics reported above.

AR115

# Appendix B – Drugs Seizures – All Ports of Entry

**OFO Drug Seizures at Ports of Entry FY 2007 to FY 2016**

| DRUG | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 |
|---|---|---|---|---|---|
| Grand Total | 372,493.60 | 433,037.02 | 680,417.93 | 395,390.47 | 371,813.83 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | | | | | 953.62 |
| COCAINE | 35,635.13 | 18,246.01 | 27,946.47 | 28,063.88 | 23,517.88 |
| CRYSTAL METHAMPHETAMINES | 235.15 | 186.25 | 360.6 | 544.2 | 875.61 |
| DIHYDROCODEINONE (HYDROCODONE) | | | 70.92 | 26.37 | 8.46 |
| ECSTASY | 771.36 | 700.28 | 500.83 | 527.71 | 264.92 |
| EPHEDRINE | 888.58 | 7,901.41 | 8,762.73 | 7,738.18 | 4,475.71 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | |
| GAMMA HYDROXY BUTYRATE | 39.28 | 48.34 | 26.16 | 79.86 | 24.28 |
| HASH,LIQUID (HASH OIL) | 0.06 | 0.1 | 0.08 | 0.26 | 0.04 |
| HASHISH | 128.94 | 105.3 | 276.83 | 143.11 | 104.83 |
| HEROIN | 932.08 | 845.46 | 827.61 | 1,316.57 | 1,594.24 |
| KETAMINE | 11.86 | 100.77 | 40.85 | 66.84 | 112.47 |
| KHAT (CATHA EDULIS) | 41,216.88 | 54,815.24 | 116,691.90 | 95,988.98 | 70,061.23 |
| LSD | 0.16 | 0.85 | 4.58 | 0.78 | 10.09 |
| MARIJUANA | 280,387.77 | 261,611.58 | 312,264.86 | 246,546.43 | 253,771.78 |
| MARIJUANA PLANTS | | | | | 13.15 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | | | | | |
| MEPHEDRONE | | | | 0.5 | |
| METHAMPHETAMINE | 1,164.53 | 1,155.95 | 1,970.25 | 2,900.33 | 3,824.11 |
| METHYLONE | | | | | 1.3 |
| METHYLPHENIDATE (RITALIN) | 39.95 | 46.74 | 38.95 | 23.79 | 28.11 |
| MORPHINE | 7.4 | 8.15 | 1.08 | 22.86 | 6.2 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 0.02 | 9.36 | 182.79 | 15.24 | 12.9 |
| NEXUS/2 CB | 0 | | 0.16 | 0 | 0.11 |
| OPIUM | 529.5 | 318.74 | 662.55 | 825.52 | 667.96 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 2,257.77 | 5,814.91 | 5,878.10 | 7,125.77 | 5,452.89 |
| OXYCODONE (OXYCONTIN) | 1.59 | 2.8 | 4.86 | 5.21 | 6.07 |
| PARAMETHOXYAMPHETAMINE | 0.03 | | | 0.01 | 0 |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 7,521.86 | 80,705.40 | 203,508.22 | 230.2 | 4,760.66 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 24.58 | 25.81 | 4.81 | 4.71 | 3.74 |
| ROHYPNOL | 0.24 | 0.18 | 0.05 | 0.53 | 0.21 |
| STEROIDS | 698.88 | 386.16 | 389.02 | 3,117.40 | 331.81 |

66

AR116

| DRUG | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|---|
| SYNTHETIC CANNABINOIDS - ALL TYPES | | | | 72.1 | 929.35 |
| YABA | | 1.25 | 2.67 | 3.14 | 0.08 |
| **Grand Total** | 344,129.80 | 336,121.66 | 309,214.45 | 400,719.44 | 367,612.58 |
| COCA PRODUCTS, TEA BAGS OR LIQUOR | 270.63 | 112.31 | 335.66 | 370.24 | 210.93 |
| COCAINE | 20,529.67 | 17,723.96 | 18,738.75 | 17,302.28 | 23,949.98 |
| CRYSTAL METHAMPHETAMINES | 1,377.53 | 1,522.53 | 1,742.36 | 1,625.40 | 2,084.99 |
| DIHYDROCODEINONE (HYDROCODONE) | 1.79 | 4.29 | 11.24 | 2.98 | 14.45 |
| ECSTASY | 49.56 | 104.26 | 111.04 | 103.97 | 704.61 |
| EPHEDRINE | 2,350.28 | 5.1 | 28.57 | 42.1 | 13.5 |
| FENETHYLLINE-(CAPTAGON-AMPHETAMINE) | | | | | 1.22 |
| FENTANYL | | | | | 208.25 |
| GAMMA HYDROXY BUTYRATE | 218.16 | 33.09 | 73.31 | 48.68 | 483.76 |
| HASH,LIQUID (HASH OIL) | 0.18 | 0.13 | 13.98 | 0.77 | 0.45 |
| HASHISH | 60.96 | 58.1 | 117.11 | 82.43 | 75.24 |
| HEROIN | 1,714.41 | 1,809.90 | 1,957.01 | 2,508.16 | 1,915.58 |
| KETAMINE | 81.31 | 88.58 | 77.78 | 43.69 | 150.59 |
| KHAT (CATHA EDULIS) | 47,972.07 | 84,023.03 | 67,478.21 | 66,953.87 | 70,087.11 |
| LSD | 17.82 | 3 | 7.02 | 3.57 | 2.41 |
| MARIJUANA | 237,053.80 | 213,186.12 | 198,650.99 | 273,423.14 | 233,774.29 |
| MARIJUANA PLANTS | 0.03 | 7.97 | 0.66 | 0.25 | 1.64 |
| MDPV-(METHYLENEDIOXYPYROVALERONE) | 29.22 | 335.14 | 225.68 | 234.05 | 41.75 |
| MEPHEDRONE | 12.4 | 11.82 | 9.11 | 5.72 | 2.66 |
| METHAMPHETAMINE | 5,032.37 | 7,884.50 | 8,796.53 | 11,529.10 | 15,018.32 |
| METHYLONE | 74.63 | 322.27 | 829.42 | 315.68 | 41.98 |
| METHYLPHENIDATE (RITALIN) | 36.63 | 20.03 | 15.14 | 13.69 | 12.3 |
| MORPHINE | 13.1 | 31.36 | 213.71 | 19.29 | 520.21 |
| N-BENZYLPIPERAZINE (BZP TABLETS) | 73.71 | 87.78 | 1.61 | 1.16 | 0.1 |
| NEXUS/2 CB | 0.06 | 0.09 | 0.11 | 1.26 | 0.06 |
| OPIUM | 1,150.49 | 1,289.80 | 1,637.34 | 652.98 | 905.89 |
| OTHER DRUGS, PRESCRIPTIONS, CHEMICALS | 5,719.66 | 4,135.02 | 5,117.21 | 22,330.66 | 12,987.55 |
| OXYCODONE (OXYCONTIN) | 13.72 | 13.17 | 11.14 | 6.46 | 20.65 |
| PARAMETHOXYAMPHETAMINE | 0.15 | | | | |
| PRECURSOR CHEMICALS EXCEPT EPHEDRINE | 18,778.76 | 739.27 | 748.2 | 1,293.69 | 3,377.95 |
| PSILOCYN OR PSILOCYBIN MUSHROOMS | 17.98 | 23.38 | 24.11 | 16.18 | 45.78 |
| ROHYPNOL | 0.23 | 0.74 | 0.04 | 0 | 0.08 |

AR117

| | | | | | |
|---|---|---|---|---|---|
| STEROIDS | 476.53 | 470.05 | 554.53 | 581.16 | 613.24 |
| SYNTHETIC CANNABINOIDS - ALL TYPES | 1,001.97 | 2,074.37 | 1,686.67 | 1,206.82 | 550.79 |
| YABA | | 0.47 | 0.18 | | 2.53 |

Note: Tea bags included in this table are those used to carry coca products.

AR118



**U.S. Customs and Border Protection Enforcement Actions - Southwest Border**
**Total - Apprehensions and Inadmissible Aliens by Country of Citizenship**
**FY17 - 19TD through May**

| | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| El Salvador | 11,335 | 12,026 | 11,359 | 6,714 | 3,384 | 1,452 | 1,184 | 1,575 | 1,629 | 1,900 | 2,388 | 2,156 | 2,745 | 3,270 | 3,034 | 1,891 | 1,804 | 2,643 | 3,144 | 3,820 | 3,492 | 3,240 | 3,789 | 4,170 | 4,839 | 5,187 | 3,928 | 3,794 | 5,499 | 9,285 | 11,194 | 16,150 |
| Guatemala | 12,694 | 13,313 | 12,226 | 7,684 | 3,146 | 1,423 | 1,372 | 2,456 | 3,402 | 5,250 | 6,843 | 6,826 | 8,192 | 10,306 | 13,250 | 9,060 | 9,080 | 11,836 | 12,624 | 14,170 | 11,129 | 9,486 | 11,048 | 13,150 | 18,030 | 19,869 | 22,059 | 18,897 | 24,185 | 33,980 | 33,499 | 45,321 |
| Honduras | 8,702 | 9,958 | 9,876 | 5,973 | 2,765 | 1,558 | 1,081 | 1,634 | 2,257 | 2,773 | 3,449 | 3,604 | 3,959 | 5,198 | 5,105 | 4,721 | 4,709 | 8,247 | 9,304 | 10,576 | 8,858 | 7,744 | 9,526 | 10,325 | 13,059 | 14,407 | 14,717 | 13,438 | 22,610 | 29,389 | 31,522 | 42,794 |
| Mexico | 23,790 | 20,011 | 15,650 | 16,090 | 12,331 | 11,076 | 11,116 | 12,858 | 13,042 | 13,746 | 15,955 | 16,441 | 17,539 | 17,395 | 16,084 | 18,175 | 19,169 | 24,537 | 22,980 | 19,385 | 16,088 | 15,414 | 17,830 | 17,991 | 19,542 | 16,983 | 13,928 | 16,552 | 17,893 | 22,315 | 21,529 | 23,127 |
| Other | 10,321 | 7,910 | 9,268 | 5,898 | 1,931 | 1,285 | 1,045 | 1,443 | 1,343 | 1,400 | 1,947 | 2,253 | 2,436 | 2,882 | 3,046 | 2,058 | 1,989 | 3,084 | 3,116 | 3,911 | 3,613 | 4,265 | 4,526 | 4,932 | 5,307 | 6,016 | 6,142 | 5,607 | 6,346 | 8,760 | 11,730 | 16,886 |

| Other Than Mexico Enforcement Actions – CBP Total | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | Total | FYTD (MAY) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY19 | 41,235 | 45,479 | 46,846 | 41,736 | 58,640 | 81,414 | 87,945 | 121,151 | | | | | 524,446 | 524,446 |
| FY18 | 17,332 | 21,656 | 24,435 | 17,730 | 17,582 | 25,810 | 28,188 | 32,477 | 27,092 | 24,735 | 28,889 | 32,577 | 298,503 | 185,210 |
| FY17 | 43,052 | 43,207 | 42,729 | 26,269 | 11,226 | 5,718 | 4,682 | 7,108 | 8,631 | 11,323 | 14,627 | 14,839 | 233,411 | 183,991 |



**U.S. Customs and
Border Protection**

AR119

| Credible Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 Q1 |
|---|---|---|---|---|---|---|---|---|
| Referrals from CBP or ICE | 5,338 | 5,252 | 4,995 | 5,369 | 8,959 | 11,217 | 13,880 | 5,552 |
| Completed | 5,241 | 5,286 | 4,828 | 5,222 | 8,777 | 11,529 | 13,579 | 4,860 |
| CF Found | 3,320 | 3,182 | 3,097 | 3,411 | 6,293 | 9,423 | 10,838 | 3,843 |
| CF Not Found | 584 | 1,062 | 816 | 1,004 | 1,404 | 1,054 | 1,187 | 502 |
| Closed | 1,337 | 1,042 | 915 | 807 | 1,080 | 1,052 | 1,554 | 515 |
| Of cases decided on the merits, % where CF was found | 85.04% | 74.98% | 79.15% | 77.26% | 81.76% | 89.94% | 90.13% | 87.64% |
| Of all referred cases, % where CF was found | 63.35% | 60.20% | 64.15% | 65.32% | 71.70% | 81.73% | 79.81% | 70.07% |

| Reasonable Fear Cases | FY-06 | FY-07 | FY-08 | FY-09 | FY-10 | FY-11 | FY-12 | FY-13 Q1 |
|---|---|---|---|---|---|---|---|---|
| Referrals | 325 | 550 | 700 | 1,109 | 2,060 | 3,233 | 5,070 | 1,465 |
| Completed | 292 | 504 | 619 | 971 | 1,293 | 2,756 | 4,692 | 1,247 |
| RF Found | 55 | 122 | 135 | 163 | 202 | 603 | 938 | 299 |
| RF Not Found | 57 | 128 | 172 | 165 | 206 | 270 | 960 | 275 |
| Closed | 180 | 254 | 312 | 643 | 885 | 1,883 | 2,794 | 673 |
| Of cases decided on the merits, % where RF was found | 49.11% | 48.80% | 43.97% | 49.70% | 49.51% | 69.07% | 49.42% | 52.09% |
| Of all referred cases, % where RF was found | 18.84% | 24.21% | 21.81% | 16.79% | 15.62% | 21.88% | 19.99% | 23.98% |

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim[1]



| FY | Grants | Grant Rate | Denials | Denial Rate | Other[2] | Other Rate | Admin Closure[3] | Admin Closure Rate | No Asylum Application Filed | Percentage of No Asylum Application Filed | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | 1,014 | 29.34% | 835 | 24.16% | 303 | 8.77% | 64 | 1.85% | 1,240 | 35.88% | 3,456 |
| 2009 | 992 | 30.58% | 660 | 20.35% | 282 | 8.69% | 54 | 1.66% | 1,256 | 38.72% | 3,244 |
| 2010 | 1,001 | 33.94% | 513 | 17.40% | 241 | 8.17% | 88 | 2.98% | 1,106 | 37.50% | 2,949 |
| 2011 | 1,396 | 27.01% | 820 | 15.86% | 349 | 6.75% | 69 | 1.33% | 2,535 | 49.04% | 5,169 |
| 2012 | 1,503 | 22.33% | 957 | 14.22% | 501 | 7.44% | 179 | 2.66% | 3,590 | 53.34% | 6,730 |
| 2013 | 1,400 | 16.03% | 1,466 | 16.79% | 618 | 7.08% | 237 | 2.71% | 5,011 | 57.39% | 8,732 |
| 2014 | 1,690 | 12.62% | 2,703 | 20.18% | 1,281 | 9.56% | 409 | 3.05% | 7,312 | 54.59% | 13,395 |
| 2015 | 1,955 | 13.52% | 2,806 | 19.40% | 1,366 | 9.44% | 2,064 | 14.27% | 6,274 | 43.37% | 14,465 |
| 2016 | 2,481 | 11.94% | 3,765 | 18.12% | 1,762 | 8.48% | 3,703 | 17.83% | 9,063 | 43.63% | 20,774 |
| 2017 | 3,980 | 13.85% | 7,347 | 25.56% | 2,649 | 9.22% | 1,919 | 6.68% | 12,846 | 44.70% | 28,741 |
| 2018 | 5,601 | 16.33% | 10,063 | 29.34% | 4,793 | 13.97% | 342 | 1.00% | 13,499 | 39.36% | 34,298 |
| 2019 (Second Quarter[4]) | 3,544 | 15.20% | 7,035 | 30.18% | 2,545 | 10.92% | 3 | 0.01% | 10,185 | 43.69% | 23,312 |

Data Generated: April 12, 2019
[1] Asylum decisions subsequent to a credible fear book-in at Department of Homeland Security in completed removal, deportation, exclusion proceedings (initial case completions only) or in proceedings that have been administratively closed.
[2] Asylum Others have a decision of abandonment, not adjudicated, other, or withdrawn.
[3] Administrative Closure decisions that have not been placed back on the docket (redocketing occurs following an immigration judge's grant of a party's motion to recalendar).
[4] FY 2019 Second Quarter through March 31, 2019.

## Convention determining the State responsible for examining applications for asylum lodged in one of the Member States of the European Communities - Dublin Convention

Official Journal C 254 , 19/08/1997 p. 0001 - 0012

Text:

CONVENTION determining the State responsible for examining applications for asylum lodged in one of the Member States of the European Communities (97/C 254/01)

HIS MAJESTY THE KING OF THE BELGIANS,

HER MAJESTY THE QUEEN OF DENMARK,

THE PRESIDENT OF THE FEDERAL REPUBLIC OF GERMANY,

THE PRESIDENT OF THE HELLENIC REPUBLIC,

HIS MAJESTY THE KING OF SPAIN,

THE PRESIDENT OF THE FRENCH REPUBLIC,

THE PRESIDENT OF IRELAND,

THE PRESIDENT OF THE ITALIAN REPUBLIC,

HIS ROYAL HIGHNESS THE GRAND DUKE OF LUXEMBOURG

HER MAJESTY THE QUEEN OF THE NETHERLANDS,

THE PRESIDENT OF THE PORTUGUESE REPUBLIC,

HER MAJESTY THE QUEEN OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND,

HAVING REGARD to the objective, fixed by the European Council meeting in Strasbourg on 8 and 9 December 1989, of the harmonization of their asylum policies;

DETERMINED, in keeping with their common humanitarian tradition, to guarantee adequate protection to refugees in accordance with the terms of the Geneva Convention of 28 July 1951, as amended by the New York Protocol of 31 January 1967 relating to the Status of Refugees, hereinafter referred to as the 'Geneva Convention` and the 'New York Protocol` respectively;

CONSIDERING the joint objective of an area without internal frontiers in which the free movement of persons shall, in particular, be ensured, in accordance with the provisions of the Treaty establishing the European Economic Community, as amended by the Single European Act:

AR122

AWARE of the need, in pursuit of this objective, to take measures to avoid any situations arising, with the result that applicants for asylum are left in doubt for too long as regards the likely outcome of their applications and concerned to provide all applicants for asylum with a guarantee that their applications will be examined by one of the Member States and to ensure that applicants for asylum are not referred successively from one Member State to another without any of these States acknowledging itself to be competent to examine the application for asylum;

DESIRING to continue the dialogue with the United Nations High Commissioner for Refugees in order to achieve the above objectives;

DETERMINED to co-operate closely in the application of this Convention through various means, including exchanges of information,

HAVE DECIDED TO CONCLUDE THIS CONVENTION AND TO THIS END HAVE DESIGNATED AS THEIR PLENIPOTENTIARIES:

HIS MAJESTY THE KING OF THE BELGIANS,

Melchior WATHELET

Deputy Prime Minister, Minister for Justice, Small and Medium-sized Businesses and the Self-Employed

HER MAJESTY THE QUEEN OF DENMARK,

Hans ENGELL

Minister for Justice

THE PRESIDENT OF THE FEDERAL REPUBLIC OF GERMANY,

Dr. Helmut RÜCKRIEGEL

Ambassador of the Federal Republic of Germany at Dublin

Wolfgang SCHÄUBLE

Federal Minister for the Interior

THE PRESIDENT OF THE HELLENIC REPUBLIC,

Ioannis VASSILIADES

Minister for Public Order

HIS MAJESTY THE KING OF SPAIN,

José Luis CORCUERA

Minister for the Interior

AR123

THE PRESIDENT OF THE FRENCH REPUBLIC,

Pierre JOXE

Minister for the Interior

THE PRESIDENT OF IRELAND,

Ray BURKE

Minister for Justice and Minister for Communications

THE PRESIDENT OF THE ITALIAN REPUBLIC,

Antonio GAVA

Minister for the Interior

HIS ROYAL HIGHNESS THE GRAND DUKE OF LUXEMBOURG,

Marc FISCHBACH

Minister for Education, Minister for Justice, Minister for the Civil Service

HER MAJESTY THE QUEEN OF THE NETHERLANDS,

Ernst Maurits Henricus HIRSCH BALLIN

Minister for Justice

THE PRESIDENT OF THE PORTUGUESE REPUBLIC,

Manuel PEREIRA

Minister for the Interior

HER MAJESTY THE QUEEN OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND,

David WADDINGTON

Secretary of State for the Home Department (Home Secretary)

Sir Nicholas Maxted FENN, KCMG

Ambassador of the United Kingdom of Great Britain and Northern Ireland at Dublin

WHO, having exchanged their Full Powers, found in good and due form,

HAVE AGREED AS FOLLOWS:


Article 1

AR124

1. For the purposes of this Convention:

(a) 'Alien` means: any person other than a national of a Member State;

(b) 'Application for asylum` means: a request whereby an alien seeks from a Member State protection under the Geneva Convention by claiming refugee status within the meaning of Article 1 of the Geneva Convention, as amended by the New York Protocol;

(c) 'Applicant for asylum` means: an alien who has made an application for asylum in respect of which a final decision has not yet been taken;

(d) 'Examination of an application for asylum` means: all the measures for examination, decisions or rulings given by the competent authorities on an application for asylum, except for procedures to determine the State responsible for examining the application for asylum prusuant to this Convention;

(e) 'Residence permit` means: any authorization issued by the authorities of a Member State authorizing an alien to stay in its territory, with the exception of visas and 'stay permits` issued during examination of an application for a residence permit or for asylum;

(f) 'Entry visa` means: authorization or decision by a Member State to enable an alien to enter its territory, subject to the other entry conditions being fulfilled;

(g) 'Transit visa` means: authorization or decision by a Member State to enable an alien to transit through its territory or pass through the transit zone of a port or airport, subject to the other transit conditions being fulfilled.

2. The nature of the visa shall be assessed in the light of the definitions set out in paragraph 1 (f) and (g).

Article 2

The Member States reaffirm their obligations under the Geneva Convention, as amended by the New York Protocol, with no geographic restriction of the scope of these instruments, and their commitment to co-operating with the services of the United Nations High Commissioner for Refugees in applying these instruments.

Article 3

1. Member States undertake to examine the application of any alien who applies at the border or in their territory to any one of them for asylum.

2. That application shall be examined by a single Member State, which shall be determined in accordance with the criteria defined in this Convention. The criteria set out in Articles 4 to 8 shall apply in the order in which they appear.

3. That application shall be examined by that State in accordance with its national laws and its international obligations.

4. Each Member State shall have the right to examine an application for asylum submitted to it by an alien, even if such examination is not its responsibility under the criteria defined in this Convention, provided that the applicant for asylum agrees thereto.

The Member State responsible under the above criteria is then relieved of its obligations, which are transferred to the Member State which expressed the wish to examine the application. The latter State shall inform the Member State responsible under the said criteria if the application has been referred to it.

5. Any Member State shall retain the right, pursuant to its national laws, to send an applicant for asylum to a third State, in compliance with the provisions of the Geneva Convention, as amended by the New York Protocol.

6. The process of determining the Member State responsible for examining the application for asylum under this Convention shall start as soon as an application for asylum is first lodged with a Member State.

7. An applicant for asylum who is present in another Member State and there lodges an application for asylum after withdrawing his or her application during the process of determining the State responsible shall be taken back, under the conditions laid down in Article 13, by the Member State with which that application for asylum was lodged, with a view to completing the process of determining the State responsible for examining the application for asylum.

This obligation shall cease to apply if the applicant for asylum has since left the territory of the Member States for a period of at least three months or has obtained from a Member State a residence permit valid for more than three months.

Article 4

Where the applicant for asylum has a member of his family who has been recognized as having refugee status within the meaning of the Geneva Convention, as amended by the New York Protocol, in a Member State and is legally resident there, that State shall be responsible for examining the application, provided that the persons concerned so desire.

The family member in question may not be other than the spouse of the applicant for asylum or his or her unmarried child who is a minor of under eighteen years, or his or her father or mother where the applicant for asylum is himself or herself an unmarried child who is a minor of under eighteen years.

Article 5

1. Where the applicant for asylum is in possession of a valid residence permit, the Member State which issued the permit shall be responsible for examining the application for asylum.

2. Where the applicant for asylum is in possession of a valid visa, the Member State which issued the visa shall be responsible for examining the application for asylum, except in the following situations:

AR126

(a) if the visa was issued on the written authorization of another Member State, that State shall be responsible for examining the application for asylum. Where a Member State first consults the central authority of another Member State, inter alia for security reasons, the agreement of the latter shall not constitute written authorization within the meaning of this provision.

(b) where the applicant for asylum is in possession of a transit visa and lodges his application in another Member State in which he is not subject to a visa requirement, that State shall be responsible for examining the application for asylum.

(c) where the applicant for asylum is in possession of a transit visa and lodges his application in the State which issued him or her with the visa and which has received written confirmation from the diplomatic or consular authorities of the Member State of destination that the alien for whom the visa requirement was waived fulfilled the conditions for entry into that State, the latter shall be responsible for examining the application for asylum.

3. Where the applicant for asylum is in possession of more than one valid residence permit or visa issued by different Member States, the responsibility for examining the application for asylum shall be assumed by the Member States in the following order:

(a) the State which issued the residence permit conferring the right to the longest period of residency or, where the periods of validity of all the permits are identical, the State which issued the residence permit having the latest expiry date;

(b) the State which issued the visa having the latest expiry date where the various visas are of the same type;

(c) where visas are of different kinds, the State which issued the visa having the longest period of validity, or, where the periods of validity are identical, the State which issued the visa having the latest expiry date. This provision shall not apply where the applicant is in possession of one or more transit visas, issued on presentation of an entry visa for another Member State. In that case, that Member State shall be responsible.

4. Where the applicant for asylum is in possession only of one or more residence permits which have expired less than two years previously or one or more visas which have expired less than six months previously and enabled him or her actually to enter the territory of a Member State, the provisions of paragraphs 1, 2 and 3 of this Article shall apply for such time as the alien has not left the territory of the Member States.

Where the applicant for asylum is in possession of one or more residence permits which have expired more than two years previously or one or more visas which have expired more than six months previously and enabled him or her to enter the territory of a Member State and where an alien has not left Community territory, the Member State in which the application is lodged shall be responsible.

Article 6

When it can be proved that an applicant for asylum has irregularly crossed the border into a Member State by land, sea or air, having come from a non-member State of the European Communities, the Member State this entered shall be responsible for examining the application for asylum.

That State shall cease to be responsible, however, if it is proved that the applicant has been living in the Member State where the application for asylum was made at least six months before making his application for asylum. In that case it is the latter Member State which is responsible for examining the application for asylum.

Article 7

1. The responsibility for examining an application for asylum shall be incumbent upon the Member State responsible for controlling the entry of the alien into the territory of the Member States, except where, after legally entering a Member State in which the need for him or her to have a visa is waived, the alien lodges his or her application for asylum in another Member State in which the need for him or her to have a visa for entry into the territory is also waived. In this case, the latter State shall be responsible for examining the application for asylum.

2. Pending the entry into force of an agreement between Member States on arrangements for crossing external borders, the Member State which authorizes transit without a visa through the transit zone of its airports shall not be regarded as responsible for control on entry, in respect of travellers who do not leave the transit zone.

3. Where the application for asylum is made in transit in an airport of a Member State, that State shall be responsible for examination.

Article 8

Where no Member State responsible for examining the application for asylum can be designated on the basis of the other criteria listed in this Convention, the first Member State with which the application for asylum is lodged shall be responsible for examining it.

Article 9

Any Member State, even when it is not responsible under the criteria laid out in this Convention, may, for humanitarian reasons, based in particular on family or cultural grounds, examine an application for asylum at the request of another Member State, provided that the applicant so desires.

If the Member State thus approached accedes to the request, responsibility for examining the application shall be transferred to it.

Article 10

1. The Member State responsible for examining an application for asylum according to the criteria set out in this Convention shall be obliged to:

(a) Take charge under the conditions laid down in Article 11 of an applicant who has lodged an application for asylum in a different Member State,

(b) Complete the examination of the application for asylum,

(c) Readmit or take back under the conditions laid down in Article 13 an applicant whose application is under examination and who is irregularly in another Member State,

(d) Take back, under the conditions laid down in Article 13, an applicant who has withdrawn the application under examination and lodged an application in another Member State,

(e) Take back, under the conditions laid down in Article 13, an alien whose application is has rejected and who is illegally in another Member State.

2. If a Member State issues to the applicant a residence permit valid for more than three months, the obligations specified in paragraph 1 (a) to (e) shall be transferred to that Member State.

3. The obligations specified in paragraph 1 (a) to (d) shall cease to apply if the alien concerned has left the territory of the Member States for a period of at least three months.

4. The obligations specified in paragraph 1 (d) and (e) shall cease to apply if the State responsible for examining the application for asylum, following the withdrawal or rejection of the application, takes and enforces the necessary measures for the alien to return to his country of oirigin or to another country which he may lawfully enter.

Article 11

1. If a Member State with which an application for asylum has been lodged considers that another Member State is responsible for examining the application, it may, as quickly as possible and in any case within the six months following the date on which the application was lodged, call upon the other Member State to take charge of the applicant.

If the request that charge be taken is not made within the six-month time limit, responsibility for examining the application for asylum shall rest with the State in which the application was lodged.

2. The request that charge be taken shall contain indications enabling the authorities of that other State to ascertain whether it is responsible on the basis of the criteria laid down in this Convention.

3. The State responsible in accordance with those criteria shall be determined on the basis of the situation obtaining when the applicant for asylum first lodged his application with a Member State.

4. The Member State shall pronounce judgment on the request within three months of receipt of the claim. Failure to act within that period shall be tantamount to accepting the claim.

5. Transfer of the applicant for asylum from the Member State where the application was lodged to the Member State responsible must take place not later than one month after acceptance of the request to take charge or one month after the conclusion of any proceedings initiated by the alien challenging the transfer decision if the plroceedings are suspensory.

6. Measures taken under Article 18 may subsequently determine the details of the process by which applicants shall be taken in charge.

Article 12

Where an application for asylum is lodged with the competent authorities of a Member State by an applicant who is on the territory of another Member State, the determination of the Member State responsible for examining the application for asylum shall be made by the Member State on whose territory the applicant is. The latter Member State shall be informed without delay by the Member State which received the application and shall then, for the purpose of applying this Convention, be regarded as the Member State with which the application for asylum was lodged.

Article 13

1. An applicant for asylum shall be taken back in the cases provided for in Article 3 (7) and in Article 10 as follows:

(a) the request for the applicant to be taken back must provide indications enabling the State with which the request is lodged to ascertain that it is responsible in accordance with Article 3 (7) and with Article 10;

(b) the State called upon to take back the applicant shall give an answer to the request within eight days of the matter being referred to it. Should it acknowledge responsibility, it shall then take back the applicant for asylum as quickly as possible and at the latest one month after it agrees to do so.

2. Measures taken under Article 18 may at a later date set out the details of the procedure for taking the applicant back.

Article 14

1. Member States shall conduct mutual exchanges with regard to:

- national legislative or regulatory measures or practices applicable in the field of asylum,

- statistical data on monthly arrivals of applicants for asylum, and their breakdown by nationality. Such information shall be forwarded quarterly through the General Secretariat of the Council of the European Communities, which shall see that it is circulated to the Member States and the Commission of the European Communities and to the United Nations High Commissioner for Refugees.

2. The Member States may conduct mutual exchanges with regard to:

- general information on new trends in applications for asylum,

- general information on the situation in the countries of origin or of provenance of applicants for asylum.

3. If the Member State providing the information referred to in paragraph 2 wants it to be kept confidential, the other Member States shall comply with this wish.

Article 15

1. Each Member State shall communicate to any Member State that so requests such information on individual cases as is necessary for:

- determining the Member State which is responsible for examining the application for asylum,

- examining the application for asylum,

- implementing any obligation arising under this Convention.

2. This information may only cover:

- personal details of the applicant, and, where appropriate, the members of his family (full name and where appropriate, former name; nicknames or pseudonyms; nationality, present and former; date and place of birth),

- identity and travel papers (references, validity, date of issue, issuing authoirity, place of issue, etc.),

- other information necessary for establishing the identity of the applicant,

- places of residence and routes travelled,

- residence permits or visas issued by a Member State,

- the place where the application was lodged,

- the date any previous application for asylum was lodged, the date the present application was lodged, the stage reached in the proceedings and the decision taken, if any.

3. Furthermore, one Member State may request another Member State to let it know on what grounds the applicant for asylum bases his or her application and, where applicable, the grounds for any decisions taken concerning the applicant. It is for the Member State from which the information is requested to decide whether or not to impart it. In any event, communication of the information requested shall be subject to the approval of the applicant for asylum.

4. This exchange of information shall be effected at the request of a Member State and may only take place between authorities the designation of which by each Member State has been communicated to the Committee provided for under Article 18.

5. The information exchanged may only be used for the purposes set out in paragraph 1. In each Member State such information may only be communicated to the authorities and courts and tribunals entrusted with:

- determining the Member State which is responsible for examining the application for asylum,

- examining the application for asylum,

- implementing any obligation arising under this Convention.

6. The Member State that forwards the information shall ensure that it is accurate and up-to-date.

If it appears that this Member State has supplied information which is inaccurate or which should not have been forwarded, the recipient Member State shall be immediately informed thereof. They shall be obliged to correct such information or to have it erased.

7. An applicant for asylum shall have the right to receive, on request, the information exchanged concerning him or her, for such time as it remains available.

If he or she establishes that such information is inaccurate or should not have been forwarded, he or she shall have the right to have it corrected or erased. This right shall be exercised in accordance with the conditions laid down in paragraph 6.

8. In each Member State concerned, the forwarding and receipt of exchanged information shall be recorded.

9. Such information shall be kept for a period not exceeding that necessary for the ends for which it was exchanged. The need to keep it shall be examined at the appropriate moment by the Member State concerned.

10. In any event, the information thus communicated shall enjoy at least the same protection as is given to similar information in the Member State which receives it.

11. If data are not processed automatically but are handled in some other form, every Member State shall take the appropriate measures to ensure compliance with this Article by means of effective controls. If a Member State has a monitoring budy of the type mentioned in paragraph 12, it may assign the control task to it.

12. If one or more Member States wish to computerize all or part of the information mentioned in paragraphs 2 and 3, such computerization is only possible if the countries concerned have adopted laws applicable to such processing which implement the principles of the Strasbourg Convention of 28 January 1981 for the Protection of Individuals, with regard to automatic processing of personal data and if they have entrusted an appropriate national body with the independent monitoring of the processing and use of data forwarded pursuant to this Convention.

Article 16

1. Any Member State may submit to the Committee referred to in Article 18 proposals for revision of this Convention in order to eliminate difficulties in the application thereof.

2. If it proves necessary to revise or amend this Convention pursuant to the achievement of the objectives set out in Article 8a of the Treaty establishing the European Economic Community, such achievement being linked in particular to the establishment of a harmonized asylum and a common visa policy, the Member State holding the Presidency of the Council of the European Communities shall organize a meeting of the Committee referred to in Article 18.

3. Any revision of this Convention or amendment hereto shall be adopted by the Committee referred to in Article 18. It shall enter into force in accordance with the provisions of Article 22.

Article 17

1. If a Member State experiences major difficulties as a result of a substantial change in the circumstances obtaining on conclusion of this Convention, the State in question may bring the matter before the Committee referred to in Article 18 so that the latter may put to the Member States measures to deal with the situation or adopt such revisions or amendments to this Convention as appear necessary, which shall enter into force as provided for in Article 16 (3).

2. If, after six months, the situation mentioned in paragraph 1 still obtains, the Committee, acting in accordance with Article 18 (2), may authorize the Member State affected by that change to suspend temporarily the application of the provisions of this Convention, without such suspension being allowed to impede the achievement of the objectives mentioned in Article 8a of the Treaty establishing the European Economic Community or contravene other international obligations of the Member States.

3. During the period of suspension, the Committee shall continue its discussions with a view to revising the provisions of this Convention, unless it has already reached an agreement.

Article 18

1. A Committee shall be set up comprising one representative of the Government of each Member State.

The Committee shall be chaired by the Member State holding the Presidency of the Council of the European Communities.

The Commission of the European Communities may participate in the discussions of the Committee and the working parties referred to in paragraph 4.

2. The Committee shall examine, at the request of one or more Member States, any question of a general nature concerning the application or interpretation of this Convention.

The Committee shall determine the measures referred to in Article 11 (6) and Article 13 (2) and shall give the authorization referred to in Article 17 (2).

The Committee shall adopt decisions revising or amending the Convention pursuant to Articles 16 and 17.

3. The Committee shall take its decisions unanimously, except where it is acting pursuant to Article 17 (2), in which case it shall take its decisions by a majority of two-thirds of the votes of its members.

4. The Committee shall determine its rules of procedure and may set up working parties.

The Secretariat of the Committee and of the working parties shall be provided by the General Secretariat of the Council of the European Communities.

Article 19

As regards the Kingdom of Denmark, the provisions of this Convention shall not apply to the Faroe Islands nor to Greenland unless a declaration to the contrary is made by the Kingdom of Denmark. Such a declaration may be made at any time by a communication to the Government of Ireland which shall inform the Governments of the other Member States thereof.

As regards the French Republic, the provisions of this Convention shall apply only to the European territory of the French Republic.

As regards the Kingdom of the Netherlands, the provisions of this Convention shall apply only to the territory of the Kingdom of the Netherlands in Europe.

As regards the United Kingdom the provisions of this Convention shall apply only to the United Kingdom of Great Britain and Northern Ireland. They shall not apply to the European territories for whose external relations the United Kingdom is responsible unless a declaration to the contrary is made by the United Kingdom. Such a declaration may be made at any time by a communication to the Government of Ireland, which shall inform the Governments of the other Member States thereof.

Article 20

This Convention shall not be the subject of any reservations.

Article 21

1. This Convention shall be open for the accession of any State which becomes a member of the European Communities. The instruments of accession will be deposited with the Government of Ireland.

2. It shall enter into force in respect of any State which accedes thereto on the first day of the third month following the deposit of its instrument of accession.

Article 22

1. This Convention shall be subject to ratification, acceptance or approval. The instruments of ratification, acceptance or approval shall be deposited with the Government of Ireland.

2. The Government of Ireland shall notify the Governments of the other Member States of the deposit of the instruments of ratification, acceptance or approval.

3. This Convention shall enter into force on the first day of the third month following the deposit of the instrument of ratification, acceptance or approval by the last signatory State to take this step.

The State with which the instruments of ratification, acceptance or approval are deposited shall notify the Member States of the date of entry into force of this Convention.

En fe de lo cual, los plenipotenciarios abajo firmantes suscriben el presente Convenio.

Til bekræftelse heraf har undertegnede befuldmægtigede underskrevet denne konvention.

Zu Urkund dessen haben die unterzeichneten Bevollmächtigten ihre Unterschriften unter dieses Übereinkommen gesetzt.

Óå ðßóôùóç ôùí áíùôÝñù, ïé êÜôùèé ðëçñåîïýóéïé õðÝãñáøáí ôçí ðáñïýóá óýìâáóç.

In witness whereof, the undersigned plenipotentiaries have hereunto set their hands.

En foi de quoi, les plénipotentiaires soussignés ont apposé leurs signatures au bas de la présente convention.

Dá fhianú sin, chuir na Lánchumhachtaigh thíos-sínithe a lámh leis an gCoinbhinsiún seo.

In fede di che, i plenipotenziari sottoscritti hanno apposto le loro firme in calce alla presente convenzione.

Ten blijke waarvan de ondergetekende gevolmachtigden deze overeenkomst hebben ondertekend.

Em fé do que os plenipotenciários abaixo assinados apuseram as suas assinaturas no final da presente convenção.

Hecho en Dublín el quince de junio de mil novecientos noventa, en un ejemplar único, en lenguas alemana, inglesa, danesa, española, francesa, griega, irlandesa, italiana, neerlandesa y portuguesa, dando fe asimismo los textos redactados en cada una de dichas lenguas depositados en los archivos del Gobierno de Irlanda que transmitirá una copia certificada conforme a cada uno de los Estados miembros.

Udfærdiget i Dublin, den femtende juni nitten hundrede og halvfems i ét eksemplar på dansk, engelsk, fransk, græsk, irsk, italiensk, nederlandsk, portugisisk, spansk og tysk, hvilke tekster har samme gyldighed og deponeres i arkiverne hos Irlands regering, som sender en bekræftet kopi til hver af de andre medlemsstater.

Geschehen zu Dublin am fünfzehnten Juni neunzehnhundertneunzig, in einer Urschrift in dänischer, deutscher, englischer, französischer, griechischer, irischer, italienischer, niederländischer, portugiesischer und spanischer Sprache, wobei jeder Wortlaut gleichermaßen verbindlich ist; sie wird im Archiv der Regierung von Irland hinterlegt, die den übrigen Mitgliedstaaten jeweils eine beglaubigte Abschrift übermittelt.

˛ãéíã óôï Äïõâêßíï óôéò äŶêâôŶíôâ Éïõíßïõ ÷ßëéá åííéáêóóóéá åíåíÞíôá, óá Ŷíá ìûíï áíôßßôõõõ óôçí ä̃ãã̃ééôÞ, ã̃ëëéóôÞ, ã̃ñ̃ìááéóôÞ, ä̃áíéôÞ, ß̃ëçíéôÞ, éñ̃áíä̃ôÞ, é̃õóãá̃éóôÞ, é̃ó̃áíé̃ôÞ, ï̃ëëä̃áíé̃ôÞ ễá̃ ð̃ïñ̃ôõã̃á̃éóôÞ ã̃ë̃ð̃óóá. Óá ễẫ̃í̃áãá̃íá̃ óỗéò ã̃ë̃ð̃óóáò á̃óỗŶ̃ò ã̃ß̃á̃é á̃ì̃ß̃óꞷᷠ̃̃á̃õ̃õ̃ễõ̃õ̃á̃ễẫõ̃̃á̃ễá ̃õ̃ï̃ð̃ß̃á̃ ễá̃ ä̃é̃á̃ẫễÛÞᷫᷫᷫᷫᷫᷫᷫᷫ ̃á̃õ̃õ̃ꞷᷦᷫᷫᷫᷫᷫᷫᷫᷫ

Done at Dublin this fifteenth day of June in the year one thousand nine hundred and ninety, in a single original, in the Danish, Dutch, English, French, German, Greek, Irish, Italian, Portuguese and Spanish languages, the texts drawn up in each of these languages being equally authentic and being deposited in the archives of the Government of Ireland which shall transmit a certified copy to each of the other Member States.

Fait à Dublin, le quinze juin mil neuf cent quatre-vingt-dix, en un exemplaire unique, en langues allemande, anglaise, danoise, espagnole, française, grecque, irlandaise, italienne, néerlandaise et portugaise, les textes établis dans chacune de ces langues faisant également foi et étant déposés dans les archives du gouvernement d'Irlande qui transmettra une copie certifiée conforme à chacun des autres États membres.

Arna dhéanamh i mBaile Átha Cliath ar an gcúigiú lá déag de Mheitheamh sa bhliain míle naoi gcéad nócha, i scríbhinn bhunaidh amháin sa Bhéarla, sa Danmhairgis, sa Fhraincis, sa Ghaeilge, sa Ghearmáinis, sa Ghréigis, san Iodáilis, san Ollainnis, sa Phortaingéilis agus sa Spáinnis agus comhúdarás ag na téacsanna i ngach ceann de na teangacha sin; déanfar iad a thaisceadh i gcartlann Rialtas na hÉireann agus cuirfidh an Rialtas sin cóip dheimhnithe chuig gach ceann de na Ballstáit eile.

Fatto a Dublino, addì quindici giugno millenovecentonovanta, in esemplare unico, nelle lingue danese, francese, greca, inglese, irlandese, italiana, olandese, portoghese, spagnola e tedesca, il cui testo in ciascuna di queste lingue fa ugualmente fede ed è depositato negli archivi del governo d'Irlanda che provvederà a rimetterne copia certificata conforme a ciascuno degli altri Stati membri.

Gedaan te Dublin, de vijftiende juni negentienhonderd negentig, in één exemplaar in de Deense, de Duitse, de Engelse, de Spaanse, de Franse, de Griekse, de Ierse, de Italiaanse, de Nederlandse en de Portugese taal, zijnde de teksten in elk van deze talen gelijkelijk authentiek en nedergelegd in het archief van de regering van Ierland, die een voor eensluidend gewaarmerkt afschrift daarvan toezendt aan alle overige lidstaten.

Feito em Dublim, em quinze de Junho de mil novecentos e noventa, num único exemplar, nas línguas alemã, dinamarquesa, espanhola, francesa, grega, inglesa, irlandesa, italiana, neerlandesa e portuguesa, fazendo fé qualquer dos textos, que serão depositados nos arquivos do Governo da Irlanda, que enviará uma cópia autenticada a cada um dos outros Estados-membros.

Pour Sa Majesté le Roi des Belges

 

# UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions)

| | |
|---|---|
| Publisher | UN High Commissioner for Refugees (UNHCR) |
| Publication Date | 16 August 1991 |
| Citation / Document Symbol | 3 European Series 2, p. 385 |
| Cite as | UN High Commissioner for Refugees (UNHCR), *UNHCR Position on Conventions Recently Concluded in Europe (Dublin and Schengen Conventions)*, 16 August 1991, 3 European Series 2, p. 385, available at: https://www.refworld.org/docid/3ae6b31b83.html [accessed 16 July 2019] |
| Comments | The UNHCR comments relate to: the Convention Determining the State Responsible for Examining Applications for Asylum lodged in one of the Member States of the European Communities ("Dublin Convention") of 15 June 1990; and the Convention Implementing the Schengen Agreement of 14 June 1985 between the Governments of the States of the Benelux Economic Union, the Federal Republic of Germany and the French Republic, on the Gradual Abolition of Checks at their Common Borders of 19 June 1990. |

Europe has traditionally enjoyed a liberal refugee and asylum policy through most of the twentieth century. The large influx of refugees and migrants fleeing to Europe since the 1980s has, however, over-burdened governments, prompted some xenophobia within the European populations and caused governments to resort to, inter alia, immigration measures to stem the flow of those requesting asylum. Against this backdrop and in anticipation of the 1992 establishment of Europe without internal borders, two multi-State conventions have been signed which should become effective in 1992.

The Convention Determining the State Responsible for Examining Applications for Asylum Lodged in One of the Member States of the European Communities, commonly referred to as the "Dublin Convention," addresses which country is responsible for considering an asylum claim. The Convention on the Application of the Schengen Agreement of 14 June 1985 Relating to the Gradual Suppression of Controls at Common Frontiers, commonly referred to as the "Schengen Convention", deals more broadly with border controls in addition to refugee and asylum issues, such as drug trafficking. Both these instruments (together, "Conventions") represent commendable efforts to share and allocate the burden of review of refugee and asylum claims, and to establish effective arrangements by which claims can be heard.

These regional Conventions reflect the parties' recognition that the protection of refugees, the elimination of the problem of "refugees in orbit" and the reduction in multiple or unfounded claims are international concerns which should be addressed among States, particularly those geographically proximate and whose asylum procedures are similar. UNHCR considers such cooperation to be one of

AR138

the very "measures calculated to improve the situation of refugees and to reduce the number requiring protection." UNHCR Stat., para. 8(a),(b).

Large numbers of unfounded claims, compounded by multiple claims of asylum-seekers in several States, have taxed States' immigration resources and contributed to a backlog in the consideration of claims. This is undesirable from the point of view of refugee protection and UNHCR appreciates that one intent of the Conventions is to guarantee prompt review of claims, in accordance with the applicable international instruments, and assign clear responsibility for protection and return of those claimants deemed not to be refugees.

This effort is consistent with recommendations already articulated by the Executive Committee, for example in its 1979 Conclusion No. 15(Refugees without an Asylum Country). In this Conclusion, the Executive Committee called upon States to consider criteria by which States could agree as to which State would be responsible for examining an asylum request, and agreements providing for the return by States of persons who have entered into their territory from another State. Such provisions, was noted, should ensure review of claims, reduce multiple claims, and minimize the creation of "refugees in orbit."

Executive Committee Conclusion No. 15 also called upon States to facilitate, in the interest of family reunification and for humanitarian reasons, the admission to their territory of family members of persons to whom refugee status or asylum has been granted. UNHCR appreciates the inclusion of provisions in the conventions affording States the flexibility to admit family members and, for humanitarian reasons, such other persons as the States deem appropriate. UNHCR hopes that in their implementation of these provisions States take into account the call of the Executive Committee in its 1981 Conclusion No. 24 ̄ (Family Reunification) to States "to apply liberal criteria in identifying those family members who can be admitted with a view to promoting a comprehensive reunification of the family." In addition, consistent with the recognition that there will be humanitarian reasons which will cause States to be flexible on entry, UNHCR recommends that these reasons be understood to include considerations of language, education and former association.

UNHCR welcomes the reaffirmation, in both Conventions of the obligations of parties under the, 1951 Convention and the 1967 Protocol, and understands that, these instruments, as expressions of preeminent international law, should provide guidance and direction for the implementation of the regional Conventions. The fundamental protection of the '51 Convention is that of nonrefoulement. States are, "jointly and severally" responsible for the application of this principle so as to do everything in their power to avoid asylum-seekers being, returned to their countries of origin without an exhaustive examination of their claims.

UNHCR also welcomes the recognition in the Dublin Convention of the value and indeed necessity of continued cooperation and coordination with UNHCR. In light of its experience and its charge under its mandate to provide protection to refugees and supervise the application of international agreements, UNHCR believes it can play a valuable role in relation to implementation of these Conventions, including through facilitating dialogue among States and working with States towards harmonization of internal asylum procedures UNHCR could also be of assistance in the exchange and dissemination of legal and country of origin information informed decisions in refugee status determination procedures and effective protection of persons in need depend on clear, accurate and current information, regarding the situations of countries of origin. The dissemination of country of origin information already available in the public domain is an urgent need. UNHCR's role as collector and a potential provider of such information is currently under active consideration. UNHCR

AR139

has already been working on an ad hoc basis with States to expand its own information base and that of States in this regard.

This being said, UNHCR emphasizes that the States parties to the conventions, themselves, remain responsible for daily implementation by their own services of the Conventions. Refugee status determination, removal to third countries, securing necessary guarantees of "Safety", and such other obligations contemplated by Articles 11, 13, and 15 of the Dublin Convention are basic State responsibilities.

Against this background, UNHCR hopes that means will be found to associate it appropriately with the mechanisms or committees envisaged in the respective instruments to monitor their implementation.

In addition to the above general comments, UNHCR would like to make the following related observations.

## Re:    Harmonization of Refugee Status Procedures and Practices

The Conventions provisions setting out criteria by which States assume or deny responsibility for review of refugee status or asylum claims should reduce the multiplicity of claims, ensure that claims are considered promptly and fairly, and provide for the protection of an individual not permitted to remain in a State which does not accept responsibility for determination of refugee status. However, the significant differences among States' procedures governing asylum and refugee status determinations such as initial hearing procedures, appeals, conditions for stay, deportation, border controls and criteria for granting status may perpetuate some of the very problems both Conventions sought to solve.

In the absence of harmonization of procedures, differences both in procedures and in standards for admission may permit exploitation of the current imbalance in the refugee and asylum burden of States. Furthermore, strict assignment of responsibilities on the basis of which State authorized entry could lead to rejection of individual claims which, in another State party, might have been recognized. Presumably, pursuant to Article 3, paragraph 4, each State party is free to examine any, claim, even a claim previously rejected by another State.

UNHCR can assist States in developing and promoting harmonized standards of application (e.g., to whom the standards apply, which are countries of reception or responsibility), standards of treatment (e.g., how the standards apply and when), standards of implementation and supervision (e.g. , definitions, treatment of asylum-seekers, cooperation in the processes of identification, return, country of origin determination, readmission, determination of claims, solutions and repatriation). Through its branch and regional offices, and especially with financial underwriting from recipient States, UNHCR can be an active presence in assisting countries of origin to prepare conditions to permit repatriation, or return of non-refugees.

Harmonization of the interpretation of the Dublin and Schengen Conventions with each other and other international instruments is also an interest of UNHCR. Since the Conventions provisions for informal consultation between States should not be a substitute for adherence to international obligations (non-refoulement, etc.) UNHCR has a role to play in assisting States to achieve consistency and complementarity between the requirements of regional and of international refugee instruments.

AR140

Case 3:19-cv-04073-JST   Document 29-1   Filed 07/19/19   Page 150 of 185

**Re:    Visas-and Carrier Sanctions**

Both Conventions take as their starting point for assigning responsibilities the fact of authorization of entry. The State which provided the entry authorization a fact determinable in accordance with a hierarchy of explicit rules is normally the State which must accept responsibility for considering the application. There is clearly a logic in this approach, but UNHCR is concerned where the emphasis on this "authorization principle" has the effect of causing States to strengthen even further both their entry requirements (visa arrangements), and their mechanisms to enforce these requirements (airline sanctions).

Asylum-seekers who are refugees are by definition persons whose flight from their country of origin is typically marked by the unwillingness or inability of their governments to provide them with protection from persecution. Often the persecutor feared is the national authorities from whom a refugee may not safely be able to obtain a valid passport, necessary to obtain a visa to enter another country. Visa prerequisites such as the possession of an address in the country of refuge, monetary sums, a return air ticket or family ties are prerequisites a refugee will very often have, difficulty meeting. For some refugees, the very real dangers attendant in even approaching governmental authorities for visas hinder considerably their search for protection

States are increasingly enacting and enforcing visa requirements through airline personnel. Although carrier sanctions are not necessarily contrary to international law, UNHCR is particularly concerned about the imposition of carrier sanctions and strict visa requirements which do not distinguish asylum seekers from other aliens.

In symbiotic relation to visa requirements are the documentation review obligations States in effect impose upon carriers. Forcing carriers to verify visas and other travel documentation helps to shift the burden of determining the need for protection to those whose motivation is to avoid monetary penalties on their corporate employer, rather than to provide protection to individuals. In so doing, it contributes to placing this very important responsibility in the hands of those (a) unauthorized to make asylum determinations on behalf of States (b) thoroughly untrained in the nuances and procedures of refugee and asylum principles, and (c) motivated by economic rather than humanitarian considerations. Inquiry into whether the absence of valid documentation may evidence the need for immediate protection of the traveller is never reached.

UNHCR believes that the concerns which States attempt to address through carrier sanctions and visas can be better addressed through the careful harmonization of standards of application, treatment and implementation. Timely consideration of claims by trained and authorized personnel who have the authority to exercise humanitarian discretion urged in the Conventions, along with coordinated standards of return and deportation, serve the same ends of preventing unfounded claims, but do not foreclose the chance to request protection t to those in true need of it. As recognized by the Executive Committee in its 1983 Conclusion No. 30⁻ (The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum), the problem of large numbers of applications for refugee status can be mitigated by the allocation of sufficient resources to the determination of refugee status processes to shorten the appeal time.

Recognizing nonetheless that carrier sanctions are unlikely to be revoked in the immediate future, UNHCR urges States to enforce such sanctions only in the event that carriers demonstrate negligence in checking documents and knowingly and willingly bring into the States aliens who do not possess valid entry documents and who do not leave their countries of origin due to a well-founded the burden of proof falls more fear of persecution. In this posture, the burden of proof falls more appropriately

AR141

upon the shoulders of the States in recognition of the fact that States, not carrier personnel, have the training and appropriate motivation to identify those with well-founded claims for refuge and asylum.

This standard is consistent with and underscores the flexibility in the Conventions expressly given to States to admit persons, even in the absence of proper documentation, for humanitarian reasons. Here it should be noted that carrier personnel are neither qualified, nor so inclined in light of penalties, to permit transport of those to whom the State might otherwise extend protection for humanitarian reasons.

## Re:    Sharing of Information

UNHCR welcomes the willingness of States to share with each other and with UNHCR statistical information and data concerning refugee trends, and is appreciative of States' recognition that information concerning specific refugee, and asylum claimants requires confidential treatment. The sharing of such general,information may aid protection in enhancing the capability to foresee refugee trends and issues, as well as assist countries in achieving their burdensharing goals.

However, because of the possibility of misuse of confidential information, for example by countries of origin to engage in retaliatory measures or punitive treatment of refugees, asylum-seekers or their family members, UNHCR hopes that States adopt effective measures by which such information is afforded every safeguard. Current Convention provisions refer to procedures by which an applicant for asylum may be able to have the receiving country correct or erase information he or she believes should not have been forwarded to that country. UNHCR urges the adoption of measures by which potentially damaging transfers of information can also be preempted, not only remedied after the event. In light of the ability by computer to copy or transfer with ease large quantities of information, States should further ensure that access to such information is strictly controlled and that the approval of the transfer of information potentially identifying a claimant or refugee is made by qualified personnel, sensitive to the inherent dangers of information-sharing. UNHCR welcomes the Conventions' requirement that the exchange of information by computer take place only among countries that are party to the 1981 Council of Europe Convention for the Protection of Individuals with regard to Automatic Processing of Personal Data.

## Search Refworld

by keyword [Enter a word or phrase]
and / or country [All countries ⌄]
[Clear]  [Search]

[Advanced Search] | [Search Tips]

## Topics

- [Access to procedures]

29.6.2013 | EN | Official Journal of the European Union | L 180/31

# REGULATION (EU) No 604/2013 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL

## of 26 June 2013

**establishing the criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless person (recast)**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 78(2)(e) thereof,

Having regard to the proposal from the European Commission,

Having regard to the opinion of the European Economic and Social Committee [1],

Having regard to the opinion of the Committee of the Regions [2],

Acting in accordance with the ordinary legislative procedure [3],

Whereas:

(1) A number of substantive changes are to be made to Council Regulation (EC) No 343/2003 of 18 February 2003 establishing the criteria and mechanisms for determining the Member State responsible for examining an asylum application lodged in one of the Member States by a third-country national [4]. In the interests of clarity, that Regulation should be recast.

(2) A common policy on asylum, including a Common European Asylum System (CEAS), is a constituent part of the European Union's objective of progressively establishing an area of freedom, security and justice open to those who, forced by circumstances, legitimately seek protection in the Union.

(3) The European Council, at its special meeting in Tampere on 15 and 16 October 1999, agreed to work towards establishing the CEAS, based on the full and inclusive application of the Geneva Convention Relating to the Status of Refugees of 28 July 1951, as supplemented by the New York Protocol of 31 January 1967 ('the Geneva Convention'), thus ensuring that nobody is sent back to persecution, i.e. maintaining the principle of *non-refoulement*. In this respect, and without the responsibility criteria laid down in this Regulation being affected, Member States, all respecting the principle of *non-refoulement*, are considered as safe countries for third-country nationals.

(4) The Tampere conclusions also stated that the CEAS should include, in the short-term, a clear and workable method for determining the Member State responsible for the examination of an asylum application.

(5) Such a method should be based on objective, fair criteria both for the Member States and for the persons concerned. It should, in particular, make it possible to determine rapidly the Member State responsible, so as to guarantee effective access to the procedures for granting international protection and not to compromise the objective of the rapid processing of applications for international protection.

(6) The first phase in the creation of a CEAS that should lead, in the longer term, to a common procedure and a uniform status, valid throughout the Union, for those granted international protection, has now been completed. The European Council of 4 November 2004 adopted The Hague Programme which set the objectives to be implemented in the area of freedom, security and justice in the period 2005-2010. In this respect, The Hague Programme invited the European Commission to conclude the evaluation of the first-phase legal instruments and to submit the second-phase instruments and measures to the European Parliament and to the Council with a view to their adoption before 2010.

(7) In the Stockholm Programme, the European Council reiterated its commitment to the objective of establishing a common area of protection and solidarity in accordance with Article 78 of the Treaty on the Functioning of the European Union (TFEU), for those granted

---

[1] OJ C 317, 23.12.2009, p. 115.

[2] OJ C 79, 27.3.2010, p. 58.

[3] Position of the European Parliament of 7 May 2009 (OJ C 212 E, 5.8.2010, p. 370) and position of the Council at first reading of 6 June 2013 (not yet published in the Official Journal). Position of the European Parliament of 10 June 2013 (not yet published in the Official Journal).

[4] OJ L 50, 25.2.2003, p. 1.

AR143

international protection, by 2012 at the latest. Furthermore it emphasised that the Dublin system remains a cornerstone in building the CEAS, as it clearly allocates responsibility among Member States for the examination of applications for international protection.

(8) The resources of the European Asylum Support Office (EASO), established by Regulation (EU) No 439/2010 of the European Parliament and of the Council (¹), should be available to provide adequate support to the relevant services of the Member States responsible for implementing this Regulation. In particular, EASO should provide solidarity measures, such as the Asylum Intervention Pool with asylum support teams, to assist those Member States which are faced with particular pressure and where applicants for international protection ('applicants') cannot benefit from adequate standards, in particular as regards reception and protection.

(9) In the light of the results of the evaluations undertaken of the implementation of the first-phase instruments, it is appropriate, at this stage, to confirm the principles underlying Regulation (EC) No 343/2003, while making the necessary improvements, in the light of experience, to the effectiveness of the Dublin system and the protection granted to applicants under that system. Given that a well-functioning Dublin system is essential for the CEAS, its principles and functioning should be reviewed as other components of the CEAS and Union solidarity tools are built up. A comprehensive 'fitness check' should be foreseen by conducting an evidence-based review covering the legal, economic and social effects of the Dublin system, including its effects on fundamental rights.

(10) In order to ensure equal treatment for all applicants and beneficiaries of international protection, and consistency with the current Union asylum *acquis*, in particular with Directive 2011/95/EU of the European Parliament and of the Council of 13 December 2011 on standards for the qualification of third-country nationals or stateless persons as beneficiaries of international protection, for a uniform status for refugees or for persons eligible for subsidiary protection, and for the content of the protection granted (²), the scope of this Regulation encompasses applicants for subsidiary protection and persons eligible for subsidiary protection.

(11) Directive 2013/33/EU of the European Parliament and of the Council of 26 June 2013 laying down standards for the reception of applicants for international protection (³)

should apply to the procedure for the determination of the Member State responsible as regulated under this Regulation, subject to the limitations in the application of that Directive.

(12) Directive 2013/32/EU of the European Parliament and of the Council of 26 June 2013 on common procedures for granting and withdrawing international protection (⁴) should apply in addition and without prejudice to the provisions concerning the procedural safeguards regulated under this Regulation, subject to the limitations in the application of that Directive.

(13) In accordance with the 1989 United Nations Convention on the Rights of the Child and with the Charter of Fundamental Rights of the European Union, the best interests of the child should be a primary consideration of Member States when applying this Regulation. In assessing the best interests of the child, Member States should, in particular, take due account of the minor's well-being and social development, safety and security considerations and the views of the minor in accordance with his or her age and maturity, including his or her background. In addition, specific procedural guarantees for unaccompanied minors should be laid down on account of their particular vulnerability.

(14) In accordance with the European Convention for the Protection of Human Rights and Fundamental Freedoms and with the Charter of Fundamental Rights of the European Union, respect for family life should be a primary consideration of Member States when applying this Regulation.

(15) The processing together of the applications for international protection of the members of one family by a single Member State makes it possible to ensure that the applications are examined thoroughly, the decisions taken in respect of them are consistent and the members of one family are not separated.

(16) In order to ensure full respect for the principle of family unity and for the best interests of the child, the existence of a relationship of dependency between an applicant and his or her child, sibling or parent on account of the applicant's pregnancy or maternity, state of health or old age, should become a binding responsibility criterion. When the applicant is an unaccompanied minor, the presence of a family member or relative on the territory of another Member State who can take care of him or her should also become a binding responsibility criterion.

---

(¹) OJ L 132, 29.5.2010, p. 11.
(²) OJ L 337, 20.12.2011, p. 9.
(³) See page 96 of this Official Journal.

(⁴) See page 60 of this Official Journal.

(17) Any Member State should be able to derogate from the responsibility criteria, in particular on humanitarian and compassionate grounds, in order to bring together family members, relatives or any other family relations and examine an application for international protection lodged with it or with another Member State, even if such examination is not its responsibility under the binding criteria laid down in this Regulation.

(18) A personal interview with the applicant should be organised in order to facilitate the determination of the Member State responsible for examining an application for international protection. As soon as the application for international protection is lodged, the applicant should be informed of the application of this Regulation and of the possibility, during the interview, of providing information regarding the presence of family members, relatives or any other family relations in the Member States, in order to facilitate the procedure for determining the Member State responsible.

(19) In order to guarantee effective protection of the rights of the persons concerned, legal safeguards and the right to an effective remedy in respect of decisions regarding transfers to the Member State responsible should be established, in accordance, in particular, with Article 47 of the Charter of Fundamental Rights of the European Union. In order to ensure that international law is respected, an effective remedy against such decisions should cover both the examination of the application of this Regulation and of the legal and factual situation in the Member State to which the applicant is transferred.

(20) The detention of applicants should be applied in accordance with the underlying principle that a person should not be held in detention for the sole reason that he or she is seeking international protection. Detention should be for as short a period as possible and subject to the principles of necessity and proportionality. In particular, the detention of applicants must be in accordance with Article 31 of the Geneva Convention. The procedures provided for under this Regulation in respect of a detained person should be applied as a matter of priority, within the shortest possible deadlines. As regards the general guarantees governing detention, as well as detention conditions, where appropriate, Member States should apply the provisions of Directive 2013/33/EU also to persons detained on the basis of this Regulation.

(21) Deficiencies in, or the collapse of, asylum systems, often aggravated or contributed to by particular pressures on them, can jeopardise the smooth functioning of the system put in place under this Regulation, which could lead to a risk of a violation of the rights of applicants as set out in the Union asylum *acquis* and the Charter of

Fundamental Rights of the European Union, other international human rights and refugee rights.

(22) A process for early warning, preparedness and management of asylum crises serving to prevent a deterioration in, or the collapse of, asylum systems, with EASO playing a key role using its powers under Regulation (EU) No 439/2010, should be established in order to ensure robust cooperation within the framework of this Regulation and to develop mutual trust among Member States with respect to asylum policy. Such a process should ensure that the Union is alerted as soon as possible when there is a concern that the smooth functioning of the system set up by this Regulation is being jeopardised as a result of particular pressure on, and/or deficiencies in, the asylum systems of one or more Member States. Such a process would allow the Union to promote preventive measures at an early stage and pay the appropriate political attention to such situations. Solidarity, which is a pivotal element in the CEAS, goes hand in hand with mutual trust. By enhancing such trust, the process for early warning, preparedness and management of asylum crises could improve the steering of concrete measures of genuine and practical solidarity towards Member States, in order to assist the affected Member States in general and the applicants in particular. In accordance with Article 80 TFEU, Union acts should, whenever necessary, contain appropriate measures to give effect to the principle of solidarity, and the process should be accompanied by such measures. The conclusions on a Common Framework for genuine and practical solidarity towards Member States facing particular pressures on their asylum systems, including through mixed migration flows, adopted by the Council on 8 March 2012, provide for a 'tool box' of existing and potential new measures, which should be taken into account in the context of a mechanism for early warning, preparedness and crisis management.

(23) Member States should collaborate with EASO in the gathering of information concerning their ability to manage particular pressure on their asylum and reception systems, in particular within the framework of the application of this Regulation. EASO should regularly report on the information gathered in accordance with Regulation (EU) No 439/2010.

(24) In accordance with Commission Regulation (EC) No 1560/2003 (¹), transfers to the Member State responsible for examining an application for international protection may be carried out on a voluntary basis, by supervised departure or under escort. Member States should promote voluntary transfers by providing adequate information to the applicant and should ensure that supervised or escorted transfers are undertaken in a humane manner, in full compliance with fundamental rights and respect for human dignity, as well as the

_____
(¹) OJ L 222, 5.9.2003, p. 3.

best interests of the child and taking utmost account of developments in the relevant case law, in particular as regards transfers on humanitarian grounds.

(25) The progressive creation of an area without internal frontiers in which free movement of persons is guaranteed in accordance with the TFEU and the establishment of Union policies regarding the conditions of entry and stay of third-country nationals, including common efforts towards the management of external borders, makes it necessary to strike a balance between responsibility criteria in a spirit of solidarity.

(26) Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (¹) applies to the processing of personal data by the Member States under this Regulation.

(27) The exchange of an applicant's personal data, including sensitive data on his or her health, prior to a transfer, will ensure that the competent asylum authorities are in a position to provide applicants with adequate assistance and to ensure continuity in the protection and rights afforded to them. Special provisions should be made to ensure the protection of data relating to applicants involved in that situation, in accordance with Directive 95/46/EC.

(28) The application of this Regulation can be facilitated, and its effectiveness increased, by bilateral arrangements between Member States for improving communication between competent departments, reducing time limits for procedures or simplifying the processing of requests to take charge or take back, or establishing procedures for the performance of transfers.

(29) Continuity between the system for determining the Member State responsible established by Regulation (EC) No 343/2003 and the system established by this Regulation should be ensured. Similarly, consistency should be ensured between this Regulation and Regulation (EU) No 603/2013 of the European Parliament and of the Council of 26 June 2013 on the establishment of 'Eurodac' for the comparison of fingerprints for the effective application of Regulation (EU) No 604/2013 establishing the criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless

person and on requests for the comparisons with Eurodac data by Member States' law enforcement authorities and Europol for law enforcement purposes (²).

(30) The operation of the Eurodac system, as established by Regulation (EU) No 603/2013, should facilitate the application of this Regulation.

(31) The operation of the Visa Information System, as established by Regulation (EC) No 767/2008 of the European Parliament and of the Council of 9 July 2008 concerning the Visa Information System (VIS) and the exchange of data between Member States on short-stay visas (³), and in particular the implementation of Articles 21 and 22 thereof, should facilitate the application of this Regulation.

(32) With respect to the treatment of persons falling within the scope of this Regulation, Member States are bound by their obligations under instruments of international law, including the relevant case-law of the European Court of Human Rights.

(33) In order to ensure uniform conditions for the implementation of this Regulation, implementing powers should be conferred on the Commission. Those powers should be exercised in accordance with Regulation (EU) No 182/2011 of the European Parliament and of the Council of 16 February 2011 laying down the rules and general principles concerning mechanisms for control by the Member States of the Commission's exercise of implementing powers (⁴).

(34) The examination procedure should be used for the adoption of a common leaflet on Dublin/Eurodac, as well as a specific leaflet for unaccompanied minors; of a standard form for the exchange of relevant information on unaccompanied minors; of uniform conditions for the consultation and exchange of information on minors and dependent persons; of uniform conditions on the preparation and submission of take charge and take back requests; of two lists of relevant elements of proof and circumstantial evidence, and the periodical revision thereof; of a *laissez passer*; of uniform conditions for the consultation and exchange of information regarding transfers; of a standard form for the exchange of data before a transfer; of a common health certificate; of uniform conditions and practical arrangements for the exchange of information on a person's health data before a transfer, and of secure electronic transmission channels for the transmission of requests.

---

(¹) OJ L 281, 23.11.1995, p. 31.

(²) See page 1 of this Official Journal.
(³) OJ L 218, 13.8.2008, p. 60.
(⁴) OJ L 55, 28.2.2011, p. 13.

(35) In order to provide for supplementary rules, the power to adopt acts in accordance with Article 290 TFEU should be delegated to the Commission in respect of the identification of family members, siblings or relatives of an unaccompanied minor; the criteria for establishing the existence of proven family links; the criteria for assessing the capacity of a relative to take care of an unaccompanied minor, including where family members, siblings or relatives of the unaccompanied minor stay in more than one Member State; the elements for assessing a dependency link; the criteria for assessing the capacity of a person to take care of a dependent person and the elements to be taken into account in order to assess the inability to travel for a significant period of time. In exercising its powers to adopt delegated acts, the Commission shall not exceed the scope of the best interests of the child as provided for under Article 6(3) of this Regulation. It is of particular importance that the Commission carry out appropriate consultations during its preparatory work, including at expert level. The Commission, when preparing and drawing up delegated acts, should ensure a simultaneous, timely and appropriate transmission of relevant documents to the European Parliament and to the Council.

(36) In the application of this Regulation, including the preparation of delegated acts, the Commission should consult experts from, among others, all relevant national authorities.

(37) Detailed rules for the application of Regulation (EC) No 343/2003 have been laid down by Regulation (EC) No 1560/2003. Certain provisions of Regulation (EC) No 1560/2003 should be incorporated into this Regulation, either for reasons of clarity or because they can serve a general objective. In particular, it is important, both for the Member States and the applicants concerned, that there should be a general mechanism for finding a solution in cases where Member States differ over the application of a provision of this Regulation. It is therefore justified to incorporate the mechanism provided for in Regulation (EC) No 1560/2003 for the settling of disputes on the humanitarian clause into this Regulation and to extend its scope to the entirety of this Regulation.

(38) The effective monitoring of the application of this Regulation requires that it be evaluated at regular intervals.

(39) This Regulation respects the fundamental rights and observes the principles which are acknowledged, in particular, in the Charter of Fundamental Rights of the European Union. In particular, this Regulation seeks to ensure full observance of the right to asylum guaranteed by Article 18 of the Charter as well as the rights recognised under Articles 1, 4, 7, 24 and 47 thereof. This Regulation should therefore be applied accordingly.

(40) Since the objective of this Regulation, namely the establishment of criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless person, cannot be sufficiently achieved by the Member States and can therefore, by reason of the scale and effects of this Regulation, be better achieved at Union level, the Union may adopt measures in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union (TEU). In accordance with the principle of proportionality, as set out in that Article, this Regulation does not go beyond what is necessary in order to achieve that objective.

(41) In accordance with Article 3 and Article 4a(1) of Protocol No 21 on the position of the United Kingdom and Ireland in respect of the Area of Freedom, Security and Justice, annexed to the TEU and to the TFEU, those Member States have notified their wish to take part in the adoption and application of this Regulation.

(42) In accordance with Articles 1 and 2 of Protocol No 22 on the position of Denmark, annexed to the TEU and to the TFEU, Denmark is not taking part in the adoption of this Regulation and is not bound by it or subject to its application,

HAVE ADOPTED THIS REGULATION:

CHAPTER I

SUBJECT MATTER AND DEFINITIONS

*Article 1*

**Subject matter**

This Regulation lays down the criteria and mechanisms for determining the Member State responsible for examining an application for international protection lodged in one of the Member States by a third-country national or a stateless person ('the Member State responsible').

*Article 2*

**Definitions**

For the purposes of this Regulation:

(a) 'third-country national' means any person who is not a citizen of the Union within the meaning of Article 20(1) TFEU and who is not a national of a State which participates in this Regulation by virtue of an agreement with the European Union;

AR147

L 180/36 ⬚EN⬚ Official Journal of the European Union 29.6.2013

(b) 'application for international protection' means an application for international protection as defined in Article 2(h) of Directive 2011/95/EU;

(c) 'applicant' means a third-country national or a stateless person who has made an application for international protection in respect of which a final decision has not yet been taken;

(d) 'examination of an application for international protection' means any examination of, or decision or ruling concerning, an application for international protection by the competent authorities in accordance with Directive 2013/32/EU and Directive 2011/95/EU, except for procedures for determining the Member State responsible in accordance with this Regulation;

(e) 'withdrawal of an application for international protection' means the actions by which the applicant terminates the procedures initiated by the submission of his or her application for international protection, in accordance with Directive 2013/32/EU, either explicitly or tacitly;

(f) 'beneficiary of international protection' means a third-country national or a stateless person who has been granted international protection as defined in Article 2(a) of Directive 2011/95/EU;

(g) 'family members' means, insofar as the family already existed in the country of origin, the following members of the applicant's family who are present on the territory of the Member States:

— the spouse of the applicant or his or her unmarried partner in a stable relationship, where the law or practice of the Member State concerned treats unmarried couples in a way comparable to married couples under its law relating to third-country nationals,

— the minor children of couples referred to in the first indent or of the applicant, on condition that they are unmarried and regardless of whether they were born in or out of wedlock or adopted as defined under national law,

— when the applicant is a minor and unmarried, the father, mother or another adult responsible for the applicant, whether by law or by the practice of the Member State where the adult is present,

— when the beneficiary of international protection is a minor and unmarried, the father, mother or another adult responsible for him or her whether by law or by the practice of the Member State where the beneficiary is present;

(h) 'relative' means the applicant's adult aunt or uncle or grandparent who is present in the territory of a Member State, regardless of whether the applicant was born in or out of wedlock or adopted as defined under national law;

(i) 'minor' means a third-country national or a stateless person below the age of 18 years;

(j) 'unaccompanied minor' means a minor who arrives on the territory of the Member States unaccompanied by an adult responsible for him or her, whether by law or by the practice of the Member State concerned, and for as long as he or she is not effectively taken into the care of such an adult; it includes a minor who is left unaccompanied after he or she has entered the territory of Member States;

(k) 'representative' means a person or an organisation appointed by the competent bodies in order to assist and represent an unaccompanied minor in procedures provided for in this Regulation with a view to ensuring the best interests of the child and exercising legal capacity for the minor where necessary. Where an organisation is appointed as a representative, it shall designate a person responsible for carrying out its duties in respect of the minor, in accordance with this Regulation;

(l) 'residence document' means any authorisation issued by the authorities of a Member State authorising a third-country national or a stateless person to stay on its territory, including the documents substantiating the authorisation to remain on the territory under temporary protection arrangements or until the circumstances preventing a removal order from being carried out no longer apply, with the exception of visas and residence authorisations issued during the period required to determine the Member State responsible as established in this Regulation or during the examination of an application for international protection or an application for a residence permit;

(m) 'visa' means the authorisation or decision of a Member State required for transit or entry for an intended stay in that Member State or in several Member States. The nature of the visa shall be determined in accordance with the following definitions:

— 'long-stay visa' means an authorisation or decision issued by one of the Member States in accordance with its national law or Union law required for entry for an intended stay in that Member State of more than three months,

AR148

29.6.2013    EN    Official Journal of the European Union    L 180/37

— 'short-stay visa' means an authorisation or decision of a Member State with a view to transit through or an intended stay on the territory of one or more or all the Member States of a duration of no more than three months in any six-month period beginning on the date of first entry on the territory of the Member States,

— 'airport transit visa' means a visa valid for transit through the international transit areas of one or more airports of the Member States;

(n) 'risk of absconding' means the existence of reasons in an individual case, which are based on objective criteria defined by law, to believe that an applicant or a third-country national or a stateless person who is subject to a transfer procedure may abscond.

CHAPTER II

GENERAL PRINCIPLES AND SAFEGUARDS

Article 3

### Access to the procedure for examining an application for international protection

1.    Member States shall examine any application for international protection by a third-country national or a stateless person who applies on the territory of any one of them, including at the border or in the transit zones. The application shall be examined by a single Member State, which shall be the one which the criteria set out in Chapter III indicate is responsible.

2.    Where no Member State responsible can be designated on the basis of the criteria listed in this Regulation, the first Member State in which the application for international protection was lodged shall be responsible for examining it.

Where it is impossible to transfer an applicant to the Member State primarily designated as responsible because there are substantial grounds for believing that there are systemic flaws in the asylum procedure and in the reception conditions for applicants in that Member State, resulting in a risk of inhuman or degrading treatment within the meaning of Article 4 of the Charter of Fundamental Rights of the European Union, the determining Member State shall continue to examine the criteria set out in Chapter III in order to establish whether another Member State can be designated as responsible.

Where the transfer cannot be made pursuant to this paragraph to any Member State designated on the basis of the criteria set out in Chapter III or to the first Member State with which the application was lodged, the determining Member State shall become the Member State responsible.

3.    Any Member State shall retain the right to send an applicant to a safe third country, subject to the rules and safeguards laid down in Directive 2013/32/EU.

Article 4

### Right to information

1.    As soon as an application for international protection is lodged within the meaning of Article 20(2) in a Member State, its competent authorities shall inform the applicant of the application of this Regulation, and in particular of:

(a) the objectives of this Regulation and the consequences of making another application in a different Member State as well as the consequences of moving from one Member State to another during the phases in which the Member State responsible under this Regulation is being determined and the application for international protection is being examined;

(b) the criteria for determining the Member State responsible, the hierarchy of such criteria in the different steps of the procedure and their duration, including the fact that an application for international protection lodged in one Member State can result in that Member State becoming responsible under this Regulation even if such responsibility is not based on those criteria;

(c) the personal interview pursuant to Article 5 and the possibility of submitting information regarding the presence of family members, relatives or any other family relations in the Member States, including the means by which the applicant can submit such information;

(d) the possibility to challenge a transfer decision and, where applicable, to apply for a suspension of the transfer;

(e) the fact that the competent authorities of Member States can exchange data on him or her for the sole purpose of implementing their obligations arising under this Regulation;

(f) the right of access to data relating to him or her and the right to request that such data be corrected if inaccurate or be deleted if unlawfully processed, as well as the procedures for exercising those rights, including the contact details of the authorities referred to in Article 35 and of the national data protection authorities responsible for hearing claims concerning the protection of personal data.

2.    The information referred to in paragraph 1 shall be provided in writing in a language that the applicant understands or is reasonably supposed to understand. Member States shall use the common leaflet drawn up pursuant to paragraph 3 for that purpose.

Where necessary for the proper understanding of the applicant, the information shall also be supplied orally, for example in connection with the personal interview as referred to in Article 5.

AR149

3.   The Commission shall, by means of implementing acts, draw up a common leaflet, as well as a specific leaflet for unaccompanied minors, containing at least the information referred to in paragraph 1 of this Article. This common leaflet shall also include information regarding the application of Regulation (EU) No 603/2013 and, in particular, the purpose for which the data of an applicant may be processed within Eurodac. The common leaflet shall be established in such a manner as to enable Member States to complete it with additional Member State-specific information. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2) of this Regulation.

*Article 5*

**Personal interview**

1.   In order to facilitate the process of determining the Member State responsible, the determining Member State shall conduct a personal interview with the applicant. The interview shall also allow the proper understanding of the information supplied to the applicant in accordance with Article 4.

2.   The personal interview may be omitted if:

(a) the applicant has absconded; or

(b) after having received the information referred to in Article 4, the applicant has already provided the information relevant to determine the Member State responsible by other means. The Member State omitting the interview shall give the applicant the opportunity to present all further information which is relevant to correctly determine the Member State responsible before a decision is taken to transfer the applicant to the Member State responsible pursuant to Article 26(1).

3.   The personal interview shall take place in a timely manner and, in any event, before any decision is taken to transfer the applicant to the Member State responsible pursuant to Article 26(1).

4.   The personal interview shall be conducted in a language that the applicant understands or is reasonably supposed to understand and in which he or she is able to communicate. Where necessary, Member States shall have recourse to an interpreter who is able to ensure appropriate communication between the applicant and the person conducting the personal interview.

5.   The personal interview shall take place under conditions which ensure appropriate confidentiality. It shall be conducted by a qualified person under national law.

6.   The Member State conducting the personal interview shall make a written summary thereof which shall contain at least the main information supplied by the applicant at the interview. This summary may either take the form of a report or a standard form. The Member State shall ensure that the applicant and/or the legal advisor or other counsellor who is representing the applicant have timely access to the summary.

*Article 6*

**Guarantees for minors**

1.   The best interests of the child shall be a primary consideration for Member States with respect to all procedures provided for in this Regulation.

2.   Member States shall ensure that a representative represents and/or assists an unaccompanied minor with respect to all procedures provided for in this Regulation. The representative shall have the qualifications and expertise to ensure that the best interests of the minor are taken into consideration during the procedures carried out under this Regulation. Such representative shall have access to the content of the relevant documents in the applicant's file including the specific leaflet for unaccompanied minors.

This paragraph shall be without prejudice to the relevant provisions in Article 25 of Directive 2013/32/EU.

3.   In assessing the best interests of the child, Member States shall closely cooperate with each other and shall, in particular, take due account of the following factors:

(a) family reunification possibilities;

(b) the minor's well-being and social development;

(c) safety and security considerations, in particular where there is a risk of the minor being a victim of human trafficking;

(d) the views of the minor, in accordance with his or her age and maturity.

4.   For the purpose of applying Article 8, the Member State where the unaccompanied minor lodged an application for international protection shall, as soon as possible, take appropriate action to identify the family members, siblings or relatives of the unaccompanied minor on the territory of Member States, whilst protecting the best interests of the child.

To that end, that Member State may call for the assistance of international or other relevant organisations, and may facilitate the minor's access to the tracing services of such organisations.

The staff of the competent authorities referred to in Article 35 who deal with requests concerning unaccompanied minors shall have received, and shall continue to receive, appropriate training concerning the specific needs of minors.

5.    With a view to facilitating the appropriate action to identify the family members, siblings or relatives of the unaccompanied minor living in the territory of another Member State pursuant to paragraph 4 of this Article, the Commission shall adopt implementing acts including a standard form for the exchange of relevant information between Member States. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

CHAPTER III

**CRITERIA FOR DETERMINING THE MEMBER STATE RESPONSIBLE**

*Article 7*

**Hierarchy of criteria**

1.    The criteria for determining the Member State responsible shall be applied in the order in which they are set out in this Chapter.

2.    The Member State responsible in accordance with the criteria set out in this Chapter shall be determined on the basis of the situation obtaining when the applicant first lodged his or her application for international protection with a Member State.

3.    In view of the application of the criteria referred to in Articles 8, 10 and 16, Member States shall take into consideration any available evidence regarding the presence, on the territory of a Member State, of family members, relatives or any other family relations of the applicant, on condition that such evidence is produced before another Member State accepts the request to take charge or take back the person concerned, pursuant to Articles 22 and 25 respectively, and that the previous applications for international protection of the applicant have not yet been the subject of a first decision regarding the substance.

*Article 8*

**Minors**

1.    Where the applicant is an unaccompanied minor, the Member State responsible shall be that where a family member or a sibling of the unaccompanied minor is legally present, provided that it is in the best interests of the minor. Where the applicant is a married minor whose spouse is not legally present on the territory of the Member States, the Member State responsible shall be the Member State where the father, mother or other adult responsible for the minor, whether by law or by the practice of that Member State, or sibling is legally present.

2.    Where the applicant is an unaccompanied minor who has a relative who is legally present in another Member State and where it is established, based on an individual examination, that

the relative can take care of him or her, that Member State shall unite the minor with his or her relative and shall be the Member State responsible, provided that it is in the best interests of the minor.

3.    Where family members, siblings or relatives as referred to in paragraphs 1 and 2, stay in more than one Member State, the Member State responsible shall be decided on the basis of what is in the best interests of the unaccompanied minor.

4.    In the absence of a family member, a sibling or a relative as referred to in paragraphs 1 and 2, the Member State responsible shall be that where the unaccompanied minor has lodged his or her application for international protection, provided that it is in the best interests of the minor.

5.    The Commission shall be empowered to adopt delegated acts in accordance with Article 45 concerning the identification of family members, siblings or relatives of the unaccompanied minor; the criteria for establishing the existence of proven family links; the criteria for assessing the capacity of a relative to take care of the unaccompanied minor, including where family members, siblings or relatives of the unaccompanied minor stay in more than one Member State. In exercising its powers to adopt delegated acts, the Commission shall not exceed the scope of the best interests of the child as provided for under Article 6(3).

6.    The Commission shall, by means of implementing acts, establish uniform conditions for the consultation and the exchange of information between Member States. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

*Article 9*

**Family members who are beneficiaries of international protection**

Where the applicant has a family member, regardless of whether the family was previously formed in the country of origin, who has been allowed to reside as a beneficiary of international protection in a Member State, that Member State shall be responsible for examining the application for international protection, provided that the persons concerned expressed their desire in writing.

*Article 10*

**Family members who are applicants for international protection**

If the applicant has a family member in a Member State whose application for international protection in that Member State has not yet been the subject of a first decision regarding the substance, that Member State shall be responsible for examining the application for international protection, provided that the persons concerned expressed their desire in writing.

*Article 11*

**Family procedure**

Where several family members and/or minor unmarried siblings submit applications for international protection in the same Member State simultaneously, or on dates close enough for the procedures for determining the Member State responsible to be conducted together, and where the application of the criteria set out in this Regulation would lead to their being separated, the Member State responsible shall be determined on the basis of the following provisions:

(a) responsibility for examining the applications for international protection of all the family members and/or minor unmarried siblings shall lie with the Member State which the criteria indicate is responsible for taking charge of the largest number of them;

(b) failing this, responsibility shall lie with the Member State which the criteria indicate is responsible for examining the application of the oldest of them.

*Article 12*

**Issue of residence documents or visas**

1.   Where the applicant is in possession of a valid residence document, the Member State which issued the document shall be responsible for examining the application for international protection.

2.   Where the applicant is in possession of a valid visa, the Member State which issued the visa shall be responsible for examining the application for international protection, unless the visa was issued on behalf of another Member State under a representation arrangement as provided for in Article 8 of Regulation (EC) No 810/2009 of the European Parliament and of the Council, of 13 July 2009, establishing a Community Code on Visas (¹). In such a case, the represented Member State shall be responsible for examining the application for international protection.

3.   Where the applicant is in possession of more than one valid residence document or visa issued by different Member States, the responsibility for examining the application for international protection shall be assumed by the Member States in the following order:

(a) the Member State which issued the residence document conferring the right to the longest period of residency or, where the periods of validity are identical, the Member State which issued the residence document having the latest expiry date;

(b) the Member State which issued the visa having the latest expiry date where the various visas are of the same type;

(¹) OJ L 243, 15.9.2009, p. 1.

(c) where visas are of different kinds, the Member State which issued the visa having the longest period of validity or, where the periods of validity are identical, the Member State which issued the visa having the latest expiry date.

4.   Where the applicant is in possession only of one or more residence documents which have expired less than two years previously or one or more visas which have expired less than six months previously and which enabled him or her actually to enter the territory of a Member State, paragraphs 1, 2 and 3 shall apply for such time as the applicant has not left the territories of the Member States.

Where the applicant is in possession of one or more residence documents which have expired more than two years previously or one or more visas which have expired more than six months previously and enabled him or her actually to enter the territory of a Member State and where he has not left the territories of the Member States, the Member State in which the application for international protection is lodged shall be responsible.

5.   The fact that the residence document or visa was issued on the basis of a false or assumed identity or on submission of forged, counterfeit or invalid documents shall not prevent responsibility being allocated to the Member State which issued it. However, the Member State issuing the residence document or visa shall not be responsible if it can establish that a fraud was committed after the document or visa had been issued.

*Article 13*

**Entry and/or stay**

1.   Where it is established, on the basis of proof or circumstantial evidence as described in the two lists mentioned in Article 22(3) of this Regulation, including the data referred to in Regulation (EU) No 603/2013, that an applicant has irregularly crossed the border into a Member State by land, sea or air having come from a third country, the Member State thus entered shall be responsible for examining the application for international protection. That responsibility shall cease 12 months after the date on which the irregular border crossing took place.

2.   When a Member State cannot or can no longer be held responsible in accordance with paragraph 1 of this Article and where it is established, on the basis of proof or circumstantial evidence as described in the two lists mentioned in Article 22(3), that the applicant — who has entered the territories of the Member States irregularly or whose circumstances of entry cannot be established — has been living for a continuous period of at least five months in a Member State before lodging the application for international protection, that Member State shall be responsible for examining the application for international protection.

If the applicant has been living for periods of time of at least five months in several Member States, the Member State where he or she has been living most recently shall be responsible for examining the application for international protection.

AR152

### Article 14

#### Visa waived entry

1.    If a third-country national or a stateless person enters into the territory of a Member State in which the need for him or her to have a visa is waived, that Member State shall be responsible for examining his or her application for international protection.

2.    The principle set out in paragraph 1 shall not apply if the third-country national or the stateless person lodges his or her application for international protection in another Member State in which the need for him or her to have a visa for entry into the territory is also waived. In that case, that other Member State shall be responsible for examining the application for international protection.

### Article 15

#### Application in an international transit area of an airport

Where the application for international protection is made in the international transit area of an airport of a Member State by a third-country national or a stateless person, that Member State shall be responsible for examining the application.

### CHAPTER IV

#### DEPENDENT PERSONS AND DISCRETIONARY CLAUSES

### Article 16

#### Dependent persons

1.    Where, on account of pregnancy, a new-born child, serious illness, severe disability or old age, an applicant is dependent on the assistance of his or her child, sibling or parent legally resident in one of the Member States, or his or her child, sibling or parent legally resident in one of the Member States is dependent on the assistance of the applicant, Member States shall normally keep or bring together the applicant with that child, sibling or parent, provided that family ties existed in the country of origin, that the child, sibling or parent or the applicant is able to take care of the dependent person and that the persons concerned expressed their desire in writing.

2.    Where the child, sibling or parent referred to in paragraph 1 is legally resident in a Member State other than the one where the applicant is present, the Member State responsible shall be the one where the child, sibling or parent is legally resident unless the applicant's health prevents him or her from travelling to that Member State for a significant period of time. In such a case, the Member State responsible shall be the one where the applicant is present. Such Member State shall not be subject to the obligation to bring the child, sibling or parent of the applicant to its territory.

3.    The Commission shall be empowered to adopt delegated acts in accordance with Article 45 concerning the elements to be taken into account in order to assess the dependency link, the criteria for establishing the existence of proven family links, the criteria for assessing the capacity of the person concerned to take care of the dependent person and the elements to be taken into account in order to assess the inability to travel for a significant period of time.

4.    The Commission shall, by means of implementing acts, establish uniform conditions for the consultation and exchange of information between Member States. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

### Article 17

#### Discretionary clauses

1.    By way of derogation from Article 3(1), each Member State may decide to examine an application for international protection lodged with it by a third-country national or a stateless person, even if such examination is not its responsibility under the criteria laid down in this Regulation.

The Member State which decides to examine an application for international protection pursuant to this paragraph shall become the Member State responsible and shall assume the obligations associated with that responsibility. Where applicable, it shall inform, using the 'DubliNet' electronic communication network set up under Article 18 of Regulation (EC) No 1560/2003, the Member State previously responsible, the Member State conducting a procedure for determining the Member State responsible or the Member State which has been requested to take charge of, or to take back, the applicant.

The Member State which becomes responsible pursuant to this paragraph shall forthwith indicate it in Eurodac in accordance with Regulation (EU) No 603/2013 by adding the date when the decision to examine the application was taken.

2.    The Member State in which an application for international protection is made and which is carrying out the process of determining the Member State responsible, or the Member State responsible, may, at any time before a first decision regarding the substance is taken, request another Member State to take charge of an applicant in order to bring together any family relations, on humanitarian grounds based in particular on family or cultural considerations, even where that other Member State is not responsible under the criteria laid down in Articles 8 to 11 and 16. The persons concerned must express their consent in writing.

L  180/42          EN          Official Journal of the European Union          29.6.2013

The request to take charge shall contain all the material in the possession of the requesting Member State to allow the requested Member State to assess the situation.

The requested Member State shall carry out any necessary checks to examine the humanitarian grounds cited, and shall reply to the requesting Member State within two months of receipt of the request using the 'DubliNet' electronic communication network set up under Article 18 of Regulation (EC) No 1560/2003. A reply refusing the request shall state the reasons on which the refusal is based.

Where the requested Member State accepts the request, responsibility for examining the application shall be transferred to it.

CHAPTER V

**OBLIGATIONS OF THE MEMBER STATE RESPONSIBLE**

*Article 18*

**Obligations of the Member State responsible**

1.    The Member State responsible under this Regulation shall be obliged to:

(a)  take charge, under the conditions laid down in Articles 21, 22 and 29, of an applicant who has lodged an application in a different Member State;

(b)  take back, under the conditions laid down in Articles 23, 24, 25 and 29, an applicant whose application is under examination and who made an application in another Member State or who is on the territory of another Member State without a residence document;

(c)  take back, under the conditions laid down in Articles 23, 24, 25 and 29, a third-country national or a stateless person who has withdrawn the application under examination and made an application in another Member State or who is on the territory of another Member State without a residence document;

(d)  take back, under the conditions laid down in Articles 23, 24, 25 and 29, a third-country national or a stateless person whose application has been rejected and who made an application in another Member State or who is on the territory of another Member State without a residence document.

2.    In the cases falling within the scope of paragraph 1(a) and (b), the Member State responsible shall examine or complete the examination of the application for international protection made by the applicant.

In the cases falling within the scope of paragraph 1(c), when the Member State responsible had discontinued the examination of an application following its withdrawal by the applicant before a decision on the substance has been taken at first instance, that Member State shall ensure that the applicant is entitled to request that the examination of his or her application be completed or to lodge a new application for international protection, which shall not be treated as a subsequent application as provided for in Directive 2013/32/EU. In such cases, Member States shall ensure that the examination of the application is completed.

In the cases falling within the scope of paragraph 1(d), where the application has been rejected at first instance only, the Member State responsible shall ensure that the person concerned has or has had the opportunity to seek an effective remedy pursuant to Article 46 of Directive 2013/32/EU.

*Article 19*

**Cessation of responsibilities**

1.    Where a Member State issues a residence document to the applicant, the obligations specified in Article 18(1) shall be transferred to that Member State.

2.    The obligations specified in Article 18(1) shall cease where the Member State responsible can establish, when requested to take charge or take back an applicant or another person as referred to in Article 18(1)(c) or (d), that the person concerned has left the territory of the Member States for at least three months, unless the person concerned is in possession of a valid residence document issued by the Member State responsible.

An application lodged after the period of absence referred to in the first subparagraph shall be regarded as a new application giving rise to a new procedure for determining the Member State responsible.

3.    The obligations specified in Article 18(1)(c) and (d) shall cease where the Member State responsible can establish, when requested to take back an applicant or another person as referred to in Article 18(1)(c) or (d), that the person concerned has left the territory of the Member States in compliance with a return decision or removal order issued following the withdrawal or rejection of the application.

An application lodged after an effective removal has taken place shall be regarded as a new application giving rise to a new procedure for determining the Member State responsible.

CHAPTER VI

**PROCEDURES FOR TAKING CHARGE AND TAKING BACK**

*SECTION I*

***Start of the procedure***

*Article 20*

**Start of the procedure**

1.    The process of determining the Member State responsible shall start as soon as an application for international protection is first lodged with a Member State.

2.    An application for international protection shall be deemed to have been lodged once a form submitted by the applicant or a report prepared by the authorities has reached the competent authorities of the Member State concerned. Where an application is not made in writing, the time elapsing between the statement of intention and the preparation of a report should be as short as possible.

3.    For the purposes of this Regulation, the situation of a minor who is accompanying the applicant and meets the definition of family member shall be indissociable from that of his or her family member and shall be a matter for the Member State responsible for examining the application for international protection of that family member, even if the minor is not individually an applicant, provided that it is in the minor's best interests. The same treatment shall be applied to children born after the applicant arrives on the territory of the Member States, without the need to initiate a new procedure for taking charge of them.

4.    Where an application for international protection is lodged with the competent authorities of a Member State by an applicant who is on the territory of another Member State, the determination of the Member State responsible shall be made by the Member State in whose territory the applicant is present. The latter Member State shall be informed without delay by the Member State which received the application and shall then, for the purposes of this Regulation, be regarded as the Member State with which the application for international protection was lodged.

The applicant shall be informed in writing of this change in the determining Member State and of the date on which it took place.

5.    An applicant who is present in another Member State without a residence document or who there lodges an application for international protection after withdrawing his or her first application made in a different Member State during the process of determining the Member State responsible shall be taken back, under the conditions laid down in Articles 23, 24, 25 and 29, by the Member State with which that application for international protection was first lodged, with a view to completing the process of determining the Member State responsible.

That obligation shall cease where the Member State requested to complete the process of determining the Member State responsible can establish that the applicant has in the meantime left the territory of the Member States for a period of at least three months or has obtained a residence document from another Member State.

An application lodged after the period of absence referred to in the second subparagraph shall be regarded as a new application giving rise to a new procedure for determining the Member State responsible.

## SECTION II

### Procedures for take charge requests

#### Article 21

#### Submitting a take charge request

1.    Where a Member State with which an application for international protection has been lodged considers that another Member State is responsible for examining the application, it may, as quickly as possible and in any event within three months of the date on which the application was lodged within the meaning of Article 20(2), request that other Member State to take charge of the applicant.

Notwithstanding the first subparagraph, in the case of a Eurodac hit with data recorded pursuant to Article 14 of Regulation (EU) No 603/2013, the request shall be sent within two months of receiving that hit pursuant to Article 15(2) of that Regulation.

Where the request to take charge of an applicant is not made within the periods laid down in the first and second subparagraphs, responsibility for examining the application for international protection shall lie with the Member State in which the application was lodged.

2.    The requesting Member State may ask for an urgent reply in cases where the application for international protection was lodged after leave to enter or remain was refused, after an arrest for an unlawful stay or after the service or execution of a removal order.

The request shall state the reasons warranting an urgent reply and the period within which a reply is expected. That period shall be at least one week.

3.    In the cases referred to in paragraphs 1 and 2, the request that charge be taken by another Member State shall be made using a standard form and including proof or circumstantial evidence as described in the two lists mentioned in Article 22(3) and/or relevant elements from the applicant's statement, enabling the authorities of the requested Member State to check whether it is responsible on the basis of the criteria laid down in this Regulation.

The Commission shall, by means of implementing acts, adopt uniform conditions on the preparation and submission of take charge requests. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

#### Article 22

#### Replying to a take charge request

1.    The requested Member State shall make the necessary checks, and shall give a decision on the request to take charge of an applicant within two months of receipt of the request.

2.    In the procedure for determining the Member State responsible elements of proof and circumstantial evidence shall be used.

3.    The Commission shall, by means of implementing acts, establish, and review periodically, two lists, indicating the relevant elements of proof and circumstantial evidence in accordance with the criteria set out in points (a) and (b) of this paragraph. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

(a)  Proof:

   (i) this refers to formal proof which determines responsibility pursuant to this Regulation, as long as it is not refuted by proof to the contrary;

   (ii) the Member States shall provide the Committee provided for in Article 44 with models of the different types of administrative documents, in accordance with the typology established in the list of formal proofs;

(b)  Circumstantial evidence:

   (i) this refers to indicative elements which while being refutable may be sufficient, in certain cases, according to the evidentiary value attributed to them;

   (ii) their evidentiary value, in relation to the responsibility for examining the application for international protection shall be assessed on a case-by-case basis.

4.    The requirement of proof should not exceed what is necessary for the proper application of this Regulation.

5.    If there is no formal proof, the requested Member State shall acknowledge its responsibility if the circumstantial evidence is coherent, verifiable and sufficiently detailed to establish responsibility.

6.    Where the requesting Member State has pleaded urgency in accordance with the provisions of Article 21(2), the requested Member State shall make every effort to comply with the time limit requested. In exceptional cases, where it can be demonstrated that the examination of a request for taking charge of an applicant is particularly complex, the requested Member State may give its reply after the time limit requested, but in any event within one month. In such situations the requested Member State must communicate its decision to postpone a reply to the requesting Member State within the time limit originally requested.

7.    Failure to act within the two-month period mentioned in paragraph 1 and the one-month period mentioned in paragraph 6 shall be tantamount to accepting the request, and entail the obligation to take charge of the person, including the obligation to provide for proper arrangements for arrival.

*SECTION III*

*Procedures for take back requests*

*Article 23*

**Submitting a take back request when a new application has been lodged in the requesting Member State**

1.    Where a Member State with which a person as referred to in Article 18(1)(b), (c) or (d) has lodged a new application for international protection considers that another Member State is responsible in accordance with Article 20(5) and Article 18(1)(b), (c) or (d), it may request that other Member State to take back that person.

2.    A take back request shall be made as quickly as possible and in any event within two months of receiving the Eurodac hit, pursuant to Article 9(5) of Regulation (EU) No 603/2013.

If the take back request is based on evidence other than data obtained from the Eurodac system, it shall be sent to the requested Member State within three months of the date on which the application for international protection was lodged within the meaning of Article 20(2).

3.    Where the take back request is not made within the periods laid down in paragraph 2, responsibility for examining the application for international protection shall lie with the Member State in which the new application was lodged.

4.    A take back request shall be made using a standard form and shall include proof or circumstantial evidence as described in the two lists mentioned in Article 22(3) and/or relevant elements from the statements of the person concerned, enabling the authorities of the requested Member State to check whether it is responsible on the basis of the criteria laid down in this Regulation.

The Commission shall, by means of implementing acts, adopt uniform conditions for the preparation and submission of take back requests. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

*Article 24*

**Submitting a take back request when no new application has been lodged in the requesting Member State**

1.    Where a Member State on whose territory a person as referred to in Article 18(1)(b), (c) or (d) is staying without a residence document and with which no new application for international protection has been lodged considers that another Member State is responsible in accordance with Article 20(5) and Article 18(1)(b), (c) or (d), it may request that other Member State to take back that person.

2.    By way of derogation from Article 6(2) of Directive 2008/115/EC of the European Parliament and of the Council of 16 December 2008 on common standards and procedures in Member States for returning illegally staying third-country

nationals ($^1$), where a Member State on whose territory a person is staying without a residence document decides to search the Eurodac system in accordance with Article 17 of Regulation (EU) No 603/2013, the request to take back a person as referred to in Article 18(1)(b) or (c) of this Regulation, or a person as referred to in its Article 18(1)(d) whose application for international protection has not been rejected by a final decision, shall be made as quickly as possible and in any event within two months of receipt of the Eurodac hit, pursuant to Article 17(5) of Regulation (EU) No 603/2013.

If the take back request is based on evidence other than data obtained from the Eurodac system, it shall be sent to the requested Member State within three months of the date on which the requesting Member State becomes aware that another Member State may be responsible for the person concerned.

3.   Where the take back request is not made within the periods laid down in paragraph 2, the Member State on whose territory the person concerned is staying without a residence document shall give that person the opportunity to lodge a new application.

4.   Where a person as referred to in Article 18(1)(d) of this Regulation whose application for international protection has been rejected by a final decision in one Member State is on the territory of another Member State without a residence document, the latter Member State may either request the former Member State to take back the person concerned or carry out a return procedure in accordance with Directive 2008/115/EC.

When the latter Member State decides to request the former Member State to take back the person concerned, the rules laid down in Directive 2008/115/EC shall not apply.

5.   The request for the person referred to in Article 18(1)(b), (c) or (d) to be taken back shall be made using a standard form and shall include proof or circumstantial evidence as described in the two lists mentioned in Article 22(3) and/or relevant elements from the person's statements, enabling the authorities of the requested Member State to check whether it is responsible on the basis of the criteria laid down in this Regulation.

The Commission shall, by means of implementing acts, establish and review periodically two lists indicating the relevant elements of proof and circumstantial evidence in accordance with the criteria set out in Article 22(3)(a) and (b), and shall adopt uniform conditions for the preparation and submission of take back requests. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

### Article 25

#### Replying to a take back request

1.   The requested Member State shall make the necessary checks and shall give a decision on the request to take back the person concerned as quickly as possible and in any event no later than one month from the date on which the request was

received. When the request is based on data obtained from the Eurodac system, that time limit shall be reduced to two weeks.

2.   Failure to act within the one month period or the two weeks period mentioned in paragraph 1 shall be tantamount to accepting the request, and shall entail the obligation to take back the person concerned, including the obligation to provide for proper arrangements for arrival.

SECTION IV

### Procedural safeguards

#### Article 26

#### Notification of a transfer decision

1.   Where the requested Member State accepts to take charge of or to take back an applicant or other person as referred to in Article 18(1)(c) or (d), the requesting Member State shall notify the person concerned of the decision to transfer him or her to the Member State responsible and, where applicable, of not examining his or her application for international protection. If a legal advisor or other counsellor is representing the person concerned, Member States may choose to notify the decision to such legal advisor or counsellor instead of to the person concerned and, where applicable, communicate the decision to the person concerned.

2.   The decision referred to in paragraph 1 shall contain information on the legal remedies available, including on the right to apply for suspensive effect, where applicable, and on the time limits applicable for seeking such remedies and for carrying out the transfer, and shall, if necessary, contain information on the place where, and the date on which, the person concerned should appear, if that person is travelling to the Member State responsible by his or her own means.

Member States shall ensure that information on persons or entities that may provide legal assistance to the person concerned is communicated to the person concerned together with the decision referred to in paragraph 1, when that information has not been already communicated.

3.   When the person concerned is not assisted or represented by a legal advisor or other counsellor, Member States shall inform him or her of the main elements of the decision, which shall always include information on the legal remedies available and the time limits applicable for seeking such remedies, in a language that the person concerned understands or is reasonably supposed to understand.

#### Article 27

#### Remedies

1.   The applicant or another person as referred to in Article 18(1)(c) or (d) shall have the right to an effective remedy, in the form of an appeal or a review, in fact and in law, against a transfer decision, before a court or tribunal.

2.   Member States shall provide for a reasonable period of time within which the person concerned may exercise his or her right to an effective remedy pursuant to paragraph 1.

---

($^1$) OJ L 348, 24.12.2008, p. 98.

L 180/46    EN    Official Journal of the European Union    29.6.2013

3.    For the purposes of appeals against, or reviews of, transfer decisions, Member States shall provide in their national law that:

(a)  the appeal or review confers upon the person concerned the right to remain in the Member State concerned pending the outcome of the appeal or review; or

(b)  the transfer is automatically suspended and such suspension lapses after a certain reasonable period of time, during which a court or a tribunal, after a close and rigorous scrutiny, shall have taken a decision whether to grant suspensive effect to an appeal or review; or

(c)  the person concerned has the opportunity to request within a reasonable period of time a court or tribunal to suspend the implementation of the transfer decision pending the outcome of his or her appeal or review. Member States shall ensure that an effective remedy is in place by suspending the transfer until the decision on the first suspension request is taken. Any decision on whether to suspend the implementation of the transfer decision shall be taken within a reasonable period of time, while permitting a close and rigorous scrutiny of the suspension request. A decision not to suspend the implementation of the transfer decision shall state the reasons on which it is based.

4.    Member States may provide that the competent authorities may decide, acting *ex officio*, to suspend the implementation of the transfer decision pending the outcome of the appeal or review.

5.    Member States shall ensure that the person concerned has access to legal assistance and, where necessary, to linguistic assistance.

6.    Member States shall ensure that legal assistance is granted on request free of charge where the person concerned cannot afford the costs involved. Member States may provide that, as regards fees and other costs, the treatment of applicants shall not be more favourable than the treatment generally accorded to their nationals in matters pertaining to legal assistance.

Without arbitrarily restricting access to legal assistance, Member States may provide that free legal assistance and representation not be granted where the appeal or review is considered by the competent authority or a court or tribunal to have no tangible prospect of success.

Where a decision not to grant free legal assistance and representation pursuant to this paragraph is taken by an authority other than a court or tribunal, Member States shall provide the right to an effective remedy before a court or tribunal to challenge that decision.

In complying with the requirements set out in this paragraph, Member States shall ensure that legal assistance and

representation is not arbitrarily restricted and that the applicant's effective access to justice is not hindered.

Legal assistance shall include at least the preparation of the required procedural documents and representation before a court or tribunal and may be restricted to legal advisors or counsellors specifically designated by national law to provide assistance and representation.

Procedures for access to legal assistance shall be laid down in national law.

### Detention for the purpose of transfer

*Article 28*

### Detention

1.    Member States shall not hold a person in detention for the sole reason that he or she is subject to the procedure established by this Regulation.

2.    When there is a significant risk of absconding, Member States may detain the person concerned in order to secure transfer procedures in accordance with this Regulation, on the basis of an individual assessment and only in so far as detention is proportional and other less coercive alternative measures cannot be applied effectively.

3.    Detention shall be for as short a period as possible and shall be for no longer than the time reasonably necessary to fulfil the required administrative procedures with due diligence until the transfer under this Regulation is carried out.

Where a person is detained pursuant to this Article, the period for submitting a take charge or take back request shall not exceed one month from the lodging of the application. The Member State carrying out the procedure in accordance with this Regulation shall ask for an urgent reply in such cases. Such reply shall be given within two weeks of receipt of the request. Failure to reply within the two-week period shall be tantamount to accepting the request and shall entail the obligation to take charge or take back the person, including the obligation to provide for proper arrangements for arrival.

Where a person is detained pursuant to this Article, the transfer of that person from the requesting Member State to the Member State responsible shall be carried out as soon as practically possible, and at the latest within six weeks of the implicit or explicit acceptance of the request by another Member State to take charge or to take back the person concerned or of the moment when the appeal or review no longer has a suspensive effect in accordance with Article 27(3).

When the requesting Member State fails to comply with the deadlines for submitting a take charge or take back request or where the transfer does not take place within the period of six weeks referred to in the third subparagraph, the person shall no longer be detained. Articles 21, 23, 24 and 29 shall continue to apply accordingly.

4.     As regards the detention conditions and the guarantees applicable to persons detained, in order to secure the transfer procedures to the Member State responsible, Articles 9, 10 and 11 of Directive 2013/33/EU shall apply.

SECTION VI

*Transfers*

*Article 29*

**Modalities and time limits**

1.     The transfer of the applicant or of another person as referred to in Article 18(1)(c) or (d) from the requesting Member State to the Member State responsible shall be carried out in accordance with the national law of the requesting Member State, after consultation between the Member States concerned, as soon as practically possible, and at the latest within six months of acceptance of the request by another Member State to take charge or to take back the person concerned or of the final decision on an appeal or review where there is a suspensive effect in accordance with Article 27(3).

If transfers to the Member State responsible are carried out by supervised departure or under escort, Member States shall ensure that they are carried out in a humane manner and with full respect for fundamental rights and human dignity.

If necessary, the applicant shall be supplied by the requesting Member State with a *laissez passer*. The Commission shall, by means of implementing acts, establish the design of the *laissez passer*. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

The Member State responsible shall inform the requesting Member State, as appropriate, of the safe arrival of the person concerned or of the fact that he or she did not appear within the set time limit.

2.     Where the transfer does not take place within the six months' time limit, the Member State responsible shall be relieved of its obligations to take charge or to take back the person concerned and responsibility shall then be transferred to the requesting Member State. This time limit may be extended up to a maximum of one year if the transfer could not be carried out due to imprisonment of the person concerned or up to a maximum of eighteen months if the person concerned absconds.

3.     If a person has been transferred erroneously or a decision to transfer is overturned on appeal or review after the transfer has been carried out, the Member State which carried out the transfer shall promptly accept that person back.

4.     The Commission shall, by means of implementing acts, establish uniform conditions for the consultation and exchange of information between Member States, in particular in the event of postponed or delayed transfers, transfers following acceptance by default, transfers of minors or dependent persons, and supervised transfers. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

*Article 30*

**Costs of transfer**

1.     The costs necessary to transfer an applicant or another person as referred to in Article 18(1)(c) or (d) to the Member State responsible shall be met by the transferring Member State.

2.     Where the person concerned has to be transferred back to a Member State as a result of an erroneous transfer or of a transfer decision that has been overturned on appeal or review after the transfer has been carried out, the Member State which initially carried out the transfer shall be responsible for the costs of transferring the person concerned back to its territory.

3.     Persons to be transferred pursuant to this Regulation shall not be required to meet the costs of such transfers.

*Article 31*

**Exchange of relevant information before a transfer is carried out**

1.     The Member State carrying out the transfer of an applicant or of another person as referred to in Article 18(1)(c) or (d) shall communicate to the Member State responsible such personal data concerning the person to be transferred as is appropriate, relevant and non-excessive for the sole purposes of ensuring that the competent authorities, in accordance with national law in the Member State responsible, are in a position to provide that person with adequate assistance, including the provision of immediate health care required in order to protect his or her vital interests, and to ensure continuity in the protection and rights afforded by this Regulation and by other relevant asylum legal instruments. Those data shall be communicated to the Member State responsible within a reasonable period of time before a transfer is carried out, in order to ensure that its competent authorities in accordance with national law have sufficient time to take the necessary measures.

EN     Official Journal of the European Union     29.6.2013

2.   The transferring Member State shall, in so far as such information is available to the competent authority in accordance with national law, transmit to the Member State responsible any information that is essential in order to safeguard the rights and immediate special needs of the person to be transferred, and in particular:

(a) any immediate measures which the Member State responsible is required to take in order to ensure that the special needs of the person to be transferred are adequately addressed, including any immediate health care that may be required;

(b) contact details of family members, relatives or any other family relations in the receiving Member State, where applicable;

(c) in the case of minors, information on their education;

(d) an assessment of the age of an applicant.

3.   The exchange of information under this Article shall only take place between the authorities notified to the Commission in accordance with Article 35 of this Regulation using the 'DubliNet' electronic communication network set-up under Article 18 of Regulation (EC) No 1560/2003. The information exchanged shall only be used for the purposes set out in paragraph 1 of this Article and shall not be further processed.

4.   With a view to facilitating the exchange of information between Member States, the Commission shall, by means of implementing acts, draw up a standard form for the transfer of the data required pursuant to this Article. Those implementing acts shall be adopted in accordance with the examination procedure laid down in Article 44(2).

5.   The rules laid down in Article 34(8) to (12) shall apply to the exchange of information pursuant to this Article.

### Article 32

#### Exchange of health data before a transfer is carried out

1.   For the sole purpose of the provision of medical care or treatment, in particular concerning disabled persons, elderly people, pregnant women, minors and persons who have been subject to torture, rape or other serious forms of psychological, physical and sexual violence, the transferring Member State shall, in so far as it is available to the competent authority in accordance with national law, transmit to the Member State responsible information on any special needs of the person to be transferred, which in specific cases may include information on that person's physical or mental health. That information shall be transferred in a common health certificate with the necessary documents attached. The Member State responsible shall ensure that those special needs are adequately addressed, including in particular any essential medical care that may be required.

The Commission shall, by means of implementing acts, draw up the common health certificate. Those implementing acts shall be adopted in accordance with the examination procedure laid down in Article 44(2).

2.   The transferring Member State shall only transmit the information referred to in paragraph 1 to the Member State responsible after having obtained the explicit consent of the applicant and/or of his or her representative or, if the applicant is physically or legally incapable of giving his or her consent, when such transmission is necessary to protect the vital interests of the applicant or of another person. The lack of consent, including a refusal to consent, shall not constitute an obstacle to the transfer.

3.   The processing of personal health data referred to in paragraph 1 shall only be carried out by a health professional who is subject, under national law or rules established by national competent bodies, to the obligation of professional secrecy or by another person subject to an equivalent obligation of professional secrecy.

4.   The exchange of information under this Article shall only take place between the health professionals or other persons referred to in paragraph 3. The information exchanged shall only be used for the purposes set out in paragraph 1 and shall not be further processed.

5.   The Commission shall, by means of implementing acts, adopt uniform conditions and practical arrangements for exchanging the information referred to in paragraph 1 of this Article. Those implementing acts shall be adopted in accordance with the examination procedure laid down in Article 44(2).

6.   The rules laid down in Article 34(8) to (12) shall apply to the exchange of information pursuant to this Article.

### Article 33

#### A mechanism for early warning, preparedness and crisis management

1.   Where, on the basis of, in particular, the information gathered by EASO pursuant to Regulation (EU) No 439/2010, the Commission establishes that the application of this Regulation may be jeopardised due either to a substantiated risk of particular pressure being placed on a Member State's asylum system and/or to problems in the functioning of the asylum system of a Member State, it shall, in cooperation with EASO, make recommendations to that Member State, inviting it to draw up a preventive action plan.

The Member State concerned shall inform the Council and the Commission whether it intends to present a preventive action plan in order to overcome the pressure and/or problems in the functioning of its asylum system whilst ensuring the protection of the fundamental rights of applicants for international protection.

A Member State may, at its own discretion and initiative, draw up a preventive action plan and subsequent revisions thereof. When drawing up a preventive action plan, the Member State may call for the assistance of the Commission, other Member States, EASO and other relevant Union agencies.

2.    Where a preventive action plan is drawn up, the Member State concerned shall submit it and shall regularly report on its implementation to the Council and to the Commission. The Commission shall subsequently inform the European Parliament of the key elements of the preventive action plan. The Commission shall submit reports on its implementation to the Council and transmit reports on its implementation to the European Parliament.

The Member State concerned shall take all appropriate measures to deal with the situation of particular pressure on its asylum system or to ensure that the deficiencies identified are addressed before the situation deteriorates. Where the preventive action plan includes measures aimed at addressing particular pressure on a Member State's asylum system which may jeopardise the application of this Regulation, the Commission shall seek the advice of EASO before reporting to the European Parliament and to the Council.

3.    Where the Commission establishes, on the basis of EASO's analysis, that the implementation of the preventive action plan has not remedied the deficiencies identified or where there is a serious risk that the asylum situation in the Member State concerned develops into a crisis which is unlikely to be remedied by a preventive action plan, the Commission, in cooperation with EASO as applicable, may request the Member State concerned to draw up a crisis management action plan and, where necessary, revisions thereof. The crisis management action plan shall ensure, throughout the entire process, compliance with the asylum *acquis* of the Union, in particular with the fundamental rights of applicants for international protection.

Following the request to draw up a crisis management action plan, the Member State concerned shall, in cooperation with the Commission and EASO, do so promptly, and at the latest within three months of the request.

The Member State concerned shall submit its crisis management action plan and shall report, at least every three months, on its implementation to the Commission and other relevant stakeholders, such as EASO, as appropriate.

The Commission shall inform the European Parliament and the Council of the crisis management action plan, possible revisions and the implementation thereof. In those reports, the Member State concerned shall report on data to monitor compliance with the crisis management action plan, such as the length of the procedure, the detention conditions and the reception capacity in relation to the inflow of applicants.

4.    Throughout the entire process for early warning, preparedness and crisis management established in this Article, the Council shall closely monitor the situation and may request further information and provide political guidance, in particular as regards the urgency and severity of the situation and thus the need for a Member State to draw up either a preventive action plan or, if necessary, a crisis management action plan. The European Parliament and the Council may, throughout the entire process, discuss and provide guidance on any solidarity measures as they deem appropriate.

CHAPTER VII

**ADMINISTRATIVE COOPERATION**

*Article 34*

**Information sharing**

1.    Each Member State shall communicate to any Member State that so requests such personal data concerning the applicant as is appropriate, relevant and non-excessive for:

(a)  determining the Member State responsible;

(b)  examining the application for international protection;

(c)  implementing any obligation arising under this Regulation.

2.    The information referred to in paragraph 1 may only cover:

(a)  personal details of the applicant, and, where appropriate, his or her family members, relatives or any other family relations (full name and where appropriate, former name; nicknames or pseudonyms; nationality, present and former; date and place of birth);

(b)  identity and travel papers (references, validity, date of issue, issuing authority, place of issue, etc.);

(c)  other information necessary for establishing the identity of the applicant, including fingerprints processed in accordance with Regulation (EU) No 603/2013;

(d) places of residence and routes travelled;

(e) residence documents or visas issued by a Member State;

(f) the place where the application was lodged;

(g) the date on which any previous application for international protection was lodged, the date on which the present application was lodged, the stage reached in the proceedings and the decision taken, if any.

3. Furthermore, provided it is necessary for the examination of the application for international protection, the Member State responsible may request another Member State to let it know on what grounds the applicant bases his or her application and, where applicable, the grounds for any decisions taken concerning the applicant. The other Member State may refuse to respond to the request submitted to it, if the communication of such information is likely to harm its essential interests or the protection of the liberties and fundamental rights of the person concerned or of others. In any event, communication of the information requested shall be subject to the written approval of the applicant for international protection, obtained by the requesting Member State. In that case, the applicant must know for what specific information he or she is giving his or her approval.

4. Any request for information shall only be sent in the context of an individual application for international protection. It shall set out the grounds on which it is based and, where its purpose is to check whether there is a criterion that is likely to entail the responsibility of the requested Member State, shall state on what evidence, including relevant information from reliable sources on the ways and means by which applicants enter the territories of the Member States, or on what specific and verifiable part of the applicant's statements it is based. It is understood that such relevant information from reliable sources is not in itself sufficient to determine the responsibility and the competence of a Member State under this Regulation, but it may contribute to the evaluation of other indications relating to an individual applicant.

5. The requested Member State shall be obliged to reply within five weeks. Any delays in the reply shall be duly justified. Non-compliance with the five week time limit shall not relieve the requested Member State of the obligation to reply. If the research carried out by the requested Member State which did not respect the maximum time limit withholds information which shows that it is responsible, that Member State may not invoke the expiry of the time limits provided for in Articles 21, 23 and 24 as a reason for refusing to comply with a request to take charge or take back. In that case, the time limits provided for in Articles 21, 23 and 24 for submitting a request to take charge or take back shall be extended by a period of time which shall be equivalent to the delay in the reply by the requested Member State.

6. The exchange of information shall be effected at the request of a Member State and may only take place between authorities whose designation by each Member State has been communicated to the Commission in accordance with Article 35(1).

7. The information exchanged may only be used for the purposes set out in paragraph 1. In each Member State such information may, depending on its type and the powers of the recipient authority, only be communicated to the authorities and courts and tribunals entrusted with:

(a) determining the Member State responsible;

(b) examining the application for international protection;

(c) implementing any obligation arising under this Regulation.

8. The Member State which forwards the information shall ensure that it is accurate and up-to-date. If it transpires that it has forwarded information which is inaccurate or which should not have been forwarded, the recipient Member States shall be informed thereof immediately. They shall be obliged to correct such information or to have it erased.

9. The applicant shall have the right to be informed, on request, of any data that is processed concerning him or her.

If the applicant finds that the data have been processed in breach of this Regulation or of Directive 95/46/EC, in particular because they are incomplete or inaccurate, he or she shall be entitled to have them corrected or erased.

The authority correcting or erasing the data shall inform, as appropriate, the Member State transmitting or receiving the information.

The applicant shall have the right to bring an action or a complaint before the competent authorities or courts or tribunals of the Member State which refused the right of access to or the right of correction or erasure of data relating to him or her.

10. In each Member State concerned, a record shall be kept, in the individual file for the person concerned and/or in a register, of the transmission and receipt of information exchanged.

11. The data exchanged shall be kept for a period not exceeding that which is necessary for the purposes for which they are exchanged.

12.    Where the data are not processed automatically or are not contained, or intended to be entered, in a file, each Member State shall take appropriate measures to ensure compliance with this Article through effective checks.

### Article 35

**Competent authorities and resources**

1.    Each Member State shall notify the Commission without delay of the specific authorities responsible for fulfilling the obligations arising under this Regulation, and any amendments thereto. The Member States shall ensure that those authorities have the necessary resources for carrying out their tasks and in particular for replying within the prescribed time limits to requests for information, requests to take charge of and requests to take back applicants.

2.    The Commission shall publish a consolidated list of the authorities referred to in paragraph 1 in the *Official Journal of the European Union*. Where there are amendments thereto, the Commission shall publish once a year an updated consolidated list.

3.    The authorities referred to in paragraph 1 shall receive the necessary training with respect to the application of this Regulation.

4.    The Commission shall, by means of implementing acts, establish secure electronic transmission channels between the authorities referred to in paragraph 1 for transmitting requests, replies and all written correspondence and for ensuring that senders automatically receive an electronic proof of delivery. Those implementing acts shall be adopted in accordance with the examination procedure referred to in Article 44(2).

### Article 36

**Administrative arrangements**

1.    Member States may, on a bilateral basis, establish administrative arrangements between themselves concerning the practical details of the implementation of this Regulation, in order to facilitate its application and increase its effectiveness. Such arrangements may relate to:

(a)  exchanges of liaison officers;

(b)  simplification of the procedures and shortening of the time limits relating to transmission and the examination of requests to take charge of or take back applicants.

2.    Member States may also maintain the administrative arrangements concluded under Regulation (EC) No 343/2003.

To the extent that such arrangements are not compatible with this Regulation, the Member States concerned shall amend the arrangements in such a way as to eliminate any incompatibilities observed.

3.    Before concluding or amending any arrangement referred to in paragraph 1(b), the Member States concerned shall consult the Commission as to the compatibility of the arrangement with this Regulation.

4.    If the Commission considers the arrangements referred to in paragraph 1(b) to be incompatible with this Regulation, it shall, within a reasonable period, notify the Member States concerned. The Member States shall take all appropriate steps to amend the arrangement concerned within a reasonable time in such a way as to eliminate any incompatibilities observed.

5.    Member States shall notify the Commission of all arrangements referred to in paragraph 1, and of any denunciation thereof, or amendment thereto.

CHAPTER VIII

**CONCILIATION**

### Article 37

**Conciliation**

1.    Where the Member States cannot resolve a dispute on any matter related to the application of this Regulation, they may have recourse to the conciliation procedure provided for in paragraph 2.

2.    The conciliation procedure shall be initiated by a request from one of the Member States in dispute to the Chairman of the Committee set up by Article 44. By agreeing to use the conciliation procedure, the Member States concerned undertake to take the utmost account of the solution proposed.

The Chairman of the Committee shall appoint three members of the Committee representing three Member States not connected with the matter. They shall receive the arguments of the parties either in writing or orally and, after deliberation, shall propose a solution within one month, where necessary after a vote.

The Chairman of the Committee, or his or her deputy, shall chair the discussion. He or she may put forward his or her point of view but may not vote.

Whether it is adopted or rejected by the parties, the solution proposed shall be final and irrevocable.

CHAPTER IX

**TRANSITIONAL PROVISIONS AND FINAL PROVISIONS**

*Article 38*

**Data security and data protection**

Member States shall take all appropriate measures to ensure the security of transmitted personal data and in particular to avoid unlawful or unauthorised access or disclosure, alteration or loss of personal data processed.

Each Member State shall provide that the national supervisory authority or authorities designated pursuant to Article 28(1) of Directive 95/46/EC shall monitor independently, in accordance with its respective national law, the lawfulness of the processing, in accordance with this Regulation, of personal data by the Member State in question.

*Article 39*

**Confidentiality**

Member States shall ensure that the authorities referred to in Article 35 are bound by the confidentiality rules provided for in national law, in relation to any information they obtain in the course of their work.

*Article 40*

**Penalties**

Member States shall take the necessary measures to ensure that any misuse of data processed in accordance with this Regulation is punishable by penalties, including administrative and/or criminal penalties in accordance with national law, that are effective, proportionate and dissuasive.

*Article 41*

**Transitional measures**

Where an application has been lodged after the date mentioned in the second paragraph of Article 49, the events that are likely to entail the responsibility of a Member State under this Regulation shall be taken into consideration, even if they precede that date, with the exception of the events mentioned in Article 13(2).

*Article 42*

**Calculation of time limits**

Any period of time prescribed in this Regulation shall be calculated as follows:

(a) where a period expressed in days, weeks or months is to be calculated from the moment at which an event occurs or an action takes place, the day during which that event occurs or that action takes place shall not be counted as falling within the period in question;

(b) a period expressed in weeks or months shall end with the expiry of whichever day in the last week or month is the same day of the week or falls on the same date as the day during which the event or action from which the period is to be calculated occurred or took place. If, in a period expressed in months, the day on which it should expire does not occur in the last month, the period shall end with the expiry of the last day of that month;

(c) time limits shall include Saturdays, Sundays and official holidays in any of the Member States concerned.

*Article 43*

**Territorial scope**

As far as the French Republic is concerned, this Regulation shall apply only to its European territory.

*Article 44*

**Committee**

1.   The Commission shall be assisted by a committee. That committee shall be a committee within the meaning of Regulation (EU) No 182/2011.

2.   Where reference is made to this paragraph, Article 5 of Regulation (EU) No 182/2011 shall apply.

Where the committee delivers no opinion, the Commission shall not adopt the draft implementing act and the third subparagraph of Article 5(4) of Regulation (EU) No 182/2011 shall apply.

*Article 45*

**Exercise of the delegation**

1.   The power to adopt delegated acts is conferred on the Commission subject to the conditions laid down in this Article.

2.   The power to adopt delegated acts referred to in Articles 8(5) and 16(3) shall be conferred on the Commission for a period of 5 years from the date of entry into force of this Regulation. The Commission shall draw up a report in respect of the delegation of power not later than nine months before the end of the 5-year period. The delegation of power shall be tacitly extended for periods of an identical duration, unless the European Parliament or the Council opposes such extension not later than three months before the end of each period.

3.   The delegation of power referred to in Articles 8(5) and 16(3) may be revoked at any time by the European Parliament or by the Council. A decision to revoke shall put an end to the delegation of the power specified in that decision. It shall take effect the day following the publication of the decision in the *Official Journal of the European Union* or at a later date specified therein. It shall not affect the validity of any delegated acts already in force.

4.    As soon as it adopts a delegated act, the Commission shall notify it simultaneously to the European Parliament and to the Council.

5.    A delegated act adopted pursuant to Articles 8(5) and 16(3) shall enter into force only if no objection has been expressed either by the European Parliament or the Council within a period of four months of notification of that act to the European Parliament and to the Council or if, before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object. That period shall be extended by two months at the initiative of the European Parliament or of the Council.

*Article 46*

**Monitoring and evaluation**

By 21 July 2016, the Commission shall report to the European Parliament and to the Council on the application of this Regulation and, where appropriate, shall propose the necessary amendments. Member States shall forward to the Commission all information appropriate for the preparation of that report, at the latest six months before that time limit expires.

After having submitted that report, the Commission shall report to the European Parliament and to the Council on the application of this Regulation at the same time as it submits reports on the implementation of the Eurodac system provided for by Article 40 of Regulation (EU) No 603/2013.

*Article 47*

**Statistics**

In accordance with Article 4(4) of Regulation (EC) No 862/2007 of the European Parliament and of the Council of 11 July 2007 on Community statistics on migration and international protection (¹), Member States shall communicate to the Commission (Eurostat), statistics concerning the application of this Regulation and of Regulation (EC) No 1560/2003.

*Article 48*

**Repeal**

Regulation (EC) No 343/2003 is repealed.

Articles 11(1), 13, 14 and 17 of Regulation (EC) No 1560/2003 are repealed.

References to the repealed Regulation or Articles shall be construed as references to this Regulation and shall be read in accordance with the correlation table in Annex II.

*Article 49*

**Entry into force and applicability**

This Regulation shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union.*

It shall apply to applications for international protection lodged as from the first day of the sixth month following its entry into force and, from that date, it will apply to any request to take charge of or take back applicants, irrespective of the date on which the application was made. The Member State responsible for the examination of an application for international protection submitted before that date shall be determined in accordance with the criteria set out in Regulation (EC) No 343/2003.

References in this Regulation to Regulation (EU) No 603/2013, Directive 2013/32/EU and Directive 2013/33/EU shall be construed, until the dates of their application, as references to Regulation (EC) No 2725/2000 (²), Directive 2003/9/EC (³) and Directive 2005/85/EC (⁴) respectively.

This Regulation shall be binding in its entirety and directly applicable in the Member States in accordance with the Treaties.

Done at Brussels, 26 June 2013.

|  |  |
|---|---|
| *For the European Parliament* | *For the Council* |
| *The President* | *The President* |
| M. SCHULZ | A. SHATTER |

―――――

(¹) OJ L 199, 31.7.2007, p. 23.

(²) Council Regulation (EC) No 2725/2000 of 11 December 2000 concerning the establishment of 'Eurodac' for the comparison of fingerprints for the effective application of the Dublin Convention (OJ L 316, 15.12.2000, p. 1).

(³) Council Directive 2003/9/EC of 27 January 2003 laying down minimum standards for the reception of asylum seekers (OJ L 31, 6.2.2003, p. 18).

(⁴) Council Directive 2005/85/EC of 1 December 2005 on minimum standards on procedures for granting and withdrawing refugee status (OJ L 326, 13.12.2005, p. 13).

L 180/54     EN     Official Journal of the European Union     29.6.2013

*ANNEX I*

**Repealed Regulations (referred to in Article 48)**

Council Regulation (EC) No 343/2003

(OJ L 50, 25.2.2003, p. 1)

Commission Regulation (EC) No 1560/2003 only Articles 11(1), 13, 14 and 17

(OJ L 222, 5.9.2003, p. 3)

———

EN   Official Journal of the European Union

*ANNEX II*

**Correlation table**

| Regulation (EC) No 343/2003 | This Regulation |
|---|---|
| Article 1 | Article 1 |
| Article 2(a) | Article 2(a) |
| Article 2(b) | — |
| Article 2(c) | Article 2(b) |
| Article 2(d) | Article 2(c) |
| Article 2(e) | Article 2(d) |
| Article 2(f) | Article 2(e) |
| Article 2(g) | Article 2(f) |
| — | Article 2(h) |
| — | Article 2(i) |
| Article 2(h) | Article 2(j) |
| Article 2(i) | Article 2(g) |
| — | Article 2(k) |
| Article 2(j) and (k) | Article 2(l) and (m) |
| — | Article 2(n) |
| Article 3(1) | Article 3(1) |
| Article 3(2) | Article 17(1) |
| Article 3(3) | Article 3(3) |
| Article 3(4) | Article 4(1), introductory wording |
| — | Article 4(1)(a) to (f) |
| — | Article 4(2) and (3) |
| Article 4(1) to (5) | Article 20(1) to (5) |
| — | Article 20(5), third subparagraph |
| — | Article 5 |
| — | Article 6 |
| Article 5(1) | Article 7(1) |
| Article 5(2) | Article 7(2) |
| — | Article 7(3) |
| Article 6, first paragraph | Article 8(1) |
| — | Article 8(3) |
| Article 6, second paragraph | Article 8(4) |
| Article 7 | Article 9 |

AR167

L 180/56        EN        Official Journal of the European Union        29.6.2013

| Regulation (EC) No 343/2003 | This Regulation |
|---|---|
| Article 8 | Article 10 |
| Article 9 | Article 12 |
| Article 10 | Article 13 |
| Article 11 | Article 14 |
| Article 12 | Article 15 |
| — | Article 16 |
| Article 13 | Article 3(2) |
| Article 14 | Article 11 |
| Article 15(1) | Article 17(2), first subparagraph |
| Article 15(2) | Article 16(1) |
| Article 15(3) | Article 8(2) |
| Article 15(4) | Article 17(2), fourth subparagraph |
| Article 15(5) | Articles 8(5) and (6) and Article 16(2) |
| Article 16(1)(a) | Article 18(1)(a) |
| Article 16(1)(b) | Article 18(2) |
| Article 16(1)(c) | Article 18(1)(b) |
| Article 16(1)(d) | Article 18(1)(c) |
| Article 16(1)(e) | Article 18(1)(d) |
| Article 16(2) | Article 19(1) |
| Article 16(3) | Article 19(2), first subparagraph |
| — | Article 19(2), second subparagraph |
| Article 16(4) | Article 19(3) |
| — | Article 19(3), second subparagraph |
| Article 17 | Article 21 |
| Article 18 | Article 22 |
| Article 19(1) | Article 26(1) |
| Article 19(2) | Article 26(2) and Article 27(1) |
| — | Article 27(2) to (6) |
| Article 19(3) | Article 29(1) |
| Article 19(4) | Article 29(2) |
| — | Article 29(3) |
| Article 19(5) | Article 29(4) |
| Article 20(1), introductory wording | Article 23(1) |
| — | Article 23(2) |
| — | Article 23(3) |

AR168

| Regulation (EC) No 343/2003 | This Regulation |
|---|---|
| — | Article 23(4) |
| Article 20(1)(a) | Article 23(5), first subparagraph |
| — | Article 24 |
| Article 20(1)(b) | Article 25(1) |
| Article 20(1)(c) | Article 25(2) |
| Article 20(1)(d) | Article 29(1), first subparagraph |
| Article 20(1)(e) | Article 26(1), (2), Article 27(1), Article 29(1), second and third subparagraphs |
| Article 20(2) | Article 29(2) |
| Article 20(3) | Article 23(5), second subparagraph |
| Article 20(4) | Article 29(4) |
| — | Article 28 |
| — | Article 30 |
| — | Article 31 |
| — | Article 32 |
| — | Article 33 |
| Article 21(1) to (9) | Article 34(1) to (9), first to third subparagraphs |
| — | Article 34(9), fourth subparagraph |
| Article 21(10) to (12) | Article 34(10) to (12) |
| Article 22(1) | Article 35(1) |
| — | Article 35(2) |
| — | Article 35(3) |
| Article 22(2) | Article 35(4) |
| Article 23 | Article 36 |
| — | Article 37 |
| — | Article 40 |
| Article 24(1) | — |
| Article 24(2) | Article 41 |
| Article 24(3) | — |
| Article 25(1) | Article 42 |
| Article 25(2) | — |
| Article 26 | Article 43 |

| Regulation (EC) No 343/2003 | This Regulation |
| --- | --- |
| Article 27(1), (2) | Article 44(1), (2) |
| Article 27(3) | — |
| — | Article 45 |
| Article 28 | Article 46 |
| — | Article 47 |
| — | Article 48 |
| Article 29 | Article 49 |

| Regulation (EC) No 1560/2003 | This Regulation |
| --- | --- |
| Article 11(1) | — |
| Article 13(1) | Article 17(2), first subparagraph |
| Article 13(2) | Article 17(2), second subparagraph |
| Article 13(3) | Article 17(2), third subparagraph |
| Article 13(4) | Article 17(2), first subparagraph |
| Article 14 | Article 37 |
| Article 17(1) | Articles 9, 10, 17(2), first subparagraph |
| Article 17(2) | Article 34(3) |

AR170

29.6.2013          EN          Official Journal of the European Union          L 180/59

### STATEMENT BY THE COUNCIL, THE EUROPEAN PARLIAMENT AND THE COMMISSION

The Council and the European Parliament invite the Commission to consider, without prejudice to its right of initiative, a revision of Article 8(4) of the Recast of the Dublin Regulation once the Court of Justice rules on case C-648/11 MA and Others vs. Secretary of State for the Home Department and at the latest by the time limits set in Article 46 of the Dublin Regulation. The European Parliament and the Council will then both exercise their legislative competences, taking into account the best interests of the child.

The Commission, in a spirit of compromise and in order to ensure the immediate adoption of the proposal, accepts to consider this invitation, which it understands as being limited to these specific circumstances and not creating a precedent.

AR171

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### §71.1   [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.9Z, Airspace Designations and Reporting Points, dated August 6, 2015, effective September 15, 2015, is amended as follows:

*Paragraph 6002   Class E Airspace designated as surface areas.*

\*     \*     \*     \*     \*

### AGL SD E2   Rapid City, SD (Amended)

Rapid City Regional Airport, SD
   (Lat. 44°02′43″ N., long. 103°03′27″ W.)
Ellsworth AFB, SD
   (Lat. 44°08′42″ N., long. 103°06′13″ W.)
Rapid City VORTAC
   (Lat. 43°58′34″ N., long. 103°00′44″ W.)

   Within a 4.4-mile radius of the Rapid City Regional Airport, excluding the portion north of a line between the intersection of the Rapid City Regional Airport 4.4-mile radius and the Ellsworth AFB 4.7-mile radius, and that airspace extending upward from the surface within 2.6 miles each side of the Rapid City VORTAC 155°/335°. radials extending from the 4.4-mile radius of the Rapid City Regional Airport to 7 miles southeast of the VORTAC, excluding that airspace within the Rapid City, SD, Class D airspace area.

\*     \*     \*     \*     \*

*Paragraph 6004   Class E Airspace Areas Designated as an Extension to a Class D or Class E Surface Area.*

\*     \*     \*     \*     \*

### AGL SD E4   Rapid City, SD (Amended)

Rapid City Regional Airport, SD
   (Lat. 44°02′43″ N., long. 103°03′27″ W.)
Rapid City VORTAC
   (Lat. 43°58′34″ N., long. 103°00′44″ W.)

   That airspace extending upward from the surface within 2.6 miles each side of the Rapid City VORTAC 155°/335° radials extending from the 4.4-mile radius of the Rapid City Regional Airport to 7 miles southeast of the VORTAC, excluding that airspace within the Rapid City, SD, Class D airspace area.

   Issued in Fort Worth, Texas, on January 27, 2016.

**Robert W. Beck,**

*Manager, Operations Support Group, ATO Central Service Center.*

[FR Doc. 2016–02037 Filed 2–3–16; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF STATE

### 22 CFR Part 41

**[Public Notice: 9428]**

### RIN 1400–AD17

### Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended

**AGENCY:** Department of State.

**ACTION:** Interim final rule.

**SUMMARY:** As a result of this rule, a passport and a visa will be required of a British, French, or Netherlands national, or of a national of Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, who has residence in British, French, or Netherlands territory located in the adjacent islands of the Caribbean area, or has residence in Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, if the alien is proceeding to the United States as an agricultural worker. In light of past experience, and to promote consistency of treatment across H–2A agricultural workers, prudent border management requires these temporary workers to obtain a visa along with most other H–2A agricultural workers.

   The previous rule allowing temporary workers from these countries to enter the United States without a visa presented a vulnerability. Temporary workers from these countries now require H–2A visas to enter the United States.

**DATES:** This rule is effective February 19, 2016. *Comment period:* The Department will accept comments until April 4, 2016.

**ADDRESSES:**

   • Interested parties may submit comments at any time by any of the following methods:

   • *Mail:* U.S. Department of State, Visa Services, Legislation and Regulations Division, 600 19th Street NW., Room 12–526B, Washington, DC 20006 ATTN: Paul-Anthony L. Magadia.

   • If you have access to the Internet you may submit comments by going to *http://www.regulations.gov/#!home* and searching for Public Notice number XXXX.

**FOR FURTHER INFORMATION CONTACT:**
Paul-Anthony L. Magadia, U.S. Department of State, Visa Services, Legislation and Regulations Division, Washington, DC 20006, (202) 485–7641, Email: *magadiapl@state.gov*.

**SUPPLEMENTARY INFORMATION:**

### Why is the Department promulgating this rule?

   The Department of State (the Department) is amending the previous rule to alleviate fraud and security concerns that have developed subsequent to that rule's publication. The previous rule, 22 CFR 41.2(e)(1), allowed nationals of certain Caribbean countries, as well as nationals of certain other countries who have residence in such countries' territories in the Caribbean, to enter the United States as temporary agricultural workers without visas. The amended rule requires that temporary workers from these countries obtain H–2A visas to enter the United States.

### What is the current rule?

   Currently, British, French, and Netherlands nationals and nationals of Antigua, Barbados, Grenada, Jamaica, and Trinidad and Tobago, who have their residence in British, French, or Netherlands territory located in the adjacent islands of the Caribbean area or in Antigua, Barbados, Grenada, Jamaica, or Trinidad and Tobago, are not required to obtain visas before traveling to the United States as H–2A agricultural workers.

### What will prospective H–2A agricultural workers be required to do?

   The amended rule requires these prospective H–2A agricultural workers to obtain a visa prior to traveling to the United States. Any spouses or children of these workers also will have to obtain a visa. To obtain a visa, these nonimmigrant aliens will have to be in possession of a valid passport, submit a visa application to and appear for an interview at a U.S. embassy or consulate, and undergo the Department's visa screening process.

### Will the amended rule ensure that prospective H–2A agricultural workers are properly screened prior to their arrival in the United States?

   Requiring these prospective H–2A agricultural workers to obtain visas will ensure that they are sufficiently screened prior to arrival in the United States. This will lessen the possibility that persons who pose security risks to the United States and other potential immigration violators may improperly gain admission to the United States. At the same time, requiring that these applicants appear before consular officers will provide greater opportunities to prescreen for potential employment fraud and will promote compliance with Department of Homeland Security (DHS) and Department of Labor (DOL) H–2A rules.

AR172

**How will the amended rule further the national security interests of the United States?**

The Department, in conjunction with DHS, has determined that the visa exemption provided a loophole that could potentially be exploited by terrorists and other persons seeking to engage in unlawful activities in the United States and threatens the security interests of the United States. This visa exemption is outdated in the post-9/11 environment and inconsistent with the visa requirement for other H–2A agricultural workers from other countries. The Department and DHS have determined that eliminating this visa exemption furthers the national security interests of the United States.

**How will the amended rule affect the Department's visa issuance process?**

The application of the general visa requirement to the class of Caribbean agricultural workers described above will ensure that these applicants for admission, like other H–2A agricultural workers, are properly screened through the Department's visa issuance process prior to arrival in the United States. This will lessen the possibility that persons who pose security risks to the United States and other potential immigration violators may improperly gain admission to the United States.

Moreover, extending the visa requirement to these Caribbean H–2A agricultural workers will better ensure that such workers are protected from certain employment and recruitment-based abuses. It also will ensure that agricultural workers have been informed, and are aware of, their rights and responsibilities before departing from their home countries to engage in H–2A agricultural work.

**What other changes is the Department making in this rule?**

Redesignated paragraph (e)(2)(iv) is being amended to reflect that The Royal Virgin Islands Police Department has been renamed the Royal Virgin Islands Police Force.

**Will DHS be publishing a parallel amendment?**

DHS is publishing a parallel amendment to 8 CFR 212.1(b).

*Regulatory Findings*

**Administrative Procedure Act**

The publication of this rule as an interim final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5

U.S.C. 553(b)(B)). There is reasonable concern that publication of the rule as a proposed rule, which would permit continuation of the current visa exemption, could lead to an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule. Accordingly, the Department finds that it is impracticable and contrary to the public interest to publish this rule with prior notice and comment period. Under the good cause exception, this rule is exempt from the notice and comment and delayed effective date requirements of the APA.

In addition, the Department is of the opinion that eliminating the visa exemption and requiring a visa for Caribbean H–2A agricultural workers, and the spouses or children accompanying or following these workers, is a foreign affairs function of the U.S. government. As this rule implements this function, the Department is of the opinion that, pursuant to 5 U.S.C. 553(a)(1), this rule is exempt from the requirements of 5 U.S.C. 553, including the notice and comment and 30-day delayed effective date requirements. The Department is nevertheless providing the opportunity for the public to provide comments for 60 days.

**Regulatory Flexibility Act/Executive Order 13272: Small Business**

Because this interim final rule is exempt from notice and comment rulemaking under 5 U.S.C. 553, it is exempt from the regulatory flexibility analysis requirements set forth at sections 603 and 604 of the Regulatory Flexibility Act (5 U.S.C. 603 and 604). Nonetheless, consistent with section 605(b) of the Regulatory Flexibility Act (5 U.S.C. 605(b)), the Department certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rulemaking regulates individual aliens who seek consideration for nonimmigrant visas and does not affect any small entities, as defined in 5 U.S.C. 601(6).

**The Unfunded Mandates Reform Act of 1995**

Section 202 of the Unfunded Mandates Reform Act of 1995, Public Law 104–4, 109 Stat. 48, 2 U.S.C. 1532, generally requires agencies to prepare a statement before proposing any rule that may result in an annual expenditure of $100 million or more by state, local, or tribal governments, or by the private

sector. This rule will not result in any such expenditure, nor will it significantly or uniquely affect small governments.

**The Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by 5 U.S.C. 804, for purposes of congressional review of agency rulemaking under the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121.

**Executive Order 12866: Regulatory Review**

The costs of this rulemaking are discussed in the companion DHS rule, RIN 1651–AB09, included elsewhere in this edition of the **Federal Register**. That discussion is incorporated by reference herein. The Department has reviewed the costs and benefits of this rule to ensure its consistency with the regulatory philosophy and principles set forth in Executive Order 12866 and has determined that the benefits of this interim final rule justify its costs.

**Executive Order 13563**

The Department has considered this rule in light of Executive Order 13563, dated January 18, 2011, and affirms that this regulation is consistent with the guidance therein.

**Executive Orders 12372 and 13132: Federalism**

This regulation will not have substantial direct effects on the states, on the relationship between the national government and the states, or the distribution of power and responsibilities among the various levels of government; nor will the rule have federalism implications warranting the application of Executive Orders 12372 and 13132.

**Executive Order 13175 Consultation and Coordination With Indian Tribal Governments**

The Department has determined that this rulemaking will not have tribal implications, will not impose substantial direct compliance costs on Indian tribal governments, and will not pre-empt tribal law. Accordingly, the requirements of Executive Order 13175 do not apply to this rulemaking.

**Executive Order 12988: Civil Justice Reform**

The Department has reviewed this interim final rule in light of Executive Order 12988 to eliminate ambiguity, minimize litigation, establish clear legal standards, and reduce burden.

AR173

## Paperwork Reduction Act

This rule does not impose any new information collections subject to the Paperwork Reduction Act, 44 U.S.C., Chapter 35. The Department anticipates between 100 and 4,100 additional nonimmigrant visa applicants per year as a result of this rulemaking. The current burden for this information collection (OMB Control No. 1405–0182) is 13,875,345 hours, with 11,100,276 respondents. The burden per response is 75 minutes. The top estimate for the number of additional respondents would add approximately 5,000 hours to a burden that is almost 14 million hours. Therefore, the addition of these respondents does not significantly increase the burden associated with this information collection.

## List of Subjects in 22 CFR Part 41

Aliens, Foreign officials, Immigration, Nonimmigrants, Passports and visas.

For the reasons stated in the preamble, the Department of State is amending 22 CFR part 41 to read as follows:

## PART 41—[AMENDED]

■ 1. The authority citation for part 41 is revised to read as follows:

**Authority:** 22 U.S.C. 2651a; 8 U.S.C. 1104; Pub. L. 105–277, 112 Stat. 2681–795 through 2681–801; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458, as amended by section 546 of Pub. L. 109–295).

■ 2. Amend § 41.2 as follows:
■ a. Remove paragraph (e).
■ b. Redesignate paragraphs (f) through (m) as paragraphs (e) through (l).
■ c. Revise redesignated paragraph (e)(2)(iv).

The revisions read as follows:

### § 41.2 Exemption or waiver by Secretary of State and Secretary of Homeland Security of passport and/or visa requirements for certain categories of nonimmigrants.

\*    \*    \*    \*    \*

(e) \* \* \*

(2) \* \* \*

(iv) Presents a current certificate issued by the Royal Virgin Islands Police Force indicating that he or she has no criminal record.

\*    \*    \*    \*    \*

Dated: January 22, 2016.

**David T. Donahue,**

*Acting Assistant Secretary for Consular Affairs, Department of State.*

[FR Doc. 2016–02191 Filed 2–3–16; 8:45 am]

**BILLING CODE 4710–06–P**

## DEPARTMENT OF THE TREASURY

## Internal Revenue Service

## 26 CFR Part 1

[TD 9748]

RIN 1545–BM57

## Allocation of Creditable Foreign Taxes

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final and temporary regulations.

**SUMMARY:** This document contains temporary regulations that provide guidance relating to the allocation by a partnership of creditable foreign tax expenditures. These temporary regulations are necessary to improve the operation of an existing safe harbor rule that is used for determining whether allocations of creditable foreign tax expenditures are deemed to be in accordance with the partners' interests in the partnership. The text of these temporary regulations also serves as the text of the proposed regulations set forth in the notice of proposed rulemaking (REG–100861–15) published in the Proposed Rules section in this issue of the **Federal Register**. These regulations affect partnerships that pay or accrue foreign income taxes, and their partners.

**DATES:** *Effective Date:* These regulations are effective on February 4, 2016.

*Applicability Dates:* For dates of applicability, see §§ 1.704–1T(b)(1)(ii)(*b*)(*1*) and (b)(1)(ii)(*b*)(*3*)(*B*).

**FOR FURTHER INFORMATION CONTACT:** Suzanne M. Walsh, (202) 317–4908 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Background and Explanation of Provisions

Allocations of creditable foreign tax expenditures ("CFTEs") do not have substantial economic effect, and accordingly a CFTE must be allocated in accordance with the partners' interests in the partnership. *See* § 1.704–1(b)(4)(viii). Section 1.704–1(b)(4)(viii) provides a safe harbor under which CFTE allocations are deemed to be in accordance with the partners' interests in the partnership. In general, the purpose of the safe harbor is to match allocations of CFTEs with the income to which the CFTEs relate.

In order to apply the safe harbor, a partnership must (1) determine the partnership's "CFTE categories," (2) determine the partnership's net income in each CFTE category, and (3) allocate the partnership's CFTEs to each category. Section 1.704–

1(b)(4)(viii)(*c*)(*2*) requires a partnership to assign its income to activities and provides for the grouping of a partnership's activities into one or more CFTE categories based generally on whether net income from the activities is allocated to partners in the same sharing ratios. Section 1.704–1(b)(4)(viii)(*c*)(*3*) provides rules for determining the partnership's net income (for U.S. federal income tax purposes) in a CFTE category, including rules for allocating and apportioning expenses, losses, and other deductions to gross income. Section 1.704–1(b)(4)(viii)(*d*) assigns CFTEs to the CFTE category that includes the related income under the principles of § 1.904–6, with certain modifications. In order to satisfy the safe harbor, partnership allocations of CFTEs in a CFTE category must be in proportion to the allocations of the partnership's net income in the CFTE category.

### I. Effect of Section 743(b) Adjustments

Section 1.704–1(b)(4)(viii)(*c*)(*3*)(*i*) of the current final regulations provides that a partnership determines its net income in a CFTE category by taking into account all partnership items attributable to the relevant activity or group of activities, including items of gross income, gain, loss, deduction, and expense, and items allocated pursuant to section 704(c). The current final regulations do not state whether an adjustment under section 743(b) is taken into account in computing the partnership's net income in a CFTE category.

In the case of a transfer of a partnership interest that results in an adjustment under section 743(b) (because the partnership has a section 754 election in effect, or because there is a substantial built-in loss (as defined in section 743(d)) in the partnership), the partnership must adjust the basis of partnership property with respect to the transferee partner only (a section 743(b) adjustment). No adjustment is made to the common basis of partnership property, and the section 743(b) adjustment has no effect on the partnership's computation of any item under section 703. § 1.743–1(j)(1).

The Treasury Department and the IRS believe that a transferee partner's section 743(b) adjustment with respect to its interest in a partnership should not be taken into account in computing such partnership's net income in a CFTE category because the basis adjustment is unique to the transferee partner and because the basis adjustment ordinarily would not be taken into account by a foreign jurisdiction in computing its foreign

AR174

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 264**

**[ICE No. 2301–3]**

**RIN 1653–AA29**

**Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants**

**AGENCY:** U.S. Immigration and Customs Enforcement, Department of Homeland Security.

**ACTION:** Interim rule with request for comments.

---

**SUMMARY:** This rule amends Department of Homeland Security (DHS) regulations for the registration and monitoring of certain nonimmigrant aliens. This rule amends existing regulations by suspending the 30-day and annual re-registration requirements for aliens who are subject to the National Security Entry-Exit Registration System (NSEERS) Registration. Instead of requiring all aliens subject to NSEERS to appear for 30-day and/or annual re-registration interviews, the DHS will utilize a more tailored system in which it will notify individual aliens of future registration requirements. This rule also eliminates the requirement for those nonimmigrant aliens subject to special registration who are also enrolled in the Student and Exchange Visitor Information System (SEVIS) to separately notify DHS of changes in educational institutions and addresses. Additionally, this rule clarifies how nonimmigrant aliens may apply for relief from special registration requirements and clarifies that certain alien crewmen are not subject to the departure requirements. Finally, certain conforming amendments have been made to the existing regulations to reflect the fact that the former Immigration and Naturalization Service (Service) has been abolished and its functions transferred from the Department of Justice to DHS under the Homeland Security Act of 2002 (HSA), Public Law 107–296.

**DATES:** *Effective date:* This interim rule is effective December 2, 2003.

  *Comment date:* Written comments must be submitted on or before February 2, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, U.S. Citizenship and Immigration Services, DHS, 425 I Street, NW., Room 4034, Washington, DC 20536. To ensure proper handling, please reference ICE

No. 2301–03 on your correspondence. Comments may also be submitted electronically to DHS at *rfs.regs@dhs.gov*. Comments submitted electronically must include the ICE No. 2301–03 in the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Robert Schoch, U.S. Immigration and Customs Enforcement, DHS, 425 I Street, NW., Room 1000, Washington, DC 20536, telephone (202) 353–3173.

**SUPPLEMENTARY INFORMATION:**

**Background**

*How Does Registration of Aliens Work Under the Existing Statutory and Regulatory Provisions?*

  Section 262(a) of the Immigration and Nationality Act (Act) provides that all aliens who have not previously been registered and fingerprinted pursuant to section 221(b) of the Act have a duty to apply for registration and to be fingerprinted if they remain in the United States for 30 days or longer. Under the existing regulations at 8 CFR 264.1(a), DHS registers nonimmigrants using Form I–94 (Arrival-Departure Record). Section 263(a) of the Act also authorizes the Secretary of DHS to prescribe special regulations and forms for the registration of special groups of aliens in the United States. As authorized by section 262(c) of the Act, the existing regulations at 8 CFR 264.1(e) contain general provisions waiving the fingerprinting requirement for many nonimmigrants. Accordingly, at the present time, most nonimmigrant aliens are admitted to the United States without being either fingerprinted or photographed.

  Section 214 of the Act authorizes the Attorney General (now deemed to be the Secretary of DHS under the HSA) to prescribe conditions for the admission of nonimmigrant aliens. Section 215 of the Act provides for departure control from the United States. In addition, section 265 of the Act requires that all aliens who remain in the United States who are required to be registered under the Act must notify the Secretary of DHS of each change of address within ten days from the date of such change and furnish with such notice additional information as the Secretary of DHS may prescribe.

  Prior to the enactment of the HSA and the transfer of the functions of the former Service from the Department of Justice to DHS, the Service exercised the previously described registration authority to require that certain classes of aliens are specially registered while in

the United States. Pursuant to section 263(a) of the Act, as well as the general registration authority under section 262 of the Act, the former Service promulgated 8 CFR 264.1(f), which required that certain nonimmigrant aliens be registered, fingerprinted, and photographed by the Service at the port of entry (POE) at the time the nonimmigrant aliens apply for admission. *See* 67 FR 52584 (Aug. 12, 2002). Registration at the POEs shall be known as "POE registration" for the purpose of this discussion. Additionally, pursuant to section 265 of the Act, 8 CFR 264.1(f) directed that certain nonimmigrant aliens designated by the Attorney General who were already in the United States appear before the Service for special registration. *Id.* Registration of aliens already present in the United States shall be known as "call-in registration" for the purpose of this discussion.

*How Does This Rule Change the Current Special Registration Requirements?*

  Currently, 8 CFR 264.1(f)(3) provides that aliens specially registered at a POE must appear before DHS 30 days after their admission into the United States for a continuing registration interview. This rule suspends this automatic 30-day continuing registration requirement.

  As currently written, 8 CFR 264.1(f)(5) requires that all aliens who were subject to special registration appear for an annual re-registration interview. This rule also suspends the annual re-registration requirement.

  The suspension of the 30-day and annual re-registration requirement applies to all aliens previously registered under the NSEERS program, whether call-in or POE registration, as well as any aliens registered subsequent to the effective date of this rule. In place of these previous requirements that all nonimmigrant aliens subject to NSEERS registration appear for additional 30-yday and annual interviews, this rule will allow DHS, as a matter of discretion, to notify nonimmigrant aliens subject to NSEERS registration to appear for one or more additional continuing registration interviews in those particular cases where it may be necessary to determine whether the alien is complying with the conditions of his or her nonimmigrant visa status and admission.

  This rule also provides that when an alien who is monitored under SEVIS notifies DHS of a change of address or educational institution through SEVIS, it also constitutes a notification for the purposes of NSEERS registration. It also clarifies that certain alien crewmen, described at section 101(a)(15)(D) of the

AR175

Act, and are subject to special registration, are exempted from the departure control requirements of 8 CFR section 264.1(f) (8).

Finally, this rule reflects that the Service was abolished, and DHS now performs its functions. Thus, throughout 8 CFR 264.1(f), this rule substitutes the Secretary of Homeland Security for the Attorney General, and replaces references to the Service with references to DHS.

This rule does not eliminate or in any way limit the authority of the Secretary of DHS under section 263 of the Act, for certain types of aliens, and section 265 of the Act, for any class or group of aliens, through notice, to require such aliens to appear for special registration in the future if circumstances so require. Additionally, this rule does not limit or alter any other special registration requirement under section 263 of the Act.

*What Other Changes Are Made by This Rule?*

This rule also clarifies how nonimmigrant aliens subject to NSEERS registration may apply for relief from registration departure requirements. Aliens subject to NSEERS registration are required to register their departure before an immigration officer at a designated port of departure and depart from that port on the same day. Aliens previously could contact the Service district director to obtain relief from these departure requirements. However, the abolition of the former Service and the distribution of its functions to various agencies within DHS, such as U.S. Citizenship and Immigration Services (CIS) and U.S. Customs and Border Protection (CBP), have created uncertainties for aliens as to how to seek such relief. For nonimmigrant aliens who have been NSEERS registered, this regulation clarifies how the alien may seek a waiver from the departure registration requirements.

First, under the revisions set out in this rule, a nonimmigrant alien subject to the departure registration requirements based upon NSEERS registration may seek relief from these requirements before his or her departure from an official designated by DHS or from the CBP field office director for the port from which the alien intends to depart. The alien seeking such relief must establish to the satisfaction of the field office director or designated official that exigent or unusual circumstances exist, and that the alien warrants a favorable exercise of discretion.

Additionally, for an alien who has been registered and who makes frequent

trips to the United States, based upon a showing of good cause, exigent or unusual circumstances, the CBP field office director over the port to which the alien most frequently arrives in the United States may exempt the alien from future POE registrations. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis. In making this determination, the field office director or his designee will consider the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In seeking such relief, the alien bears the burden of establishing he or she warrants a favorable exercise of discretion. If granted, relief from POE registrations also shall include relief from NSEERS registration departure control requirements.

An alien alternatively may seek an exemption from the NSEERS registration requirements from the Department of State by such forms and methods as the Department of State may prescribe.

There are no specific forms to request relief from the NSEERS requirements from DHS; an individual seeking relief should direct a letter to the appropriate CBP field office director. In such a letter, the alien should provide a detailed description of the type of relief sought, their full name, date-of-birth, Fingerprint Identification Number (which is reflected on the Form I–94), a 1″ x 1″ passport style photograph, the alien's A-number, if one has been assigned, and any documents that support the relief request. Information regarding the relief provisions will be provided to aliens upon completion of registration. Copies of these materials, known as the "walk-away" materials, are also available on the Web site *www.ice.gov,* in the special registration section.

This rule further clarifies to aliens applying for relief that, until an application for relief from the NSEERS registration requirements is granted, the alien is required to comply with the registration requirements.

The decision of any DHS officer or official to grant or deny relief from the NSEERS registration provisions is done as an exercise of discretion, and as such is final and cannot be appealed.

A DHS officer authorized to grant relief also may terminate such relief by providing notice to the alien.

*Why Is This Rule Necessary?*

The former Service, and now DHS (as of March 1, 2003), have evaluated the

utility of the 30-day and annual interviews under the current requirements for national security and immigration enforcement purposes. Additionally, DHS is under a congressional mandate set forth in various amendments to the Act to create a comprehensive entry-exit system. In carrying out this mandate through the establishment of the US–VISIT Program, DHS has reviewed the use of the special registration program for both POE and call-in registrations. After considering these factors, DHS has determined it is appropriate to suspend the continuing registration requirements set out in 8 CFR 264.1(f), that automatically required aliens subject to NSEERS registration to report for 30-day and/or annual re-registration interviews. Special registration of aliens at POEs has, consistent with the program's intent, provided important law enforcement benefits, which have included the identification of a number of alien terrorists and criminals. This rule is not amending the procedures for NSEERS registration at the POE's. In addition to US–VISIT, which will soon become operational, DHS has other systems available that can help ensure that those aliens who are already subject to NSEERS registration remain in compliance with the terms of their visa and admission. For example, Congress mandated that DHS develop a student monitoring system. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, section 641; "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism" (USA Patriot Act), Public Law 107–56, section 416. This system, SEVIS, is now fully operational. Schools now must report directly to DHS when a student or exchange visitor alien changes schools, fails to appear for classes or otherwise fails to maintain his or her student status following admission into the United States.

Thus, DHS is now in a position to suspend the mandatory re-registration interview requirements for those aliens who are already subject to NSEERS registration, which will reduce the burden on those required to register under the current regulations, as well as to DHS. Instead, DHS will be able to schedule re-registration interviews on a more targeted and effective basis, only in those particular cases where it may be appropriate for additional scrutiny to ensure that an alien remains in compliance with the terms of his or her nonimmigrant visa and admission.

AR176