## Who Is Affected by This Rule?

Aliens who have been subject to NSEERS registration, whether as a result of being registered at a POE upon arrival, or as a result of being called in to register by **Federal Register** notice, are affected by the rule, because it reduces their current reporting requirements by eliminating the mandatory 30-day and annual re-registration interviews. Additionally, aliens who hereafter enter the United States and are NSEERS registered at a POE are affected by this rule. Affected aliens have been or will be given a Form I–94 documenting their registration, which will reflect their Fingerprint Identification Number (FIN). DHS uses the FIN recorded on the Form I–94 to identify the records of an alien subject to special registration. Based upon the number of aliens who have previously registered, DHS estimates that over the 6 month time span from December 2003 through May 2004, approximately 82,532 aliens will benefit from this change and will not have to report for either a 30-day or annual re-interview during that period.

## How Does This Rule Affect Registration at POEs?

This rule does not affect the procedures for the NSEERS registration of aliens, including fingerprinting, photographing, and provision of information, at POEs. As is obligatory under current regulations, nonimmigrant aliens subject to POE registration will still be required, utilizing the information collection system in place, to provide routine and readily available information as a condition of admission. This includes such information as is necessary to identify the alien in the United States. Lists of information that may be required during NSEERS registration have previously been issued. See, *e.g.*, 67 FR 40581, 40582.

Registration at POEs continues to allow DHS to determine if an alien's fingerprints match those of known terrorists or criminals, and to detain for removal or refuse admission of the alien if such an identity match is established.

## How Will DHS Provide Notice to Individual Aliens That They Must Appear for an Additional Registration Interview?

In place of the automatic re-registration requirements set out in the original NSEERS registration provisions, this rule substitutes a more tailored approach to re-registration. The determination of whether an alien will be subject to additional registration requirements will be made on a case-by-case basis. The admission of any nonimmigrant alien subject to NSEERS registration is subject to the requirement that, under this rule, he or she may be required to appear for future continuing re-registration interviews at the discretion of DHS. At the time of admission, DHS will advise all nonimmigrant aliens subject to special registration that they may be required to appear for additional registration interviews upon notice. DHS will separately notify those aliens selected to appear before DHS to comply with the additional re-registration requirements, which for a small number of aliens may be more frequent than the 30-day and annual re-registration requirements set out in the prior rule. However, only aliens who are notified of the re-registration requirements will have to appear before DHS for such requirement, and the majority of individuals registered will see a reduction in the burden of additional registration as a result of this rule. Notification under these regulations may be given to the alien in a manner reasonably calculated to reach the alien, which shall include, but is not limited to, notice by publication in the **Federal Register**, a letter sent via standard U.S. postal mail to the last address provided by the alien to DHS using regular mail, an e-mail to the address the alien provided to DHS during a previous NSEERS registration interview, or in-person delivery. The nonimmigrant alien must appear at the designated U.S. Immigration and Customs Enforcement office location, and on the specified date and time, unless otherwise specified in the notice. DHS will provide the alien at least ten days, measured from the date DHS publishes or sends notice to the alien, to comply with the re-registration obligation.

Notice to an alien of registration or re-registration requirements may be issued by the ICE Assistant Secretary, his designee, or any other such individual designated by the Secretary of DHS.

## How Does This Rule Affect an Alien's Obligation To Notify DHS of a Change of Address or Employment?

This rule reiterates, for this distinct group of nonimmigrant aliens who are subject to NSEERS registration, and who remain in the United States for more than thirty days, the requirement that the nonimmigrant alien notify DHS of any change of address, employment and/or educational institution within 10 days of such change. Affected aliens may notify DHS by mail, or such other means as the Secretary of DHS may designate, of a change of address. The required form, the AR–11 for Special Registration, is available at DHS offices and on the DHS Internet Web site at *http://www.uscis.gov*, in the special registration section.

However, this rule discontinues the requirement that student aliens monitored under SEVIS who are subject to special registration separately notify DHS of a change in their educational institution or address, if such information is provided to DHS through SEVIS. This rule provides that when an alien reports a change of address or educational institution to DHS through SEVIS, that action fulfills his or her special registration requirement to notify DHS of changes in address. However, student aliens who are monitored under SEVIS who are subject to special registration will still be required under 8 CFR 264.1(f)(5) to notify DHS of any change of employment which is currently not captured in the SEVIS system.

## How Does This Rule Affect Departure Control Requirements?

This rule does not change the general requirement that a nonimmigrant alien subject to NSEERS registration, either POE registration or a prior or future call-in registration, also report his or her actual departure from the United States. Cessation of departure controls is inconsistent with the congressional mandate requiring that DHS establish a comprehensive entry-exit monitoring system. As DHS develops the larger system mandated by Congress, to be called US–VISIT, it will integrate the NSEERS registration currently in use. This requirement of departure registration means that the alien must appear at a designated Port of Departure before a departure control officer, *i.e.*, a CBP inspector, on the day he or she departs the United States to close his or her registration and also depart from that port. This departure requirement will ensure that all NSEERS registrations are properly closed.

If the departure control requirements do not continue, registration records for the nonimmigrant aliens subject to NSEERS registration would be left open without explanation. This could result in serious difficulties, including the possibility of future inadmissibility, for already registered aliens who depart and attempt to return to the United States.

The most recent **Federal Register** notice listing Ports of Departure can be found at 68 FR 8967. This rule does not alter or amend that list.

This rule does clarify that certain alien crewmen described at 101(a) (15) (D) of the Act who are subject to special registration requirements are exempt

from the departure registration requirements of 8 CFR 264(f) (8).

*Does This Rule Change Any of the Penalties for Failing To Comply With the Special Registration Provisions?*

No. This rule does not change any of the penalties for failing to comply with the special registration provisions. Moreover, this rule does not excuse any prior failure to comply with special registration provisions.

Under section 214(a) of the Act, as amended by the HSA, the admission of all nonimmigrant aliens to the United States "shall be for such time and under such conditions as the [Secretary of DHS] may by regulations prescribe." The Secretary of DHS may impose conditions on admission that are rationally related to the maintenance of nonimmigrant status. See, *e.g., Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1980)(upholding regulation requiring Iranians on student visas to report and "provide information as to residence and maintenance of nonimmigrant status" or be subject to deportation proceedings). The regulations that currently implement section 214 of the Act provide in part that one condition of a nonimmigrant's continued stay in the country "is the full and truthful disclosure of all information requested" by DHS. 8 CFR 214.1(f).

The NSEERS registration requirements previously imposed upon aliens, either through POE registration or call-in registration, were intended in part to ensure that nonimmigrant aliens are complying with their nonimmigrant status (*e.g.,* by continuing to be students or employees, as contemplated at the time of the issuance of their visas or admission). Additionally, 8 CFR 214.1(f) was amended to reflect that a nonimmigrant alien's willful failure to comply with the special registration provisions constitutes a failure to maintain the relevant nonimmigrant status, and would render the alien removable under section 237(a)(1)(C)(i) of the Act.

Although this rule amends the regulations to eliminate the existing automatic 30-day and annual re-registration interview requirements, aliens who willfully failed to comply with prior registration requirements, including aliens who failed before December 2, 2003 to appear for a required initial call-in registration, a 30-day re-registration interview, or an annual re-registration interview, remain subject to the penalties outlined above and in previous **Federal Register** notices. Additionally, aliens who willfully fail to comply with any future call-in notice or additional registration

requirement imposed pursuant to this rule would be removable under section 237(a)(1)(C)(i) of the Act.

*What Is the Effect of an Alien's Failure To Comply With the Departure Reporting Requirements Upon the Alien's Subsequent Application for Admission?*

An alien who is subject to the special registration requirements who has failed, without good cause, to report his or her departure with DHS is presumed inadmissible to the United States. The presumption of inadmissibility arises if there was no good cause for the alien's failure to report to DHS at the time of his or her departure from the United States. However, an alien may overcome the presumption of inadmissibility by establishing to the Secretary of State and the Secretary of DHS that he or she does not seek to enter the United States to engage solely, principally, or incidentally in any unlawful activity.

An alien who fails to report his or her departure may, at the time he or she applies for a new nonimmigrant visa abroad, attempt to establish that there was good cause for the failure to report and, in the event that no good cause is found, that he or she is not inadmissible under section 212(a)(3)(A)(ii) of the Act. If the consular officer, in adjudicating the new visa application, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the POE, while not bound by the DOS determination, will consider this finding as a significantly favorable factor in determining whether the alien is inadmissible due to his or her prior failure to register at the time of departure from the United States.

**Good Cause Exception**

Immediate implementation of this interim rule with provision for post-promulgation public comments is based upon the good cause exception found at 5 U.S.C. 553(b)(B). Pursuant to 5 U.S.C. 553(b)(B), prior notice and opportunity for comment is not necessary where it is "impracticable, unnecessary, or contrary to the public interest." DHS estimates that without this regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews between December 2003 and May 2004. Therefore DHS believes there is an urgent need for the immediate implementation of this rule suspending the automatic interview requirements to avoid unnecessarily burdening the public impacted by this rule.

**Initial Regulatory Flexibility Act Determination**

The regulatory Flexibility Act of 1980, as amended (RFA) was enacted by Congress to ensure that small entities (small businesses, not-for-profit organizations, and small governmental jurisdictions) are not unnecessarily or disproportionately burdened by Federal regulations. The RFA requires agencies to review rules to determine if they have "a significant economic impact on a substantial number of small entities." DHS has determined that this interim final rule will not have a significant economic impact on a substantial number of small entities.

This rule will not affect small entities as defined at 5 U.S.C. 605(b) and will relieve cost burdens on individuals.

In accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), I have reviewed this rule and by approving it, I certify that this rule will not have a significant economic impact on a substantial number of small entities.

**Executive Order 12866**

Executive Order 12866, "Regulatory Planning and Review," requires a determination whether a regulatory action is "significant" and therefore subject to review by the Office of Management and Budget (OMB) and to E.O. 12866's requirements.

This rule is considered by DHS to be a significant regulatory action under Executive Order 12866, section 3(f), Regulatory Planning and Review. However, it does not have an impact on the economy of $100 million or more and, therefore, is not economically significant. Accordingly, this regulation has been submitted to the Office of Management and Budget (OMB) for review.

DHS has assessed both the costs and benefits of this rule as required by Executive Order 12866. First, this rule significantly reduces costs to the public by reducing the burden of re-registration and continuing registration requirements for aliens present in the United States. Without this regulation, in between December 2003 and May 2004, an estimated 82,532 aliens would be subject to re-registration under prior regulations. Assuming that each interview will last 45 minutes, and each alien will have to prepare approximately 30 minutes for the interview, DHS anticipates that between December 2003 and May 2004, the burden reduction on the public to be a total of over 103,000 hours.

DHS also will experience a burden reduction, based upon the reduced costs related to information collection and

processing. Based upon the number of estimated registrations between December 2003 and May 2004 and assuming that each registration lasts approximately 45 minutes, under this regulation DHS estimates it will be able to reallocate almost 62,000 work hours. DHS is able to shift personnel who would have conducted these re-registration interviews to other law enforcement functions. These resources also can be better utilized to craft a targeted registration process that meets the national security needs of the country.

The costs to DHS of not amending the regulations would be significant. Because the initial call-in registrations by the former Service occurred over a brief period of months, the number of aliens appearing for re-registration in a brief period of time will be significant. DHS would be forced to reallocate personnel resources from other law-enforcement functions in order to timely register aliens.

### Executive Order 13132

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism summary impact statement.

### Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions are deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### Executive Order 12988: Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### Paperwork Reduction Act of 1995

The regulations at 8 CFR 264.1(f)(7) allows an alien who has been registered under the provisions of 8 CFR 264.1(f) and who has not yet departed from the United States, to seek relief from the departure control requirement contained in 8 CFR 264.1(f)(8) for that admission. In order to seek relief the alien must apply to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion. This request for relief is considered an information collection requirement under the Paperwork Reduction Act (PRA).

The Department of Homeland Security (DHS) and the U.S. Immigration and Customs Enforcement (ICE) has submitted an emergency information collection request (ICR) utilizing emergency review procedures, to the Office of Management and Budget (OMB) for review and clearance in accordance with section 1320.13(a)(1)(ii) and (a)(2)(iii) of the Paperwork Reduction Act of 1995. The DHS has determined that it cannot reasonably comply with the normal clearance procedures under this part because normal clearance procedures are reasonably likely to prevent or disrupt the collection of information. Therefore, immediate OMB approval has been requested. If granted, the emergency approval is only valid for 180 days. ALL comments and/or questions pertaining to this pending request for emergency approval must be directed to OMB, Office of Information and Regulatory Affairs, Attention: Department of Homeland Security Desk Officer, 725—17th Street, NW., Suite 10235, Washington, DC 20503.

During the first 60 days of this same period, a regular review of this information collection is also being undertaken. During the regular review period, the DHS requests written comments and suggestions from the public and affected agencies concerning this information collection. Comments are encouraged and will be accepted until February 2, 2004. During 60-day regular review, all comments and suggestions, or questions regarding additional information, to include obtaining a copy of the information collection instrument with instructions, should be directed to Mr. Richard A. Sloan, 202–514–3291, Director, Regulations and Forms Services Division, Department of Homeland Security, Room 4034, 425 I Street, NW., Washington, DC 20536. Written comments and suggestions from the public and affected agencies concerning the proposed collection of information should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agencies estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses. Overview of this information collection:

(1) *Type of Information Collection:* New information collection.

(2) *Title of the Form/Collection:* Exemption from NSEERS Registration Requirements.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No Agency Form Number. File No. OMB–40. U.S. Immigration and Customs Enforcement.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals and Households. This information collection allows an alien to seek an exemption from the NSEERS registration requirements by submitting a letter to the Department of Homeland Security containing specific information.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 5,800 responses at 30 minutes (.5 hours) per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* 2,900 annual burden hours.

If additional information is required contact: Mr. Steve Cooper, PRA

AR179

Clearance Officer, Department of Homeland Security, Office of Chief Information Officer, Regional Office Building 3, 7th and D Streets, SW., Suite 4636–26, Washington, DC 20202.

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. This rule suspends the 30-day and annual re-registration requirements for aliens who are subject to NSEERS registration. The OMB information collection number under NSEERS is 1115–0254. It is estimated that approximately 82,000 aliens will no longer be subject to the 30-day or annual re-registration interviews once this rule is implemented. Accordingly, ICE has submitted the required Paperwork Reduction Change Worksheet (OMB–83C) to OMB reflecting the reduction in burden hours for NSEERS.

**List of Subjects in 8 CFR Part 264**

Reporting and recordkeeping requirements.

■ Accordingly, part 264 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES**

■ 1. The authority citation for Part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

■ 2. Section 264.1(f) is revised to read as follows:

**§ 264.1   Registration and fingerprinting.**

*   *   *   *   *

(f) *Registration, fingerprinting, and photographing of certain nonimmigrant aliens.*

(1) Registration requirement for certain nonimmigrants. Notwithstanding the provisions in paragraph (e) of this section, nonimmigrant aliens identified in paragraph (f)(2) of this section are subject to special registration, fingerprinting, and photographing requirements upon arrival in the United States. This requirement shall not apply to those nonimmigrant aliens applying for admission to the United States under sections 101(a)(15)(A) (8 U.S.C. 1101(a)(15)(A)) or 101(a)(15)(G) (8 U.S.C. 1101(a)(15)(G)) of the Act. In addition, this requirement shall not apply to those classes of nonimmigrant aliens to whom the Secretary of Homeland Security and the Secretary of State jointly determine it shall not

apply, or to any individual nonimmigrant alien to whom the Secretary of Homeland Security or the Secretary of State determines it shall not apply. Completion of special registration pursuant to this paragraph (f) is a condition of admission under section 214 of the Act (8 U.S.C. 1184) if the inspecting officer determines that the alien is subject to registration under this paragraph (f) (hereinafter "nonimmigrant alien subject to special registration").

(2) Identification of aliens subject to registration at ports-of-entry. Nonimmigrant aliens in the following categories are subject to the requirements of paragraph (f)(3) of this section:

(i) Nonimmigrant aliens who are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**;

(ii) Nonimmigrant aliens whom a consular officer or an inspecting officer has reason to believe are nationals or citizens of a country or territory designated by the Secretary of Homeland Security, in consultation with the Secretary of State, by a notice in the **Federal Register**; or

(iii) Nonimmigrant aliens who meet pre-existing criteria, or whom a consular officer or the inspecting officer has reason to believe meet pre-existing criteria, determined by the Secretary of Homeland Security or the Secretary of State to indicate that such aliens' presence in the United States warrants monitoring in the national security interests, as defined in section 219 of the Act (8 U.S.C. 1189), or law enforcement interests of the United States.

(3) *Obligations regarding registration.* (i) Any nonimmigrant alien who is included in paragraph (f)(2) of this section, and who applies for admission to the United States, shall be specially registered by providing information required by the Department of Homeland Security, shall be fingerprinted, and shall be photographed, by Department of Homeland Security, at the port-of-entry at such time the nonimmigrant alien applies for admission to the United States. The Department of Homeland Security shall advise the nonimmigrant alien subject to special registration that the nonimmigrant alien may, upon ten days notice, and at the Department of Homeland Security's discretion, be required to appear at a U.S. Immigration and Customs Enforcement office in person to verify information by providing additional information or

documentation confirming compliance with the conditions of his or her visa status and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the specified date and time, unless otherwise specified in the notice.

(ii) At the time of verification of information for registration pursuant to paragraph (f)(3)(i) of this section, the nonimmigrant alien subject to special registration shall provide the Department of Homeland Security with proof of compliance with the conditions of his or her nonimmigrant visa status and admission, including, but not limited to, proof of residence, employment, or registration and matriculation at an approved school or educational institution. The nonimmigrant alien subject to special registration shall provide any additional information required by the Department of Homeland Security.

(4) *Registration of aliens present in the United States.* (i) The Secretary of Homeland Security, by publication of a notice in the **Federal Register**, also may impose such special registration, fingerprinting, and photographing requirements upon nonimmigrant aliens who are nationals, citizens, or residents of specified countries or territories (or a designated subset of such nationals, citizens, or residents) who have already been admitted to the United States or who are otherwise in the United States. A notice under this paragraph (f)(4) shall explain the procedures for appearing in person and providing the information required by the Department of Homeland Security, providing fingerprints, photographs, or submitting supplemental information or documentation.

(ii) Any nonimmigrant alien who is currently subject to special registration as a result of the publication of any previous **Federal Register** notice may, while he or she remains in the United States, upon 10 days notice and at the Department of Homeland Security's discretion, be required to appear at a Department of Homeland Security Office in person to provide additional information or documentation confirming compliance with his or her visa and admission. The Department of Homeland Security will determine on a case-by-case basis which aliens must appear in person to verify information. The nonimmigrant alien subject to special registration must appear at the designated office location, and on the

specified date and time, unless otherwise specified in the notice.

(5) *Obligation to provide updated information.* In addition to any additional re-registrations that may be required pursuant to paragraphs (f)(3) and (f)(4) of this section, any nonimmigrant alien subject to special registration under this paragraph (f) who remains in the United States for 30 days or more shall notify the Department of Homeland Security by mail or other such means as determined by the Secretary of Homeland Security, using a notification form designated by the Department of Homeland Security, of any change of address, change of residence, change of employment, or change of educational institution within 10 days of such change. Notice to the Department of Homeland Security of a change of address, change of residence or change of educational institution made within 10 days of such a change through the Student and Exchange Visitor Information System (SEVIS) shall constitute notice under this paragraph.

(6) [Reserved]

(7) *Relief from registration requirements.* A nonimmigrant alien subject to special registration may apply for relief from the registration requirements as follows:

(i) *Relief from departure controls set out in 264.1(f) (8).* An alien who has been registered under the provisions of this section (f) and has not yet departed the United States may seek relief from the departure control requirement contained in paragraph (f)(8) for that admission by applying to the U.S. Customs and Border Protection field office director for the port from which the alien intends to depart. In making an application for relief, the alien must establish that exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(ii) *Frequent travelers.* An alien who previously has been registered and who would otherwise be subject to registration at a port of entry under the provisions of paragraphs (f)(2) and (3) of this section may seek relief from the registration requirements from the Secretary of Homeland Security after his initial registration if the alien makes frequent trips to the United States. An alien seeking relief under this paragraph from the Secretary of Homeland Security may apply to the U.S. Customs

and Border Protection field office director for the port to which the alien most frequently arrives in the United States. The field office director or his designee will make the determination that the frequency of arrival warrants relief from the registration requirements on a case-by-case basis, and will consider in this analysis the mode of travel, business and economic concerns, purpose of travel, or other factors as determined by the director. In making an application for relief, the alien must establish that good cause or exigent or unusual circumstances exist and that the alien warrants a favorable exercise of discretion.

(iii) *Exemption from registration.* At a Department of State consular office abroad, an alien may seek exemption from these regulations from the Department of State by such methods as it may prescribe.

(iv) *For all applications for relief.* Any decision of a Department of Homeland Security officer or official to grant or deny relief under this paragraph (f)(7) is final and not appealable. Absent receipt of a decision exempting or relieving the nonimmigrant alien from these requirements, he or she shall comply with the special registration requirements contained in this section.

(v) *Termination of relief.* Relief granted under paragraphs (f)(7)(i) or (ii) of this section may be terminated by notice to the alien by any field office director or other Department of Homeland Security officer or official authorized to grant such relief.

(8) *Departure requirements.* (i) General requirements When a nonimmigrant alien subject to special registration departs from the United States (other than nonimmigrant crewmen as defined under section 101(a)(15)(D) of the Act) he or she shall report to an inspecting officer of the Department of Homeland Security at any port of entry unless the Department of Homeland Security has, by publication of a notice in the **Federal Register**, specified that nonimmigrant aliens subject to special registration may not depart from specific ports. This paragraph (f)(8) applies only to those nonimmigrant aliens who have been registered under paragraph (f)(3) of this section, or who have been required to register pursuant to paragraph (f)(4) of this section, and who have not been granted relief from the departure requirements under paragraph (f)(7).

(ii) *Presumption of inadmissibility.* Any nonimmigrant alien subject to special registration who fails, without good cause, to be examined by an inspecting officer at the time of his or her departure and to have his or her departure recorded by the inspecting officer shall thereafter be presumed to be inadmissible under, but not limited to, section 212(a)(3)(A)(ii) of the Act (8 U.S.C. 1182(a)(3)(A)(ii)), as an alien whom the Secretary of Homeland Security has reasonable grounds to believe, based on the alien's past failure to conform with the requirements for special registration, seeks to enter the United States to engage in unlawful activity.

(iii) *Overcoming inadmissibility.* An alien may overcome the presumption of inadmissibility set out in paragraph (f)(8)(ii) by making a showing that he or she satisfies conditions set by the Secretary of Homeland Security and the Secretary of State. If a consular officer, in adjudicating a new visa application by an alien that previously failed to register his or her departure from the United States, finds good cause existed for the alien's failure to register departure or that the alien is not inadmissible under section 212(a)(3)(A)(ii) of the Act, the inspecting officer at the port-of-entry, while not bound by the consular officer's decision, will consider this finding as a significantly favorable factor in determining whether the alien is admissible.

(9) *Completion of registration.* Registration under this paragraph (f) is not deemed to be complete unless all of the information required by the Department of Homeland Security and all requested documents are provided in a timely manner. Any additional re-registration that may be required and each change of material fact is a registration that is required under sections 262 and 263 of the Act (8 U.S.C. 1302, 1303). Each change of address required under this paragraph (f) is a change of address required under section 265 of the Act (8 U.S.C. 1305).

\* \* \* \* \*

Dated: November 27, 2003.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 03–30120 Filed 12–1–03; 8:45 am]

**BILLING CODE 4410–10–P**

4769

# Rules and Regulations

Federal Register

Vol. 82, No. 10

Tuesday, January 17, 2017

---

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

---

## DEPARTMENT OF HOMELAND SECURITY

**Office of the Secretary**

**8 CFR Part 235**

**[DHS Docket No. DHS–2017–0003]**

**RIN 1601–AA81**

### Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** This final rule revises Department of Homeland Security (DHS) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by Regulatory Information Number (RIN) 1601–AA81 and DHS Docket Number DHS–2017–0003, by any one of the following methods:

• *Federal e-Rulemaking Portal* www.regulations.gov. Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray

Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov.* The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize what are known as "expedited removal proceedings." Specifically, section 235(b) was amended to authorize the Attorney General (now the Secretary of

Homeland Security [1]) to remove, without a hearing before an immigration judge, aliens arriving in the United States who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii).

When it created the expedited removal process, Congress also created a limited exception for certain aliens who arrived at a U.S. port of entry by aircraft. Under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." For many years, this exception applied to Cuban nationals due to the lack of full diplomatic relations between the United States and Cuba. DHS regulations implementing section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), thus expressly stated that the expedited removal provisions apply to "[a]rriving aliens, as defined in 8 CFR 1.2, except for citizens of Cuba arriving at a United States port-of-entry by aircraft." 8 CFR 235.3(b)(1)(i); *see also* 8

---

[1] Under section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice (DOJ) official to DHS by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

CFR 1235.3(b)(1)(i) (parallel Department of Justice (DOJ) regulations stating that the expedited removal provisions apply to ''[a]rriving aliens, as defined in [8 CFR 1001.1(q)], except for citizens of Cuba arriving at a United States port-of-entry by aircraft'').[2]

Since that regulation was promulgated, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries. DHS, in consultation with the Department of State, has determined that the limitation at section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F) no longer applies with respect to Cuba.

Moreover, DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate

favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. Accordingly, DHS is eliminating provisions in its regulations that categorically exempt Cuban nationals who arrive at a U.S. port of entry by aircraft from expedited removal proceedings under 8 CFR 235.3. Importantly, the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by air no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. Moreover, previous U.S. policy justifications for exempting Cuban nationals from expedited removal—including Cuba's general refusal to accept the repatriation of its nationals—are no longer valid in many respects. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS, in consultation with the Department of State, has determined that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States. Accordingly, as a result of this final rule, Cuban nationals will be subject to expedited removal proceedings under section 235(b) of the INA and 8 CFR 235.3 like nationals of other countries. For the same reasons, DHS is also publishing a notice in this issue of the **Federal Register** to remove the parallel exceptions for expedited removal of Cuban nationals who arrive by sea or who are encountered by an immigration officer within 100 air miles of the U.S. border.

## II. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The implementation of this rule as a final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)(B)). Delaying the implementation of the change announced in this rule to allow pre-promulgation notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be

modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). And this rule is necessary to remove quickly from the United States certain Cuban nationals who arrive by air at U.S. ports of entry. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

Pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Specifically, DHS is concerned that publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life. Accordingly, DHS finds that it would be impracticable and contrary to the public interest to accept pre-promulgation comments on this rule. For the same reasons, DHS also finds good cause to issue this rule without a 30-day delayed effective date requirement of the APA, see 5 U.S.C. 553(d).[3]

In addition, the change implemented by this rule is part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and is also exempt from the notice and comment and 30-day delayed effective date requirements of the APA on that basis. DHS is

---

[2] DOJ initially promulgated 8 CFR 235.3(b)(1)(i) as an exercise of the functions of the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review. See 62 FR 10312 (Mar. 6, 1997). Following enactment of the HSA, 8 CFR 235.3(b)(1)(i) was transferred to DHS, and effectively duplicated in parallel DOJ regulations at 8 CFR 1235.3(b)(1)(i). See 68 FR 10349 (Mar. 5, 2003). DOJ is revising its parallel regulation by separate rulemaking in this issue of the **Federal Register**.

[3] In addition, in light of the lack of pre-publication notice and comment and a delayed effective date for the related notice that DHS has published in this issue of the **Federal Register**, a delay in the effective date of this regulation would be incongruous and unnecessary.

nevertheless providing the opportunity for the public to comment.

*B. Executive Orders 13563 and 12866*

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget has not designated this rule as a significant regulatory action under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has not reviewed this rule.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare a regulatory flexibility analysis that describes the effect of a proposed rule on small entities when the agency is required to publish a general notice of proposed rulemaking. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act); a small not-for-profit organization; or a small governmental jurisdiction (locality with fewer than 50,000 people). Because this final rule is exempt from notice-and-comment rulemaking requirements under 5 U.S.C. 553, a regulatory flexibility analysis is not required.

**Regulatory Amendments**

**List of Subjects for 8 CFR Part 235**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Authority and Issuance**

For the reasons stated in the preamble, part 235 of title 8 of the Code of Federal Regulations is amended as set forth below:

**8 CFR CHAPTER I**

**PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION**

■ 1. The authority citation for part 235 continues to read:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2004 Comp., p. 278], 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458]; Pub. L. 112–54.

■ 2. Revise § 235.3(b)(1)(i) to read as follows:

**§ 235.3   Inadmissible aliens and expedited removal.**

\*      \*      \*      \*      \*

(b) \* \* \*
(1) \* \* \*
(i) Arriving aliens, as defined in 8 CFR 1.2;

\*      \*      \*      \*      \*

Signed at Washington, DC, this 11th of January 2017.

Jeh Charles Johnson,

*Secretary of Homeland Security.*

[FR Doc. 2017–00915 Filed 1–13–17; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1235**

**[AG Order No. 3817–2017; EOIR Docket No. 401]**

**RIN 1125–AA80**

**Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air**

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule; request for comments.

**SUMMARY:** This final rule revises Executive Office for Immigration Review (EOIR) regulations to eliminate the categorical exception from expedited removal proceedings for Cuban nationals who arrive in the United States at a port of entry by aircraft. This final rule conforms with a parallel Department of Homeland Security (DHS) regulation. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

**DATES:** This final rule is effective January 13, 2017. Interested persons are invited to submit written comments on this final rule on or before March 20, 2017. Comments received by mail will be considered timely if they are

postmarked on or before that date. The electronic Federal Docket Management System (FDMS) will accept comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Please submit written comments to Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041. To ensure proper handling, please reference RIN No. 1125–AA80 or EOIR Docket No. 401 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Jean King, General Counsel, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041; telephone (703) 605–1744 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. EOIR also invites comments that relate to the economic, environmental, or federalism effects that might result from this rule. To provide the most assistance to EOIR, comments should explain the reason for any recommended change, and should include data, information, or authority that supports such recommended change.

All comments submitted for this rulemaking should include the agency name and RIN 1125–AA80 or EOIR Docket No. 401. Please note that all comments received are considered part of the public record and will be made available for public inspection at *www.regulations.gov.,* including personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) voluntarily submitted by the commenter.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase ''PERSONALLY IDENTIFIABLE INFORMATION'' in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase ''CONFIDENTIAL BUSINESS INFORMATION'' in the first paragraph of your comment. You also must prominently identify confidential

business information to be redacted within the comment. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.*

Personally identifiable information and confidential business information provided as set forth above will be placed in the agency's public docket file, but not posted online. To inspect the agency's public docket file in person, you must make an appointment with agency counsel. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for agency counsel's contact information.

## II. Background

This rule conforms to the rule published by DHS in this issue of the **Federal Register** that revises 8 CFR 235.3(b)(1)(i). This rule revises the parallel Department of Justice (DOJ) regulation, 8 CFR 1235.3(b)(1)(i), which states that the expedited removal provisions apply to "[a]rriving aliens, as defined in [8 CFR 1001.1(q)], except for citizens of Cuba arriving at a United States port-of-entry by aircraft".[1] Both the DHS rule and this rule eliminate the provisions in the Departments' respective regulations that categorically exempt Cuban nationals who arrive at a U.S. port of entry by aircraft from expedited removal proceedings. As a result of these changes, Cuban nationals who arrive in the United States at a port of entry by aircraft will be subject to expedited removal proceedings commensurate with nationals of other countries.

## III. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

The implementation of this rule as a final rule, with provisions for post-promulgation public comments, is based on the good cause exception found in section 553 of the Administrative Procedure Act (APA) (5 U.S.C. 553(b)(B)). Delaying the implementation of the change announced in this rule to allow pre-promulgation notice and comment would be impracticable and contrary to the public interest. Section 235(b)(1)(A)(iii)(I) of the Immigration and Nationality Act explicitly

authorizes the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and makes clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." 8 U.S.C. 1225(b)(1)(A)(iii)(I). This conforming rule is necessary to conform to the DHS rulemaking, which will allow DHS to remove quickly from the United States certain Cuban nationals who arrive by air at U.S. ports of entry. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

Pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Specifically, the Department is concerned that publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life.

Accordingly, DOJ finds that it would be impracticable and contrary to the public interest to accept pre-promulgation comments on this rule. For the same reasons, DOJ also finds good cause to issue this rule without a 30-day delayed effective date requirement of the APA, *see* 5 U.S.C. 553(d).[2]

In addition, the change implemented by this rule is part of a major foreign policy initiative announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DOJ, in consultation with the

Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and is also exempt from the notice and comment and 30-day delayed effective date requirements of the APA on that basis. DOJ is nevertheless providing the opportunity for the public to provide comments.

### B. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Office of Management and Budget has not designated this rule as a significant regulatory action under section 3(f) of Executive Order 12866. Accordingly, the Office of Management and Budget has not reviewed this rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare a regulatory flexibility analysis that describes the effect of a proposed rule on small entities when the agency is required to publish a general notice of proposed rulemaking. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act); a small not-for-profit organization; or a small governmental jurisdiction (locality with fewer than 50,000 people). Because this final rule is exempt from notice-and-comment rulemaking requirements under 5 U.S.C. 553, a regulatory flexibility analysis is not required.

### D. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions

---

[1] DOJ initially promulgated 8 CFR 235.3(b)(1)(i) as an exercise of the functions of the former Immigration and Naturalization Service (INS) and the Executive Office for Immigration Review. *See* 62 FR 10312 (Mar. 6, 1997). Following enactment of the HSA, 8 CFR 235.3(b)(1)(i) was transferred to DHS, and effectively duplicated in parallel DOJ regulations at 8 CFR 1235.3(b)(1)(i). *See* 68 FR 10349 (Mar. 5, 2003).

[2] In addition, in light of the lack of pre-publication notice-and-comment and a delayed effective date for the related notice that DHS has published in this issue of the **Federal Register**, a delay in the effective date of this regulation would be incongruous and unnecessary.

of the Unfunded Mandates Reform Act of 1995.

*E. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996. *See* 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*F. Executive Order 13132: Federalism*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988: Civil Justice Reform*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*H. Paperwork Reduction Act*

The provisions of the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320, do not apply to this rule because there are no new or revised recordkeeping or reporting requirements.

**List of Subjects in 8 CFR Part 1235**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Accordingly, for the reasons stated in the preamble, part 1235 of title 8 of the Code of Federal Regulations is amended as follows:

**PART 1235—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

■ 1. The authority citation for part 1235 continues to read:

   **Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224,

1225, 1226, 1228, 1365a note, 1379, 1731–32; Title VII of Public Law 110–229; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458).

■ 2. Revise § 1235.3(b)(1)(i) to read as follows:

**§ 1235.3  Inadmissible aliens and expedited removal.**

\*      \*      \*      \*      \*

   (b) \*  \*  \*
   (1) \*  \*  \*
   (i) Arriving aliens, as defined in § 1001.1(q) of this chapter;

\*      \*      \*      \*      \*

   Dated: January 11, 2017.

**Loretta E. Lynch,**
*Attorney General.*
[FR Doc. 2017–00902 Filed 1–13–17; 8:45 am]
**BILLING CODE 4410–30–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2016–9110; Directorate Identifier 2015–NM–196–AD; Amendment 39–18773; AD 2017–01–06]**

**RIN 2120–AA64**

**Airworthiness Directives; Airbus Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for certain Airbus Model A319–115, A319–132, A320–214, A320–232, A321–211, A321–213, and A321–231 airplanes. This AD was prompted by a report of certain tie rod assemblies installed on the hinged fairing assembly of the main landing gear (MLG) with no cadmium plating on the rod end threads. This AD requires inspection and replacement of certain tie rod assemblies installed on the hinged fairing assembly of the MLG. We are issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective February 21, 2017.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of February 21, 2017.

**ADDRESSES:** For service information identified in this final rule, contact Airbus, Airworthiness Office—EIAS, 1 Rond Point Maurice Bellonte, 31707 Blagnac Cedex, France; telephone +33 5 61 93 36 96; fax +33 5 61 93 44 51; email *account.airworth-eas@airbus.com;*

Internet *http://www.airbus.com.* You may view this referenced service information at the FAA, Transport Airplane Directorate, 1601 Lind Avenue SW., Renton, WA. For information on the availability of this material at the FAA, call 425–227–1221. It is also available on the Internet at *http:// www.regulations.gov* by searching for and locating Docket No. FAA–2016–9110.

**Examining the AD Docket**

You may examine the AD docket on the Internet at *http:// www.regulations.gov* by searching for and locating Docket No. FAA–2016–9110; or in person at the Docket Management Facility between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this AD, the regulatory evaluation, any comments received, and other information. The street address for the Docket Office (telephone 800–647–5527) is Docket Management Facility, U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE., Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Sanjay Ralhan, Aerospace Engineer, International Branch, ANM–116, Transport Airplane Directorate, FAA, 1601 Lind Avenue SW., Renton, WA 98057–3356; telephone 425–227–1405; fax 425–227–1149.

**SUPPLEMENTARY INFORMATION:**

**Discussion**

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Airbus Model A319–115, A319–132, A320–214, A320–232, A321–211, A321–213, and A321–231 airplanes. The NPRM published in the **Federal Register** on September 19, 2016 (81 FR 64083).

The European Aviation Safety Agency (EASA), which is the Technical Agent for the Member States of the European Union, has issued EASA Airworthiness Directive 2015–0234, dated December 8, 2015 (referred to after this as the Mandatory Continuing Airworthiness Information, or "the MCAI"), to correct an unsafe condition for certain Airbus Model A319–115, A319–132, A320–214, A320–232, A321–211, A321–213, and A321–231 airplanes. The MCAI states:

A production quality issue was identified concerning tie rod assemblies, having Part Number (P/N) starting with D52840212000 or D52840212000, which are installed on the main landing gear (MLG) hinged fairing assembly. This quality issue affects the cadmium plating surface treatment which

AR186

(OMB) for review and clearance under the Paperwork Reduction Act of 1995.

**DATES:** Fax written comments on the collection of information by September 10, 2004.

**ADDRESSES:** OMB is still experiencing significant delays in the regular mail, including first class and express mail, and messenger deliveries are not being accepted. To ensure that comments on the information collection are received, OMB recommends that written comments be faxed to the Office of Information and Regulatory Affairs, OMB, Attn: Fumie Yokota, Desk Officer for FDA, FAX: 202–395–6974.

**FOR FURTHER INFORMATION CONTACT:** Karen L. Nelson, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1482.

**SUPPLEMENTARY INFORMATION:** In compliance with 44 U.S.C. 3507, FDA has submitted the following proposed collection of information to OMB for review and clearance.

**Draft Guidance for Industry on Pharmacogenomic Data Submissions (OMB Control Numbers 0910–0014, 0910–0001, and 0910–0338)—Extension**

The guidance provides recommendations to sponsors submitting or holding investigational new drug applications (INDs), new drug applications (NDAs), or biologic liscensing applications (BLAs) on what pharmacogenomic data should be submitted to the agency during the drug development process. Sponsors holding and applicants submitting INDs, NDAs, or BLAs are subject to FDA requirements in parts 312, 314, and 601 (21 CFR 312, 314, and 601) for submitting to the agency data relevant to drug safety and efficacy (§§ 312.22, 312.23, 312.31, 312.33, 314.50, 314.81, 601.2, and 601.12).

*Description of Respondents*: Sponsors submitting or holding INDs, NDAs, or BLAs for human drugs and biologics.

*Burden Estimate*: The guidance interprets FDA regulations for IND, NDA, or BLA submissions, clarifying when the regulations require pharmacogenomics data to be submitted and when the submission of such data is voluntary. The pharmacogenomic data submissions described in the guidance that are required to be submitted to an IND, NDA, BLA, or annual report are covered by the information collection requirements under parts 312, 314, and 601 and are approved by OMB under control numbers 0910–0014 (part 312—INDs; approved until January 1, 2006); 0910–0001 (part 314—NDAs and annual reports; approved until March 31, 2005); and 0910–0338 (approved until August 31, 2005).

The guidance distinguishes between pharmacogenomic tests that may be considered valid biomarkers appropriate for regulatory decisionmaking, and other, less well developed exploratory tests. The submission of exploratory pharmacogenomic data is not required under the regulations, although the agency encourages the voluntary submission of such data.

The guidance describes the voluntary genomic data submission (VGDS) that can be used for such a voluntary submission. The guidance does not recommend a specific format for the VGDS, except that such a voluntary submission be designated as a VGDS. The data submitted in a VGDS and the level of detail should be sufficient for FDA to be able to interpret the information and independently analyze the data, verify results, and explore possible genotype-phenotype correlations across studies. FDA does not want the VGDS to be overly burdensome and time-consuming for the sponsor.

FDA has estimated the burden of preparing a voluntary submission described in the guidance that should be designated as a VGDS. Based on FDA's familiarity with sponsors' interest in submitting pharmacogenomic data during the drug development process, FDA estimates that approximately 20 sponsors will submit approximately 80 VGDSs and that, on average, each VGDS will take approximately 10 hours to prepare and submit to FDA.

In the **Federal Register** of November 4, 2003 (68 FR 62461), FDA published a 60-day notice requesting public comment on the information collection provisions. No comments were received on the information collection estimates.

TABLE 1.—ESTIMATED ANNUAL REPORTING BURDEN[1]

| | Number of Respondents | Number of Responses per Respondent | Total Annual Responses | Hours per Response | Total Hours |
|---|---|---|---|---|---|
| Voluntary genomic data submissions | 20 | 4 | 80 | 10 | 800 |

[1] There are no capital costs or operating and maintenance costs associated with this collection.

Dated: August 5, 2004.

**Jeffrey Shuren,**
*Assistant Commissioner for Policy.*
[FR Doc. 04–18360 Filed 8–6–04; 12:04 pm]
**BILLING CODE 4160–01–S**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Bureau of Customs and Border Protection**

**Designating Aliens For Expedited Removal**

**AGENCY:** Bureau of Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice authorizes the Department of Homeland Security to place in expedited removal proceedings any or all members of the following class of aliens: Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter. DHS believes that exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.

AR187

**DATES:** This notice is effective on August 11, 2004.

**ADDRESSES:** Please submit written comments to: Regulations Branch, Office of Regulations and Rulings, Bureau of Customs and Border Protection, 1300 Pennsylvania Avenue, NW., Washington, DC 20229. *See* SUPPLEMENTARY INFORMATION section for more details on submission of comments.

**FOR FURTHER INFORMATION CONTACT:** Dana E. Graydon, Acting Associate Chief, Office of Border Patrol, U.S. Customs and Border Protection, 1300 Pennsylvania Ave., NW., Suite 6.5–E, Washington, DC 20229, *dana.graydon@dhs.gov,* 202–344–3153.

**SUPPLEMENTARY INFORMATION:** Please submit written comments, original and two copies, to the address listed above on or before after October 12, 2004. Submitted comments may be inspected at the Office of Regulations and Rulings, Bureau of Customs and Border Protection, 799 9th Street, NW., Washington, DC, during regular business hours. Arrangements to inspect submitted comments should be made in advance by calling Mr. Joseph Clark at (202) 572–8768.

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, aliens arriving in the U.S. who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7). Under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), expedited removal proceedings may be applied to two categories of aliens. First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are "arriving in the United States." "Arriving aliens" are defined by regulation to mean "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international waters and brought into the United States by any means whether or not to a designated port-of-entry." (8 CFR 1.1(q)). Cuban citizens who arrive at U.S. ports-of-entry by aircraft are exempted from this first category of

aliens subject to expedited removal under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). Second, section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), permits the Attorney General (now the Secretary of Homeland Security), in his or her sole and unreviewable discretion, to designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), authorizes the Secretary to apply (by designation) expedited removal proceedings to aliens who arrive in, attempt to enter, or have entered the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility.

By statute, an alien present in the U.S. who has not been admitted shall be deemed for purposes of the Act to be an applicant for admission. 8 U.S.C. 1225(a), section 235(a)(1) of the Act. Once alienage has been established, an alien applicant for admission has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of this Act. Aliens who have not been admitted or paroled and who are subject to expedited removal under this designation have the burden of proof to show affirmatively that they are not inadmissible and have maintained the required continuous physical presence in the U.S. Any absence from the U.S. shall serve to break the period of continuous physical presence. 8 CFR 235.3(b)(1)(ii).

Pursuant to 8 CFR 235.3(b)(1)(ii) (62 FR 10312, 10355, March 6, 1997), the Attorney General provided that her designation authority would be exercised by the Commissioner of the former Immigration and Naturalization Service (INS). Pursuant to sections 102(a), 441, 1512(d) and 1517 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2310, 6 U.S.C. 112, 251, 552(d), 557, and 8 CFR 2.1, the authority of the Attorney General and the Commissioner of the INS in accordance with 8 U.S.C. 235(b)(1)(A)(iii) and 8 CFR 235.3(b)(1)(ii), respectively, was transferred to the Secretary of Homeland Security, and references to the Attorney General or the Commissioner in the statute and regulations are deemed to refer to the Secretary.

DHS has a pressing need to improve the security and safety of the nation's

land borders, and expanding expedited removal between ports of entry will provide DHS officers with a valuable tool to meet that objective. Presently DHS officers cannot apply expedited removal procedures to the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry. It is not logistically possible for DHS to initiate formal removal proceedings against all such aliens. This is primarily a problem along the southern border, and thus the majority of such aliens are Mexican nationals, who are "voluntarily" returned to Mexico without any formal removal order. Based upon anecdotal evidence, many of those who are returned to Mexico seek to reenter the U.S. illegally, often within 24 hours of being voluntarily returned (it is not uncommon for DHS officers to apprehend the same individual many times over a span of several months). On the southern land border with Mexico, those aliens who are apprehended who are not Mexican nationals cannot be returned to Mexico. Currently, non-Mexican nationals who are inadmissible may be voluntarily returned to their country of citizenship or nationality via aircraft, or placed in formal removal proceedings under section 240 of the Act. Because DHS lacks the resources to detain all third-country nationals (aliens who are neither nationals of Mexico nor Canada) who have been apprehended after illegally crossing into the U.S. from both the northern and southern land borders, many of these aliens are released in the U.S. each year with a notice to appear for removal proceedings. Many of these aliens subsequently fail to appear for their removal proceedings, and then disappear in the U.S.

Without limiting its ability to exercise its discretion in the event of a national emergency, other unforeseen events, or a change in circumstances, DHS plans under this designation as a matter of prosecutorial discretion to apply expedited removal only to (1) third-country nationals and (2) to Mexican and Canadian nationals with histories of criminal or immigration violations, such as smugglers or aliens who have made numerous illegal entries. We recognize that certain aliens, including unaccompanied minors, members of the Class Action Settlement in *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991) (which settled the claims of a class of Salvadorans and Guatemalans regarding handling of asylum claims), and aliens who may be eligible for cancellation of removal under section 240A of the Act,

AR188

for example, may possess equities that weigh against the use of expedited removal proceedings. Accordingly, in appropriate circumstances and as an exercise of prosecutorial discretion, officers will be able to permit certain aliens described in this notice to return voluntarily, withdraw their application for admission, or to be placed into regular removal proceedings under section 240 of the Act in lieu of expedited removal proceedings.

In the interests of focusing enforcement resources upon unlawful entries that have a close spatial and temporal nexus to the border, this notice does not implement the full nationwide expedited removal authority available to DHS pursuant to section 235 of the Act, 8 U.S.C. 1225. Nor does this notice limit DHS from implementing the full nationwide enforcement authority of the statute through publication of a subsequent **Federal Register** notice. The statute provides DHS with the authority to apply expedited removal to aliens who cannot establish that they have maintained a physical presence in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility. The statute also does not limit geographically the application of expedited removal. At this time, DHS has elected to assert and implement only that portion of the authority granted by the statute that bears close temporal and spatial proximity to illegal entries at or near the border. Accordingly, this notice applies only to aliens encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border.

It is anticipated under this designation that expedited removal will be employed against those aliens who are apprehended immediately proximate to the land border and have negligible ties or equities in the U.S. Nevertheless, this designation extends to a 100-mile operational range because many aliens will arrive in vehicles that speedily depart the border area, and because other recent arrivals will find their way to near-border locales seeking transportation to other locations within the interior of the U.S. The 100-mile range already has been established by regulation as a reasonable distance from the external boundary of the U.S. for the purpose of preventing the illegal entry of aliens into the U.S. *See* section 287(a)(3) of the Act; 8 CFR 287.1(a)(2) and (c).

The use of expedited removal orders, which prohibit reentry for a period of 5 years, will deter unlawful entry, and make it possible to pursue future

criminal prosecution against those aliens who continue to enter the U.S. in violation of law. It will also accelerate the processing of inadmissible aliens because it generally does not require an appearance before an immigration judge, except in certain circumstances. Deterring future entries and accelerating removals will enhance DHS's ability to oversee the border, and to focus its resources on threats to public safety and to national security. DHS also believes that the use of expedited removal will likely interfere with human trafficking and alien smuggling operations, which are growing in sophistication, and which induce aliens from all over the world to cross the country's borders. Alien smuggling organizations have been responsible for numerous violent crimes, including homicide, hostage-taking, and crimes involving sexual exploitation. DHS expects that the expansion of expedited removal under this notice will ultimately reduce the number of aliens who risk injury or death attempting to enter the U.S. through difficult mountainous and desert terrain, as well as decrease property crimes in border areas.

All aliens placed into expedited removal as a result of this designation will have the same rights to a credible fear screening by an asylum officer, and the right to review of an adverse credible fear determination by an immigration judge, that are provided to arriving aliens who are currently placed into expedited removal after being denied admission at a port of entry. Any alien who falls within this designation, who is placed in expedited removal proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a removal proceeding under section 240 of the Act, sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4). The Forms I–867A and I–867B currently used by officers who process aliens under the expedited removal program provide to all aliens in expedited removal proceedings information concerning the credible fear interview, in accordance with the statutory requirement at section 235(b)(1)(B)(iv) of the Act, 8 U.S.C. 1225(b)(1)(B)(iv). The forms require that the officer inquire whether the alien has any reason to fear harm if returned to his or her country. Officers authorized

to administer the expedited removal program will be trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

Similarly, all aliens placed into expedited removal as a result of this designation, who claim lawful permanent resident, refugee, asylee status, or U.S. citizenship will receive the same procedures, including the right to review of any adverse expedited removal order by an immigration judge, that are provided to arriving aliens making similar status claims who are currently placed in expedited removal at ports of entry under 8 CFR 235.3(b). DHS, with limited exceptions, plans to detain aliens who are placed in expedited removal under this designation. Section 235(b)(1)(B)(iii)(IV) of the Act, 8 U.S.C. 1225(b)(1)(B)(iii)(IV), and 8 CFR 235.3(b)(2)(iii) direct that any alien who is placed in expedited removal proceedings shall be detained pending a final determination of credible fear and, if found not to have such a fear, such alien shall be detained until removed. Parole of such alien under 8 CFR 235.3(b)(2)(iii) may be permitted only when the Secretary determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), directs that if a credible fear has been established, the alien shall be detained for further consideration of the protection claim or claims. Under Department of Justice regulations, immigration judge review of custody determinations is permitted only for bond and custody determinations pursuant to section 236 of the Act, 8 U.S.C. 1226, 8 CFR 1236, and 8 CFR 1003.19(a). Aliens subject to expedited removal procedures under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond redetermination before an immigration judge. Parole of aliens determined to have a credible fear may be considered in accordance with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5), and 8 CFR 212.5.

The expedited removal authority implemented in this Notice will not be employed against Cuban citizens because removals to Cuba cannot presently be assured and for other U.S. policy reasons.

The Department has determined that good cause exists under the

Administrative Procedure Act (APA), 5 U.S.C. 553(b)(3)(B) and (d)(3), to exempt this notice from the notice and comment requirements under the APA. Delaying the implementation of this notice to allow public notice and comment would be impracticable, unnecessary and contrary to the public interest.

Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). The large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries, necessitates that DHS expand the expedited removal program as provided in this designation. DHS is confident that the experience gained through implementation of the expedited removal program at ports of entry will enable DHS to expand the program in a manner that is both effective and humane.

There is an urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders, as well as the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations. The expansion of expedited removal will increase the deterrence of illegal entries by ensuring that apprehension quickly leads to removal. This is especially critical because of the environmental dangers faced by aliens illegally entering the U.S. across desert or mountainous areas. In the Arizona desert alone, since the initiation of the Arizona Border Control Initiative (ABC) in March of 2004, the Border Patrol has rescued hundreds of aliens in distress and has unfortunately discovered over 40 aliens who have died in the attempt to enter the U.S.

This designation is necessary to remove quickly from the U.S. aliens who are encountered shortly after illegally entering the U.S. across the land borders. The ability to detain aliens while admissibility and identity is determined and protection claims are adjudicated, as well as to quickly remove aliens without protection claims or claims to lawful status, is a necessity for national security and public safety. As a critical element of a number of DHS initiatives to enhance security along the border, the expansion of expedited removal will increase

national security, diminish the number of illegal entries, and impair the ability of smuggling organizations to operate. Accordingly, for the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable, unnecessary and contrary to the public interest as those terms are used under the APA.

Although the Department believes for the foregoing reasons that pre-promulgation notice and comment procedures are not statutorily mandated in this case, DHS is interested in receiving comments from the public on all aspects of the expedited removal program, but especially on the effectiveness of the program, problems envisioned by the commenters, and suggestions on how to address those problems. DHS believes that by maintaining a dialogue with interested parties, DHS can ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

The expansion of expedited removal under this notice will also support the Arizona Border Control Initiative (ABC), a program designed to secure and protect the Arizona border. Working with other Federal, State, local and tribal entities, DHS has placed significant personnel and technical assets on the border to decrease the deaths of illegal immigrants in the desert; and to lower the rate of violent crime related to illegal border traffic in Southern Arizona. The ABC began operations in March 2004. For the reasons stated above, the ABC's success will rely in part upon the ability of DHS officers to place inadmissible aliens apprehended shortly after illegal entry into expedited removal.

Every year, illegal aliens from many different countries continue to enter the U.S. illegally across the nation's land borders. It is critical for public safety and national security that these aliens are not released into the U.S. without adequate verification of their identities and backgrounds.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act ("Act") and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) Except as provided in paragraph (5), the Department of Homeland Security, through its component bureaus, may place in expedited removal proceedings any or all members of the following class of aliens: Aliens who are inadmissible under sections

212(a)(6)(C) or (7) of the Act, who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter. Each alien subject to this notice bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the U.S. continuously for the relevant 14-day period. This notice does not apply to aliens who arrive at U.S. ports-of-entry, as these aliens are already subject to expedited removal. This notice will be given effect only with respect to apprehensions made within the CBP Border Patrol sectors of (Laredo, McAllen, Del Rio, Marfa, El Paso, Tucson, Yuma, El Centro, San Diego, Blaine, Spokane, Havre, Grand Forks, Detroit, Buffalo, Swanton, and Houlton).

(2) Any alien who falls within this designation who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer to determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for proceedings under section 240 of the Act, 8 U.S.C. 1229a.

(3) Any alien who is placed in expedited removal proceedings under this designation who claims lawful permanent resident, refugee, asylee status, or U.S. citizenship will be processed in accordance with the procedures provided in 8 CFR 235.3(b) and 8 CFR 1235.3(b).

(4) Any alien who is placed in expedited removal proceedings under this designation will be detained pursuant to section 235(b) of the Act, 8 U.S.C. 1225(b), with certain exceptions, until removed. However, aliens determined to have a credible fear may be considered by DHS for parole in accordance with section 212(d)(5) of the Act and 8 CFR 212.5. Aliens detained pursuant to the expedited removal provisions under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond

redetermination before an immigration judge.

(5) This notice applies to aliens described in paragraph (1) who are encountered within the U.S. beginning August 11, 2004.

(6) The expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals.

Dated: August 3, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–18469 Filed 8–10–04; 8:45 am]

**BILLING CODE 4820–02–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4903–N–63]**

## Notice of Proposed Information Collection: Comment Request; Contract and Subcontract Activity

**AGENCY:** Office of the Chief Information Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

This is a request for approval of a revision to the currently approved information collection, which enables HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

**DATES:** *Comments due:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Wayne_Eddins@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number. Copies of available documents may be obtained from Mr. Eddins and at HUD's Web site at *http:/*

*/www5.hud.gov:63001/po/i/icbts/ collectionsearch.cfm.*

**FOR FURTHER INFORMATION CONTACT:** Lillian Deitzer, Information Technology Specialist, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Lillian_L_Deitzer@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number.

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

This Notice is soliciting comments from members of the public and affecting agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Contract and Subcontract Activity.

*OMB Control Number, if applicable:* 2535–pending.

*Description of the need for the information and proposed use:* Information will enable HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

*Agency form numbers, if applicable:* HUD 2516.

*Estimation of the total number of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:* An estimation of the total numbers of hours needed to prepare the information collection is 5,000, number of respondents is 5,000,

frequency of response is "annually," and the hours per response is 1 hour.

*Status of the proposed information collection:* Revision of a currently approved collection.

**Authority:** Section 3506 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, as amended.

Dated: August 4, 2004.

**Wayne Eddins,**

*Departmental Reports Management Officer, Office of the Chief Information Officer.*

[FR Doc. 04–18301 Filed 8–10–04; 8:45 am]

**BILLING CODE 4210–72–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4907–N–26]**

## Notice of Proposed Information Collection: Comment Request; Automated Clearing House (ACH) Program Application—Title I Insurance Charge Payments System

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street, SW., L'Enfant Plaza Building, Room 8001, Washington, DC 20410 or *Wayne Eddins@hud.gov*.

**FOR FURTHER INFORMATION CONTACT:** Lester J. West, Director, Financial Operations Center, Department of Housing and Urban Development, 52 Corporate Circle, Albany, NY 12203, telephone (518) 464–4200 x4206 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** The Department is submitting the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

AR191

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### "Family Unit" Data for Select Courts[1]

| Court | Initial Receipts | Initial Case Completions | Initial Case Completion Decisions | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Removal | *In Absentia Removal* | Relief | Termination | Voluntary Departure | Other |
| ATLANTA | 4,510 | 1,926 | 1,888 | 1,571 | 0 | 1 | 37 | 0 |
| BALTIMORE | 1,616 | 419 | 402 | 366 | 1 | 0 | 16 | 0 |
| CHICAGO | 4,253 | 1,124 | 1,046 | 498 | 4 | 52 | 10 | 12 |
| DENVER | 2,306 | 561 | 552 | 550 | 0 | 5 | 4 | 0 |
| HOUSTON | 12,525 | 2,895 | 2,757 | 2,334 | 3 | 3 | 132 | 0 |
| LOS ANGELES | 6,045 | 806 | 770 | 660 | 8 | 18 | 10 | 0 |
| MIAMI | 7,602 | 2,303 | 2,201 | 2,065 | 3 | 50 | 49 | 0 |
| NEW ORLEANS | 5,076 | 1,415 | 1,383 | 1,274 | 3 | 2 | 27 | 0 |
| NEW YORK CITY | 5,961 | 1,521 | 1,471 | 1,327 | 15 | 11 | 23 | 1 |
| SAN FRANCISCO | 6,392 | 343 | 314 | 232 | 25 | 4 | 0 | 0 |
| TOTAL | 56,286 | 13,313 | 12,784 | 10,877 | 62 | 146 | 308 | 13 |

Data Generated: June 17 2019
Data for period from September 24, 2018 through June 14, 2019
[1] The term "family unit" is an apprehension classification used by the Department of Homeland Security (DHS), and EOIR does not generally differentiate "family unit" cases from other cases unless they are identified as such by DHS. Accordingly, the "family unit" cases represented in the chart do not include all cases of "family units" currently in immigration proceedings nationwide.

AR192

# Presidential Documents

Executive Order 13767 of January 25, 2017

## Border Security and Immigration Enforcement Improvements

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (8 U.S.C. 1101 *et seq.*) (INA), the Secure Fence Act of 2006 (Public Law 109–367) (Secure Fence Act), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208 Div. C) (IIRIRA), and in order to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, I hereby order as follows:

**Section 1**. *Purpose.* Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety. Such aliens have not been identified or inspected by Federal immigration officers to determine their admissibility to the United States. The recent surge of illegal immigration at the southern border with Mexico has placed a significant strain on Federal resources and overwhelmed agencies charged with border security and immigration enforcement, as well as the local communities into which many of the aliens are placed.

Transnational criminal organizations operate sophisticated drug- and human-trafficking networks and smuggling operations on both sides of the southern border, contributing to a significant increase in violent crime and United States deaths from dangerous drugs. Among those who illegally enter are those who seek to harm Americans through acts of terror or criminal conduct. Continued illegal immigration presents a clear and present danger to the interests of the United States.

Federal immigration law both imposes the responsibility and provides the means for the Federal Government, in cooperation with border States, to secure the Nation's southern border. Although Federal immigration law provides a robust framework for Federal-State partnership in enforcing our immigration laws—and the Congress has authorized and provided appropriations to secure our borders—the Federal Government has failed to discharge this basic sovereign responsibility. The purpose of this order is to direct executive departments and agencies (agencies) to deploy all lawful means to secure the Nation's southern border, to prevent further illegal immigration into the United States, and to repatriate illegal aliens swiftly, consistently, and humanely.

**Sec. 2**. *Policy.* It is the policy of the executive branch to:

(a) secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism;

(b) detain individuals apprehended on suspicion of violating Federal or State law, including Federal immigration law, pending further proceedings regarding those violations;

(c) expedite determinations of apprehended individuals' claims of eligibility to remain in the United States;

(d) remove promptly those individuals whose legal claims to remain in the United States have been lawfully rejected, after any appropriate civil or criminal sanctions have been imposed; and

(e) cooperate fully with States and local law enforcement in enacting Federal-State partnerships to enforce Federal immigration priorities, as well as State monitoring and detention programs that are consistent with Federal law and do not undermine Federal immigration priorities.

**Sec. 3.** *Definitions.* (a) "Asylum officer" has the meaning given the term in section 235(b)(1)(E) of the INA (8 U.S.C. 1225(b)(1)).

(b) "Southern border" shall mean the contiguous land border between the United States and Mexico, including all points of entry.

(c) "Border States" shall mean the States of the United States immediately adjacent to the contiguous land border between the United States and Mexico.

(d) Except as otherwise noted, "the Secretary" shall refer to the Secretary of Homeland Security.

(e) "Wall" shall mean a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier.

(f) "Executive department" shall have the meaning given in section 101 of title 5, United States Code.

(g) "Regulations" shall mean any and all Federal rules, regulations, and directives lawfully promulgated by agencies.

(h) "Operational control" shall mean the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband.

**Sec. 4.** *Physical Security of the Southern Border of the United States.* The Secretary shall immediately take the following steps to obtain complete operational control, as determined by the Secretary, of the southern border:

(a) In accordance with existing law, including the Secure Fence Act and IIRIRA, take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border;

(b) Identify and, to the extent permitted by law, allocate all sources of Federal funds for the planning, designing, and constructing of a physical wall along the southern border;

(c) Project and develop long-term funding requirements for the wall, including preparing Congressional budget requests for the current and upcoming fiscal years; and

(d) Produce a comprehensive study of the security of the southern border, to be completed within 180 days of this order, that shall include the current state of southern border security, all geophysical and topographical aspects of the southern border, the availability of Federal and State resources necessary to achieve complete operational control of the southern border, and a strategy to obtain and maintain complete operational control of the southern border.

**Sec. 5.** *Detention Facilities.* (a) The Secretary shall take all appropriate action and allocate all legally available resources to immediately construct, operate, control, or establish contracts to construct, operate, or control facilities to detain aliens at or near the land border with Mexico.

(b) The Secretary shall take all appropriate action and allocate all legally available resources to immediately assign asylum officers to immigration detention facilities for the purpose of accepting asylum referrals and conducting credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1225(b)(1)) and applicable regulations and reasonable fear determinations pursuant to applicable regulations.

(c) The Attorney General shall take all appropriate action and allocate all legally available resources to immediately assign immigration judges to immigration detention facilities operated or controlled by the Secretary, or operated or controlled pursuant to contract by the Secretary, for the

purpose of conducting proceedings authorized under title 8, chapter 12, subchapter II, United States Code.

**Sec. 6**. *Detention for Illegal Entry*. The Secretary shall immediately take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country to the extent permitted by law. The Secretary shall issue new policy guidance to all Department of Homeland Security personnel regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch and release," whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law.

**Sec. 7**. *Return to Territory*. The Secretary shall take appropriate action, consistent with the requirements of section 1232 of title 8, United States Code, to ensure that aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came pending a formal removal proceeding.

**Sec. 8**. *Additional Border Patrol Agents*. Subject to available appropriations, the Secretary, through the Commissioner of U.S. Customs and Border Protection, shall take all appropriate action to hire 5,000 additional Border Patrol agents, and all appropriate action to ensure that such agents enter on duty and are assigned to duty stations as soon as is practicable.

**Sec. 9**. *Foreign Aid Reporting Requirements*. The head of each executive department and agency shall identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico on an annual basis over the past five years, including all bilateral and multilateral development aid, economic assistance, humanitarian aid, and military aid. Within 30 days of the date of this order, the head of each executive department and agency shall submit this information to the Secretary of State. Within 60 days of the date of this order, the Secretary shall submit to the President a consolidated report reflecting the levels of such aid and assistance that has been provided annually, over each of the past five years.

**Sec. 10**. *Federal-State Agreements*. It is the policy of the executive branch to empower State and local law enforcement agencies across the country to perform the functions of an immigration officer in the interior of the United States to the maximum extent permitted by law.

(a) In furtherance of this policy, the Secretary shall immediately take appropriate action to engage with the Governors of the States, as well as local officials, for the purpose of preparing to enter into agreements under section 287(g) of the INA (8 U.S.C. 1357(g)).

(b) To the extent permitted by law, and with the consent of State or local officials, as appropriate, the Secretary shall take appropriate action, through agreements under section 287(g) of the INA, or otherwise, to authorize State and local law enforcement officials, as the Secretary determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties.

(c) To the extent permitted by law, the Secretary may structure each agreement under section 287(g) of the INA in the manner that provides the most effective model for enforcing Federal immigration laws and obtaining operational control over the border for that jurisdiction.

**Sec. 11**. *Parole, Asylum, and Removal*. It is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens.

(a) The Secretary shall immediately take all appropriate action to ensure that the parole and asylum provisions of Federal immigration law are not illegally exploited to prevent the removal of otherwise removable aliens.

(b) The Secretary shall take all appropriate action, including by promulgating any appropriate regulations, to ensure that asylum referrals and credible fear determinations pursuant to section 235(b)(1) of the INA (8 U.S.C. 1125(b)(1)) and 8 CFR 208.30, and reasonable fear determinations pursuant to 8 CFR 208.31, are conducted in a manner consistent with the plain language of those provisions.

(c) Pursuant to section 235(b)(1)(A)(iii)(I) of the INA, the Secretary shall take appropriate action to apply, in his sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II).

(d) The Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole.

(e) The Secretary shall take appropriate action to require that all Department of Homeland Security personnel are properly trained on the proper application of section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (8 U.S.C. 1232) and section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)), to ensure that unaccompanied alien children are properly processed, receive appropriate care and placement while in the custody of the Department of Homeland Security, and, when appropriate, are safely repatriated in accordance with law.

**Sec. 12.** *Authorization to Enter Federal Lands.* The Secretary, in conjunction with the Secretary of the Interior and any other heads of agencies as necessary, shall take all appropriate action to:

(a) permit all officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to have access to all Federal lands as necessary and appropriate to implement this order; and

(b) enable those officers and employees of the United States, as well as all State and local officers as authorized by the Secretary, to perform such actions on Federal lands as the Secretary deems necessary and appropriate to implement this order.

**Sec. 13.** *Priority Enforcement.* The Attorney General shall take all appropriate steps to establish prosecution guidelines and allocate appropriate resources to ensure that Federal prosecutors accord a high priority to prosecutions of offenses having a nexus to the southern border.

**Sec. 14.** *Government Transparency.* The Secretary shall, on a monthly basis and in a publicly available way, report statistical data on aliens apprehended at or near the southern border using a uniform method of reporting by all Department of Homeland Security components, in a format that is easily understandable by the public.

**Sec. 15.** *Reporting.* Except as otherwise provided in this order, the Secretary, within 90 days of the date of this order, and the Attorney General, within 180 days, shall each submit to the President a report on the progress of the directives contained in this order.

**Sec. 16.** *Hiring.* The Office of Personnel Management shall take appropriate action as may be necessary to facilitate hiring personnel to implement this order.

**Sec. 17.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 25, 2017.*

[FR Doc. 2017–02095
Filed 1–27–17; 11:15 am]
Billing code 3295–F7–P

accounting would also permit the individual who is the subject of a record to impede the investigation, to tamper with witnesses or evidence, and to avoid detection or apprehension, which would undermine the entire investigative process.

(ii) From subsection (e)(8) (Notice on Individuals) because compliance would interfere with DHS's ability to obtain, serve, and issue subpoenas, warrants, and other law enforcement mechanisms that may be filed under seal and could result in disclosure of investigative techniques, procedures, and evidence.

(iii) From subsection (g) (Civil Remedies) to the extent that the system is exempt from other specific subsections of the Privacy Act.

(b) Additionally, this system contains records or information recompiled from or created from information contained in other systems of records that are exempt from certain provisions of the Privacy Act. For these records or information only, the Secretary of Homeland Security, pursuant to 5 U.S.C. 552a(j)(2), has exempted this system from the following provisions of the Privacy Act: 5 U.S.C. 552a(c)(3), (c)(4); (d)(1)–(4); (e)(1), (e)(2), (e)(3), (e)(4)(G), (e)(4)(H), (e)(4)(I), (e)(5) and (e)(8); (f); and (g). Additionally, the Secretary of Homeland Security, pursuant to 5 U.S.C. 552a(k)(2), has exempted this system from the following provisions of the Privacy Act, 5 U.S.C. 552a(c)(3); (d)(1)–(4); (e)(1), (e)(4)(G), (e)(4)(H), (e)(4)(I); and (f). Exemptions from these particular subsections are justified, on a case-by-case basis to be determined at the time a request is made, for the following reasons:

(i) From subsection (c)(3) and (c)(4) (Accounting for Disclosures) because release of the accounting of disclosures could alert the subject of an investigation of an actual or potential criminal, civil, or regulatory violation to the existence of that investigation and reveal investigative interest on the part of DHS as well as the recipient agency. Disclosure of the accounting would therefore present a serious impediment to law enforcement efforts and/or efforts to preserve national security. Disclosure of the accounting would also permit the individual who is the subject of a record to impede the investigation, to tamper with witnesses or evidence, and to avoid detection or apprehension, which would undermine the entire investigative process.

(ii) From subsection (d) (Access to Records) because access to the records contained in this system of records could inform the subject of an investigation of an actual or potential

criminal, civil, or regulatory violation to the existence of that investigation and reveal investigative interest on the part of DHS or another agency. Access to the records could permit the individual who is the subject of a record to impede the investigation, and to avoid detection or apprehension. Amendment of the records could interfere with ongoing investigations and law enforcement activities and would impose an unreasonable administrative burden by requiring investigations to be continually reinvestigated. In addition, permitting access and amendment to such information could disclose security-sensitive information that could be detrimental to homeland security.

(iii) From subsection (e)(1) (Relevancy and Necessity of Information) because in the course of investigations into potential violations of federal law, the accuracy of information obtained or introduced occasionally may be unclear, or the information may not be strictly relevant or necessary to a specific investigation. In the interests of effective law enforcement, it is appropriate to retain all information that may aid in establishing patterns of unlawful activity.

(iv) From subsection (e)(2) (Collection of Information from Individuals) because requiring that information be collected from the subject of an investigation would alert the subject to the nature or existence of the investigation, thereby interfering with that investigation and related law enforcement activities.

(v) From subsection (e)(3) (Notice to Subjects) because providing such detailed information could impede law enforcement by compromising the existence of a confidential investigation or reveal the identity of witnesses or confidential informants.

(vi) From subsections (e)(4)(G), (e)(4)(H), and (e)(4)(I) (Agency Requirements) and (f) (Agency Rules), because portions of this system are exempt from the individual access provisions of subsection (d) for the reasons noted above, and therefore DHS is not required to establish requirements, rules, or procedures with respect to such access. Providing notice to individuals with respect to existence of records pertaining to them in the system of records or otherwise setting up procedures pursuant to which individuals may access and view records pertaining to themselves in the system would undermine investigative efforts and reveal the identities of witnesses, potential witnesses, and confidential informants.

(vii) From subsection (e)(5) (Collection of Information) because with the collection of information for law enforcement purposes, it is impossible to determine in advance what information is accurate, relevant, timely, and complete. Compliance with subsection (e)(5) would preclude DHS agents from using their investigative training and exercise of good judgment to both conduct and report on investigations.

(viii) From subsection (e)(8) (Notice on Individuals) because compliance would interfere with DHS's ability to obtain, serve, and issue subpoenas, warrants, and other law enforcement mechanisms that may be filed under seal and could result in disclosure of investigative techniques, procedures, and evidence.

(ix) From subsection (g) (Civil Remedies) to the extent that the system is exempt from other specific subsections of the Privacy Act.

*   *   *   *   *

Dated: March 2, 2016.

**Karen L. Neuman,**

*Chief Privacy Officer, Department of Homeland Security.*

[FR Doc. 2016–06233 Filed 3–18–16; 8:45 am]

**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 234**

**U.S. Customs and Border Protection**

**19 CFR Part 122**

**[USCBP–2016–0015; CBP Dec 16–06]**

**RIN 1651–AB10**

**Flights to and From Cuba**

**AGENCY:** U.S. Customs and Border Protection, DHS.

**ACTION:** Interim final rule; request for comments.

---

**SUMMARY:** Current U.S. Customs and Border Protection (CBP) regulations contain a separate subpart O addressing flights to and from Cuba. The provisions in that subpart are either obsolete due to intervening regulatory changes or are duplicative of regulations applicable to all other similarly situated international flights. This rule therefore amends the regulations by removing subpart O. These amendments are consistent with the President's policy promoting the normalization of relations between the United States and Cuba.

AR198

**DATES:** This interim final rule is effective on March 21, 2016. Comments must be received by April 20, 2016.

**ADDRESSES:** You may submit comments, identified by docket number, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments via docket number USCBP–2016–0015.

• *Mail:* Border Security Regulations Branch, Regulations and Rulings, Office of International Trade, U.S. Customs and Border Protection, 90 K Street NE., 10th Floor, Washington, DC 20229–1177.

*Instructions:* All submissions received must include the agency name and docket number for this rulemaking. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received, go to *http://www.regulations.gov.* Comments submitted will be available for public inspection during regular business days between the hours of 9:00 a.m. and 4:30 p.m. at Regulations and Rulings, Office of International Trade, U.S. Customs and Border Protection, 90 K Street NE., 10th Floor, Washington, DC 20229–1177. Arrangements to inspect submitted comments should be made in advance by calling Mr. Joseph Clark at (202) 325–0118.

**FOR FURTHER INFORMATION CONTACT:** Arthur A.E. Pitts, Sr., U.S. Customs and Border Protection, Office of Field Operations, by phone at (202) 344–2752 or by email at *arthur.a.pitts@cbp.dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

**Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of the interim final rule. DHS also invites comments that relate to the economic, environmental, or federalism effects that might result from this interim final rule. Comments that will provide the most assistance to DHS will reference a specific portion of the interim final rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change.

**Background**

As part of the President's new approach to Cuba policy, DHS and CBP examined their regulations and policies pertaining to Cuba, particularly as they relate to air travel between the two countries.[1] The existing regulations pertaining to flights to and from Cuba (codified at 19 CFR part 122, subpart O) are no longer needed because they are either obsolete in light of intervening regulatory changes or substantively identical to the general CBP requirements applicable to aircraft seeking to fly into or out of the United States. Accordingly, DHS is amending 19 CFR part 122 to remove subpart O and to make conforming amendments to other provisions.

Under 19 CFR part 122, subpart O, only certain CBP-approved airports may accept aircraft traveling to or from Cuba. Section 122.153 (19 CFR 122.153) provides a process by which a port authority must submit a written request to CBP requesting that an airport receive approval to accept flights to or from Cuba. Section 122.153 also contains a list of approved airports. The remaining sections in subpart O pertain to other requirements for flights to and from Cuba, including notice of arrival, documents to be presented upon arrival, the release of passengers arriving from Cuba, and documents required for clearance. None of the regulatory requirements that apply specifically to flights to and from Cuba is mandated by statute, but rather are authorized by the broad authority granted to the Secretary of Homeland Security respecting all aircraft arriving in and departing from the United States under 19 U.S.C. 1433, 1644 and 1644a.[2]

Prior to 2011, only three U.S. airports were authorized to accept flights to and from Cuba: John F. Kennedy International Airport, Los Angeles International Airport, and Miami International Airport. In 2011, the President announced a series of changes to ease certain restrictions on travel to and from Cuba.[3] The announcement stated that the regulation should be modified to allow a U.S. airport to apply to accept authorized flights if the airport has adequate customs and immigration capabilities and if an authorized carrier has expressed an interest in providing service between Cuba and the airport.[4] In response, DHS issued a final rule in the **Federal Register** (76 FR 5058) on January 28, 2011, that amended 19 CFR 122.153 to allow additional airports to request approval to accept Cuba flights.

On December 17, 2014, the President announced that the United States would begin the process of normalizing relations with Cuba, including taking steps to re-establish diplomatic relations (which occurred on July 20, 2015), adjust regulations to more effectively empower the Cuban people, and facilitate an expansion of authorized travel under general licenses for the twelve existing categories of travel to Cuba authorized by law.[5] As part of the President's new approach to relations with Cuba, the Department of the Treasury's Office of Foreign Assets Control (OFAC), and the Department of Commerce's Bureau of Industry and Security (BIS) have issued five sets of amendments to the Cuban Assets Control Regulations (CACR) and Export Administration Regulations (EAR), respectively.[6] In February 2016, representatives from the Departments of State and Transportation signed an arrangement with Cuba that provides the basis for the restoration of scheduled air services between the United States and Cuba.[7]

In light of these intervening regulatory changes, the regulations specifically addressing flights to and from Cuba in 19 CFR part 122, subpart O are no longer necessary. Accordingly, DHS is removing that subpart. DHS is also making conforming amendments to certain provisions in titles 8 and 19 of the CFR: 8 CFR 234.2, 19 CFR 122.31, and 19 CFR 122.42. The removal of part 122, subpart O, will make clear that flights to and from Cuba are subject to the same entry and clearance requirements in 19 CFR part 122 as all other similarly situated international flights.

*Removal of 19 CFR Part 122, Subpart O*

Part 122, subpart O, of title 19 CFR, consists of eight sections numbered

---

[1] *See Fact Sheet: Charting a New Course on Cuba,* The White House (Dec. 17, 2014), *https://www.whitehouse.gov/the-press-office/2014/12/17/statement-president-cuba-policy-changes.*

[2] Specifically, 19 U.S.C. 1433(c) provides that the pilot of any aircraft arriving in the United States or the U.S. Virgin Islands from any foreign location is required to comply with such advance notification, arrival reporting, and landing requirements as regulations may require. Under 19 U.S.C. 1644 and 1644a, the Secretary can designate ports of entry for aircraft and apply vessel entry and clearance laws and regulations to civil aircraft.

[3] *Reaching Out to the Cuban People,* The White House (Jan. 14, 2011), *https://www.whitehouse.gov/the-press-office/2011/01/14/reaching-out-cuban-people.*

[4] *Id.*

[5] *Fact Sheet: Charting a New Course on Cuba,* The White House (Dec. 17, 2014), *https://www.whitehouse.gov/the-press-office/2014/12/17/fact-sheet-charting-new-course-cuba.*

[6] *See* 81 FR 13989 (Mar. 16, 2016), 81 FR 4583 (Jan. 27, 2016), 80 FR 56915 (Sept. 21, 2015), 80 FR 34053 (June 15, 2015), and 80 FR 2291 (Jan. 16, 2015) (amending the CACR); 81 FR 13972 (Mar. 16, 2016), 81 FR 4580 (Jan. 27, 2016), 80 FR 56898 (Sept. 21, 2015), 80 FR 43314 (July 22, 2015), and 80 FR 2286 (Jan. 16, 2015) (amending the EAR).

[7] *United States, Cuba Sign Arrangement Restoring Scheduled Air Service,* U.S. Dep't of Transp. (Feb. 16, 2016), *https://www.transportation.gov/briefing-room/united-states-cuba-sign-arrangement-restoring-scheduled-air-service.*

from 122.151 to 122.158 (19 CFR 122.151–122.158). A description of each section follows, along with an explanation as to why it is no longer necessary, desirable, or consistent with the U.S. government's current approach towards Cuba.

Section 122.151 (19 CFR 122.151) consists of two definitions, one for the "United States" and one for "Cuba," which apply within subpart O. The definition for the "United States" is duplicative of the one in 19 CFR 122.1(l), and is therefore unnecessary. "Cuba" is not defined in 19 CFR 122.1, but this definition is also unnecessary in light of the removal of the special regulations governing flights to and from Cuba.

Section 122.152 (19 CFR 122.152), regarding the application of subpart O, provides that the subpart applies to all aircraft entering or departing the United States to or from Cuba, except for public aircraft. As explained below, the other sections in subpart O are unnecessary, so there is no longer a need for this section.

Section 122.153 (19 CFR 122.153) covers the limitation on airports of entry and departure for flights to and from Cuba. Under this section, flights to or from Cuba are limited to the Miami International Airport, John F. Kennedy International Airport, Los Angeles International Airport, or any other airport approved by CBP according to the procedures in paragraph (b). Paragraph (b) of § 122.153 outlines the approval process, which allows an international airport, landing rights airport, or user fee airport to request CBP approval to become an airport of entry and departure for aircraft traveling to and from Cuba. Under this process, CBP would determine whether the airport is properly equipped to facilitate passport control and baggage inspection and whether there is an OFAC licensed carrier that is prepared to provide flights between the airport and Cuba. Approved airports are listed on the CBP Web site and in updates to a list of approved airports in paragraph (c) of § 122.153.

The limitations regarding airports authorized to provide flights to and from Cuba are not required by statute. The regulation, now codified at 19 CFR 122.153, was originally promulgated in 1980 and appeared in 19 CFR 6.3a. The preamble for the **Federal Register** document implementing the regulation stated that "[b]ecause of the present situation involving aliens attempting to reach the U.S. from Cuba, there is serious reason to believe that unsafe and unlawful means of transportation will

be utilized." [8] As to the authority underlying the new limits, the preamble stated the rule was being undertaken in accordance with regulations propounded by the Federal Aviation Administration (14 CFR 91.101), the Immigration and Naturalization Service (8 CFR parts 231 and 239), and the Department of Commerce (15 CFR 371.19). None of these authorities limits the number of airports that can service flights to or from Cuba or requires an application process to qualify airports to service Cuban flights in particular.

DHS has determined that the approval process set forth in § 122.153(b) is no longer necessary because the criteria for obtaining approval to accept flights to and from Cuba are not materially different than the requirements applicable to all other similarly situated airports and aircraft operators seeking to conduct international flights. In evaluating requests by aircraft for permission to land at an international, landing rights or user fee airport, CBP researches and evaluates the impact on the overall operations at a given airport regardless of its classification. CBP also evaluates, in consultation with the airport authority where appropriate, the ability of the proposed airport to handle the flight, travelers, baggage, and cargo. CBP ensures that each airport for which a new international flight is requested is equipped to facilitate passport control and baggage inspection, and has the appropriate infrastructure to properly service the plane from the runway to its assigned gate.[9]

[8] 45 FR 29247 (May 1, 1980).

[9] Certain aircraft arriving from areas south of the United States are subject to a modified process. Such flights are subject to specific notice of arrival requirements and must land at the airport listed under 19 CFR 122.24(b) that is nearest the point at which the aircraft crosses the border, unless an overflight exemption is granted. *See* 19 CFR 122.23–122.25. In designating the airports listed in 19 CFR 122.24(b), CBP has determined that these airports have adequate facilities and resources available to inspect and process aircraft subject to the regulation and their attendant crew, passengers, and cargo. If an exemption is sought pursuant to 19 CFR 122.25, CBP considers whether the proposed destination airport has adequate resources to handle the flight, travelers, baggage, and cargo, just as it considers these factors when deciding whether to grant permission to land a new international flight that is not subject to 19 CFR 122.24. This modified process does not apply to (1) public aircraft, (2) aircraft operated on a regularly published schedule, pursuant to a certificate of public convenience and necessity or foreign aircraft permit issued by the Department of Transportation, authorizing interstate, overseas air transportation; or (3) aircraft with a seating capacity of more than 30 passengers or a maximum payload capacity of more than 7,500 pounds which are engaged in air transportation for compensation or hire on demand. *See* 19 CFR 122.23(a). With the removal of 19 CFR part 122, subpart O, the requirements in 19 CFR 122.23–122.25 would apply to flights to and from Cuba that fall within the scope of those regulations.

The requirement in § 122.153 that the requesting aircraft must have an OFAC-licensed carrier service provider that is prepared to provide flights between the airport and Cuba is obsolete. OFAC no longer requires an air carrier to obtain a specific license to provide carrier services to or from Cuba. Rather, an air carrier may fly to or from Cuba pursuant to a general license under the CACR, so long as the air carrier is providing carrier services in connection with travel or transportation of persons, baggage, or cargo that is itself authorized under the CACR, 31 CFR part 515, and is no longer required to obtain a specific license from OFAC.[10] *See* 31 CFR 515.317 and 515.572(a).

Accordingly, by eliminating § 122.153, CBP will make clear that it follows the same process in certifying flights to and from Cuba as it does with all international flights. Aircraft operators will be required to follow the usual procedures for international flights found in governing law, including the regulations in 19 CFR part 122, subpart B, for obtaining permission to land and to secure new international routes. The specific requirements vary depending on whether the airport is an international airport, a landing rights airport, or a user fee airport. *See* 19 CFR 122.11–122.13 (international airports); 122.14 (landing rights airports); 122.15 (user fee airports).

Section 122.154 (19 CFR 122.154) sets forth notice of arrival requirements. This section provides that all aircraft entering the United States from Cuba (except for OFAC-approved scheduled commercial aircraft of a scheduled airline) must give advance notice of arrival, not less than one hour before crossing the U.S. coast or border. The notice must provide the type of aircraft; name of the aircraft commander; number of U.S. citizen and alien passengers; place of last foreign departure; estimated time of crossing the border; and estimated time of arrival. Section 122.154 is being removed as it is redundant with other provisions within part 122. Generally, all inbound aircraft (not just those arriving from Cuba) are required to

[10] According to OFAC, "A general license authorizes persons subject to U.S. jurisdiction to provide carrier services by vessel or aircraft to, from, or within Cuba, in connection with authorized travel, without the need for a specific license." *Frequently Asked Questions Related to Cuba*, U.S. Department of Treasury (last updated Mar. 15, 2016), *https://www.treasury.gov/resource-center/sanctions/Programs/Documents/cuba_faqs_new.pdf*. *See also* 31 CFR 501.801(a) ("General licenses have been issued authorizing under appropriate terms and conditions certain types of transactions which are subject to the prohibitions contained in this chapter.").

provide notice to CBP prior to arriving in the United States. Section 122.22 (19 CFR 122.22) generally requires all private aircraft pilots to transmit notice of arrival and manifest information to CBP at least 60 minutes prior to departure of the aircraft from the foreign port or place.[11] The data required under § 122.22 includes the data required under § 122.154. Section 122.23 (19 CFR 122.23) requires similar notice of arrival information for certain non-public aircraft arriving from locations south of the United States. Section 122.31 (19 CFR 122.31) requires advance notice of arrival from all other aircraft, with the exception of aircraft of a scheduled airline arriving under a regular schedule. In addition, 19 CFR 122.49a, 122.49b, 122.49c, and 8 CFR 231.1(a) require commercial carriers to transmit electronic manifest information for all passengers and crew.

Section 122.155 (19 CFR 122.155) requires the aircraft commander of a flight arriving from Cuba to present to CBP the manifest required by 8 CFR 231.1(b),[12] and the documents required by subpart E of 19 CFR part 122, upon arrival in the United States. As § 122.155 merely cross-references subpart E of 19 CFR part 122 and 8 CFR 231.1(b), the information referred to in this section is already required of all aircraft that are subject to the cited provisions. Furthermore, 19 CFR 122.22 imposes electronic manifest requirements on private aircraft that are commensurate with the electronic manifest requirements for commercial aircraft contained in subpart E.

Section 122.156 (19 CFR 122.156) concerns the release of passengers and aircraft. This section provides that neither passengers arriving from Cuba, nor the aircraft, will be released by Customs before the passengers are released by the Immigration and Naturalization Service or a Customs officer acting on behalf of that agency. This section is outdated due to the reorganization in 2002 which prompted the creation of CBP, in which customs and immigration functions were consolidated.[13] Moreover, the

requirement that all arriving persons report to a Customs officer and that all aliens seeking admission undergo immigration inspection is set forth in various provisions in the United States Code and titles 19 and 8 of the CFR.[14] Clearance of aircraft departing the United States is covered generally in 19 CFR part 122, subparts F, G, H and I.

Section 122.157 (19 CFR 122.157) sets forth the documents that are required to clear an aircraft for departure. Under this section, the aircraft commander must present documents required by subpart H and a license issued by the Department of Commerce under 15 CFR 371.19 or by the Department of State under 22 CFR part 123. This section is outdated and is no longer necessary. First, 15 CFR 371.19 no longer exists. Under the current regulations, flights on a "temporary sojourn" to or from Cuba generally qualify for a license exception under the EAR provided they meet certain conditions, which are administered by BIS. In general, flying an aircraft to Cuba, even temporarily, constitutes an export or re-export to Cuba.[15] However, the governing EAR provision authorizes departure from the United States of foreign registry civil aircraft on temporary sojourn in the United States and of U.S. civil aircraft for temporary sojourn abroad.[16] Thus, if

[11] If the United States is not the original destination and the flight is diverted to the United States due to an emergency, the information is required no later than 30 minutes prior to arrival. 19 CFR 122.22(b)(2)(ii).

[12] While 19 CFR 122.155 refers to the manifest required by 8 CFR 231.1(b), § 231.1(b) actually requires the submission of a properly completed Arrival/Departure Record, Form I–94 for each arriving passenger, with certain exceptions; § 231.1(a) requires the submission of an electronic manifest.

[13] Pursuant to the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (HSA), as of March 1, 2003, the legacy Immigration and

Naturalization Service (INS) of the Department of Justice and the legacy Customs Service of the Department of the Treasury were transferred to DHS and reorganized to become CBP, U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS). All inspectional functions previously assigned to legacy INS were transferred to DHS. As provided in 6 U.S.C. 552(d), references relating to an agency that is transferred to DHS in statutes, executive orders, rules, regulations, directives, or delegations of authority that precede the effective date of the HSA are deemed to refer to DHS, its officers, employees, or agents, or to its corresponding organizational units or functions.

[14] See, e.g., 19 U.S.C. 1459(b) and (d) (requiring all individuals arriving aboard a reported conveyance to report to the designated customs facility and prohibiting departure from the facility until authorized to do so by the appropriate customs officer); 8 U.S.C. 235(a) (requiring all aliens who are applicants for admission or otherwise seeking admission or readmission to the United States to undergo an immigration inspection); 8 CFR 235.1(a) (requiring application to lawfully enter the United States to be made in person to an immigration officer at a U.S. port-of-entry); and 8 CFR 234.2(c) (prohibiting aircraft carrying passengers or crew required to be inspected from discharging or permitting to depart any passenger or crewman without permission from an immigration officer).

[15] Cuba, Bureau of Industry and Security, https://www.bis.doc.gov/index.php/policy-guidance/country-guidance/sanctioned-destinations/cuba (last accessed Feb. 24, 2016); see also 15 CFR 746.2(a) (requiring a license to export or re-export all items subject to the EAR to Cuba, except as provided in the regulation).

[16] 15 CFR 740.15. Former 15 CFR 371.19, which is referenced in 19 CFR 122.157, described general

the aircraft departing the United States for Cuba meets the "temporary sojourn" definition to qualify for the license exception, there is no license requirement imposed on such aircraft. Second, clearance requirements for all international flights are currently covered under 19 CFR part 122, subparts C, F, G and H. 22 CFR part 123, which pertains to the importation or exportation of certain defense articles, contains other potential requirements for clearance. These requirements, however, are not specific to flights to and from Cuba and would apply regardless of the removal of 19 CFR part 122, subpart O.

Section 122.158 (19 CFR 122.158) states that all other provisions of part 122 relating to entry and clearance of aircraft are applicable to aircraft subject to subpart O. This section is duplicative of 19 CFR 122.0(a), which provides that the regulations in part 122 relate to the entry and clearance of aircraft and the transportation of persons and cargo by aircraft, and are applicable to all air commerce.

For the reasons discussed above, DHS has determined that 19 CFR part 122, subpart O is no longer necessary to regulate air travel to and from Cuba due to changes in the regulatory requirements governing travel and trade between the United States and Cuba, and the implementation of robust reporting requirements that apply to international flights generally. Therefore, DHS is amending 19 CFR part 122 to remove 19 CFR part 122, subpart O, pertaining to flights to and from Cuba. Flights to and from Cuba will continue to be subject to the remaining entry and clearance requirements in 19 CFR part 122, as well as all other legal requirements relating to travel and trade between the United States and Cuba including, but not limited to, the CACR and the EAR.

*Conforming Amendments*

DHS is amending various sections in title 8 CFR and title 19 CFR to bring these sections into conformity with the removal of 19 CFR part 122, subpart O. These amendments are described below.

Section 234.2 of title 8 (8 CFR 234.2) sets forth landing requirements for aircraft carrying passengers or crew required to be inspected under the Immigration and Nationality Act. Section 234.2(a) specifies the general

licensing requirements for aircraft on a temporary sojourn to or from Cuba, reflecting a prior regulatory regime that relied on general licenses, rather than license exceptions. See 61 FR 12714, 12778 (Mar. 25, 1996) (interim rule replacing general license requirement with license exceptions).

requirements regarding the place of landing for such aircraft and also includes a special requirement for flights to and from Cuba. Specifically, the last sentence in § 234.2(a) specifies that aircraft carrying passengers or crew required to be inspected on flights originating in Cuba land only at airports that have been authorized by CBP pursuant to 19 CFR 122.153 as an airport of entry for flights arriving from Cuba, unless advance permission to land elsewhere has been obtained from the Office of Field Operations at CBP Headquarters. DHS is amending § 234.2(a) to remove the last sentence.

Section 122.31 of title 19 (19 CFR 122.31) sets forth notice of arrival requirements for aircraft entering the United States from a foreign area. Paragraph (c)(1)(ii) specifies that aircraft arriving from Cuba must follow the advance notice of arrival procedures set forth in § 122.154 in part 122, subpart O. Paragraph (c)(1)(iii) specifies that certain aircraft arriving from areas south of the United States (other than Cuba) must follow the notice of arrival procedures set forth in § 122.23 in part 122. As a result of removing subpart O, flights arriving from Cuba will now give advance notice of arrival in accordance with the other provisions in 19 CFR part 122. Accordingly, DHS is removing paragraph (c)(1)(ii) from § 122.31 and making other conforming amendments to paragraph (c)(1).

Section 122.42 of title 19 (19 CFR 122.42) sets forth certain aircraft entry requirements. Paragraph (d) provides that an aircraft of a scheduled airline which stops only for refueling at the first place or arrival in the United States shall not be required to enter provided it meets certain conditions, except for flights to Cuba (provided for in subpart O of this part). To conform with the removal of subpart O, DHS is removing this exception language from paragraph (d) of § 122.42.

*Additional Requirements for Aircraft Traveling to or From Cuba*

All aircraft entering/departing the United States from/to Cuba must be properly licensed or otherwise authorized to travel between the United States and Cuba. Several federal agencies administer the necessary authorizations, and it is the responsibility of the owner or person in command of the aircraft to ensure that the aircraft has the necessary authorization to travel.

OFAC administers the CACR, 31 CFR part 515, which prohibit, in relevant part, all persons subject to the jurisdiction of the United States from engaging in travel-related transactions

involving Cuba unless authorized by OFAC. As mentioned before, air carriers are authorized to provide service to and from Cuba under a "general license" so long as the air carrier complies with the terms and conditions of the general license.

BIS administers the EAR, 15 CFR parts 730 through 774, which prohibit certain exports and re-exports to Cuba unless authorized by a license or license exception. As discussed above, flying an aircraft to Cuba constitutes an export or re-export under the EAR, but certain flights on a "temporary sojourn" qualify for a license exception. An aircraft that fails to qualify for the "temporary sojourn" license exception under 15 CFR 740.15 may require an individually validated license under the EAR in order to depart the United States for Cuba. Baggage and cargo onboard the aircraft may also require a license if it does not qualify for a license exception under the EAR.

Additionally, an aircraft traveling between the United States and Cuba may require a license from other federal agencies, as applicable, and must obtain economic and safety authorizations to provide air transportation service as an air carrier from the Office of the Secretary of Transportation and the Federal Aviation Administration. Air carriers and other commercial operators are required to adopt and implement the security requirements established by the Transportation Security Administration for individuals, property, and cargo aboard aircraft (*see* 49 CFR chapter XII, subchapter C (Civil Aviation Security)).

**Inapplicability of Notice and Delayed Effective Date Requirements, the Regulatory Flexibility Act, and Executive Order 12866**

The Administrative Procedure Act (APA) requirements in 5 U.S.C. 553 govern agency rulemaking procedures. The APA generally requires that an agency provide prior notice and an opportunity for public comment before issuing a final rule.[17] The APA also requires that a final rule have a 30-day delayed effective date.[18] The APA provides a full exemption from the requirements of section 553 for rules involving a foreign affairs function of the United States.[19] The APA also provides an exception from the prior notice and public comment requirement and the delayed effective date requirement if the agency for good cause finds that such procedures are

impracticable, unnecessary or contrary to the public interest.[20]

This interim final rule is excluded from the rulemaking provisions of 5 U.S.C. 553 as a foreign affairs function of the United States because it concerns international flights between the United States and Cuba, consistent with U.S. foreign policy goals. These amendments to clarify and simplify the regulations regarding air travel between the United States and Cuba are consistent with the President's continued effort to normalize relations between the two countries.

Accordingly, DHS is not required to provide public notice and an opportunity to comment before implementing the requirements under this interim final rule.

In addition, with respect to the removal of the regulations in 19 CFR part 122, subpart O, that are duplicative of the entry and clearance requirements in the rest of part 122, DHS finds that good cause exists for dispensing with the prior notice and comment procedure as unnecessary under 5 U.S.C. 553(b)(B) and for dispensing with the requirement for a delayed effective date under 5 U.S.C. 553(d)(3). The Department, however, is interested in public comments on this interim final rule and, therefore, is providing the public with the opportunity to comment without delaying implementation of this rule. All comments received will become a matter of the public record.

In addition, DHS does not consider this rule to be a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review. Rules involving the foreign affairs function of the United States are exempt from the requirements of Executive Order 12866. As discussed above, DHS is of the opinion that clarifying and simplifying the regulations regarding restrictions on travel between the United States and Cuba is a foreign affairs function of the United States Government and as such, this rule is exempt from the requirements of Executive Order 12866. Finally, because DHS is of the opinion that this rule is not subject to the requirements of 5 U.S.C. 553, DHS does not consider this rule to be subject to the provisions of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*).

**Signing Authority**

This interim final rule is being issued in accordance with 8 CFR 2.1 and 19 CFR 0.2(a). Accordingly, this interim final rule is signed by the Secretary of Homeland Security.

---

[17] 5 U.S.C. 553(b) and (c).
[18] 5 U.S.C. 553(d).
[19] 5 U.S.C. 553(a)(1).

[20] 5 U.S.C. 553(b)(B) and 553(d)(3).

## List of Subjects

*8 CFR Part 234*

Air carriers, Aircraft, Airports, Aliens, Cuba.

*19 CFR Part 122*

Administrative practice and procedure, Air carriers, Aircraft, Airports, Alcohol and alcoholic beverages, Cigars and cigarettes, Cuba, Customs duties and inspection, Drug traffic control, Freight, Penalties, Reporting and recordkeeping requirements, Security measures.

### Amendments to the Regulations

For the reason stated in the preamble, 8 CFR part 234 and 19 CFR part 122 are amended as set forth below.

**8 CFR Chapter 1**

## PART 234—DESIGNATION OF PORTS OF ENTRY FOR ALIENS ARRIVING BY CIVIL AIRCRAFT

■ 1. The general authority for part 234 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229; 8 CFR part 2.

**§ 234.2   [Amended]**

■ 2. Amend § 234.2 by removing the last sentence of paragraph (a).

**19 CFR Chapter 1**

## PART 122—AIR COMMERCE REGULATIONS

■ 3. The authority citation for part 122 continues to read in part as follows:

**Authority:** 5 U.S.C. 301; 19 U.S.C. 58b, 66, 1431, 1433, 1436, 1448, 1459, 1590, 1594, 1623, 1624, 1644, 1644a, 2071 note.

\*    \*    \*    \*    \*

**§ 122.31   [Amended]**

■ 4. Amend § 122.31 as follows:
■ a. Remove and reserve paragraph (c)(1)(ii);
■ b. In paragraph (c)(1)(iii), remove the text "(other than Cuba)"; and
■ c. In paragraph (c)(1)(iv), remove the text ", (c)(1)(ii)".

■ 5. Amend § 122.42 by revising the introductory sentence of paragraph (d) to read as follows:

**§ 122.42   Aircraft entry.**

\*    \*    \*    \*    \*

(d) *Exception to entry requirement.* An aircraft of a scheduled airline which stops only for refueling at the first place of arrival in the United States will not be required to enter provided:

\*    \*    \*    \*    \*

### Subpart O [Removed and Reserved]

■ 6. Remove and reserve subpart O, consisting of §§ 122.151 through 122.158.

**Jeh Johnson,**
*Secretary.*
[FR Doc. 2016–06371 Filed 3–18–16; 8:45 am]
**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF COMMERCE

### Bureau of Industry and Security

**15 CFR Part 744**

**[Docket No. 160229152–6152–01]**

**RIN 0694–AG87**

## Addition of Certain Persons and Modification to Entries on the Entity List; and Removal of Certain Persons From the Entity List

**AGENCY:** Bureau of Industry and Security, Commerce.

**ACTION:** Final rule.

**SUMMARY:** This rule amends the Export Administration Regulations (EAR) by adding forty-four persons under forty-nine entries to the Entity List. The forty-four persons who are added to the Entity List have been determined by the U.S. Government to be acting contrary to the national security or foreign policy interests of the United States. These forty-four persons will be listed on the Entity List under the destinations of China, Germany, Hong Kong, India, Iran, Malaysia, the Netherlands, Singapore, Switzerland, and the United Arab Emirates (U.A.E.).

This final rule also removes five entities from the Entity List under the destinations of Ukraine and the U.A.E., as the result of requests for removal received by BIS, a review of information provided in the removal requests in accordance with the procedure for requesting removal or modification of an Entity List entity and further review conducted by the End-User Review Committee (ERC).

Finally, this final rule modifies two existing entries in the Entity List, both under the destination of China. These entries are being modified to reflect additional aliases and addresses for these persons. BIS implements this rule to protect U.S. national security or foreign policy interests and to ensure entries on the Entity List are accurate and up-to-date.

**DATES:** This rule is effective March 21, 2016.

**FOR FURTHER INFORMATION CONTACT:** Chair, End-User Review Committee,

Office of the Assistant Secretary, Export Administration, Bureau of Industry and Security, Department of Commerce, Phone: (202) 482–5991, Fax: (202) 482–3911, Email: *ERC@bis.doc.gov.*

**SUPPLEMENTARY INFORMATION:**

### Background

The Entity List (Supplement No. 4 to part 744) identifies entities and other persons reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. The EAR imposes additional license requirements on, and limits the availability of most license exceptions for, exports, reexports, and transfers (in-country) to those listed. The "license review policy" for each listed entity or other person is identified in the License Review Policy column on the Entity List and the impact on the availability of license exceptions is described in the **Federal Register** notice adding entities or other persons to the Entity List. BIS places entities and other persons on the Entity List pursuant to sections of part 744 (Control Policy: End-User and End-Use Based) and part 746 (Embargoes and Other Special Controls) of the EAR.

The ERC, composed of representatives of the Departments of Commerce (Chair), State, Defense, Energy and, where appropriate, the Treasury, makes all decisions regarding additions to, removals from, or other modifications to the Entity List. The ERC makes all decisions to add an entry to the Entity List by majority vote and all decisions to remove or modify an entry by unanimous vote.

### ERC Entity List Decisions

*Additions to the Entity List*

This rule implements the decision of the ERC to add forty-four persons under forty-nine entries to the Entity List. These forty-four persons are being added on the basis of § 744.11 (License requirements that apply to entities acting contrary to the national security or foreign policy interests of the United States) of the EAR. The forty-nine entries added to the entity list consist of eight entries in China, four entries in Germany, three entries in Hong Kong, one entry in India, two entries in Iran, five entries in Malaysia, two entries in the Netherlands, one entry in Singapore, one entry in Switzerland and twenty-two entries in the U.A.E. There are forty-nine entries for the forty-four persons because four persons are listed in multiple locations, resulting in five additional entries.

## DEPARTMENT OF HOMELAND SECURITY

**[Docket No. DHS–2016–0089]**

### National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.

**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.

**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC,* or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@hq.dhs.gov.*

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting written comments.

• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.

• *Fax:* (703)235–9707.

• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security" and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.

**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441–5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page— *www.dhs.gov/NIAC.*

### Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions
IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

**Ginger Norris,**

*Designated Federal Officer for the NIAC.*

[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]

**BILLING CODE 9110–9–P**

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**[DHS Docket No. DHS–2017–0004]**

### Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.

**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.

**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS–2017–0004, by any one of the following methods:

AR204