• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http://www.regulations.gov.* The *http://www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http://www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http://www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to

remove, without a hearing before an immigration judge, aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)–(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)–(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions,

will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed into expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens who may be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by an immigration officer within 100 air miles

AR205

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter.'' *Id.* DHS noted at the time that ''exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.'' *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that ''removals to Cuba [could not] presently be assured and for other U.S. policy reasons,'' *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time.'' Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J–,* I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**
*Secretary of Homeland Security.*
[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]
**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]**

**RIN 1615–ZB62**

**Extension of the Designation of Somalia for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS

Web page at *http://www.uscis.gov/tps.* You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.

**Table 1. Southwest Border Encounters of non-Mexican Aliens**
**by Month and Year (FY 2013 to FY 2019Q2)**

| Month | Apprehensions | Inadmissibles | Total Encounters |
|---|---|---|---|
| OCTOBER 2012 | 8,533 | 1,597 | 10,130 |
| NOVEMBER 2012 | 8,719 | 1,582 | 10,301 |
| DECEMBER 2012 | 7,731 | 1,903 | 9,634 |
| JANUARY 2013 | 6,950 | 1,818 | 8,768 |
| FEBRUARY 2013 | 10,848 | 1,855 | 12,703 |
| MARCH 2013 | 15,328 | 2,117 | 17,445 |
| APRIL 2013 | 16,825 | 1,915 | 18,740 |
| MAY 2013 | 16,994 | 2,277 | 19,271 |
| JUNE 2013 | 13,950 | 2,134 | 16,084 |
| JULY 2013 | 14,507 | 2,066 | 16,573 |
| AUGUST 2013 | 14,709 | 2,029 | 16,738 |
| SEPTEMBER 2013 | 13,894 | 2,050 | 15,944 |
| OCTOBER 2013 | 14,978 | 2,154 | 17,132 |
| NOVEMBER 2013 | 14,391 | 2,360 | 16,751 |
| DECEMBER 2013 | 14,985 | 2,557 | 17,542 |
| JANUARY 2014 | 12,113 | 1,886 | 13,999 |
| FEBRUARY 2014 | 16,895 | 2,031 | 18,926 |
| MARCH 2014 | 24,501 | 2,654 | 27,155 |
| APRIL 2014 | 26,782 | 2,818 | 29,600 |
| MAY 2014 | 38,078 | 3,640 | 41,718 |
| JUNE 2014 | 40,244 | 3,927 | 44,171 |
| JULY 2014 | 24,322 | 3,014 | 27,336 |
| AUGUST 2014 | 15,037 | 2,832 | 17,869 |
| SEPTEMBER 2014 | 10,274 | 2,579 | 12,853 |
| OCTOBER 2014 | 10,153 | 2,783 | 12,936 |
| NOVEMBER 2014 | 10,078 | 2,987 | 13,065 |
| DECEMBER 2014 | 11,260 | 3,877 | 15,137 |
| JANUARY 2015 | 7,591 | 3,334 | 10,925 |
| FEBRUARY 2015 | 8,570 | 2,824 | 11,394 |
| MARCH 2015 | 10,566 | 3,669 | 14,235 |
| APRIL 2015 | 12,245 | 3,315 | 15,560 |
| MAY 2015 | 14,685 | 3,726 | 18,411 |
| JUNE 2015 | 14,444 | 3,968 | 18,412 |
| JULY 2015 | 14,791 | 4,610 | 19,401 |
| AUGUST 2015 | 15,656 | 6,177 | 21,833 |
| SEPTEMBER 2015 | 15,277 | 5,303 | 20,580 |
| OCTOBER 2015 | 16,801 | 7,309 | 24,110 |
| NOVEMBER 2015 | 18,425 | 7,484 | 25,909 |
| DECEMBER 2015 | 23,418 | 5,940 | 29,358 |
| JANUARY 2016 | 10,601 | 4,706 | 15,307 |
| FEBRUARY 2016 | 10,672 | 7,025 | 17,697 |
| MARCH 2016 | 13,854 | 6,927 | 20,781 |
| APRIL 2016 | 17,940 | 4,741 | 22,681 |
| MAY 2016 | 21,329 | 9,114 | 30,443 |
| JUNE 2016 | 18,796 | 5,498 | 24,294 |
| JULY 2016 | 20,296 | 7,180 | 27,476 |
| AUGUST 2016 | 22,572 | 8,640 | 31,212 |
| SEPTEMBER 2016 | 23,406 | 10,883 | 34,289 |
| OCTOBER 2016 | 28,061 | 15,075 | 43,136 |
| NOVEMBER 2016 | 31,904 | 11,457 | 43,361 |
| DECEMBER 2016 | 31,994 | 10,807 | 42,801 |
| JANUARY 2017 | 20,154 | 6,259 | 26,413 |
| FEBRUARY 2017 | 9,632 | 1,647 | 11,279 |
| MARCH 2017 | 4,773 | 1,040 | 5,813 |
| APRIL 2017 | 3,687 | 1,038 | 4,725 |
| MAY 2017 | 5,569 | 1,638 | 7,207 |
| JUNE 2017 | 7,190 | 1,590 | 8,780 |
| JULY 2017 | 9,349 | 2,068 | 11,417 |
| AUGUST 2017 | 11,915 | 2,800 | 14,715 |
| SEPTEMBER 2017 | 11,750 | 3,179 | 14,929 |
| OCTOBER 2017 | 13,435 | 4,059 | 17,494 |
| NOVEMBER 2017 | 17,363 | 4,406 | 21,769 |
| DECEMBER 2017 | 18,739 | 5,822 | 24,561 |
| JANUARY 2018 | 13,752 | 4,037 | 17,789 |
| FEBRUARY 2018 | 13,551 | 4,162 | 17,713 |
| MARCH 2018 | 19,721 | 6,130 | 25,851 |
| APRIL 2018 | 21,873 | 6,370 | 28,243 |
| MAY 2018 | 26,805 | 5,737 | 32,542 |
| JUNE 2018 | 23,282 | 3,895 | 27,177 |
| JULY 2018 | 21,360 | 3,524 | 24,884 |
| AUGUST 2018 | 25,375 | 3,631 | 29,006 |
| SEPTEMBER 2018 | 29,066 | 3,640 | 32,706 |
| OCTOBER 2018 | 37,128 | 5,675 | 42,803 |



OTM Apprehensions at SW Border, FY2013 - FY2019Q2



OTM Encounters at SW Border, FY2013-FY2019Q2

| | | |
|---|---|---|
| NOVEMBER 2018 | 40,706 | 5,833 | 46,539 |
| DECEMBER 2018 | 42,045 | 5,236 | 47,281 |
| JANUARY 2019 | 36,878 | 5456 | 42,334 |
| FEBRUARY 2019 | 54,008 | 5027 | 59,035 |
| MARCH 2019 | 75,851 | 5570 | 81,421 |

AR209

April 1, 2019

**Southwest Border Enforcement Actions: March Official Reporting**

**Key Observations:**

- March total enforcement actions increased 35% compared to February.  This rate of increase is consistent with previous years for March.
  - Overall, March is 35% higher (103,493) than February (76,535) - last FY, March was 37% higher and from FY12 – FY16 it averaged 28% higher.
  - CBP total enforcement actions this March are 132% higher than the last 7 year March average and 516% higher than March of FY17.
    - UAC increased 30% in March compared to February, last March increased 40%.
    - FMUA increased 41% in March compared to February, last March increased 48%.
- The last time that this March's level was observed (overall) was March FY08 (89,770) and April FY08 (91,566).
  - April of FY08 was the last time USBP apprehensions exceeded 70,000.
- Guatemala remains the highest country of origin/citizenship.
  - Guatemalan total enforcement actions increased 40%.
  - Honduran total enforcement actions increased 30%.
  - El Salvador total enforcement actions increased **68%**.
  - Mexico increased 25%.
- In March, UAC and FMUA are 64% of total CBP Enforcement Actions; FMUA alone are 55%.
  - FYTD, UAC and FMUA are 60% of total CBP Enforcement Actions; FMUA alone are 51%.
- In March, OTM enforcement actions are 75% of the total; 70% Northern Triangle.
  - FYTD, OTM enforcement actions are 71% of the total; 66% Northern Triangle.
- For FY19TD, CBP is on track to exceed 1 million apprehensions and inadmissible aliens along the southwest border – a level not seen since FY06.

**USBP**

- USBP Apprehensions through March (361,087) exceed fiscal year totals for FY17, FY15, FY12, and FY11.  4 of the last 10 years.
- USBP FMUA [alone] this March are **42**% higher than USBP <u>Total Apprehensions</u> last March.
- At the end of March (FY mid-point):
  - USBP will have apprehended 91% of the volume of all of last fiscal year in six months' time.
  - FMUA this FY are **77**% higher than all of last FY for USBP FMUA.
- USBP total apprehensions increased 38% in March compared to February.  This is the second consecutive month with 38% growth.
- OTM apprehensions account for 82% of March apprehensions.
  - Northern Triangle countries are 76% of total apprehensions.
- For the last month, peak apprehensions have occurred on 3 of the last 4 Tuesdays (5 of last 6).
  - Tuesday appears to be the most common peak day for UAC and FMUA apprehensions.
  - For the last 9 weeks, single adults have peaked on Tuesday, Wednesday or Thursday 3 times each.
- As a percent of total apprehensions, increases are observed in the El Paso Sector. In October, El Paso apprehensions were 14% of the total.  In March, they account for 24% of apprehensions.
  - Conversely, in October RGV apprehensions were 41% of the total – in March, they are 36%.



U.S. Customs and
Border Protection

**OFO**

- Inadmissible apprehensions this FY are tracking just below last FY (61,247 vs 63,845).  March is 13% higher than February.
- Inadmissible UAC decreased 1%.
- FMUA at the ports of entry remained nearly the same (4,194) as January and February.
- Single adults at the ports are 25% higher than February.



U.S. Customs and
Border Protection

AR211

**FY19 Planning Profile based on data through April 10, 2019**



**U.S. Customs and Border Protection - Southwest Border**
**Total Apprehensions and Inadmissible Aliens**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 108,537 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16. Projected total: 1,227,299

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 1,028,638



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR212



**U.S. Customs and Border Protection - Southwest Border**
**Total Unaccompanied Alien Children Apprehensions and Inadmissible Aliens**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 9,325 – just below the lower bound of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 112,460

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,987



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR213



U.S. Customs and Border Protection - Southwest Border
Total Individuals in a Family Unit Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 62,059 – right in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 738,671

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 578,259



U.S. Customs and Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR214



**U.S. Customs and Border Protection - Southwest Border
Total Single Adult Apprehensions and Inadmissible Aliens
FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 37,154 – higher than the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 375,684

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total:  357,908



U.S. Customs and
Border Protection





**U.S. Customs and Border Protection - Southwest Border**
**Total Child Apprehensions and Inadmissible Aliens**
**FY19 April - September Planning Profile**

No interim update is available for this slide.

*April is based on April data through the 10th.*

<u>Projection 1</u>: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 486,779

<u>Projection 2</u>: April through September is based on the monthly rate of change observed FY18.  Projected total: 438,545







**U.S. Border Patrol - Southwest Border**
**Total Apprehensions**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 98,633 – toward the lower bound of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 1,056,983

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 909,365



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR217



### U.S. Border Patrol - Southwest Border
### Unaccompanied Alien Children Apprehensions
### FY19 April - September Planning Profile

Based on data through April 22, April is projected to be 8,909 – lower than the earlier model and March totals.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 105,175

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 91,820



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR218



**U.S. Border Patrol - Southwest Border**
**Individuals in a Family Unit Apprehensions**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 58,639 – in range of the earlier model toward lower bound.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 674,171

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 554,093



U.S. Customs and
Border Protection



**CBP STAT**
Statistical Tracking and Analysis Team

AR219



**U.S. Border Patrol - Southwest Border**
**Single Adult Apprehensions**
**FY19 April - September Planning Profile**

Based on data through April 22, April is projected to be 31,085 – in the middle of the earlier model.

*April is based on April data through the 10th.*

Projection 1: April through September are based on the average rate of change occurring during FYs 15/16.  Projected total: 307,990

Projection 2: April through September is based on the monthly rate of change observed FY18.  Projected total: 293,804



U.S. Customs and
Border Protection



CBP STAT
Statistical Tracking and Analysis Team

AR220



# OTM CARAVAN
# BREAKDOWN IN MEXICO
## April 22. 2019
### 16,560 OTMs  *GOM Reporting

Migrants traveling from Arriaga, Chiapas to Ixtepec, Oaxaca

...rmation in this report is shared by GOM.
...uracy in numbers may differ from other U.S
...rts.

| | |
|---|---|
| CALIFORNIA: Tijuana 344/Mexicali 409 | 753 |
| ...RA: Hermosillo | 5 |
| ...UAHUA: Ciudad Juarez | 4,740 |
| ...UILA: Acuña 179/Piedras Negras 194 | 373 |
| ...O LEON: Monterrey 345/Guadalupe 60 | 405 |
| ...ULIPAS: Reynosa 627/Matamoros 216 | 627 |
| ...CA: Migrants arriving from Arriaga #s in next report | |
| | 6,903 |

**CHIAPAS**
REGIONAL: Traveling to Arriaga 430/ Tonala 110/Arriaga approx.500 -with partial on board train to Ixtepec, Oaxaca, from there, they will travel by train to Medias Aguas Ver.
TAPACHULA: Siglo XXI 2,229/Mesoamericana 1,309/Oth. 55
Haiti-Congo-Cameroon in town 383/Cubans in town 755
SUCHIATE: Recino Fiscal
MAPASTEPEC: # Varies 284 to 400, reporting low number
PIJIJIAPAN: left over from current INM/PF Ops
MX/GT BORDER: TVHR 650/COMAR 156
**TOTAL**

AR221

# U.S. Border Patrol Southwest Border Apprehensions by Sector Fiscal Year 2019

https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions

## Southwest Border Unaccompanied Alien Children (0-17 yr old) Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Unaccompanied Alien Children Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 850 | 581 | -32% |
| Del Rio | 998 | 2,701 | 171% |
| El Centro | 1,921 | 2,286 | 19% |
| El Paso | 3,978 | 14,593 | 267% |
| Laredo | 2,137 | 2,058 | -4% |
| Rio Grande | 17,392 | 27,837 | 60% |
| San Diego | 1,692 | 2,861 | 69% |
| Tucson | 3,983 | 4,055 | 2% |
| Yuma | 4,421 | 6,652 | 50% |
| **USBP Southwest Border Total** | **37,372** | **63,624** | **70%** |

AR222

# Southwest Border Family Unit* Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Family Unit* Apprehensions by Sector | | | |
| --- | --- | --- | --- |
| Sector | FY18TD JUN | FY19TD  JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 566 | 1,754 | 210% |
| Del Rio | 1,829 | 22,423 | 1,126% |
| El Centro | 1,976 | 7,464 | 278% |
| El Paso | 6,326 | 117,612 | 1,759% |
| Laredo | 411 | 778 | 89% |
| Rio Grande | 42,188 | 165,950 | 293% |
| San Diego | 2,392 | 14,996 | 527% |
| Tucson | 3,164 | 11,614 | 267% |
| Yuma | 9,689 | 47,717 | 392% |
| **USBP Southwest Border Total** | **68,541** | **390,308** | **469%** |

**\*Note:** Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

# Southwest Border Single Adult Apprehensions

Comparisons below reflect Fiscal Year To Date 2019 compared to Fiscal Year To Date 2018.

| Single Adult Apprehensions by Sector | | | |
|---|---|---|---|
| Sector | FY18TD JUN | FY19TD JUN | % Change FY18TD JUN to FY19TD JUN |
| Big Bend | 5,043 | 4,792 | -5% |
| Del Rio | 8,772 | 15,583 | 78% |
| El Centro | 17,033 | 18,500 | 9% |
| El Paso | 10,412 | 23,595 | 127% |
| Laredo | 21,953 | 27,192 | 24% |
| Rio Grande | 54,958 | 72,649 | 32% |
| San Diego | 24,972 | 29,981 | 24% |
| Tucson | 33,121 | 34,715 | 5% |
| Yuma | 4,793 | 7,436 | 55% |
| **USBP Southwest Border Total** | **180,357** | **234,443** | **30%** |

# Southwest Border Unaccompanied Alien Children Apprehensions by Country

Numbers below reflect Fiscal Years 2014 - 2018 and 2019 TD.

| Unaccompanied Alien Children Apprehensions by Country | | | | | | |
|---|---|---|---|---|---|---|
| Country | FY14 | FY15 | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 16,404 | 9,389 | 17,512 | 9,143 | 4,949 | **9,810** |
| Guatemala | 17,057 | 13,589 | 18,913 | 14,827 | 22,327 | **27,168** |
| Honduras | 18,244 | 5,409 | 10,468 | 7,784 | 10,913 | **16,892** |
| Mexico | 15,634 | 11,012 | 11,926 | 8,877 | 10,136 | **7,843** |

AR224

## Southwest Border Family Unit* Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Family Units* Apprehensions by Country | | | |
|---|---|---|---|
| Country | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 27,114 | 24,122 | 13,669 | **44,198** |
| Guatemala | 23,067 | 24,657 | 50,401 | 167,104 |
| Honduras | 20,226 | 22,366 | 39,439 | 152,019 |
| Mexico | 3,481 | 2,271 | 2,261 | 3,209 |

**\*Note:** Family Unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the U.S. Border Patrol.

## Southwest Border Single Adult Apprehensions by Country

Numbers below reflect Fiscal Years 2016 - 2018 and 2019 TD

| Single Adult Apprehensions by Country | | | |
|---|---|---|---|
| Country | FY16 | FY17 | FY18 | FY19TD JUN |
| El Salvador | 27,222 | 16,495 | 12,751 | 16,491 |
| Guatemala | 32,621 | 26,387 | 42,994 | 41,366 |
| Honduras | 22,258 | 17,110 | 26,161 | 36,128 |
| Mexico | 175,353 | 116,790 | 139,860 | 113,123 |

AR225

# Southwest Border Family Unit Subject, Unaccompanied Alien Children, and Single Adult Apprehensions Fiscal Year 2019 - By Month

FMUA:   Family Unit Apprehensions
UAC:     Unaccompanied Alien Children
SA:       Single Adult

**FY19 October**

| Sector | FMUA FY 2019 OCT | UAC FY 2019 OCT | SA FY 2019 OCT | TOTAL FY 2019 OCT |
|---|---|---|---|---|
| Big Bend | 17 | 37 | 501 | 555 |
| Del Rio | 548 | 145 | 1,309 | 2,002 |
| El Centro | 782 | 256 | 2,205 | 3,243 |
| El Paso | 5,180 | 830 | 1,325 | 7,335 |
| Laredo | 121 | 265 | 3,063 | 3,449 |
| Rio Grande | 11,525 | 2,307 | 6,923 | 20,755 |
| San Diego | 1,156 | 227 | 2,844 | 4,227 |
| Tucson | 1,163 | 469 | 4,196 | 5,828 |
| Yuma | 2,623 | 429 | 561 | 3,613 |
| **Southwest Border Total** | **23,115** | **4,965** | **22,927** | **51,007** |

AR226

**FY19 November**

| Sector | FMUA FY 2019 NOV | UAC FY 2019 NOV | SA FY 2019 NOV | TOTAL FY 2019 NOV |
|---|---|---|---|---|
| Big Bend | 31 | 36 | 381 | 448 |
| Del Rio | 831 | 146 | 1,111 | 2,088 |
| El Centro | 914 | 273 | 2,002 | 3,189 |
| El Paso | 6,435 | 1,038 | 1,395 | 8,868 |
| Laredo | 49 | 181 | 2,439 | 2,669 |
| Rio Grande | 11,487 | 2,310 | 6,916 | 20,713 |
| San Diego | 1,495 | 310 | 2,771 | 4,576 |
| Tucson | 754 | 465 | 3,842 | 5,061 |
| Yuma | 3,168 | 500 | 575 | 4,243 |
| **Southwest Border Total** | **25,164** | **5,259** | **21,433** | **51,855** |

**FY19 December**

| Sector | FMUA FY 2019 DEC | UAC FY 2019 DEC | SA FY 2019 DEC | TOTAL FY 2019 DEC |
|---|---|---|---|---|
| Big Bend | 122 | 74 | 425 | 621 |
| Del Rio | 919 | 155 | 949 | 2,023 |
| El Centro | 1,012 | 211 | 1,493 | 2,716 |
| El Paso | 7,336 | 970 | 1,144 | 9,450 |
| Laredo | 74 | 148 | 1,837 | 2,059 |
| Rio Grande | 10,630 | 1,881 | 5,861 | 18,372 |
| San Diego | 2,413 | 356 | 3,046 | 5,815 |
| Tucson | 1,310 | 408 | 3,193 | 4,911 |
| Yuma | 3,691 | 550 | 539 | 4,780 |
| **Southwest Border Total** | **27,507** | **4,753** | **18,487** | **50,747** |

**FY19 January**

| Sector | FMUA FY 2019 JAN | UAC FY 2019 JAN | SA FY 2019 JAN | TOTAL FY 2019 JAN |
|---|---|---|---|---|
| Big Bend | 91 | 59 | 438 | 588 |
| Del Rio | 1,009 | 192 | 1,323 | 2,524 |
| El Centro | 808 | 236 | 1,417 | 2,461 |
| El Paso | 6,838 | 1,013 | 1,287 | 9,138 |
| Laredo | 73 | 191 | 2,368 | 2,632 |
| Rio Grande | 9,942 | 2,183 | 5,586 | 17,711 |
| San Diego | 1,118 | 283 | 2,723 | 4,124 |
| Tucson | 670 | 357 | 3,069 | 4,096 |
| Yuma | 3,640 | 593 | 473 | 4,706 |
| Southwest Border Total | 24,189 | 5,107 | 18,684 | 47,980 |

**FY19 February**

| Sector | FMUA FY 2019 FEB | UAC FY 2019 FEB | SA FY 2019 FEB | TOTAL FY 2019 FEB |
|---|---|---|---|---|
| Big Bend | 186 | 61 | 598 | 845 |
| Del Rio | 2,262 | 239 | 1,512 | 4,013 |
| El Centro | 1,189 | 336 | 1,794 | 3,319 |
| El Paso | 10,892 | 1,522 | 1,759 | 14,173 |
| Laredo | 61 | 249 | 2,812 | 3,122 |
| Rio Grande | 14,430 | 2,910 | 8,026 | 25,366 |
| San Diego | 2,036 | 383 | 3,029 | 5,448 |
| Tucson | 1,024 | 438 | 3,449 | 4,911 |
| Yuma | 4,451 | 679 | 557 | 5,687 |
| Southwest Border Total | 36,531 | 6,817 | 23,536 | 66,884 |

**FY19 March**

| Sector | FMUA<br>FY 2019 MAR | UAC<br>FY 2019 MAR | SA<br>FY 2019 MAR | TOTAL<br>FY 2019 MAR |
|---|---|---|---|---|
| Big Bend | 197 | 80 | 665 | 942 |
| Del Rio | 2,831 | 435 | 2,297 | 5,563 |
| El Centro | 1,139 | 299 | 2,125 | 3,563 |
| El Paso | 16,966 | 2,188 | 3,071 | 22,225 |
| Laredo | 106 | 300 | 3,787 | 4,193 |
| Rio Grande | 20,943 | 3,714 | 9,106 | 33,763 |
| San Diego | 2,504 | 429 | 3,947 | 6,880 |
| Tucson | 1,824 | 600 | 4,833 | 7,257 |
| Yuma | 6,696 | 918 | 835 | 8,449 |
| **Southwest Border Total** | **53,206** | **8,963** | **30,666** | **92,835** |

**FY19 April**

| Sector | FMUA<br>FY 2019 APR | UAC<br>FY 2019 APR | SA<br>FY 2019 APR | TOTAL<br>FY 2019 APR |
|---|---|---|---|---|
| Big Bend | 224 | 61 | 657 | 942 |
| Del Rio | 3,440 | 395 | 2,014 | 5,849 |
| El Centro | 741 | 256 | 2,390 | 3,387 |
| El Paso | 20,642 | 2,465 | 3,980 | 27,087 |
| Laredo | 101 | 259 | 3,612 | 3,972 |
| Rio Grande | 22,895 | 3,759 | 10,074 | 36,728 |
| San Diego | 2,106 | 366 | 3,726 | 6,198 |
| Tucson | 1,533 | 396 | 3,992 | 5,921 |
| Yuma | 7,034 | 936 | 1,236 | 9,206 |
| **Southwest Border Total** | **58,716** | **8,893** | **31,681** | **99,290** |

**FY19 May**

| Sector | FMUA FY 2019 MAY | UAC FY 2019 MAY | SA FY 2019 MAY | TOTAL FY 2019 MAY |
|---|---|---|---|---|
| Big Bend | 732 | 117 | 710 | 1,559 |
| Del Rio | 5,272 | 569 | 2,721 | 8,562 |
| El Centro | 576 | 243 | 2,666 | 3,485 |
| El Paso | 29,815 | 3,256 | 5,575 | 38,646 |
| Laredo | 110 | 266 | 3,736 | 4,112 |
| Rio Grande | 33,933 | 4,870 | 11,028 | 49,831 |
| San Diego | 1,366 | 308 | 4,212 | 5,886 |
| Tucson | 1,773 | 510 | 4,592 | 6.875 |
| Yuma | 10,914 | 1,350 | 1,660 | 13,924 |
| **Southwest Border Total** | **84,491** | **11,489** | **36,900** | **132,880** |

**FY19 June**

| Sector | FMUA FY 2019 JUN | UAC FY 2019 JUN | SA FY 2019 JUN | TOTAL FY 2019 JUN |
|---|---|---|---|---|
| Big Bend | 154 | 56 | 417 | 627 |
| Del Rio | 5,311 | 425 | 2,347 | 8,083 |
| El Centro | 303 | 176 | 2,408 | 2,887 |
| El Paso | 13,508 | 1,311 | 4,059 | 18,878 |
| Laredo | 83 | 199 | 3,538 | 3,820 |
| Rio Grande | 30,165 | 3,903 | 9,129 | 43,197 |
| San Diego | 802 | 199 | 3,683 | 4,684 |
| Tucson | 1,563 | 412 | 3,549 | 5,524 |
| Yuma | 5,500 | 697 | 1,000 | 7,197 |
| **Southwest Border Total** | **57,389** | **7,378** | **30,130** | **94,897** |

Last modified: July 10, 2019

AR230

*U.S. DEPARTMENT OF STATE*

*Office of the Spokesperson*

For Immediate Release

*MEDIA NOTE*

June 7, 2019

## U.S.-Mexico Joint Declaration

The United States and Mexico met this week to address the shared challenges of irregular migration, to include the entry of migrants into the United States in violation of U.S. law.  Given the dramatic increase in migrants moving from Central America through Mexico to the United States, both countries recognize the vital importance of rapidly resolving the humanitarian emergency and security situation.  The Governments of the United States and Mexico will work together to immediately implement a durable solution.

As a result of these discussions, the United States and Mexico commit to:

**Mexican Enforcement Surge**

Mexico will take unprecedented steps to increase enforcement to curb irregular migration, to include the deployment of its National Guard throughout Mexico, giving priority to its southern border.  Mexico is also taking decisive action to dismantle human smuggling and trafficking organizations as well as their illicit financial and transportation networks.  Additionally, the United States and Mexico commit to strengthen bilateral cooperation, including information sharing and coordinated actions to better protect and secure our common border.

**Migrant Protection Protocols**

The United States will immediately expand the implementation of the existing Migrant Protection Protocols across its entire Southern Border.  This means that those crossing the U.S.

AR231

Southern Border to seek asylum will be rapidly returned to Mexico where they may await the adjudication of their asylum claims.

In response, Mexico will authorize the entrance of all of those individuals for humanitarian reasons, in compliance with its international obligations, while they await the adjudication of their asylum claims.  Mexico will also offer jobs, healthcare and education according to its principles.

The United States commits to work to accelerate the adjudication of asylum claims and to conclude removal proceedings as expeditiously as possible.

**Further Actions**

Both parties also agree that, in the event the measures adopted do not have the expected results, they will take further actions.  Therefore, the United States and Mexico will continue their discussions on the terms of additional understandings to address irregular migrant flows and asylum issues, to be completed and announced within 90 days, if necessary.

**Ongoing Regional Strategy**

The United States and Mexico reiterate their previous statement of December 18, 2018, that both countries recognize the strong links between promoting development and economic growth in southern Mexico and the success of promoting prosperity, good governance and security in Central America.  The United States and Mexico welcome the Comprehensive Development Plan launched by the Government of Mexico in concert with the Governments of El Salvador, Guatemala and Honduras to promote these goals.  The United States and Mexico will lead in working with regional and international partners to build a more prosperous and secure Central America to address the underlying causes of migration, so that citizens of the region can build better lives for themselves and their families at home.

## Proposed Interdiction of Haitian Flag Vessels

Proposed executive agreement between the government of Haiti and the United States, by which the U.S. Coast Guard is to stop and board Haitian flag vessels on the high seas in order to prevent Haitians from entering the United States illegally, is authorized both by the U.S. immigration laws, and by the President's inherent constitutional power to protect the Nation and to conduct foreign relations.

Authority for provision in proposed agreement with Haiti, by which the Coast Guard will detain Haitians emigrating in violation of Haitian law and return them to Haiti, derives from the President's statutory power to guard the borders against illegal entry of aliens, and from his inherent constitutional power in the field of foreign relations.

August 11, 1981

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This responds to your inquiry concerning the implementation of the proposed interdiction of Haitian flag vessels. As presently formulated, the government of Haiti and the United States will enter into an agreement (the Agreement) permitting the United States Coast Guard to stop Haitian flag vessels, board them and ascertain whether any of the Haitians aboard have left Haiti in violation of its travel laws and whether they intend to travel to the United States in violation of U.S. immigration laws. Individuals who are determined to have left Haiti illegally will be returned to Haiti pursuant to the President's authority in the field of foreign relations in order to assist Haiti in the enforcement of its emigration laws. Those who have left Haiti, whether legally or illegally, in an attempt to enter the United States illegally will be returned to Haiti pursuant to the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to enforce U.S. immigration laws, to protect our sovereignty, and as an exercise of his power in the field of foreign relations.[1]

The Coast Guard plans to intercept the Haitian vessels in the Windward Passage, on the high seas but relatively close to Haiti.[2] At that

---

[1] We note that the Agreement does not cover United States vessels either while they are in Haitian waters or while they are on the high seas. Therefore, the Agreement does not contemplate the return of the Haitians on board such vessels to Haiti.

[2] Placing the Coast Guard vessels closer to the United States is apparently not possible because of the increased difficulties and costs of detecting and interdicting vessels from Haiti once they have traveled far from Haiti and the practical problems of caring for the Haitians during the 4-day voyage back to Haiti.

AR233

point, Haitians will be headed toward either the United States or the Bahamas. Although experience suggests that two-thirds of the vessels are headed toward the United States, it is probable that, as the interdiction continues, an ever-increasing number will claim they are going to the Bahamas. Unless the Haitians admit they are coming to the United States, establishing their intended destination may become more difficult.

1. *Effect of the Immigration and Nationality Act (INA)*. The interdiction will not be affected by the provisions of the INA. Aliens are entitled to exclusion proceedings only when they arrive "by water or by air at any port within the United States." 8 U.S.C. § 1221(a). They are entitled to deportation proceedings only if they are "within the United States." 8 U.S.C. § 1251. Asylum claims may only be filed by those "physically present in the United States or at a land border or port of entry." The Refugee Act of 1980, Pub. L. No. 96–212, § 201(b), 94 Stat. 105 (to be codified at 8 U.S.C. § 1158(a)). Since the interdiction will be taking place on the high seas, which is not part of the United States, 8 U.S.C. § 1101(a)(38), none of these provisions will apply.

2. *Coast Guard Authority to Enforce United States Laws*. The Coast Guard is authorized to stop ships upon the high seas in order to detect violations of American laws. 14 U.S.C. § 89(a).[3] The interdiction at seas of a foreign flag vessel requires the permission of the flag state, which the contemplated Agreement expressly grants.[4] The authority for returning the Haitians who are attempting to enter the United States illegally may be found in both statutory authority and implied constitutional authority under Article II. The two statutes are 8 U.S.C. §§ 1182(f) and 1185(a)(1). The first, 8 U.S.C. § 1182(f), states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may

---

[3] This section states.

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . . for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

[4] The continuing jurisdiction of a country over vessels flying its flag on the high seas is a basic principle of international law. 1 L Oppenheim, International Law § 264 (8th ed. 1955) This principle has been codified in the Convention on the High Seas, Apr. 29, 1958, art. 6, 13 U.S.T. 2313, T.I.A.S No. 5200. Ships flying no flag may also be stopped to determine if they are stateless

AR234

by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.[5]

The second, 8 U.S.C. § 1185(a)(1), provides:

> (a) Until otherwise ordered by the President or Congress, it shall be unlawful—
>
>> (1) for any alien to . . . attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe . . .

Under § 1182(f), the President would make a finding that the entry of all Haitians without proper documentation is detrimental to the interests of the United States and issue a proclamation suspending their entry. It could be argued that the entry of illegal aliens, Haitians or otherwise, is already "suspended" since it is already illegal for them to come, and that the section is directed against those who are otherwise eligible. The section, however, is not limited by its terms to documented aliens, and the legislative history is silent on this point. Since the section delegates to the President the authority to exclude entirely certain classes of aliens, we believe that a return of the Haitians can be based on the Coast Guard's power to enforce federal laws. 14 U.S.C. § 89(a). Likewise, § 1185(a)(1) makes it unlawful for any alien to enter the country unless in compliance with the rules and limitations set by the President. All of the undocumented Haitians who are attempting to enter the country are therefore doing so in violation of this section. *See also* 8 U.S.C. § 1103 (Attorney General's duty to control and guard the borders); *Ex parte Siebold,* 100 U.S. 371, 396 (1879).[6]

Implied constitutional power is less clear. Where Congress has acted, the regulation of immigration is an area in which Congress exercises plenary power. *Kleindienst* v. *Mandel,* 408 U.S. 753, 766 (1972) (power to exclude aliens prevails over First Amendment interests of citizens). There has been recognition, however, that the sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government. *See Ekiu* v. *United States,* 142 U.S. 651, 659 (1892). An explicit discussion is found in *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537 (1950). Rejecting a claim that it should review regulations which excluded a German war bride, the Court stated:

---

[5]Neither this Office nor the Immigration and Naturalization Service (INS) is aware of any time when the power granted by this section, added in 1952, has been used

[6]Given the desperate physical condition of many of the Haitians found on the high seas, the Coast Guard may, in particular situations, also be acting pursuant to its duty to render aid to distressed persons and vessels. 14 U.S.C. §§ 2, 88.

244

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is *inherent in the executive power* to control the foreign affairs of the nation. *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304; *Fong Yue Ting* v. *United States,* 149 U.S. 698, 713. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

*Id.* at 542 (citations omitted, emphasis added). *See also Savelis* v. *Vlachos,* 137 F. Supp. 389, 395 (E.D. Va. 1955) *aff'd,* 248 F.2d 729 (4th Cir. 1957) (dictum).

The President, in the exercise of this inherent authority, would be acting to protect the United States from massive illegal immigration. His power to protect the Nation or American citizens or property that are threatened, even where there is no express statute for him to execute, was recognized in *In re Neagle,* 135 U.S. 1, 63–67 (1890). *See also In re Debs,* 158 U.S. 564, 581 (1895); *United States ex rel. Martinez-Angosto* v. *Mason,* 344 F.2d 673, 688 (2d Cir. 1965) (Friendly, J. concurring); 50 U.S.C. § 1541 (War Powers Resolution).[7] A recent Supreme Court decision points out that, in the absence of legislation, it was a common perception that the President could control the issuance of passports to citizens, citing the foreign relations power. *Haig* v. *Agee,* 453 U.S. 281, 292–94 (1981).

The President may also act to return the boats with the flag state's permission as an exercise of his power in the field of foreign relations, a field in which "with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *United States* v. *Curtiss-Wright Export Corp.,* 299 U.S. 304, 319 (1936). *See also Narenji* v. *Civiletti,* 617 F.2d 745, 747–48 (D.C. Cir. 1979), *cert denied,* 446 U.S. 957 (1980) (regulation of Iranian students); *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.,* 333 U.S. 103 (1948) (regulation of foreign airlines). The President's power is strongest where he has well recognized constitutional powers (foreign affairs) to which Congress has added statutory delegation (8 U.S.C. §§ 1182 (f), 1185).

---

[7] This Office has relied upon such inherent authority in an opinion, stating that the President could act to prevent airplane hijackings by placing marshals on board, even in the absence of express authority to take such preventive measures Memorandum for the Director, United States Marshals Service, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, 2–3 (Sept 30, 1970).

3. *Coast Guard Authority to Enforce Haitian Law Pursuant to an Agreement Entered into by the Executive.* The Coast Guard has submitted a draft Agreement that would permit the Coast Guard to board Haitian vessels in order to determine whether any alien is committing an offense against Haitian emigration laws. The issue which arises is whether the Executive can enter into an agreement under which the United States agrees to detain Haitians who are emigrating in violation of Haitian law in order to return them to Haiti. The President's authority to enter into executive agreements with foreign nations may be exercised either under congressional authorization or the President's inherent authority.[8] The President's power to enter into such agreements on his own authority can arise from "that control of foreign relations which the Constitution vests in the President as a part of the Executive function," 39 Op. Att'y Gen. 484, 486 (1940).[9] The limits on presidential power to enter into these agreements are not settled and have aroused controversy from the earliest days of our Republic.[10]

We believe that authority to enter into the Agreement is provided by two sources—the power delegated by Congress to the President, through the Attorney General, to guard the borders, 8 U.S.C. § 1103(a), and the President's authority in the field of foreign relations. The arrest of Haitian citizens as an aid to Haiti's enforcement of its emigration laws will enable the President to curtail the flow of Haitians in the furtherance of his "power and duty to control and guard the boundaries and the borders of the United States against the illegal entry of aliens." *Id.* The breadth of the President's authority in the field of foreign relations is extremely broad, as illustrated by the numerous executive agreements that have been negotiated and upheld by the courts.[11] *See United States* v. *Pink,* 315 U.S. 203 (1942) (Litvinov Agreement); *United States* v. *Belmont,* 301 U.S. 324 (1937) (same); *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902) (Mexican/United States agreement to permit both countries to cross the border in pursuit of marauding Indians);[12] *Dole* v. *Carter,* 444 F. Supp. 1065, 1068–69 (D. Kansas), *motion denied,* 569 F.2d 1109 (10th Cir. 1977) (return of the Crown of St. Stephen).

An agreement to aid the enforcement of the laws of another country is not without precedent. In 1891, the United States and Great Britain entered into an executive agreement prohibiting for one year the killing of seals in the Bering Sea. *Modus Vivendi Respecting the Fur-Seal Fisheries in Behring Sea,* 1 W. Malloy, Treaties, Conventions, International

---

[8] E. Corwin, The President's Control of Foreign Relations 116–17 (1917) (Corwin).

[9] Agreements executed by various Presidents for the settlement of claims of United States citizens against foreign governments are examples. *See Dames & Moore* v. *Regan,* 453 U.S. 654 (1981).

[10] E. Corwin, The President, 216–233 (3d ed. 1948) (debate between Hamilton and Madison over the constitutionality of Washington's Proclamation of Neutrality); L. Henkin, Foreign Affairs and the Constitution 177 (1972) (Henkin).

[11] Henkin, *supra,* at 179.

[12] 1 W. Malloy, Treaties, Conventions, International Acts, Protocols, and Agreements 1144 (1910) (Malloy).

246

Acts, Protocols, and Agreements, 743 (1910) (Malloy). This agreement permitted the seizure of offending vessels and persons if "outside the ordinary territorial limits of the United States," by the naval authorities of either country. *Id.,* Art. III. "They shall be handed over as soon as practicable to the authorities of the nation to which they respectively belong. . . ." *Id.* As there was no statutory authority for this agreement, the President acted pursuant to his inherent authority in the field of foreign affairs.

Between 1905 and 1911, Presidents Roosevelt and Taft entered into a series of executive agreements that permitted the United States to operate the customs administration of both Santo Domingo (now the Dominican Republic) and Liberia.[13]

> [This first agreement] provided, in brief, for (1) a receiver of 'the revenues of all the customs houses,' to be designated by the President of the United States and satisfactory to the Dominican President; (2) the deposit in a New York bank for the benefit of creditors of all receipts above 45 percent, which was to be turned over to the Dominican Republic for the expenses of government administration and the necessary expenses of collection; and (3) the eventual distribution of the funds in the payment of Dominican debts.

W. McClure, International Executive Agreements 94 (1941). A customs administration in Haiti was established by treaty in 1915 but an elaborate series of executive agreements were signed "both extending and terminating various phases of American intervention and assistance in the financial, medical and military affairs of Haiti."[14]

Many authorities have noted that a President's exercise of his authority in this area is "a problem of practical statemanship rather than of Constitutional Law." E. Corwin, The President's Control of Foreign Relations 120–21 (1917).[15] The Supreme Court has upheld a variety of executive agreements based upon a number of theories and it is difficult to delineate with certainty the limits of the President's authority when he enters into such agreements based solely on his inherent executive authority. *But see Reid* v. *Covert,* 354 U.S. 1, 16–19 (1957) (agreement cannot deny civilian his right to a trial by jury). Because this Agree-

---

[13] 1 W. Malloy, *supra,* at 418. *See also* McDougal & Lans, *Treaties and Congressional-Executive or Presidential Agreements,* 54 Yale L.J. 181, 279 (1945); N. Small, Some Presidential Interpretations of the Presidency, 78–79 (1970) The arrangement was based on a fear that these countries' debts would be used by European countries as a grounds for intervention.

[14] McDougal, *supra,* 54 Yale L.J. at 279. The final one was signed in 1934

[15] Commitment of financial resources overseas "depend[s] directly and immediately on appropriations from Congress. . . . While the issue of Presidential power to make executive agreements or commitments has no legal solution, political forces have mitigated its theoretical rigors. The President has to get along with Congress and with the Senate in particular, and he will not lightly risk antagonizing it by disregarding what it believes are its constitutional prerogatives." Henkin, *supra,* at 183–84. *See also* K. Holloway, Modern Trends in Treaty Law 216–17 (1967), McClure, *supra,* at 330; Restatement (Second) of the Foreign Relations Law of the United States § 121 (1965)

AR238

ment will be based both on delegated and inherent authority, we believe that it is constitutional.

4. *Obligations Under the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, United Nations, Protocol, 19 U.S.T. 6223, T.I.A.S. No. 6577.* Article 33 (19 U.S.T. 6276) of the Protocol, to which the United States is a party, provides that "No Contracting State shall . . . return (*"refouler"*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Individuals who claim that they will be persecuted for one of these reasons must be given an opportunity to substantiate their claims. The Protocol does not, however, mandate any particular kind of procedure. We have reviewed the plan outlined in the draft prepared by INS and believe that it comports with the Protocol.

5. *Effect of the Foreign Assistance Act of 1961, 22 U.S.C. § 2151–2151d (Supp. III 1979).* We know of no provision of the Act that would prohibit the interdiction, since no foreign aid funds are being used.

6. *Formal Implementation of the Interdiction.* There are three formal steps still to be taken before the interdiction can begin. The first is clearance of the Agreement by the Department of State. The second is the signing of the Agreement by the United States and the government of Haiti.[16] The third is the issuance of a proclamation by the President pursuant to 8 U.S.C § 1182(f). The proclamation would contain a finding that the entry of Haitian nationals who do not possess proper documentation for entry into the United States is detrimental to the interests of the United States. The proclamation would then suspend the entry of all such Haitian nationals. If a decision is made not to rely upon 8 U.S.C. § 1182(f), no proclamation is necessary. However, the validity of the President's action will certainly be strengthened by relying on both statutory provisions which provide support for the contemplated action.

The Coast Guard is presently under the authority of the Department of Transportation. 14 U.S.C. § 1. The Attorney General is in charge of enforcing the immigration laws. 8 U.S.C. § 1103. The Coast Guard will be enforcing both the immigration laws and the laws of Haiti pursuant to the Agreement. While a memorandum of understanding signed by the Coast Guard, INS, and the Department of State would facilitate operations, 14 U.S.C. § 141, a presidential order to the Secretary of Transportation to have the Coast Guard act to enforce both parts of the Agreement will avoid any question about the Coast Guard's authority to act.

---

[16] The Agreement should be transmitted to Congress within 60 days. 1 U S.C. § 112b(a) (Supp. III 1979).

7. *Coast Guard's Authority to Operate in Haitian Waters:* Under the Agreement Haiti will grant the Coast Guard permission to enter its waters to return Haitian nationals. The Coast Guard's authority to enter the waters will be pursuant to the Agreement.[17] By permitting the Coast Guard to enter its waters, Haiti is granting free passage to our ships and crews. Sovereign nations often grant permission for the passage of foreign forces. *Tucker* v. *Alexandroff,* 183 U.S. 424, 435 (1902); *Schooner Exchange* v. *McFaddon,* 11 U.S. 116, 139–40 (1812); 2 J. Moore, A Digest of International Law § 213 (1906). We suggest a modification to the Agreement to make it clear that Haiti will not exercise jurisdiction over the Coast Guard ships or her crews while they are in Haitian waters. *Schooner Exchange,* 11 U.S. at 140, 143.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17] It will not be pursuant to 14 U.S.C. § 89(a) because the waters of Haiti are not within the jurisdiction of the United States. *United States* v. *Conroy,* 589 F.2d 1258, 1265 (5th Cir. 1979) Section 89(a), however, does not limit the authority of the Coast Guard to act pursuant to another provision of law—in this case, the Agreement. 14 U.S.C. § 89(c).

AR240

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104
(415) 453-3307



FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 1997

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

Additional counsel listed next page

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

AR241

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ 85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC 20536
/ / /

2

AR242

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement

3

AR243

(the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I      DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in

4

AR244

Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities

for special needs minors, shall be non-secure as required under state law; provided, however, that a

facility for special needs minors may maintain that level of security permitted under state law which is

necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a

minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide

licensed placements in those geographical areas where the majority of minors are apprehended, such as

southern California, southeast Texas, southern Florida and the northeast corridor.

7. The term "special needs minor" shall refer to a minor whose mental and/or physical

condition requires special services and treatment by staff. A minor may have special needs due to drug

or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or

chronic illness that requires special services or treatment. A minor who has suffered serious neglect or

abuse may be considered a minor with special needs if the minor requires special services or treatment

as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs

and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places

children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program,

agency or organization licensed by an appropriate State agency and that meets those standards set forth

in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close

supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake

supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff

supervision, than a facility operated by a licensed program in order to control problem behavior and to

prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with

AR245

major restraining construction or procedures typically associated with correctional facilities.

II      SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this

AR246

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III    CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV    STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V    PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the  particular vulnerability of minors. Facilities will provide access  to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

7

AR247

protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

1.    as otherwise provided under Paragraph 13 or Paragraph 21;

2.    as otherwise required by any court decree or court-approved settlement;

3.    in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4.    where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B. For purposes of this paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such

8

AR248

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI    GENERAL POLICY FAVORING RELEASE

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that

9

AR249

of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

    A.    a parent;

    B.    a legal guardian;

    C.    an adult relative (brother, sister, aunt, uncle, or grandparent);

    D.    an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

    E.    a licensed program willing to accept legal custody; or

    F.    an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

    A.    provide for the minor's physical, mental, and financial well-being;

    B.    ensure the minor's presence at all future proceedings before the INS and the immigration court;

    C.    notify the INS of any change of address within five (5) days following a move;

    D.    in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

10

AR250

E.   notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.   if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

11

AR251

18. Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

VII     INS CUSTODY

19. In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier. All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20. Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21. A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.      has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

AR252

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a

delinquent act; provided, however, that this provision shall not apply to any minor

whose offense(s) fall(s) within either of the following categories:

i.    Isolated offenses that (1) were not within a pattern or practice of criminal activity

and (2) did not involve violence against a person or the use or carrying of a weapon

(Examples: breaking and entering, vandalism, DUI, etc.  This list is not

exhaustive.);

ii.    Petty offenses, which are not considered grounds for stricter means of detention in

any case (Examples: shoplifting, joy riding, disturbing the peace, etc.  This list is

not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to

believe that the individual has committed a specified offense;

B.    has committed, or has made credible threats to commit, a violent or malicious act

(whether directed at himself or others) while in INS legal custody or while in the

presence of an INS officer;

C.    has engaged, while in a licensed program, in conduct that has proven to be unacceptably

disruptive of the normal functioning of the licensed program in which he or she has been

placed and removal is necessary to ensure the welfare of the minor or others, as

determined by the staff of the licensed program (Examples: drug or alcohol abuse,

stealing, fighting, intimidation of others, etc.  This list is not exhaustive.);

D.    is an escape-risk; or

E.    must be held in a secure facility for his or her own safety, such as when the INS has

13

AR253

reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

22. The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

A.      the minor is currently under a final order of deportation or exclusion;

B.      the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

C.      the minor has previously absconded or attempted to abscond from INS custody.

23. The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24.A. A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B. Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may  seek judicial review in any

14

AR254

United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII   TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except:

A. when being transported from the place of arrest or apprehension to an INS office, or

15

B. where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults. The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26. The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14. The INS may, in its discretion, provide transportation to minors.

IX     TRANSFER OF MINORS

27. Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner. No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

X MONITORING AND REPORTS

28A. An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1)

16

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

17

terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to

the parties, including the final report referenced in Paragraph 35, so that they can submit comments on

the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is

in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial

compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on

an annual basis until three years after the court determines that the INS has achieved substantial

compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to

determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI    ATTORNEY-CLIENT VISITS

32.A.  Plaintiffs' counsel are entitled to attorney-client visits with class members even though

they may not have the names of class members who are housed at a particular location. All visits shall

occur in accordance with generally applicable policies and procedures relating to attorney-client visits at

the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the

facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the

minors housed at that facility. In all instances, in order to memorialize any visit to a minor by

Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any

attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation

of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of

appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of

the facility.

B.  Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

AR258

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

XII   FACILITY VISITS

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32,  Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23. Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit.  The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff. In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

19

AR259

XIII TRAINING

34. Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training. Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

XIV   DISMISSAL

35. After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action. Until such dismissal, the court shall retain jurisdiction over this action.

XV   RESERVATION OF RIGHTS

36. Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

XVI   NOTICE AND DISPUTE RESOLUTION

37. This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24. The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement. Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

20

AR260

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA  90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA  94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA  90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC  20044

XVII   PUBLICITY

38.  Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement.

The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by

the parties, as set forth in Exhibit 5 attached.  The parties shall pursue such other public dissemination

of information regarding this Agreement as the parties shall agree.

XVIII  ATTORNEYS' FEES AND COSTS

39.  Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs

the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

AR261

## XIX    TERMINATION

40. All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

## XX    REPRESENTATIONS AND WARRANTY

41. Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law. Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation. Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation. The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants: Signed: _Doris Meissner_ Title: Commissioner, INS

Dated: _9/16/96_

For Plaintiffs: Signed: per next page     Title:_____

Dated:_____

22

AR262

The foregoing stipulated settlement is approved as to form and content:

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos Holguin
Peter Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta

STEICH LANG
Susan G. Boswell
Jeffery Willis

Date: 1/13/97          By

Date: 11/13/96         By

23

AR263



**U.S. Department of Justice**
Executive Office for Immigration Review
*Office of the Chief Immigration Judge*

Chief Immigration Judge                                    *5107 Leesburg Pike, State 2545*

*Falls Church, Virginia 22041*

May 14, 1999

**MEMORANDUM**

TO:            All Immigration Judges
               All Court Administrators
               All Judicial Law Clerks
               All Support Personnel

FROM:          The Office of the Chief Immigration Judge

SUBJECT:       Operating Policies and Procedures Memorandum No. 99-5:
               Implementation of Article 3 of the UN Convention Against Torture

TABLE OF CONTENTS

**I.    Introduction**................................................................................................2
**II.   Convention Against Torture Claims in Removal/Deportation/Exclusion
       Proceedings**........................................................................................3
       A.    Initiating a Convention Against Torture Claim.....................................3
       B.    Conduct of the Proceedings.............................................................3
       C.    Deciding a Convention Against Torture Claim.........................................4    D    .
       Warnings Necessary upon a Grant of Deferral of Removal under the
             Convention Against Torture.............................................................4
       E.    The Effect of a Grant of Deferral of Removal under the Convention Against
       Torture.................................................................................5
       F.    Motions to Reopen...........................................................................5
             1.    Aliens with Final Orders Issued by the Immigration Court.............................5
             2.    Aliens with Final Orders who have Pending Convention
                   Against Torture Claims with the INS.............................................5
**III.  Convention Against Torture Claims in Expedited Removal Proceedings
       (Credible Fear Determinations)**.............................................................6
       A.    Initiating a Convention Against Torture Claim in Credible Fear Review Proceedings..........6
       B.    Conduct of Credible Fear Review Proceedings.........................................6

AR264

C.     Deciding a Convention Against Torture Claim in Credible Fear Review Proceedings.................................................................................................6

**IV.**     **Convention Against Torture Claims in Administrative Deportation or Reinstatement Proceedings (Reasonable Fear Determinations)**......................................6

A.     Initiating Reasonable Fear Review Proceedings...........................................7
B.     Scheduling Reasonable Fear Review Proceedings.......................................7
C.     Conduct of Reasonable Fear Review Proceedings........................................8
D.     Deciding the Claim in Reasonable Fear Review Proceedings......................9

**V.**     **Withholding-Only Proceedings**............................................................9

A.     Initiating Withholding-Only Proceedings.....................................................9
B.     Scheduling Withholding-Only Proceedings................................................10
C.     Conduct of Withholding-Only Proceedings................................................10
D.     Deciding the Claim in Withholding-Only Proceedings..............................11

**VI.**     **Asylum-Only Hearings**......................................................................11

**VII.**    **Termination of Deferral of Removal**..................................................11

A.     Introduction................................................................................................11
B.     Proper Venue and Jurisdiction...................................................................12
C.     Adjudicating the INS's Motion or the Alien's Request..............................12
D.     Scheduling a Termination of Deferral Hearing and Hearing Notice...........12
E.     Conduct of the Proceedings........................................................................13
F.     Deciding the Termination of Deferral of Removal Hearing........................13

**VIII..** **Diplomatic Assurances Process**.........................................................13

**Appendix**..................................................................................................14

# I.   <u>Introduction</u>

On February 19, 1999, an interim regulation, implementing the obligations under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment as defined in 8 C.F.R. § 208.16 (c)(1) (hereinafter cited "Convention Against Torture") was published in the Federal Register. This regulation became effective on March 22, 1999. Article 3 of the Convention Against Torture states as follows:

1.      No State party shall expel, return, ('refouler') or extradite a person to another state where there are substantial grounds for believing that he would be in danger of being subjected to torture.

2.      For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant, or mass violations of human rights.

This interim regulation, based on section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (P.L. 105-277, Div. G, Oct. 21, 1998), will have a significant impact on the Immigration Court. It creates a new type of claim which is distinct from asylum under section 208 of the Immigration and Nationality Act (INA) and withholding of removal under section 241(b)(3) of the INA. While asylum officers have some screening functions,

Immigration Judges will have sole jurisdiction to adjudicate Convention Against Torture claims.  A successful applicant under the Convention Against Torture will be granted withholding of removal or deferral of removal. Additionally, this regulation creates a new type of proceeding to adjudicate applications for withholding of removal under section 241(b)(3) of the INA and under the Convention Against Torture, for aliens who have received INS administrative removal orders under sections 238 and 241(a)(5) of the INA.  Also, this regulation, at 8 C.F.R. § 208.18(a), identifies the criteria by which to determine if an act constitutes torture under Article 3 of the Convention Against Torture.

## II.   <u>Convention Against Torture Claims in Removal/Deportation/Exclusion Proceedings</u>

The overall hearing process is not changed by the Convention Against Torture.  However, the Convention Against Torture adds a form of protection from removal and results in additional considerations for the Immigration Court.

### A.   <u>Initiating a Convention Against Torture Claim</u>

A Convention Against Torture claim is triggered if the alien either:  1) requests consideration under the Convention Against Torture; or 2) presents evidence, including his or her testimony and information contained in a Form I-589, which indicates that he or she may be tortured in the country of removal.  <u>See</u> 8 C.F.R. § 208.13 (c)(1).

Convention Against Torture claims must be asserted by filing Form I-589, Application for Asylum or Withholding of Removal. Question 7 in part C of  Form I-589 asks: "Do you fear being subject to torture in your home country?"  There are supplemental instructions attached to Form I-589  which discuss Convention Against Torture claims.

### B.   <u>Conduct of the Proceedings</u>

A Convention Against Torture claim will be adjudicated in conjunction with all claims for relief in the removal/deportation/exclusion proceedings.  There is no separate hearing to consider a torture claim.

It must be noted, however, that the 180-day clock does not apply to applications for withholding of removal under section 241(b)(3) of the INA or the Torture Convention.  A finding that the alien filed a frivolous asylum application does not preclude an alien from being granted withholding of removal under section 241(b)(3) of the INA or the Torture Convention.  <u>See</u> 8 C.F.R. § 208.19.

### C.   <u>Deciding a Convention Against Torture Claim</u>

In considering the Convention Against Torture claim, the Immigration Judge must first determine whether the alien has established that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.  <u>See</u> 8 C.F.R. § 208.16(c)(4).  The "more likely than not" standard is the same standard as withholding of removal under section 241(b)(3) of the INA and withholding of deportation under the former section

3

243(h) of the INA.

Once the Immigration Judge determines that the alien is entitled to Convention Against Torture protection, he or she must then decide whether the alien is subject to mandatory denial under one of the bars contained in section 241(b)(3)(B) of the INA.  See 8 C.F.R. §§ 208.16(c)(4); 208.16(d)(2).

If an Immigration Judge decides that the alien has met his or her burden of proof and that the alien is not subject to the bars contained in section 241(b)(3)(B) of the INA, the Immigration Judge must grant the alien withholding of removal.  A grant of withholding of removal under the Convention Against Torture has the same consequences as a grant of withholding of removal under section 241(b)(3) of the INA, i.e., the alien may not be removed to a country where it has been determined that it is more likely than not that he or she would be tortured.  The INS or the alien may appeal the Immigration Judge's decision to the Board of Immigration Appeals (BIA).

If an Immigration Judge decides that the alien has met his or her burden of proof for Convention Against Torture protection, but is subject to the bars contained in section 241(b)(3)(B) of the INA, i.e., the alien is a persecutor of others, a security threat, or has been convicted for a particularly serious crime, the Immigration Judge must deny the alien of withholding of removal under the Convention Against Torture and grant the alien deferral of removal under 8 C.F.R. § 208.17.  See 8 C.F.R. § 208.16(c)(4).

D.     Warnings Necessary upon a Grant of Deferral of Removal under the Convention Against Torture

If an Immigration Judge grants deferral of removal under the Convention Against Torture, he or she must inform the alien that:

1.     Deferral of removal does not confer any lawful or permanent immigration status on the alien;
2.     If the alien is detained, he or she may not necessarily be released by the INS;
3.     Deferral of removal is effective only until terminated;
4.     Deferral of removal may be terminated based upon the alien's request or a motion from the INS;
5.     Deferral of removal only precludes the INS from removing the alien to a particular country or countries in which it has been determined that the alien is likely to be tortured; the alien may be removed at any time to another country.

See 8 C.F.R. § 208.17(b).

E.     The Effect of a Grant of Deferral of Removal under the Convention Against Torture

The INS may not remove an alien who has been granted deferral of removal to a country in which it is more likely than not that he or she would be tortured.  A grant of deferral of removal is similar to a grant of withholding of removal, in that it precludes the INS from removing the alien to a specific country.  See 8 C.F.R. § 208.17(a). The INS may, however, detain an alien granted deferral of removal and may request the Immigration Court, at any time, based on relevant evidence that was not presented at the previous hearing, to review whether the alien should continue to have protection under the Convention Against Torture.  See 8 C.F.R. §§ 208.17(c); 208.17(d); part VII of this OPPM.  The INS or the alien may appeal the Immigration Judge's decision to the BIA.

4

F.     Motions to Reopen

      Aliens with final orders may move to reopen their proceedings in order to apply for withholding of removal under the Convention Against Torture.  Specifically, the regulation addresses two groups of aliens who may file motions to reopen: 1) aliens with final orders who have not previously sought protection under the Convention Against Torture; and 2) aliens with final orders who have previously filed claims for Convention Against Torture protection with the INS.

1.     Aliens with Final Orders Issued by the Immigration Court

      Aliens with final orders of removal, deportation, or exclusion may file a motion to reopen for the sole purpose of asserting a claim for protection under the Convention Against Torture.  The interim regulation provides for an exception to the time and numerical limitations on motions to reopen for aliens who have a final order and seek to reopen their cases for the purpose of making a Convention Against Torture claim.  The specific requirements are found at 8 C.F.R. § 208.18(b)(2).  This motion to reopen must meet the motion to reopen requirements as set forth in 8 C.F.R. § 3.23, and 1) be filed on or before June 21, 1999, and 2) show that the alien is prima facie eligible for Convention Against Torture protection.  See 8 C.F.R. § 208.18(b)(2).  There is no fee for the filing of this motion.

2.     Aliens with Final Orders who have Pending Convention Against Torture Claims with the INS

      Before the issuance of the interim regulation, the INS had an administrative procedure in which aliens with final orders could request a stay of deportation or removal pursuant to Article 3 of the Convention Against Torture.  Aliens who made a Convention Against Torture claim with the INS on or before March 22, 1999, and whose claim was not finally decided on or before March 22, 1999, will receive a notice from the INS.  See 8 C.F.R. § 208.18(b)(3)(ii).

      The interim regulation provides that an alien who applied with the INS under its administrative process shall have his or her case reopened, based on evidence that he or she applied with the INS for Convention Against Torture protection on or before March 22, 1999, and the INS had not made a final decision.  See 8 C.F.R. § 208.18(b)(3)(ii)(A).  If the alien provides a copy of the notice (see Attachment A) or other convincing evidence showing that he or she has a request for Convention Against Torture protection pending with the INS, the interim regulation requires that the motion to reopen be granted.  For this group of aliens, the regulation does not specify a deadline by which the motion to reopen must be filed.

III.    **Convention Against Torture Claims in Expedited Removal Proceedings (Credible Fear Determinations)**

A.     Initiating a Convention Against Torture Claim in Credible Fear Review Proceedings

      The interim regulation allows an alien to raise a Convention Against Torture claim through the established credible fear process in expedited removal proceedings.  See 8 C.F.R. §§ 208.30; 3.42.  The credible fear procedures are essentially unchanged.  See OPPM 97-3: Procedures for Credible Fear and Claimed Status Reviews.  However, pursuant to the interim regulations, the Immigration Judge and the asylum officer must now also consider whether

AR268

the alien has a credible fear of persecution and/or torture.  A credible fear review proceeding is initiated when the INS files Form I-863 with either block "1" or block "2" checked with the Immigration Court.

B.      Conduct of Credible Fear Review Proceedings

As noted above, considering Convention Against Torture claims in credible fear review proceedings does not change the process.  The procedures and policies described in OPPM 97-3: Procedures for Credible Fear and Claimed Status Reviews remain in effect and cover all credible fear review proceedings, including those when the alien claims a credible fear of torture.

C.      Deciding a Convention Against Torture Claim in Credible Fear Review Proceedings

The Immigration Judge shall make a de novo determination of whether the alien has a credible fear of persecution and/or torture.  If it is determined that the alien has a credible fear of persecution or torture, the Immigration Judge will vacate the INS's expedited removal order.  Alternatively, if it is determined that the alien does not have a credible fear of persecution or torture,  the Immigration Judge will  affirm the asylum officer's determination and remand the case to the INS for execution of removal.  See 8 C.F.R. §§ 3.42(d); 3.42(f).

IV.     **Convention Against Torture Claims in Administrative Deportation or Reinstatement Proceedings (Reasonable Fear Determinations)**

The interim regulation creates a new type of proceeding called a "reasonable fear review proceeding" which is modeled on the credible fear process.   Reasonable fear review proceedings will be available to aliens who have been ordered removed by the INS under section 238 of the INA (covering aliens who are not lawful permanent residents and have been convicted of an aggravated felony) and under section 241(a)(5) of the INA (reinstatement of removal orders).   This proceeding was created to consider whether such an alien is eligible for withholding of removal under either 241(b)(3) of the INA or the Convention Against Torture.

Under this process, an alien who has been ordered removed by the INS and expresses a fear of persecution or torture will have his or her claim screened by an asylum officer.  See 8 C.F.R. §§ 238.1(f)(3); 241.8(d); 208.31(b).  The asylum officer must use the "reasonable possibility" of torture or persecution standard.  See 8 C.F.R. § 208.31(c).  As defined in the regulation, this standard is, in effect, equivalent to the standard used to adjudicate asylum applications.  See 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999).  This standard is higher than the "credible fear" standard.

If the asylum officer finds that the alien has a "reasonable fear" of persecution or torture, the alien will be referred to the Immigration Court for a withholding-only proceeding.  See 8 C.F.R. § 208.31(e); part V of this OPPM.  If the asylum officer determines that the alien does not have a reasonable fear of persecution or torture, the alien may request an Immigration Judge to review the asylum officer's negative determination in a reasonable fear review proceeding.  See 8 C.F.R. § 208.31(g).  This request triggers a reasonable fear review proceeding.

A.      Initiating Reasonable Fear Review Proceedings

6

A reasonable fear review proceeding is initiated when the INS files with the Immigration Court a Form I-863 with block "5" checked.  Along with Form I-863, the INS shall also provide the record of determination, including copies of the asylum officer's notes, the summary of the material facts, and other materials upon which the asylum officer reached his or her determinations.  See 8 C.F.R. § 208.31(g).  It is likely that aliens who request a reasonable fear review are detained either by the INS or at a Federal, State, or local jail or prison.  If the distance from the Immigration Court renders it impractical for the INS to file Form I-863 in person, the Court Administrator shall also allow the filing of Form I-863 by fax, based on the same procedure set forth in OPPM 97-3, <u>Procedures for Credible Fear and Claimed Status Reviews</u>, part III.  Filing by fax shall be limited to reasonable fear review, credible fear review, and claimed status review proceedings.

B.     <u>Scheduling Reasonable Fear Review Proceedings</u>

The reasonable fear determination was designed to provide for a fair resolution of withholding of deportation or removal claims either under section 241(b)(3) of the INA or the Convention Against Torture without disrupting the operation of administrative removal and reinstatement of removal proceedings.  See 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999).  In the absence of exceptional circumstances, a reasonable fear review proceeding shall be conducted within 10 days of the filing of Form I-863 with the Immigration Court.  See 8 C.F.R. § 208.31(g)(as corrected at 64 FR 13881 (March 23, 1999).

A hearing notice entitled "Notice of Review of Reasonable Fear Hearing" has been created in ANSIR for these cases.  See Attachment B (notice T9).  The hearing notice must be sent to the alien, in care of his or her custodial authority, and his or her attorney, if any, via an appropriate overnight courier.  Service of the copy of the hearing notice shall be sent to the INS via regular mail.  See Interim OPPM 97-2: <u>Notices of Immigration Judge Hearings</u>, part II, B, 2.

C.     <u>Conduct of Reasonable Fear Review Proceedings</u>

The interim regulations do not describe how reasonable fear review proceedings will be conducted.  However, as these proceedings resemble credible fear review proceedings, much of their conduct will be modeled after credible fear review proceedings.  See 8 C.F.R. § 3.42; OPPM 97-3: <u>Procedures for Credible Fear and Claimed Status Reviews</u>.  A Record of Proceeding (ROP) will be created for each reasonable fear review determination proceeding.  The red ROP jacket used for credible fear review determinations should be used for these cases.  The ROP should be organized with the left side of the ROP containing the Immigration Judge worksheet (administrative side), and the right side containing Form I-863, any submissions filed along with Form I-863, any written hearing notice(s) and the tape envelope.  See OPPM 97-3: <u>Procedures for Credible Fear and Claimed Status Reviews</u>, part IV.

The Immigration Judge must tape record the reasonable fear review proceeding.  The tape(s) must be labeled so that they are distinguishable from other types of proceedings (e.g., "Reasonable Fear Review").  Although the tape(s) will not normally be transcribed, the tape will remain in the ROP.

The Immigration Judge may conduct proceedings by video conference (see 8 C.F.R. § 3.25 (c)); however, the interim regulations, unlike the regulations governing credible fear proceedings at 8 C.F.R. § 3.42, do not address whether a reasonable fear review may be conducted telephonically without the consent of the alien.  Therefore, in

the absence of any regulations specifically governing the conduct of these proceedings, it is left to the discretion of the Immigration Judge to determine the issue.

If an interpreter is necessary, the Immigration Court must provide one.  If a staff or a contract interpreter is not available for the hearing, the Berlitz Unscheduled Telephonic Interpreter (UT Service) should be used.  If the UT Service is unable to assist, the AT&T Language Line may be used.

With regard to representation in reasonable fear review proceedings, the interim regulations are again silent.  However, the interim regulations specify that the alien may be represented by counsel in the asylum officer's reasonable fear interview.  See 8 C.F.R. § 208.31(c).  See also 8 C.F.R. §§ 3.16(b) (governing the right to representation generally); 3.42(c) (the right to consult prior to credible fear review).  Since there is no specific regulatory guidance on this point, the issue is left to the discretion of the Immigration Judge.

D.    Deciding the Claim in Reasonable Fear Review Proceedings

The Immigration Judge must make a de novo determination of whether the alien has established a reasonable fear of persecution and/or torture.  As noted previously, the "reasonable fear" of torture or persecution standard is higher than the "credible fear" standard and is the standard used to adjudicate asylum applications.  See 8 C.F.R. § 208.31(c); 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999).  A special order for reasonable hear review proceedings has been established in ANSIR.  See Attachment B (order X8).  If the Immigration Judge finds that the alien has established a reasonable fear of persecution and/or torture, the Immigration Judge shall render an order stating that finding.   The order includes a notice that, by operation of regulation, the alien is placed into withholding-only proceedings.  During the new withholding-only proceedings, the Immigration Judge shall allow the alien to submit Form I-589.  See 8 C.F.R. § 208.31(g)(2); part V of this OPPM.  If the Immigration Judge finds that the alien does not have a reasonable fear of persecution or torture, the case shall be returned to the INS for removal of the alien.

There is no appeal from an Immigration Judge's decision in a reasonable fear determination by either the alien or the INS.  See 8 C.F.R. § 208.31(g)(1).


V.    **Withholding-Only Proceedings**

Under the interim regulations, aliens in administrative removal proceedings under section 238 of the INA and aliens subject to reinstatement of removal under section 241(a)(5) of the INA will now be able to apply for withholding of removal under section 241(b)(3) of the INA, as well as the Convention Against Torture, after a screening process by an asylum officer described in Part IV above.

A.    Initiating Withholding-Only Proceedings

A withholding-only proceeding may be initiated in two ways:

1) when an asylum officer finds that the alien established a reasonable fear of persecution or torture, and the INS files Form I-863 with block "6" checked with the Immigration Court; or,

8

2) when an Immigration Judge determines that the alien has a reasonable fear of persecution or torture in a reasonable fear review proceeding.  The INS does not need to file another Form I-863 to begin withholding-only proceedings.  The Immigration Judge's finding of reasonable fear triggers the commencement of withholding-only proceedings.  See 8 C.F.R. § 208.31(g)(2).

In a withholding-only proceeding, an Immigration Judge may only consider the alien's application for withholding of removal under section 241(b)(3) of the INA and the Convention Against Torture.  The process is similar to an asylum-only hearing pursuant to 8 C.F.R. § 208.2(b).

B.      Scheduling Withholding-Only Proceedings

Withholding-only proceedings, like the credible fear and reasonable fear proceedings, will likely involve detained aliens.  In such circumstances, these matters should be scheduled according to the normal scheduling procedures for detained aliens.  The 180-day clock does not apply in withholding-only proceedings.  The 10-day period in removal proceedings (14 days in deportation proceedings) required to allow an alien to secure counsel pursuant to section 239(b)(1) of the INA does not apply in these cases.  In scheduling and adjudicating these cases, the Immigration Judge should balance the dictates of due process concerns with regulatory compliance concerns.

The hearing notice, entitled "Notice of Withholding-Only Hearing" (see Attachment B (notice T8)), must be sent to the alien, in care of his or her custodial authority, and his or her attorney, if any, via an appropriate overnight courier.  Service of the copy of the hearing notice shall be sent to the INS via regular mail.  See Interim OPPM 97-2: Notices of Immigration Judge Hearings, part II, B, 2.

C.      Conduct of Withholding-Only Proceedings

The interim regulations do not describe the required conduct of withholding-only proceedings.  However, as these proceedings resemble asylum-only proceedings, their conduct will be modeled after asylum-only proceedings as set forth at 8 C.F.R. § 208.2(b), except that withholding-only proceedings are limited to whether the alien qualifies for withholding of deportation or removal under section 241(b)(3) of the INA or the Convention Against Torture, or deferral of removal under the Convention Against Torture.

The Immigration Court will use the blue ROP jacket for withholding-only proceedings.  The Immigration Judge's order finding that the alien has a reasonable fear of persecution or torture or a Form I-863 with block "6" checked will be the initial document in the blue withholding-only ROP.  The Immigration Judge must commence the withholding-only proceedings using a new tape.

At the initial appearance before the Immigration Judge, the alien shall be given adequate time to prepare and file a Form I-589 with the Immigration Court.  Once Form I-589 is received, a copy of the application must be forwarded to the State Department and the Immigration Judge must schedule a hearing on the merits.

The Immigration Judge may conduct any proceeding by video conference (see 8 C.F.R. § 3.25(c)); however, the interim regulations do not address whether a withholding-only proceeding may be conducted telephonically

9

without the consent of the alien.  Therefore, in the absence of any regulations specifically governing the conduct of these proceedings, it is left to the discretion of the Immigration Judge to determine the issue.

If an interpreter is necessary, the Immigration Court must provide one.  If a staff or a contract interpreter is not available for the hearing, the UT Service should be used.  If the UT Service is unable to assist, the AT&T Language Line may be used.

D.      Deciding the Claim in Withholding-Only Proceedings

In the withholding-only hearing, the scope of the Immigration Judge's adjudication is limited to consideration of the alien's withholding of removal application under 8 C.F.R. § 208.16.  See 8 C.F.R. §§ 208.31(e); 208.31(g)(2)(i).  The Immigration Judge shall rule on whether the alien is eligible for withholding of removal under section 241(b)(3) of the INA or whether the alien is eligible for withholding of removal under the Convention Against Torture.  A standard order has been generated in ANSIR for withholding-only proceedings.  See Attachment B (order Q5).  Pursuant to 8 C.F.R. § 208.16(c)(4), if the Immigration Judge determines that the alien is more likely than not to be tortured in the country of removal, he or she must either grant withholding of removal or deferral of removal, depending on whether the alien is subject to the bars in section 241(b)(3)(B) of the INA.

Both the alien and the INS may appeal the Immigration Judge's decision to the BIA.  See 8 C.F.R. §§ 208.31(e);(g)(2)(ii).


**VI.    Asylum-Only Hearings**

Under 8 C.F.R. § 208.2(b), Immigration Judges have jurisdiction over asylum applications filed by certain aliens who are not in removal, deportation, or exclusion proceedings.  Since a Convention Against Torture claim is considered an "asylum application" for purposes of section 208 of the regulations (see 8 C.F.R. § 208.1(a)), an alien who is in asylum-only proceedings pursuant to 8 C.F.R. § 208.2(b), may also apply for withholding of removal under the Convention Against Torture.  In an asylum-only proceeding, block "3" on Form I-863 must be checked.


**VII.   Termination of Deferral of Removal**

A.      Introduction

One of the differences between being granted withholding of removal and deferral of removal under 8 C.F.R. § 208.17, is the process for termination.  A grant of withholding of removal under either section 241(b)(3) of the INA or the Convention Against Torture may be terminated through a motion to reopen.  See 8 C.F.R. § 208.22(e).  By contrast, the process to terminate deferral of removal does not involve a motion to reopen; rather, the INS must file a motion to schedule a hearing to consider the termination of deferral of removal with the Immigration Court.  This motion shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred that was not presented at the previous hearing.  The INS motion need not meet the ordinary motion to reopen requirements.  See 8 C.F.R. § 208.17(d)(1).

10

If an Immigration Judge grants INS' motion to schedule a hearing to consider the termination of the deferral of removal, he or she shall then conduct a hearing based on the record of proceeding and any new evidence presented by either the INS or the alien and shall make a de novo determination of whether it is more likely than not that the alien would be tortured in the country of removal.  See 8 C.F.R. § 208.17(d)(3).

An alien may make a written request to terminate his or her deferral of removal.  See 8 C.F.R. § 208.17(e). The Immigration Judge may hold a hearing to determine whether the alien's request was knowing and voluntary. However, if the Immigration Judge is able to determine that the request was knowing and voluntary on the basis of the written submission, a hearing is not necessary.  See 8 C.F.R. § 208.17(e).

B.      Proper Venue and Jurisdiction

The INS's motion to schedule a hearing to consider the termination of deferral of removal or the alien's request to terminate deferral of removal must be filed with the Immigration Court which issued the order granting deferral of removal.  See 8 C.F.R. §§ 208.17(d)(1); 208.17(e)(1).  If such motion or request to terminate deferral of removal is filed with another Court, it must be rejected for lack of proper venue.

C.      Adjudicating the INS's Motion or the Alien's Request

The Immigration Judge must adjudicate an INS motion to schedule a hearing to consider termination of deferral in accordance with 8 C.F.R. § 208.17(d)(1).  The alien's request to terminate deferral must be considered pursuant to 8 C.F.R. § 208.17(e).  The regulation is silent regarding whether the Immigration Judge's decision on the motion to schedule a hearing is appealable.

D.      Scheduling a Termination Hearing and Hearing Notice

If the Immigration Judge grants the INS's motion to schedule a hearing to consider termination of deferral, the ROP must be obtained.  A notice of hearing must be sent to the alien, at an address provided by the INS.  See Attachment B (notice X9).  To allow the alien time to secure representation, the hearing should not be scheduled earlier than 10 days for removal proceedings (14 days for deportation proceedings) after service of the notice.  The notice will inform the alien of the nature of the hearing. It will also inform the alien that he or she may supplement the information in his or her Form I-589 application no later than 10 calendar days of service of the notice (or 13 calendar days if service of the notice was by mail).  At the end of the 10 days (or 13 days), a copy of the original Form I-589, any supplemental information the alien or INS submitted, and a notice stating the date, time and place of the termination hearing must be sent to the State Department.  See 8 C.F.R. § 208.17(d)(2).  ANSIR has been modified to generate a letter to the State Department specifically for a hearing to terminate deferral of removal.  See Attachment B (letter S8).

E.      Conduct of the Proceedings

At the hearing, the Immigration Judge may only determine whether it is more likely than not that the alien will be tortured in the country to which removal has been deferred.  The Immigration Judge shall make a de novo determination, based on the record of proceeding and initial application, as well as any new evidence presented by

11

the alien or the INS. The burden is on the alien to establish that it is more likely than not that he or she will be tortured in the country which removal has been deferred. See 8 C.F.R. § 208.17(d)(3).

F.      Deciding the Termination of Deferral of Removal Hearing

The Immigration Judge must determine whether the alien has met his or her burden of showing that it is more likely than not that he or she will be tortured in the country to which removal has been deferred. See 8 C.F.R. § 208.17(d)(4). If the Immigration Judge determines that the alien has not met his or her burden of showing that it is more likely than not that he or she will be tortured in the country to which removal has been deferred, the Immigration Judge shall terminate the deferral of removal. If the Immigration Judge determines that the alien has met his or her burden of showing that it is more likely than not that he or she will be tortured in the country to which removal has been deferred, the Immigration Judge shall order that the deferral of removal remain in place. See 8 C.F.R. § 208.17(d)(4).

Both the alien and the INS may appeal the Immigration Judge's decision to the BIA. See 8 C.F.R. §208.17(d)(4).

## VIII.. Diplomatic Assurances Process

The interim regulation provides for a process called diplomatic assurances against torture. See 8 C.F.R. § 208.18(c). In the event that the Attorney General, the Deputy Attorney General, or the INS Commissioner has determined that the diplomatic assurances are sufficiently reliable to allow the alien's removal to a country where he or she fears torture, an Immigration Judge may no longer consider the alien's Convention Against Torture claim. See 8 C.F.R. § 208.18(c)(3). The Immigration Judge may, however, adjudicate any other pending applications, including asylum and withholding of deportation or removal.

If there are any questions concerning this OPPM, the interim regulation, or the Convention Against Torture, please contact Michael Straus at (703) 305-1247.

_____
Michael J. Creppy
Chief Immigration Judge

# Appendix

# ATTACHMENT A

Notice to aliens who requested Torture Convention Protection from the INS whose request has not been adjudicated

ATTACHMENT B

Torture Convention Notices, Orders, and State Department Letters

1.  Letter SS-Request for State Department Advisory Opinion on an Asylum Application
2.  Notice T9-Notice of Review of Reasonable Fear Hearing
3.  Order X8-Order of the Immigration Judge in Reasonable Fear Review Proceedings
4.  Notice T8-Notice of Withholding-Only Hearing
5.  Order Q5-Order of the Immigration Judge in Withholding-Only Proceedings
6.  Order U8-Order of the Immigration Judge in Asylum-Only Proceedings
7.  Letter S8-Request for State Department Advisory Opinion for a Hearing to Terminate Deferral of Removal
8.  Notice X9-Notice of Hearing to Terminate Deferral of Removal

13

02/27/04 FRI 14:14 FAX
02/27/2004 12:53   5550802247
Case 4:19-cv-04073-JST   Document 29-3   Filed 07/19/19   Page 73 of 76
MEXICAN AFFAIRS
POL
PAGE 11
☒012

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## THE DEPARTMENT OF HOMELAND SECURITY
## OF THE UNITED STATES OF AMERICA
## AND
## THE SECRETARIAT OF GOVERNANCE AND THE
## SECRETARIAT OF FOREIGN AFFAIRS
## OF THE UNITED MEXICAN STATES,
## ON THE SAFE, ORDERLY, DIGNIFIED AND HUMANE
## REPATRIATION OF MEXICAN NATIONALS

The Department of Homeland Security (DHS) of the United States of America
(United States) and the Secretariat of Governance (SEGOB) and the Secretariat of
Foreign Affairs (SRE) of the United Mexican States (Mexico) hereinafter referred
to as "The Participating Agencies":

CONSIDERING that the governments of both countries have approached the
topic of migration at the highest level, and that the Joint Declaration *"Towards a
Partnership for Prosperity: The Guanajuato Proposal"* addresses this issue as a
matter of cooperation and shared responsibility; and

RECOGNIZING the need to regulate the flow of persons, particularly on our
common border, as was sanctioned in the *Declaration on Embracing Technology
and Cooperation to Promote the Secure and Efficient Flow of People and
Commerce across our Shared Border*, in the Plan of Action for Cooperation on

AR277

02/27/04 FR Case 4:12-cv-04073-JST Document 29-3 Filed 07/19/19 Page 74 of 76 PAGE 12/013
02/27/2004 12:53 5550802247 POL

- 2 -

Border Safety of June 22, 2001, and in the *U.S.-Mexico Action Plan of Border Partnership;* and

RECOGNIZING the firm commitments of both governments to protect the human rights of migrants regardless of their migratory status; as well as

CONSIDERING that on May 6, 1997, the Presidents of both countries signed a Joint Statement in which they expressed the commitment of their governments to ensure the implementation of safe and orderly procedures for repatriating Mexican migrants; and

CONSIDERING that the Working Group on Migration and Consular Affairs of the Mexico-USA Binational Commission agreed, in 1997, to a means of developing improved procedures for repatriating Mexican nationals in a safe, dignified and orderly way that recognizes their human rights. This Working Group has strengthened the mutual collaboration in the subsequent sessions on those matters; and

CONSIDERING that between 1997 and 1999 migration and consular authorities of both countries established procedures for the orderly and safe repatriation of Mexican nationals, including specific points regarding schedules, places and procedures along the border and in the interior of the United States; and

BEARING IN MIND the provisions of the Vienna Convention on Consular Relations of April 24, 1963; the Consular Convention between the United Mexican States and the United States of America of August 12, 1942; the Memorandum of Understanding concerning Consular Protection of U.S. and Mexican Nationals of May 7, 1996; and the Memorandum of Understanding on Consultation Mechanisms of the Immigration and Naturalization Service Functions and Consular Protection of June 11, 1998; and

DESIRING to establish a general frame of reference setting forth specific comprehensive and coordinated bilateral actions and transparent procedures for the safe and orderly repatriation of Mexican nationals,

Have reached the following understandings regarding criteria and principles to be used as a general framework for repatriation of Mexican nationals:

## Article 1

a.      This Memorandum of Understanding establishes basic criteria and principles that reaffirm and enhance local procedures of the Participating Agencies for the repatriation of Mexican nationals from the interior, ports of entry and at the border of the United States and Mexico.

b.      In order to ensure efficiency in the implementation of arrangements for repatriation and to agree on whatever individual and joint measures are necessary to improve their effectiveness, the principles set forth in this Memorandum of Understanding should be evaluated by the appropriate officials of the Participating Agencies at least annually or at any mutually acceptable time.

c.      The Participating Agencies, through this Memorandum of Understanding, establish the U.S. – Mexico Repatriation Technical Working Group, comprised of

appropriate officials of both governments. This group will recommend, evaluate and oversee the implementation of this Memorandum of Understanding.

## Article 2

a.     With the aim of enhancing the utility of this Memorandum of Understanding at the border between both countries, ports of entry and in the interior of the United States, the Participating Agencies should support, through their appropriate immigration and consular authorities within their respective areas of responsibility, local repatriation procedures. Authorities of both Participating Agencies, in collaboration with other government entities as appropriate, will work to reaffirm and enhance the consultation mechanisms between Mexican Consulates and DHS officials in the interior of the United States and at ports of entry, as well as the current Border Liaison Mechanisms (BLMs).

b.     Established local repatriation arrangements should be reaffirmed and enhanced by appropriate authorities of the Participating Agencies in accordance with the criteria set forth in Article 3, at the border, ports of entry and in the interior of the United States through the appropriate mechanisms.

## Article 3

Local repatriation arrangements should conform to mutually established criteria and principles for the repatriation of Mexican nationals being repatriated from the United States to Mexico. Local repatriation arrangements will be reviewed and updated in consultation with the Repatriation Technical Working Group on an annual basis. The local repatriation arrangements should include the following criteria and principles:

a)     Repatriations should be conducted in a manner consistent with the respect of human rights and dignity of Mexican nationals found in the United States in violation of immigration law;

b)     Notification of the titles of authorities that are empowered to deliver or receive Mexican nationals into Mexico;

c)     Points of repatriation are to be established in a manner consistent with scheduled hours of operation and staffing availability. Every effort should be taken by Mexico to ensure that mutually designated points of reception are fully staffed with appropriate local, state and/or federal entities responsible for the health, welfare and safety of Mexican nationals;

d)     Identification of points of contact to receive and/or convey information about incidents involving reported mistreatment or potential human rights concerns;

e)     The unity of families should be preserved during repatriation, taking into consideration administrative parameters:

f)     Incapacitated persons, unaccompanied minors and other vulnerable individuals should be repatriated during daylight hours to ensure their safety. The Mexican Participating Agencies should make every effort

to have the appropriate family welfare representatives receive such persons upon repatriation from the United States;

g)    Appropriate representatives of the Participating Agencies should address issues of mutual concern such as consular notification and access to consular assistance;

h)    Notification of repatriation should be done taking into consideration logistical and operational needs. Local arrangements should address routine notification at the border;

i)    Timely special notification and information should be provided by DHS authorities for cases where additional preparation will be required to receive an unaccompanied minor or an individual with medical, mental or other special needs.

## Article 4

If a Mexican national who is in the process of being repatriated or who has been repatriated to Mexico reports to DHS, SRE or SEGOB an incident that may involve mistreatment or potential human rights concerns, the report should immediately be referred to the appropriate authorities for investigation and follow-up.

## Article 5

Participating Agencies should explore, on a bilateral basis, mechanisms to carry out the repatriation of Mexican nationals to their place of origin, especially from high-risk zones in the United States and during the summer season to avoid injury and loss of life among migrants.

## Article 6

Participating Agencies should explore, on a bilateral basis, the dynamics of the movement of third country nationals through Mexico and the United States, considering their migratory status, and eventual repatriation mechanisms.

## Article 7

This Memorandum of Understanding and local repatriation arrangements do not affect the rights, obligations and responsibilities of the United States and Mexico and of their nationals, and are without prejudice to any rights afforded to Mexican nationals in the United States.

## Article 8

Any matters concerning the application or interpretation of this Memorandum of Understanding should be settled through consultation between the Participating Agencies, as described in Article 1 (b).