Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 1 of 187

- 5 -

## Article 9

This Memorandum of Understanding becomes applicable as of the day of its signature. Any Participating Agency may discontinue its involvement in activities under this Memorandum of Understanding at any time and should provide sixty (60) days notice of its intent to discontinue. This Memorandum of Understanding may be modified by the Participating Agencies in writing.

Signed in Mexico City on February 20, 2004, in three originals in the English and Spanish languages.

| FOR THE DEPARTMENT OF HOMELAND SECURITY OF THE UNITED STATES OF AMERICA: | FOR THE SECRETARIAT OF GOVERNANCE OF THE UNITED MEXICAN STATES: |
|---|---|

Thomas J. Ridge,
Secretary

Santiago Creel Miranda,
Secretary


FOR THE SECRETARIAT OF
FOREIGN AFFAIRS OF THE
UNITED MEXICAN STATES:

Geronimo Gutierrez Fernandez,
Undersecretary for North America

# Statement by Secretary Johnson on Southwest Border Security

Release Date:
October 17, 2016
For Immediate Release
DHS Press Office
Contact: 202-282-8010

In Fiscal Year 2016, total apprehensions by the Border Patrol on our southwest border, between ports of entry, numbered 408,870.  This represents an increase over FY15, but was lower than FY14 and FY13, and a fraction of the number of apprehensions routinely observed from the 1980s through 2008.  Apprehensions are an indicator of total attempts to cross the border illegally.  Meanwhile, the demographics of illegal migration on our southern border has changed significantly over the last 15 years – far fewer Mexicans and single adults are attempting to cross the border without authorization, but more families and unaccompanied children are fleeing poverty and violence in Central America.  In 2014, Central Americans apprehended on the southern border outnumbered Mexicans for the first time.  In 2016, it happened again.

| Southwest Border Apprehensions - FY13-FY16 | | | | |
|---|---|---|---|---|
| **Category** | **FY13** | **FY14** | **FY15** | **FY16** |
| Unaccompanied children | 38,759 | 68,541 | 39,970 | 59,692 |
| Family members | 14,855 | 68,445 | 39,838 | 77,674 |
| Individuals | 360,783 | 342,385 | 251,525 | 271,504 |
| **Total** | **414,397** | **479,371** | **331,333** | **408,870** |

Unaccompanied children and families have presented new challenges in our immigration system.  I have traveled to the southwest border 17 times over the last 34 months as Secretary and have seen this personally.  We are determined to treat migrants in a humane manner.  At the same time, we must enforce our immigration laws consistent

with our enforcement priorities.  This has included, and will continue to include, providing individuals with an opportunity to assert claims for asylum and other forms of humanitarian relief.

At the same time, we are providing a safe, alternative paths to our country for individuals in need of humanitarian protection.  Earlier this year, the Government of Costa Rica announced its agreement to enter into a protection transfer arrangement with the U.N. High Commissioner for Refugees and the International Organization for Migration to help address the Central American migration challenge. We're also establishing an in-country referral program in countries of origin including Honduras, El Salvador, and Guatemala.  This program enables vulnerable residents in the region to be considered for refugee protection in the United States after being screened and interviewed by DHS officers. We have also announced an expansion of the categories of individuals eligible for participation in our Central American Minors program when accompanied by a qualified child.  We promote and encourage use of these programs.

Border security alone cannot overcome the powerful push factors of poverty and violence that exist in Central America. Walls alone cannot prevent illegal migration.  Ultimately, the solution is long-term investment in Central America to address the underlying push factors in the region. We continue to work closely with our federal partners and the governments in the region, and are pleased with the $750 million Congress approved in FY 2016 for support and aid to Central America. We urge Congress to provide additional resources in FY 2017.

But, there is more to do for border security.  I urge the next Administration and the next Congress to continue to make smart investments in border security technology, equipment and other resources.  This is what our experts on the border -- those on the front lines every day, charged with the responsibility of protecting our borders – tell me each time I ask them.

At all times throughout President Obama's administration, we have endeavored to enforce the immigration laws in a fair and humane way, consistent with the immigration system we have.   But, the reality is the system is broken, and badly need of comprehensive immigration reform that only Congress can provide.  For one thing, we must reckon with the millions of undocumented immigrants who live in the shadows in this country, who've been here for years,  and who should be given the opportunity to

come forward and get right with the law.  It is my profound hope that the next Congress will finally address this and other issues, and enact comprehensive immigration reform.

Other points:

- The new immigration enforcement priorities President Obama and I announced in November 2014, which focus on serious convicted criminals and those apprehended at the border, are being implemented effectively by our immigration enforcement personnel.  Our priorities are reflected in actual results.  Today, over 99% of those in immigration detention fit within one of our enforcement priorities; and around 85% are within the top priority for removal.  In 2009, just 35% of those deported by ICE were convicted criminals; today that percentage is about 60%.  Enforcement actions that began early this year, focused on families and unaccompanied children now over 18 that were apprehended at the border.

- Earlier this week, I paid my sixth visit to Mexico as Secretary of Homeland Security.   On this visit I met with President Peña Nieto, my counterpart the Secretary of Government Miguel Osorio Chong, Secretary of Foreign Affairs Claudia Ruiz Massieu, Secretary of Finance Jose Antonio Meade, and Attorney General Arely Gomez Gonzalez.  Our working relationship is strong, and we've committed to do even more for our mutual border security interests.  Additionally, we've resolved to create a standing U.S.-Mexican working group, staffed largely with career officials, to ensure a permanent dialogue on security issues that will sustain itself past the Obama and Peña Nieto Administrations.

- In recent months we've seen an influx of Haitian nationals on our southern border, principally at certain land ports of entry.  On September 22, I announced we would resume removals of Haitian nationals in accordance with our existing enforcement priorities.  In light of Hurricane Matthew, which struck Haiti on October 4, removal flights to Haiti have been suspended temporarily.  Working with the Government of Haiti, DHS intends to resume removal flights as soon as possible.  DHS and the Department of State are working with the Government of Haiti and other key partners to ensure that removals occur in as humane and minimally disruptive a manner as possible.  The policy change I announced on September 22 remains in effect. Haitians attempting to enter the United States without authorization will continue to be placed into immigration detention.

- With our interagency partners, DHS continues to aggressively target and dismantle the transnational criminal organizations that smuggle and exploit migrants. One

recent example is "Operation ALL IN."  This operation resulted in the apprehension of 100 individuals now facing federal prosecution at either the federal, state, or local level. Those arrested as part of Operation ALL IN include smugglers, as well as gang members and sex offenders.

**MSF** **MEXICO CITY / NEW YORK / RIO DE JANEIRO / BARCELONA**        MAY 2017



© ANNA SURINYACH

# FORCED TO FLEE CENTRAL AMERICA'S NORTHERN TRIANGLE:

# A NEGLECTED HUMANITARIAN CRISIS



**When you have no strength left, when you no longer have anyone around to help you keep going, when you have lost all hope, when fear and distrust are your only travel companions, when you can't take another hit, when you have lost your identity, when you feel that your dignity has been missing since the last time you were assaulted, or the last time they forced you to undress —it is during these moments when you need to take a seat, regain your strength, and build the confidence to talk to people and let them help you.**

**Carmen Rodríguez**
MSF Mental Health Referent in Mexico



Cover: Migrants and refugees cross
the Suchiate River to enter
Mexico from Guatemala in 2014.
© ANNA SURINYACH

EDITOR'S NOTE: This report was updated on June 14, 2017, to include the following corrections and clarifications: On pp. 5 and 21, we noted the number of people detained and deported based on data from 2016, not 2015 as reported earlier. On p. 6, we corrected the list of places where MSF has worked along the migration route to properly identify the respective states. And on p. 27, we changed the final sentence to clarify that the humanitarian crisis is a regional issue involving countries of origin, transit, and destination.

## CONTENT

4

**EXECUTIVE SUMMARY**

6

INTRODUCTION:
**CARING FOR REFUGEES AND MIGRANTS**

8

**NORTHERN TRIANGLE OF CENTRAL AMERICA: UNPRECEDENTED LEVELS OF VIOLENCE OUTSIDE A WAR ZONE**

13

**MSF PROJECT DATA 2015-2016: EXPOSURE TO VIOLENCE AND ITS IMPACT ON HEALTH**

18

**BARRIERS TO HEALTH CARE**

20

**LIMITED ACCESS TO PROTECTION IN MEXICO**

22

**LIMITED ACCESS TO PROTECTION IN THE UNITED STATES**

26

CONCLUSION:
**ADDRESSING THE GAPS**

**28**
ANNEX 1
**RISK FACTORS**

**29**
ANNEX 2
**REACTION SYMPTOMS**

**30**
ANNEX 3
**SURVEY METHODOLOGY**

**31**
ANNEX 4
**LIST OF ACRONYMS**

AR288



© ANNA SURINYACH

Migrants travel through Mexico on a cargo train, known locally as "The Beast."

# 1

## EXECUTIVE SUMMARY

An estimated 500,000 people cross into Mexico every year[1]. The majority making up this massive forced migration flow originate from El Salvador, Honduras, and Guatemala, known as the Northern Triangle of Central America (NTCA), one of the most violent regions in the world today.

Since 2012, the international medical humanitarian organization Doctors Without Borders/Médecins Sans Frontières (MSF) has been providing medical and mental health care to tens of thousands of migrants and refugees fleeing the NTCA's extreme violence and traveling along the world's largest migration corridor in Mexico. Through violence assessment surveys and medical and psychosocial consultations, MSF

teams have witnessed and documented a pattern of violent displacement, persecution, sexual violence, and forced repatriation akin to the conditions found in the deadliest armed conflicts in the world today[2].

For millions of people from the NTCA region, trauma, fear and horrific violence are dominant facets of daily life. Yet it is a reality that does not end with their forced flight to Mexico. Along the migration route from the NTCA, migrants and refugees are preyed upon by criminal organizations, sometimes with the tacit approval or complicity of national authorities, and subjected to violence and other abuses —abduction, theft, extortion, torture, and rape— that can leave them injured and traumatized.

---

1_ Source: UNHCR MEXICO FACTSHEET. February 2017. Last visited 18 April 2017. Data compiled by UNHCR based on SEGOB and INM official sources.

2_The Geneva Declaration on Armed Violence and Development. Global Burden of Armed Violence 2015: Every Body Counts, October 2015, Chapter Two, http://www.genevadeclaration.org/fileadmin/docs/GBAV3/GBAV3_Ch2_pp49-86.pdf

Despite existing legal protections under Mexican law, they are systematically detained and deported-- with devastating consequences on their physical and mental health. In 2016, 152,231 people from the NTCA were detained/presented to migration authorities in Mexico, and 141,990 were deported.

The findings of this report, based on surveys and medical programmatic data from the past two years, come against the backdrop of heightened immigration enforcement by Mexico and the United States, including the use of detention and deportation. Such practices threaten to drive more refugees and migrants into the brutal hands of smugglers or criminal organizations.

From January 2013 to December 2016, MSF teams have provided 33,593 consultations to migrants and refugees from the NTCA through direct medical care in several mobile health clinics, migrant centers and hostels —known locally as albergues— across Mexico. Through these activities, MSF has documented the extensive levels of violence against patients treated in these clinics, as well as the mental health impact of trauma experienced prior to fleeing countries of origin and while on the move.

Since the program's inception, MSF teams have expressed concern about the lack of institutional and government support to the people it is treating and supporting along the migration route. In 2015 and 2016, MSF began surveying patients and collecting medical data and testimonies. This was part of an effort by MSF to better understand the factors driving migration from the NTCA, and to assess the medical needs and vulnerabilities specific to the migrant and refugee population MSF is treating in Mexico.

The surveys and medical data were limited to MSF patients and people receiving treatment in MSF-supported clinics. Nevertheless, this is some of the most comprehensive medical data available on migrants and refugees from Central America. This report provides stark evidence of the extreme levels of violence experienced by people fleeing from El Salvador, Honduras, and Guatemala, and underscores the need for adequate health care, support, and protection along the migration route through Mexico.

In 2015, MSF carried out a survey of 467 randomly sampled migrants and refugees in facilities the organization supports in Mexico. We gathered additional data from MSF clinics from 2015 through December 2016. Key findings of the survey include:

**Reasons for leaving:**

— Of those interviewed, almost 40 percent (39.2%) mentioned direct attacks or threats to themselves or their families, extortion or gang-forced recruitment as the main reason for fleeing their countries.
— Of all NTCA refugees and migrants surveyed, 43.5 percent had a relative who died due to violence in the last two years. More than half of Salvadorans surveyed (56.2 percent) had a relative who died due to violence in this same time span.
— Additionally, 54.8% of Salvadorans had been the victim of blackmail or extortion, significantly higher than respondents from Honduras or Guatemala.

**Violence on the Journey:**

— 68.3 percent of the migrant and refugee populations entering Mexico reported being victims of violence during their transit toward the United States.
— Nearly one-third of the women surveyed had been sexually abused during their journey.
— MSF patients reported that the perpetrators of violence included members of gangs and other criminal organizations, as well as members of the Mexican security forces responsible for their protection.

**According to medical data from MSF clinics from 2015 through December 2016:**

— One-fourth of MSF medical consultations in the migrants/refugee program were related to physical injuries and intentional trauma that occurred en route to the United States.
— 60 percent of the 166 people treated for sexual violence were raped, and 40 percent were exposed to sexual assault and other types of humiliation, including forced nudity.
— Of the 1,817 refugees and migrants treated by MSF for mental health issues in 2015 and 2016, close to half (47.3 percent) were victims of direct physical violence en route, while 47.2 percent of this group reported being forced to flee their homes.

The MSF survey and project data from 2015-2016 show a clear pattern of victimization—both as the impetus for many people to flee the NTCA and as part of their experience along the migration route. The pattern of violence documented by MSF plays out in a context where there is an inadequate response from governments, and where immigration and asylum policies disregard the humanitarian needs of migrants and refugees.

Despite the existence of a humanitarian crisis affecting people fleeing violence in the NTCA, the number of related asylum grants in the US and Mexico remains low. Given the tremendous levels of violence against migrants and refugees in their countries of origin and along the migration route in Mexico, the existing legal framework should provide effective protection mechanisms to victimized populations. Yet people forced to flee the NTCA are mostly treated as economic migrants by countries of refuge such as Mexico or the United States. Less than 4,000 people fleeing El Salvador, Honduras, and Guatemala were granted asylum status in 2016[3]. In addition, the government of Mexico deported 141,990 people from the NTCA. Regarding the situation in US, by the end of 2015, 98,923 indiviudals from the NTCA had submitted requests for refugee or asylum status according to UNHCR[4]. Nevertheless, the number of asylums status granted to individuals from the NTCA has been comparatively low, with just 9,401 granted status since FY 2011[5].

As a medical humanitarian organization that works in more than 60 countries, MSF delivers emergency aid to people affected by armed conflict, epidemics, disasters, and exclusion from health care. The violence suffered by people in the NTCA is comparable to the experience in war zones where MSF has been present for decades. Murder, kidnappings, threats, recruitment by non-state armed actors, extortion, sexual violence and forced disappearance are brutal realities in many of the conflict areas where MSF provides support.

The evidence gathered by MSF points to the need to understand that the story of migration from the NTCA is not only about economic migration, but about a broader humanitarian crisis.

While there are certainly people leaving the NTCA for better economic opportunities in the United States, the data presented in this report also paints a dire picture of a story of migration from the NTCA as one of people running for their lives. It is a picture of repeated violence, beginning in NTCA countries and causing people to flee, and extending through Mexico, with a breakdown in people's access to medical care

and ability to seek protection in Mexico and the United States.

It is a humanitarian crisis that demands that the governments of Mexico and United States, with the support of countries in the region and international organizations, rapidly scale up the application of legal protection measures —asylum, humanitarian visas, and temporary protected status— for people fleeing violence in the NTCA region; immediately cease the systematic deportation of NTCA citizens; and expand access to medical, mental health, and sexual violence care services for migrants and refugees.

# 2

INTRODUCTION:
## CARING FOR REFUGEES AND MIGRANTS

MSF has worked with migrants and refugees in Mexico since 2012, offering medical and psychological care to thousands of people fleeing the Northern Triangle of Central America (NTCA). Since the MSF program started, the organization has worked in several locations along the migration route: Ixtepec (Oaxaca State); Arriaga (Chiapas); Tenosique (Tabasco); Bojay (Hidalgo); Tierra Blanca (Veracruz State); Lechería-Tultitlán, Apaxco, Huehuetoca (State of Mexico); San Luis Potosí (San Luis Potosí State); Celaya (Guanajuato State); and Mexico City. Locations have changed based on changes in routes used by migrants and refugees or the presence of other organizations. MSF's services have mainly been provided inside hostels, or albergues, along the route. In some locations, MSF set up mobile clinics close to the rail roads and train stations.

In addition, MSF teams have trained 888 volunteers and staff at 71 shelters and hostels in "psychological first aid"—in which patients are counseled for a short period of time before they continue their journey. Health staff and volunteers in key points along the transit route, at 41 shelters and 166 medical facilities, received training on counseling related to sexual and gender-based violence (SGBV).

From January 2013 to December 2016, MSF teams carried out 28,020 medical consultations and 5,573 mental health consultations. More than 46,000 individuals attended psychosocial activities organized

---

3_  Source: UNHCR MEXICO FACTSHEET. February 2017.

4_  Regional Response to the Northern Triangle of Central America Situation. UNHCR. Accessed on 01/02/2017 at http://reporting.unhcr.org/sites/default/files/UNHCR%20-%20NTCA%20Situation%20Supplementary%20Appeal%20-%20June%202016.pdf

5_  Source: MSF calculations based on information from US Homeland Security. Yearbook of Immigration Statistics 2015.

**Migrant and refugee patients attended
by MSF from 2013-2016**



by our teams to address the following topics:  stress on the road, violence on the road, mental health promotion and prevention, myths and truths about the migration route, and developing tools to deal with anxiety.

Some of the people treated by MSF report extreme pain and suffering due to physical and emotional violence inflicted on them on the migration route. In 2016, MSF, in collaboration with the Scalabrinian Mission for Migrants and Refugees (SMR), opened a rehabilitation center for victims of extreme violence and other cruel, inhuman or degrading treatment. Since then MSF has treated 93 patients who required longer-term mental health and rehabilitation services.

Torture is inflicted by governmental security actors, while criminal organizations inflict extreme degrees of violence on these already vulnerable populations. Migrants and refugees are often easy prey, and they face severe difficulties in making any formal legal complaint. Some patients reported having been kidnapped, repeatedly beaten for days or even weeks for the purposes of extortion and ransom, or sometimes to frighten or intimidate other migrants and refugees. Attacks often include sexual assault and rape.



Center Route: From Tierra Blanca to Querétaro
Northeast Route: From Querétaro to Ciudad Acuña
Northwest Route: From Querétaro to Tijuana
North Route: From Querétaro to Puerto Palomas
Southeast Route: From Tenosique to Tierra Blanca
Southwest Route: From Tapachula to Tierra Blanca

Capital City
Transmigrant project, town of interest
Health facities
International boundary
Coastline



© GUSTAVO GRAF

After disembarking a train, migrants traveling from Central America to the United States walk to a shelter in Ixtepec, Oaxaca, Mexico, in 2014.

# 3

## NORTHERN TRIANGLE OF CENTRAL AMERICA: UNPRECEDENTED LEVELS OF VIOLENCE OUTSIDE A WAR ZONE

The violence experienced by the population of the NTCA is not unlike that of individuals living through war. Citizens are murdered with impunity, kidnappings and extortion are daily occurrences.  Non-state actors perpetuate insecurity and forcibly recruit individuals into their ranks, and use sexual violence as a tool of intimidation and control. This generalized and pervasive threat of violence contributes to an increasingly dire reality for the citizens of these countries. It occurs against a backdrop of government institutions that are incapable of meeting the basic needs of the population.

The global study on homicide carried out by the United Nations Office on Drugs and Crime (UNODC) in 2013, placed Honduras and El Salvador first and fourth respectively on the list of countries with the highest murder rates in the world[6]. In the last ten years, approximately 150,000 people have been killed in the NTCA[7]. Since then, the situation has only worsened, with a particularly worrying situation in El Salvador, where 6,650 intentional homicides were reported in 2015, reaching a staggering murder rate of 103 per 100,000 inhabitants in 2015, while Honduras suffered 57 per 100,000 (8,035 homicides) and Guatemala 30 per 100,000 (4,778 homicides).

6_ UNODC, *Global Study on Homicide 2013: Trends, Contexts, Data*, 10 April 2014, https://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf, p. 126

7_ International Crisis Group calculation of total homicides since 2006 based on data from "Crime and Criminal Justice, Homicides counts and rates (2000-2014)"

AR293

Data from the UNODC report shows that homicidal violence in the NTCA resulted in considerably more civilian casualties than in any other countries, including those with armed conflicts or war[8]. Rates of violent death in El Salvador have lately been higher than all countries suffering armed conflict except for Syria[9].

In this context, an estimated 500,000 people from the Northern Triangle of Central America (NTCA) enter Mexico every year fleeing poverty and violence, according to the UN High Commissioner for Refugees (UNHCR). As an organization treating patients in Mexico fleeing these violent contexts, MSF teams witness the harrowing stories that have pushed people to make the urgent decision to flee their homes. Lack of economic opportunities are mentioned by a significant number of individuals interviewed by MSF, however, they systematically describe personal exposure to a violent event that triggered their decision to emigrate. The cycle of poverty and violence creates an untenable setting for many, and drives them toward the treacherous path through Mexico.

Due to MSF's experience treating migrants throughout Mexico, the organization sought to better understand the realities of life for individuals making the journey north, first to assess how to improve services to this marginalized population, and second to raise awareness about the conditions they face. This information is often missing from national statistics or publicly available data. This led to the development and implementation of a survey tool to measure an individual's reasons for fleeing, and the health impacts experienced before and after embarking on the route through Mexico. These findings, along with medical project data from the past two years, illustrate that the insecurity they fled at home and the violence they experience on the route north have significant physical and emotional impact.



Art adorns the front of the men's dormitory building at a shelter for migrants in Mexico.

### The VAT Background & Methodology

As a Victimization Assessment Tool (VAT), a survey was conducted among 467 refugees and migrants in September 2015 in the albergues along the migration route in Mexico where MSF was providing health and mental care at the time: Tenosique, Ixtepec, Huehuetoca, Bojay and San Luis Potosí (see Annex 3 for methodology).

The findings from this survey paint a detailed picture of the violence migrants faced at home and as they made their way through Mexico. This aggregated information allows MSF to identify avenues for further medical programming or to modify existing approaches in reaching this population. Although demonstrative of the harrowing realities faced by many people on the route north, this study is a snapshot in time and included a selective population accessible to MSF. Interviews were conducted in albergues, where migrants seek out food, shelter, information, and health care. These interviews are not necessarily representative of the entire migrant population traveling through Mexico. MSF avoids drawing sweeping conclusions, however the survey provides valuable information about the realities that many people on this route experienced, in a specific time period, as reported to MSF teams.

---

8_ ACAPS. Other Situations of Violence in the  Northern Triangle of Central America. Humanitarian Impact July 2014.

9_ International Crisis Group. Mafia of the Poor: Gang Violence and Extortion in Central America Latin America Report N°62 | 6 April 2017.

**Who was interviewed**

Most of the people interviewed—88 percent—were male and 12 percent were female. Of those interviewed 4.7 percent were minors, 59 percent of them unaccompanied. Most interviewed, 67.6 percent, were from Honduras, while 15.7 percent were from El Salvador, 10.5 percent from Guatemala and 6.2 percent represented other nationalities. The average person surveyed was 28 years old, with 79 percent under 35.

*Nationalities of people surveyed*

|  | Number Surveyed | Percentage of Total |
|---|---|---|
| Honduras | 315 | 67.6% |
| El Salvador | 73 | 15.7% |
| Guatemala | 49 | 10.5% |
| Nicaragua | 15 | 3.2% |
| Mexico | 11 | 2.4% |
| No Response | 1 | 0.2% |
| Dominican Republic | 1 | 0.2% |
| Suriname | 1 | 0.2% |

The majority of respondents—65 percent— confirmed that they have children and 52 percent of them lived in large households (with five or more people). A majority said that their family had financially supported them to help them make their way north.

**Violence in countries of origin**

Respondents were asked several questions about their experience with direct and generalized violence in their home countries. Collectively, their individual stories show a population continuously exposed to some degree of violence or targeted threats, and, depending on their nationality, that experience can vary greatly.

— According to the survey, 57 percent of Honduran and 67 percent of Salvadoran migrants reported that they never feel safe at home, whereas only 33 percent of Guatemalans and 12 percent of Nicaraguans felt the same way.

— One third (32.5 percent) of the population from NTCA entering Mexico has been exposed to physical violence perpetrated by a non-family member (mainly members of organized crime) in the previous two years.

— Half of the population (48.4 percent) from NTCA entering Mexico received a direct threat from a non-family member (61.6 percent for Salvadorans alone). Of this group, 78 percent said that the threat seriously affected their social and professional activities.

— 45.4 percent of Hondurans and 56.2 percent of Salvadorans entering Mexico have lost a family member because of violence in the last two years before they migrated. 31 percent of the Central Americans entering Mexico knew someone who was kidnapped and 17 percent know someone who has disappeared and not been found.

— The vast majority —72 percent of Hondurans and 70 percent of Salvadorans interviewed— heard regular gunshots in their neighborhoods. Respectively, 75 percent and 79 percent had witnessed a murder or seen a corpse in the previous two years.

**Reasons for leaving country of origin**

Half (50.3 percent) of those interviewed from the NTCA entering Mexico leave their country of origin for at least one reason related to violence. For those fleeing violence, a significant 34.9 percent declared more than one violence-related reason.

*Reasons given for leaving country of origin*



🔴 Reasons exclusively related to violence
🟠 Combination of violence and non violence reasons
🟡 Reasons unrelated to violence
⚪ Not answered

Direct attacks, threats, extortion or a forced recruitment attempt by criminal organizations were given as main reasons for survey respondents to flee their countries, with numbers significantly higher in El Salvador and Honduras. Of the surveyed population, 40 percent left the country after an assault, threat, extortion or a forced recruitment attempt.

*Migration related to direct violence*



■ Direct threats against me or my family
■ Direct attacks against me or my family
■ Forced recruitment by gangs
■ Victim of extortion

**Regarding exposure to violence along the migration route through Mexico**

The findings related to violence in the survey are appalling: more than half the sample population had experienced recent violence at the time they were interviewed: 44 percent had been hit, 40 percent had been pushed, grabbed or asphyxiated, and 7 percent had been shot.

Of the migrants and refugees surveyed in Mexico, 68.3 percent of people from the NTCA reported that they were victims of violence during their transit. Repeated exposure to violence is another reality for the population from NTCA crossing Mexico. Of the total surveyed population, 38.7 percent reported more than one violent incident, and 11.3 percent reported more than three incidents.

*Number of violent incidents experienced per person during migration*



● 1 Incident
● 2 Incidents
● >3 Incidents
● 0 Incidents
● NR

AR006

In a migration context marked by high vulnerability like the one in Mexico, sexual violence, unwanted sex, and transactional sex in exchange for shelter, protection or for money was mentioned by a significant number of male and female migrants in the surveys. Considering a comprehensive definition of those categories, out of the 429 migrants and refugees that answered SGBV questions, **31.4 percent of women and 17.2 percent of men had been sexually abused during their transit through Mexico**. Considering only rape and other forms of direct sexual violence, 10.7 percent of women and 4.4 percent of men were affected during their transit through Mexico.

The consequences of violence on the psychological well-being and the capacity to reach out for assistance are striking: 47.1 percent of the interviewed population expressed that the violence they suffered had affected them emotionally.

**Honduran—Male—30 years old—** "I am from San Pedro Sula, I had a mechanical workshop there. Gangs wanted me to pay them for "protection", but I refused, and then they wanted to kill me. First they threatened me; they told me that if I stayed without paying, they would take my blood and one of my children. In my country, killing is ordinary; it is as easy as to kill an animal with your shoe. Do you think they would have pitied me? They warn you, and then they do it, they don't play, and so they came for me. Last year in September, they shot me three times in the head, you can see the scars. Since then my face is paralyzed, I cannot speak well, I cannot eat. I was in a coma for 2 months. Now I cannot move fingers on this hand. But what hurts most is that I cannot live in my own country, is to be afraid every day that they would kill me or do something to my wife or my children. It hurts to have to live like a criminal, fleeing all the time."



A woman and her granddaughter attend an MSF support session for women at the Tenosique migrant shelter in Mexico in 2017.

# 4

## MSF PROJECT DATA 2015-2016: EXPOSURE TO VIOLENCE AND ITS IMPACT ON HEALTH

Through MSF project data of more than 4,700 medical consultations in 2015 and 2016, a picture of an often harrowing and traumatic journey emerges. Crossing Mexico from the NTCA is a constant challenge for survival which can take a severe toll both physically and psychologically. Migrants and refugees walk for hours in high temperatures, on unsafe and insecure routes to evade authorities. They risk falling from the cargo trains that transport them along the route, or ride on overcrowded trucks without food, water or ventilation for hours. In addition to these challenges, migrants and refugees do not have access to medical care or safe places to eat and sleep, and must constantly be on guard against the threat of violence or sexual assault by criminal groups or deportation and detention by authorities.

The symptoms managed in MSF clinics inside shelters or in mobile clinics close to railways are directly related to the conditions associated with the route itself: exposure to violence, days spent outdoors in harsh conditions on the train or in the forest, and long walking hours that cause dehydration, foot lesions, muscle pain, and other morbidities. Contaminated and/or scarce food found on the route result in gastro-intestinal problems or diarrheal disorders and parasites.

### Main Morbidities Treated by MSF

From 2015 through December 2016, **one fourth of MSF medical consultations in the migrants/ refugee program were related to physical injuries and intentional trauma**. A morbidity analysis based on MSF consultations during 2015 and 2016 showed that most common health issues affecting migrants and refugees were intentional traumas and wounds (24 percent). Other common health issues included acute osteomuscular syndromes affecting 20 percent of respondents, upper respiratory tract infections (18 percent), skin diseases (11 percent) and unintentional physical traumas (3 percent).

© MARTA SOSZYNSKA

**10 main morbidities in MSF Clinics
in 2015 and 2016**



Some patients treated by our teams reported extreme pain and unbearable suffering due to physical and emotional violence inflicted as an extortion strategy. Patients tell of being tortured and abused in order to force migrants and refugees to reveal contact information for family members in order to demand a ransom payment, or as punishment for delay in ransom payment. Others report that violence is used to psychologically terrorize other migrants and refugees to ensure that they not report crimes to authorities or try to escape.

The mental health and physical consequences of this cruel, inhumane and degrading treatment are devastating. Their functionality is severely reduced, making survivors of violence unable to continue their journey or take care of themselves. Secondary and tertiary levels of care (including surgery, psychiatry, and neurology) are often required for patients to make a more complete recovery, and these are not always available in the areas where this violence took place or where albergues are located.



M. fled domestic and gang violence in Honduras. In early 2017, she and her nine-year-old son were living in a shelter in Mexico, where she is filing for asylum.

**Sexual Violence**

During 2015 and 2016, a total of 166 sexual violence survivors were treated by MSF. Among them, 60 percent were raped and 40 percent were exposed to sexual assault and other types of humiliation, including forced nudity.

**Honduran—Female—35 years old—** "I am from Honduras, it's the fourth time that I try to cross through Mexico, but this had never happened before. This time, I came with my neighbor, and we were both seized by a group of delinquents. A federal police officer was their accomplice, and each one of us was handed over to gang members. I was raped. They put a knife on my neck, so I did not resist. I am ashamed to say this, but I think it would have been better if they had killed me."

**Honduran—Male—19 years old—** "Today, in the early morning, hooded men assaulted us. I was traveling with my wife and my son. They beat us, and they hit me with a machete--look at my arm [there are bruises and wounds]. They took my wife to the mountain, took her away. They threatened me and told me not to turn around. They wanted us to give them information about our family to ask for ransom. But I told them we had nothing. I thought they were going to kill us. She says they did not do anything to her, but I know they abused her".

### Mental Health

An important facet of MSF's work in Mexico is to provide support for the mental health needs of migrants and refuges. The data collected by the mental health teams of the project during 2015 and 2016 reveals a worrying situation. Out of 1,817 refugees and migrants treated by MSF for mental health issues over the last two years, 92.2 percent have lived through a violent event in their country of origin or during the route that threatens their mental health and well-being. A large number of MSF patients presented more than one risk factor directly linked to their exposure to violence as a precipitating factor for their mental health condition.

The graphic below portrays the fifteen risk factors most commonly identified by our teams. A detailed list of risk factors in 2015-2016 may be found in Annex 1 of the report.

*Risk factors identified in mental health consultations during 2015 and 2016*



Of the 1,817 refugees and migrants seen by MSF in 2015-2016, 47.3 percent of patients survived "physical violence" as a precipitating event for the mental health consultation. Injuries included gunshot wounds, blunt force trauma from kicks and punches, mutilation of body parts during kidnappings, wounds from machete attacks, breaking of bones by blows from baseball bats, and wounds from being thrown out of a running train. In most cases, incidents registered under "physical violence" by MSF occurred along the migration route in Mexico.

The "precipitating event" most frequently mentioned during consultations was "Forced to flee/internally displaced/refugee/migrant" —registered by 47.2 percent of patients. This covers the period before people made the decision to flee.

Being a "victim of threats" (44.0 percent) and having "witnessed violence or crime against others" (16.5 percent) are the third and fourth most common risk factors. Witnesses to violence included patients forced to watch while others were tortured, mutilated, and/or killed —often in scenarios where they were deprived of their liberty, such as during a kidnapping for extortion.

The anguish and stress that migrants and refugees face both in their home countries and along the migration route make this population particularly vulnerable to anxiety, depression and post-traumatic stress disorder. The following graphic shows the main categories of symptoms presented by the 1,817 MSF patients seen in mental health consultations during 2015 and 2016.

*Symptoms identified in mental health consultations during 2015 and 2016*



More than half of patients who receive a mental health consultation (51.7 percent) report anxiety-related symptoms. Anxiety is described as an immediate, biological, physiological and psychological alarm reaction when faced with an assault or a threat. Migrants and refugees are under constant threat and risk along the migration route, and a heightened state of alert is an appropriate adaptive response to survive in a legitimately dangerous context. Problems arise when a person's reaction is exaggerated or out of proportion with the risk, making the individual incapable of adapting to new situations.

Nearly one-third (32.9 percent) of the migrants and refugees counseled by MSF in Mexico have symptoms associated with depression. Migration involves situations of psychological and social loss that trigger mourning processes, which begin at the moment of departure, are experienced on the route and continue at the place of destination. These elements represent significant psychological distress and suffering with an impact on a person's life.

In 11.7 percent of the cases, mental health teams are seeing manifestations of post-traumatic stress disorder. This rate documented in MSF programs in 2015 and 2016 are well above rates in the general population, which range from 0.3 percent to 6.1 percent. The PTSD rate among migrants and refugees that MSF is documenting in Mexico is much closer to the rates in populations affected by direct conflict (15.4 percent)[10, 11]. PTSD is a serious form of mental illness, which is usually caused by devastating life events and generally associated with impaired daily functioning in those affected. Individuals suffering from PTSD face greater risks to survival along the migration route, due to the multiple challenges associated with the journey.

Migrant and refugee women deserve special attention when it comes to mental health as data clearly show a particular vulnerability in this population. During migration, 59 percent of the women involved in the MSF study reported symptoms of depression, and 48.3 percent reported symptoms of anxiety. Other vulnerable groups—such as unaccompanied minors and LGBTQ people—are often specifically targeted by criminal groups and need greater support and protection.

The complete and detailed list of reaction symptoms presented by migrants and refugees during the mental health consultation can be found in Annex 2. Although these symptoms might be explained by the violence and the conditions of the route and do not always lead to depression or anxiety, they show how difficult the conditions for the patients can be and the importance of adapted case-detection strategies for mental health. If not addressed properly, these mental health issues can be a significant barrier during migration, interfering with daily functioning and putting their lives at risk.



**MSF psychologist tells the story of a 43-year-old Honduran woman—**This woman decided to leave Arriaga [Chiapas] out of fear, and walked with a group of Hondurans who would make their way along the train tracks to the town of Chahuites. However, when they slept in the mountains, they attempted to sexually abuse her. She managed to escape and arrived at the Chahuites shelter, where the patient again met her alleged assailants. She decided to flee that night to the city of Ixtepec. She was attended at the Ixtepec shelter by an MSF mental health team. She arrived with a high level of anxiety and presented post-traumatic symptoms such as flashbacks, auditory hallucinations, and sleep problems.

---

10_ Kessler, R.C. & Üstün, T. B. (eds). (2008). The WHO World Mental Health Surveys: global perspectives on the epidemiology of mental disorders. New York: Cambridge University Press, 1-580.

11_ Steel, Z., Chey, T., Silove, D., Marnane, C., Bryant, R.A., van Ommeren, M. (2009) Association of torture and other potentially traumatic events with mental health outcomes among populations exposed to mass conflict and displacement. Journal of the American Medical Association, 302(5), 537-549.



© ANNA SURINYACH

A patient receives a medical consultation inside an MSF mobile clinic in Mexico State in 2014.

# 5

## BARRIERS TO HEALTHCARE

Through its constitution and subsequent ratifications of international human rights treaties, Mexico has several legal instruments in place that protect the human rights of its citizens and all people within its borders, including provisions for adequate access to health care. Recently, Mexico has instituted laws that protect the passage of migrants through its country, ensuring that their entry into Mexico is not deemed as a criminal offense, and guaranteeing certain protections, with special attention to minorities, including women, children, indigenous

people and the elderly.[12] In December 2014, the federal government instituted the *Seguro Popular* plan, entitling undocumented immigrants to receive health care coverage for a period of three months, without discrimination.[13]

Despite these legal protections, the recognition of basic rights, and programs that are supposed to guarantee access to health care, migrants and refugees have restricted access to health services. Across health structures in the country, there is a lack of clear, standardized regulations regarding the provision of health services to migrants and refugees seeking care. Additionally, there is a lack of training or understanding by the staff at these health facilities regarding the rights of migrants and refugees to receive care and, according to testimonies delivered to MSF, there is persistent discrimination of migrants

---

12_ Ley de Migración – Op.Cit. – Article 2 - http://cis.org/sites/cis.org/files/Ley-de-Migracion.pdf and Refugee Law.

13_ Presidential Decree December 2014 – National Commission of Social Health Protection Mexico DF 28.12.2014 http://www.gob.mx/salud/prensa/otorgan-seguro-popular-a-migrantes-7519

and refugees who seek out care. The right to be informed of the duties and rights as well as the criteria for admission, request of asylum is clearly stated in the Mexican Law,[14] however in practice, there is a lack of information for migrants and asylum seekers regarding their rights and the means available to them regarding health services at public health facilities. According to some testimonies of MSF patients, those refugees and migrants who do manage to access a health facility are often confronted with additional obstacles —including delays in granting appointments, even for absolute emergencies, resistance to providing care free of charge, or the filing of a complaint before judicial authorities as a prerequisite to the provision of care. There is also a risk at the health facilities that they will be handed over to migration authorities directly. In addition, the three-month limit on access to the Seguro Popular plan might not be enough to cover the current waiting period to get asylum status.

As described above in the findings of the MSF VAT, 59 percent of migrants affected by violence did not seek any assistance during their transit through Mexico despite self-identified needs, mainly due to concerns for their security, fear of retaliation, or deportation.

In providing free health care to migrants along the route north from the border with Guatemala, MSF has itself encountered barriers to providing urgent and effective care to its patients. In Tenosique, for example, MSF teams have encountered several administrative or organizational obstacles when they needed to urgently refer victims of sexual violence for Post-Exposure Prophylaxis (PEP). The lack of knowledge regarding protocols for the treatment of sexual violence by Ministry of Health providers, and the lack of availability of treatment or PEP kits, continues to represent a significant obstacle preventing appropriate treatment of survivors of sexual violence. In areas where sexual violence against migrants is widespread, such as Tenosique, or the corridor between the Guatemalan border and Arriaga, there is limited understanding of the population needs in the area. Furthermore, the needs of marginalized minorities, including migrants and refugees, who are at higher risk of violence and sexual abuse, are ignored.

Accessing mental health support and treatment is even more challenging for refugees and migrants. The scarcity of psychologists led MSF to systematically provide mental health consultations in all the albergues where it works throughout the country.

Survivors of sexual violence (SSV) who can reach medical facilities (including MSF's) to receive comprehensive care are just a tiny part of the total affected population. There are a considerable number of reasons that help explain why many survivors do not access medical care, including stigma and fear of being judged by hospital professionals; lack of knowledge about their medical needs and rights; fear

that they will increase their risk of being abandoned or further abused; and a normalization of sexual violence as part of what's expected from men and women in order to reach their destination, in exchange for "payment" or for protection and guidance.

MSF has tried to overcome these barriers using a strategy that combines direct health care provision in migrant and refugee hostels and mobile clinics, sensitization and education of migrant and refugee populations, and additional training and staffing. Over the past two years, MSF has designed and implemented a training program to raise awareness and to provide training to health care workers, volunteers in the migrant hostels and key civil society actors on the right of migrants and refugees to health care, care protocols, mental health first aid and sexual violence case detection and management.



**Honduras—Male—** "I fell off the train and hit my knee so hard, but, at that moment, I did not [think I] hurt anything. They [doctors] told me it was a sprain. I fell on some very large stones. The backpack I wore was completely destroyed, and that was what saved my back. If I did not have it, I would have killed myself when I fell. I screamed as hard as I could to tell my cousin: 'Run, run, do not stop, faster. They are coming for us.' I could swear I saw them behind us. I was very scared. I felt the most intense fear of my life. Then, we arrived at a street where there was light, and I realized that my cousin was bathed in blood. I stopped a taxi, and asked the driver to take us to the hospital. He said that he could take us, but we would have to pay. I did not think twice. He left us at the hospital door. I asked for help, but no one helped me to get my cousin to the hospital. Nobody wanted to attend to my cousin. I asked for help, and I told everyone who saw that he was dying.

A doctor told us, 'Look, I cannot do anything until I call immigration.' I told him it does not matter if they deport us, if they want. All we want is for them to take care of us, and we do not want to be here anymore. They just sewed him up. We spent a few hours there. Two people came from the ministry. When I tried to explain what happened, one told me: 'Sure, they are thieves and that's why it happened to you. Do not tell me lies. I'm going to speak to immigration and they are going to take you.' A person who was in the adjoining bed got us the address of the migrants shelter and gave us money to get there.

14_   Ley de Migración – Op.Cit. – Article 13  - http://cis.org/sites/cis.org/files/Ley-de-Migracion.pdf



© MARTA SOSZYNSKA

A group of transgender women pose for a picture in the Tenosique migrant shelter in 2017.
LGBTQ people are often at the highest risk of harassment and abuse both in their countries
of origin and on their routes as migrants. Some shelters provide separate living spaces
for greater security and support.



**6**

## LIMITED ACCESS TO PROTECTION IN MEXICO

### Legal framework applicable to the protection of refugees in Mexico

The Americas region already has relatively robust normative legal frameworks to protect refugees: the countries of Central and North America either signed the 1951 convention on refugees or its 1967 protocol and all have asylum systems in place.  Furthermore, Mexico has been at the forefront of international efforts to protect refugees: its diplomats promoted the 1984 Cartagena Declaration on Refugees, which expands the definition to those fleeing "generalized violence".

In 2010, UNHCR established a guideline[15] for the consideration of asylum and refugee status for victims of gang violence, inviting concerned countries to apply broader criteria to the refugee definition of the 1951 Convention. In relation to these specific patterns of violence, the UNHCR concluded that direct or indirect threats (harm done to family members) and consequences (forced displacement, forced recruitment, forced "marriage" for women and girls, etc.) constituted "well-founded grounds for fear of persecution" and bases for the recognition of the refugee status or the application of the non-refoulement principle, the practice of not forcing refugees or asylum seekers to be returned to a country where their life is at risk or subject to persecution. Mexico integrated those recommendations and the right to protection stated in Article 11 of Mexico's constitution in its 2011 Refugee Law[16]. This law

15_ UNHCR Guidance Note on Refugee Claims Related to Victims of Organized Gangs – March 2010. Available at:http://www.refworld.org/cgi-bin/texis/vtx/rwmain?page=search&docid=4bb21fa02&skip=0&query=organized%20gangs

16_ Available in spanish at http://www.diputados.gob.mx/LeyesBiblio/pdf/LRPCAP_301014.pdf

AR305

considers broad inclusion criteria for refugees —stating, alongside the internationally recognized definition from the 1951 Convention, the eligibility of persons fleeing situations of generalized violence, internal conflict, massive violations of human rights or other circumstances severely impacting public order.

After Brazil Declaration of December 2014 and in line with its 2010 recommendations, the UNHCR established specific guidelines for the access to international protection mechanisms for asylum seekers from El Salvador and Honduras.

Nevertheless, despite the relatively adequate legal framework and the goodwill expressed in regional and international forums, the reality at the field level is extremely worrying: seeking asylum, getting refugee status, or even securing other forms of international protection, such as complementary measures in Mexico and the United States, remains almost impossible for people fleeing violence in the NTCA.

## Detentions and deportations from Mexico

The number of undocumented migrants from the NTCA detained[17] in Mexico has been growing exponentially for the last five years, rising from 61,334 in 2011 to 152,231 in 2016. Migrants from NTCA account for 80.7 percent of the total population apprehended in Mexico during 2016. The number of minors apprehended is extremely worrying as it nearly multiplied by 10 in the last five years, from 4,129 in 2011 to 40,542 in 2016[18]. Of children under 11 years old, 12.7 percent were registered as travelling through Mexico as unaccompanied minors (without an adult relative or care taker).

Despite the exposure to violence and the deadly risks these populations face in their countries of origin, the non-refoulement principle is systematically violated in Mexico. In 2016, 152,231 migrants and refugees from the NTCA were detained/presented to migration authorities in Mexico and 141,990 were deported[19].The sometimes swift repatriations (less than 36 hours) do not seem to allow sufficient time for the adequate assessment of individual needs for protection or the determination of a person's best interest, as required by law.

## Refugee and asylum recognition in Mexico

In 2016, Mexican authorities processed 8,781 requests for asylum from the NTCA population[20]. Out of the total asylum requests, less than 50 percent were granted. Despite the fact that Mexico appears to be consolidating its position as a destination country for asylum seekers from the NTCA, and that the recognition rate improved from last year's figures, people fleeing violence in the region still have limited access to protection mechanisms. Many asylum seekers have to abandon the process due to the conditions they face during the lengthy waiting period in detention centers.

## Protection for refugee and migrant victims of violence while crossing Mexican territory

Foreign undocumented victims or witnesses of crime in Mexico are entitled by law to regularization on humanitarian grounds and to get assistance and access to justice[21]. In 2015, a total of 1,243 humanitarian visas were granted by Mexico for victims or witnesses of crime from the NTCA[22]. These numbers might seem implausible, however the vast majority of patients (68.3 percent) in MSF's small cohort of migrants and refugees report having been victims of violence and crime.

Lack of access to the asylum and humanitarian visa processes, lack of coordination between different governmental agencies, fear of retaliation in case of official denunciation to a prosecutor, expedited deportation procedures that do not consider individual exposure to violence: These are just some of the reasons for the gap between rights and reality.

Failure to provide adequate protection mechanisms has direct consequences on the level of violence to which refugees and migrants are exposed. The lack of safe and legal pathways effectively keeps refugees and migrants trapped in areas controlled by criminal organizations.

---

17_ SEGOB. Mexico. Boletín Estadístico Mensual 2016. Eventos de extranjeros presentados ante la autoridad migratoria, según continente y país de nacionalidad, 2016.  Accessed on 06/09/2017. http://www.politicamigratoria.gob.mx/work/models/SEGOB/CEM/PDF/Estadisticas/Boletines_Estadisticos/2016/Boletin_2016.pdf

18_ Ibíd.

19_ Ibíd.

20_ Source: UNHCR MEXICO FACTSHEET. February 2017.

21_ Ley General de Migración – Article 52 Section V-a. See also Article 4 for a definition of the "victims" covered by the law.

22_ Source: Boletín Mensual de Estadísticas Migratorias 2015. Secretaría de Gobernación. Gobierno de México. Accessed on 01/02/2017.



At Tenosique migrant shelter in 2017, an MSF psychologist checks on a patient who became pregnant as a result of rape in Honduras. She fled her country out of fear that her attacker would find out about the pregnancy.

# 7

## LIMITED ACCESS TO PROTECTION IN THE UNITED STATES

**Legal framework and mechanisms for the recognition of refugees and asylum seekers in the United States**

The US Immigration and Nationality Act (INA)[23], the main body of immigration law, does not embrace as broad a criteria for eligibility as the Mexican legal system. The definitions of asylum seeker and refugee reflect the one stated in the 1951 Convention, and, on paper, the law does not take into consideration contextual changes in the NTCA, recommendations formulated through the UNHCR or regional mechanisms such as the Inter American Convention on Torture or the UN Convention against Transnational Organized Crime.

Under the existing procedure, it is extremely difficult for those fleeing violence in the NTCA to obtain asylum or refugee status in the United States. Success depends on many factors, including good

23_ Available at: https://www.uscis.gov/ilink/docView/SLB/HTML/SLB/act.html. Section 101 (a)(42) and Acts 207, 208 and 209 of specific interest for the question of asylum and refuge.

AR307

legal representation, something that many asylum and refugee applications simply do not have. NTCA refugees may not be granted recognition on the grounds that they are not fleeing a country at war. Those who are not able to demonstrate physical consequences of violence —for example because they cannot provide forensic or legal documentation to prove specifics of their case, or were not "rescued" by authorities— will face insurmountable obstacles on the road to refuge/protection. According to UNHCR, by the end of 2015, 98,923 individuals from the NTCA had submitted requests for refugee or asylum status in the US[24]. Nevertheless, the number of asylum grants to individuals from the NTCA has been comparatively low, with just 9,401 granted asylum status since FY 2011. Out of the 26,124 individuals granted asylum status in the United States during FY 2015, 21.7 percent came from the NTCA: 2,173 were from El Salvador, 2,082 were from Guatemala, and 1,416 were from Honduras[25].

During FY 2015, out of the 69,920 arrivals to the United States with refugee status, not one was from an NTCA country. The United States does not have an effective system in place to facilitate refugee recognition of individuals from NTCA when they are in their country of origin or during the transit process in Mexico.

The Central American Minors Refugee/Parole Program (CAM[26]) was created in 2014 to reduce the exposure to transnational crime and trafficking, and more generally to the dangers and violence encountered by minors of age while trying to reach the US alone. The program, currently under threat of being dissolved under current US administration, has specific quotas and is reachable through US Embassies in Guatemala, El Salvador and Honduras. The program may also be accessed through a specific request from a child's family in the United States, provided that the eligible minor can prove that she or he is in the process of reuniting with close relatives legally residing in the United States. The program does not ensure adequate protection of these minors pending the analysis of their request (according to the US Department of State, this process can take up to 18 to 24 months). It is therefore not adequate for safeguarding the lives of minors at risk. Individuals who do not have direct family members legally residing in the United States have little option but to try to reach US territory by any means. The CAM program is not accessible through a third country like Mexico, where the US embassy does not have a dedicated office or department. As a result, thousands of unaccompanied minors have no other choice but to continue their journey alone or through organized crime networks, hoping to reach US soil.

## Border control, detention, and deportation from the United States to the NTCA

US Customs and Border Protection (CBP) **apprehended** 337,117 people nationwide in FY 2015[27], compared to 486,651 in FY 2014, a 31 percent decrease. Of those, 39,970 were unaccompanied children[28]. From the total apprehended, 134,572 were from the NTCA—43,564 of whom were from El Salvador, 57,160 from Guatemala, and 33,848 from Honduras. Among other factors, the decrease in 2015 could be partly due to the shift of border control from US territory to Mexican territory under the Plan Frontera Sur joint effort. Apprehension of people from the NTCA is declining in the United States in the same proportion as it is climbing in Mexico.

In FY 2015, US Immigration and Customs Enforcement **removed/deported**[29] 21,920 people from El Salvador, 33,249 from Guatemala, and 20,309 from Honduras.

Many returnees who fled violence fear returning to their neighborhood. Upon return, women are often targeted and experience direct threats from gang members, often the same individuals who drove the families to flee. These threats include pressure to join criminal groups, pay money or "rent" to them, or sell drugs. Most of the women interviewed for this report revealed that upon return they were forced to live in hiding as a way to protect themselves from violent groups[30].

According UNHCR, some returnees remain identifiable by gang members near the reception centers and elsewhere, and some returnees have been killed by gangs shortly after return[31].

---

24_ Call to Action: Protection Needs in the Northern Triangle of Central America. UNHCR. Discussion Paper A Proposal for a Strategic Regional Response.

25_Source: MSF calculations based on information from US Homeland Security. Yearbook of Immigration Statistics 2015.

26_ https://www.uscis.gov/CAM

---

27_ Fiscal Year 2015 CBP Border Security Report December 22, 2015. https://www.dhs.gov/sites/default/files/publications/CBP%20FY15%20Border%20Security%20Report_12-21_0.pdf

28_ U.S. Custom and border protection. Official website of the Department of Homeland Security. https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2015

29_ Source: ICE Enforcement and Removal Operations Report. Fiscal Year 2015. U.S. Immigration and Customs Enforcement. https://www.ice.gov/sites/default/files/documents/Report/2016/fy2015removalStats.pdf

30_ American Immigration Council, DETAINED, DECEIVED, AND DEPORTED. Experiences of Recently Deported Central American Families.

31_ Call to Action: Protection Needs in the Northern Triangle of Central America. UNHCR. Discussion Paper A Proposal for a Strategic Regional Response.

AR 008

**Honduran—Male—24 years old—**

"I decided to leave my country due to threats of death and persecution by criminal groups. I did not know what to do because my family does not support me because of my sexual preference. I made the decision to leave my country because I was afraid and I did not know where to go. We arrived here at Tenosique, where they stopped us.  They asked me for my documents and told me that if I did not have papers, I would be deported.

I started to remember [the past] and said that I did not want to go back to Honduras. I started to cry. I felt the world crumbling down over me. Then we arrived at the station, and they interviewed me. I discussed my case with a migration officer and started talking about the shelter, but he told me that I had to be in a migration station for three to four months and asked if I could manage this. This is nothing compared to everything I have lived through in Honduras. He told me to think about it, and I told him that I had nothing to think about--that I want to ask for refuge even if I am at the station for three months. I spent a month in the migration station.

I arrived here [Albergue la 72] and spent two months. The refugee [application] process lasted three months, and then they gave me the answer denying me refuge. So I was very sad, and I did not know what to do. I said I wanted to appeal, because I do not want to return to Honduras."

**Salvadoran—Female—36 years old—**

"I requested asylum through the US embassy in San Salvador in 2011. My husband was a police officer, and [also] worked with the Mara [criminal gang]. I was threatened several times by the other gangs, because they wanted to retaliate against my husband for being a spy. I survived this, but then they started to threaten my children. I thought I should leave. My sister lives in the USA. I thought I could go there and join her. But I never received an answer to my request. I had no other choice but to stay and try to survive. My husband was killed in 2015. Then they came, they raped my kid and chased me from my house. They said I should leave, or they would take my kids. I had no other choice. The little money I had, I gave to the pollero [smuggler] to help us. I heard there were stories of rape and kidnapping along the road, but I thought: God will help me through it."



Central American migrants travel by train in Mexico in 2014. Many fall victim to violence along the journey.

© ANNA SURINYACH



A Central American migrant in Tenosique shows the identification card issued by Mexico's National Institute of Migration, which enables him to stay in Mexico with legal protections.

# 8

## CONCLUSION: ADDRESSING THE GAPS

As a medical humanitarian organization providing care in Mexico, in particular to migrants and refugees, since 2012, MSF staff has directly witnessed the medical and humanitarian consequences of the government's failure to implement existing  policies meant to protect people fleeing violence and persecution in El Salvador, Guatemala and Honduras, as described in the report.

As of 2016, MSF teams have provided 33,593 consultations through direct assistance to patients from NTCA with physical and mental traumas. People tell our staff that they are fleeing violence, conflict and extreme hardship. Instead of finding assistance and protection, they are confronted with death, different forms of violence, arbitrary detention and deportation. The dangers are exacerbated by the denial of or insufficient medical assistance, and the lack of adequate shelter and protection.

Furthermore, the findings of this report – the extreme levels of violence experienced by refugees and migrants in their countries of origin and in transit through Mexico -- comes against a backdrop of increasing efforts in Mexico and the United States to detain and deport refugees and migrants with little regard for their need for protection.

Medical data, patient surveys, and terrifying testimonies illustrate that NTCA countries are still plagued by extreme levels of crime and violence not dissimilar from the conditions found in the war zones. Many parts of the region are extremely dangerous, especially for vulnerable women, children, young adults, and members of the LGBTQ community. As stated by MSF patients in the report, violence was mentioned as a key factor for 50.3 percent of Central Americans leaving their countries. Those being denied refugee or asylum status or regularization under humanitarian circumstances are left in limbo. Furthermore, being deported can be a death sentence as migrants and refugees are sent back to the very same violence they are fleeing from. The principle of non-refoulement must be respected always, and in particular for people fleeing violence in the NTCA.

A stunning 68.3 percent of migrants and refugees surveyed by MSF reported having been victims of violence on the transit route to the United States.

Mexican authorities should respect and guarantee —in practice and not only in rhetoric— the effective protection and assistance to this population according to existing legal standards and policies.

There is a longstanding need to strengthen the Refugee Status Determination System (RSD). It must ensure that individuals in need of international protection and assistance are recognized as such and are given the support —including comprehensive health care, to which they are all entitled. Access to fair and effective RSD procedures must be granted to all asylum-seekers either in Mexico, the US, Canada and the region.

Governments across the region—mainly El Salvador, Guatemala, Honduras, Mexico, Canada and the United States—should cooperate to ensure that there are better alternatives to detention, and should adhere to the principle of non-refoulement. They should increase their formal resettlement and family reunification quotas, so that people from NTCA in need of protection and asylum can stop risking their lives and health.

Attempts to stem migration by fortifying national borders and increasing detention and deportation, as we have seen in Mexico and the United States, do not curb smuggling and trafficking operations. Instead, these efforts increase levels of violence, extortion and price of trafficking. As described in the report, these strategies have devastating consequences on the lives and health of people on the move.

The impact of forced migration on the physical and mental well-being of people on the move—in particular refugees and migrants, and, among them, the most vulnerable categories represented by women, minors, and LGBTQ individuals—requires immediate action. The response should ensure strict respect of the law and the adequate allocation of resources to provide access to health care and humanitarian assistance, regardless of the administrative status of the patient (as enshrined by Mexican law).

Addressing gaps in mental health care, emergency care for wounded, and strengthening medical and psychological care for victims of sexual violence by ensuring the implementation of adequate protocols, including provision of and access to the PEP kit, is fundamental to treating refugee patients with dignity and humanity.

As witnessed by MSF teams in the field, the plight of an estimated 500,000 people on the move from the NTCA described in this report represents a failure of the governments in charge of providing assitance and protection. Current migration and refugee policies are not meeting the needs and upholding the rights of assistance and international protection of those seeking safety outside their countries of origin in the NTCA. This unrecognized humanitarian crisis is a regional issue that needs immediate attention and coordinated action, involving countries of origin, transit, and destination.



An MSF psychologist meets with a young patient in Mexico in 2016.

© CHRISTINA SIMONS

**ANNEX 1**
RISK FACTORS

*Precipitating events identified in mental health consultations during 2015 and 2016*

| Precipitating Events and percentage of MSF patients affected | 2015 | 2016 | TOTAL | % |
|---|---|---|---|---|
| Violence as precipitating event: Other physical violence | 517 | 342 | 859 | 47.2% |
| Violence as precipitating event: Forced to flee/IDP/refugee/migration | 552 | 305 | 857 | 47.1% |
| Violence as precipitating event: Received threats | 516 | 284 | 800 | 44.0% |
| Violence as precipitating event: Witnessed violence/killing/threats | 202 | 97 | 299 | 16.4% |
| Violence as precipitating event: Domestic violence | 96 | 103 | 199 | 10.9% |
| Violence as precipitating event: Hostage/Kidnapping/Forced recruitment | 97 | 81 | 178 | 9.7% |
| Separation/Loss as precipitating event: Loss of family income | 108 | 45 | 153 | 8.4% |
| Violence as precipitating event: Marginalization/target of social stigma/discrimination | 93 | 56 | 149 | 8.2% |
| Violence as precipitating event: Sexual violence outside family | 82 | 64 | 146 | 8.0% |
| Violence as precipitating event: Deportation | 94 | 40 | 134 | 7.3% |
| Separation/Loss as precipitating event: Family member(s) killed / missing | 75 | 40 | 115 | 6.3% |
| Violence as precipitating event: Sexual violence inside family | 28 | 41 | 69 | 3.7% |
| Violence as precipitating event: Incarceration / Detention | 35 | 25 | 60 | 3.3% |
| Separation/Loss as precipitating event: Family member died | 28 | 20 | 48 | 2.6% |
| Separation/Loss as precipitating event: Unaccompanied minor/orphan | 28 | 19 | 47 | 2.5% |
| Medical condition as precipitating event: Severe medical condition | 31 | 14 | 45 | 2.5% |
| Medical condition as precipitating event: Highly stigmatized diseases | 32 | 13 | 45 | 2.5% |
| Disaster/Catastrophes as precipitating event: Accidents | 31 | 14 | 44 | 2.4% |
| Medical condition as precipitating event: History of psychological or psychiatric disorder | 19 | 10 | 29 | 1.6% |
| Violence as precipitating event: Combat experience | 17 | 9 | 26 | 1.4% |
| Violence as precipitating event: Victim of human trafficking/smuggling | 8 | 16 | 24 | 1.3% |
| Violence as precipitating event: Torture | 3 | 14 | 17 | 0.9% |
| Separation/Loss as precipitating event: Property destroyed or lost | 11 | 5 | 16 | 0.9% |
| Medical condition as precipitating event: Unwanted pregnancy | 9 | 6 | 15 | 0.8% |
| Other event/risk | 13 | 0 | 13 | 0.7% |
| Separation/Loss as precipitating event: Family member(s) arrested/detained | 0 | 12 | 12 | 0.7% |
| Separation/Loss as precipitating event: Caretaker neglected | 3 | 6 | 9 | 0.5% |
| Disaster/Catastrophes as precipitating event: Natural disaster | 0 | 2 | 2 | 0.1% |
| Violence as precipitating event: home incursion | 0 | 1 | 1 | 0.1% |

**ANNEX 2**
## REACTION SYMPTOMS

*Reaction symptoms identified in mental health consultations during 2015 and 2016*

| Reaction symptoms and percentage of MSF patients affected | 2015 | 2016 | TOTAL | % |
|---|---|---|---|---|
| Anxiety-related reaction: Anxiety / stress | 732 | 295 | 1027 | 56.50% |
| Anxiety-related reaction: Constant worry | 666 | 312 | 978 | 53.82% |
| Depression-related reaction: Sad mood | 586 | 294 | 880 | 48.43% |
| Anxiety-related reaction: Excessive fear/Phobia/Feeling threatened | 209 | 118 | 327 | 17.99% |
| Psychosomatic reaction: Sleeping problems | 245 | 78 | 323 | 17.77% |
| Psychosomatic reaction: General body pain and other psychosomatic complaints | 206 | 75 | 281 | 15.46% |
| Depression-related reaction: Irritability/anger | 180 | 74 | 254 | 13.97% |
| Depression-related reaction: Guilt/Self-blame/Feeling worthless/Low Self-esteem | 105 | 60 | 165 | 9.08% |
| Depression-related reaction: Hopeless | 89 | 68 | 157 | 8.64% |
| Post-traumatic reaction: Intrusive feelings, thoughts | 99 | 56 | 155 | 8.53% |
| Post-traumatic reaction: Hyper vigilance/Exaggerated startle response | 87 | 40 | 127 | 6.98% |
| Post-traumatic reaction: Flashbacks | 68 | 43 | 111 | 6.10% |
| Depression-related reaction: Loss of interest/anhedonia | 47 | 41 | 88 | 4.84% |
| Behavioral problems reaction: Alcohol/substance abuse | 62 | 23 | 85 | 4.69% |
| Post-traumatic reaction: Avoidance | 39 | 37 | 76 | 4.18% |
| Behavioral problems reaction: Impulsiveness | 28 | 23 | 51 | 2.80% |
| Psychosomatic reaction: Eating problems | 33 | 10 | 43 | 2.36% |
| Behavioral problems reaction: Aggressiveness | 23 | 19 | 42 | 2.31% |
| Behavioral problems reaction: Social/inter-personal isolation | 23 | 12 | 35 | 1.92% |
| Behavioral problems reaction: Reduction of family attachment / involvement | 25 | 10 | 35 | 1.92% |
| Depression-related reaction: Suicidal thoughts | 19 | 15 | 34 | 1.87% |
| Cognitive problems reaction | 21 | 10 | 30 | 1.65% |
| Anxiety-related reaction: Compulsive or repetitive behavior | 20 | 10 | 30 | 1.65% |
| Psychosis-related reaction: Disorganized thoughts/speech | 20 | 6 | 26 | 1.43% |
| Psychosis-related reaction: Bizarre behavior | 16 | 8 | 24 | 1.32% |
| Depression-related reaction: Suicidal intention/attempts | 14 | 8 | 22 | 1.21% |
| Psychosis-related reaction: Hallucinations | 15 | 4 | 19 | 1.04% |
| Psychosomatic reaction: Hypo/hyper-activity | 14 | 3 | 17 | 0.93% |
| Post-traumatic reaction: Dissociation | 10 | 5 | 15 | 0.82% |
| Psychosis-related reaction: Delusions | 9 | 2 | 11 | 0.60% |
| Depression-related reaction: Self-harm | 5 | 3 | 8 | 0.44% |
| Behavioral problems reaction: Delinquent behavior | 3 | 5 | 8 | 0.44% |
| Other reaction | 1 | 6 | 7 | 0.38% |
| Psychosomatic reaction: Enuresis and/or encopresis | 5 | 2 | 7 | 0.38% |
| Psychosomatic reaction: Sexual problems | 3 | 3 | 6 | 0.33% |
| Psychosomatic reaction: Psycho-motor changes | 5 | 0 | 5 | 0.27% |
| Behavioral problems reaction: Regression in development | 2 | 3 | 5 | 0.27% |
| Psychosomatic reaction: Verbal expression changes | 3 | 0 | 3 | 0.16% |

# ANNEX 3
## SURVEY METHODOLOGY

The victimization survey technique measures violence actually "experienced" by people and not only the violence known through police and other official reports. The survey consists of asking questions directly to people about the acts of violence they have suffered and how they felt about them. The protocol has been adapted for MSF's specific purpose, with a focus on medical/physical health and mental health consequences of violence. It includes three parts:

1) What is the violence actually experienced by people?
2) What did people do about what they experienced (focus on health)?
3) What direct or indirect impacts did violent experiences have on medical/physical health and mental health?

The cluster sampling method was used. Four clusters corresponding to the MSF attention points in the migrants' hostels were selected. Representativeness of the survey population is therefore significantly above the normal statistical level, guaranteeing a margin of error less than the 3 percent generally tolerated in this kind of study. The survey provides an accurate picture, but it is nevertheless a snapshot of the situation for these migrants and refugees at a specific moment in time. By no means are the results representative over the long term, especially given the nomadic nature of the population, the rapid changes in immigration policy, and the volatility of organized crime.

The acceptance rate was a main initial concern, given the subject of the survey (explicit violence) and the population it was applied to (migrants in irregular situations). People were actually quite eager to talk about their situation. The final acceptance rate was a satisfying 74.3 percent. 120 migrants rejected participation, 73 of whom (61 percent) were in Tenosique alone. The rejection rate in Tenosique was 49.6 percent, and fell down to 15 percent in Ixtepec, 9.8 percent in San Luis Potosí, and 22.2 percent in Huehuetoca/Bojay.

The investigators and data manager were trained and controlled during the entire process by a BRAMU survey coordinator. Each questionnaire has been checked and eventually returned to the investigator in the event of incoherence.

The study design and adapted questionnaire was submitted to OCBA medical department for feedback and approval. Approval was solicited by a Mexican ethical review board. The questionnaire was fine-tuned in collaboration with the surveyor's team and members of the project to avoid or rephrase potentially risky questions. Albergues staff and coordination members were previously informed. No smart-phones, cameras, or recording devices were allowed.

Terms of consent were presented to all participants orally (in this context of migration, anonymity was crucial for participation and accuracy, so no signatures were collected). Participants were informed that they were entitled to psychological support during and after the survey. At all survey points and during all working hours, a clinical psychologist was present with the survey teams, along with MSF social workers in two albergues. 12.6 percent of the survey participants were referred to mental health services provided by MSF staff.

A dedicated email was established for participants wanting more information on the survey and results restitution.

No security incident was reported during the survey.

## ANNEX 4
LIST OF ACRONYMS

**CAM:** Central American Minors

**COMAR:** Comisión Mexicana de Ayuda a Refugiados

**CPSB:** Comprehensive Plan for the Southern Border (most known in Spanish as "Plan Frontera Sur")

**FY 2015:** Fiscal Year 2015

**INGO:** International Non-Governmental Organization

**INM:** Instituto Nacional de Migración

**LGBTQ:** Lesbian-Gay-Bisexual-Transgender-Queer

**MSF:** Médecins Sans Frontières / Doctors Without Borders

**NTCA:** Northern Triangle of Central America

**OC:** Organized Crime

**PEP:** Post-Exposure Prophylaxis

**PTSD:** Post-Traumatic Stress Disorder

**RSD:** Refugee Status Determination

**SEGOB:** Secretaría de Gobernación de México

**SSV:** Survivors of Sexual Violence

**SV:** Sexual Violence

**TCO:** Transnational Criminal Organizations

**TPS:** Temporary Protected Status

**UN:** United Nations

**UNHCR:** United Nations High Commissioner for Refugees

**UNODC:** United Nations Office on Drugs and Crime

**USA:** United States of America

**VAT:** Victimization Assessment Tool

**WHO:** World Health Organization





# FOOD SECURITY AND EMIGRATION

Why people flee and the impact on family members
left behind in El Salvador, Guatemala and Honduras







AR318

August 2017

FOOD SECURITY AND EMIGRATION

To access the research report
that informs this summary,
follow this link/QR code



https://docs.wfp.org/api/documents/WFP-0000019629/download/

© All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in
any form or by any means (electronic, mechanical, photocopying, recording or otherwise) without prior permission.
This document has not been subject to an editorial review. This material has been funded by the World Food
Programme, the Inter-American Development Bank and the International Fund for Agricultural Development; however
the views expressed do not necessarily reflect the official position of IADB, IFAD, IOM, OAS or WFP. The responsibility
for the opinions expressed in this report rests solely with the authors.

AR319

# Foreword

Migration, food security, violence and climate variability have been studied increasingly in recent years, both in Latin America and beyond, in an effort to better understand what drives people to leave their homes and countries. Yet often these issues have been examined separately rather than together.

Migration from Central America to North America is not a new phenomenon, nor is it one that is likely to end soon. The number of irregular migrants apprehended at the United States of America border with Mexico increased fivefold from 2010 to 2015. The numbers of unaccompanied children picked up arriving from El Salvador, Guatemala, and Honduras surged between 2015 and 2016. This flow of people coincided with a period of heightened food insecurity in the Dry Corridor that traverses these three countries, known for its prolonged dry spells and droughts.

It is in this context that the World Food Programme (WFP), the Inter-American Development Bank (IADB), the International Fund for Agricultural Development (IFAD), the Organization of American States (OAS) and the International Organization for Migration (IOM) have come together to strengthen the evidence base around these key issues to help inform policies and programmes in Latin America. This study highlights the link between food insecurity and migration, and describes the main push-factors that trigger the decision to leave one's homeland, such as poverty, violence and climate variability.

Building on Hunger Without Borders, an exploratory study conducted in 2015 by WFP, IOM, OAS and the London School of Economics, this report provides greater analysis of the dynamics of emigration and its links to food insecurity, along with important insight into why people flee and into the impact of emigration on the family who remain at their places of origin.  The findings reveal some important misperceptions about the role of remittances and bring to light the precarious situation of people remaining at home without sufficient access to food.

We hope that this study will be a useful tool to strengthen the design of programmes and policies targeting the most vulnerable population segments and catalyse discussions among governments, development partners and civil society, all committed to achieving the Sustainable Development Goals and, in particular, reaching Zero Hunger. It is also our hope that this study highlights the importance of long-term investments to enhance the food security and nutrition of people in the Dry Corridor of El Salvador, Guatemala and Honduras, as this may reduce their propensity to emigrate.

WFP presents this report recognizing that without the support of the IADB, IFAD, OAS and IOM, as well as the governments of the three countries, the study could not have taken place.

**Miguel Barreto**

Regional Director for Latin America and the Caribbean

United Nations World Food Programme

AR320

# Acknowledgements

This document is based on research conducted by the United Nations World Food Programme (WFP) Regional Bureau for Latin America and the Caribbean, with the participation of the International Organization for Migration (IOM) and the Inter-American Development Bank (IDB) and the collaboration of the International Fund for Agricultural Development (IFAD) and the Organization of American States (OAS).

The research took place in the Dry Corridor of El Salvador, Guatemala and Honduras. The authors would like to recognize the invaluable collaboration of over 700 women and men from the communities visited across the region, the local and municipal authorities, as well as volunteers that facilitated the meetings.

Regis Chapman coordinated the work, while Byron Ponce-Segura managed the design, desktop and field operations. Both officials are based at the WFP Regional Bureau for Latin America and the Caribbean.

There is a large list of outstanding collabourators to this study: WFP Country Directors: Nils Grede in El Salvador, Pasqualina Di Sirio in Honduras and Mario Touchette in Guatemala, as well as their teams; Marcelo Pisani IOM Regional Director for Central America, North America and the Caribbean and the IOM country teams; the Central America, Mexico, Panama and Dominican Republic Country Department at the Inter-American Development Bank, ADB, where statistical and econometric analysis were conducted using government and WFP databases.

Various consultants and WFP staff supported the fieldwork. Danilo Palma Ramos supported the design of the methodology and led the field coordination in all three countries. The field team in El Salvador was composed of Olga Lucía Rodríguez (team leader) and Nidia María Umaña as well as and WFP staff Vittorina Sola and María Cristina Gálvez. In Honduras, the team leader was Mercedes Elena Flores, who was supported by Ana Ruth Reyes, from (IOM), as well as Harieth Marizol Nuñez, Rosa Mercedes Escolán and Mario Guillermo Suazo. Guatemala´s team was led by Arandi Melgar Castro, with support from Luis Guillermo Guerra Bone, Verónica Tobar Rodríguez and Nidia A. Ramírez Campos.

Special thanks go to Marcia Bebianno Simoes, Migration Specialist of the Social Inclusion Department of OAS; to Joaquin Lozano, Director for Latin America and the Caribbean, as well as to Pedro Tigre De Vasconcelos, from the IFAD Policy & Technical Advisory Division for their support and contribution to the report. From the Panama Regional Bureau, we would like to recognize VAM analysts Ana Gómez-Sánchez and Annette Castillo. Sincere thanks also go to Angela Koch-McBerry for editing, Maarten Immink for his kind review and Annalissa Tabarini for translating from English to Spanish. Finally andrea Cristina Ruiz, intern from Columbia University, joined the team in the last stages and made important contributions. A number of other WFP staff were also critical to the completion of this work.

AR321

# Executive summary

Building on the results and recommendations of the exploratory study on the links between Migration and Food Security ("Hunger without Borders", 2015), WFP and its partners decided to further study linkages between food insecurity and migration, relying on qualitative and quantitative analysis.

Emigration (or out-migration) trends in Central America are conditioned by political and socio-economic conditions in the region and increase in response to civil strife and poverty. This study collected and analysed data on food security and environmental and climatic factors as potential triggers for out-migration. The geographical focus of the study was El Salvador, Guatemala and Honduras, particularly the most vulnerable part of these countries known as the Dry Corridor.

**The propensity to migrate from food insecure regions of Central America is higher among the younger and more vulnerable people.** While migration from Mexico to the USA diminished in recent years, the flow of emigrants from El Salvador, Guatemala and Honduras has increased substantially since 2010. While the proportion of women and young people among the emigrants from the Dry Corridor increased in the past two years, the majority of people leaving their country are men.

According to the United States Customs and Border Protection (CBP), the number of "illegal aliens" as defined by the CBP, who were "apprehended" or detained in the Southwest border region of the USA, increased from around 50,000 during the fiscal year (FY) 2010 to more than 250,000 in FY 2014. Although the number of apprehended declined in FY 2015 to 218,810 people, in FY 2016, this number increased to 408,870. Although more apprehensions do not necessarily imply a greater migrant flows, apprehensions are often considered as a proxy indicator of the total number of persons who attempt to cross the border irregularly during a certain period.

The almost 50 percent increase from FY 2015 to FY 2016 in the number of unaccompanied children (persons 16 years old or under) apprehended by USA border authorities is of great concern.

Emigrants from El Salvador, Guatemala and Honduras returned by the Mexican authorities to their respective countries of origin were primarily men (79 percent) and 50 percent of them were working in the agricultural sector before migrating. Emigrants reported the lack of employment or economic hardship (65 percent), followed by low income and poor working conditions (19 percent) and violence and insecurity (9 percent) as the main reasons for migrating. Family reunification was only indicated as a reason in one percent of the responses, according to official reports.

**The Dry Corridor is generally characterized by high unemployment, limited and seasonal labour demands and low and irregularly paid wages.** More than half of the households interviewed reported spending more than two thirds of their income on food, which reflects a high level of economic vulnerability to food insecurity. Recent years have seen household food production further reduced due to poor rainfall and droughts linked to the El Niño phenomenon. Outside the Dry Corridor, employment opportunities in coffee production have also been reduced due to the coffee rust crisis. **Adverse climatic conditions in the Dry Corridor affect food security** by curbing agricultural productivity in commercial and subsistence farming as well as agricultural work opportunities. **The El Niño drought conditions that started in 2014 caused a significant increase in irregular migration to the USA.**

For this study, three national teams visited key districts, previously identified by key informants as having significant emigration to the USA. In addition, secondary data analysis was conducted using information provided by Mexican and and USA migration authorities.

This information was complemented with key informant interviews, separate focus group discussions with men and women and a household food security survey. The survey targeted families where members had left the country since the last El Niño episode (2014-2016).

AR322

A qualitative study was conducted in 22 communities of the Dry Corridor in the three countries. Fifty-four key informants were interviewed, while some 660 community members participated in 44 focus group discussions (one for men and women in each location). Participants in the focus group discussions estimated that around 35 percent of emigrants from El Salvador, 25 percent from Guatemala and 9 percent from Honduras travelled with a valid visa but then stayed in the USA beyond the validity of their visas. Those who travel with valid visas usually have the necessary financial and social capital to facilitate their journey. However, migrants who travel without valid visas often use a migrant smuggler, pay high costs and acquire debt, often using their assets (such as a house and/or land) as collateral.

Thus, emigration negatively impacts family members left behind, who have to assume the debts incurred. Debts levels increase in cases of unsuccessful emigration. **Successful migrants provide vital support to the family who is left behind by regularly sending remittances.**

In the cases of successful emigration, 78 percent of households in the home country receive monthly "remittances", of which 42 percent indicate that remittances are their only source of income. More than half of the funds are used to buy food, followed by agricultural investments (buying land and animals) and investments in small businesses. Remittances are also spent on education and healthcare. Improved family well-being, especially enhanced diets, are some of the main impacts of remittances on households in the home country.

When those families do not receive remittances or other assistance, their economic situation progressively worsens. This may also result in changes in the division of labour in the family. Those household shifts may result in household members assuming different roles with related negative consequences. For example, women often have to undertake the agricultural activities of departed men on top of their traditional domestic responsibilities. Overall, emigration reduces the available work force and if not offset by remittances, typically results in increased food insecurity and deepening of poverty.

**There is clearly is a link between food insecurity and emigration from the three countries.** Poverty and unemployment are the general causes of emigration, followed by reduced agricultural productivity, adverse climatic events such as droughts, pests that result in crop losses and the widespread occurrence of violence. The high rates of food insecurity found in the households that participated in this study demonstrate the linkages between emigration and food insecurity. **Nearly half (47 percent) of the families interviewed during this study were food insecure** (38 percent were moderately food insecure and 9 percent were severely food insecure). **These levels of food insecurity have not been previously seen in the region**, including in the results of various assessments over the past three years that focused on drought and the effects of El Niño in the Dry Corridor.

**The findings revealed that nearly three-quarters (72 percent) of households are already applying emergency coping strategies:** such as selling land. Again, this is well above what is normally seen in the region in times of shock. What increases concerns is that none of the households had the capacity to apply less extreme "stress coping" strategies, as they had already depleted such options. This reflects a concerning **cumulative effect over time on food insecurity,** as well as the very limited resilience such households have to protect themselves against shocks and their effects.

**While only 19 percent of interviewed households had unacceptably low food consumption levels, the lack of dietary diversity is of major concern**, even among those households with adequate total consumption levels. This finding is not new for the Dry Corridor, but it raises concerns about overall dietary quality and its impacts on health and nutrition. Guatemala, in particular, has levels of food consumption that point to a major problem, with 42 percent of interviewed households having poor or borderline food consumption levels.

**Violence also plays an important role in serving as a reason for migration in El Salvador**, where it was reported as a sensitive trigger, while in Guatemala and Honduras it was found to be less important.

The information collected through this study allows for the development of several policy and programmatic recommendations aiming at mitigating the impact of the variables acting as emigration push-factors, with a focus on food insecurity.

AR323



### The Central American Dry Corridor

is an imprecise geographic zone with homogeneous agroclimate, ecosystems, and livelihoods. Poor distribution of irregular rain, drought, environmental degradation, and low crop yields create vulnerability.

### Resilience of livelihood systems is decreasing

Households in the Dry Corridor are exposed to poverty, climate change, extreme climate events, violence and food insecurity.

**62%** of households in the Dry Corridor

**80%** of the above households live below the poverty line, and

**30%** are in extreme poverty.

Source: FAO

Percentage of population living in the Dry Corridor

● El Salvador   ● Guatemala   ● Honduras

Source: WFP

Country area inside the Dry Corridor

**El Salvador 58%**
Area: 14,823 m²

**Guatemala 38%**
Area: 25,895 m²

**Honduras 21%**
Area: 7,929 m²

Source: WFP

Map source: United Nations World Food Programme, 2016
Drought periods 2000-2001, CEPREDENAC, 2001;
Climate Risk Index from CIAT, 1999

Caribbean Sea

Nicaragua

Honduras

El Salvador

Guatemala

Belize

Mexico

Pacific Ocean

Municipality assessed
Dry Corridor
Municipal boundary

0   37.5   75   150   Km

*Why people flee and the impact on family members left behind in El Salvador, Guatemala and Honduras*   7

AR324

FOOD SECURITY AND EMIGRATION

# Focus and Objectives of the Study

The focus of this study has been on "out-migration" (emigration) across state borders in El Salvador, Guatemala and Honduras and its impacts on food and nutritional security.

The three main study objectives are as follows:
1. To identify the push-factors for out-migration from communities in the Dry Corridor of El Salvador, Guatemala and Honduras and determine the extent to which food insecurity constitutes one of these motivating factors;

**APPREHENSIONS BY MEXICAN AUTHORITIES AND HISTORIC PRECIPITATION DEFICIT**



Annual average
0% variation
Guatemala
Honduras
Periods of drought are correlated with high emigration
El Salvador

2012   2013   2014   2015   2016


Precipitation    Apprehensions

Source: WFP, Mexican Immigration Authority

"The United States is the primary destination for emigrants from El Salvador, Guatemala and Honduras".

- Approximately 79% of migrants are men, most are 20-29 years old
- Approximately 21% of migrants are women
- Half of deportees worked in agriculture before migrating
- One third of returned migrants have up to six years of formal education

**UNACCOMPANIED CHILDREN ENCOUNTERED BY USA AUTHORITIES**



El Salvador
Guatemala
Honduras

Source: US CBP

EMIF-SUR, 2015

AR325

2. To understand how migration affects those left behind, namely regarding the households' and the communities' food and nutritional security.

3. To review the potential effects of violence both on food insecurity and out-migration and provide some recommendations on protection elements.

The study explores the relationships between migration and food security, as well as some manifestations of violence and its potential effects on emigration and food insecurity. Other elements, such as climate change, natural disasters and poverty, are considered but without the detail given to the first two variables.

## Methodology in Graphics

| Country | SV | GT | HN | |
|---------|----|----|----|--|
| | | | | Secondary data review:+90 documents |
| | 18 | 22 | 14 | 54 key informants |
| | 16 | 16 | 12 | 660 people in 44 focus groups |
| | 42 | 40 | 41 | 123 household surveys |

## Migration: Status, trends, shocks and push factors

The percentage of the total population of El Salvador, Guatemala and Honduras living abroad, as per a 2013 report from the Migration Policy Institute, was 18, 8 and 12 respectively. Up to 80 percent of them reportedly live in the USA.

Recent years have witnessed an increase in the number of emigrants from the countries of the study to the USA and the sharp increase in the numbers of accompanied and unaccompanied children is particularly striking.

Emigration peaks, as captured by statistics, are conditioned by natural disasters, climatic shocks and socio-economic conditions affecting the studied countries. This study found a correlation between the number of foreigners presented to Mexican immigration authorities and the effects of El Niño on agriculture.

Increasingly more women tend to migrate as a proportion of all migrants: around 15 percent of returned migrants in 2009 were women compared to 21 percent in 2015 (EMIF-SUR, 2015).

Returned migrants increasingly come from rural areas, 31 percent in 2009 and 52 percent in 2014. This is consistent with the finding that an increasing number of migrants returned by Mexico previously worked in the agricultural sector: 41 percent in 2009 and 53 percent in 2015. On the other hand, returned migrants who previously worked in the construction sector decreased from 25 to 15 percent in the same years.

Studies by IFAD and the the Washington based Inter-American Dialogue found that in Guatemala food insecurity is linked to drought. However, it was noted that natural disasters do not determine migration in the short-term but are factors that contribute to more long-term and gradual migration patterns.



FOOD SECURITY AND EMIGRATION

## REASONS FOR EMIGRATION IN SURVEYED COMMUNITIES



● No food   ● No money   ● No job   ● Crop loss   ● Other
● Family reunification   ● Forced to leave   ● Violence



**Unemployment in the Dry Corridor according to key informant**

● El Salvador 52%

● Guatemala 54%

● Honduras 68%

### People's voices in the Dry Corridor: Shocks and Push Factors

It is already recognized that environmental, economic and social shocks are triggers of emigration.

Extensive consultations in the Dry Corridor of El Salvador, Guatemala and Honduras help to reveal what the official figures often fail to capture. WFP conducted several household Emergency Food Security Assessments (EFSA) due to El Niño between 2014 and 2016. For the surveyed emergency-affected population, considering the six main reasons to emigrate, the highest percentage say "no food" is the most important reason, other reasons are shown in the illustration.

The focus group discussions of this study identified violence (El Salvador), poverty (Guatemala) and unemployment (Honduras) as the main reasons for emigration, followed, in the same country order, by poverty and unemployment; unemployment and crop losses; and poverty and search for better opportunities. In general, "drought and its consequences" was identified as the main problem for the studied period of time. Key informants also identified family reunification as a pull factor of emigration.

Poverty is playing a critical role in emigration. The poorest cannot affort to pay migrant smuggler fees, making the trip more risky. If this option is chosen, they use their houses and small land plots as collateral. If deported in the attempt to reach the USA, they end up losing their livelihood assets and end up in a worse situation, including exacerbated food insecurity.

AR327

The full page graph on page 12 visualizes all factors related to migration from the surveyed areas, the methods employed, the possible outcomes, the effect of remittances and the impacts of emigration on the households.

Households first try to cope with shocks using temporary measures which primarily affect their level of expenditure and food consumption patterns; however, as the situation deteriorates, they move to livelihood-affecting strategies which reduce their resilience to future shocks. They stated that emigrating is a last resort. This decision brings with it not only the hardship of the journey for the individual but a series of effects both for the emigrant and the family left behind. This is captured in the infographic below.



AR328

FOOD SECURITY AND EMIGRATION

## EMIGRATION: THE CAUSAL MODEL



12

AR329

## Food insecurity and migration: the connections

The incapacity to properly feed the family can become an emigration push factor. To validate the answers provided by the key informants and the focus group discussions, the ten Emergency Food Security Assessments (EFSA) conducted by WFP since the start of the El Niño crisis provided important evidence, which was complemented with the household food security assessment that was conducted as part of the study.

Combined into one dataset, the previous EFSAs reported a significant rate of food insecurity: **32 percent**. This was enough to justify a WFP regional food assistance intervention. After extracting and reprocessing the data of households reporting a recently emigrated family member, the levels of food insecurity rose to **43 percent**. Then, after several consecutive failed crop seasons, "the survey of households with recently emigrated family members, which was conducted as part of this study, revealed a **47 percent** rate of food insecurity. This value is unprecedented in the region and is comparable with humanitarian crises in other parts of the world.

This is not a minor finding. It shows that food insecure families use emigration as the ultimate coping strategy, with very high risks in terms of personal security during the journey and for the capacity of relatives left behind to create resilience to shocks and be able to improve their livelihoods.

The indicator used by WFP to measure the severity of coping strategies and how they compromise livelihood systems shows that **72 percent** of interviewed households applied emergency type coping mechanisms.

On average, close to 20 percent of the families surveyed in 2016 had unacceptable food consumption with a peak of 42 percent in Guatemala. Because a diet based on beans, maize and oils can be calculated as acceptable, those results do not represent good dietary diversity, which in general showed poor results. WFP measurements of food consumption place a high value on both proteins and fats, noting that a diet high in beans (proteins) and oils (fats) results in good food consumption, even if the diet is not diverse. However, like the overall levels of food security, these results are extremely high compared to previous assessments in the three countries.

It also supports the statement **that food insecurity causes emigration and emigration can cause [more] food insecurity.**

## Impacts of emigration and links with debt and remittances

Emigration can have both positive and negative impacts. The positive side is mainly about remittances and the changes in the economic situation for the family that they can create, depending on the amounts received and the regularity of transfers.

The priority use of remittances is on food (this was unanimous among men and women, whether they were interviewed as key informants or part of a focus group). In Guatemala and Honduras, basic needs such as education and medicine rank second, while other investments rank third. The priority in El Salvador is the inverse of the above.



**FOOD INSECURITY**

Entire sample
**32%**

Only with emigrated relative 2014-2016
**43%**

**2016 Study Estimates**
**47%**



| Key respondent reporting of numbers of emigrants according to socio-economic levels | | | |
|---|---|---|---|
| Country | | | Total |
| 🇸🇻 | 8 | 14 | 0 | 22 |
| 🇬🇹 | 5 | 9 | 1 | 15 |
| 🇭🇳 | 3 | 8 | 0 | 11 |
| Total | 16 | 31 | 1 | 48 |

Low socio-economic level   Middle socio-economic level   High socio-economic level

**LOCAL SOCIOECONOMIC LEVEL OF EMIGRANTS' FAMILIES**

AR330

## FOOD INSECURITY OF FAMILIES BEFORE AND AFTER EMIGRATION

| Estimated percentage of families with migrant members who… | | |
|---|---|---|
| Country | | |
| (El Salvador) | 33% | 27% | 40% |
| (Guatemala) | 55% | 35% | 10% |
| (Honduras) | NK | NK | NK |

Received food assistance before departure of family members

Received food assistance after the departure of family members

No food assistance neither before nor after departure of family members

**NK** Not Known

**Note:** The term "food assistance" can include distribution of food rations, as well as other food-related assistance such as vouchers for purchase of food in markets.

The testimonies of the contacted households in the Dry Corridor area of El Salvador, Guatemala and Honduras indicate that on average 61 percent of them receive remittances, although only 34 percent receive them monthly. The monthly transfer can be as low as US$50 and as high as 1,000. Higher amounts are received to pay the emigration debts. Migrant smuggler fees across the region range from US$3,500 up to US$15,000.

On the negative side, the poorer and more indebted the emigrant family is, the more severe are the negative impacts.

Women and children are affected. If the man emigrated, the women must add the responsibility for productive activities, including agriculture, to their workload. In some cases, children also have to contribute to the productive activities of the household, which is an example of the numerous protection issues that need to be considered linked to emigration.

When the emigrant is deported or does not reach the destination for different reasons, the burden of the debt becomes unsustainable. People who offered their houses or their land as collateral for the trip debt can become destitute, as the research team confirmed.

Another negative outcome is that many families of unsuccessful emigrants become dependent on food assistance due to lack of support. In some places, relatives of emigrated people (successful or not) are subject to extortion based on the assumption that they are receiving remittances.

## DIFFERENT IMPACTS OF EMIGRATION, BY COUNTRY



Legend: El Salvador, Guatemala, Honduras

AR331

# Conclusions



## 1. EMIGRATION TRENDS IN CENTRAL AMERICA

1.1. Adults still constitute the majority of emigrants from the Dry Corridor of the three Central American countries, but the proportion of **accompanied and unaccompanied children has increased in the last years.** It is expected that the results from this study will strengthen the ongoing efforts of governments and partners to address and reverse this trend.

1.2. Successful emigrants can become a source of support for family members who stay behind, once they establish themselves in the destination country, by sending back remittances. Those emigrants who are apprehended on route to their final destination and are deported back to their communities (about half of all emigrants), very often try again, as **reaching their destination is the only way to repay debts acquired to cover the emigration costs**. The economic situation of the family is likely to worsen with each new attempt, given the high emigration costs.

## 2. CAUSES OF EMIGRATION

2.1. Poverty and unemployment are the most common causes of emigration, followed by problems linked to agricultural losses and adverse climate events (drought, high temperatures and pests), as well as high levels of violence in some

countries. The population describes this in several ways, including the **"inability to put enough food on the table".** Family reunification is an emerging motive for emigration, particularly for accompanied and unaccompanied children. The above motives are not mutually exclusive and people often emigrate for multiple reasons.

2.2. The high prevalence of food insecurity found among the families with members who have emigrated suggests that food insecurity may be both a cause and a consequence of emigration.

2.3. One of the main goals of emigration is generate income that can be sent back home as remittances, in order to repay debts, support families to meet current basic needs and to make investments for a better life. Violence and the need to escape from life threatening situations has also been mentioned as a motive for emigration, but mostly in El Salvador.

## 3. COMPLEX ROLE OF POVERTY

3.1. Legal travellers who become irregular emigrants (by overstaying their visa) usually belong to households at the relatively higher socio-economic level.

3.2. Some irregular emigrants belong to families at a middle socio-economic level. Their jobs (before departure) did not provide regular and comparatively good income and kept them in a

AR332

state of economic uncertainty and vulnerability. In turn, this economic insecurity can induce a level of food insecurity that starts as moderate and can become severe over time.

3.3. In addition to the economic problems they face and their inability to feed their families properly, emigrants from middle and low socio-economic strata have to acquire debts (with family assets as collateral) to pay for the emigration journey to the USA or elsewhere.

3.4. For the poorest strata of the population, using a migrant smuggler is not an affordable option - unless they have a relative who has previously emigrated and can cover the costs. Most emigrants in this category attempt to go on their own (without using a migrant smuggler) with increased risks of not reaching their intended destination. Their departure can translate into destitution for relatives who stay behind.

3.5. Poverty is also described by emigrants' families as a lack of capacity to adequately feed family members and pay for other basic needs.

3.6. There is often a perception that families with members who have successfully emigrated to the United States have adequate resources due to the remittances they receive. This does not account, however, for the costs of emigration and the impacts on the family members who stay behind. This study finds that those remittances do not always fully cover the total costs of emigration for family members, at least in the short to mid-term. The study found that 40 percent of households with emigrants have acquired debt and that remittances do not begin at the time of emigration. When remittances do begin to flow, most of the income goes towards debt repayment and consumption of basic foods. In the cases where emigrants stabilize and get gainful employment, more than half of the remittances are used to buy food in the three countries, followed by agricultural investments (buying land and animals and investments in small businesses) in El Salvador. The second destination in Guatemala and Honduras is education and healthcare. The study also found that in some cases, families who receive remittances are automatically excluded from social programmes, in certain cases with the approval of other community members.

3.7. There is a large difference between the minimum and maximum values of the remittances (US\$50 to US\$1,000/month) received by remaining family members. Without knowing how much each individual family receives, it is not possible to estimate which families continue to be food insecure despite the support from abroad and which families improve their financial situation.

3.8. If remittances can provide for improved food access, but do not sufficiently offset debts incurred to finance emigration costs, or offset labour force losses, the net result will be continued economic hardship. As a result, when remittances are not productively exploited, even families who regularly receive remittances appear to be stuck in a poverty trap and/or potential need to emigrate.

# 4. CLIMATE CONDITIONS, FOOD INSECURITY AND EMIGRATION

4.1. Adverse climate conditions in the Dry Corridor negatively affect food and nutritional security through declines in the local production of food, as well as a reduced availability of agricultural work opportunities. There appears to be a connection between the appearance of El Niño in 2014 and an increase in irregular emigration to the USA.

4.2. Members of families affected by the drought are 1.5 percent more likely to emigrate than similar households elsewhere. Although this is a low value, the significance lies in the fact that the correlation between drought occurrence and emigration is positive and the probability of emigrating is higher than that of families who are not from the Dry Corridor.

4.3. It clearly emerges from several studies that climate change and emigration are strongly linked. The present study did not have a focus on climate change. However, challenges stemming from climate variability, poor rainfall distribution and drought, were identified in this study as key push factors for temporary and/or permanent emigration, reflecting a response to environmental adversity. Smallholder farmers, poorer fisher folk and other IFAD target groups are among the ones who suffer the most from climate change. With the region expected to face multiple impacts of climate change in the years ahead, migration may increase its shift from affected rural areas to other

AR333

areas that experience lower environmental risks, including neighboring countries.

4.4. On the other hand, communities affected by drought conditions are also affected by unemployment, short duration of seasonal labour demand, as well as by low and irregularly paid wages. Emigration is a common coping mechanism in these communities.

4.5. It would be incorrect to conclude that in general, families are worse off when migrating. The positive impact of remittances can be observed sometimes by simple observation, but for the analysis of vulnerability and food insecurity, the attention of this study goes to those cases where the cycle of getting employment, sending remittances to pay debts and stabilizing remittances to normal and regular levels are not reached.

# 5. FOOD SECURITY AND EMIGRATION

5.1. **Food insecurity**, seen by the population as the **inability to bring food to the table**, can trigger the decision to emigrate. Moreover, the family members who stay behind can go through a period of aggravated problems to cover their food needs because they lost a food provider, they are indebted and, in the case of those who are deported or die during the journey, the crisis can extend and even lead to losing the family livelihood.

5.2. The proportion of food insecurity among families with a recently emigrated member is very high as per the WFP Food Security Index: 47% of households were found to be food insecure. This included 38% with moderate food insecurity and 9% with severe food insecurity. **These high levels of food insecurity have not been seen in the region before, including during the repeated food security emergency assessments conducted by WFP since El Niño emerged in 2014,** (please refer to figures 14, 15 and 16 in the main report using the link provided on the cover.)

5.3. The conclusions with respect to food access and according to a socio-economic classification of families provided by community members and key informants, are as follows:

- On average, a third of the families are considered as having sufficient access to food, be it through their own activities or with support from remittances.
- Another third of the families have some access to food but no long-term economic security. They consider emigration as an option. They tend to look for and take advantage of, local food assistance programmes.
- The third group, represented respectively by 35%, 40% and 27% of the families in El Salvador, Guatemala and Honduras, respectively, live in extreme poverty, have inadequate access to food and would emigrate if an opportunity presented itself.

5.4 **When a desperate situation forces the poorest families to emigrate, they take the highest risks relative to dangers for survival and sustaining their livelihood.** Community members and key informants consider food assistance as a mitigating factor to help solve some of their situation; they highly valued this assistance and related it to avoiding "forced" emigration.



- ● Enough food from remittances and other income
- ● Access to food in economic instability
- ● Live in extreme poverty

5.5. Some 70% of the families with recently migrated relatives in El Salvador and 58% in Guatemala, stated that they had not participated in food assistance programmes before or after the departure of their relatives. Receiving food assistance has been very important for families with recently emigrated relatives. Whilst having members of the family living abroad is not a

AR334

selection criterion for WFP food assistance programmes, (although it becomes important when communities make their recommendations on the families who are to receive assistance), **the high rates of food insecurity among these families suggest the conclusion that food insecurity is not only a cause for emigration. It is also an outcome which needs to be fully understood if appropriate actions are to be identified to mitigate the effects of emigration.**

5.6. Food assistance is considered very important particularly during the period when the emigrant settles down at his/her destination, finds a job, is able to send remittances and the family who stayed behind repays loans and other debts. Despite the importance of food assistance during this settling-in period, its role may be much more important **before** emigration takes place, to mitigate the push effect of food insecurity and avoid negative outcomes.

# 6. IMPACTS OF EMIGRATION

*6.1. Positive impacts on family members at the place of origin*

6.1.1 In the case of emigrants who manage to reach the USA, an average of 78% of their families report receiving US$50 to US$1,000 a month by way of remittances. Those receiving higher amounts are likely to repay debts. The amount tends to decrease and stabilize after debts have been repaid. Once stabilized, more than half of the remittances are used to buy food; followed by agricultural investments (buying land, animals) and investments in small businesses. Left-over funds are allocated to education, medicine, utility bills, or buying home appliances. There is an undetermined period between when emigration takes place and the receipt of the first remittances to support family consumption. Economic stress is very high during this period. One of the main impacts of remittances is to improve the families' well-being, especially their food consumption.

6.1.2 There are positive and negative effects on women when men emigrate. Women take charge, managing the remittances and family resources. This is likely to have a positive effect on food consumption and on the wellbeing of the family as a whole, making women's empowerment an important area for action.

6.1.3 When emigration is motivated to escape threats of violence, successful emigrants may gain personal security at their destinations. However, they may have to endure violence during their migration journey.

6.1.4 If well managed, remittances enable children of recipient families to receive proper education and then become productively employed in a variety of activities.

*6.2. Negative impacts for family members in the place or origin:*

6.2.1 When funds to emigrate come from loans or sale of properties and assets, then debts, mortgages and economic scarcity lands on the relatives who stay behind. Their economic situation is negatively impacted and may become aggravated over time, when they receive little by way of remittances or any other assistance. Acquired emigration debts have to be repaid, independently of whether the emigrant successfully reached the intended destination and engaged in gainful activities or not. Indebted deportees many times cannot go back home because creditors will be asking for payment of the debt.

6.2.2 When women replace absent men in agricultural labour and production, an added burden is introduced for them, as this is usually added to their normal household and child-caring responsibilities. During the stressful period between the start of the emigration journey and receiving assistance, women have to take care of all family needs and may have to engage in extra economic activities to survive. The above can translate into further food insecurity.

6.2.3 Emigration reduces the labour force of the family, which may have a negative impact on agricultural production, livestock rearing and other economic activities and thus decrease family incomes.

6.2.4 Family disintegration, alteration of family structure and functions and increased perception of vulnerability and danger are socio-psychological impacts of emigration. The above increases the burden on family members who stay behind and can lead to exposure to new risks.

AR335

6.2.5 As reported by community members, there are cases where young family members who benefit from remittances end up abandoning school and jobs and may get involved in drug consumption or illegal and violent activities. This is clearly a protection issue of concern for humanitarian organizations and communities alike. The study did not include data to analyse the impact of remittances on education. But it may be assumed that the positive impact of remittances on supporting educational opportunities for young family members will outweigh any negative impacts.

support and may eventually also provide economic support.

7.4. WFP has been providing food assistance to vulnerable families in the Dry Corridor. They were targeted because of the drought and crop losses. It also became apparent that many of these families have recently migrated relatives and had not received any remittances. Food assistance is described by these families as life-saving. Food insecurity among families with emigrated members is high in the Central American Dry Corridor, as evidenced by the WFP food security emergency assessments in the three countries studied.

| | Positive | Negative |
|---|---|---|
| **When remittances cover debt** | • Families can cover basic needs<br>• Invest in the household<br>• Invest in education | • One less family member<br>• Increase work burden<br>• Socio-psychological impacts<br>• Reliance on networks and community |
| **When remittances do not cover debt** | • If emigrant is fleeing violence, they gain security | • Sale of household assets<br>• Additional burden on women´s time |

# 7. SURVIVAL STRATEGIES OF FAMILIES THAT DO NOT RECEIVE REMITTANCES

7.1. Relatives who stay behind often have to assume the work (crops, domestic animals) previously undertaken by the emigrant(s) or take on wage labour jobs (*jornaleo*, domestic services) and this may be the case whether the family receives remittances or not.

7.2. Returnees may be able to repay emigration debts if they manage to earn and save money when abroad. To pay off debts they may sell properties and assets, obtain credits and loans, or ask for help from someone in the USA. There are reportedly many indebted returnees in the emigrants´ communities who were caught and deported upon arrival, who may also face higher levels of indebtedness and possibly livelihood loss.

7.3. Emigrants´ families and returnees (voluntary and deported) look for the support of organizations that are present in their communities. Some of them are international organizations, which provide institutional and legal support, as well as contacts with assistance programmes. Others are local entities, which provide legal and political

# 8. VIOLENCE, FOOD AND NUTRITIONAL SECURITY

8.1. The term "violence" includes extortion, gangs, threats, assaults, robbery and domestic violence, as well as gender based violence and death sentences for youngsters who refuse to join or collaborate with gangs. There are differences between El Salvador and the other two countries in terms of the role that violence plays in emigration decisions and food and nutritional insecurity. In El Salvador, violence was mentioned without restrictions (unlike Honduras) and came up as an important push-factor for emigration. The role of violence in Honduras is not clear due to the self-restriction by community members to discuss it openly. For Guatemala, the discussions were open and violence did not come up at the top of the triggering factors.

8.2. In the three countries, the families receiving remittances can be the subjects of threats and extortion. While in El Salvador violence was identified as a factor severely affecting normal economic activities, in Guatemala and Honduras this does not receive the same level of consideration, which does not mean that the problem is inexistent.

8.3. Only in El Salvador was it reported that voluntary and deported returnees engage in violent actions.

8.4. The interviewed citizens consider violence as a cause of both poverty and losing the capacity to properly feed their families. Violence represents restrictions to work and a constant loss of already restricted economic resources. Violence also create Protection issues.

8.5. The journey´s risks related to informal emigration are well known and documented.

The spike in recent emigration levels as well as increased numbers of unaccompanied children are a concern. Protection issues related to family members who stay behind also need to be addressed.

8.6. Protection needs to be mainstreamed into existing social assistance programmes in the Dry Corridor. Furthermore, governments and organizations with a Protection mandate must consider how to better address these specific issues along the emigration chain, both for family members who stay behind and for the broader community in areas with high levels of emigration.

# Recommendations

**Reducing vulnerability**
- Resilient livelihoods
- Hazard monitoring
- Risk insurance
- Community involvement
- Infrastructure & services
- Local market opportunities

**International cooperation**
- Prevent food insecurity and emigration
- Strengthen policy & action frameworks
- Promote regional alliances

**Response to migration crisis**
- Early response
- Protection
- Migration Crisis Operational Framework
- Targeted food assistance

**Social protection related**
- Targeting vulnerable households
- Public social protection sensitive to food insecurity
- Gender & family composition
- Develop crisis modifiers
- Reduce influence of push-factors
- Attend seasonal stress
- Link remittances with financial inclusion

**Protection, prevention and adaptation**
- Legal, social, & psychological support
- Community involvement
- Support deported returnees
- Address violence as cause of emigration
- Gender transformative approach

AR337

The findings of the study lead to certain reflexions regarding required policies and actions to deal with emigration from the Dry Corridor of the three countries. They lay the foundations for specific areas of actions to mitigate the emigration push-factors through actions like social safety nets, gender empowerment and protection measures. Research needs can also be identified to help shape prevention, mitigation and response measures to reduce the impacts of emigration on vulnerable populations.

It is expected that the study findings provide valuable input for policy and programmatic decisions by the three Governments as well as WFP and its partners. The study also provides justification for actions and investments for a large number of institutions and stakeholders. This will necessarily require broadly based consultations among all actors: governments, international organizations, local authorities, civil society organizations and the communities where emigration originates. Some general recommendations to guide actions are identified below.

## REDUCING VULNERABILITY TO PUSH-FACTORS

### Resilience and Climate Change Adaptation Related

Climate surveillance initiatives and trend analyses of climatic variables affecting crop production, combined with soil use/productive capacity and natural disaster monitoring, should be strengthened with the aim to identify critical areas that will incorporate special preventative emigration measures (geographical targeting). The use of WFP´s Integrated Context Analysis could be one tool to facilitate this analysis and should be promoted across the three countries as a starting point. This will bring together a wide range a partners, including national authorities and other development-oriented actors.

To enhance climate variability resilience, more comprehensive climate change adaptation efforts need to be pursued through a combination of both community-based and institutional-strengthening initiatives. In particular, integration with risk transfer schemes, such as weather-based parametric insurance for vulnerable farmers, might be a promising opportunity.

Financial mechanisms need to be created to ensure access to agricultural inputs for food production (cereals and pulses), as well as technical assistance and insurance schemes.

Recognizing the increasing frequency of water stress, dry spells and droughts in the Dry Corridor and using a resilience approach, it is important to create programmes to improve water management, such as small irrigation schemes, protection of water sources and agriculture diversification in areas identified as priority. These efforts, as well as community-based social safety nets aiming to increase food availability and access, need to be strengthened and integrated into community, district and departmental development plans.

These efforts need to recognize the dynamics of the Dry Corridor, each of the three countries and the sub-region. In particular, while larger-scale investments in agricultural infrastructure would result in higher gains in production, the particular vulnerability of many households who benefit from agriculture in the area would not necessarily decrease. This is due to a combination of land tenure issues (not addressed in this study) and historical precedents in which such investments often result in advantageous purchases of improved lands from marginal households.

Promote risk reduction approaches to make communities less vulnerable to shocks. Strengthen informal and formal institutions at the local level with the aim to enhance the coping capacity of the communities and make them more resilient through measures designed to prevent, respond and recover from crisis situations.

Measures are needed to create local market opportunities for diversified food production by small-scale producers.

When food assistance is provided by WFP, or others, to mitigate push-factors for emigration or to respond to emergencies, the seasonality of food production and the length of the lean season should be considered to determine the duration of the assistance. This should be done instead of limiting assistance to a specific period independent of aggravating factors.

AR338

## Responses to migration crises

For the studied countries, it is important to improve and systematize the way in which they respond to the assistance and protection needs of crisis-affected, vulnerable populations.

A useful tool for them to develop these kind of responses is the Migration Crisis Operational Framework (MCOF), which is an analytical and operational tool designed to enable countries to provide a holistic response to the complex nature of crisis-generated population flows. Therefore, it looks at all phases of a crisis (before, during, after) as a whole and considers the specific needs and vulnerabilities of crisis-affected migrants who fall outside of existing protection frameworks. Accordingly, the MCOF aims to identify and address institutional and operational gaps that exist in the current set-up of international responses to crises with a migration dimension. The Framework thus allows countries to respond to migration crises in a more coordinated, inter-connected way.

## Social protection related

Considering the long chain of events that are required for remittances to turn a positive balance in the life of the most vulnerable, it is recommended that food security programmes and other social programmes should increasingly take into account the vulnerability level of families with recent emigrants. This should apply to public social protection programmes and to assistance provided by international and national organizations. The family composition should be considered, particularly the number of small children and elderly persons and whether the family is headed by a woman.

Develop crisis modifiers within social protection schemes to be alerted through surveillance of emigration push-factors at community and household levels. The aim is to prevent or offset in a timely manner the increasing pressure of these push-factors. This can also be informed by ongoing work by study partners, as well as by an ongoing WFP and Oxford Policy Management study on Shock Responsive Social Protection. The aim should be for social protection systems to increasingly emphasize the importance of adaptation and seasonal stresses while, also potentially serving as a tool to define unexpected needs following a shock.

Improve education coverage and training services to teach income-generation skills for children and youth, with incentives to stay in school. Support school meals transfers and connect school feeding programmes with local small-scale producers, thus creating new local markets for food production, while also working with those producers to improve product quality and supply consistency.

Introduce disaster risk reduction and food and nutritional security to agricultural development initiatives, directly engaging national authorities, local governments and communities, promoting partnerships among local actors and community empowerment.

Recognizing the high transfer costs of sending remittances back home, discuss with Remittance Service Providers (MTOs, FinTechs, mobile companies, MFIs, banks, postal operators and others) how to lower transfer costs, facilitate transfers into the most remote areas and link them to additional financial services in order to promote financial inclusion. The idea is to approach money transfer companies to suggest and support linkages with financial institutions so recipients can be linked with financial products through their remittances. In other words, promote the linkage of remittances and financial inclusion which, as has been demonstrated so far, notably by IFAD, to be one of the greatest development impacts that remittances can have at the family unit level. In terms of reducing the cost, the rationale is that greater competition – innovation in the market place coupled with an enabling environment (regulatory framework) – will expand the market by providing recipients with more options while reducing transaction costs.

## Adequately Addressing Protection, Prevention and Adaptation Issues

Provide legal, social and psychological support for families with members who emigrated and who have compromised their livelihoods due to debts, mortgaged assets and loss of family labour. This must be a community-driven initiative to ensure proper targeting, making communities full partners and empowering them to make protection and prevention decisions that affect the community and the families with members who emigrated. It also involves the involvement of the beneficiaries in the participatory monitoring of activities and also of the implementers.

AR339

Support deported returnees with protection services, particularly when violence was the push-factor for emigration and create incentives to restore their livelihoods through the provision of a minimum set of resources.

Governments and the international community need to recognize that violence, particularly in El Salvador but possibly also in other Central American countries, is effectively a humanitarian emergency. Violence has significantly impeded development and while the levels of violence in the three countries of the study do not represent a traditional conflict but criminal acts, the impacts of violence are creating humanitarian needs.

There is a need to further ensure that gender needs are addressed, equal opportunities are created and assistance to the most vulnerable people prioritized with gender transformative approaches. As more men than women emigrate, the women who stay behind have to assume new responsibilities, including in agricultural production and in managing the family resources, in addition to their traditional tasks. Women's empowerment must prepare them to assume these new roles. This calls for targeted actions aimed at empowering women and to strengthen solidarity networks among women.

As it is foreseeable that climate change might continue during the near future, developing viable, specific solutions and policies (including National Adaptation Plans) to reduce forced movement is essential. Also important, such forced movements should be transformed into well-managed relocations within internal borders to help foster the resilience of individuals and communities, consequently creating diverse opportunities for livelihoods.

## INTERNATIONAL COOPERATION AND NATIONAL INSTITUTIONS

Preventing emigration caused by food insecurity should be strengthened in national initiatives linked to the SDGs and should be fully incorporated in relevant social protection, violence, as well as environmental management policy and action frameworks.

National Governments should take into consideration the identified effects of food insecurity on emigration to promote public policies and development plans focused on the vulnerabilities of the Dry Corridor of El Salvador, Guatemala and Honduras.

Promote regional alliances (UN and other international development agencies, donors and financial institutions, Civil Society), starting with the stakeholders of this study to support the government's public policies and action frameworks to reduce food and nutritional insecurity, violence and climatic events related to emigration.

All initiatives of the UN system addressing protection concerns should include a focus on food security and nutrition for an integrated approach.

Joint efforts to reduce migration and promote human development, such as the alliance for prosperity, should take into consideration long-term investment in food security and nutrition.

AR340

To download the electronic version  please scan the code


**WFP**
**World Food Programme**
wfp.org

**For more information contact:**
Regional Bureau for Latin America and the Caribbean
**World Food Programme**
Gaillard Ave. and Vicente Bonilla St.
Buildings 124-125 – City of Knowledge,
Clayton, Panama City / Tel. (507) 317-3900

AR341



# FOOD SECURITY AND EMIGRATION
Why people flee and the impact on family members
left behind in El Salvador, Guatemala and Honduras

Research report







AR342
September 2017

FOOD SECURITY AND EMIGRATION

A summary of this report
is available at the following
link/QR code:



https://docs.wfp.org/api/documents/WFP-0000019632/download/

© All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording or otherwise) without prior permission. This document has not been subject to an editorial review. This material has been funded by the World Food Programme, the Inter-American Development Bank and the International Fund for Agricultural Development; however the views expressed do not necessarily reflect the official position of IADB, IFAD, IOM, OAS or WFP. The responsibility for the opinions expressed in this report rests solely with the authors.

AR343

# Foreword

Migration, food security, violence and climate variability have been studied increasingly in recent years, both in Latin America and beyond in an effort to better understand what drives people to leave their homes and countries. Yet often these issues have been examined separately rather than together.

Migration from Central America to North America is not a new phenomenon, nor is it one that is likely to end soon. The number of irregular migrants apprehended at the United States of America border with Mexico increased fivefold from 2010 to 2015. The numbers of unaccompanied children picked up arriving from El Salvador, Guatemala, and Honduras surged between 2015 and 2016. This flow of people coincided with a period of heightened food insecurity in the Dry Corridor that traverses these three countries, known for its prolonged dry spells and droughts.

It is in this context that the World Food Programme (WFP), the Inter-American Development Bank (IADB), the International Fund for Agricultural Development (IFAD), the Organization of American States (OAS) and the International Organization for Migration (IOM) have come together to strengthen the evidence base around these key issues to help inform policies and programmes in Latin America. This study highlights the link between food insecurity and migration, and describes the main push-factors that trigger the decision to leave one's homeland, such as poverty, violence and climate variability.

Building on Hunger Without Borders, an exploratory study conducted in 2015 by WFP, IOM, OAS and the London School of Economics, this report provides greater analysis of the dynamics of emigration and its links to food insecurity, along with important insight into why people flee and into the impact of emigration on the family who remain at their places of origin. The findings reveal some important misperceptions about the role of remittances and bring to light the precarious situation of people remaining at home without sufficient access to food.

We hope that this study will be a useful tool to strengthen the design of programmes and policies targeting the most vulnerable population segments and catalyze discussions among governments, development partners and civil society, all committed to achieving the Sustainable Development Goals and, in particular, reaching Zero Hunger. It is also our hope that this study highlights the importance of long-term investments to enhance the food security and nutrition of people in the Dry Corridor of El Salvador, Guatemala and Honduras, as this may reduce their propensity to emigrate.

WFP presents this report recognizing that without the support of the IADB, IFAD, OAS and IOM, as well as the governments of the three countries, the study could not have taken place.

**Miguel Barreto**

Regional Director for Latin America and the Caribbean

United Nations World Food Programme

AR344

# Acknowledgements

This document is based on research conducted by the United Nations World Food Programme (WFP) Regional Bureau for Latin America and the Caribbean, with the participation of the International Organization for Migration (IOM) and the Inter-American Development Bank (IDB) and the collaboration of the International Fund for Agricultural Development (IFAD) and the Organization of American States (OAS).

The research took place in the Dry Corridor of El Salvador, Guatemala and Honduras. The authors would like to recognize the invaluable collaboration of over 700 women and men from the communities visited across the region, the local and municipal authorities, as well as volunteers that facilitated the meetings. Regis Chapman coordinated the work, while Byron Ponce-Segura managed the design, desktop and field operations. Both officials are based at the WFP Regional Bureau for Latin America and the Caribbean.

There is a large list of outstanding collaborators to this study: WFP Country Directors: Nils Grede in El Salvador, Pasqualina Di Sirio in Honduras and Mario Touchette in Guatemala, as well as their teams; Marcelo Pisani IOM Regional Director for Central America, North America and the Caribbean and the IOM country teams; the Central America, Mexico, Panama and Dominican Republic Country Department at the IDB, where statistical and econometric analysis were conducted using government and WFP databases.

Various consultants and WFP staff supported the fieldwork. Danilo Palma Ramos supported the design of the methodology and led the field coordination in all three countries. The field team in El Salvador was composed of Olga Lucía Rodríguez (team leader) and Nidia María Umaña as well as and WFP staff Vittorina Sola and María Cristina Gálvez. In Honduras, the team leader was Mercedes Elena Flores, who was supported by Ana Ruth Reyes, from (IOM), as well as Harieth Marizol Nuñez, Rosa Mercedes Escolán and Mario Guillermo Suazo. Guatemala´s team was led by Arandi Melgar Castro, with support from Luis Guillermo Guerra Bone, Verónica Tobar Rodríguez and Nidia A. Ramírez Campos.

Special thanks go to Marcia Bebianno Simoes, Migration Specialist of the Social Inclusion Department of OAS; to Joaquin Lozano, Director for Latin America and the Caribbean, as well as to Pedro Tigre De Vasconcelos, from the IFAD Policy & Technical Advisory Division for their support and contribution to the report. From the Panama Regional Bureau, we would like to recognize vulnerability analysis and mapping analysts Ana Gómez-Sánchez and Annette Castillo. Sincere thanks also go to Angela Koch-McBerry for editing, Maarten Immink for his kind review and Annalissa Tabarini for translating from English to Spanish. Finally, Andrea Cristina Ruiz, intern from Columbia University, joined the team in the last stages and made important contributions. A number of other WFP staff were also critical to the completion of this work.

AR345

# Executive summary

Building on the results and recommendations of the exploratory study on the links between Migration and Food Security ("Hunger without Borders", 2015), WFP and its partners decided to further study linkages between food insecurity and migration, relying on qualitative and quantitative analysis.

Emigration (or out-migration) trends in Central America are conditioned by political and socio-economic conditions in the region and increase in response to civil strife and poverty. This study collected and analyzed data on food security and environmental and climatic factors as potential triggers for out-migration. The geographical focus of the study was El Salvador, Guatemala, and Honduras, particularly the most vulnerable part of these countries known as the Dry Corridor.

**The propensity to migrate from food insecure regions of Central America is higher among the younger and more vulnerable people.** While migration from Mexico to the United States of America (USA) diminished in recent years, the flow of emigrants from El Salvador, Guatemala and Honduras has increased substantially since 2010. While the proportion of women and young people among the emigrants from the Dry Corridor increased in the past two years, the majority of people leaving their country are men.

According to the United States Customs and Border Protection (CBP), the number of "illegal aliens" as defined by the CBP, who were "apprehended" or detained in the Southwest border region of the USA, increased from around 50,000 during the fiscal year (FY) 2010 to more than 250,000 in FY 2014. Although the number of apprehended declined in FY 2015 to 218,810 people, in FY 2016, this number increased to 408,870. Although more apprehensions do not necessarily imply greater migrant flows, apprehensions are often considered as a proxy indicator of the total number of persons who attempt to cross the border irregularly during a certain period.

The almost 50 percent increase from FY 2015 to FY 2016 in the number of unaccompanied children (persons 16 years old or under) apprehended by USA border authorities is of great concern.

Emigrants from El Salvador, Guatemala and Honduras returned by the Mexican authorities to their respective countries of origin were primarily men (79 percent); 050 percent of them were working in the agricultural sector before migrating. Emigrants reported the lack of employment or economic hardship (65 percent), followed by low income and poor working conditions (19 percent) and violence and insecurity (9 percent) as the main reasons for migrating. Family reunification was only indicated as a reason in one percent of the responses, according to official reports.

**The Dry Corridor is generally characterized by high unemployment, limited and seasonal labor demands and low and irregularly paid wages**. More than half of the households interviewed reported spending more than two thirds of their income on food, which reflects a high level of economic vulnerability to food insecurity. Recent years have seen household food production further reduced due to poor rainfall and droughts linked to the El Niño phenomenon. Outside the Dry Corridor, employment opportunities in coffee production have also been reduced due to the coffee rust crisis. **Adverse climatic conditions in the Dry Corridor affect food security** by curbing agricultural productivity in commercial and subsistence farming as well as agricultural work opportunities. **The El Niño drought conditions that started in 2014 caused a significant increase in irregular migration to the USA.**

For this study, three national teams visited key districts, previously identified by key informants as having significant emigration to the USA. In addition, secondary data analysis was conducted using information provided by Mexican and USA migration authorities.

This information was complemented with key informant interviews, separate focus group discussions with men and women and a household food security survey. The survey targeted families where members had left the country since the last El Niño episode (2014-2016).

AR346

A qualitative study was conducted in 22 communities of the Dry Corridor in the three countries. Fifty-four key informants were interviewed, while some 660 community members participated in 44 focus group discussions (one for men and women in each location). Participants in the focus group discussions estimated that around 35 percent of emigrants from El Salvador, 25 percent from Guatemala and 9 percent from Honduras travelled with a valid visa but then stayed in the USA beyond the validity of their visas. Those who travel with valid visas usually have the necessary financial and social capital to facilitate their journey. However, migrants who travel without valid visas often use a migrant smuggler, pay high costs and acquire debt, often using their assets (such as a house and/or land) as collateral.

Thus, emigration negatively impacts family members left behind, who have to assume the debts incurred. Debts levels increase in cases of unsuccessful emigration. **Successful migrants provide vital support to the family who is left behind by    regularly sending remittances.**

In the cases of successful emigration, 78 percent of households in the home country receive monthly "remittances", of which 42 percent indicate that remittances are their only source of income. More than half of the funds are used to buy food, followed by agricultural investments (buying land and animals) and investments in small businesses. Remittances are also spent on education and healthcare. Improved family well-being, especially enhanced diets, are some of the main impacts of remittances on households in the home country.

When those families do not receive remittances or other assistance, their economic situation progressively worsens. This may also result in changes in the division of labor in the family. Those household shifts may result in household members assuming different roles with related negative consequences. For example, women often have to undertake the agricultural activities of departed men on top of their traditional domestic responsibilities. Overall, emigration reduces the available work force and if not offset by remittances, typically results in increased food insecurity and deepening of poverty.

**There is clearly is a link between food insecurity and emigration from the three countries.** Poverty and unemployment are the general causes of emigration, followed by reduced agricultural productivity, adverse climatic events such as droughts, pests that result in crop losses and the widespread occurrence of violence. The high rates of food insecurity found in the households that participated in this study demonstrate the linkages between emigration and food insecurity. **Nearly half (47 percent) of the families interviewed during this study were food insecure** (38 percent were moderately food insecure and 9 percent were severely food insecure). **These levels of food insecurity have not been previously seen in the region**, including in the results of various assessments over the past three years that focused on drought and the effects of El Niño in the Dry Corridor.

**The findings revealed that nearly three- quarters (72 percent) of households are already applying emergency coping strategies:** such as selling land. Again, this is well above what is normally seen in the region in times of shock. What increases concerns is that none of the households had the capacity to apply less extreme "stress coping" strategies, as they had already depleted such options. This reflects a concerning **cumulative effect over time on food insecurity**, as well as the very limited resilience such households have to protect themselves against shocks and their effects.

**While only 19 percent of interviewed households had unacceptably low food consumption levels, the lack of dietary diversity is of major concern**, even among those households with adequate total consumption levels. This finding is not new for the Dry Corridor, but it raises concerns about overall dietary quality and its impacts on health and nutrition. Guatemala, in particular, has levels of food consumption that point to a major problem, with 42 percent of interviewed households having poor or borderline food consumption levels.

**Violence also plays an important role in serving as a reason for migration in El Salvador**, where it was reported as a sensitive trigger, while in Guatemala and Honduras it was found to be less important.

The information collected through this study allows for the development of several policy and programmatic recommendations aiming at mitigating the impact of the variables acting as emigration push-factors, with a focus on food insecurity.

AR347

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................................................5

ACRONYMS and ABBREVIATIONS (Spanish and English) ............................................................11

I. GENERAL DESCRIPTION OF THE STUDY ................................................................................13

A.  Study Framework ......................................................................................................................13

A.1. Background and Justification .................................................................................................13

A.2. Study: Food Security, Migration and Violence in the Dry Corridor of El Salvador,

Guatemala And Honduras ............................................................................................................14

A.2.1. Focus and objectives of the study ....................................................................................14

A.2.2. Study Methods ..................................................................................................................14

B.  SECONDARY DATA REVIEW ON FOOD SECURITY AND MIGRATION .........................................15

B.1. The Food Security conceptual framework ...........................................................................15

B.2.Migration, Remittances, and Food Security.........................................................................17

B.3. Recent migration in the Americas........................................................................................18

C.  LOCATIONSOF THE STUDY......................................................................................................19

C.1. General Data .......................................................................................................................19

C.2. The Dry Corridor of El Salvador, Guatemala and Honduras ...............................................19

C.3. Food Security conditions.....................................................................................................21

C.4. Migration from El Salvador, Guatemala and Honduras.......................................................23

C.5. Violence and Emigration .....................................................................................................23

II. SURVEY METHODS AND RESULTS - THE QUANTITATIVE COMPONENT ....................................24

A. Quantitative analysis of migration trends................................................................................24

A.1. Sources of data ...................................................................................................................24

A.2. Methods ..............................................................................................................................24

A.3. Background data on migration in Central America .............................................................24

A.4. Characteristics of the migrants ...........................................................................................27

III. SURVEY METHODS AND RESULTS - THE QUALITATIVE COMPONENT ......................................31

A. Methods and techniques of the qualitative component ..........................................................31

A.1. Respondents, data collection techniques and instruments.................................................31

A.2. Strategy of work and calendar.............................................................................................31

B. Qualitative Results..................................................................................................................32

B.1. Migration and the Dry Corridor ..........................................................................................32

B.2. General information about Emigration ................................................................................33

B.3. Triggers for Emigration........................................................................................................34

B.4. Poverty and Migration ........................................................................................................35

B.5. Food Insecurity and Emigration ..........................................................................................37

B.6. Role of violence in Emigration.............................................................................................39

B.7 Effects of emigration on Food Security of households and communities left behind ...............42

B.8. Local Organizations, Relief programmes and Beneficiaries ................................................44

AR348

FOOD SECURITY AND EMIGRATION

B.9. Perceptions and attitudes of the situation..........................................................................44

   B.9.1 Other considerations of the focus groups ....................................................................46

C.HOUSEHOLD SURVEYS: AN EVALUATION OF FOOD SECURITY AND EMIGRATION IN THE DRY

CORRIDOR ................................................................................................................................47

   C.1. Reasons, destination and immediate impacts of emigration .............................................47

   C.2 Remittances and sources of income of families in the country of origin.................................48

   C.3 Food Security situation and vulnerability..........................................................................49

   C.4 Emergency and Crisis Coping Strategies .........................................................................51

   C.5 Results of the Food Security Index (FSI) ..........................................................................52

III. SUMMARY OF CONCLUSIONS.............................................................................................54

   A. Emigration trends in Central America ...............................................................................54

   B. Motives and reasons of Emigration..................................................................................54

   C. Complex role of poverty .................................................................................................54

   D. Climate conditions, Food insecurity and Emigration ..........................................................55

   E. Food and Nutrition Security and Emigration......................................................................56

   F. Impacts of Emigration ...................................................................................................56

   G. Survival strategies of families that do not receive remittances.............................................57

   H. Violence and Food and Nutrition Security..........................................................................58

IV. RECOMMENDATIONS ..........................................................................................................59

   A.Reducing vulnerability to push factors...............................................................................59

   b.Adequately addressing protection and prevention issues. ....................................................60

   C.International cooperation and national institutions................................................................61

ANNEX 1: MIGRATION AND REMITTANCES  RECENT RESEARCH ON MIGRATION ............................67

ANNEX 2: ECONOMETRIC ESTIMATION: MIGRATION DECISION MODEL (PREPARED BY IADB) .........70

ANNEX 3. INTERVIEW GUIDANCE FOR FOCUS GROUPS ANALYZING EMIGRATION .........................72

ANNEX 4. FORM USED FOR DATA REGISTRATION OF FOCUS GROUPS WITH COMUNNITY LEADERS..77

ANNEX 5 HOUSEHOLD SURVEY ...............................................................................................82

ANNEX 6. GUIDE FOR SECONDARY SOURCES REVIEW...............................................................88

ANNEX 7: COOPERATING PERSONS AND ORGANIZATIONS .........................................................89

AR349

## LIST OF FIGURES

Figure 1: Food and Nutrition Security Conceptual Framework

Figure 2: Levels of Food Insecurity in Guatemala, El Salvador and Honduras

Figure 3: Chronic undernutrition in children under-five years of age by Department level in Guatemala, El Salvador and Honduras

Figure 4: Trends in Border Apprehensions of Unaccompanied Children (UAC), by Country of Origin. Fiscal Years 2012-2015

Figure 5: Central American Migrants as a Percentage of Country Population

Figure 6: Apprehensions of irregular migrants other than Mexicans at Southwest Border of the US (Total number by fiscal year)

Figure 7: Unaccompanied Migrant Children Encountered by US authorities (Total number by Fiscal Year)

Figure 8: Family Units Detained by US authorities' (Total number by Fiscal Year)

Figure 9: Southwest Border Apprehensions FY 2012-2016

Figure 10: Irregular Migrants Encountered by Mexican Authorities (Total number by year)

Figure 11: Apprehension of emigrants in Mexico and average precipitation in the El Salvador, Guatemala, and Honduras

Figure 12: Migrants Returned by Mexico Classified by Economic Activity in country of origin

Figure 13: Main reasons for migration, by country

Figure 14: Different impacts of emigration, by country

Figure 15: Food Security Indicator in Dry Corridor (2014-2016)

Figure 16: Food Security Index for surveyed households with members who migrated

Figure 17: Food Security Index for households with members who migrated (2016)

Figure 18: Food consumption, distribution by country

Figure 19: Food consumption/nutritional analysis of all surveyed households

Figure 20: Household's share of food expenditures

Figure 21: Percentage distribution of livelihoods coping strategies applied

AR350

FOOD SECURITY AND EMIGRATION

## INDEX OF TABLES

Table 1: General Data of the El Salvador, Guatemala and Hondu

Table 1: General Data of the El Salvador, Guatemala and Honduras

Table 2: Agglomerate Livelihood Zones of the Dry Corridor, by Country

Table 3: Percentage of migrants returned by Mexico, by departments of origin (2015)

Table 4: Percentage of migrants returned by the US, by departments of origin, 2015

Table 5: Numbers of interviews, focus groups and survey questionnaires, country

Table 6: Reported main reasons for migrating (% total households with migrant members)

Table 7: Food security status of households, by migration status (% of total households with and without migrant members)

Table 8: Percentage of apprehended or returned emigrants

Table 9: Emigration routes described by key informants

Table 10: Main motives for emigration in surveyed communities

Table 11: Main motives for emigration, by order of importance, as reported by focus group participants

Table 12: Proportions of Emigrants according to family member's emigrants they intended to rejoin

Table 13: Local socioeconomic levels of emigrants' families

Table 14: Fees paid to traffickers of irregular emigrants

Table 15: Reported ways to obtain funds for emigration

Table 16: Proportion of families with different levels of food access in the study communities

Table 17: Proportion of key informants who consider undernutrition of children as a contributing motive for adult emigration

Table 18: Existence of food insecurity in emigrants' families before and after emigration

Table 19: Perception of violence intensity in the study communities

Table 20: Forms of violence reported in emigrants' communities

Table 21: Perceptions about effects of violence on subsistence and economic activities

Table 22: Returnees and deported persons' involvement in violent actions

Table 23: Families in emigrants' communities who receive remittances and who receive threats or endure extortions

Table 24: Have families lost food resources due to extortion, theft, and assault

Table 25: FG Discussions: proportion of families who receive remittances and average value and frequency of remittances

Table 26: Allocation of remittances by emigrants' families

Table 27:  Goods and services obtained with money from remittances

Table 28: Organizations of returnees, deported persons and emigrants in the study communities

Table 29: Relief programmes and institutions, and types and frequencies of assistance

Table 30: Key informants' perceptions regarding emigration and economic situations

Table 31: Focus group participants' perceptions regarding situation

Table 32: Focus Group participants' perceptions about their responses to food insecurity in the near future

Table 33: Percentages of families with members who had migrated

Table 34 Migrants' Preferred Destinations, by country.

Table 35: CARI results of households in the studied Dry Corridor.

AR351

**ACRONYMS AND ABBREVIATIONS (SPANISH AND ENGLISH)**

**Internationals  Organization and General Abbreviations**

English name/translation:

WB – The World Bank

FAO – The United Nations Food and Agriculture Organization

INCAP – Institute of Nutrition of Central America and Panama

OECD- Organization for Economic Co-operation and Development

OAS – Organization of American States  Americanos

IOM – International Organization for the Migrations

UN – The United Nations Organization Organization

UNDP – The United Nations Programme for Development

WFP – United Nations World Food Programme

STCNS –Technical Secretariat of the National Security Council

UNICEF –The United Nations Children's Fund

UTSAN – Technical Unit for Food and Nutrition Security

USAID –   United States Agency for International Development

**Institutions of El Salvador**

English name/translation:

CONASAN – National Board of Food Security and Nutrition

COVISAN – Food and Nutritional Security Watch

ESG – El Salvador Government

IMU – Institute of Research, Development and Women Capacity Development

MAG – Ministry of Agriculture and Livestock

MINED – Ministry of Education

PSAN – National Policy of Food and Nutrition Security

SIS – Secretariat for Social Inclusion

**Institutions of Guatemala**

English name/translation:

CICIG– International Commission Against Impunity in Guatemala.

COCODE – Community committee of Development

CRS- Catholic Relief Services

GOG – Government of Guatemala

IEPADES – Institute of Sustainable Development Studies

INE –  National Institute of Statistics

INACIF – National Institute of Forensic Sciences

MINED-Ministry of Education

PNC – National Civil Police

AR352

SEGEPLAN – Planning and Programming Secretariat of the President's Office

SESAN – National Secretariat of Food and Nutritional Security

**Institutions of Honduras**

English name/translation:

CENISS – National Center of Information of the Social Sector

COPECO – Permanent Commission for Contingencies

GOH – Government of Honduras

INE –  National Institute of Statistics

OSC –  Civil Society Organization

UTSAN –  Technical  Unit for the food/ Nutritional Security

**General Terms**

English name/translation:

CARI – Consolidated Approach for Reporting Indicators

CCAFS – Climate Change, Agriculture and Food Security

FG – Focus Groups

HDI – Human Development Index

AR353

# I. GENERAL DESCRIPTION OF THE STUDY

## A.  STUDY FRAMEWORK

### A.1. BACKGROUND AND JUSTIFICATION

Large parts of El Salvador, Guatemala and Honduras have been negatively affected by an extensive dry spell and lack of rains in 2014, compounded by an extraordinarily acute episode of *El Niño* in 2015.  This period produced very irregular rainfall distribution in terms of both frequency and location.  The most affected sub-region was the geographical area known as the "*Central American Dry Corridor*" (CADR).

In response to this situation, among other actions taken, the United Nations World Food Programme (WFP), together with governments in the regions, conducted ten Emergency Food Security Assessments (EFSA) that included household surveys.  While the purpose of these assessments was to identify food insecure population groups, the questionnaires included a short module on migration**.** The results pointed to the need to follow up with more in-depth studies on the relationship between out-migration (emigration) and food security in this vulnerable sub-region.

The first WFP-led emergency assessments in 2014 noted increased migratory trends. This finding was underwritten by the concerns of governments and international organizations, about increasing numbers of undocumented adults and especially accompanied and unaccompanied children (persons sixteen years and under with no accompanying family members), who were arriving in the United States (USA) from Central America. The number seventeen-year-old children also increased, becoming a phenomenon of concern to the International Organization for Migration (IOM).

WFP and the IOM published *Hunger Without Borders* in 2015, a study that considered the potential links between migration, food insecurity, and violence in the El Salvador, Guatemala, and Honduras. [1]The study was written with the support of the Department of International Development at the London School of Economics and Political Science, and participation from the Organization of American States (OAS). The study concluded that food insecurity, violence and outmigration are related variables in the three countries.  The study confirmed that remittances sent from the US represent a significant share of national incomes of the three countries.

Data was collected by qualitative and quantitative methods in areas affected by drought, complemented with data from secondary sources. Within the context of El Salvador, Guatemala, and Honduras, the report states that **there is a relationship between migration, food and nutrition security and violence,** though it is not conclusive regarding the causal process for out-migration.

An independent study had also concluded that economic wellbeing, employment, and family reunification in the destination country are the most commonly cited motives that induce people to emigrate.

The previous studies underline the lack of adequate information on the linkages between food security, violence and migration.  This may be due to limited availability of data, and the focus of studies on poverty as a cause, and migration as an effect.  Several stakeholders agreed that the systematic study of the relationships between food insecurity, migration, and violence would assist planners to develop appropriate responses.

The Organization of American States during its 46th General Assembly in 2016 approved the *Declaration on Climate Change, Food Security and Migration in the Americas*, in which the 34 Member States recognized the positive contributions of migrants to inclusive growth and sustainable development. The *Declaration* established goals to end hunger, achieve food security and better nutrition, as well as transition to sustainable agriculture. At the same time, it urges Member States to implement actions

---

[1] OIM-PMA. "Evaluando el relacionamiento entre la seguridad alimentaria como un factor de migración interna y externa dentro de un contexto de violencia y crimen en los países del Triángulo Norte: Guatemala, Honduras y El Salvador".  Estudio/consultoría de OIM y el PMA; Marcel Arévalo, Consultor y Coordinador Regional del Estudio.  Guatemala, 30 de abril de 2015.  Online version available at the following link: *https://unfccc.int/files/adaptation/groups_committees/loss_and_damage_executive_committee/application/pdf/oim_migracion_y_san_violencia_2015.pdf.*

to cope with the impact of climate change.  The *Declaration* also recognizes that **migration is a multidimensional reality involving various countries of the region and noted the absence of considerations for food and nutrition security in the current debate on migration**.

Furthermore, the *Declaration* highlights the impact of climate change and the cyclical effects of El Niño and La Niña on agricultural and food situations in the region, particularly in the Central American Dry Corridor, Haiti, and other Island States.  It underscores the need to face these challenges with short, medium and long-term strategies, as well as the importance of creating awareness of the impacts of climate change and El Niño and La Niña in the Americas in terms of increasing food and nutrition insecurity and growing migratory flows of the population. To these ends, stakeholders, such as agencies of the OAS and Inter-American System as well as multilateral and specialized agencies, should continuously articulate and coordinate analyses of the possible links between the impacts of climate change on food security and migration patterns.

Likewise, the OAS General Assembly approved, in 2005, the Inter-American Programme for the Promotion and Protection of the Human Rights of Migrants, including migrant workers and their families, updated in 2016. The Programme promotes in-depth studies and the dissemination of information on the causes, consequences, and impacts of migration, on the potential of migrants as agents of development, and on the effects of migration on vulnerable populations.

Finally, it is relevant here to consider the "Additional Protocol to the American Convention on Human Rights in the Area of Economic, Social and Cultural Rights" or the "Protocol of San Salvador", a unique, legally binding instrument for the observance of economic, social, and cultural rights for the citizens of the region.  The Protocol enshrines state obligations to respect, promote and facilitate the implementation of economic, social and cultural rights, including the human right to food, and to provide guarantees for the exercise of these rights by all citizens in the region. It urges state parties to promote greater international cooperation in support of the relevant national policies. The three countries that are subjects of this study have also ratified this instrument.

## A.2. STUDY: FOOD SECURITY, MIGRATION AND VIOLENCE IN THE DRY CORRIDOR OF EL SALVADOR, GUATEMALA AND HONDURAS

### A.2.1. FOCUS AND OBJECTIVES OF THE STUDY

The focus of this study has been on "out-migration" (emigration) across state borders in El Salvador, Guatemala and Honduras and its impacts on food and nutrition security.
The three main study objectives are as follows:
  1. To identify the push-factors for out-migration from communities in the Dry Corridor of El Salvador, Guatemala and Honduras and determine the extent to which food insecurity constitutes one of these motivating factors;
  2. To understand how migration affects those left behind, namely regarding the households' and the communities' food and nutritional security.
  3. To review the potential effects of violence both on food insecurity and out-migration and provide some recommendations on protection elements.

The study explores the relationships between migration and food security, as well as some manifestations of violence and their potential effects on out-migration and food insecurity. Other elements, such as climate change, natural disasters and poverty, are considered but without the detail given to the first two variables.

### A.2.2. STUDY METHODS

Data collection had three main methods, as follows:

- A qualitative component, comprising focus group discussions (FG) and interviews with key informants, through fieldwork in selected communities of the Dry Corridor of El Salvador, Guatemala and Honduras conducted by a WFP team and IOM staff.
- A quantitative statistical component, conducted by analysts of the Inter-American Development Bank (IDB) in collaboration with the WFP Regional Bureau for Latin America and the Caribbean, plus;
- A household survey, done in parallel with the qualitative fieldwork.

## B.  SECONDARY DATA REVIEW ON FOOD SECURITY AND MIGRATION
### B.1. THE FOOD  SECURITY CONCEPTUAL FRAMEWORK

The Food and Nutrition Security Conceptual Framework is based on a systematic understanding of the components of food and nutrition security, vulnerability at community, family, and individual level, and the capitals of the livelihoods approach. The framework  informs:

- The selection of indicators for analysis and use in geographic or household level targeting;
- The design of field assessment instruments; and,
- The organization of standardized reporting formats.

The framework considers **food availability, food access, and food utilization** as core elements of food security, and links them to households' asset endowments, livelihood strategies, and the political, social, institutional, and economic environment. The strength of the household livelihoods approach lies in its ability to obtain a holistic and multidimensional profile of a micro-level context, (food, nutrition, livelihood, and rights-realization), with strong regional and national contextualization, allowing for the scaling-up of interventions.

According to the 1996 World Food Summit Plan of Action, food security exists when all people, at all times, have **physical and economic access** for sufficient, safe, and nutritious food to meet their dietary needs and food preferences for an active and healthy life. The Food and Nutrition Security Conceptual Framework is based on UNICEF's Nutrition Framework and the (DFID) Sustainable Livelihoods Framework (see Figure 1). The analysis of food security begins with an examination of livelihood assets, the agro-ecological, political and institutional context of the area, and the resulting livelihood strategies adopted by the people that may further lead to food security.  Various hazards and gradual changes affect the macro context and household-level assets and strategies, and hence household food security.

The food security status of any household or individual is typically determined by the interaction among a broad range of agro-environmental, socio-economic, and biological factors. This complexity can be simplified by focusing on three distinct, but interrelated, dimensions: aggregate food availability, household food access, and individual food utilization. Achieving national food security requires addressing all three of these separate dimensions, ensuring that:

- the aggregate availability of physical supplies of food from domestic production, commercial imports, food aid, and national stocks is sufficient;
- livelihoods provide adequate access for all members of all households to those food supplies through home production, market purchases, or food transfers from other sources; and
- the utilization of those food supplies is appropriate to meet the specific dietary and health needs of all individuals within a household.

FOOD SECURITY AND EMIGRATION

**Figure 1.  Food and Nutrition Security Conceptual Framework**



Source: WFP

AR357

Vulnerability is a forward-looking concept aimed at assessing community and household exposure and sensitivity to future shocks. Ultimately, the vulnerability of a household or community is determined by the ability to cope with their exposure to the risk posed by shocks such as droughts, floods, crop blight or infestation, economic fluctuations, and conflict, among others. This ability is determined largely by household and community characteristics, most notably a household or community's asset base and the livelihood and food security strategies it pursues.

The framework in Figure 1 shows that exposure to risk is determined by the frequency and severity of natural and manmade hazards, and their socio-economic and geographic scope of conditions. The determinants of coping capacity include household levels of natural, physical, economic, human, social, and political assets; levels of household production; levels of income and consumption, and, most important, the ability of households to diversify their income and consumption sources to mitigate the effects of any shock they face.

Coping behavior involve activities such as the sale of land or other productive assets, the cutting of trees for sale as firewood, and, in an extreme example, the early integration of children in the labor force. These practices undermine not only the long-term productive potential of vulnerable households, but can also degrade important social institutions and relationships. The extent of reliance on these destructive coping practices is an indicator of vulnerability levels during a crisis.

While an understanding of coping mechanisms of households is important for analysis, **knowing how well** these households "cope," or the **resilience of household livelihoods**, is equally or even more important.

How well the local economy can absorb the additional labor or products, such as livestock or firewood, that appear on the market as the result of coping behavior during a disaster, and the stability of wages and prices for those products are critical factors in understanding vulnerability.

**Food security analysis is primarily a static view of food access and household constraints to food access**, from both a short-term or long-term perspective. **In contrast, risk and vulnerability analysis, due to its inclusion of the element of risk that households face in their day-to-day decision-making and their capacity to respond effectively over time, views food access from a more dynamic, forward-looking perspective.**

## B.2.MIGRATION, REMITTANCES, AND FOOD SECURITY

Migration, remittances, climate variability, and food security have received significant attention from the academic literature. However, the intersection between food security and migration, and vice versa, are not as thoroughly explored. The research team compiled an annotated bibliography of relevant literature pertaining to these subjects and presented in Annex 1. Attention to the subject is not purely academic, international organizations and countries have given the matter significant attention as well.

The review found literature on migration in El Salvador, Guatemala, and Honduras. This research focuses on trends in migration like the predominance of the US as a primary destination and the increase of families, women, and children who journey across the border.  Other studies on migration analyze the impacts of trans-nationalism and the impacts of migration on security in countries of origin. Other research provide rich case studies on the migration experience across countries and within specific labor markets.   Migration and remittances in the countries of study are also explored in the context of recent trends and impacts on the region's economy. In addition to trends and estimates on the amount of remittances exchanged by countries, studies delve into the remittances impact on emigrant households.

Extensive research explores the factors contributing to migration and their variation across the countries of study. One of the most salient causes of migration is poverty and economic scarcity. In regions affected by climate change and variability, households emigrate when their livelihood or income sources are affected. Some cultures with high climatic seasonality have incorporated migration as a coping strategy as is the case in Ghana were rural households immigrate to urban areas as a response to rainfall

AR358

availability. When livelihoods are compromised, migration is a coping strategy that can be resilient or erosive depending on the household's vulnerability prior to migration.  Migration to resilient household becomes a means to diversify livelihoods and manage risks. Comparatively, in vulnerable households the costs associated with migration erode benefits form emigration. In essence, migration is a tool for managing risk, including environmental drivers that compromise local conditions and become push factors for migration.

Research on food insecurity finds the main causes of this condition to be from scarce local employment, low and irregularly paid wages, and a limited availability of food. When scarcity arises some households purchase lower quality food, borrow to purchase food, or sell personal items. These coping strategies can have nutritional and health implications. If a household experiences a high state of vulnerability, migration can be erosive and contribute to food insecurity. The extent to which emigrated members can contribute through remittances plays a large role in the household's food security and has the potential to either exacerbate or reduce food insecurity.

Migration and remittances in the countries of study are also explored in the context of recent trends and impacts on the region's economy. In addition to trends and estimates on the amount of remittances exchanged by countries, studies delve into the remittances impact emigrant households. Studies on food security and remittances consider the impact that remittances have on households in origin countries in terms of preferences and access to purchased food. There are trade-offs between income from remittances and productivity losses from a reduction in the labor force once dedicated to agriculture.

### B.3. RECENT MIGRATION IN THE AMERICAS

The OAS and OECD published in 2015 the third edition of a report entitled "International Migration in the Americas." This edition shows that "during the period 2010-2013, international migration into all countries of the Americas increased on average by a modest 5% per year, but jumped to 17% per year in Latin America and the Caribbean, most of the increase due to migration from neighboring countries. If this high rate of increase continues, barring other factors, it would result in an almost doubling of immigration stocks every four years."

"According to the report, this development appears to be associated with a stabilization or decline of migration to OECD countries and, on the other hand, with the growing importance of regional integration processes among countries of the Americas, as evidenced by the Southern Common Market (MERCOSUR), the Andean Community (CAN), the Caribbean Community (CARICOM) and the Central American Integration System (SICA). Other aspects of migration that are examined in the report include the feminization of migration, outflows and expatriation rates, settlement vs return of emigrants, and the issue that highly educated emigrants from the Americas are often over-qualified in the labor markets of destination countries."

The report concludes that intra-regional migration now represents a fourth of all emigration from the countries of Latin America and the Caribbean, and that if current trends continue, intra-regional migration will significantly gain in prominence in the future.

AR359

**Table 1: General Data of the El Salvador, Guatemala and Honduras**

| No. | Features | El Salvador | Guatemala | Honduras |
|---|---|---|---|---|
| 1 | Territorial extension (sq km) | 21,041 | 108,889 | 112,492 |
| 2 | • Population 2015 (World Bank data):<br>• Total<br>• % Urban<br>• % Rural<br>• Population Density Rate (*per* km²) | 6,126,583<br>67.0<br>33.0<br>292 | 16,342,897<br>52.0<br>48.0<br>150 | 8,075,060<br>55.0<br>45.0<br>72 |
| 3 | World Bank Databank Poverty data:<br>Poverty headcount ratio at USD 3.10 a day (2014, % of population)<br>Poverty headcount ratio at USD 1.90 a day (2014, % of population)<br>Gini's Coefficient (distribution of income) | 31.8<br><br>3.0<br><br>0.418 | 59.3<br><br>9.3<br><br>0.487 | 62.8<br><br>16.0<br><br>0.506 |
| 4 | HDI Human uman Development Index (UNDP)<br>Position in Global Ranking on the  Human Development Index 2016 (UNDP)<br>Gender Inequality Index (UNDP) | 0.666<br>117/188<br><br>0.958 | 0.628<br>125/188<br><br>0.989 | 0.606<br>130/188<br><br>0.942 |
| 5 | Prevalence Undernutrition I children under five years of age (WFP) | 14 % (NSN 2014) | 46.5% (NCMHS 2014-2015) | 23 % (NHS 2011-2012) |
| 6 | UNODC Homicide Rate (per 100,000 persons) | 108.64 (2015) | 31.21 (2014) | 63.75 (2015) |
| 7 | The Dry Corridor (WFP):<br>Approximate population (2016)<br>Approximate area (ha) | 490,102<br><br>1,975,905 | 1,263,562<br><br>3,840,743 | 4,083,180<br><br>6,706,847 |

Source: Secondary data assembled by the research team.

## C.  LOCATIONSOF THE STUDY
### C.1. GENERAL DATA

The study was carried out in regions of the Dry Corridor of the three selected countries.
Key statistics on the socio-economic and nutrition situation of the three countries is presented in the below table (national and Dry Corridor level).

### C.2. THE DRY CORRIDOR OF EL SALVADOR, GUATEMALA, AND HONDURAS
The term Dry Corridor suggests a similar ecological basis, defined by a group of ecosystems combined in a region that goes from "the dry forest of Central America beginning in Chiapas (Mexico) and on a strip of land that contains the low lands of the Pacific Slope, to a large part of the premontane central region of Guatemala, El Salvador, Honduras, Nicaragua and part of Costa Rica".  According to FAO, Central America has about "53 million hectares, and about 30% of this surface is located in what is considered to be the dry corridor."

The Dry corridor is not an official geographic demarcation, but rather a characterization of an imprecise geographic zone with a homogenous agro-climate, ecosystems, and livelihoods.  In general, the dry corridor is characterized by an agro-climate of "dry tropical forests with accentuated and long dry seasons ("Verano"), a latent risk of recurring droughts during the reduced rainy season ("Invierno")

AR360

**The predominant ecosystem of the Dry Corridor are:**

■   *At low elevation, deciduous broadleaf lowland forest and broadleaf semi-decidous forest (piedmont, alluvial gallery and lowland can be found.  Secondary ecosystem are deciduous broadleaf evergreen shrubs and micro-broadleaf, seasonal broadleaf evergreen shrub in lower calcareous lowland and montane mixed,  as well as, the savannas of short graminoides with deciduous shrubs.*

■   *In the lowlands and middle elevations, seasonal evergreen broadleaf forest (lower montane or cloud forest, also sub-montane and lowland) can be found.  Seasonal evergreen forest (lower montane, montane, and sub-montane) can be found mainly in Guatemala and Honduras, and to a lesser degree in El Salvador and Nicaragua. In the highlands, pine forests, forest nuboso, broadleaf evergreen forest (sub-montane, montane and lower montane higher) are presented. In addition, mixed seasonal ev-ergreen forest (montane, lower montane, sub-montane and lowland P. caribaea) and semi-deciduous mixed forests (sub-montane and montane lower) are also indentified in highlands.*

■   *The remaining ecosystems are presented over smaller areas within the Dry Corridor. Among the pre-dominant wetland ecosystems are the mongrove forest on the Pacific, albina substrate with sparse vegetation in the Pacific marine sector, and the marshy reedbeds freshwater estuary.  Humanized ecosystems are agricultural systems, urban areas (areas with over 6 months of dry climate) and to a lesser extend reservoirs, and shrimp and salt mines. Some or parts of natural were transformed into systems for the production of a resource that requires the population or market ("land use change) such as mangroves that have been converted int shrimp forms or salt mines and deciduosus forests that have been transformed into pasture or farmland, etc.*

Source: Study of Characterization of the Dry Corridor (CA-4 Countries). FAO, 2012**.**

which arrives late (compared with the rest of the country), an extension of the mid-summer drought[1], and/or a premature halt of the rainy season.

As to the livelihoods characterization of the Dry Corridor, according to FAO the area is divided into 14 agglomerated and well-defined livelihood zones, as shown in Table 1. ("*Estudio de Caracterización del Corredor Seco*"[2])

Poor distribution of irregular rains, drought, environmental degradation, and low crop yields are among the many factors creating vulnerability in the Dry Corridor and they are the common denominators that describe the main challenges for these livelihood zones. The geophysical characteristics and deforestation make the region prone soil degradation, erosion, which increase potential for landslide and watershed altering sedimentation that increase vulnerability.

The percentage of rural population in Central America varies from 38% in El Salvador to 52% in Honduras and Guatemala. The percentage of rural families in the three countries that produce basic grains averages 62% and ranges from 54% in El Salvador and Honduras to 67% in Guatemala. The rest of the rural population (average 38%) of the three countries is dedicated to day labor in agricultural and non-agricultural activities. Therefore, of the 14 livelihoods described above, **agricultural production and day labor are the livelihoods that most characterize the population living in the Dry Corridor**.

Guatemala has the highest percentage of families dedicated to basic grain production (42.5%), followed by Honduras (31%) and El Salvador (24.7%).  **Food production by rural families in the Dry Corridor is primarily for self-consumption and there is not always a surpluses going to the market**. Moreover, WFP Food Security Assessments of the past three years reveal that not only has there been little  surplus for the purpose of sale in the market, but  **rural families have generally not produced enough to cover their basic food needs.** Adding to this hardship, the income of agricultural day laborers in the Dry Corridor "is low."

**Communities in the Dry Corridor have seen a notable rise in food insecurity over the past two years because of two to four years of droughts or dry spells.** The area has been the focus of WFPs longer-term resilience recovering efforts. Nevertheless, the area has increasingly become the focus of humanitarian interventions, as the cumulative impact of these recent dry seasons has led to negative coping strategies among those affected.

---

[1]Peralta Rodriguez 2012 and Hidalgo et al 2015
[2]Estudio de Caracterización del Corredor Seco (Países CA-4). FAO 2012:49

AR361

**Table 1: Agglomerate Livelihood Zones of the Dry Corridor, by Country**

| COUNTRY CODE: | (GUATEMALA=GT; EL SALVADOR=SV, HONDURAS=NH AND NICARAGUA=NI) |
|---|---|
| **LIVELIHOOOD ZONE CODE** | **LIVELIHOOD ZONE DESCRIPTION** |
| **AZMV-1** | Fisheries, aquaculture, tourism and subsistence agriculture (GT, SV, NI) |
| **AZMV-2** | Subsistence agriculture, day labor (HN, GT, SV) |
| **AZMV-3** | Livestock and basic grains (GT, SV, HN, NI) |
| **AZMV-4** | Coffee and basic grains (HN, NI) |
| **AZMV-5** | Coffee, vegetables and spices (GT, HN) |
| **AZMV-6** | Coffee, agribusiness and day labor (SV) |
| **AZMV-7** | Fruit , horticulture , small livestock (HN, GT) |
| **AZMV-8** | Trade, agribusiness, intensive agriculture, "maquila", day labor (NI SV, HN, GT) |
| **AZMV-9** | Urbanized with trade and industry (NI05, SV05, GT10) |
| **AZM-10** | Agricultural area, micro, small and medium enterprises (SMEs) and tourism(NI, GT) |
| **AZM-11** | Agriculture, livestock and forestry extensive (NI) |
| **AZM-12** | Agribusiness, timber industry, mining and coffee (GT) |
| **AZM-13** | Basic grains and wood (HN) |
| **AZM-14** | Timber (HN) |

Source: Study of Characterization of the Dry Corridor (CA-4 Countries), FAO, 2012

This area is largely populated by small farmers, who depend upon rain-fed agriculture in an area extremely prone to droughts, whereas neighboring areas can suffer from periodic floods. Due to the normally short periods of adequate rainfall, idle labor days are quite frequent. The demand for agricultural day laborers comes from farms that produce export crops (sugar cane, coffee, melon and others), in irrigated areas or on commercial farms outside the Dry Corridor. When climatic conditions are also unfavorable outside the Dry Corridor, its inhabitants can go unemployed for long periods, thus affecting not only food production, but also their capacity to buy the food that they cannot produce. Migration is not a recent phenomenon in Central America. Its geographic location and socioeconomic conditions make it both a source of out-migration of its population and a bridge for migrants traveling from South America to North America and other regions of the world. The current focused on the direct and indirect causes of emigration in the Dry Corridor, and the consequences of migratory trends in connection with food security, violence and the immediate results of climate change.

## C.3. FOOD SECURITY CONDITIONS

Honduras, El Salvador and Guatemala are also among the poorest and most food insecure countries in Latin America and the Caribbean[3].

---

[3] FAO (2015). Panorama de la Seguridad Alimentaria y Nutricional en Centroamérica y República Dominicana 2014. Panamá: FAO. http://www.fao.org/3/a-i4349s.pdf

FOOD SECURITY AND EMIGRATION

Food insecurity particularly affects rural areas. The summary of recent food security evaluations is presented below:

**Figure 2: Levels of food insecurity in Guatemala, El Salvador, and Honduras**



Among the three countries, Guatemala had the highest prevalence of undernutrition (children under five) for the period 2011-2013 at  30.5%,  compared to 11.9% in El Salvador and 8.7% in Honduras.

**Figure 3: Chronic undernutrition in children under-five years of age by department level in Guatemala, El Salvador, and Honduras**



22

## C.4. MIGRATION FROM EL SALVADOR, GUATEMALA, AND HONDURAS

Recent years have witnessed an increase in the number of emigrants from the region of study to the USA, and it is eye-catching the sharp increase in the numbers of accompanied and unaccompanied children.  As of today, millions of Central Americans reside abroad (see Figure 4) and 80% of them in the US.[4]

**Figure 4: Central American migrants as a percentage of country population**



Source:Migration Policy Institute

# Emigrants from the Dry Corridor

According to the results of ten household level assessments undertaken by WFP in 2014 and 2015, a notable share of households reported at least one member having emigrated because of the drought in the two months prior to the assessments. During these years, the outmigration numbers increased. This is the proportion of surveyed families that happened to have migrated family members:

· El Salvador:     5 % in 2014

· Guatemala:    12 % in 2014, and 15 % in 2015

· Honduras:      10 % in 2014, and 17 % in 2015

Most migrants reportedly left in search of work or because of crop losses. Many of the households that did not report migrant members highlighted a lack of resources or security concerns preventing members from migrating although this was considered a possible solution.

## C.5. VIOLENCE AND EMIGRATION

The UN Secretary General Ban Ki-moon declared in 2012 Central America the most violent region in the world. The homicide rate had risen to epidemic levels since 2000. In spite of a worldwide decline of 16 %, Honduras, El Salvador and Guatemala respectively ranked the first, fourth and fifth highest in homicide rates in the world.  Homicides in Honduras have tripled since 2003 and it remains the most violent country in the world.

---

[4] Manuel Orozco and Julia Yansura, (2014). Understanding Central American Migration: The Crisis of Central American Child Migrants in Context, Inter-American Dialogue, August 2014, Washington DC: Inter-American Dialogue. http://www.thedialogue.org/PublicationFiles/FinalDraft_ ChildMigrants_81314.pdf.

AR364

Violence is a likely driver of food insecurity. Extortions heavily affect most formal and informal traders and businesses, including transportation services and market vendors. Delays or refusals to pay the illegal fees, triggers violent retaliations.  Extortions also lead to significant food price increases, especially in areas with fewer shops that are more easily controlled by gangs. All the above, along with the death or disability of the breadwinner (resulting from acts of violence) results in increased and often unbearable levels of formal and informal debt on the part of households.

The report "Understanding the Central American Refugee Crisis," published in 2016 by the American Immigration Council says: "we have strong evidence from the surveys in Honduras and El Salvador in particular that   one's direct experience with crime emerges as a critical predictor of one's emigration intentions."

Lastly, the migration process in this region generates humanitarian and protection problems.  Migrants are exposed to unsafe and undignified travelling conditions, risks of kidnapping, robbery, murdering, trafficking, gender-based violence, and exploitation. People who stay behind may also be confronted with negative consequences, such as family disintegration, children growing up with no parents, depression, mental illnesses, reprisals from gangs, and other impacts.

# II. SURVEY METHODS AND RESULTS - THE QUANTITATIVE COMPONENT

## A. Quantitative Analysis of migration trends
### A.1 SOURCES OF DATA

The report includes data collected from 120 households in El Salvador, Guatemala, and Honduras. Thirty-eight (38) households participated in El Salvador, 41 in , and Honduras respectively. For the three countries, households were selected from the ten WFP Emergency Food Security Assessments (EFSA) conducted from 2014 to 2016, and **only those who reported having one or more family member who emigrated were included in the sample**. To locate the same households, the same procedures were used as in the 2014-2016 EFSA surveys.

The survey was divided into seven sections and included a number of indicators related to socio-economic status, food security, coping strategies, livelihoods, and migration.  The indicators aided in providing an insight into the relationship between migration, food security and livelihoods. In addition, the survey included evidence on the possible driving forces behind emigration.  It is important to note, **that the results are not representative, but rather indicative, and describe the socio-economic and food security situation of households with one or more member who migrated since 2014.**

### A.2. METHODS

Quantitative statistical methods were used to develop the survey and analyze the responses. The survey design followed a descriptive approach, as the intention was to establish associations between variables, without establishing possible causal relationships. The survey responses were processed using discrete numerical formats for data having multiple choices and binary formats (1-0) for yes/no answers.  Every household was given a unique Identification (ID) number.  Once data was collected, it was exported to SPSS where frequency analysis and cross-tabulation were computed. As technical principles were used for the frequency analysis, all the responses were mutually exclusive and exhaustive; therefore, the same observations were not counted twice, nor did they belong to another variable. Cross-tabulations were carried as simple joint-frequencies.

### A.3. BACKGROUND DATA ON MIGRATION IN CENTRAL AMERICA

Migration from Central America is not a new phenomenon. The total Central American immigrant population in the United States increased from 354,000 in 1980 to more than 3 million by 2013,

AR365

accounting for 7% of the total migrant population in the US over this period, accordingly to a report of the Migration Policy Institute[5].  Most of this increase has been due to the high level of immigration from El Salvador and Guatemala, and more recently Honduras.

Even though migration from Mexico diminished in recent years, the flows of migrants from the countries in this study to the USA increased substantially since 2010.  As reported by the United States Custom and Border Protection (US CBP), the number of irregular aliens (as per US CBP definition) from countries other than Mexico  apprehended in the Southwest border of the US increased from  50,000 during the fiscal year (FY) 2010[6] to more than 250,000 by FY2014, but was lower in FY 2016 (218,110 persons).

**Figure 5: Apprehensions of irregular migrants other than Mexicans at Southwest Border of the USA (Total number by fiscal year)**



Source: US CBP

There was a substantial increase in the number of unaccompanied children apprehended by the US  CBP in the USA border in 2014. During that fiscal year, 51,705 children from El Salvador, Guatemala, and Honduras were apprehended at the US southern border with Mexico. Regardless of the overall decrease in immigration observed in FY 2015, 48,893 children from the countries in this study were apprehended in FY  2016.  This represents a 65.2% increase in migration of children compared to the 28,387 unac-companied children reported in all of FY 2015.

---

[5]  MPI (2015) "Central American Immigrants in the United States" Migration Policy Institute. http://www.migrationpolicy.org/article/central-american-immigrants-united-states

[6] Fiscal years (FY) corresponds to US fiscal years October – September

AR366

**Figure 6: Unaccompanied Migrant Children Encountered by US authorities
(Total number by Fiscal Year)**



Source: US CBP

Moreover, there has been a change in the pattern of migration. More families are travelling together to the USA, particularly women with children. The number of family units apprehended at the border is substantial and remains high, even after a temporary decrease in 2015[7]. Between FY 2015 and FY 2016, the detention of families as a unit increased.

**Figure 7: Family units detained by US authorities' (Total number by Fiscal Year)**

Source: US CBP

The following graph represents the number of monthly apprehensions in the USA Southwest border between 2012 and 2016 and shows a seasonal increase in the number of detentions in the US. It also shows that fiscal years 2013 and 2014 had the highest number of detentions.

---

[7] Family unit represents the number of individuals (either a child under 18 years old, parent or legal guardian) apprehended with a family member by the US Border Patrol. https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016

AR367

**Figure 8: Southwest border apprehensions FY 2012–2016**



United States Border Patrol
Southwest Border Apprehensions
Total (FY12 - 16)

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEPT | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY16 | 32,726 | 32,842 | 37,015 | 23,759 | 26,077 | 33,319 | 38,088 | 40,349 | 34,463 | | | | 298,638 |
| FY15 | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 |
| FY14 | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,862 | 40,708 | 31,388 | 25,825 | 479,371 |
| FY13 | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 |
| FY12 | 25,612 | 23,368 | 18,983 | 25,714 | 31,579 | 42,218 | 40,628 | 36,966 | 30,669 | 26,978 | 27,567 | 26,591 | 356,873 |

Source: US CBP

Moreover, not only was there an increase in the number of detentions at the USA Southwest border but also the number **of detentions in Mexico increased substantially** in the same period. The Mexican government implemented the Southern Border Programme, where one of the objective was to secure its border with Guatemala and Belize.  Detentions doubled between 2012 and 2015.  The number of people encountered by Mexican authorities in 2016 were lower than in 2015.

**Figure 9: Irregular migrants encountered by Mexican authorities (Total number by year)**

Source: Dirección de Política Migratoria – Secretaria de Gobernación – Estados Unidos Mexicanos

## A.4. CHARACTERISTICS OF THE MIGRANTS

The drought and other natural disasters that affected the region have potential repercussions on the decision whether to migrate by the inhabitants of the El Salvador, Guatemala, and Honduras.  According to related studies currently carried out by the Inter-American Dialogue in Guatemala and mentioned by IFAD in recent reports, food insecurity is indeed linked to droughts. However, it was noted that natural disasters do not necessarily determine migration in the short term but they are a factor that contributes to more long-term and gradual migration patterns.

FOOD SECURITY AND EMIGRATION

The following graph shows the average rainfall for each country compared with the number of detained migrants in Mexico.  This suggests an **inverse relationship between** rainfall and migration, where low rainfall relates to higher levels of migration.

### Figure 10: Apprehension of emigrants in Mexico and average precipitation in the El Salvador, Guatemala, and Honduras



The EMIF-Sur Survey ("*Encuesta sobre Migración en la Frontera*") captures information on migrants from the countries in this study, who were returned by Mexico and the USA. It is a very useful tool as it includes socioeconomic information from returned migrants, including gender, age, education, place that the migrant used to live prior to migrating, and economic activities undertaken prior to migrating, among other variables.[8]

Typically, migrants from El Salvador, Guatemala, and Honduras who are returned by Mexican authorities have the following characteristics:

- Almost one in six speak indigenous languages (*lengua indígena*) and probably do not speak English

- One in three has only six years of formal education.

- One in two returnees worked in the agriculture sector before migrating

- Generally, they are mostly day laborers (destajo) rather than employees with a fixed salary

- In almost all cases (97% in 2014) the migrant had no prior migratory experience before the existing attempt

- Around 3% of the migrants use the services of a migrant smuggler ("Coyotes" or "polleros").

When asked about the reasons for the decision to migrate, 65% cited the lack of employment and/or economic crisis, 19% low income and poor working conditions, and 9% violence and insecurity. Family reunification was only mentioned in one percent of the cases. There were no substantial differences in responses between migrants from rural and from urban areas.

According to 2015 EMIF-SUR Survey, well over half of the returned migrants from the three Central American countries come from a small number of departments, as shown in the table below:

---

[8]El Colegio de la Frontera, the Secretariat of Labor and Social Welfare, the National Population Council, the Migration Policy Bureau, Secretary of Foreign Relations, National Council to Prevent Discrimination, the survey of Migration at Mexico's Southern Border, www.coel.mx/emif

AR369

**Table 3: Percentage of migrants returned by Mexico, by departments of origin (2015)**

| El Salvador | Guatemala | Honduras |
|---|---|---|
| San Salvador (13%) | Huehuetenango (24%) | Cortes (21%) |
| Usulután (11%) | San Marcos (22%) | F. Morazán (13%) |
| La Libertad (10%) | Quezaltenango (9%) | Comayagua (8%) |
| San Miguel (9%) | Quiche (7%) | Colon (7%) |
| Santa Ana (8%) | | |

Source: EMIF-Sur 2015

Migrants returned by USA authorities in 2014 typically have a slightly different profile. They are also primarily men (85% of the cases), many between 20 and 29 years old (53% of the cases), and 11% speak an indigenous language ("*lengua indigena*"). In terms of educational background, approximately one third have seven to nine years of schooling (28% of the total).  Around 40% of the migrants have been working in the agriculture sector before migrating. As in the case of the migrants returned by Mexico, for the vast majority this would be their first migratory experience. **In contrast to Mexican estimates, USA authorities reported that approximately 68% of returned migrants used the services of migrant smugglers for their last journey.** As indicated in the following table, the distribution of returned migrants by department of origin shows some differences as well in comparison to those returned by Mexican authorities.

**Table 4: Percentage of migrants returned by the USA, by departments of origin, (2015)**

| El Salvador | Guatemala | Honduras |
|---|---|---|
| San Salvador (17%) | San Marcos (16%) | Cortes (12%) |
| La Libertad (12%) | Quiche (11%) | F. Morazán (11%) |
| La Paz (8%) | Petén (11%) | Atlántida (10%) |
| Chalatenango (8%) | Quetzaltenango (8%) | Olancho (9%) |
| Usulután (7%) | Chiquimula (7%) | Colon (8%) |

Source: EMIF-SUR 2015

**Changes in the migrant's profile during the last five years may usefully help to identify some of the potential impacts of drought on the regional migratory patterns.**
**During the last five years, there have been several changes in the profile of the migrants returned by the Mexican authorities**. Changes in the migrants' profile may usefully help to identify some of the potential impacts of drought on the regional migratory patterns.

There has been an increase in returned migrants from El Salvador. Before the 2014 spike, almost half of the foreigners presented to Mexican authorities came from Guatemala, around 35% from Honduras, and 15% from El Salvador (2012).  In the latter case, returned migrants from El Salvador increased to 20% of the total migrants in 2014.

According to the EMIF-Sur 2015, increasingly more women tend to migrate as a proportion of all migrants: around 15% of returned migrants in 2009 were women compared to 21% in 2015. Migrants tend to be slightly older than before.  Around 25% of the returned migrants were between 30 and 39 years old in 2015, as compared to 20.9% in 2009, not considering children under 16 years of age.

Returned migrants increasingly come from rural areas, 31% in 2009 and 52% in 2014.  This is consistent with the finding that increasingly migrants returned by Mexico previously worked in the agricultural sector before migrating: 41% in 2009 and 53% in 2015. On the other hand, returned migrants who previously worked in the construction sector decreased from 25% to 15% in the same years.

**Figure11: Migrants returned by Mexico classified by economic activity in country of origin (% of total returned migrants)**



Source: EMIF-Sur

A more detailed analysis of the municipalities of origin in the Dry Corridor showed that the share of returned migrants from municipalities affected by the drought was slightly higher in 2015 compared to 2010: 7.5% versus 6.8%, respectively.[9]

---

[9] The difference is not statistically significant.

AR371

# III.  SURVEY METHODS AND RESULTS - THE QUALITATIVE COMPONENT

## A. METHODS AND TECHNIQUES OF THE QUALITATIVE COMPONENT

### A.1. RESPONDENTS, DATA COLLECTION TECHNIQUES AND INSTRUMENTS

Fifty-four key informants participated in the study, among them government officers, representatives of humanitarian institutions and programs, members of local organizations, retired migrant smugglers ('Coyotes'), and returnees. A semi-structured questionnaire (see Annex 3) was prepared for the interviews.

Two *focus group (FG) discussions* were conducted in each study community: one with men and one with women, with an average of 15 participants in each group. A total of 44 FG discussions were held in which 660 persons participated across the region.  Guidelines for the FG discussions were developed (see annex43) and a specific form was created to record the information that participants provided.

At household level, a structured questionnaire was prepared (See Annex 5) to be applied using a Portable Data Collection device. Its purpose was to record key aspects of food security, including the WFP corporate indicators that had been in use during the El Niño emergency, so comparison of results would be possible.  The interviewed families were identified by the participants in the focus group discussions, and the requirement was to have members who migrated between 2014 and 2016.

### A.2. STRATEGY OF WORK AND CALENDAR

The study was implemented in three stages:

1.1.  Initial stage: This comprised the integration of a regional team, three research national teams, the conduction of a regional workshop for planning and coordination, participatory refinement of tools and methods, and the elaboration of instruments; followed by national participatory workshops to select the communities to be visited and to train additional team members. This took place from June 10 to July 20, 2016

1.2.  Fieldwork: This included contacts with field workers of cooperating institutions, interviews with key informants, FG discussions and the survey of heads of households that reported migrant members.  This took place from July 21 to August 9, 2016. For a list of each visited place, please refer to annex 6.

The summary of outputs of the above is presented in the following table.

**Table 5 : Numbers of interviews, focus groups and survey questionnaires**

| | Outcome of the Fieldwork | | | |
|---|---|---|---|---|
| Country | Interviews with Key Informants | FG discussions | Household Surveys | Total |
| El Salvador | 18 | 16 | 42 | 76 |
| Guatemala | 22 | 16 | 40 | 78 |
| Honduras | 14 | 12 | 41 | 67 |
| Total | 54 | 44 | 123 | 221 |

Data processing and analyses, elaboration of country reports, and integration and revision of the draft report took place from August 9 to September 16, 2016.

AR372

*Processing*

(1) The data generated through interviews with key informants entailed tabulating frequencies of types of responses, and presentation of the frequencies in tables.

(2) Information generated in the FG discussions were classified by topic, and within each topic, summarized as to types of perceptions, opinions, and attitudes. Next, the types were analyzed and the results represented in charts.

(3) Data generated through the household survey for heads of household that reported members who had migrated, were collected with Portable Data Collection devices and then processed according to WFP standard statistics algorithms.

*Analysis*

A systematic computation of results in tables and charts was created and compared with expected results with determination of their total, partial or null value, in order to obtain answers to key questions, and to address the validity of the study hypotheses.   For the household questionnaires, WFP utilized a standard methodology called **Consolidated Approach for Reporting Indicators (CARI),**[10] which estimates a food security indicator (FSI) based on the combination of a) Percentage of total expenses utilized to buy food; b) Classification of the household food consumption through the Food Consumption Score (FCS) , and c) The level of severity of livelihood coping strategies (CSI).

## B. QUALITATIVE RESULTS

### B.1. MIGRATION AND THE DRY CORRIDOR

It is possible to analyze some of the specific migratory patterns in the Dry Corridor, making use of household level data collected by WFP through ten Emergency Food Security Assessments (EFSA) between 2014 and 2016.

Around 7% of all households in El Salvador, 12% of households in Guatemala, and 16% of  households in Honduras reported to have one or more  members who recently migrated[11].  When asked about the main reasons to migrate, the response was mostly related to looking for work (Honduras), and for food security issues (Guatemala).

**Table 6: Reported main reasons for migrating**
**(% total households with migrant members)**

| Guatemala | |
|---|---|
| Lost their crops due to drought | 37% |
| Lack of water for irrigation | 2% |
| Lack or scarcity of food | 58% |
| To pay debts | 2% |
| Due to insecurity and violence | |
| Honduras | |
| Lost their crops due to drought | 8% |
| Lack of water for irrigation | 3% |
| Going in search of jobs | 79% |
| Family reunification | 2% |

Source: WFP
NB:No information for El Salvador

---

[10] The following link provides more information on these guidelines: https://www.wfp.org/content/consolidated-approach-re-porting-indicators-food-security-cari-guidelines
[11] Results based on databases for El Salvador (2015), Guatemala (2016) and Honduras (2015) and the question related to mi-gration covers 6 months for El Salvador and 1 year for Guatemala and Honduras.

AR373

The information collected by WFP during its Food Security Emergency Assessments allows an analysis of some household characteristics, including their vulnerability to food insecurity. The percentage of food insecure households with one or more migrant members is higher than for other households in the Dry Corridor. There is insufficient data to analyze whether this result reflects that food insecure households are more likely to have one or more members migrate, or/and whether household food insecurity is the consequence of one or more members having emigrated.

**Table 7: Food security status of households, by migration status**
**(% of total households with and without migrant members)**

|  | Honduras | | Guatemala | |
|---|---|---|---|---|
|  | Yes | No | Yes | No |
| Food secure | 0% | 0% | 6% | 11% |
| Marginally food secure | 26% | 33% | 44% | 56% |
| moderately food insecure | 58% | 54% | 43% | 30% |
| severely food insecure | 16% | 12% | 7% | 2% |

Source: WFP
NB: No data available for El Salvador

The above information comes from the emergency food security assessments conducted by WFP in the Dry Corridor of the three countries from 2014 to 2016. The assessments were not intended to collect data on migration, although had a small module on the subject.  Starting at this point, it will be presented the results of the Migration study conducted in 2016, which gave place to the present report.

As an additional contribution, IDB run an econometric estimation building a Migration Decision Model (please see Annex 2) using data collected by WFP in the Dry Corridor. A Probit[12] model aimed at estimating the impact of drought on the household decision to have one or more members migrate. Migration was modelled as an economic decision where the expected income of the household member at the new location would be compared with the expected income of the person if he/she decided not to emigrate, appropriately modified by the potential risks involved in migration.
Based on such analysis, there is on average an estimated 1.5% higher probability to migrate for households in the Dry Corridor affected by a drought compared to other households. [13]

## B.2. GENERAL INFORMATION ABOUT EMIGRATION

The key informants also reported the most common **types of companions of under-aged emigrants in order of likely frequency**:

- El Salvador: Mother, father, and other relatives

- Guatemala: Father, mother, and other relatives

- Honduras: Migrant smuggler ("Coyote"), mother, other relatives.

---

[12]In statistics, a probit model is a type of regression where the dependent variable can only take on one of two values, in this case, 0=decided not to migrate, and 1= decided to migrate
[13]Estimated using information from El Salvador for 2014

AR374

The FG participants estimated the following percentages of **emigrants apprehended on their way to their destination or deported** from the USA and other countries:

### Table 8: Percentage of apprehended or returned migrants

| Country | Apprehended on their way to Mexico | Deported from the USA | Deported from other countries |
|---|---|---|---|
| El Salvador | 30   % | 20   % | 50   % |
| Guatemala | 27   % | 29   % | 44   % |
| Honduras | 26   % | 22   % | 52   % |
| Average | 27.6 % | 23.7 % | 48.7 % |

The key informants described the following emigration routes:

### Table 9: Emigration routes described by key informants

| Country | Usual Emigration Routes | |
|---|---|---|
| | **In the country** | **Border spots** |
| Guatemala | Chiquimula | Tecún Umán |
| | Huehuetenango | La Mesilla |
| | Morazán, El Progreso | Guatemala, Tecún Umán |
| | San Marcos | Tecún Umán |
| | Jalapa -San Marcos | Tecún Umán |
| | Petén | Melchor de Mencos-Belize |
| El Salvador | San Francisco Menéndez | La Hachadura |
| | Ahuachapán, Ahuachapán | Las Chinamas |
| | Citalá, Chalatenango | El Poy |
| | Metapán, Santa Ana | Anguiatú |
| Honduras | Azacualpa, El Triunfo, Choluteca | Agua Caliente, Corinto y El Espino |
| | Jamalteca y San Francisco Loma Larga, San Jerónimo, Comayagua | Agua Caliente y Corinto |
| | San Francisco, Langue, Valle | Amatillo |
| | San Juan, La Paz | Agua Caliente, El Amatillo |
| Guatemala-Mexico | Ciudad Hidalgo, Suchiate | Chiapas |
| | Agua Prieta | Sonora |
| | San Marcos | Tecún Umán |
| | Tijuana | Baja California |

## B.3. TRIGGERS FOR EMIGRATION

The **household surveys** conducted from 2014 to May 1016 by the World Food Programme as parts of their Emergency Food Security Assessments (EFSA) triggered by El Niño drought revealed the following triggers or push factors for emigration in communities of the Dry Corridor in the studied  countries.

### Table 10: Main motives for emigration in surveyed communities

| | Loss of Crops | No Money | No Job | No food | Family reunion | Violence | Forced to leave | Other | Total |
|---|---|---|---|---|---|---|---|---|---|
| Numbers | 45 | 115 | 54 | 391 | 26 | 13 | 14 | 32 | 690 |
| Percentages | 6.52 | 16.7 | 7.8 | 56.7 | 3.8 | 1.9 | 2.0 | 4.6 | 100.00 |

AR375

According to surveyed communities, the two main motives for emigration are the unavailability of food and the lack of money to buy it. The results of the present study are congruent with these claims, as indicated below.

**Table 11: Main motives for emigration, by order of importance, as reported by focus group participants**

| Country | No. | Most common triggers | Justifications |
|---|---|---|---|
| Guatemala | 1 | Poverty | Lack of wwll-being of children |
| | 2 | Unemployment | Scarcity of labor demand |
| | 3 | Crop losses | Droughts and damage by Insects |
| El Salvador | 1 | Violence | Youth gangs |
| | 2 | Poverty | No Harvest, no food |
| | 3 | Unemployment or Low Salaries | Droughts and damage by Insects |
| Honduras | 1 | Unemployment | No jobs opportunities |
| | 2 | Poverty | High living costs and low salaries |
| | 3 | Better Opportunities | Better living, job opportunities, drought in the harvests |

Poverty and unemployment in the three countries are a common cause for emigration.  Guatemalan participants also reported the loss of crops, drought, and pest infestations as a common cause.  Salvadorian participants reported violence as the main reason for emigrating, followed by droughts and pests.  Participants from Honduras did not mention the loss of crops; they linked the lack of income and employment opportunities to the poor performance of agriculture in their geographical areas.

Key informants suggested **family reunification as a motive to emigrate.**  The proportions of emigrants who intended to reunite with different family members in the destination country were as follows:

**Table 12: Proportions of Emigrants according to the family member they intended to rejoin**

| Country | Types of relatives they expect to rejoin | | | |
|---|---|---|---|---|
| | Wives/ Husbands | Sons/ Daughters | Father/ mother | Other Relatives |
| El Salvador | 30% | 20% | 80% | -------- |
| Guatemala | 17% | 31% | 23% | 29% |
| Honduras | 38% | 17% | 45% | ------- |

Most departing Salvadorian and Honduran emigrants seeking family reunification were intending to join parents, mainly.  Guatemalan emigrants had the intention to reunite with diverse family members. The most frequently intended reunion was with wives or husbands for Honduran emigrants.  These proportions do not refer to the totality of emigrants, but only to those who travelled for family reunification purposes.  In addition, the family reunification motive is not mutually exclusive from the other motivating factors such as those related to food security, among others.

## B.4. POVERTY AND MIGRATION

FG participants estimate that around 35%of emigrants to the US from El Salvador **travel legally and then, after their visa is expired, become irregular immigrants by overstaying the approved time covered by their visas.** On average, 25% of Guatemalan and 9%  of Hondurans emigrants follow

the same strategy. If they travel as regular emigrants, they generally have access to the material means and social contacts to facilitate their departure and overseas stay.

As reported by the FG participants, **emigrants before departure** worked in the agricultural sector in the three countries, usually self-employed in agricultural activities, and/or as day laborers.  Some were also employed as construction workers in El Salvador and Guatemala. Informal commercial activities were also mentioned as an income source before departure for emigrants in Honduras. Technical and research reports indicate that these jobs do not provide regular and up to the needs incomes, and keep those families permanently in economic insecurity. However, at the same time, they manage to obtain the funds to emigrate, which most likely indicates that these families do not suffer from extreme or severe poverty.

Information on the local **socio-economic levels of emigrants' families** was provided by the key informants, as follow:

### Table 13: Local socioeconomic levels of emigrants' families

| Country | Key respondent reporting of numbers of emigrants according to socio economic levels | | | Total |
|---|---|---|---|---|
| | Low socio-economic level | Middle socio-economic level | High socio-economic level | |
| El Salvador | 8 | 14 | 0 | 22 |
| Guatemala | 5 | 9 | 1 | 15 |
| Honduras | 3 | 8 | 0 | 11 |
| **Total** | **16** | **31** | **1** | **48** |

As the table shows, when dividing the families into three socio-economic groups, the majority of emigrants belongs to the middle socio economic level, followed by the lowest one. There is little reporting of emigration coming from the higher socio/economic group. This is congruent with results of previous studies reporting that families in poverty face greater difficulties to obtain the necessary money to emigrate pay a migrant smuggler ("*Coyote*") and other costs. On the other hand, families with higher levels of economic capacity can travel legally**, do not feel the need, or desire to emigrate**.

The FG participants reported the following **fees paid to migrant smuggler** fees:

### Table 14: Fees paid to traffickers of irregular emigrants

| Country | Fees paid to traffickers of irregular emigrants (August 2016) Average payments in US Dollars | | | Number of reports |
|---|---|---|---|---|
| | Lowest fees | Middle Fees | Highest fees | |
| El Salvador | 3,500.00 | 7,500.00 | 15,000.00 | 22 |
| Guatemala | 6,672.60 | 7,660.72 | 9,020.78 | 15 |
| Honduras | 2,500.00 | 6,000.00 | 8,000.00 | 11 |
| **Averages** | **4,224.20** | **7,053.57** | **10,673.59** | |

According to relatives of emigrants who participated in the FG discussions, irregular emigrants usually prefer to pay a migrant smuggler. The fees start at USD 2,400 and in the majority of cases, the cost is above USD 4,000, and  can go up to USD 15,000, depending on a number of factors, including the number of times that a migrant smuggler  will try to help the emigrant to cross the border.  Regardless, USD 4,000 is beyond the means of many families without cash or collateral assets.  These fees make it practically impossible for poor families to cover the migrant smuggler services and afford other travel expenditures.

AR377

FG participants reported that there are a number of **ways to obtain the necessary funds for emigration,** these are  listed in the next table.

### Table 15: Reported ways to obtain funds for emigration

| Country | Most common ways reported to obtain the necessary funds for emigration (by order of importance) |
|---|---|
| El Salvador | 1. Loans with family and friends<br>2. Sale of property<br>3. Loans from banks |
| Guatemala | 1.Taking out mortgages<br>2. Loans from banks<br>3. Loans from particular persons or events |
| Honduras | 1. Loans from family and friends<br>2. Sale of property<br>3. Loans from banks |

Loans (from relatives, banks, and local informal loaners) are the main source to cover the emigration costs. Both local loans and taking out mortgages are the riskiest means of paying emigration expenses, as interest rates are very high. Many migrant smugglers will prefer mortgages, as they become the beneficiaries in case of any difficulty to pay back the money. Obviously, if the loan can be paid with remittances, the family's financial situation can improve.  If, however, the migration is unsuccessful or there is a loss of life in the attempt to emigrate, the entire family can be made landless and/or homeless. Overall, risks due to the emigration of family members exists and can result in an increased precarious situation and potential exploitation of the family members who stayed behind, especially if they are women and children. Key informants in some communities of Guatemala mentioned that sometimes families are required by some commercial plantation owners to sign a contract and work for free on the plantation for several years until the loan is paid off.  This is a form of modern slavery, and further investigation into such claims should be deemed mandatory.

**B.5. FOOD INSECURITY AND EMIGRATION**

Drought and its consequences was identified during the focus group discussions in the three countries as the main problem for the studies period. **Pests and loss of crops were identified as additional problems by respondents in El Salvador and Guatemala,** while in **Honduras** respondents added **unemployment and poverty.** Participants estimated that **about 90 % of emigrants from Guatemala and Honduras, and 76% from El Salvador leave their communities because of drought.** These problems affect directly local agriculture and livestock rearing activities with direct impact on food production for self-consumption. In those communities where the possibilities of finding wage employment are rather scarce, this triggers food insecurity.

Respondents indicated that adequate food access is the main problem, but that there is no lack of food available at community level.

Respondents provided estimates of the proportions of families that fell in different food access classifications, based on their perceptions (Table 16).

**Table 16: Proportion of families with different levels of food access in the study communities**

| Country | Proportions of families according to different levels of food access | | | |
|---|---|---|---|---|
| | Enough money; enough food (% families) | Some money; not enough food (% families) | No money; depend on assistance programs (% families) | No money; no assistance. Depend on community support. (% families) |
| El Salvador | 20 | 30 | 40 | 10 |
| Guatemala | 41 | 16 | 27 | 16 |
| Honduras | 45 | 29 | 17 | 9 |
| **Promedio** | **35%** | **25%** | **28%** | **12%** |

In general, around one third of the families appear to be food self-sufficient, and the remainder face some degree of economic insufficiency to acquire food,  28% are  totally dependent on food assistance (i.e. food aid, vouchers, etc.) and other types of assistance, such as agricultural inputs (seeds and fertilizer, while 12 percent are entirely dependent on community support.

Two thirds of respondents in El Salvador and Guatemala do **not consider that undernourishment of children to be a motive for adults´ emigration; while one third do believe that this factor is important in the decision to emigrate.**  None of the respondents in Honduras considered undernourishment or the inability to provide adequate nutrition to children to be a motive for emigration. Note that the term "undernourishment" relates to the perception of caregivers with respect to meeting a perceived dietary need of children. It does not necessarily imply a recognition that a child is malnourished or under-weight, even when the prevalence of chronic undernutrition (low height per age) is high among children in this region.

**Table 17: Proportion of key informants who consider undernutrition of children as a contributing motive for adult emigration**

| Do you consider child under nutrition a cause of emigration? | | | | |
|---|---|---|---|---|
| Answers | El Salvador | Guatemala | Honduras | Total |
| Yes | 7 | 5 | 00 | 12 |
| No | 15 | 10 | 11 | 36 |
| **Total Respondents** | **21** | **15** | **11** | **48** |

Unemployment emerged as an important cause of emigration. According to key informants, more than half of the households (on average 58%) are affected by unemployment in the study communities, as follows:

- El Salvador:     52 %
- Guatemala:     54 %
- Honduras:     68 %

Informants were also asked to describe the **relationship of the emigrants´ families to food assistance before and after the departure of family members**.

AR379

**Table 18: Existence of food insecurity in emigrants' families before and after emigration**

| Country | Estimated percentage of families with -migrant members who... | | |
|---|---|---|---|
| | **Received food assistance before departure of family members** | **Received food assistance after the departure of family members** | **No food assistance neither before nor after departure of family members** |
| El Salvador | 33% | 27% | 40% |
| Guatemala | 55% | 35% | 10% |
| Honduras | Not known | Not known | Not Known |

**Note:** The term "food assistance" can include distribution of food rations, as well as other food related assistance such as vouchers for purchase of food in markets.

According to these estimates, a third of the interviewed families in El Salvador and about half of the families in Guatemala used to receive food assistance prior to out-migration of one or family members, **which means that there was food insecurity before emigration.** The proportion of families receiving food assistance after the departure of one or more family members diminished, but the study did not ask why because there was no way to know this finding beforehand. Honduras respondents did not respond to this question due to a problem with the questionnaire. It must be considered that the answers could be biased by the expectation by the informants to be selected for further food assistance.

**B.6. ROLE OF VIOLENCE IN EMIGRATION**

This was a question where the informants were requested to compare the security situation in their communities in comparison with communities in the surroundings. According to key informants, the comparative **situation of violence in emigrants' communities and neighboring communities** is as indicated in next table:

**Table 19: Perception of violence intensity in the study communities**

| Country | In the emigrants' communities, violence... | |
|---|---|---|
| | **Is less intense than in other communities** | **Is more intense than in other communities.** |
| El Salvador | 50% | 50% |
| Guatemala | 77% | 23% |
| Honduras | 80% | 20% |
| **Average** | **69%** | **31%** |

In El Salvador, the violence seems to be present in the communities of emigrating people, which is in line with information obtained by other means in the study. The research team considered the responses from Honduras as biased because the participation in the meetings was quite open in comparison with El Salvador,[14] where people could abstain from talking openly.

The most frequently mentioned **forms of violence** in the emigrants' communities, as reported by both women and men FG participants are as follows:

---

[14] It must be noted that the FG discussions in El Salvador were held in the district municipal hall with community leaders who were invited by the district authorities On the other hand, the meetings in Honduras were mostly held in the communities themselves, which allowed for any neighbor or anyone in the community to attend.

AR380

**Table 20: Forms of violence reported in emigrants' communities**

| Country | No. | Most common forms of violence reported by… | |
| | | Women | Men |
| --- | --- | --- | --- |
| El Salvador | 1 | Extortions by gangs | Extortions by gangs |
| | 2 | Confrontations between gangs and police | Confrontation between gangs and police |
| | 3 | Assaults | Assaults |
| Guatemala | 1 | Thefts by people who have vices | Theft of crops |
| | 2 | Domestic Violence | Marijuana traffickers violence ("users don´t do any harm") |
| | 3 | Women suicides | ------- |
| Honduras | 1 | (No one referred to the subject because "everyone knows everybody"). | (No one referred to the subject because "everyone knows everybody"). |

Both women and men in El Salvador indicated that the most frequent forms of violence affecting the communities are extortions, threats, and assaults perpetrated by gangs ("*maras*", organized crime).  In Guatemala there are gender differences in the perception of the forms of violence affecting communities: women denounced domestic violence and women's suicides (perhaps an outcome of violence and abuse), and coincided with men on thefts. **These results are important for humanitarian protection purposes**.  In the FG discussions in Honduras, violence in the communities was not denied, but for security reasons, the research team decided not to delve into the subject to protect the participants. Some community members were not confident to provide their names in the assistance sheets and preferred not to discuss certain topics.

With regard to the effects of violence on subsistence and economic activities, the key informants generally were of the following opinion:

**Table 21: Perceptions about effects of violence on subsistence and economic activities**

| Country | Violence hampers agriculture, livestock rearing, business and other jobs in the emigrants´ communities, | | |
| | Yes | No | Totals |
| --- | --- | --- | --- |
| El Salvador | 18 **(82%)** | 4 **(18%)** | 22 **(100%)** |
| Guatemala | 00 | 15 **(100%)** | 15 **(100%)** |
| Honduras | 1 **(10%)** | 10 **(90%)** | 11 **(100%)** |
| **Total** | **19** | **29** | **48** |

The results show that in El Salvador violence is affecting the livelihoods of community members by restricting their capacities to generate income.  For Guatemala, the situation in the Dry Corridor is not seriously affected by violence. Regarding Honduras, as mentioned before, respondents preferred no to provide information regarding these matters, which can be taken as confirmation of violence as an issue.

When asked about the extent of the involvement of **returnees and deported persons' involvement in violent actions,** the key informants in El Salvador were outspoken about feeling threatened by returnees and/or departed persons. Only one key informant in Honduras and two in Guatemala mentioned that there are some returnees and deportees who are suspected of extortion and threats to local families (next table).

AR381

**Table 22: Returnees and deported persons' involvement in violent actions**

| Country | Are some returnees or deported persons suspected of involvement in extortions and threats? | | |
|---|---|---|---|
| | Yes | No | Total |
| El Salvador | 11 | 9 | 20 |
| Guatemala | 2 | 13 | 15 |
| Honduras | 1 | 10 | 11 |
| **Total** | **14** | **32** | **46** |

Perceptions of FG participants **about families or communities who receive remittances and are often threatened and suffer extortions** are presented in the following **t**able.

**Table 23: Families in emigrants' communities who receive remittances and who receive threats or endure extortions**

| Country | Families in emigrants' communities who receive remittances receive threats and have to endure extortions? | | |
|---|---|---|---|
| | Yes | No | Totals |
| El Salvador | 184 | 30 | 214 |
| Guatemala | 1 | 00 | 1 |
| Honduras | N/A | N/A | N/A |
| **Total** | **185** | **30** | **215** |

The majority of FG participants in El Salvador stated that the families receiving remittances in their communities are often threatened. In Guatemala, only one participant declared so.

The FG participants from El Salvador also declared that there are families who had lost their plots, crops, and livestock because of extortions, thefts and armed robberies.

**Table 24: Have families lost food resources due to extortion, theft, and assault**

| Country | Number of answers: families that have lost their plots, crops and livestock because of extortions, thefts, and assaults | | | |
|---|---|---|---|---|
| | Women Respondents | | Men Respondents | |
| | Yes | No | Yes | No |
| El Salvador | 90 | 00 | 80 | 00 |
| Guatemala | 0 | 147 | 2 | 115 |
| Honduras | N/A | N/A | N/A | N/A |

Both women and men in El Salvador declared that families in their communities have lost their land, crops, and livestock because of extortion, theft and assaults. In Guatemala, this does not seem to be a problem.

AR382

**B.7 EFFECTS OF EMIGRATION ON FOOD SECURITY OF HOUSEHOLDS AND COMMUNITIES LEFT BEHIND**

Key informants were asked about value and frequency of remittances, and they consider that people can receive from USD 50 to USD 1,000 a month, depending on the existence of debts to be paid.

According to the focus group participants, the proportion of families who receive remittances, the average value and frequency of remittances, are as follows:

**Table 25: FG Discussions: proportion of families who receive remittances and average value and frequency of remittances**

| Country | Estimated number of emigrants´ ´ families who... | | Value average of remittances (US Dollars) | Most common frequency |
|---|---|---|---|---|
| | Do not receive Remittances | Receive Remittances | | |
| El Salvador | 36 % | 64 % | $ 130 | Monthly |
| Guatemala | 44 % | 56 % | $ 210 | Monthly |
| Honduras | 55 % | 45 % | $ 170 | Monthly |
| Averages | 45 % | 55 % | $ 170 | Monthly |

Concerning **the allocation of the remittances** by the emigrants´ families, the key informants indicated:

**Table 26: Allocation of remittances by emigrants' families**

| Country | Main allocation of remittances by emigrants´ families |
|---|---|
| El Salvador | 1 Food<br>2 Clothes, shoes<br>3 Basic services |
| Guatemala | 1 Food<br>2 Education<br>3 Basic services |
| Honduras | 1 Food<br>2 Education<br>3 Construction and improvement of housing |

According to the informants, **food is always a priority**; education follows for Guatemalans and Hondurans, whereas in El Salvador clothes and shoes are the second priority after food.  Basic services are third in the list of priorities for El Salvador and Guatemala, while construction and house improvements is listed as a third priority for Hondurans.

Both women and men who participated in the FG discussions reported **similar distribution of remittances** by basic needs, this time identifying main destination**:**

AR383

**Table 27:  Goods and services obtained with money from remittances**

| Country | Sex of Respondents | Allocation of remittances to different goods and services | | |
|---------|--------------------|------------------|------------------|-----------------|
| | | Priority use | Second priority use | Third priority use |
| El Salvador | Women | Buying food | Invest in crops or small businesses | Education Paying for basic services, Buying medicine |
| | Men | Buying food | Invest in crops or small businesses | Education, Buying medicine |
| Guatemala | Women | Buying food | Education, Buying medicine | No money left |
| | Men | Buying food, Buying land | Education, Paying the house, Buying medicine | No money left |
| Honduras | Women | Buying food | Education, Paying the house, Buying medicine | No money left |
| | Men | Buying food | Education, Buying medicine, Buying appliances or vehicles | No money left |

The focus group participants, who were members of the emigrants´ families, reported that:

· **More than a half** of the received money is used to buy food.

· Men of Honduras report that **a half** of the received money is used to buy food.

· For the FG participants of Guatemala and Honduras, **half of** the received money is used for agricultural and/or small business purposes.

· Men in Guatemala reported the use of **half of** the remittances to buy land.

· **Less than a half** of the received money is used in education, medicine, paying for lodging or buying home appliances.

The fact that food occupies the highest priority for the allocation of remittance is confirmed by both FG participants and key informants, men and women in all the three countries.

**Remittances and their intended purposes are what motivate emigration to mitigate the impact of adverse climate effects and socio-economic problems. The real coping mechanism is not migration in itself but the remittances that successful emigration could generate.**

What about **the survival strategies** of emigrants´ families who do not receive remittances?

Key informants reported that the women members of emigrants' families in El Salvador are farmers and take care of crops and domestic animals; in Guatemala, women are employed in domestic work outside the home and men work as independent farmers or wage laborers.

According to key informants in the three countries, the general manner by which   **deported persons - women and men – pay their debts due to emigration** is by selling their houses or plots of land.

Both women and men among the FG participants in El Salvador and Guatemala reported that they depend on the remittances to pay debts left by the emigrated family members. Honduran women and Guatemalan men report selling their houses and assets. Honduran men declared they depend on loans from relatives in the USA.  Key informants reported that both mechanisms are used by all migrants:

receiving assistance from relatives living in the US, or actions that involve livelihood assets such as sale of land or houses.

### B.8. LOCAL ORGANIZATIONS, RELIEF PROGRAMMES AND BENEFICIARIES

FG participants reported the following organizations of returnees, deported persons and emigrants in their communities:

**Table 28: Organizations of returnees, deported persons and emigrants
in the study communities**

| Country | Organizations: |
|---------|----------------|
| El Salvador | -Local organizations: Pro-Texis (Texistepeque) Improvement Sub-Committee.<br>-International organizations: United Transients in America, Joined by Chirilagua, FNLN Party Base Committee, Santa Elena Friends. |
| Guatemala | -Local organizations: CONAMIGUA, AJUDICAM, ASIJUCAM, officially recognized.<br>-International organizations: Catarineca Fraternity, Los Angeles, Calif. |
| Honduras | No reports |

These are organizations, which are reportedly active in the communities in El Salvador and Guatemala. The provided services were not identified, but the organizations are known because of their support to emigrants in different areas.  FG participants in Honduras did not provide any information, though it is known that there are some organized groups in these communities.

FG participants also reported the following **relief programs and institutions in their communities that focus their assistance on food security (next table)**

**Table 29: Relief programs and institutions, and types and frequencies of assistance**

| Country | Relief programs and institutions | Types of assistance | Frequency of provided assistance |
|---------|----------------------------------|---------------------|----------------------------------|
| El Salvador | 1 Agricultural supplies package delivery Program (Family Farming Program, the MAGA)<br>2. UN Women in coordination (with FAO and the WFP)<br>3. IMU (in coordination with the SIS) | Agricultural supplies<br><br>Food<br><br><br>Food | Once or twice a year<br><br>Periodically<br><br><br>One time |
| Guatemala | MAGA- PMA | Food | Monthly |
| Honduras | No reports | No reports | No reports |

### B.9. PERCEPTIONS AND ATTITUDES OF THE SITUATION

The perceptions of **key respondents regarding the situation and attitudes in emigrants´ families**, are as follows:

AR385

**Table 30: Key informants' perceptions regarding emigration and economic situations**

| Country | Estimated percentages of families in three different economic situations and attitude toward emigration in the study communities, | | |
|---|---|---|---|
| | % of families covering their basic needs adequately with earned resources or  remittances | % of families who have resources, but are willing to emigrate | % of families who live in extreme poverty and would emigrate if they get the means to |
| El Salvador | 30 % | 35 % | 35  % |
| Guatemala | 30 % | 30 % | 40 % |
| Honduras | 33 % | 40 % | 27 % |
| **Average** | **31 %** | **35 %** | **34 %** |

Overall, one-third of the families in the emigrants´ communities were estimated to have sufficient resources to cover their food needs; another one-third had some resources and would want to emigrate if they could; while the remaining one-third lived in poverty and would emigrate if an opportunity were to present itself.

FG participants expressed their perceptions of possible changes in the current situation and the reasons for possible changes:

**Table 31: Focus group participants' perceptions regarding situation**

| Country | Group Sex | Perceptions and attitudes of Focus Groups participants: |
|---|---|---|
| El Salvador | Women | -65 out of 91 women (71%)  thought that the situation will improve (thanks to aid programs); <br> -according to 18 women (20%), the situation will remain; <br> - For other 18 women, the situation will get worse (especially regarding personal security). |
| | Men | -45 out of 86 men (46%) think that the situation will improve ("you have to be optimistic", "you have to trust God"); <br> -19 (22%) think that things will go on the same; and. <br> -22 (26%) think things will get worse ("this is what you see coming"): |
| Guatemala | Women | -68 out of 125 women (54%) think the situation will improve ("with the aid programs and the rains"); <br> -22 (18%) think the situation will remain the same ("for those without a job, health and education"); <br> -35 (28%) think the situation will get worse ("because there is no employment") |
| | Men | -30 out of 120 men (25%) think the situation will improve ("if we get land"); <br> -10 think things will remain the same ("if there is no employment, education, and means of living"); <br> -80 (66%) think things will get worse ("because of the global warming and the lack of attention and programs for the rural areas"). |
| Honduras | Women | -16 out of 55 women (27%) think the situation will improve ("thanks to the government ant other programs of help," "it will rain"); <br> -10 (18%) think the situation will go on the same ("there are no good leaders, no jobs, no rains"); and. <br> -27 (49%) think things will get worse ("lack of employment, drought, and poor crops"). |
| | Men | -27 out of 56 men (48%) think the situation will improve ("Weather and crops will improve"); <br> -9 (17%) think things will go on the same ("there are no changes; problems with crops"); <br> -14 (25%) think things will get worse ("because of the climate change, droughts and politics") |

Optimism about improving situations is generally more evident among women than among men in El Salvador and Guatemala, while in Honduras, the opposite is the case where women tended to be more pessimistic. The tendency among optimistic women was to expect help from governments and aid programs, and among men to base their optimism to climate circumstances and agrarian improvements. Pessimistic attitudes are linked to perceptions of worse climate conditions, drought and lack of government action.

What the emigrants´ families think they would do in the future to avoid food insecurity, as reported by FG participants:

**Table 32: Focus Group participants' perceptions about their responses to food insecurity in the near future**

| Country | Sex of Group | They would... |
|---|---|---|
| El Salvador | Women | 1. Educate and give advice to young people (of the family) so that they avoid missteps or poor decisions |
| | | 2. Participate in community meetings, support the leaders and monitor their performance |
| | Men | 1. Keep the community informed |
| Guatemala | Women | 1. Look for the support of organizations |
| | | 2. Work, sell food |
| | | 3. Look for a chance to emigrate |
| | Men | 1. Get organized and look for support |
| | | 2. Wait for another chance to emigrate |
| | | 3. Whatever can be done to maintain the family |
| Honduras | Women | 1. Go to the US |
| | | 2. Keep working |
| | | 3. Work the land to produce food instead of buying it |
| | Men | 1. Look for the support of organizations and work hard to improve the family situation |
| | | 2. Establish a small business |
| | | 3. To sow, if it rains |

The information presented in the table tells us that, to respond to food insecurity in the future:

· Both women and men in El Salvador would educate their own children and participate in community activities.

· Women and men in Guatemala would seek support from organizations and wait for a chance to emigrate.

· Women and men in Honduras would invest in agriculture or small business and emigrate to the USA.

## B.9.1 OTHER CONSIDERATIONS OF THE FOCUS GROUPS

Some FG participants provided their recommendations. Women and men in Guatemala requested food aid from the government and non-government programs, with the participation of both women and men. In Honduras, men recommended a better treatment of migrants by the US and Mexican authorities, as well as better government policies to support families affected by immigration and emigrants themselves.

AR387

## C.HOUSEHOLD SURVEYS: AN EVALUATION OF FOOD SECURITY AND EMIGRATION IN THE DRY CORRIDOR
### C.1 REASONS, DESTINATION AND IMMEDIATE IMPACTS OF EMIGRATION

Overall, approximately 96% of study households reported having one or more family members who migrated since 2014 without having returned (ranging from 93% in El Salvador to 100% in Honduras). The majority of the study households (63%) in the three countries reported having one member who had migrated, and the remainder had two or more members who had migrated. (Table 33).

**Table 33: Percentages of families with members who had migrated**

| Country | One member | Two members | Three members | More than four members | No response |
|---------|------------|-------------|---------------|------------------------|-------------|
| El Salvador | 81% | 14% | 5% | 0% | 0% |
| Guatemala | 40% | 26% | 18% | 13% | 3% |
| Honduras | 68% | 22% | 7% | 3% | 0% |

The reasons for migration are different from country to country. Mainstream literature tends to list "employment, economic wellbeing, and family reunification" as the most common underlying "motives that induce migration"[15]. Results from the household survey revealed that in El Salvador the current levels of violence that affect the country were tagged as the main reason for migration, according to nearly one out of every two households. In Honduras, the main reason given was the lack of employment opportunities, while in Guatemala, agricultural production losses due to the drought were reported as the prime reason for migration. Field observations suggest that households tend to consider food insecurity as an outcome of the lack of income, employment, and of production losses.



**Figure 12: Main reasons for migration, by country**

About 58% of the study households reported that their family member left during the previous year, while some 25% reported that their relatives left more than three months ago. The USA remains overwhelmingly the preferred destination for migrants from Central America (Table 34).

---

[15] Jonathan Hiskey, Mary Malone, and Diana Orces (2014). op. cit.

**Table 34 Migrants' Preferred Destinations, by country**

| Destination | Guatemala | Honduras | El Salvador |
|---|---|---|---|
| To other Central American country | 0% | 0% | 3% |
| To US | 97% | 100% | 94% |
| Another non CA country | 0% | 0% | 3% |
| Do not know/No answer | 3% | 0% | 0% |

The impacts of emigration on the household members who stay behind are both negative and positive. Forty percent of surveyed households reported acquiring debts as the main impact of migration. Other negative impacts include abandoning their work, and a worsening of their poverty condition. Twenty-four percent perceived no change at all; while other reports are ambivalent, such as continuing the work and hiring wage labor.  Sixteen percent reported an improvement in their livelihoods because of receiving remittances.  A few did not provide responses.

**Figure 13: Different impacts of emigration, by country**



C.2 REMITTANCES AND SOURCES OF INCOME OF FAMILIES IN THE COUNTRY OF ORIGIN

Approximately, 61% of surveyed households receive remittances and 34% receive them at least once a month, while another 15% receive remittances sporadically (once every two (2) or three (3) months, or only on special occasions such as Christmas).

Remittances were considered as the main source of income for 25% of surveyed households with family members who migrated. Agricultural production is the main income source for 30% of the households, while only 7% of surveyed households reported day labor as their main income source, with differences between countries.

About one third of the surveyed households indicated having only one income source and of these 47% reported remittances as their only income source. This in turn highlights the high level of economic vulnerability of these households.

Three of every eight household indicated that their main source of income changed since their family member migrated. Of these, 28% reported that the migration severely affected their income sources, because of a 10 percent decrease in agricultural productivity, an 11.4% increase in wage income and an increase on average of 49% in remittances.

Unemployment is a big social problem affecting the majority (56%) of the surveyed households. Of the households that reported remittances as their main income source, at least 20 percent have one member who was unemployed at the time of the survey.

**C.3 FOOD SECURITY SITUATION AND VULNERABILITY**

WFP conducted ten Emergency Food Security Assessments (EFSA) in the Dry Corridor from 2014 to the first quarter of 2016.  To be used in the current study, the WFP Food Security Index (FSI) was calculated for the entire sample using the CARI methodology.  Then the cases where the households reported having a recently emigrated member were extracted and processed.  In the full sample of households, 32% of these households were found to be moderately and severely food insecure (Figure 14).

**Figure 14: Food Security Indicator in Dry Corridor (2014-2016)**



FOOD SECURITY INDICATOR (FULL SAMPLE)
Emergency Food Security Assessment 2014-2016

- Food Secure
- Marginal Food Secure
- Moderate Food Insecure

10%
27%
58%

When extracting the cases of households with recently emigrated family members, the prevalence of moderate and severe food insecurity increased to 43%.

**Figure 15: Food Security Index for surveyed households with members who migrated**



FOOD SECURITY (CARI) MIGRATION CASES
Emergency Food Security Assessment 2014-2016

- Food Secure
- Marginal Food Secure
- Moderate Food Insecure
- Severe Food Insecure

8%  7%
35%
50%

The above confirms both a high prevalence of food insecurity in the drought-affected areas, as well as a higher prevalence of food insecurity among households with recently migrated members.

In the present study, a new household survey was applied to 120 households from the three countries and the level of food insecurity was 47%, higher than any of the previous surveys, and with a very high level of **severe food insecurity** (11%). According to WFP records, this level of severe food insecurity is the highest reported in the region thus far.

**Figure 16: Food Security Index for households with members who migrated (2016)**



About three out of every four households primarily purchase their food. This represents an increase of 19% from before the family member migrated.  On the other hand, 13% of surveyed households consume self-produced foods; this is a decrease of 16% from before the family member migrated. Approximately 19% of households have an unacceptable food consumption score that lies between borderline and poor, although it varies by country.

**Figure 17: Food consumption, distribution by country.**



Most households have an acceptable food consumption score, but dietary diversity and micronutrient consumption are usually not adequate. About 15% of surveyed households report low dietary diversity, or a poor-quality diet, consuming less than four food groups in the previous seven days.

It was noted that even households with adequate food consumption, do not consume enough iron-rich foods. About 25% of surveyed households with acceptable food consumption score had not consumed iron rich-foods during the previous seven days. In addition, households with borderline and poor food consumption showed a significant deficit in the intake of vitamin A and protein-rich foods during the previous seven days.

**Figure 18: Food consumption/nutritional analysis of all surveyed households**



The proportion of the total household expenses allocated to food (known as "food share expenditure") when high, is a prime indicator of household economic vulnerability. Poorer households spend a greater share of total expenditures on food. This then lowers their capacity to purchase non-food items, as well as erodes the households' capacity to adjust and absorb upward food price fluctuations. It further indicates whether the household can adjust when faced with a crisis. Thus, if the food expenditure share is already high prior to a crisis, there is little room left for any adjustments in time of crisis.

In this regard, almost half of all households (49%) reported that more than 75% of their expenditures go to purchase food. In addition, the majority (more than 60%) of households had not consumed any foods containing adequate quantities of vitamin A or iron during the past seven days, while the food expenditure share exceeded 65%. Thus, diet quality and nutritional intake are a major area of concern among these households.

**Figure 19: Household's share of food expenditures**



## C.4 EMERGENCY AND CRISIS COPING STRATEGIES

Food coping strategies are behaviors applied by households to gain direct access to food, or access to income to purchase food. The majority of households applied more than two of the following food consumption strategies: (i) eat less preferred or cheaper foods (46%), (ii) reduce the size of food portions (31%), (iii) reduce the number of meals consumed per day (13%), (iv) reduce the quantity of food consumed by adults (mothers to benefit small children (7%), and with less degree, (v) borrow food or rely on friends and relatives.

The significant prevalence of emergency coping mechanisms among households indicated severe constraints in resilience capacity of these households to deal with shocks. In the month before the survey, some 70% of household had applied emergency coping strategies such as asset depletion (the sale of their land, and/or working for food only). About 22% of the households applied crisis coping strategies such as the sale of their agricultural assets and purchase on credit. No household reported applying stress coping strategies, due to the fact they had already applied all possible stress coping mechanism in the past 12 months. Emergency coping strategies are often considered irreversible further pushing households into greater food insecurity and poverty.

Likewise, households that apply emergency coping strategies are also economically vulnerable, as they spend more than 75% of their resources on purchasing food, and despite an acceptable food consumption score, they present severely deficient intakes of micronutrients such as iron and Vitamin A.

**Figure 20: Percentage distribution of livelihoods coping strategies applied**



**Figure 21: Dry Corridor Livelihood Coping Strategies**

## C.5 RESULTS OF THE FOOD SECURITY INDEX (FSI)

A compilation of indicators of food consumption, food expenditure and livelihood coping strategies generates the food security index (FSI). Results from the field reveal that approximately 47% of households are categorized as "food insecure" based on their FSI score.

Disaggregated by country, Guatemala presents the most striking scenario, where at least 70% of households can be considered as "food insecure," either moderately or severely. Asset depletion coping strategies are the most striking indicator related to food insecurity for these households.

Some 36% of households have received food assistance primarily from the government of their respective countries; however this percentage differs drastically among countries. Nearly three of every five households in El Salvador reported receiving assistance from the government: primarily in the form of agricultural resources such as seeds and fertilizers. Forty-two percent of households in Guatemala reported receiving food assistance from the government, while in Honduras, only 10% reported receiving food assistance. Nevertheless, food insecurity prevails, and the capacity to apply emergency coping strategies by the most vulnerable households becomes less and less over time.

The tables in the next pages provide details on the food security results. The FSI combines two types of indicators: a) current situation (represented by the Food Consumption Score and based on food consumption), and b) coping capacity (estimated through Economic vulnerability and Asset depletion, which use Food share expenditure and Livelihood coping strategies, respectively). Households are included in four categories: Food security, Marginal Food Security, Moderate Food Insecurity and Severe Food Insecurity. The combination of the data in the above four columns provides the value of the FSI.

AR393

**Table 35: CARI results of households in the studied Dry Corridor.**

| THREE CENTRAL AMERICAN COUNTRIES<br><br>Domain | Indicators | Food Security<br><br>1 | Marginal Food Security<br><br>2 | Moderate Food Insecurity<br><br>3 | Severe Food Insecurity<br><br>4 |
|---|---|---|---|---|---|
| Current Status — Food Consuption | Food Consumption Score | 81% | | 16% | 3% |
| Response Capacity — Economic Vulnerability | Food Share Expenditure | 5% | 46% | 10% | 38% |
| Response Capacity — Assets Depletion | Livelihood Coping Strategies | 6% | 0% | 22% | 72% |
| **Food Security Index** | | **3%** | **50%** | **36%** | **11%** |
| EL SALVADOR<br><br>Domain | Indicators | Food Security<br><br>1 | Marginal Food Security<br><br>2 | Moderate Food Insecurity<br><br>3 | Severe Food Insecurity<br><br>4 |
| Current Status — Food Consuption | Food Consumption Score | 95% | 0% | 5% | 0% |
| Response Capacity — Economic Vulnerability | Food Share Expenditure | 5% | 46% | 10% | 38% |
| Response Capacity — Assets Depletion | Livelihood Coping Strategies | 5% | 0% | 31% | 64% |
| **Food Security Index** | | **3%** | **64%** | **31%** | **3%** |
| GUATEMALA<br><br>Domain | Indicators | Food Security<br><br>1 | Marginal Food Security<br><br>2 | Moderate Food Insecurity<br><br>3 | Severe Food Insecurity<br><br>4 |
| Current Status — Food Consuption | Food Consumption Score | 59% | | 32% | 10% |
| Response Capacity — Economic Vulnerability | Food Share Expenditure | 5% | 29% | 5% | 61% |
| Response Capacity — Assets Depletion | Livelihood Coping Strategies | 0% | 0% | 20% | 80% |
| **Food Security Index** | | **0%** | **29%** | **46%** | **24%** |
| HONDURAS<br><br>Domain | Indicators | Food Security<br><br>1 | Marginal Food Security<br><br>2 | Moderate Food Insecurity<br><br>3 | Severe Food Insecurity<br><br>4 |
| Current Status — Food Consuption | Food Consumption Score | 90% | 0% | 10% | 0% |
| Response Capacity — Economic Vulnerability | Food Share Expenditure | 17% | 29% | 7% | 46% |
| Response Capacity — Assets Depletion | Livelihood Coping Strategies | 12% | 0% | 17% | 71% |
| **Food Security Index** | | **7%** | **56%** | **32%** | **5%** |

AR394

FOOD SECURITY AND EMIGRATION

# III. SUMMARY OF CONCLUSIONS

## A. EMIGRATION TRENDS IN CENTRAL AMERICA

1.1. Adults still constitute the majority of emigrants from the Dry Corridor of the three Central American countries, but the proportion of **accompanied and unaccompanied children has increased in the last years.** It is expected that the results from this study will strengthen the ongoing efforts of governments and partners to address and reverse this trend.

1.2. Successful emigrants can become a source of support for family members who stay behind, once they establish themselves in the destination country, by sending back remittances. Those emigrants who are apprehended on route to their final destination and are deported back to their communities (about half of all emigrants), very often try again, as **reaching their destination is the only way to repay debts acquired to cover the emigration costs**. The economic situation of the family is likely to worsen with each new attempt, given the high emigration costs.

## B. CAUSES OF EMIGRATION

2.1. Poverty and unemployment are the most common causes of emigration, followed by problems linked to agricultural losses and adverse climate events (drought, high temperatures and pests), as well as high levels of violence in some countries. The population describes this in several ways, including the **"inability to put enough food on the table".** Family reunification is an emerging motive for emigration, particularly for accompanied and unaccompanied children. The above motives are not mutually exclusive and people often emigrate for multiple reasons.

2.2. The high prevalence of food insecurity found among the families with members who have emigrated suggests that food insecurity may be both a cause and a consequence of emigration.

2.3. One of the main goals of emigration is generate income that can be sent back home as remittances, in order to repay debts, support families to meet current basic needs and to make investments for a better life. Violence and the need to escape from life threatening situations has also been mentioned as a motive for emigration, but mostly in El Salvador.

## C. COMPLEX ROLE OF POVERTY

3.1. Legal travelers who become irregular emigrants (by overstaying their visa) usually belong to households at the relatively higher socio-economic level.

3.2. Some irregular emigrants belong to families at a middle socio-economic level. Their jobs (before departure) did not provide regular and comparatively good income and kept them in a state of economic uncertainty and vulnerability. In turn, this economic insecurity can induce a level of food insecurity that starts as moderate and can become severe over time.

3.3. In addition to the economic problems they face and their inability to feed their families properly, emigrants from middle and low socio-economic strata have to acquire debts (with family assets as collateral) to pay for the emigration journey to the USA or elsewhere.
3.4. For the poorest strata of the population, using a migrant smuggler is not an affordable option - unless they have a relative who has previously emigrated and can cover the costs. Most emigrants in this category attempt to go on their own (without using a migrant smuggler) with increased risks of not reaching their intended destination. Their departure can translate into destitution for relatives who stay behind.

3.5. Poverty is also described by emigrants' families as a lack of capacity to adequately feed family members and pay for other basic needs.

AR395

3.6. There is often a perception that families with members who have successfully emigrated to the USA have adequate resources due to the remittances they receive. This does not account, however, for the costs of emigration and the impacts on the family members who stay behind. This study finds that those remittances do not always fully cover the total costs of emigration for family members, at least in the short to mid-term. The study found that 40 percent of households with emigrants have acquired debt and that remittances do not begin at the time of emigration. When remittances do begin to flow, most of the income goes towards debt repayment and consumption of basic foods. In the cases where emigrants stabilize and get gainful employment, more than half of the remittances are used to buy food in the three countries, followed by agricultural investments (buying land and animals and investments in small businesses) in El Salvador. The second destination in Guatemala and Honduras is education and healthcare. The study also found that in some cases, families who receive remittances are automatically excluded from social programs, in certain cases with the approval of other community members.

3.7. There is a large difference between the minimum and maximum values of the remittances (US$50 to US$1,000/month) received by remaining family members. Without knowing how much each individual family receives, it is not possible to estimate which families continue to be food insecure despite the support from abroad and which families improve their financial situation.

3.8. If remittances can provide for improved food access, but do not sufficiently offset debts incurred to finance emigration costs, or offset labor force losses, the net result will be continued economic hardship. As a result, when remittances are not productively exploited, even families who regularly receive remittances appear to be stuck in a poverty trap and/or potential need to emigrate.

## D. CLIMATE CONDITIONS, FOOD INSECURITY AND EMIGRATION

4.1. Adverse climate conditions in the Dry Corridor negatively affect food and nutritional security through declines in the local production of food, as well as a reduced availability of agricultural work opportunities. There appears to be a connection between the appearance of El Niño in 2014 and an increase in irregular emigration to the USA.

4.2. Members of families affected by the drought are 1.5 percent more likely to emigrate than similar households elsewhere. Although this is a low value, the significance lies in the fact that the correlation between drought occurrence and emigration is positive and the probability of emigrating is higher than that of families who are not from the Dry Corridor.

4.3. It clearly emerges from several studies that climate change and emigration are strongly linked. The present study did not have a focus on climate change. However, challenges stemming from climate variability, poor rainfall distribution and drought, were identified in this study as key push factors for temporary and/or permanent emigration, reflecting a response to environmental adversity. Smallholder farmers, poorer fisher folk and other IFAD target groups are among the ones who suffer the most from climate change. With the region expected to face multiple impacts of climate change in the years ahead, migration may increase its shift from affected rural areas to other areas that experience lower environmental risks, including neighboring countries.

4.4. On the other hand, communities affected by drought conditions are also affected by unemployment, short duration of seasonal labor demand, as well as by low and irregularly paid wages. Emigration is a common coping mechanism in these communities.

4.5. It would be incorrect to conclude that in general, families are worse off when migrating. The positive impact of remittances can be observed sometimes by simple observation, but for the analysis of vulnerability and food insecurity, the attention of this study goes to those cases where the cycle of getting employment, sending remittances to pay debts and stabilizing remittances to normal and regular levels are not reached.

## E. FOOD AND NUTRITION SECURITY AND EMIGRATION

5.1. **Food insecurity**, seen by the population as the **inability to bring food to the table**, can trigger the decision to emigrate. Moreover, the family members who stay behind can go through a period of aggravated problems to cover their food needs because they lost a food provider, they are indebted and, in the case of those who are deported or die during the journey, the crisis can extend and even lead to losing the family livelihood.

5.2. The proportion of food insecurity among families with a recently emigrated member is very high as per the WFP Food Security Index: 47% of households were found to be food insecure. This included 38% with moderate food insecurity and 9% with severe food insecurity. **These high levels of food insecurity have not been seen in the region before, including during the repeated food security emergency assessments conducted by WFP since El Niño emerged in 2014,** (please refer to figures 14, 15 and 16 in the main report using the link provided on the cover).

5.3. The conclusions with respect to food access and according to a socio-economic classification of families provided by community members and key informants, are as follows:
  - On average, a third of the families are considered as having sufficient access to food, be it through their own activities or with support from remittances.
  - Another third of the families have some access to food but no long-term economic security. They consider emigration as an option. They tend to look for and take advantage of, local food assistance programs.
  - The third group, represented by 35%, 40% and 27% of the families in El Salvador, Guatemala and Honduras, respectively, live in extreme poverty, have inadequate access to food and would emigrate if an opportunity presented itself.

5.4 **When a desperate situation forces the poorest families to emigrate, they take the highest risks relative to dangers for survival and sustaining their livelihood.** Community members and key informants consider food assistance as a mitigating factor to help solve some of their situation; they highly valued this assistance and related it to avoiding "forced" emigration.

5.5. Some 70% of the families with recently migrated relatives in El Salvador and 58% in Guatemala, stated that they had not participated in food assistance programs before or after the departure of their relatives. Receiving food assistance has been very important for families with recently emigrated relatives. Whilst having members of the family living abroad is not a selection criterion for WFP food assistance programs, (although it becomes important when communities make their recommendations on the families who are to receive assistance), **the high rates of food insecurity among these families suggest the conclusion that food insecurity is not only a cause for emigration. It is also an outcome which needs to be fully understood if appropriate actions are to be identified to mitigate the effects of emigration.**

5.6. Food assistance is considered very important particularly during the period when the emigrant settles down at his/her destination, finds a job, is
able to send remittances and the family who stayed behind repays loans and other debts. Despite the importance of food assistance during this settling-in period, its role may be much more important before emigration takes place, to mitigate the push effect of food insecurity and avoid negative outcomes.

## F. IMPACTS OF EMIGRATION

*6.1. Positive impacts on family members at the place of origin:*

6.1.1 In the case of emigrants who manage to reach the USA, an average of 78% of their families report receiving US$50 to US$1,000 a month by way of remittances. Those receiving higher amounts are likely to repay debts. The amount tends to decrease and stabilize after debts have been repaid. Once stabilized, more than half of the remittances are used to buy food; followed by agricultural

AR397

investments (buying land, animals) and investments in small businesses. Left-over funds are allocated to education, medicine, utility bills, or buying home appliances. There is an undetermined period between when emigration takes place and the receipt of the first remittances to support family consumption. Economic stress is very high during this period. One of the main impacts of remittances is to improve the families' well-being, especially their food consumption.

6.1.2 There are positive and negative effects on women when men emigrate. Women take charge, managing the remittances and family resources. This is likely to have a positive effect on food consumption and on the wellbeing of the family as a whole, making women's empowerment an important area for action.

6.1.3 When emigration is motivated to escape threats of violence, successful emigrants may gain personal security at their destinations. However, they may have to endure violence during their migration journey.

6.1.4 If well managed, remittances enable children of recipient families to receive proper education and then become productively employed in a variety of activities.

*6.2. Negative impacts for family members in the place or origin:*

6.2.1 When funds to emigrate come from loans or sale of properties and assets, then debts, mortgages and economic scarcity lands on the relatives who stay behind. Their economic situation is negatively impacted and may become aggravated over time, when they receive little by way of remittances or any other assistance. Acquired emigration debts have to be repaid, independently of whether the emigrant successfully reached the intended destination and engaged in gainful activities or not. Indebted deportees many times cannot go back home because creditors will be asking for payment of the debt.

6.2.2 When women replace absent men in agricultural labor and production, an added burden is introduced for them, as this is usually added to their normal household and child-caring responsibilities. During the stressful period between the start of the emigration journey and receiving assistance, women have to take care of all family needs and may have to engage in extra economic activities to survive. The above can translate into further food insecurity.

6.2.3 Emigration reduces the labor force of the family, which may have a negative impact on agricultural production, livestock rearing and other economic activities and thus decrease family incomes.

6.2.4 Family disintegration, alteration of family structure and functions and increased perception of vulnerability and danger are socio-psychological impacts of emigration. The above increases the burden on family members who stay behind and can lead to exposure to new risks.

6.2.5 As reported by community members, there are cases where young family members who benefit from remittances end up abandoning school and jobs and may get involved in drug consumption or illegal and violent activities. This is clearly a protection issue of concern for humanitarian organizations and communities alike. The study did not include data to analyse the impact of remittances on education. But it may be assumed that the positive impact of remittances on supporting educational opportunities for young family members will outweigh any negative impacts.

## G. SURVIVAL STRATEGIES OF FAMILIES THAT DO NOT RECEIVE REMITTANCES

7.1. Relatives who stay behind often have to assume the work (crops, domestic animals) previously undertaken by the emigrant(s) or take on wage labor jobs (*jornaleo*, domestic services) and this may be the case whether the family receives remittances or not.

7.2. Returnees may be able to repay emigration debts if they manage to earn and save money when abroad. To pay off debts they may sell properties and assets, obtain credits and loans, or ask for

help from someone in the USA. There are reportedly many indebted returnees in the emigrants´ communities who were caught and deported upon arrival, who may also face higher levels of indebtedness and possibly livelihood loss.

7.3. Emigrants´ families and returnees (voluntary and deported) look for the support of organizations that are present in their communities. Some of them are international organizations, which provide institutional and legal support, as well as contacts with assistance programs. Others are local entities, which provide legal and political support and may eventually also provide economic support.

7.4. WFP has been providing food assistance to vulnerable families in the Dry Corridor. They were targeted because of the drought and crop losses. It also became apparent that many of these families have recently migrated relatives and had not received any remittances. Food assistance is described by these families as life-saving. Food insecurity among families with emigrated members is high in the Central American Dry Corridor, as evidenced by the WFP food security emergency assessments in the three countries studied.

## H. VIOLENCE, FOOD AND NUTRITIONAL SECURITY

8.1. The term "violence" includes extortion, gangs, threats, assaults, robbery, domestic violence, as well as gender based violence and death sentences for youngsters who refuse to join or collaborate with gangs. There are differences between El Salvador and the other two countries in terms of the role that violence plays in emigration decisions and food and nutritional insecurity.

In El Salvador, violence was mentioned without restrictions (unlike Honduras) and came up as an important push-factor for emigration. The role of violence in Honduras is not clear due to the self-restriction by community members to discuss it openly. For Guatemala, the discussions were open and violence did not come up at the top of the triggering factors.

8.2. In the three countries, the families receiving remittances can be the subjects of threats and extortion. While in El Salvador violence was identified as a factor severely affecting normal economic activities, in Guatemala and Honduras this does not receive the same level of consideration, which does not mean that the problem is inexistent.

8.3. Only in El Salvador was it reported that voluntary and deported returnees engage in violent actions.

8.4. The interviewed citizens consider violence as a cause of both poverty and losing the capacity to properly feed their families. Violence represents restrictions to work and a constant loss of already restricted economic resources. Violence also create protection issues.

8.5. The journey´s risks related to informal emigration are well known and documented. The spike in recent emigration levels as well as increased numbers of unaccompanied children are a concern. Protection issues related to family members who stay behind also need to be addressed.

8.6. Protection needs to be mainstreamed into existing social assistance programs in the Dry Corridor. Furthermore, governments and organizations with a protection mandate must consider how to better address these specific issues along the emigration chain, both for family members who stay behind and for the broader community in areas with high levels of emigration.

The findings of the study lead to certain reflexions regarding required policies and actions to deal with emigration from the Dry Corridor of the three countries. They lay the foundations for specific areas of actions to mitigate the emigration push-factors through actions like social safety nets, gender empowerment and protection measures. Research needs can also be identified to help shape prevention, mitigation and response measures to reduce the impacts of emigration on vulnerable populations.

AR399

It is expected that the study findings provide valuable input for policy and programmatic decisions by the three Governments as well as WFP and its partners. The study also provides justification for actions and investments for a large number of institutions and stakeholders. This will necessarily require broadly based consultations among all actors: governments, international organizations, local authorities, civil society organizations and the communities where emigration originates. Some general recommendations to guide actions are identified below.

# IV. RECOMMENDATIONS

## A. REDUCING VULNERABILITY TO PUSH-FACTORS

### *Resilience and Climate Change Adaptation Related*

Climate surveillance initiatives and trend analyses of climatic variables affecting crop production, combined with soil use/productive capacity and natural disaster monitoring, should be strengthened with the aim to identify critical areas that will incorporate special preventative emigration measures (geographical targeting). The use of WFP´s Integrated Context Analysis could be one tool to facilitate this analysis and should be promoted across the three countries as a starting point. This will bring together a wide range a partners, including national authorities and other development-oriented actors.

To enhance climate variability resilience, more comprehensive climate change adaptation efforts need to be pursued through a combination of both community-based and institutional-strengthening initiatives. In particular, integration with risk transfer schemes, such as weather-based parametric insurance for vulnerable farmers, might be a promising opportunity.

Financial mechanisms need to be created to ensure access to agricultural inputs for food production (cereals and pulses), as well as technical assistance and insurance schemes.

Recognizing the increasing frequency of water stress, dry spells and droughts in the Dry Corridor and using a resilience approach, it is important to create programs to improve water management, such as small irrigation schemes, protection of water sources and agriculture diversification in areas identified as priority. These efforts, as well as community-based social safety nets aiming to increase food availability and access, need to be strengthened and integrated into community, district and departmental development plans.
There is a need to recognize the dynamics of the Dry Corridor, each of the three countries and the sub-region. In particular, while larger-scale investments in agricultural infrastructure would result in higher gains in production, the particular vulnerability of many households who benefit from agriculture in the area would not necessarily decrease. This is due to a combination of land tenure issues (not addressed in this study) and historical precedents in which such investments often result in advantageous purchases of improved lands from marginal households.

Promote risk reduction approaches to make communities less vulnerable to shocks. Strengthen informal and formal institutions at the local level with the aim to enhance the coping capacity of the communities and make them more resilient through measures designed to prevent, respond and recover from crisis situations.

Measures are needed to create local market opportunities for diversified food production by small-scale producers.

When food assistance is provided by WFP, or others, to mitigate push-factors for emigration or to respond to emergencies, the seasonality of food production and the length of the lean season should be considered to determine the duration of the assistance. This should be done instead of limiting assistance to a specific period independent of aggravating factors.

AR400

*Responses to migration crises*

For the studied countries, it is important to improve and systematize the way in which they respond to the assistance and protection needs of crisis-affected, vulnerable populations.

A useful tool for them to develop these kind of responses is the Migration Crisis Operational Framework (MCOF), which is an analytical and operational tool designed to enable countries to provide a holistic response to the complex nature of crisis-generated population flows. Therefore, it looks at all phases of a crisis (before, during, after) as a whole and considers the specific needs and vulnerabilities of crisis-affected migrants who fall outside of existing protection frameworks. Accordingly, the MCOF aims to identify and address institutional and operational gaps that exist in the current set-up of international responses to crises with a migration dimension. The Framework thus allows countries to respond to migration crises in a more coordinated, inter-connected way.

*Social protection related*

Considering the long chain of events that are required for remittances to turn a positive balance in the life of the most vulnerable, it is recommended that food security programs and other social programs should increasingly take into account the vulnerability level of families with recent emigrants. This should apply to public social protection programs and to assistance provided by international and national organizations. The family composition should be considered, particularly the number of small children and elderly persons and whether the family is headed by a woman.
Develop crisis modifiers within social protection schemes to be alerted through surveillance of emigration push-factors at community and household levels. The aim is to prevent or offset in a timely manner the increasing pressure of these push-factors. This can also be informed by ongoing work by study partners, as well as by an ongoing WFP and Oxford Policy Management study on Shock Responsive Social Protection. The aim should be for social protection systems to increasingly emphasize the importance of adaptation and seasonal stresses while, also potentially serving as a tool to define unexpected needs following a shock.

Improve education coverage and training services to teach income-generation skills for children and youth, with incentives to stay in school. Support school meals transfers and connect school feeding programs with local small-scale producers, thus creating new local markets for food production, while also working with those producers to improve product quality and supply consistency.
Introduce disaster risk reduction and food and nutritional security to agricultural development initiatives, directly engaging national authorities, local governments and communities, promoting partnerships among local actors and community empowerment.

Recognizing the high transfer costs of sending remittances back home, discuss with Remittance Service Providers (MTOs, FinTechs, mobile companies, MFIs, banks, postal operators and others) how to lower transfer costs, facilitate transfers into the most remote areas and link them to additional financial services in order to promote financial inclusion. The idea is to approach money transfer companies to suggest and support linkages with financial institutions so recipients can be linked with financial products through their remittances. In other words, promote the linkage of remittances and financial inclusion which, as has been demonstrated so far, notably by IFAD, to be one of the greatest development impacts that remittances can have at the family unit level. In terms of reducing the cost, the rationale is that greater competition – innovation in the market place coupled with an enabling environment (regulatory framework) – will expand the market by providing recipients with more options while reducing transaction costs.

**B. ADEQUATELY ADDRESSING PROTECTION, PREVENTION AND ADAPTATION ISSUES**

Provide legal, social and psychological support for families with members who emigrated and who have compromised their livelihoods due to debts, mortgaged assets and loss of family labor. This must be a community-driven initiative to ensure proper targeting, making communities full partners and empowering them to make protection and prevention decisions that affect the community and the families with members

AR401

who emigrated. It also involves the involvement of the beneficiaries in the participatory monitoring of activities and also of the implementers.

Support deported returnees with protection services, particularly when violence was the push-factor for emigration and create incentives to restore their livelihoods through the provision of a minimum set of resources.

Governments and the international community need to recognize that violence, particularly in El Salvador but possibly also in other Central American countries, is effectively a humanitarian emergency. Violence has significantly impeded development and while the levels of violence in the three countries of the study do not represent a traditional conflict but criminal acts, the impacts of violence are creating humanitarian needs. There is a need to further ensure that gender needs are addressed, equal opportunities are created and assistance to the most vulnerable people prioritized with gender transformative approaches. As more men than women emigrate, the women who stay behind have to assume new responsibilities, including in agricultural production and in managing the family resources, in addition to their traditional tasks. Women's empowerment must prepare them to assume these new roles. This calls for targeted actions aimed at empowering women and to strengthen solidarity networks among women.

As it is foreseeable that climate change might continue during the near future, developing viable, specific solutions and policies (including National Adaptation Plans) to reduce forced movement is essential. Also important, such forced movements should be transformed into well-managed relocations within internal borders to help foster the resilience of individuals and communities, consequently creating diverse opportunities for livelihoods.

### C. INTERNATIONAL COOPERATION AND NATIONAL INSTITUTIONS

Preventing emigration caused by food insecurity should be strengthened in national initiatives linked to the SDGs and should be fully incorporated in relevant social protection, violence, as well as environmental management policy and action frameworks.

National Governments should take into consideration the identified effects of food insecurity on emigration to promote public policies and development plans focused on the vulnerabilities of the Dry Corridor of El Salvador, Guatemala and Honduras.

Promote regional alliances (UN and other international development agencies, donors and financial institutions, Civil Society), starting with the stakeholders of this study to support the government's public policies and action frameworks to reduce food and nutritional insecurity, violence and climatic events related to emigration.

All initiatives of the UN system addressing protection concerns should include a focus on food security and nutrition for an integrated approach.

Joint efforts to reduce migration and promote human development, such as the alliance for prosperity, should take into consideration long-term investment in food security and nutrition.

# V. REFERENCES AND BIBLIOGRAPHY

## General

*2015-2019, Marco de Asistencia de Las Naciones Unidas Para El Desarrollo*. ONU, 2015.

Arévalo, Marcel, and Zepada Beatriz. "Sistema fronterizo de Guatemala. Una aproximación." "Explorando la economía política de la violencia en las regiones fronterizas de América Latina" FLACSO-Ecuador. Quito, Ecuador. 2015.

De Shutter, Oliver. *Informe Del Relator Del Derecho a La Alimentación Sr. Olivier De Shutter.* ONU, 2014. Web.

AR402

González-Barrera, Ana, Jens Manuel Krogstad, and Mark Hugo. *DHS: Violence, Poverty, Is Driving Children to Flee Central America to U.S.* N.p., 2014. Web. Factank: News in the Numbers.

Hidalgo, H., A Duran-Quesada, and J Amador. "Hydro-Climatological Process in the Central America Dry Corridor Abstract #H41A-1270." American Geophysical Union, Fall Meeting 2015. Universidad de Costa Rica, San Jose.

Hiskey, Jonathan, Diana, Mary Malone, and Diana Orces. "Violence and Migration in Central America." *Americas Barometer Insights* 101 (2014): 1–8.

Martínez, A.M. "Convenio Violencia y Trata En Centroamérica Sistematización de Buenas Prácticas." 2013: n. pag.


*Nota Técnica: Situación de La Seguridad Alimentaria y Nutricional En Centroamérica y República Dominicana*. El Salvador: Sistema de la Integración Centroamericana [Programa PRESANCA], 2011.

*Otras Situaciones de Violencia En El Triángulo Del Norte Centroamericano Fronteras Invisibles, Espirales de Violencia y Normalización Del Terror. ACAPS, 2014.*

*Resumen Del Estudio Tortillas En El Comal: Los Sistemas de Maíz y Frijol En Centroamérica y El Cambio Climático. Baltimore, Maryland: Catholic Relief Services, 2012.*

Rodriguez, Peralta O., Carrazon Alocen, and Elvir Zelaya. *Buenas Prácticas Para La Seguridad Alimentaria y La Gestión de Riesgo. Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO), 2012.*

Rodríguez Vega, Eugenio. "Costa Rica En El Siglo XX." 2004: n. pag.

Van Der Zee, A. et al. *Estudio de La Caracterización Del Corredor Seco Centroamericano. Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO), 2012.*

---. *Identificación de Actores Relevantes y Relaciones Interinstitucionales En El Corredor Seco Centroamericano. Organización de las Naciones Unidas para la Alimentación y la Agricultura (FAO), 2012.*

**EL SALVADOR**

*Almanaque 262. Estado Del Desarrollo Humano En Los Municipios de El Salvador 2009. San Salvador, El Salvador: United Nations Development Programme (UNDP), 2009.*

*Anuario Regional de Estadísticas Policiales 2011-2012. Comisión de Jefes(as) y Directores(as) de Policía de Centroamérica, México, el Caribe y Colombia, 2013. Talleres Gráficos UCA.*

*Base de Datos de Incidencia Delictiva 2014. N.p., 2015.*

*Cuadernos Sobre Desarrollo Humano: La Igualdad y La Equidad de Género En El Salvador. San Salvador, El Salvador: United Nations Development Programme (UNDP)., 2011.*

*Educación En Cifras 2009-2013. Ministerio de Educación, 2014.*

*Estado Del Arte En Cambio Climático, Agricultura y Seguridad Alimentaria En El Salvador. El Salvador: Programa de Investigación en Cambio Climático, Agricultura y Seguridad Alimentaria [GCIAR], 2013.*

*Estrategia Nacional de Prevención de La Violencia. N.p., 2013.*

*Funda Ungo. Factores Asociados a La Violencia y El Crimen En El Salvador: Una Aproximación a La Hipótesis de La Exclusión Social. El Salvador: Talleres GRAFIKA., 2013.*

---. *Factores Asociados a La Violencia y El Crimen En El Salvador: Una Aproximación a La Hipótesis Económica. El Salvador: Talleres GRAFIKA., 2013.*

---. *Factores Asociados a La Violencia y El Crimen En El Salvador: Una Aproximación a Los Factores Demográficos. El Salvador: Talleres GRAFIKA., 2013.*

*Gaborit, M. La Esperanza Viaja Sin Visa: Jóvenes y Migración Indocumentada de El Salvador. El Salvador: UNFPA/UCA, 2012.*

*Garcia, M. Alianza Para La Prosperidad Del Triángulo Del Norte: Lejos de Ser Una Solución Para La Crisis Migratoria de América Central. Council on Hemispheric Affairs (COHA).*

AR403

Gill, Georgio. Migración Femenina. Su Impacto En Las Relaciones de Género. Madrid, España: Narcea S.A. Ediciones., 2005.

Informe Sobre El Desarrollo Humano 2005: Una Mirada Al Nuevo Nosotros, El Impacto de Las Migraciones. San Salvador, El Salvador: United Nations Development Programme (UNDP), 2005.

La FAO y La Agricultura Familiar: El Caso de El Salvador. El Salvador: Organización de las Naciones Unidas para la Alimentación y la Agricultura [FAO], 2012.

La Soberanía Alimentaria En El Salvador. El Salvador: Consejo Nacional de Trabajadores de Campo, 2010.

Menchi, M, and H Menendez. Análisis de La Situación Alimentaria En El Salvador. Guatemala: INCAP, 2011.

Migración, Mujeres y Vivienda. La Conquista, Nicaragua y Texistepeque, El Salvador. San Salvador, El Salvador: UNDP, UCA, 2011.

Política Nacional de Seguridad Alimentaria y Nutricional: Garantizando El Derecho a Una Alimentación Saludable Con Inclusión y Equidad 2011-2015. N.p., 2011.

Ramos, E. Transnacionalización de La Sociedad Salvadoreña, Producto de Las Migraciones. Universidad Tecnológica de El Salvador., 2012.

Ruiz, L. El Salvador 1989-2009. Estudios Sobre Migraciones y Salvadoreños En Estados Unidos Desde Las Categorías de Segundo Montes. El Salvador: UNDP/UCA.

"Sección de Proyectos Sobre El Salvador." Banco Mundial 2013. Web.

Tasa de Retornados de El Salvador Base de Datos. México: OIM, 2015.

Zenteno, Rene. Redes Migratorias: ¿Acceso y Oportunidades Para Los Migrantes? México, D.F.: Consejo Nacional de Población (CONAPO). Migración México – Estados Unidos. Opciones de Política.


**Guatemala**

Acuña, González. Flujos Migratorios Laborales Intrarregionales: Situación Actual, Retos y Oportunidades En Centroamérica y República Dominicana. Informe de Guatemala. San José, Costa Rica: OIM, OIT, MTSS, CECC SICA, OCLAD, 2011. Red de Observatorios Del Mercado Laboral, AECID.

Análisis Del Presupuesto General Del Estado de Guatemala Aprobado Para El 2013. Enfocado En La Niñez y Adolescencia y En Seguridad Alimentaria y Nutricional. Guatemala: ICEFI/UNICEF/ Embajada de Suecia en Guatemala, 2009.

Bismarck, Pineda, and Lisardo Bolanos. Diagnóstico de La Violencia Juvenil En Guatemala. Guatemala: N.p., 2009. Documento Para Discusión.

Brands, Hal. Crime, Violence, and the Crisis in Guatemala: A Case Study in the Erosion of the State. CIPREVI. Web.

Camus, Manuela. Comunidades En Movimiento: La Migración Internacional En El Norte de Huehuetenango. Antigua, Guatemala: INCEDES/CEFOG, 2007.

Caracterización de Los Municipios Según Determinantes de La Desnutrición Crónica Con Base Al Índice de Vulnerabilidad a La Inseguridad Alimentaria y Nutricional. Guatemala: MAGA, SESAN, USAID, 2012.

Caracterización Departamentales 2013. Guatemala: Guatemala: Instituto Nacional de Estadística, 2014.

Caracterización Estadísticas República de Guatemala. Guatemala: Guatemala: Instituto Nacional de Estadística, 2013.

Caracterización República de Guatemala. Guatemala: Guatemala: Instituto Nacional de Estadística, 2014.

Casillas, R. "Las Rutas de Los Centroamericanos Por México, Un Ejercicio de Caracterización, Actores Principales y Complejidades." Migración y Desarrollo (2008): 157–174.

Cuarto Censo Nacional de Talla En Escolares de Primer Grado de Educación Primaria Del Sector Publico de La República de Guatemala. Ministerio de Educación, 2015.

AR404

*Cuarto Censo Nacional de Talla En Escolares de Primer Grado de Educación Primaria Del Sector Público de La República de Guatemala. Guatemala: MINEDUC, SESAN, INE, 2015.*

*De Shutter, Oliver. Informe Del Relator Del Derecho a La Alimentación Sr. Olivier De Shutter. ONU, 2014. Web.*

*Diagnóstico Sobre La Situación de La Niñez y Adolescencia Migrantes y/o En Tránsito En Guatemala. Guatemala: Instituto de Estudios Peruanos, 2013.*

*El Costo Del Hambre En Guatemala. Guatemala: PMA, CEPAL, 2007.*

*El Nuevo Perfil de Las Mujeres Rurales Jóvenes En Guatemala. Perú: Instituto de Estudios Peruanos, 2013.*

*Encuesta Nacional de Condiciones de Vida 2014 Principales Resultados. Guatemala: Guatemala: Instituto Nacional de Estadística, 2015. Web.*

*Encuesta Nacional de Condiciones de Vida -ENCOVI-. Guatemala: Guatemala: Instituto Nacional de Estadística, 2011.*

*Encuesta Nacional de Ingresos y Gastos Familiares ENIGFAM. Guatemala: Guatemala: Instituto Nacional de Estadística, 2013.*

*Encuesta Nacional de Salud Materno Infantil. 2008-2009. Ministerio de Salud Pública y Asistencia Social, 2009.*

*Espinoza, Christian. Informe de Consultoría Mesa Técnica Interinstitucional de Convivencia y Seguridad Ciudadana. UN, 2013.*

*Guatemala: Indicadores de Género. INE/SEPREM, 2013.*

*Gutiérrez, Edgar. Guatemala: Hábitat Del Narcotráfico. N.p., 2013.*

*Informe Anual de La Política de Desarrollo Social y Población 2013. Guatemala: Secretaría de Planificación y Programación de la Presidencia -SEGPLAN, 2013.*

*Informe Anual de La Política de Desarrollo Social y Población 2015. Guatemala: Secretaría de Planificación y Programación de la Presidencia -SEGPLAN, 2015.*

*Informe de Avances Política de Desarrollo Social y Población. Guatemala: Secretaría de Planificación y Programación de la Presidencia -SEGPLAN, 2014.*

*Informe Departamental de Desarrollo Humano: Huehuetenango. Guatemala: UNDP, 2007.*

*Krenmayr, W et al. Informe Alternativo Del Derecho a La Alimentación En Guatemala. Monitoreo de Las Directrices Voluntarias Para El Derecho a La Alimentación 2013. Guatemala: REDSAG, 2013.*

*Las Interrelaciones de La Conflictividad, La Inseguridad Alimentaria y La Migración En Guatemala. Guatemala: FLACSO, 2014.*

*López Robles, Claudia, and Alfredo Danilo Rivera. Aproximaciones de Una Política Migratoria Para Guatemala. Grupo articulador de la Sociedad Civil en materia migratoria Guatemala, 2014. Web.*

*Machin Álvarez, M. Menores y Migración: Un Acercamiento a Los Tipos de Violencia En Centroamérica Con Énfasis En Los y Las Menores Migrantes No Acompañados. N.p., 2015.  Revista de Estudios Migratorios.*

*Migración Centroamericana En Tránsito Por México Hacia Estados Unidos: Diagnóstico y Recomendaciones Hacia Una Visión Integral, Regional y de Responsabilidad Compartida.*

*Instituto Tecnológico Autónomo de México, 2014.*

*Migración Internacional En Las Américas, Sistema Continuo de Reportes Sobre Migración Internacional En Las Américas SICREMI.*

*Washington, DC: SICREMI, OCDE, OEA, 2015.*

*Palmieri, Mireya, and Hernán Delgado. Análisis Situacional de La Malnutrición En Guatemala: Sus Causas y Abordaje. Guatemala: UNDP, 2011.  Cuadernos de Desarrollo Humano UNDP Guatemala.*

*Perfil de Género y Salud. SESAN, SEPREM, UNFPA, OPS, OMS, 2013.*

*Perfil Migratorio de Guatemala 2012. Organización Internacional para las Migraciones (OIM), 2012. Web.*

*"Planes de Desarrollo Municipal." 2010: n. pag.*

AR405

*Política de Seguridad Alimentaria y Nutricional. Gobierno de Guatemala, 2005.*

*Programa de Aplicación de Los Principios Generales Para Los Mercados de Remesas de América Latina y El Caribe. El Perfil de La Población de Origen Guatemalteco En Estados Unidos. Guatemala: CEMLA, 2014.*

*Reporte Estadísticos Enero-Diciembre 2014, Dirección de Monitoreo y Comunicación STCS.*

*Guatemala: STCNS, 2014.*

*Reporte Trimestral Del Resultados: Octubre-Diciembre 2015. Tijuana México: Colegio de la Frontera Norte, 2015.*

*Rivera, D. A Propósito de La Niñez Migrante y La Gestión Migratoria En La Región: Retos y Perspectivas. N.p., 2015.  Iberoamericana.*

*Salto Al Norte Violencia, Inseguridad e Impunidad Del Fenómeno Migratorio En Guatemala. Guatemala: UNICEF, 2011.*

Varela Huerta, Amarela. *Buscando Una Vida Vivible", La Migración Forzada de Niños de Centroamérica Como Práctica de Fuga de La "Muerte En Vida".* N.p., 2015. Web.

*Violencia Armada En Guatemala. IPEADES, 2011.*

*Vulnerabilidades de Los Municipios y Calidad de Vida de Sus Habitantes (Guatemala). Guatemala: Secretaría de Planificación y Programación de la Presidencia -SEGPLAN, 2008.*

Ziegler, Jean. *Informe Del Relator Del Derecho a La Alimentación Sr. Jean Ziegler. ONU, 2006.*

**Honduras**

*Banco Central de Honduras. "Boletín de Prensa BCH 48-2012." 2012: n. pag.*

---. *"Programa Monetario 2012-2013." 2012: n. pag.*

---. *"Programa Monetario 2012-2013." 2012: n. pag.*

*Censo de Población y Vivienda. Gobierno de Honduras. Tegucigalpa, Honduras: Instituto Nacional de Estadística (INE) Honduras, 2013. Web.*

*El Manejo Político de La Inseguridad Pública: Tendencias, Peligros e Impacto. Tegucigalpa, Honduras: CEDOH, 2014. Web.*

*Encuesta Permanente de Hogares de Propósitos Múltiples, Junio 2015. Tegucigalpa, Honduras: Instituto Nacional de Estadística (INE) Honduras, 2015. Web.*

*Estrategia Nacional de Seguridad Alimentaria y Nutricional 2010-2022. Secretaria de Estado En El Despacho Presidencial. Tegucigalpa, Honduras: UTSAN -Honduras, 2011.*

*Fonseca, M.A. Factores Contextuales de La Migración Internacional de Honduras. Tegucigalpa, Honduras: N.p., 2012. Web.*

---. *Migración Calificada de Honduras En El Exterior. Tegucigalpa, Honduras: N.p., 2013. Web.*

Guillermo, Acuña, Herrera Ernesto, and Koen Voorend. *Flujos Migratorios Laborales Intrarregionales: Situación Actual, Retos y Oportunidades    En Centroamérica y República Dominicana; Informe de Honduras. San Jose, Costa Rica: CID, Gallup, 2011.*

*Hambre de Saber, Saber de Hambre, Quince Años de Cooperación Para La Seguridad Alimentaria y Nutricional, Logros y Lecciones Aprendidas. Edición Especial de Cierre 2000-2014. Tegucigalpa, Honduras: FAO, AECID, 2014.*

*Informe de Honduras, Flujos Migratorios Laborales Intrarregionales: Situación Actual, Retos y Oportunidades En Centroamérica y República Dominicana. OIM, OIT, CECC/SICA, Red de Observatorios de Mercado Laboral, Secretaría de Trabajo y Seguridad Social, 2011.*

*Informe Estadístico de Las Personas Repatriadas/Retornadas a Honduras Periodo de Enero a Septiembre de 2014. Tegucigalpa, Honduras: Centro Nacional de Información del Sector Social, 2014.*

Meza, V. *Migración y Seguridad. CEDOH, 2005.*

*Mortalidad y Otros. Tegucigalpa, Honduras: Instituto Universitario en Democracia, Paz y seguridad, 2015.*

*Organigrama Marco Institucional de La Política de Seguridad Alimentaria y Nutricional Elaborado Por La UTSAN En Base a Normativa de La Ley SAN Publicada En La Gaceta Del 7 de Julio 2011. Tegucigalpa, Honduras: UTSAN -Honduras, 2011.*

Palerm, Juan, Ernesto Flores, and Hans Nusselder. *Perfil Ambiental País de Honduras. Gobierno de la República de Honduras, 2013. Web.*

*Perfil Nutricional de Los Hogares En Los Municipios Del    Corredor Seco de Honduras. OPS, INCAP, 2010. Web.*

*Plan de Acción Nacional de Lucha Contra La Desertificación y Sequía, Honduras 2014-2022. Tegucigalpa, Honduras: Secretaria de Energía, Recursos Naturales, Ambiente y Minas de Honduras, 2014.*

*Principales Indicadores Económicos Disponibles. Tegucigalpa, Honduras: Banco Central de Honduras, 2015. Web.*

*Recursos Financieros Disponibles de La Banca Nacional y Condiciones de Prestación Según Cultivos. BANADESA, 2012. We*b.

*Refugiados y Migrantes En Estados Unidos: Familias y Niños No Acompañados- Situación de Derechos Humanos de Familias, Niños, Niñas y Adolescentes No Acompañados. Comisión Interamericana de Derechos Humanos, Organización de Estados Americanos, 2015. Web.*

Salomon, L. *Criminalidad y Violencia En Honduras, Retos y Desafíos Para Impulsar La Reforma. Tegucigalpa, Honduras: CEDOH, 2013. Web.*

---. *Los Responsables de Garantizar La Seguridad. Tegucigalpa, Honduras: CEDOH, 2014. Web.*

*Situación Actual de La Seguridad Alimentaria y Nutricional En Honduras a Diciembre 2009. Tegucigalpa, Honduras: Despacho Secretaria del Presidencial, 2010.*

*Situación Actual de La Seguridad Alimentaria y Nutricional En Honduras a Diciembre 2013 (Resumen de Capitulo: Institucionalidad de La Seguridad Alimentaria y Nutricional Del País). pg. 54: Gobierno de la República de Honduras, 2013. Web.*

*XLIV Encuesta Permanente de Hogares de Propósitos Múltiples. Tegucigalpa, Honduras: Instituto Nacional de Estadística (INE) Honduras, 2013.*

**Mexico**

Camargo, M, and Abbdel. *Arrancados de Raíz. Causas Que Originan El Desplazamiento Transfronterizo de Niñas, Niños y Adolescentes No Acompañados y/o Separados de Centroamérica y Su Necesidad de Protección Internacional. México: ACNUR, 2014.*

Carrasco González, Gonzalo. *La Migración Centroamericana En Su Tránsito Por México Hacia Los Estados Unidos. México: Departamento de Derecho, UAM-A. Web.*

Cueva, T.E., and T. Terrón. *Vulnerabilidad de Las Mujeres Migrantes En El Cruce Clandestino Por Tamaulipas-Texas. México: Universidad Autónoma del Estado de México, 2014. Web. Papeles de Población.*

Ruiz, E.E. *La Bestia: Muerte y Violencia Hacia Migrantes. México, D.F.: Universidad Iberoamericana, 2014. Web.*

**Other Countries and Regions**

Azpuru, Dinorah, and Violeta Hernandez. *Migration in Central America: Magnitude, Causes and Proposed Solutions. N.p., 2015. Web.*

*Flujos de Información Institucional Sobre Seguridad. Centro de Investigación para la Prevención de la Violencia en Centroamérica, 2013.*

Ivanovic, Danitza. *Factores Que Inciden En La Permanencia Del Educando En El Sistema Educacional, En El Marco de Un Estudio de Seguimiento. Región Metropolitana, Chile, 1987-1998. Chile: INTA Universidad de Chile, 2005.*

Kracht, Uwe, and Manfred Schulz. *Food Security and Nutrition. The Global Challenge. N.p., 1999.*

Levingson, F, and James and Yarlini Balarajan.

AR407

*Panorama de La Seguridad Alimentaria y Nutricional de Centroamérica y República Dominicana 2014. N.p., 2014.*

*Levingson, F, and Yarlini Balarajan. Addressing Malnutrition Multisectorally Case Studies from Peru, Brazil, Bangladesh. N.p., 2013. Web.*

*Maternal and Child Nutrition. The Lancet Maternal and Child Nutrition, 2013. Web.*

*Migración Equitativa. Un Programa de La OIT. Ginebra. Ginebra: Organización Internacional del Trabajo, 2014. Web.*

*Vakis, Renos, Jamele Rigolini, and Leonardo Luccetti. Los Olvidados, Pobreza Crónica En América Latina y El Caribe. Washington, DC: N.p., 2015.*

*Zenteno, Arnaldo. Artículos y Noticias. Servicio Internacional Cristiano de Solidaridad con los pueblos de América Latina, SICSAL, 2012. Web.*

# ANNEX 1:  MIGRATION AND REMITTANCES  RESEARCH ON MIGRATION

Several documents have been published on migration in tEl Salvador, Guatemala and Honduras  in the last ten years: a study on Salvadorians in the US, by Ruiz in 2010. In 2012, an essay, about trans-na-tionalization in El Salvador because of migration, was published by Ramos and a study on undocumented young Salvadoran migrants, by Gaborit *et al.*

Documents about Guatemala include: Camus' published work (2007) on out-migration of the northwestern province of Huehuetenango. The International Organization for Migrations published in 2012 a profile of migration patterns. In 2013, a diagnostic of under-aged emigrants and migrants in transit was presented by the Institute of Social Protection. Considerations and proposals for a national migration policy in Guate-mala, were published by Lopez and Rivera.

Among studies and publications about migration in Honduras, there is an assessment of security and migration, by Meza, from 2005 and two publications from 2013: one article of Carrasco on the Central American migration through México to the US and a study by CEAT of ´qualified´ Honduran migrants in other countries, was followed by a statistical report of CENISS on Honduran returnees from January to September 2014.

Two other works, of international scope, were published on migration: a proposal of the International Organization for Labor in 2014 and an international report of the Konrad Adenauer Foundation in 2015.

With the support of UNHCR, Camargo published in 2014 an analysis of causes of migration of unaccompanied children in Central America. Cueva and Terrón address the vulnerabilities of irregular women migrants in the US – Mexican border region (2014). Ruiz studied the experience of migrants on "The Beast", the train that runs from the Mexican border with Guatemala to the Mexican border with the US.

The International Organization for Migration published in 2013 a "Guatemalan Migration, Profile", based in its own and other government and non-government, national and international sources. Using census and survey data from the National Bureau of Migration and Customs Control, National Population Census and information about immigration in the Southern border of the US, it describes the Guatemalan context related to migration and analyzes its causes and effects on the economy, education, environment, health, employment and food/nutritional security, disaggregated by sex, gender, age, income, family composition and labor. The profile also explores the relationship between returnees, refugees, unaccompanied migrant children, human trafficking, family splits, institutional action and

AR408

programmes that attend to migrants. The Profile also elaborates on regularity, temporality, internal-external and transnational migration.

There is substantial information in the document.  Highlights include:

- 85 % of emigrants are 15 to 29 years old.
- 61 % of migrants depart from urban areas and 39 % from rural areas.
- 52  % of migrants are economically motivated

## REMITTANCES

Some of the above-mentioned documents refer to the effects of remittances on households and communities in the Dry Corridor of El Salvador, Guatemala and Honduras. The document by CEMLA, 2014 (Center for Studies of Middle America and Latin America) focuses specifically on remittances and provides a profile of Guatemalan immigrants in the US.

### Migration and Food Security

Out of Central America, there is an extensive literature on these subjects. Critical analyses and evaluations have also been published that highlight the main advances in conceptualization, theory, methods and results with respect to these topics. There is a varied terminology to distinguish between expulsion and attraction spots, internal and external migration, migration corridors, sending and receiving countries and others. The term "out-migration" refers to the crossing of international borders. Emigration looks at migration from the point of view of the sending country, and immigration from the point of view of the receiving country.

## EMPIRICAL RESEARCH
*Factors contributing to emigration*

Sandoval and Melendez Torres (2008), in their article on poverty, migration and food security in four regions of Sonora (Mexico), described settled women laborers who tended to have more adequate access to nutrients but also exhibited higher obesity rates, while their children tended to suffer from nutritional deficiencies. Thus, in this case, access to food resulted in over nutrition (obesity) of adults and malnutrition of children. The findings of this study are:

- In these regions, particularly in rural areas, food insecurity results from scarce local employment, low and irregularly paid wages, and a limited availability of food.   Some cultural and social traits, such as addictions to alcohol and drugs, aggravate food insecurity conditions.
- The following strategies to cope with food insecurity are employed in urban areas: families buy and eat low quality foods, eat monotonous daily diets, borrow money to purchase foods, and sell personal items to buy food. Many of those who manage to obtain a higher supply of nutrients, also have higher obesity rates, and in their children suffer from nutritional deficiencies.

In the introduction to the study "Pobreza, Migración y Seguridad Alimentaria"(Poverty, Migration and Food Security), Ortega and Alcala (2008) postulate that an important indicator of food insecurity is the way that families obtain food, and not just food availability and access.  The authors stress that there is a need to take into account the negative physical and emotional consequences of food insecurity.  They point out that migration is one of the leading consequences of malnutrition.

*Remittances and their effects*

In their study on the role of foreign remittances on food security and nutrition in Pakistan, Craven and Gartaula (2015), found that large-scale out-migration potentially makes agriculture more vulnerable and unproductive. It turns an "unattractive livelihood". They also detected cultural and social changes related to large-scale out-migration, for example, a tendency among household members who stayed behind to develop a preference for imported foods.

AR409

From his surveys on food security, migration, and development done in eleven African cities, Crush (2013) found that: (i) food insecurity, social conflict and violence are among the main driving forces of rural to urban migration; (ii) rural households are already purchasing food, since they are not producing it; (iii) urban agriculture can contribute to reducing urban food insecurity; and (iv) migration and remittances play an important contribution to urban food security.

*Reasons for migrating*

The study of Etzold, Ahmed, Hassan and Neelormi (2013) about the links of rainfall variability and food insecurity in Northern Bangladesh and their effects on migration, indicates that migration decisions are not driven by climatic changes per-se but rather by the impact on existing livelihood and labor migration systems. They found that rainfall variability reduces agricultural productivity, which reduces household incomes (monetary and non-monetary) and food consumption, and motivates migration to obtain additional income.

Rademacher-Schulz, Schraven and Salifu Mahama (2013) studied seasonal migration in Northern Ghana in response to rainfall variability and food insecurity. They found that rural households are highly dependent upon rain, subsistence agriculture and livestock rearing in societies with few livelihood options. . In these regions, emigration is a complementary strategy to cope and adapt. **Although emigration is an erosive coping strategy, the unpredictability and changes in the rainfall season reduces their capacity to cope where they reside.**

Warner, Koko, Afifi, and Tamer (2014), in their multi- country comparative study, examined vulnerable households and their use of migration to manage  risks produced by rainfall variability and food insecurity. The study includes **Guatemala,** Peru, Ghana, Tanzania, Bangladesh, India, Thailand, and Vietnam. The study distinguishes between two concepts: a) "contented migration" of resilient households, and b) "erosive migration" of vulnerable households.  In both cases, environmental factors can play a role in migration, but was not the only cause. **Resilient households use migration as one of a number of risk management strategies** to reduce climatic sensitivity; they have diverse assets and access to a variety of adaptation measures, social networks, community or government support programmes, and education. Migration is a way of diversifying livelihoods, build skill sets, and enhance resilience. **Vulnerable households**, on the other hand, **use internal migration during the hunger season, which reduces labor to harvest their crops and ensure their land tenure, and interrupts any investments in education.**

The authors indicate that research regarding "environmental migrants" has been ongoing since the mid-1980's and that environmental factors do play a role in human mobility (Afifi & Jäger, 2010). They emphasize that some people who are more exposed to environmental stressors – particularly farmers, herders, pastoralists, fishermen, and others who rely on natural resources and climate for their livelihoods – may be the least able to move very far away, if at all. **Therefore, the question is not whether environment drivers cause mobility, but about the role of migration in managing risks associated with changing environmental conditions.**

The conceptual framework of the above research highlights three main  variables: i) rainfall variability, ii) food security, and iii) migration - and their interactions. The research findings are based primarily on fieldwork-generated qualitative and quantitative data. The framework examines the interrelationships and pathways affecting household risk management and migration decisions related to rainfall, food, and livelihoods. Some risk management strategies, including migration, affect the resilience or vulnerability of the households to climatic stressors such as rainfall changes. If successful, migration can reduce food insecurity by increasing available household resources to buy food or when immigrants send back food or cash remittances. In this case, migration can be called 'contented'. **If migration as a risk management strategy is unsuccessful, migration is "erosive", i.e. it can exacerbate food insecurity,** (e.g. no remittances or food sent, reduced household labor supply for food production).

AR410

FOOD SECURITY AND EMIGRATION

# ANNEX 2: ECONOMETRIC ESTIMATION: MIGRATION DECISION MODEL (PREPARED BY IADB)

Based on the information collected by WFP in the Dry Corridor, there is on average an estimated 1.5% higher probability to migrate for households in the Dry Corridor affected by a drought[1] compared to other households.

An econometric model was used to estimate the impact of drought on the household decision to have one or more members migrate.   Migration was modelled as an economic decision where the expected income of the household member at the new location would be compared with the expected income of the person if he/she decided not to emigrate, appropriately modified by the potential risks involved in migration.

A probit model[2] was used to estimate the migration decision. Given that the income for the migrant was not observed, income levels were approximated based on household characteristics. As WFP survey only covered the municipalities within the Dry Corrido, a comparison group was created by using data collected by DIGESTIC as part of the 2014 Multipurpose Household Survey (*Encuesta de Hogares de Propósitos Múltiples* 2014). This comparison group allowed the estimation of the differential impact on the migration decision of households living within the Dry Corridor[3].

Migration = f (household characteristics, Dry Corridor location)

The estimated model is as follows:

Migration $\begin{cases} = 1 \text{ if one member of the family migrated recently[4]} \\ = 0 \ \text{ if no member of the household migrated recently} \end{cases}$

Drought is a dummy variable which is defined as:

Drought $\begin{cases} = 1 \text{ when the household lives in a Dry Corridor municipality} \\ = 0 \text{ otherwise,} \end{cases}$

The obtained results  are presented in the following table[5]:

### Table 1: Estimated marginal effects. Dependent Variable: Migration

The results show that a household that lives in the Dry Corridor is 1.5 times more likely to have had one

|  | dy/dx | Std. Err. | Z | P>z | [95% Conf.] | |
|---|---|---|---|---|---|---|
| **Ln Income** | 0.0753 | 0.0285 | 2.6500 | 0.0080 | 0.0196 | 0.1311 |
| **Ln Income square** | -0.0078 | 0.0029 | -2.6700 | 0.0080 | -0.0136 | -0.0021 |
| **Dry Corridor** | 0.0154 | 0.0050 | 3.0600 | 0.0020 | 0.0056 | 0.0253 |

of its members migrate recently, in comparison with households that do not live in this geographical area.

There is ample literature that analyses the role of **the remittances as insurance for natural disasters**. The information collected by WFP allows for an analysis of the role of remittances in Guatemala.  The calculation was generated by estimating a propensity score matching methodology. This score allows finding households that are "similar" to the households in the Dry Corridor but that

---

[1] Estimated using information from El Salvador for 2014
[2] In statistics, a probit model is a type of regression where the dependent variable can only take on one of two values, in this case, 0=decided not to migrate, and 1= decided to migrate.
[3] For this econometric analysis, only El Salvador was used due to data availability. The dataset used was El Salvador 2014
[4] The timeframe of the WFP survey is six months.
[5] Robustness test were performed using the whole sample of the EPHM 2014 and the same results was obtained.

AR411

are located in other areas of the country. The matching households were identified using household characteristics such as household size, gender of the head of household, his/her main economic activity, and size of the arable land, if applicable.

The model estimated is:

Remittances = f (household characteristics, drought,…)

Where

Remittances $\begin{cases} =1 \text{ if household received remittances in the last year} \\ =0 \text{ otherwise} \end{cases}$

Drought is a dummy variable defined as:

Drought $\begin{cases} = 1 \text{ when the household lives in a Dry Corridor municipality} \\ = 0 \text{ otherwise} \end{cases}$

**Table 2: Impact of drought on remittances. Dependent Variable: Remittances[6]**

| Remittances | Coef. | Std. Err. | Z | P>z | [95% Conf. Interval] | |
|---|---|---|---|---|---|---|
| **Average effect of drought** | | | | | | |
| | | | | | | |
| **(1 vs 0)** | 0.059667 | 0.049869 | 1.2 | 0.232 | -0.03807 | 0.157408 |

The results show that there is a positive, but not statistically significant, correlation between being a household recipient of remittances and living in the Dry Corridor area of Guatemala.

---

[6] Only Guatemala was used for this analysis

# ANNEX 3. INTERVIEW GUIDE FOR KEY INFORMANT INTERVIEWS ON EMIGRATION

(Este instrumento ha sido preparado para entrevistar funcionarios de instituciones estatales, dirigentes o técnicos de organizaciones y de programas humanitarios, representantes de organizaciones de migrantes y líderes comunitarios relacionados con migraciones, ayuda alimentaria, seguridad ciudadana y otros)

---

Datos de la Entrevista:

1. País: El Salvador _____; Guatemala_____; Honduras: _____.

2. Entrevistado(a):

    2.1.    Institución, organización o programa: _____

    2.2.    Puesto que ocupa: _____

    2.3.    Funciones que desempeña_____

    2.4.    Regiones o comunidades con las que se relaciona: _____

            _____

    2.5.    Nombre: _____

3. Lugar de entrevista:

    3.1.    Comunidad_____

    3.2.    Municipio_____ 3.3. Departamento_____

4. Local de la entrevista: 4.1. Municipalidad_____ 4.2. Iglesia_____ 4.3. Salón comunitario_____ 4.4. Oficina de la institución_____ 4.5. Otro (especificar)_____

5. Fecha de entrevista: Mes_____ día_____

6. Entrevistador(a)_____

**Explicación del propósito del estudio y solicitud de colaboración:**

De parte del Programa Mundial de Alimentos de Naciones Unidas estamos realizando un estudio sobre la inseguridad alimentaria y los motivos de las emigraciones. El aporte de personas conocedoras del tema es muy importante y por eso lo(la) estamos visitando y solicitando su colaboración. Hemos preparado unas preguntas, si me permite empiezo….

---

**A. Aspectos generales de la emigración**

1. De las regiones o comunidades en las que ustedes trabajan, ¿de cuáles han estado emigrando personas en los tres últimos años (2014-2016)? _____
_____

2. ¿Aproximadamente cuántas personas de estas comunidades han emigrado en los últimos tres años (2014 a 2016) a …

|  |  | Mujeres | Hombres | Niños | | Total |
|---|---|---|---|---|---|---|
|  |  |  |  | Acompa-ñados | No acom-pañados. |  |
| 2.1 | los Estados Unidos |  |  |  |  |  |
| 2.2 | México |  |  |  |  |  |
| 2.3 | Otros países de Centro América |  |  |  |  |  |
| 2.4. | Belice |  |  |  |  |  |
| 2.4 | Otros países: (nombrar)_____ |  |  |  |  |  |

3. A los niños emigrantes acompañados, ¿Quién los acompaña?
   _____

4. ¿Qué porcientos de los emigrados de estas comunidades han sido detenidos **en el camino** y retornados al país? _____
5. ¿Qué porcientos de los emigrados de estas comunidades han sido deportados de los Estados Unidos y devueltos al país? _____
6. ¿Cuáles son las rutas más utilizadas por los emigrantes de estas comunidades? _____
_____
7. ¿Hay en estas comunidades algún comité de emigrados, o de retornados por voluntad propia, o de deportados?
(Si la respuesta anterior fue Sí)
7.1. ¿Qué comité es?_____
7.2. ¿Es transnacional?  Sí _____  No _____
7.3. ¿Ha sido reconocido por las autoridades? Sí _____  No. _____
8. En estas comunidades ¿tienen ustedes o alguna otra institución algún programa de apoyo para retornados?
Sí _____ No _____
(si la respuesta anterior fue **sí**):

|  | 8.1. Cuáles comunidades | 8.2. Clase de ayuda | 8.3. Número de familias | 8.4.Fre-cuencia | 8.5.Tiempo que les dura la ayuda a las familias |
|---|---|---|---|---|---|
| 1 |  |  |  |  |  |
| 2 |  |  |  |  |  |
| 3 |  |  |  |  |  |
| 4 |  |  |  |  |  |
| 5 |  |  |  |  |  |

AR414

**B. M**otivos y razones de los emigrantes
9. Con base en la experiencia de ustedes, ¿cuáles son los tres principales motivos o razones de que la gente esté emigrando de estas comunidades? (de más a menos importante)
9.1) _____
¿Por qué? _____
_____
9.2 _____
¿Por qué?_____
_____
9.3_____
¿Por qué? _____
_____
10. ¿Qué porciento de los que han emigrado lo han hecho para reunirse con…
10.1. el esposo o la esposa: _____
10.2. con sus hijos(as): _____
10.3. Con su padre o su madre: _____

11. Las personas que han emigrado, ¿son miembros de las familias más pobres de estas comunidades, o de qué nivel son sus familias? _____
_____
12 ¿Se sabe cuánto están cobrando los "traficantes de migrantes" a cada emigrante por llevarlo?
_____
13 ¿Qué hacen los que quieren emigrar de estas comunidades, para reunir el dinero e irse? _____
_____

**C. La inseguridad alimentaria como motivo o razón de la emigración**
14. En estas comunidades de donde está emigrando la gente, ¿se producen alimentos de origen vegetal o animal, o los traen de otras comunidades? _____
_____

15. ¿Qué proporciones o por cientos de familias de estas comunidades…

| | | |
|---|---|---|
| 15.1 | Tienen dinero para obtener suficientes alimentos para toda la familia | |
| 15.2 | Tienen algún dinero pero no para obtener suficientes alimentos para toda la familia | |
| 15.3. | No tienen dinero para obtener alimentos y sobreviven de ayuda alimentaria | |
| 15.4. | No tienen dinero ni ayuda alimentaria y sobreviven de la caridad pública | |

16. ¿Han emigrado algunas personas por problemas de desnutrición en sus hijos?
Sí _____   No_____
17 ¿Cuánto por ciento de los jefes de las familias de estas comunidades están desempleados o sólo tienen trabajos excepcionalmente?_____
18. Las personas que han emigrado, ¿habían perdido siembras o ganado, o producto antes de irse?
Sí _____   No _____
19. Las familias de los emigrados, ¿recibían ayuda alimentaria o ayuda para comprar alimentos?
Sí _____   No _____
Si la respuesta anterior fue **Sí**:
19.1 ¿Qué proporción de las familias recibían la ayuda **antes** de que sus familiares emigraran? _____
_____
19.2. ¿Qué proporción de las familias reciben o han recibido la ayuda después de la emigración de sus miembros?
_____
19.3. ¿Qué ayuda era (o es) y cada cuánto tiempo la recibían (o reciben)?_____
19.4. ¿Quién(es) les daba(n) (o da) la ayuda?_____

AR415

**D. Papel de la violencia en las emigraciones**

20. En estas comunidades de las cuales está emigrando la gente, ¿hay violencia?

Sí_____ No_____

20.1. (si la respuesta anterior fue **Sí**) La violencia que hay en estas comunidades de donde están emigrando las personas, es mayor que la violencia de otras comunidades vecinas? _____
_____

21. ¿Las personas que se han ido, estaban siendo extorsionadas o amenazadas?

Sí_____ No _____

21.1. (si la respuesta anterior fue Sí): ¿Qué por ciento de los que se fueron se han ido porque estaban siendo extorsionados o amenazados? _____

22. ¿Se ha acusado a algunos deportados de estar amenazando, asaltando o extorsionando a otras personas en estas comunidades? _____
_____

**E. Efectos de la violencia en la inseguridad alimentaria**

23. ¿A quiénes les cuesta más conseguir alimentos en estas comunidades…

23.1. A viudas y huérfanos por violencia_____

23.2. A discapacitados por violencia _____

23.3. A todos en general sean víctimas de violencia o no?_____
_____

24. Las formas de violencia en estas comunidades, ¿impiden sembrar, o criar ganado, o trabajar en comercio u otros oficios? _____
_____

25. ¿Están extorsionando en estas comunidades a quienes tienen siembras, o ganado, o hacen negocios? ____
_____

26. ¿Están extorsionando en estas comunidades a las familias que reciben remesas? _____
_____

**F. Efectos de las emigraciones sobre la seguridad alimentaria de hogares y comunidades de origen:**

27. Las familias que quedaron en estas comunidades, ¿están recibiendo alguna ayuda de sus familiares que ya están en otros países? Sí_____ No _____

27,1. Si la respuesta anterior fue **Sí**:

(1) ¿Qué porciento de las familias que quedaron aquí están recibiendo ayuda económica de sus familiares que viven en otros países? _____

(2) En promedio, ¿cuánto dinero reciben las familias de sus familiares en el extranjero?

* Las que más reciben: _____

* Las que menos reciben_____

(3) Cada cuánto tiempo recibe la ayuda la mayoría de familias?_____ __

(4) ¿Cuáles son los tres usos principales que le dan a esa ayuda la mayoría de familias que la reciben?

(a)_____ _____

(b) _____

(c)_____

27.2. Si la respuesta a 28 fue **No:**

(1) ¿Cómo subsisten los familiares que permanecen en estas comunidades?
_____

(2) ¿Reciben ayuda de alguna institución? (si es así, ¿qué tipo de ayuda? _____

_____
_____

AR416

FOOD SECURITY AND EMIGRATION

**G. Perspectivas del futuro**

28. Desde el punto de vista de ustedes como conocedores de la situación, ¿cómo piensan ustedes que los familiares (de emigrados) que permanecen en estas comunidades ven su situación y el futuro? ¿Qué porcientos de las familias…

| No. | Actitudes | Por ciento de familias que tienen esa visión |
|-----|-----------|----------------------------------------------|
| 28.1 | Están tranquilas y saliendo adelante con los recursos que tienen para vivir, sea por trabajo propio o porque reciben remesa | |
| 28.2 | Tienen intenciones de emigrar, a pesar de tener recursos por trabajo propio para vivir, | |
| 28.3 | Viven en pobreza extrema pero emigrarían si consiguieran el dinero para hacerlo | |
| 28.4 | Otro (explicar) | |

**H. Otras observaciones**

29. ¿Tiene algunas otras informaciones o consideraciones que le gustaría agregar? _____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**MUCHAS GRACIAS POR SU TIEMPO Y SU COLABORACIÓN CON ESTE ESTUDIO.**

AR417

# ANNEX 4. FORM USED FOR DATA REGISTRATION OF FOCUS GROUPS WITH COMMUNITY LEADERS

(En cada comunidad seleccionada se deben realizar por lo menos dos Reuniones Focales; una con hombres y una con mujeres, todos jefes o representantes de familias, preferiblemente que se van de aquí a otros países y los emigrado a los Estados Unidos de América, México u otro país de Centro América. Ver la Guía Breve de Técnicas de Grupos Focales y Entrevistas Abiertas para las Evaluaciones de Seguridad Alimentaria en Emergencias, del Programa Mundial de Alimentos, Oficina Regional para América Latina y el Caribe/Panamá)

Datos de la Reunión:

1. País: El Salvador ____ ; Guatemala_____ ; Honduras: _____.

2. Lugar de la Reunión:

    2.1. Nombre de la comunidad _____

    2.2. Municipio: _____

    2.3. Departamento_____

    2.4. Local de la reunión: _____

3. Reunión de: Mujeres _____;  Hombres _____.

4. Número de participantes: _____

5. Fecha de la reunión: Mes_____ día_____

6. Conductores:

    6.1. Facilitador(a): _____

    6.2. Relator(a) _____

_____

### Explicación del motivo de la reunión

"Buenos días (tardes) señoras (señores). Gracias por estar aquí con nosotros. Venimos de parte del Programa Mundial de Alimentos a platicar con ustedes acerca de las personas que se van de aquí a otros países y los motivos que tienen para hacerlo.  Creemos que esto es importante porque las familias se separan y porque también puede significar una mejora para algunas familias. En esta reunión todos tenemos derecho a hablar y oir con respeto a los demás. Así que esperamos que cada uno(a) de ustedes participe, que nadie se quede callado. Voy a empezar haciéndoles unas preguntas:…

**Nota previa importante:** las preguntas de cada sección de esta boleta han sido elaboradas para señalar los puntos que se deben discutir de cada tema durante la reunión. No es un cuestionario que se debe aplicar como en una entrevista con algún individuo. Aquí lo importante en el grupo es captar la variedad de opiniones, experiencias y actitudes.

FOOD SECURITY AND EMIGRATION

| Temas | Asuntos: |
|---|---|
| Aspectos generales | **Primera parte**:<br><br>1. ¿Cómo cuántos habitantes hay en esta comunidad? _____<br>2. ¿Cuántas viviendas (o familias) hay en la comunidad? _____<br>3. ¿De cuántas de las familias se ha ido por lo menos uno de sus miembros a…<br><br>(table below)<br><br>4. ¿Cuántos de los que se habían ido a los Estados Unidos o a otros países ya regresaron a esta comunidad?<br>4.1. Por su cuenta? _____<br>4.2. Deportados?  _____<br><br>**Segunda parte:**<br><br>5. ¿Cuántas familias de esta comunidad están representadas hoy aquí en esta reunión?  Por favor levanten la mano para contar; solo una mano por cada familia: _____ (anote los nombres, para encuesta posterior)<br>6. Ahora, por favor levanten la mano…<br>6.1. los que tienen parientes que han ido a los Estados Unidos:_____<br>6,2, los que tienen parientes que se han ido a México: _____<br>6.3. los que tienen parientes que se han ido a otros países de Centroamérica:_____<br>6.4. los que tienen parientes que se han ido a Belice: _____<br><br>6.5. Ahora por favor levanten la mano los que tienen parientes que se han ido de 2014 para acá? _____<br>6.6. Y ahora por favor levanten la mano los que tienen parientes que se fueron antes entre el 2008 y el 2013_____ |

| | | Mujeres | Hombres | Niños | | Total |
|---|---|---|---|---|---|---|
| | | | | Acompañados | No acomp. | |
| 3.1 | los Estados Unidos | | | | | |
| 3.2 | México | | | | | |
| 3.3 | Otros países: | | | | | |
| 3.3.1 | | | | | | |
| 3.3.2 | | | | | | |
| 3.3.3 | | | | | | |

AR419

| | |
|---|---|
| | 7. ¿De qué trabajaban aquí los que se fueron?_____<br>_____<br>_____<br>_____ |
| | 8. ¿Por qué decidieron irse?<br>(Instrucciones: (a) Anotar cada uno de los motivos; (b) pida que los de cada motivo levanten la mano y cuéntelos; (c) en la anotación de los motivos ordénelos de mayor a menor número de casos. (d) Ahora lea cada motivo, del que tenga mayor número de casos al que tenga el menor número; y (e) para cada motivo pregunte **"¿Por qué...?** y anote la respuesta)<br>8.1. Motivo 1:_____<br>¿Por qué? _____<br>_____<br>8.2. Motivo 2: _____<br>¿Por qué? _____<br>_____<br>8.3. Motivo 3:_____<br>¿Por qué?_____<br>_____ |
| Preguntas para discutir el tema de los motivos o, razones de la emigración. | 9.      ¿Cuánto están cobrando los "traficantes de migrantes" por llevarse una persona a los Estados Unidos?<br><br>_____<br><br>10. ¿Ha habido aquí algunos que se fueron legales pero se quedaron en el país a donde se fueron? Sí_____  No_____<br><br>10.1. (si la respuesta anterior fue **SI**), ¿Cómo cuántos se fueron legales y se quedaron? _____<br><br>11. Los que se van, ¿cómo hacen para reunir el dinero para pagar los gastos del viaje?<br>_____<br><br>_____<br><br>_____ |
| Preguntas para discutir el tema de los Efectos de la inseguridad alimentaria sobre la emigración | 12 ¿Cuáles han sido los principales problemas que han preocupado a esta comunidad (sequías, inundaciones, deslaves, terremoto? _____<br>_____<br>13. De los que han emigrado, ¿cuántos se fueron por…<br><table><tr><td>13.1</td><td>haber perdido, siembras, animales o negocios</td><td></td></tr><tr><td>13.2</td><td>haberse quedado sin trabajo</td><td></td></tr><tr><td>13.3</td><td>reunirse con otros parientes</td><td></td></tr></table> |
| Preguntas para discutir el tema de los Efectos de la violencia en emigraciones | 14. Cómo está la situación de violencia o inseguridad en esta comunidad?   _____<br>_____<br>_____<br>15.  Los que se fueron, ¿habían sido amenazados, o extorsionados o asaltados?_____<br>16. ¿Hay familias que reciben remesas y que están siendo extorsionadas o amenazadas? _____<br>_____ |

AR420

| | |
|---|---|
| Preguntas para discutir el tema de los Efectos de la violencia en la inseguridad alimentaria | 17. ¿Hay en esta comunidad algunas familias que están padeciendo hambre y pobreza por fallecimiento de familiares por causa de la violencia? _____ _____ _____ 18. ¿Hay familias que están siendo amenazadas o extorsionadas quitándoles parte de las cosechas, animales, o terrenos, exigiéndoles dinero? _____ _____ |

Preguntas para discutir el tema de los Efectos de la emigración en seguridad alimentaria

19. ¿Cómo cuántas familias de esta comunidad están recibiendo remesas u otras ayudas de familiares que se fueron a otros países? _____
20. ¿Cuánto dinero es lo que se recibe en una remesa?
20. 1. Lo mínimo: _____
20.2. Lo máximo:
21. La mayoría de familias, ¿cada cuánto tiempo reciben su remesa? _____
_____
22 La mayoría de familias que reciben remesas ¿cuánto de lo que reciben en una remesa usan para …

| | | Todo | La mayor parte | La mitad | Menos de la mitad | Nada |
|---|---|---|---|---|---|---|
| 22,1 | Comprar comida | | | | | |
| 22.2 | los estudios de los hijos | | | | | |
| 22.3 | Hacer o pagar la casa | | | | | |
| 22.4 | Comprar medicinas | | | | | |
| 22.5 | Hacer negocios | | | | | |
| 22.6 | Comprar medicina | | | | | |
| 22.7 | Comprar o recuperar terrenos | | | | | |
| 22.8 | Comprar aparatos o vehículos | | | | | |
| 22.9 | Otros (especifique= | | | | | |

23. ¿Qué hacen las personas deportadas para pagar la deuda del pago del Coyote y los otros gastos?_____
_____

24. ¿Qué hacen los familiares que se quedan aquí para pagar deudas que dejan los que se van? _____
_____
_____

AR421

| Otros asuntos a discutir | 25, ¿Cuáles serían las ayudas más urgentes que ustedes necesitan aquí? |
|---|---|

25, ¿Cuáles serían las ayudas más urgentes que ustedes necesitan aquí?
_____
_____

26. Y si ustedes tuvieran que escoger las dos o tres ayudas más importantes  ¿cuáles escogerían?
26.1. La más importante: _____Número de votos_____
26.2. La segunda más importante: _____ Número de votos_____
26.3. La tercera más importante: _____ Número de votos_____

27 ¿Están ustedes organizados en esta comunidad? Sí_____ No_____
(Si la respuesta anterior fue **Sí)**
27.1. ¿Qué organización es?_____
27.2. ¿Ya está autorizada su organización?              Sí_____ No_____

28. ¿Hay algún proyecto, o institución que esté trayendo ayuda a las familias de aquí?
Si la respuesta anterior fue **S**í:
28.1. ¿Cuál institución?_____
28.2. ¿Qué ayuda traen?_____
28.3. ¿Para cuántas personas y durante cuánto tiempo alcanza la ayuda?
_____
_____

29. ¿Cuántos de ustedes piensan que en los siguientes meses y años la situación…

|  |  | Número de votos | ¿Por   qué? |
|---|---|---|---|
| 29.1 | Va a mejorar |  |  |
| 29.2 | Va a seguir igual |  |  |
| 29.3 | Va a empeorar |  |  |

29. ¿Y qué piensan hacer ustedes? _____
_____
_____

Bueno. Con esto estamos terminando nuestra reunión,
30. ¿Hay algo más que ustedes quisieran decir, o proponer?
_____
_____
_____

**Cierre de la reunión, agradecimiento y despedida:**
"Bueno. Estamos muy agradecidos con cada uno(a) de ustedes, que hayan venido a platicar con nosotros de estos asuntos. Esperamos que les vaya bien de regreso a sus casas o sus trabajos. Muy buenos días (tardes).
**(No olvidar que la Hoja de Participantes se debe adjuntar a este Registro de Datos. En los renglones del cuadro se anotan los adultos; abajo del cuadro pero afuera de él, se anota el número de niños y niñas que estuvieron con sus madres o familiares en la reunión)**

AR422

FOOD SECURITY AND EMIGRATION

# ANNEX 5. HOUSEHOLD SURVEY

ESTUDIO DE MIGRACIÓN

**NOTA: Indicar al Encuestador o Monitor de Campo como debe presentarse ante los hogares, y recordar siempre asegurar la <u>CONFIDENCIALIDAD DE LA ENCUESTA</u> y para que será utilizada la información brindada**

| **BOLETA NÚMERO (a llenar en la oficina)** | ☐☐☐ | **Fecha de la Encuesta dd/mm/año    ___/07/2016** | | |
|---|---|---|---|---|
| **Departamento** | Código☐☐ | **Municipio** | | Cód☐☐ |
| **Comunidad** | Código☐☐ | **Caserío** | | Cód☐☐ |
| **Dirección del Hogar** | Georreferencia(en decimales) | X:_____Y:_____ | | Altitud |
| **Encuestador:** | **Supervisor:** | | | |
| **Entrevistados/as** | 1. | | **2.** | |

**SECCION I: CONTEXTO**

| **P1.1 ¿Actualmente cuántas personas viven en su vivienda?** | | | | | ☐☐ | |
|---|---|---|---|---|---|---|

**P1.2 ¿Cuántas personas son de las siguientes edades en su hogar?**

| **GRUPOS DE EDAD** | **Total** | **Mujeres** | **Hombres** | **P1.3 ¿Cuántos saben leer y escribir?** | **P1.4 ¿Cuántos ganan dinero para sostener al hogar?** |
|---|---|---|---|---|---|
| 1. Menos de 6 meses | | | | | |
| 2. De 7 a  24 meses | | | | | |
| 3. De 2 a 5 años | | | | | |
| 4. De 6 a 17 años | | | | | |
| 5. De 18 a 60 años | | | | | |
| 6. Mayores de 60 años | | | | | |

| **P1.5 El jefe del hogar, ¿es hombre o mujer?** (Jefe es quien toma las decisiones) | 1= Hombre 2=Mujer | ☐ |
|---|---|---|
| **P1.6El (la) jefe del hogar, ¿tiene esposo(a) o marido(o), o es sola(o)?** | 1= Sí tiene 2= Es solo(a) | ☐ |
| **P1.7 El(la) jefe(a) de hogar ¿sabe leer y escribir?** | 1= Si    2= No | ☐ |
| **P1.8 ¿Hay en su hogar alguna(s) persona discapacitada en su hogar? ¿Cuántas? (decir ejemplos de discapacidad)** | (0 si no hay) | ☐ |
| **P1.9 ¿Hay en su hogar alguna persona con una enfermedad crónica? ¿Cuántas personas son? (Si es necesario, diga  que *enfermedad crónica* es un padecimiento que no es pasajero o de corta duración)** | (0 si no hay) | ☐ |
| **P1.10El (la) Jefe(a) de hogar ¿tiene tarjeta o documento de identificación?** | 1= Si    2= No | ☐ |
| **P1.11 El (la) jefe(a) del hogar, ¿tiene teléfono celular?** | 1= Si    2= No | ☐ |
| **P1.12(Si la respuesta anterior fue SI), ¿Nos permitiría usted que lo(la) llamemos a su teléfono en el futuro?** | 1= Si    2= No | ☐ |
| **P1.13(Si la respuesta anterior fue SI) ¿Cuál es el número de su teléfono?** | Teléfono: | |

AR423

| SECCIÓN II: MIGRACIÓN –MOVIMIENTO DE PERSONAS | | | | | | |
|---|---|---|---|---|---|---|
| **P 2.1a ¿Durante el 2015, algún miembro de su hogar emigro?** <br> Si=continúe. Si respondió NO pasar a la siguiente sección | | | 1= Si <br> 2= No | ☐ | | |
| **P 2.1b ¿Cuántos miembros de su familia emigraron?** | | | | | | |
| **P2.2 ¿Por qué se ha(n) ido del hogar?** (Anote  los dos principales motivos o circunstancias) | 1= Perdida de cultivos para alimento de la familia | | ☐ | 5. Para reunirse con familiares | ☐ | |
| | 2=Falta de dinero para comprar comida | | ☐ | 6= Por la violencia / la inseguridad | ☐ | |
| | 4= Por aquí no se consigue comida | | ☐ | 7= Los obligaron a irse | ☐ | |
| | 3= Falta de trabajo | | ☐ | 8. Otros | ☐ | |
| **P2.3 ¿Cuánto tiempo hace que se fue (fueron)estas personas?** | 1= Menos de un mes <br> 2=Entre 1 a 2 meses <br> 3= Entre 2 a 3 meses | 4= Más de tres meses <br> 5= Más de 1 año <br> 6=No sabe / No responde | | | ☐ | |
| **P2.4 ¿A dónde se fueron?** | 1= A pueblos vecinas <br> 2= A otros municipios de este mismo departamento <br> 3= A otros departamentos <br> 4= A la capital o a otra cuidad grande | 5= A otro país de Centro América <br> 6= A Estados Unidos <br> 7. A otro país (especifique):___ | | | ☐ | |
| **P2.5 ¿Qué efectos ha tenido en su hogar la salida de los que emigraron?** | 1.Nos quedamos endeudados | ☐ | 5.Tuvimos que contratar trabajadores | | ☐ | |
| | 2.El trabajo se quedó abandonado | ☐ | 6. Ahora estamos recibiendo remesas y vivimos mejor. | | ☐ | |
| | 3.Estamos más pobres | | 7. Seguimos igual que antes. | | ☐ | |
| | 4.Nosotros seguimos con el trabajo (preguntas cual es_____ | ☐ | 8= | | ☐ | |
| **P2.6 ¿Piensan regresar los que se fueron, o no?** ¿Cuándo? | 1= No piensan regresar <br> 2=regresarán antes de 1 mes <br> 3=Dentro de 2 a 6 meses <br> 4=En 1 año más o menos. | 5= En los próximos 2 años. <br> 6=No planea volver <br> 79=No sabe/No responde | | | ☐ | |
| **P2.7 Los que emigraron, ¿les han enviado remesas?** | | | 1= Si <br> 2= No | ☐ | | |

FOOD SECURITY AND EMIGRATION

| **P2.8 (Si la respuesta anterior fue Sí, ¿Cada cuánto tiempo reciben ustedes las remesas** | 1= cada semanal<br>2= Dos veces al mes<br>3= Una vez al mes / Mensual | 4= Cada dos o tres meses<br>5 Cada seis meses<br>6. Cuando puede<br>7= Para fechas especiales | 7. En navidad, o cumpleaños u otras fechas especiales<br>8.= No sabe\No contesta | ☐ | | |
|---|---|---|---|---|---|---|

## SECCIÓN IV: AGRICULTURA, MEDIOS DE VIDA

| **P 4.1 ¿ACTUALMENTE, cuáles son los tres trabajos principales de los miembros de la familia, con los cuales ganan dinero para vivir?** [Ordenar prioritariamente, iniciar por la más importante] **Usarcódigos (1 al 19)** | **P 4.2 De todo el dinero que logran reunir trabajando, ¿cuánto viene de cada trabajo? (la mitad, la tercera parte, la cuarta parte, etc. %)** *(Total = 100%)* | **P4.3 ¿Estos trabajos han sido lo que siempre ha tenido la familia?,** | **Sí ☐ No ☐**<br>**(Si respondió NO. complete P4.4 y P4.5** |
|---|---|---|---|
| | | **P 4.4 ¿ANTES de que se emigraran esos miembros de su hogar, ¿con qué trabajos ganaban ustedes el dinero para vivir?** [Ordenar prioritariamente, iniciar por la más importante] | **P 4.5 ¿En qué formas la emigración de los miembros de su hogar afectó los trabajos que les permitían a ustedes sobrevivir?**<br>1= Totalmente o casi totalmente afectado (más del 70%)<br>2= Parcialmente afectado (40% -70%)<br>3= Poco afectado (menos de 40%)<br>4= Sin afectación (0%) |
| 1)      ☐☐ | ☐☐  % | 1) ☐☐ | ☐☐ |
| 2)      ☐☐ | ☐☐  % | 2) ☐☐ | ☐☐ |
| 3)      ☐☐ | ☐☐  % | 3) ☐☐ | ☐☐ |
| **Códigos de las fuentes de Ingresos**<br>1= Producción propia: Agricultura de café, granos básicos u otros cultivos<br>2= Ganadería: animales mayores<br>3= Ganadería: animales menores<br>4= Pesca | 5= Jornaleo en actividad agropecuaria<br>6= Trabajo eventual (jornaleo) en actividades no agrícola<br>7= Trabajo asalariado\permanente (con sueldo regular)<br>8= Elaboración\venta de artesanías | 9= Venta de alimentos | 13= Remesas familiares<br>14=Construcción (albañil, carpintero)<br>15= Bonos\donaciones<br>16= Otros: _____ |

| **P 4.5 ¿Algunos miembros de su hogar trabajan por jornal? Sí____ No____. (Si respondió SÍ) ¿Cuantos jornalean?**<br>Hombres☐☐☐Mujeres☐☐☐Total☐☐☐ |
|---|

| **P 4.6.1 (Si hay miembros del hogar que trabajan por jornal) ¿Cuántos días jornalearon en el último mes los hombres?** ¿Y las **mujeres?** | Días al mes trabajados ☐☐☐<br>Hombres☐☐☐Mujeres ☐☐☐ |
|---|---|
| **P 4.6.2 ¿Cuánto dinero le están pagando actualmente por jornal a un hombre?** ¿Y a una **mujer?** | Hombres ☐☐☐Mujeres☐☐☐ |
| **P4.7 ¿Algún miembro de su hogar, que sea mayor de edad, está actualmente desempleado?** | 1= Si      2=No | ☐ |

## SECCION V: ACCESO A ALIMENTOS

AR425

**P5.1 ¿En qué forma obtienen o consiguen ustedes sus alimentos AHORA? ¿Y en qué formas los obtenían o los conseguían ANTES de que se fueran los migrantes** (usar los códigos)

| Fuentes o forma de obtención de Alimentos | AHORA | Antes |
|---|---|---|
| Fuente principal | ☐ | ☐ |
| Segunda fuente | ☐ | ☐ |

| **Códigos de las fuentes de Alimentos** | | |
|---|---|---|
| 1= Compra al contado<br>2= Préstamo en las tiendas/mercados<br>3= Su producción agrícola/pecuaria | 4= Pesca<br>5= Caza/recolección<br>6= Asistencia alimentaria-cupones o efectivo de instituciones<br>7= Ayuda de familiares, amigos | 8= Trueque<br>9= Otro |

### SECCIÓN VI: CONSUMO DE ALIMENTOS

¿Cuántos días (0-7) de la semana pasada, los miembros de su hogar consumieron los siguientes alimentos, preparado y/o consumidos en el hogar, y cuál fue la fuente de estos? **[Para las fuentes use los códigos, escriba 0 si no fue consumido en los últimos 7 días]**
**Nota para el encuestador: Determine si el consumo fue solamente en pequeñas cantidades.**

| | **Grupos de alimentos** | **VI.1 Número de días que lo han consumido en los últimos 7 días Escribir 0 si no fue consumido en los últimos 7 días.** | **VI.2 ¿Cómo fueron adquiridos los alimentos? (Escriba el código de la FUENTE principal de alimentos en los últimos 7 días)** | **VI.3 ¿En las ultimas 24hrs consumió alguno de los siguientes alimentos?**<br><br>1= Si 2=No |
|---|---|---|---|---|
| 1 | **Cereales, granos, raíces y tubérculos**: papa, plátano verde (de cocinar), yuca, nabo, camote, arroz, fideo, pan, harinas, maíz | ☐ | ☐ | ☐ |
| 2 | **Legumbres, nueces, y semillas secas:** frijoles, lentejas, arvejas, haba, soya, girasol, maní, almendra | ☐ | ☐ | ☐ |
| 3 | **Leche y otros productos lácteos**: Leche fresca/cortada, queso, yogurt, quesillo, cuajada, requesón (excluir la margarina/ mantequilla y pequeñas cantidades de leche para el té / café) | ☐ | ☐ | ☐ |
| 4 | **Carne, pescado y huevos**: todas las carnes rojas y blancas, incluyendo animales silvestres como todos los peces y el huevo. (No contabilizar si se utilizan en pequeñas cantidades, por ejemplo un solo huevo utilizado como ingrediente en la sopa) | ☐ | ☐ | ☐ |
| | **Si Número de días de fila 4 es igual a 0 Salte a fila número 5.** | | | |
| 4.1 | **Carnes frescas**: res, pollo, cerdos, chivo, oveja, conejo, aves de corral, animales silvestres | ☐ | ☐ | ☐ |
| 4.2 | **Vísceras de color rojo**: hígado, riñón, corazón, y carne de otros órganos. | ☐ | ☐ | ☐ |
| 4.3 | **Pescado/Mariscos**: pescado fresco, pescado enlatado, incluyendo atún en lata y/u otros mariscos (consumido NO sólo como condimento) | ☐ | ☐ | ☐ |
| 4.4 | **Huevos** (al menos uno por persona al día) | ☐ | ☐ | ☐ |
| 5 | **Vegetales y hojas:** Espinaca, cebolla, tomate, zanahoria, apio, lechuga, rábanos, etc. | ☐ | ☐ | ☐ |
| | **Si Número de días de fila 5 es igual a 0 Salte a fila número 6.** | | | |
| 5.1 | **Vegetales anaranjados** (ricos en vitamina A): zanahoria, pimentón rojo, camote, zapallo, etc. | ☐ | ☐ | ☐ |

FOOD SECURITY AND EMIGRATION

| | | | | |
|---|---|---|---|---|
| 5.2 | **Vegetales de hojas verdes**: espinaca, acelga, brócoli, berro, etc. | ☐ | ☐ | ☐ |
| 6 | **Frutas**: Guineo, manzana, naranja, limones, mangos, etc. | ☐ | ☐ | ☐ |
| colspan="5" | **Si Número de días de fila 6 es igual a 0 Salte a fila número 7.** |
| 6.1 | **Frutas de color naranja** (Frutas ricas en vitamina A): mango, papaya, damasco, melón, durazno, guayaba | ☐ | ☐ | ☐ |
| 7 | **Aceite/Grasas/Mantequilla**: manteca, aceite vegetal, margarina, mantequilla, y otras grasas/aceites | ☐ | ☐ | ☐ |
| 8 | **Azúcar o dulce**: azúcar, miel, dulces, galletas, mermeladas, pastelillos dulces bebidas azucaradas, gaseosas, etc. | ☐ | ☐ | ☐ |
| 9 | **Condimentos/especias/ bebidas**: té, café, cacao, sal, ajo, especias, polvo de hornear, levadura, salsa de tomate, etc. | ☐ | ☐ | ☐ |

| | |
|---|---|
| **Códigos de la FUENTE de los alimentos adquiridos:** <br> 1= Su propia producción (agrícola, pecuaria) <br> 2= Pescando/cazando <br> 3= Recolectando en el campo <br> 4= Préstamo <br> 5= Mercado (compra al contado) | 6= Mercado (compra al crédito) <br> 7= Caridad <br> 8= Intercambio trabajo por alimentos <br> 9= Trueque de alimentos <br> 10= Regalo (alimentos) de la familia, seres queridos o amistades <br> 11= Asistencia alimentaria de ONGs, Gobierno, PMA, etc. |

**SECCION VII: GASTOS: En esta sección las estimaciones de porcentajes serán realizadas utilizando la técnica de apilamiento proporcional (10 objetos-semillas), tomando como referencia los últimos 30 días. En el caso de gastos usar 5 categorías para el apilamiento: alimentos, salud y aseo personal, educación, transporte, servicios (agua, luz, teléfono), y otros**

| | |
|---|---|
| **VII.1 Del total de alimentos consumidos en el hogar en el último mes, qué porcentaje:** | a) Es comprado (ingreso familia) <br> b) Es producción propia-reservas <br> c) Es recibido en donaciones/apoyo   ☐☐ ☐☐ ☐☐ Total 100% |

| | | | |
|---|---|---|---|
| **VII.2 De los ingresos totales del hogar recibidos durante el último mes, que porcentaje se gastó en comprar alimentos para consumir en la casa?** | colspan="3" | ☐☐☐% |
| **VII.3 ¿Su hogar se ha endeudado en los últimos dos meses?** | 1= Si   2= No | ☐ |
| **VII.4¿Por qué se ha endeudado?** | 1= Compra de alimentos <br> 2= Compra de semilla para resiembra, <br> 3=Compra de insumos agrícolas para resiembra | 4=Pago de renta de tierra <br> 5= Enfermedades <br> 6=Pago de créditos anteriores <br> 7= otros(cual) _____ | ☐ |

**SECCION VIII: ESTRATEGIAS DE SOBREVIVENCIA**

| | | |
|---|---|---|
|  | **VIII.1 ¿Durante los últimos 7 días, cuántas veces (en días) el hogar ha realizado algunas de estas acciones para contrarrestar la falta de alimentos o dinero para comprar alimentos? Leer uno por uno.** | **Frecuencia (en número de días, de 0 a 7)** |
| a. | Comer alimentos más baratos | ☐ |
| b. | Pedir alimentos prestados, o contar con la ayuda de amigos y familiares | ☐ |
| c. | Reducir el número de comidas consumidas al día | ☐ |

86

AR427

| | |
|---|---|
| d.        Reducir el tamaño de las porciones de comida | ☐ |
| e.        Restringir el consumo de  los adultos/madres, para que coman los niños pequeños | ☐ |
| f.        Enviar a los miembros del hogar a comer a otro lugar | ☐ |
| g.        Pasar días enteros sin comer | ☐ |

| **VIII.2  ¿En el último mes, alguien en su hogar se vio en la necesidad de hacer alguna de estas actividades debido a que no había suficientes alimentos o dinero para comprar comida?** | 1= No, porque no enfrente escasez de alimentos<br>2= No, porque vendió los activos en los últimos 12 meses o porque ya recurrió a esta actividad<br>3= Sí<br>4= No aplica |
|---|---|
| a) Vender activos domésticos (radio, muebles, TV, joyas) | &#124;__&#124; |
| b) Gastar ahorros | &#124;__&#124; |
| c) Vender animales menores (aves, cerdos) | &#124;__&#124; |
| d) Enviar a los miembros del hogar a comer a otra parte | &#124;__&#124; |
| e) Comprar a crédito o pedir alimentos prestados | &#124;__&#124; |
| f) Pedir prestado dinero | &#124;__&#124; |
| g) Gastar ahorros | &#124;__&#124; |
| h) Enviar o cambiar a los niños a otras escuelas (a escuelas más económicas) | &#124;__&#124; |
| i) Vender activos productivos o medios de transporte (herramientas, moto) | &#124;__&#124; |
| j) Sacar a los niños de la escuela | &#124;__&#124; |
| k) Disminuir gastos de salud y educación | &#124;__&#124; |
| l) Cultivar granos inmaduros (maíz verde) | &#124;__&#124; |
| m) Consumir las  reservas de semillas que tenían para la próxima siembra | &#124;__&#124; |
| n) Disminuir los gastos para los insumos de agricultura, pesticidas, veterinarios | &#124;__&#124; |
| o) Vender tierras o casa | |
| p) Pedir Limosna | &#124;__&#124; |
| q) Vender los animales reproductores hembras (para los ganaderos) | &#124;__&#124; |
| r) Migración de uno o más miembros del hogar | &#124;__&#124; |
| **Opcionales (Otras Estrategias)** | |
| Trabajar solo por alimentos | &#124;__&#124; |
| Buscar otros empleos o emprender pequeños negocios | &#124;__&#124; |
| Depender de la ayuda de familiares o amigos | &#124;__&#124; |

AR428

FOOD SECURITY AND EMIGRATION

# ANNEX 6. GUIDE FOR SECONDARY SOURCES REVIEW

**STUDY ON EMIGRATION AND FOOD SECURITY IN El Salvador, Guatemala and Honduras**
**Note to contributors to the Secondary Sources review**

**A.Target:**  Studies, reports, articles or other, about Food Security and Migration, and violence related to food security and out-migration.

**B.Suggested outline** for the Reports of Review

1.Reference data:

    1.1.Author(s)
    1.2.Title of book, article or report (if part of a sourcebook, journal or magazine, please provide data or publication).
    1.3.City, publishing house or institution (if Web site source, please provide link)
    1.4.Year of publication

2.Objectives of the study, article or report.

3.Brief summary of the author(s) theory or conceptual framework (key definitions, concepts and schemes); contributions with new concepts, distinctions, definitions.

4.Brief description of methodological elements: universes or populations, samples, data collection technics and instruments, places and dates of research, types of respondents.
(if the study was of statistical nature, please indicate types of statistical analyses applied).

5.Key findings and results about relationship between food insecurity, outmigration and the possible role of violence in it.

6.To what extent the results and conclusions are sustained by the data and the analysis?

7.Main strong and weak points of the research or the report of results.

AR429

# ANNEX 7. COOPERATING PERSONS AND ORGANIZATIONS

| Colaboradores | | | |
|---|---|---|---|
| **Municipios** | **Contacts** | **Institution** | **Position** |
| **Metapán** | Juan Umaña Samayoa | Municipality of Metapán | Mayor |
| | Claudia Orellana | Municipality of Metapán | Women Department and Nutritional Security , |
| **Texistepeque** | José Armando Portillo Portillo | Municipality of Texistepeque | Mayor |
| | Oscar Sandoval | Municipalityof Texistepeque | Social Municipal programme Promoción |
| | Noelia Polanco de Escobar | Municipality of Texistepeque | Women department encharged |
| | Santos Rivera | Municipality of Texistepeque | Social Promotion assitant |
| | Juan Pablo Chicas | Municipality Texistepeque | Mayors´Contact |
| | Oscar Romero Manacia Adán Pineda | | Community Leaders |
| **Santa Rosa Guachipilín** | Hugo Flores Magaña | Municipal Alcaldia | Mayor |
| | Nahún Hernández | Municipal Alcaldia | Mayors´ Contact |
| | Patricia Guevara | Municipal Alcaldia | Mayors´ Contact |
| **Jiquilisco** | Raúl Antonio Franco | Municipal Alcaldia | National and International Procurator |
| | David Barahona Marroquin | Municipal Alcaldia | Mayor |
| **Chirilagua** | Fausto Portillo | Municipal Alcaldia | Municipal Corporation Member |
| | Manuel Antonio Vásquez Blanco | Municipal Alcaldia | Mayor |
| **Santa Elena** | Oscar Humberto Gómez | Municiapl Alcaldia | Mayor |
| | Jennifer Miguelina Cortez Montoya | Municipal Alcaldia | Social and economical development director |
| | Henry Chávez | Municipal Alcadia | Unidad Ambiental |
| **El Tránsito** | Roel Werner Martínez Romero | Municipal Alcaldia | Mayor |
| | José Ángel Benítez Benítez | Municipal Alcaldia | Social Promotion and charge |
| | Orangel Adonay | Municipal Alcaldia | Mayors´Contact |
| **Concepción Batres** | Walter Antonio Aparicio | Municipal Alcaldia | Mayor |
| | William Salmerón | Municipal Alcadia | Social Promotion Director |
| | Evelyn Roberina Portillo Cornejo | Municipal Alcaldia | Unit of Environment Services |
| | Marlene Cruz | Municipal Alcaldia | Secretary´s |

AR430

FOOD SECURITY AND EMIGRATION

**Guatemala**

| Municipios | Contacts | Institution | Position |
|---|---|---|---|
| San Luis Jilotepeque | Aristides Portillo | Ministry of Education | Principal of Grammar School Caserío los Magueyes |
| San Manuel Chaparrón | Berta Trinidad Guerra | Women Committee El Pedernal | Leader |
| | Norberto Trinidad Guerra | Comunity Committee Member COCODE | Grower |
| Teculutan | Byron Paz | Ministry of Agriculture | Field Technician |
| | Mirsa Salguero | Community Committee Member | House-Wife |
| | Claudia Barillas | CONAMIGUA | Regional Promotor |
| Aristondo, Morazan | Ing. Armando Sagastume | Agronomist | Field Technician |
| Marajuma Morazan | Sandra Figueroa de País | SESAN Community | Monitor |
| Santa Catarina Mita | Karina Aguilar de Duarte | Municipal Alcaldia | Mayores´ Wife |
| | Veronicaa Reyes | ONM Municipality | Women department Asistente |
| | Mirsa Vallejos | ONM Municipality | Women Municipal Department Cordinator |
| Baja, Verapaz /Quiche | Juan Jose Sosa | WFP | Monitor |
| | Oscar Vaides | WFP | Monitor |
| | Luis Segura | WFP | Monitor |
| Rabinal | Norma Chen | ONM | Municipal Women Department Cordinator |
| Canilla Quiche | Catarino Hernandez | Municipal Alcaldia | Mayor |
| | Maria Beatriz Gomez | ONM | Cordinator |
| Jocotan | Wiliam Garcia Perez | Food/Nutritional services | Cordinator |
| Guatemala | America Carcamo | WFP/ GUATE | Monitor |
| | Lida Escobar | WFP/GUATE | Monitor |
| | Lucia Torres | WFP/GUATE | Monitor |
| | Byron Román | WFP/GUATE | Monitor |

AR431

**Honduras**

| Municipios | Contacts | Institution | Position |
|---|---|---|---|
| San Francisco, Langue, Valle | Isabel Contreras | Secretariat of health | Administration support and linking |
| Solubre, Aramecina, Valle | Rony Fúnez | Municipal Alcaldia | Municipal Mayor |
| Azacualpa, El Triunfo, Choluteca | Profesor Juan Fausto Ortéz | Base Center Miguel Paz Barahona | Director |
| San Juan, San Juan, La Paz | Clarisa Galo | Municipal Alcaldia | Women Department encharged |
| Monjaraz, Marcovia, Choluteca | Flor de María Moya Mendoza | Alcaldía de Marcovia, Choluteca | Children/Youth promotor |
| San Jerónimo | Arnold Méndez | President | Community  Sponsors |
| Municipio El Rosario | Nancy Padilla | Coordinator | Children/Yourh Municipal Department |
| San Francisco de Loma Larga /El Rosario | Selvin Orellana | President | Community Sponsors Committee |
| San Antonio del Norte/ Pitahayas | Marlen Guadalupe Moreno | High School Teacher | Secretariat of education |
|  | Lilian Castillo | PMA | Monitor of Peace |
|  | Ana Gladys Flores | PMA | Monitor |

AR432

To download the electronic version  please scan the code



**For more information contact:**
Regional Bureau for Latin America and the Caribbean
**World Food Programme**
Gaillard Ave. and Vicente Bonilla St.
Buildings 124-125 – City of Knowledge,
Clayton, Panama City / Tel. (507) 317-3900

AR433

### *Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.*

The Wall Street Journal Online

October 19, 2018

Copyright 2018 Factiva  , from Dow Jones
All Rights Reserved



Copyright 2018 Dow Jones & Company, Inc. All Rights Reserved.

## THE WALL STREET JOURNAL.

**Section:** WORLD

**Length:** 1413 words

**Byline:** By Juan Montes

## Body

TECUN UMAN, Guatemala-A caravan of several thousand Honduran migrants on their way to the U.S. breached Mexico's southern border with Guatemala on Friday, but were held at bay by hundreds of Mexican police in a tense standoff, deepening a regional migration crisis.

The rush at the border came after Mexican officials said they would grant asylum to the caravan of about 3,000 migrants fleeing violence-prone Central America. But the Mexicans said they would let in only 100 to 200 migrants a day, because they couldn't process asylum claims more quickly.

Despite the offer, the majority of Hondurans grew restive at the prospect of waiting for days or weeks following days of walking from their hometowns to Mexico. Hundreds of migrants, mostly young men, began pulling down a fence on the Guatemalan side of the border and soon overwhelmed the handful of Guatemalan police.

One of the migrants addressed the crowd from a house in this Guatemalan border town. "If they don't let us cross now, we'll cross by the river," he said.

Migrants then rushed across the bridge that separates the two countries and tried to overwhelm some 500 federal police manning a thin fence. At one point, some in the crowd threw bottles and stones at the police, who responded with several volleys of what appeared to be tear gas. A helicopter roamed in the skies.

Some migrants carried babies in their arms, others pushed baby carriages, and nearly everyone carried their belongings in backpacks and handbags. Only a few women with children were allowed to enter Mexico.

After it became clear the Mexican police wouldn't let the majority of the crowd through, dozens of young men began climbing the fence on the bridge and throwing themselves into the shallow river, tying several makeshift rafts together in an attempt to cross illegally to the Mexican side.

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

Mexico's Interior Minister Alfonso Navarrete claimed that caravan leaders "put pregnant women and children at the front of the group." He said several Mexican police were injured as they contained crowds from crossing into Mexican territory.

The caravan has  drawn the ire of President Trump . Mr. Trump has featured the caravan and the broader immigration issue  in political rallies  around the U.S. on behalf of Republican candidates in November's midterm elections.

Most of the migrants plan to go to the U.S. and ask for asylum or try to cross the border illegally. Mr. Trump has vowed they will be sent back.

Mr. Trump has long claimed the U.S. is hobbled by lax immigration laws, including a so-called catch-and-release policy, in which immigrants requesting asylum are released into the community while they await a hearing to determine their status.

The president said that, at his request, Mexico was trying to help control the flow of immigrants from neighboring countries, but that he was prepared  to use U.S. military force if necessary .

Adding to pressure on Mexico to prevent the migrants from reaching the U.S. border, U.S. Secretary of State Mike Pompeo met with Mexican authorities in Mexico City on Friday. The migrant caravan was at the top of the agenda.

"We're prepared to do all that we can to support the decisions that Mexico makes about how they're going to address this very serious and important issue to their country," Mr. Pompeo told reporters after meeting with President Enrique Pe a Nieto.

Mexican officials had hoped the offer of asylum would break up the large caravan and persuade many migrants to stay in Mexico rather than cross the country and try to enter the U.S. illegally.

"Mexico is in a bind," said Michael Shifter, president of the Inter-American Dialogue, a Washington-based think tank. "Mexico is saying it's doing this for its own interest, and that's true, but the U.S. is also putting a lot of pressure, and Mexico has to also maintain its relationship with the U.S."

Earlier in the day, Mexico's ambassador to Guatemala, Luis Manuel L pez Moreno, met with migrants in the central square of this town. He told the exhausted travelers that they would be allowed to enter in an orderly manner.

"The border is not closed. We are open to receive them with order and according to the law," Mr. L pez Moreno said in an interview.

Some of the migrants received the news with cheers. "Thank God! Thank God! We thank Mexico for its generosity and solidarity," said Karissa Romero, a 31-year-old woman who joined the caravan on Sunday in Honduras with two of her children.

Mexico has a long record of defending the rights of its own migrants in the U.S. Images of the Honduran migrants being pushed back by Mexican police were sharply criticized by some in Mexico.

Mexico's interior minister, Mr. Navarrete, said Mexico will continue with efforts to convince the leaders of the group to assist with the orderly entry of migrants into Mexico and respect the country's laws, he told Mexican television.

"There is no possibility that we'll act in a coercive way, hurting a vulnerable group," he added.

The caravan began last week in Honduras and quickly grew in size. At the beginning, it was a group of 200 people who agreed on social media to travel together to ensure their safety through some of the world's most violent countries. But it soon grew quickly. Residents and migrants say they joined the caravan because they didn't have to pay thousands of dollars for a "coyote" smuggler to get them in the U.S.

AR435

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

"We just want to seek a better future. In Honduras, you work to survive and that's not a worthy life," said Dania L pez, 30, a divorced woman who arrived with her three children. She said she earned just $62 a week. "The journey is really difficult. My son told me this morning: Mom, let's pay a taxi," she added in tears while hugging her five-year old son, Ariel.

Mexico's effort to offer asylum marks a departure from its handling of previous caravans, when migrants were sometimes given transit visas allowing them to pass through Mexico on their way to the U.S.

Aurora Vega, spokeswoman for Mexico's government migration agency, said migrants would have to stay at a government-run shelter for the first 10 days of their stay while Mexican officials review their applications and ensure there are no criminals or terrorists among them. Mexico's asylum agency will then decide whether to approve the requests of those who pass that first screening. The asylum application process typically takes close to 45 working days.

"They are not free to roam the country when they first arrive, and if someone is caught doing so, they will be deported," she said. That means the caravan is unlikely to regroup anytime soon, she said.

During that time, migrants can choose whether to stay at a government-run shelter or go to one run by charity groups, Ms. Vega said. If they leave town during that period, the asylum request is canceled and applicants will be subject to deportation.

Asylum seekers in the U.S. also face a lengthy and complicated legal process. For those who pass an initial interview, the so-called credible fear bar, will have to prove to an immigration judge that they are likely to face persecution in their home country because of their membership in a particular social group and their government is either unwilling or unable to protect them.

Many asylum seekers from Central America have said they are fleeing gangs, domestic violence and other crime. Earlier this year, Attorney General  Jeff Sessions issued a ruling  that said domestic violence and threats from gangs are generally not grounds for winning asylum in the U.S. He said such threats were "private violence."

Nonetheless, those who do pass the credible fear bar and are released from immigration jails will face a yearslong wait for their case to be decided. More than 764,000 cases are currently pending in  federal immigration courts .

While immigrants wait, they can apply for a work permit to be allowed to legally work while their case is being decided.

Courtney McBride, Alicia Caldwell and Vivian Salama contributed to this article.

Write to Juan Montes at  juan.montes@wsj.com

Related Articles

*  Trump Threatens to Cut Off Aid to Honduras Over Immigration Caravan

*  Immigrant Children Are Staying Longer in Custody

*  Inside the Texas Tent City Housing More Than 1,000 Migrant Teens

*  As Migration From Guatemala Surges, U.S. Officials Seek Answers  (Oct. 13)

*  Nafta Rewrite Won't Boost U.S. Growth, Economists Say

*  In Brazil, Big Plans and No Money  (Oct. 3)

*  Latin America Is the Murder Capital of the World  (Sept. 20)

Migrant Caravan Crosses Mexico's Southern Border;  Nation's police hold at bay in a standoff the group fleeing violence-prone Central America for the U.S.

## Notes

PUBLISHER: Dow Jones & Company, Inc.

## Classification

**Language:** ENGLISH


**Publication-Type:** Web Publication


**Journal Code:** WSJO


**Subject:** IMMIGRATION (89%); TERRITORIAL & NATIONAL BORDERS (89%); POLITICAL ASYLUM (89%); MIGRATION ISSUES (78%); SPECIAL INVESTIGATIVE FORCES (77%); POLICE FORCES (77%); IMMIGRATION LAW (76%); ELECTIONS (71%); INFANTS & TODDLERS (69%); CAMPAIGNS & ELECTIONS (66%); WOMEN'S HEALTH (66%); PREGNANCY & CHILDBIRTH (64%); WOUNDS & INJURIES (64%); GOVERNMENT ADVISORS & MINISTERS (61%); MIDTERM ELECTIONS (60%); POLITICAL CANDIDATES (60%); gimm Human Migration; gpir Politics/International Relations; gvexe Executive Branch; gcat Political/General News; gpol Domestic Politics; gvbod Government Bodies; PROVIDER TERMS: OLAM


**Person:** DONALD TRUMP (76%)


**Geographic:** MEXICO (99%); GUATEMALA (94%); UNITED STATES (94%); HONDURAS (92%); CENTRAL AMERICA (79%); usa United States; mex Mexico; guat Guatemala; camz Central America; lamz Latin America; namz North America; devgcoz Emerging Market Countries; dvpcoz Developing Economies

IP Codes: G/EXE, N/GEN, N/PLT, R/CME, R/GT, R/LTM, R/MX, R/NME, R/US

IP Descriptors: WSJ, WSJ.com, WSJ.com Site Search, WSJAsia, WSJEurope, WSJ Japanese, Online, WSJ-PRO-WSJ.com, CARAVAN, HONDURAN CARAVAN, HONDURAN MIGRANTS, ILLEGAL IMMIGRATION, LIBERTY AND REFOUNDATION PARTY, MEXICO BORDER, MIDTERM ELECTIONS, POMPEO MEETING, SAN PEDRO SULA, SB12546240058035364043304584541634021556144, L pez, Dania, Navarrete, Alfonso, Pe a Nieto, Enrique, Pompeo, Mike, SYND, CODES_REVIEWED, Latin America News


**Load-Date:** October 29, 2018

---

*End of Document*

The border is tougher to cross than ever. But there's still one way into America. The Washington Post

Case 4:19-cv-04073-JST    Document 29-4    Filed 07/19/19    Page 158 of 187

11/29/18, 8:22 AM

The Washington Post

# The border is tougher to cross than ever. But there's still one way into America.

By Nick Miroff and
Carolyn Van Houten
October 24

*[This story has been optimized for offline reading on our apps. For a richer experience, you can find the full version of this story here. An Internet connection is required.]*

HIDALGO COUNTY, Tex. — Crouched low in the brush along the riverbank, Border Patrol agent Robert Rodriguez watched the Mexican side of the Rio Grande, waiting. A norteño ballad drifted from a radio somewhere on a nearby farm, and two pigs cooled themselves at the water's edge, wading to their bellies. For a moment, one of the border's busiest places for illegal crossings looked placid.

Then a raft appeared.

Within seconds it was in the water, a teenage guide steering the current while his boss, an older man, stood watch on the bank. In less than a minute, the teenager delivered a woman and a boy to the U.S. side and they climbed out, shoes sinking in the wet silt.

Rodriguez stepped onto the path to stop them, but the woman and the boy did not run. They wanted to be captured. This is how it works now.

The era of mass migration by Mexican laborers streaming into California and the deserts of Arizona is over. Billions spent on fencing, sensors, agents and drones have hardened the border and made it tougher than ever to sneak into the United States. The migrants coming today are increasingly Central Americans seeking asylum or some form of humanitarian protection, bearing stories of torture, gang recruitment, abusive spouses, extortionists and crooked police.

They know the quickest path to a better life in the United States is now an administrative one — not through mountains or canyons but through the front gates of the country's immigration

AR438

Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 159 of 187

bureaucracy.

Last year, U.S. immigration courts received nearly 120,000 asylum claims from migrants facing deportation, a fourfold increase from 2014. Those filings have pushed the number of pending cases before U.S. immigration courts to more than 750,000, collapsing the system and upending President Trump's sweeping promises to lock down the border.

The extraordinary surge of asylum seekers is testing the limits of whom, exactly, the United States is willing to protect, challenging the stone-carved ideal of America as the place that welcomes the tired and poor, "yearning to breathe free."

It has also presented Trump with one of the most vexing policy challenges of his presidency, and virtually every measure taken so far has made the problem worse.

Trump this spring deployed a nuclear option — separating parents from their children — in an attempt to stop families from coming. It backfired. The controversy generated by the policy and its abrupt rollback six weeks later handed smuggling guides across Central America a potent sales pitch. They now tell potential customers the Americans do not jail parents who bring children — and to hurry up before they might start doing so again.

Families asking for mercy constitute a greater-than-ever portion of those taken into custody. More than half of all arrests along the Mexican border last month were migrant family members or unaccompanied minors, up from 13 percent in 2013.

This spring, Trump fixated on a caravan of asylum seekers traveling through Mexico, about 300 of whom eventually crossed into the United States. Now, a much larger procession of as many as 7,000 Central Americans is trekking north toward the border, despite threats from the president to stop them with U.S. troops and sever aid to their countries.

There is a sinking feeling, among Department of Homeland Security officials, that more caravans are yet to come and that they will only get larger.

Families are coming in caravans and on their own because it works. Only 1.4 percent of migrant family members from Guatemala, Honduras and El Salvador who crossed the border illegally in

AR439

Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 160 of 187

2017 have been deported to their home countries, according to DHS officials.

The United States has neither the detention space nor the legal authority to hold children long enough to process their parents' claims, so families are typically released from custody to await court hearings that could be months, even years, into the future.

Trump has long derisively referred to this as "catch and release" and used it as an attack line against Democrats. But in the months since ending family separation, Trump has now made it his de facto policy.

The administration has drafted plans to add thousands of detention beds in an attempt to hold parents with children longer. DHS officials have also proposed new rules that would allow the government to withdraw from a 1997 federal court agreement limiting the amount of time children can be held in immigration jails to 20 days.

But in the meantime, so many families are coming through high-volume corridors such as the Rio Grande Valley that Rodriguez and other agents have come to describe them as "non-impactables," because they say there is nothing they can do to stop them.

As Rodriguez radioed another agent to pick up the woman and the boy, she handed him her Honduran identification card. Cecilia Ulloa was 25. Darwin, her son, was 13. The math took a moment to sink in, and Ulloa appeared to recognize a familiar look of confusion.

"My stepfather," she said. "It started when I was 10."

After a decade in prison for rape, her stepfather was free now, stalking them, blaming her for ruining his life, Ulloa said. "He's going to kill us."

Police in Honduras had told her there was nothing they could do, she said, so she and her son left for the United States. They wanted asylum.

Chances were they would be denied. But it could take months, or longer, for the U.S. immigration system to determine whether Ulloa and her son deserve protection. They would probably not be sent back to Honduras anytime soon.

AR440

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post

Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 161 of 187

11/29/18, 8:22 AM

**Credible fear**

Some migrants' stories of gang threats and police indifference have a rehearsed quality, suggesting they are concocted. The smuggling guides who charge $10,000 or more for the trip provide transportation and meals, but also coaching, including the key words migrants should say to convince U.S. asylum officers that their fears meet credibility standards.

But there are many with no need to make things up. The countries they are running from have some of the highest murder rates in the world. Their criminal justice systems barely function. Some have been victimized already.

Lisa Brodyaga, an immigration lawyer in South Texas who has worked with Central American migrants since the late 1970s, said adult asylum seekers who appear before immigration judges "are almost all being deported."

"I think judges felt freer to follow their gut under Obama than they do now," she said.

Migrants have adapted just as quickly. As asylum officers and immigration judges reject more claims, the number of single adults who arrive claiming fear of persecution is dropping. The fastest-growing portion comprises parents coming with children, preventing their long-term detention and significantly reducing the likelihood they will be deported.

Last month, border agents arrested 16,658 individuals who arrived as members of "family units," an all-time high, up from 9,247 in July.

Migrant advocates have documented cases of rejected asylum applicants being killed after they were sent back. But a full picture is difficult to obtain because U.S. government statistics do not track what happens to deportees once they leave the United States.

DHS officials point to improving public-safety statistics from Central America as evidence that the asylum trend is not driven by worsening violence.

Those fleeing lawlessness and crime are also lured north by job opportunities and the desire to reunite with parents, siblings and other relatives already living here. The United States offers not only safety but also a chance at a dramatically better life.

AR441

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post

Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 162 of 187

11/29/18, 8:22 AM

And with the U.S. unemployment rate at a 50-year low and employers across the Midwest desperate for labor, the Trump-era economy is undermining the Trump-era immigration agenda.

"Migrants from Central America seek asylum in the U.S. to escape gangs, violence and lack of opportunity," said Doris Meissner, who is policy director at the Migration Policy Institute and ran the U.S. immigration system under President Bill Clinton. "This mixture of humanitarian and economic migration is happening in other parts of the world, too."

"However, only some of those in peril are actually eligible for asylum," said Meissner, co-author of the new report "The U.S. Asylum System in Crisis." "Granting them protection but keeping asylum systems from being overwhelmed or misused requires broad solutions, including attacking the reasons people flee."

For people like Ulloa and her son, here's how it works.

Those who cross the border and turn themselves in are interviewed by a U.S. asylum officer to determine whether they have a "credible fear" of facing persecution back home. The Supreme Court has ruled that an asylum-seeker's fear is considered "well-founded" if there is a 10 percent chance they will face persecution, and those who potentially qualify are referred to an immigration judge.

Between Oct. 1, 2017 — the start of the 2018 fiscal year — and June 30, the period for which the most recent statistics are available, the government received more than 73,000 credible-fear claims, up from 5,000 during all of 2009. Of those 73,000 who were interviewed, 76 percent were found to have a credible fear of return.

The finding does not mean that a judge will eventually grant asylum. Justice Department statistics show that fewer than 10 percent of Central American applicants are awarded asylum, but the process of applying offers a shield from deportation and a toehold, however tenuous, in the United States.

Trump officials view this as a too-permissive approach to asylum claims that amounts to a mile-wide loophole in the American immigration system. U.S. generosity is being exploited by smugglers and cheats, they say, and the dysfunction encourages more to make a dangerous journey.

Under Trump, asylum denial rates have reached their highest levels in more than a decade. But

AR442

nearly half of those rulings are issued in absentia, because the applicant does not appear in court.

That is the breach Trump officials see: If asylum seekers think their case is likely to be denied, they can drop out of the court system and disappear, remaining in the United States illegally. The latest Justice Department figures show U.S. courts issued more than 40,000 removal orders in absentia during the government's 2017 fiscal year, nearly twice as many as in 2014.

"Saying a few simple words — claiming a fear of return — has transformed a straightforward arrest for illegal entry and immediate return too often into a prolonged legal process, where an alien may be released from custody into the United States and possibly never show up for an immigration hearing," Attorney General Jeff Sessions said in a September speech to a group of 44 newly hired immigration judges that he said was the largest class in history.

"Our system was not designed to handle thousands of new asylum claims every month from individuals who illegally flood across the border," he said. "But that is what has been happening, and it has overwhelmed the system."

### 'Private' violence

In the absence of a physical wall, the Trump administration is laying down new legal barriers to the asylum process. The U.S. immigration court system is a branch of the Justice Department, not the judiciary, and the attorney general effectively functions as a one-man Supreme Court. In June, Sessions issued a sweeping ruling that overturned the case of a Guatemalan domestic-violence victim who had demonstrated that police failed to protect her from spousal abuse and rape.

Sessions's ruling said asylum laws are meant to shelter those facing persecution for political or religious beliefs, or their membership in a well-defined social group, not those fleeing what he called "private" forms of violence.

"The mere fact that a country may have problems effectively policing certain crimes — such as domestic violence or gang violence — or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim," Sessions wrote.

Under Sessions, the Justice Department has attempted to reduce the court backlog by adding dozens

AR443

of immigration judges and imposing quotas that compel them to process more cases. It has taken steps to prioritize the claims of the most recent arrivals, as a way to discourage asylum seekers from taking advantage of the court backlog. And it has instructed judges and asylum officers to take a more adversarial approach to migrants' claims.

U.S. asylum laws were shaped in the aftermath of World War II, when the United States and other Western nations developed international treaties based on the principle of "non-refoulement" — that those fleeing persecution should not be sent back to places where they are likely to killed or persecuted.

Applicants who reached U.S. soil could prove eligibility for asylum on the basis of past persecution or a fear of future abuse on the basis of their "race, religion, nationality, membership in a particular social group or political opinion."

In practice, historians and immigration scholars say, political considerations have often superseded humanitarian ones. During the Cold War, refugees fleeing communist and left-wing governments in Vietnam, Cuba and Nicaragua were welcomed in large numbers, while those escaping U.S.-friendly military dictatorships in El Salvador and Guatemala were denied.

"The United States has never solely pursued asylum on the basis of humanitarian principles," said Roberto Suro, a migration expert at the University of Southern California and former director of the Pew Hispanic Center. "American approaches have always been ad hoc and driven largely by foreign policy concerns and domestic policy concerns."

Sessions has directed judges and asylum officers to adhere to a narrower definition of "membership in a social group" — the category had been used in recent years to grant protection to victims of domestic violence.

"An alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family or other personal circumstances," Sessions wrote. "Yet the asylum statute does not provide redress for all misfortune."

The president demonstrated even less patience this spring, when a large group of asylum-seeking Central American families formed a caravan to travel northward. Trump took their journey as a

AR444

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post                                              11/29/18, 8:22 AM

personal affront.

"We cannot allow all of these people to invade our Country," he wrote on Twitter. "When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came."

More than 400 caravan members eventually crossed, according to DHS statistics. Among them was Carlos Aldana, who now lives with his partner and young daughters outside Seattle, waiting to see a judge. The monitoring device strapped to his leg has been on so long he barely notices it anymore.

"We go to the park. We go to church and the grocery store," Aldana said. "It's beautiful here."

His family's asylum claim epitomizes the intertwined push-and-pull factors that bring Central Americans to the United States — and that make it unlikely he, his partner and their two daughters will be allowed to stay.

The family had a small farm near the Caribbean coast, on land purchased with money sent home by a brother working in the United States. When traces of gold were found on the property, Aldana said, he and his siblings invested in mining equipment and began digging.

Then a local crime boss found out about their discovery. He showed up at the property with a carload of men, offering to "go into business together," Aldana said. Aldana's family declined, and the man returned and said he had heard others were planning to kill them. He offered protection. Again, Aldana and his siblings refused.

The threats worsened. Then one of Aldana's brothers was killed. Aldana said his family was too scared to go to the police. "They work for him," he said of the gangster.

The family fled to another part of Honduras and attempted to start over, but a year later the man found them and the threats resumed, Aldana said.

This time Aldana and his family fled to southern Mexico. They were arrested by Mexican authorities and sent back to Honduras. They tried to start over again.

Worried that he was putting the whole family in danger, another of Aldana's brothers bid farewell

AR445

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post

Case 4:19-cv-04073-JST    Document 29-4    Filed 07/19/19    Page 166 of 187    11/29/18, 8:22 AM

and left. His body was found a few months later, tortured and mutilated. Aldana reported the crime to police, but they made no arrests, he said.

Aldana fled with his family to Mexico a second time, then found out about the caravan. Like others who joined, they saw it as a safe, affordable way to reach the border.

Along the journey, the caravan's legal advisers warned Aldana he would probably not qualify for asylum because he had been deported from the United States once before, in 2008, when he attempted to come illegally at age 19.

But he crossed anyway, and like so many Central Americans, his urge to flee is hard to separate from the desire for a better life in the United States.

"I feel safe here. I just want to be able to stay, so my girls don't have to grow up in a place like that," he said of Honduras. "I don't ever want to go back."

**'The most horrifying stories'**

Asylum seekers who make their claims at official border crossings — not on the banks of the Rio Grande — are not breaking the law. But U.S. agents have to let them cross the bridge first.

On a recent morning in South Texas, immigration lawyer Jennifer Harbury walked across the river into Mexico under a blazing sun, waiting for a nun to pick her up. They drove to a Reynosa migrant shelter in a bullet-scarred neighborhood full of cartel lookouts and stash houses used by smugglers to stage illegal crossings.

Harbury is an irritant to U.S. border officials as well as the cartels. She provides free legal advice and assistance to asylum seekers, so the nuns who run the shelter call her often to see whether she can help migrant families desperate for legal advice. Harbury's pro bono work takes profits away from traffickers, because they charge a "tax" of several hundred dollars to those who cross illegally along the river. They earn nothing from the migrants Harbury escorts to the official border crossing.

Harbury is one of the activists who also help asylum seekers stranded in the no man's land on the pedestrian bridge over the river. In recent months, U.S. officers have been turning migrants away,

AR446

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post                                    11/29/18, 8:22 AM

telling them to come back later. Harbury and others have criticized the practice as unlawful, but DHS officials say that port officers have multiple responsibilities and that busy border crossings have capacity limits.

It was Harbury who provided ProPublica with the surreptitious audio recording of a child screaming for her mother that dealt a severe blow to the family-separation policy. She has absorbed the stories of thousands of asylum seekers over the decades and increasingly views her job with the urgency of an emergency responder. She intends to help as many asylum seekers enter the United States as possible, because she believes she is saving their lives.

"These people have the most horrifying stories I have ever heard," she said. "I don't think people have better claims than those running from the cartels."

The shelter in Reynosa was crowded with newly deported Mexicans, many still carrying their belongings in plastic bags provided by the U.S. government. Immigration and Customs Enforcement had dropped off 85 deportees the previous night, and several complained harshly of bad food and abysmal conditions in U.S. detention.

The nuns had asked Harbury to help a young mother stranded for more than a week, Maria Magdalena Gonzalez, 21, and her son, Emiliano, 3. A gangster in Gonzalez's home state of Guerrero was threatening to kill her for rejecting his advances, she said. But when she and her son tried to approach the U.S. border crossing a few days earlier to seek asylum, they had been turned away.

With more and more Central Americans showing up at the port of entry, U.S. officers had set up an impromptu checkpoint over the middle of the Rio Grande, blocking them from setting foot on the U.S. side to start the asylum process.

Those who fail to cross are put at risk, because cartel lookouts ply the Mexican side of the bridge, watching for Central Americans who have been turned away. The migrants are prime targets for kidnapping because criminal groups assume they have relatives living in the United States with enough money to pay a ransom.

Harbury was there to make sure Gonzalez and her son weren't rejected again.

The border is tougher to cross than ever. But there's still one way into America. - The Washington Post

Case 4:19-cv-04073-JST   Document 29-4   Filed 07/19/19   Page 168 of 187

11/29/18, 8:22 AM

A nun drove them to the bridge over the river, and Harbury walked alongside them until a Mexican immigration official stood in the way. He had been looking for asylum seekers from Central America, but Gonzalez and her son were Mexican, so there was nothing he could do to detain them.

He told Harbury the U.S. agents had not been letting asylum seekers through, or were making others wait three or four days to be allowed to approach the American side.

Harbury, Gonzalez and the boy continued walking until three American officers blocked them halfway across the bridge. "We want asylum," Gonzalez said softly, more a question than a demand. An agent told her to stand aside and wait.

Harbury asked how long, and the officers said it could be several hours, perhaps days. She sat down on the pavement with Gonzalez and the boy. "We'll wait," she said.

The officers appeared to notice a reporter taking notes and called a supervisor. He arrived and waved everyone through.

Gonzalez reached the inspection booth and pushed her paperwork forward. Harbury gave her a hug and an invitation to dinner. Then the officers directed Gonzalez and her son to an adjacent waiting room.

"They made it," Harbury said.

She waved goodbye through the glass. The room wasn't full, not even close. There were more than 60 chairs in the waiting area, and all but two were empty.

AR448



### Nick Miroff

Nick Miroff covers immigration enforcement, drug trafficking and the Department of Homeland Security on The Washington Post's National Security desk. He was a Post foreign correspondent in Latin America from 2010 to 2017, and has been a staff writer since 2006. Follow



### Carolyn Van Houten

Carolyn Van Houten is a staff photojournalist at the Washington Post. Previously, she worked at the San Antonio Express-News and held internships at National Geographic, The Tampa Bay Times, and The Chicago Tribune, among others. She studied journalism at the University of North Carolina at Chapel Hill. Follow



### The Washington Post

# Thank you.

Your subscription supports journalism that matters.

AR449

World News October 26, 2018 / 2:33 PM

# Mexico offers plan to keep U.S.-bound migrants in Mexico

Delphine Schrank

PIJIJIAPAN, Mexico (Reuters) - Mexico on Friday offered temporary identification papers and jobs to migrants who register for asylum in the country, stepping up efforts to halt the advance of a U.S.-bound Central American caravan that has angered Washington.

U.S. President Donald Trump has threatened to close the U.S.-Mexico border and cut aid to Central America to try to stop the caravan of several thousand people. U.S. officials have said that up to 1,000 troops may be sent to the U.S. southern border to prevent the migrants from crossing.

Making reference to the caravan, Mexican President Enrique Pena Nieto said that migrants wishing to obtain temporary identification documents, jobs or education for their children could do so by registering for asylum in southern Mexico.

"This plan is only for those who comply with Mexican laws, and it's a first step towards a permanent solution for those who are granted refugee status in Mexico," Pena Nieto said in a pre-recorded address broadcast on Friday afternoon.

To qualify for the scheme he called "Estas en Tu Casa" ('Make Yourself at Home') migrants had to be in the southern states of Chiapas and Oaxaca, Pena Nieto said.

Temporary work in the states would be extended so as also to benefit Mexicans, said Pena Nieto, who leaves office on Nov. 30.

The caravan, which is moving through Chiapas on the border of Guatemala, has enabled Trump to campaign hard on illegal immigration ahead of midterm congressional elections on Nov. 6, in which Republicans are battling to keep control of Congress.

Mexican officials have said those migrants who do not qualify for refugee status are liable to be deported.

Mexico's government has said that more than 1,700 people in the convoy have registered for asylum, while others have returned home. Estimates on the size of the group vary.

Alden Rivera, the Honduran ambassador to Mexico, told Mexican radio on Friday that the caravan could reach Mexico City by next Friday. He put an "official" headcount at 3,500, estimating that at least two-thirds of them were Hondurans.

The caravan set off in Honduras nearly two weeks ago, and has picked up other Central Americans en route.

Alexander Fernandez, a Honduran traveling in the caravan, said people began leaving the town of Pijijiapan at about 3 a.m. to head for Arriaga, a town in the west of Chiapas.

A banner hanging over a bridge on the migrants' path read: "Your hearts are brave, don't give up."

Tens of thousands of Central Americans set off for the United States every year, looking to escape violence and poverty. Hondurans, Guatemalans and Salvadorans make up the bulk of illegal immigrants apprehended at the U.S. border.

On Thursday night, thousands of people took refuge under small tents or teepees made from garbage bags in Pijijiapan's town square. Many people rushed to a nearby river in the afternoon to wash off the sweat of travel and extreme heat.

A White House official said on Thursday that "a wide range of administrative, legal and legislative options" were being considered regarding the migrants.

Additional reporting by Veronica Gomez in Mexico City; Editing by Dave Graham and Tom Brown

Our Standards:The Thomson Reuters Trust Principles.

# 'We're heading north!' Migrants nix offer to stay in Mexico

By CHRISTOPHER SHERMAN   October 27, 2018

ARRIAGA, Mexico (AP) — Hundreds of Mexican federal officers carrying plastic shields blocked a Central American caravan from advancing toward the United States on Saturday, after a group of several thousand migrants turned down the chance to apply for refugee status and obtain a Mexican offer of benefits.

Mexican President Enrique Pena Nieto has announced what he called the "You are at home" plan, offering shelter, medical attention, schooling and jobs to Central Americans in Chiapas and Oaxaca states if migrants apply, calling it a first step toward permanent refugee status. Authorities said more than 1,700 had already applied for refugee status.

But a standoff unfolded as federal police officers blocked the highway, saying there was an operation underway to stop the caravan. Thousands of migrants waited to advance, vowing to continue their long trek toward the U.S. border.

At a meeting brokered by Mexico's National Human Rights Commission, police said they would reopen the highway and only wanted an opportunity for federal authorities to explain the proposal to migrants who had rejected it the previous evening. Migrants countered that the middle of a highway was no place to negotiate and said they wanted to at least arrive safely to Mexico City to discuss the topic with authorities and Mexican lawmakers.

They agreed to relay information back to their respective sides and said they would reconvene.

Orbelina Orellana, a migrant from San Pedro Sula, Honduras, said she and her husband left three children behind and had decided to continue north one way or another.

"Our destiny is to get to the border," Orellana said.

She was suspicious of the government's proposal and said that some Hondurans who had applied for legal status had already been sent back. Her claims could not be verified, but migrants' representatives in the talks asked the Mexican government to provide a list of anyone who had been forced to return.

The standoff comes after one of the caravan's longest days of walking and hanging from passing trucks on a 60-mile (100 kilometer) journey to the city of Arriaga.

The bulk of the migrants were boisterous Friday evening in their refusal to accept anything less than safe passage to the U.S. border.

"Thank you!" they yelled as they voted to reject the offer in a show of hands. They then added: "No, we're heading north!"

Sitting at the edge of the edge of the town square, 58-year-old Oscar Sosa of San Pedro Sula, Honduras concurred.

"Our goal is not to remain in Mexico," Sosa said. "Our goal is to make it to the (U.S). We want passage, that's all."

Still 1,000 miles (1,600 kilometers) from the nearest U.S. border crossing at McAllen, Texas, the journey could be twice as long if the group of some 4,000 migrants heads for the Tijuana-San Diego frontier, as another caravan did earlier this year. Only about 200 in that group made it to the border.

While such migrant caravans have taken place regularly over the years, passing largely unnoticed, they have received widespread attention this year after fierce opposition from U.S. President Donald Trump.

On Friday, the Pentagon approved a request for additional troops at the southern border, likely to total several hundred, to help the U.S. Border Patrol as Trump seeks to transform concerns about immigration and the caravan into electoral gains in the Nov. 6 midterms.

Defense Secretary Jim Mattis signed off on the request for help from the Department of Homeland Security and authorized the military staff to work out details such as the size, composition and estimated cost of the deployments, according to a U.S. official who spoke on condition of anonymity to discuss planning that has not yet been publicly announced.

Stoking fears about the caravan and illegal immigration to rally his Republican base, the president insinuated that gang members and "Middle Easterners" are mixed in with the group, though he later acknowledged there was no proof of that.

At a church in Arriaga that opened its grounds to women and children Friday, Ana Griselda Hernandez, 44, of Mapala, Honduras, said she and two friends traveling with children had decided to pay for a bus ride from Pijijiapan, because the 4-year-old and 5-year-old would have never covered the 60-mile distance.

"It's difficult because they walk very slowly," she said. She pointed out scabbed-over blisters on her feet, a testament to the fact they had walked or hitched rides since leaving their country.

The caravan is now trying to strike out for Tapanatepec, about 29 miles (46 kilometers) away.

Up until now, Mexico's government has allowed the migrants to make their way on foot, but has not provided them with food, shelter or bathrooms, reserving any aid for those who turn themselves in.

AR453

Police have also been ejecting paid migrant passengers off buses, enforcing an obscure road insurance regulation to make it tougher for them to travel that way.

On Friday, authorities were cracking down on smaller groups trying to catch up with the main caravan, detaining about 300 Hondurans and Guatemalans who crossed the Mexico border illegally, said an official with the national immigration authority.

Migrants, who enter Mexico illegally every day, usually ride in smugglers' trucks or buses, or walk at night to avoid detection. The fact that the group of about 300 stragglers was walking in broad daylight suggests they were adopting the tactics of the main caravan, which is large enough to be out in the open without fear of mass detention.

However, it now appears such smaller groups will be picked off by immigration authorities, keeping them from swelling the caravan's ranks.

On Friday evening, Irineo Mujica, whose organization People without Borders is supporting the caravan, accused Mexican immigration agents of harassment and urged migrants to travel closely together.

"They are terrorizing us," he said.

 Associated Press writers Mark Stevenson and Peter Orsi in Mexico City contributed to this report.

# Remarks by President Trump on the Illegal Immigration Crisis and Border Security

Issued on: November 1, 2018

Roosevelt Room

4:19 P.M. EDT

THE PRESIDENT: Well, thank you very much, everyone. Appreciate it. And good afternoon. I would like to provide an update to the American people regarding the crisis on our southern border — and crisis it is.

Illegal immigration affects the lives of all Americans. Illegal immigration hurts American workers; burdens American taxpayers; and undermines public safety; and places enormous strain on local schools, hospitals, and communities in general, taking precious resources away from the poorest Americans who need them most. Illegal immigration costs our country billions and billions of dollars each year.

America is a welcoming country. And under my leadership, it's a welcoming country. We lead the world in humanitarian protection and assistance, by far. There's nobody even close. We have the largest and most expansive immigration programs anywhere on the planet.

We've issued 40 million green cards since 1970, which means the permanent residency and a path to citizenship for many, many people. But we will not allow our generosity to be abused by those who would break our laws, defy our rules, violate our borders, break into our country illegally. We won't allow it.

Mass, uncontrolled immigration is especially unfair to the many wonderful, law-abiding immigrants already living here who followed the rules and waited their turn. Some have been waiting for many years. Some have been waiting for a long time. They've done everything perfectly. And they're going to come in. At some point, they're going to come in. In many cases, very soon. We need them to come in, because we have companies coming into our country; they need workers. But they have to come in on a merit basis, and they will come in on a merit basis.

The communities are often left to bear the cost and the influx of people that come in illegally. We can't allow that.

There's a limit to how many people a nation can responsibly absorb into their societies. Every day, above and beyond our existing lawful admission programs, roughly 1,500 to 2,000 people try crossing our borders illegally. We do a very good job considering the laws are so bad. They're not archaic; they're incompetent. It's not that they're old; they're just bad. And we can't get any Democrat votes to change them. It's only the Republicans that are — in unison, they

want to change them. They want to make strong borders, want to get rid of any crime because of the borders, of which there's a lot.

And we've done a great job with the laws that we have. We're moving in tremendous numbers of people to get out the MS-13 gangs and others gangs that illegally come into our country. And we're getting them out by the thousands.

But this is a perilous situation, and it threatens to become even more hazardous as our economy gets better and better. A lot of the cause of this problem is the fact that we right now have the hottest economy anywhere in the world. It's doing better than any economy in the world. Jobs, unemployment — you look at any number.

Right now, we have more workers than any time in the history of our country. We have more people working, which is a tremendous statement. More people working than at any time in the history of our country. And people want to come in, and in some cases, they want to take advantage of that, and that's okay. And we want them to come in, but they have to come in through merit. They have to come in legally.

At this very moment, large, well-organized caravans of migrants are marching towards our southern border. Some people call it an "invasion." It's like an invasion. They have violently overrun the Mexican border. You saw that two days ago. These are tough people, in many cases. A lot of young men, strong men. And a lot of men that maybe we don't want in our country. But again, we'll find that out through the legal process.

But they've overrun the Mexican police, and they've overrun and hurt badly Mexican soldiers. So this isn't an innocent group of people. It's a large number of people that are tough. They've injured, they've attacked, and the Mexican police and military has actually suffered. And I appreciate what Mexico is trying to do.

So let me begin by stating that these illegal caravans will not be allowed into the United States, and they should turn back now, because they're wasting their time. They should apply to come into our country. We want them to come into our country very much. We need people to help us, with all of these companies that are coming in. We've never had anything like this. We have car companies coming in. We have Foxconn — so involved with the manufacturing of Apple products — coming in in Wisconsin. We have a lot of companies coming in, but they have to apply, and they have to be wonderful people that are going to love our country and work hard.

And we've already dispatched, for the border, the United States military. And they will do the job. They are setting up right now, and they're preparing. We hope nothing happens. But if it does, we are totally prepared. Greatest military anywhere in the world, and it's going to be, and is now, in great shape. No longer depleted like it was when I took over as the President of the United States.

The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused these offers, which demonstrate that these migrants are not legitimate asylum-seekers. They're not looking for

protection. Because if they were, they'd be able to get it from Mexico. Mexico has agreed to take them in and encouraged them to stay. But they don't want to stay; they want to come into the United States. So this is no longer safety, and asylum is about safety.

Asylum is not a program for those living in poverty. There are billions of people in the world living at the poverty level. The United States cannot possibly absorb them all. Asylum is a very special protection intended only for those fleeing government persecution based on race, religion, and other protected status.

These caravans and illegal migrants are drawn to our country by Democrat-backed laws and left-wing judicial rulings. We're getting rulings that are so ridiculous, so bad. They're writing the laws. Can't do that. Collectively known as — as an example, catch-and-release. It's a disgrace that we have to put up with it.

These policies lead to the release of illegal aliens into our communities after they've been apprehended. But we're not releasing anymore. Big change, as of a couple of days ago. We're going to no longer release. We're going to catch; we're not going to release. They're going to stay with us until the deportation hearing or the asylum hearing takes place. So we're not releasing them into the community.

We have millions of people that, over the years, have been released into the community. They never show up for the trials. They never come back. They're never seen again. And those people, they know who they are. And we know a lot of where they are, who they are. And those people will be deported, directly deported.

The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language — by lawyers and others that stand there trying to get fees or whatever they can get — they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here.

This merely asserts the need for asylum, and then often released into the United States, and they await a lengthy court process. The court process will takes years sometimes for them to attend. Well, we're not releasing them into our country any longer. They'll wait for long periods of time. We're putting up massive cities of tents. The military is helping us incredibly well.

I want to thank the Army Corps of Engineers. They've been so efficient, so good, so talented. And we have thousands of tents. We have a lot of tents; we have a lot of everything. We're going to hold them right there. We're not letting them into our country. And then they never show up — almost. It's like a level of 3 percent. They never show up for the trial. So by the time their trial comes, they're gone. Nobody knows where they are. But we know where a lot of them are, and they're going to be deported.

There are now nearly 700,000 aliens inside the United States awaiting adjudication of their claims. Most of these people we have no idea how they got there, why they got there. And the number is actually going to be a much larger number as we look at all of the data. So if you look at just at a minimal number, it's the size of Vermont, or bigger. And the overall number could be 10 million people; it could be 12 million people; it could be 20 million people. The record keeping from past administrations has not exactly been very good.

As human smugglers and traffickers have learned how the game is played and how to game the system, we have witnessed a staggering 1,700 [percent] increase in asylum claims since the year 2010. They understand the law better than the lawyers understand the law. You have a lot of professionalism there. You have a lot of professionalism involved with setting up the caravans. You take a look at the way that's happening. Even the countries — you look at Honduras and El Salvador, and you look at what's happening at the different levels and different countries, and what's happening on the streets. There's a lot of professionalism taking place, and there seems to be a lot of money passing. And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up. They got a long way to go.

On average, once released, an asylum case takes three and half years to complete. Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, "Out. Get out. Just get out." Other countries — "Get out. We have a border. Get out."

We go through years and years of litigation because of the Democrats and the incompetent, very, very stupid laws that we have. They're the laughingstock all over the world, including the people that are marching up. They understand. But the difference is, we're not allowing them in, and we're not releasing, and we're not doing any of the things that were done for so many years that really are terrible for our country.

The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country. So they never get to see the judge. They never get to have a ruling. They don't care because they're in the country and nobody knows where they are.

All told, there are approximately 1 million aliens who have received final orders of removal. They've actually got final orders of removal. You don't have to go to court anymore. The courts have already issued the orders of removal, and we've gotten a lot of them. But who remain at large in our country. So we've moving them out.

This endemic abuse of the asylum system makes a mockery of our immigration system, displacing legitimate asylum-seekers — and there are legitimate asylum-seekers — while rewarding those who abuse or defraud our system, which is almost everybody. Everybody is abusing it and just doing things to our system which were unthinkable, I'm sure even by the Democrats who were largely responsible for getting it done.

These individuals disrespect the foundations of American government by voluntarily choosing to break the law as their first act on American soil.

Furthermore, contained within this giant flow of illegal migration to our southwest border is the movement of illicit and deadly narcotics. It's in the southwest, most of it comes in. Nearly 100 percent of heroin in the United States enters through the southern border– think of that: 100 percent, almost, of heroin comes in through the southern border, along with roughly 90 percent of cocaine, and the majority of meth, and a substantial portion of the ultra-lethal fentanyl killing our youth. Fentanyl is killing our youth.

These drugs destroy the lives and kill much more than 70,000 Americans every single year. And the number goes up. It goes up and up and up, because we are so foolish with our laws that we allow this to happen. A death toll equivalent of the size of an entire American city every year. The current influx, if not halted, threatens to overwhelm our immigration system and our communities, and poses unacceptable dangers to the entire nation. We have to have our borders. Can't let drugs come in. Not just — it's not just people. It's people; it's drugs. It's human traffickers.

Human trafficking is now at the highest level in the world that it's ever been. And that's because of the Internet. Think of it — human trafficking. You think back 200 years, 500 years. Human trafficking — where they steal children; in many cases, women, unfortunately. They steal women. The human traffickers, the lowest scum on Earth. The lowest scum on Earth. And it's at a level that it's never been. Worldwide — never been at a level like this.

If these caravans are allowed into our country, only bigger and more emboldened caravans will follow. And you see that's what's happening now. We have one that's coming up, and it's being somewhat dissipated, as they march. But then other people are joining it. And then it gets bigger. And now, if you look back at Honduras, and if you look at El Salvador, other ones are solving and they're forming. They're forming. You have new ones that are forming. And we call it "caravan number two" is unbelievably rough people. Very, very hard for the military to stop it. Our military will have no problem. But very, very hard. Mexico is having a very, very hard time with it.

Once they arrive, the Democrat Party's vision is to offer them free healthcare, free welfare, free education, and the right to vote. You and the hardworking taxpayers of our country will be asked to pick up the entire tab. And that's what's happening — medical and, in many cases, they've got some big medical problems before they get here.

No nation can allow itself to be overwhelmed by uncontrolled masses of people rushing their border. That's what's happening. They are rushing our border. They are coming up. And even before you get to the caravan, just on a daily basis, people coming in. And it's a very bad thing for our country. It's sad in many ways, but it's a very bad thing for our country. And again, costs us billions and billions and billions of dollars a year.

And I will therefore take every lawful action at my disposal to address this crisis. And that's what we're doing. The United States military, great people.

My administration is finalizing a plan to end the rampant abuse of our asylum system — it's abused — to halt the dangerous influx, and to establish control over America's sovereign

borders. We got borders. And once that control is set and standardized, and made very strong — including the building of the wall, which we've already started. $1.6 billion spent last year; $1.6 billion this year. We have another $1.6 [billion] that will be coming, but we want to build it at one time. All it does is turn people in a different direction if you don't. We want to build it at one time.

Under this plan, the illegal aliens will no longer get a free pass into our country by lodging meritless claims in seeking asylum. Instead, migrants seeking asylum will have to present themselves lawfully at a port of entry. So they're going to have to lawfully present themselves at a port of entry. Those who choose to break our laws and enter illegally will no longer be able to use meritless claims to gain automatic admission into our country. We will hold them — for a long time, if necessary.

The only long-term solution to the crisis, and the only way to ensure the endurance of our nation as a sovereign country, is for Congress to overcome open borders obstruction. That's exactly what it is: It's open border obstruction. No votes. You can come up with the greatest border plan, the greatest immigration plan. You won't get one vote from a Democrat. They have terrible policy. In many cases, they're terrible politicians. But the one thing I give them great credit for: They vote as a bloc. They stick together.

And we will end catch-and-release. We're not releasing any longer. We also must finish the job that we started by being strong at the border. When we're strong at the border, people will turn away and they won't bother. You will see, in a year from now, or in certainly a period of time from now, despite our very good economy, which some of them come for that — I can't blame them for that; you have to do it legally — but you will see that the numbers of people trying to get in will be greatly reduced.

But that can only happen if we're strong at the border. And the southern border is a big problem, and it's a tremendous problem for drugs pouring in and destroying our youth, and, really, destroying the fabric of our country. There's never been a drug problem like we have today. And as I said, much of it comes from the southern border.

So in the meantime, I will fulfill my sacred obligation to protect our country and defend the United States of America. And this is a defense of our country. We have no choice. We have no choice. We will defend our borders, we will defend our country.

Thank you very much.

Q    Mr. President, what happens to the children then? If you're ending catch-and-release, what happens to those children? Do they stay in these tent cities? Or what happens?

THE PRESIDENT: We're working on a system where they stay together. But I will say that, by doing that, tremendous numbers — you know, under the Obama plan, you could separate children. They never did anything about that. Nobody talks about that. But under President Obama, they separated children from the parents. We actually put it so that that didn't happen.

But what happens when you do that is you get tremendous numbers of people coming. It's almost like an incentive to — when they hear they're not going to be separated, they come many, many times over. But President Obama separated the children, the parents. And nobody complained. When we continued the exact same law, this country went crazy.

So we are going to continue and try to continue what we're doing. But it is a tremendous incentive for people to try. But it's going to be very, very hard for people to come into our country. So we think we'll be able to do that.

Q With the military, do you envision them firing upon any of these people?

THE PRESIDENT: I hope not.

Q Could you see the military (inaudible)?

THE PRESIDENT: I hope not. It's the military — I hope — I hope there won't be that. But I will tell you this: Anybody throwing stones, rocks — like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico — we will consider that a firearm. Because there's not much difference, where you get hit in the face with a rock — which, as you know, it was very violent a few days ago — very, very violent — that break-in. It was a break-in of a country. They broke into Mexico.

And you look at what's happening in Guatemala, just to mention Guatemala, along with El Salvador and Honduras. It's disgraceful that those countries aren't able to stop this. Because they should be able to stop it before it starts.

And the United States pays them a fortune, and we're looking at not doing that anymore. Because why should we be doing that when they do nothing for us?

Jeff. Jeff, go ahead.

Q Mr. President, how is this plan going to be legal, considering the current law?

THE PRESIDENT: Oh, this is totally legal. No. This is legal. We are stopping people at the border. This is an invasion, and nobody is even questioning that.

Q But in terms of your plans to change asylum, are you going to do this via executive order?

THE PRESIDENT: No, no, you don't have to — you don't have to release. You have — you can hold. The problem is, to hold people, you need massive facilities. It's the most ridiculous thing I've ever heard. Another country says, "Sorry, you can't come in." With us, we take their name, take their phone number, take their everything, and say, "Good luck." Only because we don't have the facilities to hold people. But we're building the facilities now. We're building massive numbers of tents, and we will hold them in tents. But you don't have to release them. They released them only because they didn't have the facilities to hold them.

AR461

Q Mr. President, is there like an executive order that you're going to be releasing today?

THE PRESIDENT: Oh, we will be doing an executive order sometime next week, yes.

Q (Inaudible) executive order dealing with ending catch-and-release and asylum?

THE PRESIDENT: It's going to end — it's going to be talking about everything. It'll be quite comprehensive. Many of the things we've talked about today.

Q Mr. President, so you're — so just to clarify, you are speaking of, in the tents, these family units that would arrive (inaudible) the children?

THE PRESIDENT: Well, we have other facilities also. But what's happened is we are holding so many facilities — so many people that our facilities are being overrun. They're being overrun. And we are putting up temporary facilities. Eventually, people won't be coming here anymore when they realize they can't get through.

Q So they will hold the children in those tents with their parents?

THE PRESIDENT: We will be holding the family and the children together. Remember this: President Obama separated children from families. And all I did was take the same law, and then I softened the law. But by softening the law, many people come up that would not have come up if there was separation.

Q Mr. President, what do you say to the critics who think this is a political thing before the midterms?

THE PRESIDENT: There's nothing political about a caravan of thousands of people, and now others forming, pouring up into our country. We have no idea who they are. All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police. They're pretty tough people. Even Mexico said, "Wow, these are tough people." I don't want them in our country. And women don't want them in our country. Women want security. Men don't want them in our country. But the women do not want them. Women want security. You look at what the women are looking for. They want to have security. They don't want to have these people in our country. And they're not going to be in our country. It's a very big thing.

Yes.

Q Mr. President, when you talk about finalizing a plan to end asylum, is this a plan that would be included in that executive order?

THE PRESIDENT: Oh, no, people are going to have a chance to go for asylum. But if you look at the records, not very many people are allowed to stay once they go to court. But what happens is they'd go into — they were using asylum — first of all, they were told what to say by lawyers

and others. "Read this statement." You read the statement, and now you're seeking asylum. The whole thing is ridiculous. And we won't put up with it any longer.

Q President Trump, U.S. law and international law says that people who have valid claims have a right to seek asylum.

THE PRESIDENT: That's right.

Q So why would — why would they be —

THE PRESIDENT: Well, they're going to go to court. They're going to go to court, as crazy as it sounds. They're going to go —

Q But the law say that they don't — they're not —

THE PRESIDENT: Excuse me. Excuse me. Ready? They're going to go to court, and a judge is going to determine. But usually, when they go to court, they're deported. It just seems that most of the people are deported once they go. The problem is they never end up going to court, because when they come in, they're told to come back in a year, for a court case, and they disappear into the United States never to be seen again.

But we're going to be —

Q But the current laws doesn't say about holding people in tent cities.

THE PRESIDENT: And they're given deportation notices. We will be deporting those people.

Q Mr. President, you're saying rocks are — rock-throwing, like happened in Mexico, will be considered —

THE PRESIDENT: We will consider that the maximum that we can consider that, because they're throwing rocks viciously and violently. You saw that three days ago. Really hurting the military. We're not going to put up with that. If they want to throw rocks at our military, our military fights back. We're going to consider — and I told them, consider it a rifle. When they throw rocks like they did at the Mexico military and police, I say, consider it a rifle.

Jeff?

Q A separate topic, sir. Did you offer Heather Nauert the job of U.N. Ambassador?

THE PRESIDENT: Well, she's under very serious consideration. She's excellent. She's been with us a long time. She's been a supporter for a long time. And she's really excellent. So she's under very serious — we'll probably make a decision next week. We have a lot of people that want the job, and there are a lot of really great people. But we'll be talking about that next week sometime.

Q Did you see Oprah Winfrey's comments today?

THE PRESIDENT: I didn't. What did she say?

Q She was campaigning in Georgia at the same time that Vice President Pence was.

THE PRESIDENT: At the same time as who?

Q Excuse me, at the same time Vice President Pence was, encouraging people to vote and —

THE PRESIDENT: Well, that's okay. I mean, I was on Oprah's last week — the last week of her show. Oprah liked me very much. I've always liked Oprah. You know, Oprah is good. But the woman that she's supporting is not qualified to be the governor of Georgia, by any stretch of the imagination.

And I'll be in Georgia the next few days — the next few days — and we have a tremendous — around Macon — we have a tremendous crowd already. Nobody has a crowd like we have because people want to see a great governor of Georgia. And I think Brian is going to be a great governor of Georgia. I think he'll be a fantastic governor. He's totally qualified.

She is not qualified to be the governor of Georgia. She's not qualified. And Georgia is a great state —

Q Why is she not qualified?

THE PRESIDENT: — it's a great, great state. Take a — take a look. Take a look at her past. Take a look at her history. Take a look at what she wants to do and what she has in mind for the state. That state will be in big, big trouble very quickly. And the people of Georgia don't want that.

Question?

Q Mr. President, really quickly, just on election integrity? Can you say for a fact that our elections are secure next week? What can you tell us?

THE PRESIDENT: Yeah, yeah. I just met with — I just met with the FBI, with Chris; and the Justice Department; and with Secretary Nielsen. And they've spent a lot of time and effort and some money on making sure that everything with respect to the election coming up in five days is going to be perfect and safe. There will be hopefully no meddling, no tampering, no nothing. And we spent a lot —

Now President Obama had the chance to do that in September before '16, but he chose not to do that because he thought Hillary Clinton was going to win. And while everybody agrees it didn't affect the vote at all, nevertheless he could have done things that probably would have made it a little more obvious, a little clearer. But he was told by the FBI in September before the election

AR464

in '16 about potential meddling or potential Russian meddling, and he did nothing about it. He didn't do that because he thought that Hillary Clinton would win.

All right, one more.

Q Are you optimistic that you can still get the continuing resolution through December 7th for Homeland Security funded, even if the Democrats take the House?

THE PRESIDENT: I think if — I think we're going to do very well in the election, I must tell you. If you look at the races, if you look at the Senate, which is very important, obviously. I'm leaving today; I'll be in Missouri. And I'll be touching down at a number of places over the next five days. But I think we're doing very well in the Senate, and I think we're doing very well in the House.

The only problem is, with the House, there's so many people. I'd like to stop for every one of them, but there's so many people. But I think we're doing very well in the House. I think people want to see strong borders. I think they want to see security. They want to see good healthcare. They want to see the things that we're providing. They don't want to have their taxes increased. We're decreasing their taxes.

We just announced yesterday, you probably heard — Kevin Brady put it out — a reduction of tax. We're going for a reduction of middle-income tax or 10 percent. The Democrats want to, I mean, double up your taxes. In some cases, you'll have to pay three times what you're paying right now in order to get bad healthcare.

And so what we're doing is something that I think the people want, and I think we're going to do very well in the election, even though history says that whoever President it — whoever the President may be, it trends the other way. It certainly does seem that way.

But nobody has ever been President that has the greatest economy in the history of our country. This is the greatest economy in the history of our country. These are the greatest unemployment and employment numbers in the history of our country. Nobody has ever had that to campaign with. So I do.

Thank you all very much. I appreciate it. Thank you.

END

4:51 P.M. EDT

(g) and (h), respectively, and by adding new paragraphs (c), (d), and (e), to read as follows:

### § 1.147   Filing; service; extensions of time; and computation of time.

\* \* \* \* \*

(b) *Who shall make service.* Copies of all such documents or papers required or authorized by the rules in this part to be filed with the Hearing Clerk shall be served upon the parties by the Hearing Clerk, or by some other employee of the Department, or by a U.S. Marshal or deputy marshal.

(c) *Service on party other than the Secretary.* (1) Any complaint or other document initially served on a person to make that person a party respondent in a proceeding, proposed decision and motion for adoption thereof upon failure to file an answer or other admission of all material allegations of fact contained in a complaint, initial decision, final decision, appeal petition filed by the Department, or other document specifically ordered by the Judge to be served by certified or registered mail, shall be deemed to be received by any party to a proceeding, other than the Secretary or agent thereof, on the date of delivery by certified or registered mail to the last known principal place of business of such party, last known principal place of business of the attorney or representative of record of such party, or last known residence of such party if an individual, *Provided that,* if any such document or paper is sent by certified or registered mail but is returned marked by the postal service as unclaimed or refused, it shall be deemed to be received by such party on the date of remailing by ordinary mail to the same address.

(2) Any document or paper, other than one specified in paragraph (c)(1) of this section or written questions for a deposition as provided in § 1.148(d)(2) of this part, shall be deemed to be received by any party to a proceeding, other than the Secretary or agent thereof, on the date of mailing by ordinary mail to the last known principal place of business of such party, last known principal place of business of the attorney or representative of record of such party, or last known residence of such party if an individual.

(3) Any document or paper served other than by mail, on any party to a proceeding, other than the Secretary or agent thereof, shall be deemed to be received by such party on the date of:

(i) Delivery to any responsible individual at, or leaving in a conspicuous place at, the last known principal place of business of such party, last known principal place of

business of the attorney or representative of record of such party, or last known residence of such party if an individual, or

(ii) Delivery to such party if an individual, to an officer or director of such party if a corporation, or to a member of such party if a partnership, at any location.

(d) *Service on another.* Any subpoena, written questions for a deposition under § 1.148(d)(2) of this part, or other document or paper, served on any person other than a party to a proceeding, the Secretary or agent thereof, shall be deemed to be received by such person on the date of:

(1) Delivery by certified mail or registered mail to the last known principal place of business of such person, last known principal place of business of the attorney or representative of record of such person, or last known residence of such person if an individual;

(2) Delivery other than by mail to any responsible individual at, or leaving in a conspicuous place at, any such location; or

(3) Delivery to such party if an individual, to an officer or director of such party if a corporation, or to a member of such party if a partnership, at any location.

(e) *Proof of service.* Any of the following, in the possession of the Department, showing such service, shall be deemed to be accurate:

(1) A certified or registered mail receipt returned by the postal service with a signature;

(2) An official record of the postal service;

(3) An entry on a docket record or a copy placed in a docket file by the Hearing Clerk of the Department or by an employee of the Hearing Clerk in the ordinary course of business;

(4) A certificate of service, which need not be separate from and may be incorporated in the document or paper of which it certifies service, showing the method, place and date of service in writing and signed by an individual with personal knowledge thereof, *Provided* that such certificate must be verified by oath or declaration under penalty of perjury if the individual certifying service is not a party to the proceeding in which such document or paper is served, an attorney or representative of record for such a party, or an official or employee of the United States or of a State or political subdivision thereof.

\* \* \* \* \*

5. The second sentence of 1.148(d)(2) is revised to read as follows:

### § 1.148   Depositions.

\* \* \* \* \*

(d) *Procedure on examination.* \* \* \*

(2) \* \* \* If the examination is conducted by means of written questions, copies of the applicant's questions must be received by the other party to the proceeding and the officer at least 10 days prior to the date set for the examination unless otherwise agreed, and any cross questions of a party other than the applicant must be received by the applicant and the officer at any time prior to the time of the examination. \* \* \*

\* \* \* \* \*

6. Section 1.149 is amended by revising the last sentence of paragraph (a), and all of paragraph (b), to read as follows:

### § 1.149   Subpoenas.[4]

(a) *Issuance of subpoenas.* \* \* \* Except for good cause shown, requests for subpoenas shall be received by the Judge at least 10 days prior to the date set for the hearing.

(b) *Service of subpoenas.* Subpoenas may be served by any person not less than 18 years of age. The party at whose instance a subpoena is issued shall be responsible for service thereof. Subpoenas shall be served as provided in § 1.147 of this part.

Done at Washington, DC this 23rd day of July 1990.

**Clayton Yeutter,**

*Secretary of Agriculture.*

[FR Doc. 90–17511 Filed 7–26–90; 8:45 am]

**BILLING CODE 3410-14-M**

---

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**8 CFR Parts 3, 103, 208, 236, 242, and 253**

[Atty. Gen. Order No. 1435–90]

**Aliens and Nationality; Asylum and Withholding of Deportation Procedures**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This final rule establishes procedures to be used in determining asylum under section 208 and withholding of deportation under section 243(h) of the Immigration and

---

[4] This section relates only to subpoenas for the stated purpose and has no relevance with respect to investigatory subpoenas.

AR466

Nationality Act, as amended by the Refugee Act of 1980. The rule adopts with minor changes the revised proposed rule published on April 6, 1988 (53 FR 11300) which substantially modified an earlier proposed rule published on August 28, 1987 (52 FR 32552) and the interim rule published on June 2, 1980 (45 FR 37392). That modification responded to numerous and diverse comments received on the August 28, 1987 proposed rule, in particular a substantial number objecting to the original proposal to require that all asylum and withholding of deportation claims be adjudicated in a nonadversarial setting by Asylum Officers within the INS. The final rule provides for continued adversarial adjudications of asylum and withholding of deportation applications by Immigration Judges for those applicants who are in exclusion or deportation proceedings. At the same time, it preserves an opportunity, prior to the institution of proceedings, for adjudication of initial applications in a nonadversarial setting by a specially-trained corps of Asylum Officers.

**EFFECTIVE DATE:** October 1, 1990.

**FOR FURTHER INFORMATION CONTACT:**

Henry L. Curry, Director, Asylum Policy and Review Unit, Department of Justice, 10th and Constitution Ave., NW., room 6213, Washington, DC 20530. Telephone: (202) 514–2415; or

Ralph Thomas, Deputy Assistant Commissioner, Refugees, Asylum, and Parole, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, DC 20536. Telephone: (202) 514–2361; or

Gerald Hurwitz, Counsel to the Director, Executive Office for Immigration Review, 5107 Leesburg Pike, suite 2800, Falls Church, Virginia 22041. Telephone: (703) 756–6470.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Refugee Act of 1980 created a statutory basis for asylum in the United States and made withholding of deportation for those who qualify mandatory rather than discretionary. In passing the Act, Congress for the first time established a statutory definition of refugee based on the definition the United States accepted upon becoming a party to the 1967 Protocol to the UN Convention Relating to the Status of Refugees. It also established a regular procedure for the admission for refugees to the United States, thus largely eliminating the need to use the Attorney General's parole authority for this purpose, and required the Attorney General to establish a procedure

through which aliens already in the United States could apply for asylum on the basis of refugee status.

Consistent with the UN refugee definition, under the Act a refugee is, in essence, someone who has been persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Someone who meets the refugee definition and who has not been firmly resettled elsewhere is eligible for a discretionary grant of asylum, unless one of several specific exclusionary provisions applies (e.g., the applicant has been convicted of a serious non-political crime). The Attorney General is vested with the discretionary authority to grant or deny asylum to refugees physically present in the United States or at a land border or port of entry, irrespective of status.

Similarly, the Act specifically recognizes the obligation under the Convention and Protocol not to expel or return—*refouler*—those whose life or freedom would be threatened upon return to a country of claimed persecution except under strictly limited circumstances. Withholding of deportation is required by the statute for those who are clearly at such risk, unless the individual falls within a limited number of exclusion classes. Entitlement to withholding of deportation thus requires a showing that the life or freedom of the applicant would be threatened in the country of proposed deportation on account of race, religion, nationality, membership in a particular social group, or political opinion.

However, Congress did not legislate any particular method by which claims for asylum or withholding of deportation were to be adjudicated, directing instead that the Attorney General establish the necessary procedures for such adjudication. Interim regulations establishing procedures and standards governing applications under the provisions of the Refugee Act of 1980 were published on June 2, 1980. These interim regulations (hereafter referred to as the "1980 interim rule") were intended only to provide a temporary regulatory mechanism for adjudicating claims pending publication of permanent procedures following a period of deliberate study and analysis. After an appropriate period of experience under the interim rule, the Department of Justice ("the Department"), including the Immigration and Naturalization Service ("INS") and the Executive Office for Immigration Review ("EOIR"), the Department of State, and other concerned administrative agencies of

the United States Government conducted detailed reviews and discussions of the asylum process in order to formulate and implement a comprehensive and uniform asylum policy and procedure. Designed within the legislative framework established by the Refugee Act, that policy reflects two basic guiding principles: A fundamental belief that the granting of asylum is inherently a humanitarian act distinct from the normal operation and administration of the immigration process; and a recognition of the essential need for an orderly and fair system for the adjudication of asylum claims.

The internal policy and regulatory process itself consumed more than two years of effort, culminating within the Attorney General's creation of an Asylum Policy and Review Unit within the Office of Policy Development in the Department of Justice and the subsequent publication of a proposed rule on August 28, 1987 (hereafter referred to as the "August 28, 1987 rule"). Following a 60-day period of intense public debate and comment, the Department announced on December 12, 1987 (52 FR 46776) that it intended to modify that rule in order to provide for continued adversarial adjudications of asylum and withholding of deportation applications by Immigration Judges for those applicants who are in exclusion or deportation proceedings. That major substantive modification as well as other procedural modifications necessitated by that change were reflected in a revised proposed rule published on April 6, 1988 (hereafter referred to as the "April 6, 1988 revised proposed rule") which was opened for an additional 30-day public comment period. This final rule adopts with minor changes the April 6, 1988 revised proposed rule. The "Supplementary Information" section accompanying the April 6, 1988 revised proposed rule provides a complete discussion of the major substantive and other procedural modifications.

The following provides a section-by-section analysis of the regulatory provisions contained in this final rule, including a discussion of relevant comments received in the 30-day comment period following the April 6, 1988, revised proposed rule. In addition to the questions of jurisdiction discussed above, the following analysis responds to comments on the proposed rule, but retains the procedures as were proposed regarding the revocation of asylum or withholding of deportation (§ 208.24), and adopts a new § 208.7 ensuring employment authorization for aliens