### § 208.14—Approval, Denial, Referral, or Dismissal of Application

This section has been substantially revised and reorganized to clarify the circumstances under which an asylum officer may grant, deny, or refer an asylum application. Because an asylum officer's authority to grant asylum to an applicant within the Asylum Office's jurisdiction is unrelated to an applicant's status, discussion of authority to grant asylum has been consolidated in § 208.14(b). The statutory requirement that identity checks be completed before asylum can be granted by an asylum officer has been added to paragraph (b).

Discussion of an asylum officer's authority to deny, dismiss, or refer an application has been placed in a new § 208.14(c), with a breakdown of how an application will be processed based on the applicant's status. In § 208.14(c)(1), language was added to clarify that applicants who are inadmissible or deportable will either be referred to the Immigration Court, or have their asylum applications dismissed. Section 208.14(c)(2) now clarifies that the classes of aliens to whom an asylum officer may grant or deny asylum status include aliens in valid Temporary Protected Status and immigrant status. New §§ 208.14(c)(3) and 208.14(c)(4) were added, and detail how the Service processes asylum applications of aliens who were paroled into the United States, depending upon the decision an asylum officer makes on the application and the validity of the parole.

### § 208.15—Definition of "firm resettlement"

All of the references to "he" have been changed to "he or she," and the references to "nation" have been changed to "country."

### § 208.16—Withholding of Removal Under Section 241(b)(3)(B) of the Act and Withholding of Removal Under the Convention Against Torture

This section was substantially revised with the publication of February 19, 1999, interim regulations on Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture) in the **Federal Register**, at 64 FR 8478, with a request for comments. Any comments regarding that interim rule will be addressed in the final rule implementing the Convention Against Torture. Some of the comments on the March 6, 1997, interim rule addressed concerns about how the Department would implement Article 3 of the Convention Against

Torture. Because many of the commenters' concerns were addressed with the February 19, 1999, interim rule, they will not be addressed in this supplementary information.

Language in paragraph (b) relating to eligibility for withholding of removal is being amended to reflect similar amendments to § 208.13 on adjudicating claims where past persecution has been established. See the discussion in this preamble regarding changes in § 208.13.

### § 208.19—Decisions

With the publication of the interim rule at 64 FR 8478 to implement Article 3 of the Convention Against Torture, § 208.17 was revised, §§ 208.18 through 208.22 were redesignated as §§ 208.19 through 208.23, and a new § 208.18 was added. However, due to Department error, § 208.17 was not redesignated and was, therefore, dropped from 8 CFR part 208. This final rule reinstates the former § 208.17 relating to decisions on applications for asylum and for withholding of removal as the new § 208.19, and redesignates §§ 208.19 through 208.23 as §§ 208.20 through 208.24.

Language in § 208.17 that appeared before it was dropped from 8 CFR part 208 has been slightly amended. In response to one comment, language has been added to indicate that a letter communicating denial or referral of the application shall state the basis for the denial or referral.

### § 208.20—Determining if an Asylum Application is Frivolous

Section 208.19 has been redesignated as § 208.20, with no substantive changes. One commenter stated that the regulatory definition of "frivolous" does not contain appropriate safeguards, and that the Service should advise every asylum applicant of the consequences of filing frivolous claims. The current regulation provides appropriate safeguards by stipulating that an immigration judge or the Board must be satisfied that an applicant had sufficient opportunity to account for any discrepancies before finding that an applicant filed a frivolous application, and by permitting an applicant to seek withholding or removal even if he or she is found to have filed a frivolous application. The regulation itself also advises an applicant that he or she is subject to the provisions of section 208(d)(6) of the Act if a final order specifically finds that the alien knowingly filed a frivolous application. Finally, both the instructions to the Form I–589 and the application itself warn the applicant about the consequences of filing a frivolous claim,

as required by section 208(d)(4) of the Act.

The Department believes that the current regulation provides for appropriate safeguards for filing a frivolous asylum application, and that, for the reasons set forth in the supplemental information to the January 3, 1997 proposed rule, the definition of frivolous is sufficient. The Department, therefore, has not changed any language in this section.

A commenter also suggested that an applicant should not be punished for voluntarily withdrawing an asylum application, and that the Department should advise adjudicators that, before finding that an individual filed a frivolous application, they should consider the fact that an applicant may not have been able to afford to retain counsel for advice on the legal strength of an asylum claim. The current regulation does not contain any provisions that punish an applicant for withdrawing an asylum application. Any applicant may choose to withdraw an application at any time prior to a final decision; however, a withdrawal does not preclude the Service from seeking removal of the alien if he or she is deportable or removable. The fact that an applicant may not have hired legal counsel may be one factor, among others, that an immigration judge or the Board may consider when determining whether an applicant had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.

### § 208.21—Admission of Asylee's Spouse and Children

Section 208.20 has been redesignated as § 208.21 and restructured to provide greater clarity. Additionally, this section has been amended to correct an error in the interim rule published in the **Federal Register** at 62 FR 10312, effective April 1, 1997, which omitted the bar to asylum eligibility based on the commission of a serious non-political crime outside the United States, for applicants who applied on or after April 1, 1997. The omission was inadvertent, since such ground had been specifically included under IIRIRA for asylees. That error has been corrected and the provision redrafted to specify the applicable bar for derivative applications filed prior to April 1, 1997, and those filed on or after April 1, 1997. The Service finds that good cause exists for adopting the provision in this final rule without the prior notice and comment period ordinarily required by 5 U.S.C. 553(b) because the provision merely codifies in the Service's regulation the statutory mandates of

section 604 of IIRIRA. In addition, after reviewing the Department's implementation of the statutory mandate, it is clear that the omission was an inadvertent error. Therefore, the notice and comment period normally required under 5 U.S.C. 553(b) is impracticable and unnecessary prior to adopting this provision.

### § 208.22—Effect on Exclusion, Deportation, or Removal Proceedings

Section 208.21 has been redesignated as § 208.22, and paragraph (b), which addresses the initiation of removal proceedings upon termination of an asylum grant, has been moved to § 208.24.

### § 208.24—Termination of Asylum and Withholding of Removal

Section 208.23 has been redesignated as § 208.24. Some comments on § 208.24 suggested that the provision be removed or narrowed, and that more procedural protections be provided before termination. The Department finds that the existing procedural protections, which provide for prior notice of grounds for termination and an opportunity to respond, are sufficient. No changes have been made in the regulations governing termination procedures.

However, § 208.24(b)(1) was revised for consistency with the revisions in this final rule to § 208.16 and for consistency with the provisions for termination of asylum. The provision that "[t]he alien is no longer entitled to withholding of deportation or removal due to a change of conditions in the country to which removal was withheld" has been replaced with, "The alien is no longer entitled to withholding of deportation or removal because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion in the country from which deportation or removal was withheld."

In addition, the former § 208.21(b), concerning the initiation of removal proceedings, is now paragraph (e) of this section. The Department deleted the phrase "under section 235 or 240 of the Act" from the former § 280.21(b) because an alien may be subject to removal under other sections of the Act, such as section 238, which concerns administrative removal of aggravated felons, or section 241(a)(5), which requires reinstatement of prior orders under certain circumstances.

### § 208.30—Credible Fear Determinations

The format of this section has been revised for the purpose of clarity. Also, a new paragraph (b) has been added at § 208.30; that paragraph provides that an accompanying dependent (spouse or child) may be included in the application of the principal alien, if the spouse or child so chooses.

Some commenters objected to the use of telephonic interpreters in credible fear interviews. Telephonic interpretation has given asylum officers flexibility in scheduling and conducting credible fear interviews, and has proven to be a reliable source of interpretation services. First, because the number of languages available through telephonic interpretation is quite large, applicants can be interviewed in the language or dialect with which they are most comfortable. Relying on physically present interpreters would limit the number of languages that are available and, although an alien may be able to speak a particular language or dialect, it may not be the language or dialect with which the alien is most comfortable speaking and understanding. Second, if an applicant requests an interpreter of a gender other than that of the individual initially assigned to perform telephonic interpretation services, a replacement interpreter can be easily identified and enlisted when using a telephonic interpreter, so the interview does not need rescheduling. The use of physically present interpreters usually limits the ability to secure such quick personnel replacements. Finally, an asylum officer can always locate an interpreter for a particular language on short notice regardless of whether the interview is conducted at a detention facility or at a remote location, such as a border port-of-entry. In many instances, live interpreters cannot appear for an interview on short notice or are not willing to travel to a remote location for an interview. The current provision for using telephonic interpreters, which has been in place for approximately 3 years, has worked well. However, as mentioned earlier, practices relating to language accessibility in federal programs are under review as part of the Department's compliance with Presidential Executive Order 13116. Therefore, the use of telephonic interpretation will be addressed in compliance with that Executive Order.

Some commenters suggested that the regulations allow counsel to be present during the credible fear interview. The regulations already allow any person with whom the alien chooses to consult to be present. For purposes of this

section, the term "persons" is interpreted to include legal counsel. Accordingly, the regulation has not been changed in that regard.

There were also some suggestions that the asylum officer's credible fear interview should also serve as an Asylum Pre-Screening Officer (APSO) interview for purposes of determining whether the alien should be released from detention. While a positive credible fear determination may be considered by a district director when making a parole decision, it is not determinative, and other factors must be taken into account, such as whether the applicant is likely to appear for a hearing or may pose a threat to the community.

Some commenters suggested that the rules specify that credible fear is a low screening standard. The Department finds that language in section 235(b)(1)(B)(v) of the Act is more precise than the rather vague term "low." While the Department does not disagree that it is a threshold or low standard, defining it as such would only foster debate about what "low" means. Accordingly, the regulation has not been amended in that regard.

There were also some suggestions that, when a case raises a novel issue of law, the individual should be referred for a full hearing before an immigration judge. The regulation has been clarified to provide that, in making a credible fear determination, the asylum officer or immigration judge shall take into consideration whether the case presents novel or unique issues.

Likewise, there were also suggestions that such a referral should be made regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the Act. The Department has adopted that suggestion and has so amended the regulation.

Several commenters suggested that the Service should presume a request for appeal by any alien who expressed fear to a pre-screening officer and tried without success to persuade an asylum officer that the alien has a credible fear of persecution. It would be contrary to the intent of the statute to mandate a review in every case, including those where the alien clearly and knowingly decides not to pursue a review. However, the regulations have been modified to provide that an alien's failure or refusal to indicate whether he or she desires a review shall be deemed to be a request for such review.

The Department has also amended paragraph (b) regarding the interview procedure by adopting language from § 208.9 on eliciting testimony and who may act as an interpreter.

Finally, in § 208.30(g)(2)(iv)(A), the Department added language that would permit the Service to reconsider a negative credible fear determination, even after such determination has been affirmed by an immigration judge, as long as the Service provides the immigration judge with notice of its reconsideration.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant impact on a substantial number of small entities. This rule will ensure that asylum applications are processed in accordance with the Act, as amended by IIRIRA, as well as with international instruments. Moreover, it will have no effect on small entities, as that term is defined in 5 U.S.C. 601(6).

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any 1 year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**Executive Order 12866**

This rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a ''significant regulatory action'' under Executive Order 12866, section 3(f), Regulatory Planning and Review. Accordingly, this rule has been submitted to the Office of Management and Budget for review.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibility among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a summary impact statement.

**Executive Order 12988**

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

**Paperwork Reduction Act**

The information collection requirements contained in this rule have been approved by the Office of Management and Budget under the provisions of the Paperwork Reduction Act. The OMB control numbers for these collections are contained in 8 CFR 299.5, Display of control numbers.

**List of Subjects in 8 CFR Part 208**

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

Accordingly, part 208 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

2. Section 208.2 is revised to read as follows:

**§ 208.2  Jurisdiction**

(a) *Office of International Affairs.* Except as provided in paragraph (b) or (c) of this section, the Office of International Affairs shall have initial jurisdiction over an asylum application filed by an alien physically present in the United States or seeking admission at a port-of-entry. The Office of International Affairs shall also have initial jurisdiction over credible fear determinations under § 208.30 and reasonable fear determinations under § 208.31.

(b) *Jurisdiction of Immigration Court in general.* Immigration judges shall have exclusive jurisdiction over asylum applications filed by an alien who has been served a Form I–221, Order to Show Cause; Form I–122, Notice to Applicant for Admission Detained for a Hearing before an Immigration Judge; or Form I–862, Notice to Appear, after the charging document has been filed with the Immigration Court. Immigration judges shall also have jurisdiction over any asylum applications filed prior to April 1, 1997, by alien crewmembers who have remained in the United States longer than authorized, by applicants for admission under the Visa Waiver Pilot Program, and by aliens who have been admitted to the United States under the Visa Waiver Pilot Program. Immigration judges shall also have the authority to review reasonable fear determinations referred to the Immigration Court under § 208.31, and credible fear determinations referred to the Immigration Court under § 208.30.

(c) *Certain aliens not entitled to proceedings under section 240 of the Act.*

(1) *Asylum applications and withholding of removal applications only.* After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any asylum application filed on or after April 1, 1997, by:

(i) An alien crewmember who:

(A) Is an applicant for a landing permit;

(B) Has been refused permission to land under section 252 of the Act; or

(C) On or after April 1, 1997, was granted permission to land under section 252 of the Act, regardless of whether the alien has remained in the United States longer than authorized;

(ii) An alien stowaway who has been found to have a credible fear of persecution or torture pursuant to the procedures set forth in subpart B of this part;

(iii) An alien who is an applicant for admission pursuant to the Visa Waiver Pilot Program under section 217 of the Act;

(iv) An alien who was admitted to the United States pursuant to the Visa Waiver Pilot Program under section 217 of the Act and has remained longer than authorized or has otherwise violated his or her immigration status;

(v) An alien who has been ordered removed under § 235(c) of the Act, as described in § 235.8(a) of this chapter (applicable only in the event that the alien is referred for proceedings under this paragraph by the Regional Director pursuant to section 235.8(b)(2)(ii) of this chapter); or

(vi) An alien who is an applicant for admission, or has been admitted, as an alien classified under section 101(a)(15)(S) of the Act (applicable only in the event that the alien is referred for proceedings under this paragraph by the district director).

(2) *Withholding of removal applications only.* After Form I–863, Notice of Referral to Immigration Judge, has been filed with the Immigration Court, an immigration judge shall have exclusive jurisdiction over any application for withholding of removal filed by:

(i) An alien who is the subject of a reinstated removal order pursuant to section 241(a)(5) of the Act; or

(ii) An alien who has been issued an administrative removal order pursuant to section 238 of the Act as an alien convicted of committing an aggravated felony.

(3) *Rules of procedure.*

(i) *General.* Except as provided in this section, proceedings falling under the jurisdiction of the immigration judge pursuant to paragraph (c)(1) or (c)(2) of this section shall be conducted in accordance with the same rules of procedure as proceedings conducted under 8 CFR part 240, subpart A. The scope of review in proceedings conducted pursuant to paragraph (c)(1) of this section shall be limited to a determination of whether the alien is eligible for asylum or withholding or deferral of removal, and whether asylum shall be granted in the exercise of discretion. The scope of review in proceedings conducted pursuant to paragraph (c)(2) of this section shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal. During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief.

(ii) *Notice of hearing procedures and in-absentia decisions.* The alien will be provided with notice of the time and place of the proceeding. The request for asylum and withholding of removal submitted by an alien who fails to appear for the hearing shall be denied. The denial of asylum and withholding of removal for failure to appear may be reopened only upon a motion filed with the immigration judge with jurisdiction over the case. Only one motion to reopen may be filed, and it must be filed within 90 days, unless the alien establishes that he or she did not receive notice of the hearing date or was in Federal or State custody on the date directed to appear. The motion must include documentary evidence, which demonstrates that:

(A) The alien did not receive the notice;

(B) The alien was in Federal or State custody and the failure to appear was through no fault of the alien; or

(C) "Exceptional circumstances," as defined in section 240(e)(1) of the Act, caused the failure to appear.

(iii) *Relief.* The filing of a motion to reopen shall not stay removal of the alien unless the immigration judge issues an order granting a stay pending disposition of the motion. An alien who fails to appear for a proceeding under this section shall not be eligible for relief under section 240A, 240B, 245, 248, or 249 of the Act for a period of 10 years after the date of the denial, unless the applicant can show exceptional circumstances resulted in his or her failure to appear.

3. Section 208.3 is amended by:

a. Revising paragraph (a);

b. Revising paragraph (c)(4); and

c. Revising paragraph (c)(5), to read as follows:

### § 208.3   Form of application.

(a) An asylum applicant must file Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form. The applicant's spouse and children shall be listed on the application and may be included in the request for asylum if they are in the United States. One additional copy of the principal applicant's Form I–589 must be submitted for each dependent included in the principal's application.

\*      \*      \*      \*      \*

(c) \* \* \*

(4) Knowing placement of false information on the application may subject the person placing that information on the application to criminal penalties under title 18 of the United States Code and to civil or criminal penalties under section 274C of the Act; and

(5) Knowingly filing a frivolous application on or after April 1, 1997, so long as the applicant has received the notice required by section 208(d)(4) of the Act, shall render the applicant permanently ineligible for any benefits under the Act pursuant to § 208.20.

4. Section 208.4 is amended by:

a. Revising paragraph (a);

b. Revising paragraph (b)(2);

c. Revising paragraph (b)(3); and

d. Revising paragraph (b)(5), to read as follows:

### § 208.4   Filing the application.

\*      \*      \*      \*      \*

(a) *Prohibitions on filing.* Section 208(a)(2) of the Act prohibits certain aliens from filing for asylum on or after April 1, 1997, unless the alien can demonstrate to the satisfaction of the

Attorney General that one of the exceptions in section 208(a)(2)(D) of the Act applies. Such prohibition applies only to asylum applications under section 208 of the Act and not to applications for withholding of removal under § 208.16. If an applicant files an asylum application and it appears that one or more of the prohibitions contained in section 208(a)(2) of the Act apply, an asylum officer, in an interview, or an immigration judge, in a hearing, shall review the application and give the applicant the opportunity to present any relevant and useful information bearing on any prohibitions on filing to determine if the application should be rejected. For the purpose of making determinations under section 208(a)(2) of the Act, the following rules shall apply:

(1) *Authority.* Only an asylum officer, an immigration judge, or the Board of Immigration Appeals is authorized to make determinations regarding the prohibitions contained in section 208(a)(2)(B) or (C) of the Act.

(2) *One-year filing deadline.*

(i) For purposes of section 208(a)(2)(B) of the Act, an applicant has the burden of proving:

(A) By clear and convincing evidence that the application has been filed within 1 year of the date of the alien's arrival in the United States, or

(B) To the satisfaction of the asylum officer, the immigration judge, or the Board that he or she qualifies for an exception to the 1-year deadline.

(ii) The 1-year period shall be calculated from the date of the alien's last arrival in the United States or April 1, 1997, whichever is later. When the last day of the period so computed falls on a Saturday, Sunday, or legal holiday, the period shall run until the end of the next day that is not a Saturday, Sunday, or legal holiday. For the purpose of making determinations under section 208(a)(2)(B) of the Act only, an application is considered to have been filed on the date it is received by the Service, pursuant to § 103.2(a)(7) of this chapter. In a case in which the application has not been received by the Service within 1 year from the applicant's date of entry into the United States, but the applicant provides clear and convincing documentary evidence of mailing the application within the 1-year period, the mailing date shall be considered the filing date. For cases before the Immigration Court in accordance with § 3.13 of this chapter, the application is considered to have been filed on the date it is received by the Immigration Court. For cases before the Board of Immigration Appeals, the application is considered to have been

filed on the date it is received by the Board. In the case of an application that appears to have been filed more than a year after the applicant arrived in the United States, the asylum officer, the immigration judge, or the Board will determine whether the applicant qualifies for an exception to the deadline.

(3) *Prior denial of application.* For purposes of section 208(a)(2)(C) of the Act, an asylum application has not been denied unless denied by an immigration judge or the Board of Immigration Appeals.

(4) *Changed circumstances.*

(i) The term ''changed circumstances'' in section 208(a)(2)(D) of the Act shall refer to circumstances materially affecting the applicant's eligibility for asylum. They may include, but are not limited to:

(A) Changes in conditions in the applicant's country of nationality or, if the applicant is stateless, country of last habitual residence;

(B) Changes in the applicant's circumstances that materially affect the applicant's eligibility for asylum, including changes in applicable U.S. law and activities the applicant becomes involved in outside the country of feared persecution that place the applicant at risk; or

(C) In the case of an alien who had previously been included as a dependent in another alien's pending asylum application, the loss of the spousal or parent-child relationship to the principal applicant through marriage, divorce, death, or attainment of age 21.

(ii) The applicant shall file an asylum application within a reasonable period given those ''changed circumstances.'' If the applicant can establish that he or she did not become aware of the changed circumstances until after they occurred, such delayed awareness shall be taken into account in determining what constitutes a ''reasonable period.''

(5) The term ''extraordinary circumstances'' in section 208(a)(2)(D) of the Act shall refer to events or factors directly related to the failure to meet the 1-year deadline. Such circumstances may excuse the failure to file within the 1-year period as long as the alien filed the application within a reasonable period given those circumstances. The burden of proof is on the applicant to establish to the satisfaction of the asylum officer, the immigration judge, or the Board of Immigration Appeals that the circumstances were not intentionally created by the alien through his or her own action or inaction, that those circumstances were directly related to the alien's failure to

file the application within the 1-year period, and that the delay was reasonable under the circumstances. Those circumstances may include but are not limited to:

(i) Serious illness or mental or physical disability, including any effects of persecution or violent harm suffered in the past, during the 1-year period after arrival;

(ii) Legal disability (*e.g.,* the applicant was an unaccompanied minor or suffered from a mental impairment) during the 1-year period after arrival;

(iii) Ineffective assistance of counsel, provided that:

(A) The alien files an affidavit setting forth in detail the agreement that was entered into with counsel with respect to the actions to be taken and what representations counsel did or did not make to the respondent in this regard;

(B) The counsel whose integrity or competence is being impugned has been informed of the allegations leveled against him or her and given an opportunity to respond; and

(C) The alien indicates whether a complaint has been filed with appropriate disciplinary authorities with respect to any violation of counsel's ethical or legal responsibilities, and if not, why not;

(iv) The applicant maintained Temporary Protected Status, lawful immigrant or nonimmigrant status, or was given parole, until a reasonable period before the filing of the asylum application;

(v) The applicant filed an asylum application prior to the expiration of the 1-year deadline, but that application was rejected by the Service as not properly filed, was returned to the applicant for corrections, and was refiled within a reasonable period thereafter; or

(vi) The death or serious illness or incapacity of the applicant's legal representative or a member of the applicant's immediate family.

(b) * * *

(2) *With the asylum office.* An asylum application shall be filed directly with the asylum office having jurisdiction over the matter in the case of an alien who:

(i) Has received the express consent of the asylum office director or the Director of Asylum to do so, or

(ii) Previously was included in a spouse's or parent's pending application but is no longer eligible to be included as a derivative. In such cases, the derivative should include a cover letter referencing the previous application and explaining that he or she is now independently filing for asylum.

(3) *With the Immigration Court.* Asylum applications shall be filed directly with the Immigration Court having jurisdiction over the case in the following circumstances:

(i) During exclusion, deportation, or removal proceedings, with the Immigration Court having jurisdiction over the underlying proceeding.

(ii) After completion of exclusion, deportation, or removal proceedings, and in conjunction with a motion to reopen pursuant to 8 CFR part 3 where applicable, with the Immigration Court having jurisdiction over the prior proceeding. Any such motion must reasonably explain the failure to request asylum prior to the completion of the proceedings.

(iii) In asylum proceedings pursuant to § 208.2(c)(1) and after the Form I–863, Notice of Referral to Immigration Judge, has been served on the alien and filed with the Immigration Court having jurisdiction over the case.

(4) * * *

(5) *With the district director.* In the case of any alien described in § 208.2(c)(1) and prior to the service on the alien of Form I–863, any asylum application shall be submitted to the district director having jurisdiction pursuant to 8 CFR part 103. If the district director elects to issue the Form I–863, the district director shall forward such asylum application to the appropriate Immigration Court with the Form I–863 being filed with that Immigration Court.

\*    \*    \*    \*    \*

5. Section 208.5 is amended by:
a. Revising the first sentence in paragraph (a);

b. Adding a new second sentence in paragraph (a); and

c. Revising paragraph (b)(1)(ii), to read as follows:

### § 208.5   Special duties toward aliens in custody of the Service.

(a) *General.* When an alien in the custody of the Service requests asylum or withholding of removal, or expresses a fear of persecution or harm upon return to his or her country of origin or to agents thereof, the Service shall make available the appropriate application forms and shall provide the applicant with the information required by section 208(d)(4) of the Act, except in the case of an alien who is in custody pending a credible fear determination under § 208.30 or a reasonable fear determination pursuant to § 208.31. Although the Service does not have a duty in the case of an alien who is in custody pending a credible fear or reasonable fear determination under either § 208.30 or § 208.31, the Service

may provide the appropriate forms, upon request. * * *

(b) * * *

(1) * * *

(ii) An alien crewmember shall be provided the appropriate application forms and information required by section 208(d)(4) of the Act and may then have 10 days within which to submit an asylum application to the district director having jurisdiction over the port-of-entry. The district director may extend the 10-day filing period for good cause. Once the application has been filed, the district director, pursuant to § 208.4(b), shall serve Form I–863 on the alien and immediately forward any such application to the appropriate Immigration Court with a copy of the Form I–863 being filed with that court.

*        *        *        *        *

6. Section 208.6 is revised to read as follows:

### § 208.6   Disclosure to third parties.

(a) Information contained in or pertaining to any asylum application, records pertaining to any credible fear determination conducted pursuant to § 208.30, and records pertaining to any reasonable fear determination conducted pursuant to § 208.31, shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Attorney General.

(b) The confidentiality of other records kept by the Service and the Executive Office for Immigration Review that indicate that a specific alien has applied for asylum, received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure. The Service will coordinate with the Department of State to ensure that the confidentiality of those records is maintained if they are transmitted to Department of State offices in other countries.

(c) This section shall not apply to any disclosure to:

(1) Any United States Government official or contractor having a need to examine information in connection with:

(i) The adjudication of asylum applications;

(ii) The consideration of a request for a credible fear or reasonable fear interview, or a credible fear or reasonable fear review;

(iii) The defense of any legal action arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear determination or reasonable fear determination under § 208.30 or § 208.31;

(iv) The defense of any legal action of which the asylum application, credible fear determination, or reasonable fear determination is a part; or

(v) Any United States Government investigation concerning any criminal or civil matter; or

(2) Any Federal, State, or local court in the United States considering any legal action:

(i) Arising from the adjudication of, or failure to adjudicate, the asylum application, or from a credible fear or reasonable fear determination under § 208.30 or § 208.31; or

(ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part.

### § 208.9   [Amended]

7. In § 208.9, paragraph (d) is amended by revising the reference to "§ 208.14(b)" to read "§ 208.14(c)."

8. Section 208.12 is amended by revising paragraph (b) to read as follows:

### § 208.12   Reliance on information compiled by other sources.

*        *        *        *        *

(b) Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State. Persons may continue to seek documents available through a Freedom of Information Act (FOIA) request pursuant to 8 CFR part 103.

9. Section 208.13 is amended by:

a. Revising the heading of paragraph (b);

b. Revising paragraph (b)(1);

c. Revising paragraph (b)(2);

d. Adding new paragraph (b)(3);

e. Adding a new paragraph (c)(2)(i)(F); and

f. Removing paragraph (d), to read as follows:

### § 208.13   Establishing asylum eligibility.

*        *        *        *        *

(b) *Eligibility.* * * *

(1) *Past persecution.* An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such

past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section. If the applicant's fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.

(i) *Discretionary referral or denial.* Except as provided in paragraph (b)(1)(iii) of this section, an asylum officer shall, in the exercise of his or her discretion, refer or deny, or an immigration judge, in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if any of the following is found by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) *Burden of proof.* In cases in which an applicant has demonstrated past persecution under paragraph (b)(1) of this section, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (B) of this section.

(iii) *Grant in the absence of well-founded fear of persecution.* An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:

(A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

(B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

(2) *Well-founded fear of persecution.* (i) An applicant has a well-founded fear of persecution if:

AR519

(A) The applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion;

(B) There is a reasonable possibility of suffering such persecution if he or she were to return to that country; and

(C) He or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear.

(ii) An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.

(iii) In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:

(A) The applicant establishes that there is a pattern or practice in his or her country of nationality or, if stateless, in his or her country of last habitual residence, of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

(3) *Reasonableness of internal relocation.* For purposes of determinations under paragraphs (b)(1)(i), (b)(1)(ii), and (b)(2) of this section, adjudicators should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. Those factors may, or may not, be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.

\*   \*   \*   \*   \*

(c) \*   \*   \*
(2) \*   \*   \*
(i) \*   \*   \*
(F) Is described within section 212(a)(3)(B)(i)(I),(II), and (III) of the Act as it existed prior to April 1, 1997, and as amended by the Anti-terrorist and Effective Death Penalty Act of 1996 (AEDPA), unless it is determined that there are no reasonable grounds to believe that the individual is a danger to the security of the United States.

\*   \*   \*   \*   \*

10. Section 208.14 is amended by:
a. Revising paragraph (b);
b. Redesignating paragraphs (c)–(f) as paragraphs (d)–(g);
c. Adding a new paragraph (c);
d. Revising newly redesignated paragraph (e); and
e. Adding a heading to new redesignated paragraph (g), to read as follows:

### § 208.14   Approval, denial, referral, or dismissal of application.

\*   \*   \*   \*   \*

(b) *Approval by an asylum officer.* In any case within the jurisdiction of the Office of International Affairs, unless otherwise prohibited in § 208.13(c), an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant who qualifies as a refugee under section 101(a)(42) of the Act, and whose identity has been checked pursuant to section 208(d)(5)(A)(i) of the Act.

(c) *Denial, referral, or dismissal by an asylum officer.* If the asylum officer does not grant asylum to an applicant after an interview conducted in accordance with § 208.9, or if, as provided in § 208.10, the applicant is deemed to have waived his or her right to an interview or an adjudication by an asylum officer, the asylum officer shall deny, refer, or dismiss the application, as follows:

(1) *Inadmissible or deportable aliens.* Except as provided in paragraph (c)(4) of this section, in the case of an applicant who appears to be inadmissible or deportable under section 212(a) or 237(a) of the Act, the asylum officer shall refer the application to an immigration judge, together with the appropriate charging document, for adjudication in removal proceedings (or, where charging documents may not be issued, shall dismiss the application).

(2) *Alien in valid status.* In the case of an applicant who is maintaining valid immigrant, nonimmigrant, or Temporary Protected Status at the time the application is decided, the asylum officer shall deny the application for asylum.

(3) *Alien with valid parole.* If an applicant has been paroled into the United States and the parole has not expired or been terminated by the Service, the asylum officer shall deny the application for asylum.

(4) *Alien paroled into the United States whose parole has expired or is terminated.*

(i) *Alien paroled prior to April 1, 1997, or with advance authorization for parole.* In the case of an applicant who was paroled into the United States prior to April 1, 1997, or who, prior to departure from the United States, had received an advance authorization for parole, the asylum officer shall refer the application, together with the appropriate charging documents, to an immigration judge for adjudication in removal proceedings if the parole has expired, the Service has terminated parole, or the Service is terminating parole through issuance of the charging documents, pursuant to § 212.5(d)(2)(i) of this chapter.

(ii) *Alien paroled on or after April 1, 1997, without advance authorization for parole.* In the case of an applicant who is an arriving alien or is otherwise subject to removal under § 235.3(b) of this chapter, and was paroled into the United States on or after April 1, 1997, without advance authorization for parole prior to departure from the United States, the asylum officer will take the following actions, if the parole has expired or been terminated:

(A) *Inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act.* If the applicant appears inadmissible to the United States under section 212(a)(6)(C) or 212(a)(7) of the Act and the asylum officer does not intend to lodge any additional charges of inadmissibility, the asylum officer shall proceed in accordance with § 235.3(b) of this chapter. If such applicant is found to have a credible fear of persecution or torture based on information elicited from the asylum interview, an asylum officer may refer the applicant directly to an immigration judge in removal proceedings under section 240 of the Act, without conducting a separate

credible fear interview pursuant to § 208.30. If such applicant is not found to have a credible fear based on information elicited at the asylum interview, an asylum officer will conduct a credible fear interview and the applicant will be subject to the credible fear process specified at § 208.30(b).

(B) *Inadmissible on other grounds.* In the case of an applicant who was paroled into the United States on or after April 1, 1997, and will be charged as inadmissible to the United States under provisions of the Act other than, or in addition to, sections 212(a)(6)(C) or 212(a)(7), the asylum officer shall refer the application to an immigration judge for adjudication in removal proceedings.

\*     \*     \*     \*     \*

(e) *Duration.* If the applicant is granted asylum, the grant will be effective for an indefinite period, subject to termination as provided in § 208.24.

\*     \*     \*     \*     \*

(g) *Applicants granted lawful permanent residence status.* \*  \*  \*

11. Section 208.15 is revised to read as follows:

### § 208.15   Definition of "firm resettlement."

An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

12. Section 208.16 is amended by
a. Revising paragraph (b)(1);
b. Revising paragraph (b)(2);
c. Revising paragraph (b)(3);
The revisions read as follows:

### § 208.16   Withholding of removal under section 241(b)(3) of the Act and withholding of removal under the Convention Against Torture.

\*     \*     \*     \*     \*

(b) \*  \*  \*

(1) *Past threat to life or freedom.* (i) If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim. This presumption may be rebutted if an asylum officer or immigration judge finds by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country; or

(B) The applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so.

(ii) In cases in which the applicant has established past persecution, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (b)(1)(i)(B) of this section.

(iii) If the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm.

(2) *Future threat to life or freedom.* An applicant who has not suffered past persecution may demonstrate that his or her life or freedom would be threatened in the future in a country if he or she can establish that it is more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to that country. Such an applicant cannot demonstrate that his or her life or freedom would be threatened if the asylum officer or immigration judge finds that the applicant could avoid a future threat to his or her life or freedom

by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so. In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

(3) *Reasonableness of internal relocation.* For purposes of determinations under paragraphs (b)(1) and (b)(2) of this section, adjudicators should consider, among other things, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties. These factors may or may not be relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

(i) In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecutor is a government or is government-sponsored.

(ii) In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable, unless the Service establishes by a preponderance of the evidence that under all the circumstances it would be reasonable for the applicant to relocate.

\*     \*     \*     \*     \*

**76136**   **Federal Register** / Vol. 65, No. 235 / Wednesday, December 6, 2000 / Rules and Regulations

**§§ 208.19 through 208.23   [Redesignated as §§ 208.20 through 208.24, respectively].**

13. Sections 208.19 through 208.23 are redesignated as §§ 208.20 through 208.24, respectively.

14. Section 208.19 is added to read as follows:

**§ 208.19   Decisions.**

The decision of an asylum officer to grant or to deny asylum or to refer an asylum application, in accordance with § 208.14(b) or (c), shall be communicated in writing to the applicant. Pursuant to § 208.9(d), an applicant must appear in person to receive and to acknowledge receipt of the decision to grant or deny asylum, or to refer an asylum application unless, in the discretion of the asylum office director, service by mail is appropriate. A letter communicating denial of asylum or referral of the application shall state the basis for denial or referral and include an assessment of the applicant's credibility.

15. Newly redesignated § 208.21 is amended to read by revising paragraph (a) to read as follows:

**§ 208.21   Admission of the asylee's spouse and children.**

(a) *Eligibility.* In accordance with section 208(b)(3) of the Act, a spouse, as defined in section 101(a)(35) of the Act, 8 U.S.C. 1101(a)(35), or child, as defined in section 101(b)(1) of the Act, also may be granted asylum if accompanying, or following to join, the principal alien who was granted asylum, unless it is determined that the spouse or child is ineligible for asylum under section 208(b)(2)(A)(i), (ii), (iii), (iv) or (v) of the Act for applications filed on or after April 1, 1997, or under § 208.13(c)(2)(i)(A), (C), (D), (E), or (F) for applications filed before April 1, 1997.

*   *   *   *   *

16. Newly redesignated § 208.22 is revised to read as follows:

**§ 208.22   Effect on exclusion, deportation, and removal proceedings.**

An alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to § 208.24. An alien in exclusion, deportation, or removal proceedings who is granted withholding of removal or deportation, or deferral of removal, may not be deported or removed to the country to which his or her deportation or removal is ordered withheld or deferred unless the withholding order is terminated pursuant to § 208.24 or deferral is terminated pursuant to § 208.17(d) or (e).

17. Newly redesignated § 208.24 is amended by:

a. Revising paragraph (b)(1);

b. Redesignating paragraphs (e) and (f) as paragraphs (f) and (g), respectively;

c. Adding a new paragraph (e); and

d. Revising newly redesignated paragraphs (f) and (g), to read as follows:

**§ 208.24   Termination of asylum or withholding of removal or deportation.**

*   *   *   *   *

(b) * * *

(1) The alien is no longer entitled to withholding of deportation or removal because, owing to a fundamental change in circumstances relating to the original claim, the alien's life or freedom no longer would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion in the country from which deportation or removal was withheld.

*   *   *   *   *

(e) *Removal proceedings.* When an alien's asylum status or withholding of removal or deportation is terminated under this section, the Service shall initiate removal proceedings, as appropriate, if the alien is not already in exclusion, deportation, or removal proceedings. Removal proceedings may take place in conjunction with a termination hearing scheduled under § 208.24(f).

(f) *Termination of asylum, or withholding of deportation or removal, by an immigration judge or the Board of Immigration Appeals.* An immigration judge or the Board of Immigration Appeals may reopen a case pursuant to § 3.2 or § 3.23 of this chapter for the purpose of terminating a grant of asylum, or a withholding of deportation or removal. In such a reopened proceeding, the Service must establish, by a preponderance of evidence, one or more of the grounds set forth in paragraphs (a) or (b) of this section. In addition, an immigration judge may terminate a grant of asylum, or a withholding of deportation or removal, made under the jurisdiction of the Service at any time after the alien has been provided a notice of intent to terminate by the Service. Any termination under this paragraph may occur in conjunction with an exclusion, deportation, or removal proceeding.

(g) *Termination of asylum for arriving aliens.* If the Service determines that an applicant for admission who had previously been granted asylum in the United States falls within conditions set forth in § 208.24 and is inadmissible, the Service shall issue a notice of intent to terminate asylum and initiate removal proceedings under section 240 of the Act. The alien shall present his or her response to the intent to terminate during proceedings before the immigration judge.

18. Section 208.30 is revised to read as follows:

**§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

(a) *Jurisdiction.* The provisions of this subpart apply to aliens subject to sections 235(a)(2) and 235(b)(1) of the Act. Pursuant to section 235(b)(1)(B) of the Act, the Service has exclusive jurisdiction to make credible fear determinations, and the Executive Office for Immigration Review has exclusive jurisdiction to review such determinations. Except as otherwise provided in this subpart, paragraphs (b) through (g) of this section are the exclusive procedures applicable to credible fear interviews, determinations, and reviews under section 235(b)(1)(B) of the Act.

(b) *Treatment of dependents.* A spouse or child of an alien may be included in that alien's credible fear evaluation and determination, if such spouse or child:

(1) Arrived in the United States concurrently with the principal alien; and

(2) Desires to be included in the principal alien's determination. However, any alien may have his or her credible fear evaluation and determination made separately, if he or she expresses such a desire.

(c) *Authority.* Asylum officers conducting credible fear interviews shall have the authorities described in § 208.9(c).

(d) *Interview.* The asylum officer, as defined in section 235(b)(1)(E) of the Act, will conduct the interview in a nonadversarial manner, separate and apart from the general public. The purpose of the interview shall be to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture, and shall conduct the interview as follows:

(1) If the officer conducting the credible fear interview determines that the alien is unable to participate effectively in the interview because of illness, fatigue, or other impediments, the officer may reschedule the interview.

(2) At the time of the interview, the asylum officer shall verify that the alien has received Form M–444, Information about Credible Fear Interview in Expedited Removal Cases. The officer shall also determine that the alien has

an understanding of the credible fear determination process.

(3) The alien may be required to register his or her identity electronically or through any other means designated by the Attorney General.

(4) The alien may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, and may present other evidence, if available. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process. Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview. The asylum officer, in his or her discretion, may place reasonable limits on the number of persons who may be present at the interview and on the length of the statement.

(5) If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview. The interpreter must be at least 18 years of age and may not be the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, a representative or employee of the applicant's country of nationality, or, if the applicant is stateless, the applicant's country of last habitual residence.

(6) The asylum officer shall create a summary of the material facts as stated by the applicant. At the conclusion of the interview, the officer shall review the summary with the alien and provide the alien with an opportunity to correct any errors therein.

(e) *Determination.* (1) The asylum officer shall create a written record of his or her determination, including a summary of the material facts as stated by the applicant, any additional facts relied on by the officer, and the officer's determination of whether, in light of such facts, the alien has established a credible fear of persecution or torture.

(2) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer or immigration judge shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(3) If an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or

being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Service shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Service shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(4) An asylum officer's determination shall not become final until reviewed by a supervisory asylum officer.

(f) *Procedures for a positive credible fear finding.* If an alien, other than an alien stowaway, is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under section 240 of the Act. If an alien stowaway is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I–863, Notice of Referral to Immigration Judge, for full consideration of the asylum claim, or the withholding of removal claim, in proceedings under § 208.2(c). Parole of the alien may be considered only in accordance with section 212(d)(5) of the Act and § 212.5 of this chapter.

(g) *Procedures for a negative credible fear finding.* (1) If an alien is found not to have a credible fear of persecution or torture, the asylum officer shall provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative decision, using Form I–869, Record of Negative Credible Fear Finding and Request for Review by Immigration Judge. The alien shall indicate whether he or she desires such review on Form I–869. A refusal by the alien to make such indication shall be considered a request for review.

(i) If the alien requests such review, or refuses to either request or decline such review, the asylum officer shall arrange for detention of the alien and serve him or her with a Form I–863, Notice of Referral to Immigration Judge, for review of the credible fear determination in accordance with paragraph (f)(2) of this section.

(ii) If the alien is not a stowaway and does not request a review by an immigration judge, the officer shall order the alien removed and issue a Form I–860, Notice and Order of Expedited Removal, after review by a supervisory asylum officer.

(iii) If the alien is a stowaway and the alien does not request a review by an

immigration judge, the asylum officer shall refer the alien to the district director for completion of removal proceedings in accordance with section 235(a)(2) of the Act.

(2) Review by immigration judge of a negative credible fear finding.

(i) The asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge upon the applicant's request, or upon the applicant's refusal either to request or to decline the review after being given such opportunity, in accordance with section 235(b)(1)(B)(iii)(III) of the Act.

(ii) The record of the negative credible fear determination, including copies of the Form I–863, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination.

(iii) A credible fear hearing shall be closed to the public unless the alien states for the record or submits a written statement that the alien is waiving that requirement; in that event the hearing shall be open to the public, subject to the immigration judge's discretion as provided in § 3.27.

(iv) Upon review of the asylum officer's negative credible fear determination:

(A) If the immigration judge concurs with the determination of the asylum officer that the alien does not have a credible fear of persecution or torture, the case shall be returned to the Service for removal of the alien. The immigration judge's decision is final and may not be appealed. The Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge.

(B) If the immigration judge finds that the alien, other than an alien stowaway, possesses a credible fear of persecution or torture, the immigration judge shall vacate the order of the asylum officer issued on Form I–860 and the Service may commence removal proceedings under section 240 of the Act, during which time the alien may file an application for asylum and withholding of removal in accordance with § 208.4(b)(3)(i).

(C) If the immigration judge finds that an alien stowaway possesses a credible fear of persecution or torture, the alien shall be allowed to file an application for asylum and withholding of removal before the immigration judge in accordance with § 208.4(b)(3)(iii). The immigration judge shall decide the

AR523

application as provided in that section. Such decision may be appealed by either the stowaway or the Service to the Board of Immigration Appeals. If a denial of the application for asylum and for withholding of removal becomes final, the alien shall be removed from the United States in accordance with section 235(a)(2) of the Act. If an approval of the application for asylum or for withholding of removal becomes final, the Service shall terminate removal proceedings under section 235(a)(2) of the Act.

Dated: November 27, 2000.

**Janet Reno,**

*Attorney General.*

[FR Doc. 00–30601 Filed 12–5–00; 8:45 am]

**BILLING CODE 4410–10–P**

---

## FEDERAL ELECTION COMMISSION

**11 CFR Parts 100, 109 and 110**

**[Notice 2000—21]**

**General Public Political Communications Coordinated With Candidates and Party Committees; Independent Expenditures**

**AGENCY:** Federal Election Commission.

**ACTION:** Final rule; transmittal of regulations to Congress.

**SUMMARY:** The Federal Election Commission is adopting new rules to address expenditures for coordinated communications that include clearly identified candidates, and that are paid for by persons other than candidates, candidates' authorized committees, and party committees. The rules address expenditures for communications made at the request or suggestion of a candidate, authorized committee or party committee; as well as those where any such person has exercised control or decision-making authority over the communication, or has engaged in substantial discussion or negotiation with those involved in creating, producing, distributing or paying for the communication. The Commission is also revising the definition of "independent expenditure," to conform with this new definition. Further changes to the rules on coordination between political party committees and their candidates are awaiting the outcome of a pending Supreme Court case. Additional information is provided in the supplementary information that follows.

**DATES:** Further action, including the announcement of an effective date, will be taken after these regulations have been before Congress for 30 legislative days pursuant to 2 U.S.C. 438(d). A document announcing the effective date will be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Ms. Rosemary C. Smith, Assistant General Counsel, or Ms. Rita A. Reimer, Attorney, 999 E Street, NW., Washington, D.C. 20463, (202) 694–1650 or (800) 424–9530 (toll free).

**SUPPLEMENTARY INFORMATION:** The Commission is issuing final rules at 11 CFR 100.23 that address coordinated communications that include clearly identified candidates, that are paid for by persons other than candidates, candidates' authorized committees, and party committees. The rules address communications made at the request or suggestion of a candidate, authorized committee or party committee; as well as those where a candidate, authorized committee, or party committee has exercised control or decision-making authority over the communication, or has engaged in substantial discussion or negotiation with those involved in creating, producing, distributing or paying for the communication. Other than the requirement that covered communications include a clearly identified candidate, the new rules contain no content standard. The Commission is also revising its rules at 11 CFR 100.16 and 109.1, which define "independent expenditure," to conform with this new definition; and making conforming amendments to 11 CFR 110.14, the section of the Commission's rules that deals with contributions to and expenditures by delegates and delegate committees.

Section 438(d) of Title 2, United States Code, requires that any rules or regulations prescribed by the Commission to carry out the provisions of Title 2 of the United States Code be transmitted to the Speaker of the House of Representatives and the President of the Senate 30 legislative days before they are finally promulgated. Because these rules were approved by the Commission on November 30, 2000, which is less than 30 legislative days before the adjournment of the 106th Congress, the Commission plans to transmit them to Congress on the first day of the 107th Congress, which will occur in January 2001. A Notice announcing the effective date of these rules will be published in the **Federal Register**.

### Explanation and Justification

The Federal Election Campaign Act, 2 U.S.C. 431 *et seq.* ("FECA" or the "Act") prohibits corporations and labor organizations from using general treasury funds to make contributions to a candidate for federal office. 2 U.S.C. 441b(a). It also imposes limits on the amount of money or in-kind contributions that other persons may contribute to federal campaigns. 2 U.S.C. 441a(a). Individuals and persons other than corporations, labor organizations, government contractors and foreign nationals can make independent expenditures in connection with federal campaigns. 11 CFR 110.4(a) and 115.2. Independent expenditures must be made without cooperation or consultation with any candidate, or any authorized committee or agent of a candidate; and they shall not be made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of a candidate. 2 U.S.C. 431(17).

Expenditures that are coordinated with a candidate or campaign are considered in-kind contributions. *Buckley* v. *Valeo,* 424 U.S. 1, 46–47 (1976) (footnote omitted) ("*Buckley*"); *Federal Election Commission* v. *The Christian Coalition,* 52 F.Supp.2d 45, 85 (D.D.C. 1999) ("*Christian Coalition*"). As such, they are subject to the limits and prohibitions set out in the Act. The Act defines "contribution" at 2 U.S.C. 431(8) to include any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for federal office.

The Commission is promulgating new rules at 11 CFR 100.23 that define the term *coordinated general public political communication.* They generally follow the standard articulated by the United States District Court for the District of Columbia in the *Christian Coalition* decision, *supra.* This decision sets out at length the standards to be used to determine whether expenditures for communications by unauthorized committees, advocacy groups and individuals are coordinated with candidates or qualify as independent expenditures.

### A. History of the Rulemaking

This rulemaking was originally initiated to implement the Supreme Court's plurality opinion in *Colorado Republican Federal Campaign Committee* v. *Federal Election Commission,* 518 U.S. 604 (1996) (*Colorado I*) concerning the application of section 441a(d) of the FECA. In that decision, the Court concluded that political parties are capable of making independent expenditures on behalf of their candidates for federal office, and that it would violate the First Amendment to subject such

10620

# Proposed Rules

Federal Register

Vol. 69, No. 45

Monday, March 8, 2004

---

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF HOMELAND SECURITY

### 8 CFR Parts 208 and 212

[CIS No. 2255–03]

RIN 1615–AA91

**Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry**

**AGENCY:** Department of Homeland Security.

**ACTION:** Proposed rule.

**SUMMARY:** On March 1, 2003, the Immigration and Naturalization Service transferred from the Department of Justice to the Department of Homeland Security (DHS), pursuant to the Homeland Security Act of 2002 (Public Law 107–296). The responsibility for administering the asylum program was transferred to U.S. Citizenship and Immigration Services ("USCIS") within DHS. The terms of a recently signed agreement between the United States and Canada bar certain categories of aliens arriving from Canada at land border ports-of-entry and in transit from Canada from applying for protection in the United States. This proposed rule would establish USCIS asylum officers' authority to make threshold determinations concerning applicability of the Agreement in the expedited removal context.

**DATES:** Written comments must be submitted on or before May 7, 2004.

**ADDRESSES:** Please submit written comments to the Director, Regulations and Forms Services Division, Department of Homeland Security, 425 I Street, NW, Room 4034, Washington, DC 20536. To ensure proper handling please reference CIS No. 2255–03 on your correspondence. You may also submit comments electronically to USCIS at *rfs.regs@dhs.gov*. When submitting comments electronically, you must include CIS No. 2255–03 in

the subject box. Comments are available for public inspection at the above address by calling (202) 514–3048 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Joanna Ruppel, Deputy Director, Asylum Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Ave., NW., Third Floor, Washington, DC 20536, telephone number (202) 305–2663.

**SUPPLEMENTARY INFORMATION:**

### What Legal Authority Permits USCIS To Use a Safe Third Country Agreement as a Bar To Applying for Asylum?

Section 208(a)(1) of the Immigration and Nationality Act ("Act") permits any alien who is physically present in or who arrives at the United States to apply for asylum. However, section 208(a)(2)(A) of the Act specifically states that paragraph (1) shall not apply where, "pursuant to a bilateral or multilateral agreement, the alien may be removed to a country where the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General [now deemed to be the Secretary of Homeland Security under the Homeland Security Act] finds that it is in the public interest for the alien to receive asylum in the United States."

On December 5th, 2002, the governments of the United States and Canada signed the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Safe Third Country Agreement" or "Agreement"). The Agreement will take effect when the United States has promulgated implementing regulations and Canada has completed its own domestic procedures necessary to bring the Agreement into force. This Agreement will be implemented by USCIS asylum officer determinations.

The Agreement allocates responsibility between the United States and Canada whereby one country or the other (but not both) will assume responsibility for processing the claims

of certain asylum seekers who are traveling from Canada into the United States or from the United States into Canada. The Agreement provides for a threshold determination to be made concerning which country will consider the merits of an alien's protection claim, enhancing the two nations' ability to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. This Safe Third Country Agreement between the United States and Canada currently constitutes the only agreement, for purposes of section 208(a)(2)(A) of the Act, that would bar an individual in or arriving at the United States from applying for asylum.

During the bilateral negotiations that have resulted in the Safe Third Country Agreement, the delegations of both countries acknowledged certain differences in their respective asylum systems. However, harmonization of asylum laws and procedures is not a prerequisite to entering into responsibility-sharing arrangements. The salient factor is whether the countries sharing responsibility for refugee protection have laws and mechanisms in place that adhere to their international obligations to protect refugees. The Executive Committee for the Office of the United Nations High Commissioner for Refugees (UNHCR) has concluded, "Overall it is UNHCR's position that, while in principle each State Party to the 1951 Convention and 1967 Protocol has a responsibility to examine refugee claims made to it, "burden-sharing" arrangements allowing for readmission and determination of status elsewhere are reasonable, provided they always ensure protection of refugees and solutions to their problems." Background Note on the Safe Country Concept and Refugee Status (EC/SCP/68), July 26, 1991. While the asylum systems in Canada and the U.S. are not identical, both country's asylum systems meet and exceed international standards and obligations under the 1951 Convention relating to the Status of Refugees (1951 Refugee Convention) and the 1967 Protocol relating to the Status of Refugees (1967 Protocol), and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture).

## What Are the Terms of the Safe Third Country Agreement Between the United States and Canada?

The Agreement permits the United States to remove to Canada certain asylum seekers attempting to enter the United States from Canada at a land border port-of-entry and aliens who are being removed from the United States in transit through the United States. Similarly, it permits Canada to return to the United States certain asylum seekers attempting to enter Canada from the United States at a land border port-of-entry and certain aliens being removed from the United States through Canada. In either case, the Agreement provides (with certain exceptions) that the alien be returned to the "country of last presence" for consideration of his or her protection claims, including asylum, withholding of removal, and protection under the Convention Against Torture, under the laws of that country.

For aliens arriving at a land border port-of-entry, the Agreement provides for a number of exceptions. These exceptions are based upon the principles underlying the U.S. position while negotiating the Agreement: (1) To the extent practicable, the Agreement should not act to separate families; (2) the Agreement must guarantee that persons subject to it would have their protection claims adjudicated in one of the two countries; and (3) it would be applied only in circumstances where it is indisputable that the alien arrived directly from the other country. These principles have been achieved by including a robust family unity exception that allows asylum seekers to join certain family members residing in the United States or Canada while they pursue their protection claims; by clearly stipulating that the alien must have his or her claim adjudicated in either Canada or the United States; and by limiting the application of the Agreement to situations where it is clear that the alien arrived directly from the other country; e.g., at land border ports-of-entry or in-transit while being removed from Canada.

The Agreement's family unity exceptions are particularly generous. The range of family members who may qualify as "anchor" relatives due to their presence in the United States is far broader than those recognized under other provisions of immigration law. The list of eligible family members includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews. For purposes of the Agreement, a "legal guardian" will be construed as someone who is currently vested with legal custody of the asylum seeker or with the authority to act on behalf of the asylum seeker, provided that the asylum seeker is both unmarried and less than 18 years of age. USCIS will provide field guidance to asylum officers to standardize the approach used in construing other family member relationships relevant to the Agreement but not defined in the Act. Finally, these family members may qualify as anchor relatives even if they themselves do not possess permanent immigration status in the U.S. Aliens in valid immigrant or nonimmigrant status may qualify as anchor relatives, with the exception of aliens who maintain only nonimmigrant visitor status under section 101(a)(15)(B) of the Act or based on admission under the Visa Waiver Program, who are precluded from serving as anchor relatives by the language of the Agreement.

More specifically, an alien who arrives at a land border port-of-entry is exempt from return under the Agreement if the alien:

(1) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(2) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, except visitor status;

(3) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending in the United States;

(4) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(5) Is applying for admission at a United States land border port-of-entry with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(6) Has been permitted, as an unreviewable exercise of discretion by DHS, to pursue a protection claim in the United States because it was determined that it is in the public interest to do so.

The specific terms of the Safe Third Country Agreement are available on the USCIS Web site at *http://www.uscis.gov*.

## How Does This Rule Propose To Implement the Safe Third Country Agreement?

The rule proposes to revise § 208.4 and add a new § 208.30(e)(6) to permit asylum officers to conduct a "threshold screening interview" in order to determine whether an alien is ineligible to apply for asylum under section 208(a)(2)(A) of the Act by operation of the Safe Third Country Agreement. New § 208.30(e)(6)(iii) would codify the exceptions to the Agreement. Under this rule, in any case where an asylum officer determines that the alien qualifies for an exception to the Agreement with Canada, the asylum officer will proceed immediately to a determination as to whether or not the alien has a credible fear of persecution or torture, as provided under existing law.

In § 208.30(e)(6)(i), this proposed rule also makes clear that, when an asylum officer determines that an alien is ineligible to pursue his or her protection claims in the United States based on the applicability of the Safe Third Country Agreement, the alien will be removed to Canada, the country of the alien's last presence, in order to pursue his or her claims there.

The rule also proposes to incorporate the existing definitions of "credible fear of persecution" and "credible fear of torture" in the new §§ 208.30(e)(2) and (e)(3). The definition of credible fear of persecution, derived from section 235(b)(1)(B)(v) of the Act and existing policy that incorporates consideration of eligibility for withholding of removal, is "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act." The proposed rule incorporates the existing definition of credible fear of torture provided in the supplementary information to the interim rule implementing the United States' obligations under the Convention Against Torture published in the **Federal Register** at 64 FR 8484 on February 19, 1999. Under current procedures, as provided in the supplementary information to the interim rule, an alien is found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture. The rule does not propose to

AR526

**10622**   **Federal Register** / Vol. 69, No. 45 / Monday, March 8, 2004 / Proposed Rules

alter current procedures related to these existing definitions.

Finally, this rule proposes to remove the provisions of 8 CFR 208.30(g)(2) relating to the conduct of credible fear review by immigration judges. In view of the transfer of the responsibilities of the former INS to DHS on March 1, 2003, the Attorney General published a rule creating a new chapter V in 8 CFR, beginning with part 1001 and containing the regulations pertaining to the functions of the Executive Office for Immigration Review (EOIR), which remains under the authority of Attorney General. The Attorney General's rule was published in the **Federal Register** at 68 FR 9824 on February 28, 2003. Accordingly, this rule revises § 208.30(g)(2) to remove the previous provisions and to substitute a new cross-reference to the current EOIR regulations which are now codified at 8 CFR 1208.30(g)(2).

## Why Is USCIS Proposing To Amend the Regulations Governing Credible Fear Determinations?

The Safe Third Country Agreement between the United States and Canada bars certain aliens from pursuing protection claims in the United States if they are either arriving from Canada at land border ports-of-entry or are being removed from Canada in transit through the United States. Instead, those aliens will be returned to Canada to have their protection claims adjudicated by Canada. In general, the Agreement will be applied to such aliens who are subject to expedited removal provisions under section 235(b) of the Act, which provides a specific removal mechanism for aliens who are inadmissible under sections 212(a)(6)(C) (fraud or willful misrepresentation) or 212(a)(7) (failure to have proper documents) of the Act. However, in light of the Safe Third Country Agreement's purpose in allowing asylum seekers access to only one of the signatory countries' protection systems, this rule proposes a modified approach to the expedited removal process in the form of a threshold asylum officer screening as to which country (Canada or the United States) will consider an alien's protection claims. Only after this threshold issue has been resolved in favor of allowing the alien to pursue an asylum claim in the United States will an asylum officer make a determination as to whether or not the alien has a credible fear of persecution or torture.

Under section 235(b), aliens subject to expedited removal who seek asylum in the United States or otherwise express a fear of persecution or torture are referred to an asylum officer. During a "credible fear interview," the asylum officer inquires as to the nature and basis of the alien's claims relating to past persecution and fear of future persecution or torture. The asylum officer then determines whether or not there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claims and other facts known to the officer, that the alien could establish eligibility for protection under U.S. law. In the event that the asylum officer determines that the alien has not established a credible fear of persecution or torture, the alien may request review of that determination by an immigration judge.

For aliens who are subject to the Agreement, however, the threshold question is whether the alien should be returned to Canada for Canadian authorities to consider the merits of the alien's claims, or whether the alien will instead be allowed to pursue his or her protection claims in the United States. Accordingly, this rule provides for a threshold screening interview by an asylum officer to determine whether an alien subject to the Agreement will be permitted to remain in the U.S. to pursue his or her protection claims, based on the alien's qualification for one of the Agreement's exceptions. It is only after this threshold screening interview (i.e., only after the asylum officer has decided that the alien is not going to be removed to Canada for an adjudication of the alien's claims) that the asylum officer would proceed to promptly consider the alien's claims for protection under United States law through the credible fear determination process. The asylum officer's notes regarding the threshold issues raised by the Agreement would then be included in the asylum officer's written record of the credible fear determination. In those instances where an asylum officer determines, after review by a supervisory asylum officer, that the alien has not provided reason to believe, by a preponderance of the evidence, that he or she qualifies for any of the Agreement's exceptions, then the asylum officer will advise the alien that he or she is being returned to Canada based on the terms of the Agreement so that the alien will be able to pursue his or her claims for asylum or protection under Canadian law.

Given the narrowness of the factual issues relevant to the threshold screening determination that the Agreement and/or its exceptions are applicable to an alien, which can readily be considered and adjudicated by asylum officers, this rule does not provide for referral to immigration judges for further review of these threshold screening determinations. The narrow factual issues concerning the Agreement's applicability and exceptions (such as the presence of family members in the U.S. or the possession of validly issued visas) do not relate to whether an alien has a fear of persecution or torture, and can adequately be resolved by asylum officers. Thus, under this proposed rule, when an asylum officer makes and a supervisor reviews this threshold determination, there would be no further administrative review of that decision. Elsewhere in the **Federal Register**, the Department of Justice is publishing a proposed rule to specify the authority of the immigration judges with respect to issues arising under the Agreement.

This method for implementing the Safe Third Country Agreement, which bars certain aliens from applying for asylum in the United States, is within the authority of the Secretary of DHS, under section 208(a)(2)(A) of the Act and under section 208(d)(5)(B) of the Act, which provides authority to impose regulatory conditions or limitations on the consideration of an application for asylum not inconsistent with the Act. Section 208(a)(2)(A) of the Act makes an alien ineligible to apply for asylum in the United States if, pursuant to a bilateral agreement, the Secretary concludes that the alien "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" in a safe third country. An alien who is covered by section 208(a)(2)(A) is thus not eligible to apply for asylum regardless of the statutory means by which he is ordered removed from the United States. By this rule, the Secretary is proposing, in a manner consistent with the Act, to delegate to asylum officers the authority to make the threshold determination whether an alien is ineligible to apply for asylum by operation of the Agreement with Canada.

USCIS thus proposes to amend the regulations governing the credible fear determination in order to implement the threshold screening process described above for aliens subject to the Safe Third Country Agreement, prior to a credible fear determination. However, this rule preserves unchanged the existing credible fear process itself, including the availability of a credible fear review by an immigration judge, in every case where the asylum officer determines that an alien subject to the Agreement does satisfy any of the threshold jurisdictional exceptions, including a discretionary decision by

DHS to allow the alien to pursue an asylum claim as a matter in the public interest. If the asylum officer determines the alien is not barred by the Agreement from pursuing his or her protection claims in the U.S., the asylum officer will then proceed immediately to a credible fear determination on the merits of the alien's claims, and, if necessary, an immigration judge will conduct a review of this determination on the merits, as provided under existing law and regulations.

**How Does This Rule or the Safe Third Country Agreement Affect Unaccompanied Minors?**

In order to understand how this rule affects unaccompanied minors, it is important to understand that the definition of an "unaccompanied minor" customarily used in determining appropriate immigration processes is different than the definition used in the Agreement for determining whether an exception to the Agreement applies. While "unaccompanied minor" has not been formally defined in the Act or in regulations, for immigration processing purposes, an individual who is under age 18 and is not accompanied by an adult relative or guardian is considered an "unaccompanied minor." This definition differs from the Agreement's language. Article 1(f) of the Agreement defines "unaccompanied minor" as "an unmarried refugee status claimant who has not yet reached his or her eighteenth birthday and does not have a parent or legal guardian in either Canada or the United States." This rule does not propose replacing the customary definition of "unaccompanied minor" with the Agreement's definition for purposes of determining immigration issues unrelated to the Agreement. However, in applying the Agreement, this difference in definitions will result in finding that some individuals under age 18 who are not accompanied by an adult relative or legal guardian when they arrive at a land border port-of-entry will not qualify for the unaccompanied minor exception in the Agreement, because they have a parent or legal guardian in the United States or Canada.

Since August of 1997, the Immigration and Naturalization Service's policy, now DHS's policy, has been to place unaccompanied minors into expedited removal proceedings only under limited circumstances. Under existing policy, an unaccompanied minor would be placed into expedited removal proceedings only if he or she (1) in the presence of a DHS immigration officer, engaged in a crime that would qualify as an aggravated felony if committed by an

adult; (2) has been convicted or adjudicated delinquent of an aggravated felony in the United States or any other country, and a U.S. Customs and Border Protection (CBP) officer has confirmation of that order; or (3) has been formally removed, excluded, or deported previously from the United States. Existing guidelines permit granting a waiver, deferring the inspection, permitting a withdrawal of the application for admission, or using other discretionary means to process unaccompanied minors who seek admission to the United States, where appropriate. This rule does not propose to change that existing policy. The Safe Third Country Agreement will be applied in the expedited removal proceedings of unaccompanied minors only when such other processing of an unaccompanied minor seeking admission at a land border port-of-entry is not appropriate. When an unaccompanied minor arrives from Canada at a land border port-of-entry and seeks protection, he or she still will be processed according to existing guidelines, which often results in placing the minor into removal proceedings under section 240 of the Act. Where the minor is placed into removal proceedings under section 240 of the Act, the Agreement, including its definition of "unaccompanied minor," will be applied by the immigration judge, as provided in the Department of Justice proposed rule published in the **Federal Register**.

**What Type of Evidence Will Satisfy USCIS When Determining Whether an Individual Meets One of the Exceptions in the Agreement?**

As specified in the proposed rule at § 208.30(e)(6)(ii) and pursuant to a Statement of Principles concerning the implementation of the Agreement, the alien bears the burden of proof to establish by a preponderance of the evidence that an exception applies, such that the alien falls outside the scope of the Agreement. Asylum officers will use all available evidence, including the individual's testimony, affidavits and other documentation, as well as available records and databases, to determine whether an exception to the Agreement applies in each individual's case. Credible testimony alone may be sufficient to establish that an exception applies, if there is a satisfactory explanation of why corroborative documentation is not reasonably available. DHS recognizes that computer systems and DHS records will not be sufficient to verify family relationships in all circumstances and that asylum seekers fleeing persecution often will

not have documents establishing family relationships with them at the time they seek to enter the United States. Asylum officers receive extensive training in evaluating credibility of testimony when there is little or no documentation in support of that testimony. Asylum officers will document their findings that the Agreement or its exceptions are applicable to an alien, and in the case of any alien who qualifies for one of the Agreement's exceptions, will immediately proceed to make a credible fear determination, as described in sections 235(b)(1)(B)(ii) and (iii) of the Act.

**How Does the Safe Third Country Agreement Address the Possibility That Individuals Will Be Removed Without Having Their Protection Claims Heard?**

An individual referred by either Canada or the United States to the other country under the terms of Article 4 cannot be removed to a third country until an adjudication of the individual's protection claims has been made. The Agreement also provides, in Article 3, that an individual returned to the country of last presence shall not be removed to another country pursuant to any other Safe Third Country Agreement or regulation.

**How Does the Safe Third Country Agreement Affect People Who Are Being Removed From Canada or the United States and Then Seek Protection While Transiting Through the Other Country?**

Pursuant to Article 5(a) of the Agreement, if an alien is being removed from Canada through the United States and expresses a fear of persecution or torture, the alien will be returned to Canada for Canada to adjudicate his or her protection claims, in accordance with Canada's protection system. Generally, individuals being removed by Canada through the United States are pre-inspected in Canada and escorted by Canadian immigration officials to their onward destination. Individuals who make a protection claim during pre-inspection will not be allowed to transit through the United States. Individuals being removed by Canada in transit through the United States are considered arriving aliens in parole status, as described in section 212(d)(5) of the Act. If such an individual asserts a fear of persecution or torture to a U.S. immigration officer, while in transit through the United States, the individual's parole status will be terminated pursuant to § 212.5(e)(2)(i), and he or she generally will be placed in expedited removal proceedings, though there may be some rare instances

in which the individual will be placed in removal proceedings under section 240 of the Act. Transit aliens placed in expedited removal proceedings under this provision will be subject to the same asylum officer threshold screening process as aliens arriving at U.S.-Canada land border ports-of-entry. For those rare instances in which such a transit alien is placed in removal proceedings pursuant to section 240 of the Act, the Agreement will be applied by the immigration judge as provided in the Department of Justice proposed rule, published in the **Federal Register**.

The effect of the Agreement on an asylum seeker being removed from the United States through Canada depends on whether the United States already has considered any asylum, withholding, or Torture Convention claim(s). If the United States has considered but denied the alien's protection claims, the person will be permitted onward movement, in accordance with Article 5(c) of the Agreement. If the United States has not already adjudicated the alien's protection claims, the person will be returned to the United States for such an adjudication.

## How Does the Agreement Affect Individuals Who Seek Withholding of Removal or Protection Under the Convention Against Torture?

Article 33 of the 1951 Refugee Convention, as supplemented by the 1967 Refugee Protocol, requires that signatory states not return persons to any country where their lives or freedom would be threatened on account of their race, religion, nationality, political opinion, or membership in a particular social group. The U.S. is a signatory to the 1967 Protocol, and Canada is a signatory to both the 1951 Refugee Convention and the 1967 Protocol. The U.S. implements its obligations under the 1967 Protocol in section 241(b)(3) of the Act, which, as implemented, prohibits DHS from removing aliens to any country where it is more likely than not that their lives or freedom would be threatened on account of the grounds enumerated above. Nevertheless, DHS is not prevented from removing aliens to countries where their lives or freedom would not be threatened.

Article 3 of the Convention Against Torture prohibits the return of persons to any country where there are substantial grounds for believing that they would be subject to torture. Like the United States, Canada is a signatory to the Convention Against Torture. The United States implements this obligation by granting withholding of

removal or deferral of removal to a country where it is more likely than not that the applicant would be subject to torture.

Article 3 of the Agreement provides that "the Parties shall not return or remove a refugee status claimant referred by either Party under the terms of [the Agreement] to another country until an adjudication of the person's refugee status claim has been made." In Article 1, the Agreement defines a refugee status claim to include a request for protection under the 1951 Refugee Convention, 1967 Protocol, or Convention Against Torture. Returning any alien to Canada pursuant to the terms of the Agreement for a consideration of the alien's protection claims, in the absence of any grounds for believing that the alien would be persecuted or tortured in Canada, is consistent with the United States' international protection obligations.

## Does CBP Plan To Place Aliens Returned to the United States From Canada Under the Safe Third Country Agreement Into Expedited Removal Proceedings?

No. For an alien to be subject to the expedited removal provisions, the alien must first meet the definition of arriving alien. The Board of Immigration Appeals has held that an alien who goes abroad but is returned to the United States after having been formally denied admission by the foreign country is not an applicant for admission, since, in contemplation of law, the alien did not leave the United States. Matter of T, 6 I&N Dec. 638 (1955). Those who entered the United States legally or illegally and are later denied admission by Canada are not arriving aliens and therefore not subject to expedited removal. Depending on their status, they may or may not be subject to removal proceedings before an immigration judge, pursuant to section 240 of the Act, or removal pursuant to sections 241(a)(5) (reinstatement of a prior order) or 238(b) (administrative removal based on aggravated felony conviction) of the Act. For example, this return to the United States would not qualify as an "arrival" for purposes of determining whether an applicant has filed for asylum within one year of the date of his or her last arrival in the United States, as required under section 208(a)(2)(B) of the Act.

## How Does This Proposed Rule Affect Individuals Who Enter the United States Through Canada and Who Then Apply for Asylum?

The proposed rule does not affect any individuals who apply for asylum after

entering the United States from Canada. The proposed rule is limited only to those individuals who are placed in expedited removal or removal proceedings upon arrival at U.S.-Canada land border ports-of-entry and to those who are aliens in transit through the United States subsequent to removal from Canada. Individuals who previously entered the United States, having come from Canada, and later apply for asylum affirmatively with USCIS or defensively in removal proceedings before an immigration judge are not arriving aliens and so will not be barred from applying for asylum by operation of the Agreement.

## Regulatory Flexibility Act

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and by approving it, DHS preliminarily certifies that this rule will not have a significant economic impact on a substantial number of small entities. This rule affects individual aliens, as it relates to claims of asylum. It does not affect small entities, as that term is defined in 5 U.S.C. 601(6).

## Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one-year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

## Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

## Executive Order 12866

The Department of Homeland Security has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), Regulatory Planning and Review, and, accordingly, this rule has been submitted to the Office of Management and Budget for review. In particular, the

AR529

Department has assessed both the costs and benefits of this rule as required by Executive Order 12866, section 1(b)(6) and has made a reasoned determination that the benefits of this regulation justify its costs.

The proposed rule would implement a bilateral agreement that allocates responsibility between the United States and Canada for processing claims of certain asylum seekers. The rule applies to individuals who are subject to expedited removal and, under existing regulations, would receive a credible fear interview by an asylum officer. This rule simply adds a preliminary screening by asylum officers to determine whether the alien is even eligible to seek protection in the United States, in which case the asylum officer will then proceed to make the credible fear determination under existing rules. Based on statistical evidence, it is anticipated that approximately 200 aliens may seek to enter the United States from Canada at a land border port-of-entry and be placed into expedited removal proceedings. A significant number of these aliens will be found exempt from the Agreement and eligible to seek protection in the United States after the threshold screening interview proposed in this rule. It is difficult to predict how many aliens will be returned to the U.S.-Canadian border under the Agreement, but the costs incurred in detaining and transporting them are not likely to be substantial. Therefore, the "tangible" costs of this rulemaking to the U.S. Government are minimal. Applicants who are found to be subject to the Safe Third Country Agreement will be returned to Canada to seek protection, saving the U.S. Government the cost of adjudicating their asylum claims and, in some cases, the cost of detention throughout the asylum process.

The cost to asylum seekers who, under the proposed rule, will be returned to Canada are the costs of pursuing an asylum claim in Canada, as opposed to the United States. There is no fee to apply for asylum in Canada and, under Canadian law, asylum seekers are provided social benefits that they are not eligible for in the United States, including access to medical coverage, adult public education, and public benefits. Therefore, the tangible costs of seeking asylum in Canada are no greater than they are in the United States. However, because there may be other tangible costs to asylum seekers attempting to enter the United States from Canada at a land border port-of-entry (*e.g.,* transportation costs to the U.S. border), public comment is invited for further consideration of what such

additional costs may include. The "intangible" costs to asylum seekers who would be returned to Canada under the proposed rule are the costs of potential separation from support networks they may be seeking to join in the United States. However, the Agreement contains broad exceptions based on principles of family unity that would generally allow those with family connections in the United States to seek asylum in the United States under existing regulations governing the credible process.

The proposed rule benefits the United States because it enhances the ability of the U.S. and Canada to manage, in an orderly fashion, asylum claims brought by persons crossing our common border. By implementing the Agreement, the proposed rule furthers U.S. and Canadian goals, as outlined in the 30-Point Action Plan under the Smart Border Declaration signed by Secretary Ridge and former Canadian Deputy Foreign Minister John Manley, to ensure a secure flow of people between the two countries while preserving asylum seekers' access to a full and fair asylum process in a manner consistent with U.S. law and international obligations. Further, the Agreement and proposed rule save the U.S. the time and expense of adjudicating protection claims brought by asylum seekers who have already had a full and fair opportunity to present their claims in Canada.

**Executive Order 13132**

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

**Executive Order 12988 Civil Justice Reform**

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

**Paperwork Reduction Act**

The regulations at 8 CFR 208.30 require that an asylum officer conduct a threshold screening interview to determine whether an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act. The threshold screening interview is considered an information collection requirement subject to review by OMB under the

Paperwork Reduction Act of 1995. Written comments are encouraged and will be accepted until May 7, 2004. When submitting comments on the information collection, your comments should address one or more of the following four points.

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of the information on those who are to respond, including through the use of any and all appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

*Overview of This Information Collection*

(1) *Type of information collection:* New.

(2) *Title of Form/Collection:* Credible fear threshold screening interview.

(3) *Agency form number, if any, and the applicable component of the Department of Homeland Security sponsoring the collection:* No form number, U.S. Citizenship and Immigration Services.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Individuals. The information collection is necessary in order for the CIS to make a determination whether an alien is eligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* 200 respondents at 30 minutes per response.

(6) *An estimate of the total of public burden (in hours) associated with the collection:* Approximately 100 burden hours.

All comments and suggestions or questions regarding additional information should be directed to the Department of Homeland Security, U.S. Citizenship and Immigration Services, Regulations and Forms Services Division, 425 I Street, NW., Room 4034, Washington, DC 20536; Attention: Richard A. Sloan, Director, 202–514–3291.

AR530

**Family Assessment Statement**

DHS has reviewed this regulation and determined that it may affect family well-being as that term is defined in section 654 of the Treasury General Appropriations Act, 1999, Public Law 105–277, Div. A. Accordingly, DHS has assessed this action in accordance with the criteria specified by section 654(c)(1). In this proposed rule, an alien arriving at a land border port-of-entry with Canada may qualify for an exception to the Safe Third Country Agreement, which otherwise requires individuals to seek protection in the country of last presence (Canada), by establishing a relationship to a family member in the United States who has lawful status in the United States, other than a visitor, or is 18 years of age or older and has an asylum application pending. This proposed rule incorporates the Agreement's definition of "family member," which may be a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew. The "family member" definition was intended to be broad in scope, to promote family unity. This proposed rule thereby strengthens the stability of the family by providing a mechanism to reunite separated family members in the United States.

In some cases the proposed rule will have a negative effect resulting in the separation of family members. The Agreement's exceptions, as expressed in the proposed rule, require the family member to have either lawful status in the United States, other than visitor, or else to be 18 years of age or older and have a pending asylum application. Family members who do not meet one of these conditions, therefore, would be separated under the proposed rule. However, this proposed rule's definition of "family member" and the exceptions to the Agreement are more generous than other family-based immigration laws, which require the anchor family member to have more permanent status in the United States (such as citizen, lawful permanent resident, asylee or refugee) and which have a more restricted list of the type of family relationships that can be used to sponsor someone for immigration to the United States (although, unlike those laws, this Agreement provides only an opportunity to apply for protection and does not directly confer an affirmative immigration benefit). Under this rule, family members will be able to reunite even if the anchor relative's status is less than permanent in the United States.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

**Proposed Amendments to the Regulations**

Accordingly, chapter I of title 8 of the Code of Federal Regulations is proposed to be amended as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1226, 1252, 1282; 8 CFR part 2.

2. Section 208.4 is amended by adding a new paragraph (a)(6) to read as follows:

**§ 208.4   Filing the application.**

\*      \*      \*      \*      \*

(a) \* \* \*

(6) *Safe Third Country Agreement.* Asylum officers have authority to apply section 208(a)(2)(A) of the Act, relating to the determination that the alien may be removed to a safe country pursuant to a bilateral or multilateral agreement, only as provided in § 208.30(e). For provisions relating to the authority of immigration judges with respect to section 208(a)(2)(A), see 8 CFR 1240.11(g).

\*      \*      \*      \*      \*

3. Section 208.30 is amended by:
a. Redesignating paragraph (e)(4) as (e)(7);
b. Redesignating paragraphs (e)(2) and (e)(3) as (e)(4) and (e)(5) respectively;
c. Revising newly designated paragraphs (e)(4) and (e)(5);
d. Adding new paragraphs (e)(2), (e)(3), and (e)(6);
e. Revising paragraph (g)(2)(i), and by
f. Removing paragraphs (g)(2)(iii) and (g)(2)(iv).
The additions and revisions read as follows:

**§ 208.30   Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.**

\*      \*      \*      \*      \*

(e) \* \* \*

(2) An alien will be found to have a credible fear of persecution if there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, the alien can establish eligibility for asylum under section 208 of the Act or for withholding of removal under section 241(b)(3) of the Act.

(3) An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to §§ 208.16 or 208.17.

(4) In determining whether the alien has a credible fear of persecution, as defined in section 235(b)(1)(B)(v) of the Act, or a credible fear of torture, the asylum officer shall consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge.

(5) Except as provided in paragraph (e)(6) of this section, if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the Act, or to withholding of removal contained in section 241(b)(3)(B) of the Act, the Department of Homeland Security shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim, if the alien is not a stowaway. If the alien is a stowaway, the Department shall place the alien in proceedings for consideration of the alien's claim pursuant to § 208.2(c)(3).

(6) Prior to any determination concerning whether an alien arriving in the United States at a U.S.-Canada land border port-of-entry or in transit through the U.S. during removal by Canada has a credible fear of persecution or torture, the asylum officer shall conduct a threshold screening interview to determine whether such an alien is ineligible to apply for asylum pursuant to section 208(a)(2)(A) of the Act and subject to removal to Canada under the Agreement Between the Government of the United States and the Government of Canada For Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries ("Agreement"). In conducting this threshold screening interview, the asylum officer shall advise the alien of the Agreement's exceptions and question the alien as to applicability of any of these exceptions to the alien's case.

(i) If the asylum officer determines that an alien does not qualify for an

AR531

exception under the Agreement during this threshold screening interview, the alien is ineligible to apply for asylum in the United States. After review of this finding by a supervisory asylum officer, the alien shall be advised that he or she will be removed to Canada in order to pursue his or her claims relating to a fear of persecution or torture under Canadian law. Aliens found ineligible to apply for asylum under this paragraph shall be removed to Canada.

(ii) If the alien establishes by a preponderance of the evidence that he or she qualifies for an exception under the terms of the Agreement, the asylum officer shall make a written notation of the basis of the exception, and then proceed immediately to a determination concerning whether an alien has a credible fear of persecution or torture.

(iii) An alien qualifies for an exception to the Agreement if the alien is not being removed from Canada in transit through the United States and:

(A) Is a citizen of Canada or, not having a country of nationality, is a habitual resident of Canada;

(B) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who has been granted asylum, refugee, or other lawful status in the United States, provided, however, that this exception shall not apply to an alien whose relative maintains only nonimmigrant visitor status, as defined in section 101(a)(15)(B) of the Act, or whose relative maintains only visitor status based on admission to the U.S. pursuant to the Visa Waiver Program;

(C) Has in the United States a spouse, son, daughter, parent, legal guardian, sibling, grandparent, grandchild, aunt, uncle, niece, or nephew who is at least 18 years of age and has an asylum application pending before U.S. of Citizenship and Immigration Services, the Executive Office for Immigration Review, or on appeal in federal court in the United States;

(D) Is unmarried, under 18 years of age, and does not have a parent or legal guardian in either Canada or the United States;

(E) Arrived in the United States with a validly issued visa or other valid admission document, other than for transit, issued by the United States, or, being required to hold a visa to enter Canada, was not required to obtain a visa to enter the United States; or

(F) The Department of Homeland Security determines, in the exercise of unreviewable discretion, that it is in the public interest to allow the alien to pursue a claim for asylum, withholding of removal, or protection under the

Convention Against Torture, in the United States.

(iv) As used in § 208.30(e)(6)(iii)(B), (C) and (D) only, "legal guardian" means a person currently vested with legal custody of such an alien or vested with legal authority to act on the alien's behalf, provided that such an alien is both unmarried and less than 18 years of age, and provided further that any dispute with respect to whether an individual is a legal guardian will be resolved on the basis of U.S. law.

\* \* \* \* \*

(g) \* \* \*

(2) \* \* \*

(i) Immigration judges will review negative credible fear findings as provided in 8 CFR 1208.30(g)(2).

\* \* \* \* \*

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

4. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1225, 1226, 1227, 1228; 8 CFR part 2.

5. Section 212.5 is amended by adding new paragraph (e)(2)(iii) to read as follows:

### § 212.5  Parole of aliens into the United States.

\* \* \* \* \*

(e) \* \* \*

(2) \* \* \*

(iii) Any alien granted parole into the United States so that he or she may transit through the United States in the course of removal from Canada shall have his or her parole status terminated upon notice, as specified in § 212.5(e)(2)(i), if he or she makes known to an immigration officer of the United States a fear of persecution or an intention to apply for asylum. Upon termination of parole, any such alien shall be regarded as an applicant for admission, and processed accordingly by the Department of Homeland Security.

\* \* \* \* \*

Dated: January 26, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–5077 Filed 3–5–04; 8:45 am]

**BILLING CODE 4410–10–P**

## DEPARTMENT OF JUSTICE

**8 CFR Parts 1003, 1208, 1212, and 1240**

**[EOIR No. 142P; AG Order No. 2709–2004]**

**RIN 1125–AA46**

### Asylum Claims Made by Aliens Arriving from Canada at Land Border Ports-of-Entry

**AGENCY:** Executive Office for Immigration Review, Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The recent Safe Third Country agreement between the United States and Canada provides new procedures for dealing with certain categories of aliens crossing at land border ports-of-entry between the United States and Canada, or in transit from Canada or the United States, and who express a fear of persecution or torture if returned to the country of their nationality or habitual residence. The Agreement recognizes that the United States and Canada are safe third countries, each of which offers full procedures for nationals of other countries to seek asylum or other protection. Accordingly, subject to several specific exceptions, the Agreement provides for the United States to return such arriving aliens to Canada, the country of last presence, to seek protection under Canadian law, rather than applying for asylum in the United States. Subject to the stated exceptions, such aliens attempting to travel from Canada to the United States, or vice versa, will be allowed to seek asylum or other protection in one country or the other, but not in both.

Elsewhere in this issue of the **Federal Register**, the Department of Homeland Security (DHS) is publishing a proposed rule that would, among other things, give asylum officers the authority to apply the Agreement with respect to arriving aliens. This proposed rule provides that the immigration judges will not review the threshold factual determinations by asylum officers that an alien does not satisfy any of the exceptions under the Agreement. However, for any alien who the asylum officer determines is not barred by the Agreement, the existing credible fear process under section 235(b) of the Immigration and Nationality Act (Act) remains unchanged, including the right to seek review by an immigration judge. Finally, this rule provides authority for an immigration judge to apply the Agreement with respect to aliens whom DHS has chosen to place in removal proceedings under section 240 of the Act.

AR532



# Mexico

April 2019

## Key Figures

From January to 31 March 2019, **12,716** people applied for **asylum** in Mexico; **3,904** in January, **4,037** in February, and **4,775** in March.*

From January-March 2019, the **increase in claimants** over the same period of 2018 was:

- Honduras: 237%
- El Salvador: 112%
- Venezuela: 71%
- Guatemala: 224%
- Nicaragua: 1,367%

In total, **631 people** have been **relocated** to facilitate local integration from 1 January till 31 March 2019.*
Preliminary COMAR figures (subject to change).

## Evolution of asylum claims

**Asylum claims in Mexico**
as of 31March 2019



| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|
| 2,137 | 3,423 | 8,789 | 14,596 | 29,600 | 12,716 |

## Protection Monitoring

**Reasons for leaving country of origin** (Combined reasons)



| Violence | 19% | **63%** |
| Violence + Livelihoods | 44% | |
| Livelihoods | 37% | |

Conducted in January 2019 in Ciudad Hidalgo. 988 people interviewed.

## OPERATIONAL CONTEXT

- The number of people arriving at Mexico's southern border with Guatemala fleeing criminal violence, political unrest and economic hardship is soaring. The number of asylum claims in Mexico rose by more than 103% in 2018 over the previous year, from 14,596 to 29,623. The upward trend is likely to continue as the drivers of displacement remain in place and because return options in the region are limited.
- Asylum-seekers from Honduras, El Salvador and Venezuela represent 86% of all asylum claimants so far in 2019. The outbreak of violence in Nicaragua and the deterioration of the situation in Venezuela are also driving an increasing number of people from these countries to seek protection in Mexico.
- A significant percentage of people entering Mexico are fleeing persecution and violence, and are in need of international protection.
- The Mexican Government announced a new migration policy which refers to the Global Compact on Migration. It is expected that during Mexico's current presidency of the Comprehensive Regional Protection and Solutions Framework (MIRPS), Mexico will transform its migration policy from a policy guided by security and control, to an approach which places greater emphasis on human rights, protection and regional cooperation.



Participatory Assessment in Tapachula, February 2019. © ACNUR/ Rafael Sanchez.

## UNHCR Strategy

UNHCR Mexico has made important commitments to significantly increase its staff and activities to support the work of the Mexican authorities in processing an increased number of asylum claims and ensure protection of its Persons of Concern (PoC). This includes the provision of technical support to ensure timely registration of asylum-seekers, setting up identification and referral mechanisms for those with specific vulnerabilities/needs, increasing the capacity and sustainability of shelters and promoting local integration opportunities.

### Information and Basic Assistance

- One main challenge associated with protecting persons in need of international protection in Mexico has been the lack of information to access the asylum procedure.
- UNHCR, the UN agencies, COMAR and the National Human Rights Commission set up a platform to provide information on the asylum system in the country of origin, transit, and destination for people fleeing from insecurity and persecution. The platform is unique as it is built on a simple and easy to access Facebook page and hotline under the name "Confiar en el Jaguar" (in English 'trust the jaguar'). Facebook is used because it is the principal means of communication for asylum-seekers. UNHCR is currently sharing information and protection messages with people of concern, in addition to directly answering questions or responding to doubts via Facebook's messenger function.

AR533





- UNHCR also strengthens the **sustainability and protection capacity of selected shelters** that provide support and assistance to migrants and refugees along the migratory routes in Mexico. Shelters continue to be key actors in identifying persons in need of international protection, inform about the right to seek asylum and refer people in need of international protection to the Mexican asylum system.
- UNHCR also works with a network of legal partners, the **Mexican Commission for Refugee Assistance (COMAR) and the National Migration Institute (INM)** to assure that persons in need of international protection are adequately informed about the asylum procedure and other forms of legal pathways at the point of entry into Mexico.
- The goal is to provide information to 30,000 persons per year. UNHCR is now assisting COMAR to increase its regional presence through the opening of new offices in key locations.
- UNHCR is providing Humanitarian Assistance in the form of **Multi-Purpose Cash Grants (MPG)** intended to cover basic needs such as food, NFIs, and contribution towards housing/utility bills. UNHCR also issues **Sectoral Top Up-Grants** using a protection-lens and in association with other technical sectors so that response options are tailored to the needs of the most vulnerable population. The expansion of its **Cash-Based Intervention (CBI)** program in 2019 allows UNHCR to engage in a more holistic and forward-looking CBI strategy with a view to transitioning over time to the inclusion of PoCs into government social safety programs, while fostering socio-economic inclusion and self-reliance.

## Access to the Asylum System

- UNHCR estimates that the number of people with international protection needs entering Mexico is much higher than those requesting asylum. The absence of proper protection screening protocols for families and adults, the lack of a systematic implementation of existing best interest determination procedures for unaccompanied children and detention of asylum-seekers submitting their claim at border entry points are strong obstacles to accessing the asylum procedure.
- The abandonment rate of asylum procedures, especially in Southern Mexico is a key protection concern. This situation, compounded by insufficient resources and limited field presence of COMAR in key locations in Northern and Central Mexico, continues to pose challenges to efficient processing of asylum claims.
- UNHCR **promotes the capacity and efficiency of Mexico's asylum system**. UNHCR has currently 39 contractors on loan to **COMAR, mainly to support with registration**. Support for additional 63 UNHCR secondments to COMAR is underway. COMAR and UNHCR are discussing additional staffing support. Plans for **additional office expansions** are also being worked on. New COMAR field locations are to include Palenque in Southern Mexico, Monterrey and Tijuana in the North. Through support to COMAR, UNHCR hopes for reduced waiting times for asylum decisions, improved quality of decisions, freedom of movement for asylum-seekers, improved access to documentation and steps to facilitate access to the labour market for asylum-seekers. These steps would reduce the number of people who abandon or withdraw their claims.

## Improved Reception Conditions

- Due to limited COMAR presence in the South and absence of opportunities to apply for asylum at the border, many PoC enter Mexico irregularly. While traveling to locations with COMAR presence they face a risk of being detained.
- Persons in need of international protection often take dangerous routes to reach COMAR offices. Women and girls in particular are at risk of sexual and gender-based violence.
- PoC often seek assistance in the network of shelters located along the migrant routes, which currently includes some 140 shelters. UNHCR will continue **strengthening the capacities of the shelters to carry out this outreach and to provide safe conditions for persons seeking asylum, including necessary legal and psycho-social support.** A range of infrastructure improvements are now being implemented in key locations, including Coatzacoalcos (Veracruz), Mexico City and Monterrey.
- UNHCR will continue to provide trainings to shelter management to reinforce their capacity to provide necessary protection and assistance for persons in need of international protection, starting with the necessary follow-up for release from detention (identification of special needs, capacity to refer to relevant institutions and finally facilitating local integration).



### Strengthened Integration Prospects

- An increasing number of persons in need of international protection see **Mexico as a destination country rather than a transit country and this trend is likely to continue.** One reason why Mexico is increasingly viewed as a destination country is that **prospects for formal employment are good in specific parts of the country**.
- Two years ago, UNHCR started its **relocation, job placement and local integration project**, the results are very promising: Within the first month of the integration process, refugee families become independent from assistance. 92% of participants in working age find a suitable job, 100% of school age children and youth are enrolled in school, and 60% of the participants graduate out of poverty within the first year of the integration process, in accordance with national indicators. Relocated refugees can apply for nationality within the first two years of the integration process and generally can purchase their own house within the first three years. A **UNHCR scholarship program** enables children of relocated families to access tertiary education, which further strengthens their long term integration prospects.
- In 2019, UNHCR's local integration programme will further **expand beyond Saltillo and Guadalajara to include also Monterrey,** and **Aguascalientes**, and on a limited basis in **Tijuana**.
- UNHCR also engages with ministries at federal and state level in order to train civil servants to be able to **recognize documentation issued to asylum-seekers and refugees** and thereby facilitate access to public and private services.
- Through **community-based protection projects**, UNHCR works towards increased social interaction between refugees, asylum-seekers and host communities to reduce social tensions.
- The sustainability of UNHCR's interventions will largely depend on the level of the **inclusion of the PoC into national programmes, development of Public Private Partnership's, as well as on the sustainability of shelters** and other interventions.

## WORKING WITH PARTNERS

In line with the Global Compact on Refugees and Sustainable Development Goal 16 "Peace, Justice and Strong Institutions", UNHCR Mexico works closely with the Government of Mexico, namely with COMAR, INM, the National System for Integral Family Development (DIF), the Foreign Affairs Ministry, and the Public Defender's Office and the Child Protection Authority (Procuraduría). UNHCR continue to support these institutions through targeted and thematic capacity-building sessions, expert support in areas such as Quality Assurance as well as through financial support. UNHCR Mexico currently works with 17 partner organizations and indirectly with shelters

- UNHCR Mexico works closely with IOM Mexico as part of the coordination for the Venezuela Situation. In 2019, partners of the Regional Refugee and Migrant Response Plan in Mexico and Central America are supporting Governments in collecting and analyzing data on human mobility and the needs of refugees and migrants from Venezuela.

- IOM and UNHCR also co-lead the Working Group on migration and refugees and UNHCR engages with UN Women, UNICEF and UNFPA within the Interagency Group on Gender and Migration.

- Regional cooperation, in particular with Honduras, El Salvador and Guatemala continues to be of utmost importance to improve protecting PoC. UNHCR hopes that Mexico's leadership of the MIRPS process, coupled with the Comprehensive Development Plan under discussion with the NCA countries, will lead to a more coordinated effort to address the root causes of forced displacement from Central America.

- Fostering private sector engagement and diversifying its donor base will remain key priorities in 2019.



**Monthly evolution of asylum claimants in Mexico**
(2014 -2019)

AR535



**MEXICO:** UNHCR Presence
3 April 2019





Creation date: 3 April 2019
Sources: UNHCR

## Offices

1 Branch Office in Mexico City

1 Sub Office in Tapachula

2 Field Offices in Monterrey and Tenosique

4 Field Units in Saltillo, Tijuana, Aguascalientes, and Acayucan

**$59.6 million**
UNHCR's financial requirements 2019



**4%**
funded [2]

- 🟥 Tightly earmarked
- 🟨 Earmarked
- 🟦 Softly earmarked (indicative allocation)
- 🟩 Unearmarked (indicative allocation)
- ⬜ Funding gap (indicative)

## Donors

UNHCR Mexico wishes to convey a special thank you to its donors – the United States of America, Nacional Monte Piedad, I.A.P, the European Union, miscellaneous donors in Mexico, and miscellaneous private donors; as well as to the following donors of softly earmarked funds: Iceland, Italy, New Zealand, Sweden, the United States of America and major donors of un-earmarked contributions: Sweden, Norway, Netherlands, United Kingdom, Germany, Denmark, Switzerland, and Private donors in Spain.

Donors, including the United States of America, have projected additional contributions for 2019 which are not yet reflected in the below funding chart. UNHCR is however concerned that it has not been able to secure **sufficient, predictable, flexible and multi-year funding within the coming years** to protect, respond, include, empower, solve and support asylum-seekers and refugees, as well as the Mexican government in its **sustainable shift from a transit to an asylum country. UNHCR strives to broaden its donor basis and mobilize private sector engagement and investment in refugee hosting areas** to enable greater social and economic inclusion and build the resilience of refugees and their host communities alike. We are looking forward to collaborating with you!

## Contacts

Antonia Hombach, Reporting Officer, Hombach@unhcr.org
Ernesto Diaz, Information Manager, Diaze@unhcr.org

AR536

June 14, 2019 / 10:01 AM

# U.S. ramps up Mexico asylum returns, Trump confirms 'safe third country' plan

[Frank Jack Daniel](), [Julio-Cesar Chavez]()

MEXICO CITY/EL PASO, Texas (Reuters) - The United States has doubled the number of asylum seekers it sends back each day to Mexico from El Paso, Texas, a Mexican immigration official said on Friday, in the first sign of action following a deal struck to avert U.S. tariffs last week.

Luis Carlos Cano, a spokesman for Mexico's national immigration agency in Ciudad Juarez, across the border from El Paso, said starting Thursday some 200 asylum seekers per day were being sent back, up from 100 previously.

Under pressure from U.S. President Donald Trump, Mexico agreed on June 7 to expand the program, known as the Migrant Protection Protocols, or 'Remain in Mexico,' which forces mostly Central American asylum seekers arriving at the U.S. southern border to await the outcome of their U.S. asylum claims in Mexico.

Remain in Mexico currently operates in Tijuana, Mexicali and Ciudad Juarez. Close to 12,000 people have been returned to Mexico since it began in January.

However, Mexico has not accepted that the United States send it an unlimited number of asylum seekers, Foreign Minister Marcelo Ebrard said, ahead of planned meetings with U.S. officials on Friday to determine details of the expansion.

"Today there is a meeting with U.S. authorities, to learn, to discuss the ports of entry and how the number will be measured, because Mexico has not accepted that it be undetermined," Ebrard said at a news conference.

The agreement has put Mexican officials under mounting pressure to deliver results. The head of Mexico's National Migration Institute, Tonatiuh Guillen, resigned on Friday for "personal reasons," an interior ministry official said.

## 'SAFE THIRD COUNTRY'

If enforcement measures are not successful after 45 days, Mexico has also agreed to consider making itself a "safe third country." Asylum seekers who first set foot on Mexican soil would have to apply for refugee status in Mexico instead of in the United States.

Mexico's government on Friday published the section of the joint accord which said Mexico would examine any changes to its legislation necessary to permit a safe third country arrangement to come into force 90 days after June 7.

The document also stated that such an agreement was intended to be "part of a regional approach to burden-sharing" in processing migrants' asylum claims.

Ebrard said this week that if Mexico could not stem the flow of people, a regional system should be established to bind in other countries crossed by migrants en route to the United States, including Guatemala, Panama and Brazil.

A rights group in Guatemala on Friday lashed out at the proposal to make asylum seekers from Honduras and El Salvador seek refuge in Guatemala, when its own citizens were fleeing poverty and violence.

Slideshow (3 Images)

Trump confirmed the deal included the safe third country plan if Mexico did not do enough to cut migration.

Asked in a Fox News interview if that possibility was part of the accord, Trump said, "It's exactly right, and that's what's going to happen."

Trump also named Tom Homan as "Border Czar."

Homan is a veteran of U.S. Immigration and Customs Enforcement and served as the agency's acting head during the first year of Trump's presidency. He retired last year, after increasing arrests of non-criminal immigrants.

*Reporting by Frank Jack Daniel in Mexico City and Julio Cesar-Chavez in El Paso; additional reporting by Makini Brice and Susan Heavey in Washington and Dave Graham in Mexico City; Editing by Phil Berlowitz and Rosalba O'Brien.*