*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



January 25, 2019

**ACTION**

MEMORANDUM FOR:      L. Francis Cissna
Director
U.S. Citizenship and Immigration Services

Kevin K. McAleenan
Commissioner
U.S. Customs and Border Protection

Ronald D. Vitiello
Deputy Director and Senior Official Performing the Duties of
Director
U.S. Immigration and Customs Enforcement

FROM:      Kirstjen M. Nielsen
Secretary

SUBJECT:      Policy Guidance for Implementation of the Migrant Protection
Protocols

On December 20, 2018, I announced that the Department of Homeland Security (DHS),
consistent with the Migrant Protection Protocols (MPP), will begin implementation of
Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) on a large-scale basis to
address the migration crisis along our southern border.  In 1996, Congress added Section
235(b)(2)(C) to the INA.  This statutory authority allows the Secretary of Homeland Security to
return certain applicants for admission to the contiguous country from which they are arriving on
land (whether or not at a designated port of entry) pending removal proceedings under Section
240 of the INA.  Consistent with the MPP, citizens and nationals of countries other than Mexico
("third-country nationals") arriving in the United States by land from Mexico—illegally or
without proper documentation—may be returned to Mexico pursuant to Section 235(b)(2)(C) for
the duration of their Section 240 removal proceedings.

AR539

## Section 235(b)(2)(C) and the MPP

The United States issued the following statement on December 20, 2018, regarding implementation of the Migrant Protection Protocols:

> [T]he United States will begin the process of implementing Section 235(b)(2)(C) . . . with respect to non-Mexican nationals who may be arriving on land (whether or not at a designated port of entry) seeking to enter the United States from Mexico illegally or without proper documentation. Such implementation will be done consistent with applicable domestic and international legal obligations. Individuals subject to this action may return to the United States as necessary and appropriate to attend their immigration court proceedings.
>
> The United States understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law. That includes applicable international human rights law and obligations as a party to the 1951 Convention relating to the Status of Refugees (and its 1967 Protocol) and the Convention Against Torture.
>
> The United States further recognizes that Mexico is implementing its own, sovereign, migrant protection protocols providing humanitarian support for and humanitarian visas to migrants.
>
> The United States proposes a joint effort with the Government of Mexico to develop a comprehensive regional plan in consultation with foreign partners to address irregular migration, smuggling, and trafficking with the goal of promoting human rights, economic development, and security.[1]

The Government of Mexico, in response, issued a statement on December 20, 2018. That statement provides, in part, as follows:

1. For humanitarian reasons, [the Government of Mexico] will authorize the temporary entrance of certain foreign individuals coming from the United States who entered that country at a port of entry or who were detained between ports of entry, have been interviewed by U.S. immigration authorities, and have received a notice to appear before an immigration judge. This is based on current Mexican legislation and the international commitments Mexico has signed, such as the Convention Relating to the Status of Refugees, its Protocol, and the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among others.

---

[1] Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).

2

2. It will allow foreigners who have received a notice to appear to request admission into Mexican territory for humanitarian reasons at locations designated for the international transit of individuals and to remain in national territory. This would be a "stay for humanitarian reasons" and they would be able to enter and leave national territory multiple times.

3. It will ensure that foreigners who have received their notice to appear have all the rights and freedoms recognized in the Constitution, the international treaties to which Mexico is a party, and its Migration Law. They will be entitled to equal treatment with no discrimination whatsoever and due respect will be paid to their human rights. They will also have the opportunity to apply for a work permit for paid employment, which will allow them to meet their basic needs.

4. It will ensure that the measures taken by each government are coordinated at a technical and operational level in order to put mechanisms in place that allow migrants who have receive[d] a notice to appear before a U.S. immigration judge have access without interference to information and legal services, and to prevent fraud and abuse.[2]

### Prosecutorial Discretion and *Non-Refoulement* in the Context of the MPP

In exercising their prosecutorial discretion regarding whether to place an alien arriving by land from Mexico in Section 240 removal proceedings (rather than another applicable proceeding pursuant to the INA), and, if doing so, whether to return the alien to the contiguous country from which he or she is arriving pursuant to Section 235(b)(2)(C), DHS officials should act consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees[3] (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[4] Specifically, a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the

---

[2] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018).

[3] The United States is not a party to the 1951 Convention but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return (*'refouler'*) a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[4] Article 3 of the CAT states, "No State Party shall expel, return (*'refouler'*) or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

INA), or would more likely than not be tortured, if so returned pending removal proceedings. The United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018.

U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement will issue appropriate internal procedural guidance to carry out the policy set forth in this memorandum.[5]

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

---

[5] A DHS immigration officer, when processing an alien for Section 235(b)(2)(C), should refer to USCIS any alien who has expressed a fear of return to Mexico for a *non-refoulement* assessment by an asylum officer.

4

**MPP Guiding Principles**

**Date:**                          January 28, 2019

**Topic:**                        Guiding Principles for Migrant Protection Protocols

**HQ POC/Office:**        Enforcement Programs Division

- Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, the Office of Field Operations, San Diego Field Office, will, consistent with its existing discretion and authorities, begin to implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) through the Migrant Protection Protocols (MPP).
  - To implement the MPP, aliens arriving from Mexico who are amenable to the process (see below), and who in an exercise of discretion the officer determines should be subject to the MPP process, will be issued an Notice to Appear (NTA) and placed into Section 240 removal proceedings.  They will then be transferred to await proceedings in Mexico.

- Aliens in the following categories are not amenable to MPP:
  - Unaccompanied alien children,
  - Citizens or nationals of Mexico,
  - Aliens processed for expedited removal,
  - Aliens in special circumstances:
    - Returning LPRs seeking admission (subject to INA section 212)
    - Aliens with an advance parole document or in parole status
    - Known physical/mental health issues
    - Criminals/history of violence
    - Government of Mexico or USG interest,
  - Any alien who is more likely than not to face persecution or torture in Mexico, or
  - Other aliens at the discretion of the Port Director

- Nothing in this guidance changes existing policies and procedures for processing an alien under procedures other than MPP, except as specifically provided. Thus, for instance, the processing of aliens for expedited removal is unchanged. Once an alien has been processed for expedited removal, including the supervisor approval, the alien may not be processed for MPP.
- Officers, with appropriate supervisory review, retain discretion to process aliens for MPP or under other procedures (e.g., expedited removal), on a case-by-case basis.  Adverse factors precluding placement in the MPP process include, but are not limited to, factors such as prior removal, criminal history, it is more likely than not that the alien will face persecution or torture in Mexico, and permanent bars to readmission.
- If an alien who is potentially amenable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening following the affirmative statement of fear of persecution or

torture in, or return to, Mexico, so that the asylum officer can assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico.

- If USCIS assesses that an alien who affirmatively states a fear of return to Mexico is more likely than not to face persecution or torture in Mexico, the alien may not be processed for MPP. Officers retain all existing discretion to process (or re-process) the alien for any other available disposition, including expedited removal, NTA, waivers, or parole.
- Aliens at the POE who are processed for MPP will receive a specific immigration court hearing date and time. Every effort will be made to schedule similar MPP alien populations (e.g. single adult males, single adult females, family units) for the same hearing dates.
- OFO and USBP will be sharing court dates using only one existing Immigration Scheduling System (ISS) queue.
- Any alien who is subject to MPP will be documented in the appropriate system of records, SIGMA, and the proper code will be added.
- POEs will provide aliens subject to MPP a tear sheet containing information about the process, as well as a list of free or low-cost legal service providers.
- Aliens who return to the POE for their scheduled hearing and affirmatively state a fear of return to Mexico will be referred to USCIS for screening prior to any return to Mexico. If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, CBP Officers should coordinate with ICE Enforcement and Removal Operations (ERO) to determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate. Such an alien may not be subject to expedited removal, however, and may not be returned to Mexico to await further proceedings.

*Hearing date and processing*
- POEs will establish scheduling for the arrival of aliens returning for their hearing to permit efficient transportation, according to applicable policy.
- Returning aliens who arrive at the POEs for proceedings will be biometrically identified, screened to ensure they have requisite documents, and turned over to ICE ERO.
- POEs will coordinate with ICE ERO to establish transfer of custody and expeditious transportation from the POE to the hearing. ERO is responsible for the transportation of aliens between the POE and court location, as well as the handling of the alien during all court proceedings.
- If the alien receives a final order of removal from an immigration judge, the alien will be processed in accordance with ERO operations.
- If the alien's INA section 240 removal proceedings are ongoing ERO will transport the alien back to the POE and CBP officers will escort the alien to the United States/Mexico limit line.

AR544



**U.S. Department of Homeland Security**
Washington, DC 20229

**U.S. Customs and Border Protection**

Commissioner

January 28, 2019

MEMORANDUM FOR:      Todd C. Owen
                     Executive Assistant Commissioner, Field Operations

                     Carla L. Provost
                     Chief, U.S. Border Patrol

FROM:                Kevin K. McAleenan
                     Commissioner

SUBJECT:             Implementation of the Migrant Protection Protocols

Effective January 28, 2019, and in furtherance of the provisions of the attached memorandum from the Secretary, U.S. Customs and Border Protection (CBP) will commence implementation of the Migrant Protection Protocols (MPP) under its existing discretion and the authority of Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Section 235(b)(2)(C) of the INA provides that the Secretary of Homeland Security may return certain applicants for admission to the contiguous country from which they are arriving on land (whether or not at a designated port of entry) pending removal proceedings under Section 240 of the INA.

MPP implementation will begin at the San Ysidro port of entry on January 28, 2019, and it is anticipated that it will be expanded in the near future. Please ensure that each stage of MPP expansion beyond OFO implementation at San Ysidro is coordinated closely with my office.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

AR545

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and
Border Protection**

January 28, 2019

MEMORANDUM FOR:          Directors, Field Operations
                         Office of Field Operations

                         Director, Field Operations Academy
                         Office of Training and Development

FROM:                    Todd A. Hoffman
                         Executive Director
                         Admissibility and Passenger Programs
                         Office of Field Operations

SUBJECT:                 Guidance on Migrant Protection Protocols

Effective January 28, 2019, in accordance with the Commissioner's Memorandum of January 28, 2019, and subject to the terms of policy, the Office of Field Operations (OFO) San Diego Field Office will, consistent with its existing discretion and authorities, implement Section 235(b)(2)(C) of the Immigration and Nationality Act (INA).

Under this implementation of section 235(b)(2)(C), referenced as the Migrant Protection Protocols (MPP), DHS is authorized to return certain applicants for admission who arrive via land at the San Ysidro Port of Entry, and who are subject to removal proceedings under Section 240 of the INA, to Mexico pending removal proceedings. Certain aliens, including vulnerable aliens, criminal aliens, or aliens of interest to the Government of Mexico (GoM) or the United States, will not be placed into MPP, in accordance with the Guiding Principles for Migrant Protection Protocols issued today by the Enforcement Programs Division (HQ) (Guiding Principles).

The Guiding Principles outline which aliens may be amenable to MPP. As part of the determination of whether an alien is amenable to MPP, OFO will refer aliens who are potentially amenable, but who affirmatively state fear of return to Mexico, whether before or after they are processed for MPP or other disposition, to United States Citizenship and Immigration Services (USCIS) for screening following the affirmative statement of fear of return to Mexico. Please see the Guiding Principles for MPP.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Please ensure that this memorandum is disseminated to all ports of entry within your jurisdiction.

AR546

Policy Number: 11088.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street SW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

February 12, 2019

MEMORANDUM FOR:     Executive Associate Directors
                    Principal Legal Advisor

FROM:               Ronald D. Vitiello
                    Deputy Director and
                    Senior Official Performing the Duties of the Director

SUBJECT:            Implementation of the Migrant Protection Protocols

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for Implementation of the Migrant Protection Protocols*, in which she provided guidance for the implementation of the Migrant Protection Protocols (MPP) announced on December 20, 2018, an arrangement between the United States and Mexico to address the migration crisis along our southern border. Pursuant to the Secretary's direction, this memorandum provides guidance to U.S. Immigration and Customs Enforcement (ICE) about its role in the implementation of the MPP.

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) allows the Department of Homeland Security (DHS), in its discretion, with regard to certain aliens who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, . . . [to] return the alien[s] to that territory pending a proceeding under [INA] section 240." Consistent with the MPP, third-country nationals (i.e., aliens who are not citizens or nationals of Mexico) who are arriving in the United States by land from Mexico may be returned to Mexico pursuant to INA section 235(b)(2)(C) for the duration of their INA section 240 removal proceedings. DHS will not use the INA section 235(b)(2)(C) process in the cases of unaccompanied alien children, aliens placed into the expedited removal (ER) process of INA section 235(b)(1), and other aliens determined, in the exercise of discretion, not to be appropriate for such processing (which may include certain aliens with criminal histories, individuals determined to be of interest to either Mexico or the United States, and lawful permanent residents of the United States).

The direct placement of an alien into INA section 240 removal proceedings (and, in DHS's discretion, returning the alien to Mexico pursuant to INA section 235(b)(2)(C) pending those proceedings) is a separate and distinct process from ER. Processing determinations, including whether to place an alien into ER or INA section 240 proceedings (and, as applicable, to return an alien placed into INA section 240 proceedings to Mexico under INA section 235(b)(2)(C) as

AR547

part of MPP), or to apply another processing disposition, will be made by U.S. Customs and Border Protection (CBP), in CBP's enforcement discretion.

MPP implementation began at the San Ysidro port of entry on or about January 28, 2019, and it is intended that MPP implementation will expand eventually across the southern border. In support of MPP, ICE Enforcement and Removal Operations (ERO) will provide appropriate transportation when necessary, for aliens returned to Mexico under the MPP, from the designated port of entry to the court facility for the scheduled removal hearings before an immigration judge and back to the port of entry for return to Mexico by CBP after such hearings. ERO also will be responsible for effectuating removal orders entered against aliens previously processed under INA section 235(b)(2)(C), including post-removal order detention. ICE attorneys will represent DHS in the related removal proceedings pursuant to 6 U.S.C. § 252(c).

As instructed by the Secretary, in exercising prosecutorial discretion concerning the potential return of third-country nationals to Mexico under INA section 235(b)(2)(C), DHS officials should act consistently with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. Specifically, a third-country national who affirmatively states a fear of return to Mexico (including while in the United States to attend a removal hearing) should not be involuntarily returned under INA section 235(b)(2)(C) if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless described in INA section 241(b)(3)(B) as having engaged in certain criminal, persecutory, or terrorist activity), or would more likely than not be tortured, if so returned pending removal proceedings. *Non-refoulement* assessments will be made by U.S. Citizenship and Immigration Services (USCIS) asylum in accordance with guidance issued by the Director of USCIS.

Within ten (10) days after this memorandum, relevant ICE program offices are directed to issue further guidance to ensure that MPP is implemented in accordance with the Secretary's memorandum, this memorandum, and policy guidance and procedures, in accordance with applicable law.

This document provides internal ICE policy guidance, which may be modified, rescinded, or superseded at any time without notice. This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigative prerogatives of DHS.

Attachment:
DHS Secretary Memorandum, *Policy Guidance for Implementation of Migrant Protection Protocols*, dated January 25, 2019.

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration and Customs Enforcement**

February 12, 2019

MEMORANDUM FOR:  Field Office Directors
Enforcement and Removal Operations

FROM:  Nathalie R. Asher *Nathalie R. Asher*
Acting Executive Associate Director

SUBJECT:  Migrant Protection Protocols Guidance

Purpose

This memorandum provides operational guidance to impacted Enforcement and Removal Operations (ERO) field offices to ensure that the Migrant Protection Protocols (MPP) are implemented in accordance with applicable law, the Secretary's January 25, 2019, memorandum, *Policy Guidance for Implementation of the Migrant Protection Protocols*, Acting Director Vitiello's February 12, 2019, memorandum of the same title, and other applicable policies and procedures.

Background

On January 25, 2019, Secretary Nielsen issued a memorandum entitled *Policy Guidance for Implementation of the Migrant Protection Protocols*, in which she provided guidance for the implementation of the MPP, an arrangement between the United States and Mexico to address the migration crisis along our southern border announced on December 20, 2018. Thereafter, on February 12, 2019, Deputy Director and Senior Official Performing the Duties of the Director Vitiello issued U.S. Immigration and Customs Enforcement (ICE) Policy Memorandum 11088.1, *Implementation of the Migrant Protection Protocols*, announcing that operational implementation of MPP began at the San Ysidro port of entry on or about January 28, 2019, and directing that ICE program offices issue further guidance to ensure that the MPP is implemented in accordance with the Secretary's memorandum, applicable law, and policy guidance and procedures.

Discussion

Under section 235(b)(2)(C) of the Immigration and Nationality Act (INA), the U.S. Department of Homeland Security (DHS) may, in its discretion, with regard to certain applicants for admission who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, . . . return the alien[s] to that territory pending a proceeding under [INA section] 240."

AR549

return the alien to Mexico pending removal proceedings pursuant to section 235(b)(2)(C) of the INA, as detailed in ICE Policy Memorandum 11088.1.  Aliens processed under the MPP will be issued a Notice to Appear (NTA) by CBP and returned by CBP to Mexico to await their removal proceedings.

Aliens returned to Mexico under the MPP pursuant to section 235(b)(2)(C) of the INA will be required to report to a designated POE on their scheduled hearing dates and will be paroled into the United States by CBP for purposes of their hearings.  As further explained in the next section, CBP will then transfer the aliens to ERO custody for transportation to designated Executive Office for Immigration Review (EOIR) court locations for their hearings.

If the alien is granted relief or protection from removal by the immigration judge or is ordered removed from the United States, and appeal is not reserved by either party, the alien will be processed in accordance with standard procedures applicable to final order cases.  If the immigration judge continues proceedings or enters an order upon which either party reserves appeal, ERO will transport the alien back to the POE, whereupon CBP officers will take custody of the alien to return the alien to Mexico to await further proceedings.

MPP implementation began at the San Ysidro port of entry (POE) on or about January 28, 2019, and it is intended that MPP implementation will expand to additional locations along the southern border.  This memorandum provides general procedural guidance applicable to ERO personnel in the implementation of the MPP.  Field Office Directors should each assign a lead POC for MPP issues arising within their AORs and issue local operational guidance applicable to their individual areas of responsibility as the MPP is phased in.

*Hearing Transportation and Custody*

Before returning an alien to Mexico under the MPP to await his or her removal proceedings, CBP will provide the alien instructions explaining when and to which POE to report to attend his or her hearing.  On the day of the hearing, an alien returned to Mexico under the MPP will arrive at the POE at the time designated—generally, a time sufficient to allow for CBP processing, pre-hearing consultation with counsel (if applicable), and timely appearance at hearings.  Once CBP conducts POE processing (including verification of identity and a brief medical screening), for hearings set at immigration courts located in the interior of the United States, CBP will parole the alien into ICE's custody under INA section 212(d)(5)(A), and ERO will maintain physical custody of the alien during transportation of the alien from the POE to the designated immigration court location, making appropriate use of contract support and complying with applicable requirements concerning the transportation of aliens.

In cases in which ICE performs that transportation function between the POE and an inland immigration court, the alien is detained in ICE custody as an arriving alien.[1]  ERO should coordinate locally with CBP officials at POEs where the MPP has been implemented, so that the

---

[1] Aliens participating in the MPP who CBP initially encounters at a POE are "arriving aliens" within the meaning of 8 C.F.R. §§ 1.2 and 1001.1(q) (defining "arriving alien" to include "an applicant for admission coming … into the United States at a port-of-entry").  Moreover, on their hearing dates before an immigration judge, aliens who CBP initially encountered *between* the POEs will come *to* a POE to attend their hearings, placing them within the "arriving alien" definition, as well.

daily volume of MPP cases can be monitored and any transportation needs may be properly met. ERO should also coordinate locally with EOIR concerning security arrangements at the immigration court location.  While EOIR is responsible for security inside the courtroom, and ERO should generally defer to immigration judges' wishes concerning their presence in the courtroom, DHS is ultimately responsible for maintaining custody of the alien.  If an alien is ordered released by an immigration judge, ERO should coordinate closely with the ICE Office of the Principal Legal Advisor (OPLA) regarding how to proceed with the case.  After an alien's removal hearing is over, ERO will transport him or her back to the POE for return to Mexico or to retrieve property, as applicable.  If the alien has received a final grant of relief or an administratively final order of removal, ERO will coordinate with CBP and make appropriate custody determinations.

*Access to Counsel*

Section 240(b)(4)(A) of the INA provides that an alien in removal proceedings before an immigration judge "shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings."  Similarly, section 292 provides that "[i]n any removal proceedings . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose."  Accordingly, in order to facilitate access to counsel for aliens subject to return to Mexico under the MPP who will be transported to their immigration court hearings by ERO, ERO will depart from the POE with the alien at a time sufficient to ensure arrival at the immigration court not later than one hour before his or her scheduled hearing time in order to afford the alien the opportunity to meet in-person with his or her legal representative.

*Non-Refoulement Considerations*

In accordance with Secretary Nielsen's January 25, 2019, memorandum, DHS should implement the MPP consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention) and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).  Specifically, an alien should not be involuntarily returned to Mexico under the MPP if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings.

If an alien subject to the MPP affirmatively states to an ERO officer that he or she has a fear of persecution or torture *in Mexico*, or a fear of return *to Mexico*, at any point while in ERO custody, ERO will notify CBP of the alien's affirmative statement so that CBP officials at the POE may refer the alien to a U.S. Citizenship and Immigration Services (USCIS) asylum officer for screening before any return to Mexico to assess whether it is more likely than not that the alien will face persecution or torture if returned to Mexico in accordance with guidance issued by the Director of USCIS.

If USCIS assesses that such an alien is more likely than not to face persecution or torture in Mexico, ERO will determine whether the alien may be maintained in custody or paroled, or if another disposition is appropriate.  Such an alien may not be subject to expedited removal; however, and may not be returned to Mexico to await further proceedings.[2]

*Recordkeeping and Reporting*

MPP aliens booked in and out of ICE custody must be appropriately documented in the Enforce Alien Detention Module (EADM) and monitored per a final Form I-216, *Record of Person and Property Transfer*.  For MPP aliens booked into ICE custody, the comment "out to court pursuant to MPP," must be added to the comments section of EADM.

EADM records for MPP aliens booked out of ICE custody will need to reflect the appropriate court dispositions.  Comments in EADM should reflect "MPP, Returned to the POE for Future Hearing;" "MPP, Granted Relief, Released from Custody;" "MPP, Claimed Fear of Mexico, returned to the POE;" or "MPP, Ordered Removed," or similar comments indicating an MPP disposition as appropriate.

*Disclaimers*

Except as specifically provided in relation to the MPP, existing policies and procedures for processing and removing aliens remain unchanged.  That applies to record-keeping responsibilities as well as removal authority and responsibility.  The MPP does not change ERO's removal operations, and removable aliens will be processed in accordance with standard practices and procedures.

This document is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, this guidance places no limitations on the otherwise lawful enforcement or litigative prerogatives of DHS.

---

[2] In MPP cases where an immigration judge grants withholding or deferral of removal *to Mexico* and appeal is reserved, ERO should confer with OPLA about appropriate next steps prior to any return under INA section 235(b)(2)(C).



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Washington, DC 20529

January 28, 2019                                                           PM-602-0169

# Policy Memorandum

SUBJECT:     **Guidance for Implementing Section 235(b)(2)(C) of the Immigration and Nationality Act and the Migrant Protection Protocols**

**Purpose**

This memorandum provides guidance to immigration officers in U.S. Citizenship and Immigration Services (USCIS) regarding the implementation of the Migrant Protection Protocols (MPP), including supporting the exercise of prosecutorial discretion by U.S. Customs and Border Protection (CBP).  This memorandum follows the Secretary of Homeland Security's January 25, 2019, memorandum, *Policy Guidance for Implementation of the Migrant Protection Protocols*.

**Background**

Section 235(b)(2)(C) of the Immigration and Nationality Act (INA) provides that aliens arriving by land from a foreign contiguous territory (i.e., Mexico or Canada)—whether or not at a designated port of entry—generally may be returned, as a matter of enforcement discretion, to the territory from which they are arriving pending a removal proceeding under Section 240 of the INA.

On December 20, 2018, Secretary of Homeland Security Kirstjen M. Nielsen announced that the Department of Homeland Security (DHS) will begin the process of implementing Section 235(b)(2)(C) of the INA on a large scale.  That statutory provision allows for the return of certain aliens to a contiguous territory pending Section 240 removal proceedings before an immigration judge.  Under the MPP, aliens who are nationals and citizens of countries other than Mexico (third-country nationals) arriving in the United States by land from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings as a matter of prosecutorial discretion.  *Accord* 8 C.F.R. § 235.3(d).

In her January 25, 2019, memorandum, Secretary Nielsen issued general policy guidance concerning DHS's implementation of Section 235(b)(2)(C) at the southern border consistent with the MPP.  Memorandum from Kirstjen M. Nielsen, Secretary of Homeland Security, *Policy*

*Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019) (Jan. 25, 2019, Memorandum).  The Secretary advised that such authority should be implemented consistent with the *non-refoulement* principles contained in Article 33 of the 1951 Convention Relating to the Status of Refugees (1951 Convention)—as incorporated in the 1967 Protocol Relating to the Status of Refugees[1]—and Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT).[2]

The Secretary specifically advised that, consistent with those principles, "a third-country national should not be involuntarily returned to Mexico pursuant to Section 235(b)(2)(C) of the INA if the alien would more likely than not be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would more likely than not be tortured, if so returned pending removal proceedings."  Jan. 25, 2019, Memorandum at 3-4.  Article 33 of the 1951 Convention and Article 3 of the CAT require that the individual demonstrate that he or she is "more likely than not" to face persecution on account of a protected ground or torture, respectively.[3]  That is the same standard used for withholding of removal and CAT protection determinations.  *See* 8 C.F.R. § 208.16(b)(2), (c)(2); Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

At the same time, under the MPP, the United States "understands that, according to the Mexican law of migration, the Government of Mexico will afford such individuals all legal and procedural protection[s] provided for under applicable domestic and international law," including the 1951 Convention and the CAT.  Letter from Chargé d'Affaires John S. Creamer to Sr. Jesús Seade, Subsecretaría para América del Norte, Secretaría de Relaciones Exteriores (Dec. 20, 2018).  Further, "[t]he United States expects that the Government of Mexico will comply with the commitments articulated in its statement of December 20, 2018."[4]

---

[1] The United States is not a party to the 1951 Convention Relating to the Status of Refugees but is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention. Article 33 of the 1951 Convention provides that: "[n]o Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[2] Article 3 of the CAT states, "No State Party shall expel, return ('*refouler*') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See also* Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a) (8 U.S.C. § 1231 note) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").

[3] *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Auguste v. Ridge*, 395 F.3d 123, 132-33 (3d Cir. 2005); *Pierre v. Gonzales*, 502 F.3d 109, 115 (2d Cir. 2007); *see also* Senate Resolution of Advice and Consent to Ratification of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, II(2), *available at* https://www.congress.gov/treaty-document/100th-congress/20/resolution-text; Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8480 (1999).

[4] Jan. 25, 2019, Memorandum at 4.

The Secretary also advised that, where an alien affirmatively states a concern that he or she may face a risk of persecution on account of a protected ground or torture upon return to Mexico, CBP should refer the alien to USCIS, which will conduct an assessment to determine whether it is more likely than not that the alien will be subject to persecution or torture if returned to Mexico.  The Secretary directed USCIS to issue appropriate internal procedural guidance to carry out this policy.  That guidance is explained below.

**Guidance**

Upon a referral by a DHS immigration officer of an alien who could potentially be amenable to the MPP, the USCIS asylum officer should interview the alien to assess whether it is more likely than not that the alien would be persecuted in Mexico on account of his or her race, religion, nationality, membership in a particular social group, or political opinion (unless such alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA),[5] or that the alien would be tortured in Mexico.  The process or procedures described in INA Sections 208, 235(b)(1), (3), and 241(b)(3) and their implementing regulations, as well as those in the CAT regulations, do not apply to the MPP assessments.

### A.  Interview

Upon receipt of such a referral, the USCIS officer should conduct the MPP assessment interview in a non-adversarial manner, separate and apart from the general public.  The purpose of the interview is to elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico pending the conclusion of the alien's Section 240 immigration proceedings.

The officer should conduct the assessment in person, via video teleconference, or telephonically.  At the time of the interview, the USCIS officer should verify that the alien understands that he or she may be subject to return to Mexico under Section 235(b)(2)(C) pending his or her immigration proceedings.  The officer should also confirm that the alien has an understanding of the interview process.  In addition, provided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals.[6]

In conducting the interview, the USCIS officer should take into account the following and other such relevant factors as:

---

[5] The disqualifying grounds for *non-refoulement* vis-à-vis the 1951 Convention and 1967 Protocol are reflected in Section 241(b)(3)(B) of the INA.  However, the reference to Section 241(b)(3)(B) should not be construed to suggest that Section 241(b)(3)(B) applies to MPP.

[6] *See* 8 C.F.R. § 292.5(b).

1. The credibility of any statements made by the alien in support of the alien's claim(s) and such other facts as are known to the officer.  That includes whether any alleged harm (i.e., the alleged persecution or torture) could occur in the region in which the alien would reside in Mexico, pending their removal proceedings, or whether residing in another region of Mexico to which the alien would have reasonable access could mitigate against the alleged harm;

2. Commitments from the Government of Mexico regarding the treatment and protection of aliens returned under Section 235(b)(2)(C) (including those set forth in the Government of Mexico's statement of December 20, 2018),[7] the expectation of the United States Government that the Government of Mexico will comply with such commitments,[8] and reliable assessments of current country conditions in Mexico (especially those provided by DHS and the U.S. Department of State); and

3. Whether the alien has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA.

### B.  Assessment

Once a USCIS officer assesses whether the alien, if returned to Mexico, would be more likely than not persecuted in Mexico on account of a protected ground (or has engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA), or would be more likely than not tortured in Mexico, the assessment shall be reviewed by a supervisory asylum officer, who may change or concur with the assessment's conclusion.  DHS staff should inform the alien of the outcome of the final assessment.  USCIS should then provide its assessment to CBP for purposes of exercising prosecutorial discretion in connection with one or more of the decisions as to whether to place the alien in expedited removal or to issue a Notice to Appear for the purpose of placement directly into Section 240 removal proceedings, and if the latter, whether to return the alien to Mexico pending the conclusion of Section 240  proceedings under Section 235(b)(2)(C) pursuant to the MPP, and, when appropriate, to U.S. Immigration and Customs Enforcement for purposes of making discretionary custody determinations for aliens who are subject to detention and may be taken into custody pending removal proceedings.

If an officer makes a positive MPP assessment (i.e., that an alien is more likely than not either to be persecuted in Mexico on account of a protected ground and has not engaged in criminal, persecutory, or terrorist activity described in Section 241(b)(3)(B) of the INA, or to be tortured in Mexico), USCIS is *not* granting withholding of removal or protection from removal under the CAT regulations.  Nor shall there be further administrative review, reopening, or reconsideration of the assessment by USCIS.  The purpose of the assessment is simply to assess whether the alien meets one of the eligibility criteria under the MPP, pursuant to Section 235(b)(2)(C).

---

[7] Secretaría de Relaciones Exteriores, *Position of Mexico on the Decision of the U.S. Government to Invoke Section 235(b)(2)(C) of its Immigration and Nationality Act* (Dec. 20, 2018); *see* Jan. 25, 2019, Memorandum at 2-3.

[8] *See* Jan. 25, 2019, Memorandum at 4.

**Disclaimer**

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

**Contact Information**

Questions relating to this memorandum must be directed through the appropriate channels to the Asylum Division Headquarters point of contact.

AR557

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## ADJUDICATION STATISTICS

### New Cases and Total Completions

| Fiscal Year | Initial Receipts[1] | Average Initial Receipts per Month | Total Completions[2] | Average Total Completions per Month |
|---|---|---|---|---|
| 1983 | 5,754 | 480 | 902 | 75 |
| 1984 | 11,517 | 960 | 2,118 | 177 |
| 1985 | 24,423 | 2,035 | 9,459 | 788 |
| 1986 | 37,911 | 3,159 | 27,223 | 2,269 |
| 1987 | 39,858 | 3,322 | 37,841 | 3,153 |
| 1988 | 67,212 | 5,601 | 60,104 | 5,009 |
| 1989 | 112,282 | 9,357 | 72,939 | 6,078 |
| 1990 | 103,429 | 8,619 | 81,678 | 6,807 |
| 1991 | 93,773 | 7,814 | 101,785 | 8,482 |
| 1992 | 88,998 | 7,417 | 87,322 | 7,277 |
| 1993 | 106,590 | 8,883 | 89,762 | 7,480 |
| 1994 | 125,711 | 10,476 | 106,815 | 8,901 |
| 1995 | 159,300 | 13,275 | 140,757 | 11,730 |
| 1996 | 197,449 | 16,454 | 186,002 | 15,500 |
| 1997 | 211,885 | 17,657 | 196,277 | 16,356 |
| 1998 | 184,076 | 15,340 | 191,981 | 15,998 |
| 1999 | 162,493 | 13,541 | 174,553 | 14,546 |
| 2000 | 159,865 | 13,322 | 165,734 | 13,811 |
| 2001 | 176,111 | 14,676 | 160,946 | 13,412 |
| 2002 | 178,528 | 14,877 | 171,413 | 14,284 |
| 2003 | 193,002 | 16,084 | 200,068 | 16,672 |
| 2004 | 199,485 | 16,624 | 212,145 | 17,679 |
| 2005 | 271,631 | 22,636 | 270,446 | 22,537 |
| 2006 | 246,489 | 20,541 | 279,411 | 23,284 |
| 2007 | 213,379 | 17,782 | 223,967 | 18,664 |
| 2008 | 225,871 | 18,823 | 230,595 | 19,216 |
| 2009 | 255,034 | 21,253 | 232,676 | 19,390 |
| 2010 | 247,178 | 20,598 | 223,350 | 18,613 |
| 2011 | 238,142 | 19,845 | 220,016 | 18,335 |
| 2012 | 212,932 | 17,744 | 186,759 | 15,563 |
| 2013 | 196,620 | 16,385 | 156,573 | 13,048 |
| 2014 | 230,175 | 19,181 | 142,121 | 11,843 |
| 2015 | 192,994 | 16,083 | 143,719 | 11,977 |
| 2016 | 228,442 | 19,037 | 143,507 | 11,959 |
| 2017 | 295,127 | 24,594 | 163,171 | 13,598 |
| 2018 | 314,316 | 26,193 | 195,670 | 16,306 |
| 2019 (Second Quarter)[3] | 180,400 | 30,067 | 111,555 | 18,593 |

Data Generated: April 23, 2019
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.
[3] FY 2019 Second Quarter through March 31, 2019.

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW ADJUDICATION STATISTICS

## New Cases and Total Completions



Data Generated: April 23, 2019
[1] Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding only cases.
[2] Total completions equals initial case completions plus subsequent case completions.
[3] FY 2019 Second Quarter through March 31, 2019.

AR559

**2. CONVENTION RELATING TO THE STATUS OF REFUGEES**

*Geneva, 28 July 1951*

| | |
|---|---|
| **ENTRY INTO FORCE:** | 22 April 1954, in accordance with article 43. |
| **REGISTRATION:** | 22 April 1954, No. 2545. |
| **STATUS:** | Signatories: 19. Parties: 146. |
| **TEXT:** | United Nations, *Treaty Series* , vol. 189, p. 137. |

*Note:* The Convention was adopted by the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, held at Geneva from 2 to 25 July 1951.  The Conference was convened pursuant to resolution 429 (V)[1], adopted by the General Assembly of the United Nations on 14 December 1950.

| Participant | Signature | Accession(a), Succession(d), Ratification | |
|---|---|---|---|
| Afghanistan | | 30 Aug | 2005 a |
| Albania | | 18 Aug | 1992 a |
| Algeria | | 21 Feb | 1963 d |
| Angola | | 23 Jun | 1981 a |
| Antigua and Barbuda | | 7 Sep | 1995 a |
| Argentina | | 15 Nov | 1961 a |
| Armenia | | 6 Jul | 1993 a |
| Australia | | 22 Jan | 1954 a |
| Austria | 28 Jul 1951 | 1 Nov | 1954 |
| Azerbaijan | | 12 Feb | 1993 a |
| Bahamas | | 15 Sep | 1993 a |
| Belarus | | 23 Aug | 2001 a |
| Belgium | 28 Jul 1951 | 22 Jul | 1953 |
| Belize | | 27 Jun | 1990 a |
| Benin | | 4 Apr | 1962 d |
| Bolivia (Plurinational State of) | | 9 Feb | 1982 a |
| Bosnia and Herzegovina[2] | | 1 Sep | 1993 d |
| Botswana | | 6 Jan | 1969 a |
| Brazil | 15 Jul 1952 | 16 Nov | 1960 |
| Bulgaria | | 12 May | 1993 a |
| Burkina Faso | | 18 Jun | 1980 a |
| Burundi | | 19 Jul | 1963 a |
| Cambodia | | 15 Oct | 1992 a |
| Cameroon | | 23 Oct | 1961 d |
| Canada | | 4 Jun | 1969 a |
| Central African Republic | | 4 Sep | 1962 d |
| Chad | | 19 Aug | 1981 a |
| Chile | | 28 Jan | 1972 a |
| China[3] | | 24 Sep | 1982 a |
| Colombia | 28 Jul 1951 | 10 Oct | 1961 |
| Congo | | 15 Oct | 1962 d |
| Costa Rica | | 28 Mar | 1978 a |
| Côte d'Ivoire | | 8 Dec | 1961 d |
| Croatia[2] | | 12 Oct | 1992 d |
| Cyprus | | 16 May | 1963 d |
| Czech Republic[4] | | 11 May | 1993 d |
| Democratic Republic of the Congo | | 19 Jul | 1965 a |
| Denmark | 28 Jul 1951 | 4 Dec | 1952 |
| Djibouti | | 9 Aug | 1977 d |
| Dominica | | 17 Feb | 1994 a |
| Dominican Republic | | 4 Jan | 1978 a |
| Ecuador | | 17 Aug | 1955 a |
| Egypt | | 22 May | 1981 a |
| El Salvador | | 28 Apr | 1983 a |
| Equatorial Guinea | | 7 Feb | 1986 a |
| Estonia | | 10 Apr | 1997 a |
| Eswatini | | 14 Feb | 2000 a |
| Ethiopia | | 10 Nov | 1969 a |
| Fiji | | 12 Jun | 1972 d |
| Finland | | 10 Oct | 1968 a |
| France | 11 Sep 1952 | 23 Jun | 1954 |
| Gabon | | 27 Apr | 1964 a |
| Gambia | | 7 Sep | 1966 d |
| Georgia | | 9 Aug | 1999 a |
| Germany[5,6] | 19 Nov 1951 | 1 Dec | 1953 |
| Ghana | | 18 Mar | 1963 a |
| Greece | 10 Apr 1952 | 5 Apr | 1960 |
| Guatemala | | 22 Sep | 1983 a |

| Participant | Signature | Accession(a), Succession(d), Ratification | | Participant | Signature | Accession(a), Succession(d), Ratification | |
|---|---|---|---|---|---|---|---|
| Guinea | | 28 Dec | 1965 d | Paraguay | | 1 Apr | 1970 a |
| Guinea-Bissau | | 11 Feb | 1976 a | Peru | | 21 Dec | 1964 a |
| Haiti | | 25 Sep | 1984 a | Philippines | | 22 Jul | 1981 a |
| Holy See | 21 May | 1952 | 15 Mar 1956 | Poland | | 27 Sep | 1991 a |
| Honduras | | 23 Mar | 1992 a | Portugal[3] | | 22 Dec | 1960 a |
| Hungary | | 14 Mar | 1989 a | Republic of Korea | | 3 Dec | 1992 a |
| Iceland | | 30 Nov | 1955 a | Republic of Moldova | | 31 Jan | 2002 a |
| Iran (Islamic Republic of) | | 28 Jul | 1976 a | Romania | | 7 Aug | 1991 a |
| Ireland | | 29 Nov | 1956 a | Russian Federation | | 2 Feb | 1993 a |
| Israel | 1 Aug | 1951 | 1 Oct 1954 | Rwanda | | 3 Jan | 1980 a |
| Italy | 23 Jul | 1952 | 15 Nov 1954 | Samoa | | 21 Sep | 1988 a |
| Jamaica | | 30 Jul | 1964 d | Sao Tome and Principe | | 1 Feb | 1978 a |
| Japan | | 3 Oct | 1981 a | Senegal | | 2 May | 1963 d |
| Kazakhstan | | 15 Jan | 1999 a | Serbia[2] | | 12 Mar | 2001 d |
| Kenya | | 16 May | 1966 a | Seychelles | | 23 Apr | 1980 a |
| Kyrgyzstan | | 8 Oct | 1996 a | Sierra Leone | | 22 May | 1981 a |
| Latvia | | 31 Jul | 1997 a | Slovakia[4] | | 4 Feb | 1993 d |
| Lesotho | | 14 May | 1981 a | Slovenia[2] | | 6 Jul | 1992 d |
| Liberia | | 15 Oct | 1964 a | Solomon Islands | | 28 Feb | 1995 a |
| Liechtenstein | 28 Jul | 1951 | 8 Mar 1957 | Somalia | | 10 Oct | 1978 a |
| Lithuania | | 28 Apr | 1997 a | South Africa | | 12 Jan | 1996 a |
| Luxembourg | 28 Jul | 1951 | 23 Jul 1953 | South Sudan | | 10 Dec | 2018 a |
| Madagascar | | 18 Dec | 1967 a | Spain | | 14 Aug | 1978 a |
| Malawi | | 10 Dec | 1987 a | St. Kitts and Nevis | | 1 Feb | 2002 a |
| Mali | | 2 Feb | 1973 d | St. Vincent and the Grenadines | | 3 Nov | 1993 a |
| Malta | | 17 Jun | 1971 a | Sudan | | 22 Feb | 1974 a |
| Mauritania | | 5 May | 1987 a | Suriname[7] | | 29 Nov | 1978 d |
| Mexico | | 7 Jun | 2000 a | Sweden | 28 Jul | 1951 | 26 Oct 1954 |
| Monaco | | 18 May | 1954 a | Switzerland | 28 Jul | 1951 | 21 Jan 1955 |
| Montenegro | | 10 Oct | 2006 d | Tajikistan | | 7 Dec | 1993 a |
| Morocco | | 7 Nov | 1956 d | Timor-Leste | | 7 May | 2003 a |
| Mozambique | | 16 Dec | 1983 a | Togo | | 27 Feb | 1962 d |
| Namibia | | 17 Feb | 1995 a | Trinidad and Tobago | | 10 Nov | 2000 a |
| Nauru | | 28 Jun | 2011 a | Tunisia | | 24 Oct | 1957 d |
| Netherlands | 28 Jul | 1951 | 3 May 1956 | Turkey | 24 Aug | 1951 | 30 Mar 1962 |
| New Zealand | | 30 Jun | 1960 a | Turkmenistan | | 2 Mar | 1998 a |
| Nicaragua | | 28 Mar | 1980 a | Tuvalu[8] | | 7 Mar | 1986 d |
| Niger | | 25 Aug | 1961 d | Uganda | | 27 Sep | 1976 a |
| Nigeria | | 23 Oct | 1967 a | Ukraine[9] | | 10 Jun | 2002 a |
| North Macedonia[2] | | 18 Jan | 1994 d | United Kingdom of Great Britain and Northern Ireland | 28 Jul | 1951 | 11 Mar 1954 |
| Norway | 28 Jul | 1951 | 23 Mar 1953 | | | | |
| Panama | | 2 Aug | 1978 a | United Republic of Tanzania | | 12 May | 1964 a |
| Papua New Guinea | | 17 Jul | 1986 a | | | | |

| Participant | Signature | Accession(a), Succession(d), Ratification | Participant | Signature | Accession(a), Succession(d), Ratification |
|---|---|---|---|---|---|
| Uruguay ......................... | | 22 Sep   1970 a | Zambia ........................... | | 24 Sep   1969 d |
| Yemen[10] ....................... | | 18 Jan   1980 a | Zimbabwe ..................... | | 25 Aug   1981 a |

***Declarations under section B of article 1 of the Convention (Unless otherwise indicated in a footnote, the declarations were received upon ratification, accession or succession.)***

### (a) "Events occurring in Europe before 1 January 1951"

**Participant**

Congo

Madagascar

Monaco

Turkey

### (b) "Events occurring in Europe or elsewhere before 1 January 1951"

**Participant**

Afghanistan

Albania

Algeria

Antigua and Barbuda

Argentina[11,12]

Armenia

Australia[12]

Austria

Azerbaijan

Bahamas

Belarus

Belgium

Belize

Benin[12]

Bolivia

Bosnia and Herzegovina[2]

Botswana[13]

Brazil[12]

Bulgaria

Burkina Faso

Burundi

Cameroon[12]

Canada

*Participant*

Central African Republic[12]

Chad

Chile[12]

Colombia[11,12]

Costa Rica

Côte d'Ivoire[12]

Croatia[2]

Cyprus

Czech Republic[4]

Democratic Republic of the Congo

Denmark

Djibouti

Dominica

Dominican Republic

Ecuador[12]

Egypt

El Salvador

Equatorial Guinea

Estonia

Ethiopia

Fiji

Finland

France[12]

Gabon

Gambia

Georgia

Germany[6]

Ghana

Greece

Guatemala

Guinea

Guinea-Bissau

Haiti

Holy See[12]

Honduras

Hungary[11,12]

Iceland

Iran (Islamic Republic of)[12]

Ireland

Israel

Italy[12]

Jamaica

Japan

Kazakhstan

Kenya

Kyrgyzstan

***Participant***

Latvia[11,12]

Lesotho

Liberia

Liechtenstein

Lithuania

Luxembourg[12]

Malawi[14]

Mali

Malta[12]

Mauritania

Mexico

Moldova

Montenegro

Morocco

Mozambique

Namibia

Nauru

Netherlands

New Zealand

Nicaragua

Niger[12]

Nigeria

Norway

Panama

Papua New Guinea

Paraguay[11,12]

Peru[12]

Philippines

Portugal[12]

Republic of Korea

Romania

Russian Federation

Rwanda

Samoa

Sao Tome and Principe

Senegal[12]

Serbia[2]

Seychelles

Sierra Leone

Slovakia[4]

Slovenia[2]

Solomon Islands

Somalia

South Africa

South Sudan

Spain

*Participant*

St. Kitts and Nevis

St. Vincent and the Grenadines

Sudan[12]

Suriname

Swaziland

Sweden

Switzerland

Tajikistan

The former Yugoslav Republic of
Macedonia[2]

Timor-Leste

Togo[12]

Trinidad and Tobago

Tunisia

Turkmenistan

Tuvalu

Uganda

United Kingdom of Great Britain
and Northern Ireland

United Republic of Tanzania

Uruguay

Yemen[10]

Zambia

Zimbabwe

## Declarations and Reservations
### (Unless otherwise indicated, the declarations and reservations were made upon ratification, accession or succession.)

### ANGOLA

The Government of the People's Republic of Angola also declares that the provisions of the Convention shall be applicable in Angola provided that they are not contrary to or incompatible with the constitutional and legal provisions in force in the People's Republic of Angola, especially as regards articles 7, 13, 15, 18 and 24 of the Convention. Those provisions shall not be construed so as to accord to any category of aliens resident in Angola more extensive rights than are enjoyed by Angolan citizens.

The Government of the People's Republic of Angola also considers that the provisions of articles 8 and 9 of the Convention cannot be construed so as to limit its right to adopt in respect of a refugee or group of refugees such measures as it deems necessary to safeguard national interests and to ensure respect for its sovereignty, whenever circumstances so require.

In addition, the Government of the People's Republic of Angola wishes to make the following reservations:

*Ad article 17:*   The Government of the People's Republic of Angola accepts the obligations set forth in article 17, provided that:

(a)   Paragraph 1 of this article shall not be interpreted to mean that refugees must enjoy the same privileges as

may be accorded to nationals of countries with which the People's Republic of Angola has signed special co-operation agreements;

(b)   Paragraph 2 of this article shall be construed as a recommendation and not as an obligation.

The Government of the People's Republic of Angola reserves the right to prescribe, transfer or circumscribe the place of residence of certain refugees or groups of refugees, and to restrict their freedom of movement, whenever considerations of national or international order make it advisable to do so.

### AUSTRALIA[15]

### AUSTRIA[16]

The Convention is ratified:

(a)   Subject to the reservation that the Republic of Austria regards the provisions of article 17, paragraphs 1 and 2 (excepting, however, the phrase "who was already exempt from them at the date of entry into force of this Convention for the Contracting State concerned, or . . ." in the latter paragraph) not as a binding obligation, but merely as a recommendation.

(b)   Subject to the reservation that the provisions of article 22, paragraph 1, shall not be applicable to the

establishment and maintenance of private elementary schools, that the "public relief and assistance" referred to in article 23 shall be interpreted solely in the sense of allocations from public welfare funds ( *Armenversorgung)* , and that the "documents or certifications" referred to in article 25, paragraphs 2 and 3 shall be construed to mean the identity certificates provided for in the Convention of 30 June 1928 relating to refugees.

## BAHAMAS

"Refugees and their dependants would normally be subjected to the same laws and regulations relating generally to the employment of non-Bahamians within the Commonwealth of the Bahamas, so long as they have not acquired status in the Commonwealth of the Bahamas."

## BELGIUM

1.   In all cases where the Convention grants to refugees the most favourable treatment accorded to nationals of a foreign country, this provision shall not be interpreted by the Belgian Government as necessarily involving the régime accorded to nationals of countries with which Belgium has concluded regional customs, economic or political agreements.

2.   Article 15 of the Convention shall not be applicable in Belgium; refugees lawfully staying in Belgian territory will enjoy the same treatment, as regards the right of association, as that accorded to aliens in general.

## BOTSWANA

"Subject to the reservation of articles 7, 17, 26, 31, 32 and 34 and paragraph 1 of article 12 of the Convention."

## BRAZIL[17]

"Refugees will be granted the same treatment accorded to nationals of foreign countries in general, with the exception of the preferential treatment extended to nationals of Portugal through the Friendship and Consultation Treaty of 1953 and Article 199 of the Brazilian Constitutional Amendment No.1, of 1969."

## CANADA

"Subject to the following reservation with reference to Articles 23 and 24 of the Convention:

"Canada interprets the phrase 'lawfully staying' as referring only to refugees admitted for permanent residence:  refugees admitted for temporary residence will be accorded the same treatment with respect to the matters dealt with in articles 23 and 24 as is accorded visitors generally."

## CHILE

(1)   With the reservation that, with reference to the provisions of article 34, the Government of Chile will be unable to grant to refugees facilities greater that those granted to aliens in general, in view of the liberal nature of Chilean naturalization laws;

(2)   With the reservation that the period specified in article 17, paragraph 2 (a) shall, in the case of Chile, be extended from three to ten years;

(3)   With the reservation that article 17, paragraph 2 (c) shall apply only if the refugee is the widow or the widower of a Chilean spouse;

(4)   With the reservation that the Government of Chile cannot grant a longer period for compliance with an expulsion order than that granted to other aliens in general under Chilean law.

## CHINA

"[Subject to] reservations on the following articles:

(1).   The latter half of article 14, which reads

'In the territory of any other Contracting State, he shall be accorded the same protection as is accorded in that territory to nationals of the country in which he has his habitual residence.'

(2).            Article 16 (3)."

## CYPRUS[18]

With confirmation of the reservations made by the Government of the United Kingdom upon application of the Convention to the territory of Cyprus.

## DENMARK[19]

"[Subject to] the following reservation:

The obligation in article 17, paragraph 1, to accord to refugees lawfully staying in Denmark the most favourable treatment accorded to nationals of a foreign country as regards the right to engage in wage-earning employment shall not be construed to mean that refugees shall be entitled to the privileges which in this respect are accorded to nationals of Finland, Iceland, Norway and Sweden."

## ECUADOR

[Subject to] the following declarations and reservation:

With respect to article 1, relating to the definition of the term "refugee", the Government of Ecuador declares that its accession to the Convention relating to the Status of Refugees does not imply its acceptance of the Conventions which have not been expressly signed and ratified by Ecuador.

With respect to article 15, Ecuador further declares that its acceptance of the provisions contained therein shall be limited in so far as those provisions are in conflict with the constitutional and statutory provisions in force prohibiting aliens, and consequently refugees, from being members of political bodies.

## EGYPT

With reservations in respect of article 12 (1), articles 20 and 22 (1), and articles 23 and 24.

1.   Egypt formulated a reservation to article 12 (1) because it is in contradiction with the internal laws of Egypt. This article provides that the personal status of a refugee shall be governed by the law of the country of his domicile or, failing this, of his residence. This formula contradicts article 25 of the Egyptian civil code, which reads as follows:

"The judge declares the applicable law in the case of persons without nationality or with more than one nationality at the same time. In the case of persons where there is proof, in accordance with Egypt, of Egyptian nationality, and at the same time in accordance with one or more foreign countries, of nationality of that country, the Egyptian law must be applied."

The competent Egyptian authorities are not in a position to amend this article (25) of the civil code.

2.   Concerning articles 20, 22 (paragraph 1), 23 and 24 of the Convention of 1951, the competent Egyptian authorities had reservations because these articles consider the refugee as equal to the national.

We made this general reservation to avoid any obstacle which might affect the discretionary authority of Egypt in granting privileges to refugees on a case-by-case basis.

AR566

## ESTONIA

"[Subject to the following] reservations ...:
1)            to Articles 23 and 24 as follows:
The Republic of Estonia considers articles 23 and 24 merely as recommendatory, not as legally binding.
2)            to Article 25 as follows:
The Republic of Estonia shall not be bound to cause a certificate to be delivered by an Estonian authority, in place of the authorities of a foreign country, if documentary records necessary for the delivery of such a certificate do not exist in the Republic of Estonia.
3)            to Article 28, paragraph 1 as follows:
The Republic of Estonia shall not be obliged within five years from the entry into force of the present Convention to issue travel documents provided in article 28."

## ETHIOPIA

"[S]ubject to the following reservations made under the terms of Article 42, paragraph 1, of the Convention and Article VII, paragraph 1, of the Protocol :
The provisions of articles 8, 9, 17 (2) and 22 (1) of the Convention are recognized only as recommendations and not as legally binding obligations."

## FIJI

The Government of Fiji stated that "...[t]he first and fourth reservations made by the United Kingdom are affirmed but have been redrafted as more suitable to the application of Fiji in the following terms:
1.   The Government of Fiji understands articles 8 and 9 as not preventing them from taking in time of war or other grave and exceptional circumstances measures in the interests of national security in the case of a refugee on the ground of his nationality.  The provisions of article 8  shall not prevent the Government of Fiji from exercising any rights over property and interests which they may acquire or have acquired as an Allied or Associated Power under a Treaty of Peace or other agreement or arrangement for the restoration of peace which has been or may be completed as a result of the Second World War.  Furthermore the provisions of article 8 shall not affect the treatment to be accorded to any property or interests which at the date of entry into force of this Convention on behalf of Fiji were under the control of the Government of the United Kingdom of Great Britain and Northern Ireland or of the Government of Fiji respectively by reason of a state of war which existed between them and any other State.
2.   The Government of Fiji cannot undertake to give effect to the obligations contained in paragraphs 1 and 2 of article 25 and can only undertake to apply the provisions of paragraph 3 so far as the law allows.
Commentary:
No arrangements exist in Fiji for the administrative assistance for which provision is made in article 25 nor have any such arrangements been found necessary in the case of refugees.  Any need for the documents or certifications mentioned in paragraph 2 of that article would be met by affidavits...
All other reservations made by the United Kingdom to the above-mentioned [Convention are] withdrawn."

## FINLAND[20]

"[S]ubject to the following reservations:
(1)  A general reservation to the effect that the application of those provisions of the Convention which grant to refugees the most favourable treatment accorded to nationals of a foreign country shall not be affected by the fact that special rights and privileges are now or may in future be accorded by Finland to the nationals of

Denmark, Iceland, Norway and Sweden or to the nationals of any one of those Countries;
[...]
(5)  A reservation to article 24, paragraph 3 to the effect that it shall not be binding on Finland;
[...]

## FRANCE

In depositing its instrument of ratification, the Government of the French Republic, acting in accordance with article 42 of the Convention, makes the following statements:
(a)   It considers that article 29, paragraph 2, does not prevent the application in French territory of the provisions of the Act of 7 May 1934 authorizing the levying of the Nansen tax for the support of refugee welfare, resettlement and relief work.
(b)   Article 17 in no way prevents the application of the laws and regulations establishing the proportion of alien workers that employers are authorized to employ in France or affects the obligations of such employers in connexion with the employment of alien workers.

## GAMBIA[21]

## GEORGIA

"According to the paragraph 1, article 40 of the [...] Convention, before the full restoration of the territorial integrity of Georgia, this Convention is applicable only to the territory where the jurisdiction of Georgia is exercised."

## GREECE[22]

"In cases or circumstances which, in its opinion, would justify exceptional procedure for reasons of national security or public order, the Hellenic Government *reserves* the right to derogate from the obligations imposed by the provisions of article 26."

## GUATEMALA[23]

## HOLY SEE

The Holy See, in conformity with the terms of article 42, paragraph 1, of the Convention, makes the reservation that the application of the Convention must be compatible in practice with the special nature of the Vatican City State and without prejudice to the norms governing access to and sojourn therein.

## HONDURAS[24]

(a)            With respect to article 7:
The Government of the Republic of Honduras understands this article to mean that it shall accord to refugees such facilities and treatment as it shall deem appropriate at its discretion, taking into account the economic, social, democratic and security needs of the country;
(b)            With respect to article 17:
This article shall in no way be understood as limiting the application of the labour and civil service laws of the country, especially is so far as they refer to the requirements, quotas and conditions of work which an alien must fulfil in his employment;
(e)            With respect to article 34:
The Government of the Republic of Honduras shall not be obligated to guarantee refugees more favourable naturalization facilities than those ordinarily granted to aliens in accordance with the laws of the country.

## IRAN (ISLAMIC REPUBLIC OF)

Subject to the following reservations:

1.    In all cases where, under the provisions of this Convention, refugees enjoy the most favourable treatment accorded to nationals of a foreign State, the Government of Iran reserves the right not to accord refugees the most favourable treatment accorded to nationals of States with which Iran has concluded regional establishment, customs, economic or political agreements.

2.    The Government of Iran considers the stipulations contained in articles 17, 23, 24 and 26 as being recommendations only.

### IRELAND[25]

"[S]ubject to the following declarations and reservations:

..

2.    The Government of Ireland understands the words `public order' in article 32 (1) and the words `in accordance with due process of law' in article 32 (2) to mean, respectively, `public policy' and `in accordance with a procedure provided by law'.

3.    With regard to article 17 the Government of Ireland do not undertake to grant to refugees rights of wage-earning employment more favourable than those granted to aliens generally.

4.    The Government of Ireland undertake to give effect to article 25 only insofar as may be practicable and permissible under the laws of Ireland.

5.    With regard to article 29 (1) the Government of Ireland do not undertake to accord to refugees treatment more favourable than that accorded to aliens generally with respect to

. . .

(c)              Income Tax (including Surtax)."

### ISRAEL

"[S]ubject to the following statements and reservations:

..

2.    Articles 8 and 12 shall not apply to Israel.

3.    Article 28 shall apply to Israel with the limitations which result from Section 6 of the Passport Law of 5712-1952, according to which the Minister may, at his discretion:

(a)              Refuse to grant, or to extend the validity of a passport or laissez-passer;

(b)              Attach conditions to the grant or the extension of the validity of a passport or laissez-passer;

(c)              Cancel, or shorten the period of validity of a passport or laissez-passer issued, and order the surrender thereof;

(d)              Limit, either at or after the issue of a passport or laissez-passer, the range of countries for which it is to be valid.

4.    Permits provided for by Article 30 shall be issued by the Minister of Finance at his discretion."

### ITALY[26]

### JAMAICA

"The Government of Jamaica confirms and maintains the following reservations, which were made when the Convention was extended to Jamaica by the United Kingdom of Great Britain and Northern Ireland:

(i)              The Government of the United Kingdom understand articles 8 and 9 as not preventing the taking by the above-mentioned territory, in time of war or other grave and exceptional circumstances, of measures in the interests of national security in the case of a refugee on the ground of his nationality.  The provisions of article 8 shall not prevent the Government of the United Kingdom from exercising any rights over property or interests which they may acquire or have acquired as an Allied or Associated Power under a Treaty of Peace or

other agreement or arrangement for the restoration of peace which has been or may be completed as a result of the Second World War.  Furthermore, the provisions of article 8 shall not affect the treatment to be accorded to any property or interests which, at the date of entry into force of the Convention for the above-mentioned territory, are under the control of the Government of the United Kingdom by reason of a state of war which exists or existed between them and any other State.

(ii)              The Government of the United Kingdom accept paragraph 2 of article 17 in its application to the above-mentioned territory with the substitution of `four years' for `three years' in subparagraph (a) and with the omission of subparagraph (c).

(iii)              The Government of the United Kingdom can only undertake that the provisions of subparagraph (b) of paragraph 1 of article 24 and of paragraph 2 of that article will be applied to the above-mentioned territory so far as the law allows.

(iv)              The Government of the United Kingdom cannot undertake that effect will be given in the above-mentioned territory to paragraphs 1 and 2 of article 25 and can only undertake that the provisions of paragraph 3 will be applied in the above-mentioned territory so far as the law alows."

### LATVIA

"Reservation
In accordance with paragraph 1 of article 42 of the [said Convention], the Republic of Latvia declares that it does not consider itself bound by the article 8 and the article 34 of the Convention.

Reservation
In accordance with paragraph 1 of the article 42 of the [said Convention], the Republic of Latvia, in respect of the article 26 of the Convention, reserves the right to designate the place or places of residence of the refugees whenever considerations of national security or public order so require.

Reservation
In accordance with paragraph 1of the article 42 of the [said Convention], the Republic of Latvia declares that the provisions of paragraphs 1 and 2 of the article 17 and article 24 of the Convention it considers as recommendations and not legal obligations.

Reservation
In accordance with paragraph 1 of the article 42 of the [said Convention], the Republic of Latvia declares that in all cases where the Convention grants to refugees the most favourable treatment accorded to nationals of a foreign country, this provision shall not be interpreted by the Government of the Republic of Latvia as necessarily involving the regime accorded to nationals of countries with which the Republic of Latvia had concluded regional customs, economic, political or social security agreements."

### LIECHTENSTEIN[27]

### LUXEMBOURG

Subject to the following reservation:  in all cases where this Convention grants to refugees the most favourable treatment accorded to nationals of a foreign country, this provision shall not be interpreted as necessarily involving the régime accorded to nationals of countries with which the Grand Duchy of Luxembourg has concluded regional, customs, economic or political agreements.

The Grand Duchy of Luxembourg considers that the reservation made by the Republic of Guatemala concerning the Convention relating to the Status of Refugees of 28 July 1951 and the Protocol relating to the Status of Refugee of 31 January 1967 does not affect the

AR568

obligations of Guatemala deriving from those instruments.

### MADAGASCAR

The provisions of article 7 (1) shall not be interpreted as requiring the same treatment as is accorded to nationals of countries with which the Malagasy Republic has concluded conventions of establishment or agreements on co-operation;

The provisions of articles 8 and 9 shall not be interpreted as forbidding the Malagasy Government to take, in time of war or other grave and exceptional circumstances, measures with regard to a refugee because of his nationality in the interests of national security.

The provisions of article 17 cannot be interpreted as preventing the application of the laws and regulations establishing the proportion of alien workers that employers are authorized to employ in Madagascar or affecting the obligations of such employers in connexion with the employment of alien workers.

### MALAWI

"In respect of articles 7, 13, 15, 19, 22 and 24

The Government of the Republic of Malawi considers these provisions as recommendations only and not legally binding ob ligations.

In respect of article 17

The Government of the Republic of Malawi does not consider itself bound to grant a refugee who fulfils any of the conditions set forth in subparagraphs (a) to (c) to paragraph (2) of article 17 automatic exemption for the obligation to obtain a work permit.

In respect of article 17 as a whole, the Government of the Republic of Malawi does not undertake to grant to refugees rights of wage earning employment more favourable than those granted to aliens generally.

In respect of article 26

The Government of the Republic of Malawi reserves its right to designate the place or places of residence of the refugees and to restrict their movements whenever considerations of national security or public order so require.

In respect of article 34

The Government of the Republic of Malawi is not bound to grant to refugees any more favourable naturalization facilities than are granted, in accordance with the relevant laws and regulations, to aliens generally."

### MALTA[28]

### MEXICO[29]

It will always be the task of the Government of Mexico to determine and grant, in accordance with its legal provisions in force, refugee status, without prejudice to the definition of a refugee provided for under article 1 of the Convention and article 1 of its Protocol.

The Government of Mexico has the power to grant refugees greater facilities for naturalization and assimilation than those accorded to aliens in general, within the framework of its population policy and, particularly, with regard to refugees, in accordance with its national legislation.

The Government of Mexico is convinced of the importance of ensuring that all refugees can obtain wage-earning employment as a means of subsistence and affirms that refugees will be treated, in accordance with the law, under the same conditions as aliens in general, including the laws and regulations which establish the proportion of alien workers that employers are authorized to employ in Mexico, and this will not affect the obligations of employers with regard to the employment of alien workers.

On the other hand, since the Government of Mexico is unable to guarantee refugees who meet any of the requirements referred to in article 17, paragraph 2 (a), (b) and (c), of the Convention, the automatic extension of the obligations for obtaining a work permit, it lodges an express reservation to these provisions.

The Government of Mexico reserves the right to assign, in accordance with its national legislation, the place or places of residence of refugees and to establish the conditions for moving within the national territory, for which reason it lodges an express reservation to articles 26 and 31 (2) of the Convention.

### MONACO

Subject to the reservation that the stipulations contained in articles 7 (paragraph 2), 15, 22 (paragraph 1), 23 and 24 shall be provisionally considered as being recommendations and not legal obligations.

### MOZAMBIQUE

The Government of Mozambique will take these provisions as simple recommendations not binding it to accord to refugees the same treatment as is accorded to Mozambicans with respect to elementary education and property.

The Government of Mozambique will interpret [these provisions] to the effect that it is not required to grant privileges from obligation to obtain a work permit.

The Government of Mozambique will not be bound to accord to refugees or groups of refugees resident in its territory more extensive rights than those enjoyed by nationals with respect to the right of association and it reserves the right to restrict them in the interest of national security.

The Government of Mozambique reserves its right to designate place or places for principal residence for refugees or to restrict their freedom of movement whenever considerations of national security make it advisable.

The Government of Mozambique does not consider itself bound to grant to refugees facilities greater than those granted to other categories of aliens in general, with respect to naturalization laws."

### NAMIBIA

"[S]ubject to the following reservation in respect of article 26:

The Government of the Republic of Namibia reserves the right to designate a place or places for principal reception and residence for refugees or to restrict their freedom of movement if consideration of national security so required or make it advisable."

### NETHERLANDS

This signature is appended subject to the reservation that in all cases where this Convention grants to refugees the most favourable treatment accorded to nationals of a foreign country this provision shall not be interpreted as involving the régime accorded to nationals of countries with which the Netherlands has concluded regional, customs, economic or political agreements.

(1)   With reference to article 26 of this Convention, the Netherlands Government reserves the right to designate a place of principal residence for certain refugees or groups of refugees in the public interest.

(2)   In the notifications concerning overseas territories referred to in article 40, paragraph 2, of this Convention, the Netherlands Government reserves the right to make a declaration in accordance with section B of article 1 with respect to such territories and to make reservations in accordance with article 42 of the Convention.

In depositing the instrument of ratification by the Netherlands, . . . I declare on behalf of the Netherlands Government that it does not regard the Amboinese who were transported to the Netherlands after 27 December 1949, the date of the transfer of sovereignty by the Kingdom of the Netherlands to the Republic of the United States of Indonesia, as eligible for the status of refugees as defined in article 1 of the said Convention.

### NEW ZEALAND

"The Government of New Zealand can only undertake to give effect to the provisions contained in paragraph 2 of article 24 of the Convention so far as the law of New Zealand allows."

### NORWAY[30]

"The obligation stipulated in article 17 (1) to accord to refugees lawfully staying in the country the most favourable treatment accorded to nationals of a foreign country in the same circumstances as regards the right to engage in wage-earning employment, shall not be construed as extending to refugees the benefits of agreements which may in the future be concluded between Norway, Denmark, Finland, Iceland and Sweden, or between Norway and any one of these countries, for the purpose of establishing special conditions for the transfer of labour between these countries."

### PAPUA NEW GUINEA[31]

"The Government of Papua New Guinea in accordance with article 42 paragraph 1 of the Convention makes a reservation with respect to the provisions contained in articles 17 (1), 21, 22 (1), 26, 31, 32 and 34 of the Convention and does not accept the obligations stipulated in these articles."

### POLAND

The Republic of Poland does not consider itself bound by the provisions of article 24, paragraph 2, of the Convention.

### PORTUGAL[32]

"In all cases in which the Convention confers upon the refugees the most favoured person status granted to nationals of a foreign country, this clause will not be interpreted in such a way as to mean the status granted by Portugal to the nationals of Brazil."

### REPUBLIC OF KOREA[33]

### REPUBLIC OF MOLDOVA

" ... with the following declarations and reservations:
1.   According to paragraph 1, article 40 of the Convention, the Republic of Moldova declares that, until the full restoration of the territorial integrity of the Republic of Moldova, the provisions of this Convention are applicable only in the territory where the jurisdiction of the Republic of Moldova is exercised.
2.   The Republic of Moldova shall apply the provisions of this convention with no discrimination generally not only as to race, religion or country of origin as stipulated in Article 3 of the Convention.
3.   For the purposes of this Convention by the notion "residence"shall be understood the permanent and lawful domicile.
4.   According to paragraph 1 of Article 42 of the Convention, the Republic of Moldova reserves the right that the provisions of the Convention, according to which refugees shall be accorded treatment not less favorable than hat accorded aliens generally, are not interpreted as

an obligation to offer refugees a regime similar to that accorded to the citizens of the states with which the Republic of Moldova has signed regional customs, economic, political and social security treaties.
5.   According to paragraph 1 of Article 42 of the Convention, the Republic of Moldova reserves the right to consider the provisions of Article 13 as recommendations and not as obligations.
6.   According to paragraph 1 of Article 42 of the Convention, the Republic of Moldova reserves the right to consider the provisions of Article 17 (2) as recommendations and not as obligations.
7.   According to paragraph 1 of Article 42 of the Convention, the Republic of Moldova interprets the provisions of Article 21 of the Convention as not obliged to accord housing to refugees.
8.   The Government of the Republic of Moldova reserves the right to apply the provisions of Article 24 so that they do not infringe upon the constitutional and domestic legislation provisions rerding the right to labor and social protection.
9.   According to paragraph 1 of Article 42 of the Convention, in implementing Article 26 of this Convention, the Republic of Moldova reserves the right to establish the place of residence for certain refugees or groups of refugees in the interest of the state and society.
10.   The Republic of Moldova shall apply the provisions of Article 31 of the Convention as of the date of the entry into force of the Law on Refugee Status.

### RWANDA

For reasons of public policy ( *ordre public* ), the Rwandese Re public reserves the right to determine the place of residence of refugees and to establish limits to their freedom of movement.

### SIERRA LEONE

"The Government of Sierra Leone wishes to state with regard to article 17 (2) that Sierra Leone does not consider itself bound to grant to refugees the rights stipulated therein.
Further, with regard to article 17 as a whole, the Government of Sierra Leone wishes to state that it considers the article to be a recommendation only and not a binding obligation.
The Government of Sierra Leone wishes to state that it does not consider itself bound by the provisions of article 29, and it reserves the right to impose special taxes on aliens as provided for in the Constitution."

### SOMALIA

"[Subject to] the following declaration:
The Government of the Somali Democratic Republic acceded to the Convention and Protocol on the understanding that nothing in the said Convention or Protocol will be construed to prejudice or adversely affect the national status, or political aspiration of displaced people from Somali Territories under alien domination.
It is in this spirit, that the Somali Democratic Republic will commit itself to respect the terms and provisions of the said Convention and Protocol."

### SPAIN

(a)   The expression "the most favourable treatment" shall, in all the articles in which it is used, be interpreted as not including rights which, by law or by treaty, are granted to nationals of Portugal, Andorra, the Philippines or the Latin American countries or to nationals of countries with which international agreements of a regional nature are concluded.
(b)   The Government of Spain considers that article 8 is not a binding rule but a recommendation.

(c)   The Government of Spain reserves its position on the application of article 12, paragraph 1.  Article 12, paragraph 2, shall be interpreted as referring exclusively to rights acquired by a refugee before he obtained, in any country, the status of refugee.

(d)   Article 26 of the Convention shall be interpreted as not precluding the adoption of special measures concerning the place of residence of particular refugees, in accordance with Spanish law.

SUDAN

SWEDEN[34]

*First* , a general reservation to the effect that the application of those provisions of the Convention which grant to refugees the most favourable treatment accorded to nationals of a foreign country shall not be affected by the fact that special rights and privileges are now or may in future be accorded by Sweden to the nationals of Denmark, Finland, Iceland and Norway or to the nationals of any one of those countries; and,   *secondly* , the following reservations:  a reservation to article 8 to the effect that that article shall not be binding on Sweden; a reservation to article 12, paragraph 1, to the effect that the Convention shall not modify the rule of Swedish private international law, as now in force, under which the personal status of a refugee is governed by the law of his country of nationality . . .; a reservation to article 17, paragraph 2, to the effect that Sweden does not consider itself bound to grant a refugee who fulfils any one of the conditions set out in subparagraphs (a)-(c) an automatic exemption from the obligation to obtain a work permit; a reservation to article 24, paragraph 1 (b), to the effect that notwithstanding the principle of national treatment for refugees, Sweden shall not be bound to accord to refugees the same treatment as is accorded to nationals in respect of the possibility of entitlement to a national pension under the provisions of the National Insurance Act; and likewise to the effect that, in so far as the right to a supplementary pension under the said Act and the computation of such pension in certain respects are concerned, the rules applicable to Swedish nationals shall be more favourable than those applied to other insured persons; a reservation to article 24, paragraph 3, to the effect that the provisions of this paragraph shall not be binding on Sweden; and a reservation to article 25, to the effect that Sweden does not consider itself bound to cause a certificate to be delivered by a Swedish authority, in the place of the authorities of a foreign country, if the documentary records necessary for the delivery of such a certificate do not exist in Sweden.

SWITZERLAND[35]

TIMOR-LESTE

"In conformity with Article 42 of the Covention, the Democratic Republic of Timor-Leste accedes to the Convention with reservations in respect of Articles 16 (2), 20, 21, 22, 23 and 24."

TURKEY

The Turkish Government considers moreover, that the term "events occurring before 1 January 1951" refers to the beginning of the events.  Consequently, since the pressure exerted upon the Turkish minority in Bulgaria, which began before 1 January 1951, is still continuing, the provision of this Convention must also apply to the Bulgarian refugees of Turkish extraction compelled to leave that country as a result of this pressure and who, being unable to enter Turkey, might seek refuge on the territory of another contracting party after 1 January 1951.

The Turkish Government will, at the time of ratification, enter reservations which it could make under article 42 of the Convention.

No provision of this Convention may be interpreted as granting to refugees greater rights than those accorded to Turkish citizens in Turkey;

The Government of the Republic of Turkey is not a party to the Arrangements of 12 May 1926 and of 30 June 1928 mentioned in article 1, paragraph A, of this Convention.  Furthermore, the 150 persons affected by the Arrangement of 30 June 1928 having been amnestied under Act No.3527, the provisions laid down in this Arrangement are no longer valid in the case of Turkey.  Consequently, the Government of the Republic of Turkey considers the Convention of 28 July 1951 independently of the aforementioned Arrangements . . .

The Government of the Republic understands that the action of "re-availment" or "reacquisition" as referred to in article 1, paragraph C, of the Convention–that is to say: "If (1) He has voluntarily re-availed himself of the protection of the country of his nationality; or (2) Having lost his nationality, he has voluntarily reacquired it"–does not depend only on the request of the person concerned but also on the consent of the State in question.

UGANDA

"(1)      *In respect of article 7:*   The Government of the Republic of Uganda understands this provision as not conferring any legal, political or other enforceable right upon refugees who, at any given time, may be in Uganda.  On the basis of this understanding the Government of the Republic of Uganda shall accord refugees such facilities and treatment as the Government of the Republic of Uganda shall in her absolute discretion, deem fit having regard to her own security, economic and social needs.

(2)      *In respect of articles 8 and 9:*   The Government of the Republic of Uganda declares that the provisions of articles 8 and 9 are recognized by it as recommendations only.

(3)      *In respect of article 13:*   The Government of the Republic of Uganda reserves to itself the right to abridge this provision without recourse to courts of law or arbitral tribunals, national or international, if the Government of the Republic of Uganda deems such abridgement to be in the public interest.

(4)      *In respect of article 15:*   The Government of the Republic of Uganda shall in the public interest have the full freedom to withhold any or all rights conferred by this article from any refugees as a class of residents within her territory.

(5)      *In respect of article 16:*   The Government of the Republic of Uganda understands article 16 paragraphs 2 and 3 thereof as not requiring the Government of the Republic of Uganda to accord to a refugee in need of legal assistance, treatment more favourable than that extended to aliens generally in similar circumstances.

(6)      *In respect of article 17:*   The obligation specified in article 17 to accord to refugees lawfully staying in the country in the same circumstances shall not be construed as extending to refugees the benefit of preferential treatment granted to nationals of the states who enjoy special privileges on account of existing or future treaties between Uganda and those countries, particularly sttes of the East African Community and the Organization of African Unity, in accordance with the provisions which govern such charters in this respect.

(7)      *In respect of article 25:*   The Government of the Republic of Uganda understands that this article shall not require the Government of the Republic of Uganda to incur expenses on behalf of the refugees in connection with the granting of such assistance except in so far as such assistance is requested

AR571

by and the resulting expense is reimbursed to the Government of the Republic of Uganda by the United Nations High Commissioner for Refugees or any other agency of the United Nations which may succeed it.

(8)     *In respect of article 32:*     Without recourse to legal process the Government of the Republic of Uganda shall have, in the public interest, have the unfettered right to expel any refugee in her territory and may at any time apply such internal measures as the Government may deem necessary in the circumstances; so however that, any action taken by the Government of the Republic of Uganda in this regard shall not operate to the prejudice of the provisions of article 33 of this Convention."

## UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

"(i)   The Government of the United Kingdom of Great Britain and Northern Ireland understand articles 8 and 9 as not preventing them from taking in time of war or other grave and exceptional circumstances measures in the interests of national security in the case of a refugee on the ground of his nationality.  The provisions of article 8 shall not prevent the Government of the United Kingdom of Great Britain and Northern Ireland from exercising any rights over property or interests which they may acquire or have acquired as an Allied or Associated power under a Treaty of Peace or other agreement or arrangement for the restoration of peace which has been or may be completed as a result of the Second World War.  Furthermore, the provisions of article 8 shall not affect the treatment to be accorded to any property or interests which at the date of entry into force of this Convention for the United Kingdom of Great Britain and Northern Ireland are under the control of the Government of the United Kingdom of Great Britain and Northern Ireland by reason of a state of war which exists or existed between them and any other State.

(ii)   The Government of the United Kingdom of Great Britain and Northern Ireland accept paragraph 2 of article 17 with the substitution of "four years" for "three years" in sub-paragraph (a) and with the omission of sub-paragraph (c).

(iii)   The Government of the United Kingdom of Great Britain and Northern Ireland, in respect of such of the matters referred to in sub-paragraph (b) of paragraph 1 of article 24 as fall within the scope of the National Health Service, can only undertake to apply the provisions of that paragraph so far as the law allows; and it can only undertake to apply the provisions of paragraph 2 of that Article so far as the law allows.

(iv)   The Government of the United Kingdom of Great Britain and Northern Ireland cannot undertake to give effect to the obligations contained in paragraphs 1 and 2 of article 25 and can only undertake to apply the provisions of paragraph 3 so far as the law allows.

Commentary

In connexion with sub-paragraph (b) of paragraph 1 of article 24 relating to certain matters within the scope of the National Health Service, the National Health Service (Amendment) Act, 1949, contains powers for charges to be made to persons not ordinarily resident in Great Britain (which category would include refugees) who receive treatment under the Service.  While these powers have not yet been exercised it is possible that this might have to be done at some future date.  In Northern Ireland the health services are restricted to persons ordinarily resident in the country except where regulations are made to extend the Service to others.  It is for these reasons that the Government of the United Kingdom while they are prepared in the future, as in the past, to give the most sympathetic consideration to the situation of refugees, find it necessary to make a reservation to sub-paragraph (b) of paragraph 1 of article 24 of the Convention.

The scheme of Industrial Injuries Insurance in Great Britain does not meet the requirements of paragraph 2 of article 24 of the Convention. Where an insured person has died as the result of an industrial accident or a disease due to the nature of his employment, benefit cannot generally be paid to his dependants who are abroad unless they are in any part of the British Commonwealth, in the Irish Republic or in a country with which the United Kingdom has made a reciprocal agreement concerning the payment of industrial injury benefits. There is an exception to this rule in favour of the dependants of certain seamen who die as a result of industrial accidents happening to them while they are in the service of British ships.  In this matter refugees are treated in the same way as citizens of the United Kingdom and Colonies and by reason of paragraphs 3 and 4 of article 24 of the Convention, the dependants of refugees will be able to take advantage of reciprocal agreements which provide for the payment of United Kingdom industrial injury benefits in other countries. By reason of paragraphs (3) and (4) of article 24 refugees will enjoy under the scheme of National Insurance and Industrial Injuries Insurance certain rights which are withheld from British subjects who are not citizens of the United Kingdom and Colonies.

No arrangements exist in the United Kingdom for the administrative assistance for which provision is made in article 25 nor have any such arrangements been found necessary in the case of refugees. Any need for the documents or certifications mentioned in paragraph 2 of that article would be met by affidavits."

## ZAMBIA

"Subject to the following reservations made pursuant to article 42 (1) of the Convention:

Article 17 (2)

The Government of the Republic of Zambia wishes to state with regard to article 17, paragraph 2, that Zambia does not consider itself bound to grant to a refugee who fulfils any one of the conditions set out in sub-paragraphs (a) to (c) automatic exemption from the obligation to obtain a work permit.

Further, with regard to article 17 as a whole, Zambia does not wish to undertake to grant to refugees  rights of wage-earning employment more favourable than those granted to aliens generally.

Article 22 (1)

The Government of the Republic of Zambia wishes to state that it considers article 22 (1) to be a recommendation only and not a binding obligation to accord to refugees the same treatment as is accorded to nationals with respect to elementary education.

Article 26

The Government of the Republic of Zambia wishes to state with regard to article 26 that it reserves the right to designate a place or places of residence for refugees.

Article 28

The Government of the Republic of Zambia wishes to state with regard to article 28 that Zambia considers itself not bound to issue a travel document with a return clause in cases where a country of second asylum has accepted or indicated its willingness to accept a refugee from Zambia."

## ZIMBABWE

"1.   The Government of the Republic of Zimbabwe declares that it is not bound by any of the reservations to the Convention relating to the Status of Refugees, the application of which had

been extended by the Government of the United Kingdom to its territory before the attainment of independence.

2.     The Government of the Republic of Zimbabwe wishes to state with regard to article 17, paragraph 2, that it does not consider itself bound to grant a refugee who

fulfills any of the conditions set out in subparagraphs (a) to (c) automatic exemption from the obligation to obtain a work permit.  In addition, with regard to article 17 as a whole, the Republic of Zimbabwe does not undertake to grant to refugees rights of wage-earning employment more favourable than those granted to aliens generally.

3.    The Government of the Republic of Zimbabwe wishes to state that it considers article 22 (1) as being a recommendation only and not an obligation to accord to refugees the same treatment as it accords to nationals with respect to elementary education.

4.    The Government of the Republic of Zimbabwe considers articles 23 and 24 as being recommendations only.

5.    The Government of the Republic of Zimbabwe wishes to state with regard to article 26 that it reserves the right to designate a place or places of residence for refugees."

### Objections
### (Unless otherwise indicated, the objections were made upon ratification, accession or succession.)

#### BELGIUM

[Regarding the reservation made by Guatemala upon accession] [the Belgian Government] considers that it is impossible for the other States parties to determine the scope of a reservation which is expressed in such broad terms and which refers for the most part to domestic law, and that the reservation is thus not acceptable. It therefore voices an objection to the said reservation.

#### ETHIOPIA

"The Provisional Military Government of Socialist Ethiopia wishes to place on record its objection to the declaration [made by Somalia upon accession] and that it does not recognize it as valid on the ground that there are no Somali territories under alien domination."

#### FRANCE

#### GERMANY[6]

"The Federal Government views [the reservation made by Guatemala] as being worded in such general terms that its application could conceivably nullify the provisions of the Convention and the Protocol. Consequently, this reservation cannot be accepted."

#### GREECE[22]

#### ITALY

[The Government of Italy] considers [the reservation made by Guatemala] to be unacceptable since the very general terms in which it is couched and the fact that it refers for the most part to domestic law and leaves it to the Guatemalan Government to decide whether to apply numerous aspects of the Convention make it impossible for other States parties to determine the scope of the reservation.

#### LUXEMBOURG

#### NETHERLANDS

"The Government of the Kingdom of the Netherlands is of the opinion that a reservation phrased in such general terms and referring to the domestic law only is undesirable, since its scope is not entirely clear."

### Territorial Application

| Participant | Date of receipt of the notification | Territories |
|---|---|---|
| Australia | 22 Jan 1954 | Nauru, Norfolk Island and Papua New Guinea |
| Denmark | 4 Dec 1952 | Greenland |
| France | 23 Jun 1954 | All territories for the international relations of which France is responsible |
| Netherlands[7] | 29 Jul 1971 | Suriname |
| United Kingdom of Great Britain and Northern Ireland[8,18,21,36,37,38,39,40,41,42] | 11 Mar 1954 | Channel Islands and Isle of Man |
| | 25 Oct 1956 | The following territories with reservations: British Solomon Islands Protectorate, Cyprus, Dominica, Falkland Islands, Fiji, Gambia, Gilbert and Ellice Islands, Grenada, Jamaica, Kenya, Mauritius, St. Vincent, Seychelles, Somaliland Protectorate, Zanzibar and St. Helena |
| | 19 Jun 1957 | British Honduras |
| | 11 Jul 1960 | Federation of Rhodesia and Nyasaland |

| Participant | Date of receipt of the notification | Territories |
|---|---|---|
| | 11 Nov 1960 | Basutoland, Bechuanaland Protectorate and Swaziland |
| | 4 Sep 1968 | Montserrat and St. Lucia |
| | 20 Apr 1970 | Bahama Islands |

## Declarations and Reservations
### (Unless otherwise indicated the declarations and reservations were made upon notification of territorial application.)

### DENMARK
#### Greenland
Subject to the reservations made on ratification by the Government of Denmark.

### NETHERLANDS[7]
#### Surinam
The extension is subject to the following reservations, which had been made in substance by the Government of the Netherlands upon ratification:

"1. that in all cases where the Convention, in conjunction with the Protocol, grants to refugees the most favourable treatment accorded to nationals of a foreign country, this provision shall not be interpreted as involving the regime accorded to nationals of countries with which the Kingdom of the Netherlands has concluded regional, customs, economic or political agreements which apply to Surinam;

"2. that the Government of Surinam as regards article 26 of the Convention, in conjunction with article 1, paragraph 1, of the Protocol, reserves the right for reasons of public order to appoint for certain refugees or groups of refugees a principal place of residence.

### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND[8,18,21,36,37,38,39,41,42]
#### The Channel Islands and the Isle of Man
"(i) The Government of the United Kingdom of Great Britain and Northern Ireland understand articles 8 and 9 as not preventing the taking in the Isle of Man and in the Channel Islands, in time of war or other grave and exceptional circumstances, of measures in the interests of national security in the case of a refugee on the ground of his nationality. The provisions of article 8 shall not prevent the Government of the United Kingdom of Great Britain and Northern Ireland from exercising any rights over property or interests which they may acquire or have acquired as an Allied or Associated Power under a Treaty of Peace or other agreement or arrangement for the restoration of peace which has been or may be completed as a result of the Second World War. Furthermore, the provisions of article 8 shall not affect the treatment to be accorded to any property or interests which at the date of the entry into force of this Convention for the Isle of Man and the Channel Islands are under the control of the Government of the United Kingdom of Great Britain and Northern Ireland by reason of a state of war which exists or existed between them and any other state.

"(ii) The Government of the United Kingdom of Great Britain and Northern Ireland accept paragraph 2 of article 17 in its application to the Isle of Man and the Channel Islands with the substitution of "four years" for "three years" in sub-paragraph (a) and with the omission of subparagraph (c).

"(iii) The Government of the United Kingdom of Great Britain and Northern Ireland can only undertake that the provisions of sub-paragraph (b) of paragraph 1 of article 24 and of paragraph 2 of that article will be applied in the Channel Islands so far as the law allows, and that the provisions of that sub-paragraph, in respect of such matters referred to therein as fall within the scope of the Isle of Man Health Service, and of paragraph 2 of that article will be applied in the Isle of Man so far as the law allows.

"(iv) The Government of the United Kingdom of Great Britain and Northern Ireland cannot undertake that effect will be given in the Isle of Man and the Channel Islands to paragraphs 1 and 2 of article 25 and can only undertake that the provisions of paragraph 3 will be applied in the Isle of Man and the Channel Islands so far as the law allows.

"The considerations upon which certain of these reservations are based are similar to those set out in the memorandum relating to the corresponding reservations made in respect of the United Kingdom, which was enclosed in my note under reference."

#### British Solomon Islands Protectorate, Cyprus, Dominica, Falkland Islands, Fiji, Gambia, Gilbert and Ellice Islands, Grenada, Jamaica, Kenya, Mauritius, St. Vincent, Seychelles and Somaliland Protectorate
[Same reservations, in essence, as those made for the Channel Islands and the Isle of Man.]

#### Zanzibar and St. Helena
[Same reservations, in essence, as those made for the Channel Islands and the Isle of Man under Nos. (i), (iii) and (iv).]

#### British Honduras
[Same reservations, in essence, as those made for the Channel Islands and the Isle of Man under No. (i).]

#### Federation of Rhodesia and Nyasaland
[Same reservations, in essence, as those made for the Channel Islands and the Isle of Man.]

#### Basutoland, Bechuanaland Protectorate and Swaziland
[Same reservations, in essence, as those made for the Channel Islands and the Isle of Man under Nos. (i), (iii) and (iv).]

#### The Bahama Islands
"Subject to the following reservation in respect of paragraphs 2 and 3 of article 17 of the Convention:

"Refugees and their dependants would normally be subject to the same laws and regulations relating generally to the employment of non-Bahamians within the Commonwealth of the Bahama Islands, so long as they have not acquired Bahamian status."

**Notes:**

1   *Official Records of the General Assembly, Fifth Session, Supplement No. 20 (A/1775),*  p.48.

2   The former Yugoslavia had signed and ratified the Convention on 28 July 1951 and 15 December 1959, respectively declaring that it considered itself bound by alternative (b) of Section B(1) of the Convention.. See also note 1 under "Bosnia and Herzegovina", "Croatia", "former Yugoslavia", "Slovenia", "The Former Yugoslav Republic of Macedonia" and "Yugoslavia" in the "Historical Information" section in the front matter of this volume.

3   On 27 April 1999, the Government of Portugal informed the Secretary-General that the Convention would apply to Macau.  Subsequently, on 18 November and 3 December 1999, the Secretary-General received communications concerning the status of Macao from the Governments of China and Portugal (see also note 3 under "China" and note 1 under "Portugal" regarding Macao in the "Historical Information" section in the front matter of this volume). Upon resuming the exercise of sovereignty over Macao, China notified the Secretary-General that the Convention with the reservation made by China will also apply to the Macao Special Administrative Region.

4   Czechoslovakia had acceded to the Convention on 26 November 1991 declaring that it considered itself bound by alternative (b) of Section B (1) of the Convention. See also note 1 under "Czech Republic" and note 1 under "Slovakia" in the "Historical Information" section in the front matter of this volume.

5   See note 1 under "Germany" regarding Berlin (West) in the "Historical Information" section in the front matter of this volume.

6   The German Democratic Republic had acceded to the Convention on 4 September 1990 choosing alternative (b) of Section B (1) of the Convention.  See also note 2 under "Germany" in the "Historical Information" section in the front matter of this volume.

7   Upon notifying its succession (29 November1978) the Government of Suriname informed the Secretary-General that the Republic of Suriname did not succeed to the reservations formulated on 29 July 1951 by the Netherlands when the Convention and Protocol relating to the Status of Refugees were extended to Suriname.

8   In a declaration contained in the notification of succession to the Convention, the Government of Tuvalu confirmed that it regards the Convention [. . .] as continuing in force subject to reservations previously made by the Government of the United Kingdom of Great Britain and Northern Ireland in relation to the Colony of the Gilbert and Ellice Islands.

9   The instrument of accession was accompanied by the following communication:

"Having transmitted to the Secretary-General the Instrument of Accession of Ukraine simultaneously to the 1951 Convention and 1967 Protocol relating to the status of refugees, and in view of the fact that the Protocol provides in article I (2) that "the term 'refugee' shall...mean any person within the definition of article 1 of the Convention as if the words 'As result of events occurring before 1 anuary 1951 and...'and the words '...as a result of such events' in article 1 A (2) were omitted" and thus modifies in effect the provisions of article 1 of the Convention, it is the position of the Government of Ukraine that no separate declaration under article 1 B (1) of the Convention is required in the circumstances."

10   The formality was effected by the Yemen Arab Republic. See also note 1 under "Yemen" in the "Historical Information" section in the front matter of this volume.

11   States having previously specified alternative (a) under section B (1) of article 1.

12   Notifications of the extension of their obligations under the Convention by adopting alternative (b) of section B (1) of article 1 of the Convention were received by the Secretary-General on the dates indicated:

| Participant | Date of notification | | |
|---|---|---|---|
| Argentina | 5 | Nov | 1984 |
| Australia | 1 | Dec | 1967 |
| Benin | 6 | Jul | 1970 |
| Brazil | 14 | Feb | 1990 |
| Cameroon | 29 | Dec | 1961 |
| Central African Republic | 15 | Oct | 1962 |
| Chile | 28 | Jan | 1972 |
| Colombia | 10 | Oct | 1961 |
| Côte d'Ivoire | 20 | Dec | 1966 |
| Ecuador | 1 | Feb | 1972 |
| France | 3 | Feb | 1971 |
| Holy See | 17 | Nov | 1961 |
| Hungary | 8 | Jan | 1998 |
| Iran (Islamic Republic of) | 27 | Sep | 1976 |
| Italy | 1 | Mar | 1990 |
| Latvia | 3 | Nov | 1997 |
| Luxembourg | 22 | Aug | 1972 |
| Malta | 17 | Jan | 2002 |
| Niger | 7 | Dec | 1964 |
| Paraguay | 10 | Jan | 1991 |
| Peru | 8 | Dec | 1980 |
| Portugal | 13 | Jul | 1976 |
| Senegal | 12 | Oct | 1964 |
| Sudan | 7 | Mar | 1974 |
| Togo | 23 | Oct | 1962 |

13   On 21 January 1983, the Secretary-General received from the Government of Botswana the following communication:

"Having simultaneously acceded to the Convention and Protocol [relating to the status of refugees done at New York on 31January 1967] on the 6th January 1969 and in view of the fact that the Protocol provides in article I (2) that the term 'refugee' shall ...mean any person within the definition of article 1 of the Convention' as if the words `As result of events occurring before 1 January 1951 and' . . . and the words `. . . as a result of such events', in article [I(A)(2)] were omitted and thus modifies in effect the provisions of article 1 of the Convention, it is the position of the Government of Botswana that no separate declaration under article 1.B(1) of the Convention is required in the circumstances."

On the basis of the afore-mentioned communication, the Secretary-General has included Botswana in the list of States having chosen formula (b) under section B of article 1.

Subsequently, in a communication, received by the Secretary-General on 29 April 1986, and with reference to article 1 B (1) of the above-mentioned Convention, the Government of Botswana confirmed that it has no objection to be listed among the States applying the Convention without any geographical limitation.

[14]   The instrument of accession contains the following declaration:

"... The mandatory declaration specifying which of the two meanings in Article 1 (B) (l) a Contracting State applies for the purpose of its obligations under the Convention has been superseded by the provisions of Article 1 of the Protocol Relating to the Status of Refugees of 31 January 1967. Furthermore, the previous date-line would render Malawi's accession nugatory.

"Consequently, and since [the Government of the Republic of Malawi] is simultaneously acceding to the said Protocol, the obligations hereby assumed by the Government of the Republic of Malawi are not limited by the previous dateline or bounded by the concomitant geographic limitation in the Convention."

On the basis of the above declaration, the Secretary-General has included Malawi in the list of States having chosen formula (b) under section B of article 1.

Further, on 4 February 1988, the Secretary-General received the following declaration from the Government of Malawi:

"When making the declaration under Section B of article 1 of the Convention, the Government of the Republic of Malawi intended and intends to apply the Convention and the Protocol thereto liberally in the lines of article 1 of the Protocol without being bounded by the geographic limitation or the dateline specified in the Convention.

"In the view of the Government of the Republic of Malawi the formula in the Convention is static and the Government of the Republic of Malawi's position, as stated, merely seeks to assist in the progressive development of international law in this area as epitomised by the 1967 Protocol. It is therefore the view of the Government of the Republic of Malawi that the declaration is consistent with the objects and purposes of the Convention and it entails the assumption of obligation beyond but perfectly consistent with those of the Convention and the Protocol thereto."

In view of the said declaration, Malawi remains listed among those States which, in accordance with Section B of article 1 of the Convention, will apply the said Convention to events occurring in Europe or elsewhere before 1 January 1951.

[15]   In a communication received on 1 December 1967, the Government of Australia notified the Secretary-General of the withdrawal of the reservations to articles 17, 18, 19, 26 and 32, and, in a communication received by the Secretary-General on 11 March 1971, of the withdrawal of the reservation to paragraph 1 of article 28 of the Convention. For the text of those reservations, see United Nations, *Treaty Series*, vol.189, p.202.

[16]   These reservations replace those made at the time of signature. For the text of reservations made on signature, see United Nations, *Treaty Series*, vol.189, p.186.

[17]   On 7 April 1972, upon its accession to the Protocol relating to the Status of Refugees done at New York on 31 January 1967, the Government of Brazil withdraws its reservations excluding articles 15 and 17, paragraphs 1 and 3, from its application to the Convention. For the text of the said reservations, see United Nations, *Treaty Series*, vol. 380, p.430.

[18]   On notifying its succession to the Convention, the Government of Cyprus confirmed the reservations made at the time of the extension of the Convention to its territory by the Government of the United Kingdom of Great Britain and Northern Ireland. For the text of these reservations, see *"Declarations and reservations made upon notification of territorial application"* under United Kingdom.

[19]   In a communication received on 23 August 1962, the Government of Denmark informed the Secretary-General of its decision to withdraw as from 1 October 1961 the reservation to article 14 of the Convention.

In a communication received on 25 March 1968, the Government of Denmark informed the Secretary-General of its decision to withdraw as from that date the reservations made on ratification to paragraphs 1, 2 and 3 of article 24 and partially the reservation made on ratification to article 17 by rewording the said reservation. For the text of the reservations originally formulated by the Government of Denmark on ratification, see United Nations, *Treaty Series*, vol.189, p.198.

[20]   On 7 October 2004, the Government of Finland informed the Secretary-General of the following:

"WHEREAS the Instrument of Accession contained reservations, inter alia, to Article 7, paragraph 2; Article 8; Article 12, paragraph 1; Article 24, paragraph 1 (b) and paragraph 3; Article 25 and Article 28, paragraph 1 in the Convention;

NOW THEREFORE the Government of the Republic of Finland do hereby withdraw the said reservations, while the general reservation concerning nationals of Denmark, Iceland, Norway and Sweden and the reservation on Article 24, paragraph 3, will remain."

The original reservations made upon accession, read as follows:

"[S]ubject to the following reservations:   (1)
A general reservation to the effect that the application of those provisions of the Convention which grant to refugees the most favourable treatment accorded to nationals of a foreign country shall not be affected by the fact that special rights and privileges are now or may in future be accorded by Finland to the nationals of Denmark, Iceland, Norway and Sweden or to the nationals of any one of those Countries;

(2)   A reservation to article 7, paragraph 2, to the effect that Finland is not prepared, as a general measure, to grant refugees who fulfil the conditions of three years residence in Finland an exemption from any legislative reciprocity which Finnish law

may have stipulated as a condition governing an alien's eligibility for same right or privilege;

(3)   A reservation to article 8 to the effect that that article shall not be binding on Finland;

(4)   A reservation to article 12, paragraph 1, to the effect that the Convention shall not modify the rule of Finnish private international law, as now in force, under which the personal status of a refugee is governed by the law of his country of nationality;

(5)   A reservation to article 24, paragraph 1 (b) and paragraph 3 to the effect that they shall not be binding on Finland;

(6)   A reservation to article 25,ffect that Finland does not consider itself bound to cause a certificate to be delivered by a Finnish authority, in the place of the authorities of a foreign country, if the documentary records necessary for the delivery of such certificate do not exist in Finland;

(7)   A reservation with respect to the provisions contained in paragraph 1 of article 28.   Finland does not accept the obligations stipulated in the said paragraph, but is prepared to recognize travel documents issued by other Contracting States pursuant to this article."

21   On notifying its succession to the Convention, the Government of Gambia confirmed the reservations made at the time of the extension of the Convention to its territory by the Government of the United Kingdom of Great Britain and Northern Ireland.

22   In a communication received by the Secretary-General on 19 April 1978, the Government of Greece declared that it withdrew the reservations that it had made upon ratification pertaining to articles 8, 11, 13, 24 (3), 26, 28, 31, 32 and 34, and also the objection contained in paragraph 6 of the relevant declaration of reservations by Greece is also withdrawn.

Subsequently, in a notification received on 27 February 1995, the Government of Greece notified the Secretary-General that it had decided to withdraw its reservation to article 17 made upon ratification. For the text of the reservations and objection so withdrawn, see United Nations, *Treaty Series* , vol. 354, p.402.

23   In a communication received on 26 April 2007, the Government of the Republic of Guatemala notified the Secretary-General that it has decided to withdraw the reservation and declaration made upon accession to the Convention.  The text of the reservation and declaration withdrawn reads as follows:

The Republic of Guatemala accedes to the Convention relating to the Status of Refugees and its Protocol, with the reservation that it will not apply provisions of those instruments in respect of which the Convention allows reservations if those provisions contravene constitutional precepts in Guatemala or norms of public order under domestic law.

The expression "treatment as favourable as possible" in all articles of the Convention and of the Protocol in which the expression is used should be interpreted as not including rights which, under law or treaty, the Republic of Guatemala has accorded or is according to nationals of the Central American

countries or of other countries with which it has concluded or is entering into agreements of a regional nature.

24   On 29 May 2013, the Government of Honduras informed the Secretary-General that it had decided to withdraw the following reservations to articles 24, 26 and 31 of the Convention made upon accession:

(c)   With respect to article 24:

The Government of Honduras shall apply this article to the extent that it does not violate constitutional provisions governing labour, administrative or social security legislation in force in the country;

(d)   With respect to articles 26 and 31:

The Government of Honduras reserves the right to designate, change or limit the place of residence of certain refugees or groups of refugees and to restrict their freedom of movement when national or international considerations so warrant;

25   In a communication received on 23 October 1968, the Government of Ireland notified the Secretary-General of the withdrawal of two of its reservations in respect of article 29 (1), namely those indicated at (a) and (b) of paragraph 5 of declarations and reservations contained in the instrument of accession by the Government of Ireland to the Convention; for the text of the withdrawn reservations, see United Nations, *Treaty Series* , vol. 254, p.412.

26   In a communication received on 20 October 1964, the Government of Italy has notified the Secretary-General that "it withdraws the reservations made at the time of signature, and confirmed at the time of ratification, to articles 6, 7, 8, 19, 22, 23, 25 and 34 of the Convention [see United Nations,  *Treaty Series* , vol.189, p. 192]. The above-mentioned reservations are inconsistent with the internal provisions issued by the Italian Government since the ratification of the Convention.  The Italian Government also adopted in December 1963 provisions which implement the contents of paragraph 2 of article 17".

Furthermore, the Italian Government confirms that "it maintains its declaration made in accordance with section B (1) of article 1, and that it recognizes the provisions of articles 17 and 18 as recommendations only".  *(See also note 12 .)*

Subsequently, in a communication received on 1 March 1990, the Government of Italy notified the Secretary-General that it had decided to withdraw the declaration by which the provisions of articles 17 and 18 were recognized by it as recommendations only.  For the complete text of the reservations see United Nations, *Treaty Series* , vol. 189, p.192.

27   On 13 October 2009, the Government of Liechtenstein informed the Secretary-General that it had decided to withdraw the reservations concerning articles 17 and 24 of the Convention made upon Ratification. The texts of the reservations withdrawn read as follows:

Ad article 17: With respect to the right to engage in wage-earning employment, refugees are treated in law on the same footing as aliens in general, on the understanding, however, that

the competent authorities shall make every effort insofar as possible, to apply to them the provisions of this article.

Ad article 24, paragraph 1(a) and (b), and paragraph 3: Provisions relating to aliens in general on training, apprenticeship, unemployment insurance, old-age and survivors insurance shall be applicable to refugees. Nevertheless, in the case of old-age and survivors insurance, refugees residing in Liechtenstein (including their survivors if the latter are considered as refugees) are already entitled to normal old-age or survivors' benefits after paying their contributions for at least one full year, provided that they have resided in Liechtenstein for ten years – of which five years without interruption have immediately preceded the occurrence of the event insured against. Moreover, the one-third reduction in benefits provided in the case of aliens and stateless persons under article 74 of the Act on Old-Age and Survivors Insurance, is not applicable to refugees. Refugees residing in Liechtenstein who, on the occurrence of the event insured against, are not entitled to old-age or survivors' benefits, are paid not only their own contributions but any contributions which may have been made by the employers.

28    The instrument of accession deposited by the Government of Malta was accompanied by the following reservation:

"Article 7, paragraph 2, articles 14, 23, 27 and 28 shall not apply to Malta, and article 7, paragraphs 3, 4 and 5, articles 8, 9, 11, 17, 18, 31, 32 and 34 shall apply to Malta compatibly with its own special problems, its peculiar position and characteristics."

On 17 January 2002, the Secretary-General received the following communication from the Government of Malta:

"The Government of Malta.....hereby withdraws the reservations relating to article 7 (2), Articles 14, 27, 28, 7 (3)(4), (5), 8, 9, 17, 18, 31 and 32; ... and confirms that: "Article 23 shall not apply to Malta, and articles 11, and 34 shall apply to Malta compatibly with and with its own special problems, its peculiar position and characteristics." Further, on 24 February 2004, the Secretary-General received from the Government of Malta, the following communication:

[The Government of Malta] "declare that the Government of Malta, having reviewed the remaining reservations and declaration, hereby withdraws the reservations relating to Article 23, and the reservations in respect of Articles 11 and 34 wherein these applied to Malta compatibly with its own special problems, its peculiar positions and characteristics."

29    On 11 July 2014, the Government of Mexico notified the Secretary-General of the partial withdrawal of the reservation made upon accession. The portion of the reservation which has been withdrawn read as follows:

The Government of Mexico lodges an express reservation to article 32 of the Convention and, therefore refers to the application of article 33 of the Political Constitution of the United Mexican States, without prejudice to observance of the principle of *non-refoulement* set forth in article 33 of the Convention.

30    In a communication received by the Secretary-General on 21 January 1954, the Government of Norway gave notice of the withdrawal, with immediate effect, of the reservation to article 24 of the Convention, "as the Acts mentioned in the said reservation have been amended to accord to refugees lawfully staying in the country the same treatment as is accorded to Norwegian nationals". For the text of that reservation, see United Nations, *Treaty Series* , vol.189, p.198.

31    On 20 August 2013, the Government of the Independent State of Papua New Guinea notified the Secretary-General, in accordance with article 42 (2) of the Convention, of its decision to partially withdraw its reservation made upon accession:

"… In accordance with article 42, paragraph 2 of the Convention, I wish to communicate to you that Papua New Guinea withdraws its reservation with respect to the provisions contained in articles 17 (1), 21, 22 (1), 26, 31, 32 and 34 of the Convention in relations to refugees transferred by the Government of Australia to Papua New Guinea and accepts the obligations stipulated in these articles in relation to such persons. This withdrawal has immediate effect. The reservation remains in effect for all other persons…"

32    The text, which was communicated in a notification received on 13 July 1976, replaces the reservations originally made by Portugal upon accession.  For the text of the reservations withdrawn, see United Nations, *Treaty Series* , vol. 383, p.314.

33    In a communication received on 1 September 2009, the Government of the Republic of Korea notified the Secretary-General that it has decided to withdraw the reservation in respect to article 7 made upon accession to the Convention as of 8 September 2009.  The text of the reservation withdrawn reads as follows:

"The Republic of Korea declares pursuant to article 42 of the Convention that it is not bound by article 7 which provides for the exemption of refugees from legislative reciprocity after fulfilling the condition of three years' residence in the territory of the Contracting States."

34    In a communication received on 20 April 1961, the Government of Sweden gave notice of the withdrawal, as from 1 July 1961, of the reservation to article 14 of the Convention.

In a communication received on 25 November 1966, the Government of Sweden has notified the Secretary-General that it has decided, in accordance with paragraph 2 of article 42 of the Convention, to withdraw some of its reservations to article 24, paragraph 1 (b), by rewording them and to withdraw the reservation to article 24, paragraph 2.

In a communication received on 5 March 1970, the Government of Sweden notified the Secretary-General of the withdrawal of its reservation to article 7, paragraph 2, of the Convention.

For the text of the reservations as originally formulated by the Government of Sweden upon ratification, see United Nations, *Treaty Series* , vol. 200, p. 336.

35    In a communication received on 18 February 1963, the Government of Switzerland gave notice to the Secretary-General of the withdrawal of the reservation made at the time of ratification to article 24, paragraph 1 (a) and (b) and paragraph

3, of the Convention, in so far as that reservation concerns old-age and survivors' insurance.

In a communication received on 3 July 1972, the Government of Switzerland gave notice of its withdrawal of the reservation to article 17 formulated in its instrument of ratification of the Convention.

In a communication received on 17 December 1980, the Government of Switzerland gave notice of its withdrawal, in its entirety, of the subsisting reservation formulated in respect of article 24, number 1, letters a and b, which encompasses training, apprenticeship and unemployment insurance with effect from 1 January 1981, date of entry into force of the Swiss Law on Asylum of 5 October 1979. For the text of the reservations made initially, see United Nations, *Treaty Series* , vol. 202, p. 368.

36   See succession by Jamaica.

37   See succession by Kenya.

38   In a letter addressed to the Secretary-General on 22 March 1968, the President of the Republic of Malawi, referring to the Convention relating to the Status of Refugees, done at Geneva on 28 July 1951, stated the following:

"In my letter to you of the 24th November 1964, concerning the disposition of Malawi's inherited treaty obligations, my Government declared that with respect to multilateral treaties which had been applied or extended to the former Nyasaland Protectorate, any Party to such a treaty could on the basis of reciprocity rely as against Malawi on the terms of such treaty until Malawi notified its depositary of what action it wished to take by way of confirmation of termination, confirmation of succession, or accession.

"I am now to inform you as depositary of this Convention that the Government of Malawi wishes to terminate any connection with this Convention which it might have inherited. The Government of Malawi considers that any legal relationship with the aforementioned Convention relating to the Status of Refugees, Geneva, 1951 which might have devolved upon it by way of succession from the ratification of the United Kingdom, is terminated as of this date."

See succession by Zambia.

39   See succession by Botswana (formerly Bechuanaland Protectorate).

40   On 3 October 1983, the Secretary-General received from the Government of Argentina the following objection :

[The Government of Argentina makes a] formal objection to the declaration of territorial extension issued by the United Kingdom with regard to the Malvinas Islands (and dependencies), which that country is illegally occupying and refers to as the "Falkland Islands".

The Argentine Republic rejects and considers null and void the [declaration] of territorial extension.

With reference to the above-mentioned objection the Secretary-General received, on 28 February 1985, from the Government of the United Kingdom of Great Britain and Northern Ireland the following declaration:

"The Government of the United Kingdom of Great Britain and Northern Ireland have no doubt as to their right, by notification to the Depositary under the relevant provisions of the above-mentioned Convention, to extend the application of the Convention in question to the Falkland Islands or to the Falkland Islands Dependencies, as the case may be.

For this reason alone, the Government of the United Kingdom are unable to regard the Argentine [communication] under reference as having any legal effect."

41   See note 1 under "United Kingdom of Great Britain and Northern Ireland" in the "Historical Information" section in the front matter of this volume.

42   See succession by Fiji.

AR580

## 5. PROTOCOL RELATING TO THE STATUS OF REFUGEES

### *New York, 31 January 1967*

| | |
|---|---|
| **ENTRY INTO FORCE:** | 4 October 1967, in accordance with article VIII. |
| **REGISTRATION:** | 4 October 1967, No. 8791. |
| **STATUS:** | Parties: 147. |
| **TEXT:** | United Nations, *Treaty Series* , vol. 606, p. 267. |

*Note:* On the recommendation of the Executive Committee of the Programme of the United Nations High Commissioner for Refugees, the High Commissioner submitted the draft of the above-mentioned Protocol to the General Assembly of the United Nations, through the Economic and Social Council, in the addendum to his report concerning measures to extend the personal scope of the Convention relating to the Status of Refugees. The Economic and Social Council, in resolution 1186 (XLI)[1] of 16 november 1966, took note with approval of the draft Protocol and transmitted the said addendum to the General Assembly. The General Assembly, in resolution 2198 (XXI)[2] of 16 December 1966, took note of the Protocol and requested the Secretary-General "to transmit the text of the Protocol to the States mentioned in article V thereof, with a view to enabling them to accede to the Protocol."

| Participant | Accession(a), Succession(d) | Participant | Accession(a), Succession(d) |
|---|---|---|---|
| Afghanistan | 30 Aug 2005 a | Chad | 19 Aug 1981 a |
| Albania | 18 Aug 1992 a | Chile | 27 Apr 1972 a |
| Algeria | 8 Nov 1967 a | China[6] | 24 Sep 1982 a |
| Angola | 23 Jun 1981 a | Colombia | 4 Mar 1980 a |
| Antigua and Barbuda | 7 Sep 1995 a | Congo | 10 Jul 1970 a |
| Argentina | 6 Dec 1967 a | Costa Rica | 28 Mar 1978 a |
| Armenia | 6 Jul 1993 a | Côte d'Ivoire | 16 Feb 1970 a |
| Australia[3,4] | 13 Dec 1973 a | Croatia[5] | 12 Oct 1992 d |
| Austria | 5 Sep 1973 a | Cyprus | 9 Jul 1968 a |
| Azerbaijan | 12 Feb 1993 a | Czech Republic[7] | 11 May 1993 d |
| Bahamas | 15 Sep 1993 a | Democratic Republic of the Congo | 13 Jan 1975 a |
| Belarus | 23 Aug 2001 a | Denmark[4] | 29 Jan 1968 a |
| Belgium | 8 Apr 1969 a | Djibouti | 9 Aug 1977 d |
| Belize | 27 Jun 1990 a | Dominica | 17 Feb 1994 a |
| Benin | 6 Jul 1970 a | Dominican Republic | 4 Jan 1978 a |
| Bolivia (Plurinational State of) | 9 Feb 1982 a | Ecuador | 6 Mar 1969 a |
| Bosnia and Herzegovina[5] | 1 Sep 1993 d | Egypt | 22 May 1981 a |
| Botswana | 6 Jan 1969 a | El Salvador | 28 Apr 1983 a |
| Brazil | 7 Apr 1972 a | Equatorial Guinea | 7 Feb 1986 a |
| Bulgaria | 12 May 1993 a | Estonia | 10 Apr 1997 a |
| Burkina Faso | 18 Jun 1980 a | Eswatini | 28 Jan 1969 a |
| Burundi | 15 Mar 1971 a | Ethiopia | 10 Nov 1969 a |
| Cabo Verde | 9 Jul 1987 a | Fiji | 12 Jun 1972 d |
| Cambodia | 15 Oct 1992 a | Finland | 10 Oct 1968 a |
| Cameroon | 19 Sep 1967 a | France[4] | 3 Feb 1971 a |
| Canada | 4 Jun 1969 a | Gabon | 28 Aug 1973 a |
| Central African Republic | 30 Aug 1967 a | Gambia | 29 Sep 1967 a |

| Participant | Accession(a), Succession(d) |
|---|---|
| Georgia | 9 Aug 1999 a |
| Germany[8,9] | 5 Nov 1969 a |
| Ghana | 30 Oct 1968 a |
| Greece | 7 Aug 1968 a |
| Guatemala | 22 Sep 1983 a |
| Guinea | 16 May 1968 a |
| Guinea-Bissau | 11 Feb 1976 a |
| Haiti | 25 Sep 1984 a |
| Holy See | 8 Jun 1967 a |
| Honduras | 23 Mar 1992 a |
| Hungary | 14 Mar 1989 a |
| Iceland | 26 Apr 1968 a |
| Iran (Islamic Republic of) | 28 Jul 1976 a |
| Ireland | 6 Nov 1968 a |
| Israel | 14 Jun 1968 a |
| Italy | 26 Jan 1972 a |
| Jamaica | 30 Oct 1980 a |
| Japan | 1 Jan 1982 a |
| Kazakhstan | 15 Jan 1999 a |
| Kenya | 13 Nov 1981 a |
| Kyrgyzstan | 8 Oct 1996 a |
| Latvia | 31 Jul 1997 a |
| Lesotho | 14 May 1981 a |
| Liberia | 27 Feb 1980 a |
| Liechtenstein | 20 May 1968 a |
| Lithuania | 28 Apr 1997 a |
| Luxembourg | 22 Apr 1971 a |
| Malawi | 10 Dec 1987 a |
| Mali | 2 Feb 1973 a |
| Malta | 15 Sep 1971 a |
| Mauritania | 5 May 1987 a |
| Mexico | 7 Jun 2000 a |
| Monaco | 16 Jun 2010 a |
| Montenegro | 10 Oct 2006 d |
| Morocco | 20 Apr 1971 a |
| Mozambique | 1 May 1989 a |
| Namibia | 17 Feb 1995 a |
| Nauru | 28 Jun 2011 a |
| Netherlands[4,10] | 29 Nov 1968 a |
| New Zealand | 6 Aug 1973 a |
| Nicaragua | 28 Mar 1980 a |
| Niger | 2 Feb 1970 a |
| Nigeria | 2 May 1968 a |
| North Macedonia[5] | 18 Jan 1994 d |
| Norway | 28 Nov 1967 a |
| Panama | 2 Aug 1978 a |
| Papua New Guinea | 17 Jul 1986 a |
| Paraguay | 1 Apr 1970 a |
| Peru | 15 Sep 1983 a |
| Philippines | 22 Jul 1981 a |
| Poland | 27 Sep 1991 a |
| Portugal[6] | 13 Jul 1976 a |
| Republic of Korea | 3 Dec 1992 a |
| Republic of Moldova | 31 Jan 2002 a |
| Romania | 7 Aug 1991 a |
| Russian Federation | 2 Feb 1993 a |
| Rwanda | 3 Jan 1980 a |
| Samoa | 29 Nov 1994 a |
| Sao Tome and Principe | 1 Feb 1978 a |
| Senegal | 3 Oct 1967 a |
| Serbia[5] | 12 Mar 2001 d |
| Seychelles | 23 Apr 1980 a |
| Sierra Leone | 22 May 1981 a |
| Slovakia[7] | 4 Feb 1993 d |
| Slovenia[5] | 6 Jul 1992 d |
| Solomon Islands | 12 Apr 1995 a |
| Somalia | 10 Oct 1978 a |
| South Africa | 12 Jan 1996 a |
| South Sudan | 10 Dec 2018 a |
| Spain | 14 Aug 1978 a |
| St. Vincent and the Grenadines | 3 Nov 2003 a |
| Sudan | 23 May 1974 a |
| Suriname[11] | 29 Nov 1978 d |
| Sweden | 4 Oct 1967 a |
| Switzerland | 20 May 1968 a |
| Tajikistan | 7 Dec 1993 a |
| Timor-Leste | 7 May 2003 a |
| Togo | 1 Dec 1969 a |
| Trinidad and Tobago | 10 Nov 2000 a |
| Tunisia | 16 Oct 1968 a |
| Turkey | 31 Jul 1968 a |
| Turkmenistan | 2 Mar 1998 a |
| Tuvalu | 7 Mar 1986 d |
| Uganda | 27 Sep 1976 a |
| Ukraine | 4 Apr 2002 a |
| United Kingdom of Great Britain and Northern Ireland[4] | 4 Sep 1968 a |
| United Republic of Tanzania | 4 Sep 1968 a |
| United States of America | 1 Nov 1968 a |
| Uruguay | 22 Sep 1970 a |

| Participant | Accession(a), Succession(d) | | Participant | Accession(a), Succession(d) | |
|---|---|---|---|---|---|
| Venezuela (Bolivarian Republic of) | 19 Sep | 1986 a | Zambia | 24 Sep | 1969 a |
| Yemen[12] | 18 Jan | 1980 a | Zimbabwe | 25 Aug | 1981 a |

### *Declarations and Reservations*
### *(Unless otherwise indicated, the declarations and reservations were made upon accession or succession.)*

#### ANGOLA

The Government of Angola, in accordance with article VII, paragraph 1, declares that it does not consider itself bound by article IV of the Protocol, concerning settlement of disputes relating to the interpretation of the Protocol.

#### BOTSWANA

"Subject to the reservation in respect of article IV of the said Protocol and in respect of the application in accordance with article I thereof of the provisions of articles 7, 17, 26, 31, 32 and 34 and paragraph 1 of article 12 of the Convention relating to the Status of Refugees, done at Geneva on 28 July 1951."

#### BURUNDI

In acceding to this Protocol, the Government of the Republic of Burundi enters the following reservations:
1. The provisions of article 22 are accepted, in respect of elementary education, only
(a) In so far as they apply to public education, and not to private education;
(b) On the understanding that the treatment applicable to refugees shall be the most favourable accorded to nationals of other States.
2. The provisions of article 17 (1) and (2) are accepted as mere recommendations and, in any event, shall not be interpreted as necessarily involving the régime accorded to nationals of countries with which the Republic of Burundi may have concluded regional, customs, economic or political agreements.
3. The provisions of article 26 are accepted only subject to the reservation that refugees:
(a) Do not choose their place of residence in a region bordering on their country of origin;
(b) Refrain, in any event, when exercising their right to move freely, from any activity or incursion of a subversive nature with respect to the country of which they are nationals.

#### CABO VERDE

In all cases where the 1951 Convention relating to the Status of Refugees grants to refugees the most favorable treatment accorded to nationals of a foreign country, this provision shall not be interpreted as involving the régime accorded to nationals of countries with which Cape Verde has concluded regional, customs, economic or political agreements.

#### CHILE

*[See chapter V.2.]*

#### CHINA

With a reservation in respect of article 4.

#### CONGO

The Protocol is accepted with the exception of article IV.

#### EL SALVADOR

With the reservation that the Government of El Salvador will not apply article 4 of the Protocol.

#### ESWATINI

Subject to the following reservations in respect of the application of the Convention relating to the Status of Refugees, done at Geneva on 28 July 1951, under article I of the Protocol:
"(1) The Government of the Kingdom of Swaziland is not in a position to assume obligations as contained in article 22 of the said Convention, and therefore will not consider itself bound by the provisions therein;
(2) Similarly, the Government of the Kingdom of Swaziland is not in a position to assume the obligations of article 34 of the said Convention, and must expressly reserve the right not to apply the provisions therein."
"The Government of the Kingdom of Swaziland deems it essential to draw attention to the accession as a Member of the United Nations, and not as a Party to the [Convention relating to the Status of Refugees] by reason of succession or otherwise."

#### ETHIOPIA

*[See chapter V.2.]*

#### FINLAND

*[See chapter V.2.]*

#### GHANA

"The Government of Ghana does not consider itself bound by article IV of the Protocol regarding the settlement of disputes."

#### GUATEMALA[13]

#### HONDURAS

With respect to article I (1):
The Government of the Republic of Honduras does not consider itself bound by those articles of the Convention to which it has entered reservations.

#### ISRAEL

"The Government of Israel accedes to the Protocol subject to the same statements and reservations made at the time of ratifying the Convention [relating to the Status of Refugees, done at Geneva on 28 July 1951], in accordance with the provisions of article VII (2) of the Protocol."

## JAMAICA

"[Subject] to the reservations set out below, ... [:]

1. The Government of Jamaica understands articles 8 and 9 of the Convention as not preventing it from taking, in time of war or other grave and exceptional circumstances, measures in the interest of national security in the case of a refugee on the ground of his nationality.

2. The Government of Jamaica can only undertake that the provisions of paragraph 2 of article 17 of the Convention will be applied so far as the law of Jamaica allows.

3. The Government of Jamaica can only undertake that the provisions of article 24 of the Convention will be applied so far as the law of Jamaica allows.

4. The Government of Jamaica can only undertake that the provisions of paragraphs l, 2, and 3 of article 25 of the Convention will be applied so far as the law of Jamaica allows.

5. The Government of Jamaica does not accept the obligation imposed by article IV of the Protocol relating to the Status of Refugees with regard to the settlement of disputes."

## LATVIA

"Declaration

In accordance with paragraph 2 of the article VII of the [said Protocol], the Republic of Latvia declares that the reservations made in accordance with article 41 of the Convention Relating to the Status of Refugees of 1951 are applicable in relation to the obligations under the Protocol."

*[See chapter V.2.]*

## LUXEMBOURG

*[See chapter V.2.]*

## MALAWI

"The Government of the Republic of Malawi reiterates its declaration on recognition as compulsory the jurisdiction of the International Court of Justice made on 12 December, 1966 in conformity with Article 36, paragraph 2 of the Statute of the Court. In this respect, the Government of the Republic of Malawi regards the phrase `settled by other means' in Article 38 of the Convention and Article IV of the Protocol to be those means stipulated in Article 33 of the Charter of the United Nations."

## MALTA

In accordance with article VII (2), the reservations to the Convention relating to the Status of Refugees of 28 July 1951 by the Government of Malta on deposit of its instrument of accession on 17 June 1971, pursuant to article 42 of the said Convention, are applicable in relation to its obligations under the present Protocol.

## NETHERLANDS[10]

"In accordance with article VII of the Protocol, all reservations made by the Kingdom of the Netherlands upon signature and ratification of the Convention relating to the Status of Refugees, which was signed in Geneva on 28 July 1951, are regarded to apply to the obligations resulting from the Protocol."

## PERU

[The Government of Peru] hereby expressly declares, with reference to the provisions of article I, paragraph 1, and article II of the aforementioned Protocol, that compliance with the obligations undertaken by virtue of the act of accession to that instrument shall be ensured by the Peruvian State using all the means at its disposal, and the Government of Peru shall endeavour in all cases to co-operate as far as possible with the Office of the United Nations High Commissioner for Refugees.

## PORTUGAL

"1. The Protocol will be applied without any geographical limitation.

2. In all cases in which the Protocol confers upon the refugees the most favoured person status granted to nationals of a foreign country, this clause will not be interpreted in such a way as to mean the status granted by Portugal to the nationals of Brazil or to the nationals of other countries with whom Portugal may establish commonwealth type relations."

## REPUBLIC OF KOREA[14]

## RWANDA

For the settlement of any dispute between States Parties, recourse may be had to the International Court of Justice only with the prior agreement of the Rwandese Republic.

## SOMALIA

*[See chapter V.2.]*

## ST. VINCENT AND THE GRENADINES

"In accordance with the provisions of Article VII paragraph 1 of the aforesaid Protocol, however, the Government of Saint Vincent and the Grenadines makes a reservation with respect to Articles IV of the Protocol that, for the submission of any dispute in terms of that article to the jurisdiction of the International Court of Justice, the express consent of all the parties to the dispute is required in each case."

## TIMOR-LESTE

"In conformity with Article VII and I of the Protocol, the Democratic Republic of Timor-Leste accedes to the Protocol, with the understanding that it has made reservations to Articles 16 (2), 20, 21, 22, 23 and 24 of the Convention relating to the Status of Refugees adopted by the General Assembly of the United Nations on the 28 July, 1951."

## TURKEY

The instrument of accession stipulates that the Government of Turkey maintains the provisions of the declaration made under section B of article 1 of the Convention relating to the Status of Refugees, done at Geneva on 28 July 1951, according to which it applies the Convention only to persons who have become refugees as a result of events occurring in Europe, and also the reservation clause made upon ratification of the Convention to the effect that no provision of this Convention may be interpreted as granting to refugees greater rights than those accorded to Turkish citizens in Turkey.

## UGANDA

*[See chapter V.2.]*

#### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

"(a) In accordance with the provisions of the first sentence of Article VII.4 of the Protocol, the United Kingdom hereby excludes from the application of the Protocol the following territories for the international relations of which it is responsible:  Jersey, Southern Rhodesia, Swaziland.

(b)  In accordance with the provisions of the second sentence of Article VII.4 of the said Protocol, the United Kingdom hereby extends the application of the Protocol to the following territories for the international relations of which it is responsible:  St. Lucia, Montserrat."

#### UNITED REPUBLIC OF TANZANIA

"Subject to the reservation, hereby made, that the provisions of Article IV of the Protocol shall not be applicable to the United Republic of Tanzania except within the explicit consent of the Government of the United Republic of Tanzania."

#### UNITED STATES OF AMERICA

With the following reservations in respect of the application, in accordance with article I of the Protocol, of the Convention relating to the Status of Refugees, done at New York on 28 July 1951:

"The United States of America construes Article 29 of the Convention as applying only to refugees who are resident in the United States and reserves the right to tax refugees who are not residents of the United States in accordance with its general rules relating to non-resident aliens.

The United States of America accepts the obligation of paragraph 1 (b) of Article 24 of the Convention except insofar as that paragraph may conflict in certain instances with any provisions of title II (old age, survivors' and disability insurance) or title XVIII (hospital and medical insurance for the aged) of the Social Security Act. As to any such provision, the United States will accord to refugees lawfully staying in its territory treatment no less favorable than is accorded aliens generally in the same circumstances."

#### VENEZUELA (BOLIVARIAN REPUBLIC OF)

In implementing the provisions of the Protocol which confer on refugees the most favourable treatment accorded to nationals of a foreign country, it shall be understood that such treatment does not include any rights and benefits which Venezuela has granted or may grant regarding entry into or sojourn in Venezuela territory to nationals of countries with which Venezuela has concluded regional or subregional integration, customs, economic or political agreements.

The instrument of accession also contains a reservation in respect of article IV.

## *Objections*
### *(Unless otherwise indicated, the objections were made upon accession or succession.)*

#### BELGIUM
*[See chapter V.2.]*

#### ETHIOPIA
*[See chapter V.2.]*

#### FRANCE
*[See chapter V.2.]*

#### GERMANY[8]
*[See chapter V.2.]*

#### ITALY
*[See chapter V.2.]*

#### LUXEMBOURG
*[See chapter V.2.]*

#### NETHERLANDS
*[See chapter V.2.]*

## *Territorial Application*

| Participant | Date of receipt of the notification | Territories |
|---|---|---|
| Netherlands[4] | 29 Jul 1971 | Suriname |
| United Kingdom of Great Britain and Northern Ireland[4,15] | 4 Sep 1968 | Montserrat and St. Lucia |
|  | 4 Sep 1968 | Exclusions: Bailiwick of Jersey, Southern Rhodesia and Swaziland |
|  | 20 Apr 1970 | Bahama Islands |
|  | 20 Feb 1996 | Jersey |

**Notes:**

1   *Official Records of the Economic and Social Council, Forty-first Session, Supplement No. 1A* (E/4264/Add.1), p. 1.

2   *Official Records of the General Assembly, Twenty-first Session, Supplement No. 16* (A/6316), p. 48.

3   With the following declaration:  "The Government of Australia will not extend the provisions of the Protocol to Papua/New Guinea."

4   In accordance with article VII (4) of the Protocol, declarations made under article 40, paragraphs 1 and 2, of the Convention (territorial application) by a State Party thereto which accedes to the Protocol shall be deemed to apply in respect of the Protocol, unless upon accession a notification to the contrary is addressed by the State Party to the Secretary-General.  See Chapter V-2.

5   The former Yugoslavia had acceded to the Protocol on 15 January 1968. See also note 1 under "Bosnia and Herzegovina", "Croatia", "former Yugoslavia", "Slovenia", "The Former Yugoslav Republic of Macedonia" and "Yugoslavia" in the "Historical Information" section in the front matter of this volume.

6   On 27 April 1999, the Government of Portugal informed the Secretary-General that the Protocol would apply to Macao. Subsequently, on 18 November and 3 December 1999, the Secretary-General received communications concerning the status of Macao from the Governments of Portugal and China (see also note 3 under "China" and note 1 under "Portugal" regarding Macao in the "Historical Information" section in the front matter of this volume). Upon resuming the exercise of sovereignty over Macao, China notified the Secretary-General that the Convention with the reservation made by China will also apply to the Macao Special Administrative Region.

7   Czechoslovakia had acceded to the Protocol on 26 November 1991. See also note 1 under "Czech Republic" and note 1 under "Slovakia" in the "Historical Information" section in the front matter of this volume.

8   The German Democratic Republic had acceded to the Protocol on 4 September 1990.  See also note 2 under "Germany" in the "Historical Information" section in the front matter of this volume.

9   See note 1 under "Germany" regarding Berlin (West) in the "Historical Information" section in the front matter of this volume.

10   The Kingdom of the Netherlands accedes to the said Protocol so far as the territory of the Kingdom situated in Europe is concerned; and, as from 1 January 1986, for Aruba.

                                        22 June 2011

Subsequently, following a modification of the internal constitutional relations within the Kingdom of the Netherlands (see note 2 under "Netherlands" in Historical Information),

effective 22 June 2011, the Protocol applies to the Caribbean part of the Netherlands (Bonaire, Sint Eustatius and Saba).

11   Upon notifying its succession (29 November 1978) the Government of Suriname informed the Secretary-General that the Republic of Suriname did not succeed to the reservations formulated on 29 July 1951 by the Netherlands when the Convention and Protocol relating to the Status of Refugees were extended to Suriname.

12   The formality was effected by the Yemen Arab Republic. See also note 1 under "Yemen" in the "Historical Information" section in the front matter of this volume.

13   In a communication received on 26 April 2007, the Government of the Republic of Guatemala notified the Secretary-General that it has decided to withdraw the reservation and declaration made upon accession to the Convention. The text of the reservation and declaration withdrawn reads as follows:

The Republic of Guatemala accedes to the Convention relating to the Status of Refugees and its Protocol, with the reservation that it will not apply provisions of those instruments in respect of which the Convention allows reservations if those provisions contravene constitutional precepts in Guatemala or norms of public order under domestic law.

The expression "treatment as favourable as possible" in all articles of the Convention and of the Protocol in which the expression is used should be interpreted as not including rights which, under law or treaty, the Republic of Guatemala has accorded or is according to nationals of the Central American countries or of other countries with which it has concluded or is entering into agreements of a regional nature.

14   In a communication received on 1 September 2009, the Government of the Republic of Korea notified the Secretary-General that it has decided to withdraw the reservation in respect to article 7 made upon accession to the Convention as of 8 September 2009.  The text of the reservation withdrawn reads as follows:

"The Republic of Korea declares pursuant to article 7 of the Protocol that it is not bound by article 7 of the Convention relating to the Status of Refugees, which provides for the exemption of refugees from legislative reciprocity after fulfilling the condition of three years' residence in the territory of the Contracting States."

15   Subject to the reservation which was formulated on behalf of the Bahama Islands in respect of the Convention relating to the Status of Refugees.



Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
Last Updated: 04 Jul 2019



Country Status

■ State Party (166)   ■ Signatory (6)   ■ No Action (25)

*Definition and meta-data: http://www.ohchr.org/Documents/Issues/HRIndicators/MetadataRatificationStatus.pdf*
*Source: Database of the United Nations Office of Legal Affairs (OLA)  https://treaties.un.org*
*For application of treaties to overseas, non-self-governing and other territories, shown here in grey, see  https://treaties.un.org*

*Note: The boundaries and the names shown and the designations used on these maps do not imply official endorsement or acceptance by the United Nations. Final boundary between the Republic of Sudan and the Republic of South Sudan has not yet been determined Dotted line represents approximately the Line of Control in Jammu and Kashmir agreed upon by India and Pakistan. The final status of Jammu and Kashmir has not yet been agreed upon by the parties.*

AR588



**U.S. Department of Justice**
**Executive Office for Immigration Review**

# Statistics Yearbook
## Fiscal Year 2017

Prepared by the Planning, Analysis, & Statistics Division

**Contact Information**
Office of Policy
Communications and Legislative Affairs Division
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041
(703) 305-0289
(703) 605-0365 (fax)

**Disclaimer**
The Statistics Yearbook has been prepared as a public service by the Executive Office for Immigration Review and is strictly informational in nature. In no way should any information in the Statistics Yearbook, in whole or in part, be regarded as legal advice or authority, or be understood in any way to enlarge upon, or otherwise modify or interpret, any existing legal authority, including, but not limited to, the Immigration and Nationality Act and Title 8 of the Code of Federal Regulations.

# TABLE OF CONTENTS

A Note on Format ................................................................................................................ 4
The Executive Office for Immigration Review ................................................................. 5
Statistics Yearbook Key Definitions................................................................................ 7
Immigration Courts ........................................................................................................... 8
    Pending Caseload ........................................................................................................... 8
    Total I-862 Matters Received and Completed .............................................................. 10
    Cases Received and Completed by Type ...................................................................... 13
    I-862 Case Completions by Decision .......................................................................... 14
    I-862 ICCs by Country of Nationality ........................................................................ 17
    I-862 ICCs by Language .............................................................................................. 18
    I-862 ICCs for Detained Cases .................................................................................... 19
    I-862 Institutional Hearing Program Cases Received and Completed ......................... 21
    I-862 ICCs with Applications for Relief ..................................................................... 22
    Asylum Cases Received and Completed ...................................................................... 24
    Asylum Cases Completed by Decision ........................................................................ 26
    Asylum Grants by Country of Nationality ................................................................... 29
    Convention Against Torture ......................................................................................... 30
    I-862 Applications for Relief other than Asylum ........................................................ 32
    I-862 *In Absentia* Orders ........................................................................................... 33
    Immigration Judge Hiring ............................................................................................ 35
Board of Immigration Appeals ....................................................................................... 36
    Total Cases Received and Completed ........................................................................... 36
    Cases Received and Completed by Type ...................................................................... 37
    Appeals from IJ Decisions Completed by Country of Nationality................................ 38
    Appeals from IJ Decisions (I-862) Completed by Representation Status ..................... 39
    Case Appeals from IJ Decision (I-862 ICCs) Completed for Detained Cases .................. 40
    IJ Decisions (I-862 ICCs) Appealed ........................................................................... 41
Office of the Chief Administrative Hearing Officer ...................................................... 42
    Total Cases Received and Completed ........................................................................... 42
Freedom of Information Act (FOIA) ............................................................................... 44
    FOIA Receipts .............................................................................................................. 44

# LISTING OF TABLES

Table 1. Immigration Courts Pending Cases ................................................................................... 9

Table 2. Total I-862 Immigration Court Matters Received by Court .......................................... 11

Table 3. Total I-862 Immigration Court Matters Completed by Court and Type ....................... 12

Table 4. Immigration Court Cases Received by Case Type .......................................................... 13

Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type ................ 13

Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision .................... 15

Table 7. FY 2017 I-862 Changes of Venue and Transfers ........................................................... 16

Table 8. I-862 ICCs by Top 25 Countries of Nationality ........................................................... 17

Table 9. I-862 ICCs by Top 25 Languages .................................................................................. 18

Table 10. FY 2017 I-862 Detained ICCs ..................................................................................... 20

Table 11. I-862 IHP ICCs by Decision ........................................................................................ 21

Table 12. FY 2017 I-862 ICCs with Applications for Relief ...................................................... 23

Table 13. Asylum ICCs by Court for FY 2017 ............................................................................ 25

Table 14. Asylum Decision Rate by Immigration Court .............................................................. 28

Table 15. Asylum Grants by Top 25 Countries of Nationality .................................................... 29

Table 16. Convention Against Torture Cases by Decision ........................................................... 30

Table 17. Convention Against Torture Completions by Court ..................................................... 31

Table 18. I-862 Cases Grants of Relief ........................................................................................ 32

Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type ......................................... 34

Table 20. BIA Receipts and Completions by Type ...................................................................... 37

Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality ..................................... 38

Table 22. BIA Detained Completions ........................................................................................... 40

AR591

# LISTING OF FIGURES

Figure 1. OCIJ Pending Caseload.................................................................................................... 8
Figure 2. BIA Pending Caseload .................................................................................................... 8
Figure 3. Total I-862 Immigration Court Matters ....................................................................... 10
Figure 4. I-862 Immigration Court Matters Received by Type ................................................... 10
Figure 5. I-862 Immigration Court Matters Completed by Type ................................................ 10
Figure 6. I-862 Case Completions ............................................................................................... 14
Figure 7. I-862 ICCs by Decision ................................................................................................ 14
Figure 8. I-862 Subsequent Case Completions by Decision ....................................................... 14
Figure 9. Administrative Closures ............................................................................................... 15
Figure 10. Total I-862 Changes of Venue and Transfers ............................................................ 15
Figure 11. I-862 ICCs by Nationality ......................................................................................... 17
Figure 12. I-862 ICCs by Language ............................................................................................ 18
Figure 13. I-862 ICCs by Detention Status ................................................................................. 19
Figure 14. I-862 Standard Detained ICCs ................................................................................... 19
Figure 15. I-862 IHP Receipts and ICCs ..................................................................................... 21
Figure 16. I-862 ICCs by Application Filling Status ................................................................... 22
Figure 17. Asylum Receipts ......................................................................................................... 24
Figure 18. Asylum Receipts and ICCs ......................................................................................... 24
Figure 19. Asylum ICCs by Decision .......................................................................................... 26
Figure 20. Affirmative and Defensive Asylum ICCs by Decision .............................................. 26
Figure 21. Administrative Closures of Asylum Cases.................................................................. 27
Figure 22. Asylum and Withholding of Removal ICCs by Decision ........................................... 27
Figure 23. Withholding of Removal ICCs by Decision ............................................................... 27
Figure 24. Asylum Grants by Country of Nationality ................................................................. 29
Figure 25. I-862 *In Absentia* Rates ............................................................................................. 33
Figure 26. Immigration Judge Hiring .......................................................................................... 35
Figure 27. Total BIA Cases Received and Completed ................................................................. 36
Figure 28. BIA Receipts and Completions by Case Type ............................................................ 37
Figure 29. Completed Appeals from IJ Decisions by Nationality................................................ 38
Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status ................. 39
Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status .................................. 40
Figure 32. I-862 ICCs Appealed to BIA ...................................................................................... 41
Figure 33. OCAHO Receipts and Completions............................................................................ 43
Figure 34. OCAHO Receipts and Completions by Type ............................................................. 43
Figure 35. FOIA Receipts .............................................................................................................44

AR592

## A NOTE ON FORMAT

Since publication of the Executive Office for Immigration Review (EOIR) fiscal year (FY) 2016 Statistics Yearbook, EOIR has reassessed the format of its annual yearbook, leading to some delay in the release of the FY 2017 Statistics Yearbook. For the FY 2017 Yearbook, EOIR has improved the graphics and the layout to make the data easier to understand. It has also endeavored to improve the precision of reported statistics and their utility for operations and public interest. Further, EOIR's ongoing public release of data reports, many of which have already reported FY 2017 data contained in the Yearbook, and the periodic public release of EOIR's overall Case Data file, which contains almost all data from FY 2017 that is otherwise presented in the Yearbook, potentially render the release of an annual yearbook obsolete. Nevertheless, EOIR anticipates releasing the FY 2018 Statistics Yearbook on a much more expeditious timetable, though its primary commitment will continue to be updates to its online data.

Please refer any questions on these improvements to EOIR's Office of Policy, Communications and Legislative Affairs Division.

# THE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

EOIR is responsible for adjudicating immigration cases. On behalf of the Attorney General, EOIR interprets and administers federal immigration laws and regulations through immigration court cases, appellate reviews, and administrative hearings in certain types of immigration-related cases. EOIR consists of three adjudicatory bodies: The Office of the Chief Immigration Judge (OCIJ), the Board of Immigration Appeals (BIA), and the Office of the Chief Administrative Hearing Officer (OCAHO).

OCIJ provides overall program direction and establishes priorities for 338 immigration judges (IJ) located in 61 immigration courts throughout the nation. The BIA hears appeals from certain decisions rendered by IJs and by district directors of Department of Homeland Security (DHS) in a wide variety of cases. OCAHO conducts hearings in civil penalty cases arising from the unlawful employment of aliens, unfair immigration-related employment practices, and civil document fraud.

Although this Statistics Yearbook addresses each of EOIR's three adjudicatory bodies, most of the data presented comes from immigration court cases. Most immigration court cases involve removal proceedings. A removal proceeding has two parts. First, an immigration judge assesses whether an alien is removable as charged under the applicable law. If an immigration judge determines that the alien is not removable, then the immigration judge will terminate proceedings.[1] If the immigration judge sustains the charge or charges of removability, proceedings continue. A finding of removability by itself never guarantees that an alien will be ordered removed or that the alien will actually be removed. Rather, if the alien is found removable, the judge must also make a second determination as to whether the alien is eligible for any relief or protection that would allow the alien to remain in the United States. Examples of such relief or protection include asylum, withholding of removal, protection under the Convention Against Torture, adjustment of status, cancellation of removal for lawful permanent residents, cancellation of removal for certain non-permanent residents, and certain waivers provided by the Immigration and Nationality Act.[2]

The removal proceeding begins when the DHS (either U.S. Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), or U.S. Customs and Border Protection (CBP)) serves an individual with a charging document, called a Notice to Appear (NTA), and files it with an immigration court.

Aliens in removal proceedings, called respondents, have a right to legal representation at no expense to the government. EOIR also provides a list of *pro bono* legal service providers to any respondent who appears in removal proceedings without representation.

---

[1] Although applicable regulations distinguish between the dismissal of proceedings and the termination of proceedings, EOIR classifies both of them as "terminations" for statistical purposes because the outcomes are substantively identical.

[2] Although relief (*e.g.* asylum) and protection (*e.g.* withholding of removal) are legally distinct outcomes, EOIR classifies both of them as "relief" for statistical purposes because the outcomes are similar in that for both, an alien is generally allowed to remain in the United States. Additionally, voluntary departure is a form of relief from removal, but it carries an alternate order of removal if the departure is not timely effectuated. Consequently, EOIR classifies it as a separate outcome for statistical purposes and does not count it as either relief or an order of removal.

During the removal proceeding, the immigration court schedules an initial hearing, referred to as a master calendar hearing, before an immigration judge.  At this hearing, the immigration judge informs the respondent of his or her rights and addresses representation. The judge may also take pleadings, determine removability, and ascertain apparent eligibility for any relief or protection provided for by law. If a judge finds an alien removable and the alien wishes to apply for relief or protection from removal, the judge will schedule an individual merits hearing on the alien's application where both parties (the respondent and DHS) may present arguments and evidence regarding that application.  If the immigration judge finds the alien eligible for relief or protection from removal, the judge will then grant the application.

If an immigration judge finds an alien is removable and ineligible for any relief or protection from removal, the judge will order the alien removed.  ICE is then responsible for any subsequent detention and removal activities. The issuance of a removal order does not guarantee the actual physical removal of an alien from the United States.

Within 30 days of the immigration judge's decision in a removal case, either party or both parties may appeal the decision to the BIA. If the BIA decision is adverse to the alien, the alien may file a petition for review of that decision with the appropriate federal circuit court of appeals within 30 days.

In certain circumstances, a party to a removal case may also file a motion with the immigration court to reconsider or reopen the case after an immigration judge or the BIA has rendered a decision.

In certain circumstances, for aliens detained by DHS or aliens recently released from custody by DHS, an immigration judge may consider requests to redetermine the conditions of custody or to ameliorate the conditions of release. Any alien may make such a request, and an immigration judge will preside over a hearing on the request, commonly called a "bond hearing." Whether an immigration judge grants the request ultimately depends on the facts and applicable law of each case.  Either party or both parties may appeal the immigration judge's bond decision to the BIA.

## STATISTICS YEARBOOK KEY DEFINITIONS

The following definitions are applicable to the FY 2017 Yearbook. Please note that prior Yearbooks may have utilized different definitions and that some terms may have different usages or definitions outside the Yearbook context.

**Immigration court matters** include cases, bond redeterminations, and motions to reopen, reconsider, and recalendar.

**Immigration court cases** include twelve case types, divided into four categories. I-862 case types include removal, deportation, and exclusion cases. I-863 case types include asylum-only, withholding-only, credible fear review, reasonable fear review, and claimed status review cases. Other case types include rescission, non-removal Nicaraguan Adjustment and Central American Relief Act (NACARA), departure control, and continued detention review cases.

**Immigration court receipts** is the total number of charging documents, bond redeterminations, and motions to reopen, reconsider, and recalendar received within the reporting period.

**Immigration court matter completions** is the total number of immigration judge decisions on cases and bond redeterminations, plus the total number of denied motions to reopen, reconsider, and recalendar.

**Initial case completion (ICC)** is the first dispositive decision rendered by an immigration judge. For instance, an I-862 removal case is completed by an order of removal, relief, voluntary departure, termination, or other. An order granting a continuance, changing venue, or administratively closing a case is not a dispositive decision and, thus, does not constitute a case completion.

**Subsequent case completion** refers to any dispositive decision by an immigration judge after an ICC.

AR596

# IMMIGRATION COURTS

## PENDING CASELOAD

**Figure 1.** The number of pending immigration court cases has grown by 84 percent since the end of FY 2013, and by 26 percent since the end of FY 2016.



**Figure 1. OCIJ Pending Caseload**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Pending | 356,060 | 430,062 | 459,973 | 521,329 | 656,067 |

**Figure 2.** The BIA's pending caseload decreased 32 percent from FY 2013 to FY 2017.



**Figure 2. BIA Pending Caseload**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Pending | 22,944 | 21,872 | 16,975 | 13,955 | 15,638 |

## Table 1. Immigration Courts Pending Cases

| Immigration Court | Pending Cases as of 9/30/2017 |
|---|---|
| Adelanto | 1,258 |
| Arlington | 38,966 |
| Atlanta | 19,159 |
| Aurora | 417 |
| Baltimore | 29,516 |
| Batavia | 317 |
| Bloomington | 6,210 |
| Boston | 22,505 |
| Buffalo | 1,466 |
| Charlotte | 12,981 |
| Chicago | 29,197 |
| Cleveland | 7,835 |
| Dallas | 16,940 |
| Denver | 10,660 |
| Detroit | 4,385 |
| El Paso | 4,879 |
| El Paso SPC | 440 |
| Elizabeth | 672 |
| Eloy | 1,096 |
| Fishkill | 119 |
| Florence | 589 |
| Harlingen | 2,498 |
| Hartford | 4,019 |
| Honolulu | 628 |
| Houston | 48,872 |
| Houston SPC | 1,219 |
| Imperial | 3,444 |
| Kansas City | 6,353 |
| Krome | 722 |
| Las Vegas | 3,652 |
| LaSalle | 318 |
| Los Angeles (N) | 61,885 |
| Los Angeles (D) | 526 |
| Louisville | 4,631 |
| Memphis | 10,858 |
| Miami | 32,486 |
| New Orleans | 8,483 |
| New York City | 84,090 |
| Newark | 33,532 |
| Oakdale | 268 |
| Omaha | 8,653 |
| Orlando | 10,410 |
| Otay Mesa | 808 |
| Otero | 196 |
| Pearsall | 765 |
| Philadelphia | 9,729 |
| Phoenix | 7,287 |
| Port Isabel | 527 |
| Portland | 4,215 |
| Saipan | 98 |
| Salt Lake City | 2,612 |
| San Antonio | 27,484 |
| San Diego | 4,530 |
| San Francisco | 47,878 |
| San Juan | 219 |
| Seattle | 8,789 |
| Stewart | 807 |
| Tacoma | 980 |
| Tucson | 723 |
| Ulster | 156 |
| Varick | 662 |
| York | 448 |
| **Total** | **656,067** |

AR598

## TOTAL I-862 MATTERS RECEIVED AND COMPLETED

**Figure 3.** The number of I-862 matters the immigration courts received increased by 28 percent between FY 2016 and FY 2017. The number of I-862 matters the immigration courts completed increased by 17 percent from FY 2016 to FY 2017.

**Figure 3. Total I-862 Immigration Court Matters**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Receipts | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |
| ■ Completions | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

**Figure 4.** New NTAs constitute the bulk of the courts' work.

**Figure 4. I-862 Immigration Court Matters Received by Type**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ New NTAs | 193,690 | 226,670 | 189,676 | 224,963 | 291,258 |
| ■ Bonds | 57,673 | 60,476 | 60,067 | 63,421 | 78,483 |
| ■ Motions | 20,363 | 19,871 | 25,177 | 27,959 | 36,206 |
| Total | 271,726 | 307,017 | 274,920 | 316,343 | 405,947 |

**Figure 5.** The majority of matters completed are I-862 ICCs.

**Figure 5. I-862 Immigration Court Matters Completed by Type**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Initial Case Completions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| ■ Subsequent Case Completions | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| ■ Bonds | 57,531 | 59,852 | 59,543 | 62,197 | 77,278 |
| ■ Motions (Not Granted) | 4,752 | 4,376 | 4,264 | 4,399 | 6,105 |
| Total | 217,123 | 203,325 | 204,909 | 207,230 | 243,128 |

### Table 2. Total I-862 Immigration Court Matters Received by Court

| Immigration Court | FY 2016 Total Matters | FY 2017 | | | | Rate of Change: Total Matters |
|---|---|---|---|---|---|---|
| | | Total Matters | New NTAs | Bonds | Motions | |
| Adelanto | 7,664 | 8,486 | 3,681 | 4,754 | 51 | 11% |
| Arlington | 13,547 | 15,488 | 12,317 | 1,492 | 1,679 | 14% |
| Atlanta | 8,524 | 11,714 | 8,625 | 2,064 | 1,025 | 37% |
| Aurora | 3,044 | 3,848 | 2,016 | 1,776 | 56 | 26% |
| Baltimore | 8,825 | 14,583 | 12,880 | 750 | 953 | 65% |
| Batavia | 2,981 | 2,491 | 1,226 | 1,239 | 26 | -16% |
| Bloomington | 3,192 | 4,748 | 2,740 | 1,369 | 639 | 49% |
| Boston | 7,791 | 11,042 | 8,396 | 1,499 | 1,147 | 42% |
| Buffalo | 534 | 782 | 588 | 0 | 194 | 46% |
| Charlotte | 5,880 | 9,449 | 8,416 | 479 | 554 | 61% |
| Chicago | 9,787 | 11,509 | 7,718 | 2,700 | 1,091 | 18% |
| Cleveland | 3,006 | 4,112 | 2,859 | 806 | 447 | 37% |
| Dallas | 11,501 | 13,236 | 11,393 | 1,183 | 660 | 15% |
| Denver | 1,824 | 2,714 | 2,053 | 241 | 420 | 49% |
| Detroit | 2,697 | 3,753 | 2,210 | 1,197 | 346 | 39% |
| El Paso | 1,091 | 1,741 | 1,422 | 38 | 281 | 60% |
| El Paso SPC | 3,950 | 3,462 | 2,171 | 1,248 | 43 | -12% |
| Elizabeth | 5,442 | 4,931 | 2,336 | 2,551 | 44 | -9% |
| Eloy | 7,154 | 8,040 | 3,582 | 4,383 | 75 | 12% |
| Fishkill | 170 | 169 | 157 | 0 | 12 | -1% |
| Florence | 5,300 | 3,991 | 2,486 | 1,448 | 57 | -25% |
| Harlingen | 3,554 | 3,429 | 2,448 | 0 | 981 | -4% |
| Hartford | 1,586 | 2,648 | 2,202 | 244 | 202 | 67% |
| Honolulu | 413 | 591 | 422 | 122 | 47 | 43% |
| Houston | 13,116 | 14,224 | 12,994 | 3 | 1,227 | 8% |
| Houston SPC | 10,454 | 14,363 | 8,859 | 5,279 | 225 | 37% |
| Imperial | 3,869 | 4,311 | 2,340 | 1,882 | 89 | 11% |
| Kansas City | 3,337 | 5,254 | 3,538 | 1,329 | 387 | 57% |
| Krome | 6,750 | 8,507 | 4,349 | 4,032 | 126 | 26% |
| Las Vegas | 3,179 | 4,447 | 2,817 | 1,166 | 464 | 40% |
| LaSalle | 4,979 | 5,998 | 3,071 | 2,902 | 25 | 20% |
| Los Angeles (N) | 16,209 | 26,188 | 21,300 | 14 | 4,874 | 62% |
| Los Angeles (D) | 4,786 | 4,697 | 1,939 | 2,721 | 37 | -2% |
| Louisville | 1,325 | 1,860 | 1,572 | 7 | 281 | 40% |
| Memphis | 5,143 | 6,430 | 5,278 | 41 | 1,111 | 25% |
| Miami | 11,921 | 16,575 | 13,918 | 53 | 2,604 | 39% |
| New Orleans | 3,866 | 5,180 | 4,616 | 0 | 564 | 34% |
| New York City | 18,445 | 27,131 | 23,895 | 5 | 3,231 | 47% |
| Newark | 5,163 | 8,708 | 7,872 | 2 | 834 | 69% |
| Oakdale | 4,206 | 4,782 | 2,405 | 2,329 | 48 | 14% |
| Omaha | 2,993 | 4,504 | 3,283 | 745 | 476 | 50% |
| Orlando | 5,271 | 8,241 | 6,012 | 1,100 | 1,129 | 56% |
| Otay Mesa | 3,284 | 4,938 | 2,145 | 2,751 | 42 | 50% |
| Otero | 350 | 1,904 | 1,179 | 715 | 10 | 444% |
| Pearsall | 6,658 | 8,168 | 5,366 | 2,764 | 38 | 23% |
| Philadelphia | 3,036 | 4,013 | 3,493 | 2 | 518 | 32% |
| Phoenix | 2,721 | 3,335 | 2,378 | 3 | 954 | 23% |
| Port Isabel | 3,895 | 4,062 | 2,605 | 1,394 | 63 | 4% |
| Portland | 1,558 | 1,357 | 1,108 | 13 | 236 | 11% |
| Saipan | 21 | 115 | 111 | 1 | 3 | 448% |
| Salt Lake City | 2,004 | 1,258 | 887 | 110 | 261 | -56% |
| San Antonio | 6,146 | 7,999 | 5,062 | 1,613 | 1,324 | 30% |
| San Diego | 2,752 | 2,842 | 2,125 | 9 | 708 | 3% |
| San Francisco | 17,127 | 20,328 | 15,162 | 3,171 | 1,995 | 19% |
| San Juan | 251 | 336 | 135 | 17 | 184 | 34% |
| Seattle | 2,687 | 2,757 | 2,164 | 0 | 593 | 3% |
| Stewart | 4,295 | 7,769 | 5,021 | 2,669 | 79 | 81% |
| Tacoma | 6,556 | 6,648 | 3,185 | 3,418 | 45 | 1% |
| Tucson | 680 | 608 | 489 | 0 | 119 | -11% |
| Ulster | 300 | 241 | 222 | 0 | 19 | -20% |
| Varick | 3,133 | 3,253 | 1,451 | 1,721 | 81 | 4% |
| York | 4,420 | 5,659 | 2,568 | 2,919 | 172 | 28% |
| **Total** | **316,343** | **405,947** | **291,258** | **78,483** | **36,206** | **22%** |

**Key**

25%+ **growth** in Total Matters Received

25%+ **decrease** in Total Matters Received

AR600

**Table 3. Total I-862 Immigration Court Matters Completed by Court and Type**

| Immigration Court | FY 2016 Total Matters | FY 2017 | | | | | Rate of Change: Total Matters | | Key |
|---|---|---|---|---|---|---|---|---|---|
| | | Total Matters | Initial Case Completions | Subsequent Case Completions | Bonds | Motions Not Granted | | | |
| Adelanto | 5,227 | 6,636 | 1,873 | 70 | 4,677 | 16 | 27% | | |
| Arlington | 6,877 | 6,509 | 4,628 | 313 | 1,404 | 164 | -5% | | 25%+ **growth** |
| Atlanta | 7,185 | 7,473 | 4,873 | 213 | 2,015 | 372 | 4% | | in Total Matters |
| Aurora | 2,108 | 2,856 | 1,013 | 30 | 1,794 | 19 | 35% | | Completed |
| Baltimore | 4,645 | 4,264 | 3,066 | 292 | 757 | 149 | -8% | | 25%+ **decrease** |
| Batavia | 1,903 | 1,837 | 562 | 25 | 1,244 | 6 | -3% | | in Total Matters |
| Bloomington | 2,059 | 2,795 | 1,358 | 84 | 1,235 | 118 | 36% | | Completed |
| Boston | 4,579 | 4,851 | 2,882 | 384 | 1,520 | 65 | 6% | | |
| Buffalo | 710 | 601 | 497 | 65 | 0 | 39 | -15% | | |
| Charlotte | 4,652 | 4,505 | 3,731 | 203 | 479 | 92 | -3% | | |
| Chicago | 5,705 | 7,879 | 4,688 | 378 | 2,699 | 114 | 38% | | |
| Cleveland | 2,005 | 2,439 | 1,522 | 104 | 776 | 37 | 22% | | |
| Dallas | 8,659 | 8,148 | 6,574 | 250 | 1,140 | 184 | -6% | | |
| Denver | 735 | 1,781 | 1,336 | 151 | 229 | 65 | 142% | | |
| Detroit | 2,097 | 2,959 | 1,629 | 92 | 1,138 | 100 | 41% | | |
| El Paso | 938 | 1,421 | 1,214 | 60 | 38 | 109 | 51% | | |
| El Paso SPC | 2,793 | 2,677 | 1,421 | 30 | 1,203 | 23 | -4% | | |
| Elizabeth | 3,780 | 4,043 | 1,441 | 54 | 2,527 | 21 | 7% | | |
| Eloy | 5,332 | 6,685 | 2,174 | 48 | 4,436 | 27 | 25% | | |
| Fishkill | 125 | 163 | 150 | 6 | 0 | 7 | 30% | | |
| Florence | 3,126 | 2,362 | 924 | 21 | 1,394 | 23 | -24% | | |
| Harlingen | 2,338 | 2,535 | 1,794 | 206 | 0 | 535 | 8% | | |
| Hartford | 1,214 | 1,263 | 898 | 91 | 240 | 34 | 4% | | |
| Honolulu | 521 | 634 | 485 | 33 | 113 | 3 | 22% | | |
| Houston | 6,137 | 7,302 | 6,776 | 355 | 3 | 168 | 19% | | |
| Houston SPC | 6,037 | 9,564 | 4,513 | 55 | 4,947 | 49 | 58% | | |
| Imperial | 2,369 | 2,434 | 519 | 25 | 1,873 | 17 | 3% | | |
| Kansas City | 2,156 | 3,238 | 1,796 | 109 | 1,282 | 51 | 50% | | |
| Krome | 5,083 | 7,062 | 3,002 | 86 | 3,899 | 75 | 39% | | |
| Las Vegas | 2,646 | 3,766 | 2,338 | 216 | 1,147 | 65 | 42% | | |
| LaSalle | 3,935 | 5,016 | 2,111 | 30 | 2,860 | 15 | 27% | | |
| Los Angeles (N) | 11,641 | 11,807 | 9,761 | 1,312 | 14 | 720 | 1% | | |
| Los Angeles (D) | 3,866 | 4,265 | 1,372 | 63 | 2,815 | 15 | 10% | | |
| Louisville | 816 | 845 | 751 | 33 | 6 | 55 | 4% | | |
| Memphis | 2,990 | 3,636 | 3,267 | 153 | 42 | 174 | 22% | | |
| Miami | 5,833 | 7,950 | 6,814 | 695 | 51 | 390 | 36% | | |
| New Orleans | 2,124 | 2,698 | 2,496 | 121 | 0 | 81 | 27% | | |
| New York City | 14,662 | 12,887 | 11,445 | 1,059 | 1 | 382 | -12% | | |
| Newark | 3,179 | 3,176 | 2,801 | 253 | 9 | 113 | 0% | | |
| Oakdale | 2,907 | 3,850 | 1,460 | 21 | 2,334 | 35 | 32% | | |
| Omaha | 1,611 | 2,625 | 1,697 | 122 | 765 | 41 | 63% | | |
| Orlando | 3,105 | 5,333 | 3,780 | 359 | 1,056 | 138 | 72% | | |
| Otay Mesa | 2,094 | 3,587 | 764 | 31 | 2,772 | 20 | 71% | | |
| Otero | 238 | 1,804 | 1,116 | 5 | 679 | 4 | 658% | | |
| Pearsall | 3,533 | 4,137 | 1,420 | 17 | 2,685 | 15 | 17% | | |
| Philadelphia | 1,659 | 1,871 | 1,653 | 155 | 2 | 61 | 13% | | |
| Phoenix | 1,797 | 2,320 | 2,093 | 159 | 3 | 65 | 29% | | |
| Port Isabel | 2,450 | 2,599 | 1,160 | 36 | 1,367 | 36 | 6% | | |
| Portland | 785 | 614 | 530 | 63 | 13 | 8 | -22% | | |
| Saipan | 21 | 25 | 18 | 4 | 1 | 2 | 19% | | |
| Salt Lake City | 1,714 | 1,286 | 991 | 89 | 148 | 58 | -25% | | |
| San Antonio | 2,904 | 5,226 | 3,157 | 262 | 1,481 | 326 | 80% | | |
| San Diego | 1,306 | 1,708 | 1,432 | 115 | 6 | 155 | 31% | | |
| San Francisco | 10,357 | 10,115 | 6,267 | 392 | 3,268 | 188 | -2% | | |
| San Juan | 193 | 158 | 105 | 24 | 17 | 12 | -18% | | |
| Seattle | 2,115 | 1,806 | 1,540 | 167 | 0 | 99 | -15% | | |
| Stewart | 3,799 | 6,979 | 4,153 | 86 | 2,694 | 46 | 84% | | |
| Tacoma | 5,053 | 5,866 | 2,278 | 39 | 3,530 | 19 | 16% | | |
| Tucson | 679 | 729 | 672 | 43 | 0 | 14 | 7% | | |
| Ulster | 204 | 218 | 199 | 9 | 0 | 10 | 7% | | |
| Varick | 2,468 | 2,560 | 892 | 53 | 1,598 | 17 | 4% | | |
| York | 3,451 | 4,750 | 1,709 | 145 | 2,852 | 44 | 38% | | |
| **Total** | **207,230** | **243,128** | **149,581** | **10,164** | **77,278** | **6,105** | **17%** | | |

AR601

## CASES RECEIVED AND COMPLETED BY TYPE

**Table 4. Immigration Court Cases Received by Case Type**

| Type of Case | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Removal | 193,689 | 226,669 | 189,674 | 224,962 | 291,258 |
| Credible Fear | 1,770 | 6,507 | 6,644 | 7,464 | 6,532 |
| Withholding Only | 2,328 | 3,145 | 3,061 | 3,261 | 3,388 |
| Reasonable Fear | 1,156 | 1,778 | 2,608 | 2,521 | 2,476 |
| Asylum Only | 393 | 294 | 255 | 227 | 399 |
| Rescission | 46 | 31 | 45 | 27 | 37 |
| Claimed Status | 31 | 22 | 21 | 11 | 6 |
| Continued Detention Review | 0 | 3 | 2 | 1 | 0 |
| Deportation | 1 | 1 | 2 | 1 | 0 |
| NACARA | 2 | 4 | 1 | 0 | 0 |
| **Total** | **199,416** | **238,454** | **202,313** | **238,475** | **304,096** |

**Table 5. Immigration Court Initial and Subsequent Case Completions by Case Type**

| Type of Case | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 | | FY 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent | Initial | Subsequent |
| Deportation | 601 | 1,592 | 472 | 1,157 | 452 | 1,100 | 477 | 1,082 | 381 | 818 |
| Exclusion | 48 | 154 | 35 | 103 | 19 | 103 | 35 | 83 | 22 | 62 |
| Removal | 136,680 | 15,765 | 124,142 | 13,188 | 126,981 | 12,447 | 127,689 | 11,268 | 149,178 | 9,284 |
| Credible Fear | 1,726 | 0 | 6,353 | 0 | 6,624 | 2 | 7,492 | 0 | 6,533 | 0 |
| Reasonable Fear | 1,135 | 0 | 1,707 | 0 | 2,559 | 0 | 2,536 | 2 | 2,437 | 0 |
| Claimed Status | 28 | 2 | 22 | 0 | 19 | 0 | 14 | 1 | 4 | 1 |
| Asylum Only | 307 | 72 | 296 | 75 | 230 | 49 | 200 | 51 | 261 | 64 |
| Rescission | 35 | 5 | 28 | 3 | 26 | 5 | 28 | 2 | 33 | 1 |
| Continued Detention Review | 2 | 0 | 2 | 0 | 3 | 0 | 2 | 0 | 0 | 0 |
| NACARA | 2 | 5 | 1 | 1 | 2 | 0 | 1 | 1 | 3 | 2 |
| Withholding Only | 1,300 | 64 | 2,553 | 107 | 2,209 | 127 | 2,501 | 132 | 2,865 | 163 |
| **Total** | **141,864** | **17,659** | **135,611** | **14,634** | **139,124** | **13,833** | **140,975** | **12,622** | **161,717** | **10,395** |

AR602

## I-862 CASE COMPLETIONS BY DECISION

**Figure 6.** I-862 ICCs increased 17 percent from FY 2016 to FY 2017.

**Figure 6. I-862 Case Completions**



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Subsequent Case Completion | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |
| ■ Initial Case Completion | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Total | 154,840 | 139,097 | 141,102 | 140,634 | 159,745 |

**Figure 7.** All I-862 case outcomes except termination increased in FY 2017.

**Figure 7. I-862 ICCs by Decision**



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Other | 499 | 366 | 436 | 481 | 514 |
| ■ Removal | 75,384 | 72,715 | 75,727 | 75,092 | 97,457 |
| ■ Voluntary Departure | 17,902 | 13,666 | 9,911 | 9,055 | 13,603 |
| ■ Relief | 24,456 | 20,297 | 17,614 | 17,248 | 19,456 |
| ■ Termination | 19,088 | 17,605 | 23,764 | 26,325 | 18,551 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

**Figure 8.** For I-862 cases, subsequent case completions have decreased by about seven percent between FY 2013 and FY 2017.

**Figure 8. I-862 Subsequent Case Completions by Decision**



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Removal | 6,781 | 5,824 | 6,049 | 4,626 | 3,988 |
| ■ Termination | 5,381 | 4,625 | 4,699 | 5,006 | 3,286 |
| ■ Relief | 3,905 | 2,897 | 2,204 | 2,129 | 2,166 |
| ■ Voluntary Departure | 1,192 | 836 | 507 | 459 | 540 |
| ■ Other | 252 | 266 | 191 | 213 | 184 |
| Total | 17,511 | 14,448 | 13,650 | 12,433 | 10,164 |

**Figure 9.** Administrative closures decreased by about 40 percent from FY 2016 to FY 2017.



**Figure 9. Administrative Closures**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Administrative Closure | 32,545 | 34,422 | 46,214 | 53,736 | 32,394 |

**Figure 10.** For I-862 cases, changes of venue have increased 35 percent since FY 2013 and transfers have increased 23 percent in the same period.

**Figure 10. Total I-862 Changes of Venue and Transfers**

|  | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| ■ Changes of Venue | 50,909 | 64,520 | 50,303 | 56,239 | 68,949 |
| ■ Transfers | 37,826 | 40,895 | 37,662 | 41,868 | 46,584 |
| Total | 88,735 | 105,415 | 87,965 | 98,107 | 115,533 |

**Table 6. Credible Fear (CF) and Reasonable Fear (RF) Review ICCs by Decision**

| Disposition | FY 13 | | FY 14 | | FY 15 | | FY 16 | | FY 17 | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | CF | RF | CF | RF | CF | RF | CF | RF | CF | RF |
| Affirmed DHS Decision | 1,503 | 977 | 5,232 | 1,439 | 5,219 | 2,053 | 5,333 | 1,915 | 4,851 | 1,811 |
| Vacated DHS Decision | 206 | 131 | 1,055 | 230 | 1,347 | 451 | 2,088 | 571 | 1,647 | 588 |
| Other | 18 | 30 | 67 | 43 | 65 | 64 | 74 | 57 | 38 | 45 |
| **Total** | **1,727** | **1,138** | **6,354** | **1,712** | **6,631** | **2,568** | **7,495** | **2,543** | **6,536** | **2,444** |

**Table 7. FY 2017 I-862 Changes of Venue and Transfers**

| Immigration Court | Changes of Venue | Transfers | Total |
|---|---|---|---|
| Adelanto | 2,327 | 30 | 2,357 |
| Arlington | 2,154 | 2,053 | 4,207 |
| Atlanta | 2,543 | 2,961 | 5,504 |
| Aurora | 1,080 | 18 | 1,098 |
| Baltimore | 915 | 31 | 946 |
| Batavia | 394 | 442 | 836 |
| Bloomington | 216 | 668 | 884 |
| Boston | 432 | 981 | 1,413 |
| Buffalo | 516 | 110 | 626 |
| Charlotte | 660 | 37 | 697 |
| Chicago | 1,845 | 2,042 | 3,887 |
| Cleveland | 324 | 507 | 831 |
| Dallas | 593 | 2,068 | 2,661 |
| Denver | 697 | 170 | 867 |
| Detroit | 303 | 627 | 930 |
| El Paso | 1,648 | 243 | 1,891 |
| El Paso SPC | 20 | 1,188 | 1,208 |
| Elizabeth | 24 | 1,406 | 1,430 |
| Eloy | 1,933 | 1 | 1,934 |
| Fishkill | 28 | 25 | 53 |
| Florence | 1,887 | 11 | 1,898 |
| Harlingen | 3,675 | 232 | 3,907 |
| Hartford | 227 | 208 | 435 |
| Honolulu | 24 | 50 | 74 |
| Houston | 7,335 | 2,706 | 10,041 |
| Houston SPC | 210 | 5,556 | 5,766 |
| Imperial | 1,949 | 2,146 | 4,095 |
| Kansas City | 602 | 797 | 1,399 |
| Krome | 1,765 | 509 | 2,274 |
| Las Vegas | 486 | 669 | 1,155 |
| LaSalle | 1,219 | 186 | 1,405 |
| Los Angeles (N) | 3,598 | 317 | 3,915 |
| Los Angeles (D) | 148 | 1,367 | 1,515 |
| Louisville | 197 | 210 | 407 |
| Memphis | 559 | 831 | 1,390 |
| Miami | 1,839 | 23 | 1,862 |
| New Orleans | 1,496 | 10 | 1,506 |
| New York City | 3,061 | 232 | 3,293 |
| Newark | 1,868 | 765 | 2,633 |
| Oakdale | 826 | 454 | 1,280 |
| Omaha | 250 | 657 | 907 |
| Orlando | 781 | 464 | 1,245 |
| Otay Mesa | 281 | 1,274 | 1,555 |
| Otero | 6 | 407 | 413 |
| Pearsall | 444 | 3,775 | 4,219 |
| Philadelphia | 626 | 294 | 920 |
| Phoenix | 1,443 | 21 | 1,464 |
| Port Isabel | 36 | 1,242 | 1,278 |
| Portland | 265 | 60 | 325 |
| Saipan | 0 | 0 | 0 |
| Salt Lake City | 331 | 211 | 542 |
| San Antonio | 5,723 | 1,757 | 7,480 |
| San Diego | 1,635 | 279 | 1,914 |
| San Francisco | 1,436 | 2,375 | 3,811 |
| San Juan | 57 | 9 | 66 |
| Seattle | 376 | 3 | 379 |
| Stewart | 926 | 0 | 926 |
| Tacoma | 1,249 | 1 | 1,250 |
| Tucson | 181 | 2 | 183 |
| Ulster | 64 | 32 | 96 |
| Varick | 123 | 505 | 628 |
| York | 1,093 | 329 | 1,422 |
| **Total** | **68,949** | **46,584** | **115,533** |

AR605

## I-862 ICCs by Country of Nationality

EOIR IJs hear cases from many different nationalities each year.

**Figure 11.** About 75 percent of I-862 ICCs in FY 2017 were cases of nationals from Mexico, Guatemala, Honduras, or El Salvador.

**Table 8.** In the last five years, Mexico, Guatemala, Honduras, El Salvador, China, Ecuador, Dominican Republic, Cuba, and India were nine of the top ten countries of nationality.

### Figure 11. I-862 ICCs by Nationality



| | Initial Case Completions |
|---|---|
| ■ Mexico | 47,309 |
| ■ Guatemala | 25,016 |
| ■ Honduras | 20,834 |
| ■ El Salvador | 19,633 |
| ■ Other | 36,789 |

### Table 8. I-862 ICCs by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | Guatemala | Guatemala | Honduras | Guatemala | Guatemala |
| 3 | El Salvador | Honduras | Guatemala | Honduras | Honduras |
| 4 | Honduras | El Salvador | El Salvador | El Salvador | El Salvador |
| 5 | China | China | China | China | China |
| 6 | Cuba | Cuba | Ecuador | Ecuador | Haiti |
| 7 | Dominican Republic | Dominican Republic | Dominican Republic | Dominican Republic | Ecuador |
| 8 | Jamaica | Ecuador | India | Cuba | Dominican Republic |
| 9 | Ecuador | India | Cuba | India | Cuba |
| 10 | India | Jamaica | Jamaica | Jamaica | India |
| 11 | Colombia | Colombia | Haiti | Colombia | Brazil |
| 12 | Philippines | Haiti | Colombia | Haiti | Jamaica |
| 13 | Haiti | Philippines | Peru | Brazil | Colombia |
| 14 | Brazil | Peru | Philippines | Somalia | Nicaragua |
| 15 | Peru | Nicaragua | Nicaragua | Nicaragua | Romania |
| 16 | Nicaragua | Brazil | Brazil | Peru | Peru |
| 17 | Nigeria | Nepal | Somalia | Ghana | Philippines |
| 18 | Russia | Nigeria | Nigeria | Philippines | Nepal |
| 19 | Nepal | Ethiopia | Ethiopia | Nigeria | Pakistan |
| 20 | Pakistan | Russia | Nepal | Pakistan | Ghana |
| 21 | Ethiopia | Egypt | Bangladesh | Nepal | Nigeria |
| 22 | Kenya | Pakistan | Pakistan | Bangladesh | Eritrea |
| 23 | Canada | Vietnam | Ghana | Canada | Venezuela |
| 24 | Vietnam | Kenya | Vietnam | Romania | Canada |
| 25 | Egypt | Canada | Canada | Egypt | Cameroon |

AR606

## I-862 ICCs by Language

In parallel to the many nationalities that come before IJs, there are similarly hundreds of languages in which hearings are conducted. EOIR provides interpretation services for all aliens in proceedings as appropriate.

**Figure 12.** About 85 percent of I-862 ICCs in FY 2017 were cases of Spanish- or English-speaking aliens.

**Table 9.** In the last five years, seven of the top ten languages were Spanish, English, Mandarin, Creole, Punjabi, Arabic, or Russian.

### Figure 12. I-862 ICCs by Language



| | Initial Case Completions |
|---|---|
| ■ Spanish | 111,321 |
| ■ English | 16,383 |
| ■ Mandarin | 4,486 |
| ▫ Other | 17,391 |

### Table 9. I-862 ICCs by Top 25 Languages

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Spanish | Spanish | Spanish | Spanish | Spanish |
| 2 | English | English | English | English | English |
| 3 | Mandarin | Mandarin | Mandarin | Mandarin | Mandarin |
| 4 | Unknown Language | Unknown Language | Unknown Language | Unknown Language | Creole |
| 5 | Russian | Russian | Arabic | Arabic | Unknown Language |
| 6 | Arabic | Arabic | Russian | Punjabi | Punjabi |
| 7 | Punjabi | Punjabi | Punjabi | Russian | Portuguese |
| 8 | Creole | Creole | Creole | Portuguese | Arabic |
| 9 | Portuguese | French | Somali | Mam | Russian |
| 10 | French | Portuguese | French | Creole | Mam |
| 11 | Korean | Korean | Portuguese | Somali | French |
| 12 | Foo Chow | Nepali | Quiche | Quiche | Quiche |
| 13 | Nepali | Somali | Nepali | French | Nepali |
| 14 | Amharic | Foo Chow | Bengali | Nepali | Tigrigna - Eritrean |
| 15 | Tagalog | Amharic | Mam | Foo Chow | Romanian-Moldovan |
| 16 | Romanian-Moldovan | Vietnamese | Foo chow | Bengali | Konjobal |
| 17 | Vietnamese | Gujarati | Korean | Amharic | Somali |
| 18 | Gujarati | Quiche | Amharic | Korean | Bengali |
| 19 | Tigrigna - Eritrean | Mam | Vietnamese | Tigrigna - Eritrean | Urdu |
| 20 | Urdu | Tagalog | Tigrigna - Eritrean | Konjobal | Foo Chow |
| 21 | Indonesian | Urdu | Gujarati | Romanian-Moldovan | Korean |
| 22 | Armenian | Albanian | Albanian | Urdu | Albanian |
| 23 | Somali | Armenian | Konjobal | Albanian | Amharic |
| 24 | Albanian | Indonesian | Tagalog | Vietnamese | Vietnamese |
| 25 | Tamil | Tigrigna - Eritrean | Urdu | Armenian | Gujarati |

AR607

## I-862 ICCs for Detained Cases

Detention locations include DHS Service Processing Centers (SPC), DHS contract detention facilities, state and local government jails, and Bureau of Prisons institutions. For the purpose of Figure 13, Institutional Hearing Program (IHP) cases are considered detained cases as are cases of unaccompanied alien children (UAC) in the custody of the Department of Health and Human Services.

**Figure 13.** Detained I-862 ICCs increased 36 percent from FY 2016 to FY 2017.



**Figure 13. I-862 ICCs by Detention Status**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Initial Case Completions for Detained Aliens | 58,813 | 51,145 | 40,358 | 39,912 | 54,098 |
| Initial Case Completions for All Aliens | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Percent Detained | 43% | 41% | 32% | 31% | 36% |

**Figure 14.** The number of standard detained completions – aliens at least 18 years of age that are not at an IHP location, are not UAC or in HHS custody, and are not considered to have competency concerns or to be subject to the *Franco* litigation – have increased 39 percent from FY 2016 to FY 2017.



**Figure 14. I-862 Standard Detained ICCs**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Completions | 49,121 | 42,605 | 32,104 | 30,749 | 42,881 |

**Table 10. FY 2017 I-862 Detained ICCs**

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,848 |
| Arlington | 1,132 |
| Atlanta | 2,072 |
| Aurora | 1,001 |
| Baltimore | 423 |
| Batavia | 539 |
| Bloomington | 735 |
| Boston | 804 |
| Buffalo | 0 |
| Charlotte | 8 |
| Chicago | 1,734 |
| Cleveland | 547 |
| Dallas | 3,095 |
| Denver | 91 |
| Detroit | 905 |
| El Paso | 113 |
| El Paso SPC | 1,421 |
| Elizabeth | 1,439 |
| Eloy | 2,152 |
| Fishkill | 150 |
| Florence | 921 |
| Harlingen | 62 |
| Hartford | 228 |
| Honolulu | 145 |
| Houston | 46 |
| Houston SPC | 4,513 |
| Imperial | 338 |
| Kansas City | 687 |
| Krome | 2,966 |
| Las Vegas | 1,036 |
| LaSalle | 2,106 |
| Los Angeles (N) | 58 |
| Los Angeles (D) | 1,368 |
| Louisville | 0 |
| Memphis | 26 |
| Miami | 198 |
| New Orleans | 5 |
| New York City | 6 |
| Newark | 2 |
| Oakdale | 1,459 |
| Omaha | 695 |
| Orlando | 729 |
| Otay Mesa | 750 |
| Otero | 1,115 |
| Pearsall | 1,419 |
| Philadelphia | 11 |
| Phoenix | 69 |
| Port Isabel | 1,158 |
| Portland | 5 |
| Saipan | 3 |
| Salt Lake City | 179 |
| San Antonio | 464 |
| San Diego | 29 |
| San Francisco | 1,491 |
| San Juan | 26 |
| Seattle | 0 |
| Stewart | 4,143 |
| Tacoma | 2,276 |
| Tucson | 379 |
| Ulster | 199 |
| Varick | 876 |
| York | 1,703 |
| **Total** | **54,098** |

AR609

## I-862 Institutional Hearing Program Cases Received and Completed

IHP is a cooperative effort between EOIR, DHS, and various federal, state, and municipal corrections agencies. IJs and court staff either travel to IHP facilities to conduct IHP hearings, or the IJs conduct the hearings by video teleconferencing.

**Figure 15.** New IHP case receipts declined in FY 2017.

**Figure 15. I-862 IHP Receipts and ICCs**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ New NTAs | 4,048 | 3,916 | 2,914 | 3,568 | 2,581 |
| ■ Initial Case Completions | 3,385 | 3,191 | 2,714 | 2,973 | 2,463 |

**Table 11. I-862 IHP ICCs by Decision**

| Disposition | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Removal | 3,277 | 3,075 | 2,573 | 2,726 | 2,333 |
| Voluntary Departure | 2 | 3 | 7 | 28 | 10 |
| Termination | 80 | 86 | 91 | 94 | 53 |
| Relief | 23 | 27 | 39 | 117 | 63 |
| Other | 3 | 0 | 4 | 8 | 4 |
| **Total Completions** | **3,385** | **3,191** | **2,714** | **2,973** | **2,463** |

AR610

## I-862 ICCs with Applications for Relief

**Figure 16.** The percent of completed I-862 cases with applications for relief has been roughly constant over the past five years.



**Figure 16. I-862 ICCs by Application Filling Status**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| With Applications | 50,834 | 44,974 | 40,789 | 45,094 | 56,035 |
| Without Applications | 86,495 | 79,675 | 86,663 | 83,107 | 93,546 |
| Total | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |

AR611

## Table 12. FY 2017 I-862 ICCs with Applications for Relief

| Immigration Court | Initial Case Completions | Number of Completions with Applications | Percent with Applications |
|---|---|---|---|
| Adelanto | 1,873 | 837 | 45% |
| Arlington | 4,628 | 1,644 | 36% |
| Atlanta | 4,873 | 1,050 | 22% |
| Aurora | 1,013 | 320 | 32% |
| Baltimore | 3,066 | 981 | 32% |
| Batavia | 562 | 178 | 32% |
| Bloomington | 1,358 | 490 | 36% |
| Boston | 2,882 | 1,496 | 52% |
| Buffalo | 497 | 208 | 42% |
| Charlotte | 3,731 | 675 | 18% |
| Chicago | 4,688 | 1,530 | 33% |
| Cleveland | 1,522 | 535 | 35% |
| Dallas | 6,574 | 1,243 | 19% |
| Denver | 1,336 | 491 | 37% |
| Detroit | 1,629 | 664 | 41% |
| El Paso | 1,214 | 287 | 24% |
| El Paso SPC | 1,421 | 208 | 15% |
| Elizabeth | 1,441 | 698 | 48% |
| Eloy | 2,174 | 526 | 24% |
| Fishkill | 150 | 32 | 21% |
| Florence | 924 | 224 | 24% |
| Harlingen | 1,794 | 540 | 30% |
| Hartford | 898 | 394 | 44% |
| Honolulu | 485 | 315 | 65% |
| Houston | 6,776 | 2,735 | 40% |
| Houston SPC | 4,513 | 991 | 22% |
| Imperial | 519 | 190 | 37% |
| Kansas City | 1,796 | 529 | 29% |
| Krome | 3,002 | 1,283 | 43% |
| Las Vegas | 2,338 | 1,054 | 45% |
| LaSalle | 2,111 | 346 | 16% |
| Los Angeles (N) | 9,761 | 4,663 | 48% |
| Los Angeles (D) | 1,372 | 511 | 37% |
| Louisville | 751 | 48 | 6% |
| Memphis | 3,267 | 1,069 | 33% |
| Miami | 6,814 | 2,531 | 37% |
| New Orleans | 2,496 | 337 | 14% |
| New York City | 11,445 | 7,622 | 67% |
| Newark | 2,801 | 1,064 | 38% |
| Oakdale | 1,460 | 265 | 18% |
| Omaha | 1,697 | 640 | 38% |
| Orlando | 3,780 | 1,815 | 48% |
| Otay Mesa | 764 | 281 | 37% |
| Otero | 1,116 | 298 | 27% |
| Pearsall | 1,420 | 436 | 31% |
| Philadelphia | 1,653 | 680 | 41% |
| Phoenix | 2,093 | 1,040 | 50% |
| Port Isabel | 1,160 | 602 | 52% |
| Portland | 530 | 347 | 65% |
| Saipan | 18 | 2 | 11% |
| Salt Lake City | 991 | 477 | 48% |
| San Antonio | 3,157 | 890 | 28% |
| San Diego | 1,432 | 451 | 31% |
| San Francisco | 6,267 | 3,199 | 51% |
| San Juan | 105 | 42 | 40% |
| Seattle | 1,540 | 970 | 63% |
| Stewart | 4,153 | 710 | 17% |
| Tacoma | 2,278 | 959 | 42% |
| Tucson | 672 | 233 | 35% |
| Ulster | 199 | 66 | 33% |
| Varick | 892 | 457 | 51% |
| York | 1,709 | 636 | 37% |
| **Total** | **149,581** | **56,035** | **37%** |

| Key |
|---|
| >50% of completions had applications |
| <15% of completions had applications |

## ASYLUM CASES RECEIVED AND COMPLETED

There are two types of asylum processes – defensive and affirmative. The defensive asylum process applies to aliens who appear before EOIR and who request asylum before an IJ. The affirmative asylum process applies to aliens who initially file an asylum application with USCIS and, subsequently, have that application referred by USCIS to EOIR.

**Figure 17.** Defensive asylum receipts have increased significantly (423 percent) from FY 2013 to FY 2017. In the same period, affirmative asylum receipts have increased 12 percent.



**Figure 17. Asylum Receipts**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Affirmative | 19,931 | 16,267 | 17,339 | 12,753 | 22,252 |
| Defensive | 23,101 | 30,876 | 45,884 | 68,980 | 120,709 |
| Total | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |

**Figure 18.** Asylum receipts increased 232 percent from FY 2013 to FY 2017; completions increased by 51 percent over the same period.



**Figure 18. Asylum Receipts and ICCs**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 43,032 | 47,143 | 63,223 | 81,733 | 142,961 |
| Completions | 28,623 | 27,788 | 27,699 | 33,116 | 43,137 |

AR613

**Table 13. Asylum ICCs by Court for FY 2017**

| Immigration Court | Completions |
|---|---|
| Adelanto | 738 |
| Arlington | 1,377 |
| Atlanta | 756 |
| Aurora | 225 |
| Baltimore | 831 |
| Batavia | 145 |
| Bloomington | 354 |
| Boston | 861 |
| Buffalo | 71 |
| Charlotte | 464 |
| Chicago | 955 |
| Cleveland | 409 |
| Dallas | 793 |
| Denver | 329 |
| Detroit | 365 |
| El Paso | 91 |
| El Paso SPC | 150 |
| Elizabeth | 531 |
| Eloy | 354 |
| Fishkill | 5 |
| Florence | 170 |
| Harlingen | 364 |
| Hartford | 316 |
| Honolulu | 289 |
| Houston | 2,493 |
| Houston SPC | 546 |
| Imperial | 143 |
| Kansas City | 352 |
| Krome | 1,011 |
| Las Vegas | 726 |
| LaSalle | 202 |
| Los Angeles (N) | 3,697 |
| Los Angeles (D) | 424 |
| Louisville | 31 |
| Memphis | 749 |
| Miami | 1,740 |
| New Orleans | 231 |
| New York City | 7,108 |
| Newark | 759 |
| Oakdale | 178 |
| Omaha | 434 |
| Orlando | 1,451 |
| Otay Mesa | 232 |
| Otero | 277 |
| Pearsall | 336 |
| Philadelphia | 500 |
| Phoenix | 603 |
| Port Isabel | 477 |
| Portland | 304 |
| Saipan | 0 |
| Salt Lake City | 286 |
| San Antonio | 808 |
| San Diego | 382 |
| San Francisco | 2,643 |
| San Juan | 10 |
| Seattle | 887 |
| Stewart | 541 |
| Tacoma | 776 |
| Tucson | 156 |
| Ulster | 13 |
| Varick | 235 |
| York | 453 |
| **Total** | **43,137** |

AR614

## ASYLUM CASES COMPLETED BY DECISION

An asylum application also generally serves as an application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act (INA). As such, EOIR reports on these two forms of relief from removal contemporaneously. Grant rates are calculated as percentages of all completed cases of the given type.

**Figure 19.** In the past five years, asylum grants have increased by about nine percent.

### Figure 19. Asylum ICCs by Decision

|         | FY 13  | FY 14  | FY 15  | FY 16  | FY 17  |
|---------|--------|--------|--------|--------|--------|
| Grants  | 9,753  | 8,638  | 8,170  | 8,730  | 10,654 |
| Denials | 8,665  | 9,152  | 8,752  | 11,695 | 17,677 |
| Other   | 10,193 | 9,996  | 10,775 | 12,690 | 14,805 |

**Figure 20.** The defensive grant rate is consistently lower than that of affirmative asylum applications. Similarly, the defensive denial rate is significantly higher than the affirmative asylum denial rate.

### Figure 20. Affirmative and Defensive Asylum ICCs by Decision



- Affirmative Grants
- Affirmative Denials
- Affirmative Other Closures
- Defensive Grants
- Defensive Denials
- Defensive Other Closures

AR615

**Figure 21.**
Administrative closures of asylum cases decreased by about 48 percent from FY 2016 to FY 2017.



**Figure 21. Administrative Closures of Asylum Cases**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Total | 7,568 | 7,335 | 12,215 | 18,630 | 9,626 |

**Figure 22.** The grant rate for either asylum or withholding of removal has decreased about 30 percent in the last five years.

**Figure 22. Asylum and Withholding of Removal ICCs by Decision**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Asylum Grants | 9,753 | 8,638 | 8,170 | 8,730 | 10,654 |
| Withholding of Removal Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| Denials of Asylum and/or Withholding of Removal | 7,298 | 7,925 | 7,713 | 10,728 | 16,197 |

**Figure 23.** The withholding of removal grant rate has decreased about 48 percent from FY 2013 to FY 2017.

**Figure 23. Withholding of Removal ICCs by Decision**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Grants | 1,624 | 1,436 | 1,138 | 1,049 | 1,265 |
| Denials | 9,237 | 9,529 | 8,950 | 12,013 | 17,684 |
| Others | 12,810 | 11,677 | 11,818 | 13,369 | 17,040 |

AR616

## Table 14. Asylum Decision Rate by Immigration Court

| Immigration Court | Grants | | Denials | | Other Closures | | Administrative Closure | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Rate | Number | Rate | Number | Rate | Number | Rate | |
| Adelanto | 98 | 13% | 498 | 67% | 142 | 19% | 0 | 0% | 738 |
| Arlington | 424 | 22% | 411 | 21% | 542 | 28% | 557 | 29% | 1,934 |
| Atlanta | 23 | 3% | 481 | 59% | 252 | 31% | 55 | 7% | 811 |
| Aurora | 29 | 13% | 147 | 65% | 49 | 22% | 1 | 0% | 226 |
| Baltimore | 355 | 36% | 221 | 22% | 255 | 26% | 166 | 17% | 997 |
| Batavia | 30 | 21% | 83 | 57% | 32 | 22% | 1 | 1% | 146 |
| Bloomington | 53 | 13% | 184 | 46% | 117 | 29% | 50 | 12% | 404 |
| Boston | 332 | 30% | 194 | 18% | 335 | 31% | 235 | 21% | 1,096 |
| Buffalo | 17 | 18% | 30 | 31% | 24 | 25% | 25 | 26% | 96 |
| Charlotte | 32 | 7% | 289 | 59% | 143 | 29% | 22 | 5% | 486 |
| Chicago | 336 | 29% | 294 | 26% | 325 | 28% | 192 | 17% | 1,147 |
| Cleveland | 39 | 7% | 175 | 33% | 195 | 37% | 114 | 22% | 523 |
| Dallas | 74 | 9% | 511 | 62% | 208 | 25% | 34 | 4% | 827 |
| Denver | 97 | 20% | 95 | 20% | 137 | 28% | 157 | 32% | 486 |
| Detroit | 46 | 11% | 184 | 43% | 135 | 32% | 58 | 14% | 423 |
| El Paso | 3 | 2% | 43 | 25% | 45 | 26% | 80 | 47% | 171 |
| El Paso SPC | 4 | 3% | 88 | 59% | 58 | 39% | 0 | 0% | 150 |
| Elizabeth | 199 | 37% | 238 | 45% | 94 | 18% | 0 | 0% | 531 |
| Eloy | 8 | 2% | 186 | 53% | 160 | 45% | 0 | 0% | 354 |
| Fishkill | 0 | 0% | 4 | 80% | 1 | 20% | 0 | 0% | 5 |
| Florence | 4 | 2% | 77 | 45% | 89 | 52% | 0 | 0% | 170 |
| Harlingen | 7 | 2% | 52 | 14% | 305 | 82% | 6 | 2% | 370 |
| Hartford | 96 | 24% | 110 | 28% | 110 | 28% | 84 | 21% | 400 |
| Honolulu | 214 | 73% | 53 | 18% | 22 | 8% | 3 | 1% | 292 |
| Houston | 205 | 8% | 1,736 | 68% | 552 | 22% | 43 | 2% | 2,536 |
| Houston SPC | 39 | 7% | 350 | 64% | 157 | 29% | 1 | 0% | 547 |
| Imperial | 24 | 16% | 79 | 54% | 40 | 27% | 4 | 3% | 147 |
| Kansas City | 59 | 13% | 176 | 39% | 117 | 26% | 105 | 23% | 457 |
| Krome | 55 | 5% | 553 | 55% | 403 | 40% | 2 | 0% | 1,013 |
| Las Vegas | 39 | 4% | 462 | 48% | 225 | 24% | 228 | 24% | 954 |
| LaSalle | 7 | 3% | 147 | 72% | 48 | 24% | 1 | 0% | 203 |
| Los Angeles (N) | 379 | 6% | 1,082 | 18% | 2,236 | 38% | 2,244 | 38% | 5,941 |
| Los Angeles (D) | 34 | 8% | 303 | 71% | 87 | 21% | 0 | 0% | 424 |
| Louisville | 0 | 0% | 4 | 7% | 27 | 47% | 27 | 47% | 58 |
| Memphis | 133 | 16% | 465 | 54% | 151 | 18% | 109 | 13% | 858 |
| Miami | 269 | 13% | 923 | 45% | 548 | 27% | 311 | 15% | 2,051 |
| New Orleans | 24 | 7% | 112 | 30% | 95 | 26% | 137 | 37% | 368 |
| New York City | 3,915 | 41% | 1,000 | 10% | 2,193 | 23% | 2,541 | 26% | 9,649 |
| Newark | 174 | 18% | 98 | 10% | 487 | 51% | 191 | 20% | 950 |
| Oakdale | 22 | 12% | 117 | 66% | 39 | 22% | 0 | 0% | 178 |
| Omaha | 34 | 6% | 187 | 35% | 213 | 40% | 95 | 18% | 529 |
| Orlando | 186 | 11% | 846 | 52% | 419 | 26% | 190 | 12% | 1,641 |
| Otay Mesa | 44 | 19% | 143 | 61% | 45 | 19% | 2 | 1% | 234 |
| Otero | 39 | 14% | 193 | 70% | 45 | 16% | 0 | 0% | 277 |
| Pearsall | 70 | 21% | 211 | 63% | 55 | 16% | 0 | 0% | 336 |
| Philadelphia | 178 | 29% | 129 | 21% | 193 | 32% | 104 | 17% | 604 |
| Phoenix | 71 | 7% | 42 | 4% | 490 | 50% | 370 | 38% | 973 |
| Port Isabel | 39 | 8% | 371 | 78% | 67 | 14% | 0 | 0% | 477 |
| Portland | 100 | 28% | 113 | 31% | 91 | 25% | 57 | 16% | 361 |
| Saipan | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 |
| Salt Lake City | 39 | 12% | 155 | 46% | 91 | 27% | 50 | 15% | 335 |
| San Antonio | 126 | 14% | 468 | 52% | 214 | 24% | 87 | 10% | 895 |
| San Diego | 62 | 13% | 183 | 40% | 137 | 30% | 78 | 17% | 460 |
| San Francisco | 1,300 | 39% | 437 | 13% | 906 | 27% | 670 | 20% | 3,313 |
| San Juan | 5 | 45% | 2 | 18% | 3 | 27% | 1 | 9% | 11 |
| Seattle | 201 | 20% | 496 | 49% | 190 | 19% | 121 | 12% | 1,008 |
| Stewart | 13 | 2% | 441 | 81% | 87 | 16% | 2 | 0% | 543 |
| Tacoma | 130 | 17% | 461 | 59% | 185 | 24% | 1 | 0% | 777 |
| Tucson | 17 | 10% | 120 | 71% | 19 | 11% | 12 | 7% | 168 |
| Ulster | 0 | 0% | 6 | 43% | 7 | 50% | 1 | 7% | 14 |
| Varick | 33 | 14% | 124 | 53% | 78 | 33% | 0 | 0% | 235 |
| York | 69 | 15% | 294 | 65% | 90 | 20% | 1 | 0% | 454 |
| **Total** | **10,654** | **20%** | **17,677** | **34%** | **14,805** | **28%** | **9,626** | **18%** | **52,762** |

AR617

## ASYLUM GRANTS BY COUNTRY OF NATIONALITY

**Figure 24.** In FY 2017, the top four nationalities accounted for 57 percent of asylum grants. China alone accounted for 26 percent of all asylum grants.

**Table 15.** For each of the five years, six of the top 10 countries from which aliens were granted asylum were China, El Salvador, Guatemala, India, Nepal, and Ethiopia.

**Figure 24. Asylum Grants by Country of Nationality**



| | Asylum Grants |
|---|---|
| China | 2,794 |
| El Salvador | 1,355 |
| Honduras | 955 |
| Guatemala | 951 |
| Other | 4,599 |

### Table 15. Asylum Grants by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | China | China | China | China | China |
| 2 | Nepal | India | Guatemala | El Salvador | El Salvador |
| 3 | Ethiopia | Ethiopia | Honduras | Guatemala | Honduras |
| 4 | India | Nepal | India | Honduras | Guatemala |
| 5 | Egypt | Egypt | El Salvador | Mexico | Mexico |
| 6 | Soviet Union | El Salvador | Nepal | India | India |
| 7 | Eritrea | Guatemala | Ethiopia | Nepal | Nepal |
| 8 | Russia | Eritrea | Mexico | Ethiopia | Eritrea |
| 9 | El Salvador | Soviet Union | Somalia | Somalia | Cameroon |
| 10 | Guatemala | Honduras | Soviet Union | Eritrea | Ethiopia |
| 11 | Mexico | Somalia | Egypt | Egypt | Syria |
| 12 | Cameroon | Russia | Eritrea | Soviet Union | Egypt |
| 13 | Pakistan | Cameroon | Russia | Cameroon | Bangladesh |
| 14 | Sri Lanka | Mexico | Syria | Bangladesh | Soviet Union |
| 15 | Guinea | Pakistan | Bangladesh | Albania | Albania |
| 16 | Honduras | Venezuela | Cameroon | Russia | Pakistan |
| 17 | Somalia | Iraq | Nigeria | Syria | Haiti |
| 18 | Mali | Gambia | Albania | Burkina Faso | Somalia |
| 19 | Moldavia (Moldova) | Sri Lanka | Haiti | Pakistan | Guinea |
| 20 | Venezuela | Moldavia (Moldova) | Colombia | Nigeria | Ecuador |
| 21 | Indonesia | Colombia | Gambia | Ghana | Burkina Faso |
| 22 | Colombia | Syria | Pakistan | Iran | Ghana |
| 23 | Gambia | Albania | Iraq | Kirghizia (Kyrgyzstan) | Ukraine |
| 24 | Bangladesh | Burkina Faso | Burkina Faso | Guinea | Nigeria |
| 25 | Burkina Faso | Nigeria | Kirghizia (Kyrgyzstan) | Ukraine | Venezuela |

## CONVENTION AGAINST TORTURE

In 1999, the Department of Justice implemented regulations regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture or CAT). There are two forms of protection under the Convention Against Torture, withholding of removal and deferral of removal.

**Table 16. Convention Against Torture Cases by Decision**

| Granted | | | Denied | Other | Withdrawn | Abandoned | Not Adjudicated | Total |
|---|---|---|---|---|---|---|---|---|
| Withholding | Deferral | Total | | | | | | |
| 760 | 175 | 935 | 17,061 | 25,249 | 6,455 | 2,044 | 14 | 51,758 |

AR619

**Table 17. Convention Against Torture Completions by Court**

| Immigration Court | Completions |
|---|---|
| Adelanto | 1,588 |
| Arlington | 2,269 |
| Atlanta | 883 |
| Aurora | 352 |
| Baltimore | 821 |
| Batavia | 203 |
| Bloomington | 405 |
| Boston | 733 |
| Buffalo | 163 |
| Charlotte | 579 |
| Chicago | 969 |
| Cleveland | 503 |
| Dallas | 825 |
| Denver | 460 |
| Detroit | 614 |
| El Paso | 200 |
| El Paso SPC | 198 |
| Elizabeth | 717 |
| Eloy | 806 |
| Fishkill | 33 |
| Florence | 517 |
| Harlingen | 311 |
| Hartford | 378 |
| Honolulu | 190 |
| Houston | 2,094 |
| Houston SPC | 856 |
| Imperial | 758 |
| Kansas City | 467 |
| Krome | 1,145 |
| Las Vegas | 973 |
| LaSalle | 247 |
| Los Angeles (N) | 3,699 |
| Los Angeles (D) | 665 |
| Louisville | 84 |
| Memphis | 786 |
| Miami | 2,219 |
| New Orleans | 354 |
| New York City | 5,915 |
| Newark | 791 |
| Oakdale | 215 |
| Omaha | 245 |
| Orlando | 1,863 |
| Otay Mesa | 846 |
| Otero | 321 |
| Pearsall | 539 |
| Philadelphia | 582 |
| Phoenix | 393 |
| Port Isabel | 603 |
| Portland | 426 |
| Saipan | 5 |
| Salt Lake City | 352 |
| San Antonio | 1,213 |
| San Diego | 645 |
| San Francisco | 3,541 |
| San Juan | 9 |
| Seattle | 1,002 |
| Stewart | 639 |
| Tacoma | 1,100 |
| Tucson | 116 |
| Ulster | 77 |
| Varick | 589 |
| York | 667 |
| **Total** | **51,758** |

AR620

# I-862 APPLICATIONS FOR RELIEF OTHER THAN ASYLUM

In addition to asylum, there is a variety of types of relief from removal available to aliens in immigration proceedings. These include, but are not limited to, different forms of cancellation of removal, adjustment of status, and different types of waivers.

**Table 18. I-862 Cases Grants of Relief**

| Fiscal Year | Relief Granted to Lawful Permanent Residents (LPR) | | Relief Granted to Non-LPR | | | | |
|---|---|---|---|---|---|---|---|
| | | | Not Subject to Annual Cap of 4,000 Grants | | | Subject to Annual Cap of 4,000 Grants | |
| | Relief Granted Under Section 212(c) | Cancellation of Removal | Adjustment of Status to LPR | Suspension of Deportation | Cancellation of Removal | Suspension of Deportation | Cancellation of Removal |
| FY 13 | 667 | 3,874 | 5,033 | 71 | 325 | 0 | 4,031 |
| FY 14 | 551 | 3,220 | 3,281 | 69 | 275 | 2 | 3,847 |
| FY 15 | 439 | 2,592 | 2,198 | 53 | 279 | 2 | 3,827 |
| FY 16 | 385 | 2,239 | 1,854 | 31 | 247 | 1 | 3,735 |
| FY 17 | 401 | 2,202 | 1,860 | 54 | 304 | 0 | 3,716 |

## I-862 IN ABSENTIA ORDERS

When an alien fails to appear for a hearing, the IJ may conduct a hearing in the alien's absence (*in absentia*). The *in absentia* rate refers to the proportion of all IJ decisions at the ICC where the removal order is issued *in absentia*.

**Figure 25.** From FY 2016 to FY 2017, the overall I-862 *in absentia* rate increased by about eight percent. In the same period, the never detained *in absentia* rate increased 18 percent. The released rate increased 13 percent.

### Figure 25. I-862 *In Absentia* Rates



**Table 19. I-862 *In Absentia* Orders and ICCs by Respondent Type**

| FY | Decision Subset | All Cases | Never Detained Cases | Released Cases | UAC Cases | Asylum Cases |
|---|---|---|---|---|---|---|
| FY 13 | In Absentia Orders | 18,747 | 10,394 | 8,278 | 836 | 1,742 |
| | Initial Case Completion | 136,761 | 51,152 | 26,798 | 2,565 | 28,459 |
| FY 14 | In Absentia Orders | 23,440 | 13,676 | 9,662 | 1,882 | 1,748 |
| | Initial Case Completion | 124,238 | 46,874 | 26,223 | 3,576 | 27,584 |
| FY 15 | In Absentia Orders | 35,166 | 24,646 | 10,464 | 6,481 | 1,847 |
| | Initial Case Completion | 127,350 | 59,550 | 27,442 | 13,435 | 27,644 |
| FY 16 | In Absentia Orders | 32,755 | 23,437 | 9,254 | 6,191 | 3,017 |
| | Initial Case Completion | 128,145 | 62,852 | 25,380 | 15,095 | 33,082 |
| FY 17 | In Absentia Orders | 41,384 | 30,010 | 11,292 | 6,759 | 4,776 |
| | Initial Case Completion | 149,436 | 67,966 | 27,376 | 13,872 | 43,013 |

## IMMIGRATION JUDGE HIRING

To better manage its caseload, EOIR focused on increased hiring of immigration judges in FY 2017.

**Figure 26.** The number of IJs on board increased 17 percent in FY 2017.



**Figure 26. Immigration Judge Hiring**

|  | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|---|---|---|
| Total IJs Hired | 17 | 39 | 4 | 8 | 0 | 20 | 56 | 64 |
| Total IJs on Board | 245 | 273 | 267 | 262 | 249 | 254 | 289 | 338 |

# BOARD OF IMMIGRATION APPEALS

## TOTAL CASES RECEIVED AND COMPLETED

The majority of cases BIA reviews arise from decisions IJs make in removal, deportation, or exclusion cases. A full list of case types heard by BIA originating from OCIJ is below. For purposes of this Statistics Yearbook, these types of cases are collectively referred to as appeals from IJ decisions.

- Case appeals from the decisions of IJs in removal, deportation, and exclusion cases at the court level;
- Appeals filed from the decisions of IJs on motions to reopen;
- Motions to reopen and/or reconsider filed in cases already decided by the BIA;
- Appeals pertaining to bond, parole, or detention;
- Interlocutory appeals; and
- Cases (or appeals) remanded from the Federal Court.

The BIA also has jurisdiction to review appeals arising from certain decisions that DHS officials render. These types of appeals are listed below. For purposes of this Statistics Yearbook, appeals from these DHS decisions are referred to as DHS decision appeals.

- Family-based visa petitions adjudicated by DHS district directors or regional service center directors;
- Waivers of inadmissibility for non-immigrants under INA § 212(d)(3)(A)(ii); and
- Fines and penalties imposed upon carriers for violations of immigration laws.

**Figure 27.** In FY 2017 completions decreased slightly while receipts increased slightly.

**Figure 27. Total BIA Cases Received and Completed**



| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| Receipts | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| Completions | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

AR625

## CASES RECEIVED AND COMPLETED BY TYPE

BIA has jurisdiction over appeals from IJ decisions and certain DHS decisions. The majority of appeals from IJ decisions are from case appeals, and the majority of appeals from DHS decisions are from visa petitions.

**Figure 31.** Appeals from IJ decisions make up most of the BIA's work. Completions of appeals from IJ decisions increased about three percent in FY 2017. Completions from DHS decisions decreased by about 32 percent.

### Figure 28. BIA Receipts and Completions by Case Type



|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Receipts: Appeals from DHS Decisions | 5,598 | 4,385 | 6,480 | 5,639 | 3,958 |
| ■ Receipts: Appeals from IJ Decisions | 29,210 | 25,365 | 22,866 | 24,582 | 29,545 |
| Receipts: Total Appeals | 34,808 | 29,750 | 29,346 | 30,221 | 33,503 |
| ■ Completions: Appeals from DHS Decisions | 5,411 | 3,293 | 6,641 | 6,767 | 4,586 |
| ■ Completions: Appeals from IJ Decisions | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| Completions: Total Appeals | 36,688 | 30,822 | 34,243 | 33,241 | 31,820 |

### Table 20. BIA Receipts and Completions by Type

| Appeal Type | FY 2013 Receipts | FY 2013 Comp. | FY 2014 Receipts | FY 2014 Comp. | FY 2015 Receipts | FY 2015 Comp. | FY 2016 Receipts | FY 2016 Comp. | FY 2017 Receipts | FY 2017 Comp. |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Appeals from IJ Decisions** | **29,210** | **31,277** | **25,365** | **27,529** | **22,866** | **27,602** | **24,582** | **26,474** | **29,545** | **27,234** |
| *Case Appeal* | 16,495 | 17,933 | 13,557 | 15,775 | 11,475 | 15,474 | 12,737 | 14,563 | 17,106 | 15,966 |
| *Appeal of IJ Motion to Reopen* | 1,639 | 1,839 | 1,516 | 1,691 | 1,454 | 1,659 | 1,453 | 1,631 | 1,785 | 1,960 |
| *Motion to Reopen/Reconsider-BIA* | 7,692 | 8,603 | 6,691 | 6,394 | 5,908 | 6,427 | 5,639 | 5,586 | 5,898 | 5,000 |
| *Bond Appeal* | 1,816 | 1,700 | 2,091 | 1,990 | 2,253 | 2,220 | 3,002 | 2,805 | 3,621 | 3,124 |
| *Bond MTR* | 28 | 24 | 32 | 35 | 52 | 47 | 57 | 45 | 33 | 43 |
| *Interlocutory Appeal* | 209 | 194 | 163 | 169 | 240 | 216 | 352 | 287 | 433 | 404 |
| *Federal Court Remand* | 1,331 | 984 | 1,314 | 1,474 | 1,484 | 1,559 | 1,341 | 1,556 | 669 | 737 |
| *Continued Detention Review* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| *Zero Bond Appeal* | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Appeals from DHS Decisions** | **5,598** | **5,411** | **4,385** | **3,293** | **6,480** | **6,641** | **5,639** | **6,767** | **3,958** | **4,586** |
| *Decisions on Visa Petitions* | 5,539 | 5,348 | 4,333 | 3,266 | 6,435 | 6,573 | 5,612 | 6,734 | 3,911 | 4,550 |
| *212(d)(3)(A) Waiver Decisions* | 55 | 60 | 49 | 25 | 45 | 65 | 26 | 33 | 45 | 33 |
| *Decisions on Fines and Penalties* | 4 | 3 | 3 | 2 | 0 | 3 | 1 | 0 | 2 | 3 |
| **Grand Total** | **34,808** | **36,688** | **29,750** | **30,822** | **29,346** | **34,243** | **30,221** | **33,241** | **33,503** | **31,820** |

## APPEALS FROM IJ DECISIONS COMPLETED BY COUNTRY OF NATIONALITY

BIA hears appeals from IJ decisions involving hundreds of nationalities. Appeals from IJ decisions arise primarily in cases of aliens from Mexico and Central America.

**Figure 29.** Over half of completed appeals from IJ decisions involve an alien from one of three countries.

**Table 21.** For the past five years, nine countries ranked among the top ten: Mexico, El Salvador, Guatemala, Honduras, China, India, Haiti, Jamaica, and Dominican Republic.

**Figure 29. Completed Appeals from IJ Decisions by Nationality**



| | Completions |
|---|---|
| ■ Mexico | 7,737 |
| ■ El Salvador | 3,958 |
| ■ Guatemala | 2,857 |
| ■ Honduras | 2,584 |
| ■ Other | 10,098 |

### Table 21. BIA Appeals from ICCs by Top 25 Countries of Nationality

| Rank | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| 1 | Mexico | Mexico | Mexico | Mexico | Mexico |
| 2 | China | China | El Salvador | El Salvador | El Salvador |
| 3 | El Salvador | El Salvador | China | China | Guatemala |
| 4 | Guatemala | Guatemala | Guatemala | Guatemala | Honduras |
| 5 | Honduras | Honduras | Honduras | Honduras | China |
| 6 | India | India | India | India | India |
| 7 | Colombia | Jamaica | Haiti | Haiti | Haiti |
| 8 | Jamaica | Colombia | Jamaica | Jamaica | Jamaica |
| 9 | Indonesia | Haiti | Colombia | Dominican Republic | Dominican Republic |
| 10 | Dominican Republic | Dominican Republic | Dominican Republic | Colombia | Ecuador |
| 11 | Haiti | Brazil | Brazil | Bangladesh | Colombia |
| 12 | Brazil | Indonesia | Nigeria | Ecuador | Bangladesh |
| 13 | Pakistan | Nigeria | Ecuador | Brazil | Brazil |
| 14 | Nigeria | Peru | Philippines | Nigeria | Nigeria |
| 15 | Venezuela | Pakistan | Peru | Philippines | Ghana |
| 16 | Philippines | Ecuador | Indonesia | Peru | Philippines |
| 17 | Ecuador | Philippines | Nicaragua | Indonesia | Pakistan |
| 18 | Peru | Kenya | Bangladesh | Armenia | Somalia |
| 19 | Kenya | Venezuela | Pakistan | Nicaragua | Peru |
| 20 | Nicaragua | Nicaragua | Nepal | Ghana | Nicaragua |
| 21 | Armenia | Ghana | Kenya | Nepal | Venezuela |
| 22 | Nepal | Russia | Armenia | Pakistan | Kenya |
| 23 | Albania | Nepal | Venezuela | Venezuela | Cameroon |
| 24 | Russia | Albania | Russia | Kenya | Cuba |
| 25 | Ghana | Armenia | Ghana | Albania | Nepal |

AR627

## APPEALS FROM IJ DECISIONS (I-862) COMPLETED BY REPRESENTATION STATUS

**Figure 30.** Representation rate for appeals has remained roughly constant across the past five years, reaching a high of 80 percent of completed appeals from IJ decisions represented in FY 2017.



**Figure 30. Completed Appeals from IJ Decisions (I-862 Cases) by Representation Status**

|                | FY 13  | FY 14  | FY 15  | FY 16  | FY 17  |
| -------------- | ------ | ------ | ------ | ------ | ------ |
| Represented    | 24,742 | 20,804 | 21,130 | 20,935 | 21,810 |
| Unrepresented  | 6,535  | 6,725  | 6,472  | 5,539  | 5,424  |
| Total          | 31,277 | 27,529 | 27,602 | 26,474 | 27,234 |
| % Represented  | 79%    | 76%    | 77%    | 79%    | 80%    |

AR628

## CASE APPEALS FROM IJ DECISION (I-862 ICCs) COMPLETED FOR DETAINED CASES

BIA handles detained cases (including aliens in IHP) as priority cases. For the purposes of Figure 31, figures for detained cases include IHP cases and cases of unaccompanied alien children in the custody of the Department of Health and Human Services.

**Figure 31.** The percent of completed case appeals from ICCs in I-862 detained cases has stayed approximately constant over the past five years, within a five-percentage point spread.



**Figure 31. Complete Case Appeals from I-862 ICCs by Detention Status**

|  | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| ■ Detained Case Appeal Decisions | 4,589 | 4,796 | 4,398 | 3,577 | 4,243 |
| ■ Total Case Appeal Decisions | 17,933 | 15,775 | 15,474 | 14,563 | 15,966 |
| Percent Detained | 26% | 30% | 28% | 25% | 27% |

**Table 22.** The percent of total detained IHP completions has been consistently between six and seven percent for the past five years.

**Table 22. BIA Detained Completions**

| Fiscal Year | Total Detained Completions | IHP Completions | Percent IHP Completions |
|---|---|---|---|
| FY 13 | 4,589 | 302 | 7% |
| FY 14 | 4,796 | 273 | 6% |
| FY 15 | 4,398 | 280 | 6% |
| FY 16 | 3,577 | 265 | 7% |
| FY 17 | 4,243 | 293 | 7% |

AR629

## IJ DECISIONS (I-862 ICCS) APPEALED

**Figure 32.** The percentage of ICCs being appealed has fluctuated between nine and 12 percent across the past five fiscal years.



**Figure 32. I-862 ICCs Appealed to BIA**

| | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 |
|---|---|---|---|---|---|
| IJ Decisions | 137,329 | 124,649 | 127,452 | 128,201 | 149,581 |
| Case Appeals Received | 16,495 | 13,557 | 11,475 | 12,737 | 17,106 |
| Percent Appealed | 12% | 11% | 9% | 10% | 11% |

AR630

## OFFICE OF THE CHIEF ADMINISTRATIVE HEARING OFFICER

### TOTAL CASES RECEIVED AND COMPLETED

OCAHO is headed by the Chief Administrative Hearing Officer, who is responsible for the general supervision of administrative law judges (ALJs), management of OCAHO and review of ALJ decisions relating to illegal hiring, employment eligibility verification violations and document fraud. OCAHO's ALJs hear cases and adjudicate issues arising under provisions of the INA relating to:

- Knowingly hiring, recruiting or referring for a fee unauthorized aliens, or the continued employment of unauthorized aliens, failure to comply with employment eligibility verification requirements, and/or requiring indemnity bonds from employees in violation of section 274A of the INA (employer sanctions provisions);
- Unfair immigration-related employment practices in violation of section 274B of the INA (anti-discrimination provisions); and
- Immigration-related document fraud in violation of section 274C of the INA (document fraud provisions).

Employer sanctions and document fraud complaints are brought by the U.S. Department of Homeland Security. Anti-discrimination complaints may be brought by the U.S. Department of Justice's Immigrant and Employee Rights Section or private litigants. All final agency decisions may be appealed to the appropriate federal circuit court of appeals.

**Figure 33.** Completions continued to outpace receipts in FY 2017. Note that completions may have been for cases received in a prior fiscal year.



**Figure 33. OCAHO Receipts and Completions**

|  | FY 16 | FY 17 |
|---|---|---|
| Receipts | 84 | 74 |
| Completions | 119 | 75 |

**Figure 34.** The bulk of OCAHO's workload is 274A and 274B complaints.



**Figure 34. OCAHO Receipts and Completions by Type**

|  | 274A and 274B Complaints | Subpoenas | Requests for Review | Attorney's Fees |
|---|---|---|---|---|
| FY 15 Receipts | 58 | 22 | 5 | 1 |
| FY 15 Completions | 77 | 22 | 5 | 0 |
| FY 16 Receipts | 37 | 21 | 2 | 0 |
| FY 16 Completions | 56 | 21 | 2 | 1 |
| FY 17 Receipts | 58 | 45 | 0 | 0 |
| FY 17 Completions | 62 | 45 | 0 | 0 |

AR632

# FREEDOM OF INFORMATION ACT (FOIA)

## FOIA RECEIPTS

**Figure 35.** Since FY 2013, the number of FOIA requests received by EOIR has increased by about 73 percent.



**Figure 35. FOIA Receipts**

| | FY 2013 | FY 2014 | FY 2015 | FY 2016 | FY 2017 |
|---|---|---|---|---|---|
| Receipts | 25,336 | 26,614 | 31,513 | 35,500 | 43,859 |

AR633

**Executive Office for Immigration Review**
**Planning, Analysis, and Statistics Division**


**<u>Asylum Median Processing Time (I-862 & I-863 Initial Case
Completions).</u>**
**<u>Date Range: October 1, 2014 through June 30, 2019</u>**
**<u>Date of Data Run: July 12, 2019</u>**

**<u>Asylum Median Processing Time (I-862 & I-863 Initial Case
Completions).</u>**


| Fiscal Year | Asylum Median Processing Time |
|---|---|
| FY 2015 | 713 days |
| FY 2016 | 589 days |
| FY 2017 | 623 days |
| FY 2018 | 765 days |
| FY 2019 (through June 30, 2019) | 812 days |

AR634

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/trump-says-guatemala-is-set-to-help-stem-migrant-flow-11560833062

LATIN AMERICA

# Trump Says Guatemala Is Set to Help Stem Migrant Flow

President also says U.S. will increase deportation efforts



People look through a section of the U.S.-Mexico border barrier on the beach in Tijuana, Mexico, on June 9. On Monday, President Trump said Guatemala was ready to sign a 'Safe-Third Agreement' to accept asylum seekers and prevent them from coming to the U.S. PHOTO: CESAR RODRIGUEZ/BLOOMBERG NEWS

*By Louise Radnofsky*

June 18, 2019 12:44 am ET

WASHINGTON—President Trump praised Mexico's efforts to intercept Central American asylum seekers and said that Guatemala was getting ready to sign an agreement that would make it a final refuge for people fleeing poverty and violence in the region.

In a pair of tweets Monday night, Mr. Trump said that Guatemala was preparing to sign a "Safe-Third Agreement," in an apparent reference to a legal designation that would require Central American migrants that cross into Guatemala to claim asylum there, blocking those migrants from lodging claims elsewhere.

Officials from Guatemala's Foreign Ministry didn't immediately respond to requests for comment, and the White House declined to immediately provide further details.

Mr. Trump also said Monday night that U.S. Immigration and Customs Enforcement would increase its efforts to remove people in the U.S. without authorization.

AR635

"Next week ICE will begin the process of removing the millions of illegal aliens who have illicitly found their way into the United States. They will be removed as fast as they come in," wrote Mr. Trump.

An administration official said there were more than one million immigrants who were subject to final deportation orders but the orders hadn't yet been enforced. The administration official said late Monday that enforcing the orders would be a top priority for ICE.

Many of the families who have been traveling through Mexico to the U.S. border have been coming from Guatemala as well as Honduras and El Salvador. Many say they are fleeing a combination of endemic poverty, violence and corruption in the region.

The issue of "safe third country" status remains a major point of contention between the U.S. and Mexico, even as the two countries have reached a deal to attempt to stem a flow of Central American adults and children that U.S. authorities say have brought the southwest border to a breaking point by arriving each day in the thousands.

Mexico had long resisted U.S. requests that it accept the safe third country status, insisting that it lacked the resources to uphold such a commitment—but as part of its agreement with the U.S., Mexico pledged last week that it would take steps to declare itself a safe third country if its other efforts failed to reduce migrant numbers.

Mexico has said that its ability to uphold its asylum commitments would depend on whether Guatemala and other Central American countries would also agree to grant asylum to migrants.

Mr. Trump's tweets on Monday night suggested that the regional framework that Mexico has been pressing for could be advancing.

"Mexico, using their strong immigration laws, is doing a very good job of stopping people long before they get to our Southern Border," wrote Mr. Trump. "Guatemala is getting ready to sign a Safe-Third Agreement."

But migrant rights groups have raised significant concerns over Guatemala's ability to provide shelter and assistance to asylum seekers crossing into the country from Honduras and El

AR636

Salvador. Charities and civic groups currently provide most of the funding and resources for such assistance right now.

U.S. officials say the American immigration system is ill-equipped to receive Central American families seeking asylum, from the moment they turn themselves in to the court adjudication of their claims. which can take years amid heavy backlogs.

**Write to** Louise Radnofsky at louise.radnofsky@wsj.com

*Appeared in the June 18, 2019, print edition as 'Trump Says Guatemala Is Set to Stem Flow.'*

Copyright © 2019 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.



**Submission by the United Nations High Commissioner for Refugees**

**For the Office of the High Commissioner for Human Rights' Compilation Report**

**Universal Periodic Review: *3rd Cycle, 31st Session***

# MEXICO

## I. BACKGROUND INFORMATION

Mexico acceded to both the *1951 Convention relating to the Status of Refugees* and its *1967 Protocol* (hereinafter jointly referred to as the "*1951 Convention*") in 2000, making reservations to articles 17, 26, 31.2 and 32 of the *1951 Convention* as well as an interpretative declaration to article 1 and the *1967 Protocol*; in 2014, Mexico withdrew its reservation to article 32. Mexico also acceded to the *1954 Convention relating to the Status of Stateless persons* (the "*1954 Convention*") in 2000 with reservations to articles 17, 31 and 32. Reservation to article 31 was subsequently withdrawn in 2014. The State is not a party to the *1961 Convention in the Reduction of Statelessness* (the "*1961 Convention*").

The *2011 Refugees, Complementary Protection and Political Asylum Act* and its *Regulatory Framework* together with the *Migration Act* constitute the domestic legal framework governing asylum. Further guarantees related to the principle of *non-refoulement*, upholding the best interests of the child, and due process during migration procedures are enshrined in the *General Law on the Rights of Children and Adolescents* published in 2014, along with its *Regulatory Framework.* The principal government body responsible for refugee issues, including refugee status determination, is the Mexican Commission for Refugees (COMAR), created by Presidential decree in 1980 under the Ministry of Interior. In 2011, Mexico adopted its Migration Law, creating a formal statelessness determination procedure which began functioning in 2012. The statelessness determination procedure (SDP) is mainly regulated by Article 150 of the Regulations to the Migration Law. Applications for statelessness status are received by the National Migration Institute, which requests a legal opinion from COMAR.

Violence and persecution inflicted mostly by criminal actors in the North of Central America (NCA)[1] triggers forced displacement with increasing numbers of unaccompanied children and adolescents, families, as well as persons discriminated against on the basis of sexual orientation and gender identity. While more than 400,000 people were estimated to have crossed Mexico's southern border in 2016, only approximately 2 percent of those applied for asylum, representing nevertheless an increase of 156 per cent from claims submitted in 2015. Out of the total asylum applications in 2016, 5,954 persons completed their process (3,076 persons were recognized as refugees and 641 were given complementary protection). From January to December 2017, 14,596 people applied for asylum (1,907 persons were recognized as refugees, 918 given complementary protection, and 7,719 cases remain pending).[2] Statistics indicate that for the period January-December 2017, 29% asylum-seekers were from Honduras, 25% from El Salvador, 4.6% from Guatemala, and 27% from Venezuela.

Regarding unaccompanied children from North of Central America (El Salvador, Honduras and Guatemala), approximately 35% of them expressed fear of returning to their country of origin due

---

[1] Mexico is also a country of transit for refugees and migrants from Asia and Africa seeking to reach the United States and Canada.
[2] Government of Mexico, *COMAR Statistics*, available at:
 https://www.gob.mx/comar/articulos/estadisticas-2013-2017?idiom=es Last visited: 12 March 2018.

1

AR638

to social violence or domestic violence.[3] UNHCR conducted interviews with unaccompanied and separated children (UASC) and determined that violence led more than 48.6% of them to leave their countries of origin, thus meaning they had potential international protection needs.[4] However, in 2016 only 242 UASC applied for asylum (103 were recognized, 28 granted complementary protection, 44 rejected, and 67 formally withdrew or abandoned their claims).

It should be noted that Mexico is playing a key role internationally and in the region with regards to advancing the protection of asylum-seekers and refugees. The Mexican Government is one of the leading States of an initiative to develop a regional application of the Comprehensive Refugee Response Framework, which will contribute to the adoption of the Global Compact on Refugees in 2018. This regional initiative, known as the Comprehensive Regional Protection and Solutions Framework (MIRPS, in Spanish) has been undertaken with the support of UNHCR.

## II. ACHIEVEMENTS AND POSITIVE DEVELOPMENTS

### Positive developments linked to the 2nd cycle UPR recommendations

**Linked to 2nd cycle UPR recommendation no. 148.173:** "Continue to work towards the protection and defence of the rights of migrants (Argentina and Bolivia)."

UNHCR commends Mexico's active participation and leadership in the San José Action Statement, the New York Declaration on Refugees and Migrants, the Leadership Summit on Refugees, and the CRPSF process in October 2017. Mexico undertook a number of laudable commitments in the framework of MIRPS. In particular, Mexico committed to: (a) expand the scope of programmes on alternative measures to detention to asylum-seekers, specifically unaccompanied children and adolescents, persons in situations of vulnerability, families, older persons, and persons with medical needs; (b) expand access to basic services and rights for asylum-seekers and refugees, such as through the incorporation in the public health-care system (Seguro Popular) and in other social programs through the Social Development Ministry (SEDESOL) and, (c) carry out information and awareness-raising campaigns on the asylum procedure for government officials as well as persons with international protection needs.

UNHCR commends Mexico for its undertaking to strengthen the Mexican Refugee Agency (COMAR) and the establishment in 2015 of the Special Unit for the Investigation of Crimes Against Migrant Persons within the Attorney General's Office (PGR).

**Linked to 2nd cycle UPR recommendation no. 148.154:** "Intensify efforts to guarantee universal access to health services, information and education on health and sexual and reproductive rights, particularly for adolescents (Uruguay)."

UNHCR is pleased to note that Mexico has 76 Ambulatory Centres for the Prevention and Attention of AIDS and Sexually Transmitted Infections (CAPASITS, in Spanish) throughout all 32 states in the country – 15 of those along the migration route - which offer medical attention and psycho-social attention, as well as free antiretroviral treatment. Migrants, asylum-seekers, and refugees can receive medical treatment and HIV and ITS medication at CAPASITS at no cost and regardless of immigration status after persons have registered with the *Seguro Popular*.[5]

## III.   KEY PROTECTION ISSUES, CHALLENGES AND RECOMMENDATIONS

### Challenges linked to outstanding 2nd cycle UPR recommendations

---

[3] CONAPO, "Características, tendencias y causas de la migración de niñas, niños y adolescentes desde, hacia y en tránsito por México, 2011-2016" en *La situación demográfica de México 2016*, https://www.gob.mx/conapo/documentos/la-situacion-demografica-de-mexico-2016.
[4] ACNUR, "Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y/o separados de Centroamérica y su necesidad de protección internacional", 2014,
http://www.acnur.org/fileadmin/scripts/doc.php?file=fileadmin/Documentos/Publicaciones/2014/9828.
[5] UNHCHR has not received any information indicating that asylum-seekers or refugees have been refused medical attention at CAPASITS, regardless of immigration status or registration with Seguro Popular.

2

**Issue 1: Ratification of international instruments**

**Linked to 2nd cycle UPR recommendation no. 148.7:** "Ratify the *1961 Convention on the Reduction of Statelessness* (Paraguay)."

Mexico is a party to the *1954 Convention Relating to the Status of Stateless Persons* having made reservations to articles 17 and 32, and has not yet acceded to the *1961 Convention on the Reduction on Statelessness*. UNHCR appreciates that Mexico has been a key promoter in international fora of the right of all persons to be registered at birth and to be recognized everywhere as a person before the law. In this regard, efforts should be made to reform national legislation in ways that permit accession to the *1961 Convention* and also to withdraw the reservations made to the *1954 Convention*.

**Recommendations:**
UNHCR recommends that the Government of Mexico:
  (a) Consider acceding to the *1961 Convention on the Reduction of Statelessness*;
  (b) Consider withdrawing the reservations made to the *1954 Convention Relating to the Status of Stateless Persons*;
  (c) Strengthen the implementation of the statelessness determination procedure; and
  (d) Ensure Mexican legislation is in line with the *1961 Convention on the Reduction of Statelessness.*

**Issue 2: Protection of human rights of asylum-seekers and refugees**

**Linked to 2nd cycle UPR recommendation no. 148.175:** "Effectively protect and guarantee the safety and human rights of migrants, especially women and children, including those that are in transit in the national territory, ensuring their access to justice, education, health and civil registry, incorporating the principle of the best interest of the child and the family unit (Holy See)."

In addition to ensuring respect for migrants' human rights, the *2011 Migration Act* also has the merit of establishing mechanisms for preventing crimes against migrants and procedures leading to regularization of immigration status, as well as for the issuance of "temporary visitor for humanitarian reasons" cards to migrants who are victims of serious crimes, unaccompanied children and asylum-seekers, which allow freedom of movement and access to formal employment in principle, but in practice individuals also require a Unique Population Code to be hired (CURP, in Spanish) and existing administrative arrangements do not allow for this code to be issued to asylum-seekers (see Issue 5, below).

Additionally, concerns persist regarding the rise in crimes and the increased risk towards migrants throughout the country, the high levels of impunity for crimes committed against migrants, and the difficulties that migrants who are victims of crime and asylum-seekers continue to face in accessing justice and obtaining regularization for humanitarian reasons under article 52 of the *2011 Migration Act*. These concerns were also raised recently by the United Nations Committee on the Rights of Migrant Workers (27 September 2017, CMW/C/MEX/CO/3)

**Recommendations:**
UNHCR recommends that the Government of Mexico:
  (a) Ensure access to justice for migrants, asylum-seekers and refugees by strengthening the Special Unit for the Investigation of Crimes against Migrant Persons within the Attorney General's Office (PGR), and the State-level Special Prosecutor Offices for the Attention of Crimes against Migrants; and
  (b) Standardize administrative practices in the National Institute of Migration (INM) to ensure that all migrants who fall within the scope of article 52 of the *2011 Migration Act* and all asylum-seekers are duly granted the "temporary visitor for humanitarian reasons" card.

**Issue 3: Sexual and gender-based violence against migrants, asylum-seekers and refugees**

3

**Linked to 2nd cycle UPR recommendation no. 148.79:** <u>"Continue to take the necessary measures to prevent violence against women, particularly migrant women and penalise those who commit these acts of violence (Nicaragua)."</u>

The *2007 General Act for Access for Women to a Life Without Violence* and its *2008 Regulations* together with the 2014-2018 Comprehensive Programme to Prevent, Punish and Eradicate Violence against Women establish the obligations of the Mexican state to punish and eradicate violence against women under its national framework. The National Human Rights Commission (CNDH) recognized violence against women as an extremely serious problem in Mexico noting that almost 7 out of 10 women in Mexico have suffered violence.[6] In this context, migrant, asylum-seeking, and refugee women are particularly vulnerable due to their national origin and their legal status in Mexico, due to discrimination, lack of generalized knowledge by public officials – particularly at the local level - regarding the rights of migrants, asylum-seekers and refugees, and due to a lack of specialized services. The application of administrative detention measures for persons submitting asylum claims at the border exacerbates the risk of violence for women, girls, and LGBTI persons because to avoid detention almost all enter the country irregularly. Asylum-seekers generally then travel to towns located 20 to 160 km from the border to make asylum claims, but to do so they often travel along remote routes and are exposed to significant risks of assault and sexual and gender-based violence. Additional obstacles hamper migrant, asylum-seeking and refugee women's access to services and justice, such as lack of access to services due to irregular migration status, lack of awareness by justice and public health authorities regarding the rights that asylum-seeking and refugee women and girls are entitled to in Mexico, lack of access to legal representation to file criminal complaints, among others.

**Recommendations:**
UNHCR recommends that the Government of Mexico:
    (a) Implement programmes aimed at the prevention, punishment and eradication of sexual and gender-based violence faced by women migrants, asylum-seekers and refugees, which include adequate training for relevant government and health officials; and
    (b) End the administrative detention of asylum-seekers who submit international protection claims at the border.

<u>**Additional protection challenges**</u>

**Issue 4: Detention of migrants and asylum seekers, particularly children and other vulnerable persons**

The *2011 Migration Act* provides for the automatic administrative detention of all persons in an irregular immigration situation in the country. This law prescribes a time limit of maximum 15 working days for immigration detention which can be extended up to 60 working days in exceptional cases. However, the *2011 Migration Act* does not specify a time limit for detention for those who initiate an administrative procedure or judicial remedy, with the consequence that in practice there is no maximum period for immigration detention for asylum-seekers who initiate a legal remedy. Furthermore, although national law prohibits the detention of children and the Government of Mexico committed to fully ending the administrative detention of children under 11 years of age during the 2016 Leaders' Summit on Refugees, many children detected by migration authorities are referred to Immigration Stations (detention centers) or to closed-door shelters. During 2016, more than 186,216 detentions for immigration-related purposes took place, including 40,144 children, of whom 17,557 were unaccompanied. Concerns have been expressed by the Inter-American Commission on Human Rights on the deterrent effect that detention has on persons

---

[6] Comisión Nacional de los Derechos Humanos, *Diagnóstico de la Comisión Nacional de los Derechos Humanos como integrante de los grupos de trabajo que dan seguimiento a los procedimientos de Alerta de Violencia de Género contra las Mujeres (AVGM),* 2017, p. 50

4

with international protection needs, who may choose not to apply for asylum in detention centres or to make a claim but later abandon or withdraw it.[7]

In 2016, the Government established a program to release asylum-seekers from detention to continue their asylum procedures in civil society shelters. From July 2016 until December 2017, over 1,900 asylum-seekers were released from detention to shelters. However, this release programme has not been regulated through the issuance of an administrative directive or a legal reform, which generates uncertainty and protection gaps.

**Recommendations:**
UNHCR recommends that the Government of Mexico:
(a) Ensure that the legal framework on migration and asylum is fully harmonized with the *General Law on the Rights of Children and Adolescents* and with relevant international standards on the rights of the child, to ensure that no child is subject to administrative detention and that all children shelters have an adequate comprehensive attention model;
(b) Ensure that the migration authority implements measures to identify international protection needs during the initial appearance at the Immigration Stations, thus facilitating access to the asylum system and the alternatives to administrative detention programs;
(c) Consider amending the *2011 Migration Act* to remove those provisions that authorize the automatic administrative detention of all persons in an irregular migratory situation, particularly asylum-seekers; and
(d) Consider amending relevant legislation or issuing an executive or administrative order to ensure that the alternative to administrative detention program for asylum-seekers is fully enforceable, transparent, and applicable throughout the country.

**Issue 5: Access to economic, social and cultural rights for asylum-seekers and refugees**

The *2011 Refugees, Complementary Protection and Political Asylum Act* establishes that refugees should have all possible means to access the rights and guarantees established in the Mexican Constitution, including the right to work, housing, health, education, and other relevant economic, social and cultural rights.

Nevertheless, asylum-seekers and refugees continue to face several obstacles in fully enjoying economic, social, and cultural rights due to obstacles in obtaining the Unique Population Code (CURP). The lack of knowledge of asylum-seekers and refugees' rights and related documentation by public service providers constitutes an additional barrier. In some instances, discriminatory patterns further complicate effective access to rights.

**Recommendations:**
UNHCR recommends that the Government of Mexico:
(a) Continue strengthening efforts to ensure full enjoyment of economic, social, and cultural rights for asylum-seekers and refugees, including by removing administrative barriers or by facilitating access to social programs;
(b) Ensure that asylum-seekers have access to the *Seguro Popular* national health insurance scheme for a period of at least one year;
(c) Ensure that banking and financial institutions fully comply with the CNBV directive so that all identity documents issued by the National Institute of Migration are duly accepted to open bank accounts and access financial services; and
(d) Consider facilitating access to the CURP identification number for asylum-seekers.

**UNHCR**
**March 2018**

---

[7] Inter-American Commission on Human Rights, *Human Rights of Migrants and other Persons in the Context of Human Mobility in Mexico* (2013), available at:
http://www.oas.org/en/iachr/migrants/docs/pdf/Report-Migrants-Mexico-2013.pdf.

AR642

# ANNEX

**Excerpts of relevant Recommendations from the 2nd cycle Universal Periodic Review, Concluding Observations from UN Treaty Bodies and Recommendations of Special Procedures mandate holders**

# MEXICO

We would like to bring your attention to the following excerpts from the 2nd cycle UPR recommendations, UN Treaty Monitoring Bodies' Concluding Observations, and recommendations from UN Special Procedures mandate holders' reports relating to issues of interest and persons of concern to UNHCR with regards to Mexico.

## I.  Universal Periodic Review (Second Cycle – 2013)

| Recommendation[8] | Recommending State/s | Position[9] |
|---|---|---|
| **Ratification of international instruments** | | |
| 148.7. Ratify the 1961 Convention on the Reduction of Statelessness. | Paraguay | Noted[10] |
| **Migrants and refugees** | | |
| 148.146. Further enhance institutions and infrastructure for human rights, policies and measures toward enhancing the social inclusion, gender equality and non-discrimination, favourable conditions for vulnerable groups of women, children, indigenous people, migrants and refugees. | Viet Nam | Supported |
| 148.58. Create a database of disappeared and missing migrants, and that all authorities cooperate to prevent and punish crimes against this group. | Norway | Supported |
| 148.173. Continue to work towards the protection and defence of the rights of migrants. | Argentina and Bolivia | Supported |
| 148.174. Continue to work with the countries of the region in special programs that address the situation of criminality against migrants. | Nicaragua | Supported |
| 148.175. Effectively protect and guarantee the safety and human rights of migrants, especially women and children, including those that are in transit in the national territory, ensuring their access to justice, education, health and civil registry, incorporating the principle of the best interest of the child and the family unit. | Holy See | Supported |
| 148.176. Maintain the humane policy that ensures the protection of the rights of migrants, and guarantee them access to justice, education and healthcare, regardless of their status. | Nigeria | Supported |
| **Gender Discrimination and SGBV** | | |
| 148.66. Enact and enforce laws to reduce incidences of violence against women and girls. | Sierra Leone | Supported |

---

[8] All recommendations made to Mexico during its 2nd cycle UPR can be found in: "Report of the Working Group on the Universal Periodic Review of Mexico" (11 December 2013), A/HRC/25/7, available at: http://www.ohchr.org/EN/HRBodies/UPR/Pages/MXindex.aspx.

[9] Mexico's views and replies, in Spanish, can be found in: *Addendum* (14 March 2014), A/HRC/25/7/Add.1, available at: http://www.ohchr.org/EN/HRBodies/UPR/Pages/MXindex.aspx.

[10] *Addendum:* "Las disposiciones de la Convención no son compatibles con el artículo 37 apartado B, fracción II de la Constitución Política de los Estados Unidos Mexicanos (CPEUM), que indica que la nacionalidad mexicana por naturalización se perderá por residir durante cinco años continuos en el extranjero. Tampoco es compatible con la Ley de Nacionalidad, ya que ésta establece en su artículo 20 que el extranjero que pretenda naturalizarse mexicano deberá acreditar que ha residido en territorio nacional cuando menos durante los últimos cinco años inmediatos anteriores a la fecha de solicitud."

6

AR643

| | | |
|---|---|---|
| 148.67. Implement the designed public policy and launch a comprehensive awareness-raising campaign to end gender-based violence that includes sexual violence and feminicide. | Slovenia | Supported |
| 148.70. Continue to prevent and combat violence against women, guaranteeing women's access to justice and continue to improve support services. | State of Palestine | Supported |
| 148.71. Ensure investigations of violence against women, and establish victim support programmes for affected women. | Maldives | Supported |
| 148.76. Make a priority the prevention and punishment of all forms of violence against women. | France | Supported |
| 148.79. Continue to take the necessary measures to prevent violence against women, particularly migrant women and penalise those who commit these acts of violence. | Nicaragua | Supported |
| 148.102. Reinforce training of police and justice officials on the issue of violence against women in order to improve the response by the Mexican authorities | Portugal | Supported |
| **Children** | | |
| 148.81. Set up a comprehensive system to protect children's rights and develop a national strategy to prevent and address all forms of violence. | Iran (Islamic Republic of) | Supported |
| 148.82. Ensure a better protection for children and adolescents against violence related to organized crime. | Algeria | Supported |
| 148.83. Enhance the dissemination of information and figures regarding children and young persons who fall victims to the struggle against drug trafficking. | Italy | Supported |
| 148.110. Continue its efforts to ensure the protection of children's rights, including by fully implementing the 2012 federal justice for adolescents act and considering implementing of restorative justice system. | Indonesia | Supported |
| **Access to rights** | | |
| 148.144. Focus on marginalised groups or disadvantaged sections of society. Of particular relevance would be measures to improve health and education. | India | Supported |
| 148.145. Continue strengthening its social policies with a view of increasing the standard of living of its people, especially the most vulnerable. | Venezuela and Trinidad and Tobago | Supported |
| 148.151. Continue efforts to design housing financing schemes for the care of the population working within the informal market economy. | Ecuador | Supported |
| 148.154. Intensify efforts to guarantee universal access to health services, information and education on health and sexual and reproductive rights, particularly for adolescents. | Uruguay | Supported |
| 148.163. Allocate more resources to education for vulnerable students and the disabled. | South Sudan | Supported |
| **Torture, arbitrary detention and enforced disappearances** | | |
| 148.52. Pursue efforts to ensure that complaints in cases of torture, arbitrary detention and disappearances are duly investigated. | Turkey | Supported |
| 148.58. Create a database of disappeared and missing migrants, and that all authorities cooperate to prevent and punish crimes against this group. | Norway | Supported |
| 148.103. Further pursue the full investigation of alleged incidents of human rights violations by the police force, especially within detention centres. | Cyprus | Supported |
| **Trafficking** | | |
| 148.84. Consider establishing mechanisms aimed at early identification, referral, assistance and support for victims of trafficking. | Egypt | Supported |
| 148.85. Increase funding for federal human trafficking prosecutors and take steps to end the impunity for public officials complicit in trafficking. | Norway | Supported |
| 148.86. Continue its policies and efforts to combat human trafficking especially those of women and children. | Bolivia, Singapore and Costa Rica | Supported |

7

AR644

| 148.89. Strengthen measures to combat human trafficking, including violence against migrants. | Algeria and Sri Lanka | Supported |
|---|---|---|

## II. Treaty Bodies

### Committee on Enforced Disappearances

Concluding Observations, (5 March 2015), CED/C/MEX/CO/1

**Disappearances of migrants**
23. The Committee is concerned by reports that there have been numerous cases of disappearances of migrants, including migrant children, and that these cases include cases of enforced disappearance. It also notes with concern the challenges that this dramatic situation poses for full observance of the rights to justice and truth embodied in the Convention, particularly since the relatives of the disappeared persons are not normally resident in the State party. In this regard, the Committee notes the information provided by the State party in relation to the investigation of disappearances of migrants and its efforts to locate them and provide support and protection. It also notes that the State party is working on the design of a transnational search and access to justice mechanism for such persons (arts. 1, 3, 12, 15 and 24).

24. **In conjunction with countries of origin and countries of destination, and with input from victims and civil society, the State party should redouble its efforts to prevent and investigate disappearances of migrants, to prosecute those responsible and to provide adequate protection for complainants, experts, witnesses and defence counsels. The transnational search and access to justice mechanism should guarantee: (a) that searches are conducted for disappeared migrants and that, if human remains are found, they are identified and returned; (b) that ante-mortem information is compiled and entered into the ante-mortem/post-mortem database; and (c) that the relatives of the disappeared persons, irrespective of where they reside, have the opportunity to obtain information and take part in the investigations and the search for the disappeared persons.**

**Register of persons deprived of their liberty**
34. The Committee takes note of the information provided by the State party regarding the information that should be entered in the Detention Registry System and the administrative arrest log. However, the Committee regrets that it has not received detailed information about the records kept in all places in which persons might be deprived of their liberty, such as migrant holding facilities or military detention centres (arts. 17 and 22).

35. **The State party should adopt the necessary measures to guarantee that:**
   (a) **All deprivations of liberty are entered in uniform registers and/or records which include, as a minimum, the information required under article 17, paragraph 3, of the Convention;**
   (b) **All registers and/or records of persons deprived of liberty are filled out and updated promptly and accurately;**
   (c) **All registers and/or records of persons deprived of liberty are subject to periodic checks and, in the event of irregularities, the officers responsible are disciplined.**

### Committee on Migrants Workers

Concluding Observations, (27 September 2017), CMW/C/MEX/CO/3

**Participación de la sociedad civil**
21. El Comité mantiene su especial preocupación ante la vulneración de derechos humanos de los defensores de los migrantes. Observa que son objeto de violencia y amenazas por parte del crimen organizado y redes de tráfico de personas, incluso en connivencia con autoridades, así como de actos de hostigamiento y deslegitimación del trabajo de esas organizaciones por parte de agentes migratorios, distintos cuerpos de seguridad gubernamentales y empresas privadas que

AR645

gestionan acciones de control migratorio o prestan servicios de vigilancia de transporte en rutas migratorias.

**22. El Comité reitera su recomendación anterior (véase CMW/C/MEX/CO/2, párr. 52), e invita al Estado parte a que adopte medidas efectivas, agiles e integrals para:**
  (a) **Garantizar la vida, libertad e integridad de defensores de derechos humanos de la población migrante, incluyendo medidas para prevenir, investigar y sancionar adecuadamente las agresiones y abusos en su contra;**
  (b) **Reconocer públicamente su labor, incluyendo el establecimiento de un registro de casos de denuncias, investigaciones realizadas y casos resueltos para ser presentados en el siguiente informe periódico; c) Facilitar el ejercicio de su labor, incluyendo su acceso amplio a los centros de detención migratoria, los albergues y otros establecimientos afines.**

### No discriminación

25. El Comité toma nota del marco jurídico del Estado parte para asegurar la no discriminación. Sin embargo, le preocupan informes sobre el aumento de la xenofobia a nivel social e institucional y el rol de los medios de comunicación en crear y mantener estereotipos contra los migrantes. También le preocupa la información recibida sobre procedimientos de control y verificación migratoria que se realizan con base en el perfil étnico de las personas.

26. **El Comité reitera su recomendación anterior (véase CMW/C/MEX/CO/2, párr. 24), y asimismo alienta al Estado parte a que establezca medidas de prevención y sanción ante la criminalización de las personas migrantes en mensajes de diferentes actores sociales y políticos. Recomienda la realización de campañas de educación, comunicación e información social, así como que se detecten y eliminen las practices discriminatorias en las instituciones públicas y privadas, incluyendo los procedimientos migratorios de control y verificación**.

27. Preocupan al Comité informes según los cuales los migrantes con estancias por razones humanitarias enfrentan obstáculos para recibir la Clave Única de Registro de Población, que es un requerimiento para acceder a derechos y beneficios sociales.

28. **El Comité recomienda que el Estado parte tome medidas inmediatas para facilitar el acceso de los migrantes y solicitantes del estatuto de refugiado con estancias por razones humanitarias a la Clave Única de Registro de Población, en línea con los artículos 25 y 27 de la Convención.**

### Protección de violencia, lesión física, amenaza e intimidación

33. El Comité expresa su profunda preocupación por las graves irregularidades en las investigaciones para identificar a los responsables y las víctimas de las masacres en los estados de Tamaulipas y Nuevo León entre 2010 a 2012, por las que no hay personas sancionadas, por el impacto extremamente grave de la desaparición forzada de personas en los migrantes y mexicanos en tránsito y por los altos niveles de violencia de género, especialmente en la frontera sur. Al Comité le preocupan mucho las alegaciones sobre la participación de autoridades públicas, particularmente policías federales, estatales y municipales, la alta impunidad que suele afectar a estos crímenes y los bajos niveles de denuncias. Asimismo, expresa su preocupación por los obstáculos que enfrentan los sobrevivientes de esos crímenes para la regularización por razones humanitarias.

34. **El Comité reitera su recomendación anterior (véase CMW/C/MEX/CO/2, párr. 30) y asimismo urge al Estado parte a que:**
  (a) **Asegure que se investiguen seria y diligentemente esos actos, incluyendo la relación de agentes estatales con estructuras criminales y delitos como la corrupción y la impunidad, y se adopten sanciones proporcionales a la gravedad del delito cometido;**
  (b) **Investigue exhaustiva y ágilmente las masacres en los estados de Tamaulipas y Nuevo León bajo la clasificación de graves violaciones a los derechos humanos;**

9

(c) **Gestione la ampliación del mandato y el financiamiento de la Comisión Forense a efecto de garantizar un cruce gradual de información forense de personas migrantes desaparecidas de otros casos además de las tres masacres;**

(d) **Garantice la implementación del Mecanismo de Apoyo Exterior Mexicano de Búsqueda e Investigación en los diferentes países de América Central, asegurando que las personas migrantes y sus familiares tengan acceso fácil a las instituciones federales estatales e información sobre las investigaciones y participen en el proceso, incluyendo a través de la creación de unidades permanentes en embajadas y consulados del Estado parte;**

(e) **Asegure la cooperación efectiva con comisiones de expertos y grupos multidisciplinarios de los países de origen y destino para asistir a las personas migrantes víctimas de delitos graves, incluyendo desapariciones forzadas, así como en la búsqueda, localización y liberación de las personas desaparecidas y, en caso de fallecimiento, en la exhumación, la identificación y la restitución digna de sus restos;**

(f) **Garantice que las víctimas sean identificadas y remitidas a los servicios apropiados y sensibles a sus circunstancias, incluyendo servicios médicos y psicosociales, y que a petición de las víctimas se solicite la cooperación de las organizaciones sociales;**

(g) **Garantice que los sobrevivientes de esos crímenes tengan acceso a la regularización por razones humanitarias;**

(h) **Sancione a los responsables, con penas adecuadas a la gravedad del delito, incluyendo a los funcionarios del Estado involucrados.**

**Gestión de las fronteras y protección de migrantes en tránsito**

35. El Comité toma nota del esfuerzo que realiza el Estado parte para enfrentar al crimen organizado y brindar seguridad integral a las personas en su territorio. Observa con preocupación, sin embargo, el aumento significativo de los crímenes contra migrantes y de los riesgos a lo largo del tránsito por el territorio mexicano, en rutas alternativas usadas por los migrantes y sus familiares a fin de evitar los múltiples dispositivos de control migratorio desplegados por el Estado.

36. **El Comité recomienda al Estado parte que evalúe de manera exhaustiva y en diálogo con todos los actores concernidos el impacto de los operativos de verificación migratoria en el aumento de los riesgos del derecho a la vida y la integridad física de la población migrante en tránsito y que se adopten las medidas necesarias para prevenir esos riesgos, proteger a esta población y, en particular, promover que las políticas y prácticas migratorias estén centradas en el enfoque de derechos humanos y de seguridad humana, incluyendo la creación de vías seguras y regulares.**

**Privación de la libertad**

37. El Comité expresa su profunda preocupación respecto del elevado número de medidas privativas de la libertad de migrantes en las 58 estaciones migratorias desplegadas a lo largo del país. Le preocupan las alegaciones de la delegación de que estas detenciones (llamadas "aseguramiento" o "presentación") no constituirían una privación de la libertad, o son descritas como una medida de protección o un beneficio. También le preocupa la presencia en esos centros de familias, mujeres embarazadas, víctimas de la trata, solicitantes de asilo y otras personas en situaciones de mayor vulnerabilidad y con necesidades especiales de protección. Asimismo, nota con especial preocupación la detención de niños, niñas y adolescentes —que aumentó en un 900% entre 2011 y 2016—, muchos de ellos no acompañados, así como de muy baja edad. Esa medida constituye, sin excepción, una violación de los derechos del niño y de su interés superior.

38. **El Comité recomienda al Estado parte, con carácter de urgencia, que:**

(a) **Adopte con carácter de urgencia todas las medidas necesarias para poner fin inmediato a la privación de libertad de niños, niñas y adolescentes, así como de familias migrantes, garantizando en la ley y la práctica medidas alternativas adecuadas, centradas exclusivamente en la protección de los derechos bajo la Ley General de los Derechos de Niñas, Niños y Adolescentes;**

(b) **Garantice la aplicación efectiva e inmediata de procesos de identificación y referencia de personas en situaciones de vulnerabilidad y su traslado a alojamientos**

10

alternativos;

(c) **Elabore un plan de acción dirigido a garantizar que la privación de libertad por razones migratorias de trabajadores migratorios adultos únicamente se aplica como medida de último recurso y por el menor tiempo posible, sobre la base de los principios de excepcionalidad, proporcionalidad, necesidad y razonabilidad;**

(d) **Garantice en la ley y en la práctica la existencia de medidas alternativas a la privación de la libertad para trabajadores migratorios en situación irregular, las cuales deben aplicarse de manera prioritaria y con base en las circunstancias de cada persona, por las autoridades administrativas y/o judiciales correspondientes;**

(e) **Asegure que los trabajadores migrantes sean informados sobre los procedimientos y derechos en un idioma que entienden.**

**Garantías procesales en casos de privación de la libertad**

39. El Comité nota con preocupación que las detenciones llevadas adelante por el INM se realizan a través de una modalidad automática, sin una adecuada fundamentación individualizada sobre su necesidad y razonabilidad. Observa que la detención sin debidas garantías procesales, como la obligación de remisión inmediata ante un juez independiente e imparcial y el derecho a la asistencia jurídica gratuita, es considerada arbitraria, en línea con la Convención y otros tratados. Le preocupan también los datos sobre la falta de información brindada a migrantes sobre las razones de su detención, los derechos y recursos disponibles, incluyendo el derecho a solicitar asilo, protección complementaria o una estancia por razones humanitarias. Se inquieta asimismo de que el ejercicio de los recursos disponibles puede llevar a una detención sin plazo máximo, y sobre el acceso restringido que tienen los abogados de organizaciones sociales para brindar asistencia y representación legal.

40. **El Comité urge al Estado parte a que:**

(a) **Asegure en los procedimientos de detención migratoria las debidas garantías procesales, incluyendo el derecho a un intérprete;**

(b) **Adopte todas las medidas dirigidas a garantizar el derecho a la asistencia y representación jurídica gratuita en procedimientos de detención migratoria, incluyendo la provisión de recursos y capacitación al Instituto Federal de Defensoría Pública. De forma complementaria, se recomienda la realización de convenios con organizaciones de la sociedad civil especializadas en dicha asistencia;**

(c) **Garantice que la detención migratoria sea una medida excepcional, de último recurso y limitada al menor tiempo posible, que esté fundamentada en el caso concreto, incluyendo las razones por las cuales no pueden ser aplicadas las medidas alternativas, y sea revisada en menos de 24 horas por una autoridad judicial independiente e imparcial; d) Garantice el derecho al acceso a justicia, sin que ello redunde en una extensión de la detención en aplicación del artículo 111.V de la Ley de Migración, para evitar que la persona que accede a una medida alternativa o solicite asilo tenga plazo indefinido de detención mientras se resuelve su petición.**

**Condiciones de detención**

41. Al Comité le preocupan las condiciones de detención de la población migrante en el Estado parte. Observa con mucha preocupación que, en ocasiones, constituyen un tratamiento cruel, inhumano y degradante.

42. **El Comité reitera su recomendación anterior (véase CMW/C/MEX/CO/2, párr. 34), e insta al Estado parte a garantizar condiciones dignas y adecuadas en los centros de detención migratoria, los cuales no pueden tener similares características y finalidades que un ámbito penitenciario. En particular, el Comité le recomienda que:**

(a) **Brinde servicios adecuados de salud y sensibles al género, incluyendo salud sexual y reproductiva, asistencia psicológica, agua, saneamiento e higiene, alimentación, actividades recreativas y de ocio;**

(b) **Erradique de forma inmediata el uso de celdas de castigo;**

(c) **Ponga fin a cualquier situación de sobrepoblación y hacinamiento;**

(d) **Investigue y sancione adecuadamente a los agentes estatales que violen los derechos**

11

AR648

de migrantes en esos centros;

(e) **Capacite a los agentes estatales en los centros de detención, sobre derechos humanos, igualdad de género, el interés superior de los niños, niñas y adolescentes, y no discriminación;**

(f) **Implemente las recomendaciones de la Comisión Nacional de Derechos Humanos y garantice la plena aplicación del Mecanismo Nacional de Prevención de la Tortura.**

**Expulsión**

43. El Comité está muy preocupado por el aumento significativo de expulsiones de personas de El Salvador, Guatemala y Honduras. Se inquieta profundamente por que el llamado "retorno voluntario y asistido" se aplica mientras las personas están privadas de libertad, sin asistencia jurídica e información adecuada, y sin alternativas para su regularización. Observa con preocupación el elevado número de personas que desisten de la solicitud del estatuto de refugiado y que las medidas de retorno puedan disponerse sin indagar adecuadamente sobre posibles riesgos para la vida y la integridad física de la persona en el país de origen.

44. **El Comité recomienda al Estado parte que:**

(a) **Vele por que las personas sujetas a una orden administrativa de expulsión o retorno, o que soliciten el estatuto de refugiado, gocen de servicios de asistencia y representación jurídica gratuita, y conozcan y puedan ejercer su derecho a interponer recursos efectivos;**

(b) **Elabore mecanismos para impedir la expulsión de los migrantes hasta tanto se haya evaluado de manera adecuada cada situación individual, a fin, entre otras cosas, de asegurarse de que no se afecte el principio de no devolución ni la prohibición de expulsiones arbitrarias o colectivas;**

(c) **Refuerce la implementación de políticas y mecanismos dirigidos a brindar alternativas a la expulsión o retorno, incluyendo el derecho al asilo, la protección complementaria, la estancia por razones humanitarias y otras formas de regularización.**

**Atención médica**

49. El Comité toma nota de que el Estado parte permite la afiliación al Seguro Popular de toda persona, sin presentar documentación alguna, pero le preocupa que este seguro sea válido solamente por 90 días. Asimismo, está preocupado porque muchos trabajadores migrantes indocumentados no acceden a los servicios de salud porque temen su detención y deportación.

50. **El Comité recomienda que se reforme el artículo 42 del reglamento de la Ley General de Salud en Materia de Protección Social en Salud, para asegurar la afiliación ilimitada de los trabajadores migrantes y sus familiares al Seguro Popular. Asimismo, recomienda que se adopten medidas para asegurar que los migrantes indocumentados accedan a servicios médicos de atención a la salud y no sean denunciados a las autoridades de inmigración.**

**Registro de nacimiento y nacionalidad**

51. El Comité toma nota del gran incremento del registro de nacionalidad mexicana de niños nacidos en los Estados Unidos. Sin embargo, le preocupan los problemas que enfrentan los mexicanos indocumentados en ese país para registrar el nacimiento de sus hijos, por los obstáculos que tienen para validar el acta de nacimiento en territorio mexicano debido a la exigencia de traducción y legalización, y por la insuficiente información para que los padres registren en consulados mexicanos el nacimiento de sus hijos. Todo ello deriva en barreras para obtener un documento de identidad y su nacionalidad, así como para acceder a la educación y otros servicios sociales una vez que las familias retornan a México.

52. **El Comité recomienda fomentar la inscripción de nacimiento en los consulados mexicanos y sensibilizar a las madres sobre la importancia del registro oportuno de la doble nacionalidad. Asimismo, recomienda que se brinde información y asistencia a padres indocumentados para que puedan registrar los nacimientos ante autoridades de los Estados Unidos. Sugiere que se establezca en México un procedimiento simplificado de registro de la nacionalidad mexicana de niños con padres mexicanos, evitando requisitos**

12

inaccesibles como la traducción y notarización del documento en los Estados Unidos cuando la familia ya ha salido de ese país. En cualquier caso, se recomienda garantizar el acceso a la educación y otros servicios sociales a los hijos de mexicanos que retornan, sin perjuicio de su documentación o nacionalidad.

**Educación**

53. El Comité toma nota de los esfuerzos del Estado parte para eliminar las barreras administrativas para el acceso a la educación de la niñez migrante. También observa que muchos niños, niñas y adolescentes migrantes sin documentos no acceden a los servicios de educación por discriminación o por temor a su detención y deportación.

54. **El Comité urge al Estado parte a que tome medidas legislativas y práctica para asegurar que se adopten e implementen de manera efectiva las nuevas normas al nivel estatal y local, y que se incluyan medidas para asegurar que la niñez migrante sin documentos no sea discriminada ni denunciada a las autoridades de inmigración.**

**Niños, niñas y adolescentes en el contexto de migración internacional**

55. El Comité observa con mucha preocupación que aún restan numerosos desafíos pendientes para la plena implementación de la Ley General de los Derechos de Niñas, Niños y Adolescentes. Junto a la preocupación por la detención de decenas de miles de niños, niñas y adolescentes en estaciones migratorias, le preocupa especialmente lo siguiente:
  (a) La falta de implementación de los procedimientos de determinación del interés superior del niño previstos en la Ley de Migración y la Ley General de los Derechos de Niñas, Niños y Adolescentes;
  (b) La insuficiente creación o adecuación a la Ley General de los Derechos de Niñas, Niños y Adolescentes de procuradurías locales de protección de niños, niñas y adolescentes y autoridades competentes;
  (c) La ausencia de mecanismos para garantizar la asistencia jurídica a niños, niñas y adolescentes en procedimientos migratorios, así como la falta de un tutor para niños no acompañados;
  (d) La ausencia de mecanismos que garanticen la participación efectiva y el derecho a ser oído de los niños, niñas y adolescentes en todos los procedimientos que les afecten, y a ser debidamente tenidos en cuenta;
  (e) El impacto grave que tienen la violencia y la persecución a los niños, niñas y adolescentes de El Salvador, Guatemala y Honduras, los abusos que sufren en su tránsito por el territorio mexicano, y las situaciones de explotación laboral de niños, niñas y adolescentes en el sur del país;
  (f) El retorno de niños, niñas y adolescentes a sus países de origen sin una previa evaluación y determinación de su interés superior que permita aplicar otras medidas de protección inmediatas y sostenibles;
  (g) La escasa proporción de niños, niñas y adolescentes que acceden a los procedimientos de solicitud del estatuto de refugiado, y la alta incidencia del desistimiento de esas solicitudes.

56. **El Comité recomienda al Estado parte que:**
  (a) **Implemente a la mayor brevedad posible un procedimiento interinstitucional de determinación del interés superior del niño, coordinado por la Procuraduría Federal de Protección de Niñas, Niños y Adolescentes en el marco del Sistema de Protección Integral de Niños Niñas y Adolescentes y de la Ley General de los Derechos de Niñas, Niños y Adolescentes, asegurando las debidas garantías procesales, incluyendo el derecho a la información y asistencia jurídica gratuita por parte de profesionales especializados en derechos de niños, niñas y adolescentes, y en caso de niños no acompañados, de un tutor, el cual debe velar por el interés superior de los niños, niñas y adolescentes en todo el proceso;**
  (b) **Asegure que los sistemas e instituciones de protección de niños, niñas y adolescentes funcionen independientemente del INM y cuenten con las capacidades necesarias para aplicar el principio del interés superior de los niños, niñas y adolescentes, y que esas decisiones tengan prioridad respecto de otras**

13

**consideraciones relativas a la condición migratoria;**
(c) **Redoble los esfuerzos para prevenir la violencia, abuso y explotación de los niños, niñas y adolescentes migrantes, protegerlos frente a esos crímenes, e investigue, juzgue y sancione a los responsables, incluyendo agentes estatales;**
(d) **Asegure que los niños, niñas y adolescentes tengan acceso inmediato a procedimientos relacionados a la regularización y protección internacional, y que las políticas migratorias respeten los derechos de los niños, niñas y adolescentes en línea con los instrumentos internacionales, incluyendo el principio de no devolución;**
(e) **Continúe desarrollando y finalice el sistema de datos desglosados sobre la protección de niños, niñas y adolescentes migrantes, refugiados y solicitantes de asilo;**
(f) **Asegure su acceso a la educación y salud;**
(g) **Adopte medidas de protección integral para atender la situación de niños, niñas y adolescentes migrantes que viven en la calle, así como en situaciones de explotación laboral en plantaciones de café, explotación por el crimen organizado y explotación sexual, entre otras;**
(h) **Implemente las recomendaciones de la Comisión Nacional de Derechos Humanos.**

**Cooperación internacional con países de tránsito y destino**
59. El Comité toma nota de los procesos regionales existentes en materia migratoria, en particular la Conferencia Regional sobre Migración. Le preocupan sin embargo los desafíos existentes en la región en materia de las causas de la migración (violencia, pobreza, entre otros), así como para la protección de los derechos de migrantes y sus familias.

60. **El Comité alienta al Estado parte a promover acuerdos y planes de acción regionales, desde un enfoque de derechos, dirigidos a abordar las causas estructurales de la migración (violencia, pobreza, entre otros) y a garantizar los derechos de toda la población migrante y sus familias, sin perjuicio de su condición migratoria.**

<u>**Committee on the Rights of the Child**</u>

<u>Concluding Observations, (3 July 2015), CRC/C/MEX/CO/4-5</u>

**Non-discrimination**
15. While taking note of the National Programme for Equality and Non-Discrimination (2014–2018), the Committee is concerned about the prevalence of discrimination against indigenous, Afro-Mexican and migrant children, children with disabilities, lesbian, gay, bisexual, transgender and intersex children, children in street situations and children living in poverty and in rural areas.

16. **The Committee recommends that the State party:**
(a) **Adopt a road map that includes adequate resources, a timeline and measurable targets requiring authorities at the federal, state and local levels to take measures, including affirmative measures, to prevent and eliminate all forms of de facto discrimination against indigenous, Afro-Mexican and migrant children, children with disabilities, lesbian, gay, bisexual, transgender and intersex children, children in street situations and children living in poverty and in rural areas;**
(b) **Ensure that the authorities, civil servants, the media, teachers, children and the general public are sensitized to the negative impact of stereotypes on children's rights and take all necessary measures to prevent these negative stereotypes, notably by encouraging the media to adopt codes of conduct;**
(c) **Facilitate child-friendly complaint mechanisms in educational establishments, health centres, juvenile detention centres, alternative-care institutions and any other setting and ensure that perpetrators of discrimination are adequately sanctioned.**

17. The Committee expresses deep concern about the persistent patriarchal attitudes and gender stereotypes that discriminate against girls and women, resulting in an extremely high prevalence of violence against women and girls in the State party.

14

AR651

18. **The Committee urges the State party to accord the utmost priority to the elimination of patriarchal attitudes and gender stereotypes that discriminate against girls and women, including through educational and awareness-raising programmes.**

**Best interests of the child**
19. While noting the constitutional recognition of the right of the child to have his or her best interests taken into account as a primary consideration, the Committee is concerned at reports that this right has not been consistently applied in practice.

20. **In the light of its general comment No. 14 (2013) on the right of the child to have his or her best interests taken as a primary consideration, the Committee recommends that the State party strengthen its efforts to ensure that this right is appropriately integrated and consistently applied in all legislative, administrative and judicial proceedings and decisions as well as in all policies, programmes and projects that are relevant to and have an impact on children. In this regard, the State party is encouraged to develop procedures and criteria to provide guidance to all relevant persons in authority for determining the best interests of the child in every area and for giving them due weight as a primary consideration.**

**Respect for the views of the child**
25. While noting the initiatives taken to foster child participation, such as the annual organization of the "parliament of the girls and boys of Mexico", the Committee regrets the lack of permanent forums aimed at promoting child participation. It is also concerned at reports that children's opinions are not consistently heard in judicial and administrative proceedings.

26. **In the light of its general comment No. 12 (2009) on the right of the child to be heard, the Committee recommends that the State party:**
   […]
  (b) **Effectively implement legislation recognizing the right of the child to be heard in relevant judicial and administrative proceedings, including by monitoring the implementation of the protocol for the administration of justice in cases involving children.**

**Birth registration**
27. While welcoming the constitutional reform of 2014 recognizing the right to birth registration, the Committee is concerned that the number of indigenous, Afro-Mexican and migrant children and children living in remote areas who are registered at birth remains low.

28. **The Committee recommends that the State party strengthen efforts to ensure universal birth registration, including by undertaking the necessary legal reforms and adopting the required procedures at the state and municipal levels. Registry offices or mobile units should be available in all maternity units, in the main points of transit or destination of migrants and in communities where children are born with traditional birth attendants.**

**Sexual exploitation and abuse**
33. While noting the adoption of a protocol to assist child victims of sexual abuse, the Committee is concerned about the high prevalence of sexual violence against children, in particular girls. The Committee is seriously concerned that perpetrators of rape can escape punishment if they marry the victim. It is also concerned that the current proposal to reform the Federal Penal Code with regard to the statute of limitation for crimes of sexual abuse against children does not adequately protect the rights of children. It is also concerned that insufficient efforts are being made to identify, protect and rehabilitate child victims and about the increasing number of cases of sexual violence in education centres.

34. **The Committee urges the State party to:**
  (a) **Review legislation at the federal and state levels to ensure that rape is criminalized in line with international standards and remove all legal provisions that can be used to excuse perpetrators of child sexual abuse;**

15

AR652

(b) **Ensure that the reform of the Federal Penal Code provides for no statute of limitation regarding both the sanctions and the criminal action in relation to crimes of sexual abuse against children, and that sanctions cover both the perpetrators and the abettors. Similar provisions should be adopted in all state penal codes;**

(c) **Establish mechanisms, procedures and guidelines to make it mandatory to report cases of child sexual abuse and exploitation and ensure the availability of child-friendly complaints mechanisms, in particular in schools;**

(d) **Prevent, investigate and prosecute all cases of sexual abuse of children and adequately punish those convicted;**

(e) **Provide training for judges, lawyers, prosecutors, the police and other relevant persons on how to deal with child victims of sexual violence and on how gender stereotyping by the judiciary affects girls' right to a fair trial in cases of sexual violence, and closely monitor trials in which children are involved;**

(f) **Effectively implement the protocol to assist child victims of sexual abuse and ensure quality services and resources to protect them, provide them with physical and psychological recovery and social reintegration and compensate them;**

(g) **Raise awareness to prevent child sexual abuse, inform the general public that such abuse is a crime and address victim stigmatization, particularly when the alleged perpetrators are relatives.**

**Standard of living**

53. The Committee remains deeply concerned about the prevalence of child poverty, which affects more than half of the child population, a higher rate than affects the adult population. It is concerned that indigenous, Afro-Mexican, migrant and displaced children, children in single-parent households and children living in rural areas are particularly affected by poverty and extreme poverty.

54. **The Committee recommends that the State party strengthen its efforts to eliminate child poverty by adopting a public policy developed in consultation with families, children and civil society organizations, including those from indigenous, Afro-Mexican, displaced, migrant and rural communities, and by allocating adequate resources for its implementation. Measures to promote early childhood development and further support families should be part of the policy.**

**Education, including vocational training and guidance**

55. The Committee notes the educational reform undertaken in 2013 aimed at ensuring quality education from preschool to senior high school. However, it is concerned about:

(a) Millions of children between 3 and 17 years of age who do not attend school;

(b) Persistent challenges for children in vulnerable situations in accessing quality education;

(c) High rates of school dropouts, particularly among students in secondary education, pregnant adolescents and adolescent mothers;

(d) The low coverage of early childhood education and the lack of public policies in this regard.

56. **In the light of its general comment No. 1 (2001) on the aims of education, the Committee reiterates its recommendations (see CRC/C/MEX/CO/3, para. 57 (a–e)) and recommends that the State party:**

(a) **Increase its efforts to improve the quality of education and its availability and accessibility to girls, indigenous, Afro-Mexican and displaced children, children in rural areas, children living in poverty, children in street situations, national and international migrant children and children with disabilities, by substantially increasing the education budget and reviewing relevant policies;**

(b) **Strengthen its efforts to ensure education in Spanish and in indigenous languages for indigenous children and ensure the availability of trained teachers;**

(c) **Strengthen measures to address school dropouts, taking into consideration the particular reasons why boys and girls drop out;**

(d) **Step up its efforts to ensure that pregnant adolescents and adolescent mothers are**

16

**supported and assisted in continuing their education in mainstream schools;**

(e) **Develop and expand early childhood education from birth, on the basis of a comprehensive and holistic policy of early childhood care and development.**

**Asylum-seeking and refugee children**

57. The Committee is concerned about:

(a) The lack of adequate measures to identify, assist and protect asylum-seeking and refugee children, including the lack of legal representation for unaccompanied children;

(b) The prolonged detention of asylum-seeking children;

(c) The lack of data on the number of asylum claims made by children and the information by the State party that only 18 children were granted refugee status in 2014.

58. **The Committee recommends that the State party:**

(a) **Increase its efforts to identify, assist and protect asylum-seeking and refugee children, including by adopting the necessary legislative, administrative and logistical measures. Legal guardians, free legal representation, interpretation and consular assistance should be ensured for them;**

(b) **Take the measures necessary to end the administrative detention of asylum-seeking children and expeditiously place unaccompanied children in community-based shelters, and accompanied children in appropriate facilities that ensure family unity and are compliant with the Convention;**

(c) **Collect disaggregated data on asylum-seeking and refugee children;**

(d) **Complete the withdrawal of the remaining reservations to the 1951 Convention relating to the Status of Refugees and its 1967 Protocol.**

**Children in situations of migration**

59. The Committee welcomes the adoption of a protocol on consular assistance for unaccompanied migrant children as well as the attention given by the State party to the plight of unaccompanied children on its territory, in particular its increasing collaboration with countries in the region to assist those children and protect them from violence. It is nevertheless concerned about:

(a) Migrant children being kept in detention centres for migrants and reports of violence and abuse against children in those centres;

(b) Migrant children being subjected to killings, kidnappings, disappearances, sexual violence, exploitation and abuse, and about the lack of official disaggregated data in this regard;

(c) Reports that many migrant children are deported without a preliminary process to determine their best interests, in spite of the legal recognition of the principle in the law on migration and the General Act on the Rights of Children and Adolescents;

(d) The insufficient measures taken to ensure the rights of national migrants as well as the rights of the many children displaced as a result of armed violence.

60. **The Committee recommends that the State party:**

(a) **Take all measures necessary to end the administrative detention of migrant children and continue to establish community-based shelters for them, in accordance with articles 94 and 95 of the General Act on the Rights of Children and Adolescents, ensuring that these shelters comply with the Convention and are regularly monitored. The protocol for assisting unaccompanied migrant children in shelters should be effectively implemented and regularly evaluated;**

(b) **Increase efforts to prevent killings, kidnappings, disappearances, sexual violence, exploitation and abuse of migrant children, and investigate, prosecute and punish perpetrators, including when the perpetrator is an agent of the State;**

(c) **Establish a best interests determination process for decisions relating to migrant children and always carry out due process with procedural safeguards to determine the individual circumstances, needs and best interests of the child prior to making a decision on his or her deportation. Special attention should be given to family reunification;**

17

AR654

(d) **Ensure that migrant children are informed about their legal status, ensuring that they fully understand their situation, and provide public defence services and/or guardians throughout the process. Children should also be informed that they can contact their consular services;**

(e) **Ensure that all relevant professionals working with or for migrant children, in particular border and immigration personnel, social workers, defence lawyers, guardians and police officers, are adequately trained and speak the native language of the children;**

(f) **Adopt comprehensive measures to provide assistance to national migrant and displaced children and ensure their access to education and health services and their protection from violence;**

(g) **Collect disaggregated data related to cases of violence against migrant and displaced children, including disappearances and enforced disappearances.**

## Committee on the Rights of Persons with Disabilities

Concluding Observations, (27 October 2014), CRPD/C/MEX/CO/1

**Liberty of movement and nationality (art. 18)**

39. The Committee is concerned that migrants with intellectual or psychosocial disabilities are detained in migrant holding centres, that the authorities set stricter requirements for entry into the country for persons with disabilities and that persons injured as a result of falling from the train known as "La Bestia" ("The Beast") receive inadequate care.

40. **The Committee urges the State party to:**
  (a) **Designate appropriate and accessible areas and appoint trained staff to assist persons with disabilities in migrant holding centres;**
  (b) **Review and harmonize the operational guidelines under the Migration Act to ensure that persons with disabilities are treated equally in the issuance of visas and entry permits;**
  (c) **Review and harmonize care protocols for migrants who are injured while in transit in Mexico, so that they are provided with not only emergency medical care but also sufficient recovery time and basic rehabilitation.**

41. The Committee notes that the steps taken to promote the registration of children with the civil registry have not led to the universal registration of children with disabilities.

42. **The Committee urges the State party to ensure that all children with disabilities are immediately registered at birth and are provided with an identity document.**

### III. Special Procedures Mandate Holders

**Report by the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment on his mission to Mexico**

Addendum: Mission to Mexico (29 December 2014) A/HRC/28/68/Add.3

**Assessment of the situation**

**Migrants**

72. Because of its location, Mexico is one of the main countries of origin, destination, transit and return of migrants. Migrants are extremely vulnerable to acts of violence by private individuals. The Special Rapporteur is concerned about the impunity that usually surrounds such crimes and the information he received that public employees collude in or tolerate such practices. Moreover, migrant arrests by public employees tend to be violent and accompanied by insults, threats and humiliation.

AR655

73. The conditions observed at the Siglo XXI migrant holding centre in Tapachula (Chiapas) are generally adequate for short periods of detention. However, detainees who lodge appeals generally spend long periods in detention. The Government should restrict the use of detention to exceptional cases, improve conditions of detention and avoid prolonged periods of detention. Unaccompanied boys are housed in the holding centre, while unaccompanied girls are taken to public and private hostels where conditions are generally poor and there is no proper supervision to detect trafficking and identify needs. The Special Rapporteur notes that, while he received no complaints or ill-treatment or torture at the Siglo XXI centre, he did receive complaints about incidents at several of the country's migrant holding centres, in which migrants were insulted, threatened, humiliated and beaten. The Special Rapporteur is concerned that lawyers and civil society organizations have limited access to holding centres to monitor and assist migrants.

**Recommendations**
87. **With regard to migrants:**
    (a) **Take steps to reduce the violence to which they are exposed, including due investigation and punishment of those responsible;**
    (b) **Facilitate access by civil society organizations and lawyers to migrant holding centres and to confidential interviews with migrants.**

**Report by the Special Rapporteur on extrajudicial, summary or arbitrary executions on his mission to Mexico,**

Addendum: Mission to Mexico (28 April 2014) A/HRC/26/36/Add.1

**Vulnerable persons**

**Migrants**
74. Undocumented migrants who transit through Mexico put their lives at serious risk, although it is difficult to obtain reliable figures on the numbers killed.6 Reportedly, there is a direct link between disappearances and killings of migrants, organized crime, and complicity of law enforcement, investigative and other authorities. Migrant shelters have been subject to multiple attacks by organized criminal groups and insufficient preventative and accountability measures have been inadequately mobilized.7 Moreover, migrants are afraid to bring cases to the police. Chronic impunity therefore persists. The Special Rapporteur urges prompt investigation of killings of migrants in order to punish those responsible and provide compensation to victims or families of victims. He also calls for strengthening of the protection framework, including ensuring the safe operation of shelters.

**Recommendations**

**B. Vulnerable Persons**
111. **Full, prompt, effective, impartial and diligent investigation of homicides perpetrated against women, migrants, journalists and human rights defenders, children, inmates and detainees and LGBT individuals should be ensured.**

113. **A safe corridor should be created for migrants in transit, including better protection while in transit; a package of protection and accountability measures should be adopted to prevent attacks in migrant shelters; cooperation should be strengthened between state departments and community organizations that provide humanitarian assistance to migrants; adequate redress should be provided to victims of violence committed in the country; consideration should be given to following an approach whereby undocumented migrants can exercise rights such as the right to report crimes to the authorities without fearing arrest; and the dignified repatriation of corpses should be ensured in coordination with the State of origin.**

19

118. **Conditions for all detainees should be improved in compliance with the Standard Minimum Rules for the Treatment of Prisoners and the right to life of all inmates should be ensured.**

119. **Police and other authorities should be trained on gender-identity and sexual orientation awareness; protective and precautionary measures should be ensured; and societal tolerance should be encouraged.**

AR657

PRESIDENTIAL MEMORANDA

# Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System

Issued on: April 29, 2019

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:     Additional Measures to Enhance Border Security
and Restore Integrity to Our Immigration System

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to ensure the safety and territorial integrity of the United States as well as to ensure that the Nation's immigration laws are faithfully executed, it is hereby ordered as follows:

Section 1.  Purpose.  As noted in Proclamations 9822 and 9842 of November 9, 2018, and February 7, 2019, respectively, our immigration and asylum system is in crisis as a consequence of the mass migration of aliens across our southern border.  In Proclamation 9844 of February 15, 2019, I declared a national emergency to address the security and humanitarian crisis at that border.  That emergency continues to grow increasingly severe.  In March, more than 100,000 inadmissible aliens were encountered seeking entry into the United States.  Many aliens travel in large caravans or other large organized groups, and many travel with children.  The extensive resources required to process and care for these individuals pulls U.S. Customs and Border Protection personnel away from securing our Nation's borders.  Additionally, illicit organizations benefit financially by smuggling illegal aliens into the United States and encouraging abuse of our asylum procedures.  This strategic exploitation of our Nation's humanitarian programs undermines our Nation's security and sovereignty.  The purpose of this memorandum is to strengthen asylum procedures to safeguard our system against rampant abuse of our asylum process.

Sec. 2.  Policy.  It is the policy of the executive branch to manage our humanitarian immigration programs in a safe, orderly manner that provides access to relief or protection from removal from the United States for aliens who qualify, and that promptly denies benefits to and facilitates the removal of those who do not.

Sec. 3.  Further Steps to Enhance the Integrity and Efficiency of the Existing Asylum System.  Within 90 days of the date of this memorandum, the Attorney General and the Secretary of Homeland Security, as applicable, shall take all appropriate actions to:

(a)  propose regulations to ensure that aliens who receive positive fear determinations pursuant to section 235(b)(1) of the Immigration and Nationality Act (INA) (8 U.S.C. 1225(b)(1)) or section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998 (8 U.S.C. 1231 note) are placed in proceedings conducted under 8 CFR 208.2(c)(1) and 1208.2(c)(1) or, if not eligible for asylum, are placed in proceedings conducted under 8 CFR 208.2(c)(2) and 1208.2(c)(2);

(b)  propose regulations to ensure that, absent exceptional circumstances, all asylum applications adjudicated in immigration court proceedings receive final administrative adjudication, not including administrative appeal, within 180 days of filing, in accordance with section 208(d)(5)(A)(iii) of the INA (8 U.S.C. 1158(d)(5)(A)(iii));

(c)  propose regulations setting a fee for an asylum application not to exceed the costs of adjudicating the application, as authorized by section 208(d)(3) of the INA (8 U.S.C. 1158(d)(3)) and other applicable statutes, and setting a fee for an initial application for employment authorization for the period an asylum claim is pending; and

(d)  propose regulations under section 208(d)(2) of the INA (8 U.S.C. 1158(d)(2)) and other applicable statutes to bar aliens who have entered or attempted to enter the United States unlawfully from receiving employment authorization before any applicable application for relief or protection from removal has been granted, and to ensure immediate revocation of employment authorization for aliens who are denied asylum or become subject to a final order of removal.

Sec. 4.  Allocation of Immigration Officers.  The Secretary of Homeland Security shall reprioritize the assignment of immigration officers and any other employees of the Department as the Secretary deems necessary and appropriate to improve the integrity of adjudications of credible and reasonable fear claims, to strengthen the enforcement of the immigration laws, and to ensure compliance with the law by those aliens who have final orders of removal.

Sec. 5.  General Provisions.  (a)  Nothing in this memorandum shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This memorandum shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c)  This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

AR659



DONATE

**Immigration**

# As United States' 'Remain in Mexico' plan begins, Mexico plans to shut its 'too successful' humanitarian visa program

**GlobalPost**

*January 24, 2019 · 9:45 PM EST*

By **Sarah Kinosian**





Migrants, part of a caravan travelling to the US, make a human chain to pull people from the river between Guatemala to Mexico in Ciudad Hidalgo and continuing to walk in Mexico, in October 2018. Many migrants headed for the border will

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND.    CLOSE

AR660

As the United States moves to implement a new plan to turn back legal asylum-seekers at the US-Mexico border, tens of thousands of Central American migrants could be stranded in Mexico while their cases are decided, which often takes a year or more.

The policy, officially called the Migrant Protection Protocols and widely known since last fall as "Remain in Mexico," was first announced by Homeland Security Secretary Kirstjen Nielsen on Dec. 20. The plan goes into effect Friday, according to a Congressional aide. It's the most drastic measure yet in President Donald Trump's crackdown on unauthorized immigration and the most sweeping change to the US asylum system in decades. Mexican President Andrés Manuel López Obrador's administration appeared split on the policy after it was officially announced last month: the foreign ministry reluctantly accepted it as the immigration authority publicly opposed it.

Many details are still unclear. But the policy sends people back to Mexico who are legally exercising their right to seek asylum after they've stepped on US soil — whether crossing at ports of entry or between them — and orders them to return to the US for a first court date within 45 days, Vox reported. It is set to be piloted Friday at the San Ysidro port of entry with an initial group of asylum-seekers being returned to Tijuana, according to news reports. A legal challenge by immigrant rights' groups is virtually guaranteed.

AR661

Like several other Mexican officials, Tonatiuh Guillén, head of Mexico's immigration authority, said he was not formally notified of the policy.

*"This could create a crisis, especially in Tijuana, which is already overwhelmed. But it depends on the amount of people we are really talking about. ... This is a US initiative, and I guess we will have to try and implement it in the most civilized way possible and in accordance with Mexican laws."*

*- Tonatiuh Guillén, head of Mexico's immigration authority*

"This could create a crisis, especially in Tijuana, which is already overwhelmed," Guillén said. "But it depends on the amount of people we are really talking about. ... This is a US initiative, and I guess we will have to try and implement it in the most civilized way possible and in accordance with Mexican laws."

The policy also comes head-to-head with a recent effort by Mexico to grant renewable, one-year humanitarian visas to many of the roughly 13,000 Central American migrants who have accumulated at the country's southern border.

### Subscribe to the Global Nation Newsletter
Weekly newsletter featuring real-world stories of immigrants in the US.

The visas will allow them to live, work, access services, and travel freely around Mexico. Initially meant to diffuse potential chaos while the Mexican government figured out how

AR662

to handle the newest wave of Central Americans, the program would be closed "shortly," Guillén said — a decision unrelated to the United States' move but rather because the program was "too successful" and could "overwhelm" Mexico's immigration system. Instead, he said, the government was exploring potential employment options for people, especially in southern Mexico. On Wednesday, Interior Minister Olga Sánchez Cordero extended work permits, previously granted only to Belizeans and Guatemalans, to Salvadorans and Hondurans in seven southern states to incentivize migrants to stay.

But visas will still be given to the more than 12,000 people who have already applied since Jan. 17, Mexican immigration authorities said. Almost 80 percent of applicants are from Honduras, where small groups have continued to depart in recent days as news of the visas spread and seemed to incentivize some of them to migrate.

Most of the migrants intend to head for the US, a fact Mexican officials have acknowledged. The "remain" policy could force asylum-seekers to wait in dangerous, cartel-controlled Mexican border towns, notorious for high homicide rates, for up to a year. The US faces an immigration court backlog of more than 800,000 cases.

Just days before Nielsen announced the policy last month, two Honduran teenagers waiting to seek asylum in the United States were killed in Tijuana. Thousands of migrants from a caravan last fall have waited there as the US has slowed processing at the San Ysidro port of entry to just a few dozen per day, a practice known as "metering."



**We are Public Media**

Support us with a monthly recurring gift

Donate

*Related: After two boys' murders, migrants fear new 'remain in Mexico' policy*

"The irony of this measure is that it is going to drive people

AR663

<span style="color:red">who are trying to apply for asylum at ports of entry and do things the right way into the mountains and deserts. This is another way to try and limit access to US asylum system rather than try to fix it."</span>

*- Andrew Selee, president of the Migration Policy Institute*

"The irony of this measure is that it is going to drive people who are trying to apply for asylum at ports of entry and do things the right way into the mountains and deserts," said Andrew Selee, president of the Migration Policy Institute in Washington, DC. "This is another way to try and limit access to US asylum system rather than try to fix it."

**"A due process disaster"**

Migrant advocates in the US have warned for weeks that a "Remain in Mexico"  policy would endanger asylum-seekers by forcing them to wait months or years as their cases are decided,  Human Rights First on Thursday called it "illegal, immoral and inhumane." The American Immigration Lawyers' Association has called it "a due process disaster."

"This plan will prevent most, if not all, returned asylum seekers from receiving a fair day in court," AILA wrote in a policy brief last month. "Individuals forced to remain outside the US will encounter substantial barriers to accessing US attorneys — representation that can make the difference between life and death."

*Related: This busy LA immigration court is now a 'ghost town' in wake of government shutdown*

Mexico, for its part, has said previously it would not accept the return of asylum-seekers who may face a "credible" threat back home, though there have been few details on how that might be determined. The policy will not be applied to vulnerable groups, such as unaccompanied minors or pregnant women, according to news reports.

In the meantime, Mexican authorities worried about the influx of new arrivals, many of

AR664

whom say the visas drew them to migrate from Honduras, El Salvador, Guatemala and other Central American countries in the first place.

"Especially after [Mexico] just gave all those humanitarian visas out, this new policy could create total disorder," said Cesar Palencia, head of migrant services in Tijuana. "What are we going to do with all the people they just let in?"

During his campaign, López Obrador — who took office Dec. 1 and is known in Mexico by his initials, AMLO — pledged to institute a more humane migration strategy than that of his predecessor, Enrique Peña Nieto, whose administration had come under fire for its treatment of migrants, which included lengthy detention times. Under Peña Nieto, Mexico began to deport more Central Americans than the United States did on a yearly basis. The country also received substantial US funding for border security and was criticized as doing the bidding of its northern neighbor.

The humanitarian visa program had been part of AMLO's immigration policy shift, as is the rollout of his "Marshall Plan" for Central America, which is supposed to pump an extra $20 billion over five years to create jobs in southern Mexico and the Northern Triangle countries of Honduras, El Salvador and Guatemala. Poverty and unemployment remain top drivers of migration from the region along with high levels of corruption and gang and state violence. AMLO's administration has yet to specify its logistics and sources of funding. But as seen with Mexico's acceptance of "Remain in Mexico," he has signaled willingness to work with the United States to reduce the flow of migrants.

## What a "too successful" program looks like

Though Mexico's humanitarian visa program is not new, authorities scaled it up dramatically to handle the caravan and subsequent influx. In the first three weeks of 2019, the number of visa applications has already surpassed the number granted last year. Of the 118,285 Central Americans apprehended last year, 8,865, or 7.5 percent, received humanitarian visas, according to the Mexican government, and only 0.4 percent, or 500 people, received one in 2014.

AR665

So far in 2019, just 1,210 visas have been granted over more than 12,000 applications, creating a bottleneck as throngs of migrants sleep in any space they can find on the Guatemalan side of the border and the no man's land on the bridge between the two countries. The wait time to even register for a visa is more than 24 hours, advocates say. Officials have had to start limiting water and food handouts.



Migrants are finding themselves stuck at the Mexico-Guatemala border awaiting legal paperwork and in Tijuana as the US lets only dozens per day into the country and will soon begin piloting the "remain in Mexico" policy.

Credit:Alex Newman/The World

Jeisen Urbina is just one of an estimated 14,000 Central Americans migrants who arrived at Mexico's southern border in the past week. The 22-year-old Honduran taxi driver was part of a caravan of about 2,000 that set off from the San Pedro Sula bus station in northern Honduras earlier this month.

It was his second time traveling with a caravan. In October, Urbina flung himself into the Suchiate River that divides Guatemala and Mexico as riot police in front of him launched tear gas at thousands of migrants who had pushed through the border fence behind him,

AR666

determined to reach the United States. Just three months later, he stood calmly eating a bag of peanuts in the same spot on the bridge.

"Well, this is different," he said, eyeing the water below. He waited for his brother to arrive before approaching Mexican immigration agents guiding Central Americans through the process of getting a humanitarian visa. There were no riot police, border agents, or closed gates — just an ever-growing mass of people waiting in the hot sun to get legal documents.

He had traveled more than 2,700 miles with the last caravan that arrived in Tijuana, Mexico, in November. But after speaking with immigration attorneys, he decided to return to Honduras to gather more documents that would strengthen his claim for US asylum. Urbina said he was facing threats after gang members killed his 16-year-old brother.

Now, with the US policy, Urbina's chances to enter the US as a legal asylum-seeker may be even narrower.

*Tania Karas contributed to this report.*

---

**If you only have 30 seconds…**

Sign up for our weekly global security newsletter **CRITICAL STATE** . Get your weekly fix of foreign policy without all the stuff you don't need – it's top news and accessible analysis for those who want an inside take without all the backroom bs.

*By subscribing, I agree to receive emails from The World and Inkstick Media.*

AR667

Categories: **Conflict & Justice**, **Conflict**, **Immigration**, **Politics**, **Global Politics** and **Global Nation**

Tagged: **Tijuana** and **Mexico**.

---

**Latest Content**



**Brazil's first Afro Brazilian lawmaker says she's a rebuke to the country's history**

---

**NASA aims to build on moon as a way station for Mars**

---

**Salt: China's deadly food habit**

---

**DR Congo has been fighting Ebola for a year. What does the WHO declaration change?**

---

**Marine vet denied entry to US for scheduled citizenship interview**

---



Hear a different voice. **PRI** Public Radio International®

Major funding provided by:

AR668



Submission by the United Nations High Commissioner for Refugees

For the Office of the High Commissioner for Human Rights' Compilation Report -

Universal Periodic Review:

# COMMONWEALTH OF THE BAHAMAS

## I.   BACKGROUND INFORMATION

The Commonwealth of the Bahamas (the Bahamas) acceded to the *1951 Convention relating to the Status of Refugees* and its *1967 Protocol* (hereinafter referred to jointly as the *1951 Convention*) in 1993. The Bahamas is neither a State party to the *1954 Convention on the Status of Stateless Persons,* nor to the *1961 Convention on the Reduction of Statelessness*.

The Bahamian Government has no refugee legislation and no regulatory framework to implement its obligations under the *1951 Convention*. As such, the Government treats asylum-seekers and refugees on an ad hoc basis, with no access to judicial remedies.

The Bahamas is the geographic gateway between the Caribbean and Florida. The island group is a major transit point for Caribbean migrants, especially Haitians and Cubans, hoping to reach the United States of America. Migrant populations include a complex mix of economic migrants, asylum-seekers and refugees, victims of trafficking, and other individuals with protection needs such as undocumented and unaccompanied minors and people with undetermined nationality.

During an average year, the Bahamas intercepts, detains, and returns hundreds of Cubans and Haitians (although these numbers rise and fall depending on the conditions in these countries), as well as others such as Sri Lankans, Chinese, Dominicans, Jamaicans, and other Caribbean and African nationalities. During 2011, despite calls from UNHCR and OHCHR to stop all involuntary returns of Haitian nationals on humanitarian grounds following Haiti's 2010 earthquake, the Bahamas repatriated 2,392 Haitians. There are an estimated 30,000 or more Haitians residing in an irregular manner in the Bahamas. As of January 2011, the Bahamas hosted 28 recognized refugees and 9 asylum-seekers. However, the Government is in charge of the refugee determination procedure and UNHCR does not receive consistent information regarding new asylum claims or decisions on pending claims.

The Royal Bahamas Defense Force (RBDF) and the United States Coast Guard (USCG) interdict migrants at sea and arrest migrants onshore for unlawful status in the Bahamas. They are held at the Carmichael Detention Centre, sometimes for extended periods. UNHCR is allowed limited access to these detainees. UNHCR is concerned that information about these detainees is shared

AR669

with authorities in their country of origin. Systematic deportations from Carmichael are conducted under bilateral Memoranda of Understanding (MOUs) with Cuba and Haiti.

## II.        ACHIEVEMENTS AND BEST PRACTICES

The Bahamian Immigration Department's Refugee Unit continues to collaborate with UNHCR by requesting Advisory Opinions or country-of-origin research on a limited number of asylum claims. UNHCR has submitted favourable Advisory Opinions for some cases, but they remain pending with the Cabinet with no final determination on refugee status.

In December 2011, Bahamian Government officials and civil society members participated in a joint UNHCR and IOM training on the protection of vulnerable migrants. The former Deputy Prime Minister (and Minister of Immigration) opened the training session. The training was productive and provided an opportunity for UNHCR, IOM, and government officials to interact on issues pertaining to the protection of vulnerable migrants, including asylum-seekers, victims of trafficking and persons at risk of statelessness.

Following concerns raised by UN Special Rapporteurs and civil society organizations, in 2009, the Government conducted an investigation of conditions in the Carmichael Detention Centre; however, the Government did not make the results of the report public. Detainees had reasonable access to visitors and could participate in religious observances. Detainees could request to meet with UNHCR representatives, and the Government allowed UNHCR representatives access to some detainees.

The Government of the Bahamas made efforts to curb human trafficking. By the end of 2010, the director of public prosecutions established a special cadre of prosecutors to prosecute trafficking cases. These prosecutors investigated officials for misconduct, but the Government did not report on the findings of the investigations or prosecutions of such officials. The Government also provided venues for trainings on trafficking and provided space in medical facilities and long term shelters to assist trafficking victims. Further, the Government announced that it is developing a campaign in English and in Creole to raise awareness of human trafficking.

## III.       KEY PROTECTION ISSUES, CHALLENGES AND RECOMMENDATIONS

### Issue 1: <u>Protection of asylum-seekers and refugees</u>

Similar to neighbouring Caribbean States, the Bahamas is located in a complex migratory environment and susceptible to the arrival of irregular migrants. A particular challenge for the Government is, on the one hand, honouring its international obligations under the *1951 Convention* by identifying persons that might be in need of international protection in a mixed migratory context, while, on the other hand, respecting its obligations embodied in migration agreements, which require expedited processing and removal of migrants, particularly Cubans and Haitians.

2

UNHCR is also concerned that the Bahamian Government routinely shares detainees' information with authorities in their country of origin. This is particularly problematic for Cuban nationals whose asylum claims are based on State persecution.

UNHCR is ready to provide technical support to the Bahamian Government to develop a national refugee policy, including the drafting of national refugee legislation. UNHCR remains ready to provide training and capacity-building services to government staff, civil society members and academics, in order to strengthen its capacity to manage mixed migration flows. UNHCR is also more than willing to provide technical assistance for a Caribbean cooperation plan to address problems like rescue-at-sea situations that are of a regional nature.

**Recommendations:**

- UNHCR encourages the Bahamas to adopt national refugee legislation, particularly in light of the sample legislations that UNHCR provided the Government in January 2012.
- UNHCR recommends that the Government of Bahamas accept UNHCR's technical support in drafting national refugee legislation, capacity building for Government officials and assistance in the development of a national refugee status determination procedure.
- UNHCR encourages the Bahamas to facilitate full and open access to asylum procedures for persons who have expressed a credible fear of returning to their country of origin and to ensure *non-refoulement* of all persons in need of international protection.
- UNHCR strongly recommends that the Bahamas fully respect the principle of confidentiality with regard to information on asylum applications and refrain from sharing migrants' information with government authorities in their countries of origin[1] until it has been appropriately determined that the respective persons are not in need of international protection.
- UNHCR encourages the Bahamas to find durable solutions for Cuban refugees who have been residing in the Bahamas for several years and whose permanent residency applications remain pending with the Cabinet.
- UNHCR encourages the Bahamas to strengthen enforcement of the Trafficking in Persons Prevention and Suppression Act by thoroughly and transparently investigating suspected traffickers, developing standardized procedures to identify trafficking victims, and allocating resources to assist trafficking victims. Any victims of trafficking who may be in need of international protection should be given the opportunity to apply for asylum in the Bahamas.

### Issue 2: Detention of persons in need of international protection

All persons entering the Bahamas in violation of immigration law, including asylum-seekers, are usually detained.[2] There is no maximum length of detention specified in the law.[3] Although the

---

[1] "Memorandum of understanding between the Government of the Bahamas and the Government of Cuba" of 12 January 1996.
[2] Bahamas Detention Profile, International Detention Project at:
http://www.globaldetentionproject.org/fileadmin/docs/Bahamas_Detention_Profile_2011.pdf

AR671

Carmichael Detention Centre is designed to be a temporary holding center pending deportation, in reality, some migrants are held there for prolonged periods of time – weeks, even months. It is UNHCR's understanding, that the facility had the capacity to hold 500 detainees with tent space for an additional 500. However, sections of the facility have been closed due to fire damage, and the remaining portions of the facility are overcrowded with anywhere from 75 to 250 detainees.

Detention conditions at Carmichael are substandard and human rights organizations have extensively documented serious concerns relating to the inhumane treatment and physical and psychological abuse of detainees.[4]

The detention of asylum-seekers and refugees should only be used as a last resort, where necessary and justified. Alternatives to detention should be sought and given preference, in particular for certain categories of vulnerable persons. If detained, asylum-seekers should be entitled to minimum procedural guarantees, including the possibility to contact and be contacted by UNHCR.

UNHCR's Revised Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum-Seekers highlight that "the position of asylum-seekers differs fundamentally from that of ordinary immigrants in that they may not be in a position to comply with the legal formalities for entry. This element, as well as the fact that asylum-seekers have often had traumatic experiences, should be taken into account in determining any restrictions on freedom of movement based on illegal entry or presence."[5]

**Recommendations:**

- The Government should ensure that refugees and asylum-seekers are not penalized for illegal entry and stay in the country, that the detention of asylum-seekers is only used as a last resort, and where necessary, for as short a period as possible and that judicial safeguards are in place to prevent arbitrary and/or indefinite detention.
- UNHCR respectfully repeats its recommendation that the Government not only contemplate improving detention conditions but, more importantly, also consider alternatives to detention, especially for asylum-seekers, refugees, stateless persons and other vulnerable individuals.

### Issue 3: Preventing and Reducing Statelessness

Stateless persons who satisfy the refugee definition contained in article 1A(2) of the *1951 Convention* are afforded the necessary international protection associated with that status. However, the international refugee protection regime does not specifically address the entitlement to rights of non-refugee stateless persons in need of international protection.

---

[3] The Immigration Department recently released two asylum seekers from Detention upon UNHCR's recommendation that they be recognized as refugees. They are allowed to work in the Bahamas.
[4] Bahamas Detention Profile, International Detention Project at:
http://www.globaldetentionproject.org/fileadmin/docs/Bahamas_Detention_Profile_2011.pdf
[5] UN High Commissioner for Refugees, UNHCR's Revised Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum-Seekers, 26 February 1999, Guideline 3, available at:
http://www.unhcr.org/refworld/docid/3c2b3f844.html.

AR672

Accession to the Statelessness Conventions would establish a framework to prevent and reduce statelessness, in order to avoid the detrimental effects that this can have on individuals and society, and to ensure minimum standards of treatment of stateless persons, providing such persons with stability and security, and ensuring that certain basic rights and needs are met.

The *1954 Convention relating to the Status of Stateless Persons* ensures minimum standards of treatment of stateless persons in respect to a number of economic, social and cultural rights. These include, but are not limited to, the right to education, employment, housing, and public relief. Importantly, the Convention also guarantees stateless persons a right to identity and travel documents and to administrative assistance.

Furthermore, the *1961 Convention on the Reduction of Statelessness* establishes an international framework to ensure the right of every person to a nationality by establishing safeguards to prevent statelessness at birth and later in life. This treaty is therefore complementary to standards contained in other human rights treaties. An increase in the number of State parties is essential to strengthening international efforts to prevent and reduce statelessness and ensuring full enjoyment of a number of these rights.

The Bahamian Constitution establishes that every person born in the Bahamas has Bahamian nationality if either or both parents are citizens of the Bahamas. The Constitution however, lacks a safeguard to prevent statelessness amongst children who are born in the Bahamas to parents who are stateless or unknown or to parents who are foreigners and unable to confer their nationality on their children. Persons born to foreign parents in the Bahamas may not acquire Bahamian nationality before turning eighteen. Administrative instructions and wide use of discretion sometimes hamper and delay attainment of nationality. In addition, although the Bahamas has ratified the Convention on the Rights of the Child, which *inter alia*, confirms the right of every child to a nationality (Article 7), the Constitution fails to make provision for the grant of Bahamian nationality to foundlings found on the territory of the Bahamas, who therefore risk being left stateless.

Further, although the Bahamas has acceded to the Convention on the Elimination of Discrimination Against Women which provides, *inter alia*, for gender equality in nationality matters (Article 9), under the Bahamian Constitution children born abroad to Bahamian mothers cannot acquire Bahamian nationality at birth; only children born of Bahamian fathers can do so.[6] In order to acquire Bahamian nationality, children born in wedlock to Bahamian mothers while living outside of the Bahamas must submit a registration application after the age of 18 but before the age of 21. These children must renounce citizenship to any other country prior to registration, so they cannot have dual citizenship. Such discrimination against women in nationality legislation may lead to statelessness of children, where the child is unable to acquire the father's nationality because he is stateless, unknown or cannot confer his nationality under the laws of his State of nationality. Further, pursuant to the Constitution, only Bahamian men are have the right to confer their citizenship on their foreign spouses, whereas Bahamian women do not have an equivalent right. Discrimination against women in this respect impedes the reduction

---

[6] Background Note on Gender Equality, Nationality Laws and Statelessness, UNHCR, March 8, 2012 at http://www.unhcr.org/cgi-bin/texis/vtx/home/opendocPDFViewer.html?docid=4f5886306&query=barbados

AR673

of statelessness where women are unable to confer their nationality on their stateless spouses and also creates further risks of statelessness amongst children.

To UNHCR's knowledge, the Bahamas have no specific provisions in its national legislation to either avoid situations of statelessness or to extend protection to stateless individuals who are lawfully present. The threat of statelessness primarily affects Bahamian-born Haitians because they cannot always gather or obtain official documents confirming their Haitian nationality. As a result, these individuals face constant threats of detention or deportation and have difficulty accessing education and healthcare, opening bank accounts, and acquiring legal employment.[7]

**Recommendations:**

- UNHCR recommends that the Government of the Bahamas accede to the *1954 Convention relating to the Status of Stateless Persons* and to the *1961 Convention on the Reduction of Statelessness.*
- Introduce a statelessness determination procedure to identify stateless persons within the Bahamas and to afford them protection.
- UNHCR recommends amendment to the provisions of the Constitution to introduce a safeguard against statelessness in the case of foundlings as well as children born in the territory of the Bahamas who would otherwise be stateless.
- UNHCR recommends amendment of discriminatory provisions of the Constitution, in order to allow women to pass their nationality to their children or to their spouses of foreign nationality on an equal basis with men.

**Human Rights Liaison Unit**
**Division of International Protection**
**UNHCR**
**June 2012**

---

7 "Immigration policy set for changes," Tribune, June 10, 2011, available at:
http://www.tribune242.com/06102011_at-immigration_news_pg1.

AR674



A Guatemalan woman and her three daughters at the border fence after crossing into El Paso, Texas, from Ciudad Juarez, Mexico.  |  David Peinado/NurPhoto via Getty Images

# The border is in crisis. Here's how it got this bad.

There really is something unprecedented — and deadly — happening at the US-Mexico border right now. But the threat is to migrants themselves.

By Dara Lind  |  dara@vox.com  |  Updated Jun 5, 2019, 1:47pm EDT

President Trump's constant temper tantrums about the US-Mexico border have become the background noise of his administration. Even as he reaches for more and more drastic threats to try to "stop" the flow of unauthorized migrants into the US — like the threat of a 5 percent tariff on all goods coming into the US from Mexico — it seems that the public (including fellow Republican politicians) have an ever harder time taking him seriously.

But as Trump has raged, something genuinely unprecedented has started happening at the border.

AR675

The past several months have seen a huge spike in unauthorized migration, especially of families, into the US.

The government's capacity to handle an influx of large groups of children and families was already under serious strain at the end of 2018. By March, politicians of both parties were recognizing it as a humanitarian crisis. And the numbers of people coming just keep rising — with 132,887 migrants apprehended by Border Patrol after crossing the US-Mexico border (committing the misdemeanor of illegal entry) in May 2019.

This isn't a manufactured crisis, or a politically engineered one, as some Democrats and progressives have argued. If it were, it would be easier to solve.

What's happening at the border is the result of a regional crisis in which — if **current rates continue** — close to 1 percent of the entire population of Guatemala and Honduras will attempt to immigrate to the US this year. The Mexican government, meanwhile, is vacillating between humanitarian rhetoric and militarized crackdowns, US border officials are openly begging for help, and Trump himself is throwing the mother of all temper tantrums.

Trump's threats will likely cause massive collateral damage throughout North America and aren't even likely to stop people from arriving at the US-Mexico border, his stated goal. But that doesn't mean there isn't a problem here, or even a crisis. It just means it's not one that's going to be solved anytime soon.

## 1) Is there an unprecedented surge of unauthorized migration into the US?

Yes — or at least, probably. But of a specific kind.

Three things are simultaneously true:

- The total number of people coming into the US without papers is still lower than it was for most of the 20th century, and substantially lower than its turn-of-the-century peak.

- The total number of people coming into the US without papers is now higher than it's been since early 2007, before the Great Recession.

AR676

- The number of people coming into the US without papers who can't simply be detained and deported — children, families, and asylum seekers — is almost certainly unprecedented.

(https:/.
url=http
3A%
2F%
2Fwww
2F2019
2F4%
2F11%
2F182S
2Fbord
immigra
illegal-
asylum
central-
america(https:/.(http://v
mexicou=httpsurl=http
trump%  3A%    3A%
3Futm_  2F%    2F%
3Dsoci2Fwww2Fwww
26utm_2F201S2F2019
3Dtwitt 2F4%   2F4%
3A%  2F11%2F11%
20Bord2F182S2F182S
20Patr(2Fbord2Fbord
20apprimmigraimmigra
2C%   illegal- illegal-
20Octcasylumasylum
202011central-central-
presenamericamerica

AR677

By this point, it's not just that there are more children and families coming than have in recent years. There is substantial evidence that the raw number of children and families entering the US is higher than it's ever been.

We don't have apples-to-apples data. Right now, DHS separately counts "unaccompanied alien children" who come without their parents, and migrants who come in "family units" of one or more parents with one or more children. Before 2011, though, it combined juveniles who came with parents and juveniles who came without them — and simply counted parents traveling with their children as adults.

We do know, however, that very few of all migrants apprehended were juveniles in the early 2000s compared to today — so even during peak unauthorized migration, rarely more than 100,000 juveniles a year were crossing. And the majority of those were coming without their parents. So if the statistics had been kept in the same way in the early 2000s that they are now, they almost certainly wouldn't have shown more than 150,000 unaccompanied children and family units coming into the US even during peak years.

So far in fiscal year 2019, with four months to go, nearly 390,000 children and parents have been apprehended. Nearly 96,000 unaccompanied children and family members were apprehended in the month of May alone.

## 2) Why can't all border crossers simply be deported?

The US border enforcement system is built to apprehend people who are trying to sneak into the US, and return them to their home country as quickly as possible.

For most of US history, apprehended migrants were just informally returned to Mexico. In the mid-2000s, the US started formally deporting apprehended migrants instead — using "expedited removal," which allowed people who got caught entering the US to get deported without going before an immigration judge. Typically, a migrant would be apprehended by Border Patrol officials,

transferred to Immigration and Customs Enforcement (ICE) custody within 72 hours, and deported once a deportation order could be signed.

But there are extra legal protections built into US law and policy for asylum seekers — who can't simply be deported — and for vulnerable groups, including children and families, who can't simply be detained.

Asylum seekers — whether they have presented themselves at a port of entry to ask for asylum (breaking no US law) or crossed into the US between ports of entry (committing the misdemeanor of illegal entry) and evoked their right to asylum after being apprehended by a Border Patrol officer — can't be deported until they've been screened by an asylum officer to see if they have a "credible fear" of persecution. Unaccompanied children from non-Mexican countries have to be transferred to the care of the Department of Health and Human Services within 72 hours and are guaranteed immigration court hearings. Families, under a 2015 court ruling, can't be detained indefinitely; generally, the government has to release them after about 20 days.

In all three cases, the "detain, then deport" system doesn't work. The system is overloaded with people it wasn't designed to handle.

## 3) Why are people coming to the United States to begin with?

The simplest answer is probably the truest: because things are bad enough for them in their home countries of Guatemala, Honduras, and El Salvador that they've decided to risk the journey to the US, and whatever treatment awaits them here, for a chance in America.



AR679



A group of Hondurans sleep as they wait to board a bus that will take them out of Honduras in April 2019. Unless stopped by Mexican authorities — which is plausible — many will likely head to the United States, as previous "caravans" of Honduran migrants have.  | Orlando Sierra/AFP/Getty Images

US law slices migrants into categories. People seeking to migrate for economic reasons or to reunite with family might have a way to migrate to the US legally, but they're not allowed legal status if they arrive without papers. People fleeing persecution have the right once on US soil to apply for asylum, whether they have papers or not.

The Trump administration claims that very few of the people coming to the US now are genuine asylum seekers, pointing to the fairly low rate of success of asylum claims in immigration court (10 to 15 percent for Northern Triangle countries) as evidence that these aren't "real" asylees, or even to claim that most of them are outright frauds.

In practice, though, it's often hard to determine a single reason that a given migrant is leaving — much less a group of hundreds of them, or a monthly flow of tens of thousands. The same people facing dire poverty can also be persecuted by their governments for their political views; someone might decide to leave because their crops are failing, but decide *when* to leave based on a threat to their lives.

The most pressing problem in Honduras and El Salvador continues to be violence, specifically gang violence. (El Salvador has reduced its homicide rate substantially, and migration to the US has declined sharply since last summer.) Victimization by gangs isn't as solid a basis for an asylum claim as victimization

AR680

by the government, and the Trump administration is trying to make it even harder to claim asylum due to gang violence.

Guatemala, which has seen the biggest increase in migration to the US in the current surge, is generally more beset by crushing poverty than gang violence. (Domestic violence is endemic in all three countries.) Poverty, no matter how dire, isn't grounds to seek asylum. But it's hard to disentangle the poverty of the Guatemalan highlands from concerns about the government's treatment of indigenous peoples, or the poor situation of the region's farmers from oppression of community and environmental activists challenging the government's land use policies.

Many of these migrants are choosing to come to the US rather than staying in Mexico because the US offers them a better opportunity to make money and support their families, in addition to being substantially safer, and US law allows asylum claims from migrants who pass through Mexico. (Asylum seekers who try to enter the US from Canada have to stay in Canada.) Many asylum seekers also have relatives in the US already. That doesn't mean they don't also have valid asylum claims.

Further complicating all of this, migrants themselves don't necessarily know what asylum is or why they might or might not qualify for it. Some migrants I've spoken to believed you could get asylum simply by having a relative in the US — or that if you had no family in the US, you couldn't get asylum. (Neither is the case.) People traveling in the "caravan" last fall often told reporters they were coming to the US to work.

To the US government (and immigration hawks), both of these are indicators that these aren't "real" asylum seekers. To advocates and immigration lawyers, they're evidence that people move between countries for complex reasons, and that some who might qualify for asylum might not even know it without help from a lawyer.

## 4) Why are more people coming now?

Trump's first few months in office set records for how few people were caught trying to enter the US from Mexico, something he continued to brag about even as apprehension levels began to rise again in summer and fall 2017. (The claim made by Trump critics that unauthorized migration is at "historic lows" is based on the fact that yearly apprehension rates are still low in comparison to the pre-recession era, but apprehensions have been rising pretty much every month since April 2017.) And building on a trend that had become noticeable since the border crisis of summer 2014, the people who were coming were unaccompanied children and, increasingly, families.

By September 2018, DHS officials were raising alarms about the number of children and families coming into the US, and warning that the system was overwhelmed. Apprehensions continued to climb through the fall. Then in February, they skyrocketed.



Large groups, like this group of 100, have become increasingly common at the US/Mexico border — contributing to the rapid spike in apprehensions of migrants in the past few months.  | David Peinado/NurPhoto via Getty Images

The rapid increase from the beginning of 2019 to now still isn't fully understood. It appears to stem from a shift in smuggling tactics and capacity. (While human smuggling is illegal, it's used by asylum seekers who feel they have no other choice as well as people migrating for economic reasons.)

The rise of "express route" buses that can take hundreds of migrants at a time through Mexico in five or six days appears to be a factor. Many migrants who might have felt the chance of arriving in the US wasn't worth the risks of a grueling and dangerous journey on foot through Mexico may be changing their calculus now that the risk is lower. Similarly, anecdotal reports indicate that smugglers are offering discounts for migrants who bring their children.

The other factor is Mexico. The government of Andrés Manuel López Obrador (who took office in December) has tried to marry rhetoric about a new humanitarian approach to migration with a desire to stay on the Trump administration's good side. In December, Mexico made it much easier for Central American migrants seeking to travel to the US to get temporary "humanitarian visas" that allowed them 90 days of legal status in Mexico.

The Mexican government wasn't prepared for how many Central Americans would seek the visas, and shut down the program rapidly. But American officials suspect the humanitarian visas made it much easier for Central Americans already in Mexico to come to the US, and may have influenced more to come.

## 5) Is the US system stretched to the "breaking point"?

It is apparent that the needs of migrants in custody have overwhelmed DHS capacity.

The department is redirecting resources from other things to the border, much like it would in a natural disaster. Customs and Border Protection has detailed a few hundred port officers to help Border Patrol agents care for families and children — slowing down the processing of people and vehicles at ports of entry accordingly, and causing hours-long lines across some international bridges. The department has called for volunteers from other agencies to help.

AR683

But they're still swamped. On a call in June, one Customs and Border Protection official said, "when we have 4,000 people in custody, we consider that high. When we have 6,000, we consider it a crisis. Right now, we have 19,000 people in custody. It's just off the charts."

In May, DHS's **inspector general office found** that as many as 900 people were being held in a Border Patrol facility built for 125 people. One cell, with a listed maximum capacity of 12 people, held 76.

In March, CBP agents in El Paso kept some families in a temporary holding pen under a bridge, with some families claiming they were kept there for several days. The holding pen was shut down at the end of March, after pictures of it attracted widespread shock and outrage, but CBP agents encouraged reporters to get pictures of it — pointing to it as an example of what they were forced to do because they had no other choice.

It's difficult to determine whether that's true, because it's really about counterfactuals — what else the Trump administration could have done in the past to prepare for this, or what other things it could be doing now. (A world in which Trump spent as much time and money on processing centers for migrant families as he spent on a wall would look very different.)

CBP has warned for months that it isn't able to house and process the current population coming into the US, and that it has nowhere to put people between when they turn themselves in to Border Patrol agents and when they are released.

The deaths of several children in Border Patrol custody have highlighted the lack of appropriate care in Border Patrol facilities. Congress included funds in its February appropriations bill to help Border Patrol provide food and shelter for migrant families in El Paso, but there are far more families and children coming now than the February bill anticipated.

Releasing asylum seekers from custody isn't as easy as letting them out. Unlike immigrants who are arrested by ICE while living in the United States, many

AR684

Case 4:19-cv-04073-JST   Document 29-8   Filed 07/19/19   Page 147 of 175

newly arrived asylum seekers aren't familiar with the US, often speak neither English nor Spanish, and may not have appropriate clothing or funds for bus fare. They are usually released with instructions to check in with an ICE agent at a field office that could be states away. There are nonprofit organizations that can help acclimate families and get them to their destination, but that too requires advance notification and effort. When the government simply dumps people outside bus stations, they end up lost, cold, and confused.

## 6) Have the Trump administration's actions contributed to the crisis?

Trump and DHS officials say that "legitimate" asylum seekers ought to have no reason to enter illegally, and even attempted to ban people who crossed between ports of entry from seeking asylum. (The ban was quickly struck down in court). But since last summer, the administration has restricted asylum seekers trying to present themselves at ports of entry, allowing in only a fraction each day of the people who are waiting — a policy called "metering" or "queue management."



Case 4:19-cv-04073-JST   Document 29-8   Filed 07/19/19   Page 148 of 175

This Honduran woman and her children wait in one of the shelters in Tijuana for migrants trying to cross into the United States. Hundreds of migrants are waiting to be allowed to present themselves legally to claim asylum at the port of entry at San Ysidro. Under the Trump administration's "metering" policy, the wait has sometimes taken months.  | Mario Tama/Getty Images

Metering varies from port to port (see **this article** to read about the policy in depth), but at the most popular ports of entry, it's forced migrants to wait weeks or months before they can step onto US soil and exercise their right to claim asylum. Faced with such a wait — sometimes in dangerous Mexican border towns — it's logical that a migrant might choose to cross illegally to present their asylum claim instead.

As the number of people caught coming into the US between ports of entry illegally has spiked, the number of "inadmissible" migrants, who come to a port of entry and are found not to have valid legal status, has stayed flat. Many Trump critics point to metering as the root of the discrepancy — and accuse Trump of manufacturing a crisis by forcing people to cross illegally, then panicking when they do.

It's clear that at least some migrants are crossing illegally only because they can't cross legally, but it's extremely likely that the number of illegal entries would be climbing even without the metering policy.

There have always been many fewer asylum seekers coming to ports of entry than crossing between them. That's especially true in the Rio Grande Valley, which has been the epicenter of child and family migration for the past decade.

Where migrants cross into the US isn't usually their choice to make; it's the choice of the smuggler facilitating their arrival. The emergence of new drop-off points for large groups of migrants like Antelope Wells, New Mexico, and Lukeville, Arizona, isn't the result of democratic decision-making by migrants — those locations are the endpoints of smuggling routes. And they're between, not at, ports of entry.

AR686

## 7) Is Trump right that Mexico and the Northern Triangle countries aren't doing anything to stop migrants from reaching the US?

No.



Mexican soldiers help string wire across the border fence in Juarez — part of the Mexican government's broader cooperation with the Trump administration in deterring and interdicting migrants.  | David Peinado/NurPhoto via Getty Images

Trump appears to be mad that Northern Triangle countries aren't doing more to stop their citizens from leaving, which is not a thing that governments are supposed to do under general human rights principles, and also, more to the point, not a thing that governments can do without a massive investment of time, personnel, and infrastructure. Trump is asking governments that can't even guarantee the safety and well-being of their citizens to monitor those citizens' whereabouts perfectly.

AR687

Guatemala, Honduras, and El Salvador have cooperated with the US on security measures; a new "compact" allowing joint policing operations between the four countries was signed by then-Homeland Security Secretary Kirstjen Nielsen and her Central American counterparts in April — shortly before Nielsen was fired.

The Mexican situation is more complicated. The Mexican government's brief expansion of humanitarian visas in December really did make it easier for Central Americans to enter and move through Mexico to the US, so it would make sense for the Trump administration to be mad at them over that.

But the Mexican government reversed its visa policy as soon as it became clear how many migrants were coming in. And since then, it's been extremely cooperative — even deferential — with the US.

Metering only works because of Mexican officials stopping asylum seekers before they can set foot on US soil. Under the "Migrant Protection Protocols," Mexican officials have allowed the US to force nearly 9,000 Central Americans to return to Mexico and wait for their asylum cases to be resolved.

In January, as a large caravan of migrants prepared to cross into a US port in Texas, a group of Mexican law enforcement officials surrounded them and detained them at an empty factory, letting out only a few a day to seek asylum; when unrest broke out at the factory, the asylum seekers were dispersed on buses to towns farther from the border.

On a couple of occasions, Mexican officials have even **deployed the military** to the isthmus connecting Mexico and Guatemala to "contain" migrants.

Trump administration officials not named Donald Trump generally acknowledge Mexico's cooperation, even if they say they'd like Mexico to do more. Trump himself, however, appears to be unshakable in the belief he's held since 2015: that the government of Mexico is at fault for anyone arriving in the US without papers.

AR688

Case 4:19-cv-04073-JST   Document 29-8   Filed 07/19/19   Page 151 of 175

## 8) Will cutting off aid to the Northern Triangle countries help?

Almost certainly not.

It's not exactly clear what the parameters of the State Department's Saturday announcement that it was cutting off aid actually are — in particular, there seems to be confusion about whether it applies to contracts that have already been signed. But because the State Department (reportedly under pressure from the Office of Management and Budget, under Trump's acting Chief of Staff Mick Mulvaney) had been slow-walking aid from 2018, not to mention 2019, that's still hundreds of millions of dollars potentially lost.

Aid is traditionally seen as an important way to curb emigration, under the logic that people will be less likely to leave their countries if they're safer and more able to make a living there. (In practice, improving someone's financial situation can in the short term make them more likely to migrate, but security aid that reduces violence in a country has been shown to decrease emigration.)

Even Trump administration officials have endorsed this point of view — from former Homeland security secretary and Chief of Staff John Kelly, who bragged that the Trump administration was doing more than previous administrations to help the region, to CBP Commissioner Kevin McAleenan — now acting secretary of DHS — who responded to a previous Trump threat to cut off aid by **telling CBS** that the US needed to invest in Central America.



AR689



A father waits with his daughter to board a bus that will take them out of Honduras to Guatemala — and from there to Mexico and (possibly) the United States. According to some estimates, the number of Hondurans and Guatemalans apprehended at the US/Mexico border this year will reach almost 1 percent of those countries' populations.  | Orlando Sierra/AFP/Getty Images

If the aid cutoff includes security aid, that would likely be immediately counterproductive, because it would make it much harder for the US to conduct anti-smuggling and anti-trafficking operations in the region — and much harder for the governments of the Northern Triangle countries to do that themselves.

The aid cutoff also threatens to damage the US-Mexico relationship. The López Obrador government has maintained a rhetorical commitment to a "Marshall Plan"-style investment in Central America — and the US's rhetorical agreement that such development was necessary helped justify Mexico's cooperation on immigration crackdowns. With the aid cutoff, the Trump administration is sending the message that it doesn't actually agree with Mexico's vision for the region — just as it ramps up pressure on Mexico to do more to target Central American migrants as a way to help Trump.

## 9) What are other solutions?

The answer to this question depends on what you see as the problem. Immigration hawks see it as too many people coming into the US without papers whose asylum claims won't ultimately prevail; immigration doves see the problem as the conditions in Central America that migrants are fleeing, and the conditions in which they're held while in the US.

There are plenty of ideas in the former category. The problem is that the ideas are not getting the support they would need to actually happen.

AR690

The US would like to get Mexico to sign a "safe third country" agreement that would allow the US to deny asylum to Central Americans, but Mexico has no interest in that. The Trump administration wants to get Congress to deport Central American children without hearings and override the court settlement that prevents long-term family detention, but House Democrats aren't biting. The White House wants to change the intentionally generous "credible fear" standard in asylum screening interviews so that fewer people are allowed to stay and apply for asylum (increasing the risk that legitimate asylum claimants will get returned to danger), but the legal concerns about that are so intense that it might have to purge generally like-minded officials from the Department of Homeland Security to carry out the plan.

In the latter category, it's easy to point to things that the administration should *stop* doing, like keeping families outdoors in cage-like holding pens. A humanitarian agenda could also include more case management outside of detention, to increase the odds that families show up to hearings, or even broader access to counsel in immigration proceedings (which isn't guaranteed under current law).

But it's not clear how much money the administration would need to invest in order to take proper care of the families coming in now, or how quickly that could be done — and it's not clear how many more families are going to come in the coming months.

The old consensus that the US needed to help address the "root causes" of migration, by investing in the Northern Triangle countries and making it more appealing for people to stay, was never supposed to be an immediate solution to anything. Of course, Trump's view of migration makes it less likely that anyone will be able to *start* work on long-term solutions that might bear fruit down the road. It is almost certainly, in the meantime, going to get worse before it gets better.

AR691

EXPLAINERS

**The House just passed a $15 minimum wage. It would be the first increase in a decade.**

EXPLAINERS

**Trump's racist tirades against "the Squad," explained**

EXPLAINERS

**The controversy over whether the media should call Trump's racist tweets "racist," explained**

View all stories in Explainers

AR692

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

## MIGRANT PROTECTION PROTOCOLS
### DAILY SITUATIONAL REPORT
PRE-DECISIONAL WORKING PAPERS

5-Jun-2019

### MPP DATA POINTS BY FIELD OFFICE

*Field Notes:*

*1) These data points are unofficial and subject to change due to the ongoing nature of processing aliens.*

*2) INMI does not allow MPP returns on Sundays. Any individuals processed for MPP Sunday will be returned on Monday and reflect on Monday's Report.*

### SOUTHWEST BORDER TOTALS

| Date | USCIS Fear Referrals | Referral: Single Adult | Referral: Family Unit | Fear Referral: Fear Found | Fear Referral: Fear Not Found | Aliens Returned to Mexico (OFO) | Aliens Returned to Mexico (USBP) | Aliens Returned to Mexico (Total) |
|---|---|---|---|---|---|---|---|---|
| 6/5/19 | 0 | 0 | 0 | 4 | 1 | 6 | 238 | 244 |
| Jan-19 | 2 | 2 | 0 | 2 | 11 | 14 | 0 | 14 |
| Feb-19 | 34 | 19 | 5 | 14 | 20 | 143 | 0 | 143 |
| Mar-19 | 66 | 16 | 17 | 11 | 55 | 200 | 0 | 200 |
| Apr-19 | 194 | 49 | 62 | 37 | 137 | 268 | 2316 | 2584 |
| May-19 | 265 | 86 | 68 | 19 | 236 | 411 | 4962 | 5373 |
| Jun-19 | 23 | 3 | 9 | 6 | 17 | 29 | 885 | 914 |
| TOTAL | 584 | 175 | 161 | 89 | 465 | 1065 | 8163 | 9228 |

### SAN YSIDRO (began 28 Jan 2019)

| Date | USCIS Fear Referrals | Referral: Single Adult | Referral: Family Unit | Fear Referral: Fear Found | Fear Referral: Fear Not Found | Aliens Returned to Mexico (OFO) | San Diego Sector Aliens Returned to Mexico (USBP) | Aliens Returned to Mexico (Total) |
|---|---|---|---|---|---|---|---|---|
| 5/29/19 | 11 | 0 | 4 | 0 | 11 | 8 | 39 | 47 |
| 5/30/19 | 13 | 0 | 5 | 0 | 13 | 3 | 46 | 49 |
| 5/31/19 | 2 | 0 | 1 | 0 | 0 | 6 | 50 | 56 |
| 6/1/19 | 3 | 1 | 1 | 0 | 3 | 0 | 60 | 60 |
| 6/2/19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/3/19 | 6 | 0 | 3 | 2 | 2 | 5 | 41 | 46 |
| 6/4/19 | 9 | 1 | 3 | 0 | 10 | 0 | 44 | 44 |
| 6/5/19 | 0 | 0 | 0 | 0 | 1 | 0 | 44 | 44 |
| Jan-19 | 2 | 2 | 0 | 2 | 0 | 14 | 0 | 14 |
| Feb-19 | 34 | 19 | 5 | 14 | 20 | 143 | 0 | 143 |
| Mar-19 | 63 | 15 | 16 | 11 | 52 | 192 | 0 | 192 |
| Apr-19 | 104 | 36 | 30 | 13 | 75 | 107 | 707 | 814 |
| May-19 | 131 | 20 | 41 | 16 | 105 | 139 | 1520 | 1659 |
| Jun-19 | 18 | 2 | 7 | 2 | 16 | 5 | 189 | 194 |
| TOTAL | 352 | 94 | 99 | 58 | 268 | 600 | 2416 | 3016 |

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

| CALEXICO (began 13 Mar 2019) | | | | | | El Centro Sector | |
|---|---|---|---|---|---|---|---|---|
| Date | USCIS Fear Referrals | Referral: Single Adult | Referral: Family Unit | Fear Referral: Fear Found | Fear Referral: Fear Not Found | Aliens Returned to Mexico (OFO) | Aliens Returned to Mexico (USBP) | Aliens Returned to Mexico (Total) |
| 5/29/19 | 0 | 0 | 0 | 0 | 0 | 1 | 97 | 98 |
| 5/30/19 | 0 | 0 | 0 | 0 | 0 | 0 | 54 | 54 |
| 5/31/19 | 0 | 0 | 0 | 0 | 0 | 0 | 76 | 76 |
| 6/1/19 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 51 |
| 6/2/19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/3/19 | 0 | 0 | 0 | 0 | 0 | 0 | 101 | 101 |
| 6/4/19 | 0 | 0 | 0 | 0 | 0 | 5 | 95 | 100 |
| 6/5/19 | 0 | 0 | 0 | 0 | 0 | 0 | 100 | 100 |
| Mar-19 | 3 | 1 | 1 | 0 | 3 | 7 | 0 | 7 |
| Apr-19 | 9 | 5 | 2 | 2 | 6 | 47 | 527 | 574 |
| May-19 | 4 | 0 | 2 | 0 | 4 | 12 | 1291 | 1303 |
| Jun-19 | 0 | 0 | 0 | 0 | 0 | 5 | 347 | 352 |
| TOTAL | 16 | 6 | 5 | 2 | 13 | 71 | 2165 | 2236 |

| EL PASO (began 19 Mar 2019) | | | | | | El Paso Sector | |
|---|---|---|---|---|---|---|---|---|
| Date | USCIS Fear Referrals | Referral: Single Adult | Referral: Family Unit | Fear Referral: Fear Found | Fear Referral: Fear Not Found | Aliens Returned to Mexico (OFO) | Aliens Returned to Mexico (USBP) | Aliens Returned to Mexico (Total) |
| 5/29/19 | 0 | 0 | 0 | 0 | 0 | 6 | 94 | 100 |
| 5/30/19 | 17 | 6 | 3 | 1 | 15 | 1 | 85 | 86 |
| 5/31/19 | 10 | 4 | 3 | 0 | 11 | 2 | 84 | 86 |
| 6/1/19 | 0 | 0 | 0 | 0 | 0 | 0 | 73 | 73 |
| 6/2/19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/3/19 | 0 | 0 | 0 | 0 | 0 | 13 | 82 | 95 |
| 6/4/19 | 5 | 1 | 2 | 0 | 1 | 0 | 100 | 100 |
| 6/5/19 | 0 | 0 | 0 | 4 | 0 | 6 | 94 | 100 |
| Mar-19 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Apr-19 | 81 | 8 | 30 | 22 | 56 | 114 | 1082 | 1196 |
| May-19 | 130 | 66 | 25 | 3 | 127 | 260 | 2151 | 2411 |
| Jun-19 | 5 | 1 | 2 | 4 | 1 | 19 | 349 | 368 |
| TOTAL | 216 | 75 | 57 | 29 | 184 | 394 | 3582 | 3976 |

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

| OPERATIONAL DEFINITIONS |
|---|

*NOTE: These definitions are summaries provided for internal DHS reporting purposes only and do not constitute policy or operational direction or guidance.*

**Single Adult:**  A person who does not meet the definition of a Family Unit or Unaccompanied Alien Child.

**Family Unit:**  An alien child or children under the age of 18 accompanied by his/her/their alien parent(s) or legal guardian(s).

**Fear Referrals:**  Aliens who are potentially amenable to MPP but who affirmatively state a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, will be referred to USCIS for a screening with an asylum officer following the affirmative statement of fear of return to Mexico.

**Fear Found:**  A determination that the alien is more likely than not to be persecuted or tortured in Mexico. The alien is not eligible for MPP processing. CBP retains all existing discretion to processes (or re-process) the alien for any other available disposition, including ER, NTA, or reinstatement. (Reinstatement is only applicable for aliens processed by USBP.  OFO includes "waivers" or "parole" here).

**Fear Not Found:**  A determination that the alien is not more likely than not to be persecuted or tortured in Mexico. The alien may continue to be subject to MPP.

**Return to Mexico:**  Aliens who entered the US, either at a Port of Entry or apprehended between Ports of Entry, who were processed under MPP and returned to Mexico.

What do you comment.

Menu

Full Episodes    Podcasts    Subscribe    Live



*Left:* A family of Central American migrants is detained by the Immigration officers during a raid on a journey towards the United States, in Pijijiapan, Mexico. Photo by Jose Cabezas/Reuters

**Leave a comment**

*By* — **Sonia Perez D., Associated Press**

# Migrants anxious after Mexican authorities raid caravan

Nation    Apr 23, 2019 9:56 AM EDT

PIJIJIAPAN, Mexico — Central American migrants hoping to reach the U.S. are finding a much tougher trek than those in previous caravans, meeting unwelcoming townsfolk and a surprise raid by Mexican police and immigration agents who detained hundreds in Mexico's south.

While their compatriots were been taken into custody Monday, hundreds of other migrants scrambled away into the brush along the highway in Chiapas state to elude authorities.

Many had already learned they would not be received in towns with the same hospitality that greeted previous caravans, and now they know they won't be safe walking along the rural highway either. Mexican authorities say they detained 367 people in the largest single raid on a migrant caravan since the groups started moving through the country last year.

Oscar Johnson Rivas fled up a mountain when officers converged on the caravan and spent six hours hiding in the thick vegetation before carefully making his way back to the highway with others. Some migrants, including women and children, remained in hiding without food.

"What we did was find the bush and get as far away as we could so they couldn't grab us," said Rivas, a 45-year-old soldier from El Salvador who said he had to flee his country because of gang threats.

## Related

**Mexican police detain hundreds of Central American migrants**

*By* Sonia Perez D., Associated Press

Share

**Barr's decision to eliminate bond for certain asylum-seekers, explained**

*By* Alexandra D'Elia

**Trump administration wants to build 2 new migrant tent camps**

*By* Noomaan Merchant, Cedar Attanasio, Associated Press

**Trump sanctuary city idea could help migrants stay in US**

*By* Astrid Galvan, Morgan Lee, Associated Press

## Go Deeper

central america

immigration

mexico

newsdesk

AR696

"They were grabbing us mercilessly, like we were animals," he said of the Mexican officials. "That's a barbarity, because we're all human."



A Central American boy is transferred to a bus as he is detained by immigration officers during a raid in their journey towards the United States, in Pijijiapan, Mexico. Photo by Jose Cabezas/Reuters

Mexico's National Migration Institute issued a statement saying agents were carrying out an immigration check on a group of migrants who "began an aggression" against the agents, who then called in federal police.

It said 367 people, including a "significant number" of children and women, were "rescued" and taken to an immigration station.

Journalists saw police target isolated groups at the tail end of a caravan of about 3,000 migrants who were making their way through Chiapas, Mexico's southernmost state.

As migrants gathered under spots of shade in the burning heat outside the city of Pijijiapan, federal police and agents arrived in patrol trucks and vans and forcibly wrestled women, men and children into the vehicles.

The migrants were driven to buses, presumably for subsequent transportation to an immigration station for deportation processing.

Some women and children wailed and screamed during the detentions on the roadside. Clothes, shoes, suitcases and strollers littered the scene after they were taken away.

Agents had encouraged groups of migrants that separated from the bulk of the caravan to rest after some seven hours of trudging along the road, including about half of that under a broiling sun. When the migrants regrouped to continue, they were detained.

Agents positioned themselves at the head of the group and at the back. Some people in civilian clothing appeared to be participating in the detentions.

AR697

After seeing others being detained, some migrants began walking in dense groups and picked up stones and sticks.

Officials from Mexico's National Human Rights Commission observed the action from a distance.

Mexico welcomed the first migrant caravans last year, but the reception has gotten colder since tens of thousands of migrants overwhelmed U.S. border crossings, causing delays at the border and angering Mexican residents.

The U.S. also has ramped up pressure on Mexico to do more to stem the flow of migrants. President Donald Trump railed against the government of his Mexican counterpart, Andrés Manuel López Obrador, and threatened to shut the entire border down, but then quickly congratulated Mexico for migrant arrests just a few weeks ago.

Mexico already allows the United States to return some asylum seekers to Mexico as their cases play out. And government officials said in March they would try to contain migrants in the Isthmus of Tehuantepec in the south. It is Mexico's narrowest area and the easiest to control. Pijijiapan and Mapastepec are not far from the isthmus' narrowest point, which is in neighboring Oaxaca state.

In recent months Mexican authorities have deported thousands of migrants, though they also have issued more than 15,000 humanitarian visas that allow migrants to remain in the country and work.

A group of about 10 prominent social organizations recently warned that detentions of migrants have been rising and accused immigration agents and federal, state and local police of violating their human rights.

The groups said the increased detentions have overwhelmed capacity at the immigration center in Tapachula. The National Human Rights Commission also said the facility is overcrowded.

In its most recent statement from last week, the Migration Institute said 5,336 migrants were in shelters or immigration centers in Chiapas, and over 1,500 of them were "awaiting deportation."

The Rights Commission said Sunday that more than 7,500 migrants were in detention, at shelters or on the road in Chiapas. It urged authorities to carry out a proper census of the migrants and attend to their needs, particularly children.

---

*By* — **Sonia Perez D., Associated Press**

**Support Provided By:** Learn more

**Additional Support Provided By:**

AR698

Discover Thomson Reuters   •••

Directory of sites   Login   Contact   Support

Business   Markets   World   Politics   TV   More



WORLD NEWS   MAY 22, 2019 / 2:47 AM / 2 MONTHS AGO

# Mexico's refugee agency turns to U.N. amid asylum surge, funding cuts

Lizbeth Diaz, Delphine Schrank

4 MIN READ

MEXICO CITY (Reuters) - Buckling under surging asylum applications and the lowest budget in years, Mexico's tiny refugee agency has turned to the United Nations for help opening three new offices across the country starting next month, its director said on Tuesday.



AR699

FILE PHOTO: Honduran migrants wait to enter the Mexican Comission for Refugee Assistance (COMAR) in Tapachula, Mexico, May 13, 2019. REUTERS/Andres Martinez Casares

Mexico is on track for 60,000 asylum applications this year, double the 2018 number, said Andres Ramirez, the head of the Mexican Commission for Refugee Assistance (COMAR).

The increase is a result of a surge in people leaving Central America, along with Cuba and countries further afield.

The number of undocumented migrants reaching the U.S. border is the highest in a decade, triggering threats from U.S. President Donald Trump to punish Mexico if it does not do more to stop the flows.

Ramirez, who served 28 years with the U.N. refugee agency before joining the administration of President Andres Manuel Lopez Obrador, said COMAR was so overwhelmed he had turned to his former employer for help.

"We at COMAR are simply trying to survive," Ramirez said in an interview with Reuters.

As well as the rising number of applications, which have doubled for three consecutive years, COMAR is facing its lowest funding in seven years, with a budget of $1.2 million, as the government tries to meet austere fiscal targets.

"Our central issue is a concern with resources - we are fighting for them, we are struggling for them - but we can't self-finance, we don't have the capacity in our hands alone to revolve this," Ramirez said.

The United Nations High Commissioner for Refugees (UNHCR) is offering financial support and staff that will enable COMAR to open offices to deal with the surge, he said.

The first new office will be in the northern border city of Tijuana, then Monterrey, and Palenque

AR700

in the southern border state of Chiapas where the vast majority of mainly Central American migrants cross into Mexico from Guatemala.

The new offices would double COMAR's current number. Ramirez said the UNHCR support included the secondment of personnel to supplement COMAR's 48-person core staff nationwide.

In response to a request for information, UNHCR said it currently has 104 contractors on loan with COMAR and was discussing additional staffing. Silvia Garduno, a spokeswoman for the agency, emphasized that the financial assistance was temporary.

"Reinforcing capacity requires an increase in the allocation in the federal budget for COMAR, but also measures to simplify procedures and speed up asylum processing," the agency said.

At the COMAR office in Tapachula, Chiapas state, the opportunity to seek an interview with COMAR staff has reached such a premium that migrants told Reuters on a recent visit that night-time sidewalk spots beside the gate can sell for $11 (200 pesos) to give people a headstart in lines that stretch three blocks.



FILE PHOTO: Migrants rest as they w…

Ramirez said he recently told staff there to cut back on 12-hour days to avoid exhaustion.

The Lopez Obrador administration took office in December and handed out at least 12,000 year-long humanitarian visas to Central Americans it expected to stay in Mexico. Many quickly moved to the U.S. border.

After it stopped the program cold within weeks, overwhelmed and facing threats from Trump to shut the border, more migrants have applied for asylum in Tapachula, COMAR staff say.

Reporting by Lizbeth Diaz and Delphine Schrank; editing by Michael Perry and Leslie Adler

*Our Standards:*   *The Thomson Reuters Trust Principles.*

AR701



American ideals. Universal values.

**FACT SHEET: NOVEMBER 2018**

# Is Mexico Safe for Refugees and Asylum Seekers?

President Trump has repeatedly falsely <u>asserted</u> that the United States can turn away asylum seekers who have crossed through Mexico without seeking asylum there first—even though there is no legal basis for this claim. Secretary of Homeland Security Kirstjen M. Nielsen has also incorrectly <u>stated</u> that asylum seekers must "seek protections in the first safe country they enter, including Mexico."

Despite this rhetoric, **many refugees face deadly dangers in Mexico. For many, the country is not at all safe.** Mexico falls far short of meeting the legal requirements that would permit U.S. officials to treat it as a "safe third country" for the purpose of turning back asylum seekers. And since there is no safe third country agreement in place, the president and members of his administration have no legal basis to state that asylum seekers must apply for asylum in Mexico.

Rather than returning refugees to a country that is currently unable to provide them safety, the United States should strengthen support to build an effective refugee protection system in Mexico. This factsheet explains the concept of safe third country agreements under U.S. law and why Mexico does not meet the legal requirements.

## What is a "safe third country"?

Under a "safe third country" agreement, the United States and another country recognize that both countries effectively protect refugees seeking asylum. With an agreement in place, asylum seekers who request protection in the United States after first passing through the "safe" country may be returned there and given an opportunity to request protection in that other country.

**Canada is the only country that has a safe third country agreement with the United States.** The <u>Canada-U.S. Safe Third Country Agreement</u> was signed on December 5, 2002 and came into effect on December 29, 2004. As a result, asylum seekers who enter the United States after passing through Canada will be returned and permitted to request asylum there unless they qualify for an exception to the agreement.

Congress has spelled out three requirements that must be met before U.S. officials and agencies can block refugees from asylum on these grounds. **Specifically**, **to be a safe third country, the** <u>Immigration and Nationality Act</u> **requires that the country must:**

- ☑ **Guarantee asylum seekers protection from persecution:** The country must be a place where the refugee's "life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion."

- ☑ **Provide access to "full and fair" procedures to assess asylum requests:** The country must afford "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."

- ☑ **Agree to be designated a safe third country:** The country must have entered into a bilateral or multilateral safe third country agreement with the United States.

# Mexico does not meet "safe third country" legal requirements

As Human Rights First has long <u>documented</u>, given the deadly dangers in Mexico and the deficiencies in its refugee protection system, Mexico falls far short of meeting "safe" country standards under U.S. law:

## Refugees are not adequately protected in Mexico.

As detailed in Human Rights First's 2017 <u>report</u> and updated in a 2018 <u>fact sheet</u>, **refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico**. Refugees in Mexico are targeted due to their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons. Certain groups—"<u>including</u> the LGBTQ community, people with indigenous heritage, and foreigners in general"—face consistent persecution in Mexico and are often forced to seek protection outside of the country. <u>Gay men</u> and <u>transgender women</u>, for example, flee discrimination, beatings, attacks, and a lack of protection by police in Mexico. **Some refugees have been trafficked into forced labor**, while women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and night clubs that cater to police, military, and other forces. Doctors Without Borders <u>reported</u> that 68% of refugees and migrants it interviewed had been exposed to violence and almost one third of refugee and migrant women had been sexually assaulted. Additionally, Amnesty International <u>reports</u> that criminal investigations of massacres and crimes against migrants remain "shrouded by impunity."

## Many refugees are left unprotected due to lack of access to full and fair procedures

**Deficiencies, barriers, and flaws in Mexico's asylum system leave many refugees unprotected** and Mexican authorities continue to improperly return asylum seekers to their countries of persecution. A 2018 Amnesty International <u>report</u> found that Mexican migration officials routinely turn back Central American asylum seekers and that **75 percent of migrants and asylum seekers surveyed were not informed of their right to seek asylum** by migration officers in detention facilities, even though this is required by Mexican law. Less than one percent of unaccompanied children apprehended in Mexico receive international protection, as <u>detailed</u> by Human Rights Watch.

Despite progress since launching an asylum system, barriers persist, leaving many refugees unprotected. The system for seeking legal protection lacks national reach and capacity. COMAR—"The Mexican Commission for Refugee Aid"—has only four offices around the country, leaving many refugees without access to the system. After halting its processing of asylum applications in 2017, Mexico only <u>reopened</u> its system in 2018 after a successful lawsuit by the Mexican Commission for the Defense and Protection of Human Rights. Refugee processing in Mexico remains plagued by backlogs and understaffing. In addition, **refugees are blocked from protection under an untenable 30-day filing deadline, denied protection by COMAR officers who claim that refugees targeted by groups with national reach can safely relocate within their countries, and lack an effective appeal process** to correct wrongful denials of protection. Finally, <u>declining</u> and <u>disparate</u> asylum recognition rates for Central Americans raise concerns that individuals from those countries remain unprotected.

## Mexico has not agreed to be a safe third country.

Mexico and the United States do not have a "safe third country" agreement.



# OVERLOOKED,

# UNDER-PROTECTED

MEXICO'S DEADLY *REFOULEMENT* OF CENTRAL AMERICANS SEEKING ASYLUM

I WELCOME



AR704

**Amnesty International is a global movement of more than 7 million people who campaign for a world where human rights are enjoyed by all.**

**Our vision is for every person to enjoy all the rights enshrined in the Universal Declaration of Human Rights and other international human rights standards.**

**We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and public donations.**

© Amnesty International 2018
Except where otherwise noted, content in this document is licensed
under a Creative Commons (attribution, non-commercial, no derivatives,
international 4.0) licence.
https://creativecommons.org/licenses/by-nc-nd/4.0/legalcode
For more information please visit the permissions page on our website:
www.amnesty.org
Where material is attributed to a copyright owner other than Amnesty
International this material is not subject to the Creative Commons licence.

First published in 2018 by Amnesty International Ltd
Peter Benenson House, 1 Easton Street, London WC1X 0DW, UK

Index: AMR 41/7602/2018
Original language: English

**amnesty.org**



*Cover photo:*
*Illustration by Joaquin Castro Caceres for Amnistía Internacional*
*© Amnesty International / Joaquin Castro Caceres*

AR705

# CONTENTS

**GLOSSARY**                                                                          **4**

**1. EXECUTIVE SUMMARY**                                                              **5**

1.1 Methodology                                                                       **6**

**2. FALLING THROUGH THE CRACKS: FAILURES IN SCREENING PROCESSES**                     **8**

2.1 First stage of screening by INM field agents                                     **10**

2.2 Falling through the cracks: Second stage of screening in detention centres       **11**

**3. LEGAL LIMBO AND HASTY RETURNS**                                                  **14**

3.1 Voluntary return papers                                                          **14**

3.2 The failure to fully inform individuals about their casefile                     **16**

3.3 Failures of INM information systems                                              **16**

**4. ILL-TREATMENT OF MIGRANTS AS PART OF THE DEPORTIONS MACHINE**                    **18**

4.1 Arbitrary detention of asylum seekers and its impact on *refoulement*            **20**

**5. RECOMMENDATIONS**                                                                **22**

AR706

# GLOSSARY

| TERM | DESCRIPTION |
|---|---|
| **REFUGEE** | A refugee is a person who has fled from their own country because they have a well-founded fear of persecution and their government cannot or will not protect them. Asylum procedures are designed to determine whether someone meets the legal definition of a refugee. When a country recognizes someone as a refugee, it gives them international protection as a substitute for the protection of their home country. |
| **ASYLUM-SEEKER** | An asylum-seeker is someone who has left their country seeking protection but has yet to be recognized as a refugee. During the time that their asylum claim is being examined, the asylum-seeker must not be forced to return to their country of origin. Under international law, being a refugee is a fact-based status, and arises before the official, legal grant of asylum. |
| **MIGRANT** | A migrant is a person who moves from one country to another to live and usually to work, either temporarily or permanently, or to be reunited with family members. **Regular migrants** are foreign nationals who, under domestic law, are entitled to stay in the country. **Irregular migrants** are foreign nationals whose migration status does not comply with the requirements of domestic immigration legislation and rules. They are also called "undocumented migrants". The term "irregular" refers only to a person's entry or stay. **Amnesty International does not use the term "illegal migrant."** |
| **UN REFUGEE CONVENTION AND PROTOCOL** | The 1951 Convention Relating to the Status of Refugees is the core binding international treaty that serves as the basis for international refugee law. The 1967 Protocol relating to the Status of Refugees retakes the entire content of the 1951 Convention and simply adds an extension on its application to all refugees, not just those arising from specific time bound conflicts in the 1940s and 50s. Mexico has ratified both the Convention and the Protocol while the USA has ratified the Protocol, which gives it identical obligations. This treaty, along with the International Covenant on Civil and Political Rights of 1966, ratified by both USA and Mexico, provide a series of fundamental rights to be enjoyed by all humans. |
| **REFOULEMENT** | *Refoulement* is the forcible return of an individual to a country where they would be at real risk of serious human rights violations (the terms "persecution" and "serious harm" are alternatively used). Individuals in this situation are entitled to international protection; it is prohibited by international law to return refugees and asylum-seekers to the country they fled – this is known as the principle of non-*refoulement*. The principle also applies to other people (including irregular migrants) who risk serious human rights violations such as torture, even if they do not meet the legal definition of a refugee. Indirect *refoulement* occurs when one country forcibly sends them to a place where they at risk of onwards *refoulement*; this is also prohibited under international law. |
| **MARAS** | Colloquial name commonly given to organized groups from the Northern Triangle of Central America that are characterized by violent criminal activities and generally associated with territorial control. |

AR707

# 1. EXECUTIVE SUMMARY

Mexico is witnessing a hidden refugee crisis on its doorstep. For a number of years, citizens from nearby countries who formerly passed through Mexico in search of economic opportunities have been leaving their countries due to fear for their lives and personal liberty. This briefing analyses the results of a survey carried out by Amnesty International with 500 responses from migrants and people seeking asylum travelling through Mexico. The information presented demonstrates that the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle[1], a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled.

The so-called "Northern Triangle" countries of Guatemala, El Salvador and Honduras continue to experience generalized violence, with homicide rates four to eight times higher than what the World Health Organization considers "epidemic" homicide levels.[2] Nearly all of the respondents to Amnesty International's survey came from these three Central American countries.[3] Of those detained by Mexican authorities, 84% (263 out of 310 that answered the question) did not desire to be returned to their country. Of these, 54% (167 out of 310) identified violence and fear as a principal reason for not wanting to go back to their country, and 35% (108 out of 310) identified direct personal threats to their life back home as the reason for not wanting to return.

Violations by Mexican authorities of the *non-refoulement* principle directly affect human lives and deny protection to those most at need. One man who came to Mexico seeking asylum after fleeing death threats in Honduras told Amnesty International he wept in desperation to try to stop his deportation, yet officials did not listen to him or inform him of his right to lodge an asylum claim, and simply deported him back to his country. This testimony echoes dozens collected by Amnesty International and contrasts with the official responses received from Mexican authorities, who informed Amnesty International that *refoulement* cases were rare.

Amnesty International analysed the 500 responses received and found 120 testimonies that gave solid indications that a *refoulement* had occurred, which is 24% of the total set of responses, and equates to 40% of the responses provided by those individuals who had been detained by the National Institute of Migration (INM). These testimonies involved people explicitly seeking asylum or expressing fear for their lives in their country of origin, yet nevertheless being ignored by the INM and deported to their country.

In addition, Amnesty International found that 75% of those people detained by the INM were not informed of their right to seek asylum in Mexico, despite the fact that Mexican law expressly requires this and public officials assured Amnesty International that the requirement is complied with. Amnesty International also found evidence of a number of procedural violations of the rights that people seeking asylum should be afforded in line with international human rights law. These violations effectively deny them the possibility to challenge their deportation and to obtain protection in Mexico.

---

1. Article 33 of the 1951 UN Convention Relating to the Status of Refugees provides that states must not return persons to territories where their "life or freedom" would be threatened. The *non-refoulement* principle is also considered a binding principle of international customary law.
2. The World Health Organization (WHO) considers a murder rate of more than 10 per 100,000 inhabitants to be an epidemic level. However, in 2016, the murder rate in El Salvador was recorded as 81.2 per 100,000 inhabitants (National Civil Police), in Honduras 58.9 per 100,000 (SEPOL) and in Guatemala 27.3 per 100,000 (National Civil Police). 2017 figures from these same sources noted 60 per 100,000 for El Salvador, 42.8 per 100,000 for Honduras, and 26.1 per 100,000 for Guatemala.
3. Of the 385 people interviewed, 208 people were from Honduras, 97 from El Salvador, 59 from Guatemala, and a series of other countries represented less than five cases each

AR708

# 1.1 METHODOLOGY

Between May and September 2017 Amnesty International carried out a survey of irregular migrants and asylum seekers with the aim of understanding how Mexican authorities are implementing their obligations to ensure the effective enjoyment of the right to seek asylum in Mexico. Surveys were carried out in queues for government offices, lawyers and UN offices, as well as in migrant shelters, in the southern states of Chiapas, Tabasco and the northern state of Coahuila. Surveys were also carried out in a reception centre for deportees in Guatemala. Three hundred and eighty-five people were surveyed in individual interviews responding to a standardized questionnaire that was read out to them.[4] Many of these people detailed multiple experiences of entering Mexico, giving a total of 500 responses to the questionnaire based on 500 discrete episodes of leaving one's country. Many migrants and people seeking asylum cross by land into Mexico more than once, which means that the data set for this survey was based on each separate experience of crossing into Mexico. At times, one interviewee filled out a number of survey responses, based on separate journeys they had made over the years.

Eighty-two per cent of the interviewees were men, 17% were women, 1% did not wish to specify their gender and 2 cases identified as transgender. The over-representation of males is reflected in the migratory flow as noted by officials statistics, with females accounting for approximately a quarter of the apprehensions of irregular migrants carried out in 2017.[5] Nevertheless, this official data does not take into account other routes that may be more precarious or clandestine that women may be forced to make and precise assessments of women-led migration routes are not readily available.

Of the 500 survey responses collected by Amnesty International, 297 pertained to migrants or people seeking asylum that had been at one point apprehended by the INM. The rest had either never been apprehended by Mexican officials, or had been apprehended by police (116 responses) the Army (11 responses) or the Navy (4 responses). Further detail on the role of the police in apprehending migrants (mostly illegally), will be outlined briefly below, however the focus of this briefing is the role of migration authorities. Survey responses were anonymous and participants were offered no benefit in their individual cases in return. The data set gathered is not a randomized sample of the estimated 500,000 irregular migrants that cross Mexico's southern border annually.[6] As such, the percentages presented here in graphs, while an indication of wider trends, are not a statistical sample of the hundreds of thousands of people that pass through Mexico each year. Nevertheless, the data obtained from the survey provides important information on the common practices of Mexican authorities in order to inform Amnesty International's recommendations.

---

4. Of the 385 people surveyed, 208 people were from Honduras, 97 from El Salvador, 59 from Guatemala, and a series of other countries represented less than five cases each.
5. From January to November 2017, females accounted for 29% of irregular migrants aprehended by the INM:See: Unit for Migratory Policy, Ministry of the Interior, Unidad de Política Migratoria, Secretaría de Gobernación, Extranjeros Presentados y Devueltos, 2017 Cuadro 3.1.3: Eventos de extranjeros presentados ante la autoridad migratoria, según grupos de edad, condición de viaje y sexo, available at: http://www.politicamigratoria.gob.mx/es_mx/SEGOB/Extranjeros_presentados_y_devueltos. Last accessed XX January 2018
6. United Nations High Commissioner for Refugees, "Factsheet – Mexico" February 2017  - Available at: http://reporting.unhcr.org/sites/default/files/Mexico%20Fact%20Sheet%20-%20Februrary%202017.pdf

AR709

# THE HUMAN EXPERIENCE OF REFOULEMENT



1. You flee threats to your life and grave danger.
2. You enter Mexico without documents.
3. Tired and hungry, you travel by foot or bus.
4. Migration agents (INM) detain you without explaining anything to you.
5. They lock you up without explaining your right to seek protection in Mexico.
6. They pressure you to sign a deportation paper.
7. They deport you by bus to your possible death back in your country.

AR710

# 2. FALLING THROUGH THE CRACKS: FAILURES IN SCREENING PROCESSES

**"Here we are not interested in your lives. Our job is to deport you."**

Mexican INM agent in response to a 27 year old Honduran man who expressed fear of returning to his country.[7]

The National Institute of Migration (INM) is the federal government body responsible for regulating borders, travel and residence documents and the flow of regular and irregular migration throughout the country. The INM is also responsible for apprehending and deporting irregular migrants. It pertains to the Interior Ministry and has a staff of close to 6,000.[8] The officials of the INM that have direct contact with people seeking asylum generally fall into two categories: INM field agents who carry out a first stage of interception and apprehensions in field activities such as highways or checkpoints; and INM officials assigned to migration detention centres, of which the INM has 54 throughout the country.

Amnesty International analysed the 500 survey responses received and found 120 testimonies that gave solid indications that a *refoulement* had occurred, which is 24% of the total set of responses, and equates to 40% of the responses provided by those individuals that had specifically been detained by the INM. These testimonies involved people seeking asylum more specifically expressing fear for their lives in their country of origin, yet despite this being ignored by the INM and deported to their country of origin.

These failures are more than simply negligent practices, and each case of *refoulement* is a human rights violation that risks costing the lives of people seeking asylum. The practical experience of an illegal deportation or *refoulement* involves the return of a person seeking asylum by land to Guatemala, Honduras and El Salvador. In the case of El Salvador and Honduras, these countries comprise limited amounts of territory where *mara* networks stretch across nearly all regions. Deportation centres and highway drop-off points for deportees are easily trackable places for these powerful and violent networks to operate and persecute deportees from different parts of the country.

---

7. Anonymous survey response from a 27 year old Honduran man interviewed by Amnesty International in the city of Saltillo on 18 September 2017
8. According to the Federal Budget of 2017 (*Presupuesto de Egresos de la Federación*, 2017), the INM had a staff of 5,809 employees.

AR711




*Amnesty International interviewed Saúl just days before he was murdered. [An asterisk next to his name* indicates Amnesty International has changed the name in order to protect his identity.] ©Amnesty International/Encarni Pindado*

## SAÚL*: MURDERED THREE WEEKS AFTER BEING ILLEGALY DEPORTED BACK TO HONDURAS BY THE INM

Saúl worked in the transport industry as a bus driver in Honduras. The transport industry has been specifically outlined by the UNHCR as one of five specific categories of at-risk profiles within the context of widespread violence in Honduras, given the grip that *maras* have through demanding bus drivers extortions or "war taxes." In November 2015 Saúl suffered an armed attack in which two of his sons were seriously wounded. Fearing for his life, Saúl fled to Mexico and applied for asylum. The COMAR denied him asylum arguing that he had options for security in his country, and the INM subsequently violated the *non-refoulement* principle by deporting him within the 15 day legal window in which he had the right to appeal his claim. Amnesty International researchers interviewed Saúl in Honduras in July 2016, three weeks after he had been deported. He expressed an acute fear for his life and had already suffered an attack in his house on arriving home. A few days later, Saul was murdered.

Officials of the INM are required by domestic law to "detect foreigners that, based on their expressions to the authority, or indeed based on their personal condition, can be presumed to be possible asylum seekers, informing them of their right to request asylum."[9] They are also required to channel those people that express their intention to seek asylum to Mexico's refugee agency, the *Comisión Mexicana de Ayuda a Refugiados* (COMAR).[10] The law and regulations do not distinguish between different categories of INM officials in relation to this obligation, as all are required to comply with these requirements, whether they are field agents or officials in detention centres. A representative of the INM informed Amnesty International that regardless of whether INM officials carry out activities related to interception and apprehensions in field operations, or whether they are in migration detention centres, they are all given uniform training on human rights and international refugee law.[11] Indeed, authorities should be capable of screening for protection needs in a variety of settings.[12]

9. Article 16 of the Reglamento de la Ley sobre Refugiados y Protección Complementaria, available at: http://www.diputados.gob.mx/LeyesBiblio/regley/Reg_LRPC.pdf
10.   Article 21 of Mexico's Refugee Law (*Ley de Refugiados y Protección Complementaria*) outlines that: "Any authority that becomes aware of the intention of a foreigner to seek refugee status, must immediately advise in writing to the Ministry of the Interior [to which the COMAR pertains.] The failure to comply with the requirement will be sanctioned in line with the legal stipulations on responsibility of public servants. [Own translation].
11.   Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017
12.   The United Nations High Commissioner for Refugees (UNHCR) outlines that "Screening and referral can be conducted at border or coastal entry points, in group reception facilities or in places where detention takes place (including detention centres). See: United Nations High Commissioner for Refugees, "The 10-point action plan: Mechanisms for Screening and Referral", available at: http://www.refworld.org/pdfid/5804e0f44.pdf, page 119.

AR712

# 2.1. FIRST STAGE OF SCREENING BY INM FIELD AGENTS

***"The INM agent said to me: now that you've been detained, you're screwed and you're gonna
get deported to your country."***

Comments from a Honduran man[13] who had fled death threats, describing the response he received from an INM field agent when
he expressed his fear of returning.

The field agents of the INM are often the very first point of contact with Mexican authorities for a
number of migrants and people seeking asylum. Yet, they do not have their names on their official
uniforms, and in many cases function as a faceless force dedicated to apprehending migrants and
asylum seekers and turning them over to migration detention centres without an individualized
assessment of each detainee's personal circumstances and protection needs.

Amnesty International analysed the conduct of INM field agents and found that this first stage of
screening during interception and apprehension of migrants displays overt failures to detect people
seeking asylum and act accordingly. Amnesty International noted just 10 cases out of 297 people
apprehended by the INM where field agents responded according to the law, by explaining asylum
seekers their right to seek protection in Mexico and informing them of the procedure they could
undergo in the COMAR. While these are promising practices from public officials, the fact that this was
the minority of cases is extremely concerning and points to grave and systemic failures by the INM to
comply with law and international human rights obligations.  The vast majority of cases involved INM
field agents ignoring or at times humiliating people seeking asylum in response to their expressions of
fear of return to their country.

Amnesty International found that 69% of those that had been apprehended by INM noted that the
field agent never asked them their reasons for having left their country. This is despite the fact that in
the Latin American Regional Guidelines for the preliminary identification and referral mechanisms for
Migrant Populations,[14] one of the preliminary questions that should be asked to irregular migrants is
why the person left their country. While this is one of a series of questions that can be asked during the
first stages of identification of asylum-seekers and refugees, and Amnesty International recommends
more precise questions,[15] the fact that field agents did not pose even such entry-level questions reveals
a lack of adequate attention to their legal obligations to screen for people seeking asylum. Many
responses to Amnesty International's questionnaire noted that INM field agents did not allow migrants
and people seeking asylum to speak and simply shouted orders at them and loaded them into vans.

A number of survey responses pointed to the indifference of INM field agents to the comments from
people seeking asylum as to their fear of returning to their country; comments that by law should
detonate a response from the agent that informs asylum authorities of the intention of the person to
seek asylum.[16] A number of responses to Amnesty International's survey outlined a rude or teasing
attitude from INM agents. INM field agents routinely ignored asylum seekers' concerns, and told
asylum seekers they could not do anything and that they should talk to their colleagues once they
arrived at the migration detention centre. This response, as will be seen below, is inadequate, given the
fact that the processes in the migration detention centres also routinely fail to detect people seeking
asylum.

---

13.   Interview response to survey carried out with Honduran man in Tapachula, Chiapas state, 14 August 2017
14.   These guidelines were agreed upon in an IOM and UNHCR sanctioned process that produced this document in 2013: http://
rosanjose.iom.int/site/sites/default/files/LINEAMIENTOS%20ingles.pdf Page 19.
15.   See Amnesty International discussion of screening procedures in Italy: *Hotspot Italy: How EU's flagship approach leads to violations of
refugee and migrant rights*, 3 November 2016, Index number: EUR 30/5004/2016, p34ff.
16.   Op Cit. See footnote 9.

AR713