One person seeking asylum told Amnesty International "I asked [the INM field agents] for asylum, and they told me that it didn't exist, and that in Mexico they didn't like Hondurans because we commit mischief."Another migrant told Amnesty International "the field agents know that you don't know your rights. They say whatever they want."

**WHAT WAS THE INM FIELD AGENT'S ATTITUDE WHEN YOU EXPRESSED YOUR REASONS FOR NOT WANTING TO RETURN TO YOUR COUNTRY?**
(171 responses to this question)



Very good 2%   Good 33%   Mediocre 16%   Bad 34%   Very bad 15%

# 2.2 FALLING THROUGH THE CRACKS: SECOND STAGE OF SCREENING IN DETENTION CENTRES

Mexico has 54 migration detention centres, many of which are highly securitized and controlled facilities resembling prison-style conditions.[17] These detention centres are the second stage of processing for irregular migrants and asylum seekers and are run by a different category of INM officials that interview detainees, prepare a casefile for each, and determine whether they are to be deported, which in the case of Central Americans, involves loading them onto buses that leave from the migration detention centres on Mexico's southern border. In the case of people seeking asylum, the law requires that these persons are channelled to COMAR without delay and are shielded from deportation.[18]

The INM informed Amnesty International that each migrant or asylum seeker that enters a detention centre is given at least an hour individually where they are interviewed and explained their rights.[19] Nevertheless, only 203 of 297 (68%) of responses from people that passed through detention centres indicated to Amnesty International they were given an interview when they entered. Of those that said they were given an interview, 57% said that it lasted less than ten minutes. Thirty-five percent said their interview lasted less than 30 minutes, and only 8% noted that it lasted more than half an hour. The UNHCR notes that the recommended time for screening interviews is between 30 minutes and a few hours per person.[20]

---

17.    The UN Special Rapporteur on Torture and other cruel, inhuman and degrading punishment noted having received reports of beatings, threats, humiliation and insults experienced by migrants in Mexico's migration detention centres in his visit to Mexico in 2014
18.    Op. cit. see footnote 9.
19.    Representative of the General Directorate for Control and Verification of the INM in an Interview with Amnesty International, Mexico City, 2 May 2017.
20.    United Nations High Commissioner for Refugees, December 2016:  "The 10-point action plan: Mechanisms for Screening and Referral", available at: http://www.refworld.org/pdfid/5804e0f44.pdf, page 119

AR714

The data collected by Amnesty International demonstrates a systematic failure to properly inform detained migrants and people seeking asylum of their rights. This is a violation of the law by the INM, which aims to ensure proper protection for asylum seekers and guard against illegal *refoulement* of people whose lives are at risk. It is extremely concerning that 75% of responses from people who passed through detention centres noted that they were not informed of their right to seek asylum in Mexico.

## WERE YOU INFORMED OF YOUR RIGHT TO SEEK ASYLUM?
(297 responses of people that passed through migration detention centres)



## DURATION OF THE INTERVIEW IN THE MIGRATION DETENTION CENTRE
(297 responses of people that passed through a migration center)



AR715

> ## *"The INM has not improved in informing people about asylum. People get the information by word of mouth."*
>
> Lawyer working on asylum and migration cases in Chiapas in the south of Mexico

Also of concern is the fact that in numerous cases, INM officers told people seeking asylum that their consul was the person in charge of explaining to them their rights to asylum in Mexico, thereby indirectly pushing them to contact their consular authorities. International practice tends to shield asylum-seekers from contact with their consular authorities, as a form of protection against the risk of identification, retaliation and human rights violations at the hands of state agents.[21]

**GIVEN THE RUN-AROUND IN THREE MIGRATION DETENTION CENTERS:**

"The people in the migration detention centre did not advise or direct me well. They told me that it would be better to return to my country, ...They gave me lots of pretexts, "buts". They said there was no COMAR office in the state I was in, so it was going to take months for my claim, so it was better to go back to my country. At first I was in the migration detention centre [in a northern state of the country]. From that place, and from the very first moment, I said I wanted asylum. They told me they couldn't do anything. On arrival at the next migration detention centre in Mexico City, the official said to me: "I can't do anything, you are already on the list to be returned to your country." It was not until Tapachula, after speaking to my consul, that I was able to speak to the COMAR!"

Comments from an El Salvadorian woman interviewed by Amnesty International who passed through three different detention centres: One in a state of northern Mexico [location has been omitted to protect the identity of the interviewee], then Mexico City and then Tapachula, Chiapas, on the southern border. In none of these did the INM properly inform her and it was only by chance that her consul informed her of the asylum procedure.

---

21.   Article 21 of Mexico's Refugee Law (*Ley de Refugiados y Protección Complementaria*) outlines that consuls must not be informed of their citizens' asylum claim, only unless the person gives express consent.

AR716

# 3. LEGAL LIMBO AND HASTY RETURNS

> **"I can't do anything for you – you are already on the list for the deportation bus."**
>
> Comments by an INM official to a 25-year-old man from El Salvador who expressed fear for his life if he was returned to his country. He told Amnesty International that INM officials did not let him read his return papers, and simply loaded him onto the bus to be deported.[22]

The detention and return of an irregular migrant or asylum seeker to their country of origin is the default response that the INM takes in relation to Central Americans arriving in Mexico. The INM opens a casefile for each person detained, taking the form of an administrative legal procedure, in which the person detained has 15 days to present arguments in their favour and seek legal counsel.[23] Once all of these stages are completed, or once the person signs papers withdrawing their intention to present arguments within the 15 day window, the INM prepares a resolution concluding the casefile and places the irregular migrant on a list to board a bus headed for their country of origin. The names on this list are checked off by the consul of the country of origin who verifies the nationality of each person.

## 3.1 VOLUNTARY RETURN PAPERS

An alarming aspect of the way the administrative migratory procedure is implemented in practice is that one of the very first steps in putting together a casefile involves detainees signing a number of papers, accepting their "voluntary return"[24] to their country and waiving their rights to present legal arguments in their favour within the stipulated 15-day procedural window. This is the default process that is carried out in the first interview or "declaration" (*comparacencia*) of the migrant or asylum-seeker before an INM official in the detention centre. This *comparecencia* takes place within the first 24 hours of a migrant or asylum-seeker entering the detention centre, and it is at this time that the INM official is by law required to comprehensively explain to them their right to asylum, among other rights. In practice, this process often involves the INM official asking the detainee to sign a number of papers, often without explaining their contents. It is extremely concerning that the signing of return papers and the waiving of very important procedural rights are the default steps in this process. Rather than being informed in detail of the different avenues available to them, including seeking asylum, thereby allowing an informed decision by each person, migrants are routinely asked to sign "voluntary return"

---

22.   Anonymous survey responses from an interview carried out with an El Salvadoran man seeking asylum in Mexico, interviewed in Tapachula, Chiapas state, 8 August 2017
23.   Article 56 of the Federal Law on Administrative Procedures (*Ley Federal de Procedimiento Administrativo*) outlines that each party in an administrative legal process must be formerly notified with the lodging of a deed as to the opening of the period for arguments and responses. Nevertheless, this does not occur in relation to the Migratory Administrative Process (Procedimiento Administrativo Migratorio).
24.   "Voluntary return" refers to deportations which do not imply administrative sanctions on re-entry in Mexico, as opposed to official deportations, which have punitive implications upon re-entry.

AR717

papers, which effectively allow for their deportation. Since the signing of the "voluntary return" paper is a default step on arriving at a migration detention centre, in order not to be returned to their country detainees must actively desist from this return, and only then will it be reversed. Reasons for desisting on "voluntary return" papers may include the decision to request asylum, or the decision to open a judicial proceeding to stop one's deportation. However, many irregular migrants and asylum seekers are also asked to sign a paper waiving their rights to present legal arguments in their favour within the stipulated 15 day procedural window.

> ## *"The INM official in the detention centre said ́if you don't sign here [my voluntary return paper], we won't give you food, you won't be able to have a shower. We will treat you like you don't exist.' "*
>
> Comments from a 23 year old Honduran man[25] to Amnesty International regarding his experience in the detention centre in Acayucan, Veracruz, in 2017.

According to the testimonies collected by Amnesty International, people seeking asylum whose lives are at risk in Central America are very frequently pressured into signing "voluntary return" deportation papers. Amnesty International received numerous testimonies of people in detention centres being hastily asked to sign voluntary return papers without being explained what they were, as well as a number of cases where people desired to seek asylum yet were ignored and told to sign their return papers. In some cases, INM officials in immigration detention centres were verbally forceful with asylum seekers or even pressured them into signing papers through coercive tactics. These overt displays of illegality on the part of INM officials are demonstrative of an institutional culture that enables systematic failures in complying with the *non-refoulement* principle.

> ## *"The lady from INM told me 'I'm not even going to talk with you.' She got angry with me because I didn't sign my deportation."*
>
> Comments from a Guatemalan woman who had asked for asylum but was refused access to the procedure while in immigration detention

---

25.   Anonymous survey interview carried out in Saltillo, Coahuila state, 19 September 2017

AR718

## 3.2 THE FAILURE TO FULLY INFORM INDIVIDUALS ABOUT THEIR CASEFILE

People seeking asylum and migrants are made even more vulnerable by the fact that they are never given a copy of their "voluntary return" paper or the casefile that pertains to them. This undermines their ability to understand the process they are being subjected to or to oppose any of the decisions made about their case. In the case of "voluntary return" papers, a public official co-signs each of these papers alongside the detainee. Denying rights-holders a copy of these papers strips them of any possibility for redress in light of arbitrary or illegal actions by authorities.

A lawyer working on dozens of cases of detained migrants and asylum seekers in the state of Chiapas told Amnesty International it is even very difficult for her to access casefiles. The fact that legal representatives also battle to access such information gravely undermines asylum seekers' rights to effective legal counsel.[26]

## 3.3 FAILURES OF INM INFORMATION SYSTEMS

In addition, internal systems within the INM enable repeated breaches of the *non-refoulement* principle. In an interview with Amnesty International, an INM chief in the southern state of Chiapas[27] admitted that the internal INM computer registries do not have a field on each person's individual file as to whether they are an asylum seeker or not. This is a grave oversight from the INM, the very same body that is able to control a sophisticated system of biodata, travel permissions and entry permits for each passport holder on its computer database. The fact that no unified system exists within INM databases that indicates whether a person is an asylum seeker or not is extremely concerning and leaves open the possibility that these at risk populations fall through the cracks. Amnesty International has received a number of reports of people seeking asylum being deported despite being in a current process of an asylum claim before the COMAR. Amnesty International has also received a number of reports of INM field agents apprehending asylum seekers and then ripping up their official paper from COMAR. This paper specifically calls on the INM to refrain from deporting them and asylum seekers carry it on them with their name and photo.

---

26.   In line with article 8 (1) and (2) of the American Convention of Human Rights, those people before an administrative legal process, as is the case with detained migrants and asylum seekers subject to deportation, have the right to be heard before competent authority; to have access to a legal representative and interpreter at no charge; and the right to appeal the decision that affects them (including deportation or "voluntary return").
27.   Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017

AR719




Emilia and one of her younger sons
©Amnesty International/Benjamín Alfaro Velázquez

## EMILIA* AND FAMILY: FINDING SAFETY AND A NEW LIFE IN MEXICO AFTER FORMERLY BEING DEPORTED

Emilia fled El Salvador and arrived in Mexico in late 2016 with her seven children,[28] after two of her other children and her brother had been killed by the *mara* in El Salvador. Her teenage daughter had also been attacked by the *mara* and the family couldn't take it anymore and fled the country. On arrival to Mexico, Emilia's eldest daughter went in to labor and had to be rushed to a hospital on entry into Mexico in order to give birth to Emilia's first grandchild, a baby girl. The family rented a small hotel room in southern Mexico in the days following, and soon afterwards Emilia had to take a bus back to the hospital to carry out paperwork for the vaccinations of the newborn baby. On her way to the regional hospital in Tapachula, Chiapas state, Emilia was stopped at an INM checkpoint alongside her teenage son who was accompanying her. Emilia pleaded with the INM agents not to return her to El Salvador where her life was at risk, and through tears, told them that she was on her way to the hospital for the paperwork for her newborn granddaughter. INM agents ignored her pleas, and detained her and her son in the nearby detention centre where they were separated and deported a few days later. By sheer luck, on arriving in El Salvador, Emilia was able to find her son and a willing citizen lent her some money to quickly return to Mexico. She found the rest of her family on return to Mexico, and remained living in a cramped room on the border, all together, for months on end while they awaited their asylum claim outcome.  Emilia and her family were granted international protection in Mexico in April 2017. After a few months, the family organized themselves to move to northern Mexico where they currently live. Emilia's children are now attending school and her baby granddaughter is now walking. Her eldest daughter is working in a local shop and the elder sons have obtained agricultural work. The family told Amnesty International they feel safe and out of harm's way.

---

28.   For the full story of threats and persecution against Emilia and her family, see: Amnesty International Facing Walls: USA and Mexico's Violation of the Rights of Asylum Seekers. June 15, 2017. AMR 01/6426/2017. Available at: https://www.amnesty.org/es/documents/amr01/6426/2017/en/

AR720

# 4. ILL-TREATMENT OF MIGRANTS AS PART OF THE DEPORTATION MACHINE

The almost automatic response by federal authorities to irregular migrants is to apprehend them and turn them over to migration detention centres. As outlined above, the INM is the authority responsible for this function, nevertheless Mexico's Migration Law specifically allows for the Federal Police to act in an auxiliary function alongside the INM in migratory verification exercises.[29] Notwithstanding this stipulation, the involvement of the Federal Police must respond to an express request by the INM, and police cannot simply pick up migrants in different parts of the country as part of their daily functions.[30] Unfortunately, irregular migrants and people seeking asylum are often subjected to arbitrary detentions by federal, state and municipal police.

### POLICE VIOLENCE AND ILL-TREATMENT

A total of 68% of those 116 responses that detailed a detention by the police described their treatment as "bad" or "very bad".

Federal and municipal police were most commonly mentioned as being involved in apprehensions that very frequently involved robbery or extortion of migrants by police. On a limited number of occasions police handed migrants over to migration detention centres.



Some testimonies noted torture or ill-treatment by police: One migrant told Amnesty International:

*"They beat me and applied electric shocks to me and they took my money. I told them I had rights, but they tortured me with a pistol that they had on their waist. They gave me electric shocks for 10 minutes"* [31]

The treatment by INM agents in apprehensions did not rate as poorly as the police in the response to Amnesty International's survey. While this is promising to note, the fact that the INM did not present such overwhelmingly poor ratings as police does not mean there is no cause for concern.

---

29.  Mexico's Migration Law (*Ley de Migración*) outlines in its Article 81: The revision of documents of people entering and leaving the country, as well as the inspection of transport lines entering and leaving the country, are considered actions of migratory control. In these actions, the Federal Police will act in an auxiliary function, in coordination with the National Institute of Migration.
30.  Mexico's Migration Law (*Ley de Migración*) outlines in its Article 96: Authorities will collaborate with the National Institute of Migration in the exercise of its functions, when the Institute requests it, without this implying that authorities can independently carry out functions of migratory control, verification and revision.
31.  Amnesty International has received a number of reports about the use of Tasers against migrants and asylum seekers throughout Mexico. The reports focus on the use of these instruments by federal agents, yet it is not clear in testimonies whether the INM also carries these instruments.

AR721

Amnesty International received a number of reports of grave human rights violations committed by INM officials during the moments of apprehension as well as in detention centres. One Honduran man[32] told Amnesty International that on entering Mexico in the southern state of Tabasco, he was apprehended by INM agents who tied him up and beat him with a tennis ball wrapped inside a wet sock in order to avoid leaving marks on his body. A number of other migrants and asylum seekers mentioned beatings and forceful treatment during their apprehension by INM agents, as well as racist and humiliating remarks. One young Honduran man told Amnesty International that an INM agent offered to let him go free in return for sexual favours.[33] This chain of ill treatment against people seeking asylum and migrants is replicated during the time in immigration detention. While a number of migrants and asylum seekers told Amnesty International that the treatment in immigration detention centers was "fine", a number of responses pointed to ill- treatment. In addition, Amnesty International has documented a number of instances of prolonged detentions for months or even up to a year, including the detention of small children and babies in detention centers. A citizen advisory body of the INM recently released a comprehensive report based on site visits and inspections of migration detention centres, which signalled the commonplace use of practices that undermine the physical and mental health of detainees and go against international standards that call for the non-detention of people seeking asylum.[34]

In addition, Amnesty International has received a number or reports from lawyers and civil society organizations of solitary confinement in "punishment cells" in migration detention centres, where detainees can be kept for weeks on end.  In at least three testimonies, Amnesty International was informed by detainees that they had been separated and placed in a small cell with very little light, where they remained all day and were not able to join other detainees during meal times. The reasons for placing detainees in these cells were in two cases in response to a fight or scuffle that guards claimed the detainee had been part of, and in the third case the confinement was a response to a woman who had experienced a psychotic episode while inside the detention centre.

Amnesty International questioned the INM on the existence of these solitary confinement cells. After an initial denial of their existence, officials admitted that their installations did in fact allow for this sort of imposed segregation of certain individuals.[35] While there are no doubt security concerns inside migration detention centres that may warrant limited disciplinary measures, the conditions reported in these "punishment cells" appear disproportionate in relation to international standards on the deprivation of liberty and rights of detainees.[36] In addition, it is important to emphasize that irregular migrants and asylum seekers have not committed a crime and are not being detained on criminal charges, as would be the case in prisons.

---

32.   Honduran man interviewed in an anonymous survey response in the city of Saltillo, Coahuila state, on 18 September 2017
33.   Survey interview  - anonymous response from a 20 year old man from Honduras interviewed in Tenosique, Tabasco State, 29 May 2017
34.   Citizen Council of the National Institute of Migration, (Consejo Ciudadano del Instituto Nacional de Migración). Personas en detención migratoria en México: Misión de Monitoreo de Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración, July 2017
35.   Amnesty International interview with INM delegation in Chiapas, southern Mexico, 16 August 2017.
36.   The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) prohibits solitary confinement under a variety of circumstances. For more information, see: https://www.unodc.org/documents/justice-and-prison-reform/GA-RESOLUTION/E_ebook.pdf

AR722

# 4.1 ARBITRARY DETENTION OF ASYLUM SEEKERS AND ITS IMPACT ON *REFOULEMENT*

Migrants, asylum seekers and refugees should not suffer any restriction on their liberty or other rights (either detention or so-called alternatives to detention) unless such a restriction is (a) prescribed by law; (b) necessary in the specific circumstances; and (c) proportionate to the legitimate aim pursued. In particular, any measure (either custodial or non-custodial) restricting the right to liberty of migrants, asylum-seekers and refugees must be exceptional



↑ 👁
*The entry point for men at a migration detention centre in the southern state of Chiapas*
*©Amnesty International*

and based on a case-by-case assessment of the personal situation of the individual concerned, including their age, history, need for identification and risk of absconding, if any. The individual concerned should be provided with a reasoned decision in a language they understand. Children, both those unaccompanied and those who migrate with their family, should never be detained, as detention is never in their best interests.[37]

In the case of Mexico, the decision to detain an irregular migrant or asylum seeker is almost completely devoid of any individualized assessment. Detention is the automatic response, and all irregular migrants apprehended by INM are detained, even if they express a wish to seek asylum. This flies in the face of international law under Article 9 of the International Covenant on Civil and Political Rights (ICCPR) which prohibits arbitrary detention.[38] In addition, due to the failures in the screening system discussed above, asylum-seekers end up being unlawfully detained together with the migrants.

Under the UN Refugee Convention and its 1967 Protocol, states are not allowed to apply punitive measures to those seeking asylum.[39] The detention of people seeking asylum can be seen as a punitive measure that undermines their intention to seek protection. In Mexico, the prospect of being unlawfully detained often pushes asylum-seekers to return to their country of origin, despite the risks they face upon return.

---

37.   See also:"UNHCR's position regarding the detention of refugee and migrant children in the migration context" (January 2017) clarifying that "children should not be detained for immigration purposes, irrespective of their legal/migratory status or that of their parents, and detention is never in their best interests.: http://www.refworld.org/docid/503489533b8.html
38.   In addition, The UN Working Group on Arbitrary Detention has explicitly stated that where the detention of unauthorized immigrants is mandatory, regardless of their personal circumstances, it violates the prohibition of arbitrary detention in Article 9 of the UDHR and Article 9 of the ICCPR. See Report of the Working Group on Arbitrary Detention on its visit to the United Kingdom, E/ CN.4/1999/63/Add.3, 18 December 1998, Paragraph33
39.   1951 UN Convention on Refugees, Article 31. Full text of the Convention available at: http://www.unhcr.org/3b66c2aa10

AR723

There may be a correlation between periods in migration detention and *refoulement* of asylum seekers from Mexico. Of 49 responses that noted that they wished to return to their country, eight that had been apprehended by INM said that the reason they wanted to return to their country was because they did not want to remain in migration detention. In the case of Emilia* (see Section 3), despite the fact that her life was at grave risk in El Salvador, she told Amnesty International that she could not bear to be locked up and separated from her son in detention, so she decided to risk her life and sign her voluntary return paper that would allow her to get out of detention, yet at the same time risk her life in the hope of being released and reunited with her son and family.

Such examples demonstrate that the failures in screening processes for asylum seekers, coupled with the failures of the migration detention system, end up enabling further violations by Mexico of the *non-refoulement* principle.

A recent promising development from the INM has been the implementation of the Programme of Alternatives to Detention (*Programa de Alternativas a la Detención*) since August 2016, as a result of an agreement between COMAR, INM and the UNCHR. Amnesty has observed that a number of asylum seekers are being released as a result of this programme, yet many failures remain. Before August 2016, asylum seekers making claims from inside a migration detention centre remained in detention for up to 3 months or more. Since late 2016, the majority of asylum seekers in detention centres are now being released within a matter of weeks due to the Programme of Alternatives to Detention that places them in migrant shelters run by civil society organizations.

Nevertheless, it is concerning that this programme is not institutionalized or published officially and thus risks being simply an act of good faith that could disappear at any moment.

In 2016, 24% of asylum claims commenced with COMAR were abandoned by the asylum seeker before the procedure was concluded. The 2017 rate of abandonment of asylum claims had dropped to 16% by August, according to figures published by the COMAR. These figures demonstrate that the fact that asylum seekers are no longer being detained for such prolonged periods could be having an impact on their adherence to the asylum procedure in Mexico and possibilities for obtaining protection rather than being returned to their country.



*Street scene near Ciudad Hidalgo, on the Mexico - Guatemala border*
© Amnesty International

AR724

# 5. RECOMMENDATIONS

**TO THE PRESIDENT:**

- Urgently order a review of screening processes implemented by the National Institute of Migration (INM). This review must have the aim of:

    - Ensuring irregular migrants who are apprehended and detained are properly informed of their right to seek asylum in Mexico;

    - Guaranteeing that their access to asylum procedures faces no obstacles; and

    - Curbing illegal practices of *refoulement* and ensuring they are met with administrative sanction.

**TO THE NATIONAL INSTITUTE OF MIGRATION (INM):**

- Urgently implement a review of screening processes implemented by the National Institute of Migration (INM). This review must have the aim of:

    - Implementing a pro-active screening system that improves identification of potential asylum seekers within the first moments of contact with the INM;

    - Ensuring irregular migrants who are apprehended and detained are properly informed of their right to seek asylum in Mexico;

    - Guaranteeing their access to asylum procedures faces no obstacles;

    - Curbing illegal practices of *refoulement* and ensure they are met with administrative sanction.

- Improve internal coordination databases and processes to ensure that asylum seekers are clearly identified in official registries to avoid oversights that enable unlawful deportations.

- Publish and institutionalize the Programa de Alternativas a la Detención in the Official Gazette (Diario Official de la Federacion).

- Provide all detained migrants and asylum seekers, as well as their legal representatives, with a full photocopy of their casefile papers on entry to a detention centre as well as a copy of their voluntary return paper and resolution in their administrative migratory procedure.

AR725

# AMNESTY INTERNATIONAL IS A GLOBAL MOVEMENT FOR HUMAN RIGHTS. WHEN INJUSTICE HAPPENS TO ONE PERSON, IT MATTERS TO US ALL.

CONTACT US

 info@amnesty.org

 +44 (0)20 7413 5500

JOIN THE CONVERSATION

 www.facebook.com/AmnestyGlobal

 @AmnestyOnline

AR726

# OVERLOOKED, UNDER-PROTECTED

## MEXICO'S DEADLY *REFOULEMENT* OF CENTRAL AMERICANS SEEKING ASYLUM

Mexico is witnessing a hidden refugee crisis on its doorstep. Citizens from nearby countries who formerly left Guatemala, Honduras and El Salvador and passed through Mexico in search of economic opportunities have for a number of years been leaving their countries due to fear for their lives and personal liberty. This briefing outlines the results of a questionnaire carried out by Amnesty International with 500 responses from migrants and people seeking asylum travelling through Mexico. The information presented demonstrates that the Mexican government is routinely failing in its treaty obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle, a binding pillar of international law that prohibits the return of people to life-threatening situations.

Index: AMR 41/7602/2018
January 2018
amnesty.org



AR727


Menu

U.S. DEPARTMENT *of* STATE

Search

☐  **RELATED MATERIALS**

☐

# 2017 Country Reports on Human Rights Practices

The annual Country Reports on Human Rights Practices – the Human Rights Reports – cover internationally recognized individual, civil, political, and worker rights, as set forth in the Universal Declaration of Human Rights and other international agreements. The U.S. Department of State submits reports on all countries receiving assistance and all United Nations member states to the U.S. Congress in accordance with the Foreign Assistance Act of 1961 and the Trade Act of 1974.

APRIL 20, 2018

**Share**  ☐

**IN THIS SECTION** /
**PREFACE**

## Preface

We are a nation founded on the belief that every person is endowed with inalienable rights. Promoting and defending these rights is central to who we are as a country.

The 2017 *Country Reports on Human Rights Practices* (The Human Rights Reports) document the status of human rights and worker rights in nearly 200 countries and territories. These reports are required by U.S. law and are used by a variety of actors, including the U.S. Congress, the Executive branch, and the Judicial branch as a factual resource for decision making in matters ranging from

AR728

assistance to asylum.

The 2017 U.S. National Security Strategy recognizes that corrupt and weak governance threatens global stability and U.S. interests. Some governments are unable to maintain security and meet the basic needs of their people, while others are simply unwilling. States that restrict freedoms of expression and peaceful assembly; that allow and commit violence against members of religious, ethnic, and other minority groups; or that undermine the fundamental dignity of persons are morally reprehensible and undermine our interests. The Governments of China, Russia, Iran, and North Korea, for example, violate the human rights of those within their borders on a daily basis and are forces of instability as a result.

Our foreign policy reflects who we are and promotes freedom as a matter of principle and interest. We seek to lead other nations by example in promoting just and effective governance based on the rule of law and respect for human rights. The United States will continue to support those around the world struggling for human dignity and liberty.

I am pleased to release the *Country Reports on Human Rights Practices for 2017* on behalf of the Department of State.

*John J. Sullivan*

*Acting Secretary of State*

# Overview and Acknowledgements

## WHY THE REPORTS ARE PREPARED

This report is submitted to the Congress by the Department of State pursuant to Sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961. 19 U.S.C. § 2464, 2467 also require that U.S. foreign and trade policy take into account countries' human rights and worker rights performance and that country reports be submitted to the Congress on an annual basis.

This report includes reports on several countries that do not fall into the categories established by these statutes and thus are not covered by the congressional requirement.

The report addresses situations and events in calendar year 2017 only.

AR729

## HOW THE REPORTS ARE PREPARED

The Department of State prepared this report using information from U.S. embassies and consulates abroad, foreign government officials, nongovernmental and international organizations, jurists and legal experts, journalists, academics, labor activists, and published reports. U.S. diplomatic missions abroad prepared the initial drafts of the individual country reports.

Once the initial drafts of the individual country reports were completed, the Bureau of Democracy, Human Rights, and Labor (DRL), in cooperation with other Department of State offices, reviewed and edited the reports, drawing on its own sources of information and the Department of Labor. Bureau officers also consulted experts on worker rights, refugee issues, military and police topics, women's issues, and legal matters, among many others. The guiding principles were that all information be reported objectively, thoroughly, and fairly. DRL also ensured that all reports followed the same methodology and conformed to standard format and structure.

DRL uses hyperlinks to other key human rights documents produced by the Department of State and the Department of Labor. Specifically, readers are asked to follow hyperlinks for complete information on religious freedom issues by consulting the *International Religious Freedom Report*, on human trafficking by consulting the *Trafficking in Persons Report*, and on child abductions by consulting the *Annual Report on International Parental Child Abduction.* Additionally linked is the Department of Labor's *Findings on the Worst Forms of Child Labor.*

## THE DRL EDITORIAL TEAM

Senior Advisor: Marc Susser

Coordinator of Human Rights Reports: Stephen Eisenbraun

Office Directors and Deputy Directors:

Directors: Mark Dieker, Michael Kelleher, Christine Lawson, Stephen Moody, Jon Piechowski, J. Andrew Plowman, Susan O'Sullivan.

Deputies: Jaroslaw Z. Anders, Mary Angelini, Matthew Hickey, Catherine Newling, Jennifer Nichols, Jason Vorderstrasse, Yelda Kazimi.

Senior Editors: Jonathan Bemis, Jillian Burns, Douglas Dearborn, Stephen Eisenbraun, Jerome L.

AR730

Hoganson, Victor J. Huser, David T. Jones, Lawrence Lesser, Dennis Dean Tidwell, Julie Turner, Joseph Dean Yap.

<u>Editors</u>: Muzna Abbas, Naim Ahmed, Paula Albertson, Wendall Albright, Asim Ali, Jaroslaw Anders, Mary Angelini, Nasreen Badat, Ian Brown, Ann Cody, Sarah Creedon, Alyssia Dobrescu, Kevin Dolliver, Samuel Downing, Christina Droggitis, Mort Dworken, Luke Falcon-Sapp, Joshua Fellman, Richard Figueroa, David Frost, Sheridan Gardner, David Guinn, Charles Gurney, Peter Higgins, Victor Huser, Stephen Kaufman, Orly Keiner, Charles Kellett, Justin Keyes, Esther Kim, Lawrence Lesser, Henrietta Levin, Amy McGann, Andrew Masloski, Hannah Meropol, David K. Meyer, Leslie Moorman, Daniel J. Murphy, Catherine Newling, Bintou Njie, Stephanie Ogorzalek, Molly O'Neal, Thomas Opstal, Jon Piechowski, Steven Pierce, Jessica Rodgers, Ereni Roess, Emily Rose, Christopher Russell, James Sayre, Stephanie Schmid, Daniel Schneider, Corena Sharp, Lisa Sherman, Wendy Silverman, Rachel Spring, Greg Staff, Jennifer Stein, Anne Stotler, Denise Taylor, Leslie Taylor, Dennis Dean Tidwell, Ambar Valles, Dan Vernon, Pilar Velasquez, David G. Wagner, Rachel Waldstein, Meir Walters, Madeleine Wells, Alexander Werman, Lindsey Whitehead, Joseph Dean Yap, Zainab Zaid.

<u>Contributing Editors</u>: Cory Andrews, Kerri Spindler-Ranta, Jonathan Collett

<u>Technical Editor</u>: Janine Czarnecki

<u>Technical Coordinator</u>: Geoffrey Palcher

# Appendix A

## Appendix A: Notes on Preparation of the Country Reports and Explanatory Material

Acts of Congress mandate the annual submission of the Country Reports on Human Rights Practices. The Country Reports on Human Rights Practices cover internationally recognized civil and political rights, including those set forth in the Universal Declaration of Human Rights, as well as worker rights. These include the rights not to be subjected to torture or other cruel, inhuman, or degrading treatment or punishment; to prolonged detention without charges; to disappearance or clandestine detention; and to other violations of the right to life, liberty, and the security of person.

AR731

Human rights seek to incorporate respect for human dignity into the processes of government and law. All individuals have the right to a nationality and the right to certain freedoms, such as freedoms of expression, association, peaceful assembly, and religion, without any distinction. The right to join a free trade union is a necessary condition of a free society and economy. Thus the reports assess key internationally recognized worker rights, including the right of association; the right to bargain collectively; the prohibition of forced or compulsory labor; the status of child labor practices and the minimum age for employment of children; discrimination with respect to employment; and acceptable work conditions.

The Country Reports on Human Rights Practices are prepared by reviewing information available from a wide variety of sources, including U.S. and foreign government officials; victims of alleged human rights violations and abuses; academic and congressional studies; and reports from the press, international organizations, and nongovernmental organizations (NGOs) concerned with human rights. Particularly helpful for citation are NGOs, whether within a single country or those with an international perspective.

The Country Reports cover respect for human rights in foreign countries and territories worldwide. They do not purport to assess the human rights implications of actions taken by the U.S. Government or its representatives.

To comply with the congressional requirement for reporting on human rights practices, the Department provides guidance to U.S. diplomatic missions annually in July for submission of updated texts in September and October. The Department updates these texts to the extent possible by year's end. A wide spectrum of concerned offices in the Department of State provides contributions, and the Bureau of Democracy, Human Rights, and Labor prepares a final draft of each Country Report. The U. S. Department of Labor contributes to material in section 7 on worker rights (see Appendix B for more detail).

The Department strives to make the reports comprehensive, objective, and uniform in scope. We seek a high standard of consistency in the reports despite the multiplicity of sources and the diversity of countries. For purposes of focus and streamlining, the reports select a few illustrative examples of alleged abuses and follow up in most instances only on the previous year's high-profile unresolved cases. Starting in 2015 and continuing into 2016, the Department's annual instructions changed many requirements to remove reporting if no allegations of abuse were involved. An example is a reduction in information on prison conditions considered adequate, allowing the reports

AR732

to increase focus on reported abuses while cutting routine descriptive detail.

For the 2017 reports, the Department made a few such changes to sharpen the focus of the reports on violations of internationally recognized human rights and each government's actions in regard to such violations.

For example, in the Executive Summary of each country report we have focused on the most egregious types of violations of internationally recognized human rights, if applicable to the country concerned. These include extrajudicial killing, torture, harsh and life threatening prison conditions, egregious interference in freedoms of expression, assembly, association, and religion, as well as bias-motivated crimes of violence and similar abuses. We have not included in the summary many other issues that are common, such as overcrowding in prisons and societal discrimination, but these continue to be covered in the body of the reports.

While we continue to report on societal conditions, including discrimination, that can affect the enjoyment of internationally recognized human rights, we have sought to reduce the amount of statistical data in each of these subsections of the report illustrating those conditions. In the age of the internet the underlying data is readily available and we have sought to provide links to it rather than repeat it in the text of the reports.

Evaluating the credibility of reports of human rights violations and abuses remains difficult. Most governments and opposition groups deny they commit human rights violations or abuses and occasionally go to great lengths to conceal any wrongdoing. There may be few eyewitnesses to specific alleged violations or abuses. Frequently, eyewitnesses are intimidated or prevented from reporting what they know. On the other hand, individuals and groups opposed to a government may have incentive to exaggerate or fabricate abuses. In similar fashion, some governments may distort or exaggerate abuses attributed to opposition groups. The Department seeks to identify those groups (for example, government forces) or individuals for whom available evidence indicates probable involvement in human rights violations or abuses or other problematic conduct.

Many governments that profess to respect human rights in principle may in fact secretly order or tacitly condone violations or abuses. Consequently, the reports look beyond statements of policy or intent to examine what a government actually did to protect human rights and promote accountability, including the extent to which it investigated, brought to trial, or punished those responsible for any violations or abuses.

AR733

The Country Reports describe facts relevant to human rights concerns. Notwithstanding terms that may be used in the reports, the reports do not state or reach conclusions about the application of domestic or international law to those facts.

Occasionally the Country Reports on Human Rights Practices state that a country "generally respected" the rights of individuals. The Department uses the phrase "generally respected" because the protection and promotion of human rights is a dynamic endeavor. It cannot be stated with absolute accuracy that any government fully respects these rights at all times without qualification, even in the best of circumstances. Accordingly, the reports use "generally respected" as a standard phrase to describe countries that attempt to protect and promote human rights in the fullest sense, and it is thus the highest level of respect for human rights assigned by these reports.

Because the Secretary of State designates foreign groups or organizations as foreign terrorist organizations (FTOs) on the FTO list, the reports describe as "terrorists" only those groups on the current Department of State FTO list.

The following notes on specific sections in each country report provide an overview of the key problems covered, but they are not intended to be comprehensive descriptions:

<u>Arbitrary and Other Unlawful or Politically Motivated Deprivation of Life</u>: Includes killings ordered by governments or committed by governments without fair trial and final appeal guarantees, including when there is evidence of a political motivation. This section also includes illustrative killings by police or security forces and actions that resulted from excessive use of force or other abuses contrary to human rights obligations and commitments, including equal protection of law.

The section generally excludes combat deaths and killings by non-state actors such as criminals. The reports cover deaths in detention due to adverse conditions in subsection 1.c., under Prison and Detention Center Conditions. Killings by terrorist groups, for example, are covered after government abuses. In optional subsection 1.g., used for countries where there was significant internal conflict, the reports cover unlawful killings and deaths resulting from indiscriminate use of force by government forces, those acting on the government's behalf, or opposition forces.

<u>Disappearance</u>: Covers cases in which the government may be involved in the abduction, disappearance, and refusal to account for the fate of the victims, including cases in which the victims have not been found. Cases eventually classified as political killings after the bodies of missing persons are discovered would be covered in the previous section, while those eventually

AR734

identified as having been arrested or held in detention may be covered in subsection 1.d., under Arbitrary Arrest or Detention.

Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment: Covers torture, defined in the Convention Against Torture, Article 1, as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind," and cruel, inhuman, or degrading treatment or punishment, committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. The subsection discusses reported occurrences without analysis of whether they fit any precise definition, and includes reported uses of physical and other force that may fall short of torture but which may be cruel, inhuman, or degrading. This section also may include reports of ill treatment that may not constitute torture or cruel, inhuman, or degrading treatment or punishment. Furthermore, the section covers prison and detention center conditions and deaths in such facilities due to poor conditions.

Arbitrary Arrest or Detention: Includes cases in which criminal detainees are held arbitrarily in official custody without being charged or, if charged, without being brought promptly before a judicial authority with power to detain or without trial within a reasonable time. The section also includes subsections on the role of the police and security apparatus, arrest and detention practices outside the criminal justice system, and any amnesties that may have occurred during the year.

Denial of Fair Public Trial: Notes whether there is an independent and impartial judiciary free of corruption or political influence and whether trials are fair and public and afford criminal defendants the minimum guarantees recognized internationally as necessary for a criminal defense (failure to hold any trial is noted in the section above). The subsection Political Prisoners and Detainees covers persons convicted, imprisoned, or detained essentially for political beliefs or nonviolent acts of dissent or expression, particularly based on overly broad and sweeping charges intended to stifle the exercise of human rights and fundamental freedoms. The subsection Civil Procedures and Remedies notes whether there is access to an independent and impartial court or other competent authority to seek a remedy, whether damages for or cessation of an alleged human rights violation. The optional subsection Property Restitution is included if there is a systemic failure of a government to enforce court orders with respect to restitution or compensation for the taking of private property under domestic law. This subsection is not intended to discuss or evaluate

individual claims.

Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence: Includes government punishment of family members for alleged offenses committed by other individuals. It includes coercive population control measures, including coerced abortion and involuntary sterilization, but it does not cover certain practices, such as female genital mutilation and early and forced marriage, which are addressed in section 6 under women's and children's issues.

Abuses in Internal Conflicts: This subsection applies only to countries experiencing significant internal conflict and describes reported abuses in such situations. It includes reports of unlawful killings in situations of significant internal conflict. This subsection also includes reports of abuses against civilians by members of the armed forces, other groups that may support the government but may also commit abuses, or groups in political opposition to the government. Any reports of the unlawful use of child soldiers by either government forces or by other organized armed groups are discussed in this subsection. Also covered are reports of attacks on health-care facilities, workers, ambulances, or patients. This subsection also includes reports concerning any restriction on medical facilities or services in a situation of significant internal conflict.

Freedom of Expression, Including for the Press: Evaluates whether the freedom of expression, including of media, exists and describes any direct or indirect undue restrictions, including intimidation and censorship. A subsection on internet freedom includes discussion of monitoring or restrictions on the exercise of freedom of expression online, including the freedom to seek, receive, or impart information, ideas, and opinions. Another subsection, entitled Academic Freedom and Cultural Events, includes information on restrictions, intimidation, and censorship in these fields.

Freedoms of Peaceful Assembly and Association: Evaluates the ability of individuals, including with others (through political parties) to exercise these freedoms. It considers instances of government failure to provide permits or licenses for meetings and demonstrations, as well as information on the ability of trade associations, professional bodies, NGOs, and similar groups to maintain relations or affiliate with recognized international bodies in their fields. Section 7, Worker Rights, discusses the right of workers to associate, organize, and bargain collectively.

Freedom of Religion: Provides a hyperlink to the Department of State's *International Religious Freedom Report*. Information on anti-Semitism appears in section 6 under a heading by that name.

Freedom of Movement: Discusses whether and under what circumstances governments exiled

AR736

citizens; restricted internal and foreign travel, including for women or members of minority populations; and revoked passports. It includes subsections on Internally Displaced Persons (if applicable), Protection of Refugees, and Stateless Persons (if applicable). As defined in the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol, refugees are persons outside their country of origin or, if stateless, outside their country of habitual residence, who are unable or unwilling to avail themselves of the protection of that country based on a well-founded fear of persecution for reasons of race, religion, nationality, membership in a particular social group, or political opinion. Under certain regional instruments, such as the Organization of African Unity Convention Governing the Specific Aspects of Refugee Problems in Africa, the term refugee may also refer to persons displaced by civil strife or other forms of generalized violence. The subsection Protection of Refugees covers abuse and discrimination against refugees and asylum seekers. It also reviews the government's extension of assistance and protection to refugees, including protection against refoulement, the provision of temporary protection, support for voluntary repatriation, longer-term integration opportunities, and third-country resettlement.

"Protection against refoulement" refers to whether the government refrained from expelling or returning a refugee in any manner to the frontiers of territories where his or her life or freedom would be threatened on account of race, religion, nationality, political opinion, or membership in a particular social group, or where there are substantial grounds for believing that an individual would be in danger of being subjected to torture. The deportation of unsuccessful asylum seekers is not necessarily refoulement.

The subsection on stateless persons examines whether a country has habitual residents who are legally stateless (not recognized as nationals under the laws of any state) or de facto stateless (not recognized as nationals by any state even if these individuals have a claim to nationality under the laws of a particular state). The report reviews whether the government has implemented effectively laws and policies to provide such persons the opportunity to gain nationality on a nondiscriminatory basis. The subsection examines, among other matters, whether there is violence or discrimination against members of resident stateless populations in employment, education, housing, health services, marriage or birth registration, access to courts, or the owning of property.

Freedom to Participate in the Political Process: Discusses whether the law provides citizens the ability to choose their government in genuine free and fair periodic elections based on universal and equal suffrage and whether in practice citizens had the freedom to participate in the conduct of public affairs free of discrimination or unreasonable restriction. The subsection Elections and

AR737

Political Participation assesses whether elections were free and fair, including participation by women and minorities on an equal basis.

Corruption and Lack of Transparency in Government: Covers allegations of corruption in the executive, legislative, and judicial branches of government and actions taken to combat it. The section also covers whether elected and appointed officials must make financial disclosures.

Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights: Discusses whether the government permits the free functioning of local human rights groups (including by investigating and allowing the publication of their findings on alleged human rights abuses), whether these groups are subject to reprisal by government or other forces, and whether government officials are cooperative and responsive to their views. The section also discusses whether the government grants access to and cooperates with outside entities (including foreign human rights organizations, international organizations, and foreign governments) interested in human rights developments in the country. It reports on national human rights commissions, parliamentary commissions, and relations with international human rights organizations.

Discrimination, Societal Abuses, and Trafficking in Persons: Contains subsections on Women; Children; Anti-Semitism; Trafficking in Persons; Persons with Disabilities; Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity. If applicable, it also includes subsections on National/Racial/Ethnic Minorities, Indigenous People, HIV and AIDS Social Stigma, Other Societal Violence or Discrimination, and Promotion of Acts of Discrimination. The section addresses discrimination and abuses not discussed elsewhere in the report, focusing on laws, regulations, and state practices denying or impeding equal access to employment, education , health care, or other governmental benefits for members of specific groups. Reluctance to report abuse–by women, children, LGBTI persons, and members of other groups–is, of course, a factor in the underreporting of abuses all the time, in all countries. In order to avoid being too repetitive, we do not make this point every time we cover a particular issue, but readers should be a aware that it is a significant factor in these kinds of abuses in all countries and cultures. (The Country Reports address abuses by government or opposition forces, such as killing, torture and other violence, or restriction of voting rights or freedom of expression targeted against specific groups, under the appropriate preceding sections.)

The subsection Women discusses societal violence against women, such as dowry deaths, "honor killings," domestic violence, rape, and female genital mutilation/cutting. Included is information on

AR738

any government tolerance of, and efforts to prevent, such practices as well as the extent to which the women have access to equality of economic opportunity and protection from discrimination and sexual harassment. A revised subsection changes the focus from "reproductive rights," which sought to cover the availability of contraceptives and maternal health issues, to cover more directly the requirement of U.S. law that we report on coercive family planning practices, such as coerced abortion and involuntary sterilization. Our focus is on coercive government action, and we therefore do not cover instances in which family members or partners may pressure someone to have an abortion. However, when rebel or terrorist groups impose such policies on persons, we do cover that, just as we cover rebel or terrorist abuses in other sections of the reports, when they equate to government actions.

The subsection Children discusses early and forced marriage and sexual exploitation of children; as applicable, it also addresses access to education and health care, and violence or other abuse against children, as well as other issues.

The subsection on Anti-Semitism discusses anti-Semitic abuses. Section 2.c. on Religious Freedom provides a hyperlink to the most recent *International Religious Freedom Report*, which also contains material on anti-Semitism.

The Trafficking in Persons subsection contains a hyperlink to the Department of State's most recent *Trafficking in Persons Report*.

The subsection Persons with Disabilities covers discrimination against persons with physical, mental, or intellectual disabilities in, among other things, employment, education, and the provision of other government services. The subsection on Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity notes laws criminalizing offenses related to homosexual status or conduct and reports on violence and discrimination against gay, lesbian, bisexual, transgender, and intersex persons, as well as those with HIV/AIDS.

Notes on the preparation of section 7, Worker Rights, are contained in Appendix B.

# Appendix B

## Appendix B: Reporting on Worker Rights

AR739

U.S. law requires annual reporting to Congress on the status of internationally recognized worker rights in countries that are eligible to receive benefits under the Generalized System of Preferences (GSP). The law defines internationally recognized worker rights to include: "(A) the right of association; (B) the right to organize and bargain collectively; (C) a prohibition on the use of any form of forced or compulsory labor; (D) a minimum age for the employment of children, and a prohibition on worst forms of child labor; and (E) acceptable conditions of work with respect to minimum wages, hours of work, and occupational safety and health." 19 U.S.C. § 2464, 2467. In addition to these rights, several U.S. free trade agreements have also included the "elimination of discrimination in respect of employment or occupation" in their definition of internationally recognized worker rights.

The International Labor Organization (ILO), in its *1998 Declaration on Fundamental Principles and Rights at Work*, sets forth these principles and rights at work as follows: freedom of association and the effective recognition of the right to collective bargaining; the elimination of all forms of forced or compulsory labor; the effective abolition of child labor; and the elimination of discrimination in respect of employment and occupation.

Worker rights are discussed in each country report under the section heading "Worker Rights" in five subsections: freedom of association and the right to collective bargaining; prohibition of forced or compulsory labor; prohibition of worst forms of child labor and minimum age for employment; prohibition of discrimination with respect to employment and occupation; and acceptable conditions of work. Enforcement of the law is key to effective implementation.

The discussion of worker rights considers not only laws, statutes, and regulations but also their practical application. The discussion is informed by internationally recognized labor rights and standards, including the Conventions and Recommendations of the ILO, and antitrafficking provisions in the UN Organized Crime Convention Protocol to Prevent, Suppress, and Punish Trafficking in Persons. Some specific guidelines derived from these are discussed below.

## FREEDOM OF ASSOCIATION AND THE RIGHT TO COLLECTIVE BARGAINING:

"Freedom of association" includes the right of workers and employers to establish and join organizations of their own choosing without previous authorization; to draw up their own constitutions and rules, to elect their representatives, and to formulate their programs; to join in confederations and affiliate with international organizations; and to be protected against dissolution or suspension by administrative authority.

AR740

"The right to organize and bargain collectively" includes the right of workers to be represented in negotiating terms and conditions of employment and the prevention and settlement of disputes with employers, the right to protection against interference by the government or employers, and the right to protection against acts of antiunion discrimination. Governments should promote mechanisms for voluntary negotiations between employers and workers and their organizations. Coverage of the right to organize and bargain collectively includes a review of the extent to which collective bargaining takes place and the extent to which workers, both in law and practice, are protected against antiunion discrimination.

The section of each report on freedom of association also covers the right to strike. While it is generally accepted for strikes to be restricted in the public sector and in essential services, the interruption of which would endanger the life, personal safety, or health of a significant portion of the population, these restrictions need to be offset by adequate safeguards for the interests of the workers concerned (for example, mechanisms for mediation and arbitration, due process, and the right to judicial review of legal actions). Reporting on restrictions on the ability of workers to strike generally includes information on any procedures that may exist for safeguarding workers' interests.

## FORCED LABOR:

"Forced or compulsory labor" is defined as work or service exacted under the menace of penalty and for which a person has not volunteered. This definition does not include "work or service" where obligations to work or serve are imposed in order to receive education or training. "Menace of penalty" includes loss of rights or privileges as well as penal sanctions. The ILO exempts compulsory military service, normal civic obligations, emergencies, and minor communal services from its definition of forced labor. The ILO has also exempted certain forms of prison labor, but only to the extent that such labor is exacted as a consequence of a conviction in a court of law and carried out under the supervision and control of a public authority, and provided that the prisoner is not hired out to or placed at the disposal of private entities. The ILO further notes that constitutional provisions concerning the obligation of citizens to work do not violate this right so long as they do not take the form of legal obligations enforced by sanctions and are consistent with the principle of "freely chosen employment."

U.S. law defines forced labor as knowingly providing or obtaining the labor or services of a person by force or threats of force, serious harm or threats of serious harm to that person or another person, abuse or threatened abuse of law or legal process, or any scheme, plan, or pattern intended

AR741

to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. The UN Trafficking Protocol also addresses forced labor, by requiring state parties to criminalize the recruitment, transport, transfer, receipt, or harboring of a person for the purpose of forced labor or services extracted through coercive or fraudulent means.

## CHILD LABOR:

"A minimum age for employment" is related to the effective abolition of child labor because it requires a minimum age for employment that is consistent with the fullest physical and mental development of young people. The "prohibition on the worst forms of child labor" looks to ILO Convention 182, which defines anyone under the age of 18 as a child, and specifies certain types of employment as "the worst forms of child labor." These worst forms of labor include slavery, debt bondage, forced labor, forced recruitment into armed conflict, child prostitution and pornography, involvement in illicit activity such as drug production or trafficking, and work that, "by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children."

## DISCRIMINATION WITH RESPECT TO EMPLOYMENT AND OCCUPATION:

"Discrimination with respect to employment and occupation" may be direct or indirect. Direct discrimination exists when laws, rules, or practices explicitly cite a particular ground (such as sex, race, religion, political opinion, national or social origin, etc.) to deny equal opportunities for employment or vocational training, as well as any other ground for distinction determined to impair equal opportunity. The ILO has noted that indirect discrimination occurs where rules or practices appear on the surface to be neutral but in practice lead to unwarranted exclusions. For example, requiring applicants to be a certain height could disproportionately exclude women and members of some ethnic groups. Unless the specified height is necessary to perform the particular job, this could illustrate indirect discrimination.

U.S. law prohibits discrimination in respect to employment on the basis of race, color, religion, sex, national origin, disability, genetic information, or age. Many states and municipalities also have enacted protections against discrimination and harassment based on sexual orientation, status as a parent, marital status, and political affiliation.

## ACCEPTABLE CONDITIONS OF WORK:

AR742

"Acceptable conditions of work" refers to the establishment and maintenance of appropriate mechanisms, adapted to national conditions, that provide for minimum working standards, namely: wages that provide a decent living for workers and their families; working hours that do not exceed 48 hours per week, with a full 24-hour day of rest; a specified number of annual paid leave days; and minimum conditions for the protection of the safety and health of workers. National laws should specify whether workers in the informal sector are covered, and whether or not any other group of workers or sectors of the economy are excluded.

# Appendix C

## Appendix C: Additional Resources

See below for resources on issues noted in the Country Reports on Human Rights Practices. Reference does not indicate endorsement by the U.S. Department of State.

### WOMEN

UN Interagency on Women and Gender Equality: http://www.un.org/womenwatch/

UN Population Fund: http://www.unfpa.org/gender/index.htm and www.unfpa.org/sites/default/files/resource-pdf/Preventing_gender-biased_sex_selection.pdf

Secretary's Office of Global Women's Issues, U. S. Department of State: http://www.state.gov/s/gwi

UNICEF: http://www.childinfo.org/fgmc_progress.html and https://data.unicef.org/topic/child-protection/female-genital-mutilation-and-cutting/

Population Reference Bureau: http://www.prb.org/pdf14/fgm-wallchart2014.pdf

World Health Organization http://www.who.int/reproductivehealth/topics/fgm/overview/en/index.html and http://www.who.int/reproductivehealth/publications/monitoring/maternal-mortality-2015/en/

Population Council: https://www.popcouncil.org/uploads/pdfs/SOTA_Synthesis_2016_FINAL.pdf

AR743

CIA: https://www.cia.gov/library/publications/resources/the-world-factbook/

*2015-16 Demographic and Health Survey*: dhsprogram.com/Where-We-Work/

## CHILDREN

UNICEF: http://www.unicef.org/,
https://www.unicef.org/sowc04/sowc04_contents.html and http://mics.unicef.org/

World Health Organization: https://www.who.int/maternal_child_adolescent/child/en/

UN Special Representative for Children and Armed Conflict: https://childrenandarmedconflict.un.org/

WATCHLIST ON CHILDREN AND ARMED CHILDREN: http://www.watchlist.org/

*2015-16 Demographic and Health Survey*: dhsprogram.com/Where-We-Work/

## ANTI-SEMITISM

Office of Religion and Global Affairs: https://www.state.gov/s/rga/resources/267538.htm

## TRAFFICKING IN PERSONS

Office to Monitor and Combat Trafficking in Persons, State Department: http://www.state.gov/j/tip

## PERSONS WITH DISABILITIES

Disabled Peoples' International: http://www.dpi.org/

Disability Rights Promotion International: http://www.yorku.ca/drpi/

Administration and Cost of Elections Project: http://www.aceproject.org/focuson/disability/index.htm

IFES – Democracy at Large: http://www.ifes.org/global-project.html?projectid=disabilitiesprograms

Ideanet International Disability Rights Monitor: http://idrmnet.org/

Disability Rights International: https://www.driadvocacy.org/

AR744

Mobility International USA: http://www.miusa.org

National Human Rights Institutions Forum: http://www.nhri.net/

United Nations Committee on the Rights of Persons with Disabilities: http://www.ohchr.org/EN/HRBodies/CRPD/Pages/CRPDIndex.aspx

United Nations Enable: https://www.un.org/development/desa/disabilities/

## NATIONAL/RACIAL/ETHNIC MINORITIES

European Roma Human Rights Center: http://www.errc.org/

## INDIGENOUS PEOPLE

UN Office of the High Commissioner on Human Rights' section on Indigenous Rights: http://www.unhchr.ch/indigenous/main.html

## ACTS OF VIOLENCE, DISCRIMINATION, AND OTHER ABUSES BASED ON SEXUAL ORIENTATION AND GENDER IDENTITY

Amnesty International: https://www.amnestyusa.org/issues/gender-sexuality-identity/

Council for Global Equality: www.GlobalEquality.org

Global Rights: http://www.globalrights.org/

Human Rights First: www.humanrightsfirst.org/discrimination/pages.aspx?id=157

Human Rights Watch: www.hrw.org/en/category/topic/lgbt-rights

International Gay and Lesbian Human Rights Commission: www.IGLHRC.org

International Lesbian and Gay Association (ILGA): www.ilga.org

International Lesbian and Gay Association – Europe (ILGA-EUROPE): www.ilga-europe.org

Mulabi (covering Latin America): www.mulabi.org

AR745

Yogyakarta Principles: www.yogyakartaprinciples.org

**HIV AND AIDS SOCIAL STIGMA**

UNAIDS: http://www.unaids.org/en/regionscountries/countries

Stigma Index: http://www.stigmaindex.org/

---

# Appendix D

## Appendix D: FY 2017 Foreign Assistance Actuals

Appendix D FY 2017 Foreign Assistance Actuals

---

# Appendix E

## Appendix E: UN General Assembly's Third Committee Country Resolution Votes 2017

Appendix E UN General Assembly's Third Committee Country Resolution Votes 2017

---

# Appendix F

## Appendix F: United Nations Universal Declaration of Human Rights

**Preamble**

- *Whereas* recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

*Whereas* disregard and contempt for human rights have resulted in barbarous acts which have outraged the conscience of mankind, and the advent of a world in which human beings shall enjoy freedom of speech and belief and freedom from fear and want has been proclaimed as the highest aspiration of the common people,

AR746

*Whereas* it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,

*Whereas* it is essential to promote the development of friendly relations between nations,

*Whereas* the peoples of the United Nations have in the Charter reaffirmed their faith in fundamental human rights, in the dignity and worth of the human person and in the equal rights of men and women and have determined to promote social progress and better standards of life in larger freedom,

*Whereas* Member States have pledged themselves to achieve, in cooperation with the United Nations, the promotion of universal respect for and observance of human rights and fundamental freedoms,

*Whereas* a common understanding of these rights and freedoms is of the greatest importance for the full realization of this pledge,

*Now, therefore,*

The General Assembly proclaims this Universal Declaration of Human Rights as a common standard of achievement for all peoples and all nations, to the end that every individual and every organ of society, keeping this Declaration constantly in mind, shall strive by teaching and education to promote respect for these rights and freedoms and by progressive measures, national and international, to secure their universal and effective recognition and observance, both among the peoples of Member States themselves and among the peoples of territories under their jurisdiction.

## ARTICLE 1

All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood.

## ARTICLE 2

Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs,

AR747

whether it be independent, trust, non-self-governing or under any other limitation of sovereignty.

## ARTICLE 3

Everyone has the right to life, liberty and the security of person.

## ARTICLE 4

No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms.

## ARTICLE 5

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment.

## ARTICLE 6

Everyone has the right to recognition everywhere as a person before the law.

## ARTICLE 7

All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination.

## ARTICLE 8

Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law.

## ARTICLE 9

No one shall be subjected to arbitrary arrest, detention or exile.

## ARTICLE 10

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

AR748

## ARTICLE 11

Everyone charged with a penal offence has the right to be presumed innocent until proved guilty according to law in a public trial at which he has had all the guarantees necessary for his defence.

No one shall be held guilty of any penal offence on account of any act or omission which did not constitute a penal offence, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offence was committed.

## ARTICLE 12

No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks.

## ARTICLE 13

Everyone has the right to freedom of movement and residence within the borders of each state.

Everyone has the right to leave any country, including his own, and to return to his country.

## ARTICLE 14

Everyone has the right to seek and to enjoy in other countries asylum from persecution.

This right may not be invoked in the case of prosecutions genuinely arising from non-political crimes or from acts contrary to the purposes and principles of the United Nations.

## ARTICLE 15

Everyone has the right to a nationality.

No one shall be arbitrarily deprived of his nationality nor be denied the right to change his nationality.

## ARTICLE 16

Men and women of full age, without any limitation due to race, nationality or religion, have the right to marry and to found a family. They are entitled to equal rights as to marriage, during marriage and at its dissolution.

Marriage shall be entered into only with the free and full consent of the intending spouses.

AR749

The family is the natural and fundamental group unit of society and is entitled to protection by society and the State.

## ARTICLE 17

Everyone has the right to own property alone as well as in association with others.

No one shall be arbitrarily deprived of his property.

## ARTICLE 18

Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or belief, and freedom, either alone or in community with others and in public or private, to manifest his religion or belief in teaching, practice, worship and observance.

## ARTICLE 19

Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers.

## ARTICLE 20

Everyone has the right to freedom of peaceful assembly and association.

No one may be compelled to belong to an association.

## ARTICLE 21

Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.

Everyone has the right of equal access to public service in his country.

The will of the people shall be the basis of the authority of government; this shall be expressed in periodic and genuine elections which shall be by universal and equal suffrage and shall be held by secret vote or by equivalent free voting procedures.

## ARTICLE 22

Everyone, as a member of society, has the right to social security and is entitled to realization, through national effort and international cooperation and in accordance with the organization and resources of each State, of the economic, social and cultural rights indispensable for his dignity and

AR750

the free development of his personality.

## ARTICLE 23

Everyone has the right to work, to free choice of employment, to just and favourable conditions of work and to protection against unemployment.

Everyone, without any discrimination, has the right to equal pay for equal work.

Everyone who works has the right to just and favorable remuneration ensuring for himself and his family an existence worthy of human dignity, and supplemented, if necessary, by other means of social protection.

Everyone has the right to form and to join trade unions for the protection of his interests.

## ARTICLE 24

Everyone has the right to rest and leisure, including reasonable limitation of working hours and periodic holidays with pay.

## ARTICLE 25

Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control.

Motherhood and childhood are entitled to special care and assistance. All children, whether born in or out of wedlock, shall enjoy the same social protection.

## ARTICLE 26

Everyone has the right to education.

Education shall be free, at least in the elementary and fundamental stages.

Elementary education shall be compulsory. Technical and professional education shall be made generally available and higher education shall be equally accessible to all on the basis of merit.

Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace.

AR751

Parents have a prior right to choose the kind of education that shall be given to their children.

**ARTICLE 27**

Everyone has the right freely to participate in the cultural life of the community, to enjoy the arts and to share in scientific advancement and its benefits.

Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author.

**ARTICLE 28**

Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized.

**ARTICLE 29**

Everyone has duties to the community in which alone the free and full development of his personality is possible.

In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society.

These rights and freedoms may in no case be exercised contrary to the purposes and principles of the United Nations.

**ARTICLE 30**

Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein.

_____

*Hundred and eighty-third plenary meeting*
*Resolution 217(A)(III) of the United Nations General Assembly,*
*December 10, 1948*

AR752

# Appendix G

## Appendix G: Errata

The following are changes to text of individual country reports since publication April 20, 2018.

**Finland**

In Section 6, Indigenous People, corrected an editing error.

**Guatemala**

In Section 1.d., corrected factual errors in the section on "Arrest Procedures and Treatment of Detainees" to clarify that, "After arraigning suspects, the prosecutor generally has three months to complete the investigation if the defendant is in pre-trial detentions, and six months to complete the investigation if the defendant is granted house arrest." Also added language to clarify that, "The law establishes a one-year maximum for pretrial detention, regardless of the stage of the criminal proceeding, but the court has the legal authority to extend pre-trial detention without limits as necessary."

**Tunisia**

In Section 2.a. corrected editing errors.

**Western Sahara**

In Section 2.b. corrected the name of an organization.

---

TAGS

Bureau of Democracy, Human Rights, and Labor

Human Rights Report

# Related Articles

JULY 18, 2019

## Statement on China

READ MORE 

JULY 18, 2019

## Statement on Respect for Religion or Belief

READ MORE 

JULY 18, 2019

## Statement on Iran

READ MORE 

AR754



## U.S. DEPARTMENT *of* STATE

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Website Feedback

AR755

| LOG IN

ADVERTISEMENT



# 'They Were Abusing Us the Whole Way': A Tough Path for Gay and Trans Migrants

AR756



Jade Quintanilla, a transgender woman from El Salvador, says she was robbed, exploited and abused on the trip to seek asylum in the United States. Kayla Reefer for The New York Times

**By Jose A. Del Real**

July 11, 2018

TIJUANA, Mexico — Jade Quintanilla had come to the northernmost edge of Mexico from El Salvador looking for help and safety, but five months had passed since she had arrived in this border town, and she was still too scared to cross into the United States and make her request for asylum.

Violence and persecution in Central America had brought many transgender women such as Ms. Quintanilla to this crossroads, along with

AR757

countless other L.G.B.T. migrants. They are desperate to escape an unstable region where they are distinct targets.

Friends in San Salvador, Ms. Quintanilla said, were killed outright or humiliated in myriad ways: They were forced to cut their long hair and live as men; they were beaten; they were coerced into sex work; they were threatened into servitude as drug mules and gun traffickers.

Still, just a few miles from the border, Ms. Quintanilla, 22, hesitated. "I've gone up to the border many times and turned back," she said in a bare concrete room at the group home where she was living, holding her thin arms at the elbows. "What if they ask, 'Why would we accept a person like you in our country?' I think about that a lot. It would be like putting a bullet to my head, if I arrive and they say no."

While the Trump administration has tightened regulations on asylum qualifications related to gang violence and domestic abuse, migrants still can request asylum on the basis of persecution for their L.G.B.T. identity. But their chances of success are far from certain, and the journey to even reach the American border is especially risky for L.G.B.T. migrants.

Trans women in particular encounter persistent abuse and harassment in Mexico at the hands of drug traffickers, rogue immigration agents and other migrants, according to lawyers and activists. Once they reach the United States, they regularly face hardship, as well.

There are no numbers available disclosing how many L.G.B.T. migrants seek asylum at the border each year or their success rate, but lawyers and activists say that the number of gay, lesbian and trans people seeking asylum each year is at least in the hundreds.

In weighing whether to risk the journey north, many L.G.B.T. migrants from Central America gamble that the road ahead cannot be worse than what they are leaving behind.

AR758

Victor Clark-Alfaro, an immigration expert at San Diego State University who is based in Tijuana, said that he has noticed more openly L.G.B.T. people in recent years making the journey to the border with hopes of seeking asylum. He said they are often the victims of powerful criminal gangs in Central America and Mexico — but also of bigoted neighbors, police officers and strangers.

"The ones who can't hide their sexuality and gender, there's a huge aggression toward them. And of them, trans women are the ones who are most heavily targeted," Mr. Clark-Alfaro said. In Central America and Mexico, "almost everyone is Catholic, and so the machismo and religious sensibilities provoke attacks against people who break gender norms."

The Inter-American Commission on Human Rights, an arm of the Organization of American States, has spoken out against the high rates of violence against L.G.B.T. people in Central American countries and Mexico and has noted that the crimes against them are often committed with impunity.



AR759

A Frida Kahlo mural inside Jardin de las Mariposas, an L.G.B.T.-focused drug rehabilitation home in Tijuana, Mexico, that has hosted dozens of Central American migrants in recent months.

Kayla Reefer for The New York Times

Shortly after Ms. Quintanilla and two friends began their journey north to Tijuana from Tapachula, in the southern Mexican state of Chiapas, in January, they were robbed. With no more money, they walked along the highway for long stretches of time in between rides, about 13 days altogether, Ms. Quintanilla said.

In Veracruz, the group boarded the so-called Beast, a train in Mexico often used by migrants to travel north; there, she said, she was sexually exploited.

"They say you can ride on top of the train," Ms. Quintanilla said. "But the reality is different. We had to give our services so that they'd let us on. They were abusing us the whole way through. And if we refused, they'd threaten to push us off."

She reached Tijuana in February and was taken in by Jardin de las Mariposas, an L.G.B.T.-focused drug rehabilitation home that has hosted dozens of Central American migrants in recent months. The director of the Mariposas, Yolanda Rocha, with whom Ms. Quintanilla has spoken about the journey, vouched for the account Ms. Quintanilla shared with The New York Times. She said that Ms. Quintanilla had appeared traumatized and exhausted when she arrived at Mariposas.

Warnings about trans migrants being neglected and abused in United States custody have amplified fears for Ms. Quintanilla and other trans migrants. A 2016 report by Human Rights Watch detailed pervasive sexual harassment and assault at detention facilities, based on interviews with dozens of transgender women.

In May, a transgender woman named Roxana Hernandez died in New Mexico, while held in custody by U.S. Immigration and Customs

AR760

Enforcement, after experiencing cardiac arrest and H.I.V.-related complications.

In interviews with The Times, several trans women described humiliation by guards and said they had been sexually assaulted by other detainees.

Seventy-two migrants who identify as transgender were being held in custody by ICE as of June 30, according to data provided by the agency. The vast majority are from Central America and Mexico. It is difficult to pinpoint how many L.G.B.T. people might be in detention because they often choose not to disclose their sexual orientation or gender identity, for fear of discrimination, even though it could help their asylum case.

"A lot of the queer men experience threats and physical assault and sometimes sexual assault. The trans women who are put into men's facilities experience sexual assault at remarkably high numbers," said Aaron Morris, a lawyer and the executive director of Immigration Equality, which provides legal assistance related to immigration and asylum to L.G.B.T. people.

ICE operates a housing unit specifically for transgender detainees at the Cibola County Correctional Center in New Mexico. Activists say that the center is far better than others, where trans women are held alongside men. But many trans women are reluctant to relocate to the Cibola center, Mr. Morris said, if it is far away from their lawyers or networks of family members.

Reports of abuse at detention centers range from guards making fun of natural facial hair that grows in between grooming to other inmates threatening violence. Of 237 allegations of sexual abuse or assault filed by ICE detainees in 2017, the agency's records show that 11 were filed by transgender people.

In some cases, migrants say they are not taken seriously when they report attacks.

AR761

One trans woman from Honduras said she had been harassed and sexually assaulted several times by men while in custody at the Otay Mesa Detention Center in San Diego, which is operated by CoreCivic. The woman requested anonymity because her asylum request is currently under review.



A Pride Flag covered the main entrance of the shelter in Tijuana. Kayla Reefer for The New York Times

Speaking in an interview with her lawyer present in Los Angeles, she described several safety issues that stem from the center grouping trans women with men and having them share bathrooms. At one point, she said, she awoke to a man forcing himself onto her and shoving his tongue into her mouth; she said she was told to ignore it by the guards, even though she was afraid that she would get in trouble because of rules against physical contact.

In other instances, she said, men would pull back the curtains in the shower to masturbate in front of her and other trans women.

AR762

"They say we have support and protection in there, but the reality is different," the woman said. "I'm not the only one. Ask any trans woman, they will each have a bad story about something that happened to them in detention."

In a statement, ICE spokeswoman Danielle Bennett said that the agency has "zero tolerance for all forms of sexual abuse or assault" and that it investigates every allegation reported.

Activists have demanded that the government avoid holding trans women and other L.G.B.T. migrants in detention altogether. Just over half of trans people are held at the specialized unit at the Cibola center, the ICE spokeswoman said, whereas the dozens spread across other facilities are "housed in units at the facility based on their physical gender."

The Honduran woman said she was disappointed to find the guards at the center where she was held to be so dismissive. In her hometown, she said, she had been viciously attacked by a man who struck her with a machete. She never reported the crime, though he had targeted her several times before, she said. "In Honduras, it's better not to go to the police, because that just makes it worse. If they don't kill me, they'll kill one of my family members."

Raiza Daniela Aparicio Hernandez, 33, a transgender human-rights activist from El Salvador, said she was physically assaulted in 2016 by four police officers in her home in San Salvador, which she shared with her boyfriend. The officers had harassed and threatened her before, arriving at their home without a warrant and demanding to be let in, before barging in and assaulting them. "They beat me. They beat me a long time," she said.

Ms. Aparicio Hernandez and her partner tried to file a formal complaint about the abuse in El Salvador she said, but they ran into obstacles along the way. She left El Salvador in June 2017 and arrived at the San Ysidro point of entry, on the border between Tijuana and San Diego, to request asylum.

AR763

Before speaking to The Times, Ms. Aparacio Hernandez shared her account with her lawyer. She won asylum through the courts on the merits of her case.

"Leaving my country was such a hard decision," she said. "I've seen a lot of friends die in this fight, at the hands of the government, and people being beat and tortured. And this is happening at the hands of police officers. It's sad, and it's difficult, but you have to fight."

Marcos Williamson, the detention relief coordinator for Transcend Arizona, a Phoenix-based nonprofit group that helps L.G.B.T. migrants, said asylum seekers who are released from detention on bond often struggle to make ends meet because they are given neither benefits nor work permits. L.G.B.T. people, who often do not have the support of family members, are particularly alone.

For now, Ms. Quintanilla feels safe at Mariposas, though she has been accosted on the streets of Tijuana and harassed, she said. She is grateful to the center for taking her in. And she is not yet ready for what comes next in her long journey.

"I decided to leave because I didn't want to die. It would just be too much for them to reject me," she said. "What good would it have been to flee my country?"

AR764

Ms. Quintanilla, standing on the roof of Jardín de las Mariposas. Kayla Reefer for The New York Times

A version of this article appears in print on , Section A, Page 12 of the New York edition with the headline: For Some Migrants, North Is No Refuge. Order Reprints | Today's Paper | Subscribe

**Related Coverage**

July 9, 2018    Judge Rejects Long Detentions of Migrant Families, Dealing Trump Another Setback

June 30, 2018    What It Costs to Be Smuggled Across the U.S. Border

ADVERTISEMENT

Go to Home Page »

AR765

**NEWS**

**OPINION**

**ARTS**

**LIVING**

**LISTINGS & MORE**

© 2019 The New York Times Company

Contact Us    Work with us    Advertise    Your Ad Choices    Privacy    Terms of Service    Terms of Sale    Site Map    Help    Subscriptions

AR766

# *More Migrants Are Crossing the Border This Year. What's Changed?*

In the past, undocumented immigrants were mostly single men from Mexico, but that's no longer the case. A look at who is coming and what is driving them.

**By Miriam Jordan**
March 5, 2019
New York Times

President Trump has tried to halt the arrival of undocumented migrants by beefing up border security, limiting who qualifies for asylum and, for a while, separating migrant children from their parents at the border. However, figures released on Tuesday suggest that those measures are failing to deter tens of thousands of migrants from journeying over land to the United States.

Indeed, after shriveling to the smallest total in five decades, the number of migrants intercepted at the southern border — the best indicator of how many undocumented people are entering the United States — is soaring again.

Border authorities detained nearly twice as many migrants — 268,044 — in the first five months of the fiscal year that started in October than were detained in the same period the previous year.

To understand what's happening, it's important to look at who is coming, what is driving them and how the answers to those questions have changed over the years.

## It used to be about Mexico. But no more.

In the past, undocumented immigrants were overwhelmingly single men from Mexico who slipped into the country undetected to find work and send money home. But immigration from Mexico has plummeted in recent years. In fact, more Mexicans are leaving than arriving in the United States. Mexicans are less compelled to come because there are more opportunities in their own country and they have smaller families to support.

Central American families have become the new face of undocumented immigration.

In the first five months of the fiscal year that began in October, the Border Patrol detained 136,150 people traveling in families with children, compared with 107,212 during all of fiscal 2018.

A trend toward family migration from Central America that began when Barack Obama was president has endured, after temporarily dipping during Mr. Trump's first year in office.

AR767

## Poverty is driving much of the latest migration

Many Central Americans live in fear. El Salvador, Honduras and Guatemala have among the world's highest homicide rates. Arriving migrants report that they have faced extortion, and want to prevent their children from being recruited by street gangs.

But murder rates in the Northern Triangle countries have been declining in recent years, and economic imperatives are believed to be the most important push factor for the majority of recent arrivals.

More than 90 percent of the most recent migrants are from Guatemala, according to the newly released data. The majority hail from impoverished regions, including the Western highlands, where conflicts over land rights, environmental changes and depressed prices for crops like maize and coffee are undermining the ability of farmers to make a living.

## Traveling with children is helping migrants avoid detention

Migrants generally lack understanding of United States immigration law. But they appear to be informed about the basics.

The majority know to request asylum at the border, either at an official port of entry or when they surrender to border agents shortly after sneaking into the country from Mexico.

They know that they are unlikely to remain detained if they travel with a child and that they have a better shot at fending off deportation when they come with a child.

By law, the government cannot keep migrant families in holding facilities at the border for more than 72 hours. It must either transfer them to an immigration detention facility suitable for children or release them.

The government has been letting thousands of detained migrants go free each week because it lacks enough beds to hold them in family detention facilities. Immigration and Customs Enforcement's three residential family centers — two in southern Texas and one in Pennsylvania — can accommodate 3,326 parents and children.

The largest share of migrants arrive in Texas, but there appears to be a growing number who are entering through remote areas of Arizona and New Mexico.

## Zero tolerance didn't work

In the spring of 2018, the Trump administration tried to discourage parents from traveling with a child by prosecuting everyone who crossed the border illegally, even those who were traveling with children — a policy known as zero tolerance. This resulted in children being removed from their parents and placed in shelters across the country.

The policy drew widespread condemnation, prompting the president to halt the practice in late June. But Customs and Border Protection officials believe that the various legal rulings preventing families from being detained have helped solidify the message to smugglers, who

roam villages offering to guide people to the United States, that adults who come with a child are protected from deportation.

## It's not that easy to get asylum, though

Whether they sneak into the country in remote areas or enter the country through a port of entry, most migrants are trying to petition for asylum.

In 2008, just under 5,000 applicants claimed they had a credible fear of persecution, the first legal step toward obtaining asylum, to avoid being returned to their homeland. Last year, nearly 100,000 claimed a credible fear.

The Trump administration contends that people are flooding the asylum system with invalid claims.

In recent years, immigration judges have granted less than 20 percent of asylum requests, a proportion that is even lower for Central Americans.

Many asylum seekers from Central America claim they have been victims of gangs, which is harder to prove than political and other types of persecution. Poverty is not among the grounds for receiving asylum.

If they are denied, asylum seekers can be deported. But since many are released while their case is pending, some never return to court and evade deportation.

**Credible Fear and Asylum Process:**
**Fiscal Year (FY) 2008 – FY 2019 Quarter 2**

### Out of 100 aliens who were to claim a credible fear...[1]

**OPTION FOR EOIR TO REVIEW A NEGATIVE FEAR FINDING**

**7 cases are closed**[3]

**3 credible fear claimants** would not request review by an immigration judge (IJ)

*Alien Is Removed*

**9 credible fear claimants would request review** by an IJ

**CREDIBLE FEAR INTERVIEW**
United States Citizenship and Immigration Services (USCIS) would **refer 81 credible fear claimants to EOIR**
*(81% of claims referred to EOIR)[2]*

**CREDIBLE FEAR REVIEW (CFR)[4]**
IJs would **find credible fear for 2 credible fear claimants**
*(IJs find credible fear in 21% of CFRs)*

**REMOVAL PROCEEDINGS**
EOIR would **receive and complete 83 I-862 cases[5] originating from credible fear claims**

### ... only 14 out of 100 would be granted asylum.



*Never Referred to EOIR*

*Referred, but Never Filed Asylum (24 ordered removed in absentia)*

*Referred & Filed, but Not Granted (4 ordered removed in absentia)*

*Referred, Filed, & Granted Asylum*

**ASYLUM APPLICATION**
**44 credible fear claimants would file for asylum**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, 53 percent of aliens filed for asylum)*

**ASYLUM DECISION**
IJs would **grant asylum to only 14 credible fear claimants** and would **not grant asylum to 30 credible fear claimants**
*(Of completed I-862 cases originating from a credible fear claim made to USCIS, IJs grant asylum 17 percent of the time)*

EOIR Data Generated: April 23, 2019
[1] Percentages used in assessing this population may change as more cases are completed over time and because some cases may be reopened.
[2] Based on USCIS data (generated April 26, 2019). Includes claims referred to EOIR in which USCIS did not make a credible fear finding because it could not obtain an interpreter.
[3] Closed cases include those in which a claim is dissolved or

withdrawn or an alien is found to be ineligible for the credible fear process.
[4] If USCIS finds that an alien has not established a credible fear, the alien may request review of that finding by an IJ. If the IJ finds that an alien has established a credible fear, then the alien (unless the alien is a stowaway) is placed in removal proceedings.
[5] Includes completed removal, exclusion, and deportation case types.

AR770


# Why Mexico Does Not Qualify as a Safe Third Country

It has been argued that refugees or asylum-seekers passing through Mexico to request asylum in the United States should be denied entry to the U.S. based on the availability of protection in Mexico as a signatory to the 1951 Convention on the Status of Refugees ("1951 Convention" or "Refugee Convention"). In some cases, this is referred to a "safe third country" option. The term "safe third country" applies to countries determined as being non-refugee-producing or as being places where refugees can receive asylum without any danger.[1] Following this concept, asylum-seekers/refugees may be denied entry or returned to countries where they have, or could have, sought asylum and where their safety would not be jeopardized. Despite important steps taken by Mexico in recent years to strengthen its asylum system, the system is still squarely within the development phase and has extremely limited resources and capacity (it currently processes a small fraction of the asylum applications received by the U.S.). **Mexico is clearly not a safe, or in many cases viable, alternative for many refugees and vulnerable migrants seeking international protection.**

## Part I. "Safe third country" concept in international refugee law

The right to seek asylum is well-established in international law, under the 1948 Universal Declaration of Human Rights and the binding 1951 Convention on the Status of Refugees. The latter establishes who qualifies as a refugee, the rights of persons recognized as refugees or granted asylum, and the obligations of States towards these persons. The U.S. acceded to the 1967 Protocol Relating to the Status of Refugees, which modified the 1951 Convention by removing the temporal and geographic limits (originally it was restricted to those persons who fled, within Europe, prior to January 1, 1951).

The position of the UNHCR – the UN entity in charge of supervising the application of the 1951 and 1967 instruments – is that "burden-sharing" arrangements allowing for readmission and determination of status elsewhere, such as the safe third country principle, are reasonable, provided they always ensure protection of refugees first and foremost.[2] This means that refugees, asylum-seekers, and other persons forcibly displaced from their homes must be safe in the third country from being removed to their home country (the *non-refoulement* principle), and that they must have access to basic social services in this third country, such as healthcare, education, and employment.

There are numerous ways this "safe third country" concept could be implemented, some of which are legal and some not.

## Part II. Origin of the "safe third country" concept in U.S. immigration law

One way this concept could be implemented is through a bar on certain asylum applications. The Illegal Immigration Reform and Responsibility Act (IIRIRA) of 1996 amended section 208 (a)(2)(A) of the Immigration and Naturalization Act (INA) to bar asylum to those aliens who can be returned to a "safe-third-country."

In order to invoke this bar, however, the INA requires the U.S. to have a "bilateral or multilateral agreement" in place with the third country.[3]

The U.S. only has one safe third country agreement in place, with Canada, which entered force in 2004. One important exception embedded in the U.S.-Canada agreement regards family reunification. Family unity is a fundamental principle of international law and is enshrined not only in the Refugee Convention but also in several other international legal instruments, such as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the Convention on the Rights of the Child, the American Declaration on the Rights and Duties of Man, and the American Convention on Human Rights, among others.

---

1  Not to be confused with the 'first country of asylum' principle, which is used to justify the decision to return an asylum-seeker to another country where s/he has already been granted protection.

2  UNHCR, Background Note on the Safe Country Concept and Refugee Status, EC/SCP/68, July 26, 1991.

3  Section 608 of IIRIRA amended the INA as follows:

> INA §208 (a)(2)(A) SAFE THIRD COUNTRY.-Paragraph (1) [stating that any alien physically present in the United States or who arrives in the United States, irrespective of status, may apply for asylum in accordance with the provisions of § 208] shall not apply to an alien if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.

AR771



The U.S.-Canada agreement provides that an asylum-seeker with a family member in the destination country, who is either in lawful immigration status or is 18 years or older and has an asylum application pending, will be allowed to enter that country (whether it be the U.S. or Canada) to join this relative. The range of eligible family members under the agreement includes spouses, sons, daughters, parents, legal guardians, siblings, grandparents, grandchildren, aunts, uncles, nieces, and nephews.[4]

The U.S. does not currently have a formal agreement with Mexico but may choose to pursue one. If they do, it is essential to remember that:

- Mexico is not a safe option for many migrants.
- Family ties and reunification are a major factor driving current migrant and refugee flows. Many child migrants, particularly unaccompanied children, are traveling through Mexico to reach the United States, where other family members are located. Including an exception for family reunification in any such agreement would be essential to protecting children's rights and the right to family life.
- Mexico's asylum system is still evolving and a large increase in the already overburdened asylum system is likely to cause further instability and delay or prevent the consolidation of an effective protection system.

## Part III. Mexico is not a safe third country

### A. Mexico is not safe for most migrants, particularly vulnerable ones

While Mexico has made commitments to strengthen its capacity to provide asylum to Central Americans, particularly those coming from the Northern Triangle countries of El Salvador, Guatemala, and Honduras, it has yet to make demonstrable progress in screening individuals for protection needs and ceasing to return families and children to danger. Significant barriers prevent migrants, including children, from accessing the right to seek and enjoy asylum in Mexico:

- Many migrants are arbitrarily detained in poor conditions in processing facilities upon apprehension. In these facilities, migrants lack access to legal counsel and opportunities to have their cases heard. Child migrants are being systematically detained, which violates their basic human rights. Between 2014 and 2015, the number of detained unaccompanied children migrants in Mexico doubled, from 10,943 to 20,368.[5] Particularly for children, the length and conditions of detention deter them from seeking asylum.[6]

- Adult and child migrants in need of international protection are not routinely informed about their rights or screened for international protection concerns as is required by Mexican law.[7] This is especially concerning as persons only have thirty business days upon entering Mexican territory to file an asylum application. Further, Mexico's Commission for Refugee Assistance (or COMAR, by its initials in Spanish) is understaffed, having only 15 agents as of June 2015, to conduct asylum interviews throughout the entire country;[8] under resourced,[9] in comparison to the large increase in asylum applications over the past few years[10]; and limited geographically, as it only has three offices - Tapachula (Chiapas), Acayucan (Veracuz), and Mexico City.[11]

4  U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS), Press Release: United States and Canada Implement Safe Third Country Agreement on Asylum (Dec. 29, 2004), p. 2.

5  José Antonio Román, "Se duplicó la detención de menores centroamericanos no acompañados" [Detention of unaccompanied children from Central America doubled], La Jornada, Oct. 25, 2016.

6  Georgetown Law Human Rights Institute (HRI), The Cost of Stemming the Tide: How Immigration Enforcement practices in Southern Mexico Limit Migrant Children's Access to International Protection (Apr. 2015), p. 25.

7  Amnesty International, Overlooked, Under-Protected: Mexico's Deadly Refoulement of Central Americans Seeking Asylum (Jan. 2018), p. 12 (in a survey of 297 migrants who passed through an immigration detention center in Mexico, 75% were not informed of their right to seek asylum in Mexico); HRI, The Cost of Stemming the Tide, p. 25, 48-50 (concerning child migrants) ; IACHR, Human Rights Situation of Migrants and Other Persons in the Context of Human Mobility in Mexico (2014), para 534 (concerning adult migrants).

8  Manu Ureate, México recibe 67% más solicitudes de refugio, pero sólo tiene 15 oficiales para atender 2 mil casos [Mexico receives 67% more requests for asylum, but only has 15 agents to deal with 2,000 cases], Animal Político, June 19, 2015.

9  Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).

10  COMAR currently has a backlog of thousands of cases; according to a press release by Mexico's National Human Rights Commission (CNDH), as of February 2018, close to 60% of asylum applications filed in 2017 have not been processed yet. The CNDH made an urgent appeal to Mexico's national government to act "in the face of a possible collapse of Mexico's refugee protection system" ["ante el posible colapso del sistema de protección de refugiados en México"].

11  COMAR, ¿Dónde está COMAR? [Where is the COMAR located?] (last accessed on May 17, 2018).

AR772


- *[CONTINUED]* These factors are reflected in the low number of asylum applications in contrast with the high number of apprehended migrants and despite numerous studies showing an increase in flows of asylum-seekers from the Northern Triangle countries, due to high levels of violence and crime.[12] Further, there is a low rate of success on asylum applications in Mexico, as illustrated by the charts below.

**Adult Migrants in Mexico: Apprehensions, Asylum Applications, and Grants of Asylum, 2013-2017[13]**

| Year | Total apprehensions | Asylum applicants (applicants from Northern Triangle, NT) | Granted protection* (#NT) |
|---|---|---|---|
| 2013 | **76,668** | **1,296** (887) | **313** (242) |
| 2014 | **104,053** | **2,137** (1,769) | **536** (477) |
| 2015 | **159,627** | **3,424** (3,138) | **1,102** (1,015) |
| 2016 | **146,102** | **8,796** (8,059) | **3,205** (2,808) |
| 2017 | **77,197** | **14,596** (8,656) | **1,907** (958) |
| **Total** | **563,647** | **30,249** (22,509) | **7,063** (5,500) |

*\* Figure in chart encompasses grants of asylum and complementary protection.*

---

12   See Latin American Working Group (LAWG), Central American Families & Children Arriving at U.S.-Mexico Border Demonstrate Need for Urgent Protection Mechanisms, Oct. 19, 2016. See also, UNHCR, Children on the Run, Apr. 2014, p. 6 (finding that of the 404 unaccompanied and separated children, ages 12-17, from Mexico, El Salvador, Guatemala, and Honduras that UNHCR interviewed, 58% raised potential international protection needs. The sample size was designed to be representative of other similarly-situated children from these four countries); UNHCR, Arrancados de Raíz [Uprooted], 2014 (finding that of 200 migrant children from El Salvador, Guatemala, and Honduras who were interviewed in Mexico, 48.6% had cited violence as a principal factor in leaving their homes).
13   Mexican Commission for the Assistance of Refugees (COMAR), Statistics 2013 to 2016 (last accessed on May 17, 2018). For apprehension numbers, please consult: National Institute on Migration of Mexico (INM), Annual Statistics Bulletins (last accessed on May 17, 2018).

AR773



**Child Migrants in Mexico: Apprehensions, Asylum Applications, and Grants of Asylum, 2013-2017[14]**

| Year | Total apprehensions of children | Child applicants for asylum (applicants from the Northern Triangle, NT) | Children granted protection* (#NT) |
|------|------|------|------|
| 2013 | **9,630** | **63** (55) | **18** (15) |
| 2014 | **23,096** | **78** (75) | **22** (22) |
| 2015 | **38,514** | **142** (139) | **44** (44) |
| 2016 | **40,114** | **242** (229) | **102** (102) |
| 2017 | **18,300** | **259** (236) | **36** (31) |
| **Total** | **129,654** | **784** (734) | **222** (214) |

*\* Figure in chart encompasses grants of asylum and complementary protection.*

- Mexican authorities, with U.S. support, have been steadily ramping up deportations of all irregular migrants, including children, from the Northern Triangle countries with little regard for due process, which increases the potential for *refoulement*.[15]

**Deportations from Mexico, 2013-2017[16]**

| Year | Total persons deported | Deported migrants from Northern Triangle (% of total deportations) | Total children deported | Deported children from Northern Triangle (% of total children deported) |
|------|------|------|------|------|
| 2013 | **80,902** | **77,896** (96%) | **8,577** | **8,401** (98%) |
| 2014 | **107,814** | **104,269** (97%) | **18,169** | **17,921** (99%) |
| 2015 | **181,163** | **175,136** (97%) | **36,921** | **36,497** (99%) |
| 2016 | **159,872** | **149,540** (94%) | **38,555** | **37,759** (98%) |
| 2017 | **80,353** | **75,677** (94%) | **16,162** | **15,821** (98%) |
| **Total** | **610,104** | **582,518** (95%) | **118,384** | **116,399** (98%) |

14  Id.

15  HRI, The Cost of Stemming the Tide, p. 14-15, 18; see also, Adam Isacson, Maureen Meyer, and Hannah Smith, Increased Enforcement at Mexico's Southern Border, WOLA (Nov. 2015) (presenting findings on research into the impacts of Mexico's Plan Frontera Sur).

16  INM, Annual Statistics Bulletins (last accessed on Oct. 28, 2016).

AR774



- Migrants often lack sufficient protections while in Mexico: in transiting through the country to arrive at the U.S.-Mexico border, they suffer violence and other abuses at the hands of organized crime and corrupt migration authorities.[17] Further, there is a lack of justice for crimes against migrants, which allows for crimes to remain in impunity and only serves to foster their repetition: between 2014 and 2016, "of the 5,284 crimes against migrants reported in Chiapas, Oaxaca, Tabasco, Sonora, Coahuila, and at the federal level, there is evidence of only 49 sentences, leaving 99 percent of the cases in impunity."[18]

- Attention may be called to Mexico's issuance of "passes" to certain migrants. If referring to the "oficios de salida" [exit passes], it is important to know that these only allow for a person in an irregular migratory situation to transit Mexico for the duration of the pass (approximately 20 days). Further, they are not uniformly granted to all migrants by Mexico's National Institute on Migration (INM or INAMI), nor do they confer any special protection to the holder or grant him or her a stable or renewable immigration status in Mexico.

## B. Mexico is not safe for certain Mexicans

- In addition to migrants from other countries, certain Mexican nationals face higher risks of having their human rights violated. These include human rights defenders and journalists, particularly women and indigenous persons; LGBTI persons; children and adolescents, particularly those being recruited for organized criminal groups; and internally-displaced persons. Mexican women continue to remain more likely than men to experience sexual crimes or be the victim of human trafficking.[19]

## Part IV. Implementation of a safe third country-like provision with Mexico

In lieu of a binational agreement[20], we may see the U.S. implement a safe third country-like approach in the following ways:

- Turning persons seeking international protection back at Ports of Entry along the U.S. southern border with Mexico with no explanation, telling them there is no space and to return later, or having them go through Mexican officials to get an appointment for a future date to come back to the Port;
- Returning persons to Mexico after placing them into removal proceedings, pursuant to INA section 240[21];
- Placing persons seeking international protection into expedited removal, returning them to Mexico, and conducting credible fear interviews in Mexico[22];
- Denying a credible fear interview based on the argument that the person (if not a Mexican citizen) could have sought protection in Mexico; or
- Denying asylum based on this same argument.

The extent to which each of these is legal varies and may depend on details of implementation.  Some may require legislation but much of this could be implemented administratively.

---

17  Ximena Suárez, Andrés Díaz, José Knippen, and Maureen Meyer, Access to Justice for Migrants in Mexico: A Right that Exists Only on the Books, WOLA (July 2017); Latin American Working Group (LAWG), Central American Families & Children Arriving at U.S.-Mexico Border Demonstrate Need for Urgent Protection Mechanisms, Oct. 19, 2016; Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).
18  Access to Justice for Migrants in Mexico: A Right that Exists Only on the Books, WOLA (July 2017), p. 4; see also, Ximena Suarez Enriquez, Jose Knippen, Maureen Meyer, A Trail of Impunity: Thousands of Migrants in Transit Face Abuses amid Mexico's Crackdown, WOLA (Oct. 20, 2016).
19  See, e.g., Inter-American Commission on Human Rights, Human Rights Situation in Mexico, OEA/Ser.L/V/II., Dec. 31, 2015, p. 112-135.
20  Although it appears the U.S. and Mexico are or have been in discussions around such an agreement, see Ted Hesson, "U.S., Mexican officials to discuss asylum pact," Politico (May 16, 2018).
21  Section 235(b)(2)(C) of the INA provides the following: Treatment of aliens arriving from contiguous territory.-In the case of an alien described in subparagraph (A) [referring to an alien who is not clearly and beyond a doubt entitled to be admitted] who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 240." As of May 2018 and according to the Office of Information and Regulatory Affairs of the Office of Management and Budget, the Department of Homeland Security is engaging in regulatory rulemaking on this provision. See the "Return to Territory" entry in the Unified Agenda [last accessed on May 17, 2018].
22  INA Section 235 (b)(1)(B)(i) establishes that "an asylum officer shall conduct [credible fear of persecution] interviews of aliens . . . either at a port of entry or at such other place designated by the Attorney General (emphasis added)."

AR775



Additionally, proposed legislation, such as section 12 of <u>HR 391</u> (proposed by Rep. Jason Chaffetz, R-Utah, in the 114th Congress and 115th Congress), has called for modifying the INA to eliminate the requirement of a safe third country (bilateral) agreement altogether. This bill was introduced in the House of Representatives in January 2017. The practical effect of such a change would be to bar persons from submitting asylum applications in the U.S. if they can be removed to another country where their life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion and where the person would have access to a full and fair procedure for determining a claim to asylum or equivalent protection. However, the U.S. has no guarantees that an asylum-seeker's claim will be addressed in that third country.

Further, as the law currently stands, the Attorney General may decide to waive the safe third country exception, if s/he finds that it is in the public interest for the asylum-seeker to receive asylum in the United States. Section 12 of HR 391 would replace the Attorney General with the Secretary of Homeland Security, which suggests that a decision to bar an asylum application would not be subject to a hearing before an immigration judge, as is currently the process; thus, the asylum-seeker would potentially have no means to challenge this decision.

**For more information, please contact:**

Leah Chavla, Policy Advisor, Women's Refugee Commission: <u>leahc@wrcommission.org</u> - tel: 202-750-8598

AR776



DONATE

Justice

# On the way to the US, children seeking asylum are often put in Mexico's detention centers

**PRI's The World**

*January 03, 2017 · 11:30 AM EST*

By Valeria Fernández





Carlos is a minor, under 18 years old, but he was still held with adults in Mexican immigration detention facilities. His girlfriend, Carla, is 19 years old and was also held in detention after they crossed the border to escape their native El

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND. CLOSE

AR777



Carlos was so scared inside the Mexican immigration detention center that instead of telling officers he was fleeing El Salvador after gang threats, the 16-year-old asked to be deported back to his country.

He shouldn't have had to make that choice. Because, according to Mexican laws, as a minor he shouldn't have been in an immigration detention center in the first place.

In the US, immigration officials are facing increased scrutiny about the conditions in which they hold Central American minors. In Texas this month, immigration officials released 500 women and children from detention after a federal judge ruled their facilities couldn't be licensed to provide childcare.

Mexico too is being criticized for the incarceration of thousands of children crossing the border to escape violence in Central America. Their National Human Rights Commission issued a 250-page report this October denouncing conditions and treatment of children in detention centers, like the one where Carlos was held.

"Unaccompanied children should not enter, much less be detained at any point at an immigration station," says Edgar Corzo Sosa, general inspector for Mexico's National Human Rights Commission. They should, instead, be moved to a shelter that cares for children.

AR778

Carlos is afraid of being found by gangs, so he asked not to use his last name in this report. He is among more than 15,000 children who were detained after crossing the border into Mexico in the first 10 months of 2016. Many of those children have a right to apply for refugee status under Mexican law. According to government policy, when Carlos was apprehended seven months ago, he should have been transferred to a children's shelter, where he could have received services and likely would have told authorities that he was seeking protection from violence. This would have allowed him to begin the process of seeking asylum.

### Subscribe to the Global Nation Newsletter
Weekly newsletter featuring real-world stories of immigrants in the US.

Instead, he spent 14 days detained with adult men. The first four days, he was held in a humid and cramped cell in a temporary holding facility near Veracruz. He says they slept on dirty pads with bugs. The cell had a clogged toilet that smelled terrible.

Guards at the small station put him in a separate room when the human rights commission staff came to interview him on one of their regular monitoring visits. The guards told him not to say that he had been detained with adults. He told them anyway.

"Afterwards immigration officials came for me and told me, 'Why did you tell them that?'" Carlos says in Spanish. "They started to admonish me and they said that since I like being with adults, they'll put me back there. And they did."

That experience solidified his distrust of Mexico's immigration authorities. And his experience only got worse.

AR779

**We are Public Media**

Support us with a monthly recurring gift

Donate



Policemen stand outside the facilities of the Siglo XXI immigration facilities in Tapachula, in the Mexican state of Chiapas October 29, 2014.

Credit:Juan Manuel /Reuters

After the holding facility, Carlos spent 10 days sleeping on cement beds in an immigration detention center meant for adults in Tapachula, Chiapas, near the Guatemalan border. He was at Siglo XXI, one of the largest government-run detention facilities for migrants in Mexico. The center can hold up to 960 people at a time.

The food, he says, was so bad that he became ill and vomited. Inside there was a marero (gang member) who threatened his life for supposedly being part of a rival gang, which he wasn't.

"He told me, 'I'll kill you at night, you'll see. When you wake up in the morning you will

AR780

have your guts out,'" Carlos recalls. "I was going to ask for asylum but I instead asked for my deportation."

He says he was beaten inside the station by a gang member, and that he complained to officers who didn't do anything. No one asked him if he was seeking refugee status either, which is information children and teenagers won't often volunteer immediately, according to experts.

"That's why it's so important for them to have specialized attention for children and not for them to be locked in an immigration station," says Gerardo Espinoza, an investigator at the Fray Matías de Córdova Human Rights Center. The nonprofit has some access to children and detainees at the Siglo XXI detention station.

Journalists are not allowed in the facility and our requests for a tour were turned down. Mexican immigration officials also turned down an interview request; they said most personnel were busy dealing with an influx of Haitians.

"It's not normal that an institution dedicated to detain and deport minors at the same time is the institution that protects them. There's something counterintuitive in this situation," says Corzo Sosa from the human rights commission.

AR781

Children fleeing violence in Central America who don't make it to the US, often end up in Mexican detention centers — or deported



Children play in the Suchiate River near Tecun Uman on August 7, 2014. Stretches of the wild, tropical and largely uninhabited Guatemalan border with Mexico are as porous as ever. The US and Mexico have cooperated to try to handle the increased numbers of families and children who are alone and crossing the borders to escape violence and poverty in Central America.

Credit:Jorge Dan Lopez/Reuters

In 2015, Mexico's Human Rights Commission found that 36,174 minors, unaccompanied or not, were detained by the National Institute of Migration, the country's immigration enforcement agency. Only a third were referred to the state's shelter system for children.

Mexican law makes it clear that children's best interests need to be protected regardless of their country of origin. But it does allow for children to be placed in detention in "exceptional circumstances," when children's shelters are at full capacity.

Each shelter operates independently, sometimes under state or municipal authority. The National System for Integral Family Development, which oversees children's shelters,

AR782

did not respond to inquiries for this story.

*Also: Advocates suggest another option — humanitarian visas — for US-bound Central Americans*

Carlos was deported in June after two weeks in detention. But he didn't take long to return to Mexico. I met him and his 19-year-old girlfriend, Carla, then nine months pregnant, in mid-July at a privately-run shelter for underage youth in Tapachula, Chiapas, near the border with Guatemala. Carla had faced similar hardships in women's immigration detention facilities.

Carlos looks his age. He is light skinned with tiny baby curls in his hair. Carla has dark skin and deep black eyes. She spent a lot of time resting on a patio, ready to give birth at any minute.

This was their third time trying to cross, and this time they managed to evade authorities and find shelter on their own. They had travelled by small shuttles or by foot, sleeping on the street or hiding in the jungle to avoid immigration checkpoints. Unlike the great majority of Central American youth who cross alone into Mexico, Carla and Carlos are not trying to reach the US. They were headed to Tijuana, Mexico, where Carla's mother lives.

On July 7, 2014, Mexican President Enrique Peña Nieto launched a new southern border strategy called "Plan Integral Frontera Sur." The Mexican president emphasized that the plan included increased protections for migrants and that unaccompanied minors would have a special place to be processed before being repatriated.

In practice, that's not what happened.

From January through October of 2016, at least 12,000 unaccompanied minors were detained in immigration stations for adults in Mexico, while another 4,749 received attention in children shelters, according to a public records request in Mexico.

AR783

The US has condoned Mexico's immigration strategy. According to a Congressional Research Services report released last March, the State Department contributed $20 million, mostly in the form of equipment and immigration enforcement training, as part of Plan Frontera Sur. Obama praised the collaboration with Mexico during a meeting with Peña Nieto in January 2015.

"I very much appreciate Mexico's efforts in addressing the unaccompanied children who we saw spiking during the summer. In part because of strong efforts by Mexico, including at its southern border, we've seen those numbers reduced back to much more manageable levels," Obama said.

Some view the exchange as positive cooperation between countries. But human rights advocates say the US is putting political pressure on Mexico to intersect and deport US-bound minors.

"We're conscious here that the responsibility when it comes to immigration policies comes from the US and descends toward Mexico and Central America," says Espinoza of the Córdova Human Rights Center.

As a result of its new border enforcement initiative, Mexico has deported more than 36,000 unaccompanied Central American children, toddlers to 17-year-olds, from July 2014 to October 2016. In comparison, the US has deported 6,055 youth that came to the country as unaccompanied children from October 2013 to September 2016. Most of them were 18-year olds by the time they were deported, but some were minors, according to an ICE spokesperson.

"If an immigration judge orders an unaccompanied child removed from the United States, or grants voluntary departure, ICE arranges for the child's safe return to his or her country of nationality according to agency policy and procedures. ICE recognizes that UAC [unaccompanied alien children] are a particularly vulnerable population and must be repatriated with special consideration and care," ICE said in statement.

In the US, there is a separate agency that takes custody of unaccompanied minors while

AR784

they go through immigration proceedings for their deportation or to gain some form of asylum or humanitarian relief. They are housed in shelters under the oversight of the Office of Refugee Resettlement; the facilities are only for children.



On their third try, Carla and Carlos made it across the border without being detained by Mexican authorities. Their son was born after they arrived at a privately-run shelter.

Credit: Valeria Fernández/PRI

As the number of Central American children escaping violence alone or with families continues to spike, the campaign promises of US President-elect Donald Trump are also a concern for advocates.

"If a wall is built, it will be a challenge for Mexico because its southern border remains

AR785

permeable," says Espinoza. "We're going to start seeing Mexico as a destination country because many people will be trapped here."

And that could mean more children in detention on their way to deportation.

On a humid and hot afternoon, I meet Carlos and Carla's newborn, Carlos Steven. Carla gave birth about 10 days after they arrived at the privately-run shelter. She lays in bed with her baby, who is covered in a white cotton blanket. His tiny wrist has a red bead bracelet to protect him from the evil eye.

They will no longer pursue asylum. Because their son was born a Mexican citizen, they can apply for residency in Mexico, where they plan to stay.

"It is a disappointment to have an experience like the one we had," Carlos says. "I wish I could be in my country. But we can't."

*Valeria Fernández is a fellow of "Bringing Home the World," a program from the International Center for Journalists, which helped make this report possible.*

---

**If you only have 30 seconds…**

Sign up for our weekly global security newsletter **CRITICAL STATE** . Get your weekly fix of foreign policy without all the stuff you don't need – it's top news and accessible analysis for those who want an inside take without all the backroom bs.

*By subscribing, I agree to receive emails from The World and Inkstick Media.*

Categories: **Conflict & Justice**, **Justice**, **Politics**, **Global Politics** and **Global Nation**

Tagged: **immigration**, **Mexico**, **El Salvador**, **Guatemala**, **Barack Obama**, **Donald Trump**, **children**,

AR786

Children fleeing violence in Central America who don't make it to the US, often end up in Mexican detention centers — or deported

**unaccompanied minors crossing border**, **immigration detention** and **shelters**.

**Latest Content**



**Brazil's first Afro Brazilian lawmaker says she's a rebuke to the country's history**

**NASA aims to build on moon as a way station for Mars**

**Salt: China's deadly food habit**

**DR Congo has been fighting Ebola for a year. What does the WHO declaration change?**

**Marine vet denied entry to US for scheduled citizenship interview**


Hear a different voice. PRI Public Radio International

Major funding provided by:

AR787

Children fleeing violence in Central America who don't make it to the US, often end up in Mexican detention centers — or deported

  

A Partner of OZY Media News

About PRI  |  Contact us  |  Donate  |  Meet the PRI.org Team  |  Privacy policy  |  Terms of use

©2019 Public Radio International

# USCIS Credible Fear (CF) Process at the FRCs

| USCIS Receives ICE Referral of Fear Claim | → 0-1 Days Later → | Data Entry into USCIS System – USCIS Support Staff | → 0-1 Days Later → | USCIS Officer Orients Adult on CF Process – Serves G-56 CF Interview Notice | → 3-5 Days Later → | USCIS Asylum Officer (AO) conducts CF interview | → 0-1 Days Later → | USCIS AO Issues CF Decision | → 0-1 Days Later → | Supervisory AO Conducts Reviews | → 0-1 Days Later → | CF Decision Documents Prepared for Service | → 0-1 Days Later → | Service of CF Decision |

**Relevant Statutory/Regulatory Provisions and Policies**

- **INA §235(b)(1)(B)(iv); 8 CFR 235.3(b)(4)** CBP/ICE officer required to provide alien information about the CF process using the M-444. **(M-444 written disclosure of process is provided for by reg.)**
- USCIS accepts jurisdiction on receipt of all properly completed Forms I-860, I-867 Parts A and B, and M-444.

---

- **INA § 235(b)(1)(B)(iv); 8 CFR § 208.30(d)(4).** Allows aliens to consult with person(s) of their choosing prior to the interview, but shall be at no expense to government and not unreasonably delay the process.
- **8 CFR § 235.3(b)(4)(ii).** Requires alien be given time to contact and consult with consultant.
- **8 CFR § 208.30(b)(d)(2).** Requires AO orient the alien to verify that alien received M-444 and determine that alien has an understanding of the CF process.
- **M-444.** Informs aliens that they can request female officer/interpreter, or male officer/ interpreter.
- **M-444 and 1997 policy** (outlined in Supplementary Information section of ER/CF Interim Rule, 62 FR 44 – 10312, 10320 (March 6, 1997)). Alien given 48 hours from arrival at detention facility to rest and conduct such consultation prior to interview, unless 48 hours is waived.
- **Local FRC policy** (since March 2015). In order to limit the previously large number of reschedule requests at the FRCs, CF interviews are scheduled for 72 hours after orientation instead of 48 hours.
- **M-444 and noted in Supplementary Information section of ER/CF Interim Rule, 62 FR 44, 10320.** Aliens should have access to a phone while in detention to contact consultants.

---

- **8 CFR § 208.30(d).** CF interview must be conducted separate and apart from general public.
- **8 CFR § 208.30(d)(5).** Requires AO to arrange for the assistance of an interpreter for the CF interview, if necessary.
- **8 CFR § 208.30(d)(1).** If AO conducting CF interview determines that alien is unable to participate effectively in interview because of illness/fatigue/other impediments, officer may reschedule interview.
- **M-444.** Allows alien to request for additional time to contact a consultant.
- **8 CFR § 208.30(d)(4).** Allows the alien to have a consultant present at the interview.

---

- **8 CFR § 208.30(e)(7).** AO's CF determination is not final until it is reviewed by a supervisory asylum officer (SAO).
- **8 CFR § 208.30(f).** Issue a Form I-862 (NTA) to each family member who is found positive for CF.
- **8 § CFR 208.30(g)(1).** Issue a Form I-869 Record of Negative Credible Fear Finding and Request for Review by Immigration Judge for each family member who is found negative for CF. Must ask each individual if they wish to have immigration judge review of the negative determination; no response or refusal to respond will be viewed as a request for review.
- **8 § CFR 208.30(g)(2)(ii).** For negative CF determinations, Asylum Offices are required to provide EOIR copies of the Form I-863, Notice of Referral to Immigration Judge, the AO interview notes, summary of the material facts, and other materials upon which the determination was based.

# Our Nation's Weak Asylum Laws are Encouraging an Overwhelming Increase In Illegal Immigration

### IMMIGRATION

Issued on: November 1, 2018

**"We will not rest until our border is secure, our citizens are safe, and we finally end the immigration crisis once and for all."**

*President Donald J. Trump*

**MISUSED ASYLUM LAWS: Flaws in our asylum system allow illegal aliens with meritless claims to cross our borders and remain here for years.**

- Our Nation's asylum laws have allowed illegal aliens with meritless claims to easily enter and stay in the United States while awaiting legal proceedings.
- Asylum seekers at the border only have to meet the low bar for establishing a "credible fear" of returning under which they must show a "possibility" to qualify for asylum.
  - Aliens who claim a credible fear of returning do not have to provide any verification or corroboration of their claims in order to receive a positive determination and be released into the interior of the United States.
- As a result, illegal aliens with meritless cases that are released from detention are able to remain in our communities for years, while their cases are litigated in immigration courts.

**AN OVERWHELMING SURGE: Our country faces a growing and overwhelming surge of illegal aliens seeking to take advantage of our weak asylum laws.**

- Today, approximately one in 10 illegal aliens arriving at our southern border claims a credible fear of return, up from one out of every 100 prior to 2013.
  - Since 2010, these claims have spiked by 1,700 percent.

- - This staggering increase has contributed to a backlog of hundreds of thousands of cases in our immigration courts.
- This surge is only growing, with reports showing that asylum requests at the southern border have recently increased from 1,500 per week to approximately 2,000 per week.
- U.S. Citizenship and Immigration Services (USCIS) processed approximately 100,000 credible fear claims this last fiscal year (FY), surpassing the 94,000 record set in FY 2016.
  - In FY 2018, USCIS received approximately 106,000 new asylum requests from those admitted legally, compared to only 25,500 in 2008.
  - Immigration courts received approximately 160,000 asylum requests in FY 2018, compared to only 42,000 in FY 2008.

**A DRIVING FACTOR IN ILLEGAL IMMIGRATION: The standards that apply to the credible fear process is a major driver of our Nation's immigration crisis.**

- While there has been an enormous spike in credible fear-initiated claims, relatively few asylum claims have ultimately been found to be meritorious.
- Approximately 80 percent of aliens arriving from Guatemala, Honduras, and El Salvador passed initial credible fear screenings, but only 15 percent of those were granted asylum.
- There has been a major increase in the number of illegal alien family units arriving at our border and family units now make up a significant percentage of credible fear claims.
  - The number of family units apprehended by U.S. Customs and Border Protection has increased 620 percent during the past five years.
  - Family units make up about 40 percent of all credible fear-initiated asylum claims.
  - As a result of loopholes, nearly all asylum seekers in family units are permitted by the Department of Homeland Security to remain in the United States, pending their asylum hearing.