1

2   Katrina Eiland (SBN 275701)          Lee Gelernt*
    Cody Wofsy (SBN 294179)              Omar C. Jadwat*
3   Spencer Amdur (SBN 320069)          Anand Balakrishnan*
    Julie Veroff (SBN 310161)           ACLU FOUNDATION
4   ACLU FOUNDATION                     IMMIGRANTS' RIGHTS PROJECT
    IMMIGRANTS' RIGHTS PROJECT          125 Broad Street, 18th Floor
5   39 Drumm Street                     New York, NY 10004
    San Francisco, CA 94111             T: (212) 549-2660
6   T: (415) 343-0770                   F: (212) 549-2654
    F: (415) 395-0950                   *lgelernt@aclu.org*
7   *keiland@aclu.org*                  *ojadwat@aclu.org*
    *cwofsy@aclu.org*                   *abalakrishnan@aclu.org*
8   *samdur@aclu.org*
    *jveroff@aclu.org*

9

10

11  *Attorneys for Plaintiffs*
    *(Additional counsel listed on following page)*

12

13              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

14

15  East Bay Sanctuary Covenant; Al Otro Lado;        Case No.: 3:19-cv-04073-JST
    Innovation Law Lab; and Central American
    Resource Center in Los Angeles,

16

17                     *Plaintiffs*,

18                          v.

19  William Barr, Attorney General, in his official    **PLAINTIFFS' REPLY IN SUPPORT**
    capacity; U.S. Department of Justice; James        **OF MOTION FOR TEMPORARY**
    McHenry, Director of the Executive Office for      **RESTRAINING ORDER**
20  Immigration Review, in his official capacity; the
    Executive Office for Immigration Review; Kevin
21  McAleenan, Acting Secretary of Homeland
    Security, in his official capacity; U.S. Department
22  of Homeland Security; Ken Cuccinelli, Acting
    Director of the U.S. Citizenship and Immigration
23  Services, in his official capacity; U.S. Citizenship
    and Immigration Services; John Sanders,
24  Commissioner of U.S. Customs and Border
    Protection, in his official capacity; U.S. Customs
25  and Border Protection; Matthew Albence, Acting
    Director of Immigration and Customs
26  Enforcement, in his official capacity; Immigration
    and Customs Enforcement,

27                     *Defendants*.

28

1

Melissa Crow**
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer**
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T:  (470) 606-9307
F:  (404) 221-5857
*mary.bauer@splcenter.org*

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*
*asalceda@aclunc.org*

*Attorneys for Plaintiffs*

*Admitted Pro hac vice
**Pro hac vice application forthcoming

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................................ 2

    A. The Rule is Inconsistent with 8 U.S.C. § 1158. ...................................................... 2

        1. The Firm Resettlement Provision.. ..................................................................... 2

        2.  The Safe Third Country Provision.. ................................................................... 4

        3. Congress Allowed Asylum for Those Who Enter
           Between Ports.. ................................................................................................... 6

        4. The Government's Other Arguments Are Unpersuasive....................... 6

    B. The Government Improperly Bypassed Notice and Comment.............................. 8

    C. The Rule is Arbitrary and Capricious Under the APA ........................................ 11

II.  THE BALANCE OF THE EQUITIES SHARPLY FAVORS PLAINTIFFS .................. 13

III. NATIONWIDE RELIEF IS APPROPRIATE ............................................................... 15

CONCLUSION .................................................................................................................. 15

1

**TABLE OF AUTHORITIES**

2

**Cases**

3
*Air All. Houston v. EPA*,
   909 F.3d 1049 (D.C. Cir. 2018) ........................................................................ 2

4

*Butte Cty. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) ...................................................................... 12
5

6
*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ............................................................... 8, 9, 10
7

8
*California v. Health & Human Servs.*,
   281 F. Supp. 3d 806 (N.D. Cal. 2017) .......................................................... 14

9
*City of Los Angeles v. Barr*,
   --- F.3d ---, 2019 WL 3049129 (9th Cir. July 12, 2019) .............................. 10
10

11
*East Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018) .................................................. passim

12
*East Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) ................................................ passim
13

14
*East Bay Sanctuary Covenant v. Trump*,
   909 F.3d 1219 (9th Cir. 2018).) ............................................................ passim

15
*El Rio Health Ctr. v. HHS*,
   396 F.3d 1265 (D.C. Cir. 2005) .................................................................... 12
16

17
*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ........................................................................ 14

18
*Lopez v. Davis*, 531 U.S. 230 (2001) ..................................................................... 7

19
*Maryland v. King*,
   567 U.S. 1301 (2012).................................................................................... 13
20

21
*Matter of B-R-*,
   26 I&N Dec. 119 (BIA 2013) ..................................................................... 3, 4

22
*Matter of Pula*,
   19 I&N Dec. 467 (BIA 1987) .............................................................. 7, 8, 10
23

24
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................................ 11

25
*Nat'l Min. Ass'n v. Babbitt*,
   172 F.3d 906, 913 (D.C. Cir. 1999) .............................................................. 10
26

27
*NRDC v. EPA*,
   966 F.2d 1292 (9th Cir. 1992) ...................................................................... 11

28

*Petersen v. Boeing Co.*,
715 F.3d 276 (9th Cir. 2013) ................................................................. 5

*Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
908 F.3d 476 (9th Cir. 2018) ............................................................... 15

*Rusak v. Holder*,
734 F.3d 894 (9th Cir. 2013) ................................................................. 5

*Trump v. East Bay Sanctuary Covenant*,
139 S.Ct. 782 (2018) ........................................................... 2, 15

*United States v. Valverde*, 628 F.3d 1159 (9th Cir. 2010)........................... 10

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ............................... 15

*Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) ................................. 9

**Statutes**

8 U.S.C. § 1158................................................................................ passim

8 U.S.C. § 1158(a)(2)(A) ............................................................... 4, 5

8 U.S.C. § 1158(a)(2)(E) ............................................................... 13

8 U.S.C. § 1158(b)(2)(A)(iv) ............................................................ 3

8 U.S.C. § 1158(b)(2)(C) ............................................................... 2

**Regulations**

8 C.F.R. § 208.15 ................................................................... 2, 3, 4

84 Fed Reg. 33839 ...................................................................... 11

**Other Authorities**

UNHCR, Note on Asylum, U.N. Doc. EC/SCP/12 (Aug. 30, 1979), available at
https://www.unhcr.org/en-us/excom/scip/3ae68cd44/note-asylum.html.................................. 4

Reply in Support of TRO
Case No.: 3:19-cv-04073

**INTRODUCTION**

The government does not deny that the new Rule would erase virtually all of the asylum process Congress has maintained for the last forty years. Just as it did in the first *East Bay* case when it enacted an unlawful categorical ban on asylum, the government seeks to justify its effort to circumvent the asylum statute Congress enacted with assertions about a crisis at the border. But the government cannot rewrite the statute Congress enacted. Nor can it ignore the important procedural and substantive limitations on agency action set out in the Administrative Procedure Act. When Congress enacted § 1158, it specifically addressed the role of third countries in the U.S. asylum system. To balance the need to protect vulnerable people fleeing persecution and the desire to share the burden of asylum processing with other countries, Congress specified when people are required to apply for asylum in third countries instead of the United States. Congress recognized the grave consequences of sending asylum seekers to another country and so required an assessment of whether an asylum seeker could be resettled in another country, or if not, would be safe in that third country and would have access to a safe, functioning, and sufficiently protective asylum system. By specifically articulating these conditions, Congress created a clear framework for any additional limitation on asylum involving a third country.

The new Rule throws those requirements out the window, eviscerating Congress's framework and frustrating Congress's obvious purpose. Under the Rule, it does not matter if an individual did not seek asylum in the transit country because she faced persecution there, because she could not practically or legally access the asylum system, because the other country had not agreed to take those seeking asylum in the United States, or because doing so would have been futile. The result is the effective elimination of asylum at the southern border for all but Mexican nationals. Whatever Defendants' immigration policy disagreements with Congress, they cannot "rewrite our immigration laws." *East Bay Sanctuary Covenant v. Trump* ("*East Bay II*"), 909 F.3d 1219, 1251 (9th Cir. 2018).

# I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS[1]

## A. The Rule Is Inconsistent with 8 U.S.C. § 1158.

The Attorney General may "establish additional limitations and conditions" on asylum, but they must be "consistent with [§ 1158]." 8 U.S.C. § 1158(b)(2)(C). The Rule in not consistent, however, with Congress's careful decisions about when transit through third countries should result in the categorical denial of asylum. Congress specifically addressed that situation in multiple places. When it did so, it required an assessment of whether the individual was (1) firmly resettled with permanent rights, or (2) whether another country had formally agreed to receive those seeking asylum in the United States and whether asylum seekers would be safe in that country and have access to a fair and functioning asylum system. Congress did not design this careful statutory scheme only to give the Attorney General the ability to eviscerate it and effectively eliminate asylum at the southern border with a transit-based asylum ban whenever it was unable to obtain a formal agreement with a third country. *See Air All. Houston v. EPA*, 909 F.3d 1049, 1061 (D.C. Cir. 2018) (explaining the "well established" principle that 'an agency may not circumvent specific statutory limits" just "by relying on separate, general rulemaking authority").

### 1. The Firm Resettlement Provision.

The definition of "firm resettlement" provides that a noncitizen will *not* be considered firmly resettled, and so will *not* be categorically barred from asylum, merely for having transited through another country. It states that the bar does not apply where a noncitizen's "entry into [another] country was a necessary consequence of his or her flight from persecution, . . . he or she remained in that country only as long as was necessary to arrange onward travel, and . . . he or she did not establish significant ties in that country." 8 C.F.R. § 208.15.[2] In enacting the firm resettlement bar, Congress codified the long-established domestic (and international) understanding of the firm resettlement bar by excluding from its application mere transit through another country—even where

---

[1] As Defendants "recognize," Opp. 7 n.1, the Ninth Circuit's decision in *East Bay* establishes that Plaintiffs' claims are justiciable and fall within the zone of interests, *see East Bay II*, 909 F.3d 1219, 1242-44 (9th Cir. 2018), a decision the Supreme Court did not overturn. *See Trump v. East Bay Sanctuary Covenant*, 139 S.Ct. 782 (2018).

[2] The regulatory definition predated mention of firm resettlement in the statute, and Congress did not alter that longstanding, well-understood definition when it enacted the firm resettlement bar in the INA. *See* TRO 8.

2

the opportunity to apply for asylum existed but was not taken. Congress thus established that mere transit through another country, without more, would *not* be a bar to asylum. The Rule turns Congress's position on its head, as it *bars* asylum precisely where the statute *preserves* asylum: where a noncitizen entered another country as a necessary consequence of persecution, stayed only as long as necessary to arrange for onward travel, and did not establish significant ties.

Moreover, the definition of "firm resettlement" that Congress incorporated into the statute, 8 U.S.C. § 1158(b)(2)(A)(iv), requires an individualized inquiry into the noncitizen's safety and rights in the third country. *See* 8 C.F.R. § 208.15 (requiring the asylum officer or immigration judge to consider, among other factors, the noncitizen's access to housing, employment opportunities, education, ability to hold property, and naturalization). The Rule, however, applies regardless of an asylum seeker's safety or rights in the third country. By dispensing with that inquiry, the Rule is plainly at odds with the purpose behind Congress's firm resettlement bar—to foreclose access to asylum only where a noncitizen would be safe and secure in another country and afforded meaningful permanent rights. *See Matter of B-R-*, 26 I&N Dec. 119, 122 (BIA 2013) (explaining that the firm resettlement provision "limit[s] an alien's ability to claim asylum in the United States when other *safe* options are available") (emphasis added).

The government contends that the Rule has nothing to do with the firm resettlement provision because they concern different groups of people: those who transited through another country and did not apply for asylum, and those who transited through another country where they had an offer of permanent resettlement. *See* Opp. 9. But that is merely a description of the *result* of who is barred from asylum by the Rule and the firm resettlement provision respectively. Clearly both concern the same group of people: those who had passed through a third country. For that group, the Rule adopts a fundamentally different approach than the one chosen by Congress. Congress decided that mere transit without applying for protection would *not* be a basis for denying asylum, in recognition of the many reasons why migrants may not be able to seek adequate protection in transit countries. The Rule unilaterally reverses that judgment.

The government also argues that the Rule and the resettlement bar in fact promote "complementary" aims, as they both "prioritize[] applicants 'with nowhere else to turn.'" *Id.*

3

1   (quoting *Matter of B-R-*, 26 I&N Dec. at 122).  But the government omits from its comparison a key

2   element of the firm resettlement bar: safety. As *Matter of B-R-* made clear, the firm resettlement bar

3   "limit[s] an alien's ability to claim asylum in the United States when other *safe* options are

4   available."  26 I&N Dec. at 122 (emphasis added). Accordingly, the firm resettlement inquiry

5   specifically accounts for a noncitizen's safety in the third country. *See* 8 C.F.R. § 208.15. The Rule

6   does not.  Because the definition of firm resettlement codified by Congress guards against returning

7   an asylum seeker to harm, and the Rule does not, the two are at cross-purposes, and not

8   "complementary."[3]

9       **2.  The Safe Third Country Provision**

10          The Rule is also inconsistent with § 1158(a)(2)(A), which addresses safe third-party

11   agreements. There, Congress provided that asylum could denied if the United States has entered into

12   a formal agreement with a country under which the country agrees to receive certain asylum seekers;

13   the asylum seeker will be safe from persecution; and the asylum seeker will "have access to a full

14   and fair" asylum procedure. *Id.* Like the firm resettlement provision, a consideration of safety and

15   access to meaningful protection is key to the safe third country provision. That is why Congress

16   required not only that the Attorney General make determinations about freedom from persecution

17   and access to a full and fair asylum procedure, but also that the country formally *agree* to receive

18   those asylum seekers. The Rule, by contrast, contains none of these safeguards. It forces an asylum

19   seeker to seek asylum abroad even if she will be subject to persecution in the other country; even if

20   that country's asylum system is corrupt, inaccessible, or insufficiently protective; and even if, as

21   here, that country has refused to sign an agreement with the United States allowing her to seek

22   asylum there. The Rule is a classic end-run around Congress and the safe third country provision.

23   Unable to secure a bilateral safe third country agreement with Mexico or Guatemala, the government

24   has declared that it will simply achieve the same basic effect unilaterally. *See East Bay II*, 909 F.3d

25   at 1250 (observing that the first asylum ban sought to "do[] indirectly what the Executive cannot do

---

[3] Defendants also fail to grapple with the UNHCR's longstanding guidance that asylum should not
be refused "solely on the ground that it could be sought from another State."  UNHCR, Note on
Asylum ¶ 11, U.N. Doc. EC/SCP/12 (Aug. 30, 1979), https://www.unhcr.org/en-
us/excom/scip/3ae68cd44/note-asylum.html.  *See* TRO 11-12.

1   directly"); *see also* TRO 9-12.[4]

2          The government strains to avoid any inconsistency between the Rule and § 1158(a)(2)(A) by

3   emphasizing that the safe third country provision bars *applications* for asylum but does not speak to

4   *eligibility. See* Opp. 12. This Court and the Ninth Circuit have previously rejected the government's

5   efforts to artificially bifurcate the right to apply for a benefit from eligibility for that benefit.  *See*

6   *East Bay II*, 909 F.3d at 1247-48 ("Although the Rule technically applies to the decision of whether

7   or not to *grant* asylum, it is the equivalent of a bar to *applying* for asylum . . . . The technical

8   differences between applying for and eligibility for asylum are of no consequence to a refugee when

9   the bottom line—no possibility of asylum—is the same."); *id.* at 1247 ("It is the hollowest of rights

10  that an alien must be allowed to apply for asylum regardless of whether she arrived through a port of

11  entry if another rule makes her categorically ineligible for asylum based on precisely that fact.");

12  *East Bay Sanctuary Covenant v. Trump* ("*East Bay I*"), 349 F. Supp. 3d 838, 857 (N.D. Cal. 2018).

13          The government also implausibly argues that the Rule is not inconsistent with

14  § 1158(a)(2)(A) because it is less harsh and "more tailored" than the safe third country agreement

15  between the United States and Canada. Opp. 12. But the U.S.-Canada agreement is the result of

16  bilateral negotiations, is predicated on a determination of safety from persecution and the availability

17  of full and fair asylum procedures, *see* § 1158(a)(2)(A), and is subject to important exceptions

18  concerning family reunification, *see* AR526. The Rule here does not require that there be any

19  bilateral or multilateral negotiations, let alone an agreement, and in no way accounts for safety from

20  persecution, access to full and fair procedures, or an individual's reasons for preferring to seek

21  asylum in the United States. That the Rule preserves the ability of noncitizens to seek withholding of

22  removal, *see* Opp. 12, is beside the point. The Rule denies *asylum* and *Congress* thought that asylum

23  was "valuable" irrespective of whether withholding or some other form of relief was theoretically

24

25  [4] The government asks the Court to strike Plaintiffs' citations to U.S. State Department reports. *See*
    Opp. 20 n.7 (citing TRO 10 n.2, 11). The Court, however, may take judicial notice of them. *See, e.g.,*
26  *Petersen v. Boeing Co.*, 715 F.3d 276, 281 (9th Cir. 2013); *Rusak v. Holder*, 734 F.3d 894, 898 (9th
    Cir. 2013). It may also consider evidence outside the administrative record in support of standing,
27  irreparable harm, and the equities. *See East Bay Sanctuary Covenant v. Trump* ("*East Bay III*"), 354
    F. Supp. 3d 1094, 1107-08 (N.D. Cal. 2018).
28

5

available. *East Bay I*, 349 F. Supp. 3d at 864-65. Indeed, the government unsuccessfully made this same argument in defense of the first asylum ban because that ban, like this one, denied asylum but left open other forms of relief. *Id.*

Finally, the government contends that the safe third country provision and the Rule are complementary because both prevent "forum-shopping." Opp. 13. But the Rule is not tailored to prevent forum-shopping; it forecloses asylum no matter the reason an individual did not seek asylum in another country. Rather than preventing forum-shopping, the Rule shuts down the asylum system even for those who have or had no opportunity to seek asylum elsewhere.

### 3.   Congress Allowed Asylum for Those Who Enter Between Ports.

The Rule is also inconsistent with 8 U.S.C. § 1158(a)(1), where Congress made clear that noncitizens may apply for asylum "whether or not at a designated port of arrival." Except for Mexicans, all asylum seekers entering the United States at or between ports of entry at the southern land border necessarily will have transited through at least one other country. The Rule will thus deny asylum to *all* non-Mexican asylum seekers entering at or between ports along the southern land border, a reality the government does not deny. That extreme result is in obvious conflict with Congress's clear command that where a noncitizen enters the United States—whether or not at a port of arrival—cannot be a basis for denying asylum, as the Rule renders that guarantee a dead letter for all but Mexican asylum seekers. The government's only response to this conflict is to repeat its argument that the Rule cannot conflict with § 1158(a)(1) because it "does not bar aliens from applying for asylum," but "simply makes it so that an alien is not *eligible* for asylum . . . ." Opp. 14. But again, the application-eligibility distinction is one this Court and the Ninth Circuit have rejected.

### 4.   The Government's Other Arguments Are Unpersuasive.

The government's other more general arguments are likewise unpersuasive. The government asserts that Plaintiffs are arguing that there can never be certain categories of noncitizens for whom asylum is unavailable. *See* Opp. 14. That is a strawman. Plaintiffs' position is simply that the government cannot erect categorical bars inconsistent with the asylum statute, not that all categorical bars are necessarily inconsistent with the asylum statute. *East Bay I*, 349 F. Supp 3d at 857 n.16.

The government also claims that because "an alien's attempts to seek asylum in a third

Reply in Support of TRO
Case No.: 3:19-cv-04073

country are relevant to the discretionary determination whether to grant him asylum," the government may adopt a categorical bar on that same basis. Opp. 8. It unsuccessfully made the same argument in the first *East Bay* case in an attempt to justify the asylum ban: that as long as it can take into account a particular factor in deciding whether to grant asylum as a matter of discretion, it can deny asylum based on that factor as a categorical matter. *See East Bay I*, 349 F. Supp. 3d at 858 ("Defendants argue that because the agency is permitted to give manner of entry *some* weight, . . . then Defendants could give it *conclusive* weight."). But as this Court and the Ninth Circuit explained, that is not so where the categorical bar is in conflict with the statutory scheme, as evidenced by Congress's treatment of the issue. *East Bay II*, 909 F.3d at 1248 n.13 (rejecting government's reliance on *Lopez v. Davis*, 531 U.S. 230 (2001) as "misplaced" because, unlike in that case, Congress had provided "criteria the [agency] could use in applying the statute" and "spoken to the precise issue" involved); *id.* (noting that "§ 1158 contains several criteria for asylum determinations"); *see also East Bay I*, 349 F. Supp. 3d at 858. Because Congress has spoken to the issue of third countries and provided criteria for making asylum determinations when a relationship with a third country is at issue—either firm resettlement or a formal agreement affording safety and access to a full and functional asylum system—Defendants are foreclosed from erecting a categorical bar.

The government cites *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), for the proposition that transit through a third country is an appropriate discretionary factor, but that case certainly does not say it is an appropriate basis on which to *categorically* deny asylum. Indeed, *Matter of Pula* does not even clearly support the proposition that mere transit through a third country can be a discretionary factor to consider. Rather, *Pula* provides that in determining whether asylum should be granted as a matter of discretion, consideration may be given to "whether the alien passed through any other countries . . . , *whether orderly refugee procedures were in fact available to help him in any country he passed through*, and whether he made any attempts to seek asylum before coming to the United States." *Id.* at 473-74 (emphasis added). *Pula* also provides that factors relevant to the grant or denial of asylum include "the length of time the alien remained in a third country," "his living conditions, safety, and potential for long-term residency there," and "whether the alien has relatives legally in

the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere," *id.* at 474, further suggesting the government is mistaken to rely on it for support that transit alone is a legitimate basis for denying asylum. And the government's position that mere transit is an acceptable basis for denying asylum has been squarely rejected by the Ninth Circuit, which has repeatedly held that it is unreasonable to deny asylum simply because an individual first transited through another country without applying for asylum there.  *See* TRO 8-9 (collecting cases).

### B.  The Government Improperly Bypassed Notice and Comment.

The Rule would eliminate much of our asylum system without even giving the public an opportunity to comment on such a fundamental change to our immigration laws. Notably, the government's arguments would mean that no matter how sweeping their revision of the immigration laws, agencies could *always* bypass notice and comment, because the government can always assert abstract foreign policy concerns or speculate about a surge.  But the Ninth Circuit has been clear that more definite indications of harm are necessary. *See California v. Azar*, 911 F.3d 558, 575-78 (9th Cir. 2018); *East Bay II*, 909 F.3d at 1252.

<u>Foreign Affairs</u>.  The government's brief repeats the same vague foreign-affairs claims as the Rule itself: that public comment would "disrupt[]" negotiations and undermine the "President's foreign-policy aims." Opp. 17-18 (84 Fed. Reg. 33842).  The Ninth Circuit has rejected such conclusory assertions.  *See East Bay II*, 909 F.3d at 1252 (not enough to "merely recite that the Rule 'implicates' foreign affairs"); TRO 15-16.  Even with the benefit of the administrative record, the government *still* fails to concretely explain "how eliminating notice and comment would assist the United States in its negotiations." *East Bay I*, 349 F. Supp. 3d at 862.  The government suggests that another recent asylum policy led to an agreement with Mexico.  Opp. 18 (citing the Migrant Protection Protocols ("MPP") policy).  But nothing in the administrative record suggests that MPP or, more critically, a lack of public comment, led to that agreement.  As the record makes clear, and as the President has repeatedly said, the recent agreement with Mexico resulted from the threat of tariffs, not from MPP, which had been in effect for almost six months before negotiations even began. *See* AR675; Ana Swanson, *Trump Says Mexico Tariffs Worked*, N.Y. Times (June 10, 2019).

1    At bottom, the government disagrees with the Ninth Circuit, which has repeatedly held that the

2    foreign affairs exception "applies in the immigration context only when" notice and comment "will

3    provoke definitely undesirable international consequences." *Compare East Bay II*, 909 F.3d at 1252

4    (alteration omitted, quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir.1980)) *with* Opp.

5    19 (asserting "no such showing" is required).

6            Good Cause. The government likewise fails to establish that good cause exists here. Its only

7    argument is that a short notice-and-comment period would cause a "short-term influx" or "surge."

8    Opp. 15, 16. The government vaguely references its "experience" with surges in response to

9    announced policy changes, *id.* at 15, but none of its record cites demonstrate any such experience.[5]

10   Indeed, nothing in the record supports the striking notion that large numbers of Central Americans

11   could and would suddenly uproot and rush through Mexico to the border before a final rule could be

12   promulgated. Reasoned agency decisionmaking requires more than such bare speculation. *See Azar*,

13   911 F.3d at 577 (rejecting good cause assertion that was "unsupported by the administrative

14   record").

15           The government's brief barely mentions the newspaper article it relied on in the first *East*

16   *Bay* case. Opp. 16 (citing the article once but not discussing it). For good reason: The article is now

17   almost a year old, does not account for subsequent changes at the border, *see* TRO 17-18, addresses

18   a very different policy. *See also East Bay III*, 354 F. Supp. 3d at 1115 n.14 (noting government's

19   argument that such articles contain "layers and layers of hearsay"). Whatever relevance the article

20   may have once had, even the government does not appear to believe it demonstrates that a surge

21   would occur here. This absence of any real evidence is striking given how much opportunity the

22   government has had to find some. If it was correct that temporary delays of new immigration

23   policies caused "short-term influx[es]" of migrants, Opp. 16, one would expect the government to

24   report influxes during previous notice-and-comment periods, or during temporary injunctions of

---

[5] *See, e.g.*, AR438-48 (describing trends over two years, but not purporting to identify any surge in response to a policy change); AR676 (same). The same is true of the Rule's assertion that "illegal immigration flows fluctuate significantly in response to news events." Opp. 16. The government's record cites demonstrate no such thing. *See* AR540-54 (text of MPP policy); AR664 (statement that refugees denied entry at ports may cross in between ports); 682 (no mention of news events or new policies). Defendants' remaining citations are similarly irrelevant. *See* AR533-46, 635-37, 676, 698.

9

major border policies like the first asylum ban. Yet despite studying migration patterns closely, *see* AR 106-07, 119, 208-20, 222-30, the government cannot find any such evidence.

If the government's offerings here were enough, the good cause exception would no longer be a "high bar" reserved for "narrow circumstances" where the government can show a "real harm." *United States v. Valverde*, 628 F.3d 1159, 1164-65 (9th Cir. 2010) (quotation marks omitted).  In the immigration context, the government could literally always avoid public comment simply by speculating that a surge was possible. *See Azar*, 911 F.3d at 576 (quotation marks omitted) (rejecting good cause argument on ground that "an exception to the notice requirement would be created that would swallow the rule").

### C.  The Rule Is Arbitrary and Capricious Under the APA.

The Court need only look to the four corners of the Rule and the administrative record to conclude that the Rule violates the APA's mandate that agencies engage in reasoned decision-making.[6] The Rule's findings and the administrative record utterly fail to support the core premises of the Rule. In fact, the record contains a mountain of evidence that migrants face grave dangers in transit countries, whose asylum systems are patently inadequate in multiple ways—critical considerations that the agencies failed to even mention, much less address, in adopting the Rule. These are classic examples of arbitrary action that Congress has instructed courts to enjoin.

First, there is simply nothing in the record to support the Rule's motivating assumptions that transiting third countries without seeking protection indicates a weak asylum claim, or that the enormous class of people subject to the Rule could obtain protection in Mexico or another transit country. The government's own brief demonstrates the lack of record evidence for the idea that transit "raises questions about the validity" of an asylum claim. Opp. 21.[7] The government does not

---

[6] Citing *City of Los Angeles v. Barr*, --- F.3d ---, 2019 WL 3049129 (9th Cir. July 12, 2019), (Opp. 20), Defendants suggest that some higher level of deference to the agency is due in this context. However, that case makes clear that the Rule is subject to the same standards for arbitrary and capricious review as any other regulation.  *See id.* at *12.

[7] Defendants' argument that an individual's failure to seek asylum in a country could sometimes indicate that that person does not have a meritorious claim or an urgent need for asylum (Opp. 21-22) (citing *Pula*, 19 I&N Dec. at 473-74), merely underscores the irrationality of making such judgments on a categorical basis.  Defendants' failure to justify the use of an overbroad proxy that extends far beyond its rationales also renders the rule arbitrary and capricious. *See Nat'l Min. Ass'n*

Reply in Support of TRO
Case No.: 3:19-cv-04073

even try to cite the record for this core premise. Basing a fundamental change on a factual premise devoid of any evidence is arbitrary and must be enjoined. *See NRDC v. EPA*, 966 F.2d 1292, 1305 (9th Cir. 1992) (rule was arbitrary where "nothing in the record support[ed]" its core factual claim).

The Rule's findings and record also fail to support the Rule's assumptions about Mexico's asylum system. Defendants' opposition asserts, for instance, that the government concluded that Mexico "is a signatory to and in compliance with the relevant international instruments governing consideration of refugee claims." Opp. 22. However, the Rule concludes only that Mexico and the countries of Central America "are *parties* to both the Refugee Convention and the Refugee Protocol," 84 Fed Reg. 33839 (emphasis added), which is true of many countries unable to provide full and fair asylum procedures, TRO 11 (noting that Afghanistan, the Democratic Republic of Congo, and Iran are signatories), and makes *no findings* that Mexico complies with its treaty obligations.[8] In fact, the record shows just the opposite, as explained below. Critically, the Rule does not conclude that Mexico can effectively provide protection for all or even a substantial number of the Central American and other asylum seekers who transit through there. Instead, the Rule concludes only that "Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased." *See* 84 Fed. Reg. 33839-40 (providing the number of applications received for 2016 to 2019).[9] That observation says nothing about the quality of its asylum system or the dangers faced by those migrants who do not apply for asylum there. The government's own record citations to support the Rule's assumptions about access to asylum in Mexico either do not address the capacity of Mexico's asylum system at all, *see* AR231-32, 318-433, or flatly *contradict* the Rule's main premises.[10]

---

*v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999) (explaining that, if an agency action applies in a sufficiently greater number of cases than its justification, it is overbroad and therefore arbitrary and capricious).

[8] Assertions in Defendants' brief cannot substitute for findings lacking in the Rule itself. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (explaining that it "is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself" and "counsel's *post hoc* rationalizations" rejected).

[9] Although the Rule elsewhere conclusorily asserts that Mexico's protection regime is "robust," *id.* at 33835, the Rule does not elaborate or identify any factual support.

[10] *See* AR286-433 (Médecins Sans Frontières report describing violence against Central American migrants in Mexico, including widespread sexual assault, and migrants' "limited access to protection mechanisms"; explaining that "the non-refoulment principle is systematically violated"); AR533-36

---

11

1    The Rule strikingly also fails to address the significant evidence in the administrative record

2  detailing the many barriers to asylum access and widespread violence and other dangers migrants

3  face in Mexico and Guatemala, including reports that those countries are "repeatedly violating the

4  non-refoulement principle," AR708, and that "migrants face acute risks of kidnapping,

5  disappearance, sexual assault, trafficking, and other grave harms," AR703; *see also* n.10. The Rule

6  fails to even *acknowledge* this evidence, much less explain why the Rule's underlying premises

7  remain justified in light of it. *See, e.g.*, *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("an

8  agency cannot ignore evidence contradicting its position"); *El Rio Health Ctr. v. HHS*, 396 F.3d

9  1265, 1278 (D.C. Cir. 2005) (striking down rule where agency "failed adequately to address relevant

10  evidence before it"). In short, the Rule does not grapple with the critical considerations raised by the

11  Departments' own administrative record that are relevant to determining whether a third country is

12  capable of effectively processing those asylum applications, whether individuals are free from the

13  risk of persecution and danger there, whether the asylum system would recognize the person's

14  claims for protection, and whether the individual can safely await a decision on her claims. The

15  failure to consider those critical considerations is arbitrary and capricious. *See* TRO 19-20.

16    Second, Defendants have no meaningful response to Plaintiffs' argument that the Rule is also

17  irrational in that, despite stating that an aim of the Rule is to preserve the system for meritorious

18  claims, it allows asylum only for those who are *denied* protection elsewhere. The Rule fails to

19  _____

20  (UNHCR fact sheet detailing Mexico's inadequate asylum system, including "lack of information to
   access the asylum procedure," the "absence of proper protection screening protocols," "the lack of a

21  systematic implementation of existing best interest determination procedures for unaccompanied
   children," and the necessity of taking "dangerous routes to reach [asylum] offices" where "[w]omen

22  and girls in particular are at risk of sexual and gender-based violence"); AR638-57 (UNHCR report
   expressing concerns "regarding the rise in crimes and the increased risk towards migrants throughout

23  the country," including "disappearances of migrants" and violence against women; concluding that
   "migrants who transit through Mexico put their lives at serious risk"; identifying Mexico's "lack of

24  adequate measures to identify, assist and protect asylum-seeking and refugee children"); AR702-66
   (Human Rights First report explaining that "migrants face acute risks of kidnapping, disappearance,

25  sexual assault, trafficking, and other grave harms in Mexico," including on account of protected
   grounds, and raising concern about Mexico's "untenable 30-day filing deadline" for asylum);

26  AR704-27 (Amnesty International report detailing how the Mexican "government is routinely failing
   in its obligations under international law to protect those who are in need of international protection,

27  as well as repeatedly violating the non-refoulement principle"); AR756-59 (news article detailing

28  high rates of violence and crimes committed with impunity against LGBT individuals in Mexico).

Reply in Support of TRO
Case No.: 3:19-cv-04073

contend with whether a previous denial could mean that such individuals have *weaker* claims than other asylum seekers who, for various reasons, never had their claims considered.

Finally, the Rule's failure to acknowledge, much less consider, the unique needs of unaccompanied children is arbitrary and capricious. Defendants point only to the Rule's conclusion that it was not *required* by statute to exempt unaccompanied children. Even assuming that were a correct interpretation of the government's obligations under the Trafficking Victims Protection and Reauthorization Act, Defendants' argument misses the point. Defendants failed to consider whether unaccompanied children *should be* exempted from the Rule for the same reasons that Congress has carved them out of other asylum bars that implicate their unique challenges in accessing protections: the safe third country provision and one-year deadline, *see* 8 U.S.C. § 1158(a)(2)(E). Additionally, and critically, the agency has failed to consider that the Rule eviscerates an unaccompanied child's right to a non-adversarial proceeding in the first instance. *See* TRO 20. Whether it is a violation of the statute or not, it is arbitrary and capricious for the agency to ignore that the Rule has the effect of unraveling Congress's carefully considered protections for vulnerable children. *See* TRO 20-21.

## II.  THE BALANCE OF THE EQUITIES SHARPLY FAVORS PLAINTIFFS

The government fails to identify imminent, irreparable injury from maintaining the long-standing status quo.  Indeed, there has never been a time since Congress enacted the Refugee Act in 1980 that mere transit through a third country barred one from seeking asylum in the U.S.  Although the public has an interest in the "efficient administration of the immigration laws at the border," it possesses a greater interest in ensuring that those very same laws are "not imperiled by executive fiat." *East Bay II*, 909 F.3d at 1255 (citing *Maryland v. King*, 567 U.S. 1301, 1301 (2012)).  As this Court has held, the executive's interest in deterring asylum seekers "on a basis that Congress did not authorize carries drastically less weight, if any." *East Bay I*, 349 F. Supp. 3d at 866.

And the harm to the public interest is already underway.  Asylum Officers are conducting threshold screening interviews pursuant to the Rule and prioritizing cases subject to the Rule.  *See* Hamed Aleaziz, *US Asylum Officers Have Been Told to Quickly Process Immigrants Subject to Trump's Ban*, Buzzfeed (July 19, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/us-asylum-officers-process-immigrants-trump.  Those asylum seekers who are unable to satisfy the

higher threshold standard for withholding and CAT are at imminent risk of wrongful removal, and the government has refused to assure the Court that removals will not occur during this litigation. The government is also wrong that withholding and CAT relief are adequate substitutes. Opp. 23. There is an extremely high bar to obtain those forms of relief. And, as this Court noted in response to the same argument in the original *East Bay* case, the right to apply for asylum is important for many other reasons besides the lower burden of proof, including the fact that asylum confers "additional important benefits," such as family reunification and a path to citizenship. *East Bay I*, 349 F. Supp. 3d at 864-65. These injuries are not simply "harm to third parties," Opp. 23, but constitute harm to the public interest. The public interest is disserved when the "logical consequence" of the Rule is that some individuals will be denied protection even if they have "meritorious asylum claims," and returned to the country of persecution. *See East Bay III*, 354 F. Supp. 3d at 1117 (considering "the public's interest in ensuring that we do not deliver aliens into the hands of their persecutors.") (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam)).

The harms to Plaintiffs are not mere "speculations," Opp. 23, but are already occurring. Plaintiffs must immediately train staff on the Rule, create and disseminate resources and advice to asylum-seekers and volunteer lawyers on the Rule's requirements, and shift resources away from core missions and activities to deal with the new legal landscape imposed by the Rule. *See* Pinheiro Decl. ¶¶ 12-20; Sharp Decl. ¶¶ 9-15; Smith Decl. ¶¶ 14-20; Manning Decl. ¶¶ 16-22. The government incorrectly asserts that Plaintiffs' loss of an opportunity to comment on the rule is "not sufficient." Opp. 24. Plaintiffs' right to provide advance input cannot be divorced from this ongoing interference with their concrete interests, and as such, constitutes irreparable harm. *See East Bay I*, 349 F. Supp. 3d at 865; *see also East Bay II*, 909 F.3d at 1243 n.8. The procedural harms that Plaintiffs suffer prior to a resolution of the merits "would not be susceptible to remedy." *East Bay I*, 349 F. Supp. 3d at 865 (quoting *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017)). Finally, the Ninth Circuit has rejected the government's repeated assertion that an injunction should not issue in the immigration area because immigration involves important executive interests. "'[C]laims that [the Government] has suffered an institutional injury by erosion

1    of the separation of powers' do not alone amount to an injury that is 'irreparable,' because the

2    Government may 'pursue and vindicate its interests in the full course of this litigation.'" *East Bay II*,

3    909 F.3d at 1254 (quoting *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017)).

4    **III.  NATIONWIDE RELIEF IS APPROPRIATE**

5         Like it did in the first *East Bay* case, the government argues that the Court cannot enjoin its

6    new asylum ban in full but again has failed to explain how such an injunction could be fashioned.

7    Opp. 24-25.[11]  Every Court to consider those arguments last time rejected them, including the

8    Supreme Court. *See Trump v. East Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018) (denying a

9    partial stay despite the government's near-identical arguments against nationwide injunction).  As

10   the Ninth Circuit made clear in that case, nationwide relief "is commonplace in APA cases,

11   promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with

12   complete redress." *East Bay II*, 909 F.3d at 1255 (quotation marks omitted).  Indeed, as this Court

13   noted, the Ninth Circuit has an "uncontroverted line of precedent" approving of "nationwide

14   injunctions in th[e immigration] context." *East Bay III*, 354 F. Supp. 3d at 1120 (quotation marks

15   omitted); *see, e.g.*, *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476,

16   511 (9th Cir. 2018). Just as before, the government has "'fail[ed] to explain how the district court

17   could have crafted a narrower [remedy]' that would have provided complete relief to the

18   Organizations." *East Bay II*, 909 F.3d at 1256. As this Court explained, "the Organizations do not

19   operate in a fashion that permits neat geographic boundaries," and their harms are not limited to their

20   "*current* clients." *East Bay III*, 354 F. Supp. 3d at 1120-21.

21                                 **CONCLUSION**

22        For the foregoing reasons, Plaintiffs' motion should be granted.

23

24

25

26   [11] The government also asserts that to the extent Plaintiffs challenge the Rule "as applied to
     expedited removals, the Court 'lacks the authority' to issue any such relief."  Opp. 24.  But even if
27   that were correct, the Court could, as it did in the first *East Bay* case, enjoin the Rule's substantive
     asylum eligibility bar, but not the portion of the Rule amending expedited removal or credible fear
28   proceedings. *See East Bay III*, 354 F. Supp. 3d at 1118-19.

1

2      Dated: July 21, 2019                          Respectfully submitted,

3      Katrina Eiland (SBN 275701)                   /s/ Lee Gelernt
       Cody Wofsy (SBN 294179)                       Lee Gelernt*
4      Spencer Amdur (SBN 320069)                    Omar Jadwat*
       Julie Veroff (SBN 310161)                     Anand Balakrishnan*
5      AMERICAN CIVIL LIBERTIES UNION                AMERICAN CIVIL LIBERTIES UNION
       FOUNDATION                                    FOUNDATION
6      IMMIGRANTS' RIGHTS PROJECT                    IMMIGRANTS' RIGHTS PROJECT
       39 Drumm Street                               125 Broad St., 18th Floor
7      San Francisco, CA 94111                       New York, NY 10004
       T:  (415) 343-1198                            T:  (212) 549-2660
8      F:  (415) 395-0950                            F:  (212) 549-2654
       *keiland@aclu.org*                            *lgelernt@aclu.org*
9      *cwofsy@aclu.org*                             *ojadwat@aclu.org*
       *samdur@aclu.org*                             *abalakrishnan@aclu.org*
10     *jveroff@aclu.org*

11     Melissa Crow**                                Christine P. Sun (SBN 218701)
       SOUTHERN POVERTY LAW CENTER                   Vasudha Talla (SBN 316219)
12     1101 17th Street, NW Suite 705                Angélica Salceda (SBN 296152)
       Washington, D.C. 20036                        AMERICAN CIVIL LIBERTIES UNION OF
13     T: (202) 355-4471                             NORTHERN CALIFORNIA, INC.
       F: (404) 221-5857                             39 Drumm Street
14     *melissa.crow@splcenter.org*                  San Francisco, CA 94111
                                                     T: (415) 621-2493
15     Mary Bauer**                                  F: (415) 255-8437
       SOUTHERN POVERTY LAW CENTER                   *csun@aclunc.org*
16     1000 Preston Avenue                           *vtalla@aclunc.org*
       Charlottesville, VA  22903                    *asalceda@aclunc.org*
17     T: (470) 606-9307
       F: (404) 221-5857
18     *mary.bauer@splcenter.org*

19     *Attorneys for Plaintiffs*                    Baher Azmy**
                                                     Angelo Guisado**
20                                                   Ghita Schwarz**
                                                     CENTER FOR CONSTITUTIONAL RIGHTS
21     *Admitted Pro hac vice*                       666 Broadway, 7th Floor
       ** *Pro hac vice application forthcoming*     New York, NY 10012
22                                                   Telephone: (212) 614-6464
                                                     Facsimile: (212) 614-6499
23                                                   *bazmy@ccrjustice.org*
                                                     *aguisado@ccrjustice.org*
24                                                   *gschwarz@ccrjustice.org*

25

26

27

28

─────────────────────────────────────────

                              16