1

2

3

4                              UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    EAST BAY SANCTUARY COVENANT,            Case No. 19-cv-04073-JST
     et al.,
8
                     Plaintiffs,             **ORDER GRANTING PRELIMINARY
9                                            INJUNCTION**
            v.
10                                           Re: ECF No. 3
     WILLIAM BARR, et al.,
11
                     Defendants.
12

13          On July 16, 2019, the Department of Justice ("DOJ") and the Department of Homeland

14   Security ("DHS") published a joint interim final rule, entitled "Asylum Eligibility and Procedural

15   Modifications" (the "Rule" or the "third country transit bar").  The effect of the Rule is to

16   categorically deny asylum to almost anyone entering the United States at the southern border if he

17   or she did not first apply for asylum in Mexico or another third country.

18          Under our laws, the right to determine whether a particular group of applicants is

19   categorically barred from eligibility for asylum is conferred on Congress.  Congress has

20   empowered the Attorney General to establish additional limitations and conditions by regulation,

21   but only if such regulations are consistent with the existing immigration laws passed by Congress.

22   This new Rule is likely invalid because it is inconsistent with the existing asylum laws.

23          First, Congress has already created a bar to asylum for an applicant who may be removed

24   to a "safe third country."  The safe third country bar requires a third country's formal agreement to

25   accept refugees and process their claims pursuant to safeguards negotiated with the United States.

26   As part of that process, the United States must determine that (1) the alien's life or freedom would

27   not be threatened on account of a protected characteristic if removed to that third country and

28   (2) the alien would have access to a full and fair procedure for determining a claim to asylum or

equivalent temporary protection there.  Thus, Congress has ensured that the United States will remove an asylum applicant to a third country only if that country would be safe for the applicant and the country provides equivalent asylum protections to those offered here.  The Rule provides none of these protections.

Congress has also enacted a firm resettlement bar, pursuant to which asylum is unavailable to an alien who was firmly resettled in another country prior to arriving in the United States. Before this bar can be applied, however, the government must make individualized determinations that an asylum applicant received an offer of some type of permanent resettlement in a country where the applicant's stay and ties are not too tenuous, or the conditions of his or her residence too restricted, for him or her to be firmly resettled.  Again, the Rule ignores these requirements.

Additionally, there are serious questions about the Rule's validity given the government's failure to comply with the Administrative Procedure Act's notice-and-comment rules.  The government made the Rule effective without giving persons affected by the Rule and the general public the chance to submit their views before the Rule took effect.  The government contends that it did not need to comply with those procedures because the Rule involves the "foreign affairs" of the United States.  But this exception requires the government to show that allowing public comment will provoke "definitely undesirable international consequences," which the government has not done.  Indeed, the Rule explicitly *invites* such comment even while it goes into effect. Thus, the government will still suffer the ill consequences of public comment – which, to be clear, are entirely speculative – but without gaining the benefit to good rule-making that public comment would provide.

Next, the Rule is likely invalid because the government's decision to promulgate it was arbitrary and capricious.  The Rule purports to offer asylum seekers a safe and effective alternative via other countries' refugee processes.  As the Rule expressly contemplates, this alternative forum will most often be Mexico.  But the government's own administrative record contains no evidence that the Mexican asylum regime provides a full and fair procedure for determining asylum claims. Rather, it affirmatively demonstrates that asylum claimants removed to Mexico are likely to be (1) exposed to violence and abuse from third parties and government officials; (2) denied their

United States District Court
Northern District of California

rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution.  The Rule also ignores the special difficulties faced by unaccompanied minors.  Congress recognized these difficulties by exempting "unaccompanied alien child[ren]" from the safe third country bar.  The Rule, which applies to unaccompanied minors just as it does to adults, casts these protections to one side.

Lastly, the balance of equities and the public interest tip strongly in favor of injunctive relief.  While the public has a weighty interest in the efficient administration of the immigration laws at the border, it also has a substantial interest in ensuring that the statutes enacted by its representatives are not imperiled by executive fiat.  Also, an injunction in this case would not radically change the law – or change it at all.  It would merely restore the law to what it has been for many years, up until a few days ago.  Finally, an injunction would vindicate the public's interest – which our existing immigration laws clearly articulate – in ensuring that we do not deliver aliens into the hands of their persecutors.

For these reasons, and the additional reasons set forth below, the Court will enjoin the Rule from taking effect.

## I.       BACKGROUND

### A.     Asylum Framework

#### 1.       Overview

In a related case, the Ninth Circuit has extensively summarized the general framework governing U.S. both immigration law generally and asylum in particular.  *See E. Bay Sanctuary Covenant v. Trump (E. Bay II)*, 909 F.3d 1219, 1231-36 (9th Cir. 2018).[1]  The Court therefore reviews the relevant law more briefly, focusing on the provisions most relevant here.

The current iteration of U.S. asylum law stems from the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980), which Congress enacted in large part "to bring United States refugee

---

[1] Because of the overlap between the claims and arguments presented, the Court refers extensively to three decisions from that case: *E. Bay Sanctuary Covenant v. Trump (E. Bay I)*, 349 F. Supp. 3d 838 (N.D. Cal. 2018) (order granting temporary restraining order ("TRO")); *E. Bay Sanctuary Covenant v. Trump (E. Bay II)*, 909 F.3d 1219 (9th Cir. 2018) (order denying stay of TRO); *E. Bay Sanctuary Covenant v. Trump (E. Bay III)*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018) (order granting preliminary injunction).

law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577 [('1967 Protocol')], to which the United States acceded in 1968." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987).  The 1967 Protocol, in turn, incorporates articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150 ("1951 Convention").  *See* 1967 Protocol, art. I.  Although these international agreements do not independently carry the force of law domestically, *see I.N.S. v. Stevic*, 467 U.S. 407, 428 n.22 (1984), they provide relevant guidance for interpreting the asylum statutes, *see Cardoza-Fonseca*, 480 U.S. at 439-40.

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA").  Under IIRIRA, an immigrant's ability to lawfully reside in the United States ordinarily turns on whether the immigrant has been lawfully "admitted," meaning that there has been a "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see also E. Bay II*, 909 F.3d at 1232 (explaining that Congress has "established 'admission' as the key concept in immigration law").  U.S. immigration law sets forth numerous reasons why aliens may be "ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a).

But "[a]sylum is a concept distinct from admission." *E. Bay II*, 909 F.3d at 1233.  Asylum "permits the executive branch – in its discretion – to provide protection to aliens who meet the international definition of refugees." *Id.*  Accordingly, "the decision to grant asylum relief is ultimately left to the Attorney General's discretion," *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011), subject to the court of appeals' review for whether the Attorney General's decision was "manifestly contrary to the law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D).

The Immigration and Nationality Act ("INA") sets forth the general rule regarding eligibility for asylum:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States

United States District Court
Northern District of California

1
2

> after having been interdicted in international or United States
> waters), irrespective of such alien's status, may apply for asylum in
> accordance with this section or, where applicable, section 1225(b) of
> this title.

3  8 U.S.C. § 1158(a)(1).  Notwithstanding the grant of discretion to the Attorney General, Congress

4  has established certain categorical bars to asylum.  These exceptions to the general rule apply to

5  aliens who (1) may be removed to a safe third country with which the United States has a

6  qualifying agreement, (2) did not apply within one year of arriving in the United States, or

7  (3) have previously been denied asylum.  *Id.* § 1158(a)(2)(B)-(C).[2]  Neither the safe third country

8  exception nor the one-year rule apply to "an unaccompanied alien child."  *Id.* § 1158(a)(2)(E).[3]

9           Congress also mandated that certain categories of aliens are ineligible for asylum.  *Id.*

10  § 1158(b)(2)(A)(i)-(vi).  Most relevant here, an alien is ineligible for asylum if she "was firmly

11  resettled in another country prior to arriving in the United States."  *Id.* § 1158(b)(2)(A)(vi).

12  Congress further empowered the Attorney General to "by regulation establish additional

13  limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for

14  asylum."  *Id.* § 1158(b)(2)(C).

15           In addition to asylum, two other forms of relief from removal are generally available under

16  U.S. immigration law.  With some exceptions not relevant here, an alien is entitled to withholding

17  of removal if "the Attorney General decides that the alien's life or freedom would be threatened in

18  that country because of the alien's race, religion, nationality, membership in a particular social

19  group, or political opinion."  *Id.* § 1231(b)(3)(A).  However, "[t]he bar for withholding of removal

20  is higher; an applicant must demonstrate that it is more likely than not that he would be subject to

21

22  ───────────────────────
    [2] An application ordinarily foreclosed by the latter two exceptions may nonetheless be considered
23  if the alien demonstrates either a material change in circumstances or that extraordinary
    circumstances prevented the alien from filing a timely application.  *Id.* § 1158(a)(2)(D).
24  [3] Congress has further defined an "unaccompanied alien child" as "a child who –

25           (A) has no lawful immigration status in the United States;
            (B) has not attained 18 years of age; and
26           (C) with respect to whom--
                    (i) there is no parent or legal guardian in the United States; or
27                   (ii) no parent or legal guardian in the United States is available
                    to provide care and physical custody.

28  6 U.S.C. § 279(g)(2).

United States District Court
Northern District of California

persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014).

An alien may also seek protection under the Convention Against Torture ("CAT"), which requires the alien to prove that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that the torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," *id.* § 1208.18(a)(1).

These forms of relief differ in meaningful respects. While an asylum grant is ultimately discretionary, withholding of removal or CAT protection are mandatory if the applicant makes the requisite showing of fear of persecution or torture. *See Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005). At the same time, an applicant must meet a higher threshold to be eligible for the latter two forms of relief. *See Ling Huang*, 744 F.3d at 1152; *Nuru*, 404 F.3d at 1216. Moreover, "[u]nlike an application for asylum, . . . a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and [the relief] only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country." *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (second alteration in original) (citation omitted); *see also E. Bay II*, 909 F.3d at 1236 (describing additional asylum benefits).

### 2.      Procedures for Asylum Determinations

Asylum claims may be raised in three different contexts. First, aliens present in the United States may affirmatively apply for asylum, regardless of their immigration status. *See* 8 U.S.C. § 1158(a)(1); Dep't of Homeland Sec. & Dep't of Justice, *Instructions for Form I-589: Application for Asylum and Withholding of Removal*, at 2 (rev. Apr. 9, 2019), https://www.uscis.gov/system/files_force/files/form/i-589instr.pdf. Affirmative applications are processed by U.S. Citizenship and Immigration Services ("USCIS"). 8 C.F.R. § 208.2(a). A USCIS asylum officer interviews each applicant and renders a decision. *Id.* §§ 208.9, 208.19. The officer may grant asylum based on that interview. *Id.* § 208.14(b). If, however, the officer determines that the applicant is not entitled to asylum *and* that the applicant is otherwise

6

1    "removable" – i.e., lacks lawful immigration status – the officer is generally required to refer the

2    applicant to immigration court for the appropriate removal proceeding before an immigration

3    judge ("IJ"). *Id.* § 208.14(c).

4          Second, an asylum claim may be raised as a defense in removal proceedings conducted

5    pursuant to 8 U.S.C. § 1229(a), sometimes referred to as "full removal proceedings." *Matter of*

6    *M-S-*, 27 I. & N. Dec. 509, 510 (BIA 2019). An alien in full removal proceedings may renew a

7    previously denied affirmative asylum application or file one with the immigration judge in the first

8    instance. *See* 8 C.F.R. § 1208.4(b)(3)(iii). If the application is denied, the immigration judge

9    must also consider the alien's eligibility for withholding of removal and, if requested by the alien

10   or suggested by the record, protection under CAT. *Id.* § 1208.3(c)(1). An alien who is denied

11   relief in these proceedings has a number of options for obtaining additional review. The alien may

12   file a motion to reconsider or reopen proceedings with the IJ, 8 U.S.C. § 1229(a)(6)-(7), or appeal

13   the decision to the Board of Immigration Appeals ("BIA"), 8 C.F.R. § 1003.1(b)(3). If the BIA

14   denies relief, the alien may likewise file a motion to reconsider or reopen with the BIA, 8 C.F.R.

15   § 1003.2(b)-(c), or petition for review of the BIA's adverse decision with the relevant circuit court

16   of appeals, 8 U.S.C. § 1252(d).

17         Finally, asylum claims may be raised in expedited removal proceedings. By statute, these

18   proceedings apply "[w]hen a U.S. Customs and Border Protection ('CBP') officer determines that

19   a noncitizen arriving at a port of entry is inadmissible for misrepresenting a material fact or

20   lacking necessary documentation." *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097,

21   1100 (9th Cir. 2019) (citing 8 U.S.C. §§ 1182(a)(6)(C), 1182(a)(7), 1225(b)(1)(A)(i)). As a

22   further exercise of its regulatory authority, 8 U.S.C. § 1225(b)(1)(A)(iii), DHS had, at the time this

23   suit was filed, "also applie[d] expedited removal to inadmissible noncitizens arrested within 100

24   miles of the border and unable to prove that they have been in the United States for more than the

25   prior two weeks." *Thuraissigiam*, 917 F.3d at 1100. On July 23, 2019, however, DHS published

26   a notice that it was expanding the scope of expedited removal to apply "to aliens encountered

27   anywhere in the United States for up to two years after the alien arrived in the United States."

28   Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409, 35,409 (July 23, 2019); *see also*

8 U.S.C. § 1225(b)(1)(A)(iii).  Aliens determined to fall within those categories shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).

If a noncitizen expresses an intent to seek asylum, the applicant is referred to an asylum officer for a credible fear interview to determine whether the applicant "has a credible fear of persecution."  *Id.* § 1225(b)(1)(B)(v).  To have a credible fear, "there [must be] a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  *Id.*  Applicants who demonstrate a credible fear of a basis for asylum, withholding of removal, or protection under CAT, are generally placed in full removal proceedings for further adjudication of their claims.  *Id.* § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(e)(2)-(3), (f).  By contrast, if the officer concludes that no credible fear exists, applicants are "removed from the United States without further hearing or review," except for an expedited review by an IJ, which is ordinarily concluded within 24 hours and must be concluded within 7 days.  8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III); *see also* 8 C.F.R. § 1208.30(g).

## B.     The Challenged Rule

On July 16, 2019, the DOJ and the DHS published a joint interim final rule, entitled "Asylum Eligibility and Procedural Modifications."  84 Fed. Reg. 33,829 (July 16, 2019) (codified at 8 C.F.R. pts. 208, 1003, 1208).  In general terms, the Rule imposes "a new mandatory bar for asylum eligibility for aliens who enter or attempt to enter the United States across the southern border after failing to apply for protection from persecution or torture in at least one third country through which they transited en route to the United States."  *Id.* at 33,830.

Under the Rule, "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum."  8 C.F.R. § 208.13(c)(4).  The Rule provides three exceptions.  First, the Rule does not apply if the alien "applied for protection

from persecution or torture in at least one country . . . through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country." *Id.* § 208.13(c)(4)(i).  Second, the Rule exempts "victim[s] of a severe form of trafficking in persons," as defined in 8 C.F.R. § 214.11.  8 C.F.R. § 208.13(c)(4)(ii)).  Finally, the Rule does not apply if "[t]he only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to [the 1951 Convention, the 1967 Protocol, or CAT]." *Id.* § 208.13(c)(4)(iii).  In sum, except for qualifying trafficking victims, the Rule requires any alien transiting through a third country that is a party to one of the above agreements to apply for protection and receive a final denial prior to entering through the southern border and seeking asylum relief in the United States.

The Rule also sets forth special procedures for how the mandatory bar applies in expedited removal proceedings.  In general, "if an alien is able to establish a credible fear of persecution but appears to be subject to one or more of the mandatory [statutory] bars to applying for, or being granted, asylum . . . [DHS] shall nonetheless place the alien in proceedings under [8 U.S.C. § 1229a] for full consideration of the alien's claim." 8 C.F.R. § 208.30(e)(5)(i).  An alien subject to the Rule's third country bar, however, is automatically determined to lack a credible fear of persecution.  *Id.* § 208.30(e)(5)(iii).  The asylum officer must then consider whether the alien demonstrates a reasonable fear of persecution or torture (as necessary to support a claim for withholding of removal or CAT protection).  *Id.*  The alien may then seek review from an IJ, on the expedited timeline described above, of the determination that the Rule's mandatory bar applies and that the alien lacks a reasonable fear of persecution or torture.  *Id.* § 1208.30(g)(1)(ii).

In promulgating the Rule, the agencies invoked their authority to establish conditions consistent with 8 U.S.C. § 1158.  84 Fed. Reg. at 33,834.  They also claimed exemption from the Administrative Procedure Act's ("APA") notice-and-comment requirements.  *See* 5 U.S.C. § 553(b)-(d).  As grounds for an exemption, they invoked § 553(a)(1)'s "military or foreign affairs function" exemption and § 553(b)(B)'s "good cause" exemption.  84 Fed. Reg. at 33,840-42.  They also invoked § 553(d)(3)'s "good cause" waiver of the thirty-day grace period that is usually required before a newly promulgated rule goes into effect.  *Id.* at 33,841.  The Court discusses the

9

1    proffered reasons for both the Rule and the waiver of § 553 requirements as relevant below.

2                    **C.    Procedural History**

3            Plaintiffs East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central

4    American Resource Center (the "Organizations") filed this lawsuit on July 16, 2019, the day the

5    Rule went into effect.  Complaint ("Compl."), ECF No. 1.[4]  The Organizations filed a motion for

6    temporary restraining order ("TRO") the following day.  ECF No. 3.  The Court set a scheduling

7    conference for the morning of July 18, 2019.  ECF No. 13, 15.[5]  At the conference, the

8    government suggested that the parties proceed directly to a hearing on a preliminary injunction on

9    the administrative record but represented that it would likely not be able to produce the record

10   until July 23, 2019.  After considering the parties' positions, the Court ordered the government to

11   file its opposition to the TRO on July 19, 2019, and the Organizations to file a reply on July 21,

12   2019.  ECF No. 18 at 1.  The Court further ordered the government to file the administrative

13   record by July 23, 2019, stating that the Court "contemplates that the administrative record may be

14   useful in subsequent proceedings but will not be the subject of argument at the July 24 hearing."

15   *Id.* at 1-2.

16           The government filed the administrative record simultaneously with its opposition to the

17   TRO on July 19, 2019, ECF No. 29, citing extensively to the record throughout its opposition,

18   ECF No. 28.  The Court then issued a notice to the parties that it was considering converting the

19   motion to a preliminary injunction, given that both sides would have an opportunity to address the

20   administrative record in their papers.  ECF No. 30.  The Organizations' reply did, in fact, address

21   the record and the government's citations to it.  ECF No. 31.  At the hearing, both parties agreed

22   that it would be appropriate to convert the motion to a preliminary injunction.  The Court therefore

23   does so.  *See* ECF No. 30.

24

25   _____

26   [4] The Organizations named as defendants a number of relevant agencies and agency officials.  The
     Court refers to them collectively as the government.

27   [5] After considering the parties' briefing on an expedited basis, the Court granted the
     Organizations' motion to relate this case to another action pending before this Court regarding a
28   different asylum eligibility regulation.  *E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-06810-
     JST (N.D. Cal.), ECF Nos. 115, 117, 118.

United States District Court
Northern District of California

1      The Organizations' motion relies on the three claims advanced in their complaint. First,

2   they claim that the Rule is substantively invalid because it is inconsistent with the statutes

3   governing asylum. Compl. ¶¶ 137-143. Second, they claim that the Rule is procedurally invalid

4   because the agencies violated the APA's notice-and-comment requirements, 5 U.S.C. § 553(b)-(d).

5   Compl. ¶¶ 144-147. Finally, they argue that the Rule is procedurally invalid because the agencies

6   failed to articulate a reasoned explanation for their decision. *Id.* ¶¶ 148-150.

7      **II.      MOTION FOR PRELIMINARY INJUNCTION**

8           **A.      Legal Standard**

9      The Court applies a familiar four-factor test on a motion for a preliminary injunction. *See*

10   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839-40 & n. 7 (9th Cir. 2001). A

11   plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer

12   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

13   and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,

14   559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20

15   (2008)). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear

16   showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

17      To grant preliminary injunctive relief, a court must find that "a certain threshold showing

18   [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per

19   curiam). Assuming that this threshold has been met, "'serious questions going to the merits' and a

20   balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

21   injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

22   that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

23   1135 (9th Cir. 2011).

24           **B.      Likelihood of Success on the Merits**

25                **1.      Standing**

26      The government challenges the Organizations' Article III and statutory standing, but only

27   in a footnote. ECF No. 28 at 16 n.1. The government concedes that its positions are generally

28   irreconcilable with the Ninth Circuit's and this Court's rulings in a prior case brought by the

United States District Court
Northern District of California

11

1    Organizations, challenging a different regulation imposing a mandatory bar on asylum eligibility

2    (the "illegal entry bar"). *Id.*; *see generally E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-

3    06810-JST (N.D. Cal.). While the Court considers these arguments, it does so correspondingly

4    briefly. *Cf. Holley v. Gilead Scis., Inc.*, 379 F. Supp. 3d 809, 834 (N.D. Cal. 2019) ("'Arguments

5    raised only in footnotes, or only on reply, are generally deemed waived' and need not be

6    considered." (quoting *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014)).

7            First, the Organizations have adequately demonstrated injury-in-fact to support Article III

8    standing. The Ninth Circuit has repeatedly recognized that "'a diversion-of-resources injury is

9    sufficient to establish organizational standing' for purposes of Article III, if the organization

10   shows that, independent of the litigation, the challenged 'policy frustrates the organization's goals

11   and requires the organization to expend resources in representing clients they otherwise would

12   spend in other ways.'" *E. Bay II*, 909 F.3d at 1241 (first quoting *Nat'l Council of La Raza v.*

13   *Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015); then quoting *Comite de Jornaleros de Redondo*

14   *Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc)). As in *East Bay II*,

15   the Organizations have "offered uncontradicted evidence that enforcement of the Rule has

16   required, and will continue to require, a diversion of resources, independent of expenses for this

17   litigation, from their other initiatives." *Id.* at 1242; *see also* ECF No. 3-2 ¶¶ 14-15, 17, 19; ECF

18   No. 3-3 ¶¶ 12-17, 19; ECF No. 3-4 ¶¶ 16-19; ECF No. 3-5 ¶¶ 10-14. The Ninth Circuit likewise

19   recognized that the Organizations "can demonstrate organizational standing by showing that the

20   Rule will cause them to lose a substantial amount of funding." *E. Bay II*, 909 F.3d at 1243. For

21   similar reasons, three of the four Organizations have shown that the majority of the clients they

22   serve would be rendered "categorically ineligible for asylum," and that they "would lose a

23   significant amount of business and suffer a concomitant loss of funding" as a result. *Id.*; *see also*

24   ECF No. 3-2 ¶¶ 15-16, ECF No. 3-3 ¶ 18; ECF No. 3-5 ¶¶ 6-7.

25           Second, the Organizations' interests are "arguably within the zone of interests to be

26   protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*

27   *v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v.*

28   *Camp*, 397 U.S. 150, 153 (1970)). Here, the Ninth Circuit has already determined that the

United States District Court
Northern District of California

12

1    Organizations' "interests fall within the zone of interests protected by the INA," and these same

2    "asylum provisions" in particular.  *E. Bay II*, 909 F.3d at 1244.[6]

3         Accordingly, the Organizations have standing to prosecute this lawsuit.

4              **2.     Substantive Validity: *Chevron***

5              **a.     Legal Standard**

6         The Organizations challenge "the validity of the [Rule] under both *Chevron* and *State*

7    *Farm*, which 'provide for related but distinct standards for reviewing rules promulgated by

8    administrative agencies.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d

9    1061, 1075 (9th Cir. 2019) (quoting *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl.*

10   *Prot. Agency*, 846 F.3d 492, 521 (2d Cir. 2017)).  "*State Farm* review for arbitrariness focuses on

11   the rationality of an agency's decisionmaking process – i.e., 'whether a rule is procedurally

12   defective as a result of flaws in the agency's decisionmaking process.'"  33 Charles Alan Wright,

13   Charles H. Koch & Richard Murphy, *Federal Practice and Procedure*, § 8435 at 538 (2d ed.

14   2018) (footnotes omitted) (quoting *Catskill Mountains*, 846 F.3d at 521).  By contrast, the

15   *Chevron* analysis considers "whether the conclusion reached as a result of that process – an

16   agency's interpretation of a statutory provision it administers – is reasonable."  *Altera Corp.*, 926

17   F.3d at 1075 (quoting *Catskills Mountains*, 846 F.3d at 521).  Thus, where a plaintiff alleges that,

18   as a result of an erroneous legal interpretation, the agency's action was "not in accordance with the

19   law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or

20   short of statutory right," *id.* § 706(2)(C), courts apply the *Chevron* framework.  *See Nw. Envtl.*

21

22   ─────────────────

     [6] The government contends that the Ninth Circuit's legal conclusion is flawed because it failed to

23   consider the judicial review provisions of 8 U.S.C. §§ 1252 and 1329, which the government reads
     to require that "review may be sought only by the affected alien."  ECF No. 28 at 16 n.1.  But the

24   government did, in fact, argue to the Ninth Circuit that "the immigration statutes . . . presuppose
     that only aliens may challenge certain asylum-related decisions and limit when and where aliens

25   may seek judicial review."  *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274 (9th Cir.), ECF
     No. 14 at 9 (citing 8 U.S.C. §§ 1225, 1252); *see also Day v. Apoliona*, 496 F.3d 1027, 1031 (9th

26   Cir. 2007) (district courts are bound by circuit precedent); *cf. Miller v. Gammie*, 335 F.3d 889, 900
     (9th Cir. 2003) (en banc) ("As a general rule, the principle of *stare decisis* directs us to adhere not

27   only to the holdings of our prior cases, but also to their explications of the governing rules of law."
     (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter,* 492 U.S. 573, 668 (1989)

28   (Kennedy, J., concurring in part and dissenting in part))).

United States District Court
Northern District of California

1   *Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008) (citing *Chevron, U.S.A., Inc. v. Nat.*

2   *Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).[7]

3        Under *Chevron*, the Court first considers "whether Congress has directly spoken to the

4   precise question at issue.  If the intent of Congress is clear, that is the end of the matter."  *Campos-*

5   *Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).

6   The Court "starts with the plain statutory text and, 'when deciding whether the language is

7   plain, . . . must read the words in their context and with a view to their place in the overall

8   statutory scheme.'"  *Altera Corp.*, 926 F.3d at 1075 (quoting *King v. Burwell*, 135 S. Ct. 2480,

9   2489 (2015)).  Consideration of "the legislative history, the statutory structure, and 'other

10  traditional aids of statutory interpretation'" supplements this plain text analysis.  *Id.* (quoting

11  *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981)).  In recent

12  years, the Supreme Court has cautioned that courts may not "engage[] in cursory analysis" of these

13  statutory questions.  *Pereira v. Sessions*, 138 S. Ct. 2105, 2120 (2018) (Kennedy, J., concurring)

14  (observing that "reflexive deference" to the agency under *Chevron* "suggests an abdication of the

15  Judiciary's proper role in interpreting federal statutes").  Rather, as it emphasized in an analogous

16  context, "only when that legal toolkit is empty and the interpretive question still has no single right

17  answer can a judge conclude that it is 'more [one] of policy than of law.'"  *Kisor v. Wilkie*, 139 S.

18  Ct. 2400, 2415 (2019) (alteration in original) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S.

19  680, 696 (1991)).

20        If, after exhausting those tools, the Court concludes the rule or regulation is ambiguous, it

21  turns to *Chevron* step two.  *Id.*  There, the Court determines whether the agency's construction is

22  "arbitrary, capricious, or manifestly contrary to the statute," again taking into account "the

23  statute's text, structure and purpose."  *Altera Corp.*, 926 F.3d at 1075 (first quoting *Chevron*, 467

24  U.S. at 843; then quoting *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007)).  "Thus,

25  an agency interpretation that is 'inconsisten[t] with the design and structure of the statute as a

26  whole,' does not merit deference."  *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014)

27

28  _____

[7] Despite the government's failure to invoke *Chevron* deference, the Court nonetheless applies the governing standard.  *See E. Bay II*, 909 F.3d at 1247-48 (citing *Chevron*).

*United States District Court*
*Northern District of California*

1   (alteration in original) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)).

2   Ultimately, the regulation "fails if it is 'unmoored from the purposes and concerns' of the

3   underlying statutory regime." *Altera Corp.*, 926 F.3d at 1076 (quoting *Judulang v. Holder*, 565

4   U.S. 42, 64 (2011)); *see also S.J. Amoroso Const. Co. v. United States*, 981 F.2d 1073, 1075 (9th

5   Cir. 1992) ("If a regulation is fundamentally at odds with the statute, it will not be upheld simply

6   because it is technically consistent with the statute.").

### b.    Statutory Framework

8          The Organizations argue that the Rule conflicts with the two statutory provisions that

9   currently disqualify asylum applicants based on third countries: (1) the firm resettlement bar and

10  (2) the safe third country bar.  These provisions reflect "[t]he core regulatory purpose of asylum,"

11  which "is not to provide [applicants] with a broader choice of safe homelands, but rather, to

12  protect [refugees] with nowhere else to turn." *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA

13  2013) (quoting *Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011)).  To determine whether the

14  Rule is consistent with these statutory bars, the Court reviews their history in greater depth.

### i.    Firm Resettlement Bar

16         The concept of firm resettlement has a long history in U.S. immigration law.  It was first

17  introduced in a 1948 statute, although the language was later dropped in 1957 legislation and

18  subsequent acts.  *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 53 (1971).  Interpreting those later

19  statutes, which limited asylum to those fleeing persecution, the Supreme Court concluded that they

20  nonetheless required the government to take the "the 'resettlement' concept . . . into account to

21  determine whether a refugee seeks asylum in this country as a consequence of his flight to avoid

22  persecution." *Id.* at 56.  "[T]he correct legal standard," the *Rosenberg* Court explained, was

23  whether the applicant's presence in the United States was "reasonably proximate to the flight and

24  not . . . following a flight remote in point of time or interrupted by intervening residence in a third

25  country reasonably constituting a termination of the original flight in search of refuge." *Id.* at 57.

26         In 1980, Congress passed the Refugee Act "to bring the INA into conformity with the

27  United States's obligations under the Convention and Protocol." *E. Bay II*, 909 F.3d at 1233.

28  Congress barred from asylum any alien "convicted of an aggravated felony," 8 U.S.C. § 1158(d)

United States District Court
Northern District of California

(1980), but did not impose other categorical restrictions.  The agency then charged with administering asylum, the Immigration and Naturalization Service ("INS") adopted additional regulatory bars, including one that required INS district directors to deny asylum to an applicant who had "been firmly resettled in a foreign country."  8 C.F.R. § 208.8(f)(1)(ii) (1981).  The regulations went on to define "firm resettlement" in greater detail.[8]  In addition, those regulations imposed a discretionary bar, providing that a district director could deny asylum if "there is an outstanding offer of resettlement by a third nation where the applicant will not be subject to persecution and the applicant's resettlement in a third nation is in the public interest."  *Id.* § 208.8(f)(2).

Because this regulatory bar applied only to district directors, the BIA subsequently concluded that it did "not prohibit an immigration judge or the Board from granting asylum to an alien deemed to have been firmly resettled."  *Matter of Soleimani*, 20 I. & N. Dec. 99, 104 (BIA 1989).  Instead, it explained, "firm resettlement is a factor to be evaluated in determining whether asylum should be granted as a matter of discretion under the standards set forth in *Matter of Pula*, 19 I & N Dec. 467 (BIA 1987)."  *Matter of Soleimani*, 20 I. & N. Dec. at 103.  In *Matter of Pula*, the BIA had rejected a rule that accorded illegal entry so much weight that its "practical effect

---

[8] Specifically, the Attorney General defined an alien as "firmly resettled" if:

> [H]e was offered resident status, citizenship, or some other type of permanent resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution, unless the refugee establishes . . . that the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of asylum/refuge that he was not in fact resettled.

8 C.F.R. § 208.14 (1980).  Officers making the firm resettlement determination were instructed to

> [C]onsider, in light of the conditions under which other residents of the country live, the type of housing, whether permanent or temporary, made available to the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country.

*Id.*

United States District Court
Northern District of California

[was] to deny relief in virtually all cases," instructing instead that "the totality of the circumstances and actions of an alien in his flight from the country where he fears persecution should be examined in determining whether a favorable exercise of discretion is warranted." 19 I. & N. Dec. at 473. And although the BIA included as relevant factors "whether the alien passed through any other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States," 19 I. & N. Dec. at 473-74, those factors were not given dispositive weight, and they were to be considered among a host of other relevant factors in their totality:

> In addition, the length of time the alien remained in a third country, and his living conditions, safety, and potential for long-term residency there are also relevant. For example, an alien who is forced to remain in hiding to elude persecutors, or who faces imminent deportation back to the country where he fears persecution, may not have found a safe haven even though he has escaped to another country. Further, whether the alien has relatives legally in the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere is another factor to consider. In this regard, the extent of the alien's ties to any other countries where he does not fear persecution should also be examined.

*Id.*

In 1990, the Attorney General expanded the mandatory firm resettlement bar to include IJ asylum determinations, thereby superseding *Matter of Soleimani*. *See* 8 C.F.R. § 208.14(c)(2) (1990). The 1990 regulations also amended the firm resettlement definition to permit an applicant to rebut a showing of a firm offer by establishing "[t]hat his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation." *Id.* § 208.15(a). The Ninth Circuit subsequently upheld this regulatory bar as "a permissible construction of the statute," noting that "[f]irm resettlement has long been a decisive factor in asylum policy," and that "[e]ven before the regulation was promulgated in 1990, firm resettlement seems to have precluded a grant of asylum in practice." *Yang v. I.N.S.*, 79 F.3d 932, 939 (9th Cir. 1996). Moreover, it reasoned, "[b]ecause firmly resettled aliens are by definition no longer

1    subject to persecution, the regulation create[d] no conflict with" the Refugee Act. *Id.*

2          Congress revisited the issue of firm resettlement in 1996, when it enacted IIRIRA.  In

3    IIRIRA, Congress codified the firm resettlement bar, providing that asylum was unavailable to an

4    alien who "was firmly resettled in another country prior to arriving in the United States."  8 U.S.C.

5    § 1158(b)(2)(A)(vi).

6          Following IIRIRA, the Attorney General issued interim implementing regulations.  In

7    addition to tracking the mandatory firm resettlement bar, 8 C.F.R. §§ 208.13(c)(2)(B), 208.15

8    (1997), the regulations also included a provision for discretionary denials "if the alien can be

9    removed to a third country which has offered resettlement and in which the alien would not face

10   harm or persecution," *id.* § 208.13(d).  In subsequent cases, the Ninth Circuit concluded that these

11   regulations had replaced the factors cited in *Matter of Pula* as a basis for discretionary denial of

12   asylum.  *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) ("Stays in third

13   countries are now governed by 8 C.F.R. § 208.15, which specifies how and when an opportunity

14   to reside in a third country justifies a denial of asylum."); *Andriasian v. I.N.S.*, 180 F.3d 1033,

15   1044 (9th Cir. 1999) ("The amended regulations now specify how and when an opportunity to stay

16   in a third country justifies a mandatory or discretionary denial of asylum by an IJ or the BIA.").  In

17   *Andriasian*, the Ninth Circuit elaborated on its rationale, explaining that a contrary reading would

18   defeat the regulations' "purpose . . . to ensure that if this country denies a refugee asylum, the

19   refugee will not be forced to return to a land where he would once again become a victim of harm

20   or persecution."  180 F.3d at 1046-47.  "[T]he discretionary authority to deny asylum when a

21   refugee has spent a brief period of time in a third country but has no opportunity to return there or,

22   if he does, would be subject to further serious harm, would permit just such a result and would

23   totally undermine the humanitarian policy underlying the regulation."  *Id.* at 1047.  Thus, "[t]hat a

24   refugee has spent some period of time elsewhere before seeking asylum in this country is relevant

25   only if he can return to that other country.  Otherwise, that fact can in no way, consistent with the

26   statute and the regulations, warrant denial of asylum."  *Id.* at 1047.

27         In 2000, the Attorney General finalized the regulations implementing IIRIRA.  During the

28   rulemaking process, the government received comments expressing concern that the discretionary

United States District Court
Northern District of California

1   denial regulation was inconsistent with the statutory safe third country bar.  Asylum Procedures,

2   65 Fed. Reg. 76,121-01, 76,126 (Dec. 6, 2000).  Although the government maintained that the

3   regulation was a proper exercise of the Attorney General's authority pursuant to 8 U.S.C.

4   § 1158(b)(2)(C), it nonetheless "decided to remove it from the regulations to avoid confusion."

5   *Id.*; *cf.* 8 C.F.R. § 208.13 (2001).  Consistent with the Ninth Circuit's recognition that these

6   regulations created a unified scheme "specif[ying] how and when an opportunity to reside in a

7   third country justifies a denial of asylum," *Mamouzian*, 390 F.3d at 1138, some courts have since

8   held that a "stay in a third country before arriving in the United States cannot support a denial of

9   [an] asylum claim" where the IJ finds that applicant "was not firmly resettled," *Tandia v.*

10  *Gonzales*, 437 F.3d 245, 249 (2d Cir. 2006) (per curiam) (emphasis omitted); *see also Prus v.*

11  *Mukasey*, 289 F. App'x 973, 976 (9th Cir. 2008); *cf. Shantu v. Lynch*, 654 F. App'x 608, 617 (4th

12  Cir. 2016) (noting the *Tandia* court's decision and inviting the BIA to consider on remand whether

13  a finding that a third country provides a "'safe haven' remains a factor that may properly be

14  considered in a discretionary asylum determination").[9]

15        Under the current statutory scheme, "[d]etermining whether the firm resettlement rule

16  applies involves a two-step process:  First, the government presents 'evidence of an offer of some

17  type of permanent resettlement,' and then, second, 'the burden shifts to the applicant to show that

18  the nature of his [or her] stay and ties was too tenuous, or the conditions of his [or her] residence

19  too restricted, for him [or her] to be firmly resettled.'"  *Arrey v. Barr*, 916 F.3d 1149, 1159 (9th

20  Cir. 2019) (alterations in original) (quoting *Maharaj v. Gonzales*, 450 F.3d 961, 976-77 (9th Cir.

21  2006) (en banc)); *see also* 8 C.F.R. § 208.15.  Further, because "firmly resettled aliens are by

22  definition no longer subject to persecution," an applicant may provide evidence of persecution in

23  the third country to "rebut the finding of firm resettlement" there.  *Arrey*, 916 F.3d at 1159-60

24  (first quoting *Yang*, 79 F.3d at 939).

25                              **ii.      Safe Third Country Bar**

26        Though a more recent innovation, the safe third country bar also provides guidance

27

28  ─────────────
    [9] Pursuant to Fourth Circuit Rule 36 and Ninth Circuit Rule 36-3, *Shantu* and *Prus* are not binding
    precedent.  The Court nonetheless relies on them as persuasive authority.

United States District Court
Northern District of California

1    regarding the statutory scheme that Congress enacted.

2         Shortly prior to IIRIRA, the Attorney general promulgated a regulation providing for

3    discretionary denials of asylum where "the alien can and will be deported or returned to a country

4    through which the alien traveled en route to the United States and in which the alien would not

5    face harm or persecution and would have access to a full and fair procedure for determining his or

6    her asylum claim in accordance with a bilateral or multilateral arrangement with the United States

7    governing such matter."  8 C.F.R. § 208.14(e) (1995).  At that time, no such agreement existed.

8         Congress then codified that bar as part of IIRIRA, converting it into a mandatory bar that

9    disqualified aliens from applying for asylum if:

> [T]he Attorney General determines that the alien may be removed,
> pursuant to a bilateral or multilateral agreement, to a country (other
> than the country of the alien's nationality or, in the case of an alien
> having no nationality, the country of the alien's last habitual
> residence) in which the alien's life or freedom would not be
> threatened on account of race, religion, nationality, membership in a
> particular social group, or political opinion, and where the alien would
> have access to a full and fair procedure for determining a claim to
> asylum or equivalent temporary protection, unless the Attorney
> General finds that it is in the public interest for the alien to receive
> asylum in the United States.

16   8 U.S.C. § 1158(a)(2)(A).  Congress further provided that the bar would not apply to

17   "unaccompanied alien child[ren]."  *Id.* § 1158(a)(2)(E).

18        To date, the United States has entered into only one such agreement, with Canada.

19   Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third

20   Countries, Can.-U.S., Dec. 5, 2002 ("Canada Third Country Agreement").  The agreement

21   generally provides that, between the two nations, the country through which the alien transited

22   (i.e., "the country of last presence") will adjudicate the alien's claim for refugee status.  *Id.*, art.

23   IV, ¶ 1.  However, the agreement contains exceptions where the "receiving country" will

24   adjudicate the claim, including where the applicant has at least one family member with refugee or

25   other lawful status or a family member who is at least 18 years old and has a pending refugee

26   claim.  *Id.*, art. IV, ¶ 2.  Notwithstanding that allocation of adjudicatory responsibility, each

27   country reserved the right to examine any claim at its own discretion if it would serve its public

28   interest to do so.  *Id.*, art. VI.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      **Discussion**

The government represents that, like the firm resettlement and safe third country bars, the Rule provides a means of separating asylum applicants who truly have "nowhere else to turn" to avoid persecution, 84 Fed. Reg. at 33,834 (quoting *Matter of B-R-*, 26 I. & N. Dec. at 122), from "economic migrants seeking to exploit our overburdened immigration system," *id.* at 33,839; *see also* ECF No. 28 at 17 ("[T]he Department heads determined . . . that aliens who fail to apply for protection in at least one third country through which they transited should not be granted the discretionary benefit of asylum, because they are not refugees with nowhere else to turn.").

The Organizations first contend that "Congress spoke directly to the issue of seeking asylum in another country and created two narrow circumstances where asylum can be denied based on a third country." ECF No. 3-1 at 14.  Implicit in this argument is that the Rule fails at *Chevron* step one because Congress has articulated the only permissible mandatory bars in this area.  *See Chevron*, 467 U.S. at 842.[10]  The Organizations' position has some force.  As noted above, some courts, including the Ninth Circuit, have treated the regulations based on the firm resettlement bar as establishing the only circumstances under which "an opportunity to stay in a third country justifies a mandatory or discretionary denial of asylum by an IJ or the BIA." *Andriasian*, 180 F.3d at 1044; *see also Prus*, 289 F. App'x at 97; *Tandia*, 437 F.3d at 249; *Mamouzian*, 390 F.3d at 1138.  But as the Organizations acknowledged at the hearing, the Court need not decide that question today.

Even assuming that the statute does not prohibit the government from adopting additional mandatory bars based on an applicant's relationship with a third country, any such bar must be consistent "with the design and structure of the statute as a whole" to survive *Chevron* step two. *Util. Air Regulatory Grp.*, 573 U.S. at 321 (citation omitted).  The Rule fails this test in at least two respects.

---

[10] At the outset, the Court rejects the government's reliance on *Lopez v. Davis*, 531 U.S. 230, 243-44 (2001), and *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017).  Those cases stand for the undisputed principle that the agencies have the authority to adopt additional categorical limitations, but do not shed light on the specific statutory conflicts and arbitrariness arguments raised in this case.  *See E. Bay II*, 909 F.3d at 1248 n.13.

First, as the government emphasizes, the two statutory bars "limit an alien's ability to claim asylum in the United States when other safe options are available." *Matter of B-R-*, 26 I. & N. Dec. at 122. But in keeping with that purpose, both provisions incorporate requirements to ensure that the third country in question actually *is* a "safe option[]." *Id.* The safe third country bar requires a third country's formal agreement to accept refugees and process their claims pursuant to safeguards negotiated with the United States. 8 U.S.C. § 1158(a)(2)(A). As part of that process, the United States must determine that (1) "the alien's life or freedom would not be threatened on account of [a protected characteristic]" if removed to that third country and (2) "the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection" there. *Id.*

Similarly, in enacting the firm resettlement bar, Congress left in place the pre-existing regulatory definition, under which the government must make individualized determinations that the applicant received "an offer of some type of permanent resettlement" in a country where the applicant's "stay and ties [were not] too tenuous, or the conditions of his [or her] residence too restricted, for him [or her] to be firmly resettled." *Arrey*, 916 F.3d at 1159 (alterations in original) (quoting *Maharaj*, 450 F3d at 976). As the Ninth Circuit has recognized, the purpose of these requirements "is to ensure that if this country denies a refugee asylum, the refugee will not be forced to return to a land where he would once again become a victim of harm or persecution." *Andriasian*, 180 F.3d at 1046-47; *see also Yang*, 79 F.3d at 939 ("[F]irmly resettled aliens are by definition no longer subject to persecution . . . .").

By contrast, the Rule does virtually nothing to ensure that a third country is a "safe option." The Rule requires only that the third country be a party to the 1951 Convention, the 1967 Protocol, or the CAT. 8 C.F.R. § 208.13(c)(4)(iii). While the firm resettlement bar requires a determination regarding each alien's individual circumstances, and the safe third country bar requires a formalized determination as to the individual country under consideration, the Rule ignores an applicant's individual circumstances and categorically deems most of the world a "safe option" without considering – or, as set forth below, in contravention of – the evidence in its own record. *See* AR 560-62, 581-83, 588. For example, the administrative record demonstrates

1    abundantly why Mexico is not a safe option for many refugees, despite its party status to all three

2    agreements.  AR 561, 582, 588.[11]  In short, Congress requires consideration of an applicant's

3    circumstances and those of the third country; the Rule turns its back on those requirements.  On its

4    face, this approach fundamentally conflicts with the one Congress took in enacting mandatory bars

5    based on a safe option to resettle or pursue other relief in a third country.

6        The government's contrary arguments are not persuasive.  First, the government contends

7    that there is no conflict with the firm resettlement bar because that bar concerns aliens who have

8    already received an offer of permanent resettlement, while the Rule disqualifies "those who could

9    have applied (but did not apply) for protection in a third country."  ECF No. 28 at 18.  The

10   government similarly asserts that the Rule need not resemble the safe third country bar because

11   that bar, as implemented by the United States' sole safe third country agreement, (1) requires

12   consideration of withholding of removal in Canada and (2) allows an alien to seek relief in the

13   United States if Canada denies the asylum claim.  *Id.* at 21; *see also* 8 C.F.R. § 208.30(e)(6).

14       The government's focus on the type of conduct that is subject to each bar, or any

15   difference in consequences that flow from its application, is misplaced.  ECF No. 28 at 18, 21-22.

16   If a country is not a safe option, there is no reason to infer that an alien's failure to seek protection

17   there undermines her claim.  For purposes of the particular question of safety, it makes no

18   difference whether the safe option is one that the alien had or has (in the case of the firm

19   resettlement bar), will have (in the case of the safe third country bar) or forewent (in the case of

20   the Rule).

21       In sum, when Congress barred asylum to an applicant with an alternative safe option in

22   another country, it required "reasonable assurance that he will not suffer further harm or

23   persecution there," *Andriasian*, 180 F.3d at 1046, in keeping with the long-held understanding that

24   these bars apply to those who have somewhere else to turn, *see Matter of B-R-*, 26 I. & N. Dec. at

25   122.  The Rule's sweeping approach makes no attempt to accommodate this concern, and so is

26

27   _____
     [11] The Organizations suggest examples of other countries that might support the same conclusion,
     but do not seek to expand the administrative record to include the relevant information.  ECF No.
28   3-1 at 18.  The Court therefore does not rely on those arguments.

1    antithetical to the statute's structure and "unmoored from the purposes and concerns of the

2    underlying statutory regime." *Altera Corp.*, 926 F.3d at 1076 (quoting *Judulang*, 565 U.S. at 64).

3        Second, the Rule is based on an unrebuttable categorical inference that is arbitrary and

4    capricious.  The Rule's major premise is that "[a]n alien's decision not to apply for protection at

5    the first available opportunity, and instead wait for the more preferred destination of the United

6    States" is sufficiently probative that the alien should be denied asylum.  84 Fed. Reg. at 33,839.

7        The Ninth Circuit has rejected this assumption as unreasonable as applied *to an individual*

8    on multiple occasions, consistent with the general principle that "[a] valid asylum claim is not

9    undermined by the fact that the applicant had additional reasons (beyond escaping persecution) for

10   coming to or remaining in the United States, including seeking economic opportunity." *Dai v.*

11   *Sessions*, 884 F.3d 858, 873 (9th Cir. 2018) (citing *Li v. Holder*, 559 F.3d 1096, 1105 (9th Cir.

12   2009)).  In *Melkonian v. Ashcroft*, for instance, the IJ found the applicant ineligible for asylum

13   "because he came to the United States in order to better himself and his family economically,

14   when he could have remained in Russia without facing persecution."  320 F.3d 1061, 1067 (9th

15   Cir. 2003).  The Ninth Circuit deemed this reasoning erroneous as a matter of law, stressing "that

16   a refugee need not seek asylum in the first place where he arrives." *Id.* at 1071.  Rather, the Ninth

17   Circuit explained, "it is 'quite reasonable' for an individual fleeing persecution 'to seek a new

18   homeland that is insulated from the instability [of his home country] and that offers more

19   promising economic opportunities.'" *Id.* (alteration in original) (quoting *Damaize-Job v. I.N.S.*,

20   787 F.2d 1332, 1337 (9th Cir. 1986)).  The court has similarly rejected the Rule's theory as a basis

21   for finding claims of persecution not credible.  *See Damaize-Job*, 787 F.2d at 1337 ("[The

22   applicant's] failure to apply for asylum in any of the countries through which he passed or in

23   which he worked prior to his arrival in the United States does not provide a valid basis for

24   questioning the credibility of his persecution claims."); *Garcia-Ramos v. I.N.S.*, 775 F.2d 1370,

25   1374-75 (9th Cir. 1985) ("We do not find it inconsistent with a claimed fear of persecution that a

26   refugee, after he flees his homeland, goes to the country where he believes his opportunities will

27

28

United States District Court
Northern District of California

be best.  Nor need fear of persecution be an alien's only motivation for fleeing.").[12]  If this inference is unreasonable as applied to *one* asylum applicant, it is manifestly more so when applied to *all* such applicants.

Moreover, the government cites nothing in the administrative record to support the inference.[13]  Instead, the government relies on a series of cases of which none supports its position, placing its greatest weight on the BIA's discussion of third country transit in *Matter of Pula*, 19 I. & N. at 473-74.  *See* 84 Fed. Reg. at 33,839 n.8; ECF No. 28 at 17.  The government notes that *Matter of Pula* includes as adverse factors supporting denial of asylum "whether the alien passed through other countries or arrived in the United States directly from his country, whether orderly refugee procedures were in fact available to help him in any country he passed through, and whether he made any attempts to seek asylum before coming to the United States." *Id.*

As an initial matter, the Court again notes that courts have concluded that *Matter of Pula* was superseded by the mandatory firm resettlement bar on this point.  *See, e.g.*, *Andriasian*, 180 F.3d at 1044.  Moreover, *Matter of Pula*'s nuanced discussion only highlights the ways in which the Rule fails to account for *other* factors influencing whether the failure to seek official protection in a third country is probative as to "the validity and urgency of the alien's claim."  84 Fed. Reg. at 33,839.  There, the BIA instructed that adjudicators should consider "the length of time the alien remained in a third country, and his living conditions, safety, and potential for long-term residency," as well as "whether the alien has relatives legally in the United States or other personal ties to this country which motivated him to seek asylum here rather than elsewhere.  *Matter of Pula*, 19 I. & N. Dec. at 473-74.  The BIA further emphasized that "an alien who is forced to

---

[12] The Rule notes a different category of cases where the lack of economic opportunity in one's home country is asserted as the persecution suffered.  84 Fed. Reg. at 33,839 n.9.  In that instance, the applicant must show that she suffered "'substantial economic disadvantage' that interferes with the applicant's livelihood" on account of a protected ground.  *He v. Holder*, 749 F.3d 792, 796 (9th Cir. 2014) (citation omitted).

[13] At the hearing, the government suggested that the holdings of these Ninth Circuit cases were factual conclusions that the agencies were free to subsequently overrule.  Without reaching the legal merits of this argument, the Court notes that the agencies have cited no facts in support of their conclusion, but only prior agency precedent, which the Court discusses below.

remain in hiding to elude persecutors, or who faces imminent deportation back to the country where he fears persecution, may not have found a safe haven even though he has escaped to another country." *Id.* at 474.  Read fairly and completely, *Matter of Pula* does not support the rationale for the Rule's categorical bar.

The government also cites *Kalubi v. Ashcroft*, 364 F.3d 1134 (9th Cir. 2004), but *Kalubi* is not on point.  There, the Ninth Circuit suggested in dicta that "[i]n an appropriate case, 'forum shopping' might conceivably be part of the *totality of circumstances* that sheds light on a request for asylum in this country." *Id.* at 1140 (emphasis added).  Because that dicta simply restates the *Matter of Pula* analysis, it provides no additional justification for a categorical bar.

Tellingly, the government does not cite a single case where third country transit, short of firm resettlement, played a substantial role in denying asylum.  *Cf. Matter of Pula*, 19 I. & N. Dec. at 475 (granting asylum and noting that it did "not appear that [the applicant] was entitled to remain permanently in either [third] country" and reasonably "decided to seek asylum in the United States because he had many relatives legally in the United States to whom he could turn for assistance").  The government's lone citation related to the safe third country bar further underscores the arbitrary and capricious nature of the Rule's failure to account for alternative explanations for failing to apply elsewhere.  In *United States v. Malenge*, the Second Circuit noted that a criminal defendant's asylum claim would normally have been barred by the Canada Third Country Agreement.  294 F. App'x 642, 644-45 (2d Cir. 2008).  But, "[u]nder an exception created by Article 4 of the Agreement, [the defendant] was entitled to pursue asylum in the United States at the time of her arrival, because her husband was already living here as a refugee with a pending asylum claim." *Id.* at 645.

Finally, as discussed in greater detail below, the administrative record evidence regarding conditions in Mexico abundantly demonstrates alternative reasons why aliens might not seek protection while transiting through third countries.

Accordingly, the Court concludes that the Organizations are likely to succeed on the merits

1    of their claim that the Rule is substantively invalid.[14]

2                        **3.    Notice-and-Comment Requirements**

3        The Court next turns to the Organizations' notice-and-comment claims.

4                            **a.    Legal Standard**

5        The APA requires agencies to publish notice of proposed rules in the Federal Register and

6    then allow "interested persons an opportunity to participate in the rule making through submission

7    of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C.

8    § 553(c). "These procedures are 'designed to assure due deliberation' of agency regulations and

9    'foster the fairness and deliberation that should underlie a pronouncement of such force.'" *E. Bay*

10   *II*, 909 F.3d at 1251 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001)); *see also*

11   *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980) ("The essential purpose of according

12   [§] 553 notice and comment opportunities is to reintroduce public participation and fairness to

13   affected parties after governmental authority has been delegated to unrepresentative agencies.").

14   Accordingly, agencies may not treat § 553 as an empty formality. Rather, "[a]n agency must

15   consider and respond to significant comments received during the period for public comment."

16   *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). It is therefore "antithetical to the

17   structure and purpose of the APA for an agency to implement a rule first, and then seek comment

18   later." *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (citation omitted).

19       These purposes apply with particular force in important cases. As Judge Posner has stated,

20   "[t]he greater the public interest in a rule, the greater reason to allow the public to participate in its

21   formation." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996).

22       Nonetheless, the APA contains some limited exceptions to the notice-and-comment

23   requirements. First, the APA provides that notice-and-comment procedures do not apply to

24   regulations involving "a military or foreign affairs function of the United States." 5 U.S.C.

25   _____

26   [14] At the hearing, the government argued for the first time that the Court should deny a
     preliminary injunction if it found the Rule consistent with the statute but inadequately explained

27   by the agency, because the government would ultimately seek the equitable remedy of remand
     without vacatur at the final relief stage. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907

28   F.3d 1105, 1121 (9th Cir. 2018). Because the Court concludes that the Rule is likely substantively
     invalid, it does not reach this argument, which the parties did not brief.

United States District Court
Northern District of California

§ 553(a)(1).  In addition, an agency need not comply with notice and comment when it "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).  Section 553(d) also provides that a promulgated final rule shall not go into effect for at least thirty days.  Independently of this good-cause exception to notice and comment, an agency may also waive this grace period "for good cause found and published with the rule." *Id.* § 553(d)(3).

### b.    Foreign Affairs

The Court first considers whether the Rule involves a "foreign affairs function of the United States."  To invoke this exception, the government must show that "ordinary application of 'the public rulemaking provisions [will] provoke definitely undesirable international consequences.'" *E. Bay II*, 909 F.3d at 1252 (second alteration in original) (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).  This standard may be met "where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule." *Id.*  The Ninth Circuit has explained that this showing is required because "[t]he foreign affairs exception would become distended if applied to [an immigration enforcement agency's] actions generally, even though immigration matters typically implicate foreign affairs." *Id.* (alterations in original) (quoting *Yassini*, 618 F.2d at 1360 n.4).[15]

The Court rejects the government's suggestions that the exception is met simply because the Rule involves illegal immigration at the southern border or would facilitate ongoing negotiations regarding that general issue.  ECF No. 28 at 26 (citing 84 Fed. Reg. at 33,841-42).  These are the same preamble justifications that the Ninth Circuit found insufficient in *East Bay II*. *Cf.* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for

---

[15] As a threshold matter, the government disputes whether the APA requires a showing of undesirable international consequences.  ECF No. 28 at 28.  This argument is foreclosed by the Ninth Circuit's clear guidance.  *See East Bay II*, 909 F.3d at 1252-53 (explaining that "courts have approved the Government's use of the foreign affairs exception where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule" and concluding that the challenged rule's explanation was insufficient); *see also E. Bay III*, 354 F. Supp. 3d at 1113-14.

United States District Court
Northern District of California

1    Protection Claims, 83 Fed. Reg. 55,934, 55,950 (Nov. 9, 2018) ("The flow of aliens across the

2    southern border, unlawfully or without appropriate travel documents, directly implicates the

3    foreign policy interests of the United States. . . .  Moreover, this rule would be an integral part of

4    ongoing negotiations with Mexico and Northern Triangle countries . . . .").  Relatedly, pointing to

5    negotiations regarding a different policy does not suffice.  *Cf. id.* at 55,951 ("Furthermore, the

6    United States and Mexico have been engaged in ongoing discussions of a safe-third-country

7    agreement, and this rule will strengthen the ability of the United States to address the crisis at the

8    southern border and therefore facilitate the likelihood of success in future negotiations.").  The

9    government must articulate some connection between the Rule and these various initatives.  *E.*

10   *Bay II*, 909 F.3d at 1252.  It does not.

11           The government also repeats its argument that the Rule is "linked intimately with the

12   Government's overall political agenda concerning relations with another country."  ECF No. 28 at

13   27 (quoting *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751

14   F.2d 1239, 1249 (Fed. Cir. 1985)); *see also E. Bay I*, 349 F. Supp. 3d at 861 (same).  As the Court

15   previously explained, the fact that a rule is "part of the President's larger coordinated effort in the

16   realm of immigration" is not sufficient to justify the foreign affairs exception.  *E. Bay I*, 349 F.

17   Supp. 3d at 861.  The Ninth Circuit then confirmed that the government must "explain[] how

18   immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed by a

19   thirty-day period of notice and comment, is necessary for negotiations with Mexico."  *E. Bay II*,

20   909 F.3d at 1252 (emphasis in original).  The government does nothing to meet this burden.  Nor

21   is the government's citation to *Rajah v. Mukasey* much help, given that the present case involves

22   neither "sensitive foreign intelligence," the government's "ability to collect intelligence," or "a

23   public debate over why some citizens of particular countries [are] a potential danger to our

24   security."[16]  544 F.3d 427, 437 (2d Cir. 2008).

25           Next, after resisting the need to make the showing, the government asserts that the record

26

27   _____

28   [16] The government's contention that immediate publication is necessary to address illegal
     immigration levels, ECF No. 28 at 28, is more properly addressed in the context of good cause,
     which the Court addresses below.

29

nonetheless demonstrates that "definitively undesirable international consequences" would result

from following the APA's procedures. *E. Bay II*, 909 F.3d at 1252 (quoting *Yassini*, 618 F.2d at

1360 n.4); *see also* ECF No. 28 at 28.  The Rule asserts for instance, that "[d]uring a notice-and-

comment process, public participation and comments may impact and potentially harm the

goodwill between the United States and Mexico and the Northern Triangle countries." 84 Fed.

Reg. at 33,842.  This assertion obviously cannot support the agencies' decision to forego notice

and comment, because the Rule actually *invites* public comment for the next 30 days. *Id.* at

33,830.  And even if the agencies' actions did not entirely contradict their words, crediting that

unexplained speculation would expand the exception to swallow the rule.  To the extent the

government anticipates that negative comments regarding those other countries will emerge during

the comment process, the same could be said any time the government enacts a rule touching on

international relations or immigration.  As the Ninth Circuit noted, courts have construed the

foreign affairs exception narrowly in this context so that it does not "eliminate[] public

participation in this entire area of administrative law." *E. Bay II*, 909 F.3d at 1252 (quoting *City

of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010)).

Finally, the government's unexplained string citations do not show any consequences

attributable to the notice-and-comment process, as they largely pertain to the issues discussed

above, such as implementation of the Migrant Protocol Policy or the general fact of ongoing

negotiations on migration issues. *See, e.g.*, AR 46-50, 537-57, 635-37.

The Court therefore concludes that the Organizations raised serious questions regarding the

government's invocation of the foreign affairs exception.

### c.     Good Cause

An agency "must overcome a high bar if it seeks to invoke the good cause exception to

bypass the notice and comment requirement." *Valverde*, 628 F.3d at 1164.  In other words, the

exception applies "only in those narrow circumstances in which 'delay would do real harm.'" *Id.*

at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)).  Courts must

conduct this analysis on a "case-by-case [basis], sensitive to the totality of the factors at play." *Id.*

at 1164 (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)).  "[T]he good cause

exception should be interpreted narrowly, so that the exception will not swallow the rule." *Buschmann*, 676 F.2d at 357 (citation omitted).

As in the first *East Bay* case, the government asserts that good cause exists to dispense with notice-and-comment and the 30-day grace period because the announcement of the rule before its enactment would encourage a "surge in migrants." 84 Fed. Reg. at 33,841. There, the Court found that an October 2018 newspaper article provided a slender but sufficient reed for the agencies to infer that "smugglers might similarly communicate" the rule's unfavorable terms to potential asylum seekers. *E. Bay III*, 354 F. Supp. 3d at 1115. Once again, the government asks the Court to reach the same conclusion. Indeed, the Court's prior *East Bay* decision and its reliance on the October 2018 article are the only relevant authority cited in the body of the Rule's good cause explanation. *See* 84 Fed. Reg. at 33,841.[17]

Although the government includes that same article in this administrative record, AR 438, the Court is hesitant to give it as much weight as the government requests. A single, progressively more stale article cannot excuse notice-and-comment for every immigration-related regulation *ad infinitum*.[18] Otherwise, as the Organizations point out, every immigration regulation imposing more stringent requirements would pass the good cause threshold – a result that would violate the Ninth Circuit's instruction that "the good cause exception should be interpreted narrowly, so that the exception will not swallow the rule." *Buschmann*, 676 F.2d at 357.

The Court's reluctance is further reinforced by the government's failure to produce more robust evidence. Why is there no objective evidence to link a similar announcement and a spike in border crossings or claims for relief? Seemingly aware of the need to provide such evidence, the government cites to a newspaper documenting "a huge spike in unauthorized migration" in the "past several months" preceding June 2019, AR 676, but does not connect it to any "public

---

[17] Although the Rule cites past instances where the agencies invoked good cause for immigration rules, 84 Fed. Reg. at 33,841, these "prior invocations of good cause to justify different [rules] – the legality of which are not challenged here – have no relevance." *California v. Azar*, 911 F.3d 558, 575-76 (9th Cir. 2018).

[18] As the government acknowledged at today's hearing, "We don't need to rest on one article and have [it] frozen in time."

United States District Court
Northern District of California

1    announcement[] . . . regarding changes in our immigration laws and procedures," 84 Fed. Reg. at

2    33,841.  The government also cites two articles reporting that Mexico experienced an influx of

3    migrants when it implemented a humanitarian visa program.  AR 663-65, 683.  While these do

4    provide some additional support for the government's theory, the government makes no effort to

5    address the similarities and differences between the two situations.  Accordingly, the

6    government's citation is reduced to a generic rule that immigration-related regulations can never

7    be the subject of notice-and-comment – which, for the reasons just given, is untenable.[19]

8         The Court therefore concludes that the Organizations have raised serious questions

9    regarding the government's invocation of good cause.

10                  **4.**        **Arbitrary and Capricious: *State Farm***

11        Finally, the Court addresses the Organizations' claim that the agencies' explanation for the

12   Rule itself is inadequate.

13                  **a.**        **Legal Standard**

14        "Under *State Farm*, the touchstone of 'arbitrary and capricious' review under the APA is

15   'reasoned decisionmaking.'"  *Altera Corp.*, 926 F.3d at 1080 (quoting *State Farm*, 463 U.S. at 52).

16   Basic principles of administrative law require the agency to "examine the relevant data and

17   articulate a satisfactory explanation for its action including a 'rational connection between the

18   facts found and the choice made.'"  *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v.*

19   *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).  In reviewing that explanation, "a

20   court is not to substitute its judgment for that of the agency."  *Turtle Island Restoration Network v.*

21   *U.S. Dep't of Commerce*, 878 F.3d 725, 732 (9th Cir. 2017) (quoting *State Farm*, 463 U.S. at 43).

22   Nonetheless, a court must "strike down agency action as 'arbitrary and capricious if the agency

23   has relied on factors which Congress has not intended it to consider, entirely failed to consider an

24   important aspect of the problem, offered an explanation for its decision that runs counter to the

25   evidence before the agency,' or if the agency's decision 'is so implausible that it could not be

---

[19] A similarly generic statement in another article that "[m]igrants generally lack understanding of United States immigration law," but that "they appear to be informed about the basics," provides only ambiguous support for the same untenable argument.  AR 768.

United States District Court
Northern District of California

ascribed to a difference in view or the product of agency expertise.'" *Id.* at 732-33 (quoting *State Farm*, 463 U.S. at 43).

### b.   Discussion

A number of the Organizations' critiques under *State Farm* overlap with the reasons why the Rule is substantively invalid under *Chevron*.  As previously discussed, the government has failed to provide any reasoned explanation for the Rule's methodology of determining that a third country is safe and asylum relief is sufficiently available, such that the failure to seek asylum there casts doubt on the validity of an applicant's claim.  Nor has the government provided any reasoned explanation for the Rule's assumption that the failure to seek asylum in a third country is so damning standing alone that the government can reasonably disregard any alternative reasons why an applicant may have failed to seek asylum in that country.  These deficiencies support a finding that the Rule is arbitrary and capricious.

*State Farm* review, however, also encompasses additional points the Court has not previously addressed, and the Court discusses them in greater detail here.  First, the government suggests that its determination that "asylum in Mexico is a feasible alternative to relief in the United States" supports the Rule.  ECF No. 28 at 31.  The argument appears to run that, even if the Rule *itself* provides inadequate safeguards for identifying third countries where transiting aliens should first seek asylum, it will provide such safeguards *in practice* because applicants subject to the Rule must necessarily transit through Mexico.  Putting aside the legal sufficiency of the analysis, the factual premise "runs counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.

The government's explanation on this point falters at the outset because, as the Organizations correctly note, the "feasible alternative" determination is based on a post hoc attempt to rewrite the Rule's supporting findings.  "[T]he principle of agency accountability . . . means that 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 (1986) (quoting *State Farm*, 463 U.S. at 50).  In the Rule's preamble, the agencies noted that "[a]ll seven countries in Central America plus Mexico are parties to both the Refugee Convention and the Refugee Protocol."  84 Fed. Reg. at

33,839.  They then found that "Mexico has expanded its capacity to adjudicate asylum claims in recent years, and the number of claims submitted in Mexico has increased," from 8,789 asylum claims filed in 2016, to 12,716 claims filed in the first three months of 2019 alone.  *Id.*  These facts do not make asylum in Mexico a "feasible alternative."

The statistics regarding the number of claims submitted in Mexico contradict the government's suggestion that Mexico provides an adequate alternative.  While the Rule notes that Mexico has expanded its system's capacity, it also projects that, independently of the Rule, Mexico will receive over five times the claims in 2019 that it received in 2016.  84 Fed. Reg. at 33,839.  The Rule does not discuss whether Mexico is adequately processing this unprecedented increase, let alone whether Mexico has capacity to handle additional claims.  At the same time, the Rule notes that USCIS received 99,035 credible fear claims in 2018, that the immigration courts received over 162,000 asylum applications in 2018, and that "non-Mexican aliens . . . now constitute the overwhelming majority of aliens encountered along the southern border with Mexico, and the overwhelming majority of aliens who assert claims of fear."  *Id.* at 33,838.  By any reasonable estimation, the Rule anticipates that tens of thousands of additional asylum claimants – i.e., most of the persons who would otherwise seek asylum in the United States – will now seek relief in Mexico.  The Rule does not even acknowledge this outcome, much less suggest that Mexico is prepared to accommodate such a massive increase.  To the contrary, the record contains reports that Mexico's "increased detentions have overwhelmed capacity at [an] immigration center," AR 698, and that the head of Mexico's refugee agency "was so overwhelmed that he had turned to [the United Nations] for help," AR 700.  Again, the administrative record fails to support the conclusion that asylum in Mexico is a "feasible alternative."

In its opposition, the government attempts to declare its way past the issue, arguing "the government determined that Mexico is a signatory to and in compliance with the relevant international instruments governing consideration of refugee claims, that its domestic law and procedures regarding such relief are robust and capable of handling claims made by Central American aliens in transit to the United States, and that the statistics regarding the influx of claims in that country support the conclusion that asylum in Mexico is a feasible alternative to relief in

the United States," followed by a string citation to the administrative record.  ECF No. 28 at 31.

But nowhere in the Rule do the agencies find that Mexico "is in compliance with the relevant

international instruments governing consideration of refugee claims."  ECF No. 28 at 31.  Nor

does the government cite any finding in the Rule that Mexico's "domestic law and procedures

regarding such relief are robust and capable of handling claims made by Central American aliens

in transit to the United States."  *Id.*[20]  Because the Court cannot "accept [government] counsel's

post hoc rationalizations for agency action," *State Farm*, 463 U.S. at 50, these arguments do not

help the Rule survive arbitrary and capricious review.  Moreover, the record cites actually weaken

the government's position.  With limited exceptions that are at best unresponsive to the question,[21]

the cited evidence consists simply of an unbroken succession of humanitarian organizations

explaining why the government's contention is ungrounded in reality.

   First, the government cites a report from the international organization Médecins Sans

Frontières, *Forced to Flee Central America's Northern Triangle: A Neglected Humanitarian

Crisis* (May 2017).  AR 286-317.  The report found that, during transit through Mexico, "68.3

percent of people from the [Northern Triangle of Central America ("NTCA")] reported that they

were victims of violence," and that "31.4 percent of women and 17.2 percent of men had been

sexually abused."  AR 296-97.  Moreover, Médecins Sans Frontières concluded that "[d]espite the

exposure to violence and the deadly risks . . . face[d] in their countries of origin, the non-

refoulement principle is systematically violated in Mexico."  AR 306.[22]  Although the report noted

---

[20] The Rule contains two ipse dixit references to Mexico's "robust protection regime" and "functioning asylum system."  84 Fed. Reg. at 33,835, 33,838.  Even were the Court to construe this as a finding by the agencies, it runs contrary to the evidence, as explained below.

[21] The government cites a State Department press release documenting Mexico's commitment to increase enforcement against migration and human smuggling and trafficking networks, as well as providing temporary protections to asylum seekers whose claims are being processed in the United States.  AR 231-32.  This does not address, however, the adequacy of Mexico's asylum process.  The remaining citations consist of reports explaining why people flees certain Northern Triangle countries, AR 318-433, documents showing Mexico as a party to the three agreements, AR 560-65, 581-83, 588, and a series of appendices explaining how the State Department prepares its Country Reports on Human Rights Practices, AR 728-55.

[22] The non-refoulement principle is "a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations."  AR 708.

that Mexico had made some official attempts to improve its system, it observed a significant "gap between rights and reality," citing "[l]ack of access to the asylum and humanitarian visa processes, lack of coordination between different governmental agencies, fear of retaliation in case of official denunciation to a prosecutor, [and] expedited deportation procedures that do not consider individual exposure to violence." *Id.* As a result, "[t]he lack of safe and legal pathways effectively keeps refugees and migrants trapped in areas controlled by criminal organizations." *Id.*

Second, an April 2019 factsheet from the United Nations High Commissioner for Refugees ("UNHCR") lists "strong obstacles to accessing the asylum procedure" in Mexico, including "[t]he absence of proper protection screening protocols for families and adults, the lack of a systematic implementation of existing best interest determination procedures for unaccompanied children and detention of asylum-seekers submitting their claim at border entry points." AR 534. Further, "[t]he abandonment rate of asylum procedures, especially in Southern Mexico is a key protection concern. This situation, compounded by insufficient resources and limited field presence of [Comisíon Mexicana de Ayuda a Refugiados ("COMAR")] in key locations in Northern and Central Mexico, continues to pose challenges to efficient processing of asylum claims." *Id.* The UNCHR also observed that "[p]ersons in need of international protection often take dangerous routes to reach COMAR offices" and that "[w]omen and girls in particular are at risk of sexual and gender-based violence." *Id.* While UNHCR indicated that it was partnering with Mexico on various initiatives, it did not suggest that these problems would be easily solved, let alone consider how a massive influx of claimants might affect the situation.

Third, the government cites to the UNCHR's July 2018 review of Mexico's refugee process. AR 638-57. The report notes two positive developments in response to a prior round of recommendations, AR 639, but documents a host of additional problems. For instance, the UNCHR stated that "concerns persist regarding the rise in crimes and the increased risk towards migrants throughout the country, the high levels of impunity for crimes committed against migrants, and the difficulties that migrants who are victims of crime and asylum-seekers continue to face in accessing justice and obtaining regularization for humanitarian reasons under article 52 of the *2011 Migration Act*." AR 640. In addition, the UNCHR highlighted ongoing problems in

United States District Court
Northern District of California

the areas of (1) "[s]exual and gender-based violence against migrants, asylum-seekers, and refugees"; (2) "[d]etention of migrants and asylum seekers, particularly children and other vulnerable persons"; and (3) "[a]ccess to economic, social and cultural rights for asylum-seekers and refugees." AR 640-42.

Fourth, the government relies on a November 2018 factsheet from Human Rights First, which asks: "Is Mexico Safe for Refugees and Asylum Seekers?" AR 702. Answering in the negative, the factsheet explains that "*many refugees face deadly dangers in Mexico. For many, the country is not at all safe.*" *Id.* (emphasis in original). Human Rights First notes that "refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico," based not just on "their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons." AR 703 (emphasis omitted). The factsheet also concludes that "[d]eficiencies, barriers, and flaws in Mexico's asylum system leave many refugees unprotected and Mexican authorities continue to improperly return asylum seekers to their countries of persecution." *Id.* (emphasis omitted). For example, "refugees are blocked from protection under an untenable 30-day filing deadline, denied protection by COMAR officers who claim that refugees targeted by groups with national reach can safely relocate within their countries, and lack an effective appeal process to correct wrongful denials of protection." *Id.* (emphasis omitted).

Fifth, the government cites to a 2018 report from Amnesty International entitled "Overlooked, Under-Protected: Mexico's Deadly *Refoulement* of Central Americans Seeking Asylum." AR 704-27. As its title suggests, the report concludes that "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement* principle, a binding pillar of international law that prohibits the return of people to a real risk of persecution or other serious human rights violations. These failures by the Mexican government in many cases can cost the lives of those returned to the country from which they fled." AR 708. Among its highlights include testimony that Mexican officials systematically coerced asylum seekers into waiving their right to asylum, including by denying detainees food, AR 718, and "a number of

1  reports of grave human rights violations committed by . . . officials during the moments of

2  apprehension as well as in detention centres," AR 722.

3      Sixth, the government points to a New York Times article, *'They Were Abusing Us the*

4  *Whole Way': A Tough Path for Gay and Trans Migrants* (July 11, 2018). AR 756-66. The article

5  notes that "[t]rans women in particular encounter persistent abuse and harassment in Mexico at the

6  hands of drug traffickers, rogue immigration agents and other migrants." AR 758. It then goes on

7  to recount the story of one migrant who was robbed and sexually exploited in transit. AR 760.

8      Additional portions of the administrative record not cited by the government bolster the

9  already overwhelming evidence on this point. The Women's Refugee Commission likewise

10  concluded that "Mexico is clearly not a safe, or in many cases viable, alternative for many

11  refugees and vulnerable migrants seeking international protection." AR 771. Another article

12  discusses the detention of unaccompanied minors in Mexico, noting that the country "deported

13  more than 36,000 unaccompanied Central American children, toddlers to 17-year-olds" in a two-

14  year period. AR 784.

15      In sum, the bulk of the administrative record consists of human rights organizations

16  documenting in exhaustive detail the ways in which those seeking asylum in Mexico are

17  (1) subject to violence and abuse from third parties and government officials, (2) denied their

18  rights under Mexican and international law, and (3) wrongly returned to countries from which they

19  fled persecution. Yet, even though this mountain of evidence points one way, the agencies went

20  the other – *with no explanation*.[23] This flouts "[o]ne of the basic procedural requirements of

21  administrative rulemaking," namely "that an agency must give adequate reasons for its decisions."

22  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Its failure to do so here,

23  particularly viewed against the mass of contrary evidence, renders the agencies' conclusion

24  regarding the safety and availability of asylum in Mexico arbitrary and capricious.

25  _____

26  [23] To be clear, the Court does not review this evidence de novo. If the government offered a
reasoned explanation why it reached a contrary conclusion from respected third-party

27  humanitarian organizations, the Court would give that explanation the deference that it was due.
But "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's

28  decision." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

Moreover, because every alien subject to the Rule must pass through Mexico, this arbitrary and capricious conclusion fatally infects the whole Rule.  And because Mexico is a party to the 1951 Convention, 1967 Protocol, and CAT, almost every alien[24] must apply for asylum in Mexico and receive a final judgment through its system before seeking asylum in the United States.[25]  In other words, if the agencies are wrong about Mexico, the Rule is wrong about everyone it covers.  The Court notes also that Mexico's example demonstrates for a second time why two of the Rule's critical assumptions are arbitrary, not just as to Mexico, but as a general matter.  First, even though Mexico is a party to the agreements listed in the Rule, the unrefuted record establishes that it is categorically not a "safe option[]" for the majority of asylum seekers.  *Matter of B-R-*, 26 I. & N. Dec. at 122.  Second, the record offers an abundance of reasons besides economic gain why an asylum seeker with a meritorious claim might choose to transit through Mexico without attempting to pursue an asylum claim there.  For all these reasons, the Rule "is arbitrary and capricious and so cannot carry the force of law."  *Encino Motorcars, LLC*, 136 S. Ct. at 2125.

While the foregoing analysis is sufficient to resolve the Organizations' *State Farm* claim in their favor, the Court briefly addresses their remaining arguments.

The Organizations contend that the agencies "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, because the Rule does not create an exception for unaccompanied minors, ECF No. 3-1 at 27-28.  The government responds that the failure to include such an exception does not conflict with any statutory provisions.  ECF No. 28 at 31-32. Regardless whether there is any true statutory conflict, Congress's enactment of special provisions regarding unaccompanied minors, including excepting them from the related safe third country bar, 8 U.S.C. §§ 279, 1158(a)(2)(E), demonstrates that such children are "an important aspect of

---

[24] Except for the limited category of aliens who qualify as a "victim of a severe form of trafficking in persons."  8 C.F.R. § 208.13(c)(4)(ii).

[25] Though asylum applicants might also seek protection in a different third country under the Rule, the Rule does not consider the asylum systems of any other countries.  For instance, persons fleeing some of the so-called Northern Triangle countries that are the focus of the Rule, 84 Fed. Reg. at 33,831, 33,838, 33,840, 33,842, i.e., El Salvador and Honduras, must pass through Guatemala before reaching Mexico.  But whereas the Rule asserts that Mexico has a "robust protection regime," *id.* at 33,835, it makes no conclusions at all regarding Guatemala, and the administrative record contains no information about that country's asylum system.

United States District Court
Northern District of California

1    the problem," *State Farm*, 463 U.S. at 43, when it comes to administering the asylum scheme.

2        Although not cited by the government, the Rule does contain a brief discussion explaining

3    why it "does not provide for a categorical exception for unaccompanied alien children." 84 Fed.

4    Reg. at 33,839 n.7. First, the Rule notes that Congress did not exempt those children from every

5    statutory bar to asylum eligibility. *Id.* As just explained, however, that does not mean that the

6    agencies need not consider whether such an exception was appropriate. Second, the Rule reasons

7    that an exception is unnecessary because unaccompanied children can still apply for withholding

8    of removal or protection under CAT. *Id.* This explanation suggests that the agencies at least

9    considered the problem of unaccompanied minors. But there are at least serious questions whether

10   this conclusion was supported by the record. For one, the agencies did not expressly consider

11   whether the Rule's rationale applies with full force to those children. Given that children have

12   more difficulty than adults pursuing asylum claims in Mexico, AR 641-42, 778-86, the agencies

13   have not explained why it is rational to assume that an unaccompanied minor's failure to apply has

14   the same probative value on the merits as an adult's – assuming for the moment that an adult's

15   failure has any meaningful value. Also, as the Court has previously explained, the availability of

16   alternative forms of immigration relief, which are subject to a higher bar and different collateral

17   consequences, are not interchangeable substitutes. *See E. Bay I*, 349 F. Supp. 3d at 864-65. Last,

18   the agencies did not address whether placing unaccompanied minors in the more rigorous

19   reasonable fear screening process, combined with the higher standard for withholding of removal

20   and protection under CAT, creates a significantly greater risk that even those alternative claims

21   will be decided wrongly.

22        Finally, the Organizations assert that the Rule is counterproductive because applicants

23   whose claims have already been denied in third countries are likely to have weaker rather than

24   stronger claims. ECF No. 3-1 at 27. The Organizations' argument is based on a misunderstanding

25   of the Rule's purposes. As the government points out, the Rule's intent is to incentivize putative

26   refugees to seek relief at the first opportunity, preferably elsewhere. ECF No. 28 at 31. The

27   agency's explanation as to how this exhaustion requirement serves its stated aims is adequate.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.      Irreparable Harm

The irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *Azar*, 911 F.3d at 581 (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).

The government contends that the Organizations' injuries are not irreparable, again relying on the general rule that "monetary injury is not normally considered irreparable" because it can "be remedied by a damage award." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). As the Court has previously explained, controlling precedent establishes that this rule "does not apply where there is no adequate remedy to recover those damages, such as in APA cases." *E. Bay III*, 354 F. Supp. 3d at 1116 (first citing *Azar*, 911 F.3d at 581; then citing *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015)); *accord Pennsylvania v. President of the United States*, -- F.3d --, No. 17-3752, 2019 WL 3057657, at *17 (3d Cir. July 12, 2019), *amended in part on other grounds*, 2019 WL 3228336 (3d Cir. July 18, 2019).

Here, the Organizations have again established a sufficient likelihood of irreparable harm through "diversion of resources and the non-speculative loss of substantial funding from other sources." *E. Bay III*, 354 F. Supp. 3d at 1116; *see also* ECF No. 3-2 ¶¶ 14-16; ECF No. 3-3 ¶¶ 12-19; ECF No. 3-4 ¶¶ 16-19; ECF No. 3-5 ¶¶ 6-7, 10-14. "That the [Organizations] promptly filed an action following the issuance of the [Rule] also weighs in their favor." *Azar*, 911 F.3d at 581.

The Court therefore finds that the Organizations have satisfied the irreparable harm factor.

### D.      Balance of the Equities and the Public Interest

The Court turns to the final two *Winter* factors. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Given the overlap with the arguments made in this case, the Ninth Circuit's decision in *East Bay II* "provide[s] substantial guidance on the equities involved" and the public interest. *E. Bay III*, 354

1  F. Supp. 3d at 1116.

2         Responding there to a similar argument from the government, the Ninth Circuit observed

3  that "aspects of the public interest favor both sides," given that "the public has a 'weighty' interest

4  'in efficient administration of the immigration laws at the border,'" counterbalanced by an

5  "interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by

6  executive fiat." *E. Bay II*, 909 F.3d at 1255 (first quoting *Landon v. Plasencia*, 459 U.S. 21, 34

7  (1982); then quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)).

8  Once again, these same factors sit on opposite sides of the scale.[26]  But as in the earlier *East Bay*

9  case, additional considerations weigh strongly in favor of injunctive relief.

10        First, an injunction would "restore[] the law to what it had been for many years prior to"

11  July 16, 2019, *E. Bay II*, 909 F.3d at 1255, by requiring the government to take into account

12  whether an applicant's "life or freedom would . . . be threatened on account of race, religion,

13  nationality, membership in a particular social group, or political opinion" in a third country before

14  denying asylum on that basis, 8 U.S.C. § 1158(a)(2)(A); *see also Andriasian*, 180 F.3d at 1046

15  ("[T]he circumstances must show that [the applicant] has established, or will be able to establish,

16  residence in another nation, and that he will have a reasonable assurance that he will not suffer

17  further harm or persecution there.").

18        Next, the Rule implicates to an even greater extent than the illegal entry rule "the public's

19  interest in ensuring that we do not deliver aliens into the hands of their persecutors."  *Leiva-Perez*,

20  640 F.3d at 971.  One of the Rule's express purposes is to incentivize all asylum applicants to seek

21  relief in other countries.  84 Fed. Reg. at 33,831.  Indeed, by imposing a categorical bar on asylum

22  in the United States, it will force them to seek relief elsewhere.  For the reasons explained above,

23  however, the Organizations have made a strong showing that the Rule contains insufficient

24  safeguards to ensure that applicants do not suffer persecution in those third countries or will not be

25  _____

26  [26] The Ninth Circuit's analysis in *Innovation Law Lab v. McAleenan*, is not on point here, because
the Organizations have shown that the Rule is unlikely to be a "congressionally authorized

27  measure[]."  924 F.3d 503, 510 (9th Cir. 2019).  And in *Innovation Law Lab*, the Mexican
government had made a specific "commitment to honor its international-law obligations and to

28  grant humanitarian status and work permits to individuals" who would temporarily reside in
Mexico while the United States processed their claims.  *Id.*

United States District Court
Northern District of California

1  wrongfully returned to their original countries of persecution – as underscored by the unrefuted

2  evidence regarding Mexico in particular.  *See* AR 286-317, 534, 638-57, 702-27, 771.

3        Nor does it change the equities that putative refugees barred by the Rule from seeking

4  asylum may nonetheless pursue withholding of removal and CAT protections.  For reasons the

5  Court previously discussed, *E. Bay I*, 349 F. Supp. 3d at 864-65, those other forms of relief are not

6  coextensive in important ways, most notably that they require aliens to meet a higher bar to avoid

7  removal.  *See Ling Huang*, 744 F.3d at 1152.  The difference between those substantive standards

8  is amplified by the Rule's use of the more stringent "reasonable fear" standard in the screening

9  process.  84 Fed. Reg. at 33,836-37; *compare* 8 C.F.R. § 208.30(e)(2)-(3), *with id.*

10  § 208.30(e)(5)(iii).  And channeling those claims into the expedited removal process only

11  increases the risk of error.  *See Thuraissigiam*, 917 F.3d at 1118 ("[The expedited screening

12  process's] meager procedural protections are compounded by the fact that § 1252(e)(2) prevents

13  any judicial review of whether DHS *complied* with the procedures in an individual case, or applied

14  the correct legal standards." (emphasis in original)).

15        The Court notes one additional equitable consideration suggested by the administrative

16  record.  The administrative record contains evidence that the government has implemented a

17  metering policy that "force[s] migrants to wait weeks or months before they can step onto US soil

18  and exercise their right to claim asylum."  AR 686.  At the same time, the record also indicates

19  that Mexico requires refugees seeking protection to file claims within 30 days of entering the

20  country.  AR 703.  For asylum seekers that forfeited their ability to seek protection in Mexico but

21  fell victim to the government's metering policy, the equities weigh particularly strongly in favor of

22  enjoining a rule that would now disqualify them from asylum on a potentially unlawful basis.

23        Finally, the government rightly notes that the strains on this country's immigration system

24  have only increased since the fall of 2018.  *See* 84 Fed. Reg. at 33,831; AR 119, 121, 208-32.  The

25  public undoubtedly has a pressing interest in fairly and promptly addressing both the harms to

26  asylum applicants and the administrative burdens imposed by the influx of persons seeking

27  asylum.  But shortcutting the law, or weakening the boundary between Congress and the

28  Executive, are not the solutions to these problems.  *See Food & Drug Admin. v. Brown &*

1    *Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an

2    administrative agency seeks to address, however, it may not exercise its authority in a manner that

3    is inconsistent with the administrative structure that Congress enacted into law." (internal

4    quotation marks and citation omitted)).  As the Ninth Circuit noted, "[t]here surely are

5    enforcement measures that the President and the Attorney General can take to ameliorate the

6    crisis, but continued inaction by Congress is not a sufficient basis under our Constitution for the

7    Executive to rewrite our immigration laws."  *E. Bay II*, 909 F.3d at 1250-51.

8           The Court also acknowledges the government's frustration that its other immigration

9    policies have also been subjected to suit.  ECF No. 28 at 10-11.  These other cases are largely

10   beyond the scope of the Court's consideration.  In any event, the presence of other lawsuits does

11   not absolve the agencies from scrutiny.  *Cf. Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 69

12   (2011) (Scalia, J., dissenting) (explaining in another context that deference is particularly

13   unwarranted where "an agency . . . has repeatedly been rebuked in its attempts to expand the

14   statute beyond its text, and has repeatedly sought new means to the same ends").

15          For the foregoing reasons, the Court concludes that injunctive relief is appropriate.

16                        **E.      Scope of Relief**

17                              **1.      Statutory Constraints**

18          The government raises a now-familiar argument that the Court's authority to issue relief is

19   constrained by 8 U.S.C. § 1252(e).  ECF No. 28 at 33.  The Court again acknowledges that "it

20   lacks the authority to enjoin 'procedures and policies adopted by the Attorney General to

21   *implement the provisions of section 1225(b)(1)* of [Title 8].'"  *E. Bay III*, 354 F. Supp. 3d at 1118

22   (emphasis in original) (quoting 8 U.S.C. § 1252(a)(2)(A)(iv)); *see also* 8 U.S.C. § 1252(e)(3).

23   But, as the Court has twice previously observed, the government has "'provided no authority to

24   support the proposition that any rule of asylum eligibility that may be *applied* in the expedited

25   removal proceedings is swallowed up' by these restrictions."  *E. Bay III*, 354 F. Supp. 3d at 1118

26   (quoting *E. Bay I*, 349 F. Supp. 3d at 867 (emphasis in original)).  The government does not

27   attempt to renew the arguments the Court previously rejected or offer new ones in their stead.  The

28   Court therefore reaches the same conclusion.

United States District Court
Northern District of California

1

### 2.      Nationwide Injunction

2      The government's arguments against a nationwide injunction likewise travel well-trod

3 ground.  ECF No. 28 at 33-34.  But the Ninth Circuit has "consistently recognized the authority of

4 district courts to enjoin unlawful policies on a universal basis."  *E. Bay II*, 909 F.3d at 1255

5 (collecting cases).  While the government disagrees with that ruling, it provides no contrary

6 authority from the immigration context and "no grounds on which to distinguish this case from

7 [the Ninth Circuit's] uncontroverted line of precedent."  *Id.* at 1256.

8                                   **CONCLUSION**

9      For the foregoing reasons, the Organizations' motion for preliminary injunction is granted.

10      Defendants are hereby ORDERED AND ENJOINED, pending final judgment herein or

11 further order of the Court, from taking any action continuing to implement the Rule and

12 ORDERED to return to the pre-Rule practices for processing asylum applications.

13      The Court sets this matter for a case management conference on October 21, 2019 at

14 2:00 p.m.  A joint case management statement is due by October 11, 2019.

15      **IT IS SO ORDERED.**

16 Dated:  July 24, 2019

17                                   _____

18                                   JON S. TIGAR
                                     United States District Judge

19

20

21

22

23

24

25

26

27

28