Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR

EAST BAY SANCTUARY COVENANT,       )
et al,                             )
                                   )
                                   )
            Plaintiffs,            )
                                   )
   vs.                             ) No. C 19-4073 JST
                                   )
WILLIAM BARR, Attorney General, in )
his official capacity, et al,      )
                                   )  San Francisco, California
            Defendants.            )  Wednesday
                                   )  July 24, 2019
_____)  9:30 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          ACLU FOUNDATION
                         Immigrants' Rights Project
                         125 Broad Street
                         18th Floor
                         New York, New York 10004
                    BY:  **LEE GELERNT, ESQ.**
                         **SPENCER AMDUR, ESQ.**

                         ACLU FOUNDATION
                         Immigrants' Rights Project
                         39 Drumm Street
                         San Francisco, California 94111
                    BY:  **JULIE VEROFF, ESQ.**
                         **KATRINA EILAND, ESQ.**
                         **VASUDHA TALLA, ESQ.**
                         **ANGELICA SALCEDA, ESQ.**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*  **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**          SOUTHERN POVERTY LAW CENTER
                            Immigrant Justice Project
                            1101 17th Street, NW
                            Suite 704
                            Washington, DC 20036
                    BY:  **MELISSA CROW, ESQ.**


                            CENTER FOR CONSTITUTIONAL RIGHTS
                            666 Broadway
                            Seventh Floor
                            New York, New York 10012
                    BY:  **BAHER AZMY, ESQ.**


**For Defendants**          U.S. DEPARTMENT of JUSTICE
                            Office of Immigration Litigation
                            Civil Division
                            P.O. Box 868, Ben Franklin Station
                            Washington, DC 20044
                    BY:  **SCOTT G. STEWART, ESQ.**


                            UNITED STATES DEPARTMENT Of JUSTICE
                            Civil Division
                            Office of Immigration Litigation
                            450 5th Street, NW
                            Washington, DC 20530
                    BY:  **EREZ R. REUVENI, ESQ.**


                            -   -   -

| | |
|---|---|
| 1 | <u>**Wednesday - July 24, 2019**</u>                    <u>**9:31 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Now calling 19 CV 4073, East Bay |
| 5 | Sanctuary Covenant, et al, versus William Barr, et al. |
| 6 | Counsel, please state your appearances. |
| 7 | **MR. STEWART:**  Good morning, Your Honor.  Scott |
| 8 | Stewart on behalf of the United States.  I'm joined by my |
| 9 | colleague Erez Reuveni. |
| 10 | **THE COURT:**  Good morning, gentlemen. |
| 11 | **MR. GELERNT:**  Good morning, Your Honor.  Lee Gelernt |
| 12 | for plaintiffs from the ACLU. |
| 13 | **THE COURT:**  Let me ask you to each come to the |
| 14 | microphone for two reasons. |
| 15 | First, it makes life easier for the court reporter and, |
| 16 | also, just to remind everyone that these proceedings are being |
| 17 | monitored by CourtCall so that members of the media who are not |
| 18 | able to join us this morning can listen in.  And if you're not |
| 19 | at a microphone, then it's hard for the court reporter or the |
| 20 | CourtCall folks to hear you. |
| 21 | **MR. GELERNT:**  I apologize, Your Honor. |
| 22 | Lee Gelernt from ACLU for plaintiffs. |
| 23 | **MS. VEROFF:**  Good morning, Your Honor.  Julie Veroff |
| 24 | from the ACLU for plaintiffs. |
| 25 | **MS. EILAND:**  Good morning, Your Honor.  Katrina |

1    Eiland from ACLU for plaintiffs.

2              **MR. AMDUR:**  Good morning.  Spencer Amdur from the

3    ACLU for plaintiffs.

4              **MS. CROW:**  Good morning, Your Honor.  Melissa Crow

5    from the Southern Poverty Law Center for plaintiffs.

6              **MR. AZMY:**  Good morning, Your Honor.  Bahar Azmy,

7    A-Z-M-Y, from the Center for Constitutional Rights for

8    plaintiffs.

9              **MS. TALLA:**  Good morning.  Vasudha Talla, ACLU

10   Foundation of Northern California, for plaintiffs.

11             **MS. SALCEDA:**  Good morning, Your Honor.  Angelica

12   Salceda, ACLU Foundation of Northern California, for the

13   plaintiffs.

14             **THE COURT:**  Good morning.  Welcome to all of you.

15        The matter is on calendar this morning for oral argument

16   on plaintiffs' motion for a temporary restraining order.  I

17   provided notice on the docket a few days ago when we received

18   the administrative record that I was considering converting

19   this motion into one for a preliminary injunction.

20        These lawyers have previously had occasion to argue

21   against each other in this courtroom, and so I welcome you

22   back.

23        Unlike the last time that you were arguing against each

24   other, I don't have that many questions, except the one I just

25   asked, which is:  Is there any reason why I shouldn't convert

1   this into a preliminary injunction given the current state of

2   the record?

3       You should assume in your arguments this morning that I am

4   deeply familiar with your briefs and, also, have the

5   administrative record, which I read over the weekend.

6       As we did before, I will allocate 45 minutes to each side.

7   You can reserve time for a rebuttal argument by talking less

8   than 45 minutes the first time you're at the microphone, and

9   whatever time you've not used you will have available for

10  rebuttal.

11      As I did last time, I will allow each side to make

12  argument, and then I'll take a recess, and then I'll come back

13  and we'll hear rebuttal arguments.  If both of you tell me at

14  the microphone that you don't intend to make a rebuttal

15  argument, then I suppose I'll just take a recess and that will

16  be that.  But that's not what I'm expecting.

17      So with that, let me proceed.  And I'll allow the moving

18  party to go first.  Mr. Gelernt.

19          **MR. GELERNT:**  Thank you, Your Honor.

20      Our principal claim, as the Court knows, is that, like the

21  first time around, this rule violates the asylum statute

22  Section 1158.  We believe that Congress has spoken clearly to

23  the situation of an immigrant's, an asylum seeker's

24  relationship to a third country.

25      And I want to start with one framing question because

1  ultimately we see the Government's argument as consistent needs

2  -- inconsistent needs to be that there is exact language that

3  directly says the administration cannot do a particular thing.

4  We don't think that can possibly be the meaning of consistent.

5  There would be no reason for Congress to say if we say X, you

6  can't do Y.

7      Obviously, that seems to be what they are arguing because

8  I think it is very difficult to look at Section 1158 and think

9  Congress would have permitted this type of transit ban.

10     This transit ban will not only virtually eliminate asylum

11 at the southern border, but it will eviscerate the two

12 provisions in which Congress spoke clearly to transiting

13 through a third country.  And that's, of course, the firm

14 resettlement provision and the third party provision.  There

15 would be no reason for the administration to ever bother with a

16 third party agreement or to evaluate whether someone had been

17 firmly resettled.

18     And, indeed, as I'm sure Your Honor is aware from news

19 accounts, the administration has been trying to get a third

20 party agreement with Guatemala and Mexico, has been

21 unsuccessful, and now has decided they are going to do the ban

22 anyway in clear contravention of what Congress decided.

23     I mean, Congress looked at this issue and said:  Well,

24 we're going to create two very narrow exceptions, and they are

25 going to both hinge on making sure that the asylum seeker

1    really has a chance and a safe place to have a full and fair

2    opportunity.

3         So firm resettlement could not be clearer.  You must have

4    permanent rights in that country.

5         And, indeed, the regulation specifically addresses the

6    situation we have here, where it says if you transit through a

7    country and you're escaping and the only reason you're going

8    through that country is to get to another country, you haven't

9    settled down, then you may seek asylum.  You're not firmly

10   resettled.  You still may seek asylum in the United States.

11   And the Ninth Circuit in the cases we've spoke, we've cited has

12   addressed that very particularly.

13        So Congress is well aware that people would transit

14   through when they are fearful and get to another country.

15        **THE COURT:**  I'm not sure I need to reach this

16   question, but let me ask you:  Do you think that by providing

17   these two exceptions, the safe third country bar and the firm

18   resettlement bar, that Congress has in so many words occupied

19   the field so that there could never be -- the Attorney General

20   could never promulgate a regulation or a rule that addressed an

21   asylum applicant who had transited through a third country?

22        **MR. GELERNT:**  Your Honor, I think that's an important

23   question, and thank you for that question.

24        Our position is that the Court does not need to go that

25   far in this case.  I mean, I can't conceive of a rule that

1  would address transit and say mere transit through another

2  country might be okay, but I don't know that this Court needs

3  to say definitively there can never be some creative rule

4  dealing with transit that might be okay.

5      So we are really resting in this case on the fact that it

6  is a very clear conflict; that there is no safety built in;

7  there is no full and fair procedure.  None of the sort of

8  formal agreement, firm resettlement.

9      Whether there is some conceivable way to --

10          THE COURT:  Your argument is really much more about

11  the specific protections that Congress has built into these two

12  bars --

13          MR. GELERNT:  That's right, Your Honor.

14          THE COURT:  -- and whether or not those protections

15  are available in this particular rule.

16          MR. GELERNT:  That's absolutely right, Your Honor.

17      I think if forced to answer definitively right now, I

18  would say it's probably unlikely that a mere transit rule could

19  survive, any type of mere transit rule, but certainly not this

20  one.

21      I think that Congress was well aware that people transit

22  through other counties.  I mean, as Your Honor noted in the

23  first asylum ban, when you enter between ports, unless you're

24  Mexican, on land you've necessarily come through another

25  country.

1     So this is not an issue that has escaped Congress's

2  attention.  I think they took pains to make sure that if we

3  were going to take that momentous decision to send someone to

4  another country to seek asylum, it would either be where that

5  other country has agreed, through a formal formal agreement,

6  yes, we will receive your asylum seekers, we will provide a

7  full and fair procedure, and it will be safe; or there has been

8  an individualized assessment:  This person has permanent rights

9  in that country and, therefore, doesn't really need our

10  protection.

11     So that's our basic statutory argument.  We think there is

12  a clear conflict with 1158.  And I think your question is the

13  right one about whether you need to rule in this case that

14  under no conceivable possibility could anybody create a transit

15  rule.  I don't think Your Honor would need to go that far.

16     I want to return to our arbitrary and capricious claim.

17  As Your Honor knows, we didn't make that the first time around,

18  although Judge Bybee in his Ninth Circuit opinion did comment

19  that he thought the first asylum ban was arbitrary and

20  capricious.  We think this is a clear-cut case where -- finding

21  that their rules are arbitrary and capricious.

22     As Your Honor knows, there are two basic bedrock

23  administrative law principles --

24          **THE COURT:**  I'm going to ask you to slow down a bit

25  for the sake of the court reporter.

 1          **MR. GELERNT:**  Yes.  Yes.  I'm sorry, Your Honor.

 2    Sorry.

 3          On our arbitrary and capricious claim the two basic

 4    administrative rules are that the administration must, must --

 5    and this is a real decision in the Ninth Circuit, the *Butte*

 6    *County* and Supreme Court decisions going back -- must address

 7    contrary evidence in the rule and explain why that doesn't

 8    conflict with the rule they have created.  Nowhere in the rule

 9    are they addressing the mountainous counter evidence.

10          And that's -- you can look at the reports from Human

11    Rights First, from Amnesty International.  I think the UNHCR

12    report is particularly useful.  And the reports go on and on

13    explaining the dangers in Mexico and Guatemala; the fact that

14    although Mexico was attempting to try and build an asylum

15    system that works, it doesn't right now; that Guatemala's

16    certainly doesn't.

17          And so for that reason --

18          **THE COURT:**  But the administrative record about the

19    dangers faced by persons transiting through Mexico and the

20    inadequacy of the asylum system there, in the Government's

21    administrative record, is stunning.

22          **MR. GELERNT:**  Is, I'm sorry?

23          **THE COURT:**  Stunning.  Stunning.

24          This is what they call a softball question in our trade.

25          (Laughter.)

1           MR. GELERNT:   That's why I just wanted to make sure I

2     heard what you said.

3           No, I think that's right, Your Honor.   I mean, obviously,

4     we agree with that; that there is a -- and, you know, in

5     fairness to the Government, we think that was fair of them to

6     put in that because, I mean, that's what any expert would tell

7     you; that they put that in.   It shows how dangerous it is and,

8     yet, they concluded under the rule that mere transit is okay

9     because if people don't apply for asylum in those countries, it

10    must be because they don't really have an urgent need for

11    asylum in their own record.

12          So we are not asking you to go outside the record.   Your

13    Honor has already made clear from the first case that you would

14    prefer to deal with these claims within the four corners of the

15    record and that's all we're asking for you now.   We have

16    declarations, but we think you can do it just from the four

17    corners of the record.

18          And so what we are saying is, A, they didn't address the

19    counter evidence.   That's dispositive right there.   It's always

20    arbitrary and capricious not to address the counter evidence.

21    But even if they address the counter evidence, as Your Honor

22    pointed out, we don't see how anybody could read this record

23    and conclude, okay, well, those are safe countries that are

24    going to give you a fair and full asylum procedure.   Therefore,

25    it must be that if someone didn't apply for asylum, they must

1  not have an urgent need.

2       So that would be our arbitrary and capricious claim.

3       On the notice and comment, I don't want to dwell on it too

4  long.  I think the foreign affairs claim is the same as the

5  first time around, which Your Honor felt it was not sufficient.

6  The standard the Ninth Circuit has set out of absolutely

7  adverse concrete consequences is not met here and the Ninth

8  Circuit had affirmed that.

9       I do want to address the good cause, because on remand

10  from the Ninth Circuit --

11            **THE COURT:**  You have to slow down again.

12            **MR. GELERNT:**  I'm sorry, Your Honor.  I apologize.

13       On the good cause on remand from the Ninth Circuit, Your

14  Honor did find good cause based on an article that smugglers

15  had been communicating with migrants and that could cause a

16  surge.  We believe that if that -- that is the only evidence in

17  the administrative record again.  We believe that the

18  Government cannot really rely on that.  And I think Your Honor

19  noted that it was a fairly thin piece, but it was sufficient at

20  the time to continue in perpetuity to rely on that article.

21  And, indeed, the rule cites Your Honor's decision a couple of

22  times.

23       And so I think at this point what the Government's

24  argument basically boils down to Your Honor found that that

25  article was sufficient for good cause, so here on in we can

1    always say there is going to be good cause.  We're going to

2    skip notice and comment and we are going to simply say no

3    notice and comment because there could be a surge.

4         We don't think any -- that article now is sufficient at

5    this point.  At this point the Government should have been able

6    to come up with more to document the surge.

7         There have been repeated immigration policies.  In fact,

8    there is a patchwork now.  So if there were surges, the

9    Government should be able to document it.  Especially when this

10   Court enjoined the last policy, people would have surged

11   knowing that it could have been overturned on appeal.

12        I think at this point, given how many immigration policies

13   there are -- I mean, it's hard for us to keep track -- it's

14   very difficult, I think, to say everyone overseas will react

15   immediately to each change in each policy.  At this point if

16   all the Government has is that one article, we don't think that

17   that -- in this case that would satisfy good cause.

18        Unless the Court has questions about irreparable harm or

19   the nationwide injunction, I would just say that it's exactly

20   the same --

21             THE COURT:  I was going to say, I don't.  I mean, I

22   think that Judge Bybee's opinion for the motions panel -- of

23   all of the things from the first *East Bay Sanctuary* case that

24   were addressed either in my prior orders or more particularly

25   in Judge Bybee's order, that one seems to me to be the

1    absolutely closest fit.

2           **MR. GELERNT:**  Right.  So I will not address that

3    unless the Court has questions.

4       So I would like to just, if that's okay with the Court,

5    reserve the remainder of my time.

6           **THE COURT:**  You're welcome to reserve as much as you

7    like.  It looks like you have about 34 minutes left.

8           **MR. GELERNT:**  Okay, very good.  Unless the Court has

9    questions, I'll sit down then.

10          **THE COURT:**  Very good.

11          **MR. GELERNT:**  Thank you, Your Honor.

12          **THE COURT:**  Good morning Mr. Stewart.

13          **MR. STEWART:**  Good morning, Your Honor.

14       May it please the Court.  This rule is lawful and it is an

15   appropriately issued interim final rule.

16       I'd like to note, Your Honor, to bring to the Court's

17   attention, that this morning Judge Kelly, in the District of

18   Columbia, denied a TRO in a very similar case challenging the

19   same rule by two organizational plaintiffs.  Judge Kelly rested

20   that ruling on an absence of showing of irreparable harm.  He

21   has asked the parties to move forward with a preliminary

22   injunction proposal scheduled there.

23       He also offered preliminary thoughts in which he -- and

24   there is -- we asked for an expedited transcript.  This

25   happened at 10:00 a.m. eastern this morning, Your Honor.  I

1    don't have that yet, but I wanted to signal to you that he did

2    provide preliminary thoughts on the merits and -- again,

3    preliminary thoughts.  And I want to be careful about that,

4    particularly because I don't have a transcript.  It was an oral

5    ruling where he expressed strong doubts about the same

6    statutory authority type arguments here and also suggested --

7         (Interruption in the proceedings.)

8         **THE COURT:**  Hold on just a moment.  A member of the

9    public has just hissed.

10        Let me just say something.  This is a court of law in

11   which we respectfully consider all the arguments made by

12   anybody before the Court, and the dignity of the court is one

13   of the things that gives it its authority.

14        And so if you're here as a member of the public to observe

15   these proceedings, I welcome you.  These proceedings this

16   morning are important to the country.  This courtroom belongs

17   to all of you, all of us.  It belongs to all of us.

18        But I have to ask if you're here, that you respect the

19   dignity of the proceedings and the dignity of the person making

20   this argument and that you respect my colleague, Judge Kelly,

21   in Washington D.C., who I'm sure gave this matter just as much

22   thought as I have, and that we not hiss when people are making

23   their arguments.  Thank you.

24        Mr. Stewart, I apologize for the interruption.

25        **MR. STEWART:**  I appreciate it, Your Honor.  Thank you

 1    very much.

 2         He saw the notice and comment issue as a closer call, Your

 3    Honor, but did signal that he was inclined to find the good

 4    cause exception satisfied.  Finally, he saw that the equities

 5    weighed against a TRO there.

 6         So I flag those issues.  I think I'll come back to them

 7    maybe a little later on on the relief question.

 8         **THE COURT:**  Let me say a little something about Judge

 9    Kelly, because he posted on the docket of his case last night

10    an indication that he would be providing this ruling at 10:00

11    a.m. this morning, which is 7:00 a.m. our time.

12         And so I knew, number one, that the ruling was

13    forthcoming.  And I also knew that because he had chosen to

14    give it in open court, it was unlikely that I would have the

15    benefit of much of his reasoning even if I knew, as I now do

16    and as you have said, what the result of his order was.

17         When I conducted a scheduling call with plaintiffs and the

18    Government last Thursday morning, I suggested that we hold this

19    hearing on Tuesday, which was yesterday, would have been

20    yesterday.  I set the hearing today instead at the Government's

21    request because Mr. Reuveni, who is sitting next to you at

22    counsel table, represented that you had another hearing to

23    argue yesterday and I wanted to be respectful of the

24    Government's choice of counsel.

25         Had we held this hearing yesterday, as I had suggested, I

1   would already have issued a ruling by now.  In that

2   circumstance I would not have expected Judge Kelly simply to

3   terminate his consideration of the Washington D.C. case.  I

4   would have expected him to rule on the motion before him.

5        My ruling is not binding on him, just as his ruling is not

6   binding on me.  I would have expected him to rule on the motion

7   before him and to allow a higher court to resolve any conflict,

8   if there was one, which is the course of action that the

9   Government essentially suggests at the very end of its

10  opposition brief in this case.

11       And now that the shoe is on the other foot, I intend to

12  follow the same course that I just outlined.

13            MR. STEWART:  Correct, Your Honor.

14       And I made the point to Judge Kelly.  I asked that he

15  issue a ruling that was in keeping with and with due respect

16  for Your Honor's own consideration of the merits here.  He

17  asked me to pin down what I meant by that, and I explained,

18  look, it's really a question of scope of relief, if he were to

19  get to a point of issuing relief.  I said both judges hearing

20  these cases, you know, should be able to consider and

21  meaningfully rule on the issue.

22       So that's what we were saying, Your Honor.

23            THE COURT:  And Judge Kelly has the benefit of the

24  same luxury I do, which is we have the appellate courts to sort

25  this out for us.

1              **MR. STEWART:**  The point is taken, Your Honor, but I

2    think, you know, I can hit this more on the relief point.

3         I think the point we're stressing is that, you know, any

4    judge who this kind of issue is going to come before will, we

5    presume, give full attention, will work as hard as they can to

6    get the ruling right and will think that they have issued the

7    best ruling they can.

8         Given the system we work in, the fact that we have two

9    different courts and two judges trying to work it out, we're

10   simply suggesting that the scope of any relief should be

11   respectful of that.

12        There is something problematic about a situation where

13   plaintiffs, organizational plaintiffs can lose in one forum

14   after a fully-considered hearing, going through all their

15   arguments, and can get that relief in a case they are not even

16   a part of.

17        So that's what we're kind of pressing on the nationwide

18   injunction.

19              **THE COURT:**  Yes.  And this is the argument that --

20   the argument made in our prior case.  And I think Judge Bybee

21   was quite clear in his response to that argument.  And he sits

22   on the Ninth Circuit, so I'm going to defer to the Ninth

23   Circuit on that point.

24              **MR. STEWART:**  Understood, Your Honor.

25        Getting back to just some of the points on this matter,

 1   Your Honor.  The thing that I would emphasize on the key points

 2   brought up by my friend with respect to Section 1158 is that

 3   Congress has not occupied the field as to how relationships

 4   with a third country or actions in a third country or things

 5   that could later happen in a third country can be considered in

 6   the context of asylum eligibility.  The Safe Third Country

 7   Agreement simply does not even actually address transit through

 8   a country at all.

 9          You can have a situation under that provision where

10   somebody is being -- a safe third country agreement authorizes

11   return -- or not return, removing somebody to a country that

12   they may never have transited.  It just requires an agreement

13   with that other country.  A safe -- kind of a safe place to

14   apply for asylum, Your Honor.  It's not addressing squarely

15   this issue of transit.

16          So this rule addresses a very different issue.  Again,

17   there can be some overlap.  You can have a situation where a

18   safe third country involves somebody who transited there, but

19   there is nothing necessary about transit through a safe

20   third -- through that country for a safe third country

21   agreement to be in play.  And that, the safe third country

22   context, again, requires removal to that country.

23          That's not what we have here.  It's a situation where

24   somebody would be -- they have their non-resettlement related

25   concerns addressed, if any, and then be removed, presumedly in

 1   most cases, to their country of origin.

 2        So there is no occupy-the-field problem here, Your Honor.

 3   There is no impinging on a determination in the safe third

 4   country provision with respect to how transit can be weighed

 5   and dealt with on a categorical basis in the eligibility

 6   context.  And I think --

 7             THE COURT:  Is the Government not concerned with

 8   whether something is a proxy for asylum protection?

 9        I mean, for example, there are three international

10   treaties.  If a country is a signatory to any one of them, then

11   that country falls within the rule; correct?  The new rule?

12             MR. STEWART:  Say it again, Your Honor?

13             THE COURT:  Well, I'd have to have the language of

14   the rule in front of me.  My language is not going to be very

15   precise.

16        But in order for the rule to be triggered, an asylum

17   applicant has to have passed through a country that is a

18   signatory to one of three international agreements; correct?

19             MR. STEWART:  That's correct, Your Honor.

20             THE COURT:  And isn't that because if the country is

21   a signatory to one of those agreements, it is a signal that

22   that country protects the rights of what in this country would

23   be an asylum seeker.  That's the reason for that requirement.

24             MR. STEWART:  I mean, I think that's part of it.  I

25   mean, I wouldn't necessarily say "asylum seeker," Your Honor,

```
 1   but non-established type principles, I think, is what --
 2           THE COURT:  Well, the rule bars eligibility for
 3   asylum.  So that only matters to someone who is seeking asylum;
 4   right?  In other words, you don't care.
 5       So that's -- so we can agree that we're focused on asylum
 6   seekers, can't we?
 7           MR. STEWART:  Correct.  But the rule is a little
 8   broader about protection in a third country and seeking
 9   whatever protection or relief may be available, Your Honor.
10   And I think there could be a distinction often drawn between
11   asylum, say, and withholding or removal.  I don't mean to split
12   hairs, but --
13           THE COURT:  Your rule doesn't affect withholding or
14   removal.
15           MR. STEWART:  It doesn't.  It preserves that.
16           THE COURT:  Okay.  So even if you -- I'm just going
17   to go with asylum seeker, because that's what the rule --
18   that's who is the object of the rule.
19       So we have this requirement that a third country have
20   signed one of these three international agreements.  Can you
21   think of another reason why the rule contains that requirement,
22   other than as a proxy for the kind of protections that go along
23   with asylum?
24           MR. STEWART:  I think it's a consideration that just
25   supports the reasonableness of requiring somebody to apply for
```

1    asylum in one of these countries, Your Honor.  And it reaffirms

2    the likelihood that there may be more than one country.

3         The rule requires just the one country.  You know, one of

4    those countries to be something that somebody transited

5    through.

6              **THE COURT:**  Is that a concept of equivalence, do you

7    think?

8         In other words, we might say it's strong equivalence or

9    weak equivalence, but isn't what the rule is doing is to say:

10   We think there is equivalent protection elsewhere and if there

11   is equivalent protection elsewhere, you need to have applied

12   for asylum there.

13             **MR. STEWART:**  I think -- I don't know that we need

14   just precise congruence or equivalence, Your Honor.  What

15   we're saying is that we --

16             **THE COURT:**  I'm not saying strong equivalence.

17   Please listen to the question.

18        I'm asking whether conceptually that's equivalence.  It's

19   not perfect.  We could say it's weak or it's strong.  But we're

20   searching for some kind of equivalence, and that's what --

21   that's why it's reasonable to require an asylum seeker to have

22   applied somewhere else; isn't it?

23             **MR. STEWART:**  I'd say -- and I don't mean to fight

24   the hypothetical, Your Honor.  I would say that it's -- there

25   is adequate and appropriate protection available or there

 1   should be an effort to seek such adequate and appropriate

 2   protection before coming here.

 3          **THE COURT:**  I'll go with adequate and appropriate.

 4       So now coming back to your point about conflict.  Assuming

 5   we can agree -- I've learned through experience that I might

 6   sometimes be surprised when we don't agree.  But assuming that

 7   we can agree that the new joint interim rule dispenses with

 8   some of the protections that Congress has required for the same

 9   person -- in other words, a person that might have previously

10   had to consider only the safe third country bar or the firm

11   resettlement bar now might be subject to this new joint interim

12   rule -- that because the rule dispenses with some of these

13   protections, Congress might not have the same view that the

14   administration does of what's adequate and appropriate.  That

15   is what I want you to address.

16          **MR. STEWART:**  Sure.  So I think the difference is

17   this, Your Honor.  It's one thing to do the exact same -- you

18   know, force the exact same result and dilute prerequisites to

19   getting that result.  But we don't have that here.

20       The safe third country bar, what it allows -- it's very

21   potent.  It's unyielding.  If you fall within -- if you can be

22   removed somewhere under that provision, you can't even apply

23   for asylum, but you're removed to that country.

24       And, again, that's through an agreement with that country

25   and all the steps are taken to make sure that that is an

1   adequate protected place to apply for asylum.

2       The difference here is you're not removed to that country.

3   You just need to seek protection there.  You need to seek

4   relief.

5       And, again, the safe third country agreement provision

6   isn't even really addressing transit by its terms.  It's a

7   matter that's just focused with the fact that, look, this

8   person -- this person came here.  We have this agreement with

9   this other country where we can send them, where they can

10  pursue, you know, relief.  It could be completely separate.  It

11  could be a place they have not been before at all.

12          **THE COURT:**  So let's -- well, let's tease that out a

13  little bit.  Let's say that we have an applicant from

14  Guatemala.  That person will have passed through Mexico on the

15  way here.  And let's put to one side for a moment whether that

16  person might have qualified for an alternative form of relief,

17  such as withholding or removal, and focus exclusively on

18  asylum.

19      If that personal previously had been subject to the safe

20  third country bar, you're saying they would have been removed

21  to a safe third country, and that's not what's happening here.

22          Under the rule what happens to that person if they don't

23  qualify for an alternative form of relief?  They appear at the

24  southern border of the United States.  They have traveled

25  through Mexico.  What happens to them?

1          MR. STEWART:  They presumably would be removed to the

2    country of origin, Your Honor.   There are other options

3    sometimes, but --

4          THE COURT:  So they would go back to Guatemala.

5          MR. STEWART:  Right, Your Honor.

6          THE COURT:  Okay.

7          MR. STEWART:  Right.  It's not like -- you know,

8    again, it's not the third country, but that's just normally how

9    removal works.  It's, you know, likely usually to the country

10   of origin.

11         THE COURT:  Yes.  Okay.

12         MR. STEWART:  Firm resettlement bar, Your Honor, the

13   point I'd emphasize here is that similar to the safe third

14   country situation -- we've hit these in our brief, so I won't

15   go too long on the point.  This is a situation where, again, we

16   are talking about somebody transiting through the country, but

17   it's almost -- Congress wanted to be sure that somebody who had

18   such a good situation --

19         THE COURT:  Mr. Stewart, the good news is you have

20   something in common with Mr. Gelernt.  The bad news is that you

21   both talk too quickly for the court reporter.

22         MR. STEWART:  Understood, Your Honor.

23         THE COURT:  I'll ask you to slow down a little bit.

24         MR. STEWART:  It might not be the last time I need to

25   be reminded, Your Honor.  I will do my best.

 1          So, again, it's a provision that says, look, if you have

 2     such a strong situation in a third country that you are firmly

 3     resettled there, permanent offer of residence, that sort of

 4     thing, then, you know, no asylum for you.

 5          That doesn't prohibit consideration of the sort of thing

 6     that this rule embodies, which is:  Have you applied for relief

 7     in another country?  And that's something that can be done in

 8     light of changed circumstances.

 9          My friend does point out to some Ninth Circuit cases that

10     talk about the reasonableness of expecting someone to apply for

11     asylum in a third country, Your Honor.  What I would emphasize

12     there is that what those cases are getting at is they rest on a

13     factual assumption about reasonableness.  And it's the Attorney

14     General and Secretary who are in a position to actually assess

15     those assumptions, make policy decisions based on them and --

16          **THE COURT:**  But the APA -- turning to that point.

17     Doesn't the APA impose some requirement on the agencies to, as

18     you say, actually assess the evidence that they have?

19          You heard my comment about the administrative record.  And

20     there is some pretty tough stuff in there, at very great length

21     about what things are actually like in Mexico.

22          Do you want to speak to that?

23          **MR. STEWART:**  Your Honor, the record -- this is at

24     pages such as 231 to 232 about the joint statement.  This kind

25     of hits some of our good cause foreign affairs efforts, efforts

1    to get things here.

2        It says the Administration has been working through the --

3    through immigration initiatives and other means to try to

4    improve the situation, to try to make sure that Mexico is

5    considering the claims of migrants and adequately dealing with

6    migration through their territories.  There has been a big

7    progress there.  Again, that's what the joint declaration

8    recognizes and --

9        THE COURT:  What the administrative record says is

10   that applications are up dramatically, but there is no

11   indication that -- in the record that the Mexican asylum system

12   has grown to be able to process those applications.

13       MR. STEWART:  Your Honor, what the record does say

14   and what the rule does say is that, look, the United States is

15   working with Mexico and it understands that Mexico is committed

16   to and will abide -- it expects it to abide by its obligations.

17   We provide, you know, as much evidence as we have alluded to,

18   at least in our briefing, regarding that.

19       And I think we fairly considered that there are issues

20   here.  We don't -- you know, we don't require somebody to apply

21   in every country.  So it reduces some risks, you know, there.

22   It makes a tailored measurement, just apply in one country and

23   get that ruling.

24       So I think it does consider those points, Your Honor.

25       THE COURT:  The rule identifies as its concern the

 1    so-called northern triangle countries; correct?

 2        I am just telling you there are exactly four references to

 3    northern triangle countries in the rule, so I think a fair

 4    reading of it is that that's a concern of the rule.  Is that

 5    wrong?

 6            MR. STEWART:  It's a big concern, Your Honor.  That's

 7    where a big part of the strain comes from here.

 8            THE COURT:  Fair enough.

 9        And then there are some conclusions in the rule itself and

10    some in the administrative record about the asylum system in

11    Mexico.  But if you look at a map, the other country through

12    which persons might pass if they are leaving northern triangle

13    countries is Guatemala.  And I was not able to find in the rule

14    or anywhere in the administrative record a scintilla of

15    evidence about the adequacy of the asylum system in Guatemala.

16        So I want to know, am I missing anything?  There is not

17    even mention of it in the rule.

18            MR. STEWART:  I think -- I mean, I think the evidence

19    that is in the record on that reflects progress in that regard.

20        Your Honor, if I have additional things, I can maybe flag

21    them on additional time.

22            THE COURT:  I will go ahead.  Even though we've not

23    used all that much time, I'm going to go ahead and take the

24    recess to give both sides a chance to go through their

25    materials before rebuttal, so that's fine.

1          **MR. STEWART:**  Thank you, Your Honor.

2      A few other points I wanted to make sure to hit.  This is

3   quite different in kind, I think, from the Section 1158(a)(1)

4   port of entry, manner of entry situation that the Court found

5   dispositive and important in the first *East Bay* case.

6      Again, this is not -- this is not something that the Court

7   found -- it's not comparable to what the Court found to run

8   afoul of the may or may not apply regardless of whether -- you

9   know, manner of entry.

10          **THE COURT:**  I would agree that the analysis here is

11  slightly more complicated.

12      In our earlier -- in the earlier, it's not our case.  In

13  the earlier case, that was sort of the platonic form of

14  conflict and here the analysis is a little more elaborate.

15          **MR. STEWART:**  We're still contesting that, Your

16  Honor, but we understand -- we'll see how it shakes out, but I

17  understand the point, Your Honor.

18          **THE COURT:**  That's one I definitely didn't expect you

19  to agree with, so that's fine.

20          **MR. STEWART:**  Very good, Your Honor.

21      On arbitrary and capricious points.  On the TVPRA I think,

22  you know, our briefs lay that out.  I think that falls with the

23  points we've already flagged.  That here is more of a -- baked

24  into the arbitrary and capricious challenge, which I'll address

25  more globally now.

1        The record does a very good job of supporting, Your Honor,

2   this problem of unconstrained migration putting a strain on our

3   system.  Your Honor is well familiar with those points from the

4   prior case and things continue on.

5        It's really aimed quite reasonably at what the UNHCR

6   itself recognized in 1991 as a shared international problem

7   about reducing unfounded claims and different -- different

8   international partners working together to solve these things.

9   I think that's a key thing this rule gets at.

10        On exceptions and notice and comment, Your Honor, if I can

11   turn back to that briefly.  I think this falls well within Your

12   Honor's teaching in its most recent -- in Your Honor's most

13   recent *East Bay* ruling.

14        I would emphasize, Your Honor, we're not resting simply on

15   one newspaper article.  There are other -- other articles, as

16   Judge Kelly recognized today.  I mean, he said "multiple

17   articles."  I'm not -- he didn't identify which ones he was

18   flagging, but I would point out, Your Honor, that we have other

19   more recent material from the *GlobalPost*, I believe is one.

20        **THE COURT:**  What would you say -- because I think --

21   let's say that the Court were to conclude -- because there is

22   more than one article in the record now.

23        Let's say the Court were to conclude that that one

24   *Washington Post*, was it?  Anyway, that one article.  You and I

25   have the same one.

1          **MR. STEWART:**  I think it's *Washington Post*, Your

2     Honor.

3          **THE COURT:**  That that was the only one that attempted

4     to actually tie the publication or announcement of an

5     immigration rules change with an uptick in migration activity.

6     Mr. Gelernt's argument is:  Well, if that's true, that can't --

7     that one article can't be carte blanche forever.

8          Do you want to respond to that argument?

9          **MR. STEWART:**  Sure, Your Honor.

10          I think what we're currently dealing with is a crisis that

11     we have identified that's become particularly stark over the

12     last, you know, few years; the spike in family units and the

13     issues that that's put -- the strain that that has put on our

14     asylum system.

15          We're not suggesting that that would be the situation

16     forever.  Again, I mean, migration trends change --

17          **THE COURT:**  Well, the question is not what if there

18     were a change in the facts at the border, because at that point

19     I think the article just becomes irrelevant.

20          The question is:  If the facts at the border remain

21     similar so that the United States continues to experience very

22     large numbers of migrants and continues to feel great

23     administrative burdens because of that, could the fact that in

24     2018 a *Washington Post* reporter said something continue to

25     permit the Government as it wheels out new immigration policies

 1   to dispense with notice and comment and just to say:  Well, in

 2   2018 this fellow at the *Washington Post* said this.  That's, I

 3   think, Mr. Gelernt's argument.

 4          **MR. STEWART:**  Right.  And we're not saying that, Your

 5   Honor.  Again, we have more recent -- we have more recent

 6   articles.

 7          I can't give a precise timeline for any of these, Your

 8   Honor, but what I can tell you is that we have -- I believe

 9   when I was here last fall, Your Honor, we had, I think it was

10   -- I can't remember if it was in the 700,000s or it hit 800,000

11   or what as the immigration backlog.  It's now over 900,000 and

12   we have continuing surges.

13          On Pages 664 to 665 we have documents that indicate, like,

14   look, when you change these policies, you have a big influx,

15   and other information saying that people are really trying to

16   get to the United States.

17          768 of the record says, look, migrants are informed.  They

18   understand the basics of the incentives and they are informed

19   about how changes in the law or changes in policy can affect

20   their options when they get here.

21          So I think we don't need to rest, I think, on just one

22   article, Your Honor, and have that frozen in time.  We're not

23   pressing the need to, you know, say that that would be carte

24   blanche forever.  I don't think that Your Honor needs to reach

25   the issue and I would suggest that, look, we have other pieces

1  that surely under Your Honor's prior ruling are enough on good

2  cause.

3       With respect to foreign affairs, and I don't want to go

4  too much longer, Your Honor, given the desire to save some time

5  for rebuttal.  I would emphasize that the migrant protection

6  protocols which have been in effect for six or seven months and

7  is another, you know, one of these initiatives to put pressure

8  and used to share the burdens with Mexico and other partners,

9  that since those have been in effect, you know, progress has

10  been made on a number of fronts.  You know, a few months after

11  those were announced -- a few months after those were

12  announced, we had the U.S.-Mexico joint declaration.

13       So I think it does show that this kind of an initiative

14  promptly put in effect is important in negotiations and just

15  keeping the pressure on.

16       I think one thing the record really does hit home very

17  effectively, Your Honor, is that pressure on Mexico works.  I

18  mean, as with negotiations more generally, you can't always --

19  you know, it's not always an ask nicely and hope somebody helps

20  you out.  It's keep the pressure on and make sure that

21  everybody is doing their part in this international challenge

22  we're facing.  So I think we are very solid on foreign affairs.

23       Harms, Your Honor.  I would -- I would hit some of the

24  points I flagged earlier with respect to Judge Kelly's ruling;

25  that he did really lead with irreparable harm.

1      And I understand Your Honor's points about --

2           **THE COURT:**  He's in a different circuit than I am.

3           **MR. STEWART:**  He is, Your Honor.

4           **THE COURT:**  I haven't read the cases that he

5      presumably read before he issued his ruling, nor would I need

6      to do that, just as I expect he may not have read the cases

7      that I've read.  But one of the cases that I read was the Ninth

8      Circuit's opinion in the prior *East Bay* case.

9           And so as I started by saying, I think to Mr. Gelernt,

10     that on the balance of harms and that part of the analysis, I

11     don't know that there is much new here.  If there is, you

12     should tell me.

13          **MR. STEWART:**  I think, you know, we'll -- we've made

14     the points we want to in our brief.

15          I take your point about *East Bay* and I understand what

16     Your Honor is saying on that.

17          We think here we have a cognizability of harms problem.

18     We do think there is a lot of speculation given that, for

19     example, none of the irreparable harm declarations that my

20     friends have submitted really acknowledge how things would

21     change if, as the Government expects, this rule will change

22     incentives and bring asylum claims to the country that are more

23     meritorious.

24          I mean, for all that has been alleged, I mean, this could

25     lead to a situation where it vastly improves the international

 1    approach to refugees; make sure that the people who actually

 2    reach our southern border seeking asylum are making credible

 3    fear claims, do have strong claims.  And when you have that,

 4    you know, could go either way sort of thing based on their

 5    declarations, I submit -- again, I understand what Your Honor

 6    has said about *East Bay*, but I submit here, given where things

 7    are, it's -- there is a different result.

 8         Finally, I just want to say circling back to something

 9    mentioned at the beginning, Your Honor, before I try to save

10    remaining time.  Just to be clear with respect to the

11    scheduling of the hearings, I was in Boston yesterday and

12    wanted to make sure that I could go to all hearings.  Judge

13    Kelly is the one who ordered the hearing on Monday.  So I just

14    want to make clear, we -- you know, we did our best to

15    accommodate all of that.

16              THE COURT:  No, no.  Now it's my turn to be clear.

17    I fault no one.  I don't think the Government was trying to

18    play games with me.  That's not -- I don't think that.  And I

19    don't think Judge Kelly -- I don't have any issue with Judge

20    Kelly either.

21         My point was not that I thought that anybody was playing

22    fast and loose with the schedule.  My point is just these are

23    two District Courts, both trying to do their best work on an

24    issue of national importance, and they both need to be allowed

25    to do their work in its entirety.  That's all.

1          MR. STEWART:  Thank you, Your Honor.

2      I just wanted to be clear, because we have a lot of balls

3  in the air and we want to make sure that the Court is -- we're

4  keeping it as informed as we can.

5          THE COURT:  Mr. Stewart, you should be flattered.  I

6  granted Mr. Reuveni's request so that I could hear your

7  argument once again.

8          MR. STEWART:  It's a great honor.  Thank you, Your

9  Honor.

10         THE COURT:  Very good.

11         MR. STEWART:  With that, Your Honor, I'm happy to

12  save additional time for rebuttal.

13         THE COURT:  Very good.  I believe, if my eyesight is

14  accurate looking down there, you have about 17 minutes and the

15  plaintiffs have about 34 minutes.

16     I'm going to honor my promise to the parties and take a

17  recess for 15 minutes.  Thank you.

18     (Whereupon there was a recess in the proceedings

19      from 10:15 a.m. until 10:30 a.m.)

20         THE COURT:  Mr. Gelernt.

21         MR. GELERNT:  Thank you, Your Honor.  I just have a

22  few very brief points.

23     On the administrative record points, whether there are

24  additional articles beyond that one *Washington Post* article, I

25  don't know all the articles that the Government was referring

1    to, but I think that they referenced one GlobalPost article at

2    AR 664-665 and another article at 678.  The article at 678

3    deals with different demographics of asylum seekers and the

4    other one at 664-665 deals with humanitarian visas.

5         The only thing I would say about that is that those

6    articles do not talk about a direct link between information to

7    migrants and surges.  They are about different things.

8         I think the other point I wanted to make is that obviously

9    the rule is not going to, for all the reasons we've said in our

10   brief, only bring the most meritorious claims.  And, in fact,

11   the odd thing is that if you had denied asylum somewhere else,

12   you can then come and apply.  So those are presumably the

13   weakest claims.

14        The final point, I wanted to just address Your Honor's

15   question that you issued over the weekend about whether we

16   would be -- whether we think it's appropriate to treat this as

17   a P.I.  Because we did get the record in time to address it in

18   our brief, we think that that is probably -- that is the

19   appropriate way to go, is to treat this as a preliminary

20   injunction given that both sides addressed the record.

21        Unless there are further questions, I will sit town.

22             THE COURT:  Mr. Gelernt, I don't have any.  Thank

23   you.

24             MR. GELERNT:  Okay.  Thank you, Your Honor.

25             THE COURT:  Mr. Stewart.

1          **MR. STEWART:**  Thank you, Your Honor.  I'll be brief

2     as well.

3          With respect to just some of the incentives and the good

4     cause, I would emphasize with respect to the GlobalPost

5     article, Page 665, Your Honor, of the record.

6          **THE COURT:**  Yes.

7          **MR. STEWART:**  It talks about an influx of new

8     arrivals following the provision of visas in Mexico.  Again, it

9     supports the quite logical understanding that the announcement

10    of a policy has an effect on influx and it can be, you know, a

11    quite prompt effect.

12         You know, this one, if it's as big an effect as

13    Mr. Gelernt says, it would be quite reasonable to expect a big

14    response to that.  That sort of change, which goes -- which

15    very strongly supports our good cause argument.

16         Two other points, Your Honor.  To the extent that Your

17    Honor were inclined to rule on the ground of just the arbitrary

18    and capricious challenge, we would submit that if the Court

19    were to believe to reach the conclusion that the record doesn't

20    support the policy for some reason, we would submit the

21    appropriate remedy in that case would be at most a remand to

22    the agency without *vacatur*, where the Court would say:  Look, I

23    think the record does not support the change in policy.

24    Agency, go back and provide support for it.

25         **THE COURT:**  I'm familiar with that mechanism.

1    Wouldn't that be appropriate in the situation where I

2    found that the rule was not inconsistent with the existing

3    provisions of 1158, on the one hand, but on the other hand I

4    found that the rule was arbitrary and capricious?  In that

5    instance, then, the mechanism that you're describing would be

6    available to me; but if I found that it was inconsistent, it

7    would not be.  Isn't that true?

8        MR. STEWART:  If you rule on the statutory authority

9    ground --

10       THE COURT:  Right.

11       MR. STEWART:  Right.  It's the arbitrary and

12   capricious ground that we're emphasizing there.

13       I think a reasonable example, going back to the migrant

14   protection protocols, was the Ninth Circuit stay panel's

15   decision there, where it stayed a nationwide injunction and it

16   did so on the ground that, look, you know, we don't -- we think

17   that the statutory authority is likely there and that's that.

18   And there was also a notice of -- you know, a legislative rule

19   issue there.

20       You know, those were the grounds that would support a

21   nationwide injunction.  Therefore, since those grounds -- the

22   stay panel found wanting, the Court stayed the nationwide

23   injunction.

24       THE COURT:  Is that Judge Seeborg's case in the

25   District Court?

 1          **MR. STEWART:**  It was, Your Honor.

 2          **THE COURT:**  Okay.  I have the case in mind.

 3          **MR. STEWART:**  And that's 924 F.3d 503.  I believe

 4   it's 508 to 509.  It's a short opinion and I think provides

 5   good support if the Court were to rule on that ground.

 6          Finally, Your Honor, the Government would be amenable,

 7   would agree as well that conversion from a TRO to a preliminary

 8   injunction would be appropriate.

 9          The point that I would just emphasize, Your Honor, is that

10   as in the prior case and as we've noted in our briefing here,

11   we oppose that -- you know, aside from permitted purposes, we

12   would oppose adding additional points to the record on, say,

13   the arbitrary and capricious challenge.  You know, as we've

14   said, if the Court were to want to consider items outside the

15   record --

16          **THE COURT:**  If I were to enjoin this rule, I do not

17   anticipate that I would speak to anything that's outside the

18   administrative record, first of all.

19          And secondly, I appreciate the parties agreeing that a

20   preliminary injunction is appropriate.  Whoever is unsuccessful

21   today, I'm sure will want immediate appellate review.  And if

22   the Court issues a temporary restraining order, it can create

23   questions in the mind of the Ninth Circuit as to whether

24   immediate review is appropriate.  And if you jump over the TRO

25   stage, then you just eliminate that question.

1          **MR. STEWART:**  Okay.  And if there's nothing else,

2     Your Honor, I think I would reiterate the points we've made in

3     our briefs.

4          **THE COURT:**  All right.  I don't have any additional

5     questions for you either.

6          **MR. STEWART:**  Thank you, Your Honor.

7          **THE COURT:**  Thank you both very much for your

8     arguments, for your thorough and well-written briefs, and for

9     the opportunity once again to work on something of such

10    interest.

11         This motion is now under submission.  I anticipate that an

12    order will issue in writing later today.  For now the motion is

13    under submission.

14         Thank you.

15         (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, July 25, 2019