# SUPPLEMENTAL DECLARATION OF STEPHEN W. MANNING, EXECUTIVE DIRECTOR, INNOVATION LAW LAB

I, Stephen W. Manning, declare as follows:

1. I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States. I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2. I am the Executive Director of the Innovation Law Lab ("Law Lab"), a nonprofit in Oregon that I founded to improve the legal rights of immigrants and refugees in the United States.

3. I previously submitted a declaration in this matter. *See East Bay Sanctuary Covenant v. Barr*, No. 3:19-cv-04073-JST (N.D. Cal.) ECF No. 3-4 (July 17, 2019). This declaration supplements that first declaration.

4. As I described in my previous declaration, Law Lab has an office in Oakland, California, in addition to offices throughout the United States, including Portland, Oregon; Atlanta, Georgia; San Diego, California; Kansas City, Missouri and San Antonio and El Paso, Texas.

5. Law Lab operates pro bono representation projects called Centers of Excellence, which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims, in Georgia, Kansas, Missouri, North Carolina, and Oregon, with expansion underway to New Mexico and California. Our BorderX project uses technology and collaboration tools to provide support to legal service providers at immigrant detention centers throughout the United States and, under a recent

expansion, at several sites on both sides of the U.S.-Mexico border.  On August 1, 2019, we opened an office in El Paso, Texas as part of our membership in the El Paso Immigration Collaborative (EPIC), which provides legal services and representation to all release-eligible asylum seekers detained at five detention centers in the El Paso jurisdiction.  We also provide direct representation to persons applying for asylum inside the Ninth Circuit and outside the Ninth Circuit.

6.     If the asylum transit ban went into effect in jurisdictions outside of the Ninth Circuit, there would be an immediate and significant detrimental effect on Law Lab's ability to serve clients and maintain its programs across the country.

7.     Law Lab's programming has a national reach not only because of our diverse geographic locations, but also because we operate our programs collaboratively across program sites.  For example, Law Lab operates pro se asylum workshops in Atlanta, Georgia; Kansas City, Missouri; Portland, Oregon; Tijuana, Mexico; and at the U.S.-Mexico border.  Our Atlanta project was the first to launch the asylum workshop concept, and templates and materials developed there are used across our other program sites.  If for example people fleeing persecution in Atlanta were subject to the asylum transit ban, while people fleeing persecution in Portland were not, Law Lab could no longer use synchronized materials across its asylum workshops.

8.     Law Lab employees also regularly staff these workshops at all of our sites, particularly in Atlanta, Portland, and Tijuana.  We hold asylum workshops on a monthly basis in Atlanta and Portland, and, in collaboration with partner organization Al Otro Lado, several times a month in Tijuana.  Law Lab attorneys and accredited representatives coordinate and implement the workshops, and also directly provide some legal services and advice to immigrant attendees.  Our workshops in Atlanta and Portland almost always have attendees who have crossed the border both within and outside of the Ninth Circuit.  If the asylum transit ban were in place in parts of the

border, but not others, our asylum workshops would have to be meaningfully restructured in order to effectively serve persons who are subject to the transit ban and persons who are not.

9. Providing legal guidance and asylum application assistance to persons subject to the transit ban at these workshops would be a significant burden on Law Lab employee time and program operations. The majority of persons served at these workshops are Central American asylum seekers who would be subject to the asylum transit ban. First, Law Lab would have to spend additional time developing the facts and legal theories for asylum applicants subject to the transit ban, as these applicants would be eligible only for withholding of removal and relief under the Convention Against Torture (CAT). Withholding and CAT have a higher burden of proof than asylum, and these applications would require the development of entirely distinct and more in-depth legal analyses. Law Lab staff supervise and train attorney and accredited representative volunteers at these workshops, and would have to devote significant time to re-training these volunteers on the new standards and how to screen for attendees who might be subject to the ban.

10. For example, just this weekend, Law Lab operated a pro se asylum workshop in Atlanta for persons seeking asylum. The workshop is part of a regular series of programming. Our staff—based in Georgia, California, Missouri, Florida, Washington, and Oregon--spent many hours training volunteers on law, process, and our materials; preparing technology for use in the workshops; and preparing individual clients and client applications in order for the workshop to be successful. However, because we used a centralized set of training materials and technology—all of which are designed around a uniform application of the asylum regulations—the workshop was likely for nothing and will have to be redone. Before it can be redone, though, we will have to divert resources from other projects to re-programming because the injunction does not apply nationwide.

11. Additionally, most of the persons fleeing persecution who we serve at our workshops are in family units. Often a nuclear family can file a single asylum application, with the spouse and minor children benefiting as derivatives. But because withholding of removal and CAT do not allow derivative relief, every member of a family subject to the transit ban would have to file a separate application. This would limit Law Lab's workshop capacity significantly—instead of completing eight applications for eight families, for example, we might only have capacity to complete eight applications for two families with four members each.

12. The workshops in Tijuana, which provide legal guidance to persons who are about to seek asylum, would also be hindered because we would have to provide guidance about a rule that might apply to people at different points throughout their asylum cases. In my experience, it is not uncommon for a person fleeing persecution to cross the border at a different location than the one in which they had sought legal advice. Additionally, the state in which a person initially requests asylum is often not the same state where they will be detained, have their credible fear interview, or have their case heard on the merits in immigration court. Therefore, even at our workshops in Tijuana, where most people anticipate seeking asylum at a border within the Ninth Circuit, we would need to create and provide guidance about the implications of the asylum transit ban for every individual seeking assistance. Specifically, there has been a significant increase of asylum seekers that Law Lab has provided guidance to in Tijuana that end up in detention centers in Louisiana and Mississippi, despite the fact that they entered the US to request asylum in the Ninth Circuit.

13. We intend to replicate the Tijuana workshops, materials and specialized technology that Law Lab developed to serve asylum seekers along the U.S.-Mexico border—both inside and outside the Ninth Circuit. For example, in late July, Law Lab began to implement an expansion of

its services to asylum seekers using the Tijuana project as our model with a focus on Ciudad Juarez. Given our very limited financial resources and staff, the program expansion would likely only be scalable if we could replicate our Tijuana workshops, materials, and specialized technology at the sites in Ciudad Juarez.

14. In addition to materials used at nationwide asylum workshops, Law Lab creates written materials and technology for use across our Centers of Excellence pro bono programs, our BorderX detention project, and other initiatives that serve people fleeing persecution throughout the United States.  These materials include printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  If the asylum transit ban were to apply to people fleeing persecution outside of the Ninth Circuit, Law Lab would have to substantially revise its materials across programs, and create bifurcated resources going forward. For example, Law Lab is just finishing several months of work on a short client-targeted video that explains the elements of asylum in plain language.  We planned to use this video as an educational tool and distribute it widely amongst our partners and amongst communities of persons fleeing persecution.  If the asylum transit ban is allowed to go into effect, the video will be essentially useless, since the ban adds an additional element to asylum eligibility that the video does not discuss.  To create an effective resource going forward, Law Lab would have to entirely re-work the initial video, and likely create two versions for use inside and outside the Ninth Circuit.

15. Though Law Lab focuses its work on building effective and scalable representation programs, we also engage in direct representation cases when necessary to serve our mission.  For example, I represented eighty men fleeing persecution who were held at the Sheridan Federal Correctional Institution in Sheridan, Oregon, in the summer of 2018; 100% of my clients passed their credible fear interviews and 97% were subsequently released from detention on bond or

parole. Law Lab continues to directly represent clients who were previously detained at Sheridan, and also directly represents clients in jurisdictions outside of the Ninth Circuit. If the asylum transit ban were to go into effect outside the Ninth Circuit, our limited direct representation work would become significantly more complicated and burdensome.

16. Additionally, the clients served by Law Lab's programs do not complete their immigration case in a single jurisdiction. It is possible that a client would move seamlessly between our program sites—and thus between different judicial circuits—as their case progresses. A person fleeing persecution might receive a legal orientation and services at a workshop supported by Law Lab in Tijuana, Mexico; obtain release on bond or parole from a detention center in Texas with assistance from our BorderX project; and complete their asylum application at a Law Lab-run legal workshop in Atlanta, Georgia. Many persons served by Law Lab programs move between jurisdictions throughout the lifetime of their asylum case as well. In my experience, such movement between jurisdictions is common for asylum seekers.

17. Law Lab's programs within the Ninth Circuit will also be adversely impacted if the asylum transit ban rule goes into effect in other jurisdictions. Law Lab coordinates the Equity Corps of Oregon, which is the region's first government-funded universal representation program. A high number—likely close to 90 percent—of the Equity Corps' clients are people who are fleeing persecution, many of whom arrived recently to the United States. Equity Corps' asylum clients enter the United States to seek protection at or in between ports of entry across the U.S.-Mexico border, and a significant percentage of these clients first entered the United States in Texas or New Mexico. If the asylum transit ban rule went into effect outside the Ninth Circuit, Equity Corps might have to shift significant resources towards representation of clients who entered the country in Texas or New Mexico and are subject to the ban. These resources would include both

the devotion of additional time to withholding of removal and Convention Against Torture applications for these clients, who would not be eligible for asylum, and also re-working of case templates, resources, and materials to account for eligibility differences based on place of entry. This resource diversion would negatively affect other clients within the Equity Corps program, and also would harm the program as a whole, which could be forced to serve fewer people overall because of the increased time burden required for a subset of cases.

18. Law Lab's work providing strategic support, limited legal assistance, and advocacy in the cases of people fleeing persecution who were forcibly returned to Mexico under the "Migrant Protection Protocols" (MPP) program would be dramatically impacted if the asylum transit ban rule went into effect outside of the Ninth Circuit. Law Lab works directly with people subject to MPP whose cases are heard in San Diego, California and El Paso, Texas; we also consult with projects that are providing assistance in Laredo, Texas and Brownsville, Texas. Because Mexican nationals cannot be subject to MPP, all of the cases we support in this work are asylum cases where the applicant traveled or resided in a country other than their country of origin before seeking asylum in the United States. Therefore, nearly all individuals subject to MPP outside of the Ninth Circuit would potentially be subject to the asylum transit ban while also facing the significant challenges that the MPP poses in litigating their asylum cases. This combination would make our work in El Paso and our consulting in Laredo and Brownsville significantly more burdensome.

19. Finally, our BorderX and EPIC programs would be significantly harmed if the asylum transit ban rule went into effect outside the Ninth Circuit. BorderX works regularly in seven immigrant detention centers, six of which are outside of the Ninth Circuit. As I noted in my prior declaration, 100% of the noncitizens BorderX serves are asylum seekers, the majority of whom transited through a third country before arriving to the United States. If the rule were to go

into effect outside of the Ninth Circuit, work in at least six of BorderX's program sites would significantly increase in difficulty, as release eligibility would be severely limited, if not eliminated, for many of our clients, and the program would have to develop alternative (and time consuming) release strategies for clients detained in those facilities. That is because release eligibility turns to a significant degree on eligibility for asylum. BorderX, like our other programs, would also have to change its templates, materials, and guidance to account for the different eligibility regimes that would govern clients based on place of entry to the United States and place of detention.

20. In short, Law Lab's work is national, not only in terms of program sites and direct representation of clients where necessary, but also the ways that our projects work together to provide high-quality resources to unrepresented asylum seekers, pro bono attorneys, and other representation projects. Allowing the asylum transit ban to go into effect outside the Ninth Circuit would not only harm our multiple programs in place outside the Ninth Circuit, but would also harm our organization's ability to employ a unified approach to our strategic programs. To fully remedy the harms the Rule will inflict on Law Lab, the Rule would need to be enjoined nationwide, not just in the Ninth Circuit.

21. Finally, had Law Lab been provided the opportunity to comment on the Rule before it went into effect, Law Lab would have submitted comments about why the Rule is unlawful and factually unsupported, and why it must be rescinded nationwide.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 18th day of August, 2019.

_____
Stephen W. Manning, OSB #013373