# DECLARATION OF NICOLE RAMOS, BORDER RIGHTS PROJECT DIRECTOR, AL OTRO LADO

I, Nicole Ramos, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am a U.S. licensed attorney practicing in the area of immigration law and human rights. I am barred by the State of New York, and I am a former Assistant Federal Public Defender. I am the Border Rights Project Director of Al Otro Lado. In that capacity, I work with asylum seekers in Tijuana, Mexico. I have been a resident of Tijuana for the last five years, and have been working with asylum seekers in Tijuana and accompanying them to U.S. ports of entry since December 2015.

3. In a previous declaration, *see East Bay Sanctuary Covenant v. Barr*, No. 3:19-cv-04073-JST (N.D. Cal.) ECF No. 3-3 (July 17, 2019), Al Otro Lado's Litigation and Policy Director, Erika Pinheiro, explained our organization's work and the harms we will experience from the Interim Final Rule ("Rule") at issue in this litigation, which categorically bars from asylum individuals who enter the southern land border after transiting through a third country without applying for protection there This declaration supplements that first declaration. For the reasons explained in that declaration, the Rule will significantly harm Al Otro Lado as an organization, seriously frustrate Al Otro Lado's mission, divert organizational resources, and jeopardize Al Otro Lado's funding.

4. I write to supplement the Declaration of Erika Pinheiro to make clear that Al Otro Lado will suffer serious harms if the Rule is allowed to go into effect everywhere other than the Ninth Circuit. To fully remedy the harms the Rule will inflict on Al Otro Lado, it is essential that the Rule be declared unlawful and enjoined nationwide, not just in the Ninth Circuit.

5. Of the thousands of noncitizens Al Otro Lado serves through its offices in Tijuana, Mexico, some ultimately enter the United States outside the Ninth Circuit, including Texas and New Mexico. For example, asylum seekers who we encounter through our Tijuana office sometimes will go to a different border point outside the Ninth Circuit where the wait list is not as long as it is in Tijuana, or, out of necessity, will decide to enter elsewhere along the border without inspection to seek asylum.

6. Furthermore, of those individuals who do enter the United States in the Ninth Circuit, many ultimately end up in jurisdictions in the United States outside the Ninth Circuit. For example, Al Otro Lado clients who entered the United States along the southern border in California have ended up in Colorado, Georgia, Maine, Maryland, Michigan, Minnesota, and Wisconsin. These individuals wind up in jurisdictions outside the Ninth Circuit because they are detained there, or because they are paroled from detention and go to live with sponsors who reside outside the Ninth Circuit.

7. Indeed, in my experience, it is quite common for asylum seekers to enter the country at one place along the southern border and travel to other parts of the country before applying for asylum. For example, asylum seekers who present at a port of entry or are apprehended near the border may be detained by the government and transferred to a location far away from their point of entry. As a result, those asylum seekers may have a credible fear interview in a different Circuit from that in which they entered. Asylum seekers who are placed in removal proceedings after passing credible fear and then released on bond or parole may travel to any part of the country and request to have their removal proceedings transferred there. Thus, an asylum seeker may, for example, enter the U.S. through California, have her credible fear interview in New Jersey, and ultimately apply for asylum through her removal proceedings in Maryland. In my

experience, our clients who are unaccompanied minors are particularly likely to have spent time in multiple shelters in different parts of the country before applying for asylum.

8. It is impossible for Al Otro Lado to know with certainty ex ante where a given asylum seeker whom we serve prior to their entry will ultimately enter the United States, or where they will end up once they are in the United States, or where a given asylum seeker whom we serve while in detention will end up if released from custody.

9. Therefore, if the Rule is only enjoined in certain parts of the country, rather than nationwide, Al Otro Lado will have to advise asylum seekers without knowing whether they will ultimately be subject to the Rule's categorical asylum bar or not. To fulfill our professional obligations, we will have to account for all possibilities in our advice, and will have to advise asylum seekers about outcomes if the Rule is applied to them, and also if it is not. Having to do so will require us to expend significant organizational resources regarding training materials, staff time, resources, and capacity, and would create a serious burden for Al Otro Lado.

10. As detailed in Erika Pinheiro's declaration, the Rule requires Al Otro Lado to revamp our representation strategy; overhaul our training materials, service delivery model, and materials we have developed to assist asylum seekers; engage Mexican attorneys; and redo our registration documents for our non-profit status in Mexico. These harms persist if the Rule is only enjoined in part of the country, because, as explained above, Al Otro Lado will have to advise asylum seekers without knowing whether or not they ultimately will be subject to the Rule.

11. Had Al Otro Lado been provided the opportunity to comment on the Rule before it went into effect, Al Otro Lado would have submitted comments about why the Rule is unlawful and factually unsupported, and why it must be rescinded nationwide.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____
Nicole Ramos
Executed this 19th day of August 2019