**DECLARATION OF CAMILA ALVAREZ, MANAGING ATTORNEY, CENTRAL AMERICAN RESOURCE CENTER OF CALIFORNIA**

I, Camila Alvarez, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

2.     I am the Managing Attorney for the Central American Resource Center of California ("CARECEN") located in Los Angeles, California. CARECEN is a plaintiff in *East Bay Sanctuary Covenant v. Barr*.

3.     In a previous declaration, *East Bay Sanctuary Covenant v. Barr*, No. 3:19-cv-04073-JST (N.D. Cal.) ECF No. 3-5 (July 17, 2019), CARECEN's Legal Director, Daniel Sharp, explained our organization's work and the harms we will experience from the Interim Final Rule ("Rule") at issue in this litigation—which categorically bars from asylum individuals who enter the southern land border after transiting through a third country without applying for protection there. For the reasons explained in that declaration, the Rule will significantly harm CARECEN as an organization, seriously frustrate CARECEN's mission, and divert organizational resources.

4.     I write supplement the Declaration of Daniel Sharp to make clear that CARECEN will suffer serious harms if the Rule goes into effect everywhere other than the Ninth Circuit.  To fully remedy the harms the Rule will inflict on CARECEN, it is essential that the Rule be declared unlawful and enjoined nationwide.

5.     It is an essential part of CARECEN's mission to serve asylum seekers from Central America regardless of where or how they entered the United States.  CARECEN's services are not limited to clients who entered the United States in one of the states in the Ninth Circuit.  As explained in Mr. Sharp's declaration, nearly all of our current caseload of

approximately 200 asylum clients would be subject to the Rule because they entered through the southern border of the United States after transiting through a third country without applying for asylum. Critically, at least 60% of these individuals entered the United States outside of the Ninth Circuit's geographic boundaries—primarily through Texas. Thus, the majority of CARECEN's asylum clients might still be subject to the Rule's categorical bar on asylum under an injunction limited to the Ninth Circuit.

6.      In my experience, it is quite common for asylum seekers to enter the country at one place along the southern border and travel to other parts of the country before applying for asylum. For example, asylum seekers who present at a port of entry or are apprehended near the border may be detained by the government and transferred to a location far away from their point of entry. As a result, those asylum seekers may have a credible fear interview in a different Circuit from that in which they entered. Asylum seekers who are placed in removal proceedings after passing credible fear and then released on bond or parole may travel to any part of the country and request to have their removal proceedings transferred there. Thus, an asylum seeker may, for example, enter the U.S. through Texas, have her credible fear interview in New Jersey, and ultimately apply for asylum through her removal proceedings in California. In my experience, our clients who are unaccompanied minors are particularly likely to have spent time in multiple shelters in different parts of the country before applying for asylum. Affirmative asylum applicants likewise may enter in a state in one Circuit and then apply for asylum in another Circuit.

7.      An injunction limited in geographic scope to the Ninth Circuit, and thus allowing the Rule to be in effect outside the Ninth Circuit, would result in myriad, significant, and irreparable harms to CARECEN.

8.      If the Rule were enjoined only in the Ninth Circuit, CARECEN's ability to serve asylum clients would be severely compromised, and we would be required to divert significant resources.  Our organization would be unable to assist asylum seekers applying affirmatively to the United States Citizenship and Immigration Services, because they would no longer be eligible for that relief.  Instead, CARECEN would only be able to assist individuals in removal proceedings in the Ninth Circuit, which is much more resource-intensive than representing someone who is applying affirmatively.

CARECEN currently represents well over 100 clients who are applying for asylum in removal proceedings in the Ninth Circuit, a significant number of whom entered the country outside of the Ninth Circuit and may still be subject to the Rule. Going forward, CARECEN would be forced to assist these individuals in applying for withholding and CAT, rather than asylum.

9.      If we had to represent the majority of our asylum-seeking clients on withholding of removal and/or Convention Against Torture claims instead of asylum, it would require a significant investment of additional resources.  Among other reasons, such claims are subject to a stricter standard than asylum claims and, unlike asylum claims, do not allow for derivative claims for certain close family members.  Even though these claims will cause us to devote substantially more resources, we currently receive a fixed amount of funding per removal case and have already committed to certain per-attorney case handling figures that are based on asylum application estimates.  This would cause a significant strain on our organization's budget and require diverting critical resources from other core programs.

10.      An injunction that enjoins the Rule in the Ninth Circuit but allows it to be in effect elsewhere also imposes a significant burden on CARECEN because we will have to

provide different services to those subject to the Rule and those not subject to the Rule, which will be administratively difficult.

11.    CARECEN cannot, consistent with its mission, cherry pick and serve only those individuals who are not subject to the Rule.  It would also be difficult as a practical matter for CARECEN to verify in the intake process the location where a prospective client entered the United States and any other geography-related information that may be relevant to the applicability of the Rule, and then enter into an attorney-client relationship accordingly.  Doing so at the intake stage would be time-consuming and resource-intensive and CARECEN would not be compensated for this additional screening work, which would strain the organization's resources.  This is particularly true because CARECEN's prospective clients frequently do not have copies of their Notices to Appear listing the location of their entry and do not know the exact location where they entered the country.  Thus, these critical questions may require additional investigation and screening to determine the applicability of the Rule.

12.    Had CARECEN been provided the opportunity to comment on the Rule before it went into effect, CARECEN would have submitted comments about why the Rule is unlawful and factually unsupported, and why it must be rescinded nationwide.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Camila Alvarez
Executed this 10th day of August 2019