# DECLARATION OF AARON REICHLIN-MELNICK

1. I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am a policy analyst at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America. At the Immigration Council, I track and analyze immigration-related statistics produced by the Department of Homeland Security ("DHS") and the Executive Office for Immigration Review ("EOIR"), including trends in the processing of asylum seekers and the case outcomes for individuals placed in removal proceedings.

3. I am familiar with the relevant public statistics published by DHS and EOIR and the methodology that DHS and EOIR use to produce statistics relating to the processing of asylum seekers and to the outcomes of immigration court proceedings. I have previously submitted declarations analyzing government-produced immigration statistics in *Innovation Law Lab v. McAleenan*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019) and *Padilla v. ICE*, No. 2:18-cv-00928-MJP (W.D. Wash. filed June 25, 2018).

4. In preparation for this declaration I have extensively reviewed public statistics on motions to change venue or transfer in immigration court, as well as information on asylum seekers' movements inside the United States after entry. I have also reviewed the Ninth Circuit's stay decision in this case, as well as this Court's decision to grant a preliminary injunction.

5. The data I analyzed reveals that motions to change venue or transfer in immigration court are routine. Immigrants frequently move from one jurisdiction to another, either of their own free

will or because Immigration and Customs Enforcement (ICE) transfers them from one detention center to another.

6. In addition, the location where an asylum seeker enters the United States does not necessarily correspond to his or her final location once inside the country. Many asylum seekers who arrive at the border in California or Arizona will move outside the Ninth Circuit's jurisdiction, just as many asylum seekers who arrive at the border in New Mexico or Texas will move inside the Ninth Circuit's jurisdiction. Some asylum seekers in DHS custody may even be moved into and out of the Ninth Circuit's jurisdiction more than once.

## Immigrants Routinely Change Venue in Immigration Court

7. Initial jurisdiction for an immigration court proceeding is set by DHS with the filing of a Notice to Appear. 8 C.F.R. § 1003.14(a). Once the Notice to Appear has been filed, "venue shall lie at the Immigration Court where jurisdiction vests," 8 C.F.R. § 1003.20(a), and may only be changed following a motion by one of the parties. 8 C.F.R. § 1003.20(b).

8. Where DHS moves a detained immigrant to a new immigration court jurisdiction, it is required to notify EOIR of the transfer. 8 C.F.R. § 1003.19(g). EOIR reports that change in jurisdiction as a "transfer." EOIR has defined "transfer" as "The Department of Homeland Security's moving of detained aliens between detention facilities or the administrative transfer of an alien's case from one hearing location to another." EOIR, *2016 Statistics Yearbook* (2017), at Glossary 12. Because EOIR reports "changes of venue" separately from "transfers," it is possible to determine the minimum percentage of jurisdictional changes that occurred at DHS's behest following the physical transfer of an individual in DHS custody from one jurisdiction to another.

9. In fiscal year 2017—the most recent year where statistics are available—a total of 115,533 motions to change venue or transfer were granted in immigration court, divided between 68,949 successful change of venue motions and 46,584 transfers. EOIR, *2017 Statistics Yearbook* (2018), at 15.

10. As shown in Figure 1, between 2008 and 2017, changes in jurisdiction (successful changes of venue and transfers) grew by 182 percent. EOIR, *2012 Statistics Yearbook* (2013), at D5. Changes of venue increased by 193 percent (from 23,550 in 2008), and transfers increased by 168 percent (from 17,386 in 2008). This growth corresponds with the overall growth of both immigration detention and the immigration court backlogs as a whole.

**Figure 1: Motions to Change Venue/Transfer by Fiscal Year**
Source: EOIR, *Statistics Yearbook 2017* (2018), at 15; EOIR, *Statistics Yearbook 2012* (2013), at D5.



11. EOIR also provides court-level data on changes of venue and transfers. Using this data, it is possible to determine what percent of jurisdictional changes are granted inside the Ninth Circuit and outside the Ninth Circuit.

12. In Fiscal Year 2017, 24.4 percent of motions to change venue or transfer (28,237) were granted in immigration courts inside the Ninth Circuit, compared to 75.6 percent (87,296) granted in immigration courts outside the Ninth Circuit (see Figure 2).

**Figure 2: Change of Venue and Transfers by Fiscal Year, by Immigration Court Location**
Source: EOIR, *Statistics Yearbook 2017* (2018), at 16; EOIR, *Statistics Yearbook 2016* (2017), at C8; EOIR, *Statistics Yearbook 2015* (2016), at C8; EOIR, *Statistics Yearbook 2014* (2015), at C7, EOIR, *Statistics Yearbook 2013* (2014), at C7.



13. DHS's authority to transfer asylum seekers from one jurisdiction to another also means that individuals may be transferred outside the Ninth Circuit. There are significantly more ICE detention centers outside of the Ninth Circuit (113) than inside of it (19). *See Detention Facility Locator*, ICE.gov, https://www.ice.gov/detention-facilities (last accessed August 18, 2019). ICE detention data produced through FOIA revealed that as of November 2017, ICE had an average daily population of 35,350 people detained outside of the Ninth Circuit, compared to 9,908 people detained inside the Ninth Circuit. Nat'l Immigrant Justice Center, *ICE Detention*

4

*Facilities As Of November 2017* (Mar. 13, 2018), *https://immigrantjustice.org/ice-detention-facilities-november-2017.*

14. Individuals released from DHS custody also move into and out of the Ninth Circuit. A study of 1,545 individuals released by CBP in El Paso, TX reveals that asylum seekers end up settling in a wide variety of locations inside the United States. *See* Nick Miroff and Tim Meko, *A snapshot of where migrants go after release into the United States*, Wash. Post (Apr. 12, 2019), https://www.washingtonpost.com/immigration/2019/04/13/snapshot-where-migrants-go-after-release-into-united-states/. Rather than remaining within one jurisdiction, the data indicates that there is almost no connection between place of entry and ultimate destination. Despite being released in El Paso, hundreds of asylum seekers moved to locations within the Ninth Circuit like San Francisco, Los Angeles, Portland, or Seattle.

15. Data shows that a significant percentage of all cases in immigration court involve a change in jurisdiction. Each year tens of thousands of cases are transferred from one immigration court to another.

EXECUTED this ___19th___ day of August, 2019.

_____
AARON REICHLIN-MELNICK