Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Julie Veroff (SBN 310161)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*jveroff@aclu.org*

Lee Gelernt*
Omar C. Jadwat*
Anand Balakrishnan*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*

*Attorneys for Plaintiffs*
*(Additional counsel listed on following page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles,<br><br>*Plaintiffs*,<br><br>v.<br><br>William Barr, Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Kevin McAleenan, Acting Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Ken Cuccinelli, Acting Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; John Sanders, Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Matthew Albence, Acting Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement,<br><br>*Defendants*. | Case No.: 3:19-cv-04073-JST<br><br>**COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO RESTORE THE NATIONWIDE SCOPE OF THE INJUNCTION** |

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA  22903
T:  (470) 606-9307
F:  (404) 221-5857
*mary.bauer@splcenter.org*

*Attorneys for Plaintiffs*

*Admitted Pro hac vice
**Pro hac vice application forthcoming

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*
*asalceda@aclunc.org*

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

BACKGROUND ............................................................................................................................. 1

ARGUMENT .................................................................................................................................. 2

    I. NATIONWIDE RELIEF IS NECESSARY AND APPROPRIATE. ............................. 2

        A. Nationwide Relief is Necessary to Remedy Plaintiffs' Specific Harms. ............ 3

        B. Nationwide Relief Is Necessary and Appropriate Given the Violations Shown. ........................................................................................................................ 9

        C. Nationwide Relief Is Appropriate Given the Need for Uniformity in the Immigration Context. ................................................................................... 10

        D. Nationwide Relief Is Necessary to Avoid Serious Administrability Problems. ............................................................................................................... 11

        E. The Equities Tip Sharply in Favor of Nationwide Relief. ................................. 12

CONCLUSION ............................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) .................................................................................. 11
*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) .............................................................................................. 2
*Califano v. Yamasaki*,
   422 U.S. 682 (1979) .............................................................................................................. 9
*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ........................................................................................... 2, 8
*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ..................................................................................... 1, 3, 8
*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ................................................................................................ 2
*Earth Island Inst. v. Ruthenbeck*,
   490 F.3d 687 (9th Cir. 2007) .......................................................................................... 9, 10
*East Bay Sanctuary Covenant v. Trump*,
   349 F. Supp. 3d 838 (N.D. Cal. 2018) .................................................................................. 9
*East Bay Sanctuary Covenant v. Trump*,
    2018 WL 8807133 (9th Cir. Dec. 7, 2018) ................................................................. passim
*East Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) ........................................................................... 1, 8
*Harmon v. Thornburgh*,
   878 F.2d 484 (D.C. Cir. 1989) .............................................................................................. 9
*Hawaii v. Trump*,
   878 F.3d 662 (9th Cir. 2017) .............................................................................................. 10
*Inland Steel Co. v. United States*,
   306 U.S. 153 (1939) ............................................................................................................ 12
*Kansas v. Nebraska*,
   135 S.Ct. 1042 (2015) ......................................................................................................... 12
*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ............................................................................................. 13
*Lemon v. Kurtzman*,
   411 U.S. 192 (1973) .............................................................................................................. 2
*Milliken v. Bradley*,
   433 U.S. 267 (1977) .............................................................................................................. 9
*Nat'l Min. Ass'n v. U.S. Army Corps of Engr's*,
   145 F.3d 1399 (D.C. Cir. 1998) ...................................................................................... 9, 10
*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
   656 F.3d 580 (7th Cir. 2011) .............................................................................................. 10
*Pa. v. President United States*,
   930 F.3d 543 (3d Cir. 2019) ................................................................................... 2, 8, 9, 12
*Pa. v. Trump*,
   351 F. Supp. 3d 791 (E.D. Pa. 2019) ............................................................................ 10, 12
*Regents of the Univ. of Cal. v. DHS*,
   908 F.3d 476 (9th Cir. 2018) ............................................................................... 8, 9, 10, 11

*Regents of the Univ. of Cal. v. DHS*,
    279 F.3d 1011 (N.D. Cal. 2018) .......................................................................................... 11
*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................................................ 10
*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................................................ 10, 11
*Trump v. East Bay Sanctuary Covenant*,
    139 S.Ct. 782 (2018) ............................................................................................................ 8
*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ........................................................................................... 10

**Statutes**

5 U.S.C. § 706 ............................................................................................................................. 9

**Other Authorities**

Wright & Miller, Retained Jurisdiction, 16 Fed. Prac. & Proc. Juris. § 3937.1 (3d ed.) ....................... 1

# INTRODUCTION

Every consideration relevant to whether nationwide injunctive relief is necessary and appropriate—the scope of Plaintiffs' harms, the nature and extent of the legal violations, the need for uniformity in the immigration context, administrability, and the equities—weighs strongly in favor of nationwide relief in this case. This Court correctly issued a nationwide preliminary injunction in the first instance and, now with the additional benefit of a supplemented record regarding Plaintiffs' harms, should restore the nationwide scope of that injunction.[1]

# BACKGROUND

This Court issued an order preliminarily enjoining the challenged Interim Final Rule nationwide on July 24, 2019. *See* ECF No. 42 (Preliminary Injunction Order). The government sought an administrative stay and a stay pending appeal from the Ninth Circuit. *See* No. 19-16487 (9th Cir.), Dkt. 3-1. The Ninth Circuit motions panel denied the government's request for an administrative stay that same day. *See id.*, Dkt. 19. On August 16, 2019, the motions panel denied the government's request for a stay "insofar as the injunction applies within the Ninth Circuit." *Id.*, Dkt. 30 (Stay Order) at 3.

The motions panel did not disturb this Court's conclusions about Plaintiffs' likelihood of success on the merits or the equities, and agreed that the government has "not made the required 'strong showing' that they are likely to succeed on the merits on [the notice-and-comment] issue."

---

[1] The Ninth Circuit's Stay Order specifically instructs that "[w]hile this appeal proceeds, the district court retains jurisdiction to further develop the record in support of a preliminary injunction extending beyond the Ninth Circuit." Stay Order at 8-9.; *see also id.* at 9 ("Because the record is insufficiently developed as to the question of the national scope of the injunction, we vacate the injunction to the extent that it applies outside California and remand to the district court for a more searching inquiry into whether this case justifies the breadth of the injunction imposed.") (quoting *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018)). Accordingly, there is no question the Court has authority to make factual findings and revise the scope of the injunction while the remainder of the case is on appeal. *See* Wright & Miller, Retained Jurisdiction, 16 Fed. Prac. & Proc. Juris. § 3937.1 (3d ed.) (explaining that "the courts of appeals often have retained jurisdiction while making a limited remand for additional findings or explanations"); *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1105 n.3 (N.D. Cal. 2018) (noting a district court's authority to "assist the court of appeals in the exercise of its jurisdiction, such as by fil[ing] written findings of fact and conclusions of law in support of the preliminary injunction order on appeal") (citations and quotation marks omitted).

*Id.* However, the motions panel limited the scope of the injunction to the Ninth Circuit. *Id.* Critically, though, the panel recognized that a nationwide injunction of the Rule could well be appropriate. But before it would uphold nationwide relief in this case, the panel required further record evidence and findings by this Court connecting that scope of relief to Plaintiffs' injuries. *Id.* at 3-6. Accordingly, the motions panel provided that "[w]hile [the preliminary injunction] appeal proceeds, the district court retains jurisdiction to further develop the record in support of a preliminary injunction extending beyond the Ninth Circuit." *Id.* at 8-9.

   Consistent with that express permission from the Ninth Circuit, Plaintiffs filed an emergency motion on August 19, 2019, respectfully requesting that the Court consider additional evidence in support of a nationwide injunction, and, based on supplemental findings of fact, restore the nationwide scope of the preliminary injunction. *See* ECF No. 57-1 (Mot.). This Court then issued a Scheduling Order, and "invite[d] the Plaintiffs to file an amended brief in support of their motion" that contained additional "legal briefing . . . on the legal framework for the issuance of a nationwide injunction." ECF No. 59.[2]

## ARGUMENT

### I. NATIONWIDE RELIEF IS NECESSARY AND APPROPRIATE.

A district court's authority to issue equitable nationwide relief is undisputed. *See Pa. v. President United States*, 930 F.3d 543, 575 (3d Cir. 2019). "In shaping equity decrees, the trial court is vested with broad discretionary power." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion). That is so because "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Id. See also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong.") (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). Accordingly, "[t]he scope of the preliminary injunction, such as its nationwide effect, is . . . reviewed for abuse of discretion." *California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018).

---

[2] For the convenience of the Court and parties, Plaintiffs have incorporated the arguments from their initial brief into this brief.

The Supreme Court and the Ninth Circuit have articulated several considerations that are relevant to determining the appropriate scope of an injunction. Every single one favors nationwide relief here.

**A. Nationwide Relief is Necessary to Remedy Plaintiffs' Specific Harms.**

As the Ninth Circuit motions panel explained, a nationwide injunction is appropriate when that scope of relief is "necessary to remedy a plaintiff's harm." Stay Order at 4. The original declarations filed in support of Plaintiffs' motion for a temporary restraining order, *see* ECF Nos. 3-2, 3-3, 3-4, 3-5, and the supplemental declarations in support of Plaintiffs' recent emergency motion, *see* ECF Nos. 57-2 (Supp. Manning Decl.), 57-3 (Supp. Smith Decl.), 57-4 (Ramos Decl.), 57-5 (Alvarez Decl.), 57-6 (Reichlin-Melnick Decl.), amply demonstrate that the injunction in this case must be nationwide "to remedy the specific harm shown" to Plaintiffs, Stay Order at 4 (quoting *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018)). *See also East Bay Sanctuary Covenant v. Trump* ("*East Bay II*"), 2018 WL 8807133, at *24 (9th Cir. Dec. 7, 2018) (holding that a nationwide injunction of the first asylum ban was "necessary to provide the plaintiffs"—the *same* four organizations that are Plaintiffs here—"with complete redress") (quotation marks omitted).

As set forth below, Plaintiffs have specific reasons why a nationwide injunction is necessary to remedy the harms to their organizations.

<u>Innovation Law Lab</u>: Law Lab's operations are not limited to the Ninth Circuit. In addition to its work in the Ninth Circuit, Law Lab has offices in Georgia, Missouri, and Texas; operates pro bono representation projects in Georgia, Kansas, Missouri, and North Carolina, with expansion underway to New Mexico; and provides direct representation to persons applying for asylum outside the Ninth Circuit. *See* Supp. Manning Decl. ¶¶ 4-5. And six of the seven detention centers at which Law Lab regularly works are outside the Ninth Circuit. *Id.* ¶ 19. Given Law Lab's national scope, an injunction limited to the Ninth Circuit would not fully remedy the harm to the organization.

First, because Law Lab provides training, materials, and overall legal assistance to other organizations and asylum seekers throughout the country, the harm to Law Lab will not be remedied by an injunction limited to the Ninth Circuit. Among other things, Law Lab currently uses

synchronized templates and materials across its program sites. A geographically limited injunction will force it to abandon this practice, and will require it to meaningfully restructure its operations to effectively serve persons who are subject to the transit ban as well as persons who are not. *Id.* ¶¶ 7-8, 13-14, 20.

Second, the fact that Law Lab directly represents individuals outside the Ninth Circuit means that an injunction limited to the Ninth Circuit is insufficient. *Id.* ¶ 15.

Moreover, providing legal guidance and assistance to persons subject to the Rule will be a significant burden on Law Lab employees' time and program operations, as these persons will now only be eligible for withholding of removal and relief under the Convention Against Torture (CAT). Those forms of relief are more time consuming than asylum to pursue, as they involve higher burdens of proof than asylum and require the development of distinct and more in-depth legal analyses. They also do not permit derivative applications to be filed on behalf of family members. In addition, Law Lab will have to retrain its volunteers on these forms of relief and adjust how it screens individuals for relief. *Id.* ¶¶ 9, 11.

And, importantly, because asylum seekers often move between different locations—and between judicial circuits—during their proceedings, Law Lab's ability to provide legal assistance workshops will be hindered. *Id.* ¶¶ 12, 16. For instance, at Law Lab's workshops in Tijuana for individuals about to seek asylum in the United States, Law Lab will not always know where they will cross or where their asylum proceedings will be conducted, and therefore will have difficulty properly advising them. Indeed, the number of asylum seekers Law Lab serves in Tijuana who end up in detention centers in Louisiana and Mississippi after entering in the Ninth Circuit has been increasing significantly. *Id.* ¶ 12. *See also* Reichlin-Melnick Decl. (discussing movement of asylum seekers across jurisdictions).[3] As a result, it will now be impossible simply to provide all of these asylum seekers and their legal representatives with one set of guidelines.

---

[3] The Reichlin-Melnick declaration analyzes recent statistics from the Department of Homeland Security (DHS) and the Executive Office for Immigration Review demonstrating that asylum seekers frequently move throughout the country during the asylum process, either by their choice or because DHS transfers detained asylum seekers from one detention center to another. This data reveals that

Finally, an injunction limited to the Ninth Circuit not only will frustrate Law Lab's operations outside the Ninth Circuit, but will adversely impact its programs within the Ninth Circuit as well. Because serving individuals affected by the Rule's categorical ban is so time consuming, Law Lab will have to direct significant resources towards their representation, which will negatively affect clients in the Ninth Circuit and may force Law Lab to serve fewer people overall. Supp. Manning Decl. ¶ 17.

East Bay Sanctuary Covenant (EBSC): The harms caused to EBSC by the Rule, *see* ECF No. 3-2, will persist if the Rule is allowed to go into effect everywhere other than the Ninth Circuit, *see* Supp. Smith Decl. ¶ 4. Part of EBSC's mission is to serve clients in affirmative asylum cases regardless of where they entered the United States. Accordingly, EBSC serves clients who enter the United States anywhere in the country, not just the Ninth Circuit. A sizable portion of EBSC's clients enter the United States outside the Ninth Circuit's geographic boundaries and then end up in California, where they apply for asylum. More than 22% of the affirmative asylum applications EBSC filed in 2019 were on behalf of clients who transited through Mexico without applying for protection there and then entered the United States in Texas or New Mexico, i.e., outside the Ninth Circuit. If the organization is unable to serve a sizable portion of its client base in affirmative asylum cases, its mission will be frustrated, and a core part of its operations will be undermined. *Id.* ¶¶ 5, 7.

For the same reason, an injunction limited to the Ninth Circuit also jeopardizes EBSC's funding streams. Pursuant to a grant from the California Department of Social Services (CDSS), EBSC receives $2,000 for every affirmative asylum case it files. If, because of the Rule, EBSC is no longer able to handle affirmative asylum cases for individuals who transit through a third country en route to the southern border and enter outside the Ninth Circuit, the organization likely will face a marked decrease in its budget. Indeed, if the Rule is allowed to remain in effect outside the Ninth Circuit, EBSC estimates that it could lose up to $50,000 under the terms of its CDSS grant during the rest of 2019 and up to $100,000 in 2020. *Id.* ¶ 8.

---

there is almost no connection between asylum seekers' place of entry and ultimate destination. Reichlin-Melnick Decl. ¶¶ 5-6, 14-15.

Because of the strain imposed on EBSC if the Rule remains in effect outside of the Ninth Circuit, EBSC will either have to significantly cut its affirmative asylum program and staff, or overhaul its program to provide types of assistance it is not currently equipped or trained to provide. *Id.* ¶ 9. Notably, EBSC does not currently have sufficient capacity or expertise to handle applications for humanitarian relief in the removal context. Yet to continue serving clients affected by the Rule, EBSC will have to shift to representing those individuals in removal cases. Doing so would be extremely resource intensive for EBSC. *Id.* ¶ 10. EBSC will also be burdened by having to provide different services to those subject to the Rule and those not subject to the Rule. *Id.* ¶¶ 12-13.

CARECEN: The injuries inflicted on CARECEN by the Rule, *see* ECF No. 3-5, will persist if the Rule is not enjoined nationwide, *see* Alvarez Decl. ¶ 4. CARECEN represents Central American asylum seekers regardless of where they enter the United States. Nearly all of CARECEN's current asylum clients entered through the southern border after transiting through a third country without applying for protection there, and at least 60% of those individuals entered outside of the Ninth Circuit. *Id.* ¶ 5. Thus, the majority of CARECEN's asylum clients could still be subject to the Rule's categorical bar on asylum under an injunction limited to the Ninth Circuit. *Id.* CARECEN would be forced to divert significant resources to serve these clients, as they would only be eligible for far more resource-intensive forms of relief, such as withholding and CAT protection. *Id.* ¶¶ 8-9. Despite having to devote significantly increased resources to such applications, CARECEN's main source of funding for its asylum work pays a fixed amount per case. This will significantly strain the organization's budget. *Id.* ¶ 9.

In addition, CARECEN will have to undertake time consuming screening efforts to determine whether a prospective client is subject to the Rule under a geographically limited injunction. Prospective clients who call CARECEN's offices for representation frequently do not have paperwork showing where they entered the country or other geographical information that may be relevant to the applicability of the Rule. *Id.* ¶ 11. CARECEN staff therefore will have to do additional investigation and screening to determine whether the Rule is likely to apply. *Id.* It will

also have to bifurcate its operations to provide different services to those subject to the Rule and those not subject to it. *Id.* ¶¶ 10-11.

Al Otro Lado: Al Otro Lado will continue to suffer injuries if the Rule is enjoined only in the Ninth Circuit. *See* ECF No. 3-3; Ramos Decl. ¶¶ 3-4. Of the thousands of noncitizens Al Otro Lado serves through its offices in Tijuana, Mexico, not all cross the border in the Ninth Circuit. Rather, some ultimately enter the United States elsewhere, including Texas and New Mexico. *Id.* ¶ 5. It is impossible for Al Otro Lado to know with certainty ex ante where a given asylum seeker whom they serve ultimately will enter the United States. *Id.* ¶¶ 5-8.[4] As a result, they will now have to provide burdensome additional guidance to ensure that individuals understand the Rule's impact in different parts of the United States. *Id.* ¶¶ 9-10.

Likewise, Al Otro Lado serves individuals who end up outside the Ninth Circuit for their asylum proceedings. Al Otro Lado clients who entered the United States along the southern border in California have ended up in Colorado, Georgia, Maine, Maryland, Michigan, Minnesota, and Wisconsin. *Id.* ¶ 6. This cross-circuit movement happens because of where a given asylum seeker goes to live after entry or release from detention. Importantly, moreover, this cross-circuit movement also happens because the government chooses where to detain a given asylum seeker, and thus the government will have critical control over the benefits of a circuit-wide injunction. *Id*. *See also* Reichlin-Melnick Decl. In Al Otro Lado's experience, this cross-circuit movement is quite common, particularly for unaccompanied minors. Ramos Decl. ¶ 7. As with the uncertainty about ultimate border-crossing locations, it is impossible for Al Otro Lado to know for certain where an individual they advise will end up following their arrival in the United States. *Id.* ¶ 8.

As a result, if the Rule is only enjoined in certain parts of the country, rather than nationwide, Al Otro Lado will have to advise asylum seekers without knowing whether they will ultimately be subject to the Rule's categorical asylum bar or not. To fulfill their professional obligations, Al Otro Lado will have to account for all possibilities in giving advice. Having to do so will require Al Otro

---

[4] Law Lab's declaration makes the same point that the organization does not know in advance where asylum seekers it serves in Mexico will enter the United States or where they will travel around the country during the asylum process. Supp. Manning Decl. ¶¶ 12, 16.

Lado to expend significant organizational resources regarding training materials, staff time, and capacity, and will create a serious burden for the organization. *Id.* ¶¶ 9-10.

* * *

Based on a very similar record, this Court and the Ninth Circuit enjoined the first asylum ban nationwide. Judge Bybee, writing for the Ninth Circuit motions panel in that case, explained that enjoining the ban nationwide was "necessary to provide the plaintiffs . . . with complete redress." *East Bay II*, 2018 WL 8807133, at *24 (quoting *Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 512 (9th Cir. 2018)). The government asked the Supreme Court to vacate the stay in full, or in the alternative, to narrow the injunction, but the Supreme Court did not narrow the injunction's nationwide scope. *See Trump v. East Bay Sanctuary Covenant*, 139 S.Ct. 782 (2018) (denying stay). The record of harm from the current asylum ban to Plaintiffs absent a nationwide injunction is even stronger than the record in that case. This record of nationwide harm is also more developed than the records in *Azar* and *City and County of San Francisco*. *Cf. Pa. v. President United States*, 930 F.3d at 575 n.32 (affirming nationwide injunction in a similar challenge to that brought in *Azar* in part because "the record before us is substantially more developed").

Unlike the state and locality plaintiffs in *Azar*, 911 F.3d at 566, 569, and *City and County of San Francisco*, 897 F.3d at 1231, Plaintiffs here "do not operate in a fashion that permits neat geographic boundaries." *East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1120-21 (N.D. Cal. 2018). As noted, Law Lab operates in various states all across the country, and Law Lab, East Bay Sanctuary Covenant, CARECEN, and Al Otro Lado all serve asylum seekers who enter the United States at various places along the southern border, not just within the Ninth Circuit. In addition, individuals that Al Otro Lado and Law Lab serve ultimately enter and apply for asylum in various regions of the country, but the organizations cannot know which regions in advance.

For these reasons and on this record, on the factor of remedying the harm to Plaintiffs alone, the Court would be well within its discretion to reinstate the nationwide scope of the preliminary injunction.

**B. Nationwide Relief Is Necessary and Appropriate Given the Violations Shown.**

In addition, as the Ninth Circuit and this Court explained in the first *East Bay* case, "the scope of [a] remedy is determined by the nature and extent of the . . . violation," and "not by the geographical extent of the plaintiff." *East Bay II*, 2018 WL 8807133, at *24 (quoting *Milliken v. Bradley*, 433 U.S. 267, 270 (1977) and *Califano v. Yamasaki*, 422 U.S. 682, 702 (1979)); *East Bay Sanctuary Covenant v. Trump* ("*East Bay I*"), 349 F. Supp. 3d 838, 866 (N.D. Cal. 2018) (same). This principle is "well-settled." *Milliken*, 433 U.S. at 281.

This Court and the Ninth Circuit concluded that the first asylum ban was likely unlawful on its face, and not merely in its application to specific plaintiffs, and so enjoined it nationwide. *See East Bay I*, 349 F. Supp. 3d at 867 ("Because the Court here concludes as a preliminary matter that the Rule is unlawful because it conflicts with the INA, it is unlawful as applied to anyone."); *East Bay II*, 2018 WL 8807133, at *4, 17-23, 24. As was true in that case, the Rule here is unlawful on its face, and not merely in its application to specific plaintiffs.

Relatedly, "[a] 'nationwide injunction . . . is [also] compelled by the text of the Administrative Procedure Act, which provides in relevant part: . . . *The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions of law found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law*.'" *East Bay I*, 349 F. Supp. 3d at 867 (quoting *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2007) (citing 5 U.S.C. § 706)) (emphasis and alterations in original). Given the plain language of the APA, it is therefore "clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engr's*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). *See also Regents of the Univ. of Cal.*, 908 F.3d at 511 (same); *Pa. v. President United States*, 930 F.3d at 575 ("[O]ur APA case law suggests that, at the merits stage, courts invalidate—without qualification—unlawful administrative rules as a matter of course, leaving their predecessors in place until the agencies can take further action. Congress determined that rule-vacatur was not unnecessarily burdensome on agencies when it provided vacatur as a standard remedy for APA

violations.") (citations omitted); *Pa. v. Trump*, 351 F. Supp. 3d 791, 831 (E.D. Pa. 2019) ("[T]he national character of an APA violation 'ordinar[ily]' demands a national remedy.") (quoting *Nat'l Min. Ass'n*, 145 F.3d at 1409), *aff'd*, 930 F.3d 543 (3d Cir. 2019). Courts accordingly have long vacated unlawful agency actions nationwide. *See, e.g.*, *Nat'l Min. Ass'n*, 145 F.3d at 1409-10; *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 589 (7th Cir. 2011); *Earth Island Inst.*, 490 F.3d at 699, *rev'd on other grounds, Summers v. Earth Island Inst.*, 555 U.S. 488 (2009).

Here, the Rule is unlawful under the APA as applied to everyone, not just Plaintiffs, and a nationwide injunction is the "ordinary" and proper result in such situations. *See Nat'l Min. Ass'n*, 145 F.3d at 1409; *East Bay II*, 2018 WL 8807133, at *24 (explaining that nationwide relief "is commonplace in APA cases") (quoting *Regents of the Univ. of Cal.*, 908 F.3d at 512).

**C. Nationwide Relief Is Appropriate Given the Need for Uniformity in the Immigration Context.**

As the Ninth Circuit also emphasized in the first asylum ban case: "In immigration matters, [the Ninth Circuit] ha[s] consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *East Bay II*, 2018 WL 8807133, at *24. This "line of precedent" is "uncontroverted." *Id. See Regents of the Univ. of Cal.*, 908 F.3d at 511 ("A final principle is also relevant: the need for uniformity in immigration policy."); *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."), *rev'd on other grounds*, 138 S.Ct. 2392 (2018); *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."); *see also Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (rejecting the government's request that the injunction be confined to specific states because "the Constitution requires 'an *uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system'") (emphasis in original).

The Rule here works an immediate, nationwide change to immigration enforcement policy, altering a forty-year status quo. The need for uniform application of immigration enforcement policies favors nationwide relief here. Indeed, the need for a nationwide injunction is especially strong in this context, where the need to provide asylum seekers with guidance and assistance is so important, and where asylum seekers will not always know in advance what part of the United States they will enter, or, once inside the country, the circuit in which their case will proceed.

**D. Nationwide Relief Is Necessary to Avoid Serious Administrability Problems.**

An injunction limited to the Ninth Circuit will create serious administrability problems. Asylum seekers enter the United States at various points all across the southern border, not just in the Ninth Circuit, and as the declarations submitted in support of Plaintiffs' emergency motion explain, asylum seekers frequently move between circuits during the course of their asylum proceedings. A geographically limited injunction cannot account for this reality and will "result in administrative confusion and simply provoke many thousands of individual lawsuits all over the country." *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018), *aff'd* 809 F.3d 476 (9th Cir. 2018).

Indeed, such cross-jurisdictional movement has been an important factor in other courts' decisions to order nationwide injunctive relief. In *Texas*, which addressed the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, the Fifth Circuit upheld the nationwide scope of a preliminary injunction in significant part because of the possibility that DAPA beneficiaries might move between states. *See Texas*, 809 F.3d at 188 ("[T]here is a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states."). Similarly, in one of the cases regarding the Deferred Action for Childhood Arrivals (DACA) program, a district court concluded that a nationwide injunction was warranted because a more limited injunction "would be unworkable, partly in light of the simple fact that people move from state to state and job to job, and would likely create administrative problems . . . ." *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018). Likewise, the Third Circuit upheld a nationwide injunction of a rule exempting employers with religious and moral objections from the Affordable Care Act's contraceptive care requirements

as "necessary to provide . . . complete relief" to the plaintiff states, explaining that "[m]any individuals work in a state that is different from the one in which they reside" and that many college students have health insurance coverage from states other than the ones in which they attend school. *Pa. v. President United States*, 930 F.3d at 576. "In light of the impact of these interstate activities," the Third Circuit reasoned, "the District Court did not abuse its discretion in concluding that a nationwide injunction was necessary to afford the States complete relief." *Id.*

Just as in those cases, an injunction limited to the Ninth Circuit "fail[s] to account for the thousands of" asylum seekers who enter in one circuit and then move to another, or who otherwise move between circuits throughout their proceedings. *Pa. v. Trump*, 351 F. Supp. 3d at 833.

### E. The Equities Tip Sharply in Favor of Nationwide Relief.

Finally, equitable considerations are relevant to the scope of injunctive relief. *See Kansas v. Nebraska*, 135 S.Ct. 1042, 1053 (2015) ("When federal law is at issue and the public interest is involved, a federal court's equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. . . . Courts of equity may, and frequently do, go much farther to give relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. In exercising our jurisdiction, we may mould each decree to the necessities of the particular case and accord full justice to all parties.") (citations and quotation marks omitted); *Inland Steel Co. v. United States*, 306 U.S. 153, 157 (1939) ("[I]t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect."). Here, the equities strongly favor a nationwide injunction. Notably, the Ninth Circuit motions panel did not disturb this Court's conclusions regarding the balance of harms and the public interest.

This case does not involve a government policy that will be implemented slowly, or that will trigger only remote or reversible harms. The Rule at issue went into effect immediately, without notice to the public or any opportunity for comment, and as a result, hundreds of thousands of asylum seekers are at imminent risk of removal to their countries of persecution. *See* Preliminary Injunction Order at 42 ("[T]he Rule implicates to an even greater extent than the illegal entry rule [at issue in the first asylum ban case] 'the public's interest in ensuring that we do not deliver aliens into

the hands of their persecutors.'") (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam)); *id.* at 42-43 ("[T]he Organizations have made a strong showing that the Rule contains insufficient safeguards to ensure that applicants do not suffer persecution in those third countries or will not be wrongfully returned to their original countries of persecution—as underscored by the unrefuted evidence regarding Mexico in particular."). These injuries cannot be remedied when the lawsuit ultimately concludes, which may be months or even years from now. Nor can the harms to Plaintiffs themselves—including diverted resources, compromised and restructured programs, and lost funding—be remedied after the fact, as this is an APA case with no damages remedy available. *See id.* at 41.

The Rule also upends a longstanding principle of asylum law—that mere transit through another country will not serve as a categorical bar to asylum in the United States—that had endured for nearly four decades. *See id.* at 42 ("[A]n injunction would 'restore[] the law to what it had been for many years prior to' July 16, 2019 . . . .") (quoting *East Bay II*, 2018 WL 8807133, at *24). Enjoining it nationwide thus merely restores the long extant status quo.

Because the Rule will cause immediate and irreparable damage nationwide, and because the equities tip sharply in Plaintiffs' favor, nationwide relief is both essential and equitable.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

Dated: August 22, 2019                Respectfully submitted,

| | |
|---|---|
| Katrina Eiland (SBN 275701) | /s/ Lee Gelernt |
| Cody Wofsy (SBN 294179) | Lee Gelernt* |
| Spencer Amdur (SBN 320069) | Omar Jadwat* |
| Julie Veroff (SBN 310161) | Anand Balakrishnan* |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT | AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT |
| 39 Drumm Street | 125 Broad St., 18th Floor |
| San Francisco, CA 94111 | New York, NY 10004 |
| T: (415) 343-1198 | T: (212) 549-2660 |
| F: (415) 395-0950 | F: (212) 549-2654 |
| *keiland@aclu.org* | *lgelernt@aclu.org* |
| *cwofsy@aclu.org* | *ojadwat@aclu.org* |

*samdur@aclu.org*
*jveroff@aclu.org*

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Mary Bauer*
SOUTHERN POVERTY LAW CENTER
1000 Preston Avenue
Charlottesville, VA 22903
T: (470) 606-9307
F: (404) 221-5857
*mary.bauer@splcenter.org*


*Attorneys for Plaintiffs*


*Admitted Pro hac vice
** Pro hac vice application forthcoming

*abalakrishnan@aclu.org*

Christine P. Sun (SBN 218701)
Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*csun@aclunc.org*
*vtalla@aclunc.org*
*asalceda@aclunc.org*

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*