Adam Siegler (SBN 116233)
**GREENBERG TRAURIG LLP**
1840 Century Park East
Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email:sieglera@gtlaw.com

Jonathan K. Ogata (SBN 325914)
**GREENBERG TRAURIG, LLP**
1201 K Street, Suite 1100
Sacramento, CA
Telephone: (916) 442-1111
Email:ogataj@gtlaw.com

Steven G. Barringer*
**GREENBERG TRAURIG, LLP**
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Caroline J. Heller*
**GREENBERG TRAURIG LLP**
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland*
Sarah T. Gillman*
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

* *Pro Hac Vice Forthcoming*

Attorneys for Proposed Plaintiff-Intervenors

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> WILLIAM BARR, et al., <br><br> Defendants. | Case No. 4:19-cv-04073-JST <br><br> [Judge:  Hon. Jon S. Tigar] <br><br> **DECLARATION FOR CAROLINE HELLER** <br><br> Date Action Filed: July 16, 2019 |

## DECLARATION OF CAROLINE HELLER

I, Caroline J. Heller declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am an attorney at law and am of counsel with the law firm Greenberg Traurig, LLP ("GT"), counsel of record for Proposed Plaintiff-Intervenors, in the above-captioned matter.  I make this declaration in support of Proposed Plaintiff-Intervenors' Motion for Leave to Intervene and Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") filed concurrently herewith.  Except where indicated on information and belief, the matters set forth herein are based upon my personal knowledge, and if called as a witness in this matter, I could and would testify competently thereto; as to the matters stated upon information and belief, I believe them to be true.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the Amended Petition for Writ of Habeas Corpus filed in D.A.M. v. Barr, 20-CV-1321 (CRC) (D.D.C.), ECF No. 31.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a District Court Decision denying motion for temporary restraining order for a stay of removal, D.A.M. v. Barr, No. 20-CV-1321 (CRC), 2020 WL 5525056, at *1 (D.D.C. Sept. 15, 2020).

4.     Attached hereto as Exhibit 3 is a true and correct copy the Declaration of Bridget Cambria, Esq. sword to October 16, 2020.

5.     Attached hereto as Exhibit 4 is a true and correct copy the Declaration of Shalyn Fluharty, Esq. sword to October 16, 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 16, 2020 in New York, New York.

*/s/Caroline Heller*
Caroline Heller

2

*ACTIVE 52989673v3*

# EXHIBIT "1"

Caroline J. Heller*
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

*Appearing *Pro Hac Vice*

Steven G. Barringer (D.D.C. Bar # 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D.A.M. et al., | § | Case No. 20-cv-01321-CRC |
| | § | |
| *Petitioners*, | § | |
| | § | |
| | § | **VERIFIED AMENDED PETITION FOR** |
| v. | § | **WRIT OF HABEAS CORPUS &** |
| | § | **COMPLAINT FOR DECLARATORY** |
| BARR et al., | § | **AND INJUNCTIVE RELIEF** |
| | § | |
| | § | |
| *Respondents*. | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| | § | |

## <u>INTRODUCTION</u>

1.      Petitioners are parents and children who have fled persecution in their home countries to seek asylum in the United States.  The vast majority of the Petitioners had final orders of removal issued based on the unlawful and recently vacated interim final rule known as the "Transit Ban", such that no valid or lawful order exists to justify the government seeking their removal absent constitutionally adequate process and due process protections.

2.      Petitioners are detained at either the South Texas Family Residential Center in Dilley, Texas ("Dilley") or the Berks County Residential Center in Leesport, Pennsylvania ("Berks"), or have been released from Dilley or Berks but remain "in custody" for habeas corpus purposes based on the substantial restrictions on liberty imposed by Respondents on those released by way of ongoing efforts to effect removal and ongoing orders of supervision, monitoring and electronic custody.

3.      Upon information and belief, Petitioners will be imminently removed from the United States in the absence of a stay of removal.

4.      At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive encroachment on liberty, and it is in that context that its protections have been strongest.  *See I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001).  These protections extend fully to noncitizens subject to an order of removal. *Id*.; *see also* Gerard L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 COLUM. L. REV. 961, 1044 (1998) ("[H]istorical precedents beginning shortly after 1787 and reaching to the present confirm the applicability of the writ of habeas corpus to the detention involved in the physical removal of aliens from the United States.  These precedents include opinions . . . denying the power of Congress to eliminate judicial inquiry.").

5.      This non-core habeas petition challenges the legality of Respondents' actions during the COVID-19 pandemic to deport Petitioners.  Respondents' actions are unsafe.  Further, the vast majority of Petitioners received orders of removal following the interim final rule jointly published by the Departments of Justice and Homeland Security entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban") that a Court in

this District found to be void *ab initio*.  *See Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020) ("*CAIR*").

6.      Attempting to remove Petitioners in an unsafe manner during a global pandemic predicated on removal orders issued pursuant to a vacated rule constitutes an encroachment into Petitioners' protected liberty interests, conclusively establishing irreparable harm in the threat of removal prior to any form of lawful process, and undercutting any governmental interest in seeking to quickly remove them.

**The Transit Ban**

7.      On June 30, 2020, in a Memorandum Opinion and accompanying Order, Judge Timothy J. Kelly of the District Court of the District of Columbia entered a final, appealable Order vacating the Transit Ban, holding that "Defendants unlawfully promulgated the [Transit Ban] without complying with the APA's notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here."  2020 WL 3542481 at *1; *see CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20. "Having found that the [Transit Ban] was enacted unlawfully, the Court sees no reason why it should not be vacated."  2020 WL 3542481 at *1.

8.      "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void ab initio."  *United States v. Goodner Bros. Aircraft, Inc.*, 966 F.2d 380, 384 (8th Cir. 1992) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 313, (1979)); *see Chrysler Corp*, 441 U.S. at 313 ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act.") (citing *Morton v. Ruiz*, 415 U.S. 199 (1974) & *U.S. v. Allegheny–Ludlam Steel Corp.*, 406 U.S. 742, 758, (1972)).

3

9.    All but thirteen (13) Petitioners in this case were subjected to the Transit Ban and its procedures. Their final orders of removal result from Respondents' application of the now-vacated Transit Ban to those Petitioners.   Petitioners subjected to the Transit Ban were categorically unable to avoid persecution by establishing a significant possibility of asylum eligibility under the credible fear standard, with few exceptions.

**Removal is Unreasonably Unsafe**

10.    The Centers for Disease Control and Prevention ("CDC"), recommends against travel now, with the CDC stating "[b]ecause travel increases your chances of getting and spreading COVID-19 staying at home is the best way to protect yourself and others from getting sick."[1]  The novel coronavirus ("COVID-19") pandemic is a global catastrophe that has affected virtually every corner of the world.

11.    In the United States, the risks of COVID-19 have caused social distancing measures to be implemented throughout the country, along with the shutdown or suspension of all but essential businesses and services in nearly every state.  Petitioners' countries of origin have been similarly impacted, but with far fewer resources to fight the spread of the virus or provide care for those who fall ill.

12.    Because of its failures to follow the CDC guideline over the past few months, the United States has removed dozens of immigrants infected with COVID-19, thereby exposing every other person who travelled with them to COVID-19.[2]

---

[1] *Consideration for Travelers - Coronavirus in the United States*, CTRS. FOR DISEASE CONTROL AND   PREVENTION,    https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited July 8, 2020).

[2] Juan Montes, U.S. Fails to Prevent Deportation of Migrants Infected With Covid-19, Guatemalan Officials Say, THE WALL STREET JOURNAL (June 24, 2020) https://www.wsj.com/articles/u-s-fails-to-prevent-deportation-of-migrants-infected-with-covid-19-guatemalan-officials-say-11593023095 ("a Guatemalan health official said that 28 deportees

13.     The risks of exposure to COVID-19 during removal are so great that on Monday, May 11, 2020, United States Representative Frederica Wilson introduced the Haitian Deportation Relief Act, which calls for the suspension of the deportation of Haitian nationals until the COVID-19 pandemic has ended in both the United States and Haiti.[3]

14.     There are no reasonable practices to test detainees for COVID-19 prior to deportation; Immigration and Customs Enforcement ("ICE") told the Miami Herald that the agency would acquire approximately 2,000 tests a month "but given the nationwide shortages of testing kits, 'the agency likely won't have enough to test all aliens scheduled for future removals and will prioritize testing based on evolving operational considerations,' ICE said."[4]

15.     Upon information and belief, Respondents do not test every detainee for COVID-19 prior to deportation.

---

tested positive upon arrival since May 4, when the first flight under the new protocols arrived from Brownsville, Texas, until mid-June."); Caitlin Dickerson & Kirk Semple, *U.S. Deported Thousands Amid Covid-19 Outbreak. Some Proved to Be* Sick, N.Y. TIMES (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/us/deportations-coronavirus-guatemala.html ("Dozens of Guatemalans flown home by Immigration and Customs enforcement since late March tested positive for the coronavirus after returning, according to Guatemalan authorities."); Maria Martin, *Official Alleges The U.S. Has Deported Many COVID-19-Positive Migrants To Guatemala*, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-to-guatema. (Guatemalan health officials claim one deportation flight from the United States arrived with 75% of its passengers infected).
[3] Press Release, Rep. Frederica S. Wilson, Wilson Introduces Bill to Suspend Deportations to Haiti During Pandemic (May 11, 2020), https://wilson.house.gov/media-center/press-releases/wilson-introduces-bill-to-suspend-deportations-to-haiti-during-pandemic.
[4] Monique O. Madan, Jacqueline Charles, & Romina Ruiz-Goiriena, *ICE plans to increase COVID-19 testing as Haiti commission calls for pause in deportations*, MIAMI HERALD (Apr. 24, 2020), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article242265956.html.

16.     Upon information and belief, when Respondents do test a detainee for COVID-19 prior to deportation, they utilize a "rapid" COVID-19 test that shows higher "false negative" rates than other methods of testing.

17.     According to ICE reports, as of July 6, 2020, ICE reported 836 cases of COVID-19 among its current detainee population of 22,805.[5]

18.     ICE Guidance on COVID-19 is woefully inadequate; it does not require: testing prior to removal; the provision of face masks to detainees; or social distancing during transportation to airports or on flights.[6]

19.     During the removal process, individuals and families are frequently shuttled across the country between different detention centers, and often confined in close quarters.  Even the ordinary process for removing asylum-seeking families—transporting families en masse via bus or other vehicle to airports, where they are crowded onto commercial airplanes and flown to their home countries—is fraught with danger related to the COVID-19.

20.     Respondents' actions also put Petitioners' health and safety at great risk even after they arrive in their home countries.  Upon arrival, Petitioners may be subjected to quarantine measures (presenting the risk of further persecution as Petitioners may be viewed as disease carriers).  Once individuals who are removed from the United States are permitted to leave quarantine, they may have no safe place to turn, especially if they were fleeing persecution in their homes in the first place. In some countries, public transportation is suspended and curfews are imposed, inhibiting Petitioners' ability to contact relatives or friends, as well as their ability to

---

[5]   *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).
[6]   *Id.*

reach a safe place to stay amid the ongoing pandemic.  These risks are all-the-more inhumane when, as here, they threaten children.

**Unreasonable Unsafe Removal & Removal Pursuant to Invalid Orders is Unconstitutional**

21.　　Deportation proceedings that subject Petitioners to COVID-19 infections in the United States and/or in Petitioners' home countries and who received orders of removal resulting from a process that was found to be void *ab initio,* would infringe on Petitioners' constitutional rights.

22.　　Without a stay of removal, Respondents may remove Petitioners at any time.

23.　　Without a stay of removal, the deportation of all detained and some non-detained Petitioners is imminent.

24.　　Absent a stay of removal from this Court, Petitioners will face imminent harm and possible death from COVID-19.

25.　　Petitioners seek a temporary stay of their removal to avoid the grave danger and risk of peril caused by the deportation process as it exists.  As described in further detail below, deporting Petitioners during the coronavirus pandemic would violate (1) Petitioners' substantive and procedural due process rights, (2) the special-relationship doctrine, (3) the state-created danger doctrine, and (4) the *Accardi* doctrine.

26.　　Petitioners also seek a temporary stay of their removal until the Petitioners who had final orders of removal issued based on the "Transit Ban" have been provided a lawful process.

**Suspension Clause**

27.　　The writ of habeas corpus is so foundational to our legal framework that the Constitution provides: "[t]he privilege of the writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it."  U.S. CONST. art. I, § 9, cl.

2.  It is the only writ enshrined in the Constitution, and this, along with the Judiciary Act of 1789 (1 Stat. 73 (1789)), establishes the authority for at least the Supreme Court to issue writs of habeas corpus when they believe detention is unlawful.

28.     The same authority vested in the Supreme Court above has been extended by Congress to the district courts through the Habeas Corpus Act of 1867 (14 Stat. 385 (1867)), which provides that a district court can grant the writ of habeas corpus whenever a petitioner is "in custody in violation of the Constitution or law and treaties of the United States." 28 U.S.C. § 2241(c)(3).

29.     Absent this Court's intervention, Petitioners have no adequate substitute to challenge the legality of Respondents' action to deport them during the COVID-19 pandemic to countries where it has been confirmed that the government has deported people who tested positive for the virus for which there is no cure.

30.     The Supreme Court has noted the habeas corpus writ's "scope and flexibility," *i.e.*, its "capacity to reach all manner of illegal detention," and its "ability to cut through barriers of form and procedural mazes." *Harris v. Nelson*, 394 U.S. 286, 291 (1969).  Additionally, the remedy should "be administered with the initiative and flexibility essential to ensure that miscarriages of justices within its reach are surfaced and corrected." *Id.*

31.     The Constitution permits and requires the Court to retain residual habeas jurisdiction to ensure that the process employed by Respondents to deport Petitioners meets constitutional standards.

32.     The writ of habeas corpus is "a procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny...." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968).

Chief Justice Earl Warren stated that it is this "high purpose [that] has made the writ both the symbol and guardian of individual liberty." *Id.*

33.     A stay of removal is necessary to maintain the *status quo* to ensure that Respondents do not engage in a removal process that unlawfully extinguishes the ability of Petitioners to pursue their claims and not be exposed to life threatening conditions in removal. A stay is therefore necessary to ensure the effectiveness of the judicial review process to protect Petitioners' property and liberty interests.

34.     Respondents' swift deportation of one family to Mexico 24 hours after Judge Berman Jackson lifted the administrative stays in *M.M.V v. Barr*, and their preparation to deport other families to Honduras the evening after Judge Berman Jackson lifted the administrative stays, are evidence that Petitioners' deportation to their countries of origin is imminent.

## PARTIES

35.     Petitioners are all mothers, fathers, and children either detained at Dilley or Berks, or released, who have been issued negative credible and reasonable fear determinations.

36.     Petitioners D.A.M. and her minor child Y.H.A. are Honduran nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 20, 2019. Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

37.     Petitioners M.M.V. and her minor son A.A.M. are Salvadoran nationals who seek protection in the United States from persecution and torture. M.M.V. and A.A.M. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear

9

interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

38.     Petitioners S.L.V. and her minor daughter M.F.L. are Salvadoran nationals who seek protection in the United States from persecution and torture.  S.L.V. and M.F.L. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

39.     Petitioners M.R.A. and her minor daughter L.C.R. are Honduran nationals who seek protection in the United States from persecution and torture.  M.R.A. and L.C.R. were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

40.     Petitioners A.L.V. and her minor sons I.G.L. and A.G.L. are Honduran nationals who seek protection in the United States from persecution and torture.  A.L.V., I.G.L., and A.G.L.

were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

41.    Petitioners L.O.R. and her minor son A.P.O. are Honduran nationals who seek protection in the United States from persecution and torture. L.O.R. and A.P.O. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

42.    Petitioners N.P. and her minor daughter R.D.P. are Honduran nationals who seek protection in the United States from persecution and torture. N.P. and R.D.P. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019. Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019. They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

43.      Petitioners M.D.E. and her minor son A.G.D. are Salvadoran nationals who seek protection in the United States from persecution and torture.  M.D.E. and A.G.D. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 29, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

44.      Petitioners M.M.B. and her minor daughter N.M.M. are Nicaraguan nationals who seek protection in the United States from persecution and torture.  M.M.B. and N.M.M. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on August 31, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

45.      Petitioners D.C.V. and her minor son S.V.C. are Guatemalan nationals who seek protection in the United States from persecution and torture.  D.C.V. and S.V.C. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 30, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in

Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

46.     Petitioners M.G.V. and her minor child A.R.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 3, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

47.     Petitioners R.P.F. and her minor child J.F.P. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

48.     Petitioners J.M.R. and her minor child C.G.M. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 20, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30,

2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

49.     Petitioners J.S.M. and her minor child D.M.S. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

50.     Petitioners Y.U. and her now adult child F.G.U. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 23, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

51.     Petitioners I.F.L. and her minor child R.F.L. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 24, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2,

2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 19, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

52.     Petitioners N.M.L. and her minor child A.R.M. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

53.     Petitioners Y.O.T., a Salvadoran national, D.L.O., a Guatemalan national and V.L.O., a Guatemalan and Salvadoran national, seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

54.     Petitioners M.A.A. and her minor children A.R.A. and C.A.A. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear

interview on September 4, 2019, and were served with negative credible fear determinations on September 4, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

55.     Petitioners C.C.N. and her minor son B.S.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  C.C.N. and B.S.C. were placed in credible fear proceedings on or around August 27, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on December 12, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

56.     Petitioners L.H.H. and her minor daughter Y.F.H. are Honduran nationals who seek protection in the United States from persecution and torture.  L.H.H. and Y.F.H. were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

57.     Petitioners S.G.H. and her minor child A.G.H. are Salvadoran nationals who seek protection in the United States from persecution and torture.  S.G.H. and A.G.H. were placed in credible fear proceedings on or around August 30, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

58.     Petitioners J.S.P. and her minor son M.A.S. are Honduran nationals who seek protection in the United States from persecution and torture.  J.S.P. and M.A.S. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 26, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

59.     Petitioners K.P.P. and her minor children I.P.P. and M.P.P. are Ecuadorean nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around September 9, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.   They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful

final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

60.    Petitioners K.N.E. and her minor son E.A.N. are Honduran nationals who seek protection in the United States from persecution and torture.  K.N.E. and E.A.N. were placed in credible fear proceedings on or around September 8, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 16, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

61.    Petitioners M.H. and her minor son J.M.H. are Honduran nationals who seek protection in the United States from persecution and torture.  M.H. and J.M.H. were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Although they have been released from the South Texas Family Residential Center in Dilley, Texas, they remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

62.    Petitioners M.C.M. and her minor child S.M.C. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2,

2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

63.     Petitioners Y.V.O. and her minor child E.P.V. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 18, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

64.     Petitioners S.L.R. and her minor child A.V.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 19, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

65.     Petitioners A.D.L. and her minor child M.D.D. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 26, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas

Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

66.     Petitioners D.P.R. and her minor child S.B.P. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

67.     Petitioners L.G.G. and her minor child W.C.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

68.     Petitioners M.C.P. and her minor children J.C.P. and M.R.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 23, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Petitioner M.C.P. has been released with her children for medical reasons.  Although they have been released from the South Texas Family Residential Center in Dilley, Texas, they remain "in custody" for habeas

corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

69.     Petitioners R.L.A. and her minor child N.C.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 28, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

70.     Petitioners M.L.M. and her minor child J.R.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 27, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Petitioner M.L.M. and J.R.L. have been released for medical reasons, but they remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

71.     Petitioners C.C.G. and her minor child E.C.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas

Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

72.    Petitioners B.C.A. and her minor child G.S.C. are Ecuadorian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 17, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

73.    Petitioners L.M.P. and her children Y.M.M. and L.P.M. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019.  The family was served with negative credible fear determinations on October 30, 2019.  The negative decisions were affirmed by an immigration judge on December 2, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

74.    Petitioners A.G.P. and her children D.S.G. and A.S.G. are Mexican nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019.  The family was served with negative credible fear determinations on October 30, 2019.  The negative decisions were affirmed by an immigration judge on December 2, 2019.

They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

75.     Petitioners C.R.R. and her children I.G.R. and V.G.R. are Mexican nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 10, 2019 and attended their initial credible fear interview on October 26, 2019.  The family was served with negative credible fear determinations on November 1, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

76.     Petitioners E.G. and her child J.G.M. are Brazilian nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview on October 12, 2019.  The family was served with negative credible fear determinations on October 31, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

77.     Petitioners B.G.C. and her child S.M.G. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 11, 2019.  The family was served with negative credible fear determinations on October 31, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

78.     Petitioners T.S.J. and her children L.P.S. and G.S.J. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview on October 18, 2019.  The family was served with negative credible fear determinations on November 1, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

79.     Petitioners I.C.A. and her child S.P.C. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 10, 2019.  The family was served with negative credible fear determinations on October 29, 2019.  The negative determinations were affirmed by an Immigration Judge on December 2, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

80.     Petitioners M.P.O. and her child G.G.L. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 17, 2019.  The family was served with negative credible fear determinations on November 1, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

81. Petitioners D.O.H. and her children L.A.O. and D.A.O. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 24, 2019 and attended their initial credible fear interview on October 7, 2019. The family was served with negative credible fear determinations around October 18, 2019. The negative determinations were affirmed by an Immigration Judge on November 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

82. Petitioners S.J.A. and her child W.A.A. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 4, 2019. The family was served with negative credible fear determinations on October 18, 2019. The negative determinations were affirmed by an Immigration Judge on November 14, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

83. Petitioner child A.V.M. is a Guatemalan national who entered the United States accompanied by her mother E.V.M., who was placed in reasonable fear proceedings. A.V.M. was placed in credible fear proceedings on September 29, 2019 and attended her initial credible fear interview on October 14, 2019. She was served with a negative credible fear determination on October 17, 2019. The negative determination was affirmed by an immigration judge on November 14, 2019. E.V.M. and A.V.M. are detained at the South Texas Family Residential

Center in Dilley, Texas and A.V.M has an unlawful final order of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

84.     Petitioners M.A.R. and her child S.R.S. are Brazilian nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 11, 2019.  The family was served with negative credible fear determinations on October 22, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

85.     Petitioners O.T.G. and her child T.T.G. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019.  The family was served with negative credible fear determinations on October 24, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

86.     Petitioners M.T.T. and her child Y.L.T. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019.  The family was served with negative credible fear determinations on October 14, 2019.  The negative determinations were affirmed by an Immigration Judge on November 12,

2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

87.     Petitioners R.C.H. and her child E.P.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019.  The family was served with negative credible fear determinations on October 9, 2019.  The negative determinations were affirmed by an Immigration Judge on November 5, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

88.     Petitioners M.J.P. and her children A.M.P., A.P.P., and C.P.P. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 17, 2019 and attended their initial credible fear interview on September 20, 2019.   The family was served with negative credible fear determinations on October 4, 2019.  The negative determinations were affirmed by an Immigration Judge on November 4, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

89.     Petitioners I.H.L. and her child S.R.H. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 23, 2019 and attended their initial credible fear interview on September 30, 2019.  The family was served with negative credible fear determinations on October

27

8, 2019. The negative determinations were affirmed by an Immigration Judge on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

90. Petitioners L.M.B. and her children Z.R.M. and E.R.M. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 26, 2019 and attended their initial credible fear interview on October 3, 2019. The family was served with negative credible fear determinations on October 10, 2019. The negative determinations were affirmed by an Immigration Judge on November 6, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

91. Petitioners C.H.G. and her child M.G.H. are Salvadoran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 25, 2019 and attended their initial credible fear interview on October 3, 2019. The family was served with negative credible fear determinations on October 26, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

92. Petitioners T.C.L. and her child A.P.C. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 16,

2019. The family was served with negative credible fear determinations on October 31, 2019. The negative determinations were affirmed by an Immigration Judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

93. Petitioners J.C. and her child Y.J.C. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. The family was served with negative credible fear determinations on October 30, 2019. The negative determinations were affirmed by an Immigration Judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

94. Petitioners L.M.L. and her child M.R.M. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 18, 2019. The family was served with negative credible fear determinations on October 4, 2019. The negative determinations were affirmed by an Immigration Judge on November 4, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

95. Petitioners T.R.M. and her child J.R.R. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 7, 2019 and attended their initial credible fear interview on September

29

18, 2019.  The family was served with negative credible fear determinations on October 10, 2019. The negative decisions were affirmed by an immigration judge on November 13, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

96.     Petitioners B.H.I. and her child D.M.H. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019.  The family was served with negative credible fear determinations on November 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

97.     Petitioners S.R.F. and her child C.M.R. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 15, 2019 and attended their initial credible fear interview on October 30, 2019.  The family was served with negative credible fear determinations on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

98.     Petitioners M.Z.L. and her child F.P.Z. are Peruvian nationals who seeks protection from persecution and torture in the United States.  They were placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 27, 2019. They were served with a negative credible fear determination on October 18, 2019.  The negative

decision was affirmed by an immigration judge on November 14, 2019. On November 27, 2019, M.Z.L. and F.P.Z. were released from detention from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes, and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

99.     Petitioners I.M.V. and her children J.T.M. and D.T.M. are Colombian nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 17, 2019. The family was served with negative credible fear determinations on September 26. The negative decisions were affirmed by an immigration judge on October 24. They were released from detention on November 27, 2019 with final orders of removal.

100.     Petitioners F.F.A., a Mexican national, D.A.B., a Honduran national, and their six-month old baby Petitioner A.A.B., a Mexican national, seek protection in the United States from persecution and torture. F.F.A., D.A.B., and A.A.B. were placed in credible fear proceedings on or around February 18, 2020, attended their credible fear interview on February 25, 2020 and were served with a negative credible fear determination on March 2, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 5, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

101.     Petitioners G.S.C., a father, M.C., a mother, both Haitian nationals, and their minor children G.R.S.C., who is a Haitain national, and Petitioner N.Y.B., who is a Chilean national, seek protection in the United States from persecution and torture. G.S.C., M.C., G.R.S.C., and N.Y.B. were placed in credible fear proceedings on or around March 2, 2020, attended their

credible fear interview on March 16, 2020 and were served with a negative credible fear determination on March 18, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 24, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the Berks County Family Residential Center in Leesport, Pennsylvania.

102.    Petitioners N.V., a Haitian national, and her minor child Z.F., a Brazilian national, seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around January 23, 2020, attended their initial credible fear interviews on January 30, 2020, and were served with negative credible fear determinations on February 5, 2020. Their negative credible fear determinations were affirmed by an immigration judge on February 14, 2020. They have final orders of removal, and Z.F.'s final order is unlawful as it was procured under the vacated Transit Ban, which no longer has the force and effect of law. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

103.    Petitioners C.L., a Haitian national, and her minor child J.A., a Brazilian national, seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around January 22, 2020, attended their initial credible fear interviews on January 31, 2020, and were served with negative credible fear determinations on February 7, 2020. Their negative credible fear determinations were affirmed by an immigration judge on February 14, 2020. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

104.    Petitioners A.O.V. and her minor child J.S.O., Honduran nationals, seek protection from persecution and torture in the United States. A.O.V. and J.S.O. were placed in credible fear

proceedings on or around August 25, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas, and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

105.    Petitioners R.S.J. and her minor child S.A. are Haitian nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around February 12, 2020, attended their initial credible fear interviews on February 24, 2020, and were served with negative credible fear determinations on March 11, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 20, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

106.    Petitioners B.L., a father, and C.N., a mother, are Haitian nationals, and their minor child B.L.N., is a Chilean national, and they seek protection in the United States from persecution and torture. B.L., C.N., and B.L.N. were placed in credible fear proceedings on or around March 11, 2020, attended their credible fear interview on March 19, 2020 and were served with a negative credible fear determination on March 26, 2020. Their negative credible fear determinations were affirmed by an immigration judge on April 8, 2020. They have been released from the Berks County Family Residential Center in Leesport, Pennsylvania, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

33

107.     Petitioners M.P.A. and her minor child G.S.P. are Ecuadorian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 26, 2020, attended their initial credible fear interviews on March 10, 2020, and were served with negative credible fear determinations on March 13, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 20, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.   They are detained at the South Texas Family Residential Center in Dilley, Texas.

108.     Petitioners S.M.C. and her minor children D.S.M. and A.M.M. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 16, 2020, attended their initial credible fear interviews on March 19, 2020, and were served with negative credible fear determinations on March 23, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 25, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

109.     Petitioners M.T.B. and her minor children A.V.B. and W.A.B. are Haitian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 27, 2020, attended their initial credible fear interviews on March 11, 2020, and were served with negative credible fear determinations on March 17, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 25, 2020.  They have unlawful final orders of removal procured under the vacated

Transit Ban, which no longer has the force and effect of law.   They are detained at the South Texas Family Residential Center in Dilley, Texas.

110.     Petitioners I.F. and her minor children Z.M.F., E.G.F., and J.M.F. are Ecuadorian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around January 14, 2020, attended their initial credible fear interviews on January 22, 2020, and were served with negative credible fear determinations on January 28, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on February 5, 2020.   They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

111.     Petitioners Z.L. and her minor child J.C.L. are Ecuadorian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 22, 2020, attended their initial credible fear interviews on February 26, 2020, and were served with negative credible fear determinations on March 4, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 10, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

112.     Petitioners R.S.P. and her minor children F.P.P. and C.P.P. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 10, 2020, attended their initial credible fear interviews on March 15, 2020, and were served with negative credible fear determinations on March 27, 2020.  Their negative credible fear determinations were affirmed by an immigration

judge on April 6, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

113.    Petitioners I.C.T. and her minor child V.T.P. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 25, 2020, and were served with negative credible fear determinations on March 30, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on April 1, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

114.    Petitioners I.E.B. and her minor child B.E. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 25, 2020, and were served with negative credible fear determinations on March 31, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on April 2, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

115.    Petitioners M.V.G. and her minor children D.M.V. and J.M.V are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 24, 2020, and were served with negative credible fear determinations on

March 26, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 31, 2020.   They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

116.   Petitioners M.P.T. and her minor children A.A.P. and H.A.P. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 7, 2020, attended their initial credible fear interviews on March 13, 2020, and were served with negative credible fear determinations on March 16, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 23, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

117.   Petitioners V.P.M. and her minor children S.L.P., N.L.P., and E.L.P. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 28, 2020, attended their initial credible fear interviews on March 2, 2020, and were served with negative credible fear determinations on March 9, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 11, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

118.   Petitioners J.H.R. and her minor child A.M.H. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 10, 2020, attended their initial credible fear interviews on March

14, 2020, and were served with negative credible fear determinations on March 16, 2020.  Their

negative credible fear determinations were affirmed by an immigration judge on March 20, 2020.

They have unlawful final orders of removal procured under the vacated Transit Ban, which no

longer has the force and effect of law.  They are detained at the South Texas Family Residential

Center in Dilley, Texas.

119.    Petitioners P.M. and M.N., Haitian nationals, and their minor child H.M.N., a

Chilean national, seek protection in the United States from persecution and torture. P.M., M.N.

and H.M.N. were placed in credible fear proceedings on or around March 11, 2020, attended their

credible fear interview on March 19, 2020 and were served with a negative credible fear

determination on March 26, 2020.  Their negative credible fear determinations were affirmed by

an immigration judge on April 8, 2020.  They have unlawful final orders of removal procured

under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained

at the Berks County Family Residential Center in Leesport, Pennsylvania.

120.    Petitioners A.Q.L. and her minor child A.G.C. are Guatemalan nationals who seek

protection in the United States from persecution and torture.  They were placed in credible fear

proceedings on or around March 1, 2020, attended their initial credible fear interviews on March

9, 2020, and were served with negative credible fear determinations on March 10, 2020.  Their

negative credible fear determinations were affirmed by an immigration judge on March 12, 2020.

They have unlawful final orders of removal procured under the vacated Transit Ban, which no

longer has the force and effect of law.  They are detained at the South Texas Family Residential

Center in Dilley, Texas.

121.    Petitioners A.B.C. and her child E.C.B. are Salvadoran nationals who seek

protection in the United States from persecution and torture. The family was placed in credible

fear proceedings on August 29, 2019 and attended their initial credible fear interview on September 4, 2019. The family was served with negative credible fear determinations on September 11, 2019. The negative determinations were affirmed by an Immigration Judge on September 23, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

122.    Respondent William P. Barr is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ").  DOJ is the federal agency responsible for the administration and enforcement of the immigration laws, and for advising the relevant federal Departments and agencies of their duties under the law.  He is sued in his official capacity, and is the immediate and legal custodian of Petitioners.  Respondent Barr's address is U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, District of Columbia 20530.

123.    Respondent Chad Wolf is the Acting Secretary of the Department of Homeland Security ("DHS"), the Department of the Executive Branch of the United States government that oversees the agencies responsible for enforcing the immigration laws of the United States. Defendant Wolf is the head of DHS and has ultimate responsibility for the administration and enforcement of the immigration laws by DHS agencies.  In that capacity, Respondent Wolf has direct authority over all policies, procedures and practices relating to the apprehension of immigrants at the United States border and any subsequent removal proceedings.  He is sued in his official capacity, and is the immediate and legal custodian of Petitioners.  Respondent Wolf's address is U.S. Department of Homeland Security, 800 K Street, N.W. #1000, Washington, District of Columbia 20528.

## JURISDICTION AND VENUE

### Jurisdiction

124.    The Court has jurisdiction over the Petitioners' claims, and this Petition is brought pursuant to 28 U.S.C. §§ 2241 *et seq*., as provided under Art. I § 9, cl. 2 of the United States Constitution ("Suspension Clause"), federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction based on the United States as respondent under 28 U.S.C. § 1346(a)(2).

125.    This case arises under the United States Constitution, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq*.

126.    This Court also has remedial authority under its inherent authority, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., and the All Writs Act, 28 U.S.C. § 1651.

127.    While only the federal courts of appeal have jurisdiction to review removal orders directly through petitions for review, *see* 8 U.S.C. §§ 1252(a)(1), (b), federal district courts have jurisdiction to hear habeas claims by noncitizens challenging the lawfulness or constitutionality of ICE's conduct in detaining them, *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

128.    This Petition has been brought by, and is directed to, the appropriate parties.  A petition for a writ of habeas corpus may be brought by anyone "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  "The writ . . . shall be directed to the person having custody of the persons detained." 28 U.S.C. § 2243. Accordingly, the proper respondent to a habeas petition is the person who has custody over the petitioner.  "[T]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."  *Rasul*, 542 U.S. at 478–79 (quoting *Braden v. 30th Judicial Circuit*, 410 U.S. 484, 495 (1973)).

40

129.    Federal courts have jurisdiction to hear habeas petitions because "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion of O'Connor, J.); U.S. CONST. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended…"); 28 U.S.C. § 2241(c)(3) (stating federal courts may grant the writ to any person "in custody in violation of the Constitution or laws or treaties of the United States").  District courts may grant habeas relief "within their respective jurisdictions." 28 U.S.C. § 2241(a).

130.    Jurisdiction over a habeas corpus petition can, under some narrow circumstances, be deprived by 8 U.S.C. § 1252, but those circumstances are not applicable here.  For 8 U.S.C. § 1252 to deprive the Court of habeas jurisdiction, the Court must assess a two-pronged inquiry: (i) whether the statute contains a clear statement that the Court lacks habeas jurisdiction, and (ii) if the statute does clearly deny jurisdiction, then whether the statute unconstitutionally suspends the habeas writ by failing to provide an adequate alternative forum for review. *Boumediene v. Bush*, 553 U.S. 723, 736, 771 (2008) (determining first whether the statute "denies the federal courts jurisdiction," and then whether the statute "avoids the Suspension Clause mandate" by providing "adequate substitute procedures for habeas corpus"); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 575 (2006) (tracing the requirement of an "unmistakably clear statement" at least as far back as *Ex parte Yerger*, 75 U.S. 85, 104-05 (1868)).

131.    With respect to the first prong, the clear-statement rule must be applied to each case's facts, *i.e.*, even though a statute's jurisdiction-stripping statement might clearly strip jurisdiction for one set of facts, the same statement might be ambiguous as to another set of facts, and in the latter circumstance, jurisdiction is retained. S*ee Flores-Torres v. Mukasey*, 548 F.3d 708, 712 n.6 (9th Cir. 2008) (holding that "in this circumstance" § 1252(b) does not provide a

41

"clear statement" even if it does in other circumstances). This has proven particularly true with section 1252 because the statute strips jurisdiction in some respects but is ambiguous in others. *See Hernandez v. Gonzales*, 424 F.3d 42, 42–43 (1st Cir. 2005) (stating that § 1252 strips jurisdiction over some but not all alien habeas petitions).

132.     The U.S. Supreme Court has confirmed that section 1252 is not universal in its jurisdiction-stripping provisions.  *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471 (1999) (hereinafter "*AADC*").  The *AADC* Court explained that section 1252 strips jurisdiction only for a "narrow" class of alien challenges to "discrete actions" of the Attorney General.  *Id.* at 482.  This "narrow" reading of section 1252 was critical to the outcome of the *AADC* case because the majority and the minority jockeyed over whether section 1252 barred the entire "universe of deportation claims," or a "much narrower" set. *Id.*  Despite the dissenting justice's arguments, the majority agreed that the narrow view must prevail.  *See id.* at 505–06 (Souter, J., dissenting) (arguing that the section was in fact "exhaustive").

133.     This limited reading of section 1252 was reinforced in *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018).  *See, e.g.*, *Osorio-Martinez v. AG United States*, 893 F.3d 153, 178 (3d Cir. 2018) (finding jurisdiction stripping under section 1252(e) violates suspension clause).  In sum, section 1252 is not a talisman to be invoked to eliminate a noncitizen's habeas petition; instead, a case-by-case analysis is necessary to determine when it applies.  *See Osorio-Martinez*, 893 F.3d at 178.

134.     Here, 8 U.S.C. § 1252 does not deprive this Court of jurisdiction over Petitioners' claims.  The right to seek habeas corpus relief is fundamental to the Constitution's scheme of ordered liberty.  Habeas corpus is "a writ employed to bring a person before a court, most frequently to ensure that the party's imprisonment or detention is not illegal." *Boumediene*, 553

U.S. at 737 (quoting BLACK'S LAW DICTIONARY 728 (8th ed. 2004)). Blackstone called it "the most celebrated writ in English law," (3 WILLIAM BLACKSTONE, COMMENTARIES *129) and deemed the Habeas Corpus Act of 1679 "the stable bulwark of our liberties" (1 WILLIAM BLACKSTONE, COMMENTARIES *137).

135.    Moreover, jurisdiction is not stripped by 8 U.S.C. § 1252(g)'s bar against jurisdiction over claims arising from the Attorney General's exercise of discretion, because this non-core habeas petition challenges not a discretionary decision, but Respondents' legal authority. When, as here, "[t]he question before the Court is not why the [Respondents] chose to execute the removal order" but is instead focused on "whether the way Respondents acted accords with the Constitution and the laws of this country," § 1252(g) does not bar jurisdiction. *You v. Nielsen*, 321 F. Supp. 3d 451, 457-58 (S.D.N.Y. 2018) (holding that "§ 1252(g) is no bar to jurisdiction" over a request for a stay pending challenge of an administrative process).

## Venue

136.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the defendant federal agencies are headquartered in this District.

137.    Venue is not controlled by the immediate custodian rule, and the Petitioners' non-core habeas claims are all properly brought in this District. *See e.g. S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018).

138.    The immediate custodian rule is "limited [] to "core" petitions challenging present physical detention, implicitly leaving open whether the rule applies to "non-core" challenges. *See id.* (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 442-43(2004)). "[U]nder the governing case law, [the Attorney General] is the proper respondent for ["non-core" habeas claims[.]" *S.N.C.*, 325 F. Supp. 3d at 410.

43

139.    This Court has jurisdiction over this claim, as the Attorney General is a named party and because venue in this district does not pose an inconvenience for the parties or otherwise offend other "traditional venue considerations[.]" *Batista-Taveras v. Ashcroft*, No. 03 Civ 1968 (LAK), 2004 U.S. Dist. LEXIS 19136 at *21 (S.D.N.Y. Sept. 22, 2004); *S.N.C.*, 325 F. Supp. 3d at 410.

## STATEMENT OF FACTS

140.    Petitioners (who are mothers, fathers, and their children) made dangerous journeys to the United States, after being subjected to harm and persecution that triggered their flights from their home countries to seek protection in the United States.

141.    Because of this past trauma, many of the Petitioners suffer from symptoms of post-traumatic stress disorder ("PTSD"), anxiety, and depression.[7]

142.    After completing their journeys to the United States—which lasted for more than a month for some Petitioners—all Petitioners were apprehended and placed in CBP custody. They remained, often for days, in cages and/or cement cells, without access to privacy, showers, beds, telephones, pillows, hot meals, or adequate medical attention.

143.    Petitioners were eventually moved to Dilley or Berks, where many of them remain detained.

144.    Some of the Petitioners were released based upon medical conditions but remain in custody of Respondents and may be removed from the United States immediately absent an administrative stay.

---

[7] *Cf.* Allen Keller et al., *Pre-Migration Trauma Exposure and Mental Health Functioning Among Central American Migrants Arriving at the U.S. Border*, PLOS (Jan. 10, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0168692, (PTSD, anxiety, and depression reported in Central American migrants).

145.    Against this backdrop, while in immigration custody, the COVID-19 pandemic hit the United States and Petitioners' home countries.

146.    On January 31, 2020, the United States Secretary of Health and Human Services declared a public health emergency under the Public Health Services Act due to COVID-19.   Press Release, U.S. Dep't of Health & Human Serv., Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

147.    On March 13 and 20, 2020, the President of the United States issued two national emergency declarations under the National Emergencies Act (Proclamation No. 9994, 2020 DAILY COMP. PRES. DOC. 156 (Mar. 13, 2020)), and  under the Stafford Act (Memorandum on Providing Federal Support for Governors' Use of the National Guard to Respond to COVID-19, 2020 DAILY COMP. PRES. DOC. 181 (Mar. 22, 2020)) respectively, and on March 18, the President invoked emergency powers via Executive Order under the Defense Production Act due to COVID-19 (Exec. Order No. 13909, 2020 DAILY COMP. PRES. DOC 172 (Mar. 18, 2020)).

**Petitioners Are at Risk for Immediate Deportation**

148.    Upon information and belief, without a stay of removal, Respondents will quickly deport all detained Respondents.

149.    Upon information and belief, without a stay of removal, Respondents will begin to deport all non-detained Respondents.

**The Majority of Petitioners Were Subjected to the Now-Void "Transit Ban"**

150.    On July 16, 2019, the Departments of Justice and Homeland Security jointly published an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban").

45

151.    The Transit Ban renders noncitizens seeking to enter the United States at its southern border categorically ineligible for asylum unless they first applied for similar protection in a third country they transited through (other than the country they fled) and were rejected there, are victims of severe forms of trafficking; or did not pass through any country that is a signatory to the Refugee Convention, Refugee Protocol in route to the United States.  *See* 84 Fed. Reg. at 33,835.

152.    The Transit Ban further provides that noncitizens ineligible for asylum under § 208.13(c)(4) are automatically and conclusively determined not to have a "credible fear" of persecution in their home countries.  *See* 8 C.F.R. § 208.30(e)(5)(iii).

153.    The Transit Ban should not limit a noncitizen's ability to seek withholding of removal under either Section 241(b)(3) of the INA or the Convention Against Torture ("CAT"). *See* 84 Fed. Reg. at 33,834.  It excludes: (1) an alien who, while in transit to the United States, applied for and was denied protection for individuals fleeing persecution or torture; (2) an alien who is a "victim of a severe form of human trafficking," 8 C.F.R. § 214.11; or (3) an alien who transited only through "a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT."  84 Fed. Reg. at 33,835.

154.    Under the Transit Ban, if an immigration officer determined that a noncitizen subject to expedited removal was barred from asylum eligibility, the noncitizen was summarily found not to have a credible fear of persecution, typically without any supervisor review as required (8 C.F.R. § 208.30(e)(8), see also U.S.C. § 1225(b)(1)(E)(ii)), and informed during the CFI interview itself that they were barred from seeking asylum in the United States.

155.    The immigration officer then proceeded to determine only if a reasonable fear of persecution existed for withholding of removal or CAT protection.

46

156.    Reasonable fear represents a higher standard than credible fear.  It is defined by regulation as "a reasonable possibility that [the applicant] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c).

157.    If the noncitizen did not establish a reasonable fear of persecution during the interview to the interviewer's satisfaction, a written notice of decision was issued, subject to review by an immigration judge under the higher standard of reasonable fear (i.e., not the more moderate credible fear standard).

158.    The Transit Ban renders noncitizens seeking to enter the United States at its southern border categorically ineligible for asylum unless they first applied for similar protection in a third country they transited through (other than the country they fled) and were rejected there. *See* 84 Fed. Reg. at 33,835.3.  The Transit Ban does not limit a noncitizen's ability to seek withholding of removal under either Section 241(b)(3) of the INA or the Convention Against Torture ("CAT").  *See* 84 Fed. Reg. at 33,834.  It excludes: (1) an alien who, while in transit to the United States, applied for and was denied protection for individuals fleeing persecution or torture; (2) an alien who is a "victim of a severe form of human trafficking," 8 C.F.R. § 214.11; or (3) an alien who transited only through "a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT."  84 Fed. Reg. at 33,835.

159.    The only Petitioners who were **not** subjected to the Transit Ban are: Petitioners A.G.P. and her children D.S.G. and A.S.G.; Petitioners C.R.R. and her children I.G.R. and V.G.R.; Petitioners E.V.M. a Guatemalan national; Petitioners I.M.V. and her children J.T.M. and D.T.M;

Petitioner N.V., a Haitian national, and; Petitioner C.L., a Haitian national, and her minor child J.A.

160.    The remaining Petitioners were subjected to the Transit Ban and its procedures and their final orders of removal resulted from Respondents' application of the Transit Ban to those Petitioners ("Transit Ban Petitioners").

161.    On June 30, 2020, in *Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020) ("*CAIR*"),[8] in a Memorandum Opinion, *id.*, and accompanying Order (*CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20), Judge Timothy J. Kelly of the District Court of the District of Columbia entered an Order vacating the Transit Ban.

162.    In *CAIR*, the plaintiffs—immigrant-services organizations and individual asylum applicants who had received negative credible fear determinations based upon the Transit Ban—alleged, among other things, that the Transit Ban was unlawful for several reasons, including that was arbitrary and capricious, and was issued without notice-and-comment procedures required under the Administrative Procedure Act ("APA").  *CAIR*, 2020 WL 3542481 at *1.

163.    The parties cross-moved for summary judgment and Judge Kelly granted plaintiffs' motion and denied the defendants', holding that "Defendants unlawfully promulgated the [Transit Ban] without complying with the APA's notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here."  *Id.*

164.    Judge Kelly vacated the Transit Ban in a final, appealable Order.  (*CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20).

---

[8] *CAIR* was consolidated with *I.A. v. Barr*, Civ. No. 19-2530 (TJK), 2020 WL 3542481 at *1.

165.    In ordering this remedy, Judge Kelly stated that the "APA commands that courts 'hold unlawful and set aside agency action[s]' taken 'without observance of procedure required by law.'" *CAIR*, 2020 WL 3542481 at *1 (citing 5 U.S.C. § 706(2)(D)).  "And the D.C. Circuit has held that '[f]ailure to provide the required notice and to invite public comment ... is a fundamental flaw that "normally" requires vacatur of the rule.'" *Id.* at *21 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)).  "Having found that the Rule was enacted unlawfully, the Court sees no reason why it should not be vacated." *Id.*

166.    Judge Kelly specifically denied the defendants' requests for alternative relief:

> Defendants also urge the Court to: limit any relief to the actual parties before the Court," Defs.' Supp. Br. at 5, pointing to Justice Thomas's concurrence in *Trump v. Hawaii*, —— U.S.——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), *id*. at 7. But there, Justice Thomas addressed the propriety of nationwide injunctions, *Trump*, 138 S. Ct. at 2424–29, which is not the issue here. As the D.C. Circuit has explained—and as Defendants concede, see Defs.' Supp. Br. at 9 n.1—"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also O.A. [v. Trump]*, 404 F. Supp. 3d [109, 153 (D.D.C. 2019).]

*Id.* at *22.

167.    "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void ab initio." *United States v. Goodner Bros. Aircraft, Inc*., 966 F.2d 380, 384 (8th Cir. 1992) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 313, (1979)); *see Chrysler Corp*, 441 U.S. at 313 ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act.") (citing *Morton v. Ruiz*, 415 U.S. 199 (1974) & *U.S. v. Allegheny–Ludlam Steel Corp*., 406 U.S. 742, 758, (1972)).

168.     Indeed, "to 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'"  *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (citing 91 C.J.S. Vacate (1955) & *Stewart v. Oneal*, 237 F. 897, 906 (6th Cir. 1916)).

169.      "An agency rule which violates the APA is void.  Agency action taken under a void rule has no legal effect."  *W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987) (citation omitted).

170.     The Transit Ban Petitioners all received negative credible fear determinations and all have final orders of removal because of the unlawfully promulgated Transit Ban.

171.     Because of *CAIR*, the Transit Ban Petitioners have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

172.     On July 6, 2020, the U.S. Court of Appeals for the Ninth Circuit held the Transit Ban unlawful pursuant to the APA and on the merits, affirming the district court's preliminary injunction against its enforcement in *East Bay Sanctuary Covenant v. Barr*, Case Nos. 19-16487, 19-16773 (9th Cir. July 6, 2020).  The preliminary injunction in that case is stayed pending further review by the Supreme Court.

**<u>Deportation Procedures</u>**

173.     When a family is scheduled for removal, ICE typically informs the family at around 8:00 p.m. that they will be processed for release from the facility immediately and be placed on a flight at around 6:00 a.m. the following morning.

174.     Families are then moved to a staging area where they are together with other families for hours overnight awaiting transport to the airport or bus station.

50

175.    This short timeframe often provides families with no opportunity to contact family members about their upcoming release to coordinate the details of their return home.

176.    During the removal process, individuals and families are frequently shuttled across the country among different detention centers, and often confined in close quarters.[9]

177.    Upon release, individuals are entitled to the money in their commissary account, which may have been deposited upon arrival or during detention by family members or friends, as well as any other personal possessions that were confiscated when they were taken into custody.

178.    Often, however, individuals are not provided with their money and/or personal possessions, including their cellphones, when they are released.  They are then unable to purchase food or tickets for travel back to their homes when they land in their country of origin, and unable to contact family for assistance.

**<u>Heightened Dangers from COVID-19</u>**

179.    As of July 8, 2020, there are 11,669,259 confirmed cases of COVID-19 worldwide and 539,906 confirmed deaths.[10]

180.    As of July 8, 2020, there are 2,923,432 confirmed cases of COVID-19 in the United States and 129,963 confirmed deaths.[11]

---

[9] Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH (Apr. 27, 2020), https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/ (last visited July 8, 2020).

[10]    *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORG., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited July 8, 2020).

[11] Coronavirus Disease (COVID-19) Dashboard, United States of America, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/us (last visited July 8, 2020).

181.    There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus.[12]

182.    The virus is thought to spread mainly from person-to-person such as (a) between people who are in close contact with one another (within about 6 feet); and (b) through respiratory droplets produced when an infected person coughs, sneezes or talks, because these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.[13]

183.    Studies have suggested that COVID-19 may be spread by people who are not showing symptoms.[14]

184.    Although it was originally believed that children who contracted COVID-19 did not become extremely ill, there are now reports of children hospitalized with a multisystem inflammatory disease who have tested positive for COVID-19.[15]   At least three children have died as a result of this multisystem inflammatory disease and new research continues to be published describing the ways that the virus can behave in children, which is not always how it behaves in adults.[16]

---

[12]  *How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html   (last   visited July 8, 2020).
[13]  *Id.*
[14]  *Clinical  Questions  about  COVID-19:  Questions  and  Answers:  Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission   (last   visited   July   8, 2020) (follow "When is someone infectious?" hyperlink).
[15]  Perri Klass, M.D., *The Checkup: Rethinking Covid-19 in Children,* N.Y. TIMES (May 12, 2020), https://www.nytimes.com/2020/05/12/well/family/coronavirus-children-covid-19.html.
[16]  *Id.*

**Many of Petitioners are Children**

185.    ICE Guidance on COVID-19 does not require: testing prior to removal; the provision of face masks to detainees, or; social distancing during transportation to airports or on flights.[17]

186.    There is no systematic testing of detainees for COVID-19 prior to deportation. Indeed, ICE told the Miami Herald that the agency would acquire approximately 2,000 tests a month "but given the nationwide shortages of testing kits, 'the agency likely won't have enough to test all aliens scheduled for future removals and will prioritize testing based on evolving operational considerations,' ICE said."[18]

187.    These inadequate medical screenings have already failed to detect cases in migrants being deported in the past few months.

188.    In Guatemala, the Health Minister testified in a congressional hearing that one such flight arrived with 75% of its passengers infected.[19]

189.    The Guatemalan government estimated that recently returned immigrants from the U.S. account for nearly 20% of Guatemala's 500 COVID-19 cases.[20]

---

[17]   *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).

[18]  Monique Madan and Jacqueline Charles, *He says he has COVID and has never been to Haiti. But ICE still wants to deport him there.*, MIAMI HERALD (May 8, 2020), https://www.miamiherald.com/news/local/immigration/article242581381.html#storylink=cpy.

[19]  Maria Martin, *Official Alleges The U.S. Has Deported Many COVID-19-Positive Migrants To Guatemala*, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-to-guatemala.

[20]  Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH, April 27, 2020, https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/.

190.    Reports also indicate that recently at least two Mexican and three Haitian deportees have also tested positive, yet had been placed on planes and/or buses with other deportees susceptible to infection.[21]

191.    It is likely that transports to many other countries have likewise included individuals positive for the virus.[22]

192.    In the report, Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows, The Center for Economic Policy and Research reports:

> While the vast majority of deportations to Mexico take place over land, ICE Air flies tens of thousands of people across the country and across the world each year. Amid the global pandemic, which has led to countries shutting down air travel and closing borders, ICE Air continues to deport thousands of immigrants held in detention centers throughout the United States. Those facilities themselves have become hotspots of COVID-19 outbreaks, meaning the US is now exporting the virus to countries throughout the region…. Since the Trump administration declared a national emergency on March 13, one ICE Air contractor has flown at least 72 likely deportation flights to 11 Latin America and Caribbean nations — including to Brazil and Ecuador, which are suffering the region's worst outbreaks of COVID-19, and which have both experienced an increase in deportation flights under the Trump administration…. From March 15 to April 24, ICE Air appears to have made 21 deportation flights to Guatemala; 18 to Honduras; 12 to El Salvador; six to Brazil; three each to Nicaragua, Ecuador, Haiti, and the Dominican Republic; and one each to Colombia and Jamaica. … [T]he Guatemalan government has estimated that 20 percent of the country's confirmed COVID-19 cases are recently returned immigrants…. Because detainees are often flown across the country and are held in closely confined spaces, it is virtually impossible to adequately isolate those who have contracted COVID-19 or to ensure that those deported have not been exposed to COVID-19.[23]

---

[21] Kevin Sieff and Nick Miroff, *U.S. is deporting infected migrants back to vulnerable countries*, WASH. POST (April 21, 2020), https://www.washingtonpost.com/world/the_americas/us-is-deporting-infected-migrants-back-to-vulnerable-countries/2020/04/21/5ec3dcfe-8351-11ea-81a3-9690c9881111_story.html.

[22] Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH (Apr. 27, 2020), https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/.

[23] *Id.*

193.    To prevent the spread of COVID-19, the Centers for Disease Control and Prevention recommends that everyone should: (a) wash hands with soap and water—or use hand sanitizer—often, for at least 20 seconds especially after being in a public place, or after blowing the nose, coughing or sneezing; (b) avoid close contact with other people, at least 6 feet; (c) avoid gathering in groups; (d) stay out of crowded places and avoid mass gatherings; (e) cover the mouth and nose with a face cloth when around others, but also continue to keep about 6 feet away from others, and; (f) clean and disinfect frequently touched surfaces.[24]

194.    While individuals in removal proceedings always face some danger, Petitioners face substantially heightened dangers because of the COVID-19 pandemic.

195.    According to ICE reports, as of July 6, 2020, ICE reported 835 cases of COVID-19 of its current detainee population of 22,579.[25]

196.    Officials admit that due to limited testing, the actual number is likely significantly higher.[26]

197.    This is unsurprising, given that detainees frequently lack personal protective equipment such as masks and gloves and cannot maintain social distancing.[27]

---

[24] *How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 8, 2020).

[25] *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).

[26] Kevin Sieff and Nick Miroff, *U.S. is deporting infected migrants back to vulnerable countries*, WASH. POST (April 21, 2020), https://www.washingtonpost.com/world/the_americas/us-is-deporting-infected-migrants-back-to-vulnerable-countries/2020/04/21/5ec3dcfe-8351-11ea-81a3-9690c9881111_story.html (last visited July 8, 2020).

[27] Patricia Sulbarán Lovera, *Coronavirus: Immigration detention centres in crisis*, BBC NEWS MUNDO (May 1, 2020), https://www.bbc.com/news/world-us-canada-52476131.

198.    Upon information and belief, the government does not provide hand sanitizer to detainees while they are in detention centers, and thus it is likely that detainees are not provided hand sanitizer during the removal process.

199.    While Respondents publicly state that they provide detainees with face masks during transport, upon information and belief Respondents do not require detainees to wear them or take any measures to enforce the use of face masks during the transfers and flights.

200.    Upon information and belief, social distancing is not required on flights, and is often not possible.

201.    In a letter published on July 6, 2020 in the journal Clinical Infectious Diseases, "two scientists from Australia and the U.S. wrote that studies have shown 'beyond any reasonable doubt that viruses are released during exhalation, talking and coughing in microdroplets small enough to remain aloft in the air.' That means people in certain indoor conditions could be at greater risk of being infected than was previously thought."[28]

202.    Accordingly, social distancing is now recognized as critical to prevent COVID-19 transmission.

203.    Respondents do not provide information about measures taken to sanitize the vehicles used to transport detainees to staging areas.

204.    Thus, Petitioners face a danger of contracting COVID-19 during the deportation process by being confined with other detainees in either an airplane or bus, depending on their destination.

---

[28] THE ASSOCIATED PRESS, *SCIENTISTS URGE WHO TO ACKNOWLEDGE VIRUS CAN SPREAD IN AIR*, https://www.nbcnews.com/health/health-news/scientists-urge-who-acknowledge-virus-can-spread-air-n1232991 (last visited July 8, 2020).

205.    Petitioners face the danger of contracting COVID-19 even after they arrive in their respective countries of origin, as well as the severe circumstances of inadequate quarantine measures, weak healthcare systems, deepening poverty, food insecurity, restrictions on public transportation, and strict curfews.

206.    Those dangers are heightened due to the COVID-19 pandemic.

207.    Pre-COVID-19, nonprofit organizations and government agencies received deported families at the airport and provided them with assistance in making phone calls or purchasing bus tickets, but these resources have been eliminated during the COVID-19 pandemic.

208.    Thus, families arriving without money or means of communication will be left stranded in a precarious and dangerous situation upon arrival in their country of origin.

**Country Conditions of Petitioners' Countries of Origin During the COVID-19 Pandemic**

209.    In Guatemala, the government declared a "state of calamity" through June 5 because of the pandemic.[29]

210.    Due to the severity of the situation, it has closed its borders, barring entry to non-Guatemalans (except for certain specific exceptions) and has instituted a mandatory curfew from 6:00 pm to 5:00 am each day.[30]

211.    Additionally, there have been reports that deported individuals were told to undertake "voluntary" quarantine after arrival without any sort of medical screening.[31]

---

[29] U.S. EMBASSY IN GUATEMALA, FAQs: HEALTH, SAFETY AND TRAVEL DURING COVID-19 RESPONSE IN GUATEMALA, p. 2 (July 5, 2020), https://gt.usembassy.gov/alert-covid-19-2/.
[30] *Id.* at p. 3.
[31] David Toro, *Siguen las deportaciones desde Estados Unidos aún con COVID-19*, MEDIUM (Mar. 23, 2020), https://medium.com/@PrensaComunitar/siguen-las-deportaciones-desde-estados-unidos-a%C3%BAn-con-covid-19-8ec944777524.

212.    The government has also suspended all public transportation within the country, impacting Petitioners' ability to travel to their communities or other necessary destinations, as well as preventing their relatives from meeting them upon arrival.[32]

213.    Conditions in Brazil are equally dire. With 1,623,284 confirmed cases and 65,487 COVID-related deaths as of July 8, 2020, 6:58 pm CEST,[33] Brazil "is experiencing widespread ongoing transmission" of the virus.[34]  Due to the poor conditions, Brazil has extended its closure banning the entry of foreigners through July 29. .[35]

214.    Ecuador's health minister, Dr. Juan Carlos Zevallos, called the situation in Ecuador "horrifying" and "terrifying."[36]

215.    Indeed, as of July 8, 2020, 6:58 pm CEST, Ecuador has 63,245 confirmed cases of COVID-19, and 4,873 reported deaths resulting from the virus.[37]

216.    The government has restricted movement throughout the country with limited exceptions, and imposed a nationwide curfew.[38]

---

[32] U.S. EMBASSY IN GUATEMALA, FAQS: HEALTH, SAFETY AND TRAVEL DURING COVID-19 RESPONSE IN GUATEMALA, p. 5 (July 5, 2020), https://gt.usembassy.gov/alert-covid-19-2/.

[33] CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID-19 Travel Recommendations by Country*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html (last visited July8, 2020)(query Brazil in the search for a destination field).

[34] U.S. EMBASSY & CONSULATES IN BRAZIL, *COVID-19 Information*, https://br.usembassy.gov/covid-19-information/ (last visited July 8, 2020).

[35] U.S. EMBASSY & CONSULATES IN BRAZIL, *COVID-19 Information*, https://br.usembassy.gov/covid-19-information/ (last visited July 8, 2020)

[36] Tim Padgett, *Ecuador Health Minister: 'Horrifying' Coronavirus Plague Better Contained Now*, WLRN (May 4, 2020), https://www.wlrn.org/post/ecuador-health-minister-horrifying-coronavirus-plague-better-contained-now#stream/0.

[37] Coronavirus Disease (COVID-19) Dashboard, Ecuador, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/ec (last visited July 8, 2020).

[38] U.S. EMBASSY & CONSULATE IN ECUADOR, *COVID-19 Information*, https://ec.usembassy.gov/covid-19-information-ecu-2/ (last visited July 8, 2020).

217.    As of July 8, 2020, 6:58 pm CEST, Mexico has 261,750 confirmed COVID-19 cases, and 31,119 reported deaths resulting from it.[39]

218.    The Mexican government has announced Phase 3 of the pandemic, meaning "widespread community transmission, thousands of cases of infection, and increased numbers of patients requiring hospitalization."[40]

219.    Individuals arriving in Mexico face a high probability of being returned to the United States or quarantined in Mexico.[41]

220.    Honduras—the second poorest country in Central America—has 24,665 confirmed cases of COVID-19 and 656 reported deaths as of July 8, 2020 6:58 pm CEST.[42]

221.    The country's health infrastructure is ill-equipped to handle severe cases of COVID-19,[43] not to mention the severe dengue outbreak Honduras was already experiencing.[44]

222.    Due to a curfew implemented by the Honduran government, grocery stores, gas stations, and pharmacies are generally closed throughout the country.[45]

---

[39]    Coronavirus Disease (COVID-19) Dashboard, Mexico, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/mx (last visited July 8, 2020)

[40] U.S. EMBASSY & CONSULATES IN MEXICO, *COVID-19 Information for U.S. Citizens in Mexico*, https://mx.usembassy.gov/u-s-citizen-services/covid-19-information/ (last visited July 8, 2020).

[41] *Id.*

[42]    Coronavirus Disease (COVID-19) Dashboard, Honduras, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/hn (last visited July 88, 2020).

[43] U.S. EMBASSY IN HONDURAS, *COVID-19 Information*, https://hn.usembassy.gov/covid-19-information/ (last visited July 8, 2020).

[44] CTRS. FOR DISEASE CONTROL AND PREVENTION, HONDURAS, *Travelers' Health, Honduras, Clinician View*, https://wwwnc.cdc.gov/travel/destinations/clinician/none/honduras (last visited July 8, 2020).

[45] U.S. EMBASSY IN HONDURAS, *COVID-19 Curfew*, https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/covid-19curfew/ (last visited July 8, 2020).

223.    Due to the pandemic, there have been reports of families being forced to live on the streets, being deprived of the little government assistance that is provided.[46]

224.    As of July 8, 2020, 6:58 pm CEST, El Salvador has reported 8,307 confirmed cases of COVID-19 and 229 deaths.[47]

225.    El Salvador's President, Nayib Bukele, announced in March a nationwide lockdown policy because of the pandemic, violations of which may result in indefinite detention in overcrowded facilities.[48]

226.     In April, the Salvadoran Supreme Court invalidated the policy, ruling that the government could not detain citizens indefinitely without suspicion of crime. Nevertheless, President Bukele openly rejected the ruling and continues to enforce the detention policy.[49]

227.    As of April 13, 4,236 people were being held in 87 containment centers, including some detained for violating the mandatory home quarantine, others after returning from abroad, and still others for not wearing facemasks (even though the policy does not require them to do so).[50]

228.    Haiti is likewise experiencing serious difficulties because of the spread of COVID-19.  Though Haiti has reported 6,371 confirmed cases of COVID-19 and 113 deaths as of July 8,

---

[46] *In already poor Honduras, coronavirus pushes some into homelessness*, THOMAS REUTERS FOUND. NEWS (Apr. 25, 2020), https://news.trust.org/item/20200424232457-oyu8c.

[47] Coronavirus Disease (COVID-19) Dashboard, El Salvador, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/sv (last visited July 8, 2020).

[48] *El Salvador: Police Abuses in Covid-19 Response*, HUMAN RIGHTS WATCH (Apr. 15, 2020), https://www.hrw.org/news/2020/04/15/el-salvador-police-abuses-covid-19-response/.

[49] *Id.*; Miranda Cady Hallett, *Mass arrests and overcrowded prisons in El Salvador spark fear of coronavirus crisis*, YAHOO! NEWS (May 6, 2020), https://theconversation.com/mass-arrests-and-overcrowded-prisons-in-el-salvador-spark-fear-of-coronavirus-crisis-137673.

[50] *El Salvador: Police Abuses in Covid-19 Response*, HUMAN RIGHTS WATCH (Apr. 15, 2020), https://www.hrw.org/news/2020/04/15/el-salvador-police-abuses-covid-19-response/.

2020 6:58 pm CEST,[51] these figures almost certainly fall far below the true totals as the country has a population of nearly 11 million people,[52] over half of whom must wait in long lines at crowded markets just to get food each day.[53]

229.    Since over half of the population lives on approximately $2 per day, the rise in the cost of food means many people within Haiti will have little to no access to sustenance.[54]

230.    In an April 27, 2020 address, President Moise acknowledged the high likelihood that "there will be famine" as a result of COVID-19.[55]

231.    The United States Department of State has said that medical facilities within Haiti are "scarce and generally substandard," and that life-threatening emergencies often require evacuation outside the country by air ambulance at the patient's expense.[56]

232.    By some estimates, the country has only 39 physicians, 124 ICU beds, and capacity to ventilate just 62 patients within ICUs.[57]

---

[51]    Coronavirus Disease (COVID-19) Dashboard, Haiti, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/ht (last visited July 8, 2020).

[52] Countries: Haiti, WORLD HEALTH ORGANIZATION, https://www.who.int/countries/hti/en/ (last visited July 8, 2020).

[53] Sam Bojarski, *Coronavirus Exposes Precarious Living Conditions in Haiti*, HAITIAN TIMES https://haitiantimes.com/2020/03/26/coronavirus-exposes-precarious-living-conditions-in-haiti/ (last visited July 8, 2020).

[54] *Id.*

[55] Samuel Louis, Jovenel Moïse Fears Famine in Haiti After Covid-19, HAITIAN TIMES, https://haitiantimes.com/2020/04/28/jovenel-moise-fears-famine-in-haiti-after-covid-19/ (last visited July 8, 2020).

[56] U.S. DEPARTMENT OF STATE, BUREAU OF CONSULAR AFFAIRS, Country Information: Haiti, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html (last visited July 8, 2020) (follow "Health" hyperlink).

[57] Sam Bojarski, *Coronavirus Exposes Precarious Living Conditions in Haiti*, HAITIAN TIMES https://haitiantimes.com/2020/03/26/coronavirus-exposes-precarious-living-conditions-in-haiti/ (last visited July 8, 2020).

61

## LEGAL STANDARD

### Due Process

233.    The Due Process Clause of the Fifth Amendment provides that "[n]o person… shall be deprived of life, liberty, or property without due process of law…."  U.S. Const. amend. V.

234.    It protects individuals against two types of government action. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 324–325 (1937).

235.    "Procedural Due Process" ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 319, 334–335 (1976).

### Accardi Doctrine

236.    Respondents have a duty to follow their own policies particularly when such policies are aimed at protecting Petitioners' due process rights and right to access the courts.  *See generally United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (establishing agency duty to follow self-imposed rules); *see also Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." (internal citation omitted)); *see also Abdi v. Duke*, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) ("[T]he relevancy of the internal policy is to ascertain whether it pertains to individual rights. If so..., that internal policy must be followed."); *accord Damus v. Nielsen*, 313 F. Supp. 3d 317, 338 (D.D.C. 2018) (finding the *Accardi* doctrine applied to same ICE Directive at issue in *Abdi* and that language "disclaiming [the conferral of] any substantive right does not prove otherwise.").

237.    "[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").

238.    Breaches of *Accardi*'s rule constitute violations of both the APA and the Fifth Amendment's Due Process Clause.

239.    Berks and Dilley are both subject to the Family Residential Standards ("FRS") and the *Flores* settlement.

240.    The FRS require Berks and Dilley to comply with CDC guidelines, just as is required in the adult detention facilities, which are governed by National Detention Standards ("NDS") and Performance-Based National Detention Standards ("PBNDS") which require that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."[58]

241.    Respondents have failed to follow their duty to comply with the FRS, which in turn require compliance with CDC guidelines and federal, state and local laws.

242.    The CDC's "COVID-19 Travel Recommendations by Country" guidelines state that the "CDC recommends that travelers avoid all nonessential travel to" Guatemala, Honduras, El Salvador, Haiti, Mexico, Brazil and Ecuador.[59]

---

[58] U.S. IMMIGRATION AND CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011, 257, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf; U.S. IMMIGRATION AND CUSTOMS ENF'T, NATIONAL DETENTION STANDARDS FOR NON-DEDICATED FACILITIES, 1 (Rev. 2019), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

[59] CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID-19 Travel Recommendations by Country*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html (last visited July 8, 2020) (query each country in "Search for a destination" field).

243. Respondents have failed to follow these guidelines because the removal of Petitioners now is nonessential.

244. The CDC's "Coronavirus and Travel in the United States" guidelines state:

> Clean your hands often.  Wash your hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing. If soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol. Cover all surfaces of your hands and rub your hands together until they feel dry.
>
> Avoid touching your eyes, nose, and mouth.
>
> Avoid close contact with others.
>
> Keep 6 feet of physical distance from others.[60]

245. Respondents have failed to follow these guidelines because when detainees are transported within the United States during the removal process, detainees are not able to keep 6 feet of physical distance from others and are not provided hand sanitizer.

246. The CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" recommends that these facilities "[s]uspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."[61]

---

[60] *Coronavirus and Travel in the United States*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited July 8, 2020).

[61] CTRS. FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 8, 2020).

247.     Respondents have failed to follow this guidance because the removal of Petitioners from the United States has not been suspended and is not necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.

## CLAIMS FOR RELIEF

## COUNT I (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic Violates their Substantive and Procedural Due Process Rights (Shocks the Conscience).

248.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

249.     "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690.

250.     "'Substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,'… or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations omitted). Thus, "the touchstone of due process is protection of the individual against arbitrary action of government…whether the fault lies in the denial of fundamental due process fairness [procedural due process], …or in the exercise of power without any reasonable justification in the service of a legitimate government objective [substantive due process]." *Cty. Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citations and internal quotations omitted).

251.     The current COVID-19 pandemic is unprecedented and presents the possibility of severe illness and death for those who contract the disease.

65

252.    There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus.

253.    The virus is thought to spread mainly from person-to-person such as (a) between people who are in close contact with one another (within about 6 feet); (b) through respiratory droplets produced when an infected person coughs, sneezes or talks, because these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.

254.    Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms.

255.    There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus.

256.    To prevent the spread of COVID-19, the CDC recommends that everyone should: (a) wash hands with soap and water—or use hand sanitizer—often for at least 20 seconds especially after being in a public place, or after blowing the nose, coughing or sneezing; (b) avoid close contact with other people, at least 6 feet; (c) avoid gathering in groups; (d) stay out of crowded places and avoid mass gatherings; (e) cover the mouth and nose with a face cloth when around others, but also continue to keep about 6 feet away from others, and; (f) clean and disinfect frequently touched surfaces ("Prevention Requirements").

257.    Because many individuals who had COVID-19 are asymptomatic, the only way to know if a person has COVID-19 is to test the person.

258.    This possibility of transmission of COVID-19 increases exponentially when Prevention Requirements and testing are not implemented or meaningfully followed during the removal process.

259.    Respondents have failed to meaningfully implement Prevention Requirements and testing to prevent transmission of COVID-19 to Petitioners during the removal process.

260.    Respondents have engaged in willful, knowing conduct, removing Petitioners from the United States without implementing Prevention Requirements.

261.    Instead, during the removal process Respondents are placing detainees in confined spaces, like cells, buses, and planes, and forcing them into situations where social distancing measures are impossible.

262.    Respondents' failure to implement Prevention Requirements and testing during the removal process deprive Petitioners of their health, safety, and bodily integrity, by placing them at extreme risk of contracting COVID-19.

263.    Further, Respondents seek to deport Petitioners to countries during their own pandemic-related crises, even though these countries may lack the transportation, housing, and medical infrastructure required to adequately deal with such a crisis.

264.    Respondents seek to deport Petitioners to their home countries despite knowing Petitioners may face persecution because of the COVID-19 pandemic.

265.    Petitioners are faced with the possibility that they will contract COVID-19 in the United States while moving through the deportation processes initiated and run by Respondents, only to be removed to a country that is unable to provide the resources and care necessary to treat COVID-19 if they are infected and that may subject them to persecution because of their infection.

266.    When the government attempts to force an individual to take anti-psychotic drugs, the due process clause prevents them from doing so absent an essential and overriding state interest. *United States v. White*, 620 F. 3d. 401, 409 (4th Cir. 2010). Without this state interest, such forcible medicating is said to shock the conscience.

267.    If the government cannot force individuals to put medication in their bodies, the government should not be able to force individual into a process that exposes their bodies to a severe and deadly virus.

268.    Given the current pandemic, the removal process employed by Respondents shocks the conscience as it forces Petitioners into a removal regime where they face infection, persecution upon arrival to their home country, and even death.

## COUNT II (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic
### Violates the State-Created Danger Doctrine.

269.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

270.    Substantive due process precludes a state actor from affirmatively acting to create or enhance a danger that will ultimately harm an individual.  *See Butera v. District of Columbia*, 235 F.3d 637, 649–51 (D.C. Cir. 2001) (citing cases).

271.    The State "owes a duty of protection when its agents create or increase the danger to an individual." *Id.*; *see also Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (due process was violated where police left detainee in more dangerous neighborhood, away from public transportation and without cell phone); *Wang v. Reno*, 81 F.3d 808, 817 (9th Cir. 1996) (alien could not be removed to China where U.S. government convinced him to testify about topic that would lead Chinese government to torture and possibly execute him).

272.    Due process is implicated when the state actor's conduct in such a case is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Butera*, 235 F.3d at 651 (quoting *Sacramento*, 523 U.S. at 847 n.8).

273.     Respondents' failure to implement Prevention Requirements and testing during the removal of detainees from the United States creates myriad increased risks and dangers to Petitioners considering the COVID-19 pandemic.

274.     By forcing detainees into confined areas, including buses and planes, without adequate screening and testing procedures, and without implementing the Prevention Requirements, Respondents substantially increase the risk that the virus will spread during the removal process.

275.     Respondents thus create or increase Petitioners' risks not only of infection, but also of persecution due to a public perception that they are likely to carry the virus like others that have passed through United States removal proceedings.

276.     Removal will also place Petitioners in a far more dangerous location than they are currently in without means of protection.

277.     Petitioners being sent to countries where public transportation has been closed will be stranded at the place Respondents release them from custody, without a way to return to their communities or meet with relatives. Others will be subject to strict quarantines and in danger of unlawful detention, food insecurity, and inadequate healthcare systems.  Notably, these dangers are substantially increased due to the COVID-19 pandemic.

278.     Respondents are aware of the increased dangers the COVID-19 pandemic presents to Petitioners.  Disregarding these risks and affirmatively pursuing removal, given the conditions during removal proceedings, likelihood of virus transmission, and dangerous points of release is egregious and shocks the conscience.

279.     Accordingly, pursuing removal proceedings constitutes a violation of Petitioners' substantive due process rights under the state-created danger doctrine.

69

## COUNT III (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic
### Violates the Special-Relationship Doctrine

280.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

281.    Respondents also owe Petitioners affirmative duties of care and protection arising from their special relationship.  *See Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (D.C. Cir. 2015) (citing *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989)). A special relationship arises between the government and an individual when the government "takes a person into its custody and holds him there against his will."  *Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991) (quoting *DeShaney*, 489 U.S. at 199–200).  This duty arises "from the limitation which [Respondents have] imposed on [Petitioners'] to act on [their] own behalf." *DeShaney*, 489 U.S. at 200.  This duty of care and protection includes a responsibility for Petitioners' safety, well-being, and medical needs.  *LaShawn A. v. Kelly*, 990 F.2d 1319, 1325 (D.C. Cir. 1993); *Harris*, 932 F.2d at 14*. (citing *Youngberg v. Romeo*, 457 U.S. 307, 314–324 (1982)).

282.    When the government has a special relationship with an individual, "governmental deliberate indifference will shock the conscience sufficiently to establish a substantive due process violation."  *Harvey*, 798 F.3d at 1050 (internal citations omitted).

283.    Respondents have detained each of Petitioners involuntarily, thus forming a special relationship with Petitioners.  Consequently, Respondents owe Petitioners a heightened duty of care and protection.

284.    Pursuing Petitioners' removal will breach Respondents' duty to care for and protect Petitioners.  As discussed *supra*, Petitioners will face a serious, heightened danger of contracting

COVID-19 during the removal process by confinement during transportation. Because pre-deportation testing and medical screening procedures are inadequate, Respondents cannot fulfill their duty to protect Petitioners from this risk. Sending Petitioners to their countries of origin also places them in substantially more danger than they currently face. Guatemala, Ecuador, Brazil, Mexico, Honduras, El Salvador, Brazil, and Haiti all have reported substantial numbers of confirmed COVID-19 cases, and Petitioners will be at risk of infection if required to return. If infected, they will suffer greater peril due to poor country conditions, their likely inability to procure effective healthcare, and probable persecution.

285.   Respondents are aware of the danger COVID-19 presents to Petitioners. Because they have a special relationship with Petitioners, pursuing removal proceedings with deliberate indifference to the COVID-19 Pandemic shocks the conscience.

286.   Accordingly, pursuing removal proceedings constitutes a violation of Petitioners' substantive due process rights under the special-relationship doctrine.

### COUNT IV (ALL PETITIONERS)

**Respondents' Attempt to Remove Petitioners During the COVID-19 Pandemic Violates their Own Policies and Regulations in Violation of the APA and the Fifth Amendment (*Accardi* doctrine).**

287.   Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

288.   Respondents further had a duty to follow their own policies related to release from custody, particularly when such policies are aimed at protecting Petitioners' due process rights. *See Accardi*, 347 U.S. 260 (establishing agency duty to follow self-imposed rules).

289.   As discussed *supra*, ICE's protocols for its detainee facilities require facilities to provide medical care to individuals in immigration custody, and provide a continuity of care plan,

71

medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary, among other things, upon release.

290.    As discussed *supra*, the FRS require compliance with CDC guidelines in Berks and Dilley, just as is required in the adult detention facilities, which are governed by NDS and PBNDS and require compliance with CDC guidelines for the prevention and control of infectious and communicable diseases.

291.    The CDC guidelines state that travelers should (a) avoid all nonessential travel to Guatemala, Honduras, El Salvador, Haiti, Mexico, Brazil, and Ecuador; (b) use a hand sanitizer that contains at least 60% alcohol if soap and water are not available, and; (c) keep 6 feet of physical distance from others.

292.    CDC Guidelines also provide that detention facilities suspend all transfers of incarcerated/detained persons to and from other jurisdictions unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.

293.    All the above policies and standards are aimed at protecting Petitioners' rights to due process and violations of these policies constitute a violation of the APA and the Fifth Amendment pursuant to the *Accardi* doctrine.

294.    Respondents have failed to comply with any of the department policies, and CDC Guidelines, outlined in the FRS discussed above.

295.    Respondents have failed to comply with the above referenced policies.

296.    Such failure to comply with FRS and CDC Guidelines constitutes a violation of the APA and the Fifth Amendment—violating the *Accardi* doctrine.

297.   Respondents seem woefully underprepared for the effects of the COVID-19 pandemic on the removal process and as such have been unable to comply with the above referenced policies.

298.   Such failure to comply with the FRS constitutes a violation of the APA and the Fifth Amendment—violating the *Accardi* doctrine.

## COUNT V (TRANSIT BAN PETITIONERS)

### Removing Petitioners Who Have Unlawful Final Orders of Removal Procured Under the Vacated Transit Ban Violates Their Substantive and Procedural Due Process Rights (Shocks the Conscience).

299.   Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

300.   In an Opinion Memorandum and Order dated June 30, 2020, Judge Kelly vacated the Transit Ban having found that it was enacted unlawfully.  *CAIR*, 2020 WL 3542481 at * 22.

301.   "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void *ab initio*."  *Goodner Bros. Aircraft, Inc.*, 966 F.2d at 384; *see also Chrysler Corp.*, 441 U.S. at 313, (1979) ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act."); *W.C.*, 807 F.2d at 1505 ("An agency rule which violates the APA is void.  Agency action taken under a void rule has no legal effect").

302.   The Transit Ban Petitioners all received negative credible fear determinations based upon the Transit Ban and all have final orders of removal as a result of those negative credible fear determinations.

303.   Because of *CAIR*, the Transit Ban Petitioners have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

304.     Respondents' attempts to deport Transit Ban Petitioners, who have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law, violate their procedural due process rights under the Fifth Amendment.

305.     Respondents' attempts to deport Transit Ban Petitioners, who have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law, violate their substantive due process rights under the Fifth Amendment and shock the conscience.

## COUNT VI (TRANSIT BAN PETITIONERS)

### Declaratory Judgment

306.     The Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

307.     Transit Ban Petitioners seek a declaration that Respondents cannot remove Transit Ban Petitioners until they have valid and lawful final orders of removal.

308.     Transit Ban Petitioners have suffered an injury in fact because Respondents seek to deport them without lawful final orders of removal.

309.     The Transit Ban Petitioners' injuries are caused by Respondents' unconstitutional and unlawful conduct.

310.     It is likely Transit Ban Petitioners' injuries will be redressed by a judgment declaring that Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioners request that the Court grant the following relief:

1.      Assume jurisdiction over this matter;

2.      Temporarily stay Petitioners' removal from the United States pending its adjudication of

this Petition;

3.      Declare that the unreasonably unsafe process intended to remove Petitioners during the

COVID-19 pandemic is unlawful;

4.      Declare Respondents cannot remove Transit Ban Petitioners until they have been

provided a lawful process;

5.      Declare that removal of Petitioners during the current COVID-19 pandemic violates the

Due Process Clause of the Fifth Amendment, the INA, APA, and federal regulations until

Respondents can demonstrate that they have complied with the law including but not

limited to compliance with the FRS, and CDC Guidelines.

6.      Order a stay of removal until further order of this Court;

7.      Award Petitioners costs and reasonable attorneys' fees under the Equal Access to Justice

Act; and

8.      Order such other relief as this Court may deem just and proper.

Dated:    9th day of July, 2020.

Respectfully Submitted,

By: /s/ Steven G. Barringer
Steven G. Barringer (D.C. Bar No. 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Caroline J. Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

**ATTORNEYS FOR PETITIONERS**

## VERIFICATION PURSUANT TO 28 U.S.C. §2242

I am submitting this verification on behalf of the Petitioners because I am one of the

Petitioners' attorneys. I have discussed with the Petitioners the events described in this Petition.

On the basis of those discussions, I hereby verify that the statements made in the attached

Petition are true and correct to the best of my knowledge.

Date:   July 9, 2020

/s/ Steven G. Barringer
Steven G. Barringer (D.C. Bar No. 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Caroline J. Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

***ATTORNEYS FOR PETITIONERS***

# EXHIBIT "2"

KeyCite Blue Flag – Appeal Notification

Appeal Filed by D.A.M., ET AL v. WILLIAM BARR, ET AL, D.C.Cir., September 15, 2020

2020 WL 5525056
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

D.A.M., et al., Petitioners,

v.

William BARR in his official
capacity as Attorney General of the
United States, et al., Respondents.

Case No. 20-cv-1321 (CRC)
|
Signed 09/15/2020

**Synopsis**
**Background:** Unsuccessful petitioners for asylum, whose petitions for asylum had been denied pursuant to an interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled, sought a writ of habeas corpus and a temporary restraining order (TRO) preventing Immigration and Customs Enforcement (ICE) from carrying out their removal during the COVID-19 pandemic. After denial of the TRO motion, but while the habeas petition was still pending, another court in the district vacated the Transit Ban, finding that it was improperly promulgated under the Administrative Procedure Act (APA), 2020 WL 3542481. Petitioners then filed a second TRO motion to block their imminent deportation, which motion was based on contention that the vacatur of the Transit Ban made it unlawful for the government to remove them without affording them all the procedures that were available to asylum seekers prior to the Transit Ban's issuance.

**[Holding:]** The District Court, Christopher R. Cooper, J., held that Immigration and Nationality Act (INA) section barring judicial review of any claim arising from or relating to the implementation or operation of expedited removal orders deprived district court of jurisdiction.

Motion denied; administrative stay of petitioners' removals lifted.

See also 2020 WL 4218003, 2020 WL 1984309, and 2020 WL 4201635.

West Headnotes (19)

**[1]    Injunction** 🔑

A temporary restraining order (TRO) is an extraordinary remedy and should be granted sparingly.

**[2]    Injunction** 🔑

To obtain a temporary restraining order (TRO), the moving party must show: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that a TRO is in the public interest.

**[3]    Injunction** 🔑

An absence of irreparable injury is fatal to a motion for a temporary restraining order (TRO).

**[4]    Federal Courts** 🔑

Courts evaluate whether they have jurisdiction through the lens of the standard applicable at each stage of litigation.

**[5]    Injunction** 🔑

A party who fails to show a substantial likelihood of standing is not entitled to a temporary restraining order (TRO).

**[6]    Administrative Law and Procedure** 🔑

In assessing its jurisdiction, the court begins with the presumption that agency action is judicially reviewable.

**[7]    Aliens, Immigration, and Citizenship** 🔑

INA section forbidding judicial review of the application to individuals of the INA section on inspection of applicants for admission did not deprive district court of jurisdiction over action by unsuccessful petitioners for asylum, whose petitions for asylum had been denied pursuant to an interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled, for a temporary restraining order (TRO) and habeas relief due to another court's vacatur of the Transit Ban; petitioners' claim was neither an attempt to relitigate individual credible-fear determinations nor a facial challenge to the Transit Ban. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(A)(iii).

**[8]    Aliens, Immigration, and Citizenship** 🔑

Vacatur of interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled, did not automatically extinguish removal orders issued to unsuccessful petitioners for asylum, whose petitions had been denied pursuant to the Transit Ban, as relevant to determining district court's jurisdiction over petitioners' action for habeas relief and a temporary restraining order (TRO) to block their imminent deportation. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(A).

**[9]    Aliens, Immigration, and Citizenship** 🔑

A judicial order vacating an agency rule does not automatically void every decision the agency made pursuant to the invalid rule.

**[10]    Administrative Law and Procedure** 🔑

When a court vacates an agency rule, the vacatur applies to all regulated parties, not only those formally before the court.

**[11]    Aliens, Immigration, and Citizenship** 🔑

INA section barring judicial review of any claim arising from or relating to the implementation or operation of expedited removal orders deprived district court, unless an exception applied, of jurisdiction over action by unsuccessful petitioners for asylum for a temporary restraining order (TRO) and habeas relief due to vacatur of interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled and which was the basis for denial of the asylum petitions; vacatur of Transit Ban did not extinguish petitioners' removal orders, and petitioners were challenging the implementation or operation of the removal orders. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(A)(i).

**[12]    Aliens, Immigration, and Citizenship** 🔑

INA section depriving courts of jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders applies to selective enforcement claims where a noncitizen accuses the government of discrimination in choosing among otherwise lawful deportations to pursue; but if the government tries to remove a noncitizen under circumstances where removal is not within the Attorney General's prosecutorial discretion, the particular INA section does not apply. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(g).

**[13]**    **Aliens, Immigration, and Citizenship** 👈

INA section allowing courts jurisdiction over cases concerning whether the petitioner was ordered removed, which section was an exception to INA section barring judicial review of any claim arising from or relating to the implementation or operation of expedited removal orders, was not a basis to find that district court had jurisdiction over action by unsuccessful petitioners for asylum for a temporary restraining order (TRO) and habeas relief due to vacatur of interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled and which was the basis for denial of the asylum petitions; there was no sound reason to conclude that vacatur of Transit Ban also vacated petitioners' removal orders. Immigration and Nationality Act § 242, 8 U.S.C.A. §§ 1252(a)(2)(A), 1252(e).

**[14]**    **Aliens, Immigration, and Citizenship** 👈

Application of INA section barring judicial review of any claim arising from or relating to the implementation or operation of expedited removal orders to preclude district court from having jurisdiction over action by unsuccessful petitioners for asylum for a temporary restraining order (TRO) blocking removal and habeas relief due to vacatur of interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled and which was the basis for denial of the asylum petitions, did not violate Constitution's provision governing the suspension of the writ of habeas corpus. U.S. Const. art. 1, § 9, cl. 2; Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(a)(2)(A).

**[15]**    **Aliens, Immigration, and Citizenship** 👈

Unsuccessful petitioners for asylum, whose petitions for asylum had been denied pursuant to an interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled, demonstrated that they would suffer irreparable harm in the absence of a temporary restraining order (TRO) blocking their removal following vacatur of the Transit Ban; petitioners had a well-founded fear that they, after removal, would be unable to return to the United States. Immigration and Nationality Act §§ 208, 235, 8 U.S.C.A. §§ 1158(a)(1), 1225(b).

**[16]**    **Injunction** 👈

In a case against the government for a temporary restraining order (TRO), the TRO factors of the balance of equities and the public interest merge.

**[17]**    **Aliens, Immigration, and Citizenship** 👈

Balance of equities and public interest weighed slightly in favor of granting temporary restraining order (TRO) blocking removal of unsuccessful petitioners for asylum, whose petitions for asylum had been denied pursuant to a since-vacated interim rule known as the "Transit Ban," which generally rendered migrants seeking admission to the United States at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled; a TRO blocking removal pending further asylum proceedings would decrease risk of petitioners being erroneously deprived of asylum.

**[18]**    **Aliens, Immigration, and Citizenship** 👈

As relevant to a determining if a temporary restraining order (TRO) is warranted, there is

always a public interest in prompt execution of removal orders because the continued presence of an noncitizen lawfully deemed removable undermines the streamlined removal proceedings Congress established.

[19]    **Aliens, Immigration, and Citizenship** ☞

As relevant to a determining if a temporary restraining order (TRO) is warranted, there is a public interest in preventing noncitizens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.

**Attorneys and Law Firms**

Gregory P. Copeland, Sarah Telo Gillman, Rapid Defense Network, New York, NY, Steven G. Barringer, Greenberg Traurig, P.A., Washington, DC, for Petitioners D.A.M., a Minor, J.S.P., L.O.R., J.S.M., S.L.V.

Caroline Heller, Pro Hac Vice, Greenberg Traurig P.A., Gregory P. Copeland, Sarah Telo Gillman, Rapid Defense Network, New York, NY, Steven G. Barringer, Greenberg Traurig, P.A., Washington, DC, for Petitioner All Plaintiffs.

Christopher Charles Hair, Erez Reuveni, U.S. Attorney's Office for the District of Columbia, Washington, DC, for Respondents.

**MEMORANDUM OPINION**

CHRISTOPHER R. COOPER, United States District Judge

**\*1**  Petitioners in this case are asylum seekers from several countries who were issued orders of expedited removal after entering the United States. Most of the petitioners were denied asylum pursuant to an interim rule known as the "Transit Ban." Petitioners originally sought a writ of habeas corpus and a temporary restraining order ("TRO") preventing Immigration and Customs Enforcement ("ICE") from carrying out their removal during the COVID-19 pandemic. Doing so, petitioners argued, would expose them to attendant health risks in violation of their substantive due process rights. The Court denied the TRO motion.

While the habeas petition was pending before this Court, however, another court in this district vacated the Transit Ban, finding that it was improperly promulgated under the Administrative Procedure Act ("APA"). Petitioners then amended their habeas petition, adding a claim that the vacatur of the Transit Ban makes it unlawful for the government to remove them without affording them all the procedures that were available to asylum seekers prior to the Transit Ban's issuance. Petitioners have now filed a second TRO motion to block their imminent deportation on that basis.

In the abstract, there may well be merit to petitioners' contention that deporting them based on removal orders issued under the now-vacated Transit Ban would violate their due process rights. However, the Court concludes that it very likely lacks jurisdiction to rule on this issue. Petitioners' claim is ultimately a challenge to the implementation of their final orders of expedited removal. With limited exceptions that do not apply here, Congress has specifically barred such claims under 8 U.S.C. § 1252, the section of the Immigration and Nationality Act ("INA") limiting judicial review of removal orders. That policy choice is consistent with the Suspension Clause of the Constitution, even if it sometimes produces troubling results. Petitioners therefore are not likely to succeed on the merits of their Transit Ban claims, and the other TRO factors do not outweigh their failure to show a likelihood of success. Accordingly, the Court will deny the pending TRO motion and lift the administrative stay of removal that the Court imposed while the motion was pending.

**I. Background**

Much of the background relevant to this case was set forth in an earlier Memorandum Opinion denying petitioners' first TRO motion.  See D.A.M. v. Barr ("D.A.M. I"), No. 20-cv-1321 (CRC), ––– F.Supp.3d ––––, 2020 WL 4218003 (D.D.C. July 23, 2020). Here, the Court will review only what is necessary for purposes of the present motion.

A. Petitioners' Administrative Proceedings

Petitioners are families from Guatemala, Honduras, El Salvador, Haiti, Mexico, Ecuador, Brazil, Colombia, Chile, Nicaragua, and Peru. They traveled to the U.S. without valid entry documents and asserted that they were seeking protection from persecution in their home countries.

Upon their arrival in the U.S., petitioners were placed into expedited removal proceedings under 8 U.S.C. § 1225(b). In the expedited removal process, arriving noncitizens without valid entry documents who indicate no intention to apply for asylum or fear of persecution are issued orders of removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). Those who do seek asylum or express fear of persecution are interviewed by an asylum officer. Id. § 1225(b)(1)(A)(ii). The asylum officer determines whether the noncitizen has demonstrated a "credible fear of persecution"—i.e., "a significant possibility ... that the alien could establish eligibility for asylum." Id. § 1225(b)(1)(B)(v). If the asylum officer finds no credible fear, the noncitizen is denied asylum and issued an order of removal, which is subject to expedited review by an immigration judge. Id. § 1225(b)(1)(B)(iii). In addition to pursuing asylum, noncitizens may seek withholding of removal under § 241(b)(3)(B) of the INA or the Convention Against Torture ("CAT"). See 8 C.F.R. § 1208.16(a). But to obtain withholding of removal on those bases, noncitizens must meet a significantly higher standard than "credible fear." Specifically, noncitizens seeking withholding of removal under the CAT must show that they are "more likely than not" to be tortured if removed. Id. § 1208.16(c)(2). Those seeking withholding of removal under § 241(b)(3) of the INA similarly must show that they are "more likely than not" to be persecuted on a protected ground in the future, or that they have suffered such persecution in the past. Id. § 1208.16(b).

*2 Petitioners here were determined to lack a credible fear of persecution. However, the process through which most of the petitioners received these determinations differed from the usual process under 8 U.S.C. § 1225(b). Specifically, most of the petitioners were subjected to the so-called Transit Ban, an interim rule jointly issued last year by the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").[1] With limited exceptions, the Transit Ban rendered migrants seeking admission to the U.S. at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled. Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,835 (July 16, 2019). Therefore, for petitioners covered by the Transit Ban, asylum officers automatically made negative credible-fear determinations, regardless of how likely it appeared that those petitioners would face persecution after removal. Petitioners thus faced expedited removal unless they could satisfy the higher standard for withholding of removal under INA § 241(b)(3) or the CAT.

Ultimately, each petitioner was issued an order of expedited removal. Many of them are now being detained by ICE at either the South Texas Family Residential Facility in Dilley, Texas or the Berks County Residential Center in Leesport, Pennsylvania. Others have been released for medical or other reasons.

B. Procedural History

1. Surrounding Litigation

Two other recent actions in this district provide necessary context for the present suit.

a. CAIR v. Trump

Shortly after DHS and DOJ promulgated the Transit Ban, immigrant-services organizations filed a lawsuit challenging the interim rule under the APA. The plaintiffs claimed that the Transit Ban was arbitrary and capricious, that it violated the INA, and that it was improperly issued without notice-and-comment procedures. Capital Area Immigrants' Rights Coal. v. Trump ("CAIR"), No. 19-cv-2117 (TJK), ---- F.Supp.3d ----, ----, 2020 WL 3542481, at *1 (D.D.C. Jun. 30, 2020).

In June 2020, Judge Timothy Kelly granted summary judgment for the plaintiffs, finding that the government's failure to advance the interim rule through notice-and-comment procedures rendered it invalid under the APA. Id. As a remedy, Judge Kelly vacated the Transit Ban. In doing so, he rejected the government's argument that the court should limit any relief to the parties in CAIR. Id. at ----, 2020 WL 3542481 at *22. He also concluded that vacatur of the interim rule would "not result in prohibitively disruptive consequences," partly because the southern border was already "effectively closed" to new asylum seekers due to the COVID-19 pandemic. Id. The government has appealed Judge Kelly's ruling to the D.C. Circuit. Notice of Appeal, Capital Area Immigrants' Rights Coal. v. Trump, No. 19-cv-2117 (TJK) (D.D.C. Aug. 28, 2020).

b. M.M.V. v. Barr

Last year, a group of plaintiffs including some of the petitioners here filed a lawsuit challenging what they described as regulations, directives, and procedures adopted to implement the Transit Ban. See M.M.V. v. Barr ("M.M.V. I"), No. 19-cv-2773 (ABJ), —— F.Supp.3d ——, 2020 WL 1984309, at *1 (D.D.C. Apr. 27, 2020). They invoked the court's jurisdiction under 8 U.S.C. § 1252(e)(3), which authorizes federal court challenges to "written" policies "implementing" the INA's expedited removal provisions under certain circumstances. The case was initially assigned to Judge Kelly as related to CAIR. However, Judge Kelly determined that the cases were not related, based in part on the M.M.V. plaintiffs' representation that their complaint did not challenge the Transit Ban itself. Order at 2, M.M.V. v. Barr, No. 19-cv-2773 (TJK) (D.D.C. Sept. 25, 2019). M.M.V. was then randomly reassigned to Judge Amy Berman Jackson.

**\*3** In April 2020, Judge Jackson dismissed the bulk of the plaintiffs' claims, finding that most of the alleged policies that they challenged were not written and that the INA stripped the court of jurisdiction to review unwritten policies. M.M.V. I, —— F.Supp.3d at —— – ——, 2020 WL 1984309, at *10-*19. She also denied several motions to join the suit by would-be plaintiffs (also petitioners here) because they either were not subject to the one written (and thus reviewable) policy or failed to challenge it within sixty days of its implementation, as required by the statute. Id. at —— – ——, 2020 WL 1984309 at *20-*22.

Judge Jackson's ruling is now pending on appeal. The D.C. Circuit denied an emergency motion to stay the plaintiffs' removals during the appeal. Order, M.M.V. v. Barr, No. 20-5106, 2020 WL 2515998 (D.C. Cir. May 15, 2020) (per curiam).

While the appeal in M.M.V. was pending, Judge Kelly issued his summary judgment decision in CAIR vacating the Transit Ban. The M.M.V. plaintiffs then asked Judge Jackson to issue an indicative ruling that, if the case were remanded from the D.C. Circuit, the district court would "reconsider its jurisdiction in light of the Transit Ban's vacatur." Mot. for Indicative Ruling at 5, M.M.V. v. Barr, No. 19-cv-2773 (ABJ) (D.D.C. July 20, 2020). She declined. Assuming for argument's sake that the vacatur of the Transit Ban also nullified all procedures adopted to implement it, as the plaintiffs argued, Judge Jackson concluded that this development would not cure the jurisdictional defect she had identified. On the contrary, it "would leave the Court with

nothing to review." Order at 4-5, M.M.V. v. Barr, No. 19-cv-2773 (ABJ) (D.D.C. Aug. 19, 2020).[2]

*2. Proceedings in this Case*

Petitioners filed this petition for habeas corpus and complaint on May 18, 2020, one business day after the D.C. Circuit denied an emergency stay and cleared the way for ICE to deport the M.M.V. plaintiffs. The petition and complaint, as originally filed, alleged that the government would violate the Constitution and the APA by removing petitioners during the COVID-19 pandemic and exposing them to the attendant health risks. See Pet'n & Compl. Petitioners immediately moved for a TRO to halt their deportation. Mot. for TRO, ECF No. 6.

The initial TRO motion was pending when Judge Kelly vacated the Transit Ban in CAIR. Petitioners promptly amended their habeas petition and complaint to add a claim that those petitioners who were subjected to the Transit Ban did not have lawful orders of removal and thus could not be removed without further process. Am. Pet'n & Compl. ¶¶ 299-310. Petitioners did not, however, seek to amend their pending TRO motion to add their new claim as a ground for emergency relief.

On July 23, 2020, this Court denied the initial TRO motion, finding that the claims underlying that motion were unlikely to succeed on the merits. The Court separately analyzed two types of claims petitioners raised: claims challenging the conditions they would face during their removal and claims based on the conditions they would face in their countries of origin after removal. As to the former, the Court found that it likely had jurisdiction, but that petitioners did not carry their burden to show that the government would likely violate the Fifth Amendment or the APA by exposing them to the dangers inherent in removal during the pandemic. D.A.M. I, —— F.Supp.3d at ——, 2020 WL 4218003, at *10. As to the latter claims, the Court concluded that it likely lacked jurisdiction under 8 U.S.C. § 1252(g), which generally bars claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." As the Court explained, the government's "decision to return petitioners to their home countries" despite the alleged dangers in those countries "is part and parcel of ICE's discretionary, unreviewable decision to execute their expedited removal orders." D.A.M. I, —— F.Supp.3d at ——, 2020 WL 4218003, at *10. "[F]or similar

reasons," the Court found that 8 U.S.C. § 1252(a)(2)(A)(i)—which generally bars claims "arising from or relating to the implementation or operation of an order of [expedited] removal"—likely provided an additional basis to find that that Court lacked jurisdiction over petitioners' home-country-conditions claims. Id. at —— n.18, 2020 WL 4218003 at *10 n.18.

**\*4** Within hours of that ruling, petitioners filed the instant TRO motion, now seeking to stay their removals in light of the vacatur of the Transit Ban. The Court administratively stayed petitioners' removals pending the resolution of this motion. Min. Order (July 23, 2020).

On August 6, the Court held a hearing on the motion by videoconference. During the hearing, the Court invited the parties to file supplemental briefs regarding Patel v. Barr, No. 20-cv-922, —— F.Supp.3d ——, 2020 WL 4282051 (E.D. Pa. July 27, 2020), a recent decision holding that, notwithstanding CAIR, 8 U.S.C. § 1252 barred an action challenging the government's denial of asylum to three noncitizens under the Transit Ban. The parties timely filed those supplemental briefs, and the second TRO motion is now ripe for resolution.

## II. Legal Standards

**[1]** **[2]** **[3]** "A TRO is an extraordinary remedy and should be granted sparingly." Basel Action Network v. Mar. Admin., 285 F. Supp. 2d 58, 60 (D.D.C. 2003). To obtain a TRO, the moving party must show: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that a TRO is in the public interest. See Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); Hall v. Johnson, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). An absence of irreparable injury is fatal to a TRO motion. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). The D.C. Circuit has suggested, without holding, that the failure to establish a likelihood of success on the merits also categorically forecloses preliminary relief. Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011).

**[4]** **[5]** Before reaching the merits, the Court should ensure that it has jurisdiction to consider petitioners' claims. Courts evaluate whether they have jurisdiction through the lens of the standard applicable at each stage of litigation. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). For example, "a party who fails to show a 'substantial likelihood' of standing is not entitled to a" temporary restraining order. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted). "That same reasoning ... extends to other jurisdictional prerequisites." Cal. Ass'n of Private Postsecondary Schs. v. DeVos, 344 F. Supp. 3d 158, 167 (D.D.C. 2018). Thus, "[a]s part of establishing a likelihood of success on the merits, the [petitioners] must first demonstrate a likelihood of success in establishing jurisdiction." Make the Rd. N.Y. v. Wolf, 962 F.3d 612, 623 (D.C. Cir. 2020).

## III. Analysis

### A. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, petitioners must first show that the Court likely has jurisdiction to grant the ultimate relief they seek.

**[6]** In assessing its jurisdiction, the Court begins with the presumption that agency action is judicially reviewable. Id. at 623-24. Even so, petitioners face a formidable challenge in establishing jurisdiction because 8 U.S.C. § 1252, which governs judicial review of removal orders, "is one of the most comprehensive jurisdiction-stripping statutes in the United States Code." D.A.M. I, —— F.Supp.3d at ——, 2020 WL 4218003, at *10.

**\*5** Petitioners make essentially three arguments in their effort to establish jurisdiction. *First*, they argue that their claim does not fall within the scope of 8 U.S.C. § 1252(a)(2)(A)—which, except for a limited number of claims described in 8 U.S.C. § 1252(e), bars judicial review of any claim "arising from or relating to the implementation or operation of" expedited removal orders. As a result, petitioners assert, this case should be treated as an ordinary habeas petition within the Court's federal-question jurisdiction. *Second*, they argue that if their claim does fall within the scope of § 1252(a)(2)(A), the Court nevertheless has jurisdiction under § 1252(e) because the claim involves a determination of whether petitioners' removal orders were validly issued, which § 1252(e) permits. *Third*, they argue that, insofar as § 1252 does purport to deprive the Court of jurisdiction over the claim at issue here, it violates the Suspension Clause of the Constitution, which prohibits Congress from limiting certain types of habeas claims except in extraordinary circumstances.

The Court cannot accept any of these arguments and therefore finds that it likely lacks jurisdiction.

*1. Section 1252(a)(2)(A)*

Petitioners' principal argument is that the jurisdiction-stripping provisions of § 1252 do not cover their claim, so the Court can exercise jurisdiction without resorting to § 1252(e) or the Suspension Clause. The Court disagrees. Petitioners' claim falls within the scope of § 1252(a)(2)(A),[3] and therefore the Court has no jurisdiction unless specifically granted by § 1252(e) or guaranteed by the Constitution.

 **[7]**  Section 1252(a)(2)(A) limits judicial review of orders of expedited removal issued under 8 U.S.C. § 1225(b)(1). It provides in relevant part:

 (2) Matters not subject to judicial review.

 (A) Review relating to section 1225(b)(1). Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to review—

 (i) except as provided in [8 U.S.C. § 1252(e)], any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to [8 U.S.C. § 1225(b)(1)].

8 U.S.C. § 1252(a)(2)(A)(i).[4]

 **\*6**  As the Court has explained, § 1252(a)(2)(A) "gives the government virtually unreviewable authority to decide whether and when to implement the petitioners' removal orders." D.A.M. I, ---- F.Supp.3d at ----, 2020 WL 4218003, at \*8. But, petitioners argue that § 1252(a)(2)(A) does not apply here because they are not challenging the implementation or operation of their removal orders. Instead, petitioners say, "their Due Process Claims are collateral challenges to unconstitutional practices and policies used by Respondents in seeking to remove the Transit Ban Petitioners from the United States prior to the exhaustion of their right to any form of constitutionally adequate lawful process." Reply 5-6. More specifically, their claim is that because CAIR vacated the Transit Ban, they have procedural and substantive due process rights to access the congressionally created pre-

removal process they would have received if the Transit Ban had never existed. Id.

 **[8]**  To determine whether § 1252(a)(2)(A) applies to this claim, the Court must first answer a threshold question: Are there currently existing orders of removal as to petitioners? Petitioners' position on this question is something of a moving target. Their briefs sometimes suggest that they do not have outstanding removal orders because CAIR wiped those orders out of legal existence. See Mot. for TRO ("TRO II Mot."), ECF No. 35 at 14 ("[T]he Transit Ban Petitioners do not seek to either vacate their removal orders (which have been vacated pursuant to CAIR), but rather, they contest their removal until they engage in meaningful process to which they are entitled."); Pet'rs' Suppl. Mem. 3 ("Because, in effect, the Transit Ban Petitioners have no negative credible fear determinations, much less review by an Immigration Judge, their orders of removal are not final or executable, and do not justify removal."). Elsewhere, petitioners appear to concede that they do have removal orders outstanding. See Pet'rs' Suppl. Mem. 2 ("Respondents ... erroneously assert[ ] that the Transit Ban Petitioners have asked this Court to rule 'that their orders must be deemed void[.]' That is a mischaracterization of their claims." (quoting Resp'ts' Suppl. Mem. 4)).

After careful consideration, the Court is persuaded that petitioners' removal orders do still exist in a legal sense. Insofar as petitioners argue otherwise, they read too much into the vacatur of the Transit Ban. Judge Kelly did not specify that his judgment would vacate existing orders of removal procured under the Transit Ban. See CAIR, ---- F.Supp.3d ----, 2020 WL 3542481. He did decline to limit the scope of relief to the parties before him, id. at ----, 2020 WL 3542481 at \*22, but it does not necessarily follow that Judge Kelly meant to set aside every removal order previously procured under the Transit Ban, which the government estimates to number into the thousands. See Hearing Tr., ECF No. 43 at 24. Indeed, some language in the opinion suggests that Judge Kelly's focus was on how vacating the rule would affect *future* agency adjudications, not past ones. See CAIR, ---- F.Supp.3d at ----, 2020 WL 3542481 at \*22 ("[T]hat recent pandemic-related administrative action appears to have effectively vacated the southern border indefinitely to aliens seeking asylum only underscores that vacatur of the Rule will not result in prohibitively disruptive consequences.").

 **[9]**  Nor do general administrative law principles compel the conclusion that petitioners' removal orders no longer exist.

On the contrary, a judicial order vacating an agency rule does not *automatically* void every decision the agency made pursuant to the invalid rule. A recent immigration case from this district illustrates the point. In L.M.-M. v. Cuccinelli, Judge Randolph D. Moss vacated certain U.S. Citizenship and Immigration Services policy directives on asylum. 442 F. Supp. 3d 1, 34 (D.D.C. 2020). Judge Moss then proceeded to a separate analysis of whether to vacate removal orders issued to individual noncitizens under the invalid directives. He concluded that the plaintiffs' own removal orders should be vacated, but specifically declined to vacate the removal orders of similarly situated nonparties. Id. at 36-37. This result would make little sense if the vacatur of the policy directives automatically voided all removal orders issued under those directives.

**\*7** Courts in non-immigration cases similarly distinguish between vacating a rule and vacating agency action taken under that rule. See, e.g., Waterkeeper Alliance, Inc. v. Wheeler, No. 18-cv-2230 (JDB), — F.Supp.3d —, — – —, 2020 WL 1873564, at *6-*7 (D.D.C. Apr. 15, 2020) (partially vacating EPA approval of state regulatory program after the D.C. Circuit separately vacated an EPA policy that was essential to the approval); Western Watersheds Project v. Zinke, 441 F. Supp. 3d 1042, 1085-89 (D. Idaho 2020) (vacating a Bureau of Land Management policy, then separately analyzing whether lease sales conducted under the vacated policy should themselves be vacated); cf. Daimler Trucks N. Am. LLC v. EPA, 745 F.3d 1212, 1215 (D.C. Cir. 2013) (noting that after the D.C. Circuit vacated an EPA interim rule, engine manufacturers litigated a separate case about whether certificates the EPA had issued under the invalid rule should be vacated).

**[10]** As petitioners emphasize, see Reply 13-16, the law is clear that when a court vacates an agency rule, the vacatur applies to all regulated parties, not only those formally before the court. For example, in O.A. v. Trump, Judge Moss rejected the government's suggestion that his vacatur of a rule restricting asylum should be limited to the plaintiffs in the case. 404 F. Supp. 3d 109, 153 (D.D.C. 2019). As he explained, "that contention is both at odds with settled precedent and difficult to comprehend. The D.C. Circuit has 'made clear that [w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—*not that their application to the individual petitioners is proscribed.*' " Id. (quoting Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); see also Make the Rd. N.Y. v. McAleenan, 405 F.

Supp. 3d 1, 68 (D.D.C. 2019) (the practice of applying vacatur beyond the litigants "reflects a common-sense understanding of what it means for a court to determine, at the conclusion of a case, that a formerly binding legal act of one of the parties is null and void"), rev'd on other grounds sub nom. Make the Rd. N.Y. v. Wolf, 962 F.3d 612 (D.C. Cir. 2020). The universal nature of vacatur means that after a court vacates an agency rule, the agency may not apply that rule *to anyone* in subsequent adjudicative decisions, even if those adjudications involve facts that predate the vacatur. See Nat'l Fuel Gas Supply Corp. v. FERC, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("Just as an Article III court may not issue an advisory decision, it may not issue a decision for less than all seasons, for some citizens and not others, as an administrator shall later decide.").

But it is one thing to say that vacatur protects everyone from having an invalid rule applied to them in future adjudications, and quite another to say that vacatur erases from legal existence all *past* adjudications under the vacated rule. Cf. Heartland By-Products, Inc. v. United States, 568 F.3d 1360, 1366-67 (Fed. Cir. 2009) (court's holding applies going forward, even to facts that predate the holding, but that "does not mean that final judicial or administrative decisions are to be reopened" if inconsistent with the new precedent). Petitioners would blur this distinction, but there is little, if any, precedent for doing so. While petitioners quote liberally from recent immigration cases in this district, see Reply 13-16, those cases do not address whether vacatur of an agency rule automatically voids agency decisions separate from the rule itself. They merely reaffirm the long-held understanding that once a rule is vacated, it is vacated for everyone. See O.A., 404 F. Supp. 3d at 153; Make the Rd. N.Y. v. McAleenan, 405 F. Supp. 3d at 71 (rejecting argument that, after vacatur, the agency should be allowed to "apply the invalid rule with respect to any person who is not the individual who filed the legal action that is before the Court"). Similarly, petitioners cite a line of cases for the proposition that "[w]hen a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect." TRO II Mot. 18-19 (quoting Env't Def. v. Leavitt, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) and collecting similar cases). But in each of these cases, vacatur simply restored the prior *regulatory* status quo; the invalid rule was eliminated and replaced by any preexisting rule it had superseded. See, e.g., Env't Def., 329 F. Supp.2d at 64 (vacatur of EPA rules restored the prior absence of such rules); Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (vacatur of rule would restore previous rule).

**\*8** Perhaps the case that comes the closest to endorsing petitioners' understanding of vacatur is W.C. v. Bowen, 807 F.2d 1502 (9th Cir. 1987). There, a class of Social Security claimants claimed that they received adverse agency decisions pursuant to an invalid rule. The Ninth Circuit agreed that the plaintiffs' decisions were issued under a rule that violated the APA. Id. at 1505. The court therefore upheld an order vacating the class members' adverse decisions. Id. at 1506. In doing so, the court stated that "[a]gency action taken under a void rule has no legal effect." Id. at 1505. In isolation, this language would appear to provide some support for the view that vacatur of a rule voids all actions taken under the rule. But as a whole, W.C. is better understood to stand for the uncontroversial proposition that, when a court with jurisdiction finds that the plaintiffs before it were harmed by an agency decision issued under an illegal rule, the court should vacate that wrongful decision as a remedy. See id. at 1505-06 (framing the issue as one of remedy). The Court will not adopt the most literal reading of the isolated sentence from W.C. that petitioners quote, especially since that reading would conflict with more recent persuasive authority. See, e.g., L.M.-M., 442 F. Supp. 3d at 36-37; Waterkeeper Alliance, ––– F.Supp.3d at –––– – ––––, 2020 WL 1873564, at \*6-\*7; Western Watersheds Project, 441 F. Supp. 3d at 1085-89.

In sum, Judge Kelly's order vacating the Transit Ban means the government cannot issue any more orders of removal under that rule, but it does not mean that petitioners' removal orders (along with thousands of others) were automatically extinguished by operation of his judgment.

 **[11]** Having found that petitioners still have outstanding removal orders, the Court has little difficulty concluding that their claim falls within the ambit of § 1252(a)(2)(A). In challenging the government's plan to deport them pursuant to their final orders of removal with allegedly inadequate process, petitioners necessarily challenge "the implementation or operation" of those orders. 8 U.S.C. § 1252(a)(2)(A)(i); see also Patel, ––– F.Supp.3d at ––––, 2020 WL 4282051, at \*4 (claim that government wrongfully applied the Transit Ban in determining petitioner's asylum eligibility and issuing removal order "is not 'collateral' to the removal order because ... regardless of its basis, [it] necessarily challenges the removal order"); Castro v. DHS, 835 F.3d 422, 428 n.8, 430-34 (3d Cir. 2016) (Section 1252(a)(2)(A) barred habeas petitions seeking to block expedited removal where asylum officers

allegedly committed procedural errors and applied the wrong substantive standard for credible fear); id. at 431-32 (collecting cases similarly interpreting § 1252's limits on review of expedited removal).

It makes no difference to frame the claim as a challenge to the "process" preceding petitioners' removal, rather than the removal itself. *All* procedural due process claims target an alleged failure to provide adequate process, but they do so in order to prevent the wrongful deprivation of some substantive interest in life, liberty, or property. See Orton Motor, Inc. v. HHS, 884 F.3d 1205, 1215 (D.C. Cir. 2018). The constitutionally protected interest at risk of deprivation here is petitioners' liberty interest in not being deported—that is, not having their orders of removal implemented. Nor does the fact that petitioners raise a substantive due process theory put them beyond the reach of § 1252(a)(2)(A). The action that petitioners characterize as a substantive due process violation is "Respondents' unjustified and unlawful decision to proceed with removal" at this time—in other words, respondents' implementation of their removal orders. TRO II Mot. 21.

The conclusion that § 1252(a)(2)(A) applies to petitioners' Transit Ban claim is fully consistent with this Court's reasoning in D.A.M. I. There, the Court found that § 1252(a)(2)(A) likely did not bar challenges to the physical conditions petitioners would face during the removal process, because such claims do "do not challenge the *fact* of their removals." ––– F.Supp.3d at ––––, 2020 WL 4218003, at \*8. However, petitioners' claims related to the conditions in their home countries likely *did* fall within the scope of § 1252(a)(2)(A), because "these claims could be said to challenge the *fact* of deportation." Id. at –––– n.18, 2020 WL 4218003 at \*10 n.18. Petitioners' Transit Ban claim similarly challenges the fact of their removal.

 **\*9** **[12]** For the same reason, the present motion is distinguishable from other cases petitioners cite in which courts exercised jurisdiction over challenges to governmental conduct that was collateral to removal itself. For example, in You v. Nielsen, the court had jurisdiction because "the habeas petition [did] not challenge the discrete decision to remove" the petitioner, but the government's conduct in connection with the removal process—specifically, its choice to arrest and detain the petitioner at his green card interview, years after his removal order was issued. 321 F. Supp. 3d 451, 455-57 (S.D.N.Y. 2018). As the court explained, "Respondents are empowered to remove Petitioner at their discretion. But they cannot do so in any manner they please."

Id., at 457; see also Jennings v. Rodriguez, —— U.S. ——, 138 S. Ct. 830, 839-40, 200 L.Ed.2d 122 (2018) (plurality) (finding jurisdiction over challenge to prolonged immigration detention, where the challengers were "not asking for review of an order of removal; ... challenging the decision to detain them in the first place or to seek removal; [or] challenging any part of the process by which their removability will be determined"); Michalski v. Decker, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (detention "is independent from the decision or action to commence an actual proceeding" and therefore reviewable).[5] Unlike in those cases, petitioners here claim that the government may not lawfully implement their removal orders, not merely that the government's preferred "manner" of removal is defective. You, 321 F. Supp. 3d at 457.

**\*10** In sum, petitioners' claim seeks to prevent their orders of removal from being implemented. Section 1252(a)(2)(A) squarely applies to such a claim.

### 2. Section 1252(e)

**[13]** The Court's conclusion that § 1252(a)(2)(A) applies to petitioners' claim does not end the jurisdictional inquiry. The Court may still have jurisdiction if § 1252(e) specifically authorizes the claim. See Make the Rd. N.Y. v. Wolf, 962 F.3d at 626 (noting that romanettes (i), (ii), and (iv) of § 1252(a)(2)(A) " 'expressly reserve jurisdiction 'as provided in subsection (e)' "). However, the Court concludes that petitioners' claim likely falls outside § 1252(e) and is therefore barred.

Section 1252(e) provides in relevant part:

(2) Habeas corpus proceedings. Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—

(A) whether the petitioner is an alien,

(B) whether the petitioner was ordered removed under such section, and

(C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled

to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

[...]

(5) Scope of inquiry. In determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal.

8 U.S.C. § 1252(e).[6]

Petitioners argue that § 1252(e)(2)(B) supplies jurisdiction, citing this Court's decision in Dugdale v. CBP, 88 F. Supp. 3d 1 (D.D.C. 2015). In Dugdale, the petitioner claimed that his expedited removal order was invalid because it was not signed by a CBP supervisor as required by the applicable regulations. Id. at 6. The Court held that it had jurisdiction to consider this claim under § 1252(e)(2)(B) because "a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect." Id. According to petitioners, this case is analogous:

**\*11** Here the Transit Ban is void *ab initio*, thus the credible fear determinations and subsequent review by an Immigration Judge required for a valid final order of removal, predicated on the heightened standard of the Transit Ban, are similarly void *ab initio*. Because, in effect, the Transit Ban Petitioners have no negative credible fear determinations, much less review by an Immigration Judge, their orders of removal are not final or executable, and do not justify removal.

Pet'rs' Suppl. Mem. 3.

The Court disagrees. CAIR may well provide a basis to argue that petitioners' removal orders were unlawfully issued. But § 1252(e)(2)(B), as interpreted in Dugdale, demands more: petitioners must raise a claim that their removal orders were, as a matter of law, *not* issued. See Castro, 835 F.3d at 433 (distinguishing Dugdale because, unlike the purported procedural defect there, alleged inadequacies in the credible-fear process preceding an expedited removal order are not even "*arguably* related to the question whether a removal order 'in fact was issued' "). Petitioners cannot shoehorn their claim into this narrow opening. As discussed above, there is no sound reason to conclude that when Judge Kelly vacated the Transit Ban, he also intended to vacate petitioners' final

orders of removal, or that his judgment automatically had that effect.

Unlike Dugdale, this case is about whether the government may lawfully implement the removal orders it has issued, not whether it issued those orders at all. Section 1252(e)(2)(B) provides no jurisdiction over such a claim. The INA thus prohibits this Court from ruling on petitioners' claim.

### 3. Suspension Clause

 **[14]**  Finally, petitioners argue that if the INA does purport to strip the Court of jurisdiction over their claim, it violates the Suspension Clause of the Constitution. This argument must fail because it conflicts with controlling precedent.

The Suspension Clause prohibits the political branches from "suspend[ing]" the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § IX, cl. 2. The Supreme Court recently considered the application of the Clause in circumstances similar to those here. In DHS v. Thuraissigiam, an asylum seeker who had received an expedited removal order filed a habeas petition, challenging the process by which the government reached his negative credible-fear determination and seeking "a new opportunity to apply for asylum and other forms of applicable relief." ––– U.S. ––––, 140 S. Ct. 1959, 1967-68, 207 L.Ed.2d 427 (2020) (citation omitted). The Court held that Congress could bar this claim because the Suspension Clause does not apply to a habeas petition seeking "to obtain additional administrative review of [an] asylum claim and ultimately to obtain authorization to stay in this country." Id. at 1963. The Court explained that "the historic core of habeas" consisted of claims challenging a person's physical confinement. Id. at 1970-75. While reserving the question of whether the Suspension Clause provides *any* protection beyond "the scope of the writ as it existed in 1789," id. at 1969 n.12, the Court made clear that the Clause may not be used to "extend the writ of habeas corpus far beyond its scope when the Constitution was drafted and ratified." Id. at 1963 (citation omitted).

Thuraissigiam forecloses petitioners' Suspension Clause argument. As petitioners admit, they are bringing " 'non-core' [habeas] claims because they do not seek release from custody, but rather challenge Respondents' legal authority to deport them prior to the exhaustion of their legal right to seek asylum." TRO II Mot. 15. That describes precisely the type of habeas claim that Thuraissigiam found to be "far beyond" the writ's historic scope and therefore outside the Suspension Clause's protection. 140 S. Ct. at 1963 (rejecting application of Suspension Clause to petition seeking "to obtain additional administrative review of [an] asylum claim and ultimately to obtain authorization to stay in this country"). While Petitioners say they do not seek an "*order* directing Respondents to provide them with a new opportunity to apply for asylum," Reply 6 (emphasis added), they expressly seek a declaratory judgment to the same effect. See Am. Pet'n & Compl. 75 (asking the Court to "[d]eclare Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process"). The declaration petitioners seek is no closer to the habeas heartland than the relief sought in Thuraissigiam.

**\*12** Petitioners argue that this case differs from Thuraissigiam because here, petitioners contend that the Suspension Clause is not strictly limited to the scope of the writ in 1789—a proposition that the Thuraissigiam Court neither endorsed nor rejected. Reply 6, 10. True enough. See Thuraissigiam, 140 S. Ct. at 1969 n.12; id. at 1969 (parties agreed there was no need for the Court to analyze whether Suspension Clause protection exceeds the scope of the circa-1789 writ). But even if Thuraissigiam leaves room for *some* constitutionally protected habeas claims outside the writ's historical core, it squarely rules out *this* claim as a candidate for Suspension Clause protection. See id. at 1969 n.12 (stating that "the writ has *never* encompassed" claims seeking an opportunity for further administrative review of asylum claims (emphasis added)). Whatever support petitioners' argument might have in the pre-Thuraissigiam case law, it must be rejected today.[7]

Accordingly, Congress's choice to deprive the Court of jurisdiction over petitioners' claim does not implicate the Suspension Clause, and the Court likely lacks jurisdiction to rule on petitioners' claim. The Court appreciates the harshness of this result. Many reasonable people will find it troubling that the judicial branch should be powerless to stop the Executive from deporting asylum seekers who received credible-fear determinations under a rule that a federal district court has found to have been illegally issued. But Congress's policy of severely restricting litigation related to removal orders makes no exception for troubling cases. See Khan v. Holder, 608 F.3d 325, 329 (7th Cir. 2010) ("To say that this [expedited removal] procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior ... is not, however, to say that courts are free to disregard jurisdictional

limitations."); accord Castro, 835 F.3d at 433. Nor is the Court free to interpret the Suspension Clause to supply jurisdiction wherever fairness may call for it.

Because the Court concludes that it lacks jurisdiction, Petitioners cannot show a likelihood of success on the merits. While the D.C. Circuit has suggested that the failure to establish likelihood of success on the merits categorically forecloses preliminary relief, see Sherley, 644 F.3d at 393, the Court will nonetheless proceed to analyze the remaining TRO factors, beginning with irreparable harm.

B. Irreparable Harm

[15]  To justify a TRO, petitioners must show that it is "likely," not merely possible, that they will suffer irreparable harm in the absence of this relief. Winter, 555 U.S. at 20, 129 S.Ct. 365. Petitioners have made a sufficient showing to satisfy this requirement.

Deportation pursuant to a removal order is "not categorically irreparable," because some deported noncitizens may still have a realistic opportunity to contest their removal post hoc and return to the United States if successful. Nken v. Holder, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Here, however, the harm petitioners seek to avoid is not merely that they will be removed from the country; they fear that after removal, they will find themselves unable to return, even if they ultimately succeed in showing that their deportation was wrongful. See Reply 20.

*13  This fear is well-founded. Once deported, petitioners will not be able to participate from abroad in whatever further asylum process they might currently be owed. See 8 U.S.C. § 1158(a)(1) (asylum applicants must be "physically present" in the U.S.); 8 U.S.C. § 1225(b) (providing procedures for asylum seekers arriving in the U.S.). In theory, petitioners could continue litigating this case after removal, and if they won, the Court could order the government to transport them back to the U.S. for new credible-fear interviews. Cf. Nken, 556 U.S. at 435, 129 S.Ct. 1749. But, assuming such a remedy would be logistically feasible, petitioners are unlikely to obtain it. That is because, as discussed at length above, the Court lacks jurisdiction to grant petitioners any relief on their Transit Ban claim, even if it agrees with their argument on the merits. In other words, petitioners might have an abstract legal right to be present in the U.S. for new credible-fear interviews, but the court cannot vindicate that right by

ordering the government to transport petitioners back to the U.S. after their removals.[8]

Therefore, if petitioners want to return to U.S. soil, they will almost certainly need to do so without the government's help. This will not be easy. As petitioners allege in their verified amended habeas petition and complaint, and the government has not contested, they arrived in the U.S. only after surviving "dangerous journeys" with their children. Am. Pet'n & Compl. ¶ 140. That petitioners were able to make these journeys once is no guarantee that they will be able to do so again. Moreover, as Judge Kelly observed in CAIR, "recent pandemic-related administrative action appears to have effectively closed the southern border indefinitely to aliens seeking asylum." —— F.Supp.3d at ——, 2020 WL 3542481, at *22 (citing, inter alia, Amendment and Extension of Order Under Sections 362 and 365 of the Public Health Service Act, Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 31,503 (May 26, 2020)); see also Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico, 85 Fed. Reg. 51,633 (Aug. 21, 2020). All told, it is almost certain that if petitioners are deported, they will not be able to reenter the U.S. anytime soon.[9]

*14  Petitioners have therefore shown a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S. Effectively permanent removal from the U.S. would constitute irreparable injury.

C. Balance of the Equities and the Public Interest

[16]  [17]  Two TRO factors remain to consider: the balance of equities and the public interest. In a case against the government, these factors merge. See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, there are equities and public interests to balance on both sides.

[18]  On the government's side, "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established." Nken, 556 U.S. at 436, 129 S.Ct. 1749 (quoting Reno, 525 U.S. at 490, 119 S.Ct. 936). That

interest is somewhat diminished here because petitioners "are not being removed because they violated the law." M.M.V. v. Barr ("M.M.V. II"), No. 19-cv-2773 (ABJ), ---- F.Supp.3d ----, ----, 2020 WL 2119744, at *3 (D.D.C. May 1, 2020); see also M.M.V. I, ---- F.Supp.3d at ----, 2020 WL 1984309, at *1 (noting that asylum seekers such as petitioners are not "illegal immigrants"). Similarly, the government's interest is arguably undercut when it seeks to remove noncitizens whose "asylum petitions have been denied under troubling circumstances." M.M.V. II, ---- F.Supp.3d at ----, 2020 WL 2119744, at *3. As the Court has already noted, reasonable observers could find it troubling that petitioners are being removed pursuant to orders procured under the now-vacated Transit Ban. Nevertheless, a TRO would implicate the government's legitimate interest in effectuating Congress's policy choice to expedite the removals of noncitizens who are denied asylum after being apprehended at the border without valid entry papers. See 8 U.S.C. § 1225(b).

 **[19]** On petitioners' side, there is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Nken, 556 U.S. at 436, 129 S.Ct. 1749. Because it likely lacks jurisdiction, the Court expresses no opinion on whether it is wrongful for the government to remove petitioners at this time, much less whether petitioners face a sufficient likelihood of harm in their home countries to warrant asylum. But it is clear that a TRO blocking petitioners' removals pending further asylum proceedings would decrease the risk of petitioners being erroneously deprived of asylum and thus subjected to danger after

removal. Petitioners and the public have an interest in minimizing that risk.

Based on these considerations, the balance of equities and the public interest tend to support petitioners. However, the Court cannot say that these TRO factors weigh strongly in either direction.

* * *

The Court has found that petitioners will likely suffer irreparable harm in the absence of a TRO, and that the balance of equities and the public interest weigh slightly in their favor. However, petitioners are unlikely to succeed on the merits, and the balance of equities and the public interest do not "clearly favor[ ] granting the injunction." Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009) (citation omitted). The Court therefore must decline to enter a TRO.

### IV. Conclusion
 **\*15** For the foregoing reasons, the Court will deny Petitioners' second Motion for Temporary Restraining Order (ECF No. 35) and lift the administrative stay of petitioners' removals. A separate Order shall accompany this Memorandum Opinion.

### All Citations

--- F.Supp.3d ----, 2020 WL 5525056

Footnotes

1   Petitioners refer to those of them who were subjected to the Transit Ban as the "Transit Ban Petitioners." For convenience, this Memorandum Opinion generally refers to the Transit Ban Petitioners simply as "petitioners," except where it is necessary to distinguish them from the few petitioners who were not subjected to the Transit Ban.

2   Aside from this case and M.M.V., there is at least one more pending case in this district involving some of the petitioners here. Some of the petitioners are plaintiffs in a lawsuit before Judge James E. Boasberg, alleging that ICE is unconstitutionally failing to protect detainees in three family residential centers from COVID-19. See O.M.G. v. Wolf, No. 20-cv-786 (JEB), ---- F.Supp.3d ----, ----, 2020 WL 4201635, at *2 (D.D.C. July 22, 2020). Judge Boasberg denied the plaintiffs' motion for a preliminary injunction requiring their release. Id. at ----, 2020 WL 4201635 at *13.

3   The parties also dispute whether petitioners' claim is covered by § 1252(g), which prohibits courts from hearing any claim "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). Because the Court finds that §§ 1252(a)(2)(A) and 1252(e) likely bar petitioners' claim, it is not necessary to decide whether § 1252(g) also deprives the Court of jurisdiction.

4   Section 1252(a)(2)(A) goes on to strip courts of jurisdiction to review
        (ii) except as provided in subsection (e), a decision by the Attorney General to invoke the provisions of [8 U.S.C. § 1225(b)(1)],
        (iii) the application of such section to individual aliens, including the determination made under [8 U.S.C. § 1225(b)(1)(B)], [and]

(iv) except as provided in subsection (e), procedures and policies adopted by the Attorney General to implement the provisions of [8 U.S.C. § 1225(b)(1)].

8 U.S.C. § 1252(a)(2)(A)(ii)-(iv).

At the hearing on the present motion, government counsel argued that § 1252(a)(2)(A)(iii) bars petitioners' claim. Hearing Tr. 59. The Court disagrees. Section 1252(a)(2)(A)(iii) "forbids review of individual aliens' credible-fear determinations, not suits ... that challenge credible-fear policies on their face." Grace v. Barr, 965 F.3d 883, 892 (D.C. Cir. 2020). Strictly speaking, petitioners' claim here is neither an attempt to relitigate individual credible-fear determinations nor a facial challenge to the Transit Ban. But their claim has much more in common with the latter category than the former. At bottom, petitioners argue they cannot be removed because their removal orders were issued pursuant to a now-invalidated agency policy. Like the asylum seekers who successfully invoked the court's jurisdiction in Grace, petitioners here are not asking the Court to "examine how USCIS officers 'appl[ied]' the challenged policies 'to individual aliens.'" Id. at 893 (quoting 8 U.S.C. § 1252(a)(2)(A)(iii)).

5    The courts in these cases did not directly analyze § 1252(a)(2)(A), focusing instead on other jurisdiction-stripping provisions that were more relevant to the facts presented. But to the extent these cases distinguish collateral challenges to the government's conduct in connection with removal (which courts may review) from challenges to removal itself (over which courts lack jurisdiction), their logic applies in the § 1252(a)(2)(A) context. See D.A.M. I, ––– F.Supp.3d at –––– – ––––, 2020 WL 4218003, at *7-*8.

There is, however, an important difference between § 1252(a)(2)(A) and § 1252(g), the jurisdiction-stripping provision at issue in several of the cases petitioners cite. Section 1252(g) provides that, with limited exceptions, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). This subsection applies "only to three discrete actions"—commencing proceedings, adjudicating cases, and executing removal orders—"that the Attorney General may take," or decline to take, as a matter of prosecutorial discretion. Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); see also D.A.M. I, ––– F.Supp.3d at ––––, 2020 WL 4218003, at *9 (applying § 1252(g) to claims that "directly implicate[] the government's discretionary authority to return noncitizens to their native countries"). For example, § 1252(g) applies to selective enforcement claims, where a noncitizen accuses the government of discrimination in choosing among otherwise lawful deportations to pursue. Reno, 525 U.S. at 485, 119 S.Ct. 936. By contrast, if the government tries to remove a noncitizen under circumstances where removal is not within the Attorney General's prosecutorial discretion, § 1252(g) does not apply. See Arce v. United States, 899 F.3d 796, 800 (9th Cir. 2018) (where government removed noncitizen in direct violation of a court order, § 1252(g) did not bar review because "his claims arise not from the execution of the removal order, but from the violation of [the] court's order," an act beyond the Attorney General's authority); Fatty v. Nielsen, NO. C17-1535-MJP, 2018 WL 3491278, at *2 (W.D. Wash. July 20, 2018) (Section 1252(g) does not bar review of "collateral legal and constitutional challenges to the process by which the government seeks to remove" a noncitizen); Calderon v. Sessions, 330 F. Supp. 3d 944, 954 (S.D.N.Y. 2018) (challenge to government's "legal authority" to proceed with removal "when the subject of the removal order also has a right to seek relief made available by the DHS" not barred by § 1252(g)).

Section 1252(a)(2)(A), by contrast, "makes abundantly clear that" courts have no jurisdiction to review any challenge to the implementation of an expedited removal order, except as provided in § 1252(e). Castro, 835 F.3d at 426-27. In this sense, § 1252(a)(2)(A) is broader than § 1252(g), so the case law finding § 1252(g) inapplicable to removals outside the Attorney General's prosecutorial discretion is not fully transferable to the § 1252(a)(2)(A) context.

6    Another subparagraph of § 1252(e) authorizes suits challenging regulations and written policies regarding the expedited-removal statute, but requires such suits to be brought within 60 days of when the challenged regulation or policy is first implemented. 8 U.S.C. § 1252(e)(3). All parties agree that § 1252(e)(3) provides no basis for jurisdiction in this case.

If anything, the existence of § 1252(e)(3) further bolsters the Court's conclusion that the INA likely bars petitioners' claim. In adopting § 1252(e)(3), Congress created an opportunity for noncitizens to challenge their expedited removal orders based on the alleged illegality of an agency rule—but only within the 60-day limitations period. The plaintiffs in M.M.V.— including some of the petitioners here—expressly chose not to challenge the Transit Ban directly under § 1252(e)(3). By entertaining petitioners' claim that their removal orders cannot be carried out because they were procured under the Transit Ban, the Court would effectively license an end run around § 1252(e)(3)'s 60-day deadline for claims along these lines.

7    Petitioners note that Thuraissigiam did not overrule INS v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). Reply 9. But they fail to identify any specific legal principle from St. Cyr that survives and overcomes the effect

of Thuraissigiam on this case. Petitioners also rely on Sean B. v. McAleenan, 412 F. Supp. 3d 472 (D.N.J. 2019). To the extent that case suggests that the Suspension Clause empowers courts to halt a deportation so that a noncitizen can take advantage of an administrative review process where 8 U.S.C. § 1252 otherwise bars judicial intervention, see Sean B., 412 F. Supp. 3d at 491, it has lost its persuasive value in the wake of Thuraissigiam.

8    By contrast, the petition for review of the removal order in Nken faced no insurmountable jurisdictional hurdle. In fact, the Fourth Circuit exercised jurisdiction and *granted* the petition on remand from the Supreme Court. Nken v. Holder, 585 F.3d 818, 823 (4th Cir. 2009).

9    The government has suggested that after being deported, petitioners may apply for refugee status from abroad, offering them an opportunity to return to the U.S. if they meet the legal criteria for asylum. Hearing Tr. 58. But the refugee program provides nothing close to a guarantee that petitioners will be able to return to the U.S., even assuming they qualify for protection. To begin, persons seeking refugee status generally must be outside their country of nationality. See 8 U.S.C. § 1101(a)(42). In other words, after being deported to their countries of origin, petitioners would likely need to flee to some other country before applying for refugee status. Next, a prospective refugee who wants to resettle in the U.S. must receive a referral to the U.S. Refugee Admissions Program (USRAP). Refugees, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees (last updated May 7, 2020). Most successful referrals to the USRAP come from the office of the United Nations High Commissioner for Refugees (UNHCR). Dep't of Homeland Sec., Annual Flow Report, Refugees and Asylees: 2017 3 (2019), https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf. But, UNHCR does not allow prospective refugees to choose their country of resettlement; UNHCR itself decides which country, if any, should receive the referral for resettlement. Information on UNHCR Resettlement, United Nations High Comm'r for Refugees, https://www.unhcr.org/en-us/information-on-unhcr-resettlement.html (last visited Sept. 12, 2020). And even if a prospective refugee is fortunate enough to be referred for resettlement in the U.S., there is no assurance that the government will grant admission. Only a finite number of refugees per year may be admitted. 8 U.S.C. § 1157.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "3"

## DECLARATION OF BRIDGET CAMBRIA, ESQ.

I, Bridget Cambria, declare that the following information is true and correct to the best of my knowledge and belief:

1. My name is Bridget Cambria, Esq. and I am an attorney with, and the Executive Director of, Aldea – The People's Justice Center ("Aldea"), a non-profit located in Reading, Pennsylvania in the County of Berks. Our organization, Aldea, offers universal representation to families detained at the Berks County Residential Center in Leesport, Pennsylvania. In the last five years, we have represented more than one thousand parents and children who have been detained in family detention in the Berks County Residential Center ("BCRC").

2. Our organization currently represents two families at the Berks Country Residential Center for immigration purposes who are Plaintiffs in the instant intervention request. They include parents and children ages two years old and three years old. The removal of these parents and children are imminent.  They are currently without a stay of removal and can be removed at any time.

3. They are subject to orders of removal which were obtained pursuant to fear interviews conducted under the third country-transit asylum eligibility bar, 8 C.F.R. § 1208.13(c)(4) (the "Rule). Each parent and child were denied the right to request asylum in the United States pursuant to 8 § U.S.C. 1158 as a direct result of the application of the Rule regulation. Therefore, they have never received credible fear interviews under the standards at 8 C.F.R. § 208.30 which require "significant possibility … the alien can establish eligibility for asylum," requiring only some chance of demonstrating at least a ten percent chance of persecution or harm.

4. Pursuant to the Rule regulation, my clients were required to establish "reasonable fear" which is a far higher burden than credible fear and is usually applied only to those persons deemed an aggravated felon or a person who is subject to a prior order of removal.  However, reasonable fear interviews have a number of protections that my clients were not afforded under the statute and regulations such as the right to obtain counsel prior to the interview and a proper orientation explaining proper legal standards.

5. The credible fear process in expedited removal involves review by an immigration judge. In my clients' cases, their review by the immigration judge was also pursuant to the heightened "reasonable fear" standard mandated by the Rule regulation. Their final orders of removal are based on the application of an unlawfully heightened standard that has now been vacated, but the government refuses to process them under the correct legal standard.

6. Neither Immigrations and Customs Enforcement ("ICE") nor the staff at BCRC

provide any notice to the families' attorneys as to when ICE intends to remove a family will.  We have requested notice prior to removal both from ICE and BCRC and both refuse to provide this information.  We learn that ICE has removed a family only when we attempt to communicate with the family concerning their case and are told that they are no longer at the facility.

7.      Once the removal process begins, ICE takes the families from BCRC and transfers them to a staging ground for removal by plane.  They are then comingled with other detained persons subject to removal.  Without a stay of removal, the deportation of these parents and children can happen at any moment.

8.      The removal of these families, if effectuated, will occur as a direct result of the third country-transit asylum eligibility bar. Immigration authorities were made aware that this bar was unlawful pursuant to *Capital Area Immigrants' Rights (CAIR) Coalition et. al. v. Trump*, No. 19-2117 (TJK), 1:19-cv-02117-TJK, Doc. 72 (D.C. Dist. Ct. Jun. 30, 2020); *I.A. v. Barr*, No. 19-2530 (TJK), 1:19-cv-02117-TJK, Doc. 72 (D.C. Dist. Ct. Jun. 30, 2020).

9.      Despite the change in law, on information and belief, immigration authorities still intend to effectuate our client families' removal based on an order received pursuant to the unlawfully heightened standard in the now vacated Rule. That removal can happen at any moment. Based on my experience and my clients' countries of origin, I expect the government to begin action to remove them immediately if not within days.

10.     If removal is effectuated for these families, they fear physical harms, sexual harms, psychological harms and torture based on their status as women, as children, based on their familial associations and their political opinions. They fear being killed, physical beatings and torture, sexual assaults and rape, kidnappings and other harms. Because they were subject to the Rule, and barred from requesting asylum, they have been completely denied the right to seek asylum or to be protected from refoulement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct pursuant to 28 U.S.C. ¶ 1746.

Date: October 16, 2020

_____
Bridget Cambria, Esq.

# EXHIBIT "4"

## DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, hereby declare under penalty of perjury as prescribed in 28 U.S.C. § 1746:

1. I direct the Proyecto Dilley, formerly known as the Dilley Pro Project and CARA Pro Bono Project, in Dilley, Texas. In this capacity, I oversee a team of attorneys and full-time paralegals, and a rotating group of volunteers, who provide legal services on behalf of asylum-seeking families who are detained at the South Texas Family Residential Center. I have been practicing law since 2010, and my practice has focused on representing detained unaccompanied immigrant children and detained immigrant families before the Executive Office of Immigration Review ("EOIR") and the Department of Homeland Security ("DHS").

2. Proyecto Dilley represents the proposed plaintiff-intervenors in this matter in their immigration proceedings. Each proposed plaintiff-intervenor has a final order of expedited removal that is based upon a negative credible fear finding issued subsequent to the application of 8 C.F.R. § 1208.13(c)(4), the third country-transit asylum eligibility bar (the "Rule). Proposed plaintiff-intervenors have not had their claims adjudicated in alignment with the legal standard or procedural protections that are required in credible fear proceedings, and instead, were subjected to the heightened "reasonable fear" standard.

3. Based upon my experience representing proposed plaintiff-intervenors, absent a Court ordered stay, ICE will likely commence removal of the proposed plaintiffs-intervenors from the United States despite the fact that their negative fear findings are based upon the application of the Rule on October 17, 2020. *Capital Area Immigrants' Rights (CAIR) Coalition et. al. v. Trump*, No. 19-2117 (TJK), 1:19-cv-02117-TJK, Doc. 72 (D.C. Dist. Ct. Jun. 30, 2020); *I.A. v. Barr*, No. 19-2530 (TJK), 1:19-cv-02117-TJK, Doc. 72 (D.C. Dist. Ct. Jun. 30, 2020). Proposed plaintiff-intervenors were recently clustered together in the same "neighborhood" within the facility. ICE regularly moves families within the facility when preparing them for removal. Additionally, today, October 16, 2020, ICE spoke with proposed plaintiff-intervenors to secure contact information for the person who will receive them when they are removed and advised proposed plaintiff-intervenors that this person should be immediately ready to receive them.

4. The proposed plaintiff-intervenors fear death, torture, rape and other extreme cruelty and harm upon return to their countries of origin. Although the removal of each proposed plaintiff-intervenor will permanently jeopardize their ability to seek asylum in the United States, plaintiff-intervenors primary fear is the irreversible physical harm they will face if deported.

5. The government has the ability and intention to execute the removal of the proposed plaintiff-intervenors with tremendous speed. I am aware that the government has removed families from Dilley in less than 24 hours after a court ordered stay was dissolved.

6. In fact, this happened to numerous plaintiffs in *M.M.V. v. Barr* who were removed during a two-day gap in federal court stays of removal.  Even some *M.M.V.* plaintiffs who *were* covered by stays of removal were removed subsequent to the issuance of the stay of removal.

7. Based upon information and belief, ICE operates daily removal flights from South Texas to many Central America countries. When ICE seeks to remove a family and ICE does not have an ICE-contracted flight immediately available, it regularly books commercial flights out of the Houston or San Antonio airports, transporting families by vehicle to the airport in the middle of the night. This allows ICE to effectuate removal for families who will be removed to any country, within a day's notice.

8. With the exception of families who are removed to El Salvador, ICE provides no notice to counsel or families prior to their removal. Typically, families are informed late at night – after 8 p.m., and most commonly around 10 p.m. – that they will be removed the following morning. Removal flights typically depart around 6:00 a.m.

9. Families most commonly learn that they are being removed less than 12 hours prior to their removal when they are directed to immediately pack up their belongings and moved to a staging area, isolated from other detained individuals. During the staging period, families are unable to come to the legal visitation trailer and have limited access to the phone. In the overwhelming majority of cases, families who are staged for removal are unable to make contact with Proyecto Dilley prior to removal; rather, we learn that the family has been removed after they arrive in their country of origin for the first time.

10. Based upon information and belief, the removal of all proposed plaintiff-intervenors is imminent. Absent the issuance of a stay of removal, proposed plaintiff-intervenors will be removed without the opportunity to have their claims properly and fully considered under the correct legal standard.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 16, 2020 in Ft. Myers, Florida.

