JEFFREY BOSSERT CLARK
*Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-4293
Email: Erez.R.Reuveni@usdoj.gov

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| East Bay Sanctuary Covenant, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 4:19-cv-04073-JST |
| Donald J. Trump, President of the United States, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## Appendix to the Defendants' Opposition to the Pending Motions

# TABLE OF CONTENTS

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - En Banc Order Dissolving Administrative Stay (10/16/20)................................................................................................................ App.001

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - En Banc Order Denying Reconsideration of Stay Denial (10/16/20)............................................................................... App.002

*D.A.M. v. Barr*, 1:20-cv-01321 (D.D.C.) - Petitioners' Memorandum of Points and Authorities in Opposition to Respondents' Motion to Dismiss or, In the Alternative, to Transfer Venue (Dkt. 56)................................................................................. App.003

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - Emergency Motion for Stay Pending Review of Petition for Rehearing En Banc (10/1/20)................................................................... App.086

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - Petition for Rehearing En Banc of Petitioners' Motion for Stay Pending Appeal (10/01/20)................................................................... App.113

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - Panel Order Denying Stay of Removal (9/30/20)................................................................................................................ App.140

*D.A.M. v. Barr*, No. 20-5281 (D.C. Circuit) - Emergency Motion for Stay Pending Review of Petitioners' Appeal (9/17/20)....................................................................... App.142

*D.A.M. v. Barr*, 1:20-cv-01321 - Petitioners' Motion for a Temporary Restraining Order and Stay of Removal (Dkt. 35) ..................................................................... App.172

*D.A.M. v. Barr*, 1:20-cv-01321 (D.D.C.) - Order Denying Stay of Removal (Dkt. 34) ......................................................................................................... App.203

*D.A.M. v. Barr*, 1:20-cv-01321 (D.D.C.) - Verified Amended Petition for Writ of Habeas Corpus & Complaint for Declaratory and Injunctive Relief (Dkt. 31)...................... App.236

*M.M.V. v. Barr*, 20-5106 (D.C. Circuit) - Panel Order Denying Stay of Removal (5/15/20) ............................................................................................................. App.313

*M.M.V. v. Barr*, 20-5106 (D.C. Circuit) - Order Denying Stay of Removal (Dkt. 106)................................................................................................................ App.315

*M.M.V. v. Barr*, 20-5106 (D.C. Circuit) - Emergency Motion for Stay Pending Review of Plaintiffs' Appeal (4/28/20)....................................................................... App.323

*M.M.V. v. Barr*, 1:19-cv-02773 (D.D.C.) – Complaint (Dkt. 54) .................................. App.359

***M.M.V. v. Barr***, 1:19-cv-02773 (D.D.C.) - Plaintiffs' Reply to Government Defendants'
Response to Plaintiffs' Objection to Administrative Notices to Relate Cases (Dkt. 11)
................................................................................................................................... **App.427**

***M.M.V. v. Barr***, 1:19-cv-02773 (D.D.C.) - Plaintiffs' Opposition to the Administrative
Notices of Designation of Related Civil Cases (Dkt. 5)................................................ **App.430**

***M.M.V. v. Barr***, 1:19-cv-02773 (D.D.C.) – Complaint (Dkt. 1) .................................... **App.438**

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 20-5281**                                        **September Term, 2020**

**1:20-cv-01321-CRC**

**Filed On: October 16, 2020**

D.A.M., et al.,

        Appellants

    v.

William Pelham Barr, Attorney General of the
United States of America and Chad F. Wolf,
Acting Secretary, Department of Homeland
Security,

        Appellees

## <u>O R D E R</u>

Upon consideration of the court's order issued this date denying the motion for en banc reconsideration and dismissing as moot the emergency motion for stay, it is

**ORDERED** that the administrative stay entered October 2, 2020, be dissolved.

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
        Manuel J. Castro
        Deputy Clerk

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 20-5281                                          September Term, 2020

1:20-cv-01321-CRC

Filed On: October 16, 2020

D.A.M., et al.,

       Appellants

    v.

William Pelham Barr, Attorney General of the
United States of America and Chad F. Wolf,
Acting Secretary, Department of Homeland
Security,

       Appellees

**BEFORE:**    Srinivasan, Chief Judge, and Henderson, Rogers, Tatel, Garland,
Millett, Pillard*, Wilkins, Katsas, Rao, and Walker, Circuit Judges

## O R D E R

Upon consideration of the motion for en banc reconsideration of the court's order filed September 30, 2020, the emergency motion for stay of removal pending disposition of the motion for en banc reconsideration, the response to the motions, and the reply, it is

**ORDERED** that the motion for en banc reconsideration be denied.  It is

**FURTHER ORDERED** that the emergency motion for stay be dismissed as moot.

### Per Curiam

FOR THE COURT:
Mark J. Langer, Clerk

BY:    /s/
Manuel J. Castro
Deputy Clerk

* Circuit Judge Pillard did not participate in this matter.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

D.A.M. et al.,

       *Petitioners*,

       -against-

BARR et al.,

       *Respondents*.

Case No. 20-1321 (CRC)

## <u>PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RESPONDENTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE</u>

Steven G. Barringer (D.C. Bar # 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

Caroline Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

*Attorneys for Petitioners*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 2

      A.    The Petitioners ................................................................................ 2

      B.    Original Petition and First Motion for a Temporary Restraining Order ................................................................................................ 4

      C.    Amended Petition and Second Temporary Restraining Order ................. 4

ARGUMENT ......................................................................................................... 7

    I.    Legal standards For Motion to Dismiss ................................................ 7

    II.    The Court Has Jurisdiction Over Petitioners' Claims .......................... 7

      A.    There is a Presumption of Judicial Review ................................... 7

      B.    Neither 1252(a)(2)(A) Nor 1252(g) Strip the Court of Jurisdiction to Review the Manner of Deportation Claims or the Country Condition Claims ......................................................................... 8

      C.    Neither 1252(a)(2)(A) Nor 1252(g) Strip the Court of Jurisdiction to Review the Due Process Claims ............................................... 11

      D.    The Court Has Jurisdiction to Review the Due Process Claims Under Section 1252(e)(2)(B) ...................................................... 16

      E.    If the Court Finds that it is Stripped of Jurisdiction to Review Petitioners' Claims, it Would Be an Unconstitutional Suspension of the Writ of Habeas Corpus ......................................................... 18

      F.    The Court Has Authority to Issue the Relief Sought .................... 22

    III.    Petitioners Properly Pleaded Their Claims ........................................ 23

      A.    Petitioners Properly Pleaded their Due Process Claims ............... 23

      B.    Petitioners Properly Pleaded Count I ............................................ 29

      C.    Petitioners Properly Pleaded Counts II and III ............................ 30

      D.    Petitioners' Preserve Their Arguments on Count IV .................... 33

    IV.    The Court Should Deny the Motion to Transfer Because Venue is Proper in the District of Columbia and Convenience and the Interests of Justice Weigh in Favor of the Petitioners. ......................................................... 33

      A.    Venue is Proper in the District of Columbia ................................ 34

      B.    Respondents Have Not Met Their Burden for Transfer ................ 36

CONCLUSION ...................................................................................................... 40

App.004

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..................................................................24, 27

*Am–Arab Anti–Discrimination Comm. v. Ashcroft*,
    272 F.Supp.2d 650 (E.D.Mich. 2003) .................................................................16

*Am. Great Lakes Ports Ass'n v. Schultz*,
    962 F.3d 510 (D.C. Cir. 2020) ..............................................................5, 23, 27

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) .............................................................36, 37, 39

*Avendano-Ramirez v. Ashcroft*,
    365 F.3d 813 (9th Cir 2004) ..................................................................12

*Avila-Sanchez v. Mukasey*,
    509 F.3d 1037 (9th Cir. 2007) .................................................................24

*Batista-Taveras v. Ashcroft*,
    No. 03 Civ. 1968, 2004 WL 2149095 (S.D.N.Y. Sept. 23, 2004) ..........................................34

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*,
    502 U.S. 32 (1991) ...........................................................................8

*Bederson v. United States*,
    756 F. Supp. 2d 38 (D.D.C. 2010) .................................................................37

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ...........................................................................29

*Boumediene v. Bush*,
    553 U.S. 723 (2008) .................................................................18, 19, 21

*Butera v. District of Columbia*,
    235 F.3d 637 (D.C. Cir. 2001) .................................................................30, 31, 33

*Calderon v. Sessions*,
    330 F. Supp. 3d 944 (S.D.N.Y. 2018) .................................................................11, 15

*Capital Area Immigrants' Rights Coalition v. Trump*
    2020 WL 3542481(D.D.C., June 30, 2020) ..............................................................4, 26, 28

*Castillo v. Barr*,
    No. CV 20-00605, 2020 U.S. Dist. LEXIS 54425 (C.D. Cal. Mar. 27, 2020) ......................30

*Castro v. U.S. Dep't of Homeland Sec.*,
    835 F. 3d 422 (3d Cir. 2016) .................................................................12

*Compere v. Nielsen*,
    358 F. Supp. 3d 170 (D.N.H. 2019) .................................................................18

*Cty. Sacramento v. Lewis*,
523 U.S. 833 (1998) ........................................................................................31

*D.A.M. v. Barr*,
20-CV-1321, 2020 WL 4218003 (D.D.C. July 23, 2020) ....5, 9, 10, 11, 13, 15, 17, 21, 27, 33, 34

*D.A.M. v. Barr*,
20-CV-1321, 2020 WL 5525056 (D.D.C. Sept. 15, 2020)..........5, 6, 11, 13, 17, 22, 24, 25, 27

*D.B. v. Cardall*,
826 F.3d 721 (4th Cir. 2016) ..................................................................21, 22

*Daimler Trucks N. Am. LLC v. EPA*,
745 F.3d 1212 (D.C. Cir. 2013) ....................................................................24

*Demore v. Kim*,
538 U.S. 510 (2003) ........................................................................................28

*Dept of Homeland Security v. Thuraissigiam*,
140 S. Ct. 1959 (2020) ............................................................12, 18, 19, 20, 28

*DeShaney v. Winnebago Cty. Dep't of Social Servs.*,
489 U.S. 189 (1989) ........................................................................................31

*DL v. Dist. of Columbia*, 450 F. Supp. 2d 11, 13 (D.D.C. 2006)...................7

*Dugdale v. U.S. Customs & Border Protection*
88 F. Supp. 3d 1, 6 (D.D.C. 2015) ..........................................................16, 17

*E. Bay Sanctuary Covenant v. Trump*,
950 F.3d 1242 (9th Cir. 2020) .......................................................................14

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*,
950 F.3d 177 (3d Cir. 2020)...........................................................................14

*Farmer v. Brennan*,
511 U.S. 825 (1994) ........................................................................................29

*Fatty v. Nielsen*,
No. 17-cv-1535, 2018 WL 3491278 (W.D. Wash. July 20, 2018), appeal
dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019) ..................11, 15

*Garcia de Rincon v. Dep't of Homeland Sec.*,
539 F.3d 1133 (9th Cir. 2008) .......................................................................12

*Guerrero-Lasprilla v. Barr*,
140 S. Ct. 1062 (2020)..........................................................................7, 8, 14

*Hale v. Tallapoosa Cty.*,
50 F. 3d 1579 (11th Cir. 1995) ......................................................................29

*Harris v. District of Columbia*,
932 F.2d 10 (D.C. Cir. 1991) .........................................................................31

*Harvey v. District of Columbia*,
798 F.3d 1042 (D.C. Cir. 2015)................................................................31, 32

*Heartland By-Products, Inc. v. United States*,
568 F.3d 1360 (Fed. Cir. 2009)......................................................................24

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009).............................................................5, 24, 27

*Helling v. McKinney*,
509 U.S. 25 (1993)...................................................................................29, 30

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)..........................................................................................3

*INS v. St. Cyr*,
533 U.S. 289 (2001)....................................................................................7, 18

*Jennings v. Rodriguez*,
—— U.S. ——, 138 S. Ct. 830 (2018)...............................................1, 9, 13, 14

*Jones v. Cunningham*,
371 U.S. 236 (1963)........................................................................................21

*Kucana v. Holder*,
558 U.S. 233 (2010)......................................................................................7, 8

*L.M.-M. v. Cuccinelli*,
No. CV 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020)...........................27

*LaShawn A. v. Kelly*,
990 F.2d 1319 (D.C. Cir. 1993).....................................................................31

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) (Blackmun, J. dissenting).............................................26

*M.M.M. on Behalf of J.M.A. v. Sessions*,
347 F. Supp. 3d 526 (S.D. Cal. 2018)............................................................12

*Make the Road New York v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020)....................................................................8, 14

*Martinez v. Napolitano*,
704 F.3d 620 (9th Cir. 2012) .........................................................................14

*Masingene v. Martin*,
424 F. Supp. 3d 1298 (S.D. Fla. 2020) ..........................................................35

*Mathews v. Eldridge*,
424 U.S. 319 (1976)..................................................................................27, 28

*McNary v. Haitian Refugee Center, Inc.*,
498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991)...........................7, 8, 14

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002)..................................................................24, 27

*Mohit v. Dept of Homeland Security*,
  20-CV-00823-PAB, 2020 WL 3971642 (D. Colo. July 14, 2020) ..........................................22

*Montgomery v. STG Int'l, Inc.*,
  532 F. Supp. 2d 29 (D.D.C. 2008) ..........................................................................................36

*Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*,
  59 F.3d 1281 (D.C. Cir. 1995) ..........................................................................................24, 27

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ..............................................................................................26

*Nestor v. Hershey*,
  425 F.2d 504 (D.C. Cir. 1969) ................................................................................................35

*Paine v. Cason*,
  678 F.3d 500 (7th Cir. 2012) ..................................................................................................30

*Palko v. Connecticut*,
  302 U.S. 319 (1937) ................................................................................................................29

*Patel v. Barr*,
  2020 WL 4282051 (E.D. Pa. July 27, 2020) ..........................................................................13

*Ravulapalli v. Napolitano*,
  773 F.Supp.2d 41, 56 (D.D.C. 2011) ................................................................................37, 39

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) .......................................................9, 10

*Reno v. Catholic Social Services, Inc.*,
  509 U.S. 43 (1993) ....................................................................................................................8

*Reno v. Flores*,
  507 U.S. 292 (1993) ................................................................................................................28

*Revere v. Mass. Gen. Hosp.*,
  463 U.S. 239 (1983) ................................................................................................................29

*Reynoldsville Casket Co. v. Hyde*,
  514 U.S. 749 (1995) ................................................................................................................24

*Rochin v. California*,
  342 U.S. 165 (1952) ................................................................................................................28

*Rodriguez Sanchez v. Decker*,
  No. 18-CV-8798 (AJN), 2019 WL 3840977 (S.D.N.Y. Aug. 15, 2019) ...............................35

*Rumsfeld v. Padilla*,
  542 U.S. 426, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) ........................................................33

*S.N.C. v. Sessions*,
  325 F. Supp. 3d 401 (S.D.N.Y. 2018) ...............................................................................34, 35

*S.N.C. v. Sessions*,
  No. 18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018) .......................................11, 15

*Santos v. Barr*,
No. CV 17-321 (RMC), 2019 WL 2504101 (D.D.C. June 17, 2019)....................................35

*Scheuer v. Rhodes*,
416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)..............................................................7

*Smith v. De Novo Legal, LLC*,
905 F. Supp. 2d 99 (D.D.C. 2012) ...............................................................................1, 7, 23

*Somir v. United States*,
354 F. Supp. 2d 215 (E.D.N.Y. 2005) .............................................................................34

*Starnes v. McGuire*,
512 F.2d 918 (D.C. Cir. 1974)..........................................................................................36

*Stewart Org., Inc. v. Ricoh Corp.*,
487 U.S. 22 (1988)............................................................................................................36

*Strait v. Laird*,
406 U.S. 341 (1972)..........................................................................................................34

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ..........................................................................5, 24, 26, 27

*Swain v. Pressley*,
430 U.S. 372 (1977)..........................................................................................................19

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)...........................................................7

*Tittle v. Jefferson Cty. Comm'n*,
10 F.3d 1535 (11th Cir. 1994) ..........................................................................................30

*Trout Unlimited v. U.S. Dep't of Agric.*,
944 F.Supp. 13 (D.D.C. 1996)..........................................................................................36

*United States v. Philip Morris, Inc.*,
116 F.Supp.2d 131 (D.D.C. 2000)......................................................................................7

*United States v. Salerno*,
481 U.S. 739 (1987)..............................................................................................19, 29, 30

*Wang v. Reno*,
81 F.3d 808 (9th Cir. 1996) ..............................................................................................31

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
650 Fed. Appx. 13 (D.C. Cir. 2016)..................................................................................25

*Washington All. of Technology Workers v. United States Dep't of Homeland Sec.*,
2015 WL 3751276 (D.D.C.) (April 6, 2015) ....................................................................25

*Waterkeeper Alliance, Inc. v. Wheeler*,
No. 18-cv-2230 (JDB), —— F.Supp.3d ——, 2020 WL 1873564 (D.D.C. Apr.
15, 2020) ...........................................................................................................................24

*Western Watersheds Project v. Zinke*,
441 F. Supp. 3d 1042 (D. Idaho 2020) ............................................................5, 6, 24, 25, 27

*Wong Wing v. United States*,
   163 U.S. 228 (1896)........................................................................................28

*You v. Nielsen*,
   321 F. Supp. 3d 451 (S.D.N.Y. 2018)..................................................10, 11, 15

*Youngberg v. Romeo*,
   457 U.S. 307 (1982)........................................................................................31

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)..................................................................................21, 28

**Statutes**

8 U.S.C. § 1225(b)(1) ........................................5, 8, 9, 12, 15, 16, 17, 22, 26, 28, 37

8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B)........................................................................3

8 U.S.C. § 1225(b)(1)(B)(ii) ...........................................................................................3

8 U.S.C. § 1225(b)(1)(B)(iii)(III)..................................................................................23

8 U.S.C. §1225(b)(1)(B)(v) .............................................................................................3

8 U.S.C. § 1252(a)(2)(A) ..................................................................................8, 9, 10, 15

8 U.S.C. § 1252(a)(2)(A)(i) ..................................................................................9, 12, 13

8 U.S.C. § 1252(b)(9) ...........................................................................................9, 13, 14

8 U.S.C. § 1252(e) .....................................................................................................8, 22

8 U.S.C. § 1252(e)(1)(A) ..............................................................................................22

8 U.S.C. § 1252(e)(1)(B) ..............................................................................................26

8 U.S.C. § 1252(e)(2)....................................................................................................19

8 U.S.C. § 1252(e)(2)(B) ..................................................................................15, 16, 17

8 U.S.C. § 1252(e)(5)....................................................................................................16

8 U.S.C. § 1252(g)........................................................................................10, 15, 22

8 U.S.C. § 1404(a) ........................................................................................................36

28 U.S.C. § 1331 .............................................................................................................8

28 U.S.C. § 2241(c)(1), (3) ..........................................................................................21

11 HALSBURY'S LAWS OF ENGLAND 25 (3d ed. 1955) ......................................20

**Regulations and Rules**

8 C.F.R. § 208.30 .............................................................................................................3

8 C.F.R. § 208.30(e)(5)(iii) .............................................................................................2

8 C.F.R. § 208.30(f) .........................................................................................................3

8 C.F.R. § 208.31(c).........................................................................................................3

8 C.F.R. § 235.3(b)(4) ........................................................................................3

84 Fed. Reg. 33,829 (July 16, 2019) ...................................................................2

84 Fed. Reg. at 33,834 ........................................................................................3

84 Fed. Reg. at 33,835 ........................................................................................2

Fed. R. Civ. P. 12(b)(1) ...................................................................................6, 7

Fed. R. Civ. P. 12(b)(6) ........................................................................................7

## Other Authorities

*Ab Initio*, Black's Law Dictionary (11th ed. 2019) ........................................17

*Berks Cty. Residential Ctr.: About Dep't*, BERKS CTY., PA.,
    https://www.co.berks.pa.us/Dept/BCRC/Pages/AboutDepartment.aspx .................35

*DuCastro's Case*, 92 Eng. Rep. 816 (K.B. 1697) .........................................20

Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text,
    Imperial Contexts, and American Implications*, 94 VA. L. REV. 575, 606 n.
    76 (2008) ........................................................................................................21

*South Tex. Family Residential Ctr.*, CORECIVIC,
    https://www.corecivic.com/facilities/south-texas-family-residential-center .................35

U.S. CONST. art. I, § 9, cl. 2 ...............................................................................18

## **INTRODUCTION**

Petitioners are parents and their children who have fled persecution in their home countries to seek asylum in the United States.  When they arrived in this country to seek asylum, they were denied access to that Congressionally sanctioned process and, instead, subjected to an unlawful rule that required them to meet a higher standard of fear of return than they would have been required to show under the lawful asylum process.  They are entitled to access the lawful asylum process for the first time.  Not only are Respondents denying Petitioners access to the asylum process mandated by Congress, they are seeking to deport Petitioners during a global pandemic without adequate protection from transmission of COVID-19.

The Court has jurisdiction over these claims because there is no clear and convincing evidence that Congress meant to strip the Court of jurisdiction to review these claims.  In fact, the clear and convincing evidence is to the contrary.  Petitioners could not have brought their claims alongside review of their removal orders and their claims are not channeled in the Immigration and Nationality Act ("INA").  Thus, cramming judicial review of Petitioners' claims into a statutory scheme in which they could not have made those claims "would be absurd," *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 40 (2018).

Further, Petitioners have properly plead all the requisite elements of these claims. And while the Court has previously determined that Petitioners would be unlikely to succeed on the merits of some of their claims, a motion to dismiss "does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 102 (D.D.C. 2012).

Finally, Respondents have failed to meet their burden to show transfer of this case

1

is appropriate. This case is about policies and practices promulgated by Respondents in the District of Columbia, thus the interests of justice favor venue in this District. The Court should deny Respondents' motion to dismiss or, in the alternative, to transfer venue ("Motion") in its entirety.

## STATEMENT OF FACTS

### A. The Petitioners

Petitioners are families who came to the United States seeking asylum after facing persecution in their home countries. (ECF 3, ¶¶ 36-121). Petitioners are detained at either the South Texas Family Residential Center in Dilley, Texas ("Dilley") or the Berks County Residential Center in Leesport, Pennsylvania ("Berks"), or have been released from Dilley or Berks but remain "in custody" for habeas corpus purposes based on the substantial restrictions on liberty imposed by Respondents on those released, by way of ongoing efforts to effect removal and ongoing orders of supervision, monitoring and electronic custody. (*Id*., ¶¶ 36-121).

On July 16, 2019, the Department of Justice and the Department of Homeland Security jointly issued an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) (the "Transit Ban"). It rendered noncitizens seeking to enter the United States at its southern border ineligible for asylum unless they first applied for similar protection in a third country they transited through and were rejected, are victims of severe forms of trafficking, or did not pass through any country that is a signatory to the Refugee Convention or Refugee Protocol in route to the United States. *See* 84 Fed. Reg. at 33,835. Migrants who transited through a third country without applying for asylum were automatically and conclusively determined not to have a "credible fear" of persecution and were barred from the asylum process. See 8 C.F.R. §

2

208.30(e)(5)(iii).

Instead, Respondents applied the more stringent "reasonable fear" standard in the Petitioners' interviews. Under that higher standard, the noncitizen must show that more likely than not, she would be persecuted or tortured in the future because of a protected ground. *See* 84 Fed. Reg. at 33,834. Reasonable fear is a significantly higher standard than credible fear. 8 C.F.R. § 208.31(c).

Prior to the Transit Ban, regardless of whether a noncitizen first applied for asylum in a third country they transited through, noncitizens subjected to expedited removal who indicated a fear of returning to his or her home country or intention to apply for asylum are referred for an interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. The asylum officer conducts a "credible fear interview," credible fear being defined by law as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]" 8 U.S.C. §1225(b)(1)(B)(v). To ultimately prevail on an asylum claim itself, the applicant need only establish that there is a 10% chance that he or she will be persecuted because of one of the five protected grounds for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430–32, 439–40 (1987); *see* 8 U.S.C. §1225(b)(1)(B)(v). If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge, with an opportunity to develop a full record before the immigration court, and the right to appeal an adverse decision to the relevant federal court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

3

All but 13 of the Petitioners were subjected to the Transit Ban.[1]

**B.      Original Petition and First Motion for a Temporary Restraining Order**

On May 18, 2020, Petitioners filed a Petition for Writ of Habeas Corpus alleging four Counts: Counts I and IV alleged that the manner in which Respondents intended to remove Petitioners during the global COVID-19 pandemic violated their procedural and substantive due process rights, (*Id.*, ¶¶248-68), and violated Respondents' own policies and procedures and regulations in violation of the Administrative Procedure Act, (*Id.*, ¶¶287-98) ("Manner of Deportation Claims"), and; Counts II and III alleged that removing Petitioners during the global COVID-19 pandemic violated the state-created danger doctrine, (*Id.*, ¶¶269-79), and the special-relationship doctrine, (*Id.*, ¶¶280-86) ("Country Condition Claims").  Petitioners filed an emergency motion for a temporary restraining order requesting a stay of removal of the detained Petitioners ("First TRO") and an emergency judge granted Petitioners' request for an administrative stay, later extended by the District Court.  (ECF 7, 8, 22).

**C.      Amended Petition and Second Temporary Restraining Order**

On June 30, 2020, a District Court vacated the Transit Ban, finding that it violated the Administrative Procedure Act.  *Capital Area Immigrants' Rights Coalition v. Trump,* No. 19-2117 (D.D.C., June 30, 2020); 2020 WL 3542481 at *1 ("*CAIR*").  In doing so, the *CAIR* court rejected the government's argument that the court should limit any relief flowing from the vacatur to the actual parties before the court.  2020 WL 3542481, at *22.

---

[1]  The only Petitioners who were not subjected to the Transit Ban are: A.G.P., her children D.S.G. and A.S.G.; C.R.R., her children I.G.R. and V.G.R.; E.V.M; I.M.V., her children J.T.M. and D.T.M; N.V.; C.L., and her child J.A.  (*See* ECF 3 ¶ 159).  Two of the Petitioners who were not subjected to the Transit Ban (E.V.M. and N.V.) are the mothers of children who were subjected to it: A.V.M. and Z.F.  (*See id.*, ¶¶ 83, 102, 159.)

Under well-settled administrative law principles, the Transit Ban is void *ab initio* and places Petitioners in the position they would have been in absent the Transit Ban, i.e. eligible to access the asylum process sanctioned by Congress under section 1225(b)(1) for the first time. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). The government appealed from that order to the D.C. Circuit on August 31, 2020, Case Nos. 20-5271, 20-5273, but there is no stay of the order.

After learning that Respondents did not intend to comply with the *CAIR* order regardless of the lack of a stay, Petitioners amended their Petition, adding Counts V and VI which allege that Respondents' attempts to remove Petitioners without providing them access to the asylum process sanctioned by Congress violates their substantive and procedural due process rights (the "Due Process Claims"). (ECF 3 ¶¶ 299-305).

On July 23, 2020, the District Court denied Petitioners' First TRO and lifted the stay of deportation. *D.A.M. v. Barr*, No. 20-CV-1321, 2020 WL 4218003 (D.D.C. July 23, 2020) ("*D.A.M. I*"). The Court held that it likely had jurisdiction over the Manner of Deportation Claims only, but that Petitioners were unlikely to succeed on the merits of those claims. *Id*. Petitioners then filed a second motion for a temporary restraining order, asking the Court to stay removal of Petitioners pending adjudication of their Due Process Claims ("Second TRO"). (ECF 35). The Court granted an administrative stay pending disposition of the Second TRO. (Minute Order, July 23, 2020). On September 15, 2020, after briefing and oral argument, the District Court denied the Second TRO (the "Order). *D.A.M. v. Barr*, 20-CV-1321 (CRC), 2020 WL 5525056, at *9-*14 (D.D.C. Sept. 15, 2020)

("*D.A.M. II*).  The Court held that while Petitioners would be irreparably injured absent a stay, it did not have jurisdiction to review the Due Process Claims and Petitioners were not likely to succeed on the merits of those claims.  *Id.*

Petitioners appealed from the Order on September 15, 2020, *D.A.M., et al v. Barr et al*, No. 20-5281 (D.C. Cir.), and moved the Court for an administrative stay pending appeal, (ECF 53).  The Court issued a minute order staying Petitioners' removals for seven days to permit Petitioners to seek emergency relief from the Court of Appeals for the District of Columbia Circuit.  (Minute Order, September 15, 2020).  On September 17, 2020, Petitioners filed an emergency motion for a stay of removal pending appeal in the D.C. Circuit.  *D.A.M.*, No. 20-5281, [1862061].  In a per curiam order, a three-judge panel ordered an administrative stay of removal pending their consideration of the emergency motion.  *Id.* [1862170].  After the parties briefed the motion, on September 30, 2020, the panel issued an order dissolving the administrative stay, denying the emergency motion, and ordering a briefing schedule pursuant to which the appeal will be fully briefed by the end of 2020.  *Id.* [1864103].  On October 1, 2020, Petitioners filed a motion for rehearing en banc and an emergency motion for a stay of removal pending disposition of the motion.  *Id.* [1864319], [1864407].  After the parties briefed the motion, on October 2, 2020, an en banc panel issued a per curiam order that Petitioners' "removal from the United States be administratively stayed pending further order of the court.  On October 16, 2020, the panel issued a per curiam order denying the motion for en banc reconsideration, dismissing the emergency motion for stay as moot, and the administrative stay was dissolved. [1866599], [1866602].

**ARGUMENT**

## I.  LEGAL STANDARDS FOR MOTION TO DISMISS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a claim must be dismissed if a district court lacks subject-matter jurisdiction to entertain the claim. Fed.R.Civ.P. 12(b)(1).   Petitioners bear the burden of establishing that the court has jurisdiction and for purposes of the motion to dismiss, the court credits as true the factual allegations in Petitioners' pleadings.  *DL v. Dist. of Columbia*, 450 F. Supp. 2d 11, 13 (D.D.C. 2006)

"A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim."  *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 102 (D.D.C. 2012) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).  "A court considering such a motion presumes the factual allegations of the complaint to be true and construes them liberally in the plaintiff's favor."  *Id.* (citing U*nited States v. Philip Morris, Inc.*, 116 F.Supp.2d 131, 135 (D.D.C. 2000).  "It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint."  *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

## II.  THE COURT HAS JURISDICTION OVER PETITIONERS' CLAIMS

### A.  There is a Presumption of Judicial Review

In March of 2020, the United States Supreme Court reaffirmed in an immigration case "'a familiar principle of statutory construction: the presumption favoring judicial review of administrative action.'"  *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001) (there is a "strong presumption in favor of judicial review.")  "Under

that 'well-settled' and 'strong presumption,' *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496, 498, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), when a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (quoting *Kucana*, 558 U.S. at 251); *see also McNary*, 498 U.S. at 496 ("[G]iven [that] presumption ..., it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review"). "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Guerrero-Lasprilla*, 140 S. Ct. at 1069 (quoting *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 64 (1993)); *see also Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991) (same). This presumption of reviewability has been consistently applied to immigration statutes. *Guerrero-Lasprilla*, 140 S. Ct. at 1069.

**B.**   **Neither 1252(a)(2)(A) Nor 1252(g) Strip the Court of Jurisdiction to Review the Manner of Deportation Claims or the Country Condition Claims**

Section 1252(a)(2)(A) was created to insulate four specific, discretionary types of decisions from judicial review—not, as Respondents claim, all claims that arise from section 1225(b)(1).[2]   As set forth herein, section 1252(a)(2)(A)'s "text and statutory

---

[2] The Supreme Court precedent cited above contradicts Respondents' argument that "[s]ection 1252(a)(2)(A) thus squarely removes from federal courts any jurisdiction to review issues 'relating to section 1225(b)(1),'… other than as explicitly permitted by section 1252(e), and thus eliminates section 1331 as a basis for district-court jurisdiction," a verbatim argument they made, and the D.C. Circuit rejected, in *Make the Road New York v. Wolf*, 962 F.3d 612, 624-25 (D.C. Cir. 2020). *See* Case No. 19-5298, Document #1821238, Government Br. at 23-24. The "'well-settled' and 'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make The Rd. New York*, 962 F.3d at 624.

8

structure expressly preserve the district court's jurisdiction under 28 U.S.C. § 1331" over Petitioners' claims.  *Make the Road New York v. Wolf*, 962 F.3d 612, 624-25 (D.C. Cir. 2020).

Section 1252(a)(2)(A)(i), the provision Respondents allege is applicable here, precludes judicial review, "except as provided in subsection (e), [of] any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title."  8 U.S.C. § 1252(a)(2)(A)(i).  In *D.A.M. I*, this Court held that it likely had jurisdiction over Petitioners' Manner of Removal Claims because they "do not challenge the fact of their removals; they challenge the conditions they would face during the removal process.  Those claims are not related to the executive's discretionary decisions to implement or execute a removal order."  *Id.*, 2020 WL 4218003, at *8 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 476–87, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (recognizing that § 1252(a)(2)(A) is "aimed at protecting the Executive's discretion from the courts").  After a thorough analysis of *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 839–41 (2018), the Court rejected Respondents' contention "that the prohibition against judicial review of any claim 'arising from or relating to the implementation ... of an order of [expedited] removal'" bars review of all of petitioners' claims here….  The Court does not read that text so broadly.  While the phrase 'arising from or relating to' is expansive, it is not limitless."  *D.A.M.*, 2020 WL 4218003 at *6 (internal citation omitted). The Court reasoned:

> [A]ccepting the government's expansive interpretation of § 1252(a)(2)(A) would lead to even more absurd results than the Supreme Court contemplated in *Jennings*. There, the plurality explained that interpreting § 1252(b)(9) to cover the plaintiffs' length-of-detention claims would have required claims based on inhumane

conditions of confinement and state law tort claims to be reviewed only during the review of final orders. *Jennings*, 138 S. Ct. at 840. That delay could have prevented meaningful review for noncitizens detained at length before they were able reach the courthouse doors. Here, because petitioners are subject to expedited removal orders, the government's interpretation would mean that alleged unconstitutional conditions of confinement could not be challenged at all…. In sum, the INA gives the government virtually unreviewable authority to decide whether and when to implement the petitioners' removal orders, but the Court retains jurisdiction to hear claims challenging the constitutionality of the manner in which the government physically carries out the removals during the deportation process. That conclusion comports with the text and purpose of § 1252(a)(2)(A) and prevents the type of "staggering results" that the Supreme Court sought to avoid in *Jennings*.

*Id.* at *8.

Similarly, the Court held that section 1252(g) likely did not bar review of Petitioners' Manner of Removal Claims because "[t]he Supreme Court has narrowly construed this subsection to preclude only challenges to the three enumerated actions listed in the statute, committing them to the agencies' discretion: deciding to commence proceedings, deciding to adjudicate cases, and deciding to execute removal orders", none of which are applicable to Petitioners' claims. *Id.* (citing *Reno*, 525 U.S. at 482, 119 S.Ct. 936). Petitioners' Manner of Removal Claims are challenges to nondiscretionary decisions, thus section 1252(g) does not strip the Court of jurisdiction to review such claims. *See id.*, at *9 (citing *You v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018)); *see also Reno*, 525 U.S. at 482, 119 S.Ct. 936.

Respondents fail to make new arguments in support of their contention that the Court does not have jurisdiction over the Manner of Removal Claims, merely referring to their opposition to Petitioners' First TRO. (Motion at 19-20). The Court should reject those arguments again and hold that it has jurisdiction over Petitioners' Manner of Removal Claims.

App.021

As to the Country Condition Claims, the Court held that section 1252(g) likely stripped it of jurisdiction to review those claims because the "challenge directly implicates the government's discretionary authority to return noncitizens to their native countries." *D.A.M. I*, 2020 WL 4218003, at \*9.  Petitioners respectfully submit that, to the contrary, the Country Condition Claims are akin to the Manner of Deportation Claims.  The Country Condition Claims do not question the decision to execute the removal orders, but rather the non-discretionary decision to do so in the middle of a global pandemic.  (ECF 31, ¶¶ 269-86).  Removal in the middle of the COVID-19 pandemic places Petitioners in substantial danger of contracting COVID-19 during removal, putting them at risk of death in their home countries due to poor health care and because they may become targets for violence as a result of fear of the disease.  (*Id.*).  The Court has jurisdiction to review these non-discretionary decision claims.  *See You*, 321 F. Supp. 3d at 457 (S.D.N.Y. 2018); *Fatty v. Nielsen*, No. 17-cv-1535, 2018 WL 3491278, at \*2 (W.D. Wash. July 20, 2018), appeal dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019); *Calderon v. Sessions*, 330 F. Supp. 3d 944, 954 (S.D.N.Y. 2018); *S.N.C. v. Sessions*, No. 18-cv-7680, 2018 WL 6175902, at \*5 (S.D.N.Y. Nov. 26, 2018).

### C.   Neither 1252(a)(2)(A) Nor 1252(g) Strip the Court of Jurisdiction to Review the Due Process Claims

The Court previously held that it likely did not have jurisdiction over Petitioners Due Process Claims.  *D.A.M. II*, 2020 WL 4218003, at \*6-\*8.  Petitioners respectfully submit that the Court misconstrued Petitioners' Due Process Claims because it asked the wrong question: "Are there currently existing orders of removal as to petitioners?"  *Id.*, at \*6.  In doing so, the Court examined what it viewed to be the merits of Petitioners' claims before determining the jurisdictional question.

App.022

The correct threshold question is, what are Petitioners' Due Process Claims? Petitioners are not asking the Court to either review their removal orders or to nullify them. Petitioners do not challenge the facts or merits of their removal orders or the executive's discretionary decision to implement or execute final orders of removal. Petitioners' removal orders, procured under the Transit Ban, were predicated on "reasonable fear" interviews and Petitioners do not seek a "redo" of those "reasonable fear" interviews. Now that the Transit Ban has been vacated, they challenge Respondents' failure to provide them access to the asylum process under section 1225(b)(1)—which entitles them to "credible fear" interviews—a right to which they would have been entitled but for application of the now void Rule. *See Dept of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1983 (2020) (a noncitizen who is an applicant for admission has "those rights regarding admission that Congress has provided by" section 1225(b)(1)). Thus, Petitioners' Due Process Claims are that Respondents are violating Petitioners' procedural and substantive due process rights by their conduct in denying them access to the asylum process prescribed by Congress. (ECF 31, ¶¶ 299-305). Because Petitioners' Due Process Claims do not arise from the implementation or operation of their removal orders, but rather arise from Respondents' denial of process, section 1252(a)(2)(A)(i) does not strip the Court of jurisdiction to review them. *See M.M.M. on Behalf of J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 532 (S.D. Cal. 2018) (holding that plaintiff childrens' petition for a stay of removal of their parents, who had final removal orders, pending resolution of the plaintiff childrens' applications for asylum  does not "aris[e] from ... the implementation or operation of an order of removal[,]" § 1252(a)(2)(A)(i) does not deprive this Court of jurisdiction to

consider Plaintiffs' request.").[3]

Petitioners' Due Process Claims here are analogous to their Manner of Removal Claims, over which the Court concluded it likely had jurisdiction, declining to "read [section 1252(a)(2)(A)(i)] so broadly." 2020 WL 4218003, at *6. To hold to the contrary with respect to the Due Process Claims would give the "arising from" and "relating to" language in section 1252(a)(2)(A)(i) the "expansive interpretation" rejected by this Court in *D.A.M. I.* and by the Supreme Court in *Jennings*. *Jennings* rejected this interpretation because it "would lead to staggering results", 138 S.Ct. at 840. Similarly, a decision here that section 1252(a)(2)(A)(i) is so expansive as to encompass Petitioners' Due Process Claims would lead to the staggering result of severe and irreversible infringement of Petitioners' constitutional rights. Indeed, such a broad reading of section 1252(a)(2)(A)(i) would foreclose judicial review of "claims of prolonged detention" if that detention was part of the implementation or operation of a removal order, a result rejected by *Jennings* in the context of an analogous provision of the INA. *Id.* at 840.

---

[3] The cases cited by Respondents are distinguishable because the petitioners in those cases all made claims concerning the substance of the process they received, seeking another chance at the same process. *See Avendano-Ramirez v. Ashcroft,* 365 F.3d 813, 818 (9th Cir 2004) (petition for review involving claim to review the substance of the underlying removal order); *Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1137 (9th Cir. 2008) (similar); *Castro v. U.S. Dep't of Homeland Sec.*, 835 F. 3d 422 (3d Cir. 2016) (claims barred by the INA because they related directly to the agency's process of determining whether the noncitizens had credible fear). Similarly, *Patel v. Barr*, 2020 WL 4282051, *1 (E.D. Pa. July 27, 2020) is distinguishable because the petitioners claimed that the Transit Ban was not promulgated in accordance with the APA and sought a declaration that the Transit Ban was unlawful and invalid, a claim entirely distinguishable from Petitioners' claims here. (*See* ECF 44). Notably, Respondents misquote *Aguilar v. United States Immigration & Customs Enforcement Division of Department of Homeland Security*, which actually states: " Congress's choice of phrase suggests that it did not intend section 1252(b)(9) to sweep within its scope claims with only a remote or attenuated connection to the removal of an alien. Courts consistently have recognized that the term 'arising from' requires more than a weak or tenuous connection to a triggering event."

App.024

The Third Circuit's recent rejection of an expansive interpretation of the "arising under" language in section 1252(b)(9), following *Jennings*, further illustrates this point:

> We distill a simple principle from *Jennings*… and the presumptions favoring judicial review. That principle informs how we read the phrase "arising under." We must ask: If not now, when? If the answer would otherwise be never, then § 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal. [T]he point of the provision is to channel claims into a single petition for review, not to bar claims that do not fit within that process.

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 185–86 (3d Cir. 2020); [4] *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1269 (9th Cir. 2020) ("The purpose of these claim-channeling provisions is to 'limit all aliens to one bite of the apple with regard to challenging an order of removal.'") (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)).

Indeed: if not now, when? The answer here is never. Petitioners could not have brought their Due Process Claims alongside review of their removal orders and review of the Due Process Claims are not channeled in the INA. Petitioners are not seeking another bite at the "reasonable fear" apple, they are seeking access for the first time to the "credible fear" standard and process denied to them by the now void Transit Ban. Cramming judicial review of Petitioners' claims into a statutory scheme in which they could not have made those claims "would be absurd." *Jennings*, 138 S. Ct. at 840.

---

[4] Respondents will likely contend that *Jennings* and *E.O.H.C.* are distinguishable because they address section 1252(b)(9), but these cases are analogous because they provide the parameters for determining when "arising from" or "relating to" language ensnares a claim, stripping the courts of judicial review where, as here, there is no other avenue to review Petitioners' claims.

Further, because Petitioners could not have brought their claims alongside any other claims in the INA, the presumption of judicial review requires a finding that the courts have the authority to review Petitioners' claims, and to determine otherwise contradicts the precedent in the Supreme Court and this Circuit. *See Guerrero-Lasprilla*, 140 S. Ct. at 1069; *McNary*, 498 U.S. at 496, 498 (1991); *Make the Rd. N.Y.*, 962 F.3d at 623. This is especially the case in light of the dearth of any clear and convincing evidence to the contrary.

Courts have reached similar conclusions in the context of section 1252(g), holding that the provision does not strip courts of jurisdiction to review Due Process Claims because these claims are non-core habeas petition challenges, not a discretionary decision. *See You*, 321 F. Supp. 3d at 457; *Calderon*, 330 F. Supp. 3d at 954; *Fatty*, 2018 WL 3491278, at *2; *S.N.C.*, 2018 WL 6175902, at *5.[5] While the Court distinguished these cases in *D.A.M. II*, concluding that "the case law finding § 1252(g) inapplicable to removals outside the Attorney General's prosecutorial discretion is not fully transferable to the § 1252(a)(2)(A) context," 2020 WL 5525056, at *9, n.5, these cases are applicable in analyzing the jurisdictional question because Petitioners, like petitioners in *You*, *Calderon*, *Fatty*, and *S.N.C.* challenge the government's conduct in connection with the removal process.

The Court should hold that it has jurisdiction to review Petitioners' Due Process Claims.

---

[5] Respondents do not argue that 1252(g) strips the Court of jurisdiction of review the Due Process Claims, only that it bars the Court from enjoining Petitioners' removals pending the adjudication of their Petition. (Motion at 11). On the contrary, because section 1252(g) does not apply to any of Petitioners' claims, it does not prohibit the Court from enjoining removal.

### D. The Court Has Jurisdiction to Review the Due Process Claims Under Section 1252(e)(2)(B)

If the Court interprets Petitioners' Due Process Claims as challenges to the legality of their removal orders—which it should not—these claims would still be subject to judicial review under section 1252(e)(2)(B), which provides judicial review in a habeas proceeding of whether a petitioner was ordered removed under section 1225(b)(1). 8 U.S.C. § 1252(e)(2)(B). Section 1252(e)(5) provides that "[i]n determining whether an alien has been ordered removed under section 1225(b)(1) of this title, the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner." 8 U.S.C. § 1252(e)(5).

In *Dugdale v. U.S. Customs & Border Protection*, this Court concluded that "a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect." 88 F. Supp. 3d 1, 6 (D.D.C. 2015) (citing *Am–Arab Anti–Discrimination Comm. v. Ashcroft*, 272 F.Supp.2d 650, 663 (E.D.Mich. 2003)). The Court held that "[the petitioner's] contention that his order was not lawfully issued because it lacked a supervisor's signature falls within that category of claims." *Id*. Here, Petitioners' removal orders also were procedurally defective and reviewable under section 1252(e)(2)(B). Respondents conceded at oral argument on the First TRO, in response to a hypothetical posed by the Court that is analogous to this case, that if ICE were to issue a removal order without a credible fear interview, "then you have a basis to review, potentially just like in *Dugdale*. You didn't get the interview so how can the order be final?" (ECF 42, Tr. at 32:4-25.) In substance, that hypothetical is this case. Petitioners were told they had no credible fear, not based on the conduct of a credible fear interview, but rather based on how they came to the United States. Petitioners

16

did not get their section 1225(b)(1) credible fear standard interviews, which they would have received but for an unlawful application of the void Transit Ban.

Respondents contend that section 1252(e)(2)(B) applies only to whether an order was issued, *see* section 1252(e)(5), not to whether a subsequent event might later impact the order. But the statute is not so limited. Further, as *CAIR* deemed the Transit Ban unlawful and void *ab initio*, Petitioners' removal orders issued pursuant to the Transit Ban are similarly void and unlawful "from the beginning,"[6]

The Court distinguished *Dugdale* from this case in *D.A.M. II*, asserting "petitioners must raise a claim that their removal orders were, as a matter of law, *not* issued." *Id.*, 2020 WL 5525056, at *11. Petitioners respectfully respond that if the Court views the Due Process Claims as challenges to the legality of their removal orders, just as in *Dugdale*, where "a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect", *Dugdale*, 88 F. Supp. 3d at 6, the crux of Petitioners' claims is that their removal orders were also not issued. Indeed, this case is stronger than *Dugdale* because it is about Respondents' application of a now-vacated rule to deprive Petitioners of a right guaranteed in federal law, not the mere absence of a signature. The Transit Ban denied Petitioners access to the credible fear screening process as provided by the INA. Circumventing the standards and procedures of credible fear review established in the INA, the Transit Ban provided that migrants who came to the United States through certain Latin American countries *ipso facto* did not have credible fear. Petitioners have no negative **credible fear** determinations, much less review by an Immigration Judge. Thus, Petitioners have not been actually

---

[6] *Ab Initio*, Black's Law Dictionary (11th ed. 2019) (available at Westlaw).

17

ordered removed under section 1225(b)(1) because they were never provided access to the congressionally mandated process. Thus, the Court has jurisdiction to review the Due Process Claims pursuant to section 1252(e)(2)(B).

    **E.**    **If the Court Finds that it is Stripped of Jurisdiction to Review Petitioners' Claims, it Would Be an Unconstitutional Suspension of the Writ of Habeas Corpus**

Even assuming, arguendo, that 1252 strips jurisdiction – which it does not – the Suspension Clause requires residual habeas jurisdiction in the circumstances of this case.

The Suspension Clause forbids suspension of the writ of habeas corpus unless a declaration is made in times of rebellion or invasion. U.S. CONST. art. I, § 9, cl. 2. The right to seek habeas corpus relief is fundamental to the Constitution's scheme of ordered liberty. *See Compere v. Nielsen*, 358 F. Supp. 3d 170, 178 (D.N.H. 2019). The Supreme Court has held that except in periods of "formal suspension" of the writ, individuals must either be given access to an "adequate substitute" to the writ or the writ itself, so as "to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene v. Bush*, 553 U.S. 723, 745 (2008). In *INS v. St. Cyr*, the Supreme Court emphasized that "at the absolute minimum" the Suspension Clause preserved the writ as of 1789 and recognized "there is historical evidence of the writ issuing to redress the improper exercise of official discretion" even in cases where detention is authorized by statute. *Id*. at 303–04. It further observed that during the finality era, habeas was "the sole means by which an alien could test the legality of his or her deportation order." *Id*. at 306. At its core, *St. Cyr* recognizes the importance of preserving habeas review of deportation challenges, and the Supreme Court's recent decision in *Department of Homeland Security v. Thuraissigiam* upholds this view. 140 S.Ct. 1959, 1981 (2020) ("St. Cyr reaffirmed the[] proposition" that "the writ could be invoked by aliens already in the country who were held

App.029

in custody pending deportation.").

To determine whether a jurisdiction stripping statute violates the Suspension Clause, the Court must proceed through the two-step analysis. *Boumediene*, 553 U.S. at 739. First, the Court determines whether a given habeas petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or the circumstances surrounding detention. *Id*. Second, the Court must determine whether Congress provided "a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977); *see Boumediene*, 553 U.S. at 739. A statute violates the Suspension Clause where, as applied, habeas corpus relief is foreclosed, and alternative remedies are inadequate to ensure that the petitioner's detention does not violate federal law. *See id*.

Here, there is no other process in which Petitioners can assert their Due Process, Manner of Removal, and Country Condition Claims. Thus, if the Court finds that section 1252 strips it of jurisdiction to review Petitioners' claims, the statute violates the Suspension Clause.

The Supreme Court's recent decision in *Department of Homeland Security v. Thuraissigiam* does not require a different conclusion. First, the government in *Thuraissigiam* took the position that the appropriate scope of Suspension Clause analysis was dictated by the existence of similar claims in or around 1789, and the Supreme Court agreed, holding: "neither the Suspension Clause nor the Due Process Clause of the Fifth Amendment requires any further review of respondent's claims, and [the Illegal Immigration Reform and Immigration Responsibility Act's] limitations on habeas review

are constitutional *as applied.*" *Id.* at 1964.[7]  In arriving at this conclusion, the Supreme Court stated that the Thuraissigiam had conceded that the appropriate scope of habeas corpus is as it existed "at the time of the adoption of the Constitution."  *Id* at 1969. Predicated on that concession, such that it was not at issue in the case, the Court in *Thuraissigiam* found that the writ of habeas corpus at the time of the adoption of the Constitution was not understood to "permit a petitioner to claim the right to enter or remain in a country or to obtain administrative review potentially leading to that result.  The writ simply provided a means of contesting the lawfulness of restraint and securing release." *Id.* at 1969.  Petitioners here do not concede that the scope of habeas review is inflexibly tied to the types of claims brought in the 1780s.

Indeed, English legal history prior to 1789 and early America history demonstrate that habeas corpus was traditionally focused on testing the power of the King and the lawfulness of his conduct, not on the relief sought by the petitioner.  See PAUL D. HALLIDAY, HABEAS CORPUS: FROM ENGLAND TO EMPIRE 160 (2010) ("HABEAS CORPUS").[8]  Thus, "[i]n any matter involving the liberty of the subject the action of the Crown or its ministers or officials [wa]s subject to the supervision and control of… judges on habeas corpus." 11 HALSBURY'S LAWS OF ENGLAND 25 (3d ed.

---

[7]  *See also Id.* at 1963 ("*As applied here*, § 1252(e)(2) does not violate the Suspension Clause" (emphasis added)); *id.* at 1983 ("*As applied here*, § 1252(e)(2) does not violate the Due Process Clause." (emphasis added)); *id.* at 1988 ("The question presented is 'whether, *as applied to respondent*, Section 1252(e)(2) is unconstitutional under the Suspension Clause.'" (Breyer, J, concurring in the judgment) (quoting Pet. for Cert. i) (emphasis added)).

[8] *See also id*. at 78 ("The broad need to do justice for the subject while protecting the honor of king and court provides the key to habeas corpus… and all the prerogative writs."); *id.* at 160 ("The court's work . . . covered novelties as soon as they appeared, restraining new practices or jurisdictions that posed greater threats to law and liberty than did older ones.")

1955) (emphasis added). For those reasons, the writ was historically available to those who were both detained and not detained, as well as to foreigners. *See DuCastro's Case*, 92 Eng. Rep. 816 (K.B. 1697) (court rejected argument that habeas should be limited for foreigners); Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 VA. L. REV. 575, 606 n. 76 (2008). Indeed, the Supreme Court recognized in *Boumediene* that the purpose of the common law writ was to vindicate the rights of "the King and his courts" rather than of the individuals. 553 U.S. at 740. While those invoking the writ of habeas corpus often seek relief from custody, the Supreme Court has explained that § 2241, the statute invoked here, "implements the constitutional command that the writ of habeas corpus be made available… to test the legality of a given restraint on liberty." *Jones v. Cunningham*, 371 U.S. 236, 238 (1963) (emphasis added); *see also Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ( "habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal period detention"); *D.B. v. Cardall*, 826 F.3d 721, 731 (4th Cir. 2016) (holding § 2241 "provides that habeas corpus relief can extend to several classes of persons, including those 'in custody in violation of the Constitution or laws or treaties of the United States.'") (quoting 28 U.S.C. § 2241(c)(1), (3)). Petitioners' claims challenge the lawfulness of Respondents' conduct, thus the appropriate scope of the writ of habeas corpus applies to them.

In *D.A.M. I*, the Court agreed with Petitioners that *Thuraissigiam* neither endorsed nor rejected the assertion that the Suspension Clause is not strictly limited to the scope of the writ in 1789 but concluded that "even if *Thuraissigiam* leaves room for some constitutionally protected habeas claims outside the writ's historical core, it squarely rules

out" claims seeking an opportunity for further administrative review of asylum claims. *D.A.M. II*, 2020 WL 5525056, at *12. Thuraissigiam sought vacatur of his removal order and an order directing the government to provide him with a new opportunity to apply for asylum under the same process. *Id.* Petitioners' claims do not seek the same relief. Petitioners' Due Process Claims do not seek review of their final orders of removal. They seek the right to pursue the constitutionally protected process that was never afforded them, and challenge Respondents' legal authority to deport them without providing them such process.[9] Similarly, the Country Condition Claims allege that removing Petitioners during the global COVID-19 pandemic violates the state-created danger doctrine and the special-relationship doctrine. As there is no other process for Petitioners to obtain review of their Country Condition Claims, the Suspension Clause requires the Court to exercise jurisdiction over those claims. And as there is no other process to protect the Petitioners' legal entitlement to access section 1225(b)(1) as Congress intended, the Suspension Clause requires Petitioners to be afforded a constitutionally adequate process to pursue their Due Process Claims.

## F.    The Court Has Authority to Issue the Relief Sought

Contrary to Respondents' contention, (Motion at 22-23), neither section 1252(g) nor 1252(e) limit the relief sought by Petitioners. First, as set forth in section II.B., *supra*, section 1252(g) does not apply to any of Petitioners claims. Second, section 1252(e) is entitled "Judicial review of orders under section 1225(b)(1)." 8 U.S.C. § 1252(e)(1)(A). The claims in this case are not challenges to orders issued under section 1225(b)(1), but

---

[9] Therefore, the case cited by Respondents, *Mohit v. Dept of Homeland Security*, is distinguishable, as the petitioner also sought a new opportunity to apply for asylum under the same process. 20-CV-00823-PAB, 2020 WL 3971642, at *2 (D. Colo. July 14, 2020).

App.033

rather are challenges to Respondents' failure to provide Petitioners process in accordance with 1225(b)(1), (Due Process Claims) and to the manner in which Respondents intend to remove Petitioners (Manner of Removal and Country Condition Claims).

Even if the Court views Petitioners' Due Process Claims as an "action pertaining to an order to exclude an alien," if the Court ultimately ruled in favor of Petitioners, they would entitled to "review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(iii)(III). At the time of the Petitioners' immigration judge review, the Transit Ban had yet to be vacated, and as a result, the immigration judge also applied the heightened "reasonable fear" standard to the Petitioners. Therefore, Petitioners were never afforded their right to review by an immigration judge of the determination that they did not have a ***credible fear*** of persecution.

## III.     PETITIONERS PROPERLY PLEADED THEIR CLAIMS

While the Court has previously determined that Petitioners would be unlikely to succeed on the merits of some of their claims, based, among other things, upon declarations submitted by Respondents, a motion to dismiss "does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim." *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 102 (D.D.C. 2012). Petitioners have stated a claim and are entitled to proceed with discovery before the Court rules on the merits.

### A.     Petitioners Properly Pleaded their Due Process Claims

It is well-settled in this Circuit that vacatur of a rule is retroactive. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("vacatur would mean that 'every payment that was made in the 2016 [commercial shipping] season was

erroneous,' and may involve the Coast Guard and the Shippers attempting to recoup and redistribute funds that changed hands years ago….") (internal citation omitted); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (holding vacatur of a rule providing that hospitals were not eligible for reimbursement would have required the government to make repayments to those hospitals); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (declining to vacate a rule where "there is no apparent way to restore the status quo ante", and requiring retroactive allocation damages was "an invitation to chaos."); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (declining vacatur because there was no way to restore the "status quo ante"); *Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("The agency must give retroactive effect to the ruling of a federal court because of the nature of that court."); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (holding remand without vacatur of a rule imposing fees was appropriate because "the Commission would need to refund all… fees collected… [and] would be unable to recover those fees under a later-enacted rule.")[10]

---

[10] The cases cited in *D.A.M. II*, 2020 WL 5525056 and Respondents' motion asserting to the contrary are distinguishable or support Petitioners' position. For example, the case *Waterkeeper Alliance, Inc. v. Wheeler*, No. 18-cv-2230 (JDB), ⸺ F.Supp.3d ⸺, 2020 WL 1873564, at *6-*7 (D.D.C. Apr. 15, 2020), supports Petitioners' argument because in that case the court vacated EPA approval of a portion of a state regulatory program that was unlawful as a result of the D.C. Circuit's separate vacatur of an EPA policy that was essential to the approval. The other cases cited are distinguishable. *See Heartland By-Products, Inc. v. United States*, 568 F.3d 1360 (Fed. Cir. 2009) (not an APA case); *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749 (1995) (addressing a change in the law, not the vacatur of an unlawful rule); *Avila-Sanchez v. Mukasey*, 509 F.3d 1037, 1040 (9th Cir. 2007) (same); *Daimler Trucks N. Am. LLC v. EPA*, 745 F.3d 1212, 1215 (D.C. Cir. 2013) (vacating certificate issued under vacated rule where agency refused to honor vacatur of rule by vacating the certificate).

24

While Respondents now assert that vacatur merely proscribes prospective application of the vacated rule, (Motion at 27), Respondents have previously acknowledged the retroactive effects of vacatur. In an action challenging an interim final rule extending the duration of optional practical training for eligible STEM foreign students, which allowed nonimmigrant foreign nationals on an F–1 student visa to engage in employment during and after school, the government argued that the court should hold any vacatur in abeyance because vacatur would result in "workers and their family members scrambl[ing] to depart the United States in an effort to avoid any possible immigration consequences…." Heller Exh. 1, *Washington All. of Technology Workers v. United States Dep't of Homeland Sec.*, 2015 WL 3751276 (D.D.C.) (April 6, 2015). The District Court agreed, stating there was no "way of immediately restoring the pre–2008 status quo without causing substantial hardship for foreign students…." *Washington All. of Technology Worker*s, 156 F. Supp. 3d 123, 128-29 (D.D.C. 2015), judgment vacated, appeal dismissed sub nom. on other grounds *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 650 Fed. Appx. 13 (D.C. Cir. 2016).

The crux of Respondents' motion to dismiss is that, despite the well-settled law on the effect of vacatur without limitation or qualification and the position they took on a prior case, Judge Kelly could not have meant the *CAIR* decision to vacate thousands of removal orders. The Court previously suggested it agreed, *D.A.M. II*, 2020 WL 5525056, at *1, *6, but Petitioners respectfully assert that upon further consideration, the Court should hold that the vacatur of the Transit Ban returns Petitioners to the *status quo ante*.

*CAIR* ordered vacatur, in part, because the government did not present "evidence" to the court that vacatur would burden the government. Quoting a phrase used by other

courts to describe the retroactive effect of vacatur, *CAIR* stated, "**Defendants have presented no evidence** suggesting that '[t]he egg has been scrambled' so that 'there is no apparent way to restore the status quo ante.'" 2020 WL 3542481, at *22 (emphasis added) (quoting *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)). In other words, the government presented no evidence that it would be burdened if prior final orders of removal predicated upon the Transit Ban were deemed unlawful. It makes sense that, absent evidence to the contrary, *CAIR* would presume that the majority of immigrants subjected to the Transit Ban had likely been deported, thus it would be no burden on the government to provide any immigrants remaining in the United States, who had been subjected to the Rule, with the process to which they would have been entitled under section 1225(b)(1).[11]

Indeed, despite having the opportunity to do so, Respondents consistently fail to disclose the number of unexecuted final Transit Ban orders of removal, the true measure of any alleged burden. It may be that Petitioners are the only noncitizens remaining in the United States who were subjected to the Transit Ban and, if so, there is no burden in providing fewer than 100 families the process to which they would have been entitled absent the void Rule. This is especially true where immigration at the border has been reduced to a trickle, and there can be no assertion that asylum officers are impaired in any

---

[11] Contrary to Respondents' contention, the *CAIR* court had no need to address section 1252(e)(1)(B). (Motion at 28). In an APA suit, "'a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 908 (1990) (Blackmun, J. dissenting). Thus, Petitioners did not have to be parties to *CAIR*, or challenge the Transit Ban, to benefit from vacatur, and have not waived any rights.

way with providing these families process under 1225(b)(1).  *CAIR*, 2020 WL 3542481, at *22.

In *D.A.M. II*, the Court stated that "a judicial order vacating an agency rule does not *automatically* void every decision the agency made pursuant to the invalid rule." 2020 WL 5525056, at *6.  That is true, but only when the judicial order specifically carves out how the remedy shall apply.  Indeed, because vacatur is so far-reaching, Courts will sometimes tailor the scope of relief to the specific case depending upon the facts, as Judge Moss did in *L.M.-M. v. Cuccinelli*, No. CV 19-2676, 2020 WL 985376, at *25 (D.D.C. Mar. 1, 2020).  Certainly, if vacatur of a rule, without limitation or qualification, were not "retroactive," it would make little sense for Judge Moss to specifically tailor the relief in *L.M.-M*.[12]

The *CAIR* decision contains no limiting language.  Thus, *CAIR*'s vacatur places Petitioners in the *status quo ante* based upon the government's own position in *Washington Alliance of Technology Workers*, Heller Exh. 1, and the well-settled administrative law in this Circuit. *See Am. Great Lakes Ports Ass'n*, 962 F.3d at 519; *Heartland Reg'l Med. Ctr.*, 566 F.3d at 198; *Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 97; *Milk Train, Inc.*, 310 F.3d at 756; *Nat'l Fuel Gas Supply Corp.*, 59 F.3d at 1289; *Allied-Signal, Inc.*, 988 F.2d at 151.

Accordingly, Petitioners' Due Process Claims are meritorious.  Procedural due process "imposes constraints on governmental decisions which deprive individuals of

---

[12] The case cited by the Court in *D.A.M. II*, *Western Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1085-89 (D. Idaho 2020) is distinguishable for the same reason.  In that case, the court addressed whether vacatur of a policy should result in vacatur of the lease sales conducted under the vacated policy.  If unqualified vacatur were not retroactive, there would be no need to discuss the parameters of the effect of vacatur in the case.

'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The Fifth Amendment entitles noncitizens to due process of law in deportation proceedings. *See Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001); *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). Petitioners have "rights regarding admission that Congress has provided by statute", *Thuraissigiam*, 140 S.Ct. at 1983, in this case, section 1225(b)(1).

Indeed, Respondents make Petitioners' argument in their motion to dismiss. Quoting *Thuraissigiam*, Respondents contend that "'Congress provided the right to a "determination"' whether Petitioners 'had "a significant possibility" of "establishing eligibility for asylum," and [Petitioners were] given that right.'" Motion at 29 (quoting *Thuraissigiam*, 140 S.Ct. at 1983). But, unlike the petitioner in *Thuraissigiam*, Petitioners **were not** given that right—access to the process Congress provided under section 1225(b)(1). Respondents have failed to provide any lawful process, let alone constitutionally sufficient process, to the Transit Ban Petitioners. *See Mathews*, 424 U.S. at 332 ("Once a petitioner has identified a protected liberty or property interest, the Court must determine whether constitutionally sufficient process has been provided.").

Similarly, because Petitioners have a liberty interest accessing this process prior to removal, Respondents' intention to remove them without access to that process violates their substantive due process rights. *Rochin v. California*, 342 U.S. 165, 172 (1952). It is conscience-shocking that Respondents are directly defying a Court order, despite their representation to the District Court that there was "no evidence" that the government would not honor the order. Defs.' Suppl. Br. at 9, *CAIR*, No. 19-2117 (D.D.C. Oct 16, 2019), ECF No. 58; *see also* Heller Exh. 1 (Respondents previously took the position that vacatur of a

28

rule is retroactive). It is conscience-shocking that Respondents are denying the Petitioners access to the statutory process guaranteed in federal law. Respondents' conduct also interferes with rights "[i]mplicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 324–325 (1937); *see also United States v. Salerno*, 481 U.S. 739, 746 (1987).

Congress provided Petitioners the right to access the credible fear process, and Respondents' refusal to provide that to Petitioners violates the Due Process Clause. Accordingly, Petitioners' have properly stated their Due Process Claims.

**B.    Petitioners Properly Pleaded Count I**

Respondents contend that Count I fails to state a cause of action because they do not identify a due process right. (Motion at 23-26). The Fifth Amendment Due Process Clause prohibits punishment of people in civil custody. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). At a minimum, the Fifth Amendment Due Process Clause prohibits Respondents' deliberate indifference to a substantial risk of serious harm that would rise to the level of an Eighth Amendment violation in the post-conviction criminal context. *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner."); *see also Hale v. Tallapoosa Cty.*, 50 F. 3d 1579, 1582 n.4 (11th Cir. 1995).

To properly plead that Respondents are acting with deliberate indifference, Petitioners must assert that Respondents are exposing them to a substantial risk of serious harm of which Respondents are aware and have disregarded. *Farmer v. Brennan*, 511 U.S. 825, 834, 837-38 (1994). The government violates the Eighth Amendment when it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a

serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Courts do not require a plaintiff to "await a tragic event" before seeking relief from a condition of confinement that unconstitutionally endangers them. *Id.* (holding prisoner's Eighth Amendment claim could be based upon possible future harm to health); *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1543 (11th Cir. 1994) (same); *Castillo v. Barr*, No. CV 20-00605, 2020 U.S. Dist. LEXIS 54425 (C.D. Cal. Mar. 27, 2020) ("civil detainee's constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as the harm caused by a pandemic.") Substantive due process prevents the government from engaging in conduct that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations omitted).

Petitioners have pleaded facts that support Count I, including that: COVID-19 is deadly; there is no vaccine; COVID-19 is spread from person-to-person; COVID-19 may be transmitted by infected individuals who are asymptomatic; the CDC has numerous recommendations to prevent COVID-19 transmission; and Respondents have engaged in willful, knowing conduct, preparing to remove Petitioners from the United States without implementing CDC guidelines. (ECF 31 ¶¶249-268). These facts, if proven to be true, will demonstrate that Respondents' manner of removal amounts to punishment and is not incident to some other legitimate purpose.

### C. Petitioners Properly Pleaded Counts II and III

As to Count II, the state-created danger doctrine claim, substantive due process precludes a state actor from affirmatively acting to create or enhance a danger that will ultimately harm an individual. *See Butera v. District of Columbia*, 235 F.3d 637, 649–51

App.041

(D.C. Cir. 2001) (citing cases). The State "owes a duty of protection when its agents create or increase the danger to an individual." *Id.*; *see also Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (due process was violated where police left detainee in more dangerous neighborhood, away from public transportation and without cell phone); *Wang v. Reno*, 81 F.3d 808, 817 (9th Cir. 1996) (alien could not be removed to China where U.S. government convinced him to testify about topic that would lead Chinese government to torture and possibly execute him). Due process is implicated when the state actor's conduct in such a case is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Butera*, 235 F.3d at 651 (quoting *Cty. Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

As to Count III, the special-relationship doctrine, Respondents also owe Petitioners affirmative duties of care and protection arising from their special relationship, a fact Respondents do not deny. *See Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (D.C. Cir. 2015) (citing *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989)). A special relationship arises between the government and an individual when the government "takes a person into its custody and holds him there against his will." *Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991) (quoting *DeShaney*, 489 U.S. at 199–200). This duty arises "from the limitation which [Respondents have] imposed on [Petitioners'] to act on [their] own behalf." *DeShaney*, 489 U.S. at 200. This duty of care and protection includes a responsibility for Petitioners' safety, well-being, and medical needs. *LaShawn A. v. Kelly*, 990 F.2d 1319, 1325 (D.C. Cir. 1993); *Harris*, 932 F.2d at 14. (citing *Youngberg v. Romeo*, 457 U.S. 307, 314–324 (1982)). When the government has a special relationship with an individual, "governmental deliberate indifference will

shock the conscience sufficiently to establish a substantive due process violation." *Harvey*, 798 F.3d at 1050 (internal citations omitted).

Petitioners have pleaded allegations supporting Counts II and III. (ECF 31, ¶¶ 269-286). The crux of Respondents' Motion is that the state-created danger doctrine has no place in immigration law. (Motion at 32-34). The cases to which Respondents cite are distinguishable because in those cases the petitioners based their state-created danger doctrine claims upon the same facts as their asylum claims. Here, Respondents have affirmatively taken steps that cause a danger—exposure to COVID-19—separate and apart from the reasons Petitioners sought asylum. Further, unlike the cases cited by Respondents, there is no procedure in current immigration law through which Petitioners can assert claims against Respondents concerning the manner in which they are deported.

Respondents also assert that Petitioners have not alleged that they have created the dangers Petitioners are facing, (Motion at 34), the second element of the state-created danger doctrine and the first element of the special-relationship doctrine. To the contrary, Petitioners allege that Respondents' failure to implement sufficient protocols to protect Petitioners from exposure to COVID-19 affirmatively creates a danger that they contract COVID-19, a serious, life-threatening illness, and will become ill during deportation, which will result in harm when they arrive in their home countries, either through persecution or inadequate medical care. (ECF 31, ¶¶ 269-286) Regardless of whether any individual petitioner contracts the virus and develops COVID-19, Respondents' repeated actions in conducting deportations without adequate precautions have increased the risk

that Petitioners will be persecuted upon release in their countries of origin due to a stigma associated with the virus.

Respondents also contend that Petitioners fail to allege sufficient facts that Respondents have engaged in acts intended to harm them or have acted with deliberate indifference. The standard is that the conduct was so egregious that it "shocks the conscience" by establishing the state official acted intentionally or, if he has time to actually deliberate over his actions, with "deliberate indifference." *Butera*, 235 F.3d at 649–51. Petitioners have alleged that Respondents are aware that detainees with COVID-19 are being deported and, therefore, their protocols are inadequate, demonstrating deliberate indifference. (ECF 31, ¶¶ 269-286). Respondents—as part of the United States government with the best intelligence agencies in the world—must be aware of what is transpiring overseas. Accordingly, Petitioners have properly pleaded Counts II and III.

### D. **Petitioners' Preserve Their Arguments on Count IV**

The Court has previously held that Count IV, Petitioners' *Accardi*/APA claim, fails as a matter of law. *D.A.M. I*, 2020 WL 4218003, at *13. Petitioners dispute this for the reasons set forth in prior briefing on their First Motion (ECF 6, 21) and preserve those arguments for appellate review.

### IV. **THE COURT SHOULD DENY THE MOTION TO TRANSFER BECAUSE VENUE IS PROPER IN THE DISTRICT OF COLUMBIA AND CONVENIENCE AND THE INTERESTS OF JUSTICE WEIGH IN FAVOR OF THE PETITIONERS.**

The Court previously recognized that "[t]he Supreme Court has held that core habeas claims must follow the physical custody rule but that the rule should not be so rigidly applied to non-core claims." *D.A.M. I*, 2020 WL 4218003, at *14 (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 435, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004)). "For non-core

33

petitions, courts 'have relied on traditional venue considerations such as the location of material events, the location of records and witnesses pertinent to the claim, and the relative convenience of the forum for each party.'" *Id.* (quoting S.*N.C. v. Sessions*, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018) (internal quotation marks omitted)). The Court held that the "Court lack[ed] sufficient information to decide whether the District of Columbia is the most appropriate venue" and deferred consideration of venue until such a motion is made. *D.A.M. I.*, 2020 WL 4218003, at *14. Now that the Motion is before the Court, the Court should deny it.

### A. <u>Venue is Proper in the District of Columbia</u>

Petitioners' claims are "non-core" claims because, as Respondents acknowledge in their Motion, they do not seek release. Petitioners challenge: (1) Respondents' failure to provide them the credible fear process to which they are entitled as a result of vacatur of the Transit Ban; (2) removal during a global pandemic without appropriate protection from COVID-19 transmission, and; (3) removal during a global pandemic when doing so puts them at risk of death in their home countries. Respondents have legal authority over those decisions.

Applying the legal control test, district courts have held that the Attorney General is the proper respondent for "non-core" claims. *See, e.g., Somir v. United States*, 354 F. Supp. 2d 215, 217-18 & n.2 (E.D.N.Y. 2005) (collecting cases); *Batista-Taveras v. Ashcroft*, No. 03 Civ. 1968, 2004 WL 2149095, at *6 (S.D.N.Y. Sept. 23, 2004). "[T]he Attorney General is a 'custodian' over individuals facing exclusion and deportation due to the 'near total control' that he exercises over them." *S.N.C.*, 325 F. Supp. 3d at 410 (citing *Somir*, 354 F. Supp. 2d at 217–18); *cf. Strait v. Laird*, 406 U.S. 341, 344 (1972).

Further, Petitioners here are held in contract facilities or have been released from the Berks Family Residential ("Berks") or South Texas Family Residential ("Dilley") Centers but remain "in custody" for habeas corpus purposes.[13] (Am Pet ¶¶ 36-123). Neither Berks County nor CoreCivic (the private prison company that operates the Dilley facility) is a proper respondent in this action alleging violations of the Constitution and federal law because they are "non-federal actor[s] who [are] 'poorly situated to defend federal interests,'" and instead the proper respondent is "'the federal official most directly responsible for overseeing the contract facility.'" *Masingene v. Martin*, 424 F. Supp. 3d 1298, 1301 (S.D. Fla. 2020) (quoting *Rodriguez Sanchez v. Decker*, No. 18-CV-8798 (AJN), 2019 WL 3840977, at *2-3 (S.D.N.Y. Aug. 15, 2019) (citation omitted)). Further, neither Berks nor Dilley has physical or legal custody of the non-detained Petitioners, rather Respondents have legal custody of them. *S.N.C.*, 325 F. Supp. 3d at 410. Thus, Attorney General William Barr and Acting Secretary for the Department of Homeland Security Chad Wolf are the proper respondents for Petitioners' "non-core" claims. And as Respondents are the proper respondents to the action, venue in the District Court for the District of Columbia is appropriate. "'Where a public official is a party to an action in his official capacity he resides in the judicial district where he maintains his official residence, that is where he performs his official duties.'" *Nestor v. Hershey*, 425 F.2d 504, 527 n.22 (D.C. Cir. 1969) (quoting 1 J. W. MOORE, FEDERAL PRACTICE ¶ 0.142 (5.-2) (1964) (collecting cases); *Santos v. Barr*, No. CV 17-321 (RMC), 2019 WL 2504101, at *6

---

[13]     *South     Tex.     Family     Residential     Ctr.*,     CORECIVIC,
https://www.corecivic.com/facilities/south-texas-family-residential-center (last visited October 14, 2020); *Berks Cty. Residential Ctr.: About Dep't*, BERKS CTY., PA.,
https://www.co.berks.pa.us/Dept/BCRC/Pages/AboutDepartment.aspx (last visited October 14, 2020).

App.046

(D.D.C. June 17, 2019) ("[v]enue is appropriate in [the District Court for the District of Columbia] under 28 U.S.C. § 1391(e) because the Defendant—Attorney General William P. Barr, acting in his official capacity—resides in the District of Columbia…").

### B.      Respondents Have Not Met Their Burden for Transfer

Respondents have the burden to establish transfer under § 1404(a) is proper. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 127 (D.D.C. 2018); *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32 (D.D.C. 2008); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F.Supp. 13, 16 (D.D.C. 1996). "When venue is properly laid in this jurisdiction, "[t]ransfer elsewhere under Section 1404(a) must ... be justified by particular circumstances that render [this] forum inappropriate by reference to the considerations specified in that statute. Absent such circumstances, transfer in derogation of properly laid venue is unwarranted." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 127 (D.D.C. 2018) (quoting *Starnes v. McGuire*, 512 F.2d 918, 925-26 (D.C. Cir. 1974)). The statute "directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs. The district court also must weigh in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)). Accordingly, Respondents must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that district and the Court should weigh private- and public-interest factors. *Id.*

"The private interest factors that are considered include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to the sources

of proof." *Bederson v. United States*, 756 F. Supp. 2d 38, 46 (D.D.C. 2010). The public interest factors, in comparison, include: (1) the local interest in making local decisions regarding local controversies; (2) the relative congestion of the transferee and transferor courts; and (3) the potential transferee court's familiarity with the governing law." *Id.*

Those private factors weigh in favor of denying the request to transfer. As to the first, the Court should give weight to Petitioners' choice of the District Court for the District of Columbia. *Bederson*, 756 F. Supp. 2d at 46.

As to the second factor, Respondents' choices of forum should not be given weight. Some of the Petitioners have been released from Berks and Dilley, yet Respondents fail to show that those Petitioners are located in the Southern District of Texas or the Middle District of Pennsylvania or explain why venue is appropriate in either jurisdiction for the non-detained Petitioners. Further, it would be a waste of judicial resources to scatter habeas petitions across the country when the parties have been uniformly litigating their claims for the past five months in the District of Columbia.

As to the third factor, Petitioners' claims arose in the District of Columbia because they challenge policies and decisions of United States Government: the policy to remove Petitioners without adequate protections during the COVID-19 crisis; and the decision to flout the *CAIR* order and deny Petitioners the process to which they are entitled under section 1225(b)(1). Those are not decisions and policies of individual ICE officials but rather of the Attorney General and the Department of Homeland Security. "[W]hen a plaintiff directly challenges a policy promulgated in the District of Columbia, 'the interests of justice could well favor venue [in this District].'" *Aracely, R.*, 319 F. Supp. 3d at 128; *see also Ravulapalli v. Napolitano*, 773 F.Supp.2d 41, 56 (D.D.C. 2011). (a court in this

jurisdiction held that the claims in that case arose primarily in the District of Columbia when "officials at the United States Citizen and Immigration Services ("USCIS") Texas Service Center denied Plaintiff's I–485 applications based on policy guidance issued from USCIS headquarters in the District of Columbia.")

As to the fourth, fifth and sixth factors, which address convenience and location of proof, Respondents do not contend that this venue is inconvenient for them, and it is not inconvenient to Petitioners. The government officials who allegedly established, developed, and promoted the policies and decisions at the heart of this case, and the documents relating thereto, will likely be found, if at all, in the District of Columbia. Respondents do not contend otherwise.

The public factors also weigh in favor of denying Respondents' Motion to Transfer. As to the first factor, the Court already has significant experience with this case and Petitioners' claims stem from policies that were conceived, promoted, and implemented by government officials in the District of Columbia, thus the claims hold a close connection to this forum.

As to the second factor, Respondents fail to address the relative congestion of the Court versus the potential transferees. As set forth in the United States District Courts — National Judicial Caseload Profile for the reporting period ending June 30, 2020, it is evident that the Southern District of Texas and Middle District of Pennsylvania are far more congested than the District of Columbia. The chart below shows the number of filings, terminations, pending cases, and actions per Judge in each of the relevant districts as of the 12-month period ending June 30, 2020

| District Court | Filings | Terminations | Pending | Actions per Judge |
|---|---|---|---|---|
| District of Columbia | 4,298 | 4,005 | 5,345 | 287 |
| Southern District of Texas | 18,459 | 18,282 | 14,466 | 972 |
| Middle District of Pennsylvania | 2,816 | 2,942 | 3,689 | 469 |

*See* Heller Exh. 2.

It is evident that the District of Columbia is less congested than the Southern District of Texas, where the cases of those detained in Dilley would be transferred. And even though the Middle District of Pennsylvania has fewer filings, it also has far fewer Judges so the number of actions per Judge is higher there than in the District of Columbia.

As to the third factor, "[t]he potential national significance of this dispute dictates that the third public-interest factor weighs against transferring the case to satisfy a local interest." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 130 (D.D.C. 2018). Petitioners, like the plaintiffs in *Aracely R.*, "have been clear that their challenge is not based on the specific decisions made by federal officials in Texas," or Pennsylvania "but rather upon an alleged national policy promulgated by [the Attorney General and] DHS, which carries with it nationwide significance." *Id.* Thus, neither Texas nor Pennsylvania nor the venue in which any of the non-detained Petitioners live have "particular localized interest in this litigation. *Id.* (citing *Ravulapalli v. Napolitano*, 773 F.Supp.2d 41, 56 (D.D.C. 2011) (holding that transferee forum had no localized interest where "plaintiffs' claims focus primarily on the policies issued from [D.C.] headquarters that apply to all [regional] offices"). This is not a "local controversy" as alleged by Respondents. This case is about Respondents' policies and actions taken by Respondents' in violation of the Constitution and federal law.

App.050

The Court should deny the motion to transfer

## **CONCLUSION**

WHEREFORE, Petitioners respectfully request that the Court deny Respondents'

motion in its entirety.

Dated:  October 16, 2020.

Respectfully submitted,

BY: */s/ Caroline J. Heller*

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

Caroline Heller (Appearing *pro hac vice*)
**GREENBERG TRAURIG LLP**
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Steven G. Barringer (D.C. Bar No. 375373
**GREENBERG TRAURIG, LLP**
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

*ATTORNEYS FOR PETITIONERS*

## CERTIFICATE OF SERVICE

I, Caroline J. Heller, hereby certify that on October 16, 2020, a true and correct copy of the foregoing opposition to motion was served electronically upon the below-listed parties via email:

Erez Reuveni, Esq.
Assistant Director
Office of Immigration Litigation
District Court Section
United States Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20530
erez.r.reuveni@usdoj.gov

Christopher C. Hair, Esq.
Assistant United States Attorney
Civil Division
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
christopher.hair@usdoj.gov

Dated:      October 16, 2020            */s/ Caroline J. Heller*

                                        ***ATTORNEY FOR PETITIONERS***

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

D.A.M.. et al.,

        *Petitioners*,

        -against-

William P. BARR, Attorney General of the United
States; Chad WOLF, Acting Secretary, U.S.
Department of Homeland Security,

        *Respondents*.

Case No. 20-1321 (CRC)

## DECLARATION OF CAROLINE J. HELLER

Caroline J. Heller declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    1)    I am a Shareholder of the law firm of Greenberg Traurig, LLP, attorneys for Petitioners.

    2)    I submit this declaration in further support of Petitioners' opposition to Respondents' motion to dismiss or, in the alternative, transfer venue.

    3)    This declaration is based upon my personal knowledge of the facts set forth herein.

    4)    Attached hereto as Exhibit "1" is a true and correct copy of Defendant's Memorandum of Law in Opposition to Plaintiff's Cross Motion for Summary Judgment filed in *Washington All. of Technology Workers v. United States Dep't of Homeland Sec.*, 2015 WL 3751276 (D.D.C.) (April 6, 2015).

1

5)       Attached hereto as Exhibit "2" is a true and correct copy of excerpts of the United States District Courts — National Judicial Caseload Profile for the District of Columbia, the Middle District of Pennsylvania, and the Southern District of Texas. https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0630.2020.pdf

6)       I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: New York, New York
        October 16, 2020

/s/ Caroline J. Heller
Caroline J. Heller

2

# EXHIBIT "1"

2015 WL 3751276 (D.D.C.) (Trial Motion, Memorandum and Affidavit)
United States District Court, District of Columbia.

# WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS, Plaintiff,

v.

# UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Defendant.

No. 14-529-ESH.

April 6, 2015.

**Defendant's Memorandum of Law in Opposition to Plaintiff's Cross Motion for Summary Judgment**

Benjamin C. Mizer, Acting Assistant Attorney General, Leon Fresco, Deputy Assistant Attorney General, William C. Peachey, Director, Erez R. Reuveni, Senior Litigation Counsel, Sarah S. Wilson, Trial Attorney, Glenn M. Girdharry, Senior Litigation Counsel, United States Department of Justice, Civil Division, Office of Immigration Litigation, District Court Section, P.O. Box 868, Ben Franklin Station, Washington, DC 20044, Tel: (202) 532-4807, Email: glenn.girdharry@usdoj.gov, for defendants.

## *ORAL ARGUMENT REQUESTED*

### *STATEMENT REGARDING ORAL ARGUMENT*

Under LCvR 7(f), Defendant respectfully requests oral argument. Oral argument will illuminate the parties' respective positions and aid the Court in reaching a decision.

## *TABLE OF CONTENTS*

I. INTRODUCTION ..................................................................................... 1
II. ARGUMENT ........................................................................................ 2
A. Plaintiff's summary judgment motion has failed to establish that Plaintiff has Article III standing .......... 2
B. The Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during post-graduation practical training .......................... 16
1. The Secretary's interpretation of the F-1 statute warrants *Chevron* deference ............................................ 16
2. Plaintiff fails *Chevron* step one because an ambiguity exists within the F-1 statute requiring the Secretary's interpretation ................................................................................................................................. 21
3. Under *Chevron* step two, the Secretary's interpretation is reasonable ...................................................... 24
i. The 2008 interim final rule does not conflict with limitations on temporary worker visas ........................ 25
ii. The OPT-STEM extension falls within the Secretary's broad discretion to set the terms and conditions for student visas .......................................................................................................................................... 29
iii. The 2008 interim final rule is consistent with the Secretary's statutory obligation to protect the economic security of the United States .............................................................................................................. 30
C. The Secretary's promulgation of the 2008 interim final rule was not arbitrary or capricious ................... 33
1. The 2008 interim final rule is amply supported by record evidence ......................................................... 33
2. The Secretary did not arbitrarily or capriciously fail to consider any relevant information in issuing the interim final rule ......................................................................................................................................... 36
i. The Secretary considered all relevant labor-supply issues ......................................................................... 36
ii. The Secretary duly considered the American STEM workforce ................................................................. 37
iii. The Secretary gave appropriate consideration to the educational need for a seventeen-month STEM extension .................................................................................................................................................... 38
D. The Secretary's promulgation of the 2008 interim final rule and clarifications of qualifying STEM programs were procedurally proper ........................................................................................................... 39

1. DHS's clarification of qualifying STEM courses of study did not require notice and comment ................ 39

2. The Secretary had good cause to publish the STEM practical training extension as an emergency rule .... 41

3. The Court should not remedy procedural defects with a vacatur order ...................................... 43

III. CONCLUSION ......................................................................................................... 45

CERTIFICATE OF SERVICE ........................................................................................... 47

*TABLE OF AUTHORITIES*

**CASE LAW**

*Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993) ...................... 15

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) .......... 43

*Agape Church v. FCC*, 738 F.3d 397 (D.C. Cir. 2013) .......... 24

*Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013) .............. 15

*Am. Hospital Ass'n v Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) ...................................................................... 40

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993) ...................................... 40

*American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) ...................................................................... 34

*Associated Gas Distribs. v. FERC*, 899 F.2d 1250 (D.C. Cir. 1990) ...................................................................... 7

*Ass'n v. FCC*, 752 F.3d 1018 (D.C. Cir. 2014) ...................... 24

*Barnhart v. Walton*, 535 U.S. 212 (2002) ............................ 19, 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ..................................................... 33

*Brown v. Gardner*, 513 U.S. 115 (1994) .............................. 22

*Central Texas Tel. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005) ..... 40, 41

*Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) ............................................................... 44

*\*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .......................................... 16, 17, 21

*Christensen v. Harris County*, 529 U.S. 576 (2000) .............. 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................................................. 34, 36

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ................ 17

*\*Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138 (2013) .... 4, 9

*Commonwealth of the Northern Mariana Islands v. United States*, 670 F. Supp. 2d 65 (D.D.C. 2009) .......................... 32

*Ctr. for Auto Safety v. Dole*, 828 F.2d 799 (D.C. Cir. 1987) ... 34

*Davis v. FEC*, 554 U.S. 724 ............................................... 4

*Davis v. Mich. Dep't of Treas.*, 489 U.S. 803 (1989) ............ 21

*DEK Energy Co. v. FERC*, 248 F.3d 1192 (D.C. Cir. 2001) .. 11

Delta Air Lines, Inc. v. Export-Import Bank, 2015 U.S. Dist. LEXIS 40109 (D.D.C. Mar. 30, 2015) ................................ 6

*Dep't of Comm., v. U.S. House of Representatives*, 525 U.S. 316 (1999) ................................................................. 3

*Fleming Companies, Inc. v. Dep't. of Agriculture*, 322 F. Supp. 2d 744 (E.D. Tex. 2004) ...................................... 23

*Floyd v. District of Columbia*, 129 F.3d 152 (D.C. Cir. 1997) ...................................................................... 4

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) ...................... 33, 37

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000) .................................... 8

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ............................ 19

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998) .................... 8

*Harris v. FAA*, 353 F.3d 1006 (D.C. Cir. 2006) .................... 30

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), .......................................... 44, 45

| | |
|---|---|
| *Heartland Reg'l Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ................................................ | 43 |
| *Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363 (D.C. 2004) ....... | 7 |
| *Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018 (D.C. Cir. 2014) ................................................ | 24 |
| *Independent U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847 (D.C. Cir. 1987) ................................................ | 45 |
| *INS v. Abudu*, 485 U.S. 94 (1998) ........................................ | 23 |
| *INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ..................... | 23 |
| *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374 (9th Cir. 1989) .................................... | 7, 10 |
| *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985) ................................ | 26 |
| *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) .................................... | 6, passim |
| *Judulang v. Holder*, 132 S. Ct. 476 (2011) ........................... | 24 |
| *KERM, Inc. v. FCC*, 353 F.3d 57 (D.C. Cir. 2004) ............... | 11 |
| *La. Forestry Ass'n Inc. v. Sec'y of Labor*, 745 F.3d 653 (3d Cir. 2014) ................................................ | 16, 22, 23 |
| *Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ......................... | 25 |
| *Lee v. Board of Governors of the Fed. Reserve Sys.*, 118 F.3d 905 (2d Cir. 1997) .................................... | 7, 10 |
| *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... | 4, passim |
| *Mack Trucks v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ............... | 42 |
| *Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44 (2011) ................................................ | 17, passim |
| *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ............. | 3, passim |
| *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ................................................ | 4, 5 |
| *Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ................................................ | 18, 19, 21 |
| *Nat'l Cable & Telecoms. Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir 2009) ................................................ | 24 |
| *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) ................................................ | 24 |
| *New World Radio, Inc. v. FCC*, 294 F.3d at 172 (D.C. Cir. 2002) ................................................ | 2, 6 |
| *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) ................................................ | 26, 27 |
| *Oil, Chem. & Atomic Workers Int'l Union v. Pena*, 18 F. Supp. 2d 6 (D.D.C. 1998) ................................ | 15 |
| *Ord v. Dist. Of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) .... | 3 |
| *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) .... | 39, 40 |
| *Programmer's Guild v. Chertoff*, 338 F. App'x 239 (3d Cir. 2009) ................................................ | 2, passim |
| *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279 (D.C. Cir. 2007) ................................................ | 5, 9 |
| *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255 (11th Cir. 2008) . | 20 |
| *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350 (2012) ...... | 21, 22 |
| *Sameena, Inc. v. United States Dep't of the Air Force*, 1996 U.S. Dist. LEXIS 18680 (N.D. Cal. Dec. 10, 1996) .............. | 15 |
| *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910 (6th Cir. 2002) ................................ | 7 |
| *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260 (11th Cir. 2011) ... | 20 |
| *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) .................................................. | 40 |
| *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..................... | 20 |

*Snake River Farmers' Ass'n v. Dep't of Labor, 9 F.3d 792 (9th Cir. 1992) ............... 7, passim

Sorenson Commc'ns, Inc. v. FCC, 567 F.3d 1215 (10th Cir. 2009) ............... 39

Stilwell v. Office of Thrift Supervision, 569 F.3d 514 (D.C. Cir. 2009) ............... 34, 38

Sullivan v. Everhart, 494 U.S. 83 (1990) ............... 18

Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334 (2014) .. 4

Telford Borough Auth v. United States EPA, 2013 U.S. Dist. LEXIS 162776 (E.D. Pa. Nov. 15, 2013) ............... 15

Tesoro Alaska Co. v. FERC, 778 F.3d 1034 (D.C. Cir. 2015) ... 16, 17

*United States v. Mead Corp., 533 U.S. 218 (2001) ............ 17, 18, 19

United States v. Richardson, 418 U.S. 166 (1974) ............... 14

U.S. Tanker Owners Comm. v. Dole, 809 F.2d 847 (D.C. Cir. 1987) ............... 45

Young v. United Parcel Service, Inc., — S. Ct. ——, 2015 WL 1310745 (Mar. 25, 2015) ............... S. Ct. ——, 2015 WL 1310745 (Mar. 25, 2015) 20, 21

Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650 (D.C. Cir. 2011) ............... 21

Washington Alliance of Technology Workers v. U.S. Department of Homeland Security., — F. Supp. 3d ——, 2014 WL 6537464 (D.D.C. Nov. 21, 2014) ............... F. Supp. 3d ——, 2014 WL 6537464 (D.D.C. Nov. 21, 2014) 3

Warth v. Seldin, 422 U.S. 490 (1975) ............... 3

White Stallion Energy Center v. EPA, 748 F.3d 1222 (D.C. Cir. 2014) ............... 22

Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43 (D.C. Cir. 1999) ............... 5

**ADMINISTRATIVE CASES**

Matter of T-, 7 I. & N. Dec. 682 (Reg. Comm. 1958) ............ 21, 27

**LEGISLATIVE HISTORY**

H. R. Rep. No. 101-723, pt. 1. 1990 WL 200418, *6746 ...... 27

**FEDERAL REGULATIONS**

8 C.F.R. § 214.2(f)(10)(i)(C) ............... 30

8 C.F.R. § 214.2(f)(10)(ii) ............... 27

8 C.F.R. § 214.2(f)(10)(ii)(C)(3) ............... 14

8 C.F.R. § 214.2(h)(4) ............... 25

**PUBLIC LAWS**

Pub. L. No. 111-306 (Dec. 14, 2010) ............... 28

Homeland Security Act of 2002, Pub. L. No. 107-296 (Nov. 25, 2002) ............... 42

Workforce Improvement Act of 1998, Pub. L. No. 105-277, Div. C., Title IV, §§ 411-415 (Oct. 21, 1998) ............... 28

**STATUTES**

5 U.S.C. § 553 ............... 19

5 U.S.C. § 553(b)(A) ............... 39

5 U.S.C. § 553(b)(B) ............... 41

5 U.S.C. § 706(2)(A) ............... 33

6 U.S.C. § 111(b)(1)(F) ............... 30, 31, 32

6 U.S.C. § 252(a)(4) ............... 29

8 U.S.C. § 1101(a) ............... 24

8 U.S.C. § 1101(a)(15)(B) ............... 26

8 U.S.C. § 1101(a)(15)(F) ............... 20

8 U.S.C. § 1101(a)(15)(F)(i) ............... 22, passim

8 U.S.C. § 1101(a)(15)(H)(i)(b) ............... 25

8 U.S.C. § 1101(a)(15)(H)(ii) ............... 26

8 U.S.C. § 1101(a)(15)(J) ............... 23

8 U.S.C. § 1101(a)(15)(M)(i) ............... 23

8 U.S.C. § 1103(a)(1) ............... 16, passim

8 U.S.C. § 1103(a)(3) ............................................. 16, passim
8 U.S.C. § 1182(a)(9)(B)(ii) ..................................... 21
8 U.S.C. § 1182(n) ................................................ 25
8 U.S.C. § 1184(a)(1) ............................................ 16, passim
8 U.S.C. § 1184(c)(1) ............................................ 22
8 U.S.C. § 1184(i)(1)(A) ......................................... 25
8 U.S.C. § 1252(g) ............................................... 30
8 U.S.C. § 1255 .................................................. 30
8 U.S.C. § 1258 .................................................. 30
8 U.S.C. § 1324a(h)(3) ........................................... 32
8 U.S.C. § 1372 .................................................. 29

**FEDERAL REGISTER NOTICES**
12 Fed. Reg. 5355 ................................................ 27
12 Fed. Reg. 5357 ................................................ 21, 27, 28
38 Fed. Reg. 35,426 .............................................. 21, 28
43 Fed. Reg. 14,575 .............................................. 30
67 Fed. Reg. 76,256 .............................................. 29
73 Fed. Reg. 18,945-46 ........................................... 31
73 Fed. Reg. 18,946-47 ........................................... 31, 38
73 Fed. Reg. 18,945-50 ........................................... 21, 28
73 Fed. Reg. 18,946-49 ........................................... 17, 18
73 Fed. Reg. 18,947 .............................................. 37
73 Fed. Reg. 18,948 .............................................. 25, 29
73 Fed. Reg. 18,950 .............................................. 42, 43
73 Fed. Reg. 18,954 .............................................. 39

## I. INTRODUCTION

Defendant, United States Department of Homeland Security ("DHS"), respectfully submits this memorandum of law in opposition to the cross motion for summary judgment filed by Plaintiff, Washington Alliance of Technology Workers. As a jurisdictional matter, at this stage in the litigation, Plaintiff has failed to meet its burden to establish Article III standing. In addition to this fatal justiciability defect, Plaintiff's summary judgment motion also fails to establish that DHS promulgated the OPT-STEM extension interim final rule in violation of the Administrative Procedure Act ("APA"). Congress has expressly authorized the Secretary to administer the Immigration and Nationality Act ("INA") with the force of law, and establish such regulations as he deems necessary for carrying out his authority under the INA. Because the Secretary was acting within his broad delegation of authority to set the terms and conditions for the admission of foreign students and his interpretation follows a longstanding construction of an ambiguous statutory provision, the Court should uphold the Secretary's interpretation of the relevant statutory provisions and resulting OPT-STEM extension rule.

Moreover, there were no procedural defects that require *vacatur* of the OPT-STEM extension rule. The Secretary had good cause to publish the regulation as an emergency rule because tens of thousands of highly-skilled individuals educated at United States colleges and universities would have been forced to leave this country in the absence of the rule. Without the immediate issuance of the 2008 interim final rule, critical sectors of the national economy along with American universities and foreign students would have faced immediate harm. And DHS's clarification of qualifying STEM occupations was an interpretive rule exempt from notice and comment rulemaking.

On these bases, Defendant is entitled to judgment in its favor.

## II. ARGUMENT

### A. Plaintiff's summary judgment motion fails to establish Article III standing.

As a threshold matter, Plaintiff's summary judgment motion has failed to establish Article III standing to proceed.[1] At this advanced stage in the litigation, Plaintiff must submit clear record evidence establishing that its members suffered a concrete, non-speculative injury-in-fact. Plaintiff, however, has failed to meet this burden. Indeed, Plaintiff continues to rely on the general averments and conclusory allegations made in its complaint, while simply resting on the Court's inference of standing in its favor that helped Plaintiff survive the motion to dismiss stage. Plaintiff also relies on extra-record evidence that, even if properly before this Court, fails to establish standing. Because Plaintiff has failed to provide the required specific, particularized evidence necessary to demonstrate that its three members are in direct and current competition for jobs with OPT students on STEM extensions, its members lack competitor standing and consequently, Plaintiff lacks associational standing to proceed. This foundational jurisdictional defect requires the Court to grant judgment in favor of Defendant.

Plaintiff's jurisdictional failure follows from the fact this litigation is currently at the summary judgment, rather than motion to dismiss, stage. As this Court recognized, ECF No. 17 at 5, at the motion to dismiss stage, a court " 'must accept as true all material allegations of the Complaint, and must construe the Complaint in favor of the complaining party.' " *Ord v. Dist. Of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Likewise, when ruling on a motion to dismiss based on the allegations in the complaint a court "must draw all fair inferences in favor of the plaintiff." *Washington Alliance of Technology Workers v. U.S. Department of Homeland Security* ("*WashTech*"), —— F. Supp. 3d ——, 2014 WL 6537464, at \*4 (D.D.C. Nov. 21, 2014).

In denying the motion to dismiss, this Court recognized that the "STEM labor market [was] broader," and thus different, "than the herder labor market at issue" in *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), the primary case on which it relied in denying Defendant's motion to dismiss. However, acknowledging that it was required to apply the liberal, deferential standard outlined above, this Court accepted as true Plaintiff's allegations in its Complaint and construed that Complaint in Plaintiff's favor, including by "draw [ing] all fair inferences in favor of the plaintiff."[2] ECF No. 17 at 5, 10. Accordingly, this Court concluded that *at the motion to dismiss stage*, it was "reasonable to infer that the named party members, who have technology-related degrees in the computer programming field and have applied for STEM employment during the relevant time period, were in direct and current competition with OPT students on a STEM extension," and therefore suffered a "concrete and particularized injury." *Id.* at 10.

However, as this Court implicitly recognized, the Court's favorable "fair inferences" and construal of the Complaint in favor of Plaintiff does not carry-over to a subsequent phase of the litigation. Indeed, to prevail on a motion for summary judgment, as opposed to a motion to dismiss, it is well established that mere allegations of injury are insufficient. *See Dep't of Comm., v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). "Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Id.* The party invoking federal jurisdiction bears the burden of establishing each element of standing which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, at the summary judgment phase, the plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " necessary to establish standing.[3] *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1149 (2013) (quoting *Lujan*, 504 U.S. at 561); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (observing that "burden of production to establish standing is more relaxed at the pleading stage than at summary judgment"). And the fact the court previously addressed standing as part of the motion to dismiss is not determinative: the court has an "independent obligation to assure [itself] of jurisdiction," *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997), at all stages of litigation. *See, e.g., Davis v. FEC*, 554 U.S. 724, 732-33 ("an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

However, simply submitting affidavits or other documentary evidence asserting general injury is insufficient, particularly where, as here, the injury Plaintiff asserts depends on the actions of third-parties like employers or employees actually regulated by the regulation who are not in fact parties to this litigation. Indeed, as the Supreme Court has held, "it is ordinarily substantially more difficult to establish" standing in cases like this where "plaintiff's asserted injury arises from the government's allegedly unlawful

regulation (or lack of regulation of someone else[]" *Lujan*, 504 U.S. 561-62. Because standing here in part "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the court cannot presume either to control or to predict" "much more is needed" to establish standing. *Id*. Finally, when a party seeks direct review of agency action, it must provide support for each element of its claim to standing in its opening brief. *See Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007). Plaintiff's opening brief does not come close to providing the necessary support for each element of its claim to standing and therefore fails to meet this threshold jurisdictional requirement.

With the foregoing in mind, Plaintiff fails to meet its burden. Standing is a jurisdictional question. *See Wyoming Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 48 (D.C. Cir. 1999). At an "irreducible constitutional minimum," a party must establish (1) that it has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Lujan*, 504 U.S. at 560-61. Plaintiff is a tech workers union asserting "associational standing" to challenge DHS's OPT STEM extension rule on behalf of its members. *See* Pl.'s Memo., ECF No. 25 at 12-14. The three-part test to establish "associational standing," requires demonstration that: (1) the association's members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d at 12. As the parties previously acknowledged, only the first of these is at issue in this case.

Plaintiff asserts, and this Court previously assumed, that three of its members -- Douglas Blatt, Rennie Sawade, and Cesar Smith -- could bring this suit in their own right under the "competitor standing" doctrine. ECF No. 25 at 12-14; *see* ECF No. 17 at 10. "A party seeking to establish standing on the basis of the competitor standing doctrine must demonstrate that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *Mendoza*, 754 F.3d at 1013 (emphasis in original, citation omitted).

In order to satisfy the requirements set forth in the governing competitor standing case law at the summary judgment stage, Plaintiff must submit specific evidence demonstrating not only that some law or regulation benefits some other class of employees or employers in the abstract, but also that there is a causal nexus between the regulation's effect on non-party student employees and Messrs. Blatt, Sawade, and Smith such that the Court can conclude they work in the *same* job category, that they are willing to work the *same* jobs going to STEM-OPT students, and that they are qualified to do so. *See, e.g., Mendoza*, 754 F.3d at 1012-13; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 800 (D.C. Cir. 1985) ("*Bricklayers*"); *accord Lujan*, 504 U.S. 561-62. This follows from basic D.C. Circuit law: where competitor standing depends "on the independent actions of third parties," the case is not a "garden variety competitor standing case[]" and plaintiff may not ask the court to "acknowledge a chain of causation firmly rooted in the basic law of economics," but must instead demonstrate such causation. *See New World Radio*, 294 F.3d at 172. This is why injury must be concrete and "imminent," rather than merely premised on "speculat[ion]," *see, e.g., Delta Air Lines, Inc. v. Export-Import Bank*, 2015 U.S. Dist. LEXIS 40109, * 21-22 (D.D.C. Mar. 30, 2015), and that imminence must be supported by facts rather than conjecture at the summary judgment stage.

For example, in *Mendoza*, the D.C. Circuit concluded that standing was established because the American herders competed directly with foreign-born herders and could show their wage would not be lower but for the foreign born workers. 754 F.3d at 1012-13. In particular, the court noted that "plaintiffs [had] attested to specific experience that qualifie[d] them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions they would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder." *Id*. at 1014.

Similarly, in *Bricklayers*, the court found standing because the union member bricklayers demonstrated that they competed directly with foreign bricklayers and provided evidence that they were "ready, willing and able" to perform the *precise* jobs foreign-born workers were performing, *i.e.* bricklaying on the *same* projects the foreign workers were working on. 761 F.2d at 800 (D.C. Cir. 1985); *see also Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363, 1368-70 (D.C. 2004) (standing established where regulation "legalize[d] the entry of a product into a market in which [plaintiff] competes"); *Sault Ste. Marie Tribe of Chippewa*

*Indians v. United States*, 288 F.3d 910, 916 (6th Cir. 2002) (no standing where plaintiff offered no evidence that casino forty miles away would detract from its business); *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) ("plaintiff must show that he personally competes in the same arena"); *Snake River Farmers' Ass'n v. Dep't of Labor*, 9 F.3d 792, 797-98 (9th Cir. 1992) (no standing where plaintiff not a direct competitor for same job); *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1378-79 (9th Cir. 1989) (standing established where plaintiff crane operators were in direct competition with Canadian crane operators); *cf. Assoc. Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990) (plaintiff must show challenged action has "clear and immediate potential" to cause competitive harm).

Accordingly, at this summary judgment stage, Plaintiff must provide specific, concrete facts like those in *Mendoza* and *Bricklayers*. It has not. In its motion for summary judgment, Plaintiff generally claims that its "filed affidavits and Appendix B contain[] the evidence supporting the factual allegations for standing in the complaint." ECF No. 25 at 11. Plaintiff's actual motion, however, points to only three factual bases for its Article III standing: (1) that Messrs. Sawade and Blatt are "computer programmer[s,]" Mr. Smith is a "computer systems and networking administrator," and both positions "appear on all of DHS's STEM lists"; (2) that "employers such as IBM, place recruitment advertisements that make OPT status a job requirement, thereby disqualifying Washtech members from consideration"; and (3) "employers do not have to pay Medicare and Social Security taxes for aliens on students visas . . . which makes workers under the OPT program 15.3% cheaper to employ than Washtech Members." ECF No. 25 at 13-14. At this stage in the proceedings, these claims present nothing more than the general averments and conclusory allegations which are insufficient to establish any injury-in-fact due to direct and current competition. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 184 (2000); *Snake River Farmers*, 9 F.3d at 797-98. They categorically do not demonstrate that the F-1 regulation benefits F-1 visa holders and that there is a causal link between the regulation's effect on F-1 visa holders and Messrs. Sawade, Blatt, Smith such that the court can conclude that they are in the same job category, that they are willing to work the same jobs going to STEM-OPT students, and that they are qualified to do so.

Even assuming it is appropriate to probe beyond the summary judgment papers and examine whether Plaintiff's affidavits and Appendix B contain actual "specific facts" supporting standing, that inquiry would be futile. For instance, Mr. Blatt's affidavit states that he is "employed currently as a computer programmer," but makes no statement that he is searching for a new programmer-type position. Blatt Aff., ECF No. 25-1. On this basis alone, he fails to show that he is in "current" competition with OPT students on STEM extensions. *See Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) (party must "show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit . . . [f]or only then does the plaintiff satisfy the rule that he was personally disadvantaged").

In addition, Mr. Blatt lists twelve instances when he applied for jobs between March 30, 2010, and June 11, 2012, including a "position at Deloitte Touche Tohmatsu," a "computer job at Ernst & Young," a "programming job at Hewlett Packard," and a "computer project management job at Fiserv." Blatt Aff., ECF No. 25-1. Based on this, Plaintiff cannot plausibly argue that Mr. Blatt's vague attestations regarding job applications years ago set forth any specific facts establishing his direct and current competition for jobs with OPT students on STEM extensions.

Messrs. Sawade's and Smith's affidavits are no different. *See* Sawade Aff., ECF No. 25-1; Smith Aff., ECF No. 25-1. Messrs. Sawade and Smith both attest that they are also presently employed and similar to Mr. Blatt, they make vague references to instances when they each applied or interviewed for jobs with tech companies. *Id.* The affidavits, however, fail to demonstrate with the degree of specificity needed at this stage in the litigation the precise facts regarding: 1) the actual job titles of the open STEM positions; 2) the details of companies' vacancy announcements (*e.g.*, job locations); 3) the specific educational, skills and experience required for the open positions; 4) whether the members possessed the minimum educational, skills and experience required for the positions; and 5) whether any of the companies advertising positions that Plaintiff members applied for actually filled the open positions with OPT students on STEM extensions. *Id.* Instead, Messrs. Blatt, Sawade and Smith affidavits simply mirror the unsupported, vague and conclusory allegations Plaintiff made at the motion to dismiss stage. *Compare* Affidavits, ECF No. 25-1 *with* Pl.'s Orig. Compl., ECF No. 1 at ¶¶ 79-154. While these conclusory assertions may have previously given

Plaintiff the fair inference of standing, they fall well short of establishing any element of Plaintiff's claim to standing at the subsequent summary judgment phase. *See Clapper*, 133 S. Ct. at 1149; *NHTSA*, 489 F.3d at 1289.

Relatedly, Plaintiff's general allegation -- unsupported by specific evidence -- that "employers such as IBM, place recruitment advertisements that make OPT status a job requirement, thereby disqualifying Washtech members from consideration" also does not advance their claim for standing. At the very least, Plaintiff would need to demonstrate, among other things, that: (1) Messrs. Sawade, Blatt, and Smith were eligible to apply for such jobs, including background requirements and willingness to relocate; that (2) the jobs were not specifically intended for students or part of a course of ongoing temporary training for students;[4] and that (3) non-OPT individuals were considered for the positions that ultimately went to students. *See, e.g., Mendoza*, 754 F.3d at 1014 ("The plaintiffs have attested to specific experience that qualifies them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions they would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder"). Their filings contain no such allegations.

In any event, at the very least, at this stage of proceedings, Plaintiff must demonstrate with specific facts that the jobs Messrs. Sawade, Blatt, and Smith attest to applying to in their affidavits were jobs that both Messrs. Sawade, Blatt, and Smith *and* OPT students were applying to. *See, e.g., Lee*, 118 F.3d at 913; *Snake River Farmers*, 9 F.3d at 797-98; *Meese*, 891 F.2d at 1378-79. If Messrs. Sawade, Blatt, and Smith *and* OPT students are not, in fact, applying for the same positions, they cannot be said to be direct and current competitors. *Mendoza*, 754 F.3d at 1012-14; *Bricklayers*, 761 F.2d at 800.

Plaintiff's own evidence makes this plain: the IBM job listings on which they rely are all for jobs in *India*. *See* Appendix B at 72-77 (job listings for positions in Bangalore, Chennai, Hyderabad, Kolkata, and Pune). Each job apparently required OPT training in the United States, but ultimately the jobs require relocating to India. Only Mr. Blatt claims to have applied for a job with IBM, ECF No. 25-1 at 2, and nothing in his declaration or any of Plaintiff's evidence indicates he applied for an IBM job in India or that he was willing to relocate to India. If Mr. Blatt was not applying for IBM jobs in India, he cannot be said to be in *direct* and *current* competition with STEM-OPT students in India, to say nothing of the fact that he cannot assert competitor standing on the theory that STEM-OPT students in the United States harm his ability to get a job in the United States if the jobs he relies on require moving to India.

Plaintiff's exhibits in Appendix B of other job listings seeking OPT students also do not cure Plaintiff's jurisdictional defect. At best, the exhibits demonstrate that employers sought to employ students in a variety of job categories with a broad set of job requirements, in different disciplines, and in different geographic locations across the country. It does not demonstrate-- particularly at the summary judgment stage--that these employers sought to employ specifically "computer programmers" or "computer systems and networking administrators" like Messrs. Sawade, Blatt, and Smith as a general matter from a pool of *both* eligible employees *and* OPT students, and chose to employ OPT students to reap the tax benefits as Plaintiff alleges. *See, e.g., DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (party may establish competitor standing by showing "substantial probability" of economic injury and no such standing where party establishes only "some vague probability" of increased competition and "a still lower probability" of injury stemming from that competition); *accord KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party may have competitor standing if it is "likely to be financially injured" by challenged government action and fails to establish standing where party did not introduce evidence of financial injury but merely purported to compete against party subject to challenged administrative decision).

Plaintiff attempts to surmount this difficulty by providing the affidavit of Michael Schendel, President of Washtech, who asserts that "[m]any employers openly solicit OPT participants to the exclusion of WashTech members." ECF No. 25-1 at 13. In support, he points to a single job listing for a software engineer in "Redmond, Washington" with an unlisted employer. *Id.* That listing seeks "OPT candidates with good Java and Android knowledge" and asks that "only direct candidates who can work on OPT respond to this." *Id.* at 14. This job advertisement seeking student employees does not demonstrate, let alone with any specificity, that Messrs. Sawade, Blatt, and Smith were direct and current competitors with the students this advertisement solicited. At a bare minimum, these individuals would have had to attest that: they wanted this "software engineer[ing]" work,

this job was an upgrade over their current position either because of a higher wage or better job quality, they applied for the job in "Redmond, Washington," they did not obtain the job, and a STEM-OPT student obtained the job. But even that may be insufficient, as Plaintiff does not explain through specific evidence how a "software engineer" position in "Redmond Washington" is interchangeable with Messrs. Blatt, Sawade, and Smith's professed professions as "computer programmers" or "computer systems and networking administrator," such they are in *direct* and *current* competition with them.

Plaintiff's references in Appendix B to similar job listings seeking STEM-OPT student candidates fares no better, as none indicates Messrs. Sawade, Blatt, and Smith were direct and current competitors with the students these advertisements solicited. *See* ECF No. 25-3 at 6. Indeed, the advertisements involve numerous tech-worker headhunting organizations that locate potential student employees for a client list that includes many large American corporations. *See* ECF at 25-3 at 1-166. Many of these positions require applicants willing to travel to the headhunter's geographic location for training and then to be assigned to work *anywhere* in the United States. *See, e.g.* ECF No. 25-3 at 10, 17, 19, 20, 22, 35, 49, 106, 109, 135, 138, 147, 153. Messrs. Sawade, Blatt, and Smith's affidavits in no way demonstrate they were in fact in direct and current competition with this class of students seeking jobs through these headhunters, as they neither demonstrate that they applied to any of these headhunters, that these headhunters were filling non-entry level positions in Plaintiff-members' desired skill and experience level, that they were willing to relocate *anywhere in the United States*, as these jobs required, or that Messrs. Sawade, Blatt, and Smith were willing to and applied for the many entry-level positions advertised. *See id.* at 6-9, 17, 19, 24, 28, 31, 35, 55, 59, 66, 93, 100, 104, 107, 109, 115, 144, 151, 153, 163.

Appendix B also lists jobs through headhunters in specific geographic locations without listing the name of the employer. *See, e.g., id.* at 6-9, 15, 17, 49, 58, 62, 109, 153. These advertisements fail to support standing for similar reasons: Messrs. Sawade, Blatt, and Smith's affidavits do not claim they applied for any of these positions through these headhunters. Perhaps acknowledging this impediment, Plaintiff provides documents from some of these headhunters listing their clients. For example, Appendix B contains such a list from "3A Soft Inc," the company whose adverts appear at pages 6-10 of the Appendix, which lists companies like HP, Disney, Cisco, Jetblue, Cingular, Microsoft, SAP, Oracle, Verizon, JP Morgan, New York Life, and Intel as some of their "key clients." To be sure, Messrs. Sawade, Blatt, and Smith claim to have applied for jobs at some of these companies. *See* ECF No. 25-1 at 1, 5-6, 19 (JP Morgan, Microsoft, HP); *see also, e.g., id.* at 14, 18, 20, 25, 27, 32, 38, 42-45, 47-48 (listing companies the respective headhunters represent). But their affidavits indicate they did so directly, not through 3A Soft Inc. or any of the headhunter companies in Appendix B, so it is impossible to ascertain whether they applied to the same jobs 3A Soft Inc. and other headhunters were recruiting for, let alone for the small class of headhunter jobs seeking computer programmers or computer systems and network administrators. *See id.* at 11, 15, 17, 20, 26, 28, 29, 31, 35, 104, 141. Plaintiff thus fails to demonstrate through specific facts that Messrs. Sawade, Blatt, and Smith are direct and current competitors of the students who the advertisements in Appendix B are relevant to, given that they adduce no evidence they are willing to move anywhere in the United States and/or because they do not show they applied for any headhunter-listed job, let alone for non-entry level positions in Plaintiff-members' desired skill and experience level.[5]

Ultimately, Plaintiff's standing allegations must fail because they turn the competitor standing doctrine on its head. The crux of Plaintiff's argument is that Messrs. Sawade, Blatt, and Smith applied for "STEM Jobs," a vague and generalized category that includes over 150 categories of separate jobs according to Department of Labor Databases. *See* O*Net Online, http://www.onetonline.org/find/stem?t=0&g=Go (last visited Apr. 6, 2015). This would include not just computer programmers or computer systems and networking administrator jobs, like those Messrs. Sawade, Blatt, and Smith claim to seek, but jobs in the sciences, engineering, mathematics, and the military, among others. Plaintiff's version of competitor standing ignores obvious distinctions between these categories, and instead postulates that Messrs. Sawade, Blatt, and Smith may sue on the generalized theory that they applied for STEM jobs, regardless of whether they were the same jobs any of Plaintiff's evidence involved, whether they were appropriately qualified, or whether they were willing to relocate anywhere in the United States. This generalized standing theory is akin to "taxpayer standing," universally rejected by the courts, *see, e.g., United States v. Richardson*, 418 U.S. 166, 171-80 (1974), in that it would provide *every* American who had applied for *any* STEM job and did not get it standing to sue because the only explanation for their not getting it must be *some* F-1 visa-holder got the job.

That cannot be so, as it would establish standing for any aggrieved U.S. worker, rather than, as precedent requires, for U.S. workers who are "direct and current" competitors of foreign nationals with F-1 visas. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 731 (2013) (rejecting "boundless theory of standing," and observing that "[t]aken to its logical conclusion, [plaintiff's] theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful -- whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on"). That is a far cry from the requirement that the aggrieved party demonstrate, with specific evidence, that they compete directly and currently in the relevant job category. *See, e.g., Mendoza*, 754 F.3d at 1012-13; *Bricklayers*, 761 F.2d 798, 800 (D.C. Cir. 1985).

In the end, Plaintiff fails to narrowly define the relevant job market, and similarly fails to provide record evidence showing Messrs. Sawade, Blatt, and Smith were in direct and current competition with the individuals who applied for the headhunter jobs at issue in Appendix B (or for jobs with OPT students on STEM extensions).[6] It therefore cannot establish competitor standing. As such, Plaintiff lacks associational standing.[7]

### B. The Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during post-graduation practical training.

Even if Plaintiff's fatal jurisdictional defects are set aside, the Court should grant judgment in Defendant's favor because the Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during the brief period of post-graduation practical training. Congress, through its creation of DHS, charged the Secretary with the broad authority to administer and enforce the INA, including the specific authority to determine the conditions for admitting nonimmigrants to the United States. *See* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1). The 2008 OPT rule, and the 2010 and 2011 STEM extension rules, are therefore the lawful result of the Secretary's reasonable interpretation of the F-1 statute under the express authority of Congress.

#### 1. The Secretary's interpretation of the F-1 statute warrants Chevron deference.

A glaring defect in Plaintiff's summary judgment motion is its reliance on the incorrect standard of review. *See* ECF No. 25 at 10-11. The Court reviews challenges to the Secretary's interpretation of the INA under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See, e.g., La. Forestry Ass'n Inc. v. Sec'y of Labor*, 745 F.3d 653, 670 (3d Cir. 2014). *Chevron* also applies when a court must determine whether the agency has acted beyond its statutory authority. *See Tesoro Alaska Co. v. FERC*, 778 F.3d 1034, 1037 (D.C. Cir. 2015). The Supreme Court has made clear: "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority," and the court will defer to the agency's reasonable interpretation of statutory ambiguities concerning both the scope of its statutory authority and the application of that authority. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).

That is precisely the situation here. Plaintiff has brought this suit challenging the Secretary's interpretation of the F-1 statute and authority under the INA to provide foreign students with temporary employment authorization during post-graduation practical training. The standard of review of such a challenge, therefore, falls squarely within the *Chevron* framework.

Under *Chevron*, if the court determines "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter." 467 U.S. at 842. If, however, "the statute is silent or ambiguous with respect to the specific issue," then the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency is entitled to *Chevron* deference when Congress delegates it authority to speak with the force of law through rulemaking, *see United States v. Mead Corp.*, 533 U.S. 218, 230 (2001), as Congress has done in this case. *See* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1); *see also* 73 Fed. Reg. at 18,946-49. Because the statute providing for the admission of foreign students contains an ambiguity in the connotation of the relevant terms, the Court affords substantial deference under *Chevron* to the Secretary's reasonable interpretation of these terms.

Plaintiff cites *Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44, 58 (2011), for the proposition that "DHS forfeited deference under *Chevron* because it failed to provide notice and comment for any of the actions at issue." ECF No. 25 at 11. Plaintiff, however, misses the mark. *Mayo* actually supports Defendant's contention that the Court must apply the *Chevron* two-step framework to the Secretary's reasonable interpretation of the statute.

In *Mayo*, the Court held that the *Chevron* two-step framework applied to its review of the Treasury Department's interpretation of provisions of the Internal Revenue Code ("IRC") resulting in a rule that exempted medical residents from FICA taxes (the "full-time employee rule"). *See* 562 U.S. at 51. The Court held that because the Secretary of the Treasury issued the full-time employee rule pursuant to Congress's explicit authorization to "prescribe all needful rules and regulations for the enforcement" of the IRC, such "express congressional authorizations to engage in the process of rulemaking" are "a very good indicator of delegation meriting *Chevron* treatment." *Mayo*, 562 U.S. at 57 (citing *Mead*, 533 U.S. at 229). The Court went on to analyze the full-time employee rule under *Chevron* holding that in issuing the rule, the Secretary had reasonably interpreted the IRC. *Id.* at 60. Directly in line with this, Congress has expressly authorized the Secretary to administer the INA with the force of law, and "establish such regulations" as he deems necessary for carrying out his authority under the INA. *See* 8 U.S.C. §§ 1103(a)(1), (3); *see also* 73 Fed. Reg. at 18,946-49. Moreover, the instant case puts directly before the Court for review the Secretary's "express congressional authorization[] to engage in the process of rulemaking" regarding his reasonable interpretation of the INA to provide F-1 students with temporary employment authorization during post-graduation practical training. *See Mayo*, 562 U.S. at 57. Under *Mayo*, therefore, *Chevron* provides the correct standard of review in this matter. *See Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81 (2005) (FCC entitled to *Chevron* deference under statutes that gave the Commission the authority to execute, enforce and prescribe such rules and regulations necessary in the public interest to carry out the provisions of the Communications Act of 1934); *Sullivan v. Everhart*, 494 U.S. 83, 88-89 (1990) (applying *Chevron* deference to HHS rule promulgated pursuant to delegation of general authority to make rules and regulations and establish procedures necessary or appropriate to carry out such provisions).

Contrary to what Plaintiff would have this Court believe, compliance with notice and comment procedures is not a requirement for determining whether a court will apply the *Chevron* framework to an agency's interpretation of a statute. Rather, as the *Mayo* court held, satisfaction of notice and comment procedures merely presents "a consideration identified in [the Court's] precedents as a 'significant' sign that a rule merits *Chevron* deference." 562 U.S. at 57-8 (citing *Mead*, 533 U.S. at 230-31). More to the point, the Court held that *Chevron* deference is appropriate " 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' " *Mayo*, 562 U.S. at 57 (citing *Mead*, 533 U.S. at 226-27). Here, Congress has expressly delegated to the Secretary the broad authority to administer all provisions of the INA with the force of law, and "establish such regulations" for this purpose, *see* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1), which includes providing F-1 students with temporary employment authorization during post-graduation practical training. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, *see* 5 U.S.C. § 553, does not automatically deprive that interpretation of the judicial deference otherwise its due"); *Mead*, 533 U.S. at 230-31 (" 'the want of' notice and comment 'does not decide the case' "); *Brand X*, 545 U.S.at 1004 (Breyer, J., concurring) ("The Court explicitly stated that the absence of notice-and-comment rulemaking did 'not decide the case,' for the Court has 'sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded' ") (citing *Mead*, 533 U.S. at 231)); *Gonzales v. Oregon*, 546 U.S. 243, 281 (2006) ("The Court does not take issue with the Solicitor General's contention that no alleged procedural defect, such as the absence of notice-and-comment rulemaking before promulgation of the Directive, renders Chevron inapplicable here.").

The Court should reject Plaintiff's assertion that *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), provides the correct standard of review. ECF No. 25 at 11. Under *Skidmore*, an agency's interpretation that lacks the force of law -- e.g., policy statements, agency manuals, or enforcement guidelines -- does not warrant *Chevron* deference, but instead is "entitled to respect" to the extent it is persuasive. *Christensen v. Harris County*, 529 U.S. 576, 577 (2000). For instance, courts will review a "non-binding administrative interpretation" by DHS under *Skidmore*, making a determination on whether the interpretation "carries a weight

dependent upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1266 (11th Cir. 2011) (citing *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008). In the instant case, however, review of a non-binding administrative interpretation by DHS is not before the Court. Rather, the Secretary has established regulations with the force of law under his express authority from Congress to administer the INA and reasonably interpreted the statute to provide F-1 students with employment authorization during post-graduation practical training. The *Skidmore* standard of review, therefore, is inappropriate.

On these bases, the Secretary's reasonable interpretation of the INA in this matter warrants *Chevron* deference.[8]

### 2. Plaintiff fails Chevron step one because an ambiguity exists within the F-1 statute requiring the Secretary's interpretation.

Plaintiff's summary judgment motion fails to demonstrate that the INA "unambiguously forecloses" the Secretary's interpretation of the term "student." *See Brand X*, 545 U.S. at 983; *Chevron*, 467 U.S. at 842; *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011). Plaintiff, therefore, has failed to get around *Chevron* step one.

Plaintiff asserts that the term "student" is not ambiguous, ECF No. 25 at 17, but fails to recognize that the INA definition of "student" is only the definition of what is required to be proven at the time of admission to obtain a student visa. After a student is admitted into the United States in F-1 status, the INA does not define the term "student" as it relates to permitted courses of study which may encompass both classroom education and practical training. *See, generally*, 8 U.S.C. §§ 1101(a), (a)(15) (F); *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012) ("Statutory language . . . 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme' ") (quoting *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989)). Instead, the INA leaves the determination as to what conduct a nonimmigrant student must comply with post-admission to maintain his F-1 status to the discretion of the Secretary, along with a determination on the length of the student's period of authorized stay while he or she holds F-1 status. *See* 8 U.S.C. §§ 1103(a)(3), 1182(a)(9)(B)(ii); 1184(a)(1).[9] Plaintiff may posit that the term "student" is defined by the four corners of a dictionary definition, ECF No. 25 at 17, but an ambiguity exists by virtue of the term's connotation within the larger context of the F-1 statute. *See White Stallion Energy Center v. EPA*, 748 F.3d 1222, 1243 (D.C. Cir. 2014) (ambiguity arises from a statutory phrase's two possible connotations); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]"). Specifically, the statute does not define the parameters of a foreign student's permitted course of study, or whether hands-on training or employment -- such as a paid internship -- may accompany or follow the course of study as practical part of the student's education in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i). In fact, employment as a means of training a student is not unusual, especially in the context of the high-skilled technology sector where specifically, a position for a computer programmer can require "several years of work-related experience, on-the-job training, and/or vocational training." *See* Occupational Information Network, *Computer Programmer*, Job Zone 4 Definition, http:// www.onetonline.org/link/summary/15-1131.00 (visited Apr. 6, 2015). The statute certainly does not unambiguously foreclose the possibility of hands-on education as a component of study. In the end, the statute's silence on these issues -- and this lack of clarity regarding the precise connotation of the term "student" within the context of the relevant provision -- indicates that Congress left an ambiguity for the agency to resolve. *See White Stallion Energy Center*, 748 F.3d at 1243; *Sea-Land Servs., Inc.*, 132 S. Ct. at 1357.

The case *Louisiana Forestry Association* supports this argument. *See* 745 F.3d at 670-71, 673. There, the court noted that because 8 U.S.C. § 1184(c)(1) did not define the term "consult," as it related to H-2B temporary non-agricultural worker petitions, Congress granted DHS broad flexibility to seek the advice of the Department of Labor ("DOL") and condition the approval of an H-2B petition on compliance with DOL regulatory requirements. *Id.* at 673. Here, Congress left a similar ambiguity regarding the exact scope of the term "student." 8 U.S.C. § 1101(a)(15)(F)(i). Because the statute does not directly limit the scope of the term or address the appropriate level of specificity at which the term should apply, an ambiguity exists for the

agency to resolve. *See La. Forestry*, 745 F.3d at 670-71; *INS. v. Aguirre-Aguirre*, 526 U.S. 415, 416 (1999) ("judicial deference to the Executive Branch is especially appropriate in the immigration context") (citing *INS v. Abudu*, 485 U.S. 94, 110 (1998)); *cf. Mayo*, 562 U.S. at 52.

Moreover, "Congressional silence 'normally creates ambiguity. It does not resolve it.' " *Fleming Companies, Inc. v. Dep't. of Agriculture*, 322 F. Supp. 2d 744, 758 (E.D. Tex. 2004) (citing *Barnhart*, 535 U.S. at 218). Here, the long history of congressional silence regarding clarification of the term "student" within the INA as it relates to the parameters of an alien's time in F-1 status while in the United States further demonstrates the existence of ambiguity. Over several decades, Congress has had many opportunities to clarify whether the term "student" included any restrictions within the INA, including when the legislature recently amended the statute after DHS published the 2008 interim final rule at issue in this case. *See* Pub. L. No. 111-306 (Dec. 14, 2010) (amending 8 U.S.C. § 1101(a)(15)(F)(i)). However, Congress's repeated election not to provide clarification on any possible restrictions of an alien "student" while holding F-1 status contributes to the ambiguity within the statutory provision.[10] *Fleming Companies, Inc.*, 322 F. Supp. 2d at 758; *Barnhart*, 535 U.S. at 218.

Along these lines, Congress added to the ambiguity by providing for the admission of other categories of "students" in others sections of the INA, which are also similarly silent on the issue of employment, *see* 8 U.S.C. § 1101(a)(15)(M)(i) (vocational institution study). Congress also uses the term "student" broadly in another section of the INA, envisioning different types of training as a component of a student's education. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(J). As a result, Congress did not preclude the possibility of foreign student employment and instead left a gap for the Secretary to fill by exercising his congressionally-mandated authority to promulgate regulations consistent with the INA, the Homeland Security Act, and DHS's mission to secure the economic position of the United States to ensure national security.

Accordingly, Plaintiff cannot succeed at *Chevron* step one by showing a clear and unambiguous congressional intent in the words of the statute.

### 3. Under Chevron step two, the Secretary's interpretation is reasonable.

Because an ambiguity in the statute exists, the Court must uphold the Secretary's interpretation as long as it is not arbitrary and capricious. *See Judulang v. Holder*, 132 S. Ct. 476, 484 n.7 (2011); *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013). To succeed at *Chevron* step-two, Plaintiff must show that the Secretary's interpretation of the term "student" as encompassing practical training employment strays so far from the paradigm that Congress intended as to render the Secretary's interpretation unreasonable. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir 2009). Plaintiff's motion fails to make this showing.

Plaintiff argues that the Secretary's interpretation of "student," which allows for limited post-graduation employment in practical training, is unreasonable because it exceeds the Department's authority to admit foreign students without complying with statutory guidelines applicable to H-1B status, a wholly distinct nonimmigrant visa classification. Because the Department has the authority to set the terms of conditions for F-1 nonimmigrant student status and the obligation to ensure that its programs are administered in a manner that protects the nation's economic security, the OPT-STEM extension does not exceed the Secretary's power. Therefore, the Secretary's reasonable interpretation of its statutory authority satisfies the APA's deferential standard. *See Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1024 (D.C. Cir. 2014); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008).

#### i. The 2008 interim final rule does not conflict with limitations on temporary worker visas.

Plaintiff argues the OPT-STEM extension "circumvents the statutory restrictions" applicable to foreign workers holding H-1B status. ECF No. 25 at 20. Plaintiff is incorrect because the Secretary's interpretation of the F-1 student provisions does not render any parts of 8 U.S.C. § 1182(n) superfluous. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). Plaintiff also incorrectly

suggests that the interim rule somehow blurs the line between the nonimmigrant classifications for F-1 student and H-1B temporary worker. *Compare* 73 Fed. Reg. at 18,948 *with* 8 C.F.R. § 214.2(h)(4). The interim final rule provides for the limited employment of foreign students in a relatively narrow range of occupations critical to the United States economy. *See* 73 Fed. Reg. at 18,948. Although the interim final rule may result in some overlap with the subject area identified in the H-1B provisions, *see* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1)(A), any limited overlap does not render the Secretary's interpretation of the F-1 statute unreasonable.

Aliens falling into the separate F-1 and H-1B classifications remain tied to independent temporal and subject matter restrictions within the respective statutory parameters. *Compare* 73 Fed. Reg. at 18,948 *with* 8 C.F.R. § 214.2(h)(4). The Secretary's interpretation, therefore, may result in some overlap in subject areas addressed in the two separate statutory provisions, but the interpretation does not render either provision without effect. For instance, foreign students working in extended practical training are limited to a total of 29 months of employment, subject to certain conditions, and may only work for qualifying companies while holding critical STEM occupations key to the United States economy. *See* 73 Fed. Reg. at 18,948. The interim final rule does not impermissibly entrench on the H-1B category, which continues to have an independent operative effect with its own temporal and subject matter limitations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Thus, any overlap between the two categories is limited and well within the discretion of the Secretary to fashion a means to promote the protection and advancement of the United States economy under the Homeland Security Act. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 9 (D.C. Cir. 2011) (courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes).

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), does not provide Plaintiffs with the support it claims it does. ECF No. 25 at 21. In *Bricklayers*, foreign workers relied on former INS Operations Instructions and entered the United States in B-1 "business visitor" status instead of the former "H-2" temporary worker status to perform manual labor, including the installation of components of a gold-ore processing system and certain brick-laying construction. 616 F. Supp. at 1392. The former H-2 provision permitted alien workers to enter the United States "to perform temporary services of labor," if unemployed U.S. workers capable of performing the services or labor could not be found. *Id.* at 1391 (citing 8 U.S.C. § 1101(a)(15)(H)(ii) (1985). The B-1 visitor provision, however, explicitly prohibited the admission of an alien as a visitor if he was "coming for the purpose of . . . performing skilled or unskilled labor . . . ." *Id.* at 1390 (citing 8 U.S.C. § 1101(a)(15) (B)). The explicit contradiction within the two statutory provisions, therefore, prohibited any interpretation claiming an overlap within the two visa categories existed.

But no such explicit contradiction exists in the instant case. The F-1 student provision is silent on the parameters of a foreign student's permitted course of study, or whether hands-on training or employment may accompany or follow the course of study as practical part of the student's education in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i). Nothing in the F-1 statute explicitly prohibits a foreign student to accept employment as a component of his or her course of study while in the United States. Accordingly, the Secretary's reasonable interpretation of the INA's F-1 provisions providing for the temporary limited employment of foreign students in occupations critical to the United States economy can validly overlap somewhat with the subject areas identified in the H-1B statute. *See Northeast Hosp. Corp.*, 657 F.3d at 9.

Moreover, the rules providing for employment authorization for F-1 students do not conflict with worker protections in place under the H-1B statute. Plaintiff's contrary assertion ignores Congress's decades-long acquiescence to the agency's permitting foreign students to engage in post-graduation practical training. *See Programmer's Guild*, 338 F. App'x at 244-45.

When Congress established the Labor Condition Application ("LCA") attestation requirements for H-1B employment, it was well aware that legacy INS's regulations provided F-1 students with work authorization. *See* H.R. Rep. No. 101-723, pt. 1, 1990 WL 200418, *6746. At the time, the agency's regulations permitted F-1 students to work in the United States post-graduation, *see* 8 C.F.R. § 214.2(f)(10)(ii) (1989), and the agency's employment authorization of foreign students had been a part of the foreign student program since 1947, *see* 12 Fed. Reg. 5355, 5357 (INS) (Aug. 7, 1947); *Matter of T-*, 7 I. & N. Dec. at 683. In creating the LCA requirements, Congress did not question the ability of F-1 students to work and further endorsed the ability of

F-1 students to seek off-campus employment as a "minimal work program providing opportunities for both U.S. employers and students to achieve their respective goals." H.R. Rep. No. 101-723, pt. 1, 1990 WL 200418, *6747. In fact, Congress explicitly acknowledged that it was expanding upon programs authorizing employment of F-1 students, and only imposed additional requirements in the form of employer attestations covering F-1 students "employed in a position *unrelated* to the aliens' field of study and off-campus" for the three years following the enactment of the statutory requirement. Pub. L. No. 101-649, § 221(a) (emphasis added). Fully recognizing that these labor protections would not apply to the long-established F-1 practical training program, Congress chose to leave the employment of F-1 students in practical training unregulated. *Id.*

In 1998, when Congress enacted further changes to the LCA process for H-1B employment, it did not address the agency's regulation providing for the employment of foreign students in practical training. *See* American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-277, Div. C., Title IV, §§ 411-415 (Oct. 21, 1998). At the same time, Congress was cognizant of the critical need to provide technical training to domestic workers in mathematics, engineering, and computer science. *Id.* §§ 414(c)-(d). Congress imposed a fee on certain H-1B employers and directed the use of that fee revenue to award monetary grants to train employed and unemployed workers and provided scholarships to low-income individuals to pursue associate, undergraduate, or graduate level degrees in mathematics, engineering, or computer science. *Id.* Although Congress identified the need to develop the technical skills of the domestic workforce, it again was silent regarding the employment of skilled foreign students under the agency's practical training regulation. *Id.*

The long history of congressional silence regarding the agency's rule for allowing foreign students to engage in post-graduation employment in practical training shows a legislative intent to continue this practice. *See Programmer's Guild*, 338 F. App'x at 244-45. Since 1947, legacy INS, and now DHS, has allowed foreign students to work in practical training. *See* 73 Fed. Reg. at 18,945-50; 38 Fed. Reg. at 35,426; 12 Fed. Reg. at 5357. If Congress thought legacy INS's or DHS's practical training rules ran afoul of other provisions of the INA, it had the opportunity to express its view over the last sixty years, particularly in its several enactments specifically addressing the F-1 nonimmigrant classification, including when it recently amended the statute after DHS published the 2008 interim final rule at issue in this case. *See Programmer's Guild*, 338 F. App'x at 244; *see also* Pub. L. No. 111-306 (Dec. 14, 2010) (amending 8 U.S.C. § 1101(a)(15)(F)(i)). Congress's repeated election not to limit DHS's authority to permit students to seek employment as part of their overall training demonstrates that the legislature understands the agency's interpretation to be statutorily permissible. *See Walton*, 535 U.S. at 220.

### ii. The OPT-STEM extension falls within the Secretary's broad discretion to set the terms and conditions for student visas.

Plaintiff argues that the STEM extension violates the agency's obligation "to ensure aliens admitted as students leave the country when they are no longer students." ECF No. 25 at 19. Plaintiff relies on cases that stand only for the proposition that when a student's F-1 status terminates, the student is no longer lawfully admitted to the United States. These cases do not answer the relevant question of *when* a student's status must terminate and in no way suggest that the Secretary lacks authority to allow F-1 students to engage in post-graduate training while maintaining F-1 status. Because the Secretary did not alter any requirement that F-1 visa holders depart the United States following the expiration of their status, and otherwise acted within the scope of his authority to define the scope of F-1 status, the STEM extension is within the Secretary's authority.

Nothing in the interim final rule permits F-1 students to remain in the United States following the termination of their F-1 status. The interim final rule does not eliminate any of the monitoring and verification requirements created by the Student Exchange Visitor Information System. *See* 67 Fed. Reg. 76,256; *see also* 6 U.S.C. § 252(a)(4); 8 U.S.C. § 1372. Therefore, to the extent the Secretary has an obligation to ensure that students leave the United States following the termination of their F-1 status, the 2008 interim final rule fully complies with that obligation. *See* 73 Fed. Reg. 18,948.

The interim final rule is supported by the Secretary's authority to set the conditions for the expiration of the student's F-1 status. The Secretary has broad discretion to set the terms and conditions of nonimmigrant visas, including setting durational limitations on a foreign student's F-1 status. *See* 8 U.S.C. § 1184(a)(1). For more than thirty years, legacy INS and the Secretary

have exercised their discretion to define a foreign student's "duration of status" to include post-graduation practical training.[11] *See* 43 Fed. Reg. at 14,575; 8 C.F.R. § 214.2(f)(10)(i)(C) (1985). As discussed infra, *supra* II.B.2, Congress has repeatedly authorized the agency's interpretation of its authority by amending other parts of the F-1 statute without altering the agency's interpretation of "duration of status."

Other provisions of the INA also contradict Plaintiff's suggestion that all F-1 students must depart the United States when they are no longer "enrolled and attend[ing] educational classes." ECF No. 25 at 19. Sections 254A and 248 permit F-1 students to adjust status to lawful permanent resident or to remain in the United States under a different nonimmigrant visa category. *See* 8 U.S.C. §§ 1255, 1258. Section 242(g) leaves the decision to institute removal proceedings to the discretion of the Secretary. *See* 8 U.S.C. § 1252(g). There is no evidence that Congress intended to set aside the Secretary's otherwise broad discretion and require the immediate departure of F-1 students upon their graduation.

### iii. The 2008 interim final rule is consistent with the Secretary's statutory obligation to protect the economic security of the United States.

Finally, Plaintiff contends that the Secretary exceeded its statutory authority by considering labor market issues in promulgating the interim final rule. ECF No. 25 at 22. The Secretary, however, is obligated to consider whether the administration of agency programs is consistent with the nation's economic interests. 6 U.S.C. § 111(b)(1)(F). In creating the Department of Homeland Security, Congress specifically tasked the Secretary with "ensuring that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." *Id*. Therefore, consideration of the economic consequences of its regulations and programs is well within the province of the Secretary.

Plaintiff incorrectly suggests that the Secretary conducted an unauthorized economic analysis of the labor market to support the interim final rule. ECF No. 25 at 22. The Secretary's analysis, however, was not dependent on an economic analysis of the supply of domestic STEM labor. The interim final rule was based on the more specific finding that, absent action by the Secretary, thousands of F-1 students already present in the United States would be forced to depart the United States without having the opportunity to seek domestic employment through the oversubscribed H-1B program. 73 Fed. Reg. 18,945-46. The Secretary concluded that the STEM extension is vital to economic competitiveness in both the short and the long term. In the short term, the Secretary concluded that by forcing thousands of American-trained STEM workers to leave and find employment in our economic competitors would undermine American competitiveness. 73 Fed. Reg. 18,946. In the long term, the Secretary found that the STEM is essential to the world's perception of the United States as providing the best opportunities for foreign STEM students. 73 Fed. Reg. 18,946-47. These conclusions do not depend on the availability or unavailability of domestic labor, but on turn on the unique importance of America's ability to attract the world's premiere STEM talent to our economic competitiveness. The Secretary arrived at these conclusions based on a thorough review of the literature on the topic and did not require the type of highly-specialized labor analysis Plaintiff suggests is within the exclusive domain of the Department of Labor. 73 Fed. Reg. 18,945-47.

Plaintiff's argument hinges on the unsupported assumption that *only* the Department of Labor is permitted to consider labor market concerns in issuing regulations. *See* ECF No. 25 at 22. This contention is contradicted by the Department of Homeland Security's enabling statute, which identifies economic impact review as a "primary mission" of the Department, and not supported by any of the statutes cited by Plaintiff. 6 U.S.C. § 111(b)(1)(F); *cf*. ECF No. 25 at 22. If the Secretary were barred from considering labor market concerns, it is unclear how the agency could comply with Congress's economic review mandate given the widely-recognized relationship between immigration policy and the labor market. *See Commonwealth of the Northern Mariana Islands v. United States*, 670 F. Supp. 2d 65, 85 (D.D.C. 2009) ("It has long been recognized that immigration laws necessarily have a significant impact on labor markets and practices."). Such a bar would also make little sense given the Department's labor-related responsibilities. *See* 8 U.S.C. § 1324a(h)(3) (delegating broad discretion to determine which noncitizens may work in the United States).

The Secretary's consideration of economic effects was permissible here due to the ample record evidence suggesting that the Secretary's pre-2008 administration of the OPT program was undermining the nation's economic security. 73 Fed. Reg. 18,945-47. This view is supported by that of the National Science Foundation ("NSF"), which noted, "The intervening years have seen security-related changes in federal visa and immigration policy that, although intended to restrict the illegal movements of only a few, have had a wider effect on many foreign-born graduate students and postdoctoral scholars who either were already in the United States or were contemplating studying here." AR at 1448. Such a warning, when considered in conjunction with evidence of the importance of these individuals to the nation's economic prosperity, properly triggered the Secretary's statutory obligation to consider whether the OPT program could be administered in a manner that would minimize the risk of a serious economic harm. *See id.*; *cf.* 6 U.S.C. § 111(b)(1)(F). Here, the Secretary applied his discretion to set the time period for the admission of foreign students in a manner that "ensur[es] that the overall economic security of the United States is not diminished" by the OPT program. 6 U.S.C. § 111(b)(1)(F); *see* 8 U.S.C. § 1184(a)(1). Therefore, because the Secretary is required to consider the economic effects of its programs and empowered to establish the parameters for those programs, the interim final rule does not exceed the Secretary's statutory authority.

For these reasons, the Secretary's interpretation of his authority under the F-1 statute is reasonable. Plaintiff's motion for summary judgment, therefore fails to succeed at *Chevron* step-two.

### C. The Secretary's promulgation of the 2008 interim final rule was not arbitrary or capricious.

Plaintiff contends that the Secretary violated 5 U.S.C. § 706(2)(A) by acting arbitrarily or capriciously in promulgating the 2008 interim final rule. Plaintiff moved for summary judgment on two categories of § 706(2)(A) claims. First, Plaintiff contends that the Secretary incorrectly concluded that there was an impending STEM labor shortage. Second, Plaintiff asserts the Secretary failed to consider other relevant information or factors in issuing the interim final rule. Both claims are contradicted by the record. Neither claim, even if supported by the record, is sufficient to demonstrate that the Secretary acted arbitrarily or capriciously in promulgating the 2008 interim final rule because the Secretary's conclusions are not dependent on a finding of a shortage of American STEM labor.

#### 1. The 2008 interim final rule is amply supported by record evidence.

Plaintiff contends that the STEM labor shortage does not exist and, therefore, cannot be supported by the record. In order to prevail on this claim, Plaintiff will have to clear the high hurdle of demonstrating the Secretary's determination is "so implausible that it could not be ascribed to a difference in view." *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012). It is not enough for Plaintiff to show that the shortage did not exist at the time of promulgation so long as the record provides a reasoned basis for the Secretary's action. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). The record supplies evidence more than sufficient to meet this minimal burden. *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("[W]e must uphold [a rule] so long as it is reasonable and reasonably explained.").

Plaintiff first relies on a passage from a 2014 book by Dr. Michael Teitelbaum to contradict the Secretary's 2008 reference to a potential STEM labor shortage.[12] The opening paragraph of Dr. Teitelbaum's book, however, demonstrates the reasonableness of the Secretary's finding:

In this increasingly globalized work, respected and influential voices warn urgently that the United States is falling behind in a global "race for talent" that will determine the country's future prosperity, power, and security. Expressions of such concerns have become common, even conventional, and are embraced with little question by many who have leadership roles in politics, business, media, and education. . . .
[M]any corporate, political and opinion leaders in the United States have been sounding persistent alarms about current or future shortages in the nation's human capital in science or engineering, and more generally to unfavorable trends relative to those

in other countries. If their concerns can be encapsulated in a single sentence, it might read as follows: The United States, long a leader in the number and quality of its scientist and engineers, has been falling behind its international competitors, and is thereby risking serious deterioration in its future prosperity and security.

Michael S. Teitelbaum, *Falling Behind?* 1-2 (Princeton University Press 2014). There can be little doubt that the Secretary's decision to rely on the "many" "respected and influential voices" "urgently" warning of an impending STEM labor shortage satisfies the APA's highly deferential standard of review. *Stilwell*, 569 F.3d at 519. Even so, the Secretary's failure to consider an opinion expressed in a future publication casts doubt only on his precognitive powers, not on the soundness of his reasoning. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971) (review of agency decisions is ordinarily limited to information before the agency in the administrative record).

Plaintiff next makes the very serious allegation that the Secretary "made up" its claimed shortage of American STEM workers by misrepresenting the conclusions in the National Science Foundation's report, *Rising Above the Gathering Storm: Energizing and Employing America for a Brighter Future* (2007) ("NSF report"). ECF No. 25 at 31-33. As support for its claim that the report "repeatedly contradicts DHS's characterizations of the labor market," Plaintiff quotes three passages from the report. *Id.* at 32-33. Two of these passages are from boxes entitled "Another Point of View," in which the report summarizes scholarship that reaches a contrary conclusion from that of the report. *See* AR at 1437, *referenced at* AR 1439 n. 13; AR at 1515, *referenced at* AR 1514 n.4, 1523. The report goes on to criticize the analysis block-quoted by Plaintiff as methodologically flawed and based on labor supply forecasts that are "likely" to "fail[] abysmally." AR at 1523.

Although the third passage expresses a view adopted by the NSF report, it is quoted in a manner that omits the report's conclusion regarding the need for international STEM labor. ECF No. 25 at 32 (quoting NSF report p. 170, located at AR 1519). In the line immediately following the quoted passage, the report warns that "the number of people with doctorates in the sciences, mathematics, and engineering awarded by U.S. institutions each year has not kept pace with the increasing importance of science and technology to the nation's prosperity." AR at 1519. Indeed, even the quoted portion expresses concern over science and engineer degree and enrollment trends, and warns that some science and engineering labor markets have shortages. ECF No. 25 at 32. Notably, Dr. Teitelbaum, on whose research Plaintiff relies, agrees with the Secretary's characterization of the NSF report's findings:

Both the [Tapping America's Potential] and Gathering Storm reports recounted indicators of decline in both the quantity and quality of U.S. student ['s] . . . skills in science and mathematics. Both made the case that the result is inadequate numbers of scientists and engineers--whether current or projected--that pose profound threats to the future of U.S. economic prosperity and security. . . .

*Falling Behind?* at 14. There can be little doubt that -- even without using the phrase "critical shortage" -- the report describes a need for international scientists and engineers to avert a coming crisis. *See, e.g.*, AR 1394; 1401-1402; 1406; 1515. The NSF report, as well as the other evidence in the record, amply supports the Secretary's decision to act. *Id.*

### 2. The Secretary did not arbitrarily or capriciously fail to consider any relevant information in issuing the interim final rule.

Under the "highly-deferential" standard for review of agency decisions, the Court should not substitute its own judgment for that of the agency, but should examine only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. 402, 416 (1971). Plaintiff asserts three gaps in the Secretary's analysis. Because the record demonstrates that the agency considered the relevant issues, Plaintiff's arguments fail.

### i. The Secretary considered all relevant labor-supply issues.

Plaintiff first argues that "DHS ignored all evidence that there was no STEM worker shortage in the United States." ECF No. 25 at 34. This is contradicted by the record, which contains studies that summarize opposing perspectives on the issue and demonstrates that the Secretary considered all necessary information in concluding that there was a need for immediate action.[13] *See* AR at 1393, 1437, 1505; *cf.* ECF No. 25 at 31-33.

Plaintiff's argument contains two critical flaws. First, Plaintiff incorrectly assumes that a finding of an American worker shortage was necessary to its finding of the importance of foreign STEM students. Plaintiff ignores the record evidence discussing the unique importance of these students to our future competitiveness, not simply from a quantity perspective, but from an international perception standpoint. AR 1438-1448. Therefore, even if the record showed there was no shortage of American STEM labor, Plaintiff's challenge would still fail because the record supports the Secretary's conclusion that the STEM extension was necessary to ensure that the world's most talented STEM students continue to perceive the United States as the best place to study. *Id*. The record further supports the Secretary's conclusion that our international perception is vital to our economic success. *Id*.

Second, Plaintiff's argument misframes the question of what constitutes a relevant fact for agency consideration. Here, Plaintiff is not claiming the existence of a unique factor that the Secretary ignored in issuing the interim final rule, but appears to challenge the outcome of the Secretary's analysis of that factor. *See supra* Section II.C.1. The record is clear that the Secretary considered *whether* there was critical need for F-1 students to remain in the United States pending their opportunity to seek H-1B status and concluded that there was such a need. *See id*. That conclusion is supported by the record. 73 Fed. Reg. 18,947. Plaintiff's criticism can be "ascribed to a difference in view," and is insufficient to overcome the deference due to the Secretary. *Fox*, 684 F.3d at 74.

### ii. The Secretary duly considered the American STEM workforce.

Plaintiff next asserts that the Secretary failed to consider "the impact of adding foreign labor on American workers." ECF No. 25 at 33-34. The record, however, is replete with discussions of why the impact on American STEM workers would be minimal. *See, e.g.*, AR at 107 ("Far from displacing U.S. workers, highly skilled foreign born workers will continue to function as they always have: as net job creators."); AR at 1401 ("Studies show, however, that the financial impact is minimal.").

Like Plaintiff's labor-shortage argument above, this argument does not raise the question of an omitted factor, but challenges the substance of the Secretary's conclusion that there existed a need for F-1 students to remain in the United States pending their opportunity to seek H-1B status. The record show that the Secretary did not omit consideration of the impact on American workers, but concluded that the nation's continued economic security depended on America's ability to continue to attract the very best STEM talent in the world. 73 Fed. Reg. 18,946-47. Plaintiff's disagreement with the Secretary's conclusion is not sufficient to override the Secretary's reasoned judgment. *Stilwell*, 569 F.3d at 519.

### iii. The Secretary gave appropriate consideration to the educational need for a seventeen-month STEM extension.

Plaintiff contends that the Secretary's analysis is flawed because it does not link the length of the STEM extension to an educational purpose. ECF No. 25 at 35-36. The record, however, includes evidence supporting the education-based need for the extension both due to the need for extended job-training and to cure the problem of foreign students foregoing "valuable training opportunities" so that they can bank their limited OPT time for use after graduation. *See, e.g.*, AR 128 ("In today's world, one year of OPT is not sufficient to provide ample practical experience to new graduates . . . ."); AR 131 ("[S]tudents are increasingly foregoing these opportunities and banking their OPT time to use after they earn their degree."). The record, therefore, contains evidence of an educational justification for the STEM extension and demonstrates that this factor was considered by the Secretary in promulgating the interim final rule.[14]

20

In any event, there is no requirement that the Secretary expressly discuss whether a short extension of an educational program serves an educational purpose. The issue facing the Secretary was whether the OPT program could be administered in a manner that preserved the nation's economic security. Because the Secretary has the statutory authority to establish the program length, and that the OPT program serves a legitimate education purpose, *see supra* Section II.B.3, it was not arbitrary or capricious for the Secretary to limit its 2008 inquiry to factors relevant to administering the program in a manner that safeguards the United States' economic interests. Here the length of the extension is directly tied to a period the Secretary deemed reasonable to allow the students already present in the United States to compete for H-1B visas during the next fiscal year following spring graduation. *See* 73 Fed. Reg.18,946-50. This is sufficient to meet the Secretary's obligation when engaging in regulatory line-drawing. *See Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013).

### D. The Secretary's promulgation of the 2008 interim final rule and clarifications of qualifying STEM programs were procedurally proper.

#### 1. DHS's clarification of qualifying STEM courses of study did not require notice and comment.

Plaintiff is incorrect that APA notice and comment provisions apply to DHS's website-based clarification of qualifying STEM courses of study and degree programs. ECF No. 25 at 28-29. DHS's clarification is an "interpretive rule" that merely clarifies an existing rule, 73 Fed. Reg. at 18,954, and does not change law, policy, or practice. DHS's clarification, therefore, is exempt from notice and comment requirements. *See* 5 U.S.C. § 553(b)(A).

A legislative rule has the force of law and creates new rights or duties, while an interpretive rule merely clarifies an existing rule and does not change law, policy, or practice. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). The rulemaking procedure to which Plaintiff refers requiring a public notice and comment period, ECF No. 25 at 28-29, applies only to an agency's proposed "legislative" rule, not to an "interpretive" rule. *See Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009) (finding that where "[t]he declaratory rulings at issue in this case did not create any new duties with respect to customer data, but merely informed providers of the FCC's interpretation of the existing regulation. . ., the restriction contained in the declaratory rulings was an interpretative rule, and the FCC was not required to comply with notice and comment procedures."). Interpretive rules, exempt from notice and comment, are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Mortgage Bankers Ass'n*, 135 S. Ct. at 1204 (citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)); *see also Am. Hospital Ass'n v Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). A rule that sensibly conforms to the wording of a statute or existing legislative rule constitutes an interpretation, and is thereby exempt from notice and comment rulemaking. *See Central Texas Tel. v. FCC*, 402 F.3d 205, 213 (D.C. Cir. 2005). Similarly, if in the absence of the agency's construction it would have an adequate legislative basis to ensure the performance of duties, then the construction falls within the interpretive rule exception. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Plaintiff cannot plausibly argue that DHS's "STEM-Designated Degree Program List" (the "list") is a legislative rule because the list does nothing more than advise the public of the degree programs offered at educational institutions across the United States that fall under the universe of STEM recognized courses of study.[15] The list is merely an itemization of degree programs divided by general subject matter areas, along with each program's corresponding Classification of Instructional Programs ("CIP") code assigned by the U.S. Department of Education's Institute of Education Sciences National Center for Education Statistics.[16]

Plaintiff asserts that the list is a legislative rule because an F-1 student holding a degree in a STEM field "is an absolute requirement for the 17-month OPT extension under the 2008 OPT Rule." ECF No. 25 at 28. However, Plaintiff fails to acknowledge that DHS's website-based list did not announce any new laws, policies or practice requiring an F-1 student to hold a STEM degree -- instead, the list merely provided the public with clarification on what specific areas of study within the universe of STEM programs offered at schools may, upon completion, qualify the student for an OPT STEM extension. *See Central Texas Tel.*, 402 F.3d at 213.

Accordingly, DHS's website-based clarification of qualifying STEM courses of study and degree programs is nothing more than an "interpretive rule" that is exempt from notice and comment requirements.

### 2. The Secretary had good cause to publish the STEM practical training extension as an emergency rule.

The Secretary had good cause to publish the STEM practical training extension rule as an emergency rule. *See* 5 U.S.C. § 553(b)(B). Any delay caused by a lengthy comment period was contrary to the economic interests and thus, public interest of the United States. *Id*. The Secretary determined that any delay would have resulted in a serious disruption to workforces in critical sectors of the United States' economy at a time when the country faced the ongoing threat of foreign economic competitors taking away U.S. educated skilled workers. Plaintiff fails to acknowledge that Congress, through the Homeland Security Act, directed the Secretary to prevent exactly this. The Secretary is charged, through the INA, to ensure the economic integrity of the United States while working with industry and academia to promote and develop key technologies for economic growth and integrity, critical infrastructure advancements, and national security. *See* Pub. L. No. 107-296, §§ 103(a)(3), 101(f)(4), 301, 302(4), (10), 308(b)(2).

Plaintiff is incorrect that the administrative record cannot support the Secretary's good cause determination. ECF No. 25 at 27. To the contrary, studies in the administrative record indicate that a key component of a nation's success in the knowledge-based economy is the ability to attract and retain workers educated in science and technology. AR 158, 172. Additionally, because of the vital importance of science and technology workers to the integrity of a nation's economy, many countries have made high-skilled migration an important part of national economic strategies. AR 338. The Secretary further determined, as supported by studies in the administrative record, that the intense competition for high-skilled and educated labor to support the knowledge-based economy threatens the ability of the United States to attract and retain workers in science and technology. AR 1547, 1549-53. Accordingly, the Secretary stated that unless the rule is implemented immediately, the skilled foreign students working in STEM occupations who cannot participate in the H-1B program because of the numerical cap would be forced to leave the country and use their U.S. education to take up employment with foreign competitors. *See* 73 Fed. Reg. at 18,950. When the Secretary issued the interim final rule, thousands of workers with STEM degrees would have been forced to depart the United States because of the H-1B cap. *Id*. The Secretary decided that avoiding these harms provided good cause to publish the interim final rule with an immediate effective date without first completing the notice and comment process. *Id*.

Moreover, *Mack Trucks v. EPA*, 682 F.3d 87, 93-94 (D.C. Cir. 2012), does not support Plaintiff's case. ECF No. 25 at 24. In *Mack Trucks*, the EPA used an emergency rule to provide a compliance exception to a single manufacturer because it chose to develop a regulatory-noncompliant technology. 682 F.3d at 94. The court held that the good cause exception did not apply to the agency's rule because the agency's rationale would allow good cause to save a manufacturer from its poor choices every time it felt a new regulation imposed some degree of economic hardship. *Id*. at 94. In the instant case, however, the Secretary did not invoke good cause to save a single regulated entity from its own ill-advised decisions. Rather, the Secretary published the interim final rule to advance the economic interests of the United States and to ensure that this country continues to attract and retain skilled workers who can make vital contributions for the development of critical technologies. *See* 73 Fed. Reg. at 18,950. The Secretary stated that "[t]he ability of U.S. high-tech employers to retain skilled technical workers, rather than losing such workers to foreign business, is an important economic interest for the United States." *Id*. DHS received communications from a wide range of concerned stakeholders, including companies in the high-tech industry, members of Congress, and United States educational institutions, about the adverse impact that STEM students being forced to leave would have on the ability of United States schools to attract talented foreign students, which, in turn, would have a detrimental effect on the United States high-tech industry and the United States economy as a whole. AR 103, 106, 117-18, 120, 124, 128-29, 132. Unlike *Mack Trucks*, therefore, the Secretary's decision to issue an emergency rule was for the advancement of the United States economy as a whole and not focused on a single manufacturing entity.

### *3. The Court should not remedy procedural defects with a vacatur order.*

To the extent the Court finds any procedural defect in the Secretary's promulgation of the OPT-STEM extension rule, because of the emergency situation invalidation would cause, the appropriate course of action would be an order that holds any *vacatur* in temporary abeyance. A *vacatur* order has the effect of setting aside an agency's rule and taking it "off the books." *See Heartland Reg'l Ctr. v. Sebelius*, 566 F.3d 193, 198-99 (D.C. Cir. 2009) (discussing the distinction between invalidating and vacating a rule); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 92 (D.D.C. 2007) ("vacatur takes the rule off the books"). Here, a *vacatur* order would "take off the books" the OPT-STEM extension rule providing thousands of foreign students with work authorization while presently in the United States. This emergency situation would cause these workers and their family members to scramble to depart the United States in an effort to avoid any possible immigration consequences.

Given the immediate dire situation a *vacatur* order would cause, should the Court issue an invalidation order, a temporary stay of *vacatur* would be appropriate. *See, e.g., Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), *appeal dismissed by* No. 03-5347, 2004 WL 1052989 (D.C. Cir. May 7, 2004). In *Hawaii Longline*, the court vacated the agency's fishing quota regulation causing "serious disruptions" to the regulated community by virtue of the agency's immediate inability to issue any fishing permits. *Id.* at 9. On motions to reconsider, the court agreed that the *vacatur* caused an immediate disruption by suspending the fishing permit process, but the court was unwilling to remand the regulation to the agency without a *vacatur* because of the agency's prior decision making process. *Id.* at 12. Nevertheless, the court agreed that the disruption to the permitting process warranted limited relief to the regulated community in the form of a temporary stay of the *vacatur*. *Id.*

In the instant case, if the Court finds any procedural defect in the Secretary's rule, a similar temporary stay of any *vacatur* order would be appropriate. Like *Hawaii Longline*, any *vacatur* of the OPT-STEM regulation would cause a "serious disruption" to 1) the employment authorization and immigration status of thousands of bright F-1 students holding OPT-STEM extensions; 2) the global competitiveness of several critical sectors of U.S. technology industries; and 3) U.S. colleges and universities preparing F-1 students to pursue OPT-STEM opportunities in the United States. *See Hawaii Longline*, 288 F. Supp. 2d at 9; *see also Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) (staying *vacatur* of agency rule to avoid disruption of regulated industry and confusion to investing public); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) (six month stay "to avoid further disruptions in the domestic market and to allow the Secretary to undertake further proceedings . . . .").

Accordingly, a temporary stay of any *vacatur* would avoid sudden disruption to these entities and would also have the advantage of "not presupposing the validity" of any invalidated rule during the temporary stay period. *See Hawaii Longline*, 288 F. Supp. 2d at 12.

### III. CONCLUSION

As demonstrated, Plaintiff has failed to meet its burden at this stage in the litigation to establish Article III standing to proceed. Jurisdiction aside, Plaintiff's summary judgment motion also fails to establish that DHS promulgated the OPT-STEM extension interim final rule in violation of the APA. For the reasons outlined above, and the reasons set forth in Defendant's summary judgment memorandum, the Court should grant judgment in favor of Defendants.

DATED: April 6, 2015

Respectfully submitted,

BENJAMIN C. MIZER

Acting Assistant Attorney General

LEON FRESCO

Deputy Assistant Attorney General

WILLIAM C. PEACHEY

Director

EREZ R. REUVENI

Senior Litigation Counsel

SARAH S. WILSON

Trial Attorney

By: *s/Glenn M. Girdharry*

GLENN M. GIRDHARRY

Senior Litigation Counsel

United States Department of Justice

Civil Division

Office of Immigration Litigation

District Court Section

P.O. Box 868, Ben Franklin Station

Washington, DC 20044

Tel: (202) 532-4807

Fax: (202) 305-7000

Email: glenn.girdharry@usdoj.gov

Footnotes

1    Defendant maintains that Plaintiff also lacks prudential or "zone of interests" standing to proceed and rests on its arguments pending before the Court. *See* Def.'s Memo., ECF No. 22. Under the case law of the Supreme Court and this Circuit, Plaintiff cannot establish that it falls within the zone of interest of the statutory provision that forms the crux of its complaint. Accordingly, the Court should dismiss this case in accordance with the Third Circuit's decision in *Programmers Guild v. Chertoff*, 338 F. App'x 239, 243 (3d Cir. 2009). *See* ECF No. 22. Defendant also reaffirms its view that the so-called "procedural injury" exception to standing rules does not apply here and cannot help Plaintiff show cognizable injury under the competitor standing doctrine. *See* ECF No. 15 at 2-5. Defendant

preserves that issue for appeal, including whether Plaintiff must demonstrate causation and redressability, issues this court did not address in denying the motion to dismiss. *See, e.g., New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (applying causation requirement in competitor standing case).

2   Plaintiff similarly conceded that the standard at the motion to dismiss stage is less onerous than at summary judgment. *See* ECF No. 11 at 4 ("At the pleadings stage, the burden imposed on plaintiffs to establish standing is not onerous and general factual allegations of injury resulting from the defendant's conduct may suffice.").

3   Plaintiff concedes that it bears the burden of proof on this issue, but fails to acknowledge the evidentiary burdens it is subject to. ECF No. 25 at 11 ("A party invoking a court's jurisdiction has the burden of demonstrating that it satisfies the irreducible minimum of standing[.]").

4   This distinguishes these positions from those in cases where plaintiffs are competing with individuals for *identical* categories of employment. *See, e.g, Mendoza*, 754 F.3d at 1014 (foreign-born and domestic sheep and goat herders competing for the same position). Unlike in those cases, where "plaintiffs do not need to apply for and be offered positions they have a reasonable basis for knowing will provide substandard compensation and conditions just to maintain standing to bring [] suit," *id.* at 1014 n. 6, Messrs. Sawade, Blatt, and Smith could not plausibly apply for the student jobs in the first place, such that the futility analysis is irrelevant.

5   As an example, Plaintiff could have, but did not, submit evidence showing a nexus between the jobs Messrs. Sawade, Blatt, and Smith claim to have applied for and the jobs listed in Appendix B. Since those jobs purport to seek OPT employees, by law each employer must be registered with "E-Verify," "an Internet-based system that allows businesses to determine the eligibility of their employees to work in the United States." *See* USCIS, E-Very website, *http://www.uscis.gov/e-verify*; *see* 8 C.F.R. § 214.2(f)(10)(ii)(C)(3) (providing student may receive 17-month extension if, among other things, "student's employer is registered in the E-Verify program"). But Plaintiff fails to proffer any such evidence.

6   If the court is inclined to conclude that Plaintiff's submissions are enough to confer standing at this stage, it nevertheless should defer ruling on the cross-motions for summary judgment to permit limited discovery on the issue of standing, in order to test the assertions made by Messrs. Sawade, Blatt, and Smith. Although this is an APA record review case, it is appropriate to consider Plaintiff's extra-record materials as part of the court's standing analysis, but only if the government is given the opportunity to test the veracity of those submissions through their own limited discovery. *See, e.g., Telford Borough Auth. v. United States EPA*, No. 12-6548, 2013 U.S. Dist. LEXIS 162776 *25 (E.D. Pa. Nov. 15, 2013); *Oil, Chem. & Atomic Workers Int'l Union v. Pena*, 18 F. Supp. 2d 6, 17 (D.D.C. 1998); *Sameena, Inc. v. United States Dep't of the Air Force*, No. 96-1899, 1996 U.S. Dist. LEXIS 18680, *10 n.2 (N.D. Cal. Dec. 10, 1996). Such discovery has been permitted or has occurred in other cases addressing competitor standing. *See, e.g., Adams v. Watson*, 10 F.3d 915, 925 (1st Cir. 1993); *Snake River Farmers*, 9 F.3d at 797-98.

7   To the extent *amicus* suggests an "abdication" theory of standing saves Plaintiff's suit from dismissal, the D.C. Circuit has never adopted such a theory. Even if such a principle were applicable here, the fact that ICE maintains the Student and Exchange Visitor Information System ("SEVIS"), a web-based database that monitors all entries premised on F and other student-based visas, and that ICE operates a fugitive operations unit which relies in part on "SEVIS" information and devotes resources to apprehending delinquent students is more than adequate to demonstrate the government is in no way abdicating its enforcement duties as prescribed by the student visa system. *See, e.g.*, ICE, SEVIS Overview, http://www.ice.gov/sevis/overview (describing SEVIS operations); ICE, Fugitive Operations, http://www.ice.gov/fugitive-operations (describing fugitive operations).

8   Even if the Court applied the *Skidmore* standard to the Secretary's interpretation of the F-1 provision, the Secretary would nevertheless prevail. Under *Skidmore*, when an agency is charged with the mission of enforcing a particular statute (as Congress has explicitly charged DHS here, *see* 8 U.S.C. §§ 1103(a)(1), (3), 1101(a)(15)(F), 1184(a)(1)), its interpretation "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Young v. United Parcel Service, Inc.*, ––– S. Ct. ––––, 2015 WL 1310745, at *13 (Mar. 25, 2015) (citing *Skidmore*, 323 U.S. at 140). Accordingly, under the *Skidmore* standard, the Court can resort to the Secretary's interpretation for guidance and uphold the 2008 OPT rule and the 2010 and 2011 STEM extension rules as the lawful product of the Secretary's explicit authority to administer and enforce the F-1 provisions within the INA. *See United Parcel Service, Inc.*, ––– S. Ct. ––––, 2015 WL 1310745, at *13.

9   For several decades, the former INS and now DHS, has interpreted the F-1 statute to allow foreign students, during their period of authorized stay in the United States, to be employed post-graduation under limited conditions for purposes of practical training. *See* 73 Fed. Reg. at 18,945-50; 38 Fed. Reg. at 35,426; 12 Fed. Reg. at 5357; *Matter of T-*, 7 I. & N. Dec. 682, 683 (Reg. Comm. 1958).

10   Congress has also repeatedly changed the H-1B visa, but has not changed the OPT program. *See, e.g.*, Pub. L. 105-277 (Oct. 21, 1998); Pub. L. 106-313 (Oct. 17, 2000); Pub. L. 108-447 (Dec. 8, 2004); Pub. L. 111-5 (Feb. 17, 2009).

11   To the extent Plaintiff challenges the STEM extension on the grounds that it allows students to stay in the United States for *any* post-graduation work, this argument is not a proper challenge to the 2008 interim final rule, but a challenge to a thirty-year-old INS regulation. *See* 43 Fed. Reg. at 14,575. Such a challenge is both time-barred and outside the scope of the Court's order limiting the challenge to the 2008 interim final rule. *See* ECF No. 17; *Harris v. FAA*, 353 F.3d 1006, 1010-13 (D.C. Cir. 2006).

12    This book and the rest of Plaintiff's Appendix A are not part of the administrative record and should not be considered by the Court. *See Ctr. for Auto Safety v. Dole*, 828 F.2d 799, 804 (D.C. Cir. 1987) ("The APA prohibits a reviewing court from considering new evidence that was not before the agency when it made its decision."); *American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) (declining to permit supplementation of the record with letters were written after the agency decision that "merely disagree with the [agency]'s conclusions").

13    Plaintiff also argues that the regulation is invalid because the Secretary failed to describe its standard for determining that there was a labor shortage in each specific STEM field. ECF No. 25 at 36-38. However, as explained above, the Secretary has adequately defended its basis for acting with regard to the entirety of the STEM fields. The degree classification lists serve only to identify program codes that qualify as STEM fields. The government explained its authority for this interpretive process in its Motion for Summary Judgment, ECF No. 27 at 34-36, and *infra* Section II.D.1.

14    It is also linked to an educational purpose by the requirement that the university certify that the employment is "directly related" to the program of study. 8 C.F.R. § 214.2(f)(1)(ii)(A).

15    *See* STEM-Designated Degree Program List, available at: http:// www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf (last visited Apr. 6, 2015).

16    The Department of Education indicates that CIP codes provide "a taxonomic scheme that supports the accurate tracking and reporting of fields of study and program completions activity." *See* Classification of Instructional Programs (CIP) 2010, found online at: http:// nces.ed.gov/ipeds/cipcode/Default.aspx?y=55 (last visited Apr. 6, 2015).

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT "2"

## U.S. District Court — Judicial Caseload Profile

**DISTRICT OF COLUMBIA**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | Jun 30 2020 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 2,554 | 3,134 | 3,071 | 3,678 | 4,206 | 4,298 | | |
| | Terminations | | 2,620 | 2,636 | 2,841 | 3,056 | 3,678 | 4,005 | | |
| | Pending | | 3,276 | 3,767 | 3,985 | 4,581 | 5,091 | 5,345 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | 68.3 | 37.1 | 40.0 | 16.9 | 2.2 | | 25 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months [2] | | 13.4 | 13.8 | 53.9 | 23.0 | 10.7 | 0.0 | | |
| **Actions per Judgeship** | Filings | Total | 170 | 209 | 205 | 245 | 280 | 287 | 83 | - |
| | | Civil | 146 | 181 | 168 | 209 | 240 | 249 | 69 | - |
| | | Criminal Felony | 15 | 20 | 21 | 28 | 30 | 25 | 90 | - |
| | | Supervised Release Hearings | 9 | 8 | 16 | 8 | 11 | 12 | 82 | - |
| | Pending Cases [2] | | 218 | 251 | 266 | 305 | 339 | 356 | 71 | - |
| | Weighted Filings [2] | | 177 | 227 | 213 | 269 | 279 | 288 | 78 | - |
| | Terminations | | 175 | 176 | 189 | 204 | 245 | 267 | 85 | - |
| | Trials Completed | | 7 | 6 | 7 | 6 | 9 | 7 | 78 | - |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.9 | 17.1 | 11.0 | 12.9 | 9.5 | 12.0 | 66 | - |
| | | Civil [2] | 8.2 | 8.0 | 6.9 | 6.0 | 5.6 | 5.3 | 5 | - |
| | From Filing to Trial [2] (Civil Only) | | 45.1 | 40.2 | 46.0 | 46.1 | 48.7 | 40.0 | 47 | - |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 368 15.1 | 369 12.5 | 393 12.5 | 438 12.3 | 663 16.5 | 672 15.8 | 76 | - |
| | Average Number of Felony Defendants Filed per Case | | 1.3 | 1.4 | 1.3 | 1.4 | 1.2 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 49.1 | 55.1 | 64.8 | 73.4 | 103.3 | 93.7 | | |
| | | Percent Not Selected or Challenged | 42.8 | 47.7 | 52.2 | 54.4 | 60.5 | 53.7 | | |

| 2020 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3,739 | 35 | 219 | 419 | 15 | 26 | 137 | 208 | 207 | 40 | 555 | 109 | 1,769 |
| Criminal [1] | 371 | 5 | 67 | 1 | 85 | 42 | 20 | 27 | - | 5 | 27 | 22 | 70 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**PENNSYLVANIA MIDDLE**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | Jun 30 2020 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 3,126 | 3,319 | 3,001 | 3,306 | 2,939 | 2,816 | | |
| | | Terminations | 3,169 | 2,928 | 2,915 | 3,040 | 3,161 | 2,942 | | |
| | | Pending | 3,310 | 3,696 | 3,771 | 4,041 | 3,818 | 3,689 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -9.9 | -15.2 | -6.2 | -14.8 | -4.2 | | 51 | 4 |
| | | Number of Judgeships | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | | Vacant Judgeship Months [2] | 0.0 | 0.0 | 0.0 | 0.0 | 8.6 | 4.2 | | |
| **Actions per Judgeship** | **Filings** | Total | 521 | 553 | 500 | 551 | 490 | 469 | 47 | 3 |
| | | Civil | 436 | 444 | 402 | 442 | 388 | 390 | 30 | 3 |
| | | Criminal Felony | 70 | 94 | 82 | 91 | 81 | 66 | 54 | 1 |
| | | Supervised Release Hearings | 16 | 16 | 16 | 19 | 22 | 13 | 79 | 1 |
| | | Pending Cases [2] | 552 | 616 | 629 | 674 | 636 | 615 | 22 | 3 |
| | | Weighted Filings [2] | 458 | 496 | 458 | 484 | 432 | 411 | 46 | 3 |
| | | Terminations | 528 | 488 | 486 | 507 | 527 | 490 | 36 | 3 |
| | | Trials Completed | 22 | 21 | 23 | 31 | 22 | 16 | 32 | 4 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 11.9 | 12.5 | 12.7 | 14.6 | 15.1 | 18.0 | 92 | 6 |
| | | Civil [2] | 9.6 | 9.0 | 9.3 | 10.1 | 10.3 | 11.1 | 73 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 33.2 | 28.8 | 36.7 | 34.4 | 36.1 | 36.9 | 40 | 4 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 193 7.4 | 237 8.6 | 250 9.2 | 242 8.3 | 280 10.2 | 284 10.7 | 61 | 3 |
| | | Average Number of Felony Defendants Filed per Case | 1.4 | 1.7 | 1.4 | 1.4 | 1.2 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 34.2 | 47.3 | 63.8 | 47.1 | 46.1 | 51.7 | | |
| | | Percent Not Selected or Challenged | 31.9 | 38.7 | 50.9 | 33.8 | 36.9 | 41.6 | | |

| **2020 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2,341 | 208 | 85 | 893 | 6 | 41 | 86 | 178 | 179 | 20 | 488 | - | 157 |
| Criminal [1] | 395 | - | 172 | 61 | 37 | 49 | 17 | 15 | 6 | 6 | 3 | 10 | 19 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**TEXAS SOUTHERN**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun 30 2015 | Jun 30 2016 | Jun 30 2017 | Jun 30 2018 | Jun 30 2019 | Jun 30 2020 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 14,159 | 15,183 | 14,140 | 14,135 | 16,792 | 18,459 | | |
| | | Terminations | 13,934 | 14,379 | 14,613 | 13,793 | 15,234 | 18,282 | | |
| | | Pending | 12,074 | 12,942 | 12,561 | 12,879 | 14,246 | 14,466 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | 30.4 | 21.6 | 30.5 | 30.6 | 9.9 | | 8 | 1 |
| | | Number of Judgeships | 19 | 19 | 19 | 19 | 19 | 19 | | |
| | | Vacant Judgeship Months [2] | 47.2 | 15.0 | 24.0 | 27.0 | 30.7 | 15.4 | | |
| **Actions per Judgeship** | **Filings** | Total | 745 | 799 | 744 | 744 | 884 | 972 | 6 | 2 |
| | | Civil | 318 | 327 | 320 | 308 | 364 | 356 | 42 | 5 |
| | | Criminal Felony | 340 | 380 | 330 | 344 | 427 | 535 | 3 | 2 |
| | | Supervised Release Hearings | 88 | 92 | 94 | 92 | 93 | 81 | 11 | 2 |
| | Pending Cases [2] | | 635 | 681 | 661 | 678 | 750 | 761 | 14 | 3 |
| | Weighted Filings [2] | | 538 | 577 | 554 | 569 | 657 | 682 | 9 | 2 |
| | Terminations | | 733 | 757 | 769 | 726 | 802 | 962 | 7 | 3 |
| | Trials Completed | | 22 | 28 | 24 | 25 | 23 | 20 | 18 | 3 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 5.1 | 5.1 | 5.1 | 5.0 | 4.6 | 4.0 | 3 | 1 |
| | | Civil [2] | 7.2 | 7.3 | 8.1 | 7.8 | 7.0 | 8.1 | 27 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 21.3 | 23.4 | 21.6 | 20.4 | 22.0 | 24.9 | 15 | 5 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 397 / 7.8 | 389 / 7.2 | 405 / 7.4 | 382 / 7.2 | 373 / 6.5 | 332 / 5.8 | 36 | 5 |
| | Average Number of Felony Defendants Filed per Case | | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 48.5 | 45.8 | 47.2 | 45.5 | 46.2 | 50.7 | | |
| | | Percent Not Selected or Challenged | 40.9 | 37.8 | 37.7 | 38.7 | 39.9 | 36.9 | | |

| **2020 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6,760 | 161 | 171 | 1,404 | 28 | 472 | 472 | 1,396 | 950 | 201 | 631 | 17 | 857 |
| Criminal [1] | 10,166 | 110 | 933 | 8,107 | 304 | 263 | 103 | 82 | - | 41 | 42 | 131 | 50 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

Case No. 20-5281

====================================================

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

--------------------------------------------------------

*D.A.M. et al*,
Petitioners-Appellants,
v.
*WILLIAM P. BARR, et al*,
Respondents-Appellees

====================================================

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:20-cv-1321-CRC
The Honorable Christopher R. Cooper

--------------------------------------------------------

## EMERGENCY MOTION FOR STAY PENDING REVIEW
## OF PETITION FOR REHEARING EN BANC

--------------------------------------------------------

RAPID DEFENSE NETWORK            GREENBERG TRAURIG LLP

Gregory P. Copeland             Steven G. Barringer
Sarah T. Gillman                2101 L. Street, N.W.
Rapid Defense Network           Washington, D.C. 20037
11 Broadway, Suite 615
New York, NY 10004              Caroline J. Heller
                                200 Park Ave.
                                New York, New York 10166


*Attorneys for Petitioners-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................1

FACTUAL BACKGROUND ........................................................2

LEGAL ARGUMENT ................................................................8

    I.    PETITIONERS' ARE LIKELY TO SUCCEED ON THE
        MERITS ............................................................................9

        A.    THE DENIAL OF THE MOTION RAISES AN ISSUE
             OF EXCEPTIONAL IMPORTANCE.......................9
        B.    THE DENIAL OF THE MOTION CONFLICTS WITH
             DECISIONS OF THE UNITED STATES SUPREME
             COURT AND THIS CIRCUIT FAVORING JUDICIAL
             REVIEW ...................................................................10
        C.    THE DENIAL OF THE MOTION CONFLICTS WITH
             DECISIONS OF THIS CIRCUIT THAT VACATUR IS
             RETROACTIVE.......................................................14

    II.    THE PETITIONERS WILL BE IRREPARABLY HARMED
        IF THEY ARE REMOVED ...............................................17

    III.    THE BALANCE OF THE EQUITIES AND PUBLIC
        INTEREST ARE IN FAVOR OF GRANTING THE STAY............18

CONCLUSION ........................................................................19

i

# TABLE OF AUTHORITIES

**Cases**

*A.B.-B. v. Morgan*,
   20-CV-846 (RJL), 2020 WL 51075 48 (D.D.C. Aug. 31, 2020) .................9, 17

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993).......................................................................5, 15

*Am. Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020)........................................................................5, 14

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp.*
   Fin., Inc., 502 U.S. 32 (1991) .............................................................................11

*Bounds v. Smith*,
   430 U.S. 817 (1977)..............................................................................................10

*Capital Area Immigrants' Rights Coalition v. Trump*,
   Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481
   (D.D.C. June 30, 2020).......................................................................................5, 16

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)................................................................................................10

*D.A.M. v. Barr*,
   20-CV-1321 (CRC), 2020 WL 5525056 (D.D.C. Sept. 15, 2020)....1, 6, 7, 9, 17,
   18

*DHS v. Thuraissigiam*,
   140 S. Ct. 1959 (2020)........................................................................................17

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) .........................................................................13

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*,
   950 F.3d 177 (3d Cir. 2020) .............................................................................13

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013)..........................................................................19

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020).................................................................................11, 13

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009).........................................................................5, 14

App.088

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)............................................................4

*Jennings v. Rodriguez*,
  138 S.Ct. 830 (2018)..............................................11, 12, 13

*Klayman v. Obama*,
  142 F. Supp. 3d 172 (D.D.C. 2015)..................................19

*Make the Rd. N.Y. v. Wolf*,
  962 F.3d 612 (D.C.Cir. 2020).....................................11, 13

*Martinez v. Napolitano*,
  704 F.3d 620 (9th Cir. 2012) ...........................................13

*McNary v. Haitian Refugee Ctr., Inc.*,
  498 U.S. 479 (1991).....................................................11, 13

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002).......................................5, 14

*Nat'l Fed'n of Fed. Emps. v. Carlucci*,
  680 F. Supp. 416 (D.D.C. 1988).......................................19

*Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*,
  59 F.3d 1281 (D.C. Cir. 1995)........................................5, 14

*Nken v. Holder*,
  556 U.S. 418 (2009).............................................................8

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002).........................................5, 14

*Washington All. of Tech. Workers v. United States Dep't of Homeland
  Sec.*,
  650 Fed. Appx. 13 (D.C. Cir. 2016) .............................5, 15

*Washington All. of Technology Workers v. United States Dep't of
  Homeland Sec.*,
  2015 WL 3751276 (D.D.C.) (April 6, 2015)..................5, 15

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours,
  Inc.*,
  559 F.2d 841 (D.C. Cir. 1977)..............................................8

**Statutes**

8 U.S.C. § 1225(b)(1)...........................................................16, 17

iii

8 U.S.C. § 1225(b)(1)(A)(ii) ...........................................................4

8 U.S.C. § 1225(b)(1)(B) ...............................................................4

8 U.S.C. § 1225(b)(1)(B)(ii) ..........................................................4

8 U.S.C. §1225(b)(1)(B)(v) ...........................................................4

8 U.S.C. § 1252(a)(2)(A)(i) ...............................................7, 11, 12

8 U.S.C. § 1252(b)(9)....................................................................12

## Other Authorities

8 C.F.R. § 208.30 ..........................................................................4

8 C.F.R. § 208.30(e)(5)(iii) ............................................................3

8 C.F.R. § 208.30(f) ......................................................................4

8 C.F.R. § 208.31(c) ......................................................................3

8 C.F.R. § 235.3(b)(4) ...................................................................4

84 Fed. Reg. 33,829 ......................................................................3

84 Fed. Reg. 33,834 ......................................................................3

84 Fed. Reg. 33,835 ......................................................................3

Fed. R. App. P. 8 ...........................................................................1

Fed. R. App. P. 35 .........................................................................8

Fed. R. App. P. 35(b)(1)(B) ..........................................................9

iv

## **INTRODUCTION**

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure and Circuit Rule 18, Petitioners D.A.M. *et al.* ("Petitioners") move for an order issuing an administrative stay of removal of Petitioners from the United States pending further order of this Court. *See* D.C. Circuit Handbook of Practice and Internal Procedures 32 (2018). Petitioners are parents and their children who have fled persecution in their home countries to seek asylum in the United States. They have final orders of removal and, thus, are at risk of immediate removal absent an order from this Court staying removal. If Petitioners are removed, they will suffer irreparable harm because they "will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S. Effectively, permanent removal from the U.S. to countries from which Petitioners fled from to seek safety in the United States would constitute irreparable injury." *D.A.M. v. Barr*, 20-CV-1321 (CRC), 2020 WL 5525056, at *14 (D.D.C. Sept. 15, 2020) (Exh. A).

In the underlying case, Petitioners allege that Respondents have denied them access to a Congressionally sanctioned asylum process in violation of their constitutional right to due process and sought a stay of removal from the District Court while they litigated their claims ("TRO"). The District Court denied Petitioners' TRO. (Exh. A). Petitioners appealed from that order and filed an Emergency Motion for a Stay of Removal pending their appeal ("Motion"). A panel

App.091

of this Court (Circuit Judges Henderson, Tatel, and Katsas) granted an administrative stay to consider the Motion.  After briefing, in a September 30, 2020 per curiam order, the panel dissolved the administrative stay and denied the Motion because "Appellants have not satisfied the stringent requirements for a stay pending appeal."  (Exh. C).

On October 1, 2020, Petitioners filed a Petition for Rehearing En Banc of Petitioners' Motion ("En Banc Petition").  The En Banc Petition raises an issue of exceptional importance and is necessary to secure consistency of decisions of the Supreme Court and this Circuit.  This Court should grant the stay of removal to allow time for this Circuit to consider the En Banc Petition.  Without a stay of removal, Petitioners will lose the right to litigate their claims.  For Petitioners, this is a life-and-death issue and a stay of removal is just and equitable.

## FACTUAL BACKGROUND

Petitioners are families who came to the United States seeking asylum after facing persecution in their home countries.  (Exh. B, ¶¶ 36-121).[1]  Petitioners are detained or have been released but remain "in custody" for habeas corpus purposes. (*Id.*, ¶¶ 36-121).

---

[1] Most of the Petitioners are Plaintiffs-Appellants in *M.M.V., et al v. Barr, et al*, Case Nos. 20-5106, 20-5129.  Oral argument was held on September 11, 2020 before Chief Judge Srinivasan, Circuit Judge Katsas, and Senior Circuit Judge Ginsburg.

2

On July 16, 2019, an interim final rule entitled "Asylum Eligibility and Procedural Modifications," (July 16, 2019) (the "Rule"), was issued. 84 Fed. Reg. 33,829. It rendered noncitizens seeking to enter the United States at its southern border ineligible for asylum unless they first applied for and were denied similar protection in a third country they transited through, or unless they are victims of severe forms of trafficking or did not pass through any country that is a signatory to the Refugee Convention or Refugee Protocol in route to the United States. *See* 84 Fed. Reg. at 33,835. Migrants who transited through a third country without applying for asylum were automatically and conclusively determined not to have a "credible fear" of persecution and were barred from the asylum process. *See* 8 C.F.R. § 208.30(e)(5)(iii). Instead, the more stringent "reasonable fear" standard was applied. Under that higher standard, the noncitizen must show that more likely than not, she would be persecuted or tortured in the future because of a protected ground. *See* 84 Fed. Reg. at 33,834. Reasonable fear is a significantly higher standard than credible fear. 8 C.F.R. § 208.31(c). All but 13 of the Petitioners were subjected to the Rule and found not to have reasonable fear.[2]

---

[2] "Petitioners" refers to those who were subjected to the Rule. The only Petitioners who were not subjected to the Rule are: A.G.P., her children D.S.G. and A.S.G.; C.R.R. her children I.G.R. and V.G.R.; E.V.M; I.M.V., her children J.T.M. and D.T.M; N.V.; C.L., and her child J.A. (*See* Exh. B, Verified Amended Petition for Writ of Habeas Corpus ❡ 159). Two of the Petitioners who were not subjected to the Rule (E.V.M. and N.V.) are the mothers of children who were subjected to it: A.V.M. and Z.F. (*See id.*, ❡❡ 83, 102, 159.) Petitioners E.V.M. and N.V. should be

3

Before the Rule was issued, a noncitizen subject to expedited removal who indicates a fear of returning to his or her home country or intention to apply for asylum is referred for an interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. The asylum officer conducts a "credible fear interview," credible fear being defined by law as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]" 8 U.S.C. §1225(b)(1)(B)(v). To ultimately prevail on an asylum claim itself, the applicant need only establish that there is a 10% chance that he or she will be persecuted because of one of the five protected grounds for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430–32, 439–40 (1987); *see* 8 U.S.C. §1225(b)(1)(B)(v). If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge, with an opportunity to develop a full record before the judge, and the right to appeal an adverse decision to the relevant federal court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

---

included in the scope of any stay because they are the parents of children entitled to pursue their claims and have a liberty interest in family unity.

On June 30, 2020, a District Court of the District of Columbia vacated the
Rule, finding that it violated the Administrative Procedures Act. *Capital Area
Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK),
2020 WL 3542481, at *1, * 22 (D.D.C. June 30, 2020) ("*CAIR*"). In doing so, the
*CAIR* court rejected the government's argument that the Court should limit any relief
flowing from the vacatur to the actual parties before the Court. 2020 WL 3542481,
at *22. Thus, the *CAIR* relief is not limited to the parties. *Id.* Under well-settled
administrative law principles, vacatur voids the Rule and restores the *status quo ante*
for Petitioners, who were affected by the rule. Thus, Petitioners are entitled to access
the lawful asylum process created by Congress that existed prior to the Rule before
their removal. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C.
Cir. 2020); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir.
2009); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir.
2002); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002); *Nat'l Fuel
Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*, 59 F.3d 1281, 1289 (D.C.
Cir. 1995); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146,
151 (D.C. Cir. 1993); *see also Washington All. of Technology Workers*, 156 F. Supp.
3d 123, 128-29 (D.D.C. 2015), judgment vacated, appeal dismissed sub nom. on
other grounds *Washington All. of Tech. Workers v. United States Dep't of Homeland*

5

*Sec.*, 650 Fed. Appx. 13 (D.C. Cir. 2016) (agreeing with government's position that vacatur would retroactively affect student visas).

The government appealed from that order to this Court, Case No. 20-5271, 20-5273, but there is no stay.

Respondents refuse to comply with the *CAIR* order and provide Petitioners access to the asylum process. Thus, Petitioners filed a Verified Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on July 9, 2020, alleging that Respondents' failure to provide them access to Congressionally sanctioned asylum process violates their due process rights ("Due Process Claims"). (Exh. B ¶¶ 299-305). Petitioners then filed the TRO, asking the District Court to stay removal of the Petitioners' pending adjudication of their Due Process Claims, and the court granted an administrative stay pending disposition of the TRO. In a Memorandum Opinion and Order ("Order") entered September 15, 2020, the District Court denied the TRO. (Exh. A).

The District Court held that the Petitioners demonstrated "a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S. Effectively, permanent removal from the U.S. to countries from which Petitioners fled from to seek safety in the United States would constitute irreparable injury." *D.A.M.*, 2020

6

WL 5525056, at *14.  The District Court also held that the balance of the equities and public interest did not favor either party, but that 8 U.S.C. § 1252(a)(2)(A)(i) likely stripped it of jurisdiction over Petitioners' claims, thus Petitioners were not likely to succeed on the merits.  *Id.*, at *9-*14.

The District Court erred because it misconstrued Petitioners' Due Process Claims as direct challenges to their final orders of removal.  Petitioners do not challenge or seek to relitigate their final orders issued pursuant to the unlawful Rule. They seek the right to pursue a lawful process that was denied to them, and challenge Respondents' legal authority to deport them without providing them access to that process.  (Exh. B ¶¶ 299-305).

Petitioners appealed from the Order on September 15, 2020 and, on September 17, 2020, filed an emergency motion to stay their removal pending further order of this Court, to provide enough opportunity to consider this emergency motion for a stay through their appeal (the "Motion").  (*D.A.M. v. Barr*, Case No. 20-5281, Document #1862061).  In a per curiam order dated September 17, 2020, a panel of this Court (Circuit Judges Henderson, Tatel, and Katsas) ordered that Petitioners' removal from the United States be administratively stayed pending further order of the Court to permit it time to consider the emergency motion for stay pending appeal.  (*D.A.M. v. Barr*, Case No. 20-5281, Document #1862170).

After briefing on the Motion, in a per curiam order dated September 30, 2020, the panel dissolved the administrative stay and denied the Motion, stating that "Appellants have not satisfied the stringent requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2019)." (Exh. C.) On October 1, 2020, Petitioners filed a Petition for Rehearing En Banc of the Motion ("En Banc Petition").

## **LEGAL ARGUMENT**

The motion for stay or for emergency relief must specifically discuss four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841 (D.C. Cir. 1977). Pursuant to Rule 35 of the Federal Rules of Appellate Procedure, a rehearing en banc will not be ordered unless: "(1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance." Petitioners' are likely to prevail on their En Banc Petition and will be irreparably injured absent a stay that provides this Court time consider the merits of the En Banc Petition.

8

## I.   PETITIONERS' ARE LIKELY TO SUCCEED ON THE MERITS

### A. THE DENIAL OF THE MOTION RAISES AN ISSUE OF EXCEPTIONAL IMPORTANCE

The denial of the Motion raises an issue of exceptional importance as contemplated by Fed. R. App. P. 35(b)(1)(B): whether the Court should maintain the status quo and grant a stay, allowing Petitioners to remain in the United States, when to deny a stay prior to a determination of the merits of Petitioners' appeal would render any victory Petitioners' might achieve completely meaningless.

The District Court held that Petitioners demonstrated "a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S.  Effectively, permanent removal from the U.S. to countries from which Petitioners fled from to seek safety in the United States would constitute irreparable injury."  *D.A.M.*, 2020 WL 5525056, at *14; *see also A.B.-B. v. Morgan*, 20-CV-846 (RJL), 2020 WL 5107548, at *8 (D.D.C. Aug. 31, 2020) ("In the absence of preliminary injunctive relief, plaintiffs would be subject to immediate removal from the United States to countries where they face significant risk of physical harm…. To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint.")

9

Respondents have never denied that if Petitioners are ultimately successful on their appeal or in the underlying case, they will not guarantee their safe return. Essentially, denial of the Motion is a decision on the merits of Petitioners case before they have had an opportunity to be heard. Fundamental principles of fair play and equity require that the rights of one side are not eviscerated pending disposition of their claims.

This Court has the inherent authority to grant a stay. Federal courts have inherent power to issue orders necessary to their jurisdiction over a pending case. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); see id. at 58 (Scalia, J., dissenting) ("Some elements of that inherent authority are so essential to the [Article III] judicial Power, that they are indefeasible, among which is a court's ability to enter orders protecting the integrity of its proceedings."); *Bounds v. Smith*, 430 U.S. 817, 824 (1977) (federal courts have inherent authority to protect litigants' access to the courts). This Court's issuance of a stay guarantees this Court's jurisdiction and Petitioners' access to the courts to vindicate rights denied to them.

## B. THE DENIAL OF THE MOTION CONFLICTS WITH DECISIONS OF THE UNITED STATES SUPREME COURT AND THIS CIRCUIT FAVORING JUDICIAL REVIEW

The panel's denial of the Motion because "Appellants have not satisfied the stringent requirements for a stay pending appeal" (Exh. C) indicates the panel did not consider Petitioners to have demonstrated a likelihood of success on the merits

of their appeal, including Petitioners' assertion that the District Court erred in concluding that 8 U.S.C. § 1252(a)(2)(A)(i) strips the courts of jurisdiction to review their claims.  (Exh. A).

Such a determination conflicts with the United States Supreme Court's decision in *Jennings v. Rodriguez*, 138 S.Ct. 830, 840 (2018) that the "arising from" and "relating to" language in the Immigration and Nationality Act should not be given an "expansive interpretation…. [that] would lead to staggering results."  *Id.*, 138 S.Ct. at 840.  It also conflicts with decisions of the United States Supreme Court and this Circuit that hold there is a presumption of judicial review, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 498 (1991); *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C.Cir. 2020), that can only be overcome by pointing to "clear and convincing evidence" of a contrary legislative intent.  *Bd. of Governors of the Fed. Reserve Sys. v. MCorp*. Fin., Inc., 502 U.S. 32, 44 (1991).

Section 1252(a)(2)(A)(i) precludes judicial review, "except as provided in subsection (e), [of] any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title."  Petitioners do not challenge the facts or merits of their removal orders or the executive's discretionary decision to implement or execute final orders of removal.  Rather, Petitioners challenge

11

Respondents "conduct" in pursuing removal despite the vacatur of the Rule and prior to the exhaustion of their right to any form of constitutionally adequate process. (Exh. B, ¶¶ 299-305). Thus, under the plain language of the statute, the Due Process Claims do not fall under the ambit of section 1252(a)(2)(A)(i).

The District Court held to the contrary, giving the "arising from" and "relating to" language in section 1252(a)(2)(A)(i) the "expansive interpretation" *Jennings* rejected because such expansive interpretation "would lead to staggering results" similar to the severe and irreversible infringement of constitutional rights Petitioners allege here. 138 S.Ct. 830 (2018). The District Court's conclusion is in direct contradiction to *Jennings*. Indeed, the District Court's reading of section 1252(a)(2)(A)(i) forecloses judicial review of "claims of prolonged detention" if that detention was part of the implementation or operation of a removal order, a result rejected by *Jennings* in the context of an analogous provision of the INA. *Id*. at 840.

The Third Circuit's recent rejection of an expansive interpretation of the "arising under" language, following *Jennings*, in section 1252(b)(9) further illustrates this point:

> We distill a simple principle from *Jennings*… and the presumptions favoring judicial review. That principle informs how we read the phrase "arising under." We must ask: If not now, when? If the answer would otherwise be never, then § 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal. [T]he point of the provision is to channel claims into a single petition for review, not to bar claims that do not fit within that process.

12

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*, 950 F.3d 177, 185–86 (3d Cir. 2020).[3]

Indeed: if not now, when?  The answer here is never.  Petitioners could not have brought their claims alongside review of their removal orders and review of Petitioners' claims are not channeled in the INA.  Consequently, cramming judicial review of Petitioners' claims into a statutory scheme in which they could not have made those claims "would be absurd," *Jennings*, 138 S. Ct. at 840, and thus the panel's denial of the Motion undercuts Supreme Court precedent in *Jennings*.

The panel's denial of the Motion also undercuts precedent in the Supreme Court and this Circuit favoring judicial review absent clear and convincing evidence.  Here, there is no clear and convincing evidence that Congress intended to strip the courts of jurisdiction to review Petitioners' Due Process Claims.  To the contrary, because they could not have brought their claims alongside any other claims in the INA, the presumption of judicial review required a finding that the courts have the authority to review Petitioners' claims, and to determine otherwise contradicts the precedent in the Supreme Court and this Circuit.  *See Guerrero-Lasprilla*, 140 S. Ct. at 1069; *McNary*, 498 U.S. at 496, 498 (1991); *Make the Rd. N.Y.*, 962 F.3d at 623.

---

[3] *E. Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242, 1269 (9th Cir. 2020) (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)) ("The purpose of these claim-channeling provisions is to 'limit all aliens to one bite of the apple with regard to challenging an order of removal.'")

13

## C. THE DENIAL OF THE MOTION CONFLICTS WITH DECISIONS OF THIS CIRCUIT THAT VACATUR IS RETROACTIVE

The panel's denial of the Motion because "Appellants have not satisfied the stringent requirements for a stay pending appeal," (Exh. C,) indicates that it did not consider Petitioners to have demonstrated a likelihood of success on the merits of their appeal, including Petitioners' assertion that the District Court erred in concluding that vacatur is not retroactive. (Exh. A). This conflicts with well-settled law in this Circuit that vacatur of a rule is retroactive. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("vacatur would mean that 'every payment that was made in the 2016 [commercial shipping] season was erroneous,' and may involve the Coast Guard and the Shippers attempting to recoup and redistribute funds that changed hands years ago….") (internal citation omitted); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (holding vacatur of a rule that hospitals were not eligible for reimbursement would have required the government to make repayments to those hospitals); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (declining to vacate a rule where "there is no apparent way to restore the status quo ante" and requiring retroactive allocation damages was "an invitation to chaos."); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (declining vacatur because there was no way to restore the "status quo ante"); *Nat'l Fuel Gas Supply Corp. v.*

14

*Fed. Energy Regulatory Comm'n*, 59 F.3d 1281, 1289 (D.C. Cir. 1995) ("The agency must give retroactive effect to the ruling of a federal court because of the nature of that court."); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) (holding remand without vacatur of a rule imposing fees was appropriate because "the Commission would need to refund all… fees collected… [and] would be unable to recover those fees under a later-enacted rule.")

Even the government has previously acknowledged the retroactive effects of vacatur.  In an action challenging an interim final rule extending the duration of optional practical training for eligible STEM foreign students, which allowed nonimmigrant foreign nationals on an F–1 student visa to engage in employment during and after school, the government argued that the court should hold any vacatur in abeyance because vacatur would result in "workers and their family members scrambl[ing] to depart the United States in an effort to avoid any possible immigration consequences…." *Washington All. of Technology Workers v. United States Dep't of Homeland Sec.*, 2015 WL 3751276 (D.D.C.) (April 6, 2015).  The District Court agreed, stating there was no "way of immediately restoring the pre–2008 status quo without causing substantial hardship for foreign students…." *Washington All. of Technology Workers*, 156 F. Supp. 3d 123, 128-29 (D.D.C. 2015), judgment vacated, appeal dismissed sub nom. on other grounds *Washington*

15

*All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 650 Fed. Appx. 13 (D.C. Cir. 2016).

*CAIR* ordered vacatur, in part, because the government did not present "evidence" to the court that vacatur would burden the government. Quoting a phrase used by other courts to describe the retroactive effect of vacatur, *CAIR* stated, "Defendants have presented no evidence suggesting that '[t]he egg has been scrambled' so that 'there is no apparent way to restore the status quo ante.'" 2020 WL 3542481, at *22 (quoting *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)). In other words, the government presented no evidence that it would be burdened if prior final orders of removal predicated upon the Rule were deemed unlawful. It makes sense that, absent evidence to the contrary, *CAIR* would presume that the majority of immigrants subjected to the Rule had likely been deported, thus it would be no burden on the government to provide any immigrants remaining in the United States, who had been subjected to the Rule, with the process to which they would have been entitled under section 1225(b)(1). The *CAIR* Court vacated the Rule understanding that the result of vacatur is retroactive effect for parties and non-parties affected by the Rule.

There is no stay of the *CAIR* decision. Vacatur of the Rule, without limitation or qualification, places Petitioners in the position they would have been in but for the Rule, i.e., entitled to process under section 1225(b)(1). Accordingly, Petitioners'

16

Due Process Claims are meritorious as they have "rights regarding admission that Congress has provided by statute", *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1983 (2020), in this case, section 1225(b)(1).  Congress provided Petitioners the right to access that process, and Respondents' refusal to provide that to Petitioners violates the Due Process Clause.

The contrary implication of the panel's denial of the Motion undercuts the well-settled law of this Circuit.

## II.   THE PETITIONERS WILL BE IRREPARABLY HARMED IF THEY ARE REMOVED

The District Court concluded that the Petitioners demonstrated "a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S.  Effectively, permanent removal from the U.S. to countries from which Petitioners fled to seek safety in the United States would constitute irreparable injury."  *D.A.M.*, 2020 WL 5525056, at *14; *see also A.B.-B. v. Morgan*, 20-CV-846 (RJL), 2020 WL 51075 48, at *8 (D.D.C. Aug. 31, 2020) ("In the absence of preliminary injunctive relief, plaintiffs would be subject to immediate removal from the United States to countries where they face significant risk of physical harm…. To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint.)

17

Indeed, if Petitioners are deported but ultimately succeed on their En Banc Petition, on their appeal, and in the underlying case, Respondents have no obligation to facilitate their return to the United States for process under section 1225. And it is far from certain that Petitioners will be able to return to the United States on their own. The Petitioners are families, some with infant children, from 11 countries, who endured harrowing journeys to get to the United States the first time. Indeed, they are the lucky ones who survived these perilous journeys. They cannot be expected to succeed again. Further, recent pandemic-related administrative action appears to have effectively closed the southern border indefinitely to noncitizens seeking asylum. Thus, even if the Petitioners make it back to the Mexico/United States border alive, it is likely that they would be denied entrance and deported immediately until the pandemic ceases. That Petitioners likely will not be able to benefit from any remedy this Court may grant at the end of this litigation is by definition irreparable.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST ARE IN FAVOR OF GRANTING THE STAY

The District Court held that "[t]here are equities and public interests to balance on both sides." *D.A.M.*, 2020 WL 5525056, at *14. Petitioners respectfully assert that the balance of harms tips in their favor. Respondents have never denied that if the Petitioners establish a likelihood that deportation without lawful process violates the U.S. Constitution, they necessarily establish that the public interest would be

18

served by injunctive relief. *Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015). This is because allowing unchecked, unconstitutional conduct is always contrary to the public interest. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416, 435 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches.").

## **CONCLUSION**

Petitioners are families who fled persecution, risking their lives to travel to the United States to seek asylum. But Respondents subjected them to an unlawful process based on the Rule, eviscerating this right. Now that a District Court has vacated the Rule, Petitioners are entitled to access the lawful process established by Congress. For more than one year, as they have litigated their claims, most Petitioners have willingly remained detained under life-threatening conditions during a global pandemic because asylum is a life-or-death matter to them. They now stand on the precipice of removal, before adjudication of their right to access the asylum system established by Congress. If this Court does not grant this Motion, and Petitioners' En Banc Petition is granted, and they succeed in obtaining a stay and win the appeal, it will be a meaningless victory as they will be unable to return to the United States. This is a matter of great importance. Petitioners simply ask this Circuit to rehear their request to temporarily preserve their ability fairly litigate their claims by staying their removal.

For all the reasons set forth herein, Petitioners respectfully request that this Court issue an order issuing an administrative stay of removal of Petitioners from the United States pending further order of this Court.

Dated:   Washington, D.C.                    Respectfully Submitted,
         October 1, 2020

                                             GREENBERG TRAURIG, LLP
                                             /s/ Caroline J. Heller
                                             By: Caroline J. Heller
                                             200 Park Ave.
                                             New York, New York 10166
                                             Tel: (212) 801-2165
                                             hellerc@gtlaw.com

                                             Steven G. Barringer
                                             2101 L. Street, N.W.
                                             Washington, D.C. 20037
                                             Tel: (202) 331-3108
                                             barringers@gtlaw.com

                                             -and-

                                             RAPID DEFENSE NETWORK
                                             Gregory P. Copeland
                                             Sarah T. Gillman
                                             Rapid Defense Network
                                             11 Broadway, Suite 615
                                             New York, NY 10004
                                             Tel: (212) 843-0910
                                             gregory@defensenetwork.org
                                             sarah@defensenetwork.org
                                             *Counsel for Petitioners-Appellants*

### Certificate of Compliance with Type-Volume Limit,
### Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. Rule 27(d) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,736 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:    October 1, 2020                    */s/ Caroline J. Heller*
                                             *Attorney for Petitioners-Appellants*

21

## <u>CERTIFICATE OF SERVICE</u>

I, Caroline J. Heller, hereby certify that on October 1, 2020, I electronically filed the foregoing with the Clerk using the Court's electronic filing system.  As all participants in the case are registered with the Court's electronic filing system, electronic filing constitutes service on the participants.  *See* Fed. R. App. P. 25(c)(2)(A); Cir. R. 25(f).

I further certify that all parties required to be served have been served

Dated:    October 1, 2020                    */s/ Caroline J. Heller*
                                             *Attorney for Petitioners-Appellants*

---
## Case No. 20-5281
---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

D.A.M. et al,

*Petitioners-Appellants*,

v.

WILLIAM P. BARR, et al**,**

*Respondents-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:20-cv-1321-CRC
The Honorable Christopher R. Cooper

---

## PETITION FOR REHEARING EN BANC OF
## PETITIONERS' MOTION FOR STAY PENDING APPEAL

---

RAPID DEFENSE NETWORK

Gregory P. Copeland
Sarah T. Gillman
Rapid Defense Network
11 Broadway, Suite 615
New York, NY 10004

GREENBERG TRAURIG LLP

Steven G. Barringer
2101 L. Street, N.W.
Washington, D.C. 20037

Caroline J. Heller
200 Park Ave.
New York, New York 10166


*Attorneys for Petitioners-Appellants*

## TABLE OF CONTENTS

INTRODUCTION AND RULE 35(B)(1) STATEMENT ........................................1

BACKGROUND ....................................................................................................5

REASONS FOR GRANTING REHEARING ...........................................................8

CONCLUSION .....................................................................................................14

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*,
    20-CV-846 (RJL), 2020 WL 51075 48 (D.D.C. Aug. 31, 2020) ........................9

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..................................................................6

*\*Am. Great Lakes Ports Ass'n v. Schultz*,
    962 F.3d 510 (D.C. Cir. 2020) ..................................................................6

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp.*
    Fin., Inc., 502 U.S. 32, 44 (1991) ...................................................4, 11

*Bounds v. Smith*,
    430 U.S. 817 (1977) ..................................................................................10

*\*Capital Area Immigrants' Rights Coalition v. Trump*,
    Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481
    (D.D.C. June 30, 2020) .................................................................2, 6, 13

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ....................................................................................10

*D.A.M. v. Barr*,
    20-CV-1321 (CRC), 2020 WL 5525056 (D.D.C. Sept. 15, 2020).......2, 5, 7, 8, 9

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020) .............................................................................14

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec.*,
    950 F.3d 177 (3d Cir. 2020) ...................................................................12

*\*Guerrero-Lasprilla v. Barr*,
    140 S. Ct. 1062 (2020) .................................................................4, 11, 13

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ..................................................................6

*\*Jennings v. Rodriguez*,
    138 S.Ct. 830 (2018) ..........................................................4, 10, 11, 12

*\*Make the Rd. N.Y. v. Wolf*,
    962 F.3d 612 (D.C.Cir. 2020) ...................................................4, 11, 13

*McNary v. Haitian Refugee Ctr., Inc.,*
   498 U.S. 479 (1991)...................................................................4, 11, 13

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002)...............................................................6

*Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n,*
   59 F.3d 1281 (D.C. Cir. 1995)...............................................................6

*Nken v. Holder,*
   556 U.S. 418 (2009).............................................................................3

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002).................................................................6

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.,*
   650 Fed. Appx. 13 (D.C. Cir. 2016).......................................................6

*Washington All. of Technology Workers,* 156 F. Supp. 3d 123, 128-29
   (D.D.C. 2015) .......................................................................................6

## Statutes

8 U.S.C. § 1225(b) ...............................................................................1, 6

8 U.S.C. § 1225(b)(1)....................................................................2, 7, 11, 14

8 U.S.C. § 1252(a)(2)(A)(i) ......................................................2, 7, 10, 11, 12

## Other Authorities

84 Fed. Reg. 33, 829 .................................................................................1

Fed. R. App. P. 35(a) ................................................................................3

Fed. R. App. P. 35(b) ................................................................................3

Fed. R. App. P. 35(b)(1)(A)................................................................4, 5, 10, 14

Fed. R. App. P. 35(b)(1)(B) .................................................................3, 8

iii

App.116

## INTRODUCTION AND RULE 35(B)(1) STATEMENT

Petitioners are parents and their children who fled persecution in their home countries, risking their lives to travel to the United States to seek asylum under the laws of this country. A denial of a stay of removal in this case will result in a termination of Petitioners' right to litigate their claims. For Petitioners, this is a life-and-death issue and a stay of removal is just and equitable.

A panel of this Court (Circuit Judges Henderson, Tatel, and Katsas) erred in denying Petitioners' Emergency Motion for a Stay of Removal pending their appeal from a District Court order that denied their motion for a temporary restraining order seeking a stay of removal ("Motion"). *See* Addendum at 1a. In the underlying case, Petitioners allege that Respondents have denied them access to a Congressionally sanctioned asylum process in violation of their constitutional right to due process and sought a stay of removal from the District Court while they litigated their claims.

When Petitioners arrived in the United States, they were denied access to the asylum process created by Congress under 8 U.S.C. § 1225(b). The process created by Congress merely requires that Petitioners demonstrate a "credible fear" of return to their home countries in order to pursue asylum. Instead, Respondents subjected them to an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule"), which required Petitioners to establish the higher standard of "reasonable fear" of return. Under the

1

Rule, Petitioners were all found not to have a "reasonable fear" and, as a result, were issued final orders of removal. On June 30, 2020, a District Court for the District of Columbia vacated that Rule without limitation or qualification. *Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481, at *1, * 22 (D.D.C. June 30, 2020) ("*CAIR*"). There is no stay of that decision.

Under well-settled law in this Circuit, vacatur of the Rule places Petitioners in the position they would have been in but for the Rule, i.e., entitled to process under section 1225(b)(1). Respondents refuse to provide Petitioners access to that process. In the underlying case, Petitioners allege that Respondents' failure to provide them access to Congressionally sanctioned asylum process violates their due process rights. Petitioners moved for a temporary restraining order, requesting that the District Court stay their removal pending adjudication of their Due Process Claims but the District Court denied it, finding that although Petitioners likely would suffer irreparable harm in the absence of the stay, and the balance of the equities and public interest did not favor either party, 8 U.S.C. § 1252(a)(2)(A)(i) likely stripped it of jurisdiction over Petitioners' claims, vacatur of the Rule was not retroactive, and thus Petitioners were not likely to succeed on the merits. *D.A.M. v. Barr*, 20-CV-1321 (CRC), 2020 WL 5525056, at *9-*14 (D.D.C. Sept. 15, 2020).

Petitioners appealed from that order and filed the Motion. After the panel granted an administrative stay to consider the Motion, in a September 30, 2020 per curiam order, the panel dissolved the administrative stay and ordered that the Motion should be denied because "Appellants have not satisfied the stringent requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2019)." *See* Addendum at 1a.

Rule 35(a) of the Federal Rules of Appellate Procedure provides that "a majority of the circuit judges who are in regular active service and who are not disqualified may order that an … other proceeding be … reheard by the court of appeals en banc." Fed. R. App. P. 35(a). The panel's denial of the Motion is an "other proceeding." This Petition satisfies the requirements of Rule 35(b).

*First,* denial of the Motion raises an issue of exceptional importance. Fed. R. App. P. 35(b)(1)(B). When there is no dispute that the denial of a stay of removal of immigrants from the United States will essentially terminate their rights to litigate claims that they are entitled to access the asylum process in the United States, is it just and equitable for a court to upend the status quo and deny that stay? The answer is no, and the court should rehear denial of the Motion en banc to address this life-and-death issue for Petitioners.

3

App.119

*Second*, denial of the Motion, which implies the panel did not consider the court to have jurisdiction over the claims, conflicts with Supreme Court precedent that the "arising from" and "relating to" language in the Immigration and Nationality Act should not be given an "expansive interpretation…. [that] would lead to staggering results." *Jennings v. Rodriguez*, 138 S.Ct. 830, 840 (2018). It also conflicts with decisions of the Supreme Court and this Circuit that there is a presumption of judicial review, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020); *McNary v. Haitian Refugee Ctr., Inc*., 498 U.S. 479, 496, 498 (1991); *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C.Cir. 2020), that can only be overcome by pointing to "clear and convincing evidence" of a contrary legislative intent. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp*. Fin., Inc., 502 U.S. 32, 44 (1991). Consideration by the full court is therefore necessary to secure and maintain consistency with Supreme Court precedent and this Circuit's decisions. Fed. R. App. P. 35(b)(1)(A).

*Third*, denial of the Motion, which implies the panel did not find that vacatur of the Rule is retroactive, conflicts with well-settled law in this Circuit. Under this Circuit's precedent, vacatur of a rule is retroactive and returns parties and non-parties affected by the rule to the *status quo ante*. The panel's denial, which suggests the contrary, would permit the executive branch to issue rules, no matter how egregious or contrary to law or that violated rights, with no obligation to remedy the

situation after vacatur.  There must be consequences when the executive branch fails to follow the law.  Such consequences are necessary to preserve this country's system of checks and balances established in the Constitution and regarded by the Framers as a self-executing safeguard against the accumulation of power in any one branch.  Consideration by the full court is therefore necessary to secure and maintain uniformity of this Circuit's decisions that vacatur of a rule is retroactive.  Fed. R. App. P. 35(b)(1)(A).

## BACKGROUND

1.    Petitioners are parents and their children who have fled persecution in their home countries to seek asylum in the United States.  They have final orders of removal and, thus, are at risk of immediate removal absent a Court order staying removal.  If Petitioners are removed at this early stage of their litigation, before this Court hears their appeal from the District Court's denial of a temporary restraining order seeking a stay of removal and prior to the disposition of their underlying case on the merits,  they will suffer irreparable harm because they "will be unable to return [to the United States], regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S."  *D.A.M. v. Barr*, 20-CV-1321 (CRC), 2020 WL 5525056, at *14 (D.D.C. Sept. 15, 2020).

2.    Upon arrival to the United States, all but 13 of the Petitioners were subjected to the Rule.  The Rule prevented Petitioners from accessing the process

created by Congress to seek asylum under 8 U.S.C. § 1225(b), and under which they merely had to demonstrate a "credible fear" of return to their home countries to pursue asylum.  The Rule frustrated this process by rendering Petitioners ineligible for credible fear determinations because they passed through other countries before arriving in the United States.  Instead, the Rule forced Petitioners to establish the higher "reasonable fear" of return, which Petitioners were all found not to have, and were issued final orders of removal as a result.

3.      In a Decision dated June 30, 2020, the District Court for the District of Columbia vacated the Rule without any conditions or limitation.  *CAIR*, 2020 WL 3542481, at *1, * 22.  Respondents have appealed, but there is no stay.[1]

4.      Based upon well-settled law in this Circuit, vacatur of the Rule rendered it void *ab initio* and returned all parties and non-parties, including Petitioners, to the *status quo ante*.  Indeed, it is well-settled in this Court that vacatur of a rule is retroactive.[2]

---

[1] *See I.A. v. Barr*, Case Nos. 20-5271, 20-5273.

[2] *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002); *Nat'l Fuel Gas Supply Corp. v. Fed. Energy Regulatory Comm'n*, 59 F.3d 1281, 1289 (D.C. Cir. 1995); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993); *see also Washington All. of Technology Workers*, 156 F. Supp. 3d 123, 128-29 (D.D.C. 2015), judgment vacated, appeal dismissed sub nom. on other grounds *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,

5.     Because of *CAIR*'s vacatur of the Rule, Petitioners are returned to the position they were in before the Rule was issued, i.e., they are entitled access to the asylum process under 8 U.S.C. § 1225(b)(1) as it existed before the Rule was issued.

6.     Respondents have refused to provide Petitioners access to this asylum process.  Thus, Petitioners filed a Verified Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief on July 9, 2020, alleging Respondents' failure to provide them access to Congressionally sanctioned asylum process to violates their due process rights ("Due Process Claims").  (*D.A.M. et a. v. Barr et al.*, 20-cv-1321 (CRC) (D.D.C.), Dkt. # 31, ¶¶ 299-305).[3]

7.     Petitioners moved for a temporary restraining order, requesting that the District Court stay their removal pending adjudication of their Due Process Claims (the "TRO").   In a Memorandum Opinion and accompanying Order ("Order") entered September 15, 2020, the District Court denied the TRO, finding that although Petitioners likely would suffer irreparable harm in the absence of the stay, and the balance of the equities and public interest did not favor either party, 8 U.S.C. § 1252(a)(2)(A)(i) likely stripped it of jurisdiction over Petitioners' claims, vacatur of the Rule was not retroactive, and thus Petitioners were not likely to succeed on the merits.  *D.A.M.*, 2020 WL 5525056, at *9-*14.

---

650 Fed. Appx. 13 (D.C. Cir. 2016) (agreeing with government's position that vacatur would retroactively affect student visas).

[3] "Dkt." refers to *D.A.M. et a. v. Barr et al.*, 20-cv-1321 (CRC) (D.D.C.)

7

8.     Petitioners appealed from the Order on September 15, 2020 and filed an emergency motion with this Court to stay their removal pending further order of this Court, to provide enough opportunity to consider this emergency motion for a stay through their appeal (the "Motion").

9.     In a per curiam order dated September 17, 2020, a panel of this Court (Circuit Judges Henderson, Tatel, and Katsas) ordered that Petitioners' removal from the United States be administratively stayed pending further order of the Court to permit it time to consider the emergency motion for stay pending appeal.  (*D.A.M. v. Barr*, Case No. 20-5281, Document #1862170).

10.    After receiving briefing on the Motion, in a per curiam order dated September 30, 2020, the panel ordered that the administrative stay be dissolved and that the emergency motion for stay be denied, stating that "Appellants have not satisfied the stringent requirements for a stay pending appeal."  Addendum at 1a.

## REASONS FOR GRANTING REHEARING

11.    This Court should grant the Petition for three reasons.

12.    **First**, the denial of the emergency motion raises an issue of exceptional importance pursuant to Fed. R. App. P. 35(b)(1)(B): whether the Court should maintain the status quo and grant a stay, allowing Petitioners to remain in the United States, when to deny a stay prior to a determination of the merits of Petitioners' claims would render any victory Petitioners might achieve completely meaningless.

8

13.   The District Court held that the Petitioners demonstrated "a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S.  Effectively, permanent removal from the U.S. to countries from which Petitioners fled from to seek safety in the United States would constitute irreparable injury." *D.A.M.*, 2020 WL 5525056, at *14; *see also A.B.-B. v. Morgan*, 20-CV-846 (RJL), 2020 WL 51075 48, at *8 (D.D.C. Aug. 31, 2020) ("In the absence of preliminary injunctive relief, plaintiffs would be subject to immediate removal from the United States to countries where they face significant risk of physical harm…. To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint.)

14.   Respondents have never denied that if Petitioners are ultimately successful on their appeal or in the underlying case, they will not guarantee their safe return.  Essentially, denial of the Motion is a decision on the merits of Petitioners' case before they have had an opportunity to be heard.  Fundamental principles of fair play and equity require that the rights of one side are not eviscerated pending disposition of their claims.

15.   This Court has the inherent authority to grant a stay.  Federal courts have inherent power to issue orders necessary to their jurisdiction over a pending

9

case.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *see id*. at 58 (Scalia, J.,

dissenting) ("Some elements of that inherent authority are so essential to the [Article

III] judicial Power, that they are indefeasible, among which is a court's ability to

enter orders protecting the integrity of its proceedings."); *Bounds v. Smith*, 430 U.S.

817, 824 (1977) (federal courts have inherent authority to protect litigants' access to

the courts).  This Court's issuance of a stay guarantees this Court's jurisdiction and

Petitioners' access to the courts.

16.    **<u>Second</u>**, the panel's denial of the Motion because "Appellants have not

satisfied the stringent requirements for a stay pending appeal," indicates it did not

consider Petitioners to have demonstrated a likelihood of success on the merits of

their appeal that the courts have jurisdiction to review their claims.

17.    A determination that Petitioners are unlikely to succeed on the merits

of their appeal from the District Court's Order that 8 U.S.C. § 1252(a)(2)(A)(i) strips

the Court of jurisdiction conflicts with decisions of the United States Supreme Court

and of this Court.  *See* Fed. R. App. P. 35(b)(1)(A).  It conflicts with the United

States Supreme Court's decision in *Jennings v. Rodriguez*, 138 S.Ct. 830, 840 (2018)

that the "arising from" and "relating to" language in the Immigration and Nationality

Act should not be given an "expansive interpretation…. [that] would lead to

staggering results."  *Id.*, 138 S.Ct. at 840.  It also conflicts with decisions of the

United States Supreme Court and this Circuit that in holding that there is a

10

presumption of judicial review, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020); *McNary v. Haitian Refugee Ctr., Inc*., 498 U.S. 479, 496, 498 (1991); *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C.Cir. 2020), that can only be overcome by pointing to "clear and convincing evidence" of a contrary legislative intent. *Bd. of Governors of the Fed. Reserve Sys. v. MCorp*. Fin., Inc., 502 U.S. 32, 44 (1991).

18.    Section 1252(a)(2)(A)(i) strips judicial review of "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title."

19.    Petitioners' Due Process Claims are that Respondents are violating Petitioners' due process rights by denying them access to the asylum process created by Congress that they would have been entitled to access but for the now-void Rule. (Dkt. # 31, ¶¶ 299-305).  Petitioners do not challenge their removal orders.  Their claims do not arise from the implementation or operation of their removal orders, but rather arise from Respondents' denial of process, thus 8 U.S.C. § 1252(a)(2)(A)(i) does not strip the courts of jurisdiction to review them.

20.    The District Court held to the contrary, giving the "arising from" and "relating to" language in section 1252(a)(2)(A)(i) the "expansive interpretation" rejected in *Jennings v. Rodriguez* because it "would lead to staggering results."  138 S.Ct. 830 (2018).  The District Court's conclusion is in direct contradiction to

11

*Jennings*.  Indeed, the District Court's reading of section 1252(a)(2)(A)(i) forecloses judicial review of "claims of prolonged detention" if that detention was part of the implementation or operation of a removal order, a result rejected by *Jennings* in the context of an analogous provision of the INA.  *Id*. at 840.

21.    The Third Circuit recently followed *Jennings* in rejecting an expansive interpretation of the "arising under" language in section 1252(b)(9), which further illustrates this point:

> We distill a simple principle from *Jennings*… and the presumptions favoring judicial review.  That principle informs how we read the phrase "arising under."  We must ask: If not now, when?  If the answer would otherwise be never, then § 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal.  [T]he point of the provision is to channel claims into a single petition for review, not to bar claims that do not fit within that process.

*E.O.H.C. v. Sec'y United States Dep't of Homeland Sec*., 950 F.3d 177, 185–86 (3d Cir. 2020).

22.    Indeed: if not now, when?  The answer here is never.  Petitioners could not have brought their claims alongside review of their removal orders and review of Petitioners' claims are not channeled in the INA.  Consequently, cramming judicial review of Petitioners' claims into a statutory scheme in which they could not have made those claims "would be absurd," *Jennings*, 138 S. Ct. at 840, and thus the panel's denial of the Motion undercuts Supreme Court precedent in *Jennings*.

12

23.     Further, it also undercuts the precedent in the Supreme Court and this Circuit favoring judicial review absent clear and convincing evidence.  Here, there is no clear and convincing evidence that Congress intended to strip the courts of jurisdiction to review Petitioners' Due Process Claims.  To the contrary, because they could not have brought their claims alongside any other claims in the INA, the presumption of judicial review required a finding that the courts have the authority to review Petitioners' claims, and to determine otherwise contradicts the precedent in the Supreme Court and this Circuit.  *See Guerrero-Lasprilla*, 140 S. Ct. at 1069; *McNary*, 498 U.S. at 496, 498 (1991); *Make the Rd. N.Y.*, 962 F.3d at 623.

24.     **Third,** the panel's denial of the Motion because "Appellants have not satisfied the stringent requirements for a stay pending appeal." indicates it believes that Petitioners had not demonstrated a likelihood of success on the merits of their appeal that vacatur is retroactive and returns Petitioners' to the *status quo ante*, entitling them to access to the asylum process.  This conflicts with well-settled law in this Circuit that vacatur of a rule is retroactive.  *See*, *supra*, n.1.

25.     In *CAIR*, Respondents did not claim that vacatur of the Rule would be burdensome or seek to limit vacatur's retroactive effect.  *See* 2020 WL 3542481.  Further, there is no stay of the CAIR decision.

26.     Vacatur of the Rule, without limitation or qualification, places Petitioners in the position they would have been in but for the Rule, i.e., entitled to

13

process under section 1225(b)(1).  Accordingly, Petitioners' Due Process Claims are meritorious as they have "rights regarding admission that Congress has provided by statute," *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1983 (2020), in this case, section 1225(b)(1).  Congress provided Petitioners the right to access that process, and Respondents' refusal to provide that to Petitioners violates the Due Process Clause.

27.    The panel's denial of the Motion, which suggests that Petitioners were not likely to succeed on the merits of their Due Process Claims, conflicts with the well-settled law in this Circuit.  Fed. R. App. P. 35(b)(1)(A).

## CONCLUSION

Petitioners are families who fled persecution, risking their lives to travel to the United States to seek asylum.  But Respondents subjected them to an unlawful rule, eviscerating this right.  Now that a District Court has vacated the Rule, Petitioners are entitled to access the lawful process established by Congress.  For more than one year, as they have litigated their claims, most Petitioners have willingly remained detained under life-threatening conditions during a global pandemic because asylum is a life-or-death matter to them.  They now stand on the precipice of removal, before adjudication of their right to access the asylum system established by Congress.  If this Court does not grant them rehearing en banc of the panel's denial of their Motion, and Petitioners win the appeal, it will be a meaningless victory as they will be unable to return to the United States.  This is a

App.130

matter of great importance.  Petitioners simply ask this Circuit to rehear their request to temporarily preserve their ability fairly litigate their claims by staying their removal.

     The petition for rehearing en banc should be granted.

| | |
|---|---|
| Dated:   Washington, D.C.<br>         October 1, 2020 | Respectfully Submitted,<br><br>GREENBERG TRAURIG, LLP<br>/s/ Caroline J. Heller<br>By: Caroline J. Heller<br>200 Park Ave.<br>New York, New York 10166<br>Tel: (212) 801-2165<br>hellerc@gtlaw.com<br>Steven G. Barringer<br>2101 L. Street, N.W.<br>Washington, D.C. 20037<br>Tel: (202) 331-3108<br>barringers@gtlaw.com<br><br>-and-<br><br>RAPID DEFENSE NETWORK<br>Gregory P. Copeland<br>Sarah T. Gillman<br>Rapid Defense Network<br>11 Broadway, Suite 615<br>New York, NY 10004<br>Tel: (212) 843-0910<br>gregory@defensenetwork.org<br>sarah@defensenetwork.org<br>*Counsel for Petitioners-Appellants* |

App.131

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1. Exclusive of the exempted portions provided in Fed. R. App. P. 32(f) and Cir. R. 32(e)(1), this petition contains 3,556 words in compliance with the length limitation in Fed. R. App. P. 35(b)(2)(A).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:    October 1, 2020                    */s/ Caroline J. Heller*
                                             *Attorney for Petitioners*

16

## <u>CERTIFICATE OF SERVICE</u>

I, Caroline J. Heller, hereby certify that on October 1, 2020, I electronically
filed the foregoing with the Clerk using the Court's electronic filing system.  As all
participants in the case are registered with the Court's electronic filing system,
electronic filing constitutes service on the participants.  *See* Fed. R. App. P.
25(c)(2)(A); Cir. R. 25(f).

I further certify that all parties required to be served have been served

Dated:    October 1, 2020                      */s/ Caroline J. Heller*
                                               *Attorney for Petitioners*

17

# ADDENDUM

Panel Order ....................................................................................1a

Certificate of Parties, Rulings, and Related Cases ...........................................3a

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 20-5281**                                   **September Term, 2020**

**1:20-cv-01321-CRC**

**Filed On: September 30, 2020**

D.A.M., et al.,

        Appellants

      v.

William Pelham Barr, Attorney General of the
United States of America and Chad F. Wolf,
Acting Secretary, Department of Homeland
Security,

        Appellees

**BEFORE:**    Henderson, Tatel, and Katsas, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the response thereto, and the reply; and the administrative stay entered on September 17, 2020, it is

**ORDERED** that the administrative stay be dissolved.  It is

**FURTHER ORDERED** that the emergency motion for stay be denied.  Appellants have not satisfied the stringent requirements for a stay pending appeal.  See <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009); <u>D.C. Circuit Handbook of Practice and Internal Procedures</u> 33 (2019).  It is

**FURTHER ORDERED** that the following briefing schedule will apply in this case:

| | |
|---|---|
| Appellants' Brief | November 2, 2020 |
| Appendix | November 2, 2020 |
| Appellees' Brief | December 2, 2020 |
| Appellants' Reply Brief | December 23, 2020 |

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## No. 20-5281                                        September Term, 2020

The Clerk is directed to schedule this case for argument on the first appropriate date following completion of briefing.  The parties will be informed later of the date of oral argument and the composition of the merits panel.

All issues and arguments must be raised by appellants in the opening brief.  The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms.  While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not widely known.  See D.C. Circuit Handbook of Practice and Internal Procedures 43 (2019); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due.  Filing by mail may delay the processing of the brief. Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Manuel J. Castro
Deputy Clerk

2a

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), counsel for Petitioners makes the following certification:

**(A)     Parties.**  Petitioners-Appellants in this case, listed pseudonymously in the Notice of Appeal, include: D.A.M.; Y.H.A., a minor; J.S.P.; M.A.S., a minor; L.O.R; A.P.O., a minor; J.S.M.; D.M.S., a minor; S.L.V.; M.F.L., a minor; M.M.B.; N.M.M., a minor; M.M.V. A.A.M., a minor; I.F.L.; R.F.L., a minor; M.G.V.; A.R.G., a minor; N.M.L.; A.R.M., a minor; C.C.N.; B.S.C., a minor; R.P.F.; J.F.P., a minor; M.C.M.; S.M.C., a minor; M.A.A.; A.R.A., a minor; C.A.A., a minor; A.L.V.; I.G.L., a minor; A.G.L., a minor; M.R.A.; L.C.R., a minor; J.M.R.; C.G.M., a minor; C.C.G.; E.C.G., a minor; K.N.E.; E.A.N., a minor; D.P.R.; S.B.P., a minor; R.L.A.; N.C.L., a minor; L.M.L.; M.R.M., a minor; Y.V.O.; E.P.V., a minor; A.D.L.; M.D.D., a minor; S.L.R; A.V.L., a minor; M.J.P.; A.M.P., a minor, A.P.P., a minor; C.P.P., a minor; D.O.H.; L.A.O., a minor, D.A.O., a minor; I.H.L.; S.R.H., a minor; M.A.R.;  S.R.S., a minor;  S.J.A.;  W.A.A., a minor;  E.V.M.; A.V.M., a minor; M.P.O.; G.G.L., a minor; O.T.G.; T.T.G., a minor; B.H.I.; D.M.H., a minor; T.C.L.; A.P.C., a minor; A.P.C., a minor; S.R.F.; C.M.R., a minor; N.V.; Z.F., a minor; V.P.M.; S.L.P., a minor; N.L.P., a minor; E.L.P., a minor; K.Z.R.; A.Z.R., a minor; J.H.R.; A.M.H., a minor; S.M.C.; D.S.M., a minor; A.M.M., a minor; I.E.B.; B.E., a minor; M.V.G.; D.V.M., a minor; J.M.V., a minor; I.C.T.; V.T.P., a minor; R.S.P.;

F.P.P., a minor; C.P.P., a minor; C.N.; B.L.; B.L.N., a minor; G.S.C.; M.C.; N.Y.B., a minor; G.R.S.C., a minor; P.M.; M.N.; H.M.N., a minor; N.P.; R.D.P., a minor; M.D.E.; A.G.D., a minor; Y.U.; F.G.U, a minor; Y.O.T.; V.L.O., a minor; D.L.O., a minor; L.H.H.; Y.F.H., a minor; A.B.C.; E.C.B, a minor; K.P.P.; M.P.P., a minor; I.P.P., a minor; M.H.; J.M.H., a minor; B.C.A.; G.S.C., a minor; L.M.P.; Y.M.M., a minor; L.P.M, a minor; A.S.G., a minor; C.R.R.; I.G.R., a minor; V.G.R. a minor; E.G.; J.G.M., a minor; B.G.C.; S.M.G., a minor; T.S.J.; L.P.S, a minor; G.S.J., a minor; I.C.A.; S.P.C., a minor; M.T.T.; Y.L.T., a minor; R.C.H.; E.P.C., a minor; L.M.B.; Z.R.M., a minor; E.R.M., a minor; C.H.G.; M.G.H., a minor; L.M.V.; C.A.M., a minor; J.C.; Y.J.C., a minor; T.R.M.; J.R.R., a minor; C.L.; J.A., a minor; M.P.A.; G.S.P., a minor; M.T.B.; A.V.B., a minor; W.A.B., a minor; I.F.; Z.M.F., a minor; E.G.F., a minor; J.M.F., a minor; Z.L.; J.C.L., a minor; M.P.T.; A.A.P., a minor; H.A.P., a minor; D.C.V.; S.V.C., a minor; M.C.P.; J.C.P.; a minor; M.R.C., a minor; M.L.M.; J.R.L., a minor; N.B.C.; J.B.M., a minor; M.Z.L; F.P.Z., a minor; I.M.V.; J.T.M., a minor; D.T.M., a minor; F.F.A.; D.A.B.; A.A.B., a minor; R.S.J.; S.A., a minor; A.O.V.; J.S.O., a minor; L.G.G.; and, W.C.G., a minor.  Defendants-Appellees are William P. Barr, the Attorney General of the United States, and; Chad F. Wolf, the Acting Secretary of the Department of Homeland Security.

    **(B)    Ruling Under Review.**  The ruling at issue is a per curiam order of a panel of this Court (Circuit Judges Henderson, Tatel, and Katsas) filed September

30, 2020: (a) denying Petitioners' emergency motion for a stay of removal pending their appeal from the denial of a temporary restraining order seeking a stay of removal, and; (2) dissolving an administrative stay ordered in a per curiam order dated September 17, 2020.

(C)    **Related Cases**.  Other than the ruling under review, this case has not previously been before this Court or any other court for appellate review.  Most of the Petitioners are Plaintiffs-Appellants in *M.M.V., et al v. Barr, et* al, Case Nos. 20-5106, 20-5129.  In that case, oral argument was held on September 11, 2020 before Chief Judge Srinivasan, Circuit Judge Katsas, and Senior Circuit Judge Ginsburg.

/s/ *Caroline J. Heller*
CAROLINE J. HELLER
*Attorneys for Petitioners*

October 1, 2020

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

**No. 20-5281**                                        **September Term, 2020**

**1:20-cv-01321-CRC**

**Filed On: September 30, 2020**

D.A.M., et al.,

      Appellants

     v.

William Pelham Barr, Attorney General of the
United States of America and Chad F. Wolf,
Acting Secretary, Department of Homeland
Security,

      Appellees

    **BEFORE:**    Henderson, Tatel, and Katsas, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for stay pending appeal, the response thereto, and the reply; and the administrative stay entered on September 17, 2020, it is

**ORDERED** that the administrative stay be dissolved.  It is

**FURTHER ORDERED** that the emergency motion for stay be denied.  Appellants have not satisfied the stringent requirements for a stay pending appeal.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2019).  It is

**FURTHER ORDERED** that the following briefing schedule will apply in this case:

      Appellants' Brief          November 2, 2020

      Appendix              November 2, 2020

      Appellees' Brief           December 2, 2020

      Appellants' Reply Brief     December 23, 2020

App.140

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 20-5281**                                          **September Term, 2020**

The Clerk is directed to schedule this case for argument on the first appropriate date following completion of briefing.  The parties will be informed later of the date of oral argument and the composition of the merits panel.

All issues and arguments must be raised by appellants in the opening brief.  The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms.  While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not widely known.  See D.C. Circuit Handbook of Practice and Internal Procedures 43 (2019); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties are strongly encouraged to hand deliver the paper copies of their briefs to the Clerk's office on the date due.  Filing by mail may delay the processing of the brief. Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:      /s/
Manuel J. Castro
Deputy Clerk

Case No. 20-5281

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

*D.A.M. et al*,
Petitioners-Appellants,

v.

*WILLIAM P. BARR, et al*,
Respondents-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:20-cv-1321-CRC
The Honorable Christopher R. Cooper

## EMERGENCY MOTION FOR STAY PENDING REVIEW
## OF PETITIONERS' APPEAL

RAPID DEFENSE NETWORK

Gregory P. Copeland
Sarah T. Gillman
Rapid Defense Network
11 Broadway, Suite 615
New York, NY 10004

GREENBERG TRAURIG LLP

Steven G. Barringer
2101 L. Street, N.W.
Washington, D.C. 20037

Caroline J. Heller
200 Park Ave.
New York, New York 10166

*Attorneys for Petitioners-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

FACTUAL BACKGROUND ........................................................................4

    I.    Procedural Background ..................................................................4

        A. Initial Habeas Petition in the District Court.............................4

        B. Amended Petition After Vacatur of the Transit Ban...............5

LEGAL ARGUMENT ..................................................................................8

    I.    THE DISTRICT COURT HAS JURISDICTION .......................8

        A. Section 1252(a)(2)(A) Does Not Strip the Court of Jurisdiction. ........8

        B. The District Court Has Jurisdiction Under 1252(e)(2)(B) ................13

        C. If the Court Were Stripped of Jurisdiction, it Would Be an Unconstitutional Suspension of the Writ of Habeas Corpus .............15

    II.   THE PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL ................................................17

    III.  THE PETITIONERS WILL BE IRREPARABLY HARMED IF THEY ARE REMOVED.................................................................20

    IV.  THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST ARE IN FAVOR OF GRANTING THE STAY ...................................20

CONCLUSION .........................................................................................21

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan,*
   20-CV-846 (RJL), 2020 WL 51075 48 (D.D.C. Aug. 31, 2020) ........... 20

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ............................................. 19

*Am–Arab Anti–Discrimination Comm. v. Ashcroft,*
   272 F.Supp.2d 650 (E.D.Mich. 2003) .................................. 13

*American Great Lakes Ports Association v. Schultz,*
   962 F.3d 510 (D.C. Cir. 2020) ............................................ 19

*Arce v. United States,*
   899 F.3d 796 (9th Cir. 2018) .............................................. 11

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.,*
   502 U.S. 32 (1991) ............................................................. 8

*Boumediene v. Bush,*
   553 U.S. 723 (2008) .......................................................... 15

*Calderon v. Sessions,*
   330 F. Supp. 3d 944 (S.D.N.Y. 2018) ............................ 11, 12

*Capital Area Immigrants' Rights Coalition v. Trump,*
   Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481
   (D.D.C. June 30, 2020) ............................... 2, 7, 9, 17, 18, 19

*Castro v. U.S. Dep't of Homeland Sec.,*
   835 F. 3d 422 (3d Cir. 2016) ............................................. 11

*D.A.M. v. Barr,*
   20-CV-1321 (CRC), 2020 WL 5525056 (D.D.C. Sept. 15, 2020).. 1, 3, 8,
   12, 14, 15, 16, 17, 20

*D.A.M. v. Barr*,
No. 20-CV-1321, 2020 WL 4218003 (D.D.C. July 23, 2020) 7, 9, 10, 11, 12

*DHS v. Thuraissigiam*,
140 S. Ct. 1959 (2020) .................................................... 15, 16

*Dugdale v. U.S. Customs & Border Protection*,
88 F. Supp. 3d 1 (D.D.C. 2015) .................................... 13, 14

*E. Bay Sanctuary Covenant v. Trump*,
950 F.3d 1242 (9th Cir. 2020) ............................................ 12

*Envtl. Def. v. Leavitt*,
329 F. Supp. 2d 55 (D.D.C. 2004) ..................................... 18

*Fatty v. Nielsen*,
Case No. 17-cv-1535, 2018 WL 3491278 (W.D. Wash. July 20, 2018), appeal dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019) ................................................ 11, 12

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ........................................... 21

*Guerrero-Lasprilla v. Barr*,
140 S. Ct. 1062, 1069 (2020) ............................................... 8

*Heartland By-Products, Inc. v. United States*,
568 F.3d 1360 (Fed. Cir. 2009) ......................................... 17

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) ............................................................ 6

*Jennings v. Rodriguez*,
—— U.S. ——, 138 S. Ct. 830 (2018) ................................. 10

*Klayman v. Obama*,
142 F. Supp. 3d 172 (D.D.C. 2015) ................................... 21

*Kucana v. Holder*,
558 U.S. 233 (2010) ......................................................... 8, 9

iii

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C.Cir. 2020) ............................................... 8

*Martinez v. Napolitano,*
  704 F.3d 620 (9th Cir. 2012) .............................................. 12

*McNary v. Haitian Refugee Ctr., Inc.,*
  498 U.S. 479 (1991) ..................................................... 8, 13

*Michalski v. Decker,*
  279 F. Supp. 3d 487 (S.D.N.Y. 2018) ................................... 12

*Milk Train v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) ............................................ 19

*Nak Kim Chhoeun v. Marin,*
  No. 17 Civ. 1898, 2018 WL 1941756 (C.D. Cal. Mar. 26, 2018) ........ 12

*Nat'l Fed'n of Fed. Emps. v. Carlucci,*
  680 F. Supp. 416 (D.D.C. 1988) .......................................... 21

*Patel v. Barr,*
  2020 WL 4282051 (E.D. Pa. July 27, 2020) ............................. 11

*Pensamiento v. McDonald,*
  315 F.Supp.3d 684 (D. Mass. 2018) ...................................... 12

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999) ...................................................... 10

*S.N.C. v. Sessions,*
  18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018) ........... 11, 12

*Sugar Cane Growers Co-op. of Florida v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ......................................... 18, 19

*United States v. Goodner Bros. Aircraft, Inc.,*
  966 F.2d 380 (8th Cir. 1992) .......................................... 7, 18

*Washington Metropolitan Area Transit Comm'n v. Holiday
  Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977) ............................................ 8

iv

*You v. Nielsen*,
  321 F. Supp. 3d 451 (S.D.N.Y. 2018)..........................................11, 12

## Statutes

8 U.S.C. § 1225(b) ..............................................................................2

8 U.S.C. § 1225(b)(1)(A)(ii) ..............................................................6

8 U.S.C. § 1225(b)(1)(B) ....................................................................6

8 U.S.C. § 1225(b)(1)(B)(ii) ..............................................................6

8 U.S.C. §1225(b)(1)(B)(v) ................................................................6

8 U.S.C. § 1252(a)(2)(A) ..........................................................3, 8, 12

8 U.S.C. § 1252(a)(2)(A)(i) ......................................................9, 10, 11

## Other Authorities

8 C.F.R. § 208.30 ................................................................................6

8 C.F.R. § 208.30(e)(5)(iii) ................................................................5

8 C.F.R. § 208.30(f) ............................................................................6

8 C.F.R. § 208.31(c) ............................................................................6

8 C.F.R. § 235.3(b)(4) ........................................................................6

84 Fed. Reg. 33,829 (July 16, 2019) .....1, 2, 3, 5, 6, 7, 9, 11, 12, 14, 17, 18

84 Fed. Reg. 33,829 ............................................................................5

84 Fed. Reg. at 33,834 ........................................................................5

84 Fed. Reg. at 33,835 ........................................................................5

## INTRODUCTION

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure and Circuit Rule 18, Petitioners D.A.M. *et al.* ("Petitioners") move for an order issuing an administrative stay of removal of Petitioners from the United States pending further order of this Court. Petitioners are parents and their children who have fled persecution to seek asylum in the United States. They have final orders of removal and, thus, are at risk of immediate removal absent an order from this Court staying removal. If Petitioners are removed, they will suffer irreparable harm because they "will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S." *D.A.M. v. Barr*, 20-CV-1321 (CRC), 2020 WL 5525056, at *14 (D.D.C. Sept. 15, 2020) ("*D.A.M. II*") (Exh. A).

Upon arrival to the United States, all but 13 of the Petitioners were subjected to an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban").[1] The Transit Ban unlawfully

---

[1] "Petitioners" refers to those who were subjected to the Transit Ban. The only Petitioners who were not subjected to the Transit Ban are: A.G.P., her children D.S.G. and A.S.G.; C.R.R. her children I.G.R. and V.G.R.; E.V.M; I.M.V., her children J.T.M. and D.T.M; N.V.; C.L., and her child J.A. (*See* Exh. B, Verified Amended Petition for Writ of Habeas Corpus ⁋ 159). Two of the Petitioners who were not subjected to the Transit Ban (E.V.M. and N.V.) are the mothers of children who were subjected to it: A.V.M. and Z.F. (*See id.*, ⁋⁋ 83, 102, 159.) Petitioners E.V.M. and N.V. should be included in the scope of any stay because they are the parents of children entitled to pursue their claims and have a liberty interest in family unity.

1

prevented Petitioners from accessing the process created by Congress to seek asylum under 8 U.S.C. § 1225(b), and under which they merely had to demonstrate a "credible fear" of return to their home countries in order to pursue asylum. The Transit Ban frustrated this process by unlawfully rendering Petitioners ineligible for credible fear determinations because they passed through other countries before arriving in the United States. Instead, the Transit Ban forced Petitioners to establish the higher "reasonable fear" of return, which Petitioners were all found not to have.

On June 30, 2020, the District Court for the District of Columbia entered an order vacating the Transit Ban, thus it is void *ab initio*. *Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481, at *1, * 22 (D.D.C. June 30, 2020) ("*CAIR*"). *CAIR* specifically declined to limit this relief to the parties. *Id.* Under wellsettled administrative law principles, vacatur restores the *status quo ante* for Petitioners, who were affected by the rule. Petitioners are entitled to access the lawful asylum process created by Congress that existed prior to the Transit Ban before removal.

Defying *CAIR*, Respondents refuse to provide this process to Petitioners. Thus, Petitioners filed a Verified Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Amended Petition") on July 9, 2020, alleging Respondents' attempts to remove Petitioners, who have unlawfully

procured final orders of removal violates their due process rights ("Due Process Claims"). (Exh. B, ¶¶ 299-305).

Petitioners moved for a temporary restraining order, requesting that the District Court stay their removal pending adjudication of their Due Process Claims (the "TRO"). In a Memorandum Opinion and accompanying Order ("Decision") entered September 15, 2020, the District Court denied the TRO, finding that although Petitioners likely would suffer irreparable harm in the absence of the stay, and the balance of the equities and public interest did not favor either party, 8 U.S.C. § 1252(a)(2)(A) likely stripped it of jurisdiction over Petitioners' claims, thus Petitioners were not likely to succeed on the merits. *D.A.M. II*, 2020 WL 5525056, at *9-*14. The District Court erred because it misconstrued Petitioners' Due Process Claims as direct challenges to their final orders of removal. Petitioners do not challenge or seek to relitigate their final orders issued pursuant to the unlawful Transit Ban. They seek the right to pursue a lawful process that was denied to them, and challenge Respondents' legal authority to deport them without providing them access to that process.

Petitioners appealed from the Decision on September 15, 2020 and filed a motion with the District Court for a stay of removal pending adjudication of this appeal. (ECF 53). The District Court ordered that "petitioners' removals are administratively stayed for seven days to permit petitioners to seek emergency relief

App.150

from the District of Columbia Circuit.    Unless vacated by the Circuit, ***this administrative stay of removal expires at 11:59 pm on September 22, 2020***." (Minute Order (Sept. 15, 2020)) (emphasis added).

Petitioners now move this Court to stay their removal beyond September 22, 2020, pending further order of the Court, to provide sufficient opportunity to consider this emergency motion for a stay through their appeal.  *See* D.C. Circuit Handbook of Practice and Internal Procedures 33 (2018).  Petitioners are likely to prevail on the merits of their Appeal, will be irreparably harmed absent a stay of removal, and the balance of the equities and public interest favors Petitioners.

## FACTUAL BACKGROUND

### I.    PROCEDURAL BACKGROUND

#### A. Initial Habeas Petition in the District Court

Petitioners are families who came to the United States seeking asylum after facing persecution in their home countries.  (Exh. B, ¶¶ 36-121).[2]  Petitioners are detained or have been released but remain "in custody" for habeas corpus purposes. (*Id.*, ¶¶ 36-121).  On May 18, 2020, Petitioners filed a Petition for Writ of Habeas Corpus alleging, among other things, that the manner in which Respondents intended

---

[2] Most of the Petitioners are Plaintiffs-Appellants in *M.M.V., et al v. Barr, et al*, Case Nos. 20-5106, 20-5129.  Oral argument was held on September 11, 2020 before Chief Judge Srinivasan, Circuit Judge Katsas, and Senior Circuit Judge Ginsburg.

4

to deport them during the COVID-19 pandemic violated their procedural and substantive due process rights.  (ECF 3).  Petitioners filed an emergency motion for a temporary restraining order requesting a stay of removal of the detained Petitioners and an emergency judge granted Petitioners' request for an administrative stay, later extended by the District Court.  (ECF 7, 8, 22).

### B. Amended Petition After Vacatur of the Transit Ban

On July 16, 2019, the Transit Ban was issued. 84 Fed. Reg. 33,829.  It rendered noncitizens seeking to enter the United States at its southern border ineligible for asylum unless they first applied for similar protection in a third country they transited through and were rejected there, are victims of severe forms of trafficking, or did not pass through any country that is a signatory to the Refugee Convention or Refugee Protocol in route to the United States.  *See* 84 Fed. Reg. at 33,835.  Migrants who transited through a third country without applying for asylum were automatically and conclusively determined not to have a "credible fear" of persecution and were barred from the asylum process.  *See* 8 C.F.R. § 208.30(e)(5)(iii).

Instead, Respondents applied the more stringent "reasonable fear" standard. Under that higher standard, the noncitizen must show that more likely than not, she would be persecuted or tortured in the future because of a protected ground.  *See* 84

Fed. Reg. at 33,834.  Reasonable fear is a significantly higher standard than credible

fear.  8 C.F.R. § 208.31(c).

Before the Transit Ban, and after its vacatur, a noncitizen subject to expedited

removal who indicates a fear of returning to his or her home country or intention to

apply for asylum is referred for an interview with an asylum officer.  *See* 8 U.S.C. §

1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30.

The asylum officer conducts a "credible fear interview," credible fear being defined

by law as "a significant possibility, taking into account the credibility of the

statements made by the alien in support of the alien's claim and such other facts as

are known to the officer, that the alien could establish eligibility for asylum[.]"  8

U.S.C. §1225(b)(1)(B)(v).  To ultimately prevail on an asylum claim itself, the

applicant need only establish that there is a 10% chance that he or she will be

persecuted because of one of the five protected grounds for asylum.  *INS v. Cardoza-*

*Fonseca*, 480 U.S. 421, 430–32, 439–40 (1987); *see* 8 U.S.C. §1225(b)(1)(B)(v).  If

a noncitizen is found by the asylum officer to have a "credible fear," the individual

is taken out of the expedited removal process and referred for a regular removal

hearing before an immigration judge, with an opportunity to develop a full record

before the judge, and the right to appeal an adverse decision to the relevant federal

court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

6

On June 30, 2020, a District Court vacated the Transit Ban, finding that it violated the Administrative Procedures Act. *CAIR*, 2020 WL 3542481 at *1. In doing so, the *CAIR* court rejected the government's argument that the Court should limit any relief flowing from the vacatur to the actual parties before the Court. 2020 WL 3542481, at *22. Under well-settled administrative law principles, the Transit Ban is void *ab initio* and renders Petitioners' final orders of removal, procured under the void Transit Ban, unlawful. *See United States v. Goodner Bros. Aircraft, Inc.*, 966 F.2d 380, 384 (8th Cir. 1992). The government appealed from that order to this Court on August 31, 2020, Case No. 20-5271, 20-5273, but it has not sought a stay.

After learning that Respondents did not intend to comply with the *CAIR* order, Petitioners amended their Petition, asserting new claims alleging that Respondents' attempts to remove the Petitioners—who have final orders of removal unlawfully procured under the vacated Transit Ban—violate their substantive and procedural due process rights. (Exh. B ¶¶ 299-305).

On July 23, 2020, the District Court denied Petitioners' motion for a temporary restraining order based upon the claims in the original Petition and lifted the stay of deportation. *D.A.M. v. Barr*, No. 20-CV-1321, 2020 WL 4218003 (D.D.C. July 23, 2020) ("*D.A.M. I*"). The Court held that it likely had jurisdiction over some of the Petitioners' claims but that they were unlikely to succeed on the merits of their claims. *Id.* Petitioners then filed the TRO, asking the Court to stay

removal of the Petitioners' pending adjudication of their Due Process Claims.  (ECF 35).  The Court granted an administrative stay pending disposition of the TRO.  On September 15, 2020, after briefing and oral argument, the District Court denied the TRO.  *D.A.M. II*, 2020 WL 5525056, at \*9-\*14.  Petitioners' immediately appealed.

## LEGAL ARGUMENT

The motion for stay or for emergency relief must specifically discuss four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public interest.  *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841 (D.C. Cir. 1977).

## I.   THE DISTRICT COURT HAS JURISDICTION

### A.   Section 1252(a)(2)(A) Does Not Strip the Court of Jurisdiction.

This Court starts with the presumption of judicial review.  *See Guerrero-Lasprilla* v. Barr, 140 S. Ct. 1062, 1069 (2020); *McNary v. Haitian Refugee Ctr., Inc*., 498 U.S. 479, 496, 498 (1991); *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *see also Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C.Cir. 2020).   The government may overcome that presumption only by pointing to "clear and convincing evidence" of a contrary legislative intent.  *Bd. of Governors of the Fed.*

8

*Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991). That presumption has consistently been applied to immigration statutes. *Kucana*, 558 U.S. at 251.

In its Decision, the District Court held that section 1252(a)(2)(A)(i) stripped it of jurisdiction to review Petitioners' claims, reaching this erroneous conclusion because it misconstrued Petitioners' claims, starting its analysis with the incorrect threshold question: "Are there currently existing orders of removal as to petitioners?" 2020 WL 4218003, at *6. In doing so, the District Court put the cart before the horse, examining the merits of Petitioners' claims before determining the jurisdictional question. Whether *CAIR* renders Petitioners' final orders of removal unlawful goes to the merits of the Due Process Claims, not to whether the Court has jurisdiction to review those claims. The correct threshold question is, what are Petitioners' claims?

Section 1252(a)(2)(A)(i) precludes judicial review, "except as provided in subsection (e), [of] any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title." Petitioners do not challenge the facts or merits of their removal orders or the executive's discretionary decision to implement or execute final orders of removal. Rather, Petitioners challenge Respondents "conduct" in pursuing removal despite the vacatur of the Transit Ban and prior the exhaustion of their right to any form of constitutionally adequate

9

process.  (Exh. A, ¶¶ 299-305).  Thus, under the plain language of the statute, the Due Process Claims do not fall under the ambit of section 1252(a)(2)(A)(i).

Petitioners' claims here are analogous to their claims in *D.A.M. I*, over which the District Court concluded it likely had jurisdiction.  In *D.A.M. I*, Petitioners challenged the manner in which Respondents intended to remove them during the pandemic.  2020 WL 4218003, at *4.  The District Court disagreed with Respondents' contention "that the prohibition against judicial review of any claim 'arising from or relating to the implementation ... of an order of [expedited] removal' bars review of all of petitioners' claims here."  *Id*. at *6 (quoting 8 U.S.C. § 1252(a)(2)(A)(i)).  The District Court declined to "read [section 1252(a)(2)(A)(i)] so broadly.  While the phrase 'arising from or relating to' is expansive, it is not limitless."  *Id.* (citing *Reno v. Am.-Arab Anti-Discrimination Comm*., 525 U.S. 471, 476–87 (1999) ("*AADC*") (narrowly construing the phrase "arising from" in § 1252(g)); *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 839–41 (2018) (plurality) (narrowly construing the phrase "arising from" in § 1252(b)(9)).  Applying the logic in *Jennings*, where the "Court unanimously agreed that ancillary challenges, such as those to the conditions of confinement, were not channeled into the review of a final removal order by § 1252(b)(9)" *Id.*, at *8, the District Court held section 1252(a)(2)(A)(i) likely did not strip it of jurisdiction over Petitioners'

10

claims because they did not challenge the facts of their removal or the executive's discretionary decision to implement or execute final orders of removal. *Id.*

Similarly, Petitioners here do not challenge the facts or merits of their removal orders or the executive's discretionary decision to implement or execute final orders of removal. Rather, their Due Process Claims are ancillary challenges to unconstitutional practices and policies used by Respondents in seeking to remove them from the United States prior to the exhaustion of their right to any form of constitutionally adequate lawful process. Through their TRO, Petitioners seek a stay of removal so that the District Court can review these claims because if they are removed, "they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S." *Id.*, at *14.[3]

Indeed, in the context of sections 1252(a)(5), (b)(9), and (g), numerous courts have held that courts are not stripped of jurisdiction challenges to Respondents' legal authority to exercise its discretion.[4]  The District Court distinguished these cases,

---

[3] Cases cited by the District Court are distinguishable. *See Patel v. Barr*, 2020 WL 4282051, *1 (E.D. Pa. July 27, 2020) (petitioners claimed that the Transit Ban was not promulgated in accordance with the APA and sought a declaration that the Transit Ban was unlawful and invalid); *Castro v. U.S. Dep't of Homeland Sec.*, 835 F. 3d 422 (3d Cir. 2016) (claims barred by the INA because they related directly to the agency's process of determining whether the noncitizens had credible fear);

[4] *See You v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018); *Calderon v. Sessions*, 330 F. Supp. 3d 944 (S.D.N.Y. 2018); *Fatty v. Nielsen*, Case No. 17-cv-1535, 2018 WL 3491278 (W.D. Wash. July 20, 2018), appeal dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019); *S.N.C. v. Sessions*, 18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018); *Arce v. United States*, 899 F.3d 796 (9th

11

concluding that "the case law finding § 1252(g) inapplicable to removals outside the Attorney General's prosecutorial discretion is not fully transferable to the § 1252(a)(2)(A) context." *D.A.M. II.*, 2020 WL 5525056, at *9, n.5.  In doing so, the District Court raises form over substance.   All these cases support Petitioners' contention.  The District Court concludes that § 1252(a)(2)(A) sweeps more broadly than §1252(g) and thus forecloses the jurisdiction of the Court.  But, this conclusion is based upon a misapprehension of Petitioners' claim.  Contrary to the conclusion of the District Court, Petitioners are not challenging "the fact of their removal" but rather whether the "government's conduct" in removing them is lawful.  Petitioners, like petitioners in *You, Calderon, Fatty, S.N.C.,* challenge the "government's conduct in connection with the removal process." *Id.*, at *9.

That Congress did not strip the courts of jurisdiction to review Petitioners' claims is consistent not only with the plain language of the statute and *D.A.M. I*, but also with the purpose of the INA.   "The purpose of these claim-channeling provisions is to 'limit all aliens to one bite of the apple with regard to challenging an order of removal.'" *E. Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242, 1269 (9th Cir. 2020) (quoting *Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012)).  Petitioners do not seek a second bite at a *rotten* Transit Ban apple.  Further, Section

---

Cir. 2018); *Pensamiento v. McDonald*, 315 F.Supp.3d 684 (D. Mass. 2018); *Nak Kim Chhoeun v. Marin*, No. 17 Civ. 1898, 2018 WL 1941756 (C.D. Cal. Mar. 26, 2018); *Michalski v. Decker*, 279 F. Supp. 3d 487 (S.D.N.Y. 2018).

12

1252 channels most claims relating to removal orders to an administrative process but offers no avenue for the Petitioners to raise their Due Process Claims. Thus, section 1252 does not foreclose judicial review of the Due Process Claims and there is no clear and convincing evidence to the contrary. See *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496 (1991).

### B. The District Court Has Jurisdiction Under 1252(e)(2)(B)

Even if this Court agrees with the District Court that Petitioners' claims are challenges to the legality of their removal orders—which it should not—these claims would still be subject to judicial review under section 1252(e)(2)(B), which provides judicial review of whether a petitioner was ordered removed under section 1225(b)(1) is available in habeas proceeding. In *Dugdale v. U.S. Customs & Border Protection*, the District Court concluded that "a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect." 88 F. Supp. 3d 1, 6 (D.D.C. 2015) (citing *Am–Arab Anti–Discrimination Comm. v. Ashcroft*, 272 F.Supp.2d 650, 663 (E.D.Mich. 2003)). The District Court held that "[the petitioner's] contention that his order was not lawfully issued because it lacked a supervisor's signature falls within that category of claims." *Id*. Here, Petitioners' removal orders also were procedurally defective and reviewable under section 1252(e)(2)(B). Respondents conceded at oral argument, in response to a hypothetical posed by the Court that is

13

analogous to this case, if ICE were to issue a removal order without a credible fear interview, "then you have a basis to review, potentially just like in *Dugdale*. You didn't get the interview so how can the order be final?" (ECF 42, Tr. at 32:4-25.) Here, Petitioners did not get their section 1225(b)(1) credible fear interviews, which they would have received but for an unlawful application of the void Transit Ban. At the very least, this Court has the jurisdiction to review this issue.

The District Court distinguishes *Dugdale* from this case, asserting "petitioners must raise a claim that their removal orders were, as a matter of law, *not* issued." *D.A.M. II*, 2020 WL 5525056, at *11. But, just as in *Dugdale*, where "a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect", *Dugdale*, 88 F. Supp. 3d at 6, Petitioners' removal orders are also procedurally defective. They were issued pursuant to a void rule, whose adoption as an interim final rule without notice or opportunity to comment flagrantly violated the Administrative Procedure Act. That rule denied Petitioners access to the credible fear screening process as provided by the INA. Circumventing the standards and procedures of credible fear review established in the INA, the Transit Ban provided that migrants who came to the United States through certain Latin American countries *ipso facto* did not have credible fear. Petitioners have no negative credible fear determinations, much less review by an Immigration Judge, and as a result their

14

orders of removal are not final or executable, and do not justify removal. Petitioners are likely to demonstrate that the Court has jurisdiction over their claims.

### C. If the Court Were Stripped of Jurisdiction, it Would Be an Unconstitutional Suspension of the Writ of Habeas Corpus

Even assuming, arguendo, that 1252 strips jurisdiction – which it does not – the Suspension Clause requires residual habeas jurisdiction in the circumstances of this case. The Supreme Court has held that except in periods of "formal suspension" of the writ, individuals must either be given access to an "adequate substitute" to the writ or the writ itself, so as "to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene v. Bush,* 553 U.S. 723, 745 (2008). The District Court held that *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020) forecloses Petitioners' Suspension Clause argument but did so based upon its misapprehension of the substance of the Due Process Claims. *D.A.M. II*, 2020 WL 5525056, at *12.

In *INS v. St. Cyr*, the Supreme Court emphasized that "at the absolute minimum" the Suspension Clause preserved the writ as of 1789, and recognized "there is historical evidence of the writ issuing to redress the improper exercise of official discretion" even in cases where detention is authorized by statute. *Id.* at 303–04. It further observed that during the finality era, habeas was "the sole means by which an alien could test the legality of his or her deportation order." *Id.* at 306. At its core, *St. Cyr* recognizes the importance of preserving habeas review of

15

deportation challenges, and *Thuraissigiam* upholds this view.  140 S.Ct. at 1981 ("*St. Cyr* reaffirmed the[] proposition" that "the writ could be invoked by aliens already in the country who were held in custody pending deportation.").

The District Court agreed with Petitioners that *Thuraissigiam* neither endorsed nor rejected the assertion that the Suspension Clause is not strictly limited to the scope of the writ in 1789, but concluded that "even if *Thuraissigiam* leaves room for some constitutionally protected habeas claims outside the writ's historical core, it squarely rules out" claims seeking an opportunity for further administrative review of asylum claims.  *D.A.M. II*, 2020 WL 5525056, at *12.  But Petitioners do not seek review of their final orders of removal.  They seek the right to pursue the constitutionally protected process that was unlawfully vitiated, and challenge Respondents' legal authority to deport them without providing them such process.

Petitioners do not concede that the scope of habeas review is inflexibly tied to the types of claims brought in the 1780s, and under these unusual circumstances, where there is no alternative remedy, the minimum habeas jurisdiction is required to ensure the Petitioners' due process claims may be heard.

As there is no other process to protect the Petitioners' legal entitlement to the law as Congress intended, the Suspension Clause requires Petitioners to be afforded a constitutionally adequate process to pursue their claims.

16

## II.   THE PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL

The District Court does not take a concrete position on whether *CAIR* restores the *status quo ante* for Petitioners, vacillating between admitting that there may be merit to Petitioners' claims, and asserting *CAIR* does not require the conclusion that Petitioners' removal orders "no longer exist." *D.A.M. II*, 2020 WL 5525056, at *1, *6.  Instead, the District Court cites cases to support of its conclusion that a judicial order vacating an agency rule does not automatically void every decision made pursuant to the vacated rule.  *Id.*, at *6-*8.[5]  But what distinguishes *CAIR* and this case from those cited by the District Court is that actions based upon the now void transit ban rule can be corrected, as illustrated by the relief sought by Petitioners.

Further, because vacatur is retroactive, courts in the cases cited by the District Court specifically tailored the scope of relief to the specific case depending upon the facts.  *CAIR* did not.  *CAIR* vacated the Transit Ban and specifically denied the government's request to limit the relief to the parties before it, acknowledging that its ruling would affect the rights of non-parties. 2020 WL 3542481, at *22.  *CAIR* ordered vacatur, in part, because the government did not present "evidence" to the court that vacatur would burden the government.  Quoting a phrase used by other

---

[5] The District Court also cites *Heartland By-Products, Inc. v. United States*, 568 F.3d 1360 (Fed. Cir. 2009), but this is not an APA case, thus it is distinguishable and it's holding is inapplicable.

17

courts to describe the retroactive effect of vacatur, *CAIR* stated, "Defendants have presented no evidence suggesting that '[t]he egg has been scrambled' so that 'there is no apparent way to restore the status quo ante.'"   2020 WL 3542481, at *22 (quoting *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)).[6]   In other words, the government presented no evidence that it would be burdened if prior final orders of removal predicated upon the Transit Ban were deemed unlawful.   It makes sense that, absent evidence to the contrary, *CAIR* would presume that the majority of immigrants subjected to the Transit Ban had likely been deported, thus it would be no burden on the government to provide any immigrants remaining in the United States, who had been subjected to the Transit Ban, with the process to which they would have been entitled under section 1225(b)(1).   *CAIR* Court vacated the Transit Ban understanding that the result of vacatur is retroactive effect.   Petitioners are restored to the *status quo ante*, and Respondents' attempts to remove Petitioners without providing access to this process violates due process.

The cases in which courts have declined to vacate an agency rule are instructive on this point.   Where the *status quo ante* cannot be restored, i.e., where the retroactive application of vacatur of the rule would be disruptive, courts do not vacate the rules.   In *Sugar Cane Growers Co-op. of Florida v. Veneman*, 289 F.3d

---

[6] *See Goodner Bros. Aircraft, Inc.*, 966 F.2d at 384; *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004).

89 (D.C. Cir. 2002), the court determined that an agency rule violated the APA, but

declined to vacate the rule:

> Normally when an agency so clearly violates the APA we would vacate
> its action…. Unfortunately, because we denied preliminary relief in
> this case, the 2001 program was launched and crops were plowed under.
> The egg has been scrambled and there is no apparent way to restore the
> status quo ante. Appellants suggested that if we were to vacate, the
> Federal Court of Claims would have the responsibility of allocating
> damages. But that seems an invitation to chaos.

*Id.* at 97-98; *Milk Train v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002).

Similarly, in *American Great Lakes Ports Association v. Schultz*, this Court

recently affirmed an order remanding a rule without vacatur because "a

quintessential disruptive consequence arises when an agency cannot easily unravel

a past transaction in order to impose a new outcome." 962 F.3d 510, 519 (D.C. Cir.

2020); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d

146, 151 (D.C. Cir. 1993) ("the consequences [of vacatur] may be quite disruptive"

because "the Commission would need to refund ... fees collected ... [and] it evidently

would be unable to recover those fees under a later-enacted rule.").

*CAIR* and administrative law principles both compel the conclusion that *CAIR*

renders Petitioners' final orders of removal unlawful, thus Petitioners are likely to

succeed on the merits of their Due Process Claims.

App.166

## III.   THE PETITIONERS WILL BE IRREPARABLY HARMED IF THEY ARE REMOVED

The District Court held that the Petitioners demonstrated "a strong likelihood that if the Court denies the TRO and allows the government to carry out their removals, they will be unable to return, regardless of whether they are legally owed an opportunity to continue seeking asylum from inside the U.S.   Effectively, permanent removal from the U.S. to countries from which Petitioners fled from to seek safety in the United States would constitute irreparable injury." *D.A.M. II*, 2020 WL 5525056, at \*14; *see also A.B.-B. v. Morgan*, 20-CV-846 (RJL), 2020 WL 51075 48, at \*8 (D.D.C. Aug. 31, 2020) ("In the absence of preliminary injunctive relief, plaintiffs would be subject to immediate removal from the United States to countries where they face significant risk of physical harm…. To say the least, this harm could not be remedied after the court has an opportunity to rule on the merits of plaintiffs' complaint.)   This Court should similarly find Petitioners will be irreparably harmed if this Motion is not granted for the reasons set forth in the Decision.

## IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST ARE IN FAVOR OF GRANTING THE STAY

The District Court held that "[t]here are equities and public interests to balance on both sides." *D.A.M. II*, 2020 WL 5525056, at \*14.  Petitioners respectfully assert that the balance of harms tips in their favor. Respondents have never denied that if

20

the Petitioners establish a likelihood that deportation without lawful process violates the U.S. Constitution, they necessarily establish that the public interest would be served by injunctive relief. *Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015). On appeal, Petitioners will make that showing. This is because allowing unchecked, unconstitutional conduct is always contrary to the public interest. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416, 435 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches.").

Instead, Respondents alleged below that they have an interest in seeing the government's laws applied. They are correct. In granting the administrative stay, the Court is not thwarting the laws established by Congress. It is defending lawful process.

## **CONCLUSION**

For all the reasons set forth herein, Petitioners respectfully request that this Court issue an order issuing an administrative stay of removal of Petitioners from the United States pending further order of this Court.

21

Dated:   Washington, D.C.  
           September 17, 2020

Respectfully Submitted,

GREENBERG TRAURIG, LLP

/s/ Caroline J. Heller  
By: Caroline J. Heller  
200 Park Ave.  
New York, New York 10166  
Tel: (212) 801-2165  
hellerc@gtlaw.com

Steven G. Barringer  
2101 L. Street, N.W.  
Washington, D.C. 20037  
Tel: (202) 331-3108  
barringers@gtlaw.com

-and-

RAPID DEFENSE NETWORK  
Gregory P. Copeland  
Sarah T. Gillman  
Rapid Defense Network  
11 Broadway, Suite 615  
New York, NY 10004  
Tel: (212) 843-0910  
gregory@defensenetwork.org  
sarah@defensenetwork.org

*Counsel for Petitioners-Appellants*

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. Rule 27(d) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,177 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.


Dated:     September 17, 2020              */s/ Caroline J. Heller*
                                           *Attorney for Appellants*

23

## <u>CERTIFICATE OF SERVICE</u>

I, Caroline J. Heller, hereby certify that on September 17, 2020, a true and correct copy of the foregoing Motion was served electronically upon the below-listed parties via email:

Christopher Hair
Erez R. Reuveni
Assistant U.S. Attorney
District of Columbia
555 4th St. NW
Washington, D.C. 20530
Office: (202) 252-2541
Mobile: (202) 809-5387
Christopher.Hair@usdoj.gov
Erez.R.Reuveni@usdoj.gov

Dated:    September 17, 2020                  */s/ Caroline J. Heller*

                                                     *Attorney for Appellants*

24

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

D.A.M. et al.,

        *Petitioners*,

    -against-

William P. BARR, Attorney General of the United States; Chad WOLF, Acting Secretary, U.S. Department of Homeland Security,

        *Respondents*.

Case No. 20-1321 (CRC)

## PETITIONERS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND STAY OF REMOVAL

Steven G. Barringer (D.C. Bar No. 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

Caroline Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

*Attorneys for Petitioners*

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

    I.      Procedural Background ......................................................................... 3
    II.    The District Court for the District of Columbia Vacates the "Transit Ban" ........... 4

           A.     The Transit Ban Eliminated the 8 U.S.C. § 1225(b) Asylum Eligibility Process for Certain Categories of Noncitizens, Including Most of the Petitioners .............................. 4
           B.     Asylum Eligibility Process for Those Not Subjected to the Transit Ban Provides a Path to Asylum in the United States ................................. 5
           C.     Judge Kelly Vacates the Transit Ban, Rendering It Void Ab Initio .......... 7

    III.   The Amended Petition ......................................................................... 7

JURISDICTION AND VENUE .................................................................................. 8

    I.      Jurisdiction .......................................................................................... 8
    II.    Venue is Proper .................................................................................. 14

ARGUMENT .............................................................................................................. 16

    I.      Legal Standard ................................................................................... 16
    II.    Transit Ban Petitioners are Likely to Succeed on the Merits of Their Claims .................................................. 17
    III.   Transit Ban Petitioners Will Be Irreparably Harmed .......................... 21
    IV.   The Balance of the Equities Are in Favor of Granting the TRO and Respondents Will Not Be Harmed ...................................... 22

CONCLUSION ........................................................................................................... 23

App.173

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................19

*Am. Great Lakes Ports Ass'n v. Zukunft,*
    301 F. Supp. 3d 99 (D.D.C. 2018), *aff'd*, 962 F.3d 510 (D.C. Cir. 2020) ..............19

*Arce v. United States,*
    899 F.3d 796 (9th Cir. 2018) ................................................................................13

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
    897 F.3d 314 (D.C. Cir. 2018) ..............................................................................22

*Batista-Taveras v. Ashcroft,*
    No. 03-cv-1968, 2004 WL 2149095 (S.D.N.Y. Sept. 23, 2004) ...........................15

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.,*
    502 U.S. 32 (1991) ...........................................................................................9, 14

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ..................................................................................9, 13, 14

*Calderon v. Sessions,*
    330 F. Supp. 3d 944 (S.D.N.Y. 2018) .............................................................12, 21

*Capital Area Immigrants' Rights Coalition v. Trump,*
    Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481 (D.D.C. June
    30, 2020) ...............................................................................1, 7, 17, 18, 19*

*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ................................................................................16

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) .........................................................................................20, 21

*Demore v. Kim,*
    538 U.S. 510 (2003) (quoting *Reno v. Flores*, 507 U.S. 292 (1993) .....................20

*Department of Homeland Security v. Thuraissigiam,*
    Case No. 19-161, 2020 WL 3454809 (U.S. June 25, 2020) ...................................14

*East Bay Sanctuary Covenant, et al. v. Barr, et al.,*
    Nos. 19-16487, 19-16773 (9th Cir. July 6, 2020) ................................................18

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..............................................................................................21

*Envtl. Def. v. Leavitt,*
    329 F. Supp. 2d 55 (D.D.C. 2004) (citing *Indep. U.S. Tanker Owners Comm. v.
    Dole*, 809 F.2d 847 (D.C. Cir. 1987)) ..................................................................18

App.174

*Fatty v. Nielsen,*
　　Case No. 17-cv-1535, 2018 WL 3491278 (W.D. Wash. July 20, 2018), appeal
　　dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019) ..............................12, 20, 21

*Flores-Torres v. Mukasey,*
　　548 F.3d 708 (9th Cir. 2008) ...................................................................................................9

*Gomez v. Kelly,*
　　237 F. Supp. 3d 13 (D.D.C. 2017) ........................................................................................16

*Gordon v. Holder,*
　　721 F.3d 638 (D.C. Cir. 2013) ..............................................................................................22

*Grace v. Whitaker,*
　　344 F. Supp. 3d 96 (D.D.C. 2018), *aff'd in part, rev'd in part on other*
　　*grounds, vacated in part on other grounds, Grace v. Barr,* No. 19-05013,
　　2020 WL 4032652 (D.C. Cir. July 17, 2020) .........................................................................6

*Guerrero-Lasprilla v. Barr,*
　　140 S. Ct. 1062 (2020)........................................................................................................8, 14

*Hamdan v. Rumsfeld,*
　　548 U.S. 557 (2006) ................................................................................................................9

*Hamdi v. Rumsfeld,*
　　542 U.S. 507 (2004) ................................................................................................................8

*Harmon v. Thornburgh,*
　　878 F.2d 484 (D.C. Cir. 1989) ................................................................................................7

*Hernandez v. Gonzales,*
　　424 F.3d 42 (1st Cir. 2005) ...................................................................................................10

*INS v. Cardoza-Fonseca,*
　　480 U.S. 421 (1987) ................................................................................................................6

*Jennings v. Rodriguez,*
　　138 S.Ct. 830 (2018) ..................................................................................................10, 11, 13

*Klayman v. Obama,*
　　142 F. Supp. 3d 172 (D.D.C. 2015) ......................................................................................22

*Kucana v. Holder,*
　　558 U.S. 233, (2010) ......................................................................................................8, 9, 14

*Kurnaz v. Bush,*
　　No. 04-cv-1135, 2005 WL 839542 (D.D.C. Apr. 12, 2005)..................................................17

*League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton,*
　　752 F.3d 755 (9th Cir. 2014) .................................................................................................22

*Mathews v. Eldridge,*
　　424 U.S. 319 (1976)..........................................................................................................20, 21

*McNary v. Haitian Refugee Ctr., Inc.,*
　　498 U.S. 479 (1991)..........................................................................................................8, 14

iii

*Michalski v. Decker*,
   279 F. Supp. 3d 487 (S.D.N.Y. 2018) .................................................................13

*Nak Kim Chhoeun v. Marin*,
   No. 17 Civ. 1898, 2018 WL 1941756 (C.D. Cal. Mar. 26, 2018) .........................13

*Nat'l Fed'n of Fed. Emps. v. Carlucci*,
   680 F. Supp. 416 (D.D.C. 1988) ..........................................................................22

*Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) ...........................................................................19

*Nestor v. Hershey*,
   425 F.2d 504 (D.C. Cir. 1969) (quoting 1 J. W. MOORE, FEDERAL PRACTICE ¶
   0.142 (5.-2) (1964) ...............................................................................................15

*Nken v. Holder*,
   556 U.S. 418 (2009) .........................................................................................16, 22

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................................6, 7

*Osorio-Martinez v. AG United States*,
   893 F.3d 153 (3d Cir. 2018) .................................................................................10

*Palko v. Connecticut*,
   302 U.S. 319 (1937) .............................................................................................20

*Pensamiento v. McDonald*,
   No. 18 Civ. 10475, 315 F.Supp.3d 684, 2018 WL 2305667 (D. Mass. May 21,
   2018) ....................................................................................................................13

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .........................................................................................10, 11

*Rochin v. California*,
   342 U.S. 165 (1952) .............................................................................................20

*S.N.C. v. Sessions*,
   18-cv-7680, 2018 WL 6175902 (S.D.N.Y. Nov. 26, 2018) .............................12, 21

*S.N.C. v. Sessions*,
   325 F. Supp. 3d 401 (S.D.N.Y. 2018) ..............................................................14, 15

*Santos v. Barr*,
   No. 17-cv-321, 2019 WL 2504101 (D.D.C. June 17, 2019)..................................15

*Sierra Club v. EPA*,
   850 F. Supp. 2d 300 (D.D.C. 2012) .....................................................................19

*Sierra Club v. Johnson*,
   374 F. Supp. 2d 30 (D.D.C. 2005) .......................................................................19

*Somir v. United States*,
   354 F. Supp. 2d 215 (E.D.N.Y. 2005) .................................................................15

*Strait v. Laird*,
    406 U.S. 341 (1972)..................................................................15

*United States v. Goodner Bros. Aircraft, Inc.*,
    966 F.2d 380 (8th Cir. 1992) ............................................7, 18

*United States v. Salerno*,
    481 U.S. 739 (1987)..................................................................20

*W.C. v. Bowen*,
    807 F.2d 1502 (9th Cir. 1987) ..............................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)......................................................................16

*Ex Parte Yerger*,
    75 U.S. 85 (1868)........................................................................9

*You v. Nielsen*,
    321 F. Supp. 3d 451 (S.D.N.Y. 2018)..................................12

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)...........................................................13, 20

**Federal Statutes**

U.S.C. § 1225(b)(1)(E)(ii) .................................................................5

8 U.S.C. § 1158 .................................................................................18

8 U.S.C. § 1225 ...............................................................2, 11, 21, 22

8 U.S.C. § 1225(b) ................................................................2, 5, 20

8 U.S.C. § 1225(b)(1) .....................................................................10

8 U.S.C. § 1225(b)(1)(A)(ii) .............................................................6

8 U.S.C. § 1225(b)(1)(B) ..................................................................6

8 U.S.C. § 1225(b)(1)(B)(ii) .............................................................6

8 U.S.C. §1225(b)(1)(B)(v) ...............................................................6

8 U.S.C. § 1252 ............................................................................9, 10

8 U.S.C. § 1252(a)(2)(A) .................................................................10

8 U.S.C. § 1252(a)(2)(A)(i)-(iv) ......................................................10

8 U.S.C. § 1252(a)(5) .......................................................................13

8 U.S.C. § 1252(b) .............................................................................9

8 U.S.C. § 1252(b)(9) .......................................................................13

8 U.S.C § 1252(e) ............................................................................10

8 U.S.C. § 1252(f) ............................................................................17

8 U.S.C. § 1252(g) ...............................................................................................11, 13

28 U.S.C. § 1391(e) ....................................................................................................14

28 U.S.C. § 2241(a) ......................................................................................................8

28 U.S.C. § 2241(c)(3) ..................................................................................................8

## Regulations

8 C.F.R. § 208.13(c)(4) .................................................................................................4

8 C.F.R. § 208.30 ..........................................................................................................6

8 C.F.R. § 208.30(e)(5)(iii) ...........................................................................................4

8 C.F.R. § 208.30(e)(8) .................................................................................................5

8 C.F.R. § 208.30(f) ......................................................................................................6

8 C.F.R. § 208.31(c) ......................................................................................................5

8 C.F.R. § 235.3(b)(4) ...................................................................................................6

"Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July
    16, 2019) ...........................................................................................................1, 4, 5

## Constitutional Provisions

U.S. CONST. amend. V .................................................................................................20

U.S. CONST. art. I, § 9, cl. 2 ..........................................................................................8

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR TEMPORARY RESTRAINING ORDER AND STAY OF REMOVAL

Petitioners respectfully move this Court for a temporary restraining order ("TRO") to prevent the government's imminent removal of them from the United States.

## INTRODUCTION

The Petitioners here are parents and their children who have fled persecution and violence to seek asylum in the United States. Petitioners are detained the South Texas Family Residential Center in Dilley, Texas ("Dilley") and the Berks County Residential Center in Leesport, Pennsylvania ("Berks"), or have been released from Dilley or Berks but remain "in custody" for habeas corpus purposes based on the substantial restrictions on liberty imposed by Respondents on those released by way of ongoing efforts to effect removal and ongoing orders of supervision often involving monitoring and electronic custody.

The vast majority of the Petitioners received final orders of removal procured under the interim final rule jointly published by the Departments of Justice and Homeland Security entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban"). On June 30, 2020, in a Memorandum Opinion and accompanying Order, Judge Timothy J. Kelly of the District Court of the District of Columbia entered a final, appealable Order vacating the Transit Ban, holding that "Defendants unlawfully promulgated the [Transit Ban] without complying with the APA's notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here." *See Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481, at *1 (D.D.C. June 30, 2020) ("*CAIR*"); *see CAIR v. Trump*, Case No. 1:19-cv-02117-TJK, (ECF 71) (D.D.C. June 30, 2020). "Having found that the [Transit Ban] was enacted unlawfully, the Court sees no reason why it should not be vacated." 2020 WL 3542481 at *1.

1

Because Judge Kelly vacated the Transit Ban, it is void *ab initio* and *CAIR* restores the *status quo* for every party affected by the rule, including most Petitioners in this case, as their final orders of removal result from Respondents' application of the now-vacated Transit Ban. The *status quo* is restored to the process created by Congress under 8 U.S.C. § 1225(b), pursuant to which these Petitioners may seek asylum. Petitioners subjected to the Transit Ban were categorically prevented from pursuing that process to seek asylum, which should only have required a significant possibility of asylum for eligibility under the credible fear standard. Accordingly, the Petitioners subjected to the Transit Ban are entitled to access the asylum process created by Congress pursuant to 8 U.S.C. § 1225.

Despite this, Respondents' position is that the Petitioners subjected to the Transit Ban "are not parties to *CAIR*, and received final orders of removal not subject to further direct review when the [Transit Ban] was valid, and so those orders are not impacted by *CAIR*." (Exhibit "2" attached to the Declaration of Caroline J. Heller dated July 23, 2020 ("Heller Decl.")). As set forth in Petitioners' Verified Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief ("Amended Petition"), attempting to remove Petitioners predicated on removal orders issued pursuant to a vacated rule violates their procedural due process rights under the Fifth Amendment, and violates their substantive due process rights because such conduct would be arbitrary action without any reasonable justification in the service of a legitimate government objective. (Heller Decl., Ex. "1" [Verified Amended Petition for Writ of Habeas Corpus dated July 9, 2020], ¶¶ 299-310). Respondents cannot now deport these Petitioners without providing them their right to a constitutionally adequate process to pursue their applications for asylum. Absent Court intervention, Petitioners have no adequate substitute to challenge the

legality of Respondents' action to deport them despite the vacatur of the Transit Ban, which will extinguish their ability to pursue the asylum process established by Congress.

## FACTUAL BACKGROUND

### I.    Procedural Background

Petitioners are families—mothers, fathers and their minor children—either held in detention at Dilley or Berks, or released but remaining "in custody" for habeas corpus purposes based on the substantial restrictions on liberty imposed by Respondents on those released by way of ongoing efforts to effect removal and ongoing orders of supervision, monitoring and electronic custody.  (Heller Decl., Ex. "1" ¶¶ 36-121).  Petitioners are applicants for asylum in the United States who fled from Ecuador, El Salvador, Haiti, Mexico, Guatemala, Brazil, and Honduras after facing persecution, abuse, sexual predation, and threats of death in those countries.  *Id.*  Petitioners include women who have been repeatedly raped and beaten, some who were drugged, kidnapped, and sold into commercial sexual slavery, and who faced terrible abuse and persecution in their home countries.

On May 18, 2020, Petitioners filed a Petition for Writ of Habeas Corpus alleging, among other things, that the manner in which Respondents intended to deport them during the COVID-19 pandemic violates (i) their procedural and substantive due process rights, (ii) the state-created danger doctrine, (iii) the special relationship doctrine, and (iv) the Administrative Procedure Act and the Fifth Amendment (the *Acccardi* doctrine).  (ECF 3).  That same day, Petitioners filed an emergency motion for a temporary restraining order requesting a stay of removal of the Petitioners who were detained at Dilley or Berks ("Detained Petitioners")

On May 18, 2020, before the Clerk's office had assigned a case number and Judge, Petitioners filed an emergency motion for the entry of an administrative order to preserve the *status*

3

*quo*, staying the deportation of the Detained Petitioners. (ECF 7). Judge Nichols granted the administrative stay until May 19, 2020 at 6:00 pm to preserve the *status quo*. (ECF 8). Petitioners had filed a notice of related case, relating it to *M.M.V. v. Barr*, Case No. 19-2773, Judge Amy Berman Jackson. (ECF 12). Judge Berman Jackson found that this case was not related to *M.M.V.*, referred the case to the Calendar and Case Management Committee for random assignment, and ordered that the administrative stay would be extended until the matter was assessed by the assigned Judge. (Minute Order, May 19, 2020). The case was assigned to Judge Cooper, who ordered that the administrative stay would be extended until the Court decided Petitioners' motion for a temporary restraining order staying the removal of Detained Petitioners. (Minute Order, May 19, 2020). The Court held oral argument on that application on May 22, 2020. (ECF 22).

On July 23, 2020, the Court denied Petitioners' application. (ECF 34). The Court also lifted the stay of deportation. (ECF 33). Based upon Respondents prior actions, they will likely attempt to deport Petitioners immediately.

## II. The District Court for the District of Columbia Vacates the "Transit Ban"

### A. The Transit Ban Eliminated the 8 U.S.C. § 1225(b) Asylum Eligibility Process for Certain Categories of Noncitizens, Including Most of the Petitioners

On July 16, 2019, the Departments of Justice and Homeland Security jointly issued the Transit Ban as an interim final rule. The Transit Ban rendered noncitizens seeking to enter the United States at its southern border categorically ineligible for asylum unless they first applied for similar protection in a third country they transited through (other than the country they fled) and were rejected there, are victims of severe forms of trafficking, or did not pass through any country that is a signatory to the Refugee Convention or Refugee Protocol in route to the United States. *See* 84 Fed. Reg. at 33,835. The Transit Ban further provided that noncitizens ineligible for asylum

under § 208.13(c)(4) are automatically and conclusively determined not to have a "credible fear" of persecution in their home countries. See 8 C.F.R. § 208.30(e)(5)(iii).

The Transit Ban did not limit a noncitizen's ability to seek withholding of removal under either Section 241(b)(3) of the INA or the Convention Against Torture ("CAT"). *See* 84 Fed. Reg. at 33,834. However, eligibility to seek asylum under these authorities is limited, requiring the more stringent showing of "reasonable fear." Thus, under the Transit Ban, if an immigration officer determined that a noncitizen subject to expedited removal was barred from asylum eligibility, the noncitizen was summarily found not to have a credible fear of persecution—typically without any supervisor review as required by 8 C.F.R. § 208.30(e)(8), *see also* U.S.C. § 1225(b)(1)(E)(ii))—and informed during the credible fear interview itself that they were barred from seeking asylum in the United States. The immigration officer then proceeded to determine only if a reasonable fear of persecution existed for withholding of removal or CAT protection.

Reasonable fear is a significantly higher standard than credible fear. It is defined by regulation as "a reasonable possibility that [the applicant] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c). If the noncitizen did not establish a reasonable fear of persecution during the interview to the interviewer's satisfaction, a written notice of decision was issued, subject to review by an immigration judge under the higher standard of reasonable fear (i.e., not the more moderate credible fear standard).

## B. Asylum Eligibility Process for Those Not Subjected to the Transit Ban Provides a Path to Asylum in the United States

Noncitizens who were **not** subjected to the Transit Ban, but subject to expedited removal proceedings, were (and are) afforded process under 8 U.S.C. § 1225(b). If an individual subject

5

to expedited removal indicates a fear of returning to his or her home country or intention to apply for asylum, the immigration officer must refer the individual for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. If the noncitizen is referred to an asylum officer, the officer conducts a "credible fear interview," credible fear being defined by law as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]" 8 U.S.C. §1225(b)(1)(B)(v). To ultimately prevail on an asylum claim itself, the applicant need only establish that there is a 10% chance that he or she will be persecuted on account of one of the five protected grounds for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430–32, 439–40 (1987); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 120 n.3 (D.D.C. 2019); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 127 (D.D.C. 2018), *aff'd in part, rev'd in part on other grounds, vacated in part on other grounds, Grace v. Barr*, No. 19-05013, 2020 WL 4032652 (D.C. Cir. July 17, 2020). (citation omitted). Thus, to prevail at a credible fear interview, the applicant need only show a "significant possibility" of asylum eligibility—i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a fraction of a 10% chance of persecution. *See* 8 U.S.C. §1225(b)(1)(B)(v). If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge. At that hearing, they will have the opportunity to develop a full record before the judge, and they may appeal an adverse decision to the BIA and the relevant federal court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

Here, the only Petitioners who were **not** subjected to the Transit Ban are: Petitioners A.G.P. and her children D.S.G. and A.S.G.; Petitioners C.R.R. and her children I.G.R. and V.G.R.;

Petitioners E.V.M. a Guatemalan national; Petitioners I.M.V. and her children J.T.M. and D.T.M;

Petitioner N.V., a Haitian national, and; Petitioner C.L., a Haitian national, and her minor child

J.A. (Heller Decl., Ex. 1 ⁋ 159). The remaining Petitioners were subjected to the Transit Ban and

its procedures and their final orders of removal resulted from Respondents' application of the

Transit Ban to those Petitioners ("Transit Ban Petitioners"). (*Id.* ⁋ 160).

### C. Judge Kelly Vacates the Transit Ban, Rendering It Void *Ab Initio*

On June 30, 2020, in *CAIR*, Judge Kelly entered a final Order vacating the Transit Ban,

holding that "Defendants unlawfully promulgated the [Rule] without complying with the APA's

notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs

function' exceptions are satisfied on the record here." 2020 WL 3542481 at *1; Case No. 1:19-

cv-02117-TJK, (ECF 71).[1] Judge Kelly rejected the government's argument that the Court should

"'limit any relief to the actual parties before the Court.'" *Id.* at *22 (citing *Nat'l Min. Ass'n v. U.S.

Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Harmon v. Thornburgh*, 878

F.2d 484, 495 (D.C. Cir. 1989); *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019))). Instead,

"[h]aving found that the Rule was enacted unlawfully, the Court [saw] no reason why it should not

be vacated." *Id*. at *21. Accordingly, under well-settled law, the Transit Ban "has no 'force or

effect of law' and therefore is void *ab initio*." *United States v. Goodner Bros. Aircraft, Inc*., 966

F.2d 380, 384 (8th Cir. 1992) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 313, (1979)).

### III.   The Amended Petition

On July 9, 2020, the Petitioners filed an Amended Petition. (*See* Heller Decl.*,* Ex. 1). The

Amended Petition added two family Petitioners,[2] and two new claims based upon the vacatur of

---

[1]  *CAIR* was consolidated with *I.A. v. Barr*, Civ. No. 19-2530 (TJK). 2020 WL 3542481 at *1.

[2] Petitioner A.Q.L. and her minor child A.G.C., and Petitioner A.B.C. and her child E.C.B. (Heller
Decl., Ex. 1 ⁋⁋120-21).

the Transit Ban.[3]   Counts V and VI, brought by the Transit Ban Petitioners, allege that Respondents' attempts to remove the Transit Ban Petitioners—who have unlawful final orders of removal procured under the vacated Transit Ban—violate their substantive and procedural due process rights and that the Court should enter an order declaring that Respondents cannot remove the Transit Ban Petitioners until they have been provided a lawful process.  (Heller Decl., Ex. 1 ¶¶ 299-310).

## JURISDICTION AND VENUE

### I.   Jurisdiction

Federal courts have jurisdiction to hear habeas petitions because "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion of O'Connor, J.); U.S. CONST. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended . . ."); 28 U.S.C. § 2241(c)(3) (stating federal courts may grant the writ to any person "in custody in violation of the Constitution or laws or treaties of the United States").  District courts may grant habeas relief "within their respective jurisdictions."  28 U.S.C. § 2241(a).

There is a "well-settled" and "strong presumption" favoring judicial review of administrative action.  *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496, 498 (1991). "When a statutory provision 'is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'"  *Kucana v. Holder*, 558 U.S. 233, 251 (2010) (quoting *de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995); *see also Guerrero-Lasprilla*

---

[3] The Amended Complaint also updated the COVID-19 statistics and, based upon Respondents' representation that Dilley and Berks are governed by the Family Residential Standards only, the Amended Petition makes those clarifications.  (*See generally* Heller Decl., Ex. 1).

*v. Barr*, 140 S. Ct. 1062, 1069 (2020).  The government may overcome that presumption only by pointing to "clear and convincing evidence" of a contrary legislative intent.  *Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991).  That presumption has consistently been applied to immigration statutes.  *Kucana*, 558 U.S. at 251.

Jurisdiction over a habeas corpus petition can, under some narrow circumstances, be deprived by 8 U.S.C. § 1252, but those circumstances are not applicable here.  For 8 U.S.C. § 1252 to deprive the Court of habeas jurisdiction, the Court must assess a two-pronged inquiry: (i) whether the statute contains a clear statement that the Court lacks habeas jurisdiction, and (ii) if the statute does clearly deny jurisdiction, then whether the statute unconstitutionally suspends the habeas writ by failing to provide an adequate alternative forum for review.  *Boumediene v. Bush*, 553 U.S. 723, 736, 771 (2008) (determining first whether the statute "denies the federal courts jurisdiction," and then whether the statute "avoids the Suspension Clause mandate" by providing "adequate substitute procedures for habeas corpus"); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 575 (2006) (tracing the requirement of an "unmistakably clear statement" at least as far back as *Ex Parte Yerger*, 75 U.S. 85, 104-05 (1868)).

With respect to the first prong, the clear-statement rule must be applied to each case's particular facts, *i.e.*, even though a statute's jurisdiction-stripping statement might clearly strip jurisdiction for one set of facts, the same statement might be ambiguous as to another set of facts, and in the latter circumstance, jurisdiction is retained. *See Flores-Torres v. Mukasey*, 548 F.3d 708, 712 n.6 (9th Cir. 2008) (holding that "in this circumstance" § 1252(b) does not provide a "clear statement" even if it does in other circumstances).  This has proven particularly true with section 1252 because the statute strips jurisdiction in some respects but is ambiguous in others.

*See Hernandez v. Gonzales*, 424 F.3d 42, 42-43 (1st Cir. 2005) (stating that § 1252 strips jurisdiction over some but not all alien habeas petitions).

The U.S. Supreme Court has confirmed that section 1252 is not universal in its jurisdiction-stripping provisions. *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471 (1999) (hereinafter "*AADC*"). The *AADC* Court explained that section 1252 strips jurisdiction only for a "narrow" class of alien challenges to "discrete actions" of the Attorney General. *Id.* at 482. This "narrow" reading of section 1252 was critical to the outcome of the *AADC* case because the majority and the minority jockeyed over whether section 1252 barred the entire "universe of deportation claims," or a "much narrower" set. *Id.* Despite the dissenting justice's arguments, the majority agreed that the narrow view must prevail. *See id.* at 505–06 (Souter, J., dissenting) (arguing that the section was in fact "exhaustive"). This limited reading of section 1252 was further solidified in *Jennings v. Rodriguez*, 138 S.Ct. 830, 841 (2018). *See, e.g.*, *Osorio-Martinez v. AG United States*, 893 F.3d 153, 178 (3d Cir. 2018) (finding jurisdiction stripping under section 1252(e) violates suspension clause).

The plain language of Section 1252(a)(2)(A) does not strip judicial review of Transit Ban Petitioners' claims. Subsections (i), (ii) and (iii) of this section address individual, as-applied challenges to determinations or decisions made under § 1225(b)(1), and subsection (iv) prohibits judicial review "except as provided in subsection (e), [of] procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)…." *See* 8 U.S.C. § 1252(a)(2)(A)(i)-(iv). Here, Transit Ban Petitioners do not challenge individual, as-applied challenges to determinations or decisions, or a policy or procedure. Instead, Transit Ban Petitioners' challenge the process employed by Respondents to remove them from the United States prior to the exhaustion of their right to a lawful process established by Congress to seek

10

asylum in the United States.  Congress created a process in 8 U.S.C. § 1225 and 8 C.F.R. Chapter B through which noncitizens may seek asylum.  The Transit Ban Petitioners, therefore, challenge Respondents' legal authority to deport them without providing them access to that process, to which they are entitled to access now that the Transit Ban has been vacated.

Similarly, 8 U.S.C. § 1252(g) does not strip the Court of jurisdiction to review the Transit Ban Petitioners' claims.[4]  The Supreme Court has held that § 1252(g) is not a "'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'" *AADC.*, 525 U.S. at 482.  "In fact, what § 1252(g) says is much narrower.  The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Id.* (quoting § 1252(g)).  The Supreme Court concluded that while § 1252(g) prohibits judicial review of challenges to the discretionary decision whether to execute a removal order, § 1252(g) does not strip the federal courts of jurisdiction over claims challenging the multitude of "***other decisions or actions that may be part of the deportation process***."  *Id.* at 482 (emphasis added); *see also Jennings*, 138 S. Ct. at 840 ("cramming judicial review of [a claim of inhumane conditions of confinement or a state-law claim for assault against a guard] into the review of final removal orders would be absurd.").

Transit Ban Petitioners challenge Respondents' *legal authority* to remove them from the United States prior to the exhaustion of the their right to a lawful process established by Congress to seek asylum.  Transit Ban Petitioners have a right to pursue the relief made available by Congress to individuals in their exact position. Judge Kelly found that the right to pursue such

---

[4] Section 1252(g) provides "[e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision…. no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

relief was unlawfully foreclosed by the Transit Ban.  The District Court for the Southern District of New York correctly framed the issue in *You v. Nielsen*, "[t]he question before the Court is not why the Secretary chose to execute the removal order.  Rather, the question is whether the way Respondent acted accords with the Constitution and the laws of this country.  Whether Respondent' actions were legal is not a question of discretion, and, therefore, falls outside the ambit of § 1252(g)."  321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018); *see also, Calderon v. Sessions*, 330 F. Supp. 3d 944, 954 (S.D.N.Y. 2018) ("Petitioner here does not challenge ICE's prosecutorial discretion.  Rather, Petitioner challenges ICE's legal authority to exercise such discretion when the subject of the removal order also has a right to seek relief made available by the DHS [an application to recognize petitioner as a spouse of a U.S. citizen].  The Court's review of ICE's legal authority is not foreclosed by 8 U.S.C. § 1252(g)."); *Fatty v. Nielsen*, Case No. 17-cv-1535, 2018 WL 3491278, at *2 (W.D. Wash. July 20, 2018), appeal dismissed, 18-35780, 2019 WL 1270844 (9th Cir. Jan. 11, 2019) (where petitioner filed a habeas petition seeking a judicial stay of his removal pending adjudication of his petition for T nonimmigrant status, holding 1252(g) did not strip the court of jurisdiction because his "claims are more properly categorized as collateral legal and constitutional challenges to the process by which the government seeks to remove him. The Court finds this to be a critical distinction, and one which enables it to hear his case."); *S.N.C. v. Sessions*, 18-cv-7680, 2018 WL 6175902, at *5 (S.D.N.Y. Nov. 26, 2018) (where petitioner filed a habeas petition seeking a stay of removal until her T-Visa and Violence Against Woman Act applications were adjudicated, holding 1252(g) did not strip the court of jurisdiction because "Petitioner's claim here is a constitutional challenge to ICE's legal authority and falls beyond §

12

1252(g)'s reach."); *Jennings*, 138 S. Ct. at 840;[5] *Zadvydas v. Davis*, 533 U.S. 678 (2001) (reviewing whether ICE has the statutory authority to detain an immigrant subject to a final removal order after the 90-day removal period). Thus, the Court's review of Respondents' legal authority is not foreclosed by § 1252(g).

Even assuming, *arguendo*, that 1252 strips jurisdiction – which it does not – the Suspension Clause requires residual habeas jurisdiction in the circumstances of this case. The Supreme Court has held that except in periods of "formal suspension" of the writ, individuals must either be given access to an "adequate substitute" to the writ or the writ itself, so as "to maintain the 'delicate balance of governance' that is itself the surest safeguard of liberty." *Boumediene*, 553 U.S. at 745.

In *Boumediene*, the Court traced the history of the Writ of Habeas Corpus and concluded that the fact that "the Framers considered the writ a vital instrument for the protection of individual liberty is evident from the care taken to specify the limited grounds for suspension…" *Boumediene,* 553 U.S. at 743. The Court also explained within the context of its historical analysis of the Writ that "[i]n our system the Suspension Clause is designed to protect against these cyclical abuses." *Id.* at 745. In finding that the Suspension Clause applied in *Boumediene,* the Court rejected the government's argument that the decisions of the Executive Branch with respect to the Petitioners in the case were unreviewable. The Court explained that "[w]ithin the Constitution's

---

[5] *Accord Arce v. United States*, 899 F.3d 796, 800 (9th Cir. 2018) ("A decision or action to violate a court order staying removal…falls outside of the statute's jurisdiction-stripping reach"); *Pensamiento v. McDonald*, No. 18 Civ. 10475, 315 F.Supp.3d 684, 688, 2018 WL 2305667, at *2–3 (D. Mass. May 21, 2018) (concluding that §§ 1252(a)(5), (b)(9), and (g) do not bar district courts from "review[ing] habeas challenges to unlawful immigration detention"); *Nak Kim Chhoeun v. Marin*, No. 17 Civ. 1898, 2018 WL 1941756, at *4 (C.D. Cal. Mar. 26, 2018) (concluding that §§ 1252(a)(5), (b)(9), and (g) "restrict[ ] district court review over claims contesting the merits or validity of a removal order," but not "the manner in which [petitioners] were re-detained" after being released); *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (concluding that § 1252(g) did not bar petitioner's challenge to his detention because detention "is independent from the decision or action to commence a removal proceeding").

separation of powers structure, few exercises of judicial power are as legitimate or as necessary as the responsibility to hear challenges to the authority of the Executive to imprison a person." *Id.* at 797.

The Supreme Court's recent decision in *Department of Homeland Security v. Thuraissigiam*, Case No. 19-161, 2020 WL 3454809 (U.S. June 25, 2020) does not require a different conclusion, as its holding is limited as applied to the facts of that case. *Id.* at *3; *see also id.*, at *1 ("*As applied here*, § 1252(e)(2) does not violate the Suspension Clause" (emphasis added)); *id.* ("*As applied here*, § 1252(e)(2) does not violate the Due Process Clause." (emphasis added)); *id.* at *23 ("The question presented is 'whether, *as applied to respondent*, Section 1252(e)(2) is unconstitutional under the Suspension Clause.'" (Breyer, J, concurring in the judgment) (quoting Pet. for Cert. i) (emphasis added)). Here, unlike *Thuraissigiam*, the Transit Ban Petitioners do not seek to either vacate their removal orders (which have been vacated pursuant to *CAIR*), but rather, they contest their removal until they engage in meaningful process to which they are entitled. Further, the presumption is that the Court may review this claim and this presumption may only be overcome by "clear and convincing evidence" of a contrary legislative intent. *See Bd. of Governors of the Fed. Reserve Sys.*, 502 U.S. at 44; *Guerrero-Lasprilla*, 140 S. Ct. at 1069; *McNary*, 498 U.S. at 496, 498; *Kucana*, 558 U.S. at 251.

II.    **Venue is Proper**

Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the Respondents' federal agencies are headquartered in this District. Venue is not controlled by the immediate custodian rule, and the Transit Ban Petitioners' non-core habeas claims are all properly brought in this District. *See S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018). The immediate custodian rule is "limited [] to 'core' petitions challenging present physical detention, implicitly

14

leaving open whether the rule applies to 'non-core' challenges." *See id.* (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 442-43 (2004)). "[U]nder the governing case law, [the Attorney General] is the proper respondent for ['non-core' habeas claims[.]" *Id.* at 410.

The Transit Ban Petitioners' amended claims are "non-core" claims because they do not seek release from custody, but rather challenge Respondents' legal authority to deport them prior to the exhaustion of their legal right to seek asylum—a right that was unlawfully denied by the now-vacated Transit Ban. (Heller Decl., Ex. 1 ¶¶ 299-310). Applying the legal control test, district courts have held that the Attorney General is the proper respondent for "non-core" claims challenging orders of removal. *See, e.g.*, *Somir v. United States*, 354 F. Supp. 2d 215, 217-18 & n.2 (E.D.N.Y. 2005) (collecting cases); *Batista-Taveras v. Ashcroft*, No. 03-cv-1968, 2004 WL 2149095, at *6 (S.D.N.Y. Sept. 23, 2004). "In these courts' view, the Attorney General is a 'custodian' over individuals facing exclusion and deportation due to the 'near total control' that he exercises over them." *S.N.C.*, 325 F. Supp. 3d at 410 (citing *Somir*, 354 F. Supp. 2d at 217–18); *cf. Strait v. Laird*, 406 U.S. 341, 344 (1972).

Venue in this district is appropriate and does not pose an inconvenience for the parties or otherwise offend "traditional venue considerations[.]" *Batista-Taveras*, 2004 WL 2149095, at *6; *S.N.C.*, 325 F. Supp. 3d at 410. "'Where a public official is a party to an action in his official capacity he resides in the judicial district where he maintains his official residence, that is where he performs his official duties.'" *Nestor v. Hershey*, 425 F.2d 504, 527 n.22 (D.C. Cir. 1969) (quoting 1 J. W. MOORE, FEDERAL PRACTICE ¶ 0.142 (5.-2) (1964) (collecting cases)); *Santos v. Barr*, No. 17-cv-321, 2019 WL 2504101, at *6 (D.D.C. June 17, 2019) ("[v]enue is appropriate in [the District Court for the District of Columbia] under 28 U.S.C. § 1391(e) because the Defendant—Attorney General William P. Barr, acting in his official capacity—resides in the

App.193

District of Columbia…").  The Transit Ban and the policies and practices at issue concerning Respondents' intent to remove the Transit Ban Petitioners without proper process arose from national policy.  Thus, the government officials responsible for those policies and decisions, and the documents relating thereto, will likely be found in the District of Columbia.

**ARGUMENT**

### I.     Legal Standard

"The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established."  *Gomez v. Kelly*, 237 F. Supp. 3d 13, 14 (D.D.C. 2017).  A plaintiff must establish: (1) whether the petition is likely to succeed on the merits; (2) whether the petitioners are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the petitioners; and (4) that the proposed relief is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Court "must balance the strengths of the requesting party's arguments in each of the four required areas."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *Id.*

Irreparable harm and the likelihood of success on the merits have been deemed the "most critical" criteria in these kinds of cases.  *See e.g., Nken v. Holder*, 556 U.S. 418, 434–36 (2009).  The "likelihood of success" factor can be satisfied by showing "more than a mere possibility of relief."  *Id.* (quotation omitted); *see also id.* (indicating that "the traditional stay inquiry calls for assessing" the third and fourth factors "[o]nce an applicant satisfies the first two factors").  Thus, to the extent that the irreparable harm in this case involves the potential removal of Transit

16

Petitioners in violation of their Constitutional rights before they have been provided a lawful process, this factor should be weighed heavily in favor of granting the TRO.

Pursuant to 8 U.S.C. § 1252(f), this Court may grant a stay of removal pending disposition of the Petition if it finds that Petitioners have satisfied the factors for granting a temporary restraining order.  *See also Kurnaz v. Bush*, No. 04-cv-1135, 2005 WL 839542, at *2 (D.D.C. Apr. 12, 2005) (federal courts have authority under the All Writs act to take steps necessary to preserve their jurisdiction).

## II.      Transit Ban Petitioners are Likely to Succeed on the Merits of Their Claims

In their Amended Complaint, the Transit Ban Petitioners added two Counts: (i) Count V alleges that removing Transit Ban Petitioners violates their substantive and procedural due process rights, and; (ii) Count VI seeks a judgment declaring that Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process.  (Exh. 1, ¶¶ 299-310).

These claims are predicated upon the fact that a Court vacated the Transit Ban, thus it is void *ab initio* and restores the *status quo* for every party affected by the rule, including the Transit Ban Petitioners.  *CAIR*, 2020 WL 3542481.  Judge Kelly specifically denied the defendants' requests for alternative relief:

> Defendants also urge the Court to "limit any relief to the actual parties before the Court," Defs.' Supp. Br. at 5, pointing to Justice Thomas's concurrence in *Trump v. Hawaii*, —— U.S.——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), *id*. at 7. But there, Justice Thomas addressed the propriety of nationwide injunctions, *Trump*, 138 S. Ct. at 2424–29, which is not the issue here. As the D.C. Circuit has explained—and as Defendants concede, see Defs.' Supp. Br. at 9 n.1—"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also O.A.* [*v. Trump*], 404 F. Supp. 3d [109, 153 (D.D.C. 2019).]

*Id.* at *22.[6]

In ordering this remedy, Judge Kelly stated that the "APA commands that courts 'hold unlawful and set aside agency action[s]' taken 'without observance of procedure required by law.'" *CAIR*, 2020 WL 3542481 at *1 (citing 5 U.S.C. § 706(2)(D)). Further, "the D.C. Circuit has held that '[f]ailure to provide the required notice and to invite public comment ... is a fundamental flaw that 'normally requires vacatur of the rule.'" *Id.* at *21 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)). "Having found that the Rule was enacted unlawfully, the Court sees no reason why it should not be vacated." *Id.*

Because *CAIR* vacated the Transit Ban, the Transit Ban is void *ab initio*, and restores the *status quo* for every party affected by the rule, including the Transit Ban Petitioners. "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void *ab initio*." *Goodner Bros. Aircraft, Inc.*, 966 F.2d at 384 (quoting *Chrysler Corp.*, 441 U.S. at 290 ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act.")); *W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987) ("An agency rule which violates the APA is void. Agency action taken under a void rule has no legal effect." (citation omitted)).

"When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect." *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) (citing *Indep.*

---

[6] On July 6, 2020, the Ninth Circuit found that the Transit Ban was unlawful pursuant to the APA and on the merits as inconsistent with 8 U.S.C. § 1158, affirming the district court's preliminary injunction against its enforcement. *See East Bay Sanctuary Covenant, et al. v. Barr, et al.*, Nos. 19-16487, 19-16773 (9th Cir. July 6, 2020). The preliminary injunction in those consolidated cases is stayed pending Supreme Court review.

*U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987)); *see also Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (same); *Sierra Club v. EPA*, 850 F. Supp. 2d 300, 303 (D.D.C. 2012) (same); *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005) (same).  Put otherwise, "the offending rule is rendered void and of no effect and there is a 'reinstat[ement] [of] the rules previously in force.'"  *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 99, 104 (D.D.C. 2018) (quoting *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983)), *aff'd*, 962 F.3d 510 (D.C. Cir. 2020).  This is because "to 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'"  *Action on Smoking & Health*, 713 F.2d at 797 (citing 91 C.J.S. Vacate (1955) & *Stewart v. Oneal*, 237 F. 897, 906 (6th Cir. 1916)).

There is no question that vacatur restores the *status quo* for every party affected by the vacated rule.  Here, Judge Kelly **chose** to vacate the Transit Ban, despite the defendants' request to "limit any relief to the actual parties before the Court."  *See* 2020 WL 3542481, at *22.[7]

The Transit Ban Petitioners all received negative credible fear determinations based upon the standards set forth in the Transit Ban and all have final orders of removal because of those

---

[7] Notably, where courts in this District and Circuit find an APA violation but that vacatur is not the appropriate remedy, their rulings make clear that vacating a rule restores the status quo for every party affected by the rule—not only the plaintiffs in the action—but that such a result would be too disruptive under the particular circumstances of the case.  *See, e.g.*, *Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 103–04 ("In this case, vacatur would mean that the rates previously declared for the 2016 shipping season would be set aside and the 2015 rates, which were lower than those in 2016, would be deemed operative for the entirety of that shipping season. Shipping companies and pilotage associations would, after vacatur, find that every payment that was made in the 2016 season was erroneous."); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993) ("the consequences [of vacatur] may be quite disruptive" because "the Commission would need to refund ... fees collected ... [and] it evidently would be unable to recover those fees under a later-enacted rule.").

negative credible fear determinations.  (Heller Decl., Ex. 1 ¶¶ 36-121).  The consequence of the vacatur of the Transit Ban is that the Transit Ban Petitioners are restored to the *status quo* prior to the Transit Ban and are entitled to process under 8 U.S.C. §1225(b).

The Due Process Clause of the Fifth Amendment provides that "[n]o person… shall be deprived of life, liberty, or property without due process of law…."  U.S. CONST. amend. V.  "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)); *see Zadvydas*, 533 U.S. at 690.  "Courts have long recognized that removal implicates substantial liberty interests, such that 'the Due Process Clause protects an alien subject to a final order of deportation.'"  *Fatty*, 2018 WL 3491278, at *2 (quoting *Zadvydas*, 533 U.S. at 693-94).

The Due Process Clause protects individuals against two types of government action.  "Procedural Due Process" ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property.  *Mathews v. Eldridge*, 424 U.S. 319, 334–335 (1976).  "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 324–325 (1937); *see also United States v. Salerno*, 481 U.S. 739, 746 (1987).  Accordingly, "the touchstone of due process is protection of the individual against arbitrary action of government … whether the fault lies in the denial of fundamental due process fairness [procedural due process], … or in the exercise of power without any reasonable justification in the service of a legitimate government objective [substantive due process]…."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotation marks and citations omitted).

Congress created a process in 8 U.S.C. § 1225 and 8 C.F.R. Subchapter B through which noncitizens found to have a credible fear of returning to their home countries are taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge. Now that the Transit Ban Petitioners are returned to the *status quo*, i.e., are noncitizens in expedited removal proceedings pursuant to 8 U.S.C. § 1225, they are entitled to participate in that process. Put another way, the Transit Ban Petitioners have the right to seek relief through a lawful process created by Congress, which the Transit Ban unlawfully took from them, and has now been restored as a result of *CAIR*. Whether they ultimately obtain asylum relief through that process, the Transit Ban Petitioners have the right to seek that relief, and deportation would extinguish that right. *See Mathews*, 424 U.S. at 334–35; *see also Calderon*, 330 F. Supp. 3d at 954 (petitioner had a right to seek relief made available by the DHS in an application to recognize petitioner as a spouse of a U.S. citizen); *Fatty*, 2018 WL 3491278, at *2 (holding petitioner had a liberty interest in obtaining a meaningful determination on T visa application.); *S.N.C.*, 2018 WL 6175902, at *5 (same). Congress established a system in which the Transit Ban Petitioners are entitled to participate, and Respondents' unjustified and unlawful decision to proceed with removal is an arbitrary action that is not in accordance with the law and conscience-shocking without any justification in the service of a legitimate government objective. *Cty. of Sacramento*, 523 U.S. at 845-54.

Accordingly, deporting the Transit Ban Petitioners before they have been provided a lawful process violates the Due Process Clause of the Fifth Amendment.

## III. <u>Transit Ban Petitioners Will Be Irreparably Harmed</u>

If the Court does not grant the TRO, the Transit Ban Petitioners will be irreparably harmed. It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, having shown a likelihood

of success on their Fifth Amendment claims, the Transit Ban Petitioners have also established irreparable harm.  *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

Further, Respondents have asserted that, absent a stay, they will deport the Transit Ban Petitioners.  Once deported, the Transit Ban Petitioners will not have access to their rights under 8 U.S.C. § 1225, extinguishing those rights.  There is no remedy for that loss.

### IV.    The Balance of the Equities Are in Favor of Granting the TRO and Respondents Will Not Be Harmed

The final two considerations for a preliminary injunction—the balance of the equities and the public interest—merge when the government is a party.  *Nken*, 556 U.S. at 435.  In assessing these factors, courts consider the impacts of the injunction on the public interest, including nonparties as well.  *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).

Where, as here, the Transit Ban Petitioners establish a likelihood that deportation without lawful process violates the U.S. Constitution, they necessarily establish that the public interest would be served by injunctive relief.  *Klayman v. Obama*, 142 F. Supp. 3d 172, 196 (D.D.C. 2015).  This is because enforcement of unconstitutional conduct is always contrary to the public interest.  *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); s*ee also Nat'l Fed'n of Fed. Emps. v. Carlucci*, 680 F. Supp. 416, 435 (D.D.C. 1988) ("[T]he public interest lies in enjoining unconstitutional searches.").

Further, there is no harm to Respondents.  A stay of removal can be inextricable from the meaningful administration of justice, by preventing cases like this one from devolving into a choice "between justice on the fly or participation in what may be an idle ceremony."  *Nken*, 556 U.S. at

421, 427, 436 ("preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.")

## **CONCLUSION**

WHEREFORE, Petitioners respectfully request that this Court grant Petitioners' Motion for a Temporary Restraining Order staying Transit Ban Petitioners' removal from the United States pending its adjudication of this Petition.

Dated:  July 22, 2020.

Respectfully submitted,

BY: */s/ Steven G. Barringer*
Steven G. Barringer (D.C. Bar No. 375373)
**GREENBERG TRAURIG, LLP**
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

Caroline Heller (Appearing *pro hac vice*)
**GREENBERG TRAURIG LLP**
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

***ATTORNEYS FOR PETITIONERS***

## **CERTIFICATE OF SERVICE**

I, Steven Barringer, hereby certify that on July 23, 2020, a true and correct copy of the

foregoing Motion was served electronically upon the below-listed parties via email:

> Christopher Hair
> Erez R. Reuveni
> Assistant U.S. Attorney
> District of Columbia
> 555 4th St. NW
> Washington, D.C. 20530
> Office: (202) 252-2541
> Mobile: (202) 809-5387
> Christopher.Hair@usdoj.gov
> Erez.R.Reuveni@usdoj.gov

Dated:     July 23, 2020                    */s/ Steven G. Barringer (D.C. Bar No. 375373)*

                                   ***ATTORNEY FOR PETITIONERS***

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **D.A.M,** *et al.,* | |
| Petitioners, | |
| v. | Case No. 20-cv-1321 (CRC) |
| **WILLIAM BARR,** in his official capacity as Attorney General of the United States, *et al.*, | |
| Respondents. | |

### <u>MEMORANDUM OPINION</u>

Petitioners in this case are nearly 100 families from eleven countries who were denied asylum after entering the United States without valid entry documents and, consequently, are subject to orders of expedited removal from the country. Many of them are currently being detained by Immigration and Customs Enforcement ("ICE") at either the South Texas Family Residential Facility in Dilley, Texas ("Dilley") or the Berks County Residential Center in Leesport, Pennsylvania ("Berks"). Others have been released for medical or other reasons. All petitioners seek a writ of habeas corpus preventing ICE from deporting them during the COVID-19 pandemic. Presently before the Court is a motion for a temporary restraining order, filed on behalf of the detained petitioners only, seeking an emergency stay of their imminent removals. They contend that if the removals were to go forward as planned, they would be exposed to increased risk of contracting COVID-19 during the deportation process, and later in their home countries, which would violate their due process rights and ICE's internal regulations. Finding that it likely has jurisdiction to review petitioners' challenge to the conditions they would experience during the deportation process but concluding that they have not satisfied the

requirements for preliminary injunctive relief, the Court will deny their TRO motion and lift the administrative stay of removal that the Court put in place while it considered the motion.

### I. Background

A. <u>Deportation in the Time of COVID-19</u>

It goes without saying that we are in the midst of a global pandemic. As of this writing, there are over fourteen and a half million confirmed cases of COVID-19 worldwide with over 600,000 people dead. <u>See</u> WHO, Coronavirus Disease (COVID-19) Pandemic (updated July 21, 2020).[1] The United States remains a hotspot, with over three and a half million confirmed cases and more than 140,000 deaths. CDC, Cases in the U.S. (updated July 21, 2020).[2]

COVID-19 is highly contagious. It spreads primarily through close person-to-person contact, because carriers of the virus produce airborne respiratory droplets when they cough, sneeze, or talk that may be inhaled by others standing nearby. <u>See</u> CDC, How to Protect Yourself & Others (Apr. 14, 2020).[3] Though less frequent, the virus can be also spread through contact with contaminated surfaces. <u>See</u> CDC, Detailed Disinfection Guidance (updated July , 2020).[4] Symptoms, such as fever, cough, and shortness of breath, typically appear two to fourteen days after exposure, but even those who are asymptomatic may be capable of spreading the disease. CDC, Clinical Questions about COVID-19: Questions and Answers – Transmission

---

[1] https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

[2] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

[3] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[4] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html.

2

(July 21, 2020).[5]  The most effective ways to prevent contracting the virus are to avoid being

within six feet of other people, to wash your hands frequently, to avoid crowded places and

gathering in groups, to cover your mouth and nose with a mask when around others, and to clean

and disinfect frequently touched surfaces.  See CDC, How to Protect Yourself & Others (Apr.

24, 2020).  In addition, the CDC discourages travel because it "increases your chances of getting

infected and spreading COVID-19" by making it difficult to follow the practices laid out in the

prevention guidelines.  CDC, Travel in the US (June 28, 2020).[6]  But, neither the CDC, nor any

other U.S. governmental body to the Court's knowledge, has banned travel altogether.  Id.

(providing tips on how to "protect yourself and others" if you travel).  Indeed, commercial air

travel has continued throughout the duration of the pandemic, although at reduced levels and

with heightened safety precautions.  See Dep't of Transp., et al., Runway to Recovery (July

2020).[7]  To date, there is no approved vaccine or cure for COVID-19.  CDC, How to Protect

Yourself & Others (Apr. 24, 2020).

　　　　During the pandemic, ICE has continued to deport noncitizens subject to final removal

orders.  At the heart of this case is whether appropriate safeguards are being taken during the

deportation process.  ICE has submitted declarations from officials familiar with the process,

and, while not to be accepted blindly, these declarations are subject to a presumption of good

faith absent clearly contradictory evidence.  C.G.B. v. Wolf, No. 20-cv-1072, 2020 WL 2935111,

at *6 (D.D.C. June 2, 2020) (Cooper, J.) (citing cases).  According to ICE's declarants, it has

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission.

[6] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html.

[7] https://www.transportation.gov/sites/dot.gov/files/2020-07/Runway_to_Recovery_
07022020.pdf.

implemented additional health screening, cleaning, and transportation protocols to help prevent the spread of COVID-19 while executing final orders of removal.  Harper Decl. ¶ 7.  ICE attests that a medical professional with its Health Service Corps completes a transfer summary certifying that each detainee is medically cleared for travel after a review of their medical records.  Id. ¶ 10.  ICE conducts COVID-19 testing prior to removal, but only for migrants being returned to countries that require the United States to do so.  Id. ¶ 11.  ICE has also implemented additional pre-removal screening procedures, which entail evaluations of all deportees by a health professional to determine whether they are experiencing any symptoms that would preclude their travel, including those associated with COVID-19.  Id. ¶ 12.  Prior to boarding any transportation vehicle, ICE also questions each detainee to confirm whether she is experiencing any COVID-19 symptoms.  Id. ¶ 14.  If the detainee clears this screening process, she is scheduled for removal.  Id.  Prior to removal, ICE medical staff ensures that each deportee's temperature is below 99 degrees, well under the 100.4-degree threshold that the CDC has identified as a symptom of COVID-19.  Id. ¶ 15.

ICE further attests that it provides detainees with personal protective equipment ("PPE"), including surgical-grade face masks, nitrile gloves on request, and hand sanitizer, throughout the removal process.  Id. ¶ 17.[8]  The same is true for transportation personnel.  Id. ¶ 22.  ICE requires masks to be worn at all times and performs temperature checks on detainees every hour.  Id. ¶ 26.  It now uses ICE-operated aircraft and ground vehicles only, which it says comply with CDC

---

[8] Petitioners present declarations from migrants deported earlier in the pandemic who say they were not provided with the full range of PPE.  See, e.g., T.A.L. Decl. ¶ 5 (no gloves); M.D.R.F. Decl. ¶ 5 (no gloves); M.M.R. Decl. ¶ 4, 8 (no gloves); M.C.P. Decl. ¶ 8 (no mask); A.C.L.T. Decl. ¶¶ 2–4 (no mask).  ICE disputes some of these reports, but nonetheless responds that PPE is fully available to all deportees now.  Hunt Decl. ¶¶ 9–16.

and ICE detention standards.  Id. ¶ 7.  ICE explains that all vehicles used during the removal process are thoroughly cleaned and disinfected by a contractor before and after transports.  Id. ¶ 21.

Upon arrival at an intermediate destination within the U.S., transportation specialists once again check all deportees' temperatures.  Id. ¶ 28.  ICE permits deportees to keep any PPE on the next mode of transportation or for use in their home countries.  Id.  ICE flights now have an extra medical provider, and its medical staff conducts another round of temperature checks and visual screenings at the airport.  Cordero Decl. ¶ 11–12.  Detainees who fail these screenings are denied boarding.  Id. ¶ 13.  During the flights, families must sit in the front of the plane while individuals are placed at the rear, and, if possible, ICE instructs that empty seats remain between families and individuals to maintain physical distance.  Id. ¶ 18.  The ICE-chartered planes are also cleaned and disinfected after every flight.  Id. ¶ 19.  As noted, ICE only tests deportees for COVID-19 prior to removal to countries that "require testing prior to repatriation."  Id. ¶ 7.  It explains that it simply "does not have enough testing resources to test all" noncitizens "scheduled for future removals."  Id. ¶ 8.

Petitioners insist that many of the precautions ICE describes are simply not being taken and that others are woefully inadequate.  For example, an attorney who works with clients detained at the Berks family residential center in Pennsylvania declares that deportation from that center requires the use of public transportation and entails comingling with detainees from other detention centers.  Cambria Decl. ¶ 10–14.  ICE acknowledges that detainees are comingled during the deportation process but adds that social distancing is practiced "to the extent possible."  Cordero Decl. ¶ 18.  Petitioners explain that, prior to the pandemic, deportees often had layovers with commercial airlines.  Cambria Decl. ¶ 12.  As noted, however, ICE

5

represents that it is currently only using ICE-chartered flights and "has taken reasonable steps to ensure that all Air Charter flights comply" with CDC and FAA regulations.  Martinez Decl. ¶ 4. Despite ICE's precautions, petitioners report that some removal flights have included individuals infected with COVID-19.  Cambria Decl. ¶ 15.

In addition to the dangers they face during the deportation process, petitioners fear what may await them when they reach their home countries.[9]  Many of these countries' medical systems, they allege, are ill-equipped to handle an influx of cases.  Am. Pet'n & Compl. ¶¶ 209–32.  In some countries, such as Guatemala, petitioners say that new arrivals from the United States are persecuted because they are seen as bringing the virus with them.  See, e.g., T.A.L. Decl. ¶¶ 12–26 (prior deportee describing physical intimidation and verbal abuse upon arrival in Guatemala).  They claim further that many of the non-profits and government agencies that typically provide services to arriving deportees have been shuttered due to COVID-19.  Fluharty Decl. ¶ 17.  Thus, some petitioners fear that they will be unable to contact family members or arrange transportation to their final destinations upon their arrival.

B.  Procedural History

1.  *Expedited Removal and Applications for Asylum*

Petitioners each sought admission to the United States without valid entry documents and, as a result, were placed into expedited removal proceedings.  Under the expedited removal statute, immigration officers were required to remove petitioners "from the United States without further hearing or review unless [they] indicate[d] either an intention to apply for asylum . . . or a

---

[9] Petitioners hail from Guatemala (72), Honduras (57), El Salvador (39), Haiti (14), Mexico (13), Ecuador (13), Brazil (6), Colombia (3), Chile (3), Nicaragua (2), and Peru (2).  Am. Pet'n & Compl. ¶¶ 36–121.

App.208

fear of persecution" supporting a claim of withholding of removal. 8 U.S.C. § (b)(1)(A)(i). After petitioners so indicated, they were interviewed by asylum officers, who sought to ascertain whether each petitioner possessed a credible "fear of persecution," such that there was "a significant possibility . . . that [they] could establish eligibility for asylum." Id. § 1225(b)(1)(B)(v). The asylum officers determined that all the petitioners failed to show a credible fear of persecution. Consequently, they were required by statute to be "removed from the United States," subject to review within seven days by an immigration judge upon petitioners' request. Id. § 1225(b)(1)(B)(iii)(I)–(III). Petitioners requested this "prompt review," id., but the immigration judges all concurred with the asylum officers' negative credible fear determinations. Petitioners therefore each have a final order of expedited removal pursuant to § 1225(b). As described in more detail below, the Immigration and Nationality Act ("INA") severely limits judicial review of any of these determinations so as to ensure that removal is indeed expedited. Id. § 1252(a)(2)(A).

Many of the petitioners faced an additional hurdle to establishing a claim for admission in the summary expedited removal process. Last year, the Department of Homeland Security and the Department of Justice jointly issued an interim rule, known as the "Transit Ban," that rendered migrants seeking admission at the border with Mexico categorically ineligible for asylum unless they first applied for and were denied similar protection in a third country through which they traveled. Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,835 (July 16, 2019). The Transit Ban, however, did not prevent petitioners from seeking admission and a withholding of removal under either section 241(b)(3) of the INA (which enables them to seek a withholding of removal after they have a final order) or the Convention Against Torture (which provides separate protections from removal). The upshot of the rule was

that petitioners who did not apply for asylum in an interim country faced a more substantial

burden when they sought admission to the U.S.; under both section 241(b)(3) and the Convention

Against Torture, asylum seekers are required to show that "it is more likely than not" that they

would either be persecuted on a protected ground or would be tortured if removed to the

proposed country.  See 8 C.F.R. § 1208.16(b)(2); id. § 1208.16(c)(2).  If petitioners subject to the

Transit Ban could not show that there was a "significant possibility" that they were eligible for

relief under either of those standards, the asylum officer was required to make a negative

credible-fear determination.  Id. § 208.30(e)(2)–(3), (g).  While this motion was pending, Judge

Timothy J. Kelly found that the Transit Ban violated the APA and vacated the rule.  Cap. Area

Immigrants' Rts. Coal. v. Trump, No. 19-cv-2117, 2020 WL 3542481, at *21–23 (D.D.C. June

30, 2020).[10]

### 2.  Related Litigation

Petitioners are no strangers to this court.  Last September, some of them challenged the

validity of their removal orders in an action before Judge Amy Berman Jackson.  See M.M.V. v.

Barr, No. 19-cv-2773, 2020 WL 1984309 (D.D.C. Apr. 27, 2020).[11]  They invoked the court's

---

[10] After Judge Kelly vacated the Transit Ban, petitioners here amended their habeas petition and complaint to add a claim arguing that petitioners who were subject to the vacated Transit Ban do not have lawful final orders of removal.  Am. Pet'n & Compl. ¶¶ 299–310. However, the currently detained petitioners have not moved to stay their removal on this ground. The Court therefore has not considered Judge Kelly's ruling in deciding the present TRO motion.

[11] Many of the petitioners are also plaintiffs in another lawsuit in this court seeking immediate release of all detainees in three family residential centers, including Dilley and Berks, on the ground that ICE's failure to protect them from COVID-19 at the facilities violates due process.  See Petition & Complaint at 38–42, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (D.D.C. Mar. 21, 2020); Motion for Preliminary Injunction at 25, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (D.D.C. July 2, 2020) (seeking a court order requiring DHS "to promptly release Petitioners *and all detained families* at the FRCs") (emphasis added).

jurisdiction under 8 U.S.C. § 1252(e)(3), which authorizes federal court challenges to "written" policies "implementing" expedited removal orders under certain circumstances. Judge Jackson dismissed the bulk of the claims, finding that the majority of the alleged policies that the petitioners challenged were not written and that the INA clearly stripped the court of jurisdiction to review unwritten policies. M.M.V., 2020 WL 1984309, at *10–19. She also denied several motions to join the suit by many would-be plaintiffs (also petitioners here) because they either were not subject to the one written (and thus reviewable) policy or failed to challenge it within sixty days of its implementation, as required by the statute. Id. at *20–22. Upon making that determination, Judge Jackson lifted an administrative stay of petitioners' deportations. Id. at *21. The government began removing individuals the next day, and petitioners sought to stay their deportations pending appeal. M.M.V. v. Barr, No. 19-cv-2773, 2020 WL 2119744, at *1 (D.D.C. May 1, 2020) (order denying stay pending appeal). Judge Jackson had entered another administrative stay while she considered the motion to stay pending appeal, but she ultimately denied the motion because the INA barred her from entering any injunctive relief. Id. at *3–4. The D.C. Circuit issued a third administrative stay in the case within an hour of Judge Jackson's denial of the stay motion but lifted it two weeks later when it denied petitioners' emergency motion for a stay pending appeal. Order, M.M.V. v. Barr, No. 20-5106 (D.C. Cir. May 1, 2020) (per curiam) (administrative stay); Order, M.M.V. v. Barr, No. 20-5106 (D.C. Cir. May 15, 2020) (per curiam) (denying stay pending appeal). While petitioners in M.M.V. apparently did not raise the argument that lifting of the stay would expose them to undue COVID-19 risks, both Judge Jackson and the Circuit surely appreciated the fact that deportations were likely to resume forthwith during the pandemic.

9

### 3.  Proceedings in this Case

This petition for habeas corpus, complaint for injunctive relief, and motion for temporary restraining order ("TRO") followed the next business day after the Circuit lifted petitioners' stay of removal.  That evening, Judge Carl J. Nichols, acting in his capacity as emergency motion judge, administratively stayed the deportations of the detained petitioners until a judge could be assigned the case.  Order Granting Administrative Stay (May 18, 2020), ECF No. 8.  Petitioners had indicated that this case was related to M.M.V. because it involved the same petitioners seeking similar relief.  Notice of Related Case (May 18, 2020), ECF No. 12.  But this case raises different claims than those in M.M.V.  There, petitioners challenged the legality of the process and standards that ICE used to determine that they were not entitled to asylum in the first instance.  Here, petitioners seek to prevent the government from deporting them during a global pandemic in violation of the Constitution and the APA.  Based on these differences, Judge Jackson determined the cases were not related and ordered this petition to be randomly reassigned.  Minute Order (May 19, 2020); Order (May 21, 2020), ECF No. 15.  She also extended Judge Nichols' stay until the assignment was made.  Id.  Upon receiving the case, this Court further extended the administrative stay while it considered the TRO motion and heard oral argument two days later.  The government filed an opposition prior to the hearing, and the Court permitted petitioners to file a reply afterwards.  The government has also sought leave to file a surreply, which the Court has considered and grants leave file.[12]  The TRO motion is now ripe.

---

[12] Petitioners ask the Court to take judicial notice of two extra-record pieces of evidence. *First*, petitioners seek to introduce congressional testimony by ICE's Executive Associate Director of Enforcement and Removal Operations, who recently testified to Congress that not all

## II.    Legal Standards

"A TRO is an extraordinary remedy and should be granted sparingly." <u>Basel Action Network v. Mar. Admin.</u>, 285 F. Supp. 2d 58, 60 (D.D.C. 2003).  To obtain a TRO, the moving party must show: (1) that he is likely to succeed on the merits of his claim; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  <u>See</u> <u>Winter v. Nat'l Res. Def. Council</u>, 555 U.S. 7, 20 (2008); <u>Hall v. Johnson</u>, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions").  The D.C. Circuit has suggested, without holding, that the failure to establish a likelihood of success on the merits categorically forecloses preliminary relief.  <u>Sherley v. Sebelius</u>, 644 F.3d 388, 393 (D.C. Cir. 2011).  It has made clear, however, that an absence of irreparable injury is fatal to a plaintiff's motion.  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006).

Before reaching the merits, the Court should ensure that it has jurisdiction to consider petitioners' claims.  Courts evaluate whether they have jurisdiction through the lens of the

---

deportees are tested prior to removal.  Pet'rs' Mot. for Judicial Notice (June 8, 2020), ECF No. 25.  The Court will take judicial notice of this sworn testimony because congressional testimony "is not subject to reasonable dispute."  Fed. R. Evid. 201(b)(2); <u>see also</u> <u>Didban v. Pompeo</u>, 435 F. Supp. 3d 168, 177 n.5 (D.D.C. 2020) (this Court taking judicial notice of congressional testimony).  *Second*, petitioners seek to introduce two newspaper articles discussing deportees who have tested positive for COVID-19 after removal.  Pet'rs' Mot. for Judicial Notice (June 26, 2020), ECF No. 29.  The Court will take judicial notice of the "existence of these articles," to show that ICE is aware of the reports.  <u>Sandza v. Barclays Bank PLC</u>, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (taking judicial notice of newspaper articles "not . . . for the truth of their assertions," but "for the fact that they . . . should have put plaintiff on notice of [their contents]" (citing <u>Washington Post v. Robinson</u>, 935 F.2d 282, 291 (D.C. Cir. 1991) ("[A] court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts.))).

App.213

standard applicable at each stage of litigation.  <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561

(1992).  For example, "a party who fails to show a 'substantial likelihood' of standing is not

entitled to a" temporary restraining order.  <u>Food & Water Watch, Inc. v. Vilsack</u>, 808 F.3d 905,

913 (D.C. Cir. 2015) (citation omitted).  "That same reasoning . . . extends to other jurisdictional

prerequisites."  <u>California Ass'n of Private Postsecondary Sch. v. DeVos</u>, 344 F. Supp. 3d 158,

167 (D.D.C. 2018).  Thus, "[a]s part of establishing a likelihood of success on the merits, the

[petitioners] must first demonstrate a likelihood of success in establishing jurisdiction."  <u>Make

the Rd. New York v. Wolf</u>, 962 F.3d 612, 623 (D.C. Cir. 2020).

### III.    Analysis

The petitioners who are currently detained at the Dilley and Berks facilities seek an

emergency stay of their removal orders during the pandemic.  They in essence raise two sorts of

claims.  First, they allege that the travel conditions they would experience *during* the deportation

process do not comport with ICE or CDC guidelines and are inherently unsafe.  Thus, they

contend that requiring them to travel during the pandemic violates their substantive due process

rights and the Administrative Procedure Act ("APA").  Second, they allege that the conditions

they would encounter in their home countries *after* the deportation process are dangerous due to

both the prevalence of COVID-19 and the stigma of having traveled from the United States.

Consequently, they claim releasing them in those destinations during the pandemic would also

violate their due process rights.

### A.  <u>Likelihood of Jurisdiction</u>

As mentioned, petitioners "must first demonstrate a likelihood of success in establishing

jurisdiction."  <u>Make the Rd.</u>, 962 F.3d at 623.  ICE contends that the Court lacks the power to

review petitioners' claims due to section 242 of the INA, 8 U.S.C. § 1252, which strips federal

courts of jurisdiction to hear a wide variety of claims made by noncitizens in connection with their immigration proceedings.  The Court interprets jurisdiction-stripping provisions like § 1252 "against the backdrop of 'a familiar principle of statutory construction: the presumption favoring judicial review of administrative action.'"  Id. (quoting Guerrero-Lasprilla v. Barr, 140 S. Ct. 1062, 1069 (2020)) (applying the presumption in interpreting § 1252).  This "'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review" and "can be overcome only by clear and convincing evidence of congressional intent to preclude judicial review" over petitioners' claims.  Id. at 624 (internal quotations omitted).  That principle in mind, the Court will "start with the text, and then read those words in light of the statutory structure and context."  Id.  The government argues that review of both sets of petitioners' claims are independently foreclosed by two subsections of § 1252, namely § 1252(a)(2)(A) and § 1252(g).  The Court takes each in turn.

    *1.  Section 1252(a)(2)(A)*

  Section 1252(a)(2)(A) limits judicial review of orders of expedited removal issued under 8 U.S.C. § 1225(b)(1).  The relevant parts state:

  (2) Matters not subject to judicial review.

    (A) Review relating to section 1225(b)(1).  Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, *no court shall have jurisdiction to review—*

      (i)  *except as provided in subsection (e)*, any individual determination *or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title*.

8 U.S.C. § 1252(a)(2)(A)(i) (emphasis added).[13]  The government contends that the prohibition

against judicial review of any claim "arising from or relating to the implementation . . . of an

order of [expedited] removal" bars review of all of petitioners' claims here.  Id.  The Court does

not read that text so broadly.  While the phrase "arising from or relating to" is expansive, it is not

limitless.  See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 476–87 (1999)

(narrowly construing the phrase "arising from" in § 1252(g)); Jennings v. Rodriguez, 138 S. Ct.

830, 839–41 (2018) (plurality) (narrowly construing the phrase "arising from" in § 1252(b)(9)

and emphasizing the Court's long history of "eschew[ing] uncritical literalism" when

interpreting phrases like "arising from and relating to" when it would "lead[] to results that no

sensible person could have intended." (internal quotation marks omitted)).

    The Supreme Court's ruling in Jennings v. Rodriguez highlights the point.  Jennings

presented a claim by arriving noncitizens that their prolonged detention without a bond hearing

---

[13] The government makes passing reference in its briefs to romanettes (ii)-(iv) of
§ 1252(a)(2)(A).  To the extent the government contends that these provision bar petitioners'
claims, the Court finds them inapplicable.  Petitioners do not challenge (ii) any "decision . . . to
invoke" § 1225(b)(1); (iii) "the application of" § 1225(b)(1) to them; or (iv) any "procedures and
policies adopted . . . to implement" § 1225(b)(1).

Subsection (e), the carve out to the jurisdictional bar in § 1252(a)(2)(A), is also
inapplicable.  Subsection (e) permits judicial review over three specific factual questions in
habeas proceedings and over certain systemic challenges to the expedited removal process.  With
respect to an individual habeas petition, the Court may only review (1) whether a petitioner is a
noncitizen, (2) whether they were in fact ordered removed, and (3) whether they have been
lawfully admitted for permanent residence, as a refugee, or been granted asylum.  8 U.S.C. §
1252(e)(2).  As for systemic challenges, the suit must be "filed no later than 60 days after the
date the challenged section, regulation, directive, guideline, or procedure . . . is first
implemented."  Id. § 1252(e)(3).  It is undisputed that these claims fall outside those parameters.

Thus, the only inquiry remaining is under romanette (i), which asks whether petitioners'
claims "aris[e] from or relat[e] to the implementation or operation of an order of removal
pursuant to section 1225(b)(1)."

violated due process. <u>Jennings</u>, 138 S. Ct. at 839. Section 1252(b)(9), another of the INA's jurisdiction-stripping provisions, requires all claims "arising from any action taken or proceeding brought to remove an alien from the United States" to be brought together, at once, in a review of a final order of removal before a federal circuit court. 8 U.S.C. § 1252(b)(9).[14] The claims in <u>Jennings</u>, however, were brought separately from any review of a final order and in the district court. The government thus argued that § 1252(b)(9) foreclosed the plaintiffs' length-of-detention challenge, at least until the review of a final order of removal, because the detention itself arose from the removal proceedings.

A three-justice plurality of the Supreme Court rejected the government's argument.[15] Writing for the plurality, Justice Alito explained that § 1252(b)(9) did not bar the claims challenging prolonged detention because the plaintiffs did "not ask[] for review of an order of removal; they [were] not challenging the decision to detain them in the first place or to seek removal; and they [were] not even challenging any part of the process by which their removability [would] be determined." <u>Jennings</u>, 138 S. Ct. at 841 (plurality). The length-of-detention constitutional claims were ancillary to the removal orders, the plurality explained,

---

[14] Section 1252(b)(9) does not apply to the expedited removal process petitioners underwent here. <u>See</u> 8 U.S.C. § 1252(a)(1) (exempting expedited orders of removal from the judicial review provisions of subsection (b)). As discussed, the § 1252(a)(2)(A) jurisdiction-stripping provisions govern the reviewability of claims by noncitizens with expedited removal orders.

[15] Although the bulk of the <u>Jennings</u> opinion garnered a majority vote, the jurisdiction section interpreting the INA was only joined by three members of the Court. However, six justices in total (the plurality plus a three-justice dissent) agreed that the INA did not bar review. (The dissent would have read the INA jurisdiction-stripping provisions even more narrowly than the plurality.) The two concurring justices, who joined the remainder of the <u>Jennings</u> opinion, would have held that the INA barred the petitioners claims. (Attentive readers will have counted only eight votes; Justice Kagan did not participate in the case.)

15

because "the legal questions" in the case were "too remote from" any "action taken to remove an alien," even if detention itself arises from such an action.  Id. at 841 n.3.  This was so even though "it may be argued" that the length-of-detention claims arose from the actions taken to order removal "in the sense that if those actions had never been taken, the aliens would not be in custody at all."  Id. at 840.  A contrary conclusion, in Justice Alito's view, would have led to "staggering results," such as requiring Bivens claims based on inhumane conditions of confinement or state-law tort claims to be reviewable only during judicial review of final removal orders.  Id.

Justice Thomas (along with Justice Gorsuch) rejected the plurality's reasoning because, to him, "detention is an 'action taken . . . to remove' an alien[.]"  Id. at 855 (Thomas, J., concurring in part).  As a result, he would have rejected the detainees' challenge as they were only contesting the fact of their detention.  Id.  He noted, however, that his interpretation of the statute would still preclude the "staggering results" that the plurality feared.  Id.  He explained:

> [M]y conclusion that § 1252(b)(9) covers an alien's challenge to the *fact* of his detention (an action taken in pursuit of the lawful objective of removal) says nothing about whether it also covers claims about inhumane treatment, assaults, or negligently inflicted injuries suffered *during* detention (actions that go beyond the Government's lawful pursuit of its removal objective).

Id. (citing Bell v. Wolfish, 441 U.S. 520, 536–39 (1979) (drawing a similar distinction)).

The three remaining justices would have read the language in § 1252(b)(9) even more narrowly, such that it would only apply to challenges to the removal order itself.  Id. at 876 (Breyer, J., dissenting).  Thus, the Court unanimously agreed that ancillary challenges, such as those to the conditions of confinement, were not channeled into the review of a final removal order by § 1252(b)(9).

16

Jennings' logic applies here. Recall that § 1252(a)(2)(A)(i) bars the Court from reviewing "any individual determination or [from] entertain[ing] any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1)," which governs expedited removals. Section 1252(b)(9), at issue in Jennings, is similar. Although it does not bar review completely, it requires claims "arising from any action taken or proceeding brought to remove an alien from the United States," apart from expedited removal orders, to be brought alongside the review of a final removal order before a federal circuit court. 8 U.S.C. § 1252(b)(9). Justice Thomas' distinction between challenging the *fact* of detention and challenging circumstances that arise *during* detention perfectly encapsulates the issues here, and all eight of the justices who participated in Jennings agreed that § 1252(b)(9) did not apply to ancillary claims such as those that arise from conditions suffered during detention.

Petitioners' first set of claims (i.e., those aimed at COVID-related travel risks) do not challenge the *fact* of their removals; they challenge the conditions they would face *during* the removal process. Those claims are not related to the executive's discretionary decisions to implement or execute a removal order. See Reno, 525 U.S. at 486 (recognizing that § 1252(a)(2)(A) is "aimed at protecting the Executive's discretion from the courts"). Furthermore, accepting the government's expansive interpretation of § 1252(a)(2)(A) would lead to even more absurd results than the Supreme Court contemplated in Jennings. There, the plurality explained that interpreting § 1252(b)(9) to cover the plaintiffs' length-of-detention claims would have required claims based on inhumane conditions of confinement and state law tort claims to be reviewed only during the review of final orders. Jennings, 138 S. Ct. at 840. That delay could have prevented meaningful review for noncitizens detained at length before they were able reach the courthouse doors. Here, because petitioners are subject to expedited

17

removal orders, the government's interpretation would mean that alleged unconstitutional conditions of confinement could not be challenged *at all*. See 8 U.S.C. § 1252(a)(2)(A).

In sum, the INA gives the government virtually unreviewable authority to decide whether and when to implement the petitioners' removal orders, but the Court retains jurisdiction to hear claims challenging the constitutionality of the manner in which the government physically carries out the removals during the deportation process. That conclusion comports with the text and purpose of § 1252(a)(2)(A) and prevents the type of "staggering results" that the Supreme Court sought to avoid in Jennings.[16]

### 2. Section 1252(g)

Turning to § 1252(g), which the government contends independently strips the Court of jurisdiction over all of petitioners' claims, the Court likewise finds that petitioners' conditions-of-deportation claims likely are not barred by that provision. Section 1252(g) prohibits the courts from hearing any claim "*arising from the decision or action by the Attorney General to* commence proceedings, adjudicate cases, or *execute removal orders*." 8 U.S.C. § 1252(g) (emphasis added). The Supreme Court has narrowly construed this subsection to preclude only

---

[16] The Third Circuit's decision in Castro v. DHS, 835 F.3d 422 (3d Cir. 2016), which the government cites to support its claim of non-reviewability, is not to the contrary. There, habeas petitioners claimed that "the asylum officer and [immigration judge] conducting their credible fear interview and review violated their Fifth Amendment procedural due process rights," as well as other rights under statutes and treaties, by "fail[ing] to prepare a written record of their negative credible fear determinations that included the officers' analysis of why . . . the alien has not established a credible fear of persecution," and by "apply[ing] a higher standard for evaluating the credibility of their fear of persecution than is called for in the statute." Castro, 835 F.3d at 428 & n.8. Those claims were clearly barred by the INA because they related directly to the agency's process of determining whether the noncitizens should be removed. Castro did not confront whether claims that are untethered to the process or decision to implement a removal order, like those here challenging the manner of deportation, fall within the ambit of the statute. As explained above, they do not.

App.220

challenges to the three enumerated actions listed in the statute: deciding to commence proceedings, deciding to adjudicate cases, and deciding to execute removal orders.  <u>Reno</u>, 525 U.S. at 482.  These three actions, the Court has observed, "represent the initiation or prosecution of various stages in the deportation process."  <u>Id.</u> at 483.  "At each stage the Executive has discretion to abandon the endeavor," and Congress saw fit to insulate these discretionary judgments from judicial review.  <u>Id.</u> at 483–84 (observing that Congress sought to curtail the ability of noncitizens to challenge discretionary decisions by the government not to defer immigration actions "for humanitarian reasons or simply for its own convenience," which had become a regular practice); <u>see also</u> <u>DHS v. Regents of Univ. of Cal.</u>, 140 S. Ct. 1891, 1907 (2020) ("Section 1252(g) is . . . narrow.").

By contrast, *non*discretionary decisions, such as physically deporting noncitizens in an unconstitutional manner, likely fall outside the statute's jurisdictional bar.  And petitioners' challenge to the physical manner of their deportation does not implicate the agency's discretionary decision to execute their removal orders.  The immigration authorities are "empowered to remove Petitioner[s] at their discretion.  But they cannot do so in any manner they please."  <u>You, Xiu Quing v. Nielsen</u>, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018).  The decisions challenged here regarding how to transport deportees during the ongoing pandemic are more akin to the "other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"—that the Supreme Court in <u>Reno</u> found not to be encompassed by § 1252(g).  <u>Reno</u>, 525 U.S. at 482.

App.221

Petitioners' second set of claims, which challenge their removal to countries they allege are ill-equipped to receive them, do not fare as well under § 1252(g). Petitioners argue that it would violate due process by releasing them into countries where COVID-19 is not controlled or where they will face persecution due to fear on the part of their compatriots that they are carrying the virus from the United States. Unlike the claims based on the conditions of deportation, this challenge directly implicates the government's discretionary authority to return noncitizens to their native countries. See Reno, 525 U.S. at 483–84 (noting that the decision to execute a removal order "represent[s] the initiation or prosecution of [a particular] stage[] in the deportation process" and that the "the Executive has discretion to abandon the endeavor" at that stage for "humanitarian reasons" or otherwise). In determining whether to implement petitioners' removal orders, the government necessarily must decide whether to return them to their home countries. Petitioners' contention that they would face danger in those same countries unavoidably calls into question that judgment, which, for better or worse, Congress has left to the exclusive province of the Executive branch. See generally 8 U.S.C. § 1231(c)(2)(A)(i) ("The Attorney General may stay the removal of an alien under this subsection if the Attorney General decides that immediate removal is not practicable or proper.").[17]

Permitting judicial review of due process challenges to the conditions in petitioners' home countries could also open the door to impermissible relitigation of negative credible-fear

_____

[17] It also bears noting that the INA provides a separate procedure for petitioners to reopen removal proceedings on the basis that changed country conditions warrant relief. See 8 U.S.C. § 1229a(c)(7)(C)(ii) (permitting noncitizens to file a belated motion to open removal proceedings "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding"); 8 C.F.R. § 1208.4(a)(4)(i)(A)–(B).

determinations.  Take, for example, a noncitizen with an expedited removal order who claims

that it would violate due process for ICE to release him into his home country because there is a

civil war raging there and he will be persecuted when he arrives.  If the presence of the civil war

was the factual basis for his rejected asylum application, his claims clearly would be barred.  In

ordering the noncitizen removed, the agency would necessarily have already rejected the

petitioner's claim that the civil war warranted asylum, and one of the primary purposes of the

INA's jurisdiction-stripping provisions is to prevent the relitigation of the agency's initial asylum

determinations.  See DHS v. Thuraissigiam, 140 S. Ct. 1959, 1966 (2020) ("A major objective of

[these provisions] was to 'protec[t] the Executive's discretion' from undue interference by the

courts; indeed, 'that can fairly be said to be the theme of the legislation.'" (quoting Reno, 525

U.S. at 486)).  Granted, petitioners' home-country claims here are not based on the same factual

predicate as their underlying asylum claims.  But, even though petitioners "may not be directly

questioning the agency's discretionary" decision to carry out their removal orders, the INA bars

review of claims that effectively do so.  C.G.B., 2020 WL 2935111, at *30 (citing Giammarco v.

Kerlikowske, 665 F. App'x 24, 26 (2d Cir. 2016) ("[B]ecause [the] petition for a writ of habeas

corpus ad testificandum essentially seeks to void discretionary decisions denying [a detainee] the

same relief, his petition is inextricably linked to those decisions," there is no "jurisdiction to

consider the merits of [the] habeas petition [under 8 U.S.C. § 1252(a)(2)(B)]." (citations

omitted))).

Because the decision to return petitioners to their home countries is part and parcel of

ICE's discretionary, unreviewable decision to execute their expedited removal orders, the Court

finds that § 1252(g) likely divests it of jurisdiction to hear petitioners' claims that exposing them to dangerous conditions in those countries would violate due process.[18]

### 3. The Suspension Clause

The final aspect of the Court's jurisdictional inquiry involves the Suspension Clause of the Constitution, which prohibits the political branches from "suspend[ing]" the writ of habeas corpus "unless when in Cases of Rebellion or Invasion the public Safety may require it," U.S. Const. Art. I, § IX, cl. 2. Petitioners contend that if the Court were to hold that the INA bars jurisdiction over their claims, the statute would violate the Suspension Clause. After the briefing on petitioners' motion was completed, the Supreme Court clarified that the Suspension Clause only protects "core" habeas claims, namely those that challenge present physical confinement. Thuraissigiam, 140 S. Ct. at 1970–71. Here, petitioners seek a "non-core" application of the writ in that they "challenge[] something other than [their] present physical confinement." Rumsfeld v. Padilla, 542 U.S. 426, 438 (2004). Indeed, they seek to stay their deportation and thereby *remain* in custody. Accordingly, the INA's bar to judicial review of the petitioner's home-country claims does not implicate the Suspension Clause.

\* \* \*

Section 1252 is one of the most comprehensive jurisdiction-stripping statutes in the United State Code, yet some claims manage to escape its clutches. Because the text of the INA does not clearly prohibit the Court from reviewing the constitutionality of the physical manner in

---

[18] Petitioners' home-country claims are also likely barred by § 1252(a)(2)(A)(i) for similar reasons. Because the government has discretion to begin or suspend the execution of removal orders, these claims could be said to challenge the *fact* of deportation and therefore "aris[e] from or relat[e] to the implementation or operation of an order of removal" within the meaning of § 1252(a)(2)(A)(i). See Jennings, 138 S. Ct. at 855 (Thomas, J., concurring in part).

22

App.224

which petitioners would be deported, the Court likely has jurisdiction to decide those claims. On the other hand, petitioners' due-process claims based on conditions they might encounter in their home countries directly implicate the government's discretionary decision to carry out their removal orders such that the Court likely lacks jurisdiction over those claims. The Court will therefore only analyze petitioners' likelihood of succeeding on the merits of their manner-of-deportation claims.

      B. <u>Likelihood of Success on the Merits</u>

Again, the petitioners claim that the manner of their contemplated deportations—specifically, their exposure to the risks of contracting COVID-19 during the transportation process—would violate both their Fifth Amendment due process rights and the APA. The Court concludes that petitioners have not established a likelihood of success on the merits of their claim on either ground.

      *1. Due Process*

Taking due process first, the government argues out of the blocks that petitioners do not have due process rights because they have not been lawfully admitted to the United States. Gov't's Opp'n 21. Not so. The Supreme Court recently clarified that an asylum seeker with a negative credible-fear determination "has only those rights *regarding admission* that Congress has provided by statute." <u>Thuraissigiam</u>, 140 S. Ct. at 1982–83 (emphasis added) (citing <u>Landon v. Plasencia</u>, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights *regarding his application*." (emphasis added)). Petitioners here do not seek to vindicate procedural due process rights related to their asylum applications, which the Supreme Court has now expressly limited to the process provided by statute. Rather, they are seeking to enforce substantive due

process rights based on what amounts to unconstitutional conditions of confinement during the removal process. See id. at 2013 n.12 (Sotomayor, J., dissenting) ("Presumably a challenge to the length or conditions of confinement pending a hearing before an immigration judge falls outside of that class of cases. Because respondent only sought promised asylum procedures, today's decision can extend no further than these claims for relief."). The Court therefore finds that petitioners are entitled to due process in relation to the conditions attendant to their deportations.

The question, then, is whether the deporting the currently detained petitioners during the pandemic would likely offend due process. This Court recently laid out the constitutional standards that apply to a conditions of confinement challenge brought by noncitizens in civil immigration detention:

> When the Government "takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being[.]" DeShaney v. Winnebago Cnty. Dep't. of Social Serv., 489 U.S. 189, 199–200 (1989). Confinement of a person in a way that "renders [her] unable to care for [her]self, and at the same time fails to provide for [her] basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety" violates the Eighth Amendment to the Constitution. Id. Accordingly, the Eighth Amendment prohibits the Government from "ignor[ing] a condition of confinement that is sure or very likely to cause serious illness." Helling v. McKinney, 509 U.S. 25, 33 (1993). While civil immigration detainees are protected by the Fifth Amendment's Due Process Clause, these Eighth Amendment protections nevertheless apply to them "because a [civil] detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" Jones v. Wolf, No. 20-CV-361, 2020 WL 1643857, at *3 (W.D.N.Y. Apr. 2, 2020) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)).

> To assess whether conditions of confinement violates due process, courts consider whether the conditions "amount to punishment of the detainee." Bell, 441 U.S. at 535. Because civil immigration detainees, like pretrial criminal detainees, have not been convicted of any present crime, they "may not be subjected to punishment of any description." Hardy v. District of Columbia, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) (quoting Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992)).

24

App.226

> In determining whether conditions of confinement amount to punishment, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Bell, 441 U.S. at 538.

C.G.B., 2020 WL 2935111, at *22.  Because petitioners would remain in ICE's custody during the deportation process up to the point of their release into their home countries, the Court will apply this standard to their challenge to the conditions attendant to that process.[19]  The relevant inquiry, therefore, is whether the manner in which their deportations would be carried out is "rationally related to a legitimate nonpunitive governmental purpose or . . . appear[s] excessive in relation to that purpose."  Kingsley, 135 S. Ct. at 2373–74 (quoting Bell, 441 U.S. at 538).[20]

The government plainly has a legitimate interest in the enforcement of immigration laws, and Congress has deemed that interest to be furthered by expeditiously removing asylum seekers who have been found not to have a credible fear of persecution in their native countries.  See, e.g., Landon, 459 U.S. at 34 ("The government's interest in efficient administration of the immigration laws at the border . . . is weighty.").  In C.G.B., this Court considered whether the conditions of detention experienced by certain noncitizens at five ICE facilities across the country violated due process.  Finding that the conditions likely violated the due process rights of some, but not all, of the detainees, the Court explained that "the Constitution does not require

---

[19] Petitioners frame their claims under the higher "deliberate indifference" and "shocks the conscience" standards that apply in substantive due process cases where the government has a "special-relationship" with the plaintiff or has exposed him to "state-created danger."  See, e.g., Harris v. District of Columbia, 932 F.2d 10, 14 (D.C. Cir. 1991); Butera v. District of Columbia, 235 F.3d 637, 649–51 (D.C. Cir. 2001).  Because, as discussed, their claims are unlikely to succeed under the lower standard set out in C.G.B., they are necessarily likely to fail under these higher standards.

[20] Petitioners do not allege "an expressed intent to punish on the part of [ICE] officials."  Bell, 441 U.S. at 538 (internal quotation marks omitted).

ICE to reduce the risk of harm to zero." C.G.B., 2020 WL 2935111, at *23 (quoting Benavides v. Gartland, No. 20-cv-46, 2020 WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020)). "If it did, then any detention that does not allow detainees to perfectly practice social distancing would be per se unconstitutional." Id. The same reasoning applies to ICE's detention of deportees during the removal process. Due process only requires ICE to provide petitioners with "reasonable safety," not perfect safety. DeShaney, 489 U.S. at 200.

As noted previously, ICE has provided the Court sworn declarations, which carry a presumption of good faith, indicating that it has taken a series of reasonable precautions to mitigate the possibility that petitioners traveling from the Berks or Dilley facility will be exposed to COVID-19 during their journey home. It will conduct verbal screenings and temperature checks of all deportees at each leg of the trip and prohibit anyone exhibiting COVID-19 symptoms from traveling further. It will provide all travelers with hand sanitizer and masks, which they will be required to wear. It has also arranged for dedicated charter flights and ground transportation for all trips, so no petitioner will be forced to congregate in commercial airports or travel in commercial vehicles or planes. Each flight will carry a healthcare provider proficient in aviation medicine, who will conduct additional pre-removal visual screenings and distribute additional PPE as needed. And ICE has committed to segregating families from individuals on flights and limiting the number of passengers on any given flight to allow for physical distancing "to the extent possible."

Still, as ICE itself acknowledges, these preventative measures will not eliminate the risk of exposure altogether. Petitioners correctly note that ICE's inability to ensure complete compliance with CDC's social distancing guidelines will increase their risk of exposure to some extent. They also stress that ICE's failure to test every deportee (in lieu of symptom-based

App.228

screening) makes it possible that asymptomatic COVID carriers will be traveling alongside non-infected petitioners.  Again, however, due process does not demand zero risk.  It only requires ICE to ensure its detainees reasonably safe conditions.  The Court is persuaded that with the precautions it has adopted, ICE has met that standard.  While the CDC has recommended against all non-essential travel during the pandemic, it has not suggested that travel be banned entirely.  Consistent with that guidance, commercial airlines have continued to operate during the pandemic.  And the conditions that thousands of commercial air travelers currently experience every day (albeit mostly voluntarily)—required masks but no guarantee of an unoccupied adjacent seat or row and no COVID testing—are comparable to those that petitioners would face on ICE charter flights.  See Dep't of Transp., et al., Runway to Recovery, at 29–30 (July 2020).

More importantly, the Court must assess the conditions that petitioners would experience during the deportation process relative to those they would continue to face were the Court to grant the requested stay.  While the parties have not provided the Court with any information on the prevalence of the virus or ICE's prevention efforts at the Berks and Dilley facilities, petitioners' counsel are actively pursuing litigation against ICE elsewhere in this court on behalf of detainees at both facilities over their alleged non-compliance with CDC's COVID-19 guidelines.  See Petition & Complaint at 3, O.M.G. v. Wolf, No. 20-cv-786 (JEB) (filed D.D.C. Mar. 21, 2020) (alleging that ICE has "failed to provide education to Petitioners and individuals employed at the [facilities], ensure that minimum basic necessities such as soap or hand sanitizer are provided, and ensure that is possible to achieve the critical need for social distancing").  Indeed, Judge Dolly Gee in the Central District of California recently found that detainees at ICE's family residential centers, including at Berks and Dilley, are at a high risk for COVID-19.  Flores v. Barr, No. 85-cv-4544, 2020 WL 3488040, at *1 (C.D. Cal. June 26, 2020).  She

specifically found that that "individuals living in congregate settings are more vulnerable to the virus," that "four employees at Dilley already have tested positive," that there have been "recent increases in COVID-19 infection rates in the counties in which . . . Dilley [is] located," and that "six children were afflicted with viral stomatitis in or about April 2020, further demonstrating the ease with which contagion can spread in congregate settings." Id. Likewise, while petitioners note the purported risk associated with comingling deportees from multiple facilities during the deportation process, similar risk exists within the detention centers. The populations of the centers are in flux, detainees are not tested on a routine basis, and staff come and go daily. Petitioners therefore have not shown that commingling during the removal process would increase their exposure to the virus beyond what it is now, let alone to such an extent that would violate constitutional due process.

The bottom line is that the risks of the removal process cannot be assessed a vacuum. Rather, the Court must ask whether it is reasonable for ICE to expose petitioners to the temporary risks of traveling as compared to the indefinite risks of remaining in congregate detention facilities with transient detainee populations who have not all been tested for the virus and staff entering and leaving every day. Viewed from that perspective, the Court has little difficulty concluding that petitioners are not likely to show that ICE will subject them to an unreasonable health risk by carrying out their removals with the precautionary measures ICE has committed to taking.

### 2. *Administrative Procedure Act*

Petitioners also contend that their removal during the pandemic would violate the APA. They root their APA claim in United States ex rel. Accardi v. Shaughnessy ("Accardi"), where the Supreme Court vacated a deportation order that was issued in a manner that did not comply

with "[r]egulations [that] prescribe[d] the procedure to be followed in processing an alien's application for suspension of deportation."  347 U.S. 260, 265 (1954).  "Accardi has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."  Battle v. FAA, 393 F.3d 1330, 1336 (D.C. Cir. 2005).  Rules that fall within Accardi's ambit include "internal agency guidance" that are "intended" to be "binding norm[s]."  Damus v. Nielsen, 313 F. Supp. 3d 317, 336 (quoting Padula v. Webster, 822 F.2d 97, 100 (D.C. Cir. 1987)).  Petitioners contend that, under Accardi, ICE's failure to follow CDC guidance and its own policies in responding to the COVID-19 pandemic is arbitrary and capricious.  Am. Pet'n & Compl. ¶¶ 287–98.  The government responds that petitioners do not challenge the type of regulation encompassed by Accardi and that, regardless, they have not shown that ICE is violating the guidelines.  The Court agrees that petitioners' claims fall outside the Accardi doctrine.

As this Court recently explained, "agency regulations do not create *substantive* due process rights."  C.G.B., 2020 WL 2935111, at *34 (emphasis in original).  Accardi is instead "rooted instead in notions of *procedural* due process."  Id. (emphasis in original) (citing Lopez v. FAA, 318 F.3d 242, 246 (D.C. Cir. 2003); Thomas W. Merrill, The Accardi Principle, 74 Geo. Wash. L. Rev. 569, 577 (2006) (noting that all post-1950s Supreme Court cases "that reference the Accardi principle . . . involve procedural as opposed to substantive regulations.")).  In Damus v. Neilson, for example, the court held that plaintiffs could challenge ICE's failure to comply its own Parole Directive, which imposed "a number of procedural requirements for assessing asylum-seekers' eligibility for release," including "an opportunity to submit documentation, the availability of an individualized parole interview, and an explanation of the reasons for a parole denial."  313 F. Supp. 3d at 324, 337; see also Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 151

(D.D.C. 2018) (recognizing an <u>Accardi</u> claim related to a policy that "establishe[d] procedural rights for asylum seekers in connection with the parole process"). The guidelines involved here, conversely, set out substantive standards for how to handle the COVID-19 crisis. But because <u>Accardi</u> does not create substantive rights, petitioners cannot rely on the APA to enforce the government's adherence to CDC guidelines or its own internal guidance during their removals. Petitioners therefore have not established likelihood of success on the merits of their APA claim.

     C. <u>Irreparable Injury</u>

     Moving to the irreparable injury prong of the TRO analysis, deportation pursuant to a valid removal order is "not categorically irreparable." <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). That is, "the burden of removal *alone* cannot constitute the requisite irreparable injury." <u>Id.</u> (emphasis added). The Supreme Court explained that noncitizens were not irreparably harmed when they could "continue to pursue their petitions for review" after removal and, if they prevailed, could "be afforded effective relief by facilitation of their return." <u>Id.</u> Here, however, removal during the pandemic would effectively foreclose this petition from review; petitioners obviously could not challenge the legality of the conditions of their deportation during a pandemic *after* they have been removed. Even if they could, the Court would not be able to afford them effective relief. Petitioners have, therefore, demonstrated irreparable harm in that regard.[21]

_____

[21] While the Court finds petitioners have shown irreparable harm insofar as they would be unable to mount their challenge absent a stay, as discussed above in connection with the merits prong of the TRO analysis, they have failed to show that the alleged harm associated with the deportation process would be any greater than the present harm inside the Dilley and Berks facilities. In fact, it may well be less.

D. Balance of the Equities and the Public Interest

When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge. See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016). There are equities and public interests on both sides of the scale here. As the Supreme Court has noted, "[t]here is always a public interest in prompt execution of removal orders" because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" Nken, 556 U.S. at 436 (quoting Reno, 525 U.S. at 490). But that interest is not as strong where, as here, petitioners "are not being removed because they violated the law." M.M.V., 2020 WL 2119744, at *3. Nor is it as strong, perhaps, where legitimate concerns have been raised over the circumstances surrounding the denial of petitioners' asylum petitions. Id. (referencing a number of "troubling" circumstances surrounding petitioners' applications—including the application of the Transit Ban, adversarial interviews, negative social media posts by interviewing officers, and the failure to apply the most favorable circuit precedent—that the court did not have jurisdiction to review); see also M.M.V., 2020 WL 1984309, at *4–6, 12–16. The Supreme Court has also recognized that there is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Nken, 556 U.S. at 436. Absent a TRO staying their removal, petitioners will very likely be deported during a worldwide pandemic, exposing them to at least some risk of contracting the virus along the way. It is in the public interest to avoid or reduce that risk. As discussed above, however, petitioners' deportation could potentially reduce their overall COVID exposure by removing them from congregate detention facilities that have been found not to comply with relevant CDC guidelines. Lowering the

capacity of those facilities would also curtail the remaining detainees' exposure to the virus, which is also in the public interest. Weighing these factors, the Court cannot say that balance tips decidedly towards one party or the other.

* * *

While petitioners will suffer irreparable harm insofar as they will not be able to mount this challenge after their deportation, because they are unlikely to succeed on the merits and the other two factors do not "'clearly favor[]' granting the injunction," Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009), the Court must decline to enter a temporary restraining order and will lift the administrative stay of removal.

### IV. Venue

Finally, the government asks the Court to transfer venue after denying petitioners' TRO motion because the so-called immediate physical custody rule requires habeas petitions to be heard in the district where the detainees are held. Opp'n 36. It also maintains that "this case presents a local controversy related to ICE removal operations" and should be transferred "to a district where one of the Family Residential Centers [at issue] are located (*i.e.*, the Southern District of Texas or Eastern District of Pennsylvania)." Id. Petitioners respond that the immediate physical custody rule only applies to core habeas petitions challenging detention itself as unlawful and seeking release. Reply 30 (citing Rumsfeld v. Padilla, 542 U.S. 426, 435 (2004)). They say that non-core claims, like those here, need not follow that rule. Id.

Petitioners are generally correct. The Supreme Court has held that core habeas claims must follow the physical custody rule but that the rule should not be so rigidly applied to non-core claims. Padilla, 542 U.S. at 435. For non-core petitions, courts "have relied on traditional venue considerations such as the location of material events, the location of records and

32

witnesses pertinent to the claim, and the relative convenience of the forum for each party."
S.N.C. v. Sessions, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018) (internal quotation marks
omitted).  At this juncture, however, the Court lacks sufficient information to decide whether the
District of Columbia is the most appropriate venue.  The government has not formally moved for
transfer and the cursory discussion of the issue in its opposition brief does not confront all the
factors relevant to customary venue considerations under 28 U.S.C. § 1404(a).  The Court
therefore will defer consideration of venue until such a motion is made.

**V.    Conclusion**

While the Court concludes that petitioners have not satisfied the exacting standard
required for the issuance of a TRO, it will remind the government that, whatever circumstances
brought the petitioners to this country, they are now in our care and will remain so until they
reach their home countries.  For that reason alone, the government has a duty to carry out their
lawful removal in as safe and humane a fashion as possible.  The Court has accepted ICE's
representations that is has implemented preventative measures to reduce the risk of COVID
exposure during petitioners' journeys.  It expects them to be followed.  The Court also urges ICE
not to spare expense or cut corners in the transportation process, such as by unnecessarily filling
buses and planes to their full capacity.  The law may require petitioners' removal to be
"expedited," but it does not demand that it be so hurried or incautious as to jeopardize their
wellbeing.

That said, and for the foregoing reasons, the Court must deny Petitioners' Motion for a
Temporary Restraining Order and lift the administrative stay.  A separate Order shall follow.


Date:  July 23, 2020

CHRISTOPHER R. COOPER
United States District Judge

App.235

Caroline J. Heller*
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

*Appearing *Pro Hac Vice*

Steven G. Barringer (D.D.C. Bar # 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D.A.M. et al., | § | Case No. 20-cv-01321-CRC |
| | § | |
| Petitioners, | § | |
| | § | |
| | § | **VERIFIED AMENDED PETITION FOR** |
| v. | § | **WRIT OF HABEAS CORPUS &** |
| | § | **COMPLAINT FOR DECLARATORY** |
| BARR et al., | § | **AND INJUNCTIVE RELIEF** |
| | § | |
| | § | |
| Respondents. | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| | § | |

## INTRODUCTION

1.      Petitioners are parents and children who have fled persecution in their home countries to seek asylum in the United States.  The vast majority of the Petitioners had final orders of removal issued based on the unlawful and recently vacated interim final rule known as the "Transit Ban", such that no valid or lawful order exists to justify the government seeking their removal absent constitutionally adequate process and due process protections.

2.      Petitioners are detained at either the South Texas Family Residential Center in Dilley, Texas ("Dilley") or the Berks County Residential Center in Leesport, Pennsylvania ("Berks"), or have been released from Dilley or Berks but remain "in custody" for habeas corpus purposes based on the substantial restrictions on liberty imposed by Respondents on those released by way of ongoing efforts to effect removal and ongoing orders of supervision, monitoring and electronic custody.

3.      Upon information and belief, Petitioners will be imminently removed from the United States in the absence of a stay of removal.

4.      At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive encroachment on liberty, and it is in that context that its protections have been strongest. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). These protections extend fully to noncitizens subject to an order of removal. *Id*.; *see also* Gerard L. Neuman, *Habeas Corpus, Executive Detention, and the Removal of Aliens*, 98 COLUM. L. REV. 961, 1044 (1998) ("[H]istorical precedents beginning shortly after 1787 and reaching to the present confirm the applicability of the writ of habeas corpus to the detention involved in the physical removal of aliens from the United States. These precedents include opinions . . . denying the power of Congress to eliminate judicial inquiry.").

5.      This non-core habeas petition challenges the legality of Respondents' actions during the COVID-19 pandemic to deport Petitioners. Respondents' actions are unsafe. Further, the vast majority of Petitioners received orders of removal following the interim final rule jointly published by the Departments of Justice and Homeland Security entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban") that a Court in

2

this District found to be void *ab initio*. *See Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020) ("*CAIR*").

6.     Attempting to remove Petitioners in an unsafe manner during a global pandemic predicated on removal orders issued pursuant to a vacated rule constitutes an encroachment into Petitioners' protected liberty interests, conclusively establishing irreparable harm in the threat of removal prior to any form of lawful process, and undercutting any governmental interest in seeking to quickly remove them.

**The Transit Ban**

7.     On June 30, 2020, in a Memorandum Opinion and accompanying Order, Judge Timothy J. Kelly of the District Court of the District of Columbia entered a final, appealable Order vacating the Transit Ban, holding that "Defendants unlawfully promulgated the [Transit Ban] without complying with the APA's notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here." 2020 WL 3542481 at *1; *see CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20. "Having found that the [Transit Ban] was enacted unlawfully, the Court sees no reason why it should not be vacated." 2020 WL 3542481 at *1.

8.     "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void ab initio." *United States v. Goodner Bros. Aircraft, Inc.*, 966 F.2d 380, 384 (8th Cir. 1992) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 313, (1979)); *see Chrysler Corp*, 441 U.S. at 313 ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act.") (citing *Morton v. Ruiz*, 415 U.S. 199 (1974) & *U.S. v. Allegheny–Ludlam Steel Corp.*, 406 U.S. 742, 758, (1972)).

3

9.     All but thirteen (13) Petitioners in this case were subjected to the Transit Ban and its procedures. Their final orders of removal result from Respondents' application of the now-vacated Transit Ban to those Petitioners.    Petitioners subjected to the Transit Ban were categorically unable to avoid persecution by establishing a significant possibility of asylum eligibility under the credible fear standard, with few exceptions.

**Removal is Unreasonably Unsafe**

10.     The Centers for Disease Control and Prevention ("CDC"), recommends against travel now, with the CDC stating "[b]ecause travel increases your chances of getting and spreading COVID-19 staying at home is the best way to protect yourself and others from getting sick."[1]  The novel coronavirus ("COVID-19") pandemic is a global catastrophe that has affected virtually every corner of the world.

11.     In the United States, the risks of COVID-19 have caused social distancing measures to be implemented throughout the country, along with the shutdown or suspension of all but essential businesses and services in nearly every state.  Petitioners' countries of origin have been similarly impacted, but with far fewer resources to fight the spread of the virus or provide care for those who fall ill.

12.     Because of its failures to follow the CDC guideline over the past few months, the United States has removed dozens of immigrants infected with COVID-19, thereby exposing every other person who travelled with them to COVID-19.[2]

---

[1] *Consideration for Travelers - Coronavirus in the United States*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited July 8, 2020).
[2] Juan Montes, U.S. Fails to Prevent Deportation of Migrants Infected With Covid-19, Guatemalan Officials Say, THE WALL STREET JOURNAL (June 24, 2020) https://www.wsj.com/articles/u-s-fails-to-prevent-deportation-of-migrants-infected-with-covid-19-guatemalan-officials-say-11593023095 ("a Guatemalan health official said that 28 deportees

4

13. The risks of exposure to COVID-19 during removal are so great that on Monday, May 11, 2020, United States Representative Frederica Wilson introduced the Haitian Deportation Relief Act, which calls for the suspension of the deportation of Haitian nationals until the COVID-19 pandemic has ended in both the United States and Haiti.[3]

14. There are no reasonable practices to test detainees for COVID-19 prior to deportation; Immigration and Customs Enforcement ("ICE") told the Miami Herald that the agency would acquire approximately 2,000 tests a month "but given the nationwide shortages of testing kits, 'the agency likely won't have enough to test all aliens scheduled for future removals and will prioritize testing based on evolving operational considerations,' ICE said."[4]

15. Upon information and belief, Respondents do not test every detainee for COVID-19 prior to deportation.

---

tested positive upon arrival since May 4, when the first flight under the new protocols arrived from Brownsville, Texas, until mid-June."); Caitlin Dickerson & Kirk Semple, *U.S. Deported Thousands Amid Covid-19 Outbreak. Some Proved to Be* Sick, N.Y. TIMES (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/us/deportations-coronavirus-guatemala.html ("Dozens of Guatemalans flown home by Immigration and Customs enforcement since late March tested positive for the coronavirus after returning, according to Guatemalan authorities."); Maria Martin, *Official Alleges The U.S. Has Deported Many COVID-19-Positive Migrants To Guatemala*, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-to-guatema. (Guatemalan health officials claim one deportation flight from the United States arrived with 75% of its passengers infected).
[3] Press Release, Rep. Frederica S. Wilson, Wilson Introduces Bill to Suspend Deportations to Haiti During Pandemic (May 11, 2020), https://wilson.house.gov/media-center/press-releases/wilson-introduces-bill-to-suspend-deportations-to-haiti-during-pandemic.
[4] Monique O. Madan, Jacqueline Charles, & Romina Ruiz-Goiriena, *ICE plans to increase COVID-19 testing as Haiti commission calls for pause in deportations*, MIAMI HERALD (Apr. 24, 2020), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article242265956.html.

5

16.     Upon information and belief, when Respondents do test a detainee for COVID-19 prior to deportation, they utilize a "rapid" COVID-19 test that shows higher "false negative" rates than other methods of testing.

17.     According to ICE reports, as of July 6, 2020, ICE reported 836 cases of COVID-19 among its current detainee population of 22,805.[5]

18.     ICE Guidance on COVID-19 is woefully inadequate; it does not require: testing prior to removal; the provision of face masks to detainees; or social distancing during transportation to airports or on flights.[6]

19.     During the removal process, individuals and families are frequently shuttled across the country between different detention centers, and often confined in close quarters.  Even the ordinary process for removing asylum-seeking families—transporting families en masse via bus or other vehicle to airports, where they are crowded onto commercial airplanes and flown to their home countries—is fraught with danger related to the COVID-19.

20.     Respondents' actions also put Petitioners' health and safety at great risk even after they arrive in their home countries.  Upon arrival, Petitioners may be subjected to quarantine measures (presenting the risk of further persecution as Petitioners may be viewed as disease carriers).  Once individuals who are removed from the United States are permitted to leave quarantine, they may have no safe place to turn, especially if they were fleeing persecution in their homes in the first place. In some countries, public transportation is suspended and curfews are imposed, inhibiting Petitioners' ability to contact relatives or friends, as well as their ability to

---

[5]     *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).
[6] *Id.*

6

reach a safe place to stay amid the ongoing pandemic. These risks are all-the-more inhumane when, as here, they threaten children.

**Unreasonable Unsafe Removal & Removal Pursuant to Invalid Orders is Unconstitutional**

21.     Deportation proceedings that subject Petitioners to COVID-19 infections in the United States and/or in Petitioners' home countries and who received orders of removal resulting from a process that was found to be void *ab initio,* would infringe on Petitioners' constitutional rights.

22.     Without a stay of removal, Respondents may remove Petitioners at any time.

23.     Without a stay of removal, the deportation of all detained and some non-detained Petitioners is imminent.

24.     Absent a stay of removal from this Court, Petitioners will face imminent harm and possible death from COVID-19.

25.     Petitioners seek a temporary stay of their removal to avoid the grave danger and risk of peril caused by the deportation process as it exists. As described in further detail below, deporting Petitioners during the coronavirus pandemic would violate (1) Petitioners' substantive and procedural due process rights, (2) the special-relationship doctrine, (3) the state-created danger doctrine, and (4) the *Accardi* doctrine.

26.     Petitioners also seek a temporary stay of their removal until the Petitioners who had final orders of removal issued based on the "Transit Ban" have been provided a lawful process.

**Suspension Clause**

27.     The writ of habeas corpus is so foundational to our legal framework that the Constitution provides: "[t]he privilege of the writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it." U.S. CONST. art. I, § 9, cl.

7

2.  It is the only writ enshrined in the Constitution, and this, along with the Judiciary Act of 1789 (1 Stat. 73 (1789)), establishes the authority for at least the Supreme Court to issue writs of habeas corpus when they believe detention is unlawful.

28.     The same authority vested in the Supreme Court above has been extended by Congress to the district courts through the Habeas Corpus Act of 1867 (14 Stat. 385 (1867)), which provides that a district court can grant the writ of habeas corpus whenever a petitioner is "in custody in violation of the Constitution or law and treaties of the United States." 28 U.S.C. § 2241(c)(3).

29.     Absent this Court's intervention, Petitioners have no adequate substitute to challenge the legality of Respondents' action to deport them during the COVID-19 pandemic to countries where it has been confirmed that the government has deported people who tested positive for the virus for which there is no cure.

30.     The Supreme Court has noted the habeas corpus writ's "scope and flexibility," *i.e.*, its "capacity to reach all manner of illegal detention," and its "ability to cut through barriers of form and procedural mazes." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). Additionally, the remedy should "be administered with the initiative and flexibility essential to ensure that miscarriages of justices within its reach are surfaced and corrected." *Id.*

31.     The Constitution permits and requires the Court to retain residual habeas jurisdiction to ensure that the process employed by Respondents to deport Petitioners meets constitutional standards.

32.     The writ of habeas corpus is "a procedural device for subjecting executive, judicial, or private restraints on liberty to judicial scrutiny...." *Peyton v. Rowe*, 391 U.S. 54, 58 (1968).

8

Chief Justice Earl Warren stated that it is this "high purpose [that] has made the writ both the symbol and guardian of individual liberty." *Id.*

33.     A stay of removal is necessary to maintain the *status quo* to ensure that Respondents do not engage in a removal process that unlawfully extinguishes the ability of Petitioners to pursue their claims and not be exposed to life threatening conditions in removal. A stay is therefore necessary to ensure the effectiveness of the judicial review process to protect Petitioners' property and liberty interests.

34.     Respondents' swift deportation of one family to Mexico 24 hours after Judge Berman Jackson lifted the administrative stays in *M.M.V v. Barr*, and their preparation to deport other families to Honduras the evening after Judge Berman Jackson lifted the administrative stays, are evidence that Petitioners' deportation to their countries of origin is imminent.

## PARTIES

35.     Petitioners are all mothers, fathers, and children either detained at Dilley or Berks, or released, who have been issued negative credible and reasonable fear determinations.

36.     Petitioners D.A.M. and her minor child Y.H.A. are Honduran nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 20, 2019. Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

37.     Petitioners M.M.V. and her minor son A.A.M. are Salvadoran nationals who seek protection in the United States from persecution and torture. M.M.V. and A.A.M. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear

9

interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

38.     Petitioners S.L.V. and her minor daughter M.F.L. are Salvadoran nationals who seek protection in the United States from persecution and torture.  S.L.V. and M.F.L. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

39.     Petitioners M.R.A. and her minor daughter L.C.R. are Honduran nationals who seek protection in the United States from persecution and torture.  M.R.A. and L.C.R. were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

40.     Petitioners A.L.V. and her minor sons I.G.L. and A.G.L. are Honduran nationals who seek protection in the United States from persecution and torture.  A.L.V., I.G.L., and A.G.L.

10

were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

41. Petitioners L.O.R. and her minor son A.P.O. are Honduran nationals who seek protection in the United States from persecution and torture. L.O.R. and A.P.O. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

42. Petitioners N.P. and her minor daughter R.D.P. are Honduran nationals who seek protection in the United States from persecution and torture. N.P. and R.D.P. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019. Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019. They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

11

43. Petitioners M.D.E. and her minor son A.G.D. are Salvadoran nationals who seek protection in the United States from persecution and torture.  M.D.E. and A.G.D. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 29, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

44. Petitioners M.M.B. and her minor daughter N.M.M. are Nicaraguan nationals who seek protection in the United States from persecution and torture.  M.M.B. and N.M.M. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on August 31, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

45. Petitioners D.C.V. and her minor son S.V.C. are Guatemalan nationals who seek protection in the United States from persecution and torture.  D.C.V. and S.V.C. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 30, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in

12

Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

46.     Petitioners M.G.V. and her minor child A.R.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 3, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

47.     Petitioners R.P.F. and her minor child J.F.P. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

48.     Petitioners J.M.R. and her minor child C.G.M. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 20, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30,

2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

49.     Petitioners J.S.M. and her minor child D.M.S. are Salvadoran nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019. They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

50.     Petitioners Y.U. and her now adult child F.G.U. are Salvadoran nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around August 23, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019. They were released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

51.     Petitioners I.F.L. and her minor child R.F.L. are Salvadoran nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around August 24, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2,

14

2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 19, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

52.     Petitioners N.M.L. and her minor child A.R.M. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

53.     Petitioners Y.O.T., a Salvadoran national, D.L.O., a Guatemalan national and V.L.O., a Guatemalan and Salvadoran national, seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

54.     Petitioners M.A.A. and her minor children A.R.A. and C.A.A. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear

15

interview on September 4, 2019, and were served with negative credible fear determinations on September 4, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

55.     Petitioners C.C.N. and her minor son B.S.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  C.C.N. and B.S.C. were placed in credible fear proceedings on or around August 27, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on December 12, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

56.     Petitioners L.H.H. and her minor daughter Y.F.H. are Honduran nationals who seek protection in the United States from persecution and torture.  L.H.H. and Y.F.H. were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

16

57.     Petitioners S.G.H. and her minor child A.G.H. are Salvadoran nationals who seek protection in the United States from persecution and torture.  S.G.H. and A.G.H. were placed in credible fear proceedings on or around August 30, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 23, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

58.     Petitioners J.S.P. and her minor son M.A.S. are Honduran nationals who seek protection in the United States from persecution and torture.  J.S.P. and M.A.S. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 26, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

59.     Petitioners K.P.P. and her minor children I.P.P. and M.P.P. are Ecuadorean nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around September 9, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 12, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful

final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

60.     Petitioners K.N.E. and her minor son E.A.N. are Honduran nationals who seek protection in the United States from persecution and torture.  K.N.E. and E.A.N. were placed in credible fear proceedings on or around September 8, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 16, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

61.     Petitioners M.H. and her minor son J.M.H. are Honduran nationals who seek protection in the United States from persecution and torture.  M.H. and J.M.H. were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Although they have been released from the South Texas Family Residential Center in Dilley, Texas, they remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

62.     Petitioners M.C.M. and her minor child S.M.C. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2,

18

2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

63.     Petitioners Y.V.O. and her minor child E.P.V. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 18, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

64.     Petitioners S.L.R. and her minor child A.V.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 19, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

65.     Petitioners A.D.L. and her minor child M.D.D. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 26, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas

Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

66.     Petitioners D.P.R. and her minor child S.B.P. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 3, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

67.     Petitioners L.G.G. and her minor child W.C.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

68.     Petitioners M.C.P. and her minor children J.C.P. and M.R.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 23, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Petitioner M.C.P. has been released with her children for medical reasons.  Although they have been released from the South Texas Family Residential Center in Dilley, Texas, they remain "in custody" for habeas

20

corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

69.     Petitioners R.L.A. and her minor child N.C.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 28, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

70.     Petitioners M.L.M. and her minor child J.R.L. are Honduran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 27, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  Petitioner M.L.M. and J.R.L. have been released for medical reasons, but they remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

71.     Petitioners C.C.G. and her minor child E.C.G. are Salvadoran nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019.  Their negative credible fear determinations were affirmed by an immigration judge on October 17, 2019.  They are detained at the South Texas

21

Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

72. Petitioners B.C.A. and her minor child G.S.C. are Ecuadorian nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 17, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 30, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

73. Petitioners L.M.P. and her children Y.M.M. and L.P.M. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. The family was served with negative credible fear determinations on October 30, 2019. The negative decisions were affirmed by an immigration judge on December 2, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

74. Petitioners A.G.P. and her children D.S.G. and A.S.G. are Mexican nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019. The family was served with negative credible fear determinations on October 30, 2019. The negative decisions were affirmed by an immigration judge on December 2, 2019.

22

They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

75.     Petitioners C.R.R. and her children I.G.R. and V.G.R. are Mexican nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 10, 2019 and attended their initial credible fear interview on October 26, 2019.  The family was served with negative credible fear determinations on November 1, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

76.     Petitioners E.G. and her child J.G.M. are Brazilian nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview on October 12, 2019.  The family was served with negative credible fear determinations on October 31, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

77.     Petitioners B.G.C. and her child S.M.G. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 11, 2019.  The family was served with negative credible fear determinations on October 31, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

78.     Petitioners T.S.J. and her children L.P.S. and G.S.J. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview on October 18, 2019.  The family was served with negative credible fear determinations on November 1, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

79.     Petitioners I.C.A. and her child S.P.C. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 10, 2019.  The family was served with negative credible fear determinations on October 29, 2019.  The negative determinations were affirmed by an Immigration Judge on December 2, 2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

80.     Petitioners M.P.O. and her child G.G.L. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 17, 2019.  The family was served with negative credible fear determinations on November 1, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

24

81.     Petitioners D.O.H. and her children L.A.O. and D.A.O. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 24, 2019 and attended their initial credible fear interview on October 7, 2019.  The family was served with negative credible fear determinations around October 18, 2019.  The negative determinations were affirmed by an Immigration Judge on November 19, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

82.     Petitioners S.J.A. and her child W.A.A. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 4, 2019.  The family was served with negative credible fear determinations on October 18, 2019.  The negative determinations were affirmed by an Immigration Judge on November 14, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

83.     Petitioner child A.V.M. is a Guatemalan national who entered the United States accompanied by her mother E.V.M., who was placed in reasonable fear proceedings.  A.V.M. was placed in credible fear proceedings on September 29, 2019 and attended her initial credible fear interview on October 14, 2019.   She was served with a negative credible fear determination on October 17, 2019.   The negative determination was affirmed by an immigration judge on November 14, 2019.   E.V.M. and A.V.M. are detained at the South Texas Family Residential

25

Center in Dilley, Texas and A.V.M has an unlawful final order of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

84. Petitioners M.A.R. and her child S.R.S. are Brazilian nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 11, 2019. The family was served with negative credible fear determinations on October 22, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

85. Petitioners O.T.G. and her child T.T.G. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019. The family was served with negative credible fear determinations on October 24, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

86. Petitioners M.T.T. and her child Y.L.T. are Guatemalan nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019. The family was served with negative credible fear determinations on October 14, 2019. The negative determinations were affirmed by an Immigration Judge on November 12,

26

2019.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

87.     Petitioners R.C.H. and her child E.P.C. are Salvadoran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019.  The family was served with negative credible fear determinations on October 9, 2019.  The negative determinations were affirmed by an Immigration Judge on November 5, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

88.     Petitioners M.J.P. and her children A.M.P., A.P.P., and C.P.P. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 17, 2019 and attended their initial credible fear interview on September 20, 2019.   The family was served with negative credible fear determinations on October 4, 2019.  The negative determinations were affirmed by an Immigration Judge on November 4, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

89.     Petitioners I.H.L. and her child S.R.H. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 23, 2019 and attended their initial credible fear interview on September 30, 2019.  The family was served with negative credible fear determinations on October

27

8, 2019. The negative determinations were affirmed by an Immigration Judge on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

90.     Petitioners L.M.B. and her children Z.R.M. and E.R.M. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 26, 2019 and attended their initial credible fear interview on October 3, 2019. The family was served with negative credible fear determinations on October 10, 2019. The negative determinations were affirmed by an Immigration Judge on November 6, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

91.     Petitioners C.H.G. and her child M.G.H. are Salvadoran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 25, 2019 and attended their initial credible fear interview on October 3, 2019. The family was served with negative credible fear determinations on October 26, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

92.     Petitioners T.C.L. and her child A.P.C. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 16,

2019.  The family was served with negative credible fear determinations on October 31, 2019. The negative determinations were affirmed by an Immigration Judge on December 3, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

93.     Petitioners J.C. and her child Y.J.C. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019.  The family was served with negative credible fear determinations on October 30, 2019.  The negative determinations were affirmed by an Immigration Judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

94.     Petitioners L.M.L. and her child M.R.M. are Guatemalan nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 18, 2019.  The family was served with negative credible fear determinations on October 4, 2019.  The negative determinations were affirmed by an Immigration Judge on November 4, 2019.  They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

95.     Petitioners T.R.M. and her child J.R.R. are Honduran nationals who seek protection in the United States from persecution and torture.  The family was placed in credible fear proceedings on September 7, 2019 and attended their initial credible fear interview on September

29

18, 2019. The family was served with negative credible fear determinations on October 10, 2019. The negative decisions were affirmed by an immigration judge on November 13, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

96.     Petitioners B.H.I. and her child D.M.H. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. The family was served with negative credible fear determinations on November 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

97.     Petitioners S.R.F. and her child C.M.R. are Honduran nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on October 15, 2019 and attended their initial credible fear interview on October 30, 2019. The family was served with negative credible fear determinations on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

98.     Petitioners M.Z.L. and her child F.P.Z. are Peruvian nationals who seeks protection from persecution and torture in the United States. They were placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 27, 2019. They were served with a negative credible fear determination on October 18, 2019. The negative

30

decision was affirmed by an immigration judge on November 14, 2019. On November 27, 2019, M.Z.L. and F.P.Z. were released from detention from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes, and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

99.　Petitioners I.M.V. and her children J.T.M. and D.T.M. are Colombian nationals who seek protection in the United States from persecution and torture. The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 17, 2019. The family was served with negative credible fear determinations on September 26. The negative decisions were affirmed by an immigration judge on October 24. They were released from detention on November 27, 2019 with final orders of removal.

100.　Petitioners F.F.A., a Mexican national, D.A.B., a Honduran national, and their six-month old baby Petitioner A.A.B., a Mexican national, seek protection in the United States from persecution and torture. F.F.A., D.A.B., and A.A.B. were placed in credible fear proceedings on or around February 18, 2020, attended their credible fear interview on February 25, 2020 and were served with a negative credible fear determination on March 2, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 5, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

101.　Petitioners G.S.C., a father, M.C., a mother, both Haitian nationals, and their minor children G.R.S.C., who is a Haitain national, and Petitioner N.Y.B., who is a Chilean national, seek protection in the United States from persecution and torture. G.S.C., M.C., G.R.S.C., and N.Y.B. were placed in credible fear proceedings on or around March 2, 2020, attended their

31

credible fear interview on March 16, 2020 and were served with a negative credible fear determination on March 18, 2020.   Their negative credible fear determinations were affirmed by an immigration judge on March 24, 2020.   They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the Berks County Family Residential Center in Leesport, Pennsylvania.

102.    Petitioners N.V., a Haitian national, and her minor child Z.F., a Brazilian national, seek protection from persecution and torture in the United States.  They were placed in credible fear proceedings on or around January 23, 2020, attended their initial credible fear interviews on January 30, 2020, and were served with negative credible fear determinations on February 5, 2020. Their negative credible fear determinations were affirmed by an immigration judge on February 14, 2020.   They have final orders of removal, and Z.F.'s final order is unlawful as it was procured under the vacated Transit Ban, which no longer has the force and effect of law.   They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

103.    Petitioners C.L., a Haitian national, and her minor child J.A., a Brazilian national, seek protection from persecution and torture in the United States.  They were placed in credible fear proceedings on or around January 22, 2020, attended their initial credible fear interviews on January 31, 2020, and were served with negative credible fear determinations on February 7, 2020. Their negative credible fear determinations were affirmed by an immigration judge on February 14, 2020.  They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have final orders of removal.

104.    Petitioners A.O.V. and her minor child J.S.O., Honduran nationals, seek protection from persecution and torture in the United States.  A.O.V. and J.S.O. were placed in credible fear

32

proceedings on or around August 25, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by an immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas, and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

105.    Petitioners R.S.J. and her minor child S.A. are Haitian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 12, 2020, attended their initial credible fear interviews on February 24, 2020, and were served with negative credible fear determinations on March 11, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 20, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

106.    Petitioners B.L., a father, and C.N., a mother, are Haitian nationals, and their minor child B.L.N., is a Chilean national, and they seek protection in the United States from persecution and torture. B.L., C.N., and B.L.N. were placed in credible fear proceedings on or around March 11, 2020, attended their credible fear interview on March 19, 2020 and were served with a negative credible fear determination on March 26, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on April 8, 2020.  They have been released from the Berks County Family Residential Center in Leesport, Pennsylvania, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

33

107.     Petitioners M.P.A. and her minor child G.S.P. are Ecuadorian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 26, 2020, attended their initial credible fear interviews on March 10, 2020, and were served with negative credible fear determinations on March 13, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 20, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.   They are detained at the South Texas Family Residential Center in Dilley, Texas.

108.     Petitioners S.M.C. and her minor children D.S.M. and A.M.M. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 16, 2020, attended their initial credible fear interviews on March 19, 2020, and were served with negative credible fear determinations on March 23, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 25, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

109.     Petitioners M.T.B. and her minor children A.V.B. and W.A.B. are Haitian nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around February 27, 2020, attended their initial credible fear interviews on March 11, 2020, and were served with negative credible fear determinations on March 17, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 25, 2020.  They have unlawful final orders of removal procured under the vacated

34

Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

110. Petitioners I.F. and her minor children Z.M.F., E.G.F., and J.M.F. are Ecuadorian nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around January 14, 2020, attended their initial credible fear interviews on January 22, 2020, and were served with negative credible fear determinations on January 28, 2020. Their negative credible fear determinations were affirmed by an immigration judge on February 5, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

111. Petitioners Z.L. and her minor child J.C.L. are Ecuadorian nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around February 22, 2020, attended their initial credible fear interviews on February 26, 2020, and were served with negative credible fear determinations on March 4, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 10, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

112. Petitioners R.S.P. and her minor children F.P.P. and C.P.P. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 10, 2020, attended their initial credible fear interviews on March 15, 2020, and were served with negative credible fear determinations on March 27, 2020. Their negative credible fear determinations were affirmed by an immigration

judge on April 6, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

113. Petitioners I.C.T. and her minor child V.T.P. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 25, 2020, and were served with negative credible fear determinations on March 30, 2020. Their negative credible fear determinations were affirmed by an immigration judge on April 1, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes.

114. Petitioners I.E.B. and her minor child B.E. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 25, 2020, and were served with negative credible fear determinations on March 31, 2020. Their negative credible fear determinations were affirmed by an immigration judge on April 2, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

115. Petitioners M.V.G. and her minor children D.M.V. and J.M.V are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 19, 2020, attended their initial credible fear interviews on March 24, 2020, and were served with negative credible fear determinations on

March 26, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 31, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

116. Petitioners M.P.T. and her minor children A.A.P. and H.A.P. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 7, 2020, attended their initial credible fear interviews on March 13, 2020, and were served with negative credible fear determinations on March 16, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 23, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

117. Petitioners V.P.M. and her minor children S.L.P., N.L.P., and E.L.P. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around February 28, 2020, attended their initial credible fear interviews on March 2, 2020, and were served with negative credible fear determinations on March 9, 2020. Their negative credible fear determinations were affirmed by an immigration judge on March 11, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law. They are detained at the South Texas Family Residential Center in Dilley, Texas.

118. Petitioners J.H.R. and her minor child A.M.H. are Guatemalan nationals who seek protection in the United States from persecution and torture. They were placed in credible fear proceedings on or around March 10, 2020, attended their initial credible fear interviews on March

37

14, 2020, and were served with negative credible fear determinations on March 16, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 20, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

119.    Petitioners P.M. and M.N., Haitian nationals, and their minor child H.M.N., a Chilean national, seek protection in the United States from persecution and torture. P.M., M.N. and H.M.N. were placed in credible fear proceedings on or around March 11, 2020, attended their credible fear interview on March 19, 2020 and were served with a negative credible fear determination on March 26, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on April 8, 2020.  They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the Berks County Family Residential Center in Leesport, Pennsylvania.

120.    Petitioners A.Q.L. and her minor child A.G.C. are Guatemalan nationals who seek protection in the United States from persecution and torture.  They were placed in credible fear proceedings on or around March 1, 2020, attended their initial credible fear interviews on March 9, 2020, and were served with negative credible fear determinations on March 10, 2020.  Their negative credible fear determinations were affirmed by an immigration judge on March 12, 2020. They have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.  They are detained at the South Texas Family Residential Center in Dilley, Texas.

121.    Petitioners A.B.C. and her child E.C.B. are Salvadoran nationals who seek protection in the United States from persecution and torture. The family was placed in credible

38

fear proceedings on August 29, 2019 and attended their initial credible fear interview on September 4, 2019. The family was served with negative credible fear determinations on September 11, 2019. The negative determinations were affirmed by an Immigration Judge on September 23, 2019. They have been released from the South Texas Family Residential Center in Dilley, Texas, but remain "in custody" for habeas corpus purposes and have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

122.     Respondent William P. Barr is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ").  DOJ is the federal agency responsible for the administration and enforcement of the immigration laws, and for advising the relevant federal Departments and agencies of their duties under the law.  He is sued in his official capacity, and is the immediate and legal custodian of Petitioners.  Respondent Barr's address is U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, District of Columbia 20530.

123.     Respondent Chad Wolf is the Acting Secretary of the Department of Homeland Security ("DHS"), the Department of the Executive Branch of the United States government that oversees the agencies responsible for enforcing the immigration laws of the United States. Defendant Wolf is the head of DHS and has ultimate responsibility for the administration and enforcement of the immigration laws by DHS agencies.  In that capacity, Respondent Wolf has direct authority over all policies, procedures and practices relating to the apprehension of immigrants at the United States border and any subsequent removal proceedings.  He is sued in his official capacity, and is the immediate and legal custodian of Petitioners.  Respondent Wolf's address is U.S. Department of Homeland Security, 800 K Street, N.W. #1000, Washington, District of Columbia 20528.

## JURISDICTION AND VENUE

**Jurisdiction**

124.    The Court has jurisdiction over the Petitioners' claims, and this Petition is brought pursuant to 28 U.S.C. §§ 2241 *et seq*., as provided under Art. I § 9, cl. 2 of the United States Constitution ("Suspension Clause"), federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction based on the United States as respondent under 28 U.S.C. § 1346(a)(2).

125.    This case arises under the United States Constitution, the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq*.

126.    This Court also has remedial authority under its inherent authority, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., and the All Writs Act, 28 U.S.C. § 1651.

127.    While only the federal courts of appeal have jurisdiction to review removal orders directly through petitions for review, *see* 8 U.S.C. §§ 1252(a)(1), (b), federal district courts have jurisdiction to hear habeas claims by noncitizens challenging the lawfulness or constitutionality of ICE's conduct in detaining them, *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

128.    This Petition has been brought by, and is directed to, the appropriate parties.  A petition for a writ of habeas corpus may be brought by anyone "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).  "The writ . . . shall be directed to the person having custody of the persons detained." 28 U.S.C. § 2243. Accordingly, the proper respondent to a habeas petition is the person who has custody over the petitioner.  "[T]he writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."  *Rasul*, 542 U.S. at 478–79 (quoting *Braden v. 30th Judicial Circuit*, 410 U.S. 484, 495 (1973)).

40

129.     Federal courts have jurisdiction to hear habeas petitions because "absent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion of O'Connor, J.); U.S. CONST. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended…"); 28 U.S.C. § 2241(c)(3) (stating federal courts may grant the writ to any person "in custody in violation of the Constitution or laws or treaties of the United States"). District courts may grant habeas relief "within their respective jurisdictions." 28 U.S.C. § 2241(a).

130.     Jurisdiction over a habeas corpus petition can, under some narrow circumstances, be deprived by 8 U.S.C. § 1252, but those circumstances are not applicable here. For 8 U.S.C. § 1252 to deprive the Court of habeas jurisdiction, the Court must assess a two-pronged inquiry: (i) whether the statute contains a clear statement that the Court lacks habeas jurisdiction, and (ii) if the statute does clearly deny jurisdiction, then whether the statute unconstitutionally suspends the habeas writ by failing to provide an adequate alternative forum for review. *Boumediene v. Bush*, 553 U.S. 723, 736, 771 (2008) (determining first whether the statute "denies the federal courts jurisdiction," and then whether the statute "avoids the Suspension Clause mandate" by providing "adequate substitute procedures for habeas corpus"); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 575 (2006) (tracing the requirement of an "unmistakably clear statement" at least as far back as *Ex parte Yerger*, 75 U.S. 85, 104-05 (1868)).

131.     With respect to the first prong, the clear-statement rule must be applied to each case's facts, *i.e.*, even though a statute's jurisdiction-stripping statement might clearly strip jurisdiction for one set of facts, the same statement might be ambiguous as to another set of facts, and in the latter circumstance, jurisdiction is retained. S*ee Flores-Torres v. Mukasey*, 548 F.3d 708, 712 n.6 (9th Cir. 2008) (holding that "in this circumstance" § 1252(b) does not provide a

41

"clear statement" even if it does in other circumstances). This has proven particularly true with section 1252 because the statute strips jurisdiction in some respects but is ambiguous in others. *See Hernandez v. Gonzales*, 424 F.3d 42, 42–43 (1st Cir. 2005) (stating that § 1252 strips jurisdiction over some but not all alien habeas petitions).

132.    The U.S. Supreme Court has confirmed that section 1252 is not universal in its jurisdiction-stripping provisions. *Reno v. Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471 (1999) (hereinafter "*AADC*"). The *AADC* Court explained that section 1252 strips jurisdiction only for a "narrow" class of alien challenges to "discrete actions" of the Attorney General. *Id.* at 482. This "narrow" reading of section 1252 was critical to the outcome of the *AADC* case because the majority and the minority jockeyed over whether section 1252 barred the entire "universe of deportation claims," or a "much narrower" set. *Id.* Despite the dissenting justice's arguments, the majority agreed that the narrow view must prevail. *See id.* at 505–06 (Souter, J., dissenting) (arguing that the section was in fact "exhaustive").

133.    This limited reading of section 1252 was reinforced in *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018). *See, e.g.*, *Osorio-Martinez v. AG United States*, 893 F.3d 153, 178 (3d Cir. 2018) (finding jurisdiction stripping under section 1252(e) violates suspension clause). In sum, section 1252 is not a talisman to be invoked to eliminate a noncitizen's habeas petition; instead, a case-by-case analysis is necessary to determine when it applies. *See Osorio-Martinez*, 893 F.3d at 178.

134.    Here, 8 U.S.C. § 1252 does not deprive this Court of jurisdiction over Petitioners' claims. The right to seek habeas corpus relief is fundamental to the Constitution's scheme of ordered liberty. Habeas corpus is "a writ employed to bring a person before a court, most frequently to ensure that the party's imprisonment or detention is not illegal." *Boumediene*, 553

42

U.S. at 737 (quoting BLACK'S LAW DICTIONARY 728 (8th ed. 2004)). Blackstone called it "the most celebrated writ in English law," (3 WILLIAM BLACKSTONE, COMMENTARIES *129) and deemed the Habeas Corpus Act of 1679 "the stable bulwark of our liberties" (1 WILLIAM BLACKSTONE, COMMENTARIES *137).

135.     Moreover, jurisdiction is not stripped by 8 U.S.C. § 1252(g)'s bar against jurisdiction over claims arising from the Attorney General's exercise of discretion, because this non-core habeas petition challenges not a discretionary decision, but Respondents' legal authority. When, as here, "[t]he question before the Court is not why the [Respondents] chose to execute the removal order" but is instead focused on "whether the way Respondents acted accords with the Constitution and the laws of this country," § 1252(g) does not bar jurisdiction. *You v. Nielsen*, 321 F. Supp. 3d 451, 457-58 (S.D.N.Y. 2018) (holding that "§ 1252(g) is no bar to jurisdiction" over a request for a stay pending challenge of an administrative process).

**Venue**

136.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the defendant federal agencies are headquartered in this District.

137.     Venue is not controlled by the immediate custodian rule, and the Petitioners' non-core habeas claims are all properly brought in this District.  *See e.g. S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 408 (S.D.N.Y. 2018).

138.     The immediate custodian rule is "limited [] to "core" petitions challenging present physical detention, implicitly leaving open whether the rule applies to "non-core" challenges.  *See id*. (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 442-43(2004)).  "[U]nder the governing case law, [the Attorney General] is the proper respondent for ["non-core" habeas claims[.]" *S.N.C.*, 325 F. Supp. 3d at 410.

139.    This Court has jurisdiction over this claim, as the Attorney General is a named party and because venue in this district does not pose an inconvenience for the parties or otherwise offend other "traditional venue considerations[.]" *Batista-Taveras v. Ashcroft*, No. 03 Civ 1968 (LAK), 2004 U.S. Dist. LEXIS 19136 at *21 (S.D.N.Y. Sept. 22, 2004); *S.N.C.*, 325 F. Supp. 3d at 410.

## STATEMENT OF FACTS

140.    Petitioners (who are mothers, fathers, and their children) made dangerous journeys to the United States, after being subjected to harm and persecution that triggered their flights from their home countries to seek protection in the United States.

141.    Because of this past trauma, many of the Petitioners suffer from symptoms of post-traumatic stress disorder ("PTSD"), anxiety, and depression.[7]

142.    After completing their journeys to the United States—which lasted for more than a month for some Petitioners—all Petitioners were apprehended and placed in CBP custody. They remained, often for days, in cages and/or cement cells, without access to privacy, showers, beds, telephones, pillows, hot meals, or adequate medical attention.

143.    Petitioners were eventually moved to Dilley or Berks, where many of them remain detained.

144.    Some of the Petitioners were released based upon medical conditions but remain in custody of Respondents and may be removed from the United States immediately absent an administrative stay.

---

[7] *Cf.* Allen Keller et al., *Pre-Migration Trauma Exposure and Mental Health Functioning Among Central American Migrants Arriving at the U.S. Border*, PLOS (Jan. 10, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0168692, (PTSD, anxiety, and depression reported in Central American migrants).

44

145.    Against this backdrop, while in immigration custody, the COVID-19 pandemic hit the United States and Petitioners' home countries.

146.    On January 31, 2020, the United States Secretary of Health and Human Services declared a public health emergency under the Public Health Services Act due to COVID-19.   Press Release, U.S. Dep't of Health & Human Serv., Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

147.    On March 13 and 20, 2020, the President of the United States issued two national emergency declarations under the National Emergencies Act (Proclamation No. 9994, 2020 DAILY COMP. PRES. DOC. 156 (Mar. 13, 2020)), and  under the Stafford Act (Memorandum on Providing Federal Support for Governors' Use of the National Guard to Respond to COVID-19, 2020 DAILY COMP. PRES. DOC. 181 (Mar. 22, 2020)) respectively, and on March 18, the President invoked emergency powers via Executive Order under the Defense Production Act due to COVID-19 (Exec. Order No. 13909, 2020 DAILY COMP. PRES. DOC 172 (Mar. 18, 2020)).

**Petitioners Are at Risk for Immediate Deportation**

148.    Upon information and belief, without a stay of removal, Respondents will quickly deport all detained Respondents.

149.    Upon information and belief, without a stay of removal, Respondents will begin to deport all non-detained Respondents.

**The Majority of Petitioners Were Subjected to the Now-Void "Transit Ban"**

150.    On July 16, 2019, the Departments of Justice and Homeland Security jointly published an interim final rule entitled "Asylum Eligibility and Procedural Modifications," 84 Fed. Reg. 33,829 (July 16, 2019) ("Transit Ban").

45

151.    The Transit Ban renders noncitizens seeking to enter the United States at its southern border categorically ineligible for asylum unless they first applied for similar protection in a third country they transited through (other than the country they fled) and were rejected there, are victims of severe forms of trafficking; or did not pass through any country that is a signatory to the Refugee Convention, Refugee Protocol in route to the United States.  *See* 84 Fed. Reg. at 33,835.

152.    The Transit Ban further provides that noncitizens ineligible for asylum under § 208.13(c)(4) are automatically and conclusively determined not to have a "credible fear" of persecution in their home countries.  *See* 8 C.F.R. § 208.30(e)(5)(iii).

153.    The Transit Ban should not limit a noncitizen's ability to seek withholding of removal under either Section 241(b)(3) of the INA or the Convention Against Torture ("CAT").  *See* 84 Fed. Reg. at 33,834.  It excludes: (1) an alien who, while in transit to the United States, applied for and was denied protection for individuals fleeing persecution or torture; (2) an alien who is a "victim of a severe form of human trafficking," 8 C.F.R. § 214.11; or (3) an alien who transited only through "a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT."  84 Fed. Reg. at 33,835.

154.    Under the Transit Ban, if an immigration officer determined that a noncitizen subject to expedited removal was barred from asylum eligibility, the noncitizen was summarily found not to have a credible fear of persecution, typically without any supervisor review as required (8 C.F.R. § 208.30(e)(8), see also U.S.C. § 1225(b)(1)(E)(ii)), and informed during the CFI interview itself that they were barred from seeking asylum in the United States.

155.    The immigration officer then proceeded to determine only if a reasonable fear of persecution existed for withholding of removal or CAT protection.

46

156.    Reasonable fear represents a higher standard than credible fear.  It is defined by regulation as "a reasonable possibility that [the applicant] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c).

157.    If the noncitizen did not establish a reasonable fear of persecution during the interview to the interviewer's satisfaction, a written notice of decision was issued, subject to review by an immigration judge under the higher standard of reasonable fear (i.e., not the more moderate credible fear standard).

158.    The Transit Ban renders noncitizens seeking to enter the United States at its southern border categorically ineligible for asylum unless they first applied for similar protection in a third country they transited through (other than the country they fled) and were rejected there. *See* 84 Fed. Reg. at 33,835.3.  The Transit Ban does not limit a noncitizen's ability to seek withholding of removal under either Section 241(b)(3) of the INA or the Convention Against Torture ("CAT").  *See* 84 Fed. Reg. at 33,834.  It excludes: (1) an alien who, while in transit to the United States, applied for and was denied protection for individuals fleeing persecution or torture; (2) an alien who is a "victim of a severe form of human trafficking," 8 C.F.R. § 214.11; or (3) an alien who transited only through "a country or countries that were not parties to the 1951 Convention relating to the Status of Refugees, the 1967 Protocol, or the CAT."  84 Fed. Reg. at 33,835.

159.    The only Petitioners who were **not** subjected to the Transit Ban are: Petitioners A.G.P. and her children D.S.G. and A.S.G.; Petitioners C.R.R. and her children I.G.R. and V.G.R.; Petitioners E.V.M. a Guatemalan national; Petitioners I.M.V. and her children J.T.M. and D.T.M;

Petitioner N.V., a Haitian national, and; Petitioner C.L., a Haitian national, and her minor child J.A.

160.    The remaining Petitioners were subjected to the Transit Ban and its procedures and their final orders of removal resulted from Respondents' application of the Transit Ban to those Petitioners ("Transit Ban Petitioners").

161.    On June 30, 2020, in *Capital Area Immigrants' Rights Coalition v. Trump*, Civil Action Nos. 19-2117, 19-2530 (TJK), 2020 WL 3542481 (D.D.C. June 30, 2020) ("*CAIR*"),[8] in a Memorandum Opinion, *id.*, and accompanying Order (*CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20), Judge Timothy J. Kelly of the District Court of the District of Columbia entered an Order vacating the Transit Ban.

162.    In *CAIR*, the plaintiffs—immigrant-services organizations and individual asylum applicants who had received negative credible fear determinations based upon the Transit Ban— alleged, among other things, that the Transit Ban was unlawful for several reasons, including that was arbitrary and capricious, and was issued without notice-and-comment procedures required under the Administrative Procedure Act ("APA"). *CAIR*, 2020 WL 3542481 at *1.

163.    The parties cross-moved for summary judgment and Judge Kelly granted plaintiffs' motion and denied the defendants', holding that "Defendants unlawfully promulgated the [Transit Ban] without complying with the APA's notice-and comment requirements, because neither the 'good cause' nor the 'foreign affairs function' exceptions are satisfied on the record here." *Id.*

164.    Judge Kelly vacated the Transit Ban in a final, appealable Order.  (*CAIR v. Trump*, Case 1:19-cv-02117-TJK, Document 71 Filed 06/30/20).

---

[8] *CAIR* was consolidated with *I.A. v. Barr*, Civ. No. 19-2530 (TJK), 2020 WL 3542481 at *1.

48

165.    In ordering this remedy, Judge Kelly stated that the "APA commands that courts 'hold unlawful and set aside agency action[s]' taken 'without observance of procedure required by law.'" *CAIR*, 2020 WL 3542481 at *1 (citing 5 U.S.C. § 706(2)(D)).  "And the D.C. Circuit has held that '[f]ailure to provide the required notice and to invite public comment ... is a fundamental flaw that "normally" requires vacatur of the rule.'" *Id.* at *21 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)).  "Having found that the Rule was enacted unlawfully, the Court sees no reason why it should not be vacated." *Id.*

166.    Judge Kelly specifically denied the defendants' requests for alternative relief:

> Defendants also urge the Court to: limit any relief to the actual parties before the Court," Defs.' Supp. Br. at 5, pointing to Justice Thomas's concurrence in *Trump v. Hawaii*, —— U.S.——, 138 S. Ct. 2392, 201 L.Ed.2d 775 (2018), *id*. at 7. But there, Justice Thomas addressed the propriety of nationwide injunctions, *Trump*, 138 S. Ct. at 2424–29, which is not the issue here. As the D.C. Circuit has explained—and as Defendants concede, see Defs.' Supp. Br. at 9 n.1—"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also O.A.* [*v. Trump*], 404 F. Supp. 3d [109, 153 (D.D.C. 2019).]

*Id.* at *22.

167.    "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void ab initio." *United States v. Goodner Bros. Aircraft, Inc*., 966 F.2d 380, 384 (8th Cir. 1992) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 313, (1979)); *see Chrysler Corp*, 441 U.S. at 313 ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act.") (citing *Morton v. Ruiz*, 415 U.S. 199 (1974) & *U.S. v. Allegheny–Ludlam Steel Corp*., 406 U.S. 742, 758, (1972)).

49

168.    Indeed, "to 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'" *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (citing 91 C.J.S. Vacate (1955) & *Stewart v. Oneal*, 237 F. 897, 906 (6th Cir. 1916)).

169.    "An agency rule which violates the APA is void.  Agency action taken under a void rule has no legal effect." *W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987) (citation omitted).

170.    The Transit Ban Petitioners all received negative credible fear determinations and all have final orders of removal because of the unlawfully promulgated Transit Ban.

171.    Because of *CAIR*, the Transit Ban Petitioners have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

172.    On July 6, 2020, the U.S. Court of Appeals for the Ninth Circuit held the Transit Ban unlawful pursuant to the APA and on the merits, affirming the district court's preliminary injunction against its enforcement in *East Bay Sanctuary Covenant v. Barr*, Case Nos. 19-16487, 19-16773 (9th Cir. July 6, 2020).  The preliminary injunction in that case is stayed pending further review by the Supreme Court.

**Deportation Procedures**

173.    When a family is scheduled for removal, ICE typically informs the family at around 8:00 p.m. that they will be processed for release from the facility immediately and be placed on a flight at around 6:00 a.m. the following morning.

174.    Families are then moved to a staging area where they are together with other families for hours overnight awaiting transport to the airport or bus station.

50

175.     This short timeframe often provides families with no opportunity to contact family members about their upcoming release to coordinate the details of their return home.

176.     During the removal process, individuals and families are frequently shuttled across the country among different detention centers, and often confined in close quarters.[9]

177.     Upon release, individuals are entitled to the money in their commissary account, which may have been deposited upon arrival or during detention by family members or friends, as well as any other personal possessions that were confiscated when they were taken into custody.

178.     Often, however, individuals are not provided with their money and/or personal possessions, including their cellphones, when they are released.  They are then unable to purchase food or tickets for travel back to their homes when they land in their country of origin, and unable to contact family for assistance.

**Heightened Dangers from COVID-19**

179.     As of July 8, 2020, there are 11,669,259 confirmed cases of COVID-19 worldwide and 539,906 confirmed deaths.[10]

180.     As of July 8, 2020, there are 2,923,432 confirmed cases of COVID-19 in the United States and 129,963 confirmed deaths.[11]

---

[9] Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH (Apr. 27, 2020), https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/ (last visited July 8, 2020).
[10] *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORG., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited July 8, 2020).
[11] Coronavirus Disease (COVID-19) Dashboard, United States of America, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/us (last visited July 8, 2020).

181.    There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus. [12]

182.    The virus is thought to spread mainly from person-to-person such as (a) between people who are in close contact with one another (within about 6 feet); and (b) through respiratory droplets produced when an infected person coughs, sneezes or talks, because these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs. [13]

183.    Studies have suggested that COVID-19 may be spread by people who are not showing symptoms. [14]

184.    Although it was originally believed that children who contracted COVID-19 did not become extremely ill, there are now reports of children hospitalized with a multisystem inflammatory disease who have tested positive for COVID-19. [15]   At least three children have died as a result of this multisystem inflammatory disease and new research continues to be published describing the ways that the virus can behave in children, which is not always how it behaves in adults. [16]

---

[12] *How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 8, 2020).

[13] *Id*.

[14] *Clinical Questions about COVID-19: Questions and Answers: Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission (last visited July 8, 2020) (follow "When is someone infectious?" hyperlink).

[15] Perri Klass, M.D., *The Checkup: Rethinking Covid-19 in Children,* N.Y. TIMES (May 12, 2020), https://www.nytimes.com/2020/05/12/well/family/coronavirus-children-covid-19.html.

[16] *Id*.

52

**Many of Petitioners are Children**

185.    ICE Guidance on COVID-19 does not require: testing prior to removal; the provision of face masks to detainees, or; social distancing during transportation to airports or on flights.[17]

186.    There is no systematic testing of detainees for COVID-19 prior to deportation. Indeed, ICE told the Miami Herald that the agency would acquire approximately 2,000 tests a month "but given the nationwide shortages of testing kits, 'the agency likely won't have enough to test all aliens scheduled for future removals and will prioritize testing based on evolving operational considerations,' ICE said."[18]

187.    These inadequate medical screenings have already failed to detect cases in migrants being deported in the past few months.

188.    In Guatemala, the Health Minister testified in a congressional hearing that one such flight arrived with 75% of its passengers infected.[19]

189.    The Guatemalan government estimated that recently returned immigrants from the U.S. account for nearly 20% of Guatemala's 500 COVID-19 cases.[20]

---

[17]    *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).

[18]    Monique Madan and Jacqueline Charles, *He says he has COVID and has never been to Haiti. But ICE still wants to deport him there.*, MIAMI HERALD (May 8, 2020), https://www.miamiherald.com/news/local/immigration/article242581381.html#storylink=cpy.

[19]    Maria Martin, *Official Alleges The U.S. Has Deported Many COVID-19-Positive Migrants To Guatemala*, NPR (Apr. 15, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/15/834999661/official-alleges-the-u-s-has-deported-many-covid-19-positive-migrants-to-guatemala.

[20]    Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH, April 27, 2020, https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/.

53

190.     Reports also indicate that recently at least two Mexican and three Haitian deportees have also tested positive, yet had been placed on planes and/or buses with other deportees susceptible to infection.[21]

191.     It is likely that transports to many other countries have likewise included individuals positive for the virus.[22]

192.     In the report, Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows, The Center for Economic Policy and Research reports:

> While the vast majority of deportations to Mexico take place over land, ICE Air flies tens of thousands of people across the country and across the world each year. Amid the global pandemic, which has led to countries shutting down air travel and closing borders, ICE Air continues to deport thousands of immigrants held in detention centers throughout the United States. Those facilities themselves have become hotspots of COVID-19 outbreaks, meaning the US is now exporting the virus to countries throughout the region…. Since the Trump administration declared a national emergency on March 13, one ICE Air contractor has flown at least 72 likely deportation flights to 11 Latin America and Caribbean nations — including to Brazil and Ecuador, which are suffering the region's worst outbreaks of COVID-19, and which have both experienced an increase in deportation flights under the Trump administration…. From March 15 to April 24, ICE Air appears to have made 21 deportation flights to Guatemala; 18 to Honduras; 12 to El Salvador; six to Brazil; three each to Nicaragua, Ecuador, Haiti, and the Dominican Republic; and one each to Colombia and Jamaica. … [T]he Guatemalan government has estimated that 20 percent of the country's confirmed COVID-19 cases are recently returned immigrants…. Because detainees are often flown across the country and are held in closely confined spaces, it is virtually impossible to adequately isolate those who have contracted COVID-19 or to ensure that those deported have not been exposed to COVID-19.[23]

---

[21] Kevin Sieff and Nick Miroff, *U.S. is deporting infected migrants back to vulnerable countries*, WASH. POST (April 21, 2020), https://www.washingtonpost.com/world/the_americas/us-is-deporting-infected-migrants-back-to-vulnerable-countries/2020/04/21/5ec3dcfe-8351-11ea-81a3-9690c9881111_story.html.

[22] Jake Johnston, *Exporting COVID-19: ICE Air Conducted Deportation Flights to 11 LAC Countries, Flight Data Shows*, CENTER FOR ECONOMIC & POLICY RESEARCH (Apr. 27, 2020), https://www.cepr.net/exporting-covid-19-ice-air-conducted-deportation-flights-to-11-lac-countries-flight-data-shows/.

[23] *Id.*

54

193.     To prevent the spread of COVID-19, the Centers for Disease Control and Prevention recommends that everyone should: (a) wash hands with soap and water—or use hand sanitizer—often, for at least 20 seconds especially after being in a public place, or after blowing the nose, coughing or sneezing; (b) avoid close contact with other people, at least 6 feet; (c) avoid gathering in groups; (d) stay out of crowded places and avoid mass gatherings; (e) cover the mouth and nose with a face cloth when around others, but also continue to keep about 6 feet away from others, and; (f) clean and disinfect frequently touched surfaces.[24]

194.     While individuals in removal proceedings always face some danger, Petitioners face substantially heightened dangers because of the COVID-19 pandemic.

195.     According to ICE reports, as of July 6, 2020, ICE reported 835 cases of COVID-19 of its current detainee population of 22,579.[25]

196.     Officials admit that due to limited testing, the actual number is likely significantly higher.[26]

197.     This is unsurprising, given that detainees frequently lack personal protective equipment such as masks and gloves and cannot maintain social distancing.[27]

---

[24] *How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 8, 2020).

[25] *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENF'T, https://www.ice.gov/coronavirus (last visited July 8, 2020).

[26] Kevin Sieff and Nick Miroff, *U.S. is deporting infected migrants back to vulnerable countries*, WASH. POST (April 21, 2020), https://www.washingtonpost.com/world/the_americas/us-is-deporting-infected-migrants-back-to-vulnerable-countries/2020/04/21/5ec3dcfe-8351-11ea-81a3-9690c9881111_story.html (last visited July 8, 2020).

[27] Patricia Sulbarán Lovera, *Coronavirus: Immigration detention centres in crisis*, BBC NEWS MUNDO (May 1, 2020), https://www.bbc.com/news/world-us-canada-52476131.

198.    Upon information and belief, the government does not provide hand sanitizer to detainees while they are in detention centers, and thus it is likely that detainees are not provided hand sanitizer during the removal process.

199.    While Respondents publicly state that they provide detainees with face masks during transport, upon information and belief Respondents do not require detainees to wear them or take any measures to enforce the use of face masks during the transfers and flights.

200.    Upon information and belief, social distancing is not required on flights, and is often not possible.

201.    In a letter published on July 6, 2020 in the journal Clinical Infectious Diseases, "two scientists from Australia and the U.S. wrote that studies have shown 'beyond any reasonable doubt that viruses are released during exhalation, talking and coughing in microdroplets small enough to remain aloft in the air.' That means people in certain indoor conditions could be at greater risk of being infected than was previously thought."[28]

202.    Accordingly, social distancing is now recognized as critical to prevent COVID-19 transmission.

203.    Respondents do not provide information about measures taken to sanitize the vehicles used to transport detainees to staging areas.

204.    Thus, Petitioners face a danger of contracting COVID-19 during the deportation process by being confined with other detainees in either an airplane or bus, depending on their destination.

---

[28] THE ASSOCIATED PRESS, *SCIENTISTS URGE WHO TO ACKNOWLEDGE VIRUS CAN SPREAD IN AIR*, https://www.nbcnews.com/health/health-news/scientists-urge-who-acknowledge-virus-can-spread-air-n1232991 (last visited July 8, 2020).

205.    Petitioners face the danger of contracting COVID-19 even after they arrive in their respective countries of origin, as well as the severe circumstances of inadequate quarantine measures, weak healthcare systems, deepening poverty, food insecurity, restrictions on public transportation, and strict curfews.

206.    Those dangers are heightened due to the COVID-19 pandemic.

207.    Pre-COVID-19, nonprofit organizations and government agencies received deported families at the airport and provided them with assistance in making phone calls or purchasing bus tickets, but these resources have been eliminated during the COVID-19 pandemic.

208.    Thus, families arriving without money or means of communication will be left stranded in a precarious and dangerous situation upon arrival in their country of origin.

**Country Conditions of Petitioners' Countries of Origin During the COVID-19 Pandemic**

209.    In Guatemala, the government declared a "state of calamity" through June 5 because of the pandemic.[29]

210.    Due to the severity of the situation, it has closed its borders, barring entry to non-Guatemalans (except for certain specific exceptions) and has instituted a mandatory curfew from 6:00 pm to 5:00 am each day.[30]

211.    Additionally, there have been reports that deported individuals were told to undertake "voluntary" quarantine after arrival without any sort of medical screening.[31]

---

[29] U.S. EMBASSY IN GUATEMALA, FAQs: HEALTH, SAFETY AND TRAVEL DURING COVID-19 RESPONSE IN GUATEMALA, p. 2 (July 5, 2020), https://gt.usembassy.gov/alert-covid-19-2/.

[30] *Id.* at p. 3.

[31] David Toro, *Siguen las deportaciones desde Estados Unidos aún con COVID-19*, MEDIUM (Mar. 23, 2020), https://medium.com/@PrensaComunitar/siguen-las-deportaciones-desde-estados-unidos-a%C3%BAn-con-covid-19-8ec944777524.

57

212.     The government has also suspended all public transportation within the country, impacting Petitioners' ability to travel to their communities or other necessary destinations, as well as preventing their relatives from meeting them upon arrival.[32]

213.     Conditions in Brazil are equally dire. With 1,623,284 confirmed cases and 65,487 COVID-related deaths as of July 8, 2020, 6:58 pm CEST,[33] Brazil "is experiencing widespread ongoing transmission" of the virus.[34]  Due to the poor conditions, Brazil has extended its closure banning the entry of foreigners through July 29. .[35]

214.     Ecuador's health minister, Dr. Juan Carlos Zevallos, called the situation in Ecuador "horrifying" and "terrifying."[36]

215.     Indeed, as of July 8, 2020, 6:58 pm CEST, Ecuador has 63,245 confirmed cases of COVID-19, and 4,873 reported deaths resulting from the virus.[37]

216.     The government has restricted movement throughout the country with limited exceptions, and imposed a nationwide curfew.[38]

---

[32] U.S. EMBASSY IN GUATEMALA, FAQs: HEALTH, SAFETY AND TRAVEL DURING COVID-19 RESPONSE IN GUATEMALA, p. 5 (July 5, 2020), https://gt.usembassy.gov/alert-covid-19-2/.

[33] CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID-19 Travel Recommendations by Country*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html (last visited July 8, 2020)(query Brazil in the search for a destination field).

[34] U.S. EMBASSY & CONSULATES IN BRAZIL, *COVID-19 Information*, https://br.usembassy.gov/covid-19-information/ (last visited July 8, 2020).

[35] U.S. EMBASSY & CONSULATES IN BRAZIL, *COVID-19 Information*, https://br.usembassy.gov/covid-19-information/ (last visited July 8, 2020)

[36] Tim Padgett, *Ecuador Health Minister: 'Horrifying' Coronavirus Plague Better Contained Now*, WLRN (May 4, 2020), https://www.wlrn.org/post/ecuador-health-minister-horrifying-coronavirus-plague-better-contained-now#stream/0.

[37] Coronavirus Disease (COVID-19) Dashboard, Ecuador, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/ec (last visited July 8, 2020).

[38] U.S. EMBASSY & CONSULATE IN ECUADOR, *COVID-19 Information*, https://ec.usembassy.gov/covid-19-information-ecu-2/ (last visited July 8, 2020).

58

217.    As of July 8, 2020, 6:58 pm CEST, Mexico has 261,750 confirmed COVID-19 cases, and 31,119 reported deaths resulting from it.[39]

218.    The Mexican government has announced Phase 3 of the pandemic, meaning "widespread community transmission, thousands of cases of infection, and increased numbers of patients requiring hospitalization."[40]

219.    Individuals arriving in Mexico face a high probability of being returned to the United States or quarantined in Mexico.[41]

220.    Honduras—the second poorest country in Central America—has 24,665 confirmed cases of COVID-19 and 656 reported deaths as of July 8, 2020 6:58 pm CEST.[42]

221.    The country's health infrastructure is ill-equipped to handle severe cases of COVID-19,[43] not to mention the severe dengue outbreak Honduras was already experiencing.[44]

222.    Due to a curfew implemented by the Honduran government, grocery stores, gas stations, and pharmacies are generally closed throughout the country.[45]

---

[39]    Coronavirus Disease (COVID-19) Dashboard, Mexico, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/mx (last visited July 8, 2020)

[40]    U.S. EMBASSY & CONSULATES IN MEXICO, *COVID-19 Information for U.S. Citizens in Mexico*, https://mx.usembassy.gov/u-s-citizen-services/covid-19-information/ (last visited July 8, 2020).

[41]    *Id.*

[42]    Coronavirus Disease (COVID-19) Dashboard, Honduras, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/hn (last visited July 88, 2020).

[43]    U.S. EMBASSY IN HONDURAS, *COVID-19 Information*, https://hn.usembassy.gov/covid-19-information/ (last visited July 8, 2020).

[44]    CTRS. FOR DISEASE CONTROL AND PREVENTION, HONDURAS, *Travelers' Health, Honduras, Clinician View*, https://wwwnc.cdc.gov/travel/destinations/clinician/none/honduras (last visited July 8, 2020).

[45]    U.S. EMBASSY IN HONDURAS, *COVID-19 Curfew*, https://hn.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/covid-19curfew/ (last visited July 8, 2020).

59

223.    Due to the pandemic, there have been reports of families being forced to live on the streets, being deprived of the little government assistance that is provided.[46]

224.    As of July 8, 2020, 6:58 pm CEST, El Salvador has reported 8,307 confirmed cases of COVID-19 and 229 deaths.[47]

225.    El Salvador's President, Nayib Bukele, announced in March a nationwide lockdown policy because of the pandemic, violations of which may result in indefinite detention in overcrowded facilities.[48]

226.    In April, the Salvadoran Supreme Court invalidated the policy, ruling that the government could not detain citizens indefinitely without suspicion of crime. Nevertheless, President Bukele openly rejected the ruling and continues to enforce the detention policy.[49]

227.    As of April 13, 4,236 people were being held in 87 containment centers, including some detained for violating the mandatory home quarantine, others after returning from abroad, and still others for not wearing facemasks (even though the policy does not require them to do so).[50]

228.    Haiti is likewise experiencing serious difficulties because of the spread of COVID-19.  Though Haiti has reported 6,371 confirmed cases of COVID-19 and 113 deaths as of July 8,

---

[46] *In already poor Honduras, coronavirus pushes some into homelessness*, THOMAS REUTERS FOUND. NEWS (Apr. 25, 2020), https://news.trust.org/item/20200424232457-oyu8c.

[47] Coronavirus Disease (COVID-19) Dashboard, El Salvador, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/sv (last visited July 8, 2020).

[48] *El Salvador: Police Abuses in Covid-19 Response*, HUMAN RIGHTS WATCH (Apr. 15, 2020), https://www.hrw.org/news/2020/04/15/el-salvador-police-abuses-covid-19-response/.

[49] *Id.*; Miranda Cady Hallett, *Mass arrests and overcrowded prisons in El Salvador spark fear of coronavirus crisis*, YAHOO! NEWS (May 6, 2020), https://theconversation.com/mass-arrests-and-overcrowded-prisons-in-el-salvador-spark-fear-of-coronavirus-crisis-137673.

[50] *El Salvador: Police Abuses in Covid-19 Response*, HUMAN RIGHTS WATCH (Apr. 15, 2020), https://www.hrw.org/news/2020/04/15/el-salvador-police-abuses-covid-19-response/.

2020 6:58 pm CEST,[51] these figures almost certainly fall far below the true totals as the country has a population of nearly 11 million people,[52] over half of whom must wait in long lines at crowded markets just to get food each day.[53]

229.     Since over half of the population lives on approximately $2 per day, the rise in the cost of food means many people within Haiti will have little to no access to sustenance.[54]

230.     In an April 27, 2020 address, President Moise acknowledged the high likelihood that "there will be famine" as a result of COVID-19.[55]

231.     The United States Department of State has said that medical facilities within Haiti are "scarce and generally substandard," and that life-threatening emergencies often require evacuation outside the country by air ambulance at the patient's expense.[56]

232.     By some estimates, the country has only 39 physicians, 124 ICU beds, and capacity to ventilate just 62 patients within ICUs.[57]

---

[51] Coronavirus Disease (COVID-19) Dashboard, Haiti, WORLD HEALTH ORG., https://covid19.who.int/region/amro/country/ht (last visited July 8, 2020).

[52] Countries: Haiti, WORLD HEALTH ORGANIZATION, https://www.who.int/countries/hti/en/ (last visited July 8, 2020).

[53] Sam Bojarski, *Coronavirus Exposes Precarious Living Conditions in Haiti*, HAITIAN TIMES https://haitiantimes.com/2020/03/26/coronavirus-exposes-precarious-living-conditions-in-haiti/ (last visited July 8, 2020).

[54] *Id.*

[55] Samuel Louis, *Jovenel Moïse Fears Famine in Haiti After Covid-19*, HAITIAN TIMES, https://haitiantimes.com/2020/04/28/jovenel-moise-fears-famine-in-haiti-after-covid-19/ (last visited July 8, 2020).

[56] U.S. DEPARTMENT OF STATE, BUREAU OF CONSULAR AFFAIRS, Country Information: Haiti, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html (last visited July 8, 2020) (follow "Health" hyperlink).

[57] Sam Bojarski, *Coronavirus Exposes Precarious Living Conditions in Haiti*, HAITIAN TIMES https://haitiantimes.com/2020/03/26/coronavirus-exposes-precarious-living-conditions-in-haiti/ (last visited July 8, 2020).

61

## **LEGAL STANDARD**

### **Due Process**

233.    The Due Process Clause of the Fifth Amendment provides that "[n]o person… shall be deprived of life, liberty, or property without due process of law…."  U.S. CONST. amend. V.

234.    It protects individuals against two types of government action. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 324–325 (1937).

235.    "Procedural Due Process" ensures that government cannot unfairly and without meaningful process deprive a person of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 319, 334–335 (1976).

### **Accardi Doctrine**

236.    Respondents have a duty to follow their own policies particularly when such policies are aimed at protecting Petitioners' due process rights and right to access the courts.  *See generally United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (establishing agency duty to follow self-imposed rules); *see also Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." (internal citation omitted)); *see also Abdi v. Duke*, 280 F. Supp. 3d 373, 389 (W.D.N.Y. 2017) ("[T]he relevancy of the internal policy is to ascertain whether it pertains to individual rights. If so..., that internal policy must be followed."); *accord Damus v. Nielsen*, 313 F. Supp. 3d 317, 338 (D.D.C. 2018) (finding the *Accardi* doctrine applied to same ICE Directive at issue in *Abdi* and that language "disclaiming [the conferral of] any substantive right does not prove otherwise.").

62

237. "[I]t is incumbent upon agencies to follow their own procedures . . . even where [they] are possibly more rigorous than otherwise would be required."); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").

238. Breaches of *Accardi*'s rule constitute violations of both the APA and the Fifth Amendment's Due Process Clause.

239. Berks and Dilley are both subject to the Family Residential Standards ("FRS") and the *Flores* settlement.

240. The FRS require Berks and Dilley to comply with CDC guidelines, just as is required in the adult detention facilities, which are governed by National Detention Standards ("NDS") and Performance-Based National Detention Standards ("PBNDS") which require that "Centers for Disease Control and Prevention (CDC) guidelines for the prevention and control of infectious and communicable diseases shall be followed."[58]

241. Respondents have failed to follow their duty to comply with the FRS, which in turn require compliance with CDC guidelines and federal, state and local laws.

242. The CDC's "COVID-19 Travel Recommendations by Country" guidelines state that the "CDC recommends that travelers avoid all nonessential travel to" Guatemala, Honduras, El Salvador, Haiti, Mexico, Brazil and Ecuador.[59]

---

[58] U.S. IMMIGRATION AND CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011, 257, https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf; U.S. IMMIGRATION AND CUSTOMS ENF'T, NATIONAL DETENTION STANDARDS FOR NON-DEDICATED FACILITIES, 1 (Rev. 2019), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.
[59] CTRS. FOR DISEASE CONTROL AND PREVENTION, *COVID-19 Travel Recommendations by Country*, https://www.cdc.gov/coronavirus/2019-ncov/travelers/map-and-travel-notices.html (last visited July 8, 2020) (query each country in "Search for a destination" field).

63

243.    Respondents have failed to follow these guidelines because the removal of Petitioners now is nonessential.

244.    The CDC's "Coronavirus and Travel in the United States" guidelines state:

> Clean your hands often.  Wash your hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing. If soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol. Cover all surfaces of your hands and rub your hands together until they feel dry.
>
> Avoid touching your eyes, nose, and mouth.
>
> Avoid close contact with others.
>
> Keep 6 feet of physical distance from others.[60]

245.    Respondents have failed to follow these guidelines because when detainees are transported within the United States during the removal process, detainees are not able to keep 6 feet of physical distance from others and are not provided hand sanitizer.

246.    The CDC's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" recommends that these facilities "[s]uspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding."[61]

---

[60] *Coronavirus and Travel in the United States*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited July 8, 2020).
[61] CTRS. FOR DISEASE CONTROL AND PREVENTION, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited July 8, 2020).

64

247.     Respondents have failed to follow this guidance because the removal of Petitioners from the United States has not been suspended and is not necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding.

## CLAIMS FOR RELIEF

## COUNT I (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic Violates their Substantive and Procedural Due Process Rights (Shocks the Conscience).

248.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

249.     "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690.

250.     "'Substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,'… or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations omitted).  Thus, "the touchstone of due process is protection of the individual against arbitrary action of government…whether the fault lies in the denial of fundamental due process fairness [procedural due process], …or in the exercise of power without any reasonable justification in the service of a legitimate government objective [substantive due process]." *Cty. Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citations and internal quotations omitted).

251.     The current COVID-19 pandemic is unprecedented and presents the possibility of severe illness and death for those who contract the disease.

65

252.     There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus.

253.     The virus is thought to spread mainly from person-to-person such as (a) between people who are in close contact with one another (within about 6 feet); (b) through respiratory droplets produced when an infected person coughs, sneezes or talks, because these droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.

254.     Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms.

255.     There is currently no vaccine to prevent COVID-19 and the best way to prevent illness is to avoid being exposed to this virus.

256.     To prevent the spread of COVID-19, the CDC recommends that everyone should: (a) wash hands with soap and water—or use hand sanitizer—often for at least 20 seconds especially after being in a public place, or after blowing the nose, coughing or sneezing; (b) avoid close contact with other people, at least 6 feet; (c) avoid gathering in groups; (d) stay out of crowded places and avoid mass gatherings; (e) cover the mouth and nose with a face cloth when around others, but also continue to keep about 6 feet away from others, and; (f) clean and disinfect frequently touched surfaces ("Prevention Requirements").

257.     Because many individuals who had COVID-19 are asymptomatic, the only way to know if a person has COVID-19 is to test the person.

258.     This possibility of transmission of COVID-19 increases exponentially when Prevention Requirements and testing are not implemented or meaningfully followed during the removal process.

66

259.    Respondents have failed to meaningfully implement Prevention Requirements and testing to prevent transmission of COVID-19 to Petitioners during the removal process.

260.    Respondents have engaged in willful, knowing conduct, removing Petitioners from the United States without implementing Prevention Requirements.

261.    Instead, during the removal process Respondents are placing detainees in confined spaces, like cells, buses, and planes, and forcing them into situations where social distancing measures are impossible.

262.    Respondents' failure to implement Prevention Requirements and testing during the removal process deprive Petitioners of their health, safety, and bodily integrity, by placing them at extreme risk of contracting COVID-19.

263.    Further, Respondents seek to deport Petitioners to countries during their own pandemic-related crises, even though these countries may lack the transportation, housing, and medical infrastructure required to adequately deal with such a crisis.

264.    Respondents seek to deport Petitioners to their home countries despite knowing Petitioners may face persecution because of the COVID-19 pandemic.

265.    Petitioners are faced with the possibility that they will contract COVID-19 in the United States while moving through the deportation processes initiated and run by Respondents, only to be removed to a country that is unable to provide the resources and care necessary to treat COVID-19 if they are infected and that may subject them to persecution because of their infection.

266.    When the government attempts to force an individual to take anti-psychotic drugs, the due process clause prevents them from doing so absent an essential and overriding state interest.  *United States v. White*, 620 F. 3d. 401, 409 (4th Cir. 2010).  Without this state interest, such forcible medicating is said to shock the conscience.

67

267.    If the government cannot force individuals to put medication in their bodies, the government should not be able to force individual into a process that exposes their bodies to a severe and deadly virus.

268.    Given the current pandemic, the removal process employed by Respondents shocks the conscience as it forces Petitioners into a removal regime where they face infection, persecution upon arrival to their home country, and even death.

### COUNT II (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic
### Violates the State-Created Danger Doctrine.

269.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

270.    Substantive due process precludes a state actor from affirmatively acting to create or enhance a danger that will ultimately harm an individual.  *See Butera v. District of Columbia*, 235 F.3d 637, 649–51 (D.C. Cir. 2001) (citing cases).

271.    The State "owes a duty of protection when its agents create or increase the danger to an individual."  *Id.*; *see also Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) (due process was violated where police left detainee in more dangerous neighborhood, away from public transportation and without cell phone); *Wang v. Reno*, 81 F.3d 808, 817 (9th Cir. 1996) (alien could not be removed to China where U.S. government convinced him to testify about topic that would lead Chinese government to torture and possibly execute him).

272.    Due process is implicated when the state actor's conduct in such a case is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Butera*, 235 F.3d at 651 (quoting *Sacramento*, 523 U.S. at 847 n.8).

68

273.     Respondents' failure to implement Prevention Requirements and testing during the removal of detainees from the United States creates myriad increased risks and dangers to Petitioners considering the COVID-19 pandemic.

274.     By forcing detainees into confined areas, including buses and planes, without adequate screening and testing procedures, and without implementing the Prevention Requirements, Respondents substantially increase the risk that the virus will spread during the removal process.

275.     Respondents thus create or increase Petitioners' risks not only of infection, but also of persecution due to a public perception that they are likely to carry the virus like others that have passed through United States removal proceedings.

276.     Removal will also place Petitioners in a far more dangerous location than they are currently in without means of protection.

277.     Petitioners being sent to countries where public transportation has been closed will be stranded at the place Respondents release them from custody, without a way to return to their communities or meet with relatives. Others will be subject to strict quarantines and in danger of unlawful detention, food insecurity, and inadequate healthcare systems.  Notably, these dangers are substantially increased due to the COVID-19 pandemic.

278.     Respondents are aware of the increased dangers the COVID-19 pandemic presents to Petitioners.  Disregarding these risks and affirmatively pursuing removal, given the conditions during removal proceedings, likelihood of virus transmission, and dangerous points of release is egregious and shocks the conscience.

279.     Accordingly, pursuing removal proceedings constitutes a violation of Petitioners' substantive due process rights under the state-created danger doctrine.

69

## COUNT III (ALL PETITIONERS)

### Removing Petitioners During the COVID-19 Pandemic
### Violates the Special-Relationship Doctrine

280.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

281.    Respondents also owe Petitioners affirmative duties of care and protection arising from their special relationship.  *See Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (D.C. Cir. 2015) (citing *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989)).  A special relationship arises between the government and an individual when the government "takes a person into its custody and holds him there against his will."  *Harris v. District of Columbia*, 932 F.2d 10, 14 (D.C. Cir. 1991) (quoting *DeShaney*, 489 U.S. at 199–200).  This duty arises "from the limitation which [Respondents have] imposed on [Petitioners'] to act on [their] own behalf."  *DeShaney*, 489 U.S. at 200.  This duty of care and protection includes a responsibility for Petitioners' safety, well-being, and medical needs.  *LaShawn A. v. Kelly*, 990 F.2d 1319, 1325 (D.C. Cir. 1993); *Harris*, 932 F.2d at 14. (citing *Youngberg v. Romeo*, 457 U.S. 307, 314–324 (1982)).

282.    When the government has a special relationship with an individual, "governmental deliberate indifference will shock the conscience sufficiently to establish a substantive due process violation."  *Harvey*, 798 F.3d at 1050 (internal citations omitted).

283.    Respondents have detained each of Petitioners involuntarily, thus forming a special relationship with Petitioners.  Consequently, Respondents owe Petitioners a heightened duty of care and protection.

284.    Pursuing Petitioners' removal will breach Respondents' duty to care for and protect Petitioners.  As discussed *supra*, Petitioners will face a serious, heightened danger of contracting

70

COVID-19 during the removal process by confinement during transportation. Because pre-deportation testing and medical screening procedures are inadequate, Respondents cannot fulfill their duty to protect Petitioners from this risk. Sending Petitioners to their countries of origin also places them in substantially more danger than they currently face. Guatemala, Ecuador, Brazil, Mexico, Honduras, El Salvador, Brazil, and Haiti all have reported substantial numbers of confirmed COVID-19 cases, and Petitioners will be at risk of infection if required to return. If infected, they will suffer greater peril due to poor country conditions, their likely inability to procure effective healthcare, and probable persecution.

285.     Respondents are aware of the danger COVID-19 presents to Petitioners. Because they have a special relationship with Petitioners, pursuing removal proceedings with deliberate indifference to the COVID-19 Pandemic shocks the conscience.

286.     Accordingly, pursuing removal proceedings constitutes a violation of Petitioners' substantive due process rights under the special-relationship doctrine.

## COUNT IV (ALL PETITIONERS)

### Respondents' Attempt to Remove Petitioners During the COVID-19 Pandemic Violates their Own Policies and Regulations in Violation of the APA and the Fifth Amendment (*Accardi* doctrine).

287.     Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

288.     Respondents further had a duty to follow their own policies related to release from custody, particularly when such policies are aimed at protecting Petitioners' due process rights. *See Accardi*, 347 U.S. 260 (establishing agency duty to follow self-imposed rules).

289.     As discussed *supra*, ICE's protocols for its detainee facilities require facilities to provide medical care to individuals in immigration custody, and provide a continuity of care plan,

medication, referrals to community-based providers as medically appropriate, and a detailed medical care summary, among other things, upon release.

290.    As discussed *supra*, the FRS require compliance with CDC guidelines in Berks and Dilley, just as is required in the adult detention facilities, which are governed by NDS and PBNDS and require compliance with CDC guidelines for the prevention and control of infectious and communicable diseases.

291.    The CDC guidelines state that travelers should (a) avoid all nonessential travel to Guatemala, Honduras, El Salvador, Haiti, Mexico, Brazil, and Ecuador; (b) use a hand sanitizer that contains at least 60% alcohol if soap and water are not available, and; (c) keep 6 feet of physical distance from others.

292.    CDC Guidelines also provide that detention facilities suspend all transfers of incarcerated/detained persons to and from other jurisdictions unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.

293.    All the above policies and standards are aimed at protecting Petitioners' rights to due process and violations of these policies constitute a violation of the APA and the Fifth Amendment pursuant to the *Accardi* doctrine.

294.    Respondents have failed to comply with any of the department policies, and CDC Guidelines, outlined in the FRS discussed above.

295.    Respondents have failed to comply with the above referenced policies.

296.    Such failure to comply with FRS and CDC Guidelines constitutes a violation of the APA and the Fifth Amendment—violating the *Accardi* doctrine.

Case 1:20-cv-04073-CRC Document 1032   Filed 07/29/20   Page 311 of 489

297.    Respondents seem woefully underprepared for the effects of the COVID-19 pandemic on the removal process and as such have been unable to comply with the above referenced policies.

298.    Such failure to comply with the FRS constitutes a violation of the APA and the Fifth Amendment—violating the *Accardi* doctrine.

## COUNT V (TRANSIT BAN PETITIONERS)

### Removing Petitioners Who Have Unlawful Final Orders of Removal Procured Under the Vacated Transit Ban Violates Their Substantive and Procedural Due Process Rights (Shocks the Conscience).

299.    Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

300.    In an Opinion Memorandum and Order dated June 30, 2020, Judge Kelly vacated the Transit Ban having found that it was enacted unlawfully.  *CAIR*, 2020 WL 3542481 at * 22.

301.    "A regulation not promulgated pursuant to the proper notice and comment procedures has no 'force or effect of law' and therefore is void *ab initio*."  *Goodner Bros. Aircraft, Inc.*, 966 F.2d at 384; *see also Chrysler Corp.*, 441 U.S. at 313, (1979) ("Certainly regulations subject to the APA cannot be afforded the 'force and effect of law' if not promulgated pursuant to the statutory procedural minimum found in that Act."); *W.C.*, 807 F.2d at 1505 ("An agency rule which violates the APA is void.  Agency action taken under a void rule has no legal effect").

302.    The Transit Ban Petitioners all received negative credible fear determinations based upon the Transit Ban and all have final orders of removal as a result of those negative credible fear determinations.

303.    Because of *CAIR*, the Transit Ban Petitioners have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law.

73

304.     Respondents' attempts to deport Transit Ban Petitioners, who have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law, violate their procedural due process rights under the Fifth Amendment.

305.     Respondents' attempts to deport Transit Ban Petitioners, who have unlawful final orders of removal procured under the vacated Transit Ban, which no longer has the force and effect of law, violate their substantive due process rights under the Fifth Amendment and shock the conscience.

<u>**COUNT VI (TRANSIT BAN PETITIONERS)**</u>

<u>**Declaratory Judgment**</u>

306.     The Petitioners re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

307.     Transit Ban Petitioners seek a declaration that Respondents cannot remove Transit Ban Petitioners until they have valid and lawful final orders of removal.

308.     Transit Ban Petitioners have suffered an injury in fact because Respondents seek to deport them without lawful final orders of removal.

309.     The Transit Ban Petitioners' injuries are caused by Respondents' unconstitutional and unlawful conduct.

310.     It is likely Transit Ban Petitioners' injuries will be redressed by a judgment declaring that Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process.

### PRAYER FOR RELIEF

**WHEREFORE,** Petitioners request that the Court grant the following relief:

1.      Assume jurisdiction over this matter;

2.      Temporarily stay Petitioners' removal from the United States pending its adjudication of this Petition;

3.      Declare that the unreasonably unsafe process intended to remove Petitioners during the COVID-19 pandemic is unlawful;

4.      Declare Respondents cannot remove Transit Ban Petitioners until they have been provided a lawful process;

5.      Declare that removal of Petitioners during the current COVID-19 pandemic violates the Due Process Clause of the Fifth Amendment, the INA, APA, and federal regulations until Respondents can demonstrate that they have complied with the law including but not limited to compliance with the FRS, and CDC Guidelines.

6.      Order a stay of removal until further order of this Court;

7.      Award Petitioners costs and reasonable attorneys' fees under the Equal Access to Justice Act; and

8.      Order such other relief as this Court may deem just and proper.

Dated:    9th day of July, 2020.

Respectfully Submitted,

By: /s/ Steven G. Barringer
Steven G. Barringer (D.C. Bar No. 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

75

App.310

Caroline J. Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

***ATTORNEYS FOR PETITIONERS***

76

## VERIFICATION PURSUANT TO 28 U.S.C. §2242

I am submitting this verification on behalf of the Petitioners because I am one of the

Petitioners' attorneys. I have discussed with the Petitioners the events described in this Petition.

On the basis of those discussions, I hereby verify that the statements made in the attached

Petition are true and correct to the best of my knowledge.

Date:   July 9, 2020

/s/ Steven G. Barringer
Steven G. Barringer (D.C. Bar No. 375373)
GREENBERG TRAURIG, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Caroline J. Heller (Appearing *pro hac vice*)
GREENBERG TRAURIG LLP
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland (D.D.C. Bar # NY0311)
Sarah T. Gillman (D.D.C. Bar # NY0316)
RAPID DEFENSE NETWORK
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

***ATTORNEYS FOR PETITIONERS***

App.312

# United States Court of Appeals
### For The District of Columbia Circuit
_____

**No. 20-5106**                           **September Term, 2019**

**1:19-cv-02773-ABJ**

**Filed On:** May 15, 2020

M.M.V., et al.,
        Appellants

        v.

William P. Barr, Attorney General of the
United States, et al.,
        Appellees

-------------------------------

Consolidated with 20-5129

    **BEFORE:**    Henderson*, Wilkins, and Rao, Circuit Judges

## O R D E R

    Upon consideration of the emergency motion for stay pending appeal, the opposition thereto, and the reply; and the administrative stay entered on May 1, 2020, it is

    **ORDERED** that the administrative stay be dissolved.  It is

    **FURTHER ORDERED** that the emergency motion for stay be denied. Appellants have not satisfied the stringent requirements for a stay pending appeal.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2019).  It is

    **FURTHER ORDERED**, on the court's own motion, and in light of the court's obligation to expedite this appeal "to the greatest possible extent," 8 U.S.C. § 1252(e)(3)(D), the following briefing schedule will apply in this case:

|  |  |
|---|---|
| Appellants' Brief | June 17, 2020 |
| Appendix | June 17, 2020 |
| Appellees' Brief | July 17, 2020 |
| Appellants' Reply Brief | July 31, 2020 |

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 20-5106**                                          **September Term, 2019**

The Clerk is directed to schedule this case for argument on the first appropriate date in September.  The parties will be informed later of the date of oral argument and the composition of the merits panel.

All issues and arguments must be raised by appellants in the opening brief.  The court ordinarily will not consider issues and arguments raised for the first time in the reply brief.

To enhance the clarity of their briefs, the parties are urged to limit the use of abbreviations, including acronyms.  While acronyms may be used for entities and statutes with widely recognized initials, briefs should not contain acronyms that are not widely known.  See D.C. Circuit Handbook of Practice and Internal Procedures 43 (2019); Notice Regarding Use of Acronyms (D.C. Cir. Jan. 26, 2010).

Parties may hand deliver the paper copies of their briefs to the Clerk's office on the date due, if feasible.  See Standing Order – In re: Paper Copies of Electronic Filings in Light of the COVID-19 Pandemic (D.C. Cir. April 1, 2020).  Filing by mail may delay the processing of the brief.  Additionally, counsel are reminded that if filing by mail, they must use a class of mail that is at least as expeditious as first-class mail.  See Fed. R. App. P. 25(a).  All briefs and appendices must contain the date that the case is scheduled for oral argument at the top of the cover.  See D.C. Cir. Rule 28(a)(8).

**Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:     /s/
Daniel J. Reidy
Deputy Clerk

*  Judge Henderson would deny the stay, concluding that the court is without authority to grant it.  See 8 U.S.C. § 1252(e)(1).

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.M.V., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 19-2773 (ABJ) |
| | ) |
| WILLIAM BARR, | ) |
| in his official capacity as | ) |
| Attorney General of the | ) |
| United States, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER

On April 27, 2020, the Court granted defendants' partial motion to dismiss because it found that it did not have jurisdiction over a majority of the claims and claimants. Order Granting Partial Mot. to Dismiss and Denying Mots. for Joinder [Dkt. # 96]. Approximately one hundred plaintiffs were dismissed from the action, and therefore, the Court lifted the administrative stays of removal orders that had been issued to preserve the status quo while the jurisdictional issues were resolved. *See id*. The Court also denied plaintiffs' five motions to join additional individuals as plaintiffs in the case on the grounds that joinder would be futile, and it lifted the administrative stays it had issued pending the ruling on the joinder motions. *Id.* That same day, plaintiffs filed a Notice of

1

Appeal.[1]  Notice of Appeal [Dkt. # 98].  On April 28, 2020, the government began removing these individuals from the United States, and plaintiffs filed a motion to stay the judgment pending appeal.  [Dkt. # 102] ("Pls.' Stay Mot.").  Defendants have opposed the motion.  Defs.' Opp. to Pls.' Mot. for Stay [Dkt. # 105]

A stay pending appeal is an extraordinary remedy.  *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985).  It is "an intrusion into the ordinary processes of administration and judicial review and accordingly is not a matter of right."  *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citation omitted).  Instead, a stay is an exercise of judicial discretion, and whether to grant it depends upon the specific circumstances of the case.  *Id.* at 433.  The moving party bears the burden of justifying why the court should grant this extraordinary remedy.  *Id.* at 433–34

A court is supposed to consider four factors in connection with a stay motion:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434.  The Supreme Court has explained that the first two factors "are the most critical."  *Id.*

---

[1]     It is unclear whether the Court of Appeals has jurisdiction to hear the appeal since eighteen plaintiffs and their claims remain in the action and have yet to be decided.   Courts of appeals have jurisdiction "of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291.  "A decision is final when it ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. By contrast, a decision that resolves some, but not all, of the claims in a complaint . . . is generally non-final and non-appealable.  With a handful of exceptions . . . a party may appeal such a partial disposition only with the district court's permission, pursuant to Federal Rule of Civil Procedure 54(b)."  *Shatsky v. Palestine Liberation Org.*, No. 17-7168, 2020 WL 1856490, at *5 (D.C. Cir. Apr. 14, 2020) (internal quotation marks and citations omitted).

With respect to the first factor, the Court of Appeals has stated that "[i]t is not enough that the chance of success on the merits [is] better than negligible." *Id.* (internal quotation marks and citation omitted). Instead, it must be "substantial[.]" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). The Court has also observed that a movant's failure to satisfy this stringent standard for demonstrating a likelihood of success on the merits is "an arguably fatal flaw for a stay application." *Citizens for Responsibility & Ethics in Washington ("CREW") v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam); *see Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) (affirming the denial of injunctive relief where the plaintiff failed to show likelihood of success on the merits).

The second factor, similarly, requires more than the mere "possibility of irreparable injury." *Nken*, 556 U.S. at 434 (internal quotation marks and citation omitted). "Irreparable harm must be 'both certain and great[,]' and 'actual and not theoretical.'" *CREW*, 904 F.3d at 1019, quoting *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). Where there is a low likelihood of success on merits, a movant must show a proportionally greater irreparable injury, *see Cuomo*, 772 F.2d at 974, in order to warrant the "extraordinary remedy" of a stay, *id.* at 978.

The last two factors, "the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Here, for all of the reasons stated in the memorandum opinion granting the partial motion to dismiss and denying the motions for joinder, the Court cannot find that plaintiffs have a substantial likelihood of success on the merits of their appeal. Their stay motion merely reiterates the arguments advanced in their opposition to the partial motion to dismiss, and the Court has not been presented with anything new to consider.

3

First, there is no evidence that a majority of the challenged actions have been reduced to writing, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") clearly strips the Court of jurisdiction to review unwritten policies. 8 U.S.C. § 1252(a)(2)(A); Mem. Op. at 24–32, citing *L.M.-M. v. Cuccinelli*, Civ. A. No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020) (finding that it did not have jurisdiction to review unwritten policies); *American Immigration Lawyers Association v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998), *aff'd* 199 F.3d 1352 (D.C. Cir. 2000) (same). Second, the D.C. Circuit has found that the sixty-day statutory time limit for bringing claims is jurisdictional and begins running on the date that the challenged regulation or written policy became effective. *Am. Immigration Lawyers Ass'n v. Reno ("AILA")*, 199 F.3d 1352, 1355 (D.C. Cir. 2000); 8 U.S.C. § 1252(e)(3)(B). The D.C. Circuit has affirmed the dismissal of plaintiffs from the case whose claims fall outside of the time limit.[2] *AILA*, 199 F.3d at 1356–57. Therefore, the Court is without jurisdiction to hear the claims of those plaintiffs added to the second amended complaint, [Dkt. # 54], and any plaintiffs added thereafter. Finally, the motions for joinder would be futile because all of the proposed plaintiffs' claims fall well outside of the sixty-day jurisdictional time period. Thus, this factor does not weigh in favor of a stay.

---

[2]    Plaintiffs argue that they have a substantial likelihood of success on the merits because the Court misinterpreted *AILA*. Pls.' Stay Mot. at 10. Plaintiffs argue that the Appeals Court "merely affirmed the dismissal of plaintiffs who were joined after the 60-day filing window where no plaintiff had a timely, viable claim," *id.*, while here there are plaintiffs with viable claims within the filing window.

The district court in *AILA* found that those plaintiffs added to an amended complaint that was filed after the sixty-day window could not "relate back" to the date of the original complaint because the statutory deadline was jurisdictional. *AILA v. Reno*, 18 F. Supp. 2d 38, 46–47 (D.D.C. 1998). Thus, the court's ruling was not predicated on the fact that no plaintiff had a viable claim. The D.C. Circuit, upon review, stated: "[w]e see no reason to disturb the district court's analysis, and so we affirm the dismissal of these claims substantially for the reasons stated in the court's thorough opinion." *Id.* at 1357.

This problem is particularly acute for the movants who have never been joined in this case as plaintiffs at all. While this action was pending, plaintiffs filed a succession of motions for joinder and emergency motions seeking to stay the deportation of proposed additional plaintiffs. While the Court granted the motions for administrative stays while it considered the merits of the joinder motions, it ultimately found that the plaintiffs could not be joined to the action, and it denied the motions without prejudice to future actions that these plaintiffs may want to file. The joinder motions had little legal support, particularly given the sixty-day rule, and the administrative stays extended to the proposed plaintiffs have been hanging by a thread for some time.

Plaintiffs argue, though, that they will be irreparably harmed, because they will be returned to countries where they "will suffer further sexual and physical violence, persecution, torture, or death." Pls.' Stay Mot. at 18. The Court is sensitive to the harsh circumstances that these plaintiffs have endured, and the fact that many of these plaintiffs are children, and it agrees that this factor weighs in favor of plaintiffs. But, given the low likelihood of success on the merits, the question is whether this showing alone warrants a stay pending appeal.

The last two factors do not weigh heavily in favor of either plaintiffs or defendants. The Supreme Court has stated that there is a "public interest in prompt execution of removal orders," because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established and permits and prolongs a continued violation of United States law." *Nken*, 556 U.S. at 436 (internal alterations, citations and quotation marks omitted). But these plaintiffs are not being removed because they violated the law; they are being removed because their asylum petitions have been denied under troubling circumstances. The Court recognized that "[t]he interest in prompt removal may be heightened by the circumstances as well" which may include whether the alien "has substantially prolonged his stay

5

by abusing the processes provided to him." *Id.* But there is no evidence of that either. The Supreme Court also stated in *Nken* that there is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* at 436. Therefore, the third and fourth factors are neutral.

The D.C. Circuit has provided some guidance that could point in the direction of a stay. While the Court is not persuaded of the strength of the appeal, a stay pending appeal may be warranted if there are "serious, substantial, [and] difficult" questions going to the merits, which make them "fair ground for litigation and thus for more deliberative investigation." *Holiday Tours, Inc.*, 559 F.2d at 844; *see also Comm. on the Judiciary of the United States House of Representatives v. Miers*, 542 F.3d 909, 911–12 (D.C. Cir. 2008) (Tatel, J., concurring). More recently, the D.C. Circuit found that "a lessor likelihood of success on the merits might suffice if each of the other three factors 'clearly favors' granting the injunction" but that "serious legal questions" would not suffice where the other three factors were merely "not contrary to a preliminary injunction." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009), quoting *Holiday Tours*, 559 F.2d at 843.

Considering those authorities, and the fact that the issues in this case warrant considerable deliberation, the Court would be inclined to grant a stay pending appeal. This is not the case described in *Davis* in which the factors are simply "not contrary" to the issuance of a stay; the Court has found that irreparable harm weighs in plaintiffs' favor. But there is another impediment to the issuance of such an order: the Court must also consider the statutory restrictions set forth in the Immigration and Nationality Act. 8 U.S.C. § 1252(e)(1) of the INA provides:

> Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—
>
> > (A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection.

The relevant "subsequent paragraph" is § 1252(e)(3)(A)(ii), which states that judicial review of determinations under § 1225(b) (which governs the expedited removal process) must be limited to determinations of "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(A)(ii). This paragraph also provides that any challenge on the validity of the system must be filed no later that sixty days after the challenged action is first implemented. *Id.* § 1252(e)(3)(B).

As stated above, in granting defendant's partial motion to dismiss, the Court found that it was precluded from reviewing a majority of the second amended complaint because they did not fall within § 1252(e)(3). Specifically, the Court found that a majority of the actions alleged in the second amended complaint were not written, and that many of the plaintiffs had brought claims outside of the sixty-day statutory window. Because this "subsequent paragraph" does not authorize judicial review, and there is no statutory provision "specifically authoriz[ing]" the Court to stay removal orders in the event of an appeal regarding the applicability the paragraph, the Court is restricted from issuing any "declaratory, injunctive, or other equitable relief." 8 U.S.C. § 1252(e)(1)(A). Thus, the Court is precluded from staying the removal orders of those plaintiffs who have been dismissed from the case.

For these reasons, plaintiffs' motion to stay pending appeal is **DENIED** and the temporary

administrative stay issued on April 28, 2020 is hereby lifted.

**SO ORDERED**.


AMY BERMAN JACKSON
United States District Judge

DATE:  May 1, 2020

8

No. 20-5106

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

M.M.V. et al,
Plaintiffs-Appellants,
v.
WILLIAM P. BARR, et al,
Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:19-cv-02773-ABJ
The Honorable Amy Berman Jackson

EMERGENCY MOTION FOR STAY PENDING REVIEW
OF PLAINTIFFS' APPEAL

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................1

FACTUAL BACKGROUND..................................................4

    A.    Prior Expedited Removal and Credible Fear Process ...........4

    B.    Defendants' Asylum Bar and the Changes to the Process ..................8

PROCEDURAL HISTORY...................................................11

LEGAL ARGUMENT ..........................................................12

    A.    Plaintiffs Will Suffer Irreparable Harm if Stay is Denied, There is No Harm to Defendants if Stay is Granted and the Stay is In the Public's Interest ............................................................13

    B.    Plaintiffs are Likely to Prevail on the Merits of the Appeal ..............14

        1.    This Court Has Jurisdiction Under 28 U.S.C. § 1331, Because the Jurisdiction- Limiting Provisions of 8 U.S.C. § 1252(a)(2)(A) Do Not Apply Here ........................................14

            a.    The Challenged Actions Could Not Have Been Adopted............................................................16

            b.    Defendant Cuccinelli Had No Authority to "Adopt" the Challenged Actions, Thus They are Not in Force and Effect and Do Not Remove this Action from Judicial Review ..........................................19

        2.    The Court Has Jurisdiction Under 8 U.S.C. § 1252(e)(3) ........21

            a.    Jurisdiction Over Challenged Action No. 9 Is Undisputed, and the Court Erred by Barring Later Joined Plaintiffs' Claims ..................................................22

            b.    Plaintiffs' Claims Are Timely .......................................23

                 i.    Equitable Tolling Applies to Section 1252(e)(3)....................................................23

                 ii.    Plaintiffs' Claims Were Brought Within 60 Days..................................................................24

i

c.    Plaintiffs Have Identified Written Policies.....................25

CONCLUSION ...................................................................................26

ii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*,
   935 F.3d 931 (2d Cir. 2019) ...................................................................16

*American Immigration Lawyers Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) .............................................................22

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*,
   502 U.S. 32 (1991) .................................................................................14

*Clark v. Martinez*,
   543 U.S. 371 (2005) ...............................................................................18

*Crowell v. Benson*,
   285 U.S. 22 (1932) .................................................................................18

*East Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018), stay of injunction pending
   appeal granted sub nom., 588 U.S. ___ (Sept. 11, 2019) .......................8

*Grace v. Whitaker*,
   344 F. Supp. 3d 96 (D.D.C. 2018) ....................................................6, 11

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020) .............................................................................2

*Henderson v. Shinseki*,
   562 U.S. 428 (2011) ...............................................................................23

*Herbert v. Nat'l Acad. of Scis.*,
   974 F.2d 192 (D.C. Cir. 1992) ...............................................................26

*I.A. v. Barr*,
   19:cv-02530, Dkt. 3, Compl. (D.D.C. Aug. 21, 2019) ...........................8

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) .................................................................................6

*INS v. St. Cyr*,
   533 U.S. 289 (2001) ...............................................................................14

*United States ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ...............................................................................19

*Kucana v. Holder*,
   558 U. S. 233, [(2010)] .................................................................... 2

*L.M.-M. v. Cuccinelli*,
   Civ. A. No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020) ............... 19, 20

*L.M.-M. v. Cuccinelli*,
   D.D.C. No. 1:19-cv-2676 .................................................................. 20

*Lopez v. Sessions*,
   2018 U.S. Dist. LEXIS 98712 (S.D.N.Y. June 12, 2018) ........................ 2

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................... 14

*Marbury v. Madison*,
   5 U.S. 137 (1803) ............................................................................. 18

*Make the Road New York v. McAleenan*, 405 F. Supp. 3d 1
   (D.D.C. 2019) .................................................................................. 24

*McNary v. Haitian Refugee Center, Inc.*,
   498 U. S. 479, [(1991)] ..................................................................... 2

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................... 13

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) .................................................... 23

*Padilla v. ICE*,
   2019 WL 7486849 (W.D. Wash. Feb. 12, 2019) .................................... 16

*United States v. Kwai Fun Wong*,
   575 U.S. 402 (2015) .......................................................................... 23, 24

*Washington Metropolitan Area Transit Comm'n v. Holiday Tours,
   Inc.*,
   559 F.2d 841 (D.C. Cir. 1977) ........................................................... 12

*Webster v Doe*,
   486 US 592 (1988) ............................................................................ 18

**State Cases**

*Brown v. Cox*,
   387 P.3d 1040 (Utah 2017) ............................................................... 16

iv

*Pub. Emps. Benefits Program v. Las Vegas Metro. Police Dep't*,
   179 P.3d 542 (Nev. 2008) ...................................................................................17

## Federal Statutes

5 U.S.C. § 3348(d)(1) ...........................................................................................19

8 U.S.C. §§ 1225(a)(2)(A)(i)-(iv) .........................................................................15

8 U.S.C. § 1225(b)(1)(A)(i) ....................................................................................4

8 U.S.C. §§ 1225(b)(1)(A)(ii) & (b)(1)(B) ............................................................5

8 U.S.C. § 1225(b)(1)(B) ........................................................................................4

8 U.S.C. § 1225(b)(1)(B)(ii) ...................................................................................7

8 U.S.C. § 1225(b)(1)(B)(iii)(II) .............................................................................7

8 U.S.C. § 1225(b)(1)(B)(iii)(III) ............................................................................7

8 U.S.C. § 1225(b)(1)(B)(iv) .............................................................................6, 11

8 U.S.C. §1225(b)(1)(B)(v) .....................................................................................6

8 U.S.C. § 1225(b)(1)(E) .........................................................................................5

8 U.S.C. § 1225(b)(1)(E)(ii) ................................................................................7, 9

8 U.S.C. § 1225(e) .................................................................................................10

8 U.S.C. § 1231 .....................................................................................................11

8 U.S.C. § 1252 ...............................................................................................16, 18

8 U.S.C. § 1252(a)(2) ............................................................................................15

8 U.S.C. § 1252(a)(2)(A)
   .....................................................................................................2, 14, 15, 20

8 U.S.C. § 1252(a)(2)(A)(iv) .........................................................2, 12, 15, 20, 21

8 U.S.C. § 1252(e)(3) .........................................................2, 12, 16, 21, 23, 24, 25

28 U.S.C. § 1331 .............................................................................................14, 25

## Rules

5th Cir. R. 18 ..........................................................................................................1

Fed. R. App. P. 8 ....................................................................................................1

v

**Regulations**

8 C.F.R § 208.1 ..................................................................................5, 10

8 C.F.R. § 208.2(a) ...................................................................................5

8 C.F.R. § 208.30 .....................................................................................5

8 C.F.R. § 208.30(d) ...........................................................................5, 11

8 C.F.R. § 208.30(d)(4) ..........................................................................11

8 C.F.R. §§ 208.30(d), 208.30(e)(7), 235.3(b)(2), (b)(7) ......................10

8 C.F.R. § 208.30(e)(1) ..........................................................................11

8 C.F.R. § 208.30(e)(4) ............................................................................6

8 C.F.R. § 208.30(e)(8) .........................................................................7, 9

8 C.F.R. § 208.30(f) ..............................................................................4, 7

8 C.F.R. § 208.30(g)(1) ............................................................................7

8 C.F.R. § 208.30(g)(2) ............................................................................7

8 C.F.R. § 208.31(c) .................................................................................9

8 C.F.R. § 235.3(b)(4) ..............................................................................5

8 C.F.R. §§ 235.3(b)(4), 208.30(d)(2) ...................................................10

8 C.F.R. § 1208.30(g)(2)(iv)(A) ..............................................................7

84 FR 33829 .............................................................................................3

**Constitutional Provisions**

U.S. Const. art. III, §§ 1, 2 ...............................................................17, 18

**Other Authorities**

Merriam-Webster's Collegiate Dictionary 16 (10th ed. 1999) ...............16

## **INTRODUCTION**

Pursuant to Rule 8 of the Federal Rules of Appellate Procedure and Circuit Rule 18, Plaintiffs M.M.V. *et al.* ("Plaintiffs") hereby move for an order issuing an administrative stay of removal of Plaintiffs from the United States pending further order of this Court.  This a case presents issues of Defendants' clandestine directives, guidance, actions and/or procedures calculated to deny asylum protections while evading judicial review.  The District Court, while acknowledging Defendants' problematic actions and procedures, found it lacked jurisdiction to review – this is incorrect.

Plaintiffs, and proposed Plaintiffs who sought to join this action (collectively referred to as Plaintiffs here), are hundreds of families—mothers and children held in a detention at the South Texas Family Residential Facility in Dilley, Texas, ("Dilley") and Berks County Residential Center in Leesport, Pennsylvania, ("Berks").  Plaintiffs are parents and children fleeing persecution, abuse, sexual predation, and threats of death.  Plaintiffs include women who have been repeatedly raped, beaten, and some drugged, kidnapped, and sold for commercial sexual slavery (Exhibit D, Dkt. # 67 ¶¶ 35, 46; Dkt. # 67-8 at 27–28.) who have faced vicious abuse in their native countries, only to now suffer a denial of any meaningful opportunity to apply for asylum protection in this country.

1

The District Court recognized that "this case is not about illegal immigration. It is about women and children who have travelled great distances, under extraordinarily difficult circumstances, to request legal admission to this country of immigrants through the long-standing process of applying for asylum[.]" (Dkt. # 97 at 3.) The District Court granted Defendants partial motion to dismiss most of the "Challenged Actions", asserting that 8 U.S.C. § 1252(a)(2)(A)(iv) stripped the Court of jurisdiction because Defendants "adopted" these secret policies and that the case did not fall within the exception to that limitation set out in 8 U.S.C. § 1252(e)(3).

"Ours is a government of laws, not of men[.]" *Lopez v. Sessions*, 2018 U.S. Dist. LEXIS 98712, at *2 (S.D.N.Y. June 12, 2018) (quoting John Adams, Novanglus Papers, No. 7 (1774), a phrase that was incorporated into the Massachusetts Constitution's Bill of Rights in 1780)). "A "well-settled" and "strong presumption," *McNary v. Haitian Refugee Center, Inc.*, 498 U. S. 479, 496, [(1991)], "favor[s] judicial review of administrative action," *Kucana v. Holder*, 558 U. S. 233, 251, [(2010)]." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1067 (2020). Contrary to the conclusions of the District Court, Congress could not have meant the jurisdiction stripping provisions of § 1252(a)(2)(A) to strip the courts of the power to review, or the Plaintiffs' ability to challenge, secret policies contrary to law and calculated to extinguish rights for those seeking safety in the United States.

2

Plaintiffs commenced the underlying litigation alleging, among other things, that certain "Challenged Actions" violate the Administrative Procedures Act (APA), the Refugee Act, and the Immigration and Nationality Act (INA), are arbitrary and capricious, and violate the right of *non-refoulment*.  (Exhibit C, Dkt. # 54 ¶¶ 174-200.)  On July 16, 2019, a new and immediately effective interim final rule titled "Asylum Eligibility and Procedural Modifications" (herein, the "Asylum Bar"), rendered most individuals who arrive in the United States via the southern border ineligible for asylum. 84 FR 33829.  The legality of the July 16, 2019, regulation is not at issue in this case.  After the implementation of the Asylum Bar, Defendants and those operating under their supervision or control have further eviscerated the "credible fear" process, implementing shifting and illegal directives, guidance, actions and/or procedures placing parents, children, and others in immigration detention at risk of wrongful deportation, persecution, and death, violating their rights.

None of the Challenged Actions, whether reduced to writing or not, have ever been made public or been formally adopted by the Attorney General. Since July 16, 2019, the credible fear passage rates at Dilley—the largest family detention center in the United States have diminished from approximately 97% of credible fear applicants, to around 10% or fewer of applicants.

3

Plaintiffs have final orders of removal and without a temporary stay to maintain the *status quo*, Defendants may, and will, deport them at any time. Plaintiffs request their removal from the United States be stayed pending further order of the Court to provide sufficient opportunity to consider the emergency motion. *See* D.C. Circuit Handbook of Practice and Internal Procedures 33 (2018). Indeed, one Plaintiff family has already been deported and the deportation of several other families is imminent. (*See* Exhibits A and B, Declarations of Shalyn Fluharty, Esq. and Bridget Cambria, Esq.) Plaintiffs have also moved for a stay from the District Court. (Dkt # 102.)

Plaintiffs are likely to prevail on the merits of their Appeal and will be irreparably harmed absent a stay of removal. We respectfully ask that this Court grant this emergency motion to temporarily stay removal to allow a full panel to consider the motion, and any response or reply.

## FACTUAL BACKGROUND

### A.    Prior Expedited Removal and Credible Fear Process

In 1996, Congress established a highly truncated removal mechanism called "expedited removal" that could be used for certain noncitizens seeking admission. (Dkt. # 54 ¶ 126.) Noncitizens subject to expedited removal are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). (Dkt. # 54 ¶ 126.) Congress, however, was careful to carve out

4

an exception for individuals who express a fear of return to their home countries. *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

If an individual subject to expedited removal indicates a fear of returning to his or her home country or intention to apply for asylum, the immigration officer must refer the individual for an interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. Congress also required the asylum officers conducting these interviews to have "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators" of asylum applications and to be "supervised by an officer" who has both like training and "substantial experience adjudicating asylum applications." 8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R § 208.1 (promulgating specific training directive for asylum officers).  This role has been performed by the Refugee, Asylum, and International Operation division ("RAIO") within USCIS.  *E.g.,* 8 C.F.R. § 208.2(a).

If the noncitizen is referred to an asylum officer, the officer conducts (with the assistance of an interpreter if necessary) a "credible fear interview." ("CFI"). (Dkt. # 54 ⁋ 129.)  The CFI is designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).  Thus, CFIs include procedural protections.  (Dkt. # 54 ⁋ 130.) The asylum officer must "conduct the interview in a non-adversarial manner."  8

5

C.F.R. § 208.30(d). Further, in determining whether credible fear is satisfied, the officer must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. 208.30(e)(4). The interviewee is entitled to "information concerning the asylum interview" (i.e., what process and standards apply) and to "consult with a person or persons of the alien's choosing prior to the interview or any review." 8 U.S.C. §1225(b)(1)(B)(iv).

At the end of the interview, the asylum officer determines whether the interviewee has a credible fear of persecution, to wit: "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]" 8 U.S.C. §1225(b)(1)(B)(v). To ultimately prevail on an asylum claim itself, the applicant need only establish that there is a 10% chance that he or she will be persecuted because one of the five protected grounds for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 127 (D.D.C. 2018).

If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge. (Dkt. # 54 ¶ 132.) At that hearing, they will have the opportunity to develop a full record before the judge, and they

6

may appeal an adverse decision to the Board of Immigration Appeals and the relevant federal court of appeals.   8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

If the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination that "shall include a summary of [all] material facts stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution."   8 U.S.C. § 1225(b)(1)(B)(iii)(II). "A copy of the officer's interview notes shall be attached to the written summary." *Id*. Supervisory asylum officers then review and approve the negative credible fear determination.   *See* 8 C.F.R. 208.30(e)(8); cf. 8. U.S.C. § 1225(b)(1)(E)(ii). Upon the individual's request, the agency must provide for prompt review of the asylum officer's negative credible fear determination by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); see also 8 C.F.R. § 208.30(g)(1).

In conducting that review, the immigration judge has access to "[t]he record of the negative credible fear determination." 8 C.F.R. § 208.30(g)(2). The integrity of the record developed by the interviewer is critical to the exercise of not only the right to apply for asylum, but also the right to review, as it has been here for Plaintiffs.   The immigration judge's decision is administratively "final and may not

7

be appealed," 8 C.F.R. § 1208.30(g)(2)(iv)(A), further emphasizing the critical importance of the integrity of the interviewer's record.

## B.   Defendants' Asylum Bar and the Changes to the Process

The legality of the July 16, 2019, regulation is currently at issue in separate litigation.[1]

In 2019 Defendants secretly did away with all the above protections for persons fleeing persecution and torture.  Some of the examples of the Challenged Actions are set forth here, and more fully in the Second Amended Complaint.  (Dkt # 54.)

Under the direction of Defendant Cuccinelli, newly purporting to serve as "Acting Director" of USCIS, USCIS secretly entered into an agreement with Customs and Border Protection (CBP) whereby improperly trained Border Patrol officers would replace career USCIS agents to conduct fear screening.  (Dkt. # 59-1, pp. 68–72.)  The arrangement was then implemented at family detention centers in September of 2019.  Once in place at Dilley and other family detention centers, Border Patrol agents conducted unlawful adversarial interrogations of families fleeing persecution and torture while abandoning longstanding child-friendly policies and interrogating children, even toddlers, by phone.  Border Patrol agents

---

[1] *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018), stay of injunction pending appeal granted sub nom., 588 U.S. ___ (Sept. 11, 2019); *I.A. v. Barr*, 19:cv-02530, Dkt. 3, Compl. (D.D.C. Aug. 21, 2019).

8

were chosen to conduct credible fear interviews precisely because they "would be tougher critics of asylum seekers" (i.e., not neutral) than Asylum Officers, who the Administration views as "soft" (i.e., neutral).  (Dkt. # 66-10.)

In this new regime, if the immigration officer determines that an alien subject to expedited removal is barred from asylum eligibility (*e.g.*, under Defendants' new Asylum Bar), the alien is summarily found not to have a credible fear of persecution, typically without any supervisor review as required (8 C.F.R. 208.30(e)(8), *see also* U.S.C. § 1225(b)(1)(E)(ii)), and announced during the CFI interview itself.  The immigration officer then proceeds to determine only if a reasonable fear of persecution exists for withholding of removal or CAT protection.  (Dkt. # 54 ⁋ 139.)

Reasonable fear represents a higher standard than credible fear.  It is defined by regulation as "a reasonable possibility that [the applicant] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal."  8 C.F.R. § 208.31(c).  If the noncitizen does not establish a reasonable fear of persecution during the interview to the interviewer's satisfaction, a written notice of decision is issued, subject to review by an immigration judge under the higher standard of reasonable fear (i.e., not the more moderate credible fear standard).  Under this new procedure, individuals purportedly subject to the Asylum Bar are categorically unable to avoid persecution by

establishing a significant possibility of asylum eligibility under the credible fear standard.  (Dkt. # 54 ⁋ 140.)

None of the Challenged Actions have been made public and requests for information of Defendants have been rebuffed, not subject to public or judicial review. (Dkt. # 54 ⁋ 4.)  Collectively, the Challenged Actions have thus been undertaken by Defendants and/or those under their supervision and control *sub rosa,* surreptitiously without any judicial, legislative, or public oversight, notice, or comment. (Dkt. # 54 ⁋ 4.)  Defendants have radically disregarded the law, changing the fundamental protections afforded by law to Plaintiffs as follows (Dkt. # 54 ⁋⁋ 147-61):

| **Prior Regime** | **Defendants' New Illegal Regime** |
|---|---|
| 1.  Migrants received an orientation on the process and standards for CFIs. | Migrants get no meaningful orientation as required by, *e.g.*, 8 C.F.R. §§ 235.3(b)(4), 208.30(d)(2). |
| 2.  CFIs were conducted by experienced, trained asylum officers. | CFIs are conducted by improperly trained agents, violating, *e.g.*, 8 U.S.C. § 1225(e); 8 C.F.R. § 208.1. |
| 3.  CFI determinations were issued after a full discussion of facts and meaningful supervisory review. | Agents make summary decisions mid-interview, ending further discussion or meaningful supervisory review, thwarting, *e.g.*, 8 C.F.R. §§ 208.30(d), 208.30(e)(7), 235.3(b)(2), (b)(7). |
| 4.  Asylum agents developed a complete factual record, permitting meaningful later review. | Agents do not probe all relevant facts, leaving an incomplete record on review, thwarting, *e.g.*, 8 C.F.R. §§ 208.30(d), 208.30(e)(7), 235.3(b)(2), (b)(7). |

10

| | |
|---|---|
| 5. Interviews were conducted in a neutral, non-adversarial manner. | Interviews are conducted using adversarial interrogation techniques, violating, *e.g.*, 8 C.F.R. § 208.30(d). |
| 6. Migrants were given meaningful advance notice of interviews and a chance to consult with counsel. | Interrogations occur without meaningful notice, prejudicing the right of consultation under, *e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(iv), 208.30(d)(4). |
| 7. If migrants are evaluated under the higher reasonable fear interview ("RFI") standard, they were given advance notice, advance orientation, and access to counsel. | RFI-standard interrogations proceed without meaningful advance notice, orientation, or consultation with counsel afforded to 8 U.S.C. § 1231 interviewees. |
| 8. Asylum officers applied the most favorable legal precedent in determinations as required by law. | Agents ignore the injunction in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018) and apply law of their choosing. |
| 9. Review for fraud was conducted where reasonable cause existed. | Every positive fear determination is pretextually reviewed for "fraud" without any basis, resulting in arbitrary rescission. |
| 10. Asylum officers disclosed the bases for their determinations. | Agents withhold bases on which negative determinations are made, violating, *e.g.*, 8 C.F.R. § 208.30(e)(1). |
| 11. Asylum officers were trained in and applied child-sensitive interviewing procedures. | Children (including as young as toddlers) are subjected to law-enforcement style interrogations, often for hours, in violation of, *e.g.*, 8 C.F.R. § 208.30(d). |

Against this backdrop, Plaintiffs sued to remedy and end eleven specific

Challenged Actions.  (Dkt. # 54.)

## PROCEDURAL HISTORY

The procedural history of this case is fully set forth in the District Court's

Memorandum Opinion. (Exh. F, Dkt. # 97, pp. 13-18.)  Relevant here, the District

11

Court issued an administrative stay of removal for the named Plaintiffs in the Second Amended Complaint. (Dkt. # 50.)  On February 14, 2020, Defendants filed a partial motion to dismiss based on lack of subject matter jurisdiction.

Plaintiffs thereafter filed five motions for joinder that were opposed by Defendants to add plaintiffs and five emergency motions to extend the administrative stay to the proposed plaintiffs. (Dkt. #s 78, 79, 85, 86, 88, 89, 91, 92, 94, 95).  Plaintiffs' motions were granted until the Court could rule on the joinder motions. (*See* Min. Orders, Mar. 25, 2020; Apr. 4, 2020; Apr. 6, 2020; Apr. 15, 2020; Apr. 23, 2020).

The District Court granted the Partial Motion to Dismiss, holding that § 1252(a)(2)(A)(iv) limited subject matter jurisdiction in this action, Plaintiffs' claims did not fall within the exception to the preclusion of judicial review found in § 1252(e)(3).  The District Court also denied the motions for joinder.  Plaintiffs' filed a Notice of Appeal of the Memorandum Decision (Exhibit F) and Order (Exhibit E) on April 27, 2020.

## **LEGAL ARGUMENT**

The motion for stay or for emergency relief must specifically discuss four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the prospect of irreparable injury to the moving party if relief is withheld; (3) the possibility of substantial harm to other parties if relief is granted; and (4) the public

12

interest.  *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977).

A.    **Plaintiffs Will Suffer Irreparable Harm if Stay is Denied, There is No Harm to Defendants if Stay is Granted and the Stay is In the Public's Interest**

Defendants have already deported one family and the deportation of other Plaintiffs are imminent.  (*See* attached hereto, Declarations of Shalyn Fluharty, Esq. and Bridget Cambria, Esq.)  Plaintiffs have all expressed credible fears of returning to their home countries where they will suffer further sexual and physical violence, persecution, torture, or death.  If they are returned to their countries, and their right to pursue their claims are upheld on Appeal, for many of them it will be too late to pursue those rights.

There is no harm to Defendants as a stay will merely maintain the status quo. A stay of removal can be inextricable from the meaningful administration of justice, by preventing appeals such as the present one from devolving into a choice "between justice on the fly or participation in what may be an idle ceremony."  *Nken v. Holder*, 556 U.S. 418, 421, 427 (2009) (quotation marks omitted) ("preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.")  *Id*. at 436.

13

**B.**     **Plaintiffs are Likely to Prevail on the Merits of the Appeal**

**1.**     **This Court Has Jurisdiction Under 28 U.S.C. § 1331, Because the Jurisdiction- Limiting Provisions of 8 U.S.C. § 1252(a)(2)(A) Do Not Apply Here**

There is a "strong presumption in favor of judicial review." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).  While the government may overcome that presumption only by pointing to "clear and convincing evidence of a contrary legislative intent." *Bd. of Governors of the Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32, 44 (1991) (internal quotation marks omitted), the government failed to do so.

Plaintiffs bear the burden of establishing jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Here, Plaintiffs' claims uniformly allege that Defendants' actions violate either the Constitution or federal statutes. (See Dkt. # 54 ¶¶ 127-53.)  The claims thus present classic federal questions over which this Court has jurisdiction under 28 U.S.C. § 1331 and related statutes. (Dkt. # 54 ¶¶ 8–9.)

Here, none of the Challenged Actions can possibly fall within the ambit of the jurisdiction-limiting language in § 1252(a)(2)(A), because (1) they were not reduced to writing thus were not "adopted", and (2) even if they could be construed as having been adopted, they were adopted by Defendant Cuccinelli, whose appointment has been found to have violated the Federal Vacancies Reform Act ("FVRA"), thus the adoption is not in force and effect and a court may review the Challenged Actions.

14

Section 1252(a)(2) limits federal-court jurisdiction over only four specific types of claims, thus, the court has jurisdiction to review Plaintiffs' claims here, unless they fall under one of the four jurisdiction limiting provisions in § 1225(a)(2)(A)(i)-(iv).  It is undisputed that Plaintiffs here bring a "programmatic" facial challenge to government policies rather than individual, as-applied challenges, thus three of the four jurisdiction limiting provisions in § 1252(a)(2)(A) are categorically inapplicable to this case.

Pursuant to § 1252(a)(2)(A)(iv), federal courts may not review some claims related to "procedures and policies *adopted* by the Attorney General to implement" the expedited-removal statute.  8 U.S.C. § 1252(a)(2)(A)(iv) (emphasis added).[2] But that does not strip jurisdiction over all programmatic challenges, only over those that concern "adopted" procedures and policies.  Congress could not have and intend for the Courts to be stripped of jurisdiction to review actions by an Executive that have been clandestine and adverse to the very rights that the Legislature sought to ensure and protect against unchecked executive power.

Thus, Plaintiffs will succeed on the jurisdictional argument.

---

[2] Since 2003 after the creation of the Department of Homeland Security, that language has referred to adoption by the DHS Secretary and/or Director of USCIS, rather than the Attorney General personally.   Because this case uniformly involves actions of USCIS, the relevant official is the Director of that agency, purportedly Defendant Cuccinelli.

15

### a.   The Challenged Actions Could Not Have Been Adopted

The Decision and Order grants immunity to any unwritten government action concerning expedited removal. It erroneously concludes that so long as the government's actions concerning expedited removal are conducted in secret using unwritten directives, it can act wholly beyond judicial review.   The analysis misconstrues section 1252 and allows Defendants to "insulate itself from review merely by declining to . . . commit its policies to writing," a holding that undermines the rule of law.  *Padilla v. ICE*, 2019 WL 7486849, at *1 (W.D. Wash. Feb. 12, 2019) (rejecting that 8 U.S.C. § 1252(e)(3) barred judicial review because "[d]efendants ha[d] not adopted any formal procedure or policy").

Defendants' primary argument on its Motion to Dismiss was that the District Court lacked jurisdiction because many of the Challenged Actions were not committed to writing.  (Dkt. # 73 at 13–14.)  Instead of adopting this argument, the District Court instead found that "a policy can certainly be 'adopted' without being reduced to writing, and the provision itself does not include the word 'formally' or any other narrowing term."  (Dkt. # 97 at 22.)

The District Court misconstrues the plain meaning of the statute.  The plain "adopt" is "to accept formally and put into effect."  *See* Merriam-Webster's Collegiate Dictionary 16 (10th ed. 1999); *accord, e.g.*, *32BJ N. Pension Fund v. Nutrition Mgmt. Servs*. Co., 935 F.3d 93, 101 (2d Cir. 2019); *Brown v. Cox*, 387 P.3d

1040, 1045 (Utah 2017); *Pub. Emps. Benefits Program v. Las Vegas Metro. Police Dep't*, 179 P.3d 542, 550 n.31 (Nev. 2008). And a "policy" that USCIS, or any other federal agency, purports to apply but does not commit to writing has not been "accept[ed] formally." After all, an unwritten "policy" is one that has not been formalized as a regulation, otherwise published in the Federal Register, made part of a policy memorandum or similar document, or even placed in an email. If such a "policy" has been applied by agents, it has been at most informally accepted. It has not been formally accepted (i.e., adopted).

Further, no court, has ever addressed the question whether a bar on the review of unwritten directives would be constitutional. It would not, and the District Court fails to grapple with this argument. The Constitution mandates: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. … [and] *shall* extend to *all* Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, §§ 1, 2 (emphasis added). Thus, while Congress may limit jurisdiction (e.g., require that certain claims be bought in this District, or based on certain timing), it cannot wholly remove or bar judicial review of cases that Article III, Section 2 expressly cites—some court, supreme or inferior, must be available to

17

hear such cases.[3]   To state otherwise defeats the long-held pillar of separation of powers that "[i]t is emphatically the province and duty of the Judicial Department to say what the law is."  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Here, each of Plaintiffs' claims—questions of federal law, constitutional violations, and treaty violations—are directly listed in the Article III, Section II mandate.  There is no suggestion in the legislative record or any judicial opinion that Congress intended to allow the government to violate its own laws and the constitutional rights of migrants without judicial review so long as the government acted in secret without memorializing the misdeed in writing.   Statutory interpretation, here of 8 U.S.C. § 1252, must adhere to the "reasonable presumption that Congress did not intend [an] alternative which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *see also Webster v Doe*, 486 US 592, 601–05 (1988) (Congress did not intend to preclude review of constitutional claims as any such intent must be clear, as it would raise a "serious constitutional question").

While Congress can limit jurisdiction, it of course cannot do so in a way that violates other constitutional rights.  Here, at minimum, "the procedure authorized by

---

[3] *See, Crowell v. Benson*, 285 U.S. 22, 60–61, 62 (1932) (It is "untenable" to assume that "constitutional courts may be deprived in all cases of the determination of facts upon evidence [where] a constitutional right may be involved….[T]he essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue…")

Congress" is a form of due process to which Plaintiffs have a right.  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

Congress could not intend §1252 as a jurisdictional bar that insulates the government from review so long as the government opts not to use a writing when it abridges the procedure set by Congress.  This would necessarily not only abridge Due Process, but also negate the effect of the exact same underlying law that Congress was enacting, which cannot be what Congress intended.

> **b.    Defendant Cuccinelli Had No Authority to "Adopt" the Challenged Actions, Thus They are Not in Force and Effect and Do Not Remove this Action from Judicial Review**

Even if the District Court's conclusion that an unwritten policy can be "adopted" has merit, which it does not, the Challenged Actions here were not "adopted" by Defendant Cuccinelli because his appointment violated the Federal Vacancies Reform Act ("FVRA") and any actions taken by officials appointed in violation of the FVRA "have no force or effect." 5 U.S.C. § 3348(d)(1).

At all times relevant to this case, when the Challenged Actions were created, Defendant Cuccinelli was purportedly served as Acting Director of USCIS.  But the appointment of Defendant Cuccinelli as Acting Director violated the FVRA.  *L.M.-M. v. Cuccinelli*, Civ. A. No. 19-2676, 2020 WL 985376 (D.D.C. Mar. 1, 2020) (setting aside two directives issued by USCIS because Defendant Cuccinelli's appointment as Acting Director of USCIS violated the FVRA).  Thus, policies

19

purportedly "adopted" by Defendant Cuccinelli have no force and effect and, therefore, Defendant Cuccinelli's policies—even if formalized in writing—cannot and do not trigger the jurisdiction-limiting language in § 1252(a)(2)(A)(iv).

The District Court noted that in *L.M.-M.* the court "exercised its jurisdiction to strike down certain written policies, but with respect to unwritten policies, it found that 8 U.S.C. § 1252(a)(2)(A)(iv) applied, and it did not have jurisdiction to review an unwritten policy even though it was attributed to Cuccinelli. *Id*. at *11. The allegedly unlawful nature of Acting Director Cuccinelli's appointment does not relieve it of its obligation to consider the applicability of § 1252(a)(2)(A)(iv) as Congress intended." (Dkt. # 97 at 21, 22.)

But the unlawful nature of Defendant Cuccinelli's appointment, and the withdrawal of the force and effect of the policies he "adopted" precisely eliminate the applicability of § 1252(a)(2)(A)(iv) to the Challenged Actions. Defendant Cuccinelli could not have legally "adopted" any of the Challenged Actions, thus, whether written or not written, they not "policies and procedures adopted by the Attorney General….", 8 U.S.C. § 1252(a)(2)(A)(iv), and are not precluded from judicial review. The District Court failed to address that the parties in *L.M.-M.* did not raise, and that case did not consider, the question of whether the procedures or policies of an improperly appointed acting official can be deemed "adopted" within the meaning of 8 U.S.C. § 1252(a)(2)(A). (*See L.M.-M. v. Cuccinelli*, D.D.C. No.

20

1:19-cv-2676, Dkts. # 12, 19, 28.)  Therefore, District Court erred in finding that it did not have jurisdiction to review the Challenged Actions–whether written or unwritten—purportedly adopted by Defendant Cuccinelli.

### 2.    The Court Has Jurisdiction Under 8 U.S.C. § 1252(e)(3)

Even if Plaintiffs' claims fell within the scope of § 1252(a)(2)(A)(iv)—and they do not—§ 1252(e)(3) provides an independent basis for subject matter jurisdiction.  The District Court found that "Section 1252(e)(3) allows judicial review on '[c]hallenges [to the] validity of the system,'" and identified two requirements for jurisdiction under that Section: (1) there is a "writing," i.e., a "regulation[] or written policy directive," underlying the challenged action; and (2) the lawsuit is "filed no later than 60 days after the date the challenged [writing] . . . is first implemented.'"  (Dkt. # 97 at 23-24, 33.)  The District Court erred in applying this standard to find jurisdiction lacking over all but one of the actions Plaintiffs challenge (and even then, in finding jurisdiction as to only some Plaintiffs).

Plaintiffs have identified multiple bases for jurisdiction under § 1252(e)(3). First, there is no dispute that this Court has jurisdiction to review Challenged Action No. 9 (Mandatory Fraud Review). Second, Plaintiffs timely filed suit against the Challenged Actions for which the government concedes the existence of written policies or procedures.   Third, despite the government's failure to disclose documents relevant to other Challenged Actions, the record all but confirms that

21

writings evidencing those Actions exist and Plaintiffs are entitled to challenge the government's representations to the contrary through discovery.

### a. Jurisdiction Over Challenged Action No. 9 Is Undisputed, and the Court Erred by Barring Later Joined Plaintiffs' Claims

With respect to Challenged Action No. 9, the District Court correctly held that both the "writing" and the 60-day filing requirement were satisfied as to "the plaintiffs named in the original complaint." (Dkt. # 97 at 37.)  However, the District Court found that the claims of the ninety-eight plaintiffs added to the second amended complaint were untimely as they were not filed within 60 days of August 23, 2019. (*Id*. at 38.)  This was error.

The District Court's exclusive reliance on *American Immigration Lawyers Ass'n v. Reno*, ("*AILA*"), 199 F.3d 1352, 1356-57 (D.C. Cir. 2000), is misplaced. There, the Court merely affirmed the dismissal of plaintiffs who were joined after the 60-day filing window where no plaintiff had a timely, viable claim. *Id*.

Here, as Defendants concede, all the original plaintiffs timely filed as to Challenged Action No. 9 such that the Court has subject matter jurisdiction and their claims will be moving forward. (Dkt. # 97 at 38.)  There is no legal basis for precluding Plaintiffs joined in the second amended complaint as Section 1252(e)(3)'s 60-day filing deadline is specific to the filing of the "action" relative to the date the challenged regulation is implemented, it is not tied to the filing of

22

individual claims.  8 U.S.C. § 1252(e)(3).  Thus, "Plaintiffs need only demonstrate that the Court has jurisdiction under § 1252(e)(3) over the claims of at least one of the individual plaintiffs" to invoke the Court's jurisdiction.  *O.A. v. Trump*, 404 F. Supp. 3d 109, 139 (D.D.C. 2019).

### b.   Plaintiffs' Claims Are Timely

#### i.   Equitable Tolling Applies to Section 1252(e)(3)

The District Court erred by rejecting Plaintiffs' argument that equitable tolling applies to § 1252(e)(3)'s filing requirement in reliance on a single, nonbinding district court decision from 1998—*AILA*—and ignoring applicable intervening Supreme Court authority, *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015), on the grounds that "the Supreme Court's holding in Wong was limited to the Federal Tort Claims Act," and the court was constrained to follow *AILA's* "binding precedent" instead.  (Dkt. # 97 at 38.)  *Wong* is not so limited, and *AILA* is not binding.

In *Wong*, the Court noted that "most time bars are non-jurisdictional."  575 U.S. at 408.  Because "filing deadlines" are "'quintessential claim-processing rules' that "'seek to promote the orderly progress of litigation'" they generally "do not deprive a court of authority to hear a case." *Id*. (quoting *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)).  Accordingly, "[t]he  Government must clear a high bar to establish that a statute of limitations is jurisdictional" and identify a "clear

23

statement" by Congress to that effect.  *Id*.  "Absent such a clear statement, courts should treat the restriction as nonjurisdictional."  *Id*. (internal quotation marks omitted).  There is no such clear statement with respect to § 1252(e)(3), and the District Court identified none in relying on *AILA*.  Absent a clear statement of Congressional intent to the contrary, equitable tolling applies to § 1252(e)(3).

### ii.   Plaintiffs' Claims Were Brought Within 60 Days

The District Court found the "writing" requirement satisfied as to Challenged Action No. 2 "which alleges that the officers conducting the asylum interviews have not been adequately trained."  (Dkt. # 97 at 35-36.)  On these findings, Plaintiffs' claims as to Challenged Action No. 2 are timely.  The Court erred in holding that the July MOA's signing date—"July 10, 2019"—constituted the "first implementation" of the policy from which § 1252(e)(3)'s 60-day filing clock began to run, as opposed to when Border Patrol Agents began conducting interviews pursuant to the training they received under the July MOA in September 2019.  Rather, "Merriam-Webster's Collegiate Dictionary defines 'implement' as 'carry out, accomplish; esp[ecially] to give practical effect to and ensure of actual fulfillment by concrete measures[.]' Merriam-Webster's Collegiate Dictionary 624 (11th ed. 2003)."  *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 31 (D.D.C. 2019).  Were it otherwise, the government could simply sign all written policies 60 days before disclosing them by putting them into effect, and thereby insulate them from review.

24

The District Court found the "writing" requirement satisfied as to Challenged Action No. 1, which "alleges that officials at the border avoid meaningfully orienting migrants to applicable standard[s] and procedures." (Dkt. # 97 at 33). Specifically, Plaintiffs identified a 2019 M-444 Form. (*Id.*) Despite Plaintiffs bringing suit within 60 days of July 16, the date on which the government began implementing the policy of providing inaccurate information to interviewees via the 2019 M-444 form, the District Court relied on the date the form was issued—"May of 2019"—to find Plaintiffs' claims time-barred. (*Id.*) For the reasons noted above and explained in Plaintiffs' opposition to the government's motion to dismiss (Dkt. # 73 at 22-25), this interpretation is unsupported and cannot be squared with the plain meaning of Congress's use of the term "implement" in § 1252(e)(3).

### c.   Plaintiffs Have Identified Written Policies

The District Court rejected Plaintiffs claims as to Challenged Action Nos. 3, 4, 5, 6, 7, 10, and 11 based on its finding that the policies Plaintiffs are challenging are not in "writing." (Dkt. # 97 at 32.) For the reasons explained above, if this conclusion is correct, then jurisdiction exists under 28 U.S.C. § 1331, as the government cannot shield itself from suit merely by adopting unwritten policies. Moreover, there was no basis to find that, as a matter of law, there were no written policies underlying the Challenged Actions.

25

For each of the Challenged Actions, Plaintiffs presented significant evidence of systematic, uniform changes in policies post-dating the Asylum Bar from which the presence of written—albeit undisclosed—directives can be inferred.  (Dkt. # 73 at 30-34.) Notwithstanding such evidence, the District Court took the government's representation that "there are no writings related to [these] policies" at face value.

This Court has held that district courts "must bear in mind what procedural protections could be required to assure that a full airing of the facts pertinent to a decision on the jurisdictional question may be given to all parties" and "indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." *Herbert v. Nat'l Acad. of Scis*., 974 F.2d 192, 198 (D.C. Cir. 1992).  This is just such a case.  Plaintiffs are entitled to continue to test the government's representations through discovery, which will establish what Defendants' lockstep policies suggest—that they are governed by written documents.

## **CONCLUSION**

For all the reasons set forth herein, Plaintiffs respectfully request that this Court issue an order issuing an administrative stay of removal of all Plaintiffs from the United States pending further order of this Court.

Dated:   Washington, D.C.
      April 28, 2020

Respectfully Submitted,

GREENBERG TRAURIG, LLP

/s/ Steven G. Barringer
By:  Steven G. Barringer
2101 L. Street, N.W.
Washington, D.C. 20037
Tel: (202) 331-3108
barringers@gtlaw.com

James E. Gillenwater
333 SE 2nd Avenue
Suite 4400
Miami, FL  33131
Tel: (305) 579-0767
gillenwaterj@gtlaw.com

-and-

RAPID DEFENSE NETWORK
Gregory P. Copeland
Sarah T. Gillman
Rapid Defense Network
11 Broadway, Suite 615
New York, NY 10004
Tel: (212) 843-0910
gregory@defensenetwork.org
sarah@defensenetwork.org

*Counsel for Plaintiffs-Appellants*

App.356

## Certificate of Compliance with Type-Volume Limit,
## Typeface Requirements, and Type-Style Requirements

1. Plaintiffs have file motion for leave to file a motion exceeding the word limit of Fed. R. App. P.Rule 27(d) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,144 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated:    April 28, 2020                  */s/ Steven Barringer*
                                          *Attorney for Appellants*

28

## CERTIFICATE OF SERVICE

I, Steven Barringer, hereby certify that on April 28, 2020, a true and correct

copy of the foregoing Motion was served electronically upon the below-listed parties

via email:

Christopher Hair
Erez R. Reuveni
Assistant U.S. Attorney
District of Columbia
555 4th St. NW
Washington, D.C. 20530
Office: (202) 252-2541
Mobile: (202) 809-5387
Christopher.Hair@usdoj.gov
Erez.R.Reuveni@usdoj.gov

Dated:     April 28, 2020                    */s/ Steven Barringer*

                                             *Attorney for Appellants*

29

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.M.V.; A.A.M., a minor; S.L.V.; M.F.L., a minor; ) | |
| A.O.V.; J.S.O., a minor; M.R.A.; L.C.R., a minor; ) | Case No. 1:19-cv-2773 |
| A.L.V.; I.G.L, a minor; A.G.L., a minor; L.O.R.; ) | |
| A.P.O., a minor; N.P.; R.D.P., a minor; M.D.E.; ) | Hon. Judge Amy Berman Jackson |
| A.G.D., a minor; M.M.B.; N.M.M., a minor; ) | |
| D.C.V.; S.V.C., a minor; M.G.V.; A.R.G., a minor; ) | **JURY TRIAL DEMAND** |
| R.P.F.; J.F.P., a minor; S.T.T.; E.T.T., a minor; ) | |
| J.M.R.; C.G.M., a minor; J.S.M., D.M.S., a minor; ) | |
| Y.U.; F.G.U., a minor; I.F.L.; R.F.L., a minor; ) | |
| N.M.L.; A.R.M., a minor; M.C.D.; E.E.C., a minor; ) | |
| Y.O.T.; D.L.O., a minor; V.L.O., a minor; M.A.A.; ) | |
| A.R.A., a minor; C.A.A., a minor; M.C.M; S.M.C., ) | |
| a minor; I.A.D.; C.L.A., a minor; C.C.N.; B.S.C., ) | |
| a minor; C.P.G.; M.B.P., a minor; L.H.H.; Y.F.H., ) | |
| a minor; W.P.R.; J.C.P., a minor; H.C.P., a minor; ) | |
| A.B.D.; E.C.B.; a minor; G.A.Q.; N.A.Q., a minor; ) | |
| A.A.Q., a minor; S.G.H.; A.G.H., a minor; J.S.P.; ) | |
| M.A.S., a minor; M.A.M.; G.M.A., a minor; ) | |
| D.G.A.; E.P.G., a minor; M.P.G., a minor; K.P.P.; ) | |
| M.P.P., a minor; I.P.P., a minor; J.A.L., a minor; ) | |
| K.N.E; E.A.N., a minor; M.H.; J.M.H., a minor; ) | |
| M.C.M.; S.M.C., a minor; A.C.B.; A.C.B., a minor; ) | |
| Y.V.O; E.P.V., a minor; S.L.R.; A.V.L., a minor; ) | |
| D.A.M.; Y.H.A., a minor; A.D.L.; M.D.D., a ) | |
| minor; D.P.R.; S.B.P., a minor; Y.E.S.; M.I.E., a ) | |
| minor; S.A.C.; V.H.A., a minor; G.R.R.; D.A.A., a ) | |
| minor; L.G.G.; W.C.G., a minor; M.C.P.; J.C.P., a ) | |
| minor; M.R.C., a minor; R.L.A.; N.C.L., a minor; ) | |
| M.L.M.; J.R.L., a minor; C.C.G.; E.C.G., a minor; ) | |
| B.C.A.; G.S.C., a minor; L.M.P.; Y.M.M., a minor; ) | |
| L.P.M, a minor; A.G.P.; D.S.G., a minor; A.S.G., ) | |
| a minor; I.G.V.; M.S.G., a minor; C.R.R.; I.G.R., a ) | |
| minor; V.G.R., a minor; M.R.S.; J.H.R., a minor; ) | |
| E.G.; J.G.M., a minor; B.G.C.; S.M.G., a minor; ) | |
| T.S.J.; L.P.S., a minor; G.S.J., a minor; C.M.B.; ) | |
| E.G.M., a minor; C.G.M., a minor; D.G.M., a ) | |
| minor; I.C.A.; S.P.C., a minor; M.P.O; G.G.L., a ) | |
| minor; E.F.R.; K.A.F., a minor; D.O.H.; L.A.O., ) | |
| a minor; D.A.O., a minor; N.B.C.; J.B.M., a minor; ) | |
| S.J.A.; W.A.A., a minor; A.V.M., a minor; M.A.R.; ) | |

S.R.S., a minor; O.T.G.; T.T.G., a minor; M.T.T   )
Y.L.T., a minor; R.C.H.; E.P.C., a minor; M.J.P.;   )
A.M.P., a minor; A.M.P., a minor; A.P.P., a minor;  )
C.P.P., a minor; E.C.B.; Y.M.C., a minor; C.G.C., a )
Minor; I.C.B., a minor; I.H.L.; S.R.H., a minor;    )
L.M.B.; Z.R.M. a minor; E.R.M., a minor; C.H.G.;  )
M.G.H., a minor; L.M.V.; C.A.M., a minor; T.C.L.; )
A.P.C., a minor; J.C.; C.G.C., a minor; L.M.L..;   )
M.R.M., a minor; T.R.M.; J.R.R., a minor; L.V.M;  )
M.B.V., a minor; E.B.V., a minor; D.P.T.; I.M.P., a )
minor; B.H.I.; D.M.H., a minor; R.U.B.; J.M.U., a )
minor; T.G.M.; K.G.G., a minor; I.C.P.; H.A.C., a )
minor; S.R.F.; C.M.R., a minor; M.J.V.; J.H.J., a  )
minor; E.M.R.; C.S.M., a minor; A.G.C.; Y.M.G., a )
minor; I.L.L.; K.H.L., a minor; Z.C.G.; D.R.C., a  )
minor; H.R.L.; V.G.R., a minor; F.G.R., a minor;  )
D.G.R., a minor; M.G.R., a minor; A.G.R., a minor; )
A.C.G.; A.R.G., a minor; M.R.G., a minor; M.Z.L.; )
I.M.V.; and J.T.M., a minor,                 )
                                     )

             Plaintiffs,             )
                                     )

[Physical address for all detained Plaintiffs:   )
South Texas Family Residential Center        )
300 El Rancho Way, Dilley, TX 78017]       )
                                     )
v.                                   )
                                     )
                                     )
WILLIAM P. BARR, Attorney General of the    )
United States; JAMES MCHENRY, Director,    )
Executive Office for Immigration Review;      )
                                     )
[Physical address for Defendants Barr and   )
McHenry:                           )
c/o Office of the Attorney General         )
U.S. Department of Justice              )
950 Pennsylvania Avenue, N.W.        )
Washington, D.C. 20530-0001]         )
                                     )

CHAD F. WOLF, Putative Acting Secretary        )
United States Department of Homeland Security; )
MARK MORGAN, Acting Commissioner,             )
United States Customs and Border Protection    )
MATTHEW T. ALBENCE, Acting Director            )
United States Immigration and Customs          )
Enforcement; KENNETH T. CUCCINELLI,           )
Putative Acting Director, United States Citizenship )
and Immigration Services; and ANDREW           )
DAVIDSON, Acting USCIS Asylum Division         )
Chief,                                         )
                                               )
[Physical address for Defendants Wolf,         )
Morgan, Albence, Cuccinelli and Davidson:      )
c/o Office of the General Counsel              )
United States Department of Homeland Security  )
Washington, D.C. 20528[1]],                    )
                                               )
Defendants.                                    )

---

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

---

[1] Pursuant to 6 C.F.R. § 5.42(a).

1.      On July 16, 2019, the Administration published a new and immediately effective interim final rule titled "Asylum Eligibility and Procedural Modifications" (herein, the "Asylum Bar"), which renders most individuals who arrive in the United States via the southern border ineligible for asylum. 84 FR 33829. The legality of the July 16, 2019, regulation is currently at issue in separate litigation.[2] Defendants and those operating under their supervision or control have since further eviscerated the "credible fear" process and have implemented ever-shifting, improper, and illegal directives, guidance, actions and/or procedures that place parents, children, and others in immigration detention at risk of wrongful deportation, persecution, and death, denying them their statutory, regulatory, and constitutional rights.

2.      Upon information and belief, since July 16, 2019, credible fear passage rates at the South Texas Family Residential Center in Dilley, Texas—the largest family detention center in the United States, with a bed and crib capacity of 2,400 for asylum seeking mothers and children— have diminished from approximately 97% of credible fear applicants, to around 10% or fewer of applicants.

3.      On information and belief, the Defendants, or those operating under their supervision or control, have implemented new directives, guidance, initiatives, actions, and/or

---

[2] *See East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018), *stay of injunction pending appeal granted sub nom.*, 588 U.S. ___ (Sept. 11, 2019); *I.A. v. Barr*, 19:cv-02530, Dkt. 3, Compl. (D.D.C. Aug. 21, 2019). 8 U.S.C. § 1252(e)(3)(B) requires that claims under that section be brought within sixty days of the date of implementation of "the challenged section, regulation, directive, guideline, or procedure." The procedures and policies stated in 84 FR 33829 arose as a result of the Department of Homeland Security's rule issued on July 16, 2019. On information and belief, follow-along directives, guidance, initiative, actions, and/or procedures concerning credible fear adjudication were then issued on or after that date. Sixty days from July 16, 2019 elapsed on Saturday, September 14, 2019.  Per F.R.C.P. 6(a)(1)(C), because the last day of the sixty-day time period was a Saturday, the time period for filing a challenge to this regulation under 8 U.S.C. § 1252(e)(3) extended to "the next day that is not a Saturday, Sunday, or legal holiday"—Monday, September 16, 2019.

procedures (herein the "Challenged Actions") concerning the evaluation of "credible" and/or "reasonable" fear in people seeking protection from persecution and/or torture, particularly since the above July 16 "Asylum Eligibility" modification was published and set in motion. As discussed further below, these Challenged Actions conflict with and overstep the statutory, regulatory, and constitutional requirements governing evaluation of fear in the asylum process.

4.     While at least some of the Challenged Actions are believed, on information and belief, to be memorialized in writing and/or authorized or adopted by Defendant Barr or the then acting Secretary of Homeland Security, most if not all have never been made public. Requests for information of Defendants have been rebuffed, with responses illegally endeavoring to keep the Challenged Actions from the light of public or judicial review.[3] Collectively, the Challenged Actions have thus been undertaken by Defendants and/or those under their supervision and control *sub rosa*, surreptitiously without any judicial, legislative, or public oversight, notice, or comment. Defendants' suppression of the facts has further prejudiced Plaintiffs' ability to understand and be made aware of the full scope of claims that they may have against Defendants.

5.     Each of the Plaintiffs has been subjected to evaluation procedures and written decisions that confirm the improper and illegal changes concerning the evaluation of fear in the asylum process that have been implemented by the Challenged Actions. Presumably, Defendants and/or those operating under their supervision and control have disseminated guidance, including written guidance, to their agents and employees conducting credible fear interviews ("CFIs") and

---

[3] *See, e.g.*, *Am. Immigration Council v. U.S. Customs and Border Protection*, No. 1:19-cv-02965, Dkt. 1, Compl. (D.D.C. Oct. 2, 2019). Given Defendants' efforts to suppress details of their actions, Plaintiffs expect a more detailed picture of Defendants' use of illegal directives, guidance, actions, and procedures—and of the extent to which this conduct was authorized by officials acting outside the scope of legal appointments—to be exposed in discovery and parallel FOIA litigation.

reasonable fear interviews ("RFIs"). And as a result of the Challenged Actions, Defendants have summarily and improperly rejected Plaintiffs' claims of fear.

6. Plaintiffs bring suit to stop the Challenged Actions, which truncate and prejudice the proper evaluation of "credible" or "reasonable" fear.[4] Plaintiffs seek declaratory and injunctive relief finding the application of new Challenged Actions unlawful, barring further application of the Challenged Actions to them, and requiring Defendants to reprocess their fear claims under the law, policies, directives, guidance and procedures that existed prior to the Challenged Actions.

7. DHS and divisions under its supervision, and/or their employees, have also failed to properly adopt and/or implement the Challenged Actions, including by failing to follow appropriate notice and comment requirements. But regardless of this violation, the Challenged Actions are arbitrary, capricious, and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2).

## JURISDICTION

8. This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing regulations; and the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

---

[4] As stated in Note 2, *supra*, the legality of the interim final rule published at 84 FR 33829 is being addressed in other litigation. While Plaintiffs contend that this regulation is illegal for the reasons raised in the parallel litigation, Plaintiffs defer here to the outcome of that parallel litigation concerning the regulation's legality. Instead, this Complaint challenges the legality of Defendants' additional Challenged Actions that further improperly modify and prejudice the process of evaluating fear.

9.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction with a waiver of sovereign immunity pursuant to the APA, 5 U.S.C. §701 et seq.); and 28 U.S.C. § 1346 (United States as defendant). Jurisdiction lies to grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act).  To the extent any claims fall within limits stated in 8 U.S.C § 1252(a)(2)(A), jurisdiction also exists under 8 U.S.C. § 1252(e)(3).

## VENUE

10.     Venue in the District of Columbia is proper pursuant to 28 U.S.C. § 1391(e), as the location where the government Defendants reside and where a substantial part of the events giving rise to the claims occurred.

11.     Venue is also proper in this District for claims under 8 U.S.C. § 1252(e)(3), which requires such claims to be brought in the United States District Court for the District of Columbia.

## PARTIES

12.     Plaintiffs are all mothers and children detained at the South Texas Family Residential Center who have been issued negative credible and reasonable fear determinations.

13.     Plaintiffs M.M.V. and her minor son A.A.M. are Salvadoran nationals who seek protection from persecution and torture in the United States. M.M.V. and A.A.M. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

14.     Plaintiffs S.L.V. and her minor daughter M.F.L. are Salvadoran nationals who seek protection from persecution and torture in the United States. S.L.V. and M.F.L. were placed in

credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

15.     Plaintiffs A.O.V. and her minor son J.S.O. are Honduran nationals who seek protection from persecution and torture in the United States. A.O.V. and J.S.O. were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

16.     Plaintiffs M.R.A. and her minor daughter L.C.R. are Honduran nationals who seek protection from persecution and torture in the United States. M.R.A. and L.C.R. were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

17.     Plaintiffs A.L.V. and her minor sons I.G.L. and A.G.L. are Honduran nationals who seek protection from persecution and torture in the United States. A.L.V., I.G.L., and A.G.L. were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations

on September 3, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

18.     Plaintiffs L.O.R. and her minor son A.P.O. are Honduran nationals who seek protection from persecution and torture in the United States. L.O.R. and A.P.O. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 3, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

19.     Plaintiffs N.P. and her minor daughter R.D.P. are Honduran nationals who seek protection from persecution and torture in the United States. N.P. and R.D.P. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

20.     Plaintiffs M.D.E. and her minor son A.G.D. are Salvadoran nationals who seek protection from persecution and torture in the United States. M.D.E. and A.G.D. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 29, 2019. Their negative credible fear determinations were affirmed by the immigration

judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

21.     Plaintiffs M.M.B. and her minor daughter N.M.M. are Nicaraguan nationals who seek protection from persecution and torture in the United States. M.M.B. and N.M.M. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on August 31, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

22.     Plaintiffs D.C.V. and her minor son S.V.C. are Guatemalan nationals who seek protection from persecution and torture in the United States. D.C.V. and S.V.C. were placed in credible fear proceedings on or around August 22, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 30, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

23.     Plaintiffs M.G.V. and her minor child A.R.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 3, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

24.     Plaintiffs R.P.F. and her minor child J.F.P. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

25.     Plaintiffs S.T.T. and her minor child E.T.T. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 27, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. They have been released for unknown reasons without review of their negative credible fear determinations by an immigration judge .

26.     Plaintiffs J.M.R. and her minor child C.G.M. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 20, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

27.     Plaintiffs J.S.M. and her minor child D.M.S. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019. Their

negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

28.     Plaintiffs Y.U. and her minor child F.G.U. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 23, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

29.     Plaintiffs I.F.L. and her minor child R.F.L. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 24, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

30.     Plaintiffs N.M.L. and A.R.M. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 28, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

31.     Plaintiffs M.C.D. and her minor child E.E.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear

proceedings on or around August 13, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on or about September 5, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

32.     Plaintiffs Y.O.T. and her minor children D.L.O. and V.L.O. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

33.     Plaintiffs M.A.A. and her minor children A.R.A. and C.A.A. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 4, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

34.     Plaintiffs I.A.D. and her minor daughter C.L.A. are Ecuadorian nationals who seek protection from persecution and torture in the United States. I.A.D. and C.L.A. were placed in credible fear proceedings on or around August 24, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on

September 4, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

35.    Plaintiffs C.C.N. and her minor son B.S.C. are Salvadoran nationals who seek protection from persecution and torture in the United States. C.C.N. and B.S.C. were placed in credible fear proceedings on or around August 27, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6, 2019. To date, they have not been scheduled for review before an immigration judge. They are detained at the South Texas Family Residential Center in Dilley, Texas.

36.    Plaintiffs C.P.G. and her minor son M.B.P. are Guatemalan nationals who seek protection from persecution and torture in the United States. C.P.G. and M.B.P. were placed in credible fear proceedings on or around August 20, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on September 6, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 26, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

37.    Plaintiffs L.H.H. and her minor daughter Y.F.H. are Honduran nationals who seek protection from persecution and torture in the United States. L.H.H. and Y.F.H. were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

38.     Plaintiffs W.P.R. and her minor children J.C.P. and H.C.P. are Salvadoran nationals who seek protection from persecution and torture in the United States. W.P.R., J.C.P., and H.C.P. were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on September 11, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

39.     Plaintiffs A.B.D. and her minor daughter E.C.B. are Salvadoran nationals who seek protection from persecution and torture in the United States. A.B.D. and E.C.B. were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 11, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

40.     Plaintiffs G.A.Q. and her minor children N.A.Q. and A.A.Q. are Salvadoran nationals who seek protection from persecution and torture in the United States. G.A.Q., N.A.Q and A.A.Q. were placed in credible fear proceedings on or around September 4, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 6, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 26, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

41.     Plaintiffs S.G.H. and her minor child A.G.H. are Salvadoran nationals who seek protection from persecution and torture in the United States. S.G.G.H. and A.G.H. were placed in

credible fear proceedings on or around August 30, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

42.     Plaintiffs J.S.P. and her minor son M.A.S. are Honduran nationals who seek protection from persecution and torture in the United States. J.S.P. and M.A.S. were placed in credible fear proceedings on or around August 16, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 26, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

43.     Plaintiffs M.A.M. and her minor daughter G.M.A. are Honduran nationals who seek protection from persecution and torture in the United States. M.A.M. and G.M.A. were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 5, 2019, and were served with negative credible fear determinations on September 12, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 23, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

44.     Plaintiffs D.G.A. and her minor children M.P.G. and E.P.G. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 11,

2019. Their negative credible fear determinations were affirmed by the immigration judge on September 26, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

45.     Plaintiffs K.P.P. and her minor children I.P.P. and M.P.P. are Ecuadorean nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around September 9, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 12, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

46.     Plaintiff J.A.L, a minor, is a Guatemalan national who seeks protection from persecution and torture in the United States. J.A.L. entered the United States accompanied by his mother, who was placed in reasonable fear proceedings. J.A.L. was placed in credible fear proceedings on or around August 30, 2019, attended an initial credible fear interview on September 10, 2019, and was served with a negative credible fear determination on September 12, 2019. Review before an immigration judge is scheduled for December 2, 2019. He is detained with his mother, who is not a plaintiff, at the South Texas Family Residential Center in Dilley, Texas.

47.     Plaintiffs K.N.E. and her minor son E.A.N. are Honduran nationals who seek protection from persecution and torture in the United States. K.N.E. and E.A.N. were placed in credible fear proceedings on or around September 8, 2019, attended their initial credible fear interview on September 12, 2019, and were served with negative credible fear determinations on September 16, 2019. Their negative credible fear determinations were affirmed by the immigration

judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

48.     Plaintiffs M.H. and her minor son J.M.H. are Honduran nationals who seek protection from persecution and torture in the United States. M.H. and J.M.H. were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 6 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

49.     Plaintiffs M.C.M. and her minor child S.M.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

50.     Plaintiffs A.C.B. and her minor child A.C.B. are Guatemalan nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 23, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

51.     Plaintiffs Y.V.O. and her minor child E.P.V. are Guatemalan nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 18, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

52.     Plaintiffs S.L.R. and her minor child A.V.L. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 19, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

53.     Plaintiffs D.A.M. and her minor child Y.H.A. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 20, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

54.     Plaintiffs A.D.L. and her minor child M.D.D. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 26, 2019. Their negative credible fear determinations were

affirmed by the immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

55. Plaintiffs D.P.R. and her minor child S.B.P. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

56. Plaintiffs Y.E.S. and her minor child M.I.E. are Cuban nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 26, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

57. Plaintiffs S.A.C. and her minor child V.H.A. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 27, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

58. Plaintiffs G.R.R. and her minor child D.A.R. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible

fear determinations on September 27, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

59. Plaintiffs L.G.G. and her minor child W.C.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

60. Plaintiffs M.C.P. and her minor children J.C.P. and M.R.C. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 23, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. Plaintiff M.C.P. has been released with her children for medical reasons due to the fact that she is well into the third trimester of her current pregnancy.

61. Plaintiffs R.L.A. and her minor child N.C.L. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 28, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

62.     Plaintiffs M.L.M. and her minor child J.R.L. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 27, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. Plaintiff M.L.M. has been released with her child for medical reasons due to the fact that she is well into the third trimester of her current pregnancy.

63.     Plaintiffs C.C.G. and her minor child E.C.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 25, 2019. Their negative credible fear determinations were affirmed by the immigration judge on October 17, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

64.     Plaintiffs B.C.A. and her minor child G.S.C. are Ecuadorian nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings, attended their initial credible fear interview, and were served with negative credible fear determinations on September 17, 2019. Their negative credible fear determinations were affirmed by the immigration judge on September 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

65.     Plaintiffs L.M.P. and her children Y.M.M. and L.P.M. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. They were interviewed by Frank Natividad, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 30, 2019. The negative decisions were affirmed by an immigration judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

66. Plaintiffs A.G.P. and her children D.S.G. and A.S.G. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019. They were interviewed by Eric Peters, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 30, 2019. The negative decisions were affirmed by an immigration judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

67. Plaintiffs I.G.V. and her child M.S.G. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 3, 2019 and attended their initial credible fear interview on October 9, 2019. They were interviewed by Benjamin Rodriguez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 31, 2019. The negative decisions were affirmed by an immigration judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

68. Plaintiffs C.R.R. and her children I.G.R. and V.G.R. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 10, 2019 and attended their initial credible fear interview on October 26, 2019. They were interviewed by Benjamin Rodriguez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 1, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

69. Plaintiffs M.R.S. and her child J.H.R. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 4, 2019 and attended their initial credible fear interview on October 30, 2019. They were interviewed by Sheila Solaimani, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 1, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

70. Plaintiffs E.G. and her child J.G.M. are Brazilian nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview

on October 12, 2019. They were interviewed by Michael Guz, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 31, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

71.     Plaintiffs B.G.C. and her child S.M.G. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 11, 2019. They were interviewed by D. Tipton, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 31, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

72.     Plaintiffs T.S.J. and her children L.P.S. and G.S.J. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 29, 2019 and attended their initial credible fear interview on October 18, 2019. They were interviewed by R. Roberts, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 1, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

73.     Plaintiffs C.M.B. and her children E.G.M., C.G.M., and D.G.M. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 25, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Eugenio Quinones, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 24, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

74.     Plaintiffs I.C.A. and her child S.P.C. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 1, 2019 and attended their initial credible fear interview on October 10, 2019. They were interviewed by Stephen Dougherty, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October

29, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

75.    Plaintiffs M.P.O. and her child G.G.L. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 17, 2019. They were interviewed by Harol Pineda, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 1, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

76.    Plaintiffs E.F.R. and her child K.A.F. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 25, 2019 and attended their initial credible fear interview on October 31, 2019. They were interviewed by Ebed Ramirez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 31, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

77.    Plaintiffs D.O.H. and her children L.A.O. and D.A.O. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 24, 2019 and attended their initial credible fear interview on October 7, 2019. They were interviewed by Habacuc Laracuente and Miguel Lemus, who, based upon information and belief, are both CBP agents. The family was served with negative credible fear determinations around October 18, 2019. The negative determinations were affirmed by an Immigration Judge on November 19, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

78.    Plaintiffs N.B.C. and her child J.B.M. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 26, 2019 and attended their initial credible fear interview on October 7, 2019. They were interviewed by Hugh Pacheco, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 18, 2019. The negative determinations were affirmed by an Immigration Judge on November 14, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

App.383

79.     Plaintiffs S.J.A. and her child W.A.A. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 4, 2019. They were interviewed by Laura Hendrickson, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 18, 2019. The negative determinations were affirmed by an Immigration Judge on November 14, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

80.     Minor plaintiff A.V.M. is a Guatemalan national who entered the united states accompanied by her mother, who was placed in reasonable fear proceedings. A.V.M. was placed in credible fear proceedings on September 29, 2019 and attended her initial credible fear interview on October 14, 2019. She was served with negative credible fear determination on October 17, 2019. The negative determination was affirmed by an Immigration Judge on November 14, 2019. She is detained at the South Texas Family Residential Center in Dilley, Texas.

81.     Plaintiffs M.A.R. and her child S.R.S. are Brazilian nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 11, 2019. They were interviewed by Perry Navarre, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 22, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

82.     Plaintiffs O.T.G. and her child T.T.G. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 3, 2019 and attended their initial credible fear interview on October 15, 2019. They were interviewed by Perry Navarre, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 24, 2019. The negative determinations were affirmed by an Immigration Judge on November 21, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

83.     Plaintiffs M.T.T. and her child Y.L.T. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Jacob Valdez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 14, 2019. The negative determinations were affirmed by an Immigration Judge on November 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

84.     Plaintiffs R.C.H. and her child E.P.C. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Andres Lopez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 9, 2019. The negative determinations were affirmed by an Immigration Judge on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

85.     Plaintiffs M.J.P. and her children A.M.P., A.P.P., and C.P.P. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 17, 2019 and attended their initial credible fear interview on September 20, 2019. They were interviewed by Laura Hendrickson, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 4, 2019. The negative determinations were affirmed by an Immigration Judge on November 4, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

86.     Plaintiffs E.C.B. and her children Y.M.C., C.G.C., and I.C.B. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 21, 2019 and attended their initial credible fear interview on September 28, 2019. They were interviewed by Luis Valdez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 10, 2019. The negative determinations were affirmed by an

Immigration Judge on November 13, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

87.   Plaintiffs I.H.L. and her child S.R.H. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 23, 2019 and attended their initial credible fear interview on September 30, 2019. They were interviewed by Andres Lopez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 8, 2019. The negative determinations were affirmed by an Immigration Judge on November 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

88.   Plaintiffs L.M.B. and her children Z.R.M. and E.R.M. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 26, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Luis Valdez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 10, 2019. The negative determinations were affirmed by an Immigration Judge on November 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

89.   Plaintiffs C.H.G. and her child M.G.H. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 25, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Ruth Hernandez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 26, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

90.   Plaintiffs L.M.V. and her child C.A.M. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 11, 2019. They were interviewed by Ruth Hernandez and E. Garayua, who, based upon information and belief, are both CBP agents. The family was served with negative credible fear

determinations on October 30, 2019. The negative determinations were affirmed by an Immigration Judge on December 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

91.     Plaintiffs T.C.L. and her child A.P.C. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 16, 2019. They were interviewed by Andres Lopez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 31, 2019. The negative determinations were affirmed by an Immigration Judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

92.     Plaintiffs J.C. and her child E.B.V. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. They were interviewed by Jacob Valdez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 30, 2019. The negative determinations were affirmed by an Immigration Judge on December 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

93.     Plaintiffs L.M.L. and her child M.R.M. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 18, 2019. They were interviewed by Laura Hendrickson and Jacob Valdez, who, based upon information and belief, are both CBP agents. The family was served with negative credible fear determinations on October 4, 2019. The negative determinations were affirmed by an Immigration Judge on November 4, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

94.     Plaintiffs T.R.M. and her child F.G.R. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 7, 2019 and attended their initial credible fear interview on September 18, 2019. They were interviewed by Jonathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on

October 10, 2019. The negative decisions were affirmed by an immigration judge on November 13, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

95.     Plaintiffs L.V.M. and her children M.B.V. and E.B.V. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 3, 2019. They were interviewed by Johnathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 8, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

96.     Plaintiffs D.P.T. and her child I.M.P. are Venezuelan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 9, 2019 and attended their initial credible fear interview on October 16, 2019. They were interviewed by Johnathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 7, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

97.     Plaintiffs B.H.I. and her child D.M.H. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 14, 2019. They were interviewed by Johnathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

98.     Plaintiffs R.U.B. and her child J.M.U. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 5, 2019 and attended their initial credible fear interview on October 28, 2019. They were interviewed by Johnathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 8, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

99.     Plaintiffs T.G.M. and her child K.G.G. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 28, 2019 and attended their initial credible fear interview on October 26, 2019. They were interviewed by Johnathan Dickey, who, based upon information

and belief, is a CBP agent. The family was served with negative credible fear determinations on November 14, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

100.    Plaintiffs I.C.P. and her child H.A.C. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 2, 2019 and attended their initial credible fear interview on October 9, 2019. They were interviewed by Johnathan Dickey, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 18, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

101.    Plaintiffs S.R.F. and her child C.M.R. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 15, 2019 and attended their initial credible fear interview on October 30, 2019. They were interviewed by Jason Torrick, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 5, 2019.They are detained at the South Texas Family Residential Center in Dilley, Texas.

102.    Plaintiffs M.J.V. and her child J.H.J. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 17, 2019 and attended their initial credible fear interview on October 28, 2019. They were interviewed by Jason Torrick, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

103.    Plaintiffs E.M.R. and her child C.S.M. are Salvadoran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 14, 2019 and attended their initial credible fear interview on October 25, 2019. They were interviewed by Jason Torrick, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 7, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

104.    Plaintiffs A.G.C. and her child Y.M.G. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 30, 2019 and attended their initial credible fear interview on October 30, 2019. They were interviewed by Jason Torrick who, based upon information and

belief, is a CBP agent. The family was served with negative credible fear determinations on November 13, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

105.     Plaintiffs I.L.L. and her child K.H.L. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 28, 2019 and attended their initial credible fear interview on November 13, 2019. They were interviewed by Jason Torrick, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 13, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

106.     Plaintiffs Z.C.G. and her child D.R.C. are Guatemalan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 18, 2019 and attended their initial credible fear interview on November 8, 2019. They were interviewed by Jason Torrick, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on November 22, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

107.     Plaintiffs H.R.L. and her children V.G.R., F.G.R., D.G.R., M.G.R., and A.G.R. are Honduran nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 7, 2019 and attended their initial credible fear interview on September 14, 2019. They were interviewed by Ruth Hernandez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on September 25, 2019. They went before an immigration judge on December 2, 2019; however, that judge found that he had no jurisdiction because their Notices to Appear under the Migrant Protection Protocols had already been filed in San Antonio immigration court. They are detained at the South Texas Family Residential Center in Dilley, Texas.

108.     Plaintiffs A.C.G. is a Honduran national and her children A.R.G. and M.R.G. are Mexican nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on October 12, 2019 and attended their initial credible fear interview on November 4, 2019. They were interviewed by Ruth Hernandez, who, based upon information and belief, is a CBP agent. The family was served with

negative credible fear determinations on November 14, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

109. Plaintiffs I.R.R. and her child E.A.R. are Nicaraguan nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 7, 2019 and attended their initial credible fear interview on September 14, 2019. They were interviewed by Steven Clark, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on October 4, 2019. The negative decisions were affirmed by an immigration judge on October 24, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

110. Plaintiff M.Z.L. is a Peruvian national who seeks protection from persecution and torture in the United States. She was placed in credible fear proceedings on September 13, 2019 and attended her initial credible fear interview on September 27, 2019. She was interviewed by Julie Dutton, who, based upon information and belief, is a CBP agent. She was served with a negative credible fear determination on October 18, 2019. The negative decision was affirmed by an immigration judge on November 14, 2019. M.Z.L. was released from detention with a final order of removal on November 27, 2019.

111. Plaintiffs I.M.V. and her child J.T.M. are Colombian nationals who seek protection from persecution and torture in the United States. The family was placed in credible fear proceedings on September 13, 2019 and attended their initial credible fear interview on September 17, 2019. They were interviewed by Benjamin Rodriguez, who, based upon information and belief, is a CBP agent. The family was served with negative credible fear determinations on September 26. The negative decisions were affirmed by an immigration judge on October 24. They were released from detention with final orders of removal on November 27, 2019.

112. Defendant William P. Barr is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ"). Defendant Barr is responsible for advising the remaining Defendants on the lawful administration and enforcement of the immigration laws and policies, including the execution of any new policies or procedures for asylum seekers, pursuant to 8 U.S.C. § 1103. Defendant Barr has ultimate authority over the

Executive Office for Immigration Review ("EOIR"), the agency within DOJ responsible for the immigration court system. He is sued in his official capacity.

113.    Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR"), the federal agency within DOJ that includes immigration judges, the immigration courts, and the Board of Immigration Appeals ("BIA").  EOIR is responsible for conducting administrative adjudicative proceedings, including adjudicating applications for asylum, withholding of removal, and relief under the Convention Against Torture, bond redeterminations, custody redeterminations, and hearings to determine appropriate restrictions on liberty for individuals detained by ICE. He is sued in his official capacity.

114.    Defendant Chad F. Wolf was appointed the Acting Secretary of the Department of Homeland Security ("DHS"), which oversees the component agencies responsible for enforcing the immigration laws of the United States. Those component agencies include U.S. Immigration and Customs Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); and U.S. Citizenship and Immigration Services ("USCIS").  Defendant Wolf's appointment was made pursuant to an "Amendment to the Order of Succession for the Secretary of Homeland Security" issued by then-Acting Secretary Kevin McAleenan on November 8, 2019.  Acting Director Wolf's appointment is presently being investigated by Congress as an *ultra vires*, unconstitutional, and illegal appointment.  *See* Letter of from H.R. Committee on Homeland Security and Committee on Oversight and Reform to Comptroller General of the United States (Nov. 15, 2019), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf.[5]

---

[5] *See also* https://www.rollcall.com/news/legality-wolf-cuccinelli-dhs-appointments-questioned.

The appointment of Wolf's predecessor, purported Acting Secretary Kevin K. McAleenan, is also alleged to have violated the law, as Acting Secretary McAleenan's appointment was subject to similar legal infirmities.  *See id*.  Thus, authorization by either Acting Director McAleenan or Acting Director Wolf for any Challenged Actions in this case may be illegal, unconstitutional, and/or void ab initio under, *inter alia*, the Appointments Clause, U.S. Const., Art. 2, Sec. 2, Exec. Order No. 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016) (setting the order of succession for DHS), and the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a)(1) (setting limit on appointment of Acting officials).  Defendant Wolf is sued in his official capacity.

115.    Defendant Matthew T. Albence is the Acting Director of ICE, the agency within DHS that is responsible for carrying out removal orders, oversees enforcement and removal operations, and is responsible for the detention of noncitizens throughout the United States. Defendant Albence has direct authority over all ICE policies, procedures, and practices relating to the detention and deportation of noncitizens.  He is sued in his official capacity.

116.    Defendant Mark Morgan is the Acting Commissioner of CBP, the agency within DHS that is responsible for the initial processing and detention of noncitizens apprehended near the United States Border. In that capacity, Defendant Morgan has direct authority over all CBP policies, procedures, and practices relating to the apprehension of asylum seekers. He is sued in his official capacity.

117.    Defendant Kenneth T. Cuccinelli was on November 13, 2019, named to be purported Acting Deputy Secretary of Homeland Security by newly sworn-in purported Acting Secretary of Homeland Security Chad Wolf.  Defendant Cuccinelli also represents himself as the purported Acting Director of USCIS, and the legality of his appointment and decisions in both

capacities is questioned.[6] USCIS is the agency within DHS that is responsible for the adjudication of immigration benefits to noncitizens in the United States, including all functions of the Asylum Office. In that capacity, Defendant Cuccinelli is purported to have direct authority over all USCIS policies, procedures and practices relating to benefits adjudication. He is sued in his official capacity.

118.     Defendant Andrew Davidson is the Acting Chief of the USCIS Asylum Division, the division within USCIS that is responsible for conducting CFIs, RFIs, and asylum interviews for affirmative asylum applicants. In that capacity, Defendant Davidson has direct authority over all USCIS policies, procedures, and practices relating to fear screening procedures for persons seeking protection from persecution or torture. He is sued in his official capacity.

## FACTS

### A.     U.S. Obligations to Provide Safe Harbor to Persons Fearing Persecution or Torture

119.     The current asylum system was enacted as part of the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, and was intended to bring U.S. law into conformity with our obligations under the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee

---

[6] Infirmities to purported Acting Director Cuccinelli's appointment at USCIS are set forth in a complaint recently filed in this District, namely that he does not satisfy the legal requirements to serve as the director under the FVRA or the Constitution. *L.M.-M. v. Cuccinelli*, 1:19-cv-02676, Compl. (D.D.C. Sept. 6, 2019). Infirmities to his appointment at DHS parallel those of purported Acting Secretary Wolf, as set forth above and summarized at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/191115%20T%20Dodaro%20re%20Letter%20to%20GAO%20on%20Wolf-Cuccinelli%20Appointment.pdf. *See also* Letter from H.R. Comm. on the Judiciary, et al. to Acting Sec'y of Homeland Security Kevin K. McAleenan (June 19, 2019), *available at* https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/06-18-2019%20Letter%20to%20Acting%20Secretary%20McAleenan.pdf. The Attorney General and U.S. Attorney for the District of Columbia have also been asked to review the Cuccinelli appointment. *See* Letter from Democracy Forward et al. to Att'y Gen. William Barr & U.S. Att'y Jessie K. Liu (July 22, 2019), *available at* https://democracyforward.org/wp-content/uploads/2019/07/Cuccinelli- Letter.pdf.

Convention") and the 1967 United Nations Protocol Relating to the Status of Refugees. Consistent with international law, the definition of "refugee" does not require a showing of certain harm. Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution." The Supreme Court directs that a showing of a 1 in 10 chance of persecution is sufficient to satisfy that standard. *See INS v. Cardozo-Fonseca*, 480 U.S. 421, 430, 440 (1987).

120.    Even assuming, *arguendo*, that the July 16, 2019 interim final rule represents a lawful exercise of Defendants' discretion, and that Defendants Wolf and Cuccinelli (and former Acting Secretary McAleenan) were legally appointed to their positions, Defendants must still comply with the *non-refoulement* obligations of the United States, as well as Defendants' statutory, regulatory, and constitutional obligations to provide Plaintiffs with a fair process for asylum applicants and fear determinations.

121.    The principle of *non-refoulement* was first articulated in Article 33 of the Refugee Convention. That article provides as follows:

> No Contracting State shall expel or return (refouler) a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion.

122.    The Defendants' *non-refoulement* obligations are found in Article 33 of the Refugee Convention,[7] Article 3 of the Convention Against Torture ("CAT"), and the domestic statutes that implement these two treaties.

---

[7] Although it is not a party to the Refugee Convention, the United States adopted the 1967 Protocol Relating to the Status of Refugees, which incorporates the Refugee Convention's prohibition on *refoulement*. See 1967 Protocol Relating to the Status of Refugees, art. 1(1) & 7(1) (stating that signatories "undertake to apply articles 2 to 34 inclusive of the [Refugee] Convention" without reservation).

123.     As part of the Refugee Act of 1980, Congress enacted the withholding of removal statute, codified at 8 U.S.C. § 1231(b)(3), to "implement the principles agreed to" in the Refugee Convention, with the specific intent to ensure that the United States does not "expel or return" noncitizens to any place where they face likelihood of persecution.  *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).  And as part of FARRA, Congress codified Article 3 of CAT, making explicit the prohibition against *refoulement*:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . .

FARRA § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231).

124.     As adopted and statutorily codified, the *non-refoulement* guarantees in both the Refugee Convention and CAT provide procedural safeguards that prohibit removal or return of non-citizens to countries where their life or liberty may be threatened.  *See generally I.N.S. v. Stevic*, 467 U.S. 408, 426 (1984) (recognizing non-citizens' statutory "entitlement" to withholding under § 1231(b)(3)); *Khouzam v. Attorney General*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("[T]he basic dictates of due process must be met . . . where, as here, mandatory statutory relief [is] at issue.").

**B.     The Prior Expedited Removal and Credible Fear Process**

125.     Prior to 1996, to ensure that the government complied with (among other things) its non-refoulement obligations, noncitizens were generally entitled to a full hearing in immigration court before they could be removed, no matter whether they were seeking admission at the border or had already entered the country.  They were also entitled to, both administrative appellate review before the BIA and judicial review in federal court.

126.    In 1996, Congress established a highly truncated removal mechanism called "expedited removal" that could be used for certain noncitizens seeking admission. Noncitizens subject to expedited removal are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

127.    Congress, however, was careful to carve out an exception for individuals who express a fear of return to their home countries.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

128.    If an individual subject to expedited removal indicates a fear of returning to his or her home country or intention to apply for asylum, the immigration officer *must* refer the individual for an interview with an asylum officer.  8 U.S.C. § 1225(b)(1)(A)(ii) & (b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30. Congress also required the asylum officers conducting these interviews to have "professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators" of asylum applications and to be "supervised by an officer" who has both like training and "substantial experience adjudicating asylum applications."  8 U.S.C. § 1225(b)(1)(E); *see also* 8 C.F.R § 208.1 (promulgating specific training directive for asylum officers). This role has been performed by the Refugee, Asylum, and International Operation division ("RAIO") within USCIS.  *E.g.*, 8 C.F.R. § 208.2(a).

129.    If the noncitizen is referred to an asylum officer, the officer conducts (with the assistance of an interpreter if necessary) a "credible fear interview." The CFI is designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).

130.    To that end, CFIs include procedural protections. The asylum officer must "conduct the interview in a non-adversarial manner." 8 C.F.R. § 208.30(d).  Further, in determining whether

credible fear is satisfied, the officer must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge." 8 C.F.R. 208.30(e)(4). And the interviewee is entitled to "information concerning the asylum interview" (i.e., what process and standards apply) and to "consult with a person or persons of the alien's choosing prior to the interview or any review." 8 U.S.C. §1225(b)(1)(B)(iv). Hence, by law, interviewees cannot be kept in the dark regarding the process or standards applicable for their interview, or denied the opportunity to reasonable consult with counsel or an advocate concerning their interview. *Id.*; *see also* 8 C.F.R. § 235.3(b)(4)(ii).

131. At the end of the interview, the asylum officer determines whether the interviewee has a credible fear of persecution. A credible fear is defined by law as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]" 8 U.S.C. §1225(b)(1)(B)(v). To ultimately prevail on an asylum claim itself, the applicant need only establish that there is a 10% chance that he or she will be persecuted on account of one of the five protected grounds for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 127 (D.D.C. 2018). Thus, to prevail at a credible fear interview, the applicant need only show a "significant possibility" of asylum eligibility—i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a *fraction* of a 10% chance of persecution. *See* 8 U.S.C. §1225(b)(1)(B)(v).

132. If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge. At that hearing, they will have the opportunity to develop a full

record before the judge, and they may appeal an adverse decision to the BIA and the relevant federal court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

133.    If the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination that "shall include a summary of [all] material facts stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution." 8 U.S.C. § 1225(b)(1)(B)(iii)(II). "A copy of the officer's interview notes shall be attached to the written summary." *Id*. Supervisory asylum officers then review and approve the negative credible fear determination. *See* 8 C.F.R. 208.30(e)(8); *cf.* 8. U.S.C. § 1225(b)(1)(E)(ii).

134.    Upon the individual's request, the agency must provide for prompt review of the asylum officer's negative credible fear determination by an immigration judge. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1). In conducting that review, the immigration judge has access to "[t]he record of the negative credible fear determination." 8 C.F.R. § 208.30(g)(2). Thus, the integrity of the record developed by the interviewer is critical to the exercise of not only the right to apply for asylum, but also the right to review, as it has been here for Plaintiffs. The immigration judge's decision is administratively "final and may not be appealed," 8 C.F.R. § 1208.30(g)(2)(iv)(A), further emphasizing the critical importance of the integrity of the interviewer's record. That record is also reviewed by Asylum Officers when later processing any later asylum application, again highlighting the importance of its integrity.

135.    Noncitizens who receive a negative credible fear determination are issued an expedited removal order, which comes with significant consequences beyond removal itself. Noncitizens who are removed pursuant to expedited removal orders are subject to a five-year bar on admission to the United States. 8 U.S.C. § 1182(a)(9)(A)(i). Thus, improper and erroneous

negative fear determinations result in severe harm, as they have for Plaintiffs here, by barring individuals from later admission and materially prejudicing their opportunity to apply for asylum that should be properly available to them.

136. The reason for the low threshold at the credible fear stage is straightforward. An asylum claim is highly fact-specific, often requires expert testimony and extensive evidence about country conditions, and takes significant time, resources, and expertise to develop. Asylum claims may also involve complex legal questions. In the expedited removal system, however, abbreviated credible fear proceedings occur within days of arrival, with little or no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, and no opportunity to examine witnesses or gather evidence while the individual is detained. It is thus highly unrealistic to expect applicants in the expedited removal system to present a fully developed asylum claim. Accordingly, Congress established a low threshold at the credible fear stage to ensure that all potentially valid asylum claims could be developed properly in a full trial-type hearing before an immigration judge. Congress viewed this credible fear process as an essential safeguard to ensure bona fide asylum seekers would not be summarily removed.

137. As a result of the Challenged Actions, threshold safeguards in place for applicants seeking protection from persecution or torture have now been eliminated. These changes have resulted, and will continue to result, in many applicants, including vulnerable children, being wrongfully returned to persecution or torture.

## C. Defendants' Asylum Bar and the Changes to the Process of Evaluating Fear

138. On July 16, 2019, the government Defendants published a regulation that purports, with limited exceptions, to bar asylum applications from any asylum seekers who passed through any third country on the way to the United States without applying for, and receiving a denial of,

protection in one such country (the "Asylum Bar"). The government Defendants have also radically changed their handling and evaluation of migrants in expedited removal for asylum, withholding of removal, and relief under CAT. These changes are chaotic, and do not comport with existing federal law, regulations, or agency policies.

139.    In this new regime, if the immigration officer determines that an alien subject to expedited removal is barred from asylum eligibility (e.g., under Defendants' new Asylum Bar), the alien is summarily found not to have a credible fear of persecution, typically without any supervisor review as required (8 C.F.R. 208.30(e)(8), *see also* U.S.C. § 1225(b)(1)(E)(ii)), and announced during the CFI interview itself. The immigration officer then proceeds to determine only if a *reasonable* fear of persecution exists for withholding of removal or CAT protection. Reasonable fear represents a higher standard than credible fear. It is defined by regulation as "a reasonable possibility that [the applicant] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." 8 C.F.R. § 208.31(c). If the alien does not establish a reasonable fear of persecution during the interview to the interviewer's satisfaction, a written notice of decision is issued, subject to review by an immigration judge under the higher standard of reasonable fear (i.e., not the more moderate credible fear standard).[8]

140.    Under this new procedure, individuals purportedly subject to the Asylum Bar are categorically unable to avoid persecution by establishing a significant possibility of asylum eligibility under the credible fear standard.  Defendants have thus used their Asylum Bar and the

---

[8] As detailed below, in the rare instance that a positive credible fear determination is made, Defendants now also require additional and pretextual "fraud detection" review designed to result in arbitrary and baseless reversals of positive determinations.

application of the follow-along Challenged Actions described here to prevent further screening of aliens (including Plaintiffs) under the standard specified by Congress.

**D.      The Challenged Actions and Their Inconsistency with Expedited Removal Law**

141.    In recent months, Plaintiffs have been subjected to a series of changes at the South Texas Family Residential Center, located in Dilley, Texas. Defendants have unilaterally eliminated protections prescribed to each Plaintiff by statute and regulation. The Challenged Actions have frustrated Plaintiffs' ability to successfully seek protection from persecution and torture in the United States and have violated the government's *non-refoulement* obligations.

142.    On information and belief, since July 16, 2019, the credible fear passage rates at the South Texas Family Residential Center have diminished from over 90% of credible fear applicants, to around 10% or fewer of applicants, reflecting what has happened to Plaintiffs here.

143.    Prior to the initiation of their credible fear screenings, Plaintiffs (who are wholly comprised of mothers and their children) completed dangerous and arduous journeys to the United States, subsequent to incidents of sexual and physical violence, or threats of violence, that triggered their flights from their home countries. As a consequence of this past trauma, many of the Plaintiffs suffer from symptoms of post-traumatic stress disorder ("PTSD"), anxiety, and depression.[9]

144.    After completing their journeys to the United States—which lasted for more than a month for some Plaintiffs—all of the Plaintiffs were apprehended and placed in CBP custody, where they remained for days in cages and/or cement cells, without access to privacy, showers, beds, telephones, pillows, hot meals, or adequate medical attention.

---

[9] *Cf.* Allen Keller et al., *Pre-Migration Trauma Exposure and Mental Health Functioning Among Central American Migrants Arriving at the U.S. Border*, 12 PLOS ONE (Jan. 10, 2017) (PTSD, anxiety, and depression reported in Central American migrants), *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0168692.

145.    Against this backdrop, while in CBP custody, Plaintiffs were placed in proceedings under Section 235 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225, and issued an Order of Expedited Removal.

146.    Despite the fact that there has been no change to the Defendants' treaty or statutory obligations, Defendants and/or those operating under their supervision or control have applied a series of ever-changing, chaotic directives, guidelines, policies, actions, and procedures to credible fear screenings without regard as to whether such changes comport with the law, regulations, or Plaintiffs due process rights. The dramatic instability Defendants have wrought on the fear screening process has severely prejudiced Plaintiffs, more than half of whom are children.

147.    First, Defendants instituted the Challenged Action to "*Avoid Meaningfully Orienting Migrants to Applicable Standard and Procedures.*"[10] In fact, as noted above, Defendants have not even disclosed *to the public* many of their new changes to the process of screening credible and reasonable fear. Plaintiffs have thus been deprived of notice, and have experienced constant confusion because, throughout their detention, Defendants have failed to inform Plaintiffs of the standards and process by which Plaintiffs' claims would be judged. Plaintiffs have a right to a legal orientation in advance of their credible fear interviews and to be oriented to any changes in legal standards when they occur. *E.g.*, 8 C.F.R. §§ 235.3(b)(4), 208.30(d)(2). As a matter of fundamental due process, Plaintiffs have a right to know what standards apply in the procedures to which they are subjected, who is questioning them, and how their responses will be used. Defendants' failure here to meaningfully orient Plaintiffs thus violates Plaintiffs their rights.

---

[10] In the absence of any official policy directive, guidance, or procedure names (prior to the discovery process), this Complaint presents temporary names for the Challenged Actions for purposes of distinguishing them. Plaintiffs will revise this when Defendants disclose any internal names assigned or used for their actions, which Defendants have not yet disclosed to the public.

148.    Second, Defendants have implemented a new policy of proceeding with fear interviews absent necessary staffing, training, and direction for those conducting them. Upon information and belief, Defendants have conspired to limit the information they put forth in writing, impeding necessary training opportunities and direction for front-line adjudicators. This Challenged Action of "*Proceed Without Required Staffing, Training, or Guidance*," has impacted the integrity and consistency of CFIs. Each variation of the changing policies, standards, and practices has been implemented inconsistently and haphazardly to the detriment of each Plaintiff. For example, interviewers did not receive appropriate, required training, including training to assess whether aliens fall under exceptions to the newly promulgated Asylum Bar, such as human trafficking exceptions, or training in how to assess and screen whether the Asylum Bar applies to a given credible fear applicant in advance of Plaintiffs' CFIs. Beginning in September 2019, Defendants have even started to use CBP law-enforcement officers in Dilley to conduct credible fear interviews, despite the fact that, on information and belief, these CBP officers lack the training that, under the INA and related regulations, constitutes a necessary prerequisite to acting as an Asylum Officer (*e.g.*, 8 U.S.C. § 1225(e); 8 C.F.R. § 208.1).[11] Many of the Plaintiffs have been interviewed by such CBP officers instead of by asylum officers as required by law, including without limitation, M.A.M., G.M.A., Y.V.O., E.P.V., D.A.M., Y.H.A., A.D.L., M.D.D., G.R.R., D.A.A., L.G.G., W.C.G., R.L.A., N.C.L., B.C.A., G.S.C., M.C.P., and J.C.P., with most if not all of the Plaintiffs incorporated into the Amended Complaint on October 17, 2019 being subjected to this practice.

---

[11] In the context of CAT, "competent authorities" are required to "take into account all relevant considerations." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, Art. 3(2).  This obligation is not and cannot be satisfied by an adversarial process conducted by improperly trained law enforcement agents.

149.    Third, since July 16, 2019, Defendants have initiated the Challenged Action to "*Issue Summary Negative Determinations to Eliminate Supervisory Review and Concurrence and to Avoid Developing a Complete Written Record.*"  In sum, Defendants have truncated the fact development and discussion of the merits in Plaintiffs' fears in interviews, unilaterally determining that Plaintiffs are ineligible for asylum. Instead, Defendants summarily announce negative asylum determinations, often directly to the applicant during the interview.  Previously, negative decisions were never announced during an interview itself. Rather, such decisions were provided later after all testimony was solicited in support of the asylum-seeker's claim in a non-adversarial interview designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear" as required by law, and only after review and concurrence by a supervisory asylum officer. *E.g.*, 8 C.F.R. § 208.30(d). As a result of this Challenged Action: (1) Plaintiffs are intimidated and discouraged from asserting their rights; (2) Plaintiffs are denied the right to have the record of their fear of persecution or torture fully, adequately, and accurately memorialized in the record of their interview as future evidence in pursuing asylum or *non-refoulement*, and (3) Plaintiffs are denied the right to a meaningful supervisory review of credible fear determinations under, for example, 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7).

150.    Fourth, even where Defendants have not issued summary negative determinations during an interview, Defendants still now implement the Challenged Action to "*Limit Fact-Finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture.*" Interviewers now improperly limit questioning, so they fail to elicit testimony necessary to develop all facts relevant or supportive of an asylum-seeker's eligibility for asylum, withholding of removal, and CAT protection under the "significant possibility" standard required for credible fear proceedings. And again this conflicts

with the law. *E.g.*, 8 C.F.R. § 208.30(d). Defendants have thus generated categorically incomplete and inaccurate evidentiary records of the bases for Plaintiffs' claims to asylum or *non-refoulement*, prejudicing their present and future petitions.[12]

151.    Fifth, Defendants have now also initiated the Challenged Action to "*Make Interviews Adversarial*," contrary to the law. *See* 8 C.F.R. § 208.30(d). Many Plaintiffs were interviewed not once, but three or more times on three or more separate dates, over a timespan of several weeks or more, often by multiple officers. These law enforcement-type interrogation tactics and consequent delay in final adjudication of Plaintiffs' claims intimidate Plaintiffs, as well as prejudice their ability to recall the exact specifics of what was discussed at each prior interview, seeking to give rise to an inaccurate impression of inconsistency where there is none. As noted above, Defendants have also advanced an improper adversarial interrogation regime by now relying on CBP law enforcement officers to interview Plaintiffs instead of using trained asylum officers as required by law.[13]

---

[12]   The above Challenged Actions thus impair Plaintiffs' rights to petition for asylum by, among other things, distorting the record of their fear determinations.  As a result of the Challenged Actions, this record evidence, which will be used to evaluate any later asylum petition, is necessarily incomplete and/or improperly or inaccurately memorialized by improperly trained personnel in violation of the law.  Thus, the evidence of Plaintiffs' interviews—to which the law states Plaintiffs are entitled—was bastardized *ab initio*, prejudicing later asylum applications.

[13]  Law enforcement agents from CBP—the agency that detained and held Plaintiffs in custody—are not neutral, unbiased arbiters of asylum law able to conduct "non-adversarial" interviews. *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, the Intercept (Aug. 11, 2019), *available at* https://theintercept.com/2019/08/11/border-patrol-asylum-claim/; Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, 5–8 (2017), *available at* https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf; A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019), available at https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

152.     A credible fear interview is psychologically demanding and difficult. It requires the asylum seeker to describe the circumstances that gave rise to their fear of persecution. Asylum seekers must present deeply personal, stigmatizing, and traumatizing details. Frequently, these details have never been relayed to another person, and their disclosure brings the asylum-seeker shame, fear, and/or renewed trauma.  Credible fear interviewees must also answer complicated and nuanced follow-up questions. By using law enforcement officers (*i.e.*, CBP agents) and interrogation-style questioning, including by extending the interview process over a long period of time with repetition of questions, Defendants employ interrogation tactics that render it extremely difficult, if not impossible, for Plaintiffs and other trauma survivors to disclose their experiences to the interrogating officer. The interrogation-style questioning has accordingly harmed Plaintiffs by prolonging their detention in government custody, denying them their right to non-adversarial questioning by a neutral, trained interviewer, denying them their right to the development of an accurate, complete evidentiary record of their fear, and exacerbating the negative consequences they experience as a result of their ongoing detention. Indeed, at Dilley, women survivors of horrific instances of gender-based violence are subject to interviews by at least one CBP agent whose public Facebook page features a picture of a CD entitled "Songs I'll choke you out to while wrecking your uterus."

153.     This Challenged Action thus violates each Plaintiff's right to a non-adversarial interview (*see* 8 C.F.R. § 208.30(d)) and creates a hostile interview environment that chills the testimony of credible fear applicants.   As an outcome of this policy, many Plaintiffs believed at the outset of their interview that their deportation was certain. Many Plaintiffs report feeling paralyzed, overwhelmed, intimidated and confused the moment they were informed their credible

fear interview was denied. Other Plaintiffs report giving up before their interview had ever truly begun, believing their case was a lost cause.

154.     Sixth, Defendants have initiated the Challenged Action to "*Limit Migrants' Right to Meaningful Consultation*."  Defendants now schedule interviews on unnecessarily truncated scheduling without sufficient advance written notice to facilitate Plaintiffs' ability to meaningfully consult with counsel or an advisor, abrogating Plaintiffs' rights. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4); U.S. Const., Amend. I; *see also* 5 U.S.C. § 555(b); 8 C.F.R. § 292.5(b).  Access to counsel is further adversely impacted by Defendants' above-noted action of scheduling multiple, repeat interviews, often without sufficient (or any) advance written notice.

155.     Seventh, Defendants have implemented the Challenged Action to "*Apply RFI Standards Without RFI Protections.*" Individuals subject to reasonable fear evaluations under section 241 of the INA, 8 U.S.C. § 1231, still have a right to (1) advance written notice of their reasonable fear interview, (2) in-person orientation to their reasonable fear proceeding by an asylum officer at least 48 hours in advance of their interview, and (3) access to counsel during their reasonable fear proceeding with a properly trained asylum agent. Although Plaintiffs were initially placed in credible fear proceedings under INA 235, 8 U.S.C. § 1225, after Plaintiffs improperly received summary determinations that they are ineligible for asylum (for example, based on application of the Asylum Bar), their respective interviewers would typically and immediately subject Plaintiffs to an RFI-type evaluation and determination, continuing the initial interview but now applying the higher RFI standard. Defendants, however, did not offer or facilitate the protections required by law for RFI interviewees while evaluating Plaintiffs under the heightened RFI standard. For example, Plaintiffs were not provided *advance* notice, including that

they would be subject to RFI standards, a proper *advance* orientation, or meaningful access to consultation with counsel. Rather, Defendants improperly extended the original interview, often interrogating Plaintiffs, including *children*, for hours on end in further violation of the prohibition on interrogation in, for example, 8 C.F.R. § 208.30(d).

156.     Eighth, Defendants have implemented the Challenged Action of "*Do Not Apply the Most Favorable Precedent in CFI Proceedings.*" Specifically, Defendants' interviewers are now rejecting the most favorable case law in credible fear proceedings, when assessing an asylum-seeker's eligibility for withholding of removal, and in assessing relief under the Convention Against Torture. This Challenged Action ignores the permanent injunction in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018), which requires the asylum officer to apply the *most favorable* circuit court precedent in credible fear proceedings, regardless of where an asylum-seeker is detained.

157.     Ninth, upon information and belief, Defendants have implemented the Challenged Action of "*Mandatory Concurrence Review by the Fraud Detection Unit.*" This Challenged Action appears to require any cases that have received a positive fear finding by the interviewer, and positive fear concurrence by the supervisory asylum officer, to then be further reviewed by USCIS's Fraud Detection and National Security Directorate. Upon information and belief, this Challenged Action—which applies only to asylum-seekers slated to be issued positive credible fear findings—has resulted in mandatory rescission of the overwhelming majority of cases sent for review subsequent to a follow-up interview conducted in response to guidance provided by the Fraud Detection unit. Yet the members of this "unit" lack experience or training relevant to the adjudication of asylum applications as required by law (*e.g.*, 8 U.S.C. § 1225(e)). This Challenged

Action appears directed at arbitrarily limiting the number of families placed in credible fear proceedings that can obtain positive determinations.

158.    Tenth, Defendants have also implemented the Challenged Action of "*Withholding Facts Relied Upon in Issuing the Credible Fear Determination*." An asylum officer is required to create a written record of his or her determination, including a summary of all material facts as stated by the applicant, and any additional facts relied upon by the officer, in issuing the credible fear determination. 8 CFR 208.30(e)(1). In conflict with this mandate, interviewers now withhold critical information relied upon when issuing a negative fear determination, which among other harms, prejudices and impairs Plaintiffs rights of review by an administrative immigration judge (as Plaintiffs are never fully told of the basis of their denial).

159.    Eleventh, Defendants have also implemented the Challenged Action to "*Abandon Child-Sensitive Treatment in Credible Fear Proceedings*," including by requiring telephonic interviews for families detained at the South Texas Family Residential Center. Since the inception of the South Texas Family Residential Center, asylum officers have conducted *in-person* interviews with mothers and children who are detained in Dilley, Texas. This practice allowed asylum officers to apply child-friendly procedures during the interview process, and to provide protections necessary to mothers, who are required to proceed with their credible fear interview while tasked with caring for their child. This prior procedure allowed asylum officers to ensure mothers who did not feel comfortable providing testimony in the presence of their children were able to leave their children in daycare, and to build trust and rapport with a child in-person prior to questioning the child regarding their history of persecution. Now, however, Defendants have discarded these protective procedures that promoted the required non-adversarial nature of credible fear interviews, 8 C.F.R. § 208.30(d), replacing them with *adversarial* telephonic interviews that

crossover to interrogations, and of children no less. Some plaintiffs have even been deprived of necessary accommodations related to their age and status as asylum-seekers traveling in a family unit in conflict with long-standing practice.[14] This is coupled with, as noted above, DHS's unprecedented policy of conducting credible fear interviews, including of women and children, using CBP officers instead of trained USCIS Asylum Officers, to thus violate Plaintiffs' rights.

160.     Thus, while Defendants have stripped Plaintiffs of protections required in credible fear proceedings, they have simultaneously denied Plaintiffs the benefit of mandatory procedures available to individuals seeking withholding of removal and CAT protection. The policy of subjecting Plaintiffs to a higher burden in threshold fear screenings violates mandatory obligations to ensure that no applicant is returned to a country where they will be subjected to persecution or torture. Defendants have heightened the burden on Plaintiffs unlawfully, and at the same time, have failed to provide safeguards normally present in heightened fear proceedings.

161.     In sum, in recent months, Defendants have radically disregarded the law, changing the fundamental protections afforded by law to Plaintiffs as follows:

| **Prior Regime** | **Defendants' New Illegal Regime** |
| --- | --- |
| 1.  Migrants received an orientation on the process and standards for CFIs. | Migrants get no meaningful orientation as required by, e.g., 8 C.F.R. §§ 235.3(b)(4), 208.30(d)(2). |
| 2.  CFIs were conducted by experienced, trained asylum officers. | CFIs are conducted by improperly trained agents, violating, e.g., 8 U.S.C. § 1225(e); 8 C.F.R. § 208.1. |

---

[14] USCIS Asylum Division. Asylum Officer Basic Course: Guidelines for Children's Asylum Claims (Mar. 21, 2009).  *Available at* https://cliniclegal.org/sites/default/files/AOBTC_Lesson_29_Guidelines_for_Childrens_Asylum _Claims_0.pdf (last visited September 16, 2019).

| | |
|---|---|
| 3. CFI determinations were issued after a full discussion of facts and meaningful supervisory review. | Agents make summary decisions mid-interview, ending further discussion or meaningful supervisory review, thwarting, e.g., 8 C.F.R. §§ 208.30(d), 208.30(e)(7), 235.3(b)(2), (b)(7). |
| 4. Asylum agents developed a complete factual record, permitting meaningful later review. | Agents do not probe all relevant facts, leaving an incomplete record on review, thwarting, e.g., 8 C.F.R. §§ 208.30(d), 208.30(e)(7), 235.3(b)(2), (b)(7). |
| 5. Interviews were conducted in a neutral, non-adversarial manner. | Interviews are conducted using adversarial interrogation techniques, violating, e.g., 8 C.F.R. § 208.30(d). |
| 6. Migrants were given meaningful advance notice of interviews and a chance to consult with counsel. | Interrogations occur without meaningful notice, prejudicing the right of consultation under, e.g., 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(4). |
| 7. If migrants are evaluated under the higher RFI standard, they were given advance notice, advance orientation, and access to counsel. | RFI-standard interrogations proceed without meaningful advance notice, orientation, or consultation with counsel afforded to 8 U.S.C. § 1231 interviewees. |
| 8. Asylum officers applied the most favorable legal precedent in determinations as required by law. | Agents ignore the injunction in *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018) and apply law of their choosing. |
| 9. Review for fraud was conducted where reasonable cause existed. | Every positive fear determination is pretextually reviewed for "fraud" without any basis, resulting in arbitrary rescission. |
| 10. Asylum officers disclosed the bases for their determinations. | Agents withhold bases on which negative determinations are made, violating, e.g., 8 CFR 208.30(e)(1). |
| 11. Asylum officers were trained in and applied child-sensitive interviewing procedures. | Children (including as young as toddlers) are subjected to law-enforcement style interrogations, often for hours, in violation of, e.g., 8 C.F.R. § 208.30(d). |

162.     Plaintiffs reserve the right to amend this Complaint to rename the above Challenged Actions as the Defendants' internal designations become known through discovery, and to add and challenge other unlawful actions as they become known through the discovery process.

**E. Defendants' Public Statements on Their Goal of Undermining Asylum Protections**

163.     Rather than comply with our asylum laws, Defendants have been open about their desire to weaken asylum protections, particularly for vulnerable immigrant children and families from Central America.  For example, Defendant Cuccinelli once proposed that States should "just point [migrants] back across the river and let them swim for it."  *See* John Binder, *Exclusive–Ken Cuccinelli: States Can Stop Migrant Caravan 'Invasion' with Constitutional 'War Powers*,' Breitbart (Oct. 23, 2018), *available at* https://www.breitbart.com/politics/2018/10/23/exclusive-ken-cuccinelli-states-can-stop-migrant-caravan-invasion-with-constitutional-war-powers/. According to Defendant Cuccinelli, the States are "actually invaded" and "under war" and need offer migrants "no due process." *Id.*[15]

164.     Indeed, Defendants have repeatedly expressed their hostility toward migrants from Mexico and Central America and of the asylum claims of children and families from those countries, urging higher credible fear screening standards in order to speed the removal of such individuals.  As Defendant Cuccinelli has publicly declared, the sentiment memorialized on the Statute of Liberty to "Give me your tired, your poor" was "referring back to people coming from Europe."  *See* Devan Cole and Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), *available a*t https://www.cnn.com/2019/08/13/politics/ken- cuccinelli-statue-of-liberty/index.html.  Driven by this unlawful animus, Defendants' Challenged Actions seek to advance these goals, including by now replacing properly trained asylum officers with improperly trained CBP law enforcement agents willing to advance Defendants' Challenged Actions and goals.

---

[15]  Audio available at https://soundcloud.com/breitbart/breitbart-news-daily-ken-cuccinelli-october-23-2018.

165.    But, while Defendants' unlawful efforts to stamp out positive credible fear determinations is evinced in Defendants' Challenged Actions, none of Defendants have the power to change the credible fear standard or related fundamental procedures and protections. These can be changed only by Congress. Thus, Defendants' Challenged Actions are each contrary to the law and should be set aside, declared illegal, and enjoined.

## F.  Defendants' Challenged Actions Place Plaintiffs in Danger of Persecution or Torture

166.    Under the correct legal standards, each of the Plaintiffs would have easily passed their credible fear interview or reasonable fear interview, and would have been referred for regular removal proceedings to seek asylum and other relief from removal. Instead, because of Defendants' Challenged Actions, Plaintiffs were each issued a negative credible fear determination, exposing them to return subject to threats of persecution, torture, or death.

167.    Many other *bona fide* asylum applicants who meet the credible fear standard similarly have also received and will receive negative credible fear determinations based on Defendants' Challenged Actions, subjecting them again to potential persecution, torture, or death.

168.    Defendants' Challenged Actions are depriving Plaintiffs and others of their rights to pursue potentially meritorious claims for protection. Indeed, immigration service providers across the country have already reported that Defendants' Challenged Actions are causing a dramatic increase in the proportion of asylum seekers who receive negative credible fear determinations.

169.    The result of these policies is that children and their mothers, including Plaintiffs, have been and will be sent back to countries that have been cited for their pervasive and widespread violence against women and children, including domestic violence, rape, and beatings, as well as abuse, torture, or death by gangs. For example, it has been widely recognized, including by the

U.S. State Department in 2018, that El Salvador has one of the highest homicide rates in the world, and Amnesty International has described El Salvador as "one of the most dangerous countries to be a woman."[16] Numerous other reports, including by United Nations High Commissioner for Refugees (UNHCR), have documented that gender-motivated killings and other murders of women in El Salvador, Honduras and Guatemala are commonplace, and that Central American gangs perpetrate pervasive, pernicious, and often uncontrollable violence and disruption in the region.[17] Human rights reports have also widely documented the systemic failures in state protection of women and children in Central American countries.[18]

---

[16] *E.g.*, Amnesty Int'l*, El Salvador 2017/2018*, *available at* https://www.amnesty.org/en/countries/americas/el-salvador/report-el-salvador/.

[17] *E.g.*, Int'l Centre for the Human Rights of Migrants, *Forced Displacement and Protection Needs Produced by New Forms of Violence and Criminality in Central America* (UNHCR, May 2012), *available at* http://www.rcusa.org/uploads/pdfs/Violence%20in%20CA%20Final20%20July2012.pdf].

[18] *See, e.g.*:

- Amnesty Int'l, *On the Brink of Death: Violence Against Women and the Abortion Ban in El Salvador*, *passim* and at 14 (Sept. 2014), *available at* https://www.amnestyusa.org/files/el_salvador_report_-_on_the_brink_of_death.pdf;
- U.S. Department of State, Overseas Security Advisory Counsel, *El Salvador 2019 Crime & Safety Report* (April 25, 2019); *available at* https://www.osac.gov/Country/ElSalvador/Content/Detail/Report/d1222be6-4e5d-461f-912c-15f4aec90b02;
- Refugees Int'l, '*It's a Suicide Act to Leave or Stay': Internal Displacement in El Salvador* (July 25, 2015), *available at* https://www.refugeesinternational.org/reports/2015/9/30/its-a-suicide-act-to-leave-or-stay-internal-displacement-in-el-salvador;
- Physicians for Human Rights, '*If I went back, I would not survive': Asylum Seekers Fleeing Violence in Mexico and Central America* (Oct. 9, 2019), *available at* https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-and-central-america/;
- Physicians for Human Rights, *There is no one here to protect you* (June 10, 2019), *available at* https://phr.org/our-work/resources/there-is-no-one-here-to-protect-you/;
- Physicians for Human Rights, *El Salvador Country Conditions*,"*available at* https://www.uacresources.org/library/attachment.269153;

170.     Indeed, numerous migrants from Central America who were deported from the United States have suffered brutal harms, including death, after returning to their home countries. For example, one study documented that 83 individuals deported to Northern Triangle countries between 2014 and 2015 were reported by local media to have been killed—and that is just the murders that were reported in the news.[19]

171.     Without judicial intervention, the Defendants will be able to effectively rewrite the expedited removal scheme and substantive asylum law to illicitly achieve the goal of eliminating the ability of Central American woman and children, and others to seek safety in the United States.

## G. Defendants' Post-Complaint Retaliatory Actions

172.     After this action was filed, Defendants or those acting under their supervision or control have engaged in coercive, intimidating, and apparently retaliatory actions that burden, impair, and threaten Plaintiffs for their participation in this case.  They have impaired the right of free speech and association by impairing Plaintiffs' ability to consult with counsel and have punished and suppressed rights to petition this Court and to participate in this lawsuit. By way of

---

- American Immigration Counsel, *No Childhood Here: Why Central American Children Are Fleeing Their Homes* (July 1, 2014), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/no_childhood_here_why_central_american_children_are_fleeing_their_homes.pdf;
- Angelia Albaladejo, *How Violence Affects Women in El Salvador* (Feb. 22, 2016), *available at* https://www.lawg.org/how-violence-affects-women-in-el-salvador/;
- United Nations High Commissioner for Refugees, *Children on the Run* (Mar. 2014), *available at* https://www.unhcr.org/56fc266f4.html; s
- United Nations High Commissioner for Refugees, *Women on the Run* (Oct. 2015), *available a*t https://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html.

[19] *See* Emily Gogolak, *Meet the Central American Women the United States is Detaining and Deporting* (The Nation, Dec. 26, 2016), *available at* https://pulitzercenter.org/reporting/meet-central-american-women-united-states-detaining-and-deporting.

example, Defendants have refused to release, parole, or even remove numerous Plaintiffs unless those Plaintiffs drop their claims against Defendants.[20]

173.    Specifically, Defendants or those acting under their supervision or control have informed detainees that they could be detained *for years* because of the lawsuit, encouraging or coercing Plaintiffs to drop their claims and coercing other detainees not to assert claims.  They have begun issuing decisions to "Continue Detention" expressly identifying the detainee's status as "a participant in the case MMV vs. Barr 19-2773." Plaintiffs who are minors are now receiving disparate treatment based on their status as Plaintiffs, with Defendants failing to follow the *Flores* Settlement and rulings for any minor Plaintiffs while they remain parties to this case.[21]  Instead, Defendants continue to illegally detain Plaintiffs in violation of *Flores* based on their status as Plaintiffs. Even if certain Plaintiff are willing to *consent* to deportation to be released from

---

[20] Defendants may not retaliate for Plaintiffs exercising their First Amendment rights. *E.g.*, *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (Government may not take action against an individual "because of his constitutionally protected speech or associations," even if the it could lawfully take action for other reasons). These First Amendment protections extend to detained immigrants, and protect those individuals from punishment, including selective enforcement of removal orders, in retaliation for exercising First Amendment Rights. *See, e.g.*, *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019). Even actions "that fall short of a direct prohibition against the exercise of First Amendment rights" still violate the Constitution. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Such retaliatory actions are categorically prohibited. Allowing them would permit Defendants to silence its critics, when the government has no right to silence its critics at all. *See, e.g.*, *Perry*, 408 U.S. at 597–98.

[21] Under *Flores*, a presumption of release prohibits categorical detention of minors *even if* subject to an order of expedited removal.  *E.g.*, *Flores v. Sessions*, CV 85-4544 DMG, Dkt. 353, Order at pp. 23–25 & nn. 15–17 (C.D. Cal. June 27, 2017) ("[T]he Court will order Defendants to comply with the unambiguous charge of the Flores Agreement to make individualized determinations regarding a minor's flight risk rather than blanket determinations."); *see also Flores v. Johnson*, 212 F. Supp. 3d 864, 877 (C.D. Cal. 2015) and *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015), *aff'd in relevant part* 828 F.3d 898, 901 (9th Cir. 2016) (upholding "a presumption in favor of releasing minors and require[ing] placement of those not released in licensed, non-secure facilities that meet certain standards"); *cf.* 8 C.F.R. §§ 212.5(b), 235.3(b)(2)(iii), 241.4.

detention, Defendants refuse to release them unless they drop their claims.[22]  This harassment and coercion violate Plaintiffs' First Amendment and Due Process rights.

## FIRST CLAIM FOR RELIEF—CHALLENGED ACTIONS ARE CONTRARY TO LAW
### (Refugee Act, Immigration and Nationality Act, Administrative Procedures Act)

174.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

175.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), provides that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be— (A) … otherwise not in accordance with law; … [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

176.    The policies and procedures of an agency are binding upon the agency, and the APA grants Plaintiffs the right to challenge the failure of an agency to comply with its own rules, regulations, directives, guidance, initiatives, actions and/or procedures. *See, e.g.,  Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018) ("It has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated," *citing Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711, 244 U.S. App. D.C. 388 (D.C. Cir. 1985)); *id*. at 335–41 (doctrine is enforced via 5 U.S.C. § 706(2)).

177.    Individually and collectively, the Challenged Actions violate, *inter alia*, the INA and the Refugee Act and related regulations, and are contrary to law under the APA for multiple reasons.  Among other reasons, they [1] conflict with the definition of "refugee," *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A) and implement standards for fear that are higher than that required

---

[22] For example, to be released from detention even by deportation, Defendants required Plaintiffs A.A.T. and her child C.A.T., R.C.C. and her child D.L.C., J.G.G. and her child E.G.G., D.S.P. and her child V.V.P., and M.R.A. and her child V.A.R all to drop their claims.

by law; [2] conflict with the required procedures and standards for an Asylum Officer to conduct and memorialize interviews under 8 U.S.C. § 1225(b)(1)(B, E),[23] including by failing to have an appropriately trained Asylum Officer apply the required procedures and fear standard; [3] represent a departure from the agency's longstanding policy without an acknowledgment of or a reasoned explanation for that departure; [4] were taken without proper authorization as required by law and [5] deprive applicants of a meaningful opportunity to establish their potential eligibility for asylum, withholding of removal, and CAT relief pursuant to 8 U.S.C. §§ 1158(b)(1), 1225(b)(1)(B), and 1231; *see also FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

178.    As a result, the above Challenged Actions are contrary to law under 5 U.S.C. § 706(2)(A) & (C), and thus must be declared and held unlawful, set aside, or otherwise vacated and enjoined.

---

[23]  *See also, e.g*., 8 C.F.R. §§ 208.1 (training), 208.2(a) (jurisdiction), 208.13(b) (asylum standard), 208.16 (standard for withholding removal per Convention Against Torture), 208.18(a) (defining torture), 208.30(d) (right to consult attorney or advocate, right to non-adversarial interview, right to record memorializing all material facts), 208.30(e) (right to complete factual record, supervisory review, and determination by legal standard), 208.31 (for reasonable fear determination, right to non-adversarial interview, counsel, and determination by legal standard), 235.3(b)(4) (right to interview by asylum officer, right to orientation, right to consult attorney or advocate).

**SECOND CLAIM FOR RELIEF——ACTIONS ARE ARBITRARY AND CAPRICIOUS**
**(Refugee Act, Immigration and Nationality Act, Administrative Procedures Act)**

179.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

180.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides that a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, [or] an abuse of discretion…."

181.    The Challenged Actions are arbitrary and capricious and constitute abuses of discretion. The Challenged Actions, for which Defendants have never attempted to advance an explanation or rationale, are illogical and irrational and thwart the purpose and goals of the Refugee Act and the INA by, *inter alia*, implicitly altering the standards that apply in CFIs and RFIs, inhibiting legitimate applicants for asylum, withholding of removal, and CAT protection from exercising rights and using procedures afforded to them by law. The Challenged Actions thus place applicants, including Plaintiffs, at increased risk of persecution and/or torture, the opposite result that the law is designed and intended to reach.

182.    As a result, the Challenged Actions must be declared and held unlawful, set aside, or otherwise vacated and enjoined under 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF—— CONSTITUTIONAL VIOLATION**
**(First Amendment and Due Process Clause of the Fifth Amendment to the United States Constitution; Administrative Procedures Act)**

183.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

184.    Plaintiffs have protected interests in applying for asylum, withholding of removal, and Convention Against Torture relief upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life. Plaintiffs

also have protected interests under the First Amendment to the free exercise of religion, freedom of speech (including the right to associate and communicate with counsel), and the right to petition the Government for a redress of grievances.

185.    Plaintiffs are entitled under the Due Process Clause of the Fifth Amendment to a fair hearing of their claims, fair asylum-related interviews that conform with the law and applicable regulations, fair, accurate, unbiased, and complete development and memorializing of supporting facts for the record, a meaningful opportunity to establish their potential eligibility for asylum and related relief from removal, and release or parole as allowed by law.

186.    Individually and collectively, the above new Challenged Actions and Defendants' post-Complaint actions have violated Plaintiffs' right to due process in numerous respects, including by foreclosing their claims regardless of their individual facts or merits; by applying an unlawful, more burdensome standard to Plaintiffs' claims than legally required; by depriving them of required procedures and standards for an Asylum Officer to conduct interviews under 8 U.S.C. § 1225(b)(1)(B), (E),[24] including by failing to have an appropriately trained Asylum Officer apply the required procedures, and thus ultimately by depriving them of an accurate, fair, unbiased, and complete evidentiary record of the assessment of their fear and thus of a meaningful opportunity to establish their potential eligibility for asylum and related relief. Plaintiffs' due process right to

---

[24] *See also, e.g.*, 8 C.F.R. §§ 208.1 (training), 208.2(a) (jurisdiction), 208.13(b) (asylum standard), 208.16 (standard for withholding removal per Convention Against Torture), 208.18(a) (defining torture), 208.30(d) (right to consult attorney or advocate, right to non-adversarial interview, right to record memorializing all material facts), 208.30(e) (right to complete factual record, supervisory review and determination by legal standard), 208.31 (for reasonable fear determination, right to non-adversarial interview, counsel, and determination by legal standard), 235.3(b)(4) (right to interview by asylum officer, right to orientation, right to consult attorney or advocate).

apply for asylum and related relief has thus been impaired; and by depriving them of the opportunity for release or parole as allowed by law.

187.    Defendants have also violated Plaintiffs rights under the First Amendment by impairing their rights to communicate with counsel and by retaliating against Plaintiffs for their participation in this case.  Defendants' have abridged Plaintiffs' First Amendment rights, including by punishing and suppressing rights to petition this Court and to participate in this lawsuit, including by refusing to release, parole, or even remove numerous Plaintiffs unless those Plaintiffs drop their claims against Defendants.

188.    The above Challenged Actions must therefore be enjoined and declared as violative of the First Amendment and/or the Fifth Amendment's guarantee of due process, and also held declared and held unlawful, set aside, or otherwise vacated and/or enjoined under the APA, 5 U.S.C. § 706(2)(A) & (B).

### FOURTH CLAIM FOR RELIEF—VIOLATION OF NOTICE AND COMMENT PROCEDURES
### (Administrative Procedure Act)

189.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

190.    The Administrative Procedure Act ("APA") requires notice and opportunity for comment prior to substantive agency action or promulgation of a rule. 5 U.S.C. §§ 553(b), (c).  In addition, the APA requires that a substantive rule be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d).

191.    The Challenged Actions constitute rules that are subject to the notice-and-comment requirements of the APA.

192.    The government Defendants did not promulgate a rule or engage in notice-and-comment rulemaking before implementing their new Challenged Actions. The government Defendants also failed to appropriately publish any of the Challenged Actions 30 days before their effective date.

193.    The Challenged Actions therefore must be declared and held unlawful and set aside for Defendants' failure to observe the procedure required by the APA. *See, e.g.*, 5 U.S.C. §§ 553(b), (c), (d), 706(2)(D).

### FIFTH CLAIM FOR RELIEF—VIOLATION OF RIGHT OF *NON-REFOULEMENT* (Immigration and Nationality Act, Withholding of Removal, and Administrative Procedure Act)

194.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

195.    The 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees, to which the United States is party, requires that the United States not "expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150; *see also* Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267; United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, Art. 3.

196.    The Refugee Convention prohibits the return of individuals to countries where they would directly face persecution on a protected ground as well as to countries that would deport them to conditions of persecution.

197. Congress has codified these prohibitions in the "withholding of removal" provision at INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), which bars removal of an individual to a country where it is more likely than not that he or she would face persecution. *See also* 8 C.F.R. § 208.16(c), (d). Congress also codified the prohibition against *refoulement* in Article 3 of CAT. FARRA § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231).

198. Pursuant to regulation, only an immigration judge can determine whether an individual faces such a risk of persecution and is entitled to withholding of removal after full removal proceedings in immigration court. 8 C.F.R. § 1208.16(a).

199. Individually and collectively, the above new Challenged Actions regarding fear screening fail to provide these safeguards to ensure the critical protection against *refoulement* and therefore violates Section 1231(b)(3) and its implementing regulations.

200. The above Challenged Actions are thus must be declared and held unlawful, set aside, or otherwise vacated and enjoined. 5 U.S.C. § 706(2)(A), (C), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

a) Declare the Challenged Actions contrary to law and/or taken without proper authorization as required by law;

b) Enter an order vacating the Challenged Actions;

c) Enter order preliminarily and permanently enjoining Defendants from continuing to apply the Challenged Actions in proceedings related to credible fear determinations, reasonable fear determinations, interviews, or hearings issued or conducted by asylum officers or immigration judges;

d)   Enter an order staying the application of the Challenged Actions to each of the
     Plaintiffs;

e)   Enter an order enjoining Defendants from issuing and/or executing expedited
     removal orders with regard to the Plaintiffs;

f)   Enter an order enjoining Defendants from removing the Plaintiffs without first
     providing each of them with a new credible fear process or reasonable fear
     process (as appropriate) under correct legal standards or, in the alternative,
     full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a;

g)   Enter a Temporary Restraining Order and a Preliminary Injunction
     maintaining the status quo by requiring the government Defendants to
     reprocess the Plaintiffs' fear claims under the accepted prior policies;

h)   Order Defendants to pay Plaintiffs' litigation costs and reasonable attorney
     fees pursuant to the Equal Access to Justice Act and 28 U.S.C. § 2412; and

i)   Order all other relief that the Court deems just and proper to ensure that the
     government Defendants act according to law.


Respectfully submitted this 5th day of December, 2019.

                                    Respectfully Submitted,

Dated: December 5, 2019         By:   /s/Amy Maldonado
                                      *Amy Maldonado (IL Bar No. 6256961)
                                      Law Office of Amy Maldonado
                                      333 Albert Avenue, Suite 610
                                      East Lansing, MI 48823
                                      Phone: (517) 803-2870
                                      Fax: (888) 299-3780
                                      E-mail: amy@amaldonadolaw.com

Dated: December 5, 2019      By:    /s/ Gregory P. Copeland
Gregory P. Copeland (Bar No. NY0311)
RAPID DEFENSE NETWORK
11Broadway, Suite 615
New York, NY 10004
Phone: (212) 843-0910
Fax: (212) 257-7033
E-mail: gregory@defensenetwork.org

Dated: December 5, 2019      By:    /s/ Sarah T. Gillman
Sarah T. Gillman (Bar No. NY0316)
RAPID DEFENSE NETWORK
11Broadway, Suite 615
New York, NY 10004
Phone: (212) 843-0910
Fax: (212) 257-7033
E-mail: sarah@defensenetwork.org

Dated: December 5, 2019      By:    /s/ Bridget Cambria
*Bridget Cambria (PA Bar No. 205271)
Cambria & Kline, P.C.
532 Walnut Street
Reading, PA 19601
Phone: (484) 926-2014
Fax: (484) 926-2032
E-mail: bridget.cambria@cambriaklinelaw.com

Dated: December 5, 2019      By:    /s/ Elora Mukherjee
* Elora Mukherjee (NY Bar No. 4427233)
Columbia Law School
Morningside Heights Legal Services, Inc.
435 W. 116th Street
New York, NY 10027
Phone: (212) 854-2603
Fax: (212) 854-3554
E-mail: emukherjee@law.columbia.edu

ATTORNEYS FOR THE PLAINTIFFS

*Pro hac vice

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.M.V., et al., | ) | |
| | ) | Case No. 1:19-cv-2773 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, Attorney General of the | ) | |
| United States;  et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' REPLY TO GOVERNMENT DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTION TO ADMINISTRATIVE NOTICES TO RELATE CASES

Plaintiffs in the above-captioned matter file this reply to the government Defendants' response[1] to their objection to the administrative notices of designation of related civil cases, and in support thereof states as follows:

1. This case is not a case brought to challenge 84 FR 33829 broadly. Rather, it is a claim brought under Section 1252(e)(3) jurisdiction, which states as follows:

Challenges on validity of the system:

(A) In general Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—

(i) whether such section, or any regulation issued to implement such section, is constitutional; or

(ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

2. The core of the Plaintiffs' claim and the primary relief sought is that these specific Plaintiffs should not be removed "without first providing each of them with a new credible fear

---

1 The government Defendants' response to the Plaintiffs' objection is mislabeled a "reply."

1

process or reasonable fear process (as appropriate) under correct legal standards or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a."

3.      The Plaintiffs in this case identified specific policy changes presumably based upon some sort of directive or guidance issued after the implementation of 84 FR 33829 that directly affected them and resulted in disparate treatment of **these Plaintiffs resulting in a 10% pass rate.**

4.      Those policy changes have been descriptively titled by Plaintiffs as follows: *Failure to Meaningfully Orient Proper Legal Standard Policy*," the "*Proceed Before Training and Written Guidance Policy*," the "*Eliminate Supervisory Review and Concurrence of Credible Fear Determination Directive*," the "*Declare a Negative Decision in the Middle of the Screening Directive*," the "*Limit Fact-Finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture Directive*," the "*RFI Standard Without RFI Protections Directive*," the "*Failing to Apply Most Favorable Precedent in CFI Proceedings Directive*," the "*Mandatory Concurrence Review by the Fraud Detection Unit Directive*," the "*Withholding Facts Relied Upon in Issuing the Credible Fear Determination*," and the "*Telephonic Interview Directive*" policies. None of the above policies are contained in the regulation at issue in 84 FR 33829 nor are any of them at issue in *CAIR* or *I.A.*.

5.      The fact that post-implementation of 84 FR 33829, the reasonable fear pass rates at the South Texas Family Residential Center have plummeted to 10%, when reasonable fear pass rates nationwide have hovered around and slightly below 50% since FY 2016 cannot be attributable to 84 FR 33829.  See Exhibit A, Credible Fear and Reasonable Fear Statistics (October 2016 through March 2019).[2]

---

2 The data in the attachment was published online by the government Defendants.
- FY16 (see page 4):
https://www.uscis.gov/sites/default/files/USCIS/Outreach/Upcoming%20National
%20Engagements/PED_CredibleFearReasonableFearStatisticsNationalityReport.pdf
- FY17 (see page 4):
https://www.uscis.gov/sites/default/files/USCIS/Outreach/Upcoming%20National
%20Engagements/PED_FY17_CFandRFstatsThru09302017.pdf
- FY18 (see page 2):
https://www.uscis.gov/sites/default/files/USCIS/Outreach/PED_CFandRFstats09302018.pdf
- FY 19 through Mar 2019 entirely): https://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from
%20Previous%20Engagements/PED_ReasonableFearStatsFY2019ThruMarch.pdf

6. The facts indicate that the Plaintiffs' grievances are arising based on some other (presumably written) policy directive, policy guideline, or procedure which has not been made public. This is, again, not at issue in *CAIR* or *I.A.*, and thus, this case can not be related to those cases as a matter of law.

WHEREFORE, Plaintiffs respectfully request that the District Court for the District of Columbia randomly assign a judge to their case in due course.

Respectfully submitted,

Dated: September 24, 2019          By:     /s/ Hassan Ahmad
                                           Hassan M. Ahmad (Bar No. MD16049)
                                           The HMA Law Firm, PLLC
                                           7926 Jones Branch Dr., Suite 600
                                           McLean, VA 22102
                                           Phone: (703) 964-0245
                                           Fax: (703) 997-8556
                                           E-mail: hma@hmalegal.com

                                           ATTORNEY FOR PLAINTIFFS

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.M.V., *et al.*, | ) | |
| | ) | Case No. 1:19-cv-2773 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PLAINTIFFS' OPPOSITION** |
| WILLIAM P. BARR, Attorney General of the | ) | **TO THE ADMINISTRATIVE** |
| United States; *et al.*, | ) | **NOTICES OF DESIGNATION** |
| | ) | **OF RELATED CIVIL CASES** |
| Defendants. | ) | |

Plaintiffs file this opposition to the government Defendants' Administrative Notices of Designation of Related Civil Cases Pending in This or Any Other United States Court in *M.M.V., et al.,v. Barr, et al.*, Case No. 1:19-cv-2773 (filed September 16, 2019).

**I.**     **The M.M.V. Plaintiffs object to relating their case to C*apital Area Immigrants' Rights Coalition v. Trump* (19-cv-2117) and/or *I.A. v. Barr, et al.* (19-cv-2530).**

The government Defendants have filed Notices of Designation of Related Civil Cases Pending in This or Any Other United States Court asserting that this case is related to *Capital Area Immigrants' Rights Coalition v. Trump* (19-cv-2117) and *I.A. v. Barr, et al.* (19-cv-2530).

Plaintiffs disagree that the cases are related and object to any consolidation of their case with those cases as follows:

**A.**     **Random judicial assignment preserves the integrity of the judicial process.**

Pursuant to the local rules, civil cases "shall be assigned to judges of this court" by random selection through an assignment deck, access to which is restricted in order to "protect the integrity and confidentiality of the random assignment of cases." At the time a civil complaint is filed, that case "shall be assigned to the judge whose name appears on the screen when the appropriate deck is selected. LCvR 40.3. The fundamental rationale for the general rule requiring random assignment of cases is to ensure greater public confidence in the integrity of the judicial process via a guarantee of fair and equal distribution of cases to all judges, avoiding

1

public perception or appearance of favoritism in assignments, and reducing opportunities for judge-shopping. *See Dale v. Executive Office of the President*, 121 F. Supp. 2d 35, 37 (*quoting Tripp v. Executive Office of the President*, 196 F.R.D. 201 (D.D.C. 2000) (discussing Rule 40.3)).

### B. The Defendants cannot meet their burden in order to relate the cases.

Pursuant to Local Rule 57.12(a)(3)-(4), civil cases are deemed related when the earliest is still pending on the merits in the District Court and they (i) relate to common property, (ii) involve common issues of fact, (iii) grow out of the same event or transaction, or (iv) involve the validity or infringement of the same patent. Additionally, criminal or civil cases shall be deemed related where a case is dismissed - with or without prejudice - and a second case is filed involving the same parties and relating to the same subject matter. The burden of proof falls upon the party seeking to "avoid random reassignment" of the case. *Dale v. Executive Office of President*, 121 F.Supp. 2d at 37.

Plaintiffs in the instant case seek fair and random judicial assignment of their case in the normal course. Defendants' allegation that the Plaintiffs' case involves common issues of fact, and arise from the same event or transaction, presented in *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.* is misplaced. Plaintiffs are not challenging the transit asylum ban at issue in *Capital Area Immigrants' Rights Coalition* and *I.A.* Rather, Plaintiffs are challenging written directives implemented in the last 60 days that have changed the credible fear process in myriad ways that are independent of the substance of the transit asylum ban. Although the transit asylum ban and the challenged credible fear directives were implemented as of July 16, 2019, they are distinct events involving different issues of fact, and so will involve different administrative records.

Specifically, Plaintiffs challenge directives that deprive them of a meaningful orientation in advance of their credible fear interview, *see* ECF No. 1 (Compl.) ¶ 106; compel asylum officers to conduct credible fear interviews absent necessary training and direction, *see id.* ¶ 107; eliminate supervisory review of negative credible fear determinations, *see id.* ¶ 108; require multiple reinterviews, without sufficient or advance written notice, *see id.* ¶ 109; require

2

announcement of a negative result in the middle of the credible fear interview, rather than after, compromising the right to a non-adversarial interview, *see id.* ¶ 112; encourage asylum officers to limit questioning that could elicit testimony sufficient to pass the screening for relief from removal, *see id.* ¶ 113; require Plaintiffs to satisfy a higher threshold screening for withholding of removal and Convention Against Torture relief, *see id.* ¶ 114; decline to apply the most favorable circuit law to Plaintiffs' protection claims, *see id.* ¶ 116; require review of any positive fear findings by USCIS' Fraud Detection and National Security Directorate, *see id.* ¶ 118; require asylum officers to withhold critical information from their written credible fear determinations, *see id.* ¶ 119; and deprive asylum-seeking parents of the ability to provide testimony without their children present, ¶ 120.

Accordingly, Plaintiffs' claims do not rise or fall based on the legality of the transit asylum ban, and indeed, a court need not assess the legality of the transit asylum ban itself at all to pass on Plaintiffs' claims. Because these cases involving challenges to different policies with different administrative records, the government's argument that Plaintiffs' case is related to those challenging the transit asylum ban thus fails to meet this district's related case rule. *See, e.g., Capital Area Immigrants' Rights Coalition v. Trump*, No. 19-2117, Minute Order July 18, 2019 (concluding that a challenge to an asylum ban based on entering between ports was not related to a challenge to the transit asylum ban).

### C. *M.M.V. v. Barr, et al.*, **involves a narrow claim brought pursuant to 8 U.S.C. § 1252(e)(3) and a set of facts separate and apart from the transit asylum ban itself.**

The Plaintiffs in *M.M.V.* are 126 mothers and children detained by Immigration and Customs Enforcement at the South Texas Family Residential Center in Dilley, Texas who have all received negative credible fear interview ("CFI") findings after July 16, 2019 (the date of publication and the effective date of the interim rule being challenged in the other two cases). Prior to that date, approximately 97% of interviewees passed the credible fear screening interview, as it is merely a threshold determination to see if an asylum seeker should be permitted to fully present her case and the standard for passing that screening is low. After July 16, 2019, the positive CFI finding rate has plummeted to approximately 10% due to the

3

application of an improperly heightened standard which Plaintiffs allege resulted in their negative CFI findings.

The *M.M.V.* Plaintiffs claims are specifically in regard to the credible fear process in expedited removal proceedings pursuant to INA § 235. Each of the *M.M.V.* Plaintiffs allege that these shifting standards as applied to them resulted in a negative credible fear determination. Section 1252(e)(3) is a provision of the Immigration and Nationality Act that provides exclusive jurisdiction in the United States District Court for the District of Columbia over systemic challenges to "the validity of the [expedited removal] system," including regulations and "written" policies regarding expedited removal.

Yet unlike the plaintiffs in the cases noticed by the Defendants, the *M.M.V.* Plaintiffs are <u>not</u> challenging the legality of the regulation itself, nor are they challenging the direct implementation of that regulation in the expedited removal process. Rather, Plaintiffs are contesting the ever-changing credible fear standards as applied to them individually (presumably pursuant to some "directive, guideline, or procedure," although none have been announced or otherwise made public). As explained above, the directives Plaintiffs challenge were implemented coincident with the transit asylum ban, but are separate from the substance of the ban itself.

Further, Counsel for the *M.M.V.* Plaintiffs are aware of pending lawsuits before the district court that are far more legally related to their case than the two pending cases noticed by the Defendants. For example, *Kiakombua v. McAleenan, et al.*, (19-cv-01872) involves a challenge to the April 30, 2019 policy document issued by Defendants that changed the credible fear "Lesson Plan" and thus the credible fear process, and is currently pending before Judge Ketanji Brown Jackson. In addition, *Make The Road New York, et. al., v. McAleenan, et al.* (19-cv-02369) challenges the expansion of expedited removal, with a particular focus on flaws in the credible fear screening, and is also before Judge Ketanji Brown Jackson. And *L.M.M. v. Kenneth T. Cucinelli, et al.*, (19-cv-02676), which claims that the appointment of Kenneth Cuccinelli as Acting Director of USCIS violates the Federal Vacancies Reform Act, and therefore none of his asylum directives may lawfully be implemented, is pending before Judge Randolph D. Moss. This case can just as easily be said to "relate" to the Plaintiffs' case to the

4

extent that it would vacate recent changes in the credible fear screening process. Of course, such a loose standard of relation is not the test in this district, and just as Plaintiffs' case is not related to these other cases involving the credible fear process, it is not related to the cases challenging the transit asylum ban.

Because the *M.M.V.* Plaintiffs have a specific set of facts based on their detention at one particular family detention facility in Texas and a narrow set of claims limited to the credible fear screening process that they were subjected to during a roughly 60-day period of time, they both merit and prefer standard random judicial selection.

### C. *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.*, concern sweeping challenges to the "Asylum Ban" regulation in its entirety.

By contrast, neither *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr,* raise the core claim brought by the Plaintiffs in this case at all. While the published regulation is the same regulation that is cited in the sweeping challenges to the constitutionality and legality of the "Asylum Ban" brought in *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.*, both of those lawsuits challenges the Trump administration's rule barring individuals that traveled through another country before crossing through the U.S. southern border. The plaintiffs in those cases seek to hold the "Asylum Ban" regulation unlawful as a whole, claiming violations of the Immigration and Nationality Act, the Administrative Procedure Act, the Due Process clause of the Fifth Amendment, and the William Wilberforce Trafficking Victims Protection Reauthorization Act. The *M.M.V.* Plaintiffs neither concede nor challenge the legality of the "Asylum Ban" regulation on the merits; rather, they seek to protect and preserve their right to go through an appropriate credible fear screening process with the correct standard applied, and to require the Defendants to provide them with such a screening.

### D. The significant differences between the instant case and *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.* preclude relating the cases.

Plaintiffs disagree that this case involves common issues of fact, or grows out of the same event(s) or transaction(s) as the claims presented in *Capital Area Immigrants' Rights Coalition v.*

App.434

*Trump* and *I.A. v. Barr, et al.* Courts in this jurisdiction have related cases when "identical issues for resolution" presented themselves, such as determining "whether the regulation impermissibly conflicts with the underlying statute and, if so, what relief should be afforded." *Autumn Journey Hospice, Inc. v. Sebelius*, 753 F. Supp. 2d 135, 140 (D.D.C. 2010), *see also Singh v. McConville*, 187 F. Supp 3d 152, 156 (D.D.C. 2016) ("As in Autumn Journey, the plaintiffs in both cases at issue here challenge the same Department of Defense and Army regulations governing requests for religious accommodations on the same grounds.").

The instant case centers on actions that Defendants have taken since announcing the July 16, 2019 regulations known as 84 FR 33829, and not the validity of the originating regulations themselves, as *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.* are doing. As Plaintiffs noted on p. 3 of the Complaint, "[t]his Complaint does not challenge the legality of 84 FR 33829, which is being addressed in other litigation. Instead, this Complaint challenges as unlawful of the Defendants' presumed guidance created as a result of 84 FR 33829 to modify the credible fear review process." ECF No. 1 (Compl.) fn. 2. Any issues of fact that *Capital Area Immigrants' Rights Coalition v. Trump* and *I.A. v. Barr, et al.* seek to address will inherently center upon actions and details relating to the legality of those regulations. In contrast, issues of fact addressed by the instant case center on the post-asylum ban procedures and directives, all effected on or after July 16, 2019, that affect the newly established credible fear process. Unlike the plaintiffs in *Singh*, Plaintiffs in the instant case are challenging guidelines, directives, policies, and/or procedures that are different from the regulation being challenged by *Capital Area Immigrants' Rights Coalition* and *I.A. v. Barr, et al.*

## II.  CONCLUSION

On the basis of the foregoing, Plaintiffs strenuously object to the relating of their case to either *Capital Area Immigrants' Rights Coalition v. Trump* (19-cv-2117) and *I.A. v. Barr, et al.* (19-cv-2530), and request standard random judicial assignment as a matter of course.

Respectfully submitted this 18th day of September, 2019:

Respectfully Submitted,

6

Dated: September 18, 2019     By:    /s/ Hassan Ahmad
                                      Hassan M. Ahmad (Bar No. MD16049)
                                      *Humza Kazmi
                                      The HMA Law Firm, PLLC
                                      7926 Jones Branch Dr., Suite 600
                                      McLean, VA 22102
                                      Phone: (703) 964-0245
                                      Fax: (703) 997-8556
                                      E-mail: hma@hmalegal.com
                                      E-mail: hak@hmalegal.com

Dated: September 18, 2019     By:    /s/Bridget Cambria
                                      *Bridget Cambria (PA Bar No. 205271)
                                      Cambria & Kline, P.C.
                                      532 Walnut Street
                                      Reading, PA 19601
                                      Phone: (484) 926-2014
                                      Fax: (484) 926-2032
                                      E-mail: bridget.cambria@cambriaklinelaw.com

Dated: September 18, 2019     By:    /s/Amy Maldonado
                                      *Amy Maldonado (IL Bar No. 6256961)
                                      Law Office of Amy Maldonado
                                      333 Albert Avenue, Suite 610
                                      East Lansing, MI 48823
                                      Phone: (517) 803-2870
                                      Fax: (888) 299-3780
                                      E-mail: amy@amaldonadolaw.com

Dated: September 18, 2019     By:    /s/ Elora Mukherjee
                                      * Elora Mukherjee (NY Bar No. 4427233)
                                      Columbia Law School
                                      Morningside Heights Legal Services, Inc.
                                      435 W. 116th Street
                                      New York, NY 10027
                                      Phone:  (212) 854-2603
                                      Fax:  (212) 854-3554
                                      E-mail:  emukherjee@law.columbia.edu

ATTORNEYS FOR THE PLAINTIFF
*Motion for pro hac vice admission forthcoming

7

8

App.437

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.M.V.; A.A.M., a minor; S.L.V.; M.F.L., a minor; | ) | |
| J.G.G.; E.G.G., a minor; J.G.O.; I.M.G., a minor; | ) | |
| A.O.V.; J.S.O., a minor; M.R.A.; L.C.R., a minor; | ) | |
| A.L.V.; I.G.L, a minor; A.G.L., a minor; L.O.R.; | ) | Case No. 1:19-cv-2773 |
| A.P.O., a minor; N.P.; R.D.P., a minor; M.D.E.; | ) | |
| A.G.D., a minor; M.M.B.; N.M.M., a minor; | ) | |
| D.C.V.; S.V.C., a minor; L.A.C.; B.A.G., a minor; | ) | **COMPLAINT FOR** |
| M.G.V.; A.R.G., a minor; R.P.F.; J.F.P., a minor; | ) | **DECLARATORY AND** |
| S.T.T.; E.T.T., a minor; R.G.R.; B.B.G., a minor; | ) | **INJUNCTIVE RELIEF** |
| D.B.G., a minor; J.M.R.; C.G.M., a minor; M.R.A.; | ) | |
| V.A.R., a minor; H.M.M.; T.A.M., a minor; J.S.M., | ) | |
| D.M.S., a minor; Y.U.; F.G.U., a minor; I.F.L.; | ) | |
| R.F.L., a minor; R.C.C.; D.L.C., a minor; N.M.L.; | ) | |
| A.R.M., a minor; M.C.D.; E.E.C., a minor; Y.O.T.; | ) | |
| D.L.O., a minor; V.L.O., a minor; M.A.A.; A.R.A., | ) | |
| a minor; C.A.A., a minor; M.C.M; S.M.C., a minor; | ) | |
| I.A.D.; C.L.A., a minor; C.C.N.; B.S.C., a minor; | ) | |
| C.P.G.; M.B.P., a minor; L.P.E.; C.C.P., a minor; | ) | |
| D.C.P., a minor; L.H.H.; Y.F.H., a minor; A.A.T.; | ) | |
| C.A.T., a minor; V.O.V.; E.H.O., a minor; I.H.O., a | ) | |
| minor; W.P.R.; J.C.P., a minor; H.C.P., a minor; | ) | |
| D.M.G.; N.E.M, a minor; A.B.C.; E.C.B.; a minor; | ) | |
| P.A.; I.A., a minor; G.A.Q.; N.A.Q., a minor; | ) | |
| A.A.Q., a minor; S.G.H.; A.G.H., a minor; M.S.M.; | ) | |
| C.C.S., a minor; I.S.R.; J.A.S., a minor; J.S.P.; | ) | |
| M.A.S., a minor; N.C.A.; M.P.C., a minor; J.L.C., a | ) | |
| minor; M.A.M.; G.M.A., a minor; D.V.R.; A.V.R., | ) | |
| a minor; D.S.P.; V.V.P., a minor; D.G.A.; E.P.G., a | ) | |
| minor; M.P.G., a minor; K.P.P.; M.P.P., a minor; | ) | |
| I.P.P., a minor; M.G.P.; M.U.G., a minor; J.A.L., a | ) | |
| minor; F.G.; I.G., a minor; J.T.; Y.J.T., a minor; | ) | |
| M.V.C.; E..P.V., a minor; K.N.E; and E.A.N., a | ) | |
| minor; M.H.; J.M.H., a minor. | ) | |
|            Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM P. BARR, Attorney General of the | ) | |

United States; JAMES MCHENRY, Director,         )
Executive Office for Immigration Review; KEVIN  )
K. MCALEENAN, Acting Secretary, United States  )
Department of Homeland Security; MARK          )
MORGAN, Acting Commissioner, United States     )
Customs and Border Protection; MATTHEW T.       )          JURY TRIAL DEMAND
ALBENCE, Acting Director, United States         )
Immigration and Customs Enforcement;            )
KENNETH T. CUCCINELLI, Purported Acting        )
Director, United States Citizenship and Immigration )
Services; and ANDREW DAVIDSON, Acting          )
USCIS Asylum Division Chief,                    )
                                                )
Defendants.                                     )

## INTRODUCTION

1.      On July 16, 2019, the Administration published new and immediately effective "Asylum Eligibility and Procedural Modifications." 84 FR 33829. The legality of the July 16, 2019 regulation is currently at issue in separate litigation.[1] However, subsequent to that announcement, Defendants have eviscerated the "credible fear" process and have implemented ever-shifting directives, guidance and procedures that place parents and children in immigration detention at risk of wrongful deportation, persecution, and death.

2.      Upon reason and belief, since July 16, 2019 the credible fear passage rates at the South Texas Family Residential Center in Dilley, Texas—the largest family detention center in the United States with a bed and crib capacity of 2,400 for asylum seeking mothers and children—have diminished from approximately 97% of credible fear applicants, to fewer than 10% of applicants.

---

[1] *See Barr v. East Bay Sanctuary Covenant*, 588 U.S. ___ (Sept. 11, 2019).

App.439

3.     On information and belief, since July 16, 2019, the Defendants have implemented new regulations, directives, guidance and/or procedures concerning the evaluation of "credible fear" in people seeking protection from persecution and torture.

4.     On information and belief, said regulations, directives, guidance and/or procedures are written and have not been made public; however, each of the Plaintiffs have been subjected to written decisions that confirm said changes concerning the evaluation of "credible fear." Presumably, written guidance has been disseminated by the Defendants to their agents and employees conducting these "credible fear" evaluations. As a result of these new regulations, directives, guidance and/or procedures, the immigration authorities summarily rejected Plaintiffs' claims of fear.

5.     Plaintiffs challenge the new regulations, directives, guidance and/or procedures concerning the evaluation of "credible fear,"[2] and seek declaratory and injunctive relief finding the application of new credible fear standard(s) to them unlawful, barring further application of such policies and procedures to them, and requiring the government Defendants to reprocess their fear claims under the prior existing and established policies, directives, guidance and procedures.

6.     DHS failed to follow appropriate notice and comment requirements, and in addition, the new regulations, directives, guidance and/or procedures concerning the evaluation of "credible fear" are arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2).

---

[2] This Complaint does *not* challenge the legality of 84 FR 33829, which is being addressed in other litigation. Instead, this Complaint challenges the legality of the Defendants' additional regulations and directives created as a result of 84 FR 33829 to modify the credible fear review process.

## JURISDICTION

7.     This case arises under the United States Constitution; the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*. and its implementing regulations; and the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).

8.     The Court has jurisdiction under 8 U.S.C. § 1252(e)(3). Section 1252(e)(3) is a provision of the INA that provides exclusive jurisdiction in the United States District Court for the District of Columbia over systemic challenges to "the validity of the [expedited removal] system," including regulations and "written" policies regarding expedited removal. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction with a waiver of sovereign immunity pursuant to the Administrative Procedure Act, 5 U.S.C. §701 et seq.); and 28 U.S.C. § 1346 (United States as defendant). Jurisdiction lies to grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

9.     8 U.S.C. § 1252(e)(3)(B) requires that suit be brought within sixty days of the date of implementation of "the challenged section, regulation, directive, guideline, or procedure." The policies in question arose as a result of the Department of Homeland Security's rule issued on July 16, 2019. 84 FR 33829. On information and belief, guidance on credible fear adjudication was issued by the Attorney General on or after this date. Sixty days elapsed on Saturday, September 14, 2019. However, as per F.R.C.P. 6(a)(1)(C), because the last day of the sixty-day time period was a Saturday, the time period for filing to challenge the regulation

extended to "the next day that is not a Saturday, Sunday, or legal holiday" - Monday, September 16, 2019. Plaintiffs' challenge to all subsequent directives, guidelines and procedures is thus also timely.

## VENUE

10.     Venue is proper in this District because 8 U.S.C. § 1252(e)(3)(A) requires that all 8 U.S.C. § 1252(e)(3) actions be brought in the United States District Court for the District of Columbia.

11.     Venue in the District of Columbia is further proper pursuant to 28 U.S.C. § 1391(e), as the location where the government Defendants reside and where a substantial part of the events giving rise to the claims occurred.

## PARTIES

12.     Plaintiffs are mothers and children detained at the South Texas Texas Family Residential Center who have been issued negative credible fear determinations.

13.     Plaintiffs M.M.V. and her minor son A.A.M. are Salvadoran nationals who seek protection from persecution and torture in the United States. M.M.V. and A.A.M. were placed in credible fear proceedings on or around August 22, 2019 attended their initial credible fear interview on August 29, 2019 and were served with negative credible fear determinations on August 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

14.     Plaintiffs S.L.V. and her minor daughter M.F.L. are Salvadoran nationals who seek protection from persecution and torture in the United States. S.L.V. and M.F.L. were placed in credible fear proceedings on or around August 22, 2019 attended their initial credible fear

5

interview on August 29, 2019 and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

15.     Plaintiffs J.G.G. and her minor daughter E.G.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. J.G.G. and E.G.G. were placed in credible fear proceedings on or around August 24, 2019 attended their initial credible fear interview on August 29, 2019 and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

16.     Plaintiffs J.G.O. and her minor son I.M.G. are Honduran nationals who seek protection from persecution and torture in the United States. J.G.O. and I.M.G. were placed in credible fear proceedings on or around August 24, 2019 attended their initial credible fear interview on August 29, 2019 and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

17.     Plaintiffs A.O.V. and her minor son J.S.O. are Honduran nationals who seek protection from persecution and torture in the United States. A.O.V.. and J.S.O. were placed in credible fear proceedings on or around August 25, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

6

18.     Plaintiffs M.R.A. and her minor daughter L.C.R. are Honduran nationals who seek protection from persecution and torture in the United States. M.R.A. and L.C.R. were placed in credible fear proceedings on or around August 28, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

19.     Plaintiffs A.L.V. and her minor sons I.G.L. and A.G.L. are Honduran nationals who seek protection from persecution and torture in the United States. A.L.V., I.G.L., and A.G.L. were placed in credible fear proceedings on or around August 28, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

20.     Plaintiffs L.O.R. and her minor son A.P.O. are Honduran nationals who seek protection from persecution and torture in the United States. L.O.R. and A.P.O. were placed in credible fear proceedings on or around August 16, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

21.     Plaintiffs N.P. and her minor daughter R.D.P. are Honduran nationals who seek protection from persecution and torture in the United States. N.P. and R.D.P. were placed in credible fear proceedings on or around August 16, 2019 attended their initial credible fear interview on August 27, 2019 and were served with negative credible fear determinations on

App.444

August 29, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

22.     Plaintiffs M.D.E. and her minor son A.G.D. are Salvadoran nationals who seek protection from persecution and torture in the United States. M.D.E. and A.G.D. were placed in credible fear proceedings on or around August 21, 2019 attended their initial credible fear interview on August 29, 2019 and were served with negative credible fear determinations on August 29, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

23.     Plaintiffs M.M.B. and her minor daughter N.M.M. are Nicaraguan nationals who seek protection from persecution and torture in the United States. M.M.B. and N.M.M. were placed in credible fear proceedings on or around August 21, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on August 31, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

24.     Plaintiffs D.C.V. and her minor son S.V.C. are Guatemalan nationals who seek protection from persecution and torture in the United States. D.C.V. and S.V.C. were placed in credible fear proceedings on or around August 22, 2019 attended their initial credible fear interview on August 27, 2019 and were served with negative credible fear determinations on August 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

25.     Plaintiffs L.A.C. and her minor child B.A.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear

App.445

proceedings on or around August 20, 2019, attended their initial credible fear interview on August 23, 2019, and were served with negative credible fear determinations on August 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

26.    Plaintiffs M.G.V. and her minor child A.R.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

27.    Plaintiffs R.P.F. and her minor child J.F.P. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

28.    Plaintiffs S.T.T. and her minor child E.T.T. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 27, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

29.    Plaintiffs R.G.R. and her minor children B.B.G. and D.B.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations

9

on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

30.     Plaintiffs J.M.R. and her minor child C.G.M. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 20, 2019, attended their initial credible fear interview on August 27, 2019, and were served with negative credible fear determinations on August 29, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

31.     Plaintiffs M.C.M. and her minor daughter S.M.C. are Honduran nationals who seek protection from persecution and torture in the United States. M.C.M. and S.M.C. were placed in credible fear proceedings on or around August 26, 2019 attended their initial credible fear interview on September 2, 2019 and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

32.     Plaintiffs P.A. and her minor daughter I.A. are Romanian nationals who seek protection from persecution and torture in the United States. P.A. and I.A. were placed in credible fear proceedings on or around August 31, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

33.     Plaintiffs G.A.Q. and her minor son N.A.Q. are Salvadoran nationals who seek protection from persecution and torture in the United States. G.A.Q. and N.A.Q. were placed in credible fear proceedings on or around September 4, 2019 attended their initial credible fear

10

interview on September 5, 2019 and were served with negative credible fear determinations on September 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

34.     Plaintiffs S.G.H. and her minor child A.G.H. are Salvadoran nationals who seek protection from persecution and torture in the United States. S.G.G.H. and A.G.H. were placed in credible fear proceedings on or around August 30, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

35.     Plaintiffs M.S.M. and her minor daughter C.C.A. are Honduran nationals who seek protection from persecution and torture in the United States. M.S.M. and C.C.A. were placed in credible fear proceedings on or around August 27, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 3, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

36.     Plaintiffs I.S.R. and her minor son J.A.S. are Honduran nationals who seek protection from persecution and torture in the United States. I.S.R. and J.A.S. were placed in credible fear proceedings on or around August 16, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

37.     Plaintiffs J.S.P. and her minor son M.A.S. are Honduran nationals who seek protection from persecution and torture in the United States. J.S.P. and M.A.S. were placed in credible fear proceedings on or around August 16, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

38.     Plaintiffs N.C.A. and her minor children M.P.C. and J.L.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 27, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

39.     Plaintiffs M.A.M. and her minor daughter G.M.A. are Honduran nationals who seek protection from persecution and torture in the United States. M.A.M. and G.M.A. were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

40.     Plaintiffs D.V.R. and her minor son A.V.R. are Honduran nationals who seek protection from persecution and torture in the United States. D.V.R. and A.V.R. were placed in credible fear proceedings on or around August 22, 2019 attended their initial credible fear interview on August 29, 2019 and were served with negative credible fear determinations on

12

September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

41.     Child J.A.L. is a Guatemalan national who entered the United States accompanied by his mother, who was placed in reasonable fear proceedings. J.A.L. was placed in credible fear proceedings on or around August 30, 2019 attended an initial credible fear interview on September 10, 2019 and was served with a negative credible fear determination on September 12, 2019.

42.     Plaintiffs D.S.P. and her minor son V.V.P. are Salvadoran nationals who seek protection from persecution and torture in the United States. D.V.S.P. and V.M.V.P. were placed in credible fear proceedings on or around August 28, 2019 attended their initial credible fear interview on September 10, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

43.     Plaintiffs D.G.A. and her minor children M.P.G. and E.P.G. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 4, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

44.     Plaintiffs K.P.P. and her minor children I.P.P. and M.P.P. are Ecuadorean nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around September 9, 2019 attended their initial credible

13

fear interview on September 12, 2019 and were served with negative credible fear determinations on September 12, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

45.     Plaintiffs M.G.P. and her minor daughter M.U.G. are Salvadoran nationals who seek protection from persecution and torture in the United States. M.G.P. and M.U.G. were placed in credible fear proceedings on or around September 7, 2019 attended their initial credible fear interview on September 11, 2019 and were served with negative credible fear determinations on September 13, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

46.     Plaintiffs M.V.C. and her minor son E.P.V. are Guatemalan nationals who seek protection from persecution and torture in the United States. M.V.C. and E.P.V. were placed in credible fear proceedings on or around August 22, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 16, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

47.     Plaintiffs K.N.E. and her minor son E.A.N. are Honduran nationals who seek protection from persecution and torture in the United States. K.N.E. and E.A.N. were placed in credible fear proceedings on or around September 8, 2019 attended their initial credible fear interview on September 12, 2019 and were served with negative credible fear determinations on September 16, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

14

48. Plaintiffs F.G. and her minor child I.G. are Romanian nationals who seek protection from persecution and torture in the United States. F.G. and I.G. were placed in credible fear proceedings on or around September 4, 2019 attended their initial credible fear interview on September 10, 2019 and were served with negative credible fear determinations on September 16, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

49. Plaintiffs J.B.T. and her minor daughter Y.J.T. are Indian nationals who seek protection from persecution and torture in the United States. J.B.T. and Y.J.T. were placed in credible fear proceedings on or around August 16, 2019 attended their initial credible fear interview on August 23, 2019 and were served with negative credible fear determinations on August 27, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

50. Plaintiffs I.A.D. and her minor daughter C.L.A. are Ecuadorian nationals who seek protection from persecution and torture in the United States. I.A.D. and C.L.A. were placed in credible fear proceedings on or around August 24, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on September 4, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

51. Plaintiffs C.C.N. and her minor son B.S.C. are Salvadoran nationals who seek protection from persecution and torture in the United States. C.C.N. and B.S.C. were placed in credible fear proceedings on or around August 27, 2019 attended their initial credible fear interview on September 4, 2019 and were served with negative credible fear determinations on

15

September 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

52.     Plaintiffs C.P.G. and her minor son M.B.P. are Guatemalan nationals who seek protection from persecution and torture in the United States. C.P.G. and M.B.P. were placed in credible fear proceedings on or around August 20, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on September 6, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

53.     Plaintiffs L.P.E. and her minor sons C.C.P. and D.C.P. are Honduran nationals who seek protection from persecution and torture in the United States. L.P.E, C.C.P., and D.C.P. were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 10, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

54.     Plaintiffs L.H.H. and her minor daughter Y.F.H. are Honduran nationals who seek protection from persecution and torture in the United States. L.H.H. and Y.F.H. were placed in credible fear proceedings on or around August 25, 2019 attended their initial credible fear interview on September 2, 2019 and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

55.     Plaintiffs A.A.T. and her minor son C.A.T. are Salvadoran nationals who seek protection from persecution and torture in the United States. A.A.T. and C.A.T. were placed in

16

credible fear proceedings on or around August 28, 2019 attended their initial credible fear interview on September 4, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

56.     Plaintiffs V.O.V. and her minor children E.H.O. and I.H.O. are Honduran nationals who seek protection from persecution and torture in the United States.V.O.V., E.H.O., and I.H.O. were placed in credible fear proceedings on or around August 25, 2019 attended their initial credible fear interview on September 3, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

57.     Plaintiffs W.P.R. and her minor children J.C.P. and H.C.P. are Salvadoran nationals who seek protection from persecution and torture in the United States.W.P.R., J.C.P., and H.C.P. were placed in credible fear proceedings on or around August 21, 2019 attended their initial credible fear interview on August 30, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

58.     Plaintiffs D.M.G.. and her minor daughter N.E.M.. are Honduran nationals who seek protection from persecution and torture in the United States. D.M.G. and N.E.M. were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 5, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

59.     Plaintiffs A.B.D. and her minor daughter E.C.B. are Salvadoran nationals who seek protection from persecution and torture in the United States. A.B.D. and E.C.B.. were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 4, 2019 and were served with negative credible fear determinations on September 11, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

60.     Plaintiffs M.H. and her minor son J.M.H. are Honduran nationals who seek protection from persecution and torture in the United States. M.H. and J.M.H. were placed in credible fear proceedings on or around August 29, 2019 attended their initial credible fear interview on September 4, 2019 and were served with negative credible fear determinations on September 6 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

61.     Plaintiffs M.R.A. and her minor child V.A.R. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 14, 2019, attended their initial credible fear interview on August 26, 2019, and were served with negative credible fear determinations on August 29, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

62.     Plaintiffs H.M.M. and her minor child T.A.M. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 25, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 29, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

63.     Plaintiffs J.S.M. and her minor child D.M.S. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

64.     Plaintiffs Y.U. and her minor child F.G.U. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 23, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

65.     Plaintiffs I.F.L. and her minor child R.F.L. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 24, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

66.     Plaintiffs R.C.C. and her minor child D.L.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on August 29, 2019, and were served with negative credible fear determinations on August 30, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

67.     Plaintiffs N.M.L. and her minor child A.R.M. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear

App.456

proceedings on or around August 28, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on or about September 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

68.     Plaintiffs M.C.D. and her minor child E.E.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 13, 2019, attended their initial credible fear interview on August 30, 2019, and were served with negative credible fear determinations on or about September 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

69.     Plaintiffs Y.O.T. and her minor children D.L.O. and V.L.O. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 21, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 5, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

70.     Plaintiffs M.A.A. and her minor children A.R.A. and C.A.A. are Salvadoran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 29, 2019, attended their initial credible fear interview on September 4, 2019, and were served with negative credible fear determinations on September 4, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

20

71.     Plaintiffs M.C.M. and her minor child S.M.C. are Honduran nationals who seek protection from persecution and torture in the United States. They were placed in credible fear proceedings on or around August 26, 2019, attended their initial credible fear interview on September 2, 2019, and were served with negative credible fear determinations on September 2, 2019. They are detained at the South Texas Family Residential Center in Dilley, Texas.

72.     Defendant William P. Barr is the Attorney General of the United States and the head of the United States Department of Justice ("DOJ"). Defendant Barr is responsible for advising the government Defendants on the lawful administration and enforcement of the immigration laws and policies, including the execution of any new policies or procedures for asylum seekers, pursuant to 8 U.S.C. § 1103. Defendant Barr has ultimate authority over the Executive Office for Immigration Review ("EOIR"), the agency within DOJ responsible for the immigration court system. He is sued in his official capacity.

73.     Defendant James McHenry is the Director of the Executive Office for Immigration Review "EOIR," the federal agency within the DOJ that includes immigration judges, the immigration courts, and the Board of Immigration Appeals ("BIA"). EOIR is responsible for conducting administrative adjudicative proceedings, including adjudicating applications for asylum, withholding of removal, and relief under the Convention Against Torture, bond redeterminations, custody redeterminations, and hearings to determine appropriate restrictions on liberty for individuals detained by ICE. He is sued in his official capacity.

74.     Defendant Kevin K. McAleenan is the Acting Secretary of the Department of Homeland Security ("DHS"), the Department of the Executive Branch of the United States government that oversees the component agencies responsible for enforcing the immigration

laws of the United States. Those component agencies include U.S. Immigration and Customs Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); and U.S. Citizenship and Immigration Services ("USCIS"). Defendant McAleenan directs and is responsible for the administration and enforcement of the immigration laws in the United States. He is sued in his official capacity.

75.     Defendant Matthew T. Albence is the Acting Director of ICE, the agency within DHS that is responsible for carrying out removal orders, oversees enforcement and removal operations, and is responsible for the detention of noncitizens throughout the United States. Defendant Albence has direct authority over all ICE policies, procedures and practices relating to the detention and deportation of noncitizens. He is sued in his official capacity.

76.     Defendant Mark Morgan is the Acting Commissioner of CBP, the agency within DHS that is responsible for the initial processing and detention of noncitizens apprehended near the United States Border. In that capacity, Defendant Morgan has direct authority over all CBP policies, procedures and practices relating to the apprehension of asylum seekers. He is sued in his official capacity.

77.     Defendant Kenneth T. Cuccinelli is purportedly the Acting Director of USCIS,[3] the agency within DHS that is responsible for the adjudication of immigration benefits to noncitizens in the United States, including all functions of the Asylum Office. In that capacity, Defendant Cuccinelli has direct authority over all USCIS policies, procedures and practices relating to benefits adjudication. He is sued in his official capacity.

---

[3] A complaint for declaratory and injunctive relief was filed in federal district court for the District of Columbia on September 6, 2019, alleging that Mr. Cuccinelli does not satisfy the legal requirements to serve as the director under Federal Vacancies Reform Act ("FVRA") and the Constitution. That lawsuit is ongoing.

78.     Defendant Andrew Davidson is the Acting USCIS Asylum Division Chief, the division within USCIS that is responsible for conducting credible fear interviews, reasonable fear interviews, and asylum interviews for affirmative asylum applicants. In that capacity, Defendant Davidson has direct authority over all USCIS policies, procedures and practices relating to "credible fear" screening procedures for persons seeking protection from persecution or torture. He is sued in his official capacity.

## FACTS

### A.      U.S. Obligations to Provide Safe Harbor to Persons Fearing Persecution or Torture

79.     The current asylum system was enacted in 1980, as part of the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102, and was intended to bring U.S. law into conformity with our obligations under the United Nations Convention Relating to the Status of refugees and 1967 United Nations Protocol Relating to the Status of Refugees.  Consistent with international law, the definition of "refugee" does not require a showing of *certain* harm.  Instead, individuals can establish eligibility for asylum based on a "well-founded fear of persecution."  The Supreme Court has explained that a showing of a 1 in 10 chance of persecution is sufficient to satisfy that standard.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987).

80.     Defendants purport to have exercised discretion in constructing the new July 16, 2019 regulation to bar Plaintiffs from applying for asylum pursuant to 8 U.S.C. § 1158. However, even if Plaintiffs are barred from asylum relief as a matter of discretion (which they do not concede), the Defendants must still comply with the non-refoulement obligations of the United States (withholding of removal and relief under the Convention Against Torture).

App.460

81.    The principle of non-refoulement was first articulated in Article 33 of the 1951 Convention Relating to the Status of Refugees ("Refugee Convention") as follows:

> No Contracting State shall expel or return (refouler) a refugee in any manner whatsoever to the frontiers of territories where his [or her] life or freedom would be threatened on account of his [or her] race, religion, nationality, membership of a particular social group or political opinion.

82.    The Defendants' non-refoulement obligations are found in Article 33 of the Refugee Convention,[4] and also Article 3 of the Convention Against Torture ("CAT") and the domestic statutes that implement these two treaties.

83.    As part of the Refugee Act of 1980, Congress enacted the withholding of removal statute, codified at 8 U.S.C. § 1231(b)(3), to "implement the principles agreed to" in the Refugee Convention, with the specific intent to ensure that the United States does not "expel or return" noncitizens to any place where they face likelihood of persecution.  I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 427 (1999).  And as part of the Foreign Affairs Reform and Restructuring Act of 1999 ("FARRA"), Congress implemented Article 3 of CAT in the INA, making explicit the prohibition against refoulement:

> It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . .

FARRA § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note).

---

[4] Although not a party to the 1951 Refugee Convention, the United States adopted the 1967 Protocol Relating to the Status of Refugees, which incorporates the Refugee Convention's non-refoulement prohibition.  See 1967 Protocol Relating to the Status of Refugees, art. 1(1) & 7(1) (stating that signatories "undertake to apply articles 2 to 34 inclusive of the [Refugee] Convention" without reservation).

24

84.     Therefore, as adopted and statutorily codified, the non-refoulement guarantees in both the Refugee Convention and CAT provide procedural safeguards that prohibit removal or return of non-citizens to countries where their life or liberty may be threatened.  *See generally I.N.S. v. Stevic*, 467 U.S. 408, 426 (1984) (recognizing non-citizens' statutory "entitlement" to withholding under § 1231(b)(3)); *Khouzam v. Attorney General*, 549 F.3d 235, 256–57 (3d Cir. 2008) ("[T]he basic dictates of due process must be met . . . where, as here, mandatory statutory relief [is] at issue.").

**B.  The Pre-July 16, 2019 Expedited Removal and Credible Fear Process**

85.     Prior to 1996, noncitizens were generally entitled to a full hearing in immigration court before they could be removed, whether they were seeking admission at the border or had already entered the country.  They were also entitled to administrative appellate review before the BIA and judicial review in federal court.

86.     In 1996, Congress enacted legislation that established a highly truncated removal mechanism called "expedited removal" that could be used for certain noncitizens seeking admission. Noncitizens subject to expedited removal are ordered removed by an immigration officer "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

87.     Congress, however, was careful to carve out an exception for individuals who express a fear of return to their home countries.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

88.     If an individual indicates a fear of returning to his or her home country or intention to apply for asylum, the immigration officer must refer the individual for an interview with an asylum officer, called a "credible fear" interview.  8 U.S.C. §§ 1225(b)(1)(A)(ii),

1225(b)(1)(B); 8 C.F.R. § 235.3(b)(4); *see also* 8 C.F.R. § 208.30.  If the noncitizen is referred to an asylum officer, the officer conducts (with the assistance of an interpreter if necessary) a rudimentary "credible fear interview" which is designed "to elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture."  8 C.F.R. § 208.30(d).  The asylum officer must "conduct the interview in a non-adversarial manner."  *Id.*  Further, in determining whether credible fear is satisfied, the officer must "consider whether the alien's case presents novel or unique issues that merit consideration in a full hearing before an immigration judge."  8 C.F.R.  208.30(e)(4).

89.     At the conclusion of the interview, if the asylum officer makes a negative credible fear determination, the officer must provide a written record of the determination that "shall include . . . the officer's analysis of why, in light of [the] facts, the alien has not established a credible fear of persecution."  8 U.S.C. § 1225(b)(1)(B)(iii)(II).

90.     Upon the individual's request, the agency must provide for prompt review of the asylum officer's negative credible fear determination by an immigration judge.  8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see also* 8 C.F.R. § 208.30(g)(1). ["shall include an opportunity to be heard and questioned by the immigration judge," but "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days." Id. § 1225(b)(1)(B)(iii)(II).] In conducting that review, the immigration judge has access to "[t]he record of the negative credible fear determination." 8 C.F.R. § 208.30(g)(2).  The immigration judge's decision is administratively "final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(iv)(A).  Noncitizens undergoing credible fear review before immigration judges

26

are still in expedited removal proceedings, and do not get the full panoply of rights available in regular immigration court removal proceedings.

91.    Noncitizens who receive a negative credible fear determination are issued an expedited removal order, which comes with significant consequences, beyond removal itself. Noncitizens who are removed pursuant to expedited removal orders are subject to a five-year bar on admission to the United States.  8 U.S.C. § 1182(a)(9)(A)(i).

92.    To ultimately prevail on an asylum claim the applicant need only establish that there is a 10% chance that he or she will be persecuted on account of one of the five protected grounds for asylum.  To prevail at a credible fear interview, however, the applicant need only show a "significant possibility" of asylum eligibility—i.e., a "significant possibility" of a 1 in 10 chance of persecution, or a *fraction* of 10%.  *See* 8 U.S.C. §1225(b)(1)(B)(v) (defining credible fear as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum[.]").

93.    If a noncitizen is found by the asylum officer to have a "credible fear," the individual is taken out of the expedited removal process and referred for a regular removal hearing before an immigration judge.  At that hearing, they will have the opportunity to develop a full record before the judge, and they may appeal an adverse decision to the BIA and federal court of appeals.  8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

94.    The reason for the low threshold at the credible fear stage is straightforward.  An asylum claim is highly fact-specific and often will take significant time, resources and expertise to develop, including expert testimony and extensive evidence about country conditions.  It may

27

also involve complex legal questions. In the expedited removal system, however, abbreviated credible fear proceedings occur within days of arrival, with little or no preparation or assistance by counsel, little to no knowledge of asylum law by the applicant, and no opportunity to examine witnesses or gather evidence, while the individual is detained. It is thus highly unrealistic for applicants in the expedited removal system to present a fully developed asylum claim. Accordingly, Congress established a low threshold at the credible fear stage to ensure that potentially valid asylum claims could be developed properly in a full trial-type hearing before an immigration judge. Congress viewed this credible fear process as an essential safeguard to ensure bona fide asylum seekers would not be summarily removed.

95. The threshold safeguards in place for applicants seeking protection from persecution or torture have now been eliminated. As a result of Defendant's changes in policies, practices, directives and guidance, no longer can a parent or child demonstrate a significant likelihood of success in asylum proceedings – now that mother and child carry a much higher burden. Such a high burden will result in many applicants, including vulnerable children, being returned to persecution or torture.

## C. Current Expedited Removal, Credible Fear and Reasonable Fear Process

96. On July 16, 2019, the government Defendants published a regulation that purports to ban asylum applications from any asylum seekers who passed through any third country on the way to the United States without applying for protection (the "Asylum Ban"). That policy is not challenged here.[5] Rather, subsequent to the new Asylum Ban, the government Defendants have radically changed their handling of procedures to evaluate migrants in expedited removal

---

[5] *Barr v. East Bay Sanctuary Covenant*, 588 U.S. ___ (Sept. 11, 2019), is pending class action litigation challenging the Asylum Ban.

App.465

for asylum, withholding of removal and relief under the Convention Against Torture. These changes in procedure and policy are chaotic, and do not comport with existing federal law, regulations and agency policies in violation of the APA and the *Accardi* doctrine.

97. In the new regulations, if the government determines during initial screening that an alien subject to expedited removal is barred from asylum eligibility, the alien is issued a negative credible fear determination. The alien is then placed in proceedings to determine if a *reasonable* fear of persecution exists for withholding of removal or Convention Against Torture (CAT) protection. If the alien does not establish a reasonable fear of persecution during the interview, the asylum office issues a written notice of decision, subject to immigration judge review under the higher standard of reasonable fear.

98. While the regulation purports to not change the credible fear standard, it states that aliens subject to the asylum bar are categorically unable to establish a significant possibility of asylum eligibility, and prevents further screening from taking place under the credible fear standard.

**D.     Impact of the New Process on the Plaintiffs**

99. Since July 16, 2019, Plaintiffs have been subjected to a series of policy changes at the South Texas Family Residential Center, located in Dilley, Texas. Defendants have unilaterally eliminated procedural protections proscribed to each Plaintiff by statute and regulation in order to frustrate their ability to successfully seek protection from persecution and torture in the United States.

100. In the aggregate, Defendants' new regulation and changes to directives, guidelines, policies and procedures eliminate access to safe harbor for families seeking

protection from persecution and torture. While some of the policy changes implemented by the Defendants flow from the application of the new "Asylum Ban," other recent changes are independent, yet serve the same purpose: to prevent access to legal protections in the United States. Upon reason and belief, since July 16, 2019 the credible fear passage rates at the South Texas Family Residential Center have diminished from approximately 97% of credible fear applicants, to fewer than 10% of applicants.

101.     Prior to the initiation of their credible fear screenings, Plaintiffs (who are wholly comprised of mothers and their children) completed dangerous and arduous journeys to the United States, subsequent to incidents of sexual and physical violence, or threats of violence, that triggered their flights from their home countries. As a consequence of this past trauma, many of the Plaintiffs suffer from symptoms of post-traumatic stress disorder ("PTSD"), anxiety, and depression.

102.     After completing the journey to the United States – which lasted for more than a month for some Plaintiffs – all of the Plaintiffs were apprehended and placed in CBP custody, where they remained for days in cages and/or cement cells, without access to privacy, showers, beds, telephones, pillows, hot meals, or adequate medical attention.

103.     Against this backdrop, while in CBP custody, Plaintiffs were placed in proceedings under Section 235 of the INA and issued an Order of Expedited Removal.

104.     Despite the fact that there has been no change to the Defendants' treaty or statutory obligations, in the last 60 days, the Defendants have issued a series of ever-changing regulations, directives, guidelines, policies and procedures and have applied these constantly shifting standards in the Plaintiffs' credible fear screenings.

105.    The chaotic and changing credible fear paradigm has wrought havoc on the Plaintiffs' credible fear process. The legal standard applied to the Plaintiffs' cases has changed unexpectedly and without meaningful explanation to the Plaintiffs throughout each part of their process. For many Plaintiffs, the law that dictated the outcome of their case was different when they were placed into proceedings, different at the time of their first interview, different when they had a second interview, and different at the time of their final follow-up interview. And it will be different yet again, when they present in front of the immigration judge to seek review of their negative credible fear determinations.

106.    The dramatic instability in the credible fear screening process since July 16, 2019 has prejudiced Plaintiffs, more than half of whom are children. Since their proceedings began, Plaintiffs have experienced a constant state of confusion because they have been denied the opportunity to understand the basis on which their fear would be evaluated. Plaintiffs have a right to a legal orientation in advance of their credible fear interviews. The Defendants' failure to appropriately and meaningfully orient the Plaintiffs in advance of their interview – and throughout the interview in accordance with the changing process and standard to which they were subjected – has effectively denied them their right to be oriented to the credible fear process, as established in 8 C.F.R § 235.3(b)(4)(i). Defendants' "*Failure to Meaningfully Orient Proper Legal Standard Policy*"[6] has denied Plaintiffs their right to understand and participate in their proceedings and to meaningfully understand what laws are applicable to them in the threshold screening process.

---

[6] In the absence of official policy directive names (prior to the discovery process), this complaint presents alternative policy names for the purposes of clarity.

31

107.     Defendants have also implemented a new policy of proceeding with fear interviews absent necessary training and direction for the asylum officers charged with conducting them. Upon information and belief, Defendants have conspired to limit the information they put forth in writing, impeding necessary training opportunities and direction for front-line adjudicators. This policy, the "*Proceed Before Training and Written Guidance Policy*," has impacted the integrity and consistency of credible fear interviews conducted by the asylum office. Each variation of the changing policies and practices has been implemented inconsistently and haphazardly to the detriment of each Plaintiff. Asylum officers did not receive training relevant to the proper application of the Asylum Ban, including training regarding the trafficking exception and how to assess whether or not the Asylum Ban applies to a given credible fear applicant, in advance of Plaintiffs credible fear interviews. During some interviews, supervisors interrupted the interview after an interview had already begun to announce in English to the officer, "apply the bar," subsequent to discovery of a new court order.

108.     Defendants' "*Eliminate Supervisory Review and Concurrence of Credible Fear Determination Directive*" has compounded Defendants' "Proceed Before Training and Written Guidance Directive". Subsequent to July 16, 2019 the asylum office has eliminated supervisory review of credible fear determinations in violation of 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7).     Based upon this new directive, interviewing asylum officers unilaterally denied Plaintiffs' credible fear claim, and announced their determination, prior to completion of supervisory asylum officer review and concurrence.

109.     Many Plaintiffs were interviewed not once, but three or more times on three separate dates, over a timespan of several weeks or more. The delay in final adjudication of each

32

Plaintiffs' claims prejudiced each Plaintiff's ability to recall what was discussed at their prior interview, and to participate meaningfully in their interview. This impacted Plaintiffs' ability to access counsel during each separate meeting with the asylum office, which occurred without sufficient or any advance written notice.

110.    A credible fear interview is psychologically demanding and difficult. It requires the asylum seeker to describe the circumstances that gave rise to their fear of persecution. Asylum seekers must present deeply personal, stigmatizing, and traumatizing details. Frequently, these details have never been relayed to another person, and their disclosure brings the asylum-seeker shame, fear, and/or renewed trauma.  Credible fear applicants must also answer complicated and nuanced follow-up questions. Extending the interview process over a long period of time impacted the Plaintiffs by prolonging their detention in government custody, which exacerbated the negative consequences they have experienced as a result of their ongoing detention.

111.    Being subjected to repeated interviews, without thoughtful and accessible explanation through the statutorily required orientation process, limited Plaintiffs' meaningful participation in their credible fear proceeding.

112.    The application of Asylum Ban has impeded Plaintiffs' right to a non-adversarial interview, in accordance with the new "*Declare a Negative Decision in the Middle of the Screening Directive*."  Subsequent to July 16, 2019 the asylum office implemented a policy of having the interviewing asylum officer announce a negative credible fear decision to the applicant, directly, in the middle of their credible fear interview. Previous to this new policy, negative decisions were never announced during an interview itself, but made subsequent to the

33

entirety of the interview process, after all testimony was solicited in support of the asylum-seekers claim during a non-adversarial interview. This new policy violates each Plaintiff's right to a non-adversarial interview and creates a hostile interview environment that chills the testimony of credible fear applicants. *See* 8 C.F.R. § 208.30(d). As an outcome of this policy, Plaintiffs believed at the outset of their interview that their deportation was certain. Many Plaintiffs report feeling paralyzed, overwhelmed, intimidated and confused the moment they were informed their credible fear interview was denied. Other Plaintiffs report giving up before their interview had ever truly begin, believing their case was a lost cause.

113.    Defendants have also implemented a new "*Limit Fact-Finding Relevant to a Significant Possibility of Eligibility for Asylum, Withholding of Removal, and Relief Under the Convention Against Torture Directive*." This Directive encourages asylum officers to limit questioning that solicits testimony necessary to evaluate an asylum-seeker's eligibility for asylum, withholding of removal, and protection against the Convention Against torture under the "significant possibility" standard required for credible fear proceedings. Based upon this new policy, Defendants fail to adequately evaluate whether or not an asylum-seeker merits a positive credible fear finding based upon eligibility and erroneously issue negative credible fear findings.

114.    While Defendants have stripped Plaintiffs of procedural protections required in credible fear proceedings, they have simultaneously denied Plaintiffs the benefit of mandatory procedures available to individuals seeking protection under Withholding and the CAT. The policy of subjecting Plaintiffs to a higher burden in threshold fear screening violates mandatory obligations to ensure that no applicant is returned to a country where they will be subjected to persecution or torture. Defendants have heightened the burden on Plaintiffs unlawfully, and at

the same time, have failed to provide procedural safeguards normally present in heightened fear proceedings.

115.     Individuals placed in reasonable fear proceedings under section 241 of the INA have a right to (1) advance written notice of their reasonable fear interview, (2) in-person orientation to their reasonable fear proceeding by an asylum officer at least 48 hours in advance of their interview, and (3) access to counsel during their reasonable fear proceeding. Although Plaintiffs were placed in credible fear proceedings under INA 235, Defendants' application of the procedural protections available in reasonable fear proceedings while evaluating Plaintiffs' under the heightened reasonable fear standard, or "*RFI Standard Without RFI Protections Directive*" defies the law under both credible and reasonable fear proceedings.

116.     Defendants' have also implemented a new policy directive of rejecting the most favorable case law in credible fear proceedings, when assessing an asylum-seekers eligbility for withholding of removal and relief under the Convention Against Torture. The "*Failing to Apply Most Favorable Precedent in CFI Proceedings Directive*" ignores the permanent injunction issued in *Grace v. Whitaker*, 344 F. Supp. 3d 96,  (D.D.C. 2018) which requires the asylum officer to apply the most favorable circuit court precedent in credible fear proceedings, regardless of where an asylum-seeker is detained.

117.     In addition to new directives related to the application of the Asylum Ban and applied to each individual Plaintiff, Defendants have also established three additional policies to ensure the smallest percentage of families placed in credible fear proceedings obtain positive credible fear proceedings.

35

118.    Upon information and belief, USCIS has implemented a "*Mandatory Concurrence Review by the Fraud Detection Unit Directive*." This new directive requires any and all cases that have received a positive fear finding by the interviewing asylum officer, and positive fear concurrence by the supervisory asylum officer, to be reviewed by USCIS's Fraud Detection and National Security Directorate. Upon information and belief, this new procedure —which applies only to asylum-seekers slated to be issued positive credible fear findings—has resulted in mandatory rescission of the overwhelming majority of cases sent for review subsequent to a follow-up interview conducted in response to guidance provided by the Fraud Detection unit.

119.    Relatedly, the asylum office has a new policy of "*Withholding Facts Relied Upon in Issuing the Credible Fear Determination*."  The asylum officer is required to create a written record of his or her determination, including a summary of all material facts as stated by the applicant, and any additional facts relied upon by the officer, in issuing the credible fear determination. 8 CFR 208.30(e)(1). In conflict with this regulatory mandate, the asylum office now withholds critical information relied upon when issuing a negative fear determination.

120.    The asylum office has also implemented a new policy abandoning child-sensitive treatment in credible fear proceedings, including the "*Telephonic Interview Directive*" for families detained at the South Texas Family Residential Center. Since the inception of the South Texas Family Residential Center, asylum officers have conducted in-person interviews with mothers and children who are detained in Dilley, Texas. This practice allowed asylum officers to apply child-friendly procedures during the interview process, and to provide protections necessary to mothers, who are required to proceed with their credible fear interview while tasked

36

with caring for their child. Prior policy allowed asylum officers to ensure mothers who did not feel comfortable providing testimony in the presence of their children were able to leave their children in daycare, and to build trust and rapport with a child in-person prior to questioning the child regarding their history of persecution. Some plaintiffs were deprived necessary accommodations related to their age and status as asylum-seekers traveling in a family unit in conflict with long-standing asylum office practice.[7]

121.    Plaintiffs reserve the right to amend this Complaint to rename the above directives as the official designations become known through discovery, and to add other unlawful directives as they become known through the discovery process.

122.    The *Accardi* doctrine stands for the unremarkable proposition that an agency must abide by its own regulations. Thus, an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination.

**D.    Defendants' Public Statements Regarding Their Goal to Undermine Asylum Protections**

123.    Rather than comply with our asylum laws, Defendants have been open about their desire to weaken asylum protections, particularly for vulnerable immigrant children and families from Central America.  Indeed, Defendants have repeatedly expressed their hostility towards the asylum claims of such children and families and urged higher credible fear screening standards in order to speed the removal of such individuals.  The new policies seek to advance these goals.

---

[7] USCIS Asylum Division. Asylum Officer Basic Course: Guidelines for Children's Asylum Claims (Mar. 21, 2009).  *Available at* https://cliniclegal.org/sites/default/files/AOBTC_Lesson_29_Guidelines_for_Childrens_Asylum_Claims_0.pdf (last visited September 16, 2019).

37

124.    Thus, the unlawful efforts to heighten the credible fear standard evinced in the Defendants' new credible fear policies culminated from Defendants' expressed desire to change that standard.  But none of the Defendants have the power to change the credible fear standard, which can be changed only by Congress.

**E.  The New Credible Fear Policies Place Plaintiffs in Grave Danger**

125.    Under the correct legal standards, each of the Plaintiffs should have easily passed their credible fear interview or reasonable fear interview, and would have been referred for regular removal proceedings to seek asylum and other relief from removal.  Instead, because of the new credible fear policies, they were each issued a negative credible fear determination.

126.    Many other *bona fide* asylum applicants who meet the credible fear standard similarly have received and will receive negative credible fear determinations based on the new policies.

127.    Defendants' new policies are depriving Plaintiffs their right to pursue potentially meritorious claims for protection.  Indeed, immigration service providers across the country have already reported that the new credible fear policies are causing a dramatic increase in the proportion of asylum seekers who receive negative credible fear determinations.

128.    The result of these policies is that children and their mothers have been and will be sent back to countries that have been cited for their pervasive and widespread violence against women and childen, including domestic violence, rape, and beatings, and other abuse by gangs. For example, it has been widely recognized, including by the U.S. State Department in 2018, that El Salvador has one of the highest homicide rates in the world, and Amnesty International has described El Salvador as "one of the most dangerous countries to be a woman."  Numerous other

38

reports, including by UNHCR, have documented that gender-motivated killings and other murders of women in El Salvador, Honduras and Guatemala are commonplace, and that Central American gangs perpetrate "pervasive, pernicious, and often uncontrollable violence and disruption in the region." Human rights reports have also widely documented the systemic failures in state protection in Central American countries.

129. Indeed, numerous migrants from Central American who were deported from the United States have suffered brutal harms, including death, after returning to their home countries. For example, one study documented that up to 83 individuals deported to Northern Triangle countries between 2014 and 2015 have been killed.

130. Without judicial intervention the Defendants will be able to effectively rewrite the expedited removal scheme and substantive asylum law to achieve the policy goal of eliminating the ability of Central American children to seek safety in the United States.

## FIRST CLAIM FOR RELIEF
### (Refugee Act, Immigration and Nationality Act, Administrative Procedures Act)

131. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

132. Pursuant to 8 U.S.C. § 1252(e)(3), judicial review is available before the Court regarding whether "a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement [8 U.S.C. § 1252(b)] is not consistent with applicable provisions of [Subchapter II of the INA] or is otherwise in violation of law."

133. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be—(A)

39

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

134.    The new policies related to expedited removal proceedings violate the INA and the Refugee Act and are arbitrary and capricious and contrary to law under the APA for multiple reasons. Among other reasons, the new policies conflict with the definition of "refugee," *see* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A); conflict with the credible fear standard at 8 U.S.C. § 1225(b)(1)(B)(v); represent a departure from the agency's longstanding policy without an acknowledgment of or a reasoned explanation for that departure; are illogical and irrational; and deprive applicants of a meaningful opportunity to establish their potential eligibility for asylum, withholding of removal, and CAT relief pursuant to 8 U.S.C. §§ 1158(b)(1), 1225(b)(1)(B), and 1231.

135.    In determining whether an alien is eligible for protection under the Convention Against Torture, the threshold determination at an interview is whether or not the alien has demonstrated a "significant possibility that he or she is eligible for...deferral of removal under the Convention Against Torture." 8 C.F.R. §208.30(e)(3).

136.    The newly promulgated regulations have mandated that aliens deemed ineligible for asylum are to be assessed under a "reasonable possibility" threshold, rather than the lower threshold "significant possibility" requirement.

137.    Upon information and belief, this assessment is conducted without assessing whether aliens fall under exceptions to the newly promulgated regulations, such as human trafficking exceptions. This assessment also denies aliens protections associated with reasonable

40

fear interviews, such as access to counsel, advance notice of their interviews, and an in-person orientation by an asylum officer.

138.    Defendants' application of the procedural protections available in reasonable fear proceedings while evaluating Plaintiffs' under the heightened reasonable fear standard, or "RFI Standard Without RFI Protections Directive" defies the law under both credible and reasonable fear proceedings.

139.    As a result, the new asylum procedures/policies are contrary to law. *See* 5 U.S.C. § 706(2)(A).

### SECOND CLAIM FOR RELIEF
**(Separation of Powers, Immigration and Nationality Act, Administrative Procedure Act)**

140.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

141.    The doctrine of separation of powers is embodied in the U.S. Constitution.  The Constitution establishes the paramount authority of the Judiciary to interpret the law—"to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)—and to render decisions that bind the other branches of government in our constitutional system.  The Executive Branch—like Congress—is bound by the decisions issued by the federal courts.  Respect for the controlling authority or judicial opinions and judgments is a fundamental component of the rule of law.  The new policies and regulations violate the separation of powers; violate the INA, including the credible fear standard at 8 U.S.C. § 1225(b)(1)(B)(v); and are arbitrary and capricious and contrary to law under the APA.

### THIRD CLAIM FOR RELIEF
**(Due Process Clause of the Fifth Amendment to the United States Constitution)**

142.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

143.     Plaintiffs have protected interests in applying for asylum, withholding of removal, and Convention Against Torture relief upon a showing that meets the applicable standards, and in not being removed to a country where they face serious danger and potential loss of life.

144.     Plaintiffs are entitled under the Due Process Clause to a fair hearing of their claims, and a meaningful opportunity to establish their potential eligibility for asylum and related relief from removal.

145.     The new policies and regulations have violated Plaintiffs' right to due process in numerous respects, including by foreclosing their claims regardless of their individual facts or merits; by applying an unlawful, more burdensome legal standard to Plaintiffs' claims; and by depriving them of a meaningful opportunity to establish their potential eligibility for asylum and related relief.

**FOURTH CLAIM FOR RELIEF**
**(Administrative Procedure Act)**

146.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

147.     The Administrative Procedure Act ("APA") requires notice and opportunity for comment prior to the promulgation of a rule. 5 U.S.C. § 553(b), (c).

148.     The government Defendants' nondiscretionary procedures for screening for threshhold credible fear as the first step in evaluatint the Plaintiffs' eligibility for asylum and related relief, as well as for determining whether an individual is more likely than not to face persecution or torture in a specific country, and thus precluded from being returned to that

42

country during the pendency of removal proceedings, constitutes a rule that requires notice-and-comment rulemaking.

149.    The government Defendants did not promulgate a rule or engage in notice-and-comment rulemaking before implementing their new procedures for evaluating fear for asylum, withholding of removal and relief under the Convention Against Torture.

150.    The APA requires that a substantive rule be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d).

151.    The government Defendants failed to appropriately publish its new asylum, withholding and CAT fear screening procedures, and related guidance 30 days before their effective date.

## FIFTH CLAIM FOR RELIEF
### (Administrative Procedure Act)

152.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

153.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 702, 706(2)(A). The policies and procedures of ICE, CBP and USCIS are binding upon those agencies pursuant to the Accardi doctrine, and the APA grants the Plaintiffs the right to challenge the failure of those agencies to comply with their own rules, regulations, and guidance. *See, e.g., Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.C. Dist. Court 2018) (stating "[i]t has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated," *citing Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711, 244 U.S. App. D.C. 388 (D.C. Cir. 1985)).

43

154.     The *Accardi* doctrine is enforced via the mechanism of § 706(2) of the APA. *See,*
*Damus v. Nielsen*, 313 F. Supp. 3d at 335-341; *see also, Torres v. U.S. Dep't of Homeland Sec.*,
2017 U.S. Dist. LEXIS 161406, 2017 WL 4340385, at *5-6 (S.D. Cal. Sept. 29, 2017) (holding
that the failure of DHS to follow its own Operating Procedures governing  Deferred Action for
Childhood Arrivals, or DACA, in terminating the plaintiff's status was properly framed as a
claim that the agency's actions were 'arbitrary, capricious, and an abuse of discretion' pursuant
to the APA).

155.     The government Defendants' new regulation, directives, guidance, policies and
procedures are arbitrary, capricious, and contrary to law, in that they do not comport with
established agency directives, policies and procedures for determining whether individuals face a
"credible fear," or a likelihood of persecution or torture, and as such, they are presumptively
invalid.

156.     Moreover, the government Defendants have not articulated a reasoned
explanation for their decision to adopt these new procedures; have failed to consider relevant
factors; have relied on factors Congress did not intend to be considered; and have offered
explanations for their decision that are counter to the evidence before the agency.

**SIXTH CLAIM FOR RELIEF**
**(Immigration and Nationality Act, Withholding of Removal, and**
**Administrative Procedure Act)**

157.     All of the foregoing allegations are repeated and realleged as if fully set forth
herein.

158.     The 1951 Refugee Convention and the 1967 Protocol relating to the Status of
Refugees, to which the United States is party, requires that the United States not "expel or return

44

('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150; *see also* Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267.

159.    The Refugee Convention prohibits the return of individuals to countries where they would directly face persecution on a protected ground as well as to countries that would deport them to conditions of persecution.

160.    Congress has codified these prohibitions in the "withholding of removal" provision at INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), which bars the removal of an individual to a country where it is more likely than not that he or she would face persecution.

161.    Pursuant to regulation, only an immigration judge can determine whether an individual faces such a risk of persecution and is entitled to withholding of removal after full removal proceedings in immigration court. 8 C.F.R. § 1208.16(a).

162.    The new agency regulation, directives, guidance, policies and procedures regarding fear screening adopted pursuant to the Asylum Ban provide none of these safeguards to ensure the critical protection against *nonrefoulement* and therefore violates Section 1231(b)(3) and its implementing regulations.

## SEVENTH CLAIM FOR RELIEF
**(Immigration and Nationality Act, and Administrative Procedure Act)**

163.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

164.     The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

165.     The APA provides that courts "*shall . . . hold unlawful and set aside agency action*" that is "*in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.*" 5 U.S.C. § 706(2)(C).

166.     The APA provides that courts "*shall . . . hold unlawful and set aside agency action*" that is "*without observance of procedure required by law.*" 5 U.S.C. § 706(2)(D).

167.     The following laws require access to immigration judicial review of the conditions under which noncitizens are detained or released:

a.     19 U.S.T. 6223, art. 33 § 1 provides that the United States will not "expel or return ('*refouler*')" refugees to any country that may subject them to persecution itself, or transfer refugees to a third country that may subject them to persecution;

b.     8 U.S.C. § 1231(b)(3) as implemented by 8 C.F.R. 1208.16(a) provides for review of *nonrefoulment* decisions by an immigration judge;

168.     Because the new procedures are "not in accordance with law" and should therefore be held unlawful and set aside under 5 U.S.C. § 706(2)(C)-(D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

46

a)  Declare the new regulation, directives, guidance, policies and procedures contrary to law;

b)  Enter an order vacating the new regulation, directives, guidance, policies and procedures;

c)  Enter an order enjoining Defendants from continuing to apply the new regulation, directives, guidance, policies and procedures to credible fear determinations, reasonable fear determinations, interviews, or hearings issued or conducted by asylum officers or immigration judges;

d)  Enter an order staying the application of the new regulation, directives, guidance, policies and procedures to each of the Plaintiffs;

e)  Enter an order enjoining Defendants from issuing and/or executing expedited removal orders with regard to the Plaintiffs;

f)  Enter an order enjoining Defendants from removing the Plaintiffs without first providing each of them with a new credible fear process or reasonable fear process (as appropriate) under correct legal standards or, in the alternative, full immigration court removal proceedings pursuant to 8 U.S.C. § 1229a;

g)  Enter a Temporary Restraining Order and a Preliminary Injunction maintaining the status quo by requiring the government Defendants to reprocess the Plaintiffs' fear claims under the accepted prior policies;

h)  Order Defendants to pay Plaintiffs' litigation costs and reasonable attorney fees pursuant to the Equal Access to Justice Act; and

47

i) Order all other relief that the Court deems just and proper to ensure that the
government Defendants act according to law.

Respectfully submitted this 16th day of September, 2019.

Respectfully Submitted,

Dated: September 16, 2019    By:    /s/ Hassan Ahmad
Hassan M. Ahmad (D.D.C Bar: MD16049)
The HMA Law Firm, PLLC
7926 Jones Branch Dr., Suite 600
McLean, VA 22102
Phone: (703) 964-0245
Fax: (703) 997-8556
E-mail: hma@hmalegal.com

Dated: September 16, 2019    By:    /s/ Bridget Cambria
* Bridget Cambria (PA Bar No. 205271)
Cambria & Kline, P.C.
532 Walnut Street
Reading, PA 19601
Phone: (484) 926-2014
Fax: (484) 926-2032
E-mail: bridget.cambria@cambriaklinelaw.com

Dated: September 16, 2019    By:    /s/Amy Maldonado
* Amy Maldonado (IL Bar No. 6256961)
Law Office of Amy Maldonado
333 Albert Avenue, Suite 610
East Lansing, MI 48823
Phone: (517) 803-2870
Fax: (888) 299-3780
E-mail: amy@amaldonadolaw.com

Dated: September 16, 2019    By:    /s/ Elora Mukherjee
* Elora Mukherjee (NY Bar No. 4427233)
Columbia Law School
Morningside Heights Legal Services, Inc.
435 W. 116th Street
New York, NY 10027
Phone:  (212) 854-2603

48

App.485

Fax:  (212) 854-3554
E-mail:  emukherjee@law.columbia.edu

Dated: September 16, 2019          By:     /s/ Humza Kazmi
                                           * Humza Kazmi (DC Bar No. 1032240)
                                           The HMA Law Firm, PLLC
                                           7926 Jones Branch Dr., Suite 600
                                           McLean, VA 22102
                                           Phone: (703) 964-0245
                                           Fax: (703) 997-8556
                                           E-mail: hak@hmalegal.com


                                           ATTORNEYS FOR THE PLAINTIFFS

                                           *Motion pro hac vice forthcoming