# EXHIBIT "5"

2015 WL 1969489 (D.D.C.) (Trial Motion, Memorandum and Affidavit)
United States District Court, District of Columbia.

# WASHINGTON ALLIANCE OF TECHNOLOGY WORKERS, Plaintiff,

v.

# UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Defendant.

No. 14-529-ESH.

April 6, 2015.

### Defendant's Memorandum of Law in Opposition to Plaintiff's Cross Motion for Summary Judgment

Benjamin C. Mizer, Acting Assistant Attorney General, Leon Fresco, Deputy Assistant Attorney General, William C. Peachey, Director, Erez R. Reuveni, Senior Litigation Counsel, Sarah S. Wilson, Trial Attorney, Glenn M. Girdharry, Senior Litigation Counsel, United States Department of Justice, Civil Division, Office of Immigration Litigation, District Court Section, P.O. Box 868, Ben Franklin Station, Washington, DC 20044, Tel: (202) 532-4807, Email: glenn.girdharry@usdoj.gov, for defendants.

*ORAL ARGUMENT REQUESTED*

### *STATEMENT REGARDING ORAL ARGUMENT*

Under LCvR 7(f), Defendant respectfully requests oral argument. Oral argument will illuminate the parties' respective positions and aid the Court in reaching a decision.

#### *TABLE OF CONTENTS*

I. INTRODUCTION ........................................................................................................... 1
II. ARGUMENT ............................................................................................................... 2
A. Plaintiff's summary judgment motion has failed to establish that Plaintiff has Article III standing. .......... 2
B. The Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during post-graduation practical training. ......................... 16
1. The Secretary's interpretation of the F-1 statute warrants *Chevron* deference ........................................ 16
2. Plaintiff fails *Chevron* step one because an ambiguity exists within the F-1 statute requiring the Secretary's interpretation ........................................................................................ 21
3. Under *Chevron* step two, the Secretary's interpretation is reasonable ................................................ 24
i. The 2008 interim final rule does not conflict with limitations on temporary worker visas ....................... 25
ii. The OPT-STEM extension falls within the Secretary's broad discretion to set the terms and conditions for student visas ............................................................................................. 29
iii. The 2008 interim final rule is consistent with the Secretary's statutory obligation to protect the economic security of the United States ............................................................................ 30
C. The Secretary's promulgation of the 2008 interim final rule was not arbitrary or capricious. .................... 33
1. The 2008 interim final rule is amply supported by record evidence ........................................................ 33
2. The Secretary did not arbitrarily or capriciously fail to consider any relevant information in issuing the interim final rule ....................................................................................... 36
i. The Secretary considered all relevant labor-supply issues .................................................................. 36
ii. The Secretary duly considered the American STEM workforce ............................................................ 37
iii. The Secretary gave appropriate consideration to the educational need for a seventeen-month STEM extension ................................................................................................... 38
D. The Secretary's promulgation of the 2008 interim final rule and clarifications of qualifying STEM programs were procedurally proper. ......................................................................... 39

1. DHS's clarification of qualifying STEM courses of study did not require notice and comment ................ 39
2. The Secretary had good cause to publish the STEM practical training extension as an emergency rule .... 41
3. The Court should not remedy procedural defects with a vacatur order ...................................... 43
III. CONCLUSION ...................................................................................... 45
CERTIFICATE OF SERVICE ............................................................................. 47

### TABLE OF AUTHORITIES
#### CASE LAW

*Adams v. Watson*, 10 F.3d 915 (1st Cir. 1993) ...................... 15

*AFL-CIO v. Chao*, 496 F. Supp. 2d 76 (D.D.C. 2007) ........... 43

*Agape Church v. FCC*, 738 F.3d 397 (D.C. Cir. 2013) .......... 24

*Already, LLC v. Nike, Inc.*, 133 S. Ct. 721 (2013) ................ 15

*Am. Hospital Ass'n v Bowen*, 834 F.2d 1037 (D.C. Cir. 1987) .......................................................................... 40

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993) .......................................... 40

*American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) .................................................................. 34

*Associated Gas Distribs. v. FERC*, 899 F.2d 1250 (D.C. Cir. 1990) .................................................................. 7

*Ass'n v. FCC*, 752 F.3d 1018 (D.C. Cir. 2014) ...................... 24

*Barnhart v. Walton*, 535 U.S. 212 (2002) ........................... 19, 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ..................................................... 33

*Brown v. Gardner*, 513 U.S. 115 (1994) .............................. 22

*Central Texas Tel. v. FCC*, 402 F.3d 205 (D.C. Cir. 2005) ..... 40, 41

*Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) .................................................................. 44

*\*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .............................................. 16, 17, 21

*Christensen v. Harris County*, 529 U.S. 576 (2000) .............. 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................................................. 34, 36

*City of Arlington v. FCC*, 133 S. Ct. 1863 (2013) ................ 17

*\*Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138 (2013) .... 4, 9

*Commonwealth of the Northern Mariana Islands v. United States*, 670 F. Supp. 2d 65 (D.D.C. 2009) ........................... 32

*Ctr. for Auto Safety v. Dole*, 828 F.2d 799 (D.C. Cir. 1987) ... 34

*Davis v. FEC*, 554 U.S. 724 .............................................. 4

*Davis v. Mich. Dep't of Treas.*, 489 U.S. 803 (1989) ............ 21

*DEK Energy Co. v. FERC*, 248 F.3d 1192 (D.C. Cir. 2001) .. 11

*Delta Air Lines, Inc. v. Export-Import Bank*, 2015 U.S. Dist. LEXIS 40109 (D.D.C. Mar. 30, 2015) .............................. 6

*Dep't of Comm., v. U.S. House of Representatives*, 525 U.S. 316 (1999) ................................................................. 3

*Fleming Companies, Inc. v. Dep't. of Agriculture*, 322 F. Supp. 2d 744 (E.D. Tex. 2004) ...................................... 23

*Floyd v. District of Columbia*, 129 F.3d 152 (D.C. Cir. 1997) .......................................................................... 4

*Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012) ....................... 33, 37

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000) .................................... 8

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ............................ 19

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998) ................... 8

*Harris v. FAA*, 353 F.3d 1006 (D.C. Cir. 2006) .................... 30

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003), ........................................ 44, 45

*Heartland Reg'l Ctr. v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ....................................... 43

*Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363 (D.C. 2004) ....... 7

*Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018 (D.C. Cir. 2014) ....................................... 24

*Independent U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847 (D.C. Cir. 1987) ....................................... 45

*INS v. Abudu*, 485 U.S. 94 (1998) ....................................... 23

*INS v. Aguirre-Aguirre*, 526 U.S. 415 (1999) ....................... 23

*Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374 (9th Cir. 1989) ....................................... 7, 10

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985) ................................... 26

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985) ................................... 6, passim

*Judulang v. Holder*, 132 S. Ct. 476 (2011) ....................... 24

*KERM, Inc. v. FCC*, 353 F.3d 57 (D.C. Cir. 2004) ............... 11

*La. Forestry Ass'n Inc. v. Sec'y of Labor*, 745 F.3d 653 (3d Cir. 2014) ....................................... 16, 22, 23

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004) ....................... 25

*Lee v. Board of Governors of the Fed. Reserve Sys.*, 118 F.3d 905 (2d Cir. 1997) ....................................... 7, 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 4, passim

*Mack Trucks v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) ............. 42

*Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44 (2011) ....................................... 17, passim

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ............. 3, passim

*Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ....................................... 4, 5

*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ....................................... 18, 19, 21

*Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659 (D.C. Cir 2009) ....................................... 24

*Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) ....................................... 24

*New World Radio, Inc. v. FCC*, 294 F.3d at 172 (D.C. Cir. 2002) ....................................... 2, 6

*Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1 (D.C. Cir. 2011) ....................................... 26, 27

*Oil, Chem. & Atomic Workers Int'l Union v. Pena*, 18 F. Supp. 2d 6 (D.D.C. 1998) ....................................... 15

*Ord v. Dist. Of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009) .... 3

*Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015) .... 39, 40

*Programmer's Guild v. Chertoff*, 338 F. App'x 239 (3d Cir. 2009) ....................................... 2, passim

*Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279 (D.C. Cir. 2007) ....................................... 5, 9

*Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255 (11th Cir. 2008) . 20

*Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350 (2012) ...... 21, 22

Sameena, Inc. v. United States Dep't of the Air Force, 1996 U.S. Dist. LEXIS 18680 (N.D. Cal. Dec. 10, 1996) .............. 15

*Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910 (6th Cir. 2002) ....................................... 7

*Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260 (11th Cir. 2011) ... 20

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) .... 40
.......................................

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................... 20

*Snake River Farmers' Ass'n v. Dep't of Labor, 9 F.3d 792 (9th Cir. 1992) ................... 7, passim

Sorenson Commc'ns, Inc. v. FCC, 567 F.3d 1215 (10th Cir. 2009) ................... 39

Stilwell v. Office of Thrift Supervision, 569 F.3d 514 (D.C. Cir. 2009) ................... 34, 38

Sullivan v. Everhart, 494 U.S. 83 (1990) ................... 18

Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334 (2014) .. 4

Telford Borough Auth v. United States EPA, 2013 U.S. Dist. LEXIS 162776 (E.D. Pa. Nov. 15, 2013) ................... 15

Tesoro Alaska Co. v. FERC, 778 F.3d 1034 (D.C. Cir. 2015) 16, 17

*United States v. Mead Corp., 533 U.S. 218 (2001) ............ 17, 18, 19

United States v. Richardson, 418 U.S. 166 (1974) ................... 14

U.S. Tanker Owners Comm. v. Dole, 809 F.2d 847 (D.C. Cir. 1987) ................... 45

Young v. United Parcel Service, Inc., — S. Ct. —, 2015 WL 1310745 (Mar. 25, 2015) ................... S. Ct. —, 2015 WL 1310745 (Mar. 25, 2015) 20, 21

Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650 (D.C. Cir. 2011) ................... 21

Washington Alliance of Technology Workers v. U.S. Department of Homeland Security., — F. Supp. 3d —, 2014 WL 6537464 (D.D.C. Nov. 21, 2014) ................... F. Supp. 3d —, 2014 WL 6537464 (D.D.C. Nov. 21, 2014) 3

Warth v. Seldin, 422 U.S. 490 (1975) ................... 3

White Stallion Energy Center v. EPA, 748 F.3d 1222 (D.C. Cir. 2014) ................... 22

Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43 (D.C. Cir. 1999) ................... 5

**ADMINISTRATIVE CASES**

Matter of T-, 7 I. & N. Dec. 682 (Reg. Comm. 1958) ........... 21, 27

**LEGISLATIVE HISTORY**

H. R. Rep. No. 101-723, pt. 1. 1990 WL 200418, *6746 ...... 27

**FEDERAL REGULATIONS**

8 C.F.R. § 214.2(f)(10)(i)(C) ................... 30

8 C.F.R. § 214.2(f)(10)(ii) ................... 27

8 C.F.R. § 214.2(f)(10)(ii)(C)(3) ................... 14

8 C.F.R. § 214.2(h)(4) ................... 25

**PUBLIC LAWS**

Pub. L. No. 111-306 (Dec. 14, 2010) ................... 28

Homeland Security Act of 2002, Pub. L. No. 107-296 (Nov. 25, 2002) ................... 42

Workforce Improvement Act of 1998, Pub. L. No. 105-277, Div. C., Title IV, §§ 411-415 (Oct. 21, 1998) ................... 28

**STATUTES**

5 U.S.C. § 553 ................... 19

5 U.S.C. § 553(b)(A) ................... 39

5 U.S.C. § 553(b)(B) ................... 41

5 U.S.C. § 706(2)(A) ................... 33

6 U.S.C. § 111(b)(1)(F) ................... 30, 31, 32

6 U.S.C. § 252(a)(4) ................... 29

8 U.S.C. § 1101(a) ................... 24

8 U.S.C. § 1101(a)(15)(B) ................... 26

8 U.S.C. § 1101(a)(15)(F) ................... 20

8 U.S.C. § 1101(a)(15)(F)(i) ................... 22, passim

8 U.S.C. § 1101(a)(15)(H)(i)(b) ................... 25

8 U.S.C. § 1101(a)(15)(H)(ii) ................... 26

8 U.S.C. § 1101(a)(15)(J) ................... 23

8 U.S.C. § 1101(a)(15)(M)(i) ................... 23

8 U.S.C. § 1103(a)(1) ................... 16, passim

8 U.S.C. § 1103(a)(3) .................................................... 16, passim
8 U.S.C. § 1182(a)(9)(B)(ii) .......................................... 21
8 U.S.C. § 1182(n) ........................................................ 25
8 U.S.C. § 1184(a)(1) .................................................... 16, passim
8 U.S.C. § 1184(c)(1) ..................................................... 22
8 U.S.C. § 1184(i)(1)(A) ................................................. 25
8 U.S.C. § 1252(g) ......................................................... 30
8 U.S.C. § 1255 .............................................................. 30
8 U.S.C. § 1258 .............................................................. 30
8 U.S.C. § 1324a(h)(3) .................................................... 32
8 U.S.C. § 1372 .............................................................. 29
**FEDERAL REGISTER NOTICES**
12 Fed. Reg. 5355 .......................................................... 27
12 Fed. Reg. 5357 .......................................................... 21, 27, 28
38 Fed. Reg. 35,426 ........................................................ 21, 28
43 Fed. Reg. 14,575 ........................................................ 30
67 Fed. Reg. 76,256 ........................................................ 29
73 Fed. Reg. 18,945-46 ................................................... 31
73 Fed. Reg. 18,946-47 ................................................... 31, 38
73 Fed. Reg. 18,945-50 ................................................... 21, 28
73 Fed. Reg. 18,946-49 ................................................... 17, 18
73 Fed. Reg. 18,947 ........................................................ 37
73 Fed. Reg. 18,948 ........................................................ 25, 29
73 Fed. Reg. 18,950 ........................................................ 42, 43
73 Fed. Reg. 18,954 ........................................................ 39

## I. INTRODUCTION

Defendant, United States Department of Homeland Security ("DHS"), respectfully submits this memorandum of law in opposition to the cross motion for summary judgment filed by Plaintiff, Washington Alliance of Technology Workers. As a jurisdictional matter, at this stage in the litigation, Plaintiff has failed to meet its burden to establish Article III standing. In addition to this fatal justiciability defect, Plaintiff's summary judgment motion also fails to establish that DHS promulgated the OPT-STEM extension interim final rule in violation of the Administrative Procedure Act ("APA"). Congress has expressly authorized the Secretary to administer the Immigration and Nationality Act ("INA") with the force of law, and establish such regulations as he deems necessary for carrying out his authority under the INA. Because the Secretary was acting within his broad delegation of authority to set the terms and conditions for the admission of foreign students and his interpretation follows a longstanding construction of an ambiguous statutory provision, the Court should uphold the Secretary's interpretation of the relevant statutory provisions and resulting OPT-STEM extension rule.

Moreover, there were no procedural defects that require *vacatur* of the OPT-STEM extension rule. The Secretary had good cause to publish the regulation as an emergency rule because tens of thousands of highly-skilled individuals educated at United States colleges and universities would have been forced to leave this country in the absence of the rule. Without the immediate issuance of the 2008 interim final rule, critical sectors of the national economy along with American universities and foreign students would have faced immediate harm. And DHS's clarification of qualifying STEM occupations was an interpretive rule exempt from notice and comment rulemaking.

On these bases, Defendant is entitled to judgment in its favor.

## II. ARGUMENT

### A. Plaintiff's summary judgment motion fails to establish Article III standing.

As a threshold matter, Plaintiff's summary judgment motion has failed to establish Article III standing to proceed.[1] At this advanced stage in the litigation, Plaintiff must submit clear record evidence establishing that its members suffered a concrete, non-speculative injury-in-fact. Plaintiff, however, has failed to meet this burden. Indeed, Plaintiff continues to rely on the general averments and conclusory allegations made in its complaint, while simply resting on the Court's inference of standing in its favor that helped Plaintiff survive the motion to dismiss stage. Plaintiff also relies on extra-record evidence that, even if properly before this Court, fails to establish standing. Because Plaintiff has failed to provide the required specific, particularized evidence necessary to demonstrate that its three members are in direct and current competition for jobs with OPT students on STEM extensions, its members lack competitor standing and consequently, Plaintiff lacks associational standing to proceed. This foundational jurisdictional defect requires the Court to grant judgment in favor of Defendant.

Plaintiff's jurisdictional failure follows from the fact this litigation is currently at the summary judgment, rather than motion to dismiss, stage. As this Court recognized, ECF No. 17 at 5, at the motion to dismiss stage, a court " 'must accept as true all material allegations of the Complaint, and must construe the Complaint in favor of the complaining party.' " *Ord v. Dist. Of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Likewise, when ruling on a motion to dismiss based on the allegations in the complaint a court "must draw all fair inferences in favor of the plaintiff." *Washington Alliance of Technology Workers v. U.S. Department of Homeland Security* ("*WashTech*"), ––– F. Supp. 3d ––––, 2014 WL 6537464, at *4 (D.D.C. Nov. 21, 2014).

In denying the motion to dismiss, this Court recognized that the "STEM labor market [was] broader," and thus different, "than the herder labor market at issue" in *Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014), the primary case on which it relied in denying Defendant's motion to dismiss. However, acknowledging that it was required to apply the liberal, deferential standard outlined above, this Court accepted as true Plaintiff's allegations in its Complaint and construed that Complaint in Plaintiff's favor, including by "draw [ing] all fair inferences in favor of the plaintiff."[2] ECF No. 17 at 5, 10. Accordingly, this Court concluded that *at the motion to dismiss stage*, it was "reasonable to infer that the named party members, who have technology-related degrees in the computer programming field and have applied for STEM employment during the relevant time period, were in direct and current competition with OPT students on a STEM extension," and therefore suffered a "concrete and particularized injury." *Id.* at 10.

However, as this Court implicitly recognized, the Court's favorable "fair inferences" and construal of the Complaint in favor of Plaintiff does not carry-over to a subsequent phase of the litigation. Indeed, to prevail on a motion for summary judgment, as opposed to a motion to dismiss, it is well established that mere allegations of injury are insufficient. *See Dep't of Comm., v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). "Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Id.* The party invoking federal jurisdiction bears the burden of establishing each element of standing which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, at the summary judgment phase, the plaintiff "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts' " necessary to establish standing.[3] *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1149 (2013) (quoting *Lujan*, 504 U.S. at 561); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (observing that "burden of production to establish standing is more relaxed at the pleading stage than at summary judgment"). And the fact the court previously addressed standing as part of the motion to dismiss is not determinative: the court has an "independent obligation to assure [itself] of jurisdiction," *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997), at all stages of litigation. *See, e.g., Davis v. FEC*, 554 U.S. 724, 732-33 ("an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

However, simply submitting affidavits or other documentary evidence asserting general injury is insufficient, particularly where, as here, the injury Plaintiff asserts depends on the actions of third-parties like employers or employees actually regulated by the regulation who are not in fact parties to this litigation. Indeed, as the Supreme Court has held, "it is ordinarily substantially more difficult to establish" standing in cases like this where "plaintiff's asserted injury arises from the government's allegedly unlawful

regulation (or lack of regulation of someone else[]" *Lujan,* 504 U.S. 561-62. Because standing here in part "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the court cannot presume either to control or to predict" "much more is needed" to establish standing. *Id.* Finally, when a party seeks direct review of agency action, it must provide support for each element of its claim to standing in its opening brief. *See Public Citizen, Inc. v. NHTSA,* 489 F.3d 1279, 1289 (D.C. Cir. 2007). Plaintiff's opening brief does not come close to providing the necessary support for each element of its claim to standing and therefore fails to meet this threshold jurisdictional requirement.

With the foregoing in mind, Plaintiff fails to meet its burden. Standing is a jurisdictional question. *See Wyoming Outdoor Council v. U.S. Forest Service,* 165 F.3d 43, 48 (D.C. Cir. 1999). At an "irreducible constitutional minimum," a party must establish (1) that it has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Lujan,* 504 U.S. at 560-61. Plaintiff is a tech workers union asserting "associational standing" to challenge DHS's OPT STEM extension rule on behalf of its members. *See* Pl.'s Memo., ECF No. 25 at 12-14. The three-part test to establish "associational standing," requires demonstration that: (1) the association's members would otherwise have standing to sue in their own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Nat'l Ass'n of Home Builders v. EPA,* 667 F.3d at 12. As the parties previously acknowledged, only the first of these is at issue in this case.

Plaintiff asserts, and this Court previously assumed, that three of its members - Douglas Blatt, Rennie Sawade, and Cesar Smith - could bring this suit in their own right under the "competitor standing" doctrine. ECF No. 25 at 12-14; *see* ECF No. 17 at 10. "A party seeking to establish standing on the basis of the competitor standing doctrine must demonstrate that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *Mendoza,* 754 F.3d at 1013 (emphasis in original, citation omitted).

In order to satisfy the requirements set forth in the governing competitor standing case law at the summary judgment stage, Plaintiff must submit specific evidence demonstrating not only that some law or regulation benefits some other class of employees or employers in the abstract, but also that there is a causal nexus between the regulation's effect on non-party student employees and Messrs. Blatt, Sawade, and Smith such that the Court can conclude they work in the *same* job category, that they are willing to work the *same* jobs going to STEM-OPT students, and that they are qualified to do so. *See, e.g., Mendoza,* 754 F.3d at 1012-13; *Int'l Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798, 800 (D.C. Cir. 1985) ("*Bricklayers*"); *accord Lujan,* 504 U.S. 561-62. This follows from basic D.C. Circuit law: where competitor standing depends "on the independent actions of third parties," the case is not a "garden variety competitor standing case[]" and plaintiff may not ask the court to "acknowledge a chain of causation firmly rooted in the basic law of economics," but must instead demonstrate such causation. *See New World Radio,* 294 F.3d at 172. This is why injury must be concrete and "imminent," rather than merely premised on "speculat[ion]," *see, e.g., Delta Air Lines, Inc. v. Export-Import Bank,* 2015 U.S. Dist. LEXIS 40109, *21-22 (D.D.C. Mar. 30, 2015), and that imminence must be supported by facts rather than conjecture at the summary judgment stage.

For example, in *Mendoza,* the D.C. Circuit concluded that standing was established because the American herders competed directly with foreign-born herders and could show their wage would not be lower but for the foreign born workers. 754 F.3d at 1012-13. In particular, the court noted that "plaintiffs [had] attested to specific experience that qualifie[d] them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions they would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder." *Id.* at 1014.

Similarly, in *Bricklayers,* the court found standing because the union member bricklayers demonstrated that they competed directly with foreign bricklayers and provided evidence that they were "ready, willing and able" to perform the *precise* jobs foreign-born workers were performing, *i.e.* bricklaying on the *same* projects the foreign workers were working on. 761 F.2d at 800 (D.C. Cir. 1985); *see also Honeywell Int'l, Inc. v. EPA,* 374 F.3d 1363, 1368-70 (D.C. 2004) (standing established where regulation "legalize[d] the entry of a product into a market in which [plaintiff] competes"); *Sault Ste. Marie Tribe of Chippewa*

*Indians v. United States*, 288 F.3d 910, 916 (6th Cir. 2002) (no standing where plaintiff offered no evidence that casino forty miles away would detract from its business); *Lee v. Bd. of Governors of the Fed. Reserve Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) ("plaintiff must show that he personally competes in the same arena"); *Snake River Farmers' Ass'n v. Dep't of Labor*, 9 F.3d 792, 797-98 (9th Cir. 1992) (no standing where plaintiff not a direct competitor for same job); *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1378-79 (9th Cir. 1989) (standing established where plaintiff crane operators were in direct competition with Canadian crane operators); *cf. Assoc. Gas Distribs. v. FERC*, 899 F.2d 1250, 1259 (D.C. Cir. 1990) (plaintiff must show challenged action has "clear and immediate potential" to cause competitive harm).

Accordingly, at this summary judgment stage, Plaintiff must provide specific, concrete facts like those in *Mendoza* and *Bricklayers*. It has not. In its motion for summary judgment, Plaintiff generally claims that its "filed affidavits and Appendix B contain[] the evidence supporting the factual allegations for standing in the complaint." ECF No. 25 at 11. Plaintiff's actual motion, however, points to only three factual bases for its Article III standing: (1) that Messrs. Sawade and Blatt are "computer programmer[s,]" Mr. Smith is a "computer systems and networking administrator," and both positions "appear on all of DHS's STEM lists"; (2) that "employers such as IBM, place recruitment advertisements that make OPT status a job requirement, thereby disqualifying Washtech members from consideration"; and (3) "employers do not have to pay Medicare and Social Security taxes for aliens on students visas . . . which makes workers under the OPT program 15.3% cheaper to employ than Washtech Members." ECF No. 25 at 13-14. At this stage in the proceedings, these claims present nothing more than the general averments and conclusory allegations which are insufficient to establish any injury-in-fact due to direct and current competition. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 184 (2000); *Snake River Farmers*, 9 F.3d at 797-98. They categorically do not demonstrate that the F-1 regulation benefits F-1 visa holders and that there is a causal link between the regulation's effect on F-1 visa holders and Messrs. Sawade, Blatt, Smith such that the court can conclude that they are in the same job category, that they are willing to work the same jobs going to STEM-OPT students, and that they are qualified to do so.

Even assuming it is appropriate to probe beyond the summary judgment papers and examine whether Plaintiff's affidavits and Appendix B contain actual "specific facts" supporting standing, that inquiry would be futile. For instance, Mr. Blatt's affidavit states that he is "employed currently as a computer programmer," but makes no statement that he is searching for a new programmer-type position. Blatt Aff., ECF No. 25-1. On this basis alone, he fails to show that he is in "current" competition with OPT students on STEM extensions. *See Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) (party must "show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit . . . [f]or only then does the plaintiff satisfy the rule that he was personally disadvantaged").

In addition, Mr. Blatt lists twelve instances when he applied for jobs between March 30, 2010, and June 11, 2012, including a "position at Deloitte Touche Tohmatsu," a "computer job at Ernst & Young," a "programming job at Hewlett Packard," and a "computer project management job at Fiserv." Blatt Aff., ECF No. 25-1. Based on this, Plaintiff cannot plausibly argue that Mr. Blatt's vague attestations regarding job applications years ago set forth any specific facts establishing his direct and current competition for jobs with OPT students on STEM extensions.

Messrs. Sawade's and Smith's affidavits are no different. *See* Sawade Aff., ECF No. 25-1; Smith Aff., ECF No. 25-1. Messrs. Sawade and Smith both attest that they are also presently employed and similar to Mr. Blatt, they make vague references to instances when they each applied or interviewed for jobs with tech companies. *Id.* The affidavits, however, fail to demonstrate with the degree of specificity needed at this stage in the litigation the precise facts regarding: 1) the actual job titles of the open STEM positions; 2) the details of companies' vacancy announcements (*e.g.*, job locations); 3) the specific educational, skills and experience required for the open positions; 4) whether the members possessed the minimum educational, skills and experience required for the positions; and 5) whether any of the companies advertising positions that Plaintiff members applied for actually filled the open positions with OPT students on STEM extensions. *Id.* Instead, Messrs. Blatt, Sawade and Smith affidavits simply mirror the unsupported, vague and conclusory allegations Plaintiff made at the motion to dismiss stage. *Compare* Affidavits, ECF No. 25-1 *with* Pl.'s Orig. Compl., ECF No. 1 at ¶¶ 79-154. While these conclusory assertions may have previously given

Plaintiff the fair inference of standing, they fall well short of establishing any element of Plaintiff's claim to standing at the subsequent summary judgment phase. *See Clapper*, 133 S. Ct. at 1149; *NHTSA*, 489 F.3d at 1289.

Relatedly, Plaintiff's general allegation - unsupported by specific evidence - that "employers such as IBM, place recruitment advertisements that make OPT status a job requirement, thereby disqualifying Washtech members from consideration" also does not advance their claim for standing. At the very least, Plaintiff would need to demonstrate, among other things, that: (1) Messrs. Sawade, Blatt, and Smith were eligible to apply for such jobs, including background requirements and willingness to relocate; that (2) the jobs were not specifically intended for students or part of a course of ongoing temporary training for students;[4] and that (3) non-OPT individuals were considered for the positions that ultimately went to students. *See, e.g., Mendoza*, 754 F.3d at 1014 ("The plaintiffs have attested to specific experience that qualifies them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions they would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder"). Their filings contain no such allegations.

In any event, at the very least, at this stage of proceedings, Plaintiff must demonstrate with specific facts that the jobs Messrs. Sawade, Blatt, and Smith attest to applying to in their affidavits were jobs that both Messrs. Sawade, Blatt, and Smith *and* OPT students were applying to. *See, e.g., Lee*, 118 F.3d at 913; *Snake River Farmers*, 9 F.3d at 797-98; *Meese*, 891 F.2d at 1378-79. If Messrs. Sawade, Blatt, and Smith *and* OPT students are not, in fact, applying for the same positions, they cannot be said to be direct and current competitors. *Mendoza*, 754 F.3d at 1012-14; *Bricklayers*, 761 F.2d at 800.

Plaintiff's own evidence makes this plain: the IBM job listings on which they rely are all for jobs in *India. See* Appendix B at 72-77 (job listings for positions in Bangalore, Chennai, Hyderabad, Kolkata, and Pune). Each job apparently required OPT training in the United States, but ultimately the jobs require relocating to India. Only Mr. Blatt claims to have applied for a job with IBM, ECF No. 25-1 at 2, and nothing in his declaration or any of Plaintiff's evidence indicates he applied for an IBM job in India or that he was willing to relocate to India. If Mr. Blatt was not applying for IBM jobs in India, he cannot be said to be in *direct* and *current* competition with STEM-OPT students in India, to say nothing of the fact that he cannot assert competitor standing on the theory that STEM-OPT students in the United States harm his ability to get a job in the United States if the jobs he relies on require moving to India.

Plaintiff's exhibits in Appendix B of other job listings seeking OPT students also do not cure Plaintiff's jurisdictional defect. At best, the exhibits demonstrate that employers sought to employ students in a variety of job categories with a broad set of job requirements, in different disciplines, and in different geographic locations across the country. It does not demonstrate-- particularly at the summary judgment stage--that these employers sought to employ specifically "computer programmers" or "computer systems and networking administrators" like Messrs. Sawade, Blatt, and Smith as a general matter from a pool of *both* eligible employees *and* OPT students, and chose to employ OPT students to reap the tax benefits as Plaintiff alleges. *See, e.g., DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001) (party may establish competitor standing by showing "substantial probability" of economic injury and no such standing where party establishes only "some vague probability" of increased competition and "a still lower probability" of injury stemming from that competition); *accord KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (a party may have competitor standing if it is "likely to be financially injured" by challenged government action and fails to establish standing where party did not introduce evidence of financial injury but merely purported to compete against party subject to challenged administrative decision).

Plaintiff attempts to surmount this difficulty by providing the affidavit of Michael Schendel, President of Washtech, who asserts that "[m]any employers openly solicit OPT participants to the exclusion of WashTech members." ECF No. 25-1 at 13. In support, he points to a single job listing for a software engineer in "Redmond, Washington" with an unlisted employer. *Id.* That listing seeks "OPT candidates with good Java and Android knowledge" and asks that "only direct candidates who can work on OPT respond to this." *Id.* at 14. This job advertisement seeking student employees does not demonstrate, let alone with any specificity, that Messrs. Sawade, Blatt, and Smith were direct and current competitors with the students this advertisement solicited. At a bare minimum, these individuals would have had to attest that: they wanted this "software engineer[ing]" work,

this job was an upgrade over their current position either because of a higher wage or better job quality, they applied for the job in "Redmond, Washington," they did not obtain the job, and a STEM-OPT student obtained the job. But even that may be insufficient, as Plaintiff does not explain through specific evidence how a "software engineer" position in "Redmond Washington" is interchangeable with Messrs. Blatt, Sawade, and Smith's professed professions as "computer programmers" or "computer systems and networking administrator," such they are in *direct* and *current* competition with them.

Plaintiff's references in Appendix B to similar job listings seeking STEM-OPT student candidates fares no better, as none indicates Messrs. Sawade, Blatt, and Smith were direct and current competitors with the students these advertisements solicited. *See* ECF No. 25-3 at 6. Indeed, the advertisements involve numerous tech-worker headhunting organizations that locate potential student employees for a client list that includes many large American corporations. *See* ECF at 25-3 at 1-166. Many of these positions require applicants willing to travel to the headhunter's geographic location for training and then to be assigned to work *anywhere* in the United States. *See, e.g.* ECF No. 25-3 at 10, 17, 19, 20, 22, 35, 49, 106, 109, 135, 138, 147, 153. Messrs. Sawade, Blatt, and Smith's affidavits in no way demonstrate they were in fact in direct and current competition with this class of students seeking jobs through these headhunters, as they neither demonstrate that they applied to any of these headhunters, that these headhunters were filling non-entry level positions in Plaintiff-members' desired skill and experience level, that they were willing to relocate *anywhere in the United States*, as these jobs required, or that Messrs. Sawade, Blatt, and Smith were willing to and applied for the many entry-level positions advertised. *See id.* at 6-9, 17, 19, 24, 28, 31, 35, 55, 59, 66, 93, 100, 104, 107, 109, 115, 144, 151, 153, 163.

Appendix B also lists jobs through headhunters in specific geographic locations without listing the name of the employer. *See, e.g., id.* at 6-9, 15, 17, 49, 58, 62, 109, 153. These advertisements fail to support standing for similar reasons: Messrs. Sawade, Blatt, and Smith's affidavits do not claim they applied for any of these positions through these headhunters. Perhaps acknowledging this impediment, Plaintiff provides documents from some of these headhunters listing their clients. For example, Appendix B contains such a list from "3A Soft Inc," the company whose adverts appear at pages 6-10 of the Appendix, which lists companies like HP, Disney, Cisco, Jetblue, Cingular, Microsoft, SAP, Oracle, Verizon, JP Morgan, New York Life, and Intel as some of their "key clients." To be sure, Messrs. Sawade, Blatt, and Smith claim to have applied for jobs at some of these companies. *See* ECF No. 25-1 at 1, 5-6, 19 (JP Morgan, Microsoft, HP); *see also, e.g., id.* at 14, 18, 20, 25, 27, 32, 38, 42-45, 47-48 (listing companies the respective headhunters represent). But their affidavits indicate they did so directly, not through 3A Soft Inc. or any of the headhunter companies in Appendix B, so it is impossible to ascertain whether they applied to the same jobs 3A Soft Inc. and other headhunters were recruiting for, let alone for the small class of headhunter jobs seeking computer programmers or computer systems and network administrators. *See id.* at 11, 15, 17, 20, 26, 28, 29, 31, 35, 104, 141. Plaintiff thus fails to demonstrate through specific facts that Messrs. Sawade, Blatt, and Smith are direct and current competitors of the students who the advertisements in Appendix B are relevant to, given that they adduce no evidence they are willing to move anywhere in the United States and/or because they do not show they applied for any headhunter-listed job, let alone for non-entry level positions in Plaintiff-members' desired skill and experience level.[5]

Ultimately, Plaintiff's standing allegations must fail because they turn the competitor standing doctrine on its head. The crux of Plaintiff's argument is that Messrs. Sawade, Blatt, and Smith applied for "STEM Jobs," a vague and generalized category that includes over 150 categories of separate jobs according to Department of Labor Databases. *See* O*Net Online, http://www.onetonline.org/find/stem?t=0&g=Go (last visited Apr. 6, 2015). This would include not just computer programmers or computer systems and networking administrator jobs, like those Messrs. Sawade, Blatt, and Smith claim to seek, but jobs in the sciences, engineering, mathematics, and the military, among others. Plaintiff's version of competitor standing ignores obvious distinctions between these categories, and instead postulates that Messrs. Sawade, Blatt, and Smith may sue on the generalized theory that they applied for STEM jobs, regardless of whether they were the same jobs any of Plaintiff's evidence involved, whether they were appropriately qualified, or whether they were willing to relocate anywhere in the United States. This generalized standing theory is akin to "taxpayer standing," universally rejected by the courts, *see, e.g., United States v. Richardson*, 418 U.S. 166, 171-80 (1974), in that it would provide *every* American who had applied for *any* STEM job and did not get it standing to sue because the only explanation for their not getting it must be *some* F-1 visa-holder got the job.

That cannot be so, as it would establish standing for any aggrieved U.S. worker, rather than, as precedent requires, for U.S. workers who are "direct and current" competitors of foreign nationals with F-1 visas. *See Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 731 (2013) (rejecting "boundless theory of standing," and observing that "[t]aken to its logical conclusion, [plaintiff's] theory seems to be that a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful -- whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on"). That is a far cry from the requirement that the aggrieved party demonstrate, with specific evidence, that they compete directly and currently in the relevant job category. *See, e.g., Mendoza*, 754 F.3d at 1012-13; *Bricklayers*, 761 F.2d 798, 800 (D.C. Cir. 1985).

In the end, Plaintiff fails to narrowly define the relevant job market, and similarly fails to provide record evidence showing Messrs. Sawade, Blatt, and Smith were in direct and current competition with the individuals who applied for the headhunter jobs at issue in Appendix B (or for jobs with OPT students on STEM extensions).[6] It therefore cannot establish competitor standing. As such, Plaintiff lacks associational standing.[7]

### B. The Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during post-graduation practical training.

Even if Plaintiff's fatal jurisdictional defects are set aside, the Court should grant judgment in Defendant's favor because the Secretary did not exceed his statutory authority by reasonably interpreting the F-1 statute to provide foreign students with employment authorization during the brief period of post-graduation practical training. Congress, through its creation of DHS, charged the Secretary with the broad authority to administer and enforce the INA, including the specific authority to determine the conditions for admitting nonimmigrants to the United States. *See* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1). The 2008 OPT rule, and the 2010 and 2011 STEM extension rules, are therefore the lawful result of the Secretary's reasonable interpretation of the F-1 statute under the express authority of Congress.

### 1. The Secretary's interpretation of the F-1 statute warrants Chevron deference.

A glaring defect in Plaintiff's summary judgment motion is its reliance on the incorrect standard of review. *See* ECF No. 25 at 10-11. The Court reviews challenges to the Secretary's interpretation of the INA under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See, e.g., La. Forestry Ass'n Inc. v. Sec'y of Labor*, 745 F.3d 653, 670 (3d Cir. 2014). *Chevron* also applies when a court must determine whether the agency has acted beyond its statutory authority. *See Tesoro Alaska Co. v. FERC*, 778 F.3d 1034, 1037 (D.C. Cir. 2015). The Supreme Court has made clear: "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority," and the court will defer to the agency's reasonable interpretation of statutory ambiguities concerning both the scope of its statutory authority and the application of that authority. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013).

That is precisely the situation here. Plaintiff has brought this suit challenging the Secretary's interpretation of the F-1 statute and authority under the INA to provide foreign students with temporary employment authorization during post-graduation practical training. The standard of review of such a challenge, therefore, falls squarely within the *Chevron* framework.

Under *Chevron*, if the court determines "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter." 467 U.S. at 842. If, however, "the statute is silent or ambiguous with respect to the specific issue," then the court must determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency is entitled to *Chevron* deference when Congress delegates it authority to speak with the force of law through rulemaking, *see United States v. Mead Corp.*, 533 U.S. 218, 230 (2001), as Congress has done in this case. *See* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1); *see also* 73 Fed. Reg. at 18,946-49. Because the statute providing for the admission of foreign students contains an ambiguity in the connotation of the relevant terms, the Court affords substantial deference under *Chevron* to the Secretary's reasonable interpretation of these terms.

Plaintiff cites *Mayo Foundation for Medical Educ. & Research v. U.S.*, 562 U.S. 44, 58 (2011), for the proposition that "DHS forfeited deference under *Chevron* because it failed to provide notice and comment for any of the actions at issue." ECF No. 25 at 11. Plaintiff, however, misses the mark. *Mayo* actually supports Defendant's contention that the Court must apply the *Chevron* two-step framework to the Secretary's reasonable interpretation of the statute.

In *Mayo*, the Court held that the *Chevron* two-step framework applied to its review of the Treasury Department's interpretation of provisions of the Internal Revenue Code ("IRC") resulting in a rule that exempted medical residents from FICA taxes (the "full-time employee rule"). *See* 562 U.S. at 51. The Court held that because the Secretary of the Treasury issued the full-time employee rule pursuant to Congress's explicit authorization to "prescribe all needful rules and regulations for the enforcement" of the IRC, such "express congressional authorizations to engage in the process of rulemaking" are "a very good indicator of delegation meriting *Chevron* treatment." *Mayo*, 562 U.S. at 57 (citing *Mead*, 533 U.S. at 229). The Court went on to analyze the full-time employee rule under *Chevron* holding that in issuing the rule, the Secretary had reasonably interpreted the IRC. *Id.* at 60. Directly in line with this, Congress has expressly authorized the Secretary to administer the INA with the force of law, and "establish such regulations" as he deems necessary for carrying out his authority under the INA. *See* 8 U.S.C. §§ 1103(a) (1), (3); *see also* 73 Fed. Reg. at 18,946-49. Moreover, the instant case puts directly before the Court for review the Secretary's "express congressional authorization[] to engage in the process of rulemaking" regarding his reasonable interpretation of the INA to provide F-1 students with temporary employment authorization during post-graduation practical training. *See Mayo*, 562 U.S. at 57. Under *Mayo*, therefore, *Chevron* provides the correct standard of review in this matter. *See Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980-81 (2005) (FCC entitled to *Chevron* deference under statutes that gave the Commission the authority to execute, enforce and prescribe such rules and regulations necessary in the public interest to carry out the provisions of the Communications Act of 1934); *Sullivan v. Everhart*, 494 U.S. 83, 88-89 (1990) (applying *Chevron* deference to HHS rule promulgated pursuant to delegation of general authority to make rules and regulations and establish procedures necessary or appropriate to carry out such provisions).

Contrary to what Plaintiff would have this Court believe, compliance with notice and comment procedures is not a requirement for determining whether a court will apply the *Chevron* framework to an agency's interpretation of a statute. Rather, as the *Mayo* court held, satisfaction of notice and comment procedures merely presents "a consideration identified in [the Court's] precedents as a 'significant' sign that a rule merits *Chevron* deference." 562 U.S. at 57-8 (citing *Mead*, 533 U.S. at 230-31). More to the point, the Court held that *Chevron* deference is appropriate " 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' " *Mayo*, 562 U.S. at 57 (citing *Mead*, 533 U.S. at 226-27). Here, Congress has expressly delegated to the Secretary the broad authority to administer all provisions of the INA with the force of law, and "establish such regulations" for this purpose, *see* 8 U.S.C. §§ 1103(a)(1), (3), 1184(a)(1), which includes providing F-1 students with temporary employment authorization during post-graduation practical training. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("the fact that the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking, *see* 5 U.S.C. § 553, does not automatically deprive that interpretation of the judicial deference otherwise its due"); *Mead*, 533 U.S. at 230-31 (" 'the want of' notice and comment 'does not decide the case' "); *Brand X*, 545 U.S.at 1004 (Breyer, J., concurring) ("The Court explicitly stated that the absence of notice-and-comment rulemaking did 'not decide the case,' for the Court has 'sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded' ") (citing *Mead*, 533 U.S. at 231)); *Gonzales v. Oregon*, 546 U.S. 243, 281 (2006) ("The Court does not take issue with the Solicitor General's contention that no alleged procedural defect, such as the absence of notice-and-comment rulemaking before promulgation of the Directive, renders Chevron inapplicable here.").

The Court should reject Plaintiff's assertion that *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), provides the correct standard of review. ECF No. 25 at 11. Under *Skidmore*, an agency's interpretation that lacks the force of law - e.g., policy statements, agency manuals, or enforcement guidelines - does not warrant *Chevron* deference, but instead is "entitled to respect" to the extent it is persuasive. *Christensen v. Harris County*, 529 U.S. 576, 577 (2000). For instance, courts will review a "non-binding administrative interpretation" by DHS under *Skidmore*, making a determination on whether the interpretation "carries a weight

dependent upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260, 1266 (11th Cir. 2011) (citing *Quinchia v. U.S. Att'y Gen.*, 552 F.3d 1255, 1259 (11th Cir. 2008). In the instant case, however, review of a non-binding administrative interpretation by DHS is not before the Court. Rather, the Secretary has established regulations with the force of law under his express authority from Congress to administer the INA and reasonably interpreted the statute to provide F-1 students with employment authorization during post-graduation practical training. The *Skidmore* standard of review, therefore, is inappropriate.

On these bases, the Secretary's reasonable interpretation of the INA in this matter warrants *Chevron* deference.[8]

### 2. Plaintiff fails Chevron step one because an ambiguity exists within the F-1 statute requiring the Secretary's interpretation.

Plaintiff's summary judgment motion fails to demonstrate that the INA "unambiguously forecloses" the Secretary's interpretation of the term "student." *See Brand X*, 545 U.S. at 983; *Chevron*, 467 U.S. at 842; *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 661 (D.C. Cir. 2011). Plaintiff, therefore, has failed to get around *Chevron* step one.

Plaintiff asserts that the term "student" is not ambiguous, ECF No. 25 at 17, but fails to recognize that the INA definition of "student" is only the definition of what is required to be proven at the time of admission to obtain a student visa. After a student is admitted into the United States in F-1 status, the INA does not define the term "student" as it relates to permitted courses of study which may encompass both classroom education and practical training. *See, generally*, 8 U.S.C. §§ 1101(a), (a)(15) (F); *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012) ("Statutory language . . . 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme' ") (quoting *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989)). Instead, the INA leaves the determination as to what conduct a nonimmigrant student must comply with post-admission to maintain their F-1 status to the discretion of the Secretary, along with a determination on the length of the student's period of authorized stay while he or she holds F-1 status. *See* 8 U.S.C. §§ 1103(a)(3), 1182(a)(9)(B)(ii); 1184(a)(1).[9] Plaintiff may posit that the term "student" is defined by the four corners of a dictionary definition, ECF No. 25 at 17, but an ambiguity exists by virtue of the term's connotation within the larger context of the F-1 statute. *See White Stallion Energy Center v. EPA*, 748 F.3d 1222, 1243 (D.C. Cir. 2014) (ambiguity arises from a statutory phrase's two possible connotations); *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]"). Specifically, the statute does not define the parameters of a foreign student's permitted course of study, or whether hands-on training or employment - such as a paid internship - may accompany or follow the course of study as practical part of the student's education in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i). In fact, employment as a means of training a student is not unusual, especially in the context of the high-skilled technology sector where specifically, a position for a computer programmer can require "several years of work-related experience, on-the-job training, and/or vocational training." *See* Occupational Information Network, *Computer Programmer*, Job Zone 4 Definition, http:// www.onetonline.org/link/summary/15-1131.00 (visited Apr. 6, 2015). The statute certainly does not unambiguously foreclose the possibility of hands-on education as a component of study. In the end, the statute's silence on these issues - and this lack of clarity regarding the precise connotation of the term "student" within the context of the relevant provision - indicates that Congress left an ambiguity for the agency to resolve. *See White Stallion Energy Center*, 748 F.3d at 1243; *Sea-Land Servs., Inc.*, 132 S. Ct. at 1357.

The case *Louisiana Forestry Association* supports this argument. *See* 745 F.3d at 670-71, 673. There, the court noted that because 8 U.S.C. § 1184(c)(1) did not define the term "consult," as it related to H-2B temporary non-agricultural worker petitions, Congress granted DHS broad flexibility to seek the advice of the Department of Labor ("DOL") and condition the approval of an H-2B petition on compliance with DOL regulatory requirements. *Id.* at 673. Here, Congress left a similar ambiguity regarding the exact scope of the term "student." 8 U.S.C. § 1101(a)(15)(F)(i). Because the statute does not directly limit the scope of the term or address the appropriate level of specificity at which the term should apply, an ambiguity exists for the

agency to resolve. *See La. Forestry*, 745 F.3d at 670-71; *INS. v. Aguirre-Aguirre*, 526 U.S. 415, 416 (1999) ("judicial deference to the Executive Branch is especially appropriate in the immigration context") (citing *INS v. Abudu*, 485 U.S. 94, 110 (1998)); *cf. Mayo*, 562 U.S. at 52.

Moreover, "Congressional silence 'normally creates ambiguity. It does not resolve it.' " *Fleming Companies, Inc. v. Dep't. of Agriculture*, 322 F. Supp. 2d 744, 758 (E.D. Tex. 2004) (citing *Barnhart*, 535 U.S. at 218). Here, the long history of congressional silence regarding clarification of the term "student" within the INA as it relates to the parameters of an alien's time in F-1 status while in the United States further demonstrates the existence of ambiguity. Over several decades, Congress has had many opportunities to clarify whether the term "student" included any restrictions within the INA, including when the legislature recently amended the statute after DHS published the 2008 interim final rule at issue in this case. *See* Pub. L. No. 111-306 (Dec. 14, 2010) (amending 8 U.S.C. § 1101(a)(15)(F)(i)). However, Congress's repeated election not to provide clarification on any possible restrictions of an alien "student" while holding F-1 status contributes to the ambiguity within the statutory provision.[10] *Fleming Companies, Inc.*, 322 F. Supp. 2d at 758; *Barnhart*, 535 U.S. at 218.

Along these lines, Congress added to the ambiguity by providing for the admission of other categories of "students" in others sections of the INA, which are also similarly silent on the issue of employment, *see* 8 U.S.C. § 1101(a)(15)(M)(i) (vocational institution study). Congress also uses the term "student" broadly in another section of the INA, envisioning different types of training as a component of a student's education. *See, e.g.,* 8 U.S.C. § 1101(a)(15)(J). As a result, Congress did not preclude the possibility of foreign student employment and instead left a gap for the Secretary to fill by exercising his congressionally-mandated authority to promulgate regulations consistent with the INA, the Homeland Security Act, and DHS's mission to secure the economic position of the United States to ensure national security.

Accordingly, Plaintiff cannot succeed at *Chevron* step one by showing a clear and unambiguous congressional intent in the words of the statute.

### 3. Under Chevron step two, the Secretary's interpretation is reasonable.

Because an ambiguity in the statute exists, the Court must uphold the Secretary's interpretation as long as it is not arbitrary and capricious. *See Judulang v. Holder*, 132 S. Ct. 476, 484 n.7 (2011); *Agape Church v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013). To succeed at *Chevron* step-two, Plaintiff must show that the Secretary's interpretation of the term "student" as encompassing practical training employment strays so far from the paradigm that Congress intended as to render the Secretary's interpretation unreasonable. *See Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir 2009). Plaintiff's motion fails to make this showing.

Plaintiff argues that the Secretary's interpretation of "student," which allows for limited post-graduation employment in practical training, is unreasonable because it exceeds the Department's authority to admit foreign students without complying with statutory guidelines applicable to H-1B status, a wholly distinct nonimmigrant visa classification. Because the Department has the authority to set the terms of conditions for F-1 nonimmigrant student status and the obligation to ensure that its programs are administered in a manner that protects the nation's economic security, the OPT-STEM extension does not exceed the Secretary's power. Therefore, the Secretary's reasonable interpretation of its statutory authority satisfies the APA's deferential standard. *See Ill. Pub. Telecomms. Ass'n v. FCC*, 752 F.3d 1018, 1024 (D.C. Cir. 2014); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008).

### i. The 2008 interim final rule does not conflict with limitations on temporary worker visas.

Plaintiff argues the OPT-STEM extension "circumvents the statutory restrictions" applicable to foreign workers holding H-1B status. ECF No. 25 at 20. Plaintiff is incorrect because the Secretary's interpretation of the F-1 student provisions does not render any parts of 8 U.S.C. § 1182(n) superfluous. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). Plaintiff also incorrectly

suggests that the interim rule somehow blurs the line between the nonimmigrant classifications for F-1 student and H-1B temporary worker. *Compare* 73 Fed. Reg. at 18,948 *with* 8 C.F.R. § 214.2(h)(4). The interim final rule provides for the limited employment of foreign students in a relatively narrow range of occupations critical to the United States economy. *See* 73 Fed. Reg. at 18,948. Although the interim final rule may result in some overlap with the subject area identified in the H-1B provisions, *see* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1)(A), any limited overlap does not render the Secretary's interpretation of the F-1 statute unreasonable.

Aliens falling into the separate F-1 and H-1B classifications remain tied to independent temporal and subject matter restrictions within the respective statutory parameters. *Compare* 73 Fed. Reg. at 18,948 *with* 8 C.F.R. § 214.2(h)(4). The Secretary's interpretation, therefore, may result in some overlap in subject areas addressed in the two separate statutory provisions, but the interpretation does not render either provision without effect. For instance, foreign students working in extended practical training are limited to a total of 29 months of employment, subject to certain conditions, and may only work for qualifying companies while holding critical STEM occupations key to the United States economy. *See* 73 Fed. Reg. at 18,948. The interim final rule does not impermissibly entrench on the H-1B category, which continues to have an independent operative effect with its own temporal and subject matter limitations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Thus, any overlap between the two categories is limited and well within the discretion of the Secretary to fashion a means to promote the protection and advancement of the United States economy under the Homeland Security Act. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 9 (D.C. Cir. 2011) (courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes).

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 616 F.Supp. 1387 (N.D. Cal. 1985), does not provide Plaintiffs with the support it claims it does. ECF No. 25 at 21. In *Bricklayers*, foreign workers relied on former INS Operations Instructions and entered the United States in B-1 "business visitor" status instead of the former "H-2" temporary worker status to perform manual labor, including the installation of components of a gold-ore processing system and certain brick-laying construction. 616 F. Supp. at 1392. The former H-2 provision permitted alien workers to enter the United States "to perform temporary services of labor," if unemployed U.S. workers capable of performing the services or labor could not be found. *Id.* at 1391 (citing 8 U.S.C. § 1101(a)(15)(H)(ii) (1985). The B-1 visitor provision, however, explicitly prohibited the admission of an alien as a visitor if he was "coming for the purpose of . . . performing skilled or unskilled labor . . . ." *Id.* at 1390 (citing 8 U.S.C. § 1101(a)(15) (B)). The explicit contradiction within the two statutory provisions, therefore, prohibited any interpretation claiming an overlap within the two visa categories existed.

But no such explicit contradiction exists in the instant case. The F-1 student provision is silent on the parameters of a foreign student's permitted course of study, or whether hands-on training or employment may accompany or follow the course of study as practical part of the student's education in the United States. *See* 8 U.S.C. § 1101(a)(15)(F)(i). Nothing in the F-1 statute explicitly prohibits a foreign student to accept employment as a component of his or her course of study while in the United States. Accordingly, the Secretary's reasonable interpretation of the INA's F-1 provisions providing for the temporary limited employment of foreign students in occupations critical to the United States economy can validly overlap somewhat with the subject areas identified in the H-1B statute. *See Northeast Hosp. Corp.*, 657 F.3d at 9.

Moreover, the rules providing for employment authorization for F-1 students do not conflict with worker protections in place under the H-1B statute. Plaintiff's contrary assertion ignores Congress's decades-long acquiescence to the agency's permitting foreign students to engage in post-graduation practical training. *See Programmer's Guild*, 338 F. App'x at 244-45.

When Congress established the Labor Condition Application ("LCA") attestation requirements for H-1B employment, it was well aware that legacy INS's regulations provided F-1 students with work authorization. *See* H.R. Rep. No. 101-723, pt. 1, 1990 WL 200418, *6746. At the time, the agency's regulations permitted F-1 students to work in the United States post-graduation, *see* 8 C.F.R. § 214.2(f)(10)(ii) (1989), and the agency's employment authorization of foreign students had been a part of the foreign student program since 1947, *see* 12 Fed. Reg. 5355, 5357 (INS) (Aug. 7, 1947); *Matter of T-*, 7 I. & N. Dec. at 683. In creating the LCA requirements, Congress did not question the ability of F-1 students to work and further endorsed the ability of

F-1 students to seek off-campus employment as a "minimal work program providing opportunities for both U.S. employers and students to achieve their respective goals." H.R. Rep. No. 101-723, pt. 1, 1990 WL 200418, *6747. In fact, Congress explicitly acknowledged that it was expanding upon programs authorizing employment of F-1 students, and only imposed additional requirements in the form of employer attestations covering F-1 students "employed in a position *unrelated* to the aliens' field of study and off-campus" for the three years following the enactment of the statutory requirement. Pub. L. No. 101-649, § 221(a) (emphasis added). Fully recognizing that these labor protections would not apply to the longestablished F-1 practical training program, Congress chose to leave the employment of F-1 students in practical training unregulated. *Id*.

In 1998, when Congress enacted further changes to the LCA process for H-1B employment, it did not address the agency's regulation providing for the employment of foreign students in practical training. *See* American Competitiveness and Workforce Improvement Act of 1998, Pub. L. No. 105-277, Div. C., Title IV, §§ 411-415 (Oct. 21, 1998). At the same time, Congress was cognizant of the critical need to provide technical training to domestic workers in mathematics, engineering, and computer science. *Id.* §§ 414(c)-(d). Congress imposed a fee on certain H-1B employers and directed the use of that fee revenue to award monetary grants to train the employment of employed and unemployed workers and provided scholarships to low-income individuals to pursue associate, undergraduate, or graduate level degrees in mathematics, engineering, or computer science. *Id*. Although Congress identified the need to develop the technical skills of the domestic workforce, it again was silent regarding the employment of skilled foreign students under the agency's practical training regulation. *Id*.

The long history of congressional silence regarding the agency's rule for allowing foreign students to engage in post-graduation employment in practical training shows a legislative intent to continue this practice. *See Programmer's Guild*, 338 F. App'x at 244-45. Since 1947, legacy INS, and now DHS, has allowed foreign students to work in practical training. *See* 73 Fed. Reg. at 18,945-50; 38 Fed. Reg. at 35,426; 12 Fed. Reg. at 5357. If Congress thought legacy INS's or DHS's practical training rules ran afoul of other provisions of the INA, it had the opportunity to express its view over the last sixty years, particularly in its several enactments specifically addressing the F-1 nonimmigrant classification, including when it recently amended the statute after DHS published the 2008 interim final rule at issue in this case. *See Programmer's Guild*, 338 F. App'x at 244; *see also* Pub. L. No. 111-306 (Dec. 14, 2010) (amending 8 U.S.C. § 1101(a)(15)(F)(i)). Congress's repeated election not to limit DHS's authority to permit students to seek employment as part of their overall training demonstrates that the legislature understands the agency's interpretation to be statutorily permissible. *See Walton*, 535 U.S. at 220.

### ii. The OPT-STEM extension falls within the Secretary's broad discretion to set the terms and conditions for student visas.

Plaintiff argues that the STEM extension violates the agency's obligation "to ensure aliens admitted as students leave the country when they are no longer students." ECF No. 25 at 19. Plaintiff relies on cases that stand only for the proposition that when a student's F-1 status terminates, the student is no longer lawfully admitted to the United States. These cases do not answer the relevant question of *when* a student's status must terminate and in no way suggest that the Secretary lacks authority to allow F-1 students to engage in post-graduate training while maintaining F-1 status. Because the Secretary did not alter any requirement that F-1 visa holders depart the United States following the expiration of their status, and otherwise acted within the scope of his authority to define the scope of F-1 status, the STEM extension is within the Secretary's authority.

Nothing in the interim final rule permits F-1 students to remain in the United States following the termination of their F-1 status. The interim final rule does not eliminate any of the monitoring and verification requirements created by the Student Exchange Visitor Information System. *See* 67 Fed. Reg. 76,256; *see also* 6 U.S.C. § 252(a)(4); 8 U.S.C. § 1372. Therefore, to the extent the Secretary has an obligation to ensure that students leave the United States following the termination of their F-1 status, the 2008 interim final rule fully complies with that obligation. *See* 73 Fed. Reg. 18,948.

The interim final rule is supported by the Secretary's authority to set the conditions for the expiration of the student's F-1 status. The Secretary has broad discretion to set the terms and conditions of nonimmigrant visas, including setting durational limitations on a foreign student's F-1 status. *See* 8 U.S.C. § 1184(a)(1). For more than thirty years, legacy INS and the Secretary

have exercised their discretion to define a foreign student's "duration of status" to include post-graduation practical training.[11] *See* 43 Fed. Reg. at 14,575; 8 C.F.R. § 214.2(f)(10)(i)(C) (1985). As discussed infra, *supra* II.B.2, Congress has repeatedly authorized the agency's interpretation of its authority by amending other parts of the F-1 statute without altering the agency's interpretation of "duration of status."

Other provisions of the INA also contradict Plaintiff's suggestion that all F-1 students must depart the United States when they are no longer "enrolled and attend[ing] educational classes." ECF No. 25 at 19. Sections 254A and 248 permit F-1 students to adjust status to lawful permanent resident or to remain in the United States under a different nonimmigrant visa category. *See* 8 U.S.C. §§ 1255, 1258. Section 242(g) leaves the decision to institute removal proceedings to the discretion of the Secretary. *See* 8 U.S.C. § 1252(g). There is no evidence that Congress intended to set aside the Secretary's otherwise broad discretion and require the immediate departure of F-1 students upon their graduation.

### iii. The 2008 interim final rule is consistent with the Secretary's statutory obligation to protect the economic security of the United States.

Finally, Plaintiff contends that the Secretary exceeded its statutory authority by considering labor market issues in promulgating the interim final rule. ECF No. 25 at 22. The Secretary, however, is obligated to consider whether the administration of agency programs is consistent with the nation's economic interests. 6 U.S.C. § 111(b)(1)(F). In creating the Department of Homeland Security, Congress specifically tasked the Secretary with "ensuring that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." *Id*. Therefore, consideration of the economic consequences of its regulations and programs is well within the province of the Secretary.

Plaintiff incorrectly suggests that the Secretary conducted an unauthorized economic analysis of the labor market to support the interim final rule. ECF No. 25 at 22. The Secretary's analysis, however, was not dependent on an economic analysis of the supply of domestic STEM labor. The interim final rule was based on the more specific finding that, absent action by the Secretary, thousands of F-1 students already present in the United States would be forced to depart the United States without having the opportunity to seek domestic employment through the oversubscribed H-1B program. 73 Fed. Reg. 18,945-46. The Secretary concluded that the STEM extension is vital to economic competitiveness in both the short and the long term. In the short term, the Secretary concluded that by forcing thousands of American-trained STEM workers to leave and find employment in our economic competitors would undermine American competitiveness. 73 Fed. Reg. 18,946. In the long term, the Secretary found that the STEM is essential to the world's perception of the United States as providing the best opportunities for foreign STEM students. 73 Fed. Reg. 18,946-47. These conclusions do not depend on the availability or unavailability of domestic labor, but on turn on the unique importance of America's ability to attract the world's premiere STEM talent to our economic competitiveness. The Secretary arrived at these conclusions based on a thorough review of the literature on the topic and did not require the type of highly-specialized labor analysis Plaintiff suggests is within the exclusive domain of the Department of Labor. 73 Fed. Reg. 18,945-47.

Plaintiff's argument hinges on the unsupported assumption that *only* the Department of Labor is permitted to consider labor market concerns in issuing regulations. *See* ECF No. 25 at 22. This contention is contradicted by the Department of Homeland Security's enabling statute, which identifies economic impact review as a "primary mission" of the Department, and not supported by any of the statutes cited by Plaintiff. 6 U.S.C. § 111(b)(1)(F); *cf*. ECF No. 25 at 22. If the Secretary were barred from considering labor market concerns, it is unclear how the agency could comply with Congress's economic review mandate given the widely-recognized relationship between immigration policy and the labor market. *See Commonwealth of the Northern Mariana Islands v. United States*, 670 F. Supp. 2d 65, 85 (D.D.C. 2009) ("It has long been recognized that immigration laws necessarily have a significant impact on labor markets and practices."). Such a bar would also make little sense given the Department's labor-related responsibilities. *See* 8 U.S.C. § 1324a(h)(3) (delegating broad discretion to determine which noncitizens may work in the United States).

The Secretary's consideration of economic effects was permissible here due to the ample record evidence suggesting that the Secretary's pre-2008 administration of the OPT program was undermining the nation's economic security. 73 Fed. Reg. 18,945-47. This view is supported by that of the National Science Foundation ("NSF"), which noted, "The intervening years have seen security-related changes in federal visa and immigration policy that, although intended to restrict the illegal movements of only a few, have had a wider effect on many foreign-born graduate students and postdoctoral scholars who either were already in the United States or were contemplating studying here." AR at 1448. Such a warning, when considered in conjunction with evidence of the importance of these individuals to the nation's economic prosperity, properly triggered the Secretary's statutory obligation to consider whether the OPT program could be administered in a manner that would minimize the risk of a serious economic harm. *See id.*; *cf.* 6 U.S.C. § 111(b)(1)(F). Here, the Secretary applied his discretion to set the time period for the admission of foreign students in a manner that "ensur[es] that the overall economic security of the United States is not diminished" by the OPT program. 6 U.S.C. § 111(b)(1)(F); *see* 8 U.S.C. § 1184(a)(1). Therefore, because the Secretary is required to consider the economic effects of its programs and empowered to establish the parameters for those programs, the interim final rule does not exceed the Secretary's statutory authority.

For these reasons, the Secretary's interpretation of his authority under the F-1 statute is reasonable. Plaintiff's motion for summary judgment, therefore fails to succeed at *Chevron* step-two.

### C. The Secretary's promulgation of the 2008 interim final rule was not arbitrary or capricious.

Plaintiff contends that the Secretary violated 5 U.S.C. § 706(2)(A) by acting arbitrarily or capriciously in promulgating the 2008 interim final rule. Plaintiff moved for summary judgment on two categories of § 706(2)(A) claims. First, Plaintiff contends that the Secretary incorrectly concluded that there was an impending STEM labor shortage. Second, Plaintiff asserts the Secretary failed to consider other relevant information or factors in issuing the interim final rule. Both claims are contradicted by the record. Neither claim, even if supported by the record, is sufficient to demonstrate that the Secretary acted arbitrarily or capriciously in promulgating the 2008 interim final rule because the Secretary's conclusions are not dependent on a finding of a shortage of American STEM labor.

#### 1. The 2008 interim final rule is amply supported by record evidence.

Plaintiff contends that the STEM labor shortage does not exist and, therefore, cannot be supported by the record. In order to prevail on this claim, Plaintiff will have to clear the high hurdle of demonstrating the Secretary's determination is "so implausible that it could not be ascribed to a difference in view." *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012). It is not enough for Plaintiff to show that the shortage did not exist at the time of promulgation so long as the record provides a reasoned basis for the Secretary's action. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). The record supplies evidence more than sufficient to meet this minimal burden. *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("[W]e must uphold [a rule] so long as it is reasonable and reasonably explained.").

Plaintiff first relies on a passage from a 2014 book by Dr. Michael Teitelbaum to contradict the Secretary's 2008 reference to a potential STEM labor shortage.[12] The opening paragraph of Dr. Teitelbaum's book, however, demonstrates the reasonableness of the Secretary's finding:

In this increasingly globalized work, respected and influential voices warn urgently that the United States is falling behind in a global "race for talent" that will determine the country's future prosperity, power, and security. Expressions of such concerns have become common, even conventional, and are embraced with little question by many who have leadership roles in politics, business, media, and education. . . .

[M]any corporate, political and opinion leaders in the United States have been sounding persistent alarms about current or future shortages in the nation's human capital in science or engineering, and more generally to unfavorable trends relative to those

in other countries. If their concerns can be encapsulated in a single sentence, it might read as follows: The United States, long a leader in the number and quality of its scientist and engineers, has been falling behind its international competitors, and is thereby risking serious deterioration in its future prosperity and security.

Michael S. Teitelbaum, *Falling Behind?* 1-2 (Princeton University Press 2014). There can be little doubt that the Secretary's decision to rely on the "many" "respected and influential voices" "urgently" warning of an impending STEM labor shortage satisfies the APA's highly deferential standard of review. *Stilwell,* 569 F.3d at 519. Even so, the Secretary's failure to consider an opinion expressed in a future publication casts doubt only on his precognitive powers, not on the soundness of his reasoning. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419-20 (1971) (review of agency decisions is ordinarily limited to information before the agency in the administrative record).

Plaintiff next makes the very serious allegation that the Secretary "made up" its claimed shortage of American STEM workers by misrepresenting the conclusions in the National Science Foundation's report, *Rising Above the Gathering Storm: Energizing and Employing America for a Brighter Future* (2007) ("NSF report"). ECF No. 25 at 31-33. As support for its claim that the report "repeatedly contradicts DHS's characterizations of the labor market," Plaintiff quotes three passages from the report. *Id.* at 32-33. Two of these passages are from boxes entitled "Another Point of View," in which the report summarizes scholarship that reaches a contrary conclusion from that of the report. *See* AR at 1437, *referenced at* AR 1439 n. 13; AR at 1515, *referenced at* AR 1514 n.4, 1523. The report goes on to criticize the analysis block-quoted by Plaintiff as methodologically flawed and based on labor supply forecasts that are "likely" to "fail[] abysmally." AR at 1523.

Although the third passage expresses a view adopted by the NSF report, it is quoted in a manner that omits the report's conclusion regarding the need for international STEM labor. ECF No. 25 at 32 (quoting NSF report p. 170, located at AR 1519). In the line immediately following the quoted passage, the report warns that "the number of people with doctorates in the sciences, mathematics, and engineering awarded by U.S. institutions each year has not kept pace with the increasing importance of science and technology to the nation's prosperity." AR at 1519. Indeed, even the quoted portion expresses concern over science and engineer degree and enrollment trends, and warns that some science and engineering labor markets have shortages. ECF No. 25 at 32. Notably, Dr. Teitelbaum, on whose research Plaintiff relies, agrees with the Secretary's characterization of the NSF report's findings:

Both the [Tapping America's Potential] and Gathering Storm reports recounted indicators of decline in both the quantity and quality of U.S. student ['s] . . . skills in science and mathematics. Both made the case that the result is inadequate numbers of scientists and engineers--whether current or projected--that pose profound threats to the future of U.S. economic prosperity and security. . . .

*Falling Behind?* at 14. There can be little doubt that - even without using the phrase "critical shortage" - the report describes a need for international scientists and engineers to avert a coming crisis. *See, e.g.,* AR 1394; 1401-1402; 1406; 1515. The NSF report, as well as the other evidence in the record, amply supports the Secretary's decision to act. *Id.*

### 2. The Secretary did not arbitrarily or capriciously fail to consider any relevant information in issuing the interim final rule.

Under the "highly-deferential" standard for review of agency decisions, the Court should not substitute its own judgment for that of the agency, but should examine only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.,* 401 U.S. 402, 416 (1971). Plaintiff asserts three gaps in the Secretary's analysis. Because the record demonstrates that the agency considered the relevant issues, Plaintiff's arguments fail.

### i. The Secretary considered all relevant labor-supply issues.

Plaintiff first argues that "DHS ignored all evidence that there was no STEM worker shortage in the United States." ECF No. 25 at 34. This is contradicted by the record, which contains studies that summarize opposing perspectives on the issue and demonstrates that the Secretary considered all necessary information in concluding that there was a need for immediate action.[13] *See* AR at 1393, 1437, 1505; *cf.* ECF No. 25 at 31-33.

Plaintiff's argument contains two critical flaws. First, Plaintiff incorrectly assumes that a finding of an American worker shortage was necessary to its finding of the importance of foreign STEM students. Plaintiff ignores the record evidence discussing the unique importance of these students to our future competitiveness, not simply from a quantity perspective, but from an international perception standpoint. AR 1438-1448. Therefore, even if the record showed there was no shortage of American STEM labor, Plaintiff's challenge would still fail because the record supports the Secretary's conclusion that the STEM extension was necessary to ensure that the world's most talented STEM students continue to perceive the United States as the best place to study. *Id.* The record further supports the Secretary's conclusion that our international perception is vital to our economic success. *Id.*

Second, Plaintiff's argument misframes the question of what constitutes a relevant fact for agency consideration. Here, Plaintiff is not claiming the existence of a unique factor that the Secretary ignored in issuing the interim final rule, but appears to challenge the outcome of the Secretary's analysis of that factor. *See supra* Section II.C.1. The record is clear that the Secretary considered *whether* there was critical need for F-1 students to remain in the United States pending their opportunity to seek H-1B status and concluded that there was such a need. *See id.* That conclusion is supported by the record. 73 Fed. Reg. 18,947. Plaintiff's criticism can be "ascribed to a difference in view," and is insufficient to overcome the deference due to the Secretary. *Fox*, 684 F.3d at 74.

### ii. The Secretary duly considered the American STEM workforce.

Plaintiff next asserts that the Secretary failed to consider "the impact of adding foreign labor on American workers." ECF No. 25 at 33-34. The record, however, is replete with discussions of why the impact on American STEM workers would be minimal. *See, e.g.*, AR at 107 ("Far from displacing U.S. workers, highly skilled foreign born workers will continue to function as they always have: as net job creators."); AR at 1401 ("Studies show, however, that the financial impact is minimal.").

Like Plaintiff's labor-shortage argument above, this argument does not raise the question of an omitted factor, but challenges the substance of the Secretary's conclusion that there existed a need for F-1 students to remain in the United States pending their opportunity to seek H-1B status. The record show that the Secretary did not omit consideration of the impact on American workers, but concluded that the nation's continued economic security depended on America's ability to continue to attract the very best STEM talent in the world. 73 Fed. Reg. 18,946-47. Plaintiff's disagreement with the Secretary's conclusion is not sufficient to override the Secretary's reasoned judgment. *Stilwell*, 569 F.3d at 519.

### iii. The Secretary gave appropriate consideration to the educational need for a seventeen-month STEM extension.

Plaintiff contends that the Secretary's analysis is flawed because it does not link the length of the STEM extension to an educational purpose. ECF No. 25 at 35-36. The record, however, includes evidence supporting the education-based need for the extension both due to the need for extended job-training and to cure the problem of foreign students foregoing "valuable training opportunities" so that they can bank their limited OPT time for use after graduation. *See, e.g.*, AR 128 ("In today's world, one year of OPT is not sufficient to provide ample practical experience to new graduates . . . ."); AR 131 ("[S]tudents are increasingly foregoing these opportunities and banking their OPT time to use after they earn their degree."). The record, therefore, contains evidence of an educational justification for the STEM extension and demonstrates that this factor was considered by the Secretary in promulgating the interim final rule.[14]

In any event, there is no requirement that the Secretary expressly discuss whether a short extension of an educational program serves an educational purpose. The issue facing the Secretary was whether the OPT program could be administered in a manner that preserved the nation's economic security. Because the Secretary has the statutory authority to establish the program length, and that the OPT program serves a legitimate education purpose, *see supra* Section II.B.3, it was not arbitrary or capricious for the Secretary to limit its 2008 inquiry to factors relevant to administering the program in a manner that safeguards the United States' economic interests. Here the length of the extension is directly tied to a period the Secretary deemed reasonable to allow the students already present in the United States to compete for H-1B visas during the next fiscal year following spring graduation. *See* 73 Fed. Reg.18,946-50. This is sufficient to meet the Secretary's obligation when engaging in regulatory line-drawing. *See Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013).

### D. The Secretary's promulgation of the 2008 interim final rule and clarifications of qualifying STEM programs were procedurally proper.

#### 1. DHS's clarification of qualifying STEM courses of study did not require notice and comment.

Plaintiff is incorrect that APA notice and comment provisions apply to DHS's website-based clarification of qualifying STEM courses of study and degree programs. ECF No. 25 at 28-29. DHS's clarification is an "interpretive rule" that merely clarifies an existing rule, 73 Fed. Reg. at 18,954, and does not change law, policy, or practice. DHS's clarification, therefore, is exempt from notice and comment requirements. *See* 5 U.S.C. § 553(b)(A).

A legislative rule has the force of law and creates new rights or duties, while an interpretive rule merely clarifies an existing rule and does not change law, policy, or practice. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). The rulemaking procedure to which Plaintiff refers requiring a public notice and comment period, ECF No. 25 at 28-29, applies only to an agency's proposed "legislative" rule, not to an "interpretive" rule. *See Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009) (finding that where "[t]he declaratory rulings at issue in this case did not create any new duties with respect to customer data, but merely informed providers of the FCC's interpretation of the existing regulation . . ., the restriction contained in the declaratory rulings was an interpretative rule, and the FCC was not required to comply with notice and comment procedures."). Interpretive rules, exempt from notice and comment, are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Mortgage Bankers Ass'n*, 135 S. Ct. at 1204 (citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)); *see also Am. Hospital Ass'n v Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). A rule that sensibly conforms to the wording of a statute or existing legislative rule constitutes an interpretation, and is thereby exempt from notice and comment rulemaking. *See Central Texas Tel. v. FCC*, 402 F.3d 205, 213 (D.C. Cir. 2005). Similarly, if in the absence of the agency's construction it would have an adequate legislative basis to ensure the performance of duties, then the construction falls within the interpretive rule exception. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Plaintiff cannot plausibly argue that DHS's "STEM-Designated Degree Program List" (the "list") is a legislative rule because the list does nothing more than advise the public of the degree programs offered at educational institutions across the United States that fall under the universe of STEM recognized courses of study.[15] The list is merely an itemization of degree programs divided by general subject matter areas, along with each program's corresponding Classification of Instructional Programs ("CIP") code assigned by the U.S. Department of Education's Institute of Education Sciences National Center for Education Statistics.[16]

Plaintiff asserts that the list is a legislative rule because an F-1 student holding a degree in a STEM field "is an absolute requirement for the 17-month OPT extension under the 2008 OPT Rule." ECF No. 25 at 28. However, Plaintiff fails to acknowledge that DHS's website-based list did not announce any new laws, policies or practice requiring an F-1 student to hold a STEM degree - instead, the list merely provided the public with clarification on what specific areas of study within the universe of STEM programs offered at schools may, upon completion, qualify the student for an OPT STEM extension. *See Central Texas Tel.*, 402 F.3d at 213.

Accordingly, DHS's website-based clarification of qualifying STEM courses of study and degree programs is nothing more than an "interpretive rule" that is exempt from notice and comment requirements.

### 2. The Secretary had good cause to publish the STEM practical training extension as an emergency rule.

The Secretary had good cause to publish the STEM practical training extension rule as an emergency rule. *See* 5 U.S.C. § 553(b) (B). Any delay caused by a lengthy comment period was contrary to the economic interests and thus, public interest of the United States. *Id*. The Secretary determined that any delay would have resulted in a serious disruption to workforces in critical sectors of the United States' economy at a time when the country faced the ongoing threat of foreign economic competitors taking away U.S. educated skilled workers. Plaintiff fails to acknowledge that Congress, through the Homeland Security Act, directed the Secretary to prevent exactly this. The Secretary is charged, through the INA, to ensure the economic integrity of the United States while working with industry and academia to promote and develop key technologies for economic growth and integrity, critical infrastructure advancements, and national security. *See* Pub. L. No. 107-296, §§ 103(a)(3), 101(f)(4), 301, 302(4), (10), 308(b)(2).

Plaintiff is incorrect that the administrative record cannot support the Secretary's good cause determination. ECF No. 25 at 27. To the contrary, studies in the administrative record indicate that a key component of a nation's success in the knowledge-based economy is the ability to attract and retain workers educated in science and technology. AR 158, 172. Additionally, because of the vital importance of science and technology workers to the integrity of a nation's economy, many countries have made high-skilled migration an important part of national economic strategies. AR 338. The Secretary further determined, as supported by studies in the administrative record, that the intense competition for high-skilled and educated labor to support the knowledge-based economy threatens the ability of the United States to attract and retain workers in science and technology. AR 1547, 1549-53. Accordingly, the Secretary stated that unless the rule is implemented immediately, the skilled foreign students working in STEM occupations who cannot participate in the H-1B program because of the numerical cap would be forced to leave the country and use their U.S. education to take up employment with foreign competitors. *See* 73 Fed. Reg. at 18,950. When the Secretary issued the interim final rule, thousands of workers with STEM degrees would have been forced to depart the United States because of the H-1B cap. *Id*. The Secretary decided that avoiding these harms provided good cause to publish the interim final rule with an immediate effective date without first completing the notice and comment process. *Id.*

Moreover, *Mack Trucks v. EPA*, 682 F.3d 87, 93-94 (D.C. Cir. 2012), does not support Plaintiff's case. ECF No. 25 at 24. In *Mack Trucks*, the EPA used an emergency rule to provide a compliance exception to a single manufacturer because it chose to develop a regulatory-noncompliant technology. 682 F.3d at 94. The court held that the good cause exception did not apply to the agency's rule because the agency's rationale would allow good cause to save a manufacturer from its poor choices every time it felt a new regulation imposed some degree of economic hardship. *Id.* at 94. In the instant case, however, the Secretary did not invoke good cause to save a single regulated entity from its own ill-advised decisions. Rather, the Secretary published the interim final rule to advance the economic interests of the United States and to ensure that this country continues to attract and retain skilled workers who can make vital contributions for the development of critical technologies. *See* 73 Fed. Reg. at 18,950. The Secretary stated that "[t]he ability of U.S. high-tech employers to retain skilled technical workers, rather than losing such workers to foreign business, is an important economic interest for the United States." *Id.* DHS received communications from a wide range of concerned stakeholders, including companies in the high-tech industry, members of Congress, and United States educational institutions, about the adverse impact that STEM students being forced to leave would have on the ability of United States schools to attract talented foreign students, which, in turn, would have a detrimental effect on the United States high-tech industry and the United States economy as a whole. AR 103, 106, 117-18, 120, 124, 128-29, 132. Unlike *Mack Trucks*, therefore, the Secretary's decision to issue an emergency rule was for the advancement of the United States economy as a whole and not focused on a single manufacturing entity.

### 3. The Court should not remedy procedural defects with a *vacatur order.*

To the extent the Court finds any procedural defect in the Secretary's promulgation of the OPT-STEM extension rule, because of the emergency situation invalidation would cause, the appropriate course of action would be an order that holds any *vacatur* in temporary abeyance. A *vacatur* order has the effect of setting aside an agency's rule and taking it "off the books." *See Heartland Reg'l Ctr. v. Sebelius,* 566 F.3d 193, 198-99 (D.C. Cir. 2009) (discussing the distinction between invalidating and vacating a rule); *AFL-CIO v. Chao,* 496 F. Supp. 2d 76, 92 (D.D.C. 2007) ("vacatur takes the rule off the books"). Here, a *vacatur* order would "take off the books" the OPT-STEM extension rule providing thousands of foreign students with work authorization while presently in the United States. This emergency situation would cause these workers and their family members to scramble to depart the United States in an effort to avoid any possible immigration consequences.

Given the immediate dire situation a *vacatur* order would cause, should the Court issue an invalidation order, a temporary stay of *vacatur* would be appropriate. *See, e.g., Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.,* 288 F. Supp. 2d 7 (D.D.C. 2003), *appeal dismissed by* No. 03-5347, 2004 WL 1052989 (D.C. Cir. May. 7, 2004). In *Hawaii Longline,* the court vacated the agency's fishing quota regulation causing "serious disruptions" to the regulated community by virtue of the agency's immediate inability to issue any fishing permits. *Id.* at 9. On motions to reconsider, the court agreed that the *vacatur* caused an immediate disruption by suspending the fishing permit process, but the court was unwilling to remand the regulation to the agency without a *vacatur* because of the agency's prior decision making process. *Id.* at 12. Nevertheless, the court agreed that the disruption to the permitting process warranted limited relief to the regulated community in the form of a temporary stay of the *vacatur. Id.*

In the instant case, if the Court finds any procedural defect in the Secretary's rule, a similar temporary stay of any *vacatur* order would be appropriate. Like *Hawaii Longline,* any *vacatur* of the OPT-STEM regulation would cause a "serious disruption" to 1) the employment authorization and immigration status of thousands of bright F-1 students holding OPT-STEM extensions; 2) the global competitiveness of several critical sectors of U.S. technology industries; and 3) U.S. colleges and universities preparing F-1 students to pursue OPT-STEM opportunities in the United States. *See Hawaii Longline,* 288 F. Supp. 2d at 9; *see also Chamber of Commerce of U.S. v. SEC,* 443 F.3d 890, 909 (D.C. Cir. 2006) (staying *vacatur* of agency rule to avoid disruption of regulated industry and confusion to investing public); *Indep. U.S. Tanker Owners Comm. v. Dole,* 809 F.2d 847, 855 (D.C. Cir. 1987) (six month stay "to avoid further disruptions in the domestic market and to allow the Secretary to undertake further proceedings . . . .").

Accordingly, a temporary stay of any *vacatur* would avoid sudden disruption to these entities and would also have the advantage of "not presupposing the validity" of any invalidated rule during the temporary stay period. *See Hawaii Longline,* 288 F. Supp. 2d at 12.

### III. CONCLUSION

As demonstrated, Plaintiff has failed to meet its burden at this stage in the litigation to establish Article III standing to proceed. Jurisdiction aside, Plaintiff's summary judgment motion also fails to establish that DHS promulgated the OPT-STEM extension interim final rule in violation of the APA. For the reasons outlined above, and the reasons set forth in Defendant's summary judgment memorandum, the Court should grant judgment in favor of Defendants.

DATED: April 6, 2015
Respectfully submitted,

BENJAMIN C. MIZER

Acting Assistant Attorney General

LEON FRESCO

Deputy Assistant Attorney General

WILLIAM C. PEACHEY

Director

EREZ R. REUVENI

Senior Litigation Counsel

SARAH S. WILSON

Trial Attorney

By: *s/Glenn M. Girdharry*

GLENN M. GIRDHARRY

Senior Litigation Counsel

United States Department of Justice

Civil Division

Office of Immigration Litigation

District Court Section

P.O. Box 868, Ben Franklin Station

Washington, DC 20044

Tel: (202) 532-4807

Fax: (202) 305-7000

Email: glenn.girdharry@usdoj.gov

Footnotes

1    Defendant maintains that Plaintiff also lacks prudential or "zone of interests" standing to proceed and rests on its arguments pending
     before the Court. *See* Def.'s Memo., ECF No. 22. Under the case law of the Supreme Court and this Circuit, Plaintiff cannot establish
     that it falls within the zone of interest of the statutory provision that forms the crux of its complaint. Accordingly, the Court should
     dismiss this case in accordance with the Third Circuit's decision in *Programmers Guild v. Chertoff*, 338 F. App'x 239, 243 (3d Cir.
     2009). *See* ECF No. 22. Defendant also reaffirms its view that the so-called "procedural injury" exception to standing rules does not
     apply here and cannot help Plaintiff show cognizable injury under the competitor standing doctrine. *See* ECF No. 15 at 2-5. Defendant

preserves that issue for appeal, including whether Plaintiff must demonstrate causation and redressability, issues this court did not address in denying the motion to dismiss. *See, e.g., New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (applying causation requirement in competitor standing case).

2    Plaintiff similarly conceded that the standard at the motion to dismiss stage is less onerous than at summary judgment. *See* ECF No. 11 at 4 ("At the pleadings stage, the burden imposed on plaintiffs to establish standing is not onerous and general factual allegations of injury resulting from the defendant's conduct may suffice.").

3    Plaintiff concedes that it bears the burden of proof on this issue, but fails to acknowledge the evidentiary burdens it is subject to. ECF No. 25 at 11 ("A party invoking a court's jurisdiction has the burden of demonstrating that it satisfies the irreducible minimum of standing[.]").

4    This distinguishes these positions from those in cases where plaintiffs are competing with individuals for *identical* categories of employment. *See, e.g, Mendoza*, 754 F.3d at 1014 (foreign-born and domestic sheep and goat herders competing for the same position). Unlike in those cases, where "plaintiffs do not need to apply for and be offered positions they have a reasonable basis for knowing will provide substandard compensation and conditions just to maintain standing to bring [] suit," *id.* at 1014 n. 6, Messrs. Sawade, Blatt, and Smith could not plausibly apply for the student jobs in the first place, such that the futility analysis is irrelevant.

5    As an example, Plaintiff could have, but did not, submit evidence showing a nexus between the jobs Messrs. Sawade, Blatt, and Smith claim to have applied for and the jobs listed in Appendix B. Since those jobs purport to seek OPT employees, by law each employer must be registered with "E-Verify," "an Internet-based system that allows businesses to determine the eligibility of their employees to work in the United States." *See* USCIS, E-Very website, http://www.uscis.gov/e-verify; *see* 8 C.F.R. § 214.2(f)(10)(ii)(C)(3) (providing student may receive 17-month extension if, among other things, "student's employer is registered in the E-Verify program"). But Plaintiff fails to proffer any such evidence.

6    If the court is inclined to conclude that Plaintiff's submissions are enough to confer standing at this stage, it nevertheless should defer ruling on the cross-motions for summary judgment to permit limited discovery on the issue of standing, in order to test the assertions made by Messrs. Sawade, Blatt, and Smith. Although this is an APA record review case, it is appropriate to consider Plaintiff's extra-record materials as part of the court's standing analysis, but only if the government is given the opportunity to test the veracity of those submissions through their own limited discovery. *See, e.g., Telford Borough Auth. v. United States EPA*, No. 12-6548, 2013 U.S. Dist. LEXIS 162776 *25 (E.D. Pa. Nov. 15, 2013); *Oil, Chem. & Atomic Workers Int'l Union v. Pena*, 18 F. Supp. 2d 6, 17 (D.D.C. 1998); *Sameena, Inc. v. United States Dep't of the Air Force*, No. 96-1899, 1996 U.S. Dist. LEXIS 18680, *10 n.2 (N.D. Cal. Dec. 10, 1996). Such discovery has been permitted or has occurred in other cases addressing competitor standing. *See, e.g., Adams v. Watson*, 10 F.3d 915, 925 (1st Cir. 1993); *Snake River Farmers*, 9 F.3d at 797-98.

7    To the extent *amicus* suggests an "abdication" theory of standing saves Plaintiff's suit from dismissal, the D.C. Circuit has never adopted such a theory. Even if such a principle were applicable here, the fact that ICE maintains the Student and Exchange Visitor Information System ("SEVIS"), a web-based database that monitors all entries premised on F and other student-based visas, and that ICE operates a fugitive operations unit which relies in part on "SEVIS" information and devotes resources to apprehending delinquent students is more than adequate to demonstrate the government is in no way abdicating its enforcement duties as prescribed by the student visa system. *See, e.g.*, ICE, SEVIS Overview, http://www.ice.gov/sevis/overview (describing SEVIS operations); ICE, Fugitive Operations, http://www.ice.gov/fugitive-operations (describing fugitive operations).

8    Even if the Court applied the *Skidmore* standard to the Secretary's interpretation of the F-1 provision, the Secretary would nevertheless prevail. Under *Skidmore*, when an agency is charged with the mission of enforcing a particular statute (as Congress has explicitly charged DHS here, *see* 8 U.S.C. §§ 1103(a)(1), (3), 1101(a)(15)(F), 1184(a)(1)), its interpretation "constitue[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Young v. United Parcel Service, Inc.*, — S. Ct. —, 2015 WL 1310745, at *13 (Mar. 25, 2015) (citing *Skidmore*, 323 U.S. at 140). Accordingly, under the *Skidmore* standard, the Court can resort to the Secretary's interpretation for guidance and uphold the 2008 OPT rule and the 2010 and 2011 STEM extension rules as the lawful product of the Secretary's explicit authority to administer and enforce the F-1 provisions within the INA. *See United Parcel Service, Inc.*, — S. Ct. —, 2015 WL 1310745, at *13.

9    For several decades, the former INS and now DHS, has interpreted the F-1 statute to allow foreign students, during their period of authorized stay in the United States, to be employed post-graduation under limited conditions for purposes of practical training. *See* 73 Fed. Reg. at 18,945-50; 38 Fed. Reg. at 35,426; 12 Fed. Reg. at 5357; *Matter of T-*, 7 I. & N. Dec. 682, 683 (Reg. Comm. 1958).

10    Congress has also repeatedly changed the H-1B visa, but has not changed the OPT program. *See, e.g.*, Pub. L. 105-277 (Oct. 21, 1998); Pub. L. 106-313 (Oct. 17, 2000); Pub. L. 108-447 (Dec. 8, 2004); Pub. L. 111-5 (Feb. 17, 2009).

11    To the extent Plaintiff challenges the STEM extension on the grounds that it allows students to stay in the United States for *any* post-graduation work, this argument is not a proper challenge to the 2008 interim final rule, but a challenge to a thirty-year-old INS regulation. *See* 43 Fed. Reg. at 14,575. Such a challenge is both time-barred and outside the scope of the Court's order limiting the challenge to the 2008 interim final rule. *See* ECF No. 17; *Harris v. FAA*, 353 F.3d 1006, 1010-13 (D.C. Cir. 2006).

12   This book and the rest of Plaintiff's Appendix A are not part of the administrative record and should not be considered by the Court. *See Ctr. for Auto Safety v. Dole*, 828 F.2d 799, 804 (D.C. Cir. 1987) ("The APA prohibits a reviewing court from considering new evidence that was not before the agency when it made its decision."); *American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) (declining to permit supplementation of the record with letters were written after the agency decision that "merely disagree with the [agency]'s conclusions").

13   Plaintiff also argues that the regulation is invalid because the Secretary failed to describe its standard for determining that there was a labor shortage in each specific STEM field. ECF No. 25 at 36-38. However, as explained above, the Secretary has adequately defended its basis for acting with regard to the entirety of the STEM fields. The degree classification lists serve only to identify program codes that qualify as STEM fields. The government explained its authority for this interpretive process in its Motion for Summary Judgment, ECF No. 27 at 34-36, and *infra* Section II.D.1.

14   It is also linked to an educational purpose by the requirement that the university certify that the employment is "directly related" to the program of study. 8 C.F.R. § 214.2(f)(1)(ii)(A).

15   *See* STEM-Designated Degree Program List, available at: http:// www.ice.gov/sites/default/files/documents/Document/2014/stem-list.pdf (last visited Apr. 6, 2015).

16   The Department of Education indicates that CIP codes provide "a taxonomic scheme that supports the accurate tracking and reporting of fields of study and program completions activity." *See* Classification of Instructional Programs (CIP) 2010, found online at: http:// nces.ed.gov/ipeds/cipcode/Default.aspx?y=55 (last visited Apr. 6, 2015).

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.