Adam Siegler (SBN 116233)
**GREENBERG TRAURIG LLP**
1840 Century Park East
Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800
Email:sieglera@gtlaw.com

Jonathan K. Ogata (SBN 325914)
**GREENBERG TRAURIG, LLP**
1201 K Street, Suite 1100
Sacramento, CA
Telephone: (916) 442-1111
Email:ogataj@gtlaw.com

Steven G. Barringer*
**GREENBERG TRAURIG, LLP**
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone: (202) 331-3108
Facsimile: (202) 261-0114
Email: barringers@gtlaw.com

Caroline J. Heller*
**GREENBERG TRAURIG LLP**
200 Park Ave
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: hellerc@gtlaw.com

Gregory P. Copeland*
Sarah T. Gillman*
**RAPID DEFENSE NETWORK**
11 Broadway, Suite 615
New York, NY 10004-1490
Telephone: (212) 843-0910
Facsimile: (212) 257-7033
Email: gregory@defensenetwork.org
Email: sarah@defensenetwork.org

* *Appearance Pro Hac Vice*

*Attorneys for Proposed Plaintiff-Intervenors*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., <br><br><br> Plaintiffs, <br><br> vs. <br><br><br> WILLIAM BARR, et al., <br><br> Defendants. | Case No. 4:19-cv-04073-JST <br><br> [Judge:  Hon. Jon S. Tigar] <br><br> **NOTICE OF FILING OF TRANSCRIPT OF A HEARING IN *M.M.V. V. BARR*, 19-CV-2773 (D.D.C.) DATED DECEMBER 18, 2019** <br><br> Date Action Filed: July 16, 2019 |

Proposed Plaintiff-Intervenors give notice of filing of the attached transcript of a hearing in *M.M.V. v. Barr*, 19-CV-2773 (D.D.C.) (ECF 60) dated December 18, 2019, which Proposed Plaintiff-Intervenors cited during oral argument on their motion for a preliminary injunction (ECF 95) before the Court on October 29, 2020

Dated:  October 29, 2020                    Respectfully submitted,

                                            **GREENBERG TRAURIG LLP**
                                            Adam Siegler
                                            Jonathan K. Ogata
                                            Caroline Heller *(Appearance Pro Hac Vice)*
                                            Steven G. Berringer *(Appearance Pro Hac Vice)*

                                            ***RAPID DEFENSE NETWORK***
                                            *Gregory P. Copeland (Appearance Pro Hac Vice)*
                                            *Sarah T. Gillman (Appearance Pro Hac Vice)*


                                            By_____/s/ Caroline J. Heller_____

                                                      *Attorneys for Plaintiff-Intervenors*

NOTICE OF FILING OF TRANSCRIPT OF A HEARING IN *M.M.V. V. BARR*, 19-CV-2773
(D.D.C.) DATED DECEMBER 18, 2019

<pre>
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   M.M.V., et al.,                 .
                                     .  Case Number 19-cv-2773
 4           Plaintiffs,             .
                                     .
 5        vs.                        .
                                     .
 6   WILLIAM P. BARR, Attorney       .
     General of the United States,   .  Washington, D.C.
 7   et al.,                         .  December 18, 2019
                                     .  10:37 a.m.
 8           Defendants.             .
     - - - - - - - - - - - - - - - - -

 9

10                     TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE AMY BERMAN JACKSON
11                    UNITED STATES DISTRICT JUDGE

12

     APPEARANCES:
13
     For the Plaintiffs:          BRIDGET CAMBRIA, ESQ.
14                                Cambria & Kline, P.C.
                                  532 Walnut Street
15                                Reading, Pennsylvania 19601

16                                GREGORY COPELAND, ESQ.
                                  SARAH GILLMAN, ESQ.
17                                Rapid Defense Network
                                  11 Broadway, Suite 615
18                                New York, New York 10004

19                                AMY MALDONADO, ESQ.
                                  Law Office of Amy Maldonado
20                                333 Albert Avenue, Suite 610
                                  East Lansing, Michigan 48823
21
                                  ELORA MUKHERJEE, ESQ.
22                                Morningside Heights Legal Services
                                  435 West 116th Street, Room 831
23                                New York, New York 10027

24                        -- continued --

25
</pre>

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendants:          CHRISTOPHER HAIR, AUSA
                                    United States Attorney's Office
 3                                  555 Fourth Street Northwest
                                    Washington, D.C. 20530
 4
                                    EREZ REUVENI, ESQ.
 5                                  United States Department of Justice
                                    Civil Division
 6                                  P.O. Box 868
                                    Washington, D.C. 20044
 7

 8

 9     Official Court Reporter:     SARA A. WICK, RPR, CRR
                                    333 Constitution Avenue Northwest
10                                  U.S. Courthouse, Room 4704-B
                                    Washington, D.C. 20001
11                                  202-354-3284

12

13     Proceedings recorded by stenotype shorthand.
       Transcript produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2        (Call to order of the court.)

 3            THE COURTROOM DEPUTY:  Your Honor, this is Civil

 4    Action Number 19-2773, M.M.V. et al., versus William P. Barr,

 5    et al.

 6        Will counsel for the parties please approach the lectern

 7    and identify yourselves for the record.

 8            MS. CAMBRIA:  Your Honor, good morning.  Bridget

 9    Cambria for the families.

10            MR. HAIR:  Good morning.  Christopher Hair for the

11    United States.  Also with me at counsel table is Erez Reuveni

12    from the Office of Immigration Litigation at DOJ.

13            MS. CAMBRIA:  I apologize.  Let me introduce my

14    co-counsel.  Amy Maldonado, Gregory Copeland, Sarah Gillman, and

15    Elora Mukherjee.

16            THE COURT:  All right.  We have recently -- I have

17    recently granted docket 47, the motion to add new plaintiffs to

18    this action, and I also granted the motion for leave to file a

19    second amended complaint, which was docket 46.

20        The purpose of the hearing this morning had been to gain

21    clarity about a few questions that I had that I wanted to ask

22    before I could rule on what had been pending before me, but I

23    think this development sets back a lot of the progress I wanted

24    to make today, because the second amended complaint, to me,

25    appears to change not only the identity of most of the
</pre>

1    plaintiffs, but also some of the allegations, including the

2    jurisdictional allegations underlying the TRO.  And it's a

3    fairly substantial rewrite of the complaint I had before me,

4    which is certainly the plaintiffs' prerogative, and I think it's

5    important to continue to refine your theories and your thoughts

6    as we move along.  But right now, I'm having tremendous

7    difficulty trying to figure out if what I was thinking about and

8    what I thought I had to resolve is what I still should be

9    thinking about and what I still have to resolve.  But there

10   still are some questions I had before that I still have.

11        So I think I want to start by asking the plaintiffs some

12   questions, and then I will get to the defendants.  Yes, why

13   don't you come to the lectern.  I actually do not plan to hear

14   argument.  I'm really going to be asking questions.  This isn't

15   a full-fledged motion hearing, but I will when I'm done ask if

16   there's anything that you felt you needed to tell me today.

17             MS. CAMBRIA:  Understood, Your Honor.

18             THE COURT:  The amended complaint that we were dealing

19   with, docket 28, in its jurisdictional allegation said in

20   paragraph 8, "The Court has jurisdiction under 8 U.S.C. Section

21   1252(e)(3) because the claims are systemic challenges to the

22   validity of the expedited removal system and the regulations and

23   written policies."

24        The defendants argued that the case didn't fall within that

25   statutory provision and that I lacked jurisdiction under

1   1252(a)(2)(A), and it also raised ripeness issues with respect

2   to numerous plaintiffs.  And for those reasons, it said that the

3   TRO should fail because there was not a likelihood of success on

4   the merits, as well as these jurisdictional problems.

5       So we still have to figure out who is who with respect to

6   the plaintiffs and whose claims are ripe and whose aren't, and I

7   got the submission you filed this morning, and that was helpful.

8       But the first thing I need to understand is, are we then

9   dealing with the same jurisdictional issues anymore?  The

10  proposed amended complaint said in paragraph 9 in the

11  jurisdictional allegation that I have federal question

12  jurisdiction, sovereign immunity has been waived through the

13  Administrative Procedure Act, and I have jurisdiction under the

14  Declaratory Judgment Act.  And then there was a relatively

15  impenetrable sentence that said, "To the extent any claims fall

16  within the limits stated in 8 U.S. Code Section 1252(a)(2)(A),

17  jurisdiction also exists under U.S. Code Section 1252(e)(3)."

18      Now, let me just start with the Declaratory Judgment Act.

19  Do you agree that it is not an independent basis for

20  jurisdiction if there's no other statutory basis?

21          MS. CAMBRIA:  That's correct, Your Honor.

22          THE COURT:  Okay.  So we still need to find a

23  statutory hook.  What do you mean by "to the extent any claims

24  fall within the limits stated in 1252(a)(2)(A)"?  Do you still

25  think they do or they don't, and if so, which claims in your

1    complaint do you now -- are you saying falls within that and

2    which don't?

3            MS. CAMBRIA:  Your Honor, respectfully, we disagree

4    with the government's contention that there's no jurisdiction

5    here.  In the matter of 1252(e)(3), there's a statutory

6    authorization for jurisdiction that was carved out specifically

7    for systemic challenges and expedited removal, which we have

8    here.

9            THE COURT:  Right.  And that's what you said in your

10   first complaint, and that is what I was prepared to address.

11   But this looks like you're backing away from it.

12           MS. CAMBRIA:  Your Honor, we're not backing away from

13   it.  What we are doing is securing it.

14       Now --

15           THE COURT:  Is what?

16           MS. CAMBRIA:  Securing it, so solidifying the

17   jurisdictional portion.  1331 also provides federal question

18   jurisdiction in this case.  And there was a recent case, *Make*

19   *the Road v. McAleenan*, where Judge Ketanji Jackson ruled that a

20   1252(e)(3) action on its own might not be sufficient to

21   establish jurisdiction on its own through the statutory

22   authorization, that with a hook through a 1331 federal question

23   jurisdiction, them together in combination created sufficient

24   jurisdiction for the Court to hear the case.

25           THE COURT:  The relevant federal question jurisdiction

1    is that it raises a federal question.  So how can that -- it

2    still depends on 1252(e)(3).

3           MS. CAMBRIA:  Absolutely, it does, Your Honor.

4           THE COURT:  So I don't think federal question

5    jurisdiction adds anything.  You either have it under (e)(3) or

6    you don't.

7           MS. CAMBRIA:  Exactly, Your Honor.

8           THE COURT:  Okay.  So my question is, of the counts in

9    your complaint now, which ones fall within the limits stated

10   within -- you said to the extent they're covered, they're

11   covered, and I want to know which ones do you think --

12          MS. CAMBRIA:  I believe they all are covered under

13   (e)(3).

14          THE COURT:  All right.

15          MS. CAMBRIA:  This covers both the claims regarding

16   the APA.  It also covers constitutional actions.  That is what's

17   provided for under 1252(e)(3) if you are providing a systemic

18   challenge within the jurisdictional time.

19          THE COURT:  All right.  What is the status of any of

20   the pending challenges to the rule itself which is not being

21   challenged in this case?  Have there been injunctions entered by

22   any court staying deportations and any of them that also cover

23   these plaintiffs?

24          MS. CAMBRIA:  These plaintiffs are not covered, Your

25   Honor.  As far as I understand it, in the *I.A. v. Trump*

1    litigation, there are stays that cover individual plaintiffs who

2    are involved in that case, but that is not a nationwide

3    injunction.  As far as I understand it right now, there is no

4    nationwide injunction for the transit ban.  It is currently in

5    force, and every one of our plaintiffs that transited through a

6    third country -- which, by the way, are not all the

7    plaintiffs -- are subject to the transit ban.  And for that

8    reason, they are not able to seek asylum in the credible fear

9    paradigm that we're talking about.

10           However --

11              THE COURT:  Can you say that again?

12              MS. CAMBRIA:  Yes.  So, credible fear is the safety

13   net that Congress created when someone enters the United States

14   and is subject to expedited removal, which all of our clients

15   are.  It's the one carve-out that Congress created so that we

16   would not deport asylum seekers to physical harm, because we

17   have mandates and treaty obligations that we do not do that.  So

18   Congress carved out this one exception, and they created

19   credible fear.

20       In our case, our case involves plaintiffs all of whom are

21   subject to credible fear, some of whom are subject to the

22   transit ban and some of whom are not.  But what we're

23   challenging in this case is not the transit ban itself.  It's

24   the subsequent practices, policies, and procedures that the

25   defendants enacted against everyone that's in credible fear,

 1     specifically in beginning targeting families, targeting children

 2     and women initially at the South Texas Residential Center, where

 3     our plaintiffs are from.  They've expanded it to other family

 4     residential centers now, and it is our belief that they will

 5     expand those procedures to all of credible fear.

 6         So what our plaintiffs have done is, upon noticing 11 or 12

 7     different changes in the process immediately done, and

 8     immediately done for all of our plaintiffs, when we noticed

 9     these changes, we had to file something, because we're subject

10     to this jurisdictional time limit.

11             THE COURT:  All right.

12             MS. CAMBRIA:  So when the defendants changed credible

13     fear, we only have a certain time limit, and each of our

14     plaintiffs are subject to it.  And respectfully, there are more.

15     There are lots of women and children right now who are subject

16     to immediate removal.  There are lots of women and children who

17     are not getting a fair shot in credible fear, the thing that

18     Congress created to protect asylum seekers.

19             THE COURT:  All right.  You mentioned the time limits.

20     If you filed this action quickly to preserve making it within

21     the time limits, how does that cover the new plaintiffs who

22     you've just added?  Is it 60 days from when the new rule was

23     enacted, in which case anybody who shows up in the country more

24     than 60 days thereafter can't challenge it anymore, or is it 60

25     days from when it's applied to you?  How do you solve the

1   problem with respect to your -- because there's almost a --

2   we've gotten rid of a lot of plaintiffs whose determinations

3   were overturned.  And then we've got a whole host of new people.

4   They haven't briefed the 60 days, but they kept telling me it's

5   a problem.

6        Why isn't it a problem for the new plaintiffs?

7            MS. CAMBRIA:  Your Honor, because I believe what we

8   are challenging -- each individual in this case is challenging

9   the policy.  And what we did is filed this timely with the

10  people who are available at that time.

11       There are continuing harms based on these policies, and we

12  believe that because we filed timely and there are continuing

13  harms, that we can add plaintiffs to this case, because this was

14  filed timely and they're challenging the exact same policies.

15       The jurisdictional time limit is a problem.  It is not

16  something easily overcome, and it is the time from

17  implementation of the policy.  So it does not matter if six

18  months from now someone is subject to that policy.  They have no

19  right to contest it unless it is brought before a court within

20  60 days of implementation of the policy.

21           THE COURT:  How did they get to just --

22           MS. CAMBRIA:  I'm not saying I agree with it, but it

23  is a strong written language within 1252(e)(3) that it has to be

24  brought within 60 days.

25           THE COURT:  I understand that.  I guess what I'm

1    saying is, are you saying that if one person filed timely, to

2    the end of time you can just keep adding plaintiffs to the case,

3    and they're grandfathered in under the original claim?  Is that

4    how it works?

5        I mean, certainly, statute of limitations wouldn't work

6    that way.  It would be individual per plaintiff in the ordinary

7    situation.

8            MS. CAMBRIA:  Because we are challenging the policies,

9    to not afford the same right for review while this case is

10   ongoing -- we have to first decide whether these 11 or 12

11   challenged actions are legal.  So once that determination is

12   made, obviously, no new plaintiffs could be added.  But until

13   the time that the policy -- since we have filed this action and

14   we are contesting the legality of the policy, plaintiffs should

15   be able to join and vindicate their rights the same as all of

16   our plaintiffs.

17       The other question that we have, Your Honor, is in this

18   case, we're still waiting for the government to provide what

19   written policies or whatever directives were given to asylum

20   officers to uniformly create these 11 or 12 different challenged

21   actions.

22           THE COURT:  That's a whole different issue.

23           MS. CAMBRIA:  That's right, but in order to qualify as

24   being a -- completely implemented as required under 1252(e)(3),

25   those policies have to be adopted by the Attorney General.  And

1   it's not clear to us whether these are just written directives

2   provided to officers to go rogue, to violate what is their

3   normal obligations under the rule, or these are things that are

4   actually adopted by the highest levels of DHS.  We don't know.

5             THE COURT:  What you have basically just told me is

6   that you're not sure if you have the basis for this lawsuit or

7   you don't.

8             MS. CAMBRIA:  No --

9             THE COURT:  And that's the biggest problem for me from

10  the substantial likelihood of success on the merits.  I

11  understand you're in a box, but I'm trying to figure out how

12  this fits the rulings that I have to make to get preliminary

13  relief.  I'm going to get to that, because those problems -- I

14  still want to make sure I understand what your lawsuit is about

15  before I get to whether we have directives or not.

16            MS. CAMBRIA:  I understand.

17            THE COURT:  With respect to the -- what would you say

18  is the difference between the original complaint and the new

19  complaint, other than the added plaintiffs?

20            MS. CAMBRIA:  Your Honor, what we did is we clarified

21  the challenged actions.  So because we had filed our suit very

22  quickly in order to meet the statutory deadline and we had so

23  many plaintiffs, we were just trying to protect the people that

24  we could.  We needed to clarify the challenged actions, to point

25  the Court to the different ways that the interviews were changed

1    and the different ways that they have obligations under the

2    regulations to provide the things that they're no longer

3    providing that they just uniformly stopped.

4          Additionally, we added in --

5          THE COURT:  But the TRO, you provided a number of

6    affidavits and declarations giving me the factual basis to find

7    that this change had happened or that change had happened.  But

8    I don't have that -- we're just transferring them.  Even though

9    you're recharacterizing what the change is, it's still the same

10   underlying declarations that support the existence of the new

11   ones?

12         MS. CAMBRIA:  It's exactly the same, Your Honor.

13   We're trying to make it more clear for the Court, because to be

14   fair, credible fear and expedited removal is probably the most

15   complicated area of immigration law, which is also probably one

16   of the most complicated areas of law.  It's very difficult to

17   explain commonsensically how credible fear works, but it's so

18   important, because it's literally the only thing protecting

19   women and kids and, frankly, any asylum seeker from immediate

20   deportation to harm.

21         THE COURT:  I don't want to belittle that.  I totally

22   understand that.  And so I really need to focus this morning on

23   the legal boxes, the findings the Court has to make to get

24   involved at this stage, no matter how strongly the showing is

25   made on the big picture.

1          MS. CAMBRIA:  Understood.

2          THE COURT:  So you keep taking me back there, and I

3    understand that, and that's important advocacy on behalf of your

4    client, but it's not where I need to be this morning.

5          I'm not sure that the amended complaint clarified the

6    challenged actions.  The reason I had scheduled this hearing was

7    to talk about the challenged actions.  And so now I have a new

8    set, new way of defining them.  But part of the problem now is

9    you not only have to define them for purposes of Section

10   1252(e)(3)(A), that these are written policy directives,

11   guidelines, or procedures issued by or under the authority of

12   the Attorney General, but you've now hooked in the APA.  And so

13   now they have to be final agency action for purposes of the APA.

14         So are you alleging that everything that you're saying is a

15   challenged action that gives me jurisdiction -- under Section

16   1252(e)(3)(A) gives me jurisdiction under APA Section 704?

17         MS. CAMBRIA:  I am, Your Honor.  And that's where the

18   *Make the Road v. McAleenan* case is so important, because they've

19   already actually addressed that exact issue, because that was an

20   APA claim where the question was, does 1252(e)(3) confer

21   jurisdiction.  And they found that because it was an APA case,

22   that provided federal question, and in conjunction with the

23   1252(e)(3) --

24         THE COURT:  But wasn't there a specific decision that

25   they were pointing to?  You have to have final agency action to

1  get to 704.  I don't have that opinion at my fingers.  What was

2  the thing that triggered the APA in that case?

3  　　　　　MS. CAMBRIA:  In that case there was a written --

4  there was a written policy that had not gone through notice and

5  comment.  So they were pointing to that final agency action.

6  　　　　　THE COURT:  Okay.  That's different.  All right.

7  　　So to the extent you're going to found jurisdiction on

8  Section 1252(a)(3)(A), which is what you need for 1331, in any

9  event, you agree that determinations subject to judicial review

10  are limited to whether a section or a regulation issued to

11  implement the regulation's constitutional.

12  　　Do you have any claims that are under Section 1, that

13  there's been an unconstitutional --

14  　　　　　MS. CAMBRIA:  We do have a Fifth Amendment claim, Your

15  Honor, and that's based upon the government not following their

16  own policies or procedures via the Accardi Doctrine, and also

17  that the rules that they are doing, they're placing on these

18  families is ultra vires, that they're not following their own

19  rules and regulations that are promulgated.

20  　　　　　THE COURT:  That's a constitutional claim.  But under

21  1252(e)(3)(A), which is supposed to challenge new directives,

22  regulations, rules, are you saying that any new regulation or

23  rule that is unconstitutional or all of them under part 2?

24  　　　　　MS. CAMBRIA:  The challenged actions that we have

25  found absolutely deprive our clients of due process in the

credible fear scheme.  We're talking about taking away trained

asylum officers and having children interviewed for asylum

relief, related relief, by CBP officers.  We're talking about

putting kids and parents in interviews and telling them in the

middle of their interview, Asylum is denied and now we're going

to subject you to a different standard of law.  You don't have

time to talk to an attorney or figure out what that law is;

you're just going to do it now.

These are all things that are brand-new.  The interviews

are no longer nonadversarial.  They're adversarial.  We've gone

from interviews that lasted an hour and a half to eight to 10

hours, where children are battered with questions and parents

are battered with questions.  There's substantive changes in the

interviews that create constitutional concerns.  And that's why

we've listed the challenged actions that we have and why they're

so important in this scheme.

I'm not going to go back to the seriousness of it, but

we've laid out 11 different ways in which we have identified --

and these were done instantaneously and simultaneously -- to

render credible fear almost ineffective.  We've gone from a

system where 90 to 97 percent of families succeeded in fear

screening -- and that's what it is, just a fear screening.  This

is not -- you don't win any benefit from this interview.  You

just win the right to talk to a judge.  We've gone from a

97 percent success rate to 10 or below.  I mean, it's a

substantial swing, a substantial change, and it all happened within a month's time.

So something happened.  Something happened uniformly, because each of the officers are conducting the interviews in the same way.  That doesn't just happen, you know, on its own.  Something happened that created that change.  And that's what we're trying to identify.  And we don't believe that the government can hide these changes to prevent them from being litigated in court, because we do have this really strict jurisdictional timeline.  I mean, they could create a system where, you know --

THE COURT:  Let me ask you, is there a pending Freedom of Information Act request for any new policies or directives issued since this rule change?

MS. CAMBRIA:  No, there's not.  The only one we are aware of, Your Honor, is regarding using CBP officers to interview children.  That, we reference within our second amended complaint, because that was previously filed by a different organization, and we were seeking information from them.

THE COURT:  Well, isn't that an appropriate thing to do?  I mean, you don't necessarily get discovery in an APA case or discovery under these immigration rules.  The fundamental thing we need to figure out here is whether there are policies and written directives, and you can file a request.  You can

1    expedite.  There are a lot of things that we could be doing on a

2    parallel track here, and you're saying that's not happening?

3           MS. CAMBRIA:  It hasn't happened, Your Honor, but I'm

4    not going to discount that that's not something we should be

5    doing.  I agree with you.

6           THE COURT:  Yes.  I mean, the issue raised the day

7    this case walked in the door is, how are you going to prove the

8    existence of the policies as an element of your offense, of your

9    case.  And an expedited request, while I'm not saying they would

10   have done it, they would have had to respond in 10 days.  So we

11   would be sitting here with something where we'd also at least

12   have a parallel complaint before some other judge that these

13   should have been expedited and where are they, and there would

14   have been a schedule.  At some point, they're going to have to

15   answer whether there's a written policy or not, but right now,

16   the onus is on you to establish that there is.

17          MS. CAMBRIA:  And what we have to rely on, Your Honor,

18   in lieu of doing a FOIA, are the testimony of the families

19   themselves that acknowledge the change, the testimony of the

20   legal service providers that represent every single family

21   there.

22          THE COURT:  Well, the families can say what's happened

23   to them.  It's really the lawyers who can say this is different

24   than what was happening before.

25          MS. CAMBRIA:  That's correct.

1          THE COURT:  All right.  I'm still, though -- even if I

2     find there's jurisdiction and the statute doesn't invest me of

3     my inherent equitable powers, we need to talk about the

4     likelihood of success on the merits.  I'm having some difficulty

5     with what has been presented that would enable me to find that

6     you have made the necessary showing with respect to the

7     existence of written policy directives, guidelines, or

8     procedures, before we even get to whether they're illegal.

9          And now that you've thrown in the APA as the basis for the

10    lawsuit, to be final agency action, it has to be the

11    consummation of an agency decisionmaking process.  It can't be

12    tentative.  It can't be interlocutory.  Rights or obligations

13    have to be determined.  It has to be final agency action.

14         So I'm trying to find out how I can rule that there is a

15    substantial likelihood that you have established the existence

16    of written policies and final agency action.

17         The problems inherent in the previous complaint that you

18    say you were trying to clarify, to some extent, I think, were

19    exacerbated by the recharacterization of many of the aspects of

20    the new system which you were calling "policies" before, now

21    you're calling them "practices" or "the new regime."

22         For instance, the new amended complaint has in

23    paragraph 3, "On information and belief, the defendants or those

24    operating under their supervision or control have implemented

25    new directives, guidelines, initiatives, actions, and/or

procedures," which you're calling the challenged actions in sum.

Paragraph 4, "While at least some are believed on information and belief to be memorialized in writing," and it goes on.

Those are -- I understand why they're tentative and they're vague, but how do we get to the Rule 65 standard with that kind of characterization?

So what I want to do is go through the list of the 11 policies and talk about exactly what it is in the record that I can rely upon to establish the likely existence of a new written policy.  And my concern is that some of them fall somewhere within that ambit.  But there are others -- inadequate training -- that don't give rise to the notion that someone has written a written policy, from now on we're going to have these conducted by people with inadequate training.  And saying this was done by a person with inadequate training may be extremely problematical in many ways, but I don't see how it falls under final agency action for the APA or the written policies and directives for my jurisdictional hook.

And so let's just go through them one by one.  That is the real reason I had this hearing.

MS. CAMBRIA:  All right.

THE COURT:  Policy number 1, before, you called it "failure to meaningfully orient proper legal standard policy," and now you've called it "a policy to avoid meaningfully

orienting migrants to the applicable standards and procedures."

So first of all, how would that fall under the ambit of a final decision for the APA?  But second of all, where -- tell me where exactly in the record -- and I went through that one. We've got several declarations by a number of plaintiffs, and at this point now, I don't know if they're still plaintiffs or not. But basically, the argument is, the interviews were conducted by different officers -- I think it's the Flaherty declaration -- under different legal standards, plaintiffs didn't understand the changing nature of the legal threshold, they were nervous.

And how is that a challenge to the policy as opposed to the merits, the outcome of the interviews?

MS. CAMBRIA:  I can explain that, Your Honor.

THE COURT:  Okay.

MS. CAMBRIA:  So previously, people who were detained at the Family Residential Center received an in-person orientation from an asylum officer prior to their interview. That is not happening anymore.

Secondly, the reason there's no meaningful orientation in the majority of the cases that involve the plaintiffs, aside from that, is that -- because of the transit ban.  When CFIs are conducted, they begin as a CFI, and they're required to read them a form, called an M-444 form, that explains the purpose of the interview, the purpose of a credible fear interview.  You do that for about two hours, where they determine transit ban

1   applies, you no longer qualify for credible fear, we're going to

2   change the standard and change the interview to a reasonable

3   fear interview.

4        And they read a paragraph -- and those are available in any

5   of the credible fear interviews for any of our plaintiffs

6   subject to the transit ban.  They read a paragraph that says

7   you're now subject to a different standard of law.  And there's

8   no break.  There's no meaningful understanding of what legal

9   standard you're subject to when you walk into that -- when

10  you're sitting in that interview, until midstream.

11       And every person that is subject to a government process

12  that's going to decide their rights should understand the

13  purpose of the interview.  So where we're --

14            THE COURT:  One thing we haven't done, I don't think,

15  is specify which plaintiffs are transit ban plaintiffs.  You've

16  said to me some of yours are and some of yours aren't.

17            MS. CAMBRIA:  Yes.

18            THE COURT:  So what you're saying is that this issue

19  applies to the transit ban plaintiffs?

20            MS. CAMBRIA:  It would apply to both, Your Honor,

21  respectfully, because they're no longer being oriented previous.

22  They used to receive an in-person orientation.  They're no

23  longer receiving an in-person orientation prior to the

24  interview.  That's first.

25       Secondly --

1          THE COURT:  The procedure to conduct one, was there a

2    written regulation or procedure or guideline in existence that

3    you are aware of before that said do it?

4          MS. CAMBRIA:  Yes.  And it is listed, Your Honor.

5    Paragraph 161 does provide citations for each of the changed

6    policies that we're alleging these are the areas of the

7    regulations that they're not following.

8        So 8 C.F.R. 235.3(b)(4) requires orientation of the process

9    that they're going through.

10          THE COURT:  So the reason to believe that there's a

11    new policy is that what they're doing is contrary to the old

12    written policy, and that gives rise to an inference -- resolving

13    all inferences in your favor as a plaintiff, that there's been a

14    change in policy, that people have been told, Don't do X

15    anymore, do Y?

16          MS. CAMBRIA:  Exactly.  And it's not just that they're

17    doing it, but the credible fear interview transcripts which the

18    families receive do demonstrate for the transit ban the

19    cessation of the CFI and the beginning of an RFI and the reading

20    of one paragraph, which we don't think is a meaningful

21    orientation as to what the legal standard is you're going to be

22    subject to.

23          THE COURT:  Okay.  Is there anything more that I need

24    to know about what you're calling policy number 1 and why we

25    think there's evidence in the record that demonstrates that

1    there's a new written guidance with respect to that?

2          MS. CAMBRIA:  The only other thing I would point Your

3    Honor to is the actual transit ban regulation itself, which does

4    describe that once a credible fear interview is conducted, they

5    will change midstream and conduct a reasonable fear interview.

6    So that is a written policy.

7          THE COURT:  So are you challenging that policy, that

8    midstream policy, with respect to some or all of your

9    plaintiffs?

10         MS. CAMBRIA:  Absolutely, because changing the legal

11   standard in the middle of an adversarial interview is chaotic

12   for anyone.  When they hear, Your asylum is denied but we're

13   going to keep talking to you and read you a paragraph, there's

14   no orientation as to what they actually qualify for or can they

15   have a moment to talk with counsel or to understand what's

16   happening to them midstream.  They have no idea.

17         THE COURT:  All right.  But that is a specific

18   regulation that you're challenging?  Is that indicated in your

19   complaint somewhere that you're challenging that regulation?

20         MS. CAMBRIA:  We're not challenging the transit ban

21   itself.

22         THE COURT:  I know that.

23         MS. CAMBRIA:  We're talking credible fear process.

24         THE COURT:  You're telling me all these plaintiffs are

25   the same, but they're not all the same.  Half of them are under

1    the transit ban, half of them aren't.

2         Policy number 1, I'm just trying to figure out what we're

3    challenging.  Under policy number 1, that's it.  And we got to,

4    they used to give them in-person orientations, now they don't.

5    That's number 1?

6              MS. CAMBRIA:  That's correct.

7              THE COURT:  But you keep going from there over here

8    and saying, and my transit ban plaintiffs halfway through are

9    read a piece of paper, and it's a new standard, but that is a

10   regulation, and it's written.

11        Is that regulation part of what you're challenging in

12   policy number 1 or this lawsuit?

13             MS. CAMBRIA:  No.  We're challenging the meaningful

14   orientation.  So the regulation requires --

15             THE COURT:  You're challenging the failure to do it?

16             MS. CAMBRIA:  The failure to ensure that the person

17   being interviewed understands the legal standard they're subject

18   to.

19             THE COURT:  Okay.  But you can't challenge that.  You

20   have to challenge a written policy and directive.  So what you

21   are challenging is an alleged policy to no longer give the

22   orientation.

23        You understand what I'm saying?

24             MS. CAMBRIA:  I understand.

25             THE COURT:  Almost all of these are not cast in

1  language that would fit them under the only jurisdictional hook

2  we have here, which is the (e)(3), because the APA is even

3  harder to get to final agency action.  So if you've got one, you

4  clearly have the other.

5      But let's just deal with going back to what we've been

6  saying, what you've been saying is your fundamental basis for

7  jurisdiction, especially if you add in 1331, which is

8  1252(e)(3).

9      And so it has to be essentially a directive to do X or Y,

10  to implement immigration laws by doing X or Y.

11          MS. CAMBRIA:  That's correct.

12          THE COURT:  So policy number 1 is, I think what you're

13  saying, don't do the in-person orientations before the interview

14  anymore; is that correct?

15          MS. CAMBRIA:  That's correct.

16          THE COURT:  Okay.  Is a part of that also reading them

17  some new standard in the middle of the interview?

18          MS. CAMBRIA:  That's correct.

19          THE COURT:  Okay.  So there's like an A and B under

20  that?

21          MS. CAMBRIA:  That's correct.  And it falls under

22  8 C.F.R. 235.3, which requires meaningful orientation so that

23  the person understands the legal standard they're subject to

24  prior to the interview.

25          THE COURT:  All right.  So that's why it's unlawful?

1        MS. CAMBRIA:  Yes.

2        THE COURT:  Again, I'm not even getting to the merits

3   of whether it's lawful or unlawful right now.  I'm just trying

4   to figure out what the "it" is.

5        MS. CAMBRIA:  Understood.

6        THE COURT:  I think I understand number 1.

7     Let's talk about number 2.

8        MS. CAMBRIA:  Got it.

9        THE COURT:  Proceeding without required staffing,

10  training, or guidance.  This is one of the ones I have the most

11  difficulty fitting under the rubric -- the only rubric that I

12  have if I agree with you that I have it for jurisdiction.

13    So how is proceeding without the kind of staffing,

14  training, and guidance that one would need to do this properly

15  and fairly and constitutionally, all the things that are

16  important, how does that fit under the cubby hole of what we're

17  talking about?

18        MS. CAMBRIA:  And I do understand Your Honor's concern

19  with the words "improperly trained," because it's highly

20  unlikely there's something out there that says we're going to

21  not train our officers.

22    What we're getting at in this action is that they are

23  assigning officers to credible fear interviews for children that

24  are not taught the appropriate standards.  And this includes

25  employing CBP officers to interview children.  And part of the

1    requirement, when children are interviewed, which comes in a

2    later action also, is that they apply children-friendly

3    standards.

4            THE COURT:  Okay.  When you talk about practices --

5    and you've kind of changed the whole thrust of the complaint

6    when you amended it to focus on practices -- how does that fall

7    under 1252(e)(3)(A)?

8            MS. CAMBRIA:  Because the use -- this is the first

9    time ever in the United States that CBP officers are used to

10   interview asylum seekers.  That has not been done yet.  And

11   there's no other mechanism to challenge a change in credible

12   fear, so the use of CBP officers for the first time, but for

13   using 1252(e)(3).

14           THE COURT:  I understand that, but it has to work.

15           MS. CAMBRIA:  And we believe that there is writings,

16   because there's no mechanism to get CBP officers into the asylum

17   office besides an agreement between CBP and USCIS to conduct

18   those interviews.

19           THE COURT:  So you are telling me that "proceed

20   without required staffing, training, or guidance," which is what

21   you're calling the new policy, is use of CBP officers to conduct

22   credible fear interviews?

23           MS. CAMBRIA:  Yes.

24           THE COURT:  Okay.  And that would be something --

25           MS. CAMBRIA:  That, I believe, we could get in

1  writing.  I mean, I personally -- I do these interviews three or

2  four times a week.  There's a dramatic shift in the type of

3  person who is interviewing kids now than before.

4      In the cases involving the plaintiffs here, we've

5  identified officers -- we've identified plaintiffs interviewed

6  by CBP officers.  This is the first time that's ever happened.

7  And that's nationwide.  This is a brand-new change, and it's one

8  of the reasons that we needed to include the "using agents

9  violating 18 U.S.C. 1225."  The words "improperly trained," I

10 don't believe that there's going to be something out there that

11 says we're going to use improperly trained officers.

12         THE COURT:  No, I understand that, but I think the

13 broader and mushier -- your characterization of the challenged

14 directives are, the more you make them into practices, regimes,

15 the further you wander from the only jurisdictional hook that

16 you're hanging your hat on, which they already have problems

17 with it, but if I say it's a jurisdictional hook, these have to

18 fit.  And the way they're cast and the way they've been recast

19 makes that very challenging, and that's why I need the kind of

20 specificity that we're talking about right now.

21         MS. CAMBRIA:  I'm happy to answer this, Your Honor.

22         THE COURT:  Okay.  And it may be that then we need to

23 go back with your giving me a list and telling me exactly in the

24 record and the declarations where I can find it, assuming that

25 it still applies to the new plaintiffs.

1          All right.  I think I understand number 2.

2          Number 3, I think we had before, declaring a negative

3     decision in the middle of a screening directive was 4 and

4     eliminate supervisory review on concurrence of credible fear

5     determination directive as number 3, and now I think they've

6     been sort of combined as 3.

7          MS. CAMBRIA:  Sorry.  The only thing I would add:

8     Previously, before you could deny a CFI, a supervisor had to

9     sign it.  Now they're denying CFIs in the middle of interviews

10    and converting them into RFIs.  That's the slight

11    distinguishment from the first challenged action.

12          THE COURT:  All right.  What -- your current policy

13    number 3, I believe, you've characterized in paragraph 149 is

14    issues summary negative determinations to eliminate supervisory

15    review and concurrence and to avoid developing a complete

16    written record.

17          MS. CAMBRIA:  That's correct.

18          THE COURT:  And that one --

19          MS. CAMBRIA:  So no longer is a supervisor

20    determining -- after a CFI is conducted, a supervisor is not

21    reviewing it to make sure that it's a correct decision before

22    they move forward into a reasonable fear interview.

23          Previously --

24          THE COURT:  So these are just the transit ban ones

25    where they make the decision halfway through?

1          MS. CAMBRIA:  That's correct, Your Honor.

2          THE COURT:  So does this even apply to the nontransit

3     ban plaintiffs?

4          MS. CAMBRIA:  It would not, Your Honor, because those

5     would receive full CFIs, and at the end, a supervisor would

6     review it.

7          The difference with the transit ban cases is that the

8     failure of the CFI is decided midstream.

9          THE COURT:  All right.  At some point, I may call for

10    additional briefing, but I definitely want a supplement to what

11    I got this morning that divides your plaintiffs and tells me who

12    the transit ban ones are and who the transit ban ones aren't.

13         MS. CAMBRIA:  I will do that, Your Honor.

14         THE COURT:  Okay.  And you know, we have the problem;

15    plaintiffs are falling out and plaintiffs are coming in.  It's a

16    moving target.  And I recognize part of that is the time it's

17    taking to get to the merits of this.  But it gets delayed when

18    things get amended.

19         All right.  Number -- the fourth one, which I think was

20    similar to your prior fifth one, paragraph 140, limit

21    factfinding relevant to a significant possibility of eligibility

22    for asylum, withholding of removal, and relief against the

23    Convention Against Torture.

24         So maybe explain to me what the specific policy change is

25    that that specifically refers to.

1          MS. CAMBRIA:  Your Honor --

2          THE COURT:  And one thing you said last time is that

3     they didn't get to present testimony they wanted, and as a

4     result, there were negative findings, even though the facts of

5     their cases were sufficient to meet the standard.  People were

6     cut off and didn't get to finish what they wanted to say.

7     Asylum officer didn't believe the story, didn't let them speak,

8     kept getting cut off, didn't want to hear drama.  All of these

9     seem to me to be so merits-based.

10         So how does that one fall within, there's a policy change,

11    there's a sea change, there's a new directive, as opposed to

12    these people just are not doing my determination fairly,

13    multiple determinations fairly, but still?

14         MS. CAMBRIA:  Well, what we've seen is a trend, and

15    when it's not just one or isolated incidents, when it's

16    happening in every case, when they're not following lines of

17    inquiry that they're supposed to follow throughout the

18    interview -- when I say "they," I'm sorry, asylum officers --

19    they're not -- they've been instructed to not completely

20    investigate certain lines of inquiry.  If they receive, you

21    know, whatever information they need to to deny, they stop at

22    that moment.  And it's not necessarily, We're going to do a de

23    novo interview where we investigate all lines of inquiry.

24    They're stopping people from talking.

25         And that's something that asylum officers typically don't

1   do, because their job is to investigate and to assist, not to be

2   adversarial and deny.

3       It's a trend that we've noticed, and there are requirements

4   under the C.F.R. that they don't leave incomplete records.  They

5   have to follow those lines of inquiry.  They can't tell someone

6   to stop talking.  They can't let somebody explain -- not explain

7   their story.  And I believe that that's supported by numerous

8   declarations.

9       THE COURT:  Numerous declarations saying why it wasn't

10  happening.  My concern was how -- where the hook came that said

11  this is a directive as opposed to they're just -- these were

12  individually bad interviews on a merits situation.  What you're

13  saying, it's the consistency of it across the board and the

14  inconsistency of it with the regulations that makes you think

15  there's a new directive?

16      MS. CAMBRIA:  Yes, Your Honor.

17      THE COURT:  And I take it that's kind of the same

18  thing with respect to paragraph 151, to make interviews

19  adversarial.

20      MS. CAMBRIA:  And this, Your Honor, is an extremely

21  important one in these cases.  And I can tell from personal

22  experience, but also with the plaintiffs in this case, some of

23  these families are interviewed for 13 hours.  I mean, that's

24  never happened ever.

25      THE COURT:  And is all this -- number 4 and number 5,

1   are these -- these are not the CBP?  These are the asylum

2   officers now?

3           MS. CAMBRIA:  They're both, Your Honor.  It's

4   important to understand that we can't -- unless we ask and we

5   get an affirmative answer as to whether someone is a CBP officer

6   or not, we can't identify in a lot of cases whether they are or

7   they're not, because they're provided with asylum officer

8   identification numbers.  So in some cases, we have identified

9   them because they've disclosed that they are, or we've

10  identified them because we actually know by name that they are.

11          It's actually not disclosed to the person being interviewed

12  whether the officer is a CBP officer or not.  They're all given

13  asylum officer identification numbers, and they introduce

14  themselves as asylum officers, even if they're brought over from

15  CBP.

16          But to get back to the adversarial nature of interviews,

17  the length of interviews, their requiring of children to

18  participate in interviews, the combative type of questioning,

19  never employed before by an asylum office -- and I've been doing

20  asylum interviews for more than five years, so long -- it's just

21  different.  And they have an obligation under 8 C.F.R. 208.30(d)

22  to conduct nonadversarial interviews.

23          And where do you go when the agency has decided that we're

24  going to question you until you give up and start answering the

25  questions we want you to answer the way we want you to answer

them?  And the way that we've seen it employed is extremely long
interviews, no breaks for lunch, involving children very young.
And it's really difficult as a parent to sit in a room for eight
hours with a child, and it's really hard to force a child to go
through that process if they just can't.

So it's a very different situation.  And we're talking like
three months.  Like three months ago, it was very different.
Interviews, one to two hours.  Now they're eight hours.  Using
children now.  Weren't using children before.  Types of
questions bordering on interrogation.  Before, the whole idea
was to build trust and rapport to get someone's really traumatic
story out.  That's over.

And that doesn't just come out of a -- that doesn't just
come out of nowhere.  Somebody has to be told or trained, or
there has to be some kind of instruction as to what exactly
you're to do in these interviews.

So that's where the adversarial nature comes from.

THE COURT:  Let me ask you a question.

MS. CAMBRIA:  Yes, ma'am.

THE COURT:  Let's say it turns out that for all of
these things, there was explicit instruction to start operating
this way and it wasn't written down.

Where would that put the Court?  Would that satisfy the APA
still as a final decision?

MS. CAMBRIA:  Where I would reach at that point, Your

1    Honor, is then we're talking about the Constitution.  If we have

2    a situation where they're failing in all of these obligations

3    that they, through regulation, have always followed and they've

4    just decided now we're not going to do it anymore, that's when

5    you hit the constitutional violation.  That's when 1252(e)(3)

6    matters, because it's a written directive or a constitutional

7    violation.  And that's when I think we hit that point.

8        And for a lot of these kids, I think that we've hit that

9    point.  And unfortunately -- not unfortunately.  Fortunately for

10   our clients, 1252(e)(3), if we get it during the time frame that

11   these policies changed and it's a constitutional violation, they

12   have jurisdiction in this court to seek redress.

13        THE COURT:  Do you think that all 11 have both

14   constitutional implications and -- or there's some in particular

15   that you believe have the constitutional implications?

16        MS. CAMBRIA:  Your Honor, I think because all of them

17   are based in a regulatory scheme that they're required to do and

18   they're not doing it, I think they all pinge on constitutional

19   violations.  I think we're going to be hard-pressed to find in

20   writing each and every one of them.  I think some of them do

21   exist, some of them might not.  But certainly, all of them

22   certainly -- it really does border on, you know, the rights of

23   these clients, their constitutional violations, their rights to

24   be afforded what Congress intended them to have, and all these

25   regulations that say what they're supposed to be doing and

1    they're not.

2        So I do think that some are written.  I think that all of

3    them pinge on the constitutionality of the scheme.

4        THE COURT:  Going into 6, limiting migrants' rights to

5    meaningful consultation, this is similar to what you had before,

6    or this one is a new one?

7        MS. CAMBRIA:  Your Honor, I just want to make sure the

8    Court is aware, there is another case that's challenging notice

9    of interviews and chance to consult with counsel, and that's

10   *L.M.-M. V. Cuccinelli.*  It is before Judge Jackson as well, I

11   believe.  In this situation, we don't want to interfere with

12   their case.  I believe what we're talking about in this

13   meaningful advanced notice of interview and chance to consult is

14   for the transit ban cases, because when their status is changed

15   midstream, they have no opportunity -- this actually goes

16   into -- yeah, they have no opportunity to talk with counsel

17   about what standard they're subject to anymore.

18       THE COURT:  Okay.  So like 3, number 6 you're limiting

19   to your transit ban plaintiffs?

20       MS. CAMBRIA:  That's correct.  And it actually goes

21   into 7, no meaningful advanced notice, orientation, or

22   consultation with counsel.

23       But just so the Court is aware, the *L.M.-M. v. Cuccinelli*

24   is just another one of the things they have done to families in

25   family residential centers.  They're not interviewing families

within 24 hours of arrival.  We all want people to be in and out
of detention fast, but the purpose of that is to prevent
consultation with counsel.  The idea is, if we interview them --
eight-hour interviews, within 24 hours of arriving from a CBP
station in a family detention center, to prevent their access to
counsel, then there's no understanding when they go into the
interview what they're subject to, and it ends up with just a
client's unknowing of what's really happening to them.

THE COURT:  But that's her case.

MS. CAMBRIA:  Yes.

THE COURT:  And you're not saying this case is related
to that?  It's just this is mine and that's hers?

MS. CAMBRIA:  It's not.

THE COURT:  You had one before, a directive about RFI
standards without RFI protections, and now you're not calling it
a directive anymore.  You're just saying they're applying RFI
standards without RFI protections.

Obviously, that starts again -- we're talking about a
practice, a policy.  So explain to me how that one falls under
the rubric that we've been talking about.

MS. CAMBRIA:  So if you are subject -- credible fear
has a standard that's a significant possibility of success on
the merits of your asylum claim in a hearing.  Reasonable fear
is the fear standard that is usually employed for withholding of
removal or protection under the CAT.  It has a higher standard.

1    You have to establish a reasonable possibility that you will

2    succeed in a merits hearing on your case for withholding, or

3    CAT.

4         Now, because it's not under credible fear, it's reasonable

5    fear, you're subject to additional protections.  You have the

6    right to know in advance that you have an interview.

7         So these families who are going into credible fear

8    interviews walk in --

9              THE COURT:  So this is part and parcel with 1?

10             MS. CAMBRIA:  Correct.

11             THE COURT:  It changed halfway through, and it only

12   has to do with the transit ban plaintiffs?

13             MS. CAMBRIA:  Correct.

14             THE COURT:  But basically what you're saying there is

15   not so much that there's some new rule, but they're not applying

16   the rules that exist?

17             MS. CAMBRIA:  Exactly, Your Honor.

18             THE COURT:  And that falls under the jurisdictional

19   provision how?

20             MS. CAMBRIA:  Because, Your Honor, the DHS not

21   following their own procedures, laws, guidelines is a

22   violation -- is ultra vires.  It's violating the Accardi

23   Doctrine.  It's violating what they're supposed to be doing.

24   It's a constitutional violation.

25             THE COURT:  But the provision that you're pointing to

1    for my jurisdiction isn't based on I get to go in and stop

2    constitutional violations in terms of how they're performing

3    their job.  I get to review sections or regulations and whether

4    they are constitutional and then whether regulations or written

5    policy directives, written policy guidelines or written

6    procedures are consistent with law.

7         And a failure to follow their own regulations, how do I get

8    to review that?  You're saying they have perfectly good

9    regulations, and they're not following them -- or not perfectly

10   good.  But the ones they have, the best we've got, they're not

11   even doing it.

12             MS. CAMBRIA:  That's correct.

13             THE COURT:  So what's the answer to their saying this

14   is just a merits challenge?

15             MS. CAMBRIA:  Because, Your Honor, we're not

16   challenging whether they have a negative or not.  We're

17   challenging the procedure that they were subjected to.

18             THE COURT:  Okay.

19             MS. CAMBRIA:  So that's --

20             THE COURT:  That's your Fifth Amendment claim, the due

21   process claim.

22             MS. CAMBRIA:  That's correct.

23             THE COURT:  And you have a stand-alone due process

24   claim that doesn't depend on 1252(e)(3)(A).  Which claim is

25   that?

```
 1            MS. CAMBRIA:  Third claim, Your Honor.

 2            THE COURT:  Because this one isn't really APA-like.

 3            MS. CAMBRIA:  That's correct.

 4            THE COURT:  This is, our due process is being violated

 5    through these interviews because they're not following their own

 6    rules.

 7            MS. CAMBRIA:  That's correct.

 8         It's important, though, to understand, though, that

 9    whatever rules that they promulgated to conduct the interviews

10    regarding the transit ban, they had to instruct them to conduct

11    a CFI first, deny it, state a paragraph saying you're subject to

12    a new standard, and conduct the other interview.  That again

13    would not happen without instruction as to how to conduct them.

14         So it's likely that a writing exists, that they were told

15    to --

16            THE COURT:  This is how to deal with the transit ban

17    plaintiffs now, when they say credible fear, we're going to

18    switch halfway through, and we're going to do this.

19         I understand.

20            MS. CAMBRIA:  Okay.

21            THE COURT:  Number 8, this relates to the most

22    favorable precedent in the CFI proceedings.  So now you're

23    talking about not necessarily transit ban people; is that

24    correct?

25            MS. CAMBRIA:  That's correct.
```

1      THE COURT:  And what is the -- what are we saying?

2  What's the allegation there, that there's some new policy afoot

3  with respect to that?

4      MS. CAMBRIA:  In this action, Your Honor, what -- the

5  obligations of the asylum officer doing the interview and making

6  the determination is to apply the most favorable case law in the

7  nation to these interviews.  So it doesn't matter what circuit

8  you're in when the interview is conducted.  They're to apply the

9  most favorable law in the nation, and they've stopped doing

10  that.  They now are either silent and don't acknowledge

11  precedential laws that exist, or they affirmatively don't apply

12  certain laws.

13      And I can give an example.  With regard to cases involving

14  gangs, which is highly contentious right now, but if you have

15  issues where you fear a gang and you're from a central American

16  country, your child's targeted, because perhaps you can't afford

17  whatever war tax they're putting on you, and they've said, Well,

18  we're going to kill your child if you don't pay this, and you

19  can't pay, your child's in danger, the Fourth Circuit determines

20  that that's protected.

21      But those cases will not succeed in Dilley anymore.  So

22  what they've done, in *Grace v. Whitaker*, which is also a

23  companion case in this court, they determined that the asylum

24  officer is not allowed to do that, that they have to apply the

25  most favorable cases law in the circuit.  And again, they're

1    just not doing that.

2         And in their determinations, Your Honor, they're not citing

3    or analyzing why that might not apply.  They're just silent as

4    to it.

5              THE COURT:  And again, the notion that this is a

6    written directive is based on the fact that you're saying this

7    is a sea change that started at a particular time and it's being

8    consistently applied?

9              MS. CAMBRIA:  That's correct.

10             THE COURT:  The mandatory concurrence review by the

11   Fraud Detection Unit is something new?

12             MS. CAMBRIA:  That's correct.  Akin to the CBP

13   officers coming to interview children, we've also -- it's come

14   to our attention that all positive credible fear determinations,

15   not negative, are subjected to at sometimes third-level review

16   by a Fraud Detection Unit.  That's new.  It's our understanding

17   that those in the Fraud Detection Unit are not asylum officers

18   and shouldn't be making these decisions.  That's something new

19   that has happened within the 60 days that we filed this

20   complaint.  And cases wouldn't go to a Fraud Detection Unit

21   without some instruction that that's to be done.

22             THE COURT:  And then withholding facts relied upon,

23   this is the same as before?

24             MS. CAMBRIA:  That's correct.  It's very strange, in

25   the determinations that are being made for negative

1    determinations, they're no longer telling you why.

2            THE COURT:  And they used to get a written form, and

3    now they're not?

4            MS. CAMBRIA:  That's correct.

5            THE COURT:  Okay.  And the notion of -- well, you

6    changed "telephone interview directive," and now you've

7    got "abandoning child-sensitive treatment in credible fear

8    proceedings."  So that seems to include the telephone interview.

9       Is there more to it than that?

10           MS. CAMBRIA:  I believe that it's covered elsewhere,

11   but the -- in the South Texas Residential Center, children were

12   interviewed in person.  That stopped.  They're no longer

13   interviewed in person.  They're interviewed telephonically.  And

14   it doesn't matter how old the child is.  They're interviewed

15   telephonically, and the parent as well.

16      And what's important about the child-sensitive interviewing

17   is that it's regulatorily required and also required under the

18   training manual for USCIS that they employ certain techniques

19   when they're talking to children.

20      So going back to having interviews conducted in an

21   adversarial manner, they're doing the same thing to adults that

22   they're doing to children -- doing the same thing to children

23   that they're doing to adults.

24           THE COURT:  Okay.  All right.  I think this has been

25   helpful for me to understand what you're trying to say about

1    these issues.  I want to ask you just a couple more questions

2    about brightness and mootness, and then I want to hear from the

3    defendants, and then probably wanting from both sides whether

4    you think, in light of the changes of the complaint, that

5    there's more you want to tell me in writing, particularly given

6    the clearer understanding you may have of where my focus is.

7         With respect to the ripeness and mootness issues in

8    docket 39, you categorized the plaintiffs, and you've redone it

9    this morning with the new plaintiffs.  Category 1, basically,

10   you're dismissing on an ongoing basis people whose negative fear

11   determinations were vacated, either by the judge or the asylum

12   office.  And so that's happening.  And we appreciate the fact

13   that it's happening on an ongoing basis, and there's nothing

14   really to discuss, because that's being handled.

15        The second category were people for whom review is pending

16   but no hearing's been conducted or scheduled.  And I think there

17   were two as of docket 39, but now we're back up to about seven

18   in this morning's filing, or yesterday's filing.

19        And I guess the question is, does the availability of the

20   option where they could be vacated -- and in a number of cases,

21   they are being vacated, perhaps on some of the grounds you've

22   been raising, perhaps on just factual grounds specific to the

23   individuals -- does that mean that the ones who have not yet had

24   review, that these really aren't ripe?

25             MS. CAMBRIA:  Your Honor, I would argue that they are

1   ripe for this Court.  I would point to the case of *O.A. v.*

2   *Trump*, which was in this court, not before this judge, last year

3   with the first asylum ban.  In that case they rejected the

4   government's argument that 1252(e) limited the Court's

5   jurisdiction in cases where there was not a final order.  In

6   that case they argued -- or the Court found that simply being

7   subject to expedited removal and contesting the procedures in

8   that permitted the Court to have jurisdiction without a final

9   order.

10       Additionally, it's important to understand in these cases,

11   for these seven plaintiffs, they're all statutorily outside the

12   time that they should be subject to an immigration judge review.

13   So 8 C.F.R. 1003.42(e) requires the government to conduct an ID

14   review within seven days of the final determination --

15           THE COURT:  That does not affect the standing

16   analysis.

17           MS. CAMBRIA:  No, it does not.

18           THE COURT:  That's what I'm talking about here, is

19   standing.

20           MS. CAMBRIA:  It's very possible that tomorrow, they

21   have the ID review, determined negative, and within hours

22   deported.  So when you're in expedited removal, it's very fast.

23       In fact, in this case we lost three families that we did

24   not file in time for.  Three families were deported, despite the

25   fact that we were rushing to court for them.

1      Expedited removal is fast.  And in the case of these seven

2 families, they have negative determinations from the asylum

3 office.  They're going to go before an IJ with what we believe

4 are tarnished credible fear interviews.  So their IJ reviews are

5 compromised as well.  And we believe that if they're affirmed by

6 the IJ, they're subject to removal within hours.

7      To be honest, we don't want to rush to court every time.

8 We understand the burden that this case puts on the Court.

9 We're just trying to protect the clients that we have.  But the

10 nature of expedited removal is expedited, and these cases should

11 have already had ID reviews, and if they happen tomorrow, it's

12 very possible that tomorrow they are subject to immediate

13 removal within hours.

14      THE COURT:  What percentage of the ones for whom

15 negative credible fear determinations have been made, how is it

16 playing out in terms of the numbers that are being vacated and

17 the numbers that are being affirmed?

18      MS. CAMBRIA:  That's a good question, Your Honor.

19      THE COURT:  It seems like a lot of plaintiffs dropped

20 out, and those are also procedures that -- determinations made

21 subject to all of these procedures that you're challenging.  Is

22 that right?

23      You've said with category 2, the review is going to be

24 compromised by all these deficiencies.  But even given these

25 deficiencies, some chunk of them are being overturned?

1          MS. CAMBRIA:  Out of 240, 15.  So it's a very small

2    percentage.

3          THE COURT:  Okay.

4          MS. CAMBRIA:  ID reviews have their own difficulty.

5    But when your initial interview is compromised, it's like fruit

6    of the poisonous tree.  So when you go in front of an

7    immigration judge, they look at the interview you had.  That's

8    what they use to determine whether the decision was right or

9    wrong.  So if the interview was flawed, the judge is going to be

10   reading a flawed interview and making the review determination

11   on that interview.  In some cases a lawyer is not even allowed

12   to speak in those interviews.  You're not afforded a counsel in

13   the IJ review.  In many cases you can't introduce additional

14   evidence.

15        In the cases at Dilley, we've recently had U.S. citizens in

16   these interviews, in these IJ reviews and were not even able to

17   express that they were citizens at that point.  It's a very

18   truncated review, and it's subject entirely to the transcript of

19   the credible fear interview, which we think is tarnished by

20   these changes.

21          THE COURT:  Okay.  Thank you.

22          MS. CAMBRIA:  Thank you.  Any further questions?

23          THE COURT:  No.  I want to talk to the government.

24          MS. CAMBRIA:  Thank you for your time to explain all

25   of those questions.

1      THE COURT:  All right.  Let me hear from counsel for

2  the government.

3      MR. HAIR:  Good morning, Your Honor.

4      THE COURT:  All right.  My first question for you is,

5  you oppose the TRO based on the operative complaint that we had

6  at the time.  Are there things that you need to argue when you

7  put in your opposition to the amended complaint that -- this

8  doesn't waive your objection to the people that are the 60-day

9  issue, but do you need to submit something, a supplement to your

10  opposition to the TRO that takes into consideration the extent

11  to which some of these claims have been changed and the changed

12  underlying legal basis for the claims, such as the APA?

13      MR. HAIR:  Well, Your Honor, the missing piece for

14  us -- and I understand that sort of noting our objections or our

15  potential objections is not a lot of help at this stage.  But

16  going through the claims today has been helpful, I think, and

17  may very well allow us to sort of supplement our opposition with

18  respect to the individual policies.

19      We've had some time now as this proceeding has been pending

20  to sort of review the individual written policies that we can

21  discern, and to not only apply whether or not they exist, but

22  also understand better how the 60-day bar would apply to the

23  policies that we do know exist.

24      THE COURT:  Obviously, if you're going to argue a

25  60-day bar with respect to any policies, those policies should

1    be attached to your pleading.

2            MR. HAIR:  Yes, Your Honor.  And we --

3            THE COURT:  That would advance the ball significantly,

4    I think, for everyone's sake.

5        And so explain to me, with respect to the 60 days, if the

6    clock starts ticking as of the time of the issuance of the

7    policy, are you saying that no one who is interviewed more than

8    60 days after a new rule is issued or no one who arrives in the

9    United States more than 62 days after a new rule or policy is

10   issued can challenge it?

11           MR. HAIR:  So the 60-day bar would at least begin when

12   the policy is first implemented, and then it's sort of

13   irrespective of when the plaintiff's claims would arise.

14           THE COURT:  It doesn't matter when it's applied to

15   you; it's only when it's implemented?

16           MR. HAIR:  Correct, Your Honor.  It sort of begins,

17   the clock starts once the policy is implemented by the

18   government, and if you present your challenge -- either as the

19   initial plaintiffs had in this case, you would look back to when

20   that policy was first implemented, and then for any additional

21   plaintiffs, as we have here as well, you know, that would sort

22   of be the operative time frame when they entered the case,

23   because their claims are all individual.

24           THE COURT:  All right.  So you disagree with the

25   notion that if there's a timely filed complaint, you can just

1    get on that train?

2         MR. HAIR:  We do, Your Honor, because it's a, we

3    believe, jurisdictional requirement; there's no relate back to

4    the initial complaint.  And this was a matter that received

5    review in the *American Immigration Lawyers Association v. Reno*

6    case that Judge Sullivan handled back in 1998 and was affirmed

7    by the D.C. Circuit in 2000.

8         THE COURT:  Okay.  I feel like the parties are going

9    to have to address that at this point.  The problem with TRO and

10   preliminary injunction litigation is that it does overlap with

11   the merits significantly, but when you're talking about

12   jurisdiction, I'm legally required to ascertain whether I have

13   it before I go forward.  And the complaint -- so many of the

14   original plaintiffs are gone, some because they've succeeded in

15   their challenges, some because they've given up.  But with this

16   constantly evolving set of plaintiffs, I need to ensure myself

17   that I have plaintiffs over whom I have jurisdiction.

18       And so I am going to permit both parties to brief that

19   issue.  I don't see how I can move forward without it.

20        MR. HAIR:  To that end, Your Honor, I am prepared to

21   discuss sort of what -- we've gone through policy by policy, and

22   I think the government kind of sees them in three different

23   buckets.  And I can go through what those are, if at the very

24   least it gives the Court an idea of our position, to the extent

25   it hasn't been covered in our prior briefing.

 1          THE COURT:  I'm happy to hear about your three

 2     buckets, and then I do have some jurisdictional arguments under

 3     the statute.  But since we've just spent a lot of time talking

 4     about the policies, I would like to hear what you have to say

 5     about them.

 6          MR. HAIR:  Sure.  So the three buckets would be, the

 7     policies that we can identify as a written policy -- and just as

 8     an initial matter, I think the government would agree with how

 9     Your Honor sort of presented the statute and the limitations

10     therein, you know.  Under Section (e)(3)(A)(i), the

11     constitutionality of the regulation would be at issue, and under

12     subsection 2, the text is quite clear that it has to be a

13     written policy.

14          So that's what we have framed our review around.  And so

15     we've identified a few policies that do have a written component

16     to it and thereby would warrant further review.

17          The other two buckets, just for the sake of --

18          THE COURT:  Let me just start with those.

19          With respect to those, then, do you agree that I have

20     jurisdiction?

21          MR. HAIR:  No, Your Honor.  And I can go through the

22     reasons why.  There are four different policies that we

23     discussed today, four of the 11 that have some written component

24     to it, and two of them -- this would be the "avoid meaningfully

25     orienting migrants to applicable standards and procedures" and

then also "limit migrant's right to meaningful consultations." The government believes that these policies pertain to those subject to challenge in the *L.M.-M. v. Cuccinelli* matter before Judge Moss.

And in any event, those policies were implemented on July 8th of 2019.  Therefore, the 60-day time bar would apply on September 9th, 2019, which would mean that the complaint having been filed, I believe, September 16th would fall outside of those.

So those are sort of the two first.  We can identify written policies.  Those are subject to other litigation in the *L.M.-M.* matter.  And in any event, they would be time-barred.

The other two that they have, one is the "proceed without required staffing, training, or guidance."  We talked a few moments ago about Customs and Border Protections officers conducting the credible fear interviews.  And just as an initial matter, I would note that the statute does define an asylum officer -- and it's not specific to which branch or division of the Department of Homeland Security that that officer is employed under, but we are aware of a memorandum of agreement for the use of Customs and Border Patrol agents as asylum officers.

THE COURT:  Doesn't that suggest, then, that the words have different meaning?

MR. HAIR:  I'm sorry?

1        THE COURT:  Doesn't that suggest that asylum officer

2  means asylum officer and not Customs and Bureau -- CBP officer

3  if you had to do that?

4        MR. HAIR:  No.  It would just mean that the asylum

5  officer would have to have the proper training and requisite --

6  fill that role, not necessarily that a CBP agent could not do

7  that.  It's just a matter of sort of, you know, resource sharing

8  amongst the government to have individuals from CBP perform that

9  function, but it would still need to perform that function

10  consistent with the statute.

11      But to the extent that that memorandum of agreement, you

12  know, constitutes a written policy, that was implemented

13  July 11th of 2019, which would mean the 60-day bar would bring

14  us to September 9th, 2019.  So this action would also be

15  untimely under that rubric.

16      The final written policy that we can identify is the

17  mandatory concurrence review by the Fraud Detection Unit.  And

18  I'm using plaintiffs' titles, of course, for the sake of ease.

19        THE COURT:  Thank you.

20        MR. HAIR:  And not to necessarily agree with the

21  context.  I'm sure the Court understands that.

22        THE COURT:  I understand that.

23        MR. HAIR:  So this policy was implemented for fraud

24  detection and national security review, specifically at the

25  South Texas Family Residential Center in Dilley, Texas.  This

1    policy began and was implemented on August 30th, 2019.

2    Additional written guidance was issued subsequent to that, in

3    early September.  But based on the August 30th date, the 60-day

4    bar would bring us to November 4th, 2019.

5              THE COURT:  All right.  So with respect to this issue

6    for which you say there is a written policy in place that is not

7    more than 60 days old, do you deny that I have jurisdiction with

8    respect to that?  Do you have a jurisdictional objection to

9    that?

10             MR. HAIR:  We do, and the reason is -- well, first,

11   for the initial plaintiffs, you're right.  The 60-day bar would

12   not apply.  So no, we have no issue there.

13             THE COURT:  Okay.

14             MR. HAIR:  For the additionally added plaintiffs, for

15   the reasons that I discussed earlier on today, we do think that

16   those plaintiffs would be barred.

17             THE COURT:  All right.  There's no other objection to

18   the exercise of federal jurisdiction with respect to that

19   policy?  If we have the right plaintiffs who file on a timely

20   basis, we have a written policy.

21             MR. HAIR:  And that's an if, Your Honor, if we have

22   the right plaintiffs.  I can't discern from the complaint any

23   plaintiffs that alleged that they had their positive credible

24   fear finding reversed because of this policy.  Plaintiffs may

25   choose to identify those plaintiffs, if there are any.  But just

1    from the allegations contained in the complaint, the government

2    would assert that they would lack standing unless, of course,

3    they were subject to that policy and had a credible fear

4    determination reversed pursuant to a subsequent fraud review.

5        So that would be the only sort of -- the threshold issue

6    here.  Anything else, I would say, would go to the merits of

7    such a policy, and there's not much to go off of in the

8    complaint.  So we don't think that the likelihood of success

9    would necessarily be overwhelming in this regard.  But I do want

10   to flag that for the Court.  This is within the 60-day time

11   frame.

12           THE COURT:  All right.

13           MR. HAIR:  Notwithstanding the standing issues that we

14   have with this one.

15           THE COURT:  All right.  And with respect to the other

16   policies that we've discussed, are you saying at this point that

17   you know that there's nothing written on the subject, or are you

18   just saying you don't have written policies that you do know

19   about?

20           MR. HAIR:  No.  I can convey to the Court that we do

21   not have any written policies on -- you know, there's a number

22   of policies that we went through that did seem facially like

23   they would not have written policies, of course, so they might

24   not be of surprise:  The limited factfinding relevant to a

25   significant possibility of eligibility for asylum, make

interviews adversarial, do not apply the most favorable

precedent in CFI proceedings, withholding facts relied upon in

issuing credible fear determination, and abandon child-sensitive

treatment in credible fear proceedings.

I believe that last one was the telephone rule, and the

government doesn't dispute that hearings are conducted sometimes

by telephone.  There's no policy to that effect.  It's just

sometimes a necessity.

THE COURT:  Well, is somebody going to -- am I going

to get something sworn by some human being in the Department of

Justice that says no, there is no written policy or directive

that relates to these, now that they've really honed in on

specifically what they're saying the change in procedure and

practice is that is happening, according to them, across the

board that was not happening before?

Let's put aside whether we're talking about July 9th versus

July 15th.  Someone's going to take the position on behalf of

the agency in some sort of a declaration that this doesn't

exist?

MR. HAIR:  Yes, Your Honor.  And ideally, that would

have happened at the outset.  It was a little bit difficult for

us to sort of comb through these and sort of discern them for

ourselves.  And obviously, in light of the amendment, we

thought, just as a matter of good housekeeping, that we might

just take a look at these new allegations and see if they

1   changed the rubric.  I think now that we've had some time to

2   spend with them and in preparation of the hearing, we sort of --

3   and also counsel's, you know, helpful explanation, I think, at

4   the beginning that these are clarifications on the policies that

5   were alleged in the initial complaint and not necessarily

6   bringing up new policies that we have to then go track down, so

7   I think we're comfortable with that, providing a declaration

8   from the relevant Department of Homeland Security office that

9   would --

10          THE COURT:  All right.  I think, given the various

11   jurisdictional issues you're raising in terms of timing, the

12   factual argument you're raising with respect to whether they can

13   meet their -- make the showing that they need for jurisdiction,

14   which is the existence of written policies, that you should

15   supplement your opposition to the TRO with all the information

16   that you want me to consider, and I would like to know whether

17   you think you can do that.

18          MR. HAIR:  Understood, Your Honor.  And if you would

19   give me a moment to confer with co-counsel on that --

20          THE COURT:  Sure.

21          MR. HAIR:  -- I can get back with you.

22      (Government counsel conferred.)

23          MR. HAIR:  Thank you, Your Honor.

24      We can put a declaration before the Court in supplement to

25   our TRO opposition by next Friday, if that would be helpful.  We

1    have a vested interest in sort of having finality in terms of

2    what issues remain in the case, are in or out, so we can sort of

3    focus on addressing those issues in our response to the

4    complaint and moving forward.

5        We are under the administrative stay now.  So we sort of

6    had thought about doing this in one fell swoop in response to

7    the complaint.  But if the Court were inclined to rule on the

8    TRO in advance of that response, that would be helpful, I think,

9    to achieve that finality and maybe pare things down in our

10   minds, at least.

11       THE COURT:  Well, I mean, if the parties want to

12   consolidate with the merits and you agree to keep the

13   administrative stay in place while we deal with the merits, that

14   would be fine and dandy.  Administrative stays being what they

15   are, I think at the outset, everybody wanted me to rule on the

16   TRO.

17       MR. HAIR:  And that is still what we would like, Your

18   Honor.

19       THE COURT:  All right.  Then we need to go forward

20   with this.  I do think the merits in the TRO are emerging on a

21   daily basis.  And I don't actually -- I guess it's with the

22   preliminary injunction that I can consolidate a TRO.  It seems

23   to have been largely obviated by the administrative stays.

24       But now we have two administrative stays in place, and I

25   have yet to rule.  And part of my inability to get to this dealt

1    with -- other things that were before me, but it also dealt with

2    needing to get from both sides what I need to get, and then the

3    goalpost changed immediately before this hearing.  I was a long

4    way down the road of an opinion, and now I kind can of have to

5    go down a new road, none of which I'm complaining about, but it

6    does extend the period of time that the administrative stay is

7    in place anyway.

8         So it may make sense to do less, or a more fulsome briefing

9    and get it done.  On the other hand, plaintiffs don't want

10   people detained longer than they need to be detained, but that's

11   a little bit -- they also want review of these legal things.

12        So something has to give, one side of this or the other.

13             MR. HAIR:  And I fully appreciate that, Your Honor.  I

14   think we're sort of in preliminary injunction territory now, as

15   the Court noted.

16             THE COURT:  Right.

17             MR. HAIR:  And I think because of that, if it's

18   unlikely, for instance, that the Court would have sufficient

19   time to sort of allow the parties to supplement and then rule

20   prior to the parties engaging in briefing on the complaint --

21             THE COURT:  I'm just not sure what's going to be left

22   to the merits of the complaint that you're not going to bring up

23   in your opposition.  I mean, part of it is, we're not under

24   (e)(3) because there's nothing written.  We're outside of

25   jurisdiction because of timing.  No final agency action, I

1    imagine, is going to be a part of what you're going to say the

2    second time around.  All of these are merits issues.

3        There is an issue that goes specifically to my authority to

4    issue injunctive relief, which I haven't asked you the questions

5    about yet, but if you assume I disagree with your position on

6    that, then we still have to get to likelihood of success on the

7    merits.  Likelihood of success on the merits bears stunning

8    resemblance to the merits in almost every case, especially given

9    how jurisdictional your merits are.

10       So there might be some benefit to consolidation, but that

11   would require keeping the administrative stay in place.  If

12   you're not willing to agree to that, I have to rule on the TRO.

13   So I can let you think about that.

14       But in any event, I don't have a problem with your having

15   until next Friday, which would be December something -- 27th, to

16   brief this.  And I recognize that you are stepping up to do

17   that, you know, over the holidays, and I appreciate that.  So

18   that's fine.

19       I was going to ask the plaintiffs to supplement on a

20   parallel basis, but I do think once they file what they're going

21   to file, you're going to want to answer it anyway.  So I think,

22   to obviate your filing two, I'm going to give you an opportunity

23   to respond, since this is your motion.  And so when would you

24   like to do that, assuming they file something on December 27th?

25           MS. CAMBRIA:  We can respond a week later.

```
 1            THE COURT:  All right.  So that would be January 3rd.
 2   All right.
 3       And in connection with that or before -- I think before
 4   would be helpful -- I think it would be helpful to find out
 5   which plaintiffs are the transit ban plaintiffs and which ones
 6   are not.
 7       And then I just have a couple of questions for the
 8   government about the statutory argument about my authority to
 9   issue injunctive relief, putting aside my authority to exercise
10   review.
11            MR. HAIR:  I'm sorry, Your Honor.
12            THE COURT:  That's all right.
13       I want to go back.  We've talked about if 1252(e)(3)(A) is
14   the basis for judicial review, you have a secondary argument
15   which says that, notwithstanding, I don't have the authority to
16   enter a stay or declaratory injunctive relief.  And you said
17   that Section 1252(e)(1)(A) says, "No court may enter declaratory
18   injunctive or other equitable relief, except as specifically
19   authorized in a subsequent paragraph of the statute."
20       There is a subsequent paragraph.  The subsequent paragraph
21   that forms the basis for this action, or at least did, or I
22   guess still does, which is Section 1252(e)(3)(A), which provides
23   for judicial review of determinations made under Section 1225(b)
24   that are limited to, as we discussed, determinations about
25   whether sections, regulations, written policy directives are --
```

```
1    the sections or regulations are unconstitutional or written

2    policy directives are not consistent with the statute or

3    otherwise in violation of law.

4         So according to you, as I understand it, since the limited

5    judicial review provision that we're under provides for judicial

6    review but it doesn't specifically authorize declaratory

7    injunctive or other equitable relief, it's barred by subsection

8    (e)(1)(A); correct?

9              MR. HAIR:  That's right, Your Honor.

10             THE COURT:  All right.  So my question is, what would

11   judicial review consist of?  Do you agree that a review in court

12   could strike a policy down?

13             MR. HAIR:  Yes.  It could, Your Honor.

14             THE COURT:  So how can you review a policy and strike

15   it down if you can't declare it to be lawful or unlawful at the

16   end of the day?  Isn't the declaration essential to the review?

17             MR. HAIR:  For this matter, Your Honor, with the

18   Court's indulgence, my co-counsel, Erez Reuveni, has been

19   litigating this for some time and will be better able to answer

20   this.

21             THE COURT:  All right.  That's fair.

22        Your turn.

23             MR. REUVENI:  Hello again, Your Honor.

24        And apologies.  I'm not contagious, but my voice is not

25   what it usually is.
```

1        On this, and my co-counsel is right, this is an issue

2   pending now in a number of cases before this court.  The

3   government's eager to get a decision one way or the other on it

4   so we can stop litigating it.

5        But to answer your question, I think we have to distinguish

6   between a preliminary injunction and a final determination on

7   the merits.

8        THE COURT:  Okay.  Well, the statute that you're

9   relying on doesn't talk about "preliminary."  It just says

10  declaratory injunctive or other equitable relief.

11       MR. REUVENI:  So it defines what the Court can when do

12  in this box.  All the Court can do reading 1252(e)(1) and (e)(3)

13  together, you start with a presumption, no equitable relief,

14  period.  Then you go to the next subsection.  Does the next

15  subsection authorize some kind of relief?  There's two sections

16  that authorize some kind of relief.  (E)(2), which is not at

17  issue here, has a specific remedy; put them in normal removal

18  procedures.  That's (e)(2) plus (e)(4).  And then (e)(3) says

19  make a determination that this is unlawful.

20       Sort of comparing it to APA terms, since apparently this is

21  now also somewhat of an APA case, when you have an APA case and

22  you're in a preliminary injunction box, you don't finally

23  declare the policy unlawful.  You say it is likely to be that

24  this policy also may be set aside, but you don't set it aside

25  for everyone.  You enjoin it as to the people in the case.

1    That's how preliminary injunction works.

2          Then on final relief, when you get to the merits on summary

3    judgment, you set it aside.  And that may have systemic effects

4    just by nature of what a set-aside remedy is.  You tell the

5    agency, this is vacated or set aside, and now the agency can't

6    apply that to anyone.

7          But that's not what this does.  So comparing it again to,

8    say, the Hobbs Act, which says, during review of an agency

9    action, you may enjoin the regulation during the review of the

10   action.  That's 28 U.S.C.  I think it's in our papers.  I can

11   get you the cite if you need it.  But that's again not what this

12   does.  This says specifically make a determination that the

13   policy, written directive, whatever you have, is unlawful.

14         And we think the only way to read that is that that's a

15   final determination.  That's akin to a final declaration, after

16   merits review, that this is unlawful.

17         So while you're doing that on the one track, summary

18   judgment and you're making a determination whether this is or

19   isn't unlawful, what 1252(e)(1) tells you is, you cannot issue

20   any other sort of relief, including intermediate relief to stay

21   the individual's removal.  I think you have to read that in

22   conjunction with 1252(f) and (g) as well, which we cite in our

23   papers.

24         First, with (g), (g) is just a general bar enjoining the

25   removal of individuals other than as permitted in the statute.

1    So again, there's something else permitted.  As I've just

2    articulated, 1252(e)(3) is not what permits it.

3         There's a separate statute, 1252(f), which does allow for

4    injunctive relief.  We cited this in our papers as well.  It's

5    titled "limit on injunctive relief."  And then it refers to part

6    4 of the subchapter.  That's 8 U.S.C. 1221 to 32.  And we're

7    right in that field, because this is 8 U.S.C. 1225(b)(1), the

8    statute that plaintiffs allege is being implemented unlawfully.

9         And what that provision says is, you can enter injunctive

10   relief, if at all -- so this is preliminary injunctive relief,

11   in our view -- to individuals who are actually in removal

12   proceedings.  So you cannot set aside the policy writ large

13   under (e)(3).

14        And then under (f), you can enter --

15             THE COURT:  Isn't that what they're asking for?

16   So are you saying (f) would apply?

17             MR. REUVENI:  If you go to the merits analysis.  The

18   way I had understood this hearing -- and apologies if I

19   misunderstood the way we were litigating this -- is does the

20   Court have the authority to stay their removals.

21        And there's two ways to look at that.  Do you just have

22   inherent authority --

23             THE COURT:  That was your issue, but not the only

24   issue.

25             MR. REUVENI:  I understand.

1          THE COURT:  You need to slow down.  I talk fast, but

2     you're killing me right now.  So you need to slow down.  You

3     need to breathe at the end of sentences.

4        Okay.  Give me the statutory section that you just quoted

5     me that ends in (f).

6          MR. REUVENI:  8 U.S.C. 1252(f).

7          THE COURT:  Okay.  Now --

8          MR. REUVENI:  There's (1) and (2), and I'm referring

9     to subsection (1).

10          THE COURT:  And that is a section that talks about

11     injunctive relief?

12          MR. REUVENI:  Right.  So that lets you issue a

13     preliminary injunction as to individuals before you, if you --

14     you know, they go through the showings, likelihood of success on

15     the merits.  There's jurisdiction, irreparable harm, balance of

16     equities.

17          THE COURT:  Like Rule 65.

18          MR. REUVENI:  Right.  In a way, in a sense.  That's

19     separate, though, from 1252(e), which itself -- that's an

20     injunction.  That's not a stay of removal.  So if you were to

21     find for the plaintiffs that they made a likelihood of success

22     on the merits showing -- they've shown harm, they've shown a

23     balance of equities, and all that favors them, (f) allows you to

24     stay their and only their removal.

25        But (e) doesn't allow you to enter a preliminary injunction

1     that functions as a stay of removal.  That's a separate kind of

2     equitable relief.  So (e) doesn't carve out stay of removal.

3     (F) doesn't allow for stay of removal.  (F) allows for an

4     injunction.  So you would have to find for them on the merits,

5     likelihood of success, all those factors, and then you could

6     enter an injunction as to the operation of these alleged

7     policies to them.

8               THE COURT:  Which would stay their removal?

9               MR. REUVENI:  In effect.

10              THE COURT:  Which is what we've done administratively.

11              MR. REUVENI:  Which is what you've done

12     administratively, which we think the Court doesn't have

13     authority to do.

14         But understandably, we are where we are.

15              THE COURT:  Why doesn't 1252(f)(1) give me authority

16     to do it if I find a likelihood of success on the merits?

17              MR. REUVENI:  You haven't done that yet, but if you

18     do --

19              THE COURT:  I know that.  That's why we're having a

20     hearing.

21              MR. REUVENI:  Your Honor, where we are is a stay has

22     been entered --

23              THE COURT:  But we're not talking about whether I have

24     all of the findings in place.  We're talking about whether, if I

25     made all the findings, I would have the jurisdiction to do it at

1      the end of the day.

2              MR. REUVENI:  Sure.

3              THE COURT:  And your brief said, I can't do it under

4      (e)(1)(A) because it says no declaratory injunctive or other

5      equitable relief at all unless it's specifically authorized in a

6      later provision.

7              MR. REUVENI:  Correct.

8              THE COURT:  And then I asked, and I still don't think

9      I got the answer to that question, why doesn't the judicial

10     review provision of 1252(e)(3)(A) count as the subsequent

11     authorization?  And your position is, because that only lets you

12     make a merits determination, lets you review things, doesn't say

13     anything explicit about injunctive relief or declaratory relief.

14             MR. REUVENI:  That's our position.

15             THE COURT:  And so it just lets you make a

16     determination.

17         And so let's go back to the question I asked your colleague

18     when he went to the table and turned it over to you, which is,

19     if I am entitled to exercise judicial review under that

20     provision, how can you review a statute and strike it down or an

21     action and strike it down without declaring it to be unlawful?

22     And if I'm declaring it, isn't that inherent in judicial review?

23     So isn't there some equitable declaratory relief that is baked

24     into (e)(3)(A)?

25             MR. REUVENI:  True.  That's our position, and that's

the problem.  There's no such thing as a preliminary declaratory relief.  I mean, the Supreme Court in *Doran*, a 1974 case we cite in our brief, there's preliminary injunctive relief, which is what they want.  But there's no such thing as a preliminary declaration.

And the statute --

THE COURT:  I guess my problem with that is that (e)(1)(A) lumps them together, declaratory injunctive or other equitable relief.  And it's saying, those all rise and fall together.  And when you're trying to tease them apart and say some of them are in (e)(3) and some of them aren't but (e)(1)(A) lumped them all together, so if (e)(3) says, Judge, you get to do your thing, essentially, with respect to written directives, why doesn't that give me the whole ball of wax?

MR. REUVENI:  I think it's wrong to say that because it says injunctive, equitable, declaratory in (e)(1), that therefore, we apply some sort of canon of construction that says determination in (e)(3) means all those things.  And we know that's wrong, because then (e)(4) tells you a specific type of equitable relief the Court can provide in an (e)(2) action.  It says vacate the expedited removal order and place the individual in full removal proceedings, colloquially a 240 proceeding, a full removal proceeding, so not expedited.

So if you were right, because it says injunctive, declaratory, equitable in one, therefore, the types of relief

1    that the next two sections allow for must be all three things,

2    then (e)(4) is meaningless.  So a determination has to mean

3    something other than every type of equitable, injunctive, or

4    declaratory relief available.

5        We have taken the position here and other cases, including

6    in front of the D.C. Circuit in a case just argued, that

7    determination is declaratory relief.  As you just suggested,

8    Your Honor, you can issue a declaration when you find on the

9    merits when all is said and done that the policy, if it's

10    reviewable otherwise, is unlawful.  Issuing a declaration is

11    something you do after review with a record that, okay, this is

12    unlawful.  Sorry, agency, you can't do this anymore, I declare

13    that this implementation is unlawful.  It's not something you do

14    in a preliminary injunction, where you say, I preliminarily

15    declare this unlawful.  That's an injunction.  That's what's

16    barred, a preliminary injunction barring implementation of the

17    statute.

18        So if we're talking about an injunction, (e)(3) doesn't

19    allow for that.  It allows for a determination.  And I don't --

20            THE COURT:  And so, but why doesn't 1252(f)(1), then,

21    fill the gap?

22            MR. REUVENI:  That allows you to stay removals if you

23    find on the merits for them with respect to likelihood of

24    success, irreparable harm, balance of equity.

25            THE COURT:  I have to find that anyway to issue a TRO.

1    You keep saying, You're going to have to do that.  I, obviously,

2    have to do that.  I can't do anything equitable without that;

3    right?

4              MR. REUVENI:  Sure.

5              THE COURT:  Okay.  And if I do that -- and we've

6    talked all morning about why likelihood of success on the merits

7    might be difficult, but if I found it, that's a different

8    question about whether I have the power if I had found it to say

9    they have to stay until I finish with the merits determination

10   at the end of the day.

11             MR. REUVENI:  Well, respectfully, I think we disagree.

12   I think those statutes do two different things.

13       Again, (e)(1) says what you can do in the universe of the

14   (e)(3)-type challenge.  And what plaintiffs want here is to not

15   be removed until the merits of the case is resolved.  That, we

16   don't think the Court can do.

17             THE COURT:  I thought you said (f)(1) does apply to

18   the particular challenges brought here.

19             MR. REUVENI:  (F)(1) allows you to issue an injunction

20   preventing the application of these policies to these plaintiffs

21   going forward, yes.

22             THE COURT:  If I find the other elements that

23   ordinarily are necessary to support preliminary injunctive

24   relief?

25             MR. REUVENI:  Correct.

1          THE COURT:  So why doesn't that solve -- you can argue

2     that we haven't checked all the boxes yet, but why doesn't that

3     solve the problem of my power to do it if it persuaded me on all

4     the other elements?

5          MR. REUVENI:  I think the answer to that -- and I

6     apologize if I overspoke -- (f) is like this general backstop

7     provision that exists separate from (e).  (E) says specifically

8     what you can do in the world of a 1252(e) suit.  (F) does not.

9     (F) is just a general, you can't enter any sort of injunctive

10    relief unless these boxes can be ticked.  1252(g) says you

11    cannot stay removal unless some other provision allows you to do

12    it.  (E) says specifically unless otherwise authorized by

13    this -- a subsection of this provision.  So it has to be in (e),

14    that you can't do it.

15        I think it's helpful to compare to Judge Sullivan's

16    decision in 1998 in the *American Immigration Lawyers Affairs v.*

17    *Reno* case.  This was an argument that was sort of made there,

18    and it's made in each of these cases:  What is the point of this

19    provision if someone can be removed before they get a hearing on

20    the merits?  That that makes no sense, as the position that's

21    advanced in these cases.

22        That was the issue in Judge Sullivan's case, too.  There

23    were a number of individual plaintiffs, two of which filed

24    within the time bar, many, many more of which did not.  The two

25    that did file within the time bar were removed before there was

1    a decision on the merits.  And the case was resolved in the

2    government's favor.  So it never was an issue.  What happens is

3    a remedy there.

4         But by comparison, in *Grace*, the recent decision Judge

5    Sullivan had, there were individuals who were removed before a

6    decision on the merits.  There was no stay for those people,

7    those individuals.  And the order, as a remedy when there was a

8    final decision, is to bring them back and redo the proceedings.

9    And so that you could do on a final judgment.

10        If you make a determination saying, Well, these procedures

11   that were applied to them are unlawful, their order is null and

12   void, then the impact of that is they get a hearing --

13             THE COURT:  That may make sense in some ordinary

14   situation.  But how -- I think the plaintiffs' argument is that

15   that doesn't work in an asylum situation where you're talking

16   about it's really not an adequate substitute to say, We will

17   bring you back later after you've been physically attacked once

18   you got there.

19             MR. REUVENI:  Respectfully, like you said before,

20   these are sympathetic claims.  I don't want to belittle that.

21   These are people seeking asylum and safety from another place

22   they believe they don't want to be.  But they've had review by

23   an immigration officer.  They've had review by an immigration

24   judge.

25             THE COURT:  That begs the question:  I can't say that

1   when they're saying all these procedural deficiencies marred the

2   interviews, that just because the interviews came out against

3   them, that I should be happy and not worried about what happens

4   to them when they get there.

5   　　　　　MR. REUVENI:  This may not be the reason I'm up here,

6   but I have to quibble with that characterization.

7   　　　So plaintiffs' counsel says well, many, many, many of these

8   people are not subject to the transit bar.  But the fact is, the

9   vast majority of their plaintiffs are not eligible for asylum

10  now.  So that's sort of -- that's a fair point in a case where

11  someone is eligible for asylum.  I think I wrote down, they have

12  maybe seven sets of plaintiffs who are not subject to the

13  transit bar.

14  　　　　　THE COURT:  Right.  And I will let you know, the fact

15  that there's some that are and some that aren't is a piece of

16  information that I learned this morning for the first time.  So

17  I'm still trying to process how it affects anything.

18  　　　　　MR. REUVENI:  Understood.

19  　　　And I would like to consult with co-counsel on what makes

20  the most sense to get you all the information that you need so

21  that you can decide this.  We had a sidebar just now, and it

22  doesn't make sense --

23  　　　　　THE COURT:  You have until next Friday to file

24  whatever you think --

25  　　　　　MR. REUVENI:  Right.  It's -- the plaintiffs are the

1    ones to tell us which of their clients are not subject to the

2    transit bar.

3            THE COURT:  They will tell us which, but you can

4    certainly argue this class versus that class, and they can tell

5    you who --

6            MR. REUVENI:  My only point there is, when you talk

7    about -- it's kind of a hollow remedy that someone is sent back

8    to, say, Guatemala, and then say, Wait to see what happens in

9    your case in the United States, and then if you win you will

10   come back and start where you were before.

11       It's not really that hollow, because they're not eligible

12   for asylum at all unless they're Mexican nationals.  That's not,

13   I think, a fair concern here for the vast majority of the

14   plaintiffs.

15       I would add one other jurisdictional provision that's

16   relevant to, I think, the question of what you can do in (e)(1).

17       So (e)(1) says what we just talked about, but I think we

18   also have to look at 1252(a)(2)(A), which we cited in our

19   papers.  So 1252(a)(2)(A) is actually where we have to start

20   with what the Court does and does not have jurisdiction over.

21       And 1252(a)(2)(A) says review relating to

22   Section 1225(b)(1).  So that's the starting point for what is

23   and isn't subject to review.  And then it says -- it's got a

24   notwithstanding provision at the outset -- notwithstanding any

25   other provision of law, statutory or nonstatutory, and I'm going

1    to skip ahead, "no court shall have jurisdiction to review," and
2    then it lists four things.

3        Three of them say "other than subject to 1252(e)."  So
4    that's Romanette 1, 2, and 4.  Those things are subject to
5    review under (e), and it says:  "Except as provided in
6    subsection (e), an individual determination or to review any
7    cause or claim arising from or relating to implementation or
8    operation of an order of removal under the statute."  (ii) says,
9    again, "Except as provided in subsection (e), a decision by the
10   Attorney General to invoke these provisions," and (iv) says,
11   "Except as provided in subsection (e), procedures and policies
12   adopted by the Attorney General to implement."

13       So that's all available in a 1252(e) review.

14       But there's (iii), and that says -- and there's no
15   exception there for subsection 1252(e).  It says, "The
16   application of that subsection to individual aliens, including
17   the determination made under Section 1225(b)(1)(B)."  That's the
18   credible fear determination.  So this statute says there's no
19   statutory review of the credible fear determination at all, even
20   under 1252(e).

21       And I think it doesn't make a whole lot of sense for
22   Congress to say --

23           THE COURT:  Well, I don't think they're saying, I want
24   my credible fear determination reviewed.  That's where I
25   disagree with your characterization.  They are saying, We

1    disagree with these policies and procedures.  I don't think

2    they're saying, Judge, please review my credible fear

3    determination.

4            MR. REUVENI:  If you're staying the credible fear, the

5    implementation of the negative credible fear, you're staying the

6    implementation of their individual credible fear determination.

7    That's separate and apart from these policies they're

8    challenging.  So no one is disputing that they can challenge

9    these policies if they file within 60 days and there's a written

10   policy guideline or directive that actually implements the

11   relevant statute.

12           THE COURT:  But you're saying, Okay, well, you can

13   make declarations about policies, but you're not allowed to

14   apply them to actual people.  And if that were true, if they

15   were saying, We just want you to make a declaration in the air

16   about some policy and not apply it to actual people, you would

17   be saying there's no case or controversy, and I don't have

18   jurisdiction because they don't have standing.

19       You can't have it both ways.

20           MR. REUVENI:  We're not trying to have it that second

21   way.  What we're saying is --

22           THE COURT:  But you would if I -- if they didn't have

23   a human who was affected by the policies who is a plaintiff in

24   the case --

25           MR. REUVENI:  We're not contesting that they can't be

1   plaintiffs if they check all the boxes.  That's not our position

2   at all.  We're not saying that whatever subset of their people

3   file within 60 days and have a written policy --

4            THE COURT:  You're saying I'm allowed to issue an

5   opinion some day that applies to them, but I'm not allowed to

6   issue a stay that applies to them?

7            MR. REUVENI:  That's our position, yes.

8            THE COURT:  Got it.

9            MR. REUVENI:  And if they happen to win on the merits,

10  we can give you a brief.  We can tell you what we think should

11  happen.

12      But *Grace* gives -- Judge Sullivan's more recent decision

13  gives a model.  They come back, and the proceeding is done

14  again.

15           THE COURT:  And what I'm saying is, I don't think the

16  third provision under 1252(a)(2)(A), which carves out credible

17  fear determinations, is the reason why that's not the case.  I

18  think we are under 1252(e) and whether the bar in Section (1)(A)

19  applies or whether there's something about (e)(3)(A) that pokes

20  a hole in that.

21      And you've explained to me why it doesn't, and I haven't

22  thought about it that way.  I need to think about it that way.

23      But then there's also the question of my inherent

24  authority.

25           MR. REUVENI:  So in answer to that, but before we get

 1    to that, can I give you one more --

 2              THE COURT:  Sure.

 3              MR. REUVENI:  This is in our brief as well.  These are

 4    not new arguments.

 5        1252(3)(a) says judicial review of, and I am quoting,

 6    determinations under subsection 1225(b) of this title and its

 7    implementation, end quote.  Not "or."

 8        So there's not like a separate, you challenge an

 9    implementation, you need a determination that's actually

10    reviewable, and you need an implementation that's reviewable.

11    So if they have a policy, great.  They can get the policy

12    reviewed.  If they have this determination.  1252(a)(2)(A)(iii)

13    says one of those determinations that's not a predicate for

14    review under (e)(3) is a credible fear determination.

15        So all these things taken together say, if you're trying to

16    stay the effectuation of an order premised on the lack of a

17    positive credible fear finding, you can't do that under an

18    (e)(3) case.

19        There's a separate provision, (e)(2), that gives you

20    certain -- a limited ability to challenge an individual

21    determination, again not the credible fear determination, and

22    that's how you would get out of the box of having your order of

23    removal effectuated, because you make the showing that that

24    provision requires, and you get into a normal removal

25    proceeding.  That, in our view, is the only way to get around

1    that.

2         Under the inherent authority point, if we are discussing

3    this on a blank slate, of course, the Court has inherent

4    authority.  But I don't think anyone is disputing that Congress

5    can limit that inherent authority by specifically saying,

6    through a statute with a clear statement, that here are the

7    things you cannot do.

8         And so yes, there may be inherent authority to manage the

9    Court's docket and to issue stays in the administration of

10   justice or to determine jurisdiction as a default, but we would

11   submit 1252(e)(1) disrupts that default by saying you no longer

12   have this inherent authority to do these specific things unless

13   another subsection of the statute gives it back to you.

14        THE COURT:  And that's where we sit, and that's what I

15   have to figure out.

16        MR. REUVENI:  Yes, Your Honor.

17        THE COURT:  All right.  I think all of this has been

18   helpful.  I will read everything that is submitted to me.  If we

19   need another hearing, I will set another leering.  But I think

20   this has been clarifying, and I will continue to keep this under

21   advisement, and the administrative stay will stay in place.

22        MR. REUVENI:  Your Honor, a housekeeping matter:

23   Plaintiffs mentioned the case, and I would like to mention it,

24   too, the case pending before Judge Moss, the *L.M.-M. v.*

25   *Cuccinelli* case.

1      The policies that exist on that that plaintiffs refer to

2   have been submitted as a part of an administrative record in

3   that case.  And as my co-counsel told you, in the government's

4   view -- and we will give you a declaration on that with the

5   filing next Friday -- those are really the only written policies

6   that go to an alien's ability to consult prior to a credible

7   fear proceeding that exist.

8      The two other policies that co-counsel mentioned that CBP

9   officers are conducting some of these credible fear interviews

10  because they've received training to do so, you mention they're

11  time-barred.  So we will lay it out in our briefs.  That leaves

12  our fraud review provision.  That's not subject to the

13  Cuccinelli lawsuit that I just mentioned.

14      THE COURT:  I -- initially this case came to me

15  because someone had designated it as related to Judge Kelly's

16  case.  He decided it wasn't.  It came to me.  That made sense,

17  given the thrust of the two lawsuits.

18      Is anybody claiming that this lawsuit is related to Judge

19  Moss's case?  Plaintiffs say they're not, shaking their heads

20  no.

21      MR. REUVENI:  But they're time-barred on those two

22  issues, because again, those policies were submitted July 8th.

23  That lawsuit was filed in September within the 60-day limit.

24      Of course they would say that.  I would say it, too.

25      THE COURT:  But let's say Judge Moss says, I don't

1    like these policies, they're unconstitutional.  It would still

2    apply to them if they had been subjected to an unconstitutional

3    scheme; correct?

4         MR. REUVENI:  If they're still in the country, but

5    that's -- if the policies get vacated -- actually, no, let me

6    take that back.

7         I don't think that's how it works.  If they're a party to

8    the lawsuit, they will get their orders vacated.  If they're

9    not, I don't necessarily know that they would benefit from that,

10   because the case would issue some sort of remedy as to the

11   plaintiffs before the Court.

12        This is what happened in *Grace*.  There were thousands of

13   people who were subject to the challenged procedures there.  The

14   relief there was prospective, not retrospective.  That would

15   mean thousands of people not party to the case would have their

16   credible fear determinations overturned, and have to have those

17   proceedings done again and be returned from a foreign country

18   back to the United States.

19        So I don't know that I would agree -- it's a little

20   hypothetical at this point.  If the case is related and ends up

21   in front of Judge Moss, I guess that would be a decision for

22   Judge Moss.  And we would argue in front of him that they're

23   time-barred, they don't get relief.

24        But I don't know that that's the issue right now.

25        I would say -- just one last point on the asylum ban issue.

1   I keep hearing plaintiffs saying, We're not challenging the

2   transit bar, we're not challenging the transit bar, and that's

3   how they got away from Judge Kelly.  Judge Kelly says they say

4   they're not challenging the transit bar, so it's not related.

5   Fine.

6          THE COURT:  I don't think they were trying to get away

7   from Judge Kelly.

8          MR. REUVENI:  I don't mean to impugn.  Apologies if it

9   sounded that way.

10      They wanted the case to be cited as an individual case,

11  which is their right under the random case assignment system.

12      But now I'm hearing them explaining what policies they're

13  challenging, and a good number of these are just the

14  implementation of the transit bar.  They say, Well, they stop

15  the interview halfway and say oh, you're not eligible for

16  asylum, they never used to do that before.  Of course, they

17  never used to do that.  Before, there was no transit bar that

18  made them ineligible for asylum before.

19      They say, It used to be 90 percent of the people passed,

20  and now only 10 percent of the people passed.  Yeah, of course,

21  because a vast majority of people are eligible for asylum now

22  since the Supreme Court issued the stay of the injunction in

23  those cases.

24      So when they say they're challenging the implementation of

25  things that have followed the transit bar, I'm hearing them

saying they don't like that the transit bar is being applied to

them, and they think that is a separate sort of policy.  To me,

that sounds like they are challenging the transit bar.  And we

would be happy to lay this out in our supplemental brief.

THE COURT:  I don't think you need to do that.  I

think you made that clear at the beginning.  I think they're not

doing what you're saying.  I understand what you're saying, but

if someone subject to the transit bar is subject to a different

legal standard and they learn about it for the first time during

the interview and they're saying, Because I wasn't oriented to

that, because I didn't know about that, so I wasn't prepared for

that, didn't get to talk to my lawyer when it changed, that's my

problem.

That's not a challenge to the bar.  It's a challenge to the

written policies or the guidance under which it's being

implemented.  It is different.

MR. REUVENI:  And neither of which exist.  The

guidance is --

THE COURT:  Fine.  That's a merits issue.

MR. REUVENI:  The guidance is in the rule.  And the

rule says this is what you do.  And as they implement it case by

case, they're applying the rule on the Federal Register and

specific guidance that has gone out saying this is the transit

rule, this is what you do.

When they say that they're not being oriented mid-hearing,

1    I don't know where that comes from.  They know -- everyone who

2    goes through a credible fear proceeding knows you do two things

3    in a credible fear proceeding.  You make an asylum claim, and if

4    you fail to make your asylum claim, you make what's called a

5    withholding of removal or Convention Against Torture claim.

6        Those are two different claims, two different standards.

7        So when they say, Well, my client, hypothetical client

8    didn't know they were going to be subject to a withholding

9    claim, too, that's not correct.  It's in the regulations that

10   says if you go through a credible fear review, you get asylum,

11   which we now know is off the table for everyone but their

12   Mexican national clients, or you get withholding of removal in

13   CAT, which is a different standard.

14       Everyone knows that.  It's in the regulations.  It's a

15   surprise to no one.

16       That's why what I hear them saying, Well, it used to be

17   that they would go through the whole credible fear proceeding

18   and apply that one standard but now they're applying two

19   different standards, because we have this asylum bar which says

20   if you can't get asylum -- so we don't deal with that standard.

21   Now what we deal with is what they call a reasonable fear

22   standard.  It's a higher standard.  That's the transit bar being

23   applied.

24       THE COURT:  All right.  But if there is a regulation,

25   if it's in the bar itself, then you need to direct me to where

1    it is in the new rule.  If it's a regulation that's been

2    promulgated subsequent to the new rule, you need to direct me to

3    that.

4          MR. REUVENI:  The supplemental filing will have that

5    for you, Your Honor.

6          THE COURT:  All right.

7          MR. REUVENI:  As Mr. Hair mentioned, we will give you

8    a declaration, someone will sign under penalty of perjury saying

9    these are the policies that we understand to exist.

10          THE COURT:  If, for instance, the shift in what the

11    test should be is something that's specified in the rule itself,

12    then I need to know that.  I think we've all been hampered to a

13    certain extent by not being exactly clear about what's on the

14    table.  But I think now we're exactly clear about what's on the

15    table.  And so you should file what you think I need to know,

16    and they're going to file what they think I need to know.  And

17    then I will read it and find out if I need to know more.

18          MR. REUVENI:  Very good, Your Honor.

19          THE COURT:  All right.  I think that's it for today.

20    I appreciate everybody's thoughtfulness in answering my

21    questions, and I will keep it under advisement.

22          Thank you.

23          MR. HAIR:  Your Honor, I apologize.

24          This is with respect to the timing of the new plaintiffs

25    and the administrative stay.  In light of the supplemental

1    filing we were planning on providing, is it a fair statement

2    that the Court would deem the new plaintiffs and everybody in

3    this case subject to the original --

4            THE COURT:  Administrative stay?

5            MR. HAIR:  Yes.

6            THE COURT:  Yes.

7            MR. HAIR:  Thank you, Your Honor.

8            MS. CAMBRIA:  One other thing, Your Honor, because

9    we're talking about timelines, especially for the CBP officers,

10   the MOU that they alleged, we also believe that after an MOU,

11   guidance would be issued about how CBP officers would come to

12   interview children.

13       I'm going to talk with government counsel about getting as

14   many of the records as possible, and we are going to file an

15   additional FOIA just to get that rolling, as the Court

16   suggested.

17       Thank you.

18           THE COURT:  Yes.  To the extent you're relying on any

19   written directives that have dates, if there have been follow-up

20   guidance, whatever, ultimately, this is all going to be a part

21   of whatever record there is.  So there's no reason to not make

22   it a part of your next submission.  I think that would be

23   helpful.

24       All right.  Thank you.

25       (Proceedings adjourned at 12:48 p.m.)

```
1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    /s/ Sara A. Wick                December 21, 2019

10   SIGNATURE OF COURT REPORTER     DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```