Lee Gelernt*
Omar C. Jadwat*
Anand Balakrishnan*
Ming Cheung**
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*
*mcheung@aclu.org*

Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Morgan Russell (SBN 296137)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*mrussell@aclu.org*

*Attorneys for Plaintiffs*
*(Additional counsel listed on following page)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

East Bay Sanctuary Covenant, et al.,

    *Plaintiffs*,

    v.

Robert M. Wilkinson, et al.,

    *Defendants*.

Case No.: 4:19-cv-04073-JST

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND STAY OF FINAL RULE'S EFFECTIVE DATE PURSUANT TO 5 U.S.C. § 705**

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*vtalla@aclunc.org*
*asalceda@aclunc.org*

*Attorneys for Plaintiffs*

*Admitted pro hac vice*
***Pro hac vice application forthcoming*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 1

    I.    The Interim and Final Rules ................................................................... 1

    II.   DHS Acting Officials ............................................................................ 3

LEGAL STANDARDS ...................................................................................................... 5

ARGUMENT ..................................................................................................................... 6

    I.    Plaintiffs Are Likely to Succeed on the Merits ...................................... 6

         A.    Like the Interim Rule, the Final Rule Is Contrary to Law. ............................. 6

         B.    Like the Interim Rule, the Final Rule Is Arbitrary and Capricious. ............... 7

              1. Impermissible Premise that Final Rule Targets Individuals with Meritless Asylum Claims ................................................... 8

              2. Lack of Safe Option in Mexico ...................................... 8

              3. Failure to Reasonably Explain Lack of Exception for Unaccompanied Children ............................................. 11

         C.    Both the Interim Rule and the Final Rule Were Issued by Unlawfully Appointed DHS Officials ............................................................... 13

              1. McAleenan Lacked Authority to Issue the Interim Rule, Which Rendered It Void and Thus It Could Not Substitute for a Notice of Proposed Rulemaking. ..................................................... 14

              2. Wolf Lacked Statutory Authority to Approve the Final Rule. ................. 15

              3. Wolf and Gaynor Cannot and Have Not Validly Ratified the Interim and Final Rules. ....................................................... 16

              4. Acting General Counsel Chad Mizelle Lacked Authority to Sign the Final Rule for Publication. ............................................. 19

              5. Wolf's Tenure as Acting Secretary Violated the Appointments Clause. . 20

    II.   The Equitable Factors Favor Plaintiffs. ................................................ 21

CONCLUSION ................................................................................................................. 23

MEM. ISO MOT. FOR PRELIM. INJUNCTION & STAY OF FINAL RULE, 4:19-cv-04073-JST

# TABLE OF AUTHORITIES

**Cases**

*Advanced Disposal Servs. E., Inc. v. NLRB.*,
  820 F.3d 592 (3d Cir. 2016) ............................................................................... 18

*Batalla Vidal v. Wolf*,
  No. 16-cv-4756, 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020) .......................... passim

*Bullock v. U.S. Bureau of Land Mgmt.*,
  No. 4:20-cv-62-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020) ...................... 19

*California v. Wheeler*,
  467 F. Supp. 3d 864 (N.D. Cal. 2020) .................................................................. 21

*Capital Area Immigrants' Rights Coal. v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................................... 2

*Casa de Maryland, Inc. v. Wolf*,
  No. 20-cv-02118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) .................... 4, 13, 14, 16

*District of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................... 21

*E. Bay Sanctuary Covenant v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ................................................................. passim

*E. Bay Sanctuary Covenant v. Barr*,
  964 F.3d 832 (9th Cir. 2020) ............................................................................. passim

*Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  356 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................... 21

*Immigrant Legal Resource Center v. Wolf*,
  No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................... 4, 13, 16, 21

*In re GTE Serv. Corp.*,
  762 F.2d 1024 (D.C. Cir. 1985) ............................................................................. 21

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  796 F.3d 111 (D.C. Cir. 2015) ............................................................................. 18

*L.M.-M. v. Cuccinelli*,
  442 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 14, 19, 20

*La Clinica de la Raza v. Trump*,
  No. 19-cv-4980, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ............................... 4, 13

*La Clinica De La Raza v. Trump*,
  No. 19-cv-4980-PJH, 2020 WL 7053313 (N.D. Cal. Nov. 25, 2020) ........................... 4

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) (per curiam) ............................................................. 22

ii

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) ................................................................................................ 14

*Maryland v. King,*
   567 U.S. 1301 (2012) ................................................................................................. 22

*Mexichem Specialty Resins, Inc. v. EPA,*
   787 F.3d 544 (D.C. Cir. 2015) .................................................................................. 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................... 9, 12

*N.C. Growers' Ass'n, Inc. v. United Farm Workers,*
   702 F.3d 755 (4th Cir. 2012) .................................................................................... 15

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................................................. 21

*NRDC v. Abraham,*
   355 F.3d 179 (2d Cir. 2004) ..................................................................................... 20

*NRDC v. DOE,*
   362 F. Supp. 3d 126 (S.D.N.Y. 2019) ...................................................................... 20

*NWIRP v. USCIS,*
   No. 19-cv-3283, 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ........................ 4, 13, 16, 17

*Pangea Legal Servs. v. DHS,*
   No. 20-cv-9253-JD, 2021 WL 75756 (N.D. Cal. Jan. 8, 2021) ........................... 4, 6, 17

*SW Gen., Inc. v. NLRB,*
   796 F.3d 67 (D.C. Cir. 2015) .................................................................................... 15

*United States v. Eaton,*
   169 U.S. 331 (1898) .................................................................................................. 20

**Statutes and Legislative History**

5 U.S.C. § 553(b) ........................................................................................................... 15

5 U.S.C. § 553(d) ........................................................................................................... 20

5 U.S.C. § 3345(a) .......................................................................................................... 19

5 U.S.C. § 3346 .............................................................................................................. 19

5 U.S.C. § 3346(a)(1) ...................................................................................................... 20

5 U.S.C. § 3348(d) ................................................................................................. 14, 15, 20

5 U.S.C. § 3348(d)(1) ...................................................................................................... 18

5 U.S.C. § 3348(d)(2) ...................................................................................................... 17

MEM. ISO MOT. FOR PRELIM. INJUNCTION & STAY OF FINAL RULE, 4:19-cv-04073-JST

6 U.S.C. § 112(e) ................................................................................................................ 14

6 U.S.C. § 112(g) ................................................................................................................ 18

6 U.S.C. § 113(a)(1)(J) ....................................................................................................... 19

6 U.S.C. § 113(g)(2) ........................................................................................................... 16

8 U.S.C. § 1103(a)(3) .................................................................................................... 14, 18

8 U.S.C. § 1158(a)(2)(A) ...................................................................................................... 6

8 U.S.C. § 1158(b)(2)(A)(vi) ................................................................................................ 6

44 U.S.C. § 1507 ................................................................................................................. 20

S. Rep. No. 105-250 (1998) ................................................................................................ 18

**Regulations**

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) ...... 1, 4, 8, 11

Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) .......... passim

**Administrative and Executive Materials**

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sep. 30, 1993) ......................................... 15

Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011) ........................................... 15

**Other Authorities**

Biden-Harris Campaign Platform, *available at* https://joebiden.com/immigration............................ 3

DHS Delegation No. 106, Revision No. 8.6,
    *DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019) ................................ 4, 16

DHS Delegation No. 23028,
    https://www.dhs.gov/sites/default/files/publications/20_0112_delegation-23028-final-rules-
    regulations-other-matters.pdf ......................................................................................... 17

DHS, Ratification of Certain Actions (Nov. 16, 2020) .......................................................... 5

DHS, Ratification of Department Actions (Nov. 16, 2020) ................................................. 4, 5

Harvard Ctr. For Int'l Dev., *Why Is Chiapas Poor?* (Mar. 2016),
    https://growthlab.cid.harvard.edu/files/growthlab/files/cid_wp_300_english.pdf ........................ 10

Mem. from Ronald A. Klain, Ass't to the President & Chief of Staff, to Heads of Executive
    Departments & Agencies, Regulatory Freeze Pending Review (Jan. 20, 2021) ............................ 23

Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security
(Nov. 14, 2020) ................................................................................................................ 4

Refugees Int'l, A New Way Forward: Strengthening the Protection Landscape in Mexico
(Nov. 12, 2020), https://www.refugeesinternational.org/reports/2020/11/9/a-new-way-forward-
strengthening-the-protection-landscape-in-mexico ......................................................... 10

Rodrigo Aguilera, *Can AMLO Rescue Mexico's Poorest Southern States, Like Oaxaca, Chiapas, and
Guerrero?*, London School of Econ., Latin Am. & Caribbean Cultural Ctr. (Mar. 8, 2019),
https://blogs.lse.ac.uk/latamcaribbean/2019/03/08/can-amlo-rescue-mexicos-poorest-southern-
states-like-oaxaca-chiapas-and-guerrero/ ....................................................................... 10

U.S. Gov't Accountability Office, No. B-331650, *Decision: Matter of Department of Homeland
Security—Legality of Service of Acting Secretary of Homeland Security* ("GAO Report")
(Aug. 14, 2020) ................................................................................................................. 4

Zolan Kanno-Youngs & Maggie Haberman, *White House Fires Homeland Security Dept.'s General
Counsel*, N.Y. Times (Sep. 17, 2019), https://www.nytimes.com/2019/09/17/us/politics/john-
mitnick-homeland-security.html. .................................................................................... 19

**INTRODUCTION**

The Trump administration issued the final asylum transit ban rule on December 17, 2020, rushing it to go into effect just a day before the presidential transition.  The policy bars from asylum people who enter, attempt to enter, or arrive in the United States through the southern border if they have transited through a third country without attempting to seek asylum there, with very limited exceptions.  It has a sweeping impact, effectively barring virtually all non-Mexican asylum seekers at the southern border.  The Final Rule is materially identical to the interim version of the policy that this Court preliminarily enjoined as likely violating the asylum statute, as arbitrary and capricious, and for bypassing notice and comment procedures—a ruling that was affirmed by a Ninth Circuit panel.  The Final Rule is also unlawful for the independent reason that it was issued by former Department of Homeland Security ("DHS") Acting Secretary Chad Wolf, whom multiple courts have found unlawfully served in that role.  Plaintiffs once again face significant harm from the Final Rule and seek preliminary relief to block its enforcement pending the outcome of this litigation.

**BACKGROUND**

**I.    The Interim and Final Rules**

Then-Acting DHS Secretary Kevin McAleenan issued the transit ban interim final rule on July 16, 2019 ("Interim Rule"), and it took effect immediately.  Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019).  The agency did not go through notice-and-comment procedures but, instead, allowed for a 30-day comment period following the issuance of the Interim Rule.  *Id.* at 33,830.  The Interim Rule, like the Final Rule, barred from asylum anyone arriving through the southern border who has not applied for and been denied asylum in a country through which they transited, with limited exceptions.  As a practical matter, the policy bars nearly all non-Mexican asylum seekers at the southern border.

This Court found that the Interim Rule likely violated the asylum statute, was arbitrary and capricious, and unlawfully bypassed notice-and-comment procedures, and preliminarily enjoined it. *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 930-31 (N.D. Cal. 2019).  A Ninth Circuit panel affirmed that ruling on the merits in July 2020.  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d

832, 858 (9th Cir. 2020).[1]  On October 5, 2020, Defendants filed a petition for rehearing en banc with the Ninth Circuit, which remains pending.  Petition for Rehearing En Banc, *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487 (9th Cir. Oct. 5, 2020), ECF No. 117.[2]  On June 30, 2020, Judge Timothy J. Kelly of the D.C. District Court vacated the Interim Rule for failing to comply with notice-and-comment procedures.  *Capital Area Immigrants' Rights Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 57 (D.D.C. 2020).  Although the government appealed the order, it did not seek a stay of the ruling.  The Interim Rule has thus not been in effect since Judge Kelly's order.

The Trump administration issued the Final Rule on December 17, 2020, and set it to go into effect on January 19, 2021, one day before President Biden's inauguration.  Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020).  The Final Rule was "reviewed and approved" by then Acting DHS Secretary Chad Wolf and authorized for publication in the Federal Register by former Acting General Counsel Chad Mizelle.  *Id.* at 82,289.  In the Final Rule, Defendants state that they complied with notice-and-comment requirements because they issued the Final Rule following the 30-day, post-Interim Rule comment period.  *Id.* at 82,288.

The Final Rule is materially identical to the Interim Rule, save for two small changes that do not impact Plaintiffs' claims.  First, the Final Rule no longer exempts from the ban individuals who applied for and were denied protection from *torture* in a third country; in other words, the exemption is stricter—it now only exempts individuals who applied for and were denied *asylum* in a third country.  85 Fed. Reg. at 82,262, 82,289-90.  Second, individuals subject to the Final Rule need not seek protection in a third country that is a signatory only to the Convention Against Torture (but not a signatory to either of the two refugee treaties) in order to be exempted from the ban.  *Id.*  However, because the Final Rule is aimed at asylum applicants arriving at the southern border and Mexico is a signatory to both refugee treaties, the elimination of countries that are signatories only to the

---

[1] Prior to the Ninth Circuit's decision affirming this Court's grant of a preliminary injunction, the United States Supreme Court stayed the injunction against the Interim Rule pending appeal, without opining on the merits of Plaintiffs' challenge.  *See Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019).

[2] On January 12, 2021, Defendants filed a notice with the Ninth Circuit alerting the court to the issuance of the Final Rule and stating that the Final Rule "supersedes the interim final rule effective January 19, [2021]."  *See* Rule 28(j) Letter, *E. Bay Sanctuary Covenant v. Barr*, No. 19-16487 (9th Cir. Jan. 12, 2021), ECF No. 118.

Convention Against Torture has no practical impact on the Final Rule's operation.  *See E. Bay*, 964 F.3d at 855 ("The Rule targets only asylum applicants entering at our southern border with Mexico.").

Like the Interim Rule, the Final Rule does not require any individualized assessment of the asylum system in the country or countries through which a noncitizen transited, or any assessment of the asylum seeker's protection claims or reasons for not seeking protection in the transit country. *See* 85 Fed. Reg. at 82,266, 82,270, 82,286.  It likewise fails to meaningfully grapple with the evidence regarding whether Mexico, Guatemala, or any other transit country is in fact a safe option for asylum seekers.  *See id.* at 82,268 n.21, 82,271-72, 82,275-77, 82,279.  And it continues to rest on the unsupported assumption that an individual who does not apply for asylum in a third country is unlikely to have a meritorious asylum claim.  *E.g.*, *id.* at 82,260, 82,263, 82,275.  Finally, the Final Rule again fails to provide a sufficiently reasoned explanation why unaccompanied minors, with their unique protection needs, do not warrant exemption from the ban.  *See id.* at 82,274, 82,277-78.

Prior to his election, President Biden publicly pledged to end the asylum transit ban policy at issue in this case.  *See* Biden-Harris Campaign Platform, *available at* https://joebiden.com/immigration (stating that President Biden "will end" certain Trump Administration anti-asylum policies, including those "imposing additional restrictions on anyone traveling through Mexico or Guatemala").

## II.   DHS Acting Officials

During the last two years of the Trump Administration, DHS engaged in an unprecedented series of maneuvers to fill its senior offices with acting officials instead of Senate-confirmed appointees, including two Acting Secretaries who purported to issue and ratify the Interim and Final Rules at issue here, and an Acting General Counsel who signed the Final Rule while serving unlawfully.  These actions are described more fully below.  *See infra*, Argument Part I.C.

In brief, Kevin McAleenan purported to assume the Acting DHS Secretary role on April 10, 2019, after the resignation of the last Senate-confirmed Secretary of Homeland Security, Kirstjen Nielsen.  *See* U.S. Gov't Accountability Office, No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* ("GAO Report")

at 4 (Aug. 14, 2020).  However, DHS's internal succession orders at the time assigned the role to a different official, and thereby precluded McAleenan from serving as Acting Secretary.  *Id.* at 1-2, 5-9.  He nonetheless issued the Interim Rule on July 16, 2019.  *See* 84 Fed. Reg. at 33,845.  DHS contends in the Final Rule that the Interim Rule issued by McAleenan constituted the notice of proposed rulemaking for the Final Rule.  *See* 85 Fed. Reg. at 82,261.

On November 8, 2019, McAleenan then purported to change DHS's order of succession to designate Chad Wolf as the next Acting Secretary.  DHS Delegation No. 106, Revision No. 8.6, *DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019).  However, this change to the order of succession had no effect because McAleenan was not validly serving as Acting Secretary and, even if he was, only a Senate-confirmed DHS Secretary—not an acting official—can change the order of succession.  Thus, Wolf did not lawfully assume the position on November 13, 2019 when McAleenan resigned.

In August 2020, the GAO concluded that McAleenan had not validly served as Acting Secretary, which meant that his designation of Wolf as his successor was therefore also invalid.  GAO Report at 2.  Multiple courts have subsequently come to the same conclusion.  *See Pangea Legal Servs. v. DHS*, No. 20-cv-9253-JD, 2021 WL 75756, at *6 (N.D. Cal. Jan. 8, 2021); *La Clinica De La Raza v. Trump*, No. 19-cv-4980-PJH, 2020 WL 7053313, at *7 (N.D. Cal. Nov. 25, 2020); *Batalla Vidal v. Wolf*, No. 16-cv-4756-NGG-VMS, 2020 WL 6695076, at *1 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project ("NWIRP") v. USCIS*, No. 19-cv-3283-RDM, 2020 WL 5995206, at *13 (D.D.C. Oct. 8, 2020); *Immigrant Legal Res. Ctr. ("ILRC") v. Wolf*, No. 20-cv-5883-JSW, 2020 WL 5798269, at *7-9 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-2118-PX, 2020 WL 5500165, at *18-23 (D. Md. Sept. 11, 2020).

In response to the GAO and court decisions, DHS tried to retroactively validate Wolf's and McAleenan's actions.  On two occasions, Peter Gaynor, the FEMA Administrator, attempted to re-designate Wolf as Acting Secretary, after which Wolf attempted to ratify his and McAleenan's prior policies, including the Interim and Final Rule.  *See, e.g.*, Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020); DHS, Ratification of

Department Actions (Nov. 16, 2020); DHS, Ratification of Certain Actions (Nov. 16, 2020).[3]

Courts have enjoined these ratifications, as Gaynor did not have authority to designate Wolf as

Acting Secretary, both because Gaynor never actually assumed the role of Acting Secretary himself,

and because even if he did, acting secretaries cannot amend the order of succession.  *See NWIRP*,

2020 WL 5995206, at \*24; *Pangea*, 2021 WL 75756, at \*5; *Batalla Vidal*, 2020 WL 6695076, at \*9.

      Wolf resigned as Acting DHS Secretary on January 11, 2021, and returned to his prior role as

Under Secretary for Strategy, Policy, and Plans, citing "meritless" court decisions that held his

tenure unlawful.  CNN, *Read: Acting Homeland Security Secretary Chad Wolf's resignation letter*

("Wolf Resignation Letter") (Jan. 11, 2021), https://www.cnn.com/2021/01/11/politics/dhs-

resignation-letter-chad-wolf/index.html.  Gaynor once again purported to become Acting Secretary

and then purported to delegate to Wolf plenary power to approve "any regulatory action" and to

"establish and issue policies" for DHS.  DHS Delegation No. 23028 §§ II.A, II.C (Jan. 12, 2021),

*available at* https://www.dhs.gov/sites/default/files/publications/20_0112_delegation-23028-final-

rules-regulations-other-matters.pdf; Chad Wolf, Ratification, at 2 (Jan. 14, 2021),

https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratification-

delegable-prior-actions.pdf.  Wolf then purported to again ratify his and McAleenan's prior acts,

including the Interim and Final Rules.  Chad Wolf, Ratification, at 2-3 (Jan. 14, 2021).

**LEGAL STANDARDS**

      "On a motion for a preliminary injunction, plaintiffs must make a 'threshold showing' of four

factors."  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844-45 (9th Cir. 2020).  "Plaintiffs must

show that (1) they are likely to succeed on the merits, (2) they are likely to 'suffer irreparable harm'

without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public

interest."  *Id.*  "When the government is a party, these last two factors merge."  *Id.*

      Section 705 of the APA authorizes a court reviewing agency action to "postpone the effective

date of an agency action" pending judicial review "to prevent irreparable injury."  5 U.S.C. § 705.

---

[3] Gaynor's November 14 order is a reissuance of his September 10 succession order which, among
other deficiencies, had been signed prior to Wolf's nomination to serve as DHS Secretary.  *See*
Letter by DHS, *Batalla Vidal*, No. 16-cv-4756-NGG-VMS (E.D.N.Y. Nov. 13, 2020), ECF No. 341.

MEM. ISO MOT. FOR PRELIM. INJUNCTION & STAY OF FINAL RULE, 4:19-cv-04073-JST

The requirements for issuance of a stay of agency action under § 705 are the same as those for a preliminary injunction. *E.g.*, *California v. Wheeler*, 467 F. Supp. 3d 864, 872 (N.D. Cal. 2020).

## ARGUMENT

Plaintiffs satisfy the requirements for issuance of a preliminary injunction and for a stay of the Final Rule's effective date under § 705. The Final Rule is contrary to law for the same reasons as the materially-identical Interim Rule, and it remains arbitrary and capricious due to defects previously identified by this Court and the Ninth Circuit. The Final Rule is also unlawful in its entirety for independent reasons, most notably Chad Wolf's lack of authority to issue the Final Rule due to his invalid service as Acting DHS Secretary. The equities also tip clearly in Plaintiffs' favor, again largely for reasons already identified by both this Court and the Ninth Circuit in their decisions enjoining the Interim Final Rule.

**I.      Plaintiffs Are Likely to Succeed on the Merits.**

This Court and the Ninth Circuit have already concluded that Plaintiffs are likely to succeed on the merits of their claims that the Interim Rule is contrary to the INA, and the materially identical Final Rule is unlawful for the very same reasons. The Final Rule also remains arbitrary and capricious, largely for the same reasons previously identified by this Court. Additionally, the Final Rule is invalid in its entirety because Wolf was unlawfully serving as the Acting Secretary of DHS when he approved the Final Rule.

**A.      Like the Interim Rule, the Final Rule Is Contrary to Law.**

This Court has already held—and the Ninth Circuit has affirmed—that the substantively identical Interim Rule is unlawful, for reasons that apply entirely to the Final Rule as well. The Ninth Circuit explained that under 8 U.S.C. § 1158(b)(2)(C), regulatory asylum bars must be "consistent with" § 1158, and that the Interim Rule is contrary to law because it is inconsistent with § 1158's safe-third-country bar, 8 U.S.C. § 1158(a)(2)(A); and its firm resettlement bar, *id.* § 1158(b)(2)(A)(vi). *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d at 845-49.[4] "The safe-third-

---

[4] Although the Trump administration recently attempted to alter the firm resettlement definition through a separate rulemaking, 85 Fed. Reg. 80274, 80282-83, that rule has been preliminarily enjoined, *Pangea Legal Services v. DHS*, No. 20-cv-09253-JD, 2021 WL 75756, at *7 (N.D. Cal. Jan. 8, 2021). The prior regulatory definition thus remains operative.

country and firm-resettlement bars 'limit an alien's ability to claim asylum in the United States when other safe options are available,'" and "[a] critical component of both bars is the requirement that the alien's 'safe option' be genuinely safe." *Id.* at 847. The Ninth Circuit continued:

> In stark contrast to the safe-third-country and firm-resettlement bars, 'the [Interim] Rule does virtually nothing to ensure that a third country is a 'safe option.'" *E. Bay I*, 385 F. Supp. 3d at 944. The sole protection provided by the Rule is its requirement that the country through which the barred alien has traveled be a "signatory" to the 1951 Convention and the 1967 Protocol. This requirement does not remotely resemble the assurances of safety built into the two safe-place bars of § 1158.

*E. Bay Sanctuary Covenant*, 964 F.3d at 847.

The Final Rule maintains precisely the same fatal defect, and attempts to justify its continued inconsistency with the statute with the same argument already rejected by this Court and the Ninth Circuit. *See* 85 Fed. Reg. at 82,266 ("Regarding comments that the [Interim Rule] does not adequately consider whether a third country is 'safe' for asylum seekers, the Departments note that 8 CFR 208.13(c)(4)(iii) and 1208.13(c)(4)(iii) [which remain unchanged in relevant part under the Final Rule] apply only if an alien has transited through a third country that is a party to one of the specified international conventions that establish nonrefoulement obligations."). Accordingly, Plaintiffs are plainly likely to prevail on their claim that the Final Rule is contrary to law.

### B.      Like the Interim Rule, the Final Rule Is Arbitrary and Capricious.

This Court and the Ninth Circuit also held the Interim Rule arbitrary and capricious under the APA for three reasons. The Court concluded that the agencies failed to justify the Interim Rule's central premise that, contrary to longstanding precedent, "an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim." *E. Bay Sanctuary Covenant*, 964 F.3d at 850, 852-53. Additionally, the "evidence in the record contradicts the agencies' conclusion that aliens barred by the [Interim] Rule have safe options in Mexico." *Id.* at 849-52. Third, "the agencies failed to adequately consider the effect of the [Interim] Rule on unaccompanied minors." *Id.* at 850, 853-54. All three failures also infect the Final Rule.

7

1.  Impermissible Premise that Final Rule Targets Individuals with Meritless Asylum Claims

The Ninth Circuit concluded that there was "no evidence in the record" supporting the Interim Rule's central premise that asylum seekers' claims are likely meritless "based solely on the fact that an alien has not applied for asylum in Mexico or Guatemala." *E. Bay Sanctuary Covenant*, 964 F.3d at 852.  The court further reasoned that this premise "ignores a long line of cases holding that aliens are not required to apply for asylum in countries they pass through on their way to the United States; ignores the fact that a preference for asylum in the United States rather than Mexico or Guatemala is irrelevant to the merits of an alien's asylum claim; and ignores extensive evidence in the record documenting the dangerous conditions in Mexico and Guatemala that would lead aliens with valid asylum claims to pursue those claims in the United States rather than in those countries." *Id.* at 853.

The Final Rule repeatedly doubles down on this same arbitrary premise that individuals who "volitionally transit through a third country to reach the United States" have "meritless asylum claims."  85 Fed. Reg. at 82,260; *see also, e.g.*, *id.* at 82,275 ("As previously stated by the Departments [in the Interim Rule], one purpose of the rule is to ameliorate undue strains on the existing immigration system by deterring meritless or non-urgent asylum claims."); *id.* at 82,278 (Final Rule's principal objective is "to disincentivize aliens with meritless and non-urgent asylum claims from seeking entry to the United States.") (citing Interim Rule, 84 Fed. Reg. at 33,831).

This fundamental premise remains unjustified and legally impermissible.  "The fact that an alien might prefer to seek asylum in the United States rather than Mexico or Guatemala may be reflective of the relative desirability of asylum in these countries, but it has no bearing on the validity of the alien's underlying asylum claim." *E. Bay Sanctuary Covenant*, 964 F.3d at 852 (collecting cases).

2.  Lack of Safe Option in Mexico

The Ninth Circuit also held arbitrary and capricious the Interim Rule's assertions that Mexico provides a safe and viable alternative destination for asylum seekers, quoting at length from this Court's review of the administrative record:

> [T]he administrative record fails to support the conclusion that asylum in Mexico is a
>
> "feasible alternative."
>
> . . . [N]owhere in the Rule do the agencies find that Mexico [is] "in compliance with the relevant international instruments governing consideration of refugee claims." Nor does the government cite any finding in the Rule that Mexico's "domestic law and procedures regarding such relief are robust and capable of handling claims made by Central American aliens in transit to the United States." . . . With limited exceptions that are at best unresponsive to the question, the cited evidence consists simply of an unbroken succession of humanitarian organizations explaining why the government's contention is ungrounded in reality. . . .
>
>    In sum, the bulk of the administrative record consists of human rights organizations documenting in exhaustive detail the ways in which those seeking asylum in Mexico are (1) subject to violence and abuse from third parties and government officials, (2) denied their rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution.  Yet, even though this mountain of evidence points one way, the agencies went the other—*with no explanation*.

964 F.3d at 850-51 (quoting *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 952-55) (emphasis, capitalizations, and first two ellipses in original).  The Ninth Circuit held that these failures rendered the Interim Rule arbitrary and capricious both because "the agencies 'entirely failed to consider an important aspect of the problem,'" and because "the agencies' conclusion that aliens barred by the Rule have a safe alternative in Mexico 'runs counter to the evidence before the agency.'"  *Id.* at 851-52 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The Final Rule acknowledges that, in response to the Interim Rule, the agencies received even more evidence regarding the lack of safety and adequate asylum protections in Mexico, as well as in Guatemala and other countries through which asylum seekers commonly transit.  *See* 85 Fed. Reg. at 82,271, 82,275-76, 82,279.  This is in addition to the "mountain of evidence" of unsafe conditions already in the administrative record.  Accordingly, Plaintiffs are likely to prevail on their claim that the Final Rule remains arbitrary and capricious because it runs counter to the evidence before the agencies.

In the Final Rule, the agencies purport to address some concerns about Mexico's viability for asylum seekers.  However, their responses are either plainly irrational or reflect a failure to seriously grapple with the evidence.  The agencies' position boils down to a handful of contradictory, irrelevant, or unsupported assertions.  The agencies fault the extensive evidence of dangerous

conditions in Mexico as being alternately "anecdotal" and too "generalized."  85 Fed. Reg. at 82,271; *see also id.* at 82,271-72, 82,276-77 & n.35, 82,286.  However, "the unrefuted record establishes that [Mexico] is *categorically* not a 'safe option[]' for the majority of asylum seekers." *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 956 (emphasis added).  The agencies repeatedly single out the southernmost Mexican state of Chiapas as a supposedly safe option for asylum seekers to settle.  85 Fed. Reg. at 82,272, 82,276-77, 82,279, 82,286.  However, Chiapas is also well-known to be Mexico's poorest state,[5] in the poorest part of the country, in which "by Latin American standards, not to mention those of the OECD, the region's level of development is appalling."[6]  The agencies again rely heavily on the fact that Mexico "has ratified the 1951 Refugee Convention, the 1967 Refugee Protocol, and the CAT."  85 Fed. Reg. at 82,279; *see also id.* at 82,282.  But as this Court found previously, "the administrative record demonstrates abundantly why Mexico is not a safe option for many refugees, despite its party status to all three agreements."  *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 944-45 (quoting AR 561, 582, 588).  The agencies also claim that Mexico is a safe option for asylum seekers because "various media outlets and writers have opined on living in or retiring to Mexico, which . . . suggests that the quality of life, including safe living conditions, continues to improve."  85 Fed. Reg. at 82,271 n.25.  Particularly in light of the administrative record and this Court's prior findings, it is irrational for the agencies to claim that the "quality of life" and access to protection that indigent and vulnerable refugees can expect in Mexico is comparable to that of wealthy American retirees.  Such reasoning illustrates the agencies'

---

[5] *E.g.*, Harvard Ctr. For Int'l Dev., *Why Is Chiapas Poor?* 3 (Mar. 2016), https://growthlab.cid.harvard.edu/files/growthlab/files/cid_wp_300_english.pdf.
[6] Rodrigo Aguilera, *Can AMLO Rescue Mexico's Poorest Southern States, Like Oaxaca, Chiapas, and Guerrero?*, London School of Econ., Latin Am. & Caribbean Cultural Ctr. (Mar. 8, 2019), https://blogs.lse.ac.uk/latamcaribbean/2019/03/08/can-amlo-rescue-mexicos-poorest-southern-states-like-oaxaca-chiapas-and-guerrero/; *see also* Refugees Int'l, A New Way Forward: Strengthening the Protection Landscape in Mexico (Nov. 12, 2020), https://www.refugeesinternational.org/reports/2020/11/9/a-new-way-forward-strengthening-the-protection-landscape-in-mexico ("Under Mexican law, asylum seekers must remain in the state where they submitted their asylum request and are required weekly to sign a form in the state's [asylum or immigration] office to prove their presence. . . .  Southern states like Chiapas (where 60 percent of asylum requests are submitted) have some of the highest poverty rates in the country, and there are fewer work opportunities in these states.  Mexico's northern states have high rates of violence and crime and a large cartel presence.  Asylum seekers are forced to stay in areas where they may not be able to provide for their basic needs, or where they are at higher risk to their personal security.").

continued failure to seriously weigh and address the well-documented dangers facing *asylum seekers* in Mexico.

The agencies also make several assertions concerning Mexico's asylum system, citing an increase in asylum applications and an increase in the Mexican asylum agency's 2020 budget. 85 Fed. Reg. at 82,271-72, 82,279, 82,286 n.48. But the mere fact that more desperate individuals are applying for asylum in Mexico—likely in large part due to the Trump administration's policies that have unlawfully blocked them from seeking protection in the United States—says nothing about whether those applicants are actually finding safety. Nor does increased funding alone indicate that the grave deficiencies in Mexico's ability to protect asylum seekers have been resolved. *See, e.g.*, *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 954-55 (citing reports "that 'refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico,' based not just on 'their inherent vulnerabilities as refugees but also on account of their race, nationality, gender, sexual orientation, gender identity, and other reasons'"; and "that 'the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection, as well as repeatedly violating the *non-refoulement*[']'") (quoting AR 703, 708).

### 3. Failure to Reasonably Explain Lack of Exception for Unaccompanied Children

Like the Interim Rule, the Final Rule is also arbitrary and capricious for failing to provide a reasoned explanation for its failure to exempt unaccompanied children. As this Court explained, the Interim Rule set forth just two reasons for not exempting unaccompanied children: (1) "that Congress did not exempt those children from every statutory bar to asylum eligibility"; and (2) "that an exception is unnecessary because unaccompanied children can still apply for withholding of removal or protection under CAT." *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 956 (citing 84 Fed. Reg. at 33,839 n.7). This Court rejected the first rationale as inadequate because "the agencies did not expressly consider whether the Rule's rationale applies with full force to those children":

> Given that children have more difficulty than adults pursuing asylum claims in Mexico, AR 641-42, 778-86, the agencies have not explained why it is rational to assume that an unaccompanied minor's failure to apply has the same probative value on the merits as an adult's—assuming for the moment that an adult's failure has any meaningful value.

1   *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 957.  And it rejected the Interim Rule's second

2   rationale both because the possible availability of withholding of removal or CAT protection, "which

3   are subject to a higher bar and different collateral consequences, are not interchangeable substitutes"

4   for asylum; and relatedly, because the agencies failed to explain why "the higher standard[s]"

5   applicable to those forms of protection do not "create[] a significantly greater risk that even those

6   alternative claims will be decided wrongly."  *Id.*  The Ninth Circuit affirmed this Court's conclusion,

7   noting that the fact that unaccompanied children "are not exempt from [all] other provisions of

8   § 1158 . . . in no way addresses the special vulnerability of unaccompanied minors and the failure of

9   the Rule to take that vulnerability into account."  *E. Bay Sanctuary Covenant*, 964 F.3d at 854

10   (quoting *State Farm*, 463 U.S. at 43).

In the Final Rule, the agencies again refused to exempt unaccompanied children.  85 Fed.

12   Reg. at 82,277-78.  The Final Rule asserts that "the Departments have not overlooked the special

13   circumstances of UAC [unaccompanied alien children] in crafting this rule, but those circumstances

14   are insufficiently compelling to warrant a special exception for UAC from the rule's application."

15   *Id.* at 82,278.  Instead, the Final Rule maintains the same two principal justifications for refusing to

16   exempt unaccompanied children: that "[t]he Departments believe that the rule is consistent with the

17   Act"; and that unaccompanied children, "like others subject to the third-country-transit bar," "still

18   will be considered for withholding of removal . . . and for protection under the CAT regulations."  85

19   Fed. Reg. at 82,277.  These explanations remain deficient for the same reasons they were deficient in

20   the Interim Rule.

The only new explanations offered in the Final Rule likewise still fail to "address[] the

22   special vulnerability of unaccompanied minors" or rationally "take that vulnerability into account."

23   *See E. Bay Sanctuary Covenant*, 964 F.3d at 854.  The Final Rule states that "this rule may

24   encourage families with children and UAC to avoid making a long, arduous, and extremely

25   dangerous journey that brings with it a great risk of harm that could be avoided if they were to more

26   readily avail themselves of legal protection from persecution or torture in a third country closer to

27   the family's or child's country of origin."  85 Fed. Reg. at 82,277.  But this statement does not

28

distinguish between unaccompanied and accompanied children, or acknowledge the "special vulnerability" of the former.  *See E. Bay Sanctuary Covenant*, 964 F.3d at 854.

Tellingly, the agencies also attempt to justify the Final Rule on the basis that "[t]he numbers of family units and UAC migrating to the United States ha[s] grown."  85 Fed. Reg. at 82,277. While the agencies apparently view every reduction in the number of asylum claims as a benefit, the Final Rule still contains no explanation whatsoever of *why* that perceived general benefit outweighs the specific harm of refusing otherwise-available protection to vulnerable children.  It certainly does nothing to "address[] the special vulnerability of unaccompanied minors."  *See E. Bay Sanctuary Covenant*, 964 F.3d at 854.

Finally, the Final Rule asserts that any unaccompanied child "who is old enough to travel independently across hundreds or thousands of miles to the United States can logically also be expected to seek refuge in one of the countries transited if the [child] is genuinely seeking protection."  85 Fed. Reg. at 82,278.  But there is no legitimate basis to assume that children of any age are "old enough" to initiate a complex legal proceeding just because they are old enough to ride a bus or hop a train; that is especially true for very young children.

For all of these reasons, Plaintiffs are likely to demonstrate that the Final Rule remains arbitrary and capricious and should be set aside.

### C.   Both the Interim Rule and the Final Rule Were Issued by Unlawfully Appointed DHS Officials.

The unlawful appointments of McAleenan and Wolf as Acting DHS Secretary have generated a large and consistent body of case law invalidating their actions.  *See Pangea*, 2021 WL 75756, at *6; *Batalla Vidal*, 2020 WL 6695076, at *1 ; *NWIRP*, 2020 WL 5995206, at *13; *ILRC*, 2020 WL 5798269, at *7-9; *Casa de Maryland*, 2020 WL 5500165, at *18-23 ; *see also La Clinica De La Raza*, 2020 WL 7053313, at *9 (denying motion to dismiss Plaintiffs' claims that McAleenan's acting service is unlawful).  As every court to decide the issues has held, neither official had authority to serve as Acting Secretary because neither was validly designated to hold the position under the applicable order of succession.  DHS's subsequent attempts to circumvent these court decisions fail to save the Interim or Final Rule.

As an initial matter, DHS's rulemaking authority is assigned to the DHS Secretary by statute. *See* 6 U.S.C. § 112(e); 8 U.S.C. § 1103(a)(3). Any official who issues a rule while unlawfully serving as Secretary or Acting Secretary is therefore acting in excess of authority, rendering the action invalid under both the APA and the Federal Vacancies Reform Act ("FVRA"). *See* 5 U.S.C. § 3348(d); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 23 (D.D.C. 2020); *Casa de Maryland*, 2020 WL 5500165, at *21.

1.  McAleenan Lacked Authority to Issue the Interim Rule, Which Rendered It Void and Thus It Could Not Substitute for a Notice of Proposed Rulemaking.

"Unless a statutory exception applies, the APA requires agencies to publish a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020). Defendants seek to use the Interim Rule as a substitute for a notice of proposed rulemaking, to render the Final Rule compliant with the APA. But because the Interim Rule was unlawfully issued by McAleenan, it had no legal force, and the Final Rule violates the APA's notice-and-comment procedures.

When former DHS Secretary Nielsen resigned on April 10, 2019, McAleenan leapfrogged the officials ahead of him in the applicable line of succession. DHS had two different lines of succession—one that applied when a vacancy arises due to death or resignation ("Resignation Line") and another when a vacancy occurs due to a "disaster or catastrophic emergency" ("Emergency Line"). *E.g.*, *Batalla Vidal*, 2020 WL 6695076, at *8. At the time of Nielsen's resignation, her lawful successor according to the Resignation Line was Christopher Krebs, who was the Director of the Cybersecurity and Infrastructure Agency ("CISA"), not McAleenan, who was the Commissioner of Customs and Border Protection. *See, e.g.*, *id.* As such, "Director Krebs should have assumed the role as Acting Secretary of Homeland Security," but "[i]nstead, Mr. McAleenan purported to be Acting Secretary, although he possessed no statutory authority to do so." *Id.* (collecting cases).

McAleenan issued the Interim Rule on July 16, 2019, while unlawfully serving as Acting Secretary. *See* 84 Fed. Reg. at 33,845. Because the Interim Rule was void *ab initio*, Defendants may not rely on the Interim Rule's request for comment to satisfy their notice-and-comment

14

obligations under the APA.  85 Fed. Reg. at 82,261 (claiming that the Interim Rule functioned as a notice of proposed rulemaking); *see SW Gen., Inc. v. NLRB*, 796 F.3d 67, 71 (D.C. Cir. 2015) ("[T]he FVRA renders actions taken by persons serving in violation of the Act void ab initio.") (citing 5 U.S.C. § 3348(d)), *aff'd*, 137 S. Ct. 929 (2017).  Nor can this rule be issued *without* notice and comment, as the district court held in *CAIR*, 471 F. Supp. 3d at 57 (rejecting foreign affairs and good cause exceptions).  The Final Rule was therefore issued in violation of the APA's notice-and-comment requirements.  5 U.S.C. § 553(b).

Finally, even if the Interim Rule was not void, the agencies have failed to explain why the Interim Rule deviated from the customary 60-day period for public comment.  *See* Exec. Order No. 13,563, 76 Fed. Reg. 3,821, 3,821-22 (Jan. 18, 2011) ("[A] comment period . . . should generally be at least 60 days."); Exec. Order No. 12,866, 58 Fed. Reg. 51,735, 51,740 (Sep. 30, 1993) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days.").  The Interim Rule allowed only 30 days for public comment on a complex rule that reshapes the asylum system, has wide-ranging domestic impacts, and requires rigorous assessment of the asylum systems of multiple foreign nations.  Moreover, because the Interim Rule took effect immediately, there was no "urgency or exigency" that could have justified a shorter comment period.  *See N.C. Growers' Ass'n, Inc.* v. *United Farm Workers*, 702 F.3d 755, 768 (4th Cir. 2012) (holding that shortened comment period was arbitrary and capricious in part because agencies failed to demonstrate any exigency necessitating quick agency action); *see also Pangea Legal Servs. v. DHS*, No. 20-CV-07721, 2020 WL 6802474, at *20 (N.D. Cal. Nov. 19, 2020) ("[A]t least one circuit has recognized that 90 days is the 'usual' amount of time allotted for a comment period.") (citation omitted).  By arbitrarily providing only 30 days for public comment, the agencies failed to provide a meaningful opportunity for public participation, even according to the executive branch's own standards.

2.  Wolf Lacked Statutory Authority to Approve the Final Rule.

Because Wolf never lawfully assumed the role of Acting Secretary, he lacked the authority to approve the Final Rule.  Two acting officials have attempted to designate him as Acting Secretary, but neither official had authority to do so.

1    McAleenan attempted to designate Wolf as his successor on November 8, 2019, when he

2    amended the order of succession for the Acting DHS Secretary.  DHS Delegation No. 106, Revision

3    No. 8.6, *DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019) (invoking 6 U.S.C.

4    § 113(g)(2)).  McAleenan's order would have designated Wolf to serve as Acting Secretary upon

5    McAleenan's resignation on November 13, 2019.  But because "McAleenan's [own] appointment

6    was invalid under the agency's applicable order of succession, . . . he lacked the authority to amend

7    the order of succession to ensure Wolf's installation as Acting Secretary."  *Casa de Maryland*, 2020

8    WL 5500165, at *23; *see also, e.g.*, *ILRC*, 2020 WL 5798269, at *8.

9    Even if McAleenan had validly been serving as Acting Secretary, "an Acting Secretary may

10   not amend the Department's order of succession."  *NWIRP*, 2020 WL 5995206, at *24.  The relevant

11   statute allows the DHS Secretary to provide a "further order of succession to serve as Acting

12   Secretary" when the first two deputy positions are vacant (which they have been at all relevant

13   times).  6 U.S.C. § 113(g)(2).  As the court recognized in *NWIRP*, this statute distinguishes between

14   "the Secretary" and an "Acting Secretary," and only gives power over the order of succession to the

15   *Secretary*.  2020 WL 5995206, at *19.  A contrary interpretation would raise serious constitutional

16   concerns; under the Appointments Clause, only a *principal* officer serving as a head of department

17   may appoint another officer, whereas an Acting Secretary is merely an *inferior* officer.  *Id.* at *19-

18   23.  Thus, because even a lawful Acting Secretary may not change DHS's order of succession,

19   McAleenan could not lawfully install Wolf as Acting Secretary.

20   <ins>3. Wolf and Gaynor Cannot and Have Not Validly Ratified the Interim and Final Rules.</ins>

21   Despite the illegality of McAleenan's and Wolf's tenures, DHS engaged in ever-more-

22   convoluted attempts to let Wolf ratify his expansive revisions of immigration law.  Instead of placing

23   these decisions in the hands of a Senate-confirmed Secretary, or even a valid Acting Secretary, DHS

24   took great pains to maintain Wolf's control.  Courts have consistently rejected these efforts and

25   should reject the latest maneuver.

26   On September 10 and November 14, 2020, a different DHS official—Peter Gaynor, the

27   FEMA Administrator—attempted to re-designate Wolf as Acting Secretary, who then attempted to

28   ratify his and McAleenan's actions.  As DHS explained, Gaynor was next in line to serve as Acting

Secretary under the order of succession in place when Nielsen resigned.  And while Gaynor never actually claimed to *become* the Acting Secretary, he supposedly altered the line of succession under 6 U.S.C. § 113(g)(2) to re-install Wolf.  *See* Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Sep. 17, 2020).[7]  This roundabout maneuver failed for two reasons.  One is that, as just explained, an acting secretary cannot invoke the authority of § 113(g)(2) to amend the order of succession.  *NWIRP*, 2020 WL 5995206, at *24.  The other is that Gaynor never actually became the Acting Secretary: he was never sworn in, DHS never gave the Senate notice of his service, and Wolf claimed the role throughout.  *See Pangea*, 2021 WL 75756, at *5 ("Because Gaynor was never the Acting Secretary . . . Gaynor could not have designated Wolf to be Acting Secretary."); *Batalla Vidal*, 2020 WL 6695076, at *9 ("DHS cannot recognize [Gaynor's] authority only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the alternative.").  Gaynor thus never validly made Wolf the Acting Secretary, so Wolf lacked authority to ratify his or McAleenan's unlawful actions.

Next, after Wolf resigned as Acting Secretary on January 11, DHS *again* tried to give him the authority to lead the Department and ratify his and McAleenan's actions.  On January 12, 2021, Gaynor, again claiming to be Acting Secretary, immediately delegated all rulemaking authority right back to Wolf in Wolf's role as Under Secretary.  *See* DHS Delegation No. 23028, § II.  The Delegation purports to give Wolf authority to "review, approve or disapprove, and sign *any* regulatory action," ratify "prior regulatory actions," and issue any policy documents he wants.  *Id.* §§ II.A, II.C (emphasis added).  In other words, even as it pretended to yield to the unanimous decisions of half a dozen courts and the GAO finding Wolf's tenure illegal, DHS tried to keep Wolf's authority essentially unchanged.  He immediately used this authority to once again ratify all of his and McAleenan's actions.  *See* Chad Wolf, Ratification (Jan. 14, 2021).  This latest attempt to prolong Wolf's authority fails for at least three reasons.

First, the Interim and Final Rules categorically "may not be ratified."  5 U.S.C. § 3348(d)(2).  The FVRA bars ratification of actions taken by an acting official whose service is not authorized by

---

[7] Gaynor did this twice because the first time, he signed the memorandum *before* purporting to have authority to do so.  *See* Letter by DHS, *Batalla Vidal*, No. 16-cv-4756-NGG-VMS (E.D.N.Y. Nov. 13, 2020), ECF No. 341.

the FVRA or an agency-specific succession statute.  *See* 5 U.S.C. § 3348(d)(1).  Congress adopted this rule to prevent agencies from doing an end-run around Senate confirmation by ratifying illegal actions, because such ratification "would render enforcement of the [FVRA] a nullity."  S. Rep. No. 105-250, at 8, 18, 20 (1998).  The no-ratification rule applies to any actions taken "in the performance of any function or duty of a vacant office."  5 U.S.C. § 3348(d)(1).  The Secretary's functions or duties include "[t]he issuance of regulations," which is assigned by statute to the Secretary and no other official.  6 U.S.C. § 112(g); *see* 8 U.S.C. § 1103(a)(3).  The FVRA thus bars ratification here.

Second, Wolf's latest attempt violates ratification principles.  An agency may ratify an otherwise-illegal action only if "a properly appointed official has the power to conduct an independent evaluation of the merits and does so."  *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015).  Here, the only official who was authorized to serve as Acting Secretary, Gaynor, specifically *disavowed* any role in reviewing the merits of Wolf's and McAleenan's actions.  Instead, Gaynor simply passed these responsibilities back to Wolf wholesale, without engaging in *any* review (independent or otherwise).  There can be no valid ratification when the official who is legally authorized to act and statutorily responsible for issuing regulations openly abdicates any role in reviewing the ratified regulations.  *See Advanced Disposal Servs. E., Inc. v. NLRB.*, 820 F.3d 592, 603 (3d Cir. 2016) ("[T]he ratifier must make a 'detached and considered judgment,' not simply rubberstamp the earlier action.").  Furthermore, the circumstances of Wolf's resignation suggest that he did so in order to wield the Secretary's powers as an Under Secretary and circumvent the court rulings he viewed as "meritless."  Both Gaynor's delegation and Wolf's ratification, in other words, were predetermined and tainted by Wolf's unlawful service as Acting Secretary.  *Cf. Intercollegiate*, 796 F.3d at 121-22, 124 (rejecting arguments as to lack of independence because properly constituted agency conducted *de novo* review prior to ratification, with no evidence of unlawful predecessors' "hidden influence" or "continuing taint" of prior violation).  In short, Plaintiffs are entitled to independent consideration of the Final Rule by a lawfully serving Secretary—Gaynor's abdication of his role to the wrongdoer himself does not remedy Wolf's unlawful actions as Acting Secretary.

1    Third, Gaynor's delegation violates the FVRA and HSA because it functionally kept Wolf in

2    the role of Acting Secretary, despite Wolf's inability to serve in the role, as explained above.  The

3    delegation gives Wolf open-ended power to take whatever regulatory actions he wants, to issue any

4    policies he wants, and more.  *See* Chad Wolf, Ratification, at 2 (Jan. 14, 2021).  That is precisely the

5    type of blanket delegation that motivated the FVRA's enactment.  Congress enacted the law because

6    agencies were evading the Appointments Clause process by simply reassigning cabinet secretaries'

7    functions to other officials, who continued shaping policy without the accountability of Senate

8    confirmation.  *See L.M.-M.*, 442 F. Supp. 3d at 29, 34 (describing the use of "delegation statutes to

9    assign the duties of PAS offices to officers and employees[] with little or no check from Congress").

10   Courts have therefore invalidated actions taken by officials—whatever their title—who purport to

11   exercise the core functions of senior officials without being eligible to serve under the FVRA or an

12   agency-specific statute.  *See, e.g.*, *Bullock v. U.S. Bureau of Land Mgmt.*, No. 4:20-cv-62-BMM,

13   2020 WL 5746836, at *9 (D. Mont. Sept. 25, 2020); *L.M.-M.*, 442 F. Supp. 3d at 23.

14   4.  Former Acting General Counsel Chad Mizelle Lacked Authority to Sign the Final Rule
     for Publication.

15

16   In the course of issuing the Final Rule, Wolf "delegate[ed] the authority to electronically sign

17   [the Final Rule] to Chad R. Mizelle, who [wa]s the Senior Official Performing the Duties of the

18   General Counsel for DHS, for purposes of publication in the Federal Register."  85 Fed. Reg. at

19   82289.  Mizelle, however, was serving as Acting General Counsel for DHS[8] in violation of the

20   FVRA's 210-day limit on acting service.  *See* 6 U.S.C. § 113(a)(1)(J) (General Counsel requires

21   Senate confirmation); 5 U.S.C. § 3345(a) (FVRA applies to positions requiring Senate

22   confirmation); *id.* § 3346 (aggregate 210-day limit where FVRA applies).  The most recent Senate-

23   confirmed General Counsel was fired on September 17, 2019.[9]  Thus, on December 17, 2020, when

24

25

26   [8] The fact that Mizelle's formal title was not "Acting General Counsel" is of no moment.  *See Bullock*, 2020 WL 5746836, at *9 ("The Interior Secretary carefully crafted the Secretarial Order to avoid designation of Pendley as 'Acting BLM Director,' but the Executive Branch cannot use wordplay to avoid constitutional and statutory requirements.").

27

28   [9] Zolan Kanno-Youngs & Maggie Haberman, *White House Fires Homeland Security Dept.'s General Counsel*, N.Y. Times (Sep. 17, 2019), https://www.nytimes.com/2019/09/17/us/politics/john-mitnick-homeland-security.html.

Mizelle purported to sign the Final Rule for publication, 457 days had elapsed, and his signature was therefore without legal force.  *See* 5 U.S.C. §§ 3346(a)(1), 3348(d); *L.M.-M.*, 442 F. Supp. 3d at 23.

Because an authorized signature was needed for publication in the Federal Register, *see* 85 Fed. Reg. at 82289, and the Final Rule remains unsigned, the Final Rule may not lawfully take effect.  *See* 5 U.S.C. § 553(d) (requiring publication "not less than 30 days before" effective date).  Signature and publication are far from mere formalities.  "[P]ublication in the Federal Register . . . is the culminating event in the rulemaking process."  *See NRDC v. DOE*, 362 F. Supp. 3d 126, 143 (S.D.N.Y. 2019) (quoting *NRDC v. Abraham*, 355 F.3d 179, 196 (2d Cir. 2004)).  Here, because Mizelle's signature on the Final Rule is clearly unlawful, the document has not been duly issued or authorized for publication, and the Final Rule may not take effect until at least 30 days after it is signed and published in correct form.  *See* 44 U.S.C. § 1507 (creating "rebuttal presumption" "that [published document] was duly issued, prescribed, or promulgated" and that "all requirements" for publication "have been complied with").

Wolf's latest ratification attempt, even if valid (which it was not), does not save the unauthorized publication of the Final Rule.  Wolf's memo purported to ratify only his and McAleenan's prior actions but not Mizelle's unlawful signature on the Final Rule.  Thus, Wolf merely affirmed his prior delegation of signature authority to Mizelle, but that re-delegation did nothing to cure Mizelle's unlawful tenure as Acting General Counsel of DHS.  In short, the Final Rule remains unsigned and ineffective.

### 5.  Wolf's Tenure as Acting Secretary Violated the Appointments Clause.

Under the Appointments Clause an acting officer may perform the duties of a principal officer (such as the DHS Secretary) only temporarily.  *See Batalla Vidal*, 2020 WL 6695076, at *7 n.9 ("[A]llowing acting officers to serve without time limitations and other enforcement mechanisms raises serious constitutional concerns.").  With indefinite, extended service, the acting officer becomes indistinguishable from a principal officer, whose appointment requires presidential nomination and Senate confirmation.  *See United States v. Eaton*, 169 U.S. 331, 343 (1898) (holding that an acting officer carrying out the functions of a principal officer does not need Senate

confirmation because their service is "for a limited time and under special and temporary conditions").

When he issued the Final Rule, *617 days* after former Secretary Nielsen left office, Wolf's extended, indefinite service as Acting Secretary violated the Appointments Clause. "[C]ourts can and must play a role in policing 'acting' appointments that are effectively permanent." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 153 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019). Here, Wolf became the longest serving DHS Secretary under the Trump administration, acting or otherwise, filling a vacancy that is now the longest in U.S. history. Wherever the precise constitutional line may be, acting service for almost two full years—nearly three times as long as the FVRA allows—surely crosses it. The Final Rule therefore violates the Appointments Clause.

## II.     The Equitable Factors Favor Plaintiffs.

The remaining equitable factors—irreparable harm, the balance of equities, and public interest—also favor Plaintiffs, and therefore justify the issuance of a preliminary injunction and/or a stay of the Final Rule under 5 U.S.C. § 705.[10]

With respect to the materially-identical Interim Rule, Plaintiffs have already "'established a sufficient likelihood of irreparable harm through diversion of resources and the non-speculative loss of substantial funding from other sources.'" *E. Bay Sanctuary Covenant*, 964 F.3d at 854 (quoting *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 957). They "established that the Rule harms their mission of representing and assisting asylum seekers and results in a substantial loss of

---

[10] Section 705 "authorizes courts to stay agency rules pending judicial review." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) (emphasis omitted); *see also In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (noting that § 705 provides "statutory authority to stay agency orders pending [judicial] review"). The requirements for issuance of a stay of agency action under § 705 are the same as those for a preliminary injunction. *California v. Wheeler*, 467 F. Supp. 3d 864, 872 (N.D. Cal. 2020); *ILRC*, 2020 WL 5798269, at \*4; *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). However, preliminary injunctions and stays "serve different purposes." *Nken v. Holder*, 556 U.S. 418, 428 (2009). An injunction "is directed at someone, and governs that party's conduct." *Id.* In contrast, a stay of agency action does not "direct[] the conduct of a particular actor" and therefore does not constitute "a coercive order against the Government." *Id.* at 429. Rather, such a stay "temporarily suspend[s] the source of [the agency's] authority to act." *Id.* at 428-29. Thus, the overlap between the injunction and stay factors is "not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* at 434.

1    organizational funding," and "[t]he government d[id] not dispute these factual findings." *Id.* As the

2    Ninth Circuit explained:

> The Rule forces plaintiffs to overhaul their programs and pursue more complex and
> time-and-resource intensive forms of relief, resulting in plaintiffs' providing fewer
> services to fewer individuals. The Rule also jeopardizes the plaintiffs' funding streams.
> For example, plaintiff East Bay Sanctuary Covenant receives a fixed per-case amount
> for each affirmative asylum case it files. Plaintiff Al Otro Lado receives funding at a
> fixed per-case rate to represent individuals in bond proceedings, but applicants affected
> by the Rule are ineligible for bond for at least six months after entry. Because the Rule
> renders a substantial portion of plaintiffs' clients categorically ineligible for asylum, it
> directly threatens their standard caseload, and consequently, their caseload[-]dependent
> funding.

9    *Id.* All of these harms persist under the Final Rule. *See* Further Suppl. Smith Decl.; Further Suppl.

10   Manning Decl.; Further Suppl. Ramos Decl.; Further Suppl. Alvarez Decl.

11         The third and fourth factors, which merge here, also continue to strongly favor granting

12   interim relief. There is a "public interest in not returning refugees to their persecutors or to a country

13   where they would be endangered," and "[t]his concern is especially pressing here." *E. Bay*

14   *Sanctuary Covenant*, 964 F.3d at 854 (quoting *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 958)

15   (in turn citing *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (per curiam)); *see also id.*

16   ("'[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to

17   countries where they are likely to face substantial harm.'") (quoting *Nken*, 556 U.S. at 436). Also

18   still applicable is "the public interest in 'ensuring that statutes enacted by [the public's]

19   representatives are not imperiled by executive fiat.'" *Id.* at 855 (some internal quotation marks

20   omitted) (quoting *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 958) (in turn quoting *Maryland v.*

21   *King*, 567 U.S. 1301, 1301 (2012)). And while "the public has an interest in relieving burdens on

22   the asylum system and the efficient conduct of foreign affairs," "'shortcutting the law, or weakening

23   the boundary between Congress and the Executive, are not the solutions to these problems.'" *Id.*

24   (quoting *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 959).

25         Finally, Defendants will not be harmed by the issuance of interim relief. There is no

26   evidence that the government was harmed during the six months in which the Interim Rule was

27   vacated, and indeed, the government did not even bother to seek a stay of Judge Kelly's decision

28   vacating the interim rule in its entirety. In addition, President Biden has already pledged to "end"

the asylum transit ban policy.  *See* Biden-Harris Campaign Platform, *supra*.  Rather than imposing any burden on the agencies, a preliminary injunction or stay of the Final Rule's effective date would merely prevent needless harm to Plaintiffs from a policy that there is every reason to expect the new Administration to rescind.  Indeed, but for the prior administration's issuance of the Final Rule at the eleventh hour—following the election results and with an effective date one day before President Biden's inauguration—the Final Rule's effective date likely would have been suspended by the new Administration without this Court's intervention.  *See* Mem. from Ronald A. Klain, Ass't to the President & Chief of Staff, to Heads of Executive Departments & Agencies, Regulatory Freeze Pending Review (Jan. 20, 2021) (directing agencies to consider postponing effective dates and reopening comment periods for "rules that have been issued in any manner, but have not taken effect" by noon on January 20, 2021, "for the purpose of reviewing any questions of fact, law, and policy the rules may raise"), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/regulatory-freeze-pending-review/.

## CONCLUSION

For the foregoing reasons, the Court should issue an order preliminarily enjoining the Final Rule or staying the Final Rule's effective date pending judicial review pursuant to 5 U.S.C. § 705.

Dated: January 21, 2021

Respectfully submitted,

/s/ Katrina Eiland

| | |
|---|---|
| Lee Gelernt* | Katrina Eiland (SBN 275701) |
| Omar Jadwat* | Cody Wofsy (SBN 294179) |
| Anand Balakrishnan* | Spencer Amdur (SBN 320069) |
| Ming Cheung** | Morgan Russell (SBN 296137) |
| AMERICAN CIVIL LIBERTIES UNION | AMERICAN CIVIL LIBERTIES UNION |
| FOUNDATION | FOUNDATION |
| IMMIGRANTS' RIGHTS PROJECT | IMMIGRANTS' RIGHTS PROJECT |
| 125 Broad St., 18th Floor | 39 Drumm Street |
| New York, NY 10004 | San Francisco, CA 94111 |
| T: (212) 549-2660 | T: (415) 343-1198 |
| F: (212) 549-2654 | F: (415) 395-0950 |
| *lgelernt@aclu.org* | *keiland@aclu.org* |
| *ojadwat@aclu.org* | *cwofsy@aclu.org* |
| *abalakrishnan@aclu.org* | *samdur@aclu.org* |
| *mcheung@aclu.org* | *mrussell@aclu.org* |

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*vtalla@aclunc.org*
*asalceda@aclunc.org*

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

*Attorneys for Plaintiffs*

* Admitted pro hac vice
**Pro hac vice application forthcoming

MEM. ISO MOT. FOR PRELIM. INJUNCTION & STAY OF FINAL RULE, 4:19-cv-04073-JST