# Exhibit A

**FURTHER SUPPLEMENTAL DECLARATION OF NICOLE RAMOS, BORDER RIGHTS PROJECT DIRECTOR, AL OTRO LADO**

I, Nicole Ramos, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a U.S.-licensed attorney practicing in the area of immigration law and human rights.  I am barred by the State of New York, and I am a former Assistant Federal Public Defender.  I am the Border Rights Project Director of Al Otro Lado.  In that capacity, I work with asylum seekers in Tijuana, Mexico.  I have been a resident of Tijuana for the last six years, and have been working with asylum seekers in Tijuana and accompanying them to U.S. ports of entry since December 2015.

2.      I am familiar with the new final rule ("Final Rule"), which seeks to deny asylum to anyone who enters, attempts to enter, or arrives in the United States through the U.S.-Mexico southern border without having applied for and been denied asylum in a country through which they transited, with limited exceptions.  I am also familiar with the previous interim final rule ("Interim Rule"), which is substantially similar and has been vacated.

**Al Otro Lado's Mission**

3.      Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles and San Diego, California, and Tijuana, Mexico.  Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to assist deportees, refugees, and other indigent immigrants with legal and social service needs.  We have a staff of 12 people in our Tijuana office.

4.      Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops at our offices in Tijuana, Mexico.  Our focus is on providing information about the

1

U.S. asylum system to migrants who wish to seek asylum in the United States.  As part of this representation, our staff accompany some asylum seekers who wish to present themselves to Customs and Border Protection ("CBP") officers at the San Ysidro Port of Entry, represent them at their credible/reasonable fear interviews before asylum officers with U.S. Citizenship and Immigration Services ("USCIS"), and assist them with their *pro se* I-589 asylum applications. On average, Al Otro Lado, our volunteer attorneys, and clinic students from law schools around the country provide representation to about 30 individuals per year in their credible fear interviews.  Since November of 2018, we have helped over 5,000 migrants prepare for their credible fear interviews.  Because we only encourage migrants to present themselves at a Port of Entry, prior to the Interim Rule, our service delivery model in Tijuana, our volunteer training program, and our materials are geared toward preparing asylum seekers for credible fear, rather than to meet the higher standard in reasonable fear interviews.  We also work with individuals returned to Mexico pending the resolution of their immigration proceedings pursuant to the Migrant Protection Protocols, and with individuals who are waiting in Mexico for the opportunity to apply for asylum in the United States but have been delayed in doing so because of the U.S. policy of metering migrants at ports of entry.

5.     To expand our capacity, Al Otro Lado frequently recruits and trains volunteers and pro bono attorneys to assist with legal orientation workshops in Tijuana, border accompaniment, and credible fear representation.  Since November 2018, we have trained and deployed over 3,000 volunteers.

6.    We also work with asylum seekers and other community advocates to document human rights violations by both U.S. and Mexican immigration authorities against asylum seekers.

7.    Al Otro Lado also has an office in San Diego, California, through which we provide representation to detained asylum seekers in Southern California.  Al Otro Lado's San Diego office hosts our Otay Mesa Release Project, focused on helping detained asylum seekers apply for bond or parole.

8.    Pursuant to the Trump Administration's "Zero Tolerance" and "Operation Streamline" policies, large numbers of migrants entering the United States without inspection are criminally prosecuted.  If asylum seekers enter without inspection near San Diego, they are usually detained at the Otay Mesa Detention Facility and represented by federal public defenders in their criminal proceedings.  The federal public defenders often refer these asylum seekers to Al Otro Lado for representation in their bond and/or removal proceedings.

9.    Generally, when asylum seekers who entered without inspection are referred to Al Otro Lado, our attorneys represent them in their bond proceedings.  Almost all these clients are released on bond.  If an individual goes to the Los Angeles area following release, our Los Angeles office continues to represent him or her before the Los Angeles immigration court.  If the client moves to another jurisdiction, Al Otro Lado connects the client with local pro bono counsel or a local nonprofit.

10.    The San Diego office also receives referrals from the Tijuana office.  Al Otro Lado staff in Tijuana identify particularly vulnerable asylum seekers, and we then work to prepare their parole applications.  Al Otro Lado's Otay Mesa Release Project is an established

3

partnership with Innovation Law Lab's Border X Project, through which we collaborate to locate sponsors, prepare parole and bond applications, and represent asylum seekers in their requests for release from custody.  Through this collaboration, we have helped obtain release for over 50 asylum seekers since January of 2019.  Al Otro Lado serves clients regardless of where they enter or plan to enter the United States.  Although most of our clients enter through California, our clients also travel to cross into the United States via the Texas border, because of the long waits to present at a port of entry in Tijuana.

**Impact of the Transit Ban on Al Otro Lado**

11.     Once the Final Rule is in effect, individuals who transit through a third country while en route to the United States and do not apply for asylum there are, once again, ineligible for asylum in the United States.   Because of the Interim Rule and the possibility that the Final Rule will reinstate the transit ban, Al Otro Lado has had to completely revamp its representation strategy, overhaul the materials we use to train volunteers and pro bono attorneys and the materials we have developed to assist asylum seekers out of our Tijuana office, and develop a whole new training program for our attorneys in our San Diego office.  The Final Rule will force Al Otro Lado to continue devoting resources to training or educating staff, volunteers, clients, and broader communities on the transit ban—resources that the organization could otherwise use to advance its mission of helping clients obtain asylum.  In addition, we would have to expend additional resources to brief eligibility issues, resulting in additional hearings and time spent on each case, and would have to apply for more complex and time-consuming forms of relief for our clients, thus limiting the number of clients we can represent.

4

12.      The virtually identical Interim Rule drained Al Otro Lado's resources when it was in effect.  Because of the drastic change in asylum eligibility, Al Otro Lado's staff had to train its staff and volunteers on the implications of the transit ban, revise training and education materials, and conduct numerous presentations in its client communities.  Because the Interim Rule has been vacated for more than six months, Al Otro Lado would have to repeat the staff training and community education process for the Final Rule.  A community education campaign for the Final Rule will be especially difficult to execute because community members will be confused by the whiplash of the Interim Rule being issued, enjoined, allowed to take effect, vacated, and now reinstated.

13.      The Final Rule, like the Interim Rule, will affect the majority of the individuals Al Otro Lado built its mission and programs to serve.  Approximately two-thirds of the individuals Al Otro Lado serves out of its Tijuana office transited through another country.  2,254 of Al Otro Lado's adult clients have already transited through a third country and entered the United States after July 16, 2019; all of those clients and all other family members with whom they migrated to the border would be impacted by the Final Rule.

14.      The Final Rule, like the Interim Rule, will continue to slow down our client intake process because of the time it takes to explain the transit policy to clients.  The complexity of the transit ban, combined with the Migrant Protection Protocols and the Title 42 policy, has caused intakes to take twice as much time as usual.  In my experience, explaining the transit ban is the most time-consuming because clients are astonished and dumbfounded by the requirement of seeking asylum in countries like Mexico or Guatemala.  Clients tend to protest strenuously that doing so is absurd for a variety of reasons and that the transit ban is nonsensical—Guatemala has

5

no asylum office, and they have never heard of anyone seeking asylum there; Mexico is too

dangerous because it has the same gangs (and sometimes the same gang members) as their home

country; Central Americans, Africans, and non-Spanish speaking clients suffer pervasive housing

discrimination in Mexico, even when Al Otro Lado guarantees rent payments to landlords; lack

of employment opportunities in Mexico is exacerbated by the Mexican asylum system's long

processing times; and clients are often easy targets for corrupt police officers and organized

crime due to their racial and linguistic differences.  Convincing the clients that none of those

common-sense considerations matter for purposes of the transit ban takes significant time.

Additionally, because we also prepare our clients for fear interviews and provide other legal

advice during intake, our attorneys have to expend more time explaining the difference between

asylum and withholding of removal, the practical difference between proving a 10% probability

and a 51% probability of persecution, and the difference between credible and reasonable fear.

If the Final Rule is not enjoined or vacated, Al Otro Lado will have to continue to devote

significant time explaining the transit ban policy to its clients, unnecessarily prolonging the

intake process and draining staff time.

15.     The Final Rule will also require us to divert resources away from our core

programs to litigate the eligibility bar in individual cases, as well as to pursue more complex and

time-consuming forms of relief.  The vast majority of our asylum-seeking clients who enter or

attempt to enter the United States at the southern border have immediate family members in their

countries of origin with whom they hope to reunify once they gain lawful status in the United

States.  Stripping these individuals of the ability to qualify for asylum would also eliminate their

ability to petition for their immediate family members, even if they ultimately win withholding

of removal or protection under the Convention Against Torture.  In many cases, the spouses and children left behind in the country of origin also face persecution, and our clients are anxious to win asylum so that they can remove their family members from dangerous situations.  Given our clients' goals, Al Otro Lado would have no choice but to vigorously litigate issues of asylum eligibility for any client who transited through another country and would otherwise be eligible for asylum.

16.     In addition, most of Al Otro Lado's asylum clients are families traveling with minor children.  Unlike asylum applications, withholding and CAT applications do not allow for a principal applicant to petition for derivative applicants such as children.  Thus, should they become ineligible for asylum, spouses and minor children could no longer be counted as derivatives in a single application.  Al Otro Lado would be forced to prepare separate cases for each family member, exponentially increasing the number of hours required to prepare the cases for a family unit.  This will require significant additional staff time to prepare and litigate each case, including preparing separate evidence and witnesses in each separate case.  Compared to asylum applications, withholding and CAT applications require meeting a higher evidentiary standard, and often require more time and greater legal resources.  Similarly, because the evidentiary standard for withholding and CAT is higher, these regulatory changes will also likely lead to a greater number of losses in immigration court, and a greater number of appeals filed by attorneys.

17.     The Final Rule also would jeopardize some of Al Otro Lado's most critical funding streams.  Currently, the California Department of Social Services ("CDSS") gives us funding at a fixed per-case rate to represent individuals in bond proceedings, which may no

7

longer be available to individuals subject to the Final Rule.  We also receive a fixed per-case rate to represent migrants in their removal cases, but this funding is limited to a small number of cases.  Even now, the funding received per full removal case does not cover the true cost of a complex asylum case that requires extensive briefing, expert testimony, and multiple hearings to litigate eligibility issues.  The Final Rule would make such cases even more challenging and labor-intensive.

18.     When the Interim Rule was in effect, although the funding remained fixed on a per-case basis, our attorneys had to devote significantly more hours and resources towards our clients' withholding of removal and Convention Against Torture claims, which were much harder to win but had to be pursued as the exclusive remedies for many of our clients.  As an example, for one of our clients who was persecuted in Honduras for being gay, it would have been much easier for her to apply for asylum, but because of the Interim Rule, we could only pursue withholding of removal, a more difficult to obtain and more limited form of relief.  Her attorney had to prepare her case to meet the higher ultimate burden for withholding, which required significantly more time and resources.  We have also had to assist over 100 asylum seekers with motions to reopen their proceedings in order to seek asylum once the Interim Rule was enjoined and vacated.  Due to the burdens caused by the Interim Rule, our attorneys had reduced caseloads in order to devote sufficient time to each client.

19.     Al Otro Lado is also harmed by the lack of a 60-day comment period before the Final Rule went into effect.  Due to the complexity of the policy and the strain on Al Otro Lado's resources in adjusting to the Interim Rule, Al Otro Lado did not have time to research,

investigate, and submit a separate comment concerning the impact of the policy on our client population and the reasons why the policy rationales are not justified.

**Many Asylum Seekers Cannot Access Protection in Mexico or Guatemala**

20.     Individuals who arrive at the southern border seeking protection in the United States through the asylum process are fleeing some of the most dangerous countries in the world.

21.     For many who reach the United States after transiting through Guatemala and/or Mexico, remaining in those countries and pursuing asylum there is not an option.

22.     Many of Al Otro Lado's non-Mexican clients face discrimination and persecution in Mexico, as well as in other countries through which they transited.  For example, Hondurans face significant persecution in Mexico based on their nationality.  Haitian and African migrants similarly face discrimination on the basis of national origin and race.  Lesbian, gay, bisexual, and transgender persons regularly are subject to discrimination and persecution in Guatemala and Mexico.

23.     Several people Al Otro Lado has served have suffered persecution or torture at the hands of Mexican officials, who turned them over to cartels, beat them, or extorted them.

24.     Al Otro Lado clients have been kidnapped, raped, assaulted, and murdered in Tijuana, which is one of the most dangerous cities in the world right now.  Migrants are particularly vulnerable to violence here.

25.     Central Americans fleeing gang violence will not be safe in Guatemala, as their persecutors are often able to find them there, given that travel between the Northern Triangle countries is virtually unrestricted and the reach of persecuting criminal networks is often transnational.

9

26.     COMAR, the Mexican asylum agency, is underfunded, understaffed, and overwhelmed.  Based on my experience, COMAR does not have sufficient resources to adequately process asylum seekers now, let alone additional asylum seekers forced to apply in Mexico because of the Final Rule.  The asylum system in Mexico is far less well developed than the asylum system in the United States.  It is difficult to access and unpredictable in its processing.

27.      Because COMAR does not have a meaningful presence north of Mexico City, it is very difficult for anyone in northern Mexico to apply for asylum in Mexico.

28.     Asylum seekers in Mexico are also vulnerable to being forced to return to their home countries by Mexican authorities.  Mexican authorities have deported asylum seekers back to their home countries even as they wait on a list in one of the northern border cities to apply for asylum in the United States.  Mexican authorities have also forced or coerced asylum seekers returned to Mexico pursuant to the Migrant Protection Protocols to return to their home countries.

29.     Many asylum seekers must transit through a third country before reaching the United States because they lack the resources or ability to travel directly to the United States.  For some, the danger they face in their home country compels them to leave without having had the time to gather the necessary resources to get a visa and secure a flight.  Other asylum seekers, particularly many Central Americans, do not have the financial means to travel to the United States except by land.  Some asylum seekers do not have passports and are unable to obtain them to fly directly to the United States, especially if they are fleeing imminent persecution from their own governments.

10

30.     Many of the asylum seekers Al Otro Lado serves have family and networks in the United States who can help them, but lack similar connections in Mexico.  Without such support, asylum seekers in Mexico may lack a safe place to stay and access to basic resources, like food and shelter.  Given these vulnerable conditions, Mexico is not a feasible alternative for many, especially those traveling with children.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:   January 20, 2021

Nicole Ramos

11