Exhibit B

**FURTHER SUPPLEMENTAL DECLARATION OF STEPHEN W. MANNING,**
**EXECUTIVE DIRECTOR, INNOVATION LAW LAB**

I, Stephen W. Manning, declare as follows:

1.      I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States.  I am over 18 and have personal knowledge of the facts described herein.

2.      I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA.  In 2015, I was awarded the AILA Founder Award as a person who had the most substantial impact on the field of immigration law or policy in relation to the Artesia Pro Bono Project and the Dilley Pro Bono Project.  In 2017, I was named the most innovative lawyer in North America by *Financial Times* for my work in creating these immigrant and refugee representation detention-based projects.

3.      I am the Executive Director of the Innovation Law Lab ("Law Lab"), a nonprofit that I founded to improve the legal rights of immigrants and refugees in the United States.  Law Lab has an office in Oakland, California, and has staff and offices from which we provide services in other locations around the United States, including: Portland and Eugene, Oregon; Atlanta, Georgia; San Diego, California; Gainesville, Florida; Chicago, Illinois; Chandler, Arizona; Seattle, Washington; and San Antonio and El Paso, Texas.  Law Lab's work is centered on providing representation to asylum seekers.

4.      I previously submitted two declarations in this matter.  *See East Bay Sanctuary Covenant v. Barr*, No. 3:19-cv-4073-JST (N.D. Cal.) ECF No. 3-4 (July 17, 2019); *id.*, ECF No. 57-2 (Aug. 19, 2019).  This declaration updates and supplements the information provided in my

previous declarations in light of the issuance of the Final Rule version of the asylum transit ban policy, set to take effect on January 19, 2021.

5.      In my role at Law Lab, I led the organizing of the Artesia Pro Bono Project in 2014 and the Dilley Pro Bono Project in 2015, which are detention-based projects that provided universal representation to detained families in rapid removal proceedings.  The Artesia Pro Bono Project provided representation to more than 700 women and children who were detained at the Artesia Family Residential Center in Artesia, New Mexico, including representation during the credible and reasonable fear screenings, applications for release, and merits adjudication on immigration relief.  The Artesia Pro Bono Project lasted six months and ended when the detention center in Artesia was closed in December 2014.  The Dilley Pro Bono Project, which continues to operate at the South Texas Family Residential Center, has been representing noncitizen asylum seekers during proceedings since its inception in 2015.  A related project operates at the Karnes Family Residential Center; together, both projects have represented over 100,000 individuals since their launch.  I also designed the model for the Southeast Immigrant Freedom Initiative, an initiative of the Southern Poverty Law Center in collaboration with Law Lab, to provide representation to adult noncitizens detained at immigration facilities in the Southeastern United States in 2017.

6.      In 2018, Law Lab mobilized around the civil detention of 123 asylum-seeking immigrant men at the Federal Correctional Institution Sheridan in Oregon ("FCI Sheridan").  Law Lab provided pro bono legal representation to every man in the Sheridan cohort who requested our representation.  In collaboration with almost 200 legal advocates and community members, Law Lab represented 80 men from 11 different countries.  Every individual represented by Law Lab was found to have a credible fear of persecution or torture; leading to, for most, the conclusion of

expedited removal proceedings, the initiation of immigration judge § 240 proceedings, and eligibility for release from detention.  All but three of our 80 clients were released from FCI Sheridan on bond or parole.  Law Lab has continued to represent, or facilitate pro bono representation, on the merits in the cases that remain before the Portland Immigration Court.

7.      As part of designing and scaling representation projects at detention centers, I have relied on data acquired during the different representation phases of immigration proceedings to make estimates about when and how long attorneys and other legal workers must spend interviewing, conferring, and consulting with clients.  My estimates form the basis of the representational models, which have proven to be very successful when measured by client outcomes, with most individuals prevailing in seeking relief.

8.      Law Lab's current asylum-related work includes the following programs.

9.      I designed and direct our pro bono representation project called the Centers of Excellence, which provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.  Through the Centers of Excellence, I direct representation projects in California, Georgia, New Mexico, North Carolina, Oregon, and Texas.  In Oregon, under my direction, approximately 150 pro bono lawyers have been trained on asylum and removal defense.  I also designed and lead coordination of the Equity Corps of Oregon, which is the region's first government-funded universal representation program.  I designed and directed a program called BorderX that uses technology and collaboration tools to provide support to legal service providers at immigrant detention centers.  BorderX currently serves clients detained at immigrant detention centers in Southern California, Texas, New Mexico, and Louisiana.  I designed BorderX so that remote attorneys and advocates—that is, attorneys and advocates who are unable to physically enter a detention center because of its

remoteness—can participate by telephone and through cloud-software to scale representation efficiently. In August 2019, we opened an office in El Paso, Texas as part of our membership in the El Paso Immigration Collaborative (EPIC), which provides legal services and representation to all asylum seekers detained at detention centers in the El Paso jurisdiction. In early 2020, we closed our program in Kansas City, Missouri.

10.     Innovation Law Lab also has played a central role in the development and piloting of the Equity Corps, Oregon's first universal representation program, which launched on October 1, 2018. Innovation Law Lab coordinates and reviews all case intake and provides technical and strategic support to partner nonprofit immigration legal service providers who represent immigrants in removal proceedings before the Portland Immigration Court. In July 2019, the Equity Corps received an additional two million dollars of funding that enabled expansion of services throughout the state of Oregon for a two-year period. The Equity Corps provides representation regardless of case type. A high number—likely close to 90 percent—of the Equity Corps's clients are people who are fleeing persecution, many of whom arrived to the United States recently. Every week we receive referrals and begin providing services to newly-arrived asylum seekers in the state of Oregon.

11.     In Georgia and Oregon, Law Lab conducts and supports legal services asylum workshops to assist people who have fled persecution in removal proceedings with legal advice, application preparation and filing. Since the onset of the COVID-19 pandemic, we have conducted these workshops remotely.

12.     Innovation Law Lab also has provided direct and support services for cases of people fleeing persecution who were forcibly returned to Mexico under the "Migrant Protection Protocols" (MPP) program. Because Mexican nationals cannot be subject to MPP, all of the cases

we have supported in this work are asylum cases where the applicant traveled or resided in a country other than their country of origin before seeking asylum in the United States.

13.     Law Lab also provides direct representation to persons applying for asylum both within and outside the Ninth Circuit.

14.     With the exception of Mexican nationals, all of the asylum-seeking clients Law Lab serves through these programs have traveled through a country other than their country of origin on their way to the United States.  A meaningful majority of the people we serve are nationals of the Northern Triangle countries of El Salvador, Honduras, and Guatemala; we also provide services to nationals of countries in Africa, South America, Asia, and Europe.  By necessity, these persons who have fled persecution have traveled through at least one other country, if not several, in order to seek asylum in the United States.  By statute, asylum can only be sought when physically present in the United States or arriving to the United States.  Traveling directly to the United States would require travel documents, a valid visa, and funds to pay for air or sea travel; our indigent clients do not have access to any of these.  In 2020, approximately 84 percent of client served by the EPIC program entered the United States after transiting through a third country.  Approximately 95 percent of non-EPIC clients served by our BorderX project in 2020 entered the United States after transiting through a third country.  And approximately two thirds of the nearly 1,0000 clients served in 2020 by our non-detained representation programs in Oregon, Atlanta, Charlotte, and Kansas City entered the United States after transiting through a third country.  We anticipate that similar proportions of asylum seekers we would serve through these programs in the future will also have transited through a third country.

15.     The majority of the asylum seekers served by Law Lab's programs also did not seek asylum in the countries through which they transited.  Our work with asylum seekers subject

to the MPP vividly illustrates why most asylum seekers are not safe in Mexico, Guatemala, or other countries through which they've traveled.  Asylum seekers who remain in Mexico under MPP have suffered kidnapping, rape, and extortion; many are homeless and lack the opportunity to work to support themselves.  The asylum systems in Mexico and Guatemala are not set up to fairly adjudicate asylum claims, and the countries' institutions are not sufficiently strong to provide protection from the harms that most asylum seekers are fleeing.  Many of the persecutors of Law Lab's clients have transnational reach; gangs work across Central American borders, and persecutors can often travel freely to find their victims in Mexico or other Central American countries.

16.     Because of Law Lab's organizational focus on asylum seekers, and the high percentage of people we serve who have transited through a country other than their country of nationality en route to the United States without seeking asylum in those countries, if the transit asylum ban Final Rule goes into effect, it will require us to divert our limited resources significantly.  The vast majority of the people we serve in Georgia, North Carolina, Oregon, Texas, New Mexico, California, and at the U.S.-Mexico border are asylum seekers.  The Final Rule would make a high percentage of the asylum seekers we serve entirely ineligible for asylum because they traveled through a third country before reaching the United States without seeking asylum there. As explained below, we saw this impact on asylum seekers we serve across our various program during the period that the previous Interim Final Rule version of the asylum transit ban was in effect following the Supreme Court stay in September 2019 until June 2020 when the interim rule was vacated.  Implementation of the Final Rule would require us to again rework the advice and guidance we provide in our legal services workshops and respond to a flood of inquiries and

uncertainty from the immigrant communities we serve regarding the attempt to change asylum law once more.

17.     The nationwide scope of Law Lab's asylum-related work means that only nationwide relief can remedy the harm that the Final Rule would cause to our mission and programs.  If the asylum transit ban went into effect in jurisdictions outside of the Ninth Circuit, there would be an immediate and significant detrimental effect on Law Lab's ability to serve clients and maintain its programs across the country.  Law Lab's programming has a national reach not only because of our diverse geographic locations, but also because we operate our programs collaboratively across program sites.  Law Lab's work is national not only in terms of program sites and direct representation of clients where necessary but also in the ways that our projects work together to provide high-quality resources to unrepresented asylum seekers, pro bono attorneys, and other representation projects.

18.     For example, Law Lab operates pro se asylum workshops in Atlanta, Georgia and Portland, Oregon.  These workshops are being operated remotely during the COVID-19 pandemic. The majority of persons served at these workshops are Central American asylum seekers who would be subject to the asylum transit ban.  Law Lab attorneys and accredited representatives coordinate and implement the workshops, and also directly provide some legal services and advice to immigrant attendees.  Our workshops in Atlanta and Portland almost always have attendees who have crossed the border both within and outside of the Ninth Circuit.  Our Atlanta project was the first to launch the asylum workshop concept, and templates and materials developed there are used across our other program sites.  If, for example, people fleeing persecution in Atlanta were subject to the asylum transit ban, while people fleeing persecution in Portland were not, Law Lab could no longer use synchronized materials across its asylum workshops.  If the Final Rule went into

effect in parts of the country, but not others, our asylum workshops would have to be meaningfully restructured in order to effectively serve persons who are subject to the Final Rule and persons who are not.

19.     Providing legal guidance and asylum application assistance to persons subject to the transit ban at these workshops would be a significant burden on Law Lab employee time and program operations.  Law Lab would have to spend additional time developing the facts and legal theories for asylum applicants subject to the Final Rule, as these applicants would be eligible only for withholding of removal and relief under the Convention Against Torture (CAT).  Withholding and CAT have a higher burden of proof than asylum, and these applications would require the development of entirely distinct and more in-depth legal analyses.  Law Lab staff supervise and train attorney and accredited representative volunteers at these workshops, and would have to devote significant time to re-training these volunteers on the new standards and how to screen for attendees who might be subject to the Final Rule.  Law Lab experienced this increased burden and diversion of resources in our workshop operations after the interim version of the asylum transit ban rule went into effect in September 2019.  Staff had to spend more time advising clients at workshops, including additional time spent on expanding questioning about individuals' travels through third countries.

20.     Additionally, most of the persons fleeing persecution who we serve at our workshops are in family units.  Often a nuclear family can file a single asylum application, with the spouse and minor children benefiting as derivatives.  But because withholding of removal and CAT do not allow derivative relief, every member of a family subject to the transit ban would have to file a separate application.  This would limit Law Lab's workshop capacity significantly—

7

instead of completing eight applications for eight families, for example, we might only have capacity to complete eight applications for two families with four members each.

21.    Through the Centers of Excellence, Law Lab places and mentors attorneys taking on pro bono cases across the country.  The asylum transit ban Final Rule would make a significant percentage of our new pro bono cases a great deal more complicated and will require us to reevaluate relief eligibility in all of the cases that we screen and mentor.  This will require, for each pro bono case, significant legal research and multiple strategy meetings with pro bono counsel. Clients ineligible for asylum due to the rule will only be eligible for withholding of removal or CAT relief, which have a higher standard of proof than asylum, do not allow for derivative applications, and are more time-consuming cases to handle.  Had the transit ban Interim Final Rule not been vacated in June 2020, we would have had to begin preparing pro bono attorneys for cases in which withholding of removal and CAT protection are the only possible relief from deportation. If the Final Rule is allowed to remain in effect, we will certainly have to work to prepare pro bono attorneys to present these more difficult and complicated cases, and the Centers of Excellence may begin to lose more cases.  We would then be forced to shift a significant portion of our resources towards mentoring pro bono attorneys on complicated appeals before the Board of Immigration Appeals and the circuit courts.

22.    Our BorderX program and the EPIC program will also suffer immediate and dramatic impacts from the Final Rule.  BorderX builds better systems for advocates working in immigrant detention centers, and, as a part of its mission, coordinates effective release strategies for noncitizens in detention.  Since the program's launch in October 2017, close to 100% of the noncitizens served have been asylum seekers, the majority of whom transited through a third country before arriving to the United States.  BorderX's release strategy is, in many ways,

dependent on a noncitizen's asylum eligibility, as release becomes possible only after passing a credible fear interview, which moves the asylum seeker out of expedited removal proceedings and into immigration judge § 240 or withholding proceedings.  The Final Rule, which would apply to credible fear screenings, would eliminate release eligibility for a significant percentage of clients of both BorderX and EPIC.  Pivoting to determine advocacy strategies for this group will take a significant amount of resources, and will divert our attention from the noncitizen population that remains eligible for asylum under the new rule and who will still remain in desperate need of the support of BorderX and EPIC.

23.    Our BorderX and EPIC programs would be significantly harmed if the Final Rule went into effect outside the Ninth Circuit.  BorderX works regularly in twelve immigrant detention centers, eleven of which are outside of the Ninth Circuit.  If the Final Rule were to go into effect outside of the Ninth Circuit, work in at least six of BorderX's program sites would significantly increase in difficulty, as release eligibility would be severely limited, if not eliminated, for many of our clients, and the program would have to develop alternative (and time consuming) release strategies for clients detained in those facilities.  That is because release eligibility turns to a significant degree on eligibility for asylum.  BorderX, like our other programs, would also have to change its templates, materials, and guidance to account for the different eligibility regimes that would govern clients based on place of entry to the United States and place of detention.  When the transit ban Interim Final Rule went into effect for a period in September 2019 before being vacated in June 2020, Law Lab had to adjust its resources, templates, instructional guides, and trainings, and training materials to adjust to the new policy, so that BorderX volunteers could properly advise clients and clients' sponsors and family members.  This meant that we had to pause other work and provide services to fewer people.  This also affected Law Lab's relationship with

several law schools where we trained students to provide free services to detained individuals. By the time we were able to resume these trainings with adapted materials, many students were no longer available to volunteer. As a result, detained individuals lost services our programs would have otherwise provided. Since the Interim Final Rule was vacated, we have re-adjusted our trainings and materials, and so our programs would have to again divert time and resources from client services to updating training and materials if the Final Rule is allowed to go into effect.

24.     Law Lab staff also began to see the other concrete detrimental impacts that this Final Rule would have on the BorderX and EPIC programs and the detained clients they serve during the period the Interim Final Rule was in effect. The impact of the Interim Final Rule was most acute in these programs, which serve detained individuals, because immigration proceedings move more quickly for those who are detained. During the time the Interim Final Rule was in effect, a number of clients sought assistance through Law Lab's BorderX and EPIC programs but could not seek asylum as a result of being subject to the Interim Final Rule. One such client, who I will refer to by his initials, M.E.A.A., was jailed in 2018 as a political dissident in his home country and his life is at risk from his nation's government. He traveled to Mexico in 2019, where he was detained. He was unable to apply for asylum in Mexico because he does not speak or write Spanish, and because he does not think Mexico would be a safe place for him to live. After being released from detention in Mexico, he was unable to pay for housing and all of his money and possessions were stolen. He spent six months living in a shelter in Ciudad Juarez before he was allowed to present himself at the United States border and seek asylum on September 21, 2019, after the Interim Final Rule was allowed to go into effect. Although he passed his screening interview with the asylum officer, Immigration and Customs Enforcement denied M.E.A.A. release from detention on the basis that he was ineligible for asylum under the Interim Final Rule.

Another client, who I will refer to as Y.S.L.V., is an indigenous Garifuna lesbian woman from Honduras who fled persecution on account of her race and sexual orientation. She was determined to be subject to the asylum transit ban Interim Final Rule while it was in effect and therefore ineligible for asylum.

25.     The transit ban Interim Final Rule made it more difficult for Law Lab staff to try to advise such asylum seekers who had transited through a third country. Assessing their cases was more complicated and Law Lab staff had to re-enforce our client agreement and the relevant educational materials that we shared with clients. We also had to update our training practices and materials for all staff and volunteers that speak directly with prospective clients in order to ensure that the language and content of how we discussed the impact of the interim rule would be consistent and accurate.

26.     Law Lab creates written materials and technology for use across our Centers of Excellence pro bono programs, our BorderX detention project, and other initiatives that serve people fleeing persecution throughout the United States. These materials include printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country. We have had to update our advisals, training materials, templates, and educational materials every time a new asylum rule is issued or vacated. If the Final Rule were to apply to people fleeing persecution outside of the Ninth Circuit, Law Lab would have to substantially revise its materials across programs, and create bifurcated resources going forward.

27.     Thousands of individuals rely on Law Lab's systems. The new rule will require Law Lab to deploy expensive and limited engineering resources to recode its software to create new analytical modeling. Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other

resources that are used around the country.  The Final Rule will require Law Lab to substantially revise this material and create new learning engagements and materials.  This endeavor would represent such a substantial burden that it could cause Law Lab to cease most of its pro bono activities.

28.     Again, we began to see the negative impacts this Final Rule will have on our operations upon the issuance of the asylum transit ban Interim Final Rule.  Before it was vacated, that interim version of the transit ban rule impeded our development and rollout of Asylum Assistant, a new claim-development tool for asylum cases.  Because of the uncertainty around the transit ban, we were forced to hold back development and public release of the tool.  We could not build this uncertainty into the Asylum Assistant, and were instead forced to orient people to the possibility that they might or might not be eligible for asylum at all, depending on what happened with the transit ban.  We had been granted funds to build the beta version of the tool, and we planned to get more grant money to launch it.  However, the asylum transit ban caused the project to stall at the beta stage and prevented us from getting additional grant money for the launch.

29.     Though Law Lab focuses its work on building effective and scalable representation programs, we also engage in direct representation cases when necessary to serve our mission, as with our work at FCI Sheridan.  Law Lab continues to directly represent clients who were previously detained at FCI Sheridan, and also directly represents clients in jurisdictions outside of the Ninth Circuit.  If the asylum transit ban were to go into effect outside the Ninth Circuit, our limited direct representation work would become significantly more complicated and burdensome. Additionally, the clients served by Law Lab's programs do not complete their immigration case in a single jurisdiction.  It is possible that a client would move seamlessly between our program sites—and thus between different judicial circuits—as their case progresses.  A person fleeing

persecution might receive a legal orientation and services at a workshop supported by Law Lab in Tijuana, Mexico; obtain release on bond or parole from a detention center in Texas with assistance from our BorderX project; and complete their asylum application at a Law Lab-run legal workshop in Atlanta, Georgia.  Many persons served by Law Lab programs move between jurisdictions throughout the lifetime of their asylum case as well.  In my experience, such movement between jurisdictions is common for asylum seekers.

30.     Law Lab's direct representation programs within the Ninth Circuit will also be adversely impacted if the asylum transit ban rule goes into effect in other jurisdictions.  In Oregon, Equity Corps' asylum clients enter the United States to seek protection at or in between ports of entry across the U.S.-Mexico border, and a significant percentage of these clients first entered the United States in Texas or New Mexico.  If the Final Rule were to go into effect outside the Ninth Circuit, Equity Corps might have to shift significant resources towards representation of clients who entered the country in Texas or New Mexico and are subject to the transit ban.  These resources would include both the devotion of additional time to withholding of removal and CAT applications for these clients, who would not be eligible for asylum, and also re-working of case templates, resources, and materials to account for eligibility differences based on place of entry. Thus, when the Interim Final Rule version of the asylum transit ban was in effect, we had to suspend use of materials developed to distribute to pro se individuals seeking asylum in Immigration Court, and provide caveats in other materials.  Additionally, Lab Law staff had to spend more time advising clients, inquiring about clients' travel through third countries, screening for trafficking that might qualify the client for an exception to the transit ban, and strategizing during the preparation and filing of their asylum applications.  These same disruptions in services and diversion of resources would occur again now if the Final Rule takes effect.  This resource

13

diversion would negatively affect other clients within the Equity Corps program, and also would harm the program as a whole, which could be forced to serve fewer people overall because of the increased time burden required for a subset of cases.

31. Additionally, Law Lab's work creating accountability within the immigration system will also be significantly hindered due to the impact of the Final Rule. We are currently engaged in research and policy advocacy around improving due process and access to justice in the asylum process and removal proceedings. Given the centrality of the asylum process to our organizational work and mission, the Final Rule will force us to turn our attention from the many pressing issues we are currently investigating towards mitigating the effects of this new policy on our existing programs and clients.

32. In sum, every single one of Law Lab's programs will be significantly affected, irrevocably damaged, and immediately diverted by the asylum transit ban Final Rule, and these harms will occur unless the Final Rule is prevented from taking effect nationwide. Allowing the Final Rule to go into effect outside the Ninth Circuit would not only harm our multiple programs in place outside the Ninth Circuit, but would also harm our organization's ability to employ a unified approach to our strategic programs. To fully remedy the harms the Final Rule will inflict on Law Lab, relief against the Final Rule must be nationwide, not just in the Ninth Circuit.

33. Finally, Law Lab is also harmed by the lack of an adequate public comment period before this Final Rule was issued. The interim final rule was issued on July 16, 2019 with only a thirty-day comment period. Along with the other Plaintiffs and the organizations serving as our counsel in this action, Law Lab submitted a four-page joint comment on the interim final rule on the final day of that comment period. That joint comment addressed some of the most serious legal flaws in the interim rule and some of the most egregious defects in its reasoning. Had an

adequate opportunity been provided to comment on the asylum transit ban rule before it went into effect, Law Lab would have employed a data-driven, well-researched approach to explain why the policy set forth in that interim final rule—and now being reissued in the current Final Rule—will not achieve the objectives it has set forth, as well as comment on the quality of the data proffered in support of the rule.  Law Lab would have explained how the rule would harm the population Law Lab is dedicated to serving, and would have included in its comments more detail concerning the numerous reasons why many asylum seekers must transit through third countries before reaching the United States and are unable to seek and receive protection in those countries.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 19th day of January, 2021.

Stephen W. Manning, OSB #013373