Exhibit C

**FURTHER SUPPLEMENTAL DECLARATION OF CAMILA ALVAREZ, LEGAL
DIRECTOR, CENTRAL AMERICAN RESOURCE CENTER OF CALIFORNIA**

I, Camila Alvarez, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Legal Director for the Central American Resource Center
("CARECEN") of California, headquartered in Los Angeles, California.  CARECEN is a
non-profit organization that offers low-cost immigration legal services, community
education programs, and advocacy and organizing to achieve fair and more inclusive
immigration, education, and labor laws and policies.

2.      CARECEN is a 501(c)(3) nonprofit corporation, incorporated in Los Angeles,
California.  Our headquarters is located at 2845 W. Seventh St., Los Angeles CA 90005.  We
also have permanent offices in Van Nuys and San Bernardino, California.

3.      CARECEN's mission is to empower Central Americans and all immigrants by
defending human and civil rights, working for social and economic justice and promoting
cultural diversity.  Since its founding in 1983, when thousands of Central Americans fled the
brutality of civil war, CARECEN has worked to change unjust immigration laws, provide lawful
status for immigrants, and foster community activism on issues such as education reform,
workers' and immigrants' rights, economic justice and community strengthening.

4.      As part of its mission, CARECEN (1) provides legal immigration services; (2)
educates immigrant communities; (3) organizes and advocates on behalf of better immigration
policies.  *First*, CARECEN provides high-quality, affordable immigration legal services to
clients throughout Southern California.  These services include assistance in applying for
naturalization, Temporary Protected Status ("TPS"), removal defense, relief under the
Violence Against Women Act ("VAWA"), U and T Visas, adjustment of status applications,
and affirmative asylum cases.  We provide immigration services at our headquarters in

1

central Los Angeles, permanent offices in the San Fernando Valley (Van Nuys) and San Bernardino, as well as over 20 offsite locations throughout Los Angeles and Orange Counties, where we offer immigration counseling and legal services on a weekly, bi-weekly or monthly basis. *Second,* CARECEN educates immigrants through a number of programs for children, youth, and adults. These initiatives include citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities. We regularly provide information on changes in immigration law to the community at our offices and through presentations at various locations around Southern California; these sessions are temporarily being conducted remotely due to the COVID-19 pandemic. We operate a day laborer center that provides information and job skills training to workers. We also operate a parent and youth center, and provide academic enrichment and college preparation support to youth. *Third*, CARECEN helps organize immigrant communities to advocate on behalf of their rights on specific policy items. Advocacy activities include legislator visits, forums to educate the community on civic issues, and marches in support of particular policy changes.

5.     The CARECEN legal department was created over three decades ago for the purpose of providing legal advice and representation to asylum seekers who fled violence in Central America. Over the years, we have provided legal counseling and pro se asylum application preparation assistance to thousands of individuals, while providing direct representation to hundreds. As a key part of its mission, CARECEN continues to provide affirmative and defensive representation for asylum seekers. We currently are representing nearly 200 individuals who are applying for asylum. We are litigating a majority of these cases in removal proceedings. We also represent several individuals with "affirmative" asylum

applications—i.e. persons not in removal proceedings and filed with the United States

Citizenship and Immigration Services ("USCIS").  All of our current asylum applicant clients are

individuals who have entered the United States through the southern border and have transited

through at least one other country en route from their country of origin.

6.     CARECEN serves clients regardless of where they entered the United States.

Although CARECEN is based in California, most of CARECEN's clients originally crossed the

southern border elsewhere, including in Texas.  In my experience, it is quite common for asylum

seekers to enter the country at one place along the southern border and travel to other parts of the

country before applying for asylum.  For example, asylum seekers who present at a port of entry

or are apprehended near the border may be detained by the government and transferred to a

location far away from their point of entry.  As a result, those asylum seekers may have a

credible fear interview in a different state from the one they originally entered.  Asylum seekers

who are placed in removal proceedings after passing credible fear and then released on bond or

parole may travel to any part of the country and request to have their removal proceedings

transferred there.  Thus, an asylum seeker may, for example, enter the U.S. through Texas, have

her credible fear interview in New Jersey, and ultimately apply for asylum through her removal

proceedings in California.  In my experience, our clients who are unaccompanied minors are

particularly likely to have spent time in multiple shelters in different parts of the country before

applying for asylum.  Affirmative asylum applicants likewise may enter in one state and then

apply for asylum in another.

7.     Funding for our asylum work is based in large part on the number of cases we

handle per year, and the number of cases we anticipate serving.  For instance, the California

Department of Social Services is one of our largest funding sources for our organization.  The

state sets a flat rate for representing a client.  We receive $2,000 for representing a client in an affirmative application process with USCIS, $5,000 to $6,500 for representing a non-detained client in removal proceedings, and $6,500 to $8,000 for representing a detained client in removal proceedings.  This rate does not cover the full cost of our services, nor does it vary depending on the amount of time spent on the case or whether an appeal is taken.  For other sources of funding for our asylum work, such as the LA Justice Fund, we have already committed to a target number of cases handled per attorney.

8.      We currently have approximately 11 staff members who handle affirmative and defensive asylum cases.  These staff members carry out legal intakes, work with clients to fill out paperwork, collect relevant evidence for their case, prepare clients for interviews and hearings, draft legal arguments, and represent clients in affirmative asylum interviews and in removal proceedings.  Our legal staff have also prepared prospective asylum, withholding of removal, and Convention Against Torture applicants for reasonable and credible fear interviews, as well as represented individuals in those interviews.

9.      The Department of Justice ("DOJ") and Department of Homeland Security ("DHS") final rule ("Final Rule") published on December 17, 2020, will seriously frustrate CARECEN's mission, divert organizational resources, and cause irreparable harm to the organization.

10.      CARECEN suffered those harms when the agencies' substantially similar, interim final rule ("Interim Rule") was in effect, and the organization will suffer those harms again when the Final Rule goes into effect.

11.      First, CARECEN's mission as it relates to affirmative asylum applicants and asylum applicants in removal proceedings would be severely compromised.  One hundred

percent of CARECEN's current clients seeking asylum transited through a third country en route to the United States, approximately 25% of whom entered the country after July 16, 2019. Accordingly, many of CARECEN's current clients—and virtually all of its clients in the future—would be subjected to the Final Rule. The organization would be unable to assist those clients—including some of its current clients who entered after July 16, 2019—in submitting their asylum applications affirmatively to USCIS, because they would no longer be eligible. Instead, CARECEN would only be able to assist individuals in removal proceedings, which is much more resource-intensive than representing someone who is applying affirmatively. Additionally, the Final Rule would also negatively impact CARECEN's representation of individuals who seek asylum while in removal proceedings. For example, CARECEN currently represents well over 100 clients who are applying for asylum in removal proceedings and who transited through another country without seeking asylum there; approximately 25% of those clients entered the United States after July 16, 2019. CARECEN would not be able to represent these clients in their asylum claims because they would no longer be eligible under the Final Rule. Based on the characteristics of our current client population, going forward, virtually none of our clients would be eligible for asylum and so we would not be able to represent them in their removal proceedings to apply for asylum. CARECEN's mission is to provide representation to asylum seekers, regardless of their manner of entry or how they traveled to the United States. CARECEN cannot, consistent with its mission, cherry pick and serve only those few individuals who entered the U.S. without transiting through a third country. It would also be difficult as a practical matter for CARECEN to verify in the intake process when and how an individual traveled to the United States, and enter into an attorney-client relationship accordingly. Doing so at the intake stage would be time-consuming and resource-intensive and CARECEN would not

be compensated for this additional screening work, which would strain the organization's resources.

12.     Instead, CARECEN would be forced to focus exclusively on withholding and CAT claims for our client base.  Compared to asylum applications, withholding and CAT applications require meeting a higher evidentiary standard, and require significantly more time and greater legal resources to be successful.  Similarly, because the evidentiary standard for withholding and CAT is higher, these regulatory changes will also likely lead to a greater number of losses in immigration court, and a greater number of appeals that must be filed by attorneys.

13.     Moreover, unlike asylum applications, withholding and CAT applications do not allow for a principal applicant to petition for derivative applicants such as children.  Therefore, even if CARECEN is successful in meeting the higher evidentiary standards, CARECEN would still have to pursue a greater number of those applications for withholding and CAT when it represents family units, some of which have up to six or more members.  This would require significant additional staff time preparing and litigating each case, including preparing separate evidence and putting on witnesses for each .

14.     The additional staff time required to handle withholding of removal and CAT cases would require diverting resources from other critical areas of work.  Our other legal service units, including our Survivors of Violence Unit (representing VAWA, U Visa and T Visa applicants), are already working at capacity.  Diverting the time of experienced attorneys in these units to provide support to individuals applying for withholding and CAT would place enormous strain on these critical programs, particularly because it would require additional training resources for staff.

15.     CARECEN will also have to expend significant resources to adjust to a changed regulatory landscape, and significantly reduce the number of clients we can assist as a result. CARECEN provides immigration information to the community through presentations.  We also operate a hotline and our receptionists provide general information to the immigrant community. The reinstatement of the transit ban in the form of this Final Rule after the Interim Rule was vacated will create considerable confusion in the immigrant communities we serve, generating significant inquiries at our offices, on our hotline, and requiring workshops to address and explain the changes to the community.  Accordingly, CARECEN will have to devote staff time and organizational resources to educating and advising our clients, prospective clients, and the immigrant community.

16.     The Final Rule will also put a financial strain on the organization.  As mentioned above, for much of its work in removal proceedings, CARECEN receives a flat fee regardless of the time spent on a particular case.  Because withholding and CAT cases are more resource intensive than asylum cases, precluding nearly all CARECEN asylum-seeking clients from applying for asylum would create a greater financial loss in these cases.  In other words, we would likely receive the same funding, but have to devote more hours per case.  We would likely have to devote significant additional resources toward appealing cases for clients who are found not to meet the higher legal standards for withholding and CAT, but would have otherwise been eligible for asylum.  The same attorneys who provide affirmative and defensive asylum representation would represent these clients on appeal.  This would significantly limit their availability to represent other clients.  As mentioned above, CARECEN has made certain commitments to one of our funders regarding a target number of cases that we will complete per attorney.  Because of the additional resources that would be required to represent our asylum-

seeking clients in withholding and/or CAT claims rather than asylum, the Final Rule undermines our ability to meet these commitments, potentially jeopardizing our future funding.

17.     When the practically-identical Interim Rule was in effect, the aforementioned harms quickly materialized.

18.     The Interim Rule caused CARECEN to divert significant resources and prevented it from fulfilling its mission and assisting more clients.  First, due to the Interim Rule, CARECEN's attorneys had to reduce their caseloads so that they could devote sufficient time and resources towards advancing the more stringent withholding and CAT claims, which were the exclusive avenues for relief for many of our clients.  As one example, CARECEN represented a Ukrainian husband and wife in their removal proceedings.  Absent the transit ban, CARECEN would have pursued an asylum claim for one spouse, with the other as a derivative on the application.  But because they were made ineligible for asylum by the Interim Rule, CARECEN had to expend additional resources, including representing the wife on the appeal of the denial of her withholding claim, before ultimately obtaining asylum and derivative relief for both spouses after the Interim Rule was vacated.

19.     Because of the resource drain caused by the Interim Rule, CARECEN had to stop nearly all intake of new clients so that it could focus on existing, resource-intensive withholding and CAT cases.  While the Interim Rule was in effect, CARECEN was rejecting 10 to 20 callers seeking representation per month, twice the typical number of rejections.

20.     The inability to intake more cases meant that CARECEN could not obtain additional funding, which, as explained above, is primarily provided on a per-case basis. Because of the reduced intake, CARECEN could not meet the case volume required by one of its largest grants.  That has harmed CARECEN's reputation and standing with the grant-provider,

and CARECEN is concerned that it will receive less funding in the next grant cycle.  The Interim Rule also meant that CARECEN could not obtain funding to file affirmative asylum claims for several clients who entered after the Interim Rule's effective date.

21.     Additionally, due to the Interim Rule, CARECEN had to spend significant time calling and informing all impacted clients and preparing community presentations and other education efforts about the transit ban policy.  Because the Interim Rule has been vacated for more than six months, CARECEN will now have to repeat this process for the Final Rule.  For clients who have suffered the whiplash of a rapidly changing regulatory environment, the move from the Interim Rule to its vacatur to its effective reinstatement as the Final Rule will be especially jarring.  Counseling these clients about their options will therefore be especially time consuming.

22.     The shifting legal landscape caused by the Interim Rule also undermined client relationships, which has forced CARECEN attorneys to devote significantly more time to reestablishing their clients' trust.  For many clients, but especially those who are children in detention, the loss of asylum as a form of relief was not only frustrating but often incomprehensible.  Due to the Interim Rule, client meetings became much more time-intensive, as attorneys had to explain the impact of the Interim Rule while also responding to the emotional toll of the negative news.  For example, one of our young clients initially refused to file an asylum claim after the Interim Rule was vacated because we had previously advised him that he was ineligible under that rule.  The client initially did not believe our attorney who attempted to explain the vacatur; he was reluctant to amend his application, thinking that the immigration judge would not understand the reason for the amendment.  The Final Rule will retrigger and

exacerbate that dynamic, forcing CARECEN to explain yet another reversal and again lose hard-earned credibility with its clients.

23.     If the Final Rule takes effect, all of those irreparable injuries will undoubtedly recur.

24.     Like the Interim Rule, the Final Rule also cuts at the heart of the founding mission and identity of CARECEN as an organization.  As discussed above, the organization was established in 1983 for the purpose of providing legal advice and representation to asylum seekers fleeing violence in Central America.  We continue to provide services to the families of this same group of individuals today, including naturalization, family-based immigration, and other benefits.  However, nearly all of the individuals who the organization was founded to serve would have been denied access to asylum if, at the time, individuals who transited through a third country were barred, as these Central American asylum seekers largely traveled by land to reach the southern border of the United States.

25.     CARECEN is also harmed by the lack of a 60-day comment period before the Final Rule went into effect.  Due to the complexity of the policy and the strain on CARECEN's resources in adjusting to the Interim Rule, CARECEN did not have time to research, investigate, and submit more detailed comments concerning the impact of the policy and the reasons why it is unlawful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on:   ____January 20, 2021____

Camila Alvarez

11