# Exhibit D

**FURTHER SUPPLEMENTAL DECLARATION OF MICHAEL SMITH, REFUGEE RIGHTS PROGRAM DIRECTOR, EAST BAY SANCTUARY COVENANT**

I, Michael Smith, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

2. I am the Refugee Rights Program Director of the East Bay Sanctuary Covenant ("EBSC"). I helped start EBSC's affirmative asylum program in 1992, and have been with the organization since. In my current role, I oversee our affirmative asylum practice, which includes over 500 cases currently pending before the U.S. Citizenship and Immigration Services ("USCIS").

3. EBSC is a 50l(c)(3) nonprofit corporation, incorporated in 1996 in Berkeley, California. Our office is located at 2362 Bancroft Way, Berkeley, California, 94704.

4. I previously submitted two declarations in this matter. *See East Bay Sanctuary Covenant v. Barr*, No. 3:19-cv-4073-JST (N.D. Cal.), ECF No. 3-2 (July 17, 2019); *id.*, ECF No. 57-3 (Aug. 19, 2019). This declaration updates and supplements the information provided in my previous declarations in light of the issuance of the Final Rule version of the asylum transit ban policy, set to take effect on January 19, 2021.

**<u>EBSC's mission and activities</u>**

5. EBSC is part of the National Sanctuary Movement founded in 1982 to assist refugees fleeing the terrible civil wars and violence in El Salvador and Guatemala.

6. EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping war, terror, political persecution, intolerance, exploitation, and other expressions of violence. In particular, one of EBSC's critical missions is

to assist individuals fleeing persecution in applying for asylum and similar humanitarian relief in the United States. EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

7. As part of its mission, EBSC provides legal and social services to immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including applicants in California, Washington, and Oregon. We offer our clients legal assistance in applying for affirmative asylum, Deferred Action for Childhood Arrivals ("DACA"), Temporary Protective Status ("TPS"), Special Immigrant Juvenile Status ("SIJS"), permanent residency, and naturalization. We also provide social services, including regular workshops on integrating new immigrants into the United States, English as a second language tutoring program, and one-on-one assistance in finding housing, employment, or educational opportunities.

8. Also, as part of its mission, EBSC helps train professionals to assist immigrant and refugee communities. For example, we partner with law schools to provide legal training opportunities to law students and attorneys looking to get experience in immigration and asylum law.

**EBSC's affirmative asylum program**

9. EBSC's affirmative asylum program is a key part of the organization's mission. It is our most important program and accounts for nearly half of our organizational budget. Its success is the reason that EBSC has been able to grow and develop other programs. Affirmative asylum applications are those that are filed with USCIS rather than in immigration court, on behalf of applicants who are not in removal proceedings. Individuals not in removal proceedings cannot apply for other forms of relief like Withholding of Removal or protection under the Convention against Torture, which only an Immigration Judge can adjudicate.

10. Our program is among the largest in the country and provides legal services to individuals applying for affirmative asylum within the San Francisco Asylum Office jurisdiction. Since the affirmative asylum program began in 1992, we have filed nearly 5,000 cases. Over 97.5% of adjudicated asylum applications have been granted. Currently, we handle about 20 intakes per week, and have over 500 pending cases before USCIS.

11. A significant percentage of the clients in our affirmative asylum program enter the country through the southern land border after transiting through a third country en route to seek asylum in the United States. This was true of approximately half of the affirmative asylum applications we filed in 2018, almost one third of the applications we filed in 2019, and about one quarter of the applications we filed in 2020. We expect that we would continue to have a substantial proportion of clients for whom this will be true in the future, at least if the transit ban Final Rule is not in effect. Most of these individuals are fleeing persecution in their home countries in Central America.

12. We work mainly with low-income and poor refugees and immigrants from around the world in the jurisdiction of the San Francisco Asylum Office. We work especially closely with vulnerable populations in the immigrant and refugee community, including victims of gender-based violence and domestic violence, indigenous Guatemalans, LGBT (lesbian, gay, bi-sexual, transgender) individuals, and those suffering from HIV/AIDS, as well as unaccompanied children.

13. Funding for our affirmative asylum program is based in part on the number of cases we handle per year, and the number of cases we anticipate serving. For instance, one of our main grants is currently from the California Department of Social Services. In applying for this grant, we generally rely on the number of affirmative asylum applications we filed in the preceding year. We filed 213 affirmatively asylum applications in 2020. This was down from the 296

affirmative asylum applications we filed in 2019. Around one fourth of these applications filed in 2020 were for people who entered the U.S. through the southern land border after transiting through a third country, whereas such clients had accounted for approximately half of the applications we filed in 2018 and almost a third of applications we filed in 2019. We currently receive $2,000 for every asylum case we handle, which does not cover the full cost of our services.

14. Currently, we have 15 staff members who work primarily in our affirmative asylum program. These include 4 attorneys, 1 BIA accredited representative, and 10 support or administrative staff. These individuals carry out legal intakes, work with clients to fill out paperwork, help clients collect relevant evidence for their case, prepare clients for interviews, and represent clients in affirmative asylum interviews with USCIS officers. We also work with and train law students to represent clients in affirmative asylum cases. Since 1994, for instance, we have worked with U.C. Berkeley School of Law. Currently, we help oversee the law school's California Asylum Representation Clinic (CARC), which represents approximately 40 affirmative asylum cases per year. We also have second- and third-year law students from other schools perform externships, and have a summer internship program. Law students are an important part of our work because they are able to represent clients for much of the affirmative asylum process, under the supervision of one of our attorneys. Law students allow us to significantly increase the number of cases we can process.

**The transit ban Final Rule will harm EBSC's mission and affirmative asylum program**

15. The new Final Rule barring individuals from asylum who enter through the southern land border after transiting through a third country will significantly harm EBSC as an organization, seriously frustrate EBSC's mission, and divert organizational resources. As the result of the Final Rule, the organization will have to expend significant resources to adjust to a

new regulatory landscape and substantially reduce its affirmative asylum practice. This would result in a significant restricting of our organization and the overall number of clients we can serve, and a diversion of resources from our current practice. The Final Rule will also directly frustrate EBSC's mission of providing assistance and support to individuals fleeing persecution and violence, especially through our affirmative asylum program.

16. As noted above, providing legal services to affirmative asylum applicants, regardless of their manner or means of entry is a key part EBSC's mission and core activities. Since the Final Rule makes individuals who enter through the southern land border after transiting through a third country unable to obtain asylum, EBSC would be unable to continue much of the work it does in this regard. Because as many as one third to one half of our affirmative asylum clients in recent years entered the U.S. through the southern land border after passing through another country first, EBSC would no longer be able to serve a substantial proportion of our client base going forward.

17. Our affirmative asylum program was impacted when the interim version of the transit ban rule went into effect between September 2019 and June 2020, and that experience made clear the grave harms that our asylum program will suffer if the Final Rule goes into effect now. In Fall 2019, we began to receive new asylum clients who had entered on or after the July 16, 2019 effective date of the rule, and so were rendered ineligible for asylum once the interim rule took effect that September. We accepted them as clients, but if we had filed affirmative asylum applications for them while the interim rule was in effect, they would have been placed into removal proceedings without having a chance to have their asylum claims heard by the asylum office. Ultimately, we were able to hold off on filing those clients' asylum applications until after the D.C. District Court's decision vacating the rule in June 2020, such that the interim rule no longer barred their eligibility. Because the interim rule was in effect for only nine

months, and was vacated less than one year after it was originally issued on July 16, 2019, we were able to file applications for all of these clients before their one-year filing deadlines.

18. Additionally, the number of affirmative asylum applications EBSC filed dropped by approximately 30 percent from 2019 to 2020. Moreover, the percentage of our clients who had transited through a third country also dropped, both in 2019 (when the interim rule was first announced and was ultimately in effect for three months) and in 2020 (when the interim rule was in effect for six months). I believe that the transit ban interim rule accounts for at least part of the significant drop-off in total affirmative asylum cases and also for the decrease in the number of clients who have transited a third country. I believe that potential clients from Central America who were subject to the interim transit rule heard about the policy, and were too frightened or discouraged to seek legal assistance in seeking asylum.

19. Going forward, an ever-greater percentage of new clients and potential clients who transited a third country en route to the United States will have entered the United States on or after July 16, 2019—which remains the entry cut-off under the Final Rule—and so will be ineligible for asylum if the Final Rule is in effect. This means that, unless we drastically revamp our mission and operations to represent individuals in removal proceedings in immigration court, we will not be able to serve either these existing clients or virtually any new clients from countries other than Mexico, as almost none of them will be eligible to receive asylum via affirmative applications.

20. If the Final Rule goes into effect, we will either have to significantly cut our affirmative asylum program and staff, or dramatically overhaul our program to provide types of assistance we are not currently equipped or trained to provide. EBSC does not currently have capacity to handle applications for humanitarian relief in the removal context. We handle defensive asylum cases only in the rare situation in which one of our clients who initially applies

affirmatively is then referred to immigration court by the asylum office. We currently have just fourteen defensive asylum cases on our docket, three of which are being handled by the pro bono department of a private firm. Shifting from an almost exclusively affirmative-asylum-based model to representing much larger numbers of individuals in removal cases would be extremely resource-intensive, and would involve developing such a program, developing training materials, identifying a new client base, significant training of existing staff, and hiring different staff experienced in practicing before the immigration court. In addition, much of our affirmative asylum work is done by volunteers—law students and non-practicing attorneys who prepare applications under supervision of EBSC attorneys—but these volunteers would not be able to appear independently in immigration court.

21. Even if EBSC were to attempt to overhaul our service delivery model to represent asylum seekers in removal proceedings, it would be extremely resource-intensive to represent these individuals on claims for withholding of removal and/or protection under the Convention Against Torture instead of asylum. That is in part because such claims are subject to a stricter standard and do not allow for derivative claims for certain close family members as with asylum applications. Instead, EBSC would have to prepare a separate application for each individual. Given the intensive resources required, if we were forced to shift our model to do increased removal cases, EBSC would be able to serve only a fraction of the individuals that we currently represent through our affirmative asylum program.

22. In addition, we would have to divert significant resources because of the Final Rule. This would include devoting staff time and organizational resources to understanding the Final Rule's impact on the communities we serve, and subsequently educating and advising our staff, clients, and prospective clients accordingly. Our operations were previously impacted by such resource diversion following the release of the interim rule in July 2019, and during the period

when that interim rule was in effect between September 2019 and June 2020. We had to regularly spend time during staff meetings to discussion and staff training on the impact of the transit ban policy, which diverted staff time and resources from advancing other operations and case planning. We also had to expend extensive amounts of staff time and resources analyzing whether it was safe to go forward with filing asylum applications in several cases, based on whether those clients could be deemed subject to the transit ban interim rule. It would be extremely burdensome to once again try to prepare our staff and client communities to navigate such a transformative change in asylum law that impacts as many as half of the clients we normally serve. Educating the communities we serve about the Final Rule would require significant resources and take away from our other existing programs. To properly counsel new prospective clients who seek our affirmative asylum services going forward, we would need to invest resources in training multiple intake staff not only to screen for asylum eligibility based on the Final Rule, but to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.

23. The Final Rule also jeopardizes EBSC's funding streams. As explained above, under our California Department of Social Services grant, we currently receive $2,000 for every affirmative asylum case we file. If the organization is no longer able to handle affirmative cases for individuals who transited through a third country en route to the southern border, we will likely face a marked decrease in our budget. If the Final Rule goes into effect, we can expect to lose one third to one half of this funding each year. In recent years, we have filed between 200 and 300 affirmative asylum cases per year. Since the Final Rule will prevent us from filing affirmatively asylum applications for as much as one third to one half of our normal client base, it will likely deprive of us of approximately $100,000 per year in state per-case funding.

24. The grant that funds EBSC's work is only to serve people who make under 250% of

the poverty guidelines and EBSC's mission is to serve poor asylum seekers from all around the world who have few resources and cannot afford attorneys. In practice, many of the few noncitizens who will remain eligible to apply affirmatively for asylum under this rule are those who have visas of some kind and can travel to the United States by air. For the most part, individuals who obtain visas and travel without transiting through a third country fall outside of the poorer population it is EBSC's mission to serve, and they likely do not meet the income requirements for EBSC's services.

25. In addition, as part of its mission, EBSC supervises and trains law students to prepare and represent clients in affirmative cases. As a result of the Final Rule, however, we would be unable to continue training law students to handle these types of cases, or would have to substantially reduce our training program. This would frustrate our mission of helping to train legal professionals to assist individuals fleeing persecution and violence.

**<u>Nationwide relief is needed to prevent serious harm to EBSC's programs and funding</u>**

26. The above significant harms that the Final Rule will inflict on EBSC cannot be prevented by relief that is specific to just one jurisdiction, such as the state of California or the geographic area of the Ninth Circuit. It is part of EBSC's mission to serve clients regardless of where or how they entered the United States. Accordingly, EBSC's services are not limited to clients who entered the United States in one of the states in the Ninth Circuit. A sizable portion of EBSC's clients enter the United States outside the Ninth Circuit's geographic boundaries and then end up in California and apply for asylum. For example, approximately 20 percent of affirmative asylum applications EBSC filed in 2019 were on behalf of clients who entered the United States in Texas or New Mexico.

27. EBSC's funding streams as to clients who enter outside the Ninth Circuit will also be jeopardized absent nationwide relief. If we are no longer able to handle affirmative asylum

cases for individuals who transit through a third country en route to the southern border and enter outside the Ninth Circuit, we likely will face a marked decrease in our budget due to the loss of the $2,000 in state funding we receive for each case. Indeed, if the Final Rule is allowed to go into effect outside the Ninth Circuit for the rest of 2021, I estimate that EBSC could lose approximately $40,000 this year under the terms of our state grant.

28. Relief that prevents the Final Rule from taking effect in the Ninth Circuit but allows it to go into effect elsewhere would impose a significant burden on EBSC because we may either have to totally shut down our services to individuals who enter outside the Ninth Circuit—a significant part of our client base—or bifurcate our operations, providing different services to those subject to the Final Rule and those not subject to it. Bifurcating our operations in this way will be extremely cumbersome, as we will have to make the changes discussed above (for clients subject to the Final Rule), in addition to maintaining our current operations (for those not subject to it). Doing so will pose a significant strain on our staff and resources.

29. Finally, EBSC is also harmed by the issuance of the Final Rule without an adequate period in which to submit comments and criticisms of the interim final rule. That interim rule was issued on July 16, 2019 with a 30-day comment period that lasted only until August 15, 2019. Together with our fellow Plaintiffs and with the legal organizations that serve as our counsel in this action, EBSC submitted a four-page joint comment on the interim final rule on the final day of that comment period. Our joint comment addressed some of the most serious legal flaws in the interim rule and some of the most egregious defects in its reasoning. However, with a longer public comment period as appropriate for a rule of this magnitude, EBSC would have individually submitted a more detailed comment spelling out the harms that the interim rule would cause to our organization, our clients, similar organizations serving asylum seekers, and the communities that we serve.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Michael Smith
Executed this 19th day of January, 2021