Lee Gelernt*
Omar C. Jadwat*
Anand Balakrishnan*
Ming Cheung**
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*
*mcheung@aclu.org*

Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Morgan Russell (SBN 296137)
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*mrussell@aclu.org*

*Attorneys for Plaintiffs* (Additional counsel listed on following page)

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

East Bay Sanctuary Covenant; Al Otro Lado; Innovation Law Lab; and Central American Resource Center in Los Angeles,

      *Plaintiffs*,

      v.

Jeffrey A. Rosen, Acting Attorney General, in his official capacity; U.S. Department of Justice; James McHenry, Director of the Executive Office for Immigration Review, in his official capacity; the Executive Office for Immigration Review; Peter Gaynor, Acting Secretary of Homeland Security, in his official capacity; U.S. Department of Homeland Security; Kenneth T. Cuccinelli, Acting Director of the U.S. Citizenship and Immigration Services, in his official capacity; U.S. Citizenship and Immigration Services; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection, in his official capacity; U.S. Customs and Border Protection; Tae D. Johnson, Senior Official Performing the Duties of the Director of Immigration and Customs Enforcement, in his official capacity; Immigration and Customs Enforcement; Chad Mizelle, Senior Official Performing the Duties of the General Counsel for Homeland Security, in his official capacity,

      *Defendants*.

Case No.: 4:19-cv-04073-JST

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

2   Melissa Crow*
    SOUTHERN POVERTY LAW CENTER
3   1101 17th Street, NW Suite 705
    Washington, D.C. 20036
4   T: (202) 355-4471
    F: (404) 221-5857
5   melissa.crow@splcenter.org

6

7

8

9

10

11

12

13

14

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
T: (212) 614-6464
F: (212) 614-6499
bazmy@ccrjustice.org
aguisado@ccrjustice.org
gschwarz@ccrjustice.org

Vasudha Talla (SBN 316219)
Angélica Salceda (SBN 296152)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
vtalla@aclunc.org
asalceda@aclunc.org

15   *Attorneys for Plaintiffs*

16   *Admitted pro hac vice*
17   **Pro hac vice application forthcoming*

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.  Defendants have re-imposed an unlawful ban on asylum that was previously enjoined or vacated by two separate federal courts, including this Court.  The new final rule ("Final Rule"), which is set to take effect one day before the end of the current administration, suffers from the same defects as the previously enjoined and vacated interim final rule ("Interim Rule").  Both iterations of the policy violate this nation's asylum laws by denying asylum to anyone who enters, attempts to enter, or arrives in the United States through the southern border without having applied for and been denied asylum in a country through which they transited, with limited exceptions.  Neither iteration contains a reasoned explanation, and both were promulgated in violation of the Administrative Procedure Act's ("APA") notice-and-comment requirements and are contrary to law. Furthermore, the Final Rule was published less than 60 days before its effective date, contrary to the Congressional Review Act ("CRA"), and was issued by unlawfully appointed Department of Homeland Security ("DHS") officials; the Final Rule must therefore be vacated and enjoined on those additional grounds.

2.  The United States has a longstanding commitment under domestic and international law to protecting people fleeing persecution from further harm.

3.  The Immigration and Nationality Act reflects Congress's carefully considered balance between effectuating our broad, historic commitment to international humanitarian law principles in the context of our asylum system and ensuring fairness and efficiency in the process.  In crafting our asylum laws, Congress sought to implement the principles in the 1951 Refugee Convention, which was designed to avoid the horrors visited on refugees around World War II.

4.  As part of our nation's commitment to the protection of people fleeing persecution and consistent with our international obligations, it is longstanding federal law that merely transiting through a third country is not a basis to categorically deny asylum to refugees who arrive at our shores.

5.      Specifically, Congress expressly provided in the Immigration and Nationality Act ("INA") that a noncitizen is ineligible for asylum in the United States only if she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi). The concept of firm resettlement—which involves far more than a mere transitory relationship with a third country—dates back to international agreements crafted after World War II, and takes into account the ties an individual fleeing persecution formed with another country and his or her particular ability to enjoy safety and legal protection there.

6.      Moreover, Congress expressly spoke to when an asylum seeker may be removed to a third country and required to seek protection there: only where the United States and that country have entered into a bilateral or multilateral agreement, the removal is pursuant to that agreement, and there is a determination that the asylum seeker would not face persecution and "would have access to a full and fair procedure for determining a claim to asylum" in that country. 8 U.S.C. § 1158(a)(2)(A).

7.      Indeed, Congress made clear that noncitizens may apply for asylum regardless of where they enter the United States, "whether or not at a designated port of arrival." 8 U.S.C. § 1158(a)(1). All asylum seekers coming from a country other than a country contiguous to the United States who enter between ports of arrival necessarily transited through another country before reaching the southern border. Congress therefore guaranteed that they, too, should be able to seek asylum free of any categorical restriction based on their route to the United States.

8.      Together, these provisions illustrate the careful balance Congress struck between protecting vulnerable individuals from harm and sharing the burdens of asylum processing with other countries in which safety and fair processing can be assured and are appropriate, and its decision that only in specific narrow circumstances could a noncitizen's transit or even residence in a third country justify a denial of protection in the United States.

9.      Despite Congress's clear commands, on July 16, 2019, then-Attorney General, William Barr, and the then-purported Acting Secretary of DHS, Kevin McAleenan, promulgated an interim final rule ("Interim Rule") providing that noncitizens who transit through another country prior to reaching the southern border of the United States are ineligible for asylum here.  The Interim Rule, which took effect on July 16, 2019, has only three narrow exceptions, for those who applied for protection in a transit country and were denied it in a final judgment; who meet the definition of a "victim of severe form of trafficking in persons"; or who transited only through countries that are not parties to the 1951 Convention on the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the Convention Against Torture.  Mexico, which adjoins the southern border of the United States, is a party to the 1951 Refugee Convention, the 1967 Refugee Protocol, and the Convention Against Torture.

10.     The Interim Rule took effect immediately, without following the APA's notice-and-comment requirements.

11.     Both the Ninth Circuit and this Court subsequently held that the Interim Rule should be preliminarily enjoined as arbitrary and capricious and contrary to law.  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 857-58 (9th Cir. 2020); *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 930-31 (N.D. Cal. 2019).  Defendants' petition for rehearing en banc is currently pending in the Ninth Circuit.  Prior to the Ninth Circuit's decision, the U.S. Supreme Court stayed this Court's injunction pending appeal without opining on the merits, *Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3, 3 (2019).

12.     On June 30, 2020, Judge Timothy J. Kelly on the U.S. District Court for the District of Columbia vacated the Interim Rule nationwide because the agencies failed to comply with the notice-and-comment requirement of the APA.  *Capital Area Immigrants' Rights Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 57, 60 (D.D.C. 2020).  Although the government has appealed the

decision vacating the Interim Rule, it did not seek a stay of that ruling and the Interim Rule is thus currently not in effect nationwide.

13.     On December 17, 2020, then-Attorney General Barr and then-Acting Secretary of Homeland Security, Chad Wolf, published the Final Rule, which is practically identical to the Interim Rule enjoined by this Court and the Ninth Circuit and vacated by Judge Kelly in the District of Columbia.  *See* 85 Fed. Reg. 82,260, 82,262.  The Final Rule is set to take effect on January 19, 2021.

14.     The Final Rule purports—but fails—to comply with the APA's notice-and-comment requirements.  *See* 85 Fed. Reg. at 82,261.  Although the Final Rule regards the Interim Rule as a notice of proposed rulemaking for notice-and-comment purposes, the Interim Rule was issued by McAleenan, who was then unlawfully serving as Acting DHS Secretary, rendering the Interim Rule (and therefore the Final Rule) without force and effect.  The agencies also unlawfully limited the comment period to 30 days, frustrating Plaintiffs' and the public's efforts to fully address the new and complex policy.

15.     The Final Rule also violates the Congressional Review Act, which requires all major rules be published at least 60 days before they take effect.

16.     Like the Interim Rule, the Final Rule bars virtually every noncitizen fleeing persecution from obtaining asylum in the United States if they passed through another country on their way here, no matter the conditions or purpose of their journey through that country or their prospect of protection, rights, or permanent legal status in that country.  Accordingly, anyone fleeing persecution from the ongoing humanitarian crisis in the countries that constitute the Northern Triangle who does not apply for protection while en route—no matter how reasonable that decision—will be categorically denied the opportunity to seek asylum in the United States and likely forced to return to countries that are rife with danger and violence.  The Final Rule is a part of a continued, unlawful effort to significantly undermine, if not virtually repeal, the U.S. asylum system

at the southern border, and cruelly closes our doors to refugees fleeing persecution, forcing them to return to harm.

17.   Like the Interim Rule, the Final Rule directly violates Congress's clear requirement that for a noncitizen to be denied asylum because of his or her relationship with a third country, the noncitizen had to be firmly resettled in that third country or subject to a safe third country agreement, as well as Congress's requirement that asylum cannot be categorically denied based on an asylum seeker's route to the United States.  It is also arbitrary and capricious.

18.   Additionally, the Final Rule was approved and signed, respectively, by two DHS officials who were unlawfully serving in an acting capacity, former Acting Secretary Wolf and Acting General Counsel Chad Mizelle.

19.   Because Wolf was not lawfully Acting DHS Secretary, the Final Rule is contrary to law for that reason as well.

20.   Although Wolf purported to delegate the authority to sign and publish the Final Rule to Defendant Mizelle, he lacked the authority to do so and, in any event, Mizelle also has been unlawfully performing his role as Acting DHS General Counsel.

21.   The unlawful tenures of Wolf and Mizelle are independent reasons why the Final Rule is contrary to law and must be set aside.

22.   Plaintiffs accordingly seek a declaration that Defendants' actions violate the INA, the Federal Vacancies Reform Act ("FVRA"), the Homeland Security Act ("HSA"), the Appointments Clause, the CRA, and the APA, and an order vacating and enjoining the Final Rule.

## JURISDICTION AND VENUE

23.   This case arises under the APA, 5 U.S.C. § 701, *et seq.*, the FVRA, 5 U.S.C. § 3345, *et seq.*, the HSA, 6 U.S.C. § 111, *et seq.*, the INA, 8 U.S.C. § 1101, *et seq.*, the CRA, 5 U.S.C. § 801, *et seq.*, and the Appointments Clause of the United States Constitution, U.S. Const., Art. II, § 2, cl. 2. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

5

24.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are agencies of the United States and officers of the United States acting in their official capacity and 1) at least one plaintiff resides in this district; and/or 2) a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

25.     Plaintiff East Bay Sanctuary Covenant ("EBSC") is a nonprofit organization incorporated in California.  EBSC's main office is in Berkeley, California.

26.     EBSC was founded in 1982 to assist refugees fleeing the civil wars and violence in El Salvador and Guatemala.  EBSC's mission is to offer sanctuary, support, community organizing assistance, advocacy, and legal services to people escaping political persecution, terror, war, intolerance, exploitation, and other violence.  In particular, one of EBSC's critical missions is to assist individuals fleeing persecution in applying for asylum in the United States.  EBSC also trains and mentors law students and attorneys to help clients apply for asylum.

27.     Plaintiff Al Otro Lado is a nonprofit, nonpartisan organization established in 2014 and incorporated in California.

28.     Al Otro Lado is a legal services organization that serves indigent deportees, migrants, refugees, and their families, and operates primarily in Southern California, and Tijuana, Mexico.  Al Otro Lado's mission is to coordinate and provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings; to seek redress for civil rights violations; and to provide assistance with other legal and social service needs.

29.     Plaintiff Innovation Law Lab is a nonprofit organization that has projects in multiple states, including an office in Oakland, California.

30.     Innovation Law Lab seeks to advance the legal rights of immigrants and refugees in the United States, with a focus on providing and facilitating representation to asylum seekers.

31.     Plaintiff Central American Resource Center ("CARECEN") is a nonprofit organization incorporated in California.

32.     CARECEN's mission is to empower Central Americans and all immigrants by defending human and civil rights, working for social and economic justice and promoting cultural diversity.  CARECEN offers low-cost immigration legal services; community education programs; and advocacy and organizing to achieve fair and more inclusive immigration, education, and labor laws and policies in Los Angeles.  A central part of CARECEN's mission is to provide legal counseling and representation to asylum seekers.

33.     Defendant Jeffrey A. Rosen is the Acting Attorney General of the United States.  He is sued in his official capacity.  In that capacity, he issued the interim final rule challenged in this suit.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

34.     Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

35.     Defendant James McHenry is the Director of the Executive Office for Immigration Review ("EOIR").  He is sued in his official capacity.

36.     Defendant EOIR is the sub-agency of DOJ that, through its immigration judges, conducts limited review of negative credible fear determinations.

37.     Defendant Peter Gaynor[1] is the Acting Secretary of Homeland Security.  He is sued in his official capacity.  In that capacity, he directs each of the component agencies within the Department of Homeland Security.  In his official capacity, Defendant Gaynor is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103, and is empowered to grant asylum and other immigration benefits.

---

[1] By listing Defendants and their formal titles here and throughout this Complaint, Plaintiffs do not concede that these officers are lawfully serving in those capacities.

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT, 4:19-cv-04073

38.     Defendant DHS is a cabinet-level department of the United States federal government.  Its components include U.S. Citizenship and Immigration Services ("USCIS"), Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

39.     Defendant Kenneth T. Cuccinelli is the Acting Director of USCIS.  He is sued in his official capacity.

40.     Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals who apply for asylum.

41.     Defendant Mark A. Morgan is the Acting Commissioner of CBP.  He is sued in his official capacity.

42.     Defendant CBP is the sub-agency of DHS that is responsible for the initial processing and detention of noncitizens who are apprehended near the U.S. border or who present themselves at ports of entry.

43.     Defendant Tae D. Johnson is the Senior Official Performing the Duties of the ICE Director.  He is sued in his official capacity.

44.     Defendant ICE is the sub-agency of DHS that is responsible for carrying out removal orders and overseeing immigration detention.

45.     Defendant Chad Mizelle is the Senior Official Performing the Duties of the General Counsel for Homeland Security.  He is sued in his official capacity.

## BACKGROUND

**The U.S. Asylum System**

46.     Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of any one of five protected grounds: race, religion, nationality, political opinion, or membership in a particular social group.  8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A).  Withholding of removal also offers protection to individuals targeted on account

of one of the five grounds, but it requires an applicant to show that such persecution is more likely than not—a much higher standard of proof than that needed for asylum.

47. Congress also provided asylees with certain benefits that are critical to the noncitizen's safety and ability to successfully transition to a life free from persecution. *See* 8 U.S.C. §§ 1159(b) (ability to adjust to the status of a lawful permanent resident); 1427 (ability to become a United States citizen after being lawfully admitted for permanent residence). The spouse and children of a person granted asylum are likewise eligible for asylum. 8 U.S.C. § 1158(b)(3). These benefits are not available with certain other forms of relief from removal, like withholding of removal.

48. There are three principal ways for an individual to seek asylum:

49. First, where a noncitizen is not in any kind of removal proceedings, his or her application is "affirmative." *See* 8 C.F.R. §§208.2(a), 208.9. He or she files an application with USCIS, and has an interview with an asylum officer.

50. Second, a noncitizen in ordinary removal proceedings, *see* 8 U.S.C. § 1229a, may apply for asylum as a form of relief from removal, 8 C.F.R. § 208.2(b). These applications are referred to as "defensive" asylum applications.

51. Third, Congress established an alternative process, "expedited removal," applicable to certain noncitizens who are arriving at ports of entry or apprehended after entering without inspection. *See* 8 U.S.C. § 1225(b)(1); *see also Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) (expedited removal applicable to those who entered without inspection and are apprehended within 14 days of entry and 100 miles of the border).

52. As part of the expedited removal system, a noncitizen who expresses a fear of return to his or her home country is entitled to a "credible fear" screening interview. 8 U.S.C. § 1225(b)(1)(B). If the screening officer finds a "significant possibility" that the individual "could

establish eligibility for asylum," he or she is placed in regular removal proceedings and may apply

for asylum.  *Id.*

**U.S. Law on Asylum Seekers and Third Countries**

53.     Federal law provides several forms of protection for individuals fleeing persecution

and torture.  These forms of protection include asylum, 8 U.S.C. § 1158; withholding of removal, 8

U.S.C. § 1231(b)(3); and protection under the Convention Against Torture, *see* Foreign Affairs

Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, §

2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

54.     The modern asylum system was established by the Refugee Act of 1980, Pub. L. 96-

212, 94 Stat. 102, which was incorporated into the INA.  The Act reflects "one of the oldest themes

in America's history—welcoming homeless refugees to our shores," and "gives statutory meaning to

our national commitment to human rights and humanitarian concerns."  Sen. Rep. No. 256, 96th

Cong., 1st Sess. 1 (1979), *reprinted in* U.S. Code Cong. and Admin. News 141, 141.

55.     The statutory provisions governing asylum represent an effort by Congress to bring

the United States into compliance with its international obligations under the 1951 Refugee

Convention and the 1967 Protocol.

56.     It is obvious and well understood that asylum seekers often pass through third

countries on their way to seeking refuge in the United States.  Accordingly, in crafting the statutory

provisions governing asylum, Congress took care to ensure that noncitizens within our country or at

the border would be able to seek asylum even if they transited through another country to reach the

United States.

57.     8 U.S.C. § 1158(a)(1) provides: "Any alien who is physically present in the United

States or who arrives in the United States (whether or not at a designated port of arrival and

including an alien who is brought to the United States after having been interdicted in international

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT, 4:19-cv-04073

or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  Congress thus was clear that entering the United States at or between ports of arrival is not a basis to categorically deny asylum to refugees.  In so providing, Congress recognized that many asylum seekers would transit through another country before reaching the United States.  That is because, except for Mexicans arriving at the southern border and Canadians arriving at the northern border, virtually all asylum seekers arriving between ports of arrival at a land border necessarily transit through at least one other country before reaching the United States.  In guaranteeing that entering the United States at or between ports of arrival could not be a basis for categorically denying asylum, Congress also guaranteed that merely transiting through another country to reach the United States could not be a categorical barrier either.

58.    Congress also spoke directly to the circumstances when a noncitizen may be deemed ineligible for asylum based on his or her relationship with a third country.  8 U.S.C. § 1158(b)(2)(A) specifically provides that a noncitizen shall be ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  The plain text of the statute, agency regulations, and case law have long made clear that firm resettlement requires far more than merely transiting through another country.

59.    Under international law, firm resettlement requires more than transiting through a third country.  For example, the 1951 United Nations Convention Relating to the Status of Refugees provides that it shall not apply to a person who "acquired a new nationality, and enjoys the protection of the country of his new nationality" or "is recognized by the competent authorities of the country in which he has taken residence as having the rights and obligations which are attached to the possession of the nationality of that country."  Art. 1, §§ C(3), E, adopted July 28, 1951, 189 U.N.T.S. 150.

60.     In 1980, the former Immigration and Naturalization Service ("INS") issued interim regulations providing that a noncitizen would be considered firmly resettled "if he was offered resident status, citizenship, or some other type of permanent resettlement by another nation and traveled to and entered that nation as a consequence of his flight from persecution."  8 C.F.R. § 208.14 (1981).  The regulations further provided for an exception if the asylum applicant established "that the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of asylum/refuge that he was not in fact resettled."  *Id.* Officers were to consider "the type of housing, whether permanent or temporary, made available to the refugee, the types and extent of employment available to the refugee, and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges (such as travel documentation, education, public relief, or naturalization) available to others resident in the country."  *Id.*

61.     The Attorney General amended the firm resettlement regulations in 1991.  The definition of firm resettlement provided in those regulations is substantially the same as the current firm resettlement regulations set out at 8 C.F.R. §§ 208.15, 1208.15.  The 1991 regulation provided that a noncitizen would be "considered to be firmly resettled if, prior to arrival in the United States, he entered into another nation with, or while in that nation received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless" he could establish that "his entry into that nation was a necessary consequence of his flight from persecution, that he remained in that nation only as long as was necessary to arrange onward travel, and that he did not establish significant ties in that nation" or that "the conditions of his residence in that nation were so substantially and consciously restricted by the authority of the country of refuge that he was not in fact resettled."  8 C.F.R. § 208.15 (revised Jan. 1, 1991).  The regulation directed that the asylum officer and/or immigration judge undertake an individualized inquiry and consider the following factors: "the conditions under which other residents of the country live, the type of housing made

12

available to the refugee, whether permanent or temporary, the types and extent of employment

available to the refugee, and the extent to which the refugee received permission to hold property

and to enjoy other rights and privileges, such as travel documentation including a right of entry

and/or reentry, education, public relief, or naturalization, ordinarily available to others resident in the

country." *Id.*

62.     Congress then adopted the current firm resettlement bar, 8 U.S.C.

§ 1158(b)(2)(A)(vi), in 1996, when it amended the INA in the Illegal Immigration Reform and

Immigrant Responsibility Act.  In so doing, it codified the regulatory definition of "firm

resettlement."

63.     The implementing regulation on firm resettlement was finalized in 2000, and is

substantively identical to the 1991 version.[2]  It provides: "An alien is considered to be firmly

resettled if, prior to arrival in the United States, he or she entered into another country with, or while

in that country received, an offer of permanent resident status, citizenship, or some other type of

permanent resettlement unless he or she establishes: (a) That his or her entry into that country was a

necessary consequence of his or her flight from persecution, that he or she remained in that country

only as long as was necessary to arrange onward travel, and that he or she did not establish

significant ties in that country; or (b) That the conditions of his or her residence in that country were

so substantially and consciously restricted by the authority of the country of refuge that he or she

was not in fact resettled. In making his or her determination, the asylum officer or immigration judge

shall consider the conditions under which other residents of the country live; the type of housing,

whether permanent or temporary, made available to the refugee; the types and extent of employment

available to the refugee; and the extent to which the refugee received permission to hold property

---

[2] Although the Trump administration recently attempted to alter the firm resettlement definition
through a separate rulemaking, 85 Fed. Reg. 80274, 80282-83, that rule has been preliminarily
enjoined, *Pangea Legal Services v. U.S. Dep't of Homeland Security*, No. 20-CV-09253-JD, 2021
WL 75756, at *7 (N.D. Cal. Jan. 8, 2021). The 2000 regulatory definition thus remains operative.

13

and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country."

64.     Furthermore, Congress also spoke directly to the circumstances when noncitizens may be returned to a third country to have their asylum claims processed there.  8 U.S.C. § 1158(a)(2)(A) provides that the Attorney General may do so only when he or she "determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States."

65.     These statutory provisions governing asylum and a noncitizen's relationship to or opportunity to apply for asylum in a third country, including 8 U.S.C. §§ 1158(a)(1), (b)(2)(A), and (b)(2)(A)(vi), represent a carefully crafted effort by Congress to satisfy its domestic and international obligations to protect those fleeing persecution and torture while also taking account of the need to share the burden of protecting asylum seekers with those countries capable of offering safety and full and fair asylum proceedings.

66.     Our immigration laws track international humanitarian law, under which protection of an individual fleeing persecution is paramount and individuals may not be required to seek protection in a country where they lack a genuine guarantee of safety and access to a functioning procedure, even if they transited through that country.

67.     The 1951 Refugee Convention and the 1967 Protocol do not require refugees to apply for protection in the first country where it could have been sought and do not require refugees to be returned to a country that was crossed in transit.

68.     The United Nations High Commissioner for Refugees ("UNHCR") has consistently issued guidance on the "safe third country" concept, noting that the "primary responsibility to provide protection rests with the State where asylum is sought."  Asylum should not be refused "solely on the ground that it could be sought from another State," and an asylum-seeker should not be required "to seek asylum in a country with which he has not established any relevant links." UNHCR's analysis provides significant guidance for courts on issues of refugee law.

69.     UNHCR has also explained that the mere fact that a country is a party to the 1951 Convention and/or its 1967 Protocol does not allow one to be required to seek asylum in that country.

70.     Consistent with this long-standing guidance, UNHCR has publicly stated that the transit ban at issue here jeopardizes the right to *non-refoulement* and ignores the lack of effective international protection in transit countries.  *See* UNHCR Deeply Concerned About New U.S. Asylum Restrictions (July 15, 2019), https://www.unhcr.org/en-us/news/press/2019/7/5d2cdf114/unhcr-deeply-concerned-new-asylum-restrictions.html.

**The Interim Final Rule**

71.     On July 16, 2019, William Barr, in his former role as Attorney General, and Kevin McAleenan, in his former role as Acting Secretary of Homeland Security, promulgated an interim final rule pursuant to 8 U.S.C. § 1158(b)(2)(C), which provides that the Attorney General may "by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum," and 8 U.S.C. § 1158(d)(5)(B), which provides that the Attorney

General may "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter."

72.     The Interim Rule rendered ineligible for asylum noncitizens who transit through another country before arriving in the United States, with extremely limited exceptions.

73.     Specifically, the Interim Rule provided that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after" the effective date of the Interim Rule "after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States," shall be found ineligible for asylum unless one of three conditions is met: (1) "The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;" (2) "The alien demonstrates that he or she satisfies the definition of 'victim of a severe form of trafficking in persons' provided in 8 C.F.R. 214.11;" or (3) "The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees, the 1967 Protocol Relating to the Status of Refugees, or the United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment."

74.     Under the Interim Rule, noncitizens subject to expedited removal who seek protection would be screened by an asylum officer.  The asylum officer would determine whether the noncitizen was subject to the bar set out in the Interim Rule.  If the asylum officer determines that the noncitizen was subject to the bar, the asylum officer would deny asylum and then apply the reasonable-fear standard, rather than the credible-fear asylum standard, to assess the noncitizen's claims for statutory withholding of removal and Convention Against Torture protection.  A noncitizen who passed the reasonable-fear screening would be placed in removal proceedings where

16

they would be permitted to apply for withholding and/or Convention Against Torture protection.  A noncitizen could seek review of the asylum officer's determination that he or she was subject to the eligibility bar before an immigration judge.  If the immigration judge affirmed the determination that the bar applies, and that the noncitizen had failed to meet the reasonable fear standard, the applicant would be subject to removal without any opportunity for judicial review.

75.     The APA generally requires a period of public notice and comment on proposed regulations to ensure that agency actions are transparent, lawful, and appropriately vetted.  But Defendants issued the Interim Rule without following this statutory obligation.  Instead, Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and the 30-day waiting period that is required even where notice and comment are not, 5 U.S.C. § 553(d).  They also invoked the "foreign affairs" exception to those procedures.  5 U.S.C. § 553(a)(1).

76.     Both this Court and the Ninth Circuit have held that the Interim Rule should be preliminarily enjoined because Plaintiffs were likely to succeed in showing that the Interim Rule was contrary to law and arbitrary and capricious.  *E. Bay*, 964 F.3d at 857-58; *E. Bay*, 385 F. Supp. 3d at 930-31.

77.     Both this Court and the Ninth Circuit found that the Interim Rule was likely inconsistent with 8 U.S.C. § 1158, in light of the paramount concern for safety evidenced in the firm-resettlement (§ 1158(b)(2)(A)(vi)) and safe-third-country bars (§ 1158(a)(2)(A)).  *E. Bay*, 964 F.3d at 846-49 ("A critical component of both bars is the requirement that the alien's 'safe option' be genuinely safe."); *E. Bay*, 385 F. Supp. 3d at 944-45 ("By contrast, the Rule does virtually nothing to ensure that a third country is a 'safe option.'").

78.     Both the Ninth Circuit and this Court held that the Interim Rule was likely arbitrary and capricious because (1) the agencies' conclusion that Mexico provides a safe option is contradicted by the record and fails to address evidence that Mexico is unsafe for asylum seekers, (2)

17

the agencies failed to justify the assumption that a noncitizen who failed to apply for asylum in a third country is unlikely to have a meritorious asylum claim, and (3) the agencies failed to adequately consider the effect of the Interim Rule on unaccompanied minors. *E. Bay*, 964 F.3d at 849-50; *see also E. Bay*, 385 F. Supp. 3d at 951-57.

79.     On June 30, 2020, Judge Timothy J. Kelly on the U.S. District Court for the District of Columbia rejected the agencies' arguments for bypassing notice-and-comment procedures, granted the plaintiffs' motions for summary judgment, and vacated the Interim Rule on that basis. *CAIR*, 471 F. Supp. 3d at 57, 60.

**Issuance of the Nearly Identical Final Rule**

80.     On December 17, 2020, then-Acting Secretary of Homeland Security Chad Wolf and former Attorney General William Barr issued the Final Rule, which is virtually identical to the Interim Rule.

81.     The Final Rule purports to comply with notice-and-comment requirements by responding to public comments submitted within 30 days of the publication of the Interim Rule.  85 Fed. Reg. at 82,261.

82.     The Final Rule makes only minor changes that fail to address any of the fatal defects in the Interim Rule as identified by the Ninth Circuit and this Court and as alleged by Plaintiffs.  *See id.* at 82,262.

83.     Specifically, the Final Rule provides that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States," shall be found ineligible for asylum unless one of three conditions is met: (1) "The alien demonstrates that he or she applied for protection from persecution in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien

18

received a final judgment denying the alien protection in such country;" (2) "The alien demonstrates that he or she satisfies the definition of 'victim of a severe form of trafficking in persons' provided in 8 C.F.R. 214.11;" or (3) "The only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees." *Id.* at 82289-90.

84.     Like the Interim Rule, the Final Rule does not require any individualized assessment of the asylum system in the country or countries through which a noncitizen transited en route to the United States, or any assessment of the asylum seeker's protection claims or reasons for not seeking protection in the transit country.  It does not require an assessment of whether the transit country had a functioning asylum system capable of processing the asylum seeker's claim in a full and fair manner; whether the country was able to offer the asylum seeker effective protection against persecution or torture; whether the asylum seeker could even access—practically or legally—the asylum system; whether the asylum system would recognize the asylum seeker's particular claim for protection; or why the asylum seeker otherwise did not apply for protection.  If, for example, an asylum seeker has a protection claim rooted in persecution based on sexual orientation but the transit country does not offer asylum on that basis, the asylum seeker would nonetheless be subject to the Interim Rule.  So too if the asylum seeker faced threats to her safety in the transit country and staying to apply for asylum and receive a final judgment would have required her to risk further harm.

85.     Indeed, many countries that are plainly unable to provide adequate protection to asylum seekers and lack full and fair asylum systems nonetheless are signatories to international refugee agreements.  For example, countries such as Afghanistan, Chad, the Democratic Republic of Congo, Iran, Somalia, and Sudan are signatories to the 1951 Refugee Convention.  The U.S. State Department has recognized in its Country Reports that many signatories to the Convention do not

adequately protect refugees or lack adequate asylum processing systems.  For example, Egypt is a signatory to the Convention, but according to the State Department, Egypt's "laws do not provide for granting asylum or refugee status, and the government has not established a comprehensive legal regime for providing protection to refugees."  Similarly, Angola is a signatory to the Convention, but according to the State Department, "[t]he law provides for the granting of asylum or refugee status, but the law did not function during the year."

86.     Like the Interim Rule, the Final Rule contains no exception for unaccompanied children as defined in 6 U.S.C. § 279(g).  They, too, must apply for protection in a country through which they transit or will be deemed ineligible for asylum in the United States, irrespective of their age, knowledge of or ability to understand the Interim Rule's requirements, or knowledge of or ability—practical or legal—to access the asylum system in a transit country.  By contrast, Congress expressly exempted unaccompanied children from the safe third country exception in the INA.  *See* 8 U.S.C. § 1158(a)(2)(E).

87.     Like the Interim Rule, the Final Rule arbitrarily disfavors certain asylum seekers, particularly those without resources.  Asylum seekers with the financial means, time, and other resources required to obtain travel documents, a visa, and plane tickets to the United States are still able to access asylum.  But asylum seekers who are forced to flee immediately because of exigent danger, and so lack the time to make such preparations, as well as asylum seekers without adequate financial resources, will be denied.

88.     The Final Rule contains only two minor substantive changes that do not impact Plaintiffs' claims.  First, the Final Rule no longer exempts individuals who applied for and were denied protection from torture in a third country; in other words, the exemption set forth in 8 C.F.R. §§ 208.13(c)(4)(i), 1208.13(c)(4)(i) would be limited to individuals who applied for and were denied asylum in a third country.  85 Fed. Reg. at 82,262, 82,289.  Second, a third country's status as a signatory to the Convention Against Torture is no longer determinative of the country's ability to

20

provide asylum.  *Id.*  Accordingly, individuals subject to the Final Rule need not apply for protection in a third country that is a signatory to the Convention Against Torture (but not a signatory to either 1951 Refugee Convention or the 1967 Refugee Protocol) in order to qualify for the exemption set forth in 8 C.F.R. §§ 208.13(c)(4)(iii), 1208.13(c)(4)(iii).  However, because the Final Rule is aimed at asylum applicants arriving at the U.S.-Mexico border and Mexico is a signatory to 1951 Refugee Convention and the 1967 Refugee Protocol, the elimination of the reference to the Convention Against Torture has no practical impact on the operation of the rule.  *See E. Bay*, 964 F.3d at 855 ("The Rule targets only asylum applicants entering at our southern border with Mexico.").  Thus, the net effect of the changes in the Final Rule is to further narrow the Interim Rule's already limited exemptions, making it *harder* for asylum seekers at the southern border to comply with the policy.

89.     The Final Rule continues to be inconsistent with the firm-resettlement and safe-third-country bars.

90.     The Final Rule again fails to adequately consider whether Mexico, Guatemala, or any other transit country is in fact a safe option for asylum seekers.

91.     The Final Rule continues to rest on an unsupported assumption that a noncitizen who has failed to apply for asylum in a third country is unlikely to have a meritorious asylum claim.

92.     The Final Rule again fails to adequately consider the effect of the policy on unaccompanied minors.

**The 30-Day Comment Period for the Final Rule Was Inadequate**

93.     The APA requires that the public be given a meaningful opportunity to participate in rulemaking.  5 U.S.C. § 553.

94.     The customary comment period is 60 days.  *See* Exec. Order No. 13,653, 76 Fed. Reg. 3,821, 3,821-22 (Jan. 18, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment . . . on any proposed regulation, with a comment period that should generally be at least 60 days."); Exec. Order No. 12,866, 58 Fed. Reg.

51,735, 51,740 (Sep. 30, 1993) ("[E]ach agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days.").

95.     The agencies have failed to explain their decision to depart from the customary 60-day period and to provide a comment period of only 30 days.

96.     The agencies have failed to explain why a 60-day comment period was not feasible.

97.     The policy set forth in the Interim Rule and the Final Rule is complex and requires commenters to engage in extensive research and analysis of the asylum systems in potential transit countries, to determine whether they may serve as safe options for asylum seekers.

98.     The policy also has the effect of virtually eliminating asylum at the southern border, which has wide-ranging impacts domestically, including on the economy and the labor market, not to mention the effects on thousands of immigrant families hoping to use asylum to reunite with loved ones.  Those effects all require extensive research and analysis.

99.     The shortened comment period prevented Plaintiffs from fully exploring the significance of the policy and submitting more detailed comments than they did.

**Defendants Failed to Publish the Final Rule At Least 60 Days Before Its Effective Date**

100.     The CRA prohibits any "major rule" from taking effect until at least 60 days after publication of the rule in the Federal Register.  5 U.S.C. § 801(a)(3)(A).

101.     A "major rule" is one that "is likely to result in" (i) "an annual effect on the economy of $100,000,000 or more," (ii) "a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions," or (iii) "significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets."  5 U.S.C. § 804(2).

102.    As numerous studies have found, asylum seekers are a valuable source of labor for key industries.

103.    In 2019 alone, the United States received over 128,000 defensive asylum applications and over 49,000 affirmative applications from non-Mexican nationals of Latin American origin, almost all of whom would be denied asylum under the Final Rule.  If even 10% of those asylum seekers had even a minimum wage job, their annual economic impact would easily exceed $100,000,000.

104.    Indeed, one expert analysis concluded that even a two percent reduction in the number of asylum seekers would easily cost the U.S. economy and fisc over $100 million, in the first year alone.

105.    The Final Rule asserts, without explanation, that it is not a "major rule" within the meaning of the CRA.  85 Fed. Reg. at 82,289.

106.    The Final Rule is scheduled to take effect less than 60 days from its date of publication.

**The Final Rule Was Issued by Unlawfully Appointed DHS Officers**

107.    The Final Rule was approved by then-Acting DHS Secretary, Chad Wolf.  *See* 85 Fed. Reg. at 82,289 ("The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document . . . .").

108.    After approving the Final Rule, Wolf "delegat[ed] the authority to electronically sign [the Final Rule] to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the Federal Register."  *Id.*

109.    Both the Secretary and the General Counsel for DHS are offices that require appointment by the President and advice and consent of the Senate.  6 U.S.C. § 112(a)(1) ("There is a Secretary of Homeland Security, appointed by the President, by and with the advice and consent of the Senate."); § 113(a)(1)(J) (providing that the "General Counsel, who shall be the chief legal

23

officer of the Department," shall be "appointed by the President, by and with the advice and consent of the Senate").

110.     Neither Wolf nor Mizelle has been confirmed by the Senate to his respective position, and neither was lawfully serving in his respective acting role when the Final Rule was approved and signed.  Wolf's nomination to serve as DHS Secretary was withdrawn; Mizelle has never been formally nominated to serve as DHS General Counsel.

*Legal Framework*

111.     Under the Appointments Clause, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers, of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. Const., Art. II, § 2, cl. 2.

112.     Congress has also enacted various statutes that govern the appointment of acting officials, including the FVRA, a generally applicable law, and the HSA, a DHS-specific statute.

113.     The FVRA specifies the categories and tenures of individuals who may serve in an acting capacity when a Senate-confirmed position, such as DHS Secretary or General Counsel, is vacant.  *See* 5 U.S.C. §§ 3345-3349d.

114.     Under the FVRA, the "first assistant" to the vacant office automatically assumes the acting role unless the President designates another official in accordance with the Act's requirements.  5 U.S.C. § 3345(a)(1).

115.     Barring certain exceptions, an acting official may not serve beyond 210 days after the position becomes vacant.  5 U.S.C. § 3346(a).  One exception is that an official may serve in an acting capacity "once a . . . nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate."  5 U.S.C. § 3346(a)(2).  Once the allotted period has elapsed, the FVRA mandates that "the office shall remain vacant."  *See* 5 U.S.C. § 3348(b).

116.    Barring certain exceptions not applicable here, an individual whose nomination is pending in the Senate may not serve pursuant to the FVRA in an acting capacity in the office for which their nomination is pending.  5 U.S.C. § 3345(b)(1)(B).

117.    Actions taken by officers acting in violation of the FVRA "shall have no force or effect" and "may not be ratified."  5 U.S.C. § 3348(d).

118.    The FVRA is the "exclusive means" for designating acting officials for Senate-confirmed positions, unless another statute "expressly" authorizes another mechanism.  5 U.S.C. § 3347(a).

119.    The HSA sets out the order of succession for vacancies arising in the position of Secretary of Homeland Security.  6 U.S.C. § 113(a)(1)(A), (F); § 113(g).  The Deputy Secretary and then the Under Secretary for Management are each designated as "first assistant" to their immediate superiors—a reference to the FVRA, *see* 5 U.S.C. § 3345(a)(1)—and are therefore first and second in line to serve as Acting Secretary.  6 U.S.C. §§ 113(a)(1)(F), (g)(1).

120.    In addition, "the Secretary may designate" other DHS officers "in a further order of succession to serve as Acting Secretary" if the first two offices in the order of succession are vacant.  6 U.S.C. § 113(g)(2).

121.    An Acting Secretary is an inferior officer, who may perform the duties of a principal officer for only a limited period of time.

122.    Indefinite, interim service as an Acting Secretary violates the Appointments Clause's requirement that principal officers be nominated by the President and confirmed by the Senate.

123.    An Acting Secretary, as an inferior officer, may not lawfully designate another Acting Secretary.

*Wolf's and McAleenan's Unlawful Tenures as Acting DHS Secretary*

124.    There has not been a Senate-confirmed DHS Secretary since the departure of former Secretary Kirstjen Nielsen on April 10, 2019.  This is the longest cabinet-level vacancy in U.S. history.

125.    On September 10, 2020, President Trump nominated Wolf to serve as DHS Secretary and submitted his nomination for Senate confirmation.  The White House later announced the withdrawal of Wolf's nomination on January 7, 2021, and Wolf thereafter resigned, effective January 11, 2021, at 11:59 P.M.

126.    Because Wolf was not first assistant to the DHS Secretary, he could not, pursuant to the FVRA, lawfully serve as Acting DHS Secretary during the pendency of his nomination.  *See* 5 U.S.C. § 3345(b)(1).

127.    Wolf was not lawfully designated as Acting Secretary under the HSA because his predecessors failed to properly modify the order of succession under the HSA to place him in the role.  In fact, neither McAleenan, who issued the Interim Rule, nor Wolf, who issued the Final Rule, was validly serving as Acting Secretary at the time of their respective actions.

128.    At least six district courts have held that Wolf's predecessor, McAleenan, lacked authority to designate Wolf as Acting Secretary.  *See Pangea Legal Services v. DHS*, No. 20-cv-9253, 2021 WL 75756, at *5 (N.D. Cal. Jan. 8, 2021); *La Clinica De La Raza v. Trump*, No. 19-cv-4980, 2020 WL 7053313, at *6-7 (N.D. Cal. Nov. 25, 2020); *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 6695076, at *8 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project v. USCIS*, No. 19-cv-3283, 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020) ; *Immigrant Legal Resource Center (ILRC) v. Wolf*, No. 20-cv-5883, 2020 WL 5798269, at *7-9 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Wolf*, No. 20-cv-2118, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020).

129.    At the time of Nielsen's resignation, DHS had two different orders of succession, one of which was applicable to any vacancy caused by a resignation and another to any vacancy caused by an emergency.  *See* DHS Delegation No. 106 (Revision No. 08.5), *DHS Orders of Succession and*

26

*Delegations of Authority* (Apr. 10, 2019); Exec. Order No. 13,753, 81 Fed. Reg. 90,667 (Dec. 9, 2016).  Prior to her resignation, Nielsen designated the CBP Commissioner (then McAleenan) as the next in line to serve as Acting Secretary in the event of an *emergency*, but *not* in the event of a *resignation*.  Upon Nielsen's resignation, McAleenan assumed the role of Acting Secretary, even though the rightful successor pursuant to the resignation line of succession was Director of the Cybersecurity and Infrastructure Security Agency (formerly known as Under Secretary for National Protection and Programs) Christopher Krebs.

130.    On July 12, 2019, McAleenan issued the Interim Rule despite having unlawfully assumed the office of Acting Secretary.  84 Fed. Reg. at 33,829, 33,845.

131.    On November 8, 2019, the 212th day after Nielsen left office, McAleenan attempted to revise DHS Delegation 106 to consolidate the emergency and resignation orders of succession under the HSA, 6 U.S.C. § 113(g)(2).  DHS Delegation No. 106, Revision No. 8.6, *DHS Orders of Succession and Delegations of Authority* (Nov. 8, 2019) ("November Delegation").

132.    The November Delegation was apparently intended to install Wolf as McAleenan's successor, by elevating in the order of succession the office that Wolf occupied at the time (Under Secretary for Strategy, Policy, and Plans).

133.    Because McAleenan was not lawfully serving as Acting Secretary, however, he lacked the authority to issue the November Delegation.  The previous line of succession—in which Wolf was not next in line—therefore remained in effect.

134.    Moreover, the HSA empowers only a Senate-confirmed DHS Secretary to change the order of succession.  *See* 6 U.S.C. § 113(g)(2).  Thus, even if McAleenan had been properly elevated to Acting Secretary by Nielsen, he was without statutory authority to modify the order of succession.

135.    Accordingly, both McAleenan's Interim Rule and change to the order of succession in the November Delegation lacked force and effect.

136. On November 13, 2019, McAleenan resigned as CBP Commissioner and as Acting DHS Secretary.

137. Even though the November Delegation was invalid, Wolf purported to assume the role of Acting Secretary upon McAleenan's resignation.

138. On August 14, 2020, the Government Accountability Office ("GAO") concluded that neither McAleenan nor Wolf had been lawfully performing the functions of Acting DHS Secretary. *See* GAO, No. B-331650, *Decision: Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security* ("GAO Decision") (Aug. 14, 2020), https://tinyurl.com/yyf2eqew. Per the GAO Decision, DHS's succession orders at the time of Nielsen's resignation assigned the Acting Secretary role to a different official (Mr. Krebs), thereby precluding McAleenan from lawfully serving as Acting Secretary. *Id.* As such, the GAO concluded that McAleenan had not validly served as Acting Secretary and that his designation of Wolf as his successor was therefore also invalid. *Id.*

139. Notwithstanding the GAO decision, Wolf continued his unlawful service.

140. On September 10, 2020, President Trump nominated Wolf to serve as DHS Secretary and submitted his nomination for Senate confirmation.

141. According to a memorandum issued by Wolf, if McAleenan's November Delegation had been invalid, Peter Gaynor, the Administrator of the Federal Emergency Management Agency ("FEMA") would have become Acting DHS Secretary by operation of law. 85 Fed. Reg. 59,651, 59,653 (Sept. 23, 2020).

142. On the day of Wolf's nomination, Gaynor issued a memo titled, "Order Designating the Order of Succession for Secretary of Homeland Security" ("Gaynor Memo"). *See* Letter by DHS, *Batalla Vidal*, No. 16-cv-4756, Dkt. 341 (E.D.N.Y. Nov. 13, 2020) (addressing sequence of events). In that order, Gaynor purported to exercise authority under 6 U.S.C. § 113(g)(2) to adopt the same November Delegation that McAleenan had issued to re-install Wolf as Acting Secretary.

28

143.     On November 14, 2020, Gaynor reissued the same memo because the original memo may have been issued *before* Gaynor could have assumed the office of Acting Secretary.  *See* Peter T. Gaynor, Order Designating the Order of Succession for the Secretary of Homeland Security (Nov. 14, 2020).  He again purported to exercise "any authority vested in [him] as Acting Secretary" pursuant to the order of succession in place when Secretary Nielsen resigned in April 2019 and to use that authority to re-amend the order of succession to re-assign the Acting Secretary role to Wolf. *Id.*

144.     Under both iterations of the Gaynor Memo, Wolf purportedly became Acting DHS Secretary, effective immediately.  Following the Gaynor memos, Wolf attempted to ratify actions taken during his and McAleenan's unlawful tenures, including McAleenan's issuance of the Interim Rule.  *See* DHS, Ratification of Department Actions (Nov. 16, 2020); DHS, Ratification of Certain Actions (Nov. 16, 2020).

145.     However, Gaynor lacked the authority to adopt the November Delegation.  Like McAleenan before him, even assuming Gaynor served momentarily as Acting Secretary, he lacked authority to change the order of succession, an authority granted only to a Senate-confirmed Secretary of Homeland Security.  The Gaynor Memo's adoption of the November Delegation was thus without legal force, unlawful, and otherwise a nullity.

146.     Even if an Acting Secretary could change the further order of succession, Gaynor never assumed the role of Acting Secretary.  He was never sworn in, and DHS never submitted any notice to Congress that Administrator Gaynor was serving as Acting Secretary, as it has done for past Acting Secretaries.

147.     And even assuming Gaynor did assume the role of Acting Secretary, Gaynor did not resign as FEMA Administrator or Acting Secretary or otherwise create a new vacancy in the role of Acting Secretary that would trigger the order of succession and a transfer of duties to Wolf.

148.    Wolf, therefore, was never lawfully designated to serve as Acting Secretary pursuant to 6 U.S.C. § 113(g)(2)'s further order of succession, and thus never lawfully assumed the functions and duties of Acting Secretary.

149.    Even if he did assume the role of Acting Secretary, Wolf could not lawfully ratify prior actions that had no force or effect under the FVRA.  5 U.S.C. § 3348(d)(2).

150.    On December 17, 2020, Wolf purported to approve the Final Rule despite not lawfully serving as Acting Secretary.

151.    By that point, 617 days had also elapsed since the vacancy created by former Secretary Nielsen's departure, nearly three times the FVRA's 210-day limit on acting service.

152.    Moreover, Wolf's purported indefinite service as Acting DHS Secretary violated the Appointments Clause, because Wolf was acting as a principal officer without being confirmed by the Senate to the role.

153.    Because Wolf was not lawfully serving as Acting Secretary, his ratification of the Interim Rule was ineffective.  Even if Wolf had been lawfully serving as Acting DHS Secretary when he issued the ratification memos, ratification was barred by the FVRA.  *See* 5 U.S.C. § 3348(d)(2).

154.    Because Wolf was not lawfully serving as Acting Secretary, his approval of the Final Rule is also contrary to law.

155.    On January 7, 2021, the White House announced that Wolf's nomination as DHS Secretary had been withdrawn.

156.    On January 11, 2021, Wolf announced his resignation as Acting Secretary, effective that night at 11:59 P.M., citing the number of "meritless" court rulings that he was unlawfully serving as Acting Secretary.  Prior to his resignation, Wolf purported to designate, under the HSA, a new order of succession that would install Gaynor as the next Acting DHS Secretary.  *See* DHS, Ratification, at 2 (Jan. 14, 2021),

30

https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratification-delegable-prior-actions.pdf.  Because Wolf was unlawfully serving as Acting Secretary and because only a Senate-confirmed Secretary may alter the order of succession, Wolf's designation of Gaynor was ineffective.

157.    Gaynor then purported to assume the role of Acting DHS Secretary, pursuant to both the original line of succession governing resignation-related vacancies (that McAleenan and Gaynor purportedly eliminated) and Wolf's new, unlawful order of succession.  *Id.*

158.    Although Wolf purported to resign as Acting Secretary, he resumed his prior role as Under Secretary for Strategy, Policy, and Plans.

159.    The day after Wolf's resignation as Acting Secretary, Gaynor delegated the full extent of the Secretary's rulemaking authority to Wolf.  DHS Delegation No. 23028, Delegation to the Under Secretary for Strategy, Policy, and Plans (Jan. 12, 2021), https://www.dhs.gov/sites/default/files/publications/20_0112_delegation-23028-final-rules-regulations-other-matters.pdf.

160.    Two days later, on January 14, 2021, Wolf issued what would be his third ratification memo, approving each and every of his previously unauthorized actions as Acting Secretary, as well certain of McAleenan's unauthorized rulemaking, including the Interim Rule.  DHS, Ratification (Jan. 14, 2021), https://www.dhs.gov/sites/default/files/publications/20_0113_undersecretary-wolf-ratification-delegable-prior-actions.pdf.

161.    Gaynor and Wolf's latest maneuver to circumvent constitutional and statutory limits on their authority is barred by the FVRA, violates the Appointments Clause, and is contrary to basic principles of ratification.

*Defendant Mizelle's Unlawful Tenure as Acting General Counsel of DHS*

162.    After he originally approved the Final Rule, Wolf delegated authority to electronically sign the Final Rule for purposes of the Federal Register to Defendant Mizelle, in the latter's capacity as the official discharging the duties of General Counsel for DHS.

163.    Although Defendants have referred to Mizelle as the "Senior Official Performing the Duties of the General Counsel for DHS," rather than "Acting General Counsel for DHS," Mizelle has been performing duties reserved for the General Counsel and is therefore acting as General Counsel, notwithstanding his formal title.[3]

164.    The General Counsel for DHS is a position requiring Senate confirmation.  6 U.S.C. § 113(a)(1)(J).

165.    Any vacancy in the office of General Counsel for DHS is therefore subject to the FVRA's requirements, including the statute's 210-day limit on the service of acting officers.  5 U.S.C. § 3345(a) (making FVRA applicable to any office for which an appointment "is required to be made by the President, by and with the advice and consent of the Senate"); *id.* § 3346 (providing an aggregate limit of 210 days for service by acting officers, starting from the date of the vacancy).

166.    The most recent Senate-confirmed General Counsel for DHS, John Mitnick, was fired on September 17, 2019.

167.    To date, the President has not formally submitted to the Senate the nomination of any individual to serve as General Counsel for DHS.

168.    The 210-day period during which an acting official may discharge the duties of General Counsel therefore elapsed on April 15, 2020, more than eight months before Mizelle signed the Final Rule on December 17, 2020.

---

[3] Notably, Mizelle's publicly available LinkedIn page identifies his present title as "Acting General Counsel."  Chad Mizelle, LinkedIn (last visited Jan. 3, 2021), https://www.linkedin.com/in/chad-mizelle-36366917.

32

169.    Because Mizelle is performing the duties of General Counsel for DHS in violation of the FVRA's 210-day limit on acting service, his signature on the Final Rule is without force and effect, and the Final Rule was published in the Federal Register without the requisite authority.  *See* 5 U.S.C. § 553(d) (substantive rules may not take effect until at least 30 days after required publication).

170.    Wolf's ratification memo dated January 14, 2021, was unlawful, ineffective, and, in any event, does not purport to ratify Mizelle's unauthorized signing of the Final Rule.

**The Administration's Persistent Attacks on Asylum Seekers**

171.    The Interim and Final Rules bear stark resemblance to the November 8, 2018 interim final rule ("2018 Rule"), also enacted pursuant to 8 U.S.C. § 1158(b)(2)(C), and President Trump's signed 2018 Proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" ("2018 Proclamation").  The 2018 Rule provided that all persons subject to a presidential proclamation concerning the southern border issued pursuant to the INA § 212(f), 8 U.S.C. § 1182(f), or INA § 215(a)(1), 8 U.S.C. § 1185(a)(1), were ineligible for asylum.  The Proclamation suspended the entry of all persons entering without inspection at the southern border.

172.    Together, the 2018 Rule and 2018 Proclamation barred people from obtaining asylum if they entered the United States somewhere along the southern border other than a designated port of arrival—in direct violation of Congress's clear command that manner of entry cannot constitute a categorical asylum bar.

173.    On November 9, 2018, East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center—the same Plaintiffs in this action—challenged the procedural and substantive validity of the 2018 Rule.  On December 19, 2018, the district court granted a preliminary injunction preventing the government from taking any action to continue to implement the 2018 Rule.  The order remains in effect pending a final judgment and is before the

Ninth Circuit on the merits.  On December 21, 2018, the U.S. Supreme Court denied the government's request for a stay pending appeal of the district court's order granting a temporary restraining order.

174.    The Final Rule serves to bar a similar group of people in a categorical fashion—noncitizens who transit through another country prior to reaching the southern border.  Indeed, the Final Rule is more draconian than its 2018 counterpart because it forecloses the protection of asylum to those who seek asylum even at a <u>port of entry</u>.  As such, asylum seekers coming from a country other than a country contiguous to the United States—such as those from the Northern Triangle—are left with only two more limited forms of protection—withholding of removal and protection under the Convention Against Torture—regardless of whether they present themselves at a port of arrival.

175.    The Final Rule is the latest in a series of attacks on asylum seekers and yet another attempt to undermine the statutory provisions governing asylum

**Asylum Seekers at the Southern Border**

*Dire Conditions in Central America Have Prompted Many to Seek Refuge Elsewhere*

176.    Individuals who arrive at the southern border seeking protection in the United States through the asylum process, including children, are fleeing some of the most dangerous countries in the world.

177.    Although asylum seekers come to the southern border from all over the world, many come from El Salvador, Guatemala, and Honduras, countries known as the "Northern Triangle." According to a recent report from UNHCR, these countries are experiencing epidemic levels of violence.  Human rights groups have compared the levels of violence in this region to those typically seen in war zones.

178.    Those who leave often are running from life-threatening situations, leaving everything behind to make a dangerous journey.  In particular, violence against women by criminal

armed groups has escalated dramatically in Central America, and those governments have been unable or unwilling to provide effective protection.

179.    Asylum seekers fleeing their home countries in Central America face an arduous journey to the United States, involving a high risk of violence, including sexual assault, along the way.

180.    Many asylum seekers from Central American have no choice but to travel by land to the United States due to documentation requirements that would be necessary to board a plane, as well as financial constraints.

181.    The vast majority of asylum seekers from Central America thus arrive at the southern border after traveling by land across one or more countries.  Those coming from Guatemala necessarily transit through Mexico, and those coming from El Salvador and Honduras transit through Guatemala and Mexico.

182.    Many of the migrants coming to the southern border have legitimate claims to asylum.

183.    According to DHS statistics, in fiscal year 2018, 75 percent of individuals from El Salvador, Guatemala, Honduras, and Mexico who were subject to a credible fear screening by an asylum officer were found to have a significant possibility of establishing that they have been persecuted or have a well-founded fear of persecution if returned to their country.

184.    Between fiscal years 2017 and 2019, 10,943 people from El Salvador, Guatemala, and Honduras were granted asylum affirmatively, and 12,359 people from those countries were granted asylum defensively.

*Guatemala Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

185.    For most asylum seekers, remaining in Guatemala and seeking protection there is not an option.  The country lacks a full and fair asylum processing system, and is often extremely dangerous for migrants.

186. According to the U.S. State Department, rape, violence against women, trafficking, violence against LGBTQ persons, gang recruitment of children, and corruption are serious issues in Guatemala.

187. The State Department's Overseas Security Advisory Council reports that "Guatemala remains among the most dangerous countries in the world" and has an "alarmingly high murder rate" that "appears driven by narco-trafficking activity, gang-related violence, a heavily armed population, and police/judicial system unable to hold many criminals accountable."

188. Guatemala was in the top four countries whose nationals were granted asylum in the United States in fiscal years 2015, 2016, and 2017.

189. Guatemala's asylum system is new and barely functioning.

190. According to the U.S. State Department, UNHCR "reported that identification and referral mechanisms for potential asylum seekers" in Guatemala "were inadequate," and "[b]oth migration and police authorities lacked adequate training concerning the rules for establishing refugee status."

191. According to the UNHCR, only 262 people applied for refugee status in Guatemala between January and November 2018, and that number was a 75 percent increase from the prior year.  Since 2015, Guatemala has received on average fewer than 100 cases per year for asylum processing.  In the last two years, it has only decided roughly 20 to 30 asylum cases.  There are very few officials working on the asylum process in Guatemala, and its capacity to handle asylum claims is extremely limited.

192. The Final Rule is silent as to Guatemala's asylum system and ability to protect migrants from persecution or torture.  *Cf.* 85 Fed. Reg. at 82,276 (responding to concerns about safety in Mexico, Guatemala, and other transit countries by stating that asylum seekers should "seek aid from the government in the country in which the individuals have been targeted").

193.     The Final Rule also ignores the obvious impact of recent Hurricanes Eta and Iota on Central American governments' capacity to offer asylum to nationals of other countries.  According to USAID, Central American governments currently lack sufficient capacity to provide basic post-disaster relief due to widespread damage and food shortages.  USAID, *Latin America – Storms* (Dec. 11, 2020), https://www.usaid.gov/sites/default/files/documents/12.11.2020_USAID-BHA_Latin_America_Storms_Fact_Sheet_8.pdf.

*Mexico Is Not Safe for Asylum Seekers and Lacks a Fair, Functioning Asylum System*

194.     For most asylum seekers, remaining in Mexico and seeking protection there is not an option.  The country lacks a full and fair asylum processing system, and is often extremely dangerous for migrants.

195.     According to the U.S. State Department's 2017 Mexico Country Report, "violence against migrants by government officers and organized criminal groups" is one of "[t]he most significant human rights issues" in Mexico.  The State Department also reported in 2018 that the dangers that forced many Central American migrants to flee their homes are likewise present in Mexico, as the presence of Central American gangs has "spread farther into the country and threatened migrants who had fled the same gangs in their home countries," that there were reports of migrants being victimized "by criminal groups and in some cases by police, immigration officers, and customs officials," that "[t]here were media reports that criminal groups kidnapped undocumented migrants to extort money from migrants' relatives or force them into committing criminal acts on their behalf," that "[t]here were numerous instances of armed groups limiting the movements of migrants, including by kidnapping and homicides," and that there were "5,824 reported crimes against migrants" and "99 percent of the crimes were unresolved" at the federal level.

196.     Migrants in Mexico are at risk of kidnapping, disappearance, trafficking, and sexual assault, among other harms.  Lesbian, gay, bisexual, and transgender persons, as well as people with

37

indigenous heritage, regularly have been subject to persecution in Mexico.  Children in particular are at risk of robbery, sexual violence, kidnapping, femicide, extortion, and threats.

197.    Mexico experienced its highest number of murders recorded in 2018, up 33% from 2017, which previously was the highest number recorded.

198.    President Trump has himself acknowledged that Mexico is not a safe place, tweeting on January 31, 2019: "Very sadly, Murder cases in Mexico in 2018 rose 33% from 2017, to 33,341." He further stated that the situation in Mexico is "[w]orse even than Afghanistan."

199.    The asylum system in Mexico is not adequate to protect the rights of asylum seekers. Among other problems, Central American asylum seekers in Mexico face a substantial risk of being involuntarily repatriated to the countries they have fled.  Intergovernmental and human rights organizations have documented widespread instances of Mexican officials returning Central American migrants to their home countries despite their fears of persecution or torture, without any meaningful process.

200.    The U.S. Department of State has noted "incidents in which immigration agents had been known to threaten and abuse migrants to force them to accept voluntary deportation and discourage them from seeking asylum."  It further noted that "NGOs reported bribes sometimes influenced the adjudication of asylum petitions and requests for transit visas."

201.    Data from the Mexican government indicates that very few of the children who are apprehended by Mexican immigration authorities are recognized as refugees or given other formal protection in Mexico, and that Mexican immigration authorities routinely fail to inform detained children about their right to seek protection and fail to adequately screen them for refugee recognition.

202.    Despite Mexican law prohibiting the detention of children for migration purposes, many children continue to be detained by Mexico's immigration agency.  Conditions in Mexican detention centers have been widely reported to be harmful to children and in violation of

38

international law.  Mexico also sometimes deports unaccompanied children to danger, in many cases

in violation of its own child protection laws.

203.    President Trump recently encouraged Mexico to deport individuals who arrived on

"caravans" regardless of their claims for asylum or other forms of protection: "Mexico should move

the flag waving Migrants, many of whom are stone cold criminals, back to their countries.  Do it by

plane, do it by bus, do it anyway [sic] you want, but they are NOT coming into the U.S.A.  We will

close the Border permanently if need be."

204.    The Final Rule fails to grapple with the overwhelming evidence that Mexico is not

safe for asylum seekers.  It offers no analysis or evidence as to the adequacy of Mexico's asylum

system and ability to protect migrants from persecution or torture in practice.  It notes only that

asylum applications there have increased and references the existence of Mexico's formal asylum

laws.

205.    Despite the growing number of asylum applications, Mexico's Commission for

Refugee Assistance ("COMAR") has not grown its personnel or its budget accordingly.  Mexico's

asylum system is strained as a result.  COMAR routinely fails to make decisions within the time

limits provided by Mexico law and had a backlog of more than 35,000 asylum claims as of June

2020.

**Harms to Plaintiffs**

206.    Plaintiffs are nonprofit organizations that provide assistance to asylum seekers,

including those who came to the United States after transiting through another country.  The Final

Rule will cause each Plaintiff significant harm.

207.    Plaintiff East Bay Sanctuary Covenant provides legal and social services to

immigrants and refugees within the jurisdiction of the San Francisco Asylum Office, including

applicants in California, Washington, and Oregon.  It offers clients legal assistance in affirmative

asylum applications; provides social services; and helps train professionals to assist immigrant and

39

refugee communities.  EBSC's affirmative asylum program is a key part of the organization's

mission, is its most important program, and accounts for nearly half of its organizational budget.

Since 1992, EBSC has filed nearly 5,000 affirmative asylum cases.  Over 97 percent of those

adjudicated cases have been granted.

208.    A substantial percentage of clients in EBSC's affirmative asylum program come to

the United States through the southern land border after transiting through a third country en route to

seek asylum in the United States.  Most of those clients fled persecution in Central America.

209.    EBSC works mainly with low-income and poor individuals from around the world,

and works especially closely with vulnerable populations including victims of gender-based violence

and domestic violence, indigenous Guatemalans, LGBT individuals, those affected by HIV/AIDS,

and unaccompanied children.

210.    Funding for EBSC's affirmative asylum program is based in part on the number of

cases EBSC handles per year, and the number of clients EBSC anticipates serving.  EBSC

experienced harm including frustration of its mission and diversion of resources as a result of the

Interim Rule.  The Final Rule will also significantly harm EBSC as an organization, seriously

frustrate EBSC's mission, and cause it to divert organizational resources.  As a result of the policy

going into effect again, EBSC will have to expend significant resources to adjust to the shifting

regulatory landscape and substantially reduce its affirmative asylum practice, thus reducing the

number of clients it can serve and frustrating its mission of serving asylum seekers fleeing

persecution and violence regardless of their manner of entry, means of entry, or travel route.

211.    EBSC also will have to divert significant resources to, among other things,

understanding the policy and its impact on the communities EBSC serves, and educating and

advising its staff, clients, and prospective clients accordingly.  To properly counsel new prospective

clients who seek its affirmative asylum services going forward, EBSC will need to invest resources

in training multiple intake staff not only to screen for asylum eligibility based on the Final Rule, but

to conduct detailed screenings for alternative forms of relief to facilitate referrals or other forms of assistance as appropriate.  These alternative forms of relief, including withholding of removal and Convention Against Torture protection, require a far greater expenditure of staff resources per client.

212.    Under the new policy, EBSC will no longer be able to train law students to handle affirmative asylum cases, or would have to substantially reduce its training program, which frustrates its mission of helping to train legal professionals to assist individuals fleeing violence and persecution.

213.    The Final Rule also jeopardizes EBSC's funding streams, which depend in large part on per-case funding for affirmative asylum applications, many of which will be rendered ineligible for asylum under the Final Rule  If EBSC is no longer able to handle affirmative asylum cases for individuals who enter after transiting through another country, it will face a marked decrease in its budget and will have to significantly cut its program and staff, or dramatically overhaul its program to provide types of assistance it is not currently equipped or trained to provide.  The grant that funds EBSC's work is only to serve people who make under 250 percent of the poverty guidelines.  In practice, the few noncitizens who will remain eligible to apply affirmatively for asylum under the new Rule will mostly be those who have visas of some kind and could travel to the U.S. by air and so likely fall outside of the population it is EBSC's mission to serve and outside of the income requirements for EBSC's services.

214.    Plaintiff Al Otro Lado serves indigent deportees, migrants, refugees and their families, principally in Los Angeles and San Diego, California, and Tijuana, Mexico.  Al Otro Lado's mission is to provide screening, advocacy, and legal representation for individuals in asylum and other immigration proceedings, to seek redress for civil rights violations, and to assist deportees, refugees, and other indigent immigrants with legal and social service needs.  Through its Border Rights Project, Al Otro Lado hosts legal orientation workshops and provides information about the U.S. asylum system to migrants who wish to seek asylum in the United States.  Its staff accompanies

41

some asylum seekers who wish to present themselves to CBP officers at the San Ysidro Port of Entry, represent them at their credible/reasonable fear interviews, and assist them with their *pro se* I-589 asylum applications.

215.    Al Otro Lado routinely provides representation or other assistance to asylum seekers who have entered the United States after transiting through another country.  Since the effective date of the Interim Rule, Al Otro Lado has served approximately two thousand clients who transited through another country en route to the United States.

216.    The Final Rule will similarly frustrate Al Otro Lado's mission and will force Al Otro Lado to divert significant resources away from its other programs.  Because individuals who enter after transiting through another country are categorically ineligible for asylum under the Final Rule, Al Otro Lado will once again have to revamp its representation strategy, overhaul the materials it uses to train pro bono attorneys, and evaluate the eligibility of each of its clients for other types of immigration relief.  It will also have to expend resources to litigate eligibility issues, including under the higher standard governing withholding of removal, resulting in additional hearings and time spent on each case.

217.    Like the Interim Rule, the Final Rule will require Al Otro Lado to engage in a massive community education campaign to inform client communities about the significance of the transit ban policy.

218.    The Final Rule also jeopardizes some of Al Otro Lado's most critical funding streams.

219.    Most of Al Otro Lado's asylum clients are families traveling with minor children. Because they will be ineligible for asylum under the new policy, spouses and minor children can no longer be counted as derivatives in a single application.  Al Otro Lado must now prepare separate cases for each family member, exponentially increasing the number of hours required to prepare a family's case.

220.     The Final Rule, like the Interim Rule, will significantly slow down our client intake process because of the time it takes to explain the transit policy to clients.  When the Interim Rule was in effect, clients were often shocked to learn that they were required to apply for asylum in countries as unsafe as Mexico and Guatemala.  Explaining the transit ban was more time-consuming relative to other border policies, as was the process of drafting declarations addressing each country through which each client had transited.  The Final Rule will again make intake more difficult and time-consuming.

221.     Because Al Otro Lado receives funding on a per case basis, the fact that withholding and Convention Against Torture claims are more difficult to prove and require more time and greater legal resources means that the Final Rule, like the Interim Rule, will require the organization to expend many more hours without a corresponding increase in funding.

222.     Plaintiff Innovation Law Lab serves asylum seekers across the United States, including by providing workshops to individuals seeking to apply for asylum *pro se*, advocating for the release of detained asylum seekers, providing direct representation to asylum seekers, and coordinating pro bono representation to asylum seekers.  Innovation Law Lab has staff and offices from which it provides services in California, Oregon, Washington, Arizona, Texas, Illinois, and Florida.  It also coordinates pro bono representation of asylum seekers in California, Georgia, New Mexico, North Carolina, Oregon, and Texas through its "Centers of Excellence."  These Centers of Excellence provide support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.

223.     The majority of the asylum seekers Innovation Law Lab serves transit through another country en route to the United States.  Accordingly, the Interim Rule frustrated Innovation Law Lab's mission of serving asylum seekers and caused the diversion of organizational resources, including by requiring it to revise its resources, templates, instructional guides, training materials, and trainings.

224.     The Final Rule will further frustrate Innovation Law Lab's mission to serve asylum seekers, including those from Central America and others who must transit through a third country, and will require Innovation Law Lab to again divert its limited resources.  The majority of people Innovation Law Lab serves are asylum seekers, and the majority of those asylum-seeking clients have traveled through a country other than their country of origin on their way to the United States and did not seek asylum in the countries through which they transited.  The Final Rule thus will make a high percentage of the asylum seekers Innovation Law Lab serves ineligible for asylum.

225.     The Final Rule will also, among other things, require Innovation Law Lab to entirely rework the advice and guidance it provides in its legal services workshops, and respond to a flood of inquiries and uncertainty from the immigrant communities Innovation Law Lab serves regarding the attempt to change asylum law.  The Final Rule will also make a significant percentage of Innovation Law Lab's new pro bono cases a great deal more complicated and will require it to reevaluate relief eligibility in all of the cases that it screens and mentors.  And because withholding of removal and Convention Against Torture relief claims have a higher standard of proof than asylum, do not allow for derivative applications, and are more time-consuming to handle, the Centers of Excellence may begin to lose more cases, requiring a shift of significant resources toward mentoring pro bono attorneys on complicated appeals.

226.     Innovation Law Lab also will have to deploy expensive and limited engineering resources to recode its software to create new analytical modeling to account for the Final Rule.  Innovation Law Lab publishes materials for pro bono attorneys and asylum applicants, including printed guides, worksheets, training videos, self-help videos, and other resources that are used around the country.  The Final Rule will require Innovation Law Lab to substantially revise this material and create new learning engagements and materials on the Final Rule.

227.     Thousands of individuals rely on the Innovation Law Lab's systems.  The Final Rule will require the organization to divert its limited resources away from other projects and priorities.

228.     Plaintiff CARECEN provides immigration legal services to clients throughout Southern California.  These services include affirmative and defensive representation for asylum seekers.  CARECEN also educates immigrants through citizenship classes, trainings to develop organizing and advocacy skills, and workshops to facilitate the integration of immigrants into their communities.  CARECEN also helps to organize immigrant communities to advocate for their rights on specific policy issues.  CARECEN is headquartered in Los Angeles, with permanent offices in the San Fernando Valley (Van Nuys) and San Bernardino, as well as over 20 offsite locations throughout Los Angeles and Orange Counties.

229.     Like the Interim Rule, the Final Rule will seriously harm CARECEN in multiple respects, and frustrate CARECEN's mission and divert organizational resources.

230.     One hundred percent of CARECEN's current clients seeking asylum transited through a third country en route to the United States, approximately 25% of whom entered after July 16, 2019.  Accordingly, many of CARECEN's current clients—and virtually all of its clients in the future—would be subjected to the Final Rule.  The organization would be unable to fulfill its mission to assist those clients—including some of its current clients who entered after July 16, 2019—in submitting their asylum applications to USCIS or pursuing their asylum claims as part of their removal proceedings, because they would no longer be eligible.

231.     CARECEN will instead be forced to assist clients in applying for withholding and Convention Against Torture protection only, a much more resource-intensive process.  Additionally, because the evidentiary standard for withholding and CAT is higher, the inability to pursue asylum will also likely lead to a greater number of losses in immigration court, and a greater number of appeals that must be filed by attorneys.  The additional staff time required to handle each case because of the more stringent standards for withholding and CAT and lack of derivative applications will again require diverting resources from other critical areas of work.

232.    The impact of the Interim Rule on CARECEN's operations is indicative of the harm that the Final Rule will cause.  Due to the Interim Rule, CARECEN's attorneys had to reduce their caseloads so that they could devote sufficient time and resources towards advancing the more stringent withholding and Convention Against Torture claims, which were the exclusive avenues for relief for many of our clients.  As one example, CARECEN represented a Ukrainian husband and wife in their removal proceedings.  Absent the transit ban, CARECEN would have pursued an asylum claim for one spouse, with the other as a derivative on the application.  But because they were made ineligible for asylum by the Interim Rule, CARECEN had to expend additional resources, including representing the wife on the appeal of the denial of her withholding claim, before ultimately obtaining asylum and derivative relief for both spouses after the Interim Rule was vacated.

233.    Indeed, because of the resource drain caused by the Interim Rule, CARECEN had to stop nearly all intake of new clients so that it could focus on existing, resource-intensive withholding and Convention Against Torture cases.  When the Interim Rule was in effect, CARECEN was forced to reject 10 to 20 callers seeking representation per month, twice the typical number of rejections.

234.    The inability to intake more cases meant that CARECEN could not obtain additional funding, which is primarily provided on a per-case basis.

235.    The Final Rule will cause CARECEN to again divert resources to training staff and counseling current and prospective clients about the effects of the transit ban.  Like the Interim Rule, the Final Rule will require CARECEN to contact all impacted clients and counsel them on their options.  CARECEN also operates a hotline to provide general information to the broader immigrant community.  The reinstatement of the transit ban in the form of this Final Rule after the Interim Rule was vacated will create considerable confusion in our clients and in the immigrant communities we serve, generate significant inquiries at our offices and on our hotline, and require workshops to address and explain the changes to the community.

236.    Plaintiffs have also been harmed because the brief 30-day post-Interim Rule comment period prevented Plaintiffs from submitting their own separate comments, which would have been more detailed and contained additional information about specific harms to their organizations and clients had the agency provided more for public comments.

## FIRST CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act and Administrative Procedure Act)

237.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

238.    The Immigration and Nationality Act provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

239.    The Immigration and Nationality Act further provides that a noncitizen is ineligible for asylum if he or she "was firmly resettled in another country prior to arriving in the United States."  8 U.S.C. § 1158(b)(2)(A)(vi).

240.    The Immigration and Nationality Act likewise provides that asylum is not available to a noncitizen "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States."  8 U.S.C. § 1558(a)(2)(A).

241.    Any additional condition or limitation on asylum established by the Attorney General must be "consistent with" § 1158.  *See* 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B)

47

(requiring that "any other conditions or limitations on the consideration of an application for asylum" be "not inconsistent with this chapter").

242.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

243.    The Final Rule is contrary to law, including 8 U.S.C. §§ 1158(a)(1), 1158(a)(2)(A), and 1158(b)(2)(A)(vi).

## SECOND CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act)

244.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

245.    The APA requires notice and a meaningful opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  The Attorney General and Acting Secretary of Homeland Security failed to provide notice and an opportunity to comment in a timely manner.

246.    The Interim Rule was not an adequate notice of proposed rulemaking because former Acting Secretary McAleenan lacked authority to issue it and former Acting Secretary Wolf failed to effectively ratify it.

247.    Even if the Interim Rule provided adequate notice of proposed rulemaking, it failed to provide the customary 60-day comment period.

248.    Defendants failed to explain why the customary 60-day period was not practicable or why a shorter period was necessary.

249.    The agencies have not adequately explained, whether in the Interim Rule or the Final Rule, the applicability of the good-cause or foreign-affairs exceptions to notice and comment.

**THIRD CLAIM FOR RELIEF**

**(Violation of Congressional Review Act and Administrative Procedure Act)**

250.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

251.    As a "major rule," the Final Rule needed to be published at least 60 days before it takes effect.  5 U.S.C. §§ 801(a)(3), 804(2).

252.    The Final Rule was published on December 17, 2020.

253.    The Final Rule is set to take effect on January 19, 2021, only 33 days after publication.

254.    Defendants have failed to explain why the Final Rule is not a "major rule."  *See* 85 Fed. Reg. at 82,289.

255.    Accordingly, the Final Rule must be set aside as "not in accordance with law" and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

**FOURTH CLAIM FOR RELIEF**

**(Violation of Administrative Procedure Act, Arbitrary & Capricious)**

256.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

257.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

258.    Among other reasons, the Final Rule is arbitrary and capricious because, in adopting it, Defendants have failed to articulate a reasoned explanation for their decision, which represents a change in the agencies' longstanding policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decision that run counter to the evidence before the agency.

**FIFTH CLAIM FOR RELIEF**

**(Violation of the Homeland Security Act, 6 U.S.C. § 113(g)(2)
and the APA, 5 U.S.C. § 706(2)(A), (C))**

259.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

260.    The Secretary of Homeland Security must be appointed by the President with the advice and consent of the Senate.  6 U.S.C. § 112(a)(1).

261.    The FVRA is the "exclusive means" for authorizing an acting official, unless an alternative statutory provision "expressly" authorizes certain other mechanisms to fill positions in an acting capacity temporarily.  5 U.S.C. § 3347(a).

262.    The HSA provides that "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  6 U.S.C. § 113(g)(2).

263.    McAleenan and, subsequently, Wolf both improperly assumed the position of Acting Secretary in violation of the order of succession as it existed following Nielsen's resignation. Accordingly, neither had legal authority to serve as Acting DHS Secretary, and neither had authority to issue or ratify either the Interim Rule or the Final Rule.

264.    Additionally, even if McAleenan had been properly serving as Acting Secretary, he did not have authority to change the order of succession under the HSA to place Wolf next in line because the HSA reserves the authority to change the succession order to Secretaries and not to Acting Secretaries.  6 U.S.C. § 113(g)(2).  Accordingly, the November Delegation under which Wolf purportedly assumed the role of Acting Secretary was invalid.

265.    The memo issued by Peter Gaynor, which attempted again to elevate Wolf to Acting Secretary on September 10, 2020, and again on November 14, 2020, was itself unlawful under 6 U.S.C. § 113(g)(2), because Gaynor did not properly assume the role of Acting Secretary.  Even if he did, as an Acting Secretary, Gaynor did not have authority to change the order of succession.

266.    Wolf thus did not, at any point, become Acting DHS Secretary.

267.    Because Wolf never became Acting Secretary and because an Acting Secretary may not alter DHS's order of succession, his attempt to install Gaynor on January 11, 2021, was also ineffective.

268.    Because Wolf was not Acting DHS Secretary when he approved the Final Rule on December 17, 2020, the Final Rule is unlawful, without force and effect ab initio pursuant to 5 U.S.C. § 3348(d)(1), and must be set aside as "not in accordance with law" and "in excess of . . . authority" under the APA.  5 U.S.C. § 706(2)(A), (C).  *See also* 6 U.S.C. § 112(e) (identifying "issuance of regulations" as a "function" of the DHS Secretary); *see also* 8 U.S.C. § 1103(a)(3) (assigning powers and duties of the Secretary to include establishing regulations).  Wolf's unlawful actions as Acting Secretary may not be ratified, *see* 5 U.S.C. § 3348(d), and in any event, Wolf's ratification attempts were invalid.

### SIXTH CLAIM FOR RELIEF

**(Violation of the Time Limitation of the Federal Vacancies Reform Act, 5 U.S.C. § 3346(a), and the APA, 5 U.S.C. § 706(2)(A), (C))**

269.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

270.    The Secretary of Homeland Security is an officer who must be appointed by the President with the advice and consent of the Senate.  6 U.S.C. § 112(a)(1).

271.    Congress enacted the FVRA to reclaim its "Appointments Clause power" and reassert its authority over temporary appointments.  *See Sw. Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).

272.    Under the FVRA, an acting official may not fill a vacancy beyond 210 days from the date the vacancy occurs.  5 U.S.C. § 3346(a)(1).

273.    The office of DHS Secretary became vacant upon Secretary Nielsen's resignation on April 10, 2019.  The 210-day time limit for an Acting Secretary therefore expired on November 6, 2019.

274.     Because McAleenan's November Delegation was issued on November 9, 2019, after the 210 days permitted by the FVRA, the November Delegation purporting to elevate Wolf to Acting Secretary had no "force or effect."  5 U.S.C. § 3348(d)(1).

275.     Additionally, Wolf's ratification of the Interim Rule and his approval of the Final Rule are similarly invalid because both occurred outside of the 210-day period allowed under the FVRA.

276.     Accordingly, Wolf was unlawfully serving as Acting Secretary when he issued the Final Rule.

277.     The Final Rule must therefore be declared without force and effect under the FVRA, 5 U.S.C. § 3348(d)(1), and set aside as "not in accordance with law" and "in excess of … authority" under the APA.  5 U.S.C. § 706(2)(A), (C).  Wolf's and McAleenan's unlawful actions may not be ratified, *see* 5 U.S.C. § 3348(d), and in any event, Wolf's ratification attempts were invalid.

**SEVENTH CLAIM FOR RELIEF**

**(Violation of the Appointments Clause and the APA, 5 U.S.C. § 706(2)(B))**

278.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

279.     The appointment of an Acting DHS Secretary with an indefinite term of office violates the Appointments Clause of the United States Constitution, and the Acting DHS Secretary's actions must be set aside as contrary to law.

280.     The Appointments Clause provides that principal officers of the United States, including heads of executive departments, must be appointed by the President "by and with the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.

281.     An acting officer—who is carrying out the functions of a principal officer—is an inferior officer and may serve in that capacity only for a limited time.

282.     As head of department, the Secretary of Homeland Security is a principal officer.

283.    By purporting to exercise the functions and duties of the Secretary of Homeland Security free from any time limitation, McAleenan, Wolf, and Gaynor have sought to serve as principal officers.  Because they were not nominated by the President or confirmed by the Senate, their service as principal officers violated the Appointments Clause.

284.    On December 17, 2020, when Wolf purported to approve the Final Rule, the office of the Secretary of Homeland Security had been vacant without a permanent appointee for 617 days.

285.    Wolf became the longest-serving Secretary of DHS under this administration, acting or otherwise, surpassing both John Kelly and Kirstjen Nielsen, the two Senate-confirmed Secretaries of DHS.

286.    Wolf's tenure became indistinguishable from that of a permanent, Senate-confirmed DHS Secretary, making him a principal officer.

287.    Thus, even if Wolf's service as Acting Secretary of Homeland Security was consistent with the HSA and FVRA, his indefinite ascension to that office without the advice and consent of the Senate violated the Appointments Clause.

288.    Because Wolf's purported service as Acting DHS Secretary was in violation of the Appointments Clause, his approval of the Final Rule was unlawful.

289.    Similarly, when former Acting Secretary McAleenan, also serving without time limitation, purported to issue the Interim Rule, which was adopted by the Final Rule with minor changes, he lacked the authority to do so and violated the Appointments Clause.

290.    Wolf may not circumvent the constitutional limit on his service as Acting Secretary by purporting to take a subordinate role and exercising via delegation the functions assigned to the Secretary of DHS.

291.    The Final Rule is therefore invalid and must be vacated as contrary to law and constitutional authority, 5 U.S.C. § 706(2)(B).  Wolf's and McAleenan's unlawful actions may not be ratified, *see* 5 U.S.C. § 3348(d), and in any event, Wolf's ratification attempts were invalid.

**EIGHTH CLAIM FOR RELIEF**

**(Violation of the Time Limitation of the Federal Vacancies Reform Act,
5 U.S.C. § 3346(a), and the APA, 5 U.S.C. § 706(2)(A), (C))**

292.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

293.    Wolf purported to delegate authority to electronically sign the Final Rule to Defendant Mizelle, in the latter's capacity as the official discharging the duties of General Counsel for DHS.  85 Fed. Reg. at 82,289.

294.    An appointment as General Counsel for DHS requires advice and consent of the Senate, 6 U.S.C. § 113(a)(1)(J).

295.    Any vacancy in the office of General Counsel for DHS is therefore subject to the FVRA's requirements, including the 210-day limit on interim service of an acting official.  5 U.S.C. § 3345(a); *id.* § 3346.

296.    The most recent Senate-confirmed General Counsel for DHS, John Mitnick, was fired on September 17, 2019.

297.    By December 17, 2020, when Mizelle purported to sign the Final Rule on Wolf's behalf, 457 days had elapsed, more than twice the maximum period allowed under the FVRA.

298.    Mizelle was not lawfully performing the functions and duties of the office of General Counsel for DHS, which, under the FVRA, was required to remain vacant after 210 days.  5 U.S.C. § 3348(b).

299.    Because Mizelle's acting service violated the FVRA, his attempt to sign the Final Rule on Wolf's behalf was without force and effect.

300.    Because Mizelle could not lawfully perform the functions and duties of the General Counsel for DHS, Wolf's attempt to delegate authority to Mizelle, in his official capacity as the Senior Official Performing the Duties of the General Counsel for DHS, was ineffective.

301.    Because of Mizelle was not lawfully serving as an officer or employee of DHS, Wolf could not lawfully delegate the Secretary's functions to Mizelle.  *See* 6 U.S.C.§ 112(b)(1) (limiting the delegation of "any of the Secretary's functions to any officer, employee, or organizational unit of the Department").

302.    Because Mizelle was without statutory authority to sign the Final Rule on Wolf's behalf, the publication of the Final Rule was unauthorized.

303.    Because the Final Rule has not been lawfully published, the APA precludes it from taking effect.  *See* 5 U.S.C. § 553(d).

304.    Accordingly, the Final Rule must be set aside as "not in accordance with law" and "in excess of statutory . . . authority" under the APA.  5 U.S.C. § 706(2)(A), (C).  Mizelle's unauthorized signing of the Final Rule may not be ratified, *see* 5 U.S.C. § 3348(d), and in any event, Wolf's ratification was invalid and did not purport to ratify Mizelle's signature.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.  A declaration pursuant to 28 U.S.C. § 2201 that the Final Rule is unlawful and invalid;

b.  Postponement and stay of the Final Rule's effective date pending judicial review under 5 U.S.C. § 705;

c.  An order vacating the Final Rule;

d.  A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Final Rule;

e.  An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

f.  Such other and further relief as the Court deems equitable, just, and proper.

Dated: January 28, 2021

Lee Gelernt*
Omar Jadwat*
Anand Balakrishnan*
Ming Cheung**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*abalakrishnan@aclu.org*
*mcheung@aclu.org*

Melissa Crow*
SOUTHERN POVERTY LAW CENTER
1101 17th Street, NW Suite 705
Washington, D.C. 20036
T: (202) 355-4471
F: (404) 221-5857
*melissa.crow@splcenter.org*

Respectfully submitted,

/s/ Katrina Eiland
Katrina Eiland (SBN 275701)
Cody Wofsy (SBN 294179)
Spencer Amdur (SBN 320069)
Morgan Russell (SBN 296137)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*
*mrussell@aclu.org*

Vasudha Talla (SBN 316219)
Angélica Salceda
AMERICAN CIVIL LIBERTIES UNION OF
NORTHERN CALIFORNIA, INC.
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493
F: (415) 255-8437
*vtalla@aclunc.org*
*asalceda@aclunc.org*

Baher Azmy**
Angelo Guisado**
Ghita Schwarz**
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6464
Facsimile: (212) 614-6499
*bazmy@ccrjustice.org*
*aguisado@ccrjustice.org*
*gschwarz@ccrjustice.org*

*Attorneys for Plaintiffs*

***Admitted pro hac vice*
*** Pro hac vice application forthcoming*