**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT; AL OTRO LADO; INNOVATION LAW LAB; CENTRAL AMERICAN RESOURCE CENTER,<br>*Plaintiffs-Appellees*,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General; UNITED STATES DEPARTMENT OF JUSTICE; JEAN KING, Acting Director, Executive Office for Immigration Review (EOIR); EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TRACY RENAUD, Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services; TROY MILLER, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; U.S. CUSTOMS AND BORDER PROTECTION; TAE D. JOHNSON, | Nos. 19-16487<br>19-16773<br><br>D.C. No.<br>4:19-cv-04073-JST<br><br>ORDER AND AMENDED OPINION |

Acting Director, U.S. Immigration
and Customs Enforcement;
IMMIGRATION AND CUSTOMS
ENFORCEMENT,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted December 2, 2019
San Francisco, California

Filed July 6, 2020
Amended April 8, 2021

Before:  William A. Fletcher, Richard R. Clifton,
and Eric D. Miller, Circuit Judges.

Order;
Opinion by Judge W. Fletcher;
Concurrence by Judge Clifton;
Partial Concurrence and Partial Dissent by Judge Miller

# SUMMARY[*]

## Immigration / Preliminary Injunction

The panel filed: 1) an order denying on behalf of the court a petition for rehearing en banc and amending the opinion filed on July 6, 2020; and 2) an amended opinion affirming the district court's grant of a preliminary injunction against enforcement, in the four states on the United States-Mexico border, of a Department of Justice and Department of Homeland Security joint interim final rule, entitled "Asylum Eligibility and Procedural Modifications" (the "Rule"), which—with limited exceptions—categorically denies asylum to aliens arriving at the border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled.

Previously, a motions panel denied in part and granted in part the government's request for an emergency stay pending appeal, staying the injunction only insofar as it applied to states outside the Ninth Circuit. The district court later reinstated its previous preliminary injunction, but the Supreme Court stayed the injunction pending disposition of the appeal in this court and disposition of the government's petition for a writ of certiorari, if such a writ is filed.

The panel concluded that plaintiffs—nonprofit organizations that represent asylum seekers—had established Article III standing, explaining that the Rule requires a diversion of resources from plaintiffs' other initiatives, and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that three of the plaintiffs showed they would lose significant funding due to the Rule.

With respect to the likelihood of success on the merits, the government justified the Rule by relying on 8 U.S.C. § 1158(b)(2)(C), which provides that the "Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." Specifically, the government argued that the Rule is consistent with § 1158(a)(2)(A), which bars an alien who can be removed to a safe third country from applying for asylum ("safe-third-country bar"), and 8 U.S.C. § 1158(b)(2)(A)(vi), which bars a grant of asylum to an alien who was firmly resettled in another country prior to arriving in the United States ("firm-resettlement bar").

The panel held that the Rule is unlawful under the Administrative Procedures Act ("APA") on the ground that the Rule is not in accordance with law and is in excess of statutory limitations because it is not consistent with 8 U.S.C. § 1158. The panel observed that the government had not asked for deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984), to the agencies' interpretation of § 1158. However, the panel held, independently of *Chevron*, that the Rule is not consistent with § 1158. The panel also noted that it would come to the same conclusion even if it were to apply *Chevron* because the Rule is contrary to the unambiguous language of § 1158.

The panel concluded that the Rule is not consistent with § 1158 because the Rule does virtually nothing to ensure that a third country is a safe option. In so concluding, the panel explained that: 1) the sole protection in the Rule is the requirement that the country be a "signatory" to the 1951

Convention Relating to the Status of Refugees and the 1967 Protocol Relating to the Status of Refugees, neither of which requires a signatory to submit to any meaningful procedures to ensure its obligations are discharged; 2) the Rule lacks the requirements of the safe-third-country bar that there be a formal agreement between the United States and a third country, and that there be a "full and fair" procedure for applying for asylum in that country; and 3) that aliens subject to the Rule cannot conceivably be regarded as firmly resettled in Mexico, as they do not intend to settle in Mexico and have not received an offer of resettlement, as required by the firm-resettlement bar. Moreover, the panel explained that the Rule would make superfluous the protection provided by the safe-third-country and firm-resettlement bars.

The panel also concluded that the Rule is arbitrary and capricious because: 1) evidence in the record contradicted the agencies' conclusion that aliens have safe options in Mexico; 2) the agencies had not justified the Rule's assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim; and 3) the agencies failed to adequately consider the effect of the Rule on unaccompanied minors.

Next, the panel agreed with the district court that plaintiffs established a sufficient likelihood of irreparable harm through diversion of resources and the non-speculative loss of substantial funding from other sources. The panel also held that the district court did not abuse its discretion in weighing the balance of equities and the public interest.

As to the scope of the injunction, the panel noted that the motions panel had stayed the injunction insofar as it operated outside the Ninth Circuit. However, the panel concluded it

was not bound by that decision, noting that this court recently explained in *East Bay Sanctuary Covenant v. Biden*, No. 18-17274, 2020 WL 8970552, at *8 (9th Cir. 2021) (amended opinion), that in deciding whether to stay the grant of a preliminary injunction pending appeal, the motions panel predicts the likelihood of success of the appeal, while the merits panel considers whether the district court abused its discretion in granting the preliminary injunction. Given the differing legal standards and the subsequent record development in this case, the panel concluded the motions panel's order was not binding.

The panel concluded that the district court did not abuse its discretion in entering an injunction covering the four states along the Mexican border. First, the panel concluded that a limited injunction would not offer complete relief from the harms plaintiffs suffer from their inability to represent and protect aliens seeking to enter the country through Texas or New Mexico. Second, the panel explained that the APA provides that a reviewing court shall hold unlawful and set aside agency action not in accordance with the law; it does not tell a circuit to set aside unlawful agency action only within the geographic boundaries of that circuit. Moreover, the panel noted that cases implicating immigration policy have a particularly strong claim for uniform, nationwide relief, and that the government had failed to distinguish this case from the court's uncontroverted line of precedent.

Concurring, Judge Clifton wrote that he concurred in the court's opinion except as to its discussion in part V.D of the scope of the injunction. However, he concurred in the conclusion reached in that section, but only because there did not appear to be sufficient distinction between this case and precedents. To the extent that the opinion in this case

expressed agreement with or affirmative support for the reasoning behind the relevant portions of those opinions, Judge Clifton did not join the opinion.

Concurring in part and dissenting in part, Judge Miller wrote that he agreed with the court that the rule is invalid, and concurred in the court's opinion except as to part V.C.1.a, addressing the Attorney General's statutory authority, and part V.D, addressing the scope of the injunction. Judge Miller wrote separately to elaborate on why, in his view, the rule is arbitrary and capricious, and to explain why the injunction should be limited to asylum seekers having a bona fide client relationship with the plaintiff organizations. Judge Miller also wrote that he would refrain from deciding whether *Chevron* is subject to waiver or whether the Rule exceeds the scope of the Attorney General's statutory authority.

## COUNSEL

Scott G. Stewart (argued), Deputy Assistant Attorney General; Patrick Glen, Senior Litigation Counsel; Erez Reuveni, Assistant Director; William C. Peachey, Director; Jeffrey Bossert Clark, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Lee Gelernt (argued), Omar C. Jadwat, and Anand Balakrishnan, American Civil Liberties Union Foundation Immigrants' Rights Project, New York, New York; Katrina Eiland, Cody Wofsy, Spencer Amdur, Julie Veroff, and Morgan Russell, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, California; Melissa Crow, Southern Poverty Law Center, Washington, D.C.; Baher Azmy, Angelo Guisado, and Ghita Schwarz, Center for Constitutional Rights, New York, New York; Vasudha Talla and Angélica Salceda, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; for Plaintiffs-Appellees.

Alan E. Schoenfeld and Tara E. Levens, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Peter S. Margulies, Roger Williams University School of Law, Bristol, Rhode Island; Shoba Sivaprasad Wadhia, University Park, Pennsylvania; for Amici Curiae Professors of Immigration Law.

Christopher J. Hajec, Director of Litigation, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae Immigration Reform Law Institute.

Xavier Becerra, Attorney General; Michael L. Newman, Senior Assistant Attorney General; Susan Slager, Supervising Deputy Attorney General; Marissa Malouff and Erandi Zamora, Deputy Attorneys General; Attorney General's Office, Los Angeles, California; Maura Healey, Attorney General; David C. Kravitz, Deputy Solicitor General; Abigail B. Taylor, Chief, Civil Rights Division; Office of the Attorney General, Boston, Massachusetts; Philip J. Weiser, Attorney General, Colorado; William Tong, Attorney General, Connecticut; Karl A. Racine, Attorney General, District of Columbia; Kathleen Jennings, Attorney General, Delaware; Clare E. Connors, Attorney General, Hawai'i; Kwame Raoul, Attorney General, Illinois; Aaron M. Frey, Attorney General, Maine; Brian E. Frosh, Attorney General, Maryland; Dana Nessel, Attorney General, Michigan; Keith Ellison, Attorney General, Minnesota; Aaron D. Ford, Attorney General, Nevada; Gurbir S. Grewal, Attorney General, New Jersey; Hector Balderas, Attorney General, New Mexico; Letitia James, Attorney General, New York; Joshua H. Stein, Attorney General, North Carolina; Ellen F. Rosenblum, Attorney General, Oregon; Josh Shapiro, Attorney General, Pennsylania; Peter F. Neronha, Attorney General, Rhode Island; Thomas J. Donovan Jr., Attorney General, Vermont; Mark R. Herring, Attorney General, Virginia; Robert W. Ferguson, Attorney General, Washington; for Amici Curiae States of California, Massachusetts, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia.

Muhammad U. Faridi, Stephanie Teplin, and A. Robert Quirk, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amicus Curiae National Citizenship and Immigration Services Council 119.

Barbara J. Parker, City Attorney; Maria Bee, Erin Bernstein, and Malia McPherson, Attorneys; Office of the City Attorney, Oakland, California; Margaret L. Carter and Daniel R. Suvor, O'Melveny & Myers LLP, Los Angeles, California; Anne L. Morgan, City Attorney, Austin, Texas; Andre M. Davis, City Solicitor, Law Department, Baltimore, Maryland; Eugene L. O'Flaherty, Corporation Counsel, Boston, Massachusetts; Mark A. Flessner, Corporation Counsel, Chicago, Illinois; Leslie J. Girard, Acting County Counsel, County of Monterey, Salinas, California; Marc P. Hansen, County Attorney, County of Montgomery, Rockville, Maryland; Georgia M. Pestana, Acting Corporation Counsel, New York, New York; Lyndsey M. Olson, City Attorney, St. Paul, Minnesota; Zach Klein, City Attorney, Columbus, Ohio; Kimberly M. Foxx, States Attorney, County of Cook, Chicago, Illinois; Christopher J. Caso, Interim City Attorney, Dallas, Texas; Angela Wheeler, City Attorney, Flint, Michigan; Dennis J. Herrera, City Attorney, San Francisco, California; James R. Williams, County Counsel, County of Santa Clara, San Jose, California; Erin K. McSherry, City Attorney, Santa Fe, New Mexico; Peter S. Holmes, City Attorney, Seattle, Washington; Eleanor M. Dilkes, City Attorney, Iowa City, Iowa; Michael N. Feuer, City Attorney, Los Angeles, California; Susan Segal, City Attorney, Minneapolis, Minnesota; Francis X. Wright Jr., City Solicitor, Somerville, Massachusetts; William Fosbre, City Attorney, Tacoma, Washington; Michael Rankin, City Attorney, Tucson, Arizona; for Amici Curiae 24 Counties and Cities.

Blaine Bookey, Anne Peterson, Karen Musalo, and Kate Jastram, Center for Gender & Refugee Studies, U.C. Hastings College of Law, San Francisco, California, for Amici Curiae Non-Profit Organizations and Law School Clinics.

Alice Farmer, Office of the United Nations High Commissioner for Refugees, Washington, D.C.; Patrick W. Pearsall, Karthik P. Reddy, and Vaishalee V. Yeldandi, Jenner & Block LLP, Washington, D.C.; for Amicus Curiae Office of the United Nations High Commissioner for Refugees.

Harold Hongju Koh, Peter Gruber Rule of Law Clinic, New Haven, Connecticut; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Former National Security Officials.

Scott Shuchart, Kids in Need of Defense, Washington, D.C.; Ilissa S. Samplin and Jennafer Tryck, Gibson Dunn & Crutcher LLP, Los Angeles, California; Rachel S. Brass, Gibson Dunn & Crutcher LLP, San Francisco, California; for Amicus Curiae Kids in Need of Defense.

## ORDER

**1.** Appellants filed a petition for rehearing en banc on October 5, 2020 (19-16487, Dkt. Entry 117; 19-16773, Dkt. Entry 75). Judges W. Fletcher and Miller have voted to deny the petition for rehearing en banc, and Judge Clifton so recommends. The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED**.

**2.** The opinion filed on July 6, 2020, is amended as follows:

On page 49, strike the entire second paragraph, starting with, "That decision does not bind this court when sitting as a merits panel."

Replace it with:

The motions panel's decision is not binding. As we recently explained in *East Bay Sanctuary Covenant v. Biden ("East Bay III")*, No. 18-17274, 2020 WL 8970552, at *8 (9th Cir. 2021) (amended opinion), "[i]n deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel is *predicting* the likelihood of success of the appeal." (Emphasis added). As in *East Bay III*, the motions panel considered whether to stay the injunction. We consider whether the district court abused its discretion in granting the preliminary injunction. These are different issues. Moreover, after the motions panel published its opinion, the district court took additional evidence and reinstated its previously entered injunction. Given the differing legal standards and the subsequent record

development in this case, the motions panel's order is not binding.  *See id.*

**3.** An amended opinion is filed concurrently with this order.  No further petitions for rehearing may be filed.

## OPINION

W. FLETCHER, Circuit Judge:

On July 16, 2019, the Department of Justice and the Department of Homeland Security published a joint interim final Rule without notice and comment, entitled "Asylum Eligibility and Procedural Modifications" (the "Rule").  With limited exceptions, the Rule categorically denies asylum to aliens arriving at our border with Mexico unless they have first applied for, and have been denied, asylum in Mexico or another country through which they have traveled.   We describe the Rule in detail below.

Plaintiffs are nonprofit organizations that represent asylum seekers.  They brought suit in district court seeking an injunction against enforcement of the Rule, contending that the Rule is invalid on three grounds:  first, the Rule is not "consistent with" Section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158; second, the Rule is arbitrary and capricious; third, the Rule was adopted without notice and comment.  The district court found that plaintiffs had a likelihood of success on all three grounds and entered a preliminary injunction against enforcement of the Rule, with effect in the four states on our border with Mexico.

We hold that plaintiffs have shown a likelihood of success on the first and second grounds. We do not reach the third ground. We affirm.

## I. Procedural Background

The district court entered a published order on July 24, 2019, granting relief to plaintiffs. *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 960 (N.D. Cal. 2019) ("*E. Bay I*"). The government appealed and sought an emergency stay pending appeal. A motions panel of our court denied in part and granted in part the requested stay. *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1028 (9th Cir. 2019) ("*E. Bay II*"). The motions panel concluded that the government had not made a "strong showing" that it was likely to succeed on its contention that the Rule was properly issued without notice and comment. *Id.* The panel did not address the government's other contentions on the merits. It declined to stay the operation of the district court's injunction within the Ninth Circuit, but granted the stay "insofar as the injunction applies outside the Ninth Circuit, because the nationwide scope of the injunction is not supported by the record as it stands." *Id.* One member of the motions panel would have denied the stay request in its entirety. *Id.* at 1031 (Tashima, J., concurring in part and dissenting in part).

After the motions panel granted the stay with respect to the geographical scope of the injunction, the district court took additional evidence to expand the record. On September 9, 2019, the district court reinstated its previously entered injunction. *E. Bay Sanctuary Covenant v. Barr*, 391 F. Supp. 3d 974, 985 (N.D. Cal. 2019) ("*E. Bay III*"). The government again sought an emergency stay pending appeal. By the time the government sought the second stay, the appeal had been

assigned to a merits panel.  On September 10, the merits panel issued a clerk order administratively staying the district court's injunction in order to allow consideration of the government's second stay request.  On September 11, the Supreme Court issued a one-paragraph order pretermitting any decision by the merits panel on the second stay request. Without addressing either the substantive merits or the scope of the injunction, the Court stayed the district court's order "in full pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is sought." *Barr v. E. Bay Sanctuary Covenant*, 140 S. Ct. 3 (2019).  The merits panel heard argument on the government's appeal on December 2, 2019.

## II.  Background of the Immigration and Nationality Act

In 1967, the United Nations adopted the Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267, 19 U.S.T. 6223, T.I.A.S. No. 6577 ("1967 Protocol"), which largely incorporated the United Nation's 1951 Convention Relating to the Status of Refugees, 189 U.N.T.S. 137 ("1951 Convention").  The 1967 Protocol and the 1951 Convention defined a "refugee" as someone who is "unable" or "unwilling" to return to his or her country of origin due to a "well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion." *See* 1951 Convention, art. 1(A); 1967 Protocol, art. 1.  In 1968, the United States acceded to the 1967 Protocol, and by extension, the incorporated 1951 Convention.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987).

16    EAST BAY SANCTUARY COVENANT V. GARLAND

A decade later, Congress passed the Refugee Act of 1980, Pub. L. No. 96–212, 94 Stat. 102 (1980), amending the Immigration and Nationality Act ("INA"). "As [the U.S. Supreme Court] has twice recognized, one of Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in the [1967 Protocol] as well as the [1951 Convention]." *Negusie v. Holder*, 555 U.S. 511, 520 (2009) (internal quotations and citations omitted); *see generally* Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 San Diego L. Rev. 9, 46 (1981) ("Anker & Posner"); Stephen H. Legomsky & Cristina M. Rodríguez, Immigration and Refugee Law and Policy 883 (5th ed. 2009) ("Legomsky & Rodríguez").

Among other reforms, the Refugee Act codified the 1967 Protocol's definition of "refugee." *See* Pub. L. No. 96–212, § 201(a), 94 Stat. 102, 102. In relevant part, the INA defines refugees as persons outside of their own country who are "unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

The Refugee Act also codified procedures for determining eligibility for asylum. It required the Attorney General to create an "asylum procedure" under which any alien "physically present in the United States or at a land border or port of entry, irrespective of such alien's status" could apply for asylum. Pub. L. No. 96–212, § 208, 94 Stat. 102, 105; *cf.* 8 U.S.C. § 1158(a)(1) (modern equivalent). In explaining this provision, the House Report emphasized that the Act's asylum procedure was designed to give full effect to our treaty obligations:

> The Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law . . . . *The Committee intends to monitor closely the Attorney General's implementation of the section so as to insure the rights of those it seeks to protect*.

H.R. Rep. No. 96–608 ("H.R. Rep.") at 17–18 (1979) (emphasis added).

Finally, the Refugee Act codified exceptions to eligibility for asylum. As discussed in detail below, the codified exceptions paralleled exceptions to removal relief contained in the 1951 Convention. *See* H.R. Rep. at 18 ("The exceptions [to withholding of removal] are those provided in the [1951] Convention."); Legomsky & Rodríguez at 1016.

## III.  Asylum Under the Immigration and Nationality Act

Refugees, as defined in 8 U.S.C. § 1101(a)(42)(A), are eligible to apply for asylum. The burden of proof to show refugee status falls on the applicant. "To establish that the applicant is a refugee . . . , the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i).

Subject to certain statutory exceptions, an alien "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival

. . . )" is eligible to apply for asylum. *Id.* § 1158(a)(1). Those exceptions include: aliens who may be "removed" to a "safe third country"; aliens who did not apply for asylum within one year after arrival in the United States; and aliens who previously applied for, and were denied, asylum. *See id.* § 1158(a)(2)(A)–(C). The safe-third-country provision and the one-year filing deadline do not apply to unaccompanied children. *Id.* § 1158(a)(2)(E).

Again subject to certain statutory exceptions, the Attorney General or the Secretary of Homeland Security may grant asylum to refugees who are eligible to apply for asylum. *Id.* § 1158(b)(1). Those exceptions include aliens who have persecuted others on account of a protected ground; aliens who have been convicted of particularly dangerous crimes; aliens for whom there are serious reasons to believe they have committed serious nonpolitical crimes outside the United States; aliens for whom there are reasonable grounds to believe they are terrorists or a danger to the security of the United States; and aliens who have "firmly resettled in another country prior to arriving in the United States." *See id.* § 1158(b)(2)(A)(i)–(vi).

Two of the exceptions—or asylum bars—are directly relevant to the appeal before us. First, an alien subject to the "safe third country" provision may not apply for asylum. *Id.* § 1158(a)(2)(A). Second, neither the Attorney General nor the Secretary of Homeland Security may grant asylum to an alien who was "firmly resettled" in another country prior to arriving in the United States. *Id.* § 1158(b)(2)(A)(vi). We describe these two asylum bars in turn.

### A.  Safe-Third-Country Bar

In 1995, the Attorney General promulgated a regulation allowing discretionary denials of asylum in certain circumstances where asylum or its near equivalent was available in a safe third country.  8 C.F.R. § 208.15 (1995). A year later, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 604, Pub. L. No. 104–208, 110 Stat. 3009, 3009–690 (1996) ("IIRIRA"), Congress codified, with some changes, the Attorney General's regulation.  Section 1158(a)(2)(A), the safe-third-country bar, provides:

> Paragraph [a](1) [authorizing refugees to apply for asylum] shall not apply to an alien if the Attorney General determines that the alien may be removed, *pursuant to a bilateral or multilateral agreement*, to a country . . . in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and *where the alien would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection* . . . .

(emphases added.)

As indicated by the italicized language, there are two core requirements that must be satisfied before the safe-third-country bar applies.  First, there must be an agreement between the United States and another country to which the alien would be removed and in which the alien would not be subject to persecution.  Second, the country with which the

United States has such an agreement must allow access to a "full and fair" procedure for determining eligibility for asylum or equivalent temporary protection.

In 2002, the United States entered into a safe-third-country agreement with Canada. *See* Agreement Between the Government of the United States of America and the Government of Canada for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, Can.–U.S., Dec. 5, 2002, T.I.A.S. No. 04-1229 (2004). When the Rule was issued, the United States had entered into no other safe-third-country agreement.

### B.  Firm-Resettlement Bar

A firm-resettlement bar was first incorporated into United States law in the Displaced Persons Act of 1948. *See* Pub. L. No. 80–774, 62 Stat. 1009 (1948); *Rosenberg v. Woo*, 402 U.S. 49, 53–54 (1971). The bar was carried over into the Refugee Relief Act of 1953. *See* Pub. L. No. 83–203, 67 Stat. 400 (1953). The firm resettlement language was dropped from the Refugee Relief Act of 1957, *see* Pub. L. No. 85–316, 71 Stat. 639 (1957), but the concept of firm resettlement remained in refugee admissions even without an explicit statutory reference. *See Rosenberg*, 402 U.S. at 53–58. The Refugee Act of 1980 again codified the firm-resettlement bar. Pub. L. No. 96–212, § 207(c)(1), 94 Stat. 102, 103.

In 1996, Congress included the firm-resettlement bar in IIRIRA. The current statutory language provides:

> Paragraph [b](1) [authorizing discretionary grants of asylum] shall not apply to an alien if the Attorney General determines that—

. . .

> (vi) the alien was firmly resettled in another country prior to arriving in the United States.

8 U.S.C. § 1158(b)(2)(A). The current implementing regulation provides:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of

> housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 208.15.

A determination whether the firm-resettlement bar applies entails a two-step process. First, the government has the "initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely." *Maharaj v. Gonzales*, 450 F.3d 961, 976 (9th Cir. 2006) (en banc). Second, if the government has carried its initial burden, "the burden shifts to the applicant to show that the nature of his stay and ties was too tenuous, or the conditions of his residence too restricted, for him to be firmly resettled." *Id.* at 976–77. *See also Arrey v. Barr*, 916 F.3d 1149, 1159 (9th Cir. 2019) (reciting the two-step process outlined in *Maharaj*).

### IV.  The Rule

On July 16, 2019, the Departments of Justice and Homeland Security jointly issued an interim final Rule governing aliens who travel through a "third country" before reaching the southern land border of the United States. *See*

Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,830 (July 16, 2019) (codified at 8 C.F.R. §§ 208, 1003, 1208).  The Rule provides:

> Notwithstanding the provisions of [8 C.F.R.] § 208.15 [the regulation implementing the firm-resettlement bar], any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019 after transiting through at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence en route to the United States, shall be found ineligible for asylum unless:

> (i) The alien demonstrates that he or she applied for protection from persecution or torture in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States, and the alien received a final judgment denying the alien protection in such country;

> (ii) The alien demonstrates that he or she satisfies the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11; or

> (iii) The only countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating

> to the Status of Refugees, the 1967 Protocol
> Relating to the Status of Refugees, or the
> United Nations Convention against Torture
> and Other Cruel, Inhuman or Degrading
> Treatment or Punishment.

8 C.F.R. § 208.13(c)(4); *see also id.* § 1208.13(c)(4).

In effect, the Rule requires Guatemalan aliens reaching our southern border to apply for, and then be finally denied, asylum by Mexico before they are eligible to apply for asylum in the United States. The same requirement applies to aliens who arrived in Mexico from other countries by plane or ship before traveling to our southern border. Aliens traveling overland from El Salvador, Honduras, or other countries south of Guatemala, must apply for and be finally denied asylum by Mexico, Guatemala, or another country through which they traveled.

The Rule further provides that aliens ineligible for asylum under § 208.13(c)(4) are automatically and conclusively determined not to have a "credible fear" of persecution in their home countries:

> If the alien is found to be an alien described as
> ineligible for asylum in § 208.13(c)(4), then
> the asylum officer shall enter a negative
> credible fear determination with respect to the
> alien's application for asylum.

8 C.F.R. § 208.30(e)(5)(iii).

The Rule applies only to aliens seeking asylum. It does not apply to aliens seeking withholding of removal or relief

under the Convention Against Torture ("CAT").  The standards for granting withholding or CAT relief are higher than those governing a grant of asylum.  *See Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014).  Most important, an applicant for withholding or CAT relief must establish a "reasonable fear" of persecution or torture rather than merely a "credible fear."  *See* 8 C.F.R. §§ 208.30(e)(5)(iii), 1208.16(c)(2).  Further, relief under withholding of removal and under CAT is less advantageous than asylum relief.  For example, "[u]nlike an application for asylum, [] a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and [the relief] only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country." *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (citation omitted and alteration in original).

## V.  Discussion

### A.  Standard of Review

We review "the district court's decision to grant or deny a preliminary injunction for abuse of discretion." *Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017) (internal quotation marks omitted).  "The scope of the preliminary injunction, such as its nationwide effect, is . . . reviewed for abuse of discretion."  *California v. Azar*, 911 F.3d 558, 568 (9th Cir. 2018).  We review legal conclusions de novo and underlying factual findings for clear error.  *Hernandez*, 872 F.3d at 987.

## B. Article III Standing

The government challenged plaintiffs' Article III standing in the district court. In this court, it challenges their Article III standing only in a footnote. We sometimes treat as waived arguments that are made in such a perfunctory manner, *see Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014), but we have an independent obligation to determine our jurisdiction under Article III.

An organization can assert Article III standing on behalf of either its members or the organization itself. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). An organization may establish standing on its own behalf by showing that the defendant's conduct resulted in "a diversion of its resources and frustration of its mission," *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (discussing *Havens Realty*), or caused a substantial loss in organizational funding, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766–67 (9th Cir. 2018) ("*Trump I*"). Of course, an organization cannot "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

Plaintiffs are nonprofit organizations that represent and assist asylum seekers in the United States and in Mexico. Plaintiffs argue that the Rule frustrates their mission of providing legal aid to affirmative asylum applicants because it renders "a large number" of potential applicants categorically ineligible for asylum and thus "significantly

discourages" them from applying. *Trump I*, 932 F.3d at 766. The district court found that plaintiffs "offered uncontradicted evidence that enforcement of the Rule has required, and will continue to require, a diversion of resources . . . from their other initiatives." *E. Bay I*, 385 F. Supp. 3d at 937. For example, East Bay Sanctuary Covenant, which focuses on filing affirmative asylum applications, would have to "overhaul" its affirmative asylum practice into a removal defense program, diverting resources to develop new materials and train existing staff. *Trump I*, 932 F.3d at 766. Because forms of relief from removal other than asylum do not allow applicants to file derivative applications for family members, plaintiffs must divert resources to filing a greater number of applications for each family-unit client. *Id.* The district court also found that three of the plaintiffs showed that they would lose significant funding because a large portion of their funding was tied to the number of asylum applications pursued, and a significant majority of their clients were now categorically ineligible for asylum. *E. Bay I*, 385 F. Supp. 3d at 937; *see also Trump I*, 932 F.3d at 767.

Plaintiffs' injuries are not "manufacture[d] . . . injur[ies]" addressing "a problem that would not affect the organization at all." *Lake Forest*, 624 F.3d at 1088. The injuries affect plaintiffs' core mission and their organizational funding, and are sufficient to establish standing. We note that we recently held that the same four plaintiffs, asserting the same harms resulting from a different agency rule limiting asylum eligibility, had standing to challenge that rule. *See E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265–68 (9th Cir. 2020) ("*Trump II*").

### C.  Preliminary Injunction

On a motion for a preliminary injunction, plaintiffs must make a "threshold showing" of four factors.  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam). Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they are likely to "suffer irreparable harm" without relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

We consider them in turn.

### 1.  Likelihood of Success on the Merits

To show a likelihood of success on the merits, plaintiffs must show that the Rule is likely to be held unlawful agency action under the Administrative Procedure Act ("APA").  In relevant part, the APA provides:

> The reviewing court shall—
>
> . . .
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . .
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
>
> (D)  without observance of procedure required by law[.]

5 U.S.C. § 706(2).

Plaintiffs allege that the Rule is unlawful under the APA on three grounds.  First, under § 706(2)(A) and (C), the Rule is "not in accordance with law" and is "in excess of statutory . . . limitations" because it is not "consistent with" § 1158. 8 U.S.C. § 1158(b)(2)(C).  Second, under § 706(2)(A), the Rule is "arbitrary" and "capricious" because it "runs counter to the evidence before the agency" and because the agencies "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").  Third, under § 706(2)(D), the Rule was adopted "without observance of procedure required by law" because it was adopted without notice and comment.  The district court agreed with plaintiffs on all three grounds.  We affirm on the first two.  We do not reach the third.

### a.  "Not in Accordance with Law" or "in Excess of Statutory Limitations"

The Rule creates a bar to asylum, in addition to the asylum bars that already exist in § 1158.  To justify the additional bar, the government relies on § 1158(b)(2)(C), which provides that "[t]he Attorney General may by regulation establish additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum under paragraph [b](1)." (emphasis added).

An agency action must be "set aside" if it is "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).  When a plaintiff alleges a violation of a statute by a federal agency, we generally apply *Chevron* to determine whether to defer to the agency's interpretation of the statute.  *See*, *e.g.*, *Nw. Envt'l Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,* 467 U.S. 837 (1984)).  In the case before us, however, the government has not asked for deference under *Chevron* to the agencies' interpretation of § 1158.  The government did not mention *Chevron* in its briefs and specifically disclaimed reliance on *Chevron* during oral argument.  We hold, independently of *Chevron*, that the Rule is not "consistent with" § 1158.  We note, however, that we would come to the same conclusion even if we were to apply *Chevron*, for the Rule is contrary to the unambiguous language of § 1158.

The question before us is whether the Rule is "consistent with" § 1158, as required by § 1158(b)(2)(C).  For the reasons that follow, we conclude that it is not, and the Rule is

therefore "not in accordance with law," and is "in excess of statutory . . . limitations."  5 U.S.C. § 706(2)(A), (C).

Asylum bars under § 1158 fall into two broad categories. As relevant here, the first category covers aliens who may otherwise be entitled to asylum but who pose a threat to society—aliens who have persecuted others, aliens who have been convicted of particularly serious crimes, aliens who may have committed serious non-political crimes outside the United States, and aliens who may be terrorists or a danger to the security of the United States.  *See* 8 U.S.C. § 1158(b)(2)(A)(i)–(iv).  The second category covers aliens who do not need the protection of asylum in the United States—aliens who may be removed to a safe third country, and aliens who have firmly resettled in another country.  *See id.* § 1158(a)(2)(A) and (b)(2)(A)(vi).

Section 1158 is rooted in the 1951 Convention, which excludes from protection two broad categories of aliens—those persons "considered not to be *deserving* of international protection," and those persons "not considered to be in *need* of international protection."  U.N. High Commissioner for Refugees ("UNHCR") Handbook on Procedures and Criteria for Determining Refugee Status (Geneva, 1979) ("Handbook"), ch. 4, ¶¶ 144–63 (emphases added); *see Cardoza-Fonseca*, 480 U.S. at 439 n.22 (noting that Handbook provides "significant guidance" in interpreting refugee law); *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005) (same).  Specifically, the 1951 Convention recognizes that a nation may justifiably exclude persons convicted of certain crimes, such as a "serious non-political crime" from entering its borders, 1951 Convention, art. 1(F)(b), and persons who have found full "rights and obligations" in a third country, *id.*, art. 1(E).  *See Hernandez-*

*Ortiz v. INS*, 777 F.2d 509, 519 (9th Cir. 1985) (noting that denial of asylum must be on grounds either "involving the national interest or the welfare of the community, or . . . relating to the existence of other means of ensuring the safety and security of the alien."), *superseded on other grounds by statute*, *see Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009).  Scholars have noted that the bars of § 1158 "rough[ly] parallel[]" the bars of the 1951 Convention. Legomsky & Rodríguez at 1016; *see also* Deborah E. Anker, *Discretionary Asylum: A Protection Remedy for Refugees Under the Refugee Act of 1980*, 28 Va. J. Int'l L. 1, 50–51, 55–60 (1987).

The government does not argue that aliens subject to the Rule are similar to aliens barred because they are persecutors, criminals, or a threat to national security.  That is, it does not argue that the Rule furthers the purpose and is therefore "consistent with" § 1158(b)(2)(A)(i)–(iv).   Rather, the government argues that the Rule is "consistent with" the safe-third-country and firm-resettlement bars.  *See* 8 U.S.C. § 1158(a)(2)(A) and (b)(2)(A)(vi).

The safe-third-country and firm-resettlement bars "limit an alien's ability to claim asylum in the United States when other safe options are available." *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA 2013).  These two asylum bars are consistent with the "core regulatory purpose of asylum," which is "to protect [refugees] with nowhere else to turn," because "by definition" an applicant barred by a safe-place provision has somewhere else to turn.  *Id.*; *Yang v. INS*, 79 F.3d 932, 939 (9th Cir. 1996).

A critical component of both bars is the requirement that the alien's "safe option" be genuinely safe.  The safe-third-

country bar requires that the third country enter into a formal agreement with the United States; that the alien will not be persecuted on account of a protected ground in that country; and that the alien will have access to a "full and fair" asylum procedure in that country. 8 U.S.C. § 1158(a)(2)(A). "The requirement of a pre-existing [safe-third-country] agreement was an essential procedural safeguard agreed to among members of Congress to prevent arbitrary denials of asylum." Understanding the 1996 Immigration Act § 2–6 (Juan P. Osuna ed., 1997). The firm-resettlement bar requires the government to make an individualized determination whether an alien has truly been firmly resettled, or, if only an offer of permanent resettlement has been made, an individualized determination whether an alien has too tenuous a tie to the country making the offer or is too restricted by that country's authorities. 8 C.F.R. § 208.15(a), (b); *Arrey*, 916 F.3d at 1159. The safe-place requirements embedded in the safe-third-country and firm-resettlement bars "ensure that if [the United States] denies a refugee asylum, the refugee will not be forced to return to a land where he would once again become a victim of harm or persecution"—an outcome which "would totally undermine the humanitarian policy underlying the regulation." *Andriasian v. INS*, 180 F.3d 1033, 1046–47 (9th Cir. 1999).

In stark contrast to the safe-third-country and firm-resettlement bars, "the Rule does virtually nothing to ensure that a third country is a 'safe option.'" *E. Bay I*, 385 F. Supp. 3d at 944. The sole protection provided by the Rule is its requirement that the country through which the barred alien has traveled be a "signatory" to the 1951 Convention and the 1967 Protocol. This requirement does not remotely resemble the assurances of safety built into the two safe-place bars of § 1158. A country becomes a signatory to the Convention

and the Protocol merely by submitting an instrument of accession to the U.N. Secretary General.  It need not "submit to any meaningful international procedure to ensure that its obligations are in fact discharged."  *See* Declaration of Deborah Anker, Harvard Law School, & James C. Hathaway, University of Michigan Law School, ¶¶ 5, 7.  Many of the aliens subject to the Rule are now in Mexico.  They have fled from Guatemala, Honduras, and El Salvador.  All four of these countries are parties to the Convention and Protocol. 84 Fed. Reg. at 33,839.

The Rule superficially resembles the safe-third-country bar in that aliens subject to the Rule are in a third country, and they must apply for asylum in that country (Mexico) or must have previously applied for asylum in another third country (Guatemala).  Similarly, the safe-third-country bar under § 1158(a)(2)(A) allows the United States to deny asylum on the ground that the alien may be removed to and apply for asylum in a safe third country.  But entirely absent from the Rule are the requirements under § 1158(a)(2)(A) that there be a formal agreement between the United States and the third country, and that there be a "full and fair" procedure for applying for asylum in that country.

The Rule does not even superficially resemble the firm-resettlement bar.  The firm-resettlement bar denies asylum to aliens who have either truly resettled in a third country, or have received an actual offer of firm resettlement in a country where they have ties and will be provided appropriate status. Aliens subject to the Rule cannot conceivably be regarded as firmly resettled in Mexico.  They do not intend to settle in Mexico.  They have been there only for the time necessary to reach our border and apply for asylum.  Nor have they received an offer of resettlement.  Even if they were to

receive such an offer, they have no ties to Mexico.   The Supreme Court has long recognized that the firm-resettlement bar does not bar aliens who have merely traveled through third countries, since "many refugees make their escape to freedom from persecution in successive stages and come to this country only after stops along the way." *Rosenberg*, 402 U.S. at 57 n.6.   The BIA has likewise understood that denial of asylum cannot be predicated solely on an alien's transit through a third country. *See Matter of Soleimani*, 20 I. & N. Dec. 99, 103 (BIA 1989); *see also Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (BIA 1987)*; E. Bay I*, 385 F. Supp. 3d at 940.

"A statute should be construed so that . . . no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, at 181–86 (rev. 6th ed. 2000)).   In enacting the two safe-place bars, Congress specifically addressed the circumstances in which an alien who has traveled through, or stayed in, a third country can be deemed sufficiently safe in that country to warrant a denial of asylum in the United States.   The administration's new Rule would make entirely superfluous the protection provided by the two safe-place bars in § 1158.   Under the Rule, the government need neither enter into a safe-third-country agreement, nor show firm resettlement in Mexico, in order to deny asylum.   The government need only show that an alien from Guatemala, Honduras, or El Salvador has arrived at our southern border with Mexico.

The government makes essentially two arguments in favor of the Rule.   Neither argument is convincing.

First, the government argues that a holding that the Rule is not "consistent with" § 1158 would require a "field-preemptive" reading of § 1158, restricting the Attorney General to limiting eligibility for asylum only as specifically provided by its two safe-place provisions.  The government argues that such a "field-preemptive" reading is inconsistent with the statute's grant of authority to the Attorney General in § 1158(b)(2)(C) to establish by regulation "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph [b](1)."

Contrary to the government's argument, § 1158(b)(2)(C) need not be read—and we do not read it—as preempting the field, such that the government is entirely disabled from promulgating regulations with "additional limitations and conditions" under which an alien would be ineligible for asylum.  That is, we do not read the "consistent with" language of § 1158(b)(2)(C) as limiting the Attorney General's authority to the literal terms of the two safe-place statutory bars.  But we do read the words "consistent with" as limiting the scope of that authority.  We put to one side as irrelevant for present purposes the one-year time bar and regulations that are directed to persecutors, criminals, and threats to national security.  For the rest, regulations imposing additional limitations and conditions under § 1158(b)(2)(C) must be consistent with the core principle of § 1158(a)(2)(A) and (b)(2)(A)(vi)—that an otherwise qualified alien can be denied asylum only if there is a "safe option" in another country.  If such a regulation ensures a genuinely safe option in another country, that regulation would be "consistent with" § 1158.  However, the challenged Rule does no such thing.

Second, pointing to the Attorney General's discretion to deny asylum to eligible aliens, the government suggests that the Attorney General has equivalent discretion to establish criteria for asylum eligibility. The government writes in its brief, "The asylum statute makes clear that asylum is *always a matter of executive 'discretion'* and never a matter of 'entitlement.'" 1 Gov't Br. 26 (quoting *Cardoza-Fonseca*, 480 U.S. at 428 n.6 and citing 8 U.S.C. § 1158(b)(1)(A)) (emphasis added). The government writes in the next sentence: "The asylum statute also makes clear that the Executive *may exercise its discretion* through categorical rules, not just through case-by-case adjudication." *Id.* (emphasis added).

In juxtaposing these two sentences, the government suggests that the Attorney General's discretion to deny asylum under § 1158(b)(1)(A) is equal in scope to his discretion to prescribe criteria for eligibility for asylum. This suggestion is based on a misunderstanding of the Attorney General's discretion to deny asylum under § 1158(b)(1)(A). The Supreme Court in *Cardoza-Fonseca* noted that the Attorney General has broad discretion to deny asylum under § 1158(b)(1)(A), but it made clear that this discretion may be exercised only with respect to aliens who are eligible for asylum: "[A]n alien who satisfies the applicable standard under § [1158](a) does not have a *right* to remain in the United States; he or she simply is *eligible* for asylum, if the Attorney General, in his discretion, chooses to grant it." *Cardoza-Fonseca*, 480 U.S. at 443 (emphasis in original). Discretion to deny asylum to eligible aliens, as in *Cardoza-Fonseca*, is different from discretion to prescribe criteria for asylum eligibility. Unlike the broad discretion to deny asylum to aliens who are eligible for asylum, the discretion to prescribe criteria for eligibility is constrained by

§ 1158(b)(2)(C), which allows the Attorney General to "establish additional limitations and conditions . . . under which an alien shall be ineligible for asylum" only so long as those limitations and conditions are "consistent with" § 1158.

If the Attorney General's discretion to add limitations and conditions for asylum eligibility were the same as his discretion to deny asylum to eligible aliens, the "consistent with" language in § 1158(b)(2)(C) would be superfluous. Under the canons of construction, we should avoid an interpretation of statutory language that would produce superfluity. But even without resort to the canons, we can be confident that the "consistent with" language is not, and was not intended to be, superfluous. The legislative history of IIRIRA emphasizes the importance Congress attached to the constraints on the Attorney General's discretion to prescribe criteria for asylum eligibility. When enacting IIRIRA, Congress went out of its way to insert the "consistent with" language into § 1158(b)(2)(C), adding it to an earlier draft of IIRIRA that had not contained that language. *Compare* H.R. Rep. No. 104-469, at 80 (1996), *with* H.R. Rep. No. 104-828, at 164 (1996) (Conf. Rep.).

### b. Arbitrary and Capricious

"[T]he touchstone of 'arbitrary and capricious' review . . . is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52).

The Rule is arbitrary and capricious for three reasons. First, evidence in the record contradicts the agencies' conclusion that aliens barred by the Rule have safe options in Mexico. Second, the agencies have not justified the Rule's

assumption that an alien who has failed to apply for asylum in a third country is, for that reason, not likely to have a meritorious asylum claim. Finally, the agencies failed to adequately consider the effect of the Rule on unaccompanied minors.

### i. Safe Option

Consistent with the "core regulatory purpose" of asylum to "protect [refugees] with nowhere else to turn," *Matter of B-R-*, 26 I. & N. Dec at 122, the Rule must ensure some degree of safety for aliens barred from asylum. Quoting from the agencies' analysis of, and justification for, the Rule, the government argues in its brief that "applicants covered by the bar do 'have [an] alternative country where they can escape persecution or torture.'" 1 Gov't Br. 16 (quoting 84 Fed. Reg. at 33,840); *see also* 84 Fed. Reg. at 33,840 (characterizing aliens subject to the Rule as "aliens without a genuine need for asylum"). The government contends that Mexico offers a "feasible alternative" to relief in the United States. 1 Gov't Br. 39–41. At oral argument, the government stated that the Rule is "consistent with the aim and thrust of those other two bars," which "set out situations where somebody has such a good circumstance or . . . place to live, that they categorically do not need asylum from this country." The government writes further in its brief, "[A]s even the district court's review shows, Mexico has a robust refugee-protection system, which is improving in conjunction with guidance from international partners." 1 Gov't Br. 40. (citing *E. Bay I*, 385 F. Supp. 3d at 952–54).

The government misrepresents both the record and the district court's opinion.

In the pages of its opinion cited by the government, the district court described and analyzed the record:

> The statistics regarding the number of claims submitted in Mexico contradict the government's suggestion that Mexico provides an adequate alternative. . . . [T]he administrative record fails to support the conclusion that asylum in Mexico is a "feasible alternative."

> . . . [N]owhere in the Rule do the agencies find that Mexico "in compliance with the relevant international instruments governing consideration of refugee claims." Nor does the government cite any finding in the Rule that Mexico's "domestic law and procedures regarding such relief are robust and capable of handling claims made by Central American aliens in transit to the United States." . . . With limited exceptions that are at best unresponsive to the question, the cited evidence consists simply of an unbroken succession of humanitarian organizations explaining why the government's contention is ungrounded in reality.

> First, the government cites a report from the international organization, Médecins Sans Frontières, *Forced to Flee Central America's Northern Triangle: A Neglected Crisis* (May 2017). AR 286–317. The report found that, during transit through Mexico, "68.3 percent of people from the [Northern Triangle]

reported that they were victims of violence," and that "31.4 percent of women and 17.2 percent of men had been sexually abused." AR 296–97. . . .

Second, an April 2019 factsheet from the United Nations High Commissioner for Refugees ("UNHCR") lists "strong obstacles to accessing the asylum procedure" in Mexico[.] . . . AR 534. . . . The UNHCR also observed that . . . "[w]omen and girls in particular are at risk of sexual and gender-based violence. *Id*. . . .

Third, the government cites to the UNHCR's July 2018 review of Mexico's refugee process. AR 638–57. The report notes two positive developments in response to a prior round of recommendations, AR 639, but documents a host of additional problems. . . . [T]he UNHCR highlighted ongoing problems in the areas of (1) "[s]exual and gender-based violence against migrants, asylum-seekers, and refugees"; (2) "[d]etention of migrants and asylum seekers, particularly children and other vulnerable persons"; and (3) "[a]ccess to economic, social and cultural rights for asylum-seekers and refugees." AR 640–42.

Fourth, the government relies on a November 2018 factsheet from *Human Rights First*, which asks: "Is Mexico Safe for Refugees and Asylum Seekers?" AR 702.

Answering in the negative, the factsheet explains that "*many refugees face deadly dangers in Mexico. For many, the country is not at all safe.*" *Id.* (emphasis in original). Human Rights First notes that "refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico[.]" . . .

Fifth, the government cites to a 2018 report from Amnesty International entitled "Overlooked, Under-Protected: Mexico's Deadly *Refoulement* of Central Americans Seeking Asylum." AR 704–27. As its title suggests, the report concluded that "the Mexican government is routinely failing in its obligations under international law to protect those who are in need of international protection[.] . . .

Sixth, the government points to a New York Times article, *'They Were Abusing Us the Whole Way': A Tough Path for Gay and Trans Migrants* (July 11, 2018). AR 756–66. The article notes that "[t]rans women in particular encounter persistent abuse and harassment in Mexico at the hands of drug traffickers, rogue immigration agents and other migrants." AR 758. . . .

Additional portions of the administrative record not cited by the government bolster the already overwhelming evidence on this point. . . .

In sum, the bulk of the administrative record consists of human rights organizations documenting in exhaustive detail the ways in which those seeking asylum in Mexico are (1) subject to violence and abuse from third parties and government officials, (2) denied their rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution. Yet, even though this mountain of evidence points one way, the agencies went the other—*with no explanation*.

*E. Bay I*, 385 F. Supp. 3d at 952–55 (emphases in original).

An agency must "examine the relevant data and articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In promulgating the Rule, the agencies "entirely failed to consider an important aspect of the problem." *Id.* Further, the agencies' conclusion that aliens barred by the Rule have a safe alternative in Mexico "runs counter to the evidence before the agency." *Id.*

ii. Likely Merit of the Aliens' Asylum Claims

The government argues that the Rule relieves strain on an overburdened asylum system by screening out meritless asylum claims.  In support of the Rule, the agencies wrote:

> By deterring meritless asylum claims and de-prioritizing the applications of individuals who could have sought protection in another country before reaching the United States, the Departments seek to ensure that those asylees who need relief most urgently are better able to obtain it.
>
> The interim rule would further this objective by restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest opportunity, . . . and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful.

84 Fed. Reg. at 33,839.  The Rule assumes, based solely on the fact that an alien has not applied for asylum in Mexico or Guatemala, that the alien's asylum claim in the United States is "less likely to be successful."  Based on that assumption, the Rule categorically requires that an asylum officer "enter a negative credible fear determination with respect to the alien's application for asylum."  8 C.F.R. § 208.30(e)(5)(iii).  That is, the Rule categorically requires an asylum officer to disbelieve aliens from Guatemala, Honduras, or El Salvador who have not applied for asylum in Mexico or Guatemala and

who claim to have a fear that would justify a grant of asylum. There is no evidence in the record to support the Rule's assumption that such aliens are not credible.

We have held in a long line of cases that the failure to apply for asylum in a country through which an alien has traveled has no bearing on the validity of an alien's claim for asylum in the United States. For example, we wrote in *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986), that an asylum applicant's "failure to apply for asylum in any of the countries through which he passed or in which he worked prior to his arrival in the United States does not provide a valid basis for questioning the validity of his persecution claims." The fact that an alien might prefer to seek asylum in the United States rather than Mexico or Guatemala may be reflective of the relative desirability of asylum in these countries, but it has no bearing on the validity of the alien's underlying asylum claim. *See*, *e.g.*, *Garcia-Ramos v. INS*, 775 F.2d 1370, 1374–75 (9th Cir. 1985) ("We do not find it inconsistent with a claimed fear of persecution that a refugee, after he flees his homeland, goes to the country where he believes his opportunities will be best."); *see also Dai v. Sessions*, 884 F.3d 858, 873 (9th Cir. 2018); *Li v. Holder*, 559 F.3d 1096, 1105 (9th Cir. 2009); *Melkonian v. Ashcroft*, 320 F.3d 1061, 1068 (9th Cir. 2003).

The government argued in the district court that an alien's failure to apply for asylum in a country through which the alien had passed can be a legitimate—indeed the sole—factor to be considered in determining whether the alien has a credible fear of persecution and is thus eligible to apply for asylum in the United States. The sole case relied upon by the government to support this argument was *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987). *See E. Bay I*, 385 F. Supp.

3d at 946–47.  The agencies had similarly relied on *Matter of Pula* in support of the Rule.  *See* 84 Fed. Reg. at 33,839 n.8. The district court pointed out that *Matter of Pula* has been superseded by the firm-resettlement bar.  *See E. Bay I*, 385 F. Supp. 3d at 946.  In its briefing to us, the government has not relied on, or even cited, *Matter of Pula*.

The government provides to us only a single record citation in support of the Rule's categorical assumption that aliens subject to the Rule do not have a valid asylum claim if they have not previously applied for asylum in either Mexico or Guatemala. The citation is to a newspaper article reporting that Central American migrants traveling through Mexico stated that their ultimate destination was the United States. The article does nothing to support the Rule's assumption. The article does not even remotely suggest that the aliens' preference to apply for asylum in the United States rather than Mexico had any bearing on whether they had a credible fear of persecution that could support a valid claim to asylum.

Evidence in the administrative record establishes that Mexico and Guatemala are dangerous places for aliens subject to the Rule.  *See also Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1090–93 (9th Cir. 2020).  This evidence strongly suggests a reason other than invalidity of their underlying asylum claims why the aliens subject to the Rule would not apply for asylum in either of those countries.  In the course of promulgating the Rule, the agencies did not discuss or even acknowledge this evidence.

In sum, the agencies' conclusion that an alien's failure to apply for asylum in Guatemala or Mexico justifies an assumption that the alien does not have a valid asylum claim, and a categorical adverse credibility finding, ignores a long

line of cases holding that aliens are not required to apply for asylum in countries they pass through on their way to the United States; ignores the fact that a preference for asylum in the United States rather than Mexico or Guatemala is irrelevant to the merits of an alien's asylum claim; and ignores extensive evidence in the record documenting the dangerous conditions in Mexico and Guatemala that would lead aliens with valid asylum claims to pursue those claims in the United States rather than in those countries.

In failing to consider an alternative (and very likely) explanation for aliens' failure to apply for asylum in Mexico or Guatemala, the agencies "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Further, given the strength of this alternative explanation, as shown by evidence in the record, the agencies' assumption "runs counter to the evidence before the agency." *Id.*

### iii.  Unaccompanied Minors

In 2008, in recognition of the vulnerability of unaccompanied minors seeking asylum, Congress amended the INA to provide them special protection. *See* Trafficking Victims Protection Reauthorization Act, Pub. L. No. 110–457, 122 Stat. 5044 (2008). Congress added two provisions to § 1158 to ensure "children . . . who have escaped traumatic situations" would not be "forced to struggle through an immigration system designed for adults." 154 Cong. Rec. S10,886 (Dec. 10, 2008) (statement of Senator Feinstein). First, unaccompanied minors are expressly exempted from the safe-third-country bar. 8 U.S.C. § 1158(a)(2)(E). Second, they are entitled to present their asylum claims in the first instance to an asylum officer in a

non-adversarial interview instead of to an immigration court. *Id.* § 1158(b)(3)(C).

The Rule does not exempt unaccompanied minors. The agencies' only explanation for the Rule's failure to do so is that while unaccompanied minors are given special protection by § 1158(a)(2)(E) and (b)(3)(C), they are not exempt from other provisions of § 1158. *See* 84 Fed. Reg. at 33,839 n.7. This explanation in no way addresses the special vulnerability of unaccompanied minors and the failure of the Rule to take that vulnerability into account.

In failing to explain why the Rule provides no special protection for unaccompanied minors, the agencies "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

### 2.   Irreparable Harm

Plaintiffs must also show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Organizations may establish irreparable harm by showing "ongoing harms to their organizational missions." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). In the APA context, economic harms may be irreparable because plaintiffs are otherwise unable to recover monetary damages. *See Azar*, 911 F.3d at 581; 5 U.S.C. § 702 (providing for relief "other than monetary damages"). Although the government argues that monetary harms are not irreparable, controlling circuit precedent establishes otherwise. *See Azar*, 911 F.3d at 581.

As discussed above, plaintiffs established that the Rule harms their mission of representing and assisting asylum

seekers and results in a substantial loss of organizational funding. The government does not dispute these factual findings. The Rule forces plaintiffs to overhaul their programs and pursue more complex and time-and-resource intensive forms of relief, resulting in plaintiffs' providing fewer services to fewer individuals. The Rule also jeopardizes the plaintiffs' funding streams. For example, plaintiff East Bay Sanctuary Covenant receives a fixed per-case amount for each affirmative asylum case it files. Decl. Michael Smith, East Bay Sanctuary Covenant ¶ 16. Plaintiff Al Otro Lado receives funding at a fixed per-case rate to represent individuals in bond proceedings, but applicants affected by the Rule are ineligible for bond for at least six months after entry. Decl. Erika Pinheiro, Al Otro Lado ¶ 18. Because the Rule renders a substantial portion of plaintiffs' clients categorically ineligible for asylum, it directly threatens their standard caseload, and consequently, their caseload-dependent funding.

We agree with the district court that the plaintiffs "established a sufficient likelihood of irreparable harm through diversion of resources and the non-speculative loss of substantial funding from other sources." *E. Bay I*, 385 F. Supp. 3d at 957 (internal quotation marks omitted); *see also Trump II*, 950 F.3d at 1280.

### 3. Balance of Equities and Public Interest

When the government is a party, the third and fourth preliminary injunction factors merge. *Drakes Bay Oyster Co.*, 747 F.3d at 1092.

On the side of the plaintiffs, the district court found that there was a public interest in not returning refugees to their

persecutors or to a country where they would be endangered. *E. Bay I*, 385 F. Supp. 3d at 958 (citing *Leiva-Perez*, 640 F.3d at 971); *see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). This concern is especially pressing here, where the government concedes that potentially meritorious asylum claims will be "channeled" away from the United State and into Mexico. 1 Gov't Br. 4, 39.

Next, the district court noted that the government has implemented a new policy under which aliens potentially subject to the Rule must wait "weeks or months" in Mexico before they are permitted to initiate an application for asylum in the United States. *E. Bay I*, 385 F. Supp. 3d at 959. At the same time, Mexico has a 30-day filing deadline for asylum applications. *Id.* "For asylum seekers that forfeited their ability to seek protection in Mexico but fell victim to the government's . . . policy, the equities weigh particularly strongly in favor" of an injunction. *Id.*

The district court also noted the public interest in "ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat." *Id.* at 958 (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012)). As discussed earlier, the Rule is contrary to the asylum statute and contravenes clear congressional intent to give effect to our international treaty obligations.

On the side of the government, the public has an interest in relieving burdens on the asylum system and the efficient conduct of foreign affairs. But, as the district court noted, "shortcutting the law, or weakening the boundary between

Congress and the Executive, are not the solutions to these problems." *Id.* at 959 (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.")).

We hold that the district court did not abuse its discretion in weighing these factors in favor of plaintiffs. *Cf. Trump II*, 950 F.3d at 1280–82.

### D. Scope of the Injunction

Finally, we consider the proper scope of the injunction. A motions panel of this court stayed the injunction, pending the district court's further development of the record, insofar as it operated outside the Ninth Circuit. *E. Bay II*, 932 F.3d at 1030–31.

The motions panel's decision is not binding. As we recently explained in *East Bay Sanctuary Covenant v. Biden ("East Bay III")*, No. 18-17274, 2020 WL 8970552, at *8 (9th Cir. 2021) (amended opinion), "[i]n deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel is *predicting* the likelihood of success of the appeal." (Emphasis added). As in *East Bay III*, the motions panel considered whether to stay the injunction. We consider whether the district court abused its discretion in granting the preliminary injunction. These are different issues. Moreover, after the motions panel published its opinion, the district court took additional evidence and reinstated its previously entered injunction. Given the differing legal standards and the subsequent record

development in this case, the motions panel's order is not binding.  *See id.*

We note initially that although injunctions with broad geographic scope are often referred to as "nationwide" injunctions, that is a misnomer in this case.  *See Innovation Law Lab*, 951 F.3d at 1094.  The Rule targets only asylum applicants entering at our southern border with Mexico, and the district court's injunction affects the government's actions in only four states within three circuits:  California and Arizona (Ninth Circuit), New Mexico (Tenth Circuit), and Texas (Fifth Circuit).

We analyze the proper scope of the injunction in this case from two perspectives—first, the scope of the harm to plaintiffs; and, second, the nature of the case before us.

First, nationwide or other broad injunctions are appropriate when necessary to remedy a plaintiff's harm. *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).  The requested relief should be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court."  *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (internal quotations omitted), *rev'd in part, vacated in part* No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020).  However, there is "no general requirement that an injunction affect only the parties in the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1169–70 (9th Cir. 1987).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

As discussed above, the Rule interferes with plaintiffs' organizational missions and causes them to lose funding. "Complete relief" for plaintiffs must remedy both harms. In fulfilling their missions to assist asylum seekers throughout the lifetime of their cases, plaintiffs "do not operate in a fashion that permits neat geographic boundaries." *Trump II*, 950 F.3d at 1282–83. For example, plaintiff Innovation Law Lab is a legal service organization representing aliens applying for asylum both inside and outside the Ninth Circuit. Some of these aliens move between jurisdictions throughout the lifetime of their asylum case. Innovation Law Lab has offices in California, Oregon, Missouri, Texas, and Georgia, and it provides workshops and offers support to aliens and pro bono attorneys in Georgia, Kansas, Missouri, North Carolina, and Oregon. *E. Bay III*, 391 F. Supp. 3d at 982–83. Besides the harm to organizational purpose, the loss of potential clients jeopardizes funding streams that are tied to the number of asylum applications a Plaintiff organization files.

In response to the district court's initial order, the government issued guidance (the "Guidance") providing that in some circumstances the district court's order would enjoin enforcement of the Rule outside the Ninth Circuit. The Guidance generally requires the relevant enforcement agencies to treat an individual alien as protected by the injunction if "(1) the alien was apprehended in the Ninth Circuit, (2) the alien is detained in the Ninth Circuit, or (3) the [credible fear] interview or adjudication itself occurs in the Ninth Circuit." *Id.* at 977.

The district court found that, despite the Guidance, Innovation Law Lab would have to divert resources to determine which of their clients were subject to the Rule,

which could change during the lifetime of their case; they would have to redesign centralized workshops and templates; and they would have to change practices of synchronizing work across sites. *Id.* at 983.

Moreover, a limited injunction would not offer "complete relief" from the harms plaintiffs suffer from their inability to represent, and to protect, aliens seeking to enter the United States through Texas or New Mexico. As we have noted in a recent case, this would "result[] in a frustration of purpose (by preventing the organization from continuing to aid asylum applicants who seek relief), and a loss of funding (by decreasing the money it receives for completed cases)." *Trump II*, 950 F.3d at 1283.

Second, as we have previously observed in an APA case, § 706(2)(A) provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law." *Innovation Law Lab*, 951 F.3d at 1094 (quoting 5 U.S.C. § 706(2)(A)). Section 706(2) does not tell a circuit court to "set aside" unlawful agency action only within the geographic boundaries of that circuit. Vacatur of an agency rule prevents its application to all those who would otherwise be subject to its operation. *See generally id.*; *Regents of the Univ. of Cal.*, 908 F.3d at 511 ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that rules are vacated—not that their application to the individual petitioners is proscribed.") (internal quotation marks omitted); *Cal. Wilderness Coalition v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action."); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 848 (D.C. Cir. 1987) ("The APA requires us to

vacate the agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law'. . . ."); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). Because the Rule is "not in accordance" with 8 U.S.C. § 1158, our obligation as a reviewing court is to vacate the unlawful agency action.

Moreover, "cases implicating immigration policy have a particularly strong claim for uniform, nationwide relief." *Innovation Law Lab*, 951 F.3d at 1094–95; *see Arizona v. United States*, 567 U.S. 387, 401 (2012) (federal law contemplates a "comprehensive and unified" immigration policy); *Trump I*, 932 F.3d at 779 ("In immigration matters, we have consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."); *Regents of the Univ. of Cal.*, 908 F.3d at 511 ("A final principle is also relevant: the need for uniformity in immigration policy . . . . Allowing uneven application of nationwide immigration policy flies in the face of these requirements."); *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017) (per curiam) ("[A] fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."); *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017) (per curiam), *rev'd on other grounds*, — U.S. —, 138 S. Ct. 2392 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights."). The Fifth Circuit, one of the only two other federal circuits with a state affected by the Rule, agrees with the Ninth Circuit that nationwide injunctions are uniquely appropriate in immigration cases. *See Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) ("[T]he Constitution requires 'an

*uniform* Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'; and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'") (emphases in original; citations omitted).

The government "raises no grounds on which to distinguish this case from our uncontroverted line of precedent." *Trump I*, 932 F.3d at 779. Indeed, we recently held that a nationwide scope was necessary to offer adequate relief to the same four plaintiffs asserting the same organizational harms resulting from a different rule limiting asylum eligibility. *See Trump II*, 950 F.3d at 1284; *see also Innovation Law Lab*, 951 F.3d at 1094–95.

Conclusion

We hold that plaintiffs are likely to succeed on the merits of their claims. The Rule is "not in accordance with law" and "in excess of statutory limitations" because it is not "consistent with" 8 U.S.C. § 1158. *State Farm*, 463 U.S. at 43. The Rule is also "arbitrary and capricious" because it "runs counter to the evidence before the agency" and "entirely failed to consider . . . important aspect[s] of the problem." *Id.* We hold further that plaintiffs have shown that they will suffer irreparable harm, that the balance of equities lies in their favor, and that an injunction is in the public interest. Finally, we hold that the district court did not abuse its discretion in entering an injunction covering the four states along our border with Mexico.

**AFFIRMED.**

CLIFTON, Circuit Judge, concurring:

I concur in the court's opinion except as to its discussion in part V.D (pages 51–56) of the scope of the injunction. I concur in the conclusion reached in that portion of the opinion, that the district court did not abuse its discretion in entering an injunction that extends beyond the territory of the Ninth Circuit and covers every person seeking asylum at the southern border, even persons with no connection to any of the plaintiffs in this case. I do so, however, only because there does not appear to me to be a sufficient distinction between this case and precedents that bind this panel, notably *East Bay Sanctuary Covenant v. Trump* ("*Trump II*"), 950 F.3d 1242, 1282-84 (9th Cir. 2020), and *Innovation Law Lab. v. Wolf*, 951 F.3d 1073, 1094-95 (9th Cir. 2020), to support a different conclusion. To the extent that our opinion in this case expresses agreement with or affirmative support for the reasoning behind the relevant portions of those opinions, I do not join this opinion.

---

MILLER, Circuit Judge, concurring in part and dissenting in part:

I agree with the court that the rule is invalid, and I concur in the court's opinion except as to part V.C.1.a, which addresses the Attorney General's statutory authority, and part V.D, which addresses the scope of the injunction. I write separately to elaborate on why, in my view, the rule is arbitrary and capricious, and to explain why the injunction should be limited to asylum seekers having a bona fide client relationship with the plaintiff organizations.

I

The court holds that the rule exceeds the Attorney General's authority under 8 U.S.C. § 1158. In doing so, the court reasons that the Attorney General's interpretation of the statute is not entitled to deference under *Chevron USA Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), because the Attorney General did not make a *Chevron* argument in his brief. But we have never held that *Chevron* is subject to waiver, and the District of Columbia Circuit has held that it is not. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 22–23 (D.C. Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 789 (2020). I would refrain from deciding either that issue or the scope of the Attorney General's statutory authority. The court's conclusion that the rule is arbitrary and capricious is sufficient to resolve this case, and it is unnecessary for us to say more.

II

I agree with the court's analysis of why the rule is arbitrary and capricious. I think it is worth emphasizing a few additional points about the administrative record and the agencies' explanation of their decision-making process.

Under the Administrative Procedure Act, "[w]hen an administrative agency sets policy, it must provide a reasoned explanation for its action." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). "That is not a high bar, but it is an unwavering one." *Id.* To clear it, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" and it may not "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs

counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

The stated purpose of the rule is to "more efficiently identify[] aliens who are misusing the asylum system to enter and remain in the United States rather than legitimately seeking urgent protection from persecution or torture." Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829, 33,831 (July 16, 2019) (codified at 8 C.F.R. §§ 208, 1003, 1208). The rule seeks to accomplish that objective by "restricting the claims of aliens who, while ostensibly fleeing persecution, chose not to seek protection at the earliest possible opportunity." *Id.* at 33,839. The agencies reasoned that "[a]n alien's decision not to apply for protection at the first available opportunity, and instead wait for the more preferred destination of the United States, raises questions about the validity and urgency of the alien's claim and may mean that the claim is less likely to be successful." *Id.* The key factual premise of that reasoning is that asylum in Mexico (or Guatemala) is indeed an "available" opportunity, so that legitimate asylum seekers can reasonably be expected to apply for protection there. But that premise is contradicted by the agencies' own record.

First, as the district court correctly observed, "the unrefuted record establishes that [Mexico] is categorically not a 'safe option[]' for the majority of asylum seekers." *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 956 (N.D. Cal. 2019) (quoting *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (B.I.A. 2013)). To be clear, the district court based that conclusion not on evidence submitted by the plaintiffs in this litigation, but on the administrative record compiled by the

agencies themselves. That record contains numerous reports from nongovernmental organizations describing the risks faced by asylum seekers in Mexico. For example, one notes that "[t]orture is inflicted by governmental security actors, while criminal organizations inflict extreme degrees of violence on these already vulnerable populations," adding that "[m]igrants and refugees are often easy prey." Another explains that "the prospect of being unlawfully detained [in Mexico] often pushes asylum-seekers to return to their country of origin, despite the risks they face upon return." The United Nations High Commissioner for Refugees found "that almost 7 out of 10 women in Mexico have suffered violence," and that "migrant, asylum-seeking, and refugee women are particularly vulnerable due to their national origin and their legal status in Mexico." Another report echoed those concerns for children: "Many migrants are arbitrarily detained in poor conditions in processing facilities upon apprehension. . . . Particularly for children, the length and conditions of detention deter them from seeking asylum."

Second, the district court correctly recognized that applicants seeking asylum in Mexico are often "wrongly returned to countries from which they fled persecution." *E. Bay Sanctuary Covenant*, 385 F. Supp. 3d at 955. The district court cited a report from the administrative record that discussed how "the non-refoulement principle is systematically violated in Mexico," often through "swift repatriations" taking place in less than 36 hours. Despite the rule's conclusory statement that Mexico has a "robust protection regime," 84 Fed. Reg. at 33,835, record evidence shows not only that conditions in Mexico are dire enough to discourage applicants from seeking asylum, but also that many who do are subject to refoulement.

When asked at oral argument where the agencies addressed the issue of safety in Mexico, the government referred us to a single paragraph in the rule. That paragraph notes that Mexico "has expanded its capacity to adjudicate asylum claims" and has received an increasing number of such claims, but an increase in capacity or volume has little relevance to the issue of safety. 84 Fed. Reg. at 33,839–40. It also observes that Mexico is a party to the Refugee Convention and the Refugee Protocol. *Id.* at 33,839. That Mexico has joined those agreements bears little weight in the face of record evidence showing that it does not comply with them in practice.

Of course, the agencies do not have to agree with the reports of nongovernmental organizations. Had the agencies determined that the reports in the record were wrong, they could have said so. We would then have reviewed their factual determination for substantial evidence—a deferential standard under which we would have been required to accept the agencies' finding unless the record compelled a contrary conclusion. *See Dickinson v. Zurko*, 527 U.S. 150, 162–63 (1999); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). In this context, that review would have been especially deferential because an agency's assessment of conditions in another country involves an exercise of judgment on matters of foreign relations that we are poorly suited to second-guess. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010); *cf. INS v. Abudu*, 485 U.S. 94, 110 (1988) (explaining that the administration of immigration laws can involve "sensitive political functions that implicate questions of foreign relations"). But we cannot defer to a finding the agencies never made.

Alternatively, the agencies could have determined that, notwithstanding the safety risks to asylum seekers in Mexico, a bright-line rule like the one here offers offsetting advantages in ease of adjudication—a significant consideration given the overburdened immigration system at the southern border. It is up to the agencies, in the first instance, to balance the costs (denying meritorious claims of asylum seekers who were afraid to seek asylum in Mexico) and benefits (relieving burdens on the asylum system) of their actions. That balancing involves the exercise of policy judgment. Had the agencies engaged in it—offering "reasons that [could] be scrutinized by courts and the interested public," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2576 (2019)—our review of their decision would be deferential. As long as an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," the Supreme Court has made clear that "a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). But while the agencies discussed the "extraordinary strain on the nation's immigration system" caused by asylum seekers at the southern border, that is only one side of the balance. 84 Fed. Reg. at 33,831. They said nothing at all about the other. Reasoned decision making requires consideration of the tradeoffs that accompany an exercise of policy judgment, and we cannot defer to a choice the agencies did not acknowledge making. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, No. 18-587, 2020 WL 3271746, *15 (U.S. June 18, 2020); *Dep't of Commerce*, 139 S. Ct. at 2576; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

The agencies' deficient explanation is particularly troubling because the rule represents such a major change in

policy—perhaps the most significant change to American asylum policy in a generation. Having compiled a record that contained extensive evidence of safety concerns, particularly with respect to Mexico, the agencies were required to give the safety issues more consideration than a single paragraph in the rulemaking that does not meaningfully engage with the critical question: whether an applicant could safely apply for asylum in Mexico. Because the agencies "entirely failed to consider an important aspect of the problem," the rule is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

III

Although I agree with the court that the rule is invalid, I do not agree that it was appropriate for the district court to enjoin its application to every person seeking asylum at the southern border, whether or not that person has any connection to the plaintiffs in this case.

In defending the scope of the injunction, the court emphasizes that it is not "nationwide" because it does not apply throughout the entire country but instead applies in "only four" States. Slip op. 52. The distinction is not reassuring. Although only four in number, those States include every part of the country in which the rule applies—all 1,954 miles of the United States-Mexico border, about 75 percent of which is outside of the Ninth Circuit. More importantly, the injunction is broad not only in a geographic sense but also because it applies universally to everyone affected by the rule, not just to the plaintiffs in this case. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 n.1 (2018) (Thomas, J., concurring) (distinguishing "nationwide" injunctions from "universal" injunctions).

There are reasons to question the appropriateness of universal injunctions. *See, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring in the grant of a stay); *Trump v. Hawaii*, 138 S. Ct. at 2424–29 (Thomas, J., concurring). Injunctions "must comply with longstanding principles of equity," and courts of equity traditionally "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. at 2426–27 (Thomas, J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring in the grant of a stay) ("Equitable remedies . . . are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit.").

When a defendant's conduct has injured a large class of potential plaintiffs, making "injunctive relief . . . appropriate respecting the class as whole," the federal civil rules permit the certification of a class action. Fed. R. Civ. P. 23(b)(2). Such a class may be nationwide in scope. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). But when the criteria of Rule 23 are not satisfied, granting class-wide relief anyway sidesteps that rule and its requirement that the district court conduct a "rigorous analysis" before certifying a class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)); *see Zepeda v. INS*, 753 F.2d 719, 730 n.1 (9th Cir. 1983) (explaining that plaintiffs "are not entitled to relief for people whom they do not represent," and "[i]f this elementary principle were not true, there would be no need for class actions").

Even accepting that a district court may sometimes enter an injunction that prohibits the government from applying a policy to persons other than the plaintiff, it remains the case

that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano*, 442 U.S. at 702); *cf. Lewis v. Casey*, 518 U.S. 343, 349–50 (1996). The injunction here does not satisfy that requirement.

Significantly, the plaintiffs are not themselves asylum seekers who are subject to the rule. Rather, they are organizations that provide assistance, advocacy, and legal services to potentially affected applicants. As the court explains, the plaintiffs allege that the rule will harm them by causing "a substantial loss of organizational funding" and by requiring them "to overhaul their programs and pursue more complex and time-and-resource intensive forms of relief, resulting in plaintiffs' providing fewer services to fewer individuals." Slip op. 48– 49. The court approvingly cites the district court's conclusion, based on those allegations, that a universal injunction is necessary because a more limited injunction would require the plaintiffs "to divert resources to determine which of their clients were subject to the Rule" and "to redesign centralized workshops and templates." Slip op. 53–54 . But those harms are no different from those that would be suffered by any advocacy organization practicing in an area relevant to a challenged government policy. They are insufficient to support the grant of a universal injunction here.

Under *Kowalski v. Tesmer*, 543 U.S. 125 (2004), organizations do not have third-party standing to assert the rights of potential future clients. *Id.* at 134 & n.5. If the plaintiff organizations cannot rely on the substantial harms suffered by individual non-clients who will be barred from seeking asylum under the rule, they should not be allowed to rely on the derivative—and far less substantial—harm that

the organizations will suffer from not representing those potential clients in asylum proceedings. The harms suffered directly by the organizations, such as having to redesign workshops by providing different kinds of training, are similarly inadequate. It is surely easier to provide legal training when the law is uniform nationwide, but if that were enough, any plaintiff asserting an interest in teaching about the law would be entitled to a universal injunction. To the contrary, a plaintiff who lacks standing to challenge a government policy may not "manufacture standing" simply by "making an expenditure," including an expenditure to teach others about the policy. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Even if the harms asserted by the plaintiffs were sufficient to establish Article III standing with respect to the application of the rule to non-clients, they still must be weighed against the competing interests on the other side. *See Madsen*, 512 U.S. at 765. Because the plaintiffs' harms supporting a universal injunction are so attenuated, they do not outweigh the government's interest in a narrower one.

In upholding a universal injunction, the court relies heavily on our decision in *Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020), *petition for cert. filed* (Apr. 10, 2020) (No. 19-1212). The Supreme Court has stayed the universal injunction that we affirmed in that case, which should perhaps give us pause about extending the decision to affirm a universal injunction here. *Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020). In any event, although we remain bound by *Innovation Law Lab* as circuit precedent, I disagree that it requires us to affirm an injunction as broad as the one imposed by the district court.

As relevant here, in *Innovation Law Lab* we made two points. First, we reasoned that 5 U.S.C. § 706(2)(A), which directs a reviewing court to "set aside" agency action found to be unlawful, militates in favor of an injunction setting aside agency action across the board, not simply with respect to a specific plaintiff. 951 F.3d at 1094. That is a questionable interpretation of section 706, which is more naturally read not as a remedial provision but simply as an instruction to courts to disregard unlawful agency actions when deciding cases. *See* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, Yale J. on Reg. (Apr. 12, 2020), https://www.yalejreg.com/?bulletin/section-706-of-the-administrative-procedure-act?-does-not-call-for-universal-injunctions?-or-other-universal-remedies/. Indeed, we have not construed section 706 to require vacatur in every case in which an agency action is determined to be unlawful. *See, e.g.*, *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam); *accord Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Nor have we held that whenever vacatur is appropriate, a universal injunction is mandatory, a holding that would represent a major departure from historical practice. *See Trump v. Hawaii*, 138 S. Ct. at 2428–29 (Thomas, J., concurring).

Second, we noted in *Innovation Law Lab* that immigration law, in particular, is characterized by a need for uniformity such that an injunction should apply more broadly than might be appropriate in other contexts. 951 F.3d at 1094–95. Specifically, we reasoned that "the immigration laws of the United States should be enforced vigorously and *uniformly*." *Id.* at 1095 (quoting *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015)). A concern for uniform administration of the immigration laws is a doubtful basis for

imposing a universal injunction in the face of opposition from the agencies that have been charged by Congress with administering those laws, and that would bear the cost of the fragmented application of the rule they have promulgated. But again, even accepting the reasoning of *Immigration Law Lab*, it establishes only that "cases implicating immigration policy have a particularly strong claim for uniform relief," not that a universal injunction is mandatory in every immigration case. *Id.* at 1094–95.

Thus, while *Innovation Law Lab* precludes us from saying that universal injunctions are *never* appropriate, it does not require us to say that they are *always* appropriate. We concluded in *Innovation Law Lab* only that the district court had not abused its discretion in entering an injunction in that case. And, crucially, in discussing the scope of the injunction, we said nothing at all about the harms asserted by the plaintiffs. The case involved both organizational and individual plaintiffs, but the government did not challenge their standing, and we discussed their claimed injuries only briefly. 951 F.3d at 1078–79. We did not evaluate their interest in a universal injunction or compare it to the government's interest in a more limited one, and the other decisions cited by the court did not undertake such a comparison either. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265–68 (9th Cir. 2020); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 766–67 (9th Cir. 2018). Our precedent therefore does not compel us to say that the harms asserted by these plaintiffs are sufficient to support the issuance of a universal injunction. For the reasons explained above, they are not.

I would restrict the injunction along the lines suggested by the government, so that it prohibits the application of the

rule only to asylum seekers who are bona fide clients of the plaintiff organizations.